# [ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

In The

# United States Court Of Appeals

## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

## JOINT APPENDIX
## Volume I of XII
## (Pages: 1 - 456)

———————

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

Gibson Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
## Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Docket Entries [1:22-mc-00060-CJN].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Indictment**
  **filed November 12, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
  **on November 15, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
  **on November 18, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
  **on December 7, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
  **filed February 4, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

  Exhibits:

  1. **Letter**
    **dated January 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

  2. **Letter**
    **dated January 28, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

<u>Exhibits</u> to

Defendant's Motion to Compel Discovery
        filed February 4, 2022, Continued:

3.      Letter
                dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.      FBI Interview of Robert J. Costello, Esquire
                dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.      H. Res. 503, Sec. 5(c)(6)(A) & (B)
                dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.      Procedures Adopted by 117th Congress
        Regulations for Use of Deposition Authority
                dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.      FBI Interview of U.S. House of Representatives
        General Counsel Doug Letter
                dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.     Letter from Ronald C. Machen Jr., U.S. Attorney,
        to Speaker of the House John A. Bohner
                dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.     Prosecution for Contempt of Congress of an
        Executive Branch Official Who Has Asserted a
        Claim of Executive Privilege
                8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.     Attempted Exclusion of Agency Counsel from
        Congressional Depositions of Agency
        Employees, Slip Op.
                dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,
     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     Attachment:

     Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,
     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     Exhibit:

     1.    Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,
     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     Exhibit:

     1.    Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,**

**With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

<u>Exhibits:</u>

1.    E-mail Correspondence [US-001038-40]
          various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    Letter from Justin Clark
          dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    Email from Committee Counsel
          dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    Email from Costello
          dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    Email from Committee Counsel
          dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    Costello Email Chain
          dated October 14, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    Costello and Clark Email Exchange
          dated October 14-18, 2021. . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
       on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion** *in Limine* **to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
       filed March 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel,**
**With Exhibits,**
       filed March 22, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

       <u>Exhibits:</u>

       1.    **Senate Committee Investigation**
                    dated August 8, 1958.. . . . . . . . . . . . . . . . . . . . . . . . . . . 577

       2.    **Application of 28 U.S.C. § 458 to Presidential**
             **Appointments of Federal Judges**
                    dated December 18, 1995. . . . . . . . . . . . . . . . . . . . . . . . 584

       3.    **Letter from Michael B. Mukasey, Attorney**
             **General, to the Hon. Nancy Pelosi, Speaker of the**
             **House of Representatives**
                    dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . 599

Exhibits to
Defendant's Supplemental Brief in Opposition to the
Government's Motion *in Limine* on Advice of Counsel
      filed March 22, 2022, Continued:

4.     Response to Congressional Requests for
Information Regarding Decisions Made Under the
Independent Counsel Act,
      10 Op. O.L.C. 68 (1986)............................. 601

5.     Rex Lee, Executive Privilege, Congressional Subpoena
Power, and Judicial Review: Three Branches,
Three Powers, and Some Relationships,
      1978 B.Y.U. L. Rev. 231, 259......................... 619

6.     Whether the Department of Justice May Prosecute
White House Officials for Contempt of Congress,
      2008 WL 11489049 (O.L.C.)......................... 688

7.     Congressional Oversight of the White House,
      2021 WL 222744 (O.L.C.)........................... 692

Amended Exhibit to
Defendant's Supplemental Brief in Opposition to the
Government's Motion *in Limine* on Advice of Counsel
      filed March 23, 2022:

3.     Letter from Michael B. Mukasey, Attorney
General, to the Hon. Nancy Pelosi, Speaker of the
House of Representatives
      dated February 29, 2008........................... 722

Government's Response to Defendant's Supplemental Brief in
Opposition to the Government's Motion *in Limine* to Exclude
Evidence and Argument Relating to Good-faith
Reliance on Law or Advice of Counsel
      filed March 29, 2022. ...................................... 725

**Defendant's Supplemental Reply on Waiver**
          **filed March 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

**Order**
          **filed April 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

**Government's Motion *in Limine* to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
          **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

          <u>Exhibits:</u>

          1.    **Letter from White House Deputy Counsel to Costello**
                    **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

          2.    **Letter from Justin Clark to Costello**
                    **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

          3.    **Emails from Justin Clark to Costello**
                    **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

**Government's Motion *in Limine* to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
          **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

          <u>Exhibit:</u>

          1.    **Subpoena**
                    **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 781

**Government's Motion *in Limine* to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
          **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**

    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

    <u>**Exhibits:**</u>

    **A.**    **H. Res. 8 (Adoption of Rules for 117th Congress)**

           **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

    **B.**    **H. Res. 503 (Authorizing House Select Committee)**

           **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

    **C.**    **Regulations For Use Of Deposition Authority**

           **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

    **D.**    **Amerling and Letter FBI 302**

           **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
## Joint Appendix Volume III of XII

**Page:**

**Exhibits** **to**
**Defendant's Motion to Dismiss the Indictment**
**filed April 15, 2022, Continued:**

E.     **Rules of the 117th Congress**
       **dated February 2, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **938**

F.     **Republican Conference Rules of the 117th Congress**. . . . . . **991**

G.     **Congressional Oversight of The White House,**
       **45 Op. O. L. C. slip op. (Jan. 8, 2021)**. . . . . . . . . . . . . . . **1005**

H.     **Assertion of Executive Privilege Concerning the**
       **Dismissal and Replacement of U. S. Attorneys**
       **dated June 27, 2007**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **1065**

I.     **Immunity of the Former Counsel to the President from**
       **Compelled Congressional Testimony,**
       **43 Op. O. L. C. slip op. (July 10, 2007)**. . . . . . . . . . . . . . **1075**

J.     **Prosecution for Contempt of Congress of an Executive**
       **Branch Official Who Has Asserted a Claim of Privilege,**
       **8 Op. O. L. C. 101 (1984)**. . . . . . . . . . . . . . . . . . . . . . . . . **1079**

K.     **Whether the Department of Justice May Prosecute**
       **White House Officials for Contempt of Congress,**
       **32 Op. O. L. C 65 (2008)**. . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

L.     **Application of 28 U. S. C. Sec. 458 to Presidential**
       **Appointments of Federal Judges,**
       **19 Op. O. L. C slip op. (December 18, 1995)**. . . . . . . . . . **1128**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
       **filed April 15, 2022, Continued:**

**M.**    **Randolph D. Moss, Executive Branch Legal Interpretation:**
       **A Perspective from the Office of Legal Counsel,**
          **52 Admin. L. Rev. 1303 (2000)..** . . . . . . . . . . . . . . . . . . . **1143**

**N.**    **Testimonial Immunity Before Congress of the**
       **Former Counsel to the President,**
          **43 Op. O.L.C. slip op. (May 20, 2019).** . . . . . . . . . . . . **1172**

**O.**    **Response to Congressional Requests for**
       **Information Regarding Decisions Made**
       **Under the Independent Counsel Act,**
          **10 Op. O.L.C. 68 (1986)..** . . . . . . . . . . . . . . . . . . . . . . . . **1194**

**P.**    **Letter from Ronald C. Machen Jr., U. S. Attorney, to**
       **Speaker John A. Boehner**
          **dated March 31, 2015.** . . . . . . . . . . . . . . . . . . . . . . . . . . **1220**

**Q.**    **Letter from Michael B. Mukasey, Attorney General, to**
       **Speaker of the House, Hon. Nancy Pelosi**
          **dated February 29, 2008.** . . . . . . . . . . . . . . . . . . . . . . . . **1228**

**R.**    **Steven G. Bradbury, Memorandum for Attorneys of the**
       **Office Re: Best Practices for OLC Opinions**
          **May 16, 2005.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1231**

**S.**    **Trevor W. Morrison, Stare Decisis in the**
       **Office of Legal Counsel,**
          **110 COLUM. L. REV. 1448 (2010)..** . . . . . . . . . . . . . . . **1237**

**T.**    **Walter Dellinger, et al., Principles to**
       **Guide the Office of Legal Counsel**
          **dated Dec. 21, 2004.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1261**

<u>Exhibits</u> to

**Defendant's Motion to Dismiss the Indictment**

**filed April 15, 2022, Continued:**

U.    David J. Barron, Memorandum for Attorneys of the
      Office Re: Best Practices for OLC Legal
      Advice and Written Opinions
            dated July 16, 2010. .............................. 1268

V.    Frank H. Easterbrook, Presidential Review,
            40 CASE W. RES. L. REV. 905 (1990).. ............. 1275

W.    Presidential Authority to Decline to Execute
      Unconstitutional Statutes, OLC Mem. Op.
            dated November 2, 1984. ........................ 1302

X.    Douglas W. Kmiec, OLC's Opinion Writing Function:
      The Legal Adhesive for a Unitary Executive,
            15 CARDOZO L. REV. 337 (1993). ................ 1316

## TABLE OF CONTENTS
## Joint Appendix Volume IV of XII

Page:

<u>Exhibits</u> to
Defendant's Motion to Dismiss the Indictment
    filed April 15, 2022, Continued:

Y.    Applying Estoppel Principles in Criminal Cases,
    78 YALE L.J. 1046 (1969).. . . . . . . . . . . . . . . . . . . . . . . 1355

Z.    Anne Bowen Pouliun, Prosecutorial Inconsistency,
    Estoppel, and Due Process: Making the
    Prosecution Get its Story Straight,
    18 Cal. L. Rev. 1423 (2001). . . . . . . . . . . . . . . . . . . . . . . 1384

AA.    Rex E. Lee, Executive Privilege, Congressional Subpoena
    Power, and Judicial Review: Three Branches, Three
    Powers, and Some Relationships,
    1978 B.Y.U. L. REV. 231 (1978). . . . . . . . . . . . . . . . . . . . . . . 1441

BB.    John O. McGinnis, Models of the Opinion Function of the
    Attorney General: A Normative, Descriptive, and
    Historical Prolegomenon,
    15 CARDOZO L. REV 375 (1993).. . . . . . . . . . . . . . . . 1510

CC.    Griffin B. Bell, The Attorney General: The Federal
    Government's Chief Lawyer and Chief Litigator, or
    One Among Many?,
    46 FORDHAM L. REV. 1049 (1978). . . . . . . . . . . . . . . . 1572

<u>Exhibits</u> to
**Defendant's Motion to Dismiss the Indictment**
        **filed April 15, 2022, Continued:**

**DD.   Notes, The Immunity-Conferring**
        **Power of the Office of Legal Counsel,**
                **121 HARV. L. REV. 2086 (2008)**. . . . . . . . . . . . . . . . . . **1596**

**EE.   U. S. Department of Justice, Criminal**
        **Resource Manual § 2055 (Public Authority Defense)**. . . . . **1621**

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
        **filed April 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1627**

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
        **filed April 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1695**

**Defendant's Opposition to the Government's**
**Motion *in Limine* Based on Waiver**
        **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1698**

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
        **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1709**

**Defendant's Response to Government's Motion *in***
***Limine* to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
        **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1720**

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**

    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

**Exhibits:**

1.    **Letter from Chairman Bennie G. Thompson to**
    **Mr. Stephen K. Bannon**
        **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **1793**

2.    **E-mail from Cooney to Costello**
        **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **1796**

3.    **E-mail from Costello to Cooney**
        **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **1800**

4.    **E-mail from Cooney to Costello**
        **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **1803**

# TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

**Government's Opposition to**
**Defendant's Motion to Exclude Evidence**
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

**Defendant's Reply in Support of His Motion to Exclude Evidence**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of Department of Justice Opinions and Writings**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

**Government's Reply in Support of Motion *in Limine* to**
**Exclude Evidence Relating to Objections to**
**Subpoena That Defendant Waived**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of the Defendant's Prior Experience with Subpoenas**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

**Defendant's Reply in Support of His Motion to Dismiss Indictment,**
**With Exhibits,**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

    Exhibits:

    1.    Letter from Chairman Bennie G. Thompson to
          Mr. Stephen K. Bannon
                dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1885

    2.    Transcript of Oral Argument
          Before the Honorable Carl J. Nichols
                on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

<u>Exhibits</u> to

**Defendant's Reply in Support of His Motion to Dismiss Indictment**
**filed May 17, 2022, Continued:**

3.     **Letter from Costello to Congressman Thompson**
            **dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 1994

4.     **Letter from Congressman Thompson to Costello**
            **dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
     **filed May 25, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2002

     <u>Attachment:</u>

     **Brief of United States House of Representatives as**
     *Amicus Curiae* **In Support of the Department of Justice**
            **dated May 10, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
     **filed May 25, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2035

     <u>Attachment:</u>

     **Brief of the U.s. House of Representatives Minority Leader**
     **Kevin O. Mccarthy and the U.s. House of Representatives**
     **Minority Whip Stephen J. Scalise as Amicus Curiae**
            **dated May 24, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2050

**Defendant's Notice Regarding Amicus Briefs**

    **filed June 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2065**


**Motion to Quash,**

**With Attachment,**

    **filed June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2072**


    <u>**Attachment:**</u>


    **Memorandum of Points and Authorities**

    **In Support of Motion to Quash,**

    **With Exhibits,**

        **dated June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2074**

## TABLE OF CONTENTS
## Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
   on June 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2229

**Government's Omnibus Motion** *in Limine*
   filed June 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2408

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
   filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2425

  <u>Exhibits:</u>

  1. **Letter from Bannon's Counsel to Prosecutors**
     dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2442

  2. **Letter from Prosecutors to Bannon's Counsel**
     dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2445

  3. **Letter from Justin Clark to Scott Gast**
     dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2448

  4. **Letter from Pat Cipollone to Chairman Nadler**
     dated September 16, 2019. . . . . . . . . . . . . . . . . . . . . . . . 2453

  5. **Plaintiff's Motion for Judgment on the Pleadings, or in the**
    **Alternative, for Summary Judgment, & in Opposition to**
    **Defendants' Motion for Summary Judgment**
     dated May 20, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2459

**Defendant's Opposition to Motion to Quash**
   filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2597

# TABLE OF CONTENTS
## Joint Appendix Volume VII of XII

Page:

**Government's Opposition to Defendant's Motion to Compel**
filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

**Joint Proposed Jury Instructions,**
**With Attachment,**
filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

Attachment:

**Manual of Model Criminal Jury Instructions**
dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

**Government's Objections to Defendant's Proposed Jury Instructions**
filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

**Defendant's Opposition to Government's Omnibus Motion *in Limine***
filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

**Office of General Counsel U.S. House of Representatives'**
**Reply in Support of Motion to Quash,**
**With Exhibits,**
filed July 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

Exhibits:

A.    Order - *U.S. v. Moussaoui*
dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

C.    Order Granting Motion to Quash Subpoena on
U.S. Representative Maxine Waters - *D.C. v. Hayes*
dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

  filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2842**

  Exhibit:

  1.    **Memorandum**

      dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . **2853**

**Government's Reply in Support of Motion *in Limine***

  filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2863**

**Government's Motion *in Limine* to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

  filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2874**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

  on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2879**

**Defendant's Opposition to Motion *in Limine* to Bar Testimony,**
**With Exhibits,**

  filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3071**

  Exhibits:

  1.    **Letters from former President Trump to Mr. Costello and**
      **Mr. Costello's Letter to Chairman Thompson**

      dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3080**

  2.    **Certification**

      dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . **3084**

Exhibits to

Defendant's Opposition to Motion *in Limine* to Bar Testimony
      filed July 13, 2022, Continued:

3.      Subpoena
              dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 3090


4.      Letter from Thompson to Costello
              dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3092


5.      Indictment
              dated November 12, 2021. . . . . . . . . . . . . . . . . . . . . . 3096

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence or Argument Relating to the Defendant's Eleventh-hour
Assertion That He Is Willing to Testify Before the Select Committee,
With Exhibits,
      filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

      Exhibits:

1.      Letter from Thompson to Costello
              dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3114


2.      Letter from Thompson to Costello
              dated October 15, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3118

Government's Objections to Defendant's Trial Exhibits
      filed July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
## Joint Appendix Volume VIII of XII

**Page:**

**Transcript of In-person Motions Hearing and Pretrial Conference**
**Before the Honorable Carl J. Nichols**
     on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

**Defendant's Motion to Exclude Congressional Evidence or**
**Dismiss the Indictment Based on Granting the Motion to Quash,**
**With Exhibits,**
     filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

     <u>Exhibits:</u>

     1.    **Transcript Jury Trial**
           **Before the Honorable Kurt D. Engelhardt**
           *U.S. v. Rainey*, No. 12-291
               on June 1, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

     2.    **Congressional Gamesmanship Leads To An**
           **Acquittal In Deepwater Horizon Case,**
           **U. S. v. David Rainey: A Case Study**
               dated 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

**Government's Opposition to Defendant's Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
     filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

**Government's Objections to Court's Proposed**
**Statement of the Case, Voir Dire, and Jury Instructions**
     filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS
## Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of Kristin Amerling:**

      Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . . 3942

## TABLE OF CONTENTS
## Joint Appendix Volume X of XII

Page:

Transcript of Jury Trial - Day 3 - Morning Session
Before the Honorable Carl J. Nichols
on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

Testimony of <u>Kristin Amerling</u>:

Direct Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . . . 4014
Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . 4078

Transcript of Jury Trial - Day 3 - Afternoon Session
Before the Honorable Carl J. Nichols
on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

Testimony of <u>Kristin Amerling</u>:

Cross Examination by Mr. Corcoran (Continued). . . . . . . . . . . . 4149
Redirect Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . 4211

Testimony of <u>Stephen Hart</u>:

Direct Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . . . 4233
Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . 4252
Redirect Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . 4264

Defendant's Motion for Judgment of Acquittal Pursuant to
Rule 29, Federal Rules of Criminal Procedure
filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

Transcript of Jury Trial - Day 4
Before the Honorable Carl J. Nichols
on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

## TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
         filed July 21, 2022................................................. 4422

**Defendant's Notice Regarding Congressional Hearings**
         filed July 22, 2022................................................. 4432

**Notice of Defendant's Objection to Jury Instruction Number 27**
         filed July 22, 2022................................................. 4435

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
         on July 22, 2022................................................. 4438

**Jury Instructions**
         filed July 22, 2022................................................. 4555

**Counsels' Acknowledgment Concerning Trial Exhibits**
         filed July 22, 2022................................................. 4585

**Government's Exhibit List**
         filed July 22, 2022................................................. 4586

**Defendant's Exhibit List**
         filed July 22, 2022................................................. 4588

**Note from Jury**
         filed July 22, 2022................................................. 4591

**Verdict Form**
         filed July 22, 2022................................................. 4592

Order
     filed July 27, 2022.......................................... 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
     filed July 28, 2022.......................................... 4595

    Exhibits:

    1.    Screenshot of Episode 1996, War Room
         dated July 12, 2022. ............................. 4598

    2.    Bannon's Gettr Repost CNN Ad
         dated July 17, 2022. ............................. 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
     filed August 5, 2022........................................ 4600

Defendant's Motion for a New Trial
     filed August 5, 2022........................................ 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
     filed August 12, 2022....................................... 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
     filed August 19, 2022....................................... 4649

**Government's Opposition to Defendant's Motion for a New Trial**

    **filed August 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4657**


**Defendant's Reply to Opposition to Motion for a New Trial**

    **filed August 26, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4676**

**Order**

    **filed September 2, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4682**

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**

    **on October 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4687**

**Judgment in a Criminal Case**

    **filed October 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4767**

**Defendant's Notice of Appeal**

    **filed November 4, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4772**

**Order Staying Sentence Pending Appeal**

    **filed November 7, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4779**

## TABLE OF CONTENTS
## Joint Appendix Volume XII of XII - Exhibits

**Page:**

<u>Defendant's Exhibits:</u>

    9B.   **H41 Congressional Record - House
dated January 4, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **4780**

    30.   **Letter from Former President Donald Trump to
Stephen K. Bannon
dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4781**

    31.   **Letter from Robert J. Costello to
Chairman Bennie Thompson
dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4782**

    32.   **Letter from Chairman Bennie Thompson to
Robert J. Costello
dated July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4784**

    39.   **Article from Rolling Stone
dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **4786**

    40.   **Daily Mail Article
dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **4804**

<u>Government's Exhibits:</u>

    1.   **House Resolution 503.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **4808**

    2.   **Subpoena to Stephen Bannon
dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **4822**

<u>Government's Exhibits</u>, Continued:

3.      **Emails re Service of Subpoena**
        **dated September 23 and 24, 2021**.................. 4832

4.      **Letter from Costello to**
        **Chairman Thompson and Cover Email**
        **dated October 7, 2021**............................ 4835

5.      **Letter from Chairman Thompson to Costello**
        **dated October 8, 2021**............................ 4838

6.      **Letter from Costello to Chairman Thompson**
        **dated October 13, 2021**........................... 4841

7.      **Letter from Chairman Thompson to Costello**
        **dated October 15, 2021**........................... 4843

8.      **Letter from Costello to**
        **Chairman Thompson and Cover Email**
        **dated October 18, 2021**........................... 4846

9.      **Letters from Chairman Thompson to Costello**
        **dated October 19, 2021**........................... 4848

10.     **Post on Stephen Bannon's Gettr Account**
        **dated September 24, 2021.** ....................... 4851

11A.   **Post on Stephen Bannon's Gettr Account**
        **dated October 8, 2021**............................ 4852

11B.   **DailyMail Article Linked in October 8, 2021**
        **Post on Stephen Bannon's Gettr Account.** .............. 4853

Query     Reports ▾     Utilities ▾     Help     Log Out

APPEAL,CAT B,CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00670-CJN-1

Case title: USA v. BANNON                         Date Filed: 11/12/2021

---

Assigned to: Judge Carl J. Nichols

Appeals court case number: 22-3086

**Defendant (1)**

**STEPHEN K. BANNON**                  represented by **David I. Schoen**
                                       DAVID I. SCHOEN, ATTORNEY AT LAW
                                       2800 Zelda Road, Suite 100-6
                                       Montgomery, AL 36106
                                       334-395-6611
                                       Fax: 917-591-7586
                                       Email: dschoen593@aol.com
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*
                                       *Designation: Retained*

                                       **Matthew Evan Corcoran**
                                       SILVERMAN THOMPSON SLUTKIN
                                       WHITE
                                       400 East Pratt Street
                                       Suite 900
                                       Baltimore, MD 21202
                                       410-385-2225
                                       Email: ecorcoran@silvermanthompson.com
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*
                                       *Designation: Retained*

                                       **Riane A. White**
                                       SILVERMAN, THOMPSON, SLUTKIN &
                                       WHITE, LLC
                                       400 E. Pratt Street
                                       Suite 900
                                       Baltimore, MD 21202
                                       410-385-2225
                                       Email: rwhite@silvermanthompson.com
                                       *LEAD ATTORNEY*
                                       *PRO HAC VICE*
                                       *ATTORNEY TO BE NOTICED*
                                       *Designation: Retained*

**Robert J. Costello**
DAVIDOFF HUTCHER & CIRTON LLP
605 Third Avenue
New York, NY 10158
646-428-3238
Fax: 212-286-1884
Email: rjc@dhclegal.com
*TERMINATED: 07/14/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 2:192; CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; Contempt of Congress (Testimony) (1) | Defendant sentenced to Four (4) Months of Incarceration to run concurrently with Count 2. Defendant further Ordered to Pay a Fine of $6500.00 and Special Assessment of $25 on each count. |
| 2:192; CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; Contempt of Congress (Papers) (2) | Defendant sentenced to Four (4) Months of Incarceration to run concurrently with Count 1. Defendant further Ordered to Pay a Fine of $6500.00 and Special Assessment of $25 on each count. |

**Highest Offense Level (Opening)**

Misdemeanor

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Interested Party**

**PRESS COALITION**                    represented by **Charles D. Tobin**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
202-661-2218
Fax: 202-661-2299
Email: tobinc@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Designation: Retained*

**Lauren Russell**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
202-661-2200
Fax: 202-661-2299
Email: russelll@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Maxwell S. Mishkin**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
(202) 508-1140
Fax: (202) 661-2299
Email: mishkinm@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Movant**

**UNITED STATES HOUSE OF**          represented by **Douglas N. Letter**
**REPRESENTATIVES**                                 U.S. HOUSE OF REPRESENTATIVES
                                                    Office of General Counsel
                                                    5140 O'Neill House Office Building
                                                    Washington, DC 20515
                                                    202-225-9700
                                                    Email: douglas.letter@mail.house.gov
                                                    *TERMINATED: 01/10/2023*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: Retained*

                                                    **Eric Randal Columbus**
                                                    OFFICE OF GENERAL COUNSEL
                                                    District of Columbia
                                                    5140 O'Neill House Office Building
                                                    Washington, DC 20515
                                                    202-225-9700
                                                    Email: eric.columbus@mail.house.gov
                                                    *TERMINATED: 01/10/2023*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: Retained*

                                                    **Michelle S. Kallen**

JENNER & BLOCK LLP
U.S. House of Representatives
1099 New York Avenue NW
Suite 900
Washington, DC 20001
202-639-6093
Email: MKallen@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stacie Marion Fahsel**
UNITED STATES HOUSE OF
REPRESENTATIVES
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
202-590-0585
Email: stacie.fahsel@mail.house.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Todd Barry Tatelman**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
202-225-9700
Email: todd.tatelman@mail.house.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Movant**

**HOUSE MINORITY LEADERSHIP**          represented by **Stanley McKennett Brand**
BRAND WOODWARD LAW
3 Pebble Ridge Court
Rockville, MD 20854
202-258-6597
Email: stanleymbrand@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stanley Edmund Woodward , Jr.**
BRAND WOODWARD LAW
1808 Park Road NW
Washington, DC 20010
202-996-7447
Fax: 202-996-0113
Email: stanley@brandwoodwardlaw.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Plaintiff**

**USA**                                        represented by  **Amanda Rose Vaughn**
                                               U.S. ATTORNEY'S OFFICE FOR THE
                                               DISTRICT OF COLUMBIA
                                               555 4th Street NW
                                               Washington, DC 20001
                                               202-252-1793
                                               Email: amanda.vaughn@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant U.S. Attorney*

                                               **J.P. Cooney**
                                               U.S. ATTORNEY'S OFFICE FOR THE
                                               DISTRICT OF COLUMBIA
                                               555 Fourth Street, NW
                                               Washington, DC 20530
                                               (202) 252-7281
                                               Email: joseph.cooney@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant U.S. Attorney*

                                               **Molly Gulland Gaston**
                                               U.S. ATTORNEY'S OFFICE FOR THE
                                               DISTRICT OF COLUMBIA
                                               555 Fourth Street, NW
                                               Washington, DC 20530
                                               (202) 252-7803
                                               Email: molly.gaston@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant U.S. Attorney*

                                               **Christopher R. Howland**
                                               U.S. ATTORNEY'S OFFICE--DISTRICT
                                               OF COLUMBIA
                                               601 D Street NW
                                               Room 5-1529
                                               Washington DC, DC 20530
                                               (202) 252-7106
                                               Email: christopher.howland@usdoj.gov
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 11/12/2021 | 1 | INDICTMENT as to STEPHEN K. BANNON (1) count(s) 1, 2. (zstd) (Entered: 11/12/2021) |
|---|---|---|
| 11/12/2021 | 3 | NOTICE OF ATTORNEY APPEARANCE Amanda Rose Vaughn appearing for USA. (Vaughn, Amanda) (Entered: 11/12/2021) |
| 11/15/2021 | 4 | NOTICE OF ATTORNEY APPEARANCE: David I. Schoen appearing for STEPHEN K. BANNON (Schoen, David) (Entered: 11/15/2021) |
| 11/15/2021 | 5 | NOTICE OF ATTORNEY APPEARANCE: Matthew Evan Corcoran appearing for STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 11/15/2021) |
| 11/15/2021 | | Arrest of Defendant STEPHEN K. BANNON. (kk) (Entered: 11/17/2021) |
| 11/15/2021 | 7 | Arrest Warrant, dated 11/12/2021, returned executed on 11/15/2021 as to Defendant STEPHEN K. BANNON. (kk) (Entered: 11/17/2021) |
| 11/15/2021 | | Minute Entry for Initial Appearance as to STEPHEN K. BANNON held in-person before Magistrate Judge Robin M. Meriweather on 11/15/2021 : Case was also called for an Arraignment, but was not held. Arraignment to be held before Judge Nichols. The Court advised the Government of its due process obligations under Rule 5(f). Arraignment and Status Hearing set for 11/18/2021 at 11:00 AM by VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant released on Personal Recognizance Bond. Release issued. Court Reporter: FTR Gold- Ctrm. 7; FTR Time Frame: 1:53:41 - 2:18:48. Defense Attorneys: David Schoen and Matthew Corcoran; U.S. Attorneys: Amanda Vaughn, Molly Gaston and J.P. Cooney; Pretrial Officer: Andre Sidbury. (kk) (Entered: 11/17/2021) |
| 11/15/2021 | 8 | ORDER Setting Conditions of Release : Defendant STEPHEN K. BANNON released on Personal Recognizance Bond signed by Magistrate Judge Robin M. Meriweather on 11/15/2021. (Attachment: # 1 Appearance Bond) (kk) (Entered: 11/17/2021) |
| 11/17/2021 | 6 | MOTION for Waiver *of Arraignment and Entry of a Plea of Not Guilty* by STEPHEN K. BANNON. (Corcoran, Matthew) (Entered: 11/17/2021) |
| 11/17/2021 | 9 | MOTION for Protective Order *and to Disclose Grand Jury Testimony* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order)(Vaughn, Amanda) (Entered: 11/17/2021) |
| 11/17/2021 | 10 | MOTION to Disclose Grand Jury Testimony by USA as to STEPHEN K. BANNON. (See docket entry 9 to view document). (zstd) (Entered: 11/18/2021) |
| 11/18/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Status Conference as to STEPHEN K. BANNON held on 11/18/2021. Defendant waived Arraignment, without objection from the Government. Oral Motions taken under advisement. Joint Status Report due by 12/6/2021. Speedy Trial as to STEPHEN K. BANNON is Excluded from 11/18/2021 to 12/7/2021, in the Interest of Justice, XT. Status Conference set for 12/7/2021 at 11:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen and Matthew Corcoran; US Attorney: Amanda Vaughn, J.P. Cooney, and Molly Gaston. (zcal) (Entered: 11/18/2021) |
| 11/24/2021 | 11 | RESPONSE by STEPHEN K. BANNON re 9 MOTION for Protective Order *and to Disclose Grand Jury Testimony* (Attachments: # 1 Text of Proposed Order Proposed Order in pdf)(Schoen, David) (Entered: 11/24/2021) |
| 11/28/2021 | 12 | REPLY TO OPPOSITION to Motion by USA as to STEPHEN K. BANNON re 9 MOTION for Protective Order *and to Disclose Grand Jury Testimony* (Attachments: # 1 |

**-6-**

| | | Attachment 1 (Proposed Order), # 2 Attachment 2 (Under Seal), # 3 Attachment 3 (Under Seal))(Vaughn, Amanda) (Entered: 11/28/2021) |
|---|---|---|
| 11/30/2021 | 14 | MOTION for Leave to File *SurReply to Government's Reply to Defendant's Opposition to the Government Motion for Protective Order and to Disclose Grand Jury Testimony (ECF #12)* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Leave to File Surreply, # 2 Exhibit Proposed Surreply, # 3 Exhibit Copy of Press Coalition Motion to Intervene, # 4 Text of Proposed Order Proposed Order re: Grand Jury Materials)(Schoen, David) (Entered: 11/30/2021) |
| 12/02/2021 | 16 | MOTION for Leave to Appear Pro Hac Vice Robert J. Costello Filing fee $ 100, receipt number ADCDC-8902236. Fee Status: Fee Paid. by STEPHEN K. BANNON. (Attachments: # 1 Declaration Pro Hac Motion Declaration - Bob Costello, # 2 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 12/02/2021) |
| 12/03/2021 | 17 | ERRATA by STEPHEN K. BANNON re 16 MOTION for Leave to Appear Pro Hac Vice Robert J. Costello Filing fee $ 100, receipt number ADCDC-8902236. Fee Status: Fee Paid. filed by STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 12/03/2021) |
| 12/06/2021 | | MINUTE ORDER. The Court having considered Defendant's 16 Motion For Admission *Pro Hac Vice* of Robert J. Costello, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under the Local Rules, it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Robert J. Costello is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for Instructions.** Signed by Judge Carl J. Nichols on December 6, 2021. (lccjn3) (Entered: 12/06/2021) |
| 12/06/2021 | 18 | Joint STATUS REPORT by USA as to STEPHEN K. BANNON (Attachments: # 1 Attachment A)(Vaughn, Amanda) (Entered: 12/06/2021) |
| 12/07/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: VTC Status Conference as to STEPHEN K. BANNON held on 12/7/2021. Defendant appeared by video. Status Report, including a proposed briefing schedule, due by 12/16/2021. Jury Selection/Trial set to commence on 7/18/2022 at 9:00 AM in the Ceremonial Courtroom before Judge Carl J. Nichols. Bond Status of Defendant: Remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorneys: David I. Schoen, Matthew Evan Corcoran, and Robert J. Costello; US Attorneys: Amanda Rose Vaughn, J.P. Cooney, and Molly Gulland Gaston. (zkh) (Entered: 12/07/2021) |
| 12/08/2021 | 19 | NOTICE OF ATTORNEY APPEARANCE: Robert J. Costello appearing for STEPHEN K. BANNON (Costello, Robert) (Entered: 12/08/2021) |
| 12/10/2021 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of the United States' 13 Sealed Motion for Leave to File Document Under Seal, along with Defendant's 14 Motion for Leave to file SurReply, it is hereby ORDERED that the Motions are GRANTED. Signed by Judge Carl J. Nichols on December 10, 2021. (lccjn3) Modified to add defendant's name on 12/10/2021 (zkh). (Entered: 12/10/2021) |
| 12/10/2021 | 20 | PROTECTIVE ORDER as to STEPHEN K. BANNON. Signed by Judge Carl J. Nichols on December 10, 2021. (lccjn3) Modified to add defendant's name on 12/10/2021 (zkh). (Entered: 12/10/2021) |
| 12/13/2021 | 21 | Request for Hearing by PRESS COALITION as to STEPHEN K. BANNON. (zstd) (Entered: 12/14/2021) |
| 12/16/2021 | 22 | STATUS REPORT *Defendant's Position on Pre-trial Scheduling Pursuant to 12/7/2021 Oral Order* by STEPHEN K. BANNON (Attachments: # 1 Text of Proposed Order |

4/10/23, 11:15 AM                                District of Columbia live database

| | | Proposed Pre-trial Scheduling Order)(Schoen, David) (Entered: 12/16/2021) |
|---|---|---|
| 12/16/2021 | 23 | STATUS REPORT by USA as to STEPHEN K. BANNON (Attachments: # 1 Parties' Correspondence, # 2 Text of Proposed Order)(zstd) (Entered: 12/17/2021) |
| 12/16/2021 | 24 | MOTION to Exclude Time Pursuant to the Speedy Trial Act by USA as to STEPHEN K. BANNON. (See docket entry 23 to view document.) (zstd) (Entered: 12/17/2021) |
| 01/03/2022 | 25 | SCHEDULING ORDER. Signed by Judge Carl J. Nichols on January 3, 2022. (lccjn3) (Entered: 01/03/2022) |
| 01/03/2022 | | Set/Reset Deadlines/Hearings as to STEPHEN K. BANNON: Exhibit List due by 7/11/2022. due by 7/8/2022. Motions due by 2/4/2022. Motion in Limine due by 6/17/2022. Proposed Voir Dire due by 7/11/2022. Proposed Jury Instructions due by 7/11/2022. Pretrial Statement due by 7/11/2022. Responses due by 2/25/2022 Replies due by 3/8/2022. Witness List due by 7/11/2022. Pretrial Conference set for 7/14/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 01/04/2022) |
| 01/14/2022 | | MINUTE ORDER. Upon consideration of the United States' 24 Motion to Exclude Time Pursuant to the Speedy Trial Act, it is hereby ORDERED that the Motion is GRANTED. The Court finds, for the reasons cited in the December 7, 2021 status hearing and, pursuant to Standing Order No. 21-79 (December 13, 2021), the ends of justice served by a continuance in this matter outweigh the best interest of the public and the Defendant in a speedy trial. Accordingly, it is hereby ORDERED that the time from the date of the Court's 25 Scheduling Order, nunc pro tunc, through February 4, 2022, shall be excluded under the Speedy Trial Act. See 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Carl J. Nichols on January 14, 2022. (lccjn3) (Entered: 01/14/2022) |
| 02/04/2022 | 26 | MOTION to Compel *Disclosure of Government Efforts to Obtain Telephone and Email Records of Mr. Bannon's Attorneys* by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Exhibit 1 Defense Letter to Govt, # 2 Exhibit Exhibit 2 Govt Letter Response, # 3 Text of Proposed Order Proposed Order)(Schoen, David) (Entered: 02/04/2022) |
| 02/04/2022 | 28 | MOTION to Compel *Discovery* by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12) (Corcoran, Matthew) (Entered: 02/04/2022) |
| 02/04/2022 | 29 | MOTION in Limine *to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Exhibit 1)(Vaughn, Amanda) (Entered: 02/04/2022) |
| 02/25/2022 | 30 | RESPONSE by STEPHEN K. BANNON re 29 MOTION in Limine *to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel* (Attachments: # 1 Exhibit Declaration of Robert J. Costello, Esquire)(Schoen, David) (Entered: 02/25/2022) |
| 02/25/2022 | 31 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 26 MOTION to Compel *Disclosure of Government Efforts to Obtain Telephone and Email Records of Mr. Bannon's Attorneys*, 28 MOTION to Compel *Discovery* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Vaughn, Amanda) (Entered: 02/25/2022) |
| 03/08/2022 | 33 | REPLY in Support by STEPHEN K. BANNON re 28 MOTION to Compel *Discovery* (Attachments: # 1 Exhibit Exhibit 1)(Corcoran, Matthew) (Entered: 03/08/2022) |
| 03/08/2022 | 34 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 26 MOTION to Compel *Disclosure of Government Efforts to Obtain Telephone and Email Records of Mr.* |

**-8-**

|            |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
|------------|-----|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |     | *Bannon's Attorneys* (Attachments: # 1 Declaration Declaration of Robert J. Costello, Esq. with Exhibits, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4)(Schoen, David) (Entered: 03/08/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 03/08/2022 | 35  | REPLY in Support by USA as to STEPHEN K. BANNON re 29 MOTION in Limine *to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Vaughn, Amanda) (Entered: 03/08/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
| 03/10/2022 |     | MINUTE ORDER as to STEPHEN K. BANNON. Upon review of the Parties' 26 28 29 Motions, it is hereby ORDERED that the Parties shall appear for oral argument on those Motions at 11:00 am on March 16, 2022, in Courtroom 19. It is further ORDERED that no later than March 14, 2022, the United States shall provide the Court, for its ex parte review, what the United States has described as all "ex parte materials submitted to the court under 18 U.S.C. § 2703(d) that relate to toll records, email header information, and phone and email subscriber data for accounts believed to be used by Robert Costello that were obtained during the investigation." United States' Opposition to Def.'s Motions to Compel, ECF No. 31 at 10. Signed by Judge Carl J. Nichols on March 10, 2022. (lcc jn3) (Entered: 03/10/2022) |
| 03/10/2022 |     | Set/Reset Deadlines/Hearings as to STEPHEN K. BANNON: Government Ex Parte Review due by 3/14/2022. Motion Hearing set for 3/16/2022 at 11:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 03/10/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
| 03/14/2022 | 36  | MOTION for Leave to File *Surreply to Defendant's Motion to Compel Discovery Relating to Robert Costello* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Surreply in Opposition to Defendant's Motion to Compel Discovery Relating to Robert Costello and Motion to Amend the Protective Order, # 2 Text of Proposed Order) (Vaughn, Amanda) (Entered: 03/14/2022)                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 03/15/2022 | 38  | RESPONSE by STEPHEN K. BANNON re 36 MOTION for Leave to File *Surreply to Defendant's Motion to Compel Discovery Relating to Robert Costello* (Schoen, David) (Entered: 03/15/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 03/16/2022 |     | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing as to STEPHEN K. BANNON held on 3/16/2022 re Motions 26 , 28 , and 29 . Motion 26 ; Taken Under Advisement. Motion 28 ; Denied in Part and Granted in Part; for reasons set forth on the record. Motion 29 ; Taken Under Advisement. Defense Supplemental Briefs due by 3/22/2022. Government Response due by 3/29/2022. Government's Ex Parte filing due by 3/18/2022. Defense Reply due by 4/1/2022. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Robert Costello; US Attorney: Amanda Vaughn, J.P. Cooney, and Molly Gaston. (zcal) (Entered: 03/16/2022)                                               |
| 03/17/2022 | 39  | SURREPLY to 29 Government's Reply in Support of it's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel by STEPHEN K. BANNON. (Corcoran, Matthew) Modified text on 3/18/2022 (zstd). (Entered: 03/17/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| 03/22/2022 | 41  | SUPPLEMENT by STEPHEN K. BANNON re 29 MOTION in Limine *to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel* (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Corcoran, Matthew) (Entered: 03/22/2022)                                                                                                                                                                                                                                                                                                                                                                                                                       |
| 03/23/2022 | 42  | SUPPLEMENT by STEPHEN K. BANNON re 41 Supplement to any document, *Amended Exhibit 3* (Corcoran, Matthew) (Entered: 03/23/2022)                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |

| 03/29/2022 | 43 | RESPONSE by USA as to STEPHEN K. BANNON re 41 Supplement to any document, (Vaughn, Amanda) (Entered: 03/29/2022) |
| 03/30/2022 | 44 | SUPPLEMENT re 43 by STEPHEN K. BANNON *Supplemental Reply on Waiver* (Schoen, David) Modified to add link on 3/31/2022 (znmw). (Entered: 03/30/2022) |
| 04/05/2022 | 45 | First MOTION for Extension of Time to *File Motions to Dismiss the Indictment* by STEPHEN K. BANNON. (Schoen, David) (Entered: 04/05/2022) |
| 04/05/2022 | 46 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 45 First MOTION for Extension of Time to *File Motions to Dismiss the Indictment* (Vaughn, Amanda) (Entered: 04/05/2022) |
| 04/05/2022 | 48 | MOTION to Exclude Time Under The Speedy Trial Act by STEPHEN K. BANNON. (See docket entry 45 to view document.) (zstd) (Entered: 04/06/2022) |
| 04/06/2022 | 47 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 45 First MOTION for Extension of Time to *File Motions to Dismiss the Indictment* (Schoen, David) (Entered: 04/06/2022) |
| 04/06/2022 | | NOTICE OF ERROR re 45 Motion for Extension of Time to; emailed to dschoen593@aol.com, cc'd -1 associated attorneys -- The PDF file you docketed contained errors: 1. **Notice of Corrected Docket Entry:** Your entry has been modified as a courtesy. Please note the appropriate reminders for future filings; do not refile document, 2. Two-part document; second docket entry is required (Dorsett, Shedelle) (Entered: 04/06/2022) |
| 04/06/2022 | 49 | ORDER as to 29 Motion in Limine. Signed by Judge Carl J. Nichols on April 6, 2022. (lccjn3) (Entered: 04/06/2022) |
| 04/06/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of Defendant's 45 First Motion for Extension of Time, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART. The Parties shall file any motions to dismiss the indictment or other motions to exclude evidence by April 15, 2022. Oppositions to any such motion shall be filed by May 6, 2022. Any reply shall be filed by May 17, 2022. It is further ORDERED that the time between April 8, 2022 and April 15, 2022 shall be excluded from calculation under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). The Court finds that the ends of justice served by granting this continuance outweigh the interests of the public and the defendant in a speedy trial. Signed by Judge Carl J. Nichols on April 6, 2022. (lccjn3) (Entered: 04/06/2022) |
| 04/12/2022 | 50 | NOTICE *of Discovery* by USA as to STEPHEN K. BANNON (Vaughn, Amanda) (Entered: 04/12/2022) |
| 04/14/2022 | 51 | Unopposed MOTION for Leave to File Excess Pages by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 04/14/2022) |
| 04/14/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of Defendant STEPHEN K. BANNON's 51 Unopposed Motion for Leave to File Excess Pages, it is hereby ORDERED that the Motion is GRANTED. Defendant is granted leave to file a Motion to Dismiss the Indictment not to exceed 55 pages. Signed by Judge Carl J. Nichols on April 14, 2022. (lccjn3) (Entered: 04/14/2022) |
| 04/15/2022 | 52 | MOTION in Limine *to Exclude Evidence of Department of Justice Opinions and Writings* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Vaughn, Amanda) (Entered: 04/15/2022) |

-10-

| | | |
|---|---|---|
| 04/15/2022 | 53 | MOTION in Limine *to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Exhibit 1) (Vaughn, Amanda) (Entered: 04/15/2022) |
| 04/15/2022 | 54 | MOTION in Limine *to Exclude Evidence of the Defendant's Prior Experience with Subpoenas* by USA as to STEPHEN K. BANNON. (Vaughn, Amanda) (Entered: 04/15/2022) |
| 04/15/2022 | 55 | NOTICE *of a Public-Authority Defense Pursuant to Rule 12.3, Federal Rules of Criminal Procedure* by STEPHEN K. BANNON (Schoen, David) (Entered: 04/15/2022) |
| 04/15/2022 | 56 | MOTION to Exclude *Evidence* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 04/15/2022) |
| 04/15/2022 | 58 | MOTION to Dismiss Case by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K, # 12 Exhibit Exhibit L, # 13 Exhibit Exhibit M, # 14 Exhibit Exhibit N, # 15 Exhibit Exhibit O, # 16 Exhibit Exhibit P, # 17 Exhibit Exhibit Q, # 18 Exhibit Exhibit R, # 19 Exhibit Exhibit S, # 20 Exhibit Exhibit T, # 21 Exhibit Exhibit U, # 22 Exhibit Exhibit V, # 23 Exhibit Exhibit W, # 24 Exhibit Exhibit X, # 25 Exhibit Exhibit Y, # 26 Exhibit Exhibit Z, # 27 Exhibit Exhibit AA, # 28 Exhibit Exhibit BB, # 29 Exhibit Exhibit CC, # 30 Exhibit Exhibit DD, # 31 Exhibit Exhibit EE, # 32 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 04/15/2022) |
| 04/19/2022 | 59 | NOTICE *of Filing* by STEPHEN K. BANNON re 58 MOTION to Dismiss Case (Attachments: # 1 Supplement Motion to Dismiss Indictment REVISED, # 2 Supplement Index to Exhibits)(Corcoran, Matthew) (Entered: 04/19/2022) |
| 04/29/2022 | 60 | RESPONSE by USA as to STEPHEN K. BANNON re 55 Notice (Other) (Vaughn, Amanda) (Entered: 04/29/2022) |
| 05/06/2022 | 61 | MOTION for Leave to File Excess Pages by USA as to STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order)(Vaughn, Amanda) (Entered: 05/06/2022) |
| 05/06/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of the United States' 61 Motion for Leave to File Excess Pages, it is hereby ORDERED that the Motion is GRANTED. The United States is granted leave to file an opposition to the Defendant's 58 [59-1] Motion to Dismiss the Case not to exceed 50 pages. Signed by Judge Carl J. Nichols on May 6, 2022. (lccjn3) (Entered: 05/06/2022) |
| 05/06/2022 | 62 | Memorandum in Opposition by STEPHEN K. BANNON re 53 MOTION in Limine *to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived* (Corcoran, Matthew) (Entered: 05/06/2022) |
| 05/06/2022 | 63 | Memorandum in Opposition by STEPHEN K. BANNON re 54 MOTION in Limine *to Exclude Evidence of the Defendant's Prior Experience with Subpoenas* (Corcoran, Matthew) (Entered: 05/06/2022) |
| 05/06/2022 | 64 | RESPONSE by STEPHEN K. BANNON re 52 MOTION in Limine *to Exclude Evidence of Department of Justice Opinions and Writings* (Schoen, David) (Entered: 05/06/2022) |
| 05/06/2022 | 65 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 58 MOTION to Dismiss Case (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5 (Under Seal), # 6 Exhibit 6 (Under Seal))(Vaughn, Amanda) (Entered: 05/06/2022) |

| 05/06/2022 | 67 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 56 MOTION to Exclude *Evidence* (Vaughn, Amanda) (Entered: 05/06/2022) |
|---|---|---|
| 05/10/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. The Parties are hereby ORDERED to attend an in-person argument on the pending 52 53 54 56 58 Motions on May 26, 2022 at 10:00 am. Signed by Judge Carl J. Nichols on May 10, 2022. (lccjn3) (Entered: 05/10/2022) |
| 05/10/2022 | | Set/Reset Hearings as to STEPHEN K. BANNON: Motion Hearing set for 5/26/2022 at 10:00 AM In Person before Judge Carl J. Nichols. Courtroom to be determined at a later date. (zcal) (Entered: 05/10/2022) |
| 05/16/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. It is hereby ORDERED that the in-person argument previously scheduled for May 26, 2022 at 10:00 am is hereby CONTINUED until June 15, 2022 at 10:00 am. Argument will take place in person in Courtroom 19. The change of the argument date shall have no effect on the prior existing deadlines in this case. Signed by Judge Carl J. Nichols on May 16, 2022. (lccjn3) (Entered: 05/16/2022) |
| 05/16/2022 | | Set/Reset Hearings as to STEPHEN K. BANNON: Motion Hearing RESET for 6/15/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 05/16/2022) |
| 05/16/2022 | 68 | Unopposed MOTION for Leave to File Excess Pages by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 05/16/2022) |
| 05/17/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of Defendant STEPHEN K. BANNON's 68 Unopposed Motion for Leave to Exceed Page Limit, it is hereby ORDERED that the Motion is GRANTED. Defendant is granted leave to file a Reply in Support of Defendant's Motion to Dismiss the Indictment not to exceed thirty pages in length. Signed by Judge Carl J. Nichols on May 17, 2022. (lccjn3) (Entered: 05/17/2022) |
| 05/17/2022 | 69 | REPLY in Support by STEPHEN K. BANNON re 56 MOTION to Exclude *Evidence* (Corcoran, Matthew) (Entered: 05/17/2022) |
| 05/17/2022 | 70 | REPLY in Support by USA as to STEPHEN K. BANNON re 52 MOTION in Limine *to Exclude Evidence of Department of Justice Opinions and Writings* (Vaughn, Amanda) (Entered: 05/17/2022) |
| 05/17/2022 | 71 | REPLY in Support by USA as to STEPHEN K. BANNON re 53 MOTION in Limine *to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived* (Vaughn, Amanda) (Entered: 05/17/2022) |
| 05/17/2022 | 72 | REPLY in Support by USA as to STEPHEN K. BANNON re 54 MOTION in Limine *to Exclude Evidence of the Defendant's Prior Experience with Subpoenas* (Vaughn, Amanda) (Entered: 05/17/2022) |
| 05/17/2022 | 73 | REPLY in Support by STEPHEN K. BANNON re 58 MOTION to Dismiss Case (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4)(Corcoran, Matthew) (Entered: 05/17/2022) |
| 05/24/2022 | 75 | ENTERED IN ERROR..... MOTION to File Amicus Brief *on behalf of the U.S. House of Representatives Minority Leader Kevin O. McCarthy and the U.S. House of Representatives Minority Whip Stephen J. Scalise* by Stanley E. Woodward Jr.. by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order, # 2 Amicus Curiae) (Woodward, Stanley) Modified on 5/25/2022 (zstd). (Entered: 05/24/2022) |

**-12-**

| 05/24/2022 | | NOTICE OF ERROR as to STEPHEN K. BANNON regarding 75 MOTION to File Amicus Brief *on behalf of the U.S. House of Representatives Minority Leader Kevin ●. McCarthy and the U.S. House of Representatives Minority Whip Stephen J. Scalise* by Stanley E. Woodward Jr... The following error(s) need correction: Other- Chambers did not approve of this filing and counsel is not an interested party in the case. (zstd) (Entered: 05/25/2022) |
| 05/25/2022 | 76 | MOTION for Leave to File Amicus Brief by UNITED STATES HOUSE OF REPRESENTATIVES as to STEPHEN K. BANNON. "Leave to File Granted" by Judge Carl J. Nichols on 5/25/2022. (Attachments: # 1 Text of Proposed Order, # 2 Amicus Brief)(zstd) (Entered: 05/25/2022) |
| 05/25/2022 | 77 | MOTION for Leave to File Amicus Brief by HOUSE MINORITY LEADERSHIP as to STEPHEN K. BANNON. "Leave To File Granted" by Judge Carl J. Nichols (Attachments: # 1 Text of Proposed Order, # 2 Amicus Brief)(zstd) (Entered: 05/25/2022) |
| 06/07/2022 | 78 | TRANSCRIPT OF PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols held on 3/16/2022; Page Numbers: 1-99n. Court Reporter/Transcriber Lorraine T. Herman, Telephone number (202) 354-3196, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced ab ove. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/28/2022. Redacted Transcript Deadline set for 7/8/2022. Release of Transcript Restriction set for 9/5/2022.(zhsj) (Entered: 06/07/2022) |
| 06/07/2022 | 79 | TRANSCRIPT OF VIDEO ARRAIGNMENT/STATUS CONFERENCE PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols, held on November 18, 2021. Page Numbers: 1-19. Date of Issuance: June 7, 2022. Court Reporter: Lorraine T. Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse a t a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/28/2022. Redacted Transcript Deadline set for 7/8/2022. Release of Transcript Restriction set for 9/5/2022.(Herman, Lorraine) (Entered: |

| | | 06/07/2022) |
|---|---|---|
| 06/07/2022 | 80 | TRANSCRIPT OF VIDEO STATUS CONFERENCE PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols, held on December 7, 2022. Page Numbers: 1-47. Date of Issuance: June 7, 2022. Court Reporter: Lorraine T. Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/28/2022. Redacted Transcript Deadline set for 7/8/2022. Release of Transcript Restriction set for 9/5/2022.(Herman, Lorraine) (Entered: 06/07/2022) |
| 06/07/2022 | 81 | TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols, held on March 16, 2022. Page Numbers: 1-99. Date of Issuance: June 7, 2022. Court Reporter: Lorraine T. Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/28/2022. Redacted Transcript Deadline set for 7/8/2022. Release of Transcript Restriction set for 9/5/2022.(Herman, Lorraine) (Entered: 06/07/2022) |
| 06/10/2022 | 82 | NOTICE *of Defendant's Position Regarding the Amicus Briefs* by STEPHEN K. BANNON re 77 MOTION for Leave to File, 76 MOTION for Leave to File (Schoen, David) (Entered: 06/10/2022) |
| 06/15/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing as to STEPHEN K. BANNON held on 6/15/2022 re Motions 52 , 53 , 54 , 56 , and 58 . Motions 52 , 53 , 54 , and 56 taken under advisement. Further Order to be issued by the Court. Motion 58 to Dismiss Case as to STEPHEN K. BANNON (1); DENIED for reasons set forth on the record. Proposed Jury Instructions due by 6/30/2022. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, Robert Costello, and |

**-14-**

| | | Riane White; US Attorney: Amanda Vaughn, J.P. Cooney, and Molly Gaston. (zcal) (Entered: 06/15/2022) |
|---|---|---|
| 06/17/2022 | 83 | MOTION in Limine *on Presenting Indictment to the Jury* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 06/17/2022) |
| 06/17/2022 | 84 | MOTION in Limine *Precluding Evidence or Argument Regarding Attack on the U.S. Capital* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 06/17/2022) |
| 06/17/2022 | 85 | MOTION in Limine *(Omnibus)* by USA as to STEPHEN K. BANNON. (Vaughn, Amanda) (Entered: 06/17/2022) |
| 06/27/2022 | 86 | MOTION to Compel *Meadows and Scavino Declination Discovery*, MOTION for Discovery , MOTION for Release of Brady Materials by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Letter to government counsel requesting discovery, # 2 Exhibit Letter from government counsel refusing to provide requested discovery, # 3 Exhibit Letters from Justin Clark to Meadows and Scavino invoking executive privilege, # 4 Exhibit Letters from White House Counsel to Congress invoking executive privilege for communications with non-Executive Branch outsiders, # 5 Exhibit Relevant filings in Meadows v. Pelosi)(Schoen, David) (Entered: 06/27/2022) |
| 06/29/2022 | 87 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 86 MOTION to Compel *Meadows and Scavino Declination Discovery* MOTION for Discovery MOTION for Release of Brady Materials (Vaughn, Amanda) (Entered: 06/29/2022) |
| 06/29/2022 | 88 | MOTION to Continue *Trial* by STEPHEN K. BANNON. (Schoen, David) (Entered: 06/29/2022) |
| 06/29/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of Defendant STEPHEN K. BANNON's 88 Motion to Continue Trial, it is hereby ORDERED that the government file a response, if any, on or before July 5, 2022. A reply, if any, shall be filed on or before July 7, 2022. Signed by Judge Carl J. Nichols on June 29, 2022. (lccjn3) (Entered: 06/29/2022) |
| 06/29/2022 | | Set/Reset Deadlines as to STEPHEN K. BANNON: Response due by 7/5/2022. Reply due by 7/7/2022. (zcal) (Entered: 06/30/2022) |
| 06/30/2022 | 89 | Joint Proposed Jury Instructions by USA as to STEPHEN K. BANNON (Attachments: # 1 Exhibit 1)(Vaughn, Amanda) Modified text on 7/1/2022 (zstd). (Entered: 06/30/2022) |
| 07/01/2022 | 90 | RESPONSE by USA as to STEPHEN K. BANNON re 89 Proposed Jury Instructions *(United States' Objections to Defendant's Proposed Jury Instructions)* (Vaughn, Amanda) (Entered: 07/01/2022) |
| 07/01/2022 | 91 | RESPONSE by USA as to STEPHEN K. BANNON re 84 MOTION in Limine *Precluding Evidence or Argument Regarding Attack on the U.S. Capital*, 83 MOTION in Limine *on Presenting Indictment to the Jury* (Vaughn, Amanda) (Entered: 07/01/2022) |
| 07/01/2022 | 92 | MOTION to Modify *Scheduling Order to Remove Requirement that Pretrial Statement be a Joint Filing* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order)(Vaughn, Amanda) (Entered: 07/01/2022) |
| 07/01/2022 | 93 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 88 MOTION to Continue *Trial* (Vaughn, Amanda) (Entered: 07/01/2022) |
| 07/01/2022 | 94 | Memorandum in Opposition by STEPHEN K. BANNON re 85 MOTION in Limine *(Omnibus)* (Schoen, David) (Entered: 07/01/2022) |

**-15-**

| 07/06/2022 | 95 | REPLY in Support by STEPHEN K. BANNON re 88 MOTION to Continue *Trial* (Attachments: # 1 Exhibit Exhibit 1)(Corcoran, Matthew) (Entered: 07/06/2022) |
| 07/06/2022 | 96 | MOTION for Leave to File *Surreply in Opposition to Defendant's Motion to Continue* by USA as to STEPHEN K. BANNON. (Attachments: # 1 Surreply in Opposition to Defendant's Motion to Continue, # 2 Text of Proposed Order)(Vaughn, Amanda) (Entered: 07/06/2022) |
| 07/06/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Pending before the Court are a number of Motions, including ECF Nos. 83 , 84 , 85 , 86 , and 88 . The Court will hear oral argument on these Motions on Monday, July 11 at 10:00 am, in Courtroom 19. The Court will also hear oral argument in Misc. Case No. 22-mc-60 at that time. Signed by Judge Carl J. Nichols on July 6, 2022. (lccjn3) (Entered: 07/06/2022) |
| 07/06/2022 | 97 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 86 MOTION to Compel *Meadows and Scavino Declination Discovery* MOTION for Discovery MOTION for Release of Brady Materials (Attachments: # 1 Exhibit Costello Declination Memo to Govt citing relied upon OLC opinions)(Schoen, David) (Entered: 07/06/2022) |
| 07/06/2022 | | Set/Reset Hearings as to STEPHEN K. BANNON: Motion Hearing set for 7/11/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 07/07/2022) |
| 07/08/2022 | 98 | MOTION to Withdraw as Attorney by Robert J. Costello. by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 07/08/2022) |
| 07/08/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of the government's 92 Motion to Modify Scheduling Order, it is hereby ORDERED that the Motion is DENIED. The Court expects the parties to meet and confer and reach common ground on as many issues as possible. The Court will not, at this time, modify the deadlines established in the 25 Scheduling Order. Signed by Judge Carl J. Nichols on July 8, 2022. (lccjn3) (Entered: 07/08/2022) |
| 07/08/2022 | 99 | REPLY in Support by STEPHEN K. BANNON re 84 MOTION in Limine *Precluding Evidence or Argument Regarding Attack on the U.S. Capital* (Corcoran, Matthew) (Entered: 07/08/2022) |
| 07/08/2022 | 100 | REPLY in Support by STEPHEN K. BANNON re 83 MOTION in Limine *on Presenting Indictment to the Jury* (Attachments: # 1 Exhibit Exhibit 1)(Corcoran, Matthew) (Entered: 07/08/2022) |
| 07/08/2022 | 101 | REPLY in Support by USA as to STEPHEN K. BANNON re 85 MOTION in Limine *(Omnibus)* (Gaston, Molly) (Entered: 07/08/2022) |
| 07/10/2022 | 102 | TRANSCRIPT OF IN-PERSON MOTION HEARING in case as to STEPHEN K. BANNON, before Judge Carl J. Nichols. Held on June 15, 2022. Page Numbers: 1-179. Date of Issuance: July 10, 2022. Court Reporter: Lorraine T. Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the |

4/10/23, 11:15 AM                                   District of Columbia live database

| | | |
|---|---|---|
| | | public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/31/2022. Redacted Transcript Deadline set for 8/10/2022. Release of Transcript Restriction set for 10/8/2022.(Herman, Lorraine) (Entered: 07/10/2022) |
| 07/10/2022 | 103 | Supplement by STEPHEN K. BANNON re 88 MOTION to Continue *Trial (Schoen, David) Modified to add link on 7/11/2022 (zstd). (Entered: 07/10/2022)* |
| 07/10/2022 | 104 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 103 Supplement to MOTION to Continue *Trial* (Attachments: # 1 Exhibit 1)(Vaughn, Amanda) Modified text on 7/11/2022 (zstd). (Entered: 07/11/2022) |
| 07/11/2022 | 105 | MOTION in Limine *to Exclude Evidence or Argument* by USA as to STEPHEN K. BANNON. (Vaughn, Amanda) (Entered: 07/11/2022) |
| 07/11/2022 | 106 | PRETRIAL MEMORANDUM - *Joint Pretrial Statement* by USA as to STEPHEN K. BANNON (Attachments: # 1 Exhibit Proposed Statement of the Case, # 2 Exhibit Proposed Voir Dire, # 3 Exhibit Proposed Verdict Form, # 4 Exhibit Governments Witness List, # 5 Exhibit Defendants Witness List, # 6 Exhibit Governments Exhibit List) (Gaston, Molly) (Entered: 07/11/2022) |
| 07/11/2022 | | Minute Order and Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing as to STEPHEN K. BANNON held on 7/11/2022 re 52 , 53 , 54 , 56 , 83 , 84 , 85 , 86 , 88 , and 103 . Defendant Bannon was not present. His appearance was waived. 52 Granted in Part and Denied in Part by the Court. 53 Granted by the Court. 54 Granted in Part and Denied in Part by the Court. 56 Granted in Part and Denied in Part by the Court. 83 Granted by the Court. 84 Granted by the Court. 85 Granted in Part and Denied in Part by the Court. 86 Denied by the Court. 88 Denied by the Court. 103 Denied by the Court. All rulings made for reasons set forth on the record. Defense's response due by 7/13/2022 at noon. Government's reply due by 7/13/2022 evening. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Keira Sherper; US Attorney: Amanda Vaughn, J.P. Cooney, and Molly Gaston. (zcal) (Entered: 07/12/2022) |
| 07/11/2022 | | Set/Reset Deadlines as to STEPHEN K. BANNON: Defense Response due by 7/13/2022. Reply due by 7/13/2022. (zcal) (Entered: 07/12/2022) |
| 07/13/2022 | 107 | RESPONSE by STEPHEN K. BANNON re 105 MOTION in Limine *to Exclude Evidence or Argument* (Attachments: # 1 Exhibit Letters, # 2 Exhibit Contempt referral and letter, # 3 Exhibit Subpoena, # 4 Exhibit Letter, # 5 Exhibit Indictment)(Schoen, David) (Entered: 07/13/2022) |
| 07/13/2022 | 108 | MOTION to Continue *(Renewed)* by STEPHEN K. BANNON. (Schoen, David) (Entered: 07/13/2022) |
| 07/13/2022 | 109 | MOTION for Leave to Appear Pro Hac Vice Riane A. White Filing fee $ 100, receipt number ADCDC-9368303. Fee Status: Fee Paid. by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2)(Corcoran, Matthew) (Entered: 07/13/2022) |
| 07/13/2022 | 110 | REPLY in Support by USA as to STEPHEN K. BANNON re 105 MOTION in Limine *to Exclude Evidence or Argument* (Attachments: # 1 Exhibit, # 2 Exhibit)(Gaston, Molly) (Entered: 07/13/2022) |

**-17-**

| 07/13/2022 | 111 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 108 MOTION to Continue *(Renewed)* (Gaston, Molly) (Entered: 07/13/2022) |
| 07/14/2022 | 112 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 108 MOTION to Continue *(Renewed)* (Schoen, David) (Entered: 07/14/2022) |
| 07/14/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Upon consideration of the 109 Motion for Leave to Appear Pro Hac Vice, and for the reasons given during the July 14, 2022, pretrial conference, it is hereby ORDERED that the Motion is GRANTED. Riane A. White is granted pro hac vice admission to this Court. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Carl J. Nichols on July 14, 2022. (lccjn3) (Entered: 07/14/2022) |
| 07/14/2022 | 114 | NOTICE *of Government's Objections to Defendant's Trial Exhibits* by USA as to STEPHEN K. BANNON (Gaston, Molly) (Entered: 07/14/2022) |
| 07/14/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Pretrial Conference/Motion Hearing as to STEPHEN K. BANNON held on 7/14/2022 re 98 , 105 , 108 , and 109 . Defendant STEPHEN K. BANNON not present. Presence waived. 98 Motion to Withdraw as Attorney; GRANTED. Robert J. Costello withdrawn from case as to STEPHEN K. BANNON (1). 105 Motion in Limine as to STEPHEN K. BANNON (1); DENIED and Held in Abeyance, for reasons set forth on the record. 108 Motion to Continue as to STEPHEN K. BANNON (1); DENIED for reasons set forth on the record. 109 MOTION for Leave to Appear Pro Hac Vice Riane A. White; Granted. Further Order to be issued by the Court. Parties' Memorandum due by 7/18/2022. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vaughn and Molly Gaston. (zcal) Modified on 7/15/2022 (zcal). (Entered: 07/15/2022) |
| 07/15/2022 | 115 | NOTICE OF ATTORNEY APPEARANCE: Riane A. White appearing for STEPHEN K. BANNON (White, Riane) (Entered: 07/15/2022) |
| 07/15/2022 | 116 | MOTION to Dismiss Case , MOTION to Exclude *Congressional Evidence* by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Rainey Decision Transcript, # 2 Exhibit Law Review article on U.S. v. Rainey)(Schoen, David) (Entered: 07/15/2022) |
| 07/16/2022 | 117 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 116 MOTION to Dismiss Case MOTION to Exclude *Congressional Evidence* (Gaston, Molly) (Entered: 07/16/2022) |
| 07/17/2022 | 118 | NOTICE *of United States' Objections to Court's Proposed Statement of the Case, Voir Dire, and Jury Instructions* by USA as to STEPHEN K. BANNON (Vaughn, Amanda) (Entered: 07/17/2022) |
| 07/17/2022 | 119 | STATEMENT OF CASE by STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 07/17/2022) |
| 07/17/2022 | 120 | Proposed Jury Instructions by STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 07/17/2022) |
| 07/17/2022 | 121 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 116 MOTION to Dismiss Case MOTION to Exclude *Congressional Evidence* (Schoen, David) (Entered: 07/17/2022) |
| 07/18/2022 | 122 | RESPONSE TO ORDER OF THE COURT by USA as to STEPHEN K. BANNON re Order on Motion to Withdraw as Attorney,,,, Order on Motion in Limine,,,, Order on |

| | | |
|---|---|---|
| | | Motion to Continue,,,, Motion Hearing,,,, Pretrial Conference,,,, Set Deadlines,,, *United States' Response to Defendant's Objections to Exhibits* (Cooney, J.P.) (Entered: 07/18/2022) |
| 07/18/2022 | 123 | MOTION to Exclude *Hearsay Evidence (Chairman Thompson Letters) per Court Order of July 14, 2022* by STEPHEN K. BANNON. (Schoen, David) (Entered: 07/18/2022) |
| 07/18/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Jury Selection as to STEPHEN K. BANNON began and held on 7/18/2022 STEPHEN K. BANNON (1): Count 1,2. Motion 116 ; Taken under Advisement. Jury Selection / Jury Trial continued to 7/19/2022 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: AM: Lorraine Herman / PM: Lisa Edwards; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vauhn and Molly Gaston, and FBI Agent Frank D'Amico. (zcal) (Entered: 07/18/2022) |
| 07/19/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Jury Trial as to STEPHEN K. BANNON (1) held on 7/19/2022 as to Counts 1 and 2. 12 Jurors and 2 Alternates sworn. 116 Motion to Dismiss Case as to STEPHEN K. BANNON (1); DENIED for reasons set forth on the record. Motion 123 ; DENIED for reasons set forth on the record. Oral Motion to Continue Trial for 1 month; DENIED for reasons set forth on the record. Jury Trial continued to 7/20/2022 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: AM: Lorraine Herman / PM: Lisa Edwards; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vauhn, Molly Gaston, and FBI Agent Frank D'Amico. Government Witness: Kristin Amerling. (zcal) Modified on 7/20/2022 to include second motion ruling (zcal). (Entered: 07/19/2022) |
| 07/19/2022 | | MINUTE ORDER: The Court having impaneled the jury in this action, it is hereby ORDERED that during trial and deliberations all meals for said jury shall be paid by the Clerk of the Court for the U.S. District Court for the District of Columbia. So Ordered by Judge Carl J. Nichols on 7/19/2022. (zcal) (Entered: 07/19/2022) |
| 07/20/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Jury Trial as to STEPHEN K. BANNON (1) held on 7/20/2022: Counts 1 and 2. Same jury of 12 and 2 alternates. The Government rests its case. Jury Trial continued to 7/21/2022 at 10:30 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: AM: Lorraine Herman / PM: Lisa Edwards; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vaughn, Molly Gaston, and FBI Agent Frank D'Amico; Witnesses: Kristin Amerling and FBI Agent Stephen Hart. (zcal) (Entered: 07/20/2022) |
| 07/21/2022 | 125 | MOTION for Acquittal *for Judgment Pursuant to Rule 29* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order Proposed Order)(Corcoran, Matthew) (Entered: 07/21/2022) |
| 07/21/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Jury Trial as to STEPHEN K. BANNON (1) resumed and held on 7/21/2022: Counts 1 and 2. Juror number 13 discharged. Jury of 12 and 1 alternate. The Defense rests its case. Ruling on Motion for Judgment of Acquittal; Reserve by Court. Jury Trial continued to 7/22/2022 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vaughn, Molly Gaston, and FBI Agent Frank D'Amico. (zcal) (Entered: 07/21/2022) |

**-19-**

| 07/21/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. Pending before the Court is Defendant's Motion to Exclude Congressional Evidence or Dismiss the Indictment Based on Granting the Motion to Quash, ECF No. 116 . The Court has determined that good cause exists for deferring a decision on Defendant's 116 Motion, see Fed. R. Crim. P. 12(d), until after the jury returns a verdict or is discharged. The Court intends to decide Defendant's 116 Motion together with Defendant's Motion for Judgement of Acquittal Pursuant to Rule 29, ECF No. 125 . Signed by Judge Carl J. Nichols on July 21, 2022. (lccjn3) (Entered: 07/21/2022) |
|---|---|---|
| 07/21/2022 | 126 | NOTICE *of Objections to Court's Final Jury Instructions and Proposed additional instructions* by STEPHEN K. BANNON (Schoen, David) (Entered: 07/21/2022) |
| 07/22/2022 | 127 | NOTICE *Re: Congressional Hearings of July 21, 2022* by STEPHEN K. BANNON (Schoen, David) (Entered: 07/22/2022) |
| 07/22/2022 | 128 | NOTICE *of Defendant's Objection to Jury Instruction 27* by STEPHEN K. BANNON (Schoen, David) (Entered: 07/22/2022) |
| 07/22/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Jury Trial as to STEPHEN K. BANNON (1) resumed and concluded on 7/22/2022: Count 1 and 2. Same jury of 12 and 1 alternate. The remaining Alternate discharged. Deliberations began and concluded. JURY VERDICT of GUILTY as to STEPHEN K. BANNON (1): Count 1,2. REFERRAL TO PROBATION OFFICE for Presentence Investigation as to STEPHEN K. BANNON. Sentencing Memorandum due by 10/14/2022. Sentencing set for 10/21/2022 at 03:00 PM in Courtroom 19- In Person before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains on Personal Recognizance; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: Amanda Vaughn, Molly Gaston, and FBI Agent Frank D'Amico. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 129 | FINAL Jury Instructions as to STEPHEN K. BANNON (1). (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 130 | ATTORNEYS' ACKNOWLEDGMENT OF TRIAL EXHIBITS as to STEPHEN K. BANNON. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 131 | EXHIBIT LIST by USA as to STEPHEN K. BANNON. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 132 | EXHIBIT LIST by STEPHEN K. BANNON. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 133 | Jury Note as to STEPHEN K. BANNON. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 134 | **Signature Page of Foreperson** <br><br> as to STEPHEN K. BANNON in Jury Note. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 135 | VERDICT FORM as to STEPHEN K. BANNON. (zcal) (Entered: 07/22/2022) |
| 07/22/2022 | 136 | **Signature Page of Foreperson** <br><br> as to STEPHEN K. BANNON in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zcal) (Entered: 07/22/2022) |
| 07/27/2022 | 137 | ORDER. Signed by Judge Carl J. Nichols on July 27, 2022. (lccjn3) (Entered: 07/27/2022) |

| 07/27/2022 | | Set/Reset Deadlines as to STEPHEN K. BANNON: Response due by 8/12/2022. Reply due by 8/19/2022. (zcal) (Entered: 07/27/2022) |
|---|---|---|
| 07/28/2022 | 138 | RESPONSE by USA as to STEPHEN K. BANNON re 127 Notice (Other) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Vaughn, Amanda) (Entered: 07/28/2022) |
| 07/29/2022 | 139 | MOTION to Withdraw as Attorney by Stacie Marion Fahsel. by UNITED STATES HOUSE OF REPRESENTATIVES as to STEPHEN K. BANNON. (Fahsel, Stacie) (Entered: 07/29/2022) |
| 08/01/2022 | 140 | MOTION to Withdraw as Attorney by Michelle S. Kallen. by UNITED STATES HOUSE OF REPRESENTATIVES as to STEPHEN K. BANNON. (Kallen, Michelle) (Entered: 08/01/2022) |
| 08/05/2022 | 141 | SUPPLEMENT by STEPHEN K. BANNON re 116 MOTION to Dismiss Case MOTION to Exclude *Congressional Evidence* (Schoen, David) (Entered: 08/05/2022) |
| 08/05/2022 | 142 | MOTION for New Trial by STEPHEN K. BANNON. (Schoen, David) (Entered: 08/05/2022) |
| 08/12/2022 | 143 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 116 Motion to Dismiss Case, Motion to Exclude *and Response in Opposition to Defendant's Supplemental Brief* (Gaston, Molly) (Entered: 08/12/2022) |
| 08/19/2022 | 144 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 116 MOTION to Dismiss Case MOTION to Exclude *Congressional Evidence (Supplemental Reply to Supplemental Opposition)* (Schoen, David) (Entered: 08/19/2022) |
| 08/19/2022 | 145 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 142 Motion for New Trial (Vaughn, Amanda) (Entered: 08/19/2022) |
| 08/26/2022 | 146 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 142 MOTION for New Trial (Schoen, David) (Entered: 08/26/2022) |
| 09/02/2022 | 147 | ORDER as to STEPHEN K. BANNON. Signed by Judge Carl J. Nichols on September 2, 2022. (lccjn3) (Entered: 09/02/2022) |
| 09/28/2022 | | Set/Reset Hearings as to STEPHEN K. BANNON: Sentencing RESET for 10/21/2022 at 09:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. Note time change. (zcal) (Entered: 09/28/2022) |
| 10/14/2022 | 151 | Consent MOTION for Extension of Time to *Filing Deadline* by STEPHEN K. BANNON. (Attachments: # 1 Text of Proposed Order)(Corcoran, Matthew) (Entered: 10/14/2022) |
| 10/14/2022 | | MINUTE ORDER. Upon consideration of Defendant's Consent Motion for Extension of Time 151 , it is hereby ORDERED that the motion is GRANTED. Defendant shall file his sentencing memorandum on or before October 17, 2022 AT NOON. Signed by Judge Carl J. Nichols on October 14, 2022. (lccjn3) (Entered: 10/14/2022) |
| 10/14/2022 | | MINUTE ORDER as to STEPHEN K. BANNON. It is ORDERED that the Government shall file its sentencing memorandum on or before October 17, 2022 at noon. Signed by Judge Carl J. Nichols on October 14, 2022. (lccjn1) (Entered: 10/14/2022) |
| 10/17/2022 | 152 | SENTENCING MEMORANDUM by USA as to STEPHEN K. BANNON (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(Cooney, J.P.) (Entered: 10/17/2022) |

| | | |
|---|---|---|
| 10/17/2022 | 153 | ENTERED IN ERROR.....SENTENCING MEMORANDUM by STEPHEN K. BANNON (Corcoran, Matthew) Modified on 10/17/2022 (zmh). (Entered: 10/17/2022) |
| 10/17/2022 | | NOTICE OF ERROR as to STEPHEN K. BANNON regarding 153 Sentencing Memorandum. The following error(s) need correction: Other- Please refile memorandum with corrected date. (zmh) (Entered: 10/17/2022) |
| 10/17/2022 | 154 | SENTENCING MEMORANDUM by STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 10/17/2022) |
| 10/20/2022 | 156 | Corporate Disclosure Statement by STEPHEN K. BANNON identifying Corporate Parent PARAMOUNT GLOBAL for PRESS COALITION. (Tobin, Charles) (Entered: 10/20/2022) |
| 10/20/2022 | 157 | RESPONSE by STEPHEN K. BANNON re 152 GOVERNMENT'S SENTENCING MEMORANDUM (Attachments: # 1 Exhibit Exhibit A- Declaration of Robert Costello, Esq., # 2 Exhibit Exhibit B- Gordon Article)(Corcoran, Matthew) Modified to add link on 10/23/2022 (zstd). (Entered: 10/20/2022) |
| 10/20/2022 | 158 | Memorandum in Opposition by USA as to STEPHEN K. BANNON re 154 Sentencing Memorandum (Cooney, J.P.) Modified to add link and text on 10/23/2022 (zstd). (Entered: 10/20/2022) |
| 10/21/2022 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Sentencing held on 10/21/2022 as to STEPHEN K. BANNON (1): Counts 1 and 2. Defendant sentenced to Four (4) Months of Incarceration to run concurrently. Defendant further Ordered to Pay a Fine of $6500.00 and Special Assessment of $25 on each count. Bond Status of Defendant: Defendant Sentenced to 4 months Incarceration; Court Reporter: Lorraine Herman; Defense Attorney: David Schoen, Matthew Corcoran, and Riane White; US Attorney: J.P. Cooney; Probation Officer: Renee Moses-Gregory. (zcal) (Entered: 10/21/2022) |
| 10/21/2022 | 161 | JUDGMENT as to STEPHEN K. BANNON. Statement of Reasons Not Included. Signed by Judge Carl J. Nichols on 10/21/2022. (zstd) (Entered: 10/31/2022) |
| 10/21/2022 | 162 | STATEMENT OF REASONS as to STEPHEN K. BANNON re 161 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Carl J. Nichols on 10/21/2022. (zstd) (Entered: 10/31/2022) |
| 11/03/2022 | 163 | MOTION to Consolidate Cases by STEPHEN K. BANNON. (Schoen, David) (Entered: 11/03/2022) |
| 11/04/2022 | 164 | NOTICE OF ATTORNEY APPEARANCE Christopher R. Howland appearing for USA. (Howland, Christopher) (Entered: 11/04/2022) |
| 11/04/2022 | 165 | RESPONSE by USA as to STEPHEN K. BANNON re 163 MOTION to Consolidate Cases (Howland, Christopher) (Entered: 11/04/2022) |
| 11/04/2022 | 166 | NOTICE OF APPEAL - Final Judgment by STEPHEN K. BANNON re 161 Judgment, 162 Statement of Reasons,. Filing fee $ 505, receipt number ADCDC-9651444. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Exhibit Exhibit 1)(Schoen, David) (Entered: 11/04/2022) |
| 11/07/2022 | 167 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to STEPHEN K. BANNON re 166 Notice of Appeal - Final Judgment,. (zstd) (Entered: 11/07/2022) |

| 11/07/2022 | 168 | ORDER Staying Sentence Pending Appeal. Signed by Judge Carl J. Nichols on November 7, 2022. (lcc jn3) (Entered: 11/07/2022) |
| 11/07/2022 | | USCA Case Number as to STEPHEN K. BANNON 22-3086 for 166 Notice of Appeal - Final Judgment, filed by STEPHEN K. BANNON. (zstd) (Entered: 11/07/2022) |
| 11/07/2022 | 169 | Transmitted Supplemental Record on Appeal and Docket Sheet to USCA The Court of Appeal fee was previously paid in USCA Number 22-3086 as to STEPHEN K. BANNON re 166 Notice of Appeal - Final Judgment,. (zstd) (Entered: 11/07/2022) |
| 11/07/2022 | 170 | REPLY TO OPPOSITION to Motion by STEPHEN K. BANNON re 163 MOTION to Consolidate Cases (Schoen, David) (Entered: 11/07/2022) |
| 11/21/2022 | | MINUTE ORDER. Upon consideration of Defendant's Motion to Consolidate 163 , it is hereby ORDERED that the Motion is GRANTED. The clerk is directed to consolidate the instant case with 22-mc-60 and to supplement the record on appeal accordingly. Signed by Judge Carl J. Nichols on November 21, 2022. (lccjn3) (Entered: 11/21/2022) |
| 11/21/2022 | 171 | Transmitted Supplemental Record on Appeal and Docket Sheet to USCA as to STEPHEN K. BANNON re 163 MOTION to Consolidate Cases (zstd) (Entered: 11/21/2022) |
| 12/28/2022 | 172 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS, MORNING SESSION, in case as to STEPHEN K. BANNON, before Judge Carl J. Nichols, held on July 18, 2022. Page Numbers: 1-184. Date of Issuance: December 28, 2022. Court Reporter: Lorraine Herman, Telephone number 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public t erminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(Herman, Lorraine) (Entered: 12/28/2022) |
| 12/28/2022 | 173 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to STEPHEN K. BANNON before Judge Carl J. Nichols held on July 18, 2022; Page Numbers: 185-390. Date of Issuance: December 28, 2022. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public ter minal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the |

|  |  | public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(zlfe) (Entered: 12/28/2022) |
|---|---|---|
| 12/28/2022 | 174 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS, MORNING SESSION, in case as to STEPHEN K. BANNON, before Judge Carl J. Nichols, held on July 19, 2022. Page Numbers: 391-474. Date of Issuance: December 28, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pub lic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(Herman, Lorraine) (Entered: 12/28/2022) |
| 12/28/2022 | 175 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to STEPHEN K. BANNON before Judge Carl J. Nichols held on July 19, 2022; Page Numbers: 475-599. Date of Issuance: December 28, 2022. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests arc filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(zlfe) (Entered: 12/28/2022) |
| 12/28/2022 | 176 | TRANSCRIPT OF JURY TRIAL (AFTERNOON SESSION) in case as to STEPHEN K. BANNON before Judge Carl J. Nichols held on July 20, 2022; Page Numbers: 749-889. Date of Issuance: December 28, 2022. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form |

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(zlfe) (Entered: 12/28/2022)

| 12/28/2022 | 177 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS, in case as to STEPHEN K. BANNON, before Judge Carl J. Nichols, held on July 21, 2022. Page Numbers: 890-1016. Date of Issuance: December 28, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal o r purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/18/2023. Redacted Transcript Deadline set for 1/28/2023. Release of Transcript Restriction set for 3/28/2023.(Herman, Lorraine) (Entered: 12/28/2022) |
| 12/31/2022 | 178 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS (MORNING SESSION) in case as to STEPHEN K. BANNON before Judge Carl J. Nichols, held on July 20, 2022. Page Numbers: 600-748. Date of Issuance: December 31, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pub lic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | Redaction Request due 1/21/2023. Redacted Transcript Deadline set for 1/31/2023. Release of Transcript Restriction set for 3/31/2023.(Herman, Lorraine) (Entered: 12/31/2022) |
|---|---|---|
| 12/31/2022 | 179 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols on July 22, 2022. Page Numbers: 1017-1104. Date of Issuance: December 31, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal o r purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/21/2023. Redacted Transcript Deadline set for 1/31/2023. Release of Transcript Restriction set for 3/31/2023.(Herman, Lorraine) (Entered: 12/31/2022) |
| 01/04/2023 | 180 | MOTION to Withdraw as Attorney by Douglas N. Letter. by UNITED STATES HOUSE OF REPRESENTATIVES as to STEPHEN K. BANNON. (Letter, Douglas) (Entered: 01/04/2023) |
| 01/04/2023 | 181 | MOTION to Withdraw as Attorney by Eric R. Columbus. by UNITED STATES HOUSE OF REPRESENTATIVES as to STEPHEN K. BANNON. (Columbus, Eric) (Entered: 01/04/2023) |
| 01/04/2023 | 182 | NOTICE *of Outstanding Issue of Government Conduct to be Addressed* by STEPHEN K. BANNON (Attachments: # 1 Exhibit Exhibit 1 Costello Letter and associated exhibits combined)(Schoen, David) (Entered: 01/04/2023) |
| 01/09/2023 | 183 | TRANSCRIPT OF PROCEEDINGS in case as to STEPHEN K. BANNON before Judge Carl J. Nichols, held on July 11, 2022. Page Numbers: 1-153. Date of Issuance: January 9, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from th e court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/30/2023. Redacted Transcript Deadline set for 2/9/2023. Release of Transcript Restriction set for 4/9/2023.(Herman, Lorraine) (Entered: |

| | | |
|---|---|---|
| | | 01/09/2023) |
| 01/10/2023 | | MINUTE ORDER. Upon consideration of 180 and 181 Motions to Withdraw by Douglas Letter and Eric R. Columbus, it is hereby ORDERED that the Motions are GRANTED. Signed by Judge Carl J. Nichols on January 10, 2023. (lccjn3) (Entered: 01/10/2023) |
| 01/10/2023 | | Attorney update in case as to STEPHEN K. BANNON. Attorney Douglas N. Letter terminated. (zcam) (Entered: 01/11/2023) |
| 01/24/2023 | 184 | TRANSCRIPT OF RETURN ON ARREST WARRANT and INITIAL APPEARANCE PROCEEDINGS in case as to STEPHEN K. BANNON, before Magistrate Judge Robin M. Meriweather, held on November 15, 2021. Page Numbers: 1-13. Date of Issuance: January 24, 2023. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/14/2023. Redacted Transcript Deadline set for 2/24/2023. Release of Transcript Restriction set for 4/24/2023.(Herman, Lorraine) (Entered: 01/24/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/10/2023 11:07:46 | | |
| **PACER Login:** | tmstuckey | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00670-CJN |
| **Billable Pages:** | 24 | **Cost:** | 2.40 |

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-mc-00060-CJN

In Re: NON-PARTY SUBPOENAS                              Date Filed: 06/13/2022
Assigned to: Judge Carl J. Nichols                     Jury Demand: None
 Case: 1:21-cr-00670-CJN-1                              Nature of Suit: 890 Other Statutory Actions
Cause: Motion to Quash Subpoenas                        Jurisdiction: Federal Question

**In Re**

**NON-PARTY SUBPOENAS**

**Petitioner**

**NANCY PELOSI**                        represented by  **Douglas N. Letter**
*Honorable*                                             U.S. HOUSE OF REPRESENTATIVES
                                                        Office of General Counsel
                                                        5140 O'Neill House Office Building
                                                        Washington, DC 20515
                                                        202-225-9700
                                                        Email: douglas.letter@mail.house.gov
                                                        *TERMINATED: 01/03/2023*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Todd Barry Tatelman**
                                                        U.S. HOUSE OF REPRESENTATIVES
                                                        Office of General Counsel
                                                        5140 O'Neill House Office Building
                                                        Washington, DC 20515
                                                        202-225-9700
                                                        Email: todd.tatelman@mail.house.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Michelle S. Kallen**
                                                        JENNER & BLOCK LLP
                                                        U.S. House of Representatives
                                                        1099 New York Avenue NW
                                                        Suite 900
                                                        Washington, DC 20001
                                                        202-639-6093
                                                        Email: MKallen@jenner.com
                                                        *TERMINATED: 08/01/2022*
                                                        *ATTORNEY TO BE NOTICED*

**Petitioner**

**BENNIE G. THOMPSON**                  represented by  **Douglas N. Letter**
*Honorable*                                             (See above for address)
                                                        *TERMINATED: 01/03/2023*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

-28-

**Todd Barry Tatelman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
(See above for address)
*TERMINATED: 08/01/2022*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**ELIZABETH L. CHENEY**                represented by   **Douglas N. Letter**
*Honorable*                                              (See above for address)
                                                         *TERMINATED: 01/03/2023*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Barry Tatelman**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michelle S. Kallen**
                                                         (See above for address)
                                                         *TERMINATED: 08/01/2022*
                                                         *ATTORNEY TO BE NOTICED*

**Petitioner**

**ADAM B. SCHIFF**                     represented by   **Douglas N. Letter**
                                                         (See above for address)
                                                         *TERMINATED: 01/03/2023*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Barry Tatelman**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michelle S. Kallen**
                                                         (See above for address)
                                                         *TERMINATED: 08/01/2022*
                                                         *ATTORNEY TO BE NOTICED*

**Petitioner**

**JAMES B. RASKIN**                    represented by   **Douglas N. Letter**
*Honorable*                                              (See above for address)
                                                         *TERMINATED: 01/03/2023*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Todd Barry Tatelman**

-29-

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
(See above for address)
*TERMINATED: 08/01/2022*
*ATTORNEY TO BE NOTICED*

**Petitioner**
**SUSAN E. LOFGREN**                    represented by  **Douglas N. Letter**
                                          (See above for address)
                                          *TERMINATED: 01/03/2023*
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Todd Barry Tatelman**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Michelle S. Kallen**
                                          (See above for address)
                                          *TERMINATED: 08/01/2022*
                                          *ATTORNEY TO BE NOTICED*

**Petitioner**
**ELAINE G. LURIA**                     represented by  **Douglas N. Letter**
*Honorable*                               (See above for address)
                                          *TERMINATED: 01/03/2023*
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Todd Barry Tatelman**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Michelle S. Kallen**
                                          (See above for address)
                                          *TERMINATED: 08/01/2022*
                                          *ATTORNEY TO BE NOTICED*

**Petitioner**
**PETER R. AGUILAR**                    represented by  **Douglas N. Letter**
*Honorable*                               (See above for address)
                                          *TERMINATED: 01/03/2023*
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Todd Barry Tatelman**
                                          (See above for address)
                                          *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Michelle S. Kallen**
(See above for address)
*TERMINATED: 08/01/2022*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**STEPHANIE MURPHY**                represented by **Douglas N. Letter**
*Honorable*                                       (See above for address)
                                                  *TERMINATED: 01/03/2023*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Todd Barry Tatelman**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Michelle S. Kallen**
                                                  (See above for address)
                                                  *TERMINATED: 08/01/2022*
                                                  *ATTORNEY TO BE NOTICED*

**Petitioner**

**ADAM D. KINZINGER**               represented by **Douglas N. Letter**
*Honorable*                                       (See above for address)
                                                  *TERMINATED: 01/03/2023*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Todd Barry Tatelman**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Michelle S. Kallen**
                                                  (See above for address)
                                                  *TERMINATED: 08/01/2022*
                                                  *ATTORNEY TO BE NOTICED*

**Petitioner**

**JIM CLYBURN**                     represented by **Douglas N. Letter**
*Honorable*                                       (See above for address)
                                                  *TERMINATED: 01/03/2023*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Todd Barry Tatelman**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

District of Columbia live database

**Michelle S. Kallen**
(See above for address)
*TERMINATED: 08/01/2022*
*ATTORNEY TO BE NOTICED*

**Petitioner**
**STENY HOYER**                    represented by **Douglas N. Letter**
*Honorable*                                                (See above for address)
                                                           *TERMINATED: 01/03/2023*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                   **Todd Barry Tatelman**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Michelle S. Kallen**
                                   (See above for address)
                                   *TERMINATED: 08/01/2022*
                                   *ATTORNEY TO BE NOTICED*

**Petitioner**
**DAVID BUCKLEY**                  represented by **Douglas N. Letter**
                                                    (See above for address)
                                                    *TERMINATED: 01/03/2023*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                   **Todd Barry Tatelman**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Michelle S. Kallen**
                                   (See above for address)
                                   *TERMINATED: 08/01/2022*
                                   *ATTORNEY TO BE NOTICED*

**Petitioner**
**DOUGLAS LETTER**                 represented by **Douglas N. Letter**
                                                    (See above for address)
                                                    *TERMINATED: 01/03/2023*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                   **Todd Barry Tatelman**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Michelle S. Kallen**
                                   (See above for address)

*TERMINATED: 08/01/2022*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**KRISTEN AMERLING**                    represented by  **Douglas N. Letter**
                                        (See above for address)
                                        *TERMINATED: 01/03/2023*
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Todd Barry Tatelman**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Michelle S. Kallen**
                                        (See above for address)
                                        *TERMINATED: 08/01/2022*
                                        *ATTORNEY TO BE NOTICED*

**Petitioner**

**SEAN TONOLLI**                        represented by  **Douglas N. Letter**
                                        (See above for address)
                                        *TERMINATED: 01/03/2023*
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Todd Barry Tatelman**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Michelle S. Kallen**
                                        (See above for address)
                                        *TERMINATED: 08/01/2022*
                                        *ATTORNEY TO BE NOTICED*

**V.**

**Respondent**

**STEPHEN K. BANNON**                   represented by  **David I. Schoen**
                                        DAVID I. SCHOEN, ATTORNEY AT LAW
                                        2800 Zelda Road, Suite 100-6
                                        Montgomery, AL 36106
                                        334-395-6611
                                        Fax: 917-591-7586
                                        Email: dschoen593@aol.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Matthew Evan Corcoran**
                                        SILVERMAN THOMPSON SLUTKIN
                                        WHITE

**-33-**

400 East Pratt Street
Suite 900
Baltimore, MD 21202
410-385-2225
Email: ecorcoran@silvermanthompson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/09/2023 | 12 | TRANSCRIPT OF PROCEEDINGS before Judge Carl J. Nichols, held on July 11, 2022. Page Numbers: 1-153. Date of Issuance: January 9, 2022. Court Reporter: Lorraine Herman. Telephone number: 202-354-3196. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referen ced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/30/2023. Redacted Transcript Deadline set for 2/9/2023. Release of Transcript Restriction set for 4/9/2023.(Herman, Lorraine) (Entered: 01/09/2023) |
| 01/03/2023 | 11 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI. Attorney Douglas N. Letter terminated. (Letter, Douglas) (Entered: 01/03/2023) |
| 01/03/2023 | 10 | NOTICE of Appearance by Todd Barry Tatelman on behalf of PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI (Tatelman, Todd) (Entered: 01/03/2023) |
| 08/01/2022 | 9 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI. Attorney Michelle S. Kallen terminated. (Kallen, Michelle) (Entered: 08/01/2022) |
| 07/12/2022 | | Minute Order and Entry for Proceedings held before Judge Carl J. Nichols: Motion Hearing held on 7/12/2022 re 1 MOTION to Quash. Motion 1 Granted by the Court, for reasons set forth on the record. Court Reporter: Lorraine Herman. (zcal) (Entered: 07/12/2022) |

| 07/06/2022 |   | Set/Reset Hearings: Motion Hearing set for 7/11/2022 at 10:00 AM in Courtroom 19- In Person before Judge Carl J. Nichols. (zcal) (Entered: 07/07/2022) |
| 07/06/2022 |   | MINUTE ORDER. Pending before the Court is the 1 Motion to Quash. The Court will hear oral argument on this motion on Monday, July 11 at 10:00 am, in Courtroom 19. The Court will also hear oral argument in case 21-cr-670 at that time. Signed by Judge Carl J. Nichols on July 6, 2022. (lccjn3) (Entered: 07/06/2022) |
| 07/05/2022 | 8 | REPLY to opposition to motion re 1 MOTION to Quash filed by PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Letter, Douglas) Modified docket relationship on 7/6/2022 (zed). (Entered: 07/05/2022) |
| 06/27/2022 | 7 | Memorandum in opposition to re 1 MOTION to Quash filed by STEPHEN K. BANNON. (Attachments: # 1 Exhibit Transcript of June 1, 2015 Oral Order in United States v. Rainey, # 2 Exhibit Law Review article on U.S. v. Rainey)(Schoen, David) (Entered: 06/27/2022) |
| 06/17/2022 | 6 | NOTICE of Appearance by David I. Schoen on behalf of STEPHEN K. BANNON (Schoen, David) (Entered: 06/17/2022) |
| 06/16/2022 |   | NOTICE OF ERROR The following error(s) need correction: Invalid attorney signature-signature on document must match PACER login. Please refile. (zeg) (Entered: 06/16/2022) |
| 06/16/2022 | 5 | ENTERED IN ERROR.....NOTICE of Appearance by Matthew Evan Corcoran on behalf of STEPHEN K. BANNON (Corcoran, Matthew) Modified on 6/16/2022 (zeg). (Entered: 06/16/2022) |
| 06/16/2022 | 4 | NOTICE of Appearance by Matthew Evan Corcoran on behalf of STEPHEN K. BANNON (Corcoran, Matthew) (Entered: 06/16/2022) |
| 06/15/2022 | 3 | NOTICE of Appearance by Michelle S. Kallen on behalf of PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI (Kallen, Michelle) (Entered: 06/15/2022) |
| 06/15/2022 | 2 | NOTICE of Appearance by Douglas N. Letter on behalf of PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI (Letter, Douglas) (Entered: 06/15/2022) |
| 06/13/2022 | 1 | MOTION to Quash by PETER R. AGUILAR, KRISTEN AMERLING, DAVID BUCKLEY, ELIZABETH L. CHENEY, JIM CLYBURN, STENY HOYER, ADAM D. KINZINGER, DOUGLAS LETTER, SUSAN E. LOFGREN, ELAINE G. LURIA, STEPHANIE MURPHY, NON-PARTY SUBPOENAS, NANCY PELOSI, JAMES B. RASKIN, ADAM B. SCHIFF, BENNIE G. THOMPSON, SEAN TONOLLI. (Attachments: # 1 Exhibits, # 2 Text of Proposed Order)(zeg) (Entered: 06/15/2022) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 04/09/2023 23:11:08 | | | |
| **PACER Login:** | DSchoen593 | **Client Code:** | Bannon |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-mc-00060-CJN |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

-36-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on May 25, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-cr-** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| **STEPHEN K. BANNON,** | : | **VIOLATION:** |
| | : | |
| **Defendant.** | : | **Count 1: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Testimony)** |
| | : | |
| | : | **Count 2: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Papers)** |
| | : | |

**INDICTMENT**

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

**BACKGROUND**

**The Select Committee**

1.    On June 30, 2021, the U.S. House of Representatives (the "House") adopted House Resolution 503, which established the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee").

2.    According to House Resolution 503, the Select Committee's purpose was, in part:

To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors

that fomented such an attack on American representative democracy while engaged in a constitutional process.

3.    One of the Select Committee's functions, as set forth in House Resolution 503, was

to:

> investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to . . . (B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing, and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and (C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation.

4.    House Resolution 503 provided that the Select Committee would issue a final report to the House, which would include recommendations for corrective measures, including possible "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent future similar acts and "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

5.    To accomplish the Select Committee's purposes and fulfill its functions, House Resolution 503, with reference to the rules of the House, authorized the Select Committee, through the Chair of the Select Committee ("Select Committee Chair"), "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."

### The Select Committee Subpoenas Stephen K. Bannon

6.    STEPHEN K. BANNON was a private citizen. For approximately seven months in 2017, more than three years before the events of January 6, 2021, BANNON was employed in the Executive Branch of the U.S. Government as the Chief Strategist and Counselor to the

2

-38-

President.  After departing the White House in 2017, BANNON did not work again in any

Executive Branch or federal government position.

      7.     On September 23, 2021, the Select Committee issued a subpoena to BANNON.

The cover letter to the subpoena stated:

> The Select Committee has reason to believe that you have information relevant to
> understanding important activities that led to and informed the events at the Capitol
> on January 6, 2021.  For example, you have been identified as present at the Willard
> Hotel on January 5, 2021, during an effort to persuade Members of Congress to
> block the certification of the election the next day, and in relation to other activities
> on January 6. . . .  Moreover, you are quoted as stating, on January 5, 2021, that
> "[a]ll hell is going to break loose tomorrow."  Accordingly, the Select Committee
> seeks both documents and your deposition testimony regarding these and multiple
> other matters that are within the scope of the Select Committee's inquiry.

      8.     As described further below, the subpoena required BANNON to appear and

produce documents to the Select Committee on October 7, 2021, and to appear for a deposition

before the Select Committee on October 14, 2021.

      9.     On September 24, 2021, BANNON accepted service of the subpoena through his

attorney.

*The Documents Commanded by the Subpoena*

      10.    The Select Committee's subpoena commanded BANNON to appear on October 7,

2021, at 10:00 a.m., at an office in the U.S. Capitol Complex and "produce the things identified

on the attached schedule touching matters of inquiry committed to [the Select Committee]" and

"not to depart without leave of [the Select Committee]."

      11.    The schedule attached to the subpoena identified 17 categories of "documents and

communications" that BANNON was required to produce relevant to the Select Committee's

authorized investigation of the January 6th attack on the U.S. Capitol.

3

12.    The subpoena also included instructions for compliance with the document demand, titled, "DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS." The instructions directed that, if BANNON could not comply fully with the subpoena by the return date, he should comply "to the extent possible by that date" and provide an explanation and date certain for full compliance; that, if BANNON withheld any documents and communications, he should provide a detailed log of which records were withheld and why; and that, upon completion of BANNON's response to the subpoena, he should provide a written certification that a diligent search had been completed and all responsive documents had been produced.

*The Deposition Commanded by the Subpoena*

13.    The subpoena also commanded that BANNON appear on October 14, 2021, at 10:00 a.m., at an office in the U.S. Capitol Complex and "testify at a deposition touching matters of inquiry committed to [the Select Committee]" and "not to depart without leave of [the Select Committee]."

14.    The subpoena included a copy of the House's "Regulations for the Use of Deposition Authority," which provided, in part, that during a deposition:

> The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. . . . A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction . . . .

4

**-40-**

## BANNON'S Refusal to Comply with the Subpoena

15.     On October 7, 2021, by the 10:00 a.m. deadline, BANNON did not appear before the Select Committee, did not produce documents and communications, did not provide a log of withheld records, did not request an extension of time, and did not certify that he had conducted a diligent search for responsive records. In fact, BANNON had not communicated with the Select Committee in any way since accepting service of the subpoena on September 24, 2021.

16.     Instead, that evening, at 5:05 p.m., seven hours after BANNON had defaulted on the production deadline, BANNON, through his attorney, transmitted a letter ("BANNON's October 7 Letter") to the Select Committee's Chief Counsel. BANNON's October 7 Letter asserted that BANNON would not comply with the subpoena because former President Donald J. Trump had claimed that the subpoena sought records and testimony potentially protected by executive and other privileges and had instructed BANNON, "to the fullest extent permitted by law," to "(a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

17.     The next day, on October 8, 2021, the Select Committee Chair responded to BANNON in writing, rejected BANNON's reasons for non-compliance with the subpoena, and directed BANNON to comply. The Select Committee Chair stated, in part:

        a.     That the instruction from former President Trump appeared "limited to requesting that Mr. Bannon not disclose privileged information" and that it was thus inappropriate not to comply with any of the subpoena's requirements;

5

**-41-**

    b.    That former President Trump's stated "intention to assert those executive privileges" did not provide a legal basis for non-compliance;

    c.    That "virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege";

    d.    That former President Trump had not made any privilege assertion to the Select Committee;

    e.    That BANNON was still obligated to provide documents and a privilege log for any withheld records;

    f.    That the Select Committee expected BANNON to appear for a deposition as commanded by the subpoena, and that "[i]f there are specific questions at that deposition that you believe raise privilege issues, Mr. Bannon should state them at that time for the deposition record for the Select Committee's consideration"; and,

    g.    That if BANNON failed to respond to the subpoena, the Select Committee would view it as "willful non-compliance" that "would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C. §§ 192, 194—which could result in a referral from the House to the Department of Justice for criminal charges."

    18.    At 5:19 p.m. on October 13, 2021, the evening before BANNON was required to appear before the Select Committee for a deposition and five days after receiving the Select Committee Chair's October 8 letter, BANNON, through his attorney, transmitted another letter to the Select Committee Chair ("BANNON's October 13 Letter"). BANNON's October 13 Letter

announced: "Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying."

19.    On October 14, 2021, at 10:00 a.m., BANNON did not appear before the Select Committee to testify.

20.    The following day, on October 15, 2021, the Select Committee Chair sent a letter to BANNON, through his attorney, addressing BANNON's refusal to produce documents or a log of withheld records and his failure to appear for deposition testimony, as required by the subpoena. In the letter, the Select Committee Chair stated, in part:

   a.    That BANNON had "now willfully failed to both produce a single document and to appear for his scheduled deposition. The Select Committee believes that this willful refusal to comply with the Subpoena constitutes a violation of federal law";

   b.    That the Select Committee would meet on Tuesday, October 19, 2021, to consider initiating contempt of Congress procedures based on BANNON's refusal to comply in any way with the subpoena; and,

   c.    That, if there were "any additional issues relating to [BANNON's] non-compliance with the Subpoena that have not been addressed," BANNON should "submit them in writing to the Select Committee by 6:00 p.m. E.S.T. on Monday, October 18, 2021 for the Select Committee's consideration in its deliberations."

7

**-43-**

21.    By 6:00 p.m. on October 18, 2021, BANNON made no substantive submission for the Select Committee's deliberations, did not produce documents and communications, did not provide a log of withheld records, did not certify that he had conducted a diligent search for responsive records, did not appear for a deposition, and did not comply with the subpoena in any way.

## COUNT ONE
### (Contempt of Congress (Testimony)—2 U.S.C. § 192)

22.    The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

23.    On October 14, 2021, in the District of Columbia and elsewhere, the defendant,

### STEPHEN K. BANNON,

having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to appear to give testimony as required by a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to appear for a deposition at 10:00 a.m. on October 14, 2021.

(In violation of Title 2, United States Code, Section 192)

8

-44-

## COUNT TWO
### (Contempt of Congress (Papers)—2 U.S.C. § 192)

24.     The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

25.     By October 18, 2021, in the District of Columbia and elsewhere, the defendant,

### STEPHEN K. BANNON,

having been summoned as a witness by the authority of the U.S. House of Representatives to produce papers upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way with a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to produce documents and communications as delineated therein.

(In violation of Title 2, United States Code, Section 192)

A TRUE BILL

FOREPERSON

*Matthew M. Graves* /jss
**MATTHEW M. GRAVES**
ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

9

**-45-**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                                 CR Action
                                 No. 1:21-670

     vs.

                                 November 15, 2021
                                 Washington, D.C.

STEPHEN K. BANNON,
         Defendant.

---

TRANSCRIPT OF RETURN ON ARREST WARRANT & INITIAL APPEARANCE
**BEFORE THE HONORABLE ROBIN M. MERIWEATHER**
UNITED STATES DISTRICT MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| **For the U.S.:** | **AMANDA ROSE VAUGHN**<br>**MOLLY GULLAND GASTON**<br>**J.P. COONEY**<br>  U.S. ATTORNEYS OFC. FOR D.C.<br>  555 4th Street NW<br>  Washington, DC  20001<br>  202-252-1793 |
| **For the Defendant:** | **DAVID I. SCHOEN**<br>  DAVID I. SCHOEN, ATTORNEY AT LAW<br>  2800 Zelda Road, Suite 100-6<br>  Montgomery, AL  36106<br>  334-395-6611 |
| | **MATTHEW EVAN CORCORAN**<br>  SILVERMAN THOMPSON SLUTKIN WHITE<br>  201 N. Charles Street, 25th Floor<br>  Baltimore, MC  21201 |
| **Reported By:** | **LORRAINE T. HERMAN, RPR, CRC**<br>  Official Court Reporter<br>  U.S. District & Bankruptcy Courts<br>  333 Constitution Avenue, NW<br>  Room 4700-C<br>  Washington, DC 20001<br>  lorraine_herman@dcd.uscourts.gov |

1                     **P R O C E E D I N G S**

2                 **DEPUTY CLERK:**   Criminal case number 2021-670, *The*

3      *United States of America versus Stephen K. Bannon.*

4                 Molly Gaston, Amanda Vaughn and J.P. Cooney,

5      representing the government; David Schoen, Matthew Corcoran

6      representing the defendant.   Andre Sidbury is the pre-trial

7      services officer.   The defendant is participating in person

8      for this hearing.

9                 This case is called for a return on an arrest

10     warrant, an initial appearance and an arraignment.

11                Mr. Bannon, would you please stand and raise your

12     right hand?

13                **THE DEFENDANT:**   (Complied.)

14                **DEPUTY CLERK:**   Do you solemnly swear that you will

15     well and truly answer the questions propounded to you by the

16     Court, so help you God?

17                **THE DEFENDANT:**   I do.

18                **DEPUTY CLERK:**   Thank you.   You may be seated.

19                **THE COURT:**   Mr. Bannon, could you please state

20     your name for the record.

21                **THE DEFENDANT:**   Stephen K. Bannon.

22                **THE COURT:**   Thank you.

23                Do you have any health problems that would make it

24     hard for you to understand what is happening in today's

25     hearing?

1          **THE DEFENDANT:**  I do not.

2          **THE COURT:**  And in the last 24 hours, have you

3     taken any medication or other substances that would affect

4     your ability to understand today's hearing?

5          **THE DEFENDANT:**  I have not.

6          **THE COURT:**  Thank you.

7          You are here today for your initial appearance and

8     your arraignment.  In this hearing I will tell you what you

9     have been charged with.  I will advise you of your rights.

10    I will ensure that you have an attorney to represent you,

11    and I will determine whether and under what conditions you

12    will be released while waiting for your trial.

13         Let me begin by notifying you of the charges.  You

14    have been charged by indictment with one count of Contempt

15    of Congress; that's an alleged violation of 2 United States

16    Code, Section 192.  If you are found guilty of that, you

17    could face up to one year in prison and a fine of up to

18    $1,000.

19         You have also been charged with another count of

20    Contempt of Congress, in violation of 2 United States Code,

21    Section 192; that also carries a maximum term of

22    imprisonment of up to one year and a maximum fine of up to

23    $1,000.

24         Those are the charges that bring you before the

25    Court.  At this time let me notify you of your rights.  You

**-48-**

4

1   have the right to remain silent --

2          **MS. VAUGHN:**  Excuse me, Your Honor.

3          **THE COURT:**  Yes?

4          **MS. VAUGHN:**  We just wanted to clarify the maximum

5   penalties on the offense.  Title 2 U.S.C. Section 192

6   carries a minimum sentence of 30 days imprisonment.

7          **THE COURT:**  Okay.

8          **MS. VAUGHN:**  And also 18 U.S.C. 3571, a maximum

9   fine of $100,000.

10         **THE COURT:**  For both of them?

11         **MS. VAUGHN:**  Yes, Your Honor.

12         **THE COURT:**  Thank you for that clarification.  At

13  this time I will go back to the notification of rights.

14         Mr. Bannon, you have the right to remain silent;

15  that means are you not required to make any statements to

16  law enforcement while these charges are pending against you.

17  If you choose to make statements to law enforcement, your

18  statements could be used against you in this proceeding or

19  in a future proceeding.

20         You also have the right to be represented by an

21  attorney in this case.  If you cannot afford to retain your

22  own attorneys, then I will appoint a lawyer to represent you

23  at no cost to you.

24         You also have the right to a speedy and public

25  jury trial, which your guilt would have to be proven beyond

1      a reasonable doubt, and you cannot be forced to testify

2      against yourself.

3               Mr. Schoen and Mr. Corcoran, are you retained

4      counsel?

5               **MR. SCHOEN:**  Yes, Your Honor.

6               **MR. CORCORAN:**  Yes, Your Honor.

7               **THE COURT:**  Thank you.

8               **MR. SCHOEN:**  Your Honor, may I just raise one,

9      sort of, preliminary housekeeping issue?

10              I know the Court said we are here for an

11     arraignment.  My understanding under Rule 58(b)(3) is that

12     there can't be an arraignment before the Magistrate Judge,

13     even on a misdemeanor, unless the defendant consents in

14     writing to a trial before the Magistrate Judge as well.

15              I just want to be clear that there is no implied

16     waiver here by going forward with an arraignment here.

17     Local Criminal Rule 58 goes to -- is tied, obviously, to

18     Federal Rules of Criminal Procedure 58(b)(3); and that's

19     what 58(b)(3) says.  It's also consistent with 18 U.S.C.

20     3401.

21              I just want to be clear that there is no waiver

22     here of any right to proceed to jury trial or otherwise

23     before the District Court judge.

24              **THE COURT:**  No.  I routinely conduct arraignments.

25     I know this appears to be a Class A misdemeanor.

6

1              **MR. SCHOEN:**  Yes, Your Honor.

2              **THE COURT:**  I conduct felony arraignments all of

3    time, obviously, even if there is no option of consent to

4    proceed before me for felony.  So, no, I'm not requesting --

5    although, I do always ask in these cases if there will be

6    consent, so I can add that part a little bit earlier.

7              This case has been assigned to Judge Nichols as

8    District Judge.  Any defendant charged with a Class A

9    misdemeanor has the right to consent to a United States

10   Magistrate Judge.  And if you wish to do so, that can be

11   done.

12             **MR. SCHOEN:**  Yes, Your Honor.

13             And I completely understand the Court regularly

14   conducts arraignments, especially on felonies.  It shows the

15   misdemeanor provision is different, it's under Rule 58

16   (b)(3), and that's the express provision.

17             In any event, as long as we are not waiving

18   anything, the Court's going to proceed as the Court deems

19   appropriate.

20             **THE COURT:**  Okay.  Thank you.

21             **MR. SCHOEN:**  Thank you, Your Honor.

22             **THE COURT:**  So the next question I was planning to

23   ask on my outline is whether counsel wanted to proceed with

24   the arraignment.  Do you want to proceed with the

25   arraignment before me?  You can also ask to have that

7

1    arraignment before Judge Nichols.

2         **MR. SCHOEN:**   In terms of the arraignment, Your

3    Honor, Mr. Bannon was willing to waive arraignment in any

4    event, but as long as there's no waiver and the Court's

5    satisfied that Rule 58(b)(3) is consistent with that, we

6    will certainly proceed with the arraignment.   We want to,

7    you know -- we want to move forward or we would waive the

8    arraignment, frankly.

9         **THE COURT:**   Just a moment.

10         (Brief pause.)

11         **MS. VAUGHN:**   Your Honor, we are happy to do the

12    arraignment in front of the District Judge, if that's what

13    the defendant prefers.

14         **MR. SCHOEN:**   Okay.

15         **MS. VAUGHN:**   We understand that he is reserving

16    the rights under the rule.   Proceeding with an arraignment

17    before the district judge is fine with the government, if

18    that's what the defendant wishes to do.

19         **MR. SCHOEN:**   We are willing to waive the

20    arraignment in any event, which I think we are allowed to do

21    under Rule 10.

22         **MS. VAUGHN:**   We may end up in the same spot

23    anyway.

24         **THE COURT:**   Thank.

25         I think based on my review of Rule 58, it would be

**-52-**

1    prudent not to do the arraignment.  I do not want the affect

2    of anything I do to be something other than what I am

3    intending.

4              **MR. SCHOEN:**  Thank you, Your Honor.

5              **THE COURT:**  Thank you.

6              My chambers will advise Judge Nichols' chambers

7    that the arraignment was not part of today's proceedings.

8              **MR. SCHOEN:**  Thank you, Your Honor.

9              **THE COURT:**  At this time, I will advise an order

10   of the United States that it must, pursuant to Federal

11   Criminal Rule (5)(f) produce all exculpatory evidence to the

12   defense consistent with *Brady v. Maryland* and its progeny.

13   Failing to do so in a timely manner could lead to sanctions,

14   which could lead to exclusion of evidence, adverse jury

15   instructions, the dismissal of charges or contempt of

16   proceedings.

17             Ms. Kay, is this note the next date before Judge

18   Nichols?

19             **DEPUTY CLERK:**  Yes, Your Honor.

20             **THE COURT:**  Thank you.

21             I'll advise parties, Judge Nichols' next

22   availability for a status hearing in this case is Thursday,

23   November the 18th at 11 a.m.

24             And I believe -- Ms. Kay, does the location --

25   what is it their preference between in person or virtual?

9

1              **DEPUTY CLERK:**  Whatever the parties prefer.

2              **THE COURT:**  Okay.  Thank you.

3          And that can be virtual or in person, depending on

4    the parties' preference.  Should they contact his courtroom

5    deputy to confirm that preference or tell us now?

6              **DEPUTY CLERK:**  Tell us now.

7              **THE COURT:**  Okay.  Thank you.

8              **MS. VAUGHN:**  The government has no preference,

9    Your Honor.  We are happy to do whatever.

10             **MR. SCHOEN:**  We would prefer virtual, Your Honor.

11             **THE COURT:**  Okay.  Thank you.

12         So the next court date before Judge Nichols will

13   be November 18th at 11 a.m., and we will convey to his

14   courtroom deputy that the request will be a virtual hearing.

15   Thank you.

16             **MR. SCHOEN:**  I assume, by the way, it's not going

17   to cause any additional inconvenience if we do it virtual?

18             **DEPUTY CLERK:**  No, sir.

19             **MR. SCHOEN:**  Okay.

20             **THE COURT:**  Does the United States have any

21   requests with respect to conditions of release pending trial

22   or any contention that detention is appropriate in this

23   matter?

24             **MS. VAUGHN:**  No, Your Honor.  The government

25   agrees with the recommendation of Pretrial Services and

1   thinks that's sufficient in this case.

2           **THE COURT:**  So I've reviewed the pretrial report.

3   Pretrial Services' recommendation is general supervision,

4   reporting to pretrial services weekly by telephone,

5   verifying the address with pretrial services immediately or

6   within the next business day, living at the address

7   indicated in the pretrial report, surrendering passports to

8   pretrial services, not obtaining a passport or other

9   international travel document and not applying for or

10  possess any -- possessing any passport.  And then also to

11  notify pretrial services in advance of all travel outside of

12  this district; and that court approval would be necessary

13  for travel outside of the continental United States.

14          Mr. Sidbury, does that accurately summarize the

15  recommendations of Pretrial Services?

16          **PROBATION:**  Andre Sidbury for Pretrial Services.

17  Yes, Your Honor.  And he has verified his address and

18  Pretrial Services is in possession of his passport.

19          **THE COURT:**  Thank you.

20          Does the defense object to any of these

21  recommended conditions of release?

22          **MR. SCHOEN:**  No, Your Honor.

23          **THE COURT:**  Thank you.

24          **MR. SCHOEN:**  Thank you.

25          **THE COURT:**  I conclude that the conditions of

1    release recommended by Pretrial Services in which the United

2    States concurs and to which the defense does not object are

3    appropriate release conditions to govern Mr. Bannon pending

4    trial.

5            Mr. Sidbury, do you -- (brief pause) -- I have a

6    partially-completed form.  I do need to pass this back to

7    pretrial to be signed?  Or completed?  Sorry.  Or I do fill

8    in the rest?

9            **PROBATION:**  Just fill in the rest, Your Honor.

10            **THE COURT:**  Okay.  Thank you.  Okay.

11            So the release conditions are as I had indicated.

12   General supervision with weekly telephone reporting to

13   Pretrial Services, continuing to reside at the address

14   provided in the pretrial report.  I understand the

15   passport's already been surrendered.

16            An additional condition will be to not obtain

17   another passport or international travel document and not

18   apply for or possess a passport.  And then as I indicated,

19   providing notice to pretrial in advance of travel outside of

20   D.C. and court approval being necessary for travel outside

21   of the continental United States.

22            Mr. Schoen or Mr. Corcoran, are there any aspects

23   of those conditions of release that I plan to set that you

24   need me to further explain to your client?

25            **MR. SCHOEN:**  No, Your Honor.

1           **THE COURT:**  And, Mr. Bannon, can you confirm you

2    heard and understood the release conditions?

3           **THE DEFENDANT:**  I did, Your Honor.

4           **THE COURT:**  Thank you.

5       (Proceedings concluded at 2:18 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1

**C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court**

4     **Reporter,** certify that the foregoing is a true and

5     correct  transcript of the audio-recorded proceedings

6     in this matter, audio recorded on October 22, 2022,

7     and transcribed from the audio recording to the best

8     of my ability, and that said transcript has been

9     completed with the audio recording.

10

11

12

13     ___January 24, 2023___          ___/s/_____
              **DATE**                    **Lorraine T. Herman**
14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

              Plaintiff,

      vs.

STEPHEN K. BANNON,

              Defendant.

CR Action
No. 1:21-670

Washington, D.C.
November 18, 2021

11:05 a.m.

TRANSCRIPT OF VIDEO ARRAIGNMENT/STATUS CONFERENCE
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    AMANDA ROSE VAUGHN
                        J.P. COONEY
                        MOLLY GASTON
                          U.S. ATTORNEY'S OFFICE FOR D.C.
                          555 4th Street NW
                          Washington, DC 20001
                        202-252-1793

For the Defendant:    DAVID I. SCHOEN
                        2800 Zelda Road, Suite 100-6
                        Montgomery, AL 36106
                        334-395-6611

                        MATTHEW EVAN CORCORAN
                        SILVERMAN THOMPSON SLUTKIN WHITE
                        201 N Charles Street, 25th Floor
                        Baltimore, MD 21201
                        410-385-2225

Reported By:      LORRAINE T. HERMAN, RPR, CRC
                        Official Court Reporter
                        U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
                        Room 6720
                        Washington, DC 20001
                        202-354-3196

1                    **P R O C E E D I N G S**

2             COURTROOM DEPUTY:  Good morning, Your Honor.  This

3      is criminal case year 2021-670, United States of America

4      versus Stephen K. Bannon, who is present by video.

5             Counsel, please introduce yourselves for the

6      record, beginning with the government.

7             MS. VAUGHN:  Good morning, Your Honor.  Amanda

8      Vaughn, for the United States.  I am here with my colleagues

9      J.P. Cooney and Molly Gaston, who are off the screen.

10            THE COURT:  Good morning, Counsel.

11            MR. CORCORAN:  Good morning, Your Honor.  This is

12     Evan Corcoran.  And Mr. Bannon is with me.  My co-counsel

13     who will introduce himself as well.

14            MR. SCHOEN:  Good morning, Your Honor, David

15     Schoen.

16            THE COURT:  Good morning, Mr. Schoen.

17            MR. SCHOEN:  Good morning, sir.

18            THE COURT:  Just by way of just preliminary,

19     Mr. Corcoran and Mr. Schoen, does your client consent to

20     proceed this morning by video?

21            MR. CORCORAN:  Yes.

22            THE COURT:  Thank you.  I certainly find it is

23     appropriate to do so in light of the Court's current

24     standing orders and the COVID-19 pandemic.

25            My understanding is that the defendant has waived

1    arraignment.  I assume the government has no objection to

2    that.  And I believe the papers here are appropriate.

3    Ms. Vaughn?

4         MS. VAUGHN:  No objection from the government,

5    Your Honor.

6         THE COURT:  That waiver is accepted.  Ms. Vaughn,

7    can you walk me through the government's view, at least, of

8    next steps?

9         MS. VAUGHN:  Yes, Your Honor.  The government

10    would like to set a trial date and set a scheduling order

11    for motion -- for pretrial motion.

12         The government is also ready to produce discovery

13    in this matter.  We provided a draft of the standard

14    protective order in the district to counsel for the

15    defendant on Monday.  We haven't received their position

16    yet, but as soon as that order is in place, we are ready to

17    make the production.  It's less than 200 documents.  Most of

18    it is materials that the defendant already has, because it's

19    his correspondence with the House Committee or his

20    correspondence with counsel for the former President.

21         In our view, this is a very straightforward case

22    about whether or not the defendant showed up.  So we don't

23    see any reason to delay setting a trial date in this matter.

24         THE COURT:  Let's start with the pending motion,

25    which, as I understand, is a motion for protective order and

1     a motion to disclose Grand Jury testimony.

2          Mr. Corcoran, have you had a chance to review

3     those and do you have a position on them?

4          MR. CORCORAN:  Well, they were filed last night

5     and this morning.  Our position, Your Honor, is we would

6     like two weeks to respond.  Ordinarily I would ask for one

7     week, but that would run into the Thanksgiving holiday.

8          With regard, obviously, to Grand Jury testimony, I

9     think we are going to be able to reach agreement with the

10    government and come to a common position that we will be

11    able to file.  That's my expectation.

12         Overall, Mr. Bannon, as you well know, is

13    guaranteed under the constitution, a public trial.  We want

14    to make sure that any documents that are important to the

15    determination of this matter be public, be on the public

16    record.  We think that there is a compelling public interest

17    in having and seeing the documents that are considered

18    crucial to the determination of that case.

19         Obviously, next steps on that are simply just

20    going to be for us to talk further with government counsel

21    and file something with you.

22         THE COURT:  Okay.  So that implicates the broader

23    schedule.  What is Mr. Bannon's view on how long between

24    today's date and the trial date is appropriate?

25         MR. CORCORAN:  Well, obviously, management of your

5

1    calendar is well within your discretion.  I want to mention

2    something for the record that I don't think is widely known.

3    I think it is widely known, my first comment, which is the

4    U.S. District Court for the District of Columbia is one of

5    the most efficient in the country.  It is facing two issues

6    right now, not of its own making.  One is that the pandemic

7    pushed back a lot of trials so that people who are accused

8    are awaiting trial.  And the second is that there are a

9    large number of arrests flowing out of the January 6th

10   event.  Again, a historical number of prosecutions are in

11   the court.

12           As a very practical matter, we are not asking to

13   cut in line; and we understand that that is something that

14   affects the Court's docket.  And from a very practical

15   standpoint, if we were to set a trial date today -- and I

16   don't think we should do that -- if we were to block off a

17   number of weeks in a row, at your earliest available trial

18   date, which may get -- likely would get moved, that could

19   affect a large number of other criminal defendants.

20           I think, specifically, with regard to Mr. Bannon,

21   our main interest is to make sure that he gets a fair trial.

22   He, like every American -- I am now speaking about

23   principles.  You are well aware, I know, but I just want to

24   put on the record, every American is entitled to a fair

25   trial, and that includes the time to go to trial.

1          We need time to review discovery.  Obviously,

2     which we haven't done yet.  And that is consistent with the

3     Sixth Amendment right for every American to be informed of

4     the nature and cause of the accusations against him.

5          In addition, obviously, under the Sixth Amendment

6     every American has the right to confront witnesses against

7     them.  For us, that's going to involve finding out who these

8     witnesses are, reviewing discovery that will help us in

9     cross-examination and so forth.

10         We are also going to have to obtain our own

11    discovery because, as you well know, the prosecution's

12    universe of documents is not the end of the story.  I

13    believe that based on what was said, we are going to have to

14    obtain documents on our own.  We are going to have to do

15    that both from the executive branch, but also for members of

16    Congress, given the nature of the charges in the indictment;

17    and that may take time.  But it will help us to identify --

18         THE COURT:  What question will be at issue at

19    trial with such discovery -- (indiscernible audio)

20         MR. CORCORAN:  Well, an element of offense,

21    obviously, is the authority of the Select Committee.  So we

22    will have to learn exactly what was done in order to bring

23    these charges.  I know that the government has described

24    this as a simple case with only 200 documents, but I think

25    it's an oversimplification, frankly.

7

1          There are complex constitutional issues that are

2     at play.  There are likely to be issues of first impression.

3     And I'll get to that in a moment, because I think it bears

4     on a motions' schedule.  But, you know, if we are going to

5     have to identify witnesses in Mr. Bannon's favor -- and of

6     course, that is a Sixth Amendment constitutional guarantee.

7          I understand that there is some suggestion that,

8     you know, the case ought to be accelerated or it ought to be

9     handled in a more narrow fashion, but we don't agree with

10    that.  I mean, the key here is our ability to identify the

11    documents and the witnesses that will allow us to present a

12    defense for Mr. Bannon.

13         One key thing, and this goes to the idea of a

14    motions briefing, is judicial economy.  There is a case, as

15    you well know, which is pending -- it's right now in the

16    D.C. Circuit, but it's Donald J. Trump in his capacity as

17    the 45th President of the United States versus Bennie

18    Thompson in his official capacity as Chairman of the United

19    States House Select Committee, and that case is a civil

20    case.  So in some ways it is different from this criminal

21    case, but there is going to be overlap in terms of the legal

22    issues.

23         As a civil case, that case has been accelerated,

24    which is appropriate.  And, of course, it is a very

25    different consideration in terms of timing for a criminal

1    defendant.  And as we've emphasized, there is absolutely no

2    reason to accelerate this case.  But that case has an oral

3    argument scheduled before the D.C. Circuit on November 30th,

4    2021.

5          I mention that only because it will be useful, as

6    we are shaping the arguments and the briefs for our motions

7    practice, to have the benefit of the record -- of the

8    judicial record and determinations that are made in that

9    matter.

10          I think I will stop for now, but the overall

11    position here is it really does not make sense today to set

12    a trial date that likely will be moved; that a better course

13    of action and an action that's in the interest of justice

14    would be, as has happened in many criminal cases, to set a

15    further status date after the new year, after the holidays,

16    where we can meet again.  By that time, we will have had a

17    chance to see who, generally, the government's witnesses

18    are, review their documents, and have a better idea of how

19    we can present defenses and what we will need to prepare for

20    an actual trial.

21          There is simply no way right now to know what the

22    length of a trial would be in this case before seeing that.

23    So I just don't think it is prudent to block off dates on

24    the Court's calendar, when we just don't know how many dates

25    are involved.

1          As I said, it would have a compounding effect on

2    many people who -- many other accused who are seeking their

3    day in court, but who for reasons -- you know, that are

4    totally out of the control of the Court, haven't been able

5    to get there.

6          THE COURT:  I just want to make one observation,

7    and then I want to hear from Ms. Vaughn.  It seems to me

8    that I can manage the interplay between this case and the

9    other cases on my docket in a way that will ensure that no

10   one will not have their day in court.

11         Obviously, I am well aware of COVID protocols, the

12   number of January 6th cases that all of the judges in this

13   district are facing with the amount of trials we have is

14   certainly a fact.  I don't think that that is a reason, by

15   itself, to delay the trial here.

16         It does seem to me, however, that we are very

17   early in this matter.  And I am not presently sufficiently

18   informed to know whether the government's view that this is

19   a very, very, very simple case is correct or if Mr. Bannon's

20   view that this case deserves a substantial amount of

21   discovery is correct.

22         Why, Ms. Vaughn, shouldn't I -- or what about the

23   following proposal, which is to set this, not for another

24   status, after the new year, but another status in a few

25   weeks to allow Mr. Bannon to consider the government's

1    pending motion, protective order and grand jury materials,

2    to think about and I hope confer with the government on

3    additional information that Mr. Bannon might seek and

4    perhaps the government might feel the need to disclose.  And

5    then to come back at that next status -- and I am thinking

6    not very long from now, maybe three weeks from now -- and

7    have a discussion about, really, the scope of this matter

8    between now and trial.

9          Because what I am being presented with is, on the

10   one hand, the government's position that this case can go to

11   trial very, very, very soon and on the other hand,

12   Mr. Bannon's view that a lot has to happen between now and

13   then.

14         It's not clear to me that either of those

15   positions is quite correct.  So why not have the parties,

16   perhaps, confer over the next three weeks and come back,

17   have a discussion in about three weeks around -- a more

18   focused discussion, frankly, around exactly what it is that

19   parties think would be an appropriate kind of thing to do to

20   proceed in this matter?

21         MS. VAUGHN:  Your Honor, first I think most of the

22   issues that Mr. Corcoran raised, he cites the need to

23   understand our discovery and who our witnesses are.  So for

24   that reason, we think that the Court should just enter the

25   protective order today.  We can produce those records.

1    He'll see that there are four interview reports in there.

2    And if they feel the need to move to modify it later, we can

3    deal with it then.  But to get the ball rolling, we would

4    like to get the discovery out to them, and we don't see a

5    reason not to enter the protective order today.  But we can

6    do that, because that will help us answer some of these

7    questions.

8            Beyond that, most of the legal issues that

9    Mr. Corcoran is citing to are not actually going to be legal

10   issues that this Court has to decide in this case.  And so

11   he's not going to be entitled to engage in this long

12   investigation, seeking records from other branches of

13   government, and so allowing them to do that on the front end

14   is really going to be a waste of everyone's time.  We think

15   it is more prudent to set a motion schedule with a trial

16   date in mind, and we can start moving through it.  If it

17   becomes necessary to revisit it, we can obviously do that.

18   But we don't think that there is any reason to hold off on

19   doing that today.

20           THE COURT:  Mr. Corcoran, at least as to the

21   protective order, why isn't the government right that I can

22   enter it now while at least the production of discovery can

23   occur.  And then, obviously, if Mr. Bannon has a problem

24   with the protective order, he can come back and ask me to

25   modify it.

1          MR. CORCORAN:  Well, I think we should have

2    further discussions with the prosecution.  If they want to

3    provide the lawyers, for instance, with the documents today

4    on a lawyers' agreement that they will go no further than

5    us, that's fine, so we can get started looking at them.

6          But in terms of an order that would govern

7    documents in this case, as I mentioned, we are just very

8    concerned that there would be the withholding or the

9    keeping from public view of documents where there is a

10   compelling interest in public disclosure.

11         THE COURT:  Ms. Vaughn, what do you say to some

12   limited agreement or protective order that allows the

13   provision of at least the 200 pages that you referenced,

14   counsel get the ball rolling, which allows things to start.

15   And then at least Mr. Corcoran would have some time to

16   consider whether he is going to lodge any objections to the

17   Court.

18         MS. VAUGHN:  Your Honor, we wonder about that

19   because we've now -- we provided the protective order four

20   days ago and tried to confer and didn't get any information

21   from the defense about what their position was.  So we just

22   don't see a need for that.

23         Beyond that, all of these concerns about wanting

24   to make documents public, they haven't been able to make any

25   of those determinations until they do them anyway.  They can

13

1    come back and modify the order later, if they need to.  We

2    think it is best to just enter the protective order, allow

3    us to turn over the documents pursuant to that protective

4    order and have a motions hearing scheduled.

5         THE COURT:  Here is what I will do on both the

6    protective order and the grand jury motion:  The defendant,

7    next Wednesday, the Wednesday before Thanksgiving, to state

8    the filing or -- you know, perhaps there wouldn't be any

9    objection -- whether and to what extent he objects to entry

10   of the orders, both orders, as posed by the government.

11        So those motions I will take under advisement,

12   recognizing that Mr. Bannon may oppose either or both of

13   them, but the opposition is due Wednesday before

14   Thanksgiving.  Obviously, if the government wishes to

15   produce materials before I enter the protective order as

16   proposed, Mr. Corcoran has suggested a way forward for the

17   government to do that.  And I will leave it to the parties

18   to see if a lawyer-to-lawyer arrangement is doable.

19        For present purposes, I will take the motion for

20   protective order under advisement and will consider it with

21   the other motion after Mr. Bannon lodges an objection, if

22   any, by next Wednesday.

23        As to the case more generally, I'm not convinced

24   that I have quite enough before me to decide whether or not

25   this case can proceed, but I also don't think it is

14

1    appropriate to wait, essentially, a month and a half or

2    longer until we take that question up; that is to say, have

3    a status conference as early as January.

4            Instead, what I would like to do, I would like to

5    set this matter for another status on December 7th, and I'll

6    come back to that in a second, and that before that I would

7    like the parties to at least make an effort to meet and

8    confer around the scope of discovery/information that each

9    will be seeking.

10            I get that there will likely be different views

11   and more questions, but what I would very much like to have

12   is a focused set of issues or issues in dispute that can be

13   discussed on December 7th.  And on December 7th, I will take

14   up the question of when this case can be tried.  Whether it

15   can be incredibly quickly or much more slowly or some time

16   in the middle.

17            Are the parties available for another status in

18   this matter on December 7th at either 10 or 11:00 a.m.?

19            MS. VAUGHN:  The government is available at either

20   of those times, Your Honor.

21            MR. CORCORAN:  Yes, Your Honor, at 11:00 a.m.

22            THE COURT:  Okay.  So we will do another status in

23   this matter, December 7th at 11:00 a.m.

24            Again, the parties are directed and are ordered to

25   meet and confer -- I understand there may not be an

-72-

15

1    agreement, but meet and confer around the topics we have

2    discussed today.  In particular, the scope of information

3    and discovery that each will be seeking, what Mr. Bannon

4    will be seeking before trial, the potential length of the

5    trial, if it is possible to know that by the 7th.  I will

6    schedule it for pretrial motion.  And whatever other

7    macro-level questions the parties have either raised today

8    or think are relevant to my consideration on December 7th

9    regarding the trial date.

10        I'm also ordering that no later than the evening

11   of December 6th the parties file a joint status report,

12   regarding the meet and confer.  It need not be long, but it

13   will allow me to reflect upon the parties' respective

14   positions, rather than doing it on the fly on December 7th.

15   Is that relatively clear, Ms. Vaughn?

16        MS. VAUGHN:  Yes, Your Honor.

17        And to help to expedite that, can we have

18   permission from the Court today to turn over the Grand Jury

19   testimony, if the defense does not have an objection to

20   that?  And if the defense can agree here that if we turn

21   over discovery today, it will only be available to the

22   attorneys and not shared beyond that, we can provide that.

23        THE COURT:  Mr. Corcoran, I assume you are willing

24   to agree on the record that discovery from the government

25   between now and entry of the protective order would for be

-73-

1       attorneys' eyes only, and are you willing to agree the

2       government can produce to you grand jury materials?

3                   MR. CORCORAN:  Yes.

4                   THE COURT:  With that, I will enter an oral motion

5       to exchange or disclose grand jury materials from the

6       government to Mr. Bannon but only on an attorneys-eyes-only

7       basis.

8                   MS. VAUGHN:  Yes, Your Honor.

9                   THE COURT:  Any other topics, Ms. Vaughn?

10                  I assume the government believes it would be

11      appropriate to exclude Speedy Trial Act time between today's

12      date and the next status?

13                  MS. VAUGHN:  I think the pending motion is a

14      revision under the Speedy Trial Act, already excluding time

15      for that.  We don't see a basis to provide time beyond what

16      is provided for pending motion.

17                  THE COURT:  That would be the background

18      principle.  And if it's the government's view I need not

19      exclude it, it may be enough.

20                  Mr. Corcoran, do you have a view?

21                  MR. CORCORAN:  Yes.  We believe that the time

22      between this hearing and the next should be excluded for

23      computational purposes of the Speedy Trial Act.

24                  THE COURT:  That is my view.  It may very well be

25      the pending motions by the government are enough to exclude

1    time.  I'm not sure.  But I find that the interests of

2    justice are best served and outweigh the interests of the

3    public and Defendant Bannon in a speedy trial.  The time

4    between today's date and the next status, as we discussed,

5    being a few weeks from today, shall be excluded in computing

6    the time in which the trial must commence in this case under

7    the Speedy Trial Act.

8          Mr. Corcoran, do you have other topics which you

9    would like to raise today?

10          MR. COCORAN:  Just one, Your Honor, and that is, I

11   really want to commend the courtroom personnel around the

12   appearance last Monday, Mr. Bannon's initial appearance.

13   There was a lot of public interest and a lot of people.

14   Your courtroom deputy, the courtroom deputy for Judge

15   Meriweather, did a very professional and excellent job.

16          Aaron Adaway, who is with the Chief Judge, did a

17   very excellent job in terms of logistics.  Mr. Bannon noted

18   that, my cocounsel noted that, I noted that and we simply

19   wanted to here, seeing that kind of excellence in public

20   service, noted for the record.

21          THE COURT:  I wasn't there, as you know, but I

22   have observed their excellence in many ways.  So thank you

23   for saying that.

24          Any other topics we should discuss today, Counsel?

25          MS. VAUGHN:  Not from the government, Your Honor.

18

1          THE COURT:  Mr. Corcoran?

2          MR. CORCORAN:  No.

3          THE COURT:  Thank you, Counsel.

4          MR. CORCORAN:  Thank you, Your Honor.

5          MS. VAUGHN:  Thank you, Your Honor.

6          (Proceedings concluded at 11:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **C E R T I F I C A T E**

2

3            I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8            **Please Note:** This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting .

11

12

13

14    ____**November 23, 2021**____        ___/s/_____

                **DATE**                    **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

             CR Action
     Plaintiff,       No. 1:21-670

    vs.           Washington, D.C.
             December 7, 2021
STEPHEN K. BANNON,

             11:03 a.m.
     Defendant.

TRANSCRIPT OF VIDEO STATUS CONFERENCE
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   AMANDA ROSE VAUGHN
          J.P. COONEY
          MOLLY GASTON
            U.S. ATTORNEY'S OFFICE FOR D.C.
            555 4th Street NW
            Washington, DC 20001
            202-252-1793

For the Defendant:   DAVID I. SCHOEN
            2800 Zelda Road, Suite 100-6
            Montgomery, AL 36106
            334-395-6611

          MATTHEW EVAN CORCORAN
            SILVERMAN THOMPSON SLUTKIN WHITE
            201 N Charles Street, 25th Floor
            Baltimore, MD 21201
            410-385-2225

Reported By:    LORRAINE T. HERMAN, RPR, CRC
          Official Court Reporter
          U.S. District & Bankruptcy Courts
          333 Constitution Avenue, NW
          Room 6720
          Washington, DC 20001
          202-354-3196

2

1              P R O C E E D I N G S

2              **COURTROOM DEPUTY:**  Good morning, Judge Nichols.

3              **THE COURT:**  Good morning, Ms. Harris.  Could you

4    please call this matter.

5              **COURTROOM DEPUTY:**  We are on the record in

6    criminal matter 21-670, United States of America versus

7    Stephen K. Bannon.

8              Present for the government are Amanda Vaughn, J.P.

9    Cooney and Molly Gaston.  Present for the defendant are

10   David Schoen, Matthew Corcoran and Robert Costello.  Also

11   present is the defendant, Mr. Bannon.

12             **THE COURT:**  Thank you, Ms. Harris.

13             Just one little housekeeping thing.  Mr. Corcoran,

14   does your client consent to proceed this morning by

15   videoconference?

16             **MR. CORCORAN:**  Yes.

17             **THE COURT:**  Thank you.

18             I would like to first take up the question of the

19   protective order.  It seems to me that there is a little bit

20   of agreement here and then some disagreement.  I just want

21   to make sure I understand the parties' positions on the

22   various categories of information that would be covered by

23   the government's proposed protective order.  The first is,

24   it seems to me, grand jury materials.

25             Am I right, Mr. Corcoran, that the defendant

1    agrees that it's appropriate to have a protective order that

2    covers materials that were in front of the grand jury or at

3    least the information reflecting that the materials in front

4    of the grand jury should be redacted if they are used

5    publicly or something like that?  At least that is what your

6    filing suggests.

7            **MR. CORCORAN:**  Yes, Your Honor.

8            **THE COURT:**  Yes, that the protective order should

9    cover the grand jury materials or, yes, and that they should

10   be, if used at all, redacted such that grand jury

11   information is not publicly disseminated?

12           **MR. CORCORAN:**  The latter.

13           Essentially we are just asking for the normal

14   treatment, which keeps these grand jury materials secret,

15   unless and until we were to file them, you know, or use them

16   at trial for cross-examination or file them in connection

17   with the case, in which case we would make a motion with you

18   beforehand.

19           **THE COURT:**  Ms. Vaughn, does the government think

20   that is an appropriate position?

21           **MS. VAUGHN:**  Yes, Your Honor.

22           **THE COURT:**  Okay.

23           Then as to personal identifying information or

24   PII, what is the defendant's view about whether that should

25   be treated as sensitive information under the protective

4

1    order?

2           **MR. CORCORAN:**  We agree.  And any court filings

3    that we would make, we would redact personal identifying

4    information such as Social Security numbers, home addresses,

5    telephone numbers, et cetera.

6           **THE COURT:**  And, Ms. Vaughn, I assume the

7    government agrees with that?

8           **MS. VAUGHN:**  Yes, Your Honor.

9           **THE COURT:**  The third category of information is

10   actually not covered by the government's revised protective

11   order and that would be information -- because the

12   government's proposed protective order covers only

13   information, as I understand it, produced by the government

14   to Mr. Bannon, it does not apply to information obtained by

15   Mr. Bannon through other sources, whether public information

16   or obtained in some other manner.  So the protective order

17   doesn't even cover that information.

18           I assume, Mr. Corcoran, you have no problem with

19   that.

20           **MR. CORCORAN:**  Well, if what you are saying, Your

21   Honor, is that materials that come into our possession, not

22   through the government, through discovery, that we are able

23   to handle them as we ordinarily would, I agree with that.

24           **THE COURT:**  Ms. Vaughn, I believe that's the

25   government's intent.

5

1    **MS. VAUGHN:**  Yes, Your Honor, it is.

2    **THE COURT:**  So it seems to me that that leaves

3    non-grand jury, non-PII information produced by the

4    government to the defendant in this case.  The government is

5    proposing not to treat that information as sensitive, as I

6    understand it.  Although I suppose it, in specific

7    categories, could be at some point more sensitive.

8    But in general, the disagreement seems to be that

9    such information, if produced by the government to

10   Mr. Bannon, the limitation is not the sensitive designation

11   limitations but just the general limitation that that

12   information can be used only in this case.

13   Do I have that right, Ms. Vaughn?

14   **MS. VAUGHN:**  Yes, that's right, Your Honor.

15   **THE COURT:**  So let's go through the different

16   categories of information that would be covered or at least,

17   you know, the ones that the government has identified in its

18   reply, for example.

19   So if the government produces to Mr. Bannon in

20   connection with this case, either publicly available

21   information or information that Mr. Bannon likely already

22   has, why would that restriction make sense?

23   **MS. VAUGHN:**  Your Honor, we actually don't -- our

24   intention with the revised protective order would be that it

25   would not apply to those kind of materials.  So anything

6

1    that is publicly available, independent from this case, for

2    which the defendant has obtained by independent means, when

3    the government produces copies of those items, that would

4    not be covered by the proposed protective order.

5         **THE COURT:**  So it's not just that the proposed

6    protective order doesn't cover materials obtained by

7    Mr. Bannon through some other source, but even if the

8    materials are obtained from the government, if those

9    materials were publicly available or were -- I guess I'll

10   put it this way, were known to have been in Mr. Bannon's

11   possession at some point because he was a recipient of a

12   communication or something like that, the government's

13   position is that information, even though produced by the

14   government to Mr. Bannon, is also not subject to the

15   restrictions in the protective order.  Correct?

16        **MS. VAUGHN:**  That's right, Your Honor.

17        **THE COURT:**  Okay.  So what we are really talking

18   about then, is whatever other information is both not grand

19   jury information, not PII, not publicly available, not

20   otherwise in Mr. Bannon's possession for various reasons.

21   And I take it, that's really things like information

22   relating to witnesses.

23        For example, I am looking at Page 3 of your brief,

24   your reply brief, law enforcement reports of witness

25   interviews and internal communications between Select

7

1    Committee staff and really law enforcement database

2    information relating to the defendant.  Those seem to be the

3    three categories that we're talking about now.

4         So, Mr. Corcoran, with respect to those three

5    categories of information, law enforcement reports of

6    witness interviews, internal communication between Select

7    Committee staff and law enforcement database relating to the

8    defendant, why isn't it appropriate to limit the use of that

9    information to use in this case?

10        Again, as I understand it at least, that

11   information, if used in the case, wouldn't have to be filed

12   under seal.  It can be essentially used in any way necessary

13   to Mr. Bannon's defense.  But the one limitation would be

14   its use would have to be tethered to use in this litigation.

15        What is the problem from Mr. Bannon's perspective

16   with that limitation?

17        **MR. CORCORAN:**  Well, first of all, on the fourth

18   category that you just mentioned, law enforcement database

19   information with regard to Mr. Bannon, we don't have any

20   problem with that remaining protected and not being

21   disclosed publicly.

22        But the other three categories we do have a

23   problem with.  The problem is -- and I know the Court has

24   used the phrase "used in this case," but that's not what

25   what was written in the protective order, either one of the

8

1    protective orders that the government submitted to you.  And

2    our problem is that under the current protective order that

3    they're suggesting, they get to stamp something as

4    sensitive, and then we are limited, not just by use in the

5    case, but how we can use it in the case.

6          For instance, their initial submission wouldn't

7    allow -- let's take a generic example of an email that

8    forwards the subpoena from one staff member on the House

9    Select Committee to another member on the House Select

10    Committee.  The government is saying that that is somehow

11    sensitive, that it shouldn't be made public; and that we

12    should be restricted in how we can use that in preparing our

13    defense.

14          To the extent that, as I read the protective

15    order, we couldn't go to another potential witness, such as

16    legislative counsel, somebody that has worked on the Hill

17    and has been doing this for decades and asking them, Take a

18    look at this email.  Was the process followed here proper?

19          **THE COURT:**  That seems to me correct if that

20    document is marked as sensitive.  But I think the government

21    has represented that the only materials right now that it

22    intends to mark as sensitive are grand jury materials and

23    PII.  So the document that you have identified would be

24    marked as sensitive only if it was in front of the grand

25    jury.  If it's produced to you in a form that did not go

1    before the grand jury and it doesn't have a grand jury Bates

2    number on it, or whatever, all of those restrictions you

3    just identified would not be applicable.

4        **MR. CORCORAN:**  Well, if that's the government's

5    position today, it's different than what they've submitted.

6    And I'm happy to hear that.  And it eliminates some of the

7    issues that we would have in terms of the use of the

8    document.

9        I think that the real problem here, from our

10    perspective, is that it's not our burden to show that good

11    cause exists for any protective order.  It's the

12    government's, and they've got to make a specific

13    particularized showing.

14        So in the typical case where there would be

15    restriction on the use of documents that reference, for

16    instance, witness names or witness information or witness

17    positions, it might be a gang case where there has been some

18    actual intimidation of witnesses; that I can understand.

19    There's none of that in this case.  This is a case of U.S.

20    government employees who are, essentially, doing their

21    official duties.

22        And for the government to state that there's some

23    reason, that they haven't expressed yet, as to why these

24    things need to be handled differently, like documents in a

25    gang case, it just doesn't make sense to us.

1    **THE COURT:**  Ms. Vaughn, so do I have the

2    government's position correct, which is that these

3    categories of documents that I have just referenced at Page

4    3 of your reply brief, and in particular law enforcement

5    reports of witness interviews, internal communications

6    between Select Committee staff and law enforcement database

7    information relating to the defendant -- the last category

8    actually sounds like there is no objection to the protective

9    order covering -- am I right, that as to the first two, that

10   is to say law enforcement reports of witness interviews and

11   internal communications between Select Committee staff, that

12   as the government conceives the protective order here, those

13   documents would be marked as sensitive only if they went

14   before the grand jury or they contained PII.  If the

15   particular version of the document didn't go before the

16   grand jury, it would be covered by the protective order, but

17   the limitations for sensitive information would not be

18   applicable; is that right?

19   **MS. VAUGHN:**  That's right, Your Honor.

20   **THE COURT:**  So then that really just raises the

21   question of, Okay, for those versions of the documents that

22   are not sensitive, they can be used in the case, but they

23   can't be used otherwise.

24   And Mr. Corcoran makes the argument that the

25   government still bears the burden of showing why there is

11

1    good cause even for that limitation.  So what is the

2    government's argument as to why documents by definition

3    aren't sensitive -- because they wouldn't be sensitive under

4    the protective order, nevertheless deserve some protection

5    limiting their use to this litigation.  What is the

6    government's basis for that limitation?

7        **MS. VAUGHN:**  Well, Your Honor, there are two

8    reasons for that.  Most importantly, the defendant in his

9    public statements, through his counsel and representatives,

10   has made clear that he intends to make this material

11   available to the public for public discussion and

12   evaluation.

13       He told The Washington Post, quote, Members of the

14   public should make their own independent judgment as to

15   whether the U.S. Department of Justice is committed to a

16   just result based upon all of the facts; and that by their

17   opposition to the protective order they, quote, asked the

18   judge to follow the normal process and allow unfettered

19   access to and use of the documents.  And the defendant also

20   made statements he plans to make this case hell for those

21   involved.

22       So the defendant has shown that he plans to

23   disseminate the materials widely for public comment and

24   review; and that would interfere with the proper procedures

25   in this case.  By putting witness statements out publicly,

1    you expose those witnesses to commentary on their potential

2    testimony.  You allow those witnesses to know what other

3    witnesses are going to say, potentially influencing their

4    testimony at trial.  And for those reasons, a protective

5    order would be appropriate in this case.  This case should

6    be decided in the courtroom through this litigation, not in

7    the media.

8            **THE COURT:**  I just have a question.

9            So imagine I agree with that, and that there are

10   certain categories of information that are not sensitive but

11   they are otherwise subject to the protective order.  If one

12   or the other party wants to file information relating to

13   those categories in a public submission to me, to the Court,

14   they don't have to do so under seal.  Correct?  That would

15   be public.

16           **MS. VAUGHN:**  Correct, Your Honor.

17           If it's part of the litigation in this case, it

18   becomes a judicial record and therefore it is publicly

19   available.

20           **THE COURT:**  Would anything stop one party or the

21   other from, essentially, putting all of the non-sensitive

22   but produced information into a filing in front of me and

23   thereby talking about it?

24           **MS. VAUGHN:**  Your Honor, the parties are under

25   obligations to act in good faith with the Court and only

1   bring before the Court what they believe in good faith to be

2   issues to be resolved by the Court.  So if there is

3   genuinely a need to bring a witness statement to the Court's

4   attention, then obviously that is something the parties can

5   do.

6           The government would submit it would be in

7   violation of the parties obligation as officers of the Court

8   to simply just file something and attach everything just so

9   that it could be in the public record.

10          **THE COURT:**  Thank you.

11          Mr. Corcoran, what is your response to

12  Ms. Vaughn's two-pronged argument as to why it's appropriate

13  to have this potentially modest restriction on these

14  categories of information?

15          Which is to say -- and just to be clear, as I

16  understand it, this is information that would not be

17  designated as sensitive.  So you would be free to use this

18  information to prepare the case and to talk to witnesses and

19  the like, and even to file the information on the public

20  record, but you would be restricted from using that

21  information other than, basically, to litigate this matter.

22          **MR. CORCORAN:**  Your Honor, my response is that

23  that is not a modest restriction.  It's actually a very

24  stringent restriction, and we believe that there has been a

25  motion to intervene by a coalition of members of the press

1    of essentially -- you know, largely leading members of the

2    press.  And they've been uniform in their position that they

3    want a public trial.  They want public access to documents,

4    and there is public interest in this case.

5        What Ms. Vaughn has suggested by her statements is

6    that somehow we on the defense side have an interest in

7    taking the documents that they give us and turning this into

8    a public trial; and that is not our intention at all.

9        What we do want, though, is for the public to have

10   the ability to see how the decisions were made in this case

11   so that -- I think it's a positive thing, actually, that

12   there's public interest in this case that has important and

13   complex constitutional issues at play that involve the

14   interplay between the legislative branch and the executive

15   branch.  From my perspective, that is a positive thing.

16       Has Ms. Vaughn, on behalf of the government, made

17   a showing that would provide good cause for a protective

18   order to keep those documents secret?  We don't believe so.

19   And we think that any protective order in this case would

20   not be a modest one, but would be severe in its limitations

21   on Mr. Bannon's First Amendment and Sixth Amendment rights.

22       **THE COURT:**  Thank you.  So I'll take this under

23   advisement.  I hope to enter a protective order that will

24   probably be not quite in the format of what is proposed by

25   the government, clearly, because I think we've moved in some

15

1    ways away from the parties' perspective positions.  I will

2    take it under advisement.  I will be entering a protective

3    order of some sort because there is agreement as to at least

4    certain categories of information that would be protected as

5    to sensitive --

6         **MR. SCHOEN:**  Judge, if I may, David Schoen.  I

7    just wanted to clarify one point here, by specifying a kind

8    of document to make clear our argument.

9         For example, one of the categories Your Honor

10   mentioned were these internal communications with the

11   Committee.  Let's talk about that type of document or

12   Committee document.  Our view is, those are presumptively --

13   if we get them, they are presumptively public.  These are

14   public servants doing the public's business now.

15        So that document though wouldn't be considered

16   sensitive.  It would be in the all materials category.  And

17   would still be subject to the restrictions in Paragraphs 4

18   through 8, meaning of the modified proposed protective

19   order, ECF 12-1.

20        Meaning it can be shown to witnesses but not to

21   anyone else.  Meaning we can't take notes and disclose our

22   notes on those documents.  Those kinds of restrictions that

23   ordinarily wouldn't be in place if there were no protective

24   order.  Now, if they --

25        **THE COURT:**  Wait.  Wait.  Hold on.  Pause one

1    second.  Where does that limitation you just identified come

2    from?

3         **MR. SCHOEN:**  Paragraphs 4 through 8 of the

4    modified protective order.  The government's proposal, ECF

5    12-1.

6         **THE COURT:**  Right.  No, I understand.  For

7    non-sensitive information.

8         Again, let's take produced documents relating to

9    the Committee's consideration of the contempt citation.

10   Assuming they are produced to the defendant, and they are

11   not designated as sensitive, they would only be subject to

12   Paragraphs 4 through 8.

13        I want you to point me to the specific limitation

14   that you think is limiting on Mr. Bannon's ability to

15   prepare his defense in this case.

16        **MR. SCHOEN:**  No, Your Honor.  I don't think they

17   are limiting on his ability to prepare his defense.  I think

18   they are limiting on the public's right to know --

19        **THE COURT:**  Pause there then.  Wait a second.

20        There is no limitation in here on the filing of

21   such information in court or the use of such information

22   publicly.  They can be attached to -- I mean,

23   hypothetically, if we have litigation around a

24   constitutional claim about what the Committee did or advice

25   of counsel, these documents can and very likely will be put

1    on the public record, and at the time that they are part of

2    the arguments in front of me, will be public.

3         What I think can't happen, at least under the

4    government's proposal, is when those materials are produced

5    to the defendant, that they can be given to the press

6    without regard to whether they are relevant to the

7    litigation or being used in the litigation at all.

8         My question is, I guess, why is that an

9    appropriate outcome here, which is that a record produced to

10   the government **--** sorry **--** by the government to Mr. Bannon,

11   can be used by him, not by definition for litigation,

12   because we already said there is no limitation there, but

13   just for any other purpose.

14        **MR. SCHOEN:**  Yeah.  I think coming from the

15   perspective that the documents are presumptively public, if

16   they are the public business.  However, if there is

17   something -- in my view at least, the way the methodology

18   should work is that if there is something about that

19   Committee communication, since that is what we are talking

20   about, that the government believes to be something that

21   shouldn't be publicly disclosed, it doesn't reach the level

22   of sensitive, by definition or anything, but for some reason

23   it shouldn't be, then it should be incumbent on the

24   government to say, We are producing this internal

25   Congressional Committee report, whatever the communication.

18

1    And we believe this one should be kept away from the press

2    or otherwise.

3          Because, remember, under Paragraph 4, we can only

4    show this to potential witnesses and their counsel,

5    et cetera.  And remember, under Paragraph 5, we are

6    restricted on the notetaking and those sort of things.  I

7    don't think -- this is my view at least -- I don't think,

8    from the public perspective, there should be those

9    restrictions, unless there is specific reason for it.  If

10   someone is at risk, and they can make a showing of that.  I

11   think that should be on a document-by-document basis when

12   they are produced.

13         That is our position, Your Honor.

14         **THE COURT**:  Ms. Vaughn, why is that not a

15   reasonable outcome here, which is you have categories of

16   sensitive information, as to everything else that would be

17   covered by this protective order?

18         Again, I'm recognizing that there are a number of

19   categories of information that as a result of this

20   discussion aren't covered by the protective order at all.

21   But as to those documents that are produced in litigation

22   that would be covered by this protective order, that the

23   government needs to make more of an

24   individualized/particularized showing as to harm rather than

25   just say, essentially, everything that we would produce in

1    these categories is restricted in the way that Paragraphs 4

2    through 8 restrict the defense.

3            Why shouldn't the government have to make a more

4    particularized showing on a document-by-document or at least

5    category-by-category basis?

6            **MS. VAUGHN:**  Your Honor, the government believes

7    that it has made a particularized showing on a

8    category-by-category basis, and that that is sufficient

9    here.

10           So there's two categories of records at issue now.

11   Law enforcement reports of interviews.  And, frankly, I

12   think it would be unprecedented for 302s to start popping up

13   all over the press in a criminal matter.

14           And then the second category is internal

15   communications between Committee staff, which actually are

16   not presumptively public.  So all of those, though, go to

17   this issue of influencing -- improperly influencing

18   witnesses.  It's their communications summarizing what

19   occurred with respect to Mr. Bannon's subpoena.  And it's

20   interviews in which they discuss their memory and experience

21   of the same events.

22           So allowing the defendant to disseminate those to

23   the press will absolutely have the result that these

24   witnesses' potential testimony at trial will be influenced

25   in a way that's not appropriate in a criminal case like

20

1  this.

2          **MR. SCHOEN:**  Your Honor, if I may, Judge.

3          **THE COURT:**  You will get a chance in a second.

4          **MR. SCHOEN:**  Yes, sir.

5          **THE COURT:**  But I take it the government,

6  notwithstanding those concerns, is fine with that

7  information being filed on the public record to the extent

8  that that information is relevant to an issue to be decided.

9          **MS. VAUGHN:**  Yes, Your Honor.

10          **THE COURT:**  Okay.  Mr. Schoen or Mr. Corcoran?

11          **MR. SCHOEN:**  Yes, Your Honor.

12          Your Honor, I suppose on this specific issue it

13  represents a fundamental philosophical difference, frankly.

14  We do believe that the Committee's discussions about

15  Mr. Bannon's subpoena, about why to take this criminal,

16  about taking other virtually unprecedented steps, is the

17  business of the public.

18          And if there is a reason with respect to a

19  specific document, again, that something is at risk that the

20  public shouldn't be exposed to, then the government makes

21  that showing and Your Honor reviews it and makes a

22  determination; that's all.

23          **THE COURT:**  But what about the alternative, which

24  is to say, we are now talking about two categories of

25  documents.  Ms. Vaughn has made her argument about why those

-97-

21

1    categories at least can be presumptively used only in this

2    litigation.  And if the defendant would like to do something

3    more, the defendant is free to ask for relief from the

4    protective order on a document-by-document basis when you

5    are in this category.

6        **MR. CORCORAN:**  Your Honor -- David, if I could.

7        Your Honor, I just want to be very clear in terms

8    of what the government has offered in terms of a

9    particularized showing trying to establish good cause.  And

10   what they've said is that by releasing a document publicly,

11   it would improperly influence witnesses.

12       That does not make any sense for the following

13   reason.  Under Paragraph 4 we would, in any event, be able

14   to show any of our witnesses that very document.  So what

15   the government is saying that somehow the public disclosure

16   of a document would improperly influence or shape a

17   witness's testimony, but actually defense counsel showing it

18   to them is not going to have the same effect.

19       In other words, what they've put forth as their

20   sole, particularized reason justifying this aspect of the

21   protective order is baseless and meritless.

22       **MR. SCHOEN:**  Judge, my answer to your question

23   directly -- to Your Honor's question directly, is that as to

24   -- Your Honor proposed the alternative.  What about if we

25   just then made a showing?  I think my answer to that is, I

1    don't think that's the manner of proceeding that cases like

2    *Dixon* and *Johnson* suggest.

3            But let me say this, Your Honor, we have

4    absolutely no question in our mind that Your Honor is just

5    as sensitive to the public's right to know as we are, and

6    will take that into account in however Your Honor believes

7    is the best way to proceed with respect to those documents

8    on whom the burden should lie, et cetera.

9            **THE COURT:**  Thank you.

10           So as I said, I'll consider these arguments and

11   craft what I believe is an appropriate protective order

12   here.

13           So let's talk now about the overall schedule of

14   the case.  I've obviously -- I don't know if it's obvious

15   but I have reviewed the parties' submissions and the joint

16   status report, which I think was very helpful.

17           I think maybe I'd like to start with you,

18   Mr. Corcoran.

19           **MR. CORCORAN:**  Your Honor, I will have Mr. Schoen

20   speak to this.

21           **THE COURT:**  Okay, Mr. Schoen.  Of course, I

22   understand that there might be an advice of counsel defense

23   here.  I also understand there may be some constitutional

24   arguments made.  But can you tell me more about what

25   specifically the defendant would intend to contend by way of

1     those, what you say are weighty, important separation of

2     powers and other constitutional arguments?

3          I think I need to know a little bit more about how

4     supposedly difficult these questions are going to be before

5     I think about how they will affect the overall trial

6     schedule.

7          **MR. SCHOEN:**  Sure, Your Honor.

8          I preface this by saying not just difficult, but

9     also fact intensive to some degree.  Meaning information is

10    required.  I would divide that, by the way, into information

11    being required for motions to dismiss practice and for trial

12    defenses in the case.

13         I'd like to give a little bit of background.  Here

14    is what I am prepared to do, Judge.  I am prepared to first

15    address Your Honor's question directly, with the caveat, you

16    know, that we have been in this case for three weeks.  The

17    case is only three weeks old.  So I can only go into so many

18    details about those defenses.

19         **THE COURT:**  Right.  And this is not your argument

20    on the motion to dismiss or otherwise.  I am not asking for

21    a full argument.

22         **MR. SCHOEN:**  I understand, Your Honor.

23         What I also want to say I am prepared to do is go

24    a little more specifically into exactly what the kinds of

25    discovery is I believe we would need from the House, from

24

1    the DOJ, from the U.S. Attorneys, what we are talking about

2    here in terms of that body of discovery.

3         So let me go first into maybe the defenses and the

4    motion to dismiss. And then I think I can tie in why I

5    believe specific discovery I would mention is relevant,

6    necessary and time consuming. Would that be an acceptable

7    way of proceeding, Your Honor?

8         **THE COURT:** Yes.

9         **MR. SCHOEN:** All right.

10         So first of all, on the motions to dismiss, I

11    think there are some that are discovery sensitive and some

12    that aren't. But for example, we are going to be asking the

13    case, we made clear in the joint status report, for the

14    grand jury instruction. We clearly have a fundamental

15    difference of viewpoint with the government on the nature of

16    this case from start to finish.

17         The government has said in their papers they see

18    it as a one-day trial. It's basically a strict liability

19    case, according to the government. This is what they said

20    in the first hearing on the 18th. They didn't appear,

21    therefore he is guilty under Section 192.

22         We think that is fundamentally wrong. Yes, there

23    was a case, *Licavoli* in 1961 that said, advice of counsel

24    doesn't apply, for example, in 192 prosecution. First of

25    all, that case is based on an earlier case, *Sinclair*, that's

1    no longer good law.  But in any event, there are a many

2    reason that it doesn't apply, specific to the facts of this

3    case.

4         This is a case with the invocation of privilege.

5    This is a case in which the government was made aware, as

6    the Committee was made aware, Mr. Bannon relied entirely on

7    the advice of counsel.

8         We believe that the grand jury was not instructed

9    correctly as a matter of law in this case.  And advice of

10   counsel is not an affirmative defense to be instructed to

11   grand jury.  It's an element -- it negates an element of the

12   offense.

13        If the government's theory, as they've expressed

14   it at least, in very limited fashion I understand, but on

15   the 18th, is that all that is required is for him to appear.

16   And that is what the grand jury was instructed.

17        We think the indictment would have to be

18   dismissed, and we would make that showing.  That's not

19   something I think that a great deal of discovery is required

20   for.  We would show why, you know, reliance on counsel was

21   relevant here and so on.

22        We believe, again motion to dismiss, the grand

23   jury wasn't given exculpatory evidence.  Again, if this is

24   the government's theory of the case, if just showing up was

25   enough, we imagine at least that the government didn't

1    instruct the grand jury on the status of Office of Legal

2    Counsel opinions, on reliance on Office of Legal Counsel

3    opinions, on defenses like entrapment by estoppel and other

4    entrapment, potentially, efforts to cooperate, reliance on

5    good faith alternative.  These kinds of things that are all

6    part of the package.  So these are motions to dismiss.

7    Again, I don't think they are particularly discovery

8    dependent.

9             But let's talk about no proper legislative

10   purpose; that's a constitutional defense we would raise.

11   It's discussed at length in the, you know, *Mazars* case.  And

12   essentially that defense is that, you know, there are only

13   certain purposes the Committee can be convened for, as the

14   the Court well knows.  It can't issue a subpoena just for

15   the purpose of law enforcement.  It can't use subpoenas to

16   try someone before the Committee for any crime or

17   wrongdoing.  It can't have a general power of inquiry, just

18   for exposure sake.  It can't convict investigations for

19   personal aggrandizement of the members, et cetera.  And

20   recipients maintain all of their constitutional rights,

21   including the right to privilege and so on.  That's clear

22   from the *Mazars* case, 2020.

23             For this defense we need to look at, for example,

24   many, many, many statements made by members of the

25   Committee, which several scholars have suggested -- suggest

1    an unconstitutional purpose, a non-legislative purpose in

2    this case.  But we also would want to see what the Committee

3    talked about on what their agenda was here.  There's a lot

4    of language in Resolution 503 that dresses it up and makes

5    it look like an appropriate purpose, but there is good

6    reason to believe that it wasn't.

7          Selective prosecution, quite frankly, it's a

8    difficult burden, but it is a motion we intend to make.

9    Prosecution based on a partisan political attack, we

10   believe.  Prosecution based oven an attack on First

11   Amendment rights, we believe.  A prosecution based on

12   vindictiveness, we believe.  We need to see things like, you

13   know, the House documents.  We need to see, Why did everyone

14   along the way here go against the well-settled Office of

15   Legal Counsel opinions on a variety of subjects, which again

16   we can go into.

17         I know Your Honor said this is not a forum to

18   argue the motion.

19         **THE COURT:**  I also am very familiar with almost

20   all of those arguments.

21         **MR. SCHOEN:**  Of course, Your Honor.

22         **THE COURT:**  So I don't think you need to elaborate

23   on them.  I just want to understand what you are likely to

24   make.

25         **MR. SCHOEN:**  Yes, Your Honor.

28

1           **THE COURT:**  I get the arguments.

2           **MR. SCHOEN:**  And there are several others like

3      that that we believe require some discovery.  Failure to

4      follow their own rules and protocol potentially.  There is

5      an argument to be made about that potentially.

6           What was the status of privilege, for example,

7      discussed in the Committee?  Because that raises a real

8      separation of powers issue, we believe.  We believe that the

9      executives entitled to determine what documents and

10     information is privileged and we believe that the -- not

11     just we believe.  I mean, this district has said in very

12     strong terms that binding effect on the executive branch of

13     the Office of Legal Counsel opinions.  Those were violated

14     in this case.  We believe we need discovery on how that

15     happened.

16          Now, so those are some of the defenses and motions

17     to dismiss that I think are complicated and fact intensive

18     to some degree.  And if the government, their position in

19     their joint status report was the discovery they believe we

20     are going to ask for -- I'm not sure how they knew, since we

21     didn't know yet exactly and we still don't know.  We are

22     developing our case -- are either not discoverable or not

23     the government's obligation to disclose.

24          I think in the latter case, I think the

25     government's being too narrow in their view of what they are

1     going to be obligated to disclose, and I think that they are

2     being modest about their ability, frankly, to disclose those

3     things.

4          But if the government is right and those things

5     aren't going to be disclosed by the government, that means

6     extensive subpoena practice and motions practice simply

7     about our entitlement to some of these documents.

8          I will move very quickly, Your Honor.  I'm sorry

9     to tie you up, but it is a little bit of a, you know, a

10    complicated process.

11         With respect to the House, for example, this is

12    our view -- by the way I will back up one step further.  I

13    want to make this clear.  We believe that there is no basis

14    for expediting this case whatsoever.  That the government

15    made the decision in this case, an almost unprecedented

16    decision, and certainly an unprecedented decision for the

17    past decades, to go with a criminal prosecution in this

18    case.

19         This is a case in which Mr. Bannon -- I know in

20    the previous proceeding Your Honor said you are not

21    sufficiently familiar with the facts.  I can't give all of

22    the facts now, clearly.  But the Court should know that this

23    is a case in which Mr. Bannon made the offer to go before a

24    civil court.  And if a Court ordered him to comply, he would

25    comply.  But that course wasn't taken.

1          So when this decision was made to go criminal, it

2     no longer was a quest for information; that's for sure.   If

3     this were a case in which the Committee needed to have some

4     knowledge and therefore we needed to move more quickly, that

5     would be one thing.   They made a decision that this is

6     probably the last way to get information, and they had that

7     other option.   This was a radical move that they made.   And

8     we believe for a bad motive.   Those are the kind of things

9     we want to look into.

10          But secondly, of course, by making that decision

11     they triggered a number of constitutional rights that

12     otherwise wouldn't have attended it.   So Mr. Bannon is

13     entitled to all of these things, this discovery, this

14     research, this investigation that both goes to the integrity

15     of their investigation -- meaning the Committee's work in

16     this case, that's *Kyles versus Whitley*, sort of approach --

17     and it goes to his ability to prepare the case.

18          So let's talk about the House.   The House said in

19     some of their public statements they wanted to investigate

20     the root causes of what happened on January 6th.   And

21     everyone understands and agrees.   Momentous episode in

22     American history.   But what we are hearing from the

23     Committee is accusation, public accusation, after

24     accusation.

25          Let me say this, Judge, I don't believe that there

1    is any reasonable person living in a democracy, who would

2    believe that an investigation should be headed up by a

3    person who filed a personal lawsuit against President Trump

4    immediately before being appointed head of the Committee,

5    who in that lawsuit accused President Trump and others of

6    personally injuring him, causing him great personal injury

7    and damage, to then appoint that person to head up an

8    investigative committee, raises some antenna, let's just

9    say.  And then to populate that Committee with other people

10   who have made public statements.

11         Congressman Raskin was the lead prosecutor in the

12   impeachment case.  His mission in that case was to prove

13   that former president Trump and others associated with him

14   were responsible for the events of January 6th.  This is a

15   person on the Committee.  We have reason to question his

16   motivation.  We have reason, when they make public

17   statements extraordinarily accusatory of Mr. Bannon in

18   particular and statements like, We are going to make a point

19   here.  We are going to teach other people a lesson.  We are

20   going to show other people what they need to do by

21   prosecuting Bannon, that we are entitled to know what the

22   processes were within that House Committee.  They've opened

23   the door with those public statements.  We are entitled to

24   know, again, what the House's view was of privilege.

25         You know, the head of the Committee, Chairman

32

1    Thompson, was just on television I believe last night on The

2    Rachel Maddow Show and said, Anyone who comes before this

3    Committee, who exercises -- invokes their Fifth Amendment

4    privilege is basically saying, I did something wrong.

5    That's not right.  That's not how our constitution operates.

6    That is misinformation and disinformation.

7           If that's coming from the Chairman, then we ought

8    to be entitled to know what it is the House Committee

9    members discussed about that.  How they made their decision.

10    Again, these are all focused on the defense and motion to

11    dismiss regarding proper legislative purpose.

12           Judge, I can go on.  I mean, I have pages here of

13    what we need from the House and why.  I assume the Court's

14    got the point.  I can talk a little bit about the U.S.

15    Attorney's Office.  Let me just say this about that.  I will

16    make one point.  I think we are entitled to know why the

17    U.S. Attorney's Office deviated so radically from their past

18    process.

19           Let me just take an exerpt from a letter from

20    former U.S. Attorney Mr. Manchen, just 2015, which he said,

21    this conclusion -- I am reading from Page 6 of it -- this

22    conclusion follows from the Justice Department's

23    long-standing interpretation of Section 194 -- that's the

24    section that refers this case up here -- as preserving the

25    exercise of prosecutorial discretion in the executive

**-109-**

33

1    branch.

2         Now, here, It has long been the position of the

3    department across administrations of both political parties

4    that we will not prosecute an executive branch official

5    under the contempt of Congress statute for withholding

6    subpoenaed documents pursuant to a presidential assertion of

7    executive privilege.

8         And we can show the Court other OLC opinions that

9    say this applies to former members also.  It extends to

10   people outside of the branch even, if the president consults

11   with them, because the president is entitled to.

12        I know the Court is familiar with those

13   principles.  I don't need to go into it.  But the point is,

14   we are entitled to -- there is no question any fair-minded

15   person would raise that there has been a radical deviation

16   from protocol and from the Office of Legal Counsel opinions

17   in this case.  So that's something for the U.S. Attorney's

18   Office to say.

19        And the grand jury, we spoke about already, where

20   they presented with this case, as if it were a case of

21   strict liability, where they are given the exculpatory

22   information *Williams* and other cases require.

23        On the White House, we have an unprecedented

24   situation here, Judge, in which President Biden himself

25   called for the prosecution of Mr. Bannon and people

-110-

1   similarly situated.  He then took back his comments and said

2   he recognized they were inappropriate, leading the Justice

3   Department to make a statement to the effect that they won't

4   be influenced by those kinds of statements.

5          What went on with the White House that the

6   President of the United States weighed in publicly like

7   that?  What kind of influence, if any, did that cause?

8   Those are some ideas, Judge, about some of the kinds of

9   defenses we know about now, only three weeks and change into

10  the case, and why we need some discovery and time.  And if

11  not discovery, then subpoenas and motions practice to

12  litigate.

13         Sorry for talking so long, Judge.

14         **THE COURT**:  Why do you need ten months?

15         **MR. SCHOEN**:  Ten months is not a magic number,

16  Judge.  It's a number that we did based on the length of

17  time cases in this district go and the structure of orders

18  that we culled from, in working backwards through this.  We

19  need an extensive period of time.  And we need time -- it

20  may be if a time is set, we need more time as we go along.

21         I will say this, without any equivocation

22  whatsoever, I think that the government's proposal here,

23  that in six days we need to have to them our requests for

24  formal discovery, putting aside everything else.  As I say,

25  we've been in this case three weeks and change.  We had

35

1    dockets before this.  I have a brief due in the 11th Circuit

2    Friday.  I have a brief due in the Second Circuit next

3    Friday.  So there are just those practical things.

4         But beyond that, I say this unequivocally, the

5    idea of a trial in April, which the government says is six

6    months from indictment -- that in and itself confounded me.

7    I mean, I've tried on each of my hands to figure out how

8    that equals six; that to me is five.  November 12th to April

9    15th, I think is five.  But there's no place in this process

10   for that.

11        So ten months isn't magic.  The October date isn't

12   magic, but it is consistent with practice within this

13   district, based on the statistics and orders in other cases.

14   And, as we said in our joint status report submission, we

15   believe that this case is more complicated and time

16   intensive than your average drug case that goes on a long

17   time.

18        Thank you, Your Honor.

19        **THE COURT:**  Thank you, Mr. Schoen.

20        Ms. Vaughn --

21        **MS. VAUGHN:**  Yes, Your Honor.

22        **THE COURT:**  -- so obviously the defendant intends

23   to raise a host of arguments.  I'm not passing on them right

24   now, of course, but there's a lot of arguments there and

25   some of them are at a minimum unique and complicated.

**-112-**

1          In light of the fact that this is, I believe, not

2     a case through which the Committee could get information.

3     In light of the fact that this is a non-detained misdemeanor

4     defendant, why do we have to go so quickly that we would set

5     an April trial date, which would -- I mean, at a minimum it

6     would mean that the briefing on these questions and the

7     determination on these questions would be extremely fast.

8          I mean, I recognize the government very likely

9     thinks that many of the positions just articulated by

10    Mr. Schoen lack merit.  I get that.  But I have to give them

11    due consideration.  I'm certainly going to be fair about all

12    of them.  And they present not just some legal questions

13    but, at least in theory, some questions that could require

14    information.  And information and discovery, of course, can

15    be time consuming.  So why is April so critical from the

16    government's perspective?

17          **MS. VAUGHN:**  Your Honor, what is critical from the

18    government's perspective is that the public's right to a

19    speedy trial, which is just as well established and

20    recognized as the defendant's, is respected in this case.

21          Mr. Corcoran said moments ago that the public has

22    a strong interest in this case being addressed, and the

23    government agrees.  So the reason the government thinks that

24    we should move faster than the defendant has proposed is to

25    respect the public's right in the resolution of this case,

1    which the government submits is particularly strong here,

2    given that the defendant is charged with conduct involving

3    the defiance of the constitutional authority of a coordinate

4    branch of government.

5         The Supreme Court has said that the purpose of

6    this criminal statute is to vindicate that authority.  So

7    allowing this case to languish for eight months before the

8    defendant even files his first motions, in the government's

9    view, does not serve the public's right to a speedy trial or

10   the purposes of the statute.

11        Second, the issues that Mr. Schoen has raised,

12   first of all it sounds as if they already have a clear

13   understanding of their positions on those issues.  I think

14   Mr. Schoen said that he had pages of information there to

15   share with the Court.

16        Secondly, the discovery that they assert that they

17   need to support those motions, none of which have to do with

18   the merits of the allegations in this case, to be entitled

19   to that discovery, it's well established that the defendant

20   would need to make an initial showing on the merits of the

21   claims for which they think the discovery is necessary to

22   support.

23        The defendant's burden on issues like that, for

24   example -- I will take the grand jury charge as an

25   example -- is high, and it's a heavy burden.  And defendants

38

1    rarely meet the burden to be entitled to additional

2    discovery on that.

3         So the government doesn't see a need to delay

4    filing both the motions to dismiss and within those

5    requiring the defendant to articulate any further discovery

6    he needs and why he is entitled to it; so that on the

7    likelihood that he does not succeed in making the showing

8    that he's entitled to more discovery, the parties and the

9    Court don't have to relitigate the same issues twice.

10        As I said on the grand jury charge, for example,

11   he has to provide particular proof of irregularity within

12   the grand jury before he is entitled to further discovery on

13   that matter.  It is the same with things like selective

14   prosecution or vindictive prosecution.

15        The government has told the defendant and the

16   Court in its status report it does not plan to voluntarily

17   provide these materials to which he is not entitled under

18   Rule 16, Brady or any other traditional discovery

19   obligations.  So he is going to have to move this Court.

20        Given the high burden he has to meet, the

21   government proposes moving directly to motions to dismiss

22   and accompanying motions to compel, to the extent he has

23   them, as soon as possible.  There is no additional work that

24   needs to be done on the front end.

25        **THE COURT:**  What seems somewhat anomalous to me,

1    to be honest, is that in the January 6th criminal cases

2    involving the people who were in the Capitol or committed

3    violence in the Capitol, essentially none of those cases has

4    yet gone to trial for indictments that happened in January

5    and February, including for defendants who are actually

6    detained.

7        And I recognize that there are all sorts of

8    complications in those cases around the scope of discovery

9    and the volume of discovery, but those cases seem in some

10   ways to be -- first of all they are older and second of all

11   they are languishing a little bit.  And then on the other

12   hand, this case, which again is a misdemeanor and a

13   non-detained defendant, the government wants to go at light

14   speed.

15       I'm not suggesting that the public doesn't have a

16   right to a quick and speedy trial, but I also have heard, at

17   least some arguments that will be presented by the defendant

18   that require due consideration.  They may potentially

19   require discovery again.  Again, I'm not deciding that

20   question here.

21       It seems to me though, again, that we don't need

22   10 months to do this.  These issues can either be briefed up

23   in a single set of briefs or in, you know, briefs that then

24   perhaps require some additional work for discovery that

25   would happen -- again, I am not deciding that question now.

1    But 7 months or 8 months from today til trial, rather than

2    10 months, is still a long time in the arc of a criminal

3    case.

4         And so this is where I am on the overall proposals

5    by the parties, this is not really -- I am loathe to suggest

6    that I am merely splitting the difference because that's not

7    what I am doing here.

8         I do think the defendant's proposal for an October

9    trial date is too slow and too long from today.  But I also

10   think the government's proposal of an April trial date

11   doesn't reflect adequately, at least the arguments that will

12   be presented, whether they have merit or not, they still

13   need to be decided.

14        And, frankly, looking at our internal schedule

15   here at the court and my own schedule, both of which are

16   very complicated as a result of having postponed things from

17   COVID and having a number of cases from January 6th stacking

18   up, I think the appropriate thing to do is to try this case

19   in the middle of the summer.

20        And what I am doing, and what I was doing as we

21   were talking just now, is looking at our internal trial

22   calendar, including my own, to see if there are dates by

23   which or during which we could set a two-week trial

24   calendar.  Recognizing that the parties have vastly

25   different views, even about how long the trial might last,

41

1   but to be conservative, so to speak, we might as well pick a

2   two-week period so that at a minimum we cover the longest

3   likely trial here.

4          And to that end, I would like to start this trial

5   on either July 11th or July 18th and have it extend for the

6   next two weeks.  That, of course, is subject to counsel and

7   party availability.

8          Ms. Vaughn, I know the government has said in its

9   papers that it's available any time, but do those weeks work

10  for you and your team?

11          **MS. VAUGHN:**  Yes, Your Honor.

12          **THE COURT:**  Mr. Corcoran or Mr. Schoen?

13          **MR. SCHOEN:**  I think so.  I just want to look up

14  one thing, Your Honor, if I might.  I am fine with it.  It

15  works for me.

16          **MR. CORCORAN:**  Your Honor, July 18th would work

17  for a two-week block.

18          **THE COURT:**  So we are going to set trial in this

19  matter to begin July 18th.  Jury selection will begin that

20  morning at 9 a.m.

21          It seems to me that I have enough information in

22  front of me to set a series of dates that would lead up to

23  trial so that it might in the first instance be better for

24  the parties to try one more time, in light of this trial

25  date being look locked in.

-118-

1          I think to some extent the parties were expressing

2     views for shorter or longer pretrial periods, but now having

3     this trial date, the parties to take another crack at

4     negotiating over and proposing a set of motions and other

5     dates leading up to that trial.

6          Obviously that may not result in agreement, and I

7     will very -- you know, I suspect I will be resolving those

8     questions, but at least we will be focused on getting ready

9     for a July 18th trial.

10          So absent strenuous objection -- and again, I will

11    calendar this for trial in an order today.  But as to the

12    remaining pretrial dates, I would like the parties to meet

13    and confer again and to propose no later than December 16th

14    their respective positions or, of course, agreement if

15    reached on the calendar between today's date and July 18th.

16          And this conversation/discussion has been very

17    helpful because to the extent that there is disagreement, I

18    don't think I will need to have another hearing.  I can just

19    take the parties respective positions and enter an order

20    either December 17th or December 20th.  Okay?

21          Is that clear enough, Ms. Vaughn?

22          **MR. SCHOEN:**  I'm sorry.

23          **THE COURT:**  Ms. Vaughn?

24          **MS. VAUGHN:**  Yes, Your Honor.

25          Just in anticipation of conferring with the

43

1    defendant, does the Court have any views on how much time

2    the Court would like to have to resolve, for example,

3    motions to dismiss in the schedule?

4         **THE COURT:**  Not particularly.  I think as long as

5    there isn't an incredibly short time between the opposition

6    and when the schedule assumes a decision from me, then I

7    think I'm fine.  If the reply comes in that period, and if

8    there's going to be a reply, that's just fine.  It is an

9    important case, and I intend to resolve the issues as they

10   arise quickly.  So I'm not going to sit on things for a

11   month.  Basically, if there's a -- whatever the motion is,

12   whether it's a motion to exclude testimony or it's a motion

13   to dismiss.  So long as the schedule assumes a few weeks at

14   least between opposition and my determination, that would be

15   good.

16        Does that answer your question?

17        **MS. VAUGHN:**  Yes.  Thank you, Your Honor.

18        **THE COURT:**  And I welcome reply briefs.  They are

19   not critical -- or they don't have to be filed, but I

20   certainly welcome them in almost all cases.

21        Mr. Schoen, is this all reasonably clear to you

22   and Mr. Corcoran?

23        **MR. SCHOEN:**  Reasonably clear.  I would like to

24   make one remark before we finish, only because I wanted to

25   respond.  As Your Honor has recognized over and over, it is

1    a serious case.  I just want to respond to one or two things

2    that were said.

3         If I were not clear enough in what I said earlier,

4    because I heard Ms. Vaughn say that our motions don't go to

5    the merits of the case, our motions go to the merits of the

6    case.  Many of them go directly to the merits of this case

7    and the constitutional issues involved in this case.  I want

8    to be clear about that.

9         I also want to be clear, so there is no

10   misunderstanding, Mr. Bannon and everybody else involved in

11   this case believes very strongly in the public's right to a

12   speedy trial.  But maybe even more strongly in the public's

13   right to a fair and full trial, which I know this Court is

14   determined to give in this case.

15        We have a lot of experience where I come from with

16   very speedy trials, and some very bad results because those

17   trials went really too fast.  Anyway, we call this case a

18   misdemeanor, but let's remember, there are four special

19   agents of the FBI assigned to it and three experienced

20   prosecutors.  And at the end of the day if, God forbid,

21   there is a conviction, there is a mandatory jail sentence

22   according to the statute in this case.  So it's a serious

23   case.

24        And the last thing I want to say is, we don't take

25   lightly our request for grand jury proceedings of any kind.

1   But in this case, again, I'm not a betting person and I

2   don't like to -- I don't have a crystal ball, but you know

3   about the old expression of Macy's window.  I bet something

4   to do with Macy's window that we are going to meet our

5   burden as to the grand jury's legal instruction in this

6   case.

7         Because the government itself has said they don't

8   believe advice of counsel applies.  We believe advice of

9   counsel, those reliance defenses, absolutely apply.  And in

10  this case, they are going to make out a defense of

11  entrapment by estoppel and otherwise.  Anyway, I think we

12  will be able to meet our burden getting that grand jury

13  instruction but we will see.

14        **THE COURT**:  We will.

15        Ms. Vaughn, anything else from the government's

16  perspective?

17        **MS. VAUGHN**:  No, Your Honor.

18        **THE COURT**:  Mr. Schoen, anything else from the

19  defendant's perspective or Mr. Corcoran?

20        **MR. SCHOEN**:  No, Your Honor.  Thank you so much

21  for the time.

22        **MR. CORCORAN**:  No.  Thank you, Your Honor.

23        **THE COURT**:  Counsel, so we will deal with the

24  protective order.  We will enter the order or calendar the

25  trial, and then we will look for a status report from the

1    parties by December 16th.

2             Thank you, Counsel.

3             **MR. SCHOEN:**  Your Honor didn't meet Mr. Costello

4    the last time.  Your Honor has just signed an order pro hac

5    vice-ing him in, if that's a verb.  And so I wanted --

6    Mr. Costello is on the call.  I just wanted Your Honor to

7    meet Mr. Costello.

8             **THE COURT:**  Yes.  I believe Ms. Harris recognized

9    him earlier but welcome, Mr. Costello.

10            **MR. COSTELLO:**  Thank you, Your Honor.

11            **MR. SCHOEN:**  Thank you, Ms. Harris.  You did an

12   admirable job filling in.

13            **THE COURT:**  Thank you, Counsel.

14            **MS. VAUGHN:**  Thank you, Your Honor.

15            (Proceedings concluded at 12:03 p.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3              I, Lorraine T. Herman, Official Court

4     Reporter, certify that the foregoing is a true and correct

5     transcript of the record of proceedings in the

6     above-entitled matter.

7

8              Please Note:  This hearing occurred during

9     the COVID-19 pandemic and is therefore subject to the

10    technological limitations of court reporting remotely.

11

12

13

14       December 7, 2021                    /s/
              DATE                     Lorraine T. Herman
15

16

17

18

19

20

21

22

23

24

25
```

**COURTROOM DEPUTY: [1]** 2/4
**MR. CORCORAN: [11]** 2/15 3/6 3/11 4/1 4/19 7/16 9/3 13/21 21/5 22/18 41/15
**MR. SCHOEN: [20]** 15/5 16/2 16/15 17/13 20/1 20/3 20/10 21/21 23/6 23/21 24/8 27/20 27/24 28/1 34/14 41/12 42/21 43/22 46/2 46/10
**MS. VAUGHN: [19]** 3/20 4/7 4/25 5/13 5/22 6/15 10/18 11/6 12/15 12/23 19/5 20/8 35/20 36/16 41/10 42/23 43/16 45/16 46/13
**THE COURT: [47]** 2/11 2/16 3/7 3/18 3/21 4/5 4/8 4/23 5/1 5/14 6/4 6/16 8/18 9/25 10/19 12/7 12/19 13/9 14/21 15/24 16/5 16/18 18/13 20/2 20/4 20/9 20/22 22/8 22/20 23/18 24/7 27/18 27/21 27/25 34/13 35/18 35/21 38/24 41/11 41/17 42/22 43/3 43/17 45/13 45/17 45/22 46/7

**/**
**/s [1]** 47/14

**1**
**10 [2]** 39/22 40/2
**100-6 [1]** 1/16
**11:03 [1]** 1/6
**11th [2]** 35/1 41/5
**12-1 [2]** 15/19 16/5
**12:03 [1]** 46/15
**12th [1]** 35/8
**15th [1]** 35/9
**16 [1]** 38/18
**16th [2]** 42/13 46/1
**1793 [1]** 1/14
**17th [1]** 42/20
**18th [7]** 24/20 25/15 41/5 41/16 41/19 42/9 42/15
**19 [1]** 47/9
**192 [2]** 24/21 24/24
**194 [1]** 32/23
**1961 [1]** 24/23
**1:21-670 [1]** 1/4

**2**
**20001 [2]** 1/14 1/24
**201 [1]** 1/19
**2015 [1]** 32/20
**202-252-1793 [1]** 1/14
**202-354-3196 [1]** 1/24
**2020 [1]** 26/22
**2021 [2]** 1/5 47/14
**20th [1]** 42/20
**21-670 [1]** 2/6
**21201 [1]** 1/19
**2225 [1]** 1/20
**25th [1]** 1/19
**2800 [1]** 1/16

**3**
**302s [1]** 19/12
**3196 [1]** 1/24
**333 [1]** 1/23
**334-395-6611 [1]** 1/17
**36106 [1]** 1/16

**4**
**410-385-2225 [1]** 1/20
**4th [1]** 1/13

**5**
**503 [1]** 27/4
**555 [1]** 1/13

**6**

**6611 [1] 1/17**
**670 [2] 1/4 2/6**
**6720 [1] 1/23**
**6th [4] 30/20 31/14
39/1 40/17**

**A**

**a.m [2] 1/6 41/20**
**ability [5] 14/10
16/14 16/17 29/2
30/17**
**able [3] 4/22 21/13
45/12**
**about [37] 3/24
6/18 7/3 12/23
15/11 16/24 17/18
17/20 20/14 20/15
20/16 20/23 20/24
20/25 21/24 22/13
22/24 23/3 23/5
23/18 24/1 26/9
27/3 28/5 29/2 29/7
30/18 32/9 32/14
32/15 33/19 34/8
34/9 36/11 40/25
44/8 45/3**
**above [1] 47/6**
**above-entitled [1]
47/6**
**absent [1] 42/10**
**absolutely [3]**

19/23 22/4 45/9
**acceptable [1] 24/6**
**access [2] 11/19
14/3**
**accompanying [1]
38/22**
**according [2] 24/19
44/22**
**account [1] 22/6**
**accusation [3]
30/23 30/23 30/24**
**accusatory [1]
31/17**
**accused [1] 31/5**
**across [1] 33/3**
**act [1] 12/25**
**Action [1] 1/3**
**actual [1] 9/18**
**actually [8] 4/10
5/23 10/8 13/23
14/11 19/15 21/17
39/5**
**additional [3] 38/1
38/23 39/24**
**address [1] 23/15**
**addressed [1] 36/22**
**addresses [1] 4/4**
**adequately [1]
40/11**
**administrations [1]
33/3**
**admirable [1]**

46/12
**advice [7] 16/24
22/22 24/23 25/7
25/9 45/8 45/8**
**advisement [2]
14/23 15/2**
**affect [1] 23/5**
**affirmative [1]
25/10**
**after [1] 30/23**
**again [18] 7/10
16/8 18/18 20/19
25/22 25/23 26/7
27/15 31/24 32/10
39/12 39/19 39/19
39/21 39/25 42/10
42/13 45/1**
**against [2] 27/14
31/3**
**agenda [1] 27/3**
**agents [1] 44/19**
**aggrandizement [1]
26/19**
**ago [1] 36/21**
**agree [3] 4/2 4/23
12/9**
**agreement [4] 2/20
15/3 42/6 42/14**
**agrees [4] 3/1 4/7
30/21 36/23**
**AL [1] 1/16**
**all [29] 3/10 7/17**

# A

all... [27]  9/2 11/16
12/21 14/8 15/16
17/7 18/20 19/13
19/16 20/22 24/9
24/10 24/25 25/15
26/5 26/20 27/20
29/21 30/13 32/10
36/11 37/12 39/7
39/10 39/10 43/20
43/21
allegations [1]
37/18
allow [3]  8/7 11/18
12/2
allowing [2]  19/22
37/7
almost [3]  27/19
29/15 43/20
along [2]  27/14
34/20
already [4]  5/21
17/12 33/19 37/12
also [12]  2/10 6/14
11/19 22/23 23/9
23/23 27/2 27/19
33/9 39/16 40/9
44/9
alternative [3]
20/23 21/24 26/5
Although [1]  5/6
am [16]  2/25 6/23

10/9 23/14 23/14
23/20 23/23 27/19
32/21 39/25 40/4
40/5 40/6 40/7
40/20 41/14
AMANDA [2]  1/11
2/8
Amendment [4]
14/21 14/21 27/11
32/3
AMERICA [2]  1/3
2/6
American [1]  30/22
anomalous [1]
38/25
another [4]  8/9
8/15 42/3 42/18
answer [3]  21/22
21/25 43/16
antenna [1]  31/8
anticipation [1]
42/25
any [20]  4/2 7/12
7/19 9/11 14/19
17/13 21/12 21/13
21/14 25/1 26/16
31/1 33/14 34/7
34/21 38/5 38/18
41/9 43/1 44/25
anyone [2]  15/21
32/2
anything [5]  5/25

12/20 17/22 45/15
45/18
Anyway [2]  44/17
45/11
appear [2]  24/20
25/15
APPEARANCES
[1]  1/10
applicable [2]  9/3
10/18
applies [2]  33/9
45/8
apply [5]  4/14 5/25
24/24 25/2 45/9
appoint [1]  31/7
appointed [1]  31/4
approach [1]  30/16
appropriate [10]
3/1 3/20 7/8 12/5
13/12 17/9 19/25
22/11 27/5 40/18
April [5]  35/5 35/8
36/5 36/15 40/10
arc [1]  40/2
are [87]
aren't [4]  11/3
18/20 24/12 29/5
argue [1]  27/18
argument [8]  10/24
11/2 13/12 15/8
20/25 23/19 23/21
28/5

## A

arguments [10] 17/2 22/10 22/24 23/2 27/20 28/1 35/23 35/24 39/17 40/11
arise [1] 43/10
around [2] 16/23 39/8
articulate [1] 38/5
articulated [1] 36/9
as [63]
aside [1] 34/24
ask [2] 21/3 28/20
asked [1] 11/17
asking [4] 3/13 8/17 23/20 24/12
aspect [1] 21/20
assert [1] 37/16
assertion [1] 33/6
assigned [1] 44/19
associated [1] 31/13
assume [3] 4/6 4/18 32/13
assumes [2] 43/6 43/13
Assuming [1] 16/10
attach [1] 13/8
attached [1] 16/22
attack [2] 27/9 27/10

attended [1] 30/12
attention [1] 13/4
Attorney [1] 32/20
ATTORNEY'S [4] 1/13 32/15 32/17 33/17
Attorneys [1] 24/1
authority [2] 37/3 37/6
availability [1] 41/7
available [7] 5/20 6/1 6/9 6/19 11/11 12/19 41/9
Avenue [1] 1/23
average [1] 35/16
aware [2] 25/5 25/6
away [2] 15/1 18/1

## B

back [2] 29/12 34/1
background [1] 23/13
backwards [1] 34/18
bad [2] 30/8 44/16
ball [1] 45/2
Baltimore [1] 1/19
Bankruptcy [1] 1/22
BANNON [20] 1/6 2/7 2/11 4/14 4/15 5/10 5/19 5/21 6/7 6/14 7/19 17/10

25/6 29/19 29/23 30/12 31/17 31/21 33/25 44/10
Bannon's [8] 6/10 6/20 7/13 7/15 14/21 16/14 19/19 20/15
based [7] 11/16 24/25 27/9 27/10 27/11 34/16 35/13
baseless [1] 21/21
basically [4] 13/21 24/18 32/4 43/11
basis [6] 11/6 18/11 19/5 19/8 21/4 29/13
Bates [1] 9/1
be [110]
bears [1] 10/25
because [15] 4/11 6/11 11/3 14/25 15/3 17/12 18/3 28/7 33/11 40/6 42/17 43/24 44/4 44/16 45/7
becomes [1] 12/18
been [10] 6/10 8/17 9/17 13/24 14/2 23/16 33/2 33/15 34/25 42/16
before [14] 1/8 9/1 10/14 10/15 13/1

## B

before... [9]  23/4 26/16 29/23 31/4 32/2 35/1 37/7 38/12 43/24
beforehand [1]  3/18
begin [2]  41/19 41/19
behalf [1]  14/16
being [9]  7/20 17/7 20/7 23/11 28/25 29/2 31/4 36/22 41/25
believe [32]  4/24 13/1 13/24 14/18 18/1 20/14 22/11 23/25 24/5 25/8 25/22 27/6 27/10 27/11 27/12 28/3 28/8 28/8 28/10 28/11 28/14 28/19 29/13 30/8 30/25 31/2 32/1 35/15 36/1 45/8 45/8 46/8
believes [4]  17/20 19/6 22/6 44/11
best [1]  22/7
bet [1]  45/3
better [1]  41/23
betting [1]  45/1
between [9]  6/25

7/6 10/6 10/11 14/14 19/15 42/15 43/5 43/14
beyond [1]  35/4
Biden [1]  33/24
binding [1]  28/12
bit [6]  2/19 23/3 23/13 29/9 32/14 39/11
block [1]  41/17
body [1]  24/2
both [5]  6/18 30/14 33/3 38/4 40/15
Brady [1]  38/18
branch [7]  14/14 14/15 28/12 33/1 33/4 33/10 37/4
brief [5]  6/23 6/24 10/4 35/1 35/2
briefed [1]  39/22
briefing [1]  36/6
briefs [3]  39/23 39/23 43/18
bring [2]  13/1 13/3
burden [10]  9/10 10/25 22/8 27/8 37/23 37/25 38/1 38/20 45/5 45/12
business [3]  15/14 17/16 20/17

## C

calendar [5]  40/22 40/24 42/11 42/15 45/24
call [3]  2/4 44/17 46/6
called [1]  33/25
can [26]  5/12 7/12 8/5 8/12 9/18 10/22 13/4 15/20 16/22 16/25 17/5 17/11 18/3 18/10 21/1 22/24 23/17 24/4 26/13 27/16 32/12 32/14 33/8 36/14 39/22 42/18
can't [8]  10/23 15/21 17/3 26/14 26/15 26/17 26/18 29/21
Capitol [2]  39/2 39/3
CARL [1]  1/8
case [91]
cases [10]  22/1 33/22 34/17 35/13 39/1 39/3 39/8 39/9 40/17 43/20
categories [18]  2/22 5/7 5/16 7/3 7/5 7/22 10/3 12/10 12/13 13/14 15/4

# C

categories... [7] 15/9 18/15 18/19 19/1 19/10 20/24 21/1

category [10] 4/9 7/18 10/7 15/16 19/5 19/5 19/8 19/8 19/14 2 1/5

category-by-category [2] 19/5 19/8

cause [5] 9/11 11/1 14/17 21/9 34/7

causes [1] 30/20

causing [1] 31/6

caveat [1] 23/15

certain [3] 12/10 15/4 26/13

certainly [3] 29/16 36/11 43/20

certify [1] 47/4

cetera [4] 4/5 18/5 22/8 26/19

Chairman [2] 31/25 32/7

chance [1] 20/3

change [2] 34/9 34/25

charge [2] 37/24 38/10

charged [1] 37/2

Charles [1] 1/19

Circuit [2] 35/1 35/2

citation [1] 16/9

civil [1] 29/24

claim [1] 16/24

claims [1] 37/21

clarify [1] 15/7

clear [14] 11/10 13/15 15/8 21/7 24/13 26/21 29/13 37/12 42/21 43/21 43/23 44/3 44/8 44/9

clearly [3] 14/25 24/14 29/22

client [1] 2/14

coalition [1] 13/25

COLUMBIA [1] 1/1

come [3] 4/21 16/1 44/15

comes [2] 32/2 43/7

coming [2] 17/14 32/7

comment [1] 11/23

commentary [1] 12/1

comments [1] 34/1

committed [2] 11/15 39/2

committee [29] 7/1 7/7 8/9 8/10 10/6

10/11 15/11 15/12 16/24 17/19 17/25 19/15 25/6 26/13 26/16 26/25 27/2 28/7 30/3 30/23 31/4 31/8 31/9 31/15 31/22 31/25 32/3 32/8 36/2

Committee's [3] 16/9 20/14 30/15

communication [4] 6/12 7/6 17/19 17/25

communications [6] 6/25 10/5 10/11 15/10 19/15 19/18

compel [1] 38/22

complex [1] 14/13

complicated [5] 28/17 29/10 35/15 35/25 40/16

complications [1] 39/8

comply [2] 29/24 29/25

conceives [1] 10/12

concerns [1] 20/6

concluded [1] 46/15

conclusion [2] 32/21 32/22

conduct [1] 37/2

# C

confer [1]  42/13
CONFERENCE [1]
1/8
conferring [1]
42/25
confounded [1]
35/6
Congress [1]  33/5
Congressional [1]
17/25
Congressman [1]
31/11
connection [2]  3/16
5/20
consent [1]  2/14
conservative [1]
41/1
consider [1]  22/10
consideration [3]
16/9 36/11 39/18
considered [1]
15/15
consistent [1]  35/12
constitution [2]
1/23 32/5
constitutional [9]
14/13 16/24 22/23
23/2 26/10 26/20
30/11 37/3 44/7
consults [1]  33/10
consuming [2]  24/6

36/15
contained [1]  10/14
contempt [2]  16/9
33/5
contend [1]  22/25
convened [1]  26/13
conversation [1]
42/16
conversation/discus
sion [1]  42/16
convict [1]  26/18
conviction [1]
44/21
COONEY [2]  1/12
2/9
cooperate [1]  26/4
coordinate [1]  37/3
copies [1]  6/3
CORCORAN [15]
1/18 2/10 2/13 2/25
4/18 7/4 10/24
13/11 20/10 22/18
36/21 41/12 43/22
45/19 45/22
correct [6]  6/15
8/19 10/2 12/14
12/16 47/4
correctly [1]  25/9
Costello [6]  2/10
46/3 46/6 46/7 46/9
46/10
could [7]  2/3 5/7

13/9 21/6 36/2
36/13 40/23
couldn't [1]  8/15
counsel [21]  8/16
11/9 16/25 18/4
21/17 22/22 24/23
25/7 25/10 25/20
26/2 26/2 27/15
28/13 33/16 41/6
45/8 45/9 45/23
46/2 46/13
course [8]  22/21
27/21 29/25 30/10
35/24 36/14 41/6
42/14
court [29]  1/1 1/22
2/3 4/2 7/23 12/13
12/25 13/1 13/2
13/7 16/21 26/14
29/22 29/24 29/24
33/8 33/12 37/5
37/15 38/9 38/16
38/19 40/15 43/1
43/2 44/13 46/13
47/3 47/10
Court's [2]  13/3
32/13
courtroom [2]  2/2
12/6
Courts [1]  1/22
cover [4]  3/9 4/17
6/6 41/2

**C**

covered [8]  2/22 4/10 5/16 6/4 10/16 18/17 18/20 18/22
covering [1]  10/9
covers [2]  3/2 4/12
COVID [2]  40/17 47/9
COVID-19 [1]  47/9
CR [1]  1/3
crack [1]  42/3
craft [1]  22/11
CRC [1]  1/21
crime [1]  26/16
criminal [9]  2/6 19/13 19/25 20/15 29/17 30/1 37/6 39/1 40/2
critical [3]  36/15 36/17 43/19
cross [1]  3/16
cross-examination [1]  3/16
crystal [1]  45/2
culled [1]  34/18
current [1]  8/2

**D**

D.C [2]  1/5 1/13
damage [1]  31/7
database [4]  7/1 7/7 7/18 10/6

date [8]  35/11 36/5 40/9 40/10 41/25 42/3 42/15 47/14
dates [4]  40/22 41/22 42/5 42/12
DAVID [4]  1/15 2/10 15/6 21/6
day [2]  24/18 44/20
days [1]  34/23
DC [2]  1/14 1/24
deal [2]  25/19 45/23
decades [2]  8/17 29/17
December [6]  1/5 42/13 42/20 42/20 46/1 47/14
decided [3]  12/6 20/8 40/13
deciding [2]  39/19 39/25
decision [8]  29/15 29/16 29/16 30/1 30/5 30/10 32/9 43/6
decisions [1]  14/10
defendant [30]  1/7 1/15 2/9 2/11 2/25 5/4 6/2 7/2 7/8 10/7 11/8 11/19 11/22 16/10 17/5 19/22 21/2 21/3 22/25 35/22 36/4 36/24

37/2 37/8 37/19 38/5 38/15 39/13 39/17 43/1
defendant's [5] 3/24 36/20 37/23 40/8 45/19
defendants [2] 37/25 39/5
defense [14]  7/13 8/13 14/6 16/15 16/17 19/2 21/17 22/22 25/10 26/10 26/12 26/23 32/10 45/10
defenses [7]  23/12 23/18 24/3 26/3 28/16 34/9 45/9
defiance [1]  37/3
definition [3]  11/2 17/11 17/22
degree [2]  23/9 28/18
delay [1]  38/3
democracy [1]  31/1
department [3] 11/15 33/3 34/3
Department's [1] 32/22
dependent [1]  26/8
DEPUTY [1]  2/2
deserve [1]  11/4
designated [2]

-132-

# D

designated... [2]
13/17 16/11
designation [1]
5/10
details [1]  23/18
detained [3]  36/3
39/6 39/13
determination [3]
20/22 36/7 43/14
determine [1]  28/9
determined [1]
44/14
developing [1]
28/22
deviated [1]  32/17
deviation [1]  33/15
did [7]  8/25 16/24
27/13 32/4 34/7
34/16 46/11
didn't [5]  10/15
24/20 25/25 28/21
46/3
difference [3]  20/13
24/15 40/6
different [3]  5/15
9/5 40/25
differently [1]  9/24
difficult [3]  23/4
23/8 27/8
directly [5]  21/23
21/23 23/15 38/21

44/6
disagreement [3]
2/20 5/8 42/17
disclose [4]  15/21
28/23 29/1 29/2
disclosed [3]  7/21
17/21 29/5
disclosure [1]  21/15
discoverable [1]
28/22
discovery [27]  4/22
23/25 24/2 24/5
24/11 25/19 26/7
28/3 28/14 28/19
30/13 34/10 34/11
34/24 36/14 37/16
37/19 37/21 38/2
38/5 38/8 38/12
38/18 39/8 39/9
39/19 39/24
discretion [1]  32/25
discuss [1]  19/20
discussed [3]  26/11
28/7 32/9
discussion [3]
11/11 18/20 42/16
discussions [1]
20/14
disinformation [1]
32/6
dismiss [12]  23/11
23/20 24/4 24/10

25/22 26/6 28/17
32/11 38/4 38/21
43/3 43/13
dismissed [1]  25/18
disseminate [2]
11/23 19/22
disseminated [1]
3/11
district [7]  1/1 1/1
1/9 1/22 28/11
34/17 35/13
divide [1]  23/10
Dixon [1]  22/2
do [19]  5/13 7/22
10/1 12/14 13/5
14/9 20/14 21/2
23/14 23/23 31/20
34/14 36/4 37/17
39/22 40/8 40/18
41/9 45/4
dockets [1]  35/1
document [18]  8/20
8/23 9/8 10/15 15/8
15/11 15/12 15/15
18/11 18/11 19/4
19/4 20/19 21/4
21/4 21/10 21/14
21/16
document-by-docu
ment [3]  18/11 19/4
21/4
documents [21]

**D**

documents... [21]
9/15 9/24 10/3
10/13 10/21 11/2
11/19 14/3 14/7
14/18 15/22 16/8
16/25 17/15 18/21
20/25 22/7 27/13
28/9 29/7 33/6
does [10] 2/14 3/19
4/14 16/1 21/12
37/9 38/7 38/16
43/1 43/16
doesn't [10] 4/17
6/6 9/1 9/25 17/21
24/24 25/2 38/3
39/15 40/11
doing [6] 8/17 9/20
15/14 40/7 40/20
40/20
DOJ [1] 24/1
don't [23] 5/23 7/19
12/14 14/18 16/16
18/7 18/7 22/1
22/14 26/7 27/22
28/21 30/25 33/13
38/9 39/21 42/18
43/19 44/4 44/24
45/2 45/2 45/7
done [1] 38/24
door [1] 31/23
dresses [1] 27/4

drug [1] 35/16
due [4] 35/1 35/2
36/11 39/18
during [2] 40/23
47/8
duties [1] 9/21

**E**

each [1] 35/7
earlier [3] 24/25
44/3 46/9
ECF [2] 15/19 16/4
effect [3] 21/18
28/12 34/3
efforts [1] 26/4
eight [1] 37/7
either [6] 5/20 7/25
28/22 39/22 41/5
42/20
elaborate [1] 27/22
element [2] 25/11
25/11
eliminates [1] 9/6
clsc [6] 15/21 18/16
34/24 44/10 45/15
45/18
email [2] 8/7 8/18
employees [1] 9/20
end [3] 38/24 41/4
44/20
enforcement [10]
6/24 7/1 7/5 7/7
7/18 10/4 10/6

10/10 19/11 26/15
enough [4] 25/25
41/21 42/21 44/3
enter [3] 14/23
42/19 45/24
entering [1] 15/2
entirely [1] 25/6
entitled [15] 28/9
30/13 31/21 31/23
32/8 32/16 33/11
33/14 37/18 38/1
38/6 38/8 38/12
38/17 47/6
entitlement [1]
29/7
entrapment [3]
26/3 26/4 45/11
episode [1] 30/21
equals [1] 35/8
equivocation [1]
34/21
essentially [8] 3/13
7/12 9/20 12/21
14/1 18/25 26/12
39/3
establish [1] 21/9
established [2]
36/19 37/19
estoppel [2] 26/3
45/11
et [4] 4/5 18/5 22/8
26/19

# E

et cetera [4]  4/5
 18/5 22/8 26/19
evaluation [1]
 11/12
EVAN [1]  1/18
even [9]  4/17 6/7
 6/13 11/1 13/19
 33/10 37/8 40/25
 44/12
event [2]  21/13 25/1
events [2]  19/21
 31/14
everybody [1]
 44/10
everyone [2]  27/13
 30/21
everything [4]  13/8
 18/16 18/25 34/24
evidence [1]  25/23
exactly [2]  23/24
 28/21
examination [1]
 3/16
example [13]  5/18
 6/23 8/7 15/9 24/12
 24/24 26/23 28/6
 29/11 37/24 37/25
 38/10 43/2
exclude [1]  43/12
exculpatory [2]
 25/23 33/21

executive [5]  14/14
 28/12 32/25 33/4
 33/7
executives [1]  28/9
exercise [1]  32/25
exercises [1]  32/3
exerpt [1]  32/19
exists [1]  9/11
expediting [1]
 29/14
experience [2]
 19/20 44/15
experienced [1]
 44/19
expose [1]  12/1
exposed [1]  20/20
exposure [1]  26/18
expressed [2]  9/23
 25/13
expressing [1]  42/1
expression [1]  45/3
extend [1]  41/5
extends [1]  33/9
extensive [2]  29/6
 34/19
extent [5]  8/14 20/7
 38/22 42/1 42/17
extraordinarily [1]
 31/17
extremely [1]  36/7

# F

fact [4]  23/9 28/17
 36/1 36/3
facts [4]  11/16 25/2
 29/21 29/22
Failure [1]  28/3
fair [3]  33/14 36/11
 44/13
fair-minded [1]
 33/14
faith [3]  12/25 13/1
 26/5
familiar [3]  27/19
 29/21 33/12
fashion [1]  25/14
fast [2]  36/7 44/17
faster [1]  36/24
FBI [1]  44/19
February [1]  39/5
few [1]  43/13
Fifth [1]  32/3
figure [1]  35/7
file [5]  3/15 3/16
 12/12 13/8 13/19
filed [4]  7/11 20/7
 31/3 43/19
files [1]  37/8
filing [4]  3/6 12/22
 16/20 38/4
filings [1]  4/2
filling [1]  46/12
fine [4]  20/6 41/14

## F

**fine...** [2]  43/7 43/8
**finish** [2]  24/16
43/24
**first** [15]  2/18 2/23
7/17 10/9 14/21
23/14 24/3 24/10
24/20 24/24 27/10
37/8 37/12 39/10
41/23
**five** [2]  35/8 35/9
**Floor** [1]  1/19
**focused** [2]  32/10
42/8
**follow** [2]  11/18
28/4
**followed** [1]  8/18
**following** [1]  21/12
**follows** [1]  32/22
**forbid** [1]  44/20
**foregoing** [1]  47/4
**form** [1]  8/25
**formal** [1]  34/24
**format** [1]  14/24
**former** [3]  31/13
32/20 33/9
**forth** [1]  21/19
**forum** [1]  27/17
**forwards** [1]  8/8
**four** [1]  44/18
**fourth** [1]  7/17
**frankly** [5]  19/11

20/13 27/7 29/2
40/14
**free** [2]  13/17 21/3
**Friday** [2]  35/2
35/3
**front** [7]  3/2 3/3
8/24 12/22 17/2
38/24 41/22
**full** [2]  23/21 44/13
**fundamental** [2]
20/13 24/14
**fundamentally** [1]
24/22
**further** [3]  29/12
38/5 38/12

## G

**gang** [2]  9/17 9/25
**GASTON** [2]  1/12
2/9
**general** [3]  5/8 5/11
26/17
**generic** [1]  8/7
**genuinely** [1]  13/3
**get** [7]  8/3 15/13
20/3 28/1 30/6 36/2
36/10
**getting** [2]  42/8
45/12
**give** [5]  14/7 23/13
29/21 36/10 44/14
**given** [5]  17/5 25/23
33/21 37/2 38/20

**go** [22]  5/15 8/15
8/25 10/15 19/16
23/17 23/23 24/3
27/14 27/16 29/17
29/23 30/1 32/12
33/13 34/17 34/20
36/4 39/13 44/4
44/5 44/6
**God** [1]  44/20
**goes** [3]  30/14
30/17 35/16
**going** [17]  12/3
21/18 23/4 24/12
28/20 29/1 29/5
31/18 31/19 31/20
36/11 38/19 41/18
43/8 43/10 45/4
45/10
**gone** [1]  39/4
**good** [12]  2/2 2/3
9/10 11/1 12/25
13/1 14/17 21/9
25/1 26/5 27/5
43/15
**got** [2]  9/12 32/14
**government** [55]
**government's** [22]
2/23 4/10 4/12 4/25
6/12 9/4 9/12 10/2
11/2 11/6 16/4 17/4
25/13 25/24 28/23
28/25 34/22 36/16

## G

**government's...** [4]
36/18 37/8 40/10
45/15
**grand** [27] 2/24 3/2
3/4 3/9 3/10 3/14
5/3 6/18 8/22 8/24
9/1 9/1 10/14 10/16
24/14 25/8 25/11
25/16 25/22 26/1
33/19 37/24 38/10
38/12 44/25 45/5
45/12
**great** [2] 25/19 31/6
**guess** [2] 6/9 17/8
**guilty** [1] 24/21

## H

**hac** [1] 46/4
**had** [3] 30/6 34/25
37/14
**hand** [1] 39/12
**handle** [1] 4/23
**handled** [1] 9/24
**hands** [1] 35/7
**happen** [2] 17/3
39/25
**happened** [3] 28/15
30/20 39/4
**happy** [1] 9/6
**harm** [1] 18/24
**Harris** [4] 2/3 2/12

46/8 46/11
**has** [35] 5/17 5/22
6/2 7/23 8/16 8/17
8/21 9/17 11/10
11/22 13/24 14/5
14/12 14/16 19/7
20/25 21/8 24/17
28/11 33/2 33/15
36/21 36/24 37/5
37/11 38/11 38/15
38/20 38/22 39/3
41/8 42/16 43/25
45/7 46/4
**have** [59]
**haven't** [1] 9/23
**having** [3] 40/16
40/17 42/2
**he** [20] 6/11 11/10
11/13 11/20 11/22
24/21 29/24 32/20
34/1 34/2 37/14
38/6 38/6 38/7
38/11 38/12 38/17
38/19 38/20 38/22
**he's** [1] 38/8
**head** [3] 31/4 31/7
31/25
**headed** [1] 31/2
**hear** [1] 9/6
**heard** [2] 39/16
44/4
**hearing** [4] 24/20

30/22 42/18 47/8
**heavy** [1] 37/25
**hell** [1] 11/20
**helpful** [2] 22/16
42/17
**her** [2] 14/5 20/25
**here** [27] 2/20 8/18
9/9 10/12 15/7
16/20 17/9 18/15
19/9 22/12 22/23
23/13 24/2 25/21
27/3 27/14 31/19
32/12 32/24 33/2
33/24 34/22 37/1
39/20 40/7 40/15
41/3
**HERMAN** [3] 1/21
47/3 47/14
**high** [2] 37/25
38/20
**Hill** [1] 8/16
**him** [8] 17/11 25/15
29/24 31/6 31/6
31/13 46/5 46/9
**himself** [1] 33/24
**his** [10] 11/8 11/9
16/15 16/17 16/17
30/17 31/12 31/15
34/1 37/8
**history** [1] 30/22
**Hold** [1] 15/25
**home** [1] 4/4

# H

honest [1]  39/1
Honor [54]
Honor's [2]  21/23
 23/15
HONORABLE [1]
 1/8
hope [1]  14/23
host [1]  35/23
House [12]  8/8 8/9
 23/25 27/13 29/11
 30/18 30/18 31/22
 32/8 32/13 33/23
 34/5
House's [1]  31/24
housekeeping [1]
 2/13
how [12]  8/5 8/12
 14/10 23/3 23/5
 28/14 28/20 32/5
 32/9 35/7 40/25
 43/1
however [2]  17/16
 22/6
hypothetically [1]
 16/23

# I

I'd [2]  22/17 23/13
I'll [3]  6/9 14/22
 22/10
I'm [12]  9/6 18/18

28/20 29/8 35/23
 36/11 39/15 39/19
 42/22 43/7 43/10
 45/1
I've [2]  22/14 35/7
idea [1]  35/5
ideas [1]  34/8
identified [4]  5/17
 8/23 9/3 16/1
identifying [2]  3/23
 4/3
imagine [2]  12/9
 25/25
immediately [1]
 31/4
impeachment [1]
 31/12
important [3]
 14/12 23/1 43/9
importantly [1]
 11/8
improperly [3]
 19/17 21/11 21/16
inappropriate [1]
 34/2
including [3]  26/21
 39/5 40/22
incredibly [1]  43/5
incumbent [1]
 17/23
independent [3]  6/1
 6/2 11/14

indictment [2]
 25/17 35/6
indictments [1]
 39/4
individualized [1]
 18/24
individualized/parti
cularized [1]  18/24
influence [3]  21/11
 21/16 34/7
influenced [2]
 19/24 34/4
influencing [3]  12/3
 19/17 19/17
information [58]
ing [1]  46/5
initial [2]  8/6 37/20
injuring [1]  31/6
injury [1]  31/6
inquiry [1]  26/17
instruct [1]  26/1
instructed [3]  25/8
 25/10 25/16
instruction [3]
 24/14 45/5 45/13
integrity [1]  30/14
intend [3]  22/25
 27/8 43/9
intends [3]  8/22
 11/10 35/22

**I**

**intensive [3]** 23/9
28/17 35/16
**intent [1]** 4/25
**intention [2]** 5/24
14/8
**interest [4]** 14/4
14/6 14/12 36/22
**interfere [1]** 11/24
**internal [9]** 6/25
7/6 10/5 10/11
15/10 17/24 19/14
40/14 40/21
**interplay [1]** 14/14
**interpretation [1]**
32/23
**intervene [1]** 13/25
**interviews [6]** 6/25
7/6 10/5 10/10
19/11 19/20
**intimidation [1]**
9/18
**investigate [1]**
30/19
**investigation [3]**
30/14 30/15 31/2
**investigations [1]**
26/18
**investigative [1]**
31/8
**invocation [1]** 25/4
**invokes [1]** 32/3

**involve [1]** 14/13
**involved [3]** 11/21
44/7 44/10
**involving [2]** 37/2
39/2
**irregularity [1]**
38/11
**is [178]**
**isn't [4]** 7/8 35/11
35/11 43/5
**issue [6]** 19/10
19/17 20/8 20/12
26/14 28/8
**issues [10]** 9/7 13/2
14/13 37/11 37/13
37/23 38/9 39/22
43/9 44/7
**it [82]**
**it's [24]** 3/1 6/5
8/25 9/5 9/10 9/11
12/17 13/12 13/23
14/11 19/18 19/19
22/14 24/18 25/11
26/11 27/7 34/16
37/19 37/25 41/9
43/12 43/12 44/22
**items [1]** 6/3
**its [5]** 5/17 7/14
14/20 38/16 41/8
**itself [2]** 35/6 45/7

**J**

**J.P [2]** 1/12 2/8
**jail [1]** 44/21
**January [5]** 30/20
31/14 39/1 39/4
40/17
**job [1]** 46/12
**Johnson [1]** 22/2
**joint [4]** 22/15
24/13 28/19 35/14
**judge [13]** 1/9 2/2
11/18 15/6 20/2
21/22 23/14 30/25
32/12 33/24 34/8
34/13 34/16
**judgment [1]** 11/14
**judicial [1]** 12/18
**July [6]** 41/5 41/5
41/16 41/19 42/9
42/15
**jury [27]** 2/24 3/2
3/4 3/9 3/10 3/14
5/3 6/19 8/22 8/25
9/1 9/1 10/14 10/16
24/14 25/8 25/11
25/16 25/23 26/1
33/19 37/24 38/10
38/12 41/19 44/25
45/12
**jury's [1]** 45/5
**just [46]** 2/13 2/20
3/13 5/11 6/5 7/18

# J

**just... [40]** 8/4 9/3 9/25 10/3 10/20 11/16 12/8 13/8 13/8 13/15 15/7 16/1 17/13 18/25 21/7 21/25 22/4 23/8 25/24 26/14 26/17 27/23 28/11 31/8 32/1 32/15 32/19 32/20 35/3 36/9 36/12 36/19 40/21 41/13 42/18 42/25 43/8 44/1 46/4 46/6

**Justice [3]** 11/15 32/22 34/2

**justifying [1]** 21/20

# K

**keep [1]** 14/18
**keeps [1]** 3/14
**kept [1]** 18/1
**kind [5]** 5/25 15/7 30/8 34/7 44/25
**kinds [5]** 15/22 23/24 26/5 34/4 34/8
**knew [1]** 28/20
**know [32]** 3/15 5/17 7/23 12/2 14/1 16/18 22/5 22/14

23/3 23/16 25/20 26/11 26/12 27/13 27/17 28/21 28/21 29/9 29/19 29/22 31/21 31/24 31/25 32/8 32/16 33/12 34/9 39/23 41/8 42/7 44/13 45/2

**knowledge [1]** 30/4
**known [1]** 6/10
**knows [1]** 26/14
**Kyles [1]** 30/16

# L

**lack [1]** 36/10
**language [1]** 27/4
**languish [1]** 37/7
**languishing [1]** 39/11
**largely [1]** 14/1
**last [6]** 10/7 30/6 32/1 40/25 44/24 46/4
**later [1]** 42/13
**latter [2]** 3/12 28/24
**law [12]** 6/24 7/1 7/5 7/7 7/18 10/4 10/6 10/10 19/11 25/1 25/9 26/15
**lawsuit [2]** 31/3 31/5
**lead [2]** 31/11 41/22

**leading [3]** 14/1 34/2 42/5
**least [17]** 3/3 3/5 5/16 7/10 15/3 17/3 17/17 18/7 19/4 21/1 25/14 25/25 36/13 39/17 40/11 42/8 43/14
**leaves [1]** 5/2
**legal [7]** 26/1 26/2 27/15 28/13 33/16 36/12 45/5
**legislative [5]** 8/16 14/14 26/9 27/1 32/11
**length [2]** 26/11 34/16
**lesson [1]** 31/19
**let [5]** 22/3 24/3 30/25 32/15 32/19
**let's [9]** 5/15 8/7 15/11 16/8 22/13 26/9 30/18 31/8 44/18
**letter [1]** 32/19
**level [1]** 17/21
**liability [2]** 24/18 33/21
**Licavoli [1]** 24/23
**lie [1]** 22/8
**light [4]** 36/1 36/3 39/13 41/24

# L

lightly [1]  44/25
like [25]  2/18 3/5
 6/12 6/21 9/24 10/8
 13/19 19/25 21/2
 22/1 22/17 23/13
 26/3 27/5 27/12
 28/2 31/18 34/6
 37/23 38/13 41/4
 42/12 43/2 43/23
 45/2
likelihood [1]  38/7
likely [5]  5/21
 16/25 27/23 36/8
 41/3
limit [1]  7/8
limitation [10]  5/10
 5/11 7/13 7/16 11/1
 11/6 16/1 16/13
 16/20 17/12
limitations [4]  5/11
 10/17 14/20 47/10
limited [2]  8/4
 25/14
limiting [4]  11/5
 16/14 16/17 16/18
litigate [2]  13/21
 34/12
litigation [10]  7/14
 11/5 12/6 12/17
 16/23 17/7 17/7
 17/11 18/21 21/2

little [8]  2/13 2/19
 23/3 23/13 23/24
 29/9 32/14 39/11
living [1]  31/1
loathe [1]  40/5
locked [1]  41/25
long [9]  32/23 33/2
 34/13 35/16 40/2
 40/9 40/25 43/4
 43/13
long-standing [1]
 32/23
longer [3]  25/1 30/2
 42/2
longest [1]  41/2
look [7]  8/18 26/23
 27/5 30/9 41/13
 41/25 45/25
looking [3]  6/23
 40/14 40/21
LORRAINE [3]
 1/21 47/3 47/14
lot [3]  27/3 35/24
 44/15

# M

Macy's [2]  45/3
 45/4
Maddow [1]  32/2
made [21]  8/11
 11/10 11/20 14/10
 14/16 19/7 20/25
 21/25 22/24 24/13

 25/5 25/6 26/24
 28/5 29/15 29/23
 30/1 30/5 30/7
 31/10 32/9
magic [3]  34/15
 35/11 35/12
maintain [1]  26/20
make [25]  2/21
 3/17 4/3 5/22 9/12
 9/25 11/10 11/14
 11/20 15/8 18/10
 18/23 19/3 21/12
 25/18 27/8 27/24
 29/13 31/16 31/18
 32/16 34/3 37/20
 43/24 45/10
makes [4]  10/24
 20/20 20/21 27/4
making [2]  30/10
 38/7
Manchen [1]  32/20
mandatory [1]
 44/21
manner [2]  4/16
 22/1
many [7]  23/17
 25/1 26/24 26/24
 26/24 36/9 44/6
mark [1]  8/22
marked [3]  8/20
 8/24 10/13
material [1]  11/10

**M**

materials [16]  2/24 3/2 3/3 3/9 3/14 4/21 5/25 6/6 6/8 6/9 8/21 8/22 11/23 15/16 17/4 38/17

matter [8]  2/4 2/6 13/21 19/13 25/9 38/13 41/19 47/6

MATTHEW [2] 1/18 2/10

may [6]  15/6 20/2 22/23 34/20 39/18 42/6

maybe [3]  22/17 24/3 44/12

Mazars [2]  26/11 26/22

MD [1]  1/19

me [22]  2/19 2/24 5/2 8/19 12/13 12/22 16/13 17/2 22/3 22/24 24/3 30/25 32/15 32/19 35/6 35/8 38/25 39/21 41/15 41/21 41/22 43/6

mean [7]  16/22 28/11 32/12 35/7 36/5 36/6 36/8

meaning [5]  15/18 15/20 15/21 23/9

30/15

means [2]  6/2 29/5

media [1]  12/7

meet [7]  38/1 38/20 42/12 45/4 45/12 46/3 46/7

member [2]  8/8 8/9

members [7]  11/13 13/25 14/1 26/19 26/24 32/9 33/9

memory [1]  19/20

mention [1]  24/5

mentioned [2]  7/18 15/10

merely [1]  40/6

merit [2]  36/10 40/12

meritless [1]  21/21

merits [5]  37/18 37/20 44/5 44/5 44/6

methodology [1] 17/17

middle [1]  40/19

might [6]  9/17 22/22 40/25 41/1 41/14 41/23

mind [1]  22/4

minded [1]  33/14

minimum [3]  35/25 36/5 41/2

misdemeanor [3]

36/3 39/12 44/18

misinformation [1] 32/6

mission [1]  31/12

misunderstanding [1]  44/10

modest [4]  13/13 13/23 14/20 29/2

modified [2]  15/18 16/4

MOLLY [2]  1/12 2/9

Momentous [1] 30/21

moments [1]  36/21

Montgomery [1] 1/16

month [1]  43/11

months [9]  34/14 34/15 35/6 35/11 37/7 39/22 40/1 40/1 40/2

more [13]  5/7 18/23 19/3 21/3 22/24 23/3 23/24 30/4 34/20 35/15 38/8 41/24 44/12

morning [4]  2/2 2/3 2/14 41/20

Most [1]  11/8

motion [11]  3/17 13/25 23/20 24/4

# M

motion... [7]  25/22
27/8 27/18 32/10
43/11 43/12 43/12
motions [15]  23/11
24/10 26/6 28/16
29/6 34/11 37/8
37/17 38/4 38/21
38/22 42/4 43/3
44/4 44/5
motivation [1]
31/16
motive [1]  30/8
move [5]  29/8 30/4
30/7 36/24 38/19
moved [1]  14/25
moving [1]  38/21
Mr [4]  32/20 45/20
45/22 46/10
Mr. [51]
Mr. Bannon [17]
2/11 4/14 4/15 5/10
5/19 5/21 6/7 6/14
7/19 17/10 25/6
29/19 29/23 30/12
31/17 33/25 44/10
Mr. Bannon's [8]
6/10 6/20 7/13 7/15
14/21 16/14 19/19
20/15
Mr. Corcoran [12]
2/13 2/25 4/18 7/4

10/24 13/11 20/10
22/18 36/21 41/12
43/22 45/19
Mr. Costello [4]
46/3 46/6 46/7 46/9
Mr. Schoen [10]
20/10 22/19 22/21
35/19 36/10 37/11
37/14 41/12 43/21
45/18
Ms [1]  2/3
Ms. [19]  2/12 3/19
4/6 4/24 5/13 10/1
13/12 14/5 14/16
18/14 20/25 35/20
41/8 42/21 42/23
44/4 45/15 46/8
46/11
Ms. Harris [3]  2/12
46/8 46/11
Ms. Vaughn [15]
3/19 4/6 4/24 5/13
10/1 14/5 14/16
18/14 20/25 35/20
41/8 42/21 42/23
44/4 45/15
Ms. Vaughn's [1]
13/12
much [2]  43/1
45/20
my [11]  13/22
14/15 17/8 17/17

18/7 21/22 21/25
35/7 40/15 40/22
43/14

# N

names [1]  9/16
narrow [1]  28/25
nature [1]  24/15
necessary [3]  7/12
24/6 37/21
need [24]  9/24 13/3
23/3 23/25 26/23
27/12 27/13 27/22
28/14 31/20 32/13
33/13 34/10 34/14
34/19 34/19 34/20
34/23 37/17 37/20
38/3 39/21 40/13
42/18
needed [2]  30/3
30/4
needs [3]  18/23
38/6 38/24
ncgatcs [1]  25/11
negotiating [1]  42/4
nevertheless [1]
11/4
next [2]  35/2 41/6
NICHOLS [2]  1/8
2/2
night [1]  32/1
no [21]  1/4 4/18
10/8 15/23 16/6

# N

no... [16]  16/16 16/20 17/12 22/4 25/1 26/9 29/13 30/2 33/14 35/9 38/23 42/13 44/9 45/17 45/20 45/22

non [7]  5/3 5/3 12/21 16/7 27/1 36/3 39/13

non-detained [2]  36/3 39/13

non-grand [1]  5/3

non-legislative [1]  27/1

non-PII [1]  5/3

non-sensitive [2]  12/21 16/7

none [3]  9/19 37/17 39/3

normal [2]  3/13 11/18

not [73]

Note [1]  47/8

notes [2]  15/21 15/22

notetaking [1]  18/6

notwithstanding [1]  20/6

November [1]  35/8

now [15]  7/3 8/21 15/14 15/24 19/10 20/24 22/13 28/16 29/22 33/2 34/9 35/24 39/25 40/21 42/2

number [6]  9/2 18/18 30/11 34/15 34/16 40/17

numbers [2]  4/4 4/5

NW [2]  1/13 1/23

# O

objection [2]  10/8 42/10

obligated [1]  29/1

obligation [2]  13/7 28/23

obligations [2]  12/25 38/19

obtained [5]  4/14 4/16 6/2 6/6 6/8

obvious [1]  22/14

obviously [4]  13/4 22/14 35/22 42/6

occurred [2]  19/19 47/8

October [2]  35/11 40/8

offense [1]  25/12

offer [1]  29/23

offered [1]  21/8

OFFICE [9]  1/13 26/1 26/2 27/14 28/13 32/15 32/17 33/16 33/18

officers [1]  13/7

official [4]  1/22 9/21 33/4 47/3

Okay [6]  3/22 6/17 10/21 20/10 22/21 42/20

OLC [1]  33/8

old [2]  23/17 45/3

older [1]  39/10

one [19]  2/13 7/13 7/25 8/8 12/11 12/20 14/20 15/7 15/9 15/25 18/1 24/18 29/12 30/5 32/16 41/14 41/24 43/24 44/1

one-day [1]  24/18

ones [1]  5/17

only [14]  4/12 5/12 8/21 8/24 10/13 12/25 16/11 18/3 21/1 23/17 23/17 26/12 34/9 43/24

opened [1]  31/22

operates [1]  32/5

opinions [6]  26/2 26/3 27/15 28/13 33/8 33/16

opposition [3]  11/17 43/5 43/14

option [1]  30/7

# O

order [41]  2/19
2/23 3/1 3/8 4/1
4/11 4/12 4/16 5/24
6/4 6/6 6/15 7/25
8/2 8/15 9/11 10/9
10/12 10/16 11/4
11/17 12/5 12/11
14/18 14/19 14/23
15/3 15/19 15/24
16/4 18/17 18/20
18/22 21/4 21/21
22/11 42/11 42/19
45/24 45/24 46/4
ordered [1]  29/24
orders [3]  8/1 34/17
35/13
ordinarily [2]  4/23
15/23
other [24]  4/15 4/16
6/7 6/18 7/22 12/2
12/12 12/21 13/21
17/13 20/16 21/19
23/2 26/3 30/7 31/9
31/19 31/20 33/8
33/22 35/13 38/18
39/11 42/4
others [3]  28/2 31/5
31/13
otherwise [7]  6/20
10/23 12/11 18/2
23/20 30/12 45/11

ought [1]  32/7
our [26]  4/21 5/23
8/2 8/12 9/9 9/10
14/8 15/8 15/12
15/21 18/13 21/14
22/4 28/22 29/7
29/12 32/5 34/23
35/14 40/14 40/21
44/4 44/5 44/25
45/4 45/12
out [3]  11/25 35/7
45/10
outcome [2]  17/9
18/15
outside [1]  33/10
oven [1]  27/10
over [4]  19/13 42/4
43/25 43/25
overall [3]  22/13
23/5 40/4
own [4]  11/14 28/4
40/15 40/22

# P

p.m [1]  46/15
package [1]  26/6
Page [3]  6/23 10/3
32/21
pages [2]  32/12
37/14
pandemic [1]  47/9
papers [2]  24/17
41/9

Paragraph [3]  18/3
18/5 21/13
Paragraphs [4]
15/17 16/3 16/12
19/1
part [3]  12/17 17/1
26/6
particular [4]  10/4
10/15 31/18 38/11
particularized [6]
9/13 18/24 19/4
19/7 21/9 21/20
particularly [3]
26/7 37/1 43/4
parties [13]  12/24
13/4 13/7 33/3 38/8
40/5 40/24 41/24
42/1 42/3 42/12
42/19 46/1
parties' [3]  2/21
15/1 22/15
partisan [1]  27/9
party [3]  12/12
12/20 41/7
passing [1]  35/23
past [2]  29/17 32/17
Pause [2]  15/25
16/19
people [6]  31/9
31/19 31/20 33/10
33/25 39/2
perhaps [1]  39/24

**P**

**period [3]** 34/19
41/2 43/7
**periods [1]** 42/2
**person [6]** 31/1
31/3 31/7 31/15
33/15 45/1
**personal [5]** 3/23
4/3 26/19 31/3 31/6
**personally [1]** 31/6
**perspective [10]**
7/15 9/10 14/15
15/1 17/15 18/8
36/16 36/18 45/16
45/19
**philosophical [1]**
20/13
**phrase [1]** 7/24
**pick [1]** 41/1
**PII [5]** 3/24 5/3
6/19 8/23 10/14
**place [2]** 15/23 35/9
**Plaintiff [2]** 1/4
1/11
**plan [1]** 38/16
**plans [2]** 11/20
11/22
**play [1]** 14/13
**please [2]** 2/4 47/8
**point [8]** 5/7 6/11
15/7 16/13 31/18
32/14 32/16 33/13

**political [2]** 27/9
33/3
**popping [1]** 19/12
**populate [1]** 31/9
**position [8]** 3/20
6/13 9/5 10/2 14/2
18/13 28/18 33/2
**positions [7]** 2/21
9/17 15/1 36/9
37/13 42/14 42/19
**positive [2]** 14/11
14/15
**possession [3]** 4/21
6/11 6/20
**possible [1]** 38/23
**Post [1]** 11/13
**postponed [1]**
40/16
**potential [4]** 8/15
12/1 18/4 19/24
**potentially [6]** 12/3
13/13 26/4 28/4
28/5 39/18
**power [1]** 26/17
**powers [2]** 23/2
28/8
**practical [1]** 35/3
**practice [5]** 23/11
29/6 29/6 34/11
35/12
**preface [1]** 23/8
**prepare [4]** 13/18

16/15 16/17 30/17
**prepared [3]** 23/14
23/14 23/23
**preparing [1]** 8/12
**present [4]** 2/8 2/9
2/11 36/12
**presented [3]** 33/20
39/17 40/12
**preserving [1]**
32/24
**president [7]** 31/3
31/5 31/13 33/10
33/11 33/24 34/6
**presidential [1]**
33/6
**press [6]** 13/25 14/2
17/5 18/1 19/13
19/23
**presumptively [5]**
15/12 15/13 17/15
19/16 21/1
**pretrial [2]** 42/2
42/12
**previous [1]** 29/20
**principles [1]** 33/13
**privilege [6]** 25/4
26/21 28/6 31/24
32/4 33/7
**privileged [1]** 28/10
**pro [1]** 46/4
**probably [2]** 14/24
30/6

**P**

problem [7]  4/18 7/15 7/20 7/23 7/23 8/2 9/9

procedures [1] 11/24

proceed [2]  2/14 22/7

proceeding [3]  22/1 24/7 29/20

proceedings [3] 44/25 46/15 47/5

process [5]  8/18 11/18 29/10 32/18 35/9

processes [1]  31/22

produce [1]  18/25

produced [12]  4/13 5/3 5/9 6/13 8/25 12/22 16/8 16/10 17/4 17/9 18/12 18/21

produces [2]  5/19 6/3

producing [1] 17/24

pronged [1]  13/12

proof [1]  38/11

proper [4]  8/18 11/24 26/9 32/11

proposal [5]  16/4 17/4 34/22 40/8

40/10

proposals [1]  40/4

propose [1]  42/13

proposed [8]  2/23 4/12 6/4 6/5 14/24 15/18 21/24 36/24

proposes [1]  38/21

proposing [2]  5/5 42/4

prosecute [1]  33/4

prosecuting [1] 31/21

prosecution [9] 24/24 27/7 27/9 27/10 27/11 29/17 33/25 38/14 38/14

prosecutor [1] 31/11

prosecutorial [1] 32/25

prosecutors [1] 44/20

protected [2]  7/20 15/4

protection [1]  11/4

protective [38]  2/19 2/23 3/1 3/8 3/25 4/10 4/12 4/16 5/24 6/4 6/6 6/15 7/25 8/1 8/2 8/14 9/11 10/8 10/12 10/16 11/4 11/17 12/4

12/11 14/17 14/19 14/23 15/2 15/18 15/23 16/4 18/17 18/20 18/22 21/4 21/21 22/11 45/24

protocol [2]  28/4 33/16

prove [1]  31/12

provide [3]  14/17 38/11 38/17

public [36]  4/15 8/11 11/9 11/11 11/11 11/14 11/23 12/13 12/15 13/9 13/19 14/3 14/3 14/4 14/8 14/9 14/12 15/13 15/14 17/1 17/2 17/15 17/16 18/8 19/16 20/7 20/17 20/20 21/15 30/19 30/23 31/10 31/16 31/23 36/21 39/15

public's [8]  15/14 16/18 22/5 36/18 36/25 37/9 44/11 44/12

publicly [13]  3/5 3/11 5/20 6/1 6/9 6/19 7/21 11/25 12/18 16/22 17/21 21/10 34/6

## P

purpose [8] 17/13 26/10 26/15 27/1 27/1 27/5 32/11 37/5
purposes [2] 26/13 37/10
pursuant [1] 33/6
put [3] 6/10 16/25 21/19
putting [3] 11/25 12/21 34/24

## Q

quest [1] 30/2
question [13] 2/18 10/21 12/8 17/8 21/22 21/23 22/4 23/15 31/15 33/14 39/20 39/25 43/16
questions [6] 23/4 36/6 36/7 36/12 36/13 42/8
quick [1] 39/16
quickly [4] 29/8 30/4 36/4 43/10
quite [2] 14/24 27/7
quote [2] 11/13 11/17

## R

Rachel [1] 32/2
radical [2] 30/7

33/15
radically [1] 32/17
raise [3] 26/10 33/15 35/23
raised [1] 37/11
raises [3] 10/20 28/7 31/8
rarely [1] 38/1
Raskin [1] 31/11
rather [2] 18/24 40/1
reach [1] 17/21
reached [1] 42/15
read [1] 8/14
reading [1] 32/21
ready [1] 42/8
real [2] 9/9 28/7
really [6] 6/17 6/21 7/1 10/20 40/5 44/17
reason [11] 9/23 17/22 18/9 20/18 21/13 21/20 25/2 27/6 31/15 31/16 36/23
reasonable [2] 18/15 31/1
reasonably [2] 43/21 43/23
reasons [3] 6/20 11/8 12/4
recipient [1] 6/11

recipients [1] 26/20
recognize [2] 36/8 39/7
recognized [4] 34/2 36/20 43/25 46/8
recognizing [2] 18/18 40/24
record [8] 2/5 12/18 13/9 13/20 17/1 17/9 20/7 47/5
records [1] 19/10
redact [1] 4/3
redacted [2] 3/4 3/10
reference [1] 9/15
referenced [1] 10/3
refers [1] 32/24
reflect [1] 40/11
reflecting [1] 3/3
regard [2] 7/19 17/6
regarding [1] 32/11
relating [6] 6/22 7/2 7/7 10/7 12/12 16/8
releasing [1] 21/10
relevant [4] 17/6 20/8 24/5 25/21
reliance [4] 25/20 26/2 26/4 45/9
relied [1] 25/6
relief [1] 21/3

# R

relitigate [1]  38/9
remaining [2]  7/20 42/12
remark [1]  43/24
remember [3]  18/3 18/5 44/18
remotely [1]  47/10
reply [6]  5/18 6/24 10/4 43/7 43/8 43/18
report [7]  17/25 22/16 24/13 28/19 35/14 38/16 45/25
Reported [1]  1/21
Reporter [2]  1/22 47/4
reporting [1]  47/10
reports [5]  6/24 7/5 10/5 10/10 19/11
representatives [1] 11/9
represented [1] 8/21
represents [1] 20/13
request [1]  44/25
requests [1]  34/23
require [6]  28/3 33/22 36/13 39/18 39/19 39/24
required [4]  23/10

23/11 25/15 25/19
requiring [1]  38/5
research [1]  30/14
resolution [2]  27/4 36/25
resolve [2]  43/2 43/9
resolved [1]  13/2
resolving [1]  42/7
respect [6]  7/4 19/19 20/18 22/7 29/11 36/25
respected [1]  36/20
respective [2]  42/14 42/19
respond [2]  43/25 44/1
response [2]  13/11 13/22
responsible [1] 31/14
restrict [1]  19/2
restricted [4]  8/12 13/20 18/6 19/1
restriction [5]  5/22 9/15 13/13 13/23 13/24
restrictions [5] 6/15 9/2 15/17 15/22 18/9
result [5]  11/16 18/19 19/23 40/16

42/6
results [1]  44/16
review [1]  11/24
reviewed [1]  22/15
reviews [1]  20/21
revised [2]  4/10 5/24
right [23]  2/25 5/13 5/14 6/16 8/21 10/9 10/18 10/19 16/6 16/18 22/5 23/19 24/9 26/21 29/4 32/5 35/23 36/18 36/25 37/9 39/16 44/11 44/13
rights [4]  14/21 26/20 27/11 30/11
risk [2]  18/10 20/19
Road [1]  1/16
Robert [1]  2/10
Room [1]  1/23
root [1]  30/20
ROSE [1]  1/11
RPR [1]  1/21
Rule [1]  38/18
rules [1]  28/4

# S

said [22]  17/12 21/10 22/10 24/17 24/19 24/23 27/17 28/11 29/20 30/18 32/2 32/20 34/1

# S

said... [9]  35/14 36/21 37/5 37/14 38/10 41/8 44/2 44/3 45/7
sake [1]  26/18
same [4]  19/21 21/18 38/9 38/13
say [19]  10/10 12/3 13/15 17/24 18/25 20/24 22/3 23/1 23/23 30/25 31/9 32/15 33/9 33/18 34/21 34/24 35/4 44/4 44/24
saying [5]  4/20 8/10 21/15 23/8 32/4
says [1]  35/5
schedule [7]  22/13 23/6 40/14 40/15 43/3 43/6 43/13
SCHOEN [14]  1/15 2/10 15/6 20/10 22/19 22/21 35/19 36/10 37/11 37/14 41/12 43/21 45/18 45/20
scholars [1]  26/25
scope [1]  39/8
seal [2]  7/12 12/14
second [7]  16/1 16/19 19/14 20/3 35/2 37/11 39/10
secondly [2]  30/10 37/16
secret [2]  3/14 14/18
section [3]  24/21 32/23 32/24
Security [1]  4/4
see [8]  14/10 24/17 27/2 27/12 27/13 38/3 40/22 45/13
seem [2]  7/2 39/9
seems [8]  2/19 2/24 5/2 5/8 8/19 38/25 39/21 41/21
Select [6]  6/25 7/6 8/9 8/9 10/6 10/11
selection [1]  41/19
selective [2]  27/7 38/13
sense [3]  5/22 9/25 21/12
sensitive [25]  3/25 5/5 5/7 5/10 8/4 8/11 8/20 8/22 8/24 10/13 10/17 10/22 11/3 11/3 12/10 12/21 13/17 15/5 15/16 16/7 16/11 17/22 18/16 22/5 24/11
sentence [1]  44/21
separation [2]  23/1 28/8
series [1]  41/22
serious [2]  44/1 44/22
servants [1]  15/14
serve [1]  37/9
set [7]  34/20 36/4 39/23 40/23 41/18 41/22 42/4
settled [1]  27/14
several [2]  26/25 28/2
severe [1]  14/20
shape [1]  21/16
share [1]  37/15
short [1]  43/5
shorter [1]  42/2
should [16]  3/4 3/8 3/9 3/24 8/12 11/14 12/5 17/18 17/23 18/1 18/8 18/11 22/8 29/22 31/2 36/24
shouldn't [5]  8/11 17/21 17/23 19/3 20/20
show [7]  9/10 18/4 21/14 25/20 31/20 32/2 33/8
showing [15]  9/13 10/25 14/17 18/10

# S

showing... [11]
18/24 19/4 19/7
20/21 21/9 21/17
21/25 25/18 25/24
37/20 38/7
shown [2] 11/22
15/20
side [1] 14/6
signed [1] 46/4
SILVERMAN [1]
1/18
similarly [1] 34/1
simply [2] 13/8
29/6
since [2] 17/19
28/20
Sinclair [1] 24/25
single [1] 39/23
sir [1] 20/4
sit [1] 43/10
situated [1] 34/1
situation [1] 33/24
six [3] 34/23 35/5
35/8
Sixth [1] 14/21
slow [1] 40/9
SLUTKIN [1] 1/18
so [69]
Social [1] 4/4
sole [1] 21/20
some [34] 2/20 4/16

5/7 6/7 6/11 9/6
9/17 9/22 11/4
14/25 15/3 17/22
22/23 23/9 24/11
24/11 28/3 28/16
28/18 29/7 30/3
30/19 31/8 34/8
34/8 34/10 35/25
36/12 36/13 39/9
39/17 39/24 42/1
44/16
somebody [1] 8/16
somehow [3] 8/10
14/6 21/15
someone [2] 18/10
26/16
something [14] 3/5
6/12 8/3 13/4 13/8
17/17 17/18 17/20
20/19 21/2 25/19
32/4 33/17 45/3
somewhat [1] 38/25
soon [1] 38/23
sorry [4] 17/10 29/8
34/13 42/22
sort [3] 15/3 18/6
30/16
sorts [1] 39/7
sounds [2] 10/8
37/12
source [1] 6/7
sources [1] 4/15

speak [2] 22/20
41/1
special [1] 44/18
specific [8] 5/6 9/12
16/13 18/9 20/12
20/19 24/5 25/2
specifically [2]
22/25 23/24
specifying [1] 15/7
speed [1] 39/14
speedy [5] 36/19
37/9 39/16 44/12
44/16
splitting [1] 40/6
spoke [1] 33/19
stacking [1] 40/17
staff [6] 7/1 7/7 8/8
10/6 10/11 19/15
stamp [1] 8/3
standing [1] 32/23
start [4] 19/12
22/17 24/16 41/4
state [1] 9/22
statement [2] 13/3
34/3
statements [11]
11/9 11/20 11/25
14/5 26/24 30/19
31/10 31/17 31/18
31/23 34/4
STATES [5] 1/1
1/3 1/9 2/6 34/6

**S**

statistics [1]  35/13
status [9]  1/8 22/16
 24/13 26/1 28/6
 28/19 35/14 38/16
 45/25
statute [4]  33/5
 37/6 37/10 44/22
step [1]  29/12
STEPHEN [2]  1/6
 2/7
steps [1]  20/16
still [5]  10/25 15/17
 28/21 40/2 40/12
stop [1]  12/20
Street [2]  1/13 1/19
strenuous [1]  42/10
strict [2]  24/18
 33/21
stringent [1]  13/24
strong [3]  28/12
 36/22 37/1
strongly [2]  44/11
 44/12
structure [1]  34/17
subject [6]  6/14
 12/11 15/17 16/11
 41/6 47/9
subjects [1]  27/15
submission [3]  8/6
 12/13 35/14
submissions [1]

22/15
submit [1]  13/6
submits [1]  37/1
submitted [2]  8/1
 9/5
subpoena [5]  8/8
 19/19 20/15 26/14
 29/6
subpoenaed [1]
 33/6
subpoenas [2]
 26/15 34/11
succeed [1]  38/7
such [6]  3/10 4/4
 5/9 8/15 16/21
 16/21
sufficient [1]  19/8
sufficiently [1]
 29/21
suggest [3]  22/2
 26/25 40/5
suggested [2]  14/5
 26/25
suggesting [2]  8/3
 39/15
suggests [1]  3/6
Suite [1]  1/16
summarizing [1]
 19/18
summer [1]  40/19
support [2]  37/17
 37/22

suppose [2]  5/6
 20/12
supposedly [1]  23/4
Supreme [1]  37/5
sure [4]  2/21 23/7
 28/20 30/2
suspect [1]  42/7

**T**

take [16]  2/18 6/21
 8/7 8/17 14/22 15/2
 15/21 16/8 20/5
 20/15 22/6 32/19
 37/24 42/3 42/19
 44/24
taken [1]  29/25
taking [2]  14/7
 20/16
talk [6]  13/18 15/11
 22/13 26/9 30/18
 32/14
talked [1]  27/3
talking [8]  6/17 7/3
 12/23 17/19 20/24
 24/1 34/13 40/21
teach [1]  31/19
team [1]  41/10
technological [1]
 47/10
telephone [1]  4/5
television [1]  32/1
tell [1]  22/24
ten [3]  34/14 34/15

# T

ten... [1] 35/11
terms [5] 9/7 21/7
 21/8 24/2 28/12
testimony [5] 12/2
 12/4 19/24 21/17
 43/12
tethered [1] 7/14
than [7] 9/5 13/21
 18/24 35/16 36/24
 40/1 42/13
Thank [15] 2/12
 2/17 13/10 14/22
 22/9 35/18 35/19
 43/17 45/20 45/22
 46/2 46/10 46/11
 46/13 46/14
that [297]
that's [24] 4/24
 5/14 6/16 6/21 7/24
 9/4 10/19 19/25
 20/22 22/1 24/25
 25/18 26/10 26/21
 30/2 30/16 32/5
 32/5 32/7 32/23
 33/17 40/6 43/8
 46/5
their [27] 8/6 9/20
 11/5 11/14 11/16
 12/1 12/3 14/2 18/4
 19/18 19/20 21/19
 24/17 26/20 27/3

28/4 28/18 28/19
28/25 29/2 30/15
30/19 32/3 32/9
32/17 37/13 42/14
them [17] 3/15 3/15
3/16 4/23 8/17
15/13 21/18 27/23
33/11 34/23 35/23
35/25 36/10 36/12
38/23 43/20 44/6
then [21] 2/20 3/23
6/18 8/4 10/20 13/4
16/19 17/23 19/14
20/20 21/25 24/4
31/7 31/9 32/7 34/1
34/11 39/11 39/23
43/6 45/25
theory [3] 25/13
25/24 36/13
there [47] 2/19 9/14
9/17 10/8 10/25
11/7 12/9 13/2
13/24 14/4 15/3
15/23 16/19 16/20
17/12 17/12 17/16
17/18 18/8 18/9
18/18 20/18 22/22
22/23 24/11 24/22
25/1 26/12 27/5
28/2 28/4 29/13
30/25 33/14 33/15
35/3 35/24 37/14

38/23 39/7 40/22
42/17 43/5 44/9
44/18 44/21 44/21
there's [9] 9/19
9/22 14/12 19/10
27/3 35/9 35/24
43/8 43/11
thereby [1] 12/23
therefore [4] 12/18
24/21 30/4 47/9
these [20] 3/14 9/23
10/2 13/13 15/10
15/13 16/25 19/1
19/23 22/10 23/4
26/5 26/6 29/7
30/13 32/10 36/6
36/7 38/17 39/22
they [67]
they're [1] 8/3
they've [7] 9/5 9/12
14/2 21/10 21/19
25/13 31/22
thing [7] 2/13 14/11
14/15 30/5 40/18
41/14 44/24
things [14] 6/21
9/24 18/6 26/5
27/12 29/3 29/4
30/8 30/13 35/3
38/13 40/16 43/10
44/1
think [46] 3/19

# T

think... [45]  8/20
9/9 14/11 14/19
14/25 16/14 16/16
16/17 17/3 17/14
18/7 18/7 18/11
19/12 21/25 22/1
22/16 22/17 23/3
23/5 24/4 24/11
24/22 25/17 25/19
26/7 27/22 28/17
28/24 28/24 29/1
32/16 34/22 35/9
37/13 37/21 40/8
40/10 40/18 41/13
42/1 42/18 43/4
43/7 45/11
thinks [2]  36/9
36/23
third [1]  4/9
this [130]
THOMPSON [2]
1/18 32/1
those [49]
though [5]  6/13
14/9 15/15 19/16
39/21
three [8]  7/3 7/4
7/22 23/16 23/17
34/9 34/25 44/19
through [13]  4/15
4/22 4/22 5/15 6/7

11/9 12/6 15/18
16/3 16/12 19/2
34/18 36/2
tie [2]  24/4 29/9
til [1]  40/1
time [18]  17/1 24/6
34/10 34/17 34/19
34/19 34/20 34/20
35/15 35/17 36/15
40/2 41/9 41/24
43/1 43/5 45/21
46/4
today [4]  9/5 40/1
40/9 42/11
today's [1]  42/15
told [2]  11/13 38/15
too [4]  28/25 40/9
40/9 44/17
took [1]  34/1
traditional [1]
38/18
transcript [2]  1/8
47/5
treat [1]  5/5
treated [1]  3/25
treatment [1]  3/14
trial [32]  3/16 12/4
14/3 14/8 19/24
23/5 23/11 24/18
35/5 36/5 36/19
37/9 39/4 39/16
40/1 40/9 40/10

40/21 40/23 40/25
41/3 41/4 41/18
41/23 41/24 42/3
42/5 42/9 42/11
44/12 44/13 45/25
trials [2]  44/16
44/17
tried [1]  35/7
triggered [1]  30/11
true [1]  47/4
Trump [3]  31/3
31/5 31/13
try [3]  26/16 40/18
41/24
trying [1]  21/9
turning [1]  14/7
twice [1]  38/9
two [10]  10/9 11/7
13/12 19/10 20/24
40/23 41/2 41/6
41/17 44/1
two-pronged [1]
13/12
two-week [3]  40/23
41/2 41/17
type [1]  15/11
typical [1]  9/14

# U

U.S [9]  1/13 1/22
9/19 11/15 24/1
32/14 32/17 32/20
33/17

# U

**unconstitutional [1]**
2 7/1
**under [15]** 3/25
7/12 8/2 11/3 12/14
12/24 14/22 15/2
17/3 18/3 18/5
21/13 24/21 33/5
38/17
**understand [12]**
2/21 4/13 5/6 7/10
9/18 13/16 16/6
22/22 22/23 23/22
25/14 27/23
**understanding [1]**
37/13
**understands [1]**
30/21
**unequivocally [1]**
35/4
**unfettered [1]**
11/18
**uniform [1]** 14/2
**unique [1]** 35/25
**UNITED [5]** 1/1
1/3 1/9 2/6 34/6
**unless [2]** 3/15 18/9
**unprecedented [5]**
19/12 20/16 29/15
29/16 33/23
**until [1]** 3/15
**up [14]** 2/18 19/12

25/24 27/4 29/9
29/12 31/2 31/7
32/24 39/22 40/18
41/13 41/22 42/5
**upon [1]** 11/16
**us [2]** 9/25 14/7
**use [15]** 3/15 7/8
7/9 7/14 7/14 8/4
8/5 8/12 9/7 9/15
11/5 11/19 13/17
16/21 26/15
**used [12]** 3/4 3/10
5/12 7/11 7/12 7/24
7/24 10/22 10/23
17/7 17/11 21/1
**using [1]** 13/20

# V

**variety [1]** 27/15
**various [2]** 2/22
6/20
**vastly [1]** 40/24
**VAUGHN [17]**
1/11 2/8 3/19 4/6
4/24 5/13 10/1 14/5
14/16 18/14 20/25
35/20 41/8 42/21
42/23 44/4 45/15
**Vaughn's [1]** 13/12
**verb [1]** 46/5
**version [1]** 10/15
**versions [1]** 10/21
**versus [2]** 2/6 30/16

**very [16]** 13/23
16/25 21/7 21/14
22/16 25/14 27/19
28/11 29/8 36/8
40/16 42/7 42/16
44/11 44/16 44/16
**vice [1]** 46/5
**vice-ing [1]** 46/5
**VIDEO [1]** 1/8
**videoconference [1]**
2/15
**view [8]** 3/24 15/12
17/17 18/7 28/25
29/12 31/24 37/9
**viewpoint [1]** 24/15
**views [3]** 40/25
42/2 43/1
**vindicate [1]** 37/6
**vindictive [1]** 38/14
**vindictiveness [1]**
27/12
**violated [1]** 28/13
**violation [1]** 13/7
**violence [1]** 39/3
**virtually [1]** 20/16
**volume [1]** 39/9
**voluntarily [1]**
38/16

# W

**Wait [3]** 15/25
15/25 16/1
**want [16]** 2/20 14/3

# W

**want...** [14]  14/3 14/9 16/13 21/7 23/23 27/2 27/23 29/13 30/9 41/13 44/1 44/7 44/9 44/24

**wanted** [5]  15/7 30/19 43/24 46/5 46/6

**wants** [2]  12/12 39/13

**was** [23]  6/11 7/25 8/18 8/24 22/16 24/23 25/5 25/6 25/8 25/16 25/20 25/24 27/3 28/6 28/19 30/1 30/2 30/7 31/11 31/12 31/24 32/1 40/20

**Washington** [4]  1/5 1/14 1/24 11/13

**wasn't** [3]  25/23 27/6 29/25

**way** [12]  6/10 7/12 17/17 19/1 19/25 22/7 22/25 23/10 24/7 27/14 29/12 30/6

**ways** [2]  15/1 39/10

**we** [128]

**we're** [1]  7/3

**we've** [2]  14/25 34/25

**week** [3]  40/23 41/2 41/17

**weeks** [7]  23/16 23/17 34/9 34/25 41/6 41/9 43/13

**weighed** [1]  34/6

**weighty** [1]  23/1

**welcome** [3]  43/18 43/20 46/9

**well** [9]  4/20 7/17 9/4 11/7 26/14 27/14 36/19 37/19 41/1

**well-settled** [1] 27/14

**went** [3]  10/13 34/5 44/17

**were** [19]  3/2 3/15 6/9 6/9 6/10 14/10 15/10 15/23 28/13 30/3 31/14 31/22 33/20 34/2 39/2 40/21 42/1 44/2 44/3

**what** [56]

**whatever** [4]  6/18 9/2 17/25 43/11

**whatsoever** [2] 29/14 34/22

**when** [7]  6/2 17/4

18/11 21/4 30/1 31/16 43/6

**where** [7]  9/14 9/17 16/1 33/19 33/21 40/4 44/15

**whether** [6]  3/24 4/15 11/15 17/6 40/12 43/12

**which** [32]  3/14 3/17 6/2 10/2 13/15 17/9 18/15 19/15 19/20 20/23 22/16 25/5 26/25 27/15 29/19 29/23 30/3 32/20 33/24 35/5 36/2 36/5 36/19 37/1 37/17 37/21 38/17 39/12 40/15 40/23 40/23 44/13

**WHITE** [3]  1/18 33/23 34/5

**Whitley** [1]  30/16

**who** [9]  9/20 31/1 31/3 31/5 31/10 32/2 32/3 39/2 39/5

**whom** [1]  22/8

**why** [21]  5/22 7/8 9/23 10/25 11/2 13/12 17/8 18/14 19/3 20/15 20/25 24/4 25/20 27/13 32/13 32/16 34/10

## W

why... [4]  34/14
36/4 36/15 38/6
widely [1]  11/23
will [31]  14/23 15/1
15/2 16/25 17/2
19/23 19/24 20/3
22/6 22/19 23/5
29/8 29/12 32/15
33/4 34/21 37/24
39/17 40/11 41/19
42/7 42/7 42/8
42/10 42/18 45/12
45/13 45/14 45/23
45/24 45/25
Williams [1]  33/22
window [2]  45/3
45/4
withholding [1]
33/5
within [4]  31/22
35/12 38/4 38/11
without [2]  17/6
34/21
witness [10]  6/24
7/6 8/15 9/16 9/16
9/16 10/5 10/10
11/25 13/3
witness's [1]  21/17
witnesses [11]  6/22
9/18 12/1 12/2 12/3
13/18 15/20 18/4
19/18 21/11 21/14
witnesses' [1]  19/24
won't [1]  34/3
words [1]  21/19
work [6]  17/18
30/15 38/23 39/24
41/9 41/16
worked [1]  8/16
working [1]  34/18
works [1]  41/15
would [72]
wouldn't [6]  7/11
8/6 11/3 15/15
15/23 30/12
written [1]  7/25
wrong [2]  24/22
32/4
wrongdoing [1]
26/17

## Y

Yeah [1]  17/14
yes [19]  2/16 3/7
3/8 3/9 3/21 4/8 5/1
5/14 20/4 20/9
20/11 24/8 24/22
27/25 35/21 41/11
42/24 43/17 46/8
yet [3]  9/23 28/21
39/4
you [58]
your [67]

## Z

Zelda [1]  1/16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

                               :       Criminal No. 21-670 (CJN)

                               :

v.                              :

                               :

STEPHEN K. BANNON,          :

                               :

         *Defendant.*        :

                               :

**DEFENDANT'S MOTION TO COMPEL DISCOVERY**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully moves this Court for an Order compelling the Government to comply with its obligations and provide discovery that is material to the preparation of Mr. Bannon's defense, based upon the following:

**Introduction**

To prevail on a motion to compel the search for and disclosure of additional discovery, we need not prove that it would lead to admissible evidence. The burden is much lower – we need only make a threshold showing that the information sought would tend to help in preparing a defense. Mr. Bannon's discovery requests were specific and tailored to the charges in this case. *See* Exhibit 1. Our seven-page letter provided controlling legal authority and requested 30 specific categories of discoverable information. The Government's three-paragraph response contended that they have nothing more to show to the defense. Exhibit 2 at 2. That curt response mirrors a scene from John Huston's film *The Treasure of the Sierra Madre,* where an American character played by Humphrey Bogart questions the legal authority of a group posing as law enforcement agents, only to get the reply: "Badges? . . . We don't need no badges. I don't have to show you any stinking badges!"

1

**-158-**

When an accused faces federal criminal charges, however, the Government cannot ignore legitimate requests for information pertinent to the preparation of a defense. Well-settled authority, and the local criminal rules, require the disclosure of a broad range of information that could potentially add to the quantum of evidence in a defendant's favor. A key aspect of the discovery rules is that the Government must disclose to the defense information that would allow it to *prepare* a defense. *See* Fed. R. Crim. P. 16(1)(1)(E).

The Government cannot avoid its discovery obligations by declining to search files they are required to search, or by taking a narrow view of what information might be helpful to the defense. As described in greater detail below, the Government has an obligation to conduct a broad search for information that tends to: be inconsistent with a defendant's guilt; negate an element of the crime; mitigate the charged offense; establish a defense theory; or cast doubt upon the credibility or accuracy of any witness or evidence. An accused has no ability to require the Government to search its files. While the Government's failure to meet its discovery obligations can result in reversal on appeal, and sanctions, such post-trial remedies do not help an accused who seeks a fair trial. Accordingly, we respectfully request that this Court compel the Government to meet its obligations in advance of trial, so that we can prepare a defense.[1]

### The Government's Allegations

On November 12, 2021, a grand jury charged Stephen K. Bannon in a two-count indictment. [Doc. 1] Count One charged him with Contempt of Congress, in violation of 2 U.S.C. § 192, alleging that "having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House,

---

[1] At the December 7, 2021, status hearing in this case, we outlined our need for discovery as it related to the preparation of pre-trial motions, and the preparation of a defense. *See* 12/7/2021 Tr. at 26-35.

2

did willfully make default – that is, in a matter under inquiry before the House Select Committee

to Investigate the January 6th Attack on the United States Capitol, BANNON refused to appear to

give testimony in response to a subpoena dated September 23, 2021, issued by the Select

Committee and commanding BANNON to appear for a deposition at 10:00 a.m. on October 14,

2021." *Id.* at 8. Count Two also charged him with Contempt of Congress, in violation of 2 U.S.C.

§ 192, alleging that "having been summoned as a witness by the authority of the U.S. House of

Representatives to produce papers upon a matter under inquiry before a committee of the House,

did willfully make default – that is, in a matter under inquiry before the House Select Committee

to Investigate the January 6th Attack on the United States Capitol, BANNON refused to produce

documents and communications, provide a log of any withheld records, certify a diligent search

for records, and comply in any way with a subpoena dated September 23, 2021, issued by the

Select Committee and commanding BANNON to produce documents and communications as

delineated therein." *Id.* at 9.

The statute states as follows:

> Every person who having been summoned as a witness by the authority of either House of
> Congress to give testimony or to produce papers upon any matter under inquiry before
> either House, or any joint committee established by a joint or concurrent resolution of the
> two Houses of Congress, or any committee of either House of Congress, willfully makes
> default, or who, having appeared, refuses to answer any question pertinent to the question
> under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more
> than $1,000 nor less than $100 and imprisonment in a common jail for not less than one
> month nor more than twelve months.

2 U.S.C. § 192.

The Government has the burden of proving, beyond a reasonable doubt, all elements of the

offenses charged. A threshold issue involves whether the subpoena seeking testimony and

documents was valid and issued pursuant to lawful authority. The Supreme Court has held, in

reversing a 2 U.S.C. § 192 conviction, that "Courts administering the criminal law cannot apply

sanctions for violation of the mandate of an agency – here, the Subcommittee – unless that agency's authority is clear and has been conferred in accordance with law." *Gojack v. United States*, 384 U.S. 702, 714 (1966). The Government must prove that Congress had the constitutional power to investigate the matter at issue and make the specific inquiry. *Watkins v. United States*, 354 U.S. 178, 187 (1957). The Government must also prove that the Select Committee was authorized to conduct the specific investigation, and that the actions of the Select Committee were in accordance with the authority granted, and the authorized procedures. *United States v. Rumely*, 345 U.S. 41, 42-43 (1953).

The Supreme Court has held that a defendant prosecuted under 2 U.S.C. § 192 is entitled to "every safeguard which the law accords in all other federal criminal cases." *Russell v. United States*, 369 U.S. 749, 755 (1962). Any citizen facing criminal charges is entitled to due process of law. U.S. Const. Amend. V. Consistent with that constitutional guarantee, if the government officials and employees involved in this matter did not follow the rules of the U.S. House of Representatives, or the rules applicable to the Select Committee, pertaining to the September 23, 2021, subpoena, then there can be no conviction for a violation of 2 U.S.C. § 192. *Yellin v. United States*, 374 U.S. 109 (1963) (Section 192 conviction reversed where committee did not follow rules regarding executive session); *see also Gojack*, *supra*, 384 U.S. at 716 ("[t]he legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense"); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum). The Government will also have the burden of proving that the questions or documents sought were pertinent to the authorized inquiry. *Barenblatt v. United States*, 360 U.S. 109 (1959).

Significantly, the Government must prove that Mr. Bannon acted with criminal intent. There is no violation of the statute unless a person "willfully makes default." 2 U.S.C. § 192. Given the plain language of the statute, and controlling Supreme Court precedent, the Government must prove beyond a reasonable doubt that Mr. Bannon acted "willfully" to violate the statute that prohibits Contempt of Congress. Specifically, the Government must prove that Mr. Bannon knew that his conduct constituted "default," *knew that his conduct was unlawful*, and intended to do something that the law forbids. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998); *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *United States v. Zeese*, 437 F. Supp. 3d 86, 95 (D.D.C. 2020).

### **Applicable Discovery Principles**

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i)     the item is material to preparing the defense;

(ii)    the government intends to use the item in its case-in-chief at trial; or

(iii)   the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)I. The D.C. Circuit has emphasized that the prosecution must disclose evidence which is material "to *the preparation of* the defendant's defense." *United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998) (emphasis in original). The government must disclose both inculpatory and exculpatory evidence. *Id.* "Inculpatory evidence, after all, is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence" because "it is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths."

5

*Marshall*, 132 F.3d at 67; *accord United States v. O'Keefe*, No. 06-0249 (PLF), 2007 WL 1239204, at *2 (Apr. 27, 2007).

The discovery obligations of Rule 16 are "intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case.'" *O'Keefe*, 2007 WL 1239204, at *2 (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (materiality standard "is not a heavy burden" – information is material and must be disclosed if it has the potential to play an "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal"); *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (discovery materiality hurdle "is not a high one").

"As a general matter, Rule 16 establishes the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." *United States v. Apodaca*, 287 F. Supp. 3d 21, 39 (D.D.C. 2017); *see also United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003) Moreover, "the government cannot take a narrow reading of the term material in making its decisions on what to disclose under Rule 16." *O'Keefe, supra*, 2007 WL 1239204, at *2.

Government disclosure of exculpatory and impeachment evidence is essential to the constitutional guarantee to a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* are constitutional obligations, *Brady/Giglio* evidence must be disclosed regardless of whether the defendant makes a request for the

6

information. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Since it is sometimes difficult to

assess the materiality of evidence before trial, prosecutors must err on the side of disclosure. *Kyles*,

514 U.S. at 439.

The Department of Justice ("DOJ") Manual, § 9-5.001, provides as follows:

**Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required.** Department policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence. As a result, this policy requires disclosure by prosecutors of information beyond that which is 'material' to guilt as articulated in Kyles v. Whitley, 514 U.S. 419 (1995), and Strickler v. Greene, 527 U.S. 263, 280-81 (1999). The policy recognizes, however, that a trial should not involve the consideration of information which is irrelevant or not significantly probative of the issues before the court and should not involve spurious issues or arguments which serve to divert the trial process from examining the genuine issues. Information that goes only to such matters does not advance the purpose of a trial and thus is7ubjectt to disclosure.

**Additional exculpatory information that must be disclosed.** A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

**Additional impeachment information that must be disclosed.** A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence — including but not limited to witness testimony — the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

**Information.** Unlike the requirements of Brady and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

**Cumulative impact of items of information.** While items of information viewed in isolation may not reasonably be seen as meeting the standards outlined in paragraphs 1 and 2 above, several items together can have such an effect. If this is the case, all such items must be disclosed.

DOJ    Manual,    https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last visited on Feb. 4, 2022) (emphasis in original).

To ensure that prosecutors adhere to their discovery obligations, the United States District Court for the District of Columbia Local Rules of Criminal Procedure specify the types of information that must be disclosed. The rules provide, in pertinent part, that the Government must disclose to the defense:

> (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged;
>
> (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty;
>
> (3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged;
>
> (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and
>
> (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

Local Rule Crim. P. 5.1(b).

## ARGUMENT

Given the allegations in the indictment and applicable law, the Government must expand its search for information to additional sources of potentially discoverable information and must disclose all information that is material to the preparation of Mr. Bannon's defense.

### Information That Tends To Show That The Indictment Is Invalid

The Government takes the spurious position that grand jury secrecy only counts when they want selectively to withhold information. The Government in this case requested an order allowing disclosure of grand jury materials pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i), which allows a district

8

court to authorize disclosure "preliminarily to or in connection with a judicial proceeding." [Doc.
9] The Government acknowledged in its motion that "such an order is appropriate because grand
jury testimony in this case constitutes material to which the defendant is entitled as part of his
discovery." *Id.* at 2. The Court issued a protective order that authorized disclosure of grand jury
witness transcripts and exhibits, subject to restrictions on the further disclosure of such "Sensitive
Materials." [Doc. 20 at ¶¶ 10-12]

As part of the discovery materials provided to the defense, the Government selectively
included some, but not all, grand jury materials. We made additional requests for the following
grand jury-related information:

2. All documents and information obtained in response to any subpoena or
investigative request relating to Mr. Bannon, and/or any person acting on his
behalf or associated with him.

3. All subpoenas or investigative requests relating to Mr. Bannon, and/or any
person acting on his behalf or associated with him.

4. All documents and information used in support of any subpoena or investigative
request – including but not limited to affidavits – relating to Mr. Bannon, and/or
any person acting on his behalf or associated with him.

*    *    *

24. All documents and information that reflect how the grand jury was charged in
this matter.

25. All documents and information of any kind that were presented to the grand
jury in this matter.

26. All documents and information that were obtained pursuant to a grand jury
subpoena, but not presented to a grand jury in this matter.

27. All documents and information reflecting consideration of, and/or the
presentation of, any information to a grand jury in this matter which would tend
to negate an element of the offenses charged.

9

28. All documents and information reflecting consideration of, and/or the presentation of, any information to a grand jury in this matter which would tend to cast doubt on the credibility or accuracy of any other evidence presented to the grand jury, including witness testimony.

29. All documents and information reflecting consideration of, and/or the presentation of, any information to a grand jury in this matter which would tend to establish a defense to the offenses charged, including but not limited to reliance on the advice of counsel, reliance on authority of the U.S. Department of Justice Office of Legal Counsel or U.S. Attorney's Office policies or any other public authority, and/or entrapment by estoppel.

Exhibit 1 at 3, 6. The Government rejected these requests without explanation.

Federal Rule of Criminal Procedure 6(e) provides a general rule of secrecy for matters occurring before a grand jury. The purpose of the rule is to: (1) encourage grand jury witnesses to be truthful and willing to testify; (2) prevent grand jury targets from fleeing or interfering with the grand jury; and (3) protect suspects who might later be exonerated. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). Where, as here, the Government has sought and obtained Court authorization for the disclosure of selective portions of the matters occurring before the grand jury, it should not be permitted to argue that secrecy concerns justify withholding additional information about matters occurring before that grand jury. The policy reasons underlying grand jury secrecy are no longer applicable. There is no chance that disclosure of the additional grand jury information in this case would discourage grand jury witnesses from testifying, cause targets to flee, or adversely affect suspects who were later exonerated. The grand jury has already returned an indictment.

Under these circumstances, the defense is entitled to a full picture of what was presented to the grand jury, what was not presented, how the prosecution team characterized the evidence and the proposed charges, and the instructions that were given on the law to be applied to the facts. There is no legitimate basis for the Government to be able to choose what material occurring before

10

this grand jury should be kept secret, when they have already sought authorization for, and disclosed, selective parts of the grand jury record.

Beyond that, there is a Protective Order in place that restricts defense counsel from further disclosing "Sensitive Materials" – including grand jury information received from the Government. [Doc. 20] Given those restrictions, there is no legitimate basis for the Government to withhold any additional grand jury materials. Any grand jury materials disclosed, and marked "Sensitive Material," will continue to be protected even after disclosure to the defense.

In addition, there is another particularized need for the disclosure of additional grand jury materials. Based upon information we have reviewed, grounds *may* exist to dismiss the indictment because of a matter that occurred before the grand jury. *See* Rule 6(e)(3)(E)(ii) (court may authorize disclosure "at the request of a defendant who shows that a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury") (emphasis added).

First, as is the subject of a separate motion filed today, the Government used grand jury subpoenas to investigate Mr. Bannon's attorney, Robert J. Costello, Esquire, *at the very time* that Mr. Costello was communicating with the prosecution team and advocating on Mr. Bannon's behalf. There are stringent rules that apply to the investigation of attorneys. Such rules exist because these types of investigations may constitute an impermissible interference with the attorney-client relationship, and the effective assistance of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution. If the Government failed to follow the applicable rules – which will be revealed through additional discovery – a ground may exist to dismiss the indictment. That separately filed motion explains the need for discovery on that troubling issue, so that the defense has sufficient information to evaluate whether some sanction, including dismissal, is appropriate.

11

**-168-**

Second, based upon information known to the defense that must be supplemented with additional discovery, grounds may exist to dismiss the indictment based upon the failure to properly charge the grand jury on applicable law. From the very start, this matter has involved lawyers. Mr. Bannon had no direct communication with the Select Committee. Communications were through his counsel, Robert J. Costello, Esquire. On October 7, 2021, Mr. Costello advised the Select Committee that "Mr. Bannon is legally unable to comply with your subpoena requests for documents and testimony." Exhibit 3 [US-000254]. In this and subsequent communications, Mr. Costello explained the reasons that Mr. Bannon could not legally comply with the subpoena at that time. These included, but were not limited to, the following:

- President Donald J. Trump, through his attorney, instructed Mr. Bannon to protect information covered by the executive and other privileges, to invoke these immunities and privileges, to not produce and documents concerning privileged material in response to the subpoena, and to not provide any testimony concerning privileged material in response to the subpoena. *Id.* at US-000253.

- President Donald J. Trump's attorney advised Mr. Bannon that President Donald J. Trump was "prepared to defend these fundamental privileges in court." *Id.*

- Mr. Costello advised that Mr. Bannon "will comply with the directions of the courts, when and if they rule on these claims of both executive and attorney client privileges." *Id.*

- Mr. Costello consistently informed the Select Committee that Mr. Bannon was acting in accordance with applicable law, as set forth in detailed official legal opinions issued by the Office of Legal Counsel, U.S. Department of Justice, which analyzed the legal issues under analogous circumstances. *See* Exhibit 4 (FBI Interview of Robert J. Costello, Esquire, on November 3, 2021). [US001769 to 001782]

Thus, the Select Committee knew from the outset that Mr. Bannon believed that he was acting in accordance with the law, as advised by his attorney, and that he welcomed the adjudication of any disputed interpretation of legal issues by a court of law.

On October 18, 2021, President Donald J. Trump filed a lawsuit in the U.S. District Court for the District of Columbia seeking the judicial determination of his assertion of executive

privilege in response to a request for documents from the Select Committee. The same day, Mr.

Costello, on behalf of Mr. Bannon, communicated with the Select Committee seeking a one-week

adjournment of the subpoena date. The communication stated, in pertinent part, as follows:

> We write on behalf of Stephen Bannon. We have just been advised of the filing of a lawsuit
> in federal court for the District of Columbia entitled Donald J. Trump v. Bennie Thompson,
> et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we respectfully request a
> one-week adjournment of our response to your latest letter so that we might thoughtfully
> assess the impact of this pending litigation. (US-000290)

On October 19, 2021, the Select Committee rejected Mr. Bannon's reasonable request for a one-

week adjournment to assess this legal development, and instead forwarded a resolution to the full

House of Representatives recommending that Steven K. Bannon be found in Contempt of

Congress. [US-000607-000652].

The grand jury, in considering whether to return an indictment for a violation of 2 U.S.C.

§ 192, would need to consider evidence that goes to the question whether Mr. Bannon "willfully

[made] default." Grand jury materials already disclosed to the defense raise significant questions

as to what evidence was presented on this issue, and what legal instructions were given. Mr.

Bannon was clear in conveying his position to the Select Committee – he would testify if a court

considered the legal issues involved and determined that no privilege prevented his testimony or

production of documents. Another plausible option actually presented itself, with the filing of a

lawsuit by President Donald J. Trump seeking a judicial determination of the privilege issue by a

federal judge. At that juncture, Mr. Bannon sought a short adjournment to assess this development.

Mr. Bannon's request for an adjournment while a federal court considered the executive privilege

invocation by President Donald J. Trump is a critical piece of evidence. The grand jury was entitled

to consider that evidence. In addition, the grand jury was entitled to clear and accurate instructions

on the legal framework within which to consider that evidence, particularly as the grand jury

13

weighed the essential element of intent. This was at the heart of any decision on whether Mr.

Bannon "willfully [made] default."

The selective grand jury materials provided to the defense leave critical questions on these

topics unanswered. In testimony on November 12, 2021, the lead FBI agent in the case made no

mention of Mr. Bannon's request for adjournment even when specifically questioned about the

topic. *See* Exhibit 5 (filed under seal in accordance with Protective Order) [US-000061 to US-

000065]. It is unlikely that this involved a lapse in memory because the same lead FBI agent was

aware of the request for adjournment when he testified. Robert J. Costello, Esquire, had told him

about it in a November 3, 2021, interview, and it is referenced in a report of that interview that the

lead FBI agent finalized on November 11, 2021 – *just one day* before his grand jury appearance.

*See* Exhibit 4 at 2 (November 11, 2021, FBI Report of Interview of Robert J. Costello, Esquire).

The letter seeking an adjournment on behalf of Mr. Bannon is not among the grand jury

exhibits that were provided to the defense. Additional discovery is needed to assess whether the

lead agent's testimony, viewed in conjunction with the grand jury instructions and any other

information provided to the grand jury by the prosecution team, may be grounds for dismissal of

the indictment. This discovery may tend to negate an element of the offense, since the Government

must prove beyond a reasonable doubt that Mr. Bannon knew that his conduct was unlawful and

intended to do something that the law forbids.

It cannot be contested that the Select Committee was aware that from the start that Mr.

Bannon was relying upon legal advice provided by his attorney. The prosecution team also knew

this from the start. On November 3, 2021, Robert J. Costello, Esquire, informed the prosecution

team that he "advised that BANNON should wait to respond until an agreement was reached

between the Select Committee and former President TRUMP or if a court defined what was

14

**-171-**

covered under Executive Privilege." Exhibit 4 at 4 (November 11, 2021, FBI Report of Interview of Robert J. Costello, Esquire) [US-001772]. In addition, Mr. Costello consistently advised the Government that Mr. Bannon was acting in accordance with legal opinions issued by the Office of Legal Counsel, U.S. Department of Justice, which analyzed the issues under analogous circumstances. *Id.* at 3.

Given that reliance on advice of counsel is central to this case, it is essential that the grand jury was properly instructed not only on the elements of the offense, but also on how to consider the legal significance of information presented regarding the advice of counsel. Available information suggests that the prosecution team may not have accurately instructed the grand jury on applicable law, which may present grounds for dismissal of the indictment as set forth in Rule 6(e)(3)(E)(ii). The Government has taken the position that, in their view, advice of counsel is inapplicable to this case. [Doc. 25 at ¶ 2] Given the Government's position, it is reasonable to question whether the grand jury was properly instructed on this essential legal concept.

A review of the grand jury materials already provided to the defense raises questions about whether the grand jury was properly instructed on the law. For instance, the lead FBI agent in the case appears to have provided information to the grand jury which suggests that a witness cannot not validly assert executive privilege before the Select Committee unless the President himself (or his representative) *directly* communicated the assertion of executive privilege to the Select Committee. *See* Exhibit 6 (filed under seal in accordance with Protective Order) [US-000073]. This could have misled the grand jury about a material legal concept. There is no authority for the proposition that an assertion of executive privilege is not valid unless the President himself, or his representative, communicates it to the Select Committee. Mr. Costello conveyed President Donald

15

J. Trump's invocation of executive privilege to the Select Committee, and the Select Committee had knowledge of President Donald J. Trump's invocation of the privilege from other sources.

Failure to instruct the grand jury properly on the legal principles of advice of counsel may be grounds for dismissal of the indictment. *See United States v. Stevens*, 771 F. Supp. 556, 567 (D. Md. 2011) (dismissing indictment based upon failure to properly instruct the grand jury regarding advice of counsel, finding that "good faith reliance on the advice of counsel negates a defendant's wrongful intent, and is therefore highly relevant to the decision to indict."); *see generally United States v. Peralta*, 763 F. Supp. 14 (S.D.N.Y. 1991) (dismissal of indictment based upon grand jury instructions that did not properly state the law). In addition, some district courts have ordered the disclosure of grand jury instructions without a showing of particularized need, given that the instructions are part of the ground rules under which the grand jury conducts its proceedings, and do not reveal the grand jury's deliberations. *See United States v. Belton*, 2015 U.S. Dist. LEXIS 52426, *7 (N.D. Cal. 2015) (citing cases). Accordingly, we request an order compelling disclosure of additional grand jury materials.

**Information That Tends To Show That The Subpoena Was Not Lawfully Authorized**

The Government must prove beyond a reasonable doubt that the subpoena seeking Mr. Bannon's testimony and documents was valid and was issued pursuant to lawful authority. Under the rules of discovery, the defense is entitled to any information that tends to negate Mr. Bannon's guilt as to this element of the offense. We are also entitled to any information that tends to cast doubt on the credibility or accuracy of any evidence – including witness testimony and tangible evidence – that the Government intends to rely upon at trial.

This prosecution was set in motion by the actions of officials, members, employees, and staff of the Select Committee. They communicated with Robert J. Costello, Esquire, regarding

16

-173-

service of the subpoena. They communicated with Mr. Costello regarding Mr. Bannon's response to the subpoena, orally and in writing. They took actions to create a record regarding Mr. Bannon's response to the subpoena. They drafted a resolution suggesting that the U.S. House of Representatives find Mr. Bannon in Contempt of Congress. Once that resolution passed, the Speaker of the House, and her staff, took action to effectuate a criminal prosecution of Mr. Bannon.

No criminal prosecution would have followed but for their actions. Accordingly, Mr. Bannon is entitled to information in the files of those individuals, so that he can prepare a defense. The Government has an obligation to search their files for discoverable material. We specifically requested the following information.

5. All documents and information regarding the establishment of the Select Committee, its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

6. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding Mr. Bannon's appearance as a witness and/or production of documents.

7. All documents and information in the possession of the U.S. House of Representatives Rules Committee, Office of General Counsel, and Office of the Speaker, or any of its officials, members, employees, or staff, regarding Mr. Bannon's appearance as a witness and/or production of documents.

8. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding the issuance of a subpoena to Mr. Bannon.

9. All documents and information in the possession of the Select Committee, the main Department of Justice, the U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

10. All drafts of the October 8, 2021, letter from the Select Committee Chair referenced in Paragraph 17 of the Indictment.

11. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding attendance by members and staff at the October 14, 2021, hearing room, referenced in Paragraph 19 of the Indictment.

12. All drafts of the October 15, 2021, letter from the Select Committee Chair referenced in Paragraph 20 of the Indictment.

13. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding what constitutes a default by a witness in response to a subpoena, and/or what does not constitute a default by a witness in response to a subpoena.

14. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding whether the Select Committee would receive the testimony of any witness in a non-public deposition.

Exhibit 1 at 4 to 5. The Government declined to search the files or provide the information requested, contending that the officials, members, employees, and staff of the U.S. House of Representatives are not part of the prosecution team. Exhibit 2 at 1. This cramped interpretation is at odds with the Government's basic obligations in any criminal case. *See United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989) (Rule 16 intended to provide a defendant "the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case").

The Government must inquire whether witnesses are biased, and whether the tangible evidence provided by witnesses is valid. This is not limited to trial witnesses. As the Government is aware, there are numerous officials, members, employees, and staff of the U.S. House of

18

Representatives who were directly involved in this matter from the beginning. This criminal case was a direct result of their actions and omissions.

The limited information that the defense has received from the files of officials, members, employees, and staff of the U.S. House of Representatives indicates that the actions by the Select Committee were *not* in accordance with the authority conferred by the U.S. House of Representatives. Because valid legal authority is an element of the offense, we are entitled to any information that is inconsistent with or tends to negate the defendant's guilt as to this element. *See* Local Rule Crim. P. 5.1(b).

For instance, the Select Committee's legal authority to issue subpoenas and conduct depositions is limited by the resolution establishing the Select Committee, and the general Rules of the House of Representatives, which are incorporated by reference into that resolution. That authority limits certain actions with regard to subpoenas and depositions by requiring consultation with, and notice to, the ranking minority member of the Select Committee. *See* Exhibit 7 (H. Res. 503, Sec. 5(c)(6)(A) & (B)) [US-000268 to 000269], incorporating Exhibit 8 (procedures adopted by 117th Congress on January 4, 2021, Regulations For Use Of Deposition Authority, ¶ 2) [US-000963]. The Select Committee did not act within its legal authority with regard to the subpoena and the deposition of Mr. Bannon, because there was no consultation with the ranking minority member. Simply put, the Select Committee does *not have a ranking minority member. See* Exhibit 9 (November 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter). The top lawyer for the U.S. House of Representatives acknowledged this in an FBI interview, as follows:

> Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess [sic] procedural powers.

19

LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

*Id.* at 4 [US-000248]. Mr. Bannon is entitled to all information along these lines, which would tend

to negate an element of the offense.

Given the central role of the Select Committee, the Speaker of the House, and the U.S.

House of Representatives, in initiating this prosecution, the Government is obligated to make

inquiry of those whose actions precipitated this prosecution, and to disclose any information that

is material to the preparation of Mr. Bannon's defense.

### **Information That Tends To Negate Willfulness**

The Government has an obligation to disclose information that tends to negate the intent

element of this offense. Specifically, we believe that the Government is in possession of documents

and communications which tend to establish that a person in Mr. Bannon's position – asserting a

privilege in response to a Congressional subpoena – should not be criminally prosecuted under 2

U.S.C. § 192. Accordingly, we requested that the Government search for and disclose the

following information:

> 19. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), and U.S. Attorney's Office, or any of its officials, members, employees, or staff, regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

> 20. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice – including but not limited to the Office of Legal Counsel – and the U.S. Attorney's Office, or any of its officials, members, employees,

20

> or staff, regarding the applicability of the advice of counsel defense to an
> alleged failure to comply with a Congressional subpoena, involving Mr.
> Bannon or any other individual.

Exhibit 1 at 5.

Given that the United States Attorney General made a personal statement about the case

on the day that Mr. Bannon was indicted, there is reason to believe that main Justice was involved

with the prosecution team in initiating this case. We understand that the files at main Justice, the

U.S. Attorney's Office, and the White House all contain documents analyzing the assertion of

privilege in response to a congressional subpoena, and determining that a prosecution of someone

in Mr. Bannon's position cannot be sustained.

For instance, in a memorandum explaining why the U.S. Attorney's Office would not

pursue a under 2 U.S.C. § 192 prosecution of a former executive branch official who asserted

privilege and refused to answer any questions based upon privilege, the U.S. Attorney for the

District of Columbia at the time stated, in pertinent part, that:

> It has long been the position of the Department, across administrations of both political
> parties, that we will not prosecute an Executive Branch official under the contempt of
> Congress statute for withholding subpoenaed documents pursuant to a presidential
> assertion of executive privilege.

Exhibit 10 at 6 (Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House

John A. Bohner, (March 31, 2015)). Likewise, the Office of Legal Counsel, U.S. Department of

Justice, has similar documents that tend to negate Mr. Bannon's guilt or establish a defense to the

charges. For example, Theodore Olson, Assistant Attorney General, Office of Legal Counsel,

wrote that:

> We believe that the Department's long-standing position that the contempt of Congress
> statute does not apply to executive officials who assert Presidential claims of executive
> privilege is sound, and we concur with it.

21

**-178-**

Exhibit 11 at 129 (*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984)).

Another example of an Office of Legal Counsel document that tends to negate the element of willfulness involved a former White House employee who was subpoenaed to testify before a House Committee and who anticipated questions that were protected by executive privilege. In that matter, the Committee's rules allowed the former White House employee to be accompanied by private counsel, but did not allow the presence of agency counsel, who would represent the interests of the Executive Branch – the same procedure employed by the Select Committee here, to which Mr. Bannon objected through his attorney Robert J. Costello, Esquire. Under those circumstances, Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, concluded that:

> Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.

Exhibit 12 at 1 (*Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, slip op. (May 23, 2019)).

Because the defense does not have the ability to search the files of the government actors involved in this prosecution that may possess additional such documents, we respectfully request that the Court compel the Government to meet its obligations in this regard.[2]

### Information That Tends To Show Bias Or The Invalidity Of Evidence

Available information suggests that political considerations played an impermissible role in the events leading to the prosecution of Mr. Bannon. Under Local Rule Crim. P. 5.1(b), Mr.

---

[2] Additional discovery will tend to support several defenses to the charges, such as a public authority defense, including the defenses of actual authority, implied authority, and entrapment by estoppel.

Bannon is entitled to information that tends to show the bias of any witness against him. Such

information would tend to cast doubt on the credibility or accuracy of the Government's evidence.

Mr. Bannon is also entitled to any information that tends to show that this prosecution was initiated

or pursued because of political considerations. Such information would tend to establish an

articulated and legally cognizable defense theory or recognized affirmative defense. Thus, the

information must be disclosed pursuant to Local Rule of Criminal Procedure 5.1(b).

We requested the following information from the Government:

2. Any private or public statement by any member of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, or any of its officials, members, employees, or staff, regarding Mr. Bannon's interaction with the Select Committee.

3. Any private or public statement by any official, employee, or staff of the U.S. Department of Justice regarding Mr. Bannon's interaction with the Select Committee.

4. Any private or public statement by any official, employee, or staff of the U.S. Attorney's Office for the District of Columbia regarding Mr. Bannon's interaction with the Select Committee.

5. Any private or public statement by any official, employee, or staff of the White House regarding Mr. Bannon's interaction with the Select Committee.

\*   \*   \*

22. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice – including but not limited to the Office of Legal Counsel – the U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words of similar meaning and effect.

23. All documents and information in the possession of any Member of the Select Committee, or any Member of the U.S. House of Representatives, who voted in favor of a criminal referral of the matter involving Mr. Bannon, which tend to show that Member's bias (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated), or conflict of interest.

Exhibit 1 at 5-6. The Government declined to provide any such information, or even make the requested search for responsive documents.

Information obtained by the defense provides the basis for these discovery requests, as follows:

- Select Committee members were selected by the Speaker of the House, a Democrat, after she declined to appoint key Republican members recommended by the Republican Leader. *See* Lindsay Wise, *Pelosi Rejects Two GOP Picks for Jan. 6 Capitol Riot*, THE WALL STREET JOURNAL, updated July 21, 2021, https://www.wsj.com/articles/pelosi-rejects-two-gop-selections-for-jan-6-capitol-riot-committee-11626889294.

- The Select Committee noted that Mr. Bannon was the Chief Executive Officer of President Donald J. Trump's 2016 presidential campaign. [US-000611]

- The Select Committee noted that Mr. Bannon served in the White House as President Donald J. Trump's chief strategist. *Id.*

- The Select Committee noted that after Mr. Bannon left the White House, he remained active in media and politics. [US-000612]

- The Select Committee noted that Mr. Bannon was the host of a radio show and podcast focused on "rallying supporters" of President Donald J. Trump. *Id.*

- The Select Committee noted that before the 2020 Presidential election, Mr. Bannon made public efforts to explain "his belief that the Democrats are plotting to steal the 2020 election." *Id.*

- The Select Committee rejected Mr. Bannon's reasonable request for a judicial determination of his assertion of executive privilege. [US-000291 to 000294]

- The Select Committee rejected Mr. Bannon's reasonable request for a one-week adjournment of his appearance, after President Donald J. Trump filed a lawsuit seeking a judicial determination of the assertion of executive privilege. [US-000275]

- The U.S. House of Representatives voted largely along party lines in approving a resolution finding Mr. Bannon in contempt of Congress. *See* Claudia Grisales, *The House votes to hold Steve Bannon in contempt for defying a subpoena*, NPR, Oct. 21, 2021, https://www.npr.org/2021/10/21/1048051026/u-s-house-approves-criminal-contempt-referral-for-steve-bannon.

- Members of the Select Committee have made public statements regarding their desire to set an example through the criminal prosecution of Mr. Bannon. *See, e.g.,*

  o Mychael Schnell, *Schiff says holding Bannon in criminal contempt 'a way of getting people's attention*,' The Hill (Oct. 17, 2021) https://www.msn.com/en-us/news/politics/schiff-says-holding-bannon-in-criminal-contempt-a-way-of-getting-people-s-attention/ar-AAPDsOV

  o Jordan Williams, *Kinzinger says he hopes Bannon indictment sends 'chilling message*,' The Hill (Nov. 13, 2021) https://www.msn.com/en-us/news/politics/kinzinger-says-he-hopes-bannon-indictment-sends-chilling-message/ar-AAQFs.k "So, this is certainly a good thing, and I hope it sends a chilling message to anybody else who was going to follow through like this."

- The Speaker of the House, a Democrat, made a public statement regarding her desire to have Mr. Bannon criminally prosecuted. *See* "On Sunday, Pelosi addressed the issue during an interview on CNN's State of the Union, answering 'yes' when asked if Bannon should be prosecuted and jailed for refusing to submit documents and testimony for the investigation." Natalie Colarossi, *Steve Bannon's 1/5 Comments Resurface as Pelosi Says He Should Be Jailed Over Subpoena Refusal*, NEWSWEEK, https://www.newsweek.com/steve-bannons-1-5-comments-resurface-pelosi-says-he-should-jailed-over-subpoena-refusal-1642016.

- The President of the United States, a Democrat, made a public statement stating that those in Mr. Bannon's position should be criminally prosecuted. *See* Amy B. Wang, *Biden says Justice Department should prosecute those who refuse Jan. 6 Committee subpoenas*, WASHINGTON POST, Oct. 15, 2021, https://www.washingtonpost.com/politics/2021/10/15/biden-says-justice-department-should-prosecute-those-who-refuse-jan-6-committees-subpoenas/. "When asked Friday if the Justice Department should prosecute those who refuse the committee's subpoenas, Biden responded, 'I do. Yes.'"

- In indicting Mr. Bannon, the U.S. Department of Justice ignored long-standing policies that: (1) a former executive branch official cannot be prosecuted for contempt of Congress after asserting executive privilege; and (2) congressional subpoenas seeking the testimony of executive branch employees – where the committee does not allow the presence of agency counsel – are invalid and unenforceable.

25

**-182-**

- The Attorney General of the United States, nominated by the President, a Democrat, took the unusual step of including his personal opinion in a press release announcing Mr. Bannon's indictment. *See* Press Release, United States Department of Justice, *Stephen K. Bannon Indicted for Contempt of Congress* (Nov. 12, 2021) https://www.justice.gov/opa/pr/stephen-k-bannon-indicted-contempt-congress.

- To date, Mr. Bannon is the only individual who has been criminally prosecuted for interactions with the Select Committee.

Given these facts, Mr. Bannon is entitled to the disclosure of information tending to show the bias of any of individual who set in motion his criminal prosecution, and information tending to show that this prosecution is politically motivated.

## CONCLUSION

Wherefore, for the reasons set forth above, Mr. Stephen K. Bannon respectfully requests an Order compelling the Government to produce the requested discovery materials so that he may prepare a defense to the charges in this matter.

Dated: February 4, 2022                    Respectfully submitted,

                                           **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                               /s/ M. Evan Corcoran
                                           M. Evan Corcoran (D.C. Bar No. 440027)
                                           210 N. Charles Street, 26th Floor
                                           Baltimore, MD 21201
                                           Telephone: (410) 385-2225
                                           Facsimile: (410) 547-2432
                                           Email: ecorcoran@silvermanthompson.com


                                               /s/ David I. Schoen
                                           David I. Schoen (D.C. Bar No. 391408)
                                           David I. Schoen, Attorney at Law
                                           2800 Zelda Road, Suite 100-6
                                           Montgomery, Alabama 36106
                                           Telephone: (334) 395-6611
                                           Facsimile: (917) 591-7586
                                           Email: schoenlawfirm@gmail.com

26

_____/s/_ Robert J. Costello_____

Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com


*Counsel for Defendant Stephen K. Bannon*

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of February 2022, a copy of the foregoing DEFENDANT'S MOTION TO COMPEL DISCOVERY was served *via* the Court's CM/ECF system on registered parties and counsel.

/s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

Case 1:21-cr-00670-CJN   Document 28-1   Filed 02/04/22   Page 1 of 8

# EXHIBIT 1



# SILVERMAN THOMPSON

**Silverman Thompson Slutkin White**

**ATTORNEYS AT LAW**

*A Limited Liability Company*
201 N. Charles Street
26th Floor
Baltimore, Maryland 21201
Telephone 410.385.2225
Facsimile 410.547.2432
silvermanthompson.com
*Baltimore | Towson | New York | Washington, DC*

Writer's Direct Contact:
Evan Corcoran
410-385-2225
ecorcoran@silvermanthompson.com

January 14, 2022

## *VIA – ELECTRONIC DELIVERY*

Amanda Vaughn, Esquire
J.P. Cooney, Esquire
Molly Gaston, Esquire
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

       Re:    *United States v. Stephen K. Bannon,* Criminal No. 21-670 (CJN)

Dear Counsel:

We make the following discovery requests pursuant to the Court's January 3, 2022, Scheduling Order (Doc. 25).

Our requests are based, without limitation, upon Federal Rule of Criminal Procedure 16, Local Rule of Criminal Procedure 5.1(b), the Jencks Act, Federal Rule of Evidence 404(b), the *Brady/Giglio/Kyles* line of cases, the United States Department of Justice's policies governing discovery, and the United States Attorney's Office for the District of Columbia's policies governing discovery.

### A. **Scope of Review**

U.S. Department of Justice policy states that:

> It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant.

JM 9-5.001.

It is your responsibility to search for exculpatory and impeachment information in the custody and control of the attorneys, agents, and other employees of the U.S. Attorney's Office. Because employees of the main U.S. Department of Justice participated in the investigation and prosecution of this case, it is also your responsibility to search for exculpatory and impeachment information in the custody and control of the officials, attorneys, agents, and other employees of the main U.S. Department of Justice. In addition, because Members of Congress, staff, and employees of the U.S. House of Representatives participated in the investigation and prosecution of this case – and in some instances may be witnesses in this case – it is your responsibility to search for exculpatory and impeachment information in the custody and control of the attorneys, agents, and other employees of the U.S. House of Representatives. This includes individuals associated with the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter "Select Committee"), the Rules Committee, Office of General Counsel, and Office of the Speaker of the House. In addition, since both the U.S. Attorney General and the President of the United States commented publicly upon the prosecution of Mr. Bannon, it is your responsibility to search for discoverable information within the Office of the Attorney General, and the White House.

### B. Materials To Review

You are required to review all potentially discoverable materials within the custody or control of the governmental organizations set forth above. This includes, without limitation: the FBI's entire investigative files; confidential informant, witness, human source, and source files; information gathered during the investigation; and all case-related communications.

In addition, you are required to obtain, review, and disclose all prior statements of individuals at the U.S. Attorney's Office, the main U.S. Department of Justice, the FBI, the U.S. House of Representatives, and the White House, who participated in any way in this matter. You are responsible for disclosing potentially inconsistent prior statements (including potentially inconsistent attorney proffers), statements or reports reflecting witness statement variations, and conditions that could affect a person's bias (including animosity toward Mr. Bannon, or animosity toward any group with which Mr. Bannon is affiliated).

### C. Local Rule of Criminal Procedure 5.1(b)

As you are aware, the local rules for the United States District Court for the District of Columbia make explicit your obligations as to each piece of information that you review for discovery purposes. You are required to consider how a given piece of information might add to the quantum of evidence in favor of the defendant, and to disclose any information which has any weight at all in a defendant's favor. You are required to disclose any information that would make conviction less likely, or a lower sentence more likely. This includes any information that is inconsistent or tends to negate any element of the offense charged. It also includes any

2

**-188-**

information that would tend to support any defense to the offense charged. It further includes information that has not been documented. With regard to such information, it is your responsibility to reduce it to writing so that it can be produced to us.

The local rules provide, in pertinent part, that you are obligated to disclose to us, without limitation:

(1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged;

(2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty;

(3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged;

(4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and

(5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

LCrR 5.1(b).

### D. Additional Requests

1. All statements of Mr. Bannon, and/or any person acting on his behalf or associated with him.

2. All documents and information obtained in response to any subpoena or investigative request relating to Mr. Bannon, and/or any person acting on his behalf or associated with him.

3. All subpoenas or investigative requests relating to Mr. Bannon, and/or any person acting on his behalf or associated with him.

4. All documents and information used in support of any subpoena or investigative request – including but not limited to affidavits – relating to Mr. Bannon, and/or any person acting on his behalf or associated with him.

3

5. All documents and information regarding the establishment of the Select Committee, its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

6. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding Mr. Bannon's appearance as a witness and/or production of documents.

7. All documents and information in the possession of the U.S. House of Representatives Rules Committee, Office of General Counsel, and Office of the Speaker, or any of its officials, members, employees, or staff, regarding Mr. Bannon's appearance as a witness and/or production of documents.

8. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding the issuance of a subpoena to Mr. Bannon.

9. All documents and information in the possession of the Select Committee, the main Department of Justice, the U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

10. All drafts of the October 8, 2021, letter from the Select Committee Chair referenced in Paragraph 17 of the Indictment.

11. All documents and information in the possession of the Select Committee, or any of its officials, members, employees, or staff, regarding attendance by members and staff at the October 14, 2021, hearing room, referenced in Paragraph 19 of the Indictment.

12. All drafts of the October 15, 2021, letter from the Select Committee Chair referenced in Paragraph 20 of the Indictment.

13. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding what constitutes a default by a witness in response to a subpoena, and/or what does not constitute a default by a witness in response to a subpoena.

4

14. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, regarding whether the Select Committee would receive the testimony of any witness in a non-public deposition.

15. Any private or public statement by any member of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, or any of its officials, members, employees, or staff, regarding Mr. Bannon's interaction with the Select Committee.

16. Any private or public statement by any official, employee, or staff of the U.S. Department of Justice regarding Mr. Bannon's interaction with the Select Committee.

17. Any private or public statement by any official, employee, or staff of the U.S. Attorney's Office for the District of Columbia regarding Mr. Bannon's interaction with the Select Committee.

18. Any private or public statement by any official, employee, or staff of the White House regarding Mr. Bannon's interaction with the Select Committee.

19. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice (including but not limited to the Office of Legal Counsel), and U.S. Attorney's Office, or any of its officials, members, employees, or staff, regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

20. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice – including but not limited to the Office of Legal Counsel – and the U.S. Attorney's Office, or any of its officials, members, employees, or staff, regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

21. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice – including but not limited to the Office of Legal Counsel – and the U.S.

5

Attorney's Office, or any of its officials, members, employees, or staff, regarding the meaning of the term "papers" in Title 2, United States Code, Section 192.

22. All documents and information in the possession of the Select Committee, Rules Committee, Office of General Counsel, and Office of the Speaker, main Department of Justice – including but not limited to the Office of Legal Counsel – the U.S. Attorney's Office, and the White House, or any of its officials, members, employees, or staff, that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words of similar meaning and effect.

23. All documents and information in the possession of any Member of the Select Committee, or any Member of the U.S. House of Representatives, who voted in favor of a criminal referral of the matter involving Mr. Bannon, which tend to show that Member's bias (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated), or conflict of interests.

24. All documents and information that reflect how the grand jury was charged in this matter.

25. All documents and information of any kind that were presented to the grand jury in this matter.

26. All documents and information that were obtained pursuant to a grand jury subpoena, but not presented to a grand jury in this matter.

27. All documents and information reflecting consideration of, and/or the presentation of, any information to a grand jury in this matter which would tend to negate an element of the offenses charged.

28. All documents and information reflecting consideration of, and/or the presentation of, any information to a grand jury in this matter which would tend to cast doubt on the credibility or accuracy of any other evidence presented to the grand jury, including witness testimony.

29. All documents and information reflecting consideration of, and/or the presentation of, any information to a grand jury in this matter which would tend to establish a defense to the offenses charged, including but not limited to reliance on the advice of counsel, reliance on authority of the U.S. Department of Justice Office of Legal Counsel or U.S. Attorney's Office policies or any other public authority, and/or entrapment by estoppel.

6

30. All documents previously requested in our January 6, 2022, letter regarding the Government's investigative activities.

Please provide the information requested above by January 28, 2022, in accordance with the Court's Scheduling Order.

Thank you for your attention to this request.

Sincerely,

David I. Schoen
Robert J. Costello
M. Evan Corcoran

*Counsel for Stephen K. Bannon*

# EXHIBIT 2



**U.S. Department of Justice**

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

January 28, 2022

**DELIVERY VIA EMAIL**
David I. Schoen
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
dschoen593@aol.com

Robert J. Costello
Davidoff Hutcher & Cirton LLP
605 Third Ave.
New York, NY 10158
rjc@dhclegal.com

M. Evan Corcoran
Silverman Thompson Slutkin White
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201
ecorcoran@silvermanthompson.com

  RE: *United States v. Stephen K. Bannon*, 21-cr-670 (CJN)

Dear Counsel:

  We write in response to your letter of January 14, 2022, making certain discovery requests. As we have stated previously, we understand our obligations under Rule 16, the Jencks Act, and *Brady*, *Giglio*, and their progeny. To date, we have provided discovery that exceeds our obligations.

  We have carefully reviewed all of your requests and the materials in our possession, custody, and control. As an initial matter, your letter asserts that the U.S. House of Representatives and the White House are part of the prosecution team in this case. They are not. We have provided all discoverable materials we have received from those parties and thus have nothing more to provide in response to requests in which you seek information in their possession.

Regarding your remaining requests, either we have already provided you with any discoverable materials that are in the possession, custody, or control of the prosecution team, or your requests call for documents and information that are not discoverable.

Please do not hesitate to contact us with any questions.

Sincerely,

MATTHEW M. GRAVES
United States Attorney

By:     /s/ *Amanda R. Vaughn*
        J.P. Cooney
        Molly Gaston
        Amanda R. Vaughn
        Assistant United States Attorneys
        United States Attorney's Office
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov

2
**-196-**

# EXHIBIT 3



## DAVIDOFF HUTCHER & CITRON LLP

ATTORNEYS AT LAW

605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 266-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914) 381-7400

WEST PALM BEACH
ATTORNEYS AT LAW
1107 NORTH OLIVE AVENUE
WEST PALM BEACH, FL 33401
(561) 567-8488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

October 7, 2021

Kristin Amerling, Esq.
Chief Counsel/Deputy Staff Director
House Select Committee to Investigate
The January 6th Attack on the United States Capitol
1540A Longworth HOB
Washington, DC 20515

        Re:    The Subpoena for Stephen K. Bannon dated September 23, 2021

Dear Ms. Amerling:

        I write today on behalf of Stephen K. Bannon with respect to the above referenced subpoena, which I accepted on behalf of Mr. Bannon. On the afternoon of October 6, 2021, I received a letter from Justin Clark, as counsel for then President of the United States Donald J. Trump. That letter references the subpoena that your Committee served upon Mr. Bannon, and notes that the subpoena:

        "seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

        Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

        It is therefore clear to us that since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert

**Jan. 6 Sel. Comm. 0011**



US-000253

**-198-**

DAVIDOFF HUTCHER & CITRON LLP

Kristin Amerling, Esq.
October 7, 2021
Page 2

those executive privileges enumerated above, we must accept his direction and honor
his invocation of executive privilege. As such, until these issues are resolved, we are
unable to respond to your request for documents and testimony.

We will comply with the directions of the courts, when and if they rule on
these claims of both executive and attorney client privileges. Since these privileges
belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr.
Bannon is legally unable to comply with your subpoena requests for documents and
testimony.

Very truly yours,

/s/ Robert J. Costello

RJC/nc
None

Jan. 6 Sel. Comm. 0012

US-000254

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



OFFICIAL RECORD

Date of entry    11/11/2021

    ROBERT COSTELLO, Partner, Davidoff Hutcher & Citron, LLP, 605 Third
Avenue, New York, New York, was interviewed via Webex. COSTELLO was joined
in the interview via Webex by his associate ADAM KATZ.  COSTELLO was
interviewed by Assistant United States Attorney (AUSA) J.P. Cooney, U.S.
Attorney's Office for the District of Columbia (USAO-DC), AUSA Molly
Gaston USAO-DC, AUSA Amanda Vaughn USAO-DC, Paralegal Chad Byron USAC-DC,
FBI Special Agent Katherine E. Pattillo, FBI Special Agent Frank G. D'Amico,
FBI Special Agent Matthew Lariccia, and FBI Special Agent Stephen R. Hart.
There were no agreements or conditions governing the conversation
between COSTELLO and representatives of USAO-DC or FBI.  After being advised
of the identities of the interviewing AUSAs and Agents and the nature of the
interview, COSTELLO provided the following information:

    COSTELLO had initiated contact with the U.S. Attorney's Office (USAO)
because he was not certain what had been provided to them regarding his
interactions with the U.S. House of Representatives Select Committee to
Investigate the January 6th Attack on the United States Capitol (the Select
Committee) regarding their subpoena to his client, STEPHEN BANNON (BANNON).
COSTELLO was willing to provide USAO additional written correspondence
between him and the Select Committee.

    The Select Committee subpoena requested a number of different categories
of information from BANNON.  Among them, the Select Committee sought copies
of BANNON's podcast.  COSTELLO found this request odd because the
podcasts are available to the public online.  COSTELLO and BANNON discussed
the categories and were preparing to respond to Chairman Thompson on October
19, 2021, when they received a letter on October 18, 2021, from the Select
Committee notifying of a deadline to respond.  However, just that afternoon,
COSTELLO had learned of a lawsuit filed by attorneys for former President
DONALD TRUMP in US District Court in Washington, DC, challenging the Select
Committee.  COSTELLO had not had communication with attorneys for TRUMP

Investigation on  11/03/2021  at  Manassas, Virginia, United States (Phone, Other (Webex))

File #  72-WF-3513323                                    Date drafted  11/03/2021

by  HART STEPHEN R, SA FRANK G. DAMICO, Matthew U. Lariccia, Katherine E. Pattillo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-001769

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert
Continuation of FD-302 of Costello _____ , On 11/03/2021 , Page 2 of 10

prior to that date.  After learning of the lawsuit filed by the attorneys
for former President TRUMP, COSTELLO wrote a short letter to the Select
Committee requesting an adjournment from the proceedings.  COSTELLO did not
expect the Select Committee to give him a full seven days adjournment, but
he did expect the Select Committee to give him 24-48 hours to review the
lawsuit and whether or not it applied to the subpoena served on BANNON.

With regards to responding to the Select Committee's request for
documents, COSTELLO planned to send a link to the website hosting all of
BANNON's publicly accessible podcasts.  COSTELLO and BANNON had also
identified five other categories for which BANNON had no responsive
documents.  COSTELLO believed the request listed as number 17 involved
information over which BANNON could assert attorney-client privilege given
it included a request for communications between BANNON and RUDOLPH
GIULIANI, JENNA ELLIS, and other attorneys who were working for former
President TRUMP.  COSTELLO did not want to assert Executive Privilege over
items BANNON didn't possess or were publicly available, like the podcasts.
Former President TRUMP's attorneys were the first to say they were invoking
Executive Privilege.  COSTELLO believed he first heard this asserted in a
letter dated October 6, 2021.

At approximately 5:59pm on October 18, 2021, COSTELLO sent a letter to
the Select Committee requesting an adjournment.  However, COSTELLO received
a letter from White House Counsel's Office at 6:55pm advising former
President TRUMP's use of Executive Privilege in regards to activities on
January 6, 2021, was not valid and could therefore not be asserted by
BANNON.  COSTELLO assumed the Select Committee forwarded his letter to the
White House generating the response.  The Select Committee responded on
October 19, 2021. However, per Select Committee rules, COSTELLO was not
allowed to respond.

The following day, the Select Committee held a press conference regarding
their vote and to make an example out of BANNON.  The Select Committee had
served subpoenas to BANNON, MARK MEADOWS, PATEL, and SCAVINO (writer's note:
PATEL and SCAVINO are KASH PATEL and DAN SCAVINO).  COSTELLO reminded
interviewing agents and attorneys that nothing had happened to any of the
other subpoena recipients although the Select Committee was reportedly
engaging with MEADOWS and PATEL.  But, it was believed that neither MEADOWS

US-001770

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of    Costello                                    ,On   11/03/2021   ,Page   3 of 10

nor PATEL had been brought before the Select Committee nor had they produced
documents as required in their subpoenas.

COSTELLO informed BANNON that BANNON did not have the ability to waive
Executive Privilege since that authority belongs to the President.

COSTELLO spoke with an attorney on the Select Committee the night before
BANNON was scheduled to appear.  (Writer's note:  This attorney was SEAN
TONOLLI.)  The attorney informed COSTELLO he was checking to see if COSTELLO
and/or BANNON was going to appear.  The attorney stated he had young kids at
home and preferred to be at home with them rather than preparing for a
deposition if they had no plans to appear.  COSTELLO told the attorney he
could go home for the night as they would not be appearing before the Select
Committee.  COSTELLO brought up to the attorney the unusual Select Committee
rule that the only lawyer allowed to be present with a witness was the
witness's attorney.  The Committee attorney responded those were the rules
of the Select Committee and offered no further explanation or discussion.

COSTELLO viewed the whole issue as a "battle" between the Select
Committee and former President TRUMP.  Per the DOJ Office of Legal Counsel
(DOJ-OLC), BANNON did not have to be a government employee to receive
protections under Executive Privilege.  COSTELLO believed BANNON was covered
under Executive Privilege and that former President TRUMP had to the right
to claim it for BANNON.  COSTELLO stated, similar to DOJ-OLC's opinion, the
Supreme Court has held since 1977 that a person does not need to be a
government employee to receive protections under Executive Privilege.
COSTELLO believed the Executive Privilege issue should be worked out between
the Select Committee and former President TRUMP and not by BANNON.  In
regards to Executive Privilege, COSTELLO and BANNON would follow any
agreements made by former President TRUMP and the Select Committee or legal
ruling of a court.  BANNON was not a contemptuous person in regards to the
Select Committee's proceedings.

The Select Committee told COSTELLO the issue of Executive Privilege was
not to be decided by BANNON.  COSTELLO pointed out BANNON had testified on
four previous occasions.  Each of these instances involved discussions
regarding BANNON's communications with former President TRUMP and the
possible issue of Executive Privilege.  BANNON had previously testified once

US-001771

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of ___Costello_____ , On _11/03/2021_ , Page _4 of 10_

before the Mueller Special Counsel's Office, once before the Senate
Intelligence Committee, and twice before the House Intelligence Committee.
Representative ADAM SCHIFF is on the Select Committee and SCHIFF should be
aware that BANNON knows the processes.

DOJ-OLC had previously reviewed a similarly constructed House committee
which operated under the same rules as the Select Committee. COSTELLO did
not know who or what was covered under Executive Privilege but that decision
was up to former President TRUMP and the courts. COSTELLO believed the
Select Committee was purposely going after BANNON because of who he was and
the Select Committee wanted to use the USAO to force people to reply to the
Select Committee. COSTELLO believed that based upon the DOJ-OLC guidance,
BANNON would not have to reply to the Select Committee subpoena.

COSTELLO believed that ten of the topics listed in the schedule
attachment of the Select Committee subpoena were protected by Executive
Privilege leaving seven which were not. COSTELLO advised BANNON not to
respond to the Select Committee subpoena. Instead, COSTELLO advised
that BANNON should wait to respond until an agreement was reached between
the Select Committee and former President TRUMP or if a court defined what
was covered under Executive Privilege. COSTELLO requested USAO decline
prosecution of BANNON and for the U.S. House of Representatives to attempt
to settle the matter civilly. COSTELLO believed under the legal argument
*void ab initio* there was no civil recourse for the Select Committee.
BANNON was fully engaged with COSTELLO throughout the entire
subpoena process.

COSTELLO could not recall the exact date and time, but a Select Committee
staffmember had called him prior to the subpoena issue to confirm
COSTELLO still represented BANNON. The following day, KRISTIN AMERLING
called COSTELLO to ask if he would accept the service of the Select
Committee subpoena on behalf of BANNON. AMERLING sent the Select Committee
subpoena to COSTELLO before COSTELLO had a chance to speak with BANNON.
COSTELLO was contacted by various press outlets before he agreed to accept
service of the Select Committee subpoena. The Select Committee held a press
conference about the subpoena before COSTELLO had the opportunity to reply
to the Select Committee.

US-001772

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of Costello _____ , On 11/03/2021 , Page 5 of 10

COSTELLO did not know who was representing SCAVINO, PATEL, MEADOWS, or former President TRUMP. COSTELLO later learned which attorney was representing MEADOWS. COSTELLO attempted to contact the attorney he believed was representing former President TRUMP, but that attorney advised him that former President TRUMP was being represented by JUSTIN CLARK. COSTELLO first had contact with CLARK on approximately October 4 or October 5, 2021. COSTELLO could not recall the exact date, but recalled it was a day or two before he received the letter from the Select Committee on October 6, 2021. COSTELLO believed he may have attempted to contact CLARK first but the first substantive contact occurred when CLARK responded to COSTELLO. Throughout the subpoena response process, COSTELLO, KATZ, and BANNON have operated independently of others who have received subpoenas from the Select Committee and their respective attorneys.

COSTELLO sent the Select Committee subpoena to BANNON to review. BANNON did not think he had documents for all 17 items listed in the schedule attachment. BANNON was certain he had no documents for five of the categories. COSTELLO did not inform the Select Committee of BANNON's position on the 17 items in the schedule. However, on October 18, 2021, COSTELLO was in the process of drafting a letter to the Select Committee about that when he was informed of the lawsuit filed on behalf of former President TRUMP. COSTELLO was surprised he was not given a courtesy 24-48-hour adjournment by the Select Committee to review the lawsuit. COSTELLO believed the adjournment was intentionally not given by the Select Committee in order to be able to send the matter to the House for a vote. Per DOJ-OLC's opinion, the Select Committee knew the subpoenas were illegal and unenforceable.

After AMERLING contacted COSTELLO, he may have contacted her the following day. COSTELLO did not have any additional contact with AMERLING subsequent to the subpoena service. COSTELLO also spoke with SEAN TONOLLI at the Select Committee. Outside of AMERLING and TONOLLI, COSTELLO has not spoken with anyone else at the Select Committee. COSTELLO was not sure of the exact date, but recalled TONOLLI first called COSTELLO between 7:30pm and 8:00pm. TONOLLI advised he was staff counsel at the Select Committee and would be the one person asking questions during the deposition. TONOLLI called to verify neither COSTELLO nor BANNON were going

US-001773

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of Costello _____ , On  11/03/2021 , Page  6 of 10

to appear at the deposition.  TONOLLI said he had kids and would prefer to
be at home with them instead of at work if COSTELLO confirmed neither he nor
BANNON would appear at the deposition.  COSTELLO brought up the issue of
Executive Privilege and informed TONOLLI the Select Committee could either
agree to it or litigate.  COSTELLO told TONOLLI he noticed in the Select
Committee's rules the only attorney who could attend the deposition would be
an attorney representing the witness and no outside attorneys.
COSTELLO believed this would be a secret deposition since, unlike other
depositions, neither the witness nor the witness's attorney could review the
transcript.  TONOLLI told COSTELLO's those are the Select Committee's
rules.  COSTELLO did not ask TONOLLI to change the rules.  COSTELLO noted
TONOLLI was not in a position to change the Select Committee's rules
anyway.

COSTELLO did not communicate his issues with the Select Committee's rules
to anyone in the Select Committee who actually had the ability to change the
rules.  COSTELLO did not tell Chair Bennie Thompson, who is not an attorney,
about COSTELLO's objections to the Select Committee's rules.  COSTELLO was
surprised the Select Committee didn't know it's own rules.  COSTELLO and
BANNON were waiting for additional instructions from the Select Committee on
how to proceed, but neither COSTELLO nor BANNON received any additional
instructions, even though the Select Committee made media statements
that BANNON could not be covered under Executive Privilege.

COSTELLO believed there were seven items in the attachment that could be
disposed of quickly.  BANNON did not possess any responsive documents for
these items.  For example, BANNON did not have any communication with the
Proud Boys, the Oathkeepers, Three Percenters, ALEX JONES, or SCOTT PERRY.
COSTELLO acknowledged it might have put BANNON in a better light had
COSTELLO responded to the Select Committee there were no documents or
communications for the seven items and that those items were not covered
under Executive Privilege.  COSTELLO stated Executive Privilege doesn't
cover items a person doesn't possess.  The podcasts requested could be
obtained by the Select Committee off the internet, and since they were in
the public domain, the podcasts also were not covered under Executive
Privilege.

COSTELLO knew the Select Committee was going to refer the matter to DOJ

US-001774

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of Costello                                    , On 11/03/2021 , Page 7 of 10


and believed Congress was overstepping its authorities and was doing the job
of the FBI.  COSTELLO did not believe the actions were appropriate under the
Constitution.  COSTELLO and BANNON were willing to reply to the Select
Committee subpoena but they needed someone from the Select Committee to
advise them of the proper rules.

   COSTELLO did not discuss disposing of any documents requested in the
Select Committee subpoena with any attorneys who represented former
President TRUMP.

   COSTELLO had "an email or two" with CLARK, who COSTELLO believed was the
attorney who filed the lawsuit on behalf of former President TRUMP. However,
COSTELLO subsequently learned the lawsuit was filed by a Virginia-based
attorney named First Name Unknown (FNU) BINNALL.

   COSTELLO again stated he did not inform the Select Committee about
disposing of the seven items in the Select Committee subpoena because the
Select Committee would not respond to COSTELLO.

   COSTELLO did not request any other adjournments.  The House of
Representatives voted quickly after COSTELLO's request for adjournment.
COSTELLO believed that was done in order to make an example of BANNON.
COSTELLO didn't raise the adjournment issue after the House's vote because
he knew he'd eventually have to deal with the USAO anyway.

   COSTELLO was not prepared to respond on BANNON's behalf on October 7,
2021.  At that time, COSTELLO did not know what BANNON possessed that would
have been responsive to the Select Committee's subpoena.  Once
COSTELLO learned of what items BANNON possessed or didn't possess,
COSTELLO believed they would be able to dispose of those items.
COSTELLO felt BANNON's history of testifying should have been known to
Representative SCHIFF.

   COSTELLO did not provide any documents to attorneys representing former
President TRUMP for review to determine if Executive Privilege covered the
documents.  At the time, COSTELLO did not know what attorneys were
representing others who had received Select Committee subpoenas.

   COSTELLO asked CLARK to reach out to the Select Committee and to directly

US-001775

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert
Continuation of FD-302 of Costello                                    , On 11/03/2021 , Page 8 of 10

express to the Select Committee what COSTELLO and BANNON were confused about
in regards to Executive Privilege.  COSTELLO estimated he requested this of
CLARK approximately two or three times; however, CLARK did not reach out to
the Select Committee.  COSTELLO did not have prior knowledge of the lawsuit
on behalf of former President TRUMP.

COSTELLO again stated that on October 7, 2021, he did not know what
BANNON possessed that may have been responsive to the Select Committee
subpoena, so COSTELLO was not in a position to attempt to dispose of those
documents.  COSTELLO did not request the Select Committee grant a production
deadline extension, but he had hoped the Select Committee would have come to
an agreement with attorneys representing former President TRUMP or the
Executive Privilege issue would have been resolved prior to the production
deadline.  COSTELLO stated it was not BANNON's responsibility to determine
what was covered under Executive Privilege.

COSTELLO admitted he would not have handled the situation the way he had
if he had known in advance of the lawsuit filed on behalf of former
President TRUMP.  Attorneys representing former President TRUMP informed
COSTELLO all those who received a Select Committee subpoena would be given
Executive Privilege.

The Select Committee did not receive a copy of the letter from CLARK nor
did the Select Committee request more than the two paragraphs of CLARK's
letter provided by COSTELLO.

Neither COSTELLO nor BANNON appeared on the record before the Select
Committee.  While BANNON lived in Washington, DC, COSTELLO lived in New
York, and had issues about COVID.  COSTELLO believed BANNON could not
respond to issues about Executive Privilege when BANNON did not possess the
ability to grant or waive Executive Privilege.

COSTELLO noted the Select Committee did not seem to be in a hurry to make
the other three recipients of Select Committee subpoenas testify or produce
documents.  COSTELLO believed the Select Committee was trying to make an
example out of BANNON.

There were no separate communications between KATZ and the Select
Committee or attorneys representing former President TRUMP.

US-001776

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of Costello _____ , On 11/03/2021 , Page 9 of 10

COSTELLO identified the seven items of the 17 in the subpoena attachment that could be deposed as: 1, 4, 5, 6, 15, 16, and 17.  COSTELLO said item 5 dealt with the War Room podcasts and were available in the public domain. COSTELLO felt Executive Privilege did not cover item 16 and it would take a "creative argument" to apply Executive Privilege to that particular item. COSTELLO believed item 17 was covered by attorney-client privilege or by attorney work product protections.  Even though MICHAEL FLYNN was not an attorney, he was present during attorney-client-protected discussions. Those particular attorneys represented former President TRUMP and CLARK informed COSTELLO not to respond to item 17.

COSTELLO admitted he did not have a good answer as to why he didn't disclose to the Select Committee that the podcasts were in the public domain and BANNON was not required to respond to that particular item. COSTELLO believed the particular requests regarding the podcasts was just a "bad request" by the Select Committee.

COSTELLO advised he didn't understand how Executive Privilege would apply to any communications BANNON had with the Proud Boys or others if those communications existed.

CLARK would not identify for COSTELLO what would be covered under Executive Privilege and that CLARK left that determination up to those who had received the Select Committee subpoena.  CLARK also refused to reach out to the Select Committee on behalf of COSTELLO or BANNON.

COSTELLO sent copies of Chair THOMPSON's letters to the Virginia-based attorney representing former President TRUMP.  COSTELLO did not believe the lawsuit applied to the Select Committee subpoena.  COSTELLO could not recall how he found out about the lawsuit, but believed he may have heard about it from a reporter, not from attorneys representing former President TRUMP.

COSTELLO did not provide or offer any documents to attorneys representing former President TRUMP to review for Executive Privilege.

COSTELLO believed BANNON possessed some documents that would be responsive to the other ten items in the Select Committee subpoena attachment.

US-001777

72-WF-3513323

(U) November 3, 2021 Interview of Robert

Continuation of FD-302 of   Costello                                          , On   11/03/2021   , Page   10 of 10


COSTELLO stated he also represented RUDOLPH GIULIANI and on January 7, 2021, COSTELLO sent documents to the USAO related to activities on January 6, 2021. However, COSTELLO did not know who at the USAO had received those documents.

COSTELLO opined if BANNON had been working with attorneys who were working with former President TRUMP on January 6, 2021, any documents may be covered under attorney work product privilege. COSTELLO admitted he was not certain if former President TRUMP could assert that privilege or not.

COSTELLO could not recall if it was he or CLARK that first brought up the idea of Executive Privilege, but COSTELLO stated he could have been the one to have initiated the discussion. COSTELLO was hoping to get guidance on Executive Privilege from attorneys representing former President TRUMP to see if BANNON should assert Executive Privilege. COSTELLO recalled explaining Executive Privilege to BANNON.

COSTELLO said he would send to the USAO all memorializations of communications he had with the Select Committee, CLARK, and former President TRUMP's attorneys.

COSTELLO was surprised to have received the letter from the White House since he had no communication with anyone in the White House.

COSTELLO did not want to speak with anyone at the Select Committee after the House vote because he knew he would eventually end up speaking with USAO.

COSTELLO did not ask CLARK to attend the Select Committee hearing since CLARK wouldn't even contact the Select Committee on COSTELLO's behalf.

US-001778

FD-302 (Rev. 5-8-10)
- 1 of 4 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry     11/11/2021

Robert J. Costello (Costello) and Adam Katz (Katz), legal counsel of Steven Kevin Bannon (Bannon), were interviewed via Webex. The following representatives of the investigative team were present for the interview: Federal Bureau of Investigation (FBI) Special Agents Matthew U. Lariccia, Katherine E. Pattillo, and Stephen R. Hart; and District of Columbia Assistant United States Attorneys Joseph Cooney, Molly Gaston, and Amanda Vaughn.

Agent Note: This was a scheduled, voluntary interview of Costello and Katz, as a follow-up to the November 03, 2021 interview of Costello and Katz.

Costello stated their defense was not solely advice of counsel, but their position regarding advice of counsel was based on legal opinions of the Office of Legal Counsel. There was mixed case law regarding advice of counsel, but the Office of Legal Counsel's opinion was clear.

Costello stated the original subpoena was illegal, invalid, and unconstitutional. He told Bannon, verbally, they did not have to respond to the subpoena.

Costello stated the Legislature was using the Department of Justice (DOJ) and FBI. This was a game and Bannon was the "whipping boy."

Costello stated Congress set up the rules improperly. He believed, based on his interpretation of the opinion, the rules were that a Congressional committee could not compel a member of the Executive Branch to testify about potentially privileged matters without legal counsel. Further, based on his interpretation of the opinion, current or former White House Employees could not be prosecuted.

Costello stated he was aware, historically, DOJ did not prosecute contempt of Congress cases. He believed the subpoena was invalid, based on an opinion

Investigation on 11/08/2021 at Manassas, Virginia, United States (, Other (Webex))

File # 72-WF-3513323                                    Date drafted 11/09/2021

by Matthew U. Lariccia, HART STEPHEN R, Katherine E. Pattillo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-001779

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) FOLLOW-UP INTERVIEW OF ROBERT J.
Continuation of FD-302 of COSTELLO AND ADAM KATZ _____ ,On 11/08/2021 , Page 2 of 4

of the Office of Legal Counsel. He advised Bannon of the same. He believed
Congress usurped DOJ's authority.

Katz stated they were asking for a court ruling, or decision, regarding
executive privilege.

Costello stated they asserted executive privilege in his letter. He
acknowledged executive privilege was not appropriate for seven of the
seventeen items requested in the subpoena.

Costello stated Justin Clark (Clark) was trying to be intentionally vague;
however, Costello was clear former President Donald Trump (President Trump)
asserted executive privilege with regard to Bannon.

Costello stated he was not told who represented former President Trump, Mark
Meadows (Meadows), nor the others subpoenaed by the Select Committee. He
found out on his own who represented former President Trump and Meadows, but
still did not know who represented the others.

Costello stated neither he, nor Bannon, had to be present in Washington D.C.
because of executive privilege. Further, neither he nor Bannon were going to
attend a deposition where former President Trump could not have
representation with regard to executive privilege, as executive privilege
belonged to former President Trump, not Bannon.

Costello stated they were trying to setup Bannon. He had conversations with
Bannon, because Bannon was not a lawyer and did not understand the process.
Bannon knew about executive privilege and thought he had executive
privilege, but he explained to Bannon executive privilege belonged to former
President Trump. Bannon also thought he was subpoenaed for open testimony,
but Costello explained it was for a private deposition.

Costello stated he knew, once before, the Office of Legal Counsel said this
was illegal. The Select Committee did not consider the Office of Legal
Counsel opinion. He told Bannon he did not believe Bannon had to go and, as
such, they were not going to appear.

Costello stated he sent a letter to Congressman Bennie G. Thompson
(Congressman Thompson), where he explained it did not make sense for

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) FOLLOW-UP INTERVIEW OF ROBERT J.

Continuation of FD-302 of  COSTELLO AND ADAM KATZ                                    , On  11/08/2021 , Page  3 of 4

Bannon to appear for a private deposition where former President Trump was
not represented. He and Bannon did not know what was protected by privilege.
From day one, they "were spectators at this event."

Costello stated once there was a court ruling or decision regarding
executive privilege, they would abide by the decision. He stated, "I don't
think I'm at fault or read opinions wrong."

Costello stated they did not have a court ruling or decision by the deadline
and were denied a request for extension. On October 19, 2021, the Select
Committee closed the door to communication. He referred to the draft letter
he composed on October 18, 2021.

Costello stated he quickly read former President Trump's lawsuit. Clark was
not cooperative and cut-off communication. The lawsuit did not impact his
decision to not comply with the subpoena. This was a fight between the
Select Committee, their counsel, and former President Trump and his counsel.
Again, he stated once there was a court ruling or decision regarding
executive privilege, they would comply. He explained this in his letters.

Costello stated Bannon asserted executive privilege through him. He
reiterated, "not our privilege to waive."

Costello stated he was sure he sent the Select Committee letters to Bannon.
He stated, "did he read it? I doubt it." He did not quote lines from
Congressman Thompson but explained the letters to Bannon.

Costello stated he was not trying to be an obstructionist, but was abiding
by privileges as he understood. The Select Committee wanted him to present
Bannon where justice was not involved. He never heard of a private
deposition where there was no transcript nor interested parties involved.

Costello stated he advised Bannon not to appear before the Select Committee.
The fault lies with him, not Bannon; however, he did not believe there was
fault. This does not change Bannon's position. He did write, at the
conclusion of an email to Bannon, "beware" in capital letters to warn
Bannon his failure to comply could result in a referral to DOJ.

Costello stated Clark did not have to interfere, Clark just had to say they

US-001781

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) FOLLOW-UP INTERVIEW OF ROBERT J.
Continuation of FD-302 of COSTELLO AND ADAM KATZ _____ ,On 11/08/2021 ,Page 4 of 4

asserted executive privilege. He told Clark they should do this.

Costello stated Bannon was innocent, as Bannon was following directions from
him. His directions to Bannon were based on his interpretations of Office of
Legal Counsel opinions.

Costello stated that had the Select Committee taken this matter seriously,
they would have gone to court or to former President Trump's counsel
regarding executive privilege.

Costello stated his decisions were based on Office of Legal Counsel
opinions. Costello read Office of Legal Counsel opinions and explained them
to Bannon. The opinions said Bannon did not have to be a government employee
to assert executive privilege. The Select Committee was aware they were
asserting executive privilege, received from Clark. He reiterated, "I made
the decision, not Bannon."

Costello stated Clark was playing some games. Clark placed Bannon in an
awkward position.

Costello stated he did not want to waive executive privilege, which belonged
to former President Trump. He and Bannon, referring to Clark's email, never
claimed immunity. He acknowledged that immunity does not mean not showing
up.

US-001782

# EXHIBIT 5
## FILED UNDER SEAL

# EXHIBIT 6
# FILED UNDER SEAL

# EXHIBIT 7



# H. Res. 503

## *In the House of Representatives, U. S.,*

*June 30, 2021.*

Whereas January 6, 2021, was one of the darkest days of our
democracy, during which insurrectionists attempted to
impede Congress's Constitutional mandate to validate the
presidential election and launched an assault on the
United States Capitol Complex that resulted in multiple
deaths, physical harm to over 140 members of law en-
forcement, and terror and trauma among staff, institu-
tional employees, press, and Members;

Whereas, on January 27, 2021, the Department of Homeland
Security issued a National Terrorism Advisory System
Bulletin that due to the "heightened threat environment
across the United States," in which "[S]ome ideologi-
cally-motivated violent extremists with objections to the
exercise of governmental authority and the presidential
transition, as well as other perceived grievances fueled by
false narratives, could continue to mobilize to incite or
commit violence." The Bulletin also stated that—

(1) "DHS is concerned these same drivers to vio-
lence will remain through early 2021 and some DVEs
[domestic violent extremists] may be emboldened by the
January 6, 2021 breach of the U.S. Capitol Building in
Washington, D.C. to target elected officials and govern-
ment facilities."; and



US-000259

2

(2) "Threats of violence against critical infrastruc-
ture, including the electric, telecommunications and
healthcare sectors, increased in 2020 with violent extrem-
ists citing misinformation and conspiracy theories about
COVID-19 for their actions";

Whereas, on September 24, 2020, Director of the Federal
Bureau of Investigation Christopher Wray testified before
the Committee on Homeland Security of the House of
Representatives that—

(1) "[T]he underlying drivers for domestic violent
extremism – such as perceptions of government or law
enforcement overreach, sociopolitical conditions, racism,
anti-Semitism, Islamophobia, misogyny, and reactions to
legislative actions – remain constant.";

(2) "[W]ithin the domestic terrorism bucket cat-
egory as a whole, racially-motivated violent extremism is,
I think, the biggest bucket within the larger group. And
within the racially-motivated violent extremists bucket,
people subscribing to some kind of white supremacist-
type ideology is certainly the biggest chunk of that."; and

(3) "More deaths were caused by DVEs than inter-
national terrorists in recent years. In fact, 2019 was the
deadliest year for domestic extremist violence since the
Oklahoma City bombing in 1995";

Whereas, on April 15, 2021, Michael Bolton, the Inspector
General for the United States Capitol Police, testified to
the Committee on House Administration of the House of
Representatives that—

(1) "The Department lacked adequate guidance for
operational planning. USCP did not have policy and pro-
cedures in place that communicated which personnel were
responsible for operational planning, what type of oper-

•HRES 503 EH

3

ational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents."; and

(2) "USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021."; and

Whereas the security leadership of the Congress under-prepared for the events of January 6th, with United States Capitol Police Inspector General Michael Bolton testifying again on June 15, 2021, that—

(1) "USCP did not have adequate policies and procedures for FRU (First Responder Unit) defining its overall operations. Additionally, FRU lacked resources and training for properly completing its mission.";

(2) "The Department did not have adequate policies and procedures for securing ballistic helmets and vests strategically stored around the Capitol Complex."; and

(3) "FRU did not have the proper resources to complete its mission.": Now, therefore, be it

*Resolved,*

**SECTION 1. ESTABLISHMENT.**

There is hereby established the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter referred to as the "Select Committee").

**SEC. 2. COMPOSITION.**

(a) APPOINTMENT OF MEMBERS.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

•HRES 503 EH

US-000261

4

(b) DESIGNATION OF CHAIR.—The Speaker shall designate one Member to serve as chair of the Select Committee.

(c) VACANCIES.—Any vacancy in the Select Committee shall be filled in the same manner as the original appointment.

**SEC. 3. PURPOSES.**

Consistent with the functions described in section 4, the purposes of the Select Committee are the following:

(1) To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process.

(2) To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted vi-

-220-

US-000262

5

olence and domestic terrorism relevant to such terrorist attack.

(3) To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack.

SEC. 4. FUNCTIONS.

(a) FUNCTIONS.—The functions of the Select Committee are to—

(1) investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to—

(A) activities of intelligence agencies, law enforcement agencies, and the Armed Forces, including with respect to intelligence collection, analysis, and dissemination and information sharing among the branches and other instrumentalities of government;

(B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing,

•HRES 503 EH

US-000263

6

and malign foreign influence operations and cam-
paigns may have factored into the motivation, orga-
nization, and execution of the domestic terrorist at-
tack on the Capitol; and

(C) other entities of the public and private sec-
tor as determined relevant by the Select Committee
for such investigation;

(2) identify, review, and evaluate the causes of and
the lessons learned from the domestic terrorist attack on
the Capitol regarding—

(A) the command, control, and communications
of the United States Capitol Police, the Armed
Forces, the National Guard, the Metropolitan Police
Department of the District of Columbia, and other
Federal, State, and local law enforcement agencies
in the National Capital Region on or before Janu-
ary 6, 2021;

(B) the structure, coordination, operational
plans, policies, and procedures of the Federal Gov-
ernment, including as such relate to State and local
governments and nongovernmental entities, and
particularly with respect to detecting, preventing,
preparing for, and responding to targeted violence
and domestic terrorism;

•HRES 503 EH

7

(C) the structure, authorities, training, man-
power utilization, equipment, operational planning,
and use of force policies of the United States Cap-
itol Police;

(D) the policies, protocols, processes, proce-
dures, and systems for the sharing of intelligence
and other information by Federal, State, and local
agencies with the United States Capitol Police, the
Sergeants at Arms of the House of Representatives
and Senate, the Government of the District of Co-
lumbia, including the Metropolitan Police Depart-
ment of the District of Columbia, the National
Guard, and other Federal, State, and local law en-
forcement agencies in the National Capital Region
on or before January 6, 2021, and the related poli-
cies, protocols, processes, procedures, and systems
for monitoring, assessing, disseminating, and acting
on intelligence and other information, including ele-
vating the security posture of the United States
Capitol Complex, derived from instrumentalities of
government, open sources, and online platforms;
and

(E) the policies, protocols, processes, proce-
dures, and systems for interoperability between the
United States Capitol Police and the National

•HRES 503 EH

US-000265

8

Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021; and

(3) issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary.

(b) REPORTS.—

(1) INTERIM REPORTS.—In addition to the final report addressing the matters in subsection (a) and section 3, the Select Committee may report to the House or any committee of the House from time to time the results of its investigations, together with such detailed findings and legislative recommendations as it may deem advisable.

(2) TREATMENT OF CLASSIFIED OR LAW ENFORCE-MENT-SENSITIVE MATTER.—Any report issued by the Select Committee shall be issued in unclassified form but may include a classified annex, a law enforcement-sensitive annex, or both.

(c) CORRECTIVE MEASURES DESCRIBED.—The corrective measures described in this subsection may include changes in law, policy, procedures, rules, or regulations that could be taken—

•HRES 503 EH

**-224-**

US-000266

9

(1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions;

(2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and

(3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

(d) NO MARKUP OF LEGISLATION PERMITTED.—The Select Committee may not hold a markup of legislation.

**SEC. 5. PROCEDURE.**

(a) ACCESS TO INFORMATION FROM INTELLIGENCE COMMUNITY.—Notwithstanding clause 3(m) of rule X of the Rules of the House of Representatives, the Select Committee is authorized to study the sources and methods of entities described in clause 11(b)(1)(A) of rule X insofar as such study is related to the matters described in sections 3 and 4.

(b) TREATMENT OF CLASSIFIED INFORMATION.—Clause 11(b)(4), clause 11(e), and the first sentence of clause 11(f) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of

•**HRES 503 EH**

US-000267

10

Representatives shall apply to the Select Committee except as
follows:

(1) Clause 2(a) of rule XI shall not apply to the Se-
lect Committee.

(2) Clause 2(g)(2)(D) of rule XI shall apply to the
Select Committee in the same manner as it applies to
the Permanent Select Committee on Intelligence.

(3) Pursuant to clause 2(h) of rule XI, two Mem-
bers of the Select Committee shall constitute a quorum
for taking testimony or receiving evidence and one-third
of the Members of the Select Committee shall constitute
a quorum for taking any action other than one for which
the presence of a majority of the Select Committee is re-
quired.

(4) The chair of the Select Committee may author-
ize and issue subpoenas pursuant to clause 2(m) of rule
XI in the investigation and study conducted pursuant to
sections 3 and 4 of this resolution, including for the pur-
pose of taking depositions.

(5) The chair of the Select Committee is authorized
to compel by subpoena the furnishing of information by
interrogatory.

(6)(A) The chair of the Select Committee, upon
consultation with the ranking minority member, may
order the taking of depositions, including pursuant to

•HRES 503 EH

**-226-**

US-000268

11

subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

(7) Subpoenas authorized pursuant to this resolution may be signed by the chair of the Select Committee or a designee.

(8) The chair of the Select Committee may, after consultation with the ranking minority member, recognize—

(A) Members of the Select Committee to question a witness for periods longer than five minutes as though pursuant to clause 2(j)(2)(B) of rule XI; and

(B) staff of the Select Committee to question a witness as though pursuant to clause 2(j)(2)(C) of rule XI.

(9) The chair of the Select Committee may postpone further proceedings when a record vote is ordered on questions referenced in clause 2(h)(4) of rule XI, and

•HRES 503 EH

US-000269

12

may resume proceedings on such postponed questions at any time after reasonable notice. Notwithstanding any intervening order for the previous question, an underlying proposition shall remain subject to further debate or amendment to the same extent as when the question was postponed.

(10) The provisions of paragraphs (f)(1) through (f)(12) of clause 4 of rule XI shall apply to the Select Committee.

### SEC. 6. RECORDS; STAFF; TRAVEL; FUNDING.

(a) SHARING RECORDS OF COMMITTEES.—Any committee of the House of Representatives having custody of records in any form relating to the matters described in sections 3 and 4 shall provide copies of such records to the Select Committee not later than 14 days of the adoption of this resolution or receipt of such records. Such records shall become the records of the Select Committee.

(b) STAFF.—The appointment and the compensation of staff for the Select Committee shall be subject to regulations issued by the Committee on House Administration.

(c) DETAIL OF STAFF OF OTHER OFFICES.—Staff of employing entities of the House or a joint committee may be detailed to the Select Committee to carry out this resolution and shall be deemed to be staff of the Select Committee.

•HRES 503 EH

US-000270

-228-

13

(d) USE OF CONSULTANTS PERMITTED.—Section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 4301(i)) shall apply with respect to the Select Committee in the same manner as such section applies with respect to a standing committee of the House of Representatives.

(e) TRAVEL.—Clauses 8(a), (b), and (c) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(f) FUNDING; PAYMENTS.—There shall be paid out of the applicable accounts of the House of Representatives such sums as may be necessary for the expenses of the Select Committee. Such payments shall be made on vouchers signed by the chair of the Select Committee and approved in the manner directed by the Committee on House Administration. Amounts made available under this subsection shall be expended in accordance with regulations prescribed by the Committee on House Administration.

## SEC. 7. TERMINATION AND DISPOSITION OF RECORDS.

(a) TERMINATION.—The Select Committee shall terminate 30 days after filing the final report under section 4.

(b) DISPOSITION OF RECORDS.—Upon termination of the Select Committee—

(1) the records of the Select Committee shall become the records of such committee or committees designated by the Speaker; and

•HRES 503 EH

-229-

US-000271

14

(2) the copies of records provided to the Select
Committee by a committee of the House under section
6(a) shall be returned to the committee.

Attest:

*Clerk.*

•HRES 503 EH

US-000272

# EXHIBIT 8

*January 4, 2021*                    **CONGRESSIONAL RECORD—HOUSE**                    **H41**

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

US-000963

# EXHIBIT 9

FD-302 (Rev. 5-8-10)                              - 1 of 8 -



# FEDERAL BUREAU OF INVESTIGATION

Date of entry ___11/10/2021___

KRISTIN AMERLING, Chief Counsel and Deputy Staff Director, U.S. House of
Representatives Select Committee to Investigate the January 6th Attack on
the United States Capitol, was interviewed at the Thomas P. O'Neill Jr.
Federal Building, 200 C Street SW, Washington, DC.  AMERLING was accompanied
by U.S. House of Representatives General Counsel DOUG LETTER, and by U.S.
House of Representative Deputy General Counsel TODD TATELMAN, who joined via
phone.  AMERLING was interviewed by Assistant United States Attorney (AUSA)
J.P. Cooney, US Attorney's Office for the District of Columbia (USAO-DC),
AUSA Molly Gaston USAO-DC, AUSA Amanda Vaughn USAO-DC, FBI Special Agent
Katherine E. Pattillo, FBI Special Agent Frank G. D'Amico, and FBI Special
Agent Stephen R. Hart. After being advised of the identity of the
interviewing AUSAs and Agents and the nature of the interview, AMERLING
provided the following information (AMERLING was shown various numbered
exhibits during the interview.  These will be referenced when shown during
the interview and will be maintained in the 1A section of the file.):

AMERLING's current role was as the Chief Counsel and Deputy Staff
Director for the U.S. House of Representatives Select Committee to
Investigate the January 6th Attack on the United States Capitol (the Select
Committee).  In her role she worked directly with Staff Director DAVID
BUCKLEY to staff the Select Committee.  Also, as a part of the investigative
team, she oversaw any legal issues which arose during the investigation
process.

AMERLING was previously the legislative assistant for Representative Ted
Weiss from 1988-1990.  AMERLING was then the press secretary for Senator
George Mitchell from 1990-1991.  AMERLING then attended law school and
worked for a private firm subsequent to graduation.  From 1997-2012,
AMERLING worked for Representative Henry Waxman on the House Committee for
Reform and Oversight.  During her tenure with Representative Waxman's
office, Representative Waxman moved to the Energy and Commerce Committee

---

Investigation on ___11/02/2021___ at  Washington, District Of Columbia, United States (In Person)

File # 72-WF-3513323                                    Date drafted  11/02/2021

by HART STEPHEN R, SA FRANK G. DAMICO, Katherine E. Pattillo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

US-000245

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin
Continuation of FD-302 of Amerling                                          ,On 11/02/2021 ,Page 2 of 8

where he eventually became the Ranking Member.  From 2013-2014, AMERLING was
the Director of Investigations for the Senate Commerce Committee which was
chaired by Senator Rockefeller.  AMERLING then went to work in the
Administration of President Obama and then separately became the General
Counsel for the Senate Energy and the House Oversight Committees.

   The Select Committee was composed of three primary teams: the
investigative teams, the admin teams, and the communications teams.  The
investigative teams were led by Chief Investigative Counsel TIM HEAPHY.  The
various Chief Counsels had subject matter expert roles and the teams were
staffed with additional attorneys and research staff.  The Communications
Director had an assistant and the Admin staff facilitated the personnel
assignments.  The Staff Director and the investigative teams were comprised
of non partisan staff who worked collaboratively on subpoenas and other
tasks. AMERLING was not sure if she could further describe the upper
hierarchy or committee processes, but stated that all senior staff, which
included herself and the Staff Director, worked together.

   (AMERLING was shown Exhibit 1.)  This document, House Resolution 503 (HR
503), along with the U.S. House of Representative Rules describe where the
Select Committee get its authorities.  HR 503 is the main source of the
Select Committee's authority.  This document is the primary source in which
the purpose of the Select Committee is articulated.  House Resolution 8 (HR
8) also contains rules for guiding the Select Committee's actions and
authorities.

   For document requests or subpoenas issued by the Select Committee,
AMERLING reviews the initial proposal and provides input to the Staff
Director and the Chair of the Select Committee.  In the case of the Select
Committee's subpoena to STEPHEN BANNON (BANNON), AMERLING served the
subpoena to the attorney representing BANNON.  AMERLING worked together with
the investigative staff to put together the substantive request and with the
administrative staff to "get the subpoena out the door."

   LETTER advised all subpoenas issued by the Select Committee are reviewed
by himself or members of the General Counsel's office as well as leadership
of the U.S. House of Representatives.  This process applies to subpoenas
issued by every House committee.  All subpoenas issued by all House

US-000246

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin

Continuation of FD-302 of  Amerling                                                             ,On  11/02/2021 , Page  3 of 8

committees are issued and signed by the Clerk for the U.S. House
of Representatives. The Clerk will only sign subpoenas if they have been
reviewed by LETTER. AMERLING explained the subpoenas were first signed by
the Chair of the Select Committee, then reviewed by the General Counsel's
Office, and then sent on to the Clerk for signature. LETTER further
explained subpoenas were prepared by committee staff, signed by the Chair,
reviewed by the Office of General Counsel, logged in, and then walked over
to the Clerk.

(AMERLING was shown Exhibit 2.) AMERLING noted the subpoena called for
BANNON to appear and testify, not just to appear. Document production is
not always required to be done in person. Typically, after a subpoena is
issued, document production from the recipient can be provided by hand, mail
service, or via email. The subpoena commanded document production be
completed by 10am on October 7, 2021, and that BANNON appear for a
deposition on October 14, 2021. The subpoena was signed by both the Chair
of the Select Committee and the Clerk of the U.S. House of Representatives.
AMERLING confirmed she sent the subpoena via email to BANNON's defense
attorney, ROBERT COSTELLO (COSTELLO). The letter that accompanied the
subpoena was designed to inform the witness of the subpoena and to describe
the range of information being requested in the subpoena. The letter
summarizes the information commanded, whereas the attachment gives a
detailed list of records and documents requested.

Neither the letter nor the attachment described the full accounting of
the public records the Select Committee possesses and / or has reviewed.
The subpoena schedule reflected a broad set of categories of information
requested from BANNON, but the categories were not an exhaustive list of
topics which might be covered in his deposition. Many of the categories had
nothing to do with former President DONALD TRUMP. All of these categories
were listed in the contempt report issued by the U.S. House of
Representatives and covered a wide range of topics not dealing with former
President TRUMP. AMERLING advised the last page of Exhibit 2, which
described the Select Committee Regulations for Use of Deposition Authority,
was provided to BANNON and COSTELLO so they would have a full understanding
of BANNON's rights in regards to depositions and other proceedings of the
Select Committee. The Select Committee was aware the email was sent to

-236-

US-000247

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin

Continuation of FD-302 of  Amerling                                    , On  11/02/2021 , Page  4 of 8

COSTELLO.

Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

A copy of Section 3(b) was not provided to COSTELLO with the subpoena. However, the section would have been provided to the witness at deposition when the witness was reminded of their rights. COSTELLO received a copy of 117th Congress Regulations For Use of Deposition Authority with the letter accompanying the subpoena. COSTELLO never raised any objections related to the requirement stipulated in paragraph 11.

(AMERLING was shown Exhibit 3.) JENNA HOPKINS was a professional staff member of the Select Committee assigned to assist the research staff of the investigative teams. AMERLING did not recall anyone from the Select Committee directly contacting BANNON or an attorney representing BANNON before September 22, 2021. "Tim, Yoni, and Jacob" mentioned in Exhibit 3 were likely TIM HEAPHY, senior investigative counsel; YONI MOSKOWITZ, staff attorney; and JACOB NELSON, research assistant. Nothing outside of what was included in the email was discussed between AMERLING and HOPKINS.

(AMERLING was shown Exhibit 4.) AMERLING did not recall much of the conversation beyond what she cited in the email to COSTELLO. COSTELLO did not raise any objections during their phone call and advised he would get back to her after confirming with BANNON that COSTELLO was authorized to accept subpoena service. AMERLING sent the subpoena in a subsequent email to COSTELLO. At that time, AMERLING believed COSTELLO represented BANNON based upon COSTELLO's reply email.

US-000248

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin

Continuation of FD-302 of __Amerling_____ , On __11/02/2021__ , Page __5 of 8__

(AMERLING was shown Exhibit 5.)   AMERLING first became aware of
COSTELLO's objections to the subpoena through his correspondence with the
Select Committee.  AMERLING was not sure if COSTELLO's objection was public
at that time.

(AMERLING was shown Exhibit 6.)   To date, neither AMERLING nor the Select
Committee had received the letter from JUSTIN CLARK referenced in the
exhibit.  AMERLING had not herself received nor was she aware of any
objections or privilege assertions submitted to the Select Committee from
former President TRUMP or his representatives.

(AMERLING was shown Exhibit 7.)   The letter was specifically sent to
remind BANNON of his obligation to respond to the subpoena as well as the
requirement for a privilege log if warranted.  The letter also fully
identified the criminal statutes BANNON would violate if he failed to comply
with the Select Committee's subpoena.  AMERLING was not aware of any
additional communications with COSTELLO leading up to the October 7, 2021,
document deadline.

(AMERLING was shown Exhibit 8.)   SEAN TONOLLI (TONOLLI) was responsible
for conducting BANNON'S deposition.  TONOLLI is the leader of one of the
investigative subgroups. It would be logical for someone in TONOLLI's
position to reach out to COSTELLO to confirm logistical arrangements prior
to the scheduled appearance.  LETTER interjected that different House
committees use different processes; there were no standardized procedures in
place governing the logistics of these arrangements.  AMERLING stated that
different teams within the Select Committee handled different subjects and
it would be logical for senior staff, like TONOLLI, to lead depositions and
testimony.  The Chair of the Select Committee was aware of work
assignments.  AMERLING could not recall the process by which TONOLLI was
designated as the staff member to cover BANNON, but it was normally done
with the knowledge of the Chair and other Members.  KEVIN ELLIKER,
referenced in Exhibit 8, was a staff attorney on one of the investigative
teams.

AMERLING believed she and TONOLLI discussed TONOLLI's conversations with
COSTELLO.  She could not recall the precise details of those discussions but
believed, based on her communication with TONOLLI in Exhibit 8, the

US-000249

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin

Continuation of FD-302 of ___Amerling_____ , On _11/02/2021_ , Page _6 of 8_

discussions were confined to the logistics of BANNON's arrival and
testimony. LETTER noted AMERLING was currently managing subpoenas to a
number of different individuals, some of whom were going to appear before
the Select Committee and some of whom may not appear before the Select
Committee. AMERLING did not know the TOM KAVALER referenced in a separate
email between TONOLLI and COSTELLO. AMERLING did not think there was any
other correspondence memorializing any additional interactions between
TONOLLI and COSTELLO. AMERLING was not certain but she believed she had
been made aware of the discussions between TONOLLI and COSTELLO prior to the
email sent by TONOLLI to AMERLING, BUCKLEY, and HEAPHY on October 13, 2021
(Exhibit 8).

     In Exhibit 8, TONOLLI referred to COSTELLO's "two questions for future
reference." AMERLING confirmed that neither BANNON nor COSTELLO were
provided with other or alternative dates on which BANNON could testify. It
was AMERLING's understanding that these questions did not prompt negotiation
or discussion about alternate deposition dates. AMERLING believed
COSTELLO was suggesting a general discussion point regarding a future
appearance related to the subpoena, but no discussion ever occurred.
TONOLLI was not authorized to offer or to say anything different than what
had been sent in the October 8, 2021 email. AMERLING did not recall any
other communications with TONOLLI about this issue. AMERLING did not
formally accept COSTELLO's letter to Chairman THOMPSON as it was sent via
email.

     (AMERLING was shown Exhibit 10.) The Select Committee communicated
with COSTELLO prior to receiving this particular letter. This letter
offered no new objections and failed to address the Chair's points made on
October 8, 2021, about testimony on topics unrelated to former President
TRUMP.

     (AMERLING was shown Exhibit 12.) Both AMERLING and TONOLLI attended the
deposition on October 14, 2021. AMERLING believed Representative ADAM SCHIFF
attended the hearing virtually. Other Select Committee staff who attended
the hearing were: HEAPHY, ELLIKER, BARRY POMP, Select Committee
parliamentarian, and EVAN MALDER, clerk. AMERLING advised she should be
able to get interviewing agents and attorneys an un-redacted copy of the
transcript. The Select Committee was prepared to proceed with the

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin
Continuation of FD-302 of Amerling _____ , On 11/02/2021 , Page 7 of 8

deposition had BANNON appeared.  AMERLING's role for the hearing would have
been to serve as a consultative legal resource.  AMERLING was highly
confident the Select Committee's Parliamentarian, POMP, would have brought
the House Rules to the hearing.

    AMERLING did not have any communication with BANNON or any party
representing him on October 14, 2021.  No one from the Select Committee
suggested to BANNON or anyone representing him that he did not have to
appear before the Select Committee.  In fact, the Select Committee did quite
the opposite.  No staff member told BANNON or anyone representing him they
could work out privilege issues prior to BANNON being deposed.  The letters
sent to BANNON and his counsel made it clear that BANNON had to appear at
the hearing where he would be permitted to vocalize and memorialize his
objections.  The Chair was available for contact during the scheduled
hearing in case BANNON had arrived and voiced objections.  However, it was
not required to resolve the objections during the hearing, it was only
required to document them for the record.

    (AMERLING was shown Exhibit 11.)  There was no communications between the
Select Committee and BANNON or his representatives indicating that the
prospect of a Contempt of Congress charge would change their response to the
subpoena.  The email sent by AMERLING to COSTELLO on October 19, 2021, was
the only communication subsequent to the deposition date.

    (AMERLING was shown Exhibit 14.)  AMERLING received the letter from the
White House via email.  AMERLING did not know if either BANNON or
COSTELLO also received the letter from the White House.  AMERLING also did
not receive any letters from the Department of Justice.  AMERLING was not
aware of any sort of communication between the White House and BANNON or
COSTELLO.  Correspondence from COSTELLO described a letter from an attorney
representing former President TRUMP, however, AMERLING has not received a
copy of that letter.  AMERLING believed the extent of President JOE
BIDEN's knowledge of the proceedings was in Exhibit 14.  AMERLING was not
aware of any other requests from COSTELLO to JUSTIN CLARK.

    (AMERLING was shown Exhibit 13.)  She was aware of this letter and of the
adjournment request.

US-000251

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin
Continuation of FD-302 of  Amerling                                                      , On  11/02/2021  , Page  8 of 8


    (AMERLING was shown Exhibit 15.)  The Select Committee issued two letters
to COSTELLO; one before and one after the Select Committee hearing on
October 19, 2021 (Exhibits 15 and 16).  AMERLING was not aware of any other
communication or correspondence with COSTELLO after those letters.
AMERLING was not aware of any additional objections raised by COSTELLO not
captured by correspondence between COSTELLO and the Select Committee.

US-000252

# EXHIBIT 10



U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 31, 2015

The Honorable John A. Boehner
Speaker
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Speaker:

On May 7, 2014, you referred the matter of Lois G. Lerner, former Director, Exempt Organizations, Internal Revenue Service (IRS), to the United States Attorney's Office for the District of Columbia, after the U.S. House of Representatives voted to hold Ms. Lerner in contempt of Congress under 2 U.S.C. § 192. *See* H.R. Res. 574, 113th Cong. (2014). As you know, the House did so after Ms. Lerner, on March 5, 2014, asserted her Fifth Amendment privilege not to testify at a hearing held by the House Committee on Oversight and Government Reform. The Committee had previously determined that Ms. Lerner waived this privilege when she made an opening statement during an appearance before the Committee on May 22, 2013. *See* H.R. Rep. No. 113-415, at 11-12 (2014) (the "Committee Report").

Under 2 U.S.C. § 192, a person is guilty of contempt of Congress if he or she, "having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before . . . any committee of either House of Congress, willfully . . . refuses to answer any question pertinent to the question under inquiry." Where the House of Representatives has voted to find a witness in contempt, 2 U.S.C. § 194 directs the Speaker of the House to "certify" the matter "to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."

Upon receipt of your referral, a team of experienced career prosecutors in this United States Attorney's Office was assigned to assess the matter. As discussed in more detail below, after extensive analysis of the facts of this matter and the applicable law, it was the team's conclusion that the Committee followed proper procedures in notifying Ms. Lerner that it had rejected her claim of privilege and gave her an adequate opportunity to answer the Committee's questions. Thus, Ms. Lerner's refusal to answer would be "willful" under Section 192 unless otherwise excused. However, the team also concluded that Ms. Lerner did not waive her Fifth Amendment privilege by making an opening statement on May 22, 2013, because she made only general claims of innocence. Thus, the Fifth Amendment to the Constitution would provide Ms.

Lerner with an absolute defense should she be prosecuted under Section 192 for her refusal to testify.

Given this assessment, we have further concluded that it is not appropriate for a United States Attorney to present a matter to the grand jury for action where, as here, the Constitution prevents the witness from being prosecuted for contempt. We respectfully inform you that we will therefore not bring the Congressional contempt citation before a grand jury or take any other action to prosecute Ms. Lerner for her refusal to testify on March 5, 2014.

## I.    Factual and Procedural Background

The proceedings at issue arose from the Committee's investigation of complaints that IRS employees had delayed for partisan political reasons the approval of applications by certain organizations for status as tax-exempt entities. On May 14, 2013, the chairman of the Committee, Representative Darrell E. Issa, sent a letter inviting Ms. Lerner to testify at a hearing on May 22, 2013. After Ms. Lerner's counsel informed Committee staff members that Ms. Lerner would refuse to answer questions on Fifth Amendment grounds, Chairman Issa issued a subpoena on May 20, 2013, compelling Ms. Lerner to testify two days later.

Ms. Lerner appeared at the hearing on May 22, 2013, and gave an opening statement that included the following:

> I have not done anything wrong. I have not broken any laws. I have not violated any IRS rules or regulations, and I have not provided false information to this or any other congressional committee.
>
> And while I would very much like to answer the Committee's questions today, I've been advised by my counsel to assert my constitutional right not to testify or answer questions related to the subject matter of this hearing. After very careful consideration, I have decided to follow my counsel's advice and not testify or answer any of the questions today.

Chairman Issa responded that he believed Ms. Lerner had waived her Fifth Amendment privilege and asked her to reconsider her position on testifying. Ms. Lerner, however, continued to refuse to answer any questions, and the chairman excused her, reserving the right to recall her as a witness at a later date.

On June 28, 2013, the Committee held a business meeting at which it approved a resolution determining that the opening statement offered by Ms. Lerner constituted a waiver of her Fifth Amendment privilege. On February 25, 2014, Chairman Issa sent a letter informing Ms. Lerner that the Committee had rejected her Fifth Amendment privilege claim, and that she was expected to appear and answer the Committee's questions at a reconvened hearing on March 5, 2014. Ms. Lerner's counsel responded by letter, stating that although he and his client understood that the Committee believed that Ms. Lerner waived her rights, Ms. Lerner would

continue to assert her Fifth Amendment privilege at any subsequent hearing. The Committee, however, insisted that Ms. Lerner appear at the reconvened hearing.

When the hearing reconvened on March 5, 2014, with Ms. Lerner and her counsel present, Chairman Issa stated for the record that the Committee had voted and found that Ms. Lerner had waived her Fifth Amendment privilege by making a voluntary opening statement on May 22, 2013. *See The IRS: Targeting Americans for Their Political Beliefs, Hearing Before the H. Comm. on Oversight and Government Reform,* 113th Cong. 2 (Mar. 5, 2014) ("March 5, 2014 Hearing"). Chairman Issa added that "if Ms. Lerner continued to refuse to answer" the Committee's questions, the Committee "may proceed to consider whether she should be held in contempt." *Id.* at 3.

Chairman Issa then proceeded to ask a series of factual questions about the matters under investigation by the Committee. To each question, Ms. Lerner stated that she declined to answer based on the advice of her counsel that she had not waived her Fifth Amendment privilege. Each time Ms. Lerner provided such a response, Chairman Issa proceeded to his next question. Eventually, Chairman Issa adjourned the hearing upon determining that Ms. Lerner would not cooperate with the Committee. The May 7, 2014, referral to this Office followed.

## II.    Legal Analysis

### A.    The Committee Followed Proper Procedures in Notifying Ms. Lerner That It Had Rejected Her Claim of Privilege, and Thereafter Gave Her an Adequate Opportunity to Answer the Committee's ●uestions.

The Supreme Court has held that Section 192 "requires a criminal intent – in this instance, a deliberate, intentional refusal to answer." *Quinn v. United States,* 349 U.S. 155, 165 (1955). Thus, where a witness objects to a question, *e.g.,* by asserting a privilege, the questioning committee may either "sustain the objection and abandon the question, even though the objection might actually be without merit," or "disallow the objection and thus give the witness the choice of answering or not." *Id.* However, "unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under [Section] 192 for refusal to answer that question." *Id.* at 166.

Both Ms. Lerner's counsel and some Members of the Committee have argued that Ms. Lerner cannot be prosecuted under Section 192 because the Committee did not follow procedures designed to ensure that a witness is "clearly apprised" that her testimony is required. Specifically, they have argued that when a witness asserts a claim of privilege, the questioning committee should, with respect to each question, specifically overrule the claim, warn the witness that she will be held in contempt if she continues to refuse to answer, and then give the witness another opportunity to answer.

We agree with the view of the Committee majority, however, that Ms. Lerner was given notice that her claim of privilege had been rejected and sufficient opportunity to answer the Committee's questions after receiving that notice. In three Supreme Court cases relied upon by Ms. Lerner, the relevant Congressional committee never actually made a ruling disallowing the

3

claim of privilege. *See Quinn*, 349 U.S. at 166; *Emspak v. United States*, 349 U.S. 190, 202 (1955); *Bart v. United States*, 349 U.S. 219, 222 (1955). As the Court explained in *Quinn*, this meant the witness "was never confronted with a clear-cut choice between compliance and noncompliance, between answering the question and risking prosecution for contempt. At best he was left to guess whether or not the committee had accepted his objection." 349 U.S. at 166. The Court went on to state, however, that

> [j]ust as the witness need not use any particular form of words to present his objection, so also the committee is not required to resort to any fixed verbal formula to indicate its disposition of the objection. So long as the witness is not forced to guess the committee's ruling, he has no cause to complain.

*Id.* at 170.

The Supreme Court and other federal courts have accordingly reversed contempt convictions where defendants were not informed that their objections had been rejected before the relevant questions were asked, but generally affirmed them where defendants were so informed. *Compare, e.g., Raley v. Ohio*, 360 U.S. 423, 437-42 (1959), and *Grossman v. United States*, 229 F.2d 775, 776 (D.C. Cir. 1956) *with Barenblatt v. United States*, 240 F.2d 875, 879-80 (D.C. Cir. 1957), *vacated and remanded on other grounds, Barenblatt v. United States*, 354 U.S. 930 (1957); *Davis v. United States*, 269 F.2d 357, 362-63 (6th Cir. 1959); *Wollam v. United States*, 244 F.2d 212, 215 (9th Cir. 1957), *rev'd on other grounds, Simpson v. United States*, 355 U.S. 7 (1957). In this matter, the Committee (1) informed Ms. Lerner, both in writing and in person, that it had rejected her claim of privilege; (2) warned Ms. Lerner that she could be held in contempt if she continued to refuse to answer; and (3) then posed questions to her (which she continued to refuse to answer on grounds of privilege). Thus, at the time the Committee posed the questions, Ms. Lerner was not "forced to guess" the Committee's position on her claim of privilege, and it would have been an unnecessary "form of words" for the Chairman to continue to repeat the Committee's ruling and warning for each question. Ms. Lerner's refusal thereafter to answer was accordingly "willful" under Section 192.

### B.    Ms. Lerner Did Not Waive Her Fifth Amendment Privilege.

The Supreme Court has made clear that witnesses who testify before Congress are protected by the Fifth Amendment to the Constitution. *See Quinn*, 349 U.S. at 161. Thus, it is undisputed that Ms. Lerner had the right not to testify at the Committee hearing, given the possibility that her answers could be used against her in a subsequent criminal proceeding. *See, e.g., Hoffman v. United States*, 341 U.S. 479, 486 (1951); *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984); *United States v. Balsys*, 524 U.S. 666, 672 (1998). The only question is whether she waived that right by giving her opening statement on May 22, 2013.

In finding that Ms. Lerner waived her Fifth Amendment privilege, the Committee focused on her assertions that she had done nothing wrong, had broken no laws, had violated no IRS rules, and had provided no false information to Congress. Citing the Supreme Court's decisions in *Brown v. United States*, 356 U.S. 148, 154-55 (1958), and *Mitchell v. United States*,

4

526 U.S. 314, 321 (1999), the Committee found that these "four specific denials" amounted to voluntary testimony about the subject matter of the hearing, which Ms. Lerner could not then refuse to be questioned about. *See* Committee Report, at 11, 36-37.

We respectfully disagree with this conclusion, however, because case law establishes that Ms. Lerner's general denials of wrongdoing did not amount to "testimony" about the actual facts under the Committee's review. In *Brown*, the defendant in a civil immigration proceeding voluntarily took the stand and gave substantive testimony on direct examination, but refused to answer pertinent questions about that testimony on cross-examination. 356 U.S. at 150-52. The Court upheld the defendant's contempt conviction for that refusal, noting that a party may not put a "one-sided account of the matters in dispute" before the trier of fact, which could not be tested by adversarial cross-examination. *Id.* at 155. *See also Mitchell*, 526 U.S. at 321 (noting that "a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details").

Where witnesses do not offer *substantive* testimony, however, and instead merely make general denials or summary assertions, federal courts have been unwilling to infer a waiver of the Fifth Amendment privilege. *See, e.g., Isaacs v. United States*, 256 F.2d 654, 656-57, 660-61 (8th Cir. 1958) (witness before grand jury who repeatedly stated that he had committed no crime did not waive his Fifth Amendment privilege); *Ballantyne v. United States*, 237 F.2d 657, 665 (5th Cir. 1956) (concluding that "the United States Attorney could not, by thus skillfully securing from appellant a general claim of innocence, preclude him from thereafter relying upon his constitutional privilege when confronted with specific withdrawals"); *United States v. Hoag*, 142 F. Supp. 667, 669 (D.D.C. 1956) (witness who generally denied being a spy or saboteur before Congressional committee did not waive Fifth Amendment privilege).

In her opening statement before the Committee, Ms. Lerner offered no account or explanation of what occurred and revealed no facts about the matters under the Committee's review. Instead, she made general assertions lacking substantive content. She did not purport to explain why she believed she was innocent or why any information she had previously provided was not false. This matter therefore appears materially indistinguishable from cases like *Isaacs*, *Ballantyne*, and *Hoag*, in which defendants were held not to have waived Fifth Amendment protection simply by asserting general innocence or even denying guilt of specific offenses.

There is likely an additional barrier to finding that Ms. Lerner waived her Fifth Amendment privilege through her general denials of wrongdoing. Unlike the civil defendant in *Brown* and defendants in criminal cases (who similarly subject themselves to wide-ranging cross-examination if they voluntarily take the stand), Ms. Lerner was an ordinary witness who had been compelled to testify by subpoena. The Supreme Court has held that "where the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." *McCarthy v. Arndstein*, 262 U.S. 355, 359 (1923); *see also, e.g., United States v. Powell*, 226 F.2d 269, 276 (D.C. Cir. 1955); *accord Rogers v. United States*, 340 U.S. 367, 368, 373 (1951). Ms. Lerner did not testify to any incriminatory facts during her opening statement but, to the contrary, asserted her innocence. Thus, like the defendant in *Arndstein*, she had the right to "stop[] short" after making her self-exculpatory statement.

5

The Committee found that Ms. Lerner's opening statement was the equivalent of the "voluntary" testimony at issue in *Brown*, presumably because she did not have to make the statement at all. Although in theory this could render the *Arndstein* line of cases inapplicable, that conclusion is doubtful. Ms. Lerner was compelled by subpoena to appear before the Committee on May 22, 2013 after she declined an invitation to appear voluntarily and informed the Committee that she would invoke her Fifth Amendment privilege. Courts have not found waiver under such circumstances. *See, e.g., Hoag*, 142 F. Supp. at 669-71.

**C.    A United States Attorney Retains Discretion To Decline To Present a Matter to the Grand Jury Under 18 U.S.C. § 194 When He Determines that a Witness Is Shielded From Prosecution by the Constitution.**

Because Ms. Lerner did not waive her Fifth Amendment privilege before refusing to answer the Committee's questions, a conviction under Section 192 for that refusal would be unconstitutional. The question thus arises whether Section 194 requires this matter to be presented to a grand jury even though no prosecution can constitutionally proceed. We have concluded that it does not.

This conclusion follows from the Justice Department's longstanding interpretation of Section 194 as preserving the exercise of prosecutorial discretion in the Executive Branch. It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege. The fullest explanation of the legal basis for the Department's position was provided during the Reagan Administration by Assistant Attorney General for the Office of Legal Counsel Theodore Olson. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984) (the "1984 Opinion"). Although the 1984 Opinion was issued to address the specific question of contempt citations made against Executive Branch officials asserting executive privilege, the opinion addressed the more general question of whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. As to that question, the opinion concluded that "as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury." *Id.* at 128.

The 1984 Opinion reached this conclusion for several reasons. First, the opinion noted that the Department had previously taken the position, in a case where the President's executive privilege was not at issue, that it was not required to refer a contempt-of-Congress matter to a grand jury. *Id.* at 119-20. Second, the opinion noted that a number of judicial decisions implicitly recognized that a United States Attorney retained discretion not to make a referral to a grand jury, despite the apparently mandatory language of Section 194. *Id.* at 120-22. The opinion explained that the cited cases indicate that "prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena." *Id.* at 122. Third,

6

**-248-**

the opinion cited the common-law doctrine of prosecutorial discretion, which precludes an interpretation that the statute requires automatic referral. *Id.* Because the "general rule is that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[,]'" the opinion noted that "courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated." *Id.* Finally, the opinion noted that interpreting Section 194 to require referral to a grand jury would raise serious constitutional problems in light of separation-of-powers principles. *Id.* at 124-25. The opinion cited cases in which courts had refused to issue, or overturned on appeal, orders purporting to compel United States Attorneys to prosecute individuals. *Id.* at 125-26. Noting the Supreme Court's admonition that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," the opinion further stated that "[a] legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based." *Id.* at 126-27 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

Thus, for at least three decades it has been the Department's position that Section 194 does not eliminate a United States Attorney's traditional prosecutorial discretion not to bring a specific matter before a grand jury. And, in light of the Department's criminal charging policy, which provides that a federal prosecutor should "commence or recommend Federal prosecution" of a person only "if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction," *see* United States Attorneys' Manual § 9-27.220A, we have concluded it would not be proper to commence grand jury proceedings against a witness whose prosecution for contempt is barred by the Constitution.

## III.    Conclusion

We wish to assure you that the Department of Justice does not question the authority of Congress "to summon witnesses before either House or before their committees," or "to pass laws 'necessary and proper' to carry into effect its power to get testimony." *See Adams v. Maryland*, 347 U.S. 179, 183 (1954) (citing U.S. Const. art. 1, § 8). Thus, in appropriate circumstances, a United States Attorney's Office will refer to a grand jury under Section 192 witnesses who contumaciously withhold testimony or other information that Congress has legitimately sought to compel in the exercise of its legislative or oversight responsibilities. Because, however, the authority of any branch of the United States government to compel witness testimony is limited by the protections of the Constitution, and Ms. Lerner did not waive those protections in this matter, the United States Attorney's Office will not bring the instant contempt citation before a grand jury.

Sincerely,

Ronald C. Machen Jr.
United States Attorney

7

**-249-**

# EXHIBIT 11

# Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege

As a matter of statutory construction and separation of powers analysis, a United States Attorney is not required to refer a congressional contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who carries out the President's instruction to invoke the President's claim of executive privilege before a committee of Congress.

May 30, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

## I. Introduction

This memorandum memorializes our formal response to your request for our opinion whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194, a United States Attorney must prosecute or refer to a grand jury a citation for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of executive privilege in response to written instructions from the President of the United States. Your inquiry originally arose in the context of a resolution adopted by the House of Representatives on December 16, 1982, during the final days of the 97th Congress, which instructed the Speaker of the House of Representatives to certify the report of the Committee on Public Works and Transportation concerning the "contumacious conduct of [the] Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee . . . to the United States Attorney for the District of Columbia, to the end that the Administrator . . . may be proceeded against in the manner and form provided by law." H.R. Res. 632, 97th Cong., 2d Sess. (1982).[1] Section 192 of Title 2, United States Code, provides, in general, that willful failure to produce documents in response to a congressional subpoena shall be a misdemeanor. Section 194 provides that if such a failure is reported to either house of Congress it "shall" be certified to the "appropriate United States attorney whose duty it shall be to bring the matter before the grand jury for its action."

---

[1] Although the December 1982 dispute is now a matter of history, it raises recurring issues.

101

Your inquiry presents a number of complex issues that will be considered in this memorandum. The first issue is whether the Executive retains some discretion with respect to referral of a contempt of Congress citation to a grand jury. This issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion. The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege. This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983.

102

Constitutional conflicts within the federal government must be resolved carefully, based upon the facts of each specific case. Although tensions and friction between coordinate branches of our government are not novel and were, in fact, anticipated by the Framers of the Constitution, they have seldom led to major confrontations with clear and dispositive resolutions.

> The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory.

Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts*, 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original). "The great ordinances of the Constitution do not establish and divide fields of black and white." *Springer v. Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are confident of our conclusions, prudence suggests that they should be limited to controversies similar to the one to which this memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis.

## II. Background

Because the difficult and sensitive constitutional issues that we consider in this opinion could conceivably be resolved differently depending upon the specific facts of a controversy, this analysis is presented in the context of the December 16, 1982, actions of the House of Representatives. The facts surrounding this dispute will be set out in detail in the following pages.

### A. EPA's Enforcement of the Superfund Act

On December 16, 1982, the House of Representatives cited the Administrator of the Environmental Protection Agency (EPA) because she declined to produce, in response to a broad subcommittee subpoena, a small portion of the subpoenaed documents concerning the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, 9657 (Supp. V 1981) (Superfund Act). The Superfund Act, adopted in December of 1980, authorizes the federal government to take steps to remedy the hazards posed by abandoned and inactive hazardous waste sites throughout the United States.[2] The EPA, which was delegated part of the President's authority to enforce the Superfund Act in August of 1981,[3] has considerable flexibility with respect to

---

[2] Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, provides federal authority to deal with the current disposal of hazardous industrial wastes.

[3] See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

103

**-253-**

how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an "imminent and substantial endangerment to the public health or welfare or the environment." *See* 42 U.S.C. § 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. *See* 42 U.S.C. § 9631. If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages. *See* 42 U.S.C. § 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances. *See* 42 U.S.C. §§ 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release. *See* 42 U.S.C. § 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and evaluating the evidence that exists or that must be generated to support government action. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983). Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents. *Id.*

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment.[4] EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites. *See* 47 Fed. Reg. 20664 (1982).

Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act. As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a

---

[4] Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up. *See* 47 Fed. Reg. 58476 (1982)

104

clean up plan. These negotiations may involve hundreds of potentially respon-
sible parties and millions of dollars in clean up costs. Depending upon the
strengths and weaknesses of individual cases and the effect on the overall
enforcement effort, EPA may decide to settle with some but not all parties and
proceed to litigation with a certain number of potential defendants. If EPA
decides to bring a lawsuit, it refers the case to the Land and Natural Resources
Division of this Department, which is responsible for conducting the actual
litigation.[5]

During EPA's enforcement of the Superfund Act, the agency created or
received hundreds of thousands of documents concerning various aspects of
the enforcement process. Many of these documents concerned the facts relating
to specific hazardous waste sites; others involved general agency strategy and
policies with respect to the Superfund Act; still others, a small portion of the
enforcement files, were attorney and investigator memoranda and notes that
contained discussions of subjects such as EPA's enforcement strategy against
particular defendants, analyses of the strengths and weaknesses of the
government's case against actual or potential defendants, consideration of
negotiation and settlement strategy, lists of potential witnesses and their antici-
pated testimony, and other litigation planning matters. Enforcement officials at
both the career and policy level at EPA and in the Land and Natural Resources
Division at the Department of Justice determined that some of those docu-
ments, which concerned the legal merits and tactics with respect to individual
defendants in open enforcement files, were particularly sensitive to the en-
forcement process and could not be revealed outside the agencies directly
involved in the enforcement effort without risking injury to EPA's cases
against these actual and potential defendants in particular and the EPA enforce-
ment process in general.[6]

### B. The House Subcommittee's Demands for Enforcement Files

In the midst of EPA's ongoing enforcement efforts under the Superfund Act,
the Subcommittee on Oversight and Investigations of the House Committee on
Public Works and Transportation (Public Works Subcommittee), chaired by
Rep. Levitas, began hearings to review EPA enforcement of the Act. In the
course of these hearings, the Public Works Subcommittee first demanded
access to, and then subpoenaed, a wide range of documents concerning en-
forcement of the Superfund Act with respect to the 160 sites that were on the

---

[5]We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken
Superfund financed action at 112 sites involving the obligation of in excess of $236 million, instituted
Superfund claims in 25 judicial actions, and obtained one criminal conviction. As of the early months of
1983, EPA and the Department of Justice had reached settlements in 23 civil actions providing for the
expenditure of more than $121 million to conduct clean up operations and were actively negotiating with
responsible parties concerning the clean up of 56 sites throughout the country. See Amended Declaration of
Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel of the
EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983).
[6]*Id.*

105

agency's interim priorities list. The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants.[7] The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982. The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena.[8] The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, *see* Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed. A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials. Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation. The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive

---

[7] The subpoena required the EPA Administrator to produce: all books, records, correspondence, memoranda, papers, notes and documents drawn or received by the Administrator and/or her representatives since December 11, 1980, the date of enactment of the Superfund Act, including duplicates and excepting shipping papers and other commercial or business documents, contractor and/or other technical documents, for those sites listed as national priorities pursuant to Section 105(8)(B) of the Superfund Act. *See United States v. House of Representatives*, 556 F. Supp. 150, 151 (D.D.C. 1983).

[8] *See* Testimony of Administrator Gorsuch before the Public Works Subcommittee, attached as Exhibit C to Declaration of Robert M. Perry, *supra*.

as of the return date of the subpoena that their disclosure might adversely affect
pending investigations and open enforcement proceedings. The President imple-
mented this decision in a memorandum dated November 30, 1982, to the EPA
Administrator, which instructed her to withhold the particularly sensitive docu-
ments from disclosure outside the Executive Branch as long as the documents
remained critical to ongoing or developing enforcement actions. The legal
basis for this decision was explained in letters from the Attorney General on
November 30, 1982, to the House Public Works Subcommittee and one other
House subcommittee.[9] On December 2, 1982, 64 of the most sensitive docu-
ments were withheld from the Subcommittee.[10]

## C. The Contempt of Congress Proceedings in the House of Representatives

The President's assertion of executive privilege, and the Attorney General's
explanation of the law enforcement considerations and constitutional justifica-
tion for the decision not to release the documents outside the Executive Branch
while enforcement proceedings were ongoing, did not dissuade the congres-
sional subcommittees from pressing their demands for the withheld material.
After the EPA Administrator asserted the President's claim of privilege at a
December 2, 1982, Public Works Subcommittee hearing, the Subcommittee
immediately approved a contempt of Congress resolution against her. The full
Committee did likewise on December 10, 1982, and rejected a further proposal
by the Department of Justice to establish a formal screening process and
briefings regarding the contents of the documents.[11] The full House adopted
the contempt of Congress resolution on December 16, 1982,[12] and the follow-

[9] See Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney General William French Smith (Nov. 30, 1982). The Subcommittee on Oversight and Investigations of the House Energy and Commerce Committee (Energy and Commerce Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel demand for similar documents relating to enforcement of the Superfund Act with respect to certain specific sites that were among the 160 on the interim priorities list. While the Energy and Commerce Subcommittee sought documents relative to three specific hazardous waste sites, the Public Works Subcommittee subpoena demanded production of virtually all documents for all 160 sites. The President's assertion of executive privilege applied to both subpoenas. Although the Energy and Commerce Subcommittee approved a contempt of Congress resolution against the EPA Administrator, this resolution never reached the full Committee or the floor of the House of Representatives.

[10] As of that date, EPA had been able to examine only a portion of the hundreds of thousands of pages of documents that had been subpoenaed. The 64 documents that were withheld were those among the subpoe-naed documents that had been reviewed and determined to fall within the President's instruction not to produce documents the release of which would adversely affect ongoing enforcement proceedings See Amended Declaration of Robert M. Perry, supra

[11] See Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs (Dec. 9, 1982).

[12] The contempt resolution stated:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee on Public Works and Transportation as to the contumacious conduct of Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, and as ordered by the subcommittee, together with all of the facts in
Continued

107

ing day Speaker O'Neill certified the contempt citation to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute.

*D. The Criminal Contempt of Congress Statute*

The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. §§ 192 & 194.[13] Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House or the President of the Senate, as the case may be, and the United States Attorney, to take certain actions leading to the prosecution of persons certified by a house of Congress to have failed to produce information in response to a subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House. *it shall be the duty of the said President of the Senate or the Speaker of the House*, as the case may be, *to certify, and he shall so certify, the statement of facts* aforesaid under the seal of the

---

[12] ( . . . continued)
connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, may be proceeded against in the manner and form provided by law.
128 Cong. Rec. 31754 (1982).

[13] A third provision, 2 U.S.C. § 193, which denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that this testimony would disgrace him, is not relevant to the issues discussed in this memorandum.

108

> Senate or House, as the case may be, *to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.*

(Emphasis added.)

### E. The Department of Justice Civil Suit

Immediately after the House passed the resolution adopting the finding that the EPA Administrator was in contempt of Congress, the Department of Justice filed a civil suit in the United States District Court for the District of Columbia to obtain a ruling that "insofar as [the EPA] Administrator . . . did not comply with the Subpoena, her non-compliance was lawful" because of a valid Presidential claim of executive privilege.[14] The House moved to dismiss the Department's complaint on jurisdictional grounds, and the Department cross moved for summary judgment on the merits. In a letter to Speaker O'Neill dated December 27, 1982, the United States Attorney indicated that during the pendency of the lawsuit, he would take no further action with respect to the Speaker's referral of the contempt citation. The Speaker responded in a letter dated January 4, 1983, in which he took the position that the United States Attorney must, as a matter of law, immediately refer the matter to a grand jury.

The trial court responded to the cross-motions for dismissal and summary judgment by exercising its discretion under equitable rules of judicial restraint not to accept jurisdiction over the lawsuit, and it dismissed the suit. The court concluded:

> When constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted. . . .
>
> The difficulties apparent in prosecuting [the] Administrator . . . for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement.

*United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C. 1983). No appeal was taken.[15]

---

[14] *See* Amended Complaint in *United States* v. *House of Representatives*, Civ. No. 82-3583 (D.D.C. Dec. 29, 1982).

[15] Although the United States Court of Appeals for the District of Columbia Circuit previously had been willing to entertain a civil action to resolve a conflict between a congressional subpoena for documents and a Presidential claim of executive privilege when the action was brought by a congressional committee, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), the trial court decision in the EPA matter casts some doubt on the viability of such an action when Congress, as in this case, does not wish to resolve the controversy in a civil suit. We must assume, for the purpose of this opinion, that a civil suit is an avenue that is open to Congress, but closed to the Executive, absent a legislature willing to have the matter resolved in a civil proceeding.

Of course, the courts might be more amenable to a civil action challenging a contempt citation if they felt that a criminal prosecution in this context was untenable. The district court judge in the EPA matter noted but did not attempt to consider in depth the "difficulties" of prosecuting an executive official for carrying out the President's constitutional responsibility.

*F. Resolution of the EPA Dispute*

Subsequent to the trial court decision, the two branches engaged in negotiations to reach a compromise settlement. The parties eventually reached an agreement under which the Public Works Subcommittee would have limited access to the withheld documents and would sponsor a resolution to "withdraw" the contempt citation against the EPA Administrator. Pursuant to the agreement, the Subcommittee reviewed the documents, and the House later adopted a resolution withdrawing the contempt citation. H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983). The issue whether the House of Representatives in the 98th Congress could "withdraw" the contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the United States Attorney for the District of Columbia refrained from referring the contempt citation to the grand jury. The United States Attorney took the position that referral would have been inappropriate during that period and that the statute left him with discretion to withhold referral. *See* Testimony of Stanley S. Harris before the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. 100–07 (June 16, 1983). Following the passage of the resolution withdrawing the contempt citation, "the relevant facts and documents were presented . . . to a federal grand jury, which voted unanimously not to indict [the EPA Administrator]." Letter from Stanley S. Harris, United States Attorney, District of Columbia, to Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5, 1983).

### III. Generally Applicable Legal Principles: The Separation of Powers, the Duties of the Executive to Enforce the Law, and the Derivation and Scope of the Principles of Prosecutorial Discretion and Executive Privilege

*A. The Separation of Powers*

The basic structural concept of the United States Constitution is the division of federal power among three branches of government. Although the expression "separation of powers" does not actually appear in the Constitution, the Supreme Court has emphasized that the separation of powers "is at the heart of our Constitution," and has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976). It needs little emphasis that the separation of powers doctrine is vital to any analysis of the relative responsibilities of the branches of our government, *inter se*. In *The Federalist* No. 47, James Madison, who believed that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the concept of the separation of powers, defended this tripartite arrangement in the Constitution by citing

110

Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

> The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*."

*The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); *see Buckley v. Valeo*, 424 U.S. at 120–21.[16]

Of the three branches of the new government created in Philadelphia in 1787, the legislature was regarded as the most intrinsically powerful, and the branch with powers that required the exercise of the greatest precautions.

Madison warned that the "legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist* No. 48, *supra*, at 309. He admonished that because of their experiences in England, the founders of the thirteen colonies had focused keenly on the danger to liberty from an "overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority," but had tended to ignore the very real dangers from "legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations." *Id.* Reflecting the views of many of his colleagues, Madison believed that although the risk of tyranny would naturally come from the King in an hereditary monarchy, in a representative republic, like that created by the constitutional convention, in which executive power was "carefully limited, both in the extent and duration of its power," the threat to liberty would come from the legislature,

> which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

*Id.*

---

[16] Madison characterized Montesquieu as the "oracle who is always consulted and cited on [the] subject [of the separation of powers]." *See The Federalist* No. 47, *supra*, at 301.

111

The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. *Id.* at 310. The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments." *United States* v. *Brown*, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown." *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id.* at 962.

Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An *elective despotism* was not the government we fought for." T. Jefferson, *Notes on the State of Virginia* 120 (Univ. N.C. Press ed. 1955)[17] The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id.* The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its consti-

---

[17] It is noteworthy, at least from an historical perspective, that the House of Representatives, because of its immense powers, was considered to be the governmental body least vulnerable to encroachments by other segments of government and, at the same time, because of its popular origin and frequent renewal of authority by the people, the body whose encroachment on the other branches would be least distrusted by the public. The Supreme Court later noted:

> It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositories of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.

*Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881).

112

tutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. *Id*. at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." *Buckley* v. *Valeo*, 424 U.S. at 121, 123. Therefore, although the Constitution does not contemplate "a complete division of authority between the three branches," each branch retains certain core prerogatives upon which the other branches may not transgress. *Nixon* v. *Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977). Each branch must not only perform its own delegated functions, but each has an additional duty to resist encroachment by the other branches. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, *must* be resisted." *INS* v. *Chadha*, 462 U.S. at 951 (emphasis added).

## B. The Duties of the Executive to Enforce the Law

The fundamental responsibility and power of the Executive Branch is the duty to execute the law. Article II, § I of the Constitution expressly vests the executive power in the President. Article II, § 3 commands that the President "take Care that the Laws be faithfully executed." Enforcement of the laws is an inherently executive function, and by virtue of these constitutional provisions, the Executive Branch has the exclusive constitutional authority to enforce federal laws. Since the adoption of the Constitution, these verities have been at the heart of the general understanding of the Executive's constitutional authority. During the debates on the Constitution, James Wilson noted that the "only powers he conceived strictly executive were those of executing the laws." I M. Farrand, *The Records of the Federal Convention of 1787*, at 65–66 (1937). During the first Congress, James Madison stated that "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws." I *Annals of Congress* 481 (1789). The Supreme Court has recognized this fundamental constitutional principle. In *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928), the Court observed:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

*Id.* at 202. More recently, Judge Wilkey, writing for a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit in a decision later affirmed by the Supreme Court, recognized that the Constitution

113

prevents Congress from exercising its power of "oversight, with an eye to legislative revision," in a manner that amounts to "shared administration" of the law. *Consumer Energy Council of America* v. *Federal Energy Regulatory Commission*, 673 F.2d 425, 474 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America*, 43 U.S. 1216 (1983). It thus seems apparent that the drafters of the Constitution intended clearly to separate the power to adopt laws and the power to enforce them and intended to place the latter power exclusively in the Executive Branch.[18] As a practical matter, this means that there are constitutional limits on Congress' ability to take actions that either disrupt the ability of the Executive Branch to enforce the law or effectively arrogate to Congress the power of enforcing the laws.

## C. The Derivation and Scope of Prosecutorial Discretion and Executive Privilege

The issues addressed by this memorandum involve two important constitutional doctrines that spring from the constitutional limits imposed by the separation of powers and the Executive's duty to enforce the laws: prosecutorial discretion and executive privilege.

### 1. Prosecutorial Discretion

The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress. That principle was reaffirmed by the Supreme Court in *Buckley* v. *Valeo*, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President *pro tempore* of the Senate and the Speaker of the House. In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed." Art. II, § 3.

424 U.S. at 138.

---

[18] Of equal concern was the need to separate the judicial power from the executive power. The drafters intended to preserve the impartiality of the judiciary as "neutral arbiters in the criminal law" by separating the judiciary from the prosecutorial function. *Nader* v. *Saxbe*, 497 F.2d 676, 679 n.18 (D.C Cir. 1974).

114

The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals. This principle was explained in *Smith* v. *United States*, 375 F.2d 243 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. . . . This discretion is required in all cases.
>
> We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246-47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." *Id.* at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below. At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

2. Executive Privilege

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch. If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional preroga-

115

tives. This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States* v. *Nixon*, 418 U.S. 683, 708 (1974). We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch. *United States* v. *Nixon*, 418 U.S. at 713; *see also Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc). Nevertheless, the unanimous Supreme Court decision in *Nixon* clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities.[19]

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws. First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. *United States* v. *Nixon*, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." *United States* v. *Nixon*, 418 U.S. 683, 706 (1974). In *Nixon*, the Court stated:

> As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. In *C.& S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111

---

[19] Presidents have invoked the privilege throughout our history for a variety of reasons. *See, e.g.,* "History of Refusals by Executive Branch to Provide Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz, Counsel to the President (June 8, 1977); Position of the Executive Department Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

116

(1948), dealing with Presidential authority involving foreign policy considerations, the Court said:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

In *United States* v. *Reynolds*, 345 U.S. 1 (1953), dealing with a claimant's demand for evidence in a Tort Claims Act case against the Government, the Court said:

> "It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.* at 10.

No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. at 710–11.

An additional important application of executive privilege, which, as noted earlier, relates centrally to the discharge of the President's constitutional duties, involves open law enforcement files. Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature.[20] The basis for this application

---

[20] As explained by Attorney General (later, Supreme Court Justice) Robert Jackson in April 1941:

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.

40 Op. Att'y Gen. 45, 46 (1941). As similarly expressed a few years later by Deputy Assistant Attorney General Kauper:

> Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most impor-
> Continued

117

of the privilege is essentially the same as for all aspects of executive privilege; the Executive's ability to enforce the law would be seriously impaired, and the impermissible involvement of other branches in the execution and enforcement of the law would be intolerably expanded, if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files.

IV. The Duty of the Executive Branch When an Executive Official
Has Been Cited for Contempt of Congress for Asserting
the President's Claim of Executive Privilege

A. Prosecutorial Discretion

The first specific question that is presented by the circumstances that gave rise to this memorandum is whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. This question raises issues of statutory construction as well as the constitutional limits of prosecutorial discretion. We deal first with the statutory questions.

As a preliminary matter, we note that § 194 does not on its face actually purport to require the United States Attorney to proceed with the prosecution of a person cited by a house of Congress for contempt; by its express terms the statute discusses only referral to a grand jury. Even if a grand jury were to return a true bill, the United States Attorney could refuse to sign the indictment and thereby prevent the case from going forward. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965); *In re Grand Jury, January, 1969*, 315 F. Supp. 662 (D. Md. 1970). *See* Hamilton & Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury.[21]

---

[20] (. . . continued)
tant, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969). This significant constitutional privilege provides a foundation for our discussion below of the penalties that Congress may attach to the President's assertion of the privilege in response to a congressional subpoena.

[21] Although it is by no means certain as a matter of law, if the case were referred to a grand jury, the United States Attorney might be required to take certain steps short of signing the indictment, and the grand jury's decision might well become public. In *Cox*, a majority of the court (made up of the three dissenting judges and one concurring judge) took the view that the United States Attorney could be required to prepare an indictment for use by the grand jury. In addition, the district court in *In re Grand Jury, supra*, held that even though the United States Attorney could not be required to sign an indictment, in the circumstances of that case "the substance of the charges in the indictment should be disclosed, omitting certain portions as to which
Continued

118

1. Previous Department of Justice Positions Concerning Prosecutorial
Discretion Under the Contempt of Congress Statute

In the past, the Department of Justice has taken the position that if Congress
cited an executive officer for contempt because of an assertion of executive
privilege and "the Department determined to its satisfaction that the claim was
rightfully made, it would not, in the exercise of its prosecutorial discretion,
present the matter to a grand jury." Testimony of Assistant Attorney General
(now Solicitor General) Rex Lee, *Hearings on Representation of Congress and
Congressional Interests in Court, Before the Subcomm. on Separation of
Powers of the Senate Committee on the Judiciary*, 94th Cong., 2d Sess. 8
(1976).

This principle of prosecutorial discretion under the contempt of Congress
statute was followed by the Department in the cases of three officials of the
Port of New York Authority who were cited for contempt of Congress in 1960
for refusing to produce documents to the House Judiciary Committee. As a part
of an investigation of the Port Authority, which had been established by an
interstate compact approved by Congress, the Judiciary Committee subpoe-
naed a large number of documents concerning the Port Authority's operations,
most of which the Port Authority declined to produce on the orders of the
governors of New York and New Jersey (the states within which the Port
Authority was located). Because of the failure to produce the documents, the
Committee recommended, and the House adopted, contempt resolutions against
three principal officials of the Port Authority.[22] On August 23, 1960, these
resolutions were referred to the United States Attorney for prosecution. *See*
N.Y. Times, Aug. 24, 1960, at 1. The United States Attorney never referred any
of these citations to the grand jury. On November 16, 1960, the Department of
Justice announced that it would proceed against the officials by information

---

[21] (. . . continued)
the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the
private prejudice to the persons involved, none of whom are charged with any crime in the proposed
indictment." 315 F. Supp. at 678–79. Under this analysis, if the contempt citation were to reach a grand jury
and the grand jury were to vote a true bill, a court might be able to require the United States Attorney to
prepare an indictment and then might order the disclosure of that indictment as voted by the grand jury. For
the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the
United States Attorney to prosecute.

    Because the contempt of Congress statute does not require the United States Attorney to refer to a grand
jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim
of executive privilege, we have not attempted to determine definitively what additional steps, if any, the
United States Attorney could be required to take if such a matter were referred to a grand jury.

[22] See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority);
*id.* at 17316 (citation against S. Sloan Colt, Chairman of the Board); *id.* at 17319 (citation against Joseph G.
Carty, Secretary). The contempt resolution in each case read as follows:

    Resolved, That the Speaker of the House of Representatives certify the report of the Committee
    on the Judiciary as to the contumacious conduct of [name] in failing and refusing to furnish
    certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee
    of said committee served upon him and as ordered by the subcommittee, together with all of the
    facts in connection therewith, under seal of the House of Representatives, to the United States
    attorney for the District of Columbia, to the end that [name] may be proceeded against in the
    manner and form provided by law.

119

**-269-**

rather than indictment, and therefore would not present the citations to a grand jury. *See* N.Y. Times, Nov. 17, 1960, at 1. On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials. *See* N.Y. Times, Nov. 26, 1960, at 1. The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so. Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962).[23]

In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute.[24] For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.

2. Judicial Opinions Interpreting the Language of § 194

Section 194 imposes similarly worded, nominally mandatory, referral obligations on both the Speaker of the House (or the President of the Senate) and the United States Attorney once a contempt of Congress resolution has been adopted by the House or Senate:

> *it shall be the duty* of the said President of the Senate or the Speaker of the House as the case may be, to certify, *and he shall so certify*, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States attorney, *whose duty it shall be* to bring the matter before the grand jury for its action.

(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be," might suggest a nondiscretionary obligation, the United States Court of Appeals for the District of Columbia Circuit has expressly held, at least with respect to the Speaker of the House, that the duty is *not* mandatory, and that, in fact, the Speaker has an obligation under the law, at least in some cases, to exercise his discretion in determining whether to refer a contempt citation. *Wilson* v. *United States*, 369 F.2d 198 (D.C. Cir. 1966). In *Wilson*, the court reversed a conviction for contempt of Congress on the ground that the Speaker had assumed that the statute did not permit any exercise of discretion by him

---

[23] The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

[24] We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice. *See* Department of Justice File No. 51–51–484 (1956). The file was closed because the Department concluded that there was an insufficient basis for prosecution.

and he had therefore automatically referred a contempt citation to the United States Attorney while Congress was not in session. The court based its conclusion that the Speaker was required to exercise his discretion on the longstanding practice of both the House and Senate and on congressional debates on contempt citations in which the houses had recognized their own discretion not to approve a contempt resolution. The court concluded that because full House approval of a contempt citation is necessary when Congress was in session, the Speaker is required to exercise some discretion when the House is not in session. 369 F.2d at 203–04.

Although the reasons underlying the court's decision not to impose a mandatory duty on the Speaker in *Wilson* do not necessarily require the same conclusion with respect to the United States Attorney, the decision at least supports the proposition that the seemingly mandatory language of § 194 need not be construed as divesting either the Speaker or the United States Attorney of all discretion.[25]

In several cases, the United States Court of Appeals for the District of Columbia Circuit has at least assumed that the United States Attorney retains discretion not to refer a contempt of Congress citation to a grand jury. In these cases, the court refused to entertain challenges to congressional subpoenas, at least in part on the ground that the prospective witnesses would have adequate subsequent opportunities to challenge a committee's contempt finding, including the opportunity to persuade the United States Attorney not to refer the case to a grand jury. For example, in *Ansara* v. *Eastland*, 442 F.2d 751 (D.C. Cir. 1971), the court declined to entertain a suit to quash a congressional subpoena on the ground that it would be inappropriate, as a matter of the exercise of its equitable power, to interfere with an ongoing congressional process. The court stated that protections were available "within the legislative branch or elsewhere," and then in a footnote indicated that these protections resided "perhaps in the Executive Branch *which may decide not to present the matter to the grand jury* (as occurred in the case of the officials of the New York Port Authority); or perhaps in the Grand Jury which may decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added).[26] *See also Sanders* v. *McClellan*,

---

[25] In this respect, we believe that *Wilson* implicitly disapproved the *dictum* of *Ex parte Frankfeld*, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

> It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it. He is required, under the language of the statute, to submit the facts to the grand jury.

*Id* at 916. The *Frankfeld* court expressly linked the responsibilities of the Speaker and the United States Attorney. *Wilson* ruled that the Speaker's duty is discretionary, at least when the House is not in session. Therefore, since the Speaker's duty is *in pari materia* with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

[26] *Ansara* v. *Eastland* was cited with approval three times by Judge Smith in *United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C 1983). Thus, although the opinion made a passing reference to the mandatory nature of referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

121

463 F.2d 894 (D.C. Cir. 1972). In *United States Servicemen's Fund* v. *Eastland*, 488 F.2d 1252 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1974), the court agreed to review a challenge to a congressional subpoena brought by a third party, and it distinguished *Ansara* and *McClellan* on the ground that, because the congressional subpoena was issued to a third party, the plaintiffs had no alternative means to vindicate their rights. 488 F.2d at 1260. Among the alternative means the court cited was the right to "seek to convince the executive (the attorney general's representative) not to prosecute." *Id.*

These cases emphasize the particular significance of prosecutorial discretion in the context of the contempt of Congress statute. In general, with respect to any criminal allegation, prosecutorial discretion plays an important role in protecting the rights of the accused by providing an additional level of review with respect to the factual and legal sufficiency of the charges. This role is even more important when dealing with the contempt of Congress statute because, as the above cases demonstrate, witnesses generally have no opportunity to challenge congressional subpoenas directly. Thus, as the cases indicate, prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena.

Thus, the practice of the Congress and the available judicial authority support the proposition that the seemingly mandatory duties imposed on congressional officials by 2 U.S.C. § 194 are and were intended to be discretionary. The practice of the Executive Branch and the court decisions reflect a similarly discretionary role under the statute for the United States Attorney. Because, as the balance of this memorandum reveals, these interpretations are consistent with other common-law principles and avoid conclusions that would be at odds with the separation of powers, we believe that a correct reading of 2 U.S.C. § 194 requires recognition of the prosecutor's discretion with respect to referral to a grand jury.

### 3. Common-Law Prosecutorial Discretion

In addition to the court decisions that suggest that the United States Attorney may decide not to refer a contempt citation to a grand jury, the common-law doctrine of prosecutorial discretion weighs heavily against and, in our opinion, precludes an interpretation that the statute requires automatic referral. Because of the wide scope of a prosecutor's discretion in determining which cases to bring, courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated. The general rule is that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States* v. *Nixon*, 418 U.S. 683, 693 (1974). *See also Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869). The Attorney General and his subordinates, including the United States Attorneys, have the authority to exercise this discretion reserved to the Executive. *United States* v. *San Jacinto Tin Co.*, 125 U.S. 273 (1888); *The Gray*

122

*Jacket*, 72 U.S. (5 Wall.) 370 (1866). In general, courts have agreed with the view of Judge (now Chief Justice) Burger:

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). *See also United States* v. *Batchelder*, 442 U.S. 114 (1979); *Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. § 547, which states in part that "each United States Attorney, within his district, *shall* . . . prosecute *for all* offenses against the United States." (Emphasis added.) For example, in *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank. The court ruled: "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion." *Id*. at 234. *See also United States* v. *Brown*, 481 F.2d 1035 (8th Cir. 1973); *Bass Anglers Sportsman's Society* v. *Scholze Tannery, Inc.*, 329 F. Supp. 339 (E.D. Tenn. 1971); *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961); *United States* v. *Brokaw*, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications. For example, 42 U.S.C. § 1987 states that United States Attorneys are "authorized *and required* . . . to initiate prosecutions against all persons violating any of the provisions of [the federal criminal civil rights statutes]." (Emphasis added.) Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, *see* Note, *Discretion to Prosecute Federal Civil Rights Crimes*, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case. For example, in *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in § 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes." 477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "[s]uch language has never been thought to preclude the exercise of prosecutorial discretion." *Id*. *Accord Peek* v. *Mitchell*, 419 F.2d 575 (6th Cir. 1970); *Moses* v. *Kennedy*, 219 F. Supp. 762 (D.D.C. 1963), *aff'd sub nom. Moses* v. *Katzenbach*, 342 F.2d 931 (D.C. Cir. 1965). The language employed in 2 U.S.C. § 194 is neither stronger

123

nor more clearly mandatory than the language of § 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. *See* 2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double Jeopardy Clause under the criminal laws, even if the defendant had already been punished by Congress, because the act created two separate offenses, one against Congress and one against the United States). This principle was adopted by the Supreme Court when it upheld the constitutionality of the contempt of Congress statute. *In re Chapman*, 166 U.S. 661 (1897). In *Chapman*, the Court held that the contempt statute did not violate the Double Jeopardy Clause even though a defendant could be punished through Congress' inherent contempt power as well as under the contempt statute. The Court concluded that a refusal to testify involved two separate offenses, one against Congress and one against the United States, and that

> it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together.

166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent contempt power is the remedy for the offense against Congress, and that remedy remains within Congress' control. The crime of contempt of Congress, like any other federal statutory crime, is an offense against the United States that should be prosecuted as is any other crime. This criminal offense against the United States properly remains subject to the prosecutorial control of the Executive Branch. Therefore, because the contempt statute should be treated as are other federal criminal statutes, we do not believe that § 194 should be read to limit the common law prosecutorial discretion of the United States Attorney. There is nothing in the legislative history of the contempt of Congress statute that is inconsistent with this conclusion. *See* 42 Cong. Globe, 34th Cong., 3d Sess. 4030–44 (1857).

4. Constitutional Considerations

Our construction of § 194 is reinforced by the need to avoid the constitutional problems that would result if § 194 were read to require referral to a

124

grand jury. As discussed above, the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law. Although most cases expressly avoid this constitutional question by construing statutes not to limit prosecutorial discretion, the cases that do discuss the subject make it clear that common law prosecutorial discretion is strongly reinforced by the constitutional separation of powers. *See, e.g.*, *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966).

A number of courts have expressly relied upon the constitutional separation of powers in refusing to force a United States Attorney to proceed with a prosecution. For example, in *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961), the court declined to order the United States Attorney to commence a prosecution for violation of federal wiretap laws on the ground that it was

> clear beyond question that it is not the business of the Courts to tell the United States Attorney to perform what they conceive to be his duties.
>
> Article II, § 3 of the Constitution, provides that "[the President] shall take Care that the Laws [shall] be faithfully executed." The prerogative of enforcing the criminal law was vested by the Constitution, therefore, not in the Courts, nor in private citizens, but squarely in the executive arm of the government.

193 F. Supp. at 634. *See also Goldberg* v. *Hoffman*, 225 F.2d 463, 464–65 (7th Cir. 1955).[27]

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). In *Cox*, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:

> The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceed-

---

[27] These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. *See Rinaldi* v. *United States*, 434 U.S. 22 (1977); *United States* v. *Hamm*, 659 F.2d 624 (5th Cir. 1981); *United States* v. *Ammidown*, 497 F.2d 615 (D.C. Cir. 1973). The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." *United States* v. *Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483 (S.D.N.Y. 1964).

ings and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

342 F.2d at 171 (footnotes omitted). *See also id.* at 182–83 (Brown, J. concurring); *id.* at 190–93 (Wisdom, J., concurring). Even the three dissenting judges in *Cox* conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward." *Id.* at 179. *See United States* v. *Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, *inter alia, Cox*).

Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies. *See Nader* v. *Saxbe*, 497 F.2d 676 (D.C. Cir. 1974); *Adams* v. *Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (per curiam); *NAACP* v. *Levi*, 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, § 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.'" *Nader* v. *Saxbe*, 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free

126

**-276-**

speech. *See, e.g.*, *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980); *Oyler* v. *Boles*, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is *not* to be performed by a given branch." *United States* v. *Brown*, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions. *See Buckley* v. *Valeo*, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See United States* v. *Brown*, 381 U.S. 437 (1965); *United States* v. *Lovett*, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810); *see United States* v. *Brown*, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

127

328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. *A fortiori*, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment. A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment. The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all. *See Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Smith* v. *United States*, 375 F.2d 243, 248 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967). In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case.[28]

For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury. It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

---

[28] A statute giving one house of Congress the power to *direct* an Executive Branch official to take any particular action also raises a separate issue under the Supreme Court's decision in *INS* v. *Chadha*, 462 U.S. 917 (1983). Under the current contempt statute, the role of the House or Senate in simply referring a matter to the United States Attorney for possible prosecution raises no substantial issue under *Chadha* because the House or Senate is acting, in a sense, as a private citizen would — by reporting a possible violation of federal criminal law. Thus, *Chadha's* proscription of actions by one house (or two houses or a congressional committee) that are designed to have "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch" would be inapplicable. *Id* at 952. If the contempt statute precluded prosecutorial discretion, however, one house would be empowered to impose on the United States Attorney an affirmative legal duty to initiate a prosecution and to take certain steps in that prosecution. To empower one house of Congress in that manner would appear to be contrary to the clear language and rationale of *Chadha*. This is not, of course, to say that Congress' attempt to impose such an obligation on the United States Attorney by plenary legislation in a specific case would be constitutional; it is to say that a permanent mechanism to be triggered by the vote of one house raises a significant additional constitutional concern.

128

*B. Whether the Criminal Contempt of Congress Statute Applies to an*
*Executive Official Who Asserts, On Direct Orders of the President,*
*the President's Claim of Executive Privilege*

We next consider, aside from the issue of prosecutorial discretion, whether
the criminal contempt of Congress statute is intended to apply, or constitution-
ally could be applied, to Presidential claims of executive privilege.

1. Previous Department of Justice Interpretations of the Contempt of
Congress Statute

The Department of Justice has previously taken the position that the criminal
contempt of Congress statute does not apply to executive officials who assert
claims of executive privilege at the direction of the President. In 1956, Deputy
Attorney General (subsequently Attorney General) William P. Rogers took this
position before a congressional subcommittee investigating the availability of
information from federal departments and agencies. In a lengthy memorandum
of law, Deputy Attorney General Rogers set forth the historical basis of
executive privilege and concluded that in the context of Presidential assertions
of the privilege, the contempt of Congress statute was "inapplicable to the
executive departments." *See Hearings Before a Subcommittee of the House*
*Committee on Government Operations*, 84th Cong., 2d Sess. 2933 (1956).[29]
We are not aware of any subsequent Department position that reverses or
weakens this conclusion, and we have found no earlier Department position to
the contrary.

We believe that the Department's long-standing position that the contempt
of Congress statute does not apply to executive officials who assert Presidential
claims of executive privilege is sound, and we concur with it. Our conclusion is
based upon the following factors: (1) the legislative history of the contempt of
Congress statute demonstrates that it was not intended to apply to Presidential
assertions of executive privilege; and (2) if the statute were construed to apply
to Presidential assertions of executive privilege, it would so inhibit the President's
ability to make such claims as to violate the separation of powers.

2. The Legislative History of the Contempt of Congress Statute

Neither the legislative history nor the historical implementation of the con-
tempt statute supports the proposition that Congress intended the statute to
apply to executive officials who carry out a Presidential assertion of executive
privilege. The criminal contempt statute was originally enacted in 1857 during
proceedings in the House of Representatives to consider a contempt of Con-
gress citation against a New York Times correspondent who had refused to

---

[29] The memorandum cited, *inter alia*, a 1909 Senate debate over the issue of executive privilege in which
Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the
United States to order an executive department about like a servant." 43 Cong. Rec. 3732 (1909) Other
historical examples cited by the report are discussed below.

129

answer questions put to him by a select committee appointed by the House to investigate charges of bribery of certain Representatives. As a result of the committee's unavailing efforts to obtain the reporter's testimony, the committee chairman introduced a bill designed "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to deliver testimony." 42 Cong. Globe 404 (1857). The bill was supported as a necessary tool in the House's efforts to investigate the allegations of bribery. See id. at 405 (remarks of the Speaker), 426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen. Brown). The bill was rushed through Congress in less than a week in order to permit the House to bring greater pressure on the reporter to reveal the alleged source of the congressional corruption. That the bill was sponsored by the select committee, and not the Judiciary Committee, further demonstrates that the bill was not the result of a general consideration of Congress' contempt power, but was enacted as an expedient to aid a specific investigation. Thus, the circumstances of the bill's passage certainly do not affirmatively suggest that Congress anticipated application of the statute to instances in which the President asserted a claim of executive privilege.

In fact, the sponsor of the bill disclaimed any such far-reaching implications. Representative Dunn asked the sponsor, Representative Orr, what impact the proposed bill would have on diplomatic secrets, one of the principal areas in which the President had historically asserted a privilege of confidentiality. Representative Dunn stated that use of the contempt statute by Congress to force disclosure of such material "might be productive of great mischief, and in time of war of absolute ruin of the country." 42 Cong. Globe 431 (remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a case" and emphasized that the bill should not be attacked "by putting instances of the extremest cases" because the "object which this committee had in view was, where there was corruption in either House of Congress, to reach it." Id. at 431 (remarks of Rep. Orr). The implication is that Congress did not intend the bill to apply to Presidential assertions of privilege.[30]

---

[30] The legislative history contains one reference to the application of the statute against executive officials. During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people." 42 Cong. Globe at 429. This statement does not, however, suggest that the statute was intended to apply to Presidential assertions of executive privilege. Indeed, virtually all previous assertions of executive privilege against Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt provisions against the President. Representative Marshall's statement, therefore, simply lends support to the proposition, with which we agree, that there are certain circumstances in which the congressional contempt statute might be utilized against an executive official, such as instances in which an executive official, acting on his own, engaged in disruptive and contumacious conduct during a congressional hearing, or in which an executive official, acting on his own, committed an offense. See Marshall v. Gordon, 243 U.S. 521 (1917). As the remainder of Representative Marshall's remarks demonstrate, the principal force driving the bill was Congress' desire to obtain an expeditious method for investigating questions regarding the integrity of Congress and not to provide Congress with a statute requiring the President to prosecute criminally those who had asserted the President's constitutionally based claim of executive privilege. We have found no evidence in the legislative history that supports an intention to apply the proposed statute in such a context.

130

In the years preceding the adoption of the statute, the President had, on a number of occasions, withheld documents from Congress under a claim of executive privilege, and many of these instances had been hotly contested in the public arena, and at least five of these instances occurred within the decade immediately preceding the enactment of the congressional contempt statute. *See supra* note 19 (collecting authorities). In spite of these highly visible battles over the subject of executive privilege, we have located no indication in the legislative history of the criminal contempt statute that Congress intended the statute to provide a remedy for refusals to produce documents pursuant to a Presidential claim of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is reinforced by Congress' failure, as far as we know, *ever* to utilize its inherent power of arrest to imprison Executive Branch officials for contempt of Congress for asserting claims of executive privilege, even though Congress had previously asserted and exercised its clearly recognized right to do so with respect to other instances of contempt by private citizens. *See Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821); *Ex Parte Nugent*, 18 F. Cas. 471 (C.C.D.C. 1848). The absence of any congressional discussion of the use of the contempt power against Presidential claims of executive privilege and Congress' previous failure ever to attempt to use its inherent contempt power in such cases, strongly suggest that the statute was not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional contempt statute. Since enactment of the statute in 1857, there have been numerous instances in which the President has withheld documents from Congress under a claim of executive privilege. Despite the fact that many of these disputes were extraordinarily controversial, until the citation of the EPA Administrator in December 1982, 125 years after the contempt statute was enacted, neither house of Congress had ever voted to utilize the contempt statute against a Presidential assertion of executive privilege. In fact, during congressional debates over Presidential refusals to produce documents to Congress, there have been express acknowledgements by members of Congress that Congress had no recourse against the Executive if the President asserted executive privilege. In 1886, the Senate engaged in a prolonged debate over President Cleveland's order to his Attorney General not to produce to Congress documents concerning the dismissal of a United States Attorney. The debate was intense, controversial, and memorable; 23 years after the debate a Senator termed it the "most remarkable discussion which was ever had upon this question [of the President's right to withhold documents from Congress]." 43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon). During this debate, even Senators who insisted upon the Senate's right to receive the documents recognized that if the President ordered them not to be produced, "there is no remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); *see also id.* at 2737 (1886) (remarks of Sen. Voorhees).[31]

---

[31] The only remedy then recognized by the Senators was the ultimate sanction of impeachment. *See* 17

Continued

131

Congress' failure to resort to the contempt statute during any of the multi-tude of robust conflicts over executive privilege during the previous century and one quarter and Congress' own explicit recognition that it was without a remedy should the President order the withholding of documents, strongly suggest that Congress never understood the statute to apply to an executive official who asserted the President's claim of executive privilege.[32]

### 3. Prudential Reasons for Construing the Contempt Statute Not To Apply to Presidential Assertions of Privilege

Courts traditionally construe statutes in order to avoid serious doubts about a statute's constitutionality. *Califano* v. *Yamasaki*, 442 U.S. 682, 693 (1979); *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932). As stated by the United States Court of Appeals for the District of Columbia Circuit, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of contrary legislative intent." *United States* v. *Brown*, 483 F.2d 1314, 1317 (D.C. Cir. 1973) (quoting *United States* v. *Thompson*, 452 F.2d 1333, 1337 (D.C. Cir. 1971), *cert. denied*, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation. A highly significant example may be found in the procedural history and holding of *United States* v. *Nixon*, 418 U.S. 683 (1974), in which the Court construed the limitation in 28 U.S.C. § 1291 (that appeals be taken only from "final" decisions of a district court) in order to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court. Although the plain language of that statute seemed to preclude an appeal of a lower court's

---

[31] (. . . continued)
Cong. Rec. 2737, 2800 (1886). As we note below, a much more effective and less controversial remedy is available — a civil suit to enforce the subpoena — which would permit Congress to acquire the disputed records by judicial order. *See also Senate Select Committee on Presidential Campaign Practices* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

[32] Congress' practices with respect to the contempt statute and the absence of any previous application of the statute to an Executive Branch official in these circumstances are highly probative of the meaning and applicability of the statute. In general, the Supreme Court has examined historical practice to determine the scope of Congress' powers. For example, in determining the scope of Congress' power to call and examine witnesses, the Court looked to the historical experience with respect to investigations and concluded:

> when [Congress'] practice in the matter is appraised according to the circumstances in which it was begun and to those in which it has been continued, it falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers; and therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful.

*McGrain* v. *Daugherty*, 273 U.S. 135, 174 (1927); *see also Fairbank* v. *United States*, 181 U.S. 283, 308 (1901). Moreover, the Court traditionally gives great weight to a contemporaneous construction of a statute by the agency charged with its execution. *See Power Reactor Development Co.* v. *Electricians*, 367 U.S. 396, 408 (1961); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U.S. 143, 153 (1946). In this instance, Congress is responsible for taking the first step in implementing the contempt statute. Therefore, Congress' previous interpreta-tions and past uses of the statute are analogous to the contemporaneous construction of the agency charged with implementation of the statute, and are of significance in determining the meaning of the statute.

132

interlocutory ruling on an evidentiary matter, the Court construed the statute to permit an immediate appeal, without going through the otherwise required contempt proceeding:

> The traditional contempt avenue to immediate appeal is pecu- liarly inappropriate due to the unique setting in which the ques- tion arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism of the ruling would be unseemly, and would present an unnecessary occasion for con- stitutional confrontation between two branches of the government.

418 U.S. at 691–92.

Congress itself has previously recognized the impropriety of resolving ex- ecutive privilege disputes in the context of criminal contempt proceedings. During the dispute over the Watergate tapes, Congress provided a civil en- forcement mechanism through which to test the President's claim of executive privilege. Senator Ervin, the sponsor of the bill, noted in his explanatory statement to the Senate that the use of criminal contempt "may be inappropri- ate, unseemly, or nonefficacious where executive officers are involved." 119 Cong. Rec. 35715 (1973). In defending the civil enforcement procedure before the district court, Congress argued that in that case the contempt procedures would be "inappropriate methods for the presentation and resolution of the executive privilege issue," and that a criminal proceeding would be "a mani- festly awkward vehicle for determining the serious constitutional question here presented." Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, Civ. No. 1593–73, at 5 (D.D.C. Aug. 28, 1973).

The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappro- priate means for resolving document disputes, especially when they involve another governmental entity. In *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction on the ground that the congressional subpoena had gone beyond the investigative authority delegated to the committee that issued the subpoena. After deciding this issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal contempt of Congress case against a public official. In *dictum*, the court noted that the "conflicting duality inherent in a request of this nature is not particu- larly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.

> Moreover, to raise these issues in the context of a contempt case
> is to force the courts to decide many questions that are not really
> relevant to the underlying problem of accommodating the inter-
> est of two sovereigns.

306 F.2d at 276. *See also United States* v. *Fort*, 443 F.2d 670, 677–78 (D.C.
Cir. 1970), *cert. denied*, 403 U.S. 932 (1971).

    The analysis contained in *United States* v. *Nixon* demonstrates that prin-
ciples of the separation of powers compel the application of special rules when
a Presidential claim of a constitutional privilege is in tension with the request of
another branch for confidential Executive Branch records. In discussing the
issue of executive privilege in that case in response to a judicial subpoena, the
Court stressed that the President's assertion of privilege was not to be treated as
would a claim of a statutory or common law privilege by a private citizen. 418
U.S. at 708, 715. The President's constitutional role as head of one of three
separate branches of government means that special care must be taken to
construe statutes so as not to conflict with his ability to carry out his constitu-
tional responsibilities. *See, e.g., Myers* v. *United States*, 272 U.S. 52 (1926)
(upholding the President's removal power against limitations Congress sought
to impose). The same special attention is provided, of course, to the other two
branches when they assert responsibilities or prerogatives peculiar to their
constitutional duties. *See, e.g., Gravel* v. *United States*, 408 U.S. 606 (1972)
(extending immunity of Speech and Debate Clause to congressional assis-
tants); *Pierson* v. *Ray*, 386 U.S. 547 (1967) (granting absolute civil immunity
for judges' official actions).

    In this case, the congressional contempt statute must be interpreted in light
of the specific constitutional problems that would be created if the statute were
interpreted to reach an Executive Branch official such as the EPA Administra-
tor in the context considered here.[33] As explained more fully below, if execu-
tive officials were subject to prosecution for criminal contempt whenever they
carried out the President's claim of executive privilege, it would significantly
burden and immeasurably impair the President's ability to fulfill his constitu-
tional duties. Therefore, the separation of powers principles that underlie the
doctrine of executive privilege also would preclude an application of the
contempt of Congress statute to punish officials for aiding the President in
asserting his constitutional privilege.[34]

---

[33] The same principle applies to protect the constitutional functions of the other branches. The separation of
powers would similarly seem to require that a statute that made it a crime to disregard a statute passed by
Congress be read not to apply to a judge who struck down a congressional enactment as unconstitutional.

[34] In addition to the encroachment on the constitutionally required separation of powers that prosecution of
an Executive Branch official in this context would entail, there could be a serious due process problem if such
an official were subjected to criminal penalties for obeying an express Presidential order, an order which was
accompanied by advice from the Attorney General that compliance with the Presidential directive was not
only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in
order to aid the President in the performance of his constitutional obligations to take care that the law was
faithfully executed. *See Cox* v. *Louisiana*, 379 U.S. 559 (1965); *Raley* v. *Ohio*, 360 U.S. 423 (1959).

Continued

134

4. The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch Officials Who Assert the President's Claim of Privilege

The Supreme Court has stated that, in determining whether a particular statute

> disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon*, 418 U.S. at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Nixon* v. *Administrator of General Services*, 433 U.S. 425, 443 (1977). Thus, in analyzing this separation of powers issue, one must look first to the impact that application of the congressional contempt statute to Presidential assertions of executive privilege would have on the President's ability to carry out his constitutionally assigned functions. Then, if there is a potential for disruption, it is necessary to determine whether Congress' need to impose criminal contempt sanctions in executive privilege disputes is strong enough to outweigh the impact on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to enforce the laws of the United States and the necessarily included ability to protect the confidentiality of information vital to the performance of that task. As explained earlier in this memorandum, the authority to maintain the integrity of certain information within the Executive Branch has been considered by virtually every President to be essential to his capacity to fulfill the responsibilities assigned to him by the Constitution. Thus, as discussed above, and as the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is *presumptively valid* and can be overcome only by a clear showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information. *United States* v. *Nixon*, 418 U.S. at 708. In *Nixon*, the Court stated that "upon receiving a claim

---

[34] ( . . . continued)

Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States* v. *Murdock*, 290 U.S. 389, 397–98 (1933); *Townsend* v. *United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See* Model Penal Code § 2.04(3)(b); *United States* v. *Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).

135

of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged." 418 U.S. at 713. The United States Court of Appeals for the District of Columbia Circuit has stated that this presumptive privilege initially protects documents "even from the limited intrusion represented by *in camera* examination of the conversations by a court." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc). The court went on to note:

> So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

*Id.* at 730. In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." *Id.* at 731 (emphasis added). Thus, the President's assertion of executive privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties.

   Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility that he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege. As Judge Learned Hand stated with respect to the policy justifications for a prosecutor's immunity from civil liability for official actions,

> to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to [sic] satisfy a jury of his good faith.

*Gregoire* v. *Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949 (1950). The Supreme Court has noted, with respect to the similar issue of

136

executive immunity from civil suits, that "among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 752 n.32 (1982); *see also Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982); *Butz* v. *Economou*, 438 U.S. 478 (1978). Thus, the courts have recognized that the risk of civil liability places a pronounced burden on the ability of government officials to accomplish their assigned duties, and have restricted such liability in a variety of contexts. *Id.*[35] The even greater threat of criminal liability, simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair his ability to enforce the law, would unquestionably create a significant obstacle to the assertion of that privilege. *See United States* v. *Nixon*, 418 U.S. 683 (1974).

By contrast, the congressional interest in applying the criminal contempt sanctions to a Presidential assertion of executive privilege is comparatively slight. Although Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function, Congress could obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena.[36] Congress' use of civil enforcement power instead of the criminal contempt statute would not adversely affect Congress' ultimate interest in obtaining the documents. Indeed, a conviction of an Executive Branch official for contempt of Congress for failing to produce subpoenaed documents would not result in any order for the production of the documents.[37] A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate a legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process. Although

---

[35] *See also Barr* v. *Matteo*, 360 U.S. 564 (1959), *Spalding* v. *Vilas*, 161 U.S. 483 (1896). Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts. *Imbler* v. *Pachtman*, 424 U.S. 409 (1976), *Pierson* v. *Ray*, 386 U.S. 547 (1967).

[36] It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U.S.C. § 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under § 1331 in a previous civil enforcement action brought by the Senate. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 366 F. Supp. 51 (D.D.C. 1973). In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc); Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J on Legis. 145 (1984).

[37] *See* Hamilton and Grabow, *supra*, 21 Harv. J. on Legis. at 151.

137

this significant *in terrorem* effect would surely reduce claims of executive
privilege and, from Congress' perspective, would have the salutary impact of
virtually eliminating the obstacles to the obtaining of records, it would be
inconsistent with the constitutional principles that underlie executive privilege
to impose a criminal prosecution and criminal penalties on the President's
exercise of a presumptively valid constitutional responsibility. The *in terrorem*
effect may be adequate justification for Congress' use of criminal contempt
against private individuals, but it is an inappropriate basis in the context of the
President's exercise of his constitutional duties. In this respect it is important to
recall the statement of Chief Justice Marshall, sitting as a trial judge in the *Burr*
case, concerning the ability of a court to demand documents from a President:
"In no case of this kind would a court be required to proceed against the
President as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas.
187, 192 (C.C. Va. 1807).[38] This fundamental principle, arising from the
constitutionally prescribed separation of powers, precludes Congress' use against
the Executive of coercive measures that might be permissible with respect to
private citizens. The Supreme Court has stated that the fundamental necessity
of maintaining each of the three general departments of government entirely
free from the control or coercive influence, direct or indirect, of either of the
others, has often been stressed and is hardly open to serious question. So much
is implied in the very fact of the separation of the powers of these departments
by the Constitution; and in the rule which recognizes their essential equality.
*Humphrey's Executor* v. *United States*, 295 U.S. 602, 629–30 (1935).

Congress' use of the coercive power of criminal contempt to prevent Presi-
dential assertions of executive privilege is especially inappropriate given the
presumptive nature of the privilege. In cases involving congressional subpoe-
nas against private individuals, courts start with the presumption that Congress
has a right to all testimony that is within the scope of a proper legislative
inquiry. *See Barenblatt* v. *United States*, 360 U.S. 109 (1959); *McGrain* v.
*Daugherty*, 273 U.S. 135 (1927). As noted above, however, the President's
assertion of executive privilege is presumptively valid, and that presumption
may be overcome only if Congress establishes that the requested information
"is demonstrably critical to the responsible fulfillment of the Committee's
functions." *See Senate Select Committee on Presidential Campaign Activities*
v. *Nixon*, 498 F.2d at 731; *see also United States* v. *Nixon*, 418 U.S. at 708–09.
If Congress could use the power of criminal contempt to coerce the President
either not to assert or to abandon his right to assert executive privilege, this
clearly established presumption would be reversed and the presumptive privi-
lege nullified.

Congress has many weapons at its disposal in the political arena, where it has
clear constitutional authority to act and where the President has corresponding
political weapons with which to do battle against Congress on equal terms. By
wielding the cudgel of criminal contempt, however, Congress seeks to invoke

---

[38] The *Nixon* Court thought this statement significant enough in the context of an executive privilege
dispute to quote it in full at two separate places in its decision *United States* v. *Nixon*, 418 U.S. at 708, 715.

138

the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried out the President's constitutionally authorized commands,[39] for asserting a constitutional privilege. That effort is inconsistent with the "spirit of dynamic compromise" that requires accommodation of the interests of both branches in disputes over executive privilege. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). In the AT&T case, the court insisted on further efforts by the two branches to reach a compromise arrangement on an executive privilege dispute and emphasized that

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*Id*. at 130. Congress' use of the threat of criminal penalties against an executive official who asserts the President's claim of executive privilege, flatly contradicts this fundamental principle.[40]

The balancing required by the separation of powers demonstrates that the contempt of Congress statute cannot be constitutionally applied to an executive official in the context under consideration. On the one hand, Congress has no

---

[39] One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

> when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y U. L Rev. 231, 259.

[40] Even when a privilege is asserted by a cabinet official, and not the President, courts are extremely reluctant to impose a contempt sanction and are willing to resort to it only in extraordinary cases and only after all other remedies have failed. In *In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903 (1979), the court granted the government's mandamus petition to overturn a district court's civil contempt citation against the Attorney General for failing to turn over documents for which he had asserted a claim of privilege. The court recognized that even a *civil* contempt sanction imposed on an Executive Branch official "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted. *Id.* at 65. In the case of a Presidential claim of executive privilege, there is even more reason to avoid contempt proceedings because the privilege claim has been made as a constitutionally based claim by the President himself and the sanction involved is criminal and not civil contempt. The use of criminal contempt is especially inappropriate in the context under discussion because Congress has the clearly available alternative of civil enforcement proceedings.

139

compelling need to employ criminal prosecution in order to vindicate its rights. The Executive, however, must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance. Thus, when the major impact on the President's ability to exercise his constitutionally mandated function is balanced against the relatively slight imposition on Congress in requiring it to resort to a civil rather than a criminal remedy to pursue its legitimate needs,[41] we believe that the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.[42]

The construction of the statute that is dictated by the separation of powers is consistent with the legislative history of the statute and the subsequent legislative implementation of the statute. Although at the time the criminal statute was enacted, Congress was well aware of the recurring assertions of the right to protect the confidentiality of certain Executive Branch materials, it gave no indication that it intended the contempt statute to tread upon that constitutionally sensitive area. In the many debates on executive privilege since the adoption of the statute, Congress at times has questioned the validity of a Presidential assertion of privilege, but, until December of 1982, it never attempted to utilize the criminal contempt sanction to punish someone for a President's assertion of privilege. Regardless of the merits of the President's action, the fundamental balance required by the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution. We therefore conclude that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including predecisional Executive Branch deliberations, national security information, and sensitive law enforcement proceedings, from disclosure to Congress. No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege has recognized its validity and importance in the constitutional scheme. Executive privilege, properly asserted, is as important to the President as is the need for confidenti-

---

[41] See Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas.* 21 Harv. J. on Legis. 145 (1984).

[42] We believe that this same conclusion would apply to any attempt by Congress to utilize its inherent "civil" contempt powers to arrest, bring to trial, and punish an executive official who asserted a Presidential claim of executive privilege. The legislative history of the criminal contempt statute indicates that the reach of the statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect to the penalties imposed). See 42 Cong. Globe 406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well.

140

ality at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory element to an already explosive environment. We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution. The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials.[43] Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by [the Constitution]. In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.

---

[43] The Tenure of Office Act was, of course, later declared to have been unconstitutional. *Myers* v. *United States*, 272 U.S. 52 (1926).

141

\*        \*        \*

> How can the President fulfill his oath to preserve, protect, and
> defend the Constitution, if he has no *right* to *defend* it against an
> act of Congress, sincerely believed by him to have been passed
> in violation of it?[44]

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt. Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury. In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[44] R. Warden, *An Account of the Private Life and Public Services of Salmon Portland Chase* 685 (1874). Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. *Id. See* M. Benedict, *The Impeachment and Trial of Andrew Johnson* 154–55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. *Id.* at 156.

142

# EXHIBIT 12

(Slip Opinion)

## Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees

Congress may not constitutionally prohibit agency counsel from accompanying agency employees called to testify about matters that potentially involve information protected by executive privilege. Such a prohibition would impair the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with Congress.

Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.

May 23, 2019

### MEMORANDUM OPINION FOR THE ATTORNEY GENERAL AND THE COUNSEL TO THE PRESIDENT

On April 2, 2019, the House Committee on Oversight and Reform (the "Committee") issued subpoenas seeking to compel testimony in two separate investigations from two witnesses: John Gore, Principal Deputy Assistant Attorney General for the Department's Civil Rights Division, and Carl Kline, the former head of the White House Personnel Security Office. The Committee sought to question both witnesses about matters that potentially involved communications that were protected by executive privilege. Although the Committee's Rule 15(e) permitted the witnesses to be accompanied at the depositions by private counsel, who would owe duties to the witnesses themselves, the rule purported to bar the presence of agency counsel, who would represent the interests of the Executive Branch.[1] Despite some efforts at accommodation on both sides, the Committee continued to insist that agency counsel could not attend the witnesses' depositions. In response to your requests, we advised that a congressional committee may not constitutionally compel an executive branch witness to testify about potentially privileged matters while depriving the witness of the assistance of agency counsel. Based upon our advice, Mr. Gore and Mr. Kline were directed not to appear at their depo-

---

[1] Tracking the text of the Committee's rule, which excludes "counsel . . . for agencies," we speak in this opinion of "agency counsel," but our analysis applies equally to all counsel representing the interests of the Executive Branch, no matter whether the witness works for an "agency," as defined by statute. *See, e.g., Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (holding that the Office of the President is not an "agency" for purposes of the Freedom of Information Act).

1

*Opinions of the Office of Legal Counsel in Volume 43*

sitions without agency counsel. This memorandum explains the basis for
our conclusions.

When this issue last arose, during the Obama Administration, this Of-
fice recognized "constitutional concerns" with the exclusion of agency
counsel, because such a rule "could potentially undermine the Executive
Branch's ability to protect its confidentiality interests in the course of the
constitutionally mandated accommodation process, as well as the Presi-
dent's constitutional authority to consider and assert executive privilege
where appropriate." *Authority of the Department of Health and Human
Services to Pay for Private Counsel to Represent an Employee Before
Congressional Committees*, 41 Op. O.L.C. __, *5 n.6 (Jan. 18, 2017)
("*Authority to Pay for Private Counsel*"). This Office, however, was
asked to address only the retention of private counsel for a deposition and
thus did not evaluate these constitutional concerns.

Faced squarely with the constitutional question here, we concluded that
Congress may not compel an executive branch witness to appear without
agency counsel and thereby compromise the President's constitutional
authority to control the disclosure of privileged information and to super-
vise the Executive Branch's communications with congressional entities.
The "Executive Branch's longstanding general practice has been for agen-
cy attorneys to accompany" agency employees who are questioned by
congressional committees conducting oversight inquiries. *Id.* at *3. When
an agency employee is asked to testify about matters within the scope of
his official duties, he is necessarily asked to provide agency information.
The agency must have the ability to protect relevant privileges and to
ensure that any information provided on its behalf is accurate, complete,
and properly limited in scope. Although private counsel may indirectly
assist the employee in protecting privileged information, counsel's obliga-
tion is to protect the personal interests of the employee, not the interests
of the Executive Branch. The Committee, therefore, could not constitu-
tionally bar agency counsel from accompanying agency employees called
to testify on matters within the scope of their official duties. In light of
this constitutional infirmity, we advised that the Committee subpoenas
purporting to require the witnesses to appear without agency counsel were
legally invalid and not subject to civil or criminal enforcement.

I.

Congress generally obtains the information necessary to perform its
legislative functions by making requests and issuing subpoenas for docu-

2

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

ments and testimony through its organized committees. *See, e.g., Barenblatt v. United States*, 360 U.S. 109, 116 (1959); *Watkins v. United States*, 354 U.S. 178, 187–88 (1957). Committees typically seek the information they need from the Executive Branch first by requesting documents and sometimes voluntary interviews. Following such requests, a committee may proceed with a hearing at which Members of Congress ask questions of the witness, and such a hearing is usually open to the public. When executive branch employees appear—either at a voluntary interview or a hearing—agency counsel or another agency representative traditionally accompany them. *See, e.g., Representation of White House Employees*, 4B Op. O.L.C. 749, 754 (1980).

Congressional committees have only rarely attempted to collect information by compelling depositions conducted by committee staff. *See* Jay R. Shampansky, Cong. Research Serv., 95-949 A, *Staff Depositions in Congressional Investigations* 1–2 & n.3 (updated Dec. 3, 1999) ("*Staff Depositions*"). Historically, these efforts were confined to specific investigations that were limited in scope. *See, e.g., Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Governments of the S. Comm. on the Judiciary*, 96th Cong. 1708–10, 1718–27, 1742 (1980) (discussing issues related to Senate resolution authorizing depositions by staff members). Recently, however, committees have made increasing use of depositions, and the House of Representatives has adopted an order in the current Congress that permits depositions to go forward without the presence of any Member of Congress. *See* H. Res. 6, 116th Cong. § 103(a)(1) (2019).

Although executive branch witnesses have sometimes appeared and testified at staff depositions, the Executive Branch has frequently objected to the taking of compelled testimony by congressional staff members. These objections have questioned whether committees may properly authorize staff to depose senior executive officials, whether Members of Congress must be present during a committee deposition, and whether the procedures for such depositions adequately protect the President's ability to protect privileged executive branch information. *See, e.g.,* H. Comm. on International Relations, 104th Cong., Final Report of the Select Subcommittee to Investigate the United States Role in Iranian Arms Transfers to Croatia and Bosnia 54–56 (Comm. Print 1997) (summarizing the White House's position that its officials would not "be allowed to sit for staff depositions, because to do so would intrude upon the President's 'deliberative process'"); *see also* Letter for Henry Waxman, Chairman, Commit-

3

*Opinions of the Office of Legal Counsel in Volume 43*

tee on Oversight and Government Reform, U.S. House of Representatives, from Dinah Bear, General Counsel, Council on Environmental Quality at 1 (Mar. 12, 2007) ("Allowing Committee staff to depose Executive Branch representatives on the record would be an extraordinary formalization of the congressional oversight process and would give unelected staff powers and authorities historically exercised only by Members of Congress participating in a public hearing."); Letter for Henry A. Waxman, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives, from Stephanie Daigle, Associate Administrator, U.S. Environmental Protection Agency at 2 (Apr. 12, 2007) ("[T]he use of formal interviews by Committee counsel, transcribed by a court reporter, rather than the customary informal briefings, have the potential to be overly adversarial and to intimidate Agency staff."). No court has addressed whether Congress may use its oversight authority to compel witnesses to appear at staff depositions conducted outside the presence of any Member of Congress. Courts have recognized, however, that Congress's ability to "delegate the exercise of the subpoena power is not lightly to be inferred" because it is "capable of oppressive use." *Shelton v. United States*, 327 F.2d 601, 606 n.14 (D.C. Cir. 1963); *cf. United States v. Bryan*, 339 U.S. 323, 332 (1950) (concluding, in the context of a criminal contempt-of-Congress citation, that "respondent could rightfully have demanded attendance of a quorum of the Committee and declined to testify or to produce documents so long as a quorum was not present").

The question we address here arose out of the Committee's effort to compel two executive branch witnesses, Mr. Gore and Mr. Kline, to appear at depositions subject to the restrictions of Committee Rule 15(e). In relevant part, Rule 15(e) provides as follows:

> No one may be present at depositions except members, committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's counsel. Observers or counsel for other persons, or for agencies under investigation, may not attend.

H. Comm. on Oversight & Reform, 116th Cong., Rule 15(e). In both instances, the Committee sought executive branch information, including matters that implicated executive privilege, but it asserted the authority to compel the witness to answer questions without the assistance of agency counsel. We summarize here the efforts at accommodation made by the Executive Branch and the Committee in connection with the disputes.

4

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

**A.**

The Committee subpoenaed Mr. Gore to testify about privileged matters concerning the Secretary of Commerce's decision to include a citizenship question on the 2020 United States Census. On March 7, 2019, Mr. Gore voluntarily appeared before the Committee, with the assistance of Department counsel, for a transcribed interview on the same topic. Mr. Gore answered all of the Committee's questions, except for those that were determined by Department counsel to concern confidential deliberations within the Executive Branch. The Department's interest in protecting this subject matter was particularly acute because the Secretary of Commerce's decision was subject to active litigation, and those challenges were pending in the Supreme Court. *See Dep't of Commerce v. New York*, No. 18-966 (U.S.) (argued Apr. 23, 2019). Some of the information sought by the Committee had previously been held by a federal district court to be protected by the deliberative process privilege, as well as other privileges, in civil discovery.

On April 2, the Committee served Mr. Gore with a deposition subpoena in an effort to compel responses to the questions that he did not answer during his March 7 interview. Committee staff advised that Committee Rule 15(e) required the exclusion of the agency counsel who had previously represented Mr. Gore. On April 9, the Department explained that the Committee's effort to bar Department counsel would unconstitutionally infringe upon the prerogatives of the Executive Branch. *See* Letter for Elijah E. Cummings, Chairman, Committee on Oversight and Reform, U.S. House of Representatives, from Stephen E. Boyd, Assistant Attorney General, Office of Legislative Affairs at 2–3 (Apr. 9, 2019). Because the Committee sought information from Mr. Gore relating to his official duties, the Department explained that agency counsel must be present to ensure appropriate limits to Mr. Gore's questioning, to ensure the accuracy and completeness of information provided on behalf of the Department, and to ensure that a Department official was not pressed into revealing privileged information. *Id.* The Attorney General determined that Mr. Gore would not appear at the deposition without the assistance of Department counsel. *Id.* at 3.

On April 10, 2019, the Committee responded by disputing the Department's constitutional view, contending that Committee Rule 15(e) had been in place for more than a decade and reflected an appropriate exercise of Congress's authority to determine the rules of its own proceedings. *See* Letter for William P. Barr, Attorney General, from Elijah E. Cummings,

5

Chairman, Committee on Oversight and Reform, U.S. House of Repre-
sentatives at 2–3 (Apr. 10, 2019) ("April 10 Cummings Letter") (citing
U.S. Const. art. I, § 5, cl. 2). The Committee advised that Mr. Gore could
be accompanied by his private counsel, *id.* at 2, and offered to allow
Department counsel to wait in a separate room during the deposition, *id.*
at 3. The Committee stated that, if necessary, Mr. Gore could request a
break during the deposition to consult with Department counsel. *Id.*

On April 24, 2019, the Department reiterated its constitutional objec-
tion and explained that the Committee's proposed accommodation would
not satisfy the Department's need to have agency counsel assist Mr. Gore
at the deposition. *See* Letter for Elijah E. Cummings, Chairman, Commit-
tee on Oversight and Reform, U.S. House of Representatives, from Ste-
phen E. Boyd, Assistant Attorney General, Office of Legislative Affairs
at 1 (Apr. 24, 2019). Mr. Gore therefore did not appear on the noticed
deposition date.

**B.**

The Committee subpoenaed Mr. Kline to testify concerning the activi-
ties of the White House Personnel Security Office in adjudicating security
clearances during his time as head of the Office. On March 20, 2019, the
current White House Chief Security Officer, with representation by the
Office of Counsel to the President ("Counsel's Office"), briefed the
Committee's staff on the White House security clearance process for
nearly 90 minutes and answered questions from a Member of Congress
and staff. On April 1, 2019, the White House offered to have Mr. Kline
appear voluntarily before the Committee for a transcribed interview.

Instead, the Committee subpoenaed Mr. Kline on April 2, 2019. The
Committee indicated that Committee Rule 15(e) would bar any repre-
sentative from the Counsel's Office from attending Mr. Kline's deposi-
tion. On April 18, 2019, the Counsel's Office advised the Committee that
a representative from that office must attend to represent the White
House's interests in any deposition of Mr. Kline. *See* Letter for Elijah E.
Cummings, Chairman, Committee on Oversight and Reform, U.S. House
of Representatives, from Michael M. Purpura, Deputy Counsel to the
President at 2 (Apr. 18, 2019). The Counsel's Office relied on the views
concerning the exclusion of agency counsel that were articulated by the
Department in its April 9, 2019 letter to the Committee. *Id.* The Counsel's
Office explained that the President has the authority to raise privilege

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

concerns at any point during a deposition, and that this could occur only if an attorney from the Counsel's Office accompanied Mr. Kline. *Id.*

On April 22, 2019, the Committee responded, stating, as it had in correspondence concerning Mr. Gore, that its rules were justified based upon Congress's constitutional authority to determine the rules of its proceedings. *See* U.S. Const. art. 1, § 5, cl. 2. The Committee asserted that Committee Rule 15(e) had been enforced under multiple chairmen. *See* Letter for Pat Cipollone, Counsel to the President, from Elijah E. Cummings, Chairman, Committee on Oversight and Reform, U.S. House of Representatives at 3 (Apr. 22, 2019) ("April 22 Cummings Letter"). The Committee advised that Mr. Kline could be accompanied by his private counsel, and, as with Mr. Gore, offered to permit attorneys from the Counsel's Office to wait outside the deposition room in case Mr. Kline requested to consult with them during the deposition. *Id.*

In an April 22, 2019 reply, the Counsel's Office explained that, in light of the Committee's decision to apply Rule 15(e), the Acting Chief of Staff to the President had directed Mr. Kline not to attend the deposition for the reasons stated in the April 18, 2019 letter. *See* Letter for Elijah Cummings, Chairman, Committee on Oversight and Reform, U.S. House of Representatives, from Michael M. Purpura, Deputy Counsel to the President at 1 (Apr. 22, 2019). The Committee and the Counsel's Office subsequently agreed to a voluntary transcribed interview of Mr. Kline with the participation of the Counsel's Office. Mr. Kline was interviewed on May 1, 2019. He answered some of the Committee's questions, but at the direction of the representative from the Counsel's Office, he did not address particular matters implicating privileged information.

## II.

Under our constitutional separation of powers, both Congress and the Executive Branch must respect the legitimate prerogatives of the other branch. *See, e.g., INS v. Chadha*, 462 U.S. 919, 951 (1983) ("The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."); *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127, 130–31 (D.C. Cir. 1977) ("[E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation."). Here, the Committee sought to apply Committee Rule 15(e) to compel executive branch officials to testify about poten-

7

tially privileged matters while barring agency counsel from the room. We concluded that the Committee could not constitutionally compel such an appearance for two reasons. First, the exclusion of agency counsel impairs the President's ability to exercise his constitutional authority to control privileged information of the Executive Branch. Second, the exclusion undermines the President's ability to exercise his constitutional authority to supervise the Executive Branch's interactions with Congress.

### A.

Committee Rule 15(e) unconstitutionally interferes with the President's right to control the disclosure of privileged information. Both the Supreme Court and this Office have long recognized the President's "constitutional authority to protect national security and other privileged information" in the exercise of the President's Article II powers. *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 80 (2004) ("*Authority of Agency Officials*"); *see Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (the President's "authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President [as Commander in Chief] and exists quite apart from any explicit congressional grant"); *United States v. Nixon*, 418 U.S. 683, 705–06 (1974) ("Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings."). That authority is "not limited to classified information, but extend[s] to *all* . . . information protected by [executive] privilege," including presidential and attorney-client communications, attorney work product, deliberative process information, law enforcement files, and national security and foreign affairs information. *Authority of Agency Officials*, 28 Op. O.L.C. at 81 (emphasis added).[2] Protection of such information is "fundamental to the operation of Government and inextri-

---

[2] Although some of these components, such as deliberative process information, parallel aspects of common law privileges, each falls within the doctrine of executive privilege. *See, e.g., Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 101–102 n.34 (1998); *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (opinion of Attorney General Janet Reno) (observing that "[e]xecutive privilege applies" to certain White House documents "because of their deliberative nature, and because they fall within the scope of the attorney-client privilege and the work-product doctrine").

8

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

cably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708. It ensures that "high Government officials and those who advise and assist them in the performance of their manifold duties" can engage in full and candid decisionmaking, *id.* at 705, 708, and it is necessary to protect sensitive security and other information that could be used to the public's detriment.

The President may protect such privileged information from disclosure in the Executive's responses to congressional oversight proceedings. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). As we have explained, "[i]n the congressional oversight context, as in all others, the decision whether and under what circumstances to disclose classified information" or other forms of privileged information "must be made by someone who is acting on the official authority of the President and who is ultimately responsible to the President." *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 100 (1998) ("*Whistleblower Protections*"). Thus, "'Congress may not vest lower-ranking personnel in the Executive branch with a "right" to furnish national security or other privileged information to a member of Congress without receiving official authorization to do so.'" *Authority of Agency Officials*, 28 Op. O.L.C. at 80 (quoting March 9, 1998 Statement of Administration Policy on S. 1668, 105th Cong.); *see Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 43 (2008) ("*Direct Reporting Requirement*") ("We have long concluded that statutory provisions that purport to authorize Executive Branch officers to communicate directly with Congress without appropriate supervision . . . infringe upon the President's constitutional authority to protect against the unauthorized disclosure of constitutionally privileged information."). Because "statutes may not override the constitutional doctrine of executive privilege," they may not "prohibit the supervision of the disclosure of any privileged information, be it classified, deliberative process or other privileged material." *Authority of Agency Officials*, 28 Op. O.L.C. at 81. It necessarily follows that congressional committees' rules of procedure may not be used to override privilege or the Executive's ability to supervise the disclosure of privileged information.

The foregoing principles governed our analysis here. In order to control the disclosure of privileged information, the President must have the discretion to designate a representative of the government to protect this interest at congressional depositions of agency employees. When employ-

9

ees testify about information created or received during their employment, they are disclosing the Executive Branch's information. The same thing is true for former employees.[3] Yet, in many cases, agency employees will have only limited experience with executive privilege and may not have the necessary legal expertise to determine whether a question implicates a protected privilege. Moreover, the employees' personal interests in avoiding a conflict with the committee may not track the longer-term interests of the Executive Branch. Without an agency representative at the deposition to evaluate which questions implicate executive privilege, an employee may be pressed—wittingly or unwittingly—into revealing protected information such as internal deliberations, attorney-client communications, or national security information. *See Nixon*, 418 U.S. at 705–06; *Senate Select Comm.*, 498 F.2d at 731. Or the agency employee may be pressed into responding to inquiries that are beyond the scope of Congress's oversight authority. *See Barenblatt*, 360 U.S. at 111–12 ("Congress may only investigate into those areas in which it may potentially legislate or appropriate [and] cannot inquire into matters which are within the exclusive province of one of the other branches of the Government.").

Even if the President has not yet asserted a particular privilege, excluding agency counsel would diminish the President's ability to decide whether a privilege should be asserted. The Executive Branch cannot foresee every question or topic that may arise during a deposition, but if questions seeking privileged information are asked, agency counsel, if present, can ensure that the employee does not impermissibly disclose privileged information. *See* Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore may be unable to confine his remarks only to those which do not impair the deliberative process."). The President, through his subordinates, must be able to intervene *before* that information is disclosed, lest the effectiveness of the

---

[3] *See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1 (2007) (opinion of Acting Attorney General Paul D. Clement) (concluding that the President may assert executive privilege with respect to testimony by two former White House officials).

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

privilege be diminished. *See* Memorandum for Peter J. Wallison, Counsel
to the President, from Charles J. Cooper, Assistant Attorney General,
Office of Legal Counsel at 2 (Sept. 8, 1986) (agency counsel attending
congressional interviews can advise "about the sensitivity of particular
information and, if need be, to terminate the interview to avoid disclosure
of privileged information"). Accordingly, Committee Rule 15(e) unduly
interferes with the President's supervision of the disclosure of privileged
information by barring agency counsel from the deposition of an agency
employee concerning official activities.

   These concerns were readily apparent in connection with the subpoenas
of Mr. Gore and Mr. Kline. In both instances, the Committee sought
information about communications among senior executive branch offi-
cials regarding official decisions. There was no doubt that the depositions
would implicate matters in which the Executive Branch had constitution-
ally based confidentiality interests. Indeed, in Mr. Gore's March 7 inter-
view, the Committee repeatedly asked him questions concerning poten-
tially privileged matters—some of which a federal court had already held
were protected by privilege in civil discovery. *See New York v. U.S. Dep't
of Commerce*, 351 F. Supp. 3d 502, 548 n.19 (S.D.N.Y. 2019) (summariz-
ing discovery orders). And the Committee then noticed the deposition
precisely to compel answers to such questions. *See* April 10 Cummings
Letter at 3 ("The Department is well aware of the scope of the deposition,
based on the issues raised at Mr. Gore's March 7 interview and the list of
18 [previously unanswered] questions provided by Committee staff.").
In Mr. Kline's May 1 interview, the witness was similarly instructed not
to answer a number of questions implicating the Executive Branch's
confidentiality interests. Prohibiting agency counsel from attending the
depositions would have substantially impaired the Executive Branch's
ability to continue to protect such privileged information and to make
similar confidentiality determinations in response to new questions. The
Committee's demands that the witnesses address questions already
deemed unanswerable by agency counsel indicated that the exclusion of
agency counsel would have been intended, in no small part, to circumvent
executive branch mechanisms for preserving confidentiality.

### B.

   Committee Rule 15(e) also interferes with the President's authority
to supervise the Executive Branch's interactions with Congress. The
Constitution vests "[t]he executive Power" in the President, U.S. Const.

11

art. II, § 1, cl. 1, and requires him to "take Care that the Laws be faithfully executed," *id.* § 3. This power and responsibility grant the President the "constitutional authority to supervise and control the activity of subordinate officials within the executive branch." *The Legal Significance of Presidential Signing Statements*, 17 Op. O.L.C. 131, 132 (1993) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992)); *see also Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 637 (1982) ("*Constitutionality of Reporting Statute*"). As we have previously explained, "'the right of the President to protect his control over the Executive Branch [is] based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities.'" *Authority of HUD's Chief Financial Officer to Submit Final Reports on Violations of Appropriations Laws*, 28 Op. O.L.C. 248, 252 (2004) ("*Authority of HUD's CFO*") (quoting *Constitutionality of Reporting Statute*, 6 Op. O.L.C. at 638–39).

The President's authority to supervise his subordinates in the Executive Branch includes the power to control communications with, and information provided to, Congress on behalf of the Executive Branch. *See Direct Reporting Requirement*, 32 Op. O.L.C. at 31, 39; *Authority of Agency Officials*, 28 Op. O.L.C. at 80–81; *cf. United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467–68 (1951) (upholding "a refusal by a subordinate of the Department of Justice to submit papers to the court in response to its subpoena *duces tecum* on the ground that the subordinate [wa]s prohibited from making such submission by" a valid order of the Attorney General). At a minimum, this responsibility includes the power to know about, and assert authority over, the disclosures his subordinates make to Congress regarding their official duties.

Congressional efforts to prevent the President from supervising the Executive Branch's interactions with Congress interfere with the President's ability to perform his constitutional responsibilities. We have long recognized that statutes, "if construed or enforced to permit Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates, would violate the constitutional separation of powers and, specifically, the President's Article II authority to supervise Executive Branch personnel." *Direct Reporting Requirement*, 32 Op. O.L.C. at 31–32, 39 (citing *Authority of the Special Counsel of the Merit Systems Protection Board to Litigate and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 31 (1984); *Authority of HUD's*

12

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

*CFO*, 28 Op. O.L.C. at 252–53; *Authority of Agency Officials*, 28 Op. O.L.C. at 80–82). It is on this basis that the Department has consistently resisted congressional attempts to require, by statute, that executive branch officials submit information to Congress in the form of reports without prior opportunity for review by their superiors. *See, e.g., id.* at 34–39 ("[S]tatutory reporting requirements cannot constitutionally be applied to interfere with presidential supervision and control of the communications that Executive Branch officers . . . send to Congress."); *Authority of HUD's CFO*, 28 Op. O.L.C. at 252–53; *Access to Classified Information*, 20 Op. O.L.C. 402, 403–05 (1996); *Inspector General Legislation*, 1 Op. O.L.C. 16, 18 (1977).

Information sought in congressional depositions is no different. An agency employee testifying about official activities may be asked to disclose confidential information, yet the employee may lack the expertise necessary to protect privileged information on his own. Nor will an employee's private counsel always adequately protect such information. Private counsel may not have the expertise to recognize all situations raising issues of executive privilege, and in any event, recognizing such situations and protecting privileged information is not private counsel's job. Private counsel's obligation is to protect the personal interests of the employee, not the interests of the Executive Branch. An agency representative, by contrast, is charged with protecting the Executive Branch's interests during the deposition —ensuring that the information the employee provides to Congress is accurate, complete, and within the proper scope, and that privileged information is not disclosed. The Committee's rule prohibiting agency counsel from accompanying an agency employee to a deposition would effectively, and unconstitutionally, require that employee to report directly to Congress on behalf of the Executive Branch, without an adequate opportunity for review by an authorized representative of the Executive Branch.

## C.

Having concluded that the Committee could not constitutionally bar agency counsel from accompanying Mr. Gore or Mr. Kline to depositions, we further advised that the subpoenas that required them to appear without agency counsel, over the Executive Branch's objections, exceeded the Committee's lawful authority and therefore lacked legal effect. The Committee could not constitutionally compel Mr. Gore or Mr. Kline to appear under such circumstances, and thus the subpoenas could not be

13

*Opinions of the Office of Legal Counsel in Volume 43*

enforced by civil or criminal means or through any inherent contempt power of Congress.

This conclusion is consistent with our treatment of referrals to the Department of contempt-of-Congress citations for criminal prosecution under 2 U.S.C. §§ 192 and 194. We have opined that "the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995); *see also Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 65–69 (2008) (concluding that the Department cannot take "prosecutorial action, with respect to current or former White House officials who . . . declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege"); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 101–102 (1984) ("*Prosecution for Contempt*") (finding that "the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official" who followed presidential instructions to "assert[] the President's claim of executive privilege"). Nor may Congress "utilize its inherent 'civil' contempt powers to arrest, bring to trial, and punish an executive official who assert[s] a Presidential claim of executive privilege." *Prosecution for Contempt*, 8 Op. O.L.C. at 140 n.42. The fundamental constitutional principles underlying executive privilege would be vitiated if any executive branch employee following a direction to invoke the privilege could be prosecuted for doing so.

Similarly, we believe it would be unconstitutional to enforce a subpoena against an agency employee who declined to appear before Congress, at the agency's direction, because the committee would not permit an agency representative to accompany him. As discussed above, having an agency representative present at a deposition of an agency employee may be necessary for the President to exercise his authority to supervise the disclosure of privileged information, as well as to ensure that the testimony provided is accurate, complete, and properly limited in scope. Therefore, agency employees, like Mr. Gore and Mr. Kline, who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully to protect the constitutional interests of the Executive Branch.

14

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

## III.

In reaching this conclusion, we considered the contrary arguments advanced by the Committee in its April 10 and April 22 letters. The Committee's principal argument was that prohibiting agency counsel from attending depositions of agency employees poses no constitutional concern because Congress has the authority to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2; *see* April 10 Cummings Letter at 2–3; April 22 Cummings Letter at 3. But congressional rulemaking authority "only empowers Congress to bind itself." *Chadha*, 462 U.S. at 955 n.21 (positing that the Constitution's provision of several powers like procedural rulemaking where each House of Congress can act alone reveals "the Framers' intent that Congress not act in any legally binding manner outside a closely circumscribed legislative arena, except in specific and enumerated instances"). Such rulemaking authority does not grant Congress the power to compel testimony from agency officials under circumstances that interfere with the legitimate prerogatives of the Executive Branch.

Congress's authority to make rules governing its own procedures does not mean that the constitutional authorities of a co-equal branch of government are checked at the door. *See Barenblatt*, 360 U.S. at 112 (noting that when engaging in oversight, Congress "must exercise its powers subject to the limitations placed by the Constitution on governmental action"). To the contrary, Congress "may not by its rules ignore constitutional restraints." *United States v. Ballin*, 144 U.S. 1, 5 (1892). Congress may not, by statute, override the President's constitutional authority to control the disclosure of privileged information and to supervise executive branch employees. *See Direct Reporting Requirement*, 32 Op. O.L.C. at 43–44; *Whistleblower Protections*, 22 Op. O.L.C. at 100. It necessarily follows that a committee may not accomplish the same result by adopting a rule governing its own proceedings.

The Committee also justified Committee Rule 15(e) on the ground that it has been in place for a decade. *See* April 10 Cummings Letter at 3; April 22 Cummings Letter at 3. But congressional committee use of depositions is a relatively recent innovation, and historically such "[d]epositions have been used in a relatively small number of major congressional investigations." *Staff Depositions* at 1. Moreover, committees proposing the use of depositions have previously faced objections that they may improperly "'circumvent the traditional committee process'" of hearings and staff interviews and may "compromise the rights of

15

**-308-**

*Opinions of the Office of Legal Counsel in Volume 43*

deponents." *Id.* at 2; *see supra* pp. 3–4. Accordingly, the Committee's limited previous use of depositions from which agency counsel were excluded does not reflect a "long settled and established practice," much less one that has been met by acquiescence from the Executive Branch. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (internal quotation marks and brackets omitted).

In addition, the Committee claimed that Rule 15(e) serves the purpose of "ensur[ing] that the Committee is able to depose witnesses in further-ance of its investigations without having in the room representatives of the agency under investigation." April 10 Cummings Letter at 2; April 22 Cummings Letter at 3. But that assertion does no more than restate the rule's effect, without advancing any legitimate rationale for excluding the agency's representatives, much less one sufficient to alter the constitu-tional calculus. The Committee here did not seek information concerning the private affairs of agency employees or articulate any particularized interest in excluding agency counsel. In fact, agency counsel appeared at the staff interviews of both Mr. Gore and Mr. Kline. In view of the Presi-dent's clear and well-established interests in protecting privileged infor-mation and supervising the Executive Branch's interactions with Con-gress, the Committee offered no countervailing explanation for why it would be necessary to exclude any agency representative from these two depositions.

Indeed, the Committee has not explained why, as a general matter, the House needs to exclude agency counsel from depositions of agency offi-cials. Agency representatives routinely accompany and support agency employees during congressional hearings and staff interviews. *See Au-thority to Pay for Private Counsel*, 41 Op. O.L.C. at *3 ("When congres-sional committees seek to question employees of an Executive Branch agency in the course of a congressional oversight inquiry of the agency, the Executive Branch's longstanding general practice has been for agency attorneys to accompany the witnesses."); *Reimbursing Justice Department Employees for Fees Incurred in Using Private Counsel Representation at Congressional Depositions*, 14 Op. O.L.C. 132, 133 (1990) ("[W]hen Department employees are asked in their official capacities to give oral testimony for a congressional investigation (whether at a hearing, inter-view or deposition), a Department counsel or other representative will normally accompany the witness."); *Representation of White House Employees*, 4B Op. O.L.C. at 754 ("[L]egitimate governmental interests" are "[o]rdinarily . . . monitored by agency counsel who accompany execu-tive branch employees called to testify before congressional commit-

16

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

tees."). There is no basis for believing that this routine practice diminishes the Committee's ability to acquire any information it may legitimately seek.[4]

In defending the exclusion of agency counsel, the Committee pointed out that the witnesses may bring their private counsel to the depositions. April 10 Cummings Letter at 2; April 22 Cummings Letter at 3. But allowing agency employees to be accompanied by private counsel is no substitute for the presence of agency counsel. In addition to imposing unnecessary burdens on agency employees by requiring the retention of private counsel, the practice does not adequately protect the agency's interests. As explained above, the President must be able to supervise who discloses executive branch information and under what conditions. An employee's private counsel, however, represents the interests of the employee, not the agency, and "the attorney owes a fiduciary duty and a duty of confidentiality to the employee, not the agency." *Authority to Pay for Private Counsel*, 41 Op. O.L.C. at *5; *see also Representation of White House Employees*, 4B Op. O.L.C. at 754 ("[A]ny counsel directed to represent governmental interests must be controlled by the Government, and private counsel retained by employees to represent personal interests should not be permitted to assert governmental interests or privileges."). Even if the private counsel may sometimes assist the agency employee in protecting agency information, the Committee cannot require the Executive Branch to rely upon the private counsel to make such judgments. Private counsel is not likely to know as well as agency counsel when a line of questioning, especially an unanticipated one, might intrude upon the Executive Branch's constitutionally protected interests.

Finally, we concluded that the Committee's proposed accommodation—to make a separate room available for agency counsel at the two depositions—was insufficient to remedy these constitutional concerns. *See* April 10 Cummings Letter at 3; April 22 Cummings Letter at 3. That

---

[4] In a similar vein, agency employees are routinely represented by agency counsel in connection with depositions in civil litigation and, where appropriate, agency counsel will instruct agency employees not to answer questions that implicate privilege. Further, as the Supreme Court recognized in *Touhy*, 340 U.S. 462, the head of an agency may properly bar subordinate officials from disclosing privileged agency information, and departments have accordingly enacted so-called *Touhy* regulations to ensure that privileged information is appropriately protected by agency officials in civil discovery. *See, e.g.*, 28 C.F.R. §§ 16.21–16.29 (Department of Justice *Touhy* regulations). Just as agency counsel may properly participate in ensuring appropriate disclosures in depositions in civil litigation, agency counsel may properly do so in congressional depositions.

17

practice would put the onus on the agency employee and his private counsel to divine whether the agency would have privilege concerns about each question, and then "request a break during the deposition to consult with" agency counsel. April 10 Cummings Letter at 3; *see* April 22 Cummings Letter at 3. Because this practice would leave such judgments entirely up to the employee and his private counsel, as well as depend on the discretion of the Committee's staff to grant the requested break, it would not adequately ensure that the agency could make the necessary decisions to protect privileged information during the course of the deposition. It also would prevent the Executive Branch from ensuring that the testimony provided was accurate, complete, and properly limited in scope.

We recognize that there is at least one circumstance—an appearance before a grand jury—where a witness's attorney must remain in a separate room during questioning. *See* Fed. R. Crim. P. 6(d)(1); *United States v. Mandujano*, 425 U.S. 564, 581 (1976). However, grand juries can hardly provide a model for congressional depositions, because they operate under conditions of extreme secrecy, and there is a long-established practice of excluding *all* attorneys for witnesses before the grand jury. *See, e.g.*, *In re Black*, 47 F.2d 542, 543 (2d Cir. 1931); *Latham v. United States*, 226 F. 420, 422 (5th Cir. 1915). Committee Rule 15(e) not only lacks the historical pedigree of grand-jury proceedings, but the information collected in congressional depositions is not inherently confidential. Indeed, the Committee does not even have a categorical objection to allowing witnesses to be accompanied by counsel. Rather, the rule permits witnesses to be accompanied by counsel of their choice, provided that counsel does not represent the agency as well. This targeted exclusion underscores the separation of powers problems.[5]

---

[5] Indeed, the federal courts have recognized that "[t]here is a clear difference between Congress's legislative tasks and the responsibility of a grand jury." *Senate Select Comm.*, 498 F.2d at 732; *see also Nixon*, 418 U.S. at 712 n.19 (distinguishing the "constitutional need for relevant evidence in criminal trials," on the one hand, from "the need for relevant evidence in civil litigation" and "congressional demands for information," on the other). Congressional depositions appear more akin to depositions in civil litigation, rather than grand juries, and in civil litigation it is well established that attorneys "representing the deponent" and attorneys representing "any party to the litigation" have "the right to be present" at a deposition. Jay E. Grenig & Jeffrey S. Kinsler, *Handbook of Federal Civil Discovery and Disclosure* § 5:29 (4th ed. 2018).

18

*Attempted Exclusion of Agency Counsel from Congressional Depositions*

## IV.

For the foregoing reasons, we concluded that the Committee's prohibition on agency counsel's attendance at depositions impermissibly infringed on the President's constitutional authority to protect information within the scope of executive privilege and to supervise the Executive Branch's communications with Congress. Although the Executive Branch must facilitate legitimate congressional oversight, the constitutionally mandated accommodation process runs both ways. *See Am. Tel. & Tel. Co.*, 567 F.2d at 127, 130–31. Just as the Executive must provide Congress with information necessary to perform its legislative functions, Congress through its oversight processes may not override the Executive Branch's constitutional prerogatives. *See Barenblatt*, 360 U.S. at 112. Here, the constitutional balance requires that agency representatives be permitted to assist agency officials in connection with providing deposition testimony, including on matters that implicate privileged information. Thus, we advised that the subpoenas purporting to compel Mr. Gore and Mr. Kline to appear without agency counsel exceeded the Committee's authority and were without legal effect.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARGUMENT**
**RELATING TO GOOD-FAITH RELIANCE ON LAW OR ADVICE OF COUNSEL**

The Defendant, Stephen K. Bannon, is charged with contempt of Congress for willfully defying a subpoena that required him to produce records to and appear for a deposition before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"). Despite the subpoena's demands, the Defendant did not produce a single record and did not appear for testimony on the date designated; he did not even submit objections to compliance or properly assert a privilege in the manner required by the subpoena. Since being indicted, the Defendant has indicated that his disregard of the subpoena was purportedly justified by legal privileges and his attorney's advice regarding them, as well as other claims relating to the legal validity of the subpoena. The Defendant's excuses for non-compliance are without merit, and his erroneous reliance on privileges and purported advice of counsel is no defense to contempt. The deliberate failure to comply with a congressional subpoena—regardless of motivation—constitutes the crime of contempt. Any evidence or argument relating to the Defendant's or his counsel's views of the law, or the Defendant's reliance on it, should therefore be excluded at trial.

I.    **The Defendant's Claims Relating to Privilege and Advice of Counsel**

The Defendant is charged with two counts of contempt of Congress, in violation of 2 U.S.C. § 192, for refusing to comply in any way with a subpoena issued by the Committee. The subpoena, issued to the Defendant on September 23, 2021, commanded the Defendant to appear and to produce documents on October 7, 2021, and to appear for a deposition on October 14, 2021. The Defendant did neither. Instead, the Defendant submitted an excerpt of a letter he received from counsel to former President Donald J. Trump. In the letter, the former President's counsel informed the Defendant that he believed the subpoena called for privileged information and instructed the Defendant to assert privileges "where appropriate" and "to the fullest extent of the law." Ex. 1 at US-000418. Through correspondence to the Committee, the Defendant's counsel claimed that these instructions effectively empowered the Defendant to ignore the subpoena unless a court ordered him to do otherwise. *Id.* at US-000419. Despite the Committee's subsequent rejection of the Defendant's legal position, repeated direction that he comply or properly submit any privilege claims for resolution by the required procedures, and warning that his failure to do so would likely constitute willful non-compliance in violation of Section 192, *id.* at US-000420-22, US-000448-50, the Defendant still refused, *id.* at US-000423-24.

Since being charged in this matter, the Defendant has indicated that he intends to use the same claims, or his reliance on them, as defenses in this matter. During a press conference the Defendant and his counsel held after the Defendant's initial appearance, his counsel asserted that the contempt charges were without merit because former President Trump's purported invocation of executive privilege required that the Defendant not comply with the subpoena.[1]  At the

---

[1] *See "Misdemeanor from Hell": Watch Bannon Speak Out After He's Released*, CNN, Nov. 15, 2021, *available at* https://www.youtube.com/watch?v=-diE7kCCidE (last accessed Feb. 4, 2022). The Defendant's counsel stated, "It's not a matter of equal justice under the law, Mr.

December 7, 2021, status hearing, the Defendant's counsel again claimed, "This is a case with the invocation of privilege. . . . Mr. Bannon relied entirely on the advice of counsel" and advice of counsel "negates an element of the offense." Status Hrg., Dec. 7, 2021, Tr. at 25:4-7, 25:11-12. At the same hearing, counsel also indicated that the Defendant would contest the pending charges by challenging the legal validity of the subpoena based on claims relating to the Committee's investigative authority. *Id.* at 26:9-22.

## II.    Good-Faith Reliance on the Law or Advice of Counsel is Not a Defense to Contempt

The Defendant's claims of executive and other privileges and the Committee's authority, or any other claim relating to legal defenses to the subpoena, are without merit, which the Government will establish if and when the Defendant files his motions to dismiss on those grounds. At trial, however, the Defendant's erroneous beliefs and his purported reliance on his counsel's erroneous advice otherwise is no defense to the crime charged. Accordingly, evidence or argument supporting such a defense should be excluded at trial.

To establish that the Defendant's disregard of the subpoena constituted criminal contempt, the Government must prove that his default was willful. 18 U.S.C. § 192. A willful default is a deliberate and intentional failure to appear or produce records as required. *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) ("[H]e who deliberately and intentionally fails to respond to a subpoena 'willfully makes default.'") (citing *United States v. Bryan*, 339 U.S. 323 (1950); *United States v. Fleischman*, 339 U.S. 349 (1950)); *see also Bryan*, 339 U.S. at 330

---

Garland, to charge a matter like this criminally. The holder of the privilege in this case, executive privilege, invoked the privilege. When the privilege has been invoked by the purported holder of the privilege, he has no choice but to withhold the documents. You can't put the genie back in the bottle. Mr. Bannon acted as his lawyer counseled him to do, by not appearing and by not turning over documents in this case. He didn't refuse to comply. He made quite clear that, if a court ordered him to comply, he would do that, but he had an obligation to honor the privilege that was invoked." *Id.*

3

("[W]hen the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default."). The Government does not have to prove the Defendant had an "evil motive"; "[a] deliberate intention not to appear is sufficient." *Licavoli*, 294 F.2d at 208. Accordingly, while the Defendant's failure to appear due to "illness, travel trouble, misunderstanding, etc.," might be a valid defense, his deliberate decision not to appear or produce records is not. *See id.*

A deliberate and intentional decision not to comply with a congressional subpoena based on the subpoenaed party's erroneous belief that the law excused compliance constitutes a willful default. *Yellin v. United States*, 374 U.S. 109, 123 (1963) (addressing defendant's refusal to answer congressional committee's questions and noting, "[o]f course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense.") (citing *Watkins v. United States*, 354 U.S. 178, 208 (1957); *Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995)); *see also Watkins*, 354 U.S. at 208 (discussing a witness's refusal to answer a committee's questions on the belief that the questions are not pertinent to its inquiry and noting that "[a]n erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry"). And a defendant's good-faith reliance on counsel's advice that the law excuses compliance does not "immunize a deliberate, intentional failure to appear pursuant to a lawful subpoena lawfully served." *Licavoli*, 294 F.2d at 209; *see also Bryan*, 339 U.S. at 325, 330 (finding defendant's intentional refusal to produce records in response to a congressional subpoena

was a willful default even where the defendant claimed to the congressional committee at the time

of refusal that she was following the advice of her counsel); *Sinclair*, 279 U.S. at 299 ("There is

no merit in appellant's contention that he is entitled to a new trial because the court excluded

evidence that in refusing to answer he acted in good faith on the advice of competent counsel. . .

. His mistaken view of the law is no defense."). As described above, that the defendant "meant to

stay away was made abundantly clear. That he did so upon the advice of a lawyer is no defense."

*Licavoli*, 294 F.2d at 209.[2]

  That good-faith reliance on the law or advice of counsel is no defense reflects the nature of

the contempt offense and the purposes of the contempt statute to "vindicat[e] the authority of

Congress to compel the disclosure of facts which are needed in the fulfillment of the legislative

function." *Bryan*, 339 U.S. at 327; *see also Watkins*, 354 U.S. at 187-88 ("It is unquestionably the

duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for

intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect

the dignity of the Congress and its committees and to testify fully with respect to matters within

the province of proper investigation."). The Supreme Court has long affirmed that, once a

congressional committee has directed a witness to comply with a congressional subpoena, it is the

witness who risks contempt by continuing not to do so. As the Court described in *Quinn v. United

States*, when objections are raised:

---

[2] The Defendant has suggested that *Licavoli* is not controlling because, according to counsel, "that case is based on an earlier case, *Sinclair*, that's no longer good law. *See* Status Hrg., Dec. 7, 2021, Tr. at 24:22-25:1. In *Sinclair*, the Supreme Court addressed several issues relating to Section 192. Among them, the Court held that a refusal to answer a committee's questions constituted contempt even if the defendant believed in good faith, and relied on his counsel's advice, that the law allowed him to refuse to answer the questions. 279 U.S. at 299. The Supreme Court has never overruled this holding. The Supreme Court has overruled only *Sinclair*'s holding on the entirely different issue of whether pertinency of a question posed by a congressional committee must be decided by the court or the jury. *See Gaudin*, 515 U.S. at 520-22.

> the committee may sustain the objection and abandon the question, even though the
> objection might actually be without merit. In such an instance, the witness' refusal
> to answer is not contumacious, for there is lacking the requisite criminal intent. Or
> the committee may disallow the objection and thus give the witness the choice of
> answering or not. Given such a choice, the witness may recede from his position
> and answer the question. And if he does not then answer, it may fairly be said that
> the foundation has been laid for a finding of criminal intent to violate [Section] 192.

349 U.S. 155, 165-66 (1955); *see also United States v. House of Representatives of U.S.*, 556 F.

Supp. 150, 152 (D.D.C. 1983) ("The statutory provisions concerning penalties for contempt of

Congress, 2 U.S.C. § 192 and § 194, constitute 'an orderly and often approved means of

vindicating constitutional claims arising from a legislative investigation.' Under these provisions,

constitutional claims and other objections to congressional investigatory procedures may be raised

as defenses in a criminal prosecution." (quoting *Sanders v. McClellan*, 463 F.2d 894, 899 (D.C.

Cir. 1972))).

These principles are no different from those that apply in contempt of court cases involving

violations of 18 U.S.C. § 401(3) (defining criminal contempt to include "[d]isobedience or

resistance to [a court's] lawful writ, process, order, rule, decree, or command"). As with contempt

of Congress, a defendant's failure to comply with a court order must be willful in order to constitute

a criminal violation, *see, e.g.*, *United States v. Armstrong*, 781 F.2d 700, 706 (9th Cir. 1986)

("[W]illfulness is an essential element of criminal contempt."), and willfulness is defined as a

refusal that is deliberate and intentional, *see, e.g.*, *United States v. Straub*, 508 F.3d 1003, 1012

(11th Cir. 2007) (defining willfulness for contempt of court as "a deliberate or intended violation,

as distinguished from an accidental, inadvertent, or negligent violation of an order" (internal

quotation marks and citations omitted)); *United States v. Rapone*, 131 F.3d 188, 195 (D.C. Cir.

1997) ("A defendant commits a willful violation when he acts with deliberate or reckless disregard

of the obligations created by a court order."). Further, as with contempt of Congress, a good-faith

belief that a court order is invalid, or reliance on counsel's advice not to comply, provides no defense to contempt of court. *See, e.g.*, *United States v. Myers*, 302 F. App'x 201, 205 (4th Cir. 2008) ("We agree with the district court that Myers' reliance on counsel's advice to fail to appear as ordered does not negate the willfulness element of the contempt offense."); *United States v. Remini*, 967 F.2d 754, 758 (2d Cir. 1992) (affirming exclusion of evidence of advice of counsel in trial for contempt for refusal to testify and affirming instructions to jury that advice of counsel and a good-faith refusal to comply was not a defense to contempt); *United States v. Monteleone*, 804 F.2d 1004, 1010-11 (7th Cir. 1986) (rejecting that the defendant's erroneous belief that he complied with an order to testify based on his counsel's advice provided a defense to contempt in the face of a clear order and noting that "an attorney may not exculpate his client of contempt by advising him to disobey an order of the court because the judge is 'wrong'"); *United States v. Di Mauro*, 441 F.2d 428, 437 (8th Cir. 1971) (rejecting defendants' contention that their failure to testify before a grand jury was not willful because they were relying in good faith on advice of counsel). Just as with contempt of Congress, to properly vindicate the authority of the issuing court, it is the party to whom a court order is directed who takes the risk of contempt in deciding simply not to comply. *See United States v. Ryan*, 402 U.S. 530, 533 (1971) ("[W]e have consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal.").

Here, the Committee warned the Defendant that his privilege claims did not excuse him from his obligations under the subpoena to produce records and to appear for a deposition, or to

follow the required procedures for submitting his privilege claims. The Defendant, nevertheless,

intentionally decided not to comply. When given the choice between compliance and contempt

that the Supreme Court described in *Quinn*, the Defendant chose contempt. And the Defendant's

total refusal to take even one step toward compliance, even refusing to submit a privilege log,

provides ample evidence that he was not relying in good faith on legal privileges or advice of

counsel. But even if his contempt were based on an erroneous but good-faith belief that he had a

valid legal excuse for ignoring the subpoena's demands, whether by his own determination or his

attorney's, it is no defense. All evidence and argument related to good-faith reliance on the law

or an attorney's advice should therefore be excluded at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

8
**-320-**



**DAVIDOFF HUTCHER & CITRON LLP**

ATTORNEYS AT LAW

605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 286-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914) 381-7400

WEST PALM BEACH
ATTORNEYS AT LAW
1107 NORTH OLIVE AVENUE
WEST PALM BEACH, FL 33401
(561) 567-0488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

October 7, 2021

Kristin Amerling, Esq.
Chief Counsel/Deputy Staff Director
House Select Committee to Investigate
The January 6th Attack on the United States Capitol
1540A Longworth HOB
Washington, DC 20515

Re:    The Subpoena for Stephen K. Bannon dated September 23, 2021

Dear Ms. Amerling:

I write today on behalf of Stephen K. Bannon with respect to the above referenced subpoena, which I accepted on behalf of Mr. Bannon. On the afternoon of October 6, 2021, I received a letter from Justin Clark, as counsel for then President of the United States Donald J. Trump. That letter references the subpoena that your Committee served upon Mr. Bannon, and notes that the subpoena:

"seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Bannon to:    (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

It is therefore clear to us that since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert

**Jan. 6 Sel. Comm. 0011**

US-000418

**-321-**

DAVIDOFF HUTCHER & CITRON LLP

Kristin Amerling, Esq.
October 7, 2021
Page 2

those executive privileges enumerated above, we must accept his direction and honor
his invocation of executive privilege. As such, until these issues are resolved, we are
unable to respond to your request for documents and testimony.

We will comply with the directions of the courts, when and if they rule on
these claims of both executive and attorney client privileges. Since these privileges
belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr.
Bannon is legally unable to comply with your subpoena requests for documents and
testimony.

Very truly yours,

/s/ Robert J. Costello

RJC/nc
None

Jan. 6 Sel. Comm. 0012

US-000419

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

### One Hundred Seventeenth Congress
#### Select Committee to Investigate the January 6th Attack on the United States Capitol

October 8, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

I write in response to your October 7, 2021 letter which states that your client, Stephen Bannon, is "legally unable to comply" with the September 23, 2021 subpoena (the "Subpoena") issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"). Your letter relies on an apparent instruction from former President Donald Trump that appears limited to requesting that Mr. Bannon not disclose privileged information. Despite this limited instruction, your letter takes the inappropriate position that Mr. Bannon will not comply with any request for information or testimony sought by the Select Committee. Moreover, Mr. Trump's stated "intention to assert those executive privileges" that may or may not belong to him, does not provide a legal basis for Mr. Bannon's refusal to comply with the Subpoena.

You accepted service of the Subpoena for documents and testimony on Mr. Bannon's behalf on September 24, 2021. The Subpoena required that, by October 7, 2021 at 10:00 a.m., Mr. Bannon produce certain documents and other records referring or relating to the matters described in the Subpoena's schedule. All the requested documents relate directly to the inquiry being conducted by the Select Committee, serve a legitimate legislative purpose, and are within the scope of the authority expressly delegated to the Select Committee pursuant to House Resolution 503. In the letter accompanying the Subpoena, the Select Committee set forth the basis for its determination that the documents and records sought by the Subpoena and Mr. Bannon's deposition testimony are of critical importance to the issues being investigated by the Select Committee.

Your letter indicates that the sole basis for defiance of the Subpoena is Mr. Trump's "direction" to your client and his decision to "honor [Mr. Trump's] invocation of executive privilege." That position has no basis in law, and your letter does not cite any statute, case law, or other legal precedent for support.

*First*, virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege. You have provided no basis for Mr. Bannon's refusal to comply with

**Jan. 6 Sel. Comm. 0013**

US-000420

Mr. Robert J. Costello
Page 2

those portions of the Subpoena not covered by any privilege. Furthermore, blanket assertions of the deliberative process and attorney-client privileges, such as those apparently requested by Mr. Trump, have been rejected by courts as "unsustainable" even when—unlike the situation with Mr. Bannon—the subpoena recipient is an Executive Branch agency. *See Comm. on Oversight and Gov't Reform v. Holder*, 2014 WL 12662665, at *2 (D.D.C. 2014) (rejecting DOJ's assertion of deliberative process privilege on all documents after a particular date and noting that the "Attorney General has not cited any authority that would justify this sort of blanket approach").

*Second*, the Select Committee has not received any assertion, formal or otherwise, of any privilege from the Mr. Trump. Even assuming that, as a former President, Mr. Trump is permitted to formally invoke executive privilege, he has not done so. At most, Mr. Trump has "announced his intention to assert those executive privileges." The Select Committee is not aware of any legal authority, and your letter cites none, holding that the mere intention to assert a privilege absolves a subpoena recipient of his duty to comply.

*Third*, your letter indicates that Mr. Trump has requested that your client "to the fullest extent permitted by law … not provide any testimony concerning privileged material in response to the Subpoena." Even if your client had been a senior aide to the President during the time period covered by the contemplated testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest that Mr. Trump has requested he assert. To the contrary, every court that has considered the absolute immunity Mr. Trump alludes to has rejected it. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) (rejecting former White House counsel's assertion of absolute immunity from compelled congressional process). *Miers* made clear that even the most senior Presidential advisors may not resist a congressional subpoena "based solely on their proximity to the President." *Id.* at 101 (citing *Harlow*, 457 U.S. at 810).[1] If there is no absolute immunity for senior Presidential advisors, then there certainly can be no such immunity for private citizens, such as Mr. Bannon, who occasionally communicate with the President on non-official, non-governmental, or campaign-related matters.

Regardless of any purported privilege assertion by Mr. Trump, Mr. Bannon has an ongoing obligation to produce documents to the Select Committee. Accordingly, please produce all responsive documents and records identified in the Subpoena. Should Mr. Bannon seek to withhold specific responsive documents, consistent with the Subpoena instructions, he must provide the Select Committee with a privilege log that "identifies and describes the material in a manner 'sufficient to enable resolution of any privilege claims.'" *See Comm. on Oversight*, 2014 WL 12662665 at *2 (quoting *Miers*, 558 F. Supp. 2d at 107). Such a privilege log should, at a minimum, provide the author(s) and recipient(s), indicate the general subject matter of each document being withheld, and the specific basis for withholding it.

---

[1] It is also worth noting that the court in *Miers* rejected the former White House Counsel's claim of absolute immunity from congressional testimony even though the sitting President had formally invoked executive privilege. *Id.* at 62.

**Jan. 6 Sel. Comm. 0014**

US-000421

Mr. Robert J. Costello
Page 3

Finally, the Select Committee expects Mr. Bannon's appearance at the time and place
designated in the Subpoena for a deposition and respond fully to questions by the Select
Committee. If there are specific questions at that deposition that you believe raise privilege
issues, Mr. Bannon should state them at that time for the deposition record for the Select
Committee's consideration and possible judicial review.

Please be advised that the Select Committee will view Mr. Bannon's failure to respond to
the Subpoena as willful non-compliance with the Subpoena. His willful non-compliance with the
Subpoena would force the Select Committee to consider invoking the contempt of Congress
procedures in 2 U.S.C. §§ 192, 194---which could result in a referral from the House to the
Department of Justice for criminal charges—as well as the possibility of having a civil action to
enforce the Subpoena brought against Mr. Bannon in his personal capacity.

Sincerely,

Bennie G. Thompson
Chairman

**Jan. 6 Sel. Comm. 0015**

US-000422



**DAVIDOFF HUTCHER & CITRON LLP**

ATTORNEYS AT LAW

605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 286-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914)381-7400

WEST PALM BEACH
ATTORNEYS AT LAW
1107 NORTH OLIVE AVENUE
WEST PALM BEACH, FL 33401
(561) 587-6488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

October 13, 2021

Hon. Bennie G. Thompson
Chairman
House Select Committee to Investigate the January 6th Attack
c/o Kirstin Amerling, Esq.
1540 A Longworth HOB
Washington, DC 20515

Re:   The Subpoena for Stephen K. Bannon dated September 23, 2021

Dear Congressman Thompson:

I write on behalf of Stephen K. Bannon to respond to some of the inaccurate statements made in your letter to me dated October 8, 2021, which purports to address the positions taken by Mr. Bannon with respect to the above-referenced subpoena.

As an initial matter, your use of the word "defiance" is inappropriate. Mr. Bannon's position is not in defiance of your Committee's subpoena; rather, Mr. Bannon noted that President Trump's counsel stated that they were invoking executive and other privileges and therefore directed us not to produce documents or give testimony that might reveal information President Trump's counsel seeks to legally protect. Mr. Bannon has testified on three prior occasions, before the Mueller Investigation, the House Intelligence Committee and the Senate Intelligence Committee. In each of those instances, when President Trump waived his invocation of the executive privileges, Mr. Bannon testified.

As recently as today, counsel for President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved. Your Committee will have the right to challenge that exercise or its scope. That is an issue between the Committee and President Trump's counsel and Mr. Bannon is not required to respond at this time. See *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019) ("The President can certainly identify sensitive information that he deems subject to executive privilege, and his doing

**Jan. 6 Sel. Comm. 0016**

US-000423

DAVIDOFF HUTCHER & CITRON LLP

Hon. Bennie G. Thompson
October 13, 2021
Page 2

so gives rise to a legal duty on the part of the aide to invoke the privilege on the
President's behalf when, in the course of his testimony, he is asked a question that
would require disclosure of that information.")

      Until such time as you reach an agreement with President Trump or receive a
court ruling as to the extent, scope and application of the executive privilege, in order to
preserve the claim of executive and other privileges, Mr. Bannon will not be producing
documents or testifying. As noted previously, Mr. Bannon will revisit his position if
President Trump's position changes or if a court rules on this matter.

      Mr. Bannon's communications with President Trump on the matters at issue
in the Subpoena are well within the scope of both the presidential communications and
deliberative process executive privileges. See *In re Sealed Case (Espy)*, 121 F.3d 729
(D.C. Cir. 1997) (holding that the presidential communications privilege covers
communications made or received by presidential advisors in the course of preparing
advice for the President even if those communications are not made directly to the
President); *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 868 (D.C.
Cir. 1980) (finding that deliberative process privilege applies to "recommendations, draft
documents, proposals, suggestions, and other subjective documents which reflect the
personal opinions of the writer rather than the policy of the agency.")

               Very truly yours,

               /s/ Robert J. Costello

RJC/nc

Jan. 6 Sel. Comm. 0017

US-000424

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

One Hundred Seventeenth Congress

Select Committee to Investigate the January 6th Attack on the United States Capitol

October 15, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

The Select Committee to Investigate the January 6th Attack ("Select Committee") is in receipt of your October 13, 2021 letter (the "October 13 letter"), in which you reassert that your client, Stephen Bannon, will not comply with the September 23, 2021 Subpoena to him for documents and deposition testimony (the "Subpoena"). As you know, the Subpoena demanded that Mr. Bannon produce documents by October 7, 2021 and appear on October 14, 2021 before the Select Committee to provide deposition testimony on a wide range of issues relating to the January 6, 2021 attack on the United States Capitol, as well as plans to interfere with the count of the 2020 Electoral College results. Mr. Bannon has now willfully failed to both produce a single document and to appear for his scheduled deposition. The Select Committee believes that this willful refusal to comply with the Subpoena constitutes a violation of federal law.

As justification for Mr. Bannon's complete failure to comply with any portion of the Subpoena, you continue to rely on ex-President Trump's stated intention to invoke executive privilege with respect to Mr. Bannon, and Mr. Trump's purported request that Mr. Bannon not produce documents to or testify before the Select Committee. As was explained in the Select Committee's October 8, 2021 letter (attached), the former President has not communicated any such assertion of privilege, whether formally or informally, to the Select Committee. Moreover, we believe that any such assertion of privilege—should it be made by the former President—will not prevent the Select Committee from lawfully obtaining the information it seeks.

Further, your letter makes no attempt to justify Mr. Bannon's failure to comply with the Subpoena's demand for documents and testimony on a range of subjects that do not involve communications with the former President. As is clear from the Subpoena and accompanying letter, and as underscored in the Select Committee's October 8, 2021 response letter, the Select Committee seeks documents and testimony on numerous other matters, including Mr. Bannon's

**Jan. 6 Sel. Comm. 0041**

US-000448

Mr. Robert J. Costello
Page 2

communications with Members of Congress, presidential campaign representatives, and other private parties concerning the events of January 6, 2021, that could not conceivably be barred by a privilege claim.

Moreover, even if the Select Committee were inclined to accept the unsupported premise that executive privilege reaches communications that the Select Committee seeks to examine between President Trump and Mr. Bannon,[1] Mr. Bannon does not enjoy any form of absolute immunity from testifying or producing documents in response to a Congressional subpoena. Your citation to *Committee on Judiciary v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019) actually supports the Select Committee, not your client. In *McGahn*, the district court unequivocally held that even senior White House aides are not entitled to absolute immunity from testifying in response to a Congressional subpoena. *Id.* at 214 ("To make the point as plain as possible, it is clear to this Court ... that, with respect to senior-level presidential aides, absolute immunity from compelled congressional process simply does not exist.").[2] Indeed, the footnote in *McGahn* that you selectively quote makes clear that a President lacks legal authority to order an aide not to appear before Congress based on a claim of executive privilege. *See Id.* at 213, n. 34 ("But the invocation of the privilege by a testifying aide is an order of magnitude different than DOJ's current claim that the President essentially owns the *entirety* of a senior-level aide's testimony such that the White House can order the individual not to appear before Congress *at all*." (Emphasis in original)).

Accordingly, the Select Committee views Mr. Bannon's failure to produce documents by the October 7, 2021 deadline as willful non-compliance with the Subpoena. Mr. Bannon has persisted in his refusal to produce any documents to the Select Committee, and he has failed to provide a privilege log identifying specific, asserted privileges. Mr. Bannon has now further compounded his non-compliance by refusing to appear on October 14, 2021 at the Select Committee deposition to which he was summoned to provide testimony. The Select Committee will therefore be meeting on Tuesday, October 19, 2021 to consider invoking the contempt of Congress procedures set forth in 2 U.S.C. §§ 192, 194.

If Mr. Bannon believes that there are any additional issues relating to his non-compliance with the Subpoena that have not been addressed, please submit them in writing to the Select

---

[1] Notably, neither of the cases you cite supports the claim that communications between the former President and a private citizen may be shielded by either the presidential communications or deliberative process privilege. Indeed, the case you rely upon to support your presidential communications claim specifically held that the privilege extends only to a President's closest advisors in the White House. *In re Sealed Case (Espy)*, 121 F.3d 729, 752 (D.C. Cir. 1997). *See also Committee on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 100 (D.D.C. 2008) (privilege claimants acknowledged that executive privilege applies only to "a very small cadre of senior advisors").

[2] The *McGahn* court followed *Committee on the Judiciary v. Miers*, 558 F. Supp.2d 53, 108 (D.D.C. 2008), which reached the same conclusion 13 years ago. *McGahn*, 415 F. Supp. 3d at 202-03 ("this Court finds that the *Miers* court rightly determined not only that the principle of absolute testimonial immunity for senior-level presidential aides has no foundation in law, but also that such a proposition conflicts with key tenets of our constitutional order").

**Jan. 6 Sel. Comm. 0042**

US-000449

Mr. Robert J. Costello
Page 3

Committee by 6:00 p.m. E.S.T. on Monday, October 18, 2021 for the Select Committee's
consideration in its deliberations.

Sincerely,

Bennie G. Thompson
Chairman

**Jan. 6 Sel. Comm. 0043**

US-000450

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

**DEFENDANT'S OPPOSITION TO**
**GOVERNMENT MOTION IN LIMINE ON ADVICE OF COUNSEL**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court deny the Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel [Doc. 29], for the reasons set forth below.

**BACKGROUND**

Picture this. You are a former top advisor to the President of the United States. You receive a subpoena from a congressional committee. The subpoena includes 10 pages of arcane instructions. It seeks testimony and documents about communications with your former boss while he was President. You are not a lawyer. You retain a lawyer. He is a seasoned former federal prosecutor who has experience with subpoenas. He explains that the former President has asserted executive privilege, and that based on long-standing U.S. Department of Justice authority, you should not appear for deposition or provide documents. He tells you that he will try to reach an accommodation with the Select Committee. You follow the advice of your attorney. Shortly thereafter you are charged with a crime and face up to two years in jail. You are told that when

**-331-**

you go to trial, the Government does not want the jury to hear anything about your state of mind, your lawyer's advice about the law, or your reliance on your lawyer's advice. Justice or not?[1]

The foregoing is not a hypothetical situation. It is the position taken by the Government in this case. Yet every event in this case involved attorney advice. Every communication was between attorneys. The Select Committee sought service of the subpoena not on Mr. Bannon, but *via* his attorney, Robert J. Costello, Esquire. The communications that followed between the Select Committee and Mr. Bannon were all made through attorneys. These communications involved complex legal principles – such as executive privilege – that are the argot of lawyers, not laymen. Based upon clear legal authority, Mr. Costello explained the legal justifications and communications with Select Committee counsel to Mr. Bannon. Mr. Costello provided legal justifications for Mr. Bannon's position to the Select Committee and received responses back from Select Committee attorneys. Mr. Costello provided legal advice to Mr. Bannon, and Mr. Bannon acted on that advice.

Mr. Costello's advice, followed by Mr. Bannon, included the following:

- The Select Committee subpoena was invalid, based on long-standing U.S. Department of Justice authority, because the Select Committee would not allow former President Donald J. Trump's counsel to be present at Mr. Bannon's deposition, so as to protect executive privilege;

- A former White House official does not violate 2 U.S.C. § 192 when a President invokes executive privilege in response to a congressional subpoena, based upon U.S. Department of Justice authority;

- Mr. Bannon could not waive executive privilege, since the privilege belonged to former President Trump; and

- Because former President Trump asserted executive privilege, Mr. Bannon was not in a position to determine what documents or testimony he could lawfully provide to the Select Committee; and

---

[1] *See, generally*, *A Theory Of Justice,* John Rawls (1971) (in creating the rules of a just society, the author must not know in advance where they would end up within that society).

2

- Consistent with prior experience, the lawyers involved would attempt to reach an accommodation between the two political branches, or the matter would be determined by a court of law.

To be sure, there was a difference of opinion on the legal issues between lawyers for the Select Committee and Mr. Bannon's attorney. On behalf of Mr. Bannon, Mr. Costello asked the Select Committee to allow a judge to decide the complex legal questions and declared that Mr. Bannon would respond to the subpoena once the privilege issues had been resolved. That was not an unreasonable position, given that where the political branches have a dispute involving executive privilege, it is the role of the judiciary to "'say what the law is.'" *United States v. Nixon*, 418 U.S. 683, 705 (1974) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). Yet the Select Committee rejected that request. Mr. Costello, again on behalf of Mr. Bannon, also asked the Select Committee for a one-week adjournment after former President Trump filed a civil lawsuit seeking the judicial determination of certain executive privilege issues. That request was denied. Instead, the very same day the Select Committee initiated this criminal prosecution.

Now, the Government wants to whitewash that history. The Government makes two principal arguments in support of its motion. First, the Government argues that a person commits a crime if they receive a congressional subpoena and decides not to appear or produce documents on the return date, regardless of the reason. [Doc. 29 at 3-6]. The Government's theory – based on a 60-year-old case that has been rendered obsolete by subsequent decisions – is without merit. Controlling law dictates that 2 U.S.C. § 192 is not a strict liability crime, as the Government contends. The Supreme Court has clarified that the word "willfully" in criminal statutes means knowledge that one's actions are unlawful. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998); *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994).

3

Notably, none of the cases cited by the Government involve a former top Presidential advisor facing demands from a congressional committee on one hand, and an assertion of executive privilege by a former President on the other hand. U.S. Department of Justice policy provides clear direction. In such circumstances, Mr. Costello's advice to Mr. Bannon about what the law requires and Mr. Bannon's reliance and right to rely on the advice of his attorney is highly relevant in a subsequent criminal prosecution.

The Government's second argument is that this Court should rely upon legal principles that pertain to criminal Contempt of Court (18 U.S.C. § 401(3)) when construing the Contempt of Congress statute (2 U.S.C. § 192). No canon of statutory construction supports this theory, given the different language used in the two statutes. Beyond that, Contempt of Court is a different species entirely – unlike either civil or criminal actions. Contempt of Court involves an assertion of power to enforce obedience and keep the legal system functioning.

The Government alleges that Mr. Bannon committed a crime. Every act that they intend to rely upon as proof involved Mr. Bannon's reliance upon legal advice. Yet the Government wants to redact the legal advice before presenting the evidence to the jury. The question remains: why would the Government not want evidence of Mr. Bannon's actual intent presented to the jury?

### Relevant Facts[2]

On September 23, 2021, Kristen Amerling, Esq. ("Ms. Amerling"), Chief Counsel and Deputy Staff Director of the Select Committee, telephoned Robert J. Costello, Esquire ("Mr. Costello"), to ascertain whether he represented Stephen K. Bannon, and to inquire whether he was authorized to accept a subpoena directed to Mr. Bannon. [US-000255]. Mr. Costello confirmed that he represented Mr. Bannon and stated that he would seek authorization and get back to her.

---

[2] See also Declaration of Robert J. Costello, Esquire [Exhibit "1" hereto].

4

That same day, Ms. Amerling emailed Mr. Costello a subpoena for Mr. Bannon along with other attachments. [US-000001 to 000010]. Ms. Amerling acknowledged in her email that Mr. Costello would check with his client about acceptance of service. *Id.* Despite not having received acceptance of service, Ms. Amerling sent an attachment to the email that included a "Proof of Service" which stated that she had "Served" the subpoena on "9/23/21" and the "Manner of service" was "email to attorney for Mr. Bannon, Robert Costello . . .." [US-000002]. On September 24, 2021, Mr. Costello agreed to accept service of the subpoena on Mr. Bannon's behalf. [US-000257]. The subpoena had a return date of October 14, 2021, for Mr. Bannon's testimony. [US-000001].

On October 5, 2021, Justin Clark, Esquire, counsel to former President Donald J. Trump, telephoned Mr. Costello and advised him that President Trump was invoking executive privilege with respect to the subpoena to Mr. Bannon. [US-001098]. On October 6, 2021, Mr. Costello received a letter from Mr. Clark, which stated, in pertinent part:

> President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.
>
> Through the Subpoenas, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others, the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court
>
> Therefore to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena.

[US-000971].

Upon receipt of this letter from President Trump's counsel, Mr. Costello provided legal advice to Mr. Bannon. Mr. Costello advised Mr. Bannon that he did not have the ability to waive executive privilege and he did not have the ability to discern what documents or communications were privileged, since that authority belonged to former President Trump. [US-001771]. Mr. Costello further advised Mr. Bannon that he should not provide documents or testify in response to the subpoena, because Mr. Bannon must be guided by President Trump's invocation of privilege, pending an accommodation between the Select Committee and former President Trump, or a judicial resolution of the matter. [US-001098].

Mr. Costello advised Mr. Bannon that based upon legal authority in binding authoritative opinions published by the U.S. Department of Justice Office of Legal Counsel (OLC), Mr. Bannon did not have to appear or produce documents in response to the Select Committee subpoena. Mr. Costello advised that the subpoena was invalid, among other reasons, because the Select Committee prohibited counsel for President Trump from being present at the deposition in order to protect executive privilege. [US-001772, 001779]. Mr. Costello confirmed with a Select Committee attorney that the Select Committee would not allow counsel for President Trump to attend Mr. Bannon's deposition in order to protect executive privilege. [US- 000317 to 000318].

On October 7, 2021, Mr. Costello emailed Ms. Amerling a letter detailing the communication from President Trump's counsel. It stated, in pertinent part, as follows:

> It is therefore clear to us that since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert those executive privileges enumerated above, we must accept his direction and honor his invocation of executive privilege. As such, until these issues are resolved, we are unable to respond to your request for documents and testimony…We will comply with the directions of the courts, when and if they rule on these claims of both executive and attorney client privileges. Since these privileges belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr. Bannon is legally unable to comply with you subpoena requests for documents and testimony.

6

**-336-**

[US-000234-235]. On October 8, 2021, Mr. Costello received a letter response from Congressman Bennie G. Thompson, Chair of the Select Committee, which rejected any assertion of privilege. [US-000238 to 000239].

On October 13, 2021, Mr. Costello spoke by telephone with Sean Tonolli, Esquire, Senior Investigative Counsel for the Select Committee. Among other things, Mr. Tonolli told Mr. Costello that the Select Committee would not allow an attorney for former President Trump to be present and participate in the deposition of Mr. Bannon, or to assert privilege objections on behalf of President Trump. [US-000317]. Mr. Costello advised Mr. Bannon that, based upon OLC opinions, Mr. Bannon need not appear for a congressional deposition at which President Trump's attorney could not be present to assert executive privilege because the subpoena was unconstitutional and a nullity. [US-001780].

In a separate telephone call that same day, Mr. Costello told Mr. Tonolli that he had asked counsel for President Trump (Mr. Clark) to delineate the subject areas upon which President Trump was invoking executive privilege, but had not received a response, and that Mr. Bannon was not in a position to draw those lines himself. [US-000318]. Mr. Costello informed Mr. Tonolli that the privilege issues needed to be resolved between the Select Committee and President Trump and that Mr. Bannon was on the sidelines of this inter-branch dispute. [US-000318, 001780].

On October 13, 2021, Mr. Costello emailed to Ms. Amerling a letter to Chairman Thompson. In the letter, Mr. Costello provided legal authority for Mr. Bannon's position given President Trump's assertion of executive privilege and stated that Mr. Bannon intended to comply with the subpoena if President Trump withdrew his assertion of executive privilege, or if a court ruled on the matter. The letter stated, in pertinent part, as follows:

7

Mr. Bannon's position is not in defiance of your Committee's subpoena; rather, Mr. Bannon noted that President Trump's counsel stated that they were invoking executive and other privileges and therefore directed us not to produce documents or give testimony that might reveal information President Trump's counsel seeks to legally protect. Mr. Bannon has testified on three prior occasions, before the Mueller Investigation, The House Intelligence Committee and the Senate Intelligence Committee. In each of those instances, when President Trump waived his invocation of the executive privileges, Mr. Bannon testified.

As recently as today, counsel for President Trump, Justin Clark, Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved. Your Committee will have the right to challenge that exercise or its scope. That is an issue between the Committee and President Trump's counsel and Mr. Bannon is not required to respond at this time. See *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019) ("The President can certainly identify sensitive information that he deems subject to executive privilege, and his doing so gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf when, in the course of his testimony, he is asked a question that would require disclosure of that information.")[.]

Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying. As noted previously, Mr. Bannon will revisit his position if President Trump's position changes or if a court rules on this matter.

[US-000315 to 000316]. Mr. Bannon followed Mr. Costello's legal advice and did not appear for

deposition on October 14, 2021. [US-000277-288].

On October 15, 2021, Ms. Amerling emailed Mr. Costello a letter signed by Chairman

Thompson. Among other things, the letter stated that the Select Committee planned to meet on

October 19, 2021, to consider whether to request that the U.S. House of Representatives find Mr.

Bannon in contempt. The letter invited Mr. Costello to provide additional information on Mr.

Bannon's behalf by October 18, 2021. [US-000300 to 000301].

On October 18, 2021, upon learning about the filing of a civil lawsuit, Mr. Costello sent

an email to Ms. Amerling. The attachment to that email was a letter to Chairman Thompson

requesting a short adjournment. The letter stated, in pertinent part, the following:

8

We write on behalf of Stephen Bannon. We have just been advised of the filing of a
lawsuit in federal court for the District Court of Columbia entitled Donald J. Trump v.
Bennie Thompson, et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we
respectfully request a one-week adjournment of our response to your latest letter so that
we might thoughtfully assess the impact of this pending litigation.

[US-000290].

The next morning, on October 19, 2021, Ms. Amerling emailed Mr. Costello a one-

paragraph response from Chairman Thompson rejecting Mr. Bannon's request for a one-week

adjournment, noting that the Select Committee's work was too "important and urgent" to justify

a one-week adjournment. [US-000275]. The same day, the Select Committee voted to

recommend that the U.S. House of Representatives find Mr. Bannon in Contempt of Congress.

[US-000322]. On October 21, 2021, the U.S. House of Representatives voted 229-202, largely

along party lines, to find Mr. Bannon in Contempt of Congress. [US-000459-504].

Mr. Costello commenced discussions with representatives of the U.S. Attorney's office

on Mr. Bannon's behalf, seeking to persuade them that a criminal prosecution would be a

mistake. Mr. Costello made clear to Government counsel that Mr. Bannon acted upon his legal

advice, that the advice was based upon authoritative OLC opinions, and that long-standing DOJ

policy precluded a criminal prosecution. [US-001779 to 001782; US-001098 to 001105].

On November 12, 2021, the indictment followed. [Doc. 1].

## ARGUMENT

### A. Evidence Of Advice Of Counsel Negates Criminal Intent

The Select Committee sought the criminal prosecution of Mr. Bannon. If the Select

Committee really wanted information from Mr. Bannon, it could have taken the path suggested

by Mr. Bannon – having a judge decide the legal questions in the civil context. When the

Government proceeds with a criminal prosecution under 2 U.S.C. § 192, the accused is entitled

to "every safeguard which the law accords in all other federal criminal cases." *Russell v. United States,* 369 U.S. 749, 755 (1962). Now, the Government essentially asks this Court to rule that Mr. Bannon cannot put on a defense. *See* [Doc. 29 at 1] ("Any evidence or argument relating to the Defendant's or his counsel's views of the law, or the Defendant's reliance on it, should therefore be excluded at trial."). The Government's position is that it need only prove that Mr. Bannon received a subpoena and did not appear. This position must be rejected, as it would violate Mr. Bannon's constitutionally-based due process and trial rights.

Every citizen accused of a crime must be afforded the constitutional right to present a defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). It is a fundamental right rooted in the Fifth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses, as well as other fair trial rights. That guarantee extends to the evidence and argument a defendant is allowed to present, and the jury instructions on defense theories. *See, e.g., United States v. Johnson*, 944 F.2d 980, 988 (2d Cir.) ("A criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence."), *cert. denied,* 126 L.Ed. 2d 364, 114 S. Ct. 418 (1993).

Reliance on advice of counsel fundamentally negates guilt. It bears on whether a defendant acted "willfully" knowing that the action was unlawful. That is why the failure to instruct a grand jury on advice of counsel may require dismissal of the indictment. *United States v. Stevens*, 771 F. Supp. 2d 556, 567-568 (D. Md. 2011).[3] That is also why failure to provide an

---

[3] A significant exception to the general rule that a prosecutor need not present exculpatory evidence to a grand jury. *See United States v. Williams*, 504 U.S. 36 (1992).

advice of counsel jury instruction at trial may warrant reversal. *See United States v. DeFries*, 129

F.3d 1293, 1308-1309 (D.C. Cir. 1997) (reversing conviction for failure to give advice of

counsel jury charge in embezzlement case, where defense evidence suggested that they relied on

advice of counsel that their "severance payments" were not unlawful).

A central issue in any criminal prosecution is the intent or *mens rea* element of the

offense charged. The Contempt of Congress statute charged in this case provides as follows:

> Every person who having been summoned as a witness by the authority of either House
> of Congress to give testimony or to produce papers upon any matter under inquiry before
> either House, or any joint committee established by a joint or concurrent resolution of the
> two Houses of Congress, or any committee of either House of Congress, *willfully makes
> default*, or who, having appeared, refuses to answer any question pertinent to the question
> under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more
> than $1,000 nor less than $100 and imprisonment in a common jail for not less than one
> month nor more than twelve months.

2 U.S.C. § 192 (emphasis added).

The Supreme Court has noted that the statute describes two separate types of conduct: (1)

"willfully makes default" and (2) appears but refuses to answer a pertinent question. *United*

*States v. Murdock*, 290 U.S. 389 (1933). The Supreme Court found that:

> Two distinct offenses are described in the disjunctive, and in only one of them is
> willfulness an element. Sinclair, having been summoned, attended the hearing. He was
> therefore guilty of no willful default in obeying a summons. He refused to answer certain
> questions not because his answers might incriminate him, for he asserted they would not,
> but on the ground the questions were not pertinent or relevant to the matters then under
> inquiry. The applicable statute did not make a bad purpose or evil intent an element of the
> misdemeanor of refusing to answer, but conditioned guilt or innocence solely upon the
> relevancy of the question propounded. Sinclair was either right or wrong in his refusal to
> answer, and, if wrong, he took the risk of becoming liable to the prescribed penalty.

*Murdock, supra*, 290 U.S. at 397. The language suggests that even as early as 1933, the Supreme

Court saw "bad purpose or evil intent an element of the misdemeanor of" the "willfully makes

default" offense.

11

**-341-**

This is consistent with older Supreme Court cases which hold that "willfully" requires "bad purpose" or no "justifiable excuse." *See*, *e.g.*, *Heikkinen v. United States*, 355 U. S. 273, 279 (1958) ("[I]t cannot be said that he acted willfully - *i.e.*, with a bad purpose or without justifiable excuse") (internal quotations omitted); *Felton v. United States*, 96 U. S. 699, 702 (1878) (willfully implies a bad purpose). As discussed below, over time the Supreme Court moved away from the malleable concept of "bad purpose."

"Willfully makes default" is an inelegant formulation.[4] There is no definition of "makes default" or "willfully" in 2 U.S.C. § 192. Generally, "makes default" means failure to fulfill a legal duty.[5] *See* Default, BLACK'S LAW DICTIONARY (8th ed. 2004). "Willfully" is not surplusage. It adds yet another layer and must be construed in context. *See Bryan v. United States*, 524 U.S. 184, 191 (1998). In criminal statutes, "willfully" "typically refers to a culpable state of mind." *Bryan, supra,* 524 U.S at 191. "In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Id.* at 191-192 (quoting *Ratzlaf v. United States*, 510 U. S. 135, 137 (1994)). To meet its burden of proving a crime that requires that an action was done "willfully," the government must prove beyond a reasonable doubt "that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan, supra*, 524 U.S. at 193.[6]

---

[4] To the extent that the phrase "willfully makes default" is ambiguous, the defense reading should prevail. *See Adamo Wrecking Co. v. United States*, 434 U. S. 275, 284-285 (1978) ("'where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'") (quoting *United States v. Bass*, 404 U. S. 336, 348 (1971)).

[5] For instance, in the civil context, a party defaults when they fail to fulfill a legal obligation required by a contract.

[6] The Supreme Court has distinguished this meaning of "willfully" from another term used in some criminal statutes, "knowingly." *See Bryan*, *supra*, 524 U.S. at 193 ("unless the text of the

12

The Government ignores controlling Supreme Court precedent that construes "willfully" as requiring proof that a defendant knew his conduct was unlawful. Instead, the Government relies upon *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961). But that reliance is misplaced. First, *Licavoli* was decided based on *Sinclair v. United States*, 279 U.S. 263 (1957). *See Licavoli*, *supra*, 294 F.2d at 207. But *Sinclair* is no longer good law. *See United States v. Gaudin*, 515 U.S. 506, 520 (1995). The Supreme Court has eviscerated *Sinclair* in no uncertain terms. *Id.* at 520 ("[o]ther reasoning in *Sinclair*, not yet repudiated, we repudiate now"), and 521 ("we think *stare decisis* cannot possibly be controlling when, in addition to those factors, the decision in question has been proved manifestly erroneous, and its underpinnings eroded, by subsequent decisions of this Court").

Significantly, in the six decades since *Licavoli*, the Supreme Court has provided clarity on the meaning of "willfully" in criminal statutes. *See Bryan*, *supra*, 524 U.S. at 196 (to establish "willfulness" the Government must prove that a defendant knew his conduct was unlawful); *Ratzlaf v. United States*, 510 U.S. 135, 138 (1994) ("to give effect to the statutory 'willfullness' specification, the Government had to prove [the defendant] knew the structuring he undertook was unlawful"). In fact, the D.C. Circuit has recognized a progression over time in the Supreme Court's construction of the word "willfully." *See, e.g.*, *United States v. Burden*, 934 F.3d 675, 692-692 (D.C. Cir. 2019) (discussing Supreme Court approach to reading "willfully" as requiring proof that a defendant had a "culpable state of mind" and knew that his acts were unlawful). District courts have applied this law. *See United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020) ("Generally, 'in order to establish a 'willful' violation of a statute, 'the

---

statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense").

13

Government must prove that the defendant acted with knowledge that his conduct was unlawful.'") (citation omitted).

The Government also relies on *dicta* in *Yellin v. United States*, 374 U.S. 109 (1963), a case which read in its entirety undermines the Government's position in this case. The Government's quotation of *dicta* from the opinion is misleading. [Doc. 29 at 4] ("should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense"). The Government omits from its brief the next sentence in the opinion. *See Yellin*, *supra*, 374 U.S. at 123 ("But he would at least be entitled to submit the correctness of his belief to a court of law."). It is also curious that the Government omits from its brief the language in the paragraph from *Yellin* above its selected quotation, which reads as follows:

> It may be assumed that if petitioner had expressly rested his refusal to answer upon a violation of Rule IV and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his defense.

*Id.* This language supports the rule that a witness who offers evidence of a good faith and valid reason for not complying a congressional subpoena may be entitled to acquittal. That is the circumstance here, and Mr. Bannon should be afforded wide latitude to submit his defense to the jury.

The Government's proposed definition of "willfully" in this case is anomalous. The Government has provided no reason why recent controlling authority on the construction of "willfully" in the Contempt of Congress statute should be ignored. The Government submits that Mr. Bannon's *actual intent* in responding to the congressional subpoena is of no matter. But the Government provides no persuasive authority for this position. Quite to the contrary, the Supreme Court has made clear that under 2 U.S.C. § 192, an accused is entitled to "every

14

**-344-**

safeguard which the law accords in all other federal criminal cases." *Russell*, *supra*, 369 U.S. at

755. In fact, in other cases involving the word "willfully" the Government has accepted – as it

must – the Supreme Court's guidance on the meaning of "willfully." *See*, *e.g.*, *United States v.*

*Zeese,* 437 F. Supp. 3d 86, 95 (D. D.C. 2020) (Howell, C.J.) ("The government and the

defendants thus agree that establishing a willful violation of 18 U.S.C. § 118 here requires proof

that defendants *knew that it was unlawful* for them to remain in the Embassy after DSS agents

had ordered them to leave.") (emphasis added).

## B. Reliance On OLC Opinions Negates Guilt

The discussion above focuses on the intent element in *any* 2 U.S.C. § 192 prosecution.

But the *specific circumstances of this case* further demonstrate that advice of counsel is a core

issue that must be presented to the jury. This Court is well-versed in the separation-of-powers

principles involved. For most of this country's history, disputes between the political branches

involving the testimony and document production by executive branch witnesses have been

resolved through accommodation, not criminal prosecution. Separation-of-powers interests have

historically meant that senior advisors to a President could not be compelled to testify or produce

documents to Congress. The rationale underlying this is that we want senior advisors to be

candid and offer a range of ideas to be considered in Presidential decision-making. The assertion

of executive privilege, which keeps those communications confidential, promotes candid

discussions. *See In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) (noting critical role that

confidentiality plays in Presidential decision-making). Consistent with the separation of powers

doctrine, Congress cannot dictate to the Executive Branch when and how executive privilege

may be involved. Nor can Congress appoint itself as the arbiter of executive privilege disputes.

15

**-345-**

The actions taken by Mr. Bannon were consistent with long-standing legal principles as explained to him by his attorney. Mr. Bannon's actions were intended to allow the Select Committee and President Trump to reach an accord on the testimony and documents sought. *See United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977) (Congress and Executive Branch "should take cognizance of an implicit constitutional mandate to seek optimal accommodation" to resolve disputes). Mr. Bannon's attorney advised him that he could not waive executive privilege on his own. His actions were fully consistent with his understanding of the law. Therefore, evidence of the legal advice that Mr. Bannon relied upon must be presented to the jury.

Mr. Bannon received a congressional subpoena *via* his attorney, which included 10 pages of arcane instructions and definitions. A former top White House advisor, he was informed by Mr. Costello that the President who he had served was asserting executive privilege. As a lay person, it is not surprising that he sought legal advice, and relied upon it to navigate this complex legal issue. The fact that Mr. Bannon no longer worked in the White House added yet another layer of complexity. Again, this involves legal issues beyond the ken of a layperson. Mr. Bannon's lawyer – an experienced former federal prosecutor – provided legal advice based on specific U.S. Department of Justice OLC opinions that directly applied to the circumstances. Mr. Bannon followed that advice. He was subsequently charged with a crime for acting in accordance with that legal advice. These facts unquestionably bear on whether Mr. Bannon "willfully ma[de] default" and must be presented to the jury.

For instance, Mr. Bannon received and relied upon advice that pertained to the invalidity of the subpoena given constitutional separation-of-powers principles. Just re-reading the previous sentence signals that the issues involved are not within the daily knowledge of a lay

16

**-346-**

person. The sentence cries – "ask a lawyer." Thus, it should be no surprise that Mr. Bannon did

just that. As a starting point, OLC authority directs that all presidential communications are

presumptively privileged. *Congressional Oversight Of The White House*, 45 Op. O.L.C. __, at

*34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main. Moreover, the

Department of Justice has "long maintained . . . that the contempt statute does not apply to

executive branch officials who resist congressional subpoenas in order to protect the prerogatives

of the Executive Branch." *Id.* at 50. As recently as 2021, OLC has opined that:

> The White House has declined to make many of the President's immediate advisers
> available since the establishment of the EOP, and for almost 50 years, the Department of
> Justice has articulated this position as a legal immunity – that "the President and his
> immediate advisers are absolutely immune from testimonial compulsion by a
> Congressional committee on matters related to their official duties." *Immunity of the
> Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).21 As
> Assistant Attorney General Rehnquist explained:

> The President and his immediate advisers – that is, those who customarily meet with the
> President on a regular or frequent basis – should be deemed absolutely immune from
> testimonial compulsion by a congressional committee. They not only may not be
> examined with respect to their official duties, but they may not even be compelled to
> appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from

William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of

Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7

(Feb. 5, 1971); *see also Immunity of the Former Counsel to the President from Compelled

Congressional Testimony*, 43 Op. O.L.C. __, at *7-11 (July 10, 2007) ("*Immunity of Former

Counsel*"), *available at* https://www.justice.gov/olc/opinions-main (listing historical examples of

immediate presidential advisors refusing to testify); Letter for Phillip E. Areeda, Counsel to the

President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, at 6 (Sept.

25, 1974) ("at least since the Truman Administration," presidential advisors "have appeared

17

before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").

How do these principles apply to a Presidential advisor like Mr. Bannon, after they have left the federal government? The answer is that executive privilege survives a job change. Governing legal principles apply even after a Presidential advisor leaves the White House. *See Immunity of Former Counsel* at *2; *See also Congressional Oversight of the White House* , 45 Op. O.L.C. __, at *15-16 (Jan. 8, 2021) , *available at* https://www.justice.gov/olc/opinions-main (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure").

Mr. Bannon relied upon legal advice that the Select Committee subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege. As was explained to Mr. Bannon, OLC opinions hold that under these unique circumstances, non-compliance with a congressional subpoena is lawful. *See Congressional Oversight Of The White House, supra*, at *56 ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").[7]

---

[7] The legal guidance provided by OLC is clear. Hence, even if there was no attorney involved, and Mr. Bannon read the opinions, evidence of Mr. Bannon's consideration of this information would negate criminal intent.

18

Mr. Bannon also relied upon legal advice that he did not have to comply with the subpoena because former President Trump was asserting executive privilege. OLC opinions and the long-standing policy of the Department of Justice, as explained to Mr. Bannon by counsel, hold that non-compliance with the subpoena under the circumstances would be lawful. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (1984) ("We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it.[8]

What about his status as a former federal employee? Again, Mr. Bannon was advised of, and relied upon, advice of counsel based on OLC authority that stated that former executive branch officials must, protect executive privilege upon request of the privilege-holder. An OLC opinion states, in pertinent part, as follows:

> . . . communications between White House officials and individual outside the Executive Branch, including with individuals in the Legislative Branch . . . fall within the scope of executive privilege . . . Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch.

Letter from Paul D. Clement, Solic. Gen./Acting Att'y Gen., to President George W. Bush (June 27, 2007), https://www.hsdl.org/?view&did=741974. It is beyond dispute that Mr. Bannon received and acted in accordance with his attorney's advice. This utterly negates the

---

[8] *See also* Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House John A. Bohner, (March 31, 2015) at 6 ("It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege.").

19

Government's position that Mr. Bannon knew his actions were unlawful. Mr. Bannon is therefore entitled to present this defense to the jury.

Mr. Bannon was on solid ground when following the OLC opinions. The OLC is nearly as old as our nation and has opined on some of the weightiest matter in public life. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017). OLC opinions are authoritative and binding by custom and practice in the Executive branch. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 484 (D.C. Cir. 2019). Accordingly, OLC opinions are entitled to great weight. They "reflect the legal position of the executive branch" and "provide binding interpretive guidance for executive agencies." *Casa de Maryland v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718 n.1 (4th Cir. 2019).

The legal authority that Mr. Bannon relied upon was sound. It had been the authoritative position of the executive branch across administrations of both political parties over many decades. It was objectively reasonable for Mr. Bannon to rely on it. But even if Mr. Bannon's reliance was misplaced, he did not commit a crime. The Supreme Court has held that a criminal defendant has not acted willfully even when the actions taken were based upon a good faith misunderstanding of the law or a good faith belief that the acts were not in violation of the law, regardless of whether the misunderstanding or belief was objectively reasonable. *Cheek v. United States*, 498 U.S. 192, 203 (1991) (noting that "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision."). Because Mr. Bannon's reliance on Mr. Costello's advice goes to the core question of whether he "willfully ma[de] default," the defense must be allowed to present evidence and argument on this topic at trial.

Mr. Bannon's right to present advice of counsel evidence is also supported by additional

legal defenses pertinent to this case. For instance, he may rely at trial upon a public authority

defense, such as the defense of entrapment by estoppel. *See Raley v. State of Ohio*, 360 U.S. 423,

438 (1959). In *Raley*, the Court found that the government may not convict "a citizen for

exercising a privilege which the State clearly had told him was available to him." *Id.* The case

involved an accused charged with failing to answer questions put to him by the Un-American

Activities Commission of the State of Ohio. *Id.* at 424. The accused had invoked the privilege

against self-incrimination on advice that the privilege applied. *Id.* at 425. The accused was

indicted for refusing to answer the questions, even though certain Commission members stated

that it was acceptable to invoke privilege rather than answer the questions posed. *Id.* The

Supreme Court reversed, holding that due process does not permit the criminal conviction of a

person who acts in reliance on authoritative pronouncements by relevant government officials or

a government agency. *Id.* at 438-39; *see also United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir.

1995) (entrapment by estoppel "focuses on the conduct of the government leading the defendant

to believe reasonably that he was authorized to do the act forbidden by law. The doctrine

depends on the unfairness of prosecuting one who has been led by the conduct of government

agents to believe his acts were authorized."); *United States v. Levin*, 973 F.2d 463, 468 (6th Cir.

1992) (entrapment by estoppel is a defense to criminal liability where a government agency

announces that a charged criminal act was lawful and accused reasonably relied on that

announcement).

It is not clear what the Government is seeking. The motion requests that "[a]ll evidence

and argument related to good-faith reliance on the law or an attorney's advice should therefore

be excluded at trial." [Doc. 29 at 8]. It would unprecedented in a criminal case, however, to

prohibit an accused from presenting evidence that their actions were based on reliance on "the law" and it is an absurd proposition to urge otherwise. Mr. Bannon has the due process right to raise the defense of entrapment by estoppel based on his reliance on the binding authority of the OLC opinions described above. He must also be allowed to present evidence that supports any other defense based on his "good-faith reliance on the law." *See generally*, *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983) (constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution under Sec. 192, and this expressly includes the defense of executive privilege).

## C. **Contempt Of Court Is Distinguishable**

There are significant differences between the following two scenarios: (1) an attorney advising a client to disobey a lawful court order; and (2) an attorney advising a former top White House official – consistent with long-standing U.S. Department of Justice policy – not to appear before or provide documents to a congressional committee after a President has invoked executive privilege. The former case, for instance, involves no separation-of-powers principles involving co-equal branches of government. But another key distinction is the language of the two statutes involved. Because of these differences, the Government's reliance on Contempt of Court principles is misplaced. While Contempt of Congress and Contempt of Court have in common the word "contempt," any similarity ends there.

Contempt of Court cases are different in nature than civil actions or criminal prosecutions. *See Myers v. United States*, 264 U.S. 95, 103 (1924) ("Contempt proceedings are neither civil actions nor prosecutions for offenses within ordinary meaning of those terms; but are assertions of power inherent in all courts to enforce obedience which they must possess in

22

order properly to perform their functions."). The availability of Contempt of Court proceedings

promotes expedition in the administration of law. *See United States v. Ryan*, 402 U.S. 530, 533

(1971). The court system could not function if every litigant or witness could disregard lawful

orders. There is no similar need for expedition where a congressional committee is conducting

fact-finding in advance of legislation. To deal with immediate threats to its functions, Congress

has the power to "guard itself from contempts." *Anderson v. Dunn*, 19 U.S. 204, 228 (1821). But

in this case, it has taken a different route – and there are many added steps when Congress seeks

to initiate a prosecution under 2 U.S.C. § 192.

The Contempt of Court statute cited by the Government, 18 U.S.C. § 401(3), does not

contain any of the words "willfully" "makes" or "default" – much less that combination of words

as an element of the offense. So that statute cannot be used to construe the meaning of those

words in 2 U.S.C. § 192.[9]

Beyond that, the cases the Government cites in its motion do not support the blanket

position that an accused in criminal contempt proceedings cannot present evidence of reliance on

advice of counsel. *See, e.g.*, *United States v. Myers*, 302 Fed. App'x 201, 205 (4th Cir. 2008)

(district court "did not believe Myers had a legitimate, good faith belief in the advice from her

counsel"); *United States v. Monteleone*, 804 F.2d 1004 (7th Cir. 1986) (no error where trial court

refused to instruct jury on reliance in good faith on the advice of counsel where: (1) a judge

immunized a witness and ordered him to testify before a grand jury; (2) the witness appeared

before the grand jury and read a short statement saying he had previously refused to testify on

---

[9] While 18 U.S.C. § 401(3), not cited by the Government, does use the word "willfully" – it
applies to actions that are both contempt of court and also constitute a criminal offense under
federal or state law. Thus, that statute does not provide guidance on construing an element of 2
U.S.C. § 192.

23

the advice of counsel, then refused to answer any questions; and therefore (3) the 7th Circuit

found that because the order to testify before the grand jury was "unambiguous and

uncomplicated . . . [the witness] could not reasonably have believed that reading his statement

complied with that order, no matter what his lawyer told him").[10]

In short, the Government's reliance on Contempt of Court principles is misplaced.[11]

---

[10] Nor does the *Rapone* case, cited by the Government, provide guidance on construing the phrase "willfully makes default." That case involved the repeated retaliatory harassment of a witness in an ongoing sexual harassment lawsuit, in direct violation of a court order. The D.C. Circuit found "abundant evidence" from which a reasonable fact-finder could find that the conduct involved – repeated harassing acts despite repeated warnings to obey the court's order, could lead a reasonable factfinder to find a willful violation of the order). *United States v. Rapone*, 131 F.3d 188, 195 (D.C. Cir. 1997).

[11] Moreover, the Government appears to subscribe to the notion "consistency is the hobgoblin of little minds." (Ralph Waldo Emerson, "Self-Reliance" Essays: First Series 1841). Its position on the availability of an advice of counsel defense appears to have shifted even with respect to a contempt prosecution under Section 401. The Court in *United States v. Taylor*, 139 F.3d 924, 934 n.10 (D.C. Cir. 1998) expressly noted, in the context of the Section 401 contempt prosecution at issue, that this same U.S. Attorney's office did not contest the availability of an advice of counsel defense in such a prosecution and the district court assumed it was available as well, obviating the need for the circuit court to address the issue.

24

## CONCLUSION

**WHEREFORE**, Defendant Stephen K. Bannon respectfully requests that this Court deny the Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel, for the reasons set forth above, together with those offered at any hearing on the motion.

Dated: February 25, 2022          Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

   /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
210 N. Charles Street, 26th Floor
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

   /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

   /s/ Robert J. Costello
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of February 2022, a copy of the foregoing Opposition To Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

/s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                              |     |                          |
| ---------------------------- | --- | ------------------------ |
|                              | :   |                          |
| UNITED STATES OF AMERICA     | :   |                          |
|                              | :   | Criminal No. 21-670 (CJN) |
|                              | :   |                          |
| v.                           | :   |                          |
|                              | :   |                          |
| STEPHEN K. BANNON,           | :   |                          |
|                              | :   |                          |
| *Defendant.*                 | :   |                          |
|                              | :   |                          |

**<u>ORDER</u>**

Upon consideration of the Government's Motion In Limine To Exclude Evidence Or
Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel, the Defendant's
Opposition, the Government's Reply, and the entire record in the case, it is hereby **ORDERED**
that the Government's Motion is **DENIED**.

Dated: _____, 2022

 

_____
Hon. Carl J. Nichols
*United States District Judge*

27

**-357-**

Case 1:21-cr-00670-CJN   Document 30-1   Filed 02/25/22   Page 1 of 15

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |

Criminal No. 21-670 (CJN)

## **DECLARATION OF ROBERT J. COSTELLO, ESQUIRE**

Robert J. Costello declares the following:

## **INTRODUCTION**

1.  I am submitting this Declaration in support of the Defendant, Stephen K.

    Bannon's Opposition to the Government's Motion in Limine to Exclude

    Evidence or Argument Relating to Good-Faith Reliance on Law or Advice

    Of Counsel [Doc. 29] in the above-captioned case. This Declaration is

    based on my personal knowledge.

2.  I am a partner with the New York law firm Davidoff Hutcher & Citron LLP

    and I have been an attorney for almost fifty years. I previously served as the

    Deputy Chief of the Criminal Division of the United States Attorney's

    Office for the Southern District of New York.

3.  I am providing in this Declaration information that is necessary to respond to

    the Government's motion; however, it is not my intention nor Mr. Bannon's

1

intention for the disclosures herein in response to the Government's motion

to in any way constitute a waiver of Mr. Bannon's attorney-client privilege

with me beyond the information disclosed herein.

4.  I am personally familiar with the facts set forth in Mr. Bannon's Opposition

to the Government's Motion in Limine to Exclude Evidence or Argument

Relating to Good-Faith Reliance on Law or Advice of Counsel

("Opposition").  All facts that are alleged in the Opposition are true and

accurate to the best of my knowledge and recollection.  I incorporate herein

by reference all of the facts alleged in the Opposition.  They do not, of

course, reflect all relevant facts I know in this matter.

5.  At all times relevant to the subpoena that is the subject of the above-

captioned case, I have served as legal counsel for the Defendant Stephen K.

Bannon.

6.  From the initiation of this matter, on September 23, 2021, when I was first

contacted by a Select Committee representative asking me to accept service

of the subpoena on behalf of Mr. Bannon, through all times thereafter, any

and all communication with the Select Committee related to Mr. Bannon has

been exclusively with me, in my role as legal counsel for Mr. Bannon and

never with Mr. Bannon.  As noted in the Opposition, a Select Committee

2

representative contacted me from the outset and asked me to accept service

of the subpoena for Mr. Bannon, rather than dealing directly with him.

7.  The consideration of a subpoena from a Select Committee of Congress raises

all sorts of legal issues that a diligent lawyer who faithfully wishes to serve

his client's interests and competently advise his client must fully explore.

Many of these are technical legal issues that a lay person would not be

familiar with, and certainly Mr. Bannon was not.  The subpoena required me

to become familiar with the Select Committee's specific rules, the resolution

for its formation, evaluate its legislative purpose, formation, and

composition, and the pertinence of the subject matter of the subpoena, and

more.  Once executive privilege was invoked, the relevant issues became

more in number and complexity.  At all relevant times, Mr. Bannon relied

entirely on my research and legal advice and agreed to follow my legal

advice as my client.

8.  As set out in the Opposition, from the date on which a copy of the subpoena

for Mr. Bannon was sent to me by the Select Committee until October 21,

2021, when I was advised that the U.S. House of Representatives had voted

to find Mr. Bannon in contempt of Congress, I was in regular telephone and

written communication with representatives of the Select Committee as

counsel for Mr. Bannon.

3

9. In my communications with the Select Committee as counsel for Mr. Bannon, I repeatedly offered suggestions for courses of action that would allow Mr. Bannon to comply with the subpoena, consistent with his legal rights, duties, and obligations. No one can fairly or accurately say that Mr. Bannon in any way willfully defaulted with respect to this subpoena. Mr. Bannon's actions, through me as his counsel, were quite the opposite of a willful default.

10. On October 5, 2021, I received a phone call from an attorney representing former President Trump, advising me that the former President was invoking executive privilege with respect to the Select Committee's subpoena directed to Mr. Bannon. I immediately communicated that information to Mr. Bannon.

11. I immediately began researching the impact on Mr. Bannon's rights, duties, and obligations vis a vis the subpoena, in light of the former President's invocation of executive privilege. I conducted exhaustive research on the subject, thoroughly reading all relevant formal opinions from the Department of Justice's Office of Legal Counsel ("OLC"), which I understood to be binding authority on the Executive Branch. I also researched relevant case law.

4

12. I then shared with Mr. Bannon the results of my research. I advised Mr.
Bannon as his attorney, and knowing that he was fully relying on my legal
advice and would follow it, that in light of the fact that the Select Committee
had adopted a rule that would prevent the President's counsel from attending
the proposed deposition in order to protect the President's claims of
executive privilege, the Office of Legal Counsel ("OLC") had issued an
opinion in 2019, which was binding upon the Executive Branch of
Government, which stated that the subpoena that Mr. Bannon received was
illegal, unlawful and incapable of being enforced either civilly or criminally.
Therefore Mr. Bannon was legally entitled to refuse to produce documents
or testify pursuant to that subpoena. In spite of this statement of law which
would allow Mr. Bannon to ignore the subpoena, we sought in good faith to
try to reach an accommodation with the Select Committee. The Select
Committee simply ignored our requests and made no attempt to reach an
accommodation.

13. Indeed, from the date on which I was notified that executive privilege had
been invoked forward, I began to develop a strategy that would allow Mr.
Bannon to meet any and all legal obligations and again to see if some kind of
accommodation could be reached with the Select Committee that would not

5

-363-

cause Mr. Bannon to violate his obligations under the invocation of executive privilege.

14. For example, I asked counsel for the Select Committee whether, if Mr. Bannon were to appear for a deposition pursuant to the subpoena, the Select Committee would permit a representative of the privilege holder to be present in order to be able to invoke privilege on a question by question basis. I was told unequivocally that the Committee would not permit this.

15. I advised the Select Committee that Mr. Bannon was constrained from complying with the subpoena based on the invocation of executive privilege; but I assured the Select Committee that if it were able to resolve the privilege issue with former President Trump or if the Select Committee would present the matter to a judge in a civil proceeding – a practice I had understood had been followed in other situations before other Congressional committees when executive privilege had been invoked – and the judge directed Mr. Bannon to comply with the subpoena, he would comply. The Select Committee ignored my proposal.

16. On the late afternoon of October 18th, as we were about to send our reply to Chairman Thompson's previous letter, I learned that former President Trump had filed a lawsuit against the Select Committee Chairman. I knew nothing about the substance of the lawsuit but I presumed it might address

6

the issues Mr. Bannon was facing and so, instead of just sending our reply to Chairman Thompson, I asked the Select Committee for a brief extension of time in order to evaluate that lawsuit and the impact it might have on Mr. Bannon's obligations under the subpoena. The next morning, which was the day the Select Committee was holding a televised news conference to vote on holding Mr. Bannon in criminal contempt of Congress, Chairman Thompson summarily rejected our request for an adjournment, claiming the Select Committee's work was too important to grant an adjournment. This was a farcical excuse as the same Committee has granted numerous adjournments to other subpoena recipients, but not to Mr. Bannon. That night on television, after they voted to recommend to the entire House that Mr. Bannon be held in criminal contempt of Congress, both the Chair and the Vice Chair said they wanted to make an example out of Mr. Bannon.

17. It soon became clear to me that the Select Committee did not actually appear to be interested in any information or materials it thought Mr. Bannon might have. Rather it seemed clear to me that the Select Committee wanted to try to punish Mr. Bannon for his adherence to the invocation of executive privilege and for partisan political reasons and to make him an example. Public comments by Select Committee members have confirmed this.

7

18. I suppose I should not have been surprised to conclude that this was the
Select Committee's true agenda, given what I view as the extraordinarily
inappropriate composition of the Select Committee, if it were truly intended
to engage in an investigatory process concerning the events at the Capitol on
January 6, 2021.

19. I learned that the Chairman of the Select Committee had personally filed a
lawsuit against former President Trump that was filled with allegations
concerning his view of the causes of the events of January 6th and asserting
that former President Trump was responsible for those events and for
causing personal damages to the Chairman. It struck me as outrageous that a
person who had alleged such personal damages and who already had arrived
at conclusions was selected to head an "investigation."

20. Similarly, I learned that other members of the Select Committee had made
prejudgments about the cause of and responsibility for the events of January
6th . These included Congressman Raskin, who had led the impeachment
prosecution centered on the events of January 6th and publicly announced his
conclusions as well as Congressman Schiff, who similarly had announced
his conclusions, with both members more recently hawking books each has
written on the subject, while the "investigation" supposedly is ongoing.
There are several other examples of Committee members who similarly have

8

announced their public prejudgments concerning the matters purportedly under investigation and who have made many public comments while serving on the Select Committee that indicate a partisan political agenda far removed from any legislative purpose and an inappropriate agenda vis a vis Mr. Bannon.

21. In the course of my evaluation of Mr. Bannon's legal rights, duties, and obligations with respect to the subpoena, I consulted several relevant OLC opinions which I believed were directly on point and that I understood to be binding authority which Mr. Bannon was duty bound to follow, as a former adviser in the executive branch.

22. Among the OLC opinions that I consulted and which I understood were binding and had to be followed by Mr. Bannon was the following:

A May 23, 2019 OLC Opinion titled: **Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Empoyees**.

This OLC Opinion covers a number of directly relevant subjects. These include the recognition of separation of powers concerns in such a situation as this and the absolute need for a representative of the Executive Branch party to be present in order to determine when to invoke privilege, and the application of the Opinion to former employees. Perhaps most significantly, it provides the formal binding opinion that a subpoena directing an

9

Executive Branch employee or former employee to appear before Congress

for a deposition, while not permitting an appropriate Executive Branch

employee to be present exceeds the Committee's authority and "therefore

lack(s) legal effect." [Page 13]. It further holds that no such subpoena can

be enforced by civil or criminal means or through any inherent contempt

power of Congress. [Page 13-14]. The binding OLC Opinion then refers

specifically to the possibility of a criminal prosecution under 2 U.S.C.

Sections 192 and 194 and it notes that the OLC previously had opined that

"the criminal contempt of Congress statute does not apply to the President or

presidential subordinates who assert executive privilege." [Page 14].

Lastly, it expresses the view that it would be "unconstitutional" to try to

enforce any such subpoena where the committee will not permit the

Executive Branch representative to accompany the witness. [Page 14].

Tellingly, these principles apply under this OLC Opinion, even if the

Executive Branch has not yet invoked the privilege; for it is essential that an

Executive Branch representative be permitted to be present when a current

or former Executive Branch employee is deposed in case a privileged matter

were to arrive which the witness might not recognize as such. [Page 10].

23. I consulted several other directly relevant OLC Opinions that supported the

conclusion that Mr. Bannon should not appear or produce documents under

the subpoena as a matter of law.  At all times I discussed each Opinion and other legal source with Mr. Bannon, gave him my legal conclusions and I directed him that he must not appear or produce documents in response to the subpoena.  He relied in good faith on my legal advice and on these OLC Opinions and other legal sources I brought to his attention, and he agreed to follow my legal advice as directed.

24.  On behalf of Mr. Bannon, I did everything I believed to be legally possible and appropriate to arrive at some kind of accommodation with the Select Committee that was legally permissible (e.g. proposing that they take the matter before a judge for resolution of the issues; requesting a brief extension of time to let the executive privilege litigation play out).  At no time did Mr. Bannon nor I intend to defy any Congressional body or default on any legal obligation. The fact that Mr. Bannon did not appear or produce documents pursuant to the subpoena was entirely a function of my legal conclusions and my legal advice and directives to him based on the OLC Opinions and case law concerning his legal rights, duties, and obligations, and the effect the invocation of executive privilege had on the same, prohibiting him, in my studied and expressed legal opinion, from complying with the subpoena.

25. In an attempt to secure a declination from the United States Attorney's
Office for the District of Columbia, I produced all the correspondence
between myself and the Select Committee and voluntarily agreed to meet
with representatives of the United States Attorney's Office to set forth the
reasons behind my legal conclusions. I provided them with the details of
some of the OLC Opinions and other legal authority on which I relied in
arriving at my legal conclusions and on which Mr. Bannon relied through
my legal advice and direction.

26. I believed and continue to believe that there are other legal deficiencies
with respect to the Select Committee and its authority that also rendered the
subpoena legally unenforceable and prohibit any criminal prosecution of Mr.
Bannon and I have so advised Mr. Bannon and he has continued to rely on
my legal advice in good faith.

27. Following the referral by Congress to the Department of Justice for
consideration of prosecution for criminal contempt, I entered in good-faith
into discussions with the prosecutors assigned to this case in an effort to
demonstrate why a criminal prosecution would be both unlawful and
inappropriate under the circumstances of this matter. I provided them orally
and in writing with my reasons, many of the bases for my legal conclusions,
I specified OLC Opinions that I relied on and that Mr. Bannon had relied on

12

through me, and I repeatedly told the prosecutors that Mr. Bannon has at all

times relied on the OLC opinions and my legal advice in all regards in this

matter and that he did not comply with the subpoena based on my legal

advice and directives to him and his good-faith reliance on the same and on

the binding effect of the OLC Opinions which I went over with him, along

with other legal authority.

28. I was shocked by additional events that have attended this matter. First,

while I thought I was in the middle of good-faith discussions with these

prosecutors, I was simply notified, without advance notice, that they had

obtained an indictment against Mr. Bannon. Secondly, I was shocked to

read that President Biden decided to insert himself in this matter and

publicly called for the criminal prosecution in this case. Third, and most

recently, I was shocked to learn last month that while I believed I was

engaged in good-faith discussions, the prosecutors in this case were secretly

taking steps to obtain my personal and professional telephone and email

records. I have never encountered such conduct in the almost fifty years I

have been practicing law.

29. Finally, I am baffled by the Government's motion. I cannot understand,

especially in a case of this nature, why the Government would want to

prevent the jury in this case from hearing all of the relevant facts and the

13

truth about the reason Mr. Bannon did not comply with the subpoena or why

the Government would fail to acknowledge the appropriateness of a lay

person having to rely on advice of counsel in dealing with technical legal

concepts like executive privilege and committee rules. To prevent Mr.

Bannon from putting on evidence or presenting any argument related to his

good-faith reliance on my advice as his attorney would, by definition, mean

presenting the jury with a false rendition of the actual operative facts.

Moreover, the Government goes well beyond that in its motion and literally

asks the Court to bar Mr. Bannon from putting on any evidence or making

any argument that he acted in good-faith reliance on the law. The idea that a

defendant charged in a criminal case cannot present a defense that he relied

in good faith on the law is absurd beyond words and it is shameful that the

Government would seek such an Order.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the

laws of the United States of America, that the foregoing is true and correct.

Executed on February 25, 2022

New York, New York

/s/ Robert J. Costello

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

## REPLY IN SUPPORT OF
## DEFENDANT'S MOTION TO COMPEL DISCOVERY

Defendant Stephen K. Bannon, through undersigned counsel, respectfully submits this Reply in support of his Motion To Compel Discovery [Doc. 28].[1]

### Summary

The Government hopes that discovery is over.[2] With respect to grand jury materials, the Government argues that additional information sought by the defense should be kept secret. They rely on a general rule, but do not even attempt to dispute that the Protective Order issued in this case alleviates all secrecy concerns. Instead, the Government argues that the defense has not stated a particular need for the documents. This significantly undervalues the four separate bases for additional grand jury discovery, namely: (1) Government transgression of the rules on seeking attorney records; (2) Government misstatements of the law on intent; (3) misleading grand jury testimony on whether Mr. Bannon sought an adjournment; and (4) misleading grand jury testimony

---

[1] On the topic of attorney records, we have filed a separate Defendant's Reply To The Government's Opposition To The Defendant's Motion To Compel Disclosure Of Government Efforts To Obtain Telephone And Email Records of Mr. Bannon's Attorneys. The Government enfolds its opposition to the defense motion on that distinct topic at pages 10 to 15 of its omnibus opposition [Doc. 31].

[2] We attach Exhibit 1, a table that sets forth the positions taken by the Government and defense, in order to assist this Court in tracking the various categories of information at issue.

on what constitutes a valid assertion of executive privilege. Given the Protective Order, secrecy issues do not imbalance the scale. On the other side of the scale, however, are solid facts. Justice requires disclosure.

Moreover, the Government resists any search of U.S. Attorney's Office files – or the files of the White House, Main Justice, or Congress – for documents such as the OLC opinions we have cited that state that a person in Mr. Bannon's position has committed no crime. Although such OLC opinions are offered as sacred texts when they are helpful, here the Government tries to characterize them as water cooler musings. Controlling authority takes a different view. They are binding on the Executive Branch, and thus on the U.S. Attorney's Office. Local Rule 5.1(b) mandates the disclosure of such information to the defense in the circumstances here.

Likewise, the Government ignores Rule 5.1(b) in resisting the defense request that they search beyond the handful of documents given to them by Congress. The Select Committee is not like every other complainant. The statutory framework sets forth the specific steps Members of Congress must take to initiate a Section 192 prosecution. Thus, Congress is part of the "prosecution team" and the files of the people involved are discoverable. Any information found in those files that is inconsistent with Mr. Bannon's guilt as to an element of the offense (such as "willfully makes default"), or any information that casts doubt on the accuracy of evidence to be used by the Government to prove any element of the offense (such as the validity of the subpoena), must be disclosed pursuant to Local R. Crim. P. 5.1(b)(1) and (4).

Finally, the Government tries to recast the defense request for documents that show a politically motivated prosecution under the rubric of "selective prosecution." [Doc. 31, 24 to 28]. There is a high threshold to those discrimination claims. But contrary to the Government's position, the defense has made no "selective prosecution" claim. Thus, the caselaw on "selective

2

prosecution" is inapplicable. At this point, we have not asserted a defense of selective prosecution. Rather, the authority for our discovery request on this type of information is the local rule. We seek information that – among other things – tends to support any defense theory, and information that casts doubts on the credibility or accuracy of any evidence. *See* Local R. Crim. P. 5.1(b)(3) & (4). *Public statements* by the Select Committee members, the Speaker of the House, the Attorney General of the United States, and the President, all indicate that this is a politically motivated prosecution. Thus, it is not unreasonable for the defense to ask whether their *private statements* are along the same lines. If so, they are discoverable.

## The Protective Order Will Preserve Secrecy
## If Grand Jury Instructions And Argument Are Disclosed

The Government's contention that materials generated in the course of the grand jury proceeding should remain secret must be viewed with skepticism. For instance, the Government has refused to provide materials related to its request for records under the Stored Communications Act. What the Government fails to acknowledge, however, is that there is a "presumption of access" to Stored Communications Act materials. *Leopold v. United States*, 964 F.3d 1121, 1130 (D.C. Cir. 2020). Upon examination, the Government's secrecy claims pertaining to other materials are just as specious.

Distilled to their essence, grand jury disclosure cases turn on secrecy. Most are styled *In re Sealed Case* – even the party names are secret because the grand jury is still at work, or because it is a third party seeking disclosure. That is not the case here. Evidence has been presented and the grand jury returned an indictment. What secrecy interest remains? Given that we have a Protective Order in place, none. Secrecy is assured. Here the Government has provided everything but the argument of the AUSA and the legal instructions. This information can be disclosed to the defense,

3

under the terms of the Protective Order, without concerns about grand jury secrecy. A veil is a veil.

Beyond that, the defense has met the standard for disclosure where there is no protective order in place. We articulated the particular needs that we have for the information. What is a particularized need? It is shorthand for a stated reason that outweighs the general rule of secrecy. The defense has set forth its particular needs, any of which would be sufficient for disclosure of the instructions and AUSA argument, as follows:

- The Government improperly abused the grand jury process to obtain telephone and email records of Mr. Bannon's attorney, in violation of Mr. Bannon's 6th Amendment rights, Mr. Costello's privacy rights, the 6th Amendments right of Mr. Costello's other clients, and the privacy rights of other "Robert Costellos" who had that name, but were not Mr. Bannon's attorney;[3]

- The Government has taken the position that "willfully makes default" means "received a subpoena and did not appear" – which misstates the law;

- The Government presented misleading evidence to the grand jury about whether Mr. Bannon sought an adjournment, a key point to be considered in determining whether Mr. Bannon "willfully ma[de] default"; and

- The Government presented misleading evidence on what constitutes a valid assertion of executive privilege.

Given these particularized facts, disclosure of additional grand jury information – pursuant to the Protective Order – is warranted.[4]

### Documents Showing That Mr. Bannon
### Committed No Crime Must Be Disclosed

---

[3] As to the Government's actions to obtain Mr. Costello's records, and secure his unwitting participation in an FBI interview, we note that never in our collective experience have we seen so many lines crossed, so many rights trampled, so much smoke blown – all in the vain hope of obtaining information that at its best would be of the slightest evidentiary value.

[4] Even if this Court disagrees with our position on disclosure to the defense, we respectfully request that the Court conduct an *in camera* inspection of the AUSA argument to and instructions to the grand jury, to determine what steps are warranted under applicable law.

4

In our motion we quote several public documents where the U.S. Department of Justice informed the world that a person in Mr. Bannon's position has not committed a crime. The Government was aware of these documents before seeking an indictment, because Mr. Costello provided them as authority in seeking a declination. We also believe that many other similar documents exist in the Government's files. But the Government does not want to search for, much less turn over, these documents. The Government makes three arguments in support of its position that it need not turn over additional documents containing such information. The Governments argues that: (1) "reliance on the law is not a defense" [Doc. 31 at 9]; (2) even if reliance on the law was a defense, any documents in the Government's possession do not reflect what was in Mr. Bannon's mind [*id*.]; and (3) the Government is "aware of" no such documents within its files [*id*. at 10]. These arguments are without merit.

We address the first argument in our response to the Government's motion on advice of counsel and thus do not repeat it in full here. [Doc. 30] Suffice to say that if the Government loses on its gamble that a 60-year-old opinion based on over-ruled caselaw is still viable, then the Government must go back to the beginning and conduct a review of its files, and the files of the White House, Congress, and Main Justice, with a reformed view of what is discoverable.

The Government's second argument is also misplaced. First, contrary to the Government's position, information is discoverable even if it would not be deemed "relevant" at trial.[5] *See United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (documents not directly related to guilt or innocence are discoverable – they may lead to admissible evidence, aid in witness preparation, corroborate testimony, *etc*.). Second, *mens rea* is not the sole issue in the case. The evidence will not be limited to exactly what was in Mr. Bannon's mind at the time he sought and relied upon

---

[5] The Government's caselaw involving the relevance of trial evidence is inapposite. [Doc. 31 at 9] citing *United States v. Libby*, 475 F. Supp. 2d 73 (D.D.C. 2007) and *United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009).

5

Mr. Costello's advice and the OLC's pronouncements in responding to the subpoena. The evidence will also include information that bears upon what it means to make a "default" after receiving a subpoena. Thus, any documents that discuss that issue – whether they bear upon whether someone in Mr. Bannon's position has committed a crime, or speak to whether the subpoena here was invalid – are discoverable. They tend to undermine the notion that Mr. Bannon's actions constituted "default."

Any document that supports the position that a former presidential advisor need not provide documents or testimony when the President they served has asserted executive privilege *tends to negate* Mr. Bannon's guilt as to the element of "default." This information *is inconsistent with* guilt. The local rules mandate disclosure of such information. Rule Crim. P. 5.1(b)(1) (information "to be disclosed" includes "[i]nformation that is *inconsistent with* or *tends to negate* the defendant's guilt as to any element . . . of the offense(s) with which the defendant is charged") (emphasis added).

Another basis for disclosure is Local Rule of Crim. P. 5.1(b)(3), which mandates disclosure of "[i]nformation that tends to establish an articulated and legally cognizable defense theory." We articulated several legally cognizable defense theories in our opposition [Doc. 30] to the Government's motion in limine on advice of counsel. Such defenses include public authority theories, including entrapment by estoppel. Any government document that supports the position that a former presidential advisor need not provide documents or testimony when the President they served has asserted executive privilege tends to establish an articulated and legally cognizable defense theory. Specifically, it would support the defense theory that Mr. Bannon has not committed a crime given that the Department of Justice has for decades, across administrations

6

-378-

representing both major political parties, announced that a person in his position is legally justified
in acting as he did.

The Government takes a very narrow view of its obligations and suggests that only a
document that sets out the precise factual scenario here could conceivably be discoverable. If the
Government's position was correct, then they would have no obligation to turn over to the defense
a government document that reads as follows:

> *A former presidential advisor who withholds documents and testimony from a*
> *congressional committee because the President they served has asserted executive*
> *privilege has not committed a crime.*

Withholding such a document does not seem just. Conduct cannot be deemed criminal just because
a prior official pronouncement does not explicitly state every factual detail of the case in question.
Reading authority in concert provides guidance about what the law is. As applicable here, OLC
opinions and U.S. Attorney's Office documents, when read together, make clear that Mr. Bannon
acted lawfully. *See, e.g.,* [Doc. 20, Ex. 10 at 6] ("we will not prosecute an Executive Branch official
under the contempt of Congress statute for withholding subpoenaed documents pursuant to a
presidential assertion of executive privilege"); [Doc. 20, Ex. 11 at 129] ("the contempt of Congress
statute does not apply to executive officials who assert Presidential claims of executive privilege").
Under the local rules, a document containing the italicized sentence above is discoverable. *See*
Local Rule of Crim. P. 5.1(b)(1) (inconsistent with or tends to negate the defendant's guilt as to
any element) and 5.1(b)(3) (tends to establish an articulated and legally cognizable defense).

In passing, the Government suggests that it is aware of no document that supports Mr.
Bannon's claim that official DOJ opinions hold that he has committed no crime. [Doc. 31 at 10].
Obviously, the Government has not exerted itself in seeking documents on this topic, since the
defense has found many in the public domain. The Government contends that "the Defendant is

7

simply wrong about what the Government's files contain," since "the Government is aware of no internal opinion or analysis that purports to excuse a private citizen from complying with a congressional subpoena because he used to work in the Executive Branch and a former President informed him of his belief that unidentified materials or information may be 'potentially protected' by privilege." [Doc. 31 at 10]. Public sources – which we have cited – are exactly opposite to the Government's position in this case. In fact, Mr. Costello provided these very OLC opinions to the prosecutors. He hoped to convince the prosecutors not to indict his client. But, unbeknownst to Mr. Costello, his advocacy was foreclosed because the prosecutors deceived Mr. Costello into thinking his communications were being received as arguments of counsel, when in fact the prosecutors were surreptitiously treating him as a witness and a source of information against his client's interests.[6] It would take minimal effort for the Government to send an email to OLC, the White House, and the Office of the General Counsel, U.S. House of Representatives, simply attaching our document requests [Doc. 31, Ex. 1] and asking them to search their files for responsive documents. That the Government does not want to shake the tree suggests a fear of the fruit that will fall.

## Congressional Documents Showing The
## Invalidity Of The Subpoena Must Be Disclosed

The Government contends that the handful of congressional documents it has provided constitute the universe of documents to be considered in this case. We disagree. Congress cannot be permitted to initiate a prosecution under Section 192, *see* 2 U.S.C. § 194, and then unilaterally decide to limit access to documents that would otherwise be available to the defense in any other criminal prosecution. The Select Committee Members, and staff, the Speaker of the House, and

---

[6] The facts are set forth in our separate Reply on that issue, also filed today.

8

the General Counsel of the U.S. House of Representatives, all played a role in initiating this prosecution. Given our requests, their files must be reviewed.

Select Committee staff have selectively withheld key documents. For instance, under the House Rules:

> 11. A witness *shall not be required to testify* unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

[US-000010] (*117th Congress Regulations For Use Of Deposition Authority,* Jan. 4, 2021) (emphasis added). Mr. Bannon never received a copy of section 3(b) of H. Res. 8. [Doc. 28, Ex. 9 at 4] (November 10, 2021, FBI Report of Interview of Kristin Amerling) ("A copy of Section 3(b) was not provided to COSTELLO with the subpoena."). Select Committee Chief Counsel and Deputy Staff Director Kristin Amerling provided Mr. Bannon (though Mr. Costello) with 10 pages of detailed and arcane instructions, including the subpoena. But she did not provide the specific document required by the House Rules before a witness was required to testify. Why? Rule 3(b) provides, in pertinent part, as follows:

> SEC. 3. SEPARATE ORDERS.
>
> (b) Deposition Authority.—
>
> (1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, *upon consultation with the ranking minority member* of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.
>
> (2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

H. Res. 8, *Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes* (emphasis added). This requirement applies to Select Committee depositions. *See* Doc. 28, Ex. 7 at 12 (H. Res. 503, establishing the Select Committee)

9

("Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.")

One could be forgiven for thinking that the reason that Ms. Amerling provided voluminous rules and instructions about the subpoena – but not the one key document required to be provided to a witness under the House rules – was because the withheld document referenced a key witness protection. The protection is that before taking a deposition, the chair of a committee must consult with the ranking minority member. That protection is not available to any Select Committee witness, because the Select Committee has no ranking minority member. [Doc. 28, Ex. 9 at 4].

The omission of this key document – which bears on whether Mr. Bannon committed a crime – provides support for the defense position that we are entitled to more from the files of the Select Committee and its staff than they selectively provided to the U.S. Attorney's Office.

The Government must prove at trial as an element of the offense that the subpoena was issued pursuant to valid authority. This means, among other things, that the rules of the U.S. House of Representatives, and the rules of the Select Committee, were followed. It also involves whether the Select Committee acted within its authority. In addition, valid authority involves the consideration of whether the Select Committee issued a valid subpoena in this case and could seek the testimony of Mr. Bannon without any consultation with a ranking minority member. We have requested, and are entitled to receive, any document that bears upon that issue. Any information that is inconsistent with Mr. Bannon's guilt as to this element, or any information that casts doubt on the accuracy of any evidence to be used by the Government to prove this element, must be disclosed. *See* Local R. Crim. P. 5.1(b)(1) and (4).

10

**Documents Showing Bias or An Improper**
**Purpose In Prosecuting Mr. Bannon Must Be Disclosed**

The Government contends that it need only reveal bias information in time for the defense to use it in the cross-examination of witnesses at trial. [Doc. 31 at 15 -17]. We disagree. The Government's obligations extend beyond *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Under the local rules, the Government must disclose "[i]nformation that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged." Local Rule Crim. P. 5.1(b)(3). It must also disclose "[i]nformation that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial." Local Rule Crim. P. 5.1(b)(4). The Government has not even attempted to explain how it could comply with those directives, yet not search for and disclose information that tends to show that Members and staff of the Select Committee were biased against him, or that they responded to political pressure in initiating this prosecution.

In the unusual statutory framework here, Congress initiated the prosecution. *See* 2 U.S.C. § 194. The evidence relied upon by the Government in obtaining the indictment was limited to the subpoena, and emails back and forth between Mr. Bannon's lawyer and counsel for the Select Committee (who sometimes included letters that on their face appear to be from the Chair of the Committee). If any of that "evidence" was influenced by a person's political bias against Mr. Bannon, we are entitled to information that tends to show that bias. *See* Local R. Crim. P. 5.1(b)(3) (tends to establish a defense theory) and (b)(4) (casts doubts on the credibility or accuracy of any evidence). The same is true of documents that reflect an improper, politically motivated purpose in prosecuting Mr. Bannon. *Id.*

11

**-383-**

While the Government devotes several pages to caselaw pertaining to selective prosecution, [Doc. 31 at 24 -28], that discussion misses the mark. Mr. Bannon has not, at this stage, raised a selective prosecution defense. There is no mention of that legal theory in our motion to compel. The authority that the Government discusses in the selective prosecution context – pertaining to discriminatory effect and discriminatory intent – simply are not applicable at this stage of discovery given that we are seeking information based upon different authority, for different purposes. Under Local R. Crim. P. 5.1(b)(3) & (b)(4) the Government must search for and disclose any information that tends to show that the prosecution was politically motivated or initiated or pursued by any person who was biased against Mr. Bannon.

## CONCLUSION

Wherefore, for the reasons set forth above, Mr. Stephen K. Bannon respectfully requests an Order compelling the Government to produce the requested discovery materials so that he may prepare a defense.

Dated: March 8, 2022                    Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

12

____/s/ Robert J. Costello_____
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

13

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of March 2022, a copy of the foregoing REPLY

IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL DISCOVERY was served *via* the

Court's CM/ECF system on registered parties and counsel.


                                 /s/ M. Evan Corcoran
                                 M. Evan Corcoran (D.C. Bar No. 440027)

14

Case 1:21-cr-00670-CJN   Document 33-1   Filed 03/08/22   Page 1 of 5

# EXHIBIT 1

| Discovery | Government | Defense | Resolution |
|---|---|---|---|
| Grand jury witness testimony, exhibits, and records obtained *via* subpoena. | All have been provided. [Doc. 31 at 18] | If provided, no further action needed. | |
| Grand jury subpoenas, Stored Communications Act materials, and requests supporting issuance. [Doc. 28 at 9] | Grand jury secrecy outweighs defendant's need. [Doc. 31 at 18-24] | Some documents are discoverable without regard to Fed. R. Crim P. 6(e). There is a "presumption of access" to Stored Communications Act materials. *Leopold v. United States*, 964 F.3d 1121, 1130 (D.C. Cir. 2020). For other documents, even if secrecy interests are considered, the Protective Order will preserve secrecy. Particularized need is established because Government did not seek USDOJ approval when subpoenaing attorney records. | |
| Grand jury instructions and statements by AUSA. | Defense has not shown particularized need, just "mere conjecture". [Doc. 31 at 24] | Protective Order will preserve secrecy. Defense has articulated particular reasons justifying need: (1) Government has misstated law on "willfully makes default" in its advice of counsel motion and in open court, and likely did so before the grand jury; | |

2

-388-

| | | | |
|---|---|---|---|
| | | (2) Government presented evidence to the grand jury to the effect that Mr. Bannon did not seek adjournment, when he did (bears on "willfully makes default"); and (3) Government presented evidence to the grand jury to the effect that executive privilege can only be asserted *via* a direct communication from a President, which is not the law (bears on "willfully makes default"). If not cured through instructions that accurately stated the law, each of these particular facts would be grounds for dismissal of the indictment. | |
| OLC Opinions And Similar Documents Suggesting That Mr. Bannon Committed No Crime | Not discoverable because: (1) reliance on the law is not a defense; (2) documents do not reflect what was in Mr. Bannon's mind; and (3) as a former federal employee, such documents do not apply to Mr. Bannon. [Doc. 31 at 8 – 10] | OLC opinions and similar documents – which pertain to current *and* former presidential advisors – negate guilt as to "willfulness," tend to support established defenses, and cast doubt on government evidence. Thus, they *must* be disclosed under the explicit requirements of Local R. Crim. P. 5.1(b). | |
| Documents Showing That Subpoena Was Invalid | All documents obtained from Congress so far have been provided. Select | It is an element of the offense that the subpoena be lawfully authorized, in | |

3

-389-

| | Committee files beyond what they provided are off-limits as outside our control. Select Committee Members and staff are just complainants. [Doc. 31 at 17] | accordance with the rules of the House of Representatives, so any information that is inconsistent with Mr. Bannon's guilt as to this element, or any information that casts doubt on the accuracy of any evidence, must be disclosed pursuant to Local R. Crim. P. 5.1(b)(1) and (4). In addition, Select Committee members and staff are not mere complainants – they set in motion the criminal prosecution in a way that ordinary witnesses cannot. *See* 2 U.S.C. § 194 (committee reports "facts" – after vote it "shall" be the duty of the Speaker to certify and "shall" be the duty of the U.S. Attorney "to bring the matter before the grand jury." Thus, the Select Committee cannot limit the "data set" available for preparing a defense to criminal charges. | |
| Documents Reflecting Bias Against Mr. Bannon | We will provide bias information only for Government trial witnesses. [Doc. 31 at 15 to 17] | *See* above. The local rule mandates disclosure of information that is inconsistent with guilt, supports a defense theory, or casts doubts on the credibility or | |

4

| | | | |
|---|---|---|---|
| | | accuracy of any evidence (not just Government witness testimony). Just providing *Giglio* information for trial witnesses does not meet the Government's obligation. | |
| Documents Reflecting An Improper Purpose In Prosecuting Mr. Bannon | Defendant has not met its burden to obtain selective prosecution discovery. [Doc. 31 at 28]. | We are not seeking discovery under the theory of selective prosecution at this stage. Instead, we seek all information that suggests that *political considerations* played an impermissible role in this prosecution. The Government must disclose such information pursuant to Local R. Crim. P. 5.1(b)(3) (tends to establish a defense theory) and (4) (casts doubts on the credibility or accuracy of any evidence). | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION IN LIMINE
TO EXCLUDE EVIDENCE OR ARGUMENT RELATING TO
GOOD-FAITH RELIANCE ON LAW OR ADVICE OF COUNSEL**

It is a settled question that reliance on the law and advice of counsel provide no defense to

contempt of Congress, and longstanding and controlling Supreme Court and Circuit precedent

establish that neither is available to a defendant who deliberately refuses to comply with a valid

congressional subpoena. Having chosen to ignore a congressional subpoena that required him to

produce documents and appear for testimony, the Defendant, Stephen K. Bannon, cannot change

binding law now that he is facing the consequences of his decision. The Government's motion to

exclude evidence or argument related to these defenses should be granted.

**I.    The Defendant's Incomplete Factual Recitation Attempts to Conceal His Bad Faith.**

The facts underlying the Defendant's contemptuous conduct are immaterial to the legal

question of whether a good faith defense is available to him. But the inaccurate recitation of facts

in the Defendant's opposition requires the Government to correct the record and make clear that,

regardless of what the law may require, the Defendant and his attorney, Robert J. Costello, pursued

a bad-faith strategy of total noncompliance with a valid congressional subpoena.

On September 23, 2021, the Select Committee to Investigate the January 6th Attack on the

United States Capitol ("the Committee") issued a subpoena to the Defendant for documents and

testimony. Indictment, ECF No. 1, ¶ 7. The Defendant's inaccurate recitation of facts begins here.

The Defendant suggests that the Committee did not properly serve the subpoena. ECF No. 30 at 5 ("Despite not having received acceptance of service, Ms. Amerling sent an attachment to the email that included a 'Proof of Service' which stated that she had 'Served' the subpoena on '9/23/21' and the 'Manner of service" was 'email to attorney for Mr. Bannon, Robert Costello.'"). The email correspondence to which the Defendant refers, but does not attach to his pleading, instead shows that the Committee asked Mr. Costello, as the Defendant's attorney, if he would accept service on the Defendant's behalf and stated that it was attaching the subpoena "in the event" he did. Ex. 1 at US-001038. The Committee by this email did not assume service complete. The next day, September 24, 2021, Mr. Costello confirmed that the Defendant had authorized him to accept service. *Id.*

When he was served with the subpoena, the Defendant was a private citizen; although he had been a White House advisor for seven months at the beginning of former President Donald J. Trump's term, at the time the subpoena issued, he had not been an Executive Branch employee for more than four years. Indictment ¶ 6. And the subpoena sought records and testimony completely unrelated to his time in the White House. The Committee's cover letter to the subpoena explained that it sought information from the Defendant because he had information relevant to January 6, 2021, including that he had been identified as present on January 5 for "an effort to persuade Members of Congress to block the certification of the election" and was quoted as having said that day, "All hell is going to break loose tomorrow." *Id.* ¶ 7.

The subpoena required the Defendant to appear and produce documents to the Committee by 10:00 a.m. on October 7, 2021, and to appear for a deposition before the Committee on October 14, 2021. *Id.* ¶ 8. It also included clear instructions for compliance with the subpoena's demands. *Id.* ¶¶ 10-14. With respect to documents, the subpoena made plain that, if the Defendant could not

2

fully comply with the subpoena's demand by October 7, he should comply to the extent possible and tell the Committee when he could accomplish full compliance; in addition, the subpoena directed that if the Defendant withheld documents for any reason, including a privilege, he should provide a detailed log of such documents to the Committee. *Id.* ¶ 12. Regarding the Defendant's required appearance at a deposition, the Committee provided the House of Representatives' established rules for depositions, which made clear that to assert a privilege, the Defendant had to appear for the deposition and assert the privilege on a question-by-question basis. *Id.* ¶ 14.

The Defendant's next steps after receiving the subpoena are where the Defendant's narrative again leaves out important facts. The Defendant claims that the former President's lawyer, Justin Clark, reached out to Mr. Costello on October 5, 2021, to inform him that the former President was invoking executive privilege. ECF No. 30 at 5. What he does not disclose is that, in the eleven days after accepting service of the subpoena, instead of gathering and reviewing potentially responsive records, Mr. Costello had spent the time searching for an attorney representing former President Trump. *See* Interview of Robert Costello, ECF No. 28-4 at 5; *id.* at 7 ("Costello was not prepared to respond on Bannon's behalf on October 7, 2021. At that time, Costello did not know what Bannon possessed that would have been responsive."). Mr. Costello seemingly did so because he was trying to help the Defendant find a way to avoid compliance with the subpoena; indeed, contrary to what the Defendant suggests to the Court, Mr. Costello told the Government that he believed he may have attempted to contact Clark first and that, when they finally made contact, it was Mr. Costello who may have initiated a discussion of executive privilege. *Id.* at 5, 10. Moreover, although Mr. Costello claims that Clark stated that former President Trump was "invoking executive privilege with respect to the Select Committee's subpoena directed to Mr. Bannon," Costello Decl., ECF No. 30-1, ¶ 10, as outlined below, the

former President never properly did so, and the Defendant and Mr. Costello knew this.

On October 6, 2021, after his phone call with Mr. Costello, Clark sent him a letter, as the Defendant outlines in his opposition. ECF No. 30 at 5. But, as is clear on the face of the letter, nowhere in it did former President Trump assert executive privilege over any document in the Defendant's possession or any testimony the Defendant may be called to provide. *See* Gov't Opp'n to Mot. to Compel, Ex. 2, ECF No. 31-2 (October 6, 2021, Letter from Justin Clark). Nevertheless, the Defendant endeavored over the next eight days to use the letter to refuse compliance, at any level, with the subpoena's demands.

First, the Defendant did not comply in any way with the subpoena's document demand by the 10:00 a.m. deadline on October 7, 2021. Indictment ¶ 15. The Defendant did not reach out to the Committee to discuss the subpoena, request an extension, or provide a log of withheld records. *Id.* In fact, by the due date, the Defendant had taken no steps to determine what responsive materials he may possess. *See* ECF No. 28-4 at 7. Instead, seven hours after the Defendant willfully defaulted on the subpoena's document demands, Mr. Costello sent a letter to the Committee claiming the Defendant would not comply with the subpoena because of the October 6, 2021, letter from Clark. Indictment ¶ 16. The Defendant did this, despite Mr. Costello having identified categories of information they understood could not possibly implicate executive privilege, *see* ECF No. 28-4 at 4, 6, 9—another fact the Defendant omits from his narrative.

The following day, on October 8, 2021, the Committee Chair responded to Mr. Costello's letter. Indictment ¶ 17. In particular, the Committee Chair's letter noted that the former President had not actually asserted executive privilege; that, in any event, most of the documents and testimony the Committee sought from the Defendant were not possibly covered by executive privilege; that the Defendant was required to provide non-privileged documents and a log of

withheld records; and reiterated the subpoena's requirement that the Defendant appear for his October 14 deposition and raise any privilege assertions in-person before the Committee. *Id.* Finally, the Committee Chair warned the Defendant that continued willful noncompliance with the subpoena could subject him to criminal prosecution. *Id.*

For several days, the Defendant did not respond to the Committee. On October 12, 2021, a Committee Senior Investigative Counsel ("Committee Counsel") reached out to Mr. Costello by telephone to determine whether the Defendant would appear as required on October 14 so the Committee could make logistical preparations. Ex. 2 at US-000360 (Interview Report, Committee Counsel). Mr. Costello responded that the Defendant was unlikely to appear and that he would send a letter to the Committee the following day. *Id.* Committee Counsel contacted Mr. Costello by email the next day, October 13, at 12:35 p.m., asking again about the Defendant's deposition. Ex. 3 (October 13, 2021, Email from Committee Counsel). At the same time, and seemingly for the first time, with the deadline looming, Mr. Costello sent an email to Clark attaching the Committee Chair's October 8 letter rejecting the Defendant's pretenses for refusing to comply with the subpoena, and writing to Clark, in part:

> Apparently they do not recognize your letter to the subpoena recipients as an invocation of executive and other privileges. I would strongly suggest that a direct communication from you on behalf of President Trump would clarify the President's position with respect to the document request and the deposition requests.

Ex. 4 at US-000999 (October 13, 2021, Email from Costello). This was not Mr. Costello's only recognition that the former President had not actually invoked executive privilege. As he told the Government, over the course of the Defendant's dealings with the Committee, Mr. Costello reached out to Clark several times to try to have the former President make a direct invocation, but Clark refused. ECF No. 28-4 at 7-8, 9.

After sending the email to Clark, Mr. Costello called Committee Counsel and informed

him that the Defendant would not appear for a deposition the following day. Ex. 5 at US-000390

(October 13, 2021, Email from Committee Counsel). The Defendant claims that Mr. Costello

informed Committee Counsel in a call on October 13 that the Defendant could not appear if former

President Trump's counsel were not allowed by the Committee to appear. ECF No. 30 at 7. But

this suggestion that he made former President Trump's counsel's appearance a condition of

compliance conflicts with Mr. Costello's statements to the Government and contemporaneous

evidence. In his interviews with the Government, Mr. Costello stated that, on the call, he told

Committee Counsel only that he noticed the Committee's rules barred attorneys other than the

witness's from attending the deposition, and Mr. Costello conceded that he did not ask Committee

Counsel to change the rules because he noted that Committee Counsel was not in a position to do

so. ECF No. 28-4 at 6. This aligns with an email Committee Counsel sent the same day recounting

the conversation and noting that Mr. Costello inquired—but said that he did not need an immediate

answer—whether there was a way for a lawyer for former President Trump to appear at the

Defendant's deposition. Ex. 5 at US-000389. Never did the Defendant raise the attorney rules as

an objection to the Committee. ECF No. 28-4 at 6. And, as Mr. Costello told the Government,

but does not tell the Court, never did he ask Clark if counsel for former President Trump wanted

to attend. ECF No. 28-4 at 10.

After his calls with Committee Counsel on October 13, 2021, at 5:19 that evening, Mr.

Costello sent a letter to the Committee Chair reiterating that the Defendant would refuse to produce

documents or appear for a deposition until "such time as you reach an agreement with President

Trump or receive a court ruling as to the extent, scope and application of the executive privilege."

Indictment ¶ 18.

As the Defendant recounts in his opposition, on the morning of October 14, 2021, the

Defendant failed to appear for a deposition as required by the subpoena. ECF No. 30 at 8;

Indictment ¶ 19. He omits from his retelling, however, that, while he was using Clark's October

6 letter as an excuse for total noncompliance, the former President's lawyer was admonishing that

the Defendant not do so. On the afternoon of the Defendant's default, on October 14, Clark sent

an email to Mr. Costello suggesting that Mr. Costello had misrepresented Clark's position to the

Committee in his October 13 letter, writing in part:

> I just read your letter dated October 13, 2021 to Congressman Benny [sic]
> Thompson. In that letter you stated that '[a]s recently as today, counsel for
> President Trump, Justin Clark Esq., informed us that President Trump is exercising
> his executive privilege; therefore, he has directed Mr. Bannon not to produce
> documents or testify until the issue of executive privilege is resolved.'
>
> To be clear, in our conversation yesterday I simply reiterated the instruction from
> my letter to you dated October 6, 2021, and attached below.

Ex. 6 at US-000987-88 (October 14, 2021, Costello Email Chain). Almost immediately, Mr.

Costello forwarded Clark's message to the Defendant, writing:

> This is not accurate. He definitely stated that Trump was invoking the executive
> privilege.... I also told him to not leave anyone guessing he should send an email
> to the House stating Trump's invocation of executive privilege. I don't know what
> game Clark is playing but it puts Steve Bannon in a dangerous position. Beware."

*Id.* at US-000987 As Mr. Costello told the Government, he said, "Beware," "to warn Bannon his

failure to comply could result in a referral to DOJ." ECF No. 28-4 at 13. Mr. Costello took no

steps, however, to contact the Committee and correct the representations he had made regarding

Clark's directions. And despite his counsel's warning, the Defendant took no steps to comply with

the Committee's subpoena.

On October 15, 2021, the Committee Chair sent a letter advising the Defendant that the

Committee would meet on October 19 to consider initiating contempt proceedings and directed

the Defendant to raise any issues regarding his noncompliance for the Committee's consideration

by 6:00 p.m. on October 18. Indictment ¶ 20.

On October 16, 2021, Clark again advised Mr. Costello that Mr. Costello was

misrepresenting former President Trump's position to the Committee—particularly with respect

to the Defendant's decision not to appear for his deposition—writing:

> Just to reiterate, our letter referenced below [the October 6 letter from Clark to Mr.
> Costello] didn't indicate that we believe there is immunity from testimony for your
> client. As I indicated to you the other day, we don't believe there is. Now, you
> may have made a different determination. That is entirely your call. But as I also
> indicated the other day other avenues to invoke the privilege - if you believe it to
> be appropriate - exist and are your responsibility. If you haven't already I'd
> encourage you again to contact counsel for the committee to discuss it further.

Ex. 7 at US-000985 (October 14-18, 2021, Costello and Clark Email Exchange). Still the

Defendant did not comply with the subpoena. Instead, two days later, Mr. Costello asserted to

Clark, without support, that "President Trump's invocation of those privileges absolutely limits

Mr. Bannon's ability to testify before Congress and provide documents." *Id.* at US-000984. This,

despite Mr. Costello's acknowledgment to the Government that it was the former President, not

Mr. Costello and the Defendant, who delineated the outlines of any claim of executive privilege

the former President may assert. ECF No. 28-4 at 4 ("Costello did not know who or what was

covered under Executive Privilege but that decision was up to former President Trump and the

courts."). Mr. Costello also again asked Clark to confirm to the Committee that former President

Trump was asserting privileges. Ex. 7 at US-000984. Clark never did. Incredibly, even in light

of Clark's messages, and the opportunity the Committee had offered to the Defendant to cure his

complete noncompliance with the subpoena, the Defendant still took no steps to comply.

The Defendant's recitation of his supposed good-faith defense is irrelevant to the merits of

the Government's motion because it is a matter of law, not fact, that bars good faith as a defense.

But there is no doubt that, as a factual matter, the Defendant lacks one in any event—the record above is littered with bad faith. The Defendant's attempt to suggest his is a sympathetic case that warrants ignoring controlling law is therefore particularly unavailing. The Court, however, need not reach those factual issues for the purposes of the Government's motion, because, whether asserted in good or bad faith, the Defendant's reliance on his and his counsel's opinions of the law are not available as a defense to contempt of Congress.

II.     **The Defendant's Claims that a Good-Faith Defense is Available for Contempt of Congress are Meritless.**

The Defendant wishes to raise a defense that he believed, based on his attorney's advice, that the Committee and its subpoena were unlawful and therefore he was excused from compliance with the subpoena's demands. By this defense, the Defendant concedes that he made an intentional, deliberate decision not to appear or produce a single record. He did not fail to appear because he mistakenly thought he was to appear on a different day. He did not fail to produce records because he mistakenly believed that the Committee had given him an extension. He failed to appear or produce records because he made an intentional decision to do so. Having now admitted that he had the requisite intent under the law to commit the offense, he searches for any way out. But the law is the law. The Supreme Court has long made clear that Congress's authority to conduct investigations is not subject to the legal and political machinations of its witnesses. If it were, Congress would have no authority at all. Accordingly, the Supreme Court's and this Circuit's controlling precedents clearly establish that an intentional refusal to comply, regardless of the motive, is a contemptuous act subject to criminal sanction.

In support of his attempt to avoid controlling law, the Defendant makes several unavailing arguments. First, he claims that one of this Circuit's controlling precedents, *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), has been invalidated. ECF No. 30 at 13. Second, the

9

**-400-**

Defendant claims that the Government is attempting to make congressional contempt a strict

liability offense and to deny him a defense. *Id.* at 10, 14. Third, the Defendant claims that any

guidance this Court may find in the contempt of Court context must be ignored. *Id.* at 22-24. To

make his arguments, the Defendant misapplies and ignores applicable legal principles. His claims

must be rejected and the Government's motion to exclude evidence or argument relating to good-

faith reliance on the law and advice of counsel must be granted.

### A.     *Licavoli* Remains the Controlling Law of this Circuit.

In *Licavoli*, the D.C. Circuit held that advice of counsel is not a defense for a defendant

who "willfully makes default." 294 F.2d at 209. The holding is directly on point and controlling

in this case. The Defendant contests this and makes two claims in support of his position. First,

he claims that *Licavoli*'s holding is based on a prior Supreme Court holding in *Sinclair v. United

States*, 279 U.S. 263 (1929), that since has been overturned. ECF No. 30 at 13. Second, he claims

that the Supreme Court has, since *Licavoli*, "provided clarity" on the meaning of willfulness that

has invalidated any meaning requiring less than a defendant's knowledge that his conduct was

unlawful. *Id.* The Defendant is wrong on both fronts.

### 1.     The Relevant Holding of *Sinclair* Has Never Been Invalidated.

The Defendant claims that the controlling precedent in *Licavoli* must fall because,

according to him, it relies on the Supreme Court's opinion in *Sinclair*. He is incorrect.

As an initial matter, *Licavoli*'s holding on the meaning of "willfully makes default" is not

based on *Sinclair*. Instead, the D.C. Circuit found that the Supreme Court's decisions in *United

States v. Bryan*, 339 U.S. 323 (1950), and *United States v. Fleischman*, 339 U.S. 349 (1950), had

established that "he who deliberately and intentionally fails to respond to a subpoena 'willfully

makes default.'" 294 F.2d at 208. In *Bryan* (1950),[1] the defendant was summoned by a committee of the U.S. House of Representatives to appear and produce records. 339 U.S. at 324-25. In response, the defendant appeared but refused to produce records because "'after consulting with counsel (she) came to the conclusion that the subpoena was not valid' because the Committee had no constitutional right to demand the books and records." *Id.* at 325. After the defendant was convicted at trial, the Supreme Court found that where the Government introduced evidence "that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default." *Id.* at 330; *see also id.* at 328 ("Respondent does not and cannot, in view of the jury's verdict, contest the finding that she deliberately and intentionally refused to produce the papers called for in the subpoena.").

After finding that, based on *Bryan* (1950) and *Fleischman*, willfulness in the context of congressional contempt meant an intentional and deliberate refusal to comply with a congressional subpoena, the *Licavoli* court found that the intent the Supreme Court required for willful default was the same as that articulated by the Court in *Quinn v. United States*, 349 U.S. 155 (1955), for a refusal to answer pertinent questions when appearing for testimony pursuant to a congressional subpoena. *Licavoli*, 294 F.2d at 208. Having found that the two intent standards were the same, the Court then relied on the Supreme Court's finding in *Sinclair*, a case addressing a refusal to answer questions once the witness had appeared, that advice of counsel was not a defense to that standard. *Id.* at 207, 209. From its review of the relevant Supreme Court cases, the *Licavoli* court ultimately concluded, "[a]ll that is needed in either event is a deliberate intention to do the act.

---

[1] Because there are two Supreme Court cases at issue in this brief titled "*Bryan*," the Government will include the year of the relevant opinion in its short cites to avoid confusion.

Advice of counsel does not immunize that simple intention." *Id.* at 209.

*Bryan* (1950) and *Fleischman* still stand. The Defendant does not argue otherwise. Regardless of the status of *Sinclair*, therefore, *Licavoli*'s conclusion from *Bryan* (1950) and *Fleischman* that "[e]vil motive is not a necessary ingredient of willfulness under this clause of the statute," *id.* at 208, is untouched. Nor does the Defendant explain why two other Circuit precedents deciding the same issue of how willfulness is defined under the statute are no longer controlling. Several years before *Licavoli*, the D.C. Circuit in *Dennis v. United States*, similarly rejected that "to make out a case of wilfulness under the statute it was necessary that the Government be required to allege and prove that the act of refusal shall have been done from a bad purpose or evil motive." 171 F.2d 986, 990 (D.C. Cir. 1948). A year before that, in *Fields v. United States*, the D.C. Circuit affirmed the district court's instruction to the jury that, under Section 192, "[t]he word 'willful' does not mean that the failure or refusal to comply with the order of the committee must necessarily be for an evil or a bad purpose. The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident." 164 F.2d 97, 100 (D.C. Cir. 1947). The Defendant does not address any of these precedents or why *Sinclair*'s status would have any bearing on them. Because they still stand and are controlling law, even without *Sinclair*, therefore, the basis for excluding advice of counsel still exists.

Nevertheless, the relevant holding of *Sinclair*, that advice of counsel is no defense to congressional contempt, has not been overruled. In *Sinclair*, the Supreme Court affirmed the defendant's conviction for refusing to answer a pertinent question posed by a U.S. Senate committee. 279 U.S. at 289-90. In affirming the conviction, the Supreme Court decided several issues, including whether the committee's inquiry had a legislative purpose, *id.* at 291-295;

12

**-403-**

whether a resolution to continue the committee's investigative authority was sufficient to do so where it failed to directly reference the prior resolution, *id.* at 295-96; whether the question posed was pertinent, *id.* at 296-98; whether the question of pertinency was for the judge or jury, *id.* at 298-99; and whether the defendant was entitled to present evidence that he relied in good faith on his counsel's advice not to answer the question, *id.* at 299. The Court decided each of these issues. With respect to whether the judge or jury decides pertinence, the Court held it was a question of law for the court. *Id.* at 298-299. With respect to whether the defendant could present an advice-of-counsel defense, the Court held that he could not because the offense did not involve "moral turpitude" and "intentional violation is sufficient." *Id.* at 299.

In *United States v. Gaudin*, the Supreme Court held that "materiality," as an element of the offense under 18 U.S.C. § 1001, the false statements statute, must be determined by the jury, not the court. 515 U.S. 506, 522-23 (1995). In holding as such, the Court directly addressed and overturned *Sinclair*'s holding that pertinency was a question for the court. *Id.* at 519-21. The Court, however, never overturned *Sinclair*'s other holdings. It did not even reference them. The Defendant nevertheless claims that all of *Sinclair* was invalidated and that all of *Licavoli* therefore falls. His argument misunderstands principles of *stare decisis.*

Courts, including the Supreme Court, recognize that, when the Supreme Court overrules one holding in an opinion, it does not automatically overrule every pronouncement of law therein. *See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005) (citing *Henry v. A.B. Dick Co.*, 224 U.S. 1, 48 (1912) for the proposition that a presumption arises of intent to infringe a patent where an article sold only can be used for the infringing purpose, despite other parts of *Henry* being overruled by the Court in *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518 (1917)); *Avila v. Dailey*, 246 F. Supp. 3d 347, 355 (D.D.C. 2017)

13

**-404-**

(citing *Monroe v. Pape*, 365 U..S. 167 (1961) for the proposition that individual law enforcement officers are subject to suit under 42 U.S.C. § 1983, despite another holding of *Monroe* being overruled by the Supreme Court in *Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658 (1978)). There is no basis, therefore, to conclude that, because *Gaudin* overturned one holding of *Sinclair*, it overturned all of them.

The Defendant selectively quotes from the Court's opinion in *Gaudin* to try to suggest that the Court did, in fact, expressly overrule all of *Sinclair*'s holdings. But when the Defendant's chosen excerpts are read in context, it is clear that the Court did not. For example, the Defendant cites the *Gaudin* Court's statement that "[o]ther reasoning in *Sinclair*, not yet repudiated, we repudiate now," ECF No. 30 at 13 (quoting *Gaudin*, 515 U.S. at 520), as evidence that "[t]he Supreme Court has eviscerated *Sinclair* in no uncertain terms," *id.* What he does not cite, however, is that the "other reasoning" of *Sinclair* the Court repudiates is clearly identified and delineated in the very next sentence through the following paragraph of the opinion, and it relates only to *Sinclair*'s assertion that the question of pertinency is like the question of relevance for the admission of trial evidence and *Sinclair*'s assertion that materiality in perjury cases is a question of law for the court. *Gaudin*, 515 U.S. at 520-21. These two propositions are irrelevant to the issue of intent. Rejecting them, therefore, does nothing to undermine the reasoning behind the *Sinclair* Court's holding that advice of counsel provides no defense to the intent element of contempt of Congress. The Defendant's attempt to twist *Gaudin*'s holding to do so fails.

### 2. *Bryan* (1998) and *Ratzlaf* Do Not Overcome the Controlling Supreme Court and Circuit Precedents.

Without any analysis, the Defendant claims that the Supreme Court's later decisions in *Bryan v. United States*, 524 U.S. 184 (1998), and *Ratzlaf v. United States*, 510 U.S. 135 (1994), control the meaning of "willful" under 18 U.S.C. § 192 and require the Government to prove that

the Defendant knew his conduct was unlawful. ECF No. 30 at 13. According to the Defendant, the opinions represent a "progression over time in the Supreme Court's construction of the word 'willfully,'" and he suggests they therefore invalidate any prior holding that "willful" in the context of congressional contempt means an intentional and deliberate decision. ECF No. 30 at 12. The Defendant's conclusory assertion is incorrect.

To understand why the Defendant's claims about *Bryan*'s (1998) and *Ratzlaf*'s effect are wrong, it is necessary to first review the different standards of willfulness the Supreme Court has recognized through its jurisprudence. The highest standard is that articulated in *Cheek* and *Ratzlaf* for criminal tax and currency structuring offenses, in which a defendant's conduct is "willful" only if the defendant was aware that his conduct violated a specific legal duty. *Cheek v. United States*, 498 U.S. 192, 199-201 (1991) (applying this standard to criminal tax offenses); *Ratzlaf*, 510 U.S. at 149 (requiring the government under structuring statutes to prove that the defendant knew the structuring in which he was engaged was unlawful). In both cases, the Supreme Court's interpretation of "willful" grew from a concern that, without defining it by the heightened standard, the highly regulatory offenses would ensnare innocent conduct. *See Cheek*, 498 U.S. at 199-200 (noting that "[t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws"); *Ratzlaf*, 510 U.S. at 144-45 (expressing concern for individuals who structure transactions for reasons other than avoiding the relevant reporting requirement).

The next level of "willfulness" is that articulated in *Bryan* (1998). In *Bryan* (1998), the Court held that to "willfully" violate a statute barring the unlicensed sale of firearms, a defendant had to know his conduct generally was unlawful, even if he did not know the specific law he was violating. 524 U.S. at 193-96.

Finally, the Supreme Court has interpreted "willful" to require only general intent in line with the traditional rule that ignorance of the law is no defense.  In *Bryan* (1950), as discussed above, the Court found that willful default had been shown where the Defendant "intentionally failed to comply." 339 U.S. at 330.  As another example, in *Browder v. United States*, the Supreme Court held that "willfully and knowingly" in the context of a statute prohibiting "willfully and knowingly" using a passport obtained by false statements meant "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent." 312 U.S. 335, 341 (1941). The Court further cited its earlier opinion in *United States v. Murdock*, 290 U.S. 389 (1933), which the Defendant also cites, ECF No. 30 at 11, for the proposition that "the word 'willful' often denotes an intentional as distinguished from an accidental act.  Once the basic wrong under this passport statute is completed, that is the security of a passport by a false statement, any intentional use of that passport in travel is punishable," *id.* at 342; *see also United States v. George*, 386 F.3d 383, 388-89 (2d Cir. 2004) (Sotomayor, J.) (applying *Browder*'s definition of "willfully and knowingly" to find that another provision of the same statute similarly did not require proof that the defendant knew his conduct was unlawful); *United States v. Aifang Ye*, 808 F.3d 395, 399 & n.2 (9th Cir. 2015) (same).

In neither *Cheek*, *Ratzlaf*, nor *Bryan* (1998) did the Supreme Court purport to re-define "willful" as it may have been interpreted in contexts other than those under the statutes at issue in those cases.  As the Court recognized in *Bryan* (1998), "[t]he word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan*, 524 U.S. at 191 (citation omitted).  Further, the Court noted that it was only "typically" that "willful" in the criminal law referred to a culpable state of mind.  *Id.*  "Typically" is not "always." *See Cheek*, 498 U.S. at 208-09 (Scalia, J., concurring) ("One may say, as the law

16
**-407-**

does in many contexts, that 'willfully' refers to consciousness of the act but not to consciousness

that the act is unlawful.""). Indeed, several courts after *Cheek*, *Ratzlaf*, and *Bryan* (1998), including

the D.C. Circuit, have applied the lowest standard of "willful" described above in various contexts,

recognizing that the Supreme Court did not purport to eliminate the word's various meanings. *See,

e.g.*, *George*, 386 F.3d at 390-96; *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002) (finding

that "willfully" in a statute prohibiting "willfully injur[ing]" federal government property, 18

U.S.C. §§ 1361, 1362, required proof only that the defendants acted deliberately, not that they

knew the act was unlawful, and rejecting that advice of counsel was a defense); *United States v.

Hsia*, 176 F.3d 517, 521-22 (D.C. Cir. 1999) (finding that "willfully" under 18 U.S.C. § 2(b),

which imposes criminal liability as a principal on "[w]hoever willfully causes an act to be done

which if directly performed by him or another would be an offense against the United States," did

not require that the defendant knew her conduct was unlawful); *United States v. Georgopoulos*,

149 F.3d 169, 171-72 (2d Cir. 1998) (per curiam) (holding that 29 U.S.C. § 186(d)(2), which

imposes criminal penalties on anyone who "willfully violates" a statute prohibiting certain

payments to union officials, did not require the government to prove that "appellants had acted

with bad purpose and with knowledge that their conduct was unlawful" but merely required a

showing of general intent); *cf. United States v. Danielczyk*, 917 F. Supp. 2d 573, 576-77 (E.D. Va.

2013) (reviewing the three standards of willfulness).

The Defendant cites two cases from this Circuit, *Burden* and *Zeese*, as evidence that courts

here have read *Cheek*, *Ratzlaf*, and *Bryan* (1998) to eliminate other meanings of "willful." ECF

No. 30 at 13. The cases on which the Defendant relies do not support such a claim. In *Zeese*, the

district court recognized that, with respect to "willfulness," "[a]s the Supreme Court hinted in

*Bryan*, in some cases, the government may be able to satisfy this element of the offense by relying

on the 'traditional rule that ignorance of the law is no excuse.'" 437 F. Supp. 3d 86, 96 (D.D.C.

2020) (quoting *Bryan*, 524 U.S. at 196). In *Burden*, the D.C. Circuit cited *Bryan*'s (1998) note

that willfulness has many meanings depending on the context and was deciding only the parties'

dispute as to whether *Bryan* (1998) or *Ratzlaf/Cheek* applied to the statute at issue. 934 F.3d 675,

689-90 (D.C. Cir. 2019). The court was not asked to and did not decide whether the spectrum of

willfulness was limited to those two standards.

    In any event, given that *Cheek*, *Ratzlaf*, and *Bryan* (1998) did not directly address the

contempt of Congress statute and did not expressly overrule the Supreme Court's prior precedents

in *Bryan* (1950) or *Fleischman*, to find that it overruled them nevertheless, this Court would have

to conclude that the Supreme Court overruled its prior holdings on willfulness as used in other

statutes—not just in *Bryan* (1950), but also in cases like *Browder*—by implication. The Supreme

Court has made clear, however, that "[w]e do not acknowledge, and we do not hold, that other

courts should conclude our more recent cases have, by implication, overruled an earlier precedent.

We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest

on reasons rejected in some other line of decisions, the Court of Appeals should follow the case

which directly controls, leaving to this Court the prerogative of overruling its own decisions.'"

*Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/American

Express, Inc.*, 490 U.S. 477, 484 (1989)). The D.C. Circuit has followed this direction, refusing

to find on-point Supreme Court precedents overruled even where the Supreme Court itself has

expressed doubts as to its continuing viability in light of later cases. *See, e.g.*, *United States v.

Webb*, 255 F.3d 890, 897-98 (D.C. Cir. 2001) (refusing to reject a Supreme Court precedent that

had not been expressly overruled even where the Supreme Court had expressed skepticism about

the prior holding in a later opinion) (citing *Agostini*, 521 U.S. at 237); *United States v. Weathers,*

186 F.3d 948, 955-57 (D.C. Cir. 1999) (finding the court could not assume that the Supreme Court's discussion of the meaning of "waiver" under Fed. R. Crim. P. 52(b) in one case "redefin[ed] sub silentio the meaning of the word 'waiver'" under Fed. R. Crim. P. 12 and thus overruled a prior Supreme Court precedent regarding waiver under Rule 12 where the later case did not mention the prior precedent or Rule 12). *Bryan* (1950) and *Fleischman* are directly on point, outlining the meaning of "willful default" under Section 192. Under the Supreme Court's direction, they control the meaning of willful in this case.

Aside from requiring this Court to find that the Supreme Court silently overturned its prior precedents, the Defendant's position also would require the Court to ignore binding Circuit precedent in *Licavoli*, *Dennis*, and *Fields* that is directly on point, something it also cannot do. "[D]istrict judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997); *see also Rouse v. Berry*, 848 F. Supp. 2d 4, 10 (D.D.C. 2012) ("The decisions of the D.C. Circuit . . . are binding on the lower courts of this circuit 'unless and until overturned by the court en banc or by Higher Authority.'" (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc)). Neither *Licavoli*, *Dennis*, nor *Fields* has been overturned by the D.C. Circuit or the Supreme Court. Even if this Court were to conclude that *Cheek*, *Ratzlaf*, and *Bryan* (1998) weakened the reasoning of *Licavoli*, *Dennis*, and *Fields*, this Court is still bound by them. As described above, *Bryan* (1998), *Cheek*, and *Ratzlaf* neither address Section 192 nor do they claim to limit other definitions of willfulness such that they are incompatible with this Circuit's precedents on Section 192. Where intervening Supreme Court opinions do not address the specific statute at issue in the lower court matter, district courts do not find the intervening opinion to have overturned controlling circuit precedent that does

19

address the specific statute, even if the intervening Supreme Court opinion casts doubt on the

circuit's prior holding. *See Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018) ("[L]ower

courts . . . , out of respect for the great doctrine of *stare decisis*, are ordinarily reluctant to conclude

that a higher court precedent has been overruled by implication." (quoting *Levine v. Heffernan*,

864 F.2d 457, 461 (7th Cir. 1988)) (citing *Agostini*, 521 U.S. at 207)); *Mdewakanton Sioux Indians*

*of Minnesota v. Zinke*, 264 F. Supp. 3d 116, 130 n.21 (D.D.C. 2017) ("However, because the D.C.

Circuit has not yet addressed the application of [a more recent Supreme Court opinion] to §

2401(a), this Court continues to follow the D.C. Circuit's prior conclusion until the D.C. Circuit

addresses it in the first instance."); *In re Chaplaincy*, 2016 WL 541126, at *3 (D.D.C. Feb. 9,

2016) (finding the district court remained bound by circuit precedent where it spoke clearly on the

direct issue at hand even where a Supreme Court opinion addressing a similar provision held

otherwise and the Circuit had "recently questioned the continuing viability" of its prior holding)

(citations omitted). Even to the extent the Defendant may believe *Bryan* (1998), *Ratzlaf*, or *Cheek*

calls the controlling precedents into doubt, therefore, that is not a sufficient basis to ignore them.[2]

---

[2] Even if the intermediate level of willfulness applied and the Government had to prove
that the Defendant knew his refusal to comply with the subpoena was unlawful, the advice-of-
counsel defense the Defendant proffered in his opposition still would not be available to him
because it consists solely of advice that the underlying legal duty—the subpoena's demands—was
legally invalid. *See, e.g.*, ECF No. 30 at 16, 18, 19; ECF No. 30-1 at ¶¶ 12, 18, 26. A good-faith
belief, whether by advice or otherwise, that a legal duty is invalid is not a defense to willfulness.
*See Cheek*, 498 U.S. at 204-06 (rejecting defendant's claim that he should be acquitted because
"he believed in good faith that the income tax law is unconstitutional as applied to him and thus
could not legally impose any duty upon him of which he should have been aware," because the
beliefs "do not arise from innocent mistakes caused by the complexity of the Internal Revenue
Code. Rather, they reveal full knowledge of the provisions at issue and a studied conclusion,
however wrong, that those provisions are invalid and unenforceable."); *Zeese* 437 F. Supp. 3d at
100 ("[T]o negate willfulness, a defense must suggest that defendants were unaware that their
conduct was unlawful. A defendant's claim that the applicable legal duties are invalid, however,
suggests that the defendant knew about the legal duties, thought about the legal duties, and formed
an opinion about those legal duties. Considered disagreement with a legal duty embodied in the

*Bryan* (1950), *Fleischman*, *Licavoli*, *Dennis*, and *Fields* have direct application in this case—they define "willful" as the term is used in Section 192 and they delineate available defenses. Their holdings are clear in their application to this matter and must be followed.

**B.    "Willful Default" as Defined by Controlling Supreme Court and Circuit Precedent Does not Create a Strict Liability Offense or Bar the Defendant From Raising Legal Defenses.**

The Defendant, likely recognizing the legal infirmity of his assertions that the Court should ignore controlling precedent, resorts to hyperbole—arguing that defining "willfulness" as a deliberate and intentional refusal to comply makes contempt of Congress a "strict liability" offense and denies him his right to put on a defense. *E.g.*, ECF No. 30 at 3, 10, 14. The Defendant misunderstands the meaning of "willful" and the scope of his right to present evidence at trial.

As *Licavoli* made clear, "willfully" under Section 192 divides innocent default—a failure to appear or produce records due to, "e.g., illness, travel trouble, misunderstanding, etc."—from criminal default—a failure to comply due to a deliberate decision to defy the demands of a congressional subpoena. 294 F.2d at 208. In both circumstances, a defendant may know he is not appearing or producing records as required. What divides them, however, is whether his failure to do so was the result of accident or deliberate choice. Without "willfully" in the statute, any default, for any reason, would be subject to prosecution. Of course, then, the Defendant may justifiably be concerned that innocent conduct may be captured by the statute. But the Supreme Court has made clear that deliberate defiance of a congressional subpoena is inherently not innocent conduct, because a summoned witness is not the arbiter of congressional authority. *Quinn*, 349 U.S. at 165-66. The definition of "willful" articulated by the controlling cases thus

---

criminal law is not a defense to a charged criminal violation, even where the *mens rea* of the offense is willfulness.").

marks the appropriate dividing line and allows a defense where failure to comply is for reasons out of a defendant's control.

The Defendant further claims that controlling precedents on the meaning of "willful" must be ignored because it denies him a defense. ECF No. 30 at 10 ("Now, the Government essentially asks this Court to rule that Mr. Bannon cannot put on a defense."); *id.* at 14 ("Mr. Bannon should be afforded wide latitude to submit his defense to the jury."); *id.* at 22 ("He must be allowed to present evidence that supports any other defense based on his good-faith reliance on the law."). He is wrong.

As an initial matter, the Defendant confuses legal defenses and factual defenses. The Defendant is not barred from challenging the indictment before this Court on the basis that the subpoena or the Committee's exercise of authority was unconstitutional or unlawful. He certainly can do that at the motion-to-dismiss stage of this case. And it is well-established that contempt of Congress charges cannot stand if Congress exceeds its legislative authority or encroaches on the constitutional rights of its witnesses. *See Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959) ("The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution. Broad as it is, the power is not, however, without limitations. . . . [T]he Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action."). Such defenses are no different from those raising challenges to criminal charges on other constitutional grounds, such as vagueness or arguments that a statute's application in a particular case violates a defendant's First Amendment rights. But they are constitutional attacks raising questions of law for the court, not issues going to the essential elements of the offense for the jury to decide. *See Gaudin*, 515 U.S. at 513 (question of law are for the court).

22
**-413-**

A good-faith defense at trial, on the other hand, is not a defense on the merits of a defendant's legal opinions, however he may have obtained them. By the time of trial, the merits of those opinions have been rejected because the indictment still stands. A good-faith reliance defense is one that negates a heightened willfulness standard by demonstrating that, despite the inaccuracy of a defendant's beliefs, a defendant did not hold the requisite criminal intent because he, in good faith, relied on those inaccurate beliefs and thus believed he was complying with his legal obligations. In the contempt of Congress context, however, because the heightened willfulness standard is not the intent element at issue, good-faith reliance is not available as a defense. Accordingly, while the Defendant still can raise the merits of his legal claims about the subpoena's and Committee's legal validity to challenge the indictment through motions to dismiss, once he loses, he cannot then assert good-faith reliance on those claims as a defense at trial.

The Defendant's confusion between legal and factual defenses is evident in his misreading of the Supreme Court's decision in *Yellin v. United States*, 374 U.S. 109 (1963). *See* ECF No. 30 at 14. In *Yellin*, the Supreme Court found that a congressional committee's violation of one of its rules provided a basis for acquittal that the defendant could raise where the rule gave the defendant certain rights before the committee. 374 U.S. at 122-23. *Yellin* also made clear, however, that should the merits of the defendant's claims fail, he could not raise a good-faith reliance on them as a defense. 374 U.S. at 123. It is the first finding of the *Yellin* opinion that the Defendant cites in his opposition to argue that "[t]his language supports the rule that a witness who offers evidence of a good faith and valid reason for not complying a [sic] congressional subpoena may be entitled to acquittal." ECF No. 30 at 14. The Defendant combines two defenses, however—a "good faith" defense and a defense that his constitutional objection to the subpoena actually has merit. The Government does not dispute that the Defendant can argue the merits of his legal beliefs as a

defense in a motion to dismiss the indictment, but the law makes clear that he cannot then rely on

his erroneous reliance on those beliefs as a factual defense to willfulness at trial.

Finally, the Defendant seems to suggest that, at the very least, he should be allowed to raise

an advice-of-counsel defense in any event because "*the specific circumstances of this case* further

demonstrate that advice of counsel is a core issue that must be presented to the jury." ECF No. 30

at 15 (emphasis in original).  This perhaps explains why the Defendant provides a lengthy factual

recitation of his proffered advice-of-counsel defense to answer a motion that moves to exclude the

defense as a matter of law.[3]  But the intent standard for a particular criminal offense does not shift

with the particular facts of each case.  *Cf. Ratzlaf*, 510 U.S. at 143 ("We have even stronger cause

to construe a single formulation, here § 5322(a), the same way each time it is called into play.")

(rejecting that the penalty provision applicable to multiple offenses takes on a different meaning

depending on the offense to which it is applied).  That the Defendant in his particular case refused

to comply on spurious claims of executive privilege has no bearing on the applicable intent

standard.  Nor can the regret the Defendant's attorney may feel in leading him down this path

change the intent standard.  *Cf. Maness v. Meyers*, 419 U.S. 449, 459-60 (1975) ("A lawyer who

_____

[3] Of course, a proffer does not suffice to show the Defendant is entitled to have the jury
consider an advice-of-counsel defense in any event, as the Defendant still would need to
demonstrate that he made full disclosure of all material facts to his attorney before receiving advice
and that he relied in good faith on the advice he received. *United States v. Gray-Burriss*, 920 F.3d
61, 66 (D.C. Cir. 2019).  Moreover, a defendant who asserts advice-of-counsel waives privilege,
*e.g.*, *United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) (noting that a reliance on advice-
of-counsel defense waives attorney-client privilege); *United States v. Crowder*, 325 F. Supp. 3d
131, 138 (D.D.C. 2018) ("Moreover, even otherwise-privileged communications that defendants
do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel
defense, are subject to disclosure in their entirety." (internal quotation marks and citation
omitted)), and the counsel who offered the advice is disqualified from representation because he
becomes a fact witness, *see Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir. 1983) (affirming
disqualification of counsel where counsel was also a potential witness at trial); ABA Model Rule
of Professional Conduct 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer
is likely to be a necessary witness.")

counsels his client not to comply with a court order during trial would, first, subject his client to contempt."). The Defendant may not like that the law renders his preferred defense irrelevant, but that does not mean the statute unconstitutionally bars him from putting on a defense. *See United States v. Libby*, 475 F. Supp. 2d 73, 91 (D.D.C. 2007) ("[A]lthough the Constitution entitles a defendant an opportunity 'to present [his] version of the facts . . . to the jury so it may decide where the truth lies,' that guarantee extends only to relevant evidence." (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)) (citations omitted)). The Defendant's attempts to justify his legal position because his defiance occurred under what he deems special circumstances should be rejected.

### C.    The Defendant's Attempts to Distinguish Contempt of Court Fail.

As outlined in its opening brief, both contempt of Congress and contempt of court, the latter in violation of 18 U.S.C. § 401(3), require that a defendant's contempt be "willful," and courts have defined the term to have the same meaning for both offenses. *See* ECF No. 29 at 6-7. The Supreme Court has recognized that contempt raises the same issues whether the contempt results from defiance of a congressional subpoena or defiance of a court subpoena. In *Bryan* (1950), for example, the Court relied on contempt of court principles in its reasoning for rejecting the defendant's claim that her default on a congressional subpoena should be excused because the relevant committee lacked a quorum. 339 U.S. at 330-35 (citing contempt of court cases, including, *United States v. Goldstein*, 105 F.2d 150 (2d Cir. 1939); *Blair v. United States*, 250 U.S. 273 (1919); and *Hale v. Henkel*, 201 U.S. 43 (1906)). The Court addressed the two offenses interchangeably when discussing a subpoenaed witness's obligations:

> [P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning

25
**-416-**

> of courts and legislatures, would be a nullity. We have often iterated the importance
> of this public duty, which every person within the jurisdiction of the Government
> is bound to perform when properly summoned.

*Id.* at 331 (citing *Blair*, 250 U.S. at 281 (contempt of court case); *Blackmer v. United States*, 284

U.S. 421, 438 (1932) (same)).

The Defendant claims contempt of court is different because it serves to keep the court

system functioning and reflects the "power inherent in all courts to enforce obedience which they

must possess in order properly to perform their functions." ECF No. 30 at 22-23 (quoting *Myers*

*v. United States*, 264 U.S. 95, 103 (1924)) (internal quotation marks omitted). He fails to

acknowledge, however, that the Supreme Court has recognized the same purpose in contempt of

Congress. *Bryan*, 339 U.S. at 327 (finding contempt of Congress is a means of "vindicating the

authority of Congress to compel the disclosure of facts which are needed in the fulfillment of the

legislative function"). The Defendant also claims that contempt of court is different because it is

not a criminal prosecution. ECF No. 30 at 22 ("Contempt of court cases are different in nature

than civil actions or criminal prosecutions."). But the Supreme Court has held the opposite, finding

that defendants in contempt of court cases are entitled to the same due process rights of any

criminal defendant. *See Bloom v. State of Ill.*, 391 U.S. 194, 201 (1968) ("Criminal contempt is a

crime in the ordinary sense.") (finding a constitutional right to a jury trial for contempt of court).

The Defendant's attempts to distinguish contempt of court from contempt of Congress

appear to be aimed instead at avoiding the inevitable result of applying the Defendant's position

vis-à-vis the meaning of "willful" to contempt of court. The Defendant takes the position that

"willful" when used in the criminal law can mean nothing less than that a defendant knew his

conduct was unlawful. This in turn allows defendants to raise defenses that they lack criminal

intent because of good-faith reliance on the law. The consequences of this position for contempt

of court are just as clear as for contempt of Congress, however. Litigants and witnesses could refuse to comply with a court order to appear for testimony or produce documents by simply hiding behind their own claims of belief or the advice of a lawyer that the order was an invalid exercise of the court's authority. It would be the exact "game of hare and hounds" that the Supreme Court in *Bryan* (1950) found contempt charges to guard against. 339 U.S. at 331.

The Defendant's attempts to have this Court disregard any persuasive authority it may find in contempt of court cases are based on unfounded distinctions that this Court should reject.[4]

## III.    Conclusion

The Defendant's counsel asserts he is "baffled" by the notion that the Defendant would not be able to use his supposed belief that the subpoena was legally invalid as a defense at trial. But that is the law. It is clearly established in directly applicable and controlling Supreme Court and Circuit precedents. Defendant was served with a subpoena and failed to do anything that the subpoena required him to do. That was a choice he could make. But, as the Supreme Court has recognized, it is a choice that equates to contempt. The Government's motion to exclude all evidence and argument of good-faith reliance on the law or advice of counsel should be granted.

---

[4] The Defendant also suggests the Court cannot look to contempt of court cases unless a cannon of statutory construction so allows. ECF No. 30 at 4. But cannons of statutory construction are irrelevant. The Court does not have to engage in statutory construction here. The Supreme Court and D.C. Circuit have already defined willfulness as it is used in Section 192. Because the definition is the same as that for "willful" in the contempt of court context, there is nothing barring the Court from looking to contempt of court cases for examples of how the definition is applied. That "willful" has already been defined is also why the rule of lenity is not available, as the Defendant claims. ECF No. 30 at 12 n.4. "The rule of lenity . . . applies only if, 'after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" *United States v. Slatten*, 865 F.3d 767, 783 (D.C. Cir. 2017) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The Supreme Court in *Bryan* (1950) and the D.C. Circuit in *Fields, Dennis,* and *Licavoli* have found no such ambiguity in defining "willful" under Section 192 and finding an advice-of-counsel defense unavailable.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Amanda R. Vaughn
      J.P. Cooney (D.C. 494026)
      Molly Gaston (VA 78506)
      Amanda R. Vaughn (MD)
      Assistant United States Attorneys
      United States Attorney's Office
      555 4th Street, N.W.
      Washington, D.C. 20530
      (202) 252-1793 (Vaughn)
      amanda.vaughn@usdoj.gov

# EXHIBIT 1

**From:** "Costello, Robert J." <rjc@dhclegal.com>
**To:** "'Joseph.Cooney@usdoj.gov'" <Joseph.Cooney@usdoj.gov>
**Subject:** [EXTERNAL] FW: subpoena to Mr. Bannon
**Date:** Fri, 5 Nov 2021 02:22:56 +0000
**Importance:** Normal

---

**From:** Costello, Robert J.
**Sent:** Friday, September 24, 2021 1:24 PM
**To:** Amerling, Kristin <Kristin.Amerling@mail.house.gov>
**Subject:** Re: subpoena to Mr. Bannon


In response to your email of yesterday, this will advise you that I have been authorized by Steve Bannon to accept service of the subpoena from the House Select Committee on his behalf.

Very truly yours,

Robert J. Costello


Sent from my iPhone


On Sep 23, 2021, at 6:38 PM, Amerling, Kristin <Kristin.Amerling@mail.house.gov> wrote:


**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Dear Mr. Costello,


I am following up on our conversation today in which you confirmed that you represent Stephen Bannon. I understand that you are checking with Mr. Bannon regarding whether he will authorize you to accept service of a subpoena on his behalf. The Select Committee to Investigate the January 6th Attack on the United States Capitol is today issuing the attached subpoena to Mr. Bannon for his testimony and the production of documents to the Committee. In the event that you will accept service, I am attaching to this

SKB-000069

email the subpoena, along with a letter from Chairman Bennie Thompson, a document schedule with accompanying production instructions, and a copy of the deposition rules.

Please confirm whether you will accept service of this subpoena on Mr. Bannon's behalf.

Thank you,

Kristin Amerling

*Kristin Amerling*

*Chief Counsel and Deputy Staff Director*

*Select Committee to Investigate the January 6th Attack on the United States Capitol*

*U.S. House of Representatives*

<Bannon, Stephen K. Subpoena 9.23.21.attachments.pdf>

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should never wire money to any bank account that our office provides to you via email without first speaking with our office. Further, do not accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. Please call us first at a number you know to be correct for this office to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.

SKB-000070

US-001039

**-422-**

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.
*********************************************************************

SKB-000071

US-001040

# EXHIBIT 2

FD-302 (Rev. 5-8-10)

- 1 of 5 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _____11/10/2021_____

Sean Tonolli, Senior Investigative Counsel, U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol, was interviewed at the Thomas P. O'Neill Jr. Federal Building, 200 C Street SW, Washington, D.C. He was accompanied by U.S. House of Representatives General Counsel Doug Letter and by U.S. House of Representative Deputy General Counsel Todd Tatelman who attended via telephone.  Tonolli was interviewed by Assistant United States Attorney (AUSA) J.P. Cooney, US Attorney's Office for the District of Columbia (USAO-DC), AUSA Molly Gaston USAO-DC, AUSA Amanda Vaughn USAO-DC, FBI Special Agent Katherine E. Pattillo, FBI Special Agent Frank G. D'Amico, and FBI Special Agent Stephen R. Hart. After being advised of the identities of the interviewing agents and attorneys and the nature of the interview, Tonolli provided the following information.(Tonolli was shown various exhibits during the interview.  These will be referenced when shown during the interview and will be maintained electronically in the 1A section of the file.  The numbering convention provided by the Select Committee will be used to identify specific pages.):

Tonolli graduated from law school in 2005 and joined the United States Attorney's Office (USAO) for the District of Columbia (DC) after clerking for a federal judge.  Tonolli worked as a prosecutor for the USAO DC for approximately four years before transitioning to the Eastern District of Virginia (EDVA).  He departed EDVA in March 2014 to work for the private firm Cahill Gordon & Reindel.  He stayed with this firm until September 2021 when he joined the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the Select Committee) team.  Tonolli is senior investigative counsel for one of five investigative teams and reports to Tim Heaphy (Heaphy).  Tonolli is assigned to the "red team" which is focused on matters related to rioters, certain political rallies, and "war room" meetings which may have occurred in hotels preceding 6 January 2021.  Tonolli's team is also peripherally responsible

Investigation on ___11/02/2021___ at ___Washington, District Of Columbia, United States (In Person)___

File # 72-WF-3513323                                                Date drafted ___11/03/2021___

by  Katherine E. Pattillo, HART STEPHEN R, SA FRANK G. DAMICO

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-000358

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of (U) Interview of Sean Tonolli                    , On 11/02/2021 , Page 2 of 5

for examining the chronology of events at the White House on 6 January 2021.

Tonolli had been on staff less than two weeks when the Select Committee's subpoena for Stephen K. Bannon (Bannon) was issued. He was not involved in the decision to issue the subpoena nor did he participate in drafting either the subpoena or the attached schedule describing the range and scope of documents requested. Tonolli was assigned to depose Bannon and has, consequently, reviewed the subpoena, the subpoena schedule, and all official correspondence between the Chairman of the Select Committee and Bannon's counsel, Robert "Bob" Costello (Costello).

When shown the Bannon subpoena and the Chairman's accompanying letter dated September 23, 2021 (Jan. 6 Sel. Comm 0003-0010), Tonolli confirmed that the second paragraph in the letter accurately summarized the Select Committee's mandate. He further confirmed that the penultimate paragraph described prospective topics about which Bannon might be asked during the course of his deposition. According to Tonolli, these topics all fall within the scope of the Select Committee and many are wholly unrelated to former President Trump. For example, Bannon's podcast, The War Room, may have sponsored a "Women for America First" bus tour which encouraged attendance at 6 January, pro Trump rallies.

Tonolli explained the Select Committee staggered the production of documents deadline and the deposition / appearance deadline to allow Select Committee members to review any records provided as part of the deposition preparation. In the case of Bannon, documents were required by the Select Committee by October 7, 2021 and deposition testimony on October 14, 2021. No responsive documents were ever provided by Bannon or any representative.

Tonolli confirmed that he was familiar with documents identified as Jan. 6 Sel. Comm. 0011-0015, correspondence between Select Committee representative Kristin Amerling (Amerling) and Costello between October 7-8, 2021. The letter from Costello referenced correspondence he received from Justin Clark, counsel for former President Trump. Costello quoted an excerpt from this letter in which Clark suggests there is a subset of documents requested by the Select Committee which may be "potentially protected from disclosure by executive and other privileges." Tonolli was not aware of the Select Committee ever receiving correspondence from Clark or anyone representing former President Trump regarding executive

US-000359

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  (U) Interview of Sean Tonolli                              , On  11/02/2021  , Page   3 of 5

privilege. It was Tonolli's understanding that the Chairman's response (Jan. 6 Sel. Comm. 0013-0015) clearly articulated Bannon was still required to appear for his deposition, could not assert executive privilege, and reminded Costello that Bannon had an ongoing responsibility to provide the documents requested by the subpoena and / or a privilege log.

After determining that no one from the Select Committee had been in touch with Costello regarding the upcoming, scheduled deposition, Tonolli called Costello at some time after 7pm on the evening of October 12, 2021. This was the first of three brief phone calls between the two men over the course of October 12-13, 2021. Prior to contacting Costello, Tonolli cleared the call with Amerling or David Buckley. The purpose of the call was strictly to introduce himself and to discuss logistics associated with Bannon's appearance. Tonolli first called Costello's office number and subsequently reached Costello on the cell phone number provided by his office mail; the call lasted approximately ten to fifteen minutes. Costello was initially quite gruff but seemed to warm as Tonolli introduced himself, highlighted their shared experience as federal prosecutors, and mentioned a mutual acquaintance, Tom Kavalar. Given COVID protocols and the high profile nature of Bannon's testimony, Tonolli explained he wanted to ensure that all necessary arrangements were in place for the deposition. Costello informed Tonolli that it was "highly unlikely" that Bannon would be appearing on Thursday, October 14, 2021. Costello mentioned that he planned on sending a letter to the Select Committee Chairman but asked Tonolli to refrain from sharing that information.

Tonolli's intent upon initiating a dialogue with Costello was exclusively to engage in discussions about the logistics of Bannon's deposition and he explicitly stated so to Costello; neither Tonolli nor Costello attempted to engage in substantive legal conversation. During the course of this call, Costello never directly referenced any communications with Bannon although he did make several statements using the pronoun "we" which Tonolli presumed included Bannon. Tonolli also got the sense from his conversation with Costello that he had previously represented Bannon and there was a certain level of familiarity in their working relationship.

During this first call or possibly on 13 October, Costello complained to Tonolli about comments made by Select Committee member Representative Adam Schiff in the media. Costello characterized these remarks as unhelpful but

US-000360

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of (U) Interview of Sean Tonolli                    , On  11/02/2021  , Page  4 of 5

Tonolli did not engage him on this topic nor had he seen the news coverage
in question.  They concluded their call on the 12th with no specific plans
to speak again.  However, Tonolli knew he would reach out the following day
to confirm again that Bannnon and / or Costello did not intend to appear for
the scheduled deposition.  Tonolli gave Heaphy a summary of this call and
may also have discussed it with Kevin Elliker (Elliker), an attorney who
sits behind him.

    On October 13, 2021, Tonolli spoke with Costello twice.  Both of these
calls were memorialized in two emails he sent to David Buckley, Amerling,
and Heaphy; these are identified as Jan. 6 Sel. Comm. 0054- 0055.
Costello called Tonolli at approximately 1:40pm in response to an email sent
by Tonolli.  They spoke for no more than ten minutes and Tonolli put the
call on speakerphone so it could be witnessed by Elliker.  Costello was
initially quite aggressive and asserted very clearly that neither he nor
Bannon had any intention of attending the scheduled deposition.
Costello also expressed frustration that former President Trump's legal team
would not respond to him and mentioned Justin Clarke specifically.
Costello asked Tonolli if the Select Committee had been in contact with
representatives of former President Trump's legal team.  Tonolli shared that
he was not aware of any communications between the Select Committee and any
counsel for former President Trump.

    Tonolli did not engage in any substantive conversation about the legal
merits of any privilege arguments nor did he reiterate the Select
Committee's position on these matters as articulated in the Chairman's
letters to Costello.  Tonolli asked if Costello had submitted the letter to
the Chairman referenced in the previous evening's phone call given that it
might impact his preparations for the deposition.  Costello said he was
still drafting the letter and would let Tonolli know when it had been sent.

    Costello called Tonolli at his desk at approximately 4:10pm on October
12th to share that he expected to send the letter shortly but confirmed
again that neither he nor Bannon would be attending the depostion.  This
call again lasted no more than ten minutes.  Costello clearly seemed to
understand that Bannon was still expected to appear as described in the
Congressional subpoena.  In fact, he distinguished between being commanded
by a court versus Congress and caveated a remark with, "if a court later
orders this to happen."  Costello likened their respective situations to

US-000361

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of (U) Interview of Sean Tonolli ,On 11/02/2021 ,Page 5 of 5

having ringside seats to a privilege showdown. During the course of the
conversation, Costello raised two issues to which Tonolli did not provide
answers. Costello was clear that he did not expect immediate answers
because neither he nor Bannon would be appearing for the deposition
regardless.

Costello asked Tonolli if there would be any way for a third party
attorney to attend the deposition to assert executive privilege on behalf of
former President Trump. Costello was aware that the Select Committee's
deposition rules prohibited third party attorneys. Costello also inquired
about the possibility of conducting the deposition remotely. Tonolli did
not feel obligated to lecture Costello on the consequences of his client
failing to appear given Costello's experience and seniority. Tonolli agreed
that the letter finally sent to the Select Committee Chairman by
Costello did not raise any of the issues mentioned during this call nor did
it contemplate other conditions under which Bannon might opt to
appear. Tonolli might have discussed this call with Amerling.

On the morning of October 14, 2021, Tonolli was in the room designated
for the deposition by the Congressional subpoena. Also present were a court
reporter, Elliker, Heaphy, Amerling, Select Committee parliamentarian Barry
Pump, Chief Clerk Evan Malder (ph), Samantha Stiles (ph), Chief
Administrative representative and Congressman Schiff attended virtually.
Tonolli had prepared an outline for the deposition with supporting
documentation; topics to be covered were within the scope of the Select
Committee's mission. Tonolli had also prepared a manila folder of documents
to be provided to Bannon should he appear. This manila folder contained a
copy of House Resolution 503, Section 3(b) of House Resolution 8, and a copy
of the 117th Congress Regulations For Use of Deposition Authority.

At the conclusion of the interview, Tonolli retrieved the above described
folder prepared for Bannon's deposition and provided it to SA Pattillo. An
FD-597 Receipt for Property was signed by Tonolli and a copy was provided to
U.S. House of Representatives General Counsel Doug Letter. The original
will be maintained in the 1A section of this file and the folder will be
maintained as a single 1B item.

US-000362

# EXHIBIT 3

| | |
|---|---|
| **From:** | Tonolli, Sean |
| **To:** | "rjc@dhclegal.com" |
| **Subject:** | Steve Bannon: Touching base about tomorrow |
| **Date:** | Wednesday, October 13, 2021 12:35:00 PM |

Bob,

It was good talking with you last night. And hearing your take on Tom Kavaler.

Did you end up sending your letter, or is it on the way?

If you and your client are coming, I need to arrange the logistics. You will need to meet with a member of our security team, who, because of COVID restrictions, has to escort you into and through the building.

Can you give me a call to discuss? My numbers are below.

Thanks,
Sean

_____

**Sean P. Tonolli**
Senior Investigative Counsel
Select Committee to Investigate
  the January 6th Attack on the United States Capitol
U.S. House of Representatives

**Jan. 6 Sel. Comm. 0033**

US-000388

# EXHIBIT 4

**From:** "Costello, Robert J." <rjc@dhclegal.com>
**To:** "'Joseph.Cooney@usdoj.gov'" <Joseph.Cooney@usdoj.gov>
**Subject:** [EXTERNAL] FW: Transfer file from "Epson Connect Scan to Cloud"
**Date:** Wed, 3 Nov 2021 22:25:00 +0000
**Importance:** Normal
**Attachments:** Epson_10132021091453.pdf

---

-----Original Message-----
From: Costello, Robert J.
Sent: Wednesday, October 13, 2021 12:35 PM
To: 'Justin.Clark@ElectionLawLLC.com' <Justin.Clark@ElectionLawLLC.com>
Subject: FW: Transfer file from "Epson Connect Scan to Cloud"

Justin,

    Attached is the letter I received from Congressman Bennie Thompson on behalf of the Select Committee of the House, responding to my previous letter. The Committee is taking the position that President Trump has not yet invoked executive and other privileges with respect to the subpoenas received by Steve Bannon and three others calling for documents and testimony. I direct your attention to the first full paragraph of the letter where Thompson states that : "the Select Committee has not received any assertion, formal or otherwise, of any privilege from Mr. Trump."

    Apparently they do not recognize your letter to the subpoena recipients as an invocation of executive and other privileges. I would strongly suggest that a direct communication from you on behalf of President Trump would clarify the President's position with respect to the document requests and the deposition requests.

Very truly
yours,

Bob

Costello


IMPORTANT NOTICE: Beware of Cyber Fraud. You should NEVER wire money to any bank account that our office provides to you via email without first
speaking with our office. Further, DO NOT accept emailed wire instructions from anyone else without voice verification from a known employee of our office.
Even if an email looks like it has come from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE to verify the information before wiring any money.
Be particularly wary of any request to change wire instructions you already received.

*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.

SKB-000030

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SKB-000031

US-001000

**-434-**

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(20,2) 225-7800

**One Hundred Seventeenth Congress**

**Select Committee to Investigate the January 6th Attack on the United States Capitol**

October 8, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

I write in response to your October 7, 2021 letter which states that your client, Stephen Bannon, is "legally unable to comply" with the September 23, 2021 subpoena (the "Subpoena") issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"). Your letter relies on an apparent instruction from former President Donald Trump that appears limited to requesting that Mr. Bannon not disclose privileged information. Despite this limited instruction, your letter takes the inappropriate position that Mr. Bannon will not comply with any request for information or testimony sought by the Select Committee. Moreover, Mr. Trump's stated "intention to assert those executive privileges" that may or may not belong to him, does not provide a legal basis for Mr. Bannon's refusal to comply with the Subpoena.

You accepted service of the Subpoena for documents and testimony on Mr. Bannon's behalf on September 24, 2021. The Subpoena required that, by October 7, 2021 at 10:00 a.m., Mr. Bannon produce certain documents and other records referring or relating to the matters described in the Subpoena's schedule. All the requested documents relate directly to the inquiry being conducted by the Select Committee, serve a legitimate legislative purpose, and are within the scope of the authority expressly delegated to the Select Committee pursuant to House Resolution 503. In the letter accompanying the Subpoena, the Select Committee set forth the basis for its determination that the documents and records sought by the Subpoena and Mr. Bannon's deposition testimony are of critical importance to the issues being investigated by the Select Committee.

Your letter indicates that the sole basis for defiance of the Subpoena is Mr. Trump's "direction" to your client and his decision to "honor [Mr. Trump's] invocation of executive privilege." That position has no basis in law, and your letter does not cite any statute, case law, or other legal precedent for support.

*First*, virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege. You have provided no basis for Mr. Bannon's refusal to comply with

SKB-000032

US-001001

Mr. Robert J. Costello
Page 2

those portions of the Subpoena not covered by any privilege. Furthermore, blanket assertions of the deliberative process and attorney-client privileges, such as those apparently requested by Mr. Trump, have been rejected by courts as "unsustainable" even when—unlike the situation with Mr. Bannon—the subpoena recipient is an Executive Branch agency. *See Comm. on Oversight and Gov't Reform v. Holder*, 2014 WL 12662665, at *2 (D.D.C. 2014) (rejecting DOJ's assertion of deliberative process privilege on all documents after a particular date and noting that the "Attorney General has not cited any authority that would justify this sort of blanket approach").

*Second*, the Select Committee has not received any assertion, formal or otherwise, of any privilege from the Mr. Trump. Even assuming that, as a former President, Mr. Trump is permitted to formally invoke executive privilege, he has not done so. At most, Mr. Trump has "announced his intention to assert those executive privileges." The Select Committee is not aware of any legal authority, and your letter cites none, holding that the mere intention to assert a privilege absolves a subpoena recipient of his duty to comply.

*Third*, your letter indicates that Mr. Trump has requested that your client "to the fullest extent permitted by law ... not provide any testimony concerning privileged material in response to the Subpoena." Even if your client had been a senior aide to the President during the time period covered by the contemplated testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest that Mr. Trump has requested he assert. To the contrary, every court that has considered the absolute immunity Mr. Trump alludes to has rejected it. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) (rejecting former White House counsel's assertion of absolute immunity from compelled congressional process). *Miers* made clear that even the most senior Presidential advisors may not resist a congressional subpoena "based solely on their proximity to the President." *Id.* at 101 (citing *Harlow*, 457 U.S. at 810).[1] If there is no absolute immunity for senior Presidential advisors, then there certainly can be no such immunity for private citizens, such as Mr. Bannon, who occasionally communicate with the President on non-official, non-governmental, or campaign-related matters.

Regardless of any purported privilege assertion by Mr. Trump, Mr. Bannon has an ongoing obligation to produce documents to the Select Committee. Accordingly, please produce all responsive documents and records identified in the Subpoena. Should Mr. Bannon seek to withhold specific responsive documents, consistent with the Subpoena instructions, he must provide the Select Committee with a privilege log that "identifies and describes the material in a manner 'sufficient to enable resolution of any privilege claims.'" *See Comm. on Oversight*, 2014 WL 12662665 at *2 (quoting *Miers*, 558 F. Supp. 2d at 107). Such a privilege log should, at a minimum, provide the author(s) and recipient(s), indicate the general subject matter of each document being withheld, and the specific basis for withholding it.

---

[1] It is also worth noting that the court in *Miers* rejected the former White House Counsel's claim of absolute immunity from congressional testimony even though the sitting President had formally invoked executive privilege. *Id.* at 62.

SKB-000033

US-001002

Mr. Robert J. Costello
Page 3

Finally, the Select Committee expects Mr. Bannon's appearance at the time and place designated in the Subpoena for a deposition and respond fully to questions by the Select Committee. If there are specific questions at that deposition that you believe raise privilege issues, Mr. Bannon should state them at that time for the deposition record for the Select Committee's consideration and possible judicial review.

Please be advised that the Select Committee will view Mr. Bannon's failure to respond to the Subpoena as willful non-compliance with the Subpoena. His willful non-compliance with the Subpoena would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C §§ 192, 194—-which could result in a referral from the House to the Department of Justice for criminal charges—as well as the possibility of having a civil action to enforce the Subpoena brought against Mr. Bannon in his personal capacity.

Sincerely,

Bennie G. Thompson
Chairman

SKB-000034

US-001003

# EXHIBIT 5

| | |
|---|---|
| **From:** | Tonolli, Sean |
| **To:** | Buckley, David; Amerling, Kristin; Heaphy, Tim |
| **Subject:** | RE: Memo to File re Call with Robert Costello |
| **Date:** | Wednesday, October 13, 2021 4:28:23 PM |

Follow-Up Call with Robert Costello
October 13, 2021
Approximately 4:10pm

- Bob called me at my desk. He expects to send the letter at or before 5pm, but cannot guarantee it – an unspecified "they" are reviewing the letter before it goes out. He still does not know whether Justin Clark or anyone else will directly notify the Committee that President Trump is invoking executive privilege.

- Bob confirmed, again, he and his client are not appearing tomorrow. And again he said there is no reason to work out logistics for their appearance.

- He asked two questions for future reference, but said he does not need answers tonight or by tomorrow. He did not characterize these as an effort to engage on arranging for his client to appear, but that is certainly the thrust of the questions. So I demurred and said I could answers if and when necessary.
  - (1) Is there a way to allow a lawyer for Trump to participate in the deposition to allow them to make privilege objections? He knows what the deposition rules state about third-party attorneys.

  - (2) Can a deposition be conducted remotely?

---

**From:** Tonolli, Sean
**Sent:** Wednesday, October 13, 2021 2:33 PM
**To:** Buckley, David <David.Buckley@mail.house.gov>; Amerling, Kristin <Kristin.Amerling@mail.house.gov>; Heaphy, Tim <Tim.Heaphy@mail.house.gov>
**Subject:** Memo to File re Call with Robert Costello

Call with Robert Costello re Steve Bannon Deposition
October 13, 2021
Approximately 1:40pm

- On October 13, 2021, at 12:35pm, I emailed Robert ("Bob") Costello to ask that he call me to discuss logistics for the deposition of Steve Bannon, scheduled for October 14, 2021, at 10am.

- Bob called me at 1:35pm at my desk phone, but I was unable to pick up. He left a voicemail and asked me to return his call. I did so at approximately 1:40pm, reaching him on his cell phone at 516-987-0213. I had the call on speakerphone so that Kevin Elliker could listen as a witness.

**Jan. 6 Sel. Comm. 0054**

US-000389

In sum and substance, Bob said that, as he explained in his October 7 letter, he and his client are not appearing for the deposition tomorrow. He will be sending a letter later today to Chairman Thompson further explaining his client's position.

- The letter is not finalized because of communications Bob has had today with Justin Clark, President Trump's attorney. Bob sent Justin the October 8 letter from Chairman Thompson, which Justin had not previously seen. Bob directed him in particular to the portion that says President Trump has not notified the Select Committee that he is invoking executive privilege. Bob told Justin that it would be helpful to Mr. Bannon's position if President Trump would do so. Bob did not represent whether we should expect the notification to come in.

- Whether President Trump notifies the Select Committee or not, Bob said Mr. Bannon's position is the same – he is not coming to the deposition tomorrow. And therefore Bob said there was no reason to work out logistics for his appearance.

- Bob added that he has asked President Trump, through Justin, to delineate the subject areas for which he is invoking executive privilege to provide Mr. Bannon more guidance. But to date that delineation has not been made, and Mr. Bannon's position is that he is not able to draw those lines himself. These issues need to be resolved and/or litigated between the Select Committee and President Trump—he and Mr. Bannon are just "sitting in ring-side seats."

**Sean P. Tonolli**
Senior Investigative Counsel
Select Committee to Investigate
the January 6th Attack on the United States Capitol
U.S. House of Representatives
███████████████

**Jan. 6 Sel. Comm. 0055**

US-000390

# EXHIBIT 6

**From:** "Costello, Robert J." <rjc@dhclegal.com>
**To:** "'Joseph.Cooney@usdoj.gov'" <Joseph.Cooney@usdoj.gov>
**Subject:** [EXTERNAL] FW: October 13, 2021 Benny Thompson Letter
**Date:** Wed, 3 Nov 2021 22:23:35 +0000
**Importance:** Normal
**Attachments:** Bannon_Letter.pdf

---

**From:** Costello, Robert J.
**Sent:** Thursday, October 14, 2021 5:13 PM
**To:** Steve Bannon <Stephenkbannon@protonmail.com>
**Cc:** Boris Epshteyn <bepshteyn@gmail.com>; Adam Katz <akatz_ofcounsel@russolaw-llc.com>
**Subject:** Fwd: October 13, 2021 Benny Thompson Letter


This is not accurate. He definitely stated that Trump was invoking the executive privilege because I told him the House in Bennie Thompson's letter to me stated they did not believe that Trump had formally or informally invoked executive privilege. I sent him Thompson's letter stating that. I also told him to not leave anyone guessing he should send an email to the House stating Trump's invocation of executive privilege.

I don't know what game Clark is playing but it puts Steve Bannon in a dangerous position. Beware.

　　　　Bob

Sent from my iPhone


Begin forwarded message:

**From:** Justin Clark <justin.clark@electionlawllc.com>
**Date:** October 14, 2021 at 4:48:17 PM EDT
**To:** "Costello, Robert J." <rjc@dhclegal.com>
**Subject: October 13, 2021 Benny Thompson Letter**


**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Bob – I just read your letter dated October 13, 2021 to Congressman Benny Thompson. In that letter you stated that "[a]s recently as today, counsel for President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved."

SKB-000018

US-000987

To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated October 6, 2021, and attached below.

Best Regards,

Justin Clark

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via email without first speaking with our office. Further,<u>do not</u> accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. <u>Please call us first at a number you know to be correct for this office</u> to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
*************************************************************************

STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform you that any discussion of a federal tax issue contained in this communication (including any attachments) is not intended or written to be used, and it cannot be used, by any recipient for the purpose of (i) avoiding penalties that may be imposed on the recipient under United States federal tax laws, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
*************************************************************************

SKB-000019

US-000988

-443-

# ELECTIONS, LLC

**Attorneys at Law**
**Justin R. Clark**
E Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, NY 10158
rjc@dhclegal.com

Dear Mr. Costello:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Steven Bannon (the "Subpoena"). The Subpoena requests that Mr. Bannon produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (e.g., the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena.

1000 Maine Avenue, SW, 4th Floor  |  Washington, D.C. 20024

SKB-000020

US-000989

-444-

Page 2

Thank you for your attention to this matter.  Please do not hesitate to contact me if you have any
questions or would like to discuss.

Sincerely,

Justin Clark
*Counsel to President Trump*

SKB-000021

US-000990

# EXHIBIT 7

**From:** "Costello, Robert J." <rjc@dhclegal.com>
**To:** "'Joseph.Cooney@usdoj.gov'" <Joseph.Cooney@usdoj.gov>
**Subject:** [EXTERNAL] FW: October 13, 2021 Benny Thompson Letter
**Date:** Wed, 3 Nov 2021 22:20:20 +0000
**Importance:** Normal

---

**From:** Costello, Robert J.
**Sent:** Monday, October 18, 2021 1:52 PM
**To:** 'Justin Clark' <justin.clark@electionlawllc.com>
**Subject:** RE: October 13, 2021 Benny Thompson Letter

Thank you Justin . Your original letter speaks for itself and that is what we are basing our communications with the Select Committee on.

Your suggestion that I reach out to counsel for the Committee is curious, considering that I have asked you to do the same, to confirm that President Trump has invoked executive and attorney-client privileges.

I believe it is clear that he has invoked, but Congressman Thompson appears confused as he continues to incorrectly reiterate that President Trump has yet to formally or informally invoke those privileges. I previously provided you with his two letters stating that point.

President Trump's invocation of those privileges absolutely limits Mr. Bannon's ability to testify before Congress and provide documents.

To eliminate all doubt in the Committee's mind, please confirm to the Committee that President Trump has invoked executive and attorney-client privileges before Tuesday when the Committee plans to vote regarding Mr. Bannon.

Thanks,

Bob

Costello

SKB-000015

US-000984

-447-

**From:** Justin Clark <justin.clark@electionlawllc.com>
**Sent:** Saturday, October 16, 2021 12:24 PM
**To:** Costello, Robert J. <rjc@dhclegal.com>
**Subject:** Re: October 13, 2021 Benny Thompson Letter

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Bob - In light of press reports regarding your client I wanted to reach out. Just to reiterate, our letter referenced below didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is. Now, you may have made a different determination. That is entirely your call. But as I also indicated the other day other avenues to invoke the privilege - if you believe it to be appropriate - exist and are your responsibility.

If you haven't already I'd encourage you again to contact counsel for the committee to discuss it further.

Justin

On Oct 14, 2021, at 4:48 PM, Justin Clark <justin.clark@electionlawllc.com> wrote:

Bob – I just read your letter dated October 13, 2021 to Congressman Benny Thompson. In that letter you stated that "[a]s recently as today, counsel for President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved."

To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated October 6, 2021, and attached below.

Best Regards,

Justin Clark

<Bannon Letter.pdf>

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should never wire money to any bank account that our office provides to you via email without first speaking with our office. Further,do not accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. Please call us first at a number you know to be correct for this office to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY

SKB-000016

US-000985

The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.
**********************************************************************

SKB-000017

US-000986

# JOINT APPENDIX PAGES: 450-456

# INTENTIONALLY LEFT BLANK