In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

––––––––––––––

## JOINT APPENDIX
## Volume IV of XII
## (Pages: 1355 - 1805)

––––––––––––––

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL 36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC 20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

# TABLE OF CONTENTS
## Joint Appendix Volume I of XII

**Page:**

Docket Entries [1:21-cr-00670-CJN-1].. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Docket Entries [1:22-mc-00060-CJN]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Indictment
      filed November 12, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Transcript of Return on Arrest Warrant & Initial Appearance
Before the Honorable Robin M. Meriweather
      on November 15, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Transcript of Video Arraignment/Status Conference
Before the Honorable Carl J. Nichols
      on November 18, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Transcript of Video Status Conference
Before the Honorable Carl J. Nichols
      on December 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Defendant's Motion to Compel Discovery,
With Exhibits,
      filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

    Exhibits:

    1.    Letter
            dated January 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . 186

    2.    Letter
            dated January 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Exhibits to
Defendant's Motion to Compel Discovery
     filed February 4, 2022, Continued:

3.      Letter
             dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.      FBI Interview of Robert J. Costello, Esquire
             dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 169

7.      H. Res. 503, Sec. 5(c)(6)(A) & (B)
             dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.      Procedures Adopted by 117th Congress
        Regulations for Use of Deposition Authority
             dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.      FBI Interview of U.S. House of Representatives
        General Counsel Doug Letter
             dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 231

10.     Letter from Ronald C. Machen Jr., U.S. Attorney,
        to Speaker of the House John A. Bohner
             dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.     Prosecution for Contempt of Congress of an
        Executive Branch Official Who Has Asserted a
        Claim of Executive Privilege
             8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . 248

12.     Attempted Exclusion of Agency Counsel from
        Congressional Depositions of Agency
        Employees, Slip Op.
             dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,
     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     Attachment:

     Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,
     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     Exhibit:

     1.     Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,
     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     Exhibit:

     1.     Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . 385

Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,

With Exhibits,

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

Exhibits:

1.    E-mail Correspondence [US-001038-40]
             various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    Letter from Justin Clark
             dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    Email from Committee Counsel
             dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    Email from Costello
             dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    Email from Committee Counsel
             dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    Costello Email Chain
             dated October 14, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    Costello and Clark Email Exchange
             dated October 14-18, 2021. . . . . . . . . . . . . . . . . . . . . . . 444

# TABLE OF CONTENTS
## Joint Appendix Volume II of XII

Page:

Transcript of Oral Argument
Before the Honorable Carl J. Nichols
on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

Defendant's Surreply to the Government's Reply in Support of its
Motion *in Limine* to Exclude Evidence or Argument Relating to
Good-faith Reliance on Law or Advice of Counsel
filed March 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

Defendant's Supplemental Brief in Opposition to the
Government's Motion *in Limine* on Advice of Counsel,
With Exhibits,
filed March 22, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

Exhibits:

1.   Senate Committee Investigation
dated August 8, 1958.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 577

2.   Application of 28 U.S.C. § 458 to Presidential
Appointments of Federal Judges
dated December 18, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . 584

3.   Letter from Michael B. Mukasey, Attorney
General, to the Hon. Nancy Pelosi, Speaker of the
House of Representatives
dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . 599

Exhibits to
Defendant's Supplemental Brief in Opposition to the
Government's Motion *in Limine* on Advice of Counsel
    filed March 22, 2022, Continued:

4. Response to Congressional Requests for
   Information Regarding Decisions Made Under the
   Independent Counsel Act,
      10 Op. O.L.C. 68 (1986)............................. 601

5. Rex Lee, Executive Privilege, Congressional Subpoena
   Power, and Judicial Review: Three Branches,
   Three Powers, and Some Relationships,
      1978 B.Y.U. L. Rev. 231, 259.......................... 619

6. Whether the Department of Justice May Prosecute
   White House Officials for Contempt of Congress,
      2008 WL 11489049 (O.L.C.). ........................ 688

7. Congressional Oversight of the White House,
      2021 WL 222744 (O.L.C.). .......................... 692

Amended Exhibit to
Defendant's Supplemental Brief in Opposition to the
Government's Motion *in Limine* on Advice of Counsel
    filed March 23, 2022:

3. Letter from Michael B. Mukasey, Attorney
   General, to the Hon. Nancy Pelosi, Speaker of the
   House of Representatives
      dated February 29, 2008.......................... 722

Government's Response to Defendant's Supplemental Brief in
Opposition to the Government's Motion *in Limine* to Exclude
Evidence and Argument Relating to Good-faith
Reliance on Law or Advice of Counsel
    filed March 29, 2022. ...................................... 725

**Defendant's Supplemental Reply on Waiver**
        **filed March 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **735**

**Order**
        **filed April 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **741**

**Government's Motion *in Limine* to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **745**

        **Exhibits:**

        1.      **Letter from White House Deputy Counsel to Costello**
                        **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **765**

        2.      **Letter from Justin Clark to Costello**
                        **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **767**

        3.      **Emails from Justin Clark to Costello**
                        **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **769**

**Government's Motion *in Limine* to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **771**

        **Exhibit:**

        1.      **Subpoena**
                        **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **781**

**Government's Motion *in Limine* to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **792**

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**
     filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 798

**Defendant's Motion to Exclude Evidence**
     filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 800

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**
     filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 807

     <u>Exhibits:</u>

     A.    **H. Res. 8 (Adoption of Rules for 117th Congress)**
               dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 867

     B.    **H. Res. 503 (Authorizing House Select Committee)**
               dated June 30, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 912

     C.    **Regulations For Use Of Deposition Authority**
               dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 927

     D.    **Amerling and Letter FBI 302**
               dated November 10, 2021. . . . . . . . . . . . . . . . . . . . . 929

# TABLE OF CONTENTS
## Joint Appendix Volume III of XII

Page:

Exhibits to
Defendant's Motion to Dismiss the Indictment
filed April 15, 2022, Continued:

E.      Rules of the 117th Congress
            dated February 2, 2021.............................938

F.      Republican Conference Rules of the 117th Congress......991

G.      Congressional Oversight of The White House,
            45 Op. O. L. C. slip op. (Jan. 8, 2021)................1005

H.      Assertion of Executive Privilege Concerning the
        Dismissal and Replacement of U. S. Attorneys
            dated June 27, 2007...............................1065

I.      Immunity of the Former Counsel to the President from
        Compelled Congressional Testimony,
            43 Op. O. L. C. slip op. (July 10, 2007)...............1075

J.      Prosecution for Contempt of Congress of an Executive
        Branch Official Who Has Asserted a Claim of Privilege,
            8 Op. O. L.C. 101 (1984)...........................1079

K.      Whether the Department of Justice May Prosecute
        White House Officials for Contempt of Congress,
            32 Op. O. L.C 65 (2008)...........................1122

L.      Application of 28 U. S. C. Sec. 458 to Presidential
        Appointments of Federal Judges,
            19 Op. O. L.C slip op. (December 18, 1995)...........1128

Exhibits to
Defendant's Motion to Dismiss the Indictment
filed April 15, 2022, Continued:

M.      Randolph D. Moss, Executive Branch Legal Interpretation:
        A Perspective from the Office of Legal Counsel,
                52 Admin. L. Rev. 1303 (2000)........................ 1143

N.      Testimonial Immunity Before Congress of the
        Former Counsel to the President,
                43 Op. O.L.C. slip op. (May 20, 2019). ............. 1172

O.      Response to Congressional Requests for
        Information Regarding Decisions Made
        Under the Independent Counsel Act,
                10 Op. O.L.C. 68 (1986)........................... 1194

P.      Letter from Ronald C. Machen Jr., U. S. Attorney, to
        Speaker John A. Boehner
                dated March 31, 2015. ........................... 1220

Q.      Letter from Michael B. Mukasey, Attorney General, to
        Speaker of the House, Hon. Nancy Pelosi
                dated February 29, 2008........................... 1228

R.      Steven G. Bradbury, Memorandum for Attorneys of the
        Office Re: Best Practices for OLC Opinions
                May 16, 2005.................................... 1231

S.      Trevor W. Morrison, Stare Decisis in the
        Office of Legal Counsel,
                110 COLUM. L. REV. 1448 (2010).................. 1237

T.      Walter Dellinger, et al., Principles to
        Guide the Office of Legal Counsel
                dated Dec. 21, 2004.............................. 1261

Exhibits to
Defendant's Motion to Dismiss the Indictment
    filed April 15, 2022, Continued:

U.    David J. Barron, Memorandum for Attorneys of the
      Office Re: Best Practices for OLC Legal
      Advice and Written Opinions
          dated July 16, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268

V.    Frank H. Easterbrook, Presidential Review,
          40 CASE W. RES. L. REV. 905 (1990).. . . . . . . . . . . . . . 1275

W.    Presidential Authority to Decline to Execute
      Unconstitutional Statutes, OLC Mem. Op.
          dated November 2, 1984. . . . . . . . . . . . . . . . . . . . . . . . . 1302

X.    Douglas W. Kmiec, OLC's Opinion Writing Function:
      The Legal Adhesive for a Unitary Executive,
          15 CARDOZO L. REV. 337 (1993). . . . . . . . . . . . . . . . . 1316

# TABLE OF CONTENTS
## Joint Appendix Volume IV of XII

Page:

Exhibits to
Defendant's Motion to Dismiss the Indictment
    filed April 15, 2022, Continued:

Y.    Applying Estoppel Principles in Criminal Cases,
            78 YALE L.J. 1046 (1969)........................... 1355

Z.    Anne Bowen Pouliun, Prosecutorial Inconsistency,
      Estoppel, and Due Process: Making the
      Prosecution Get its Story Straight,
            18 Cal. L. Rev. 1423 (2001)......................... 1384

AA.   Rex E. Lee, Executive Privilege, Congressional Subpoena
      Power, and Judicial Review: Three Branches, Three
      Powers, and Some Relationships,
            1978 B.Y.U. L. REV. 231 (1978)...................... 1441

BB.   John O. McGinnis, Models of the Opinion Function of the
      Attorney General: A Normative, Descriptive, and
      Historical Prolegomenon,
            15 CARDOZO L. REV 375 (1993)..................... 1510

CC.   Griffin B. Bell, The Attorney General: The Federal
      Government's Chief Lawyer and Chief Litigator, or
      One Among Many?,
            46 FORDHAM L. REV. 1049 (1978)................ 1572

Exhibits to
Defendant's Motion to Dismiss the Indictment
      filed April 15, 2022, Continued:

      DD.  Notes, The Immunity-Conferring
           Power of the Office of Legal Counsel,
               121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . . 1596

      EE.   U. S. Department of Justice, Criminal
            Resource Manual § 2055 (Public Authority Defense). . . . . 1621

Defendant's Notice of Filing,
With Attached Motion to Dismiss the Indictment and Exhibits Index,
      filed April 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

Government's Response to Defendant's
Notice under Federal Rule of Procedure 12.3
      filed April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

Defendant's Opposition to the Government's
Motion *in Limine* Based on Waiver
      filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698

Defendant's Opposition to the Government's
Motion to Exclude Prior Subpoena Evidence
      filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709

Defendant's Response to Government's Motion *in
Limine* to Exclude Evidence of Department of
Justice Opinions and Writings [Doc. 52]
      filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720

Government's Opposition to Defendant's Motion to Dismiss,
With Exhibits,

filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1745

<u>Exhibits:</u>

1.  Letter from Chairman Bennie G. Thompson to
    Mr. Stephen K. Bannon
        dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1793

2.  E-mail from Cooney to Costello
        dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1796

3.  E-mail from Costello to Cooney
        dated November 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1800

4.  E-mail from Cooney to Costello
        dated November 5, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1803

Page:

Government's Opposition to
Defendant's Motion to Exclude Evidence
     filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

Defendant's Reply in Support of His Motion to Exclude Evidence
     filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of Department of Justice Opinions and Writings
     filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

Government's Reply in Support of Motion *in Limine* to
Exclude Evidence Relating to Objections to
Subpoena That Defendant Waived
     filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of the Defendant's Prior Experience with Subpoenas
     filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

Defendant's Reply in Support of His Motion to Dismiss Indictment,
With Exhibits,
     filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

     <u>Exhibits</u>:

    1.    Letter from Chairman Bennie G. Thompson to
        Mr. Stephen K. Bannon
           dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1885

    2.    Transcript of Oral Argument
        Before the Honorable Carl J. Nichols
           on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

Exhibits to
Defendant's Reply in Support of His Motion to Dismiss Indictment
    filed May 17, 2022, Continued:

    3.    Letter from Costello to Congressman Thompson
           dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1994

    4.    Letter from Congressman Thompson to Costello
           dated October 19, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 1997

United States House of Representatives'
Motion for Leave to File *Amicus Curiae* Brief,
With Attachment
    filed May 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2002

    Attachment:

    Brief of United States House of Representatives as
    *Amicus Curiae* In Support of the Department of Justice
           dated May 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2009

United States House Minority Leadership
Motion for Leave to File *Amicus Curiae* Brief,
With Attachment,
    filed May 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2035

    Attachment:

    Brief of the U.s. House of Representatives Minority Leader
    Kevin O. Mccarthy and the U.s. House of Representatives
    Minority Whip Stephen J. Scalise as Amicus Curiae
           dated May 24, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2050

**Defendant's Notice Regarding Amicus Briefs**
     filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2065

**Motion to Quash,**
**With Attachment,**
     filed June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2072

     <u>Attachment:</u>

     **Memorandum of Points and Authorities**
     **In Support of Motion to Quash,**
     **With Exhibits,**
          dated June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2074

# TABLE OF CONTENTS
## Joint Appendix Volume VI of XII

Page:

Transcript of In-person Motions Hearing
Before the Honorable Carl J. Nichols
    on June 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2229

Government's Omnibus Motion *in Limine*
    filed June 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2408

Defendant's Motion to Compel
Meadows & Scavino Declination Discovery,
With Exhibits,
    filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2425

Exhibits:

1.    Letter from Bannon's Counsel to Prosecutors
            dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2442

2.    Letter from Prosecutors to Bannon's Counsel
            dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2445

3.    Letter from Justin Clark to Scott Gast
            dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 2448

4.    Letter from Pat Cipollone to Chairman Nadler
            dated September 16, 2019. . . . . . . . . . . . . . . . . . . . . . . . 2453

5.    Plaintiff's Motion for Judgment on the Pleadings, or in the
        Alternative, for Summary Judgment, & in Opposition to
        Defendants' Motion for Summary Judgment
            dated May 20, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2459

Defendant's Opposition to Motion to Quash
    filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2597

# TABLE OF CONTENTS
## Joint Appendix Volume VII of XII

Page:

Government's Opposition to Defendant's Motion to Compel
    filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

Joint Proposed Jury Instructions,
With Attachment,
    filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

    Attachment:

    Manual of Model Criminal Jury Instructions
        dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

Government's Objections to Defendant's Proposed Jury Instructions
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

Defendant's Opposition to Government's Omnibus Motion *in Limine*
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

Office of General Counsel U.S. House of Representatives'
Reply in Support of Motion to Quash,
With Exhibits,
    filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

    Exhibits:

    A.    Order - *U.S. v. Moussaoui*
        dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

    B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
        dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

    C.    Order Granting Motion to Quash Subpoena on
        U.S. Representative Maxine Waters - *D.C. v. Hayes*
        dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel Meadows and Scavino Declination Discovery, With Exhibit,**

    filed July 6, 2022............................................ 2842

Exhibit:

    1.    **Memorandum**

               dated October 29, 2021............................. 2853

**Government's Reply in Support of Motion *in Limine***

    filed July 8, 2022............................................ 2863

**Government's Motion *in Limine* to Exclude Evidence or Argument Relating to the Defendant's Eleventh-hour Assertion That He Is Willing to Testify Before the Select Committee**

    filed July 11, 2022........................................... 2874

**Transcript of In-person Motions Hearing Before the Honorable Carl J. Nichols**

    on July 11, 2022............................................ 2879

**Defendant's Opposition to Motion *in Limine* to Bar Testimony, With Exhibits,**

    filed July 13, 2022........................................... 3071

Exhibits:

    1.    **Letters from former President Trump to Mr. Costello and Mr. Costello's Letter to Chairman Thompson**

               dated June 9, 2022................................. 3080

    2.    **Certification**

               dated October 21, 2021............................. 3084

Exhibits to
Defendant's Opposition to Motion *in Limine* to Bar Testimony
     filed July 13, 2022, Continued:

    3.    Subpoena
            dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3090

    4.    Letter from Thompson to Costello
            dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 3092

    5.    Indictment
            dated November 12, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3096

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence or Argument Relating to the Defendant's Eleventh-hour
Assertion That He Is Willing to Testify Before the Select Committee,
With Exhibits,
     filed July 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

     Exhibits:

    1.    Letter from Thompson to Costello
            dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 3114

    2.    Letter from Thompson to Costello
            dated October 15, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 3118

Government's Objections to Defendant's Trial Exhibits
     filed July 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

# TABLE OF CONTENTS
## Joint Appendix Volume VIII of XII

Page:

Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols
      on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,
      filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

      Exhibits:

    1.     Transcript Jury Trial
          Before the Honorable Kurt D. Engelhardt
          *U.S. v. Rainey*, No. 12-291
               on June 1, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

    2.     Congressional Gamesmanship Leads To An
          Acquittal In Deepwater Horizon Case,
          U. S. v. David Rainey: A Case Study
               dated 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash
      filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**
       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**
       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**
       filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**
       filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
       on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

# TABLE OF CONTENTS
## Joint Appendix Volume IX of XII

Page:

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of <u>Kristin Amerling</u>:**

      Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . . . 3942

# TABLE OF CONTENTS
## Joint Appendix Volume X of XII

Page:

Transcript of Jury Trial - Day 3 - Morning Session
Before the Honorable Carl J. Nichols
    on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

    Testimony of <u>Kristin Amerling</u>:

    Direct Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . . 4014
    Cross Examination by Mr. Corcoran.. . . . . . . . . . . . . . . . . . . . . . 4078

Transcript of Jury Trial - Day 3 - Afternoon Session
Before the Honorable Carl J. Nichols
    on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

    Testimony of <u>Kristin Amerling</u>:

    Cross Examination by Mr. Corcoran (Continued). . . . . . . . . . . . 4149
    Redirect Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . 4211

    Testimony of <u>Stephen Hart</u>:

    Direct Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . . . 4233
    Cross Examination by Mr. Corcoran.. . . . . . . . . . . . . . . . . . . . . . 4252
    Redirect Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . 4264

Defendant's Motion for Judgment of Acquittal Pursuant to
Rule 29, Federal Rules of Criminal Procedure
    filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

Transcript of Jury Trial - Day 4
Before the Honorable Carl J. Nichols
    on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

# TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

Page:

Notice of Defendant's Objections to the Court's Final
Jury Instructions and Additional Requested Instructions
    filed July 21, 2022........................................... 4422

Defendant's Notice Regarding Congressional Hearings
    filed July 22, 2022........................................... 4432

Notice of Defendant's Objection to Jury Instruction Number 27
    filed July 22, 2022........................................... 4435

Transcript of Jury Trial - Day 5
Before the Honorable Carl J. Nichols
    on July 22, 2022............................................. 4438

Jury Instructions
    filed July 22, 2022........................................... 4555

Counsels' Acknowledgment Concerning Trial Exhibits
    filed July 22, 2022........................................... 4585

Government's Exhibit List
    filed July 22, 2022........................................... 4586

Defendant's Exhibit List
    filed July 22, 2022........................................... 4588

Note from Jury
    filed July 22, 2022........................................... 4591

Verdict Form
    filed July 22, 2022........................................... 4592

Order
    filed July 27, 2022............................................ 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
    filed July 28, 2022............................................ 4595

    Exhibits:

    1.    Screenshot of Episode 1996, War Room
                dated July 12, 2022. .............................. 4598

    2.    Bannon's Gettr Repost CNN Ad
                dated July 17, 2022. .............................. 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
    filed August 5, 2022........................................... 4600

Defendant's Motion for a New Trial
    filed August 5, 2022........................................... 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
    filed August 12, 2022.......................................... 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
    filed August 19, 2022.......................................... 4649

**Government's Opposition to Defendant's Motion for a New Trial**
  filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657

**Defendant's Reply to Opposition to Motion for a New Trial**
  filed August 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676

**Order**
  filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
  on October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687

**Judgment in a Criminal Case**
  filed October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767

**Defendant's Notice of Appeal**
  filed November 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772

**Order Staying Sentence Pending Appeal**
  filed November 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

Page:

<u>Defendant's Exhibits:</u>

9B.   **H41 Congressional Record - House**
       **dated January 4, 2021**............................. 4780

30.   **Letter from Former President Donald Trump to**
       **Stephen K. Bannon**
       **dated July 9, 2022.** ............................... 4781

31.   **Letter from Robert J. Costello to**
       **Chairman Bennie Thompson**
       **dated July 9, 2022.** ............................... 4782

32.   **Letter from Chairman Bennie Thompson to**
       **Robert J. Costello**
       **dated July 14, 2022.** ............................. 4784

39.   **Article from Rolling Stone**
       **dated September 24, 2021.** ......................... 4786

40.   **Daily Mail Article**
       **dated October 8, 2021**............................. 4804

<u>Government's Exhibits:</u>

1.   **House Resolution 503.**................................. 4808

2.   **Subpoena to Stephen Bannon**
       **dated September 23, 2021.** ......................... 4822

# Government's Exhibits, Continued:

3. Emails re Service of Subpoena
   dated September 23 and 24, 2021. . . . . . . . . . . . . . . . . . . 4832

4. Letter from Costello to
   Chairman Thompson and Cover Email
   dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 4835

5. Letter from Chairman Thompson to Costello
   dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 4838

6. Letter from Costello to Chairman Thompson
   dated October 13, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4841

7. Letter from Chairman Thompson to Costello
   dated October 15, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4843

8. Letter from Costello to
   Chairman Thompson and Cover Email
   dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4846

9. Letters from Chairman Thompson to Costello
   dated October 19, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4848

10. Post on Stephen Bannon's Gettr Account
    dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . . . 4851

11A. Post on Stephen Bannon's Gettr Account
    dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4852

11B. DailyMail Article Linked in October 8, 2021
    Post on Stephen Bannon's Gettr Account. . . . . . . . . . . . . 4853

# EXHIBIT Y

## Applying Estoppel Principles in Criminal Cases

The solidly entrenched, though little discussed, judicial principle
that the government cannot be estopped in criminal actions[1] is now
subject to some doubt. In *Raley v. Ohio*[2] and *Cox v. Louisiana*,[3] the
Supreme Court reversed a number of criminal convictions because
the defendants had relied upon the advice of state officials that they
were acting within the law. The majority opinions made these cases
out as a variation of entrapment, but the facts differed significantly
from the typical entrapment situation.[4] The officials in *Raley* and *Cox*

1. *See, e.g.,* Carolina-Virginia Racing Ass'n v. Cahoon, 214 F.2d 830, 832 (4th Cir. 1954);
United States v. Associated Gen. Contractors of America, 238 F. Supp. 273 (E.D. La 1964),
*rev'd per curiam*, 382 U.S. 17 (1965); Commonwealth v. Malco-Memphis Theatres, 293 Ky.
531, 169 S.W.2d 596 (1943); Western Surgical Supply Co. v. Affleck, 110 Cal. App. 2d 388,
392, 242 P.2d 929, 931-32 (Cal. 1952); 28 AM. JUR. 2d. *Estoppel and Waiver* § 126 (1960); 31
C.J.S., *Estoppel* § 140(c) (1964), and cases cited therein; *cf.* United States v. Socony-Vacuum
Oil Co., 310 U.S. 15 (1940). *But see* United States v. Davis, 272 F.2d 149, 153 (7th Cir. 1959),
where the court denied that estoppel applies in the circumstances of that case but
specifically refrained from saying that estoppel can never apply in a criminal action. The
usual rationale given is that "the application of estoppel against the State is particularly
inappropriate in areas such as criminal prosecution, where the welfare and safety of the
community are the paramount considerations." State v. Abbott, 64 N.J. 131, 133, 165 A.2d
537, 543 (1960). (The question there was one of collateral estoppel but the rationale used
against equitable estoppel is the same.)
In an aside, Newman, *Should Official Advice Be Reliable?—Proposals as to Estoppel and
Related Doctrines in Administrative Law*, 53 COLUM. L. REV. 374 (1953) states: ". . . good
faith reliance on agency rulings will probably keep a man out of jail . . . ." This optimism
seems completely unwarranted, however, as the support Newman musters for it suggests.
More accurate is the observation of Hall & Seligman, *Mistake of Law and Mens Rea*, 8 U.
CHI. L. REV. 641, 677 (1941) [hereinafter cited as Hall & Seligman] that "[T]he proposed
defense is much wider than that recognized by most courts."
2. 360 U.S. 423 (1959). The appellants had relied on the privilege against self-incrimina-
tion when questioned by a commission of the Ohio legislature. Despite the fact that the
commission a ured the appellants that they had a right to silence, the Supreme Court
of Ohio affirmed their contempt convictions on the theory that a state immunity statute
deprived them of the privilege. State of Ohio v. Raley, 164 Ohio St. 529, 133 N.E.2d 101
(1956). The United States Supreme Court reversed. All eight justices participating agreed
as to three of the four appellants:
We hold that in the circumstances of these cases, the judgments of the Ohio Supreme
Court affirming the convictions violated the Due Process Clause of the Fourteenth
Amendment and must be reversed. . . . After the Commission, speaking for the State,
acted as it did, to sustain the Ohio Supreme Court's judgment would be to sanction
an indefensible sort of entrapment by the State—convicting a citizen for exercising a
privilege which the State had clearly told him was available to him.
360 U.S. 425-26. Four justices voted to affirm the conviction of appellant Stern since Stern
had refused to answer the question, "Where do you reside, Mr. Stern?" and persisted in
his refusal when directed by the commission to answer the question. Thus Stern's con-
viction was affirmed by an evenly divided court. *Id.* at 444.
3. 379 U.S. 559 (1965). The Chief of Police of Baton Rouge "gave permission" to Cox,
the leader of a demonstration involving over 2000 person , to proceed to a point across
the street from a courthouse where a group of arrested demonstrators were being held.
A Louisiana statute prohibited picketing "near" a courthouse. LA. REV. STAT. § 14.401
(Cum. Sup. 1962). Cox was convicted under the statute, but the Court reversed finding
the same "active misleading." 360 U.S. at 438, that was dispositive in *Raley*.
4. The Supreme Court first addressed itself to the entrapment doctrine in *Sorrells v.*

1046

Applying Estoppel Principles in Criminal Cases

were known by the defendants to be government agents and had no design to deceive and entrap the defendants, nor did they persuade the defendants to commit the criminal acts.[5] Instead, they merely gave their honest opinion that what the defendants proposed to do was not unlawful. While the entrapment doctrine rests at least in part on the need to control undesirable police practices,[6] the *Raley* and *Cox* hold-

United States, 287 U.S. 435 (1932), and propounded a two-fold test for the defense: (1) the crime is the product of the creative activity of the government agents which defendant was induced to participate in; and (2) the defendant did not have a criminal predisposition or design. *Id.* at 451. They stated that the true basis for the defense was statutory interpretation:

> We are not forced by the letter to do violence to the spirit and purpose of the statu e. . . . If the requirements of the highest public policy in the maintenance of the integrity of administration would preclude the enforcement of the statute in such circumstances as are present here, the same considerations would justify the conclusion that the case lies outside the purview of the Act and that its general words should not be construed to demand a proceeding at once inconsistent with that policy and abhorrent to the sense of justice.

*Id.* at 448-49. This view was followed in the latest entrapment decision by the Court, Sherman v. United States, 356 U.S. 369 (1957). *But see* note 6 *infra.*

*See generally* Donnelly, *Judicial Control of Informants, Spies, Stool Pigeons and Provocateurs,* 60 YALE L.J. 1091 (1951); Rotenberg, *The Police Detection Practice of Encouragement,* 49 VA. L. REV. 871 (1963); Note, *Entrapment,* 73 HARV. L. REV. 1333 (1960); Note, *The Serpent Beguiled Me and I Did at, The Constitutional Status of the Entrapment Defense,* 74 YALE L.J. 942 (1965).

5. In *Sorrells* and *Sherman,* the entrapment cases discussed in note 4 *supra,* the government agents were involved in the practice of encouraging or inducing criminal conduct by the defendant through undercover informers. This is in stark contrast to the facts presented in *Cox* and *Raley* where the defendants sought advice, or received it gratuitously, from state officials as to the proper course of action to be followed in the situation presented at the time.

6. The proper rationale for the entrapment defense has been disputed. Sorrells v. United States, 287 U.S. 435, 456-57 (1932) (Roberts, J., concurring); Sherman v. United States, 356 U.S. 369, 381 (1957) (Frankfurter, J., concurring). Both concurrences held that the proper basis for the defense was the inherent power of the judiciary to protect the courts from the degradation of convicting persons who had been induced to commit illegal acts. In *Sherman,* Frankfurter states that this power derives from the Court's "supervisory jurisdiction over the administration of criminal justice." 356 U.S. at 381. This view implies that the purpose of the defense is control of police solicitation tactics. On balance, the concurrence's view is more reasonable than the legislative intent position adopted by the majorities. *See* note 4 *supra.* Legislative intent on the issue is problematic. The legislature wanted simply to prohibit certain conduct, conduct in which the defendant engaged. The fundamental issue has nothing to do with the defendant's culpability:

> The defendant whose crime results from an entrapment is neither less reprehensible or dangerous nor more reformable or deterrable than other defendants who are properly convicted. Defendants who are aided, deceived or persuaded by police officials stand in the same moral position as those who are aided, deceived or persuaded by other persons. It is the attempt to deter wrongful conduct on the part of the government that provides the justification for the defense of entrapment not the innocence of the defendant.

MODEL PENAL CODE § 2.10 at 14, Comments (Tent. Draft No. 9, 1959). This recognition that the integrity of the criminal process is at stake implies that entrapment is a defense of constitutional proportions under the due process clause. *See* Note, 74 YALE L.J. 942, 945 (1965), compare the language used by both groups in *Sherman* and *Sorrells* with that used in Rochin v. California, 342 U.S. 165, 169, 173 (1952). Since the legitimate goal of law enforcement practices is the prevention and detection of anti-social conduct, not the solicitation, inducement or creation of anti-social acts, a "less restrictive alternative" model demonstrates the need for constitutional restraints on such police practices. *See* Note, 74 YALE L.J. 942, 945-47 (1965) for a discussion of the legitimate state goal in the entrap-

1047

ings reflect only an elemental notion of fairness: the individual must
have fair warning of what conduct the government intends to punish.[7]

Ordinarily, of course, a "mistake of law" is no answer to a criminal
charge.[8] The policies underlying the penal law are thought sufficiently
serious that the citizen must be at his peril to know the law and obey
it.[9] Nonetheless, the Supreme Court on numerous occasions has found
constitutional objections to criminal laws which did not express the
proscribed conduct with minimal clarity.[10] Moreover, the long-standing

ment practice. For a comprehensive analysis of the use of the due process clause to protect
fundamental social values by insisting on a socially useful purpose and the least intrusive
methods of all state action, see Ratner, *The Function of the Due Process Clause,* 116 U.
PA. L. REV. 1048, 1075-89 (1968). One commentator concludes that the Constitution estab-
lishes three independent limitations on police entrapment practices based on self-incrim-
ination, due process, and sear h and se'izu . Note, 74 YALE L.J. 942, 952 (1965).
  7. "Engrained in our concept of due process is the requirement of notice," Lambert
v. California, 355 U.S. 225, 228 (1957). *See also* Wright v. Georgia, 373 U.S. 284, 293 (1963);
*In re* Anastoplo, 366 U.S. 82, 94 (1960). Th'isrequirement cannot reasonably be met when
the state speaks with contradictory voices—one voice from the criminal statute at issue
and another from the law enforcement officials. *See* Johnson v. United States, 318 U.S.
189, 197 (1943).
  8. *See* Model Penal Code, § 2.02(a) (Tent. Draft No. 4, 1955). *But see id.,* Comments 131:
It should be noted that the general principle that ignorance or mistake of law is no
excuse is usually greatly overstated: it has no application when the circumstances
made material by the definition of the offense include a legal element.
  Some commentators have dealt with estoppel situations as part of the broader category
of mistake of law. *See, e.g.,* Hall & Seligman. *supra* note 1, at 675-83; Ryu & Silving, *Error
Juris: A Comparative Study,* 24 U. CHI. L. REV. 421, 436-38 (1957); MODEL PENAL CODE
§ 2.04(3)(b)(iii), Comment (Tent. Draft No. 4, 1955).
  9. It is no doubt true that there are many cases in which the criminal could not
have known that he was breaking the law, but to admit the excuse at all would be
to encourage ignorance where the law-maker was determined to make men know and
obey, and justice to the individual is rightly outweighed by the larger interests of
the other side of the scale.
O.W. HOLMES, THE COMMON LAW 48 (1881). *See* p. 1054 *infra.*
  10. The constitutional requirement of precision or clarity in statutory criminal laws
proceeds from the due process notion that an individual ought to be adequately warned
that sanctions will attach to conduct he might contemplate, and that such warning may
not be issued in su h a form that "men of common intelligence must necessarily guess
as to its meaning and differ as to its application." Connally v. Gen. Constr. Co., 269 U.S.
385, 391 (1926). *See also* G'izcio v. Pennsylvania, 382 U.S. 399 (1966); Winters v. New
York, 333 U.S. 507 (1948); Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939); Champlin
Ref. Co. v. Corp. Comm. of Oklahoma, 286 U.S. 210, 243 (1932); United States v. Cohen
Grocery, 255 U.S. 81, 89 (1931); Int'l Harvester Co. v. Kentucky, 234 U.S. 216 (1914); Col-
lins v. Kentucky, 234 U.S. 634 (1914). Aside from the notise requirement, concern over
vague criteria arises from the fear of the potential for government abuse and uncertainty
of application that is afforded. *See, e.g.,* Smith v. California, 361 U.S. 147 (1959); Watkins
v. United States, 354 U.S. 178 (1957); Connally v. Gen. Constr. Co., *supra* at 395. The
vagueness doctrine also derives support from the concern that judicial tribunals ought
to apply statutes within the bounds of construction and interpretation and not be charged
with the essentially law-making function of providing vague legislation with content.
*See, e.g.,* Cline v. Frink Dairy Co., 274 U.S. 445 (1927); Patten v. Alum. Castings Co., 105
Ohio St. 1, 136 N.E. 426 (1922). *But see* Nash v. United States, 229 U.S. 373 (1913). Even
stricter standards of precision are applied where vagueness might result in a chilling
effect on first amendment freedoms. *See* Keyishian v. Bd. of Regents, 385 U.S. 589 (1967);
Baggett v. Bullitt, 377 U.S. 360 (1964); Cramp v. Bd. of Pub. Instruction, 368 U.S. 278
(1961); Shelton v. Tucker, 364 U.S. 479, 488 (1960); Smith v. California, *supra;* Niemotko
v. Maryland. 340 U.S. 268 (1951); Thomas v. Collins, 323 U.S. 516 (1945); Herndon v.
Lowry, 301 U.S. 242 (1937); Stromberg v. California, 283 U.S. 359, 369 (1931). *See* Note,
*The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U. PA. L. REV. 67 (1960).

rule that the words or actions of its agents cannot estop the govern-
ment has suffered considerable erosion.[11] In its application to civil cases,
courts and commentators have long attacked it,[12] while in criminal
cases the ex post facto clause—and its due process analog when a high
court has reversed itself on a matter of statutory or constitutional in-
terpretation[13]—embodies principles similar to the estoppel doctrine.

11. *See, e.g.,* Moser v. United States, 341 U.S. 41, 46 (1951); United States v. Fox Lake
State Bank, 366 F.2d 962 7th Cir. 1966); Stockstrom v. Comm'r, 190 F.2d 283 (D.C. Cir.
1951); United States v. Associated Gen. Contractors of America, 238 F. Supp. 273 (E.D.
La. 1964), *rev'd per curiam,* 382 U. . 17 (1965); City of Sheridan v. Montana-Dakota Util.
Co., 157 F. Supp. 664, 670 (D.C. Wy. 1958); Gruber v. Mayor of Raritan, 39 N.J. 1, 186
A.2d 489 (1962) (extensive review of authorities); Vogt v. Borough of Belmar, 14 N.J. 195,
206-07 (1954); City of Los Angeles v. Los Angeles County, 9 Cal. 2d 624, 630-31 (1937).
However, the state of the law on the application of equitable estoppel principles to gov-
ernments and governmental agencies is presently ver ' uncertain. *See* K. Davis, Admin-
istrative Law Treatise §§ 17.01-.09 (1958). For cases supporting the view that the govern-
ment cannot be estopped, see, e.g., Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383 (1917);
Legurlotz v. Rogers, 266 F.2d 457, 459 (D.C. Cir. 1959); Rock v. United States, 279 F. Supp.
96, 101 (S.D.N.Y. 1968); United States v. Amcco Electronic Corp., 221 F. Supp. 783, 786
(E.D.N.Y. 1963).

12. *See, e.g.,* K. Davis, Administrative Law Treatise §§ 17.01-.09 (1958); Berger,
*Estopp l Against the Government,* 21 U. Chi. L. Rev. 680 (1954); Manning, *The Applica-
tion of the Doctrine of Estoppel Against the Government in Federal Tax Cases,* 30 N.C.L.
Rev. 356 (1952); Newman, *Should Official Advice Be Reliable?—Proposals as to Estoppel
and Related Doctrines in Administrative Law,* 53 Colum. L. Rev. 374 (1953); Whelan &
Dunigan, *Government Contracts: Apparent Authority and Estoppel,* 55 Geo. L.J. 830
(1967); Comment, *Estoppel Against the Government in California,* 44 Calif. L. Rev. 340
(1956); Comment, *Estoppel Against State, County, and City,* 23 Wash. L. Rev. 51 (1948).
Various courts and judges have also dealt with the problem in some depth. *See* cases cited
in note 11 *supra.* The uniform agreement of commentators that the traditional doctrine
should be discarded is matched by the judicial dissatisfaction with the doctrine demon-
strated in the nu erous judicial abridgments of the no-estoppe rule. *See* 31 C.J.S.
*Estoppel* §§ 138-46 (1964). Thus, governments are more likely to be estopped when the
litigation has arisen out of their "proprietary" functions rather than their "govern-
ments " or "public" functions, when the government is the plaintiff rather than the
defendant, when the act of the agent relied on was "authorized" rather than "unautho-
rized," when the question is procedural rather than substantive, when it is a subordinate
government or governmental agency rather than a sovereign state or the United States,
and when the government's misrepresentation is by "action" rather than "inaction."

It is apparent that the more liberal view will gain increasing acceptance. It should be
noted, however, that the demise of the traditional doctrine is not altogether a foregone
conclusion, and the optimism of Professor Davis on this point may be somewhat pre-
mature. *See, e.g.,* Kondo v. Katzenbach, 356 F.2d 351, 363 (1966) (J. Skelly Wright, J.,
dissenting). Judge Wright based his dissent on estoppel grounds and supported his posi-
tion with ample precedent and scholarship. On appeal the Supreme Court reversed, *sub
nom.* Honda v. Clark, 386 U.S. 484, 500 (1967), but rested its decision on byzantine stat-
utory interpretation. It specifically refused to reach the estoppel issue. In any case, the
growing curtailment of the traditional doctrine does not imply that the government will
uniformly be held estopped by actions that would estop a private party. Rather, the
equities of the situation will be balanced with governmental needs kept in mind. *See*
United States v. Radio Corp. of America, 358 U.S. 334 (1959); George H. Whike Constr.
Co. v. United States, 140 F. Supp. 560 (Ct. Cl. 1956).

13. Bouie v. City of Columbia, 378 U.S. 347, 362 (1964). Petitioners, "sit-in" demon-
strators, were convicted of refusing to leave private property after being asked to do so
under a criminal statute which proscribed entry on the lands of another after notice pro-
hibiting entry. The South Carolina Supreme Court affirmed on the basis of a subsequent
decision construing the statute as applicable to the act of remaining on the premises of
another after receiving notice to leave. The United States Supreme Court reversed, hold-
ing that the statute did not give the petitioners fair notice that their conduct was illegal,
and that the state court's retroactive app ication of its new construction of the statute

1049

Case 1:21-cr-00670-CJN   Document 58-25   Filed 04/15/22   Page 6 of 29

If the Supreme Court chooses to follow the logic of *Raley* and *Cox*, it must end by replacing the no-estoppel rule in criminal prosecutions with some sort of due process-estoppel defense. The Court might contrive some basis for distinguishing and isolating the two cases: both have first amendment undertones, *Raley* involves a conviction for contempt of a state legislative commission—not a common occurrence—, and in *Cox* Justice Goldberg's majority opinion pointed out that a statute prohibiting picketing "near a courthouse" raised some questions of vagueness.[14] Yet it is not easy to draw fine and narrow lines around fundamental concepts of fairness,[15] and it is not likely that the Court will want to do so.

On the other hand, constructing a doctrine of criminal estoppel from the rationale of *Cox* and *Raley* is no simple task itself. These two cases may provide the precedential foundation for such a doctrine,[16] but they

amounted to a denial of due process since it operated exactly like an ex post facto law. The underlying equitable rationale is similar to criminal estoppel. Iowever, it is unrealistic to think that the petitioners were relying on the wording of the statute, particularly since both petitioners expressed a willingness to be arrested and the expectation that they would be. *Id.* at 367 (Black, J., dissenting). Also, it seems safe to say that in 1960 a black person about to sit-in at a lunch counter in Columbia, South Carolina, could reasonably expect to be arrested and convicted of *some* criminal violation. However, to make reliance the on y relevant question is to ignore half the problem—the conduct of the state. The majority's recognition of the functional equivalency of such retroactive application to ex post facto laws adequately characterizes this type of judicial deviation from the rule of law.

Also note Justice Brennan's statement that the petitioners' conduct was not "improper or immoral." *Id.* at 362. In this connection, see Hall & Seligman, *supra* note 1.

*See also* James v. United States, 366 U.S. 213 (1961). James had been convicted of "willfully and knowingly" failing to pay income tax on embezzled funds, and based his defense on Comm'r v. Wilcox, 327 U.S. 404 (1946), which held that embezzled funds were not taxable income. The Supreme Court overruled *Wilcox*, yet reversed James' conviction. Three justices rested on the ground that since his actions took place while *Wilcox* was still valid, "wilfulness" couldn't be shown, and three others on the grounds that *Wilcox* was right when decided. In addition, Justices Harlan and Frankfurter (who had agreed on the overruling of *Wilcox*) voted to remand the case for a new trial in which the government would have to prove that James' failure to pay income taxes was wilful, *i.e.*, that he did not rely on *Wilcox*. On the prospective overruling issue generally, see Note, *Prospective Overruling and Retroactive Application in the Federal Courts*, 71 YALE L.J. 907, 923-27 (1962). *See also* Desist v. United States, 37 L.W. 4225 (1969); Linkletter v. Walker, 381 U.S. 618 (1965).

14. Cox v. Louisiana, 379 U.S. 559, 568 (1966). The majority admitted that there was "some lack of specificity in a word such as 'near'." However, the Court circumvented this problem, saying that though the statute was not unconstitutionally vague, it required and anticipated "a degree of on-the-spot administrative interpretation by officials " *Id.* This analysis has been found unpersuasive by at least one commentator. Note, *The Supreme Court, 1964 Term*, 79 HARV. L. REV. 105, 154 (1965). *See* note 10 *supra*.

15. On the fundamental nature of due process adjudication and the broad scope of the Court's power under that clause, see Ratner, *The Function of the Due Process Clause*, 116 U. PA. L. REV. 1048 (1968).

16. The opinions in Raley v. Ohio, 360 U.S. 423 (1959), managed to ignore totally the estoppel implications of that decision. Some cursory mention of the fundamental nature of the issue can be found in *Cox*. Mr. Justice Goldberg stated for the majority:

Nor does this limited administrative regulation of traffic which the Court has consistently recognized as necessary and permissible, constitute a waiver of law which is beyond the power of the police. Obviously telling demonstrators how far from the

1050

Applying Estoppel Principles in Criminal Cases

hardly suggest the finished analytic structure. Most importantly, the opinions fail to take account of the basic policy reasons for the no-estoppel rule: the doctrine of separation of powers and the fictive presumption that every citizen knows the criminal law. However much the rule's urgency has been exaggerated, the policy underlying it is by no means unimportant and, eventually, must help shape any emerging theory of criminal estoppel.

I.

*Separation of Powers.*[17]—The interests embodied in the criminal law are *public* interests of the greatest weight. No official or agency of

courthouse steps is "near" the courthouse for purposes of a permissible peaceful demonstration is a far cry from allowing one to commit, for example, murder, or robbery.
379 U.S. at 569.

In dissent, Mr. Justice Black stated categorically that "a police chief cannot authorize violations of his State's criminal laws." *Id.* at 582. However, the cases cited in support of this broad statement demonstrate that support for Black's position is as difficult to muster as its opposite. All three are antitrust cases; and only *Socony* is a criminal prosecution: United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350-52 (1963); California v. Federal Po er Comm'n, 369 U.S. 482, 484-85 (1962); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225-27 (1940).

In *Socony* the defendants had offered to prove the encouragement, cooperation and acquiescence of the Federal Petroleum Administration in the buying programs the defendants had inaugurated in order to stabilize the price of refined gas. The trial court rejected the offer and the Supreme Court affirmed. The Court noted that the National Industrial Recovery Act set up a mechanism for securing immunity for such programs from the Sherman Act. The defendants eschewed that mechanism while it was operative, and the scheme continued after the expiration of the NIRA. It is reasonable to read the case as one in which the agency had "alerted defendants that their conduct would be considered unlawful unless formal approval were obtained." (as the district court did in United States v. Associated Gen. Contractors of America, 238 F. Supp. 273, 283 (E.D. La. 1965)), although the Court in *Socony* specifically refused to rest on this ground. The Supreme Court reversed per curiam in *Associated General,* 382 U.S. 17 (1965), citing *Socony* and Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 623-24 (1953). ("Doubtless, long-tolerated trade arrangements acquire no vested immunity under the Sherman Act; no prescriptive rights accrue to the prosecutor's delay.")

The decisions in *Cox* and *Raley* certainly curtail the scope of the language in *Socony* relied on in the per curiam reversal. If the *Socony* principle is to be considered viable today, it must be due to the peculiar characteristics of the antitrust field or the limited reading of the case that the district judge gave it in *Associated General.*

Certainly *Associated General* is not the vehicle to reinstate the no-estoppel doctrine even in the antitrust field. The district court used estoppel language, but the decision is erroneous on any basis and should be deemed a sport. The judge brought the estoppel issue up sua sponte based on a ngle document submitted by the government for another purpose. The question the government presented on appeal was whether the government is estopped from prosecuting someone criminally *solely* because, after previously investigating the *activity,* it did not institute civil or criminal suit thereon. This is a fair statement of the record. The government had investigated the Association ten years prior to this action and issued no statement or indictment. The Association argued in its brief that the case was covered by *Cox* and that the appeal should be dismissed for want of a substantial federal question. Nothing in *Cox* or this Note covers such a case since there was no inducement, no widespread nonenforcement, no advice, and probably no reliance. The case deserved the summary reversal the Court gave it. *See* Case Note, 196 DUKE L.J. 619.

17. The traditional formulation of the doctrine of separation of powers dictates that

1051

The Yale Law Journal                    Vol. 78: 1046, 1969

government has the authority to waive the public interest,[18] and so none---save the legislature—can define the limits of the criminal law. A defense of criminal estoppel would in effect permit the individual official to alter or suspend the statutory penal law simply by misinterpreting it.[19]

Justifying the rule against estopping the government in terms of separation of powers, however, is only a formal expression of the belief that the criminal law is too serious a matter to allow law enforcement officials to make mistakes as to what it covers. If the individual is unsure where the boundary of lawful conduct lies, he should "steer wide of the unlawful zone" rather than seek official advice as to how far he might legally go. This makes a great deal of sense where the prohibited conduct threatens grave injury to persons or property or a serious disruption of the economy, but the no-estoppel rule has traditionally been applied without regard to the gravity of the offense and its probable consequences.[20] The criminal law has become ex-

---

the legislative branch retain exclusive power to make the law. "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. art. I. See, e.g., Schechter Poultry Corp. v. United States, 295 U.S. 495, 529-42 (1935); Panama Refining Co. v. Ryan, 293 U.S. 388 (1935); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

However, numerous institutional compromises have been grafted onto this model. See generally C. BLACK, PERSPECTIVES IN CONSTITUTIONAL LAW 56-64 (1963); A. BICKEL, THE LEAST DANGEROUS BRANCH, 159-61 (1962); L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 28-86 (1965); 1 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 2.01-.16 (1958); Jaffe, An Essay on Delegation of Legislative Power: II, 47 COLUM. L. REV. (1947).

18.  See Cox v. Louisiana, 379 U.S. 559, 582 (1965) (Black, J., dissenting). See note 16 supra. See generally articles cited note 12 supra.

19.  As the law now stands, police and other law enforcement officers have not been delegated discretion not to invoke the criminal process for violations within the "full enforcement area." J. Goldstein, Police Discretion Not to Invoke the Criminal Process: Low Visibility Decisions in the Administration of Criminal Justice, 69 YALE L.J. 543, 577-80 (1960) [hereinafter cited as J. Goldstein]. For a graphic illustration of the level of actual enforcement, see id. at 563; THE CHALLENGE OF CRIME IN A FREE SOCIETY, A REPORT BY THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE 8-9 [hereinafter cited as CHALLENGE].

20.  Despite the strength of the no-estoppel rule, scattered state cases indicate that the principle of criminal estoppel is gaining some acceptance. See, e.g., People v. Ferguson, 134 Cal. App. 41, 24 P.2d 965 (1933). The court reversed conviction for violation of state securities statute for failure to get a permit to sell certain interests in a land development scheme. The trial court had rejected the defendant's offer to prove that he had been in doubt as to whether the scheme was covered by the statute and had received a ruling from the corporations commissioner that the land interests were not "securities" and thus no permit was needed. But see Western Surgical Supply Co. v. Affleck, 110 Cal. App. 2d 388, 242 P.2d 929 (1952). See also Market Street Ry. Co. v. State Bd. of Equalization, 137 Cal. App. 2d 87, 290 P.2d 20 (1955); State v. Ragland, 4 Conn. Cir. 424, 233 A.2d 698 (1967) (discussed at note 73 infra; People v. Donovan, 27 App. Div. 2d 957, 279 N.Y.S.2d 404 (1967) (discussed at note 80 infra); People v. Markowitz, 18 N.Y.2d 953, 223 N.E.2d 572, 277 N.Y.S.2d 149 (1966) (defendant made various attempts to get a peddler's license to sell scorecards at ballpark, but was told by licensing officials that it wasn't necessary; later he was convicted of unlicensed peddling, but the New York Court of Appeals reversed per curiam on the basis of Cox); Commonwealth v. Wilson, 158 Pa. Super. 198, 44 A.2d 520 (1945) (where the local practice had been to issue two subpoenas for attendance of Commonwealth witnesses, one for the grand jury and another for the trial, an

1052

---

tensively used as an instrument of social control with a complex,
sometimes labyrinthian administrative structure. Where an individual
has relied upon the enforcement agency's interpretation of a highly
technical law,[21] or obeyed the reasonable order of someone with ap-
parent authority to give it,[22] allowing the government to disclaim the
action of its agent seems not only unjust, but unnecessary to the proper
functioning of the criminal process and to any rational theory of the
allocation of power between different branches of government.

*The Presumption of Knowledge of the Law.*—Courts refusing to
apply estoppel against the government in civil cases often state that
the citizen is charged with knowledge of the statutes and regulations
relevant to the transaction.[23] In the criminal area, the common law
enshrined this notion in the rule that ignorance of the law is no ex-
cuse for breaking it.[24] Though the presumption was admittedly a

individual had a right to rely on the custom; though the defendant was unable to appear
at the grand jury due to illness, and it was not legally necessary to send two subpoenas,
the judgment of conviction for failure to obey the one subpoena was reversed); People v.
Walker, 14 N.Y.2d 901, 200 N.E.2d 779, 252 N.Y.S.2d 96 (1964) (memorandum decision),
*conviction rev'd,* 50 Misc. 2d 751, 271 N.Y.S.2d 447 (Sup. Ct. 1966) (discussed at note 106
*infra*).

21. *See* People v. Ferguson, 134 Cal. App. 41, 24 P.2d 965 (1933).

22. *See* State v. Ragland, 4 Conn. Cir. 424, 233 A.2d 698 (1967).

23. *See, e.g.,* Fed'l C op Ins. Corp. v. Mer ill, 332 U.S. 360 (1947). The plaintiff applied
for a wheat crop insurance policy from the FCIC through the county committee, dis-
closing to them that part of the crop was reseeded winter wheat. The branch office of
FCIC approved the policy on the county committee's recommendation. When the plaintiff
tried to recover under the policy, the FCIC refused to pay, based on a Wheat Crop Insur-
ance Regulation that precluded insurance for reseeded wheat. The county committee had
misled plaintiff to believe the entire crop was insurable, and plaintiff had no knowledge
of the regulation. The Supreme Court reversed a jury verdict for the plaintiff saying that
private parties had the burden to know the law regulating government agents.

It is more reasonable to charge the citizen with knowledge of the law in a criminal
case since the relevant law proscribes the conduct by the individual rather than regulating
the power distribution within the government. *See* note 16 *supra,* especially United States
v. Socony-Vacuum O 1 Co., 310 U.S. 150 (1940).

24. *See* note 9 *supra. See generally* Hall & Seligman, *supra* note 1.

Austin felt that the question of whether the defendant was actually ignorant of the
law was so difficult to solve that the adjudication of the issue would be impractical or
impossible. J. AUSTIN, JURISPRUDENCE § 699, at 342 (Campbell ed. 1875). As Holmes pointed
out, this rationale for the rule is entirely insufficient:

[The presumption] has accordingly been defended by Austin and others, on the
ground of difficulty of proof If justice requires the fact to be ascertained, the diffi-
culty of doing so is no ground for refusing to try. . . . [N]ow that parties can testify,
it may be doubted whether a man's knowledge of the law is any harder to investigate
than many questions which are gone into. The difficulty, such as it is, would be met
by throwing the burden of proving ignorance on the law-breaker.
O. W. HOLMES, THE COMMON LAW 48 (1881).

Objections to this position are no more persuasive than Austin's original statement.
*See, e.g.,* Hall & Seligman, *supra* note 1, at 647-48. *See, e.g.,* Lambert v. California, 355
U.S. 225 (1957), where the Court eschewed the common law principle that ignorance of
the law will not excuse, and held that an ex-convict who failed to register as a convicted
person under an ordinance requiring registration could not be held criminally liable for
the failure absent actual notice of the o dinance. Due process requires notice in these

1053

The Yale Law Journal                    Vol. 78: 1046, 1969

fiction at common law, the diversity of American society and the explosion of statutory crimes has divorced the fiction from reality entirely.

In fact, the criminal process has not for some time been the simple mechanism which the no-estoppel rule presupposes. Legislatures continually pass criminal statutes that require interpretation[25] and outright policy-making by administrative officials. Separate agencies may share responsibility for enforcing the same body of law. Even the police, working with many broadly-framed laws and limited resources,[26] make refinements in the law that the legislature may not have intended.[27] An individual, confronted with the practices and views of the enforcement agency, has little means of discovering whether the prosecutor—much less the legislature—knows or agrees with how the law is being administered. In light of such state-sponsored confusion, government insistence that the citizen should know the true state of the law is at best unreasonable.[28]

Reasons which might justify the no-estoppel rule in some cases, therefore, do not apply in many others, while the reason for an estoppel

circumstances because the "conduct" was wholly passive and the defendant had no knowledge of any wrongdoing.

The presumption is also overcome in other situations. Where the Court determines there was a lack of *mens rea*, there is no conviction. *See* note 77 *infra*. Similarly, the legislature may require more than the presumption or a general intent to do the acts, e.g., by requiring a specific intent to violate the law, that the acts be done "wilfully." *See* James v. United States, 366 U.S. 213, 221 (1961); United States v. Murdock, 290 U.S. 389 (1933).

25.   The statute involved in Cox v. Louisiana, 379 U.S. 559 (1965), is an example. The classic example is the normal breach of the peace statute. *See* H. Goldstein, *Police Discretion: The Ideal Versus the Real,* 23 Pub. Admin. Rev. 140, 142-43 (1967); Remington & Rosenblum, *The Criminal Law and the Legislative Process,* 1960 U. Ill. L. Forum 481, 485-93 (1960).

26.   *See* J. Goldstein, *supra* note 19, at 560-62; H. Goldstein, *supra* note 25, at 142-43.

27.   These decisions have a wide impact on the attitudes of citizens toward the criminal law, law enforcement, and government generally. *See* Challenge, *supra* note 19, at 91-95, 99-101; Hall, *Police and Law in a Democratic Society,* 28 Ind. L.J. 133, 144 (1953); W. LaFave, Arrest: The Decision to Take a Suspect into Custody 89-91, 118-19, 155-56 n.16 (1965) [hereinafter cited as LaFave]; Williams, *Turning a Blind Eye,* 1954 Crim. L. Rev. 271.

These distinctions or refinements may be rational ones based on sound policy determinations. *But see, e.g.,* J. Goldstein, *supra* note 19, at 553, particularly n.17; Yick Wo v. Hopkins, 118 U.S. 356; People v. Utica Daw's Drug Co., 16 App. Div. 2d 12, 225 N.Y.S.2d 128 (1962); and note 108 *infra.* But even rational enforcement distinctions may operate against the goals of the criminal process or the legislative will. *See* J. Goldstein, *supra* note 19, at 562, 567-73, 576-77, 582-86.

28.   If the main basis for the presumption is the state's need "to make men know and obey," the fact that the executive arm of the state has interposed a different standard for obedience, a standard including the threat of immediate enforcement as well as the power to grant effective immunity, vitiates the rationale for the presumption. *See* Hall & Seligman, *supra* note 1, at 649; Model Penal Code, § 2.04(3)(b) and comments, at 17-18, 138-39 (Tent. Draft No. 4, 1955). *See also* Ryu & Silving, *Error Juris: A Comparative Study,* 24 U. Chi. L. Rev. 421, 436-38 (1957).

Applying Estoppel Principles in Criminal Cases

defense applies in all.[29] Moreover, recognition of a criminal estoppel defense would focus attention on interstitial law-making by enforcement agencies,[30] providing the legislature a more realistic view of the criminal process[31] and enabling different branches of the government to better coordinate their roles in administering the criminal law.[32] The question, then, becomes not whether the courts should accept a defense of estoppel, but how far it should extend—in short, a question of what kind of reliance on what kind of official mis-representation should estop the state from prosecuting a person for what kind offense.

## II.

Because a plea of estoppel would constitute a special excuse for a criminal act and would often involve facts peculiarly within the de-

29.  The suggestion for an estoppel defense contained in this Note is not altogether original, but it does go considerably beyond earlier proposals. *See* Comment, *Estoppel Against the Government in California*, 44 CALIF. L. REV. 340, 342-44, 352-53 (1956), for a section of a proposed statute on estoppel that would deal with a limited number of the situations discussed herein. *See also* People v. Donovan, 53 Misc. 2d 687, 279 N.Y.S.2d 404 (Spec. Sess., Westchester 1967); Case Note, 81 HARV. L. REV. 895 (1968); authorities cited note 8 *supra*.

30.  On the need for judicial review of law enforcement officers' discretion in order to assure that the rule of law prevails, see LaFAVE 68-72; H. Goldstein, *Administrative Problems in Controlling the Exercise of Police Authority*, 58 J. CRIM. L.C. & P.S. 160, 168-69 (1967) (excellent summary of various efforts to obtain review and the problems involved); LaFave & Remington, *Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions*, 63 MICH. L. REV. 987 (1965); LaFave, *Improving Police Performance Through the Exclusionary Rule*, 30 MO. L. REV. 391 (1965).

31.  Professor Goldstein concludes that the ultimate answer is not to legitimate police discretion and make attempts to control it through review, but rather to eliminate police discretion and strive for full enforcement. The hope is that this would either force real reform of the statutory criminal law or follow such eform. *See* J. Goldstein, *supra* note 19, at 560-62, 586-89. Whatever the validity of this view in regard to police, it seems impossible to endorse with respect to agencies, prosecutors and other law enforcement officers. In any case, the theoretical possibility of full enforcement is not dealt with here. The various judicial and scholarly justifications for enforcement discretion seem persuasive, and the emphasis here is on obtaining review of such discretion in order to curb abuses. *See* Cox v. Louisiana, 379 U.S. 559, 569 (1965); CHALLENGE, *supra* note 19, at 106; TASK FORCE REPORT: THE POLICE 18; H. Goldstein, *Police Discretion: The Ideal Versus the Real*, 23 PUB. ADMIN. REV. 140, 146; United States v. Cox, 342 F.2d 167 (5th Cir. 1965); Powell v. Katzenbach, 359 F.2d 234 (D.C. Cir. 1965).

32.  Since criminal estoppel would result in a complete defense, the judicial determination of police misrepresentation should have some impact on police practices. It might force the police to re-examine the amount of discretion left to individual officers. For a discussion of why police departments are reluctant to formulate such policy now, see CHALLENGE, *supra* note 19, at 103-04; LaFave, 493-95; H. Goldstein, *Police Discretion: The Ideal Versus the Real*, 23 PUB. ADMIN. REV. 140, 143-45.

The judiciary is the best institution now available for considering the delicate issues involved. The courts are situated at the proper stage of the process for determining whether the accused has reasonably relied on official action or inaction because: (1) the police and prosecutor have had an opportunity to consider the propriety of their actions against the person, and (2) the principle is directly analogous to civil estoppel which the judiciary has dealt with over a long period of time. Being somewhat more immune f om the political pressure and tensions of law enforcement than the police and prosecutor, courts are better able to render considered decisions on the fairness of police and prosecutorial decisions and the reasonableness of the defendant's claimed reliance on officials' misrepresentations.

1055

fendant's knowledge,[33] it would properly be an affirmative defense.[34] The defendant would bear the burden of coming forward with convincing evidence that the government had misled him, and the jury would decide whether he had actually acted in reliance on some official word or deed.[35] The reasonableness of this reliance,[36] however, determined in light of the policies weighing both for and against estoppel, would be an issue of law, since the courts will be defining the limits of the defense by specifying the circumstances in which reliance is justifiable.[37]

33.  Those facts peculiarly within the defendant's knowledge would be those relating to his actual reliance—the knowledge of the pertinent law he had at the time of violation, what he heard the law enforcement officer to say, his belief in the advice or directions and his reliance thereon. However, in many cases highly important data might be just as "peculiarly" within the knowledge of the prosecution or police department, e.g., enforcement patterns, poli y dire tives, the orders the law enforcement official was acting under. In such situations, ample discovery should be provided. See, e.g., People v. Harris, 182 Cal. App. 2d Supp. 837, 5 Cal. Rptr. 852 (1960).

34.  Cf. 31 C. JS., Estoppel § 63 at 397; § 75 at 453; 153(1) at 743-49 (1964). The criminal estoppel defense is heavily fact-oriented. Thus, the issue must be tied to the jury in some form. However, the prejudice to the defendant involved in trying the issue to the jury could be nearly as great as that involved in trying the entrapment issue to the jury. See MODEL PENAL CODE § 2.10(2), Comment 5 at 14, 21-22 (Tent. Draft No. 9, 1959).

35.  Sin e the defense is affirmative, the burden would seem to be best left with the defendant. However, the prosecution traditionally has the burden of proving all the elements of a crime "beyond a reasonable doubt." Moreover, the prosecution clearly has better access to the evidence on one half of the defense—official misleading; but the defendant has better access to the evidence on the other half—his own reliance. The treatment of burden of proof for the insanity defense is of some assistance here. The defendant raising the insanity defense bears the burden of coming forward with evidence on the issue, the "production" burden. In half of the states and the federal courts, the defendant can satisfy this burden by presenting "some evidence" of insanity. By doing so, the defendant shifts the burden of production (as well as the persuasion burden) to the prosecution, which must present sufficient evidence of sanity to convince reasonable men beyond a reasonable doubt. The prosecution also bears the "risk of non-persuasion," though in a majority of states the defendant is said to have to prove his insanity by a preponderance of the evidence. See A. GOLDSTEIN, THE INSANITY DEFENSE 110-15 (1967). Though the defendant can carry the issue to the jury by presenting "some evidence" (and Prof. Goldstein indicates that this standard is liberally interpreted), he must demonstrate insanity by a preponderance of the evidence in order to get a directed verdict. The prosecution's burden to prove intent beyond a reasonable doubt is conceptually distinct.

There is some argument for applying this allocation in a criminal estoppel situation. However, the state's ease of access to evidence of misleading re uires some variation. The proper solution would seem to be: (1) that the defendant should initially bear the production burden on both questions—misleading and reliance; (2) that if the defendant presents "some evidence" on both elements, the production burden and the burden of persuasion is placed on the prosecution on the question of misleading; (3) that the defendant retains the production burden and the burden of persuasion on the question of his own reasonable reliance; (4) that the standard for a directed verdict should be that the defendant must prove his estoppel defense by a preponderance of the evidence unless the evidence presented raises a reasonable doubt as to intent or mens rea or another element of the crime. On mens rea, see note 77 infra.

36.  Cf. 31 C. JS. Estoppel § 67 (1964).

37.  Since the criminal estoppel defense is based on due process, a matter of law, the trial court must exercise close supervision over the treatment of the entire issue. Where undisputed testimony demonstrates all the elements of the defense, or the defendant proves the elements of the defense by a clear preponderance of the evidence, the court should grant a directed verdict for the defendant. Where testimony on one or more elements of

1056

Applying Estoppel Principles in Criminal Cases

Before a court can judge whether reliance on official misleading was justifiable, it will have to consider all the circumstances under which reliance is claimed.[38] Because the estoppel defense rests on due process notions of fairness to the individual, an abstract "reasonable man" standard that ignores individual characteristics will not do:[39] the socio-economic, educational, and cultural traits of the defendant, as well as those of the community in which he lives,[40] are no less relevant to

the defense conflicts, mandatory instructions should be given the jury. See MODEL PENAL CODE § 2.04(4) (Tent. Draft No. 4, 1955).

38.  Cf. Bealle v. Nyden's, Inc., 245 F. Supp. 86, 92-5 (D. Conn. 1965) for an example of a trial judge's treatment of all the facts and inferences available concerning the plaintiff's reliance in a civil equitable estoppel claim.

39.  This insistence on an individualized standard for reliance comports with the Supreme Court's view of the due process mandate in another sensitive area of police practices—interrogations. Prior to the promulgation of the Miranda rules, the Court's test for the admissibility of confessions obtained by police interrogation was "voluntariness," whether the defendant's will was overborn by the police conduct in questioning him. This seemingly objective standard became highly personalized in application. For example, in Crooker v. California, 357 U.S. 433, 438 (1958) the Court states:

[The possibility of coercion] is negated here by petitioner's age [31], intelligence, and education. While in law school he had studied criminal law; indeed, when asked to take the lie detector test, he informed the operator that the results of such a test would not be admissible at trial absent a stipulation by the parties.

The Court then distinguished an earlier case that held that due process was violated, House v. Mayo, 324 U.S. 42 (1945), because there the defendant was "au uneducated man" and a "stranger to the area." Another contrast to the Crooker determination is Spano v. New York, 360 U.S. 315, 321-23 (1959), where the Court noted that the defendant was fo eign-born, only 25 years old, had no criminal record or exposure to police questioning, had finished only one-half year of high school, and had a history of emotional instability, before holding that the use of the confession solicited f om him by the police through his "childhood friend" violated due process.

This individualized standard departs somewhat, however, from the normal treatment of reliance in civil estoppel and the mythical "reasonable man" of tort law. But it is apparent that the abstract "reasonable man" does take on a very large number of the features of the defendant in a civil suit:

It would appear that there is no standardized man; that there is only in part an objective test; that there is no such thing as reasonable or unreasonable conduct except as viewed with eference to certain qualities of the actor—his physical attributes, his intellectual powers, probably, if superior, his knowledge and the knowledge he would have acquired had he exercised standard moral and at least average mental qualities at the time of action or at some connected time.

Seavey, Negligence—Subjective or Objective?, 41 HARV. L. REV. 1, 27 (1927). See generally W. PROSSER, THE LAW OF TORTS 153-83 (3d ed. 1964). Whatever the benefits of the totally objective reasonable man might be in determining liability in civil matters (where the objective is to compensate victims and hold all citizens to a reasonable standard of care), the requirements of due process in the criminal estoppel situation should be made to turn on the reasonableness of the defendant's reliance, since the objective here is to prevent the stigma of a criminal conviction from attaching to a person who has relied on the advice or directions of the executive officials. Cf. Moser v. United States, 341 U.S. 41 (1951).

40.  Significant practical difficulties, as well as definitional problems, are presented in determining a defendant's "community" and the community's "mores." Certainly the relevant community should not be considered to be as large as a state jurisdiction in most cases, nor as small as the defendant's private circle of friends or peer group. In a modern urban context the notion of a physically definable community of mutually dependent actors with shared values and norms has only an attenuated meaning. The congruent social, economic, political and ethical worlds of the agrarian town have disappeared; thus, there is substantial difficulty in determining the folkways or fuundmental moral standards of conduct of citizens. Despite these problems, as long as the relevant com-

1057

determining whether the individual *should* have relied than to determining whether he actually did. At the same time, a standard of justifiable reliance cannot disregard society's interest in strict observation of the criminal law.[41] Where the defendant knew that his acts were illegal, he must face a heavy presumption that reliance was not reasonable.[42] The judge's task is to decide when, even after the official misleading involved in the case, the individual still has a duty to know the law.

Clearly, a mere expectation that the government will not prosecute does not raise the defense.[43] A defendant who, for reasons not generally applicable, has received "license"[44] to violate the law from those charged with enforcing it cannot validly claim estoppel. The purpose of criminal estoppel is the protection of those whom the government has confused as to the state of the law; and collusion, bribes, and favoritism by officials are outside its scope—no matter how much the defendant may have relied on such misconduct.[45]

Beyond this, however, a court can fashion few hard-and-fast rules for an estoppel defense. To rule on the reasonability of reliance, the court must juggle a complex set of factors. Besides the defendant's personal characteristics, it must weigh in the balance the gravity of the

munity is dealt with as a function of the characteristics of the individual involved rather than according to such arbitrary classifications as political boundaries, the import of the factor of community standards can be preserved. *Cf.* Hall & Seligman, *supra* note 1.

The relationship of the defendant's conduct to his community's standard of conduct may not always be helpful in determining whether reliance is reasonable. Where the person knowingly adheres to community mores, this should be some evidence of the reasonability of his reliance on official misleading. Where the defendant was not aware of the illegality of his acts, his deviation from community mores should not be considered to establish an "intent to deviate" that seriously jeopardizes the reasonability of reliance. The person's deviation from community mores may have little probative import on the question of reliance since the community in question may support a strict standard of conduct and the defendant may not endorse it or even be particularly aware of it.

41. *See* pp. 1051-52 *supra*.

42. Actual knowledge of illegality does not here require that the defendant have actual knowledge of a specific statute or statutes, but rather that he know his conduct is illegal in a functional sense, i.e., that under normal circumstances the proposed conduct would legitimately result in arrest and conviction if observed by law enforcement officials. Where the statute is vague or broadly phrased this type of knowledge would be more difficult to demonstrate. Where there is a selective nonenforcement policy or the statute has fallen into desuetude, such functional knowledge of the statute would be required to raise the presumption. *Cf.* Ryu & Silving, *Error Juris: A Comparative Study*, 24 U. CHI. L. REV. 421, 459 (1957).

43. See the discussion at note 16 *supra* of United States v. Associated Gen. Contractors of America, 238 F. Supp. 2 3, 283 (E.D. La. 1965), *rev'd per curiam*, 382 U.S. 17 (1965).

44. The sense of the term "license" here is "5. exceptional freedom allowed in a special situation. 6. excessive or undue freedom of liberty. . . ." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 826 (unabridged ed. 1967).

45. *See, e.g.*, United States v. Cerone, 150 F.2d 382 (7th Cir. 1945), where in criminal estoppel defense would be totally inapplicable since the defendants had colluded with and bribed the officials involved in the case.

Applying Estoppel Principles in Criminal Cases

offense, the ambiguity of the governing law[46] and the degree to which its definition had been left to the administering agency,[47] the means by which the government had misled the defendant,[48] and the extent to which a citizen should be charged with knowledge of the internal workings of government.[49] Some, if not all, of these considerations will also bear on the jury's determination whether the defendant was actually misled, but the court must look at them in a different light. The question for it is not what the defendant did, but how great a margin of error the public interest can permit and due process may require in cases like his.[50]

46.  The Court stated in Cox v. Louisiana, 379 U.S. 559 (1965), that though the statute involved passed constitutional muster on vagueness grounds, some ambiguity remained: "near" a courthouse could have different meanings to different people. See note 14 supra. The Court felt that the statute oresaw an administrative interpretation to clarify it in a particular situation. Remington and Rosenblum have stated that the average state's criminal law is permeated with mbiguities and inconsistencies necessitating a great deal of administrative discretion. Some such ambiguities result from legislative inertia or the ineffective use of language, but others clearly result from legislative design—to facilitate administrative discretion, to eliminate possible loopholes, or to deliberately delegate policy decisions to law enforcement agencies. Remington & Rosenblum, The Criminal Law and the Legislative Process, 1960 U. Ill. L.F. 481, 483-93 (1960). All of this lends much support to the arguments for allowing law enforcement agencies to exercise discretion. but it also means that the area of functional illegality in much of the substantive criminal law has hazy contours indeed. Similarly ambiguous standards are created by some common law defenses such as self-defense or the right to defend one's property with reasonable force. The result of ci minal laws that are ambiguous but not void-for-vagueness. see note 10 supra, is to create a large zone of actions which are possibly criminal where the private actors will place great reliance on an official's interpretation of legality.

47.  For example, courts are much more inclined to allow wide discretion to federal administrative agencies (in defining the scope of a regulatory statute, in selecting remedies, and in rule-making) than they are to recognize police discretion in regard to normal criminal statutes. This may be due to a number of factors: greater faith in the "special competence" of the agency than of the average police department, the realization that agencies generally initiate the criminal sanction as an incident to economic regulation, and an awareness that regulatory statutes generally grant rule-making powers to agencies that are not granted to police. See Moog Industries v. FTC, 355 U.S. 411 (1958); Bryce Motor Lines, Inc. v. United States, 342 U.S. 337 (1952); Jacob Siegel Co. v. FTC, 327 U.S. 608 (1946). Where a defendant relies on misrepresentations of an agency that has a great deal of recognized authority to define the manner and occasions of a law's enforcement. the reasonableness of his reliance would seem clear in most cases.

48.  Three main categories of official misleading will be dealt with in this Note—by order, by opinion and by selective non-enforcement. However, each of these categories admits of any number of nuances such as whether the misrepresentation was written or oral, whether the official who misrepresented the law had actual authority to give a correct decision. Cf. Comment, Estoppel Against the Government in California, 44 Calif. L. Rev. 340, 342-44, 352-55 (1956).

49.  In some civil cases where courts have refused to apply estoppel against the government, plaintiffs have been held to a very high degree of knowledge of the government. See, e.g., Federal Corp Ins. Corp. v. Merrill, 332 U.S. 380, 383 (1947); note 23 supra. However, the main thesis of this Note is that due process will not allow a similar standard when a criminal conviction is at stake.

50.  Although the courts may be reluctant to all w the estoppel defense in a situation that could recur with some frequency, each case should be dealt with individually; if the requirements of estoppel are met, frequency of occurrence may be material. Other prospective factors, perhaps even the instant decision that an official had misled the defendant and thus created an estoppel (if the next defendant was aware of the decision or should have been), may intervene to make the reliance of later defendants on the same type of misleading unreasonable.

1059

### Nature of the Offense

Common sense suggests that the more serious an offense is regarded, the more urgent is society's interest in its strict prevention and deterrence; for similar reasons, a jury will be less likely to find actual reliance when the crime is a serious one. The distinction between *mala in se* and *mala prohibita* at first seems to provide an easy line of demarcation,[51] but the clarity of this distinction has eroded over the years until now it connotes little except an historical contrast between the old common law crimes and the newer statutory ones.[52] For purposes of the analysis here, it seems helpful to differentiate between crimes involving great physical cruelty and injury;[53] crimes involving substantial personal injury;[54] crimes involving substantial theft or destruction of property or a serious disruption of the public or economic order;[55] vice crimes;[56] and finally violation of regulatory statutes, "public welfare laws," and minor misdemeanors.[57]

Estoppel can never be a valid defense to a charge of an heinous

51. *See, e.g.,* People v. Ferguson, 134 Cal. App. 41, 24 P.2d 965 (1933), where the court mentions the distinction and, since the securities offen e involved was *malum prohibitum*, allows an estoppel defense.

52. The distinction often seems to embody a gross moral judgment based not on contemporary standards, but the common law or vague notions of natural law. *See* Sayre, *Public Welfare Offenses,* 33 COLUM. L. REV. 55, 70-71 (1933). However, it may retain content for some commentators as a label for those crimes that require mens rea as an element of the offense as against those that do not. *See* Hall & Seligman, *Supra* note 1, at 642.

53. Such "heinous" crimes involve such markedly cruel ph sical treatment of other persons as to involve shocking disregard for the dignity of life and person. Murder iu the first degree and second degree, forcible rape, compulsory prostitution, forced addiction, and sabotage or bomb'ngs in reckless disregard of life would fall into this category. *Cf.* Advisory Council of Judges of the National Council on Crime and Delinquenc , *Model Sentencing Act,* 9 CRIME & DELIN. 339, 355-6 (1963). This categor is in no sense analytically discrete, and implies a moral judgment about the offensiveness of particular crimes. Rational discussion of types of crimes requires some such judgment where the question involved is the reasonability or justifiability of reliance on official misleading.

54. This class of crimes would include all crimes that would be in the category of heinous crimes, *see* note 53 *supra*, but for the absence of the surrounding circumstances that make those crimes shocking. It also includes manslaughter, negligent homicide, assaults and such other offenses where real injur to another rson takes p ace.

55. Property taking or damaging crimes should include all crimes such as theft, shoplifting, burglary, robbery, destroying public or private property, unauthorized major strikes, price-fixing, etc. where the negligent or reckless disregard of life of the categories he'nous crimes or injury to persons is not involved. *See* notes 53-54 *supra*.

56. "Vice" crimes are those which involve conduct the legislature deems morally deviant although no direct injury is involved to any other person or propert s ch as narcotics, liquor, sex and gambling laws.

57. These three types of crimes are discussed together beca se they generally involve no deviation, or at least no generally acknowledged deviation, from community mores in violations and because there is usually no direct injury to any person or property involved in violations. (Financial or other loss can be adequately compensated by civil liability.) Regulatory statutes should be taken to include health codes, tax laws, securities and corporations laws, labor statutes, motor vehicle laws and others. Minor crimes include breach of the peace, disorderly conduct and other misdemeanors. For an analysis of the term "public welfare laws" see Sayre, *Public Welfare Offenses,* 33 COLUM. L. REV. 55 (1933).

1060

Applying Estoppel Principles in Criminal Cases

crime. The consequences of such an offense are so severe and the act itself so reprehensible that society cannot permit a doubt as to the law —no matter how well-founded—to serve as an excuse for a violation. Individuals will never have good cause to approach the "zone of unlawfulness" here and the government has every reason to keep them away from it.[58] Moreover, the law is rarely ambiguous with regard to these crimes, and they deviate so far from community morals that their wrongfulness should be apparent even in the face of official misleading.[59] For similar reasons almost any crime involving substantial personal injury would be outside an estoppel defense. Society has the strongest interest in preventing these offenses and actual reliance on official misleading is unlikely in the face of the injured party's universally recognized moral right to bodily safety. Where the victim has in some way provoked the crime, however, widely held views on the right to protect one's own person, property and dignity may create uncertainty as to the law—especially when the law itself has granted some legitimacy to such views.[60] Since legal and moral notions about matters like self-defense have already introduced ambiguity into the criminal law here, recognizing a claim of estoppel would not seriously weaken the deterrent force.

The need for deterrence is nearly as great when the offense threatens serious damage to property or to the public or economic order, but at this point the law becomes much more ambiguous. Confusion as to the existence and extent of intangible rights in property can present many situations where the defendant might reasonably seek and rely on official advice.[61] Serious disturbances of the public order often arise from the exercise of rights of speech and protest, where the individual has the sanction of the Constitution in approaching near the zone of

58. This "shocks the conscience" standard is obviously vague, but no court or jury will have difficulty ascertaining that the defendant's r liance was totally unreasonable and unjustifiable in a given case. The preventive interest of society is so paramount as to render absurd the raising of an estoppel defense.

59. The statement that heinous crimes deviate from community mores would be circular were it not for the problem of civil disorder. During civil disorder law and perhaps mores have completely broken down in a significant body of the population in a community. The difficulty this creates for a defense based on a legal doctrine such as estoppel and the question of reasonable or justifiable reliance is obvious.

It should also be noted that reliance by insane persons is b yond the scope of this Note, except to point out that the insanity defense and the criminal estoppel defense are basically inconsistent since legal insanity is defined in terms of lack of control and lack of knowledge of right and wrong.

60. See generally MODEL PENAL CODE §§ 3.04-3.06 and Comments (Tent. Draft No. 8, 1958).

61. See, e.g., MODEL PENAL CODE, § 206.10 (Tent. Draft No. 4, 1955) and Comments (Tent. Draft No. 2, 1954) at 98.

1061

unlawfulness.[62] Even grave economic offenses may be similar to conduct which is lawful as well as profitable.[63] Entertaining an estoppel defense to charges like these would not only import more fairness into the criminal process, but would reduce undesirable chilling effects of the substantive law.

The category of vice crimes includes a wide variety of offenses, but they have in common the purpose of preserving the moral fiber of those tempted to commit the crime. Because the injury to society is problematic at best, an individual seeking to comply with these laws might justifiably rely on official advice and enforcement practices.[64] Moreover, mores in many communities are changing rapidly on matters involving sex, drugs, liquor, gambling, and the other objects of vice statutes, thereby out-dating the law and giving further support to a claim of estoppel.[65]

If a criminal estoppel defense were generally available, however, its importance would be greatest in prosecutions under regulatory statutes, public welfare laws, and the minor crimes of numerous types and varying scope which pervade American life.[66] Frequently, these statutes do

62. *See, e.g.,* Cox v. Louisiana, 379 U.S. 559 (1965).
63. *See, e.g.,* United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940). *But see,* note 16 *supra.*
64. Such reliance would be even more likely where official advice is coupled with a selective nonenforcement policy. *See* pp. 1069-72 *infra.* However, if the acts involved are clearly illegal (*e.g.,* prostitution) and known to be so by the relying party, it is hard to see how one could reasonably expect that the permission would last beyond the scope of that official's power. Where the acts violate community mores, this inference is even more persuasive. But where the legal question is unclear and community mores also permit or endorse the acts (*e.g.,* social gambling), reliance absent notice of a policy change should offer a valid estoppel defense.
On social gambling and the special problems of current practices in this area, see LaFave 89-91, 148-9, 155-6; H. Goldstein, *Police Discretion: The Ideal Versus the Real,* 23 Pub. Admin. Rev. 140, 141-2 (1962).
The estoppel defense should not be used as a means to wed police, prosecutor, or administrative agency to their present policy, but the typ of prospective notice to which these officials should be held in order to change policy is a significant problem. A strict standard (i.e., that the notice was insufficient if it did not reach the defendant trying to raise the estoppel defense based on the old policy), might well be considered too heavy a burden to place on the government. The standard of notice should, however, reflect the basis of the estoppel defense, reasonable reliance, and thus demand of the official a reasonable effort to use the reasonable means available to notify all persons who can be expected to be affected by the change of policy.
65. Professor LaFave prefers to conceptualize the situation of nonenforcement of gambling laws against social gamblers as a case where the legislature made certain conduct subject to the criminal law to insure against creating a loophole through which serious offenders could regularly escape. *See* LaFave 89-91. Thus it could be said that social gambling is not within the legislative intent. This may provide a justification for a selective nonenforcement pattern, but it provides no protection for unknowing persons arrested when police "abuse" their discretion and violate the legislative will by following the clear language of the statute to arrest social gamblers.
66. Such offenses are generally considered less serious in nature and thus less likely to deviate substantially from community mores. By the same token the defendant's claim of lack of knowledge of the illegality of his acts and his claim of reasonable reliance on

Applying Estoppel Principles in Criminal Cases

not so much prohibit harmful conduct as require that perfectly lawful undertakings be conducted in a particular way, in order to facilitate government supervision of the activity. These rules-of-the-road laws usually have little to do with common notions of good and evil, and the defendant unaware of their existence will get no warning from his moral instincts that his conduct may be criminal.[67] Most important, such statutes often commit broad rule-making powers and discretion to the enforcing agency, leaving even the knowledgeable individual[68] no other reliable guide to the law. The ambiguity or complexity of many of these laws only compounds this dilemma.[69] Under these circumstances, an estoppel defense, once raised, should be persuasive.

*Nature of the Misrepresentation*

The second major factor in determining whether reliance on official misrepresentation was justifiable is the form that such misrepresentation took. Government long ago grew too large and complex to be bound in every case by the words or actions of each of its agents. Often, misrepresentation may result from a miscomprehension of what the official said or did. Since actual reliance is difficult to disprove after the defendant has shown some misrepresentation—the criminal act itself providing some evidence held that he relied[70]—the defense would become overly subject to abuse were any act of any agent capable of estopping the government. The court may determine, in light of the conflicting demands of justice and order, how much knowledge and comprehension of the government agent's actual authority the defendant should be held to possess.[71]

*Estoppel by Order.*—The clearest case for justifiable reliance is that in which a recognized official orders the defendant to perform acts in violation of the criminal law.[72] A private individual should not lightly

official misleading will both be mo e credible. Similarly, police and prosecutorial d scretion are more accepted and expected n these areas. *See* Cox v. Lou sian , 579 U.S. 559, 569 (1965); J. Goldstein *supra* note 19, at 60-68; H. Goldstein, *Police Discretion: The Ideal Versus the Real*, 23 PUB. ADMIN. REV. 140, 142-43 (1962). Comment, *The Right to Nondiscriminatory Enforcement of State Penal Laws*, 61 COLUM. L. REV. 1103, 1119-22 (1961).

67.  *See, e.g.*, State v. Ragland, 4 Conn. Cir. 424, 233 A.2d 698 (1967 ; People v. Markowitz, 18 N.Y.2d 953 (1966), 227 N.Y.S.2d 149, 223 N.E.2d 572 (1966).

68.  A defendant experienced n the workings of the law enforcement agency should naturally be held to a higher standard of understanding of he actual authority of the agen s wi h which he deals. *See also* notes 89-90 *infra*.

69.  *See* note 46 and accompanying ext *supra*. *See also* People v. Ferg son. 134 Cal. App. 41, 24 P.2d 965 (1933).

70.  *See* no es 33-35 *supra*.

71.  *See* notes 39, 68 *supra* and note 90 and accompanying text *infra*.

72.  There is a certain  ount of ambiguity in the term "order" since statements meant and un erstood as requests are often phrased in the imperative. An "order" sho ld be

1063

disregard the reasonable orders of authorized public officials,[73] and this fact alone will usually justify reliance whether or not the defendant knew the ordered acts were otherwise illegal. Yet an official order cannot absolve the citizen of responsibility for all acts in compliance with it: ordered to commit plain murder or robbery[74] the citizen must refuse. Crimes involving substantial physical injury to any person would seem to deserve similar summary treatment where an estoppel by order defense is presented.[75] Yet such acts may not resemble criminal conduct at all under some circumstances: for example, when a policeman orders a bystander to help him subdue someone resisting arrest, the inherent ambiguity of the situation may reach the point that justifiable reliance on an official order to cause substantial injury is possible.

Reliance is more clearly justifiable when the acts ordered by the official do not involve inflicting injury on another. In *Schiff v. People*[76]

taken to mean a command t at implies a real threat of some sort of punishment, either legal arrest or positive extra-legal detriment, to the person commanded if the order is not obeyed. *See, e.g.,* note 80 *infra.* On this basis, an order can be distinguished from an opinion or request with normative import in that the latter implies only displeasure on the art of t e misleading official with conduct that deviates from the request, or the possibility of future legal or extra-legal detriment to the relying party.

73.  *See, e.g.,* State v. Ragland, 4 Conn. Cir. 424, 233 A.2d 698 (App. Div. 1967). A police officer ordered the defendant to drive his vehicle to police headquarters to ost a bond after the defendant had requested a ride in the police cruiser. Though the defendant did not inform the police of the fact, his "right to operate" a motor vehicle in Connecticut was under suspension. He was later charged and convicted of driving while under suspension. The Appellate Division reversed his conviction for driving to the police headquarters, stating:

[W]hen one is affirmatively ordered by a police officer . . . to perform a certain act and in the performance of that act one violates a statute, a conviction should not obtain.

*Id.* at 426, 223 A.2d at 701.

The fact that the defendant first asked to ride to headquarters in the police cruiser could indicate that he knew that his license was under suspension and that his driving in Connecticut was illegal. If this were the case his reliance would appear to be on the ignorance of the offi ers rather than on the order to drive to headquarters. The court avoided this problem by stating that the defendant had no obligation to reveal his motor vehicle record to the police. *Id.* at 427, 233 A.2d at 702. This may well be justification for nondisclosure when the relying party is already under arrest as in *Ragland* or where the disclosure would reveal present or past criminal conduct and thus bring self-incrimination rights into play. However, in the normal situation reliance, and the criminal estoppel defense, could never be based on a partial disclosure of the relevant facts involved in a proposed course of conduct. Actually, in *Ragland* the court was probably relying on the public interest in rapid obedience to the orders of officers charged with traffic regulation, a policy embodied in 14 CONN. GEN. STATS. 223.

74.  Cox v. Louisiana, 379 U.S. 559, 569 (1965).

75.  The relying party should, however, be liable for damages done to a third erson if a reasonable person would have recognized the risk of injury with normal attention and care. *See* RESTATEMENT (SECOND) OF TORTS § 289 (1962). The state should also be liable for damages done to third persons by the relying party based on official misleading. *See* RESTATEMENT (SECOND) OF TORTS § 311. *But see* 28 U.S.C. 1346(b) (a knowledging liability for acts done by employees of the government within the scope of their offices); *cf.* 28 U.S.C. 2680(b) (no liability for exercise of discretionary function, even if discretion is abused).

76.  111 Colo. 333, 141 P.2d 892 (1943).

1064

Applying Estoppel Principles in Criminal Cases

the conviction of a junkdealer for larceny in retaining stolen property
he had purchased unknowingly was reversed; the appellate court stated
that since the police directed the defendant to hold the property he
lacked criminal intent:

> The hold order was a condition imposed by the police for the
> benefit of . . . the complaining witness, and Schiff should not be
> penalized for following the instructions of the police, even though
> it later develops that the police instructions had no legal basis in
> fact. His retention of the property in reliance upon the police
> order does not constitute an "intent to steal," which is one of the
> essential elements of the crime under the statute.[77]

Orders by officials with a good deal of discretion in enforcement of
regulatory statutes or by police in regard to minor crimes or vice
crimes[78] offer an all but irresistible case for estoppel. Sufficient discre-
tion makes an official by and large *the* law-maker, the ordinary citizen
cannot be expected to challenge the legal accuracy of the order and

---

77. *Id.* at 336. The court's use of the concept of *mens rea* to reverse a conviction
resting on facts that would bring the case squarely within the estoppel defense presented
in this Note raises the question of the degree of overlap between these two conceptual
approaches to acquittal. One view of *mens rea* equates it with culpability of any kind
necessary for a fair imposition of criminal responsibility and hence sees cases of non-
culpable ignorance of the law as involving basic *mens rea* principles. *See* Packer, *The
Supreme Court and Mens Rea,* 1962 SUP. CT. REV. 107; Hart, *The Aims of the Criminal
Law,* 23 LAW & CONTEMP. PROB. 401, 404-06 (1958). Orthodox *mens rea* requirements
overlap with the estoppel defense to the extent that official misleading has led a defendant
to a mistaken view of the circumstances of his conduct so that under his view of the
circumstances his conduct is not a crime. This was essentially the situation the court found
in *Schiff. See also* Morissette v. United States, 342 U.S. 246 (1952). However, the Model
Penal Code treats its limited estoppel defense se arately within its general provision that
mistake of law is a defense if the mistake "negatives the purpose, knowledge, belief,
recklessness or negligence required to establish a material element of he offense. . . ."
MODEL PENAL CODE § 2.04(1)(a) and § 2.04(3)(b) Comments at 138-39 (Tent. Draft No. 4,
1955). The rationale for the distinction that is offered in the comments is hat the defense
would normally apply to *mala prohibita* where the penal san tions are appro-
priate only for deliberate evasion and a single violation does no major public injury. *Id.*
at 138. In these types of crimes the *mens rea* requirement is attenuated because the crime
is one of strict liability or presumed intent, and thus the esto el defense is clearly the
preferable rationale. However, there are ot er cases where presumably *mens rea* c uld be
shown, but there are sound reasons not to allow a conviction. Cox v. Louisiana, 379 U.S.
559 (1965); Bouie v. City of Columbia, 378 U.S. 347 (1961); State v. Jones, 44 N.M. 623, 107
P.2d 324 (1940).

The "willfulness" standard has sometimes been read by ourts to excuse good faith
errors by defendants about the law whether or not the product of conduct would give rise
to the estoppel defense advocated here. United States v. Murdock, 290 U.S. 389 (1933);
United States v. Mancuso, 139 F.2d 90 (3d Cir. 1943). This tack is sometimes woefully
deficient as, for example, in James v. United States, 366 U.S. 213, 221 (1961), wh re he
Court stated that its reversal of an earlier decision (under which the defendant would
not have been guilty of income tax evasion) made it analytically impossible to convict
the defendant under a wilfuln s standard. Surely an estoppel framework for this decision,
although it does not involve executive misleading and thus is beyond the scope of this
Note, would have been preferable.

In any event, the doctrine of *mens rea* provides strong support for he estoppel defense
presented here. *See generally* Hall & Seligman, *supra* note 1.

78. *See* LAFAVE 71 nn.52-33. *See also* note 64 *supra.*

1065

The Yale Law Journal                    Vol. 78: 1046, 1969

the official's legal power to give it.[79] As one judge pointed out in a case where the police had ordered an obviously drunk defendant to drive off, and then arrested her for it:

> The average citizen does not argue with uniformed authority; when the law suggests "Move on," the healthy instinct is to get going. Moreover, one in the defendant's condition cannot be expected to discuss with reasoned calm the merits and dangers of proposed action.[80]

*Estoppel by Opinion.*—When a government agent did not order the defendant to act, but merely advised or suggested that the conduct did not violate the law, the issue of justifiable reliance is more difficult to resolve. The official may have urged a course of action on the defendant, giving his opinion as to the lawfulness of the action some of the persuasive force of an order,[81] or he may only have signified tacit consent. The defendant may have sought out the opinion, or the official may have announced it unsolicited. The agent whose opinion is put forward as grounds for estoppel may have been the logical official from whom to seek advice,[82] or he may have had no apparent authority to

---

79. *See* note 78 *supra.*

80. People v. Donovan, 279 N.Y.S.2d 404, 406 (Ct. Spec. Sess. 1967); Case Note, 81 Harv. L. Rev. 895 (1968). Police summoned by a homeowner found an intoxicated motorist parked in a driveway, and informed the defendant that she was on private property and would have to leave. They then left and waited down the road until the defendant drove out on to the public highway and arrested her for drunken driving. Interestingly, Section 1102 of the Vehicle and Traffic Law of New York makes it an offense to fall to obey any order of a police officer, but the judge found that the police officer's statements did not amount to an order. *Id.* at 406. At this point it "occurred" to Judge Friedman that estoppel could apply against the state in such a case. *Id.* at 406.

81. On the facts, Cox probably should be considered as an example of such a no native opinion. The Chief of Police, who may not even have be n aware of the courthouse picketing statute, was apparently saying that the demonstration *should* be conducted across the street from the courthouse. This, however, could not be considered an order since Cox had already refused to obey the Chief's order to turn back. Cox v. Louisiana, 379 U.S. 559, 571 (1965).

82. Many federal, state and local statutes require the issuance of permits or licenses by duly constituted public agencies or officials before certain activities can take place. Where a person has been granted a permit or license, this fact should create a valid estoppel defense for acts that officials would naturally expect to be performed under the permit or license which are not otherwise illegal. For exampl , the issuanc of a driver's license to a person who has answered all reasonable inquiries of the licensing authority and sought the license in good faith should create a valid estoppel defense for prosecution for unlicensed driving where it is later discovered that the party is ineligible for licensing. Where the party is told by the proper authorities that a license is not required for the proposed activity, this should create a val d estoppel defense for conducting those activities without the license. People v. Ferguson, 134 Cal. App. 41, 24 P.2d 965 (1933); People v. Markowitz, 18 N.Y.2d 953, 277 N.Y.S.2d 149, 223 N.E.2d 572 (1966).

The apparent authority of the agent is far more important than the actual authority in determining reasonable reliance in criminal estoppel cases. However, depending on the knowledge and status of the relying party, it might reasonably be said in some cases that he knew or should have known the limits of the authority of the agent he was dealing with. This is not to say that the government in the criminal area should be bound by the same standards of apparent authority that a private corporation or partnership is held to.

Applying Estoppel Principles in Criminal Cases

offer advice under the law in question. All these variables are important to fixing the point at which the government's duty to stand by its agent's clarification of the criminal law ends and the citizen's duty to know it begins.

There is, for example, no basis for estoppel if an official's consent to certain conduct suggests only an offer of individualized immunity from arrest or prosecution.[83] Policemen sometimes give license to violate the law, especially in the area of vice and minor crimes.[84] Usually these cases also involve conduct that is plainly illegal, so that the defendant has no reason to believe that the permission carries any legal force. Where the official's license is but a particular instance of a general policy of nonenforcement,[85] however, a valid estoppel claim is presented.

A similar problem arises where a statute necessarily commits a great deal of discretion to the enforcement agency, and different officials can reasonably and properly assess the same situation differently. For example, police may visit a party upon complaint and advise those present not to become louder. Although the noise level remains the same, other officers later arrive and arrest the host for disturbing the peace. Unless he was assured by the first officers that his conduct was unquestionably within the law, the defendant in such a case should realize he was relying on little more than their individual discretion.[86] Moreover, opinions about such laws as breach of the peace statutes

---

See generally Whelan & Dunigan, *Government Contracts: Apparent Authority and Estoppel*, 55 GEO. L.J. 830 (1967).

83. The purpose of an estoppel defense is to prevent the criminal sanctioning of conduct performed in reliance on official advice that it was legal or at least not currently punished as a uniform policy. Official favoritism or unreasonable leniency are not legitimated by the defense because the essential good faith element is missing—the defendant would know that the permission is not a legal grant to all persons similarly situated but rather an extra-legal license that amounts to an abuse of the official's discretion. *See* notes 44, 45 *supra*.

84. For example, a policeman might advise combatants to "fight it out" around the corner, not in public view. He is offering the combatants his own personal immunity from an assault or breach of the peace charge, not a legal opinion, and his words are probably understood as just that.

85. *See* pp. 1069-72 *infra*.

86. The relevant statutes do not delegate authority to police not to invoke the criminal process within the "full enforcement" area. *See* J. Goldstein, *supra* note 19, at 557-60. However, police discretion is such a widely accepted aspect of the criminal process that reasonable reliance on reasonable discretion should be considered to be a valid form of estoppel.

The situations in which police mislead by opinion will usually be informal queries addressed to patrolmen or officers. Where this is the case, the question of whether the official response was a granting of a "license" rather than a statement as to legality will be crucial. Where the inquiry is more formal, it is more likely to be addressed to the prosecutor or district attorney than the police. However, unusual situations such as that in *Cox* occur with some regularity in organized protests and incidents of controlled civil disobedience.

1067

carry the implied qualification that reliance is reasonable only so long as the situation remains unchanged—and it can change whether the defendant alters his conduct or not.[87]

Most cases of estoppel by opinion will involve regulatory and public welfare statutes[88] where the opinions and practices of the administering agency actually define the scope of much of the law. Recognizing the need for their advice, many such agencies have institutionalized the giving of opinions[89] and where the defendant has received and followed advice of this type, he has a compelling claim to an estoppel defense. On the other hand, a party acting through counsel or experienced with the agency procedure[90] would have substantial difficulty demon-

---

87. Thus, to return to the party example, a given noise level may be tolerable at 9:00 p.m. and yet be considered illegal at 2:00 a.m. However, the feature of the situation that changes sufficiently to make further reliance unreasonable must be a feature that is reasonably related to the supposed illegality.

88. The fact that laws in this category often involve relatively minor offenses does not mean that official orders to perform an illegal act may not have serious consequences. The drunken driver ordered to drive home may kill someone on the way. The slumlord is ordered to keep his tenement open in spite of the rats, and a tenant's child may be injured by rat bites. However, the reasonability or justifiability of reliance should be judged by the circumstances at the time of the reliance; later fortuitous events may be grounds for tort liability against the individual or the state, but not a determining factor in criminal liability. *See* note 73 *supra*.

89. For example, the Department of the Treasury issues guidance to taxpayers under the authority of INT. REV. CODE OF 1954, § 7805. The "advice" comes in the form of Treasury Regulations, Revenue Rulings, Revenue Procedures and private determination letters. *See* B. BITTKER, FEDERAL INCOME, ESTATE AND GIFT TAXATION 25-28 (1961).

Similarly, the Department of Justice's Antitrust Division gives advice on business conduct in relation to the antitrust laws through its "Business Review Procedure." Antitrust Division Directive No. 2-68 sets up stringent requirements for the issuance of a business review letter by the Division: a request for review must be submitted in writing and can only involve proposed business conduct; the requesting parties "are under an affirmative obligation to make full and true disclosure"; no oral releases can bind the enforcement policy of the Division, a business review letter states only the enforcement intentions of the Division as of the date of the letter and the Division remains completely free to alter its intention in the public interest (although, the Directive states, the Division "has never exercised its right to bring a criminal action where there has been full and true disclosure at the time of presenting the request"); a final caveat states that a failure by the Division to take action after the receipt of a request and accompanying documents does not in any way estop the government from taking any appropriate action thereafter. 28 C.F.R. 50.6.

Thus, it is apparent that the Division considers itself not to be binding itself in any way by issuing a business review letter in regard to business conduct. It has been held that such clearance does not bind the Division. United States v. Joseph Schlitz Brewing Co., 253 F. Supp. 129 (N.D. Cal. 1966). However, *Schlitz* was a civil action and thus not related to the criminal defense offered here. On the criminal side, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226 (1940), was the last antitrust case that involved an estoppel fact situation. *See* note 16 *supra*.

90. Perhaps the greatest instinctive difficulty with a criminal estoppel principle is its application in fields of law where lawyers abound and one can justifiably fear that the government might be taken advantage of. Obviously, the reasonableness standard for reliance would be very high where the private party employs legal talent to deal with the government. Moreover, experienced counsel should be held to have known the actual authority of the agent with which he is dealing. There is also the question of whether the party is actually relying on the misleading or the independent judgment of his own attorney. It is not necessary that the official misleading be determined to be a "but for" cause of the offense, but to the extent that the party is relying on counsel the

1068

---

strating reasonable reliance on an opinion which did not emerge from the institutionalized process.[91] Reasonable reliance will usually require that the defendant obtained his advice by pursuing whatever regular channels are clearly available.

Whether an opinion of one agency can cross jurisdictional lines to estop another must ultimately depend on how plainly the lines are marked. Where the second jurisdiction is a separate government altogether—as in the case of different states, or the federal government and a state—the opinion can never have the power to estop.[92] Even when the party did not know that his acts might violate the laws of another jurisdiction, the public interest in ensuring that legislatively-designated administrators of a given statute retain control of its enforcement would foreclose the defense. One government cannot be charged with the responsibility of educating the officers of another, however likely it is that these officers might render opinions. Normally the same no-estoppel rule should apply to separate agencies within the same government.[93]

*Estoppel by Selective Nonenforcement.*—Of course, principles underlying the concept of estoppel apply no less to what government officials do than to what they say. Patterns of enforcement and nonenforcement could well ground a criminal estoppel defense.[94] Selective nonenforcement is common to all enforcement agencies,[95] the practice

estoppel defense is diminished. Reliance on private counsel is not and should not be a defense to a criminal action. Hall & Seligman, *supra* note 1, at 652-53; Ryu and Silving, *supra* note 30, at 439.
    91. This is the basic fact situation in United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940). *See* note 16 *supra*.
    2. *See* United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350-52 (1963); California v. Federal Power Commission, 369 U.S. 482, 484-5 (1962).
    93. A possible exception to this rule might be found in cases where separate agencies have jurisdiction over the same laws, e.g., the FTC and the Antitrust Division.
    94. As stated in *Cox* and *Raley*, the due process requirement for a criminal estoppel defense is unequivocal in the case of an individual misled in an ad hoc situation when the state, through the executive, is focusing attention on his conduct. However, due process protection does not favor individuals who were denied their rights by indirection. *See, e.g.*, Griswold v. Connecticut, 381 U.S. 479 (1965); Johnson v. United States, 318 U.S. 189, 197 (1943); Pierce v. Society of Sisters, 268 U.S. 510 (1925). The issue is whether the individual was reasonably misled by inconsistent positions taken by the government, not "Year Book distinctions between feasance and nonfeasance." Lambert v. California, 355 U.S. 225, 231 (1957) (Frankfurter, J., dissenting). Certainly, civil estoppel principles do not recognize such a distinction. 31 C.J.S. *Estoppel* §§ 72, 87.
    95. *See* J. Goldstein, *supra* note 19, at 550-62; H. Goldstein, *Police Discretion: The Ideal Versus the Real*, 23 PUB. ADMIN. REV. 140, 142-43 (1963); LaFave 61-72, 492-95.
    A strict nonenforcement policy is that which ists when the police or prosecutors do not enforce a given criminal law or laws under any circumstances. Over a sufficiently long period of time such a law is said to have fallen into desuetude. *See* Bonfield, *The Abrogation of Pe al Statutes by Nonenforcement*, 49 IOWA L. REV. 389 (1961); Poe v. Ullman, 367 U.S. 497 (1961). *But see* Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968); District of Columbia v. John R. Thompson Co., 346 U.S. 100 (19 3). However, a selective

1069

going far beyond the inability to investigate and prosecute all violations
because of inadequate resources.[96] Police, for example, often choose
not to enforce a statute against classes of violations which they and the
community do not regard as serious. Gambling statutes and some pub-
lic welfare statutes such as housing code violations provide perhaps the
most familiar example of laws enforced selectively for this reason.[97]
In other cases, the enforcement agency may regard offenses that fall
below a particular quantum of violation too trival to pursue: tame
drunks and brawlers typically lie below the level of criminal conduct
that police consider worth their notice.[98] Whenever the law goes largely
unenforced against a particular class of violations for reasons which
suggest that officials do not really want to sanction these violations,[99]

nonenforcement policy is that under which police do not enforce a given criminal law or
laws against certain types of persons, during certain times of the day, in certain geo-
graphical areas, or in certain types of factual situations though police are aware of
violations and could enforce the law. See generally LaFave 61-161; J. Goldstein, supra
note 19, at 558-59.

Thus, classes of persons which have not b en the subject of law enforcement for a par-
ticular statute though there have been noticeable (to the police or prosecutor) violations
may rely on the continuation of that nonenforcement. The problem of determining
identifiable classes is substantial in any given fact situation. However, the misleading of
the kitzen by the state and his reasonable reliance are the governing factors in determin-
ing the class. The offense to fundamental fairness involved in official misleading is not
dissipated by the fact that large numbers of persons are misled; rather, su h practic s strike
at the heart of fair government. "Engrained in our concept of due process is the require-
ment of notice." Lambert v. California, 355 U.S. 225, 228 (1957). This requirement cannot
reasonably be met when the executive ha contradicted the legislative purpose embodied
in a criminal statute by refusing to enforce it. See LaFave 60.

96.  See J. Goldstein, supra note 19, at 561-2; H. Goldstein, Police Discretion: The Ideal
Versus the Real, 23 Pub. Admin. Rev. 140, 143-48; H. Goldstein, Administrative Problems
in Controlling the Exercise of Police Authority, 58 J. Crim. L., C. & P.S. 160, 163, 171-72
(1967); Challenge, supra note 19, at 103-106; LaFave 61-161.

Professor LaFave points out that even these financial limitations on law enforcement,
which might be taken as not representing a policy choice on the part of the state, are in
fact the legislative body's policy choice as to the general level of law enforcement the
community is willing to pay for. Having granted the law enforcement agencies only scarce
resources with which to maintain "law and order," the legislature is opting for something
less than full enforcement of resources, to the law enforcement agencies.

97.  See LaFave 89-91, 148-9, 155-56.

98.  Professor Goldstein has also pointed out that police sometimes use nonenforcement
tactics where relatively serious crimes are involved: narcotics, "victimless" assaults, and
rackets violations, J. Goldstein, supra note 19, at 562-89. However, under the principles of
estoppel offered in this Note some of the major examples mentioned would not result in
an estoppel defense. For example, in Goldstein's "victimless" assault example the prosecutor
refused for a time to prosecute assaults where the victim refused to sign a complaint.
Such an enforcement pattern does not create reliance in the citizens subject to it—at least
not reliance that the law will not be enforced at all. Rather the citizen, who in all likeli-
hood knows that the assault is illegal, knows that the question of prosecution vel non will
depend on the victim—and if the victim misleads the defendant as to whether he would
prosecute that is not a due process issue since the state is not involved.

99.  This is not to make value judgments about the rationality of fully enforcing any
substantive criminal statute. It is only to say: (1) that the police do not enforce the law
fully, often pursuant to a cons ious policy dec sion; (2) that the community may not
want them to enforce a law fully; and (3) that the community or part thereof, often relies
on the nonenforcement policy.

But, the fact that evidence is presented to show that the class of persons of which

1070

Applying Estoppel Principles in Criminal Cases

an estoppel defense should be available to the occasional transgressor who relies on the enforcement policy and is prosecuted.

Estoppel by nonenforcement has already gained some small recognition under the heading of desuetude.[100] Despite some suggestion that desuetude could not be found unless enforcement of a statute had lapsed altogether, the reasons for permitting continuous nonenforcement to serve as a defense press just as strongly when nonenforcement has been only partial.[101] Nor do sporadic incidents of enforcement preclude estoppel, so long as the nonenforcement remains notorious and the few arrests and prosecutions pass unnoticed by the community. As with estoppel by order and by opinion, the critical element in the nonenforcement estoppel defense is that some agent of the government has caused the defendant to believe that his conduct was not considered outside the law.

Actions, however, can be far more ambiguous in their implications than words, and not every case of selective nonenforcement will justify reliance. If the fact that some crimes were difficult to trace, or that the enforcement agency could not afford to investigate many violations were enough to estop the prosecutor,[102] most of the criminal law would disappear under the mantle of the estoppel defense. Reliance by price-fixers on the improbability that the Justice Department will discover their activity is hardly justifiable. Passive enforcement tactics—that is, prosecuting an offense only when the evidence is readily available—should also be insufficient for estoppel,[103] unless enforcement becomes so passive as to appear almost nonexistent.

the defendant presenting an estoppel defense is a member might have reasonably relied on the enforcement pattern does not excuse the defendant himself from the burden to show that he himself reasonably relied on the selective nonenforcement pattern.

100.  *See* Bonfield, *The Abrogation of Penal Statutes by Nonenforcement,* 49 IOWA L. REV. 389 (1964).

101.  *See* note 95 *supra.*

102.  If a criminal statute is enforced against all or most of the violations observed by police or enforced randomly, no reliance defense should be upheld even though the police have adopted an enforcement policy not to investigate for violations of the law which perhaps doesn't catch the largest part of the violations. However, where the enforcement practice is not to arrest for certain types of violations of a law unless for ulterior motives (see note 106 *infra;* LAFAVE 144-152) even when they are observed, the defense should be upheld where reliance is shown.

 *See* Moog Industries, Inc. v. FTC, 255 U.S. 411, 413 (1958) where the Supreme Court upheld the right of the FTC to proceed only against major violators because of inadequate resources for full enforcement:

[T]he commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically.

A random enforcement policy almost by definition cannot create reasonable reliance of nonenforcement against any person or group within the population governed by the statute. The crux of the problem is in assuring that the enforcement pattern is actually random in something approaching the mathematical use of that term.

103.  *See* note 102 *supra.*

1071

The Yale Law Journal                    Vol. 78: 1046, 1969

As a general rule, there would never be an occasion for estoppel when the pattern of selective nonenforcement appears to reflect something other than an official belief that the purposes of the law did not call for enforcement against certain types of violations. During a riot, for instance, police toleration of looting does not support justifiable reliance because the thief should well know that the general turmoil alone—not official approval of his acts—protects him.[104] On the same plane, the immunity from arrest and prosecution that racially-motivated crimes often enjoy in some parts of the South has no weight for the purposes of estoppel: there it is not the conduct that the police think unworthy of their attention, but the victims.[105]

Perhaps the strongest case for a defense of estoppel is one in which the occasional arrest and prosecution is based on reasons completely external to the offense itself.[106] Police may invoke the laws against drunkenness or vagrancy only when they have violators whom they want to harass, interrogate, or simply remove from the streets.[107] Minor criminal statutes may serve as means of oppressing and intimidating classes of people whom the police dislike. In the latter situation, the estoppel defense can rest equally on due process and equal protection principles.[108]

104. See p. 1070 supra.

105. In different circumstances, perhaps only where very minor offenses are involved, totally illegitimate enforcement criteria (such as race) may give rise to reasonable reliance by that class against whom the statute is not enforced. See, e.g., People v. Harris, 182 Cal. App. 2d Supp. 837, 5 Cal. Rptr. 852 (1960), where a group of blacks were prosecuted under anti-gambling statutes. The defendants offered to prove that there was a police policy of concentrating gambling investigations in black areas, disproportionate prosecutions of blacks relative to the population figures and non-enforcement in instances where police knew that whites were violating the law. The Appellate Department reversed conviction on the ground that the trial court should not have denied the offer of proof of a denial of equal protection of the laws. The case presents a particularly difficult example of the burden of proof that the defendant raising an equal protection defense must bear. See Comment, 61 COLUM. L. REV. 1103, 1120-1131 (1961). However, the criminal estoppel defense would be available to white persons able to show reliance on the enforcement pattern.

106. See, e.g., People v. Walker, 14 N.Y.2d 901, 200 N.E.2d 779, 252 N.Y.S.2d 96 (1964), and 50 Misc. 2d 751, 271 N.Y.S.2d 447 (App. Term, 1st Dept. 1966), reversing the second conviction. Defendant Walker demonstrated at the second trial that she was intentionally discriminated against in her prosecution for housing code violation after she had publicly exposed the corruption in the Department of Building in regard to Code enforcement. In the second decision this was determined to be a denial of equal protection of the laws. However, this might also be an excellent example of the applicability of the criminal estoppel defense where selective nonenforcement has created reliance in certain classes of persons. Defendant Walker was not given the normal amount of time to correct violations in order to avoid prosecution.

107. See LaFave 149-50. The arresting of a "bad actor" for reasons other than the specific offense involved is one of a number of practices which he discusses under the rubric, "Arrest in Cases in Which the Process Is Not Ordinarily Invoked." Id. 141-52. Each presents a separate set of considerations for an estoppel defense.

108. In order to raise a successful equal protection defense to a criminal prosecution under a statute fair on its face, the defendant must show: 1) that the police intentionally

1072

Applying Estoppel Principles in Criminal Cases

The development of a full-blown defense of criminal estoppel would bear two interrelated advantages for a rational system of criminal justice. First, the defense would assure a decent standard of fairness for citizens who detrimentally rely on official misrepresentations. Second, it would provide an adequate standard for judicial review of the broad executive discretion granted to the administrators of the criminal law.

discriminated against him or his class; and 2) that the classification made by the police was an unreasonable one in terms of the subject matter of the statute. Comment, *The Right to Nondiscriminatory Enforcement of State Penal Laws*, 61 COLUM. L. REV. 1103, 1113-1122 (1961). Thus, the defendant must first show something more than "mere non-enforcement of the statute against others similarly situated." DiMaggio v. Brown, 19 N.Y.2d 283, 291, 225 N.E.2d 871, 279 N.Y.S2d 161, 167 (1967). Often it is said that the defendant must show "an evil motive causing the statute to be discriminatorily applied." United States v. Elliott, 266 F. Supp. 318, 325 (S.D.N.Y. 1967). Having demonstrated the intentional selectivity or discrimination in enforcement, the defendant must still show that the classification that the police or agency has made is unreasonable, "an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles. 368 U.S. 448, 456 (1962). A reasonable classification is apparently one that the legislature could have made in the statute itself under the usual "rational connection" test. *See* Kotch v. Board of River Port Pilot Com'rs, 330 U.S. 552 (1947); Taylor v. City of Pine Bluff, 226 Ark. 309, 289 S.W.2d 679, *cert. denied*, 352 U.S. 894 (1956). The following cases are examples of successful employment of the defense: People v. Walker, 14 N.Y.2d 901, 200 N.E.2d 779 (1964), 252 N.Y.S2d 96; *id.*, 50 Misc. 2d 751, 271 N.Y.S2d 447 (App. Div. 1966), (reversing the second conviction); People v. Harris, 182 Cal. App. 2d Supp. 837, 5 Cal. Rptr. 852 (1960); Bargain City U S A., Inc. v. Dilworth, 29 U.S.L.W. 2002 (Phila. City C.P. June 10, 1960), *aff'd*, 407 Pa. 129, 179 A.2d 439 (1962).

However, criminal estoppel is based on a wholly different rationale than the equal protection defense. Where there are two classes of persons, A and B, subject to the prohibitions of a statute, and A is discriminated against by the police while B has not had the statute enforced against it, defendants in class A will have a valid equal protection defense where the discrimination is intentional and the A-B classification is unreasonable. However, defendants in class B who can demonstrate reasonable reliance will always have a criminal estoppel defense whether or not the classification is reasonable (and though they might also be able to raise an equal protection defense in some circumstances; *see* the *Walker* case *supra*). Criminal estoppel goes to the fairness of the notice of illegality that the defendant had in the selective nonenforcement situation, rather than the equal protection clause's mandate of equal justice.

1073

# EXHIBIT Z

# Prosecutorial Inconsistency, Estoppel, and Due Process:  Making the Prosecution Get Its Story Straight

## Anne Bowen Poulin†

*In a surprisingly large number of criminal cases, the prosecution advances inconsistent positions on a common set of facts in separate proceedings. For example, in a number of cases where two defendants were charged with capital murder and the victim died as a result of a single gun shot, the prosecution has argued in separate proceedings that each of the two defendants fired the fatal shot. The prosecution not only argued for conviction on the basis that the particular defendant on trial shot the victim, but also, the prosecution argued for the death sentence, emphasizing the defendant's role as the shooter. Using these inconsistent arguments, the prosecution obtained convictions and death sentences for both defendants. Unfortunately, the law has no defined response to this problem.*

*This Article argues that the prosecution should be prohibited from exploiting inconsistent positions in separate proceedings, suggesting that prosecutorial inconsistency violates the defendant's right to due process. The Article explores approaches to controlling such prosecutorial inconsistency and suggests adapting the law of party admissions, collateral estoppel and judicial estoppel to preclude the prosecution from advancing such inconsistent positions. Finally, the Article details the due process analysis the courts should apply when the inconsistency is discovered after conviction, providing relief to defendants unless the prosecution can demonstrate that there is no reasonable possibility that the inconsistent position influenced the outcome.*

---

Copyright © 2001 California Law Review, Inc. California Law Review, Inc. (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.

†    Professor of Law, Villanova University School of Law. I am grateful to all my colleagues for their helpful comments, particularly Len Packel and Louis Sirico. I am indebted to Michael Frankel, Tammy Lauder, and Katherine Neikirk for their research assistance, and to Villanova University School of Law for its generous support.

1423

*CALIFORNIA LAW REVIEW*

## INTRODUCTION

Two defendants, Smith and Jones, are charged with the capital offense of committing a murder in the course of a robbery. The victim died as a result of a single gunshot. The evidence clearly implicates both defendants in the robbery that led to the homicide, but it does not establish which defendant was the shooter. The trials of the defendants are severed, and Smith is tried first. At Smith's trial, the prosecutor, pointing to circumstantial evidence implicating Smith and emphasizing that Smith had a motive, argues that the jury should conclude beyond a reasonable doubt that Smith shot the victim. At the sentencing hearing, the prosecutor emphasizes Smith's role as the shooter, and the jury sentences Smith to death. Jones's trial then begins, and the prosecutor, pointing again to circumstantial evidence and suggesting a motive for Jones, argues that the jury should conclude beyond a reasonable doubt that Jones shot the victim. Jones is convicted. At the sentencing hearing, as at trial, the prosecutor emphasizes Jones's role as the shooter. Like Smith, Jones is sentenced to death.[1]

The result is certainly troubling.[2] Arguing inconsistently that Smith and Jones each fired the single bullet, the prosecutor has successfully obtained convictions and death sentences for both defendants. If the result in each case rests on the proposition that the particular defendant fired the fatal shot, then one result must be wrong. The outcome is comparable to convicting two defendants for a crime that only one person committed.[3]

Such prosecutorial inconsistency can occur for a variety of reasons. At worst, the prosecutor knows or believes she knows which defendant pulled the trigger, but she decides to exploit ambiguity to win death-penalty convictions against both defendants. Such a strategy would amount to intentional unethical corruption of the justice process. However, prosecutorial inconsistency does not only result from unethical conduct. In many cases, the proof is equivocal, and the prosecutor simply may not know which defendant was the shooter. When the evidence fails in this way, the prosecutor has three options. First, she may use her best judgment to pick the defendant most likely to have been the shooter and proceed accordingly. Second, she may embrace the uncertainty, acknowledge that she cannot prove which of the two pulled the trigger, and adjust her charge and

---

1. These facts are similar to those of several reported cases. *E.g.*, Nichols v. Scott, 69 F.3d 1255, 1259-66 (5th Cir. 1995); Parker v. Singletary, 974 F.2d 1562, 1566-70 (11th Cir. 1992); Drake v. Kemp, 762 F.2d 1449, 1451-52 (11th Cir. 1985); State v. Roach, 680 A.2d 634, 638-39 (N.J. 1996); Littlejohn v. State, 989 P.2d 901, 908 (Okla. Crim. App. 1998).

2. *See* Barry Tarlow, *Limitations on the Prosecution's Ability To Make Inconsistent Arguments in Successive Cases*, CHAMPION, Dec. 1997, at 40. Tarlow refers to this scenario as an "increasingly common prosecution practice." *Id.*

3. *See, e.g.*, State v. Couch, 111 S.W.2d 147, 150 (Mo. 1937). In *Couch*, the Missouri Supreme Court upheld the defendant's conviction of murder even though only one person committed the offense and another defendant was already serving a life sentence for the murder. *Id.*

sentencing goals downward. Third, she may exploit the uncertainty to maximize the severity of the convictions and sentences by persuading fact finders in separate proceedings that each defendant pulled the trigger, as in the example. While arguments can be made in defense of the first two options, the third strategy cannot be justified. Causing two defendants to be sentenced to death by presenting inconsistent arguments in separate proceedings is unjust and represents a greedy exercise of prosecutorial authority. This inconsistency undermines the fairness of the judicial process and may precipitate inappropriate results.

Unfortunately, the law has no clear response to the problem of prosecutorial inconsistency. Defendants have attempted a number of different legal challenges to obtain relief from the burden of inconsistent prosecutorial positions. While expressing concern, courts facing the above situation have adopted no uniform legal position and have often refused to give the defendant relief.[4]

This Article suggests that the assertion of inconsistent positions violates the due process clause. For guidance in evaluating claims of prosecutorial inconsistency, courts should look to cases addressing prosecutors' violation of due process through presentation of false testimony and through improper argument.[5] Those cases make it clear that the due process clause protects the defendant from knowing prosecutorial reliance on false testimony and from prosecution argument that undermines the fairness of the trial. When the prosecution advances a position in the trial of one defendant and then adopts an inconsistent position in the trial of another on the same facts, the prosecution is relying on a known falsity. To allow the prosecution to do so corrupts the process. The courts should therefore define specific approaches for preventing the problem in the first place, relying principally on the doctrine of judicial estoppel, which bars a party from asserting at a later judicial proceeding a position inconsistent with a position relied on at an earlier proceeding.[6]

---

4. *See, e.g.,* Thompson v. Calderon, 120 F.3d 1045, 1070 (9th Cir. 1997) (Kozinski, J., dissenting) (remarking that there is something troubling about a sovereign convicting two defendants of a crime committed by a single person), *rev'd on other grounds,* 523 U.S. 538 (1998); United States v. McCaskey 9 F.3d 368, 379 (5th Cir. 1993) (describing the prosecution's conduct as "less than exemplary"); *Drake,* 762 F.2d at 1477 (Clark, J., specially concurring) (noting that all courts that considered Drake's claim expressed concern about inconsistency but granted no relief); People v. Watts, 91 Cal. Rptr. 2d 1, 7, 8 (Cal. Ct. App. 1999) (describing the prosecution's action as "troubling," but denying relief), *cert. denied,* 121 S. Ct. 97 (2000); State v. Kilgore, 771 S.W.2d 57, 67 (Mo. 1989) (finding "no . . . fundamental unfairness, however disquieting the inconsistent presentation of evidence might be"); *see also* United States v. Kattar, 840 F.2d 118, 127 (1st Cir. 1988) (criticizing the prosecution's change in its characterization of the victim, the Church of Scientology, remarking "it is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an organization, individual, or series of events variously as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations").

5. *See infra* notes 225-254 and accompanying text.

6. *See infra* notes 170-222 and accompanying text.

*CALIFORNIA LAW REVIEW* [Vol. 89:1423

Barring the prosecution from asserting a position inconsistent with an earlier position will promote fair enforcement of the criminal laws without unduly impeding the goal of law enforcement. The prosecution should be allowed to pursue both defendants, but it must do so without relying on inconsistent theories. In the single-shooter case, for example, it can prosecute and convict both defendants, but it may not obtain an aggravated conviction and sentence against each defendant as the one who pulled the trigger.[7] If the evidence is so ambiguous that the prosecution cannot determine which defendant actually fired the shot, then the shooter may be convicted and punished less severely than is warranted based on the actual, but not fairly provable, involvement. The tenets of our criminal law jurisprudence, the foremost of which is a very high standard of proof for guilt, should not tolerate a strategy that invites juries to convict and punish two defendants for a single act.

This Article examines the issues raised when the prosecution alters its positions in separate proceedings arising from a single criminal episode to gain an advantage over one or more defendants.[8] Part I discusses the nature of the injustice that results from allowing the prosecution to pursue inconsistent arguments in two separate trials. Part II evaluates existing legal tools that may be applied to discourage or prevent prosecutorial inconsistency and then advocates strengthening these mechanisms. Even if these existing tools are strengthened and universally applied in cases of prosecutorial inconsistency, their protection remains inadequate. This Article therefore argues that the doctrine of collateral estoppel should be strengthened to prevent some instances of inconsistency, but that an enhanced rule of judicial estoppel would be the most promising tool for barring prosecutorial inconsistency. Part III examines the due process implications of prosecuting, convicting, and sentencing defendants based on inconsistent prosecution positions and concludes that prosecutorial inconsistency violates due process and that a conviction obtained by espousing a theory inconsistent with one successfully advanced in the prior trial cannot stand.

---

7.   Some commentators have suggested that, in the civil arena, the doctrine of judicial estoppel will entirely bar the litigant from proceeding and may therefore frustrate the fairness of the process. *E.g.,* Douglas W. Henkin, Comment, *Judicial Estoppel – Beating Shields into Swords and Back Again,* 139 U. Pa. L. Rev. 1711, 1714 (1991).

8.   This Article does not consider the prosecution's mere use of a witness whose credibility has been attacked by the prosecution in an earlier proceeding. For an example of a case discussing this use, see *United States v. Hozian,* 622 F.2d 439, 442 (9th Cir. 1980), which rejects the defendant's argument that the prosecution should not have been permitted to rely on testimony of an immunized codefendant who had previously testified in his own trial, having been impeached by the prosecution and convicted. Witnesses sometimes change their accounts of pertinent events. A party is not bound by its witnesses' testimony, but is permitted to attack the credibility of its own witness. FED. R. EVID. 607. This Article focuses on those situations in which the government sings one tune at the first proceeding and a different tune at a later proceeding. This Article also does not address the prosecution's presentation of alternative theories to a single jury, a practice which is clearly allowed. *See infra* note 29 and accompanying text.

Finally, Part IV argues that the first-tried defendant should be entitled to relief if the prosecution changes its position in a later proceeding.

I

THE NATURE OF THE PROBLEM

When a single offense leads to related but separate proceedings, the prosecution has the opportunity to exploit inconsistent positions, persuading the separate fact finders that the evidence more strongly inculpates the defendant before them. Because the proceedings are separate, the prosecution can convince the separate fact finders, for example, that each defendant committed specific acts central to the crime. By doing so, the prosecution may obtain more serious convictions and sentences than would be possible in a single trial. Such inconsistency unfairly burdens the defendant, yet often goes unredressed. The problem of inconsistent prosecution positions may arise whenever there are separate but related proceedings, such as when codefendants are severed for trial,[9] when separate federal or state prosecutions grow out of a common set of transactions,[10] or when a retrial occurs.[11]

Variations on the theme of the single-shooter example, perhaps the most outrageous examples of prosecutorial inconsistency, are the most common instances of prosecutorial inconsistency reported.[12] But, prosecutorial inconsistency is not confined to single-shooter homicide cases. In *State v. Fondren*,[13] for example, the prosecution charged two defendants, Fondren and Lupo, with assault during a bar fight. First, at Lupo's trial for peace disturbance, the prosecution argued that Lupo was the initial aggressor.[14] Later, at Fondren's trial, the prosecutor argued that Fondren was the

9. *See generally* WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 17.2 (3d ed. 2000) (discussing severance).

10. *See, e.g.,* United States v. Hemmingson, 157 F.3d 347, 356 (5th Cir. 1998) (considering prosecutorial inconsistency growing out of prosecutions in two federal districts where evidence substantially overlapped but crimes were different); *see also* Elizabeth T. Lear, *Contemplating the Successive Prosecution Phenomenon in the Federal System,* 85 J. CRIM. L. & CRIMINOLOGY 625, 625-44 (1995) (attributing proliferation of federal prosecutions to intricate nature of federal crimes, decentralized efforts in federal prosecutions, prosecutors' political ambitions, and joinder barriers from constitutional venue requirements).

11. *See, e.g.,* People v. Cruz, 643 N.E.2d 636 (Ill. 1994).

12. *See, e.g.,* State v. Lavalais, 685 So. 2d 1048 (La. 1996); State v. Roach, 680 A.2d 634 (N.J. 1996). In *Lavalais,* a capital murder case, the prosecution argued in the first defendant's trial that he dominated and controlled Lavalais. 685 So. 2d at 1056. At Lavalais' capital sentencing hearing, the prosecution, disputing his claim that his codefendant had dominated and controlled him, successfully persuaded the jury to sentence him to death. *Id.* In *Roach,* where only two of the several accomplices had fired shots, the prosecution argued in the first three trials that two of Roach's codefendants were the shooters. *Roach,* 680 A.2d at 640. At Roach's trial, however, the prosecution argued that Roach and one of the accomplices fired the shots. *Id.* at 639.

13. 810 S.W.2d 685 (Mo. Ct. App. 1991).

14. *Id.* at 687.

initial aggressor.[15] Relying on these inconsistent arguments, the prosecution successfully convicted both participants in the fight.[16] In *United States v. Salerno*,[17] the government successfully prosecuted the person it had identified as a victim of other defendants in a separate trial arising from the same events.[18] In *People v. Cruz*,[19] between the defendant's first and second trials, the prosecution altered its position on a key fact in order to deflect the impact of exculpatory evidence offered by the defendant in the second trial.[20] In each of these instances, the separation of the proceedings allowed the prosecution to advance inconsistent positions to the defendant's disadvantage.

### A.   The System's Tolerance of Inconsistency

Although the courts have sometimes recognized a value in consistency,[21] they have nevertheless made it clear that consistency is not a paramount constitutional value in structure of the criminal justice system. The law tolerates inconsistent verdicts.[22] The Supreme Court has held that if a single fact finder, whether jury or judge, returns a verdict that is internally inconsistent, the conviction may stand.[23] For example, the jury may acquit a defendant of a narcotics offense, but it may convict the defendant of using the telephone to commit that offense. The conviction is inconsistent with the acquittal but will stand despite that inconsistency.[24] Similarly, if either a single fact finder or separate fact finders acquit one defendant of a crime requiring two or more participants and convict the other alleged participant, the apparently inconsistent verdicts will stand.[25]

---

15.   *Id.*

16.   *Id.* at 686.

17.   937 F.2d 797 (2d Cir. 1991).

18.   *See* discussion *infra* notes 93-102 and accompanying text.

19.   643 N.E.2d 636 (Ill. 1994).

20.   *See* discussion *infra* notes 58-67 and accompanying text.

21.   *E.g.*, Griffith v. Kentucky, 479 U.S. 314, 327 (1987) (concluding on the question of retroactivity of judicial decisions that all cases on direct appeal should be subject to the new rule and rejecting the "clear break" exception; noting that the exception would create a "problem of not treating similarly situated defendants the same"); Walker v. United States, 969 F.2d 814, 817 (9th Cir. 1992) (remarking that "[f]undamental fairness requires that like cases be treated alike").

22.   United States v. Powell, 469 U.S. 57, 62 (1984) (holding that an acquittal for a felony did not bar a conviction for telephone facilitation of that felony; stating that "'[c]onsistency in the verdict is not necessary'") (quoting Dunn v. United States, 284 U.S. 390, 393 (1932)); Standefer v. United States, 447 U.S. 10, 25 (1980) (holding that the defendant may be found guilty of aiding and abetting a crime for which the principal has been acquitted). *See generally* Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 HARV. L. REV. 771 (1998).

23.   *Powell*, 469 U.S. at 69; Harris v. Rivera, 454 U.S. 339, 345 (1981) (holding that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside" in a non-jury criminal trial).

24.   *See Powell*, 469 U.S. at 69; Muller, *supra* note 22, at 773-74 (examining a situation where the defendant may not be found guilty of possession of drugs, but may be found guilty of using the telephone to commit the possession offense).

25.   *Standefer*, 447 U.S. at 26 (holding that acquittal of principal did not bar defendant's conviction for aiding and abetting); United States v. Garcia, 16 M.J. 52 (C.M.A. 1983) (holding that the

The courts have never accepted a broad "consistency of judgments" argument that would require the judgment in one criminal trial to conform with the judgment in a different, but related, proceeding.[26] They have also largely abandoned the rule of consistency that once reconciled separate verdicts in conspiracy cases.[27] The courts fear that any rule demanding greater consistency would inappropriately allow a defendant to exploit an erroneous acquittal.[28]

Issues of inconsistency may also arise within a single trial, but they do not threaten the basic fairness of the process. Numerous legal mechanisms protect defendants against prosecutorial inconsistency in that setting. A single fact finder evaluates all allegations and evidence. When the prosecution offers the fact finder alternative bases on which to resolve the case, as the alternative pleading rules permit, the fact finder can weigh inconsistent alternatives in the context of the whole case.[29] If the prosecution argues truly irreconcilable positions, such as claiming that each of two defendants fired the single fatal bullet, the fact finder can evaluate them as alternatives, knowing that both cannot be true.

Furthermore, concessions made by the prosecution may act as judicial admissions and bind the prosecution, foreclosing later inconsistency.[30] If the prosecution strays too far from the charging instrument, the law of variance offers the defendant protection.[31] As the case moves through successive proceedings, the government's assertions may foreclose later

codefendant's acquittal was no bar to the conviction of the defendant for conspiracy). *Cf.* People v. Allee, 740 P.2d 1 (Colo. 1987) (acquittal of defendant's son did not require conclusion that defendant's attempt to protect son from police officer's use of force was legally justified).

26.   *E.g.,* Potts v. State, 430 So. 2d 900 (Fla. 1982); State v. Wilson, 19 N.W.2d 232 (Iowa 1945); Commonwealth v. Cerveny, 439 N.E.2d 754, 757 (Mass. 1982) (commenting that "inconsistency in verdicts is intellectually discomforting" but declining to adopt a rule encouraging consistency).

27.   *Harris,* 454 U.S. at 464; United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) (stating that "it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty"); People v. Palmer, 103 Cal. Rptr. 2d 13 (2001) (summarizing the law and abandoning the rule of consistency); Muller, *supra* note 22, 787-88. *See also* Garcia, 16 M.J. 52 (summarizing development of the law).

28.   *Allee,* 740 P.2d at 10 (stating that "[i]nconsistent verdicts are not necessarily repugnant to our sense of justice in criminal cases because society's interest in enforcement of the criminal law 'dictates that we guard against compounding the effect of a possibly erroneous or irrational acquittal'") (citing Marquiz v. People, 726 P.2d 1105, 1107-08 (Colo. 1986)). *See generally* Muller, *supra* note 22.

29.   *See* LaFave et al., *supra* note 9, § 19.3(b).

30.   2 Kenneth S. Broun et al., McCormick on Evidence § 254 (John W. Strong ed., 5th ed. 1999); *see also* United States v. Blood, 806 F.2d 1218, 1220-21 (4th Cir. 1986) (acknowledging that prosecution statements during voir dire requests and opening argument could act as judicial admissions, but concluding that the statements were not factual and therefore did not bar conviction); United States v. Powers, 467 F.2d 1089, 1094 (7th Cir. 1972) (suggesting in dictum that the prosecution's position in another defendant's trial could act as a judicial admission). *See generally* David S. Coale, *A New Framework for Judicial Estoppel,* 18 Rev. Litig. 1, 15-25 (1999) (comparing judicial admissions and judicial estoppel).

31.   A variance occurs when the proof at trial diverges from the charges against the defendant. The law of variance assures that the jury will not be permitted to convict the defendant on evidence that departs too far from the charging instrument. *See* LaFave et al., *supra* note 9, § 19.6(a).

arguments since waiver principles bar the government from advancing new positions on appeal.[32] The law of the case doctrine prevents relitigation of settled issues.[33] Sometimes, of course, the protections fail. When, despite all these protections, a fact finder returns inconsistent verdicts, the inconsistency flows from the fact finder's evaluation of the evidence and, possibly, from the fact finder's confusion, willingness to compromise, or exercise of lenity.[34] It does not result from the government's manipulation and corruption of the process.

### B.  *The Special Problem of Prosecutorial Inconsistency*

Prosecutorial inconsistency poses a more serious problem than other types of inconsistency tolerated by the system. Inconsistency in a single trial flows from the fact finder's evaluation of all the evidence and occurs despite the fact finder's exposure to all the admissible evidence. Inconsistency in separate trials may occur in the absence of prosecutorial inconsistency because different fact finders may simply react differently to the same evidence and arguments. Prosecutorial inconsistency, however, occurs when the prosecution takes advantage of separate proceedings to advance inconsistent positions to separate fact finders, each unaware that the prosecution advanced a conflicting position at a different proceeding.

The protections present in a single trial are lacking when related offenses are tried separately.[35] When the prosecution faces defendants in two

---

32.  *Id.* § 24.7(e); *see also* Steagald v. United States, 451 U.S. 204, 209 (1981) (stat'mg that "[t]he Government . . . may lose its right to raise factual issues . . . before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary find'mgs by those courts, or when it has failed to raise such questions in a timely fashion during the litigation").

33.  *E.g.*, United States v. Corrado, 227 F.3d 528 (2000) (concluding that the law of the case doctrine applied and barred reconsideration of specified issues); Isom v. State, 750 So. 2d 734 (Fla. Dist. Ct. App. 2000) (applying the doctrine to bar reconsideration of the sentencing question); State v. Graham, 13 S.W.3d 290 (Mo. 2000) (applying the doctrine to bar argument); *see also* People v. Evans, 727 N.E.2d 1232 (N.Y. 2000) (discussing the doctrine, but concluding it did not apply because the ruling was evidentiary). *See generally* 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4478 (1981); Joan Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation*, 135 U. PA. L. REV. 595 (1987).

34.  *See generally* Muller, *supra* note 22, at 781-86 (discussing mistake, compromise, and lenity as causes of inconsistent verdicts).

35.  Even in multiple proceedings, a single defendant is better protected against prosecutorial inconsistency than codefendants tried separately. The constitutional protection against double jeopardy and the doctrine of collateral estoppel limit successive prosecutions of one defendant and may restrict the government's arguments from one trial of the defendant to the next. *See* U.S. CONST. amend. V (providing that a person shall not "be subject for the same offense to be twice put in jeopardy of life or limb"). These doctrines often prevent the prosecution from adopting inconsistent positions to punish one defendant. The protection against double jeopardy does not absolutely foreclose successive prosecutions arising from the same criminal episode, but it limits the government's ability to repeatedly try a defendant. *See* GEORGE C. THOMAS III. DOUBLE JEOPARDY: THE HISTORY, THE LAW (1998). *But see* Heath v. Alabama, 474 U.S. 82 (1985) (holding that the successive prosecution of a defendant for the same conduct by separate states does not violate double jeopardy). In some cases, a party prevails against the government in a civil proceed'ug and then faces related criminal charges. *E.g.*, United States

**-1392-**

separate trials and presents inconsistent arguments to the separate fact find-
ers, the fact finders may ultimately convict and punish two defendants on
the basis of a single act. The prosecution's exploitation of inconsistent
theories to gain an advantage over a defendant violates the defendant's
rights and undermines the integrity of the justice system.[36] Each fact finder
considers only the case against the defendant before it, ignorant of the
prosecution arguments against the separately-tried codefendant and the
results of the separate trial. The fact finder has no reason to suspect that the
prosecution persuaded a different fact finder to accept an inconsistent posi-
tion. Such inconsistency creates the risk that the defendant who did not fire
the shot will be convicted at an inappropriately severe level and will re-
ceive an unduly harsh sentence, perhaps even the death penalty. By assert-
ing irreconcilable positions before separate fact finders, each unaware that
the prosecutor argued that another defendant was convicted in another pro-
ceeding of the act now attributed to the defendant, the prosecutor invites
unfairly inconsistent verdicts.

### C.  *The Inadequacy of Ethical Rules*

Special ethical obligations imposed on prosecutors do not effectively
protect defendants from the harm of prosecutorial inconsistency.[37] First,

v. Rogers, 960 F.2d 1501 (10th Cir. 1992). In those instances, the criminal defendant may invoke the
doctrine of collateral estoppel, or issue preclusion, to bar aspects of the criminal case. *Id.* at 1510. Such
cases are beyond the scope of this Article.

   36.   *See* Lear, *supra* note 10, at 649-51 (arguing that apparent impropriety in criminal prosecution
is more harmful to the integrity of the justice system than comparable impropriety in civil litigation).
The public keeps a watchful eye on criminal cases and expects a higher standard of fairness in its public
representatives in the justice system than of private actors in private cases. Bruce A. Green, *Why Should
Prosecutors "Seek Justice"?*, 26 FORDHAM URB. L.J. 607, 615-16 (1999). Green emphasizes the
prosecutor's "duty to avoid public perception that criminal proceedings are unfair." *Id.* at 636. *See
generally* Roberta K. Flowers, *What You See Is What You Get: Applying the Appearance of
Impropriety Standard to Prosecutors*, 63 Mo. L. REV. 699, 728-30 (1998) (discussing importance of
perception of fairness in criminal justice system).

   37.   This Article does not dwell on whether prosecutorial inconsistency violates ethical standards.
It is worth noting, however, that the rules of professional responsibility impose special obligations on
prosecutors. *See generally* Michael Q. English, Note, *A Prosecutor's Use of Inconsistent Factual
Theories of a Crime in Successive Trials: Zealous Advocacy or a Due Process Violation?*, 68
FORDHAM L. REV. 525 (1999) (discussing ethical duty). Prosecutors are expected to assume special
responsibility for the fairness of criminal proceedings. Unlike their adversaries in the criminal justice
process, prosecutors do not represent clients and are therefore unfettered by the client obligations
imposed on most lawyers. *See generally* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 13.10
(student ed., 1986) (suggesting that while not representing an individual as his client, a prosecutor in a
policy-making position should regard the public as his client, while those in more subordinate roles
should consider their office superiors as such); English, *supra* (discussing the special obligations of the
prosecutor); Flowers, *supra* note 36, at 728-30 (characterizing the prosecutor's client as the government
and the public); Roberta K. Flowers, *A Code of Their Own: Updating the Ethics Codes To Include the
Non-Adversarial Roles of Federal Prosecutors*, 37 B.C. L. REV. 923, 931 (1996) (discussing
constituencies represented by the prosecutor as being victims, law enforcement agencies, and office
policies); they have a special obligation of candor and are often exhorted to "do justice" or "seek
justice." Green, *supra* note 36, at 631-33 (asserting that prosecutors have a duty not to impeach true

translating the special duties into practical terms has proved difficult.[38] One can argue that a prosecutor who knowingly adopts inconsistent positions in separate proceedings without adequate justification acts unethically because she knows that at least one of those positions is wrong and therefore lacks a good faith belief in one or both of the positions.[39] Nevertheless, the ethical rules do not clearly condemn the conduct and do not state whether a prosecutor may ethically defer to the jury to resolve uncertainties in the proof, such as which of the two defendants in the Smith and Jones example fired the fatal shot, or whether the prosecutor has an obligation to be certain herself.[40] Second, even if the conduct is unethical, courts will not necessarily remedy harm merely because it is generated by unethical prosecution.[41] Third, and most important, a defendant may be harmed even by ethical prosecutorial inconsistency. If the prosecutor unwittingly adopts a position inconsistent with the position taken by another prosecutor working for the same sovereign at an earlier proceeding, the prosecutor is not unethical,[42] but the defendant, as well as the fairness of the process and the integrity of the justice system, suffers nonetheless.

---

testimony or argue false theories, but rather to seek fairness and truth in order to obtain justice). Commentators have said that the prosecutor's clearest obligation is to refrain from convicting the innocent. *Id.* at 635; *see also* Flowers, *supra* note 36, at 729-30 (noting that prosecutors have a dual role of prosecuting criminals while protecting the innocent from conviction).

   38.   *See* Green, *supra* note 36, at 637-42.

   39.   *See* Fred C. Zacharias, *Structuring the Ethics of Prosecutorial Trial Practice: Can Prosecutors Do Justice?*, 44 VAND. L. REV. 45, 61 (1991). Professor Zacharias argues that the prosecutor cannot ethically prosecute without a good faith belief that the defendant is guilty. *Id.* He states that "[i]f the evidence is in conflict, an ethical prosecutor cannot rationalize a conviction simply on the ground that the trial is fair." *Id.* at 61. *See also* Kenneth Melilli, *Prosecutorial Discretion in an Adversary System*, 1992 BYU L. Rev. 669, 693-97 (1992) (noting shortcomings of adversarial system as truth-finding mechanism and questioning whether prosecutor can avoid responsibility for questionable case). The prosecutor has a duty to prejudge the evidence. Zacharias, *supra*, at 89-90; *see also* Bennett L. Gershman, *A Moral Standard for the Prosecutor's Exercise of the Charging Discretion*, 20 FORDHAM URB. L.J. 513, 522 (1993) (arguing that the prosecutor must "assure herself that she is morally certain that the defendant is both factually and legally guilty, and the criminal punishment is morally just").

   40.   *See* Green, *supra* note 36, at 619-20; *see also* WOLFRAM, *supra* note 37, § 13.10.3 (stating that the prosecutor's ethical obligation is generally set low, merely demanding that the prosecutor not prosecute unless she knows there is probable cause; English, *supra* note 37 (discussing lack of clarity in the law). *But see* Flowers, *supra* note 37, at 934-39 (examining the obligation of prosecutors as fact finders reconstructing past events); Green, *supra* note 36, at 639-41 (arguing that a prosecutor's obligation goes beyond mere assurance that probable cause exists).

   41.   *See* United States v. Ash, 413 U.S. 300, 320 (1973) (noting, in regard to pretrial photographic identification issues, that "[t]he primary safeguard against abuses of this kind is the ethical responsibility of the prosecutor"). The Court further notes that by establishing procedures for agents of the prosecution, the prosecutor as supervisor can continue to minimize abuses while the investigation of the case continues before trial. *Id.* at 320 n.16.

   42.   *See* Michael S. Ross, *Alternative Forums for Ethics Disputes*, CRIM. JUST., Spring 1996, at 43 (emphasizing that the prime factor in establishing unethical prosecutorial conduct is "actual knowledge" of false position taken).

Regardless of how the prosecutor's ethical duty is defined, courts should not permit the prosecution to convict a defendant on one theory and then pursue an inconsistent theory to win a guilty verdict against a second defendant charged on the basis of the same criminal episode.[43] The courts have yet to recognize that prosecutorial inconsistency threatens the fairness of the process, even when the prosecutor advancing the inconsistent position is unaware of the prior prosecution position. Unlike inconsistent verdicts that result from the fact finders' views of the evidence, prosecutorial inconsistency involves the government's manipulation of the process to encourage separate fact finders to reach contrary conclusions, each favoring the government. Due process requires that courts address this problem. This Article attempts to define legal mechanisms for achieving this protection.

## II
### EXISTING LEGAL TOOLS FOR PROMOTING CONSISTENCY

Despite the unfairness of allowing prosecutors to take inconsistent positions, courts have failed to view prosecutorial inconsistency as a constitutional problem. They allow prosecutors to advance inconsistent positions in separate trials and uphold the resulting convictions and sentences. The courts have not agreed upon any legal mechanism that forecloses prosecutorial inconsistency. In some cases, special circumstances such as an existing plea agreement allow the defendant to prevent the assertion of an inconsistent position.[44] More often, however, the defendant cannot identify any such special circumstance and must attempt to apply existing legal protections from other contexts. When courts turn to established doctrines such as estoppel law for guidance, they generally conclude that the doctrines provide the defendant no protection from prosecutorial inconsistency.[45]

Acknowledging the danger to due process posed by prosecutorial inconsistency, the courts should strengthen the means of protecting defendants. The law recognizes some legal tools for enforcing or encouraging consistency, which may help avoid prosecutorial inconsistency.[46] In many cases, these mechanisms have provided defendants inadequate protection.

---

43.  I do not go so far as to argue that a prosecutor faced with ambiguous evidence cannot proceed in prosecuting both defendants. I insist, however, that the government crosses the line when prosecutors play the ambiguity two different ways in separate proceedings.

44.  *See, e.g.*, Hunt v. State, 613 So. 2d 893 (Fla. 1992) (vacating a death sentence on grounds that by sentencing the defendant before codefendant's trial, the trial court breached the plea agreement that defendant would be sentenced after codefendant's trial; granting resentencing in which the trial court would consider the record in codefendant's case in which the prosecution had portrayed the defendant as totally dominated by codefendant).

45.  *See* cases cited *supra* notes 4 and 12.

46.  For a complete discussion of the application of party admissions, collateral estoppel, and judicial estoppel to promote prosecutorial consistency, see *infra* Parts II.A, II.B, & II.C, respectively.

Properly modified, however, existing legal doctrines should provide a suitable framework for addressing most prospective claims of inconsistency. Three existing legal tools may discourage or prevent prosecutorial inconsistency: introducing prosecutors' prior inconsistent statements as party admissions, applying collateral estoppel, and using judicial estoppel.

These tools will be effective, however, only if prevailing law is clarified and modified. First, the courts should admit prosecutors' inconsistent statements from prior proceedings into evidence as party admissions. As a tool for preventing prosecutorial inconsistency, this evidentiary response should be a last resort, applied only if the court rejects the argument that prosecutorial inconsistency should be barred altogether. Allowing the defendant to introduce the prosecution's inconsistent statements offers only a weak palliative, letting the jury know of the inconsistency but not directly precluding it. Estoppel principles provide better protection than evidentiary rules. The second tool, collateral estoppel, may be useful to address a narrow range of inconsistency problems; this limited doctrine, however, cannot reach most instances of prosecutorial inconsistency. The third mechanism, judicial estoppel, offers the greatest promise to bar prosecutorial inconsistency. The doctrine of judicial estoppel bars a party that successfully asserted a position in a prior proceeding from asserting an inconsistent position in a later proceeding. The courts should strengthen the doctrine and apply it to attack the problem of prosecutorial inconsistency.

### A.   Admitting Prosecutors' Statements as Party Admissions

If the court allows the prosecution to advance a theory inconsistent with that asserted in a prior proceeding, the defendant may want to inform the jury of this change in position by introducing the prosecutor's statements from the earlier proceeding.[47] Defendants frequently attempt to offer into evidence prosecutors' earlier statements as party admissions not excluded by the hearsay rule.[48] Courts have shown increasing willingness to admit such statements, although some express reluctance and either refuse to admit the statements altogether or subject them to special scrutiny.[49]

---

47. *See* FED. R. EVID. 801(d)(2). The inconsistency may not warrant estoppel, but the prosecution's position in the later trial may be sufficiently incongruent with its position in the prior trial that the jury should be informed. *E.g.*, United States v. Salerno, 937 F.2d 797, 811-12 (2d Cir. 1991) (stating that the prosecution's portrayal of the defendant as an extortion victim at the first trial did not warrant estopping subsequent prosecution of the defendant for fraud, but the portrayal was relevant to whether the defendant possessed the requisite intent to defraud).

48. *See* FED R. EVID. 801(d)(2). Under the federal rule, admissions by a party opponent are not exceptions to the hearsay rule, but instead are considered not to be hearsay and therefore fall outside the rule's general prohibition on out-of-court statements as evidence. *See* FED R. EVID. 801(d)(2), 802.

49. *See* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 801.33[3] (Joseph M. McLaughlin ed., 2d ed. Supp. 2000) (stating only that "some courts have indicated that rule 801(d)(2)(D) may be invoked against the government, particularly when dealing

-1396-

The rule governing party admissions, a well-accepted principle of evidence law, admits statements attributable to a party-opponent over a hearsay objection.[50] Party admissions include statements adopted by the party, statements made by an agent with authority and offered against the principal, and, under the modern rule, statements made by an agent concerning matters within the scope of the agent's duties.[51] The rationale for admitting a party's statement is that, in our adversary system, a party should not be able to exclude its prior statements as hearsay but instead, may explain them in court.[52]

The law governing prosecutor's statements is neither uniform nor well-developed.[53] Some courts have rebuffed defendants' efforts to admit prosecutors' inconsistent statements,[54] invoking "the common law principle that no individual should be able to bind the sovereign."[55] The reasoning of cases invoking this principle is not persuasive, however, when the government speaks in court through its agent, the prosecutor.[56] Not only are

---

with statements made by government attorneys"); *see also* cases cited in 5 *id.* §§ 801-71 to -72 nn.20-23.

    50.  FED. R. EVID. 801(d)(2); *see also* BROUN ET AL., *supra* note 30, § 254.

    51.  *See* BROUN ET AL., *supra* note 30, § 254. *See also* FED. R. EVID. 801(d)(2).

    52.  BROUN ET AL. supra note 30, § 254 (noting also that the party cannot complain of its own loss of credibility or of the lack of opportunity to cross-examine the speaker).

    53.  *See* WEINSTEIN & BERGER, *supra* note 49, § 801.33[3]. Even when courts recognize that prosecutors' statements may fall within FED. R. EVID. 801(d)(2), they do not appear to agree about the particular provision of the rule. *See id.* at 801-72 n.23. Courts variously rely upon subsections (A), (B), (C), and (D). *E.g., Salerno*, 937 F.2d at 811-12 (relying on *McKeon*'s admittance of defense counsel's prior statements as party admissions under FED. R. EVID. 801(d)(2)(B-C) to rule that the prosecution's prior trial opening statement was admissible); United States v. Kattar, 840 F.2d 118, 130 (1st Cir. 1988) (holding that at least the Justice Department, if not every federal agency, is a party-opponent in criminal cases under FED. R. EVID. 801(d)(2)(A)); Hoptowit v. Ray, 682 F.2d 1237, 1262 (9th Cir. 1982) (holding that the investigative report prepared by the prosecutor's office was admissible under FED R. EVID. 801(d)(2)(D)); United States v. Morgan, 581 F.2d 933, 937-38 (D.C. Cir. 1978) (finding that the government manifested a belief in the informant's statements under FED. R. EVID. 801(d)(2)(B) when it indicated in a sworn affidavit for a search warrant that it believed the statements were trustworthy). Subsection (B) does not seem to be the appropriate provision for statements by prosecutors; it is not clear how the government manifests adoption of the prosecutor's words. Nor should the defendant have to demonstrate adoption. Prosecutors are agents of the government. When they represent the government in the prosecution of a criminal case, they speak with authority and their statements should generally be admitted under subsection (C) as authorized statements of agents. Analysis under (D), examining whether the prosecutor acted during the agency and whether the subject matter related to her area of employment, should also lead to admissibility. Any further elaboration of this question is beyond the scope of this Article.

    54.  *E.g.,* Parker v. Singletary, 974 F.2d 1562 (11th Cir. 1992) (noting that the prosecutor's inconsistent argument in the codefendant's case would not have been admissible).

    55.  United States v. Zizzo, 120 F.3d 1338, 1351 n.4 (7th Cir. 1997) (rejecting the argument that the prosecutor's statements fall within FED. R. EVID. 801(d)(2)); *see also* United States v. Santos, 372 F.2d 177, 180 (2d Cir. 1967) (explaining that FED. R. EVID. 801(d)(2) is inapplicable to criminal proceedings because government agents are uninterested in the outcome and are unable to bind the sovereign). Unlike law enforcement officers, however, prosecutors are partisan advocates.

    56.  *See* United States v. Bakshinian, 65 F. Supp. 2d 1104, 1106 (C.D. Cal. 1999) (holding that prosecutors, if not all government agents, can bind the sovereign).

prosecutors authorized to speak for the government in criminal cases, they can unquestionably bind the government on a range of legal matters through, for example, stipulations and plea agreements.[57] Therefore their statements in other aspects of the case should be treated as party admissions.

*People v. Cruz*[58] demonstrates the unjust results that can arise when courts restrict the admissibility of prosecutors' prior inconsistent statements.[59] In *Cruz*, the Supreme Court of Illinois upheld the trial court's refusal to admit in the defendant's second trial the prosecutor's inconsistent statements made during the opening statement in the defendant's first trial.[60] In the first trial, the prosecution argued that the victim, a 10-year-old girl, was murdered where her body was found on the Illinois Prairie Path.[61] In the defendant's retrial, the prosecution argued that the murder occurred elsewhere.[62] This change in position was a response to statements of another suspect (Dugan) introduced by the defense; in the statements, Dugan claimed that he alone had committed the crime and that he had murdered the girl on the Illinois Prairie Path.[63]

Cruz was convicted and sentenced to death for the vicious murder.[64] The court concluded that prosecutors' statements could sometimes constitute admissions, but held that the trial court acted within its discretion in excluding the statements in this case.[65] What would the jury have thought if it learned that the prosecutor himself had earlier taken a position that now supported Dugan's guilt rather than Cruz's? While we cannot know how the prosecutor's knowledge would have influenced the jury, we do know that later DNA analysis linked Dugan to the assault and that the case against Cruz evaporated; Cruz was innocent.[66]

The court should have seen the prosecutor's shift in position as a warning flag.[67] At a minimum, the court should have admitted the

---

57.  *See* Santobello v. New York, 404 U.S. 257, 262 (1971) (declaring that fulfillment of the prosecutor's promise in return for guilty plea is a necessary safeguard for the defendant); United States v. Clark, 55 F.3d 9, 12 (1st Cir. 1995) (finding that the government breached a binding plea agreement with the defendant).

58.  643 N.E.2d 636 (Ill. 1994).

59.  *See* Tarlow, *supra* note 2, at 42-44.

60.  *Cruz*, 643 N.E.2d at 665.

61.  *Id.* at 664-65.

62.  *Id.* at 664.

63.  *Id. See generally* JIM DWYER ET AL., ACTUAL INNOCENCE 176-80 (2000) (detailing case).

64.  *Cruz*, 643 N.E.2d at 639.

65.  *Id.* at 665.

66.  *See* DWYER ET AL., *supra* note 63, at 178-80 (discussing case); Tarlow, *supra* note 2, at 42 (detailing state's evidence, including a DNA sample, which did not implicate defendant).

67.  Rather than recognizing a possible problem with the case against Cruz, the Supreme Court of Illinois noted the unfortunate impact of reversal on the victim's family and expressed regret. 643 N.E.2d at 667. When the corruption in the prosecution of the case was later uncovered, Cruz was released from death row. The case ultimately led to a civil suit against several law enforcement officers

*PROSECUTORIAL INCONSISTENCY*

prosecution's earlier statements, so that the jury could have considered whether that change signaled an effort to make up for a deficient case. Perhaps that evidentiary decision would have exposed the injustice earlier. The decision reflects the courts' traditional reluctance to treat a prosecutor's statement as a party admission, used against the prosecution in a later case. That reluctance is unwarranted and allows the prosecution inappropriate freedom to exploit inconsistent positions in separate proceedings.

*1. The McKeon Test for Admitting Defense Counsels' Statements as Party Admissions*

The leading cases interpreting the federal rule governing party admissions as it applies to lawyers' statements are the Second Circuit Court of Appeals decisions in *United States v. McKeon*[68] and *United States v. Salerno.*[69] In *McKeon*, the court considered the government's argument that defense counsel's inconsistent remarks in a prior trial's opening statement were admissible against the defendant in a subsequent trial.[70] Concluding that lawyers' statements would sometimes be admissible, the court stated:

> We believe that prior opening statements are not per se inadmissible in criminal cases. To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact.[71]

The court nevertheless adopted a case-by-case approach based on a multi-factor test to determine when counsel's earlier opening statement would be admitted; it feared the problems that could flow from the "expansive practices sometimes permitted" under the party-admissions rule.[72] The court identified five factors: consumption of time, unfairness to the defense, deterrence of advocacy, compromise of the defense, and disqualification of defense counsel.[73] Applying this test, the *McKeon* court

---

and prosecutors on the basis of their deceit and manipulation of evidence. *See* DWYER ET AL., *supra* note 63, at 180.

    68.   738 F.2d 26 (2d Cir. 1984).

    69.   937 F.2d 797 (2d Cir. 1991).

    70.   *See McKeon,* 738 F.2d at 28-29 (noting the government's argument that the statements were admissible under FED. R. EVID. 801(d)(2)(B), (C) or (D)).

    71.   *Id.* at 31.

    72.   *Id.* at 31-33.

    73.   *Id.* at 32-33. Considering all these factors, the *McKeon* court concluded that a trial court should not admit defense counsel's statement unless its inconsistency with a prior statement is clear and it is the equivalent of a testimonial statement of the defendant. *Id.* at 33. The court also exhorted the

held that the defense attorney's statements in his prior opening were admissible.[74]

Many courts adopt the multi-factor approach elaborated in *McKeon*,[75] but they should do so with caution. Because *McKeon*'s multi-factor test was developed for statements by defense counsel, it is too strongly weighted against admitting prior statements to provide an appropriate test for prosecution statements. *Cruz* illustrates the risk of applying *McKeon* to exclude prosecution statements.[76] While some of the factors identified in *McKeon* apply with equal weight to prosecutors' prior statements, others do not.

The first factor, the prospect that free use of attorney statements in prior trials will "consume substantial time to pursue marginal matters," should guide courts in evaluating the admissibility of prosecution statements.[77] In *McKeon*, the court recognized that predicting the evidence in the opening statement is difficult and that evidence in a case may not remain static from trial to trial.[78] The court was therefore concerned that inconsistent statements with innocent explanations would distract attention from the main issues at trial.[79] Like the defense, the prosecution may be surprised by a witness's actual testimony at trial or may discover new evidence. However, given the potential injustice in prosecutorial inconsistency, the trial court should weigh the defendant's argument carefully and stay alert for any danger signaled by the prosecution's change of position. The threat to the fairness of the process justifies the necessary consumption of time.

Courts should also consider the second factor, the risk of inviting unfair inferences from inconsistent positions, in determining whether the government's admissions should be allowed into evidence. The court can assess the significance of the proffered evidence and the validity of the arguments based on it, adequately protecting against improper use of the admissions. Courts should be receptive to admitting the prosecution's prior statements. The reasoning in *McKeon* rested on considerations unique to use of the party admission rule to admit prior statements by a criminal defense attorney; the court suggested that a legitimate inconsistency might

---

trial court to determine that "the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation does not exist." *Id.* The court further stated that if the question of innocent explanation could not be resolved, the statement should be excluded. *Id.*

74. *See id.* at 33-34 (relying on Fed. R. Evid. 801(d)(2)(B), (C)).

75. *E.g.,* Hoover v. State, 552 So. 2d 834, 839-40 (Miss. 1989) (applying the *McKeon* test to the state's argument from the prior trial).

76. *See* discussion *supra* notes 58-66 and accompanying text.

77. *McKeon*, 738 F.2d at 32.

78. *Id.*

79. *Id.*

arise because of the defendant's limited burden in a criminal trial.[80] By contrast, the government must "present a coherent version of the facts" and should have a comprehensive understanding of the case at the outset, since it bears the initial burden of production.[81] Consequently, admission of the prosecution's prior statements will more often be fair than admission of defense counsel's statements.

The remaining three factors should not enter into the consideration of governmental admissions. The third *McKeon* factor, avoiding deterrence of "vigorous and legitimate advocacy,"[82] does not apply because different standards apply to prosecution and defense advocacy to provide the defense greater latitude.[83] Commentators and courts have noted the prosecutor's obligations to do justice[84] and to strike only fair blows.[85] The Supreme Court has frequently emphasized the importance of prosecutorial fairness in criminal cases.[86] The difference in these advocacy standards weakens the

---

80.   *Id.* at 32. A defendant might target one weakness in the government's case in the first trial and another in the later trial; this would unfairly appear to the jury as an inconsistency that undermined the legitimacy of the defense. *See id.*

81.   *Id.*

82.   *Id.*

83.   See articles cited *supra* note 37.

84.   See articles cited *supra* note 37.

85.   *See, e.g.*, Berger v. United States, 295 U.S. 78, 88 (1935) ("[W]hile he may strike hard blows, he is not at liberty to strike foul ones.").

86.   In *Berger*, 295 U.S. at 88, the Court set the bar for expectations of prosecutorial conduct, stating:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Court stated:

> The State's interest in prevailing at trial—unlike that of a private litigant—is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases. Thus, also unlike a private litigant, a State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained.

*Id.* at 79. *See also* Strickler v. Greene, 527 U.S. 263, 281 (1999) (noting the prosecutor's special role in the "search for truth in criminal trials"); Patterson v. Illinois, 487 U.S. 285, 309 (1988) (Stevens, J., dissenting) (arguing that the prosecutor offering legal advice to the defendant is unfair because the "prosecuting authorities' true adversary posture" may be underestimated); Young v. United States *ex rel.* Vuitton Et Fils S.A., 481 U.S. 787, 814 (1987) (demanding assurance that prosecutors who exercise discretionary charging power "will be guided solely by their sense of public responsibility for the attainment of justice"); United States v. Young, 470 U.S. 1, 25 (1985) (Brennan, J., concurring in part and dissenting in part) (noting in dissent that the majority failed to acknowledge that "a representative of the United States Government is held to a higher standard of behavior" than that provided by ethical rules of conduct); Imbler v. Pachtman, 424 U.S. 409, 424 (1976) ("A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court."); Donnelly v. DeChristoforo, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting) ("The function of the

*CALIFORNIA LAW REVIEW* [Vol. 89:1423

argument against admitting inconsistent statements by the prosecution. Unlike deterrence of energetic defense advocacy, deterrence of prosecutorial exaggeration and excessive zeal serves the interest of justice.

The fourth factor, the risk that forcing the defense to explain the source of inconsistency may "expose work product, trial tactics, or legal theories"[87] and thus compromise the defendant's rights, is far less significant when evaluating the prosecution's statements. A prosecutor's explanation may expose the prosecution's theory and tactics, but that exposure is less harmful to the prosecution than to the defense.[88] Moreover, preserving the fairness of the proceeding warrants placing the burden of that risk on the prosecution.

The fifth policy concern raised in *McKeon,* the risk that admitting the statements will require removal of the attorney who made the prior statements,[89] also carries less force when evaluating a prosecutor's inconsistent statements. Removing a particular prosecutor is far less troublesome than removing defense counsel. Removal of defendant's counsel of choice raises constitutional concerns.[90] In addition, a substitute prosecutor can be brought into the case far more easily than can substitute defense counsel.[91]

### 2. Tests Offered for Assessing Admissibility of Prosecution's Statements

Although *McKeon* offers a helpful starting point, its focus on statements of defense counsel does not provide a satisfactory template to determine the admissibility of prosecutors' inconsistent statements. A number of courts have applied less restrictive tests and concluded that prosecution

---

prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial."); United States v. Ash, 413 U.S. 300, 320 (1973) (highlighting the "ethical responsibility of the prosecutor" as a safeguard against the accidental or purposeful subversion of the trial); United States v. Wade, 388 U.S. 218, 256-57 (1967) (White, J., concurring in part and dissenting in part) (stating in dissent that prosecutors "have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to . . . the ascertainment of the true facts . . . .").

87. *McKeon,* 738 F.2d at 32.

88. The prosecution is obligated to provide more pretrial discovery than the defense. LAFAVE ET AL., *supra* note 9, § 20.1. At trial, the prosecution proceeds first and must present proof beyond a reasonable doubt on all elements of the offense, whereas the defendant may elect to introduce no evidence whatsoever. In addition, the question of attorney client privilege may arise if the defendant is required to explain, but the privilege is not implicated by prosecution explanation.

89. *McKeon,* 738 F.2d at 33. *But see* State v. Cardenas-Hernandez, 579 N.W.2d 678, 685 (Wis. 1998) (mentioning this factor prominently).

90. *See McKeon,* 738 F.2d at 34; *see also* Vivian O. Berger, *The Supreme Court and Defense Counsel: Old Roads, New Paths—A Dead End?,* 86 COLUM. L. REV. 9 (1986); Stephen J. Schulhofer & David D. Friedman, *Rethinking Indigent Defense: Promoting Effective Representation through Consumer Sovereignty and Freedom of Choice for All Criminal Defendants,* 31 AM. CRIM. L. REV. 73 (1993).

91. Most prosecutors offices have a number of assistants on staff. *See* CAROL J. DEFRANCIS & GREG W. STEADMAN, U.S. DEP'T OF JUSTICE, PROSECUTORS IN STATE COURTS, 1996 (1998).

statements should be admissible.[92] In *United States v. Salerno*, the Second Circuit adapted its reasoning in *McKeon* to statements made by government lawyers and offered by a criminal defendant.[93] The court identified three determinations for the trial court: (1) whether the prior statement involves a factual assertion inconsistent with the prosecutions later assertions; (2) whether the prosecutor's statements were the equivalent of a client's testimonial statements; and (3) whether the inconsistent statement fairly supports the inference to be drawn and is not subject to innocent explanation.[94]

In *Salerno*, the government charged Auletta as a defendant and treated him as a culpable actor.[95] By contrast, in an earlier prosecution, the government had prosecuted other defendants on the theory that Auletta was a victim of extortion.[96] At his trial, Auletta sought to introduce the indictment and the prosecution's opening and closing arguments from the prior trial.[97] He argued that these statements constituted party admissions and should be presented to the jury to rebut the prosecution's claim that he was criminally liable.[98] The trial court excluded all the statements,[99] but the Second Circuit held that the opening and closing should have been admitted as party admissions.[100] The court noted that the assertions offered by the defendant were both factual and inconsistent with the government's position at his trial.[101] The court stressed the jury's need for the information, noting that "the jury, and not the government, must ultimately decide . . . ."[102]

Similarly, in *United States v. Bakshinian*,[103] the district court reasoned that *McKeon*'s analysis was peculiar to statements by defense counsel and

---

92.  *E.g.*, United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991) (concluding that the defendant can inform the jury "that the government at one time believed, and stated, that its proof established something different from what it currently claims;" holding that the bill of particulars constitutes a party admission when offered against the government); United States v. Kattar, 840 F.2d 118, 130-31 (1st Cir. 1988) (concluding that the term "party-opponent" encompasses the Justice Department acting in criminal cases and holding Department's statements admissible under FED. R. EVID. 801(d)(2)); *see also* United States v. Johnson, 28 F.3d 1487, 1496 (8th Cir. 1994) (discussing the admissibility of the bill of particulars from a different trial but concluding that the bill was not inconsistent with the current trial).

93.  *See* United States v. Salerno, 937 F.2d 797, 811 (2d Cir. 1991).

94.  *Id.* at 811.

95.  *Id.*

96.  *Id.*

97.  *Id.* at 810-11.

98.  *Id.*

99.  *Id.* at 811-12.

100.  *Id.* The court concluded that the indictment was a statement of the grand jury rather than the government and therefore did not fall within the rule. The court did not specify which subsection of Rule 801(d)(2) applied to any of the statements. *See id.*

101.  *Id.*

102.  *Id.* at 812.

103.  65 F. Supp. 2d 1104 (C.D. Cal. 1999).

that the government should not receive the same leeway.[104] The court asserted that the government "may not take inconsistent positions as to what occurred."[105] Consequently, the court simply enforced the usual rule that a party-opponent's statements of opinion and even argument are admissible.[106] As these decisions suggest, the test for admissibility of prosecutors' statements should not be biased against admissibility. Instead, the test should turn on two key questions: whether the prosecution made an inconsistent assertion and whether there is an innocent explanation for the inconsistency.[107]

Of course, some prosecutorial statements are properly excluded, and the suggested test will prevent their admission if the statements are not truly inconsistent or if they have innocent explanations.[108] In *State v. Cardenas-Hernandez*,[109] the Wisconsin Supreme Court declined to admit statements made by the prosecutor during the defendant's initial bail hearing.[110] Acknowledging that such statements could in some instances qualify as party admissions, the court recognized the policy arguments against admissibility, applied the rule derived from *McKeon* and *Salerno*, and concluded that the prior statements were not clearly inconsistent with the government position at the trial in question.[111] The court could also have considered that the statements were made at a point in the trial where the prosecutor had not fully investigated the case, thus providing an innocent explanation for the change in argument.

Even a perfectly structured and perfectly administered test for admitting prosecutors' prior inconsistent statements offers a weak response to prosecutorial inconsistency and may not adequately protect the defendant's rights. The court in *United States v. Bakshinian*[112] seemed optimistic about

---

104. *Bakshinian*, 65 F. Supp. 2d at 1107-08.
105. *Id.* at 1108.
106. *Id.* at 1109. The court did not apply *McKeon*'s requirement that the statement be one of fact, and the court did not specify which subsection of Fed. R. Evid. 801(d)(2) applied. *See id.*
107. *See* United States v. Orena, 32 F.3d 704, 715-16 (2d Cir. 1994) (describing the conditions necessary to permit the defense to introduce the prosecutor's prior statements as evidence). Some courts draw a distinction between statements of fact and statements of law. *E.g.*, United States v. DeLoach, 34 F.3d 1001, 1005-06 (11th Cir. 1994) (noting that the statement was made during the closing, a time of argument, and therefore was not a statement of fact). This distinction does not seem useful. The line between fact and law may be blurred, and prosecutorial inconsistency concerning the legal implications of the evidence should be exposed to the jury.
108. *See, e.g.*, United States v. Bailey, 159 F.3d 637, 637 (D.C. Cir. 1998) (upholding the exclusion of an inconsistent factual statement at a suppression hearing because the prosecution corrected the statement in a timely fashion and explained the mistake); *Orena*, 32 F.3d at 716 (upholding the exclusion of the government's allegedly inconsistent statements, concluding that the positions were consistent, since the prosecution merely expanded its theory).
109. 579 N.W.2d 678 (Wis. 1998).
110. *Id.* at 686.
111. *See id.* at 684-86; *see also Johnson*, 28 F.3d at 1496 (concluding that the statements were not inconsistent).
112. 65 F. Supp. 2d 1104 (C.D. Cal. 1999).

the party-admissions rule preventing prosecutorial inconsistency. Relying on the prosecutor's promise to provide a consistent theory, the court denied a motion in limine to preclude the prosecution from presenting a theory inconsistent with that presented in his codefendant's separate trial.[113] The court nevertheless noted that the prosecution must not present inconsistent theories, remarking in a footnote that the admissibility of prior governmental statements would encourage the prosecution "to consider several cases as a related whole, with a consistent theory of prosecution running through all of the cases."[114] I do not share the court's optimism. Admitting the prosecutor's prior statements is a nudge in the direction of consistency but may not dissuade the government from advancing an inconsistent theory. Instead, the courts should afford the defendant protection by estopping the use of inconsistent theories.

### B. Collateral Estoppel

Admitting the prosecutor's prior statements does not foreclose the harmful effects of prosecutorial inconsistency; the fact finder may dismiss the significance of the inconsistency and allow the prosecution to exploit the inconsistent position. Consequently, other tools for addressing prosecutorial inconsistency must be considered.

The doctrine of collateral estoppel, or issue preclusion, provides that a party cannot relitigate an issue of ultimate fact once it has been determined by a valid and final judgment.[115] When it applies, collateral estoppel operates to encourage consistency in results[116] by preventing the reassertion and relitigation of a position that the estopped party advanced and lost in the first proceeding. Although some aspects of collateral estoppel are embodied in the double jeopardy clause of the Constitution,[117] the doctrine has limited utility for criminal defendants. The doctrine should be modified to broaden its protection by restricting the prosecution in later litigation against related defendants. A modified doctrine of collateral estoppel will help deter prosecutorial inconsistency.

Currently, because of the requirement of mutuality, collateral estoppel is rarely available to achieve consistency between criminal defendants. Indeed, when courts treat collateral estoppel as the governing principle in determining whether to grant relief based on prosecutorial inconsistency,

---

113.   *Id.* at 1110-11.
114.   *Id.* at 1110 n.7.
115.   *See* Ashe v. Swenson, 397 U.S. 436, 443 (1970) (quoting United States v. Kramer, 289 F.2d 909, 913 (2d Cir. 1961)).
116.   *See generally* Christopher Murray, Comment, *Collateral Estoppel in Criminal Prosecutions: Time To Abandon the Identity of Parties Rule*, 46 S. CAL. L. REV. 922, 924 (1973).
117.   *Ashe*, 397 U.S. at 445.

they conclude that the defendant is not protected.[118] The mutuality requirement limits collateral estoppel to instances in which both parties, the government and the defendant seeking to invoke collateral estoppel, participated in the first proceeding.[119] The mutuality requirement has been widely eliminated in civil cases, allowing a party that did not participate in the prior proceeding to invoke collateral estoppel against a party that lost in the prior proceeding.[120] The courts should similarly relax the requirement to make collateral estoppel more useful in criminal cases.

Even if the mutuality requirement is relaxed, the defendant must identify a particular issue favorably determined in the first proceeding.[121] This requirement is an essential aspect of collateral estoppel and poses an insurmountable barrier to applying collateral estoppel to protect defendants from prosecutorial inconsistency. Identifying the issue resolved in the first trial is challenging, given the general nature of verdicts in most criminal cases.[122] In some cases, however, the defendant can overcome the barrier and persuade the court that the proceedings against the first defendant resolved a specific issue involved in the ongoing proceedings. In those instances, the doctrine should protect the defendant in subsequent proceedings.

---

118.   *E.g.*, Nichols v. Scott, 69 F.3d 1255, 1270 (5th Cir. 1995) (declining to extend collateral estoppel against the government to criminal cases because of mutuality issues); *see also* Daniels v. State, 534 So. 2d 628, 638 (Ala. Crim. App. 1985) (summarily rejecting a collateral estoppel argument); People v. Franklin, 656 N.E.2d 750, 755 (Ill. 1995) (same); State v. Nunley, 923 S.W.2d 911, 926 (Mo. 1996) (same); State v. Fondren, 810 S.W.2d 685, 687-88 (Mo. Ct. App. 1991) (same). *See generally* Murray, *supra* note 116, at 959-61 (discussing the application of nonmutual collateral estoppel to criminal convictions).

119.   *See, e.g.,* Standefer v. United States, 447 U.S. 10, 23-24 (1980) (declining to extend collateral estoppel on lack of mutuality grounds); *Daniels*, 534 So. 2d at 638 (same); State v. Kaplan, 469 A.2d 1354, 1355-56 (N.H. 1983) (same).

120.   *See* Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313 (1971); People v. Allee, 740 P.2d 1, 5 (Colo. 1987).

121.   *See Ashe*, 397 U.S. at 436; United States v. Keller, 624 F.2d 1154, 1158-59 (3d Cir. 1980); United States v. Crispino, 586 F. Supp. 1525, 1531-32 (D.N.J. 1984) (discussing the rule that allows collateral estoppel of issues decided in the defendant's favor); Allan D. Vestal, *Issue Preclusion and Criminal Prosecutions,* 65 IOWA L. REV. 281, 306 (1980) (explaining collateral estoppel as it applies to criminal prosecutions); *see also Fondren,* 810 S.W.2d at 687 (discussing the importance of mutuality as a requirement for collateral estoppel).

122.   *See, e.g.,* United States v. Quintero, 165 F.3d 831, 836 (11th Cir. 1999) (holding collateral estoppel inapplicable to hung jury verdicts when inconsistency of verdicts does not provide knowledge of jury's reasoning); United States v. Vaughn, 80 F.3d 549, 551 (D.C. Cir. 1996) (listing possible bases for jury verdict); Johnson v. Estelle, 506 F.2d 347, 349-52 (5th Cir. 1975); United States v. Forman, 990 F. Supp. 875, 887-89 (E.D. Mich. 1997) (rejecting the defendant's attempt to use juror affidavits to clarify the basis for the verdict in the first trial). *But see* United States v. Garcia, 78 F.3d 1517, 1521 (11th Cir. 1996) (refusing to apply collateral estoppel even though the issue was clearly identified by the judge who granted defendant's motion for judgment of acquittal).

### 1. The Requirement of Mutuality

At common law, collateral estoppel required mutuality; that is, the doctrine applied only if both parties had been involved in the prior litigation.[123] This requirement has been largely eliminated in civil litigation,[124] but in criminal cases most courts continue to enforce it.[125] The mutuality requirement eliminates the utility of collateral estoppel as a tool for giving one criminal defendant the benefit of a helpful determination made in another's case. As long as mutuality is required, a defendant cannot preclude litigation of issues resolved favorably in the related trial of a codefendant. Instead, the defendant can reap the benefit of issue preclusion only if the defendant herself obtained the favorable result. Thus, consistency would be better served if the mutuality requirement were relaxed.

### a. Enforcing the Requirement of Mutuality

Most of the cases declining to relax the mutuality requirement in criminal cases arise from jury acquittals, and the arguments for retaining the requirement in those cases are compelling.[126] It is inappropriate to expand the impact of jury acquittals to third parties because of the jury's power to acquit against the evidence and the inability of the prosecution to challenge the propriety of an acquittal.[127]

In *Standefer v. United States*,[128] the defendant tried to invoke the acquittal of his alleged principal to bar the prosecution against him.[129] The Supreme Court declined to recognize nonmutual collateral estoppel in criminal cases.[130] As factors weighing against the extension of nonmutual collateral estoppel into the criminal sphere, the Court identified legal

---

123. *See generally* 18 WRIGHT ET AL., *supra* note 33, § 4463; Murray, *supra* note 116, at 923-24 (summarizing the law of collateral estoppel).

124. *See Parklane Hosiery*, 439 U.S. at 322 (reasoning that the system benefits from the elimination of the mutuality requirement); *Blonder-Tongue Labs.*, 402 U.S. at 313 (concluding that judicial economy is served if the party who has fully litigated and lost an issue may be estopped from relitigating that issue in a later case regardless of mutuality).

125. *See, e.g.*, Standefer v. United States, 447 U.S. 10 (1980); *Fondren*, 810 S.W.2d 685.

126. *See* State v. Jimenez, 634 P.2d 950, 953 (Ariz. 1981) (retaining the requirement of mutuality in order to avoid "'compounding the effect of a possibly erroneous or irrational verdict or acquittal'") (quoting Commonwealth v. Brown, 375 A.2d 331, 335 (Pa. 1977)); People v. Franklin, 656 N.E.2d 750, 755 (Ill. 1995) (declaring concern for state's opportunity to fully and fairly litigate the issues in the codefendant's case); State v. Cegon, 309 N.W.2d 313, 314 (Minn. 1981) (declining to presume reasons why jury might choose to acquit the codefendant); People v. Berkowitz, 406 N.E.2d 783, 790 (N.Y. 1980) (stating society's desire for "correctness of the result" as reason not to abandon the mutuality requirement); *see also Fondren*, 810 S.W.2d at 688-89 (citing cases in which absence of mutuality was fatal to the defendant's claim for collateral estoppel).

127. *See Standefer*, 447 U.S. at 22; *see also* Dunn v. United States, 284 U.S. 390, 393-94 (1932) (commenting that verdicts should not be upset because of speculation as to their basis). *See generally* LAFAVE ET AL., *supra* note 9, § 27.3 (discussing limitations on the government's right to appeal).

128. 447 U.S. 10 (1980).

129. *Id.* at 14.

130. *Id.* at 23-24.

barriers to the prosecution's opportunity to fully and fairly litigate.[131] Specifically, the Court mentioned the prosecution's limited discovery rights, the prohibition on the use of directed verdicts, judgments notwithstanding the verdict, and appellate review as potential vehicles for avoiding or correcting an acquittal against the evidence.[132] The Court noted that, as a result of these restrictions, the jury can acquit for improper reasons.[133]

Additionally, the Court pointed to special evidentiary rules, such as the Fourth Amendment exclusionary rule, that exclude evidence against one defendant while permitting its use against another.[134] If the favorable outcome in the first trial resulted from such a rule and the second defendant could not claim the same protection, then collateral estoppel should not extend the benefit of the favorable result.[135] Further, the Court rejected the argument that it could address these concerns on a case-by case basis,[136] concluding that the process would be "protracted and burdensome."[137] In *Standefer*, the Court also described the public interest in the accuracy and justice of criminal results as greater than the concern for judicial economy that underlies the expansion of collateral estoppel in civil cases.[138] The Court feared that nonmutual collateral estoppel in criminal cases would extend the benefit of an erroneous acquittal to the other participants in the charged criminal conduct.[139]

In *United States v. Mollier*,[140] the Fifth Circuit extended the reasoning in *Standefer* to a criminal case in which the prior proceedings culminated in a judicial determination that the evidence was insufficient rather than in

---

131.  *Id.* at22.

132.  *Id.; see also Franklin,* 656 N.E.2d at 755 (examining the mutuality requirement dictated by other jurisdictions). Courts have also commented that an acquittal does not establish factual innocence, but merely establishes the legal status of innocence. *See* People v. Allee, 740 P.2d 1, 6 (Colo. 1987) (noting that innocence is factual status not established by acquittal); *Franklin,* 656 N.E.2d at 755 (stating that "[t]he acquittal of a codefendant or the reversal of a codefendant's conviction does not establish a status of innocence" for the defendant).

133.  *See Standefer,* 447 U.S. at 22-23; *see also* Potts v. State, 430 So. 2d 900, 903 (Fla. 1982) (declining to take the trier-of-fact function out of hands of jury in order to maintain consistency of judgment); Commonwealth v. Cerveny, 439 N.E.2d 754, 757 (Mass. 1982) (stating that the jury may acquit out of compassion or prejudice).

134.  *Standefer,* 447 U.S. at 23-24.

135.  *Id.*

136.  *Id.* at 24.

137.  *Id.*

138.  *Id.* at 24-25.

139.  *Id.* at 25; *see also* People v. Allee, 740 P.2d 1, 6 (Colo. 1987) (stating that the defendant cannot use the acquittal of another to establish the facts of his own case); State v. Kaplan, 469 A.2d 1354, 1356 (N.H. 1983) (stating that policy considerations outweigh judicial economy concerns); Commonwealth v. Brown, 375 A.2d 331, 335 (Pa. 1977) (noting that the argument against inconsistent verdicts is strong but is outweighed by the public's interest in not extending the impact of an improper acquittal).

140.  853 F.2d 1169 (5th Cir. 1988).

a jury acquittal.[141] Even though the case raised no question of jury reasoning, the court determined that nonmutual estoppel should not apply because the prosecution was foreclosed from appealing the court-granted judgment and because evidence inadmissible against the first defendant may be admissible against the second defendant.[142] The court reasoned that efficient use of judicial resources justifies collateral estoppel. However, this benefit would be lost if the courts had to assess the sufficiency of the government's prior opportunity to litigate in order to determine whether to give a prior determination preclusive effect.[143] The court also noted that the "efficiency concerns that drive the collateral estoppel on the civil side are not nearly so important in criminal cases."[144]

### b.   *Relaxing the Requirement of Mutuality*

Although the results in *Standefer* and *Mollier* rest on strong arguments, nonmutual collateral estoppel should play a role in criminal prosecutions when the basis for the estoppel is not an acquittal but is another type of judicial ruling in a prior proceeding. In such cases, the prosecution is able to protect against unjust results by appealing.[145] The courts that refuse to extend nonmutual collateral estoppel to decisions other than acquittals have undervalued the importance of consistent results in the criminal justice system as an aspect of the public's interest in accuracy and justice in criminal cases.[146] The interest in consistency does not tip the scales where the government cannot appeal and nonmutual collateral estoppel would risk giving a broad ripple effect to a baseless acquittal. However, it does tip the scales when the defendant seeks to preclude further litigation of a non-acquittal issue because the government is adequately protected. The interest in consistency and the reduced disadvantage to the prosecution should persuade the courts to extend nonmutual collateral estoppel to such issues, thus promoting consistency between cases.

Thus, the courts should recognize and apply nonmutual collateral estoppel to matters that were not addressed in a jury verdict or a judicial

---

141.   *Id.* at 1175-76; *see also* Kott v. State, 678 P.2d 386, 391-93 (Alaska 1984) (declining to extend nonmutual collateral estoppel to acquittal in a bench trial).

142.   *Mollier,* 853 F.2d at 1176.

143.   *Id.*

144.   *Id.*

145.   *See* United States v. Scott, 437 U.S. 82 (1978) (holding that the prosecution's appeal from a mid-trial dismissal does not violate the defendant's right to protection from double jeopardy, even though it may force the defendant to endure a second trial); People v. Allee, 740 P.2d 1, 7 (Colo. 1987); State v. Kaplan, 469 A.2d 1354, 1356 (N.H. 1983).

146.   *See* Commonwealth v. Brown, 375 A.2d 331, 366 (Pa. 1977) (noting that preventing inconsistent judgments is the strongest argument in favor of nonmutual collateral estoppel). *But see* People v. Berkowitz, 406 N.E.2d 783. 790 (N.Y. 1980) (stating that because of society's concern for correctness within criminal prosecution, litigation-limiting devices should be liberally applied in civil cases but not in criminal cases).

acquittal. Specifically, collateral estoppel should apply if an issue helpful to the defendant was resolved by the court in a codefendant's separate proceeding and the prosecution was permitted to appeal.[147] In these situations, the government can adequately protect the public's interest in law enforcement by challenging the favorable determination in the first trial. Consequently, there is no risk of expanding the impact of an unjustified but unassailable determination.

A few jurisdictions have recognized nonmutual collateral estoppel in criminal cases.[148] Only California has applied nonmutual collateral estoppel based on a jury verdict. In *People v. Taylor*,[149] the California Supreme Court applied nonmutual collateral estoppel to bar prosecution of a defendant whose criminal liability rested entirely on the criminal conduct of a co-actor who had been acquitted in a jury trial.[150] The court concluded that consistency and fairness required the extension of nonmutual collateral estoppel to the case before it.[151] The court stressed the need for judicial economy in criminal cases, in which delay not only injures the defendant but also harms the public interest.[152] More importantly, however, the court viewed inconsistent verdicts as tremendously threatening to the integrity of the judicial system.[153] Because the public follows criminal trials closely, unfairness in that setting shapes the public's view of the fairness of the system more than comparable issues in the civil setting.

While the mutuality requirement should be relaxed in some criminal cases, *Taylor* goes too far. As the Court reasoned in *Standefer*, such a broad rule of nonmutual collateral estoppel would give a codefendant the benefit of an acquittal even if it resulted from factors peculiar to the acquitted defendant.[154] For example, the acquittal may result from weakness

---

147. Traditionally, the prosecution was not permitted to appeal. In the second half of the twentieth century, however, statutes were enacted authorizing the government to appeal criminal cases. The constitutional protection against double jeopardy restricts the government's ability to appeal, but it permits appeal from a judicial determination other than a judgment of acquittal based on insufficient evidence. *See generally* LaFave et al., *supra* note 9, § 27.3.

148. *See* People v. Taylor, 527 P.2d 622, 630-31 (Cal. 1974) (holding that lack of mutuality does not preclude the application of collateral estoppel); State v. Gonzalez, 380 A.2d 1128, 1135 (N.J. 1977) (stating that serving the goals of fairness and consistency of outcome outweighs the requirement of mutuality). *But see* State v. Perank, 858 P.2d 927, 931 n.3 (Utah 1993) (declining to resolve the question of whether nonmutual collateral estoppel applies against the state).

149. 527 P.2d 622 (Cal. 1974).

150. *Id.* at 697-98; *see also* People v. Super. Ct., 118 Cal. Rptr. 702, 705-06 (Cal. Ct. App. 1975) (following *Taylor* and barring the prosecution of a third alleged conspirator after the acquittal in separate trial of the other two alleged conspirators). *See generally* Murray, *supra* note 116, at 935-37 (arguing in favor of eliminating mutuality in criminal cases).

151. *Taylor*, 527 P.2d at 697-98.

152. *Id.* at 698.

153. *Id.*

154. Standefer v. United States, 447 U.S. 10, 22-24 (1980).

in the evidence against the acquitted defendant or jury sympathy for the defendant that would not extend to the codefendant.[155]

Other courts have applied nonmutual collateral estoppel more narrowly, avoiding the problems identified in *Standefer*.[156] In *State v. Gonzales*,[157] the New Jersey Supreme Court applied nonmutual collateral estoppel to bar relitigation of the legality of a search after one defendant had succeeded in his motion to suppress.[158] The court acknowledged that the public may react negatively either to the apparent unfairness of inconsistent results, on the one hand, or to the enforcement of the Fourth Amendment exclusionary rule to benefit a defendant who has not litigated the issue, on the other.[159] Weighing these considerations, the court concluded that "the basic goal of fairness in the administration of justice is better served by requiring consistency in outcome."[160]

Similarly, in *Jennings v. State*,[161] the court applied collateral estoppel to bar relitigation of a suppression issue won by the defendant's compatriot in a separate proceeding. Given advances in the law of collateral estoppel, the court concluded that the doctrine should apply since the state had a full and fair opportunity to litigate the issues raised by the initial motion to suppress.[162] The court concluded that it would be fundamentally unfair to allow the state to seek favorable determinations of the same issue in separate proceedings, remarking that "the administration of justice is better served by requiring consistency in outcome."[163]

The reasoning of these decisions is persuasive. A judicial determination in favor of one defendant, based on facts equally applicable to both defendants and either not appealed or affirmed on appeal, should collaterally estop the government in the second case. For example, a suppression order entered in one proceeding and not overturned on appeal should protect a defendant facing the same evidence in a separate proceeding, unless the prosecution can demonstrate a reason to treat the defendant invoking

155. *But see* Murray, *supra* note 116, at 947–48 (arguing that procedural mechanisms can protect against inappropriate results).

156. *See* People v. Super. Ct., 118 Cal. Rptr. 702, 704 (Cal. Ct. App. 1975) (allowing acquittals to have preclusive effect when the defendant would be the only participant left facing conspiracy charges); Jennings v. State, 714 N.E.2d 730, 733–35 (Ind. Ct. App. 1999) (holding that the admission of evidence that was suppressed in the codefendant's case due to an illegal search was barred by collateral estoppel); State v. Gonzalez, 380 A.2d 1128, 1135 (N.J. 1977) (same); United States v. Bruno, 333 F. Supp. 570 (E.D. Pa. 1971) (holding that acquittals of alleged co-conspirators barred the defendant's conviction).

157. 380 A.2d 1128 (N.J. 1977).

158. *Id.* at 1130.

159. *Id.* at 1134–35.

160. *Id.* at 1135.

161. 714 N.E.2d at 730.

162. *Id.* at 734.

163. *Id.* at 734–35.

collateral estoppel differently from the defendant who won the order.[164] Similarly, if one defendant successfully demonstrates a speedy trial violation and wins dismissal of the charges, the other defendants in the case should be able to invoke that determination except when essential factual findings are peculiar to the defendant who won the order.[165]

Requiring mutuality or identity of the parties impairs the utility of collateral estoppel as a means of encouraging consistency in criminal cases. Furthermore, it allows the prosecution to benefit from separate proceedings by gaining the opportunity to relitigate issues on which it has already lost and obtain inconsistent results against related defendants. The courts should therefore relax the requirements for collateral estoppel. Although the courts are justifiably reluctant to extend the benefit of one defendant's acquittal to a codefendant through the operation of collateral estoppel, the courts should give preclusive effect to judicial rulings resolving issues common to separate proceedings against related defendants.

### 2. *Identifying an Issue to be Precluded*

Even if the courts give defendants the benefit of nonmutual collateral estoppel, the defendant must identify an issue judicially determined in the first proceeding that limits the prosecution in the second case. Generally, the second defendant would employ collateral estoppel to enforce a determination favorable to the first defendant and preclude the prosecution from reasserting arguments that failed in the first proceeding. Rarely, however, the second defendant may identify a determination unfavorable to the first defendant that is helpful in the second defendant's case and should be allowed to invoke collateral estoppel to bar the prosecution from adopting an inconsistent position.

The most common use of nonmutual collateral estoppel by a criminal defendant, then, will be to ride on the coattails of the first defendant's success in a motion to the court.[166] The most fruitful application is likely to be extending the benefit of successful motions to suppress evidence on Fourth Amendment grounds.[167] If the first defendant wins a motion to suppress

164. The second defendant might not have standing to complain, because the governmental violation may not have affected the second defendant's constitutional rights.

165. *Cf.* Walter v. United States, 969 F.2d 814, 817-18 (9th Cir. 1992) (resolving a speedy trial claim on the basis of a determination in the codefendant's case on the principle of consistency). In some cases, the question of prejudice must be addressed on a case-by-case basis. The defendant seeking the benefit of collateral estoppel would have to demonstrate prejudice but should normally be permitted to bar the prosecution from relitigating common questions such as the reason for the delay.

166. *See, e.g., Walter*, 969 F.2d at 816 (holding that the defendant's speedy trial claim should be handled in the same way as codefendant's claim); State v. Gonzalez, 380 A.2d 1128, 1133-34 (N.J. 1977) (applying nonmutual collateral estoppel to the suppression issue).

167. *See generally* LaFave et al., *supra* note 9, § 10.3. Other bases for suppression, such as the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel,

evidence, the second defendant may be able to invoke collateral estoppel to avoid giving the prosecution a second shot at avoiding suppression. For example, suppose that in the first proceeding, the prosecution argued that the evidence was obtained through a valid search of a vehicle incident to the arrest of the passenger based on probable cause, and the trial court made specific findings of fact and held that the police did not have probable cause. The prosecution should be estopped from litigating the probable cause issue in the proceedings against the second defendant.[168]

The defendant may also use collateral estoppel to foreclose the prosecution from asserting an inconsistent position in the second proceeding. Suppose, for example, that the prosecution overcomes the first defendant's motion to suppress the evidence by persuading the court to make specific factual findings that the police constitutionally ordered the first defendant out of the back seat of the car and the drugs were in plain sight where he had been sitting. If the prosecution argues in the second proceeding that the drugs were located nearer to the second defendant, collateral estoppel should preclude the government from taking this inconsistent position.[169]

Even if nonmutual collateral estoppel becomes available to criminal defendants, the doctrine would represent only an incremental move toward greater consistency. The doctrine's primary thrust would be to foreclose the prosecution from asserting a position consistent with one already decided against it in an earlier proceeding. The doctrine would not prevent the prosecution from adopting inconsistent positions in separate trials as a means of swaying the jury.

## C. Judicial Estoppel

In light of the limitations of the other doctrines, judicial estoppel, with its broad applicability, may be the best tool for preventing prosecutorial inconsistency. Judicial estoppel precludes a party that successfully asserted a position in a prior proceeding from asserting an inconsistent position in a later proceeding.[170] As currently applied, judicial estoppel

---

cannot be extended from one defendant to another; the rights are personal and the facts giving rise to the protection are not likely to relate to another defendant. *Id.* § 10.6(d).

168.   The prosecution could attempt to justify the search on some other ground not resolved at the first proceeding. The prosecution could challenge the second defendant's claim that her rights (as differentiated from those of the first defendant) were violated or could argue that the police had reasonable suspicion and stayed within the scope of a permitted car frisk. *See* LAFAVE ET AL., *supra* note 9, §§ 3.8, 9.1.

169.   The prosecution would be free to pursue a constructive possession theory. *See generally* W. LAFAVE & A. SCOTT, CRIMINAL LAW § 3.2 (2d ed. 1986).

170.   *See* Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996) (explaining that the doctrine precludes a party from taking a position inconsistent with the position that the party has previously taken); United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993) (defining the judicial estoppel doctrine as a tool to "[prevent] internal inconsistency"). *See also* Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 NW. U. L. REV. 1244

offers little protection for criminal defendants. Even in civil cases, the courts have not arrived at a consensus concerning whether and how to apply judicial estoppel,[171] and most have resisted applying the doctrine in criminal cases.[172] The doctrine is applied as necessary in the court's discretion to protect the integrity of the court from the corruption introduced when a party adopts in a later proceeding a position inconsistent with that espoused in an earlier proceeding.[173] When applied, the doctrine prevents the party "from playing fast and loose with the courts" and protects "the essential integrity of the judicial process."[174] It also targets the risk of inconsistent results that follows if the courts entertain inconsistent positions.[175] Although some behavior, such as intentional inconsistency, clearly represents an assault on the court's integrity and may warrant the application of judicial estoppel,[176] the courts do not have a uniform view of the type of behavior that threatens judicial integrity. Leaving application of the doctrine in the courts' discretion permits each court to respond to the specific inconsistency targeted by the request for judicial estoppel.

Courts should adapt the doctrine of judicial estoppel to address the harm threatened by inconsistent prosecutorial positions. The courts should recognize that this application of judicial estoppel is an essential aspect of

---

(1986) (discussing the principle that the position taken in a pleading, a deposition, or in testimony cannot be contradicted at a later judicial proceeding).

171.    *See generally* Boyers, *supra* note 170 (summarizing the development and application of the doctrine); Henkin, *supra* note 7 (same).

172.    *See* Webb v. ABF Freight Sys., Inc, 155 F.3d 1230, 1242 (10th Cir. 1998) ("The Tenth Circuit has firmly established that it will not be bound by the doctrine of judicial estoppel."); Am. Methyl Corp. v. EPA, 749 F.2d 826 (D.C. Cir. 1984) (characterizing judicial estoppel doctrine as out of synch with modern rules of liberal pleading and the courts' truth-seeking function). See also Nichols v. Scott, 69 F.3d 1255, 1274 (5th Cir. 1995), *rev'g* Nichols v. Collins, 802 F. Supp. 66, 74 (S.D. Tex. 1992) (reversing the trial court's determination that the prosecution was "constitutionally estopped from obtaining a fact finding in one trial and seeking and obtaining an inconsistent fact finding in another trial"); *McCaskey*, 9 F.3d at 378 (noting the absence of application of the doctrine to criminal proceedings); United States v. Kattar, 840 F.2d 118, 129 n.7 (1st Cir. 1988) (remarking that "this obscure doctrine has never been applied against the government in a criminal proceeding").

173.    *See* Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 601-02 (9th Cir. 1995) (noting that the court has discretion to invoke the doctrine); Morris v. California, 966 F.2d 448, 453 (9th Cir. 1991) (recognizing the discretionary nature of the application of judicial estoppel).

174.    *Lowery*, 92 F.3d at 223 (citation omitted); *see also* Russell v. Rolfs, 893 F.2d 1033, 1038 (9th Cir. 1990) (stating that the court is entitled to craft such rules of judicial estoppel as "it considers necessary to protect its dignity and its system of justice"). In *Kattar*, the court rejected the defendant's argument for a variety of reasons. *See* 840 F.2d at 129-30 n.7. Other than inconsistency, the only standard noted by the court was that the litigant to be *estopped* must be "playing fast and loose with the courts." *Id.* (quoting Scarano v. Central R. Co. of N.J., 203 F.2d 510 (3d Cir. 1953)). In *Garcia*, the court noted that a minority of courts apply judicial estoppel "'if the court determines that the alleged offending party engaged in "fast and loose" behavior which undermined the integrity of the cour.'" United States v. Garcia, 37 F.3d 1359, 1367 (9th Cir. 1994) (quoting Britton v. Co-op Banking Group, 4 F.3d 742, 744 (9th Cir. 1993)).

175.    Boyers, *supra* note 170, at 1253.

176.    *See, e.g.,* Vennerberg Farms, Inc. v. IGF Ins. Co., 405 N.W.2d 810, 814 (Iowa 1987).

---

**-1414-**

due process.[177] Whereas traditional civil judicial estoppel protects the integrity of the court and sanctity of the oath,[178] in criminal cases judicial estoppel protects the fairness of the process to the defendant. The courts should apply judicial estoppel to bar the prosecution from asserting a proposition if the prosecution asserted an inconsistent proposition in an earlier proceeding, unless the prosecution has an adequate explanation for the inconsistency.

Judicial estoppel has two almost universally recognized aspects that make it a particularly suitable tool for attacking the problem of prosecutorial inconsistency. First, the position barred by the doctrine need not have been litigated in the prior proceeding.[179] Judicial estoppel therefore acts as a useful adjunct to collateral estoppel. Where collateral estoppel offers protection only when the specific issue was actually litigated in the prior proceeding,[180] judicial estoppel bars the winning party from asserting a position simply because it is inconsistent with one advanced successfully in the prior proceeding.[181]

Second, courts have not limited judicial estoppel to situations in which there is mutuality of parties.[182] The problem of prosecutorial inconsistency is most acute and most difficult to address when the prosecution exploits the separate trials of alleged joint actors to assert irreconcilable arguments in front of separate juries. As the foregoing discussion of nonmutual collateral estoppel reflects, lack of mutuality often eliminates the utility of collateral estoppel as a means of addressing prosecutorial inconsistency.[183] Judicial estoppel therefore promises to be a more effective tool against prosecutorial inconsistency.

*1. Requirements Imposed on the Doctrine of Judicial Estoppel*

Other requirements that may be imposed on a party seeking the benefit of judicial estoppel, however, would make the doctrine less useful in criminal cases. These requirements should be relaxed to reflect the special characteristics of criminal cases. Judicial estoppel comes into play only when the party to be estopped prevailed at least to some degree in the first

---

177.    *See* discussion *infra* Part III.

178.    Boyers, *supra* note 170, at 1251 (discussing the rationale for judicial estoppel); Henkin, *supra* note 7, at 1726 (same).

179.    *Lowery*, 92 F.3d at 223 n.3 (comparing judicial estoppel requirements to those of collateral estoppel).

180.    *E.g.*, State v. Foadren, 810 S.W.2d 685, 688 (Mo. Ct. App. 1991) (stating that the verdict in the first proceeding did not necessarily determine who instigated the fight).

181.    *Lowery*, 92 F.3d at 223 n.3.

182.    *E.g.*, *id.* at 223 n.3 (noting that judicial estoppel does not require mutuality even when state law requires it because the doctrine is an issue of federal law). *See generally* Boyers, *supra* note 170, at 1258-60. *But see* State v. Towery, 920 P.2d 290, 304 (Ariz. 1996) (discussing the preconditions necessary for the court to apply judicial estoppel, including that parties be the same).

183.    *See supra* notes 123-144 and accompanying text.

*CALIFORNIA LAW REVIEW*

proceeding.[184] Many courts also require that the prior position has been "accepted by the court."[185] This requirement is satisfied if the prior position was the basis either for a ruling on a preliminary matter or for a final disposition of the case. Nevertheless, many courts decline to apply judicial estoppel if the results of the first proceeding are inconclusive, perhaps because the case ended in settlement.[186] The courts reason that, unless the party had succeeded in the prior assertion, there would be no need for relief because there would be no risk of inconsistent or misleading results.[187]

Instead of transporting this requirement whole cloth into the criminal context, it should be adapted to address the particular problems of regulating prosecutorial inconsistency in criminal cases. In criminal cases, judicial estoppel should apply if the prosecution prevailed in a manner consistent with acceptance of the prior position. The basis for actions in criminal cases is rarely articulated; although courts in criminal cases sometimes elaborate the basis for their actions, juries never do.[188] The collateral estoppel cases demonstrate the difficulty of determining the basis for judicial or

---

184.   *See* Bogle v. Phillips Petroleum Co., 24 F.3d 758, 761 (5th Cir. 1994) (noting that the plaintiff's success in a partial nonsuit motion makes judicial estoppel available to the defendant to bar reassertion of the same claims in the future); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982) (stating that success with a position in a prior proceeding is necessary to apply the doctrine); *see also* cases cited in 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[2] n.10 (3d ed. 2000).

185.   *Lowery*, 92 F.3d at 224; *see also* United States v. Garcia, 37 F.3d 1359, 1367 (9th Cir. 1994) (characterizing acceptance as the majority view); *Edwards*, 690 F.2d at 599 n.5 (explaining that the doctrine requires only that the court adopted the position as a preliminary matter or as part of the final disposition); *Towery*, 920 P.2d at 305 (regarding the acceptance of a prior position as creating the risk of inconsistent results, thus necessitating application of the doctrine). *See also* Roach v. Crouch, 524 N.W.2d 400, 403 (Iowa 1994) (stating that judicial estoppel applies when a party has "successfully and unequivocally" asserted the position in a prior proceeding) (quoting Graber v. Iowa Dist. Ct., 410 N.W.2d 224, 227 (Iowa 1987)). *See generally* Boyers, *supra* note 170, at 1254-58 (summarizing the requirements for judicial estoppel in various jurisdictions); Henkin, *supra* note 7, at 1719-24 (same).

186.   *See* Bates v. Long Island R.R., 997 F.2d 1028, 1038 (2d Cir. 1993) (stating that a settlement is not an endorsement of the position by the court); *Edwards*, 690 F.2d at 599 (arguing that a settlement cannot constitute a successfully asserted position); Konstantinidis v. Chen, 626 F.2d 933, 939 (D.C. Cir. 1980) ("A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus . . . does not provide the prior success necessary for judicial estoppel."). *But see* Kale v. Obuchowski, 985 F.2d 360, 361-62 (7th Cir. 1993) (regarding a settlement favorable to one party as judicial acceptance of that party's position); Teledyne Indus. v. NLRB., 911 F.2d 1214, 1218-19 (6th Cir. 1990) (regarding a settlement by a court-entered order containing a party position in explicit findings of fact as successfully asserted); Reynolds v. Comm'r, 861 F.2d 469, 473 (6th Cir. 1988) (holding that a settlement in bankruptcy court, which requires fair and equitable determination of underlying facts, constitutes judicial adoption of a party's position).

187.   *See Towery*, 920 P.2d at 305 (noting that acceptance of a prior position is necessary to create the risk of inconsistent results); *Roach*, 524 N.W.2d at 403 (stating that a party's prior success with a position is a "fundamental feature" of judicial estoppel); *see also Lowery*, 92 F.3d at 224 (applying judicial estoppel with an acceptance requirement against prior criminal defendant in a later civil complaint). In *Lowery*, the court concluded that the plaintiff's prior position satisfied this requirement because the plaintiff had asserted the inconsistent factual claim as the basis of his guilty plea in a criminal proceeding and the court accepted the guilty plea on that factual basis. *Id.* at 224-25.

188.   *See* cases cited *supra* note 122.

jury action in criminal cases.[189] That difficulty would be amplified in en-
forcing an acceptance requirement for judicial estoppel; if the barred claim
was not actually litigated, the jury need not have resolved the issue. In the
single-shooter example, the jury could convict each defendant of first-
degree murder based on a theory of accomplice liability,[190] but it may be
more likely to convict the defendant who actually shot the victim of first-
degree murder.

Sentencing questions are even more nuanced. In the example, the
prosecutor may argue, in support of capital punishment, that the defendant
and his accomplice were engaged in committing a felony, but the defendant
could mitigate against capital punishment by arguing that the accomplice's
role was much greater.[191] The jury may return a death sentence without
specifying which facts it accepted or which factors influenced its deci-
sion.[192] Judicial estoppel should bar the prosecution in the second defen-
dant's trial from res ng its argument on the theory that the second
defendant was the shooter, even when it is not clear that the first jury ac-
cepted the inconsistent claim in arriving at its verdict or sentence. The
prosecution should be able to avoid the impact of the doctrine only by
demonstra ng that the inconsistent theory was specifically rejected by the
court or the jury in the first trial.

A second requirement that courts sometimes impose on the doctrine of
judicial estoppel is that the party to be estopped must have "intentionally
misled the court to gain unfair advantage."[193] Courts that articulate a stan-
dard that the party must be playing fast and loose with the court also

---

189.   *See supra* notes 121-122 and accompanying text.

190.   *See* United States v. Paul, 217 F.3d 989 (8th Cir. 2000) (noting that the defendant could be convicted as aider and abettor regardless of who shot the victim). *See generally* LaFave & Scott, *supra* note 169 (discussing accomplice liability).

191.   *See, e.g.,* Ala. Code §§ 13A-5-49, 13A-5-51 (1975) (defining aggravating and mitigating circumstances to be considered in determining whether to recommend the death penalty); Cal. Penal Code § 190.3 (West 1999) (same).

192.   *See* Nichols v. Scott, 69 F.3d 1255, 1270 (5th Cir. 1995) (pointing out that the jury provided a general guilty verdict and did not indicate its underlying findings); *see also* Ala. Code § 13A-5-46 (1975) (setting forth the procedure for jury advisory verdict in a capital case); Cal. Penal Code § 190.3 (West 1999) (directing that the trier of fact must weigh aggravating factors against mitigating factors when determining whether the death penalty is appropriate); Turner v. Calderon, 970 F. Supp. 781, 792 (finding the penalty-phase process of California constitutionally sound even though "it fails to require . . . written find'ngs as to the aggravating factors supporting a death judgment"); Bush v. State, 431 So. 2d 555, 559 (Ala. Crim. App. 1982) (stating that since a jury sentencing verdict is advisory only, there is no requirement that they make specific findings with regard to aggravating circumstances).

193.   Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996) (quoting Tenneco Chems., Inc. v. William T. Burnett & Co., 691 F.2d 658, 665 (4th Cir. 1982) (regarding intention to mislead as determinative factor for applying doctrine). *See also* Graber v. Iowa Dist. Ct., 410 N.W.2d 224, 228 (Iowa 1987) (stating that intention to mislead the court must be shown). *But see* Callman Road Improvement Co. v. United States, 345 U.S. 507, 806 (1953) (barring civil party from asserting an inconsistent position without inquiring into either judicial acceptance of the earlier position or intentionality of the party's behavior).

suggest an intent requirement. When applying the doctrine to prevent prosecutorial inconsistency, however, actual intent should not be required.[194] Courts evaluating due process claims based on the prosecution's failure to disclose exculpatory evidence have reasoned that bad faith is not a prerequisite to relief.[195] The essence of the constitutional harm is the corruption of the process, not governmental misconduct. The same reasoning should persuade courts that intentional bad behavior should not be required in these cases.[196] Moreover, a defendant who requests judicial estoppel in a timely manner thereby informs the prosecutor of the prior governmental position, eliminating further protestations of innocent prosecutorial inconsistency.

Some courts also impose a third requirement, that the position must be "one of fact rather than law or legal theory."[197] In *McNunis v. Zufosky*,[198] the court held that the doctrine should not be applied to estop a party from changing its position on a question of law. The court emphasized that the question on which the party had taken inconsistent positions was one of first impression and that applying judicial estoppel in these cases would discourage lawyers from assisting courts in developing the law.[199] However, not all courts observe this distinction. In *Russell v. Rolfs*,[200] for example, the court applied the doctrine to estop the state from arguing that the defendant was procedurally barred from pursuing federal relief.[201] The court found the state's representations in the successive proceedings to be "flatly inconsistent."[202]

Courts should only cautiously import a distinction between law and fact into the doctrine of judicial estoppel in criminal cases. The line between positions of law and those of fact is not always clear. On the one hand, the government's position of law on unrelated facts should not constrain them in a separate proceeding. On the other hand, having successfully taken the position that a specific set of facts lead to a particular legal conclusion, the prosecution should not be permitted to shift to an inconsistent position on the ground that it reflects a difference in the law rather than in the facts. Once the prosecution advances a theory of the legal implications of the facts shown by the evidence in the case, it should be estopped from asserting an inconsistent position in a related case. This restriction

194. *See generally* Steven Alan Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure*, 135 U. PA. L. REV. 1365 (1987) (criticizing use of standards based on prosecutorial intent).

195. Strickler v. Greene, 527 U.S. 263, 279 (1999); Anderson v. Calderon, 232 F.3d 1053, 1062 (9th Cir. 2000).

196. *See infra* notes 228–235 and accompanying text.

197. *Lowery*, 92 F.3d at 224; *see also* Boyers, *supra* note 170, at 1262 (discussing requirement).

198. 89 S.E.2d 354 (W. Va. 1955).

199. *Id.* at 358.

200. 893 F.2d 1033 (9th Cir. 1990).

201. *Id.* at 1038–39.

202. *Id.* at 1037.

protects the fairness of the process and, because it does not bind the prosecution in unrelated cases, it leaves the prosecution free to make a different legal argument in an unrelated case in which the prosecution wants to assist in developing the law.

### 2. *Circumstances in Which Judicial Estoppel Should Not Operate*

There are three specific circumstances in which the change in the prosecution's position can be explained and judicial estoppel should not operate: first, if the prosecution advanced its initial position before full investigation of the case; second, if the prosecution can identify evidence discovered after the first proceeding that prompted the change; or, third, if the court or jury in the first proceeding rejected the prosecution's initial position.[203]

First, the prosecution's factual assertions in the early stages of a criminal proceeding may be viewed as sufficiently tentative so that a defendant should not later be permitted to use those assertions to bar the prosecution from changing its position.[204] For example, in *United States v. Shea*,[205] the defendant argued that the prosecution should be estopped from asserting that he owned or used a gun. At his codefendant's detention hearing the prosecution had argued that the gun was linked to the codefendant, who was sitting on it when he was arrested, rather than to the defendant.[206] Because the detention hearing was held before the prosecution could fully investigate the case, the defendant's rights would not be violated if the prosecution later adopted an inconsistent position.[207] Similarly, assertions in pleadings that are amended before or during trial should not provide the basis for judicial estoppel.[208]

---

203. *E.g.*, People v. Sakarias, 995 P.2d 152, 176 (Cal. 2000). In *Sakarias*, the court declined to address defendant's argument based on prosecutorial inconsistency on direct appeal. *Id.* The court reasoned that the issue should be left for habeas corpus review to allow the prosecution to explain the alleged inconsistencies. *Id.*

204. *See* United States v. McCaskey, 9 F.3d 368, 379 (5th Cir. 1993) (holding that an indictment is not an adequate basis for judicial estoppel). In some cases, the prosecutor's prior statements may be admitted as party admissions. *See* discussion *supra* Part II.A.

205. 150 F.3d 44, 52 (1st Cir. 1998). *See McCaskey*, 9 F.3d at 379 (holding indictment not an adequate basis for judicial estoppel). In some cases, the prosecutor's prior statements may be admitted as party admissions. *See supra* Part II.A.

206. 150 F.3d at 52.

207. The court concluded that the statements were not inconsistent with the prosecution's position at trial. *Id.*

208. *E.g.*, Decker v. Vt. Educ. Television, Inc., 13 F. Supp. 2d 569, 572 (D. Vt. 1998) ("'It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.'") (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). In developing the law of judicial estoppel in civil cases, courts have not treated the party's pleadings as binding, recognizing that pleadings are subject to amendment as discovery clarifies the facts of the case and should therefore not be given undue weight. *See* Boyers, *supra* note 170, at 1257 (noting the difficulty in determining which of separate inconsistent assertions in pleadings would be considered accepted by

Second, new information may emerge after the first trial that warrants a change in the prosecution's stance. For example, in *United States v. Sharpe*,[209] new information came to light after the defendants' first trial.[210] One of the convicted defendants, cooperating in exchange for a reduced sentence, provided startling information[211] when he disclosed the identities of additional participants in the criminal scheme and also clarified the roles of the original defendants.[212] The prosecution acquired knowledge not only that an additional politician was involved in the fraud scheme and murder plot, but also that the actual killer was someone never mentioned in the first trial.[213] Faced with this dramatically different picture of the crime, the prosecution obtained a new indictment, charging the two newly identified defendants along with two of the original defendants.[214] The defendants complained that the prosecution had changed its position between the two trials and argued that their right to due process was violated by the government's inconsistency.[215] Rejecting that claim, the court characterized the government's conduct "merely as the presentation of new and significant evidence that justified the prosecution in question."[216]

Although the discovery of new evidence may justify a change in position, courts should evaluate such claims with skepticism. In most cases, by the time the trial begins, the prosecutor should have marshaled all the evidence and should be in a position to assess each defendant's culpability. Barring turncoat witnesses, the prosecutor should not ordinarily have any reason to adopt a new position.[217]

---

a court); *see also* Henkin, *supra* note 7, at 1729-34 (arguing that judicial estoppel should not apply to inconsistent pleadings in separate actions in recognition that "controlling facts" can change over time).

209.   193 F.3d 852 (5th Cir. 1999).

210.   *Id.* at 859-60.

211.   *Id.* at 860.

212.   *Id.*

213.   *Id.* at 860-61. The case involved prosecution for federal offenses, and the murder charge, a state offense, was not before the court in either case.

214.   *Id.* at 861. The cooperating defendant, Gillich, appears not to have been recharged.

215.   *Id.* at 872.

216.   *Id.* It appears that no inconsistent verdicts were left intact. At the initial trial, none of the defendants, including Ransom who was at that time alleged to be the trigger man, was convicted on the basis of the actual shooting. *Id.* at 860-61.

217.   In *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998), discussed *infra* notes 266-273 and accompanying text, the prosecution simply called different witnesses against the two defendants and shifted theories accordingly. The difference in the evidence appeared to result from prosecution manipulation rather than the discovery of new information. In *Jacobs v. Scott*, 513 U.S. 1067 (1995), the prosecutor claimed to have changed his mind based on the investigation that took place between the capital sentencing hearing for the first defendant and the hearing for Jacobs. *Id.* at 1068. In each of these cases, the claim that the evidence conveniently changed to permit the prosecution to obtain the most serious conviction against each codefendant should be carefully assessed before triggering an exception to judicial estoppel. *But see* Lear, *supra* note 10, at 638 (arguing that newly discovered evidence may be a common phenomenon in federal cases, given the number and geographic separation of government offices involved). Moreover, having

Third, if the prosecutor can demonstrate that the first jury rejected the initial argument, he should be given latitude to present a new and inconsistent theory. The prosecution is entitled to reevaluate the case in light of the first jury's verdict. In some instances, the verdict indicates that the jury rejected specific positions advanced by the prosecution. For example, in *Kattar* the court evaluated the jury's verdict and concluded that the jury had rejected arguably false testimony by acquitting the defendant on certain counts of the indictment.[218] In the single-shooter example, suppose the prosecution argues in the first trial that the defendant fired the gun, but the jury rejects that version of the facts. In the trial of the second defendant, the prosecution should not be bound by its position in the first trial if the evidence would support a belief beyond a reasonable doubt that the second defendant was actually the shooter. Of course, in attempting to demonstrate the jury's rejection, the prosecution may be hamstrung by the difficulty that afflicts defendants attempting to invoke collateral estoppel after a jury verdict since it is generally extremely difficult to determine the basis for the verdict.[219] Where the problem arises because of prosecutorial inconsistency, however, it is fair for the government to bear the burden of that difficulty.

Even if strengthened in the ways I have suggested, these legal tools will not control prosecutorial inconsistency adequately. A defendant can employ estoppel only by identifying the prosecutorial inconsistency in time to preclude the prosecution from advancing the inconsistent position in the second proceeding. It is questionable whether defendants can routinely be expected to ferret out the prosecution's position on relevant issues in prior proceedings. Even though the defendant may know that a proceeding involving a codefendant has taken place and may know, at least in general terms, the outcome of that proceeding, the defendant will not know the specific positions the prosecution adopted in that proceeding. Some prosecution positions will be recorded in written filings,[220] but many will be reflected only in oral presentations, such as opening statement and closing argument.[221] The later-tried defendant will need access to transcripts of those presentations to determine the prosecution's position. Those transcripts will be available only if the first-tried defendant has appealed; if the

---

discovered that some of the evidence presented at the first trial is incorrect, the government may have an obligation to correct any related errors in the first verdict. *See infra* Part IV.

218.   United States v. Kattar, 840 F.2d 118, 129 (1st Cir. 1988).

219.   *See supra* notes 121, 122 and accompanying text.

220.   For example, the prosecution may make factual assertions in its response to a motion to suppress evidence. *See generally* Edit-cito Roman, *"Your Honor What I Meant To State Was . . .": A Comparative Analysis of the Judicial and Evidentiary Admission Doctrines as Applied to Counsel Statements in Pleadings, Open Court, and Memoranda of Law,*22 Pepp. L. Rev. 981, 993-95 (1995).

221.   *See id.* at 998-1001.

*CALIFORNIA LAW REVIEW* [Vol. 89:1423

first defendant did not appeal, a transcript is unlikely to have been prepared.[222]

Although prosecutorial inconsistency cannot always be avoided, the courts should enforce judicial estoppel if the defendant establishes that the prosecution previously advanced an inconsistent position. Courts should bar prosecutorial inconsistency unless the prosecution proffers a sufficient explanation.

## III
## DUE PROCESS ANALYSIS

Even if the courts strengthen the tools for preventing prosecutorial inconsistency, they will not be able to prevent it in every case. Sometimes a defendant will discover only after both trials are completed that the prosecution exploited in the first proceeding a position inconsistent with that relied on at the later proceeding. The courts must recognize that this prosecutorial inconsistency violates notions of fundamental fairness. When the inconsistency is not precluded and the prosecution therefore obtains convictions or sentences by advancing inconsistent positions in separate proceedings, the courts must turn to due process principles to assess the validity of such convictions. Some courts have acknowledged that prosecutorial inconsistency violates principles of due process, but they have not provided extensive support for that conclusion.[223] This section will examine two lines of cases defining due process violations that should guide the courts in their evaluation of prosecutorial inconsistency: those defining the prosecutor's constitutional duty to refrain from presenting false testimony and those concluding that improper non-evidentiary statements by the prosecutor threaten the defendant's right to due process.

These decisions establish two propositions critical to the assessment of prosecutorial inconsistency. First, uncorrected false statements pose an unacceptable threat to the justice process. And second, the prosecutor's statements, even though they are not evidence, can so impact the fairness of the proceeding that reversal is required. Applying the rationale of these decisions to the problem of prosecutorial inconsistency, courts should conclude that the prosecutor's presentation of inconsistent positions violates due process; it is tantamount to presenting false information in an effort to sway the jury and may require that a conviction be set aside.

222.   *See, e.g.,* FED. R. APP. P. 10 (imposing on the appellant a duty to order transcript).
223.   *See, e.g.,* Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000) (recognizing a due process violation when the prosecution theories in separate trials are inherently contradictory); Thompson v. Calderon, 120 F.3d 1045, 1059 (9th Cir. 1997), *rev'd on other grounds,* 523 U.S. 538 (1998); State v. Lavalais, 685 So. 2d 1048, 1056-57 (La. 1996) (suggesting that fundamental fairness would require relief if the prosecutor's positions were inconsistent); *see also* English, *supra* note 37.

**-1422-**

*PROSECUTORIAL INCONSISTENCY*

### A.   *Presentation of False Testimony*

Although prosecutorial inconsistency does not necessarily entail presentation of false testimony, the due process principles governing the presentation of false testimony provide a useful framework for analyzing due process violations through prosecutorial inconsistency. The prosecution violates the defendant's right to due process if it knowingly allows material false testimony to stand uncorrected.[224] In *Mooney v. Holohan*,[225] the Court held that a prosecutor could not knowingly present false testimony to the court. The Court has extended this principle to cases in which the prosecution's testimony created a false impression, even though it was not clearly perjured.[226] In more recent decisions, the Court has stated repeatedly that the prosecution violates the defendant's right to due process if the prosecutor knowingly presents perjured testimony or allows it to go uncorrected and there is any reasonable likelihood that the perjury had an impact on the outcome.[227]

The Court has further held that the prosecution violates due process by presenting perjured testimony even if the particular prosecutor does not know that the testimony is false. In *Giglio v. United States*,[228] a prosecution witness testified falsely that he had been given no promise in exchange for his cooperation.[229] The prosecutor in the courtroom was unaware of the promise to the witness and therefore did not correct the false statement.[230] The prosecutor who had made the promise was not participating in the trial

---

224.   *See* Giglio v. United States, 405 U.S. 150, 153-55 (1972) (remarking that uncorrected witness testimony concerning a deal with the government, even if unknown to trial prosecutor, constitutes a due process violation); Pyle v. Kansas, 317 U.S. 213, 215-16 (1942) (declaring that the prosecution's knowing use of perjured testimony would deprive the defendant of due process); Mooney v. Holohan, 294 U.S. 103, 112 (1935) (holding that the prosecution's knowing use of perjured testimony is "deliberate deception of court and jury" and violates due process). *See generally* Stephen A. Saltzburg, *Perjury and False Testimony: Should the Difference Matter So Much?*, 68 FORDHAM L. REV. 1537 (2000) (detailing development of the law concerning false testimony).

225.   294 U.S. 103 (1935).

226.   *See, e.g.*, Napue v. Illinois, 360 U.S. 264, 269 (1959) (asserting that the prosecutor's failure to correct testimony, even testimony relating only to credibility, was a constitutional violation); Alcorta v. Texas, 355 U.S. 28, 31 (1957) (holding that, in a trial for the murder of his wife, the defendant was denied due process by nondisclosure of the prosecutor's knowledge of the extent of the relationship between the witness and the defendant's wife); *see also* Blankenship v. Estelle, 545 F.2d 510, 513 (5th Cir. 1977) (stating that testimony could violate due process if it created a false impression, even though it was technically true). *See generally* Saltzburg, *supra* note 224, at 1560-64.

227.   *See* Strickler v. Greene, 527 U.S. 263, 299 (1999) (Souter, J., concurring) (noting that "reasonable likelihood" has been equated to both "reasonable possibility" and "the more-likely-than-not" standards); United States v. Bagley, 473 U.S. 667, 680 (1985) (stating that perjured testimony "is considered material unless failure to disclose it would be harmless beyond a reasonable doubt"); United States v. Agurs, 427 U.S. 97, 103 (1976) (asserting that convictions "obtained by the knowing use of perjur[y] [are] fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

228.   405 U.S. 150 (1972).

229.   *Id.* at 151-52.

230.   *Id.* at 152-53.

and was unaware that the witness had testified falsely.[231] The Court nevertheless held that the presentation of false testimony violated the defendant's right to due process.[232] The Court concluded that the individual prosecutor's ignorance had no bearing on the fairness of the proceeding, which is the foundation of the due process argument, and voted unanimously to reverse the conviction.[233] The gravamen of the harm is in the "corruption of the truth-seeking function of the trial process."[234]

The lower courts have applied *Giglio* to attribute to the prosecution knowledge on the part of other government employees.[235] Thus, if the government has information that demonstrates the falsity of the testimony, the prosecutor has a duty to correct it. Failure to do so may violate due process. This rule does not prohibit presentation of conflicting testimony; if the prosecutor presents witnesses whose accounts are in conflict, the jury can

---

231.   *Id.*

232.   *Id.* at 153-55. Interestingly, the Court has not confronted a case where the defendant based a claim for relief on the argument that the government presented false testimony since it decided *Giglio.* Some decisions concerning the failure to disclose exculpatory testimony could have raised the issue of false testimony but were not decided on that basis. *See* Saltzburg, *supra* note 224, at 1538-39, 1570-73. Professor Saltzburg argues that the Court should have treated *Bagley* and, more recently, *Strickler* as false testimony cases. *Id.* at 1571-72, 1574. However, the defendant did not make a false testimony argument in either *Bagley* or *Strickler*. *See* Brief for Respondent at 10-12, United States v. Bagley, 473 U.S. 667 (1985) (No. 84-48); Brief for Petitioner at 20-21, Stickler v. Greene, 527 U.S. 263 (1999) (No. 98-5864). Indeed, Bagley's brief appears to concede that the case is not within the "perjured testimony" category, Petitioner's Brief at 10-11, *Bagley* (No. 98-5864), and the record in the case does not demonstrate that the witnesses in question made any affirmative false representations or created a specific false impression. In cases dealing with nondisclosure of exculpatory evidence, the Court has stated in dictum that knowing presentation of material perjured testimony violates the defendant's right to due process. *See* cases cited *supra* note 227 and accompanying text; *see also* Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) (quoting *Agurs*, 427 U.S. at 103, to state the rule that knowing use of perjured testimony must have "reasonable likelihood" that the jury's judgment was affected); *Bagley*, 473 U.S. at 678 (same). Although that statement seems to define narrower protection than that recognized in *Giglio*, the Court has never suggested that *Giglio* is no longer good law, and the question of false testimony was not before the Court when it phrased the standard narrowly. *Compare Giglio*, 405 U.S. at 153-54 (holding that uncorrected testimony, even though falsity is unknown to prosecutor, violates the defendant's right to due process), *with Agurs*, 427 U.S. at 103 (asserting that fairness is trampled by a conviction gained through use of known perjured testimony in a case addressing the nondisclosure of evidence).

233.   *See Giglio*, 405 U.S. at 153-55; *cf. Kyles*, 514 U.S. at 438-54 (holding that the failure of the prosecution to disclose exculpatory information known to the police but not to prosecutors violated due process).

234.   *Agurs*, 427 U.S. at 104.

235.   *See* United States *ex rel.* Smith v. Fairman, 769 F.2d 386, 391-92 (7th Cir. 1985) (declaring that, although unknown to the prosecution at trial, police knowledge of the inoperability of the gun allegedly used in the crime was attributable to the prosecution as nondisclosure); United States v. Antone, 603 F.2d 566, 569-70 (5th Cir. 1979) (stating that, although not material, information known to state investigators should be imputed to federal prosecutors when a joint investigation takes place); United States v. Butler, 567 F.2d 885, 888-89 (9th Cir. 1978) (imputing knowledge to the prosecution of a "probable dismissal" deal with eyewitness made by government agents); United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975) (declaring that government agents, who knew of witness's role as a government informant and his subsequent dealings with the government, were an "arm of the prosecutor").

fairly evaluate the credibility of their respective accounts, just as it can de-
termine which, if any, alternative theory of the crime is believable. How-
ever, the rule is a firm condemnation of governmental reliance on false
statements to obtain a conviction or sentence.

To establish a due process violation, the defendant must also demon-
strate that the false testimony was material. In *United States v. Bagley*,[236]
the Court stated that if the defendant established that the prosecution pre-
sented and did not correct false testimony, the falsity will be "considered
material unless failure to disclose it would be harmless beyond a
reasonable doubt."[237] If, instead, the defendant's claim is based on the
prosecution's failure to disclose exculpatory evidence to the defense, the
evidence will be considered material only if the defendant establishes that
"there is a reasonable probability that, had the evidence been disclosed to
the defense, the result of the proceeding would have been different."[238] The
standard of materiality is thus easier to satisfy for claims that the prosecu-
tion presented false testimony than for cases based on claims that the
prosecution failed to disclose exculpatory evidence. That difference re-
flects the Court's concern with the corrupting influence of the false pres-
entation to the fact finder.

### B.  *Presentation of Improper Argument*

Another instructive line of cases encompasses those addressing im-
proper prosecutorial argument. While the decisions do not draw a bright
line between proper and improper argument to the jury, they recognize that
a prosecutor's argument can violate the defendant's right to due process.[239]
Prosecutorial inconsistency is tantamount to improper argument. When the
prosecution presents inconsistent positions in separate proceedings, one is
necessarily incorrect. The cases addressing improper argument therefore
help define the due process violation represented by prosecutorial incon-
sistency.

In *Miller v. Pate*,[240] the Court condemned the prosecution for deliber-
ately misrepresenting the truth throughout the trial.[241] In argument, as well
as in other aspects of the trial, the prosecutor represented that stains on a
pair of shorts introduced against the defendant were blood, even though the
prosecutor knew they were paint.[242] The Court overturned the defendant's

---

236.   473 U.S. 667 (1985).
237.   *Id.* at 680.
238.   *Id.* at 682.
239.   *See* Zacharias, *supra* note 39, at 96–97 (commenting on the lack of clear standards to aid
prosecutors in striking a balance between zealous argument and "overargument" rising to misconduct).
240.   386 U.S. 1 (1967).
241.   *Id.* at 3–6.
242.   *Id.*

*CALIFORNIA LAW REVIEW* [Vol. 89:1423]

death sentence in *Caldwell v. Mississippi*[243] because the prosecutor told the jurors that their decision would be reviewed for correctness, and thus they should not be swayed by defense counsel's argument that they were responsible for the defendant's life.[244] The Court emphasized that the prosecutor misstated the jury's role and was not corrected by the court.[245]

In *Donnelly v. DeChristoforo*,[246] the Court considered but rejected the defendant's argument that the prosecutor's argument violated his right to due process. In his argument, the prosecutor stated, "They (the defendant and his counsel) said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder."[247] The Court pointed to several reasons why the prosecution's argument did not violate the defendant's rights.[248] First, the Court concluded that the remark was ambiguous, so the jury would not necessarily have drawn the improper inference of which the defendant complained and questioned his motives for standing trial.[249] Second, the improper comment was "one moment in an extended trial."[250] The trial court immediately responded with cautionary instructions to reduce the impact of the comment on the jury.[251] As a result, the defendant had not met the standard for determining whether improper remarks by the prosecutor violated due process: that the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[252]

These decisions recognize the influence that a prosecutor can exert over the jury. Although juries are routinely instructed that what an attorney says is not evidence, courts realize that an attorney's words are designed to and actually may influence the jury. The likelihood of influence is greater when the attorney is a prosecutor because they enjoy "unique prestige and symbolic power."[253] The prosecutor comes before the jury as the representative of the state, rather than a hired gun for a particular client.[254] As a result, a prosecutor who oversteps the bounds of proper argument violates

243.  472 U.S. 320 (1985).
244.  *Id.* at 328-30 (reinforcing principle that jury has "'awesome responsibility'" as sentencer whose discretion is necessary for Eighth Amendment "'need for reliability in the determination that death is the appropriate punishment in a specific case'") (quoting Woodson v. North Carolina, 428 U.S. 280,305 (1976) (plurality opinion)).
245.  *Id.* at 333.
246.  416 U.S. 637 (1974).
247.  *Id.* at 640.
248.  *Id.* at 643-48.
249.  *Id.* at 643-44.
250.  *Id.* at 645.
251.  *Id.* at 644.
252.  *Id.* at 643 (rejecting the claim that the prosecutor's remarks regarding the defendant's expectations for the jury's verdict met the standard).
253.  Zacharias, *supra* note 39, at 59.
254.  *See id.* (arguing that prosecutor "commonly carries more influence with juries than attorneys allied solely with individual clients").

the rights of the defendant unless the court takes appropriate remedial action.

### C.  Applying Due Process Analysis to Prosecutorial Inconsistency

The courts should conclude that prosecutorial inconsistency violates the defendant's right to due process if there is any reasonable likelihood that the inconsistent position influenced the outcome of the case. First, prosecutorial inconsistency, advancing a position inconsistent with one advanced at an earlier proceeding, creates a false impression that threatens the truth-finding process. Second, by analogy to the false testimony cases, the defendant should receive relief if there is any reasonable likelihood that the outcome was influenced by the inconsistent positions.

When the prosecution argues inconsistent positions in separate trials, the false statement of the prosecutor threatens to corrupt the proceeding in the same way as the false testimony of a witness. Perjury is not involved; the jury will be told that the statements of counsel are not testimony,[255] and the prosecutors are not sworn during the proceedings. Nevertheless, falsity in either guise undermines, and even may destroy, the accuracy of the truth-finding process, whether the truth finder is a jury or a judge. Moreover, the prosecutor's falsity is difficult to attack. The prosecutor enjoys presumptive credibility in the eyes of the jury and, unlike witnesses who take an oath and are subject to testing through cross-examination and impeachment, the prosecutor is rarely specifically so challenged.[256]

The two lines of due process analysis discussed above should guide the courts' analysis of prosecutorial inconsistency.[257] When the prosecution takes inconsistent positions in separate proceedings, absent an explanation, only one of them can be correct. In one of the cases, then, the prosecution has advanced a false impression. In some cases, the prosecution rests its position on such inconsistent testimony that the case may fit conventional false testimony analysis.[258] In other cases, false testimony is not involved. Rather, the inconsistency flows from changes in testimony or from the spin placed on the facts by the prosecutors.[259] Nevertheless, the prosecution's

---

255.  1A KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 12.03 (5th ed. 2000) (noting the standard instruction that arguments of counsel are not evidence).

256.  *See* Berger v. United States, 295 U.S. 78, 88 (1935) ("[T]he average jury . . . has confidence that [the] obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed."); United States v. Gonzalez-Vargas, 558 F.2d 631, 633 (1st Cir. 1977) ("[T]he representative of the government approaches the jury with the inevitable asset of tremendous credibility . . . .").

257.  *See* Jacobs v. Scott, 513 U.S. 1067, 1067 (1995) (Stevens, J., dissenting) (advocating a due process analysis that requires the reversal of death sentences based on a "factual determination that the State has formally disavowed").

258.  *See supra* notes 224-238 and accompanying text.

259.  *See, e.g.*, Nichols v. Scott, 69 F.3d 1255, 1268 (5th Cir. 1995) (discussing the prosecutor's use of different interpretations of the same evidence at separate trials of the defendant and codefendant

creation of a false impression should entitle the defendant to due process relief.

A number of cases report inconsistencies that amount to false statements by the prosecution. In *Beathard v. Johnson*,[260] for example, two defendants, Beathard and Hathorn, were tried separately for murder.[261] The trial court found that in separate proceedings the prosecutor asserted three different positions concerning the roles of the two defendants.[262] At Beathard's trial, the prosecutor argued that Beathard "entered the trailer and killed the family while Hathorn remained outside."[263] At Hathorn's trial, the prosecutor argued that Hathorn probably entered the trailer and killed his family while Beathard remained outside.[264] Finally, at the state habeas corpus hearing, the prosecutor suggested that Beathard fired one shot through the window at Hathorn's father with a shotgun and that both men fired shots inside of the house.[265]

Similarly, in *Thompson v. Calderon*,[266] where two defendants were tried separately for a murder following a rape, the prosecutor argued at Thompson's trial that no evidence placed his codefendant, Leitch, in the apartment where the murder took place and that Thompson was the only person in the apartment with the victim.[267] At the codefendant's trial, however, the prosecutor argued that, "all of the evidence we have incriminates Mr. Leitch, at best, equally and more so than Mr. Thompson . . . . Both men were together inside that apartment with [the victim]."[268]

---

to assert that each fired the single, fatal shot); Parker v. Singletary, 974 F.2d 1562, 1578 (11th Cir. 1992) (declaring that not "necessarily contradictory evidence" was the basis for "inconsistency . . . in the state's alternative arguments"); Drake v. Francis, 727 F.2d 990, 994 (11th Cir. 1984) (noting the prosecutor's characterization of the defendant's presence at the murder scene in the codefendant's trial as a secondary role while later in the defendant's trial using codefendant's weakened physical state to infer the defendant's role as primary); Littlejohn v. State, 989 P.2d 901, 908 (Okla. Crim. App. 1998) (noting that the absence of physical evidence of actual shooter's identity enabled the prosecutor to argue inconsistently in separate trials that the codefendant, and then later the defendant, was the triggerman).

260.   177 F.3d 340 (5th Cir. 1999).
261.   *Id.* at 342-44.
262.   *Id.* at 344.
263.   *Id.*
264.   *Id.*
265.   *Id.* at 344.
266.   120 F.3d 1045 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998).
267.   *Id.* at 1057.
268.   *Id. See also* Stephen Reinhardt, *The Anatomy of an Execution: Fairness vs. "Process,"* 74 N.Y.U. L. REV. 313 (1999) (discussing *Thompson* in detail). Another example is *Nichols v. Collins*, 802 F. Supp. 66 (S.D. Tex. 1992), in which the district court ordered relief because the prosecutor had knowingly used false evidence, but was reversed by the court of appeals. The district court identified numerous inconsistencies between the prosecution's positions at the first and second trial. *Id.* at 72-74. For example, the prosecutor argued in Williams's trial, "[T]here is only one bullet that could possibly have done it [killed the victim] and that was Willie Williams [sic]," whereas in Nichols's trial the prosecutor argued, "Willie could not have shot him." *Id.* at 73 (alteration in original). At Nichols's capital sentencing hearing, the prosecutor argued that it was unfair and unequal for Williams to be on death row "when this man [Nichols] planned the whole thing and fired the shot." *Id.* at 73. *See also*

In each of these cases, as in other instances of prosecutorial inconsistency, the prosecution exploited separate trials to sway separate fact finders to infer diametrically opposed conclusions from the evidence. Some judges have reasoned that prosecutorial inconsistency violates due process in the same way as the presentation of false testimony.[269] In *Thompson*, the Ninth Circuit, sitting en banc, considered a claim of prosecutorial inconsistency.[270] In a decision that generated seven opinions, a majority of the court held that Thompson was entitled to relief.[271] A plurality of the court concluded that the prosecution's inconsistency violated the rights of Thompson, the first-tried defendant.[272] The plurality reasoned that due process prohibits prosecutorial inconsistency, stating that the rule was "well-established" and citing, among other authorities, the decisions prohibiting the presentation of false testimony.[273] In *Drake v. Kemp*,[274] the prosecutor advanced opposing factual accounts at the two trials and, therefore, must have known that one was false.[275] Judge Clark argued in concurrence that the sequence of events forced the conclusion that the prosecutor did not believe the testimony on which Drake's conviction rested, "bringing the case under the logical if not actual factual framework of *Mooney* and *Napue*."[276]

Other judges have been altogether unreceptive to the argument that prosecutorial inconsistency violates due process.[277] Some courts have refused to hold prosecutorial inconsistency unconstitutional on the ground

---

State v. Fondren, 810 S.W.2d 685, 686 (Mo. Ct. App. 1991); discussion *supra* notes 13-15 and accompanying text.

269.  *See* cases cited *supra* note 223.

270.  120 F.3d 1045.

271.  *Id.* at 1059-60. The favorable holding was reversed by the Supreme Court on grounds unrelated to this discussion. Calderon v. Thompson, 523 U.S. 538, 565-66 (1998).

272.  *Thompson*, 120 F.3d at 1059.

273.  *Id.* at 1058.

274.  762 F.2d 1449 (11th Cir. 1985).

275.  *See id.* at 1452-55 (reporting that the prosecutor's theory portrayed the defendant's role as primary at one trial and secondary at the other trial).

276.  *Id.* at 1479 (Clark, J., concurring). The assertion that the prosecutor must believe the testimony seems to overstate the constitutional requirement. *See id.* The constitution bars presentation of false evidence if the government possesses the contrary information but does not mandate presentation only of evidence the prosecutor actually believes. *See Thompson*, 120 F.3d at 1074 (Kleinfeld, J., dissenting) (remarking that "there is no reason to think the prosecutor knew . . . [the] theory he presented was false, when he presented it"); *see also* Napue v. Illinois, 360 U.S. 264, 269 (1959); Alcorta v. Texas, 355 U.S. 28, 31 (1957); Mooney v. Holohan, 294 U.S. 103, 112-13 (1935). *But see* Durley v. Mayo, 351 U.S. 277, 290-91 (1956) (Douglas, J., dissenting) (arguing that once the state learned that the conviction rested on false testimony, due process mandated a hearing on the prisoner's habeas corpus petition).

277.  *See, e.g.*, United States v. Kattar, 840 F.2d 118, 128 (1st Cir. 1988) (rejecting the argument that testimony at odds with the government position was false or perjured and concluding that "the government's inconsistent positions do not rise to the level of constitutional error"); State v. Roach, 680 A.2d 634, 640-41 (N.J. 1996) (rejecting a due process violation claim where the prosecutor argued inconsistently from the same evidence at separate trials of codefendants because the evidence to which jurors were exposed could support different inferences).

*CALIFORNIA LAW REVIEW* [Vol. 89:1423]

that the prosecutor's arguments are not evidence.[278] Although this takes the cases out of the strict holding of *Giglio*,[279] it does not eliminate the constitutional problem.

The cases recognizing that improper argument may violate the constitution are instructive.[280] The courts should recognize that when the prosecution attempts to sway separate juries, adopting factually inconsistent positions in argument and questioning at separate trials, the fairness of the proceedings is threatened. In *People v. Watts*,[281] rejecting the defendant's plea for relief from prosecutorial inconsistency, the court noted that the prosecutor argues "not that a particular set of facts is the true set of facts; but that the evidence shows that a particular set of facts is the true set of facts."[282] Unfortunately, the jury is unlikely to appreciate this fine distinction. When the prosecutor advocates a particular position based on the evidence, she puts her credibility and that of her office behind that position. If the prosecution successfully advanced a different position in an earlier trial before a different fact finder, the prosecutor creates a false impression, taking advantage of the separation of the defendants to put the credibility of the government behind inconsistent theories in separate proceedings.

A number of courts have expressed willingness to consider claims of prosecutorial inconsistency while rejecting defendants' attempts to invoke protection on the ground that no inconsistency exists.[283] In some cases, courts would have found an inconsistency had it scrutinized the prosecution arguments more carefully. Courts often simply conclude that the prosecution's broad theories are consistent without closely examining the

---

278.  *See, e.g.*, Beathard v. Johnson, 177 F.3d 340, 348 (5th Cir. 1999); Nichols v. Scott, 69 F.3d 1255, 1274 (5th Cir. 1995); *see also Thompson*, 120 F.3d at 1074 (Kleinfeld, J., dissenting) (recalling the standard jury instruction that counsel's arguments are not evidence).

279.  405 U.S. 150, 154-55 (1972) (finding a due process violation where perjured testimony is presented, regardless of the prosecutor's knowledge of falsity).

280.  *See* Caldwell v. Mississippi, 472 U.S. 320, 322 (1985) (asserting that the prosecutor's argument that the jury would not be responsible for death penalty sentence because the decision would be reviewed, violated the Eighth Amendment); Miller v. Pate, 386 U.S. 1, 3-7 (1967) (holding that the prosecutor's representation of red stains on shorts as blood, when he knew they were paint, violated due process). *But see* Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974) (noting that ambiguous remarks made by the prosecution did not violate due process).

281.  91 Cal. Rptr. 2d 1 (Cal. Ct. App. 1999).

282.  *Id.* at 10.

283.  *E.g.*, United States v. Antosh, 172 F.3d 877 (9th Cir. 1999) (unpublished table decision) (declaring no inconsistency in the prosecutor's underlying theory of conspiracy when only a time discrepancy existed); United States v. Hemmingson, 157 F.3d 347, 356 (5th Cir. 1998) (asserting no inconsistency with regard to the representation of a company as the victim in one jurisdiction and the defendant as the victim in another, pointing to word choice of "shareholders" versus "company"); United States v. Shea, 150 F.3d 44, 52 (1st Cir. 1998) (stating no inconsistency of position existed when the government argued at the detention hearing that the gun was the codefendant's and at trial that it was the defendant's); State v. Lavalais, 685 So. 2d 1048, 1056 (La. 1996) (reconciling an alleged inconsistency as a mere difference in emphasis at separate trials).

**-1430-**

specific positions the prosecution advanced to support those positions.[284] In many prosecutorial inconsistency cases, the prosecution relies on a broad and consistent theory that both defendants participated in the crime and share culpability.[285] Simultaneously, however, the prosecution advances narrower and inconsistent theories in separate trials, by claiming in each that the particular defendant is the more culpable and thus milking the case to maximize the chance of convicting each defendant on all charges and severely punishing each defendant.[286]

In *Drake v. Francis*,[287] for example, the court glossed over the fact that at Campbell's trial the prosecutor had argued that Campbell actually struggled with and killed the victim, whereas, later at Drake's trial, the same prosecutor argued that Drake must have assisted in the struggle because Campbell was too infirm to have done it alone.[288] The court upheld Drake's conviction and death sentence, rejecting the argument that the prosecution had impermissibly relied on inconsistent theories because in each trial the prosecution argued that both defendants were involved in the murder-robbery.[289] Thus, the prosecution's theory that both defendants

---

284. *See, e.g., Hemmingson*, 157 F.3d at 356 (rejecting the argument without discussing the specifics of the prosecution's theory in the separate trials).

285. *E.g.*, Parker v. Singletary, 974 F.2d 1562, 1578 (11th Cir. 1992) (declaring, due to the uncertainty of the evidence, that presentation of alternate theories of facts for each defendant in separate trials was proper); Drake v. Kemp, 762 F.2d 1449, 1456 (11th Cir. 1985) (stating that both defendants "were present . . . and participated in the beating and killing").

286. *See, e.g.*, State v. Flowers, 489 S.E.2d 391 (N.C. 1997) (rejecting a claim of prosecutorial inconsistency on the grounds that the prosecution proved in each trial that all defendants were equally culpable; the court did not address the defendant's claim that the prosecution labeled him a mere lookout in trial of codefendants but in his own trial argued that he stabbed the victim); State v. Roach, 680 A.2d 634, 640 (N.J. 1996) (stating that "the prosecutor isentitled to present the strongest case against each defendant" and that it is proper to present inconsistent theories if both can be drawn from the evidence).

287. 727 F.2d 990 (11th Cir. 1984).

288. *Id.* at 994.

289. *Id.* at 994. A similar example is *United States v. Fuentes*, 18 M.J. 41 (C.M.A. 1984), where the Court of Military Justice reversed the Court of Military Review's determination that the prosecutor had improperly allowed a false impression to go uncorrected. *Id.* at 54. *Fuentes* arose from a near-fatal assault. *Id.* at 42. The prosecution first tried codefendant Cyr on the theory that he aided and abetted defendant Fuentes in the assault. *Id.* at 42. At Cyr's trial, the victim, a weak witness, testified concerning the assault, and Cyr testified in his own defense. *Id.* at 46-47. He recounted a self-serving version of the events in which he came upon Fuentes and the victim struggling and attempted to break them up. *Id.* at 47. At Cyr's trial, the prosecutor argued that Cyr's testimony was "improbable, contradictory, and . . . fabricated." *Id.* at 47. Cyr was convicted, sentenced, then immunized by the prosecution and ordered to testify against Fuentes. *Id.* at 42-43, 47-48. At Fuentes's trial, the prosecution did not call the victim, but relied instead on Cyr's testimony. *Id.* at 48. Although Cyr provided the same account of the events, the prosecution now embraced Cyr's credibility and argued successfully that Fuentes had used excessive force. *Id.* at 49-50. The Court of Military Justice emphasized that Cyr's testimony was consistent with the prosecution theory of Fuentes' criminal liability. *Id.* at 50. The court did not, however, evaluate the constitutionality of the prosecution condemning the account as false in the first trial, where it tended to exculpate the first defendant, and endorsing it as true in the second, where it provided a plausible theory on which to convict the second defendant. The two positions could be reconciled if the portions of the testimony condemned as false in

were involved bridged the two trials, but the prosecution advanced inconsistent theories on the question of physical involvement in the murder, a likely key to winning a death penalty, positioning the prosecution to maximize its advantage in each trial.[290] This inconsistency violated due process, and the court should not have allowed the prosecution to escape that conclusion by pointing to its broad consistent arguments. Instead, the court should have given relief based on the specific inconsistency.

Courts should find a due process violation even if the prosecutor in the second proceeding was personally unaware of the prior inconsistent government stance. Although some reported instances of prosecutorial inconsistency involved the same prosecutor making conflicting arguments in separate trials, many cases involve a different prosecutor making the inconsistent argument in the second case.[291] The change in personnel should not alter the due process analysis. A change in personnel eradicates neither the unfairness of espousing inconsistent positions nor the threat to the integrity of the justice system and, therefore, should not defeat a claim for relief. The prosecutor's knowledge is pertinent to whether there is an ethical violation, but it should not draw the discussion away from the core issue in due process analysis, which is the fairness of the process. The courts should apply the rule of attribution established in *Giglio* to cases of prosecutorial inconsistency as well.[292] Where the prosecutor was oblivious to the

---

the first trial were not important to the conviction in the second trial. Nonetheless, the question of inconsistent factual positions should have been raised and addressed. The court emphasized the consistency of the evidence presented at the two trials but disregarded the inconsistency of the prosecutor's stance. *See id.* at 52-53.

290.   Judge Clark provides a thorough evaluation of the prosecution's arguments in his concurring opinion to the en banc decision reversing Drake's conviction on other grounds. *See* Drake v. Kemp, 762 F.2d at 1470 (Clark, J., concurring). Judge Clark quotes the closing argument from Campbell's trial, in which the prosecutor stated, "It is my thoughts [sic] on this evidence that this is the actual slayer, Mr. Campbell is, of [the victim]." *Id.* at 1472. Once Campbell was convicted, the prosecutor argued for the death penalty, saying that Campbell "killed his victim." *Id.* at 1472. In that trial, the jury responded to the prosecution's arguments by convicting Campbell on the charges and recommending the death penalty and rejected Campbell's self-serving testimony that Drake had committed the crime single-handedly. *Id.* at 1471. At Drake's trial, Campbell testified for the prosecution and again offered a self-serving version of the crime, laying all responsibility on Drake. *See id.* at 1472. Campbell was the only witness who linked Drake to the crime, and his testimony at the two trials contained numerous inconsistencies. *Id.* at 1472-75. The prosecutor then argued that Campbell could not have overcome the victim without help from Drake, emphasizing that Drake must have played a physical role in killing the victim. *Id.* at 1475. Drake was convicted and sentenced to death. *Id.* at 1475; *see also* Daniels v. State, 534 So. 2d 628, 639-40 (Ala. Crim. App. 1985) (concluding there was no inconsistency because both triggerman and nontriggerman could be guilty of capital murder; court did not examine prosecution positions advanced at separate trials).

291.   *E.g.*, Beathard v. Johnson, 177 F.3d 340, 344 (5th Cir. 1999) (observing that the prosecutor was the same for both trials); Nichols v. Scott, 69 F.3d 1255, 1262 (5th Cir. 1995) (same); State v. Roach, 680 A.2d at 637 (same). *But see, e.g.*, Parker v. Singletary, 974 F.2d 1562, 1577 (11th Cir. 1992) (noting a separate prosecutor appeared at each trial).

292.   Later cases have reaffirmed this application of due process protection. *See* Smith v. Phillips, 455 U.S. 209, 219 (1982) (noting that the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"); United

falsity of the testimony, knowledge of the inconsistency should be imputed to the later prosecutor.[293] The prosecutor's office is a single entity, and the due process violation exists "irrespective of good faith or bad faith."[294]

### 1.  Establishing Prejudice

In order to demonstrate a violation of due process, the defendant generally must demonstrate some form of prejudice.[295] The courts should adapt the standard from false testimony cases and hold that the defendant is entitled to relief if there is any reasonable likelihood that the inconsistent position influenced the outcome of the case. The impact on the proceeding is far more like that of false testimony than of inflammatory argument. In the decisions defining the prosecutor's duty to correct false testimony and to disclose exculpatory evidence, the Court has implemented the prejudice requirement through the requirement that the defendant demonstrate the materiality of the falsity or exculpatory evidence.[296] The definition of materiality varies with the nature of the violation.[297] When the violation is presenting or failing to correct false testimony, the Court has stated that the false testimony is material and the defendant is entitled to relief if there is any reasonable likelihood that the falsity influenced the outcome of the case.[298] Because prosecutorial inconsistency corrupts the process in the same manner as false testimony, the same standard should apply, and the defendant should receive relief if there is any reasonable likelihood that the prosecution's inconsistent position influenced the outcome.[299]

The courts should not derive the test from the standard applied in improper argument cases, whether the impropriety "so infected the trial with

---

States v. Kattar, 840 F.2d 118, 127 (1st Cir. 1988) (stating that "[i]t is immaterial that the particular prosecutor in this case may not have known about the evidence"); Reiss, *supra* note 194, at 1410 n.214 (stating that the court will impute knowledge of one prosecutor to another). *See also* United States v. Agurs, 427 U.S. 97, 103 (1976) (stating that the rule applies if the prosecutor "knew, or should have known, of the perjury").

293.  Giglio v. United States, 405 U.S. 150, 154 (1972).

294.  *Id.* at 153 (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)).

295.  *See. e.g., Kattar.* 840 F.2d at 128-31 (concluding that the government's conduct did not cross the "threshold of materiality"); State v. Nunley, 923 S.W.2d 911, 925-26 (Mo. 1996) (stating that the "defendant fails to demonstrate any prejudice; therefore, there is no lawful basis to reverse").

296.  *See Smith,* 455 U.S. at 221 (commenting that convictions may be overturned, not merely when government actions are undesirable or erroneous, but when constitutional error occurs) (citing Cupp v. Naughten, 414 U.S. 141, 146 (1973)); *Agurs,* 427 U.S. at 112-13 (commenting on the standard of materiality that must be met to find constitutional error); Donnelly v. DeChristoforo, 416 U.S. 637, 639 (1974) (granting certiorari only to evaluate whether the prejudicial extent of the prosecutor's remarks violated due process); *Brady,* 373 U.S. at 87 (holding that suppression violates due process "where the evidence is material") .

297.  *See* United States v. Bagley, 473 U.S. 667 (1985).

298.  *See Bagley,* 473 U.S. at 678-80; *Agurs,* 427 U.S. at 103; *see also* Gilday v. Callahan, 59 F.3d 257, 267-68 (1st Cir. 1995) (analyzing the standards applied to false testimony concerning materiality).

299.  *See supra* notes 228-235 and accompanying text.

unfairness as to make the resulting conviction a denial of due process."[300]
That standard is designed to take into account the ways in which a trial
court may reduce the impact of the improper argument, and it reflects the
Court's holding that improper argument should not be grounds for relief if
it was adequately contained and did not taint the entire proceeding. The
circumstances that mitigate the impact of improper argument are absent
from the prosecutorial inconsistency cases. The inference that the prose-
cutor asks the jury to draw is clearly stated. The prosecutorial inconsis-
tency pervades the trial; it is not a mere passing improper comment.
Finally, the trial court gives no cautionary instructions informing the jury
of the threatened inconsistent verdicts or possible falsity; the jury and the
judge are altogether oblivious to the inconsistency.

Courts considering claims based on prosecutorial inconsistency have
sometimes imposed on the defendant a higher burden than reasonable like-
lihood. Some courts have declined to remedy prosecutorial inconsistency
where the jury might not have decided the case on the basis argued by the
prosecution.[301] In *State v. Roach*,[302] for example, four men, including the
defendant, were convicted in a robbery and murder.[303] The evidence estab-
lished that only two of the participants shot the victims, but it was ambigu-
ous about which two.[304] In three separate trials, the prosecution argued that
two of the defendant's accomplices were the shooters.[305] In the defendant's
trial, however, the prosecutor argued that the defendant and one of his ac-
complices were the shooters.[306] The court excused this inconsistency be-
cause the jurors "were . . . exposed to evidence that permitted different
inferences concerning a basis for defendant's criminal guilt" and because
the remarks of the attorneys were not evidence.[307] The approach illustrated
by *Roach* overlooks the impact of the inconsistent arguments on the sepa-
rate proceedings.

---

300.   *Donnelly*, 416 U.S. at 643.
301.   *E.g.*, People v. Watts, 91 Cal. Rptr. 2d 1, 8 (Cal. Ct. App. 1999) (noting that the jury's
conclusion that the defendant committed the crime was plausible regardless of the outcome of the
codefendant's trial); State v. Roach, 680 A.2d 634, 641 (N.J. 1996) (noting indications that the jury
based its verdict on accomplice theory; thus, the inconsistency of the prosecutor's arguments had no
weight).
302.   680 A.2d 634 (N.J. 1996).
303.   *Id.* at 637.
304.   *Id.* at 638-39.
305.   *Id.* at 640.
306.   *Id.*
307.   *Id.* at 641. The court also seemed to view the inconsistency as harmless because the jury's
questions suggested that they convicted defendant only on a theory of accomplice liability. *Id.*; *see also*
Beathard v. Johnson, 177 F.3d 340, 348 (5th Cir. 1999) (rejecting the prosecutorial inconsistency
argument, in part because the jury heard both sides of the story); Parker v. Singletary, 974 F.2d 1562,
1578 (11th Cir. 1992) (concluding that inconsistent arguments were a fair response to uncertain
evidence concerning which defendant was the triggerman); Littlejohn v. State, 989 P.2d 901, 909
(Okla. 1998) (concluding that the question of who shot the victim was an appropriate question for the
jury in each trial).

In every case where the defendant raises a claim of prosecutorial inconsistency, the court will reach that claim only if the prosecutor has sufficient evidence to convict; if not, the insufficiency of the evidence would require reversal.[308] The question, then, should not be whether the record supports the jury's conclusion, but whether there is any reasonable likelihood that the prosecution's improper inconsistent argument influenced the outcome of the case.[309] When the prosecutor makes inconsistent arguments, often exaggerating to each fact finder the culpability of the defendant whose fate it must decide, the prosecutor's sole purpose is to convince the jury to convict. By swaying the jury in each case to view the particular defendant on trial as the more culpable, the prosecutor lays favorable emotional groundwork and enhances the likelihood that the jury will find the defendant guilty of the most serious offenses charged and that the sentencer, whether judge or jury, will impose the most serious sentence.[310] The mere fact that the uncertainty in the evidence is displayed to the jury should not be viewed as an antidote to the inconsistent argument. Uncertainty about the basis for the jury's verdict should weigh against the prosecution since the prosecution sought the advantage of the inconsistent arguments.

Judge Tashima, concurring in *Thompson v. Calderon*, expressed another view of the prejudice requirement.[311] Although he agreed that prosecutorial inconsistency violates due process, he concluded that no relief was warranted unless the defendant demonstrated that his conviction rested on a false theory.[312] Judge Tashima's approach places too great a burden on the defendant because proving that the basis for the conviction is a false theory may be impossible. Perhaps the evidence is simply so ambiguous that neither of the inconsistent positions can be demonstrated to be false[313] or perhaps the prosecution's presentation of the evidence hopelessly confused the record. By pressing inconsistent positions, the prosecution backed a falsity

---

308.  *See* LaFave et al., *supra* note 9, § 25.4.

309.  *See* Kyles v. Whitley, 514 U.S. 419, 434 n.8 (1995).

310.  In *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995), for example, the prosecutor interviewed jurors after the first trial ended in mistrial. 69 F.3d at 1262. He learned that the question of whether Nichols was the triggerman "'had caused problems for the jury on considering the death penalty.'" *Id.* (quoting Nichols v. Collins, 802 F. Supp. 66, 75 (S.D. Tex. 1992)). In the second trial, the defense emphasized that Nichols had not been the shooter and the prosecution "primarily argued that Nichols fired the fatal shot." *Id.* at 1262. *See also* Nichols v. Collins, 802 F. Supp. at 71 (commenting that the jury can find mitigation more easily for the nontriggerman).

311.  *See* Thompson v. Calderon, 120 F.3d 1045, 1064 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998).

312.  *Id*; *see also* People v. Watts, 91 Cal. Rptr. 2d 1, 7 (Cal. Ct. App. 1999) (concluding that the defendant's conviction could stand even though someone else had been convicted of the same conduct because sufficient evidence supported the conviction).

313.  *See, e.g.*, Nichols v. Scott, 69 F.3d 1255, 1271 (5th Cir. 1995) ("[I]t was 'factually unknown and evidentiarily improvable who fired the fatal shot.'") (quoting Nichols v. State, 754 S.W.2d 185, 202 n.18 (Tex. Crim. App. 1988)).

in at least one of the cases and created the possibility that the juries would arrive at inconsistent results.[314] The prosecution not only persuaded separate juries to validate irreconcilable propositions as true, but also, in doing so, may have raised doubts about the validity of either position. The burden of untangling the case should fall on the prosecution. If the prosecution can convince the court that there is no reasonable likelihood that the falsity influenced the outcome, the prosecution can overcome the due process argument.

The legal tools discussed so far only address the unfairness to the later-tried defendant. Prosecutorial inconsistency, however, is often equally harmful to the first-tried defendant. The prosecution should not be given one free opportunity to manipulate the facts and only brought to task at the later proceedings. The courts should employ the due process principles outlined above to evaluate the impact of the inconsistency on the rights of the first-tried defendant as well as the later-tried defendant and to protect both defendants from improper prosecutorial inconsistency.

## IV
## A REMEDY FOR THE FIRST DEFENDANT?

When the prosecution adopts an inconsistent position in a later case, the first-convicted defendant may also suffer injustice because of the inconsistent position that the prosecution advanced in the first trial and later abandoned. The mechanisms for avoiding inconsistency (admission of inconsistent statements, collateral estoppel, and judicial estoppel) come into play only in the second proceeding and so are of no use to the first-prosecuted defendant. Instead, the defendant must simply argue that, in light of the prosecution's changed position, the conviction violates due process. If there is a reasonable likelihood that the position advanced in the first proceeding influenced the outcome and the prosecution does not advance an acceptable explanation for its change in position, the court should grant the defendant relief.

In extreme cases, the prosecutorial inconsistency signals intentional manipulation by the prosecution and is readily characterized as a violation of due process. In *Smith v. Groose*,[315] for example, the court granted relief to the defendant convicted in the first trial on the ground that the prosecutorial inconsistency between the first and second trials violated his right to due process.[316] *Smith*, like many inconsistency cases, represents the

---

314.  Judge Kozinski, concurring in *Thompson*, argued that "[i]f the system works as it should, A and B both may be acquitted, but in no event should more than one of them be convicted." *Thompson*, 120 F.3d at 1071 (Kozinski, J., concurring). The cases addressed here are the very cases he argues should never occur.

315.  205 F.3d 1045 (8th Cir. 2000).

316.  *Id.* at 1052.

prosecution's attempt to extract maximum convictions and sentences from a somewhat ambiguous set of facts.[317] The court emphasized that the prosecution's positions at the two trials were diametrically opposed, that both versions were known from the outset, and that the same prosecutor tried both cases.[318] The court appeared to view the prosecutor's conduct in the case as tantamount to knowing or reckless use of false testimony.[319] The case did not involve prosecution theories that could be reconciled;[320] nor did it involve a surprise change in a witness's account of the events.[321] Instead, aware that the key witness had given two versions of what happened, "the prosecutor chose" to use one version of the witness's story to convict Smith and then use the other version to convict his codefendant.[322] In the court's view, the prosecution manipulated the evidence, "stack[ing] the deck in his favor."[323] The court not only vacated the conviction, but directed that, if the state retried Smith, it could not rely on the witness's statement to establish Smith's guilt.[324]

In *Thompson v. Calderon,* a plurality of the court took a similar approach and voted to grant relief.[325] The prosecution advanced one theory at the preliminary hearing, abandoned it long enough to portray Thompson as the more culpable of the two defendants in his trial, and then returned to the theory to convict his codefendant.[326] The plurality condemned the prosecution's behavior, stating that "[t]he prosecutor manipulated evidence

---

317.   The criminal episode itself had an unusual twist. Smith, a juvenile, went looking for a house to burglarize with his three juvenile companions. *Id.* at 1047. Observing telltale signs of a burglary in progress, they decided to "rob the burglars." *Id.* When one of the juveniles, Dixon, recognized one of the burglars, they spoke and the burglar gave the juveniles permission to take what they wanted from the house; the juveniles then entered the house and stole several items. *Id.* At some point in the course of the two burglaries, the homeowners were murdered. *Id.* at 1047-48. Lytle, one of the juvenile burglars, "cooperated" with the police, first telling them that Cunningham, one of the original burglars, claimed responsibility for the murder and later changing his story to place responsibility on one of the juveniles. *Id.* Only under the second version could Smith be convicted of felony murder. At Smith's trial, then, the prosecutor introduced Lytle's second statement not just to impeach Lytle's testimony but as substantive evidence that the juvenile had committed the murder. *Id.* at 1048. Smith was convicted of all charges and received multiple life sentences. *Id.* The state then proceeded against Cunningham, charging him with the murders, relying on Lytle's testimony consistent with his original statement, and largely ignoring his later statement implicating the juvenile in the murder. *Id.*

318.   *Id.* at 1050-52. The court also invoked language describing the unique position of the prosecution in criminal cases. *Id.* at 1049 (describing the role as having "mandates as well as privileges").

319.   *See id.* at 1051-52.

320.   *See id.* at 1052.

321.   *See id.* at 1051.

322.   *Id.*

323.   *Id.*

324.   *Id.* at 1054.

325.   120 F.3d 1045, 1060 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998).

326.   *Id.* at 1056. At the preliminary hearing, the prosecutor presented four jailhouse informants who testified that Thompson's codefendant was the more culpable of the defendants. In Thompson's trial, the prosecutor called two different jailhouse informants to testify that Thompson had confessed to greater involvement in the crime. *Id.* at 1055-56.

and witnesses, argued inconsistent motives, and at [Thompson's codefendant's] trial essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial."[327] The plurality rejected the argument that only Thompson's codefendant could claim a due process violation, pointing out that the prosecution's position was consistent in the preliminary hearing and in the codefendant's trial because it deviated only for the sake of maximizing the state's advantage in Thompson's trial.[328] These cases represent the appropriate approach when the prosecution intentionally adopts inconsistent positions to the first defendant's disadvantage.

Other cases are more difficult. Some courts do not view the inconsistency as violating the first defendant's rights at all. When the prosecution can justify the position it advances at the time of first trial, the prosecution's inconsistency emerges only when the prosecution commits itself to the second position. The Seventh Circuit stated, "The offense is not taking inconsistent positions so much as it is winning, twice, on the basis of incompatible positions."[329]

By contrast, in *Drake v. Francis*, the Eleventh Circuit appeared to decide which one of the two inconsistent positions was the true one. The court concluded that the theories at the separate trials were consistent.[330] The court remarked in a footnote, however, that Drake's rights would not have been violated even had the theories been inconsistent.[331] Instead, the court agreed with the state court judge that, if an inconsistency prejudiced anyone, it was the first-tried defendant because he "was convicted and sentenced to death by a prosecution that contended on another day that he was too old and sick and weak to commit the crime."[332]

When confronted with a situation in which there is a chance that the first-tried defendant was prejudiced by later prosecutorial inconsistency, the court must attempt to determine the reason for and the significance of that inconsistency. First, if the inconsistency arises from the discovery of new evidence that mitigates the case against the first defendant, that defendant should receive relief. The prosecution should be required to offer the

---

327.   *Id.* at 1057.

328.   *Id.* at 1059. The plurality noted that the prosecutor appears to have known that his theory at the first trial contradicted the approach he planned to take at the second trial. *Id.* at 1058 n.12.

329.   Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp., 910 F.2d 1540, 1548 (7th Cir. 1990).

330.   Drake v. Francis, 727 F.2d 990, 994 (11th Cir. 1984). When it reconsidered the case en banc, the court, with the exception of one concurring judge, did not address the question of prosecutorial inconsistency. *See* Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985).

331.   727 F.2d at 994 n.4.

332.   *Id.* (quoting state habeas judge). In a concurring opinion, Judge Clark disagreed, stating that "[e]ither both defendant's were prejudiced by the prosecutor's actions or neither's were." Drake v. Kemp, 762 F.2d at 1479 (Clark, J., concurring).

first defendant the benefit of the new information.[333] In *People v. Watts*, for example, the court upheld the conviction of the second defendant against an inconsistency argument, noting in part that the evidence available by the time of the later trial suggested that the first defendant had not held the gun.[334] The court should also have required that the prosecution revisit the first defendant's conviction and sentence, rather than allowing the inconsistent results to stand. The prosecution should not be able to justify convicting and punishing two defendants for a single act; if the later prosecution can be explained, then the earlier conviction must fall.

If, however, the change in positions does not signal presentation of false testimony and the court cannot determine which of the two versions is true, the prosecution should lose the benefit of both positions. In such cases, the first defendant should benefit equally with the second. To conclude that only the second-prosecuted defendant deserves relief appears arbitrary, particularly since the order of the trials may result from mere happenstance. Instead, the court should ask whether there is any reasonable likelihood that the prosecutorial position inconsistent with its later stance influenced the outcome of the first trial. If the answer is yes, then the first defendant should be entitled to relief.

In sum, prosecutorial inconsistency harms the first-tried defendant in the same way it harms the later-tried defendant. Due process principles require the courts to scrutinize the prosecution's change in position. If it cannot be justified and there is any reasonable likelihood that the prosecution position abandoned in the later proceeding influenced the outcome of the earlier proceeding, the court must grant relief.

## CONCLUSION

The problem of prosecutorial inconsistency occurs too often. When it does, the prosecution achieves an unfair advantage by getting the benefit of inconsistent positions in separate proceedings. The result can be unjustly harsh convictions and sentences. The courts must develop effective responses to claims that a prosecutor has presented or is about to present a theory inconsistent with an earlier position.

First, when defendants identify impending prosecutorial inconsistency, courts should recognize the impropriety of such inconsistency and employ available legal tools to prevent or discourage it. Three approaches offer assistance to the courts in eliminating tolerance of such inconsistency. At the very least, courts should admit the prior statements setting out the inconsistent position as party admissions so that the fact finder knows that the prosecution has changed its story. Generally, courts should bar the

---

333. *Thompson*, 120 F.3d. at 1071 (stating belief that, concerning inconsistent theories, at least one of the verdicts should be modified or set aside) (Kozinski, J., concurring).

334. People v. Watts, 91 Cal. Rptr. 2d 1, 7-8 (Cal. Ct. App. 1999).

prosecution from presenting its inconsistent position. If the doctrine of collateral estoppel is strengthened and the requirement of mutuality is eliminated, it will preclude some types of inconsistency. The doctrine of judicial estoppel, however, is more suited to the problem. The courts should embrace and strengthen that doctrine to prevent the prosecution from relying in a later proceeding on a position inconsistent with one advanced in an earlier proceeding.

Second, in some cases, the defendant discovers that the prosecution's position at the second trial was inconsistent with its position at an earlier trial only after the trial has been completed. In such cases, courts should apply due process analysis to determine whether the prosecution's action violated the defendant's constitutional rights. Courts should determine whether there is any reasonable likelihood that the inconsistent position influenced the outcome. If reasonable likelihood exists, courts should afford the defendant the appropriate relief in the form of a new trial or re-sentencing hearing.

Finally, even if the question is raised by the first-convicted defendant, courts should evaluate the constitutionality of the prosecution's action and should, in some instances, grant relief. If new evidence favorable to the first-tried defendant prompted the prosecution's change in position, that defendant should be given the benefit of the new evidence. If the prosecution's change in position signals presentation of false or misleading evidence, the defendant is entitled to relief under existing due process principles. Even if the inconsistency does not arise from either of these sources, courts should ask whether the correct position on the evidence can be determined from the evidence available. If the correct position is ascertainable, the court should rule accordingly. Otherwise, courts should again apply due process principles and ask whether there is any reasonable likelihood that the theory later discredited by the adoption of an inconsistent position had an effect on the outcome of the first trial. Courts should grant the defendant relief in cases where the inconsistent theory may have affected the outcome.

By adopting these approaches to prosecutorial inconsistency, courts will better protect the fairness of the criminal justice process. They will deter or remedy unjust results in specific cases and discourage prosecutors from manipulating the evidence in separate proceedings to obtain inconsistent convictions and sentences.

# EXHIBIT AA

# BYU Law Review

Volume 1978 | Issue **2**                                                     Article 1

5-1-1978

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

Rex E. Lee

Follow this and additional works at: https://digitalcommons.law.byu.edu/lawreview

Part of the Constitutional Law Commons, and the Law and Politics Commons

Recommended Citation

Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 BYUL. Rev. 231 (1978).
Available at: https://digitalcommons.law.byu.edu/lawreview/vol1978/iss2/1

This Article is brought to you for free and open access by the Brigham Young University Law Review at BYU Law Digital Commons. It has been accepted for inclusion in BYU Law Review by an authorized editor of BYU Law Digital Commons. For more information, please contact hunterlawlibrary@byu.edu.

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

## *Rex E. Lee**

In *United States v. Nixon*,[1] the United States Supreme Court recognized the existence of the President's right under appropriate circumstances to withhold certain kinds of information from coordinate branches of government.[2] The Court held that this right, which bears the label executive privilege, is based on separation of powers. One year later, in *Eastland v. United States Servicemen's Fund*,[3] the Court held that the issuance and enforcement of congressional subpoenas are protected under the speech or debate clause.[4]

A case now pending before the United States Court of Appeals for the District of Columbia Circuit, *United States v. American Telephone & Telegraph Co. (AT&T)*,[5] raises additional important issues concerning executive privilege, congressional investigative power, and the broader separation of powers context out of which these issues arise. Described by the court of appeals as presenting "nerve-center constitutional questions,"[6] the case brings squarely into confrontation for the first time in history three potent prerogatives of our three branches of government:

---

* Dean and Professor of Law, J. Reuben Clark Law School, Brigham Young University. B.A., 1960, Brigham Young University; J.D., 1963, University of Chicago. Assistant United States Attorney General, May 1975-January 1977. Dean Lee was personally involved in the *AT&T* case, and argued the case before the district court and the court of appeals. The views expressed herein do not necessarily represent those of the Department of Justice during the Ford administration.

The author acknowledges the valuable assistance of Allen D. Butler, a recent graduate of the J. Reuben Clark Law School, Brigham Young University.

1. 418 U.S. 683 (1974).

2. *Id.* at 706-07. In *Nixon* the Court held that, under the circumstances of the case, the President was obligated to comply with a judicial subpoena, because the President raised only generalized claims of confidentiality, as contrasted with the judiciary's specific need for the information in a criminal proceeding. While congressional subpoenas were not directly involved in *Nixon*, the fair inference to be drawn from the opinion is that executive privilege has applicability to attempts by either Congress or the courts to obtain information.

3. 421 U.S. 491 (1975).

4. *See* notes 43-58 and accompanying text *infra*.

5. The court of appeals has issued two opinions in the case. The first is reported at 551 F.2d 384 (D.C. Cir. 1976); and the second, at 567 F.2d 121 (D.C. Cir. 1977).

6. 551 F.2d at 394.

231

232    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

Congress' investigatory (subpoena) power, executive privilege exercised to protect foreign intelligence secrets, and judicial review.

Section I of this Article briefly examines that *AT&T* case. Subsequent sections will explore some of the issues that it raises. Section II will discuss the applicability of the speech or debate clause to congressional investigations and the scope of executive privilege when the information at issue is not in the government's possession. Secton III will explore the possible procedural avenues by which an executive privilege-congressional subpoena confrontation might arise, including the constitutional impediments to bringing such confrontations before the courts. Section IV deals with the constitutional authority of the courts to resolve these conflicts, and Section V examines the possible standards appropriate for their resolution.

## I. United States v. American Telephone & Telegraph Co.

### A.  History of the Controversy

For several decades, the United States has engaged in warrantless electronic surveillance (wiretapping) to protect national security interests.[7] Such surveillance is initiated only after ap-

---

7.  There is no authorizing statute for such surveillance. Its assumed legal basis is an inherent power in the President derived from his responsibilities as Commander in Chief of the Armed Forces, his responsibilities in the area of foreign relations, and his duty under article II, § 1 of the Constitution to "preserve, protect, and defend the Constitution of the United States." The Supreme Court held in United States v. United States District Court (Keith), 407 U.S. 297 (1972), that the President lacks such power at least insofar as domestic threats to national security are concerned. The *Keith* opinion left open the issue of inherent Presidential power to protect national security from foreign threats, including foreign powers, foreign agents, and agents of foreign powers. *Id.* at 308, 321-22. *See also* Zweibon v. Mitchell, 516 F.2d 594 (D.C. Cir. 1975) (held illegal a warrantless surveillance imposed on the Jewish Defense League whose activities were directed against foreign powers, but which is not itself a foreign power).

Further detail on the procedures involved in instituting such a surveillance is contained in United States v. AT&T, 419 F. Supp. 454, 456 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The lack of statutory authority for these foreign intelligence surveillances has been a source of concern for the Attorney General. To alleviate this problem, S. 3197, 94th Cong., 2d Sess., was proposed in 1976 with the support of the Ford administration, particularly Attorney General Levi. The bill was reported favorably by the Senate Judiciary Committee and by the Senate Committee on Intelligence, but died in the Senate at the close of the 94th Congress. Currently, the Foreign Intelligence Act of 1978, S. 1566, 95th Cong., 2d Sess., has been reported favorably by the same committees that reported S. 3197 during the 94th Congress. S. Rep. No. 701, 95th Cong., 2d Sess. 6-7 (1978).

S. 3197 recognized the possible existence of inherent Presidential authority, in addition to that authorized by the bill. The current bill, by contrast, specifies that its provisions constitute the "exclusive means by which electronic surveillance as defined . . . may be conducted." S. 1566, 95th Cong., 2d Sess. § 2511(2) (1978).

proval by the Attorney General, and is effected by the government leasing a telephone line which runs from the telephone of the surveillance target to an FBI monitoring station. Prior to 1969, the arrangements for these leased lines were handled orally.[8] Since then, however, all leased line arrangements have been memorialized by a "leased line letter," sometimes called a "national security request letter." This is a single-paragraph form letter identifying the points "from" and "to" which service is to be leased. It states that the service is to effect a foreign intelligence surveillance authorized in writing by the Attorney General, and cautions that the existence of the letter should not be disclosed lest the investigation be impeded.[9] These leased line letters have never been classified. The persons who handle them within the AT&T affiliate companies are all AT&T employees who have not undergone any formal governmental clearance procedure. The security afforded the letters has been described, however, as

---

8. United States v. AT&T, 551 F.2d at 388 n.5.

9. The leased line letter form is as follows:

Date

Addressee
Dear Mr. _____

    In connection with an investigation being conducted by the Federal Bureau of Investigation, under its lawful and established jurisdiction, it is requested that you furnish to the Federal Bureau of Investigation, at the usual commercial rates, the facilities or services set out below. This request is made upon the specific written authorization of the Attorney General of the United States as a necessary investigative technique under the powers of the President to protect the national security against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities, in connection with an investigation of organizations or individuals suspected to be agents of or acting in collaboration with a foreign power. Your cooperation in this matter will be greatly appreciated.

    It is requested that private line facilities be furnished as follows:
    From:
    To:

    You are not to disclose the existence of this request. Any such disclosure could obstruct and impede the investigation.

Very truly yours,

Clarence M. Kelley,

Director

Joint Appendix at 48, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) [hereinafter cited as Joint Appendix].

    The "from" portion of the form is followed by information identifying the surveillance target by telephone number, address, telephone pole or line number, or other more technical information from which the telephone company can identify the telephone to be tapped.

involving "the strictest security safeguards."[10]

On June 22, 1976, pursuant to its investigation into possible
governmental abuse of section 605 of the Communications Act,[11]
the House Committee on Interstate and Foreign Commerce is-
sued a subpoena directing AT&T to deliver to that committee's
Subcommittee on Oversight and Investigations four categories of
documents.[12] The first category consisted of the leased line letters

---

10. *Id* at 44. AT&T security safeguards were described by Robert L. Keuch, deputy
assistant to the Attorney General, as follows:

> Upon information and belief AT&T receives and maintains all leased line
> letters under the strictest security safeguards. In the normal case not more than
> one individual per company is authorized to receive and have access to the
> request letter. In all cases the leased line letters are maintained within the
> security section of the corporation. Under company policies, members of
> AT&T's security organization are employed only after a full field investigation
> of the general nature utilized by the FBI in processing security clearances.
> Finally, all leased line letters are separately maintained in safes or secure com-
> partments as would be required for classified information held by the Executive
> Branch. In all the years in which AT&T has performed this function, there is
> no evidence that the security of the leased line evidence has ever been compro-
> mised.

*Id.*

11. 47 U.S.C. § 605 (1970). Section 605 protects the privacy of radio or wire communi-
cations by prohibiting the interception of such communications or the divulgence of the
contents of such communications. *Id.* The dual purpose of the investigation, as described
by Congressman Moss, was "to determine whether existing law, specifically section 605
of the Communications Act, is being abused by the Executive Branch" and "the possible
need for corrective legislation . . . relating to the protection and interception of private,
interstate communications." Joint Appendix, *supra* note 9, at 193.

Certain activities by the President are excepted from § 605:

> Nothing . . . in section 605 of the Communications Act of 1934 (48 Stat.
> 1143; 47 U.S.C. 609) shall limit the constitutional power of the President to take
> such measures as he deems necessary to protect the Nation against actual or
> potential attack or other hostile acts of a foreign power, to obtain foreign intelli-
> gence information deemed essential to the security information against foreign
> intelligence activities.

18 U.S.C. § 2511(3) (1970).

12. The four categories were:

> 1. Full and complete copies of Federal Bureau of Investigation (FBI) na-
> tional security request letters, in the possession or control of American Tele-
> phone and Telegraph (AT&T) and its 24 operating companies listed below, for
> access to phone lines handling either verbal or non-verbal communications.
> 2. Copies of any and all records in the possession or control of AT&T or its
> operating companies prior to 1969 when written FBI requests were not routinely
> requested by AT&T and its operating companies.
> 3. Copies of any and all applicable Bell System Practices (BSP's) describing
> company policy regarding national security "taps" or "provision of facilities"
> to law enforcement or intelligence agencies. This should include both current
> BSP's and any BSP's on the subject which have since been revised or discontin-
> ued.
> 4. Copies of internal memoranda, correspondence, board minutes, or other
> records relative to AT&T, and/or any AT&T operating company, practice or

231]                    SEPARATION OF POWERS                    235

in the possession of AT&T and its affiliates. The White House responded to the AT&T subpoena by attempting to negotiate a compromise with the subcommittee. The principal focus of the negotiation efforts was to substitute copies of memoranda prepared by the FBI for the leased line letters. These memoranda describe the facts and circumstances relevant to the requested surveillance, and provide the basic information considered by the Attorney General in making his decision.

The general concept of such a substitution served the interests of both sides. One of the principal concerns underlying the congressional investigation was whether the wiretaps had been restricted to foreign intelligence matters or activities or whether some of the taps had been used for domestic purposes. The letters themselves contained no information concerning the background or activities of the person whose telephone had been tapped or why those activities qualified him—or failed to qualify him—as a legitimate foreign intelligence surveillance target.[13] By contrast, the backup memoranda would reveal to the subcommittee the circumstances and considerations that justified the surveillance. The executive branch also preferred to release the memoranda (with certain deletions to prevent identification of the specific targets) rather than the letters themselves. Release of the letters would increase the number of people having access to information that could identify every foreign intelligence target under United States surveillance since 1969.

Through a series of negotiations lasting nearly a month, agreement was reached on some, but not all points. It was agreed that AT&T would provide to the subcommittee, and the subcommittee in turn would provide to the FBI, a list of the dates of the leased line letters. From these dates, the FBI would identify the letters that pertained exclusively to domestic surveillances,[14] and the backup memoranda pertaining to domestic surveillances would be supplied with only such minor deletions as were neces-

---

policy with respect to national security "taps" or "provision of facilities" to law enforcement or intelligence agencies, covering the last 10 years.

United States v. AT&T, 419 F. Supp. 454, 455-56 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

13. It would be theoretically possible, of course, for the subcommittee to conduct its own investigation to determine whether a tap on a particular telephone was for legitimate foreign intelligence, but there is no suggestion that the subcommittee proposed, or felt itself qualified, to carry out that kind of highly secret and sensitive investigation.

14. Leased line letters in this category would be limited to those that occurred between 1969, when the leased line letter procedure began, and June 19, 1972, the date of the *Keith* decision. *See* note 7 *supra*.

236    BRIGHAM YOUNG UNIVERSITY LAW REVIEW        [1978:

sary to shield particularly sensitive ongoing investigations. With
regard to foreign intelligence surveillances, the subcommittee
would select a random sample of the backup memoranda for two
selected years, 1972 and 1975. The FBI would make copies of
these sample memoranda, substituting generic classifications or
descriptions[15] for any information that might identify targets or
sources. The subcommittee would then have access to the edited
memoranda at the FBI.

The irreconcilable point of difference was the subcommit-
tee's view that in order to verify the integrity of the expurgating
process, the subcommittee would need to compare a subsample
of the edited backup memoranda with unexpurgated originals.
The subcommittee proposed that three representatives be
allowed to compare the original and edited memoranda at the
FBI, and that they be permitted to take their notes back to the
subcommittee. The executive branch opposed this plan princi-
pally because the notes, if allowed to leave the FBI, would be-
come subcommittee records, subject to examination by any
House member under House Rule XI § 2(e)(2).[16]

On July 22, after nearly a month of negotiations and one day
prior to the July 23 subpoena compliance date, the executive
branch filed suit against AT&T to obtain a temporary restraining
order.[17] At the temporary restraining order hearing, Congressman
John Moss, chairman of the subcommittee, presented a motion
to intervene which the court granted. After argument, the court
issued an order restraining AT&T from releasing the letters.

---

15. For example, the term "Middle East Diplomat" might be substituted for the
target's name.

16. Rule XI § 2(e)(2) provides: "All committee hearings, records, data, charts, and
files shall be kept separate and distinct from the congressional office records of the mem-
ber serving as chairman of the committee; and such records shall be the property of the
House and all Members of the House shall have access thereto." W. BROWN, MANUAL AND
RULES OF THE HOUSE OF REPRESENTATIVES, H.R. DOC. NO. 416, 93d Cong., 2d Sess. 420
(1975).

17. At the same time, the President sent a letter to Congressman Staggers, chairman
of the full Committee on Interstate and Foreign Commerce, who had signed the subpoena.
The letter constituted an invocation of executive privilege. It advised the chairman:

I have determined that compliance with the subpoena would involve unaccept-
able risks of disclosure of extremely sensitive foreign intelligence and counterin-
telligence information and would be detrimental to the national defense and
foreign policy of the United States and damaging to the national security. Com-
pliance with the Committee's subpoena would, therefore, be contrary to the
public interest.

United States v. AT&T, 419 F. Supp. 454, 458 (D.D.C.), modified, 551 F.2d 384 (D.C. Cir.
1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) (quoting letter from
Gerald R. Ford to Harley O. Staggers (July 22, 1976)).

Eight days later the district court rendered final judgment for the executive branch.[18]

The court observed that the case involved an assertion of executive privilege having an effect on Congress' powers of speech or debate under *Eastland v. United States Servicemen's Fund*,[19] but rejected the position taken by Congressman Moss that the legislative authority to investigate is absolute. In the district court's view, "the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum."[20] The district court concluded not only that "[t]he helpfulness of the national security request letters in determining the basis on which the wire taps were instituted is minimal," but also that "the President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters." Because "[s]uch a determination by the Executive is generally accorded great deference by the courts,"[21] judgment was rendered for the executive and a permanent injunction issued.

The Court of Appeals for the District of Columbia Circuit[22] took a different approach. After holding that there was federal jurisdiction to consider the case under 28 U.S.C. § 1331,[23] the court held that it need not decide whether the case was moot,[24] whether it presented a nonjusticiable political question,[25] or how it should resolve the "patently conflicting assertions of absolute authority."[26] Following its earlier precedent in *Nixon v. Sirica*,[27]

---

18. United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

19. 421 U.S. 491 (1975).

20. 419 F. Supp. at 459.

21. *Id.* at 460.

22. United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

23. Section 1331 grants jurisdiction over cases arising under the Constitution, laws, or treaties of the United States, wherein the amount in controversy exceeds $10,000. 28 U.S.C. § 1331(a) (1970). The court found a federal question in the executive's claim that "its constitutional powers with respect to national security and foreign affairs included the right to prevent transmission of the request letters to Congress." 551 F.2d at 389. The $10,000 requirement was satisfied by the court's conclusion that "far more than $10,000 would be required to repair [the] damage" which would result from disclosure, such as "disruption of diplomatic relations and of our intelligence and counterintelligence programs, including possible danger to the lives of counterintelligence sources." *Id.*

24. 551 F.2d at 390. The subpoena would have expired with the adjournment of the House, since the House, unlike the Senate, is not a continuing body. Eastland v. United States Servicemen's Fund, 421 U.S. 491, 512 (1975).

25. 551 F.2d at 390-91. The court did face this issue in its second opinion. *See* notes 126-29 and accompanying text *infra*.

26. 551 F.2d at 391-92.

27. 487 F.2d 700 (D.C. Cir. 1973).

238   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

the court held that issues of such magnitude involving the constitutional powers of its sister branches should not be judicially resolved until every opportunity for a negotiated settlement had been exhausted, especially since (at least in the court's view) the parties had already come so close to reaching a settlement.[28] While observing that "[i]t would be the function of the parties to propose the structure and its details," the court suggested in some detail how the parties might proceed.[29] The court of appeals ordered the district court "to report to us concerning the progress of these negotiations within three months of the date of this opinion, unless the executive and congressional parties jointly ask for an extension or report an earlier impasse."[30]

Negotiations pursuant to the court of appeals' first opinion and order extended over a period of two months, culminating in a final offer by the Justice Department closely approximating the suggestions contained in the court of appeals' opinion. The subcommittee found this proposal unacceptable.

When the case came back before the court of appeals for the second time,[31] that court held the controversy justiciable and rejected the claims of both parties that their respective substantive positions were entitled to absolute constitutional protection. The court declined, however, to render a final judgment in favor of either side. Adhering to the fundamental premise of its earlier opinion that, to the maximum extent possible, the conflict should be resolved by negotiation between the article I and article II branches rather than by decree from the article III branch, the court elected "to continue our approach of gradualism."[32] The court ordered that the parties experiment with the following procedure: Members of the subcommittee staff would be allowed to examine a sample of ten unexpurgated memoranda, and would be allowed to take notes. The notes, however, would remain under

---

28. "There was almost a settlement in 1976. It may well be attainable in 1977." 551 F.2d at 394. Earlier the court had observed: "It is an additional, if fortuitous, advantage that under our decision, negotiations can be conducted not only by a new House but by a new President." *Id.* at 390.

29. *Id.* at 395 n.18. The suggestion of the court was that a small number of congressional staff investigators be given access to a subsample of the unexpurgated backup memoranda. The President would be allowed to certify the investigators' security clearance, and the investigators' notes would be held under seal and not revealed unless there was a claim that there were discrepancies between the original and edited memoranda. That claim would be submitted to the district court, which would base its decision on an in camera comparison of both sets of memoranda and the investigators' sealed notes.

30. *Id.* at 395.

31. 567 F.2d 121 (D.C. Cir. 1977).

32. *Id.* at 131.

seal with the FBI. If inaccuracies were found, the subcommittee
could take its claim to the district court, where the memoranda
would be examined in camera. The executive would be allowed
to make substitutions, but only upon an in camera showing that
the memoranda were accurately edited and that the contents
were extraordinarily sensitive. While this procedure was being
carried out, the subcommittee was to have access to all memo-
randa for the sample years (1972 and 1975) in edited form.[33]

 Thus, on the delicate and difficult ultimate issue in the
case—accommodating the competing constitutional needs of two
sister branches, and declaring a winner—commonsense practical-
ity once again prevailed over traditional judicial form. In its sec-
ond opinion as in its first, the court of appeals used the power and
authority of the federal judiciary not to settle the dispute between
the other two branches, but rather to intensify the incentive and
the pressure on these branches to settle the dispute themselves.
The theoretical and practical strengths of this approach are dis-
cussed in Section III, Subsection C of this Article.

### B. Implications of the Controversy

 The court of appeals in its first opinion expressed the view
that "[t]he negotiations came close to success."[34] In one sense
this is a correct statement. The information at issue—targets and
sources contained in a subsample of original memoranda—
constituted only a very small portion of the total information in
the memoranda, viewed either from the standpoint of word count
or substantive content.

 From another vantage point, however, the disagreement over
verification represented nothing less than a head-on conflict be-
tween the fundamental authority and responsibility of the article
I and article II branches: congressional powers of investigation
versus Presidential responsibility for preservation of foreign in-
telligence secrets. Chairman Moss insisted that the subcommit-
tee's rights of investigation, as interpreted by the Supreme Court
in *Eastland*, were absolute and that the subcommittee could not
discharge its responsibility without verifying, at least on a sample
basis, (1) that there were in fact original memoranda from which
the expurgated copies had been made, and (2) the accuracy of
the generic substitutes. The President, on the other hand, relied

33. *Id.* at 131-32.
34. 551 F.2d at 386.

240   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

upon *United States v. Nixon*[35] to his assertion that it was the executive's prerogative to decide whether sensitive intelligence information should be disclosed. From the executive's viewpoint, the proposed verification process raised the same concerns as did access to the leased line letters: identification of foreign intelligence surveillance targets. Though the problem was susceptible to resolution through negotiation, neither was willing to trust the other. Chairman Moss would not accept the President's assurance that no domestic surveillances were involved, and the President was unwilling to run the risk that out of 435 members of Congress having access to the information, not one would disclose it.[36] Thus, each side was in the unaccustomed position of having one of its constitutional responsibilities in a face-off with an equally clear constitutional responsibility of another branch. Accordingly, the prerequisite to a negotiated settlement was a concession by one branch of part of its constitutional authority to the corresponding benefit of the other branch.[37]

During the negotiations the dispute had centered around the allocation of authority between two branches of government. But once the suit was filed, the conflict expanded to embrace the authority of the article III branch as well. In the initial district court proceedings, counsel for Chairman Moss took the position that the court's restraining order would have no effect on Congress and that article I gave Congress exclusive jurisdiction over all aspects of the matter.[38] On the day following the temporary

---

35. 418 U.S. 683 (1974).

36. The court of appeals observed that such release could be forbidden either by the subcommittee, the committee, or the full House. 551 F.2d at 386. Any individual member of Congress, however, may publicize even the most sensitive information, and so long as he does so within the scope of congressional activity covered by the speech or debate clause—such as floor debate or committee hearings—that clause immunizes him from any civil or criminal consequences from such publication. Gravel v. United States, 408 U.S. 606 (1972).

37. An objective examiner of the record in *United States v. AT&T* might conclude that just such a concession was in fact made by the President and rejected by Chairman Moss. There was an offer to permit the chairman himself to compare the expurgated copies with the original documents from which they were copied. Joint Appendix, *supra* note 9, at 145-48. This might be viewed as effectively resolving the standoff in favor of the legislative branch. Nevertheless, the chairman rejected this offer. In his view the subcommittee had a right of access to the information, and the expurgated-copy-with-verification procedure was itself a compromise. Particularly significant in the chairman's view was the fact that "[w]e have been advised by the Federal Bureau of Investigation that at least 14 Executive Branch officials and staff have routine access to these documents, and an unknown number of additional staff have access on a 'need-to-know' basis." Joint Appendix, *supra* note 9, at 148 (letter from Chairman Moss to Assistant Attorney General Rex E. Lee).

38. At the outset of his argument at the temporary restraining order hearing, counsel for the subcommittee stated: "The issue is, I don't think your Honor with due respect,

---

restraining order hearing, however, the subcommittee elected not
to enforce its subpoena and thus avoided placing AT&T in the
difficult position of having to choose between being held in con-
tempt of court or contempt of Congress.[38]

*United States v. AT&T* marks the second time in history
that a case involving an assertion of executive privilege against a
congressional subpoena has reached the federal court of appeals
level.[40] It is the first such case where the purpose of the executive
privilege assertion was to protect foreign intelligence secrets. In
light of the holding in *United States v. Nixon*[41] that executive

---

with all due respect to Your Honor and to the Court, I don't think you have jurisdiction
to block Article I of the Constitution where we have, where the Subcommittee has clear
jurisdiction." Transcript of Oral Argument, Motion for Temporary Restraining Order at
20, United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir.
1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The following colloquy occurred at the time the district court judge indicated that
he would grant a temporary restraining order:

THE COURT:  I am going to grant a TRO.
MR. LEMOV:  That won't affect the Congress.
THE COURT:  All Right.
MR. LEMOV:  I am sorry, Your Honor.
THE COURT:  All right. I am glad to know the position of your constitu-
ents.
MR. LEMOV:  Our position is that Article One is self sufficient and it is
not—
THE COURT:  In other words, you are going to flaunt the TRO, is that
it?
MR. LEMOV:  I would not say we are going to flaunt the TRO. It is—
THE COURT:  Well, what did you say?
MR. LEMOV:  I would say that the TRO would not bind the Congress in
the exercise of its legislative powers, but I would refer that matter to our Sub-
committee.
THE COURT:  Yes.
MR. LEMOV:  To make that decision.

*Id.* at 29.

39. The occasion was a subcommittee hearing held at the appointed time for compli-
ance with the subpoena, Friday, July 23. The witnesses at the hearing were AT&T offi-
cials. Chairman Moss reiterated the view stated the evening before by his counsel that
the courts had no authority to enjoin compliance with a properly issued congressional
subpoena. Nevertheless, he announced that he would not precipitate the issue by holding
AT&T officials in contempt of Congress:

MR. MOSS:  Well, the Chair recognizes the very difficult position Ameri-
can Telephone and Telegraph is placed in because of the actions of the court,
which were taken late yesterday afternoon.
While the Subcommittee or the Chairman, does not recognize that the court
has a lawful authority to interfere with this committee, it recognizes that to
pursue this matter at this moment would place AT&T between the very difficult
choices of being in contempt of the House or in contempt of the court.

Joint Appendix, *supra* note 9, at 95.

40. The first was Senate Select Comm. on Presidential Campaign Activities v. Nixon,
498 F.2d 725 (D.C. Cir. 1974). *See* text accompanying notes 90-105 *infra.*

41. 418 U.S. 683 (1974).

privilege is constitutionally based, and the holding in *Eastland v. United States Servicemen's Fund*[42] one year later that at least some aspects of the issuance and enforcement of congressional subpoenas are included within the speech or debate immunity, issues raised by the confrontation between these two constitutionally based prerogatives are likely to be increasingly important in the future. In *AT&T*, and potentially in future cases, the scope of these competing congressional and executive prerogatives has an important bearing on the conflict between them. Two issues involved with the scope of these prerogatives are discussed in Section II.

## II.   SCOPE OF SPEECH OR DEBATE AND EXECUTIVE PRIVILEGE

The final issue with which this Article will deal concerns the standards by which federal courts should resolve conflicts between Congress' investigative powers and a Presidential assertion of executive privilege.[43] Before such standards can be delineated, however, the scope of the two competing powers and the constitutional anchorage of each must be explored. Accordingly, this Section will examine two problems. The first concerns the scope of the speech or debate clause as it relates to congressional investigations. The second involves the scope of the executive privilege doctrine when the information is in the hands of a private third party.

### A.   *Speech or Debate and Congressional Investigations*

Congress' investigative powers are not expressly authorized by the Constitution. The Supreme Court has long recognized, however, that they are so essential to the legislative function as to be implied by the general vesting of legislative power in Congress.[44] *Eastland v. United States Servicemen's Fund* contains

---

42. 421 U.S. 491 (1975).

43. Section V *infra*.

44. Watkins v. United States, 354 U.S. 178, 187 (1957); McGrain v. Daugherty, 273 U.S. 135, 174-75 (1927). The investigatory powers are not unlimited, however, and may be employed only "in aid of the legislative function." Kilbourn v. Thompson, 103 U.S. 168, 189 (1881). In addition, a congressional committee must show that it has been authorized to make the investigation and that the information sought is pertinent. Watkins v. United States, 354 U.S. at 201, 208-09. *Cf.* Barenblatt v. United States, 360 U.S. 109 (1959) (giving a much more liberal interpretation of the authorization requirement).

The protection afforded by the speech or debate clause has similar limitations in that it protects only those activities which fall within the "sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376 (1951). *See* Doe v. McMillian, 412 U.S. 306 (1973) (clause did not bar suit against person who, with authorization from Congress,

arguable bases for an inference that the speech or debate clause, where applicable, affords an even larger measure of support for congressional investigative activity than are implied by Congress' general investigative powers.[45]

The speech or debate clause appears in the first paragraph of article I, section 6 of the Constitution. That paragraph provides:

> The Senators and Representatives Shall receive a Compensation for their services, to be ascertained by Law, and Paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

Both the context and also the language of the speech or debate clause imply that its fundamental purpose is to prevent the kind of interference with the discharge of congressional responsibilities that would result from Senators and Representatives being involuntarily involved in legal proceedings while Congress is in session.[46] The thrust of the clause is to protect members of the Congress (or their aides) from arrest or litigation *as defendants*. This

---

distributed allegedly injurious materials to the public rather than limiting distribution solely to legislative activities); Gravel v. United States, 408 U.S. 606 (1972) (clause would bar questioning of congressional aide, but would not preclude an inquiry into alleged arrangements for the private publication of the Pentagon Papers); United States v. Brewster, 408 U.S. 501 (1972) (clause did not bar prosecution for acceptance of a bribe).

45. One of these inferential bases is provided by Justice Marshall's concurring opinion, analyzed in this Section. Another is the Court's distinction of its earlier holdings in Watkins v. United States, 354 U.S. 178 (1957), and Barenblatt v. United States, 360 U.S. 109 (1959). *See* note 51 *infra*. A third is the bare fact that the Court decided the case under the speech or debate clause. Whether speech or debate extends to congressional investigative activities other than the issuance and enforcement of subpoenas, and whether those components of congressional investigations that are included within speech or debate (assuming there is a difference) enjoy greater constitutional protection, are questions outside the reach of this Article. For reasons discussed in Section V, the controlling consideration for present purposes is the fact that Congress' investigative powers which come into confrontation with assertions of executive privilege are constitutionally based.

46. Powell v. McCormack, 395 U.S. 486, 505 (1969). *See also* Dombrowski v. Eastland, 387 U.S. 82, 84-85 (1967); Tenney v. Brandhove, 341 U.S. 367, 377 (1951) (same immunity accorded state legislators); LIBRARY OF CONGRESS, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ANALYSIS AND INTERPRETATION, S. DOC. NO. 82, 92d Cong., 2d Sess. 117-20 (1973). For a detailed history of the speech or debate clause, see Reinstein & Silvergate, *Legislative Privilege and the Separation of Powers*, 86 HARV. L. REV. 1113 (1973). For a complete discussion of all Supreme Court decisions regarding the clause, see Suarez, *Congressional Immunity: A Criticism of Existing Distinctions and a Proposal for a New Definitional Approach*, 20 VILL. L. REV. 97 (1974).

244    BRIGHAM YOUNG UNIVERSITY LAW REVIEW        [1978:

is the only application of speech or debate that has ever been
made by Supreme Court holdings.

In *Eastland* the Court held that the speech or debate clause
precluded a federal court from enjoining the issuance of a con-
gressional subpoena duces tecum directing a bank to produce
records of an organization, notwithstanding the Court's apparent
acceptance of the argument that the disclosure of such records
would infringe upon the plaintiff's first amendment rights of asso-
ciation.[47] An issue left unresolved by *Eastland* is whether speech
or debate protection is applicable in those cases where no congres-
sional person or entity is named as a defendant. Alternatively
stated, the issue is whether speech or debate creates only an
immunity from suit for Congressmen and their aides, or whether
it constitutes a positive constitutional guarantee that can be as-
serted either defensively or affirmatively. The issue is present in
cases involving an assertion of executive privilege where the exec-
utive branch can simply refuse to disclose information in its pos-
session, thus forcing Congress to go to court as a plaintiff to
enforce its subpoena. The issue also arises in the *AT&T* situation
since the executive branch can achieve its nondisclosure objective
through a judicial decree that runs only to noncongressional par-
ties to the litigation, thus forcing Congress into the role of inter-
venor.

Although the issue was not raised in *Eastland,* some support
can be found in that case for the proposition that speech or debate
protects all congressional investigations from judicial interfer-
ence.[48] Rather than resting the decision upon the simple fact that

---

47. *Eastland* involved a subpoena issued by the Senate Subcommittee on Internal
Security. The subcommittee was investigating the activities of the United States Service-
men's Fund (USSF) and, pursuant to that investigation, issued a subpoena to the bank
where USSF had an account, commanding the bank to produce " 'any records appertain-
ing to or involving the account or accounts of [USSF].' " 421 U.S. at 494. USSF and its
members brought suit to enjoin implementation of the subpoena. Named as defendants
were Subcommittee Chairman Eastland, nine other Senators, the subcommittee's chief
counsel, and the bank. *Id.* at 495. The bank did not participate in the action. *Id.* at 495
n.5.

48. The issue would have been raised in *Eastland* if the suit had been pursued exclu-
sively against the bank. (Although the bank was named as a defendant, it did not partici-
pate in the action—apparently because it was never served. *Id.* at 494-95 nn.4 & 5.)
Although the majority opinion does not deal with the issue, the theoretical complications
from the presence of the bank—a nongovernmental entity—as a defendant in the case
were the focus of some concern at the oral argument. During the rebuttal argument, the
Court persisted in questioning Mr. Miller, attorney for the subcommittee and Senator
Eastland, concerning the nonavailability of the speech or debate immunity to the bank,
until it finally extracted from him the following concession:

    MR. MILLER: The Court of Appeals decision authorizes a judgment

the decree in that case ran only to Senators and their aides, the
Court emphasized the disruption and delay of the legislative pro-
cess occasioned by judicial review. At one point the Court stated:

> This case illustrates vividly the harm that judicial interfer-
> ence may cause. A legislative inquiry has been frustrated for
> nearly five years, during which the Members and their aide
> have been obliged to devote time to consultation with their
> counsel concerning the litigation, and have been distracted
> from the purpose of their inquiry. The Clause was written to
> prevent the need to be confronted by such "questioning" and
> to forbid invocation of judicial power to challenge the wisdom
> of Congress' use of its investigative authority.⁴⁹

Also instructive is the Court's approach to the issue in
*Eastland*. As the Court framed the issue, "[t]he question to be
resolved is whether the actions of [Congress] fall within the
'sphere of legitimate legislative activity.' If they do, [Congress]
'shall not be questioned in any other Place' about those activities
since the prohibitions of the Speech or Debate Clause are abso-
lute . . . ."⁵⁰ The significance of these two sentences, is of course,
their confinement of the relevant issues in the case to the scope
of the speech or debate clause. The Court found that the power
to investigate and the subpoena power plainly fell within the
"legitimate legislative sphere" protected by speech or debate.
Having found that, the Court refused to balance the speech or
debate interests against the plaintiff's countervailing first
amendment claim.⁵¹

against the Senators. And if I say so myself, it would be the only time, to my
knowledge, that any such type—

    QUESTION:  But if we should reverse that, Mr. Miller, there will still be,
in this lawsuit, something that involves the banks?

    MR. MILLER:  The banks are, as I understand it, are still defendants,
and—

    QUESTION:  So even if you win, this lawsuit is not completely over?
    MR. MILLER:  I assume that they could still proceed against the banks,
to—the banks are defendants unless—

    QUESTION:  And if they do in that circumstance, your victory on the
Speech or Debate Clause will not assist the banks any, in their defense of the
lawsuit.

    MR. MILLER:  I would think not, Your Honor. I would think not.

Joint Appendix, *supra* note 9, at 68-68a.

    49. 421 U.S. at 511 (footnote omitted).

    50. *Id.* at 501 (footnote omitted).

    51. The Court recognized that in two earlier opinions, Watkins v. United States, 354
U.S. 178, 198 (1957), and Barenblatt v. United States, 360 U.S. 109, 126 (1959), first
amendment rights had been balanced against congressional investigatory power. Those
cases were distinguishable, however, because they were criminal prosecutions, wherein the

246   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

On the other hand, Justice Marshall's concurring opinion in *Eastland* (joined by Justices Brennan and Stewart) contains language that appears squarely supportive of the view that the speech or debate clause provides immunity only in suits against Congressmen or their aides. The following excerpts are illustrative:

> As our cases have consistently held, . . . the Speech or Debate Clause protects legislators and their confidential aides from suit; it does not immunize congressional action from judicial review.[52]

> [T]he protection of the Speech or Debate Clause is personal. It extends to Members and their counsel acting in a legislative capacity; it does not preclude judicial review of their decisions in an appropriate case, whether they take the form of legislation or a subpoena.[53]

> Our prior cases arising under the Speech or Debate Clause indicate that only a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all.[54]

The language cited above, taken either alone or in context,[55]

defendants asserted their first amendment rights to justify their refusals to answer congressional inquiries, and thus Congress had sought the aid of the judiciary in enforcing its will. *Eastland,* on the other hand, was "an attempt to interfere with an ongoing activity by Congress, and that activity is . . . within the legitimate legislative sphere"; thus balancing would not be applied. 421 U.S. at 509 n.16. Another commentator suggests that the import of *Eastland* "is not simply that particular defendants were immune from suit, but rather that pre-enforcement review of a congressional subpoena may not be available at all." *The Supreme Court, 1974 Term,* 89 HARV. L. REV. 47, 136 (1975) (footnote omitted).

52. 421 U.S. at 513 (Marshall, J., concurring).
53. *Id.* at 515.
54. *Id.* at 516.

There may be another explanation for the apparent neatness with which these and other excerpts from Justice Marshall's concurrence fit the argument that the speech or debate immunity applies only where Congressmen or their aides are the actual defendants. The peculiar problem in *Eastland* was that the persons whose first amendment rights were allegedly threatened did not have custody over the documents whose disclosure would constitute the alleged invasion of first amendment interests. As a consequence, the usual procedure for challenging a subpoena on constitutional grounds—refusal to comply followed by litigation of the legal issues in the enforcement proceeding—was not available to the United States Servicemen's Fund, "since a neutral third party could not be expected to resist the subpoena by placing itself in contempt." *Id.* at 514. Thus, it may be that the purpose of Justice Marshall's concurrence in *Eastland* was simply to emphasize that, notwithstanding the absolute nature of the speech or debate guarantee, it was proper for the district court to entertain the suit brought by the servicemen's fund. Because the fund was not subject to the subpoena it could not assert its constitutional interests in the customary way, by resisting compliance.

55. Particularly if that context includes the concession extracted from counsel for the

implies that at least three members of the United States Supreme
Court have concluded that the speech or debate clause provides
only immunity from suit to Congressmen and their aides. While
Justice Marshall's opinion stops short of an assertion that the
speech or debate clause would be unavailing in a suit where the
only relief sought was an injunction against a private party, that
is its necessary import. The opinion recognizes and approves the
absolute nature of the speech or debate guarantee which, where
applicable, puts an end to judicial inquiry. It also approves the
district court's entertaining the suit under the peculiar proce-
dural posture of that case. But both of these propositions were
also recognized by the majority, and Mr. Justice Marshall's con-
currence appears to be written for the principal purpose of ex-
pressing a view on an issue that is not covered by the majority
opinion.

     The issue whether the speech or debate clause guarantees
only an immunity for members of Congress and their aides when
they are joined as defendants in litigation, or whether it consti-
tutes an affirmative grant of power, was raised in *United States
v. AT&T* because the documents at issue were in the possession
of a private party, and disclosure could be enjoined without nam-
ing a member of Congress or congressional aide as a defendant.
     In its brief in *AT&T* the executive argued:

> Both by its express language and by Supreme Court interpreta-
> tion, the Speech or Debate Clause creates nothing more than an
> immunity of Congress in actions *against them*. It is not a tool
> that Congress may use to prevent judicial determination of Con-
> stitutional issues. It is a defense to either criminal or civil liabil-
> ity and available only to members of Congress and their aides.
> It cannot be asserted for the benefit of private parties or entities,
> either by those private parties, or by members of Congress.[56]

The district court rejected the executive's position:

> The plaintiff has taken the position that this action should
> be considered one seeking solely to restrain a private entity,
> AT&T, from releasing documents in its possession. In this way,
> plaintiff argues, the Court need not consider the applicability of
> the Speech or Debate Clause, since the immunity of that consti-
> tutional provision runs only to members of Congress and their

subcommittee at oral argument—*see* note 48 *supra*.

56. Brief for Plaintiff-Appellee at 50-51, United States v. AT&T, 419 F. Supp. 454
(D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir.
1977) (second opinion).

248   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

close aides when defending against a lawsuit, and does not afford any protection to a private entity such as AT&T. This argument is advanced so that the Court can avoid dealing with a constitutional confrontation between two of the three branches of our Government. But to take this avenue would be to place form over substance. The effect of any injunction entered by this Court enjoining the release of materials by AT&T to the Subcommittee would have the same effect as if this Court were to quash the Subcommittee's subpoena. In this sense the action is one against the power of the Subcommittee and should be treated as such, assuming that Representative Moss has authority to speak for the Subcommittee.[57]

Neither of the court of appeals' opinions reached the ultimate issue on the merits, but the second opinion appears to agree with the executive branch on the *Eastland* issue.[58]

Justice Marshall's concurrence in *Eastland* and the court of appeals' opinion in *United States v. AT&T* notwithstanding, the speech or debate protection should not be limited to cases in which relief is sought against members of Congress and their aides. The reasons for this position can be best appreciated in connection with the somewhat comparable problem of the applicability of executive privilege to information outside the control of the government.

---

57. 419 F. Supp. at 458.

The reach of speech or debate immunity was not dispositive in *AT&T*. The district court held that even though speech or debate is not limited to suits against Congressmen or their aides, and even though *Eastland* imparted to speech or debate a potency that gives it absolute powers of infringement on first amendment rights, it does not necessarily follow that speech or debate powers are similarly absolute when pitted against the constitutionally based prerogatives of another branch. *Id.* at 459-61.

58. The court of appeals' second opinion states:

The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena. *See Eastland,* 421 U.S. at 513, . . . Justice Marshall concurring.

567 F.2d at 129. The court went on to say:

In sum, while this case is similar in several respects to the situation in *Eastland*, . . . for purposes of considering whether the Executive's claim is entitled to at least some judicial consideration, we emphasize that no member of the Subcommittee in the present dispute has been made a defendant in a judicial proceeding. The courts do not accept the concept that Congress' investigatory power is absolute. What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

*Id.* at 130.

Case 1:21-cr-00670-CJN Document 58-27 Filed 04/15/22 Page 21 of 69

## B. *Executive Privilege: Applicability Where the Information Is Not in the Possession of the Government*

One view of executive privilege is that it is a narrowly limited, strictly defensive doctrine, applicable only in circumstances where the executive branch declines to supply information in its possession. On the other hand, executive privilege may be viewed as an affirmative power to prevent disclosure of information whose disclosure would be harmful to the interests of government. In most circumstances, the difference in the two views is of no practical significance, because the information sought is in the executive's possession. This is not always the case, however. In order to carry out certain governmental functions the United States must enter into contracts with private companies and share with them highly secret information. Probably the most common example of this practice is in the manufacture of military equipment, which is frequently accomplished through contracts with private companies. Pursuant to such contracts, the government makes available to the private contractor design data, construction details, and other secret information. Another example is of course the line-leasing arrangement involved in *United State v. AT&T* which required the executive to share the location of its wiretapping activities with the telephone company. In these and other contexts, so long as the government elects not to go into the business of running the nation's telephone service, or building its own national defense hardware, it must enter into contractual arrangements with private entities and often share highly secret information with them. Is that information—which originated from the government, and which would not be in the possession of the private entity but for the governmental function performed by that entity—subject to executive privilege?

The limited judicial authority on this question would appear to answer it in the affirmative. Although the only case squarely on point is *United States v. AT&T,* and none of the opinions in that case discusses the issue, the district court held in favor of the executive. Additionally, the court of appeals' second opinion appears to rest on the premise that the invocation of executive privilege is not impeded by the fact that the information is in nongovernmental possession. And, two earlier cases have implied an affirmative executive privilege to restrain third-party disclosures.

In *E.W. Bliss Co. v. United States,*[59] the Supreme Court

_____

59. 248 U.S. 37 (1918).

affirmed an order enjoining a government contractor "from exhibiting or communicating the construction and operation of a torpedo known as the Bliss-Leavitt torpedo."[60] The government in the *Bliss* case was enforcing an explicit contract, but the Supreme Court quoted with approval this observation of the lower court:

> Throughout the entire record, in the contracts, correspondence and dealings of the parties, the importance of secrecy is everywhere manifest. *The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation.* The very nature of the service makes the construction urged by the defendant untenable.[61]

Similarly, in *United States v. Marchetti*,[62] the Fourth Circuit Court of Appeals upheld an injunctive order against a former CIA official enforcing an agreement not to publish certain information concerning the Central Intelligence Agency.[63] It would thus appear that executive privilege can be used affirmatively to prevent the disclosure of sensitive information in the hands of third parties.

There are similarities between this issue and the issue discussed in Subsection A of this Section, the scope of the speech or debate clause as it relates to congressional investigations. In both instances the issue is raised in cases where a nongovernmental third party is involved: In the speech or debate cases, the private party (rather than Congress) is the potential defendant in a suit

---

60. *Id.* at 39.

61. *Id.* at 46 (emphasis added).

62. 466 F.2d 1309 (4th Cir.), *cert. denied*, 409 U.S. 1063 (1972).

63. The court stated:

[T]he agency requires its employees as a condition of employment to sign a secrecy agreement, and such agreements are entirely appropriate to a program in implementation of the congressional direction of secrecy. Marchetti, of course, could have refused to sign, but then he would have not been employed, and he would not have been given access to the classified information he may now want to broadcast.

Confidentiality inheres in the situation and the relationship of the parties. *Since information highly sensitive to the conduct of foreign affairs and the national defense was involved, the law would probably imply a secrecy agreement had there been no formally expressed agreement,* but it certainly lends a high degree of reasonableness to the contract in its protection of classified information from unauthorized disclosure.

*Id.* at 1316 (emphasis added).

to prevent compliance with the congressional subpoena—the bank in *Eastland*, the telephone company in *AT&T*. In the executive privilege context, the private party (rather than the President) is the one in possession of the information whose disclosure an assertion of executive privilege seeks to prevent. In both settings the question is whether the doctrines are limited to defensive uses, relieving the particular branch from the necessity of taking action that it views as undesirable, or whether the doctrines can also be used to require action or forbearance on the part of someone else. The most important similarity is that in each case the fundamental issue is whether the reach of a constitutionally based doctrine central to the operation of one of the branches of government should be determined by conceptual considerations or by the policy on which the doctrine is founded.

With both speech or debate and executive privilege, the arguments for a narrow interpretation are largely conceptual. In the case of executive privilege, the premise concept is a privilege to refrain from divulging information within one's own control. In the case of speech or debate, the premise concept is an immunity against being joined as a defendant in a lawsuit. On the other hand, policy considerations in both cases eschew a restrictive view. A basic purpose of executive privilege is to permit the President to withhold information whose dissemination, in his considered view, would be sufficiently detrimental to the public interest that such extraordinary action as assertion of executive privilege is warranted. Physical possession of the information is irrelevant to the considerations that the President takes into account. This does not mean that the President can prevent the disclosure of any information in the possession of any private person or entity upon a determination by him that its disclosure would be detrimental to the national interest. Certainly the President could not prevent a private corporation from disclosing information whose existence and development were unrelated to government, no matter how detrimental to governmental interests the disclosure might be. But in cases such as *Bliss, Marchetti,* and *AT&T,* the information came from the government, the only reason that the information is in the possession of the private party is because it is essential to the performance by that private party of a governmental function, and but for the performance of that essential governmental function the information would never have been supplied. In that kind of case the President should have the same power to prevent disclosure as if the information were in the

252   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

possession of one of his subordinates.[64]

Similar policy considerations apply in delineating the scope of the speech or debate clause. The applicability of that constitutional guarantee to congressional investigations should not turn on the fortuity of whether Congress participates in the litigation as plaintiff, defendant, or intervenor. While it is true that in *Eastland* the congressional litigants were defendants, it is also true that the impact on congressional activity (and therefore on speech or debate) will be the same when the executive can prevent third parties from disclosing, without naming Congress as a defendant, as in *AT&T*. Thus, the district court in *AT&T* was correct in concluding that to draw a distinction between members of Congress (or their aides) as defendants and as intervenors "would be to place form over substance."[65]

For these policy reasons, the applicability of either executive privilege or speech or debate should not be foreclosed in those cases where the documents or other information are in the possession of a private party or where the congressional entity participates in the litigation as plaintiff or intervenor. In considering the conflicting interests of the two doctrines, as discussed in Section V, the courts should afford a generous interpretation that will give full effect to the underlying purpose of each.

In fact, however, very few executive privilege-congressional subpoena cases have reached the courts. One of the reasons is that there are significant roadblocks—constitutional and otherwise—to each of the avenues by which such disputes can reach the courts. Some of the problems attendant upon bringing executive privilege-congressional subpoena problems before the courts constitute the subject of Sections III and IV.

---

64. During the early stages of the AT&T litigation, the government relied on an agency theory. The complaint squarely alleged that "defendant AT&T has participated as an agent of the United States in effectuating certain national security investigations." Joint Appendix, *supra* note 9, at 16-17. The agency argument was not pursued beyond the pleading stage, and the agency analogy is not very helpful. Whether an agency relationship exists or not is simply irrelevant to the competing interests on both sides of the information disclosure issue. Mr. Marchetti was quite clearly an agent of the CIA and of the United States. The Bliss Company, at least for purposes of torpedo manufacture, was an agent of the United States. AT&T's agency is more questionable. But the important point is that focusing on the agency issue diverts attention away from the relevant issues, the involvement of the government in the creation of the information, and whether the government as a matter of public interest and constitutional doctrine should be able to prevent its disclosure.

65. 419 F. Supp. at 458.

## III. CONGRESSIONAL ENFORCEMENT POWERS IN EXECUTIVE PRIVILEGE CASES

The typical executive privilege-congressional subpoena conflict arises because the executive has determined not to give information to the Congress. The conflict is usually resolved either by negotiation or by eventual abandonment of the attempt to obtain the information. In a small number of cases, however, a negotiated settlement will not be possible. Since the executive usually has possession of the documents, the next move is up to Congress. There are there three procedures available to Congress to implement its investigatory objective:[66] (1) direct punishment for contempt by the appropriate House of Congress; (2) criminal prosecution by the appropriate United States Attorney under 2 U.S.C. § 194; or (3) a civil suit to enforce the subpoena. Each of these alternatives presents separate but significant hurdles.

### A. Direct Punishment for Contempt

Although the Constitution does not expressly confer upon Congress the power to punish for contempt,[67] Congress' power to do so was early established by Congress itself[68] and also by the Supreme Court. In *Anderson v. Dunn* the Court held that to deny

---

66. Of course Congress has indirect means available for enforcing its will. It can cut off funds or attempt to impeach the President for failure to respond to its wishes. Even an appropriation cutoff, however, is not always successful, as demonstrated by President Eisenhower's response to a cutoff of foreign aid funds because the executive failed to reveal information. Eisenhower simply instructed the Secretary of the Treasury to disregard the cutoff and to draw on federal funds to make the payments. *See* R. BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 306 (1974); C. MOLLENHOFF, WASHINGTON COVER-UP 173-74 (1962).

67. Article I, § 5 of the Constitution deals with such internal affairs as the authority of each House to judge the elections, returns, and qualifications of its members, the constitution of a quorum to do business, compelling the attendance of absent members, punishing members for disorderly behavior, expulsion of members, and adjournment; but it says nothing about punishment for contempt.

68. The first attempt by Congress to respond in an official way to contumacious conduct occurred in 1795. It arose out of an alleged bribery of certain members of the House by Robert Randall and his chief associate, Charles Whitney. Under authority of a warrant signed by the Speaker of the House, Randall and Whitney were arrested and appeared before the bar of the House. Their request to be represented by counsel and for time to prepare a defense was granted, and the full House considered both direct and cross-examination testimony. At the conclusion of the hearing, the House adopted a resolution declaring Randall guilty of contempt, resulting in a reprimand by the Speaker and commitment to the custody of the Sergeant at Arms. He was finally discharged a week later. The Randall-Whitney case is recorded in 5 ANNALS OF CONG. 166-230 (1795). *See* C. BECK, CONTEMPT OF CONGRESS 3, 191 app. (1959). A summary of the major contempt cases initiated between 1795 and 1943 and a list of all prosecutions from 1944 through 1958 are set forth in appendixes A and B of C. BECK, *supra*.

the legislature such powers would lead to "the total annihilation of the power of the House of Representatives to guard itself from contempts, and [leave] it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it."[69] The procedure basically involves a resolution by the affected House of Congress and the subsequent issuance of a warrant signed by its presiding officer. The alleged contemnor is then arrested by the Sergeant at Arms. The accused may be represented by counsel, and may be given time to prepare a defense. The entire House hears the testimony, both direct and cross-examination, and then adopts a resolution as to the guilt or innocence of the accused. If guilt is found, the resolution prescribes an appropriate punishment.[70]

Although the constitutionality of the direct contempt proceeding appears to be well established, there are several reasons why it is not the most appropriate vehicle for the enforcement of a congressional inquiry. There is something unseemly about a House of Congress getting into the business of trial and punishment. Congress is simply not geared to the determination of guilt or innocence or the meting out of punishment for improper conduct. Though the constitutionality of the direct contempt proceeding has been upheld, there is an uncomfortable similarity between the direct contempt proceeding and a bill of attainder. Both involve the legislative branch in determining whether certain conduct should be punished and what punishment is appropriate. It is true that access to the courts is ultimately available through a habeas corpus proceeding, but at least in the first instance it is a House of Congress that determines guilt and prescribes punishment. Moreover, in a case involving an assertion of executive privilege the alleged contemnor is usually a prominent officer of the executive branch. Use of the direct contempt proceeding in that setting might degrade not only the alleged contemnor, but also government in general, including Congress.[71]

---

69. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 228 (1821). *See also Ex parte* Nugent, 18 F. Cas. 471 (C.C.D.D.C. 1848) (No. 10,375). Nugent had obtained and given to the *New York Herald* a copy of the secret treaty between the United States and Mexico. He was called to the bar of the Senate and sworn as a witness, but refused to answer questions concerning his publication. Imprisoned on order of the President of the Senate, Nugent applied, unsuccessfully, for a writ of habeas corpus.

70. *See* C. Beck, *supra* note 68, at 3-5, 191-95 app.

71. Some scholars evidently do not feel that this approach should be avoided.

This need not be regarded as unseemly or punitive but merely as the mechanism that opens the door to judicial review. Once the recalcitrant official is in Congress' custody he can obtain his freedom by filing a petition with a court for a

Finally, the direct contempt proceeding has been virtually replaced by criminal prosecution for contempt. No direct contempt proceeding has been brought since 1945.[72]

### B.  Criminal Prosecution for Contempt

Prior to 1857 the only means for punishing congressional contempt was the direct contempt procedure. In 1857 Congress established contempt as a statutory crime,[73] thus shifting to the courts the major responsibility for determining contempt. Over the intervening century, the 1857 statute has been modified, but its basic provisions have remained the same. The current version, 2 U.S.C. § 192, provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.[74]

---

writ of habeas corpus, which poses the issue of Congress' constitutional power to insist that the information be supplied.

R. BERGER, *supra* note 66, at 310. *But see* Levi, *Some Aspects of Separation of Powers,* 76 COLUM. L. REV. 371, 390 (1976):

> Either course [the direct contempt procedure or statutory prosecution under § 194] would be, at the least, unedifying, the more so when punishment rather than clarification is sought. It would be an attempt by one branch to assert its authority by imposing personal sanctions on officials who seek to perform their duty for another branch equal to the Congress in its responsibility to serve the people. This is neither the level of statesmanship which created our republic, nor is it justified by past abuses. Such an attempt would not rectify abuses; it would supplant them with new ones.

The one arguable advantage of the direct contempt procedure is that there are no barriers to getting the controversy into court. For reasons set forth in Subsection C, I do not regard as salutary the absence of such barriers. The principal disadvantage, discussed above, is that it vests in Congress the initial responsibility for determining guilt or innocence and for imposing punishment. Such functions do not mesh well with congressional structure or duties. The congressional role is to make general policy, not to determine individual wrongdoing. Congress' organization and institutional mind-set is oriented toward the achievement of the former, but not the latter.

72. C. BECK, *supra* note 68, at 7.

73. Act of Jan. 24, 1857, Ch. 19, 11 Stat. 155 (current version at 2 U.S.C. 192 (1970)).

74. 2 U.S.C. § 192 (1970).

Section 192 is a criminal statute. Therefore, in contrast to direct contempt procedures, which are the exclusive province of Congress, implementation of section 192 is the responsibility of the executive branch, carried out by enlisting the machinery of the judiciary. Whenever a violation of section 192 is reported to the appropriate House of Congress, 2 U.S.C. § 194 provides that the President of the Senate or Speaker of the House is to refer the matter "to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."[75] The establishment of a statutory contempt proceeding did not diminish Congress' direct contempt power; it simply provided Congress with an alternative means of dealing with contempts.[76]

Use of the statutory contempt proceeding creates no particular separation of powers problem where the alleged contemnor is a private party. But it is a different case where the alleged contempt results from a government officer's refusal to give testimony or deliver documents on the ground that the information sought is subject to an assertion of executive privilege. Referring that kind of case to "the appropriate United States attorney," who by statute has an unqualified obligation to prosecute, places the Attorney General on the horns of a dilemma. One of the horns is statutory, the other ethical. The "appropriate United States attorney" is an officer of the Justice Department. His file leader is the Attorney General. By statute the conduct of litigation in which the United States is a party (which would of course include section 194 suits) is vested in the Attorney General.[77] Therefore, the command of section 194 to United States attorneys is also a command to the Attorney General. But, ethically, the Attorney General may not be able to obey that command. The assertion of executive privilege by the President is a weighty and solemn matter. Before taking such a step, it is virtually certain that the President will have conferred with his chief legal officer, the Attorney General; indeed, since 1969 this has been a formal requirement by presidential directive.[78] Having consulted the President

---

75. *Id.* § 194.

76. "[T]he purpose of the statute was merely to supplement the power of contempt by providing for additional punishment." Jurney v. MacCracken, 294 U.S. 125, 151 (1935).

77. 28 U.S.C. § 516 (1970).

78. In 1969 President Nixon issued the following memorandum:

The policy of this Administration is to comply to the fullest extent possible with Congressional requests for information. While the Executive branch has the responsibility of withholding certain information the disclosure of which would

about the assertion, the Attorney General could not then ethically bring an action against the President or one of the President's subordinate officers in connection with a matter on which the Attorney General earlier gave his advice as a lawyer.[79]

The statute, however, permits no exceptions: the case is certified to the United States attorney, "whose duty it shall be to bring the matter before the grand jury for its action."[80] Utilizing the statutory procedure in an executive privilege case would therefore force the nation's chief legal officer either to refuse to obey an unqualified statutory command or to bring a criminal prosecution against one whose sole criminal conduct consists of obedience to a Presidential order, in connection with which the

---

be incompatible with the public interest, this Administration will invoke this authority only in the most compelling circumstances and after a rigorous inquiry into the actual need for its exercise. For those reasons Executive privilege will not be used without specific Presidential approval. The following procedural steps will govern the invocation of Executive privilege:

1.  If the head of an Executive department or agency (hereafter referred to as "department head") believes that compliance with a request for information from a Congressional agency addressed to his department or agency raises a substantial question as to the need for invoking Executive privilege, he should consult the Attorney General through the Office of Legal Counsel of the Department of Justice.

2.  If the department head and the Attorney General agree, in accordance with the policy set forth above, that Executive privilege shall not be invoked in the circumstances, the information shall be released to the inquiring Congressional agency.

3.  If the department head and the Attorney General agree that the circumstances justify the invocation of Executive privilege, or if either of them believes that the issue should be submitted to the President, the matter shall be transmitted to the Counsel to the President, who will advise the department head of the President's decision.

4.  In the event of a Presidential decision to invoke Executive privilege, the department head should advise the Congressional agency that the claim of Executive privilege is being made with the specific approval of the President.

5.  Pending a final determination of the matter, the department head should request the Congressional agency to hold its demand for the information in abeyance until such determination can be made. Care shall be taken to indicate that the purpose of this request is to protect the privilege pending the determination, and that the request does not constitute a claim of privilege.

R. Nixon, Memorandum for the Heads of Executive Departments and Agencies: Establishing a Procedure to Govern Compliance with Congressional Demands for Information (Mar. 24, 1969).

79. "A lawyer should never represent in litigation multiple clients with differing interests . . . ." ABA CODE OF PROFESSIONAL RESPONSIBILITY EC 5-15 (1975). "No one could conscionably contend that the same attorney may represent both the plaintiff and defendant in an adversary action." *Id.* n.19 (quoting Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 235, 135 A.2d 252, 254 (1957), *cert. denied*, 355 U.S. 966 (1958)).

80. 2 U.S.C. § 194 (1970).

Attorney General was consulted, and whose issuance he probably counseled.[81]

Referring section 194 cases involving executive privilege to a special prosecutor would not solve the problem. A special prosecutor within the executive branch would have some of the same ethical problems discussed above. Vesting the enforcement of section 192 in a special prosecutor attached to Congress or the courts would raise other serious constitutional questions since the executive branch has exclusive authority and absolute discretion to decide whether to prosecute a case.[82]

A theoretically possible solution—though not an adequate one—might be to establish a special prosecutor with powers analogous to those of an independent regulatory agency, appointed by the President, but not subject to his removal powers. Currently, the conduct of litigation in which the United States is a

81. The dilemma implicit in statutorily mandating the Attorney General to criminally prosecute conduct which he has advised in his capacity as a governmental lawyer arose in 1975 when the problem approached the crisis stage in two cases involving members of the President's Cabinet.

The first case involved an assertion of executive privilege by Secretary Kissinger. The House Select Committee on Intelligence had subpoenaed "[a]ll documents relating to State Department recommending covert action made to the National Security Council and the Forty Committee and its predecessor committees from January 20, 1961. to the present." HOUSE SELECT COMM. ON INTELLIGENCE, REPORT OF THE SELECT COMMITTEE ON INTELLIGENCE CITING HENRY A. KISSINGER, H.R. Doc. No. 693, 94th Cong., 1st Sess. 5 (1975). President Ford asserted executive privilege as to these documents. The House Select Committee then recommended that the Speaker certify its report to the United States Attorney for the District of Columbia "to the end that Henry A. Kissinger, as Secretary of State, may be proceeded against in the manner and form provided by law." *Id.* at 2. In subsequent briefings the information was supplied to the committee, and as a result Chairman Pike reported to the House that "substantial compliance has been achieved" and by unanimous consent the committee's report recommending contempt proceedings was recommitted. 121 CONG. REC. 39730 (1975).

The second case arose at about the same time. On Nov. 11, 1975, the Subcommittee on Oversight and Investigations of the House Interstate and Foreign Commerce Committee voted to recommend to the full committee that Secretary of Commerce Rogers Morton be cited for contempt for refusing to deliver to the subcommittee documents concerning compliance by American companies with the Arab boycott. Secretary Morton's position was not based on executive privilege, but was grounded in part on an opinion from the Attorney General that the subcommittee was not entitled to receive the reports in question unless, in exercising the discretion granted him by § 7(c) of the Export Administration Act, 50 U.S.C. app. § 2406(c) (1970), the Secretary determined that withholding them would be contrary to the national interest. Once again, crisis was averted through negotiation, this time on the eve of a full committee vote. *See Contempt Proceedings Against Secretary of Commerce, Rogers C. B. Morton including Hearings and Related Documents Before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce*, 94th Cong. 1st Sess. (1975).

82. *See* United States v. Nixon, 418 U.S. 683, 694 (1974); Confiscation Cases, 74 U.S. (7 Wall.) 454 (1869); United States v. Cox, 342 F.2d 167, 171 (5th Cir.), *cert. denied*, 381 U.S. 935 (1965).

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 31 of 69

party—which of course includes criminal litigation—is vested in the Attorney General.[83] This could be changed by statute. There is at least some question, however, whether a function located as close to the core of executive responsibility as enforcement of a criminal statute could constitutionally be vested in an entity possessing an element of insulation from the executive branch comparable to the independent regulatory agencies. Moreover, as a matter of practical policy and politics, it is highly doubtful that Congress would create a special prosecutor with such independent powers in order to solve a problem that exists only in theory, and has never ripened into an actual prosecution in spite of the fact that the statute has been in existence for almost a century and a quarter.

The best solution would be to interpret the mandatory language of section 194 as inapplicable to executive privilege cases or any other cases in which the allegedly contumacious conduct consists of obedience to legal advice given by the Attorney General. Although on its face the statutory language permits no such exception, and there is nothing in the legislative history to indicate that Congress thought about this problem, it is certainly not an unreasonable interpretation in light of the wrenching effect that a literal reading of section 194 would have on separation of powers problems and the Attorney General's ethical responsibilities. The scope of this exception would be limited, and nonapplicability of section 192 within such a limited sphere does not offend basic notions of fair play. At issue is not the general power of the executive branch to punish violations of criminal statutes by persons within the executive branch. The Justice Department clearly possesses and exercises that power. But when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

---

83. 28 U.S.C. § 516 (1970).

260    BRIGHAM YOUNG UNIVERSITY LAW REVIEW        [1978:

There is such an alternative: a civil suit to enforce a congressional subpoena ordering delivery of the desired information. Assuming a continuation of congressional declination to use its direct contempt powers, this is the only feasible vehicle by which conflicts between congressional investigative powers and Presidential assertions of executive privilege can be resolved.

### C.  Civil Enforcement of Congressional Subpoenas

Even though civil enforcement is the preferred route to the resolution of executive privilege-congressional subpoena disputes (assuming the failure of negotiation), such a procedure also raises constitutional questions. Does the initiation of a civil suit by Congress constitute a usurpation of the executive's law enforcement function? Does a federal court have jurisdiction to decide the issue? And, assuming that the court has jurisdiction, is the issue justiciable? The law enforcement and jurisdiction issues are discussed in this Section, while the broader justiciability issue is discussed in Section IV.

### 1.  Congressional suit as law enforcement

The constitution declares that the President "shall take Care that the Laws be faithfully executed."[84] The Supreme Court reaffirmed, in *Buckley v. Valeo*, that the executive responsibility includes bringing litigation to implement federal policy: "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' Art. II § 3."[85] One issue that must be faced, therefore, is whether a civil suit to enforce a congressional subpoena is an unconstitutional usurpation of the executive's law enforcement responsibility. Analogies can be drawn to direct contempt proceedings, the constitutionality of which has been upheld. On one hand, civil action, unlike direct contempt, requires the filing of a lawsuit enlisting the federal judicial machinery in the vindication of congressional interests. In this sense civil action involves an element of enforcement not present in direct contempt cases. On the other hand, while either civil enforcement or direct contempt proceedings may be used to obtain information, direct contempt involves the infliction of punishment for offenses against

84. U.S. Const. art. II, § 3.
85. 424 U.S. 1, 138 (1976).

a governmental entity. In this respect direct contempt bears a closer resemblance to law enforcement than does a civil proceeding to enforce a subpoena.

The controlling consideration, however, is that civil enforcement suits, like direct contempt and unlike bills of attainder or law enforcement, generally are brought for the sole purpose of vindicating internal congressional prerogatives, not enforcing criminal statutes or other laws or policies of the United States. A civil proceeding to enforce a subpoena is not a suit "vindicating public rights"[86] or implementing official federal policy; seen in that light, such a proceeding is not forbidden by the Court's holding in *Buckley v. Valeo.* Additionally, it has been held that a Congressman has a right to sue in his representative capacity as a Congressman to enforce rights inherent in his position, and from this right a congressional power to bring civil enforcement suits can be extrapolated. *Kennedy v. Sampson*[87] held that because of his interest in protecting the effectiveness of his vote, Senator Kennedy had standing to challenge an attempted "pocket veto" of a bill for which he had voted. Similarly, in *Mitchell v. Laird*[88] the Court of Appeals for the District of Columbia Circuit held that a Congressman had standing to challenge executive action taken in prosecuting the war in Indochina without congressional approval. While standing is a separate issue from separation of powers, the constitutionality of civil enforcement actions would seem to follow a fortiori from the holding in *Kennedy* and *Mitchell.* In those cases lawsuits were initiated by individual members of Congress, and the courts entertained them even though they involved vindication of public policy because the suits related to the performance of their duties as Congressmen. If individual Congressmen can sue, certainly Congress itself can authorize a similar remedy, so long as the suit is for vindication of interests internal to Congress, and not for enforcement of general national policy.[89]

86. *Id.* at 140.

87. 511 F.2d 430 (D.C. Cir. 1974). *See also* Kennedy v. Jones, 412 F. Supp. 353 (D.D.C. 1976); Note, *Congressional Access to the Federal Courts,* 90 HARV. L. REV. 1632 (1977); Comment, *Congressional Standing to Challenge Executive Action,* 122 U. PA. L. REV. 1366 (1974); Note, *Standing to Sue for Members of Congress,* 83 YALE L.J. 1665 (1974).

88. 488 F.2d 611 (D.C. Cir. 1973). *Cf.* Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973), *cert. denied,* 416 U.S. 936 (1974) (holding that a Congresswoman did not have standing to obtain an injunction against United States participation in military activities in or over Cambodia).

89. The court of appeals in its first *AT&T* opinion observed: "It is clear that the

### 2. *Jurisdiction*

Another impediment to a civil enforcement action is federal court jurisdiction to entertain it. The only authority on the subject to date is the district court's opinion in *Senate Select Committee on Presidential Campaign Activities v. Nixon.*[90] In that case Judge Sirica held that such jurisdiction is not supported by any general jurisdictional statute. *Senate Select Committee* was a suit by the Senate Select Committee and its chairman, Senator Ervin, to compel compliance with two subpoenas: one seeking certain tapes, and the other requiring the production of certain documents and other materials the committee considered relevant to its investigation. The plaintiffs "deliberately chose not to attempt an adjudication of the matter by resort to a [criminal] contempt proceeding . . . or via Congressional common law powers which permit the Sergeant at Arms to forcibly secure attendance of the offending party."[91]

Four jurisdictional bases were urged by the plaintiffs: 28 U.S.C. § 1345[92] (suits by the United States as plaintiff), 28 U.S.C. § 1361[93] (suits in the nature of mandamus to compel an officer of the United States to perform his duty), 5 U.S.C. §§ 701-706[94] (the Administrative Procedure Act), and 28 U.S.C. § 1331[95] (the "federal question" jurisdictional statute). Judge Sirica rejected all four grounds: section 1345 because 28 U.S.C. § 516 "reserves to the Attorney General and the Department of Justice authority to litigate as United States,"[96] the mandamus statute because "the Court cannot in good conscience hold that any duty defendant may have as President is 'plainly defined as preemptory,' "[97] and the Administrative Procedure Act because "the rule in this Circuit precludes use of this Act altogether as an independent basis of jurisdiction."[98] Federal question jurisdiction was unavailable because the case was not "capable of valuation in dollars and cents"[99] and thus failed to satisfy the requirement that the

House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391.
90. 366 F. Supp. 51 (D.D.C. 1973).
91. *Id.* at 54.
92. (1970).
93. (1970).
94. (1970).
95. (1970).
96. 366 F. Supp. at 56.
97. *Id.* at 57.
98. *Id.* at 58 (footnote omitted).
99. *Id.* at 59.

amount in controversy exceed the sum or value of $10,000. Since "[n]o jurisdictional statute known to the Court, including the four which plaintiffs name[d], warrant[ed] an assumption of jurisdiction,"[100] the action was dismissed.

While the appeal in the *Senate Select Committee* case was pending, Congress passed a special statute conferring jurisdiction on the District Court for the District of Columbia over any civil action brought by the Senate Select Committee "to enforce or secure a declaration concerning the validity of any subpoena."[101] After the new statute took effect, the court of appeals remanded[102] the case to the district court which ruled against the committee on other grounds.[103] An appeal was taken only as to the subpoena seeking the tapes, but the court of appeals did not reach the jurisdictional issue.[104]

The solution to the jurisdictional problem in *Senate Select Committee* may seem to suggest that it would be advisable to enact a general statute conferring jurisdiction on federal courts over all civil suits to enforce congressional subpoenas.[105] Disputes over congressional subpoenas typically involve issues of law—issues that touch on the most fundamental powers of two branches of government. Does it not follow that disputes of such magnitude should be regularly resolved by the third branch, whose powers are not directly at issue and whose core functions include interpretation of the laws and the Constitution and the resolution of disputes?

---

100. *Id.* at 61.

101. Act of Dec. 18, 1973, Pub. L. No. 93-190, 87 Stat. 736 (1973).

102. *See* Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 727-28 & *n.*11 (D.C. Cir. 1974).

103. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 370 F. Supp. 521 (D.D.C.), *aff'd,* 498 F.2d 725 (D.C. Cir. 1974) (ruling on the subpoena requesting the tapes); *id.* at 522 n.1 (ruling on the subpoena requesting the documents).

104. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974).

105. Indeed, somewhat comparable legislation has been proposed. During the 93d Congress, a bill was introduced containing the following provision:

The District Court for the District of Columbia shall have original, exclusive jurisdiction for any civil action brought by either House of Congress, a joint committee of Congress, or any committee of either House of Congress with respect to any claim of executive privilege asserted before either such House or any such joint committee or committee.

*Hearings Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations and the Subcomms. on Separation of Power and Administrative Practice and Procedure of the Senate Comm. on the Judiciary,* 93d Cong., 1st Sess. 534-35 (1973) (S. 2073, § 1364). A companion section of the bill authorized any Senate, House, or joint committee to bring suit to contest claims of executive privilege. *Id.* at 536-37 (§ 3103).

264   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

On balance, I think not.

There is an observable reluctance on the part of both the article I and article II branches to submit issues for resolution by the third branch that go to the core of their respective constitutional authority. This may be due in part to interbranch territorial instincts or to a residual discomfort over some of the implications of *Marbury v. Madison*.[106] Whatever the reason for this reluctance, the result contributes to good government. Notwithstanding the judiciary's final authority in matters of constitutionality, all three branches are concerned with constitutional issues which they are called upon to resolve as a regular part of their duties. Moreover, it is in the interest of each branch individually—and in the interest of the nation as a whole—that disputes concerning overlapping or allegedly inconsistent powers conferred by article I and article II be resolved, if possible, by the branches whose powers are implicated. This is not only because negotiated settlements are usually more effective than litigation in accommodating the competing interests of both sides,[107] whether in the government or nongovernment context. It is also because there is something of an inverse relationship between the effectiveness of article III's heavy artillery for dispute resolution and the frequency of its use. Particularly in areas involving conflicts over interbranch powers, saving the judiciary for the few cases in which Congress and the President are absolutely unable to resolve their own differences will sharpen the issues that must go to litigation and will magnify respect for the judicial decision in the rare case in which it must be rendered.

Recognition of the superiority of a negotiated settlement over a judicially imposed settlement appears to be an underlying premise of the court of appeals' approach in both of its opinions in *United States v. AT&T*. The facts of that case illustrate the correctness of the premise. The competing interests of the two branches in *AT&T* were, on the one hand, the need to protect foreign intelligence secrets, and on the other, the need for information relevant to possible legislation. The depth and breadth of those needs are matters that lie peculiarly within the expertise of the executive and legislative branches. The extent to which the provisions of a judicial decree might adversely affect these or other important governmental interests are also peculiarly within

---

106. 5 U.S. (1 Cranch) 137 (1803).

107. *See* Levi, *Some Aspects of Separation of Powers,* 76 COLUM. L. REV. 371, 385-86 (1976); Comment, United States v. AT&T: *Judicially Supervised Negotiation and Political Questions,* 77 COLUM. L. REV. 466 (1977).

the ken of the disputants. While the approach taken by the court
of appeals in *AT&T* does not mesh nicely with traditional judicial
forms or procedures, it does combine judicial creativity and flexi-
bility with the fundamental values of judicial restraint. The por-
tions of the second opinion dealing with the steps that the district
court is to take in implementing the court of appeals' decision
demonstrate the essentially nonjudicial aspects of the task.[108] The
skills that this opinion requires of the district court are more the
skills of the mediator, or even the manager, than the federal
judge. And yet, just as the court of appeals' approach is charac-
terized by creativity and flexibility, it also achieves the funda-
mental values of judicial restraint. There was a dispute between
parties to a lawsuit. Based upon applicable precedents, the court
correctly held that it was a justiciable case or controversy under
article III of the Constitution. The court discharged its responsi-
bility to resolve the controversy by utilizing its judicial power
only to the minimum extent necessary, leaving the maximum
opportunity for the parties before it—its sister branches of gov-
ernment—to apply their own superior knowledge concerning their
own peculiar needs. This is the essence of judicial restraint.

Ironically, then, it is not in the interest of good government
to make it easier for two coordinate branches to have differences
over their respective constitutional powers readily resolved by the
third. Accordingly, enactment of a statute generally conferring
federal court jurisdiction over the enforcement of congressional
subpoenas would not be in the public interest. Such disputes are
best resolved by ad hoc enactment of narrow jurisdictional stat-
utes such as the Senate Watergate Committee obtained. Direct
punishment should be left in its present dormant state, and 2
U.S.C. § 194 should be used only for non-executive-privilege cases
which do not confront the Attorney General with the dilemma
discussed above. With the only avenue for judicial relief in execu-
tive privilege-congressional subpoena confrontations requiring an
act of Congress, the pressure on both sides[109] to reach a negotiated
settlement will be just about right—not insuperable, as the Sen-
ate Watergate Committee experience shows, but nevertheless suf-
ficient to provide real incentive.

The preferability of negotiation over adjudication as a means

108. 567 F.2d at 131-32. *See* text accompanying note 33 *supra*.

109. In one sense, the "pressures" are greater on Congress, because the disputed
information is in the possession of the executive branch. It is Congress, however, that can
elect judicial resolution as an alternative to a negotiated settlement by enacting a jurisdic-
tional statute.

of settling interbranch disputes is also fundamental to the issues
of the justiciability of such disputes. These issues are the subject
of Section IV of this Article.

## IV.  JUSTICIABILITY OF EXECUTIVE PRIVILEGE-CONGRESSIONAL SUBPOENA CONFLICTS

Whether a conflict between a President's exercise of execu-
tive privilege and a congressional assertion of investigative power
is a justiciable "case or controversy"[110] that the federal courts are
authorized by article III to adjudicate depends principally on
whether such an issue is a "political question." In 1958, when the
reach of the political question doctrine was far broader than it is
today, no lesser an authority than Judge Learned Hand expressed
the view that such a dispute between two branches of government
was a clear example of a nonjusticiable constitutional question.[111]

The leading case dealing with the political question issue,
*Baker v. Carr*,[112] contains a general statement that "it is the rela-
tionship between the judiciary and the coordinate branches of the
Federal Government, and not the federal judiciary's relationship
to the States, which gives rise to the 'political question.' "[113] Judi-
cial accommodation of the doctrines of executive privilege and
congressional subpoena power fits rather neatly within the
Court's general description, "the relationship between the judici-
ary and the coordinate branches of the Federal Government."
Necessarily, however, any time the federal courts are called upon
to determine the scope of the constitutional authority of a coordi-
nate branch, "the relationship between the judiciary and the co-
ordinate branches of the Federal Government" is involved. On
several occasions over the past half century, the Court has been
required to make decisions having the effect of allocating author-
ity between the legislative and executive branches. *A.L.A.
Schechter Poultry Corp. v. United States*[114] and *Panama Refining*

110. *See* U.S. CONST. art. III, § 2, cl. 1. In earlier years a dispute between Congress
and the executive might have been thrown out of court on the grounds that the same
party—the United States—cannot be both plaintiff and defendant. The Gray Jacket, 72
U.S. (5 Wall.) 342, 371 (1866) (Treasury Department could not ordinarily oppose the
Attorney General). In recent years, however, the courts have entertained intergovern-
mental suits. *See, e.g.*, United States *ex rel* Chapman v. Federal Power Comm'n, 345 U.S.
153 (1953); ICC v. Jersey City, 322 U.S. 503 (1944). *See also* R. BERGER, *supra* note 66, at
313-20.

111. L. HAND, THE BILL OF RIGHTS 15-18 (1962).

112. 369 U.S. 186 (1962) (holding that equal protection challenges to legislative ap-
portionment were justiciable).

113. *Id.* at 210.

114. 295 U.S. 495 (1935) (invalidating as an unconstitutional delegation of legislative

*Co. v. Ryan*[115] involved allocations of constitutional power between the Congress and the President where there was no dispute between the branches. *Buckley v. Valeo,*[116] *Youngstown Sheet & Tube Co. v. Sawyer,*[117] *United States v. Lovett,*[118] *Humphrey's Executor v. United States,*[119] and *Meyers v. United States*[120] all involved, in one form or another, issues of allocation of authority between Congress and the President that the third branch was called upon to resolve. These are the clearest kinds of cases involving "the relationship between the judiciary and the coordinate branches of the Federal Government."

*Baker v. Carr* also described some of the characteristics "[p]rominent on the surface of any case held to involve a political question."[121] They are,

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[122]

The "lack of judicially discoverable and manageable standards

---

powers portions of the National Industrial Recovery Act authorizing the President to approve "codes of fair competition").

115. 293 U.S. 388 (1935) (striking down the "Petroleum Code" of the National Industrial Recovery Act as excessive delegation of legislative powers to the executive).

116. 424 U.S. 1 (1976) (holding that Congress may not appoint federal executive officers, in this case, members of a federal elections commission; the power to appoint officers of the United States is an article II executive power and the Constitution prohibits Congress from performing that function).

117. 343 U.S. 579 (1952) (invalidating a Presidential order nationalizing the steel industry as a usurpation of the lawmaking authority of Congress).

118. 328 U.S. 303 (1946) (invalidating as a bill of attainder a provision of an appropriation bill requiring that no funds could be used to compensate three named government employees).

119. 295 U.S. 602 (1935) (holding that Congress could limit the President's power to remove members of the Federal Trade Commission, an independent regulatory agency).

120. 272 U.S. 52 (1926) (holding that Congress could not constitutionally prohibit the President from removing executive officers).

Powell v. McCormack, 395 U.S. 486 (1969), another prominent political question case, dealt solely with the issue of congressional power asserted with respect to internal congressional affairs, and did not implicate the powers of the executive branch.

121. 369 U.S. at 217.

122. *Id.*

for resolving" the issue and the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" would appear particularly descriptive of executive privilege-congressional subpoena confrontations. In the few instances in which federal courts have faced such issues, however, they have decided them. A conflict between a congressional subpoena and a Presidential assertion of executive privilege was involved in *Senate Select Committee on Presidential Campaign Activities v. Nixon.*[123] Neither the court of appeals nor the district court opinions in that case discussed justiciability, but both courts reached the merits. Necessarily, therefore, both held the case justiciable.[124]

Although the *Senate Select Committee* decisions were rendered prior to *Eastland's* very deferential treatment of congressional activities,[125] the same conflict between executive privilege and congressional investigations was involved in *United States v. AT&T* and, in that case, both courts held it justiciable. The court of appeals dealt at length with the justiciability issue in its second opinion. The court first noted that the Constitution did not commit the resolution of the issue to either branch.[126] It then rejected both the executive's claim that the "Constitution confers on the executive absolute discretion in the area of national security"[127] and Congress' claim that the speech or debate clause prevented judicial interference with its actions.[128] As to the question whether the court should abstain for lack of "judicially discoverable and manageable standards," the court concluded that negotiations

---

123. 498 F.2d 725 (D.C. Cir. 1974). This appeal involved only the subpoena seeking disclosure of certain tape recordings. No appeal was taken from the district court's earlier order quashing a subpoena seeking certain records and documents. *See* notes 102-04 and accompanying text *supra.*

124. Judge Wilkey took the position that the case presented a nonjusticiable political question; however, because that conclusion was foreclosed by the court's earlier holding in Nixon v. Sirica, 487 F.2d 700 (1973), he concurred in the court's opinion. 498 F.2d at 734 (Wilkey, J., concurring).

125. *See* notes 44-58 and accompanying text *supra.*

126. 567 F.2d at 126.

127. *Id.* at 128. The court noted that the Constitution confers powers related to national security upon both the President and Congress, and that "the question of allocation of powers associated with foreign affairs and national security" falls within a "zone of twilight" in which the President and Congress share authority. *Id.*

128. *Id.* at 128-29. In refuting Congress' claim that the speech or debate clause immunized congressional action from judicial interference, the court relied upon *Senate Select Committee* and the *Eastland* Court's observation that in prior cases the Court had balanced congressional investigatory powers against first amendment rights. *Id.* at 129. *See* note 51 *supra.*

between the parties had "largely obviated this problem by bring-
ing into sharper focus the needs of the parties."[129]

The Court in *United States v. Nixon* observed in connection
with the justiciability argument in that case that "[i]n the Con-
stitutional sense, controversy means more than disagreement and
conflict; rather it means the kind of controversy courts tradition-
ally resolve."[130] If "the kind of controversy courts traditionally
resolve" means historic judicial practice and not just frequency
of occurrence, it would seem quite clear that *United States v.
Nixon* also supports the view that article III authorizes judicial
resolution of disputes concerning allocation of authority between
the article I and the article II branches.[131] The instances in which
such disputes have reached the courts have been rare. But when
they have, the courts historically have resolved them, as illus-
trated by the cases discussed above.

The controversy in *Nixon* was between two officials of the
executive branch. Other things being equal, the case for justicia-
bility of an intrabranch dispute is harder than that of a dispute
between coordinate branches of government. Most of the criteria
prescribed by *Baker v. Carr*—including particularly "the impos-
sibility of deciding without an initial policy determination of a
kind clearly for nonjudicial discretion" and "the potentiality of
embarrassment from multifarious pronouncements by various
departments on one question"[132]—are clearly more pronounced
when the dispute involves only a single branch. Disagreements
between two executive departments or two committees of Con-
gress would seem clearly nonjusticiable under the *Baker v. Carr*
guidelines and under the dictates of common sense. In an intra-
branch dispute there is a final, nonjudicial authority over the
disputants (the President or the congressional leadership) and
the controversy should be resolved within the branch in which it
arises. Even so, *United States v. Nixon* and *Powell v.*

129. 567 F.2d at 127.

130. 418 U.S. at 696.

131. Professor Archibald Cox takes a different view as to the meaning of this phrase:
But the Chief Justice probably meant to limit these sentences by the preceding
sentence which points out that the evidence whose production is sought and
resisted is "deemed by the Special Prosecutor to be relevant and admissible in
*a pending criminal case*"—an element that satisfied the need for the "kind of
controversy courts traditionally resolve."

Cox, *Executive Privilege*, 122 U. PA. L. REV. 1383, 1423-24 (1974) (emphasis in original)
(footnote omitted).

132. 369 U.S. at 217.

*McCormack*[133] were both intrabranch controversies that were held justiciable. In those cases, however, the concept of an intrabranch final authority was inapplicable because the President in *Nixon* and the congressional leadership in *McCormack* were parties to the disputes. Moreover, there is serious question whether *United States v. Nixon* would have been justiciable absent the regulation delegating authority "to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure."[134]

Professor Cox argues that "[t]he absence of a material private stake in the outcome may prove . . . important"[135] to the justiciability issue. He points out that in *Schechter Poultry, Panama Refining, Meyers, Humphrey's Executor, Youngstown Sheet & Tube,* and *Lovett* "[e]ach of the . . . cases was brought by or against a state or a private person who had a material stake in the outcome."[136] By contrast, he points out, "[t]he named parties in an action to enforce a subpoena against a claim of executive privilege might be the Congress or a congressional body and the President."[137] It is probably true that there will be some kind of private stake in the outcome in most cases (other than executive privilege-congressional subpoena conflicts) wherein the underlying issue concerns the distribution of power between two branches of government. This was true in *Powell v. McCormack,* as well as in the cases cited by Professor Cox. It was technically true in *United States v. AT&T,* though the interest of the telephone company in that case was only a formal one.[138] But, the presence of a private stake in the outcome of interbranch disputes should have no bearing on justiciability. No more important questions come before federal courts than how the Constitution distributes power among the branches of government. The com-

133. 395 U.S. 486 (1969).

134. 418 U.S. at 694 (footnote omitted).

135. Cox, *supra* note 131, at 1423.

136. *Id.*

137. *Id.*

138. Professor Cox seems to argue that even in *United States v. Nixon* there was something like a private controversy. *Id.* at 1423-24. He finds significant the language of the opinion describing the evidence at issue as "deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case." 418 U.S. at 697. In my view, the interest of the special prosecutor did not impart to *United States v. Nixon* "a material private stake in the outcome." However his peculiar relation to the executive branch is defined, the special prosecutor was clearly an officer of government and an officer of the executive branch. He was performing functions that no one outside the executive branch could constitutionally perform. Buckley v. Valeo, 424 U.S. 1, 138 (1976). And his interest in the litigation rested exclusively on his official governmental responsibilities.

parative magnitude of the relevant governmental interests do not
vary in the slightest according to whether some private party also
has a stake in the outcome. Therefore, the existence or nonexis-
tence of private interests should be irrelevant to the justiciability
question.

A characteristic of executive privilege-congressional sub-
poena cases that arguably cuts against justiciability is that with-
holding judicial relief will not result in failure of resolution. The
case will usually be resolved by the President's deciding to com-
ply or not comply with the subpoena. While the President is an
elected officer and is presumed to act in the public interest, this
approach is not at all satisfactory because it commits the resolu-
tion of the dispute to one of the disputants.[139] Moreover, where,
as in *AT&T*, the documents at issue are in the possession of a
private corporation, a holding of nonjusticiability shifts the effec-
tive decisional authority, not to a governmental entity, but to a
corporation which has neither an interest in the dispute nor any
reason to have considered—much less weighed—the competing
governmental values.

There is another characteristic—unique to executive
privilege-congressional subpoena cases—which, taken alone,
makes the case for justiciability of such disputes more difficult
than in other instances where the judiciary is called upon to re-
solve competing claims to constitutional authority by its sister
branches. For reasons discussed in Section V below, the prefera-
ble method for judicial resolution of executive privilege-
congressional investigation conflicts is to have the courts balance
the competing interests without creating a presumption in favor
of either. Admittedly, that kind of balancing will significantly
involve the federal courts in reexamining underlying policy
choices in substantive areas quite clearly committed to one or
both of the other branches of government. It is, however, the
alternative that is most consistent, both in theory and in applica-
tion, with underlying separation of powers precepts. In this re-
spect, the issue of justiciability is closely linked to the final issue

---

139. The court of appeals in its second *AT&T* opinion stated:

Where the dispute consists of a clash of authority between two branches, how-
ever, judicial abstention does not lead to orderly resolution of the dispute. No
one branch is identified as having final authority in the area of concern. If the
negotiation fails—as in a case where one party, because of chance circumstance,
has no need to compromise—a stalemate will result, with the possibility of
detrimental effect on the smooth functioning of government.

567 F.2d at 126.

to be discussed by this Article: If federal courts are constitutionally empowered to resolve confrontations between assertions of executive privilege and exercise of congressional investigatory powers, by what standards should they perform that task? The final discussion of justiciability will therefore be deferred and considered in connection with the issue of appropriate judicial standards.

### V.   STANDARDS FOR JUDICIAL RESOLUTION OF INTERBRANCH EXECUTIVE PRIVILEGE-CONGRESSIONAL SUBPOENA CONFLICTS

One approach to constitutional law is to divide the entire field into two broad components. The first deals with the powers of government, state or federal, and the second with the protection of individual interests against the exercise of those governmental powers. The lines separating the two are not always rigid. The diffusion of power and authority among the three branches, as well as between the national and state governments, helps to assure against arbitrary infringement of individual rights by lessening the concentration of power in any one group, and by setting off some governmental entities as checks and balances against the powers of others.

This view of constitutional law as divisible into two broad categories is helpful in determining the proper standards by which federal courts should decide cases involving conflicts between executive privilege and congressional investigations. Such conflicts fall within the realm of the first category of constitutional law, the powers of government. Determination of the proper standards for resolution of these conflicts, however, is aided by examination of the judicial struggles and the results of those struggles in connection with the second category, the protection of individual interests against the exercise of governmental powers.

In attempting to achieve a constitutional accommodation of governmental-societal and individual interests, the courts have used a single overarching approach. That approach has been to balance in some fashion the competing sets of interests—those of the individual, and those of society (as determined by society's elected legislative representatives). Not all of the opinions describe their approach as involving balancing, and in most cases the balancing has not been evenhanded in the sense that the inquiry is usually not whether the interests on the one side or the other preponderate. Rather, the courts generally inquire into whether the interests on one side are sufficient to overcome a

predetermined weighting favoring the other. But it is a balancing approach in the sense that the conflicting interests of the individual and society are reconciled by taking into account in some fashion the comparative strengths of those conflicting interests in each particular case. Indeed, the only alternative to some kind of balance between governmental and individual interests is an absolutist, per se approach, which would prescribe that in certain contexts either the legislative decision will always be honored or the constitutionally recognized individual rights will always be protected. While the absolutist approach has been advocated in cases involving individual versus societal interests,[140] it has rarely if ever been followed.

The question has not been whether to balance, but how. Some of the most important issues over the long range of our experience with constitutional adjudication have concerned the weighting of the balance scales either in favor of the individual or the government. This weighting is not that which results from a consideration of the merits of the individual case, but rather that which occurs before the court reaches the merits for all cases of that kind, so that in the particular case one side or the other will have more than a fifty-fifty burden to overcome.

In areas where there have been a substantial number of cases involving a conflict between governmental and individual interests—including the first amendment, equal protection, due process, and the commerce clause—this pre-merits weighting has occurred. Some of the most important developments in American constitutional history have centered on whether the weighting should favor government or the individual. In determining the constitutionality of state-imposed burdens on interstate commerce resulting from exercises of the police power, the balance scales were at one time weighted heavily in favor of the legislative judgment.[141] The weighting probably still favors state government, though not as much as before.[142] In cases involving the first

---

140. Its most vigorous advocates in recent years have been Justices Black and Douglas, who have argued for such an approach in favor of government in commerce clause cases, *see. e.g.,* Southern Pac. Co. v. Arizona, 325 U.S. 761, 789 (1945) (Black, J., dissenting); *id.* at 795 (Douglas, J., dissenting); J. HELLERSTEIN & W. HELLERSTEIN, STATE AND LOCAL TAXATION, 250-51 (4th ed. 1978), and in favor of the individual in first amendment cases, *see. e.g.,* Konigsberg v. State Bar, 366 U.S. 36, 64-74 (1961) (Black, J., dissenting); Black, *The Bill of Rights*, 35 N.Y.U. L. REV. 865, 867, 875-81 (1960). *See also* Brandenburg v. Ohio, 395 U.S. 444, 450-57 (1969) (Douglas, J., concurring). On the general issue of the absolutist versus the balancing approach see L. TRIBE, AMERICAN CONSTITUTIONAL LAW 582-84 (1978).

141. South Carolina Highway Dep't v. Barnwell Bros., 303 U.S. 177 (1938).

142. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 524 (1959): "These safety

---

amendment and other "fundamental" rights, the pre-merits weighting favors the individual.[143] In substantive due process cases, individual interests, both economic and noneconomic, were given a heavy preference for many years.[144] At least as to economic matters this has now been reversed, and the judicially imposed weighting favors the government;[145] indeed, the opinions in some cases even suggest an absolutist standard.[146] As to certain noneconomic matters, the eradication of the earlier substantive due process approach is less clear.[147] In equal protection cases the general rule has been for many years,[148] and still is,[149] that the state may distinquish among persons or classes so long as the distinction is not irrelevant to the achievement of a legitimate state objective. Two exceptions have been rather firmly established, however. If either (1) the classification itself falls into a "suspect" category,[150] or (2) the individual interest affected is "fundamental,"[151] the weighting is reversed and the balance scale, prior to consideration of the merits of the individual case, is tipped in favor of the individual. Thus, the consistent judicial approach to cases constituting one of the two broad components of constitutional law—the accommodation of individual and gov-

measures carry a strong presumption of validity when challenged in court." Southern Pac. Co. v. Arizona, 325 U.S. 761, 770 (1945): "There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce."

143. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621 (1969); Shapiro v. Thompson, 394 U.S. 618 (1969); Sherbert v. Verner, 374 U.S. 398 (1963).

144. Pierce v. Society of Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923); Coppage v. Kansas, 236 U.S. 1 (1915); Adair v. United States, 208 U.S. 161 (1908); Lochner v. New York, 198 U.S. 45 (1905); Allgeyer v. Louisiana, 165 U.S. 578 (1897).

145. Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421 (1952); West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937); Nebbia v. New York, 291 U.S. 502 (1934).

146. Ferguson v. Skrupa, 372 U.S. 726, 731 (1963): "Unquestionably, there are arguments showing that the business of debt adjusting has social utility, but such arguments are properly addressed to the legislature, not to us." Williamson v. Lee Optical Co., 348 U.S. 483, 487 (1955): "The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement."

147. Vlandis v. Kline, 412 U.S. 441 (1973); Roe v. Wade, 410 U.S. 113 (1973); Griswold v. Connecticut, 381 U.S. 479 (1965). See also Constitutional Law Symposium: Allocation of Policymaking Authority Between Court and Legislature, 1976 B.Y.U. L. Rev. 37.

148. McGowan v. Maryland, 366 U.S. 420 (1961); Kotch v. Board of River Pilot Comm'rs, 330 U.S. 552 (1947).

149. Mathews v. De Castro, 429 U.S. 181 (1976).

150. The categories which have been defined as "suspect" include race, alienage, and national origin. Graham v. Richardson, 403 U.S. 365, 371-72 (1971). But see Foley v. Connelie, 98 S. Ct. 1067 (1978) (holding that limiting state police appointments to U.S. citizens does not violate equal protection rights of aliens).

151. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 626 (1969).

ernmental interests—has been to balance and to identify in advance of the balance which set of interests is to be preferred.

In those cases involving conflicts between governmental interests and individual interests, there are sound theoretical and practical reasons for pre-merits weighting of the balance scales. The practical reason is that cases calling for a choice between competing interests are easier to decide if the court is called upon, not to decide which of the two is in fact heavier, but whether one is sufficiently heavy to overcome a predetermined handicap. The theoretical support for a pre-merits weighting of governmental-versus-individual-interests cases is that the competing interests are of different quality and come from readily distinguishable sources. With the governmental set of interests being rooted in a legislative judgment and the individual set of interests in the Constitution, good arguments can be made for preferring either.

The basic argument for weighting the scale in the individual's favor is that his position is based on the Constitution and is therefore entitled to greater weight than his opponent's competing claim based on a statute. As Hamilton observed in *No. 78* of *The Federalist*, "If there should happen to be an irreconcilable variance between [the Constitution and a statute] that which has the superior obligation and validity ought of course to be preferred; or in other words, the Constitution ought to be preferred to the statute."[152] This familiar statement is probably the best contemporary support for the argument that judicial review was contemplated by the original Constitution-makers. Its underlying and undisputed premise—the superiority of the Constitution over legislative acts—also provides a theoretical basis for a general pre-merits weighting in favor of individual interests.

On the other hand, it can be argued that the legislature should have the scales tipped in its favor, since the competing considerations underlying all legislative judgments involve issues of public policy. The accommodation of competing policy interests is the single most important responsibility of legislative bodies. Legislators, like judges, are sworn to uphold the Constitution, and to the extent constitutional issues are involved, these will be taken into account by the legislators in making the final choices among policy alternatives. Therefore, the argument runs, though legislators' decisions should not be immune from judicial review, their judgments should be given deference.

For present purposes, the important point is not which of

---

152. The Federalist No. 78, at 492 (A. Hamilton) (B. Wright ed. 1961).

these positions is more persuasive, or whether what the court has in fact done—giving the preference to the state in some contexts and to the individual in others—is in accord with sound constitutional principles. The important point is that there is a sound theoretical basis for giving a preference either way, and good practical reasons for doing so.

There is a difference between this kind of case and executive privilege-congressional subpoena cases, however. Executive privilege-congressional subpoena cases involve questions of the constitutional allocation of power among coequal branches of the federal government, rather than protection of constitutionally based individual interests against the exercise of governmental powers. The conflict in first amendment, fourteenth amendment, and commerce clause cases is between governmental and nongovernmental parties. The claim of one is based on the Constitution, and the other on the judgment of the legislature in matters of public policy choice. By contrast, in executive privilege-congressional subpoena cases, the conflicting interests are rooted in the same source and are of the same general type. The dispute is between two of three coordinate branches of the federal government, each of which bases its claim on a grant of power contained in the United States Constitution.

In selecting the appropriate standard for deciding executive privilege-congressional subpoena conflicts, the courts have three basic choices. They are:

(1.) An absolute, per se rule, under which the interests of one of the branches will always prevail, regardless of the comparative strengths of the parties' positions in the case.

(2.) A balancing approach similar to that employed in the governmental interests versus individual interests context, assigning a predetermined preference either to congressional subpoena power or executive privilege.

(3.) A true, evenhanded balance, weighing the impact of alternative outcomes on the underlying objectives of both executive privilege and congressional investigations without any pre-merits weighting.

These three alternatives for judicial resolution of executive privilege-congressional subpoena cases will now be considered, including, as to each, an examination of its supporting authority and the theoretical and practical implications of its adoption. These alternatives assume that the substance of the controversy is to be resolved by the courts. The alternative of resolution by another branch (by hypothesis one of the parties to the dispute), the policy and constitutional issues posed by that alternative,

and its similarities to the absolutist approach will also be considered in connection with the examination of the alternative standards.

### A.  The Absolutist Standard

There are three basic arguments favoring adoption of an absolutist approach. The first is that it is simple to apply. Second, it yields consistent, predictable results with consequent planning benefits to government and nongovernment individuals and institutions. The third argument is similar to the position that executive privilege-congressional subpoena cases are not justiciable: either of the other approaches necessarily involves the judiciary to some degree in a reexamination of the underlying policy considerations made by one or both of the other branches in issuing the subpoena or asserting executive privilege. These are matters that are not only "committ[ed] . . . to a coordinate political department,"[153] they lie at the very core of the responsibilities of the other branches.

The strongest support for vesting final decisional authority in the Congress comes from Professor Cox, who would vest that authority in either House of Congress that considers the matter. Judges MacKinnon and Wilkey of the Court of Appeals for the District of Columbia Circuit have advocated that the President should have that authority.

### 1.  Professor Cox and absolute deference to Congress

In the subsection of his article on executive privilege entitled "Modern Need to Invest the Court With Enforcement Jurisdiction," Professor Cox reviews three developments that in his view "furnish persuasive evidence of a need to increase the power of Congress to compel the President and others in the executive branch to produce information."[154] He then proposes the following:

> These trends probably make it desirable to put the force of law behind some congressional subpoenas addressed to the President, his aides or other executive officials. Ideally, I think, the legislative right should prevail in every case in which either the Senate or House of Representatives votes to override the Executive's objections, provided that the information is relevant to a

153. Baker v. Carr, 369 U.S. at 217.
154. Cox, *supra* note 131, at 1432.

278     BRIGHAM YOUNG UNIVERSITY LAW REVIEW      [1978:

> matter which is under inquiry and within the jurisdiction of the
> body issuing the subpoena, including its constitutional jurisdic-
> tion. A single committee or subcommittee, because it offers lit-
> tle guaranty of restraint, is the greatest threat to the values of
> confidentiality and carries the great danger of oppression. The
> very need for a vote of an entire chamber would not only provide
> a forum in which the Executive's arguments could be fairly
> considered, but the uncertainty of the outcome would press all
> concerned to negotiate a resolution. A vote of the entire Senate
> or House of Representatives is required to cite a private person
> for contempt. The requirement has proved useful in the past. If
> either House did vote to require the information, the President
> should have no constitutional right to withhold it and the Judi-
> ciary should not go behind the voted demand except to decide
> questions of relevance and jurisdiction. This would avoid the
> difficulty of developing nonpolitical, judicial standards of deci-
> sion and thus would meet the chief constitutional objection to
> other legislative proposals.[155]

Under Professor Cox's proposal, the judicial role would be
limited to deciding the threshold questions of relevance and juris-
diction. Any issues concerning the conflicting policy demands of
the legislative and executive branches would presumably be left
to the final decision of the particular House of Congress, as would
the persuasiveness of the executive's arguments, which are to be
"fairly considered."

### 2.  Judges MacKinnon and Wilkey and absolute deference to the President

The positions of Judges MacKinnon and Wilkey are set forth
in separate opinions concurring in part and dissenting in part
from the en banc per curiam opinion of the Court of Appeals for
the District of Columbia Circuit in *Nixon v. Sirica.*[156] At issue in
*Nixon v. Sirica* was an order entered by District Judge Sirica to
enforce a grand jury subpoena duces tecum directing President
Nixon to produce certain tapes and documents. The legality of
Judge Sirica's order was challenged by both the President and
also the special prosecutor, then Mr. Archibald Cox. Because of
serious questions concerning its jurisdiction to consider the spe-
cial prosecutor's petition under the "all writs" statute,[157] the

155. *Id.* at 1434. *See also* P. KURLAND, WATERGATE AND THE CONSTITUTION 130 (1978).
156. 487 F.2d 700, 729-62 (D.C. Cir. 1973) (MacKinnon, J., concurring in part, dis-
senting in part); *id.* at 762-99 (Wilkey, J., dissenting).
157. "The Supreme Court and all courts established by Act of Congress may issue

court exercised its discretion to consider only the President's petition.[158]

Having asserted executive privilege with regard to the items sought by the grand jury, President Nixon's counsel contended, *inter alia,* "that Executive privilege is absolute with respect to presidential communications, so that disclosure is at the sole discretion of the President."[159] The majority rejected the President's argument that the privilege is absolute, observing that throughout history "there have frequently been conflicts between independent organs of the federal government"[160] and that "[w]hen such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them—one Supreme Court."[161] In response to the contention that the President's position was sustained by the doctrine of separation of powers, the court responded that "[t]o leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing, rather than a separation of Executive and Judicial functions."[162]

In place of absolute deference, the majority applied a weighted balancing test, discussed further in Subsection B, with the pre-merits presumption favoring the executive. The court observed that "such conversations are presumptively privileged"[163] but held that the presumption "must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case."[164]

Judges MacKinnon and Wilkey wrote separate opinions and each concurred in the other's opinion. Judge MacKinnon's opinion contains a lengthy and scholarly review of the history of Presidential assertions of executive privilege and an analysis of some of the relevant Supreme Court opinions, from which he concludes there is a sound basis for "an absolute, evidentiary privilege for conversations and deliberations of the President with his close advisors," and further that "the privilege also has constitutional dimensions."[165]

---

all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1970).

158.  **487** F.2d at 706-08.

159.  *Id.* at 708.

160.  *Id.* at 715.

161.  *Id.*

162.  *Id.*

163.  *Id.* at 717.

164.  *Id.*

165.  *Id.* at 750 (MacKinnon, J., concurring in part, dissenting in part).

In Judge Wilkey's view, the issue in the case was as follows:

> The *Per Curiam* here never confronts the fundamental Constitutional question of separation of powers, but instead prefers to treat the case as if all were involved was a weighing and balancing of conflicting public interests. There *are* conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that. Therefore, the most fundamental, necessarily decisive issue is, Who Does [sic] the weighing and balancing of conflicting public interests? The District Judge or the President? The answer to this question necessarily involves the Constitutional question of separation of powers.[166]

Addressing the issue "Who decides?" Judge Wilkey concluded:

> I thus reach the conclusion, differing from the majority of my colleagues, that the privilege asserted by the President here derives *both* from the Constitutional principle of separation of powers and from the common sense-common law, statutory privilege of confidentiality of Governmental decision-making, whatever the Branch. The latter may be subject to weighing and balancing of conflicting public interests, as many of the cases have done, but never in a case involving the President as a party. But where the privilege of the Chief Executive is derived from the *Constitutional principle* of separation of powers, it is no more subject to weighing and balancing than any other Constitutional privilege can be weighed and balanced by extraneous third parties.
>
> Every President, beginning with Washington and Jefferson, has asserted that the privilege and the scope and applicability are for him alone to decide. This is precisely what Congress does when it either grants or withholds documents in response to the request of a court for evidence in a criminal case. This is what no doubt *this court* would do if confronted with a demand by a Congressional committee for any of our internal documents. We would weigh and decide and assert the privilege as *we* saw it, not as a Congressional committee would see it. *We* would do so on the Constitutional ground of separation of powers. And this is what the President has done here.[167]

*Nixon v. Sirica* did not involve a conflict between executive privilege interests and congressional investigative interests. While there was no confrontation of executive and legislative branch prerogatives, there was a straight confrontation between

---

166. *Id.* at 763 (Wilkey, J., dissenting) (emphasis in original).
167. *Id.* at 773-74 (Wilkey, J., dissenting) (emphasis in original).

the judiciary and the executive.[168] Thus, Judges MacKinnon and
Wilkey contended for absolute deference to the Presidential judg-
ment in asserting executive privilege against the judiciary. There
is no reason to conclude they would take any other position vis-
à-vis Congress. Moreover, in his concurring opinion in *Senate
Select Committee on Presidential Campaign Activities v.
Nixon*,[169] which involved a confrontation between congressional
investigative power and executive privilege, Judge Wilkey re-
ferred to his opinion in *Nixon v. Sirica* as taking the position that
actions challenging Presidential assertions of executive privilege
are nonjusticiable.[170]

The positions taken by advocates of the absolutist approach
demonstrate the close linkage between the issues of justiciability
and the substantive standards by which courts should resolve the
dispute. If the judicial decision on the merits runs in favor of the
executive, then in the majority of cases the net effect will be the
same as if the court held either that (1) the case is not justiciable,
or (2) even though justiciable the courts should withhold judicial
relief as a matter of prudence. In the typical executive privilege-
congressional subpoena case it is Congress that needs affirmative
judicial action because the executive has possession of the docu-
ments. If the courts do not act, that possession remains unaf-
fected, and the executive wins. The result is the same if the courts
decide the case, but defer absolutely to the executive. Thus, it
should not be surprising that the opinions of the two principal
advocates of absolute deference to the executive judgment,
Judges MacKinnon and Wilkey, do not sharply distinguish be-
tween issues of justiciability and substantive standards for deci-
sion. Rather, they concentrate on the propriety—as a matter of
history, policy, and good constitutional adjudication—of leaving
the final judgment to the President. Similarly, while Professor
Cox's view is that ultimate resolution should be left to a full vote
of the appropriate House of Congress, it is not clear whether his
position is (1) that Congress should pass a statute authorizing
such a procedure, and the courts should hold the statute constitu-
tional; (2) that absent such a statute, courts should hold that
since another branch of government is better suited to resolve

168. The tapes were to be examined in camera by the district judge "and the grand
jury may never see or hear any of them after the District Judge's review *in camera.*" *Id.*
at 788. As a consequence, "the Judiciary.Executive confrontation is there at the outset,
whatever the character of the grand jury." *Id.*
169. 498 F.2d 725 (D.C. Cir. 1974).
170. *Id.* at 734 (Wilkey, J., concurring).

such disputes the courts will refrain from decision and will if
necessary enforce the judgment of the House of Congress when
made; or (3) that if a House of Congress has passed on the issue,
courts should refrain from taking any action. As in the case of the
positions taken by Judges MacKinnon and Wilkey, any of these
views results in shifting the real decisional authority from the
courts to another branch of government.[171]

### B.  Weighted Balancing

Three federal judicial opinions have considered on the merits
square conflicts between a Presidential assertion of executive
privilege and a congressional subpoena. They are the district
court's and court of appeals' opinions in *Senate Select Committee
on Presidential Campaign Activities v. Nixon*,[172] and the district
court opinion in *United States v. AT&T.*[173] At least two of the
three opinions (and perhaps all three) have applied a weighted
balancing standard, with the pre-merits weighting favoring the
President. This is the only approach, therefore, that is clearly
supported by a majority opinion of a federal court.

The *Senate Select Committee* case was a suit by the Ervin
committee seeking access to five tape recordings of conversations
between President Nixon and John Dean. The committee had
served a subpoena duces tecum on the President, who responded
by asserting executive privilege. On the first go-around of at-
tempted judicial enforcement, Judge Sirica ruled that the district
court lacked jurisdiction. Congress thereupon passed a special
statute giving the district court jurisdiction to enforce the select
committee's subpoenas.[174] In the subsequent enforcement action
the district court (Judge Gesell) dismissed the complaint without
prejudice. Whether he gave any pre-merits weight to the assertion
of executive privilege is not clear from the opinion. On the one
hand, the opinion made the observation that "[i]t has not been
demonstrated to the Court's satisfaction that the Committee has
*a pressing need* for the subpoenaed tapes or that further public
hearings before the Committee concerning the content of those

---

171. If shifted to a House of Congress, this will mean that the legislative branch wins.
There may, however, be some occasions when a House of Congress would decide to deny
to one of its constituent committees the information requested from the executive branch,
but this would rarely occur.

172. The district court opinion is reported at 370 F. Supp. 521 (D.D.C. 1974) and the
court of appeals opinion at 498 F.2d 725 (D.C. Cir. 1974).

173. 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opin-
ion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

174. *See* text accompanying note 101 *supra*.

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 55 of 69

tapes will at this time serve the public interest."[175] On the other hand, the concluding paragraph stated that "while the controversy presented is justiciable, the Select Committee *has not established by a preponderance of the evidence* that it is entitled at this particular time to an injunction directing the President to comply with its subpoena for the five tape recordings."[176]

By contrast, the court of appeals in the *Senate Select Committee* case quite clearly followed a weighted balancing approach. That court held applicable the same basic approach that it had followed in *Nixon v. Sirica:* a generalized assertion of executive privilege by the President is "presumptively privileged,"[177] and the presumption can be overcome "only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access [to the documents sought]."[178] Thus, the court of appeals in *Senate Select Committee* (1) adopted as the governing rule a weighted balancing approach with the presumption favoring the Presidential assertion of privilege in cases involving conflicts between congressional subpoenas and assertions of executive privilege based on confidential communications; (2) relied as precedent on its earlier ruling in *Nixon v. Sirica,* thus suggesting that the same standard is applicable whether the Presidential assertion conflicts with fundamental functions of either of the other branches; and (3) rejected the district court's opinion insofar as it followed a contrary approach.[179] By the time the case reached the court of appeals, the House Committee on the Judiciary had begun its inquiry into Presidential impeachment. Under these circumstances, the court held that "the Select Committee has failed to make the requisite showing"[180] because its "immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative."[181] With regard to the weight of the burden, the court observed that the committee had not shown that "the subpoenaed evidence is demonstrably

175. 370 F. Supp. at 522 (emphasis added).

176. *Id.* at 524 (emphasis added).

177. 498 F.2d at 730.

178. *Id.*

179. The "apparent understanding" of the district court opinion which the court of appeals rejected was probably the district court's failure to weight the scales in the President's favor. *Id.*

180. *Id.* at 731.

181. *Id.* at 732. With regard to congressional oversight, the opinion observed, "In the circumstances of this case, we need neither deny that the Congress may have, quite apart from its legislative responsibilities, a general oversight power, nor explore what the lawful reach of that power might be under the Committee's constituent resolution." *Id.*

critical to the responsible fulfillment of the Committee's functions."[182]

The court of appeals opinion in *Senate Select Committee v. Nixon* was issued just about a year before the Supreme Court held in *Eastland v. United States Servicemen's Fund* that the issuance and enforcement of congressional subpoenas are included within the speech or debate clause immunity. *United States v. AT&T* is the only post-*Eastland* case to consider on the merits a square conflict between executive privilege and congressional subpoena power. The magnitude of the conflict was sharpened by the fact that the asserted executive interest was the protection of foreign intelligence secrets, an area of Presidential responsibility in which the United States Supreme Court declared in *United States v. Nixon* that "courts have traditionally shown the utmost deference."[183] Moreover, the congressional interest in *AT&T* was enforcement of a subpoena, held by *Eastland* to be included within speech or debate, and the *Eastland* opinion had declared that "the prohibitions of the Speech or Debate Clause are absolute."[184]

While the formal parties in *United States v. AT&T* were the United States (the executive branch) as plaintiff and AT&T as defendant, the telephone company had no interest in the outcome of the suit, filed no pleadings, and neither briefed nor argued any of the issues. The position adverse to that of the President was vigorously advanced by the intervenor and the real party in interest, Chairman Moss, who initially appeared on behalf of himself, and later on behalf of the entire House of Representatives. Chairman Moss took the absolutist position that the judicial inquiry should end with a determination that the subpoena was issued for a legitimate legislative purpose. The district court rejected this view and stated that the appropriate test was to balance the competing interests:

> The Court accepts the position of the intervenor that the subpoenaed materials are sought pursuant to a legitimate legislative investigation. Contrary to the intervenor's argument, however, the Court's inquiry cannot conclude at this point. The legislative authority to investigate is not absolute. In our system of government the Constitution is supreme, but no one portion of the Constitution is sacrosanct. Here, the nature, the extent

182. *Id.* at 731.
183. 418 U.S. at 710.
184. 421 U.S. at 501.

and the relative importance of the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum.[185]

The district court listed three factors it felt should appropriately be taken into account in affecting the balance: (1) "whether the information requested is essential to 'the responsible fulfillment of the committee's functions,' *Senate Select Committee v. Nixon,* . . . 498 F.2d 725, 731 (1974)"; (2) "whether there is 'an available alternative' which might provide the required information 'without forcing a showdown on the claim of privilege,' *United States v. Reynolds,* 345 U.S. 1, 11 . . . (1953)"; and (3) "the circumstances surrounding and the basis for the Presidential assertion of privilege. [*United States v. Reynolds,* 345 U.S. at 11]; *United States v. Nixon,* 418 U.S. 683, 710-11 . . . (1974)."[186]

As to the first two factors, the court commented that "[t]he helpfulness of the national security request letters in determining the basis on which the wiretaps were instituted is minimal."[187] However, the backup memoranda, even though subject to deletion of specific information, would "ostensibly afford the Subcommittee relevant information upon which to determine whether the wiretaps were instituted for foreign intelligence surveillance rather than domestic surveillance and to make the determination as to whether new legislation should be drawn."[188]

With regard to the third factor, the court observed:

> [T]he President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters. The possible effect of such disclosure has been detailed above. Such a determination by the Executive is generally accorded great deference by the courts.[189]

The court's final conclusion was as follows:

> [I]f a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role in these areas

---

185. 419 F. Supp. at 459.

186. *Id.* at 460.

187. *Id.*

188. *Id.*

189. *Id.* (citing United States v. Nixon, 418 U.S. 683, 710-11 (1974); United States v. Reynolds, 345 U.S. 1, 10 (1953); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)).

is entrusted. In the areas of national security and foreign policy, that role is given to the Executive.[190]

The same considerations discussed above as supporting an absolutist approach also support the position that if the court is to balance the interests of one branch against those of another, pre-merits weighting is better than a straight balancing. It is easier, it yields more consistent and predictable results, and it requires lesser judicial involvement in policy matters clearly committed to another branch. Weighted balancing also has the support of the limited judicial precedents dealing with the issue. The conceded materiality of these considerations notwithstanding, they are insufficient to carry the day. They bear more heavily on justiciability and on the wisdom of the court of appeals' efforts in the *AT&T* and *Nixon v. Sirica* cases to achieve a negotiated settlement than on the standards for judicial decision.

I believe that the preferred approach is an evenhanded balancing with no pre-merits weighting. Unlike the other two approaches, it has been advocated by neither judicial nor scholarly opinion. Some of the reasons why it is the best approach are closely linked to the issue of justiciability. Accordingly, the final Subsection of this Article will discuss my views concerning justiciability (discussed earlier in Section IV) and nonweighted balancing as the appropriate standard for judicial resolution of executive privilege-congressional subpoena cases.

## C.  Justiciability and Nonweighted Balancing

### 1.  Justiciability

All three opinions that have resolved on their merits conflicts between executive privilege and the congressional subpoena power—the district court and the court of appeals in *Senate Select Committee* and the district court in *AT&T*—have necessarily held that such conflicts are justiciable. The court of appeals' second opinion in *AT&T* also held such disputes justiciable, thus providing the basis for its creative attempts to achieve a negotiated solution, if possible, and for its ultimate disposition of the merits of the case, if necessary.

190. *Id.* at 461. This case demonstrates that the three standards suggested above—absolute deference, weighted balancing, and straight balancing—may shade into each other. Judge Gasch's final paragraph, quoted above, suggested that in carrying out his stated purpose to balance the competing considerations he may have weighted the scales so heavily in the executive's favor that the end result was absolute deference to the President's decision, the approach advocated by Judges Wilkey and MacKinnon.

The arguments against justiciability, discussed in Section IV above, highlight the problems that result from judicial attempts to resolve confrontations between executive privilege and congressional investigative power. If the appropriate judicial standard is to balance without a pre-merits weighting, judicial resolution will not only involve consideration of matters that are "committ[ed] . . . to a coordinate political department;"[191] in the usual case courts will be required to reevaluate the policy judgments reached by the other branches. Moreover, in the usual executive privilege-congressional subpoena case, these policy judgments are not only central to the other branches' constitutional duties; they are also judgments that the other branches are much more qualified to make.

What this counsels, however, is not that executive privilege-congressional subpoena cases are nonjusticiable, but rather that courts should follow the lead of the court of appeals in *AT&T:* decline to reach the merits in such suits until all reasonable efforts to bring about a negotiated settlement have been exhausted. Manifestly, the parties understand better than the courts which aspects of their positions can be compromised without working serious damage to their own particular needs and to important governmental objectives. Moreover, because of the case or controversy limitation on judicial fact finding, courts lack the fine-tuning capability to achieve through judicial decree a resolution that would serve the competing interests as well as would a negotiated compromise. It is therefore consistent with article III's case or controversy limitation, as well as with basic separation of powers principles, for courts to afford the parties to interbranch disputes every reasonable opportunity to achieve—and sometimes pressure them toward achieving—a compromise, prior to and as a precondition of judicial resolution.

It must be recognized, however, that even the most creative judicial efforts to maximize the opportunity and the incentive for a negotiated settlement will not always bear fruit. While it is in the interest of good government to have the disputant branches resolve their own differences if they can, it is not in the interest of good government to leave the dispute unresolved. Indeed, leaving such disputes "unresolved" does not really leave them unresolved. A holding of nonjusticiability means victory for the defendant; in most executive privilege-congressional subpoena cases this will be the President. The conflict in these cases is real and

191. Baker v. Carr, 369 U.S. at 217.

288    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

the stakes are high; the relevant issues are central to governmental functions. Such issues deserve consideration on the merits rather than decision by default. It is unthinkable, for example, that the dispute in *Youngstown Sheet & Tube Co. v. Sawyer*[192]—a pure vanilla dispute over the respective powers of Congress and the President—should have been left unresolved.

It is therefore necessary that there be a final decisional authority. Such authority should—and does—rest with the courts. The issues in interbranch controversies concern the interpretation of the Constitution for the purpose of settling disputes between disagreeing parties. Both the resolution of disputes and the declaration of constitutional doctrine are the traditional province of the judiciary. And whatever the difficulties or potential improprieties posed by the federal judiciary's attempting to resolve such disputes and fashion an appropriate remedy, they are certainly no greater than in legislative apportionment or busing cases. Judicial resolution of interbranch disputes should be a last resort. But in those rare cases where judicial resolution is necessary, decision of such cases on the merits is not only consistent with the case or controversy limitation of article III, it is the most important thing federal courts do.

### 2. *Nonweighted balancing: the preferred judicial approach*

Just as courts should avoid deciding executive privilege-congressional subpoena cases as long as there is any reasonable possibility that judicial efforts to induce a negotiated settlement may be successful, a court faced with the necessity of deciding such cases should apply a rule of decision that recognizes the equality of its sister branches of government who are the litigants in its courtroom. The standard that achieves maximum fidelity to this objective is a straight balance with no pre-merits weighting given to either side.

As discussed above, an absolutist standard would be the easiest to apply and would yield the most consistent and predictable results. But it is a standard that places the judiciary in the position of having to decide which of its sister branches is to receive such automatic and inflexible favor at the expense of the other. That kind of judicial decision is unseemly, unwise, and inconsistent with sound separation of powers theory. A fundamental premise of separation of powers theory is that even though each branch enjoys spheres of activity within which it is supreme, in

---

192. 343 U.S. 579 (1952).

their interbranch relationships and in the status to which each is
entitled before other branches, all are equal. This is especially
true when the position of each branch in a litigated interbranch
dispute is solidly grounded on settled constitutional principles.
An absolute, never-changing preference of one of these positions
over the other regardless of the circumstances of the individual
case is inconsistent with the premise that each branch is equal
in its relationships with other branches.

Based perhaps on notions of separation of powers, there is a
decided and understandable judicial reluctance to reexamine a
policy judgment made by a coordinate branch within its own
particular sphere of responsibility. For example, in support of his
"Who decides?" approach in *Nixon v. Sirica* (and his conclusion
that the one who decides is the President), Judge Wilkey reasons,
"There *are* conflicting public interests involved, they must be
carefully weighed, balanced, and appraised; the President says he
has done just that."[193] Judge Wilkey's conclusion is:

> Thus, the real issue, even by the analysis in other parts of
> the *Per Curiam* opinion, is whether it is appropriate for the court
> to determine the legal validity of a claim of privilege by the
> President, or whether the Constitutional principle of separation
> of powers requires the court to yield to the President's judgment
> as to where the public interest lies. My answer would be the
> latter.[194]

The final paragraph of District Judge Gasch's opinion in
*United States v. AT&T* states the same basic approach:

> The Court is not implying that the members of the Sub-
> committee, or of the House of Representatives, will act negli-

---

193. 487 F.2d 700, 763 (D.C. Cir. 1973) (Wilkey, J., dissenting) (emphasis in original).
The foregoing analysis assumes, for reasons set forth and discussed in text accompanying
notes 168-70 *supra*, that Judges Wilkey and MacKinnon would apply the same rationale
as contained in their *Nixon v. Sirica* opinions to a controversy involving conflicting prerog-
atives of the legislative and executive branches. In any event, the analysis set forth above
is also applicable to the dispute in *Nixon v. Sirica*, since the conflict there was between
the powers of the executive and judicial branches. Arguably, the hardest case for justicia-
bility of interbranch conflicts and for the application of a nonweighted balancing approach
occurs in those cases where one of the branches involved in the interbranch conflict is the
judiciary. In such cases, the courts act, in a sense, as judges of their own case. Notwith-
standing this conceptual concern, the conclusions reached in the text are equally applica-
ble where judicial powers are in conflict with those of another branch. The underlying
premise of the "rule of necessity," Evans v. Gore, 253 U.S. 245, 247-48 (1920); Atkins v.
United States, 556 F.2d 1028, 1040 (Ct. Cl. 1977), is that when there is no other alterna-
tive, judicial decision of cases in which the judiciary may have an institutional interest
poses lesser net drawbacks than leaving important issues, particularly constitutional is-
sues, unresolved.

194. 487 F.2d at 794 (Wilkey, J., dissenting).

gently or in bad faith if they have access to these documents. But it does appear to the Court that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure must be made, it should be made by the constituent branch of government to which the primary role of these areas is entrusted. In areas of national security and foreign policy, that role is given to the Executive.[195]

This reluctance to reevaluate the policy judgments of another branch is appropriate in the vast majority of contexts. Indeed, on many issues within areas of exclusive executive or legislative responsibility, the judicial standard ought to be nothing less than absolute deference.[196] But that kind of approach breaks down where the interests on both sides of the conflict are supported by policy determinations made by officials of two separate branches of government, each acting in his own particular sphere of governmental responsibility. Judge Wilkey is right: The President has balanced the competing national interest considerations. He has done so in the exercise of his constitutional responsibilities, and he has reached a final conclusion. If the President were the only governmental entity and if his decision were the only public policy judgment involved in the litigation, then absolute deference or something approaching it would be the appropriate standard. But where the litigated interests in conflict with those of the President are also supported by a policy judgment made by a coequal branch of government, the supporting rationale for absolute deference is missing and the absolutist approach is inappropriate.

Professor Cox's position that "the legislative right should prevail in every case in which either the Senate or the House of Representatives votes to override the Executive's objections"[197] suffers from the same defect. His assurance that "[t]he very need for a vote of an entire chamber would . . . provide a forum in which the Executive's arguments could be fairly considered"[198] might or might not be realized in any given case. A fair forum notwithstanding, vesting the final decisional authority over disputes between the Congress and the President with either of the

195. 419 F. Supp. at 461.
196. Eastland v. United States Servicemen's Fund, 421 U.S. 491 (1975); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 431-33 (1964); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp. 333 U.S. 103 (1948).
197. Cox, *supra* note 131, at 1434.
198. *Id.*

disputants is still fundamentally unfair and the unfairness strikes at the very roots of coequality and separation of powers.

The district court in *AT&T* concluded

> that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role [in the areas of national security and foreign policy] is entrusted.[199]

There is a parallel, equally persuasive article I-based position that if a final decision as to the need of these materials for legitimate legislative purposes—and the ability of a subcommittee to adequately safeguard them—must be made, it should be made by the constituent branch of government to which the primary responsibility for policymaking is entrusted.[200] Thus, litigation involving interbranch conflicts places the court in a genuine theoretical dilemma. Choosing between the conflicting positions of sister branches and reviewing the substance of policy decisions made by those branches are not the kinds of functions that courts perform best. But the alternatives are even worse: adopting the absolutist approach and thus yielding automatically in every case to the judgment of one branch and rejecting that of the other; or simply staying out of the matter, which necessarily results in a de facto holding in favor of one branch or the other.

A weighted balancing approach is also inappropriate for the resolution of executive privilege-congressional subpoena cases. When the competing interests requiring judicial resolution are those of society on one hand and the individual on the other, there are both practical and theoretical reasons for giving a preference to one set of interests.[201] There is no adequate basis for such a distinction, however, when the competing interests are those of

---

199. 419 F. Supp. at 461.

200. Indeed Chairman Moss took just such a position. His first brief before the court of appeals states:

> The plain mandate of existing judicial authority . . . makes clear that the responsibility of courts in a case such as this is limited to a determination of whether Congress is acting within its jurisdiction, as opposed to usurping powers exclusively vested elsewhere. Conversely, those authorities make abundantly clear that, having made such determination, the principle of separation of powers precludes the courts from substituting their judgment for that of Congress as to the specific need for particular information that Congress seeks in a course of a valid legislative investigation.

Brief for Intervenor-Appellant at 49-50, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

201. *See* text following note 151 *supra*.

coordinate branches of government and when both sets of interests are rooted in the Constitution.

While there are other possible arguments for preferring one set of interests over another, they fall short of justifying a pre-merits weighting in favor of either the legislature or the executive. In favor of Congress it might be asserted that congressional investigative powers fall under the speech or debate immunity[202] which is expressly guaranteed by the Constitution while executive privilege is only implied. Although a true statement, it is unpersuasive for several reasons. First, even though the Constitution expressly provides for speech or debate immunity, it does not expressly extend such immunity to the issuance and enforcement of congressional subpoenas. Second, the Court has not traditionally assigned a higher constitutional value to express rights and principles than to implicit ones and is not likely to do so. The premier power and function of the federal courts, judicial review, is implicit rather than express. Some of the individual rights that the Court has held to be "fundamental," such as the right to travel[203] and various aspects of the right of privacy,[204] must be inferred from more explicit provisions.

For the executive, it might be argued that a decision by the President, in whom all article II authority is vested, does not really stand on the same footing as a decision by a single committee of one House of Congress (or in some cases, a single subcommittee or subcommittee chairman, vested with authority to issue subpoenas). This argument also is insufficiently persuasive. The functioning of each branch within itself and the level of approval that must be obtained before official action is to be taken are matters internal to that branch, as long as the requirements of the Constitution are met. Even if one were to assume that the Constitution requires such symmetry that the decision of a President is under all circumstances to be preferred to that of a congressional committee or subcommittee, the needs of such conceptual symmetry would be satisfied by the fact that the reason subpoenas can be approved by the action of a committee, subcommittee, or a chairman is that the entire House of Congress has arranged its internal structure to permit such a procedure.

Finally then, these two postulates remain: (1) Each branch enjoys primary responsibility and authority over certain govern-

---

202. *See* notes 44-58 and accompanying text *supra.*

203. Shapiro v. Thompson, 394 U.S. 618 (1969).

204. Roe v. Wade, 410 U.S. 113 (1973); NAACP v. Alabama, 357 U.S. 449 (1958).

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 65 of 69

mental functions (lawmaking, law enforcement, and law interpre-
tation, including judicial review). Nevertheless, in their inter-
branch relationships, in the deference that each branch owes to
the other two, and in the standing that each enjoys before the
others, the three branches are equal. (2) It is fundamentally in-
consistent with that principle of coequality for the judiciary to
resolve cases or controversies involving competing constitution-
ally based claims of the other two branches by according absolute
deference to the judgment of either. It is equally inconsistent with
coequality for the courts to hold such a case nonjusticiable
(thereby effecting the same net result as absolute deference) or
to employ a balancing approach that weights the balance scales
in favor of one branch or the other.

Thus, the remaining alternative is a genuine balancing ap-
proach without any predetermined preference for either side, with
the victor to be determined on the basis of a simple preponder-
ance of relevant considerations. This approach will be the most
difficult of all possible judicial approaches and will provide the
least predictable results. Since executive privilege-congressional
subpoena controversies so rarely call for judicial resolution, how-
ever, and since the governmental stakes involved are so large,
judicial ease and predictability do not seem as important as in
other contexts.

Whenever an executive privilege-congressional subpoena
case comes before a court, both parties will have already made
certain judgments and reached certain conclusions. In the *AT&T*
case, for example, the subcommittee had determined that access
to the leased line letters was necessary to the subcommittee's
oversight function and to enable it to determine whether amend-
ments to the Communications Act should be enacted. On the
other side of the balance scale was the President's determination
that compliance with the subpoena would involve unacceptable
risks of disclosure. In attempting to achieve a balance between
these two competing determinations, there are several levels of
possible judicial reevaluation of underlying policy judgments,
and concomitantly, judicial intrusion into substantive policy
areas committed to other branches.

The first level, involving the least judicial intrusion, would
be for the court to accept the correctness of the judgments made
by each of its sister branches and—taking these judgments as
correct—balance the one against the other. Because it involves
less judicial intrusion into the affairs of the other branches, this
would be the preferable approach, provided that it would satis-
factorily resolve the case. I suspect that in many executive

294   BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

privilege-congressional subpoena cases, however, it will not. Applying such an approach to the facts of the *AT&T* case, it might be contended that the President's determination has a broad sweep involving detriment "to the national defense and foreign policy of the United States and damag[e] to the national security." Accepting this determination at full value, it has a greater impact on national interests than the oversight of one subcommittee and consideration of the possible need to amend section 605 of the Communications Act. This is an unduly formalistic kind of analysis, however, and would simply invite broader congressional definitions of the legislative investigative purpose. In *AT&T*, for example, the purpose of the investigation could have been described as a determination of the extent to which the United States government is infringing upon the constitutionally guaranteed rights of its own citizens. This could have been coupled with a legislative determination that access to the documents was indispensable to the achievement of the legislative objective. Thus, taking the policy judgments of the respective branches totally at face value as articulated by Congress or the President and attempting to balance them may be a futile exercise.

   The level of judicial inquiry at the opposite extreme would involve the court in a complete redetermination of the policy judgments made by the other two branches. In the *AT&T* case, reexamination of the underlying legislative policy judgments would have involved such inquiries as, "Why is this information really important to the legislative inquiry?" or "What kind of legislation does the subcommittee have in mind, and how do these documents bear on that legislation?" A more extreme inquiry—which I assume no court would ever make—would be, "Are any amendments to section 605 really necessary?" On the Presidential side, a reevaluating court might ask what the "risks of disclosure" really are, and why they are "unacceptable." Neither Mr. Moss nor anyone on the subcommittee ever indicated an intent to disclose anything in the subpoenaed documents. Indeed, the subcommittee pointed to its own excellent record in maintaining the security of secret information. On what, then, does the President base his judgment that there are risks of disclosure and that they are unacceptable? This kind of reevaluation of Presidential decisions could lead the court into other areas which most courts would quite clearly want to avoid and which in most cases they should avoid. But, in some cases, certain such questions might be appropriate for in camera review, such as: What do the documents really contain? And, why is it that their disclosure

(assuming that there are risks of disclosure) would be detrimental to national interests?[205]

In most cases, total judicial abstinence from substantive examination of the competing determinations of the other branches would provide an insufficient basis for deciding the case, but complete judicial reevaluation of those judgments would involve more judicial intrusion than is necessary. There is an intermediate level of judicial inquiry that I believe in most cases will enable the court to satisfactorily perform its constitutional duty to decide cases or controversies, without unduly intruding into the constitutional domain of the other branches. In most—possibly all—executive privilege-congressional subpoena cases the court could accept as its premise the correctness of the competing policy judgments made by the Congress and the President. It could then focus on possible alternatives to the withholding or disclosure of the information at issue, and in the process determine which alternatives would serve the policy objectives of one of the branches without significantly diminishing those of the other.

The *AT&T* case is again illustrative. The President determined that compliance with the subpoena would involve unacceptable risks of disclosure. Without reexamining that judgment, are there alternative means for protecting against the risks of disclosure, other than total withholding? Would it be possible to limit the examination of the documents to a secure place provided by the executive branch, or to limit the number of legislative branch personnel who will make the examination and who

205. There are persons whose general orientation opposes exposure of secret material to persons outside the executive branch. Certainly, it is in the interest of government and its citizens to limit the number of persons, no matter how reliable, who have access to secret information. But, there is no magical linkage between executive branch employment and reliability with regard to secret information. For reasons set forth below, it is preferable for courts applying a balancing test to executive privilege-congressional subpoena cases to do so at a level that will involve the least possible intrusion into underlying policy judgments of sister branches, so long as such intrusion minimization can be achieved without sacrificing the court's ability satisfactorily to decide the case. The subjective impression born of my personal experience is that courts generally are very cautious about examining government secrets, and that when such examination has been necessary, the judicial security record is at least as good as that of either of the other branches. It is true that federal judges have not signed—as executive branch personnel have—a written undertaking not to disclose, and it would be unseemly to ask them to do so. But they have taken an oath to uphold and defend the Constitution. In those few cases where it may be necessary for a court to conduct a limited in camera investigation of secret material, including material of the sensitivity involved in the *AT&T* case, such an examination should be made. The reason that executive branch personnel have access to such information is that it is necessary to the performance of the governmental responsibilities. There are circumstances under which the same would be true with the federal judge. In such a case, the court should make the examination.

will have access to the results of that study? On the legislative side, the subcommittee determined that the information contained in the leased line letters is essential to the performance of its legislative duties of oversight and possible statutory revision. Accepting the correctness of that determination, are there means of supplying the information other than providing access to the leased line letters? Are there other documents whose delivery to the subcommittee (accepting also at face value the President's determination concerning risks of disclosure) would pose lesser risks, but would be just as helpful or even more helpful to the committee?

The foregoing questions certainly do not exhaust the alternatives in *AT&T*, and any executive privilege-congressional subpoena case will present its own unique set of alternative solutions. What these examples illustrate is that in *AT&T* the consideration of alternatives would permit the court to apply a nonweighted balancing approach at a level that would minimize substantive reexamination of the underlying policy judgments made by its sister branches. This should be true in most executive privilege-congressional subpoena cases. The ultimate issue in those cases will always be whether information should be delivered to Congress, where a component of Congress has decided that it should be delivered and the President has decided that it should not. Thus, just as in *AT&T* and in the *Senate Select Committee* case (where the court of appeals considered alternatives to the information sought by the committee and ultimately based its decision on the existence of such alternatives), any executive privilege-congressional subpoena case should present opportunities for consideration of alternative solutions. The consideration of alternatives does not completely extricate courts from the business of policy reevaluation, but at the very least, it shifts the reevaluation to a less intrusive level. In *AT&T*, consideration of alternatives could be undertaken without disturbing either the Presidential judgments concerning the disclosure risks, or the congressional judgments concerning the need for information.

In other contexts, consideration of alternatives has been found relevant to the resolution of constitutional issues.[206] In executive privilege-congressional subpoena cases, such an approach would permit the courts to balance the competing governmental

206. Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85 (1977); United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976); Dean Milk Co. v. City of Madison, 340 U.S. 349 (1951).

interests, but with minimal reevaluation of the policy judgments made by other branches. It would therefore seem to be the approach that best satisfies the judicial responsibility to decide cases or controversies without undue intrusion into functions that are equally central to constitutional duties of the other two branches.

## VI. CONCLUSION

The germs of executive privilege and congressional investigatory powers were contained in the 1787 Constitution. Nevertheless, principles for dealing with the interactions between these two doctrines have only recently begun to emerge.

Probably the least satisfactory judicial approach to the accommodation of the competing needs of these two constitutional doctrines would be to hold the issue nonjusticiable. Such an approach would in fact resolve the conflict on a general, all-encompassing basis, without any opportunity for taking into account the particular characteristics of the individual case.

It is important that courts resolve these or any other conflicts between Congress and the President in a way that not only decides the case, but also recognizes the equality of the article I and article II branches as they appear before the article III branch. The only approach that is faithful to this objective is a straight balance of the competing interests, with no pre-merits weighting. For this reason it is the preferred approach, even though to date no court has applied it, and no judge or scholar has advocated it.

# EXHIBIT BB

# MODELS OF THE OPINION FUNCTION OF THE ATTORNEY GENERAL: A NORMATIVE, DESCRIPTIVE, AND HISTORICAL PROLEGOMENON

*John O. McGinnis**

Introduction .................................................. 375
I.  The Constitution and the Attorney General as Opinion
    Writer .................................................... 378
    A.   The Court-Centered Model ........................ 382
    B.   The Independent Authority Model................ 389
    C.   The Independent Authority Model and Stare
         Decisis ........................................... 400
    D.   The Situational Lawyer Model.................... 402
    E.   Theoretical Models in a Political World .......... 403
II. The First Example of the Independent Authority Model
    and its Consequences .................................. 406
    A.   Attorney General Levi Lincoln and Independent
         Interpretive Authority ........................... 407
    B.   Attorney General Lincoln, President Jefferson, and
         the Louisiana Purchase ........................... 412
III. An Analysis of the Operations of the Current Office of
    Legal Counsel ......................................... 420
    A.   The Central Dilemma of OLC.................... 421
    B.   The Matching of Models to Tasks ................ 425
Conclusion ................................................... 435

## INTRODUCTION

The judiciary is not the only branch of government that offers authoritative constructions of the Constitution and other federal laws. Since the beginning of the Republic, the executive branch has made

---

* Assistant Professor, Benjamin N. Cardozo School of Law. I served as an attorney advisor from 1985 to 1987 and as Deputy Assistant Attorney General from 1987 to 1991 in the Office of Legal Counsel ("OLC"). I participated in drafting some of the materials cited in this article. I discuss, however, only material that has been made publicly available.

I am grateful to Robert Delahunty, a senior civil servant at OLC, for verifying certain of OLC's informal jurisdictional rules discussed in part III as well as for his helpful comments on this Article. I am also grateful to David Leitch, formerly Deputy Assistant Attorney General in OLC, for obtaining copies of letters drafted by OLC and sent to Congress. Thanks also to Mark Edelman, Michael Herz, David Rudenstine, Jeanne Schroeder, Paul Shupack, and Charles Yablon for their helpful comments.

375

formal pronouncements on constitutional and statutory issues of such a substantial scope and variety that they rival the opinions of the Supreme Court. A public recording of the executive branch's most authoritative legal voice is contained in forty-three volumes of published opinions of the Attorney General and sixteen volumes of published opinions of the Office of Legal Counsel ("OLC")—the office to which the Attorney General now delegates the great majority of his legal opinion writing.[1] These published opinions are only the tip of the iceberg. In OLC's library sit at least five filing cabinets of largely unpublished opinions dating from the time of OLC's creation in 1932. Biographies of former Attorneys General also report the existence of important unpublished opinions and memoranda of advice from past Attorneys General.[2]

These opinions comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters. Moreover, many of the opinions are the final word on the law because judicial resolution of the legal issue is unavailable. Yet, while the Supreme Court's work has been subjected to detailed and disparate analysis by historians, political scientists, and law professors, the opinion work of the Attorney General and his modern principal delegate—the OLC—has never been systematically addressed.

To be sure, the Attorney General's opinion-writing function has been mentioned in studies of the office of the Attorney General,[3] and some of the major opinions of the Attorney General addressing such issues as the Bank of the United States and the Missouri Compromise have been discussed in the context of the political and legal controversies that gave rise to them. These opinions, however, are never analyzed as a group in order to shed light on the role of the executive branch's legal interpretation in constitutional theory or on the influence of the Attorney General's opinions in constitutional history. If, as is widely believed, the executive branch has some measure of responsibility for interpreting the Constitution,[4] more attention should

---

[1] On January 15, 1993 the Office of Legal Counsel released a "preliminary print" of opinions from 1983 to 1992. These continue a series of six bound volumes begun in 1977.

[2] *See, e.g.,* Letter from Edmund Randolph to Thomas Jefferson (July 7, 1792), *quoted in* JOHN J. REARDON, EDMUND RANDOLPH: A BIOGRAPHY 205 (1974) (opining that a recess appointment could be made only if the vacancy occurred during a recess of the Senate). For a discussion of the circumstances of the opinion, see REARDON, *supra.*

[3] For a discussion of the opinion function in the most recent study of the office of the Attorney General, see NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE, 1789-1990, at 14-18, 24-26 (1992).

[4] *See, e.g.,* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 3-4, at 34-37 (2d ed. 1988). The inattention is all the more surprising in light of the substantial interest that has

be paid to what is distinctive regarding the substance and scope of its construction.

The purpose of this Article is to make a start in filling this gap in both constitutional analysis and constitutional history. Because so little previous analysis exists, the most useful kind of work is a prolegomenon—a framework for more detailed analysis to come. To this end I will first address as a normative constitutional matter the three most plausible models of Attorney General as opinion writer: the "court-centered" model that views the Attorney General as bound by Supreme Court precedent and therefore as essentially circumscribed by the judiciary's view of the law; the "independent authority" model which views the Attorney General as providing an interpretation of the law that articulates the President's jurisprudential principles rather than those of the Court; and the "situational" model which views the Attorney General as interpreting the law in a manner that most advances the President's political or situational interest on a particular issue with little or no sense of obligation to either court-centered or autonomous jurisprudential principles. The analysis will address the premises of each model and attempt to compare them on a theoretical and practical level, addressing along the way some implications of the models for such constitutional doctrines as stare decisis.[5] Finally, this section will consider what political forces will influence the kind of model of executive interpretation or mix of models that an Attorney General chooses to adopt.

Second, this Article will provide an example of an early administration's adoption of one of the models and its consequences. In his opinion writing in the Jefferson administration, Attorney General Levi Lincoln consciously embraced an independent authority model so he could advance the strict constructionist jurisprudence of Jefferson and the Republicans—a jurisprudence not shared by the Federalist judiciary.[6] Lincoln, however, ultimately failed to persuade Jefferson to adhere to his own jurisprudence in the Louisiana Purchase.[7] His failure facilitated the triumph of Federalist jurisprudence. Indeed, John Quincy Adams believed that it was this lapse in executive interpretation that guaranteed the victory of Chief Justice

---

been shown in the work of the Solicitor General in his role as the chief litigator of the United States. *See, e.g.,* LINCOLN CAPLAN, THE TENTH JUSTICE (1987); Eric Schnapper, *Becket at the Bar—The Conflicting Obligations of the Solicitor General,* 21 LOY. L.A. L. REV. 1187 (1988).

[5] Thus, the purpose of this Article is *not* to determine which model is correct, but rather to refine the models and show the relationships among them.

[6] *See infra* notes 126-29 and accompanying text.

[7] *See infra* notes 137-60 and accompanying text.

Marshall's constitutional principles.[8] I hope this case study of one Attorney General's jurisprudence may prompt inquiry into the work of other Attorneys General and thus reorient the history of constitutional interpretation from its exclusive focus on the Supreme Court.

Finally, I will address the role of the modern Office of Legal Counsel. This office has inherited most of the opinions functions of the Attorney General, while the Attorney General's office has evolved from one primarily concerned with legal analysis to one whose responsibilities extend to as many policymaking areas as a European home secretary or interior minister. OLC is a producer of legal opinions, but it is also a bureaucracy in the modern administrative state concerned with maintenance of its position. Accordingly, this Article will explore the complex set of bureaucratic needs and pressures that shape the processes by which the legal opinions are produced and effect the degree to which various models of executive branch interpretation are realized in modern practice. Thus, through a mixture of normative constitutional theory, constitutional history, and bureaucratic theory, this Article will attempt to clarify the nature and function of the opinions of the Attorney General and OLC.[9]

## I. THE CONSTITUTION AND THE ATTORNEY GENERAL AS OPINION WRITER

The Constitution makes clear that the President has legal responsibilities. He swears an oath to "preserve, protect and defend the Constitution of the United States."[10] The Framers expected him to exercise this power of legal interpretation in vetoing bills: he would interpret the statute and then measure it against the Constitution.[11] At least some framers also expected him to refuse to execute unconsti-

---

[8] *See infra* note 166 and accompanying text.

[9] In the first section I will refer to the Attorney General generically to encompass both the Attorney General and his or her opinion-writing delegate.

[10] U.S. CONST. art. II, § 1, cl. 8. For a fuller discussion of the significance of the President's oath—an oath more elaborate in form than that required of any other constitutional actor—see John O. McGinnis, *Principle Versus Politics: The Solicitor General's Office in Constitutional and Bureaucratic Theory*, 44 STAN. L. REV. 799, 804 & n.31 (1992) [hereinafter McGinnis, *Solicitor General's Office*]; John O. McGinnis, *The President. the Senate. the Constitution. and the Confirmation Process: A Reply to Professors Strauss and Sunstein*, 71 TEX. L. REV. 633, 646-47 (1993) [hereinafter McGinnis, *Reply*].

[11] *See* THE FEDERALIST NO. 73, at 442, 445 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (stating that the veto power protects against laws that would violate the President's constitutional prerogatives). Madison also believed that the veto power was given to the President in part so he could veto unconstitutional laws. *See infra* note 40. Professor Michael Rappaport has recently argued that the President has a constitutional obligation to veto unconstitutional laws. *See* Michael B. Rappaport, *The President's Veto and the Constitution*, 87 NW. U. L. REV. 735, 771-76 (1993).

tutional laws and therefore to engage in a constitutional review of en-
acted laws in a manner not unlike that of the judiciary itself.[12]

While the Framers did not focus directly on the interpretation of
the laws which any administration has to undertake to carry out its
day to day functions, the structure of Article II suggests that the Pres-
ident is ultimately responsible for the legal interpretation of his ad-
ministration. He has the right to require opinions from any
department within his administration.[13] He has the obligation to

---

[12] 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 450-51
(Merrill Jensen ed., 1976) [hereinafter DOCUMENTARY.HISTORY] (statement of James Wilson
on Dec. 1, 1787) (analogizing the authority of the President to refuse to enforce an unconstitu-
tional law to the judiciary's duty to invalidate an unconstitutional law that comes before it).
*See also* Freytag v. Comm'r, 111 S. Ct. 2631, 2653 (1991) (Scalia, J., dissenting) ("[T]he means
[available to the President] to resist legislative encroachment . . . [include] the power to veto
encroaching laws or even to disregard them when they are unconstitutional.") (citation
omitted).

[13] U.S. CONST. art. II, § 2, cl. 1. Professor Lessig has argued that the early practice of the
opinion writing by the Attorney General undercuts the contention that the Framers contem-
plated a unitary executive branch. *See* Lawrence Lessig, *Readings by our Unitary Executive*,
15 CARDOZO L. REV. 175, 186-96 (1993). Specifically, he argues that the Attorney General's
narrow construction of the statute that mandated opinions for cabinet heads and his refusal to
write opinions beyond his statutory mandate suggests that the Framers did not believe that the
power to create a centralized opinion function was inherent in the executive branch. *Id.* at
196. The evidence he adduces, however, does not appear to support his claim. All statements
of the early Attorneys General in the opinions Professor Lessig cites are wholly consistent with
the proposition that the Attorney General has the authority to write any opinion on any sub-
ject at the direction of the President. As long as the President retains this inherent authority
(and Congress even appeared to recognize it in passing a statute that provided that the Attor-
ney General should write opinions when "required by the President," as well as "requested by
the heads of any of the departments," *see* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93),
executive branch legal interpretation is as unitary as the President chooses to make it.

Indeed, the decisions of the early Attorneys General to refuse to write opinions without
express direction from the President for anyone besides heads of departments is completely
consistent with the actual holding of Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792), cited by
Professor Lessig himself. Lessig, *supra*, at 188 & n.62. In *Hayburn*, the Court held that Attor-
ney General Randolph needed authorization from the President to enter a case where a federal
law was being challenged as unconstitutional. 2 U.S. (2 Dall.) at 409. He was thus not viewed
as the equivalent of the British Attorney General who had an independent commission to
represent the public interest without authorization from the head of government. *See* Maeva
Marcus & Robert Teir, Hayburn's Case: *A Misinterpretation of Precedent*, 1988 WIS. L. REV.
527, 534-39. In light of this rebuff to a previous Attorney General, Attorney General Wirt's
restraint in rendering opinion without the express direction of the President is better inter-
preted as respect for the *President's* role as head of a hierarchical executive branch and a
rejection of the notion of the Attorney General as a quasi-judge or the representative of the
public interest in legal uniformity. Should the President have requested him to do so either
specifically or by standing order, there is no indication that he would not have rendered opin-
ions to district attorneys and others within the executive branch for whom he refused to write
opinions. As Professor Lessig himself acknowledges, *see* Lessig, *supra*, at 190, the office of the
Attorneys General was so understaffed in the early republic that it probably influenced the
Attorneys General to interpret their statutory responsibilities narrowly to avoid being

"take Care that the Laws be faithfully executed."[14]  This combination of authority and obligation gives him both the means and the responsibility to conduct an administration under the rule of law.  Thus, it would appear that a model of the Attorney General as opinion writer would begin with the notion that he is aiding the President in carrying out the legal responsibilities, including that of constitutional interpretation, with which the President has been entrusted by the Constitution itself.

Although the Constitution gives the President these legal responsibilities, it does not expressly define how they should be exercised and therefore has left substantial room for disagreement concerning the Attorney General's obligation as a legal advisor and opinion writer.[15]  Three basic models for the Attorney General have been suggested.  The first model I have labeled the court-centered model because it is premised on the contention that the Attorney General is obliged in his legal opinions to follow the precedents laid down by the

overburdened, and the President would have been constrained in making his own legal demands for similar reasons.

Moreover, no inference adverse to unitariness can be drawn, as Professor Lessig suggests, *see id.* at 189, from Attorney General Wirt's refusal to render opinions for Congress.  He was not required to do so by Congress (such a requirement would raise separation of powers issues in any event), and it hardly would be in the President's interest for the Attorney General to have permitted Congress to foist hard legal questions on the executive whenever it chose.  Like the OLC of today, *see infra* part III, early Attorneys General understood that interpretative authority had to be exercised prudently to be politically effective.

[14] U.S. CONST. art. II, § 3.  Of course, the meaning of the Take Care Clause is a matter of some controversy; its explication would require a full article in itself.  Professor Lessig has presented the beginnings of an interesting argument that the Take Care Clause does not confer upon the President the authority to control the discretionary legal interpretations of his agents within the executive branch.  *See* Lessig, *supra* note 13, at 196-99.  The case for construing the Clause to confer this power on the President has recently been advanced in Saikrishna B. Prakash, *Hail to the Chief Administrator: The Framers and the President's Administrative Powers,* 102 YALE L.J. 991, 1000-04 (1993).

[15] In my view, however, the various oaths which the Constitution requires of the judges, legislators, and the President may suggest that each branch's responsibility is to the Constitution itself rather than to another branch's interpretation of the Constitution.  As Professor Sanford Levinson has said:

If one believes that the judiciary "finds" the [law] instead of "creating" it, then the law is indeed "unconstitutional from the start."  Indeed, the judicial authority under this view is derived from its ability to recognize the constitutionality or unconstitutionality of laws, but, at least theoretically, the constitutional status [of statutes] is independent of judicial recognition.  To argue otherwise is ultimately to adopt a theory that says that the basis of law—including a declaration of unconstitutionality—is the court's decision itself.  *Among other problems with this theory is the incoherence it leads to in trying to determine what it can mean for judges to be faithful to their constitutional oaths.*

*Constitutionality of GAO's Bid Protest Function: Hearings Before a Subcomm. of the Comm. on Gov't Operations House of Rep.,* 99th Cong., 1st Sess. 67 (1985) (remarks of Professor Sanford Levinson) (emphasis added).

Supreme Court.[16] The second model is labeled the independent authority model because it is premised on the contention that the President has the authority to interpret the law as he believes it should be interpreted independent of Court precedent.[17] The final model is the situational model in which the President simply interprets the law to advance his political objectives, taking into account precedent or legal principles only to the extent that they may create a political obstacle to fulfilling those objectives.[18]

It will be the thesis of this section that although the initial premises of these normative models seem wholly different, a more refined analysis of the constitutional theory will suggest that the disparities among the models and the divergence among the opinions they would produce may not be as substantial as might at first appear. First, as a matter of theory, even within a court-centered model the executive branch retains substantial autonomy in interpretation. Because the Constitution places the executive branch in a different institutional role from the judiciary, it should, as a matter of theory, have to take an independent view of any issues that rest on judicial doctrines that depend on institutional concerns peculiar to the judiciary, such as the political question doctrine. While the range of the Court's doctrine that rests on institutional as opposed to purely analytical concerns is itself open to dispute, within that range the Attorney General should be understood to exercise independent interpretative authority even under the court-centered model.[19]

Thus, the difference between the court-centered model and the independent model as a matter of theory can be narrowed to the issue of whether the executive branch must follow judicial precedent that rests on analytical foundations. The strongest argument for executive independence with respect to the analytical judgments of the Court rests on the notion that even these judgments need to be subject to

---

[16] For examples of adherence to this model, see Burt Neuborne, *The Binding Quality of Supreme Court Precedent*, 61 TUL. L. REV. 991, 1001 (1987); Michel Rosenfeld, *Executive Autonomy, Judicial Authority and the Rule of Law: Reflections on Constitutional Interpretation and the Separation of Powers*, 15 CARDOZO L. REV. 137, 173 (1993) (suggesting that except in extraordinary circumstances the President's obligation to abide by Supreme Court precedent resembles that of a federal appellate judge).

[17] For recent statements of this view, see John Harrison, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 371 (1988); Edwin Meese III, *The Law of the Constitution*, 61 TUL. L. REV. 979 (1987).

[18] Although commentators do not explicitly defend this model, the situational or political model may be the most influential in actual practice. *See* BAKER, *supra* note 3, at 27. For a possible defense of the situational model as a normative matter, see *infra* notes 95-100 and accompanying text.

[19] For a discussion of the difference between jurisprudence that rests on analytical as opposed to institutional concerns, see *infra* notes 29-39 and accompanying text.

challenge by another institution with a different perspective. The distinctive institutional perspective of the executive branch, however, rests precisely on the fact that it is closer to the popular will. This implies that the executive must be appropriately expected to reflect the popular will to some degree. Taken to an extreme, this political component will tend to make executive interpretation turn on the pressing policy issues of the day without regard to any underlying jurisprudential issues, such as those of interpretive methodology. Thus, a more sophisticated understanding of the court-centered model reveals that it incorporates a substantial amount of independent executive authority; so, too, a sophisticated analysis of the independent model reveals that it incorporates aspects of the situational model.

Thus, while the three models would continue to yield different results in at least some cases, the relationship of the models should be imagined as three cones whose bases overlap rather than three separate cones. One important conclusion of the inquiry into constitutional theory is that under any sophisticated model, executive branch interpretation, including that carried out by the Attorney General, cannot be simply interpretation by an executive officer that attempts to mimic the judiciary in either form or content. A recognition of the popular base of independent executive interpretation may in fact suggest that the executive, at least on occasion, should employ a somewhat different jurisprudential methodology of interpretation from that of the judiciary, one that better reflects the popular will through the use of analogical and particularistic argument rather than deductive and abstract argument. Moreover, the overlap between the models makes it easier for an administration to employ an eclectic mix of models depending on the context and kind of legal issue presented.

## A.  *The Court-Centered Model*

The first model of the Attorney General's opinion-writing function assumes that executive branch officials are not only obliged to obey the decisions of the Supreme Court but must also follow the constitutional principles the Court announces. In *Cooper v. Aaron*,[20] the Supreme Court in fact appeared to suggest that its holdings become a part of the supreme law of the land and thus are no less binding on government officials than the text of the Constitution itself.[21]

---

[20]  358 U.S. 1 (1958).

[21]  *Id.* at 18 ("[T]he interpretation of [the Constitution] enunciated by this Court . . . is the supreme law of the land, and Art[icle] VI of the Constitution makes it of binding effect on the States . . . . Every state legislator and executive and judicial officer is solemnly committed by

Under this view of the content of constitutional law, the President's responsibility for interpreting the Constitution is mediated by the decisions of the Supreme Court.[22] Thus, in the starkest form of the court-centered model, the Attorney General as an opinion writer becomes not unlike an "inferior" court charged with trying to faithfully interpret Supreme Court decisions as well as the Constitution itself.[23]

The pure court-centered model, however, is tempered substantially both in theory and practice by the limitations the Constitution imposes on the judiciary and by the jurisprudential limitations the judiciary imposes on itself.[24] In some areas of the law, for instance, the Attorney General will be addressing issues which rarely, if ever, come before the Court because of the justiciability barriers posed by the "Cases . . . [and] Controversies" requirement of Article III.[25] A prime example of cases barred by this requirement are those in which there are few, if any, litigants who have standing to bring a relevant

oath taken pursuant to Art[icle] VI, cl. 3, 'to support this Constitution.'"). Thus, the strong version of *Cooper*'s holding is that Supreme Court decisions themselves become part of the supreme law of the land and thus binding on all those who take an oath to support the Constitution. If Supreme Court decisions have this exalted status, it would appear that the members of the executive branch, who, like state officials, take an oath to uphold the Constitution, would be no more entitled to disregard or dissent from them than they would be entitled to disregard or dissent from the Constitution itself. This view of the status of Supreme Court decisions cannot be correct (if it is correct) simply because the Court announced it. To conclude that the Court's principles have binding force beyond the case in which they are announced on the basis of an announcement in a case would be obviously circular.

[22] I have elsewhere argued against the court-centered view in the context of the appellate advocacy of the executive branch. *See* McGinnis, *Solicitor General's Office*, *supra* note 10, at 801-08. Some variation of the court-centered view, however, has been defended in discussions of the Solicitor General and elsewhere. *See, e.g.*, CAPLAN, *supra* note 4, at 127-33; Neuborne, *supra* note 16, at 1001 (1987) (praising the "conception of judicial precedent" set forth in *Cooper v. Aaron*, namely, that the Court's construction of the Constitution is "binding on all government officials").

[23] As Professor Merrill observes, the court-centered model can also be supported by the notion that stare decisis applies across all branches of the government—not simply the judiciary. *See* Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations for Judgments*, 15 CARDOZO L. REV. 43, 66-67 (1993). If the court-centered model rests on this premise, it is still subject to the substantial limitations noted here.

[24] *See* Frank H. Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802, 826-28 (1982) (suggesting that the institutional structure of the Supreme Court, principally its changing membership and shifting coalitions, make it impossible for the Court to render consistent decisions). Moreover, as a practical matter, as long as the Court's decisions are in tension with one another within a single subject matter area, the court-centered model would also allow substantial autonomy as a practical matter because the Attorney General may choose to favor one line of decisions over another. Nevertheless, this practical autonomy does not fundamentally disturb the analogy between the Attorney General and an inferior court because inferior courts also have substantial ability to weave together the conflicting precedent of a superior court to reach what they perceive to be a constitutionally correct result.

[25] U.S. CONST. art. III, § 2, cl. 1, *amended by* U.S. CONST. amend. XI.

Case 1:21-cr-00670-CJN   Document 58-28   Filed 04/15/22   Page 11 of 62

constitutional claim.[26]  Nevertheless, under a pure court-centered
view, the Attorney General would appear obligated to look to judicial
decisions for analogy or appropriate methodology even where there is
no directly relevant precedent.  Given that constraints of a multi-
member decision-making body make it difficult, if not impossible, for
a court to apply a consistent interpretative methodology across sub-
stantive areas,[27] the Attorney General will nevertheless have, as a
practical matter, enormous autonomy in these areas of a kind not en-
joyed by inferior courts.

   Moreover, the institutional character of much of the Court's ju-
risprudence also tempers the court-centered model as a matter of the-
ory.  The Court's jurisprudence throughout history has been deeply
self-referential; at least, as a matter of conscious theory, the question
has not simply been how the Constitution should be interpreted by an
ideal observer but how it should be interpreted by the judicial ob-
server with its peculiar institutional and structural constraints.[28]
Thus, the Court's constitutional jurisprudence often reflects an *insti-
tutional* approach, peculiar to the judiciary itself, rather than a purely
*analytical* approach which could be employed by anyone or any
branch.[29]

---

[26] Many issues relating to the allocation of foreign affairs and war power fall into this
category.

[27] If the Court is not consistent even within a single area, *see* Easterbrook, *supra* note 24, it
certainly cannot be expected to be consistent in interpretive methodologies that cut across
substantive areas. Therefore in subject matter areas which the Court does not address, the
Attorney General will not be constrained by a consistent methodology that can be inferred
from cases in other areas.

[28] For a classic statement of the view that the Court should take institutional factors into
account in its jurisprudence, see ALEXANDER M. BICKEL, THE LEAST DANGEROUS BRANCH
(1962).

[29] The distinction is between the Court's rejecting a constitutional claim for "analytical"
reasons (e.g., the text of the Constitution fails to support this claim) and "institutional" rea-
sons (e.g., the claim cannot be enforced for reasons such as judicial competence). *See* Lawrence
G. Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms*, 91 HARV.
L. REV. 1212, 1217-18 (1978). Professor Sager makes this distinction to argue that constitu-
tional actors other than the federal courts (in particular the Congress and the state courts) may
legitimately enforce constitutional norms to a greater extent than the federal courts when these
norms are underenforced in the federal judicial forum for institutional reasons. *Id.* at 1220-21.
Professor Sager, however, does not apply the distinction, as we do here, in a consideration of
the executive branch's interpretive responsibilities, nor does he apply the distinction to the
enforcement of structural as opposed to individual rights provisions of the Constitution.

   The distinction, however, can clearly be applied to the executive branch: insofar as the
executive branch has a different institutional position and competence than that of the judici-
ary, its responsibility for enforcing the Constitution may differ.  Moreover, institutional con-
siderations play a role in interpreting the structure of the enumerated powers and other
limitations on the federal government no less than in the interpretation of individual rights.
The Constitution of 1789 was in large measure designed to keep the federal government from
infringing on state authorities and these limitations may be underenforced for institutional

For instance, one strand of the political question doctrine suggests that the Court may be institutionally unsuited to determine certain kinds of constitutional issues.[30]  The court-centered model would not require the Attorney General to follow the Court and also to decline to decide an issue because of such a precedent when the Court has in fact made a decision about the judiciary's institutional competence and not about the executive's.  Moreover, it might well not be sensible to look for other precedents in other areas or at the Court's general methodology because this strand of the political question doctrine is itself a recognition that the Court's own jurisprudential tools are not well adapted to determining these kind of questions.[31]

The importance of the Court's self-referential institutional constraints as a limitation of the court-centered model depends on the degree to which the Court's jurisprudence incorporates institutional concerns.  Certainly, there are many other areas besides the political question doctrine in which the Court is frank to acknowledge that its institutional limitations affect its enforcement of constitutional norms.  For instance, in *Garcia v. San Antonio Metropolitan Transit Authority*,[32] the Court abjured the enforcement of the Tenth Amendment in part because it claimed that it was unable to draw principled lines to distinguish between state functions which were "traditional" and thus protected from Congressional regulation under the Tenth Amendment and those that were not "traditional" and thus unprotected.[33]  If the executive branch believed it were in a better institutional position

---

reasons. *See infra* note 51.  The concept of overenforcement and underenforcement as it relates to the separation of powers is more complicated because it is not always clear which provisions are meant to empower and which to limit particular branches.  Nevertheless, in the separation of powers, the judiciary also can give both analytical and institutional reasons for its decisions.  Therefore when a separation of powers decision is based on institutional reasons, the executive may enforce separation of powers provisions to a greater or lesser extent than the judiciary.

[30]  *See* Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.  Such decisions are . . . delicate, complex, and involve large elements of prophecy. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ."); Goldwater v. Carter, 444 U.S. 996, 1002-03 (1979) (Rehnquist, J., concurring) (stating that the President's power to abrogate a treaty was a " 'political' and therefore nonjusticiable" issue).  The notion goes back to Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), the fount of judicial review, which itself suggests institutional limits on the Court's role: "Questions, in their nature political, or which are, by the [C]onstitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170 (orthography modernized). *See also* Sager, *supra* note 29, at 1224-25.

[31]  *See* Coleman v. Miller, 307 U.S. 433, 454-55 (1939) (stating that "the lack of satisfactory criteria for a judicial determination" is one of the "dominant" considerations in the political question doctrine).

[32]  469 U.S. 528 (1985).

[33]  *Id.* at 539-47.

to make the evaluation of such traditions, perhaps it could undertake more vigorous enforcement of the Tenth Amendment than attempted by the Court.[34]

Once a distinction between analytical and institutional reasons underlying Court decisions is recognized, there remains the question of the degree to which the executive branch may determine for itself which decisions are motivated by institutional and which by analytical reasons. A weaker version of the executive branch's autonomy within the court-centered model would permit the exercise of independent judgment *only* insofar as the Court's opinion declared openly that it was based on institutional reasons. A stronger version of this authority would permit executive autonomy as long as the Court itself has not identified whether institutional or analytical concerns are at the core of its reasoning. A justification for this version of executive authority would be broadly analogous to the underlying rationale of the Supreme Court's own decision to review state constitutional law decisions unless it is clear that they rest on independent and adequate state grounds: just as the Court's rule encourages state courts to be clear about whether a decision rests on state rather than federal law, a presumption of autonomy would encourage the Court to be clear about the degree to which its decision rested on analytical rather than institutional concerns.[35]

Under the latter view, the executive branch would enjoy substantial autonomy over a wide range of issues. For instance, the Court today no longer enforces the Commerce Clause[36] to any substantial extent against Congress when the latter regulates private parties.[37] The reason for judicial abnegation can be understood as the failure of the Court to find any standard (such as the indirect-direct distinction) that was capable of principled judicial application. Such a view of the development of the Court's Commerce Clause jurisprudence would empower the Attorney General, even when acting within a court-cen-

---

[34] One of the reasons that the executive branch may be in a better institutional position is that it more closely reflects the popular will and thus can better engage in a more open-ended process of analogical reasoning to assess whether a particular form of state activity is central to political governance. *See infra* notes 76-84 and accompanying text.

For another discussion of the distinct roles of the Congress and the judiciary under *Garcia*, see Mark V. Tushnet, *The Constitution Outside the Courts: A Preliminary Inquiry*, 26 VAL. U. L. REV. 437, 451-53 (1992). Tushnet uses the term "court-centered" to mean something akin to what I refer to as the judiciary's institutional considerations in jurisprudence.

[35] *See* Michigan v. Long, 463 U.S. 1032, 1042 (1983) (holding that the Supreme Court will review state judicial decisions that raise federal constitutional issues unless there is a "plain statement" that these decisions rest on independent and adequate state grounds).

[36] U.S. CONST. art. I, § 8, cl. 3.

[37] *See, e.g.,* Wickard v. Filburn, 317 U.S. 111 (1942).

tered model, to employ his own and stricter Commerce Clause juris-
prudence in determining whether to recommend a veto of
congressional legislation.[38]

Indeed, many analyses of the Court's jurisprudence view institu-
tional considerations as necessarily at the heart of *all* its constitutional
opinions. For instance, it has been argued that as a matter of judicial
restraint—a consideration that flows from the Court's institutional
position in the government—the Court should give substantial defer-
ence to congressional enactments, invalidating them only when their
constitutionality is beyond "reasonable doubt."[39] If the judiciary sys-
tematically underenforces a constitutional norm such as the Tenth
Amendment because of general considerations of judicial restraint,
even under a model that respects the judiciary as the ultimate genera-
tor of constitutional principle, the Attorney General has the author-
ity, if not the obligation, to enforce the Constitution without reference
to considerations of judicial restraint.

Paradoxically, however, the same focus on the institutional char-
acter of constitutional decision-making that permits the executive
branch substantial autonomy even within the court-centered model
may also temper the executive's use of that autonomy in either the
court-centered or wholly independent authority model. If the execu-
tive branch may purge its analysis of the judiciary's institutional con-
siderations, it follows that under any model of executive branch
interpretation the executive branch should reflect on its own institu-
tional constraints in the exercise of at least some of its constitutional
interpretations: it is not an ideal observer any more than is the
judiciary.

For instance, consider the difference between the function an At-
torney General's opinion performs in determining whether a law
should be vetoed because it is unconstitutional and whether enforce-
ment of a law should be refused because it is unconstitutional.[40] In

---

[38] One might claim that because the President could veto such a bill for any reason at all,
the fact that he gives constitutional reasons for doing so does not bear on the extent or auton-
omy of his interpretative authority. For a response, see *infra* note 40.

[39] James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*,
7 HARV. L. REV. 129, 149 (1893). *See* Sager, *supra* note 29, at 1216-17.

[40] Some have suggested that a theory of the executive branch's interpretative authority
does not have to address the President's vetoes of bills for constitutional reasons. *See, e.g.*,
Judge Samuel Alito, Address at the *Cardozo Law Review* Symposium on Executive Branch
Interpretation (Nov. 15, 1992). It has been argued that because the President may veto a bill
for any reason at all, it does not matter whether he exercises his vetoes on autonomous juris-
prudential principles or on court-centered ones. The Framers, however, gave the President the
veto power in part so he could veto bills on constitutional grounds, see James Madison, Obser-
vations on the "Draught of a Constitution for Virginia," *in* 11 THE PAPERS OF JAMES

the first instance, the Attorney General is advising the President on the exercise of a power by which he himself participates in the legislative process.[41] Because this process is not complete until he signs the bill, the constitutional determination embodied in the bill deserves less deference than that given by the judiciary to a legislative enactment.[42] Therefore the President may veto bills even if they are not clearly unconstitutional. Because of this relaxed standard, he naturally may depend more on his own views of the Constitution and does not have to fortify confidence in his judgments by reference to the Supreme Court.[43] On the other hand, once the bill has become law it is possible to argue that the executive branch's constitutional review should become at least as deferential as the "clearly unconstitutional" standard once suggested for judicial review of legislation.[44] Judicial

---

MADISON 285, 292-93 (Robert A. Rutland & Charles F. Hobson eds., 1977), and also directed the President to uphold the Constitution. U.S. CONST. art. II, § 1, cl. 8. Therefore he has an obligation to veto bills if they are unconstitutional even if they seem good policy. Thus the standard of constitutional review he should employ is a matter of moment when he confronts legislation that from his point of view is sound policy but is constitutionally questionable. The issue is also of frequent practical importance to the Attorney General when he must decide whether to urge the veto of a bill on constitutional grounds that the rest of the administration supports as a matter of policy (or at least as a matter of assuaging a powerful congressman). Moreover, whenever the President vetoes a bill for constitutional reasons, his veto message has generally been understood to become part of the common constitutional discourse and can be relied upon as precedent by the legislature and his successors. The constitutional veto is thus an act that cannot be assimilated to a veto for mere policy reasons.

[41] *See* THE FEDERALIST No. 73, at 444 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (discussing the President's veto power as part of a system of legislation).

[42] For a discussion of this deferential standard, see *supra* note 39 and accompanying text.

[43] For an example of a recent presidential veto based on constitutional views not shared by the Supreme Court, see Message to the Senate Returning S. 742 Without Approval, 23 WEEKLY COMP. PRES. DOC. 715 (June 19, 1987) [hereinafter Veto Message]. President Reagan vetoed a congressional enactment of the so-called "fairness doctrine," *see* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969), that permitted content-based regulation of that medium, suggesting that technological advances in broadcasting had undermined Supreme Court precedent and also stating that "[q]uite apart from these technological advances, . . . [h]istory has shown that the dangers of an overly timid or biased press cannot be adverted through bureaucratic regulation, but only through the freedom and competition that the First Amendment sought to guarantee." Veto Message, *supra*, at 715.

[44] Attorneys General have even on occasion suggested a more deferential standard with respect to decisions not to enforce a statute. *See* 4A Op. Off. Legal Counsel 55, 59 (1980) (opinion of Attorney General Civiletti stating that the President should refuse to enforce a law for constitutional reasons only in "rare cases" and giving examples of *patently* unconstitutional legislation such as a statute that would order the prosecution of members of a particular party). The underlying rationale for this even more deferential standard was the Attorney General's observation that in most cases the judiciary could be relied on to invalidate unconstitutional statutes. *Id.* Presumably his notion was that since the courts could entertain the suits and the executive branch had already had a chance to evaluate the bill at the time of presentment, the judiciary was the appropriate forum.

The executive branch, however, has not always articulated such a deferential standard. *See* 9 Op. Att'y Gen. 462, 469-70 (1860) ("*Every law is to be carried out so far forth as is*

precedents suggesting that a law is unconstitutional fortify the President's judgment and may thus have a greater role to play in decisions not to enforce than in veto decisions. Accordingly, it may be a theory of *executive* restraint, which relies on institutional considerations that parallel those underlying judicial restraint, and like the theory of judicial restraint has its roots in a branch's self-reflection on its constitutional position, that justifies the much greater latitude Attorneys General have traditionally taken in constitutional interpretation when recommending or threatening the veto of bills than in refusing to enforce laws once they are enacted.[45]

## B. *The Independent Authority Model*

Even under the more sophisticated understanding discussed above, the court-centered model differs from the independent authority model. The more sophisticated understanding permits the executive branch to exercise autonomy insofar as decisions that would otherwise constrain it are made for institutional reasons peculiar to the judiciary.[46] Insofar as judicial decisions rest on analytical reasons, however, it is the essence of the court-centered model to require that these decisions be binding precedent on the executive branch.

The independent authority model ultimately rests on the notion that even the analytical decisions of the Court should be subject to challenge by an official interpreter of the Constitution. A premise of this view is that the text and structure of the Constitution assigns to

---

*consistent with the Constitution . . . . You are therefore entirely justified in treating this condition (if it be a condition) as if the paper on which it is written were blank.*") (emphasis added). One way of reconciling Attorney General Black's hyperaggressive approach to the issue of non-enforcement with the *far* more deferential standard of Attorney General Civiletti is to note that the former addressed a provision that violated the separation of powers. The President may have more latitude in refusing to enforce provisions that violate the separation of powers than provisions that violate other constitutional provisions because it is well understood that the best way to reach a constitutional equilibrium in this area is for each branch to vigorously enforce its own interests. *See infra* notes 87-88 and accompanying text. *See also* 14 Op. Off. Legal Counsel 38, 51-53 (1990) (preliminary print) (suggesting that the President's authority to refuse to enforce a law is at its height when a provision violates his own prerogatives).

[45] For a discussion of an instance in which the Department of Justice recommended a veto on constitutional grounds of provisions it did not challenge once enacted, see the discussion of the Reagan and Bush administrations' analysis of independent agencies, *infra* notes 215-22 and accompanying text.

[46] It is important to note that the autonomy of the Attorney General under the court-centered model is contingent on the Court's incorporation of institutional considerations into its jurisprudence. Much of his autonomy would disappear if the Supreme Court simply interpreted the Constitution as a set of formal rules which it was entirely competent to interpret in every case (or at least all those cases where the Constitution does not contain a meta-rule depriving it of interpretative authority in a particular area).

the executive branch a responsibility to interpret the Constitution in-
dependently in carrying out its responsibilities. As to the text, we
have already seen that there are a variety of textual provisions that
suggest that the executive has legal responsibilities separate from
those of the judiciary.[47] As to the structure, the Constitution gener-
ally is structured to avoid giving a monopoly on any function to a
single branch, and the power of constitutional interpretation should
be no exception. This structural argument is strengthened if one be-
lieves that systemic errors in the Court's analytical output are likely
to flow from the Court's institutional position. For instance, its rela-
tive insulation from the direct control of other branches may natu-
rally tend to encourage it to aggrandize its own powers in its
analytical interpretations of the Constitution.[48] In other words, de-
spite the self-reflection found in the institutional reasons for its deci-
sions, analytical errors can inevitably be expected to arise from the
Court's *unacknowledged* exploitation of its institutional position.[49]

   As a result, it is the danger of overenforcement rather than the
danger of underenforcement of norms that provides most often the
compelling motivation for the independent authority model.[50] It is
the Court's institutional position—its insulation from direct political

---

[47] *See supra* notes 10-15 and accompanying text, particularly the remarks of Professor Levinson, *supra* note 15.

[48] For a general discussion of the way the Court's institutional interests shape its doctrine, see John O. McGinnis, *Constitutional Review by the Executive in Foreign Affairs and War Powers: A Consequence of Rational Choice in the Separation of Powers*, 56 LAW & CONTEMP. PROBS. (forthcoming 1993).

[49] Analytical error under this view can be defined only by a neutral observer with no insti-
tutional position to distort his interpretation. No official interpreter of the Constitution pos-
sesses this privileged position, but that does not deprive the concept of its meaning because all
actors act as if there are analytical constitutional truths that can be defined apart from their
institutional perspective. In other words, analytical correctness is a presupposition of constitu-
tional interpretation: even if not realized in practice, it is a regulative ideal for constitutional
interpreters.

   The most difficult question for the independent autonomy model is to what degree auton-
omous executive interpretation is likely to move the system toward analytical correctness. As
discussed below, the model rests on the notion that the clash of interpreters with different
institutional interests is more likely to lead to analytical correctness than leaving the responsi-
bility wholly in the hands of an actor with a single distinctive institutional perspective.

[50] Overenforcement of constitutional norms can rarely be understood as premised on insti-
tutional considerations—as opposed to analytical error. One counterexample is perhaps the
exclusionary rule. The Court's decision to prohibit all involuntary confessions may over-
enforce the Fifth Amendment because, for institutional reasons, the Court cannot create a
system of tort liability that would adequately enforce the Fourth Amendment. *See* Henry P.
Monaghan, *The Supreme Court, 1974 Term—Foreword: Constitutional Common Law*, 89
HARV. L. REV. 1, 3-10 (1975). If Congress had created such a liability system, the Court
might substantially defer to Congress's judgment, i.e., that its choice of tort liability was a
sufficient remedy for Fifth Amendment violations. Thus, by proposing and signing legislation
to enact such a remedial scheme, the President would be engaged in constitutional interpreta-

response—that gives it the latitude to overenforce constitutional norms, such as the Bill of Rights, and so usurp the prerogatives of the other branches and the states.[51] There is no adequate response to this problem within the court-centered model because, in that model, the executive branch acquiesces in the judiciary's usurpations so long as these usurpations are based on analytical considerations.[52] Thus, the strongest argument for the independent authority model of executive branch interpretation is the familiar need for "[a]mbition . . . to counteract ambition."[53] If the President and his subordinates within the executive branch have the authority to interpret the Constitution independent of the Court, they may insure that the debate about first constitutional principles is ever renewed and no usurpation is entrenched beyond challenge.[54] As such, the independent authority model may be thought to comport with the architecture of the Constitution as a whole, specifically in its exploitation of institutional conflict to prevent a monopoly of power by any one branch over any aspect of civic life.

Professor Paulsen has argued that the independent authority model must logically permit the executive branch to disregard the Court's judgments as well as challenge the Court's precedents.[55] Professor Paulsen contends that if the executive branch has an independent obligation to follow the Constitution, it must consider that obligation in deciding whether to execute the Court's judgments no less than in any other situation.[56] Professor Paulsen's lucid and crea-

---

tion that would discount the institutional limitations of the judicial branch that led to overenforcement of the Fourth Amendment.

[51] Underenforcement, however, can also result from the judiciary's abuse of its institutional position. Indeed, the anti-federalist Brutus feared that the judiciary as a federal entity would have an institutional interest in failing to construe the enumerated powers strictly. *See* Brutus No. 11 *in* THE ANTI-FEDERALIST PAPERS AND THE CONSTITUTIONAL CONVENTION DEBATES 296-98 (Ralph Ketcham ed., 1986). As we will see, the motivation behind the adoption by Jefferson's Attorney General of an independent authority model was the enforcement of what Jefferson believed were unenforced limitations on the federal government.

[52] Another response within the court-centered model would be for the President to appoint Supreme Court justices who disagree with constitutional principles or precedent espoused by the Court, but this response is not adequate by itself to provide an effective check. First, it depends on the accident of a court vacancy. Second, the incorrect principle or precedent will be debated again only if the Court takes an appropriate case, and it may often be the case that only the President (or Congress) can act inconsistently with Court precedent to create another case. *See infra* note 69 and accompanying text.

[53] THE FEDERALIST No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).

[54] For a discussion of the importance of structuring government to provide debate about the first principles of the republic, see McGinnis, *Reply, supra* note 10, at 658-59.

[55] Michael S. Paulsen, *The Merryman Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81, 99-109 (1993).

[56] *Id.* at 103-06.

tive arguments are important because the independent authority model had not previously been thought to imply that executive authority may disobey judgments. Nevertheless, his arguments are not persuasive either as a matter of the Constitution's text or its original understanding.

First, the "Cases . . . [and] Controversies" language of Article III[57] can be understood as a textual commitment to constitutional decisions in particular cases.[58] Just as the judiciary lacks authority to review the Senate's constitutional determinations in an impeachment trial,[59] the executive lacks the authority to review the judiciary's determination in a particular case. Thus, the text of the Constitution itself offers a persuasive reason to distinguish the executive obligation to follow precedent from its obligation to obey a judgment.

Moreover, the Framers' original understanding of the concept of the judicial power can only be understood against the rise of the English judiciary as a check against arbitrary action by the king—a check that was premised precisely on the understanding that the king was not at liberty to refuse to execute the judiciary's judgments.[60] There seems to have been no similar understanding of the king's obligation to follow judicial precedent.[61] It is thus not surprising that even ad-

---

[57] U.S. CONST. art. III, § 2, cl. 1 (amended 1795).

[58] Article III, Section 2, Clause 1 provides:

The judicial Power *shall* extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the Unites States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

*Id.* (emphasis added).

[59] *See* Nixon v. United States, 113 S. Ct. 732 (1993).

[60] It seems to have been a premise of the English Constitution from the time of the Stuart Monarchy that the king could not disregard judgments of the courts. Although the king tried to influence judicial decisions, he did not flout their mandates. Indeed, the understanding of the finality of judgments under the Stuarts is underlined by King James I's use of his power to dismiss judges who would likely make undesirable rulings. *See* J. P. KENYON, THE STUART CONSTITUTION 1603-1688, at 90, 92, 103 (1966) (discussing the king's power of dismissal and his use of this power to dismiss recalcitrant judges, including the great Sir Edward Coke). Moreover, at least in the eyes of the Puritans, the entire political system of England was founded on "distributive authority"—the notion that the fundamental law distributed power to the courts, Parliament, and the king as independent institutions. *See* JOHN D. EUSDEN, PURITANS, LAWYERS, AND POLITICS IN EARLY SEVENTEENTH-CENTURY ENGLAND 141-43 (1958). There would be nothing left of the authority distributed to the courts if the king could constitutionally disregard their judgments because the English constitutional system had no provision for the impeachment of a king.

[61] In contrast to viewing judgments as binding, sophisticated jurists like Sir Edward Coke

herents of the autonomy of executive branch legal interpretation among the founding generation *conceded* that court judgments must be obeyed even though these judgments did not create binding precedent. A signal proof of the consensus that the binding nature of judgments was an essential attribute of judic'ial power were the views of Jefferson's first Attorney General, Levi Lincoln. As we shall see, Lincoln not only articulated an independent Republican jurisprudence that sharply contrasted with the Federalist courts but he also expressly celebrated the multiplicity of legitimate constitutional interpreters other than the Court, including the executive branch.[62] Yet Lincoln himself acknowledged the binding force of the Supreme Court's judgment in any case in which it was rendered, while reserving the executive branch's right to disregard that precedent in the future.[63] There is thus substantial evidence that the distinction between judgments and precedents that Professor Paulsen seeks to obliterate was well recognized both in English history and among the founding generation.

The corrective mechanism rationale for autonomy in executive branch interpretation also suggests that there are structural reasons as well that the executive branch should have the authority to challenge the Court's precedents but not its judgments. If the Court's precedents were not open to challenge, any usurpations would be permanent, and thus the constitutional order could be permanently disfigured. On the other hand, obeying judgments as a general matter does not permanently undermine constitutional order.[64] If the judgment is based on an erroneous constitutional interpretation, there will be other cases in which the correct constitutional principles can be asserted.[65]

---

recognized that even in a common law system precedent could be challenged. KENYON, *supra* note 60, at 102-03. This view gains additional force in a system, like that of the United States, where a written constitution is available against which to measure a judge's decisions.

[62] For a discussion of these views of Levi Lincoln, see *infra* notes 126-28 and accompanying text.

[63] See *infra* notes 126-28 and accompanying text.

[64] The Court could threaten a lasting transformation of the constitutional order if it entered a permanent injunction against the executive branch, for instance, if it enjo'inedthe President from taking military action in the absence of congressional authorization. The extent of such an injunction, however, would raise serious questions about whether the Court was following the "case or controversy" requirement of the Constitution. *See* U.S. CONST. art. III, § 2, cl. 1 (amended 1795). Because this requirement is a presupposition of the executive branch's obedience, *see supra* notes 57-59 and accompanying text, the executive may have a stronger case for disregarding that portion of the judgment which disregarded the requirement. This extraordinary and limited circumstance is no warrant for inferring a general executive authority to d'isobey judgments when a court has honored the case or controversy requirement.

[65] Indeed, if Judge Easterbrook is correct in the view that the Court necessarily embraces inconsistent principles in its decisions, *see supra* note 27 and accompanying text, the executive

Moreover, if the executive were required to pass on the legality of all judgments of the Court, its power over the development of the law would be stronger than that of the judiciary because it would have the final say in constitutional interpretation, not only on constitutional issues which did not give rise to a case or controversy, but also on issues which did give rise to such a case. There is substantial evidence, however, that the Framers thought the judiciary had a comparative advantage over the other branches in making constitutional interpretations.[66] This advantage would be greatly diluted if the executive sat as a kind of court of appeal from the judiciary's decisions in every case. The Constitution is characteristically structured to give one branch the greatest share of control over a particular subject, but checks that power through giving another branch a less comprehensive power over the same subject.[67] Only in this way does the Constitution obtain the benefits of the comparative advantages of the institutions it creates while denying any institution a monopoly of power. By retaining the judiciary's absolute authority over judgments while permitting executive departures from precedent, one both preserves comparative advantage and avoids monopoly.

At the other extreme from Professor Paulsen, some commentators have argued that the executive branch does have a general obligation to follow Court precedent, suggesting that a sufficient corrective mechanism exists as long as the executive branch has the power simply to criticize Supreme Court decisions.[68] One difficulty with this argument is that mere criticism of the Court does not necessarily create an opportunity for changing the Court's jurisprudence. For instance, if the Court had ruled fifty years ago that imposing drug tests on any federal employee violates the Fourth Amendment, the only way to challenge that ruling would be to institute the drug tests again. Similarly, if the Court had ruled that it was improper to fire the head of an "independent" agency except for moral turpitude, the only way to change that regime would be to fire the head of an independent agency for other reasons. The same "case or controversy" require-

branch over time may be able to exploit those inconsistencies to shift the Court's framework of analysis to its liking.

[66] *See* THE FEDERALIST NO. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (viewing the judiciary as the branch "least dangerous to the political rights of the Constitution"). Mark Tushnet also uses the term "comparative advantage" regarding the federal judiciary. *See* Tushnet, *supra* note 34, at 443. I have also used the term previously and independently. *See* McGinnis, *Reply*, *supra* note 10, at 648.

[67] *See* McGinnis, *Reply*, *supra* note 10, at 668 (characterizing the Appointments Clause as giving a substantial advantage to the President in nominations while relying on the Senate as a check on the President's power).

[68] *See* Neuborne, *supra* note 16, at 993; Rosenfeld, *supra* note 16, at 169-71.

ment that requires executive obedience to the judgments also prohibits advisory opinions and therefore may force the elected branches to take concrete steps to create an opportunity for reconsideration.

Indeed, a refusal to permit the executive and other elected branches the opportunity to take action that is inconsistent with Supreme Court precedent creates a troubling asymmetry. Whenever the Court has ruled against the right of the executive (or Congress for that matter) to take an action because of the Bill of Rights, there would be no opportunity to force reconsideration. On the other hand, whenever the Court ruled in favor of the executive branch, there would be no structural impediment to the renewal of the arguments that the Bill of Rights correctly interpreted should bar the action. The asymmetry is especially troubling if one believes that the Court may have an institutional tendency to overenforce the Bill of Rights in order to increase its own power.[69] Therefore an additional argument for the independent authority model is that it is neutral as to the underenforcement and overenforcement of constitutional provisions: both kinds of erroneous interpretations may be subject to direct challenge.

The most difficult question for the independent authority model is not whether the executive must obey judgments of the Court or whether it must always follow precedent, but whether it must follow particular kinds of precedent as, for instance, where a failure to do so would lead to substantial disparities in the treatment of similarly situated individuals or to needless litigation. For instance, if the Second Circuit has made a decision on a Social Security case, can the executive, if it disagrees with the decision, force Social Security recipients within the Second Circuit to relitigate the case? This is the area of potential executive autonomy that is generally described by the term "nonacquiescence." Although the subject is too large for resolution here,[70] an outline of a theory emerges from the preceding discussion of the executive's obligation to obey judgments.

First, the executive branch has no general obligation rooted in the Constitution's text to follow such precedents. The textual commitment of cases to the judiciary requires only that judgments be obeyed.[71] Nevertheless, a corrective mechanism exists as long as the executive ultimately retains the right to challenge precedent; therefore the most important structural rationale for autonomy does not sug-

---

[69] For reasons for such a belief, see McGinnis, *supra* note 48.

[70] For an excellent discussion of nonacquiescence, see Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679 (1989).

[71] *See supra* notes 57-59 and accompanying text.

gest that the executive must at every turn challenge a precedent that it believes wrong in the face of countervailing considerations. Prudence may dictate acquiescence in a range of cases for reasons either of equity or litigation resources. These prudential decisions regarding when to acquiesce may in turn create traditions from which the executive should not depart but for compelling reasons.

In any event, as long as the executive retains the right to challenge precedent in the Supreme Court and the judiciary retains the right to have its judgments respected, each branch has a mechanism for ensuring continuing conflict.[72] The battle over where to draw the line on nonacquiescence is a secondary one: it is less important that the line be drawn in any particular place than that it be drawn as a result of the tension between two branches with conflicting institutional structures and ambitions.

While the difference in the view of the President's interpretative responsibilities is likely to make a substantial difference both in litigation strategy and in opinion writing, the difference in opinion writing may well be greater precisely because of these prudential traditions. Litigation occurs either before inferior courts, which have an almost absolute obligation to follow the Supreme Court's precedent, or before the Supreme Court, which gives substantial weight to its own precedent because of the doctrine of stare decisis. Accordingly, prudence may suggest accepting Court precedents with which the Attorney General as litigator disagrees.[73] On the other hand, many of the Attorney General's opinions do not address justiciable issues. Moreover, the Attorney General's opinions may often pretermit judicial review of the issue. For instance, the President may be considering vetoing a bill: if it is vetoed on constitutional grounds, it will never be considered by the judiciary. (Presidents have, in fact, vetoed bills on constitutional grounds even though they would clearly be upheld by the Court.)[74] Similarly, an executive or administrative action that is

---

[72] As Professor Merrill observes, the judiciary, by creating causes of action that hold officials liable in damages for illegal acts, offers a powerful incentive for the executive to comply with judicial precedent. These incentives would operate even assuming the executive has the *constitutional* authority to disregard precedent. *See* Merrill, *supra* note 23, at 72.

[73] Of course, the independent authority model has substantial implications for the conduct of litigation as well. *See* McGinnis, *Solicitor General's Office*, *supra* note 10, at 805-09 (describing how the Solicitor General should conduct his business under the independent authority model).

[74] President Jackson vetoed the Bank of the United States legislation despite the fact that it had been upheld in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819). Veto Message from Andrew Jackson to the Senate (July 10, 1832), *in* 2 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789-1897, at 576, 581-82 (James D. Richardson ed., Washington, Gov't Printing Office 1896) [hereinafter 2 MESSAGES].

considered unconstitutional and therefore not implemented will never be reviewed. Therefore, it is in the opinions of the Attorney General that one would most expect to find an articulate body of independent constitutional and statutory interpretation.

Even assuming that the Attorney General should exercise substantial autonomy in these areas of his work, there remains at least one additional question within the independent authority model: should his opinions approximate those of the judiciary in method or should they have a distinctive, non-judicial cast of interpretation? As we have seen,[75] even under the court-centered model of the Attorney General as opinion writer, there can be, at least theoretically, substantial divergences between the opinions of the Attorney General and those of a court when the judicial precedents depend on institutional considerations that are inapplicable to the executive branch. A fortiori, under the model of the Attorney General as independent interpreter, the institutional constraints which may color the opinions of the judiciary no longer need apply.[76]

More fundamentally, however, it is not clear that the Constitution contemplates that the President and his subordinates will exercise their constitutional responsibilities with a jurisprudence whose methodology exactly tracks that of the judiciary; and the independent authority model does not necessarily imply that Attorney General opinions not resemble those that would be produced by a shadow court of jurists following the President's jurisprudential principles.[77] The President is not insulated from public passions in the same way that life tenure insulates the Article III judiciary. Indeed, at least some of the Framers believed it important that the people influence constitutional interpretation through their political representatives: only in this way can people correct constitutional usurpations.[78] Given that the President's constitutional responsibilities are, as a matter of constitutional structure, more closely related to the people's will, the independent authority model can be expected to generate opinions that should reflect in part some of that "will" and not partake only of the "judgment" expected of the judiciary.[79] The premises

---

[75] *See supra* notes 29-39 and accompanying text.

[76] I discuss above the possibility that institutional constraints peculiar to the executive branch should circumscribe the Attorney General's opinion-writing function in some instances. *See supra* notes 42-45 and accompanying text.

[77] Of course, even to make this comparison one has to believe, as I do, that the Constitution presupposes that a court will have a jurisprudence of a particular character. *See* McGinnis, *Reply, supra* note 10, at 665 n.140.

[78] THE FEDERALIST NO. 44, at 286 (James Madison) (Clinton Rossiter ed., 1961).

[79] Hamilton justifies the judiciary power of judicial review on the assumption that judicial decisions are based entirely on "judgment" and not on the "will" exerted by the political

of the independent authority model may thus tend to move the executive branch toward a more political mode of interpretation.[80]

Indeed, if legal reasoning were made up of different elements, and if no one system of jurisprudence were likely to arrive at just results on its own, it would seem reasonable for each branch to contribute the kind of legal reasoning in which it has a comparative advantage. In this way, as a general matter, the analytical product of a system of institutionally distinct interpreters may result in a product superior to that of a single system.[81] Professor Sunstein has recently argued that reasoning from systematic principle and reasoning from analogy are in tension.[82] It may be that the judiciary has a tendency to reason more systematically than the political branches, pushing abstract principles derived from the Constitution to their limit, even when the consequence is to substantially transform social practices.[83] The executive branch may be expected to be more restrained in its systematic reasoning, preferring a more analogical approach with particular attention to distinctions rooted in the social world.[84] Thus, the methodology of executive branch legal interpretation may, as a gen-

---

branches. THE FEDERALIST NO. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[80] For a discussion of the reasons that the independent model, despite its more political orientation, may not wholly collapse into the situational model of interpretation, see *infra* note 96 and accompanying text.

[81] Of course, there may also be some areas of jurisprudence in which the institutional structure of one branch would preclude it from participating as an equal partner in law interpretation. The political questions doctrine, for instance, demarcates some areas where the judiciary defers almost entirely to the political branches. *See supra* notes 30-31 and accompanying text. Moreover, given that the decision of particular cases is textually committed to the judiciary in many areas, the judiciary has the last word at any given moment.

[82] Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 751 (1993).

[83] The Court has not always been guided by an application of determinate principle in the manner the Constitution presupposes. *See* McGinnis, *Reply, supra* note 10, at 665 n.140 (arguing that judicial review presupposes that the Court will proceed by the application of fairly determinate principles). Chief Justice Warren, for instance, both expressly and covertly grounded his decisions as much on the basis of his vision of the good society as on elaboration of constitutional principles. *See* Philip B. Kurland, *Earl Warren: Master of the Revels*, 96 HARV. L. REV. 331, 338-39 (1982) (reviewing G. EDWARD WHITE, EARL WARREN: A PUBLIC LIFE (1982)) (stating that Chief Justice Warren attempted to construct a jurisprudence based on his visceral reactions to issues). When the Court departs from its proper constitutional interpretative methodology, it would be likely that an executive branch that opposed the results of that reasoning would choose a more formalist methodology so as to criticize it in a manner that would seem principled in comparison with a judiciary that had abandoned its proper function. Thus, in practice, there may be eras of jurisprudential inversion in which the judiciary and the executive exchange their normal methodology for the methodology of the other branch.

[84] Sunstein correctly sees that the tension between these different kinds of reasoning are not unlike the tensions between the French *philosophes* and Edmund Burke. *See* Sunstein, *supra* note 82, at 754 & n.49. It is natural that those purposefully insulated by life tenure from the vicissitudes of public life should resemble the French *philosophes* and that those in the popu-

eral matter, appropriately be in some tension with that of the judicial branch.[85] From that tension, an appropriate synthesis, or, in Professor Sunstein's words, "reflective equilibrium," can be reached between systematic principles and a more particularistic, socially cognizant way of reasoning.[86]

In some specific areas of constitutional interpretation, a distinctive executive branch approach to interpretation may be necessary to create an appropriate jurisprudential equilibrium given the institutional interests of the other branches. For instance, the President is, in a very real sense, the party in interest in separation of powers cases that involve his prerogatives. Not surprisingly, the Framers believed that the President would use his power of legal interpretation to safeguard his own office.[87] Indeed, there are systemic reasons as well not to object to an intrusion of the executive branch's institutional interests into its interpretation in separation of powers issues: institutional interests will surely have a particularly strong influence on the other branches' interpretation of constitutional provisions that affect their own institutional prerogatives and the prerogatives of the competing branches.[88] Given the inevitability of strong institutional interests in

---

larly elected branches should be generally more sensitive to the place of social distinctions in the framework of legal reasoning.

[85] The view that the executive and the judiciary may engage in a somewhat different kind of legal reasoning was not unfamiliar to the Framers. Blackstone saw the grant of the pardoning power as a way for the executive to construe the law according to its spirit while the judiciary was restricted to its letter. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *397 ("[T]he exclusion of pardons [from the power of the king] must necessarily introduce a very dangerous power in the judge or jury, that of construing the criminal law by the spirit instead of the letter; or else it must be holden, what no man will seriously avow, that the situation and circumstances of the offender . . . ought to make no distinction in the punishment.") (citation omitted) (orthography modernized). Blackstone's understanding of the pardoning power had wide currency among the Framers. *See* 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 110-13 (Jonathan Elliot ed., Philadelphia, J.B. Lippincott & Co. 2d ed. 1876) [hereinafter 4 ELLIOT'S DEBATES] (remarks of James Iredell) (stating that the pardoning power was given to the President so he can apply the spirit rather than the letter of the law); WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, 174-78 (Philadelphia, Philip H. Nicklin, Law Bookseller 1829) (same).

[86] Sunstein, *supra* note 82, at 751. Although the notion that constitutional interpretation may represent a synthesis of different principles is not, to my knowledge, expressly reflected in the era of the Framers, the notion that republican government must synthesize conflicting principles in society was very familiar. GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776-1787, at 197-255 (1969) (describing republican theory of constructing mixed government to reflect different and potentially conflicting principles in the republic).

[87] *See* 2 DOCUMENTARY HISTORY, *supra* note 12, at 451 (stating that the President could use the authority of constitutional review to "shield himself").

[88] For a discussion of the manner in which institutional interest shapes the Court's doctrine, see McGinnis, *supra* note 48.

this area, it would appear that a plausible solution is to permit the constituent parts of the system to pursue their self-interest with the confidence that a system so constituted could work more easily in the public interest. Thus, a vigorous advocacy by the Attorney General of the executive branch's institutional interests on separation of powers questions in his opinions could be seen to redound to the benefit of the constitutional system as a whole.

The manner of pursuing this interest would, of course, have to take into account (and in a sense be enlightened by) the existence of the other branches. For instance, the executive branch would presumably be careful not to make such outlandish claims for its powers that the other branches would be in a good position to obtain the support of public opinion in resisting them.[89] Nevertheless, the approach in such an interpretation would be fundamentally different from the ideal of judicial interpretation since it would not undertake its reasoning with dispassion but with a regard for the executive branch's own interests.

The executive branch's understanding of the tripartite nature of the constitutional system would similarly seem to prevent political excesses from infecting its autonomous interpretation of the Constitution. The body of the Attorney General's opinions will have greater influence in constructing a plausible alternative jurisprudence insofar as they are principled and consistent. Given that one of the central purposes of permitting the President independent authority to interpret the Constitution is to make available a method of correction to the constitutional interpretation of the Court, these opinions overall should partake of the coherence necessary to influence the judiciary and the public.

## C. *The Independent Authority Model and Stare Decisis*

In any event, acceptance of the independent authority model to any degree suggests constitutional doctrines, where relevant, take conscious account of the jurisprudential interplay between the branches.

---

[89] Perhaps the best example of such a failure by the executive branch was *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), popularly known as the *Steel Seizure Case*, in which the claims put forward were so broad that they elicited an adverse public reaction and ultimately unfavorable judicial opinion. *See* WILLIAM H. REHNQUIST, THE SUPREME COURT 47-53 (1987). Interestingly, at the time of the *Steel Seizure Case*, President Truman was bereft of an Attorney General because Howard McGrath had been forced to resign in a corruption scandal. MAEVA MARCUS, TRUMAN AND THE STEEL SEIZURE CASE 35 (1977). Moreover, the legal advice in the Truman administration has been generally characterized as "evasive" and "unresponsive." *Id.* at 36 (quoting Richard Neustadt, a staff member of the White House at the time).

For instance, stare decisis as applied by the judiciary in recent times has looked only to judicial precedent to determine whether a constitutional issue should be treated as settled.[90]  However, if constitutional law is understood to be constituted by a reflective equilibrium brought about by executive (and perhaps legislative and state) interpretation as well as judicial interpretation, then stare decisis should not be confined to an inquiry into past judicial interpretation.  Instead, stare decisis should be replaced by a broader doctrine of constitutional closure that regards constitutional law as settled only when concurred to (for some period of time or through some number of instances) by more than one branch of government.

Such an understanding of constitutional closure has the additional advantage of comporting with the understanding widely shared in the early Republic.  For instance, in agreeing to sign bank legislation, James Madison put aside his doubts about the bank's constitutionality by referring to the "repeated recognitions under varied circumstances of the validity of such an institution in acts of the *legislative, executive, and judicial branches* of the Government, accompanied by indications, *in different modes*, of a concurrence of the general will of the nation . . . ."[91]  In *M'Culloch v. Maryland*,[92] Chief Justice John Marshall also referred to the constitutional approval that other branches had previously given to the bank as an important reason for holding the bank to be constitutional:

> The principle now contested was introduced at a very early period of our history, has been *recognized by many successive legislatures*, and has been acted upon by the judicial department, in cases of peculiar delicacy . . . .  After being resisted, first in the fair and open field of debate, and *afterwards in the executive cabinet*, with as much persevering talent as any measure has ever experienced, and being supported by arguments which convinced minds as pure and as intelligent as this country can boast, [the bill to incorporate the bank] became a law.[93]

Justice Joseph Story, the first comprehensive theorist of the Constitu-

---

[90]  *See* Planned Parenthood v. Casey, 112 S. Ct. 2791, 2803, 2810 (1992) (implicitly criticizing the executive branch for asking that *Roe* be overruled and viewing the stare decisis effect of *Roe* solely in the context of *judicial* developments in constitutional law).

[91]  Veto Message from James Madison to the Senate (Jan. 30, 1815), *in* 2 MESSAGES, *supra* note 74, at 540.

[92]  17 U.S. (4 Wheat.) 316 (1819).

[93]  *Id.* at 401-02 (emphasis added).  The minds which were convinced were, of course, Alexander Hamilton and George Washington, who signed the bill into law.  Both Thomas Jefferson, the Secretary of State, and Edmund Randolph opposed the bill on constitutional grounds. REARDON, *supra* note 2, at 197-99.  It was President Washington's practice to ask for the legal opinions of all of his cabinet officers on legal matters rather than rely solely on the opinion of his Attorney General. *Id.* at 199, 229.

tion, also appeared to have a theory of constitutional closure that was not court-centered but took into account the views of other official interpreters of the Constitution.[94]

## D. *The Situational Lawyer Model*

Without the kind of institutional constraints discussed above[95] as well as constraints imposed by any method of legal reasoning (even more analogical methods),[96] the model of independent interpretation would collapse into the situational model of the Attorney General. In such a model, the Attorney General would write opinions in the situational interest of his client without any obligation to preserve legal principles whether autonomous or court-centered. This model can be justified normatively in one of two ways. First, it can be premised on a rejection of the notion that the President has any special duties of legal fidelity under the Constitution. The oath to defend the Constitution is simply a generalized admonition not to subvert it through self-evidently extraconstitutional means (for instance, by entering into a treaty with a foreign power that abrogated the Constitution).[97] The duty to "take Care that the Laws be faithfully executed"[98] is simply a requirement not to suspend or ignore laws that Congress has passed. A second defense of the model would be premised on the idea that the President's interpretation was understood to be political not merely in the sense that it should reflect an articulation of the popular will but that the popular will is represented simply by pursuit of the President's particular political interest on a case-by-case basis.

The consequences of such a view would be that the Attorney General would approach his opinion work with an attitude akin to the bad man's view of the law.[99] As in the court-centered model,

---

[94] *See* 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 391 (photo. reprint 1970) (Boston, Hilliard, Gray, & Co. 1833) (arguing that the system of construction of the Constitution which mandated judicial review was as "absolutely conclusive, as any ever can be" because it was accepted by Congress and the states for a period of forty years). *See also* H. Jefferson Powell, *The Political Grammar of Early Constitutional Law*, 71 N.C. L. REV. 949, 968-74 (1993).

[95] *See supra* note 89 and accompanying text.

[96] *See* Sunstein, *supra* note 82, at 770-71 (arguing that analogical reasoning imposes "discipline" on decision-making).

[97] *Cf.* David A. Strauss & Cass R. Sunstein, *On Truisms and Constitutional Obligation: A Response*, 71 TEX. L. REV. 669, 674 (suggesting that the Oath Clause does not impose any obligation on the President to nominate a justice who shares his constitutional principles).

[98] U.S. CONST. art. II, § 3.

[99] I originally entitled this model the "private lawyer" model, but the role of the private lawyer is not invariably that of Holmes's proverbial bad man, particularly in opinion writing. Indeed, particularly in complex transactional work, the lawyer will frequently be called on to render a legal opinion which must meet a high standard of objectivity, since it will be relied on

Supreme Court precedent would be considered, not as a matter of obligation, but only insofar as the flouting of precedent would have adverse political consequences. If the President's short term situational interest demanded, the Attorney General would make the most plausible case for a position even in the teeth of precedent.[100] Unlike the independent authority model, a particular Attorney General would not be concerned with expounding a consistent and principled jurisprudence that reflected the President's philosophy but with using any plausible principles to achieve the policy goal desired by his client. The only substantial constraints on the Attorney General in this model would be those of self-interest—of the President's and his own—such as: 1) the need to avoid specific legal positions so untenable that the costs outweighed the benefits to the President; 2) the more general need to cultivate the appearance of fidelity to the law that is probably expected by the public of the President and his subordinates; and 3) the desire of the Attorney General and those writing the opinions to maintain their professional reputations.

### E.  *Theoretical Models in a Political World*

While each model of the Attorney General—court-centered, independent authority, and situational—has at least a measure of plausibility as well as internal coherence, we have seen that the models are not as distinct as they may first appear. Because of the distinctive institutional content of Supreme Court jurisprudence, even the court-centered model permits a large measure of independent executive branch autonomy in interpretation. The independent authority model, in turn, can by degrees be shaped to give free enough play to the President's institutional and political interests that opinions under that model might often be hard to distinguish from that of a lawyer acting in his client's situational interests. Despite the blurring at the edges of each model, we can expect that each of these normative con-

---

by parties to the transaction as a kind of insurance. The varying standards such private opinions must meet are well understood among the circle of transactional lawyers who use them and are enforced by a mixture of legal sanctions (e.g., malpractice laws) and social sanctions (e.g., the lawyer's standing and reputation among other transactional lawyers). For an interesting discussion of the problems of providing a legal opinion in private and the role reputation plays in giving value to the opinion, see JAMES C. FREUND, LAWYERING: A REALISTIC APPROACH TO LEGAL PRACTICE 313-23 (1979).

100 A caricature of the "situational" model was implicit in a recent column of Evans and Novak discussing the issue of the President's legal authority to index capital gains. *See* Rowland Evans & Robert Novak, *A Presidential Test on Capital Gains*, WASH. POST, Sept. 2, 1992, at A21. According to Evans and Novak, the issue was not whether OLC could write a legally correct opinion in favor of this position but rather how the White House could make plain that it wanted an opinion with this result, whatever the reasoning. *Id.*

stitutional models appeals to different kinds of administrations and may lend themselves to different types of issues within a single administration. Indeed, as we shall see, in some circumstances the President and Attorney General, for reasons of political or bureaucratic interest, may adopt a more naive and less nuanced version of a model than can be strictly justified as a matter of constitutional theory. This suggests that to a large degree political and bureaucratic imperatives shape the Attorney General's opinion-writing function in practice as much as normative constitutional considerations.[101]

The model of independent interpretation would appear to have most purchase with an administration with a jurisprudence that differed substantially from that which prevailed in the federal courts and that was an important part of the President's political platform. For such a President, it would be of substantial importance to present and live by a coherent body of constitutional principles that would present a clear alternative to the established constitutional jurisprudence. Backed by the President's political power, such a jurisprudence could help change the country's perception of the Constitution and bring about a constitutional transformation. Paradoxically, however, the implementation of an independent authority model to effectuate the President's revolutionary jurisprudence may perhaps be best achieved if these principles are applied by an officer not generally responsible for policy or political issues likely to be at cross purposes with the advancement of a specific set of jurisprudential principles.[102] Indeed, in delegating his interpretive function to the Attorney General (and creating a structure in which the Attorney General would be insulated from political influence), such a President could be understood to be following a "precommitment strategy" in which he understands that the siren song of politics and policy will always be tempting the President himself to abandon his jurisprudence in order to achieve other political goals.[103] While the President always retains the power to untie himself, there are likely to be a set of cases where he would

---

[101] For a discussion of the power of organizational imperatives to shape the executive branch's conduct of its constitutional responsibilities even in the face of proper constitutional imperatives, see McGinnis, *Solicitor General's Office, supra* note 10, at 804-12.

[102] By "revolutionary" I mean a jurisprudence that departs sharply from the contemporary Court's jurisprudence.

[103] For a discussion of precommitment strategies generally, see THOMAS C. SCHELLING, THE STRATEGY OF CONFLICT (1980) (explaining how an actor can optimize his utility according to a theory that prevents him from choosing future actions inconsistent with his current preferences); *cf.* Michael J. Klarman, *Constitutional Fact/Constitutional Fiction: A Critique of Bruce Ackerman's Theory of Constitutional Moments,* 44 STAN. L. REV. 759, 795 (1992) (book review) (viewing the Constitution as a whole as a precommitment strategy to protect against moments of political passion).

have jumped but for the trouble of untying himself. Overruling the Attorney General is often not politically cost free; hence the selection of a principled Attorney General may maximize the opportunity to promote an independent jurisprudence.[104]

Of course, not all Presidents will have an interest in promoting a revolutionary jurisprudence. For them, the independent authority model will have less appeal. It adds another dimension to policy decisions and therefore risks entanglements in controversies of a legal nature that may distract from the economic, social, and foreign policy of their administration. Insofar as Presidents lack a substantial jurisprudential interest, they will probably embrace an internal legal regime that tends toward the other two models because both have advantages to the administration. The court-centered model has the advantage of administrative regularity. As the panel on the unitariness of executive interpretation suggested,[105] the different departments and agencies of the government are frequently fragmented in their interpretation of the law because they have fundamentally different political and bureaucratic interests. Some of these controversies will be of no substantial importance to the implementation of the President's political or policy agenda. What is important about these disputes is not so much that they have a particular resolution as that they be settled in a predictable fashion rather than be permitted to create festering legal discord within the administration.[106] Moreover, the mechanism to resolve these disputes should appear neutral and determined by criteria outside of the control of the agencies themselves. If an interagency dispute has been resolved by an apparently neutral mechanism and has the appearance of fairness, the President and his subordinate will have to spend less resources enforcing it. Because a court-centered model offers well-established and neutral principles as a framework for the Attorney General's resolution of some kinds of issues, the court-centered model may actually be superior to an independent authority model and a situational lawyer model, even from the point of view of the administration's self-interest. For this model to succeed the Attorney General too must have substantial independence from the policy and political imperatives of a given case that would other-

---

[104] President Jefferson appeared to follow this strategy, appointing a strong adherent of the strict constructionist school of jurisprudence to be Attorney General. *See infra* text accompanying notes 118-19.

[105] *See, e.g.,* Michael Herz, *Imposing Unified Executive Branch Statutory Interpretation*, 15 CARDOZO L. REV. 219, 249 (1993).

[106] Insofar as the resolution is predictable, there should be fewer disputes. As a result, there should be both less of the kind of interagency uncertainty that is created by a dispute and fewer resources devoted to resolving these disputes.

wise distort the desired administrative regularity.[107]

Inevitably, the administration faces a set of legal disputes and legal issues whose outcome, unlike most disputes, implicates the President's essential political and policy interests. In such disputes, the court-centered model can impair the President's interests because it will, in some instances, call for results that are more consonant with the Supreme Court's jurisprudence at the expense of resolutions that would maximize the President's policy or political interests. Thus, an administration without strong jurisprudential commitments would appear to favor the situational lawyer model for the resolution of such disputes. Even under this model the Attorney General will have some measure of independence, albeit limited, since the President will presumably want to understand the legal consequences of his actions, the proper evaluation of which are likely to be distorted if the officer responsible for making them is too heavily involved in the policy decision itself.[108]

Thus, each of the three roles for the Attorney General that we have mapped as normative constitutional models potentially fits different potential interests of the President and the executive branch. The degree to which different models will have purchase in an administration thus can be expected to depend both on the general interest of the President and the kind of dispute at issue. The third section of the Article will expand on this analysis in an attempt to explicate the operations of the modern Office of Legal Counsel.

## II. The First Example of the Independent Authority Model and Its Consequences

Given that the first section creates models of the roles of the Attorney General almost entirely as a matter of construction from constitutional theory, it would be useful to review the entire history of the Attorney General's opinion writing to determine to what degree the various Attorneys General have operated under the normative models described and what the consequences are for their administration for the model or mix of models they have chosen. Obviously a complete survey would be a massive undertaking that cannot be attempted here. What can be done is to provide a single case study of the interpretative choices of an Attorney General and their consequences.

The first and perhaps purest example of the Attorney General as

---

[107] Hence there are also reasons within this model for the President to precommit himself by choosing a lawyer of consistent principle. *See supra* note 103 and accompanying text.

[108] In part III we will review how all three models can coexist in the modern OLC depending on the function performed.

independent interpreter is Levi Lincoln, Jefferson's Attorney General.[109] His story is instructive, because it shows the difficulty of making consistent and principled independent interpretations even in the administration of a President fundamentally committed by public declaration to a system of constitutional interpretation distinct from that of the Supreme Court. It shows how more pragmatic officials can frustrate an Attorney General who forcefully articulates the President's jurisprudential views when these views conflict with important policy concerns. Precisely because these jurisprudential views are independent of court precedent, abandoning them may create few legal difficulties in the courts or elsewhere. Thus, the President himself may likely discount his own jurisprudential principles in matters of overwhelming political importance: as we shall see, Jefferson did so, when, over Lincoln's objections, he agreed to purchase and add Louisiana to the United States without seeking authorization in a constitutional amendment.

Nevertheless, as Attorney General, Lincoln vindicated a distinctive executive jurisprudence of strict construction in some not inconsequential matters, even in the face of policy considerations favoring contrary results. Moreover, Lincoln's persistence in attempting to apply a consistent jurisprudence even when politically disadvantageous shows that once an Attorney General has chosen a model for his actions, as Lincoln did, the internal logic of the model chosen will have substantial influence over his actions and opinions even if it becomes opposed to the situational interest of the President.

## A. *Attorney General Levi Lincoln and Independent Interpretive Authority*

There can be no doubt that Jefferson was elected in part on a platform of constitutional interpretation—the so-called Virginia school of constitutional interpretation—that stressed that the powers of the federal government were enumerated and limited and that the states as well as the federal courts had the authority to interpret the

---

[109] For a discussion of Edmund Randolph, another early Attorney General, see Susan L. Bloch, *The Early Role of the Attorney General in our Constitutional Scheme: In the Beginning There was Pragmatism*, 1989 DUKE L.J. 561. Randolph appears to have been a much less jurisprudentially aggressive Attorney General than Levi Lincoln. Washington in fact wanted Randolph to be an arbitrator between the conflicting views of Alexander Hamilton and Thomas Jefferson—views that frequently manifested themselves in legal opinions. *See* REARDON, *supra* note 2, at 189 ("Randolph's uncanny talent for identifying the 'middle position' [between Hamilton's and Jefferson's] had made him indispensable to the President."). As we shall see, however, Levi Lincoln's jurisprudential approach shows that early Attorneys General were *not* always pragmatists.

scope of such powers for themselves.[110]  For instance, one of Jefferson's principal objections to the Federalist administration of John Adams was its unconstitutional usurpation of state rights.  These objections came to head in the controversy over the Alien and Sedition Acts[111] which punished seditious speech.

James Madison summarized the constitutional objections in the Virginia Resolutions.[112]  The Resolutions' first ground of objection to these Acts was not that they violated the First Amendment but that they were beyond Congress's enumerated powers.  The Virginia Resolutions also posited the existence of a power of independent constitutional interpretation in the states.  They declared that

> the powers of the federal government . . . [are] no further valid than they are authorized by the grants enumerated in that compact; and that, in case of a deliberate, palpable, and dangerous exercise of other powers, not granted by the said compact, the states, who are parties thereto, have the right, and are in duty bound, to interpose, for arresting the progress of the evil, and for maintaining, within their respective limits, the authorities, rights, and liberties, appertaining to them.[113]

Jefferson agreed with the substance of the Virginia Resolutions but believed that the proclamation of the states' authority of constitutional interpretation and action should be made even stronger.  Jefferson's draft of the Kentucky Resolutions was even more forceful in its defense of independent state authority, declaring "that [the federal] government, created by this compact, was not made the exclusive or final judge of the extent of the powers delegated to itself . . . but that . . . *each party has an equal right to judge for itself* [the meaning of the Constitution] . . . ."[114]

Accordingly, Jefferson came to power with a distinctive constitutional philosophy completely opposed to the Federalist orthodoxy that dominated the federal courts and the federal bar.[115]  He also had

---

[110] As Jefferson said in his first inaugural address, "I deem [one of] the essential principles of our government, and consequently [one] which ought to shape its administration . . . [to be] the support of the state governments in all their rights . . . ." Thomas Jefferson, Inauguration Address (Mar. 4, 1801), *in* 3 THE WRITINGS OF THOMAS JEFFERSON 317, 321 (Albert E. Bergh ed., 1907) [hereinafter Bergh, 3 WRITINGS].

[111] Act of June 18, 1798, ch. 54, 1 Stat. 566 (repealed 1802); Alien Enemies Act, ch. 66, 1 Stat. 577 (1798) (current version at 50 U.S.C. §§ 21-22 (1988)); Alien Act, ch. 58, 1 Stat. 570 (1798) (expired 1800); Sedition Act, ch. 74, 1 Stat. 596 (1798) (expired 1801).

[112] Virginia Resolutions of 1798, 4 ELLIOT'S DEBATES, *supra* note 85, at 528 (pronouncing the Alien and Sedition Laws to be unconstitutional).

[113] *Id.*

[114] *Id.* at 540.

[115] Robert W. Gordon, *The Independence of Lawyers*, 68 B.U. L. REV. I, 41 (1988) ("In the New England of 1800, . . . the list of bar leaders is virtually identical to the roster of the

a robust view of the interpretative authority of constitutional actors outside the courts. The stage thus appeared set for a Presidency which would attempt to transform constitutional interpretation from Federalist principles to the Virginia School.

One leading Federalist, however, shrewdly, if cynically, welcomed the likely effect of Jefferson's election on constitutional jurisprudence. Shortly after Jefferson's election, Gouverneur Morris of Pennsylvania, a prominent Framer of the Constitution, discussed the effect of political exigencies on the coming Republican administration's interpretation of the Constitution's enumerated powers:

> The democrats will push the Constitution forward more rapidly than the federalists dared to do, and will wind up its powers as high as they ought to go, and perhaps a little higher. The result of this will be some clashing, by and by, with their friends in the States; and if we have good sense enough not to make too much noise we shall by and by be called in to take the business up in a much better condition than when we were forced . . . to lay it down . . . .[116]

Morris thus foresaw that a Republican administration, eager to exercise effective political power, would be constantly tempted to undermine its own jurisprudence and pave the way for broader acceptance of the Federalist's jurisprudence. Perhaps Jefferson's famous line in his inaugural address, "We are all republicans—we are federalists,"[117] immediately presaged this kind of difficulty for the advancement of Republican jurisprudence, indicating that President Jefferson might be tempted to push divisive jurisprudential issues into the background in the interest of building broad political coalitions.

At the center of this delicate mixture of jurisprudence and politics was Jefferson's first Attorney General, Levi Lincoln, a leading Republican politician from western Massachusetts.[118] He had made a reputation there as a strict constructionalist, an adherent of states' rights, and indeed something of a political firebrand, making acerbic speeches against religious ministers who were some of the mainstays of the Federalist party in predominantly Federalist Massachusetts.[119]

---

Federalist party leadership cadre."); Stewart Jay, *Origins of Federal Common Law: Part One*, 133 U. PA. L. REV. 1003, 1016 (1985) (observing that all federal judges before the election of Jefferson were Federalists).

[116] Letter from Gouverneur Morris to John Parish (Nov. 13, 1801), *in* 2 THE DIARY AND LETTERS OF GOUVERNEUR MORRIS 415 (Anne Cary Morris ed., New York, Charles Scribner's Sons 1888).

[117] Thomas Jefferson, Inauguration Address, Bergh, 3 WRITINGS, *supra* note 110, at 319.

[118] For a discussion of Levi Lincoln's life, see Marvin J. Petroelje, Levi Lincoln, Sr.: Jeffersonian Republican of Massachusetts (1969) (unpublished Ph.D. dissertation, Michigan State).

[119] *Id.* at 55-63.

He was elected to the House of Representatives in 1800.[120] Once Jefferson was elected President, Lincoln was promptly appointed Attorney General because he was an able lawyer who was perhaps the most unwavering adherent of Jeffersonian republicanism in all New England.[121]

Shortly after taking office, Lincoln took the opportunity to strictly construe the Constitution against the opposition of Treasury Secretary Albert Gallatin and the rest of the Cabinet.[122] The issue was the extent of the President's authority as commander-in-chief to take action without the authorization of Congress. The precipitating event was the sailing of a squadron of United States warships to protect American shipping against the Barbary pirates.

Lincoln argued that the navy had authority only to repulse individual attacks, thus suggesting that the executive branch's military authority was quite limited in the absence of congressional authorization.[123] Gallatin thought that once hostilities began the executive should have general authority to direct force as it chose, permitting it to pursue the enemy ships if necessary.[124] Jefferson, in recounting the subsequent action, appeared to side with Lincoln, suggesting that the navy action had been merely defensive and that Congress would have to authorize offensive action.[125]

Early in his tenure as Attorney General, Lincoln took a more important step toward creating a distinctively Republican jurisprudence by seizing an opportunity to declare the President's independent authority to interpret the Constitution even in the teeth of contrary Supreme Court precedent.[126] The Schooner Peggy, an armed French vessel, was captured by the United States. It was condemned by a district court and ordered sold as a prize. The Court ordered the return of the prize money.[127] Although Lincoln disagreed with the Court's ruling, he acknowledged that the principle the Jus-

---

[120] 10 ANNALS OF CONG. 1005 (1851).

[121] Petroelje, *supra* note 118, at 70.

[122] The entire deliberations of the cabinet are well recounted in NOBLE E. CUNNINGHAM, THE PROCESS OF GOVERNMENT UNDER JEFFERSON 15 (1974).

[123] Lincoln stated: "Our men of war may repel an attack on individual vessels, but after the repulse, may not proceed to destroy the enemy's vessels generally." *Id.* at 48-49.

[124] *Id.* at 49.

[125] Jefferson requested that Congress "consider whether, by authorizing measures of offence, also, they will place our force on an equal footing with that of its adversaries." First Annual Message of Thomas Jefferson (Dec. 8, 1801), *in* 8 THE WRITINGS OF THOMAS JEFFERSON 108, 118 (Paul L. Ford ed., New York, G.P. Putnam's Sons 1897) [hereinafter 8 WRITINGS].

[126] 1 Op. Att'y Gen. 119, 119-20 (1802).

[127] United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103 (1801).

tices laid down was "binding in this particular instance" because the Court was "competent to decide this principle."[128] Nevertheless, Lincoln declared that

> Although they have fixed the principle for themselves, and thereby bound others, in reference to the case on which they have adjudicated, it can, I conceive, extend no further. In all other cases in which the executive or other courts are obliged to act, they must decide for themselves; paying a great deference to the opinions of a court of so high an authority as the supreme one of the United States, but still greater to their own convictions of the meaning of the laws and [C]onstitution of the United States, and their oaths to support them.[129]

Lincoln's appears to be the first official statement of the independent interpretative authority of the President.[130] The President's independent interpretative authority flowed naturally from the Virginia school of constitutional interpretation with its emphatic denial that the federal government had a monopoly on constitutional interpretation. It was no harder to infer the executive's right of independent authority from the Oath Clause than to infer the states' interpretative authority from the structure of the Constitution as compact.[131] With this declaration of interpretive independence, Lincoln created a vehicle for the Jeffersonian Presidency to infuse Republican constitutional views into its administration of the law.

Lincoln then used this right of independent interpretative authority to craft an opinion jurisprudence that bore the mark of the Virginia school even when those interpretations circumscribed the authority of the President, thus preventing at least temporarily the validation of Gouverneur Morris's prediction. For instance, Lincoln declared that there was no federal common law of crime available to vindicate the Spanish Ambassador, who had complained to the federal government that he had been a victim of an assault. Lincoln

---

[128] 1 Op. Att'y Gen. 119, 122 (1802).

[129] *Id.*

[130] Lincoln may have used an Attorney General opinion to proclaim the President's independent authority in constitutional interpretation because other more pragmatic cabinet members had previously prevailed upon Jefferson to remove such a declaration from his first annual message to Congress. *See* CUNNINGHAM, *supra* note 122, at 75-76. In his draft of the message, Jefferson had suggested that his oath required him to declare the Seditions Act unconstitutional because it was "in palpable and unqualified contradiction to the [C]onstitution." Letter from Robert Smith, Secretary of the Navy, to Thomas Jefferson (Nov. 21, 1801), *quoted in* CUNNINGHAM, *supra* note 122, at 75.

[131] Attorney General Meese more recently came to similar conclusions based in part on his reading of the Oath Clause. *See* Meese, *supra* note 17. However, there is no recognition in either his speech or the extensive commentary on it that Meese was following directly in the footsteps of one of the earliest Attorneys General.

wrote that the alleged assault would violate the law of nations but that this law was "part of the municipal law of each State" and not of the federal government.[132] In rejecting a federal common law of crime, Lincoln was following the Republican philosophy of strict construction and ruling against federal power in a sensitive area although prior opinions by a Federalist Attorney General[133] and justices of the Supreme Court had endorsed the federal common law of crime.[134] In another opinion, Lincoln strictly construed the Ordinance of the Northwest Territory[135] to vest the appointment of most officials in the Governor rather than the President and rejected the notion that presidential powers could generally be enlarged by implication.[136]

### B. *Attorney General Lincoln, President Jefferson, and the Louisiana Purchase*

By far the most important test of Republican jurisprudence, however, concerned the purchase of Louisiana from France. Near the end of 1802, an official of Spain closed New Orleans to transshipment of American goods.[137] Although later rescinded, this act was widely thought to presage the attitude France would take toward the United States shipping when it took control of Louisiana under a pending treaty from Spain.[138] Merchants throughout the country, but particularly in the South and West where the Republicans were strong, became insistent that France not be allowed to obtain a stranglehold on this crucial commercial transit.[139] The Jefferson administration was urged to protect free passage to the Gulf with force if necessary.[140] Thus when Monroe negotiated to buy the Louisiana Territory and parts of Florida, he did so with the knowledge that the protection of commercial interests which the treaty afforded was crucial to keeping the fledgling republic at peace. The stakes were higher than those the Jefferson administration faced by repulsing the Barbary pirates and the constitutional issues no less significant.

---

[132] 5 Op. Att'y Gen. 691, 692 (1803). *See* Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 VAND. L. REV. 819, 844 & n.115 (1989).

[133] 1 Op. Att'y Gen. 52, 53 (1794).

[134] For a collection of these opinions, see Jay, *supra* note 115, at 1083-89.

[135] Act of Aug. 7, 1789, ch. 8, 1 Stat. 50.

[136] 1 Op. Att'y Gen. 102, 103-04 (1802). The opinion did relax its strict construction'ist approach to admit that the President could continue to appoint certain kinds of judges which previous Presidents had also appointed. *Id.*

[137] JAMES K. HOSMER, THE HISTORY OF THE LOUISIANA PURCHASE 61 (1902).

[138] *Id.* at 61-62.

[139] *Id.* at 57, 63-64.

[140] Indeed, Federalist Senator Ross of Pennsylvania had proposed a resolution suggesting immediate seizure of New Orleans by force. *Id.* at 68.

Two principal constitutional issues were raised by the purchase. First, Article IV of the Constitution provided Congress with the express authority to admit new states into the Union but did not provide the Union with express authority to acquire new territory.[141] Thus, the Jefferson administration faced the strict constructionist argument that the federal government lacked the authority to acquire territory even with the consent of Congress.[142] Moreover, the strict constructionist argument continued, the executive could not exceed the enumerated powers of the federal government merely by making the acquisition in the form of the treaty.[143]

Second, once the territory was acquired there was the issue of its status: could it be admitted by Congress as a state? It might seem as a textual matter that this is an easier question to answer assuming that the United States has a right of acquiring additional territory. The right of Congress to admit new states is only qualified when the terri-

---

[141] Article IV, Section 3 provides:

> New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.
>
> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

U.S. CONST. art. IV, § 3.

[142] As an original matter, the question of whether Article IV implicitly grants the United States the power to acquire territory is a difficult one. A report by the Committee on Detail at the Constitutional Convention restricted the power of admission to states "within the present limits of the [U]nited [S]tates." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 147 (Max Farrand ed., 1966). A later draft omitted the word "present." *Id.* at 173.

The Supreme Court did not address this question until 1828. Justice Marshall settled the question in a single declarative sentence: "The Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty." American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 542 (1828).

[143] In Missouri v. Holland, 252 U.S. 416 (1920), the Court held that a treaty could resolve issues that Article I of the Constitution did not otherwise authorize Congress to address. Justice Holmes's reasons for giving such scope to the treaty power, however, were hardly consistent with a strict constructionist philosophy:

> It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, "a power which must belong to and somewhere reside in every civilized government" is not to be found. . . . [W]hen we are dealing with words that are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.

Missouri v. Holland, 252 U.S. 416, 433 (1920) (quoting Andrews v. Andrews, 188 U.S. 14, 33 (1903)).

tory of the state to be admitted is under the jurisdiction of a state already in the Union.[144] Nevertheless, the admission of a new state could lead to change in the balance of the Union thus suggesting to adherents of states' rights that such a significant transformation of the nation could be accomplished only by an act of the sovereign people speaking through their states in the amendment process.[145]

Attorney General Lincoln tactfully expressed a strict constructionist view, writing Jefferson before Monroe entered into the treaty that

> [i]f the opinion is correct, that the Genl Govt [sic] when formed, was predicated on the then existing *United* States, and such as could grow out of *them*, . . . and that its authority, is, constitutionally, limited to the people composing the several political State Societies in that union, & such as such might be formed out of them; would not a direct independent purchase, be extending the executive power further, . . . than the proposed indirect mode?[146]

The "indirect mode" Lincoln proposed instead was to add the territory not to the United States but to its already existing states and territories—in this case, to Georgia and the Mississippi territory—thus avoiding the appearance that the United States was itself acquiring land. Presumably, the theory was that the nation was not acquiring territory and thus not exceeding its enumerated powers, because Georgia would have consented to the addition to its territory and Congress, which was charged by the Constitution with plenary power over the territories, would have consented on behalf of the Mississippi territory.

Albert Gallatin, Jefferson's Secretary of Treasury, ridiculed Lincoln's solution and suggested that no constitutional problem existed in the first place:

> If the acquisition of territory is not warranted by the Constitution, it is not more legal to acquire for one State than for the United States . . . . What could, on his construction, prevent the President and the Senate by treaty annexing Cuba to Massachusetts, or Ben-

---

[144] U.S. CONST. art. IV, § 3, cl. 1 (prohibiting new states from being formed from existing states or from the junction of two states "without the Consent of the Legislatures of the States concerned").

[145] Indeed, as a matter of social, even if not constitutional, theory, such adherents were clearly right about the significance of admitting new states: because the questions that their admission prompted could not easily be answered within the framework of the original compact, disputes over their admission in Congress led to a series of national crises culminating in the Civil War.

[146] Letter from Levi Lincoln to Thomas Jefferson (Jan. 10, 1803), *quoted in* EVERETT S. BROWN, THE CONSTITUTIONAL HISTORY OF THE LOUISIANA PURCHASE 18, 19 (photo. reprint 1972) (1920).

gal to Rhode Island, if ever the acquirement of colonies shall be-
come a favorite object with governments, and colonies shall be
acquired?

But does any constitutional objection really exist?

: . . .

. . . To me it would appear:

1st. That the United States as a nation have an inherent right
to acquire territory.

2d. That whenever that acquisition is by treaty, the same con-
stituted authorities in whom the treaty-making power is vested
have a constitutional right to sanction the acquisition.[147]

Thus Gallatin first seized upon a weakness in the articulation of Lin-
coln's argument: if, as Lincoln conceded, a new territory could be
admitted as long as one state was willing to enlarge its territory, the
nation could be enlarged even without constitutional amendment.
The breadth of Gallatin's affirmative constitutional argument for ter-
ritorial acquisition, however, was directly contrary to the main tenets
of a Republican jurisprudence. In a government of strictly enumer-
ated powers, the United States had no powers not granted by the Con-
stitution and thus no *inherent* right to acquire territory.[148]

Jefferson seemed at first swayed by Gallatin's arguments,
although his reply was somewhat ambiguous:

You are right, in my opinion, as to Mr. L's proposition; there is no
constitutional difficulty as to the acquisition of territory, and
whether, when acquired, it may be taken into the Union by the
Constitution as it now stands, will become a question of expedi-
ency. I think it will be safer not to permit the enlargement of the
Union but by amendment of the Constitution.[149]

By August 9, 1803, however, Jefferson wrote that a constitutional
amendment to complete the incorporation of Louisiana into the

---

[147] Letter from Albert Gallatin to Thomas Jefferson (Jan. 13, 1803), *in* 1 THE WRITINGS OF
ALBERT GALLATIN 111, 112-13 (photo. reprint 1960) (Henry Adams ed., Philadelphia, J.B.
Lippincott & Co. 1879).

[148] In a sense, Gallatin's argument presaged that of the Court in United States v. Curtiss-
Wright Export Corp., 299 U.S. 304 (1936), in which Justice Sutherland asserted that the fed-
eral government's powers in foreign affairs, unlike that in the domestic sphere, was largely
inherited from the Crown rather than granted by the states. *Id.* at 316-17. His argument is
not clearly right as a matter of the original understanding of the Framers, *see* Charles A.
Lofgren, United States v. Curtiss-Wright Export Corporation: *An Historical Reassessment*, 83
YALE L.J. 1 (1973) (criticizing Sutherland for misreading history), and in any event was at
odds with the central tenet of the Virginia School of constitutional interpretation—that the
federal government had only the powers enumerated in the Constitution, and those powers
were to be strictly construed against the federal government as beneficiary.

[149] Letter from Thomas Jefferson to Albert Gallatin (Jan. 1803), *in* 8 WRITINGS, *supra* note
125, at 241 n.1.

Union "seems necessary."[150] He stated clearly that the doctrine of strict construction required such an action. "Our confederation is certainly confined to the limits established by the revolution. The general government has no powers but such as the [C]onstitution has given it; and it has not given it a power of holding foreign territory, & still less of incorporating it into the Union."[151]

In fact, Jefferson circulated to the entire cabinet a constitutional amendment that would have obviated the constitutional difficulties Lincoln raised.[152] Lincoln favored transmitting the amendment to Congress but apparently the rest of the cabinet members disagreed.[153] Jefferson did not submit the amendment to Congress. Besides the opposition of his cabinet, the prime reason was fear that entangling the treaty in a constitutional amendment might delay and kill the treaty by kindling debate on fundamental issues of constitutional interpretation.[154] He wrote Lincoln: "[T]he less that is said about any constitutional difficulty, the better; and that it will be desirable for Congress to do what is necessary, *in silence*. I find but one opinion as to the necessity of shutting up the country for some time."[155]

Jefferson, however, appeared to leave open the possibility that he would submit an amendment after the treaty was approved by the Senate. His Third Annual Message to Congress seems studiously am-

---

[150] Letter from Thomas Jefferson to John Dickinson (Aug. 9, 1803), *in* 8 WRITINGS, *supra* note 125, at 261, 262.

[151] *Id.* at 262.

[152] 8 WRITINGS, *supra* note 125, at 241-49. There were two versions of the proposed amendment remaining in Jefferson's manuscripts. The shorter reads as follows:

> Louisiana, as ceded by France to the U S. [sic] is made a part of the U S. Its white inhabitants shall be citizens, and stand, as to their rights & obligations, on the same footing with other citizens of the U S. in analogous situations. Save only that as to the portion thereof lying North of an East & West line drawn through the mouth of Arkansa [sic] river, no new State shall be established, nor any grants of land made, other than to Indians in exchange for equivalent portions of land occupied by them, until authorised by further subsequent amendment to the Constitution shall be made for these purposes.

> Florida also, whenever it may be rightfully obtained, shall become a part of the U S. U S. [sic] its white inhabitants shall thereupon be Citizens & shall stand, as to their rights & obligations, on the same footing with other citizens of the U S. in analogous situations.

*Id.* at 241-45. The longer version incorporates Louisiana into the United States as well, but also, among other things, specifically addresses the relations between Indians and other inhabitants in the newly incorporated territory. *See id.* at 241-49.

[153] Petroelje, *supra* note 118, at 95 n.75.

[154] *See* Letter from Thomas Jefferson to Thomas Paine (Aug. 18, 1803), *in* 8 WRITINGS, *supra* note 125, at 245 n.1. *See also* Letter from Thomas Jefferson to James Madison (Aug. 18, 1803), *in* 8 WRITINGS, *supra* note 125, at 245 n.1.

[155] Letter from Thomas Jefferson to Levi Lincoln (Aug. 30, 1803), *in* 8 WRITINGS, *supra* note 125, at 246 n.1.

biguous as to what steps were ultimately necessary to bring Louisiana into the Union.[156] A month before he had written to Wilson Cary Nicholas, a Republican Senator, of his continuing concerns about the constitutionality of the purchase but suggested that he would be guided by his party colleagues as to what action to take.[157]

His Republican colleagues in Congress did not press for an amendment and defended the acquisition as constitutional under the treaty power.[158] On the other hand, the Federalists delighted in noting that it was clearly unconstitutional under strict constructionist theories.[159] After the respective positions taken in this debate, it would have been clearly impossible for Jefferson to suggest a confirming amendment because the suggestion would have undercut his own party's position.[160] Thus, in purchasing Louisiana without obtaining the constitutional amendment favored by his Attorney General, Jefferson abandoned his jurisprudential principles in the face of political exigencies.

---

[156] Jefferson stated, "Should the acquisition of Louisiana be constitutionally confirmed and carried into effect, a sum of nearly thirteen millions of dollars will then be added to our public debt . . . ." Thomas Jefferson, Third Annual Message to Congress (Oct. 17, 1803), *in* Bergh, 3 WRITINGS, *supra* note 110, at 351, 356. The phrase "constitutionally confirmed" seems to encompass either passage of an amendment or simply obtaining the advice and consent of the Senate.

[157] *See* Letter from Thomas Jefferson to Wilson C. Nicholas (Sept. 7, 1803), *in* 8 WRITINGS, *supra* note 125, at 247, 248 n.1 ("[I]t [is] important . . . to set an example against broad construction, by appealing for new power to the people. If, however, our friends shall think differently, certainly I shall acquiesce with satisfaction; confiding, that the good sense of our country will correct the evil of construction when it shall produce ill effects.").

[158] For instance, Senator John Taylor stated:

> Neither the means nor the right of acquiring territory are forbidden to the United States; on the contrary, in the fourth article of the Constitution, Congress is empowered "to dispose of and regulate the territory belonging to the United States." [sic] This recognises the right of the United States to hold territory. The means of acquiring territory consist of war and compact . . . .

13 ANNALS OF CONG. 50 (1852).

[159] *Id.* at 54 (statement of Sen. Tracy).

[160] Lincoln himself resigned less than a year after the treaty's passage. *See* CUNNINGHAM, *supra* note 122, at 69. Gallatin remained as Secretary of Treasury for over twelve years, serving well into the Madison administration and gaining the reputation as the indispensable minister in Republican government. RAYMOND WALTERS, JR., ALBERT GALLATIN: JEFFERSONIAN FINANCIER AND DIPLOMAT 262 (1957). After Gallatin left the Treasury, he was offered the post again by James Madison and John Tyler. *Id.* at 297, 371. John Quincy Adams also wanted him for the post but did not make him a direct offer because Gallatin made it known that he would not accept. *Id.* at 330. The last offer came when he was eighty-three. *Id.* at 371. He continued to display Federalist jurisprudential sympathies, making efforts on behalf of the Bank of the United States and generally espousing a construction of the Constitution indistinguishable from that of his predecessor, Alexander Hamilton. *Id.* at 237-43, 262-63.

After leaving the presidency, Jefferson himself attempted a justi-
fication of his actions:

> The question you propose, whether circumstances do not some-
> times occur, which make it a duty in officers of high trust, to as-
> sume authorities beyond the law, is easy of solution in principle,
> but sometimes embarrassing in practice. A strict observance of the
> written laws is doubtless *one* of the high duties of a good citizen,
> but it is not *the highest*. The laws of necessity, of self-preservation,
> of saving our country when in danger, are of higher obligation. To
> lose our country by a scrupulous adherence to written law, would
> be to lose the law itself, with life, liberty, property and all those
> who are enjoying them with us; thus absurdly sacrificing the end to
> the means.[161]

Jefferson did not specifically refer to the Louisiana purchase in ex-
pounding these sentiments, but he did refer to a hypothetical purchase
of territory that was not strictly constitutional. Thus it seems fair to
take this letter as his apologia for the act of acquiring Louisiana with-
out the constitutional amendment he implicitly acknowledges was
required.

In the same letter Jefferson advocates fidelity to the Constitution
in more minor matters.

> [The principle of yielding to a higher duty than obeying the Consti-
> tution] do[es] not go to the case of persons charged with petty du-
> ties, where consequences are trifling, and time allowed for a legal
> course, nor to authorize them to take such cases out of the written
> law. In these, the example of overleaping the law is of greater evil
> than a strict adherence to its imperfect provisions. It is incumbent
> on those only who accept of great charges, to risk themselves on
> great occasions, when the safety of the nation, or some of its very
> high interests are at stake.[162]

Accordingly, Jefferson justified the aggressive jurisprudence of his At-
torney General in quotidian matters while reserving to himself the
power of constitutional suspension on great matters of state.

One difficulty with this justification is that the effect of one act of
indifference to the President's constitutional jurisprudence in a matter
of substantial public importance is likely to long outlive his presi-
dency while the many acts of constitutional fidelity on smaller matters
will be buried with the end of his administration. So it appears to be
the case with Jefferson's administration. By rejecting his Attorney
General's advice to obtain the Louisiana purchase by constitutional

---

[161] Letter from Thomas Jefferson to John B. Colvin (Sept. 20, 1810), *in* 12 THE WRITINGS
OF THOMAS JEFFERSON 418, 418 (Albert E. Bergh ed., 1907).
[162] *Id.* at 421-22.

amendment and discarding the Republicans' strict construction of the enumerated powers, the President notoriously undermined the jurisprudence he proclaimed. Gouverneur Morris's prophesy was fulfilled because it appeared that even a Republican administration ran on a Federalist jurisprudence whenever it was particularly useful. Attorney General Lincoln's other constitutional opinions could hardly compensate for this abandonment in the public mind. Although Lincoln's opinion on unconstitutionality of the federal law of crimes did ultimately prevail,[163] Jefferson's very public repudiation of strict construction appeared to have more lasting consequences.

When questions of the constitutionality of enumerated powers came before the Court in *M'Culloch v. Maryland*,[164] it was understood that even the adherents of the strict constructionist philosophy had already discarded it when the philosophy conflicted with important political imperatives. This could hardly fail to make even Republican Justices more reluctant to invalidate the creation of a bank which merely facilitated the execution of *enumerated* powers when the first Republican President had appeared to countenance the assertion of an *unenumerated* right to acquire territory.[165] An observer no less prominent than John Quincy Adams summed up the effect of the Louisiana purchase on subsequent constitutional developments:

> It introduce[d] whole systems of legislation abhorrent to the spirit and character of our institutions, and all this done by an Administration which came in blowing a trumpet against implied powers. After this, to nibble at a bank, a road, a canal, the mere mint and cummin [sic] of the law, was but glorious inconsistency.[166]

---

[163] *See* United States v. Hudson and Goodwin, 11 U.S. (7 Cranch) 32, 32 (1812) (holding that the United States cannot exercise "a common law jurisdiction" in criminal cases).

[164] 17 U.S. (4 Wheat.) 316 (1819).

[165] The whole incident sheds a somewhat ironic light on Jefferson's bitter complaints about the performance of Republican appointees on the Marshall Court. *See* Letter from Thomas Jefferson to Thomas Ritchie (Dec. 25, 1820), *in* 15 THE WRITINGS OF THOMAS JEFFERSON 295, 295-99 (Albert E. Bergh ed., 1907) (calling certain Justices on the Court, presumably including his appointees, "lazy or timid" for failing to dissent from the opinions of Chief Justice Marshall, "a crafty chief judge"). Lincoln was not timid, but his boldness did not allow him to succeed in persuading Jefferson to seek a constitutional amendment in order to purchase Louisiana. Jefferson in fact appears to have justified his refusal to abide by Republican jurisprudence with a theory as "crafty" as any espoused by Chief Justice Marshall.

[166] 5 MEMOIRS OF JOHN QUINCY ADAMS 401 (Charles F. Adams ed., Philadelphia, J.B. Lippincott & Co. 1875). His grandson, Henry Adams, took a similar view of the effect of the Louisiana purchase. *See* HENRY ADAMS, HISTORY OF THE UNITED STATES OF AMERICA DURING THE ADMINISTRATIONS OF THOMAS JEFFERSON 353-79 (Library of America 1986).

Perhaps John Quincy Adams slightly overstated his case. Presidents did veto legislation on the basis of a strict constructionist constitutional theory favoring states' rights even after the Louisiana Purchase. For instance, James Madison vetoed a bill for internal improvements because he believed the creation of improvements were not among the enumerated powers and

### III. AN ANALYSIS OF THE OPERATIONS OF THE CURRENT OFFICE OF LEGAL COUNSEL

This final section will analyze the current functions and structure of the Office of Legal Counsel in order to provide a fuller understanding of the bureaucratic and political forces that shape its opinions and advice.[167] In contrast to the models in part I which are drawn from normative constitutional theory and a consideration of presidential interest, this section will emphasize analysis drawn from "bottom-up" organizational analysis.[168] In this way we will survey how the beliefs, tasks, and interests of the managers and line attorneys in OLC influence its output—its opinions and advice—and lead to the employment of a mix of the models discussed in part I.

Indeed, analyzing executive legal opinions in terms of the interests of the legal advisor as well as his client is suggested not only by bureaucratic theory but by William Shakespeare. In fact, the largest concentration of legal material appearing in any Shakespearean play is essentially a legal opinion for the executive—the Archbishop of

---

thus a constitutional amendment was necessary to permit them. *See* James Madison, Veto Message (Mar. 3, 1817), *in* 8 THE WRITINGS OF JAMES MADISON 386, 386-88 (Gaillard Hunt ed., 1908). Nevertheless, many of his Republican colleagues in the Congress did not agree, *see* JEFFERSON POWELL, LANGUAGES OF POWER: A SOURCEBOOK OF EARLY AMERICAN CONSTITUTIONAL HISTORY 315 (1991), and his veto, as well as the subsequent veto of the bank by Andrew Jackson on constitutional grounds, did not succeed in rallying a consensus against the more dominant nationalist theories of constitutional interpretation.

[167] Unless otherwise indicated, the information about the OLC in this section comes from my experience there. The assertions about its procedural rules and the composition of its staff have been kindly verified by Robert Delahunty, Senior Counsel at OLC.

[168] For a discussion of "bottom-up" bureaucratic analysis, see JAMES Q. WILSON, BUREAUCRACY 23-28 (1989). The premise of this analysis is that bureaucratic behavior can be explained in terms of the distinctive mission and organization of the bureaucracy and the interests of the bureaucrats who work there. *See also* GRAHAM T. ALLISON, ESSENCE OF DECISION 67 (1971) (describing a paradigm in which governmental behavior can be understood less as the result of deliberative choices of high-level leaders, and "more as *outputs* of large organizations functioning according to standard patterns of behavior"). The bottom-up analysis has its roots in the organization theory of James March and Herbert Simon which stresses that the limitation of knowledge of organizational actors leads to a structure that "relies upon habits, routines, and other forms of programmed decisionmaking." *See* Terry M. Moe, *Politics and the Theory of Organization*, 7 J.L. ECON. & ORG., Special Issue 1991, at 106, 110. *See also* JAMES G. MARCH & HERBERT A. SIMON, ORGANIZATIONS 34-82 (1958) (examining the relationship between organizational demands and individual attitudes in determining organizational behavior).

Competing theories of political organization include the "institutional school of organization theory," which views organizational structures as more a reflection of society at large than a solution to the tasks for which the organization is responsible, and "positive economic theories of organization" which stress that organizations can be understood as a product of rational choice theory. *See* Moe, *supra*, at 116-20 (surveying current political organization theories). These theories offer plausible explanations of some aspects of OLC's structure. *See, e.g., infra* note 199 and accompanying text.

Canterbury's eighty-line explication of Henry V's right to conquer certain lands in France.[169] Despite King Henry's claim that he is interested in sincere and objective legal advice,[170] Shakespeare makes clear that the Archbishop has his own interests in giving the King the advice he wants to hear: in the opening scene of the play, the Archbishop suggests that forwarding the King's plans in France will influence him to oppose a pending bill which would deprive the Church of half its property.[171] It has recently been argued that the advice was legally correct in terms of the law of war existing at the time of Henry's reign.[172] Nevertheless, within the context of the play, the Archbishop's prolix, convoluted, and repetitive speech, studded with references to a dozen different historical personages as well as obscure events, and confusing to the King himself,[173] would naturally be played as comedy, thus also undercutting any perception that the advice is well reasoned. Shakespeare's message about executive legal opinions is clear: to understand the shape of the opinions produced, one must understand the interests of both the advisor and the advised.

### A.  *The Central Dilemma of OLC*

The Office of Legal Counsel is headed by an Assistant Attorney General who reports directly to the Attorney General. Considered to be one of forty or so key subcabinet posts in an administration, he is a political appointee confirmed by the Senate and is generally selected from the ranks of the lawyers of the President's party with outstanding credentials and reputation.[174] Although he is the Attorney General's lawyer, he also provides advice directly to other agencies and in particular to the White House. Given that he is the White House Counsel's lawyer as well as the Attorney General's, the White House and the Counsel's office in particular will often have more influence over his appointment than over other assistant attorneys general.[175]

---

[169] WILLIAM SHAKESPEARE, THE LIFE OF KING HENRY THE FIFTH act 1, sc. 2, lines 35-98, 101-118 (Louis B. Wright & Virginia A. LaMar eds., Folger Library 1960) [hereinafter HENRY V].

[170] *Id.* at lines 10-34.

[171] *Id.* at act 1, sc. 1, lines 76-85.

[172] *See* Theodor Meron, *Shakespeare's Henry the Fifth and the Law of War*, 86 AM. J. INT'L L. 1 (1992).

[173] In the first sixty lines of his speech the Archbishop fails to give a firm conclusion, triggering an exasperated question from the King: "May I with right and conscience make this claim?" HENRY V, *supra* note 169, at act 1, sc. 2, line 99.

[174] *See* SENATE COMM. ON GOV'TAL AFFAIRS, 102D CONG., 2D SESS., UNITED STATES GOVERNMENT POLICY AND SUPPORTING POSITIONS 85 (Comm. Print 1992) (commonly referred to as the PLUM BOOK).

[175] For instance, William P. Barr, when he was appointed as the first Assistant Attorney General for OLC in the Bush administration, had no connections to the incumbent Attorney

The central dilemma for any Assistant Attorney General of OLC is how to provide his clients, particularly his key patrons, the White House Counsel and the Attorney General, with advice and opinions they find generally congenial while at the same time upholding the reputation of the office as an elite institution whose legal advice is independent of the policy and political pressures associated with a particular question.[176] The reputation of the office is particularly important to the Assistant Attorney General for both personal and institutional reasons.

His interest in giving congenial advice is readily explained: by doing so he protects his position, retains influence with the president and Attorney General, and advances his prospects of promotion.[177] His interest in the reputation of the Office requires a more complicated explanation. Personally, he has an interest maintaining the reputation because it will be useful to his career. Because OLC does not have a specialized subject matter area or substantial litigation or lobbying functions, the prestige and reputation of the office will be what will enhance his status as he returns to private practice. (For those heads of OLC coming from academics, the concern over reputation for principled decision-making may be even more readily apparent since a reputation for principled analysis is understood as central to academic standing.) Moreover, heads of OLC are judges in waiting to the highest courts in the land both during and after their tenure.[178] A public reputation for offering the rubber stamp of legality for

---

General, Richard Thornburgh, but was often described by the media as a protege of C. Boyden Gray, the White House Counsel. *See, e.g.,* Phil McCombs, *Counsel's Lost Hurrah: The Final, Furious Days of C. Boyden Gray,* WASH. POST, Jan. 16, 1993, at G1, G9.

[176] The tension between maintaining OLC's reputation and serving its clients may be understood as a classic example of the tension between the maintenance and function of an organization explored in CHESTER I. BARNARD, THE FUNCTIONS OF THE EXECUTIVE (30th anniversary ed. 1968). OLC's reputation is necessary to maintain its effectiveness by attracting good lawyers and by giving its opinions weight beyond that of general counsel's throughout government. Its function, however, is to serve clients within the executive branch, most importantly the President and the Attorney General.

[177] Nelson Lund believes that the actions of OLC can be essentially explained by this interest. *See* Nelson Lund, *Rational Choice at the Office of Legal Counsel,* 15 CARDOZO L. REV. 437 (1993).

[178] William Rehnquist was Assistant Attorney General when he was appointed to the Supreme Court. Richard L. Berke, *Clinton Names Ruth Ginsburg, Advocate for Women, to Court,* N.Y. TIMES, June 15, 1993, at A1, A22 (inset entitled *The High Court in Profile* giving position of each justice at time of appointment). Antonin Scalia was Assistant Attorney General from 1974 to 1977 and was later named a justice of the Supreme Court. 2 WHO'S WHO IN AMERICA 2968 (Marquis Who's Who ed., 47th ed. 1992). More recently, Michael Luttig was head of the Office of Legal Counsel when he was appointed to the United States Court of Appeals for the Fourth Circuit. *See* Daniel Klaidman, *Inside Justice: Barr Learning the Bureaucratic Minute,* LEGAL TIMES (Washington), Nov. 18, 1991, at 6, 12.

whatever the policy favored by the most powerful decision-makers in the administration would not enhance the prospects of being confirmed to such a position.[179]

The reasons for protecting OLC's reputation, however, are not only narrowly personal but broadly institutional.[180] As indicated in part I and described in more detail below, one of OLC's central functions is to resolve disputes between agencies.[181] Insofar as OLC maintains an outstanding reputation for principled legal advice, agencies are more likely to accept OLC's resolutions as final rather than (1) covertly resisting its rulings, causing continuing disarray within the administration and uncertainty in the administration's legal position, or (2) appealing the rulings to the Attorney General or the President.[182] The disadvantages of such appeals are threefold, in increasing order of importance. First, they take up the valuable time of the President or the Attorney General. Second, their resolution will frequently require a greater expenditure of political capital on the part of the President and the Attorney General because any political unpopularity in legal resolution will fall more directly on them. Finally, the resolution of the legal issue will likely appear based more on legal principles than on policy or political issues if it is made by OLC rather than the President or the Attorney General. Because of the centrally political nature of his job, decisions of the President—even those purporting to be based on law—will inevitably be viewed through a political prism. This is also increasingly true of the Attor-

---

[179] Of course, to be nominated he must please the President and the Attorney General. Even in terms of raw personal ambition, the head of OLC must perform a difficult balancing act.

[180] The notion that organizations evaluate their actions in terms of their "reputation effects" is not confined to political organizations. *See* David M. Kreps, *Corporate Culture and Economic Theory, in* PERSPECTIVES ON POSITIVE POLITICAL ECONOMY 90, 90-143 (James E. Alt & Kenneth A. Shepsle eds., 1990) (explaining behavior and indeed the existence of corporations to be premised largely on the need to build a reputation for trust that will avoid the "prisoner's dilemma" of a one shot transaction where each side would have incentives to cheat the other).

[181] According to OLC's public budgetary data, OLC gave 625 opinions to outside agencies in 1991. Although these figures do not distinguish instances in which the legal issue is contested by two or more agencies from those in which the legal issue is addressed by only one agency, according to Senior Counsel Robert Delahanty, a senior OLC civil servant, interagency disputes constitute at least 25% of opinions rendered to outside agencies.

[182] Indeed, given the uncertainty over whether some interagency disputes are amenable to resolution by the judicial rather than the executive branch, the executive branch has an interest in providing a fair forum for the resolution of such disputes. This will discourage resorting to the judiciary which will tend to erode the President's authority if successful and will publicize the dispute if unsuccessful. For a discussion of the extent to which the courts entertain interagency suits, see Michael Herz, United States v. United States: *When Can the Federal Government Sue Itself?*, 32 WM. & MARY L. REV. 893 (1991).

ney General who has growing policy responsibilities because more law enforcement responsibility has become federal and because, at least in the Reagan and Bush administrations, a measure of responsibility for general domestic policy has fallen to him through the chairmanship of the domestic policy council.[183]

Even outside the area of interagency disputes the reputation of OLC for legally principled advice has political and policy value for the President and the Attorney General. Precisely because the President (and to a lesser extent the Attorney General) have so many political responsibilities, the legal force of even their purportedly legal decisions or views may be discounted. And yet the President is likely to want his legal views to have force. This will certainly be so to the extent that, like Presidents from Jefferson to Reagan, he has a distinctive legal jurisprudence that he wishes to press before the country and the Supreme Court. Even in the absence of such a jurisprudence, the President will recognize that the President is perceived to have legal obligations[184] and he will thus want a mechanism by which he is perceived to be taking these responsibilities seriously. Hence it is useful for the office to cultivate a reputation of applying the law scrupulously without regard to political or policy interest.

The need for preserving reputation is also reinforced by the need to recruit outstanding attorneys who can carry the heavy responsibilities shouldered by the Office of Legal Counsel. Unlike the Solicitor General's Office and the litigating divisions of the Department, attorneys at OLC do not gain litigation or other readily transferable knowledge from their experience; and yet like these attorneys, their salaries are far less than they could command in private practice. Thus, the only incentive is the reputation of the office and the interest of the work. The reputation for principled legal analysis is particularly important to those attorneys at OLC who plan an academic career.[185]

However strong the reputation of OLC, the lack of readily trans-

---

[183] *See* John Hanchette, *Campaign '92: Musical Chairs at the White House*, Gannet News Service, Feb. 5, 1992, *available in* LEXIS, Nexis Library, Wires File (noting that Attorneys General Meese and Barr had been Chairmen of the Domestic Policy Council). While William P. Barr became Attorney General, the Domestic Policy Council was dissolved in a government reorganization. *Id.*

[184] He is correct in believing he has such responsibilities. *See supra* notes 10-13 and accompanying text. In any event, it is a staple of modern political culture that the President is to be governed by the rule of law through the operation of a nonpartisan Justice Department. *See, e.g.,* Terry Adamson & Zoe Baird, *Advice to William French Smith: Learn From the Past*, LEGAL TIMES (Washington), Feb. 16, 1981, at 11.

[185] In the last twenty years, about 20% of attorneys at OLC have chosen an academic career.

ferable skill tends to limit the tenure of line attorneys to two or three years.[186]  The large turnover is one of the important reasons that each Assistant Attorney General has the opportunity to appoint a greater proportion of his own staff than the Solicitor General and thus build an office whose members generally share his and the administration's general jurisprudence.  This is one reason that the Office has a culture that tends to take the jurisprudential concerns of the President more seriously than does the Office of the Solicitor General.[187]  This difference will manifest itself more acutely in an administration in which the President has a distinctive jurisprudential program, like the Reagan administration.[188]

### B.  *The Matching of Models to Tasks*

The tension between preserving the Office's reputation and providing advice that is consonant with the administration's objectives is central to understanding how OLC conducts its assignments.  OLC's principal responsibility is to provide legal opinions and advice to executive branch agencies.  The Attorney General "shall give his advice and opinion on questions of law when required by the President."[189]  In addition, he is charged with giving advice to department heads who "may require the opinion of the Attorney General on questions of law arising in the administration of his department."[190]  By executive order the President has directed that agency heads should seek the opinion of the Attorney General when they have different opinions about a matter that implicates their responsibilities and thus have a legal dispute.[191]  The Attorney General in turn has delegated this

---

[186]  At one time the staff of OLC consisted largely of attorneys who would make a career of government service.  The Carter administration changed from that hiring model and subsequent administrations have never returned to it.  The advantages of hiring highly credentialed legal attorneys directly from a clerkship or after a few years of private practice are twofold.  First, they will generally be stronger in raw analytic ability.  Second, they will better understand current methods of interpretation generally prevalent in the legal academy and in the judiciary.

[187]  Another reason is the ability of the Solicitor General's office to use its putative expertise in Supreme Court precedent as insulation from the views of other legal actors in the administration.  *See* McGinnis, *Solicitor General's Office, supra* note 10, at 809-14.

[188]  For discussion of the clashes between the head of OLC and the Solicitor General's office in the Reagan administration, see CHARLES FRIED, ORDER AND LAW 34-35 (1991).

[189]  28 U.S.C. § 511 (1988).

[190]  28 U.S.C. § 512 (1988).

[191]  Section 1-401 of Executive Order No. 12,146 provides: "Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General."  Exec. Order No. 12,146, 3 C.F.R. 409 (1979), *reprinted as amended in* 28 U.S.C. § 509 (1988).  This order has been interpreted to allow any agency to request resolution of a dispute even if other agencies

*CARDOZO LAW REVIEW* [Vol. 15:375

authority to OLC by providing that its Assistant Attorney General is responsible for "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal advisor to the President and as a member of . . . the Cabinet."[192]

Opinions are now rarely rendered in the form of Attorney General opinions.[193]  Instead, the advice is rendered in writing in the form of opinions from the Assistant Attorney General or one of his deputies.  Moreover, although the statutes appear to give agency heads the right to obtain opinions, OLC has by tradition and informal rules limited this right by imposing a variety of requirements on outlying agencies (all agencies except the White House, OMB, and the Department of Justice itself) seeking opinions.

These jurisdictional requirements help OLC preserve its reputation by preventing it from becoming engulfed in needless controversy.[194]  For instance, OLC will not generally write an opinion about a matter in litigation because it is recognized that an argument asserted in litigation does not have to meet the same standard as one that forms the basis of an OLC opinion.[195]  Writing on matters in litigation would thus frequently force OLC to the unwelcome choice of abandoning its reputation for scrupulousness or clashing with the Department of Justice's litigating divisions.

Another example is the rule against providing opinions to a requesting agency unless that agency itself provides a legal opinion.[196]

---

would prefer not to see the dispute resolved. *See* Memorandum for Donald L. Ivers, General Counsel, Veterans Administration, from Charles J. Cooper, Assistant Attorney General, 12 Op. Off. Legal Counsel 109, 113-14 (1988) (preliminary print).

[192] 28 C.F.R. § 0.25(a) (1992).

[193] William Barr, Richard Thornburgh, and Edwin Meese did not sign any formal opinions arising from inquiries or proceedings outside the Department of Justice although they occasionally signed cover memoranda that accompanied formal opinions. *See, e.g.*, Letter from William P. Barr, Attorney General, to President Bush, 16 Op. Off. Legal Counsel 6 (1992) (preliminary print) (summarizing and enclosing OLC opinion on the President's authority to commit troops to Somalia). This is the culmination of a decades-long trend in which the Attorney General does not personally supervise the writing of even the most important legal opinions in the executive branch. His responsibility for the Department's litigation, for overseeing its vast law enforcement and immigration bureaucracy, and for participating in helping to set the domestic policy of the administration apparently make such close analytic work impossible.

[194] Indeed, one might compare OLC's use of these requirements to the Supreme Court's use of jurisdictional and other doctrines as "passive virtues" that help preserve its political capital and respect among citizens by avoiding decisions in controversial matters at inopportune times. *See* BICKEL, *supra* note 28, at 111-99. *See also infra* note 219 and accompanying text.

[195] *See* 38 Op. Att'y Gen. 149, 150 (1934). The rule is a venerable one.

[196] This convention was the rule that in my experience most often blocked opinion requests

---

**-1562-**

Forcing the requesting agency to record its own legal opinion has as a primary objective preventing outlying agencies from sending legal questions to OLC simply to avoid controversy. Thus the rule helps preserve OLC's reputation by reducing its opinions on controversial topics which, however well reasoned, would be subject to political attack because of their results. The rule has the added advantage of imposing a cost (in time and effort) on the agencies seeking advice and thus preventing OLC from being swamped by opinion requests.[197] Even so, OLC frequently has more opinion requests than it can handle, but even this overload can be turned to its advantage as long as it is not too substantial. Opinion requests that pose controversial questions but which the White House or other powerful interests in the administration are not pressing to have answered can be allowed to languish and principled opinions on less controversial subjects can be produced instead.[198]

The final advantage to the rule requiring submissions from other agencies is that it creates a formal process that helps OLC to act and appear to act much like a court. This is clearest in the case of an interagency legal dispute where OLC receives submissions from both parties but is true even of unilateral submissions. By forcing the agency to express its arguments in a legal memoranda, OLC obtains the advantage that any court does from forcing litigants to provide it with briefs ventilating legal issues. This is particularly important for OLC since its lawyers are typically young generalists and agency lawyers will have far more specific experience and expertise in the issues involved. The requirement that the parties to the disputes make written submissions, however, has an expressive as well as functional

---

from other agencies. Its origins are obscure and may seem in tension with a former ruling—which was not applied during my tenure—that OLC would not rule merely to confirm another Department's internal position. *See* 28 Op. Att'y Gen. 596, 597 (1911).

[197] The degree of uniformity of interpretation throughout the executive branch is likely to be determined in practice by a balancing of the cost and benefits of such uniformity. When the cost of a divided interpretation to the President or another powerful subordinate becomes greater than the costs (political and institutional) of settling the issue, the interpretation will be unified by OLC or another mechanism. This suggests that the executive branch is always likely to embrace a number of substantially divergent interpretations in areas where unity is relatively unimportant. Moreover, it suggests that the reason that OLC only occasionally settles disputes between independent agencies and executive branch agencies is the high political cost of enforcing the settlement. Hence OLC has a variety of rules, both formal and informal, that permit it to avoid getting involved in such disputes where the costs outweigh the benefits.

[198] Thus, the jurisdictional conventions of OLC may have an important agenda-setting function. By allowing some opinion requests to languish, OLC can more easily avoid issues whose resolution would interfere with the administration's agenda and settle issues that would promote some item on its agenda. Mechanisms for agenda setting are central to rational choice theories of organization. *See* Moe, *supra* note 168, at 119.

value.[199] OLC's process symbolizes that OLC will be acting more like a court than a private outside counsel: the only arguments that will influence its decision are those that can be reduced to legal writing. With requests from outlying agencies OLC typically emphasizes its judicial appearance by rarely meeting with lawyers from the other agencies and never meeting with policymaking officials, choosing instead to rely on written submissions and its own research.

OLC not only administers an opinion-writing process for outlying agencies that mimics the judicial process in some instances but creates a product that has the appearance of deliberative and authoritative judicial opinions.[200] This satisfies the interests of the OLC attorneys as former clerks and as lawyers with an academic and architectural interest in the law. The formality of the process and the product also allows the Office to appear to be more than simply another legal office within the government, but rather *the* oracle of executive branch legal interpretation.[201] Another mark of differentiation is that the Office publishes many of its opinions (although after a lag of several years to preserve confidentiality), thus proclaiming that they can endure the same scrutiny as a judicial opinion or law review article.[202]

The fairly formal process that is used for opinions from outlying agencies also reinforces a court-centered model for the content of opinion writing. The agencies appeal to precedents and other well-established principles (which generally means that they have been established by courts) and OLC deliberates on the principles and precedents and then writes an opinion which can be measured against established law. Nevertheless, it is possible to make this process consistent with the model of independent authority at least where the administration's independent principles are well known. As discussed in part I, however, an administration will rarely have as reticulated a

---

[199] For a discussion of the importance of symbolic values to organization theory, see Moe, *supra* note 168, at 117-18.

[200] The sixteen published volumes of OLC opinions are full of lengthy and self-consciously deliberate opinions. For an example of an opinion of particularly self-consciously legal refinement, see 5 Op. Off. Legal Counsel 116 (1981) (discussing the issue of whether an attempt to assassinate the President could be made punishable by the death penalty).

[201] If, as suggested in part I, executive branch legal interpretation may be understood to have a constitutional purpose distinct from that of judicial branch interpretation, there may be a danger in having OLC opinions so consciously ape the judicial product. *See* Alito, *supra* note 40. In the public mind the judiciary is the ultimate (and indeed perhaps the only) repository of authoritative legal interpretation, and it is therefore natural for OLC to try to build its reputation by mimicking the judiciary. As we shall see, it sometimes then uses this reputation to undertake legal analysis that is more distinctly like that of the executive branch in nature.

[202] Publication of opinions also has the advantage of economy as agencies can find the answers to questions that they would otherwise put to OLC.

body of principles as the courts, and thus it will be easier to uphold a reputation for legally principled opinions if the legal principles used can be referenced to principles articulated in court.

The process emphasis in the production of most OLC opinions, however, is not consonant with the model of the Attorney General as situational legal advisor. There is little reason for such formality if the opinion must simply translate the preferred policy position into a legal formulation. Moreover, publication of opinions may actually be harmful since they may reveal substantial jurisprudential inconsistencies in opinions taken for different policy ends.

When the legal issues implicate essential policy interests of the administration, the Assistant Attorney General for OLC faces a different trade-off between the twin objectives of maintaining the reputation of his office and serving his patrons. Therefore, on issues of interest to the White House or the Attorney General, the jurisdictional requirements and formal process imposed on outlying agencies are substantially relaxed. The White House Counsel's office is able to obtain opinions without first providing their own analysis. Moreover, there is much greater willingness to supply the White House with oral advice. (OLC generally disfavors oral advice because by furnishing a necessarily less deliberate analysis in circumstances where it has been less able to evaluate the legal and political implications of its views, OLC runs a more substantial risk of legal error and of controversy.) Moreover, as informal contact is substituted for formal process, OLC lawyers naturally come to treat the White House more as clients than as litigants. This informality symbolizes that the court-centered model no longer has substantial sway and the Office has moved toward an independent authority or situational model, depending on whether it is following the independent jurisprudential principles or the situational interests of the White House. This in turn depends on how far the administration is interested in advancing independent jurisprudential principles.[203]

This is not to say that OLC, on the basis of the situational model, simply provides a legal seal of approval to the White House's policy desires. The emphasis on process in the treatment of outlying agencies under the judicial model has a powerful influence on the culture of OLC. Further, the lawyers of OLC are generally recent judicial clerks for whom a court-centered model has the intrinsic appeal of familiarity. Finally and most importantly, because of its greater ex-

---

[203] For a discussion of the President's trade-off between advancing an independent set of jurisprudential principles and his own situational political interest, see *supra* notes 102-03 and accompanying text.

pertise in the law, OLC may assess more accurately than policy makers around the President legal events such as, for instance, the Supreme Court's certain rejection of a line of argument and the long-term policy consequences of these events.[204]

In fact, in several recent cases the Office has decided against the President's perceived political interest.[205] The most celebrated instance of resistance by OLC to a strong policy interest of the President, however, occured when William Rehnquist, while serving as the first Assistant Attorney General of the Nixon administration, rejected the proposition that the President had an inherent authority to impound funds (i.e. refuse to spend funds appropriated by Congress). He wrote bluntly: "It may be argued that the spending of money is inherently an executive function, . . . and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them."[206] Subsequently in the Nixon administration, an Assistant Attorney General was eased out of office largely on account of similar views,[207] and Deputy Attorney General Sneed, a former law school dean, testified that the President did have a constitutional right to impound funds, expressly disavowing Rehnquist's memorandum.[208] In light of these developments, it is hard to imagine that it was clearly in Rehnquist's self-interest, as defined solely by his interest in pleasing the White House and advancing his career, to render this blunt and unfavorable advice. It is better explained by a concern to protect his own reputation and that of the Office by refusing to advance a doubtful proposition even if other able lawyers outside OLC were willing to do so.

---

[204] *See supra* note 107 and accompanying text.

[205] *See, e.g.,* 12 Op. Off. Legal Counsel 159 (1988) (preliminary print) (opining that President did not have inherent constitutional authority to veto separate items within a single bill); 16 Op. Off. Legal Counsel 145 (1992) (preliminary print) (opining that the Treasury did not have the legal authority to index capital gains by means of regulation).

[206] Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools 11 (Dec. 1, 1969) (on file with author).

[207] These events were recounted to me by Herman Marcuse, an attorney who has served at OLC for the past few decades. By this time, Rehnquist had been appointed to the Supreme Court.

[208] *Impoundment of Appropriated Funds by the President: Joint Hearings on S. 373 Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Gov't Operations and the Subcomm. on Separation of Powers of the Sen. Comm. on the Judiciary,* 93d Cong., 1st Sess. 358, 362, 380 (1973) (statement of Hon. Joseph T. Sneed, Deputy Att'y Gen., Justice Dep't). Department of Justice litigators also subsequently argued (with little success) that the President had inherent power to impound funds. *See* Guadamuz v. Ash, 368 F. Supp. 1233, 1239, 1243-44 (D.D.C. 1973); Sioux Valley Empire Elec. Ass'n v. Butz, 367 F. Supp. 686, 691, 697-98 (D.S.D. 1973); Oklahoma v. Weinberger, 360 F. Supp. 724, 728 (W.D. Okla. 1973); Local 2677, Am. Fed'n of Gov't Employees v. Phillips, 358 F. Supp. 60, 76-77 (D.D.C. 1973).

A second central duty of the Office is to review legislation for its constitutionality and then send comments on the legislation to Congress if it is still pending there or to the White House if the bill has been presented. The function OLC plays in these bill comments is also more consciously that of an advocate than in interagency opinions. Because the legislation originates in a separate and often adversary branch of government, OLC will react more as an adversary than as a court. Moreover, because a bill that dies or is vetoed on account of constitutional objections is never subject to legal challenge, the executive may be bolder with its opinions because there is necessarily less fear of being directly contradicted by the judiciary. Accordingly, it is not surprising that in bill comments either the independent authority model or situational model holds greater sway (depending on the extent to which the administration wishes to press a coherent independent jurisprudence).[209]

In particular, in the bill comment process, OLC treats congressional encroachments on the President's putative constitutional powers in a manner particularly far removed from the court-centered model. As noted in part I, the structure of constitutional interpretation the President and his subordinates employ should analyze separation of powers issues from the standpoint of the executive branch's institutional interest. Moreover, there is little risk to OLC's reputation in advocating a version of the jurisprudence on executive-congressional separation of powers issues that aggressively advances the executive interest with little regard for court precedent because the permanent interests of the executive branch are likely to generate a coherent and articulated jurisprudence that has substantial continuity between administrations.[210] For these reasons, OLC regularly gives cases unfavorable to executive branch prerogative vis-à-vis Congress a far more limited reading than cases in other areas and, conversely, gives favorable cases a very broad reading.[211]

---

[209] As we have seen in part I, the independent authority model and situational model can blend together, particularly in the context of the separation of powers.

[210] Of course, such separation of powers issues may arise in the course of opinions outside of the bill comment process where OLC's views may be subject to challenge in court. Given that the bill comment process bulks so large in OLC's daily activities and consists largely of defending the executive branch against congressional encroachments, the jurisprudence of separation of powers stemming from the bill comment process will establish an aggressive edge to OLC's entire opinion writing on the subject.

[211] Another important product of OLC in recent years is the signing statement. When the President needs, for policy or political reasons, to obtain passage and to sign a bill with constitutional defects, the solution has been for the President to issue a signing statement listing the constitutional defects. By signing the bill but attaching a signing statement, the President's pragmatic interest is served while the structure of the office's separation of powers jurisprudence is preserved at least in form. Signing statements are thus a natural product of an office

Perhaps the best example of OLC's approach in interpreting a separation of powers case is its treatment of *Morrison v. Olson*.[212] In that case, the Court upheld the law creating an office of independent counsel against the contention that it violated Article II because the counsel was liable to dismissal "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties."[213] Congress has attempted to use this as a precedent to create other offices with similar removal provisions and, in every instance, despite *Morrison*, the Department of Justice has declared that provisions limiting removal would be unconstitutional.[214]

For instance, in 1992 Congress proposed transferring authority over uranium enrichment from the Department of Energy to the United States Enrichment Corporation, whose Administrator would be removable "only for neglect of duty or malfeasance in office."[215] Despite the limited scope of the duties of the Administrator, the Department sharply distinguished *Morrison* in a manner that showed that it would apply that case to permit restrictions only on the re-

---

concerned with maintaining a consistent jurisprudence but wishing to avoid opposition to the President's political and policy imperatives. As OLC has come to comment on all legislation, the number of signing statements has sharply risen. For instance, in the third year of the Bush administration, the President issued over twenty times as many signing statements as did President Carter in the third year of his administration. Compare Signing Statements of President Carter, 15 WEEKLY COMP. PRES. DOC. (1979) with Signing Statements of President Bush, 25 WEEKLY COMP. PRES. DOC. (1989).

[212] 487 U.S. 654 (1988). This is only one of many examples. The Department has recently seized on Justice Kennedy's concurrence in Public Citizen v. United States Dep't of Justice, 491 U.S. 440 (1989), to argue that Congress is without power to impose qualifications requirements on principal officers, *see* Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Rep. George Miller, Chairman, Committee on Interior and Insular Affairs (Feb. 13, 1992) (on file with author), despite the many statutes that already have such qualifications. Indeed, the statute that has been publicized as preventing Hillary Rodham Clinton from being appointed to a cabinet post by her husband is plainly unconstitutional under OLC's view. *See generally* 5 U.S.C. § 3110 (1988) (prohibiting the President from appointing close relatives to government positions); Naftali Bendavid, *The First Lady and the Law: Old Debate Over Spouse's Role Takes a New Twist*, LEGAL TIMES (Washington), Mar. 15, 1993, at 1, 22 (discussing the statute and U.S. District Judge Royce Lamberth's March 10 ruling).

[213] *Morrison*, 487 U.S. at 663 (quoting 28 U.S.C. § 596(a)(1) (1988)). The *Morrison* Court also upheld the statute against the challenge that court appointment of the independent counsel violated the Appointment Clause and that judicial involvement in the independent counsel process violated Article III. *Id.* at 671-85.

[214] For examples of letters opposing independent agencies after *Morrison*, see Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Rep. Dan Rostenkowski, Chairman, Committee on Ways and Means (June 23, 1992) (on file with author) (opposing creation of an independent Social Security Administration as unconstitutional). OLC drafts the Department's letters on constitutional issues.

[215] S. Res. to Amend H.R. 776, 102d Cong., 2d Sess. 337, 138 CONG. REC. S10700 (daily ed. July 29, 1992).

moval of the independent counsel itself.[216] Indeed, in suggesting that agencies with permanent policymaking responsibilities cannot be insulated from presidential control under the *Morrison* analysis, OLC's analysis casts doubt on the constitutionality of independent agencies in general, most of which engage in more important policymaking decisions than the Uranium Enrichment Corporation.[217] The fact that

---

[216] The Department wrote:

> First, the Administrator of the Enrichment Corporation appears to have the powers and duties of a principal officer, not an inferior officer. His appointment by the President with the advice and consent of the Senate is consistent with this status. *See* U.S. Const. art. II, § 2, cl. 2. Such individuals have traditionally been viewed as being at the heart of the corps of officers whom the President must have unfettered discretion to supervise if he is to execute the law in a unified and coherent fashion.
>
> Second, the Administrator would not have jurisdiction limited in time and scope as that of the independent counsel in *Morrison*. Rather, he would be appointed to serve a renewable term of six years and would be charged with substantial policymaking and administrative authority over the government's uranium enrichment functions. *Compare* proposed AEA §§ 1501(b)(2) & 1401 *with Morrison*, 487 U.S. at 691-93.
>
> Third, unlike the independent counsel in *Morrison*, who generally is to follow the prosecutorial guidelines established by the Department of Justice, the Administrator may exercise authority without any statutory direction to follow policy guidelines established by the Department of Energy or any other agency. *See generally* proposed AEA § 1501(c)(2).
>
> Finally, unlike the situation in *Morrison*, where there was arguably a conflict of interest between the President's duty to prosecute individuals and his putative concern for protecting his closest personal advisers, there is no conflict between the President's duty to execute the law and the Administrator's duty to supervise uranium enrichment activities.

Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Sen. J. Bennett Johnston 13-14 (Sept. 15, 1992) (on file with author). Because the letter addressed constitutional issues it was written by OLC.

[217] Most commentators see *Morrison* as strengthening rather than weakening the doctrinal argument for the constitutionality of independent agencies, *see, e.g.*, Glen O. Robinson, *Independent Agencies: Form and Substance in Executive Prerogative*, 1988 DUKE L.J. 238, because it explicitly rejects the strong unitary position espoused by Justice Scalia in dissent. *Compare Morrison*, 487 U.S. at 705 (Scalia, J. dissenting) (stating that all officers of the United States must be removable at will by the President) *with Morrison*, 487 U.S. at 690 n.29 (labeling the dissent's claim a "rigid demarcation—a demarcation incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known nor foreseen by the Framers [which] depends upon an extrapolation from general constitutional language which we think is more than the text will bear"). This view is open to question, however, because *Morrison* eliminates the safe-harbor that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958), gave to quasi-legislative and quasi-judicial agencies. In contrast, *Morrison's* test replaces these "rigid categories" with a more functional test, focusing on whether "the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." 487 U.S. at 689, 691. In holding that the independent counsel did not interfere with the President's ability because it had "limited jurisdiction and tenure and lack[ed] . . . significant administrative authority," the Court left open to constitutional attack the independence of administrative agencies with substantially more administrative power. *Id.* at 691. Thus, once the fact that

434          *CARDOZO LAW REVIEW*          [Vol. 15:375

the Department of Justice does not challenge the constitutionality of
these ongoing entities shows that the Department generally applies a
different standard of constitutional review to pending legislation than
it applies to enacted statutes.[218]

Accordingly, OLC's opinion work cannot be described as follow-
ing any one particular model but rather is an eclectic mix of different
models and models used to different degrees depending on the func-
tion of the opinion. The models arise from a set of bureaucratic prac-
tices and attitudes that have as their objective achieving the proper
trade-off between advancing both the administration's situational in-
terest and advancing OLC's reputation for principled legal advice—a
reputation which is itself in the administration's long-term interest.
Because, as we saw in Part I, the models themselves overlap to some
degree, it will not always be clear which model the executive is em-
ploying. Moreover, the overlap makes it easier to move more
smoothly among models depending on the bureaucratic and political
interests involved. Of course, the mixture is likely to be affected by
the degree to which the President has a genuine interest in a coherent
jurisprudence that departs from that prevailing in the courts; but as
long as OLC serves as a centralized opinion-writing office in a com-
partmentalized executive branch, the independent authority model is
likely to be generally subordinate to other models for the bulk of
OLC's opinion writing function.

It should not escape notice that this analysis of OLC suggests
that it operates, at least in part, on the political or reputational capital
model not wholly dissimilar to that which has been used to explain
the performance of the Supreme Court.[219] While its opinions for the
most part aim at objectivity and consistency, the jurisdictional doc-
trines it employs are subject to—perhaps even designed for—manipu-

---

the executive branch lost in *Morrison* recedes in importance, the doctrine it lays down may
well be understood as a two-edged sword.

Moreover, *Morrison*'s emphasis on the President's duty to "take care that the laws be
faithfully executed," *id*. at 690 (quoting U.S. CONST. art. II, § 3) (alteration in original), may
also permit the President to reduce the autonomy independent agencies enjoy in construing
their statutes. For instance, while an agency may enjoy autonomy in exercising the discretion
provided by delegation of statutory authority, *Morrison*'s emphasis on the Take Care Clause
suggests that the President may have a duty to supervise the agency in its construction of the
outer limitations of the delegation. If the agency head refuses to follow the President's con-
struction, *Morrison* may permit the President to contend that such a refusal in itself may be
cause for dismissal.

[218] For a discussion of a theory of these limitations, see *supra* notes 34-40 and accompany-
ing text.

[219] For an example of understanding the Court's doctrines as a means of husbanding its
political capital, see ARCHIBALD COX, THE ROLE OF THE SUPREME COURT IN AMERICAN
GOVERNMENT 103-04 (1976).

lation.[220]   These "passive virtues" permit OLC to avoid
entanglements that would be unwise and preserve its political capital
for other decisions that will be of more use both to the President and
to its own reputation.[221]   Occasionally, this political capital is spent in
giving the President the benefit of the doubt on a close issue that is of
particular importance to him, just as occasionally the Court appears
to make an unprincipled decision for the greater social good.   More-
over, just as the Court's product is also shaped in part by internal
institutional considerations such as, for instance, its concern for insti-
tutional stability,[222] it is not surprising OLC's methods and products
also reflect the interests and aspirations of those who work there.

   Accordingly, it should be stressed that undertaking this bureau-
cratic analysis of OLC's operations is in no way to denigrate the opin-
ions it produces.   That institutional forces shape OLC's opinions and
shape them differently depending on their function does not make
OLC different from other legal institutions, notably the Supreme
Court.   In any event, understanding the forces that are at work is the
first step to reforming any institution charged with legal interpreta-
tion if the product of those forces does not comport with our notion of
what the Constitution requires.

## CONCLUSION

   The strongest argument for autonomy in executive branch inter-
pretation is that it serves as a necessary check on the ambition of the
judiciary and helps prevent a monopoly of power in official constitu-
tional interpretation.   Executive interpretation, however, will inevita-
bly itself be a product of that branch's own ambition.   Because its
ambition is of a different character—more political and more con-
cerned with the daily problems of governance—and because many of
its core constitutional responsibilities are often of a type left unad-
dressed by courts, executive branch interpretation will necessarily be
different in scope and character from that undertaken by the judici-
ary.   On the other hand, executive branch interpretation does not ap-
pear to be simply politics by other means, for the Constitution's
imposition of legal duties on the President has created substantial
pressures for some kind of legal regularity.   Between the political and

---

[220] For a justification of the Supreme Court's manipulation of its jurisdictional doctrines,
see BICKEL, *supra* note 28, at 199-208.

[221] The phrase "passive virtues" is, of course, Bickel's. *Id.* at 111.

[222] For an interesting discussion of the institutional reasons for the Court's jurisprudence of
statutory interpretation, see Frederick Schauer, *Statutory Construction and the Coordinating
Function of Plain Meaning*, 1990 SUP. CT. REV. 231.

# EXHIBIT CC

# Fordham Law Review

Volume 46 | Issue 6                                                          Article 1

1978

# The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?

Griffin B. Bell

Recommended Citation

Griffin B. Bell, *The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?*, 46 Fordham L. Rev. 1049 (1978).
Available at: http://ir.lawnet.fordham.edu/flr/vol46/iss6/1

This Article is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized administrator of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# THE ATTORNEY GENERAL:

## The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?

### *GRIFFIN B. BELL**

#### I. INTRODUCTION

I became Attorney General with fixed expectations about the Department of Justice. Despite its size and recent history I expected to find a strong Department with a clear understanding of its place in the nation's government and a confident vision of its future.

After only a few weeks on the job I began to question my expectations. Now, well into my second year, I believe I fully appreciate the realities of the Department of Justice.

The truth is that the Department of Justice is strong. But it is a strength born solely of the outstanding individuals who comprise it. The Department as a whole draws little strength or stability from a clear conception, either within the Department or elsewhere, of the role that the Department should play in our federal government. Least of all is there a clear course charted for the future of the Department.

As Attorney General I am unavoidably caught up in several great issues: the investigation of Korean influence-buying in Congress, the investigation of past abuses in the Federal Bureau of Investigation, the national effort to develop a response to the influx of undocumented aliens, and several others. But these headline-grabbing issues will pass, many to become mere footnotes to history. As much as possible without shortchanging sensitive matters of the immediate moment, I am focusing on the Department of Justice as a whole—past, present, and future. It is my firm belief that clarifying the position and role of the Department of Justice in the order of government is of first importance to the long-range interests of the nation.

Tonight I want to share some of what I have learned about the Department, some of my perceptions of its current problems, and some tentative views on its proper place in our system.

The Department of Justice today has 54,528 employees, including 3,806 attorneys (2,008 in the Justice Department and 1,798 in the United States Attorney's Offices).[1] About 92% of our attorneys are involved in the trial and appeal of lawsuits. The other 300 attorneys

---

* Attorney General of the United States. This article is taken from the Eighth Annual John F. Sonnett Memorial Lecture, delivered by Mr. Bell at the Fordham University School of Law on March 14, 1978.

1. *See* U.S. Dep't of Justice, Legal Activities 2 (1977).

supervise divisions or offices, render legal advice, consult with Congress or other departments and agencies regarding legislation, and—to a quite limited extent—draft and interpret rules and regulations.

Shortly after I took office, the President asked me to determine the total number of lawyers in the government and their functions. I learned that such information had not been gathered in several years, so we started an inventory of every department and agency in the government. We discovered 19,479 lawyers who are performing "lawyer-like" functions—litigating, preparing legal memoranda, giving legal advice, and drafting statutes, rules, and regulations. These lawyers are distributed throughout the departments and agencies, and practically no agency is too small to have its own "General Counsel."

Some of the 15,673 federal lawyers in government agencies outside the Department of Justice are handling litigation themselves; some are involved in direct support of the Justice Department's litigation efforts. Others are involved in other administrative law functions within their agencies. About one-fourth of all the federal government's lawyers, 5,247 to be exact,[2] are in the Department of Defense and the military services where they administer a totally separate court-martial system under the Uniform Code of Military Justice.

Although I am the chief legal officer in the executive branch, I have learned that I have virtually no control or direction over the lawyers outside the Department of Justice, except indirectly in connection with pending litigation.

## II.  AUTHORITY OF THE ATTORNEY GENERAL AND THE DEPARTMENT OF JUSTICE

### A. *History*

It may come as a surprise to many of you, as it did to me, to learn that the Department of Justice is little more than a century old. For over eighty years the nation had only an Office of the Attorney General. This fact alone, and the reasons for it, go far to explain the absence of strong traditions and clearly defined roles to undergird the present Department.

The first Congress created the office of Attorney General in the Judiciary Act of 1789,[3] at the same time it created the federal court system. The Act called for "a meet person, learned in the law, to act as attorney-general for the United States,"[4] but gave him little power. He

2. This figure includes 3,730 lawyers in uniform.

3. Ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. § 503 (1970)).

4. *Id.*

was to do nothing more than represent the United States before the Supreme Court and, upon request, to give opinions on matters of law to the President and heads of departments.[5] Congress also clearly intended the Attorney General to rank below the heads of the three departments—War, Foreign Affairs, and Treasury—which existed at the time. First, it ranked the Attorney General behind them for succession and protocol purposes. Whereas the salary for the heads of the Treasury and Foreign Affairs Departments was set at $3,500, that of the Attorney General was only $1,500.[6] And, whereas the department heads were given ample staff and quarters, the Attorney General received nothing beyond his salary—no funds to hire a clerk, purchase office supplies, or provide for heat or light. He was required to pay all his expenses himself.

Historians have discerned two motives behind Congress' treatment of the office of Attorney General. The first was frugality; the new nation was unsound financially and Congress had to cut corners wherever possible.[7] But the second and perhaps more important motive for our purposes was fear of a strong Attorney General.[8] Those early representatives vividly remembered the tyranny that could result from strong central enforcement of laws, and they hesitated to create machinery in the executive branch that possibly could serve as an engine of oppression. Nowhere was this concern more evident than in the arrangement for the enforcement of penal law and the representation of the federal government in civil litigation at the trial level. The Judiciary Act gave the Attorney General no role in either matter, vesting both powers exclusively in the thirteen United States attorneys,[9] then called district attorneys, who were totally independent of the Attorney General.

The first Attorney General, Edmund Randolph, made his first report to the President in 1791. In it he sought redress of the very handicaps that Congress had intentionally placed upon him. He requested authority to participate in litigation in the inferior courts, in order to have some input into making the records in cases which he eventually would have to argue in the Supreme Court. He requested authority to supervise the district attorneys, because they already had shown tendencies toward uneven enforcement of the laws. And he requested a clerk to help him with the simple mechanical chores of his office.

5. *Id.* (corresponds to 28 U.S.C. §§ 511-512 (1970)).
6. J. Easby-Smith, The Department of Justice 5 (1904).
7. *See* L. Huston, The Department of Justice 9-10 (1967).
8. *See id.* at 7-8.
9. Ch. 20, § 35, 1 Stat. 92 (1789) (no longer in force).

President Washington endorsed all three requests and transmitted them to Congress—where they got nowhere.[10]

The congressional snub of Randolph's recommendations in 1791 established a pattern that was to persist for decades. Seven Attorneys General had succeeded Randolph before Congress in 1818 finally appropriated funds for the hire of a clerk.[11] Despite renewed recommendations by President Jackson in 1829 and 1830, by President Polk in 1846, and by President Pierce in 1854. it was not until 1861—a full seventy years after the first request by Randolph and Washington—that Congress finally gave the Attorney General some measure of authority over the district attorneys.[12]

The congressional opposition to these requests by successive administrations illustrates the persistence throughout much of the nineteenth century of the fear of a strong Attorney General. As the federal government grew, its legal business grew along with it. There were periodic attempts by some administrations and some members of Congress to gain support for the idea of a centralized law department to handle that legal business. The unfailing reaction of Congress to each new increment, however, was to create a law officer, usually known as a Solicitor, in the department generating the legal issues and put him in control of the resulting litigation with no duty to answer to the Attorney General. The first Solicitor was created in the Treasury Department in 1830.[13] The next forty years witnessed a steady stream of such officers—Solicitors for the Navy, for the War Department, for the State Department, for the Post Office, for Internal Revenue.

As for the Attorney General, the Congress was perfectly willing to add piecemeal to his duties; for instance, placing him on the Patent Board, making him a member of the Sinking Fund Commission—whatever that was, and rerouting executive clemency petitions from the State Department to him. But Congress refused to authorize any enlargement of his legal domain. And it was careful to keep the Attorney General's staff just large enough—some would say too small—to assist him with his duties already assigned, so there was no chance of his augmenting his power by asserting de facto control over legal business where Congress had refused him de jure authority. In fact, in debates over how to handle increasing federal litigation, those who opposed the creation of a law department invariably cited the overworked state of the Attorney General as proof that the new business could not be lodged with him.

10. J. Easby-Smith. The Department of Justice 6-7 (1904).
11. W. Seymour. United States Attorney 21 (1975).
12. *Id.* at 22.
13. *See* A. Langeluttig, The Department of Justice of the United States 5 (1927).

At some point, of course, the fear of centralized authority had to dissipate as the memories of legal oppression from the Old World receded and the federal government increased in power without becoming more prone to abuses of the states or individuals in the process. Added to that development was a growing belief that centralization of the legal activity of the federal government would be more efficient and thus cheaper than the system of Solicitors and relatively independent district attorneys. That system had effectively broken down under the continuing press of new business in the 1860's, resulting in the hiring of numerous outside counsel at considerable expense.

The conjunction of these two threads—acceptance of the idea of centralization, and a desire for economy—helped to create the Department of Justice in 1870. The debates in Congress at the time evidence a third reason for the move—the need to insure that the federal government spoke with one voice in its view of and adherence to the law. Senator Jenckes of Rhode Island, in explaining the proposal to the Senate, addressed himself to the existing Solicitors and expressly spelled out this purpose:

> I need not dwell upon the manner in which these officers have performed their duties. I have no doubt they have performed them to the best of their ability and honestly in every case. But we have found that there has been a most unfortunate result from this separation of law powers. We find one interpretation of the laws of the United States in one Department and another interpretation in another Department. . . .
>
> . . . .
>
> . . . It is for the purpose of having a unity of decision, a unity of jurisprudence, if I may use that expression, in the executive law of the United States, that this bill proposes that all the law officers therein provided for shall be subordinate to one head.[14]

The Act establishing the Department of Justice sought to remedy the problem of divergent executive branch legal views by giving the Attorney General supervision over the several departmental Solicitors as well as the district attorneys and any outside counsel employed on behalf of the United States.[15] The position of Solicitor General was created as an assistant to the Attorney General, as were two positions of Assistant Attorney General.[16] The Act also gave the Attorney General and the Department of Justice control of all criminal and civil litigation in which the United States was interested.[17]

---

14. Cong. Globe, 41st Cong., 2d Sess. 3036 (1870).

15. Act of June 22, 1870, ch. 150, §§ 3, 15-16, 16 Stat. 162, 164 (corresponds to 28 U.S.C. §§ 518-519, 543 (1970)).

16. *Id.* § 2, 16 Stat. 162 (corresponds to 28 U.S.C. §§ 505-506 (1970)).

17. *Id.* § 5, 16 Stat. 162-63 (corresponds to 28 U.S.C. §§ 514-519 (1970)).

On its face, the Act of 1870 seemed to presage preeminence for the new Department of Justice and a new era of economy and harmony in the legal business of the federal government. But two serious oversights by Congress at the time effectively doomed from the outset this attempt to consolidate and rationalize federal legal activity. First, Congress failed to repeal or modify the statutes establishing the various Solicitors as independent legal officers and defining their duties. The 1870 Act did state that they now were subject to "supervision" by the Attorney General,[18] but that is a vague term and the Solicitors continued to claim their same pre-1870 powers and independence. The second oversight greatly compounded the difficulties caused by the first. Congress gave the new Department no building or other quarters where all of the attorneys under the Attorney General's supervision could concentrate their offices. The Solicitors stayed in the buildings housing their old departments, where they were subject to continuing supervision by the heads of those departments rather than their nominal new boss, the Attorney General.

Congress was exhibiting a curious ambivalence about the role of the Attorney General and the Department of Justice, appearing to give them total control over the nation's legal business on the one hand but failing to take action necessary to make that control effective on the other. Within five years of creating the Department of Justice, Congress took three steps that showed it had not been serious about centralizing all legal activity under the Attorney General. In 1871 and 1872 it created two new Assistant Attorney General positions, but expressly assigned them to the Interior and Post Office Departments where they were subject to supervision by the heads of those departments rather than the Attorney General. And in 1874 Congress reenacted all of the old laws defining the roles of the Solicitors, with no attempt to modify their powers so as to subject them to more effective attorney general control.

The creation of the first independent regulatory agency, the Interstate Commerce Commission, in 1887,[19] with the express congressional intent that it not be under the control of the President or the executive branch, added a new dimension to what Congress intended the role of the Department of Justice to be. There is some evidence that the Commission handled most of its cases in the lower courts from the beginning, and that it cooperated with the Solicitor General in the presentation of its cases to the Supreme Court. In any event, in 1910 President Taft sent a special message to Congress recommending that

18. *Id.* § 3, 16 Stat. 162 (no longer in force).
19. Act of February 4, 1887, ch. 104, § 11, 24 Stat. 383 (current version at 49 U.S.C. § 11 (1970)).

all litigation affecting the government be under the control of the Department of Justice and specifically objecting to the practice of the Interstate Commerce Commission in employing its own attorneys who, "while subject to the control of the Attorney-General, act upon the initiative and under the instructions of the commission."[20] After a vigorous debate in Congress—centering largely on whether the Department of Justice would have the authority to second-guess the Commission on the merits—Congress enacted legislation allowing the Commission to intervene as a party and, as such, to be represented by its own attorneys. Justice Department attorneys could therefore oppose the Commission's attorneys in court, and indeed, that has happened on a number of occasions, although the Commission and the Solicitor General have cooperated to file joint briefs in the Supreme Court in most cases.

During most of the pre-World War I period, however, the Attorney General was nominally the head of all federal legal activity, but the Solicitors and their offices retained their actual independence. The Labor, Commerce, and Agriculture Departments were created, each with its own Solicitor. And at the Attorney General's suggestion the two Assistant Attorneys General in the Post Office and Interior Departments were made Solicitors in acknowledgment of their real independence from him.

There was one bright spot for the Attorney General during this period. In 1886 the last vestige of the earlier concern with downgrading the Attorney General was removed when the Attorney General was restored to the fourth rank among Cabinet positions for protocol and succession purposes. Previously he had ranked behind all other heads of departments, even those created after the office of Attorney General.[21]

At the outset of World War I many new agencies were created in the federal government to meet the emergency situation. Following the lead of the older departments, these agencies all insisted on their own legal counsel and authority over their own litigation. Their demands created enough confusion that the question of the lack of centralized litigating authority was brought to President Wilson's personal attention. The result was an Executive order under which all Solicitors and other law officers were directed to submit to the Attorney General's authority, and the Attorney General's legal opinions were made binding on all execu-

---

20. Special Message of the President of the United States on Interstate Commerce and Antitrust Laws and Federal Incorporation, H.R. Doc. No. 484, 61st Cong., 2d Sess. 5 (1910).

21. J. Easby-Smith, The Department of Justice 4-5 (1904).

tive departments.[22] But this Executive order was promulgated under an act giving the President temporarily expanded powers for the war effort, and it expired along with the act six months after the armistice. The predictable result was an almost immediate return to the status quo ante, with all Solicitors and other legal officers reasserting their independence from the Attorney General.

In 1920, the Interstate Commerce Commission attorneys were granted statutory authority to appear for the Commission "in any case in court,"[23] and the United States Shipping Board was authorized to employ attorneys to "represent the board in any case in court."[24] In 1921 a Veterans Bureau was established, and its attorneys were given control over all veterans' litigation.

Before long, different parts of the government again were making different interpretations of the same laws and again taking inconsistent positions before the courts. In 1928, the Attorney General in his Annual Report likened the situation to that which had existed prior to the creation of the Department of Justice in 1870. He noted that only 115 of the 900[25] legal positions in the executive departments and agencies in Washington were even nominally under his control. The Attorney General recommended that serious consideration again be given to consolidating all legal activities under the chief law officer of the government.[26]

A few months into his administration, President Franklin Roosevelt issued an Executive order centralizing all litigating authority in the Department of Justice and giving the Attorney General the exclusive right to supervise United States attorneys.[27] Roosevelt's action, like that of the Congress in 1870 and President Wilson in 1918, resulted from a perception that decentralized control of the government's legal affairs had led to chaos and excessive expense.

Roosevelt's effort met the same fate as the two before it. The trend away from centralized responsibility started again almost immediately. The Securities and Exchange Commission was established in 1934[28] and the National Labor Relations Board in 1935,[29] and both were given the

22.  Exec. Order No. 2877 (May 31, 1918), *reprinted in* Key, *The Legal Work of the Federal Government*, 23 Va. L. Rev. 165, 190 n.94 (1938).

23.  Transportation Act, 1920, ch. 91, § 428, 41 Stat. 492 (current version at 49 U.S.C. § 16(11) (1970)).

24.  Act of June 5, 1920, ch. 250, § 3, 41 Stat. 990 (repealed 1936).

25.  Compared to 3,806 of the 15,740 federal civilian lawyers today.

26.  [1928] Att'y Gen. Ann. Rep. 1-2, 347.

27.  Exec. Order No. 6166, § 5 (June 10, 1933), *reprinted in* 77 Cong. Rec. 5707-08 (1933).

28.  Securities Exchange Act of 1934, ch. 404, § 4, 48 Stat. 885 (current version at 15 U.S.C. § 78d (1976)).

29.  Act of July 5, 1935, ch. 372, § 3(a), 49 Stat. 451 (current version at 29 U.S.C. § 153(n) (1970)).

power to conduct their own litigation. The cycle of disintegration and reform had continued.

The exceptions to centralized litigation authority which were created during the next thirty-five years mostly involved new independent regulatory agencies, although one executive department, the Department of Labor, also received some independent litigating authority. Agencies such as the Federal Communications Commission, the Federal Power Commission (now the Federal Energy Regulatory Commission), the Federal Maritime Commission, the Atomic Energy Commission (now the Nuclear Regulatory Commission), and the Equal Employment Opportunity Commission were granted at least some degree of independent litigating authority. Since about 1969-1970, new grants of independent litigating authority have literally seemed to explode, with authority not only going to independent agencies such as the Consumer Product Safety Commission, the Commodity Futures Trading Commission, and the International Trade Commission, but also to some executive branch agencies such as the Environmental Protection Agency. Today, some thirty-one separate federal governmental units have or exercise authority to conduct at least some of their own litigation.

### B. *The Present*

The basic statutory scheme today is the same as in 1870: Except as otherwise authorized by Congress, the conduct of litigation in which the United States or an agency or officer thereof is a party, or is interested, is reserved to officers of the Department of Justice, under the direction of the Attorney General. The problem is the number of exceptions authorized by Congress. Professor John Davis has aptly characterized the situation as follows:

a continuing effort by Attorneys General to centralize responsibility for all government litigation in Justice, a continuing effort by many agencies to escape from that control with respect to civil litigation, and a practice by Congress of accepting the positions of the Attorneys General in principle and then cutting them to pieces by exceptions.[30]

Prosecution of all criminal violations is controlled by the Department of Justice, and I do not understand that authority to be seriously challenged; but there is no consistent or rational statutory scheme applicable to agencies in civil litigation. The curious patchwork of civil litigation authority cannot be explained in terms of a congressional conception of the role of the Justice Department. Some grants of separate litigating authority seem to have been enacted simply because of loud and persistent complaints from the agencies seeking such authority. Others seem

---

30. Davis, Department of Justice Control of Agency Litigation 17 (Report to the U.S. Administrative Conference Aug. 14, 1975).

designed to increase the control of particular congressional committees or subcommittees over particular agencies or programs. Neither a congressional body which works closely with an agency, nor the agency itself, wants the Justice Department making decisions counter to its desires. Fiefdoms have been created, and the Justice Department's efforts to ensure uniformity in government litigating postures can constitute a real threat to them.

Some recent grants of independent litigating authority have occurred in strange ways. For example, the litigating authority of the Federal Trade Commission was significantly enlarged in 1973 by an amendment on the floor of the Senate tacked onto the Act authorizing the Trans-Alaska oil pipeline,[31] thereby avoiding veto.

I recognize that Congress intended some regulatory agencies and government corporations to be independent of the executive branch and the President. That independence has extended to independence from the Department of Justice in legal matters, including litigation. The price of such independence is high, as it can and sometimes does result in two sets of government lawyers opposing each other at taxpayer expense. More importantly, it requires the judicial branch to decide interagency disputes that might be resolved more easily and better through the mediation of the Department of Justice.

I do not favor the independence of these regulatory agencies and government corporations in legal matters. I think it is unseemly for two government agencies to sue each other. It requires the judicial branch to decide questions of government policy, a role never envisioned by our country's Founding Fathers. It is time-consuming and expensive. I believe it would be possible to preserve the independence of these bodies even if they were represented by the Justice Department. Such a system would be more efficient and would reduce the amount of judicial intrusion into intragovernmental disputes. The Department of Justice can exercise a review and supervisory function in an effort to bring uniformity to government legal positions and still recognize the independence of the regulatory agencies' enforcement efforts.

My predecessors as Attorney General have shared my view that the Justice Department should represent the regulatory agencies. To date, however, Congress has been willing to pay the price of independent litigating authority for those agencies.

If separate litigating authority is going to continue for independent regulatory agencies and government corporations, then we should at least devise a rational system for the conduct of such litigation. One

31. Act of Nov. 16, 1973, Pub. L. No. 93-153, § 408. 87 Stat. 591-92 (1973) (current version at 15 U.S.C. §§ 45(l), 46, 53(b), 56 (1976)).

agency's case often will affect other regulatory agencies or executive branch departments. At the least, an agency should be required to alert the Justice Department in such cases so that the views of the executive branch could also be presented to the court. If a case could affect the entire government, such as an employment discrimination claim or a Freedom of Information Act complaint, the Justice Department should have control of the litigation rather than the single agency which is party to the case. The position taken by a single agency on a question of general concern should not bind the entire federal government.

It is my view that the Justice Department should represent all executive branch departments and agencies. The Department must, of course, work closely with its clients in a cooperative effort, recognizing the peculiar expertise and abilities of agency lawyers and delegating authority to agency lawyers in certain circumstances, but always retaining final control in the Justice Department.

A study of federal legal offices in 1955 found that the absence of lines of authority from agency general counsels to the Attorney General contributed to the diversity of legal positions in the federal government. The report of that study strongly supported centralized litigation authority in the Department of Justice.

President Carter last August directed his Reorganization Project to study the way the government's lawyers are used, stating that he considers "the effective use of legal resources to be a vital part of . . . [the] Administration's effort to improve the performance of the Federal Government . . . ." The President hopes that better use of these resources will enable the federal government better to comply with its own rules and regulations and thus prevent unnecessary litigation and administrative delay. The President stated that he also hoped to improve the procedures for conducting government litigation in order to ensure more uniform application of the law.[32]

### C.  *Plans for the Future*

The President's Reorganization Project is completing its study and will forward its recommendations to the President in the next few weeks. This seems a particularly appropriate time to discuss the proper role of the Department of Justice in the future.

It is clear that the Solicitor General must continue to perform his current function of representing all the executive departments and the independent regulatory agencies before the Supreme Court. As counsel

---

32. In addition to studying the proper allocation of litigation authority, the President's Reorganization Project is examining several other issues that touch on the future role of the Justice Department. These include the flow of information between government lawyers, the hiring and retention of lawyers, and their training.

for the federal government, the Solicitor General is responsible for
presenting cases to the Supreme Court in the manner which will best
serve the overall interests of the United States. He is also responsible for
deciding whether lower court decisions adverse to the Government
should be appealed, and whether the Government should file amicus
curiae briefs in cases to which it is not a party. During the past term, the
Government filed or supported petitions for writs of certiorari in 107
cases, 76% of which were granted.[33] That percentage should be com-
pared to the percentage of all petitions granted—6%. This reflects the
Solicitor General's careful screening of the Government's cases, and his
skillful advocacy in presenting the Government's views in an accurate
and balanced manner. Last year was not exceptional—over the past
decade, the Supreme Court has reviewed only 6-10% of the cases
presented to it, but taken 60-70% of the Government's cases.[34]

The United States is involved in about one-half of the cases decided
on the merits by the Supreme Court each year.[35] The Solicitor General's
overview of all these cases is critical to avoiding inconsistencies in the
Government's positions. His responsibility to the entire government
helps him avoid litigating a significant legal issue with government-wide
impact in a case which, because of its factual or procedural context, is a
poor vehicle. An agency often does not see this broader picture; vindica-
tion in the pending case is often more important to it than the long-range
interests of the United States. Solicitor General Erwin Griswold made
that point in this way:

The Solicitor General's client in a particular case cannot be properly represented before
the Supreme Court except from a broad point of view, taking into account all of the
factors which affect sound government and the proper formulation and development of
the law. In providing for the Solicitor General, subject to the direction of the Attorney
General, to attend to the "interests of the United States" in litigation, the statutes have
always been understood to mean the long-range interests of the United States, not
simply in terms of its fisc, or its success in the particular litigation, but as a government,
as a people.[36]

The Solicitor General's screening function is an aid to the Supreme
Court itself because of the large volume of cases filed there. The Court
recognizes and supports this role. Chief Justice Burger sent a letter to
Congress in 1971, on behalf of a unanimous Court, in response to a

33. [1977] Solicitor Gen. Ann. Rep. 2.

34. *See* Statement of Solicitor General Erwin N. Griswold Concerning Securities Exchange
Act H.R. 5050 Before the Subcomm. on Commerce and Finance of the House Comm. on
Interstate and Foreign Commerce, 93d Cong., 1st Sess. 5 (June 7, 1973).

35. *See* [1977] Solicitor Gen. Ann. Rep. table I.

36. The Office of the Solicitor General—Representing the Interests of the United States
Before the Supreme Court 12, Address by Solicitor General Erwin N. Griswold, University of
Missouri Law School (Mar. 14, 1969) (footnote omitted).

congressional inquiry whether the Securities and Exchange Commission should be empowered to conduct its Supreme Court litigation independently of the Solicitor General's Office. The Chief Justice noted the Solicitor General's "highly important role in the selection of cases to be brought here"[37] and predicted that diluting the Solicitor General's authority would very likely increase the workload of the Supreme Court.

The various Solicitors General have been careful in the exercise of their authority, and the Office is well respected by other departments and agencies for its expertise, independence, and objectivity. Although Congress has authorized several agencies[38] independently to file petitions for writs of certiorari in certain categories of cases, such separate petitions have been relatively infrequent, presently averaging one or two a year. The Solicitor General's Office recognizes that control over the Government's litigation is not intended to transform the Department of Justice into a superagency sitting in judgment on the policy decisions of other departments or agencies. With a few notable exceptions, such as the antitrust and the civil rights laws and the Freedom of Information Act, Congress has committed elsewhere the primary responsibility for most of the policy decisions in the government.

It is my belief that all 3,800 lawyers in the Justice Department can perform with the same degree of independence, objectivity, and litigation expertise as the twenty attorneys in the Solicitor General's Office. Agency lawyers are enmeshed in the daily routine of a specific government agency, and cannot be expected to litigate cases with the broad perspective and objectivity that ensures proper representation of the best interests of the entire government, and therefore of the people. Justice Department lawyers have the perspective and objectivity, but they must take care not to interfere with the policy prerogatives of our agency clients. An agency's views should be presented to a court unless they are inconsistent with overall governmental interests, or cannot fairly be argued.

Agency lawyers are often experts in their own regulatory and enforcement programs and statutes, and are often deeply involved in their

---

37.  Statement of Solicitor General Erwin N. Griswold Concerning Securities Exchange Act H.R. 5050 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess. 11 (June 7, 1973).

38.  These include the Federal Communications Commission, the Nuclear Regulatory Commission, the Interstate Commerce Commission, the Federal Maritime Commission, the Maritime Administration, and the Secretary of Agriculture (under the Packers and Stockyards Act, 1921, ch. 64, § 316, 42 Stat. 168 (current version at 7 U.S.C. § 217 (1976)), and the Perishable Agricultual Commodities Act, 1930, ch. 436, § 11, 46 Stat. 535 (current version at 7 U.S.C. § 499k (1976)). In addition, the Tennessee Valley Authority has in some cases represented itself before the Supreme Court.

agency's programs. Justice Department lawyers and United States attorneys are litigation experts, and perform a critical function in translating the agency's programmatic expertise into effective briefs and arguments for judges who deal with an almost bewildering variety of cases and problems involving the federal government.

I recognize that our lawyers must better utilize the expertise of our client agencies. Since taking office I have recognized that we need to improve our day-to-day working relationships with other agencies. We have taken new steps to ensure advance consultation with client agencies before cases can be settled, and to ensure that our client agencies are properly informed of the progress of pending cases. In short, we have tried to develop a new sensitivity to treating our client agencies as any private lawyer would treat a client. To help nurture this sensitivity, we are devising a new system of evaluating the performance of our lawyers which will include consideration of comments from the agencies they have represented.

We are considering other steps to more effectively and better serve our client agencies. A number of agencies feel that the Justice Department has not devoted sufficient effort to affirmative enforcement of their programs because of the demands of an increasingly heavy civil defensive caseload. One way to meet this problem may be the establishment of a group of attorneys who would litigate only affirmative agency cases.

Overburdened and strained resources continue to be a problem for the Justice Department, just as they were during our early history. We are examining ways to better manage the resources we have, including a better system of dividing civil cases between Washington and the field. We also have to work with our client agencies to make the most effective use of our attorneys. For example, every case does not need an agency lawyer in the field, an agency lawyer in Washington, a Justice Department lawyer in Washington, and an assistant United States attorney to review and agree to the filing of each pleading. More sensible delegations of responsibility simply have to be worked out. As a first step we are considering significantly increasing the authority of United States attorneys to settle monetary claims against the Government without first getting approval from Washington. In keeping with our concern for the views of our client agencies, however, if the client agency objects to the proposed disposition we will require review of the matter at a supervisory level of the Justice Department in Washington.

I would like to speak for a moment to another issue related to the Justice Department's role of representing agencies in litigation. I believe Justice can and should play a greater role in prelitigation counseling of other departments and agencies. After all, one of the principal functions of a lawyer is to "keep all clients out of court"—that is, to advise him or

her how to accomplish objectives without leaving him or her vulnerable to suit. This legal counseling role for government agencies is now generally performed by their own general counsels. Functioning as a lawyer independent of the agency, the Department of Justice can provide the agency with a dispassionate view of legal problems associated with policy objectives. Moreover, as chief litigator for the government, the Department is able to apply the knowledge and experience it gains in that arena to anticipate potential legal difficulties presented by agency activities.

A good example of how that experience has been put to use is in the area of agency affirmative action efforts. The Department has probed this complex area of the law through its experience in formulating a position in the *Bakke* case,[39] as well as in representing the Department of Commerce in extensive litigation over the minority business enterprise provision of the Public Works Employment Act of 1976.[40] By gaining familiarity with the issues common to all affirmative action programs, we are able to advise departments or agencies of potential legal problems. Thus, the experience gained in filing a brief amicus curiae on behalf of the United States and in representing the Department of Commerce might be utilized in advising the Department of Defense or representing the Labor Department.

Because the Department has become familiar with potential problems in the affirmative action area, I have brought those questions to the attention of the various departments and have offered the services of the Department in advising them on the establishment of such programs. For example, the Department has taken the position that an affirmative action program is legally justified if necessary to remedy the effects of past public and private discrimination. Articulation of such a purpose will aid a court in evaluating the legality of a program if it is later challenged. Moreover, we can advise agencies how to tailor their programs to accomplish their remedial objectives. In this way we hope to establish a uniform position throughout the government, to enable agencies to better accomplish their goals and to avoid litigation.

The Freedom of Information Act[41] is another example of a set of legal principles and public policies which pertain to all federal activities and which should be interpreted and respected throughout the government with a fair degree of uniformity. There is a clear need for effective government-wide coordination to avoid conflicting interpretations by

39.  Bakke v. Regents of the Univ. of Cal., 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), *cert. granted,* 429 U.S. 1090 (1977).
40.  Pub. L. No. 94-369, § 207, 90 Stat. 1007-08(current version at 42 U.S.C.A. § 6727 (West Supp. 1978)).
41.  5 U.S.C. §§ 552-559 (1976).

various government agencies. In 1977 the Justice Department consulted with other federal agencies over 400 times on Freedom of Information Act questions not then in litigation, and we feel these efforts make an important contribution to securing a uniform application of the law.

### III. OPINIONS OF THE ATTORNEY GENERAL: THE STRUGGLE FOR POLITICAL INDEPENDENCE

Since 1789, the Attorney General has been charged by statute with responsibility for providing the President and the heads of departments with his opinion on questions of law.[42] With regard to the President, this responsibility was extended in 1870 to the giving of the Attorney General's "advice" as well as his opinion on legal questions.[43]

Most opinions are rendered on questions that will not ultimately be resolved by the courts in litigation. Attorneys General have traditionally declined to render formal legal opinions on questions then in litigation. These opinions of the Attorney General are generally regarded as authoritative within the executive branch, and they may often have the salutary effect of avoiding litigation by acting as a check on executive conduct that may not be in accord with the law.

Historically, Attorneys General have personally approved and signed their opinions. Until 1950, preparation of those opinions was vested generally in the Solicitor General or the Assistant Solicitor General. In 1950, the latter position was abolished and the opinion preparation function was transferred to what is now the Office of Legal Counsel, headed by an Assistant Attorney General. In addition to preparing his formal legal opinions, that Office, acting for the Attorney General, renders legal advice and opinions to the executive branch and agencies on a daily basis under the same rules as are followed with respect to formal opinions of the Attorney General.[44]

The increased complexity of our society and the government's relationship to it over the past several decades is reflected in the opinion-giving functions performed by the Attorney General and his subordinates. Today, the subject matter encompassed by that function is as broad as the activities of the government itself. It is not overstatement to say that, in this complex society, the need for sound legal advice in

---

42. *See* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. §§ 511-512 (1970)).

43. Act of June 22, 1870, ch. 150, § 14, 16 Stat. 164 (corresponds to 28 U.S.C. § 511 (1970)).

44. Formal opinions of the Attorney General have been published in the past. We are now preparing for publication the first volume which will contain the separate opinion letters and memoranda of the Office of Legal Counsel as well as the formal Attorney General opinions.

advance of governmental action has become particularly acute. There is no substitute for doing something right the first time.

Another important objective—and one perhaps more difficult to achieve—furthered by the opinion function is ensuring that the many diverse agencies of government speak with one voice on the many legal issues that cut across the responsibilities of more than one department or agency. In the past, the reconciling of interagency disputes regarding questions of law arising in litigation has often not taken place until specific cases were brought to the attention of the Solicitor General after a decision by a federal district court on the question involved. Where no litigation is involved, the opinion function may serve and has served to harmonize diverse legal opinions and to ensure that the government acts legally.

As we examine what the role of the Department of Justice should be in the future, we must consider the fact that in recent years there has been a frequent voicing of the idea of an "independent" Attorney General. This concept encompasses the entire Department of Justice and contemplates some kind of formal measures to insulate it from executive branch pressures in carrying out its law-defining and law-enforcing responsibilities. The currency of this "independence" movement is partly due to the Watergate experience. Many people called not only for a cleansing of the Department but for the removal of the potential for abuse forevermore. In 1976, President Carter made the subject one of national debate by proposing during his campaign that the Attorney General be appointed for a term of between five and seven years, with removal occurring only upon congressional and presidential approval.

Discussions about the role of the Attorney General and his need for independence from policy matters are not new to the political scene. From the inception of the office of the Attorney General in the Judiciary Act of 1789,[45] there has been ambiguity about the role, and disagreement about the independence, of the Attorney General. The Judiciary Act described the functions of the office in terms seemingly without relation to the policymaking, politically-rooted tasks of the rest of the executive branch:

to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments . . . .[46]

---

45. Ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. § 503 (1970)).

46. *Id.* (corresponds to 28 U.S.C. §§ 509, 511 (1970)).

*FORDHAM LAW REVIEW* [Vol. 46

The opinion-giving responsibility of the Attorney General was for "questions of law" only. Moreover, President Washington's letter to Edmund Randolph urging him to become Attorney General indicates he was seeking a skilled, neutral expounder of the law rather than a political adviser:

The selection of the fittest characters to expound the laws, and dispense justice, has been the invariable object of my anxious concern. I mean not to flatter when I say that considerations like these have ruled in the nomination of the attorney general of the United States, and that my private wishes would be highly gratified by your acceptance.[47]

Notwithstanding those noteworthy independent beginnings, our Attorneys General soon came to know the tensions created when the independence of their deliberations came in conflict with the policy preferences of the Presidency. Senator George H. Williams, who himself later became Attorney General, described such a clash during the controversy in 1830 over the national bank:

Consulting with his Attorney General, [President Jackson] found that some doubts were entertained by that officer as to the existence of any law authorizing the Executive to [designate certain banks to be depositories of U.S. funds], whereupon Old Hickory said to him, "Sir, you must find a law authorizing the act or I will appoint an Attorney General who will."[48]

This tension between the Attorney General's role as one who dispassionately defines the legal limits of executive action and the presidential desire to receive legal advice facilitating certain policy decisions has been manifested in modern administrations as well.

In 1940, President Roosevelt determined to provide the British with fifty destroyers in exchange for long-term leases on British territory in the western hemisphere. However, the United States had in 1939 proclaimed its neutrality, which potentially barred such an exchange. As a result, three legal questions were posed to then Attorney General Robert H. Jackson:

(a) Could the President acquire the leases by an executive agreement between himself and the British Prime Minister, or must the agreement be submitted to the Senate as a treaty . . . ? (b) Did the President have the authority to dispose of the 50 destroyers, and if so, on what conditions? (c) Did the statutes of the United States forbid delivery of such war vessels by reason of the belligerent status of Great Britain?[49]

---

47. L. Huston, A. Miller, S. Krislov & R. Dixon, Roles of the Attorney General of the United States 44 (1968).
48. *Id.* at 51. There is some doubt as to whether this incident actually occurred. *See* H. Cummings & C. McFarland, Federal Justice 109-10 (1937).
49. L. Huston, A. Miller, S. Krislov & R. Dixon, Roles of the Attorney General of the United States 57 (1968).

Although each of these issues was difficult, Jackson stated in an opinion issued on August 27, 1940, that the President could make the exchange without seeking Senate approval,[50] and the exchange was made. But a respectable, though by no means unanimous, body of legal opinion in the United States thought that Jackson had gone too far in accommodating the law to the exigencies of politics.

A somewhat different example of limited independence of an Attorney General is reported in Francis Biddle's account of the internment of American Japanese in World War II. Biddle, Attorney General under Roosevelt, stated that at the time of the internment proposal he thought the program "ill-advised, unnecessary, and unnecessarily cruel."[51] However, he did not so advise the President, and the Justice Department subsequently defended the action successfully before the Supreme Court. Biddle explained that he "was new to the Cabinet, and disinclined to insist on my view to an elder statesman [Secretary of War Stimson] whose wisdom and integrity I greatly respected."[52]

A final illustration of the pressures on an Attorney General when a President seeks a legal opinion on a course of action he deems to be necessary occurred during the 1962 Cuban missile crisis. President Kennedy had decided to take action, but there was concern as to whether a detention and search of Soviet ships carrying arms to Cuba would be interpreted as a blockade, an act of war. If the ship searches could be considered a quarantine, they would qualify as a legitimate defensive measure. Because of time pressures, the opinion was hammered out in oral discussions between Justice and State Department lawyers. Notwithstanding serious questions of international and constitutional law, the opinion was favorable to the President's wishes.[53]

This difficulty regarding independence is due in part to the multifaceted nature of the Attorney General's job. The Attorney General has a variety of responsibilities: to prosecute violations of federal law; to represent the United States in judicial proceedings, either as lawyer for client agencies and departments or as amicus in cases of national importance; to provide legal opinions on questions submitted by other departments and agencies; to provide requested comment on pending legislation; to propose and steer Justice Department legislation through the Congress; and to advise the President on the appointment of federal judges and prosecutors. These tasks and responsibilities require varying degrees of contact and coordination with the executive branch on the one hand, and independence from the executive branch on the other.

50.  *Id.* at 57-58.

51.  *Id.* at 55.

52.  *Id.* at 56.

53.  *Id.* at 59.

Thus, the independence of the Attorney General has only a general and uneven tradition to support it, and a complexity that resists easy resolution.

The executive branch inevitably encounters legal questions arising out of its policy formulation and implementation alternatives. As a matter of good government, it is desirable generally that the executive branch adopt a single, coherent position with respect to the legal questions that arise in the process of government. Indeed, the commitment of our government to due process of law and to equal protection of the laws probably requires that our executive officers proceed in accordance with a coherent, consistent interpretation of the law, to the extent that it is administratively possible to do so. It is thus desirable for the President to entrust the final responsibility for interpretations of the law to a single officer or department. The Attorney General is the one officer in the executive branch who is charged by law with the duties of advising the others about the law and of representing the interests of the United States in general litigation in which questions of law arise. The task of developing a single, coherent view of the law is entrusted to the President himself, and by delegation to the Attorney General. That task is consistent with the nature of the office of Attorney General.

Moreover, with a few rather significant exceptions, the Attorney General is removed from the policymaking and policy implementation processes of government, and this is especially true when he deals with legal questions that arise in the administration of departments other than his own. It makes sense to assign the task of making definitive legal judgments to an officer who is not required, as a general matter, to play a decisive role in the formulation of policy. Such an officer enjoys a comparative advantage over policymakers in the discharge of the lawgiving function.

Therefore, some have suggested that the independence of the Attorney General should be increased and secured institutionally, within the limits imposed by the Constitution. It has been suggested that an Executive order could be issued that would endorse the concept that the Attorney General must be free to exercise independent judgment in his litigating function and in his counseling function, subject only to the constitutional prerogatives of the President. Such an order could provide that the Attorney General's opinions on questions of law, as opposed to questions of policy, would be binding in certain circumstances. It could establish removal procedures that would require the President to justify the removal of an Attorney General because of differences of opinion over questions of law. It might also include an expiration provision, terminating the order on the inauguration of President Carter's successor, but the order could be a model for future administra-

tions. I haven't reached any conclusions as to whether I would recommend to President Carter that he issue such an Executive order. However, as we discuss and decide the future role of the Department of Justice, careful consideration must be given to this problem.

In the *Bakke* case[54] and in some other instances, I have played an important role as a buffer between our truly independent litigating lawyers in the Department of Justice, including the Solicitor General and his staff, and other government officials outside the Department of Justice. In these specific instances, I think I have been successful in preserving the independent positions taken by our Justice Department lawyers. A refined definition of the Attorney General's role in such disputes is something that is clearly needed as we decide our charter for the future.

### IV.   CONCLUSION

I have mentioned a number of important questions tonight that deserve careful consideration as we reexamine what the roles of the Attorney General and the Department of Justice should be in the future. Although our client is the government, in the end we serve a more important constituency: the American people. As the President seeks to make our increasingly complex federal government more responsive to the needs of the people, we must improve the performance of the government's lawyers, including those in the Department of Justice. I hope we can do that in part by developing a clear concept of just what the roles of the Attorney General, the Justice Department, and indeed, the government lawyer, should be.

We covered a lot of history tonight. I don't know if you've been as fascinated listening to the history of the Department as I have been in researching it and telling the story. I must share one little tidbit with you as an aside. I was very pleased to learn that the Attorney General when the Department of Justice was created, A. T. Akerman, was from Georgia. I admit that I subsequently discovered that he was born in New Hampshire, but he moved to Georgia at an early age and grew up there. While that rather significant fact doesn't have much to do with tonight's speech, it was an important discovery for an amateur Georgia historian. His lack of fame in Georgia is no doubt the result of his having been appointed Attorney General by President Grant shortly after what we in the South sometimes call the War of Northern Aggression.

---

54.  Bakke v. Regents of the Univ. of Cal., 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), *cert. granted*, 429 U.S. 1090 (1977).

## SELECTED BIBLIOGRAPHY*

Bell, *Federalism in Current Perspective,* 1 Ga. L. Rev. 586 (1967).
Cohen, *Justice Report: Richardson Moves To Assert His Control of Watergate-Shaken Justice Department,* 5 Nat'l J. Rep. 1011 (1973).
Cohen, *Justice Report: U.S. Attorneys Push Wide-Ranging Study To Gain Larger Role in Law Enforcement Policy,* 5 Nat'l J. Rep. 1785 (1973).
Comm. on Organization of the Executive Branch of the Government, Final Report to the Congress (June 1955) (2d Hoover Comm.).
Eisenstein, J., Counsel for the United States (1978).
Horowitz, D., The Jurocracy (1977).
Key & LeSourd, The Struggle of the Attorney General To Retain His Powers (undated, unpublished paper in Department of Justice Library).
Learned, *The Attorney-General and the Cabinet,* 24 Political Sci. Q. 444 (1909).
Navasky, V., Kennedy Justice (1970).
Note, *Government Litigation in the Supreme Court: The Roles of the Solicitor General,* 78 Yale L.J. 1442 (1969).
Note, *Judicial Resolution of Administrative Disputes Between Federal Agencies,* 62 Harv. L. Rev. 1050 (1949).
Stern, *"Inconsistency" in Government Litigation,* 64 Harv. L. Rev. 759 (1951).
Swisher, *Federal Organization of Legal Functions,* 33 Am. Political Sci. Rev. 973 (1939).

* Supplemental to those materials cited in footnotes.

# EXHIBIT DD

# N**O**TES

## THE IMMUNITY-CONFERRING POWER
## OF THE OFFICE OF LEGAL COUNSEL

At a February 2008 congressional hearing, Attorney General Michael Mukasey stated that "the Justice Department . . . could not investigate or prosecute somebody for acting in reliance on a Justice Department opinion," even if it turns out that the advice in the opinion was erroneous.[1]   When pressed by Congressman Bill Delahunt on whether any "legal precedent" supported this conclusion, the Attorney General replied that his analysis rested on "a practical consideration."[2] He acknowledged, "I can't sit here and cite you a case."[3]

The Department of Justice's Office of Legal Counsel (OLC) had issued the legal opinions that were the subject of this colloquy.   OLC exercises the Attorney General's opinion-writing function and serves as "the executive branch's most authoritative legal voice."[4]   As OLC has risen in prominence since 9/11, many commentators have asserted, in agreement with Attorney General Mukasey, that it is "virtually inconceivable" that criminal charges could be brought against officials for illegal acts previously approved by an OLC opinion.[5]   This "momentous and dangerous power[]" of OLC is not limited to issues in the war on terrorism.[6]   It is potentially at stake every time the office interprets a criminal law that applies to the government.

The widespread belief in OLC's immunity-conferring power is not matched by analysis of the legal or institutional bases supporting the belief.   This Note aims to fill that gap.   Part I provides background on OLC's advisory function and procedures.   Part II analyzes three potential defenses that stand in the way of prosecuting someone who has relied on an OLC opinion: entrapment by estoppel, the public authority defense, and innocent intent.   Part III contends that, although the

---

[1] *Oversight Hearing of the Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. (2008), *available at* 2008 WL 331459 [hereinafter *Oversight Hearing*].

[2] *Id.*

[3] *Id.*

[4] *See* John **O**. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 CARDOZO L. REV. 375, 376 (1993).  McGinnis refers to the collective legal opinions of the Attorney General and OLC, but in recent decades OLC has produced the vast majority of these memoranda.

[5] Posting of Marty Lederman to Balkinization, http://balkin.blogspot.com/2008/02/dissenting-view-on-prosecuting.html (Feb. 8, 2008, 3:33 EST); *see also* JACK GOLDSMITH, THE TERROR PRESIDENCY: LAW AND JUDGMENT INSIDE THE BUSH ADMINISTRATION 96 (2007) (citing a senior official's belief that prosecution is "practically impossible"); Kathleen Clark, *Ethical Issues Raised by the OLC Torture Memorandum*, 1 J. NAT'L SECURITY L. & POL'Y 455, 469 (2005) (deeming prosecution "unlikely").

[6] GOLDSMITH, *supra* note 5, at 97.

immunizing effect of OLC opinions is ambiguous as a doctrinal matter, Department of Justice prosecutions are implausible due to various institutional and practical factors. Part IV concludes.

## I. THE ADVISORY FUNCTION
### OF THE OFFICE OF LEGAL COUNSEL

### A. History

Under Article II of the Constitution, the President must "take Care that the Laws be faithfully executed."[7] The President must exercise the power of legal interpretation to carry out this textually specified duty: he must first construe the law in order to enforce it.

By statutory duty, the Attorney General aids the President in fulfilling this function. In the Judiciary Act of 1789, Congress charged the newly created office of the Attorney General with the obligation to "give . . . advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments."[8] The Attorney General's opinions were prepared primarily by the Solicitor General or Assistant Solicitor General until the mid-twentieth century.[9]

Upon the elimination of the Assistant Solicitor General position in 1950, OLC assumed the opinion-writing mantle.[10] The office is tasked under Department of Justice regulations with "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President."[11] Today, OLC lawyers pen almost all of the Department of Justice's formal opinions — "the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters."[12]

### B. Pressures

In the private lawyer context, a defendant who acts illegally cannot invoke an advice-of-counsel defense.[13] As Judge Richard Posner

---

[7] U.S. CONST. art. II, § 3.

[8] Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–513 (2000)).

[9] *See* Griffin B. Bell, *The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?*, 46 FORDHAM L. REV. 1049, 1064 (1978).

[10] *Id.*

[11] 28 C.F.R. § 0.25(a) (2007).

[12] McGinnis, *supra* note 4, at 376.

[13] *See* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.6(e)(4), at 419 (2d ed. 2003); *see also* Livingston Hall & Selig J. Seligman, *Mistake of Law and* Mens Rea, 8 U. CHI. L. REV.

*HARVARD LAW REVIEW* [Vol. 121:2086]

noted: "There are almost a million lawyers in the United States. Not all of them are competent; not all are honest. If unreasonable advice of counsel could automatically excuse criminal behavior, criminals would have a straight and sure path to immunity."[14]

In the government lawyer context, the stakes are higher. Former Assistant Attorney General of OLC Randolph Moss observed that the office's responsibilities differ from those of private lawyers because its opinions "define . . . the meaning of the law for an entire branch of government, and that branch of government has an obligation to get the law right."[15] OLC issues advice to a wide array of executive branch agencies and personnel, often aided by little to no judicial precedent. As judicial resolution is unavailable for many issues,[16] officials have treated Attorney General and OLC advice "as conclusive and binding since [the early nineteenth century]."[17] When an OLC opinion sanctions a course of conduct, it not only advises officials on potential legal exposure, but also shapes how the Department of Justice enforces the law as a practical matter.

One characteristic of OLC advice is that it is prepared at the behest of executive branch officials. OLC opinions thus differ from, for instance, "no-action letters" by the Securities and Exchange Commission (SEC). SEC letters similarly opine on the legality of proposed transactions, but are requested by private parties dealt with at arm's length.[18] OLC opinions, in contrast, challenge the lawyers to provide valuable advice while resisting the attendant pressures of self-dealing.

Precisely what it means as a normative matter for OLC to "get the law right" is uncertain. OLC is housed in a political branch of government, but the extent to which it may bear in mind political considerations has been vigorously debated. The Assistant Attorney General of OLC is a political appointee and thus necessarily "philosophically attuned" to the administration's policies.[19] But there are countervailing fears that the office, subject to little oversight, could become overly

---

641, 652 (1941) ("[P]rivate lawyers are under enough temptations toward dishonesty already, without giving them the power to grant indulgences, for a fee, in criminal cases.").

[14] United States v. Urfer, 287 F.3d 663, 665 (7th Cir. 2002).

[15] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 ADMIN. L. REV. 1303, 1321 (2000) (referring to Attorney General and OLC opinions collectively).

[16] Executive branch interpretations often do not adversely affect private individuals, and when they do, suits are often precluded by justiciability barriers such as standing, mootness, or ripeness. *See id.* at 1304.

[17] *Id.* at 1320.

[18] *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 CORNELL L. REV. 921, 936–39 (1998).

[19] William H. Rehnquist, *The Old Order Changeth: The Department of Justice Under John Mitchell*, 12 ARIZ. L. REV. 251, 252 (1970); *see also* GOLDSMITH, *supra* note 5, at 34 ("Philosophical attunement with the administration is legitimate . . . .").

politicized and interpret the law opportunistically.[20]  Professor Jack
Goldsmith, who headed OLC from 2003 to 2004, observed that "[l]egal
advice to the President from the Department of Justice is neither like
advice from a private attorney nor like a politically neutral ruling from
a court.  It is something inevitably, and uncomfortably, in between."[21]

### C. Ex Ante Procedural Constraints

The inherent tensions in OLC's advisory function underscore the
importance of the office's internal norms.  OLC has implemented —
by tradition and informal regulation — numerous checks to aid its
lawyers in resisting political pressures.  These ex ante constraints help
ensure that they get the law wrong as rarely as possible, notwithstand-
ing the normative debate over OLC's interpretive posture.[22]   By
minimizing erroneous or tendentious opinions and controversial entan-
glements, these processes "protect OLC from itself."[23]

First, OLC exercises jurisdictional discretion over whom to advise
and imposes requirements on requesting agencies and personnel.
Typically, an agency's General Counsel must provide his or her own
legal opinion.[24]  The submissions not only ventilate the issues for the
benefit of OLC, but also deter agencies from inundating the office with
frivolous questions.  They also guard against agencies' punting conten-
tious issues to OLC merely to avoid taking the heat — thus keeping
opinions on politically divisive topics to a minimum.

Second, OLC generally does not write opinions "on matters in liti-
gation."[25]  This enables the lawyers to avoid getting locked into post
hoc justifications of the government's action.[26]  At the same time, this
norm steers OLC away from the unsavory choice of either "abandon-
ing its reputation for scrupulousness or clashing with the Department
of Justice's litigating divisions."[27]

---

[20] *See* Moss, *supra* note 15, at 1306 (noting that OLC should reason "within the framework of the *best* view of the law").

[21] GOLDSMITH, *supra* note 5, at 35.

[22] *See* Richard B. Bilder & Detlev F. Vagts, Editorial Comment, *Speaking Law to Power: Lawyers and Torture*, 98 AM. J. INT'l. L. 689, 693-94 (2004) (noting the difficulty of "agree[ing] on any clear criteria or tests for determining when a legal argument or position . . . is so clearly erro-neous or politically slanted as to be simply 'out of the ballpark' and beyond the range of permis-sible good-faith argument").

[23] Harold Hongju Koh, *Protecting the Office of Legal Counsel from Itself*, 15 CARDOZO L. REV. 513, 515 (1993) (emphasis omitted).

[24] *See* McGinnis, *supra* note 4, at 426–27.  However, requests from the White House may not be declined and are excepted from this practice.  *Id.* at 426.

[25] *Id.* at 426.

[26] *See* Koh, *supra* note 23, at 515.

[27] McGinnis, *supra* note 4, at 426.

Third, OLC disfavors giving oral advice on major matters, opting for a formalized writing process.[28]  The requesting agency's opinion is used as a starting point from which OLC lawyers conduct independent research and consult agencies with expertise on opinion drafts,[29] before securing the sign-off of the Assistant Attorney General or one of his deputies.  Requiring written memoranda promotes a deliberative drafting process that allows OLC to present itself authoritatively — an appearance particularly valuable in resolving interagency disputes.  The formality also helps prevent recipients from exaggerating or selectively comprehending nuanced analyses.

Fourth, OLC opinions adhere to substantive guiding principles.  The lawyers appeal to executive branch practices and judicial principles to write opinions that measure up against settled law.  If Supreme Court precedents are on point and well-established, the executive branch generally acquiesces to "the relative primacy, but non-exclusivity, of the courts in defining the law."[30]  If precedents are less clear, OLC tends to rely on "general guidance" from the Court, "absent a strong, executive branch conviction that such guidance is not well-founded."[31]  As a 1996 OLC opinion stated: "While the Supreme Court's decisions interpreting the Constitution cannot simply be *equated* with the Constitution, we are mindful of the special role of the courts in the interpretation of the law of the Constitution."[32]  OLC, although often cast as "quasi-judicial,"[33] recognizes that its interpretive license is constrained to a degree by the pronouncements of other branches.

Lastly, many OLC opinions are published and made available to the public online.[34]  Publication, however, typically occurs only "after a lag of several years."[35]  Moreover, classified information may not be divulged, precluding publication of many national security–related opinions.  Nonetheless, to some degree this routine conditions OLC lawyers to prepare only sound analyses that they believe can withstand public scrutiny.

---

[28] *See id.* at 429.

[29] GOLDSMITH, *supra* note 5, at 166.

[30] Moss, *supra* note 15, at 1326.

[31] *Id.*

[32] Memorandum from Walter Dellinger, Assistant Att'y Gen., to the Gen. Counsels of the Fed. Gov't (May 7, 1996), *reprinted in* LAW & CONTEMP. PROBS., Winter/Spring 2000, at 514, 517.

[33] *See* Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 CARDOZO L. REV. 437, 441 (1993).

[34] *See* Office of Legal Counsel, Memoranda and Opinions, http://www.usdoj.gov/olc/opinions.htm; *see also* McGinnis, *supra* note 4, at 428.

[35] McGinnis, *supra* note 4, at 428.

## II. LEGAL GROUNDS FOR IMMUNITY

Officials who rely on OLC's legal conclusions worry that, in spite of OLC's best efforts, erroneous legal opinions will slip through the cracks. For these officials, the dearth of prosecutions in practice brings tenuous relief, but uncertainties remain about the long-term legal consequences of their actions.

In civil cases, qualified immunity ensures a margin of error for officials to make reasonable mistakes about the law.[36] Even if there has been a legal violation, officials are generally not liable for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[37] In effect, "all but the plainly incompetent or those who knowingly violate the law" are immunized.[38] As the Supreme Court reasoned in *Harlow v. Fitzgerald*,[39] imposing liability would "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties"[40] and deter talented individuals from entering public service.[41]

In criminal cases, by contrast, it is less clear that officials enjoy the same leeway. On the one hand, *Harlow*'s deterrence rationale seems to apply with even greater force, because criminal punishment deals a more devastating blow than does civil liability. On the other hand, immunizing officials from government prosecution raises self-dealing concerns absent from private party suits. And although some commentators assert that officials who have relied on OLC opinions are "already protect[ed] . . . against criminal culpability,"[42] few have rigorously explored the doctrinal bases for this assumption.

---

[36] That said, the "reasonableness" of mistakes based on OLC opinions in qualified immunity cases may be undermined by recent reports that the Department of Justice's Office of Professional Responsibility is investigating OLC's approval of waterboarding tactics against Al Qaeda suspects. *See* Scott Shane, *Waterboarding Focus of Inquiry by Justice Dept.*, N.Y. TIMES, Feb. 23, 2008, at A1.

[37] Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[38] Malley v. Briggs, 475 U.S. 335, 341 (1986); *see also* United States v. Lanier, 520 U.S. 259, 270-71 (1997) (describing the qualified immunity test as "the adaptation of the fair warning standard [in criminal law]").

[39] 457 U.S. 800.

[40] *Id.* at 814 (alteration in original) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)) (internal quotation marks omitted). Due to their lesser financial benefits and greater exposure to conflict-prone situations, officials are susceptible to "skewed incentives" toward "inaction, underenforcement, delay and other defensive tactics that . . . disadvantage the public." Barbara E. Armacost, *Qualified Immunity: Ignorance Excused*, 51 VAND. L. REV. 583, 586 (1998).

[41] *Harlow*, 457 U.S. at 816.

[42] Posting of Marty Lederman to Balkinization, http://balkin.blogspot.com/2005/12/mccain-amendment-ugly.html (Dec. 16, 2005, 11:24 EST).

 [Vol. 121:2086]

Under U.S. criminal law, ignorance of the law or a mistake as to the law's requirements is generally not a defense to criminal conduct.[43] However, courts have carved out narrow doctrinal exceptions to this maxim.[44] The U.S. Attorneys' Criminal Resource Manual describes three closely related defenses — entrapment by estoppel, the public authority defense, and innocent intent — that "in theory a defendant might assert" upon committing a crime "in response to a [governmental] request."[45] Whether reliance on an OLC opinion warrants an exception to the mistake-of-law rule will turn on whether relying officials can effectively avail themselves of these defenses.

## A. Due Process: Entrapment by Estoppel

Due process bars conviction when a defendant commits what would otherwise be a crime in reasonable reliance on an official interpretation of the law.[46] This affirmative defense, "entrapment by estoppel"[47] (EBE), applies when four requirements are met: first, a government official with authority over the area in question[48] affirmatively represented that the conduct was legal;[49] second, the de-

---

[43] *See* United States v. Int'l Minerals & Chem. Corp., 402 U.S. 558, 563 (1971); Lambert v. California, 355 U.S. 225, 228 (1957); Hall & Seligman, *supra* note 13, at 641.

[44] *See, e.g.*, *Lambert*, 355 U.S. at 229–30 (exception for lesser regulatory crimes); People v. Weiss, 12 N.E.2d 514, 515–16 (N.Y. 1938) (call-to-aid exception); 1 LAFAVE, *supra* note 13, § 5.6(e)(1), at 412 (exception for conduct occurring before enactment "reasonably made available" (quoting MODEL PENAL CODE § 2.04(3)(a) (1962))); *id.* § 5.6(e)(2), at 413–15 (exception for reliance upon statutes or judicial decisions subsequently deemed invalid).

[45] U.S. ATTORNEYS' MANUAL, TITLE 9: CRIMINAL RESOURCE MANUAL § 2055, *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm02055.htm. The three defenses are often confused. *See* United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) (noting the "muddled state of the law . . . regarding defenses . . . when a defendant claims he performed the acts for which he was charged in response to a request from an agency of the government"); U.S. ATTORNEYS' MANUAL, *supra*, § 2055 (grouping entrapment by estoppel, public authority, and innocent intent all under the subtitle "Public Authority Defense").

[46] The Model Penal Code provides:
A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when . . . [the defendant] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense.
MODEL PENAL CODE § 2.04(3)(b) (1962).

[47] EBE is also referred to as "criminal estoppel." *See, e.g.*, John W. Lundquist, *"They Knew What We Were Doing": The Evolution of the Criminal Estoppel Defense*, 23 WM. MITCHELL L. REV. 843 (1997).

[48] *See* Mark Cohen, *Entrapment by Estoppel*, NEB. LAWYER, June 2001, at 11, *available at* http://www.nebar.com/pdfs/nelawyer/2001/060104.pdf ("[T]he source of the information [must be] a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue.").

[49] Government silence, conduct alone, prior nonenforcement of law, and vague or contradictory statements do not meet the bar. *See id.*

fendant relied on the representation; third, reliance was reasonable; and fourth, prosecution would be unfair.[50] EBE is related to the principle that citizens punished under overly vague or contradictory statutes have been deprived of fair warning.[51] By similar logic, punishing citizens whom the state has "active[ly] misle[d]" violates principles of fundamental fairness grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments.[52]

EBE has its genesis in two Warren Court opinions. *Raley v. Ohio*[53] involved witnesses called to testify before the Ohio Un-American Activities Commission. Relying on erroneous instructions by the Commission chairman, the witnesses invoked the privilege against self-incrimination and were subsequently convicted of contempt.[54] The Supreme Court reversed the convictions, stating that to hold otherwise would "sanction the most indefensible sort of entrapment by the State — convicting a citizen for exercising a privilege which the State clearly had told him was available to him."[55]

Six years later, in *Cox v. Louisiana*,[56] the Court considered the case of a demonstrator who was assured by the Chief of Police that he could picket if he remained 101 feet from the courthouse steps.[57] The demonstrator was later convicted under a statute prohibiting demonstrations "near" a courthouse.[58] The Court reversed, holding that the defendant was wrongly advised by the very officials "charged with responsibility for administering and enforcing" the statute.[59] Prosecution under these circumstances would again be "indefensible . . . entrapment" violative of due process.[60]

---

[50] *See id.*

[51] Criminal sanctions are unsupportable if imposed under "vague and undefined" terms or "[i]nexplicably contradictory" statutes. Raley v. Ohio, 360 U.S. 423, 438 (1959) (citing Lanzetta v. New Jersey, 306 U.S. 451 (1939), and United States v. Cardiff, 344 U.S. 174 (1952)).

[52] *Id.; cf.* Lambert v. California, 355 U.S. 225, 228 (1957) ("Engrained in our concept of due process is the requirement of notice.").

[53] 360 U.S. 423.

[54] *Id.* at 424–25.

[55] *Id.* at 438. The Court later applied *Raley* to a prosecutor's statements regarding the existence of immunity, Stevens v. Marks, 383 U.S. 234, 245–46 (1966), State Department pronouncements on area restrictions, United States v. Laub, 385 U.S. 475, 485–87 (1967), and longstanding Army Corps of Engineers regulations interpreting discharge permit requirements, United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 673–74 (1973).

[56] 379 U.S. 559 (1965).

[57] *Id.* at 570–71.

[58] *Id.* at 560.

[59] *Id.* at 568.

[60] *Id.* at 571 (quoting *Raley*, 360 U.S. at 426).

Every federal court of appeals has recognized the defense.[61] Defendants have successfully invoked EBE by pointing to Army[62] and Air Force officers,[63] draft boards,[64] state judges,[65] DEA agents,[66] and even federally licensed gun dealers,[67] upon whom they have relied. With *objective reasonableness* as the touchstone, lower courts have explained that reliance is reasonable when "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries."[68]

In the same vein, a defendant who has reasonably relied on OLC lawyers may seek to estop the government from prosecution. Reliance was justified in *Raley* because the "Chairman of the Commission . . . appeared to be the agent of the State in a position to give such assurances."[69]   It was similarly justified in *Cox* because the Chief of Police was one of "the highest police officials of the city."[70]  OLC is comprised of "outstanding attorneys" selected for their expertise and credentials.[71]   Unlike a policeman expounding on the bounds of a statute, the lawyers are specifically charged with issuing legal advice. Moreover, unlike the on-the-spot advice in *Cox*, dispensed at the scene of a demonstration, OLC opinions undergo a rigorous drafting process. As a result, OLC arguably deprives officials of fair warning when it affirmatively espouses the legality of the relevant conduct.

However, courts have applied EBE with "great reluctance"[72] and may be wary of extending the doctrine.  The OLC situation diverges

---

[61] *See* United States v. Stewart, 185 F.3d 112, 124 (3d Cir. 1999); United States v. Aquino-Chacon, 109 F.3d 936, 938–39 (4th Cir. 1997); United States v. Spires, 79 F.3d 464, 466 (5th Cir. 1996); United States v. Howell, 37 F.3d 1197, 1204 (7th Cir. 1994); United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir. 1994); United States v. Levin, 973 F.2d 463, 468 (6th Cir. 1992); United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994); United States v. Brebner, 951 F.2d 1017, 1024 (9th Cir. 1991); United States v. Smith, 940 F.2d 710, 714 (1st Cir. 1991); United States v. Austin, 915 F.2d 363, 365 (8th Cir. 1990); United States v. Hedges, 912 F.2d 1397, 1404 (11th Cir. 1990); Bellums v. Powell, 566 F.2d 167, 182–83 (D.C. Cir. 1977).

[62] *See* United States v. Clegg, 846 F.2d 1221, 1223 (9th Cir. 1988).

[63] *See Hedges*, 912 F.2d at 1398–99.

[64] *See* United States v. Timmins, 464 F.2d 385, 386–87 (9th Cir. 1972).

[65] *See* United States v. Brady, 710 F. Supp. 290, 294–95 (D. Colo. 1989).

[66] *See* United States v. Abcasis, 45 F.3d 39, 40–42 (2d Cir. 1995).

[67] *See* United States v. Tallmadge, 829 F.2d 767, 774 (9th Cir 1987).

[68] United States v. Treviño-Martinez, 86 F.3d 65, 69 (5th Cir. 1996) (quoting United States v. Brebner, 951 F.2d 1017, 1024 (9th Cir. 1991) (internal quotation marks omitted)).

[69] Raley v. Ohio, 360 U.S. 423, 437 (1959).

[70] Cox v. Louisiana, 379 U.S. 559, 571 (1965).

[71] McGinnis, *supra* note 4, at 424.

[72] United States v. Browning, 630 F.2d 694, 702 (10th Cir. 1980); *see also id.* ("The only circumstances justifying use of the doctrine are those which add up to the conclusion that it does not interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation."); Sean Connelly, *Bad Advice: The Entrapment by Estoppel Doctrine in Criminal Law*, 48 U. MIAMI L. REV. 627, 633 (1994) ("[B]ecause the doctrine is such strong medicine, the doctrine should be reserved for those cases where it is truly needed.").

from paradigmatic EBE applications in potentially significant ways. First, in EBE cases, the two parties are typically a public official and a private citizen, often on adversarial footing, with the advice tendered at arm's length. In the OLC context, the two are members of the same team: the executive branch. The so-called victims are often long-serving experts with informed views and an independent "obligation to ascertain the legality of [their] conduct."[73] This eviscerates underlying "entrapment" concerns, because it is highly unlikely that OLC would make deliberate misrepresentations to ensnare officials into committing crimes they would not otherwise commit.[74] It also amplifies the risk of self-dealing. Availing officials of the EBE defense could magnify "pressures on government lawyers to 'bend' or ignore the law in order to support policy decisions."[75] The fear is that granting EBE in practice may amount to providing advance immunity for officials' intended actions.

Second, EBE misrepresentations are made "*directly* to the defendant" who acts in reliance on that misrepresentation.[76] However, OLC's status as "the executive branch's most authoritative legal voice"[77] does not connote a direct relationship with every executive branch official. OLC advice is conveyed, at varying levels of generality, by General Counsels down indeterminate chains of communication, resulting in attenuated relationships between OLC and recipient officials. In fact, officials who act on the basis of OLC conclusions may be wholly unaware of OLC's role. More often than not, "direct" authorization comes from immediate superiors — upon whom reliance may not be so reasonable.

Additionally, in *Raley* and *Cox*, the conduct allegedly implicated constitutional rights.[78] In contrast, EBE claims have been unsuccessful in lower court cases involving such nonconstitutionally protected

---

[73] 1 LAFAVE, *supra* note 13, § 5.6(d), at 410.

[74] *See infra* Part III, pp. 2102–08.

[75] Bilder & Vagts, *supra* note 22, at 693 (discussing pressures on government lawyers in rendering opinions on highly political issues such as foreign policy); *cf.* Miriam Gur-Arye, *Reliance on a Lawyer's Mistaken Advice: Should It Be an Excuse from Criminal Liability?*, 29 AM. J. CRIM. L. 455, 466 (2002) (noting concerns "that granting the excuse [in the private lawyer context] might lead to people purchasing custom-tailored legal opinions in order to acquire immunity from criminal prosecution").

[76] United States v. Eaton, 179 F.3d 1328, 1332 (11th Cir. 1999) (emphasis added).

[77] McGinnis, *supra* note 4, at 376.

[78] *See* Raley v. Ohio, 360 U.S. 423, 427 (1959) (discussing Ohio and federal Fifth Amendment privileges against self-incrimination); *see also* Cox v. Louisiana, 379 U.S. 559, 560–66 (1965) (discussing First Amendment challenge); *cf.* Stevens v. Marks, 383 U.S. 234, 246 (1966) ("A witness has, we think, a constitutional right to stand on the privilege against self-incrimination . . . . This, it seems to us, is the teaching of *Raley* . . . .").

acts as drug trafficking,[79] illegal reentry,[80] fraudulent transfers,[81] and
the importation of illegal species.[82] Moreover, EBE may be simply in-
applicable when the underlying acts are so egregious and reprehensible
that defendants cannot claim lack of notice of illegality.[83] The issues
before OLC are wide-ranging and frequently unrelated to constitu-
tional rights. Application of the defense, therefore, will at a minimum
be issue-specific.

## B. *Public Authority Defense*

At common law, courts excused illegal acts committed in the course
of an official's duties if the official was specifically authorized to en-
gage in the conduct to further the public interest.[84] This "public au-
thority" defense applies to individuals who have acted in reasonable
reliance on a government agent's authority to engage him or her in a
covert governmental activity.[85] The public authority defense is some-
times termed the "CIA Defense" because it has most often arisen in
cases where defendants believed their acts to be intelligence- or na-
tional security–related operations authorized by the CIA.[86]

The distinction between EBE and the public authority defense is a
subtle one.[87] The defendant in EBE cases believed, due to erroneous
official assurances, that his conduct constituted no offense. By con-
trast, the defendant in public authority cases knew his conduct to be
otherwise illegal, but engaged in the conduct at the request of an offi-
cial. The mistake of law involved not the substance of the official in-
terpretation itself, but a misperception of the legal prerogatives at-

---

[79] United States v. Pitt, 193 F.3d 751, 758–59 (3d Cir. 1999); United States v. Smith, 802 F.2d
1119, 1124–26 (9th Cir. 1986).

[80] United States v. Treviño-Martinez, 86 F.3d 65, 69–70 (5th Cir. 1996).

[81] United States v. Stewart, 185 F.3d 112, 124 (3d Cir. 1999).

[82] United States v. Eaton, 179 F.3d 1328, 1332–33 (11th Cir. 1999).

[83] *See* Lundquist, *supra* note 47, at 868 (suggesting that EBE might not be applicable to "hei-
nous" criminal offenses where "consequences . . . are so severe and the acts so reprehensible"); *cf.*
Armacost, *supra* note 40, at 662 (predicting that "when the underlying conduct is egre-
gious[,] . . . qualified immunity will be denied regardless of whether there is factually-analogous
precedent") (emphasis omitted).

[84] *See* 2 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES § 141 (1984) (discussing law en-
forcement authority, authority to maintain order and safety, parental and benevolent custodial
authority, and medical authority).

[85] *See* United States v. Pitt, 193 F.3d 751, 756 (3d Cir. 1999).

[86] *See, e.g.,* United States v. Reyes-Vasquez, 905 F.2d 1497, 1499 (11th Cir. 1990) (discussing
claim that CIA encouraged cocaine deal); United States v. Anderson, 872 F.2d 1508, 1513–20 (11th
Cir. 1989) (discussing claim that CIA authorized violations of firearms and explosives law); United
States v. Rosenthal, 793 F.2d 1214, 1235–37 (11th Cir. 1986) (discussing claim that CIA authorized
drug smuggling activities as part of intelligence operation for national security objectives); United
States v. Lopez-Lima, 738 F. Supp. 1404, 1408–13 (S.D. Fla. 1990) (discussing claim that CIA au-
thorized hijacking of plane to Cuba).

[87] *See* United States v. Jumah, 493 F.3d 868. 875 n.4 (7th Cir. 2007).

**-1607-**

tached to the official's status. The objective reasonableness of the defendant's reliance thus turns on the legal *authority* of the authorizing official. In assessing the validity of the defense, courts have struggled to define the requisite level of "authority."

*1. Apparent Authority.* — The most expansive formulation of the defense was articulated by Judge Malcolm Wilkey in *United States v. Barker*.[88] Under Judge Wilkey's view, a defendant need not establish that the official had real authority to permit the proscribed activity — only that he *reasonably believed* he did.[89] Two threshold showings are required: facts justifying reasonable reliance on the official, and a legal theory on which to base reasonable belief that the official possessed authority to permit the conduct.[90]

*Barker* involved the Ellsberg break-in of the Watergate affair.[91] The defendants allegedly had believed the warrantless burglary to be specially authorized by E. Howard Hunt, the White House official who recruited them.[92] Reversing their convictions,[93] Judge Wilkey analogized to a police officer's reliance on a magistrate's issuance of a defective search warrant, or a citizen's reliance on an officer's authority when called to aid an unlawful arrest.[94] In each case, he reasoned, there was "an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected."[95]

OLC's pronouncements provide a potential apparent authority defense if a defendant believed OLC could legally validate otherwise illegal acts. The mistake, arguendo, could be justified by the overriding interest in having officials rely on OLC to ensure uniform legal interpretation throughout the executive branch. For "facts justifying reasonable reliance," the defendant could point to longstanding executive branch practice treating OLC opinions as binding. For "a legal theory," the defendant could highlight OLC's unique proximity to the Attorney General. Judge Wilkey found plausible the *Barker* defendants' theory that there were valid exceptions to the warrant requirement in

---

[88] 546 F.2d 940, 943 (D.C. Cir. 1976) (opinion of Wilkey, J.).

[89] *Id.* at 949; *cf.* FED. R. CRIM. P. 12.3 (recognizing the defense of "actual or believed" public authority).

[90] *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.).

[91] Two men broke into the office of Daniel Ellsberg's psychiatrist. Ellsberg was the source of the Pentagon Papers leak to the New York Times. *Id.* at 943.

[92] *Id.* at 943–44.

[93] The case was remanded for a new trial by a 2–1 vote, with Judges Merhige and Wilkey agreeing that the defendants might have a valid defense based on an exception to the mistake-of-law rule, although disagreeing on the parameters of the exception. *See id.* at 944; *id.* at 957 (opinion of Merhige, J.).

[94] *Id.* at 948 (opinion of Wilkey, J.).

[95] *Id.* at 947.

part because Attorneys General had long endorsed this theory.[96] Specifically, he pointed to the "vast accumulated experience" of Attorneys General and their "long perspective of what our legal problems . . . have been . . . and are likely to be."[97]  The defendant could argue that this same deference should attach to "the Attorney General's Lawyer."[98]

However, *Barker* excused the defendants' misconception of Hunt's authority largely because of "the gap . . . between a private citizen and a government official with regard to their ability . . . to judge the lawfulness of a particular governmental activity."[99]  When two government officials are involved, this gap closes.  The relying individual should have independent knowledge,[100] and both parties share a strong interest in believing in the conduct's legality.  Courts may take seriously the danger (not presented in apparent authority cases) that officials will seek out OLC opinions as "advance pardon[s]."[101]  Even apart from the question of whether the President's pardon power may be delegated to a subordinate official — the prevailing view is that it may not[102] — courts may find the risk of abuse to be too great.[103]

Moreover, lower courts have been reluctant to embrace the apparent authority defense.[104]  As the Fourth Circuit warned in *United States v. Wilson*,[105] recognition of the apparent authority defense would potentially "grant any criminal *carte blanche* to violate the law

---

[96] *Id.* at 951–52.

[97] *Id.* at 952 n.37.

[98] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive*, 15 CARDOZO L. REV. 337, 337 (1993) (internal quotation marks omitted).

[99] *Barker*, 546 F.2d at 948–49 (opinion of Wilkey, J.).

[100] *See* Thomas W. White, Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution*, 77 COLUM. L. REV. 775, 806–07 (1977) ("[T]hose who believe themselves to be operating on behalf of the government should be held to a strict standard of knowledge of the substantive limitations imposed on their actions by the Constitution and laws of the United States."); *see also id.* at 808 (deeming the defense "inappropriate for a situation where the actor acts voluntarily and which involves a long period of advance planning").

[101] GOLDSMITH, *supra* note 5, at 96.

[102] *See* Margaret Colgate Love, *Of Pardons, Politics and Collar Buttons: Reflections on the President's Duty To Be Merciful*, 27 FORDHAM URB. L.J. 1483, 1486 (2000).

[103] *See Barker*, 546 F.2d at 969 (Leventhal, J., dissenting) (noting concern for "opening the door to justification for serious offenses"); White, *supra* note 100, at 807 ("[A] defense based solely on . . . apparent authority . . . could excuse the grossest forms of anti-social conduct as well as invasions of elementary civil rights." (footnote omitted)).

[104] *See, e.g.*, United States v. Fulcher, 250 F.3d 244, 253–54 (4th Cir. 2001); United States v. Pitt, 193 F.3d 751, 758 (3d Cir. 1999); United States v. Holmquist, 36 F.3d 154, 161 n.6 (1st Cir. 1994); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); United States v. Rosenthal, 793 F.2d 1214, 1235–37 (11th Cir. 1986); United States v. Duggan, 743 F.2d 59, 83–84 (2d Cir. 1984). Even the D.C. Circuit conceded that it "d[id] not think that any coherent principle [could] be gleaned from the *Barker* case." United States v. North, 910 F.2d 843, 881 (D.C. Cir. 1990).

[105] 721 F.2d 967 (4th Cir. 1983).

should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries."[106]

2. *Actual Authority*. — A narrower formulation of the defense has been more palatable to courts and more consistent with the doctrine's common law origins.[107] This version requires reasonable reliance on the *actual* authority of an official to engage the defendant in the covert activity.[108] In other words, only "[a]ctions *properly* sanctioned by the government are not illegal."[109]

It is well established that the President — and thus OLC — has the authority to interpret laws.[110] The President has, pursuant to the Oath Clause and Take Care Clause, a corresponding power to "decline to enforce a statute that he views as unconstitutional."[111] In 1994, then-Assistant Attorney General of OLC Walter Dellinger issued an opinion calling the proposition "uncontroversial" and supported by "significant judicial approval" and executive branch "[o]pinions dating to at least 1860."[112]

Nonetheless, OLC does not have actual authority to *authorize illegal conduct* — the critical element of the actual authority defense. There is a vigorous debate over the extent to which the executive branch, as a coequal branch of government, may defy judicial decisions with which it disagrees.[113] This debate, however, is largely theo-

---

[106] *Id.* at 975; *see also North*, 910 F.3d at 883–84 (warning that the apparent authority defense might allow "a jury sympathetic to the official's individual notion of morality [to] exculpate a self-styled Robin Hood bureaucrat who concealed, altered, or destroyed documents that he knew Congress needed").

[107] Requiring actual authority is consistent with the common law defense's requirement that actions be taken "under color of public authority." *See Fulcher*, 250 F.3d at 254 n.4 (citing United States v. Reyes-Vasquez, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990)).

[108] *See id.* at 252; *Pitt*, 193 F.3d at 758; *Holmquist*, 36 F.3d at 161 n.7; *Baptista-Rodriguez*, 17 F.3d at 1368 n.18; *Duggan*, 743 F.2d at 84.

[109] *Baptista-Rodriguez*, 17 F.3d at 1368 n.18 (emphasis added).

[110] *See* Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 905 (1990) ("Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.").

[111] Memorandum from Walter Dellinger, Assistant Att'y Gen., to Abner J. Mikva, Counsel to the President (Nov. 2, 1994), *available at* http://www.usdoj.gov/olc/nonexcut.htm.

[112] *Id.*; *see also* Recommendation that the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, 8 Op. Off. Legal Counsel 183, 195 (1984); The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 59 (1980); Memorial of Captain Meigs, 9 Op. Att'y Gen. 462, 469-70 (1860).

[113] The debate is often framed as a battle between judicial supremacists, who underscore the need for deference to the Supreme Court, and departmentalists, who emphasize the President's independent capacity for constitutional interpretation. However, "[v]ery few self-described departmentalists argue that the President's interpretive independence includes the authority to refuse to comply with judicial orders." Dawn E. Johnsen, *Functional Departmentalism and Nonjudicial Interpretation: Who Determines Constitutional Meaning?*, LAW & CONTEMP. PROBS., Summer 2004, at 105, 112. *But see* Michael Stokes Paulsen, *The Most Dangerous Branch: Execu-*

retical, as "[o]verwhelming executive branch practice and precedent" indicate that OLC will not deem any activities that are illegal under judicial precedents to be legal.[114] Meanwhile, nothing in OLC's statutory grant or delegated responsibilities authorizes the approval of exceptions to constitutional or statutory law.[115]

A further distinction is that OLC's authority lies wholly in the arena of legal advice, rather than enforcement. In paradigmatic applications of the actual authority defense, citizens claimed that they were solicited to assist with CIA covert operations.[116] By contrast, no recipients of an OLC opinion could believe themselves recruited to participate in an OLC covert "operation."

## C. Innocent Intent

Lower courts have shown more readiness to consider "innocent intent" arguments than EBE and public authority defenses.[117] Unlike the other two defenses, innocent intent is not an independent basis for exoneration. It is not an affirmative defense per se, but rather a "failure of proof 'defense[]'"[118] — a strategy to negate "an essential element of the prosecution's case."[119] A defendant seeks to negate the mens rea for the crime by showing, first, that he honestly believed he was acting in cooperation with the government, and second, that the official on whom he relied had actual authority to authorize the acts.[120] The defendant initially offers evidence of his "innocent intent."[121] If the evi-

---

*tive Power To Say What the Law Is*, 83 GEO. L.J. 217, 343 (1994) ("The President may exercise a power of legal review over the determinations of the judiciary . . . and refuse to give them effect . . . .").

[114] Moss, *supra* note 15, at 1325–26.

[115] *See* 28 U.S.C. § 510 (2000); 28 C.F.R. § 0.25(a) (2007).

[116] *See, e.g.*, United States v. Clegg, 846 F.2d 1221, 1222–24 (9th Cir. 1988) (permitting defendant to present evidence that he was solicited by military personnel to supply arms to Afghan rebels); United States v. Lopez-Lima, 738 F. Supp. 1404, 1413 (S.D. Fla. 1990) (permitting defendant to introduce evidence that he reasonably relied on government assets who could obtain CIA authorization for anti-Castro mission); United States v. Smith, 592 F. Supp. 424, 437 (E.D. Va. 1984) (addressing defendant's contention that CIA authorized his disclosure of classified information).

[117] *See, e.g.*, United States v. Reyes-Vasquez, 865 F. Supp. 1539, 1547 (S.D. Fla. 1994) ("The fact that [the district judge] did not permit the defense to rely upon the apparent authority and entrapment by estoppel defenses in no way precluded the defense of lack of the specific intent to commit the crime with which the Movant was charged.").

[118] United States v. Jumah, 493 F.3d 868, 873 (7th Cir. 2007).

[119] United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); *see also* United States v. Anderson, 872 F.2d 1508, 1517–18 & n.14 (11th Cir. 1989) (approving jury instruction that defendants should be exonerated if jury entertained reasonable doubt whether they acted in good faith under the sincere belief that their activities were exempt from the law); United States v. Juan, 776 F.2d 256, 258 (11th Cir. 1985) (reversing conviction on the ground that district court prohibited defendant from introducing evidence necessary to prove defense of lack of criminal intent).

[120] U.S. ATTORNEYS' MANUAL, *supra* note 45, § 2055.

[121] *See id.*

dence is admitted, he receives a jury instruction that puts the prosecution to the burden of proving each element of the offense beyond a reasonable doubt.[122]   Thus, in *United States v. Anderson*,[123] the court approved an instruction to the jury that, if it harbored "a reasonable doubt as to whether the [d]efendant acted in good faith, sincerely believing himself to be exempt by the law, then he did not intentionally violate a known legal duty."[124]   In other words, an "essential part of the offense would not be established."[125]

The central requirement, therefore, is merely *honest belief* — not objective reasonableness.  Showing honest belief of acting "in cooperation with the government" is relatively straightforward in the OLC situation, where the defendant is himself a government official.   Private citizen defendants claiming innocent intent have had to resort to offering, for example, evidence of a prior relationship with a government agency[126] or previous engagement as a civilian operative[127] to substantiate their alleged state of mind.   But government defendants acting in the course of their official duties presumptively believe themselves to be assisting the government.

An OLC opinion that espouses the legality of conduct might underscore the defendant's honest, good faith belief that he is not violating criminal law.   The opinion, in other words, would illustrate the basis of the defendant's lack of knowledge that his conduct constitutes a crime.   Under these circumstances, the government would be hard-pressed to prove the intentional violation of a known legal duty.

The second requirement, the official's actual authority to authorize otherwise criminal acts, is more problematic.   Most lower courts that have considered the question have held that criminal intent is not negated when a defendant cooperates with an official with mere *apparent* authority.[128]   On this score, innocent intent arguments run up against the same problem as the public authority defense: OLC lacks the actual authority to authorize illegal acts.[129]

More generally, innocent intent applies only to crimes which expressly include — or which courts have interpreted to include — intent requirements.   Ignorance is no excuse unless the statutory formulation requires, or is read to require, proof of knowledge of the elements of the crime.   To be sure, the Supreme Court has, over the past century,

---

[122]  2 LAFAVE, *supra* note 13, § 9.1(a).

[123]  872 F.2d 1508.

[124]  *Id*. at 1518 n.14.

[125]  *Id*.

[126]  United States v. Juan, 776 F.2d 256, 258 (11th Cir. 1985).

[127]  United States v. Baptista-Rodriguez, 17 F.3d 1354, 1363 (11th Cir. 1994).

[128]  *See, e.g.*, United States v. Fulcher, 250 F.3d 244, 252 (4th Cir. 2001).

[129]  *See supra* pp. 2099–2100.

2102          *HARVARD LAW REVIEW*          [Vol. 121:2086

construed an expanding array of statutory and regulatory criminal laws to require such proof of knowledge of illegality.[130] Such constructions are more prevalent when the laws in question are highly technical or complex,[131] as is often true when OLC intervenes. It is nonetheless far from clear that courts would do so with every crime in the OLC context. And it is equally unclear that doing so would inure to the benefit of every official relying on OLC advice.

Ultimately, the efficacy of innocent intent arguments — as well as EBE and public authority claims — is riddled with uncertainties. Their legal force will turn on the willingness of courts to fashion exceptions to the general rule that ignorance of the law is no excuse. At the core of the mistake-of-law maxim is the argument that "it may be harsh upon the individual defendant who was reasonably ignorant or mistaken concerning the penal law, [but] 'public policy sacrifices the individual to the general good.'"[132] This argument will pose obstacles to an official who has engaged in illegal conduct in reliance on an OLC opinion, and who fears that he will become that sacrificial figure.

## III. INSTITUTIONAL AND PRAGMATIC GROUNDS FOR IMMUNITY

Whether the three potential defenses translate to the OLC context is unresolved by courts and likely to depend on the particular facts litigated. The legal defenses, however, provide only part of the picture. The immunizing effect of OLC opinions is not solely a doctrinal question, but a practical one as well. Notwithstanding the defenses' potential shortcomings, there are numerous reasons why the Department of Justice is unlikely to bring criminal charges against officials who have relied on OLC advice at all. The widespread belief in OLC's immunity-conferring power is more a product of prevailing institutional and pragmatic considerations than of the doctrinal considerations sketched in Part II. Coupled with the reality that few officials violate the law in reliance on official advice in the first place, these factors help explain why prosecutions do not and will not happen in practice.

### A. Promoting Reliance on OLC Advice

One reason for the immunizing effect of OLC opinions is that OLC, the President, the Department of Justice, and the public each

---

[130] *See* Sharon L. Davis, *The Jurisprudence of Willfulness: An Evolving Theory of Excusable Ignorance*, 48 DUKE L.J. 341, 343–44 (1998).

[131] *See, e.g.*, Cheek v. United States, 498 U.S. 192, 201 (1991) (interpreting "willfulness" in tax evasion statute to require proof of a "voluntary, intentional violation of a known legal duty"). The Court justified its interpretation by pointing to the complexity of the tax laws. *Id.* at 199–200.

[132] 1 LAFAVE, *supra* note 13, § 5.6(d), at 408 (quoting OLIVER WENDELL HOLMES, JR., THE COMMON LAW 48 (1881)).

have instrumental interests in fostering reliance on these opinions. Exposing officials who have relied on OLC opinions to the possibility of jail — or even, as in EBE, subjecting their reliance to a reasonableness inquiry — would dramatically undermine this confidence. Prosecution would undercut incentives to seek out OLC advice at all.[133]

From OLC's perspective, there is a reputational interest at stake. OLC is not merely a legal advisor but "also a bureaucracy in the modern administrative state concerned with maintenance of its position."[134] In the "competitive market for advisory power," OLC must maintain the high value of its opinions to secure its status and share of responsibility.[135] Agency heads have no formal duty to solicit OLC's advice on the legal questions before them.[136] Concerns about the reliability of OLC advice could prompt the Attorney General or President to increasingly turn to other government lawyers.[137]

OLC's reputation as a principled expositor of the law has political payoffs for the President as well. Many decisions of the President, and to a large extent the Attorney General, are viewed through a politicized lens.[138] Thus, it is often beneficial to maintain OLC's perceived independence; the President can potentially defuse controversies by deflecting responsibility onto OLC.[139] Any prosecution of an official for acts undertaken pursuant to an OLC opinion would cast doubt on OLC's legal analysis and credibility. The more controversial and agenda-driven its image, the less weight that OLC's support for the administration's legal positions will carry with Congress and the public. Fostering reliance on OLC, therefore, preserves this option for the President.

For the Department of Justice — the presumptive prosecuting entity — reliance on OLC opinions is essential to deter unconstitutional conduct and ensure systematic compliance with the rule of law by executive branch officials. An internal advice-seeking norm promotes the respect for rule of law at the heart of the public service ideal. The norm also promotes the smooth functioning of government generally.

---

[133] Attorney General Michael Mukasey expressed qualms about undermining reliance on Department of Justice opinions at a recent congressional hearing:

> [Prosecution] would put in question not only th[e] opinion [on which the official relied], but also any other opinion from the Justice Department. Essentially, it would tell people: '. . . [Y]ou will be subject to criminal investigation when, as and if the tenure of the person who wrote the position changes or, indeed, the political winds change.' And that's not something that I think would be appropriate . . . .

*Oversight Hearing, supra* note 1.

[134] McGinnis, *supra* note 4, at 378.
[135] Lund, *supra* note 33, at 440.
[136] *See id.* at 488.
[137] *Id.* at 497.
[138] *See* McGinnis, *supra* note 4, at 423–24.
[139] *Id.* at 423.

First, it gives OLC leverage to resolve interagency disputes. If agency officials were to resist OLC's authority, it would engender "continuing disarray within the administration and uncertainty in the administration's legal position."[140] Second, it serves as a moderating influence by forcing agencies to undertake more probing deliberations before proceeding with initiatives. Because OLC requires the requesting official to submit his or her own analysis ex ante, it conditions officials to confront legal questions thoroughly at a preliminary stage.

Finally, the advice-seeking norm may also reap long-term benefits for members of the public. OLC opinions collectively "construct[] a self-referential system of precedent that Justice Department attorneys can consult as future cases come along."[141] In effect, reliance helps ensure that executive branch legal interpretation builds incrementally. This in turn promotes predictability and stability in law enforcement practices and executive action generally.

### B. Preventing Chill on OLC Lawyers

A less intuitive explanation for OLC's immunity-conferring power is a fear of the effect on OLC lawyers — specifically, a fear of overdeterrence. There is much hand-wringing over how best to ensure the detached, independent nature of OLC opinions. There is, however, a correlative need to ensure that the analysis pushes sufficiently close to the legal line. The Department of Justice, as both the primary prosecuting entity and the home of OLC, is wary of prosecution's potential chill on its own lawyers.

The exclusionary rule provides an apt analogy. The suppression of evidence obtained unconstitutionally deters police misconduct. The Supreme Court, however, has also carved out numerous "good faith" exceptions[142] to afford police the room to make reasonable mistakes. In effect, the Court recognized that there is a point at which the deterrence benefits of preventing police from obtaining evidence unlawfully are "marginal or nonexistent."[143] At that point, they do not justify the costs of overdeterring police from taking sufficiently aggressive action to pursue and investigate crime.

Commentators have fiercely debated where to draw the line between deterrence and overdeterrence in the context of OLC lawyering.

---

[140] *Id.*

[141] Koh, *supra* note 23, at 515.

[142] *See, e.g.*, Illinois v. Krull, 480 U.S. 340 (1987) (admitting evidence seized in reliance on an unconstitutional statute); Massachusetts v. Sheppard, 468 U.S. 981 (1984) (admitting evidence seized in reliance on a warrant that incorrectly listed items to be seized); United States v. Leon, 468 U.S. 897 (1984) (applying good faith exception to admit evidence discovered pursuant to a warrant not supported by probable cause).

[143] *Leon*, 468 U.S. at 922.

At one end of the spectrum is the "quasi-judicial" or "neutral exposi-tor" model of OLC. The "quasi-judicial" model hearkens back to At-torney General Caleb Cushing's pronouncement in 1854 that the At-torney General "is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation."[144] Under this view, OLC lawyers must be strongly deterred from engaging in aggres-sive analysis and insulated from political considerations. They must be vigilant in "accept[ing] only the strongest legal arguments"[145] and must achieve "[o]bjectivity and balance"[146] when they interpret and apply the law.

However, others have advocated more client-centered lawyering. Randolph Moss has opined that OLC should reason "within the framework of the *best* view of the law," yet also be encouraged to "fur-ther the legal and policy goals of the administration [it] serves."[147] Former Attorney General Elliot Richardson argued that "[a]dvice to a president needs to have the political dimension clearly in view, without a regard for any pejorative attached to the word political."[148] And Professor Nelson Lund has suggested that OLC may adopt a "private practice" model because "there is no obvious reason for [the President] to have less freedom than private clients to require from his lawyers the kind of legal advice he thinks will be most useful to him."[149]

Professor Douglas Kmiec points to one example of excessively cau-tious advice. In an opinion evaluating a proposed executive order banning government pornography sales at military bases and other federal retail outlets, OLC "hedged."[150] The office found a plausible constitutional argument that the proposal would not violate the First Amendment. It also warned, however, that this argument might not be embraced by courts. As a result, no order was issued. In Professor Kmiec's view, the opinion was "driven more by the risk of adverse liti-gation than a dispassionate appraisal of the constitutional require-ments . . . to fully demarcate the extent of the President's authority."[151] The recipient was unable to discern the difference between what was a conservative appraisal of the risks of litigation, and a conclusion that

---

[144] Moss, *supra* note 15, at 1309 (quoting 6 Op. Att'y Gen. 326, 334 (1854)) (internal quotation mark omitted).

[145] *Id.* at 1312.

[146] *Id.* at 1311.

[147] *Id.* at 1306.

[148] NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE 27 (1992).

[149] Lund, *supra* note 33, at 449.

[150] Kmiec, *supra* note 98, at 360–61.

[151] *Id.* at 361.

the proposal was actually illegal or unconstitutional.[152]  A narrow assessment of the "best" view of the law — "so thoroughly established as to be beyond all legal question"[153] — may have less utility to recipients than information about where the outer edges of legal authority lie.

More concretely, in the national security context, excessively cautious advice has been lambasted for handicapping the government's ability to combat threats.  The 9/11 Commission Report pointed to "institution[al] avers[ion] to risk" and bureaucratic paralysis as key factors contributing to the terrorist attacks.[154]  "[C]autious lawyers" had "spooked" the military and intelligence establishments[155] and created a "paralyzing culture of risk-averse legalism . . . before 9/11."[156]  Thus, even as the Department of Justice seeks to deter illegal conduct, it is fearful of overdeterring OLC lawyers from offering advice that goes right up to the legal line.  Such advice may ultimately better aid officials in evaluating how to respond to crises or promote administration priorities.[157]

### C. Inter-Administration Comity

Granting immunity to officials that have relied on prior OLC opinions reinforces institutional continuity across different administrations.  As a general guideline, OLCs strive to maintain a level of respect for previous occupants of the office.  "OLC has adopted a rule suggesting that past precedent should be accorded a certain measure of stare decisis from administration to administration, even if those administrations represent different political parties and strikingly different political philosophies."[158]  One illustration of the stare decisis effect of OLC opinions was the consistent position adopted by numerous administrations that the legislative veto was unconstitutional — a position ultimately adopted by the Supreme Court in *INS v. Chadha*.[159]  Government lawyers view themselves as "obligat[ed] to work within a tradition of reasoned, executive branch precedent, memorialized in formal written opinions."[160]

---

[152] *See id.* at 361–62.
[153] *Id.* at 361.
[154] *See* GOLDSMITH, *supra* note 5, at 95.
[155] *Id.*
[156] *Id.* at 94.  *See also Nomination of Scott W. Muller To Be General Counsel of the Central Intelligence Agency: Hearing Before the S. Select Comm. on Intelligence*, 107th Cong. (2002) (opening statement of Sen. Bob Graham), *available at* http://www.fas.org/irp/congress/2002_hr/100902muller.html.
[157] *Cf.* GOLDSMITH, *supra* note 5, at 94.
[158] Koh, *supra* note 23, at 516.
[159] 462 U.S. 919 (1983).
[160] Walter Dellinger, *After the Cold War: Presidential Power and the Use of Military Force*, 50 U. MIAMI L. REV. 107, 109 (1995).

Inter-administration comity brings stability and predictability in the law. To be sure, the Department of Justice's legal analysis has not always withstood the test of time: During the Nixon Administration, Deputy Attorney General Joseph Sneed disavowed an earlier OLC opinion by then-Assistant Attorney General William Rehnquist that denied any constitutional authority for the President to impound funds. In 1989, an OLC opinion partially reversed an earlier opinion on the FBI's authority to engage in extraterritorial abductions. In 1991, an OLC opinion overruled a decade-old opinion regarding whether Haitian refugees interdicted on the high seas should be afforded a screening process to substantiate their claims.[161] And in 2004, OLC formally repudiated the analysis in a 2002 opinion on the aggressive interrogation of terrorism suspects, replacing the so-called "torture memo" with a new opinion.[162]

However, these reversals of position have been flashpoints for criticism.[163] The desires to avoid controversy and provide clear guidelines to officials on the bounds of permissible activities have meant that OLC has only rarely revisited its prior determinations. This is particularly so with respect to issues involving statutory or treaty interpretation, when the underlying language has remained constant.[164] This continuity across administrations of both parties stems in part from OLC's institutional interest in staying above the winds of political pressure. Frequent repudiation of opinions penned by OLCs of previous administrations would appear politically motivated and damage OLC's credibility. Prosecutions of officials who relied on previous OLCs' opinions would likewise be vulnerable to these charges of politicization.

### D. Unlikelihood of Jury Conviction

From a prosecutorial standpoint, the unlikelihood that juries would convict officials who have acted pursuant to OLC advice is another powerful limiting force. "Prosecutors do not charge in a vacuum; they do so against the backdrop of trial."[165] They have incentives not to press criminal charges when cases are unlikely to be won.[166] These incentives are compounded by the greater influence of costs on prosecu-

---

[161] Koh, *supra* note 23, at 520.

[162] *See* Press Briefing by White House Counsel Judge Alberto Gonzales, DoD General Counsel William Haynes, DoD Deputy General Counsel Daniel Dell'Orto and Army Deputy Chief of Staff for Intelligence General Keith Alexander (June 22, 2004), *available at* http://www.whitehouse.gov/news/releases/2004/06/20040622-14.html.

[163] *See generally* Koh, *supra* note 23.

[164] *Id.* at 516.

[165] Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 YALE L. J. 1909, 1933 (1992).

[166] *Id.*

tors' discretionary decisions today as compared to thirty or forty years ago.[167]  In addition to other barriers to bringing officer suits to trial — for instance, split loyalties or official stonewalling of investigations — the low chance of obtaining a conviction gives prosecutors pause.

Federal prosecutors confront structural and legal problems in bringing criminal charges against law enforcement officials.  One study of criminal cases brought by the Department of Justice's Civil Rights Division between 1984 and 2001 is indicative, revealing that the Department had "greater difficulty obtaining a successful prosecutorial outcome . . . for law enforcement officials than non-law enforcement individuals."[168]  Law enforcement defendants also constituted the "vast majority of acquittals."[169]

One basis for the disparity lies in the traditional deference juries have shown to officials who have acted within their scope of employment.  Particularly on national security matters — which are most likely to entail covert programs, detention, interrogation, surveillance, or other aggressive actions — juries will tend to defer to operatives in much the same way that they have historically deferred to police officers in police misconduct cases.[170]  Juries are unlikely to second-guess the judgment calls of officials who have made heat-of-battle determinations in emergency situations.  And it is precisely in these high pressure situations that OLC's ex ante constraints may be short-circuited and tendentious legal opinions are most likely to arise.

An additional challenge is that OLC typically intervenes when difficult constitutional or statutory issues not easily resolved by existing precedent are at stake.  In the absence of clear legal guidelines, prosecutors would be hard-pressed to convince a jury that a legal opinion is so patently unreasonable or erroneous that the relying official should have known better than to accept it as true.  This holds especially true when questions of first impression are at issue.  Barring instances of truly egregious conduct or collusion, therefore, prosecutors are unwilling to expend valuable resources on these suits.

---

[167] *See* William J. Stuntz, *The Political Constitution of Criminal Justice*, 119 HARV. L. REV. 780, 815–16 (2006).

[168] Steven Puro, *Federal Responsibility for Police Accountability Through Criminal Prosecution*, 22 ST. LOUIS U. PUB. L. REV. 95, 118 (2003).  Between 1984 and 1995, the Criminal Section had a 71% success rate in prosecuting law enforcement officers charged with civil rights violations, compared to a 95% success rate for prosecuting non-law enforcement individuals.  *Id.* at 104; *see also* Laurie L. Levenson, *The Future of State and Federal Civil Rights Prosecutions: The Lessons of the Rodney King Trial*, 41 UCLA L. REV. 509, 541 & n.182 (1994) (noting that a 1993 Civil Rights Division Internal Report revealed consistently lower conviction rates for prosecution of law enforcement officers than any other type of civil rights prosecution).

[169] Puro, *supra* note 168, at 113.

[170] *See id.* at 116.

## IV. CONCLUSION

Framing OLC's immunity-conferring power as a legal question misplaces the focus. EBE, the public authority defense, and innocent intent are three defenses that would potentially shield officials from domestic criminal liability. They are, nevertheless, tools of imperfect recourse and as yet relatively uncharted territory for courts. Thus far, lower courts have applied EBE's fairness rationale narrowly and have resisted broader formulations of the public authority and innocent intent defenses. The efficacy of these defenses in the OLC context, therefore, is likely to depend on numerous factors: the reasonableness of the official's reliance, the egregiousness of the acts, the unreasonableness of the advice, and, more generally, how strictly courts analogize to the paradigmatic cases. The doctrinal grounds thus do not on their own provide an adequate explanation for OLC opinions' immunizing effect.

Dwelling on the legal enforceability of OLC opinions misses the reality that immunity is ultimately a question of practicality. The widespread belief in immunity stems not from the surefire strength of the legal defenses, but rather the powerful institutional and pragmatic forces guiding the Department of Justice. Unless the institutional landscape changes, these practical considerations render prosecution of officials who have relied on OLC advice implausible and, ultimately, bad policy.

The existence of de facto immunity does not alleviate the pressures on OLC. Rather, it lays bare OLC's momentous capacity to shield a wide spectrum of government activities from prosecution with the issuance of an opinion. Accordingly, it serves to highlight the ongoing and thorny dilemmas surrounding how this immunity-conferring power should best be exercised.

# EXHIBIT EE

 An official website of the United States government
Here's how you know


THE UNITED STATES
DEPARTMENT OF JUSTICE This is archived content from the U.S. Department of Justice website. The information here may be
ARCHIVES outdated, and links may no longer function. Please contact webmaster@usdoj.gov if you have any
questions about the archive site.

## 2055. PUBLIC AUTHORITY DEFENSE

There has been considerable confusion in the law regarding what truly constitutes a defense of governmental authority.
There are at least three different defenses that in theory a defendant might assert when he/she alleges that he/she
committed the crimes charged in response to a request from an agency of the government. In gauging the appropriate
response to rebut the defense, the government should determine which of the defenses actually applies and, if
necessary, file the necessary pleadings to have the defendant elect which defense is at issue.

First, the defendant may offer evidence that he/she honestly, albeit mistakenly, believed he/she was performing the
crimes charged in the indictment in cooperation with the government. More than an affirmative defense, this is a
defense strategy relying on a "mistake of fact" to undermine the government's proof of criminal intent, the mens rea
element of the crime. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363-68 (11th Cir. 1994); *United States v.
Anderson*, 872 F.2d 1508, 1517-18 & n.4 (11th Cir.), *cert. denied*, 493 U.S. 1004 (1989); *United States v. Juan*, 776 F.2d
256, 258 (11th Cir. 1985). The defendant must be allowed to offer evidence that negates his/her criminal intent, *id.*, and,
if that evidence is admitted, to a jury instruction on the issue of his/her intent, *id.*, and if that evidence is admitted, he is
entitled to a jury instruction on the issue of intent. *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995); *United States
v. Anderson*, 872 F.2d at 1517-1518 & n. In *Anderson*, the Eleventh Circuit approved the district court's instruction to the
jury that the defendants should be found not guilty if the jury had a reasonable doubt whether the defendants acted in
good faith under the sincere belief that their activities were exempt from the law.

In *Juan*, the defendant admitted the criminal acts charged against him, but sought to defend by demonstrating a lack of
criminal intent, i.e., that he thought he was doing those things in cooperation with the United States government.
Specifically, he moved, pursuant to the dictates of Classified Information Procedures Act (CIPA), to use classified
information to prove a prior relationship with a government agency in order to prove that his belief of cooperation was
reasonable. The court held that

1. ... the mere fact that appellant had, in the past, engaged in the activity he seeks to prove does not insulate him
   from criminal responsibility for unlawful acts thereafter. . . Yet, the past events tend to make more plausible that
   which, absent proof of those events, would be implausible. Appellant should be allowed to establish the premise
   for his claim.

*Id.*at 258.

The second type of government authority defense is the affirmative defense of public authority, i.e., that the defendant
knowingly committed a criminal act but did so in reasonable reliance upon a grant of authority from a government
official to engage in illegal activity. This defense may lie, however, only when the government official in question had
actual authority, as opposed to merely apparent authority, to empower the defendant to commit the criminal acts with
which he is charged. *United States v. Anderson*, 872 F.2d at 1513-15; *United States v. Rosenthal*, 793 F.2d 1214, 1236,
*modified on other grounds*, 801 F.2d 378 (11th Cir. 1986), *cert. denied*, 480 U.S. 919 (1987). The genesis of the
"apparent authority" defense was the decision in *United States v. Barker*, 546 F. 2d 940 (D.C. Cir. 1976). *Barker*
involved defendants who had been recruited to participate in a national security operation led by Howard Hunt, whom
the defendants had known before as a CIA agent but who was then working in the White House. In reversing the
defendants' convictions, the appellate court tried to carve out an exception to the mistake of law rule that would allow
exoneration of a defendant who relied on authority that was merely apparent, not real. Due perhaps to the unique intent

requirement involved in the charges at issue in the *Barker* case, the courts have generally not followed its "apparent authority" defense. *E.g.*, *United States v. Duggan*, 743 F.2d 59, 83-84 (2d Cir. 1984); *United States v. Rosenthal*, 793 F.2d at 1235-36. If the government official lacked actual or real authority, however, the defendant will be deemed to have made a mistake of law, which generally does not excuse criminal conduct. *United States v. Anderson*, 872 F.2d at 1515; *United States v. Rosenthal*, 793 F.2d at 1236; *United States v. Duggan*, 743 F.2d at 83-84. *But see* discussion on "entrapment by estoppel," *infra*.

The last of the possible government authority defenses is "entrapment by estoppel," which is somewhat similar to public authority. In the defense of public authority, it is the defendant whose mistake leads to the commission of the crime; with "entrapment by estoppel," a government official commits an error and, in reliance thereon, the defendant thereby violates the law. *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994); *United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir. 1990); *United States v. Clegg*, 846 F.2d 1221, 1222 (9th Cir. 1988); *United States v. Tallmadge*, 829 F.2d 767, 773-75 (9th Cir. 1987). Such a defense has been recognized as an exception to the mistake of law rule. In *Tallmadge*, for example, a Federally licensed gun dealer sold a gun to the defendant after informing him that his circumstances fit into an exception to the prohibition against felons owning firearms. After finding that licensed firearms dealers were Federal agents for gathering and dispensing information on the purchase of firearms, the Court held that a buyer has the right to rely on the representations made by them. *Id.* at 774. *See United States v. Duggan*, 743 F.2d at 83 (citations omitted); but, to assert such a defense, the defendant bears the burden of proving that he\she was reasonable in believing that his/her conduct was sanctioned by the government. *United States v. Lansing*, 424 F.2d 225, 226-27 (9th Cir. 1970). *See United States v . Burrows*, 36 F.3d at 882 (citing *United States v. Lansing*, 424 F.2d at 225-27).

*Federal Rule of Criminal Procedure 12.3*

Regardless of which form of the government authority defense the defendant chooses to pursue, the Federal rules require notice of the defense well in advance of trial. As the following discussion demonstrates, it also offers the government the opportunity to challenge the defense to justify in advance any proposed foray into law enforcement or IC files.

Fed.R.Crim.P. 12.3 is the newest of three rules pertaining to specific defenses and requiring advance notice to the government before being asserted by a defendant. The rule provides as follows, in pertinent part:

1. Notice Of Defense Based Upon Public Authority

1. (a)(1) A defendant intending to claim a defense of actual or believed exercise of public authority on behalf of a law enforcement or Federal intelligence agency at the time of the alleged offense shall. . .serve upon the attorney for the government a written notice of such intention. . . . Such notice shall identify the law enforcement or Federal intelligence agency and any member of such agency on behalf of which and the period of time in which the defendant claims the actual or believed exercise of public authority occurred....

When the prosecutor has reason to believe that a Rule 12.3 defense is likely to be asserted to a pending indictment, the prosecutor should consider immediate action to force the issue, such as filing a demand for notice pursuant to Rule 12.3(a)(1). The responsive notice, if it is as comprehensive as this section stresses below it should be, will provide the prosecutor with abundant information that can guide that prosecutor's strategy and tactics in preparing for trial.

Moreover, if the responsive notice alleges public authority by an agency of the IC, it most certainly signals that the prosecutor must consider invoking CIPA. With such an invocation will come enormous administrative burdens, both for the prosecutor and for the court, as security clearances must be obtained, proper facilities established for storing classified documents, and potentially innumerable hearings held under sections 4 and 6 of CIPA to determine the admissibility of classified evidence.

When a prosecutor receives a 12.3 notice, he/she should not hesitate, but should respond quickly and aggressively to determine whether there is a true public authority defense at hand, or just a diversionary tactic. If the prosecutor is able successfully to handle the Rule 12.3 issue, he/she may avoid the immense impact on the preparation of the case that is inevitably involved when classified information becomes at risk. The information that follows is offered to assist in that regard.

**-1623-**

LEGAL DISCUSSION

Rule 12.3 has been held not to improperly infringe upon a defendant's guarantee against self-incrimination, *United States v. Abcasis*, 785 F. Supp. 1113, 1116-17 (E.D.N.Y 1992), *rev'd on other grounds*, 45 F.3d 39 (2d Cir. 1995); or upon the defendant's due process rights to reciprocal discovery, 785 F.Supp. at 1118; and not to abridge a defendant's right of compulsory process. *United States v. Seeright*, 978 F.2d 842, 848-49 (4th Cir. 1992). In reaching these conclusions, the respective courts have analogized Rule 12.3 to its sister rules, 12.1 and 12.2.

Rule 12.1 provides for pretrial notice to the government of the defendant's intention to offer a defense of alibi. The government carries the burden of triggering the notice requirement through a written demand served upon the defendant specifying the time, date, and place of the charged offense. If the defendant intends to offer an alibi defense, he/she must then respond by specifying his/her whereabouts at the time of the offense and by identifying the witnesses whom he/she intends to call to prove his/her alibi. The prosecution must then serve the defendant with notice of those witnesses who will place him/her at the crime scene.

Florida's notice of alibi provision, which is virtually identical to Rule 12.3, was considered and its constitutionality upheld in *Williams v. Florida*, 399 U.S. 78 (1970). Specifically, the Court noted that there is no abridgement of the Fifth Amendment's protection against self-incrimination by requiring a defendant to give notice of intent to assert a defense, as opposed to requiring a defendant to testify in support of that defense. Moreover, the court recognized a strong government interest in avoiding the unfair prejudicial surprise that would occur if the defendant were allowed to assert an alibi defense without warning. *Id*. at 1116-17. The legislative history behind Rule 12.1 reflects that Congress was also concerned that the prosecution not be unfairly surprised at trial by only then learning of the defendant's claim of an alibi. Thus, to avoid unnecessary interruption and delay in the trial while the government conducts an investigation into the alibi, it included advance notice and exchange of witness names as a condition to assert the defense. H.R.Rep.No. 247, 94th Cong., 1st Sess. 8, *re-printed* in 1975 U.S.Code Cong. & Ad.News 674 et seq.; Notes of Committee on the Judiciary House Report No. 941-247. *See* 8 J. Moore, *Moore's Federal Practice* 12.1.02 (2d ed. 1981).

Similarly, Rule 12.2 requires a defendant to give notice to the government of his/her intent to rely on an insanity defense. The Notes of the Advisory Committee on Rules state that

1. [t]he objective [of Rule 12.2] is to give the government time to prepare to meet the issue, which will usually require reliance upon expert testimony. Failure to give advance notice commonly results in the necessity for a continuance in the middle of a trial, thus unnecessarily delaying the administration of justice.

Like its companion rules, Rule 12.3 is designed to provide the government with reasonable notice that the defendant intends to defend the charges against him in a very unique way, that is, by admitting the crimes but denying criminal intent by claiming that he was authorized to do so by a representative of the government. The purpose of requiring a particularized list of witnesses under any of these unique defense notice rules is to ensure that the defense is a real defense, to avoid prejudicial surprise, and to obviate the need for continuances. In the context of an alibi defense, the courts have held, for example, that, to avoid rendering Rule 12.1 useless, the Rule necessarily requires a reasonable threshold of completeness and specificity. *See United States v. Vela*, 673 F.2d 86, 68-89 (5th Cir. 1982); *United States v. Myers*, 550 F.2d 1036, 1041-43 (5th Cir. 1977). Similar specificity and forthrightness have been held to be required as to notice under Rule 12.2. *United States v. Ruchbinder*, 796 F.2d 910, 915 (7th Cir. 1986)

The same argument must reasonably apply to Rule 12.3. If the intent of the rule is to be accomplished, the defendant who asserts a public authority defense should be required to answer the following questions in his/her Rule 12.3 Notice: Who does the defendant say authorized him to perform the criminal acts with which he is charged? When and where did that authorization occur?

In short, the defendant must be required, as part of his/her notice, to make a prima facie showing of a colorable public authority defense. Mere speculation that the government knew of the defendant's activity is insufficient. Likewise, the claim that the government was fully aware of the defendant's criminal acts, and for whatever reason did not interfere, is simply not public authority. The court in *United States v. Rosenthal*, 793 F.2d 1214 (11th cir. 1986), held that the defense of public authority must depend upon a grant of authority that is real, and not merely apparent. *See also United States v. Lopez-Lima*, 738 F. Supp. 1404 (S.D.Fla. 1990). Moreover, the authority must actually be given, not simply presumed, by the defendant. The imagined specter of some lurking, invisible government presence, coupled with the

fact that the government never interfered with the defendant's criminal activity, is not public authorization. If it were a defense, it would be a haven for the paranoid felon.

In substance, the rule provides:

1. A defendant intending to file a claim of actual or believed exercise of public authority shall serve upon the government a notice of such public authority.
2. The notice shall identify the law enforcement or Federal intelligence agency and any member of such agency on behalf of which defendant claims the actual or believed exercise of public authority occurred. The government must admit or deny the public authority happened.
3. At the time the government responds to the defense claim, the government may make a written demand for the names and addresses of witnesses the defendant intends to rely on to prove the defense.
4. Within seven days after service of the government's demand, the defense must provide the names and addresses of witnesses upon which the defense intends to rely to prove its defense.
5. Seven days after the government receives a list of the defense witnesses, the government must supply a witness list of government witnesses that the government intends to rely on in opposing the defense.

In cases involving CIPA, the government may not want to ask for reciprocal discovery if the government will have to divulge names of undercover intelligence agents.

It cannot be seriously disputed that a defendant should have the opportunity to assert a *fact-based* defense that someone in the government asked him/her to commit the crimes alleged in the indictment for political, diplomatic, or any other reason he cares to offer. But the *quid pro quo* must be that the defendant identifies specifically the person or persons who directly, or even by a "wink and a nod," conferred on his/her authority to act on behalf of the government; and he\she must be required to link any alleged grant of authority to act for the government specifically to one or more of the crimes in the indictment.

[cited in <u>Criminal Resource Manual 2050</u>]

| ‹ 2054. Synopsis Of Classified Information Procedures Act (CIPA) | up | 2056. Preparation Of Witnesses Whose Testimony May Involve Classified Information › |

*Updated January 17, 2020*

**-1625-**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

**ORDER**

Based upon the representations in the Defendant's Motion To Dismiss The Indictment and

upon consideration of the entire record, it is hereby:

**ORDERED** that the Motion is GRANTED; it is further

**ORDERED** that the Indictment filed on November 12, 2021, is dismissed.

Dated: _____

_____
Hon. Carl J. Nichols
*United States District Judge*

**-1626-**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

Criminal No. 21-670 (CJN)

**DEFENDANT'S NOTICE OF FILING**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully files the following materials in connection with the Motion To Dismiss Indictment [Doc. 58]:

1. For the convenience of the Court we file an Index To Exhibits. The exhibits were filed on April 15, 2022, as Docs. 58-1 to 58-31 and Exhibit FF (filed under seal).

2. We file Exhibit GG, a one-page document cited in the motion but inadvertently not filed.

3. We also file a corrected version of the Table of Contents (correcting two typographical errors) and Table of Authorities (correcting the omission of asterisks for authority chiefly relied upon). No changes have been made to the Motion To Dismiss Indictment.

Dated: April 19, 2022                    Respectfully submitted,

                                         **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                         /s/ M. Evan Corcoran
                                         M. Evan Corcoran (D.C. Bar No. 440027)
                                         400 East Pratt Street – Suite 900
                                         Baltimore, MD 21202
                                         Telephone: (410) 385-2225
                                         Facsimile: (410) 547-2432
                                         Email: ecorcoran@silvermanthompson.com

**-1627-**

/s/ David I. Schoen
_____
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

/s/ Robert J. Costello
_____
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of April 2022, a copy of the foregoing Notice Of Filing was filed through the Court's CM/ECF system and was served *via* electronic delivery on counsel of record.

/s/ M. Evan Corcoran
_____
M. Evan Corcoran (D.C. Bar No. 440027)

2

**-1628-**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**MOTION TO DISMISS THE INDICTMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

I.     BACKGROUND ...................................................................................... 2

II.    THE SUBPOENA WAS NOT LAWFULLY ISSUED ........................................... 2

    A.    The Composition of the Select Committee Invalidates the Subpoena .......... 4

    B.    The Select Committee Exceeded Its Subpoena Authority – By
         Violating Rules Which Mandate Ranking Minority Member
         Consultation and Providing Protective Rules to the Deponent .................... 5

         1.    Limits on Subpoena and Deposition Authority .................................. 6

         2.    The Select Committee Has No Ranking Minority Member ............. 9

    C.    The Subpoena was a Misguided and Unconstitutional Effort to Make
         an Example of Mr. Bannon ........................................................................ 12

    D.    Count II Must be Dismissed Because the Select Committee Has No
         Authority to Compel Production of a Privilege Log or Certification ......... 14

III.    THIS PROSECUTION VIOLATES DUE PROCESS ........................................ 16

    A.    Mr. Bannon Relied on Official, Binding, Authoritative DOJ Policy .......... 17

    B.    OLC Opinions are Binding, Authoritative Statements Reflecting the
         Official Policy of the Department of Justice ............................................... 22

    C.    This Prosecution is Barred by the Doctrines of Entrapment by
         Estoppel, Actual Public Authority, and Apparent Public Authority ........... 27

         1.    Entrapment by Estoppel ................................................................... 32

         2.    Public Authority .............................................................................. 35

             a. Actual Authority ......................................................................... 34

             b. Apparent Authority .................................................................... 35

    D.    The Government Should Be Estopped from Prosecuting This Case .......... 37

IV.    2 U.S.C. § 192 IS UNCONSTITUTIONAL AS APPLIED TO THE FACTS OF
       THIS CASE ................................................................................................... 39

       A.    Statutory Interpretation Problems ............................................................ 42

       B.    2 U.S.C. § 192 as Applied Violates the Separation of Powers
             Doctrine, is Unconstitutional, Over Broad, and is Void for
             Vagueness ................................................................................................ 43

             1.    The Statute as Applied Violates the Constitutional Separation
                   of Powers Doctrine ........................................................................ 43

             2.    The Statute as Applied is Unconsitutionally Overbroad and
                   Void for Vagueness ........................................................................ 44

V.     PROSECUTORIAL OVER-REACHING REQUIRES DISMISSAL OF THE
       INDICTMENT ............................................................................................... 48

       A.    Targeting Mr. Bannon's Counsel Requires Dismissal ............................. 48

       B.    Misleading the Grand Jury Requires Dismissal ...................................... 52

VI.    CONCLUSION ............................................................................................... 53

ii

# TABLE OF AUTHORITIES

## CASES

*Ansara v. Eastland,*
   442 F.2d 751 (D.C.Cir.1971) ................................................................................ 47

*Barenblatt v. United States,*
   360 U.S. 109 (1959) ................................................................................................ 47

*Boyce Motor Lines v. United States,*
   342 U.S. 337, 343 n. 16 (1952) ............................................................................... 2

*Calautti v. Franklin,*
   439 U.S. 379, 395 (1979) ........................................................................................ 45

*Casa de Maryland v. United States Dep't of Homeland Sec,*
   924 F.3d 684, 718 n.1 (4th Cir. 2019) ................................................................... 24

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
   542 U.S. 367, 370 (2004) ........................................................................................ 15

*Christoffel v. United States,*
   338 U.S. 84 (1949) ............................................................................................... 2, 5

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
   846 F.3d 1235, 1238 (D.C. Cir. 2017) ................................................................... 23

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
   922 F.3d 480, 483 (D.C. Cir. 2019) .................................................................. 23, 24

*City of Chicago v. Morales,*
   527 U.S. 41, 74-81 (1999) ...................................................................................... 39

*Comm. On the Judiciary of the United States House of Representatives v. McGahn,*
   968 F.3d 755 (2020) ................................................................................................ 20

*Cox v. Louisiana,*
   379 U.S. 559, 575 (1965) .............................................................................. 30, 32, 33

*Exxon Corp. v. FTC,*
  589 F.2d 582, 592 (D.C. Cir. 1978) .......................................................................... 5

*I.N.S. v. Chadha,*
  462 U.S. 919, 944 (1983) ................................................................................... 15, 44

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880), ............................................................................................ 3, 13

*Kolender v. Lawson,*
  U.S. 352, 357 (1983), ............................................................................................... 45

*Lanzetta v. New Jersey,*
  306 U.S. 451, 453 (1939), ......................................................................................... 45

*McGrain v. Daugherty,*
  273 U.S. 135, 161 (1927) ..................................................................................... 6, 13

*\*Nixon v. Adm'r of General Services,*
  433 U.S. 425, 448-449 (1977)............................................................................. 17, 44

*Nixon v. Fitzgerald,*
  457 U.S. 731, 749 (1982) .......................................................................................... 13

*Nixon v. Sirica,*
  487 F.2d 700 (1973).................................................................................................. 15

*NLRB v. Sears Roebuck & Co.,*
  421 U.S. 132, 153 (1975) .......................................................................................... 24

*\*Raley v. State of Ohio,*
  360 U.S. 423 (1959 ........................................................................................ 32, 33, 46

*Senate Select Committee on Presidential Campaign Activities v. Nixon,*
  498 F.2d 725, 730 (D.C. Cir. 1974) ..................................................................... 15, 17

*Setser v. United States,*
  566 U.S. 231, 239 (2012) .......................................................................................... 43

*Stirone v. United States,*
    361 U.S. 212, 217 (1960) ................................................................................................ 52

*Tobin v. United States,*
    306 F.2d 270, 276 (D.C.Cir.1962) ................................................................................ 47

*\*Trump v. Mazars USA, LLP,*
    140 S. Ct. 2019, 2031 (2020) ........................................................... 6, 12, 13, 43, 46

*Trump v. Thompson,*
    20 F.4th 10, 41 (D.C. Cir. 2021) .................................................................. 13, 17, 47

*Trump v. Thompson,*
    142 S. Ct. 680 (2022) ...................................................................................................... 17

*United States v. Abcassis,*
    45 F.3d 39 (2d Cir 1995) ................................................................................................ 29

*United States v. AT&T,*
    567 F.2d 121, 127 (D.C. Cir. 1977).............................................................................. 47

*\*United States v. Baker,*
    438 F.3d 749 (7th Cir. 2006)...........................................................................................35

*United States v. Baptista-Rodriguez,*
    17 F.3d 1354, 1368 n.18 (11th Cir. 1994)............................................................... 35

*United States v. Batres-Santolino,*
    521 F.Supp. 744, 750-53 (N.D. Cal. 1981) ............................................................. 50

*\*United States v. Barker,*
    546 F.2d 940, 952 (D.C. Cir. 1976) ..............................................................28, 29, 30, 36, 37

*\*United States v. Baird,*
    29 F.3d 647, 654 (D.C. Cir. 1994) ............................................................................ 36

*United States v. Ballin,*
    144 U.S. 1 (1892) ............................................................................................................... 2

*United States v. Ciambrone*,
 601 F.2d 616, 623 (2d Cir. 1979) ............................................................................ 53

*United States v. Brown*,
 381 U.S. 437, 443 (1965) ......................................................................................... 53

*\*United States v. Davis*,
 139 S. Ct. 2319, 2325 (2019) .................................................................................. 45

*United States v. House of Representatives*,
 556 F. Supp. 150, 152-153 (D.D.C. 1983) .............................................................. 47

*United States v. Hsia*,
 81 F.Supp.2d 7, 19 (D.D.C. 2000) .......................................................................... 51

*United States v. Irwin*,
 612 F.2d 1182, 1187 (9th Cir. 1980) ....................................................................... 51

*United States v. Levin*,
 973 F.2d 463, 468 (6th Cir. 1992) .............................................................. 28, 29, 30

*\*United States v. Marshank*,
 777 F. Supp. 1507, 1524 (N.D. Cal. 1991) ...................................................... 50, 52

*United States v. Miller*,
 2022 U.S. Dist. LEXIS 45696, *16-*17 (D. D.C., March 7, 2022) .......................... 42

*\*United States v. Nixon*,
 418 U.S. 683, 708-709 (1974) ................................................................ 17, 42, 44

*United States v. Nobles*,
 422 U.S. 225, 232 (1975) ......................................................................................... 42

*United States v. Lawson*,
 502 F. Supp. 158, 172 (D. Md. 1980) ..................................................................... 53

*United States v. Licavoli*,
 294 F.2d 207 (D.C. Cir. 1961) ................................................................................. 40

*United States v. Pennsylvania Industrial Chemical Corp,
  411 U.S. 655, 673-675 (1973)................................................................................. 29, 32, 34

United States v. Pitt,
  193 F.3d 751, 756-758 (3d Cir. 1999).................................................................... 35

United States v. Reyes-Vasquez,
  905 F.2d 1497, 1500 n.5 (11th Cir. 1990).............................................................. 35

United States v. Salerno,
  481 U.S. 739, 745 (1987)......................................................................................... 39

United States v. Schell,
  775 F.2d 559 (4th Cir. 1985).............................................................................. 51, 52

United States v. Smith,
  286 U.S. 6 (1932) ...................................................................................................... 2

United States v. Stevens,
  569 U.S. 460, 473 (2010) ......................................................................................... 45

*United States v. Tallmadge,
  829 F.2d 767, 775 (9th Cir. 1987)...................................................................... 30, 31

United States v. Tobias,
  662 F.2d 381, 387 (5th Cir. 1981)........................................................................... 51

United States v. Viola,
  2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) ........... 38

United States v. Viola,
  2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) ........... 38

Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc,
  455 U.S. 489, 498-99 (1982).................................................................................... 45

Wash. State Grange v. Wash. State Republican Party,
  552 U.S. 442, 449-451 (2008).................................................................................. 39

*Watkins v. United States,*
  354 U.S. 178, 200 (1957) ......................................................................... 13

*\*Yellin v. United States,*
  374 U.S. 109, 114 (1963) ....................................................................... 2,3

## **RULES**

Fed. R. Crim. P. 12(b)(3)(A) ............................................................ 2, 4, 5, 48
Fed. R. Crim. P. 12(b)(3)(B) ..................................................................... 2
Fed. R. Civ. P. 26(b)(5)(A)(ii) ................................................................ 14

## **STATUTES**

2 U.S.C. § 192 .......................................................... 3, 16, 26, 30, 38, 39, 42, 43, 45, 52
2 U.S.C. § 193 ...................................................................................... 42, 43
2 U.S.C. § 194 .......................................................................................... 44
*\*Model Penal Code § 2.04(3)(b) (1962) ................................................... 31, 37

\*Denotes authority chiefly relied upon.

viii

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court dismiss the Indictment. In support of this motion, we state as follows:

## I.  Background

On November 12, 2021, Mr. Bannon was charged in a two count Indictment based on his conduct after receiving a subpoena dated September 23, 2021, issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").[1] [Doc. 1] Mr. Bannon now seeks dismissal of both counts based on defects in instituting the prosecution, Fed. R. Crim. P. 12(b)(3)(A), and defects in the Indictment, Fed. R. Crim. P. 12(b)(3)(B). A court considering a motion to dismiss an indictment assumes the truth of the indictment's factual allegations. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16 (1952).

## II.  The Subpoena Was Not Lawfully Issued

The indictment must be dismissed because the subpoena commanding Mr. Bannon to appear and produce documents was not lawfully issued. Mr. Bannon cannot be prosecuted for failing to comply with an unlawful subpoena. The Constitution vests the legislative power in Congress. U.S. Const. Art. I. Article I provides that "[e]ach House may determine the rules of its proceedings." U.S. Const. Art. I § 5. The current House of Representatives is the 117th Congress – which upon convening established the Rules that govern its actions. The "rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109, 114 (1963).[2] The

---

[1] Count One alleged that Mr. Bannon "refused to appear to give testimony" while Count Two alleged that he "refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way . . .." [Doc. 1 at ¶¶ 23, 25].

[2] *Citing Christoffel v. United States*, 338 U.S. 84 (1949); *United States v. Smith,* 286 U.S. 6 (1932); and *United States v. Ballin*, 144 U.S. 1 (1892).

2

rules provide an essential safeguard because they operate as a check and control on the actions of the majority.[3] When a committee violates the rules by exceeding its authorized power in a way that threatens the liberty interest of an individual, the judiciary must protect that individual. *See Yellin v. United States*, 374 U.S. 109, 117-119 (1963) (reversing 2 U.S.C. § 192 conviction where congressional subcommittee violated its rules by (a) failing to consider injury to the witness' reputation and (b) failing to address his request for an executive session).

The House Rules that apply to this case were established on January 4, 2021, when the House approved H. Res. 8 (adopting Rules for the 117th Congress).[4] [Ex. A]. The House Rules establish certain committees – to which the full House has delegated much of its power to act – as well as rules that govern the procedures of those committees. A committee may only act within the authority that has been delegated to it by the full House. This delegation of authority to a committee is set forth in the resolution establishing the committee. If a committee acts beyond its delegated authority, that action is *ultra vires* and invalid.

As reflected in ¶ 1 of the Indictment, the Select Committee was established by the passage of H. Res. 503 on June 30, 2021. [Ex. B]. The authority of the Select Committee is set forth in that authorizing resolution, together with the House Rules. In other words, in determining whether an action by the Select Committee is authorized, one looks to its authorizing resolution (the grant of authority by the House), and to the House Rules that govern the operations of all committees. Any action by the Select Committee that is inconsistent with the procedures authorized by the full

---

[3] *See Jefferson's Manual of Parliamentary Practice*, § 1 – Importance of Adhering To Rules ("It is much more material that there should be a rule to go by than what that rule is; that there may be a uniformity of proceeding in business not subject to the caprice of the Speaker or captiousness of the members") (available at https://www.govinfo.gov/content/pkg/HMAN-117/pdf/HMAN-117.pdf).

[4] H. Res. 8 adopted and modified certain House Rules from the 116th Congress.

House is *ultra vires* and invalid. *See, e.g., Kilbourn v. Thompson*, Kilbourn v. Thompson, (congressional compulsory process may not exceed the limit of its own authority). In addition, the Select Committee, like any committee, may only act within the bounds set forth by the Constitution. Select Committee actions that infringe upon an individual's constitutional rights, or that implicate separation-of-powers issues, are invalid.

## A. **The Composition Of The Select Committee Invalidates The Subpoena.**

The Select Committee that issued the subpoena to Mr. Bannon was not composed consistent with the authority granted to the Select Committee by the full House. Because its membership was not authorized, the subpoena to Mr. Bannon was not valid, and the Indictment must be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A). The resolution authorizing the Select Committee provided, in pertinent part, as follows:

### Sec. 2. COMPOSITION.

(a) Appointment of Members. – The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

[Ex. B at 3] (H. Res. 503, 117th Cong. (2021) at § 2) (emphasis added). The word "shall" provides no discretion to the Speaker. Nonetheless, the Speaker did not follow this mandatory language. In an unprecedented step,[5] the Speaker rejected the nominees suggested by the Minority Leader[6] and

---

[5] *See* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021) ("Speaker Nancy Pelosi has taken the unprecedented step of denying the minority party's picks for the Select Committee on January 6. This represents an egregious abuse of power and will irreparably damage this institution.") available at https://www.republicanleader.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/; Press Release by Speaker Nancy Pelosi (D-CA), *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol* (Jul. 21, 2021) (acknowledging that the rejection of the Minority Leader's nominees was an "unprecedented decision."), available at https://www.speaker.gov/newsroom/7212-2.

[6] The Minority Leader recommended Reps. Jim Banks (R-IN), Rodney Davis (R-IL), Jim Jordan (R-OH), Kelly Armstrong (R-ND), and Troy Nehls (R-TX).

4

**-1640-**

instead appointed 9 members to the Select Committee of her own choosing.[7]

In a political body such as the House, procedural safeguards have been established to protect the rights of deposition witnesses and the rights of the minority party. These procedures are especially important where, as here, a select committee was created to inquire into events that took place following a disputed Presidential election. Nonetheless, the Speaker decided to appoint members of the Select Committee in a manner that violated the authorizing resolution. The result was that the Select Committee's membership was composed – according to the Minority Leader – to advance the Speaker's political objectives, without regard for the rights of the minority.[8] To act under a lawful grant of authority, however, the Select Committee "must conform strictly to [its authorizing] resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Because the Select Committee was not composed as authorized, the subpoena to Mr. Bannon is invalid, and the indictment must be dismissed. *See Christoffel v. United States*, 338 U.S. 84, 90 (1949) (reversing perjury conviction before House committee because rule requiring quorum ignored – the Supreme Court held that "[a] tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction.").

## B. The Select Committee Exceeded Its Subpoena Authority – By Violating Rules Which Mandate Ranking Minority Member Consultation And Providing Protective Rules To The Deponent.

---

[7] The Speaker appointed Reps. Bennie Thompson (D-MS), Zoe Lofgren (D-CA), Adam Schiff (D-CA), Pete Aguilar (D-CA), Stephanie Murphy (D-FL), Jamie Raskin (D-MD), Elaine Luria (D-VA), Liz Cheney (R-WY), and Adam Kinzinger (R-IL). 167 CONG. REC. H3597 (daily ed. July 1, 2021).

[8] *See* Chelsey Cox, *Who has been subpoenaed so far by the Jan. 6 committee?*, USA TODAY (Nov. 10, 2021, 8:22 P.M.), https://www.usatoday.com/story/news/politics/2021/11/10/jan-6-committee-whos-been-subpoenaed/6378975001/ (last updated Mar. 3, 2022, 4:52 P.M.) (Minority Leader stated that "Speaker Pelosi's rejection of the Republican nominees to serve on the committee and self-appointment of members who share her pre-conceived narrative will not yield a serious investigation. The Speaker has structured this select committee to satisfy her political objectives.").

On its face, the Indictment fails to allege that the subpoena was issued to Mr. Bannon in compliance with the subpoena authority granted to the Select Committee – which requires consultation with the ranking minority member. The Select Committee has no ranking minority member. Because the Select Committee violated the grant of subpoena authority provided by the full House, the Indictment must be dismissed under Fed. R. Crim. P. 12(b)(3)(A).

## 1. Limits On Subpoena And Deposition Authority

In exercising its legislative power, the House of Representatives has delegated certain powers to committees. For instance, House committees have the power to secure information via subpoena. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (citing *McGrain v. Daugherty,* 273 U.S. 135, 161 (1927)). However, that grant of authority is limited. The rules protect the rights of deponents, as well as the rights of the minority.

There are three sources of authority for the rules that govern the Select Committee's exercise of subpoena and deposition power: (a) the resolution that created the Select Committee (H. Res. 503); (b) the Rules of the House for the 117th Congress; and (c) and the regulations for the use of deposition authority in the 117th Congress.

H. Res. 503 provides, in pertinent part, as follows:

**SEC. 5. PROCEDURE.**

* * *

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES
OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee except as follows:

＊ ＊ ＊(6)(A) The chair of the Select Committee, *upon consultation with the ranking minority member,* may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

6

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

[Ex. B at 9-11] (H. Res. 503, 117th Cong. (2021) at § 5) (emphasis added).Thus, the authorizing resolution only allows depositions, pursuant to subpoena, after consultation with the Select Committee's ranking minority member. The authorizing resolution also incorporates both the House Rules and the separate regulations on use of deposition authority, which both require consultation with the ranking minority member before seeking depositions pursuant to subpoena.

H. Res. 8 (adopting rules for the 117th Congress) provides, in pertinent part, as follows:

### SEC. 3. SEPARATE ORDERS.

\* \* \*

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, *upon consultation with the ranking minority member* of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

[Ex. A at 16] (H. Res. 8, 117th Cong. (2021) at § 3(b)) (emphasis added). The deposition regulations referenced in both H. Res. 503 and H. Res. 8 also require ranking minority member consultation. They read, in pertinent part, as follows:

### REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

\* \* \*

2. Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken.

\* \* \*

> 3. . . . Observers or counsel for other persons, including counsel for government agencies, may not attend.
>
> \* \* \*
>
> 5. . . . When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the *ranking minority member* per round.
>
> 6. Deposition questions shall be propounded in rounds . . . equal time to the majority and minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the *ranking minority member* shall ask questions second.
>
> \* \* \*
>
> 10. The chair and *ranking minority member* shall consult regarding the release of transcripts . . ..
>
> 11. A witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress, and these regulations.

[Ex. C] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

As demonstrated in the mandatory rules quoted above, the applicable rules and regulations limit the use of subpoena and deposition authority in ways designed to protect witnesses, and the rights of the minority. Among other things, the rules require consultation with the ranking minority member before issuance of a subpoena for deposition testimony, participation by counsel designated by the ranking minority member in questioning a deponent, and consultation with the ranking minority member before release of a deposition transcript.

The safeguards mandating consultation with the ranking minority member are so important that if a witness is not provided with a copy of the rules, then they need not testify. Paragraph 11 of the Regulations For Use Of Deposition Authority clearly states that "a witness shall not be required to testify unless the witness has been provided with" a copy of Section 3(b) (describing deposition authority) and the regulations for use of deposition (which include the witness protections involving the ranking minority member). The Indictment on its face does not allege

that the Select Committee followed the mandatory rule and provided him with a copy of Rule 3(b). Nor could the Indictment so allege, because it is undisputed that Mr. Bannon was *not* provided with a copy of Section 3(b).

In serving the subpoena on Mr. Bannon via his counsel Mr. Costello, Select Committee Chief Counsel and Deputy Staff Director Kristin Amerling provided 10 pages of detailed and arcane instructions, including the subpoena. She did not, however, provide the specific document required by the House Rules before a witness was required to testify. *See* Ex. D (November 10, 2021, FBI Report of Interview of Kristin Amerling) ("A copy of Section 3(b) was not provided to COSTELLO with the subpoena."). That unequivocal statement was made on November 2, 2021, in the presence of all three prosecutors in this case – just 10 days before the Indictment in this case was filed. Because Mr. Bannon was not provided with a copy of Section 3(b), the House Rules authorizing depositions makes explicit that he "shall not be required to testify." Given that, and the failure of the Indictment to explain the lack of lawful authority for the subpoena under those circumstances, the Indictment must be dismissed.[9]

## 2. **The Select Committee Has No Ranking Minority Member**

The Indictment does not allege that the subpoena to Mr. Bannon was issued after consultation with the Select Committee's ranking minority member, as required by the committee's authorizing resolution. Nor could it. There is no ranking minority member on the Select Committee. Doug Letter, the General Counsel for the U.S. House of Representatives,

---

[9] The House Rules further state that "[c]ompliance with a subpoena issued by a committee or subcommittee under subparagraph (1)(B) may be enforced only as authorized or directed by the House." [Ex. E at 20] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2(m)(1)(3)(C)). Compliance with the subpoena issued to Mr. Bannon could only be enforced under the authority of the House after providing him with Rule 3(b), which was not done.

acknowledged this in an FBI interview, in the presence of all three prosecutors in this case, as follows:

> Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess [sic] procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

*See* Ex. D at 4 (Nov. 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter). Accordingly, the subpoena issued to Mr. Bannon was invalid. It was not in accord with the subpoena and deposition authority granted by the House to the Select Committee.

The Speaker designated Rep. Bennie Thompson (D-MS) chair of the Select Committee. The chair designated Rep. Liz Cheney (R- WY) as vice chair.[10] H. Res. 502 does not reference a vice chair. The authorizing resolution does not grant any power to a vice chair. The resolution uses the term "ranking minority member" a term with a long history. A vice chair is not a ranking minority member – and cannot fulfill the authorized duties of a ranking minority member that are set forth in the resolution creating the Select Committee and the subpoena and deposition rules that apply to the Select Committee.[11]

---

[10] *See* January 6 Select Committee, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021), available at https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-Cheney-select-committee-vice-chair.

[11] The House Rules reveal that vice chairs and ranking minority members are different. For instance, Rule XI, which sets forth committee procedures, provides that committees can continue their work in the temporary absence of a committee chair as follows: "If the chair and vice chair of a committee or subcommittee are not present at any meeting of the committee or subcommittee, the ranking majority member who is present shall preside at that meeting." [Ex. E at 17-18] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2 (d)).

A committee's ranking minority member is designated by the minority party.[12] Ranking minority members have significant roles that protect the rights of deposition witnesses and the rights of the minority in the legislative process.[13] By long-standing practice, it is the role of each party to, in accordance with its own procedures, determine how committee chairs and ranking members are designated. This role cannot be usurped by the other party.

Republicans are in the minority in the 117th Congress. Accordingly, Republican Conference rules set forth the procedures for the recommendation of select committee members, and the designation of ranking minority members.[14] Under these rules, the Republican Leader recommends Republican members for select committees and designates the Ranking Republican Member of select committees. [Ex. F at Rule 13 & 14].

Thus, the Speaker's "unprecedented" decision to appoint 9 members to the Select Committee (in contravention of the mandatory language of the authorizing resolution), and to reject the Republican Leader's nominees, including his nominee as ranking minority member, had unforeseen consequences. The Select Committee has no ranking minority member. It follows that the grant of subpoena power from the House to the Select Committee – which was contingent upon

---

[12] *See generally* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021)     4

[13] *See A Guide To The Rules, Precedents, and Procedures of the House* (2017) at 806 ("Under long-standing practice, special orders of business give control of general debate in the House or in the Committee of the Whole to the chair and ranking minority member of the reporting committee(s), and recognition is extended accordingly."), available at https://www.govinfo.gov/content/pkg/GPO-HPRACTICE-115/pdf/GPO-HPRACTICE-115.pdf.

[14] Understanding these rules requires some transposition. While Republicans are in the minority, reference in the rules to "Speaker" becomes "Republican Leader," "Chair" becomes "Ranking Republican Member," and the authority vested under the rules to the "Speaker" and "Chair" are vested in the "Republican Leader" or "Ranking Republican Member." *See* [Ex. F] (House Republican Conference Rule 2(d)).

11

consultation between the chair and the ranking minority member before issuance of a deposition subpoena – cannot be lawfully exercised.[15]

## C. The Subpoena Was A Misguided And Unconstitutional Effort To Make An Example Of Mr. Bannon.

H. Res. 503 describes three functions of the Select Committee, namely: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for correct measures described in the subsection (c) as it may deem necessary." The subpoena issued to Mr. Bannon, however, did not advance any of those authorized functions. Instead, the subpoena was an unconstitutional attempt to usurp the executive branch's authority to enforce the law, and an effort to impede Mr. Bannon's first amendment rights to association and free speech. As made clear in the Indictment, the Select Committee targeted Mr. Bannon because on January 5, 2021, he was present at the Willard Hotel with others, and because he made statements on his podcast about what might occur on January 6, 2021. [Doc. 1 at ¶ 7]. Select Committee members have articulated that Mr. Bannon was targeted to send a message to other potential deponents. The Select Committee is not authorized to issue a subpoena for that purpose.

Congress' subpoena power is ancillary to its legislative authority. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031(2020). Accordingly, a congressional committee may only issue

---

[15] The procedural safeguard involving consultation with the ranking minority member before seeking a deposition is the rule, not an exception made just for the Select Committee. *See* [Ex. A] (H. Res. 8 §3(b) 117th Cong. (2021)) ("During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.").

a subpoena that serves a valid legislative purpose. Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional – such as an impermissible infringement on the authority of the executive branch. *See McGrain v. Daugherty*, 273 U.S. 135, 171 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 195 (1880); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

Courts considering whether a subpoena serves a valid legislative purpose consider whether a particular subpoena serves a valid purpose, not whether the committee has a valid legislative purpose. *See Mazars*, 140 S. Ct. at 2031. A committee subpoena issued in order to create a record of alleged violations of law, or to harass witnesses or send a message, is not valid. A congressional subpoena issued to investigate and punish perceived criminal wrongdoing unconstitutionally intrudes on the powers of the Executive Branch. Similarly, a desire to "expose for the sake of exposure" in not a valid purpose of a congressional subpoena. *See Watkins v. United States*, 354 U.S. 178, 200 (1957).The Indictment fails to allege how the subpoena issued to Mr. Bannon could validly inform legislation.[16] Rather, the statements of Select Committee members reveal that the subpoena issued to Mr. Bannon had an invalid purpose.[17] Because the subpoena was not issued in furtherance of a valid legislative purpose, the Indictment must be dismissed.

---

[16] While the D.C. Circuit has noted that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Trump v. Thompson,* 20 F.4th 10, 41 (D.C. Cir. 2021) (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031-32 (2020)), *injunction denied*, 142 S. Ct. 680 (Jan. 19, 2022), *cert. denied*, No. 21-932 (Feb. 22, 2022), we raise a different argument – that the subpoena *issued to Mr. Bannon* served no valid legislative purpose.

[17] Rep. Elain Luria – "[I]f we determine that criminal actions were taken … that will be forwarded from the committee and the appropriate manner [sic] to the Department of Justice …. [T]hat's exactly why we're conducting the investigation to find out all the facts, … and … hold people accountable who are responsible." Rep. Jamie Raskin – Select Committee seeks to "expose each and every level of it … the closer you get to Donald Trump … a religious and political cult of personality … outside of our Constitutional order.", CNN POLITICS, Expose Each and Every Level: Lawmaker Makes Promise for Jan. 6 Hearings, (Jan. 16, 2022), https://www.cnn.com/videos/politics/2022/01/16/rep-jamie-raskin-january-6th-

## D. Count II Must Be Dismissed Because The Select Committee Has No Authority To Compel Production Of A Privilege Log Or Certification.

Count II must be dismissed because there is no House Rule that authorizes a committee to require a deponent to create a privilege log of documents withheld on the basis of privilege, or a "written certification that a diligent search has been completed." [Doc. 1 at ¶ 12]. Even if such a rule existed, its application to a former presidential advisor asserting executive privilege on behalf of the President he served would raise serious separation of powers issues.

The Select Committee's purported commands to Mr. Bannon were more onerous and posed a higher risk of disclosure of privileged material than the obligations imposed on civil litigants under Fed. R. Civ. P. 26(b)(5)(A)(ii), which requires that a party asserting privilege to "describe the nature of documents, communications, or tangible things not produced or disclose – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." By contrast, the Committee's instructions demanded specific details about the withheld materials that may in themselves be privileged. For example, requiring the privilege log to specify the name of the "author, addressee, and any other recipient(s)" as the "relationship of the author and addressee to each other" reveals significant information regarding confidential matters being contemplated by the President. Allowing the Select Committee to

---

hearings-dotb-acostanr-vpx.cnn). Rep. Bennie Thompson – "Witnesses who assert 5th Amendment rights before Select Committee should be considered "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty"*, REALCLEAR POLITICS(Dec. 2, 2021), https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_i f_you_plead_the_fifth_youre_part_and_parcel_guilty.html. Rep. Bennie Thompson – "[W]e'll let the evidence based on what we look at determine guilt or innocence." Rep. Bernie Thompson (D-MS), Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, available at https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

undermine the assertion of executive privilege in this manner would effectively eliminate all checks on Congress's ability to interfere with the prerogatives of the Executive Branch.

Controlling Supreme Court precedent directs that "[s]pecial considerations control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 370 (2004). Thus, presidential communications are presumptively privileged, and this presumption can be overcome "only by an appropriate showing of public need by the party seeking access to the conversations." *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (applying the standard from *Nixon v. Sirica*, 487 F.2d 700 (1973)). As explained by the Court of Appeals in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, the showing required to overcome the presumption favoring confidentiality turns "solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions." *Id.* at 731. The purpose of this required showing is to ensure that Congress cannot intrude upon the prerogatives and autonomy of the Executive unless doing so is "critical to performance of its legislative functions." *Id.* at 732. The Select Committee cannot circumvent this invaluable constitutional safeguard by demanding that Mr. Bannon produce an exhaustive privilege log detailing materials withheld pursuant to President Trump's invocation of executive privilege. *See generally*, *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

### III.    **This Prosecution Violates Due Process**

The prosecution in this case under 2 U.S.C. § 192 violates Mr. Bannon's right to due process of law, guaranteed under the Fifth Amendment to the United States Constitution. As Mr. Bannon already has made clear in previous submissions in this case [*e.g.*, Doc. 30 at 16-21; Doc. 41; Doc. 44], his response to the subpoena on which this prosecution is based was at all times a function of the former President's invocation of executive privilege and was based on, pursuant to, and in reasonable, good-faith reliance upon the official published policy of the United States Department of Justice, through binding, authoritative legal opinions of that Department's Office of Legal Counsel ("OLC") and was fully consistent with the same. The Department of Justice, of course, is the same agency that is prosecuting this case. The OLC opinions were brought to Mr. Bannon's attention by his attorney, Robert J. Costello, Esquire, who advised Mr. Bannon that the OLC opinions were binding authority on the Department of Justice and that they were controlling authority in the circumstances he faced.  Mr. Costello provided Mr. Bannon with legal advice, based on the OLC opinions and Mr. Bannon acted at all relevant times in the manner Mr. Costello directed him, based on the OLC opinions and Mr. Bannon at all relevant times reasonably relied on the OLC opinions.

The OLC opinions provided Mr. Bannon with the actual, implied, and apparent public authority to proceed as he did with respect to the subpoena on which this prosecution is based, and his reasonable, good-faith reliance on the invocation of executive privilege and the OLC opinions at all times with respect to his actions vis a vis the subpoena further gives rise to the complete, due process-based defense of entrapment by estoppel, prohibiting the Department of Justice from prosecuting Mr. Bannon in this case. All previous submissions by Mr. Bannon are incorporated

herein.  Mr. Bannon assumes the Court's familiarity with the relevant facts for these purposes. [*See also e.g.*, Docs. 30, 30-1, 39].

## A. **Mr. Bannon Relied On Official, Binding, Authoritative DOJ Policy.**

At all relevant times, Mr. Bannon proceeded with respect to the subpoena at issue in reliance upon and in conformity with former President Trump's invocation of executive privilege and the official, legally binding, authoritative policy of the Department of Justice, as reflected in its Office of Legal Counsel ("OLC") Opinions and related materials.

First, when former President Trump, through his attorney, Mr. Clark, advised Mr. Bannon, through Mr. Costello, that he was invoking executive privilege with respect to the subject matter of the subpoena, Mr. Bannon was duty bound under the OLC opinions (and relevant case law) to presume that the former President was within his authority to invoke executive privilege[18] and to presume that the matters so designated by former President Trump were, indeed, privileged. [19]

Second, Mr. Bannon was entitled to rely on binding DOJ policy, as reflected in the OLC opinions, for his conclusion that executive privilege can be and was properly invoked with respect to former employees, no longer working in the Executive Branch, and even to people from outside the Executive Branch whose privileged counsel the President might seek.[20]  The governing legal

---

[18] Mr. Bannon certainly was entitled to rely on the principle that a former President retains the right to invoke executive privilege as to communications that occurred during the time he was President. *Nixon v. Adm'r of General Services*, 433 U.S. 425, 448-449 (1977); *Trump v. Thompson*, 142 S. Ct. 680; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring).

[19] [Ex. G] *Congressional Oversight of The White House*, 45 Op. O.L.C. slip op., at *34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main. *See also, Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-709 (1974).

[20] Consider the following official DOJ policy statement:
". . . communications between White House officials and individual outside the Executive Branch, including with individuals in the Legislative Branch . . . fall within the scope of executive privilege . . .

principles apply even after a Presidential advisor leaves the White House.[21]

Third, Mr. Bannon relied further on binding, authoritative DOJ OLC opinions that expressly provided that the Select Committee subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege. As Mr. Costello explained to Mr. Bannon when he went over the OLC opinions with Mr. Bannon, OLC opinions hold that under these unique circumstances, non-compliance with a congressional subpoena is lawful.[22] [Doc. 30-1 at §§ 14, 22]. Mr. Bannon relied on this OLC opinion in reasonably believing that the subpoena was not valid and that compliance was not, therefore, either appropriate or required as a matter of fact and law.

Fourth, Mr. Bannon also relied on long-standing, definitive OLC opinions that not only advised him not to comply once executive privilege was invoked and that the matter was out of

---

Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."

*Letter from Paul D. Clement, Solic. Gen./Acting Att'y Gen., to President George W. Bush* (June 27, 2007), https://www.hsdl.org/?view&did=741974; *See also, Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys* at 5 (June 27, 2007) [Ex. H] (recognizing right to invoke Executive Privilege over communications with former employees and outside consultants never formally employed by the Executive Branch. Available at: https://www.justice.gov/file/451161/download#:~:text=Executive%20privilege%20may%20properly%20be%20asserted%20over%20the,that%20have%20been%20subpoenaed%20by%20congressional%20commit-%20tees.

[21] *See* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. __, at *2 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main; *See* [Ex. G] *also Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *15-16 (Jan. 8, 2021) , *available at* https://www.justice.gov/olc/opinions-main (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure").

[22] *See* [Ex. G] *Congressional Oversight of The White House, supra*, at *56 ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

his hands, but he relied as well on express, definitive DOJ OLC opinions and the long-standing policy of the Department of Justice, that, under any circumstances (and certainly the circumstances present here) non-compliance with the subpoena would be lawful and could not subject him to criminal prosecution.[23] [Doc. 41-7 at 22]

Indeed, the Department of Justice has "long maintained . . . that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." [Ex. G] *Congressional Oversight of The White House,* at 50. As recently as 2021, an official binding OLC opinion declared as follows:

> The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity – that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel,* 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).

> As Assistant Attorney General Rehnquist explained:
> The President and his immediate advisers – that is, those who customarily meet with the President on a regular or frequent basis – should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb.

---

[23] *See* [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 129 (1984) ("We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it.); [Ex. G] *Congressional Oversight of the White House,* 2021 WL 222744 (O.L.C.) at *33. *See also* [Ex. P] Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House John A. Bohner, (March 31, 2015) at 6 ("It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege.").

19

**-1655-**

5, 1971); *see also* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. slip op. at \*7-11 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main (listing historical examples of immediate presidential advisors refusing to testify); *Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel*, at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisors "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").[24]

---

[24] Even if the conclusion of the OLC opinions as to the absolute immunity of an executive branch employee has been undermined in this Circuit by, for example, the decision in *Comm. On the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755 (2020) (*en banc*), Mr. Bannon maintains his right to immunity in reliance on the OLC Opinions, in addition to the other arguments advanced here. The 2021 OLC opinion post-dates *McGahn*. Mr. Bannon's reliance need not be correct, nor need the OLC opinion be a correct statement of the law for entrapment by estoppel or apparent authority purposes. *United States v. Barker*, 546 F.2d 940. 952 (D.C. Cir. 1976). The decision in *McGahn* is significant for at least two other reasons. First, it clearly reflects the central role OLC opinions play within the Department of Justice and for Executive Branch employees or former employees who rely on them. Indeed, the Court in *McGahn* expressly cited the OLC opinions on which Mr. Bannon relied for his reasonable and correct conclusion that it is long-standing DOJ policy that no criminal charges under 2 U.S.C. §192 will lie when an executive branch or former executive branch member fails to comply with a congressional subpoena and Executive Privilege is invoked. *McGahn*, 968 F.3d at 773 ("Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor."). *See, e.g.*, [Ex. N] *Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at \*14 (O.L.C. May 20, 2019); [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) Cooper Opinion, 10 Op. O.L.C. at 83; Olson Opinion, 8 Op. O.L.C. at 142").

Secondly, the *McGahn* Court makes clear that it is the role of the judiciary – not Congress itself - to act as the arbiter, in the context of a civil matter, over a dispute between Congress and the Executive Branch in just such a matter as this, when there is a tension between Congress's subpoena power and the interests underlying executive privilege. *See McGahn*, 968 F.3d at 766 ("Further, the OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas."). *See* [Ex. O] *Response to Congressional Requests for Information Regarding Decisions Made under the Independent Counsel Act*, 10 Op. O.L.C. 68, 83 (1986) ("Cooper Opinion"); [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. ●.L.C. 101, 137 (1984) ("Olson Opinion")"). Indeed, the McGahn Court expressly noted that the DOJ has opined at least twice in OLC opinions that a civil enforcement action, not a criminal contempt indictment, is the "only practicable" way to proceed when non-compliance with a congressional subpoena by a current or former Executive Branch employee is at issue. *McGahn*, 968 F.3d at 776.

The DOJ's definitive position that the criminal contempt statute does not apply where Executive Privilege has been invoked goes back well over six decades. Mr. Bannon relied on that in his response to the subpoena and he was entitled to rely on that official policy. The DOJ must be estopped from prosecuting this case, in light of its official, published policy on this exact issue.

As the OLC opinion, [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C. at \*2) expressly reports, in 1956, Deputy Attorney General William Rogers presented a report to Congress that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President has asserted executive privilege. [See Doc. 41-6].

In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would not present the matter to a grand jury (notwithstanding the mandatory language in Sec. 194).[25] In Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion,[26] drawing on canons of statutory construction, legislative history, and basic constitutional principles, (including constitutional separation of powers principles), the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege." [Ex. L] *Application of 28 U.S.C. Sec. 458*, 19 Op. O.L.C. at 356 (emphasis added).

---

[25] *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

[26] [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("Prosecution for Contempt of Congress")

Professor Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Id.*[27] These are the binding DOJ policies on which Mr. Bannon reasonably relied.

## B. OLC Opinions Are Binding, Authoritative Statements
## Reflecting The Official Policy Of The Department Of Justice.

Under Article II of the Constitution, the President must "take Care that the Laws be faithfully executed." *U.S. Const. art. II, § 3.* The President exercises the power of legal interpretation to carry out this textually specified duty. "In doing so, he must first construe the law in order to enforce it."[28] It is, of course, the Attorney General who aids the President in fulfilling this function. (*See* Note 11, *infra*.).

Under the Judiciary Act of 1789, Congress created the office of Attorney General which was charged with the obligation to "give ... advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments." *Judiciary Act of 1789,* Ch. 20 § 35: *see,* 28 U.S.C. §§ 511-513.

Until the mid-20th Century, the opinions under the Judiciary Act were prepared primarily by the Solicitor General or Assistant Solicitor General.[29] Starting in 1950, the OLC took on the task of writing opinions under the Judiciary Act.[30] The OLC was assigned the role of "preparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the

---

[27] *See also,* [Ex. ⬛] *Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives* (Feb. 28, 2008); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act,* 10 Op. O.L.C. 68 (1986) (by Assistant Attorney General Charles Cooper).

[28] *See* [Ex. DD] Note, *The Immunity-Conferring Power of the Office of Legal Counsel,* 121 Harv. L. Rev. 2086, 2087 (June 2008).

[29] *See,* [Ex. CC] Griffin B. Bell, *The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?* 46 Fordham L. Rev. 1049, 1064 (1978).
[30] *Id.*

various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal advisor to the President." 28 C.F.R. § 0.25(a) (2007). Today the OLC opinions form "the largest body of official interpretation of the Constitution and Statutes outside the volumes of the Federal Court Reporters."[31] As Judge Randolph D. Moss has written, OLC Opinions "define ... the meaning of the law for an entire branch of government and that branch of government has an obligation to get the law right." [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev 1303, 1321, (2000). OLC advice has been treated "as conclusive and binding since [the Nineteenth Century]." *Id.* at 1320.

As the Court wrote in *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 483 (D.C. Cir. 2019) (CREW II), *quoting from*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (CREW I), [T]he authority of the Office of Legal Counsel (OLC) is "nearly as old as the Republic itself." "Since the Judiciary Act of 1789, the United States Attorney General has had the authority "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching on matters that may concern their departments." *Id. quoting from,* Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511-513). Since then, the Attorney General has "delegated much of his authority to the OLC." *CREW II*, at 483. "Over the years, the OLC has opined on 'some of the weightiest matters in our public life ....'" *CREW II*, at 483, *quoting from CREW I*, 846 F.3d at 1238. OLC opinions "reflect the legal position of the executive branch" and "provide binding interpretive

---

[31] *See*, [Ex. BB] John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 Cardozo L. Rev 375, 376 (1993).

guidance for executive agencies." *Casa de Maryland v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718 n.1 (4th Cir. 2019).

The OLC "considers its written formal opinions to be 'one particularly important form of controlling legal advice.'" *CREW II*, 922 F.3d at 484, *quoting from* [Ex. U] Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel, [Ex. U] *Best Practices of OLC Legal Advice and Written Opinions 1-2* (July 16, 2010) at 1. The OLC's informal legal advice, often taking the form of letters or memoranda, along with the formal written opinions have been described by a former head of the OLC, Karl Thompson, as "authoritative" and "binding by custom and practice in the executive branch." Indeed, specifically referring to both the formal written OLC opinions and the informal OLC advice, given orally or in emails, OLC Head Thompson said, both are "authoritative," and "binding" in the executive branch. He said that both reflect the "official view of the office" and that [P]eople are supposed to and do follow it." *See CREW II*, 922 F.3d at 484, *citing*, Josh Gerstein, *Official:  FOIA Worries Dampen Requests for Formal Legal Opinions*, at 2, POLITICO, Under the Radar, November 5, 2015).[32] The OLC opinions at issue in this case, reflect the OLC's legally binding, authoritative position on matters directly related to its own agency, the Department of Justice, and they reflect consistent policy directives extending back over six decades, having long ago been adopted by the DOJ. They are, in short, the DOJ's "working law," with the full "force and effect of law." *See e.g., NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 153 (1975), *quoting* H.R. Rep. No. 1497.

One leading legal commentator has written, "[F]or decades, the Office of Legal Counsel (OLC) has been the most significant centralized source of legal advice within the Executive

---

[32]    https://www.politico.com/blogs/under-the-radar/2015/11/official-foia-worries-dampen-requests-for-formal-legal-opinions-215567

Branch." [Ex. S] Trevor W. Morrison, *Stare Decisis in the Office of Legal* Counsel, 110 Colum. L. Rev. 1448, 1451 (2010). *See CREW I*, 846 F.3d at 1238.

The OLC itself has gone to great lengths to ensure the reliability and correctness of its process and the substance of its opinions. Professor Morrison, an OLC veteran, cites three significant memoranda that reflect the emphasis on the integrity, mission, and goals of the OLC opinion-generating process. *Id.* at 1452-1455.

These are (1) "Principles to Guide the Office of Legal Counsel" ("OLC Guidelines), a 2004 memorandum written principally by Professor Walter Dellinger and eighteen other members of the OLC (including Judge Moss of this Court) who served during the Clinton Administration, and some of whom worked in other administrations as well. These Guidelines provide, *inter alia*, that "OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President" and they issue the directive that "OLC should provide an accurate and honest appraisal of applicable law, even if the advice will constrain the administration's pursuit of desired policies." *See* [Ex. T] Walter Dellinger, *et al.*, Principles to Guide the Office of Legal Counsel (2004); (2) An official OLC memorandum from May 2005 entitled "Best Practices for OLC Opinions" written by Principal Deputy Assistant Attorney General Steven G. Bradbury on May 16, 2005 ("OLC Best Practices Memorandum"). This memorandum provides, *inter alia*, that "Subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch." *Id.* at 1. It further provides that "OLC's interest is simply to provide the correct answer on the law ...." *Id.* at 3. Mr. Bradbury describes a detailed, careful process to make sure the OLC gets the law right, and especially on separation of powers issues, among all questions; *Id.*[33] and

---

[33] Mr. Bradbury is the author of one of the OLC Opinions on which Mr. Bannon relied. *See Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress* (February 29, 2008).

(3) the July 16, 2010 David J. Barron Memorandum, referred to above, that updates the Bradbury "Best Practices Memorandum.[34]" This Memorandum reiterates that "OLC's core function … is to provide controlling advice to Executive Branch officials on questions of law…." Then Acting Assistant Attorney General Barron emphasizes the importance of the OLC's work and the central goal of getting the law right in every OLC Opinion, in a manner that is faithful to the substance and values reflected in the Constitution. *Id. See also,* [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective From the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1318-20 (noting that for over two hundred years "agencies have in practice treated (OLC) opinions as binding."). Professor Morrison persuasively argues that it is precisely because OLC Opinions always have been treated as binding within the executive branch that the principle of *stare decisis* should be applied and he emphasizes that "especially on issues of the constitutional separation of powers," the OLC Opinions play a particularly important role. 110 Colum. L. Rev. 1448 at 1493, 1496.

The legal authority that Mr. Bannon relied upon in this case reflects the formal, official, binding, authoritative position of the Department of Justice, the very agency that is prosecuting this case in direct contravention of its own formal, binding, published official policy. The policies relied upon reflect the legally binding, official, authoritative position adopted by the Department of Justice extending back over six decades and across every administration since at least 1956. It

---

Mr. Bradbury's OLC Opinion provides in no uncertain terms, drawing on OLC official policy papers going back at least to 1956, and across all administrations, the OLC's official, binding, authoritative conclusion, as a matter of binding policy, that former or current White House advisors who decline to provide documents or testimony, or who decline to appear to testify, in response to a subpoena from a congressional committee, based on the President's assertion of executive privilege, absolutely cannot be criminally prosecuted by the Department of Justice under the statute charged here, 2 U.S.C. § 192. https://www.justice.gov/opinion/file/832851/download

[34] https://www.justice.gov/sites/default/files/olc/legacy/2010/08/26/olc-legal-advice-opinions.pdf

was objectively reasonable and absolutely appropriate as a matter of fact and law for Mr. Bannon to rely on the OLC opinions.

### D. This Prosecution Is Barred By The Doctrines Of Entrapment By Estoppel, Actual Public Authority, And Apparent Public Authority.

This case emphatically presents the hallmark case in which the prosecuting authority must be prohibited from prosecuting the Defendant because its own formal, official, binding, published policy statements (OLC Opinions) licensed/directed the Defendant's conduct for which he is being prosecuted and assured the Defendant that if he were to engage in the conduct at issue – non-compliance with the subpoena based on the invocation of Executive Privilege – he absolutely could not lawfully be criminally prosecuted and would not be prosecuted.

This prosecution must be dismissed under the indisputably extraordinary circumstances of this case. There can be no legitimate material dispute that (1) Mr. Bannon is a former close Executive Branch advisor of former U.S. President Trump, that (2) former President Trump invoked Executive Privilege with respect to the subpoena at issue in this case, that (3) Mr. Bannon, through counsel, advised the Committee that his non-compliance was based on the invocation of Executive Privilege and the relevant OLC opinions, that (4) counsel for Mr. Bannon asked the Committee whether the privilege holder's representative would be permitted to attend Mr. Bannon's deposition to which the subpoena was directed and was told that no privilege holder representative could attend, that it was not permitted under the Committee's rules and that (5) Mr. Bannon relied on OLC Opinions that provided, *inter alia*, that (A) the invocation by the former of current President is presumptively valid; that (B) Executive privilege validly can be invoked by a former President and can validly be invoked with respect to communications with a former Executive Branch employee/close advisor or any outside party consulted by the President (or former); and that (C) a person who refuses to comply with a congressional subpoena based on the

27

invocation of Executive Privilege cannot be criminally prosecuted – and specifically not under 2 U.S.C. § 192 and that (D) the refusal to let a privilege holder representative attend the deposition rendered the subpoena unlawful and invalid.

Under the circumstances presented here, it would be fundamentally unfair and a clear due process violation to permit this prosecution to go forward. It must be dismissed. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (granting pre-trial motion to dismiss). Here, as in *Levin*, there can be no factual dispute about what the written, binding, authoritative OLC Opinions provided on the matters directly at issue, nor can there be any factual dispute about Mr. Bannon's reliance on them. Dismissal, therefore, is the appropriate remedy. This is even more emphatically the case here, where Mr. Bannon also received a direct order from the former President requiring that he fully honor the invocation of executive privilege and where the authority relied upon is actually from the very agency now prosecuting the case. This prosecution is in direct contravention of its own binding, published, authoritative positions.

A due process-based prohibition on prosecuting a case under the operative facts presented in this case has long been established by the United States Supreme Court and this Circuit has led the way in acknowledging these principles. *See United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976).

**Preliminary Note:**

As a preliminary note, Government counsel appear to recognize the defenses discussed here, as of course they must,[35] but their apparently evolving view, as they have presented it to the

---

[35] The U.S. Attorneys' Criminal Resource Manual has recognized these defenses that a defendant might assert if he or she is charged with committing a crime that arguably is committed in reliance upon the position taken by a government agency. *See* [Ex. EE] U.S. Attorneys' Manual, Title 9: Criminal Resource Manual § 2055 (archives). https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense.

Court most recently, reflects a fundamental misunderstanding on at least three issues. First, the

Government has represented to the Court that the defenses of public authority and entrapment by

estoppel require and turn on some direct interaction, a sort of question-and-answer session between

a specific government agent and the defendant [Doc. 46 at 2-3]. The Government is absolutely

wrong. *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675

(1973) ("PICCO") (reliance on agency's administrative regulations); *United States v. Barker*, 546

F.2d 940, 951-952 (D.C. Cir. 1976) (reliance on a "legal theory espoused by this and all past

Attorneys General for forty years").[36]

Secondly, Government counsel have represented to the Court that these defenses are "not

legal defenses the Court decides on a motion to dismiss." [Doc. 46 at 2]. Again, the Government

is wrong. Government counsel simply fail to acknowledge the decision in *United States v. Levin*,

973 F.2d 463, 468-470 (6th Cir. 1992), in which the Sixth Circuit expressly approved the district

court's decision to grant a motion to dismiss at the pre-trial stage, based on the fundamental

unfairness of prosecuting a defendant for conduct that the relevant agency's policy, reflected in

opinion letters to others, indicated would be legal conduct. *See also Id.* at 465 (expressly noting

that the defendants "initiated no inquiry of their own concerning the legality of (their conduct)").

---

[36] The Government repeatedly cites the landmark Second Circuit decision in *United States v. Abcassis*, 45 F.3d 39 (2d Cir 1995) in support of its thesis that direct inquiry and representations between the defendant and a government agent are required to support the defenses of public authority and entrapment by estoppel. [E.g., Doc. 43 at 8; Doc. 46 at 2]. *Abcassis* did, indeed, involve direct contact between the defendants, former government informants, and a government agent who they believed gave them license to pursue an illegal heroin importation deal and their convictions and sentences of 30, 12, and 5 years in prison were reversed, based on the district court's agreement to give an actual authority jury instruction, but refusal to give an entrapment by estoppel instruction. However, the fact that that was the scenario in that case or any other, or even if that is the paradigm scenario for public authority and entrapment by estoppel defenses, neither *Abcassis* nor any other decision stands for the proposition that this is the only kind of scenario that supports these defenses. Indeed, in *Abcassis*, 45 F.3d at 43, the Court expressly referred to the Sixth Circuit's decision in *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) in support of its conclusion, and the defendant in *Levin*, of course, made no inquiry and received no personal assurances; rather he relied on official written agency policy statements. *See Levin*, 973 F.2d at 465.

Also, in several other cases, once the Court found that the government's position was as the defendant understood it, the Court held that a prosecution under those circumstances would be totally unfair and could not be pursued, and the courts reversed the convictions. They did not remand for the defense to be put before a judge or jury at a new trial. *Cox v. Louisiana*, 379 U.S. 559, 575 (1965); *United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987). The defense clearly is not just a trial defense and the instant case presents the strongest case possible for pre-trial dismissal on this issue.

Third, Government counsel has asserted to the Court that OLC and other DOJ "records" that support Mr. Bannon's defense, which he "did not already know about" "could not be relevant to (the public authority and entrapment by estoppel defenses) and thus have no bearing on his ability to make motions related to them." [Doc. 46 at 3]. Once again, the Government is absolutely wrong. The formulation of the elements of an entrapment by estoppel defense in this Circuit and elsewhere includes a requirement that the reliance by the Defendant was "reasonable." *See, e.g.*, *United States v. Barker*, 546 F.2d at 951-952 (reasonable to rely on forty years of the Attorney General's position); *United States v. Levin*, 973 F.2d at 468 (defendant's reliance must be reasonable); *United States v. Tallmadge*, 829 F.2d 767, 773-775 (same; reversing conviction for defendant, based on entrapment by estoppel, finding it reasonable for defendant to rely on representations by licensed firearms dealer and defendant's attorney).[37]

---

[37] *See also,* The Model Penal Code, which provides in pertinent part as follows:

> "A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when … [the defendant] acts in *reasonable reliance* upon an official statement of the law … contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) *an official interpretation of the public officer of body charged by law with responsibility for the interpretation or enforcement of the law defining the offense."*

The history of the DOJ's OLC opinions writings and position on the subjects at hand is directly relevant to the question of "reasonableness." It is more "reasonable" for the Defendant to have relied on the OLC Opinions he saw and to have believed them to be legally binding, adopted, authoritative positions of the DOJ and the Executive Branch charged with enforcing the statute if the positions taken reflect the same positions taken and adopted over the course of six decades. Those historic "records" he might not have seen are directly relevant. Similarly, say for example, the Defendant read an OLC Opinion that stated that employees of the Executive Branch cannot be prosecuted criminally under 2 U.S.C. § 192 for failing to comply with a subpoena when executive privilege is invoked, and the Defendant believed from the rationale of the OLC Opinion that it included former employees or even outside consultants who have communications with the President. OLC Opinions the Defendant might not have seen that expressly provide that former employees and outside consultants are covered as well are directly relevant to the "reasonableness" of his belief (and reliance on) regarding the ambit of the OLC Opinion he did see. Similarly, of course, as the Court in *Tallmadge* expressly found, the advice by Mr. Bannon's experienced attorney, Mr. Costello, is independently relevant to support the "reasonableness" of Mr. Bannon's belief in what the OLC Opinions provided and the "reasonableness" of his reliance on them. *Tallmadge*, 829 F.2d at 775. The historic "records" of the DOJ on the matters relevant to the issues before the Court are also independently relevant to demonstrate the adoption by the DOJ of the positions reflected in the OLC Opinions and other writings and as further evidence of actual and apparent authority. Each of the OLC Opinions also should be deemed party admissions.

## 1. **Entrapment by Estoppel**

---

Model Penal Code § 2.04(3)(b) (1962) (emphasis added).

The doctrine of entrapment by estoppel was first recognized and explained in two decisions from the United States Supreme Court handed down many years ago: *Raley v. State of Ohio*, 360 U.S. 423 (1959) and *Cox v. Louisiana*, 379 U.S. 559 (1965).

In *Raley*, 360 U.S. 423, 438 (1959), the Court held that the government may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* The case involved an accused charged with failing to answer questions put to him by the Un-American Activities Commission of the State of Ohio. *Id.* at 424. The accused had invoked the privilege against self-incrimination on advice that the privilege applied. *Id.* at 425. The accused was indicted for refusing to answer the questions, even though certain Commission members stated that it was acceptable to invoke privilege rather than answer the questions posed. *Id.* The Supreme Court reversed, holding that due process does not permit the criminal conviction of a person who acts in reliance on authoritative pronouncements by relevant government officials or a government agency. *Id.* at 438-39.

In *Cox v. Louisiana*, the Supreme Court reiterated the principles enunciated in *Raley*, making clear that due process of law does not permit a criminal prosecution for conduct a State official or agency indicated was lawful. 379 U.S. 559, 571 (1965). In *Cox*, a group of people engaged in a demonstration across from a courthouse to protest what they believed to be the illegal arrest of 23 students. *Id.* at 564-65. Reverend B. Elton Cox, a civil rights leader, was convicted under a Louisiana statute that made it a crime to picket or demonstrate near a courthouse for the purpose of influencing a judge, juror, witness, or court officer. *Id.* at 559. The evidence was undisputed that, notwithstanding the term "near" in the statute, the State had made clear that demonstrating across the street from the courthouse was a permissible distance. *Id.* The *Cox* Court, relying on *Raley*, held that a conviction under those circumstances could not stand, even though

the Sheriff, at some point, ordered the demonstrators to disperse and leave. The Court in *Cox* opined:

> In *Raley v. Ohio*, 360 U.S. 423, this Court held that the Due Process Clause prevented conviction of persons for refusing to answer questions of a state investigating commission when they relied upon assurances of the commission, either express or implied, that they had a privilege under state law to refuse to answer, though in fact this privilege was not available to them. The situation presented here is analogous to that in *Raley*, which we deem to be controlling. As in *Raley*, under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State -- convicting a citizen for exercising a privilege which the State had clearly told him was available to him." The Due Process Clause does not permit convictions to be obtained under such circumstances.

*Id.* at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959) (internal citations omitted).

In *United States v. Pennsylvania Industrial Chemical Corp.*, 461 F.2d 468 (3d Cir. 1972), *modified and remanded*, 411 U.S. 655 (1973), the Third Circuit first recognized and applied the defense of entrapment by estoppel. The defendant was charged with discharging pollution into the Monongahela River, in violation of the Rivers and Harbors Act, 33 U.S.C. § 407. At trial, the defendant sought to present evidence that its allegedly criminal acts had been authorized by Army regulations and the federal government's long-term interpretation of the statute. The district court prohibited the defendant from introducing the evidence and refused to instruct a jury that the defendant should be acquitted if his actions resulted from affirmative government representations that its acts were lawful.

Citing due process grounds, the Third Circuit reversed on appeal. The Court wrote that the concept of fair play is implicit in our basic notions of what is meant by due process of law. In this regard, an individual or corporation should not be held criminally responsible for activities which could not reasonably have been anticipated to be illegal based on 70 years of consistent

33

**-1669-**

government interpretation and subsequent behavior. *Id.* 461 F.2d at 479. Because the defendant had not been allowed to present the evidence nor had the jury been instructed on the entrapment by estoppel defense, the Court of Appeals granted a new trial. *Id.*

The Supreme Court agreed with the Third Circuit's statement of the law, holding "it was error for the District Court to refuse to permit PICCO to present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute." *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 675 (1973) ("PICCO"). The Court also held that the defense applies where there is reliance on a government agency's position or interpretation of the law it is charged with enforcing or on the enforcing agency's behavior with respect to the activity at issue and that reliance was reasonable under the circumstances. *Id.* In *PICCO,* there was no direct inquiry by the defendants to the agency nor any communication from the agency directly to the defendants. The decision in PICCO prohibits this prosecution on due process grounds. Mr. Bannon was entitled to rely on the former President's invocation and directive and on the OLC Opinions and he reasonably did so. His prosecution is barred by the Due Process Clause, based on the defense of entrapment by estoppel.

### 2. **Public Authority**

The defenses of entrapment by estoppel and public authority are closely related, with some courts questioning the meaningfulness of the difference between the two. *See e.g., United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006). Nevertheless, there are some subtle differences. Mr. Bannon raises the defenses of actual authority and apparent authority in addition to the defense of entrapment by estoppel.

### A. **Actual Authority**

It is beyond dispute that the President – and therefore OLC – has the authority to interpret laws.[38] Further, the President has, pursuant to the Oath Clause and the Take Care Clause, the power to "decline to enforce a statute that he views as unconstitutional."[39] The defense of actual authority is consistent with the common law defense's recognition that actions taken "under color of public authority" are lawful and cannot be prosecuted criminally.[40] It requires reasonable reliance on the actual authority of an official with respect to the conduct at issue. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994).

Mr. Bannon received actual authority in this case for his non-compliance with the subpoena directly from former President Trump's invocation of executive privilege and corresponding directive to Mr. Bannon, that Mr. Bannon must honor that invocation with respect to the subpoena. The OLC Opinions referred to herein also provided a source of the actual authority Mr. Bannon received to the effect that the subpoena was unlawful and invalid, in light of the committee's rules (and refusal to permit a privilege holder representative to attend the deposition), that it would be unlawful for a congressional committee to try to compel production or testimony from a person so situated once executive privilege was invoked, and that it would be unconstitutional for a person so situated to be criminally prosecuted under the statute charged in this case. Mr. Bannon reasonably relied on both sources of actual authority, both the former President and the OLC Opinions carried with them actual authority in the situation at issue. Mr. Bannon cannot be

---

[38] *See* [Ex. V] Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 905 (1990) ("Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.").

[39] [Ex. W] Memorandum from Walter Dellinger, Assistant Att'y Gen. to Abner J. Mikva, Counsel to the President (Nov. 2, 1994). https://www.justice.gov/sites/default/files/olc/opinions/1994/11/31/op-olc-v018-p0199_0.pdf   *See Id.* at ¶ 6, concluding that the President has an "enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency."

[40] *See United States v. Pitt*, 193 F.3d 751, 756-758 (3d Cir. 1999); *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001); *United States v. Reyes-Vasquez*, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990).

criminally prosecuted on the undisputed operative facts in this case, based on the due process-based defense of actual authority.

## B. **Apparent Authority**

This Circuit's landmark decision in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) also supports the dismissal of the indictment in this case on due process grounds.[41]

In *Barker*, the defenses of entrapment by estoppel and apparent authority truly converged. The defendants purportedly believed that their Watergate-era warrantless burglary of psychiatrist Daniel Ellsberg's office was authorized by their C.I.A. recruiter E. Howard Hunt, who they believed had the authority to authorize such conduct (apparent authority) and they further relied on a policy espoused by the President and put forward by the Attorney General as official policy for at least forty years. *Barker*, 546 F.2d at 951-954. The defense of apparent authority requires a reasonable belief (whether correct or mistaken) that the source for the information relied upon had the authority to license the conduct at issue and did so. *Barker*, 546 F.2d at 947-948, 954-957; Model Penal Code § 2.04(3)(b).[42]

---

[41] To the extent the Government has attempted to cast some question on the continued viability of the landmark *Barker* decision by quoting out of context a line in *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994) – *See* Doc. 43 at 7 n.3 ("The D.C. Circuit has since noted that '[t]he exact precedential effect of Judge Merhige's opinion is unclear'") – any such suggestion is misleading. Judge Merhige wrote a concurring opinion in *Barker* that would have narrowed the availability of the defense, from Judge Wilkey's broader formulation. *Barker*, 546 F.2d at 955. The instant case qualifies for the defenses of entrapment by estoppel and public authority under either judge's formulation of the defenses and their underlying principles. Moreover, the Court in *Baird*, in large part based on its reliance on *Barker*, reversed the defendant's conviction, expressly because the trial court had excluded testimony that would have included the position of the agency's legal and contracting officers, as transmitted to the defendant's superior officer, concerning the legality of the conduct for which the defendant was charged and convicted. *Baird*, like *Barker*, certainly supports Mr. Bannon's position in the instant case.

[42] Judge Merhige's Opinion specifically mentions "opinions of the Attorney General" as among the "strongest" bodies sources for authority, consistent with the policy fostered by the defense of apparent authority – obedience to the decisions issued by bodies put in "positions of prominence in the governing structure." *Barker*, 546 F.2d at 956.

Mr. Bannon was entitled as a matter of law to reasonably rely, as he did, on the directive

from former President Trump when he invoked Executive Privilege and on the OLC Opinions

("the Attorney General's Lawyer")[43] described herein in proceeding as he did with respect to the

congressional committee subpoena at issue and to reasonably believe that those two sources had

the authority to license his conduct. He acted at all times consistently with the positions directed

by those two sources of apparent authority as he reasonably believed their policies to provide.

### 3.  The Government Should Be Estopped From Prosecuting This Case.

Mr. Bannon respectfully submits that, while the leading entrapment by estoppel cases do

not spend a great deal of time focused on the estoppel implications of the decisions, the instant

case presents the perfect vehicle through which this Court should order the Government estopped

from pursuing this prosecution, based on the long line of OLC Opinions referenced herein, going

back decades in their consistency for the propositions relied upon herein.  Separate from the

doctrine of entrapment by estoppel, Mr. Bannon asks the Court to find that as a matter of due

process, the Government is estopped from prosecuting this case because it is irreconcilable with

the legally binding policy and practice of this same prosecuting agency.  Mr. Bannon respectfully

submits that the principles underlying equitable estoppel, judicial estoppel, estoppel by opinion,

and estoppel by selective non-enforcement (including the principle of desuetude) should bar this

prosecution or if the Court rejects applying criminal estoppel, the Court permit evidentiary

consequences from the Government's inconsistent and truly irreconcilable positions between its

long-established policy and the pursuit of this prosecution.[44]

---

[43] [Ex. X] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive*, 15 Cardozo L. Rev. 337 (1993).

[44] *See e.g.*, [Ex. Y] *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046 (1969); Anne Bowen Poulin, [Ex. Z] *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 18 Cal. L. Rev. 1423 (2001).

In the instant case, the full circle is closed. It was the "State," through the former President of the United States, that told Mr. Bannon that executive privilege had been invoked and that he was legally required to honor such invocation with respect to the subpoena and it was the "State," through the Department of Justice – the exact same federal agency now prosecuting Mr. Bannon[45] - whose official policy provided that, under the circumstances presented, (1) the subpoena was legally invalid, (2) the invocation of the privilege was the former President's sole prerogative and not Congress's, (3) the invocation was presumptively valid, (4) it applies to former employees and outside consultants, (5) that bringing a criminal prosecution against a person in Mr. Bannon's situation would violate the separation of powers doctrine and would be unlawful, and (6) that, for a variety of reasons, a person so situated cannot be prosecuted criminally under 2 U.S.C. § 192 as a matter of law. As all of the authority cited herein establishes, prosecuting Mr. Bannon under this statute, in light of the legally binding authoritative OLC Opinions and related writings and the former President's invocation of Executive Privilege, is prohibited as a matter of fundamental fairness and due process of law. The defenses of actual and apparent public authority and entrapment by estoppel compel the dismissal of the indictment in this case.

## IV.   2 U.S.C. § 192 is Unconstitutional As Applied to the Facts of this Case.

Mr. Bannon respectfully moves to dismiss the indictment in this case on the ground that 2 U.S.C. § 192 is unconstitutional as applied to Mr. Bannon and the facts of this case.[46]

---

[45] *See e.g., United States v. Viola*, 2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) (emphasizing the relevance of reliance on a federal authoritative source for the defense of entrapment by estoppel to apply to a federally charged crime).

[46] When mounting a facial challenge to a statute, a movant must, of course, establish "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-451 (2008). An as-applied challenge, raised here, asks a court simply to find the statute at issue unconstitutional as applied to the facts and the party before the court. *See e.g., City of Chicago v. Morales*, 527 U.S. 41, 74-81 (1999) (Scalia, J.,

2 U.S.C. § 192 provides as follows:

> Every person who having been summoned as a witness by the authority of either
> House of Congress to give testimony or to produce papers upon any matter under
> inquiry before either House, or any joint committee established by a joint or
> concurrent resolution of the two Houses of Congress, or any committee of either
> House of Congress, *willfully makes default*, or who, having appeared, refuses to
> answer any question pertinent to the question under inquiry, shall be deemed guilty
> of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100
> and imprisonment in a common jail for not less than one month nor more than
> twelve months.

2 U.S.C. § 192. (emphasis added).

On April 6, 2022, the Court unqualifiedly granted [Doc. 49] the Government's Motion in

Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of

Counsel [Docs. 29; 35]. The impact of the Court's decision is that all that needs to be proven to

establish a violation of the statute is that the defendant received a valid subpoena and did not

comply with it. The reason for the non-compliance is legally irrelevant, according to the

Government's motion and the Court's decision, unless the non-compliance was a function of an

accident. No bad purpose or motive is required; nor does the Government need to prove even that

the defendant had some awareness that his conduct was wrong or in violation of the law. *Id.*[47]

This, the Court concluded, is required by the decision in *United States v. Licavoli*, 294 F.2d

207 (D.C. Cir. 1961), and it applies to all defendants and circumstances surrounding the failure to

---

Dissenting) (explaining the difference between facial and as-applied challenges, favoring the latter, while
suggesting the former should be impermissible); see also, Richard H. Fallon, Jr., *As-Applied and Facial
Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000)("[a]s-applied challenges are
the basic building blocks of constitutional adjudication.").

[47] The rejection of a *mens rea* that includes some consciousness of the wrongfulness of the conduct, in favor
of the standard adopted by the Court, has come under sustained criticism for many years in especially
compelling terms where a term of incarceration is the possible consequence of conviction, with
commentators asserting that the error in permitting the same is of constitutional dimensions. *See e.g.*, H.
Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107, 147-152 (1962); Dubin, *Mens Rea
Reconsidered: A Plea for a Due Process of Criminal Responsibility*, 18 Stan. L. Rev. 322 (1966); Note,
*Criminal Liability Without Fault: A Philosophical Perspective*, 75 Colm. L. Rev. 1517 (1975). This also
supports a dismissal.

comply with a congressional committee. [Docs. 29, 35, 49]. Based on the Court's Order, a defendant who fails to comply on a whim or for no reason at all, is legally situated vis a vis criminal liability under the statute, identically to the defendant who (1) fails to comply because his lawyer told him the subpoena was invalid, (2) fails to comply because he was directed not to comply in connection with the invocation of Executive Privilege by a former President of the United States or (3) fails to comply in reliance on and consistent with the official, legally binding position of the Department of Justice. Indeed, the Government expressly argued in its motion that privilege provides no excuse for non-compliance under the applicable definition of "willfully." [Doc. 29 at 1; 8]. The failure to differentiate between the invocation of Executive Privilege and other situations vis a vis the application of this statute is completely contrary to the DOJ's long-standing official policy on this subject.[48]

The Court held that the reason or motivation for not complying is simply legally irrelevant under this criminal statute which carries a mandatory sentence of incarceration upon conviction. [Doc. 29 at 1, 8; 3/16/22 Hearing Tr. at 4, 5, 6, 7, 8; Doc. 49].[49]

---

[48] [Ex. J] The DOJ has made clear its view that the invocation of Executive Privilege stands alone and is different from a subpoena that triggers any other privilege, because of the separation of powers issues it implicates. Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* (OLC Opinion May 30, 1984) at 131, 134. ("Olson Memo"),https://www.justice.gov/sites/default/files/olc/opinions/1984/05/31/op-olc-v008-p0101_0.pdf#:~:text=As%20a%20matter%20of%20statutory%20construction%20and%20separation,of%20executive%20privilege%20before%20a%20committee%20of%20Congress. *See also,* [Ex. AA] Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships,* 1978 B.Y.U. L. Rev. 231, 259 (1978) (suggesting that the §§ 192 & 194 should not apply where Executive Privilege is invoked).

[49] The Government's motion expressly asserts the following: [T]he Defendant's excuses for non-compliance are without merit, and his erroneous reliance on privileges and purported advice of counsel is no defense to contempt. The deliberate failure to comply with a congressional subpoena – *regardless of motivation* – constitutes the crime of contempt." [Doc. 29 at 1] (emphasis added). The Government's motion, again granted by the Court without qualification, goes even further than just referring to an advice of counsel defense (and jury instruction). The Government urged the Court to take the following extraordinary position:

Based on the Court's Order construing the statute in this regard, 2 U.S.C. § 192 is unconstitutional as applied to Mr. Bannon and the circumstances of this case because it (1) violates the separation of powers doctrine; (2) is unconstitutionally overbroad, criminalizing lawful conduct (e.g., non-compliance based on the invocation of Executive Privilege and reliance on the OLC Opinions) within its ambit; (3) is unconstitutionally void for vagueness (e.g. when considered with the DOJ's official position as reflected in the OLC Opinions, it fails adequately to give notice

---

"But even if his contempt were based on an erroneous but good-faith belief that he had a valid legal excuse for ignoring the subpoena's demands, whether by his own determination or his attorney's, it is no defense. All evidence and argument related to good-faith reliance on the law or an attorney's advice should therefore be excluded at trial." [Doc. 29 at 8].

At oral argument, the Government reiterated its position that, other than an accident, there is no legal justification for failing to comply with a congressional subpoena. Government counsel put it as follows: "So contempt of Congress for willful default is about whether or not you showed up; that is whether to produce records or to testify." [3/16/22 Hearing Tr. at 4] (emphasis added). "So if a defendant makes a deliberate and intentional decision not to appear, he has the requisite intent for contempt; that is, does the defendant know he's been summonsed and does he intentionally, knowing that, not show up? That is all that is required." [*Id.* at 5] (emphasis added). "And what the Supreme Court made clear is that that intentional choice not to comply, that is inherently a criminal choice. There is no innocent way that someone decides they are just not going to comply with the statute. [*Id.* at 6] (emphasis added). "And that's where contempt of Congress draws (sic), between someone who accidentally does not comply with their obligations, and someone who makes an intentional and deliberate choice not to do so." [*Id.* at 7]. Finally, in response to the Court's direct question as to what the Government needs to prove in this case on *mens rea*, the Government summed up its position as follows:

"The government would need to demonstrate that the defendant knew he had been summonsed; so that means, knew that Congress was requiring him to show up and produce records on October 7th; and that Congress was requiring him to show up and testify on October 14th. And that he knew that that was the obligation; and that despite knowing that, he decided not to comply. He has to have – the government has to prove that he was given a clear choice from Congress. Either show up or you are in contempt. That would be all that the government is required to show there." ... "And it's no different from in the contempt of court context. A witness gets a summons to appear before a grand jury or to appear for testimony in trial. And if they deliberately decide, I will not appear, they are subject to prosecution for contempt. It's the same principle in the contempt of Congress." [*Id.* at 8].

as to what conduct is subject to criminal prosecution); (4) unconstitutionally prohibits Mr. Bannon

from telling the entire story of his case.[50]

### A.  Statutory Interpretation Problems

There is a fundamental statutory interpretation problem with such a reading, when one

considers the associated statute found in 2 U.S.C. § 193 which provides as follows:

> No witness is privileged to refuse to testify to any fact, or to produce any paper,
> respecting which he shall be examined by either House of Congress, or by any joint
> committee established by a joint or concurrent resolution of the two Houses of
> Congress, or by any committee of either House, upon the ground that his testimony
> to such fact or his production of such paper may tend to disgrace him or otherwise
> render him infamous.

Construing the term "willfully" as used in § 192, the statute to which § 193 refers, as this

Court has - making any reason for the failure to comply and any *mens rea*, other than that the

witness "deliberately" and "intentionally" failed to comply, and thereby making a claimed

justification of privilege for the failure to comply legally irrelevant, renders § 193 nothing more

than surplusage. As this Court has noted, "[W]hen possible, of course, the Court must give effect

to every word in a statute." *United States v. Miller*, 2022 U.S. Dist. LEXIS 45696, *16-*17 (D.

D.C., March 7, 2022) (Nichols, J.), *citing, Setser v. United States*, 566 U.S. 231, 239 (2012). There

would be no reason for Congress to have added § 193, if the invocation of privilege, like any other

reason or motivation for the failure to comply, were legally irrelevant. "Willfully makes default,"

we already have been told, is not concerned with why the witness did not comply – what is in his

mind as to why he did not have to comply; so there would be no need for Congress to identify

what kind of privilege will not avail the witness.

---

[50] *See, e.g., United States v. Nixon*, 418 U.S. 683, 709 (1974) ("the need to develop all relevant facts in the
adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated
if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of
the judicial system depends on full disclosure of all the facts, within the framework of the rules of
evidence."); *United States v. Nobles*, 422 U.S. 225, 232 (1975).

If, on the other hand, § 193 were intended to serve some legally cognizable purpose, then the Court's construction of § 192 would fail under fundamental *expressio unius* analysis, with its identification of one particular type of privilege – a claim that compliance would "tend to disgrace" or otherwise render the witness "infamous" – as being inapplicable, implying that other privileges, like executive privilege, would be a privilege that would permit the witness to refuse to testify or produce a document. The constitutional infirmities of 2 U.S.C. § 192, though, as applied to Mr. Bannon and the circumstances, where Executive Privilege is invoked and is relied on for noncompliance, go well beyond matters of statutory interpretation.

## B. **2 U.S.C. § 192 As Applied Violates the Separation of Powers Doctrine, Is Unconstitutionally Over Broad, And Is Void For Vagueness.**

### 1. **The Statute As Applied Violates The Constitutional Separation Of Powers Doctrine.**

The Court's decision makes the invocation of Executive Privilege by the former President of the United States and the associated directive to Mr. Bannon not to comply with the subpoena, based on executive privilege legally irrelevant. It gives Congress a veto over a President's invocation of privilege. That position cannot be reconciled with the United States Supreme Court's holding in *Trump v. Mazars USA,* LLP, 140 S. Ct. 2019, *2032; 207 L. Ed. 2d 951 (2020) that executive privilege absolutely applies in the context of a congressional subpoena and its invocation provides a basis for noncompliance with a congressional subpoena. The validity of the invocation surely can be challenged in a civil enforcement proceeding; but it is presumed to be valid when made and provides a lawfully recognized basis for the witness's failure, indeed, inability, to comply. *Id.* The statute as applied also violates the separation of powers doctrine by directly infringing on the President's right to determine which communications he deems to be appropriately covered by executive privilege. Doing so is contrary to established constitutional

principles that a statute that "disrupts the proper balance between the coordinate branches" is unconstitutional and that the President's invocation of executive privilege is presumptively valid and must be honored by Congress.[51] As the Olson Memo provides, subjecting executive officials to prosecution for criminal contempt when they are carrying out the President's claim of Executive Privilege, "would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Olson Memo* at 134.

2 U.S.C. § 194 is unconstitutional as applied because its mandatory terms, especially where Executive Privilege is invoked, violate the separations of powers doctrine by encroaching on prosecutorial decisions reposited under the Constitution exclusively in the Executive branch.[52] Members of the Committee have made clear their belief that the prosecution is mandatory under the statute. Bess Levin, *January 6 Panel Politely Requests That Merrick Garland Do His F—king Job*, VANITY FAIR (Mar. 29, 2022), ( https://www.vanityfair.com/news/2022/03/january-6-committee-merrick-garland-donald-trump.   That renders the statute unconstitutional under *Chadha*.

## 2.   The Statute As Applied Is Unconstitutionally Overbroad And Void For Vagueness.

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[53]   The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process

---

[51] *Nixon v. Admin. of General Services*, 433 U.S. 425, 443 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974).

[52] *See, e.g., United States v. Brown*, 381 U.S. 437, 443 (1965); *INS v. Chadha*, 462 U.S. 917 (1983).

[53] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id.* "Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id.* (citations omitted). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.[54] Issues, like those here, with the *mens rea* element of the statute, exacerbate vagueness problems.[55] Vagueness concerns are intensified where a statute imposes criminal penalties.[56] A statute is unconstitutionally overbroad where, as here, it risks including within its prohibition fully lawful conduct undertaken in good-faith or because of the uncertainty of the definition of material terms (like "willfully" or "default").[57]

2 U.S.C. § 192, and specifically the phrase "willfully makes default" as this Court has interpreted it and has the elements of the offense charged have been characterized, is void for vagueness and overbroad, as applied to the instant case or any case in which executive privilege is invoked, especially in light of the OLC Opinions referred to in this motion to dismiss. The Government's position on the elements of the crime and that any reason for noncompliance, other than accident, is legally irrelevant, adopted by the Court in unqualifiedly granting its motion in limine [Docs. 29; 35; 49], is directly at odds with long-established authority that the invocation of

---

[54] *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

[55] *Calautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision … the statute is little more than a 'trap for those who act in good faith.'").

[56] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has … expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

[57] *See, e.g., United States v. Stevens*, 569 U.S. 460, 473 (2010)

executive privilege must be permitted as a legally cognizable reason for non-compliance. *See e.g.*, *Mazars*, 140 S. Ct. at 2032.

Moreover, in light of the legally binding, published, authoritative position of the Department of Justice, reflected in the OLC Opinions cited herein that the criminal statute does not apply and cannot be applied to a current or former executive branch employee when executive privilege is invoked, the statute, as applied, is void for vagueness; for it does not give constitutionally sufficient notice of what conduct will expose a person so situated to criminal sanction.

Statements by the Government, through its agents or officials, concerning criminal sanctions, which are contradictory or so vague and undefined "as to afford no fair warning as to what might transgress (the statute)" render the statute unconstitutionally vague, much in the same way contradictory statements within a criminal statute render the statute unconstitutional. *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In the instant case, the OLC Opinions go well beyond mere "contradictory" or "vague" statements – they absolutely give full license, indeed they command, the very course of conduct Mr. Bannon took in response to the subpoena (and that was ordered by the invocation of Executive privilege); yet now he faces criminal prosecution for actions consistent with published DOJ policy. This renders the statute, at best, void for vagueness.

The statute is unconstitutionally overbroad as applied because, as the Court has defined "willfully makes default" and the elements of the crime, it unconstitutionally includes within its ambit, fully legal and constitutionally protected conduct – noncompliance based on the invocation of Executive Privilege and reliance on the OLC Opinions. Moreover, the Court's decision, granting the Government's motion, which included a prohibition on the Defendant's reliance "on law" is

irreconcilable with the well settled principle that in the criminal setting, all constitutional and other applicable defenses must be afforded the Defendant.[58]

The statute also is void for vagueness because the key phrase "willfully makes default" gives insufficient notice as to what constitutes a "default" in light of the long line of authority that raises to a constitutional level the imperative that Congress and the Executive branches must work toward an accommodation in situations like the one presented here.[59]  Mr. Bannon, through Mr. Costello, went to extraordinary lengths to try to come to an accommodation with the Committee. [Doc. 30-1, ¶¶ 13-20].  Among other steps, he advised the Committee that Mr. Bannon would testify if the Committee worked out the executive privilege issue with former President Trump or if they went before a judge and a judge ordered Mr. Bannon to comply, after considering the executive privilege claim.  Mr. Costello asked the Committee for a one-week adjournment to consider the impact of the lawsuit former President Trump filed against the Committee, involving issues of executive privilege, with the exact same issue present in this case.[60]

On October 18, 2021, notwithstanding his conclusion based on the OLC Opinions that the subpoena was unlawful and invalid, in a further effort to accommodate, Mr. Costello drafted a

---

[58] *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983); *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.C.Cir.1971); *Tobin v. United States*, 306 F.2d 270, 276 (D.C.Cir.1962).

[59] *See e.g., United States v. AT&T, 567 F.2d 121, 127 (D.C. Cir. 1977)* (Congress and Executive Branch "should take cognizance of an implicit constitutional mandate to seek optimal accommodation" to resolve disputes).

[60] In the lawsuit former President Trump filed, a primary issue was whether a current President's decision to deny executive privilege can override a former President's invocation of executive privilege.  *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021).  In the instant case on ●ctober 18, 2021, after the return dates for the subpoena had passed, a representative of President Biden wrote to Mr. Costello, purporting to override former President Trump's invocation of executive privilege [Ex. GG] [U.S. 000313].  That same day, Mr. Costello asked the committee for a one-week extension to allow him to consider the matter and the impact of the lawsuit.  The committee summarily denied the request or any accommodation and set the following day for a vote on a contempt referral.

letter to the committee identifying categories of materials in the subpoena for which Mr. Bannon clearly had no responsive materials or testimony to offer. [U.S. 000992-000993]. The committee's response to Mr. Costello's accommodation efforts and request for a one-week extension of time to consider the Trump lawsuit and the executive privilege issue, was to set a committee vote on contempt the following day. The Select Committee made clear that they had no interest in an accommodation with Mr. Bannon (in sharp contrast to other witnesses who, for example, upon information and belief, the Select Committee permitted a privilege holder representative to appear at a deposition, and for whom extensions of time were granted, etc.). Under these circumstances and the institutional interests in working toward an accommodation, the term "willfully makes default" is unconstitutionally void for vagueness and the indictment should be dismissed based on the Select Committee's refusal to work toward any accommodation.

For the foregoing reasons, this statute is unconstitutional as applied and the indictment must be dismissed.

## V.    **Prosecutorial Over-Reaching Requires Dismissal Of The Indictment**

Counsel for the Government improperly targeted Mr. Costello – counsel for Mr. Bannon – during the grand jury investigation in a manner that drove a wedge between attorney and client. Moreover, counsel for the Government misled the grand jury on key evidence. These errors require the dismissal of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(A)(v).

### A.    **Targeting Mr. Bannon's Counsel Requires Dismissal.**

On October 21, 2021, the House made a contempt referral involving Mr. Bannon to DOJ.[61] [US-000459-504]. On October 25, 2021, Mr. Costello – counsel for Mr. Bannon – emailed AUSA

---

[61] The defense has moved to compel disclosure of Government efforts to obtain the telephone and email records of Mr. Costello, Mr. Bannon's attorney. [Doc. 26]. Certain documents have been provided, but the motion remains under advisement. Nonetheless, we move for dismissal of the Indictment based on the Government's conduct – and intend to supplement this motion if additional information is forthcoming.

Cooney to initiate efforts to seek a declination of any criminal charges. Mr. Costello identified himself as the attorney for Mr. Bannon. [US-001136]. On November 1, 2021, Mr. Costello sent AUSA Cooney a legal memorandum outlining the reasons for declination. A video conference was held on November 3, 2021, so that Mr. Costello and counsel for the Government could further discuss the matter. Mr. Costello believed – as is customary in criminal cases – that the back-and-forth between himself and counsel for the Government was a good faith effort to persuade DOJ not to prosecute his client, Mr. Bannon.

However, Government counsel misled Mr. Costello. They suggested to Mr. Costello that they were interested in hearing his arguments on declination. However, at the same time they were improperly using the power of the grand jury to collect evidence about Mr. Costello, in the hope that they could use it against his client Mr. Bannon. The very day of the initial contact with the U.S. Attorney's Office, October 25, 2021, the Government began issuing grand jury subpoenas to third party providers seeking Mr. Costello's phone and email records. Some of these grand jury subpoenas sought records dating to September 1, 2021 – 22 days before the Select Committee issued its subpoena.[62] This was improper. Section 9-13.410(A) of the U.S. Attorneys' Manual requires main DOJ approval in such circumstances. No approval was obtained by counsel for the Government here. In addition, counsel for the Government obtained a 2703(d) Order from a magistrate judge, seeking additional records of Mr. Costello.[63]

---

[62] And the records obtained via the § 2703(d) Order date back to March 5, 2021. [US-001151-001249].

[63] Incredibly, counsel for the Government represented to the Court that these records were necessary to the investigation, and that some grand jury subpoenas were for records of "other" Bob Costellos. Their purported reason has no basis in fact as they already knew that there was never a claim that Mr. Bannon did not accept service of the subpoena.

Moreover, counsel for the Government misled Mr. Costello by staging two surreptitious "interviews" of him, all the while suggesting to him that he was engaged on advocacy on behalf of his client. There was never any intention to consider declination – the issuance of the first subpoena before Mr. Costello ever met with anyone from the U.S. Attorney's Office established that. During videoconferences on November 3 and 8, 2021, counsel for the Government had FBI agents listen in and later draft FBI 302 "interview reports" capturing statements made by Mr. Costello. Finally, counsel for the Government requested, and Mr. Costello provided (on November 4, 2021), more than 100 pages of documents – including attorney work product created during the representation of Mr. Bannon – without divulging that Mr. Costello was being treated by the Government as a witness against Mr. Bannon, not his counsel.

This Court can, in its supervisory power, dismiss the Indictment as a sanction for the Government's improper conduct. *See, e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *United States v. Batres-Santolino*, 521 F.Supp. 744, 750-53 (N.D. Cal. 1981). Dismissal is appropriate where, as here, the improper tactics by the Government drove a wedge between a defendant and his attorney. *United States v. Marshank*, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991) (doctrine permitting dismissal of indictment on basis of outrageous government misconduct is grounded in due process clause of Fifth Amendment and is therefore applicable to cases where government interference in attorney-client relationship is so shocking to universal sense of justice that it violates due process); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985). In determining whether governmental interference into an attorney-client relationship is outrageous enough to violate due process courts analyze: (1) the government's objective awareness of ongoing, personal attorney-client relationship between its informant and defendant; (2) whether the government's intrusion into that relationship was deliberate; and (3) actual and substantial

prejudice to defendant. *United States v. Hsia*, 81 F.Supp.2d 7, 19 (D.D.C. 2000); *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981) (whether outrageous government conduct exists depends on the totality of the circumstances). Prejudice can "result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial." *U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).

The Government's intrusion into the attorney-client relationship was knowing and deliberate. The Government misled this Court and counsel with two different explanations for its conduct, neither of which make any sense. Moreover, Mr. Bannon been prejudiced by it. First, even if the toll and email records did not give the Government the contents of Mr. Costello's communications, having a record of who Mr. Costello spoke to and when provides significant insight into the defense's strategy and theory of the case that the Government would not have access to but for their improper intrusion. In addition, the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate. The Government contended that Mr. Costello was "a witness to the Defendant's deliberate decision to ignore the subpoena's requirements." [Doc. 31 at 12-13]. Then at oral argument they claimed they needed the information to determine if Mr. Costello informed Mr. Bannon of the subpoena. Both claims are false. Courts have held that due process is violated when the government turns the defendant's attorney into a prosecution witness. *See United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985). "Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances." *Schell*, 775 F.2d at 565.

## B. **Misleading The Grand Jury Requires Dismissal.**

To return a valid indictment, a grand jury must consider evidence that satisfies all elements of the offense charged. *Stirone v. United States*, 361 U.S. 212, 217 (1960). 2 U.S.C. § 192 includes the element "willfully makes default." The grand jury here was misled in three ways by counsel for the Government, such that the grand jury could not have found evidence supporting that element of the offense.[64]

First, the grand jury was misled about Mr. Bannon's communication to the Select Committee that President Trump has asserted executive privilege. In testimony on November 12, 2021, the Government's sole grand jury witness – an FBI agent – suggested to the grand jury that a witness could not validly assert executive privilege before the Select Committee unless the President himself (or his representative) directly communicated the assertion of executive privilege to the Select Committee. [Exhibit FF at 44] (filed under seal in accordance with Protective Order). This was misleading testimony and Mr. Costello sent President Trump's counsel's letter invoking executive privilege to the Select Committee.

Second, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon never sought an adjournment of his deposition. *See* [Exhibit FF at 32-36] (filed under seal in accordance with Protective Order). This was false testimony. A request for a one-week adjournment was denied.

Third, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon received (through his attorney Mr. Costello) a complete copy of the House deposition

---

[64] We also move to dismiss the Indictment on the ground that the grand jury was not properly instructed as to the element of "willfully makes default" and the applicability of the advice of counsel doctrine. But given the Court's Order [Doc. 49] on the Government's motion in limine on advice of counsel [Doc. 29], we do not fully brief the issue again here.

rules along with the subpoena. *See* [Exhibit FF at 20-21] (filed under seal in accordance with Protective Order). This was false testimony as the General Counsel of the House, Doug Letter, informed the FBI and all three prosecutors more than a week before the grand jury testimony. As described in greater detail above, Mr. Bannon was not provided with section 3(b) of H. Res. 8, 117th Congress, even though the House Rules make explicit that "a witness *shall not be required to testify* unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations." [Ex. C ] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

In short, the Indictment must be dismissed because the grand jury was misled about three key issues that bear on whether Mr. Bannon "willfully [made] default." *See U.S. v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979) ("[T]he prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it."); *U.S. v. Lawson,* 502 F. Supp. 158, 172 (D. Md. 1980) ("By intentionally and repeatedly asking misleading questions, while failing to disclose known, exculpatory evidence on the issue of [defendants'] guilty knowledge, the prosecutor denied defendants their constitutional right to an 'unbiased' grand jury.").

## VI.    **CONCLUSION**

Accordingly, Mr. Bannon respectfully requests that the Court grant this Motion and dismiss the Indictment.

Dated: April 15, 2022                     Respectfully submitted,

**SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

_/s/ M. Evan Corcoran_
M. Evan Corcoran (D.C. Bar No. 440027)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225

53
**-1689-**

Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

/s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

/s/ Robert J. Costello
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron **LLP**
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of April 2022, a copy of the foregoing Motion

To Dismiss The Indictment was filed through the Court's CM/ECF system and was served *via*

electronic delivery on counsel of record.

/s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## ORDER

Based upon the representations in the Defendant's Motion To Dismiss The Indictment and

upon consideration of the entire record, it is hereby:

**ORDERED** that the Motion is GRANTED; it is further

**ORDERED** that the Indictment filed on November 12, 2021, is dismissed.

Dated: _____

_____

Hon. Carl J. Nichols
*United States District Judge*

**-1691-**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |

### INDEX TO EXHIBITS

**Motion To Dismiss The Indictment [Doc. 58]**

| Docket Entry | Exhibit Number | Title |
|---|---|---|
| 58-1 | Ex. A | H. Res. 8 (Adoption of Rules for 117th Congress) |
| 58-2 | Ex. B | H. Res. 503 (Authorizing House Select Committee) |
| 58-3 | Ex. C | Regulations For Use Of Deposition Authority (Jan. 4, 2021) |
| 58-4 | Ex. D | Amerling and Letter FBI 302 (November 10, 2021) |
| 58-5 | Ex. E | Rules of the 117th Congress (Feb. 2, 2021) |
| 58-6 | Ex. F | Republican Conference Rules of the 117th Congress |
| 58-7 | Ex. G | Congressional Oversight of the White House, 45 Op. O.L.C. slip op. (Jan. 8, 2021) |
| 58-8 | Ex. H | Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys (June 27, 2007) |
| 58-9 | Ex. I | Immunity of Former Counsel to the President from Compelled Congressional Testimony, 43 Op. O.L.C. slip op. (July 10, 2007) |
| 58-10 | Ex. J | Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Privilege, 8 Op. O.L.C. 101 (1984) |
| 58-11 | Ex. K | Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress, 32 Op. O.L.C 65 (2008) |
| 58-12 | Ex. L | Application of 28 U.S.C. Sec. 458 to Presidential Appointments of Federal Judges, 19 Op. O.L.C slip op. (December 18, 1995) |
| 58-13 | Ex. M | Randolph D. Moss, Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel, 52 Admin. L. Rev. 1303 (2000) |

| 58-14 | Ex. N | Testimonial Immunity Before Congress of the Former Counsel to the President, 43 Op. O.L.C. slip op. (May 20, 2019) |
|-------|-------|-------|
| 58-15 | Ex. O | Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 Op. O.L.C. 68 (1986) |
| 58-16 | Ex. P | Letter from Ronald C. Machen Jr., U. S. Attorney, to Speaker John A. Boehner (Mar. 31, 2015) (re Lois G. Lerner, former Director, Exempt Organizations, IRS) |
| 58-17 | Ex. Q | Letter from Michael B. Mukasey, Attorney General, to Speaker of the House, Hon. Nancy Pelosi (Feb. 29, 2008) (re Joshua Bolten, Chief of Staff, and Harriett Miers, former White House Counsel) |
| 58-18 | Ex. R | Steven G. Bradbury, Memorandum for Attorneys of the Office Re: Best Practices for OLC Opinions (May 16, 2005) |
| 58-19 | Ex. S | Trevor W. Morrison, Stare Decisis in the Office of Legal Counsel, 110 COLUM. L. REV. 1448 (2010) |
| 58-20 | Ex. T | Walter Dellinger, et al., Principles to Guide the Office of Legal Counsel (Dec. 21, 2004) |
| 58-21 | Ex. U | David J. Barron, Memorandum for Attorneys of the Office Re: Best Practices for OLC Legal Advice and Written Opinions (Jul. 16, 2010) |
| 58-22 | Ex. V | Frank H. Easterbrook, Presidential Review, 40 CASE W. RES. L. REV. 905 (1990) |
| 58-23 | Ex. W | Presidential Authority to Decline to Execute Unconstitutional Statutes, OLC Mem. Op. (Nov. 2, 1984) |
| 58-24 | Ex. X | Douglas W. Kmiec, OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive, 15 CARDOZO L. REV. 337 (1993) |
| 58-25 | Ex. Y | Applying Estoppel Principles in Criminal Cases, 78 YALE L.J. 1046 (1969) |
| 58-26 | Ex. Z | Anne Bowen Pouliun, Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get its Story Straight, 18 Cal. L. Rev. 1423 (2001) |
| 58-27 | Ex. AA | Rex E. Lee, Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships, 1978 B.Y.U. L. REV. 231 (1978) |
| 58-28 | Ex. BB | John O. McGinnis, Models of the Opinion Function of the Attorney General:  A Normative, Descriptive, and Historical Prolegomenon, 15 CARDOZO L. REV 375 (1993) |
| 58-29 | Ex. CC | Griffin B. Bell, The Attorney General:  The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?, 46 FORDHAM L. REV. 1049 (1978) |

2

| 58-30 | Ex. DD | Notes, The Immunity-Conferring Power of the Office of Legal Counsel, 121 HARV. L. REV. 2086 (2008) |
| 58-31 | Ex. EE | U.S. Department of Justice, Criminal Resource Manual § 2055 (Public Authority Defense) |
| No Docket Entry | Ex. FF | Grand Jury Materials (Filed Under Seal) |
| Pending Docket Entry | Ex. GG | Letter to Robert J. Costello, Esq. from Jonathan C. Su, Esq., Deputy Counsel to the President (October 18, 2021) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' RESPONSE TO DEFENDANT'S
### NOTICE UNDER FEDERAL RULE OF PROCEDURE 12.3

The Defendant has filed a Notice, pursuant to Federal Rule of Criminal Procedure 12.3, stating that he intends to assert at trial that his refusal to comply with the subpoena for testimony and documents issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") was an exercise of public authority. *See* ECF No. 55. The Defendant further noticed his intent to assert that he was entrapped into defying the subpoena by Department of Justice opinions and writings. *See id.* The Notice is deficient and neither defense is available to excuse his contempt of Congress.

First, pursuant to Federal Rule of Criminal Procedure 12.3(3), the Government denies that the Defendant exercised public authority when he defaulted on the Select Committee's subpoena. The Defendant was not directed by a law enforcement agent to engage in total noncompliance. *See, e.g., United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) ("The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied'" on the "actual authority of a government official to engage him in a covert activity." (citations omitted)). The only communication the Defendant had with any Executive Branch official was an unsolicited letter from the White House Counsel's Office that explicitly advised him that the President had decided not to assert executive privilege over the Defendant's deposition testimony

**-1695-**

or any responsive documents in his possession. *See* ECF No. 52-1 (October 18, 2021, letter from White House Deputy Counsel to Robert J. Costello stating that the President had determined "that an assertion of executive privilege is not justified" with respect to "certain subjects within the purview of the Select Committee" and that the decision applied to the Defendant's "deposition testimony and to any documents" he possessed). As explained in the United States' Motion in Limine to Exclude Evidence of Department of Justice Opinions and Writings, *see* ECF No. 52 at 14-19, and as will be elaborated in the Government's forthcoming opposition to the Defendant's Motion to Dismiss Case, ECF No. 58, having received no direction from law enforcement to engage in default, a public-authority defense is unavailable to the Defendant and any evidence or argument the Defendant proposes in furtherance of that defense should be excluded.

Second, the Defendant's Notice is deficient because it fails to identify "the [law enforcement] agency member on whose behalf [he] claims to have acted." Fed. R. Crim. P. 12.3(2)(B); *see also United States v. Abcasis*, 785 F. Supp. 1113, 1117 (E.D.N.Y. 1992) (explaining "that the government has a strong interest in being apprised of a claimed authorization defense" because "it is possible for Defendants, in the closing moments of trial, to offer testimony that a particular law enforcement officer authorized their acts" and, "[i]n the absence of notice, the government might have difficulty rebutting that testimony"). The Defendant's Notice asserts that he defaulted on the subpoena under the authority of former President Donald J. Trump and the Department of Justice. *See* ECF No. 55 at 1. But the former President was not a government official at the time of the Defendant's default, and the Defendant fails to identify any Department of Justice official with whom he consulted on his decision to default, much less one who authorized him to do so.

The Defendant also noticed his intent to mount an entrapment-by-estoppel defense. That defense is distinct from a public-authority defense, *see United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) (explaining that the entrapment-by-estoppel defense "arises when an individual criminally prosecuted for an offense reasonably relied on statements made by a government official charged with 'interpreting, administering, or enforcing the law defining the offense' and those statements actively misled the individual to believe that his or her conduct was legal"), and not subject to Rule 12.3. Like the public-authority defense, however, as explained in the United States' Motion in Limine to Exclude Evidence of Department of Justice Opinions and Writings, *see* ECF No. 52 at 8-12, and as will be elaborated in the Government's forthcoming opposition to the Defendant's Motion to Dismiss Case, ECF No. 58, the Government never sanctioned the Defendant's default and an entrapment-by-estoppel defense is unavailable.

The Defendant's Notice of his claimed public-authority defense is deficient, and there is nothing that can be done to rectify it because the Defendant's decision to default was not an exercise of public authority or the product of entrapment—the decision was his own. Neither defense is available to excuse his contempt of Congress.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

3
**-1697-**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                            |   |                              |
|----------------------------|---|------------------------------|
| UNITED STATES OF AMERICA   | : |                              |
|                            | : | Criminal No. 21-670 (CJN)    |
|                            | : |                              |
| v.                         | : |                              |
|                            | : |                              |
| STEPHEN K. BANNON,         | : |                              |
|                            | : |                              |
| *Defendant.*               | : |                              |

**OPPOSITION TO THE GOVERNMENT'S
MOTION *IN LIMINE* BASED ON WAIVER**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court deny the United States' Motion *In Limine* To Exclude Evidence Relating To Objections To Subpoena That Defendant Waived [Doc. 53], for the reasons set forth below.

**Summary of Argument**

The Government has the burden at trial of proving beyond a doubt every element of the crime charged. Criminal Jury Instructions for the District of Columbia ("Redbook"), No. 2.107 (5th ed. 2021). This burden never shifts to the accused. *Id.* Among other things, the Government must prove, as an element of the offense, that Mr. Bannon was "summoned as a witness by the authority of either House of Congress." 2 U.S.C. § 192. In addition, the Government must prove that Mr. Bannon "willfully ma[de] default." *Id.* The evidence that the Government seeks to exclude by this motion bears directly on those elements. Specifically, the Government does not want the jury to hear that:

**-1698-**

- The Select Committee has no "ranking minority member," such that the House grant of deposition authority to the Select Committee – which precluded the issuance of subpoenas unless there was consultation with the ranking minority member – was violated;[1]

- Select Committee rules did not allow the attendance at deposition of counsel for President Donald J. Trump to protect executive privilege, rendering the subpoena "legally invalid and . . . not subject to civil or criminal enforcement";[2] and

- The Select Committee did not follow the House grant of authority that provided that "[a] witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress, and these regulations."[3]

Mr. Bannon has a constitutional due process right to present evidence that tends to negate his guilt as to any element of the offenses charge. Whether or not an objection was raised before the Select Committee makes no difference to whether Mr. Bannon can present evidence to a jury that bears upon an element of the offense. A defendant cannot be held to have waived – even by silence – the due process right requiring that the Government establish every fact necessary to prove the crimes charged. *See In re Winship*, 397 U.S. 358, 364 (1970) (due process requires proof beyond a reasonable doubt of every fact necessary to constitute the crimes charged); *United States v. Powell*, 449 F.2d 994, 996-97 (D.C. Cir. 1971) (jury charge should state that each element of the crimes charged must be proved beyond a reasonable doubt). Mr. Bannon must be afforded the opportunity to present the evidence at trial so that the jury can weigh all facts that bear on the charges. This is essential to a fair trial.

---

[1] *See* H. Res. 503, § (c)(6)(A) ("The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress."); Government argument seeking exclusion at [Doc. 53 at 6–7].

[2] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement."); Government argument seeking exclusion at [Doc. 53 at 7–8].

[3] 117th Congress Regulations For Use Of Deposition Authority (Cong. Rec. H41 (Jan. 4, 2021)); Government argument seeking exclusion at [Doc. 53 at 8–9].

## ARGUMENT

### A. Mr. Bannon Has Not Waived His Right to Due Process.

Federal courts have "the duty to accord a person prosecuted for [alleged violations of 2 § 192] every safeguard which the law accords in all other criminal cases." *Russell v. United States*, 369 U.S. 749, 755 (1962). The Government is held to the same exacting standards in criminal contempt of Congress cases, as in other criminal cases, "to assure that the congressional investigative power, when enforced by penal sanctions, would not be abused." *Gojack v. United States*, 384 U.S. 702, 707 (1966). The Supreme Court has noted that fairness to a congressional witness is a paramount concern. *Watkins v. United States*, 354 U.S. 178, 209 (1957) (explaining that advance knowledge of the pertinency of the area of questioning "must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense"); *id.* at 215 (explaining that where Congress uses compulsory process, there is a need for protective procedures "which provide the constitutional requisites of fairness for witnesses"). In any subsequent criminal prosecution, "it is clear as a matter of law that the usual standards of criminal law must be observed, including proper allegation and proof of all the essential elements of the offense." *Gojack*, *supra*, 384 U.S. at 707.

If a committee subpoena exceeds the authority granted by the full House, it is invalid and unenforceable, and no criminal conviction can follow. Section 192 requires, as an element of the offense which the Government must prove beyond a reasonable doubt, that Mr. Bannon was "summoned as a witness by the *authority* of either House of Congress." 2 U.S.C. § 192 (emphasis added). The Supreme Court has consistently found that an accused may not be convicted of a Section 192 violation where a congressional committee has exceeded its authority. *See Yellin v. United States,* 374 U.S. 109 (1963) (Section 192 conviction reversed where committee did not follow rules regarding executive session); *Gojack*, *supra*, 384 U.S. at 716 ("The legislative history

3

of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense."); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum).

Mr. Bannon at no point waived any right available to him. He, and other Select Committee witnesses, have enforceable rights that flow from the limited grant of deposition authority from the full House to the Select Committee, as set forth in its authorizing resolution and the House rules incorporated therein. These rights are grounded in the due process clause of the Constitution. Contrary to the Government's argument, constitutionally based rights cannot be waived by silence. Our criminal justice system does not take lightly the waiver of a criminal defendant's rights. The time-honored rule is that a valid waiver requires the "intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), which in a later formulation involves that a waiver be "knowing and voluntary." *Brady v. United States*, 397 U.S. 742, 748 (1970).

## B. The Caselaw Relied Upon By The Government Is Inapposite.

The Government contends that a congressional witness who does not raise an objection at the committee level cannot assert that objection at a criminal trial for contempt of Congress, citing *United States v. Bryan*, 339 U.S. 323 (1950) and *Hutcheson v. United States*, 369 U.S. 599 (1962). *See* [Doc. 53 at 4–5]. That sweeping assertion is incorrect. As set forth above, due process requires that a criminal defendant be permitted to offer evidence that tends to negate any element of the offense charged. But beyond that, the cases upon which the Government relies are inapplicable.

In *Bryan*, the accused appealed her conviction under 2 U.S.C. § 192 for failing to produce documents in response to a subpoena issued by the House Committee on Un-American Activities.

4
**-1701-**

She argued that the lack of a quorum of that committee at the time of her appearance required reversal. The Supreme Court found that "whether or not a quorum was present at any time is not clear from the record." *Bryan*, *supra*, 339 U.S. at 333. The *Bryan* Court also found that "appearance before a committee is not an essential element of the offense." *Id.* at 329. Based upon that, the Court held "that the Government is not required to prove that a quorum of the Committee was present when the default occurred, and that under the circumstances disclosed by this record a defense of lack of a quorum was not open to [Bryan]." *Id.* at 335. This case presents a completely difference circumstance, where Mr. Bannon seeks to offer evidence that goes directly to an element of the offense – the element that requires the Government to prove that he was "summoned as a witness by the authority of either House of Congress." 2 U.S.C. § 192.

The other case chiefly relied upon by the Government is also unavailing, as it does not involve what evidence may be presented at trial. In *Hutcheson*, the accused was convicted after a bench trial of violating 2 U.S.C. § 192, and the court of appeals affirmed, without opinion. 369 U.S at 599. The accused refused to answer certain questions put to him by the McClellan Committee. The Supreme Court noted that "[n]o claim of the Fifth Amendment privilege against self-incrimination was made at any stage." *Id.* at 605. On appeal, the accused asked the Supreme Court to over-rule its then-controlling precedent which held that "possible self-incrimination under state law is not a ground for refusing to answer questions in a federal inquiry." *Id.* at 608. The Court declined to consider that position, and instead found that "petitioner never having claimed the Fifth Amendment privilege before the Committee, this aspect of his due process challenge is not open to him now." *Id.* at 608-09. *Hutcheson* is silent on what evidence the accused might have presented at the trial level. The case does not stand for a sweeping rule of forfeiture. Instead, it is limited to a factual situation where an accused asked the Supreme Court to overturn

5

its precedent, and the Court declined to do so given that the accused had not raised the argument advanced on appeal "at any stage." *Id*. at 606.

The more recent Supreme Court authority cited by the Government, *Yellin v. United States*, 374 U.S. 109 (1963), controls here and compels the result that a criminal defendant must be allowed to present evidence to the fact-finder of a committee's departure from rules that govern its authority. The *Yellin* Court held that procedural objections are not forfeited by failure to make them clear to a congressional committee. *374* U.S. at 122-23. The Court held that whether or not procedural objections are clearly communicated to a committee, they are not forfeited. The accused should be able to present the evidence and be acquitted at trial if the defense is proved. Even if the accused is wrong, he nonetheless must be accorded the opportunity to "submit the correctness of his belief to a court of law." *Id*. at 123.[4]

## C. There Can Be No Forfeiture Where The Evidence Bears On An Element Of The Offense.

The evidence at issue in the Government's motion to exclude bears not only on the "authority" element of the statute, but also on the intent element of Section 192. The statute provides as follows:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce appears upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House or Congress, *willfully makes default*, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2 U.S.C. § 192 (emphasis added).

---

[4] *See also Liveright v. United States*, 347 F.2d 473, 474-76 (D.C. Cir. 1965) (no forfeiture of rights where at the time of committee appearance the witness was unaware of procedural defects).

Section 192, "like the ordinary federal criminal statute, requires a criminal intent – in this instance, a deliberate, intentional refusal to answer." *Quinn v. United States*, 349 U.S. 155, 165 (1955).[5] "This element of the offense, like any other, must be proved beyond a reasonable doubt." *Id.* at 675. Section 192 requires a "culpable state of mind." *Bryan, supra*, 524 U.S. at 191. Mr. Bannon deserves wide latitude to offer evidence that bears on his intent. *See Yellin, supra*, 374 U.S. at 123 (accused "would at least be entitled to submit the correctness of his belief to a court of law").

The Government argues that Mr. Bannon had an obligation to notify the Select Committee that it lacked a "ranking minority member,"[6] had a deposition rule involving outside counsel that made the subpoena unenforceable and failed to comply with the House Rules on providing deposition witnesses certain critical information. [Doc. 53]. That is not the obligation of a potential deponent. The Government cannot seriously contend that if only Mr. Bannon had notified the Select Committee that it lacked a "ranking minority member," then they would have rushed right out to get one. In fact, because all members were appointed by Speaker Pelosi, the task was impossible.

Nor can the Government seriously contend that the Select Committee was not put on notice of the defect in its outside counsel rules. On October 12, 2021, Mr. Costello spoke with Sean Tonolli, Senior Investigative Counsel for the Select Committee, and specifically discussed with him the Select Committee rule that would preclude attendance at the hearing by counsel for President Donald J. Trump. [US-000973]. Mr. Bannon had no obligation to try to persuade the

---

[5] We maintain the position set forth in several filings (but not restated here) that *Licavoli* does not accurately set forth the intent element of Section 192.

[6] An ironic position considering that they failed to deliver Section 3(b) which discusses the need to have a "ranking minority member" and the failure of such delivery means that the prospective witness does not have to appear pursuant to paragraph 11 of the deposition rules of the House.

Select Committee to change its rules. *See, e.g., United States v. Bart*, 349 U.S. 219, 220-22 (1955) (where a witness has put the committee on notice of a potential objection and has not received a clear-cut ruling, there is insufficient evidence of the requisite criminal intent to violate Section 192); *Quinn, supra*, 349 U.S. at 164 ("As everyone agrees, no ritualistic formula is necessary in order to invoke [a] privilege.").

Finally, Mr. Bannon had no obligation to sift through the multitude of rules provided to him with the subpoena to ascertain that the Select Committee had misled him as to what was contained therein. A key House regulation on the use of deposition authority requires that "[a] witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress and these regulations."[7] That regulation includes no exceptions. It has no escape-clause, whereby a witness has forfeited rights by not demanding that a committee provide all of the materials described in that regulation. In serving the subpoena on Mr. Bannon via Mr. Costello, Select Committee Chief Counsel and Deputy Staff Director Kristin Amerling provided 10 pages of detailed and arcane instructions, including the subpoena and its definitions. [US-00001-00010]. The cover letter, signed by Chairman Thompson, misleadingly stated that *"[a] copy of the rules governing Select Committee depositions"* was attached. [US-00001] (emphasis added). Despite this misleading statement, the Select Committee did *not* provide the specific materials required by the House deposition regulations.   Doug Letter, General Counsel of the House of Representatives, confirmed that the Select Committee did not provide the required materials to Mr. Bannon. *See* [US-000248] ("A copy of Section 3(b) was not provided to COSTELLO with the subpoena.").

---

[7] 117th Congress Regulations For Use Of Deposition Authority (Cong. Rec. H41 (Jan. 4, 2021)).

In short, the Select Committee failed to give Mr. Bannon a copy of the regulations as required. The Select Committee misled him about that in official correspondence. Given these circumstances, the Government cannot argue that Mr. Bannon somehow forfeited his right to present evidence on this matter, which bears directly on the element of intent. *See Yellin*, *supra*, 374 U.S. at 123 ("[W]hen the Committee's practice leads witnesses to misplaced reliance upon its rules ..., the witness' reasonable expectation is that the Committee actually does what it purports to do, adhere to its own rules. To foreclose a defense based upon those rules, simply because the witness was deceived by the Committee's appearance of regularity, is not fair.").

## CONCLUSION

WHEREFORE, Defendant Stephen K. Bannon respectfully requests that this Court deny the United States' Motion *In Limine* To Exclude Evidence Relating To Objections To Subpoena That Defendant Waived, for the reasons set forth above, together with any offered at a hearing on the motion.

*(Signature block on next page)*

9

**-1706-**

Dated: May 6, 2022                    Respectfully submitted,

                                      **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                      _/s/_ M. Evan Corcoran
                                      M. Evan Corcoran (D.C. Bar No. 440027)
                                      400 E. Pratt Street – Suite 900
                                      Baltimore, MD 21202
                                      Telephone: (410) 385-2225
                                      Facsimile: (410) 547-2432
                                      Email: ecorcoran@silvermanthompson.com


                                      _/s/_ David I. Schoen
                                      David I. Schoen (D.C. Bar No. 391408)
                                      David I. Schoen, Attorney at Law
                                      2800 Zelda Road, Suite 100-6
                                      Montgomery, Alabama 36106
                                      Telephone: (334) 395-6611
                                      Facsimile: (917) 591-7586
                                      Email: schoenlawfirm@gmail.com


                                      _/s/_ Robert J. Costello
                                      Robert J. Costello (_pro hac vice_)
                                      Davidoff Hutcher & Citron LLP
                                      605 Third Avenue
                                      New York, New York 10158
                                      Telephone: (212) 557-7200
                                      Facsimile: (212) 286-1884
                                      Email: rjc@dhclegal.com

                                      _Counsel for Defendant Stephen K. Bannon_

10
**-1707-**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of May 2022, a copy of the foregoing Opposition

to Government's Motion *In Limine* Based on Waiver was served *via* the Court's CM/ECF system

on all properly registered parties and counsel.

        /s/ M. Evan Corcoran

        M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

**OPPOSITION TO THE GOVERNMENT'S
MOTION TO EXCLUDE PRIOR SUBPOENA EVIDENCE**

Defendant Stephen K. Bannon ("Mr. Bannon"), through undersigned counsel, respectfully requests that this Court deny the United States' Motion In Limine To Exclude Evidence Of The Defendant's Prior Experience With Subpoenas [Doc. 54].[1] In support of our opposition, we state as follows:

**Summary of Argument**

The Government must prove beyond a reasonable doubt, as an essential element of the offenses charged, that Mr. Bannon "willfully made default."[2] A key issue for the jury will be to determine Mr. Bannon's intent. This will require the jury to assess the evidence presented at trial. It is vexing that the Government does not want the jury to hear what really happened. The jury will be asked to determine guilt or innocence, a determination that affects Mr. Bannon's liberty.

---

[1] The Government's motion seeks to exclude prior instances where Mr. Bannon testified in connection with an investigation by Special Counsel Robert S. Mueller, III, as well as before House and Senate Permanent Select Committees on Intelligence. [Doc. 54 at 2].

[2] The Indictment charges Mr. Bannon with two counts of contempt of Congress, in violation of 2 U.S.C. § 192, based on his alleged non-compliance with a September 23, 2021, subpoena issued by the Select Committee to Investigate the January 6th Attack on the United States Capital ("Select Committee"). [Doc. 1]. Count One pertains to testimony, while Count Two pertains to documents. [Doc. 1 at ¶¶ 23, 25].

Jurors draw from their own life experiences when evaluating evidence.[3] In the same way, Mr. Bannon's life experience informed his thinking and his actions upon receipt of the Select Committee subpoena. The jury must be allowed to hear about Mr. Bannon's life experiences that shaped his thinking, and in turn his actions. The Government's arguments that this intent evidence is not relevant, or even if relevant that it is confusing and complicated, are meritless and should be rejected. We have faith that the jurors can assess this evidence and give it the weight it is entitled, in accordance with the instructions on the law provided by this Court.

## ARGUMENT

As a threshold matter, the Government mischaracterizes this evidence. It will not be offered as character evidence (so Fed. R. Evid. 404(b) and 405 do not apply). It will not be offered to prove predisposition.[4] On the contrary, the evidence goes to intent, not character or predisposition. The test for admission will be Fed. R. Evid. 401 (relevance) and Fed. R. Evid. 403 (probative value outweighed by prejudice). The Government uses a simplistic example: "the fact that a person did not rob a bank on one day is irrelevant to determining whether he robbed a bank on another." [Doc. 54 at 4-5]. The example does not apply here.[5] As with all evidence, the question is *why* it is being introduced. The defense will not argue at trial that because Mr. Bannon testified before, his character is such that he is a testifier. The defense will not argue at trial that because Mr. Bannon testified on prior occasions, the jury should find that he acted *in conformity with* those prior actions when he responded to the Select Committee subpoena. Instead, the evidence reflects Mr. Bannon's

---

[3] *See, e.g.*, Standard Jury Instruction for the District of Columbia, Instruct. 2.200 Credibility Of Witnesses ("You may consider anything that in your judgment affects the credibility of any witness.").

[4] They Government mistakenly argues that "[t]he only conceivable argument [Mr. Bannon] could make to the jury from such evidence is that he is not predisposed to be contemptuous." [Doc. 54 at 3].

[5] A prosecutor may well be able to introduce evidence of prior bank entry to prove a bank robbery if used for a proper purpose – such as intent, opportunity, motive, or identity. For instance, the prior entry may tend to show that the accused was casing the bank for a future robbery.

2

life experience that informed his thinking – his intent – upon receipt of the Select Committee subpoena. Such intent evidence is admissible. It will be a key trial issue.[6]

Intent is routinely proved based upon surrounding circumstances, as well as the acts and statements of the accused. The standard jury instruction acknowledges this and gives the jury guidance on how to consider such evidence, as follows:

### Instruction 3.101 PROOF OF STATE OF MIND

Someone's [intent] [knowledge] [insert other appropriate state of mind] ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer someone's [intent] [knowledge] [other appropriate state of mind] from the surrounding circumstances. You may consider any statement made or acts [done] [omitted] by [name of the defendant], and all other facts and circumstances received in evidence which indicate his/her [intent] [knowledge] [other appropriate state of mind].

[You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts s/he intentionally did or intentionally did not do.] It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that [name of the defendant] acted with the necessary state of mind.

Criminal Jury Instructions for the District of Columbia ("Redbook"), No. 3.101 (5th ed. 2021).

Thus, the jury can infer Mr. Bannon's intent from the surrounding circumstances, as well as his statements and acts.

It is the Government's burden to establish that Mr. Bannon "willfully made default." As explained below, evidence that Mr. Bannon previously testified – after an accommodation was

---

[6] Importantly, Mr. Bannon demonstrated his willingness to work with the Select Committee to reach an agreement on accommodations that would have resulted in a different response to the Select Committee subpoena. The three reasonable accommodations sought, which were rejected or ignored by the Select Committee, included: (1) having the Select Committee and President Donald J. Trump reach an accommodation on executive privilege issues; (2) letting a court decide the executive privilege issues; and (3) allowing a one-week extension so that the parties could assess the implications of the complaint filed in *Trump v. Thompson*, 20 F.4th 10 (D.C. 2021), which was argued on November 30, 2021, released on December 9, 2021, and involved an assertion of the executive privilege over Presidential records sought by the Select Committee.

reached between the entity seeking testimony and former President Donald J. Trump on the issue

of executive privilege – is admissible because it negates an element of 2 U.S.C. § 192. We do not

agree with the Government that a jury, properly instructed, is incapable of considering this

evidence without prejudice or confusion.

## A.  The Evidence Is Directly Relevant To An Element Of The Offense.

The standard for admission of relevant evidence is low. Evidence is relevant if "it has *any*

tendency to make a fact more or less probable than it would be without the evidence" and "the fact

is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added). The evidence

standing alone need not resolve the case. *See* Fed. R. Evid. 401, Advisory Committee's Note to

1972 proposed rule ("A brick is not a wall.") (quoting McCormick § 152, p. 317); *see also*

*Bourjaily v. United States*, 483 U.S. 171, 179-180 (1987) ("[I]ndividual pieces of evidence,

insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary

presentation may well be greater than its constituent parts."). In a criminal case, any fact that tends

to prove or disprove an element of the offense is of consequence in determining the action.

Mr. Bannon's prior experience testifying before investigative bodies – which involved

accommodations on executive privilege – tends to negate his guilt by showing that he lacked the

criminal intent required to prove a violation of 2 U.S.C. § 192. The statute provides as follows:

> Every person who having been summoned as a witness by the authority of either
> House of Congress to give testimony or to produce papers upon any matter under
> inquiry before either House, or any joint committee established by a joint or
> concurrent resolution of the two Houses of Congress, or any committee of either
> House of Congress, *willfully makes default*, or who, having appeared, refuses to
> answer any question pertinent to the question under inquiry, shall be deemed guilty
> of a misdemeanor . . . .

2 U.S.C. § 192 (emphasis added).

We have previously briefed our position on the intent element of Section 192, [Doc. 30 & Doc. 41], and note that a well-respected and long-time chief of the Public Corruption Section, U.S. Attorney's Office for the District of Columbia, recognizes the justice in our position. *See* Randall Eliason, *Steve Bannon, Contempt, and Advice of Counsel*, SIDEBARS (Apr. 18, 2022), https://sidebarsblog.com/steve-bannon-contempt-advice-counsel/. We preserve those arguments, but do not restate them here. Even under the outdated standards of *Licavoli*, the Government must prove that Mr. Bannon had a "deliberate intention not to appear." *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961).

The evidence identified in the Government's motion has a tendency to make it less probable that Mr. Bannon had a "deliberate intention not to appear." *See* Fed. R. Evid. 401. Evidence that Mr. Bannon was previously summoned to appear for testimony, and testified after an accommodation was reached involving executive privilege issues, directly bears on his state of mind and intent upon receipt of the Special Committee subpoena. If Mr. Bannon believed that the executive privilege issues would be resolved through accommodation, then this "tends" to negate Mr. Bannon's guilt by showing that he did not have a "deliberate intention not to appear." *Licavoli*, 294 F.2d at 208.[7]

There is no question that the evidence is probative. Nor is there a legitimate issue of prejudice. Prejudice occurs when evidence by its nature could be considered by the jury for an improper purpose. There is little risk of that here, as the evidence bears directly on the critical issue

---

[7] The authority relied upon by the Government is inapposite, as it involves instances where an accused sought to introduce character evidence, not evidence bearing upon an element of the offense charged. *See, e.g., United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997) (previous awards did not bear on corruption charges); *United States v. Dimora*, 750 F.3d 619 (2014) (constituent service did not bear on bribery charges); *United States v. Ellisor*, 522 F.3d 1255 (11th Cir. 2008) (general good conduct not admissible to negate intent); *United States v. Marrero*, 904 F.2d 251 (5th Cir. 1990) (character evidence not admitted).

**-1713-**

of intent. The Government's arguments that the evidence would occasion a "trial-within-a-trial" and cause jury "confusion" are unfounded. [Doc. 54 at 5].

Under Federal Rule of Evidence 403, a court may "exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). Thus, Rule 403 "establishes a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *United States v. Roberson*, No. CR 21-102 (JDB), 2022 WL 35643, at *3 (D.C Cir. Jan. 4, 2022) (citation omitted).

Accordingly, when performing the Rule 403 balancing test, a district court may only find relevant evidence inadmissible "upon a showing that it presents a risk of 'unfair prejudice,' *i.e.*, prejudice that is 'compelling or unique,' or has 'an undue tendency to suggest decision on an improper basis.'" *United States v. Hutchings*, No. 19-361 (BAH), 2021 WL 4589850, *3 (D.C. Cir. Oct. 6, 2021) (citing *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995)); *see also United States v. Oreuga*, 430 F.3d 1158, 1165 (D.C. 2005) ("The gravamen of unfair prejudice is 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'") (citing *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). "[T]he balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged.'" *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 44 (D.C. Cir. 2016) (citing *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002)).

Since the evidence directly bears on intent, there is no basis to exclude it here. The Government's purported concern about a protracted trial-within-a-trial is misplaced, as the

evidence can be presented concisely and efficiently of the evidence. With proper instruction, there is no reason to believe that the jury will have difficulty weighing how the evidence bears on the issues in this case. [*See* Doc. 54 at 5]. Such factual evaluations and comparisons are precisely what juries are entrusted to do in criminal trials. *See United States v. Ayeni*, 374 F.3d 1313, 1320 (D.C. Cir. 2004) (emphasizing that the jury's role as fact-finder is "central to our jurisprudence"). Moreover, given the direct relevance of the contested evidence to Mr. Bannon's intent, which is an essential element of the charges, the small amount of additional time that will add to the trial by the presentation of that evidence is not a sufficient reason to exclude it. Mr. Bannon, after all, has a fundamental due process right to present a defense by offering his version of the facts to the jury. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). Finally, the neutral nature of the evidence means that it poses no danger of injecting the type of prejudice into the trial that Rule 403 aims to prevent.[8] *See Orenuga*, *supra*, 430 F.3d at 1165. Accordingly, Mr. Bannon respectfully requests that this Court deny the Government's Motion in Limine.

## B. **While Not Rule 404(b) Evidence, It Is Admissible Even Under That Rule**.

Federal Rule of Evidence 404(b) applies where evidence of other acts is offered to "prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it." Fed. R. Evid. 404(b), Advisory Committee's note to 1972 proposed rule. As described above, that is not the purpose for the introduction of the evidence in this case. Nonetheless, even if viewed in light of Rule 404(b), the evidence would be admissible. As the Supreme Court has held, "[e]xtrinsic acts evidence may be critical to the establishment of the truth

---

[8] The jury can be instructed as to the proper use of the evidence with an instruction. *See United States v. Williams*, 507 F. Supp. 3d 181, 193 (D.D.C. 2020) ("The best way of ensuring that any risk of prejudicial effect is minimized is not by exclusion, but by issuing a limiting instruction to the jury."); *United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015) (noting that "limiting instructions" serve "to mitigate the danger of undue prejudice or improper inferences"); *United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir 2007) (holding that the district court properly addressed any possible unfair prejudice when it "carefully instructed the jury on the proper use of the Rule 404(b) evidence both on the morning after introduction of the evidence and in its final charge to the jury").

as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Fed. R. Evid. 404(b) does not allow the introduction of evidence of other crimes, wrongs, or acts to show propensity, or in the words of the Rule, "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character trait." Fed. R. Evid. 404(b). But the Rule allows for the admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* Rule 404(b) is most often used by prosecutors. But defendants can avail themselves of it too. *See, e.g., United States v. Edwards*, 901 F. Supp. 2d 12, 16 (D.D.C. 2012) (citing *United States v. Alayeto*, 628 F.3d 917, 921 (7th Cir. 2010)).

Courts analyze "other acts" evidence under a more relaxed standard when a defendant offers that evidence. The prohibition on propensity evidence is "based on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Williams*, 507 F. Supp. 3d 181, 189 (D.D.C. 2020). But this concern does not apply to "other acts" evidence offered by the defendant. *See Edwards, supra*, 901 F. Supp. 2d at 16. The primary question whether to admit evidence offered by a defendant under Rule 404(b) is whether the evidence "tends, along or with other evidence, to negate the defendant's guilt of the crime charged against the defendant."[9] *Id.* (quoting *Alayeto*, 628 F.3d at 921) (brackets omitted); *see also United States v. Young*, No. 12-CR-00042 (BAH), 2013 WL 12430555, at *6 (D.C. Cir. Apr. 22, 2013). If the evidence satisfies

---

[9] "The D.C. Circuit has not directly addressed the admissibility of reverse 404(b) evidence." *Edwards, supra*, 901 F. Supp. at 16.

this test and complies with other applicable rules of evidence (*e.g.*, relevancy, hearsay, and probative verse prejudicial balancing), it will be admitted. *See id.* Thus, even if the Court disagrees with the defense and views this as Rule 404(b) evidence – which it is not – the evidence should be admitted at trial.

## CONCLUSION

WHEREFORE, Defendant Stephen K. Bannon respectfully requests that this Court deny United States' Motion in Limine To Exclude Evidence Of The Defendant's Prior Experience With Subpoenas, for the reasons set forth above, together with any offered if there is a hearing on the motion.

*(Signature block on next page)*

Dated: May 6, 2022                    Respectfully submitted,

                                      **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com


    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com


    /s/ Robert J. Costello
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

10

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of May 2022, a copy of the foregoing Opposition

To The Government's Motion To Exclude Prior Subpoena Evidence was served *via* the Court's

CM/ECF system on all properly registered parties and counsel.

    /s/ M. Evan Corcoran

M. Evan Corcoran (D.C. Bar No. 440027)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant.* | : | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE OF DEPARTMENT OF JUSTICE
OPINIONS AND WRITINGS [DOC. 52]**

On April 15, 2022, the Government filed a Motion *In Limine* to Exclude Evidence of

Department of Justice Opinions and Writings [Doc. 52]. The Government's motion is a

meritless further attempt to deny Mr. Bannon defenses to the charges against him in this case that

he is entitled to raise as a fundamental matter of due process of law and the right to a fair trial,

guaranteed to him and every other citizen under the Fifth and Sixth Amendments to the United

States Constitution. The Government's motion confirms what it has made clear at various

junctures in this case – it would like to deny Mr. Bannon any and all legally cognizable and

constitutionally guaranteed factual and legal defenses to the charges against him and it would

like the Court to put its imprimatur on that effort. The Government's motion has no merit and

must be denied.

Based on the history of at least six decades in which the very agency prosecuting this

case has had an unequivocal, official, formalized, published, and adopted policy licensing and

supporting the position Mr. Bannon took vis a vis the subpoena at issue and making clear the

inapplicability of the criminal contempt of congress statute to a person so situated, with

1

**-1720-**

executive privilege having been invoked, and as a matter of equity, the Government should be estopped from filing and pursuing such a motion and from prosecuting this case altogether.[1]

The Government's motion either reflects its continuing fundamental misunderstanding of the legal principles attending the defenses of public authority and entrapment by estoppel or an intentional effort to mislead the Court with respect to those legal principles and the relevant facts. In either case, its efforts must be soundly rejected and the motion must be denied. The motion is substantively without merit as will be demonstrated herein and as the previously filed Motion to Dismiss [Doc. 59-1], which anticipated these arguments, demonstrates.

Mr. Bannon incorporates herein by reference all previous filings and argument presented in this case and respectfully draws the Court's attention to Pages 16-48 of his previously filed Motion to Dismiss [Docs. 58 and associated exhibits; 59-1] and the authority cited therein. Mr. Bannon's Motion to Dismiss fully addresses the meritless claims made in the Government's motion at bar. Nevertheless, he will address herein each claim made by the Government in its

---

[1] *See e.g.*, Lundquist, John W. (1997) *"They Knew What We Were Doing?": The Evolution of the Criminal Estoppel Defense*, William Mitchel Law Review: Vol. 23: Iss. 4, Article 1. (*"Lundquist Article"*) https://open.mitchellhamline.edu/cgi/viewcontent.cgi?article=2003&context=wmlr *See Id.* at 847 *quoting from Raley v. Ohio*, 360 U.S. 423 , 438 (1959) (… "the conviction of the defendants for contempt as a result of invoking the Fifth Amendment was 'the most indefensible sort of entrapment by the State – convicting a citizen for exercising a privilege which the State clearly told him was available to him.'"); *Id.* at 848, *referring to Cox v. Louisiana*, 379 U.S. 559, 571 (1959), and characterizing such conduct as "an indefensible sort of entrapment by the State." *Id.* at 848-849, *referring to and quoting from*, *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 674, and the defendant's reliance on written agency regulations, ("[T]o the extent the regulations deprived [the defendant] of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with this prosecution."). *See also*, *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046 (1969); Anne Bowen Poulin, *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 18 Cal. L. Rev. 1423 (2001); [Doc. 59-1 at 37; Docs. 58-25; 58-26].

2

motion *in limine*, while trying, to the fullest extent possible, to limit the degree to which the

Court is burdened with redundancy from the Motion to Dismiss.

At the outset of its argument, the Government bafflingly asserts, without citing any

authority or offering any explanation, that "[D]epartment records evaluating the contempt statute

and Congress's subpoena power in the face of a valid assertion of executive privilege cannot be

used (to support defenses of entrapment by estoppel, public authority, or a lack of intent)." [Doc.

52 at 3]. This is an absurd and patently erroneous assertion and need not be dignified by being

separately addressed. Mr. Bannon's motion to dismiss more than sufficiently demonstrates

otherwise. [Doc. 59-1 at 16-39].[2]

**The Government's Argument on Relevance is Inapposite.**

On Page 3 of its Motion, the Government writes "Only relevant evidence is admissible at

trial." [Doc. 52 at 3]. This, assertion, on the other hand, is unassailably correct; but it certainly

does not advance the Government's argument at all.

Government counsel prove throughout their motion *in limine*, once again, that they have

a fundamental misunderstanding of public authority and entrapment by estoppel defenses and

---

[2] At Pages 2-3 of their motion *in limine,* Government counsel list what they purportedly
understand to be Mr. Bannon's claims regarding the relevance of the OLC Opinions and other
DOJ writings [Doc. 52 at 2-3]. Notably absent from its list is the relevance of the OLC Opinions
and other DOJ writings to the conceptually independent Due Process concern of notice or fair
warning concerning what conduct will subject a person to criminal liability – a fundamental
requirement of Due Process and "traditional notions of fairness inherent in our system of
criminal justice." *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 670-675
(1973); *Cox v. Louisiana*, 379 U.S. 559, 571-572 (1966); *Raley v. Ohio*, 360 U.S. 423, 437-442
(1959). The OLC Opinions and other DOJ writings Mr. Bannon has cited throughout these
proceedings and especially in his motion to dismiss are vitally important and directly relevant on
this issue and, indeed, support the dismissal of the indictment. *United States v. Levin*, 973 F.2d
463 (6th Cir. 1992).

3

**-1722-**

their core relationship to due process of law.  This fundamental misunderstanding is displayed even in their discussion of relevancy.

The Government cites to the decision in *United States v. Smith*, 568 U.S. 106, 110-112 (2013) for the proposition that "where a defendant wishes to raise an affirmative defense that does not negate the elements of the offense, but justifies its commission, the defendant bears the burden of proof." [Doc. 52 at 4].  Putting aside the difficulty understanding how such a proposition bears directly on a question of "relevance" or the admissibility of evidence, *Smith* is completely inapposite.  In *Smith*, Justice Scalia explained that it is permissible to require a defendant who claims to have withdrawn from a conspiracy prior to the end of the conspiracy (for purposes of calculating the statute of limitations) to bear the burden of proving the same. That conclusion was based, in significant part, on the undeniable principle that a "withdrawal," by definition, presupposes the commission of the criminal conspiracy and it is a crime that continues beyond the withdrawal.  The withdrawal simply limits the individual defendant's liability for post-withdrawal acts of his co-conspirators, but the person "remains guilty of conspiracy." *Id*. at 111.  In sharp contrast, with public authority and entrapment by estoppel, a criminal conviction is absolutely prohibited as a matter of due process of law when the conduct at issue has been authorized or the defendant reasonably believes it to have been authorized as legal.  *See e.g., Raley v. State of Ohio*, 360 U.S. 423, 439 (1959).

In any event, evidence of the facts and sources supporting the defenses of public authority – actual and apparent - and of entrapment by estoppel are directly relevant in this case under any formulation of relevancy under the Federal Rules and such facts and sources are clearly admissible on the record in this case.

4

Moreover, notwithstanding the Government's efforts at every juncture to try and prevent Mr. Bannon from presenting any defense to the jury, our Constitution requires that he be permitted to present his complete defense, supported by the evidence, as a matter of due process and the right to a fair trial found in its Fifth and Sixth Amendments. *See e.g., Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Crane v. Kentucky*, 476 U.S. 683 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984).

Tellingly, in *United States v. House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983), this Court expressly noted the difficulties inherent in a criminal contempt of Congress case where executive privilege is invoked, counseling sharply in favor of reaching a compromise rather than resorting to a prosecution, but emphasizing that if a criminal contempt of Congress charge is brought, "constitutional claims and other objections to congressional investigatory procedures may be raised as defenses...." *Id.* at 152, *citing, inter alia, Barenblatt v. United States*, 360 U.S. 109 (1959).

One might fairly have hoped that Government counsel would have taken the teaching of cases like the landmark go-to favorite *United States v. Abcassis*, 45 F.3d 39 (2d Cir. 1995) and the mistakes the district court therein made by not permitting the defense of entrapment by estoppel, for example, to go forward, as a lesson to avoid. It caused a great deal of wasted time, money, and other resources, and led to three convictions and lengthy prison sentences being overturned, with the defendants going home after long pre-trial and trial proceedings. Instead, the Government begs this Court to unconstitutionally deny Mr. Bannon his constitutionally guaranteed rights to due process of law, to compulsory process, to confrontation and to a fair trial. The Government's efforts and this motion must be rejected.

5

**The OLC Opinions and other DOJ Writings are Directly Relevant to the Elements.**

The Government writes next that the OLC Opinions and other writings are "irrelevant to proving whether the Defendant committed the charged offenses," further specifying that they are "irrelevant to the intent element of the offense" and therefore "inadmissible." [Doc. 52 at 4]. The Government acknowledges that it must prove that Mr. Bannon acted deliberately and intentionally [Doc. 52 at 4] and, indeed, this Circuit expressly has held that where a witness before a congressional committee refuses to answer a question based on a claim of privilege, the question of whether the refusal was deliberate and intentional must be put to the jury. *Keeney v. United States*, 218 F.2d 843, 845 (D.C. Cir. 1954). Significantly, in his concurring opinion in *Keeney*, Judge Prettyman expressly opined that a failure to comply based on the invocation of privilege, might not at all be a deliberate and intentional refusal to answer; rather it might be a genuine question by the witness about the witness's "ability to answer under legal compulsions." In any event, that is a question for a jury to determine under all circumstances. *Id.* at 850 (Prettyman, J., concurring).

Mr. Bannon is, of course, aware of the Court's ruling on the Government's Motion to Exclude All Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel [Doc. 49] and has preserved his position in opposition to that motion.[3] [Docs. 30; 39; 41; Tr. 3/16/2022 Hearing].

However, his intent is directly relevant to the burden the Government acknowledges it has of proving the charged conduct was "deliberate and intentional" [See Doc. 52 at 4]. For

---

[3] Prior to this case, it seemed unimaginable that any representative of the Government ever would ask a court to prohibit a defendant in a criminal case from relying on "the law;" but that is exactly what Government counsel did in this case – and the motion was unqualifiedly granted. [See Doc. 29 at 8; Doc. 49].

6

example, did Mr. Bannon deliberately and intentionally not comply or, as Judge Prettyman suggested as a possibility in *Keeney*, did he genuinely have a question as to whether he had the "ability" to comply, given the "legal compulsions" attending a claim of privilege? The OLC Opinions and other writings and Mr. Bannon's reasonable belief regarding the same and regarding the authority of the former President to direct him to withhold compliance based on executive privilege are directly relevant on this question and are admissible.[4]

This is especially true here, where there is an issue raised as to whether there was a "default" under the statute, intentional and deliberate or not, in light of the constitutional (and OLC) imperative to try to reach an accommodation. [Doc. 59-1 at 47]. Mr. Bannon went to great lengths to try to do so, in indicating his willingness to comply if privilege were worked out between the committee and President Trump or if a judge were to order him to comply, and requesting a one week adjournment in order to study the question in *Trump v. Thompson*, as well as by drafting a response to the committee, that addressed areas in which he had no information in any event, notwithstanding his firm belief based on the OLC Opinions, that there was no valid or constitutional subpoena outstanding (based on the refusal to allow a privilege holder representative to be present). [Doc. 59-1 at 48].

**The Materials Mr. Bannon Has Cited Fully Support Entrapment by Estoppel.**

At Pages 5-14 of its motion *in limine*, the Government argues that the OLC Opinions and other DOJ writings on executive privilege and contempt of congress do not support an entrapment by estoppel defense [Doc. 52 at 5-14]. The Government claims that this is so

---

[4] The DOJ Manual expressly recognizes the direct relevance of public authority defenses to criminal intent and provides, "[T]he defendant must be allowed to offer evidence that negates his/her criminal intent…" and to a "jury instruction" on the same. https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense

7

because (1) "no government official affirmatively misled the Defendant that his default was legal" [Doc. 52 at 8-12], (2) "The Defendant's attorney's interpretation of Department opinions provides no basis for the defense because his attorney is not a government agent" [Doc. 52 at 12-13], and (3) "The Defendant cannot show his reliance on Department records, if any, was objectively reasonable" [Doc. 52 at 13-14]. The Government's arguments are frivolous and without merit. Its second argument in this series is simply an absurd strawman argument that does not reflect any argument Mr. Bannon has made in this case: he has never in any way contended that his attorney is a "government official" or that his attorney is the source for the public authority on which he relied.

**Entrapment by Estoppel Does Not Require Direct Interaction with an Official.**

The Government's first claim, that entrapment by estoppel does not apply because "no government official affirmatively misled the Defendant that his default was legal" [Doc. 52 at 8-12] need not be addressed at any length. It is based on a completely erroneous legal premise – the same erroneous premise Government counsel has operated from at all times on this issue – and it miscasts the relevant facts. The short and accurate answer demonstrating the error in the Government's argument is that (1) there simply is no requirement that a defendant seek permission from some authorized person in a one on one exchange nor that some agency official personally, affirmatively mislead the defendant for the defense of entrapment by estoppel to apply[5] and that (2) the binding, official, authoritative policy of the DOJ affirmatively provided

---

[5] Even in an actual direct statements case, like the often-cited decision in *United States v. Abcassis*, 45 F.3d 39 (2d Cir. 1995), the court recognized that the appropriate inquiry focuses not solely on specific advice, but on all circumstances, including conduct, that form the basis for the defendant's belief. *Id.* 45 F.3d at 42-43, *citing Cox v. Louisiana*, 379 U.S. 559 (1965); *Lundquist Article* at 853. Ultimately estoppel rests "upon principles of fairness" and therefore it can be raised even in strict liability cases. *United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir. 1990), *citing United States v. Tallmadge*, 829 F.2d 767, 773 (9th Cir. 1987).

authoritative positions on the rights and duties of a witness facing a congressional committee subpoena when executive privilege is invoked and provided assurances that the statute under which Mr. Bannon is charged does not and cannot apply to a person so situated.

Mr. Bannon reasonably relied on that official policy, as he was fully entitled to do and he acted at all times based on that reasonable reliance. The Government's continued erroneous assertion that the law requires some affirmative communication directly between the agency and the defendant completely ignores the authority of *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675 (1973) ("*PICCO*") (reliance on an agency's administrative regulations); *United States v. Barker*, 546 F.2d 940, 951-952 (D.C. Cir. 1976) (reliance on a "legal theory espoused by this and all past Attorneys General for forty years" and reflected in a memorandum); *United States v. Levin*, 973 F.2d 463, 465 (6th Cir. 1992) (reliance on written agency policy statements and no personal inquiry by or personal assurance to the defendant); *See also* Doc. 59-1 at 28-29. The Model Penal Code, § 2.04(3)(b) (1962) provides additional support both for the reliance defense and for the sources upon which one is entitled to rely. *See* Doc. 59-1 at 30 & n.37.

The Government's assertion that "a defendant cannot extrapolate the government's statement of the law in one scenario as a free pass to commit crimes in another and then claim the defense" [Doc. 52 at 8-11] simply is not relevant here. The OLC Opinions and other writings relied upon by Mr. Bannon and cited in support of the defenses of public authority and entrapment by estoppel apply directly to this situation.[6] Over six decades of OLC Opinions and

---

[6] The Government is simply wrong when it argues that there can be no entrapment by estoppel claim based on "implication." [Doc. 52 at 9]. The Court in *Raley* and *Cox* made clear that policy relied upon can be "implied" from behavior and from circumstances. *See Raley*, 360 U.S. at 437-439; *Cox*, 379 U.S. at 571. Indeed, the defense can be based on policy statements by an

9

other DOJ writings make clear that when executive privilege in invoked with respect to a congressional subpoena, the invocation must be respected, the witness cannot be compelled to comply in violation of the privilege, and the criminal contempt of congress statute (charged here) cannot be used to bring a criminal charge against the subpoena recipient.

Further, specifically identified OLC Opinions and other DOJ writings expressly address every relevant aspect of Mr. Bannon's situation and his conduct comported at all times with the DOJ binding policy on which he reasonably relied. This is all discussed at some length, in detail, and with the underlying OLC Opinions and other DOJ writings provided to the Court in Mr. Bannon's motion to dismiss [*See* Doc. 59-1 at 17-28; 31-38 & Exhibits to Doc. 58] and he will not burden the Court here with a repetition of that discussion. Rather he incorporates herein by reference the discussion in his motion to dismiss on this subject in response to the Government's claim.

**The Government's Attempted Distinctions are Factually and Legally Wrong.**

The Government's attempts to distinguish Mr. Bannon's situation based on phony distinctions that are wrong factually and are not legally cognizable as material distinctions are unavailing and certainly do not in any way bar him from advancing his public authority and entrapment by estoppel defenses in this case (e.g. that Mr. Bannon was a "private citizen" or that the subpoena was directed to him in his capacity as a "private citizen" or that he was not excused from complying at least in part).

---

agency that appear to be contradicted by other authoritative agency statements. *See PICCO*, 411 U.S. at 671-675. *See also, "Lundquist Article"* at 850. Indeed, the defense applies even if the reasonably relied upon agency policy is incorrect. *See United States v. Barker*, 546 F.2d 940, 952 (D.C. Cir. 1976). None of this is necessary to consider in the instant case; rather it is offered simply in response to the Government's specious (and wrong) argument that for entrapment by estoppel purposes agency policy reasonably relied on cannot by "implication." [Doc. 52 at 9].

10

Former President Donald J. Trump, as was his prerogative, invoked executive privilege with respect to the committee subpoena directed to Mr. Bannon, a former top white house official and Mr. Bannon acted consistently with and in reasonable reliance upon official, binding, authoritative policy.  As discussed in Mr. Bannon's motion to dismiss, the OLC Opinions and other DOJ writings make clear that executive privilege can be invoked for communications with current or former executive branch employees as well as for communications with outside consultants ("private citizens" as the Government would have it) who have never been executive branch employees. [Doc. 59-1 at 17-18, n.20].  That makes perfect sense of course.

If the Government could put aside for a moment that the Defendant is Stephen K. Bannon and its associated political agenda with respect to Mr. Bannon and his followers, perhaps it would see the matter with common sense.  It makes perfect sense for say, President Biden, to be able to call the CEO of a major oil company to consult on the state of gasoline prices, or  Henry Kissinger to discuss foreign policy matters – both being "private citizens" – and to expect to have the ability to invoke executive privilege in the face of a congressional subpoena designed to question either person about those communications.  Both are private citizens, not executive branch employees.

### There is No Legal Basis for Requiring Partial Compliance with a Subpoena the OLC Opinions Deemed Invalid

As for the Government's claim that there was no basis for Mr. Bannon to reasonably believe that he did not at least have to comply in part with the subpoena [Doc. 52 at 11 – arguing that he should have produced a privilege log or asserted privilege on a "question-by-question basis"], Mr. Bannon, through Mr. Costello, has been clear at all relevant times that he relied on official DOJ policy that provided that subpoenas requiring an appearance without allowing agency counsel or the privilege holder's representative to be present are "without legal effect"

11

and may not constitutionally be enforced either civilly or criminally and he was allowed to so reasonably rely as a matter of fact and law. *See* Doc. 59-1 at 18 & n.22; Doc 58-8, *Congressional Oversight of the White House*, 2021 WL 222744 (O.L.C.) at *56 (January 8, 2021); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019).

The Government's attempt to bar the defense of entrapment by estoppel based on a parsing of the communications with Justin Clark is unavailing, both based on the OLC Opinion advising that the entire subpoena was invalid and not legally enforceable, in light of the refusal to allow a privilege holder representative to be present and because the uncontradicted record evidence is that Messrs. Costello and Bannon understood executive privilege to have been invoked concerning the subpoena and did not believe they had the authority to discern what materials or testimony President Trump deemed to be subject to executive privilege and could not risk a waiver [Doc. 39 at 4-5; 30-1 at ¶¶ 23-24] Moreover, as Mr. Costello affirmatively noted, the concern applies, according to the OLC Opinions, even if the President has not yet invoked privilege, for a privileged matter might not be recognized ahead of time, but easily can arise at any time if the current or former executive branch employee appears. *See* Doc. 30-1 at ¶ 22; *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *8 (May 23, 2019).

### The Post-Return Date Letter From the Biden Administration Purporting to Supersede President Trump's Invocation of Executive Privilege Does Not Advance the Government's Argument.

The Government's reference to the October 18, 2021, letter from White House Deputy Counsel Jonathan Su to Mr. Costello, reflecting a purported attempt by President Biden to supersede former President Trump's invocation of privilege [Doc. 52 at 11; Doc. 52-1] certainly

12

does not aid the Government's effort to bar Mr. Bannon's due process-based defenses. Rather it undercuts the Government's effort.

Mr. Su's letter clearly recognizes expressly or implicitly that former President Trump had invoked privilege and that Mr. Bannon's noncompliance was based on that invocation of executive privilege. Secondly, the letter post-dates the subpoena return date, consistent with Mr. Costello's view that this was an ongoing process designed to reach an accommodation, based on the constitutional imperative for the same, repeatedly voiced by the courts and reflected in OLC Opinions. However, notwithstanding the letter, purporting to be on behalf of President Biden directly Mr. Costello to have Mr. Bannon comply with the subpoena and purporting to remove the invocation of executive privilege, the very next day, October 19, 2021, the committee ignored President Biden's letter and directive and went forward with its previously scheduled televised contempt referral vote for Mr. Bannon, leaving him no opportunity to comply with Mr. Su's letter. Furthermore, the committee rejected out of hand Mr. Costello's request for a one-week extension so that he could consider the then pending case, *Trump v. Thompson*, which had at its heart, the question of whether and, if so, when, a sitting President can supersede a former President's invocation of executive privilege. *See* Doc. 30-1, ¶ 16.

**The Government Mischaracterizes the Provisions of the OLC Opinions.**

There is nothing in any of this that left Messrs. Bannon and Costello to "guess" [Doc. 52 at 12] about the DOJ's position when a former executive branch employee receives a committee subpoena and the former President of the United States notifies the recipient that he is invoking executive privilege with respect to the subpoena; nor were they left to "guess" as to the DOJ's position regarding the effect of the committee's refusal to allow the privilege holder to have a representative present to invoke privilege; nor were they left to "guess" on the DOJ's position

13

concerning the absolute barring of any criminal prosecution under 2 U.S.C. § 192 for the failure

of a former executive branch employee to comply with a subpoena when executive privilege has

been invoked (and the privilege holder's representative is not permitted to appear).

All of these things are answered expressly and in detailed fashion, with careful detail and

reasoning set forth in multiple OLC Opinions and other DOJ writings reflecting long-established

formal binding authority.

To the extent Mr. Bannon was, in fact left to "guess" as the Government asserts, then the

indictment must be dismissed for its failure to provide adequate notice of what conduct would

and would not subject a citizen in such circumstances as Mr. Bannon faced to criminal liability,

in light of the binding OLC Opinions – a fundamental requisite for any criminal prosecution as a

matter of due process of law guaranteed under the United States Constitution. [*See* Doc. 59-1 at

45-48; *PICCO*, 411 U.S. at 670-675; *Cox*, 379 U.S. at 571-572; *Raley*, 360 U.S. at 437-442;

*Lundquist Article* at 850].

**Mr. Bannon Has Never Claimed His Attorney Was a Government Agent.**

The Government's next argument is just a nonsensical strawman argument that has

nothing to do with any assertion Mr. Bannon has made. The Government argues that Mr.

Costello's representations to Mr. Bannon about the OLC Opinions cannot provide the basis for

an estoppel by entrapment defense because "[D]efendant's attorney is not a government official"

and the "… defense is focused on the unfairness of a government agent telling a defendant

proposed conduct is legal and then prosecuting him for that very conduct." [Doc. 52 at 12-13].

No one on behalf of Mr. Bannon has ever argued in this case that Mr. Costello's

conclusions "about the reach of the contempt statute" can be "attributed to the government"

14

[Doc. 52 at 13], that Mr. Costello is somehow a government agent or that it is reliance on Mr. Costello directives that provides a public authority or entrapment by estoppel defense.

**Mr. Costello's Testimony Will Be Directly Relevant to Reasonableness.**

The testimony of Mr. Costello, a very experienced criminal defense lawyer, about how he communicated to Mr. Bannon the substance and import of the OLC Opinions and other DOJ writings, furnishing the same to Mr. Bannon, so that Mr. Bannon could decide how to proceed, and Mr. Costello's experienced legal opinion on the impact of the OLC Opinions and other DOJ writings as he communicated that to Mr. Bannon as well, is all independently relevant and must be admitted at trial in this case (if the motion to dismiss is denied), as directly relevant testimony on the issue of the reasonableness of Mr. Bannon's belief that the OLC Opinions and other DOJ writings authorized him to take the action he took and prevented any civil or criminal enforcement of the subpoena under the circumstances present here. *See United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987)[7]  The Government forcefully asserts that Mr. Bannon bears the burden of proving his reliance on the OLC Opinions and other sources for his public authority and entrapment defenses was reasonable [Doc. 52 at 13-14; 18-19]. Mr. Costello's testimony is both directly relevant and fully admissible for the purpose of meeting the reasonableness burden. *Id.*

---

[7] "Tallmadge did not rely solely on the misleading representations of the licensed firearms dealer. He also sought and obtained advice from an experienced criminal lawyer regarding his right to possess a nonconcealable firearm in light of the state trial judge's admonition against possessing a *concealable* weapon. He was told by his attorney that he could possess a "long gun." The uncontradicted evidence establishes that Tallmadge's reliance on the firearm dealer's misleading information was reasonable in light of his attorney's legal opinion that he could purchase a rifle, and the comments of the state trial judge and the deputy district attorney at the probation termination proceedings." *Tallmadge*, 829 F.2d at 775 (emphasis added).  The DOJ Manual explaining the defense of entrapment by estoppel, cites the decision in *Tallmadge* as an example of the defense's application.  https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense at Page 2.

15

**Mr. Bannon's Reliance Was Reasonable By Any Standard.**

The Government argues next that Mr. Bannon cannot show that his reliance on the OLC Opinions and other DOJ writings was reasonable. [Doc. 52 at 13-14]. Suffice it to say that the OLC Opinions and other DOJ writings, [Docs. 58-8 through 58-18; 58-20; 58-21]; including the position taken by a former U.S. Attorney in this district [Doc. 58-16], speak for themselves. They provide more than sufficient evidence of the reasonableness of his reliance on them to meet any recognized threshold for the reasonableness inquiry; and further the long-established history of OLC Opinions and other DOJ writings consistent with the positions relied upon by Mr. Bannon, along with experienced defense counsel's legal conclusion concerning the same, all support a finding that the reliance was reasonable under any standard. Mr. Bannon also was entitled to reasonably believe that he was authorized to proceed as he did based on the invocation of executive privilege and associated communications on behalf of the former President and they support his defense of entrapment by estoppel (and public authority).

The evidence is sufficient both to support the motion to dismiss based on such reliance and, at a minimum to put the matter before a jury to decide. As noted above and in the motion to dismiss [Doc. 59-1 at 16-38; Exhibits to Doc. 58], a fair reading of the cited OLC Opinions and other DOJ writings supports Mr. Bannon's reliance on them in response to the subpoena and the invocation of executive privilege and his corresponding actions in conformity with the same. Every specific aspect of his circumstance is addressed in the OLC Opinions and other DOJ writings – former executive branch employee, executive privilege invoked regarding his committee subpoena, status of a subpoena when the committee will not let the privilege holder's representative to be present and much more are all directly discussed in great detail and with

impressive reasoning provided in a form that represents binding, authoritative policy for the DOJ.

### Mr. Bannon Must Be Permitted to Adduce Evidence on Public Authority.

The Government next makes essentially the same arguments as to why it claims Mr. Bannon should not be permitted to put forward the defense of public authority. [Doc. 52 at 14-19].[8] The Government's arguments are similarly wholly without merit and must be rejected.

### Public Authority Can Be Based On Written Policy Statements.

The Government's argument on the public authority defense suffers from the same defect regarding its premise as its argument on entrapment by estoppel. There simply is no requirement as a matter of law that the defendant seek out some law enforcement agent to get his or her authority in order for the defense to apply, notwithstanding the Government's reference to

---

[8] The Government asserts in its motion that Mr. Bannon had not filed notice under Rule 12.3 of the Federal Rules of Criminal Procedure, of his intention to raise a public authority defense. [Doc. 52 at 15, n.2]. Mr. Bannon timely filed his Rule 12.3 notice contemporaneously with his pre-trial motions as the rule provides. [Doc. 55]. In that notice Mr. Bannon identified the support for his public authority (actual and apparent) and entrapment by estoppel defenses. The matters on which he has relied at all relevant times in connection with those defenses are the authority of the former President in invoking executive privilege regarding the subpoena and the authority of the Department of Justice and its constituent parts and branches, including this U.S. Attorney's Office, reflected in directly relevant, applicable, and binding Opinions from the OLC and other DOJ writings, going back consistently over six decades. [Doc. 55]. Rule 12.3 provides for a response by the Government either admitting or denying that the defendant exercised the public authority identified in the notice. Rule 12.3(a)(3). The Government filed its response on April 29, 2022, [Doc. 60] arguing that the notice was deficient for the same absolutely frivolous reasons it offers to support its motion *in limine* seeking to bar Mr. Bannon from advancing these defenses, continuing its consistent pattern of making unsupportable arguments that ignore binding precedent from the United States Supreme Court and from this Circuit, including the right of a former President to invoke executive privilege and the right to rely on agency policy for public authority and entrapment by estoppel, without any personal inquiry or communication. The Rules do not provide for a Reply to the notice and none should be required here to these same frivolous arguments. There is nothing deficient about the notice. Mr. Bannon also provided the Government with more than ample, detailed notice in the motion to dismiss regarding the specific authority relied upon for these defenses.

17

cases in which that was the scenario. [Doc. 52 at 14-16]. Mr. Bannon reasonably relied on direct communications on behalf of former President Trump and formal binding policy statements in the form of the OLC Opinions and other DOJ writings for his public authority defense.

This Circuit expressly has recognized that a public authority defense can be based on agency documents, including a single memorandum reflecting a long-standing policy. *See United States v. Barker*, 546 F.2d 940, 951-952 (D.C. Cir. 1976) (recognizing the defense of public authority in the form of "apparent authority" based on an Attorney General's memorandum setting forth a "legal theory espoused by this and all past Attorneys General for forty years).

The Government's argument is all over the place. On the one hand, the Government argues that the fact that no "law enforcement agent" authorized Mr. Bannon's response to the subpoena is fatal to the defense [Doc. 52 at 15]; but on the very same page, it appears to recognize the relevance of the President's authority, arguing that the only communication Mr. Bannon had with an executive branch official was the October 18, 2021 letter from Jonathan Su, post-dating the subpoena return date and purporting to supersede former President Trump's invocation of executive privilege. [*Id*.].

At all relevant times following his receipt of the subpoena through the return date and beyond, Mr. Bannon was advised by former President Trump's agent that the former President had invoked executive privilege as to the subpoena and he was duty bound to respect and follow that invocation and directive. Former President Trump, in his capacity as the former President of the United States had the authority to invoke executive privilege and Mr. Bannon was entitled to rely on that authority and to presume the invocation of executive privilege to be valid. [*See* Doc.

59-1 at 17-21; 22-31; 35 and the authority cited therein]. Mr. Bannon reasonably relied on President Trump's actual and apparent authority. He supports this position in detail in his motion to dismiss, primarily at the pages identified and will not burden he Court with a repetition of that argument here. Rather he incorporates it herein by reference.

This was not a matter of Mr. Bannon "attempt[ing] to predict, based on inapposite Department writing, whether the Department would prosecute him." [Doc. 52 at 16] Quite to the contrary, Mr. Bannon acted on the directive from the former President, based on the latter's authority and on the authority of the Department of Justice, based on its binding, authoritative policy, based on his status as a former executive branch official who had received a committee subpoena regarding which executive privilege had been invoked – the exact subject of multiple binding OLC Opinions and other DOJ writings on the exact subject, reiterating decades old policy and with the authority to issue such binding authority.

**The OLC Opinions Unquestionably are Binding on the DOJ and Should Have Barred This Prosecution.**

The only real question here, is how and by what authority, other than as a function of base political partisanship and virulent hatred of former President Trump, Mr. Bannon and his followers and a concerted effort to take all steps possible to stop their influence on their millions of political followers and on matters of public interest, these prosecutors can justify defying the authority of the OLC Opinions that prohibit this prosecution and that are binding on the Department of Justice.

The Government here disclaims its own authority – the authority of the very prosecuting agency pursuing this case and under whose supervision these prosecutors act and attempt to discount the OLC Opinions and other writings, indisputably recognized as binding, authoritative policy statements for the Department of Justice [*See* Doc. 59-1 at 17-27] by asserting that "they

were not authored by law enforcement officials with actual authority to direct the Defendant to defy the subpoena." [Doc. 52 at 16]. The argument ignores the constitutional Article II relationship between the DOJ and chief executive, the Attorney General's role within the Article II branch, vis a vis the President, the President's power under Article II, § 3, and specifically the President's power, on his own or as delegated through the Attorney General to the OLC with respect to the enforcement of a statute. [*See e.g.,* Doc. 59-1 at 35]. In any event, Mr. Bannon reasonably and appropriately acted on the public authority of former President Trump and the DOJ.

It is just plain nonsense to assert that neither the President nor the Attorney General (acting through the OLC) has the authority to direct action, as the advocate for the executive branch, in the face of a subpoena that raises separation of powers concerns and that implicates the invocation of executive privilege and it is just as nonsensical to assert that the DOJ lacks the authority to give assurances that a person acting in conformity with its policy as enunciated through OLC Opinions will not and cannot be criminally prosecuted. The Government cites no authority of course for its position on the claim that neither the President nor the DOJ has authority.

In disclaiming the DOJ's public authority, the Government first, as with the former President, without citation, asserts that the DOJ lacks actual authority and then writes: "Every court to have decided the issue has held that, for the public authority defense to be available, a defendant must have received a direction to commit a crime from a law enforcement agent who had 'actual, not apparent authority' to so direct him.'" [Doc. 52 at 16]. The Government's

20

assertion is wrong and paints the matter with a mistakenly broad brush.[9]  It also misses the point

here.  The Government bases its assertion on a mischaracterization of Mr. Bannon's defense and

on an overly simplistic and misleading diminution of the decision in *United States v. Barker*, 546

F.2d 940 (D.C. Cir. 1976) [Doc. 52 at 17 & n. 3].[10]

---

[9] The Government's representation to the Court goes even well beyond the position taken in the
DOJ Manual on apparent authority.  The DOJ Manual, at least, recognizes that the defense of
apparent authority was recognized and credited by this Circuit in *United States v. Barker*, 546
F.2d 940 (1976), but it then comments that "perhaps" due to the "unique intent requirement
involved in the charges at issue in the *Barker* case, the courts have **generally** not followed its
'apparent authority' defense."  https://www.justice.gov/archives/jm/criminal-resource-manual-
2055-public-authority-defense (emphasis added).  At least one legal commentator has asserted
that the inquiry actually should focus on apparent authority, rather than actual authority, writing:

> "Rather than judging whether an agent has the actual authority to bind the
> government, the issue should be framed as whether the official had the apparent
> authority to make the pronouncement and whether the defendant's reliance was
> reasonable.  Thus, the issue of authority turns on a mixed fact determination of (1)
> whether the agent had some colorable authority to render the advice and (2)
> whether the defendant's reliance was reasonable under the circumstances."

> https://open.mitchellhamline.edu/cgi/viewcontent.cgi?article=2003&context=wml
> r at Page 872.

[10] While the split in the panel in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) has led to
a questioning by some of its actual precedential value, one thing that is absolutely clear is that
reliance on the opinions of the Attorney General (here as delegated to the OLC), whether
characterized as "actual" or "apparent" authority is cited by Judge Merhige in *Barker* as a source
of authority that fully serves the desired policy of "fostering obedience to the decisions of certain
individuals and groups of individuals that society has put in positions of prominence in the
governing structure …." *Barker*, 546 F.2d at 956.  The Government omits from its footnote
referring to the critique of *Barker* by the Court in *United States v. North*, 910 F.2d 843, 879
(D.C. Cir. 1990), the later decision in *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994)
that clarified the critique in *North*, affirmatively providing that while it had questioned an aspect
of *Barker*, it "expressly said that (it) did 'not mean to suggest that criminal defendants in this
Circuit could not avail themselves of the defense of reliance on an official misstatement of law as
that defense is described in Judge Merhige's opinion." (citation omitted).  Clearly, Judge
Merhige's conclusion that Attorney General opinions (and therefore OLC opinions) have the
status of public authority, whether characterized as actual or apparent authority, Mr. Bannon
reasonably relied on them as sources of public authority and he was entitled to do so as a matter
of law.

21

### The DOJ and OLC Have Actual and Apparent Public Authority; the Government Misstates the Relevant Inquiry.

The Government writes that "[T]he Office of Legal Counsel and other representatives of the Department of Justice do not have the authority to invoke executive privilege and direct a private citizen, subpoenaed in his capacity as such, to ignore completely a congressional subpoena's documents and testimony requirements." [Doc. 52 at 17]. Mr. Bannon has never asserted that the OLC or any other DOJ representative either invoked executive privilege or had the authority to do so and the Government well knows that. Its assertion has no applicability to this case. Former President Trump invoked executive privilege and he had the authority to do so, and much more, based on well settled case law [*See* Doc. 59-1 at 17-35]. Mr. Bannon relied on his actual authority and the associated directives with the invocation of executive privilege.

### The Government Ignores the Invocation of Executive Privilege and Other Relevant Attending Circumstances in Miscasting the Issue.

Mr. Bannon was not just a "private citizen, subpoenaed in his capacity as such" in the context of this matter. [Doc. 52 at 17]. Rather he was a former top level executive branch official and close advisor to the President and he was a witness with a subpoena regarding which the former President had invoked executive privilege. Under those circumstances and the constitutional issues, including separation of powers issues it implicated, the DOJ, acting through the OLC, certainly had the authority to set parameters, to determine the obligations and rights of the former executive branch official, and the appropriate response by the former executive branch official, once executive privilege, at the former President's prerogative, had been invoked. The concerns were properly institutional ones reflected by the invocation of executive privilege. The DOJ, as the executive branch's lawyer, also had the authority to determine whether the failure to comply with a subpoena under such circumstances could and would be

22

**-1741-**

prosecuted and its OLC Opinions have spoken clearly and authoritatively on that subject as well, as has been described at length. Mr. Bannon had the right to rely on that authority and his reliance on that authority, as a matter of due process should have prohibited this prosecution both because of the express, binding authority announcing that prosecution under this statute is prohibited where executive privilege has been invoked and because its directive on this subject, strips away the notice due process requires that would lead someone in Mr. Bannon's situation to have reason to believe that his response to the subpoena could constitute a crime – a fundamental due process prerequisite for any criminal charge.

Mr. Bannon was entitled to rely on the public authority of former President Trump, who in the unique situation of a former President, maintains the authority to invoke executive privilege even after his term in office ends and he was entitled to rely on the public authority of the DOJ as reflected in its binding policy statements. He reasonably relied on both and based on that did not and could not have committed a crime through his actions in compliance with the same. The prosecution must be dismissed or, at a minimum, without in any way waiving that position, surely the jury must be presented with his public authority defense and a corresponding jury instruction as with the entrapment by estoppel defense.

The balance of the Government's submission on public authority is just more of the same and has no application to this case. The Government skips back to the President from the DOJ and writes that only the President can invoke executive privilege and a subordinate cannot. [Doc. 52 at 18]. That has nothing to do with this case. It was the former President who invoked executive privilege and has been asserted repeatedly, with long-standing authoritative support, he fully had and has the actual (and apparent) authority to invoke executive privilege. He did so, and Mr. Bannon reasonably relied on that exercise of public authority.

23

**-1742-**

**Mr. Bannon's Reliance on Public Authority Was Reasonable by Any Measure.**

Contrary to the Government's penultimate argument, [Doc. 52 at 18-19], Mr. Bannon's reliance on public authority surpasses any threshold for reasonableness for the question to be presented to a jury, based on all relevant facts, at the bare minimum, for the same reasons he satisfies this element with respect to the defense of entrapment by estoppel.

**Presenting Evidence on These Due Process Defenses Is Necessary and Appropriate.**

The Government's final argument, that allowing Mr. Bannon to present the due process based defenses of public authority and entrapment by estoppel, based on the OLC Opinions and other DOJ writings would "confuse the issues and mislead the jury" [Doc. 52 at 19] is completely unfounded, offensive to the fundamental constitutional principles at issue, has no basis in fact or law, and reflects a very troubling approach by these prosecutors. They have made clear their goal, at all costs, and even at the expense of the rule of law and the fair application of our constitutional guarantees to any defendant, to do everything they can to deny Mr. Bannon the opportunity to put the actual facts and circumstances of his case and the important attending legal principles of constitutional dimension before the jury. That agenda must be definitively rejected.

## CONCLUSION

Based on all of the foregoing and on all previous pleadings and argument, and especially the argument and authority set out in Docs. 58, 58-1 through 58-31 and other exhibits, and 59-1, it is respectfully submitted that the Defendant's motion is due to be and must be denied.

Dated: May 6, 2022                    Respectfully submitted,

**SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

_/s/ M. Evan Corcoran_
M. Evan Corcoran (D.C. Bar No. 440027)

24

400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

        /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

        /s/ Robert J. Costello
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of May 2022, a copy of the foregoing

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE

EVIDENCE OF DEPARTMENT OF JUSTICE OPINIONS AND WRITINGS was filed through

the Court's CM/ECF system and was served *via* electronic delivery on counsel of record.

        /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Defendant contends that the Indictment should be dismissed. His principal grievance is that his total noncompliance with the subpoena is excused by executive privilege and prior Department of Justice writings and opinions. Not so. The Defendant's contention ignores the straightforward facts of this case: that the Defendant was subpoenaed for information related to his activities as a private party in 2020-21, and not in his capacity as a White House advisor in 2017; that neither the current nor former President asserted executive privilege in a manner consistent with or allowing the Defendant to engage in total noncompliance; and Department of Justice writings and opinions say nothing about someone like the Defendant—a private party subpoenaed to testify and provide documents to Congress about events that occurred long after he left the government. The Defendant's remaining challenges to the Indictment—that 2 U.S.C. § 192 is unconstitutional as-applied, that the Committee exceeded its authority in issuing the subpoena, and that the prosecution team committed misconduct—are also meritless. The courts have applied Section 192 to contemnors for over 100 years without difficulty; the Defendant waived procedural objections to the subpoena by failing to raise them with the Select Committee, which acted well within its legislative authority; and the prosecution did not commit misconduct or otherwise overreach in investigating and prosecuting the Defendant's default. The Defendant's motion to dismiss should be denied.

## BACKGROUND

The Defendant is a private citizen who, for about seven months in 2017, worked in the White House as an advisor to former President Donald J. Trump. ECF No. 1, Indictment ¶ 6. On September 23, 2021, the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee") subpoenaed the Defendant on information and belief that he possessed information relevant to its investigation of the circumstances of the January 6, 2021, Capitol attack. *Id.* ¶ 7. The subpoena commanded the Defendant (1) to produce, by October 7, 2021, documents related to the attack or a log of documents withheld under any claim of privilege; and (2) to appear, on October 14, 2021, for a deposition. *Id.* ¶¶ 8, 10-14. He did neither. *Id.* ¶¶ 15, 19. Instead, the Defendant sent letters to the Committee claiming that executive privilege exempted him from any modicum of compliance. *Id.* ¶¶ 16, 18. The Committee rejected the Defendant's executive-privilege assertion and warned him that his total noncompliance could result in a contempt prosecution. *Id.* ¶¶ 17, 20. The Defendant persisted in his noncompliance and offered no further justification or objection to the subpoena. *Id.* ¶ 21.

On November 12, 2021, a Grand Jury of the District of Columbia returned an Indictment charging the Defendant with two counts of contempt of Congress, in violation of 2 U.S.C. § 192— Count One for willfully defaulting on his obligation to appear for a deposition and Count Two for willfully defaulting on his obligation to produce documents or a privilege log. *See* ECF No. 1.

## ARGUMENT

According to the Defendant's brief, he seeks dismissal of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A) for alleged defects in instituting the prosecution and 12(b)(3)(B) for alleged defects in the Indictment. ECF No. 59-1 at 2. He claims (1) that executive

privilege and prior Department of Justice writings and opinions excuse his noncompliance with the Committee's subpoena and bar the prosecution; (2) that Section 192 is unconstitutional; (3) that the Committee's subpoena is unlawful based on procedural defects; and (4) that the prosecution committed misconduct. We address the claims in that order. For each, the Court should accept as true the factual allegations contained in the Indictment. *United States v. Ballestas*, 795 F.3d 138, 148-49 (D.C. Cir. 2015).

## I.   EXECUTIVE PRIVILEGE PROVIDES NO BASIS FOR DISMISSING THE INDICTMENT.

The Defendant seeks dismissal of the Indictment on the ground that executive privilege excused his appearance at the deposition before the Committee and his production of any documents in response to the Committee's subpoena and so it is unconstitutional to prosecute him under Section 192. *See* ECF No. 59-1 at 43-44. He also argues that the Department of Justice is estopped by its opinions and writings from prosecuting for contempt of Congress apparently anyone, private or public, who seeks to aid the President. *Id.* at 16-38. Neither claim holds water.

### A.   The Defendant Has Failed to Establish That Executive Privilege Was Asserted to Justify Total Noncompliance.

The Defendant repeatedly asserts in his briefing that there was an invocation of executive privilege by former President Trump that allowed the Defendant to ignore the Committee's subpoena entirely. *See, e.g.*, ECF No. 59-1 at 43 (describing "the invocation of Executive Privilege by the former President . . . and the associated directive to Mr. Bannon not to comply with the subpoena"). But the Defendant does not identify when the privilege was invoked, how it was invoked, or over what information it was invoked, nor does he explain why it allowed him to legally default. In fact, there is no evidence that the former President ever invoked executive privilege over the materials and information sought by the Committee's subpoena in a manner

3
**-1747-**

calling for total noncompliance. Accordingly, the Court does not need to consider whether any invocation validly allowed the Defendant's total default, because the Defendant has failed to demonstrate that there was, in fact, any such assertion of privilege in the first place. The Defendant's claims for dismissal based on executive privilege must be rejected.

Because the Defendant does not hold the executive privilege, he cannot assert it. *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (noting that the privilege resides with the current President and that former presidents have been recognized to "retain for some period of time a right to assert executive privilege over documents generated during their administrations" (internal citation omitted)); *cf. United States v. Reynolds*, 345 U.S. 1, 7 (1953) (finding that the state secrets privilege "can neither be claimed nor waived by a private party"). Instead, the Court must look to whether the President—here, based on the Defendant's claims, the former President— made an assertion of executive privilege. *See id.*; *cf. McClelland v. Andrus*, 606 F.2d 1278, 1290 n.59 (D.C. Cir. 1979) ("To interpose an objection to disclosure based on Executive privilege '(t)here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.'" (quoting *Reynolds*, 345 U.S. at 7-8)); *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) ("We think it abundantly clear . . . that any claim of privilege, whether of executive or Presidential privilege . . . , must be made with particularity."). The Defendant offers no evidence that the former President asserted executive privilege with respect to the Defendant's subpoena directly to the Committee, in any court proceeding, or to any office of the Executive Branch. Instead, to support his arguments, the Defendant relies entirely on the communications he received from the former President's counsel, Justin Clark. *See* ECF No. 59-1 at 17. Whatever the validity of an assertion by the former President might be, however, Mr. Clark's correspondence never explicitly asserted

executive privilege, never claimed that any such privilege applied to all potentially responsive records, and never directed the Defendant to refuse to appear for a deposition. *See* ECF No. 52-2.

To make his executive privilege objections to the Committee, the Defendant relied on a letter he received from Mr. Clark on October 6, 2021, one day before the subpoena's document deadline. *See* ECF No. 52-2; ECF No. 29-1 at US-000418-19. The letter did not assert executive privilege over the entirety of the information subject to the Committee's subpoena or state that the Defendant should delay compliance or refuse to comply in any way. *See* ECF No. 52-2. Instead, the letter indicated, at most, the possibility that the former President would assert privilege at some point, stating only that the subpoena seeks information "which is potentially protected from disclosure by [] executive and other privileges" and that the former President "is prepared" to defend the privileges in court. *Id.* Indeed, in reporting the letter to the Committee, the Defendant recognized that it represented only an "intention" to assert executive privilege at some future time. *See* ECF No. 29-1 at US-000418-19 (explaining that the Defendant, after receiving the October 6 letter, would not comply "since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert those executive privileges enumerated [in the October 6 letter]"). After noting the former President's potential invocation, Mr. Clark's October 6 letter then stated, in a separate paragraph, that the Defendant was being instructed to, as the law allowed, "where appropriate, invoke any immunities and privilege *he* may have from compelled testimony in response to the Subpoena," to "not produce any documents concerning privileged material," and to "not provide any testimony concerning privileged material." ECF No. 52-2 (emphasis added).

The letter provided no further information. It did not indicate what privileged material the Defendant should withhold; did not request an opportunity to review the material for potentially

privileged information before the Defendant produced it; did not instruct the Defendant to seek an extension or make a protective claim of privilege on the former President's behalf so that the former President could review material and assert as necessary; did not instruct the Defendant to withhold non-privileged material and to refuse to produce a privilege log of records withheld; did not ask to have counsel attend the deposition with the Defendant to assert executive privilege on the former President's behalf; and did not instruct the Defendant to refuse to appear for testimony. *See id.* Moreover, as confirmed by the Committee, *see* ECF No. 29-1 at US-000421, and Mr. Costello's preindictment interviews with the Government, *see* ECF No. 28-4 at US-001775-79, 001781-82, after sending this letter, Mr. Clark never followed up with the Defendant or the Committee to do any of those things or to take any other steps to assert or preserve the privilege—despite Mr. Costello's entreaties to Mr. Clark that he do so.

In fact, in later correspondence, Mr. Clark admonished that the former President had neither asserted privilege in a manner to allow, nor instructed the Defendant to engage in, total noncompliance. On October 14, 2021, Mr. Clark emailed Mr. Costello stating that he had read Mr. Costello's October 13 letter to the Committee, in which Mr. Costello asserted to the Committee that "counsel for former President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved." ECF No. 52-3. Mr. Clark then stated, "To be clear, in our conversation yesterday, I simply reiterated the instruction from my letter to you dated October 6, 2021." *Id.* Mr. Costello forwarded this email to the Defendant and told him to beware in deciding not to comply with the subpoena based on Mr. Clark's communications. *See* ECF No. 35-6. In an October 16, 2021, email to Mr. Costello, Mr. Clark further made clear that the former President did not invoke executive privilege in any way to bar the Defendant from

appearing for a deposition or to direct him not to attend, stating, "Just to reiterate, our letter referenced below [the October 6, 2021, letter] didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is." ECF No. 52-3.

The Defendant has acknowledged time and again throughout this litigation the settled principle that executive privilege is not his to invoke. *See, e.g.*, Mot. Hrg., 3/16/21, Tr. at 66:10 (Costello: "Executive privilege doesn't belong to Steve Bannon."); ECF No. 59-1 at 27 (stating that he is not the privilege holder); ECF No. 28-4 at US-001771, 001780. Only the privilege holder can invoke it. Even assuming that the former President can invoke executive privilege in this context—an issue the Court need not decide—he has previously demonstrated his ability, intention, and decision to assert executive privilege in relation to the Committee's investigation. *See Trump*, 20 F. 4th at 20-21 (noting that the former President reviewed and identified specific pages of records out of a larger collection over which he was asserting executive privilege when the Committee subpoenaed his presidential records from the National Archives).[1] The Defendant has failed to show that the former President took any similar steps here or asserted executive privilege here in a manner purporting to direct the Defendant to engage in total noncompliance. All the Defendant's claims based on an invocation of executive privilege can be rejected, therefore, without further analysis.

In any event, the Government is aware of no authority, and the Defendant points to none, supporting the notion that a private citizen subpoenaed in that capacity is entitled to absolute immunity from testimony based on executive privilege. In fact, courts in this district have rejected

---

[1] The former President was represented in *Trump v. Thompson* by Justin Clark, the same attorney who corresponded on the former President's behalf with Mr. Costello.

the application of absolute immunity from deposition altogether. *See Comm. on Judiciary v.*

*McGahn*, 415 F. Supp. 3d 148, 202-03 (D.D.C. 2019), *overruled on other grounds,* 951 F.3d 510

(D.C. Cir. 2020); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 99-107 (D.D.C. 2008).

Although the Government disagrees with those categorical holdings, the Department of Justice's

view, as outlined in Office of Legal Counsel (OLC) opinions and its briefings in *McGahn* and

*Miers*, has been that absolute immunity from appearing at a deposition under a claim of executive

privilege is only available, at most, to senior presidential advisors, subpoenaed in their capacity as

such or in relation to their service as such, over whose testimony executive privilege is asserted

and who are consequently directed by the President not to appear. *See generally Congressional*

*Oversight of the White House*, 45 Op. O.L.C. __, at *55 (Jan. 8, 2021); Combined Mem. of Points

and Authorities in Support of Def.'s Mot. for Summary Judgment and In Opp. To Pl.'s Mot. for

Summary Judgment, *McGahn,* Case No. 1:19-cv-02379, ECF No. 33 at 58-61 (Oct. 1, 2019);

Mem. in Support of Defs.' Mot. to Dismiss, *Miers,* Case No. 1:08-cv-00409, ECF No. 16-2 at 50-

55 (May 9, 2008). The Defendant was subpoenaed in his capacity and in relation to his activities

as a private citizen—indeed, the subpoena's date range was from April 1, 2020, to the date of its

issuance, pertaining to documents and information several years after the Defendant's departure

from the White House. And the Defendant was never directed by the former President—let alone

by the current President—not to appear for the subpoenaed deposition. In fact, he was told exactly

the opposite. *See* ECF Nos. 52-1, 52-3. No assertion of executive privilege gave the Defendant

immunity from appearing for a deposition. Moreover, a subpoenaed witness cannot refuse to

appear simply because he thinks Congress might exceed the bounds of its authority in its

questioning. *See Barenblatt v. United States*, 360 U.S. 109, 132 (1959) ("[C]ertainly the

conclusion would not be justified that the questioning of petitioner would have exceeded

permissible bounds had he not shut off the Subcommittee at the threshold."); *cf. Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 773 (D.C. Cir. 2020) (noting that the ability to invoke executive privilege to refuse to answer specific questions during congressional testimony is "unaffected by an order compelling [the witness] to appear and testify").

Likewise, executive privilege provides no basis to refuse to produce even a single document. As the Defendant's counsel has conceded, ECF No. 28-4 at US-001770, US-001777, the Committee's subpoena sought several categories of records completely unrelated to the former President and the Executive Branch that executive privilege does not reach. *See* ECF No. ECF No. 53-1 at US-000410-12; *see also Trump*, 20 F.4th at 25 ("[The presidential communications privilege] allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997))); *In re Sealed Case*, 121 F.3d at 737 ("[The deliberative process privilege] allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967))). The Government is aware of no authority, and the Defendant cites none, that executive privilege reaches private records about the private affairs of a private citizen. Thus, even if the former President had made a valid assertion of executive privilege over some records, the Defendant was not excused from producing the rest.

The Defendant has not met the threshold requirement to demonstrate that executive privilege was invoked in a manner prompting total noncompliance. All the Defendant's claims

for dismissal based on a purported assertion of executive privilege must therefore be rejected and his motion to dismiss based on those claims denied.

## B.   The Defendant Has Failed To Demonstrate that Dismissal is Appropriate on the Ground of Entrapment by Estoppel.

To succeed on an entrapment-by-estoppel defense, the Defendant carries the burden of proof and must establish four elements: "(1) that a government agent actively misled [the defendant] about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)). The Government examined the Defendant's burden and these elements in depth in its Motion in Limine to Exclude Evidence of Department of Justice Opinions and Writings, ECF No. 52 at 5-14, and will not repeat its review of the controlling law here but incorporates it by reference.

In his Motion to Dismiss, the Defendant does not even cite the elements of estoppel, let alone explain why he has met them. Instead, relying on a Sixth Circuit case, *United States v. Levin*, 973 F.2d 463, 470 (6th Cir 1992), he contends that he is entitled to dismissal because "there can be no factual dispute about what the written, binding, authoritative OLC Opinions provided on the matters directly at issue, nor can there be any factual dispute about Mr. Bannon's reliance on them." ECF No. 59-1 at 28 (citing *Levin*, 973 F.2d at 470 (affirming district court's dismissal of fraud and false statements charges where "undisputed extrinsic evidence" supporting estoppel rendered the prosecution "incapable of proving beyond a reasonable doubt the intent required to convict" (emphasis omitted)). But unlike the defendants in *Levin*, the Defendant cites no facts at

all, let alone undisputed ones, supporting his estoppel claim.  In fact, the factual record reveals that

the OLC opinions on which the Defendant claims to have relied do not sanction his total

noncompliance with the Committee's subpoena, and, in any event, he provides no evidence that

he considered or relied on them other than his unsupported assertion that he did.  The Defendant's

motion to dismiss the Indictment on entrapment-by-estoppel grounds should, therefore, be denied,

and as explained in the Government's motion to exclude, the Defendant should be prohibited from

introducing any evidence or argument on the defense at trial.

> **1.      The Defendant has failed to identify any government statement
> sanctioning his default.**

First, the Defendant has failed to identify any Government writing or opinion that stated

his default did not violate 2 U.S.C. § 192.  Although the Defendant makes claims that he was "duty

bound" and "entitled to rely" on various OLC opinions, ECF No. 59-1 at 17, and selectively quotes

from some of them, *see id.* at 27-30, he identifies only three opinions on which he claims to have

"relied" in deciding he could lawfully default:

> 1) *Prosecution for Contempt of Congress of an Executive Branch Official Who Has
> Asserted a Claim of Executive Privilege* [hereinafter *Prosecution for Contempt of
> Congress*], 8 Op. O.L.C. 101 (1984), *see* ECF No. 59-1 at 19-20 n.23;
>
> 2) *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency
> Employees*, 43 Op. O.L.C. ___ (May 23, 2019) [hereinafter *Exclusion of Agency
> Counsel*], *see* ECF No. 59-1 at 18 n.22; and
>
> 3) *Congressional Oversight of the White House*, 45 Op. O.L.C. ___ (Jan. 8, 2021), *see* ECF
> No. 59-1 at 18-19 & n.21.

The Defendant also suggests he "relied" on a letter from the former U.S. Attorney for the

District of Columbia to the former Speaker of the U.S. House in which the U.S. Attorney stated,

"It has long been the position of the Department . . . that we will not prosecute an Executive Branch

official under the contempt of Congress statute for withholding subpoenaed documents pursuant

to a presidential assertion of executive privilege." *See* ECF No. 59-1 at 19 n.23. None of these opinions or writings, however, suggests that the separation of powers immunizes a private citizen, subpoenaed in relation to his capacity as such, from complying with a congressional subpoena, particularly where, as here, there was no presidential assertion of executive privilege. These opinions and writings, therefore, cannot support an entrapment-by-estoppel defense to the Defendant's noncompliance with the subpoena in this case.

An examination of the documents on which the Defendant claims to have relied—an exercise in which he does not engage—makes plain that they do not apply here. The opinion in *Prosecution for Contempt of Congress* is limited to circumstances entirely different from those of the Defendant's default. The opinion addressed an executive branch official's refusal to produce law enforcement records where the official first identified responsive records that contained sensitive law enforcement information, submitted the materials to OLC and the President's counsel for a determination of whether executive privilege applied, and received a memorandum from the President after that evaluation, instructing the official to withhold the documents under an assertion of executive privilege. 8 Op. O.L.C. at 105-07. The opinion thus addresses only "whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege," *id.* at 102, and concludes that, "[i]n the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official," *id.* at 142; *see also id.* at 129 ("The Department of Justice has previously taken the position that the criminal contempt of Congress

statute does not apply to executive officials who assert claims of executive privilege at the direction of the President."). Because the former President did not assert executive privilege here, and neither the current nor former President instructed the Defendant not to appear at the deposition or to refuse to produce any documents, the opinion is irrelevant and does not excuse his default. Indeed, the opinion is striking in how much the conduct it addresses differs from the Defendant's.

OLC's opinion in *Exclusion of Agency Counsel* similarly addresses only the legality of a current or former executive branch official refusing to comply with a subpoena in relation to his or her official duties. Specifically, the opinion states that such an official acts lawfully if he or she refuses to appear for testimony after a congressional committee refuses to allow agency counsel to accompany the official over the Executive Branch's objection. 43 Op. O.L.C. at *4 ("The question we address here arose out of the Committee's effort to compel two executive branch witnesses . . . to appear at depositions."); *id.* at *2 ("The Committee, therefore, could not constitutionally bar agency counsel from accompanying agency employees called to testify on matters within the scope of their official duties."); *id.* at *13-14 ("[W]e further advised that the subpoenas that required them to appear without agency counsel, over the Executive Branch's objections, exceeded the Committee's lawful authority and therefore lacked legal effect."); *id.* at *14 ("[A]gency employees . . . who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully."). Again, the Defendant was subpoenaed only in relation to his activities as a private citizen. Moreover, because the former President's counsel never requested or sought to attend the deposition, *see* ECF No. 28-4 at US-001774, 001780, or directed the Defendant not to attend without the former President's counsel, *see* ECF No. 52-3, the opinion also has no conceivable relevance to the Defendant's case and does not sanction his

default. Furthermore, the opinion says nothing of a congressional document demand, a wholly separate requirement of the subpoena with which the Defendant failed to comply.

OLC's opinion in *Congressional Oversight of the White House* addresses whether and under what circumstances current or former executive branch officials, subpoenaed in relation to their capacity as such, may lawfully refuse compliance with a subpoena. The opinion states that "the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." 45 Op. O.L.C. at *50 (citing *Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 129-42). It further states that "the President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties," *id*. at 53 (citing *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *3 (May 20, 2019)), and on that basis, "the President can also direct them not even to appear," *id.* at 54 (citation omitted)). The opinion further describes this immunity as applying to compelled testimony from immediate presidential advisors "about their official duties in that capacity even after they leave the White House," *id*. at *54-55 (citation omitted), and describes the fact-based inquiry required to determine whether an executive branch official qualifies for the immunity, *id.* at *55 ("[I]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President."). The opinion notes that "most members of the White House staff do not qualify for immunity from compelled testimony." *Id.* The opinion also states that "[s]ubpoenas requiring White House personnel to testify without agency counsel . . . may not be enforced, civilly or criminally, against their recipients." *Id.* at *56 (citing *Exclusion of Agency Counsel*, 43 Op. O.L.C. at *3-14). Because the Committee subpoenaed the Defendant only in relation to his activities as

a private citizen, activities that occurred three years after he left the White House, *see* ECF No. 53-1 at 4-6 (subpoena describing topics on which the Defendant was believed to have relevant information and on which he was required to produce records), and because neither the current nor former President directed him not to appear, OLC's opinion in *Congressional Oversight of the White House* has no relevance to the Defendant's case and does not sanction his default.

Moreover, all three opinions make clear that executive privilege does not protect from disclosure a private citizen's private papers or information. For example, OLC's opinion in *Congressional Oversight of the White House* describes the deliberative process, attorney-client communications and work-product, and presidential communications components of executive privilege as protecting from disclosure "internal communications and information concerning presidential and other executive branch decision-making," *id.* at *32, notes that the various components of the privilege "vary in scope and the extent of protection from disclosure," *id.* at *57, and states that "[i]t has long been the Executive Branch's policy to 'comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch,'" *id.* at *59 (citation omitted). The Office's opinion in *Prosecution for Contempt of Congress* similarly describes the bounds of executive privilege, noting that it protects "deliberative communications between the President and his advisors," "material necessary to protect military, diplomatic, or sensitive national security secrets," and "open law enforcement files." 8 Op. O.L.C. at 116-17; *see also id.* at 116 (describing executive privilege as "prevent[ing] disclosure of certain Executive Branch documents"); *id.* ("[I]t may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities."). By contrast, as the Defendant himself has identified,

ECF No. 28-4 at US-001770, areas of inquiry on the face of the subpoena here have no relation to the former President or executive privilege. ECF No. 53-1 at US-000410-12. Nevertheless, the Defendant did not produce records or appear to testify on those matters, whatever the claim of executive privilege might be with respect to other categories of information.

Finally, the letter from the former U.S. Attorney for the District of Columbia that the Defendant cites for the most part addresses issues entirely unrelated to those presented by this case—specifically, whether a congressional witness could be prosecuted for contempt of Congress after invoking her Fifth Amendment right against self-incrimination to refuse to answer questions during a hearing to which she had been subpoenaed. *See* ECF No. 58-16. To be sure, the letter states that "[i]t has long been the position of the Department . . . that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege," *see* ECF No. 59-1 at 19 n.23, but this is all it says on the issue and it notes that "[t]he fullest explanation of the legal basis for the Department's position" was provided in *Prosecution for Contempt of Congress*, ECF No. 58-16. The letter is inapposite for the same reason the OLC opinion which it incorporates is inapposite: The Defendant was not an executive branch official and there was no presidential assertion of executive privilege as to particular documents. The letter provides no basis for the Defendant's disregard of the subpoena.

The Department writings on which the Defendant claims to have relied address the legality of circumstances entirely different from those presented by the Defendant's default, and, despite having the burden of proof for the affirmative defenses he raises, the Defendant provides no evidence or argument to conclude otherwise. The fact of the matter is that the Defendant cannot point to a single Department writing stating that a private individual may lawfully ignore a

congressional subpoena for materials or testimony relating to his conduct as a private individual. For that reason alone, the Defendant cannot satisfy the requirements for an entrapment-by-estoppel defense. *See United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (explaining that the defendant "must do more than show that the government made 'vague or even contradictory statements'" and "must show that the government affirmatively told him the proscribed conduct was permissible" (quoting *Raley v. Ohio*, 360 U.S. 423, 438 (1959))); *United States v. Abcasis*, 45 F.3d 39, 43-44 (2d Cir. 1995) ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization.").

## 2.   The Defendant has failed to demonstrate that his decision to default was made in reliance on Department writings.

To establish an estoppel defense, the Defendant must not only have been "actively misled" by the Government into believing his conduct was lawful, but he must have acted in reliance on the Government's statement of the law when committing the offense. *Chrestman*, 525 F. Supp. 3d at 31. Here, not only do the writings on which the Defendant claims to have relied fail to address the legality of his actions, but, even if they did, the Defendant has failed to meet his burden to show that he even had knowledge of the OLC opinions. Instead, the record demonstrates that the Defendant relied on his attorney's estimation of how the government might extend the reasoning in the OLC opinions to the Defendant's conduct. An entrapment-by-estoppel defense cannot be sustained when it is a private party's interpretation of the law on which the Defendant relies. *United States v. Hardridge*, 379 F.3d 1188, 1194 (10th Cir. 2004) ("[W]here, as here, the alleged unfairness to the defendant arises out of private conduct and not from government action, it is not the government that has denied due process." (emphasis omitted)); *United States v. W.*

*Indies Transp., Inc.*, 127 F.3d 299, 314 (3d Cir. 1997) ("The entrapment by estoppel defense applies only to representations made by government officials, not to asserted reliance on legal advice or representations from non-governmental actors. Representations made by [a] private entity as to the legality of [the defendant's conduct] cannot remotely establish a valid entrapment by estoppel defense.").

The Defendant appears to concede that he never read the OLC opinions himself and instead relied on what his attorney told him about the opinions. *See* ECF No. 59-1 at 16 ("The OLC opinions were brought to Mr. Bannon's attention by his attorney, Robert J. Costello, Esquire, who advised Mr. Bannon that the OLC opinions were binding authority on the Department of Justice and that they were controlling authority in the circumstances he faced. Mr. Costello provided Mr. Bannon with legal advice, based on the OLC opinions and Mr. Bannon acted at all relevant times in the manner Mr. Costello directed him, based on the OLC opinions and Mr. Bannon at all relevant times reasonably relied on the OLC opinions."). In addition, the record reflects that in most, if not all instances, the Defendant relied on Mr. Costello's personal conclusions about how the government might view the Defendant's default based on his reading of the OLC opinions, not the actual substance of the OLC opinions. *See* Costello Decl., ECF No. 30-1, at ¶ 7 ("At all relevant times, Mr. Bannon relied entirely on my research and legal advice and agreed to follow my legal advice."); *id.* at ¶ 23 ("At all times I discussed each Opinion and other legal source with Mr. Bannon, gave him my legal conclusions and I directed him that he must not appear or produce documents in response to the subpoena. He relied in good faith on my legal advice and on these OLC Opinions and other legal sources I brought to his attention, and he agreed to follow my legal advice as directed."); *id.* at ¶ 24 ("The fact that Mr. Bannon did not appear or produce documents pursuant to the subpoena was entirely a function of my legal conclusions and my legal advice and

directives to him based on the OLC Opinions and case law concerning his legal rights, duties, and obligations, and the effect the invocation of executive privilege had on the same, prohibiting him, in my studied and expressed legal opinion, from complying with the subpoena."). For example, Mr. Costello, in the sworn statement he has submitted to the Court, stated,

> in light of the fact that the Select Committee had adopted a rule that would prevent the President's counsel from attending the proposed deposition in order to protect the President's claims of executive privilege, the Office of Legal Counsel ("OLC") had issued an opinion in 2019, which was binding upon the Executive Branch of Government, which stated that the subpoena that Mr. Bannon received was illegal, unlawful and incapable of being enforced either civilly or criminally. Therefore Mr. Bannon was legally entitled to refuse to produce documents or testify pursuant to that subpoena.

Costello Decl., ECF No. 30-1, at ¶ 12. As outlined above, however, OLC's opinion in *Exclusion of Agency Counsel* addresses only a congressional demand for testimony, not congressional demands for documents as Mr. Costello told the Defendant. *See* 43 Op. O.L.C. at *4. Moreover, the opinion does not decide whether the mere existence of a rule excluding outside counsel renders defiance lawful, but instead concludes only that "agency employees . . . who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully," *id.* at *14, and the opinion is limited to circumstances in which agency employees, or former agency employees, are called to testify "about information created or received during their employment," *id.* at *10, and who were acting at the direction of agency counsel in refusing to appear, *id.* at *14. Mr. Costello's conclusion that the Department may ultimately conclude the mere existence of the rule would bar compliance in all circumstances based on its conclusions in the narrow circumstances addressed in *Exclusion of Agency Counsel* cannot provide a basis for estoppel.

### 3. The Defendant has failed to demonstrate that any reliance he placed on Department writings was reasonable.

While the Defendant asserts that the "history" of the OLC opinions and his attorney's advice are "relevant" to evaluating reasonableness, *see* ECF No. 59-1 at 31, the Defendant nowhere

actually cites the standard for "reasonableness" that courts apply in considering entrapment-by-estoppel claims or explains why his reliance on his counsel's extrapolation from inapposite OLC opinions was, in fact, reasonable. He has thus failed to demonstrate this element of the entrapment-by-estoppel defense as well.

"[R]easonable reliance means a defendant must establish that 'a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *W. Indies Transp., Inc.*, 127 F.3d at 313. None of the four writings on which the Defendant claims to have relied address his circumstances or position, and the foundational writing, *Prosecution for Contempt of Congress*, on which the others rely, makes clear that whether and under what circumstances a subpoenaed witness has immunity from appearing in response to a congressional subpoena based on executive privilege is a fact-based inquiry requiring independent analysis of each situation. *See* 8 Op. O.L.C. at 103 (cautioning that the opinion's conclusions are fact-based and that the issues "could conceivably be resolved differently depending upon the facts of a controversy"); *see also Congressional Oversight of the White House*, 45 Op. O.L.C. at *55 (noting that "most members of the White House staff do not qualify for immunity from compelled testimony" and explaining that "[i]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President."). With a clear statement in the OLC opinions that the Defendant should inquire further, the Defendant cannot seriously claim his actions meet the standard for reasonableness under an entrapment-by-estoppel defense.

## C. The Defendant Has Failed to Demonstrate that His Default Was Conducted Under Public Authority.

To establish a public authority defense, which is distinct from an estoppel defense, the Defendant must demonstrate 1) that "a federal law enforcement officer . . . actually authorized the

defendant to commit the particular criminal act at issue," 2) that "the defendant . . . reasonably relied on that authorization when engaging in that conduct," and 3) that "the government official on whom the defendant purportedly relied . . . actually had the authority to permit a cooperating individual to commit the criminal act in question." *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015). As with entrapment-by-estoppel, the Government examined these elements and their application to the instant case in-depth in its motion in limine, and will not duplicate that analysis here, but incorporates it by reference. *See* ECF No. 52 at 14-19. In arguing for dismissal based on public authority, the Defendant does not cite, let alone engage in any analysis of, these elements. Applying these elements to the facts of the Defendant's default, however, makes clear that the Defendant's public-authority defense fails because the Defendant does not and cannot demonstrate that he received a direction from any law enforcement officer to commit the crime of contempt and he has failed to demonstrate that any reliance would have been reasonable.

> **1.    The Defendant has failed to establish that he received a direction from a federal law enforcement officer with actual authority to engage in contempt of Congress.**

The Defendant claims that both the former President and OLC are federal law enforcement officials with actual authority to direct him to default. *See* ECF No. 59-1 at 35. He then claims that he received a direction to default from the former President based on the latter's "invocation of executive privilege and corresponding directive to Mr. Bannon, that Mr. Bannon must honor that invocation with respect to the subpoena." *Id.* He also claims that OLC directed him to default by its opinions concluding that executive branch officials need not comply with subpoenas for testimony where directed by agency personnel after a congressional committee refuses to allow agency counsel to attend. *Id.* Neither the former President nor OLC were law enforcement

officials with actual authority to direct the Defendant to commit a crime. He cannot, therefore, make out a public-authority defense.

First, the former President was a private citizen at the time the Defendant received the Committee's subpoena. He was not a federal law enforcement official. Any direction the former President gave to the Defendant to default, therefore, fails to meet the threshold requirement of a public-authority defense that a defendant be acting under the direction of a law enforcement officer. *See, e.g.*, *United States v. Sariles*, 645 F.3d 315, 317 (5th Cir. 2011) (noting the defense "is available when the defendant is engaged by a government official to participate or assist in covert activity" (internal quotation marks and citation omitted)). As the Defendant acknowledges, the public-authority defense is available for actions "taken 'under color of public authority.'" ECF No. 59-1 at 35 (quoting *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001)). A private citizen's direction does not provide color of public authority.

Second, the Defendant has not identified an official within OLC that he claims directed him to engage in contempt of Congress or, even if one had, that the official had actual authority to do so. He did not seek and OLC did not issue any directives or opinions to the Defendant. To support his claim that OLC directed him to engage in total noncompliance, the Defendant instead includes one sentence in his brief:

> The OLC Opinions referred to herein also provided a source of the actual authority Mr. Bannon received to the effect that the subpoena was unlawful and invalid, in light of the committee's rules (and refusal to permit a privilege holder representative to attend the deposition), that it would be unlawful for a congressional committee to try to compel production or testimony from a person so situated once executive privilege was invoked, and that it would be unconstitutional for a person so situated to be criminally prosecuted under the statute charged in this case.

ECF No. 59-1 at 35. The Defendant appears to be referring only to OLC's May 23, 2019, opinion regarding the presence of agency counsel at depositions. This opinion, however, was not directed

to the Defendant and, as described above, *supra* at 13-14, it addresses only the legality of an executive branch official, subpoenaed in relation to his duties as such, refusing to appear for a deposition where he receives a direction not to appear from the agency after the relevant committee refuses to allow agency counsel to attend the deposition over the agency's objection. The Defendant meets none of those criteria. *See also* ECF No. 60 at 2 (United States' Response to Defendant's Notice Under Federal Rule of Criminal Procedure 12.3, explaining the deficiency of the Defendant's notice of public-authority defense for failing to identify any law enforcement agency member on whose behalf he acted).

Moreover, the Defendant has failed to demonstrate that any OLC official, even if he had identified one, had actual authority to direct the Defendant to default on the subpoena. To establish that an OLC official had actual authority to direct the Defendant to engage in criminal conduct, the Defendant states only that "the President – and therefore OLC – has authority to interpret laws." *See* ECF No. 59-1 at 35. But the ability to interpret laws is not an ability to direct violation of them. OLC is not like a DEA agent directing an informant to buy drugs from a subject-drug dealer after having received the necessary agency authorizations to run a drug trafficking investigation with controlled buys. *See Fulcher*, 250 F.3d at 254-55 (finding DEA agent's testimony that he could not authorize a money laundering operation without the Attorney General's approval and would not authorize an individual to sell drugs suggested the DEA agent lacked authority to direct the defendant to engage in money laundering and drug trafficking); *United States v. Rosenthal*, 793 F.2d 1214, 1236 (11th Cir. 1986) (finding CIA officials had no actual authority to direct individuals to engage in drug activity because they were subject to regulations barring them from authorizing conduct that would violate U.S. laws). As the Defendant explains at length to the Court, *see* ECF No. 59-1 at 22-27, OLC's sole function is to render legal advice to the Executive

Branch. The Defendant does not identify and the Government is aware of no regulations, laws, or other authority that allows OLC to direct individuals to engage in criminal conduct.

> **2.** **"Apparent authority" does not give rise to a public-authority defense and the Defendant identifies no person who acted even with the apparent authority of a federal law enforcement officer.**

The Defendant also claims that, even if the former President and OLC did not have actual authority to direct his default, they had apparent authority. ECF No. 59-1 at 36-37. But the defense of apparent public authority is not supported by controlling authority in this or any Circuit, and, even it was, for many of the same reasons just discussed, the Defendant still has not met his burden.

The legal foundation for the Defendant's claim is the opinion of a single judge—Judge Wilkey—in a D.C. Circuit case, *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976), which the Defendant claims was a "landmark decision" providing for an apparent authority public-authority defense. *See* ECF No. 59-1 at 36 (citing *Barker*, 546 F.2d at 947-48, 951-54). But *Barker* had no controlling opinion. Instead, the Court issued a per curiam decision reversing the judgment of the district court and the two judges supporting reversal wrote separate opinions. Only one of those judges, Judge Wilkey, endorsed the idea of a public-authority defense based on apparent authority. 546 F.2d at 949. The other, Judge Mehrige, endorsed a defense that aligns with the entrapment-by-estoppel defense, *id.* at 955, which, as explained above, is unavailable to the Defendant. In *United States v. North*, 910 F.2d 843, 878-81 & n.10 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990), the D.C. Circuit rejected the argument that the public-authority defense includes apparent authority, holding that the defendant was not entitled to a jury instruction on the authorization defense purportedly recognized in *Barker*. The D.C. Circuit explained that "we have read *Barker*, and reread it, and simply cannot find a rule of law to apply," *id.* at 879, and concluded that "[i]n the absence of clear

and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one." *Id.* at 881; *see also id.* at 881 n. 10 (explaining that whatever the exact scope of an authorization defense, it "is far more circumscribed than the one sought by [the defendant] here").

Apart from Judge Wilkey's non-binding opinion, the Defendant cites no legal authority supporting an apparent authority public-authority defense—because none exists. Indeed, every court to decide the issue has held that a public-authority defense is unavailable based on a law enforcement officer's "apparent authority." *See, e.g., Sariles*, 645 F.3d at 318-319 (observing that Judge Wilkey's opinion "cannot be viewed as the rationale" of the D.C. Circuit and holding "that the public authority defense requires the defendant reasonably to rely on the actual, not apparent, authority of the government official or law enforcement officer to engage the defendant in covert activity" (internal citation and quotation marks omitted)); *Fulcher*, 250 F.3d at 254 ("[W]e adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official to engage him in a covert activity."); *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999) (limiting "the use of the defense of public authority to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question"), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) ("[R]eliance on the *apparent* authority of a government official is not a defense in this circuit." (emphasis in original)); *United States v. Holmquist*, 36 F.3d 154, 161 n.6 (1st Cir. 1994) ("The 'defense' of apparent public authority is a defense based on a mistaken but good-faith belief that one's conduct is authorized by the government.  Appellant's repeated references to this defense constitute little more than a school of red herrings.  The defense is not a defense at all.");

*United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) ("We decline to adopt Judge Wilkey's view that a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real."), *superseded by statute on other grounds as recognized by United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010).

The Court does not have to decide if apparent authority satisfies the requirements of a public-authority defense, however, because, even if it did, the Defendant still has failed to demonstrate his default meets the defense's elements. The D.C. Circuit has noted that, assuming the defense exists, "a defendant must show at least that he 'honestly and reasonably' believed that his actions were being committed pursuant to lawful authority, and the belief must be 'objectively reasonable.'" *United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 n.9 (D.C. Cir. 1991) (quoting *Barker*, 546 F.2d at 947-49). Even Judge Wilkey in *Barker* would have required the defendant to show "both (1) facts justifying [his] reasonable reliance on [the official's] apparent authority and (2) a legal theory on which to base a reasonable belief that [the official] possessed such authority." 546 F.2d at 949 (Wilkey, J.).

Here, the Defendant has identified no facts on which he could have reasonably believed the former President, a private citizen, was an authorized law enforcement official. And the Defendant concedes OLC's sole duties consist of interpreting the law and providing legal advice to the Executive Branch. *See* ECF No. 59-1 at 22-27. Further, even had the Defendant shown he reasonably believed an OLC official had the authority to direct his default, he still has failed to show any official did. Moreover, for the same reasons that the Defendant cannot establish that his alleged reliance on past Department writings and opinions to defy the Committee's subpoena would be reasonable, he has failed to establish it for purposes of attempting to mount a public-

authority defense. Accordingly, the Defendant cannot satisfy his burden to adduce facts supporting a public-authority defense whether it rests on actual or apparent authority.

## II. THE DEFENDANT'S OTHER CONSTITUTIONAL CLAIMS SHOULD BE REJECTED.

### A. The Constitutionality of 2 U.S.C. § 194 is Irrelevant to the Pending Charges.

In three sentences and with no analysis, the Defendant asserts that 2 U.S.C. § 194, the statute laying out the referral procedures for contempt of Congress, is unconstitutional as applied. *See* ECF No. 59-1 at 44. But the Defendant does not explain why, even if Section 194 is unconstitutional, the unconstitutionality of that statute would provide a basis for dismissing an Indictment charging him with violating a different statute (Section 192). Nor has the Defendant established why he has standing to challenge Section 194 in this case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In any event, the Defendant has claimed an "as-applied" challenge. Here, the Government exercised its discretion to investigate the allegations and determine whether they should be presented to the grand jury, as it always has with respect to contempt of Congress referrals. It did not act by automation. And it was the grand jury that returned the Indictment after finding probable cause to believe the Defendant committed the charged offenses.

### B. The Defendant's Supposed Efforts to Reach an Accommodation With the Committee Does Not Render the Term "Default" Unconstitutionally Vague.

The Defendant asserts that the term "default" in Section 192 is unconstitutionally vague as applied because of the admonition that Congress and the Executive Branch should accommodate each branch to the extent possible when disputes arise over one or the other's scope of authority. *See* ECF No. 59-1 at 47. Other than recite his supposed efforts to accommodate the Committee, however, the Defendant does not cite any authority for his position or engage in any analysis as to

why "default" is vague. "The determination whether a criminal statute provides fair warning of

its prohibitions must be made on the basis of the statute itself and other pertinent law, rather than

on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *United*

*States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (internal citation and quotation marks

omitted). Accordingly, whether "default" is vague has nothing to do with whether the former

President and Congress should try to work out disputes when it comes to executive privilege—

although there was nothing to work out in this case, because there was no assertion supporting

total noncompliance. Instead, the inquiry requires "assessing meaning with the elementary rule of

statutory interpretation: Words receive their plain, obvious and common-sense meaning, unless

context furnishes some ground to control, qualify, or enlarge it." *Id.* at 1108 (internal citation

omitted). "Default" is a word with a plain and clear meaning. *See* "Default," *Merriam-*

*Webster.com Dictionary* (defining default as "to fail to fulfill a contract, agreement, or duty" or

"to fail to appear in court"), *available at* https://www.merriam-webster.com/dictionary/default

(last viewed May 6, 2022). It thus provides a clear standard against which an ordinary person can

judge their conduct—*i.e.*, whether they show up when subpoenaed or not—and does not render

Section 192 unconstitutionally vague. *See Bronstein*, 849 F.3d **at** 1107 ("[A] statute is

unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]'

'no standard of conduct . . . at all.'" (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614

(1971))).

> **C.    The Defendant's Other Vagueness and Overbreadth Challenges Reflect a Fundamental Misunderstanding of the Defense He Has Been Barred from Raising at Trial.**

The Defendant claims that Section 192 is "void for vagueness" and "unconstitutionally

overbroad" because he cannot assert executive privilege as a defense to the charges under this

Court's April 6 Order precluding a good-faith defense. *See* ECF No. 59-1 at 45-46 (claiming Section 192 is "void for vagueness" as applied to him because the definition of "willful" within the statute is contrary to Supreme Court precedent and OLC opinions holding that executive privilege provides immunity from congressional subpoenas); *id.* at 46-47 (claiming the statute is "unconstitutionally overbroad as applied" because it criminalizes "constitutionally protected conduct—noncompliance based on the invocation of Executive Privilege and reliance on OLC Opinions"). The Defendant's claims, however, are based on a fundamental misunderstanding of the defense he has been barred from raising at trial pursuant to the Court's April 6 Order granting the Government's Motion to Exclude All Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel. *See* ECF No. 49. The Government has never argued, and no court has ever held, that executive privilege, or any other privilege, cannot be a defense to a contempt charge under Section 192. Indeed, Supreme Court precedent makes clear that privileges, when they are valid and properly asserted before the relevant congressional committee, provide a defense to contempt charges. *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 196-97 (1957); *Barenblatt*, 360 U.S. at 112.

As the Government has pointed out several times, however, when the Defendant has previously made the same misguided claim, *e.g.*, ECF No. 35 at 22; ECF No. 43 at 56, whether Congress exceeded its constitutional authority in attempting to compel the Defendant's appearance and the production of documents in violation of a valid privilege is a question determined by the court before trial—juries are not asked to determine the bounds of constitutional privileges. The Government's motion and the Court's Order granting it, however, address an entirely different question—that is, whether a defendant's purported good-faith, but erroneous, reliance on privilege, or his counsel's advice about it, negates the intent element of the offense. As the Supreme Court,

the D.C. Circuit, and now this Court have held, it does not, because the intent element of the statute requires only that the Defendant's failure to appear or produce records be deliberate and intentional, whatever the reason it is so.

The Defendant has not, therefore, been barred from attempting to raise constitutional challenges to the Committee's subpoena and the subsequent contempt charges. Once those claims have been rejected as meritless, however, he is barred from attempting to argue to the jury that his deliberate decision not to appear or produce a single record should be excused because his attorney told him to do it or he believed he was excused under the law. As he has before, the Defendant confuses defenses to the factual elements of the offense and constitutional defenses to the charges. Because the Defendant's vagueness and overbreadth challenges are based on this misunderstanding and nothing more, they should be rejected.

**D.      The Defendant's Attempts to Relitigate the Government's Motion to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel Should be Rejected.**

Under the guise of raising constitutional challenges to Section 192, the Defendant seeks to relitigate the meaning of "willful" under the statute. Specifically, he claims that the settled definition of "willful," which precludes good-faith reliance defenses, is invalid under canons of statutory construction because it renders meaningless 2 U.S.C. § 193, which precludes claims of privilege based on disgrace or infamy to avoid complying with a congressional subpoena, ECF No. 59-1 at 42-43, and contradicts the Supreme Court's opinion in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), *id*. at 43. Again, however, the Defendant misunderstands this Court's April 6 Order and the meaning of "willful" under the statute. Because both arguments are based on his misunderstanding, they are meritless and should be rejected.

First, Section 193 is not rendered superfluous by the settled definition of "willful" as used in the contempt of Congress statute. The Defendant claims that, as defined, "willful" bars defendants from raising any privilege to avoid compliance with a subpoena, and, therefore, Section 193, which expressly bars subpoenaed witnesses from raising particular privileges would be unnecessary. ECF No. 59-1 at 42. But, as described above, the definition of "willful" does not bar witnesses from asserting privileges before a congressional committee and then relying on them as a basis to dismiss a contempt charge if a court subsequently finds the invocation of the privilege valid. *See Quinn v. United States,* 349 U.S. 155, 164-65 (1955) (reversing contempt of Congress conviction where congressional committee and district court failed to recognize and rule on a valid privilege assertion). The meaning of "willful" only bars defendants from raising their reliance on privilege, or any other law or legal advice, at trial as a factual defense to the intent element of the offense.

For the same reason, the settled definition of "willful" in the contempt of Congress statute is not contrary to the Supreme Court's opinion in *Mazars.* In *Mazars,* the Court noted that subpoenaed witnesses retain all constitutional privileges before congressional committees. 140 S. Ct. at 2032. They do. And the Defendant can raise such privileges before the Court as he has in his motion to dismiss. Once they are rejected, however, his reliance on erroneous claims of privilege cannot negate a deliberate and intentional decision not to comply with a subpoena.

## II.   THE DEFENDANT HAS WAIVED HIS OBJECTIONS TO THE SUBPOENA AND THE SUBPOENA WAS A VALID EXERCISE OF LEGISLATIVE AUTHORITY.

The Defendant moves to dismiss the Indictment because of several alleged procedural defects in the operation of the Committee and its issuance of the subpoena, which the Defendant claims renders the subpoena unlawful and thus unenforceable. ECF No. 59-1 at 2-12. All his objections to the subpoena fail, however, because the Defendant could have made them at the time

31

of his noncompliance, and did not—accordingly, he has waived them. In addition, the Defendant argues that the subpoena issued to him did not have a valid legislative purpose, *id.* at 13, but this claim also is without merit.

**A.    The Defendant Waived the Objections Raised in His Motion to the Composition of the Committee and Compliance with Its Rules.**

The Defendant's motion raises for the first time before this Court several objections that he could have—but did not—raise before the Committee. These include his objection to the composition of the Committee, ECF No. 59-1 at 4-5; the claim that the Committee did not provide the Defendant with a copy of a particular rule, *id.* at 8-9; and the Committee's lack of a member using the title of "ranking minority member," *id.* at 5-12. The Defendant waived all of these objections.

When he refused to produce documents or appear for a deposition before the Committee, the Defendant raised only one objection or privilege as a basis for doing so: an alleged assertion of executive privilege by the former President. As set forth in the Government's Motion in Limine to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived, ECF No. 53, the Defendant has waived any other privileges or objections that were apparent at the time of his default, but that he did not make. *See United States v. Bryan*, 339 U.S. 323, 330-334 (1950) (finding defendant waived objection regarding a "defect in composition" of the issuing Committee—lack of quorum—because she raised it for the first time at her contempt trial); *cf. Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (a constitutional objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court. To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer.") (internal citations omitted).

In his motion, the Defendant cites *Yellin v. United States*, 374 U.S. 109 (1963), but that case is inapposite here. *See* ECF No. 59-1 at 2-3. *Yellin* concerned a witness who, after being subpoenaed by a congressional committee for public testimony, sent the committee a telegram asking instead to testify in an executive session. 374 U.S. at 111. A committee staff member rejected the Defendant's request. Not apparent to the witness in the rejection, however, was that, in violation of its rules, the Committee members—instead of the staff—had not considered the witness's request before it was rejected. *Id.* at 120-123. The *Yellin* court held that, in such a situation, a witness is not considered to have waived an objection or privilege that a witness could not have known about. *Id.* at 122-123. The Defendant is not similarly situated here to the defendant in *Yellin*, however—every objection that he makes in his motion to dismiss was available and apparent at the time that he chose to default, and he did not raise any of them before the Committee. Thus, he waived them.

### 1.   The Defendant waived his objection to "the composition" of the Committee.

Much like the defendant in *Bryan*, 339 U.S. at 330, the Defendant makes for the first time before this Court the argument that there is a defect in the composition of the Committee requiring testimony and documents because the Committee has nine members, but its authorizing resolution states that the Speaker of the House "shall appoint 13" members. ECF No. 59-1 at 4. And like the defendant in *Bryan*, the Defendant's claim before the Court fails because he could have objected at the time he was subpoenaed but did not. As the Defendant sets forth in his brief, the political dispute regarding the Committee's composition was public and known to him at the time that he received the subpoena. The Defendant, for instance, cites press releases issued by members of Congress on July 21, 2021, and the Congressional Record on July 1, 2021—the date that the Speaker of the House appointed Committee members. ECF No. 59-1 at 4 n.5, 5 n.7. When the

Defendant received his subpoena three months after this, the cover letter that accompanied his subpoena listed the members of the Committee—nine of them. *See* ECF No. 53-1 at US-000410. The Defendant had all of the information necessary to object to the Committee's subpoena on the basis that it was issued by a Committee with too few members, but he chose not to, and has now waived that particular objection.

Even if the Defendant had not waived, a court in this District has already considered and dispensed with this objection to the Committee's composition on the merits. *See Republican Nat'l Comm. v. Pelosi*, Case No. 1:22-cv-00659, ECF No. 33 at 30-31 (May 1, 2022) (rejecting challenge to a subpoena based on the Committee having only nine members because the Committee's authorizing resolution "is not conclusive as to whether thirteen members are required for it to lawfully operate" and because the House's adoption of the Committee's contempt resolutions reflect that the House views the Committee as "duly constituted and empowered to act under its authorizing resolution, even though [it] has only nine members.").

## 2. The Defendant waived his objection to not being provided with Section 3(b) of House Resolution 8.

The Defendant next claims that he was excused from complying with the Committee's subpoena because the House's rules for deposition authority state that a witness "shall not be required to testify unless [he] has been provided with a copy of Section 3(b)" of House Resolution 8, ECF No. 28-8 at US-000963, and he was not provided with a copy of Section 3(b). ECF No. 59-1 at 8-9. The deposition rules on which the Defendant relies to raise this objection were attached to the subpoena that the Defendant received, however, meaning that he knew that he was entitled to a copy of Section 3(b) at the time he defaulted but never raised the issue as a reason for his noncompliance before the Committee—which would have allowed the Committee to resolve the issue. *See* ECF No. 53-1 at US-000417. "To deny the Committee the opportunity to consider

34

the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Bryan*, 339 U.S. at 333 (internal citation omitted). In any event, the record shows that the Committee planned to provide the Defendant with Section 3(b), as required, before the start of his deposition; Committee counsel brought a copy to the deposition at which the Defendant failed to appear. *See* ECF No. 35-2 at US-000362.

### 3.   The Defendant waived his objection to the Committee Vice Chair.

Next, the Defendant appears to raise two objections based on the Committee's use of the title "Vice Chair" for its ranking minority member. The first—the fact that the Committee's ranking Republican Member is referred to as a Vice Chair rather than a Ranking Minority Member—he has waived for the same reasons he has waived the objections discussed above: it was public knowledge at the time he defaulted and he did not raise it with the Committee. *See* ECF No. 53 at 6-7. The title was used in the press releases issued by the Committee, that predate the Defendant's default, and that the Defendant cites in his motion. *See id.*; ECF No. 59-1 at 10 n.10. Yet, he did not object before the Committee. *See Bryan*, 339 U.S. at 332 ("[T]he courts need not treat as important that which the witness obviously regarded as unimportant.").

The Defendant's second argument appears to be that because the Committee does not have a "ranking minority member," the Committee violated its rule that the Chair consult with such a member before issuing the Defendant's subpoena. ECF 59-1 at 7-12. If in fact the Committee violated its rules requiring internal Committee consultation, the Defendant's claim might have merit for the reasons articulated in *Yellin*—that he could not have known about, and objected to, such a violation of Committee Rules that occurred behind closed doors and out of public view. But, as the Defendant is aware from the discovery in this case, the Chair was in consultation with Committee members, including the ranking minority member, Rep. Cheney, before the subpoena

was issued to the Defendant, and the Committee abided by its deposition notice requirement to its members. *See* Ex. 1 at US-001143. The Defendant has failed to identify any defect.

> **4.    The Defendant waived his objection to the procedure for a privilege log contained in the subpoena.**

The Defendant also argues that the second count of the indictment—which charges him with failing to provide documents in response to the subpoena—is invalid because the Committee does not have authority to compel production of a privilege log. ECF No. 59-1 at 14-15. Although the Committee cannot compel the Executive Branch to produce a privilege log, *see Miers*, 558 F. Supp. 2d at 107 ("[I]n the absence of an applicable statute or controlling case law, the Court does not have a ready ground by which to *force* the Executive to [provide a privilege log] strictly in response to a congressional subpoena." (emphasis in original)), the question of whether Congress can compel a private party subpoenaed in his private capacity to produce a log has not been litigated. But the Court need not address that question here because the Defendant is charged in Count II with refusing to comply with the document demand in any way, even though there were subpoena items that, as even he partially concedes, could not possibly have implicated executive privilege, *see supra* at 15-16. Whether the Committee can or cannot require a privilege log would not excuse the rest of the Defendant's noncompliance.

In any event, in advance of his default on the document demand, the Defendant did not raise a specific objection to the Committee regarding its request for a privilege log. That the Defendant is now searching for after-the-fact justifications for his noncompliance is all the more reason that his failure to do so previously constitutes waiver. *See McPhaul v. United States*, 364 U.S. 372, 378-80 (1960) (finding that if defendant did not produce records because he did not have them "a decent respect for the House of Representatives . . . would have required that (he) state (his) reasons for noncompliance upon the return of the writ," that "[h]is failure to make any such

statement was 'a patent evasion of the duty of one summoned to produce papers before a congressional committee (, and) cannot be condoned,'" and that, because he raised the claim for the first time at trial, the government had no burden to show he could have produced the records).

### B.    The Subpoena Had a Valid Legislative Purpose.

Finally, the Defendant claims the subpoena the Committee issued to him served no legislative purpose. *See* ECF No. 59-1 at 13.   But as the Defendant concedes, this Circuit has already determined that the Committee itself has a valid legislative purpose.   These purposes include that:

> Congress could (1) pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions; (2) amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election; (3) allocate greater resources to the Capitol Police and enact legislation to "elevat[e] the security posture of the United States Capitol Complex," *id.* § 4(a)(2)(D); or (4) revise the federal government's "operational plans, policies, and procedures" for "responding to targeted violence and domestic terrorism[,]" *id.* § 4(a)(2)(B), J.A. 97.

*Trump,* 20 F.4th at 42 (citing H.R. Res. 503 § 4(a)(2)).

As described in the Indictment, the Committee's cover letter to the subpoena stated that it sought documents and testimony from the Defendant because he may "have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021." ECF No. 1 at ¶ 7.  And the topics the subpoena identifies for which the Committee sought records and testimony from the Defendant all relate to the planning for and lead up to the events of January 6. ECF No. 53-1 at US-000410-12. The information the subpoena sought falls within multiple of the Committee's valid legislative purposes articulated by this Circuit in *Trump v. Thompson,* as information from the Defendant could lead to amendments to the Electoral Count Act, elevating the security posture of the Capitol Complex, or revisions to the government's operational plans, policies, and procedures. *See Republican Nat'l Comm.,* Case No. 1:22-cv-

00659, ECF No. 33 at 35 n.11 (rejecting plaintiff-RNC's challenge to Committee subpoena on basis that it is unrelated to a legislative end, noting that examples of legislation for which subpoenaed information would be relevant "are not hard to find").

Despite the legislative purpose apparent on the face of the subpoena, the Defendant claims Committee members' statements show that it lacks such a purpose. ECF No. 59-1 at 13 & n.17. Not only does the Defendant fail to cite any statements made in relation to his subpoena—indeed, since the Defendant concedes the Committee has a legislative purpose, quotes from members about the general activities of the Committee do not serve his argument at all—but the Supreme Court has long held that courts will not inquire or consider the motives of a Committee's members in determining whether a Committee acted with a legislative purpose. *Barenblatt*, 360 U.S. at 133. The Defendant also suggests that the Indictment does not sufficiently allege "how the subpoena issued to Mr. Bannon could validly inform legislation." ECF No. 59-1 at 13. He provides no support for his argument, and the Indictment clearly alleges the pertinency of the information sought by the subpoena to the Committee's investigation, *see also* ECF No. 1 ¶¶ 2-4, 7. To the extent the Defendant is claiming that the Indictment also must allege the constitutional authority of the Committee, he is wrong. The legal question of the constitutional bounds of the Committee's activity is not an element of the offense to be alleged and proven, it is a question for this Court.

## IV.   THE GOVERNMENT'S INVESTIGATION WAS WARRANTED AND APPROPRIATE.

The Defendant moves for dismissal on the ground that the Government "overreached" in the investigation leading to the Indictment. Specifically, he claims that the Government intruded upon the attorney-client relationship, ECF 59-1 at 49-52, and misled the grand jury, *id.* at 52-53. The Defendant's arguments are counterfactual and, in any event, would not support dismissal under any applicable legal framework.

38

A.      **For an Indictment to Be Dismissed Based on Government Misconduct, a Defendant Must Show Misconduct and Substantial Prejudice.**

The Defendant's motion suggests the Government's investigation constitutes outrageous conduct violating the Fifth Amendment and that it infringed the grand jury's independence, but he fails to support the claims.

The Supreme Court has recognized there may be circumstances "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973); *see also United States v. Kelly*, 707 F.2d 1460, 1468 (D.C. Cir. 1983). Where the alleged outrageous conduct involves a claim relating to the attorney-client relationship, a defendant must show, at minimum, "the government's objective awareness of an ongoing, personal attorney-client relationship between [the attorney] and the defendant," "deliberate intrusion by the government into that relationship," and "actual and substantial prejudice to the defendant." *See United States v. Hsia*, 81 F. Supp. 2d 7, 18-19 (D.D.C. 2000) (citing *United States v. Voigt*, 89 F.3d 1050 (3rd Cir. 1996)). Courts have "rarely applied the doctrine" of outrageous misconduct to dismiss an indictment, *United States v. Singhal*, 800 F. Supp. 2d 1, 5 (D.D.C. 2011) (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)) (internal quotation marks omitted) ("[C]ourts have rejected its application with almost monotonous regularity"), recognizing that they "must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable," *id*. (quoting *Voight*, 89 F.3d at 1065).

"When examining a claim that the grand-jury proceeding was infected by prosecutorial misconduct, the Court first affords that proceeding 'a presumption of regularity.'" *United States v. Akinyoyenu*, 199 F. Supp. 3d 34, 36 (D.D.C. 2016) (quoting *United States v. Mechanik*, 475 U.S.

66, 75 (1986)). For a court to even consider dismissal as a possible sanction, "the defendant [must] show[ ] that the prosecutor instituted some error or irregularity—more than a mere assertion that the prosecutor presented 'inadequate, unreliable or incompetent evidence.'" *See id.* (quoting *United States v. Borda*, 905 F. Supp. 2d 201, 204 (D.D.C. 2012)). Even then, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988); *accord Akinyoyenu*, 199 F. Supp. at 36. "That is, the defendant must also prove 'that the violation substantially influenced the grand jury's decision to indict, or [that] there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *Akinyoyenu*, 199 F. Supp. at 36-37 (quoting *Bank of Nova Scotia*, 487 U.S. at 256) (additional internal quotation marks and citations omitted).

Here, the Defendant has failed to demonstrate substantial prejudice or misconduct. His claims must be rejected.

## B. The Government's Interactions with Mr. Costello and Related Investigative Steps Were Appropriate and Lawful.

The Defendant claims that the Government's interactions with and investigation of the Defendant's counsel before the Committee, Mr. Costello, were outrageous and warrant dismissal. As an initial matter, however, the Defendant fails to accurately report the facts of the Government's interactions with Mr. Costello. First, the Defendant contends that the Government conducted two "surreptitious 'interviews'" of Mr. Costello. ECF No. 59-1 at 50. There was nothing surreptitious about the Government's interactions with Mr. Costello; they were transparent and entirely voluntary, and the FBI's involvement was not a secret. As reflected in the FBI reports memorializing the November 3 and 8, 2021, videoconferences between Mr. Costello and the Government, Mr. Costello was apprised of the identity of each person who was in attendance at

the outset. *See* ECF No. 28-4 at US-001769, US-001779. Additionally, after the first meeting on November 3, the Government sent Mr. Costello an email identifying the name and title of each participant. Ex. 2.

The Defendant further claims that Mr. Costello thought that these were "meetings," not "interviews," insinuating some trickery on the Government's part. It is not clear why a "meeting" would be any different from an "interview," but any distinction between the words is immaterial. Mr. Costello himself used the word "interview" in an email to the Government after the November 3, 2021, meeting, stating that he was willing to participate in "a follow up interview" and "to answer any follow up questions [the Government] may have." Ex. 3. His grievance boils down to a disingenuous game of semantics, not substance.

The Defendant points to the fact that the FBI memorialized Mr. Costello's statements on his client's behalf in a "FD-302 Report of Interview" as evidence of foul play. *See* ECF No. 59-1 at 50. But the fact that the FBI special agents took notes and prepared a "FD-302 Report of Interview" reflects diligence, not misconduct. This is the way in which FBI special agents typically memorialize events in a criminal investigation, including interactions with individuals providing information pertinent to the investigation—regardless of whether the interaction is with an attorney, civilian, or someone else and regardless of whether it is called a "meeting," "videoconference," "discussion," "interview," or something else. And it is standard practice for the Government to memorialize an attorney's statements on behalf of his client, particularly where the attorney himself is a witness to the events under investigation. The Government was not engaged in some underhanded effort; the Government was trying to discover the facts surrounding the Defendant's default. At both the November 3 and November 8 meetings, the Government asked questions and Mr. Costello voluntarily answered them. In such a circumstance, prudence,

not trickery, dictates that Mr. Costello's statements be memorialized. What is more, the Government disclosed to the Defendant in discovery the FD-302s and special agents' notes, illustrating the transparency surrounding its interactions with Mr. Costello.

Next, the Defendant contends that the Government's investigative steps to collect Mr. Costello's toll and email records, but not their content, was improper because "Section 9-13.410(a) of the U.S. Attorney's Manual requires main DOJ approval in such circumstances." ECF No. 59-1 at 49. That is incorrect. Section 9-13.410 sets forth "Guidelines for Issuing Subpoenas to Attorneys for Information Related to Representation of Clients," not subpoenas and other process served on third parties for non-content, such as the process deployed in the investigation of this case. In any event, Justice Manual § 9-13.410(F) states that its provisions create no enforceable rights, a fact that courts have repeatedly recognized. *See* United States' Opp. to Def.'s Mot. to Compel, ECF No. 31 at 7 (collecting cases). As the Government has described before, Mr. Costello was a witness to the contempt under investigation and it obtained Mr. Costello's toll records to investigate a requisite element of contempt—that is, whether the Defendant received notice of the Committee's subpoena. Nothing was improper about the Government's investigation. *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991) ("As a necessary consequence of its investigatory function, the grand jury paints with a broad brush.").

As required for dismissal based on a claim of outrageous misconduct, the Defendant has failed to demonstrate any intrusion on the attorney-client relationship and has made no showing of prejudice, let alone substantial prejudice. It cannot be contested that the toll records the Government obtained are not privileged because they do not reveal any confidential communications between the Defendant and Mr. Costello made for the purpose of obtaining or providing legal advice. *See* ECF No. 31 at 13-15 (collecting cases). In fact, the Defendant

concedes the point. *See* ECF No. 59-1 at 50 (acknowledging that "the toll and email records did not give the Government the contents of Mr. Costello's communications"). Nor do the records, which reflect only the time, date, and duration of, and the other party or parties to, Mr. Costello's phone calls in the limited time-period surrounding the service of the Committee subpoena betray any attorney-work product-—especially given that the calls were exchanged before the Committee even made a referral for investigation. *See United States v. Williams Companies, Inc.*, 562 F.3d 387, 393 (D.C. Cir. 2009) ("The doctrine protects written materials that lawyers prepare 'in anticipation of litigation,' ensuring that 'lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials.'" (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1988))). Even if litigation was pending or anticipated—which it was not—the fact that a particular communication occurred at a particular time reveals nothing about Mr. Costello's private notes, memoranda, correspondence, or other written materials. Nor does the Defendant offer even a suggestion that Mr. Costello's voluntary statements and production of documents on behalf of his client were in some way privileged.

The Defendant cites just two cases in which indictments were dismissed based on prosecutorial intrusion of the attorney-client relationship, *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) and *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985). ECF 59-1 at 51. Both involve circumstances in which the prosecutor and defense attorney essentially colluded to secure the defendants' indictment and arrest. *See Marshank*, 777 F. Supp. at 1521 (dismissing indictment where defendant's attorney "was in league with the government" to investigate and secure defendant's arrest, while simultaneously representing a key government witness with a financial interest in the prosecution); *Schell*, 775 F.2d at 565-66 (dismissing indictment where

former defense attorney turned prosecutor participated in investigation resulting in his former clients' indictment on charges that were the subject of the former representation). The facts of these cases—the only the Defendant could muster in support of his claim—are a far cry from even the most fanciful interpretation of the Defendant's allegations in this case. Moreover, the Government did not "turn" Mr. Costello into a witness against his client. He was a witness to the Defendant's contempt before the investigation in this matter ever began. The Defendant's decision to waive his right to conflict-free counsel in this case does not render the Government's investigation and prosecution improper. *See* Model Rule of Professional Responsibility 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.").

Finally, the Defendant grasps at straws with respect to the requisite showing of substantial prejudice. First, the Defendant speculates that the Government's access to Mr. Costello's toll records "provides significant insight into the defense's strategy and theory of the case," ECF No. 59-1 at 51, but he provides no explanation as to how that is the case since the records predate the investigation in this matter or what information about his strategy the Government could possibly divine from the records. *Cf. United States v. Legal Servs. For New York City*, 249 F.3d 1077, 1081-82 (D.C. Cir. 2001) ("[T]he burden of demonstrating the applicability of the privilege lies with those asserting it. That burden requires a showing that the privilege applies to each communication for which it is asserted." (internal citations omitted)).

Second, the Defendant contends that he has been prejudiced because "the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate." ECF No. 59-1 at 51. As Mr. Costello has noted several times, he has been a practicing attorney for decades and is a former prosecutor. The fact of the matter is that the Defendant,

hoping to avoid prosecution, cooperated with the Government and produced documents and information voluntarily in response to specific written requests without restriction concerning how they would be used. *See* Exs. 2, 3, 4. That the Defendant's strategy failed provides no justification to turn around and accuse the Government of misconduct. Criminal subjects routinely engage in the sort of cooperative back and forth in which the Defendant engaged through Mr. Costello in this case. Sometimes that strategy works; sometimes it does not.

In any event, the Government did not present to the grand jury any communication records it obtained for accounts suspected to be associated with Mr. Costello, any documents or other information obtained exclusively from the Defendant through Mr. Costello, or any testimony about Mr. Costello's interviews with the Government. He therefore cannot establish any prejudice at all with respect to the grand jury's decision to indict him.

## C. The Government Did Not Mislead the Grand Jury.

The Defendant alleges that the Government misled the grand jury in three ways. ECF No. 59-1 at 52-53. The Defendant offers no argument or evidence that he was prejudiced by the supposed errors—i.e., that he would not have been indicted but for them—and his claims for dismissal should be rejected on that basis alone. *See Akinyoyenu*, 199 F. Supp. at 36-37. Moreover, his claims are based on a factually incorrect recitation of what occurred before the grand jury and he has failed to show any error at all.

First, the Defendant claims "the grand jury was misled about Mr. Bannon's communication to the Select Committee that President Trump has asserted executive privilege" through testimony that a witness must appear personally before the Committee to make such an assertion. *Id.* at 52. The Defendant does not reveal, however, that the testimony of which he complains is not an instruction about the law of executive privilege or the requirements for invoking it, but a verbatim reading of the Committee's October 8, 2021, letter to the Defendant responding to his October 7

letter in which the Defendant informed the Committee that he was withholding documents under executive privilege. *See* ECF No. 58-32 at 44 (sealed); ECF No. 31-4 (sealed). Moreover, contrary to the implication in the Defendant's brief, *see* ECF No. 59-1 at 52 ("This was misleading testimony and Mr. Costello sent President Trump's counsel's letter invoking executive privilege to the Select Committee."), the Government presented and read to the grand jury the letter from Mr. Costello to the Committee in which Mr. Costello quotes the letter he had received from the former President's attorney, and which the Defendant purports to be an assertion of executive privilege. *See* ECF No. 58-32 at 37-41 (sealed); Ex. 5. The testimony was not misleading—it was completely truthful. The grand jury was presented the very evidence the Defendant implies was omitted.

Second, the Defendant claims the Government "suggested to the grand jury that Mr. Bannon never sought an adjournment of his deposition," through testimony that at no point between the service of the subpoena and the date of the grand jury presentation did the Defendant ever contact the Committee to try and schedule an alternative date for his deposition. ECF No. 59-1 at 52 (citing ECF No. 58-32 at 32-36 (sealed)). That testimony was not misleading at all; it was exactly right. The Defendant never requested an "adjournment of his deposition." On October 18, 2021, four days after defaulting on the subpoena for testimony, the Defendant sent a letter to the Committee to "request a one-week adjournment of our response to your [October 15, 2021] letter," which had informed the Defendant that he was in default. ECF No. 31-3. That is not, as the Defendant implies, a request to adjourn the deposition; that is a post-default effort to delay a contempt citation.

Finally, the Defendant claims that the Government improperly "suggested to the grand jury that Mr. Bannon received (through his attorney Mr. Costello) a complete copy of the House

deposition rules along with the subpoena." ECF No. 59-1 at 52-53.  But, as explained above, *supra* 34-35, the Defendant was in fact provided a copy of the House deposition rules and he never raised a contrary objection to the Committee.  In any event, the testimony about which the Defendant complains involves reading to the grand jury the Committee's September 23, 2021, cover letter to the Defendant accompanying the subpoena, which correctly lists its enclosures, and showing the enclosures to the grand jury so that grand jurors could verify what was provided to the Defendant for themselves.  *See* ECF No. 58-32 at 18-21 (sealed); Ex. 6.  The testimony was not misleading— it was completely accurate.

## CONCLUSION

The Defendant's strategy in this case is to hide his contempt of Congress behind executive privilege and legal claims that have nothing to do with the facts and circumstances of his independent decision to defy the Committee's subpoena.  His motion to dismiss is another example.  The grounds on which he argues for dismissal are meritless, and the motion should be denied.

47

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
      J.P. Cooney (D.C. 494026)
      Molly Gaston (VA 78506)
      Amanda R. Vaughn (MD)
      Assistant United States Attorneys
      United States Attorney's Office
      601 D Street, N.W.
      Washington, D.C. 20530
      (202) 252-1793 (Vaughn)
      amanda.vaughn@usdoj.gov

# EXHIBIT 1

From: "Gaston, Molly (USADC)" <MGaston2@usa.doj.gov>
To: "Hart, Stephen R. (WF) (FBI)" <srhart2@fbi.gov>, "D'Amico, Frank G. (WF) (FBI)" <fgdamico@fbi.gov>, "Pattillo, Katherine E. (WF) (FBI)" <kepattillo@fbi.gov>, "Lariccia, Matthew U. (WF) (FBI)" <mulariccia@fbi.gov>
Cc: "Cooney, Joseph (USADC)" <JCooney@usa.doj.gov>, "Vaughn, Amanda (USADC)" <AVaughn@usa.doj.gov>, "Byron, Chad (USADC)" <CByron2@usa.doj.gov>
Subject: FW: Request from the Bannon prosecutors
Date: Fri, 5 Nov 2021 01:06:47 +0000
Importance: Normal
Attachments: 2028-10-14-Deposition-Transcript-Bannon-HI.I287760.pdf

From: Letter, Douglas <Douglas.Letter@mail.house.gov>
Sent: Thursday, November 4, 2021 8:06 PM
To: Gaston, Molly (USADC) <MGaston2@usa.doj.gov>; Vaughn, Amanda (USADC) <AVaughn@usa.doj.gov>; Cooney, Joseph (USADC) <JCooney@usa.doj.gov>
Cc: Tatelman, Todd <Todd.Tatelman@mail.house.gov>
Subject: [EXTERNAL] Fwd: Request from the Bannon prosecutors

Begin forwarded message:

From: "Amerling, Kristin" <Kristin.Amerling@mail.house.gov>
Date: November 4, 2021 at 7:18:47 PM EDT
To: "Letter, Douglas" <Douglas.Letter@mail.house.gov>, "Tatelman, Todd" <Todd.Tatelman@mail.house.gov>
Cc: "Buckley, David" <David.Buckley@mail.house.gov>
Subject: RE: Request from the Bannon prosecutors

Hi Doug. In response to your questions: (1) the Select Committee members including Cheney and Kinzinger were aware that the subpoena to Bannon was to be issued before the subpoena issued; and (2) the Select Committee met the deposition notice requirements to its members.

The requested unredacted deposition transcript is also attached, and the Select Committee is fine with moving forward with both Tim Heaphy and Kevin Elliker, which we are happy to work with you to arrange.

Have a good night,

Kristin

*Douglas N. Letter*

*General Counsel*

*Office of General Counsel*

*U.S. House of Representatives*

*5140 ●'Neill House Office Building*

*Washington, DC 20515*

*Douglas.Letter@mail.house.gov*

*202-225-9700*

US-001144

# EXHIBIT 2

| | |
|---|---|
| **From:** | Cooney, Joseph (USADC) |
| **Sent:** | Wednesday, November 3, 2021 5:57 PM |
| **To:** | Costello, Robert J. |
| **Cc:** | Gaston, Molly (USADC); Vaughn, Amanda (USADC) |
| **Subject:** | Meeting Follow-Up |
| **Attachments:** | Letter to Robert Costello-11.03.2021.pdf |

Dear Mr. Costello:

Thank you again for the memorandum you forwarded us on Monday and for meeting with us today. As promised, a list of the U.S. Attorney's Office and FBI participants in the meeting is below.

Attached, please find a letter memorializing our document requests. If you have any questions or concerns, please do not hesitate to email or call. Could you also please do us the favor of forwarding this to Adam Katz and letting us know his contact information?

Thank you,

J.P. Cooney

U.S. Attorney's Office for the District of Columbia, Public Corruption & Civil Rights Section
J.P. Cooney, Chief
Molly Gaston, Acting Deputy Chief
Amanda Vaughn, Assistant United States Attorney
Chad Byron, Paralegal

FBI, Washington Field Office
SA Frank D'Amico
SA Stephen Hart
SA Matthew Lariccia
SA Katherine Pattillo

---

J.P. Cooney
Chief, Public Corruption & Civil Rights Section
U.S. Attorney's Office for the District of Columbia
C/ 202-468-4529; O / 202-252-7281



**U.S. Department of Justice**

Channing D. Phillips
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

November 3, 2021

<u>DELIVERY VIA EMAIL</u>
Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 3rd Ave.
New York, NY 10158
Email: rjc@dhclegal.com

      RE:    Stephen K. Bannon

Mr. Costello and Mr. Katz:

      Thank you for meeting with us today to discuss the U.S. House of Representatives' referral of House Resolution 730, concerning your client, Stephen K. Bannon, to the United States Attorney's Office for the District of Columbia. Per our discussion, in connection with our Office's independent examination of the referral, we request that you produce to us as soon as practicable the following documents and information for the period spanning September 22, 2021, to the present:

1. Correspondence between representatives of Mr. Bannon and representatives of the January 6 Select Committee, including but not limited to Chairman Bennie Thompson, Kristin Amerling, and Sean Tonolli;

2. Correspondence between representatives of Mr. Bannon and representatives of former President Donald Trump, including but not limited to Justin Clark;

3. Correspondence between representatives of Mr. Bannon and representatives of President Joseph Biden, including but not limited to the White House Counsel's Office and Jonathan Su; and,

4. The letter that you, on Mr. Bannon's behalf, were preparing to send to the Select Committee on October 18, 2021, described on page 4 of your October 29, 2021, Memorandum addressed to our Office.

The word "correspondence" includes written correspondence, such as formal letters and emails, and contemporaneous memorialization of oral correspondence, such as notes, emails, and calendar entries.

In addition, we kindly request that you maintain copies of records, electronic or physical, that relate to your representation of Mr. Bannon arising from the Select Committee's subpoena. As you are aware, our independent examination of this matter is ongoing and may prompt future information requests.

We appreciate your assistance in this matter. Please do not hesitate to contact us with any questions.

Sincerely,

CHANNING D. PHILLIPS
Acting United States Attorney

By: _____
J.P. Cooney
Molly Gaston
Amanda R. Vaughn
Assistant United States Attorneys
Public Corruption and Civil Rights Section

Joseph.Cooney@usdoj.gov; 202.252.7281
Molly.Gaston@usdoj.gov; 202.252.7803
Amanda.Vaughn@usdoj.gov; 202.252.1793

# EXHIBIT 3

| From: | Costello, Robert J. |
|-------|---------------------|
| To: | Cooney, Joseph (USADC) |
| Subject: | [EXTERNAL] Re: Follow Up on 11/3/2021 Meeting |
| Date: | Thursday, November 4, 2021 10:58:30 PM |

In response to your letter, I went through my emails both incoming and outgoing. At the risk of being redundant, I sent you a number of emails which in several cases is rally the covering email which will show you when the email was received or sent.

I will try to go over my text messages over the weekend, to make sure I have provided you what we have.

You have bates stamped all of the documents I provided before tonight, but they are not in chronological order.

As far as a follow up interview I will check with Adam Katz for his availability, But mine would be Monday afternoon or Wednesday. As soon as I reach Adam I will let you know.

You are being very diligent in collecting documents, but that factual background is unnecessary according to the OLC opinions of May 13,2019 and February 29, 2008. That being said, I will be happy to answer any follow up questions you may have.

Bob Costello

Sent from my iPhone

On Nov 4, 2021, at 8:27 PM, Cooney, Joseph (USADC) <Joseph.Cooney@usdoj.gov> wrote:

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Mr. Costello:

Enclosed, please find a cover letter, Bates stamped compilation of your production to us, and index. As inquired in the letter, could you please review and let us know if this constitutes your entire production?

Thank you again for meeting with us yesterday. Are you and Mr. Katz available for another videoconference? We have a few follow up questions. We can be available tomorrow (Friday) afternoon at or after 2:30; or Monday? Please let us know a time or times that work for you and Mr. Katz.

Thank you,

J.P. Cooney

J.P. Cooney
Chief, Public Corruption & Civil Rights Section
U.S. Attorney's Office for the District of Columbia
C/202-468-4529; O/ 202-252-7281

<Index-Bannon Production-11.04.2021.pdf>
<Bannon Production-11.04.2021.pdf>
<Letter to Robert Costello-11.04.2021.pdf>

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,<u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number</u>
<u>you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.
************************************************************************

# EXHIBIT 4

| **From:** | Cooney, Joseph (USADC) |
|---|---|
| **To:** | Costello, Robert J. |
| **Cc:** | Gaston, Molly (CRM); Vaughn, Amanda (USADC) |
| **Subject:** | Voluntary Production and Follow Up |
| **Date:** | Friday, November 5, 2021 5:07:00 PM |
| **Attachments:** | Index-Bannon Production.pdf |
| | Letter to Robert Costello-11.05.2021.pdf |
| | Bannon Production-11.05.2021.pdf |

Mr. Costello:

Thank you again for producing documents to us on Mr. Bannon's behalf.  Enclosed is a cover letter, compilation of the documents your produced, and an index.

Are you available to meet for a follow up at 9:00am on Wednesday?

Enjoy your weekend,

J.P. Cooney

_____

J.P. Cooney
Chief, Public Corruption & Civil Rights Section
U.S. Attorney's Office for the District of Columbia
C/ 202-468-4529; O/ 202-252-7281



**U.S. Department of Justice**

Matthew M. Graves
United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

November 5, 2021

**DELIVERY VIA EMAIL**
Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 3rd Ave.
New York, NY 10158
Email: rjc@dhclegal.com

      RE:    Stephen K. Bannon

Dear Mr. Costello:

      Thank you for the additional documents you produced to us via email on the evening of November 4, 2021. Enclosed electronically, please find an Adobe file compiling all the documents you produced, Bates stamped SKB-000001 to SKB-000117, and an index. Could you please review the documents and index and confirm that the enclosed compilation constitutes the entirety of your voluntary production in response to our November 3, 2021, requests?

      Sincerely,

      MATTHEW M. GRAVES
      United States Attorney

By: _____
      J.P. Cooney
      Molly Gaston
      Amanda R. Vaughn
      Assistant United States Attorneys
      Public Corruption and Civil Rights Section

      Joseph.Cooney@usdoj.gov; 202.252.7281
      Molly.Gaston@usdoj.gov; 202.252.7803
      Amanda.Vaughn@usdoj.gov; 202.252.1793