# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 9, 2023     Decided May 10, 2024

No. 22-3086

UNITED STATES OF AMERICA,
APPELLEE

v.

STEPHEN K. BANNON,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00670-1)

*David I. Schoen* argued the cause and filed the briefs for appellant.

*Elizabeth H. Danello*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Chrisellen R. Kolb*, *J.P. Cooney*, and *Molly Gaston*, Assistant U.S. Attorneys.

Before: PILLARD, WALKER, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

2

GARCIA, *Circuit Judge*: In September 2021, the House Select Committee to Investigate the January 6th Attack on the United States Capitol issued a subpoena to appellant Stephen Bannon to testify and provide documents. Bannon did not comply—he knew what the subpoena required but did not appear or provide a single document. Bannon was later convicted of violating the contempt of Congress statute, 2 U.S.C. § 192, which criminalizes "willfully" failing to respond to a congressional subpoena. Bannon insists that "willfully" should be interpreted to require bad faith and argues that his noncompliance does not qualify because his lawyer advised him not to respond to the subpoena. This court, however, has squarely held that "willfully" in Section 192 means only that the defendant deliberately and intentionally refused to comply with a congressional subpoena, and that this exact "advice of counsel" defense is no defense at all. *See Licavoli v. United States*, 294 F.2d 207, 207 (D.C. Cir. 1961). As both this court and the Supreme Court have repeatedly explained, a contrary rule would contravene the text of the contempt statute and hamstring Congress's investigatory authority. Because we have no basis to depart from that binding precedent, and because none of Bannon's other challenges to his convictions have merit, we affirm.

**I**

On January 6, 2021, rioters attacked the United States Capitol, seeking to interfere with the certification of the 2020 presidential election results. The attack delayed the scheduled certification vote of the Joint Session of Congress. The attack also left over 140 law enforcement officers injured and resulted in several deaths.

On June 30, 2021, the House of Representatives adopted House Resolution 503, establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol.

3

The Resolution charged the Select Committee to investigate and report on the "facts, circumstances, and causes" of the January 6th attack. H.R. Res. 503, 117th Cong. § 3 (2021). It also authorized the Select Committee to subpoena witnesses to provide testimony and documents, *id.* § 5(c)(4), and to propose any legislation the Committee deemed necessary in light of its investigation, *id.* § 4(a)(3).

Public accounts indicated that Bannon had predicted on a January 5, 2021 podcast that "all hell [wa]s going to break loose" the next day. J.A. 39. Bannon had been employed as an advisor to then-President Donald Trump for approximately seven months before leaving the White House in 2017. In addition to the podcast prediction, Bannon had reportedly participated in discussions in late 2020 and early 2021 about efforts to overturn the 2020 election results.

Based on these reports, the Select Committee believed that Bannon had information relevant to its investigation. Accordingly, on September 23, 2021, the Select Committee issued a subpoena to him. The subpoena sought documents and testimony pertaining to seventeen categories of information from 2020 and 2021, long after Bannon's 2017 departure from the White House: Three pertained to Bannon's communications with President Trump in 2020 and 2021; the rest related to Bannon's communications with White House and campaign staff, other private citizens, and related activities. The subpoena ordered Bannon to produce documents by October 7, 2021, and to appear for a deposition on October 14. Bannon did not comply with either demand.

Instead, shortly after the first subpoena deadline passed on October 7, Bannon's lawyer informed the Select Committee that Bannon would not respond. That October 7 letter stated that Bannon had received communications from Justin Clark, counsel for former President Trump, indicating that President

4

Trump intended to invoke executive privilege. Until those issues were resolved, the letter stated, Bannon would not respond to the request for documents or testimony.

The next day, October 8, the Select Committee responded in a letter, stating that Bannon had provided no "legal basis" for his "refusal to comply with the Subpoena." J.A. 4838. The Select Committee noted that it had received no assertion, formal or otherwise, of executive privilege from President Trump. The Select Committee also explained that such an assertion would not, in any event, justify Bannon's wholesale noncompliance with the subpoena. As the Select Committee described, "virtually all" of the material sought concerned Bannon's actions as a private citizen and pertained to subjects not covered by executive privilege. *Id.* The Committee noted that Bannon could raise any particularized privilege concerns to the Committee in response to specific questions or document requests, but that he could not categorically claim "absolute immunity" from responding to the subpoena. J.A. 4839.

