UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 22-3086
(Cr. 21-670-CJN)

————————————

UNITED STATES OF AMERICA,                                    Appellee,

v.

STEPHEN K. BANNON,                                           Appellant.

## OPPOSITION TO APPELLANT'S EMERGENCY MOTION FOR RELEASE PENDING APPEAL

### INTRODUCTION

After this Court affirmed Stephen Bannon's convictions for contempt of Congress, the district court, on government motion, lifted the stay of Bannon's four-month sentence and ordered him to report to the Bureau of Prisons by July 1, 2024. *United States v. Bannon*, 1:21-cr-00670-CJN, ECF Doc. No. 198 (June 6, 2024). Bannon has filed an emergency motion in this Court seeking release pending the final resolution of his appeal. He fails, however, to show a "substantial question likely to result in" reversal or a new trial, as required for release.

18 U.S.C. § 3143(b). Because Bannon cannot justify what would be an extraordinary exception to the general rule of detention following conviction and an unsuccessful appeal, his motion should be denied.

## BACKGROUND

The Court's opinion recounts the relevant facts. *United States v. Bannon*, No. 22-3086, Slip Op. at 2-6 (D.C. Cir. May 10, 2024). To summarize, in September 2021, the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the Committee) issued a subpoena directing Bannon to appear and to provide documents. Public accounts of his statements and activities indicated that Bannon might have information relevant to the Committee's charge to investigate the "facts, circumstances, and causes" of the January 6, 2021, attack on the United States Capitol. Bannon had served as a White House advisor in 2017. The subpoena listed 17 categories of information that he was to provide, all for the period of 2021-2022. The vast majority of listed topics involved Bannon's activities as a private citizen and his communications with persons outside the White House. The subpoena also explained the procedures for asserting any privilege claim.

Bannon did not comply with the subpoena. After the deadline for providing documents passed, his attorney wrote the Committee and claimed that former President Trump had asserted executive privilege. The attorney attached part of an October 6, 2021, letter from President Trump's attorney, Justin Clark, which noted that the subpoena sought material "including but not limited to" information "potentially" protected by executive and other privileges, and it directed Bannon, "where appropriate," to assert any immunities or privileges Bannon "may have."

The Committee rejected Bannon's executive-privilege claim. It repeatedly told Bannon it had not received any assertion of executive privilege from President Trump, that any such assertion would not excuse Bannon's wholesale noncompliance given that "virtually all" of the information sought could not possibly implicate executive privilege, and that there were procedures to allow the assertion of any privilege objections with respect to specific questions. Bannon nonetheless insisted that President Trump had directed him not to produce documents or testify until the privilege issue was resolved.

On October 14, 2021, after learning that Bannon was refusing to comply at all with the subpoena, Clark emailed Bannon's attorney and stated, "To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated October 6, 2021 . . ." Two days later, Clark again emailed Bannon's attorney and repeated that his initial letter "didn't indicate that we believe there is immunity from testimony for your client." He added, "As I indicated to you the other day, we don't believe there is."

Bannon still refused to comply with the subpoena, and Congress ultimately referred him to the United States Attorney for a contempt prosecution. He was charged with two counts of contempt of Congress, 2 U.S.C. § 192, tried by jury before the Honorable Carl N. Nichols, found guilty, and sentenced to four months' imprisonment. The district court stayed the sentence pending appeal.

This Court unanimously affirmed Bannon's convictions. Among other rulings, the Court rejected Bannon's claim that the district court had erred in defining the mens rea element of contempt of Congress to require only that the defendant act deliberately and intentionally and thus in barring any evidence or argument on Bannon's claim that he had

