ORAL ARGUMENT HELD NOVEMBER 9, 2023

No. 22-3086

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**UNITED STATES OF AMERICA,**
*Appellee,*

**v.**

**STEPHEN K. BANNON,**
*Appellant.*

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00670-1)

**PETITION FOR REHEARING EN BANC**

R. Trent McCotter
 *Counsel of Record*
Jonathan Berry
Michael Buschbacher
BOYDEN GRAY PLLC
801 17th St NW, Ste 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION AND RULE 35(b)(1) STATEMENT ........................... 1

BACKGROUND ...................................................................................... 5

REASONS FOR GRANTING THE PETITION ......................................... 9

   I.  Rehearing *En Banc* Is Warranted on *Licavoli*'s Anomalous *Mens Rea* Holding .............................................................. 9

      A.  The Supreme Court Has Uniformly Interpreted "Willfully" in the Criminal Context to Require Knowledge of Unlawfulness .................................................................. 9

      B.  The Supreme Court Has Expressly Held that "Willfully" in Section 192 Follows the Traditional Rule ............................ 11

      C.  *Licavoli* Is Grievously Inconsistent with the Court's Textual Canons ................................................................... 13

      D.  Applying the Traditional Rule Makes Sense ....................... 14

      E.  The Stakes Could Not Be Higher, as OLC's Opinions Demonstrate ........................................................................ 15

   II.  Rehearing Is Warranted on Whether a Structural Challenge to a Committee's Authority Is a Mere "Procedural Objection" .................................................................................. 17

CONCLUSION ....................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axon Enterprises, Inc. v. FTC,*
598 U.S. 175 (2023) ............................................................ 19, 20

*Bahlul v. United States,*
840 F.3d 757 (D.C. Cir. 2016) .............................................. 11

*Bailey v. United States,*
516 U.S. 137 (1995) ............................................................ 13

*Bryan v. United States,*
524 U.S. 184 (1998) ..................................................... 9, 10, 12

*Carr v. Saul,*
593 U.S. 83 (2021) ............................................................ 21

*Felton v. United States,*
96 U.S. 699 (1877) ............................................................ 10

*Gojack v. United States,*
384 U.S. 702 (1966) .................................................. 18, 19, 20

*Licavoli v. United States,*
294 F.2d 207 (D.C. Cir. 1961) ..................................... 1–4, 7–17

*McPhaul v. United States,*
364 U.S. 372 (1960) ................................................. 12, 13, 15

*Potter v. United States,*
155 U.S. 438 (1894) ...................................................... 13, 14

*Ratzlaf v. United States,*
510 U.S. 135 (1994) ............................................................ 10

*Safeco Ins. Co. of Am. v. Burr,*
551 U.S. 47 (2007) ........................................................... 9, 10

iii

*Screws v. United States,*
    325 U.S. 91 (1945) ................................................................ 10

*Sinclair v. United States,*
    279 U.S. 263 (1929) .............................................................. 11

*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) ............................................. 16

*United States v. Bryan,*
    339 U.S. 323 (1950) ................................................. 12, 13, 20

*United States v. Murdock,*
    290 U.S. 389 (1933) ..................................................3, 11, 12

*Wooden v. United States,*
    595 U.S. 360 (2022) .............................................................. 10

**Statutes**

2 U.S.C. § 192 ....................................1, 3–4, 7–9, 11–16, 18, 20

18 U.S.C. § 3143 ............................................................... 5, 17

**Other Authorities**

Cong. Globe, 34th Cong., 3d Sess. 405 (1857) ..................... 4, 14

Cong. Globe, 34th Cong., 3d Sess. 441 (1857) .......................... 4

*Executive Privilege Assertion for Audio Recordings,*
    Christopher Fonzone, Ass't Att'y Gen., et al. to Merrick
    Garland, Att'y Gen. (May 15, 2024) ..................................... 16

*Prosecution for Contempt of Congress of an Executive Branch
    Official Who Has Asserted a Claim of Executive Privilege,*
    8 Op. O.L.C. 101 (1984) ....................................................... 17

H.R. Res. 503 ....................................................................... 18–20

# INTRODUCTION AND RULE 35(b)(1) STATEMENT

Rehearing is warranted because, as Judges Nichols and Walker have explained, this Court's decision in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), conflicts with the overwhelming weight of Supreme Court caselaw on the meaning of "willfully" in criminal statutes.

*Licavoli* addressed 2 U.S.C. § 192, which provides that anyone who "having been summoned as a witness by the authority" of Congress to "give testimony or to produce papers" and who either (1) "willfully makes default" on the subpoena, or (2) "having appeared, refuses to answer any question pertinent to the question under inquiry," is guilty of a crime. § 192. Appellant was charged and convicted under the first clause, requiring willfulness.

In the criminal context, the Supreme Court has *uniformly* held that "willfully" requires knowledge of unlawfulness, not merely an intentional or voluntary act. *See* Part I.A, *infra*. Despite this, *Licavoli* concluded in a terse opinion that "willfully" in § 192 means only intentionally or voluntarily. Under *Licavoli*, all that matters is whether a subpoena recipient chose not to respond. If so, he is necessarily guilty and is barred

from telling the jury *why* he did not respond, even if it was because he relied in good faith on executive privilege or advice of counsel, as occurred here.

Judge Nichols explained why *Licavoli* is wrong: "As I've stressed many times, I have serious reservations that the Court of Appeals' interpretation of willfully [in *Licavoli*] is consistent with the modern understanding of the word. It's not consistent with modern case law surrounding the use of that term, let alone the traditional definition of the word. But as I've previously held and I reiterate again today, I am bound by *Licavoli*." JA2993.

On appeal, this Court likewise held that *Licavoli* bound the panel, which candidly admitted that *Licavoli* did not follow the Supreme Court's "'general' rule" that "willfully" in a criminal statute requires a showing that Appellant knew his actions were unlawful. Add.9.

Judge Walker joined that opinion but subsequently dissented from the denial of Appellant's motion for bail, explaining that "the panel felt obliged to disregard the Supreme Court's 'general rule' because *Licavoli* remained binding in this Circuit." Add.24.

Judges Nichols and Walker were right, and this Court should grant rehearing of its panel opinion and order denying bail. *Licavoli* is inconsistent with a slew of Supreme Court decisions, including one expressly recognizing that "[t]wo distinct offenses are described in the disjunctive [in § 192], and in only one of them is willfulness an element," which requires the government to demonstrate Appellant was "prompted by bad faith or evil intent," rather than merely showing that it was "intentional." *United States v. Murdock*, 290 U.S. 389, 397–98 (1933).

*Licavoli* brushed aside *Murdock*'s directly on-point holding because *Murdock* itself arose out of a tax dispute, even though the Supreme Court's opinion expressly narrowed § 192 in the process.

There is no reason why § 192 should be the only criminal statute on the books where "willfully" does not require the government to prove knowledge of unlawfulness. In fact, Congress's use of two different *mens rea* elements in the very same sentence in § 192 confirms that "willfully" was meant to impose a higher threshold.

Congress wrote the statute this way because there was disagreement at the time of enactment about whether "either House of Congress has any authority at all to proceed against a defaulting

witness." Cong. Globe, 34th Cong., 3d Sess. 405 (1857). Congress compromised by imposing an especially high *mens rea* for default.

Congress also expressly rejected an "exception" in § 192 for marital or attorney-client privilege because "a party in either of those relations could not willfully make default" by standing on the privilege. Cong. Globe, 34th Cong., 3d Sess. 441 (1857). That confirms "willfully" was designed to exclude those who rely on privilege.

DOJ's Office of Legal Counsel has likewise long held that § 192's *mens rea* element allows defendants to introduce evidence of reliance on executive privilege because non-compliance in such a scenario would not be willful. But *Licavoli* flatly bars such a defense from reaching the jurors' ears. Not even OLC will defend *Licavoli*'s rationale.

This issue is of incredible importance. Disagreements about congressional subpoenas are common. They will now be met not with negotiations—but with indictments. And at trial, defendants will be barred even from arguing they relied in good faith on privilege or advice of counsel.

