# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed May 27, 2025

No. 22-3086

UNITED STATES OF AMERICA,
APPELLEE

v.

STEPHEN K. BANNON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00670-1)

———

On Petition for Rehearing En Banc

———

Before: SRINIVASAN, *Chief Judge*; HENDERSON***,
MILLETT, PILLARD**, WILKINS**, KATSAS*, RAO***,
WALKER***, CHILDS, PAN**, and GARCIA**, *Circuit Judges*

## O R D E R

Appellant's petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to

participate did not vote in favor of the petition. Upon consideration of the foregoing, the amicus curiae brief filed by the U.S. House of Representatives in support of neither party, and appellant's 28(j) letter, it is

**ORDERED** that the petition be denied.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk

* A statement by Circuit Judge Katsas respecting the denial of rehearing en banc, is attached.

** A statement by Circuit Judge Garcia, joined by Circuit Judges Pillard, Wilkins and Pan, concurring in the denial of rehearing en banc, is attached.

*** Circuit Judges Henderson, Rao, and Walker would grant the petition for rehearing en banc.

A statement by Circuit Judge Rao, joined by Circuit Judge Henderson in full, and Circuit Judge Walker with respect to Part II (limited to the question of whether to overrule *Licavoli*), dissenting from the denial of rehearing en banc, is attached.

Statement of *Circuit Judge* KATSAS respecting the denial of rehearing *en banc*: Congress has made it a crime for any person to "willfully" default on a congressional subpoena. 2 U.S.C. § 192. This case presents the question whether that offense reaches individuals who default on congressional subpoenas without knowledge of wrongdoing, such as those who honestly but mistakenly believe that a privilege protects the subpoenaed items from compelled disclosure.

When interpreting criminal statutes, the Supreme Court "consistently" has construed the term *willfully* to require that a defendant "acted with knowledge that his conduct was unlawful." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007) (cleaned up); *see, e.g.*, *Sillasse Bryan v. United States*, 524 U.S. 184, 191–92 (1998); *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *Cheek v. United States*, 498 U.S. 192, 200–01 (1991). These decisions cast significant doubt on *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), which held that good-faith "reliance upon advice of counsel" does not foreclose criminal liability under section 192. *See id.* at 207–09 ("Evil motive is not a necessary ingredient of willfulness under this clause of the statute."). As the dissent persuasively explains, *post* at 15–18, the prosecution of former Executive Branch officials for good-faith but mistaken privilege assertions raises questions that are troubling, important, and likely to recur. That concern, plus the significant tension between *Licavoli* and more recent Supreme Court decisions, supports a plausible case for rehearing *en banc*.

Nonetheless, *Licavoli* finds support in an earlier Supreme Court decision, *United States v. Helen Bryan*, 339 U.S. 323 (1950). There, a defendant refused to comply with a congressional subpoena because, "after consulting with counsel," she "came to the conclusion" that the committee at issue "had no constitutional right" to issue the subpoena. *See id.* at 325 (cleaned up). Yet the Supreme Court upheld the conviction, stating that the government makes out "a *prima*

*facie* case of wilful default" by showing that the defendant "intentionally failed to comply" with a congressional subpoena. *Id.* at 330. Moreover, the Court did so without probing either the sincerity or the reasonableness of the defendant's belief that the subpoena was unconstitutional.

If section 192 authorizes criminal liability for good-faith but mistaken assertions of unconstitutionality, then it likewise must authorize liability for good-faith but mistaken assertions of privilege. In other words, the current breadth of section 192 traces as much to *Helen Bryan* as to *Licavoli*. So, any problematic overbreadth is something that only the Supreme Court can fix.

GARCIA, *Circuit Judge*, with whom Circuit Judges PILLARD, WILKINS, and PAN join, concurring in the denial of rehearing en banc: Stephen Bannon did not respond to a congressional subpoena and was convicted of "willfully mak[ing] default" in violation of 2 U.S.C. § 192, the contempt-of-Congress statute. *See United States v. Bannon*, 101 F.4th 16, 18–20 (D.C. Cir. 2024). Bannon argued that his default was not "willful" because he acted in good-faith reliance on his counsel's advice that the subpoena sought privileged information. *See id.* at 21. A panel of our court rejected that argument as foreclosed by *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), which held that any "deliberate, intentional failure" to respond constituted "willful[]" default under Section 192. *Id.* at 208. Bannon now asks the en banc court to revisit that long-settled interpretation.