Bannon's lawyer replied in an October 13 letter to the Committee, repeating that Clark "informed" Bannon's lawyer that President Trump "is exercising his executive privilege" and that Bannon would not respond to the subpoena. J.A. 4841. In an October 15 letter, the Select Committee reiterated the points in its October 8 letter—that it had received no communication from President Trump asserting executive privilege and that such an assertion would not justify total noncompliance by Bannon. The Select Committee repeatedly warned that if Bannon continued to refuse to comply, it would consider referring Bannon for prosecution on contempt charges. The Committee gave Bannon until October 18 to submit any additional information that might bear on its contempt deliberations.

5

During this period, though Clark (former President Trump's counsel) did not contact the Select Committee, he did exchange several emails with Bannon's lawyer. In those exchanges, Clark warned—contrary to Bannon's position—that an assertion of executive privilege would not justify Bannon's total noncompliance. In his initial October 6 letter to Bannon's counsel, Clark described the subpoena as seeking materials "including but not limited to" information "potentially" protected by executive privilege. J.A. 444. Clark therefore instructed Bannon to invoke, "where appropriate," any immunities and privileges Bannon "may have." *Id.* In an October 14 letter to Bannon's lawyer, Clark disclaimed that President Trump had directed Bannon not to produce documents or testify until the issue of executive privilege was resolved. And on October 16, after learning of Bannon's continued claim to the Committee that he was justified in not responding to the subpoena, Clark repeated that his previous letter "didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is." J.A. 448.

Bannon did not comply with the subpoena in any respect. Nor, despite the Committee's warnings, did he submit by October 18 any further information bearing on the Committee's contempt deliberations. On October 19, 2021, the Select Committee informed Bannon that it had unanimously voted to recommend that the House of Representatives find him in contempt of Congress.

On November 12, 2021, a grand jury charged Bannon with two counts of violating 2 U.S.C. § 192. Section 192 provides that "[e]very person who having been summoned as a witness by the authority of . . . any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty" of contempt of Congress.

6

2 U.S.C. § 192. The indictment's first count concerned Bannon's refusal to appear for the deposition; the second concerned his refusal to produce the sought-after documents and communications.

On July 22, 2022, following a five-day trial, a jury found Bannon guilty on both counts. The district court sentenced Bannon to four months' incarceration for each count to run concurrently, with a $6,500 fine. The district court stayed Bannon's sentence pending this appeal.

**II**

Bannon raises four challenges to his convictions. He argues that the district court erroneously defined the mental state required for a contempt of Congress charge, that his conduct was affirmatively authorized by government officials, that the Select Committee's subpoena was invalid to begin with, and that the trial court should not have quashed certain trial subpoenas that sought to develop evidence for his defense. As explained below, each challenge lacks merit.

**A**

In this appeal, Bannon does not dispute that he deliberately refused to comply with the Select Committee's subpoena in that he knew what the subpoena required and intentionally did not respond; his nonresponse, in other words, was no accident. Instead, Bannon challenges the contempt of Congress charges on the ground that he reasonably believed—based on advice of counsel—that he did not have to respond. He argued below and on appeal that "willfully" making default in violation of 2 U.S.C. § 192 requires bad faith—that the defendant must know that his conduct violated the law. The district court, however, concluded that Section 192 requires proof only that the defendant deliberately and intentionally did not respond. The district court thus denied Bannon's motion to dismiss the

7

indictment based on his asserted good-faith reliance on his counsel's advice, precluded Bannon from presenting such a defense at trial, and instructed the jury consistent with those rulings. We review the district court's legal determination *de novo*. *See United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008).

Our decision in *Licavoli* directly rejects Bannon's challenge. In *Licavoli*, we concluded that "willfully" in Section 192 requires that any failure to appear in response to a congressional subpoena be only "deliberate" and "intentional." 294 F.2d at 208; *see id.* at 207–09. It does not require bad faith, evil motive, or unlawful purpose. *Id.* at 209. Indeed, *Licavoli* specifically held that an advice of counsel defense—which ultimately seeks to show the defendant acted in good faith—is unavailable under this statute. *Id.* ("Advice of counsel does not immunize that [deliberate] intention.").