refused to comply with the subpoena based on good-faith reliance on advice of counsel. Slip Op. at 6-11. The Court noted that *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), directly foreclosed Bannon's challenge. *Id.* at 7. The Court found no basis to depart from that precedent, which "every case that addresses the mental state required for a contempt of Congress conviction firmly supports." *Id.* It noted that Supreme Court cases interpreting the "refuses to answer" clause of Section 192 required only a deliberate and intentional refusal to answer and that *Licavoli* had rejected the argument that the two statutory clauses should be read as requiring different mental states. *Id.* at 7-8. Bannon had offered "no challenge to that rationale." *Id.* at 8. "Moreover," the Court explained, "cases addressing Section 192 have explained why, as a practical matter, requiring evidence of bad faith would undermine the statute's function." *Id.* at 8-9. The Court rejected Bannon's reliance on cases interpreting "willfully" in the context of other statutes, and it disagreed that Bannon's claim about executive privilege raised any constitutional concerns. *Id.* at 9-11.

After the Court ruled, the government filed a motion in the district court to lift the stay of Bannon's sentence. ECF 193. The district court

held a hearing and granted the motion, finding that the appeal "no longer raises a substantial question of law that is likely to result in a reversal or an order for a new trial under 18 U.S.C. § 3143(b)(1)(B)." ECF 198.

## DISCUSSION

Bannon's release motion should be denied. Release pending appeal is the exception to the general rule that a defendant "shall . . . be detained" following a conviction and imposition of a sentence of imprisonment. 18 U.S.C. 3143(b). Release after an appellate panel has ruled against the defendant would be all the more extraordinary. Bannon cannot meet the legal standard to justify his release.

To obtain release pending appeal, a defendant must present "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and must demonstrate "that the appeal is not for the purpose of delay and raises a substantial question of law or fact" that is "likely to result in," among other things, "reversal" of his conviction. 18 U.S.C. § 3143(b)(1). The first two requirements are not in dispute: the government does not contend that Bannon is a flight risk or that his anticipated petitions for rehearing or certiorari are for the purpose of

delay. Bannon's request for relief fails because he cannot show a substantial question that is likely to result in reversal or a new trial.

A "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Perholtz*, 836 F.2d 554, 555-56 (D.C. Cir. 1988). If this Court determines that the appeal raises a substantial question, it must also determine whether "resolution of that question in the defendant's favor [is] likely to lead to reversal." *Id.* at 555. Here, Bannon faces an additional hurdle: with only discretionary stages of appellate review remaining, before he can demonstrate that a reviewing court is likely to reverse, Bannon must demonstrate that either this Court or the Supreme Court is likely to grant discretionary review in the first place.[1] *Cf. Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett,

---

[1] Bannon errs in contending otherwise. See Mot. 17. By its plain language, section 3143 requires that the alleged substantial question be "likely to result in" reversal or a new trial. 18 U.S.C. § 3143(b)(1)(B); *see also* S. Rep. No. 225, 98th Cong., 1st Sess. 27 (1983), *reprinted in* 1984 U.S. Cong. Cong. & Admin. News 3182, 3210 (explaining that there must be "an affirmative finding that *the chance of reversal* is substantial" (emphasis added)). And there can be no likelihood of reversal or a new trial unless there is first a likelihood that discretionary review will be granted. Indeed, Bannon identifies no instances where this Court has ordered release of a defendant whose petitions for rehearing or certiorari have yet to be granted (let alone filed).

J., concurring in the denial of application for injunctive relief) (requirement for extraordinary relief that applicant is "likely to succeed on the merits" "encompass[es] not only an assessment of the underlying merits but also a discretionary judgment about whether the Court should grant review in the case"). Bannon cannot make any of these showings.

### A. The Mental State for Contempt of Congress Does Not Present a Substantial Question Likely to Result in Reversal or a New Trial

Bannon primarily argues that the mental state required for contempt of Congress presents a "substantial question" justifying release (Mot. 7-23). He does not address the issue in the context of potential panel rehearing or rehearing en banc. He focuses his argument on how he thinks the Supreme Court might view *Licavoli*. Bannon does not establish that the mens rea issue amounts to a "substantial question" or that it is likely that this Court or the Supreme Court will exercise its discretion to grant rehearing or a writ of certiorari and set aside his conviction.