The Court should grant rehearing and eliminate *Licavoli*'s anomalous *mens rea* holding, which portends serious problems for the

separation of powers. At the very least, this issue is "substantial," as Judge Walker concluded, and thus rehearing is warranted on the panel's denial of bail. 18 U.S.C. § 3143(b).

The Court should independently grant rehearing on whether a structural challenge to a congressional committee is a mere "procedural objection" that must be raised before the committee or else deemed forfeited. The Supreme Court has made clear that such structural challenges are *not* procedural and need not be raised before the allegedly unauthorized body, but the panel here held the opposite and thus deemed forfeited Appellant's challenge to the authority and structure of the very committee that purported to issue the subpoena here.

## BACKGROUND

On September 23, 2021, the House Select Committee addressing the events of January 6, 2021, issued a subpoena to Appellant, seeking information related to his communications with President Trump, White House and Trump Campaign staffers, and other matters. Add.3.

On October 6, 2021, President Trump's counsel informed Appellant's attorney that the subpoena sought information that was "protected from disclosure by the executive and other privileges." JA444.

President Trump reiterated in writing his invocation of executive privilege. JA4781 ("When [Appellant] first received the Subpoena to testify and provide documents, I invoked Executive Privilege.").

Appellant's attorney told Appellant he did not have the power to waive that privilege, as it belonged to President Trump. JA359–72. Appellant's counsel formed that view after studying, *inter alia*, opinions of DOJ's Office of Legal Counsel. JA368.

As a result, Appellant's attorney wrote to the committee on October 7, 2021—the return date of the subpoena—and explained his position that Appellant was unable to provide a response *until* the privilege issue was resolved. JA198–99. Appellant's counsel noted that Appellant "has testified on three prior occasions," but "[i]n each of those instances," "President Trump waived his invocation of the executive privileges." JA326.

Appellant's counsel requested that a similar accommodation be reached with President Trump, or that a civil lawsuit be initiated to determine privilege, even stating, "We will comply with the directions of the courts." JA199.

But instead, just a few days later, the committee recommended that Appellant be found in contempt for refusing to comply with the subpoena. Add.5. Just two days after that, the House voted 229-202 to find Appellant in contempt. JA339.

Only three weeks later, a grand jury returned an indictment against Appellant on two counts of violating 2 U.S.C. § 192. Appellant was charged with "willfully mak[ing] default."

Before trial, the government moved *in limine* to preclude Appellant from arguing, even as a defense, that he had relied in good faith on his counsel. The District Court reluctantly granted the government's motion, concluding that *Licavoli* was binding. JA743; JA4582.

Appellant was thus barred from presenting any evidence or argument on good faith reliance on counsel, even though the prosecution repeatedly and falsely accused Appellant of ignoring the subpoena and thumbing his nose at the committee with no justification. JA3913–16. The District Court instructed the jury that "[i]t is not a defense … that the Appellant did not comply … because of the legal advice he received from his attorney or someone else, because of his understanding or belief of what the law required or allowed, or because of his understanding or

belief that he had a legal privilege, such as executive privilege, that excused him from complying." JA4582.

The jury found Appellant guilty on both counts, and he was sentenced to four months' imprisonment. Add.6. The District Court granted Appellant's motion for release pending appeal. JA4762.

On appeal, this Court held that *Licavoli* had not been unequivocally overruled. Add.7. The panel acknowledged the Supreme Court's "'general' rule" that "willfully" means a defendant must act with "knowledge that his conduct was unlawful." Add.9. But because none of the Supreme Court's intervening cases involved § 192 specifically, the panel concluded *Licavoli* was still binding. Add.7, 9.

The government asked the District Court to revoke bail, which was granted. Appellant then asked this Court for bail, which was denied over Judge Walker's dissent arguing that "the panel felt obliged to disregard the Supreme Court's 'general rule' because *Licavoli* remained binding in this Circuit." Add.24.

"For a court unbound by *Licavoli*, like the Supreme Court"—or this Court sitting *en banc*—"the proper interpretation of 'willfully' in Section

192 is 'a close question or one that very well could be decided the other way." *Id.*

## REASONS FOR GRANTING THE PETITION

### I.   Rehearing *En Banc* Is Warranted on *Licavoli*'s Anomalous *Mens Rea* Holding.

As Judge Nichols explained, *Licavoli* is "not consistent with modern case law surrounding the use of th[e] term ['willfully'], let alone the traditional definition of the word." JA2993. Judge Walker raised similar concerns in his dissent from the denial of bail. Add.24. Given this, the Court should grant rehearing of the panel's May 10 opinion and its June 20 order denying bail over Judge Walker's dissent.

### A.   The Supreme Court Has Uniformly Interpreted "Willfully" in the Criminal Context to Require Knowledge of Unlawfulness.

*Licavoli* is inconsistent with the Supreme Court's longstanding approach to the meaning of "willfully" in criminal statutes. "When the term 'willful' or 'willfully' has been used in a criminal statute, we have regularly read the modifier as limiting liability to knowing violations." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 & n.9 (2007). In such statutes, "willfully" means an act "undertaken with a 'bad purpose,'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998), meaning "the

defendant acted with knowledge that his conduct was unlawful," *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *see Wooden v. United States*, 595 U.S. 360, 378 (2022) (Kavanaugh, J., concurring).

It appears this is the *uniform* interpretation from the Supreme Court in the context of criminal statutes, dating back at least 150 years. *See Bryan*, 524 U.S. at 191–92; *Ratzlaf*, 510 U.S. at 137; *Safeco*, 551 U.S. at 60; *Screws v. United States*, 325 U.S. 91, 101 (1945); *Felton v. United States*, 96 U.S. 699, 702 (1877).

The government previously claimed to have identified one—just one—case *ever* where the Supreme Court construed "willfully" or "willfulness" in a specific criminal statute to mean only "intentional[ly]" or "deliberately." Opp.23, *Bannon v. United States*, No. 23A1129 (U.S. June 26, 2024) (citing *Browder v. United States*, 312 U.S. 335, 341–42 (1941)). But even that case is easily distinguished because the relevant statutory requirement—"knowingly and willfully"—is one that the government itself has said actually still "requires knowledge of unlawfulness" in other contexts. *Id.* at 24 n.8.

That leaves 150 years of Supreme Court precedent squarely against *Licavoli*.

## B. The Supreme Court Has Expressly Held that "Willfully" in Section 192 Follows the Traditional Rule.

*Licavoli* also disregarded the directly on-point Supreme Court decision in *Murdock v. United States*, which held that "[t]wo distinct offenses are described in the disjunctive [in § 192], and in only one of them is willfulness an element." *Murdock*, 290 U.S. at 397. For the "willfully" clause, the government must demonstrate that noncompliance was "prompted by bad faith or evil intent, which the statute makes an element of the offense," rather than merely showing that it was "intentional." *Id.* at 397–98.

*Murdock* expressly narrowed the Court's 1929 *Sinclair* decision, which had addressed the provision of § 192 that does *not* include "willfully." *See Sinclair v. United States*, 279 U.S. 263 (1929).

But *Licavoli* summarily dismissed *Murdock* because it involved a dispute over a tax statute. 294 F.2d at 208–09. That completely missed the point: *Murdock* expressly interpreted the "willfully" clause in § 192.[1]

---

[1] Even if *Murdock* were dicta (it wasn't), *Licavoli* still should have "treat[ed] Supreme Court dicta as authoritative." *Bahlul v. United States*, 840 F.3d 757, 763 n.6 (D.C. Cir. 2016) (Kavanaugh, J., concurring).

Not only did *Licavoli* disregard a directly on-point Supreme Court decision, but—as the panel here recognized—*Licavoli* instead relied on numerous cases that addressed the *separate* provision of § 192 that "does not use the term 'willfully,'" Add.8, which *Murdock* had expressly distinguished from the clause at issue here.