As Judge Katsas describes, *Licavoli*'s holding stems from the Supreme Court's earlier opinion in *United States v. Helen Bryan*, 339 U.S. 323 (1950). Thus, if there are any doubts about the proper interpretation of "willful" in this statute, they are for the Supreme Court to resolve. I write separately only to briefly explain that there are compelling arguments that *Helen Bryan* and *Licavoli* were correctly decided.

Bannon is right that in criminal statutes the word "willful" is usually construed to require bad faith. *See Bannon*, 101 F.4th at 22–23 (collecting cases). "Willful," however, "is a word of many meanings, and its construction is often influenced by its context." *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (cleaned up). Thus, "willful" can at times "denote[] an intentional as distinguished from an accidental act." *Browder v. United States*, 312 U.S. 335, 342 (1941); *see Cheek v. United States*, 498 U.S. 192, 208–09 (1991) (Scalia, J., concurring in the judgment) ("One may say, as the law does in many contexts, that 'willfully' refers to consciousness of the act but not to consciousness that the act is unlawful.").

Here, statutory context indicates that "willful" default requires only deliberate conduct. Section 192 criminalizes two acts: (1) "willfully mak[ing] default" by failing to respond to a congressional subpoena and (2) "appear[ing]" before a congressional committee but "refus[ing] to answer any [pertinent] question." 2 U.S.C. § 192. The first offense includes a "willfulness" requirement, but the second does not. As Bannon sees it, then, a conviction for failing to appear at all would require a showing of bad faith, but a conviction for appearing and refusing to answer relevant questions would not.

I am skeptical that Congress intended to enact such a scheme. Imagine a witness who genuinely believed his lawyer's advice that a privilege justified refusing to testify on subjects listed in a subpoena. On Bannon's reading, that witness could not be convicted if he declined to appear before a congressional committee altogether. Yet he could be convicted if he appeared but declined to answer specific questions based on the same advice. That construction makes little sense. Why would Congress have made it harder to convict a witness for the more obstructive conduct of categorically refusing to appear, but easier to convict a witness who appears but declines to answer certain questions? Worse, why would such a witness ever appear, when doing so would place him at higher risk of prosecution and conviction? By simply declining to participate, the subpoenaed witness would put the government to the added burden of disproving his subjective belief that a privilege applied.[*]

---

[*] To be clear, a defendant facing a contempt prosecution may surely raise a privilege claim as an affirmative defense. But Bannon did not raise such an affirmative defense here; that would have required him to show that the subpoenaed topics were *in fact* protected by executive privilege. This case concerns only whether, to prove an element of the crime, the government bears the burden

Bannon has not tenably explained why Congress would pass a law that encourages less-cooperative conduct. His reading is especially perplexing given that the purpose of the contempt-of-Congress statute is to facilitate congressional inquiry. *See, e.g.*, *Helen Bryan*, 339 U.S. at 329, 331.

The strongest response would be that the statute's plain text nonetheless requires Bannon's reading, despite the perverse incentives it creates. After all, the term "willfully" appears in only the make-default portion of the statute, we presume Congress's selective usage of the term was intentional, and we must give that choice effect. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983). So, the argument goes, if the make-default and refuse-to-answer prongs have the same mens rea requirement, Congress may as well have not included the word "willfully" at all.

I am unpersuaded. "Willfully" does work in Section 192 even if it includes "deliberate, intentional" acts, because it precludes reading the make-default prong as creating criminal exposure for inadvertent defaults. There are any number of reasons a subpoenaed witness might unintentionally fail to appear and thus "default"—"illness, travel trouble, [or] misunderstanding," to name a few. *Licavoli*, 294 F.2d at 208. Without the "willfully" qualifier, the statute could have been read to criminalize those defaults too. But there would have been no similar need to clarify the scope of liability for a witness's "refus[al] to answer" pertinent questions. Unlike a "default," a "refusal" is necessarily intentional; no one would say a witness "refused" to answer a question because he did not hear it. *See id.*

Common-sense arguments support the long-settled interpretation of "willfully" in this statute. And Bannon's
_____
of disproving a defendant's subjective (but potentially mistaken) belief that a privilege applied.

reading is not necessary to give that term meaning. Those considerations further support our denial of rehearing en banc.