Bannon does not dispute that description of *Licavoli*. *See* Bannon Br. 10. He instead asks us to depart from its holding. That request, however, must clear a high bar. *Licavoli* is binding upon this panel unless it was inconsistent with an earlier, on-point decision, *United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011), or if it has been overturned—or its rationale "eviscerated"—by a subsequent decision of the Supreme Court or of this court sitting *en banc*, *Dellums v. U.S. Nuclear Regul. Comm'n*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988). Bannon has not identified any such case. To the contrary, every case that addresses the mental state required for a contempt of Congress conviction firmly supports *Licavoli*'s holding.

Recall that Section 192 criminalizes not only "willfully mak[ing] default"—the clause at issue in *Licavoli* and this case—but also—in a second clause—the conduct of one "who, having appeared, refuses to answer any question pertinent to

8

the question under inquiry." 2 U.S.C. § 192. As *Licavoli* itself observed, the Supreme Court had already held that the latter clause requires only a deliberate and intentional refusal to answer. *See* 294 F.2d at 207–08. For example, in *Sinclair v. United States*, 279 U.S. 263 (1929), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995), the Supreme Court held that a conviction under that clause requires only an "[i]ntentional violation"; no "moral turpitude" is required and assertions that a defendant "acted in good faith on the advice of competent counsel" are "no defense." *Id.* at 299. *Quinn v. United States*, 349 U.S. 155 (1955), reached the same result: Section 192's latter clause requires only "a deliberate, intentional refusal to answer." *Id.* at 165; *see also Yellin v. United States*, 374 U.S. 109, 123 (1963); *Watkins v. United States*, 354 U.S. 178, 208 (1957); *United States v. Helen Bryan* ("*Helen Bryan*"), 339 U.S. 323, 330 (1950); *Fields v. United States*, 164 F.2d 97, 101 (D.C. Cir. 1947). Although the "refusal to answer" clause does not use the term "willfully," *Licavoli* rejected the argument that the presence of the adverb in one clause but not the other counseled any different approach to the mental state required when a subpoena recipient refuses to appear altogether instead of appearing but refusing to answer pertinent questions. *See* 294 F.2d at 208. Bannon offers no challenge to that rationale—which would bind us in any event—in this appeal.

Moreover, cases addressing Section 192 have explained why, as a practical matter, requiring evidence of bad faith would undermine the statute's function. The ability to effectively enforce subpoenas is critical to Congress's power of inquiry, which is in turn essential to Congress's ability to legislate "wisely and effectively." *Quinn*, 349 U.S. at 160–61. And effectively enforcing congressional subpoenas would be exceedingly difficult if contempt charges required showing that a failure to appear or refusal to answer questions was not just deliberate and intentional, but also done in bad faith.

9

Otherwise, any subpoenaed witness could decline to respond and claim they had a good-faith belief that they need not comply, regardless of how idiosyncratic or misguided that belief may be. As the Supreme Court has colorfully put it, a "subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase." *Helen Bryan*, 339 U.S. at 331. "If that were the case, . . . the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity." *Id.*

In the face of that authority, Bannon cites cases that do not undermine *Licavoli*, much less to the degree required for this panel to even consider departing from that decision. Importantly, the cases Bannon cites do not address Section 192 or contempt charges at all, but instead interpret the word "willfully" in *other* criminal statutes to require more than a deliberate and intentional act. For example, in some criminal statutes, "willful" conduct requires that the defendant act with a "bad purpose," meaning with "knowledge that his conduct was unlawful." *Sillasse Bryan v. United States* ("*Sillasse Bryan*"), 524 U.S. 184, 191–92 (1998) (quotation omitted) (interpreting 18 U.S.C. § 924(a)(1)(D), which criminalizes unlawfully dealing in firearms without a license); *Ratzlaf v. United States*, 510 U.S. 135, 140–50 (1994) (interpreting 31 U.S.C. §§ 5322, 5324, which prohibit willfully structuring cash transactions for the purpose of evading reporting requirements); *United States v. Burden*, 934 F.3d 675, 680, 689–93 (D.C. Cir. 2019) (interpreting the "willful[]" violation of a provision prohibiting the export of defense articles without a license). But that is at most a "general" rule. *Sillasse Bryan*, 524 U.S. at 191. As those same cases explain, "willful" "is a 'word of many meanings,'" and "'its construction is often . . . influenced by its context.'" *Ratzlaf*, 510 U.S. at 141 (alteration omitted) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *see also Sillasse Bryan*, 524 U.S. at 191 (noting that