## 1. Substantial Question

The mental state required for a Section 192 charge does not present a "substantial question." Bannon cannot show that in the Supreme Court, this issue would be "a close question or one that very well could be decided the other way." *Perholtz*, 836 F.2d at 555-56.

As this Court correctly determined, a defendant acts willfully under section 192 if he deliberately and intentionally refuses to comply with a Congressional subpoena. Slip Op. 7-9; *Licavoli*, 294 F.2d at 207-09. Knowledge that his conduct is unlawful is not required, and reliance on the advice of counsel is not a defense. To hold otherwise "would undermine the statute's function." Slip Op. 8.

Numerous Supreme Court decisions accord with this approach. In *Sinclair v. United States*, 279 U.S. 263 (1929), for example, the Supreme Court held that contempt of Congress does not involve "moral turpitude" and that "[i]ntentional violation is sufficient to constitute guilt." *Id.* at 299. It held further that the exclusion of evidence that the defendant refused to answer "in good faith on the advice of competent counsel" did not entitle the defendant to a new trial because a defendant's "mistaken view of the law is no defense." *Id.* Similarly, in *Quinn v. United States*,

349 U.S. 155 (1955), the Supreme Court held that contempt of Congress requires only "a deliberate, intentional refusal to answer." *Id.* at 165. Other Supreme Court cases reflect the same understanding of the statute. *See, e.g., Watkins v. United States*, 354 U.S. 178, 208 (1957); *United States v. Fleischman*, 339 U.S. 349, 360, 364 (1950); *United States v. Helen Bryan*, 339 U.S. 323, 330 (1950).

Bannon errs in suggesting (at 11-12) that those decisions are inapposite because they involved a refusal to answer questions, to which the "willfully" mens rea in Section 192 does not apply. *See* 2 U.S.C. § 192 (penalizing one who "willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry"). As an initial matter, Bannon is factually wrong: the defendant in *Helen Bryan* was charged with having "willfully made default" based on her failure to produce records, and the Supreme Court found that the government had "made out a prima facie case" of willful default by showing simply that "on the day set out in the subpoena she intentionally failed to comply." 339 U.S. at 330.

Moreover, Bannon's proposed distinction between the mens rea applicable to the two clauses lacks merit. As this Court explained in

*Licavoli*, it was unnecessary to add "willfully" to the second clause because "a refusal to answer—the witness having appeared, being present and conscious of what is going on, understanding the question, and being advised of its pertinency—is obviously in and of itself a willful act." 294 F.2d at 208. A failure to respond to a subpoena, on the other hand, "might be due to many causes other than deliberate intention," including "illness, travel trouble, misunderstanding, etc." *Id.* Thus, it was necessary to add "willfully" to the first clause, "but that modifying word was unnecessary as a matter of legal definition in respect to refusals to answer questions. *Id.* So although it is true that differences in language are presumed to convey differences in meaning, *see Russello v. United States*, 464 U.S. 16, 23 (1983), here the difference simply reflects that adding "willfully" to the second clause would have been superfluous because the language of that clause already reflects a willfulness requirement. Bannon calls this reasoning "thin" (Mot. 12), but he does not actually show any defect in the Court's logic. As the panel in this case observed, "Bannon offers no challenge to [*Licavoli*'s] rationale." Slip Op. 8.

The Supreme Court thus already has addressed the issue that Bannon claims presents a substantial question. Although Bannon contends the Supreme Court might take a different view today, that sort of speculation is insufficient to establish a substantial question. Where, as here, there is *existing* precedent, a defendant, whose convictions have been affirmed on appeal, cannot meet the "substantial question" requirement simply by asserting that the precedent is ripe to be overruled. *Cf. Perholtz*, 836 F.2d at 555.