No subsequent Supreme Court case has purported to narrow or overrule *Murdock*. If anything, later cases support Appellant. The Supreme Court noted in *McPhaul v. United States*, 364 U.S. 372 (1960), that there was a "*prima facie*" showing by the government of willful default *only* where the recipient had made no attempt to "state his reasons for noncompliance," *id.* at 379. But Appellant's attorney was in frequent contact with the committee and repeatedly stated his good-faith belief that the executive-privilege issue first had to be resolved, as was done in the past.

The government has previously cited *United States v. Bryan*, 339 U.S. 323 (1950). But this Court's panel opinion recognized that *Bryan* is about § 192's *other*, non-"willfully" provision. Add.8. To the extent *Bryan* addressed the "willfully" provision at all, it merely reiterated *McPhaul*'s point that the recipient had "refuse[d] to give any reason" to the

committee for "fail[ing] to deliver" requested documents, which has no application here. 339 U.S. at 333.

Critically, *McPhaul* held that even when the defendant provided *no explanation whatsoever* for his default, he was still entitled to "present some evidence to explain or justify his refusal" for "resolution by the jury." 364 U.S. at 379. But *Licavoli* precludes even that salve.

### C. *Licavoli* Is Grievously Inconsistent with the Court's Textual Canons.

*Licavoli* is also wrong as a textualist matter. Where a criminal statute juxtaposes two different *mens rea* terms—as § 192 does—Congress clearly meant to impose different requirements. "The word 'willful' is omitted from the description of offenses in the latter part of this section. Its presence in the first cannot be regarded as mere surplusage; it means something. It implies on the part of the [Appellant] knowledge and a purpose to do wrong." *Potter v. United States*, 155 U.S. 438, 446 (1894); *see Bailey v. United States*, 516 U.S. 137, 146 (1995).

But *Licavoli* reached the opposite conclusion: "The elements of intent are the same in both" clauses of § 192, and both require only intentional conduct. *Licavoli*, 294 F.2d at 209. That has it exactly backwards from a textualist perspective.

To be sure, *Licavoli* tried to explain why "willfully" wasn't added to the *second* clause of § 192 (about refusing to answer questions in-person), but that doesn't explain why Congress *did* use "willfully" in the clause at issue here. That choice "means something," *Potter*, 155 U.S. at 446, but *Licavoli* erroneously held it didn't. *Licavoli* suggested "willfully" was needed to avoid criminalizing defaults caused by "illness" or "misunderstanding," 294 F.2d at 208, but those scenarios wouldn't qualify even as "intentional"—thus *Licavoli* unwittingly confirms its interpretation renders "willfully" redundant.

### D.    Applying the Traditional Rule Makes Sense.

Over Judge Walker's dissent, the panel's order denying bail suggested it would be illogical to require willfulness where a defendant defaults on a subpoena while requiring only an intentional or voluntary act where a defendant appears in person and refuses to answer questions. Add.22.

But there was a good reason for writing § 192 this way. At the time it was enacted, there was disagreement about whether "either House of Congress has any authority at all to proceed against a defaulting witness." Cong. Globe, 34th Cong., 3d Sess. 405 (1857). Congress

14

compromised by upping the *mens rea* for default, making it a crime only when the subpoena recipient lacked even a good-faith basis for his actions.

By contrast, when a person has shown up to testify in person, he has arguably submitted himself to the committee's authority, and a sudden refusal to answer questions *face-to-face* not only raises decorum concerns but also lets the recipient sandbag by raising objections for the first time during the hearing itself, preventing the Committee from taking "other appropriate steps to obtain the records" without having to adjourn, potentially for weeks or months. *McPhaul*, 364 U.S. at 379.

In those circumstances where its punitive authority is clearer and its limited hearing time has been wasted, Congress wanted to make conviction easier, so it required only intentional action.

Congress meant what it said in § 192. *Licavoli* erred by elevating unpersuasive practical concerns over clear text and binding caselaw.

### E. The Stakes Could Not Be Higher, as OLC's Opinions Demonstrate.

Before this case, there was significant doubt about whether *Licavoli* remained good law in this Circuit, as Judge Nichols noted. But now that

it has been re-affirmed, there is no obstacle to indicting anyone who defaults on a congressional subpoena, regardless of *why* he did so.

As Judge Tatel has recognized, "disputes between Congress and the President are a recurring plot in our national story." *Trump v. Mazars USA, LLP*, 940 F.3d 710, 747 (D.C. Cir. 2019). Individuals held in contempt of Congress for defaulting on subpoenas include Attorneys General of both parties, a White House Counsel, and an EPA Administrator. Under *Licavoli*, each of those officials was *necessarily* guilty of violating § 192 and would have been barred even from arguing privilege as a defense to the jury.

The government has claimed it is unlikely there will be prosecutions when officials invoked executive privilege. But that only highlights another reason for reconsidering *Licavoli*: it is irreconcilable with OLC's own interpretation of § 192. OLC's opinions have long stated that § 192's "willfully" element "was not intended to apply"[2] when the Appellant relied on executive privilege because "[t]here is some doubt

---

[2] *Executive Privilege Assertion for Audio Recordings* at 4, Christopher Fonzone, Ass't Att'y Gen., et al. to Merrick Garland, Att'y Gen. (May 15, 2024).

whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a 'willful' violation of the statute."[3]

In other words, OLC says a defendant can invoke his reliance on privilege to defeat willfulness, yet *Licavoli* flatly bars this. If not even OLC will defend *Licavoli*'s rationale, the Court should grant rehearing and shut this Pandora's Box while it still can.

\* \* \*

*Licavoli* is an anomaly. The Court should grant rehearing of its May 10 panel opinion and the June 20 order denying bail over Judge Walker's dissent. 18 U.S.C. § 3143(b).

## II. Rehearing Is Warranted on Whether a Structural Challenge to a Committee's Authority Is a Mere "Procedural Objection."

*En banc* review is separately warranted on whether a structural challenge to a congressional committee's authority is a mere "procedural

---

[3] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 134 n.34 (1984).

objection" that must be raised before the committee itself or else deemed forfeited in a subsequent criminal trial.

The panel opinion correctly held that § 192 requires the government to prove that the committee issuing the subpoena truly possessed "congressional authority," meaning it had been "'duly empowered' to investigate." Add.17. As an element of § 192, this requirement "cannot be forfeited," and there is no obligation to raise it before the committee itself. Add.16; *see Gojack v. United States*, 384 U.S. 702, 715 (1966) ("The jurisdiction of the courts cannot be invoked to impose criminal sanctions in aid of a roving commission.").

But the panel erred by concluding that Appellant's challenge to the committee's very structure was not a challenge to its authority but instead a mere "procedural objection[]" that Appellant had forfeited by not raising it before the committee. Add.15.

Appellant argued to the District Court and this Court that the committee had not been "duly empowered," Add.17, because it *never* had the minimum number of total members or minority members that House Resolution 503 required for the committee to begin business. This was the *very first* prerequisite the House imposed on the committee before it

could exercise the authority delegated to it. *See* H.R. Res. 503, § 2(a), 117th Cong. (2021) (committee "shall" have 13 members, with 5 chosen by minority leader).

This was a critical flaw because "[n]o committee of either the House or Senate, and no Senator and no Representative, is free on its or his own to conduct investigations unless authorized." *Gojack*, 384 U.S. at 716. The requisite "line of authority from the House to the Committee" was not present here. *Id.* Because the committee was not properly formed, the members were, in essence, attempting "to conduct investigations" "on [their] own," without proper authorization from the House. *Id.*

The Supreme Court has made clear that such a challenge is not "procedural." In *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023), for example, the Court held that a challenge to "the structure or very existence" of a body was *not* a challenge "to the commonplace procedures [the body] use[s] to make … decision[s]," nor was it a challenge "to any specific substantive decision." *Id.* at 189.

*Axon* rejected the government's argument that such a structural challenge must be raised "'during the administrative process and then

renew[ed]' … in the Court[s].'" *Id.* at 184. Rather, it could be raised in the *first instance* in court.