RAO, *Circuit Judge*, with whom Circuit Judge HENDERSON joins in full and Circuit Judge WALKER joins with respect to Part II, dissenting from the denial of rehearing en banc: Stephen Bannon, a former advisor to President Donald Trump, invoked executive privilege and refused to comply with a legislative subpoena seeking information about the events of January 6. He was convicted of criminal contempt of Congress and imprisoned. A panel of this court affirmed Bannon's convictions. I would grant rehearing en banc because Bannon's petition raises questions of exceptional importance.

The Supreme Court has repeatedly recognized that individuals prosecuted for contempt of Congress are entitled to "every safeguard which the law accords in all other federal criminal cases." *Russell v. United States*, 369 U.S. 749, 755 (1962); *see also Gojack v. United States*, 384 U.S. 702, 707 (1966). One fundamental safeguard is the government's burden to prove every element of the crime beyond a reasonable doubt. In Bannon's case, however, the government was not required to prove all the elements of criminal contempt of Congress under 2 U.S.C. § 192.

Section 192 requires proof the defendant "willfully" defaulted on a congressional subpoena. But over sixty years ago, this court read the willfulness requirement out of the statute. *See Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961). The full court should overturn *Licavoli* because it is at odds with the plain meaning of section 192 and longstanding Supreme Court precedent interpreting willfulness in criminal statutes. Bannon's convictions must be vacated because he was not allowed to argue at trial that he resisted the subpoena on grounds of executive privilege.

Section 192 also requires proof the defendant defaulted on a lawful subpoena issued "by the authority of either House of Congress." Bannon maintains the committee that issued the subpoena was not constituted in accordance with its

authorizing resolution, and he raises a novel and important question about whether the committee's defective composition undermined its authority to issue lawful subpoenas. If Bannon is right, this provides an independent ground for reversing his convictions.

This contempt of Congress prosecution against a former Executive Branch official asserting executive privilege raises serious separation of powers concerns. I would grant rehearing en banc to ensure we apply the exacting standards of the criminal law and protect the important individual and constitutional interests at stake.

I.

In June 2021, the House of Representatives established the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"). H.R. Res. 503, 117th Cong. §§ 1, 3(1) (2021) ("Resolution"). The Resolution prescribed the Select Committee's composition, providing that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." *Id.* § 2(a). The chairman of the Select Committee was authorized to order depositions "upon consultation with the ranking minority member." *Id.* §§ 5(c)(4), (6)(A). Notwithstanding the Resolution, the Speaker appointed only nine members to the Select Committee and never appointed a ranking minority member. The Select Committee subpoenaed dozens of individuals and organizations thought to be connected to January 6.

Stephen Bannon, a former senior advisor to President Trump, received a subpoena for documents and testimony relating to, among other things, his "communications with President Donald J. Trump" in 2020 and 2021 and with White House and campaign staff concerning the events on January 6.

Based on reports that Bannon had discussed the election certification with members of Congress on January 5 and had predicted "[a]ll hell" would "break loose" the following day, the Select Committee believed Bannon had information relevant to its investigation. Bannon declined to respond to the subpoena based on advice from counsel that the documents and testimony were protected by executive privilege. Only two weeks after Bannon's refusal to respond, the House voted to find Bannon in contempt of Congress and refer him to the Department of Justice for prosecution. Bannon was charged with two counts of "willfully mak[ing] default" on a congressional subpoena in violation of section 192.

At trial, Bannon argued section 192 requires the government to prove he defaulted willfully, that is, with knowledge that his default was unlawful. To negate willfulness, Bannon asked to present evidence that he relied in good faith on advice from counsel that he was not required to comply with the subpoena because the materials sought were protected by executive privilege. Moreover, Bannon argued *Licavoli* should not control because in the six decades since the case was decided, the Supreme Court has clarified that "willfully" in criminal statutes requires the government to prove a defendant knew his actions were unlawful. The district court rejected Bannon's request and explained that while it "might be inclined to agree with [Bannon] and allow this evidence in" if this were a matter of first impression, *Licavoli* foreclosed Bannon's defense.