10

construction of word "willfully" in statutes "is often dependent on the context in which it appears"). Because statutory context is critical, nothing in the authorities Bannon relies upon calls into question this court's longstanding interpretation of "willfully" in Section 192 as requiring a deliberate, intentional failure to respond to a subpoena.[1]

Finally, Bannon argues that applying *Licavoli* to disallow his advice of counsel defense would raise constitutional concerns because his counsel's advice was that then-former President Trump had asserted executive privilege. This case, however, provides no occasion to address any questions regarding the scope of executive privilege or whether it could have excused Bannon's noncompliance in these circumstances. President Trump did not communicate an intent to invoke executive privilege to the Committee, and Bannon never raised executive privilege as an affirmative defense to the contempt charges in district court. *See* J.A. 3017 (district court similarly observing that whether executive privilege excused Bannon from complying with the subpoena was "unteed-up").[2] The

---

[1] At oral argument, Bannon's counsel identified our pre-*Licavoli* decision in *Townsend v. United States*, 95 F.2d 352 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938), as the strongest reason why we should not apply *Licavoli*. Oral Arg. Tr. 5:10–7:8; 35:3–14. Unlike the cases interpreting "willfully" that Bannon cited in his briefs, that decision does address Section 192. But it only further confirms *Licavoli*'s holding and ours. *Townsend* acknowledged that the meaning of "willfully" depends on the specific "statute in which it is used," and concludes, contrary to Bannon's position, that "deliberately" refusing to comply with a congressional subpoena violates Section 192. 95 F.2d at 361.

[2] In a July 2022 letter to Bannon, President Trump claimed that he had previously invoked executive privilege, but that letter was written long after Bannon had already failed to comply with the subpoena in October 2021.

11

argument Bannon preserved and presses on appeal is confined to disputing the mental state required for a contempt of Congress conviction. It raises no constitutional question to reaffirm *Licavoli*'s holding that a deliberate and intentional refusal to honor a congressional subpoena violates federal law.

**B**

Bannon also sought to mount what he parses as three affirmative defenses—all based on the assertion that the government authorized his default—which he labels entrapment by estoppel, public authority, and apparent authority. Bannon advanced a common theme to support those defenses: that his noncompliance was justified because he relied on directives from then-former President Trump and a collection of opinions from the Department of Justice's Office of Legal Counsel ("OLC"). The district court concluded that none of the defenses supported dismissing the indictment and that Bannon was not entitled to a jury instruction on the defenses either. Our review is again *de novo*. *See United States v. Williamson*, 903 F.3d 124, 132 (D.C. Cir. 2018).

These defenses stem from fairness concerns with prosecuting someone who reasonably relies on a government official's advance assurance that their conduct would be legal or on a government official's authorization of illegal conduct. For example, where a federal agency "affirmatively misled" regulated entities into believing certain specific conduct was lawful, the Supreme Court held that prosecuting the entities for that very conduct would offend "traditional notions of fairness inherent in our system of criminal justice." *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973). Accordingly, these government authorization defenses require the defendant to show (in addition to other elements we need not address) that the government affirmatively authorized the defendant's conduct—here, Bannon's refusal to produce any documents or

12

testify in response to the Select Committee's subpoena. *See Cox v. Louisiana*, 379 U.S. 559, 569–71 (1965); *Raley v. Ohio*, 360 U.S. 423, 424–25 (1959); *United States v. Alvarado*, 808 F.3d 474, 484–85 (11th Cir. 2015); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 313 (3d Cir. 1997).