Bannon errs in asserting (Mot. 10) that the "novel[ty]" of the factual scenario here—described as one where the subpoena was directed at a "former executive official" and "the former President invoked executive privilege and the official's own lawyer advised him not to respond"—alone makes the question here "substantial." To start, Bannon's characterization of the facts is inaccurate. While Bannon was indeed a "former executive official," the subpoena did not target any of his White House activities but focused entirely on the period well after he had left the White House in 2017. The only indication in the record that President Trump invoked executive privilege over the contents of the subpoena was his retrospective letter sent on the eve of trial, nine months after

Bannon's default. There was no evidence that, at the time of the subpoena, President Trump did anything more than give vague directions about "potentially" privileged information, which did not amount to an assertion of executive privilege. *See Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) (requiring executive-privilege claims to be "made with particularity"). And contrary to Bannon's claim (Mot. 9), President Trump's attorney never "advised him not to respond." Rather, Clark made clear that he had not suggested total noncompliance and that he did not believe Bannon was immune from testifying.

Furthermore, even if the facts were novel, the legal issue here is not. As noted, the Supreme Court has addressed the mental state required for contempt of Congress. *E.g., Quinn*, 349 U.S. at 165; *Sinclair*, 279 U.S. at 299. The application of settled legal principles to new facts does not create a substantial question of law.

Bannon also errs in relying (at 10-11) on the "general rule" that "willfully" means "with knowledge that his conduct was unlawful." "Willfully" is a word "of many meanings whose construction is often dependent on the context in which it appears." *Silasse Bryan v. United States*, 524 U.S. 184, 191 (1998). The context here—"vindicating the

13

authority of Congress to compel the disclosure of facts which are needed in the fulfillment of the legislative function," *Helen Bryan*, 339 U.S. at 327—supports defining "willfully" to mean "deliberately and intentionally."

Indeed, the traditional mens rea standard promotes the purpose of Section 192. Congress's "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted). Without the ability to enforce its subpoenas, Congress "could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." *Quinn*, 349 U.S. at 160-61. If a subpoena is treated as "an invitation to a game of hare and hounds," then "the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity." *Helen Bryan*, 339 U.S. at 331. Defining the mens rea element of contempt of Congress to require only deliberate and intentional conduct prevents recalcitrant witnesses from using the excuse of counsel's advice, however misguided, to frustrate a congressional inquiry.

Seizing on this Court's use of the word "practical," Slip op. at 8, Bannon argues (Mot. 15) that allowing a good-faith defense does not present any real practical difficulty. This argument misses the point that requiring the government to prove bad faith would undermine the purpose of the statute to support Congress's ability to investigate, which is essential to its constitutional authority to legislate. *See* Slip Op. at 8-9. Where, as here, Congress issues a subpoena that is objectively related to a valid legislative purpose, *see id.* at 15, the witness has an "unremitting obligation" to comply. *Watkins*, 354 U.S. at 187. By ensuring that witnesses are held liable for deliberate noncompliance, the *Licavoli* standard discourages witnesses from sabotaging congressional investigations simply by manufacturing a claim of good-faith reliance on advice of counsel. Bannon offers no persuasive reason why that sabotage concern is illusory. In this case, for example, his noncompliance based on an asserted "good faith" invocation of executive privilege—despite the repeated warnings by the Committee and Clark that executive privilege could not excuse his wholesale default—deprived the Committee of information it deemed necessary to its investigation. The "rarity" of Section 192 prosecutions (Mot. 16) does not lessen that concern. Without

the *Licavoli* standard, witnesses could be emboldened to defy subpoenas and thus to stymie future congressional investigations.

Bannon's reliance (at 12-13) on *United States v. Murdock*, 290 U.S. 389 (1933), and *McPhaul v. United States*, 364 U.S. 372 (1960), is misplaced. *Murdock* was a tax case in which the Supreme Court held that the willfulness element of the charged offenses entitled the defendant to a jury charge on his claim of good faith and actual belief. *Id.* at 396. The Court explained that the meaning of willfully depends on "context," and that in the tax context, "Congress did not intend" to criminalize a taxpayer's "bona fide misunderstanding" of his tax liability. *Id.* at 395-96. *Murdock* thus rejected *Sinclair*'s interpretation of "willfully" on the ground that *Sinclair* "construed an altogether different statutory provision." *Id.* at 396-97. The Court also stated that Section 192 describes "[t]wo distinct offenses," and "in only one of them is willfulness an element." *Id.* at 397. But even that dictum did not suggest that willfulness for purposes of Section 192 necessarily would require an instruction on good faith.