Similarly, Appellant's challenge to the committee's failure to comply with the House's core structural requirements was not "procedur[al]," *id.* at 189, and thus need not have been raised before the committee itself. In *Axon*'s terminology, Appellant's challenge was not that the committee was acting improperly in just a particular instance, but rather "in all or a broad swath of its work." *Id.* That undoubtedly goes directly to the committee's authority under H.R. Res. 503, not its mere day-to-day procedures.[4]

Further, this was no mere temporary defect "which could easily have been remedied" in "a few minutes." *Bryan*, 339 U.S. at 333. The committee itself could never remedy this flaw. The Speaker would have had to reconstitute the committee. The Supreme Court has held that exhaustion requirements have no application in this context. "It makes little sense to require litigants to present claims to adjudicators who are

_____

[4] The analogy to *Axon* is especially apt because the Supreme Court has held in the context of § 192 that a congressional committee is held to the same principles as "an agency." *Gojack*, 384 U.S. at 714.

powerless to grant the relief requested." *Carr v. Saul*, 593 U.S. 83, 93 (2021).

Because the failure to constitute the committee in accordance with the authority delegated by the House strikes directly at the committee's authority to subpoena Appellant, the panel erred by concluding that his structural challenge was a mere procedural objection that had to be raised before the committee itself. The panel should have reached the merits of whether the subpoena had been properly authorized and concluded it was not.

## CONCLUSION

This Court should grant rehearing of the May 10 panel opinion and the June 20 order denying bail over Judge Walker's dissent.

July 15, 2024                     Respectfully submitted,

                                  /s/ R. Trent McCotter
                                  R. Trent McCotter
                                    *Counsel of Record*
                                  Jonathan Berry
                                  Michael Buschbacher
                                  BOYDEN GRAY PLLC
                                  801 17th St NW, Ste 350
                                  Washington, DC 20006
                                  202-706-5488
                                  tmccotter@boydengray.com

                                  *Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 35 because it contains 3880 words, excluding the portions exempted by Rule 27(a)(2)(B). This brief complies with the typeface and type style requirements of Federal Rules Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

/s/ R. Trent McCotter
R. Trent McCotter


**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

/s/ R. Trent McCotter
R. Trent McCotter

# ADDENDUM

# TABLE OF CONTENTS

PANEL OPINION ................................................................... Add.1

PANEL ORDER DENYING BAIL BY 2-1 VOTE ........................... Add.21

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................... Add.26

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 9, 2023       Decided May 10, 2024

No. 22-3086

UNITED STATES OF AMERICA,
APPELLEE

v.

STEPHEN K. BANNON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00670-1)

———

*David I. Schoen* argued the cause and filed the briefs for appellant.

*Elizabeth H. Danello*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Chrisellen R. Kolb*, *J.P. Cooney*, and *Molly Gaston*, Assistant U.S. Attorneys.

Before: PILLARD, WALKER, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

Add.1

2

GARCIA, *Circuit Judge*: In September 2021, the House Select Committee to Investigate the January 6th Attack on the United States Capitol issued a subpoena to appellant Stephen Bannon to testify and provide documents.  Bannon did not comply—he knew what the subpoena required but did not appear or provide a single document.  Bannon was later convicted of violating the contempt of Congress statute, 2 U.S.C. § 192, which criminalizes "willfully" failing to respond to a congressional subpoena.  Bannon insists that "willfully" should be interpreted to require bad faith and argues that his noncompliance does not qualify because his lawyer advised him not to respond to the subpoena.  This court, however, has squarely held that "willfully" in Section 192 means only that the defendant deliberately and intentionally refused to comply with a congressional subpoena, and that this exact "advice of counsel" defense is no defense at all.  *See Licavoli v. United States*, 294 F.2d 207, 207 (D.C. Cir. 1961).  As both this court and the Supreme Court have repeatedly explained, a contrary rule would contravene the text of the contempt statute and hamstring Congress's investigatory authority.  Because we have no basis to depart from that binding precedent, and because none of Bannon's other challenges to his convictions have merit, we affirm.

## I

On January 6, 2021, rioters attacked the United States Capitol, seeking to interfere with the certification of the 2020 presidential election results.  The attack delayed the scheduled certification vote of the Joint Session of Congress.  The attack also left over 140 law enforcement officers injured and resulted in several deaths.

On June 30, 2021, the House of Representatives adopted House Resolution 503, establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol.

3

The Resolution charged the Select Committee to investigate and report on the "facts, circumstances, and causes" of the January 6th attack. H.R. Res. 503, 117th Cong. § 3 (2021). It also authorized the Select Committee to subpoena witnesses to provide testimony and documents, *id.* § 5(c)(4), and to propose any legislation the Committee deemed necessary in light of its investigation, *id.* § 4(a)(3).

Public accounts indicated that Bannon had predicted on a January 5, 2021 podcast that "all hell [wa]s going to break loose" the next day. J.A. 39. Bannon had been employed as an advisor to then-President Donald Trump for approximately seven months before leaving the White House in 2017. In addition to the podcast prediction, Bannon had reportedly participated in discussions in late 2020 and early 2021 about efforts to overturn the 2020 election results.

Based on these reports, the Select Committee believed that Bannon had information relevant to its investigation. Accordingly, on September 23, 2021, the Select Committee issued a subpoena to him. The subpoena sought documents and testimony pertaining to seventeen categories of information from 2020 and 2021, long after Bannon's 2017 departure from the White House: Three pertained to Bannon's communications with President Trump in 2020 and 2021; the rest related to Bannon's communications with White House and campaign staff, other private citizens, and related activities. The subpoena ordered Bannon to produce documents by October 7, 2021, and to appear for a deposition on October 14. Bannon did not comply with either demand.

Instead, shortly after the first subpoena deadline passed on October 7, Bannon's lawyer informed the Select Committee that Bannon would not respond. That October 7 letter stated that Bannon had received communications from Justin Clark, counsel for former President Trump, indicating that President

Add.3

4

Trump intended to invoke executive privilege.  Until those
issues were resolved, the letter stated, Bannon would not
respond to the request for documents or testimony.

The next day, October 8, the Select Committee responded
in a letter, stating that Bannon had provided no "legal basis"
for his "refusal to comply with the Subpoena." J.A. 4838.  The
Select Committee noted that it had received no assertion,
formal or otherwise, of executive privilege from President
Trump.  The Select Committee also explained that such an
assertion would not, in any event, justify Bannon's wholesale
noncompliance with the subpoena.  As the Select Committee
described, "virtually all" of the material sought concerned
Bannon's actions as a private citizen and pertained to subjects
not covered by executive privilege.  *Id.*  The Committee noted
that Bannon could raise any particularized privilege concerns
to the Committee in response to specific questions or document
requests, but that he could not categorically claim "absolute
immunity" from responding to the subpoena.  J.A. 4839.

Bannon's lawyer replied in an October 13 letter to the
Committee, repeating that Clark "informed" Bannon's lawyer
that President Trump "is exercising his executive privilege"
and that Bannon would not respond to the subpoena. J.A. 4841.
In an October 15 letter, the Select Committee reiterated the
points in its October 8 letter—that it had received no
communication from President Trump asserting executive
privilege and that such an assertion would not justify total
noncompliance by Bannon. The Select Committee repeatedly
warned that if Bannon continued to refuse to comply, it would
consider referring Bannon for prosecution on contempt
charges.  The Committee gave Bannon until October 18 to
submit any additional information that might bear on its
contempt deliberations.

5

During this period, though Clark (former President Trump's counsel) did not contact the Select Committee, he did exchange several emails with Bannon's lawyer. In those exchanges, Clark warned—contrary to Bannon's position—that an assertion of executive privilege would not justify Bannon's total noncompliance. In his initial October 6 letter to Bannon's counsel, Clark described the subpoena as seeking materials "including but not limited to" information "potentially" protected by executive privilege. J.A. 444. Clark therefore instructed Bannon to invoke, "where appropriate," any immunities and privileges Bannon "may have." *Id.* In an October 14 letter to Bannon's lawyer, Clark disclaimed that President Trump had directed Bannon not to produce documents or testify until the issue of executive privilege was resolved. And on October 16, after learning of Bannon's continued claim to the Committee that he was justified in not responding to the subpoena, Clark repeated that his previous letter "didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is." J.A. 448.