Bannon also moved to dismiss the indictment on the ground that the subpoena was not lawfully issued. Among other things, Bannon argued the Select Committee was improperly constituted because the Speaker did not appoint thirteen members, as required by the Resolution. Bannon further claimed the subpoena was not issued in consultation

with the ranking minority member because the Select Committee had no ranking minority member. These defects, Bannon alleged, undermined the Select Committee's authority and rendered the underlying subpoena invalid. The district court dismissed the motion and barred Bannon from presenting evidence about the Select Committee's composition.

A jury convicted Bannon of violating section 192, and he was sentenced to four months of incarceration. Upholding Bannon's convictions, the panel reaffirmed *Licavoli* and held the government needed to prove only that Bannon's default was deliberate and intentional. *United States v. Bannon*, 101 F.4th 16, 21–23, 28 (D.C. Cir. 2024). Moreover, the panel found Bannon's objections to the Select Committee's composition were "procedural arguments" that did not go to any element of section 192. *Id.* at 26. As such, Bannon first had to present these arguments to the Select Committee, and his failure to do so resulted in forfeiture. *Id.*

Bannon spent four months in prison.[1] He now seeks rehearing en banc.

## II.

I would grant rehearing en banc to overrule *Licavoli*. Consistent with Supreme Court precedent, the best reading of section 192 is that a defendant willfully defaults on a

---

[1] The panel denied Bannon's request for release pending his petition for a writ of certiorari. Judge Walker dissented, explaining that Bannon should have been released pending appeal because "[f]or a court unbound by *Licavoli*, like the Supreme Court, the proper interpretation of 'willfully' in Section 192 is a close question or one that very well could be decided the other way." *United States v. Bannon*, No. 22-3086, 2024 WL 3082040, at *3 (D.C. Cir. June 20, 2024) (Walker, J., dissenting) (cleaned up).

congressional subpoena only when he knows his default is unlawful. If the district court had applied this interpretation, the government would have been required to prove Bannon had the requisite knowledge of wrongdoing, and Bannon would have been entitled to present evidence that he lacked such knowledge because he believed, in good faith, that the House sought information protected by executive privilege. Because the government was not required to prove all the elements of section 192, Bannon's convictions must be reversed. *See Gojack*, 384 U.S. at 716 (reversing section 192 conviction because the government failed to prove "an essential element of the offense").

## A.

The criminal contempt of Congress statute provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers ... *willfully* makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor.

2 U.S.C. § 192 (emphasis added). Section 192 includes two distinct offenses: (1) "willfully mak[ing] default" after being summoned by the House or Senate, and (2) appearing before the House or Senate and "refus[ing] to answer any [pertinent] question." Bannon was convicted under the first offense, which includes an explicit mens rea element—default must be made "willfully."

Because section 192 is a criminal statute, the "usual standards of the criminal law must be observed." *Gojack*, 384 U.S. at 707; *see also Russell*, 369 U.S. at 755. In criminal

statutes, "the word 'willfully' … generally means an act done with a bad purpose." *United States v. Murdock*, 290 U.S. 389, 394 (1933); *see also Felton v. United States*, 96 U.S. 699, 702 (1877) ("The word 'willfully,' … in the ordinary sense … means not merely 'voluntarily,' but with a bad purpose.") (cleaned up); *Sillasse Bryan v. United States*, 524 U.S. 184, 191 (1998) ("As a general matter, when used in the criminal context, a willful act is one undertaken with a bad purpose.") (cleaned up). In other words, to be convicted of a crime that requires willfulness, the defendant must have had "knowledge that his conduct was unlawful." *Sillasse Bryan*, 524 U.S. at 192 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). Because section 192's first offense requires willfulness, knowledge of wrongdoing is a necessary element of defaulting on a congressional subpoena.

The text and structure of section 192 reinforce that willful default means willful default. The statute's first offense explicitly requires willfulness. By contrast, the second offense does not specify a mens rea requirement. The Supreme Court has held that the second offense requires only intentional or deliberate action. *Sinclair v. United States*, 279 U.S. 263, 299 (1929). We ordinarily presume that when Congress uses a term in one place and omits it in another, the choice is intentional and the variation meaningful. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Considering the variation in mens rea requirements for the two section 192 offenses, "willfully" must mean something beyond intentional or deliberate action. *See Potter v. United States*, 155 U.S. 438, 446 (1894) (explaining that when "'willful' is omitted from the description of offences in the latter part of [the] section," "[i]ts presence in the first cannot be regarded as mere surplusage; it means something").