Bannon cannot show such authorization here. Neither the communications from former President Trump's counsel nor the OLC opinions purported to authorize Bannon's refusal to produce any documents or appear for his deposition.

First, the statements from President Trump's counsel, Justin Clark. We need not decide if a former government official can provide the requisite authorization because, as the record demonstrates, President Trump did not, in fact, authorize Bannon's refusal to respond to the subpoena. Clark's initial October 6 letter to Bannon's counsel nowhere suggested that Bannon should categorically refuse to respond to the subpoena. It stated that the subpoena "includ[ed]" requests for information "potentially" protected by executive privilege and instructed Bannon to, "where appropriate," invoke any privileges he "may have." J.A. 444. When Clark learned that Bannon was refusing to comply with the subpoena entirely, he followed up on October 14, disclaiming that President Trump had directed Bannon to do so. Most pointedly, Clark reiterated on October 16 that his earlier letter "didn't indicate that we believe there is immunity from testimony for your client" and concluded: "As I indicated to you the other day, we don't believe there is." J.A. 448. The letters, in short, explicitly communicate the opposite of what Bannon asserted to the Committee.

Second, the OLC opinions. We similarly need not decide whether and in what circumstances OLC opinions can support a government authorization defense because none of the cited opinions license Bannon's refusal to produce any documents or

13

appear to testify. Cases finding government authorization of criminal conduct have typically involved a single government statement directed to the defendant, or at least to a class of individuals that includes the defendant, authorizing a specific course of conduct. *See, e.g.*, *Pa. Indus. Chem. Corp.*, 411 U.S. at 674.

Here, the OLC opinions Bannon cites involve a variety of situations where OLC concluded executive privilege could be properly invoked. But, as the district court correctly observed, none of the opinions address a situation resembling Bannon's: a congressional committee subpoena for communications "between a nongovernmental employee and a President who, at the time of the Subpoena, was no longer in office and had not clearly directed the Subpoena recipient to decline to comply altogether." J.A. 2351–52. Further, none of the opinions addressed communications between a private citizen subpoena recipient and other private citizens. Here, only a small subset of the subpoena topics even referenced communications with President Trump or his staff—the rest concerned Bannon's communications with individuals outside the White House not even arguably subject to executive privilege.

Reflecting the fact that the OLC opinions are meaningfully distinguishable from this situation, Bannon resorts to arguing that his lawyer concluded his nonresponse was authorized by interpreting the "principles" and "rationale underlying" at least fifteen different OLC opinions and statements. Reply Br. 11, 15; *see also id.* 10–18. That Bannon can point only to his lawyer's interpretation of underlying principles and rationales, rather than any specific statement from the government, confirms that Bannon's government authorization defenses are each essentially a repackaged advice of counsel defense. As we have explained, Section 192 permits no such defense.

14

**C**

Bannon also argued that his contempt charges should be dismissed because the Select Committee's subpoena was invalid for both substantive and procedural reasons. The district court concluded that these challenges did not warrant dismissing the indictment and precluded Bannon from introducing evidence he claimed supported them. We review the denial of the motion to dismiss *de novo*, *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005), and the district court's exclusion of evidence for abuse of discretion, *United States v. Hall*, 945 F.3d 507, 514 (D.C. Cir. 2019). Bannon's challenges fail.

**1**

A congressional committee may use its investigative power only for a "valid legislative purpose." *Quinn*, 349 U.S. at 161. Bannon contends that the Select Committee lacked such a purpose in issuing its subpoena to him. We have already held that the Select Committee, as a general matter, "plainly has a valid legislative purpose" because "its inquiry concerns a subject on which legislation could be had." *Trump v. Thompson*, 20 F.4th 10, 41–42 (D.C. Cir. 2021) (quotation marks and alteration omitted) (quoting *Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020)), *cert. denied*, 142 S. Ct. 1350 (2022); *see also id.* at 24–25. As we explained in *Thompson*, the Committee's investigation into the events of January 6 could inform a range of legislation, and House Resolution 503 explicitly authorizes the Select Committee to propose legislation in light of its investigation. *Id.* at 41–42.