In *McPhaul*, a defendant convicted of violating Section 192 by failing to produce documents claimed for the first time before the

Supreme Court that there was no evidence that the requested records existed or were within his possession and control. *Id.* at 378. The Supreme Court faulted McPhaul for failing to raise any such objection before the committee that subpoenaed him, to which he owed a duty to state his reasons for noncompliance. *Id.* at 379. The Court also found that the evidence of the Committee's reasonable basis for believing the defendant had the records, coupled with his failure to suggest otherwise to the Committee, "established a prima facie case of willful failure to comply with the subpoena." *Id.* Far from supporting Bannon, the Court's finding of a prima face case of willfulness based simply on McPhaul's evident possession of the documents and his unexplained refusal to produce them accords with *Sinclair*, *Quinn*, and the other cases requiring no more than a deliberate and intentional refusal to comply.

## 2.    Likelihood of Reversal or a New Trial

Bannon fails to show that his challenge to the *Licavoli* standard is "likely to result in" reversal or a new trial, 18 U.S.C. § 3143(b)(1)(B), for two independent reasons: further discretionary review is unlikely and, even if review were granted and *Licavoli* were overruled or abrogated, any resulting trial error here would be harmless.

This case does not meet the standard for rehearing or certiorari. The Court's decision does not implicate any conflict among the circuits. On the contrary, as this Court noted, "every case that addresses the mental state required for a contempt of Congress conviction firmly supports *Licavoli*'s holding." Slip Op. at 7. Bannon asserts (Mot. 17) that the Supreme Court might be "interested in reviewing the *mens rea* issue" today because that Court reviewed 19 cases involving Section 192 in the 1950s and 1960s. See Mot. 18 n.7. But the Supreme Court's docket six or seven decades ago says nothing about the likelihood of certiorari today. And Bannon's baseless allegations of politically motivated prosecutions and his speculation about why the Chief Justice issued an in-chambers decision in *Navarro v. United States*, No. 23A834 (U.S. 2024) (Mot. 20-21), do not establish that the Court would grant review in this case to address the mens rea standard for contempt of Congress.

In any event, even if this Court or the Supreme Court were to grant discretionary review and overrule or abrogate *Licavoli*, any evidentiary or instructional error in this case would be harmless, and so Bannon would not be entitled to reversal or a new trial. Bannon principally contends that he was entitled to argue to the jury that he relied in good

faith on advice of counsel that executive privilege shielded him from compliance. But "Bannon never raised executive privilege as an affirmative defense to the contempt charges in district court." Slip Op. 10. Moreover, there was overwhelming evidence in the record that (a) President Trump did not actually invoke executive privilege before the Committee or prior to Bannon's noncompliance with the subpoena; (b) as the Committee reminded Bannon, most of the topics covered by the subpoena had nothing to do with any communications with President Trump, and indeed concerned events long postdating Bannon's service in the Executive Branch; and (c) as Clark made clear in his emails, even if executive privilege might protect *some* of the information sought by the subpoena, President Trump had not sanctioned *complete* noncompliance and Bannon was not immune from testifying. Given those undisputed facts, no reasonable jury presented with all the relevant circumstances could conclude that Bannon believed in good faith that his complete noncompliance with the subpoena was protected by executive privilege.