Bannon did not comply with the subpoena in any respect. Nor, despite the Committee's warnings, did he submit by October 18 any further information bearing on the Committee's contempt deliberations. On October 19, 2021, the Select Committee informed Bannon that it had unanimously voted to recommend that the House of Representatives find him in contempt of Congress.

On November 12, 2021, a grand jury charged Bannon with two counts of violating 2 U.S.C. § 192. Section 192 provides that "[e]very person who having been summoned as a witness by the authority of . . . any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty" of contempt of Congress.

6

2 U.S.C. § 192. The indictment's first count concerned Bannon's refusal to appear for the deposition; the second concerned his refusal to produce the sought-after documents and communications.

On July 22, 2022, following a five-day trial, a jury found Bannon guilty on both counts. The district court sentenced Bannon to four months' incarceration for each count to run concurrently, with a $6,500 fine. The district court stayed Bannon's sentence pending this appeal.

## II

Bannon raises four challenges to his convictions. He argues that the district court erroneously defined the mental state required for a contempt of Congress charge, that his conduct was affirmatively authorized by government officials, that the Select Committee's subpoena was invalid to begin with, and that the trial court should not have quashed certain trial subpoenas that sought to develop evidence for his defense. As explained below, each challenge lacks merit.

## A

In this appeal, Bannon does not dispute that he deliberately refused to comply with the Select Committee's subpoena in that he knew what the subpoena required and intentionally did not respond; his nonresponse, in other words, was no accident. Instead, Bannon challenges the contempt of Congress charges on the ground that he reasonably believed—based on advice of counsel—that he did not have to respond. He argued below and on appeal that "willfully" making default in violation of 2 U.S.C. § 192 requires bad faith—that the defendant must know that his conduct violated the law. The district court, however, concluded that Section 192 requires proof only that the defendant deliberately and intentionally did not respond. The district court thus denied Bannon's motion to dismiss the

7

indictment based on his asserted good-faith reliance on his counsel's advice, precluded Bannon from presenting such a defense at trial, and instructed the jury consistent with those rulings.  We review the district court's legal determination *de novo*.  *See United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008).

Our decision in *Licavoli* directly rejects Bannon's challenge.  In *Licavoli*, we concluded that "willfully" in Section 192 requires that any failure to appear in response to a congressional subpoena be only "deliberate" and "intentional." 294 F.2d at 208; *see id.* at 207–09.  It does not require bad faith, evil motive, or unlawful purpose.  *Id.* at 209.  Indeed, *Licavoli* specifically held that an advice of counsel defense—which ultimately seeks to show the defendant acted in good faith—is unavailable under this statute.  *Id.* ("Advice of counsel does not immunize that [deliberate] intention.").

Bannon does not dispute that description of *Licavoli*.  *See* Bannon Br. 10.  He instead asks us to depart from its holding.  That request, however, must clear a high bar.  *Licavoli* is binding upon this panel unless it was inconsistent with an earlier, on-point decision, *United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011), or if it has been overturned—or its rationale "eviscerated"—by a subsequent decision of the Supreme Court or of this court sitting *en banc*, *Dellums v. U.S. Nuclear Regul. Comm'n*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988).  Bannon has not identified any such case.  To the contrary, every case that addresses the mental state required for a contempt of Congress conviction firmly supports *Licavoli*'s holding.

Recall that Section 192 criminalizes not only "willfully mak[ing] default"—the clause at issue in *Licavoli* and this case—but also—in a second clause—the conduct of one "who, having appeared, refuses to answer any question pertinent to

8

the question under inquiry." 2 U.S.C. § 192.  As *Licavoli* itself observed, the Supreme Court had already held that the latter clause requires only a deliberate and intentional refusal to answer.  *See* 294 F.2d at 207–08.  For example, in *Sinclair v. United States*, 279 U.S. 263 (1929), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995), the Supreme Court held that a conviction under that clause requires only an "[i]ntentional violation"; no "moral turpitude" is required and assertions that a defendant "acted in good faith on the advice of competent counsel" are "no defense."  *Id.* at 299. *Quinn v. United States*, 349 U.S. 155 (1955), reached the same result:  Section 192's latter clause requires only "a deliberate, intentional refusal to answer."  *Id.* at 165; *see also Yellin v. United States*, 374 U.S. 109, 123 (1963); *Watkins v. United States*, 354 U.S. 178, 208 (1957); *United States v. Helen Bryan* ("*Helen Bryan*"), 339 U.S. 323, 330 (1950); *Fields v. United States*, 164 F.2d 97, 101 (D.C. Cir. 1947).  Although the "refusal to answer" clause does not use the term "willfully," *Licavoli* rejected the argument that the presence of the adverb in one clause but not the other counseled any different approach to the mental state required when a subpoena recipient refuses to appear altogether instead of appearing but refusing to answer pertinent questions.  *See* 294 F.2d at 208.  Bannon offers no challenge to that rationale—which would bind us in any event—in this appeal.

Moreover, cases addressing Section 192 have explained why, as a practical matter, requiring evidence of bad faith would undermine the statute's function.  The ability to effectively enforce subpoenas is critical to Congress's power of inquiry, which is in turn essential to Congress's ability to legislate "wisely and effectively." *Quinn*, 349 U.S. at 160–61. And effectively enforcing congressional subpoenas would be exceedingly difficult if contempt charges required showing that a failure to appear or refusal to answer questions was not just deliberate and intentional, but also done in bad faith.

9

Otherwise, any subpoenaed witness could decline to respond and claim they had a good-faith belief that they need not comply, regardless of how idiosyncratic or misguided that belief may be.  As the Supreme Court has colorfully put it, a "subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase."  *Helen Bryan*, 339 U.S. at 331.  "If that were the case, . . . the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity."  *Id.*

In the face of that authority, Bannon cites cases that do not undermine *Licavoli*, much less to the degree required for this panel to even consider departing from that decision. Importantly, the cases Bannon cites do not address Section 192 or contempt charges at all, but instead interpret the word "willfully" in *other* criminal statutes to require more than a deliberate and intentional act.  For example, in some criminal statutes, "willful" conduct requires that the defendant act with a "bad purpose," meaning with "knowledge that his conduct was unlawful."  *Sillasse Bryan v. United States* ("*Sillasse Bryan*"), 524 U.S. 184, 191–92 (1998) (quotation omitted) (interpreting 18 U.S.C. § 924(a)(1)(D), which criminalizes unlawfully dealing in firearms without a license); *Ratzlaf v. United States*, 510 U.S. 135, 140–50 (1994) (interpreting 31 U.S.C. §§ 5322, 5324, which prohibit willfully structuring cash transactions for the purpose of evading reporting requirements); *United States v. Burden*, 934 F.3d 675, 680, 689–93 (D.C. Cir. 2019) (interpreting the "willful[]" violation of a provision prohibiting the export of defense articles without a license).  But that is at most a "general" rule.  *Sillasse Bryan*, 524 U.S. at 191.  As those same cases explain, "willful" "is a 'word of many meanings,'" and "'its construction is often . . . influenced by its context.'"  *Ratzlaf*, 510 U.S. at 141 (alteration omitted) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)); *see also Sillasse Bryan*, 524 U.S. at 191 (noting that

Add.9

10

construction of word "willfully" in statutes "is often dependent on the context in which it appears"). Because statutory context is critical, nothing in the authorities Bannon relies upon calls into question this court's longstanding interpretation of "willfully" in Section 192 as requiring a deliberate, intentional failure to respond to a subpoena.[1]

Finally, Bannon argues that applying *Licavoli* to disallow his advice of counsel defense would raise constitutional concerns because his counsel's advice was that then-former President Trump had asserted executive privilege. This case, however, provides no occasion to address any questions regarding the scope of executive privilege or whether it could have excused Bannon's noncompliance in these circumstances. President Trump did not communicate an intent to invoke executive privilege to the Committee, and Bannon never raised executive privilege as an affirmative defense to the contempt charges in district court. *See* J.A. 3017 (district court similarly observing that whether executive privilege excused Bannon from complying with the subpoena was "unteed-up").[2] The

---

[1] At oral argument, Bannon's counsel identified our pre-*Licavoli* decision in *Townsend v. United States*, 95 F.2d 352 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938), as the strongest reason why we should not apply *Licavoli*. Oral Arg. Tr. 5:10–7:8; 35:3–14. Unlike the cases interpreting "willfully" that Bannon cited in his briefs, that decision does address Section 192. But it only further confirms *Licavoli*'s holding and ours. *Townsend* acknowledged that the meaning of "willfully" depends on the specific "statute in which it is used," and concludes, contrary to Bannon's position, that "deliberately" refusing to comply with a congressional subpoena violates Section 192. 95 F.2d at 361.