This straightforward interpretation also accords with *United States v. Murdock*, in which the Supreme Court

distinguished the two section 192 offenses and explained that the second offense does not require "bad purpose or evil intent" because it lacks a willfulness requirement. 290 U.S. at 397–98. The necessary implication of *Murdock* is that section 192's first offense requires a bad purpose. Reading the statute as a coherent whole, knowledge of wrongdoing must be an element of willful default on a congressional subpoena.

More than sixty years ago, however, our court in *Licavoli* read the willfulness requirement out of the statute. We relied principally on *United States v. Helen Bryan*, which asserted that the government can establish "a *prima facie* case of wil[l]ful default" under section 192 if it proves a defendant "intentionally failed to comply" with a valid subpoena. 339 U.S. 323, 330 (1950). But the Court did not explain how this statement comports with the text of section 192, *Murdock*, or the long line of criminal cases construing "willfully" to require knowledge of wrongdoing. Perhaps this is because the Court discussed willful default only to address the narrow question on which it had granted certiorari: whether the presence of a quorum of the committee was a material question of fact for the jury. *Id.* at 327. That was the sole issue we decided in the one-paragraph decision reversed by the Supreme Court. *Helen Bryan v. United States*, 174 F.2d 525, 526 (D.C. Cir. 1949) (per curiam). And the Court expressly stated it was not addressing any issues "not passed upon by the Court of Appeals."[2] *Helen Bryan*, 339 U.S. at 343.

---

[2] I therefore disagree with Judge Katsas that *Helen Bryan* compels the result in *Licavoli* and this case. *See* Katsas Statement 1–2. In a section of her brief raising "additional reasons not passed upon by the Court of Appeals," Bryan argued her refusal to comply with the subpoena was based on advice from counsel that the committee's authorizing resolution was unconstitutional. Brief for Respondents

Moreover, the narrowness of *Helen Bryan* was confirmed in a case decided the same day, in which the Supreme Court did not rule out the possibility that evidence of good faith could overcome the government's prima facie showing of intentional default. *See United States v. Fleischman*, 339 U.S. 349, 363 (1950); *see also McPhaul v. United States*, 364 U.S. 372, 379 (1960). There is no reason for this court to cling to an overbroad reading of *Helen Bryan* that stands in tension with the Supreme Court's consistent understanding that "willfully" in criminal statutes requires more than merely intentional or deliberate action.

Under the best interpretation of section 192, the government must prove an individual defaulted on a congressional subpoena *willfully*, that is, with knowledge that his conduct was unlawful. *Licavoli* cannot be reconciled with the text or structure of section 192, and the decision runs counter to the overwhelming weight of Supreme Court precedent. *See Bondi v. VanDerStok*, 145 S. Ct. 857, 877 (2025) (Kavanaugh, J., concurring) ("To prove 'willfulness,' the Government must demonstrate that an individual knew that his conduct was unlawful, not merely that he knew the facts that made his conduct unlawful."). *Licavoli* should be overruled.

B.

Restoring the correct meaning of section 192 would have significant consequences for this case. Bannon sought to introduce evidence that his default was not willful because he

---

at 31, *United States v. Helen Bryan*, 339 U.S. 323 (1950) (No. 99). But the Supreme Court did not grant review on this question and explicitly declined to consider any of Bryan's additional arguments. *Helen Bryan* poses no barrier to overruling *Licavoli*.

believed the requested information was protected by executive privilege. The Supreme Court has recognized that recipients of legislative subpoenas "retain common law and constitutional privileges with respect to certain materials," including "communications protected by executive privilege." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (citing *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730–31 (D.C. Cir. 1974) (en banc)); *see also Garner v. United States*, 424 U.S. 648, 663 n.18 (1976) (explaining "a defendant could not properly be convicted for an erroneous claim of privilege asserted in good faith" under a statute requiring willfulness). If Bannon believed in good faith that executive privilege protected the subpoenaed materials, his default was not willful because it was not made with knowledge of wrongdoing. Bannon should have had the opportunity to raise these arguments at trial. The government then could have offered evidence to rebut this argument.