Bannon makes no argument that the subpoena's subject matter is unrelated to that authorized investigation. Nor could he. As the indictment explains, based on public reports, the Committee believed Bannon had information "relevant to understanding important activities that led to and informed" the

15

events of January 6, and the information the subpoena sought was relevant to those events. J.A. 39–40.

Instead, Bannon argues that even if the Select Committee *could* have had a valid legislative purpose in seeking this information from him, his subpoena was invalid because the Select Committee's members *actually* acted for assertedly improper reasons, namely to target him and send a message to other potential witnesses. But this argument too runs headlong into settled law. The Supreme Court has made "clear that in determining the legitimacy of a congressional act[,] we do not look to the motives alleged to have prompted it." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975); *accord Barenblatt v. United States*, 360 U.S. 109, 133 (1959) (declining to inquire into motives of committee members); *Watkins*, 354 U.S. at 200 (same). What matters is whether the subpoena is objectively related to a valid legislative purpose. This one was.

**2**

Bannon also raised several procedural objections to the subpoena: that the Select Committee lacked the thirteen members and ranking minority member required by House Resolution 503, and that he should have received a copy of House Rule 3(b) (describing committee deposition authority) with the subpoena. These objections suffer from a common defect: Bannon did not raise them before the Select Committee and therefore forfeited them.

It is undisputed that the first time Bannon raised these arguments was in district court, long after his deadline for responding to the subpoena had passed. Bannon Br. 54–56. A witness cannot defend against a contempt of Congress charge based on an affirmative defense that they were able, but failed, to raise at the time they were ordered to produce documents or appear. *Helen Bryan*, 339 U.S. at 332–35. This rule promotes

"a decent respect for the House of Representatives" and ensures that a committee has an appropriate opportunity to remedy any claimed procedural deficiencies in its subpoenas. *Id.* at 332. As the Supreme Court has observed: "To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Id.* at 333.

Bannon argues that his failure to raise these objections at the time he was ordered to appear and produce documents should nevertheless be excused on either of two grounds. Neither applies here.

First, objections going to the elements of the contempt offense—the facts that the government must prove to secure a conviction—cannot be forfeited. *See id.* at 328–29; *Deutch v. United States*, 367 U.S. 456, 468–72 (1961). But none of the procedural defects Bannon alleges are elements of the Section 192 offense. As the district court instructed the jury here, to establish a Section 192 violation, the government was required to prove that Bannon was subpoenaed by the Select Committee to testify or produce papers, the subpoena sought testimony or information pertinent to the investigation the Select Committee was authorized to conduct, Bannon failed to comply with the subpoena, and his failure to comply was willful. A committee's compliance with procedural rules is not an aspect of any of these elements. *See Helen Bryan*, 339 U.S. at 330–35. Bannon's procedural arguments are therefore at best affirmative defenses that he failed to preserve by not raising them to the Committee. *See, e.g.*, *id.* at 328–29 (government need not prove committee quorum as an element of contempt); *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965) (committee's failure to comply with authorizing resolution is "valid defense" to contempt); *see also Yellin*, 374 U.S. at 123 (refusing to answer committee question based on rule violation would be a "defense").

17

Bannon suggests that compliance with procedural rules is part of the second element: congressional authority and pertinency. Not so. Authority is a question of whether a committee was "duly empowered" to investigate and "the inquiry was within the scope of the grant of authority." *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962). And pertinency is a question of whether witness questions in fact related to a matter the committee was authorized to investigate. *Bowers v. United States*, 202 F.2d 447, 448 (D.C. Cir. 1953). None of Bannon's procedural contentions bear on whether House Resolution 503 gave the Select Committee the authority to investigate the January 6th attack or whether the subpoena issued to Bannon related to that investigation. Because Bannon's contentions about compliance with procedural rules are not elements of the offense, they can be—and have been—forfeited.

Second, Bannon's failure to raise these arguments before the Select Committee could be excused if the grounds for them were not apparent at the time he was ordered to appear and produce documents. *Cf. Yellin*, 374 U.S. at 122–23 (excusing failure to raise procedural objection where defendant was "unable" to discern violation prior to trial); *Shelton v. United States*, 404 F.2d 1292, 1300 (D.C. Cir. 1968). But that exception has no application here either. Bannon never contests the government's assertion that the composition of the Select Committee was widely reported at the time. And if Bannon wished to argue that he was entitled to a copy of Rule 3(b) with the subpoena, he was indisputably aware of the fact that it had not been provided—indeed, the subpoena's attachments explained that he would receive a copy of that rule when he appeared to testify.