**B. The Standard for Granting Release Pending Appeal Also Does Not Present a Substantial Question Likely to Result in Reversal or a New Trial.**

Bannon additionally argues that the definition of "substantial question" in 18 U.S.C. § 3143(b)(1)(B) is itself a substantial question. As he notes, there is some disagreement among the circuits as to the precise phrasing of that definition. *Compare, e.g., Perholtz*, 836 F.2d 555-56 ("a close question or one that very well could be decided the other way") *with United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) ("fairly debatable" or "fairly doubtful"). He does not identify, nor are we aware of, any case where the difference in terminology has resulted in similarly situated defendants being treated differently. Although he claims (Mot. 24) that if he were in the Ninth Circuit he would certainly be released, the Ninth Circuit has made clear that that the "substantial question" inquiry is necessarily case-specific and that "there are no blanket categories for what questions constitute 'substantial' ones." *Handy*, 761 F.2d at 1282 n.2 (internal quotation marks omitted). In any event, given the settled Supreme Court case law on the mental state required to prove contempt of Congress, it is far from clear that even in the Ninth Circuit his *Licavoli* challenge would qualify as a substantial question.

Bannon also cannot show that, if his preferred interpretation of "substantial question" were adopted, it would be "likely to result in" a "reversal" or a "new trial," which is what the statute requires. 18 U.S.C. 3143(b)(1)(B). At most, resolution of that issue in Bannon's favor would bear on the likelihood of Bannon's release based on his mens rea claim. It would not itself lead to reversal or a new trial. Furthermore, Bannon cannot show a likelihood that this Court or the Supreme Court would grant discretionary review to address that issue. The Supreme Court previously has declined to review the circuits' different language for the meaning of "substantial question." *See Fisher v. United States*, 562 U.S. 831 (2010) (No. 09-1383). And even assuming discretionary review were granted, Bannon also fails to show that it is likely that this Court or the Supreme Court would overturn this Circuit's prevailing standard. He does not dispute that, as the Court concluded in *Perholtz*, the "close question" formulation "appears better to accord with the expressed legislative intent to increase the required showing on the part of the defendant." 836 F.2d at 556. The circuits' different formulations of the "substantial question" definition thus does not support Bannon's release.

### C. Bannon's Remaining Arguments Do Not Justify Release.

Bannon identifies several other considerations that he claims support his release. They do not.

First, the possibility that Bannon will finish serving his four-month sentence before final resolution of his anticipated bids for discretionary appellate review (Mot. 24) is not a relevant consideration. The bail statute mandates detention "unless" certain conditions are met, including that the appeal raises a substantial question of law or fact likely to result in reversal or a new trial. 18 U.S.C. § 3143(b)(1). The length of a defendant's sentence does not bear on the statutory conditions, and this Court is not free to rewrite the statute.

Second, Bannon's attempt to compare his situation to that of the Department of Justice attorneys subpoenaed to provide documents relating to Hunter Biden (Mot. 25) is misplaced. Bannon observes that "DOJ instructed its Tax Division lawyers to refuse to comply" with the congressional request (*id.*), but there is an important difference between government attorneys' noncompliance with congressional subpoenas because they have been ordered not to comply, *see United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *see also* 28 C.F.R. § 16.26, and a

private individual's unilateral decision to engage in total defiance of the subpoena on the ground of executive privilege even when told by a representative of the former President that he is not immune from testifying and may not engage in total noncompliance.

Finally, Bannon's claim (at 25-26) of "a strong public interest in [his] remaining free" does not support release. Like the length of his sentence, Bannon's role in political discourse is simply not a relevant factor under 18 U.S.C. § 3143(b)(1). Bannon also cannot reconcile his claim for special treatment with the bedrock principle of equal justice under the law. Even-handed application of the bail statute requires Bannon's continued detention.

## CONCLUSION

WHEREFORE, the government respectfully requests that the emergency motion for release pending appeal be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
Assistant United States Attorney

_____/s/_____
ELIZABETH H. DANELLO
D.C. Bar #407606
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Danello@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this motion contains 4,459 words, and therefore complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This motion has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
ELIZABETH H. DANELLO
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June, 2024, I have caused a copy of the foregoing motion to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, R. Trent McCotter.

/s/
ELIZABETH H. DANELLO
Assistant United States Attorney