[2] In a July 2022 letter to Bannon, President Trump claimed that he had previously invoked executive privilege, but that letter was written long after Bannon had already failed to comply with the subpoena in October 2021.

11

argument Bannon preserved and presses on appeal is confined to disputing the mental state required for a contempt of Congress conviction.  It raises no constitutional question to reaffirm *Licavoli*'s holding that a deliberate and intentional refusal to honor a congressional subpoena violates federal law.

**B**

Bannon also sought to mount what he parses as three affirmative defenses—all based on the assertion that the government authorized his default—which he labels entrapment by estoppel, public authority, and apparent authority.  Bannon advanced a common theme to support those defenses: that his noncompliance was justified because he relied on directives from then-former President Trump and a collection of opinions from the Department of Justice's Office of Legal Counsel ("OLC").  The district court concluded that none of the defenses supported dismissing the indictment and that Bannon was not entitled to a jury instruction on the defenses either.  Our review is again *de novo*.  *See United States v. Williamson*, 903 F.3d 124, 132 (D.C. Cir. 2018).

These defenses stem from fairness concerns with prosecuting someone who reasonably relies on a government official's advance assurance that their conduct would be legal or on a government official's authorization of illegal conduct.  For example, where a federal agency "affirmatively misled" regulated entities into believing certain specific conduct was lawful, the Supreme Court held that prosecuting the entities for that very conduct would offend "traditional notions of fairness inherent in our system of criminal justice."  *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973).  Accordingly, these government authorization defenses require the defendant to show (in addition to other elements we need not address) that the government affirmatively authorized the defendant's conduct—here, Bannon's refusal to produce any documents or

12

testify in response to the Select Committee's subpoena.  *See Cox v. Louisiana*, 379 U.S. 559, 569–71 (1965); *Raley v. Ohio*, 360 U.S. 423, 424–25 (1959); *United States v. Alvarado*, 808 F.3d 474, 484–85 (11th Cir. 2015); *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 313 (3d Cir. 1997).

Bannon cannot show such authorization here.  Neither the communications from former President Trump's counsel nor the OLC opinions purported to authorize Bannon's refusal to produce any documents or appear for his deposition.

First, the statements from President Trump's counsel, Justin Clark.  We need not decide if a former government official can provide the requisite authorization because, as the record demonstrates, President Trump did not, in fact, authorize Bannon's refusal to respond to the subpoena.  Clark's initial October 6 letter to Bannon's counsel nowhere suggested that Bannon should categorically refuse to respond to the subpoena.  It stated that the subpoena "includ[ed]" requests for information "potentially" protected by executive privilege and instructed Bannon to, "where appropriate," invoke any privileges he "may have."  J.A. 444.  When Clark learned that Bannon was refusing to comply with the subpoena entirely, he followed up on October 14, disclaiming that President Trump had directed Bannon to do so.  Most pointedly, Clark reiterated on October 16 that his earlier letter "didn't indicate that we believe there is immunity from testimony for your client" and concluded: "As I indicated to you the other day, we don't believe there is."  J.A. 448.  The letters, in short, explicitly communicate the opposite of what Bannon asserted to the Committee.

Second, the OLC opinions.  We similarly need not decide whether and in what circumstances OLC opinions can support a government authorization defense because none of the cited opinions license Bannon's refusal to produce any documents or

Add.12

13

appear to testify.  Cases finding government authorization of criminal conduct have typically involved a single government statement directed to the defendant, or at least to a class of individuals that includes the defendant, authorizing a specific course of conduct.  *See, e.g.*, *Pa. Indus. Chem. Corp.*, 411 U.S. at 674.

Here, the OLC opinions Bannon cites involve a variety of situations where OLC concluded executive privilege could be properly invoked.  But, as the district court correctly observed, none of the opinions address a situation resembling Bannon's: a congressional committee subpoena for communications "between a nongovernmental employee and a President who, at the time of the Subpoena, was no longer in office and had not clearly directed the Subpoena recipient to decline to comply altogether."  J.A. 2351–52.  Further, none of the opinions addressed communications between a private citizen subpoena recipient and other private citizens.  Here, only a small subset of the subpoena topics even referenced communications with President Trump or his staff—the rest concerned Bannon's communications with individuals outside the White House not even arguably subject to executive privilege.

Reflecting the fact that the OLC opinions are meaningfully distinguishable from this situation, Bannon resorts to arguing that his lawyer concluded his nonresponse was authorized by interpreting the "principles" and "rationale underlying" at least fifteen different OLC opinions and statements.  Reply Br. 11, 15; *see also id.* 10–18.  That Bannon can point only to his lawyer's interpretation of underlying principles and rationales, rather than any specific statement from the government, confirms that Bannon's government authorization defenses are each essentially a repackaged advice of counsel defense.  As we have explained, Section 192 permits no such defense.

14

## C

Bannon also argued that his contempt charges should be dismissed because the Select Committee's subpoena was invalid for both substantive and procedural reasons. The district court concluded that these challenges did not warrant dismissing the indictment and precluded Bannon from introducing evidence he claimed supported them. We review the denial of the motion to dismiss *de novo*, *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005), and the district court's exclusion of evidence for abuse of discretion, *United States v. Hall*, 945 F.3d 507, 514 (D.C. Cir. 2019). Bannon's challenges fail.

## 1

A congressional committee may use its investigative power only for a "valid legislative purpose." *Quinn*, 349 U.S. at 161. Bannon contends that the Select Committee lacked such a purpose in issuing its subpoena to him. We have already held that the Select Committee, as a general matter, "plainly has a valid legislative purpose" because "its inquiry concerns a subject on which legislation could be had." *Trump v. Thompson*, 20 F.4th 10, 41–42 (D.C. Cir. 2021) (quotation marks and alteration omitted) (quoting *Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020)), *cert. denied*, 142 S. Ct. 1350 (2022); *see also id.* at 24–25. As we explained in *Thompson*, the Committee's investigation into the events of January 6 could inform a range of legislation, and House Resolution 503 explicitly authorizes the Select Committee to propose legislation in light of its investigation. *Id.* at 41–42.

Bannon makes no argument that the subpoena's subject matter is unrelated to that authorized investigation. Nor could he. As the indictment explains, based on public reports, the Committee believed Bannon had information "relevant to understanding important activities that led to and informed" the

15

events of January 6, and the information the subpoena sought was relevant to those events.  J.A. 39–40.

Instead, Bannon argues that even if the Select Committee *could* have had a valid legislative purpose in seeking this information from him, his subpoena was invalid because the Select Committee's members *actually* acted for assertedly improper reasons, namely to target him and send a message to other potential witnesses.  But this argument too runs headlong into settled law.  The Supreme Court has made "clear that in determining the legitimacy of a congressional act[,] we do not look to the motives alleged to have prompted it."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975); *accord Barenblatt v. United States*, 360 U.S. 109, 133 (1959) (declining to inquire into motives of committee members); *Watkins*, 354 U.S. at 200 (same).  What matters is whether the subpoena is objectively related to a valid legislative purpose.  This one was.