For purposes of rehearing, this court need not decide whether Bannon's claim of executive privilege was made in good faith or would have ultimately prevailed. The important issue raised in this petition is the government's burden in a criminal prosecution under section 192. Because the district court and the panel followed *Licavoli*, the government was not required to prove an essential element of the crime—willful default. The full court should interpret section 192 to mean what it says, overrule *Licavoli*, and vacate Bannon's convictions.

III.

Rehearing is also warranted to consider a question of first impression: Is the proper composition of a congressional committee essential to its authority to issue a subpoena, or is it merely a "procedural" requirement that can be forfeited in a

criminal contempt of Congress prosecution, as the panel held? The full court should address this question because committee authority is an element of a section 192 violation, and it is an open question whether a committee's proper composition is an aspect of its authority. There are good reasons to conclude that a subpoena is issued by the authority of the House only when the issuing committee is constituted in accordance with its authorizing resolution.

A.

It is undisputed that "a clear chain of authority from the House to the [committee] is an essential element" of a section 192 charge. *Gojack*, 384 U.S. at 716; *see also Bannon*, 101 F.4th at 26 (recognizing "congressional authority" is an element of section 192). To prove this element, the government was required to establish beyond a reasonable doubt that the Select Committee's "authority [was] clear and [was] conferred in accordance with law." *Gojack*, 384 U.S. at 714. While courts ordinarily will not inquire into the "appropriateness of [a] procedure as a method of conducting congressional business," the Supreme Court has repeatedly emphasized the importance of evaluating legislative procedures in the "administration of criminal justice, and specifically the application of [a] criminal statute." *Id.*; *see also Christoffel v. United States*, 338 U.S. 84, 88 (1949).

The question Bannon raises is whether the Select Committee's defective composition rendered any subpoena it issued invalid for purposes of criminal contempt because it was not issued "by the authority of either House of Congress." 2 U.S.C. § 192. There is no serious dispute that the Select Committee was not composed in accordance with the plain terms of the authorizing resolution. The Resolution provides that "[t]he Speaker shall appoint 13 Members to the Select

Committee, 5 of whom shall be appointed after consultation with the minority leader." H.R. 503, 117th Cong. § 2(a) (2021). The Speaker appointed only nine members, however, and did not appoint a ranking minority member. This violated the Resolution, as the House now acknowledges. *See* Brief for the U.S. House of Representatives as Amicus Curiae in Support of Neither Party at 11, *United States v. Bannon*, No. 22-3086.

The panel held that any defects in the Select Committee's composition were merely "procedural" and did not undermine its authority to issue subpoenas. *Bannon*, 101 F.4th at 26–27. Such "procedural arguments," the panel concluded, are "at best affirmative defenses" that Bannon failed to preserve by not raising them before the Select Committee. *Id.* at 26.

Labeling Bannon's objections as "procedural" does not resolve the question presented. Neither the Supreme Court nor this court has considered whether a committee must be constituted in accordance with its authorizing resolution to issue a lawful subpoena. If proper composition is a prerequisite, then the government was required to prove this aspect of the Select Committee's authority beyond a reasonable doubt, and Bannon could not have forfeited his objection by failing to raise it to the Select Committee. *See id.*; *Gojack*, 384 U.S. at 707. Bannon raises an open and important question about the Select Committee's authority that should be decided by the full court.

B.

There are serious arguments that defects in the Select Committee's composition undermined its authority to issue a valid subpoena under section 192. Although no court has addressed this precise question, several principles can be drawn from Supreme Court and circuit precedent assessing congressional authority in the context of criminal prosecutions.

First, a committee has authority to issue subpoenas only when acting within its delegated authority. Because a committee may wield only the investigative power delegated to it from the House or Senate, its power "to exact testimony and to call for the production of documents must be found in [the] language" of its authorizing resolution. *United States v. Rumely*, 345 U.S. 41, 44 (1953). Congressional committees "are restricted to the missions delegated to them," and "[n]o witness can be compelled to make disclosures on matters outside that [delegated] area." *Watkins v. United States*, 354 U.S. 178, 206 (1957). Thus, a "[c]ourt[] administering the criminal law cannot apply sanctions for violation of the mandate of [a committee] unless that [committee]'s authority is clear and has been conferred in accordance with law." *Gojack*, 384 U.S. at 714. The Supreme Court has policed the boundaries of committee delegations and reversed section 192 convictions when a committee exceeded the authority conferred by its resolution. *See, e.g.*, *Rumely*, 345 U.S. at 47; *Gojack*, 384 U.S. at 716 (holding that "[a]bsent proof of a clear delegation to the subcommittee" to issue a subpoena, "the subcommittee was without authority which can be vindicated by criminal sanctions under [section] 192").