Because the subpoena advanced a valid legislative purpose and Bannon forfeited his procedural objections to it, the district court did not err in denying the motion to dismiss the

indictment and excluding evidence supporting those objections as irrelevant. Accordingly, the district court also did not err in instructing the jury to disregard a reference that Bannon's counsel made in his closing argument to Rule 3(b).

**D**

Finally, Bannon challenges the district court's rulings quashing trial subpoenas that he served on Select Committee members, staffers, counsel, and three House leaders. The district court held that most of the testimony and documents sought were protected by the Constitution's Speech or Debate Clause and that any information not covered by the Clause was irrelevant. Bannon then moved to dismiss, arguing that quashing resulted in a one-sided presentation of evidence that violated his Fifth and Sixth Amendment rights. The district court, after considering Bannon's detailed proffer, denied his motion because the information Bannon sought was not material to the charges or defenses properly before the jury. We again review the denial of Bannon's motion to dismiss *de novo*, *Yakou*, 428 F.3d at 246, and the district court's evidentiary rulings for abuse of discretion, *Hall*, 945 F.3d at 514.

We conclude that none of the information sought in the trial subpoenas was relevant to the elements of the contempt offense, nor to any affirmative defense Bannon was entitled to present at trial. We accordingly need not consider whether the Speech or Debate Clause also protects the sought-after information from disclosure.

As discussed above, Bannon sought to put to the jury several arguments that the district court properly excluded: that the underlying subpoena was invalid because of the political motives of Select Committee members and procedurally flawed based on the Select Committee's composition and Bannon's non-receipt of a copy of Rule 3(b).

19

Bannon's trial subpoenas sought information related to those arguments. He sought, for example, information about the subjective motives or bias of Select Committee members and their thinking behind issuing the subpoena to Bannon and communicating with his counsel. Because the district court properly concluded those arguments were irrelevant, it made no error in quashing trial subpoenas seeking information to support them.

At oral argument, when asked to identify Bannon's strongest example of purportedly relevant information sought in the trial subpoenas, Bannon's counsel identified a request for testimony from Select Committee Chairman Bennie Thompson about his letters to Bannon urging Bannon to comply with the subpoena even after the initial deadline for a response. Oral Arg. Tr. 8:22–9:8. The district court reasonably concluded that any testimony from Chairman Thompson about his letters to Bannon would be irrelevant. The district court acknowledged that Bannon could argue to the jury that he believed the subpoena dates were malleable, such that his noncompliance by the specified dates was not a deliberate and intentional default. But what an individual member of the Select Committee thought—even the chairman—does not go to Bannon's state of mind. As the district court observed, it is *Bannon's* understanding of the dates that matters. Bannon's counsel conceded that all the information Bannon had from the Select Committee was reflected in the letters themselves, which were entered into evidence. That this is Bannon's strongest example illustrates the broader conclusion that none of what Bannon sought in the trial subpoenas went to elements of the contempt offense or any affirmative defense Bannon was entitled to present.

Bannon's arguments that the district court violated his rights to compulsory process or due process by quashing his trial subpoenas and denying his motion to exclude all

20

congressional testimony also fail for the same reasons. Both claims require Bannon to show that "the evidence lost would be . . . material" to his defense. *United States v. Verrusio*, 762 F.3d 1, 23 (D.C. Cir. 2014) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)). As explained, he cannot make that showing.[3]

### III

The judgment of conviction and sentence under 2 U.S.C. § 192 is affirmed.

*So ordered.*

---

[3] We decline to reach Bannon's wholly undeveloped argument that quashing the trial subpoenas violated his rights to effective assistance of counsel and confrontation. *See, e.g.*, *Ramsey v. U.S. Parole Comm'n*, 840 F.3d 853, 863 n.6 (D.C. Cir. 2016) (even assuming a claim was preserved in district court, "perfunctory appellate briefing does not suffice to raise it in this Court").