**2**

Bannon also raised several procedural objections to the subpoena: that the Select Committee lacked the thirteen members and ranking minority member required by House Resolution 503, and that he should have received a copy of House Rule 3(b) (describing committee deposition authority) with the subpoena.  These objections suffer from a common defect:  Bannon did not raise them before the Select Committee and therefore forfeited them.

It is undisputed that the first time Bannon raised these arguments was in district court, long after his deadline for responding to the subpoena had passed.  Bannon Br. 54–56.  A witness cannot defend against a contempt of Congress charge based on an affirmative defense that they were able, but failed, to raise at the time they were ordered to produce documents or appear.  *Helen Bryan*, 339 U.S. at 332–35.  This rule promotes

16

"a decent respect for the House of Representatives" and ensures that a committee has an appropriate opportunity to remedy any claimed procedural deficiencies in its subpoenas. *Id.* at 332. As the Supreme Court has observed: "To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Id.* at 333.

Bannon argues that his failure to raise these objections at the time he was ordered to appear and produce documents should nevertheless be excused on either of two grounds. Neither applies here.

First, objections going to the elements of the contempt offense—the facts that the government must prove to secure a conviction—cannot be forfeited. *See id.* at 328–29; *Deutch v. United States*, 367 U.S. 456, 468–72 (1961). But none of the procedural defects Bannon alleges are elements of the Section 192 offense. As the district court instructed the jury here, to establish a Section 192 violation, the government was required to prove that Bannon was subpoenaed by the Select Committee to testify or produce papers, the subpoena sought testimony or information pertinent to the investigation the Select Committee was authorized to conduct, Bannon failed to comply with the subpoena, and his failure to comply was willful. A committee's compliance with procedural rules is not an aspect of any of these elements. *See Helen Bryan*, 339 U.S. at 330–35. Bannon's procedural arguments are therefore at best affirmative defenses that he failed to preserve by not raising them to the Committee. *See, e.g.*, *id.* at 328–29 (government need not prove committee quorum as an element of contempt); *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965) (committee's failure to comply with authorizing resolution is "valid defense" to contempt); *see also Yellin*, 374 U.S. at 123 (refusing to answer committee question based on rule violation would be a "defense").

17

Bannon suggests that compliance with procedural rules is part of the second element: congressional authority and pertinency. Not so. Authority is a question of whether a committee was "duly empowered" to investigate and "the inquiry was within the scope of the grant of authority." *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962). And pertinency is a question of whether witness questions in fact related to a matter the committee was authorized to investigate. *Bowers v. United States*, 202 F.2d 447, 448 (D.C. Cir. 1953). None of Bannon's procedural contentions bear on whether House Resolution 503 gave the Select Committee the authority to investigate the January 6th attack or whether the subpoena issued to Bannon related to that investigation. Because Bannon's contentions about compliance with procedural rules are not elements of the offense, they can be—and have been—forfeited.

Second, Bannon's failure to raise these arguments before the Select Committee could be excused if the grounds for them were not apparent at the time he was ordered to appear and produce documents. *Cf. Yellin*, 374 U.S. at 122–23 (excusing failure to raise procedural objection where defendant was "unable" to discern violation prior to trial); *Shelton v. United States*, 404 F.2d 1292, 1300 (D.C. Cir. 1968). But that exception has no application here either. Bannon never contests the government's assertion that the composition of the Select Committee was widely reported at the time. And if Bannon wished to argue that he was entitled to a copy of Rule 3(b) with the subpoena, he was indisputably aware of the fact that it had not been provided—indeed, the subpoena's attachments explained that he would receive a copy of that rule when he appeared to testify.

Because the subpoena advanced a valid legislative purpose and Bannon forfeited his procedural objections to it, the district court did not err in denying the motion to dismiss the

18

indictment and excluding evidence supporting those objections as irrelevant.  Accordingly, the district court also did not err in instructing the jury to disregard a reference that Bannon's counsel made in his closing argument to Rule 3(b).

**D**

Finally, Bannon challenges the district court's rulings quashing trial subpoenas that he served on Select Committee members, staffers, counsel, and three House leaders.  The district court held that most of the testimony and documents sought were protected by the Constitution's Speech or Debate Clause and that any information not covered by the Clause was irrelevant.  Bannon then moved to dismiss, arguing that quashing resulted in a one-sided presentation of evidence that violated his Fifth and Sixth Amendment rights.  The district court, after considering Bannon's detailed proffer, denied his motion because the information Bannon sought was not material to the charges or defenses properly before the jury. We again review the denial of Bannon's motion to dismiss *de novo*, *Yakou*, 428 F.3d at 246, and the district court's evidentiary rulings for abuse of discretion, *Hall*, 945 F.3d at 514.

We conclude that none of the information sought in the trial subpoenas was relevant to the elements of the contempt offense, nor to any affirmative defense Bannon was entitled to present at trial.  We accordingly need not consider whether the Speech or Debate Clause also protects the sought-after information from disclosure.

As discussed above, Bannon sought to put to the jury several arguments that the district court properly excluded: that the underlying subpoena was invalid because of the political motives of Select Committee members and procedurally flawed based on the Select Committee's composition and Bannon's non-receipt of a copy of Rule 3(b).

19

Bannon's trial subpoenas sought information related to those arguments. He sought, for example, information about the subjective motives or bias of Select Committee members and their thinking behind issuing the subpoena to Bannon and communicating with his counsel. Because the district court properly concluded those arguments were irrelevant, it made no error in quashing trial subpoenas seeking information to support them.

At oral argument, when asked to identify Bannon's strongest example of purportedly relevant information sought in the trial subpoenas, Bannon's counsel identified a request for testimony from Select Committee Chairman Bennie Thompson about his letters to Bannon urging Bannon to comply with the subpoena even after the initial deadline for a response. Oral Arg. Tr. 8:22–9:8. The district court reasonably concluded that any testimony from Chairman Thompson about his letters to Bannon would be irrelevant. The district court acknowledged that Bannon could argue to the jury that he believed the subpoena dates were malleable, such that his noncompliance by the specified dates was not a deliberate and intentional default. But what an individual member of the Select Committee thought—even the chairman—does not go to Bannon's state of mind. As the district court observed, it is *Bannon's* understanding of the dates that matters. Bannon's counsel conceded that all the information Bannon had from the Select Committee was reflected in the letters themselves, which were entered into evidence. That this is Bannon's strongest example illustrates the broader conclusion that none of what Bannon sought in the trial subpoenas went to elements of the contempt offense or any affirmative defense Bannon was entitled to present.

Bannon's arguments that the district court violated his rights to compulsory process or due process by quashing his trial subpoenas and denying his motion to exclude all

Add.19

20

congressional testimony also fail for the same reasons.  Both
claims require Bannon to show that "the evidence lost would
be . . . material" to his defense.  *United States v. Verrusio*,
762 F.3d 1, 23 (D.C. Cir. 2014) (quoting *United States v.
Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)).  As explained,
he cannot make that showing.[3]

### III

The judgment of conviction and sentence under 2 U.S.C.
§ 192 is affirmed.

*So ordered.*

---

[3] We decline to reach Bannon's wholly undeveloped argument
that quashing the trial subpoenas violated his rights to effective
assistance of counsel and confrontation.  *See, e.g.*, *Ramsey v. U.S.
Parole Comm'n*, 840 F.3d 853, 863 n.6 (D.C. Cir. 2016) (even
assuming a claim was preserved in district court, "perfunctory
appellate briefing does not suffice to raise it in this Court").

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 22-3086                        **September Term, 2023**

**1:21-cr-00670-CJN-1**

**Filed On:** June 20, 2024

United States of America,

         Appellee

    v.