Second, even when a committee possesses delegated authority to issue subpoenas, it must issue those subpoenas in conformity with the procedures contained in the committee (and House or Senate) rules. Under section 192, the government must prove beyond a reasonable doubt that a defendant was "validly served with a *lawful subpoena*." *Helen Bryan*, 339 U.S. at 330 (emphasis added). "To issue a valid subpoena … a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978).

When a committee rule relates to an element of the section 192 offense, "it must be strictly observed." *Gojack*, 384 U.S. at 708. Ensuring a committee follows its rules is part of the judicial role in the "administration of criminal justice, and specifically the application of the criminal statute which has been invoked." *Id.* at 714; *see also Yellin v. United States*, 374 U.S. 109, 122–24 (1963) (reversing a section 192 conviction despite the defendant's failure to object before the committee because the defendant reasonably thought the committee was adhering to its rules). Following these principles, this circuit has reversed convictions under section 192 when a subpoena was not issued in accordance with the committee's rules. *See Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) (reversing a section 192 conviction because the defendant "had a right under the Subcommittee charter to have the Subcommittee responsibly consider whether or not he should be subpoenaed before the subpoena issued"); *Liveright v. United States*, 347 F.2d 473, 475–76 (1965) (reversing a section 192 conviction because the subpoena was not issued in accordance with the committee's authorizing resolution). Section 192 requires the issuance of a lawful subpoena, and a subpoena is lawful only if a committee follows the governing rules in issuing it.[3]

Finally, a committee must follow the rules governing its composition in order to be a "competent tribunal." *Christoffel*,

---

[3] In *Shelton* and *Liveright*, we treated the subpoena's invalidity as an affirmative defense to, not an element of, section 192's *second offense*, because one could appear before a committee without being summoned and still unlawfully refuse to answer a pertinent question. *See Liveright*, 347 F.2d at 475 n.5. Whether an element of section 192's first offense, or an affirmative defense to the second, the lawfulness of a subpoena depends on compliance with a committee's rules for issuing subpoenas.

338 U.S. at 89. *Christoffel* involved a perjury prosecution under a statute that required a "competent tribunal" as an element of the offense. *Id.* at 85. The Supreme Court held that competency required the committee to satisfy the House quorum rules, and therefore the government was required to prove the quorum requirements were met. *Id.* at 89–90; *see also id.* at 90 ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."). As the Court explained, "[t]he question is [not] what rules Congress may establish for its own governance" but "rather what rules the House has established and whether they have been followed." *Id.* at 88–89. *Christoffel* provides a helpful analogy for interpreting section 192, which requires the committee to act by the authority of the House. Such authority, like competency, may depend on the committee following House rules governing its composition.

As this discussion demonstrates, the Supreme Court and this circuit carefully assess a committee's authority when reviewing criminal convictions under section 192. The questions Bannon raises about the Select Committee's defective composition are important and require similar consideration. The Select Committee's authorizing resolution required the appointment of thirteen members and a ranking member, neither of which occurred. Were these composition requirements essential to the Select Committee's exercise of delegated authority from the House? That is, to issue a lawful subpoena for purposes of section 192, was the Select Committee required to be constituted in accordance with the Resolution? In light of Supreme Court and circuit precedent, proper composition of a committee may well be critical to a committee's authority and, therefore, a necessary condition for issuing a lawful subpoena.

The government maintains the Select Committee was properly constituted because the Resolution did not strictly require appointment of thirteen members. But this factual issue is irrelevant to the legal question, namely, whether the Committee's proper composition is an element of its authority to issue a lawful subpoena. The full court should resolve this question because it is "unthinkable" that a committee without authority "can be the instrument of [a] criminal conviction." *Id.* at 90.

\* \* \*

When adjudicating criminal contempt of Congress, courts must ensure "that the congressional investigative power, when enforced by penal sanctions, [is] not … abused." *Gojack*, 384 U.S. at 707. Rehearing is warranted to maintain the exacting standards of the criminal law, which protect individual liberty and preserve the separation of powers.