Stephen K. Bannon,

         Appellant

**BEFORE:**     Pillard, Walker*, and Garcia, Circuit Judges

## O R D E R

Upon consideration of appellant's emergency motion for release pending appeal, the opposition thereto, and the reply, it is

**ORDERED** that the motion be denied. Stephen Bannon's ground for requesting release does not warrant a departure from the general rule that a defendant "shall . . . be detained" following conviction and imposition of a sentence of imprisonment. 18 U.S.C. § 3143(b)(1). In addition to other requirements not in dispute, a stay applicant must raise "a substantial question of law or fact likely to result in (i) reversal [or] (ii) an order for a new trial." 18 U.S.C. § 3143(b)(1). Only "a close question or one that very well could be decided the other way" counts as substantial. *United States v. Perholtz*, 836 F.2d 554, 556 (D.C. Cir. 1988). Our unanimous panel opinion explains why no such close question is present here.

Bannon was convicted of the misdemeanor of "willfully making default" in response to a congressional subpoena in violation of 2 U.S.C. § 192. He argues that the Supreme Court, or this court sitting *en banc*, is likely to overrule our squarely applicable decision in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), for failure to impose a sufficiently stringent requirement of proof that the summoned witness "willfully" refused to appear. Under *Licavoli*, proof of a deliberate and intentional default establishes the requisite willfulness. That standard precludes Bannon's sole asserted defense—that he relied in good faith on advice of counsel. *Id.*;

---

* A statement by Circuit Judge Walker, dissenting from this order, is attached.

Add.21

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

## No. 22-3086                              September Term, 2023

*United States v. Bannon*, 101 F.4th 16, 21–23 (D.C. Cir. 2024).  It was enough that Bannon knew what the subpoena required yet intentionally refused to appear or to produce any of the requested documents.

Bannon observes that *Licavoli* does not bind the Supreme Court, but much more than *Licavoli* stands between Bannon and the requested stay.  As our unanimous opinion explains in more detail, the Supreme Court has treated the willfulness requirement of the contempt of Congress statute in ways that "firmly support[] *Licavoli*'s holding."  101 F.4th at 21.  Indeed, the Supreme Court has interpreted Section 192 in the same way this court did in *Licavoli*, requiring only that a defendant act "deliberately and intentionally" to be guilty of willful default.  *United States v. Helen Bryan*, 339 U.S. 323, 328 (1950); *see also Flaxer v. United States*, 358 U.S. 147, 151 (1958).

The distinct wording and functional relationship of two clauses of the contempt statute further supports the established understanding of "willfully."  The first clause (at issue here) applies to those who "willfully make[] default" by refusing to respond to a subpoena at all, and the second clause applies to a witness who appears but "refuses to answer any question," without specifying that it be done willfully.  2 U.S.C. § 192.  The Supreme Court has repeatedly held that a conviction under the latter clause requires only a "deliberate, intentional refusal to answer" questions.  *Quinn v. United States*, 349 U.S. 155, 165 (1955); *see also Bannon*, 101 F.4th at 21–22 (collecting cases).  The first clause imposes no higher burden despite its use of the term "willfully"; as we explained in *Licavoli*, the varied wording reflects the practical reality that a physically present witness's refusal to answer a question posed is necessarily willful, whereas a failure to appear or provide responsive documents could be attributed to various "causes other than deliberate intention," such as "illness, travel trouble, [or] misunderstanding."  294 F.2d at 208.

Bannon's proposal—that to prove willful default the government must establish that the witness knew that his conduct was unlawful—cannot be reconciled with the Supreme Court's approach to the statute.  If an assertion of good-faith reliance on advice of counsel excused a witness's wholesale noncompliance, even as it is plainly unavailable to a more cooperative witness who appears but refuses to answer certain questions, Congress's power of inquiry would be "nulli[fied]."  *Helen Bryan*, 339 U.S. at 331.

Bannon's argument reduces to the observation that the Supreme Court has read the word "willful" in other criminal statutes to call for different proof.  *See Bannon*, 101 F.4th at 22.  But the Supreme Court has also consistently recognized that "'willful[]' . . . is 'a word of many meanings,' whose construction is often dependent on

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 22-3086**                    **September Term, 2023**

the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998).  He provides no basis to conclude that a higher court is likely to upend the established understanding of "willfully" in the context of contempt of a clear duty to respond to congressional subpoenas.

### **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
        Daniel J. Reidy
        Deputy Clerk

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 22-3086**                                    **September Term, 2023**

WALKER, *Circuit Judge*, dissenting:

For the following reasons, I respectfully dissent from the order denying the emergency motion for release pending appeal.

\*      \*      \*

Stephen Bannon did not respond to a congressional subpoena. He was then convicted of contempt of Congress. *See* 2 U.S.C. § 192 ("Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry . . . willfully makes default . . . shall be deemed guilty of a misdemeanor.").

On appeal, Bannon challenged his conviction "on the ground that he reasonably believed — based on advice of counsel — that he did not have to respond [to the subpoena]. He argued below and on appeal that 'willfully' making default in violation of 2 U.S.C. § 192 requires bad faith — that the defendant must know that his conduct violated the law." *United States v. Bannon*, 101 F.4th 16, 21 (D.C. Cir. 2024).

Bannon's appeal failed because "*Licavoli* directly rejects Bannon's challenge." *Id*. (citing *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961)). *Licavoli* held that "deliberate" and "intentional" conduct is "willful[ ]" under Section 192. *Licavoli*, 294 F.2d at 208. And Bannon's conduct was "intentional" and "deliberate."

Now, Bannon plans to file a petition for certiorari with the United States Supreme Court. In the motion before us, he argues that he should not begin his prison sentence before that certiorari process plays out.

For support, Bannon observes that the panel discussed more recent Supreme Court precedents that interpret "willfully" to require proof that a defendant acted with a "'bad purpose,' meaning with 'knowledge that his conduct was unlawful.'" *Bannon*, 101 F.4th at 22 (quoting *Sillasse Bryan v. United States*, 524 U.S. 184, 191-92 (1998)). Those subsequent Supreme Court decisions arguably establish "a 'general' rule" in some tension with this circuit's earlier decision in *Licavoli*. *Id*. (quoting *Sillasse Bryan*, 524 U.S. at 191).

At least in part, as Bannon correctly says in this emergency application, "the panel felt obliged to disregard the Supreme Court's "'general" rule' because *Licavoli* remained binding in this Circuit. The Supreme Court itself will have no such obstacle, however." Bannon Br. 4 (citing *Bannon*, 101 F.4th at 22).

For a court unbound by *Licavoli*, like the Supreme Court, the proper interpretation of "willfully" in Section 192 is "a 'close' question or one that very well could be decided the other way." *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987).

# United States Court of Appeals
### For The District of Columbia Circuit

_____

**No. 22-3086**                                          **September Term, 2023**

That close question may well have mattered at Bannon's trial. The district court described *Licavoli* as a case "on which at least some of my trial determinations about mens rea and the like have turned." Transcript of Motion Hearing at 6, Dkt. 199, *United States v. Bannon*, No. 1:21-CR-670 (D.D.C. June 6, 2024); *cf. United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008) ("eliminat[ing] the prosecutor's burden of proving *mens rea*" is "a serious constitutional error").

Because the Supreme Court is not bound by *Licavoli*, because *Licavoli*'s interpretation of "willfully" is a close question, and because that question may well be material, Bannon should not go to prison before the Supreme Court considers his forthcoming petition for certiorari. *Cf. McDonnell v. United States*, 576 U.S. 1091 (2015).

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 28(a)(1) and 35, Appellant hereby states that all parties, intervenors, and amici appearing in this Court are listed below.

## A. Parties and Amici

Appellant is Stephen K. Bannon. Appellee is the United States of America. The United States House of Representatives, the Minority Leader Kevin O. McCarthy, and the Minority Whip Stephen J. Scalise appeared as amici in the district court.

## B. Rulings Under Review

Appellant sought review of the district court's judgment of criminal conviction, and a panel of this Court affirmed Appellant's convictions on May 10, 2024. Appellant separately sought release pending appeal from this Court, which denied it on June 20, 2024, by a 2-1 vote.

## C. Related Cases

Other than in the instant appeal, this case has not previously been before this Court or the district court. Appellant previously filed an application for release pending appeal before the U.S. Supreme Court. *See Bannon v. United States*, No. 23A1129.