Bannon's petition first implicates the essential safeguards for individual liberty in criminal cases. The Supreme Court has repeatedly held that the protections of the criminal law apply to section 192 prosecutions. Courts must hold the government to its burden of proving every element of criminal contempt of Congress. *See id.* Yet our decision in *Licavoli* allows a person to be convicted of willful default without any showing of willfulness. We should overrule *Licavoli* and vacate Bannon's convictions.

Moreover, this case presents a question of first impression: whether the proper composition of a committee is an essential aspect of its delegated authority to issue lawful subpoenas, as required by section 192. When seeking to impose criminal sanctions, a committee must be "meticulous in obeying its own rules." *Yellin*, 374 U.S. at 124. In this political and partisan

context, rules about a committee's composition should not be lightly disregarded by courts as merely "procedural."

Finally, this case threatens the separation of powers because it involves the criminal prosecution of a former Executive Branch official invoking executive privilege in the face of a congressional subpoena. Congress may gather information and issue subpoenas in furtherance of its legislative powers. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *Mazars*, 140 S. Ct. at 2031. But the President is entitled to assert executive privilege to protect the confidentiality of his communications and the independence of the Executive Branch.[4] *United States v. Nixon*, 418 U.S. 683, 708 (1974) (recognizing executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution"). These constitutional prerogatives come into conflict when a committee seeks information the Executive considers privileged.

While such disputes between the political branches are usually resolved through accommodation and compromise without involving the courts, *Mazars*, 140 S. Ct. at 2030–31, this case involves a rare instance in which Congress recommended criminal contempt. Even more uncommon, the Executive Branch pursued the prosecution, breaking from its

---

[4] The Executive Branch has long asserted the right to withhold privileged information from congressional committees and has maintained that the President and his immediate advisors cannot be compelled to testify. *See Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 2 (2007); *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4–5 (1999); *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007).

longstanding position that section 192 "does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." *Congressional Oversight of the White House*, 45 Op. O.L.C., slip op. at 50 (Jan. 8, 2021); *see also Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 140 (1984) ("The Executive … must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance.").

In the past, Congress rarely referred Executive Branch officials for criminal contempt, and the Executive generally refused to prosecute officials who invoked executive privilege. Between 1980 and 2017, Congress referred only six Executive Branch officials for prosecution. *See* CONG. RSCH. SERV., RL34097, CONGRESS'S CONTEMPT POWER AND THE ENFORCEMENT OF CONGRESSIONAL SUBPOENAS 31, 47, 52–53, 74–85 (2017). When executive privilege was at stake, the Department of Justice declined to press charges.

Recently, however, the floodgates have opened. Between 2019 and 2023, the House cited six former or current Executive Branch officials for criminal contempt of Congress. The Department of Justice proceeded with charges against two of those officials, including Bannon. Last year, the House approved a criminal contempt citation against then-Attorney General Merrick Garland for his refusal to produce audio recordings related to President Biden's alleged mishandling of classified materials. *See* H.R. Res. 1292, 118th Cong. (2024). With this acceleration in contempt of Congress prosecutions against Executive Branch officials—prosecutions almost always brought in this circuit—the issues raised here are likely to recur and should be resolved now.

The uptick in criminal contempt of Congress prosecutions against former Executive Branch officials is further reason to clarify that section 192 requires proof of willful default. If Bannon invoked executive privilege in good faith, he would be shielded from criminal sanction under section 192 because any default would not be willful. Courts must assess this element and any protections for executive privilege even when the Executive Branch proceeds with a prosecution despite the claims of privilege. *Cf. In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, No. 23-5044, 2024 WL 158766, at *2 (D.C. Cir. Jan. 16, 2024) (statement of Rao, J., respecting denial of rehearing en banc) (explaining presidential materials may be presumptively privileged "even in the absence of an assertion of executive privilege").

When criminal contempt of Congress is pursued, "[t]he jurisdiction of the courts cannot be invoked to impose criminal sanctions in aid of a roving commission." *Gojack*, 384 U.S. at 715. Because the questions presented in this petition are vital to individual liberty and implicate the separation of powers between Congress and the Executive, I respectfully dissent from the denial of rehearing en banc.