# [ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————

## JOINT APPENDIX
### Volume II of XII
### (Pages: 457 - 937)

———————————

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

**Gibson Moore Appellate Services, LLC**
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
### Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Indictment**
      **filed November 12, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
      **on November 15, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
      **on November 18, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
      **on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
      **filed February 4, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

    <u>**Exhibits:**</u>

    1.    **Letter**
          **dated January 14, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . 186

    2.    **Letter**
          **dated January 28, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . 194

**Exhibits** to

**Defendant's Motion to Compel Discovery**
**filed February 4, 2022, Continued:**

3.    Letter
dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.    FBI Interview of Robert J. Costello, Esquire
dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.    H. Res. 503, Sec. 5(c)(6)(A) & (B)
dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.    Procedures Adopted by 117th Congress
Regulations for Use of Deposition Authority
dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.    FBI Interview of U.S. House of Representatives
General Counsel Doug Letter
dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.    Letter from Ronald C. Machen Jr., U.S. Attorney,
to Speaker of the House John A. Bohner
dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.    Prosecution for Contempt of Congress of an
Executive Branch Official Who Has Asserted a
Claim of Executive Privilege
8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.    Attempted Exclusion of Agency Counsel from
Congressional Depositions of Agency
Employees, Slip Op.
dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,
     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     Attachment:

     Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,
     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     Exhibit:

     1.    Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,
     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     Exhibit:

     1.    Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel, With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**<u>Exhibits:</u>**

1.    **E-mail Correspondence [US-001038-40] various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
### Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
> on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion *in Limine* to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
> filed March 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion *in Limine* on Advice of Counsel,**
**With Exhibits,**
> filed March 22, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

> **Exhibits:**

> 1. **Senate Committee Investigation**
>    dated August 8, 1958.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 577

> 2. **Application of 28 U.S.C. § 458 to Presidential**
>    **Appointments of Federal Judges**
>    dated December 18, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . 584

> 3. **Letter from Michael B. Mukasey, Attorney**
>    **General, to the Hon. Nancy Pelosi, Speaker of the**
>    **House of Representatives**
>    dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . 599

**Exhibits** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
     **filed March 22, 2022, Continued:**

4.     **Response to Congressional Requests for**
       **Information Regarding Decisions Made Under the**
       **Independent Counsel Act,**
          **10 Op. O.L.C. 68 (1986)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **601**

5.     **Rex Lee, Executive Privilege, Congressional Subpoena**
       **Power, and Judicial Review: Three Branches,**
       **Three Powers, and Some Relationships,**
          **1978 B.Y.U. L. Rev. 231, 259** . . . . . . . . . . . . . . . . . . . . . . . . **619**

6.     **Whether the Department of Justice May Prosecute**
       **White House Officials for Contempt of Congress,**
          **2008 WL 11489049 (O.L.C.)** . . . . . . . . . . . . . . . . . . . . . . . . **688**

7.     **Congressional Oversight of the White House,**
          **2021 WL 222744 (O.L.C.)** . . . . . . . . . . . . . . . . . . . . . . . . . . **692**

**Amended Exhibit** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
     **filed March 23, 2022:**

3.     **Letter from Michael B. Mukasey, Attorney**
       **General, to the Hon. Nancy Pelosi, Speaker of the**
       **House of Representatives**
          **dated February 29, 2008** . . . . . . . . . . . . . . . . . . . . . . . . . . **722**

**Government's Response to Defendant's Supplemental Brief in**
**Opposition to the Government's Motion** *in Limine* **to Exclude**
**Evidence and Argument Relating to Good-faith**
**Reliance on Law or Advice of Counsel**
     **filed March 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **725**

**Defendant's Supplemental Reply on Waiver**
    **filed March 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

**Order**
    **filed April 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

**Government's Motion *in Limine* to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

    **Exhibits:**

    1.    **Letter from White House Deputy Counsel to Costello**
            **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

    2.    **Letter from Justin Clark to Costello**
            **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

    3.    **Emails from Justin Clark to Costello**
            **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

**Government's Motion *in Limine* to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

    **Exhibit:**

    1.    **Subpoena**
            **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 781

**Government's Motion *in Limine* to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

 **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**

 **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

 **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

 <u>**Exhibits:**</u>

 **A.** **H. Res. 8 (Adoption of Rules for 117th Congress)**

  **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

 **B.** **H. Res. 503 (Authorizing House Select Committee)**

  **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

 **C.** **Regulations For Use Of Deposition Authority**

  **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

 **D.** **Amerling and Letter FBI 302**

  **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **929**

**TABLE OF CONTENTS**

**Joint Appendix Volume III of XII**

**Page:**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
> **filed April 15, 2022, Continued:**

> **E.**   **Rules of the 117th Congress**
> > **dated February 2, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **938**

> **F.**   **Republican Conference Rules of the 117th Congress.** . . . . . . **991**

> **G.**   **Congressional Oversight of The White House,**
> > **45 Op. O.L.C. slip op. (Jan. 8, 2021).** . . . . . . . . . . . . . . . **1005**

> **H.**   **Assertion of Executive Privilege Concerning the**
> **Dismissal and Replacement of U.S. Attorneys**
> > **dated June 27, 2007.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1065**

> **I.**   **Immunity of the Former Counsel to the President from**
> **Compelled Congressional Testimony,**
> > **43 Op. O.L.C. slip op. (July 10, 2007).** . . . . . . . . . . . . . . . **1075**

> **J.**   **Prosecution for Contempt of Congress of an Executive**
> **Branch Official Who Has Asserted a Claim of Privilege,**
> > **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1079**

> **K.**   **Whether the Department of Justice May Prosecute**
> **White House Officials for Contempt of Congress,**
> > **32 Op. O.L.C 65 (2008).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

> **L.**   **Application of 28 U.S.C. Sec. 458 to Presidential**
> **Appointments of Federal Judges,**
> > **19 Op. O.L.C slip op. (December 18, 1995).** . . . . . . . . . . **1128**

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

**M.**    Randolph D. Moss, *Executive Branch Legal Interpretation:*
    *A Perspective from the Office of Legal Counsel,*
        52 Admin. L. Rev. 1303 (2000). . . . . . . . . . . . . . . . . . . . . 1143

**N.**    Testimonial Immunity Before Congress of the
    Former Counsel to the President,
        43 Op. O.L.C. slip op. (May 20, 2019). . . . . . . . . . . . . . 1172

**O.**    Response to Congressional Requests for
    Information Regarding Decisions Made
    Under the Independent Counsel Act,
        10 Op. O.L.C. 68 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 1194

**P.**    Letter from Ronald C. Machen Jr., U. S. Attorney, to
    Speaker John A. Boehner
        dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1220

**Q.**    Letter from Michael B. Mukasey, Attorney General, to
    Speaker of the House, Hon. Nancy Pelosi
        dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . 1228

**R.**    Steven G. Bradbury, *Memorandum for Attorneys of the*
    *Office Re: Best Practices for OLC Opinions*
        May 16, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1231

**S.**    Trevor W. Morrison, *Stare Decisis in the*
    *Office of Legal Counsel,*
        110 COLUM. L. REV. 1448 (2010). . . . . . . . . . . . . . . . . 1237

**T.**    Walter Dellinger, et al., *Principles to*
    *Guide the Office of Legal Counsel*
        dated Dec. 21, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1261

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**
  **filed April 15, 2022, Continued:**

U.    **David J. Barron, Memorandum for Attorneys of the**
      **Office Re: Best Practices for OLC Legal**
      **Advice and Written Opinions**
          **dated July 16, 2010.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1268**

V.    **Frank H. Easterbrook, Presidential Review,**
      **40 CASE W. RES. L. REV. 905 (1990).** . . . . . . . . . . . . . . **1275**

W.    **Presidential Authority to Decline to Execute**
      **Unconstitutional Statutes, OLC Mem. Op.**
          **dated November 2, 1984.** . . . . . . . . . . . . . . . . . . . . . . . . . **1302**

X.    **Douglas W. Kmiec, OLC's Opinion Writing Function:**
      **The Legal Adhesive for a Unitary Executive,**
          **15 CARDOZO L. REV. 337 (1993).** . . . . . . . . . . . . . . . . **1316**

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

Y.    Applying Estoppel Principles in Criminal Cases,
      78 YALE L.J. 1046 (1969).. . . . . . . . . . . . . . . . . . . . . . . . . 1355

Z.    Anne Bowen Pouliun, Prosecutorial Inconsistency,
      Estoppel, and Due Process: Making the
      Prosecution Get its Story Straight,
      18 Cal. L. Rev. 1423 (2001).. . . . . . . . . . . . . . . . . . . . . . . . 1384

AA.   Rex E. Lee, Executive Privilege, Congressional Subpoena
      Power, and Judicial Review: Three Branches, Three
      Powers, and Some Relationships,
      1978 B.Y.U. L. REV. 231 (1978). . . . . . . . . . . . . . . . . . . . . . 1441

BB.   John O. McGinnis, Models of the Opinion Function of the
      Attorney General: A Normative, Descriptive, and
      Historical Prolegomenon,
      15 CARDOZO L. REV 375 (1993).. . . . . . . . . . . . . . . . . 1510

CC.   Griffin B. Bell, The Attorney General: The Federal
      Government's Chief Lawyer and Chief Litigator, or
      One Among Many?,
      46 FORDHAM L. REV. 1049 (1978). . . . . . . . . . . . . . . . 1572

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

DD.  Notes, The Immunity-Conferring
     Power of the Office of Legal Counsel,
         121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . 1596

EE.  U.S. Department of Justice, Criminal
     Resource Manual § 2055 (Public Authority Defense). . . . . 1621

Defendant's Notice of Filing,
With Attached Motion to Dismiss the Indictment and Exhibits Index,
    filed April 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

Government's Response to Defendant's
Notice under Federal Rule of Procedure 12.3
    filed April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

Defendant's Opposition to the Government's
Motion *in Limine* Based on Waiver
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698

Defendant's Opposition to the Government's
Motion to Exclude Prior Subpoena Evidence
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709

Defendant's Response to Government's Motion *in
Limine* to Exclude Evidence of Department of
Justice Opinions and Writings [Doc. 52]
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**

        **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

### Exhibits:

1.    **Letter from Chairman Bennie G. Thompson to**
        **Mr. Stephen K. Bannon**
                **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1793**

2.    **E-mail from Cooney to Costello**
                **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1796**

3.    **E-mail from Costello to Cooney**
                **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1800**

4.    **E-mail from Cooney to Costello**
                **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1803**

## TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

**Government's Opposition to**
**Defendant's Motion to Exclude Evidence**
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

**Defendant's Reply in Support of His Motion to Exclude Evidence**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of Department of Justice Opinions and Writings**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

**Government's Reply in Support of Motion *in Limine* to**
**Exclude Evidence Relating to Objections to**
**Subpoena That Defendant Waived**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of the Defendant's Prior Experience with Subpoenas**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

**Defendant's Reply in Support of His Motion to Dismiss Indictment,**
**With Exhibits,**
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

    Exhibits:

    1.    **Letter from Chairman Bennie G. Thompson to**
            **Mr. Stephen K. Bannon**
                **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . 1885

    2.    **Transcript of Oral Argument**
            **Before the Honorable Carl J. Nichols**
                **on March 16, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to

**Defendant's Reply in Support of His Motion to Dismiss Indictment**
        **filed May 17, 2022, Continued:**

3.      **Letter from Costello to Congressman Thompson**
                **dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1994

4.      **Letter from Congressman Thompson to Costello**
                **dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
        **filed May 25, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2002

        **Attachment:**

        **Brief of United States House of Representatives as**
        *Amicus Curiae* **In Support of the Department of Justice**
                **dated May 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
        **filed May 25, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2035

        **Attachment:**

        **Brief of the U.s. House of Representatives Minority Leader**
        **Kevin O. Mccarthy and the U.s. House of Representatives**
        **Minority Whip Stephen J. Scalise as Amicus Curiae**
                **dated May 24, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2050

**Defendant's Notice Regarding Amicus Briefs**

  **filed June 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2065**


**Motion to Quash,**

**With Attachment,**

  **filed June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2072**

  **<u>Attachment</u>:**

  **Memorandum of Points and Authorities**
  **In Support of Motion to Quash,**
  **With Exhibits,**

   **dated June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2074**

# TABLE OF CONTENTS
## Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
  **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
  **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
  **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

  <u>**Exhibits:**</u>

  1. **Letter from Bannon's Counsel to Prosecutors**
    **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

  2. **Letter from Prosecutors to Bannon's Counsel**
    **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

  3. **Letter from Justin Clark to Scott Gast**
    **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **2448**

  4. **Letter from Pat Cipollone to Chairman Nadler**
    **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . . **2453**

  5. **Plaintiff's Motion for Judgment on the Pleadings, or in the**
    **Alternative, for Summary Judgment, & in Opposition to**
    **Defendants' Motion for Summary Judgment**
    **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
  **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

# TABLE OF CONTENTS
## Joint Appendix Volume VII of XII

Page:

**Government's Opposition to Defendant's Motion to Compel**
filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

**Joint Proposed Jury Instructions,**
**With Attachment,**
filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

Attachment:

**Manual of Model Criminal Jury Instructions**
dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

**Government's Objections to Defendant's Proposed Jury Instructions**
filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

**Defendant's Opposition to Government's Omnibus Motion *in Limine***
filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

**Office of General Counsel U.S. House of Representatives'**
**Reply in Support of Motion to Quash,**
**With Exhibits,**
filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

Exhibits:

A.     Order - *U.S. v. Moussaoui*
dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

B.     Order - *U.S. v. Arthur Andersen, L.L.P.*
dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

C.     Order Granting Motion to Quash Subpoena on
U.S. Representative Maxine Waters - *D.C. v. Hayes*
dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel
Meadows and Scavino Declination Discovery,
With Exhibit,**

　　　filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

　　**Exhibit:**

　　1.　**Memorandum**

　　　　　dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion *in Limine***

　　　filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion *in Limine* to Exclude Evidence or Argument
Relating to the Defendant's Eleventh-hour Assertion That
He Is Willing to Testify Before the Select Committee**

　　　filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing
Before the Honorable Carl J. Nichols**

　　　on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion *in Limine* to Bar Testimony,
With Exhibits,**

　　　filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

　　**Exhibits:**

　　1.　**Letters from former President Trump to Mr. Costello and
　　　　Mr. Costello's Letter to Chairman Thompson**

　　　　　dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

　　2.　**Certification**

　　　　　dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
     **filed July 13, 2022, Continued:**

3.     **Subpoena**
        **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3090

4.     **Letter from Thompson to Costello**
        **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3092

5.     **Indictment**
        **dated November 12, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3096

**Government's Reply in Support of Motion** *in Limine* **to Exclude Evidence or Argument Relating to the Defendant's Eleventh-hour Assertion That He Is Willing to Testify Before the Select Committee, With Exhibits,**
     **filed July 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

     **Exhibits:**

1.     **Letter from Thompson to Costello**
        **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3114

2.     **Letter from Thompson to Costello**
        **dated October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3118

**Government's Objections to Defendant's Trial Exhibits**
     **filed July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols
     on July 14, 2022............................................... 3127

Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,
     filed July 15, 2022.......................................... 3192

    Exhibits:

    1.    Transcript Jury Trial
        Before the Honorable Kurt D. Engelhardt
        *U.S. v. Rainey*, No. 12-291
            on June 1, 2015................................... 3216

    2.    Congressional Gamesmanship Leads To An
        Acquittal In Deepwater Horizon Case,
        U.S. v. David Rainey: A Case Study
            dated 2016...................................... 3260

Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash
     filed July 16, 2022.......................................... 3303

Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions
     filed July 17, 2022.......................................... 3308

**Defendant's Statement of the Case**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310

**Defendant's Purposed Jury Instructions**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316

**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374

**Government's Response to Defendant's Objections to Exhibits**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381

**Defendant's Motion to Exclude Hearsay Evidence**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386

**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS
### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
          on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
          on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
          on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of <u>Kristin Amerling</u>:**

     **Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . . 3942**

## TABLE OF CONTENTS
## Joint Appendix Volume X of XII

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
       on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

       **Testimony of <u>Kristin Amerling</u>:**

       **Direct Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . 4014
       **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4078

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
       on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

       **Testimony of <u>Kristin Amerling</u>:**

       **Cross Examination by Mr. Corcoran (Continued).** . . . . . . . . . . . . 4149
       **Redirect Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . 4211

       **Testimony of <u>Stephen Hart</u>:**

       **Direct Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . 4233
       **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4252
       **Redirect Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . 4264

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
       filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
       on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

## TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
> filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4422

**Defendant's Notice Regarding Congressional Hearings**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4432

**Notice of Defendant's Objection to Jury Instruction Number 27**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4435

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
> on July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4438

**Jury Instructions**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4555

**Counsels' Acknowledgment Concerning Trial Exhibits**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4585

**Government's Exhibit List**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4586

**Defendant's Exhibit List**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4588

**Note from Jury**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4591

**Verdict Form**
> filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4592

Order
     filed July 27, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
     filed July 28, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

     <u>Exhibits:</u>

    1.    Screenshot of Episode 1996, War Room
         dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

    2.    Bannon's Gettr Repost CNN Ad
         dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
     filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
     filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
     filed August 12, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
     filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**
>    filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657


**Defendant's Reply to Opposition to Motion for a New Trial**
>    filed August 26, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676


**Order**
>    filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682


**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
>    on October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687


**Judgment in a Criminal Case**
>    filed October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767


**Defendant's Notice of Appeal**
>    filed November 4, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772


**Order Staying Sentence Pending Appeal**
>    filed November 7, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

# TABLE OF CONTENTS
## Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

9B.   **H41 Congressional Record - House**
         **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4780

30.   **Letter from Former President Donald Trump to**
         **Stephen K. Bannon**
         **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4781

31.   **Letter from Robert J. Costello to**
         **Chairman Bennie Thompson**
         **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4782

32.   **Letter from Chairman Bennie Thompson to**
         **Robert J. Costello**
         **dated July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4784

39.   **Article from Rolling Stone**
         **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . 4786

40.   **Daily Mail Article**
         **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4804

**Government's Exhibits:**

1.   **House Resolution 503.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4808

2.   **Subpoena to Stephen Bannon**
         **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . 4822

**Government's Exhibits, Continued:**

3.   **Emails re Service of Subpoena**
     **dated September 23 and 24, 2021** . . . . . . . . . . . . . . . . . . 4832

4.   **Letter from Costello to**
     **Chairman Thompson and Cover Email**
     **dated October 7, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4835

5.   **Letter from Chairman Thompson to Costello**
     **dated October 8, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4838

6.   **Letter from Costello to Chairman Thompson**
     **dated October 13, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . 4841

7.   **Letter from Chairman Thompson to Costello**
     **dated October 15, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . 4843

8.   **Letter from Costello to**
     **Chairman Thompson and Cover Email**
     **dated October 18, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . 4846

9.   **Letters from Chairman Thompson to Costello**
     **dated October 19, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . 4848

10.  **Post on Stephen Bannon's Gettr Account**
     **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 4851

11A. **Post on Stephen Bannon's Gettr Account**
     **dated October 8, 2021** . . . . . . . . . . . . . . . . . . . . . . . . . . . 4852

11B. **DailyMail Article Linked in October 8, 2021**
     **Post on Stephen Bannon's Gettr Account.** . . . . . . . . . . . . . . 4853

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

                            CR Action

           Plaintiff,         No. 1:21-670

      vs.                   Washington, D.C.
                            March 16, 2022

STEPHEN K. BANNON,

                            11:05 a.m.

           Defendant.



TRANSCRIPT OF ORAL ARGUMENT
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE



APPEARANCES:

**For the Plaintiff:**     **AMANDA ROSE VAUGHN**
                        **J.P. COONEY**
                        **MOLLY GASTON**
                         U.S. ATTORNEY'S OFFICE FOR D.C.
                         555 4th Street NW
                         Washington, DC 20001
                         202-252-1793


**For the Defendant:**     **DAVID I. SCHOEN**
                        2800 Zelda Road, Suite 100-6
                        Montgomery, AL 36106
                        334-395-6611

                       **MATTHEW EVAN CORCORAN**
                        SILVERMAN THOMPSON SLUTKIN WHITE
                        201 N Charles Street, 25th Floor
                        Baltimore, MD 21201
                        410-385-2225

                       **ROBERT J. COSTELLO**
                        DAVIDOFF HUTCHER & CIRTON LLP
                        605 Third Avenue
                        New York, NY 10158
                        646-428-3238

Reported By:        **LORRAINE T. HERMAN, RPR, CRC**
                    Official Court Reporter
                    U.S. District & Bankruptcy Courts
                    333 Constitution Avenue, NW
                    Room 6720
                    Washington, DC 20001
                    202-354-3196


    Proceedings reported by machine shorthand, transcript

produced by computer-aided transcription.

3

1            **P R O C E E D I N G S**

2            **COURTROOM DEPUTY:**  Good morning, Your Honor.  This

3      is criminal case year 2021-670, *United States of America*

4      *versus Stephen K. Bannon*.

5            Counsel, please come forward and introduce

6      yourselves for the record, beginning with the government.

7            **THE COURT:**  And let me just note my view, at least

8      currently, on non-jury matters, that is to say arguments,

9      status conferences and the like, is that whoever is at the

10     podium, please take your mask off.  It's easier for me to

11     hear, easier for opposing counsel to hear, the court

12     reporter and the like.  And then just put your mask back on

13     when you sit down.

14           **MS. VAUGHN:**  Yes, Your Honor.

15           Good morning, Your Honor.  Amanda Vaughn, Molly

16     Gaston and J.P. Cooney for the United States.

17           **THE COURT:**  Good morning.

18           **MR. SCHOEN:**  Good morning, Your Honor.  David

19     Schoen, Evan Corcoran and Robert Costello for Mr. Bannon,

20     Your Honor.

21           **THE COURT:**  Good morning, Counsel.

22           **MR. SCHOEN:**  Good morning.  Thank you.

23           **THE COURT:**  So I've reviewed all of the papers

24     that have been submitted, including the supplemental

25     materials filed over the last day or two.

**-459-**

1            Obviously, we have cross motions, in a sense.  I

2    don't want to have argument on the motions individually.  I

3    want to take them in a somewhat more efficient manner, which

4    is I want to hear from the government on all questions

5    first, and then the defendant all questions.  I'll allow the

6    government then, essentially, a short rebuttal; and then the

7    defendant a short surrebuttal.

8            With that, Ms. Vaughn, will you be taking the

9    lead?

10           **MS. VAUGHN:**  Yes, Your Honor.

11           **THE COURT:**  I think I'd like to start with your

12   Motion in Limine, but then I'd like to proceed through

13   Mr. Bannon's motions as well.

14           **MS. VAUGHN:**  Yes, Your Honor.

15           So starting with the government's Motion to

16   Exclude all Evidence in Argument Relating to Advice of

17   Counsel.  So contempt of Congress for willful default is

18   about whether or not you showed up; that is whether to

19   produce records or to testify.

20           The summoned witness doesn't get to decide if

21   Congress can make them show up.  If the witness were able to

22   decide that, it would mean Congress had no subpoena power at

23   all.  And these are the principles that are reflected in the

24   meaning of willfulness, under the contempt of Congress

25   statute, as the Supreme Court and the D.C. Circuit defined

1    that term more than half a century ago.

2         So if a defendant makes a deliberate and

3    intentional decision not to appear, he has the requisite

4    intent for contempt; that is, Does the defendant know he's

5    been summonsed and does he intentionally, knowing that, not

6    show up?  That's all that is required.

7         **THE COURT:**  Don't you agree that seems

8    inconsistent with more recent case law about what

9    "willfully" means from the Supreme Court?

10        **MS. VAUGHN:**  Well, Your Honor, I think the more

11   recent case law in *Bryan* and *Ratzlaf* and *Cheek*, didn't deign

12   to rewrite the meaning of willfulness as it might appear in

13   other criminal laws.  Those cases were limited to the

14   specific laws that arose in those specific cases.  And in

15   *Cheek* and *Ratzlaf*, obviously, that's the highest standard,

16   which I don't think anyone is arguing for here.

17        Even the intermediate standard, in *Bryan* it dealt

18   with the statute that you needed to be licensed to sell

19   firearms.  That too is more of a regulatory scheme.  And the

20   Court even expressed its view in that case that that statute

21   was intended to divide innocent conduct from criminal

22   conduct.  So that's really where the dividing line is.  And

23   that's what "willful," as defined by the Supreme Court, in

24   the 1950 *Bryan* and the D.C. Circuit in *Licavoli*, that's

25   where "willful" draws the line under the contempt of

1    Congress statute.

2         **THE COURT:**  What seems anomalous to me, is that

3    that means, I think, that the mens rea requirement for

4    making default and refusing to answer any questions is the

5    same, even though the term "willfully" applies only to

6    making default.

7         **MS. VAUGHN:**  So I think what the D.C. Circuit

8    found in *Licavoli*, which I think still applies, is without

9    willful before default, you are in a sense creating a strict

10   liability statute.  Because someone could be on their way to

11   Congress, break down in their car.  They know they are not

12   showing up.  They know they've committed the acts

13   constituting default.  And without that word "willful"

14   there, they would be subject to criminal prosecution under

15   the statute.

16        So "willful" separates that kind of accident,

17   where the person still knows they are making default, but it

18   wasn't intentional or deliberate.  From an intentional and

19   deliberate choice to show up.  And what the Supreme Court

20   made clear is that that intentional choice not to comply,

21   that is inherently a criminal choice.  There is no innocent

22   way that someone decides they are just not going to comply

23   with the statute.

24        **THE COURT:**  Right.  But that sounds a lot like

25   intentional rather than willful.  And those two terms

7

1    typically mean different things.

2        **MS. VAUGHN:**  Well, intentional and deliberate is

3    the definition of "willful" that's been determined for this

4    statute under the controlling precedent from the Supreme

5    Court and the D.C. Circuit.

6        And to your question --

7        **THE COURT:**  Does the government think that if

8    *Licavoli* had not been decided the way it is, that that is

9    still correct interpretation of the statute?

10       **MS. VAUGHN:**  The government does think that is

11   still the correct.  And *Licavoli* was relying on the Supreme

12   Court's decision earlier in *Bryan* and *Fleischman*.  Because,

13   again, I think what the Supreme Court talks about in *Cheek*

14   *Ratzlaf* and 1998 *Bryan*, is that these intent standards are

15   intended to divide criminal conduct from citizens who

16   innocently, sort of, get caught up in these regulatory

17   schemes.  And that's where willful and contempt of Congress

18   draws, between someone who accidentally does not comply with

19   their obligations, and someone who makes an intentional and

20   deliberate choice not to do so.

21       **THE COURT:**  So as a practical matter, assuming I

22   grant your motion, this motion, what proof does the

23   government need to make on mens rea?  What's showing?

24       **MS. VAUGHN:**  The government would need to

25   demonstrate that the defendant knew he had been summonsed;

1  so that means, knew that Congress was requiring him to show

2  up and produce records on October 7th; and that Congress was

3  requiring him to show up and testify on October 14th.  And

4  that he knew that that was the obligation; and that despite

5  knowing that, he decided not to comply.

6  He has to have -- the government has to prove that

7  he was given a clear choice from Congress.  Either show up

8  or you are in contempt.  That would be all that the

9  government is required to show there.

10  **THE COURT:**  And that would be -- the willful

11  there, really, to the extent that it does any work here goes

12  to the latter, because if a defendant knew he had or she had

13  a summons, and mistakenly missed the date, or had his or her

14  car break down, then that defendant would not act willfully

15  in the government's view.

16  **MS. VAUGHN:**  That's right, Your Honor.

17  And it's no different from in the contempt of

18  court context.  A witness gets a summons to appear before a

19  grand jury or to appear for testimony in trial.  And if they

20  deliberately decide, I will not appear, they are subject to

21  prosecution for contempt.  It's the same principle in the

22  contempt of Congress.

23  **THE COURT:**  Okay.

24  So let's move on to -- unless you have anything to

25  say on that, anything more to say on that subject, on that

9

1    motion.

2          **MS. VAUGHN:**  Not unless the Court has questions.

3          **THE COURT:**  So let's move on to defendant's

4    motions.  I think I'd like to start first with the motion

5    relating to Mr. Costello's records or the records that

6    turned out to be a different Costello's records.

7          **MS. VAUGHN:**  Yes, Your Honor.

8          **THE COURT:**  So that suite of issues.

9          **MS. VAUGHN:**  So I think they raise different

10   issues.  Now we are talking about two categories of records.

11   The first is Mr. Costello's toll records.  So these are

12   simply phone records showing who the subscriber is, and then

13   showing to and from phone numbers, dates and times.

14          And the defendant's request there, as I understand

15   it now, is that they would like all of the underlying grand

16   jury subpoenas, all of the government's internal

17   deliberations and records about its decisionmaking with

18   respect to seeking those records.

19          **THE COURT:**  So let me just pause there, because it

20   wasn't clear from the government's brief.  You just said,

21   "grand jury subpoenas."  Can you state publicly how those

22   toll records were obtained?

23          **MS. VAUGHN:**  I don't think there is an issue with

24   saying that it was part of the grand jury investigation that

25   we obtained those records, Your Honor.

1          **THE COURT:**  Okay.

2          **MS. VAUGHN:**  So the defendant is seeking those

3    grand jury subpoenas, copies of the subpoenas, which would

4    obviously show which records the grand jury sought.

5          **THE COURT:**  You just said grand -- so are we

6    talking about grand jury subpoenas --

7          **MS. VAUGHN:**  Yes, Your Honor.

8          **THE COURT:**  -- for Mr. Costello's toll records?

9          **MS. VAUGHN:**  Yes, Your Honor.

10         Also the defendant is asking for the government's,

11   sort of, internal processes --

12         **THE COURT:**  Yes.  Understood.

13         **MS. VAUGHN:**  -- in doing that.

14         So, obviously, what subpoenas were issued has no

15   bearing on establishing or disproving the facts of the

16   offense; that is, did the defendant receive a subpoena?  Did

17   it require him to show up?  Did he intentionally and

18   deliberately decide to ignore that demand?  Because it

19   doesn't go to any of those facts, those records are not

20   discoverable under Rule 16 or *Brady*.

21         So the defendant has to identify another basis to

22   be entitled to those records.  With respect to the grand

23   jury materials, he needs to show a particularized need.  And

24   the defendant's relying on the provision of Rule 6, that

25   it's needed because it may support a Motion to Dismiss.

1          But in order to pierce secrecy of the grand jury,

2     the defendant needs to do more than just allege there's

3     misconduct here.  He needs to identify what grounds he will

4     be moving to dismiss.  And he hasn't done that.

5          **THE COURT:**  So on that, as I understand it,

6     whether it's about toll records or email records, the

7     government's argument is, At the time we sought those

8     records, we needed to prove -- still need to prove -- well,

9     it may be stipulated now or conceded now -- but at one point

10    we knew that we needed to prove that Mr. Bannon knew about

11    the subpoenas or the summons from Congress.

12          And so we sought Mr. Costello's email and phone

13    toll records to what?  To help create a -- I'm missing the

14    next part.  Because it's not at all apparent to me how even

15    knowing with whom Mr. Costello was communicating would prove

16    or tend to prove that Mr. Bannon knew about the subpoena

17    from Congress.

18          **MS. VAUGHN:**  Well --

19          **THE COURT:**  If that was even a disputed issue at

20    that point.

21          **MS. VAUGHN:**  Your Honor, so obviously the scope of

22    the grand jury's investigation is not limited.  They can act

23    on suspicion, rumor, whatever they need to do to investigate

24    every lead --

25          **THE COURT:**  Is there really any dispute by the

1    time these subpoenas or the Stored Communication Act order

2    was issued that -- was there any dispute that Mr. Bannon

3    didn't know about the subpoena?  I mean, the world knew

4    about it.  The world knew about the contempt proceeding.

5         **MS. VAUGHN:**  Your Honor, the world did know about

6    it, but the government still has an obligation to make sure

7    that it has evidence to prove each of the elements.

8         **THE COURT:**  But what's unique here is that the

9    government didn't just go get -- I'll put it this way --

10   regular old records.  It sought records of the person whom

11   the government knew was serving as counsel to Bannon.  Why

12   is that an appropriate first move as a source for

13   information, where it seems to me those records are pretty

14   darn attenuated from that element of knowledge that the

15   government had to prove -- has to prove?

16        **MS. VAUGHN:**  So Mr. Costello is the intermediary

17   here.  He is the only one interfacing with the Committee.

18   So as the government is starting its investigation, it could

19   possibly be that Mr. Costello just never fully communicated

20   with the defendant about what the Committee was requiring of

21   him.

22             So the government needed to investigate whether

23   those communications had happened.  And Mr. Costello wasn't

24   the only person the government sought records for.  We also

25   sought records for the defendant.  But, obviously, we may

1    not be able to find all of the defendant's phone numbers or
2    email accounts.

3            So even though we don't have the content through
4    the tolls -- which we never sought content of any
5    communications -- the fact that a call might happen, let's
6    say, between the defendant and his intermediary with the
7    Committee, on the same day that the Committee counsel tells
8    Mr. Costello, again, No, he has to show up.  That is,
9    obviously, evidence that Mr. Costello was communicating that
10   direction to the defendant.  It may not be the most direct
11   evidence, but it is certainly relevant evidence in proving
12   that the defendant was engaged in this process with the
13   Committee, even though he was not directly engaging with it.

14            **THE COURT:**  Did the investigation team need to get
15   senior approval at DOJ to seek those toll and email records?

16            **MS. VAUGHN:**  The Justice Manual, Your Honor, only
17   requires approval for issuing subpoenas directly to an
18   attorney or a law firm.

19            **THE COURT:**  So under the Justice Manual, as I
20   understand it, the government could seek the contents of an
21   attorney's emails with a client, so long as the request is
22   posed to an internet provider?

23            **MS. VAUGHN:**  Well, obvious, we are --

24            **THE COURT:**  I mean, without seeking senior
25   approval.

1          **MS. VAUGHN:**  Yes.  And, obviously, we would go

2     through a filter process because we are not just Hoovering

3     up privileged materials; and that's the difference here too.

4     The government's only getting toll records.  There is no

5     content.  It's not a privileged communication that we are

6     collecting.  It's merely the fact that a conversation -- or

7     maybe the conversation didn't even happen.  It can be a

8     missed phone call, that it happened at a certain date and

9     time.  It doesn't tell us anything about the confidential

10    communications.  It is only that confidential communication

11    that is potentially protected.  So the government never even

12    sought that.

13         **THE COURT:**  Now, I note in the final footnote to

14    the supplemental brief the government lodged that you've

15    offered to let the defense see the application for the Gmail

16    account, so long as the defendant agrees to treat it as

17    sensitive under the protective order or otherwise is willing

18    to modify the protective order to see it.  I didn't see a

19    response to that question or proposal in Mr. Bannon's

20    response to the supplemental filing.  Would the government

21    be willing to make that same offer as to the toll records

22    subpoenas?

23         **MS. VAUGHN:**  I'm not sure that the government is

24    in the same position to be able to make that offer, because

25    the subpoenas would be controlled by Rule (6)(e).  And

1    *McKeever* made clear that unless there's a basis to provide

2    it under (6)(e) or disclose grand jury material under

3    (6)(e), the government can't do that.  And so that goes back

4    to the defendant's obligation to show a particularized need

5    for those subpoenas.

6          **THE COURT:**  Would the government object to

7    producing those requests, subpoenas, as I understand it, to

8    me for ex parte review?

9          **MS. VAUGHN:**  The government would be happy to

10   provide it to the Court for ex parte review, if the Court

11   would require that.

12         **THE COURT:**  Okay.

13              To summarize, there is obviously the question of

14   those records, the requests.  And on the -- so you've

15   provided me with the Stored Communication Act application,

16   ex parte.  I've reviewed it.  You've offered to make that

17   available to the defense team, so long as they are willing

18   to agree to certain protections.

19              You are willing to provide me the other requests,

20   the toll records and the like.  I'm not sure you can do that

21   to the defense, given (6)(e).  But then let's just go back

22   to, essentially, the two buckets of information.  You have

23   some of this turns up, as we all know now, email records for

24   a Costello, who is not Mr. Bannon's counsel.

25         **MS. VAUGHN:**  Uh-huh.

1          **THE COURT:**  The government's view, I assume is,

2    those are wholly irrelevant here, because they have nothing

3    do to with any communication between Mr. Bannon and anyone.

4          **MS. VAUGHN:**  That's right, Your Honor.

5          **THE COURT:**  And they quite plainly are not going

6    to be in this case.

7          **MS. VAUGHN:**  That's right, Your Honor.

8          **THE COURT:**  And as to the toll records of the

9    actual Mr. Costello, the government's position is that --

10   especially now that the question of Mr. Bannon's knowledge

11   and the like is essentially undisputed, the government

12   doesn't intend to use those?

13         **MS. VAUGHN:**  I hesitate to predict how trial

14   evidence might come in.  The government obviously doesn't

15   anticipate that it would need to use it affirmatively in its

16   case-in-chief.

17         Obviously, if the defendant were to start to

18   suggest, through its cross-examination of government

19   witnesses, or through any case that the defendant might

20   choose to put on, it might become necessary to the extent --

21         **THE COURT:**  In any event, that information is in

22   -- the government has produced that to the defendant.

23         **MS. VAUGHN:**  (Nodded)

24         **THE COURT:**  And beyond that the, I will put it

25   this way, methods through which the government went about

1   obtaining that information, is not in the government's view,

2   discoverable now.  But might be *Giglio* material, to the

3   extent that anyone who testifies touched that information?

4           **MS. VAUGHN:**  So to the extent we have impeachment

5   material relating to a witness that might testify.  Let's

6   say a government agent testifies.

7           **THE COURT:**  Yep.

8           **MS. VAUGHN:**  We would turn that over.

9           The government is not aware of any impeachment

10  material that would go to that, that it knows of or has

11  position of at this time, but if we became aware of it, we

12  would obviously turn it over.

13          **THE COURT:**  So now let's go to the rest -- unless

14  there is something else you would like to say on the

15  attorney records point.

16          **MS. VAUGHN:**  I -- well, I think the bottom line of

17  the attorney records is the defendant still needs to -- to

18  go rummaging around in the government's files, the defendant

19  still needs to identify on what basis he would use it.

20          So the Supreme Court's decision in *Armstrong* dealt

21  with a selective prosecution claim, where the defendant

22  wanted to go searching in the government's files for

23  evidence that its prosecution was racially motivated.

24          The Supreme Court there said, This is a burden on

25  the government, number one; and it intrudes on the executive

18

1    branch's independence in its prosecutorial decisionmaking.

2            The D.C. Circuit has applied that same logic to

3    other situations where the defendant wants to go rummaging

4    around in the government's internal files.  For example, in

5    *US v. Rashed*, that's 234 F. 3d 1280, there the defendant

6    wanted to make a due process claim about a sham prosecution.

7    And the D.C. Circuit, because it was a constitutional attack

8    on the indictment said, You still need to make a colorable

9    showing of the defense you intend to raise, before we let

10   you go diving into the government's records.

11           So I think that's really the starting line for all

12   of the defendant's requests here for the government's

13   internal records is, Have they made a colorable showing in

14   any defense that they would raise a Motion to Dismiss, some

15   kind of constitutional attack?  And they just haven't done

16   that with respect to the attorney bucket or to the

17   irrelevant records.

18           **THE COURT:**  Okay.  Thank you.

19           So now let's talk about the other -- the motion

20   that is broader, in a sense, because it's not related to the

21   government's efforts to get Mr. Costello's toll records and

22   email records.

23           **MS. VAUGHN:**  Uh-huh.

24           **THE COURT:**  So, obviously there are a number of

25   categories.  I don't want to foreclose you from walking

**-474-**

1    through them in whatever order you like.  I have questions,

2    but feel free to tackle the different components of that in

3    whatever order you would prefer.

4         **MS. VAUGHN:**  I think the best way for me to do

5    that is to walk through, sort of, the individual problems

6    with each of the requests.

7              So first is, he has a bucket of requests that are

8    completely untethered from proving or disproving the

9    elements of the offense at trial.  Did this defendant give

10   subpoena?  Did he understand the requirement to show up?

11   Did he intentionally decide not to?

12             And that is the defendant's request for the

13   internal deliberations about what the law requires for

14   contempt of Congress, and the government's internal

15   deliberations and advice from the Office of Legal Counsel,

16   about under what circumstances the executive branch may or

17   may not seek to prosecute individuals who have committed

18   contempt of Congress.  None of that is relevant to proving

19   or disproving these specific factual elements.

20             So, again, it goes back to the defendant wants to

21   get into the internal records of the government.  He needs

22   to under *Armstrong* and as has been applied later, make a

23   colorable showing of what defense --

24        **THE COURT:**  So -- I want to understand the

25   government's argument here.  It has been long-standing

1    Department of Justice policy that very close current

2    advisors of the president are absolutely immune from

3    Congressional subpoenas.

4            Imagine, hypothetically, that tomorrow -- I know

5    this is a counterfactual but Ron Klain gets a subpoena from

6    Congress to show up.  And he and the department take the

7    position that he is absolutely immune.

8            Congress doesn't like that.  Makes a contempt

9    referral.  And for whatever reason, the department -- again,

10   this is counterfactual given the parties -- but the

11   department says, We are prosecuting Mr. Klain for willfully

12   not showing up.  And Mr. Klain says, What are you talking

13   about?  The OLC opinion says, I have absolute immunity.

14           The government's view is that is irrelevant to the

15   case?

16       **MS. VAUGHN:**  That is irrelevant, Your Honor,

17   because, again -- that is the government's --

18       **THE COURT:**  But the government would be saying, We

19   have binding OLC opinion that someone has absolute immunity,

20   but we are nevertheless the same department authorized to

21   prosecute that person.

22       **MS. VAUGHN:**  Our -- the department's views on when

23   and under what circumstances it should prosecute someone is

24   different from --

25       **THE COURT:**  But how are those consistent

1    positions?  In other words, how can the department, assuming

2    the OLC opinion I just talked about has not been rescinded,

3    I don't think it has -- how can the department

4    simultaneously say someone in that position has absolute

5    immunity from showing up, and can be prosecuted for failing

6    to show up?

7         **MS. VAUGHN:**  Well, I guess the department --

8         **THE COURT:**  Those two positions would be held at

9    the same time by the same department.

10        **MS. VAUGHN:**  I think the department certainly

11   might have an inconsistent legal view at that point.  But as

12   far as whether the elements are met under the statute,

13   that's a different question --

14        **THE COURT:**  Isn't there an estoppel argument at

15   that point that the defendant might want to make and/or the

16   defendant argues that that goes to whether he has made

17   default?

18        **MS. VAUGHN:**  Well, the issue of whether or not the

19   defendant has made default, in an estoppel argument, this

20   idea that he was given permission somehow to make default;

21   that again goes to what was in the defendant's mind at the

22   time.

23        The defendant's request here is not about, We

24   think you have evidence about what was in my mind at the

25   time.  We've provided everything we have about

1    communications between the defendant and his representative

2    and the Committee, and the defendant's representative and

3    the White House.  We have provided all of that.  The

4    defendant's request is broader than that.  He says,

5    Government, I know that you have decided before that you

6    wouldn't prosecute people like me -- obviously the

7    government disagrees we ever said that.

8          THE COURT:  I understand there is a difference of

9    opinion about where Mr. Bannon fits within those OLC

10   opinions.  I'm testing the proposition on the assumption

11   that there is an express OLC opinion covering the person in

12   Mr. Bannon's shoes and -- that is why I am using Mr. Klain

13   as an example.  Chief of Staff to the President.  It fits

14   within the OLC opinions quite clearly -- and the

15   government's position here is that OLC opinion is altogether

16   irrelevant.

17         MS. VAUGHN:  It is.  Well, first, this goes back

18   to the government's Motion to Exclude Advice of Counsel --

19         THE COURT:  Partly.

20         MS. VAUGHN:  -- because of a mistake of law.  A

21   mistake of law, a mistake that you were not committing

22   contempt when you were --

23         THE COURT:  Right.  And your view is --

24         MS. VAUGHN:  -- is not an offense here.

25         THE COURT:  -- because of your position on advice

1    of counsel, Mr. Klain could not argue that he relied on -- I

2    assume he could not rely on what a lawyer told him about the

3    OLC opinions.  But you are saying he could not rely on the

4    OLC opinions themselves.

5         **MS. VAUGHN:**  Because practically at trial, how

6    would that OLC opinion come in?  He's testifying about --

7    Well, I knew I got a subpoena.  I decided not to show up --

8    or the government is presenting evidence that that's the

9    case.  There is no relevance that that OLC opinion has to

10   establishing or disproving those elements.

11        **THE COURT:**  Is it relevant -- assuming there is a

12   Motion to Dismiss the Indictment here, is it relevant or can

13   it be relevant to my consideration of that, understanding

14   the various positions OLC, at least, has taken on these

15   issues.  Not to say that they have, necessarily, taken a

16   crystal-clear position as to someone in Mr. Bannon's shoes.

17   But OLC has taken positions on issues around Congressional

18   subpoenas and executive privilege and people in certain

19   positions in the White House, are those official OLC

20   opinions?  I'll put it that way.  Are they relevant, at

21   least to my consideration, if there is a Motion to Dismiss

22   the Indictment?

23        **MS. VAUGHN:**  Your Honor, that is -- they are

24   internal department advice, and I don't think that they

25   would be controlling in any way on this Court's decisions.

1   In fact, I think sometimes courts have disagreed with the

2   DOJ's view.

3            **THE COURT:**  I agree they are not controlling.  The

4   question is whether they are relevant.

5            **MS. VAUGHN:**  I don't think that they would be.

6   The executive branch, obviously, doesn't decide what the law

7   is in a court of law.

8            And so the executive branch internally, all of the

9   time, takes views on what the law requires and does not

10   require.  But that, at the end of the day, is not

11   determinative, once we are before a judge.  And I think

12   courts before have, actually, rejected some of the reasoning

13   in DOJ OLC opinions.

14            **THE COURT:**  I know of one case very well.

15            **MS. VAUGHN:**  So I think what the defendant is

16   after here is not evidence of his intent, it's evidence of

17   the way we internally, at the Department of Justice, view

18   the law.  And that wouldn't provide him any basis for relief

19   either before trial or during trial.

20            **THE COURT:**  But isn't -- isn't there something

21   anomalous -- and I'm not sure what the right legal hook for

22   it is -- but for DOJ, the official DOJ policy to be, We say

23   someone has absolute immunity in this context and/or, We

24   will not prosecute someone in this context.  And then to say

25   that those statements of official DOJ policy are irrelevant

1    altogether in such a prosecution?

2         **MS. VAUGHN:**  I don't think it is, Your Honor, and

3    here's why.  I think the Department, as the executive, the

4    one enforcing the law through prosecutions is making

5    decisions all of the time about what it believes merits

6    prosecution and what does not.  And that is sometimes based

7    on the department's interpretation of the law.

8         DOJ OLC opinions around contempt of Congress are

9    really no different.  They are about, Under what

10   circumstances do we, the Department of Justice, believe that

11   someone is subject to prosecution under the law?

12        The analysis might change.  I guess, if we are at

13   the point we are prosecuting Ron Klain, it definitely has

14   changed.  But at the end of the day, that still is not --

15   it's just the department's view on whether prosecution is

16   appropriate.

17        **THE COURT:**  Okay.  I understand the government's

18   position.

19        Obviously my hypothetical is pointed because it

20   assumes a crystal-clear inconsistency, one would say,

21   between the OLC opinion and the later prosecution.  And I

22   understand the government's position here is there is no

23   such inconsistency, at least as to public OLC opinions.

24        **MS. VAUGHN:**  That's right, Your Honor.

25        So that's, sort of, the first bucket of what the

1    defendant is seeking, the things that are internal

2    government deliberations.

3         Second, he seeks materials in Congress'

4    possession.  Obviously we, as the executive branch, cannot

5    compel Congress to provide records to us.  In fact, it might

6    be that some of the records the defendant wants are

7    potentially protected by the Speech or Debate Clause.  So

8    even if we wanted to, we could not force Congress to turn

9    those records over.

10        Just because they are, essentially, the

11   complainant in this case, does not make them part of the

12   prosecution team, and we don't have the ability to go

13   searching in their files to produce those records.  So his

14   request relating to further searches for records in

15   Congressional files, has to be denied on that basis.

16        **THE COURT:**  But to circle back to a question that

17   arose from, my perspective at least, first in the context of

18   the attorney records, if hypothetically the government were

19   to call a witness who is a Congressional employee,

20   whether -- you know, a member of the Committee or a staff

21   person or whatever, it would have an obligation to turn over

22   impeachment evidence, if any.

23        **MS. VAUGHN:**  Anything we have or are aware of,

24   yes, it would have an obligation to turn that over.

25        **THE COURT:**  Does the government have a view about

1    whether statements about the political nature, from

2    Mr. Bannon's perspective of this prosecution, if somebody

3    said, you know, we need to go after Mr. Bannon for X-reason

4    that that would be considered *Giglio* impeachment material?

5         **MS. VAUGHN:**  If a witness said that, we would

6    certainly turn that over as potential impeachment material.

7         **THE COURT:**  Okay.  But we are not there yet,

8    obviously, because under the current schedule, there's a

9    later process for turning over impeachment information.

10         **MS. VAUGHN:**  Yes, Your Honor.

11         And our practice is, as soon as we get it, we will

12    turn it over as soon as practicable.  We won't sit on things

13    until the last minute.

14         And, actually, that's another bucket of

15    information.  Obviously his request for impeachment

16    information is essentially moot, because we provided

17    everything that we are aware of currently, and we haven't

18    even identified our trial witnesses yet.

19         The other two categories really go to what we

20    already discussed with respect to the attorney records and

21    the irrelevant email records.  It's either grand jury

22    material or it's material going to the government's internal

23    deliberations that don't go to any kind of defense pretrial

24    or during trial.

25         So unless the Court has other questions, I think

1    we've addressed all of the buckets.

2              **THE COURT:**  Yes, I agree.  I would like to hear

3    from defense counsel now.

4              **MS. VAUGHN:**  Thank you.

5              **MR. SCHOEN:**  Judge, my first role is sort of

6    emcee.  I just want to explain how we will proceed, if we

7    might.

8              **THE COURT:**  Yes.

9              **MR. SCHOEN:**  I intend to address the Costello

10    motions and Mr. Corcoran, possibly, in addition from me, is

11    going to address the other two motions.

12             So given the order the Court started in before, if

13    the Court would rather hear from Mr. Corcoran on advice of

14    counsel first, we can do that.

15             **THE COURT:**  Why don't we do that.  These are all

16    interrelated, to an extent, but since I started there, and

17    then in some ways ended with something it sounds like

18    Mr. Corcoran is going to address as well, why don't we begin

19    with him and then we will come to you.

20             **MR. SCHOEN:**  Yes, Your Honor.

21             **THE COURT:**  Very well.  Mr. Corcoran.

22             **MR. SCHOEN:**  Your Honor, Mr. Costello may also

23    address the Court on the Costello motion issue.

24             **THE COURT:**  Fair enough.

25             **MR. SCHOEN:**  By the way, the legal hook that we

1    intend to use is entrapment by estoppel, just a little plug.

2              **MR. CORCORAN:**  Good morning, Your Honor.

3              **THE COURT:**  Good morning.

4              **MR. CORCORAN:**  Your Honor, your questions on

5    advice of counsel tend to track the way that I think about

6    it in terms of the elements of the offense; that's sort of

7    how I always start with every case.  And here it's not so

8    much a defense, but it goes to this issue of "willfully

9    makes default."

10             I think one interesting thing is that you raise a

11   hypothetical, which is not so far from happening, and that

12   is, this particular statute has been used.  And Congress has

13   voted to hold in contempt a lot of top public officials.

14             On June 28th of 2012, Attorney General Eric Holder

15   was held in contempt by Congress, and a referral was made

16   under the statute to the U.S. Attorney's Office.  About

17   seven years after that, Attorney General William Barr, was

18   held by the House of Representatives in contempt of

19   Congress.  And a referral was made to the U.S. Attorney's

20   Office.  Long before that, EPA Administrator, Ann Gorsuch,

21   in 1982, was held in contempt by the House, by a House vote,

22   and a referral was made to the U.S. Attorney's Office.

23             And the odd thing is, given the elements of the

24   offense, as described by the government, if any of those

25   three top government officials were prosecuted and appeared

1   in court, they would be limited to saying, I received the

2   subpoena, which each of them obviously did; and I made a

3   decision not to comply with the subpoena, which each of them

4   obviously did.

5            All three of those top government officials would

6   be guilty of the crime.  And they would not, under the

7   government's theory, be able to say -- in the case, for

8   instance of the Attorney Generals, Look, we got the best

9   lawyers in the world here at the Department of Justice.

10   They've given me advice I don't need to appear.  The jury

11   should hear that is the way I acted the way I did.  They

12   wouldn't be able to do that.

13            So I think there's a real element of unfairness in

14   the position that the government has taken.

15       **THE COURT:**  But do you agree that if *Licavoli* is

16   binding, that it forecloses at least a component of that

17   argument?  In other words, *Licavoli* says, Advice of counsel

18   is not a defense.

19       **MR. CORCORAN:**  Right.  I don't.

20            First of all, I think it's clear, and you asked

21   the direct question, Is *Licavoli* correct?  And I am not here

22   to say that the D.C. Circuit is incorrect.  I think it is

23   clear that the case would be decided differently today.

24       **THE COURT:**  But that is not a reason that I can

25   ignore it.

1        **MR. CORCORAN:**  Oh, I understand that.  And I'm not

2   suggesting that, other than to say, you know, sometimes we

3   have to go with what's right.

4        I think what's clear in *Locavoli* is that it's

5   totally distinguishable from the case here; and that is,

6   *Licavoli* did not involve an assertion of a

7   constitutionally-based privilege.  Totally distinguishable.

8        I will read this sentence from *Licavoli* that

9   caught my eye.  It says, "Advise of counsel cannot immunize

10  a deliberate, intentional failure to appear, pursuant to a

11  lawful subpoena, lawfully served."  That's the distinction.

12       Here, as you identified, OLC opinions give

13  absolute immunity to a top presidential adviser, when the

14  president they serve asserts executive privilege.

15  Therefore, *Locavoli* is distinguishable.  It's not a case of

16  lawful opinion, lawfully served.

17       What we are talking about is a subpoena that was

18  void because of the situation that Mr. Bannon was put in,

19  and asked to protect the privilege.

20       **THE COURT:**  You can argue that the subpoena was

21  void and was unlawful for other reasons.  In fact, you've

22  suggested that you might, violation of the rules, the

23  failure to have somebody, a minority, you know, ranking

24  member or whatever.

25       But if the subpoena was lawfully served, doesn't

1    -- and that's -- that's probably a legal question.  If the

2    subpoena was lawfully served, are you saying that the fact

3    that Mr. Bannon says that he would have been testifying

4    about privileged information made the subpoena unlawful?

5         **MR. CORCORAN:**  I think that in -- yes.  In terms

6    of distinguishing *Locavoli* --

7         **THE COURT:**  In the cases that the -- so my

8    recollection is in OLC opinions about absolute immunity,

9    they don't say that by seeking the testimony of the senior

10   adviser to the president or whatever, that the subpoena is

11   unlawful or was lawfully served.  They say, You have an

12   immunity from responding to it.

13        Is your view that a subpoena as to which someone

14   has immunity is an unlawful subpoena?

15        **MR. CORCORAN:**  I'm not sure -- I'm using that

16   language because that is the language in *Locavoli*.  What I

17   would say is, Receipt of a subpoena from someone in -- it's

18   not unlawful to ignore based on OLC opinions.  If you are in

19   Mr. Bannon's shoes, it's not unlawful to ignore a subpoena,

20   even if it is validly served.

21        We have got other reasons -- and, again, for

22   purposes of deciding what the elements of the offense are,

23   we don't necessarily -- we aren't necessarily in a position

24   of having to prove each of the items that we would -- that

25   the subpoena is about.

1            I'll give you another example.  There are OLC

2     opinions, to go to the question of whether a subpoena is

3     valid, if it is served on an executive branch person.  But

4     counsel -- the president's counsel in this case -- can't

5     attend the hearing in order to assert privilege.  In our

6     view, because of OLC opinions, that subpoena is void.  The

7     person in receipt of that subpoena doesn't need to appear.

8            I am listing these things only to say *Locavoli*,

9     which did not deal with somebody asserting executive

10    privilege, asserting even a Fifth Amendment privilege, which

11    wasn't an issue here.  But a constitutionally-based

12    privilege totally distinguishes the case.

13         **THE COURT:**  Let's assume that -- assume that I

14    think that *Locavoli* is on all fours with this case or at

15    least that it's holding covers.  It's not distinguishable.

16            What is your best argument for why I need not

17    follow it?

18         **MR. CORCORAN:**  I don't think this court is a

19    potted plant, such that you have to ignore the law as it's

20    been developed and been articulated.  Not just by the D.C.

21    Circuit, but by the Supreme Court, on the keyword at issue

22    in the statute, which is "willfully."

23            The Supreme Court, in *Bryan*, was crystal clear

24    that "willfully" in a criminal context means, knowing you

25    are doing something wrong.  Knowing that you are doing

1    something unlawful.

2        **THE COURT:**  That's not the statute, that *Bryan*,

3    the 1998 *Bryan*.  And I don't think there is any Supreme

4    Court decision post *Locavoli* that says, Willfully in the

5    context of this statute means something different.

6        **MR. COSTELLO:**  That's very true.  These cases come

7    up, thankfully, once a decade.  So the Supreme --

8        **THE COURT:**  Don't you think the D.C. Circuit would

9    find itself bound by *Locavoli*, whatever it stands for,

10   whether it is distinguishable or not, but at least as to its

11   terms, unless and until it takes that question en banc?

12       **MR. CORCORAN:**  I don't think so.  I think that --

13   and we cited --

14       **THE COURT:**  So what's the legal -- what's the rule

15   of law principle that allows me to ignore a D.C. Circuit

16   opinion that has not been overruled by the D.C. Circuit or

17   the Supreme Court in the years since it's been decided?

18       **MR. CORCORAN:**  Well, I think the legal -- well, I

19   think, first of all, it's a distinguishable case.  But

20   you're assuming, and you are asking me if it's on fours, and

21   it's 60 years old, and the Supreme Court has spoken to the

22   very word that's contained in the statute, are you bound

23   with a 60-year-old D.C. Circuit opinion?  My answer is, You

24   are not.

25       **THE COURT:**  Why?

35

1          **MR. CORCORAN:**  Because you are allowed to --

2          **THE COURT:**  I'm allowed to ignore D.C. Circuit

3    opinions that have not been overruled.

4          **MR. CORCORAN:**  No.  No.  But you are allowed to

5    follow the guidance of the Supreme Court in a context of a

6    criminal statute where the rule of lenity applies, where if

7    there are multiple readings, the -- you know, the winner is

8    the defendant, et cetera, et cetera.

9          I see my co-counsel approaching --

10          **THE COURT:**  I really don't want to be doing a

11    back-and-forth.  I will let you speak when we get there, but

12    I would rather hear from Mr. Corcoran.

13          So your answer is, I can ignore a binding D.C.

14    Circuit precedent, so long as I don't think it's right and

15    it's old.

16          **MR. CORCORAN:**  My answer is, Where the Supreme

17    Court has spoken, specifically in the criminal context to

18    the meaning of the word "willfully" --

19          **THE COURT:**  I don't think anybody disagrees that

20    willfully does mean different things in different contexts.

21          **MR. CORCORAN:**  Absolutely.  And here, when it's

22    paired with default, that only adds to our position, which

23    is it is something more than intentional.  It's something

24    more than knowing.

25          **THE COURT:**  I think that the D.C. Circuit may very

1  well have gotten this wrong; that makes sense to me, what

2  you just said.  The problem is, I'm not writing on a clean

3  slate here.

4  **MR. CORCORAN:**  Well, I think the slate that you

5  are writing on is one that has already been prepared by the

6  Supreme Court in *Bryan* and by the D.C. Circuit in the cases

7  that we cite that go into great detail about the use of the

8  word "willingly" in criminal statutes.  So I don't think we

9  are asking the Court to do anything --

10  **THE COURT:**  Did you argue in your brief that

11  *Locavoli* was distinguishable from this case because it did

12  not involve the context of executive privilege and former

13  executive branch employees?

14  **MR. CORCORAN:**  I think we did.  I can't point to

15  the page right now, but that's clearly -- you know, that's

16  clearly a distinction.

17  And if you look at these cases, and many of them

18  come from the 50s and the 60s, House -- Committee on

19  Un-American Activities.  One of the things that I found,

20  where there is an assertion of a constitutionally-based

21  privilege, those cases the defendant wins.

22  And in some of the cases where it is just an

23  expression where even if a lawyer says, Well, that's not

24  within the purview of the Committee.  So we are not going to

25  answer that question, the defendant loses.

1          None of the cases deal with this specific question

2     where there's a constitutionally-based privilege that's

3     asserted from the outset by counsel to Committee counsel.

4     And a request is made, Let's let a judge decide this.  It's

5     just a different situation, Your Honor.

6          **THE COURT:**  I have that one.

7          So let's do the rest of the non-Costello email

8     discovery issues.  And I'm happy to have you walk me through

9     them in whatever order you would like to take them.

10         **MR. CORCORAN:**  Okay.

11         Well, the first -- anything that applies to the

12    grand jury -- again, I take a very practical view of this.

13    There's no doubt that the cases talk about secrecy of the

14    grand jury, the specific federal rule, Rule (6)(e) pertains

15    to it.  But there's a suggestion in the writing and the oral

16    argument of the government that somehow the grand jury is an

17    impenetrable fortress.  And it's not.

18         In this case, the government in their briefs have

19    said, We gave you all of the testimony already.  And we gave

20    you all of the exhibits already.  And they are covered by

21    the protective order.  And that's protecting -- whatever

22    secrecy interest remains is protected by the protective

23    order.

24         What they are now saying is, We are not going to

25    give you the actual subpoena, a piece of paper to a phone

**-493-**

1    company; that is pretty vanilla, frankly.  We are not going

2    to give you the order, which the Court has already reviewed

3    --

4              **THE COURT:**  That's not true.  They offered to give

5    you the order.

6              **MR. CORCORAN:**  Well, we will accept that offer

7    under the protective order.

8              **THE COURT:**  Okay.  So that's moot.

9              **MR. CORCORAN:**  That's moot.

10             But key -- they said is, We don't want to give you

11   the instructions or the argument of counsel.  Essentially

12   saying, grand jury members, you heard the evidence.  Here

13   are the instructions.  Read the instructions.  This is what

14   you should find.  Please return an indictment.  We will type

15   it up for you and hand it to you.  Please return it.

16             That information -- first of all, the instructions

17   themselves in most cases would just be Red Book.  This

18   statute is not a Red Book statute because it only comes

19   along every ten years.

20             The notion that Red Book jury instructions are

21   somehow secret, does not make sense to me.  I can say that.

22   Particularly when there is a protective order in place, we

23   believe that they should be given to us.  And we cite a case

24   from the Northern District of California.

25             **THE COURT:**  So why?  What's your hook for why you

1    think that you should get them?  Beyond just, There's a

2    protective order and we --

3        **MR. CORCORAN:**  Right.  We set forth our -- you

4    know, when you used the words "particularized need."  What

5    are our hooks?  What are our needs?  And we've identified

6    several of them.  One is -- and it's not speculative.  We

7    believe that the government provided an -- the instructions

8    on the elements of the offense, that it is wrong; that's the

9    incorrect law.

10        It's the same knowledge that they've provided here

11   today.  And we believe --

12       **THE COURT:**  So if you lose the Motion in Limine,

13   do you lose that argument as to the instructions?

14       **MR. CORCORAN:**  I don't think so, because we would

15   still want the materials --

16       **THE COURT:**  I'm sure you'd want it, but what's the

17   argument for it?

18       **MR. CORCORAN:**  No.  I'm saying we should still be

19   entitled to them for examination.

20       **THE COURT:**  But why?

21       **MR. CORCORAN:**  Because there's enough there --

22   there's enough there for us to show a particularized need.

23   In other words, to state with some specificity that it may

24   -- and that's what the rule says -- may allow us to dismiss

25   the indictment.

1      It doesn't say that we have to prove that the

2  grand jury instructions will result in a dismissal of the

3  indictment.  That would be impossible, because they are

4  secret.  The word is "may."  And we identify a number of

5  different things that suggest that the instructions are

6  wrong.  And if they are wrong, the indictment should be

7  dismissed and we'd move on that basis.

8      The other thing is we identify the grand jury

9  testimony talking about an adjournment where Mr. Costello

10  sent a letter to the Committee and said, Can we have a

11  one-week adjournment?  A case was just filed that may have

12  bearing on this issue.  We've asked all along to ask a judge

13  decide this legal issue of privilege.

14      Well, in the grand jury, that was not the

15  testimony.  The suggestion was that no request had ever been

16  made for a later date to appear.  And if that was argued, if

17  there was argument by the AUSA that said, You know what, you

18  heard there was no request for a later date, when they had

19  in their position a letter seeking an adjournment, that

20  would be a basis for the dismissal of the indictment.

21      The final issue is there's testimony before the

22  grand jury that suggests to the grand jury that President

23  Trump did not validly assert or communicate an assertion of

24  executive privilege to the Select Committee.  That was done

25  by a letter from Mr. Costello that quoted a letter from

1    counsel to the president.

2          So it would be a basis for the dismissal of the

3    indictment if the prosecutors, in telling the grand jury,

4    Well, this is a willful default here.  And by the way, there

5    was no valid assertion of executive privilege because the

6    president didn't himself communicate that to the Select

7    Committee.  If that was the argument, it would be a basis to

8    dismiss the indictment.  It is not speculative.  There is

9    grand jury testimony right on point, which we cite in our

10   motion.

11         So I think, overall in these grand jury materials,

12   particularized need just aren't magic words.  It just means

13   we need to specify why we need it.  In each of the cases

14   that I've just run through, if we get the information, we

15   believe it's a basis for dismissal of the indictment.

16         Certainly, it's a balancing.  How does that

17   balance -- how does what I said -- even if you don't believe

18   it word for word in terms of what we are going to get, how

19   does it balance with the secrecy interest?

20         There is a general secrecy interest for the grand

21   jury, it's going to be totally protected because we are

22   talking about instructions and argument by counsel to the

23   grand jury by the protective order.

24         **THE COURT:**  Okay.  You also seek non-grand jury

25   discovery.

42

1          **MR. CORCORAN:**  Yes, Your Honor.

2          **THE COURT:**  Why don't we start with executive

3     branch OLC opinions.

4          **MR. CORCORAN:**  Yes, the OLC opinions.  The cases

5     are pretty clear.  There are a bunch of them cited in our

6     brief and in the government's; that the US District Court

7     cases from this court are really instructive on this kind of

8     guidance.

9          *Naegel*, 468 F.Supp 2d. required the discovery of

10    guidance materials and policy statements from numerous US

11    trustee offices.  *O'Keefe*, 2007 West Law 123, 9204 said,

12    Decisions and policies on expedited visas at six

13    international consulates had to be turned over.

14          The *Poindexter* case involving the Iran Contra

15    issues, before Judge Greene, there were 300,000 pages of

16    documents turned over by the government before the defense

17    moved for additional discovery.  And Judge Greene said, All

18    documents in the executive branch on the applicability of

19    the Boland amendment, must be searched for and disclosed to

20    Mr. Poindexter.

21          In addition, all documents showing that executive

22    branch official had knowledge of the National Security

23    Counsel activities, had to be searched for and provided.  We

24    are asking for a much, much more narrow set of information.

25    Take our letter.  Email it to the US House of

1    Representatives' General Counsel.  Please search for these

2    materials.  Send it to Main Justice Office of Legal Counsel.

3    Please provide any information that's responsive to this

4    request.

5            **THE COURT:**  Would you be willing to limit that to,

6    what I would consider to be OLC opinions, published or not?

7    I mean, is an email from an attorney adviser to a deputy in

8    OLC discoverable if it's not an official OLC opinion?  Or

9    why should I permit that type of thing?

10            **MR. CORCORAN:**  Well, it is discoverable.

11            **THE COURT:**  On what ground?

12            **MR. CORCORAN:**  Under the local rules.

13            **THE COURT:**  What issue does it go to?

14            **MR. CORCORAN:**  Well, estoppel, essentially.

15            **THE COURT:**  So an email from an attorney adviser

16    to the Deputy Assistant Attorney General of OLC, would estop

17    the United States government from taking some position in

18    litigation?  That can't be right.

19            **MR. CORCORAN:**  Let's say the email said, You know

20    what?  It's our long-standing policy here at the Department

21    of Justice not to prosecute former, even former, top

22    presidential advisers when the president asserts privilege.

23    But let's make an example of Mr. Bannon.  That, we believe,

24    the government should search for and provide emails along

25    those lines, because they would tend to negate an element of

44

1   offense.

2              The local rule requires that.  It's broader than

3   *Giglio*.  It's broader than *Brady*.  The local rule that

4   applies to the courts that --

5              **THE COURT:**  So what element of the prosecution or

6   what defense does such an email go to?  It's even better for

7   you.  Imagine, hypothetically --

8              **MR. CORCORAN:**  Yes.

9              **THE COURT:**  -- there is an official, but

10  not-published OLC opinion, that is 100 percent on all fours

11  with this case.  Right?  Former executive branch employee

12  discussing things with the current president, Congressional

13  subpoena, assertion of privilege --

14             **MR. CORCORAN:**  Yes.

15             **THE COURT:**  -- and that OLC opinion is as strong

16  with respect to immunity or non-prosecution as one can

17  imagine.  I'm not saying there is such an opinion.  I am

18  just hypothesizing it.  The government says, That's

19  irrelevant because it doesn't go to an element of the charge

20  or a defense.  So what does it go to?

21             **MR. CORCORAN:**  Well, I think it does go to an

22  element of the charge of the offense.  Willfully makes

23  default.

24             **THE COURT:**  But why?  If that is a non-public OLC

25  opinion, then by definition neither Mr. Costello nor

1   Mr. Bannon would have known about them.

2            **MR. CORCORAN:**  Well, first of all, the discovery

3   rules do not require -- relevance is a concept for trial.

4            **THE COURT:**  I'm just trying to understand how the

5   opinion would be relevant in your view --

6            **MR. CORCORAN:**  Right.

7            **THE COURT:**  -- to something either the government

8   has to prove or you would want to say in your defense.

9            **MR. CORCORAN:**  Just to be very clear in my answer,

10  that document doesn't have to be admissible in trial.

11  Relevance is not a consideration when considering discovery.

12  The rules make clear that even if it's inadmissible, but

13  could lead to admissible evidence, then it has to be turned

14  over.

15           So for instance, in the *Safavian* case -- that was

16  Judge Friedman -- he required turning over -- it was a GSA

17  case and ethics and the government in that case for a White

18  House official.  He required at 233 FRD 12, he required the

19  turning over internal GSA guidelines and procedures

20  regarding ethics opinions and disciplinary actions.  He

21  required -- it involved Abramoff.  He said, Even emails by

22  Abramoff and Associates, even if unknown to the defendant,

23  must be turned over, because they may lead to admissible

24  evidence.

25           So for your hypothetical, a request to OLC, give

1  us emails, give us drafts, give us information, may lead to

2  admissible evidence.  So it doesn't have to be relevant.

3  And it doesn't have to be something that's in -- you know,

4  in the mind of either Mr. Bannon or counsel.  And that's,

5  you know, that's the nature.

6          In *Trie*, another case we cite, the judge required

7  both DOJ and Federal Election Commission, internal memoranda

8  had to be searched for and turned over on the topic of

9  whether a specific statute applied to conduct like the

10  defendant's.

11          In other words, it's analogous.  We are asking

12  for, not internal deliberations, but statements within the

13  government that talk about whether a certain statute applies

14  to Mr. Bannon.

15          **THE COURT:**  Okay.  So now let's turn to the other

16  bucket, which I guess is statements, documents, et cetera,

17  to suggest that this is a political prosecution.  And I

18  don't mean to limit your argument.

19          **MR. CORCORAN:**  Yes, I understand.

20          **THE COURT:**  That's a different category, I think.

21          **MR. CORCORAN:**  Well, I think, first of all, on

22  Congressional documents.  And I understand there are cases

23  that talk about Congress being, you know, obviously the

24  constitution talks -- has Congress in a different building

25  so to speak, than the Court.

47

1          We are not asking the Court to compel Congress to

2    do anything.  We are asking the Court to compel a litigant,

3    the United States Attorney's Office, which is prosecuting

4    our client criminally, to seek records.

5          In other words, again, from just a practical

6    standpoint, all they need to do is send to the general

7    counsel of the U.S. House of Representatives our letter.

8    Say, We are engaged in litigation.  We followed the criminal

9    contempt vote of the House, and we are proceeding with the

10   prosecution.

11         Please search for and give us from the Select

12   Committee staff, Select Committee members, the Speaker of

13   the House, because she had a role in certifying the vote to

14   the U.S. Attorney's Office.  Please search for these

15   materials and give them to us.

16         And the reason why it's -- so it's more like --

17   it's not just that the Select Committee is a complainant

18   here.  They initiated the prosecution.  The statutory scheme

19   gives the Select Committee and the U.S. House of

20   Representatives the power to initiate this prosecution.

21         The statutes, 2 U.S.C. 192 but 2 U.S.C. 194 says

22   that once the certification is made, the U.S. Attorney's

23   Office "shall" present the information to a grand jury.  In

24   other words, there is no choice.

25         Now, I know that different cases and OLC opinion

1   at different times has taken a different position on it.

2   But from our perspective, it's not just a complainant.  They

3   sit in the -- they are in the shoes of any other

4   investigatory or partner in a prosecution.  That's why we

5   are seeking the documents from them.  They've already made a

6   lot of public statements, members of the Committee, that

7   they are trying to make an example of Mr. Bannon.  Obviously

8   we are trying to present a defense and develop a defense,

9   prepare a defense.  And that is important information to

10  know if the reason that he -- you know, that Attorney

11  General Barr and U.S. Attorney General Holder were not

12  criminally prosecuted, but Mr. Bannon is.  And the reason is

13  they want to make an example of him, we are entitled to that

14  information from the Committee.  And it's not -- it's not a

15  burdensome request.  Again, it's sending an email with our

16  attachment and asking for them to do it.

17          Now, again, as I stated, we are not asking the

18  Court to compel Congress to do anything.  They could respond

19  to the email that they get from the AUSAs and say, You know

20  what?  We are not going to give you that.  We are not going

21  to give you that information.  Then we are in a different

22  posture.  And we'll have to decide as a defense team, what

23  do we do in that posture?

24          We are not asking you to compel them to do

25  anything.  We are saying, If we are going to have a fair

1    trial and it's initiated by members of Congress, and they

2    made statements to the effect they want to make an example

3    of him, we need their private conversations on that as well,

4    on that topic.

5         **THE COURT:**  So you are not asking me to order the

6    production of anything.  You are asking me to order the

7    government to ask Congress to "pretty please" give them

8    these materials?

9         **MR. CORCORAN:**  Yes.  You don't have to use that

10    exact language.

11         **THE COURT:**  And I wouldn't.  But if Congress

12    refuses?

13         **MR. CORCORAN:**  Then we as a defense team will have

14    to take the next step.  But we may seek, in some way, to get

15    an evidentiary benefit from that.  We may seek to foreclose

16    certain positions that might be taken at trial by the

17    government.

18         But right now we are in discovery.  Discovery is

19    all about, How do we get what we need to prepare a defense?

20    We don't have the ability to go -- we are not talking about

21    rummaging in their files.  That's the words that the

22    prosecutor used.

23         We have discrete requests that will take very

24    little time to search and fulfill.  And we believe it's

25    necessary for a fair trial.

1          **THE COURT:**  Thank you, Mr. Corcoran.  I would like

2     to hear from Mr. Schoen on the Costello emails.

3          **MR. SCHOEN:**  Your Honor, first of all, I want to

4     apologize for the protocol breach earlier.

5          **THE COURT:**  No problem.

6          **MR. SCHOEN:**  Fundamental rule, I suppose.

7          Having said that, to explain, our original plan

8     was to divide up that issue, the advice of counsel.  But I

9     wanted to respect of course the Court's wishes announced

10    this morning.

11         Can I have 20 seconds, though -- the Court asked

12    the question what is the best argument.

13         **THE COURT:**  Yes.  Yes, please.

14         **MR. SCHOEN:**  I want to give you what I believe.

15    To crystalize it, the Court's question really was, If I find

16    *Licavoli* is best law still, what is your best argument

17    around it?  Because here I am in District Court, and I am

18    bound by that.

19         I think the best argument is -- Mr. Corcoran

20    alluded to toward the end -- executive privilege takes this

21    case out of *Licavoli*.  Why?  Because it raises a separation

22    of power issues, not contemplated in *Licavoli*.  And all of

23    that is based on the advice of counsel in this case.

24         In other words, the advice of counsel, with

25    respect to executive privilege is, Bannon, your hands are

1    tied.  You don't have the will.  Willfulness is removed from

2    this equation.  Once executive privilege is invoked, there

3    is nothing volitional --

4        **THE COURT:**  This argument is that *Licavoli* can

5    still be perfectly good law and binding, but it's not

6    applicable.  So where in your brief did you make this

7    argument?

8        **MR. SCHOEN:**  I don't think that argument, in that

9    form, is made.

10        **THE COURT:**  Are you close to that form?

11        **MR. SCHOEN:**  Your Honor, I think it is sort of

12    close to it.

13        **THE COURT:**  Point me to where that is in your

14    brief.

15        **MR. SCHOEN:**  I think after you get to the *Licavoli*

16    discussion, and we talk about separation of powers, it

17    doesn't make the argument that, By the way, if you buy into

18    *Licavoli*, here is why *Licavoli* is different.

19        **THE COURT:**  No.  It just says, *Licavoli* is no

20    longer good law.  It doesn't say, Even if it is good law, we

21    win.  Because it is completely irrelevant to the question at

22    hand.

23        **MR. SCHOEN:**  I think that's right, Your Honor.  I

24    think we address that when we say *Licavoli*, that standard

25    has been replaced by *Zeese* and *Ratzlaf* and all of that.  But

1    this is an argument.

2           I personally think it's the best argument; and

3    that is -- and we do make the point about executive

4    privilege in the brief.  But the point here is, the jury

5    deserves to know what really happened.  And, in fact, if we

6    believe what Mr. Costello has said in his declaration, what

7    really happened is, he on behalf of Bannon, tried to find a

8    way to accommodate the subpoena, the opposite of "lack of

9    willfullness."  He was willing to testify.

10          He didn't default.  He didn't willfully make

11   default.  He said, Work it out with the president or take me

12   before a judge and let the judge tell me it doesn't apply.

13   I need to testify.  He was willing to do those things.  But

14   his lawyer said, You can't -- absent those things, you

15   cannot go forward.  Your hands are tied.  That's what the

16   law is, Bannon, and you've got to follow the law.

17          The jury deserves to hear that.  And if they don't

18   hear it, all they hear is, well, let's see.  Bannon got a

19   subpoena.  And Bannon didn't show up.

20          It gives Congress, in a sense, a veto power over

21   the executive privilege.  The executive branch has the right

22   to determine for itself what's a privileged matter.  The

23   ultimate arbitor would be you or the court; and that's what

24   the courts have said in a number of cases.  The ultimate

25   arbitor -- I'm sorry I'm talking too fast.  The ultimate

1       arbiter on executive privilege is the Court.

2               And so we need advice of counsel here because

3       Mr. Costello was the only -- they like to call intermediary

4       or point of contact.  He was the only person who ever dealt

5       with this Committee on Mr. Bannon's behalf.

6               To tell the story of this case, and specifically

7       on willfulness, we need to have Mr. Bannon -- we need to

8       have the evidence go in on advice of counsel.  That's, I

9       think, the best answer on that.

10              The other thing, the OLC opinions of course, is a

11      conceptually different argument.  It may be relevent to

12      wilfulness, but it's a due-process-based argument.  That is,

13      the government is estopped.  This is the classic entrapment

14      by estoppel.  The government is estoped from taking a

15      position inconsistent with these publicly-issued, binding on

16      the Department of Justice, legal opinions.

17              When they say things like, If you get -- former

18      member of the executive branch -- if you get a subpoena and

19      the rules or by Fiat, Congress committee won't allow the

20      privilege holder invoker, that subpoena is invalid -- (A

21      sneeze.)  God bless you -- that subpoena is invalid.  That's

22      a position taken in OLC opinion.

23              If an OLC opinion says, An executive branch member

24      or former executive branch member cannot be prosecuted by

25      the Department of Justice, if that person invokes executive

54

1    privilege, that's a binding, publicly-issued opinion, that

2    Mr. Bannon and everybody else is entitled to rely on.  And

3    that the government is estopped from prosecuting or from

4    violating, put it that way.  And that's a due-process-based

5    argument.

6          All right.  Back to my agenda, Your Honor.

7          Just a couple things.  I know, first of all, the

8    Court clearly has read all of the papers, knows all of the

9    arguments and is very familiar with all of the facts, which

10   is extraordinarily impressive in and of itself.  But I don't

11   need to go into the facts.  And the Court's questions at the

12   beginning of this discussion with the AUSA pointed that out.

13         I do think we have to ask the question, which the

14   Court asked, Why?  The Court knows what happened here.  They

15   went after emails -- well, we are still not clear exactly.

16   I gather from the discussion today, there is only one Stored

17   Communication Act application in order.  I'm not clear why

18   there is only one, when they went after several email

19   accounts.  And 2703(d) clearly contemplates using the Stored

20   Communications Act to get other email accounts.  So I don't

21   know what happened there on their end.

22         And I'm not sure, by the way -- it's a little bit

23   of a side issue I don't think we need to deal with today.

24   I'm not sure -- and some commendators have suggested what I

25   am going to say -- that after *Carpenter*, just getting a

**-510-**

1    Stored Communications Act order is enough, even for records,

2    non-content records.  But that's a question for another day

3    and another Court, I suppose.

4         But today we look at what they got, these email

5    records, none of which were Mr. Costello.  So it's not in

6    the posture of a Motion to Suppress.  And the telephone

7    records that are of Mr. Costello.

8         And, of course, you know, we hear the government

9    dismiss all of this as, Well, we didn't get any contents.

10   We don't know what he said in the conversation, which

11   undercuts the very basis they have for trying to get these.

12   But these are still very important.  And this is why the

13   Department of Justice's policy says, A subpoena to an

14   attorney related to the representation of clients.  It

15   doesn't require just when it relates to contents.

16        The position, by the way, since I want to try to

17   cut to what the questions and answers were earlier -- the

18   positions, by the way, that the position only applies if you

19   serve the subpoena on the attorney himself, and not to a

20   third party -- for which no authority is cited in the

21   government's brief -- is absurd on its face.

22        The principles behind the policy are reflected in

23   the policy.  There is a special relationship between

24   attorney and client.  You risk imposing and interfering with

25   that relationship by going after an attorney's records of

56

1   any kind by subpoena.  And that doesn't depend on whether

2   you handed it to Bob Costello or you handed it to TMobile.

3           In fact, there is no reason in this case not to

4   give notice to Mr. Costello.  His phone records were not

5   going away.  There is no reason in this case not to have

6   abided by the DOJ policy that requires the government to

7   seek those records voluntarily, as a matter of first course.

8           Now, you know, the government said, This policy

9   isn't binding on the Court; that's absolutely right.  The

10  Court can't enforce that policy.  I'm hopeful the Inspector

11  General will see things differently from how the government

12  presents in this case but that's also beyond the purview.

13          **THE COURT:**  So let's cut to the chase.

14          **MR. SCHOEN:**  Yes, sir.

15          **THE COURT:**  As to emails, email records, at least

16  as the record reflects, no email records for Mr. Bannon's

17  lawyer, Costello -- to be distinguished from other Costellos

18  in the world -- were collected.  I assume you agree, the

19  email records from other Costellos are completely irrelevant

20  here.

21          **MR. SCHOEN:**  The records themselves are

22  irrelevant.

23          **THE COURT:**  The records themselves.

24          **MR. SCHOEN:**  Any representation made to a federal

25  judge to get those records, under 2703(d) specific,

1    articulable facts that --

2              **THE COURT:**  Just hold on.

3              **MR. SCHOEN:**  Yes.

4              **THE COURT:**  The government has offered, and

5    Mr. Corcoran accepted the offer to produce that application

6    to you.  So you are getting that.

7              **MR. SCHOEN:**  I understand.

8              **THE COURT:**  So at least as to that question, you

9    have a set of irrelevant emails that you already have, and

10   you have an application that you are about to get.  It seems

11   to me that that's -- at least for present purposes, that's

12   the email stuff.  Now, you may want to do something with

13   that application, but in terms of discovery, you got it.

14             **MR. SCHOEN:**  Yes, Your Honor.

15             **THE COURT:**  Now, as to the phone records, you have

16   the phone records.  I'm relying on the government's

17   representations that all records that were collected have

18   been produced.  I can't do anything other than rely on that.

19   The government has said there were subpoenas as to those

20   records, and they will produce them to me for my in-camera

21   review but not to you.

22             What more do you want?

23             **MR. SCHOEN:**  I tell you what I think is relevant,

24   to some degree, I was surprised to hear today the government

25   say, Well, these telephone subpoenas really go to the grand

1    jury investigation.

2            I would be surprised, to put it mildly, if the

3    grand jury actually requested subpoenas for Bob Costello's

4    telephone records for the purposes stated here.

5            In my imagination, at least, I believe it is

6    possible that the government decided that they wanted to

7    subpoena those records.  And so I think there -- if it's

8    otherwise, if the grand jury really asked for Bob Costello's

9    telephone records, then I think we are back to

10   Mr. Corcoran's argument on another reason we need grand jury

11   minutes, because what on earth were they told about what the

12   government knew at this point?

13           Let me try to bring that home.  The Court asked

14   earlier to the government, Well, you know, certainly

15   today -- by today the defense has conceded that Mr. Bannon

16   got the subpoena and so, you know, today you wouldn't really

17   need to get those records, would you?

18           Two answers to that.  Bologna, is one.  They knew

19   -- the referral in this case was made on October 21st to the

20   Justice Department.  Banners about Bannon were in newspapers

21   all over the world.  Everybody knew that Bannon's position

22   was he wasn't complying with the subpoena because executive

23   privilege had been invoked and he couldn't.

24           There's never been any discussion that Mr. Bannon

25   never received the subpoena or that Mr. Bannon showed up in

1    the wrong place or that this was a matter of accident and

2    that's what really happened.  And it's disingenuous to

3    suggest otherwise.  These subpoenas went out after that

4    referral.  The earliest one we know about is October 25th.

5              Putting aside all of the other interaction, on

6    November 1st -- it's in the record.  I think it's 34-1 at

7    Pages 15 to 24 -- Mr. Costello put in writing to the

8    government his whole defense in the case.  The defense that

9    Bannon would raise and why the government shouldn't

10   prosecute this case.

11             No one on this planet could read that by November

12   1st and conclude in any way that either Mr. Bannon was or

13   could consider taking the defense that he never received the

14   subpoena or that there was some accident involved here.

15             But here we are in March, with the government

16   telling the Court that that's the reason they went after

17   these records.  In fact, they gave two different answers.

18   One was in document 30 -- well, one was Document 31, Page 12

19   they say, "Costello is a witness to Bannon's decision not to

20   comply."  That was on February 25th.  Then on March 14th

21   they say they have into prove deliberate non-compliance, it

22   wasn't an accident.  And Costello's a witness to establish

23   that Bannon had knowledge of the subpoena and his

24   communications are relevant to the government's

25   investigation.  And then the government tells you, at 36-1,

1    Page 2, Bannon finally has conceded in his post-indictment

2    pleadings that he knew of the demands.

3           Again, we have in the record already Bannon -- a

4    letter from Costello to the Committee that he accepted the

5    subpoena for Bannon.  But more than that, we have in writing

6    on November 1st the whole scenario of the defense.

7           According to the papers we have so far, and of

8    course now we will get the order.  The order referred to the

9    Stored Communications Act order referred to was dated

10   November 11th.  It's impossible that by November 11th the

11   government could have thought that Mr. Bannon's defense was

12   going to be, I never got the subpoena or that it was an

13   accident.

14          Putting all of that to the side, what on earth

15   were they going to tell from the records that they got?

16   From the metadata, from who we sent it to, who we got it

17   from, all of those things.  Nothing about whether he

18   received --

19          **THE COURT:**  Isn't the government allowed to, as

20   part of its investigation, look for cumulative evidence?

21          **MR. SCHOEN:**  First of all, this wouldn't be

22   cumulative, Your Honor, in my view.  But secondly --

23          **THE COURT:**  Why not?

24          **MR. SCHOEN:**  Cumulative of the fact that Bannon

25   actually received the subpoena?

1    **THE COURT:**  Or at least that Bannon and Costello

2    were talking on particular dates, which would be cumulative

3    of whether Costello had told Bannon there was a subpoena or

4    whatever.

5    **MR. SCHOEN:**  Could be, Judge.

6    Getting subpoena for attorney records wouldn't be

7    the way to do it and certainly not a matter of first course.

8    They knew he was communicating, from his written --

9    (indiscernible) -- so the Court says, Okay.  How about

10   cumulative?

11   Well, again, if Costello is going to be a witness,

12   you've got it in writing from him.  You've got in your 302s

13   that you took when you were interviewing him and all of

14   that.  But we have rules around, and ethical concepts,

15   around subpoenaing attorney records.

16   Consider this, for example --

17   **THE COURT:**  So assuming that is all true, how does

18   it impact this case?

19   **MR. SCHOEN:**  I will tell you how it impacts this

20   case, it's obviously, you know, the $64 million question, in

21   some sense.  So why am I not wasting the Court's time with

22   all of this?  I hope I am not waisting the Court's time,

23   because I think what happened is outrageous.  But I also

24   think if it's allowed to stand without being addressed, then

25   it will be accepted practice in the future.

1          **THE COURT:**  What do you mean by "without being

2     addressed"?

3               **MR. SCHOEN:**  Without being --

4          **THE COURT:**  Do you think it goes to a substantive

5     question in the case?

6               **MR. SCHOEN:**  No.  No, your Honor.

7          Right now, from what we know, I think that it goes

8     to a matter within the Court's supervisory power, to send a

9     clear message on, that this was inappropriate what happened

10    here.  The reasons given don't make any sense, and the

11    methods used don't make any sense, to try to achieve those

12    goals.  And I think that's crystal clear.  I think that

13    message has to be sent.

14         The other reason, Judge, that I thought it was

15    important to still raise this issue, once -- even though we

16    know now, we hope, what happened.  And I'm hoping that what

17    we have is a representation that Mr. Bannon's other lawyer,

18    Adam Katz's records were not going over.  I think we have

19    that representation in some earlier writing.

20         But, in any event, I think that the other reason

21    it's important is because notwithstanding what the

22    government says about -- since they didn't get the contents,

23    it doesn't affect privilege issues.  It interferes with the

24    attorney/client relationship.  And there is a long line of

25    authority going back, way back, talking about the importance

1    and the sometimes tenuous nature of that relationship, and

2    how attorney subpoenas, pitting an attorney against a

3    client, or just attorney subpoenas, puts that delicate

4    relationship at issue.  And I'm thinking of cases like *Maine*

5    *versus Moulton*, a whole host of case of cases, Judge.  You

6    are as familiar with them or more probably than I am.

7    Probably more.

8              I think that's it.  The last thing I want to talk

9    about is remedy.  The government says that we are trying to

10   get at all of their internal deliberations about all of this

11   process.  I looked at the relief we asked for.  I don't see

12   that.

13             I am looking at Document 34, Pages 24 and 25.  We

14   asked for, you know, a copy of all of the subpoenas that

15   were issued, directed at third parties, to get the email and

16   telephone records, along with all of the applications for

17   those things.

18             Then a list -- number two, "A list of third

19   parties on whom a subpoena, court order or other process was

20   served."  And I say "other process" because Google at that

21   time referred to it as an SCA order or equivalent.

22             **THE COURT:**  Uh-huh.

23             **MR. SCHOEN:**  Number three, "A list of all people

24   in the Department of Justice for whom authorization to seek

25   and obtain the email and telephone records was received."

1          I mean, I guess that's going to look something

2     like this.  (Showed the Court a blank page.) I don't know

3     that we have to follow it.  Sorry.  (Turned around and

4     displayed to opposing counsel.)

5          I asked for them to disclose to us -- or we asked

6     them to disclose to us, "Whether the email records and

7     telephone records that were obtained were shown to or

8     referred to in front of the grand jury."

9          Now, I'm led to believe today they must have been.

10    Because we heard earlier that this is all part of the grand

11    jury investigation.  So the grand jury asked for it, and

12    they must have been told something about it.

13          I think that's all I have, Judge.  I think it is

14    an important issue to take up with the Court, even if it

15    doesn't impact substantively on the case.

16          Thank you, very much, Your Honor.

17          **THE COURT:**  Thank you, Counsel.

18          Mr. Costello?

19          **MR. COSTELLO:**  Thank you, Your Honor.

20          I am the actual Robert Costello that they were

21    looking for.

22          I am kind of the cleanup hitter here.  I have a

23    couple points that I want to make about presentations we've

24    already made.

25          Your Honor was discussing the issue of willfulness

**-520-**

1    and the fact that I asked for an accommodation in not one,

2    not two, but three or four of my correspondence with

3    Chairman Bennie Thompson.  And then at the end, I asked for

4    an extension of time, because that very day -- I think it

5    was October the 18th -- President Trump filed a lawsuit that

6    presumably would have a lot to do with what we were doing.

7            So I said to them, We would like to look at the

8    lawsuit.  We don't know anything about it.  Can you give us

9    a week?  This was the night of the 18th.  They didn't reply

10   that night.  They waited until the next morning and they

11   said, No.  The reason they said no is that was the day they

12   had a televised performance of the vote to hold Mr. Bannon

13   in criminal contempt.  And after that vote, Bennie Thompson

14   and Ms. Cheney both said on television -- I watched it live

15   -- that they were doing this to make an example of

16   Mr. Bannon.

17           With respect to the issue of willfulness.  I mean,

18   when somebody has a lot of experience they are often

19   referred to -- they make a comment that "this isn't my first

20   rodeo."  Well, this isn't Mr. Bannon's first rodeo when it

21   comes to executive privilege and the Congress.  In fact,

22   it's his fifth rodeo.

23           Four times previously he was in a situation where

24   executive privilege was invoked, he was asked to answer

25   questions before the Mueller Committee, before the Senate

1  Intelligence Committee and twice before the House

2  Intelligence Committee.

3        Why is the House Intelligence Committee important?

4  Because the Chairman of the House Intelligence Committee

5  during both of these occasions is Adam Schiff, who sits on

6  the Select Committee.  So he certainly was aware that

7  Mr. Bannon, when pressed on the issue of executive

8  privilege, asked the Committee, on four previous occasions,

9  please talk to the president.  This is not our battle.

10  Executive privilege doesn't belong to Steve Bannon.  This is

11  not our battle.  Please talk to the President's counsel and

12  work something out or if you can't, go to the District Court

13  and have the District Court tell us what's executive

14  privilege, what isn't.  It's not his position or mine to

15  decide what questions are covered by executive privilege.

16        In this particular instance, we were facing a

17  committee that was going to hold a private deposition

18  pursuant to the subpoena.  That private deposition,

19  according to their rules, would not allow the president's

20  counsel to be present, in order to invoke executive

21  privilege, as to what questions he was willing to let

22  Mr. Bannon answer.

23        There is a case -- you talked about the Office of

24  Legal Counsel.  There is a decision, binding upon the

25  executive department, not binding upon the Court, but

1      binding upon the executive branch of the government, of

2      which the U.S. Attorney's Office is part, that says, When

3      Congress issues a subpoena to a man like Mr. Bannon, an

4      executive privilege is involved.  If they do not let the

5      president's lawyer attend the deposition, then that subpoena

6      is -- and this is a quote -- "unlawful, illegal" -- I don't

7      know why they used both words but they did -- "unlawful,

8      illegal and incapable of enforcement either civilly or

9      criminally."  That's information from the OLC opinion that

10     certainly I communicated to Mr. Bannon.

11              Now, let me talk for a moment about the Costello

12     issue and why is that important?  I think it's important

13     because, quite frankly, it shows terrible abuse of the grand

14     jury process.  It is not the ordinary course of business.  I

15     was a federal prosecutor myself.  I was Deputy Chief of the

16     criminal division in the Southern District of New York.  I

17     have a lot of experience in this area.  It is, by far, not

18     the normal experience to turn around and subpoena a defense

19     lawyer's records.

20              And in this case, we first asked -- when I saw

21     that, one night looking at the discovery and realized that

22     the phone number I was looking at is my personal cell phone.

23     Which, as you might imagine, during COVID season became my

24     personal phone and my business cell phone.  And when you

25     further consider that I represent not just Mr. Bannon, but I

1   also represent Rudy Giuliani, who is involved in these same

2   issues.  They subpoenaed those records the very day I

3   reached out to the U.S. Attorney's Office and said, I want

4   to make a presentation seeking a declination -- because

5   there was a long history of declinations in that office --

6   and who is the contact person I should be in touch with?

7   That day, October 25th, they issued the subpoena for my

8   personal cell phone records, which is also my business

9   records.  They went on to subpoena my office direct line in

10  New York City and my home number.  What information could

11  they be looking for?  Well, we asked that question.  And at

12  first they said, Costello is a witness.

13          Now, I can't think of any way to put a wedge

14  between a lawyer and his client than to say that that guy

15  that you thought, Mr. Bannon, was your lawyer, is now going

16  to be a witness against you; that's what they were doing

17  here.

18          The first time we asked that question, they said,

19  He's going to be a witness.  Recently when that question was

20  asked they said, Oh, we have to check to make sure that

21  Mr. Costello told Mr. Bannon about the subpoena; that this

22  isn't all just a big mistake.  First of all, you know

23  somebody is not telling the truth when they give you two

24  explanations for the same thing that are inconsistent with

25  one another.

1           Second of all, that position is preposterous.

2     They should be embarrassed to make that.  It's an insult to

3     the Court.  It's an insult to defense counsel.

4           The question of whether I communicated the fact of

5     the subpoena to Mr. Bannon is mind boggling, because it was

6     the Select Committee that contacted me, in the first

7     instance, and said, Do you represent Mr. Bannon?  Yes, I do.

8     Will you accept service of his subpoena?  I said, Well, I

9     will have to talk to Mr. Bannon about that, of course.  I

10    said, I will get back to you.  I called Mr. Bannon, spoke to

11    him about it, explained it.  He said, Sure.  Accept service

12    of the subpoena.

13          I then sent an email, which is on the record, back

14    to Select Committee saying, I am Mr. Bannon's counsel, and I

15    am accepting service of a subpoena.

16          If you allow this office to do what they did to me

17    to every other lawyer in the system, which is what is going

18    to happen if we just poo-poo this, then no lawyer in his

19    right mind is ever going to accept service or process.

20          Second of all, part of this equation is, because I

21    was acting in good faith, and I said in my first email --

22    that's why I want to talk about the people in U.S.

23    Attorney's Office about a declination.  I was aware of the

24    OLC opinions, aware of the long history of that office not

25    prosecuting.  I was aware of attorney generals, like Mike

1   Mukasey saying, I won't refer it to the U.S. Attorney's

2   Office.

3        So I sat down with them for, I am going to guess

4   because I wasn't keeping close track, maybe a total of five

5   hours on two occasions.  If they really wanted to find out

6   whether -- I mean, first of all, would I do that if I hadn't

7   given Mr. Bannon the subpoena?  Of course not.

8        **THE COURT:**  Do you remember what dates --

9        **MR. COSTELLO:**  I'm sorry?

10       **THE COURT:**  Do you remember what dates those two

11  meetings --

12       **MR. COSTELLO:**  Yeah.  November 3rd and November

13  8th.  November 3rd was the first meeting and November 8th

14  was the second meeting.

15       During that period of time never once said to me,

16  By the way, Mr. Costello, did you give Mr. Bannon the

17  subpoena?  Did you ever tell him about the subpoena?  Of

18  course it was a ludicrous question.  Because I presented

19  them, they wanted to meet right away.  I said, No, I have a

20  better idea.  I am writing a legal memo on why I think your

21  office should decline prosecution.  I would like to send

22  that to you, and then have a day or two go by so you can

23  review it, check the OLC cites, and then we can sit down and

24  have a meaningful discussion.

25       What I didn't know was they viewed that as an

1    opportunity to try to turn me into a witness.  At that Zoom

2    conference, I am looking at a table consisting of four

3    people sitting at the table.  Mr. Cooney, the two other

4    Assistant US Attorneys and in the back was a young man who

5    was a paralegal taking notes.

6         I was told, Oh, by the way, we have FBI agents

7    that are going to be listening in to the conversation.  I

8    could care less who listened in to the conversation.  I was

9    making a legal presentation on a declination.

10        Then when we get to discovery, I see there is an

11   FBI 302 Report of Investigation, pretending to be an

12   interview of me.  The interview of me that is conducted

13   while I'm conducting a Zoom conference with the U.S.

14   Attorney's Office seeking a declination.

15        Part of that FBI 302 said that I was advised of

16   the identity of the agents; that's true.  They introduced

17   themselves orally.  They weren't in the picture at any time.

18   My recollection is they didn't ask any questions.  But I

19   certainly was not advised that this is going to be an FBI

20   interview of you.  I would have been out of my mind to do

21   that.

22        When Mr. Bannon found out about that, he was

23   irritated because he thought I gave an interview to the FBI

24   because of the 302.  So that's the kind of wedge I'm talking

25   about here that they drive between a lawyer and his client,

1    by making that lawyer look like he's not a lawyer

2    representing you.  In fact, he's going to be a witness

3    against you.  To top it off, at the same time, they make a

4    Motion in Limine to deprive Mr. Bannon of the defense of

5    advice of counsel.

6          Well, I think you touched upon this earlier.  With

7    respect to the advice of counsel, especially when I am

8    talking to him about OLC opinions, that information is going

9    to come in in any event.

10          Even if you decide advice of counsel doesn't come

11   in, it's coming in under an estoppel ground because it was

12   presented to Mr. Bannon.  And that's one OLC opinion that so

13   far we haven't discussed, because that's the opinion that

14   says, with executive privilege, that subpoena is dead on

15   arrival.  It is null and void.  It's incapable of being

16   enforced civilly or criminally.

17          That's why Mr. Bannon didn't show up.  Mr. Bannon

18   said, If you can make an accommodation, work out something

19   with the president, I'll show up.  And there's proof of his

20   word.  He did that four times previously.

21          Now, with respect to grand jury materials, we are

22   pretty certain they never said anything to the grand jury

23   about the fact that Mr. Bannon had been down this road four

24   times previously, and in each occasion had ultimately

25   testified when an accommodation was worked out.

1           But there is something even more important that
2      we are almost certain they forgot to tell the grand jury.
3      In reading the FBI 302, I discovered they were interviewing
4      Doug Letter, the general counsel of the House of
5      Representatives.  He represents both democrats and
6      republicans.

7           Mr. Letter pointed out that when I accepted
8      service of the subpoena, the Select Committee did not
9      provide me with Section (3)(a) -- excuse me -- Section
10     (3)(b) of House Resolution 8, adopted January 4th, 2021.

11          Why is that important?  What they did give me was
12     The Congress' Regulations for the Use of Deposition
13     Authority, which contains Paragraph 11 that says, "A witness
14     shall not" -- excuse me.  I'll quote this again.  "A witness
15     shall not be required to testify unless the witness has been
16     provided with a copy of Section (3)(b) of House Resolution
17     8, 117th Congress, and these regulations."

18          What this says is, Because they didn't give us
19     this, (indicated) Mr. Bannon did not have to appear for his
20     deposition.  You can bet your bottom dollar that that grand
21     jury that indicted him for failure to appear, never heard
22     about that.  That's why we need to know what the grand jury
23     was told.  What they were instructed.

24          I think that's everything.  Oh, I'm sorry.  There
25     is one other thing.

74

1          In talking about this abuse of grand jury process,

2     along the way, trying to put this wedge, they now have

3     written an awful lot of stuff.  They wrote a reply to their

4     in limine motion that for the first nine pages doesn't have

5     anything to do with the in limine motion.  What it has to do

6     with, it's a nine-page, ad hominem attack on me, claiming

7     that I misspoke this or said that or I failed to say this.

8     They call it bad faith.

9          **THE COURT:**  I think both parties decided that it

10     helps their positions to throw a bunch of facts about the

11     underlying issues in their briefs.  So I wouldn't spend a

12     lot of time criticizing --

13          **MR. COSTELLO:**  I don't want to spend a lot of

14     time, Your Honor.  I want to do, unlike what the government

15     did the other night, which is to file a surreply and ask

16     permission.  It's already on the public record.  All the

17     reporters have already read it.

18          I want your permission to file a surreply just to

19     those factual issues where they are impugning my integrity.

20     And I have -- they made 12 allegations.  I can prove all 12

21     of them false.  And one of them is a fraud on the Court,

22     because they cite something from a previous filing, that I

23     quote.  They failed to quote it.  I quote it.  It's directly

24     contrary to the position the US Attorney's Office took.

25          So I don't want you to sit there and deciding

1   things and think, Maybe this guy Costello doesn't tell the

2   truth.  I do.

3         **THE COURT:**  Thank you, Counsel.

4         **MR. COSTELLO:**  Do I have permission, Your Honor?

5         **THE COURT:**  Yes.

6         **MR. CORCORAN:**  Thank you.

7         **THE COURT:**  So here's what I would like to do:  As

8   you can imagine, Madam Court Reporter would like a break.  I

9   would like to finish the argument, and so what I'm thinking

10  of is a brief rebuttal from the government.  A very brief

11  rebuttal from the defendant.  I know the issues.  I just

12  want you to focus on the most pertinent things you've heard.

13        We will then take a break.  And my plan is to then

14  come back after the break and decide some, if not all of the

15  issues that are before me, or at least have a notional way

16  forward to the extent that I am not deciding issues.

17        So with that, a brief rebuttal from the

18  government, please.

19        **MS. VAUGHN:**  Your Honor, I will start with the

20  issue of willfulness.  And there were four brief points I

21  wanted to address.

22        First this idea that *Licavoli* is distinguishable.

23  It's not.  *Licavoli* decided the meaning of willfulness under

24  the statute as a matter of law.  And because the meaning is

25  deliberate and intentional, as a matter of law, a mistaken

**-531-**

1    reliance on the law, whether that is through the defendant

2    reading the law himself or getting it from his attorney is

3    not a defense.  So *Licavoli* cannot be distinguished.

4         There's another reason it is not distinguishable.

5    The defendant claims it is different here because he raised

6    constitutional privilege of some kind.

7         Defendants in these contempt of Congress cases

8    raise constitutional privileges all of the time as a

9    defense.  Fifth Amendment.  First Amendment.  They've raised

10   the gamut.  The defendant is not barred from filing a Motion

11   to Dismiss to argue that the subpoena was invalid for some

12   constitutional violation.  That's a different question than

13   whether his mistaken reliance on the law is a defense.  And

14   *Licavoli* says "as a matter of law."  It's not.  So *Licavoli*

15   is not different.

16        Second, this idea that the Court cannot follow --

17   can decide not to follow controlling precedent in *Bryan* 1950

18   or *Fleischman* or as it was applied in *Licavoli*.  The

19   defendant's position is not that *Bryan* 1998 applies somehow

20   differently in this case because of the specific statute.

21        The defendant's position appears to be that *Bryan*

22   rewrote willfulness across the criminal law.  So if the

23   Court were to apply *Bryan*, it wouldn't be just rewriting

24   willfulness under the Contempt of Congress Statute, it would

25   be rewriting willfulness among many different statutes.  And

1    courts have addressed those post *Bryan* 1998, and find they

2    still require the lowest level of willfulness, which is

3    deliberate and intentional.

4        The defendant is really asking the Court to

5    redefine it in a number of statutes, including Contempt of

6    Congress and the Contempt of Court Statute.  And, again, the

7    Supreme Court's made clear, it does not overturn its

8    precedence by implication.  But that is what the defendant

9    is asking this Court to find and that's not allowed under

10   the law.

11       Third, the defendant suggests that there is an

12   element of unfairness in this, in not allowing him to raise

13   advice of counsel as a defense.  I think at bottom that

14   argument really goes to the fact that the defendant just

15   didn't recognize the constitutional power of Congress to

16   compel witnesses, in the same way that someone might

17   recognize the Court's power to compel witnesses.  But it is

18   a coordinate branch of government.  This is a constitutional

19   power it has, and the witness does not get to decide when

20   and how Congress gets to exercise that.

21       I think what's most telling about the defendant's

22   position is he says, Well, I told Congress that I would

23   comply, if they went to court and got an order telling me

24   to.  He is essentially saying that Congress' constitutional

25   authority to compel testimony is completely subordinate to

1    the power of the courts.  And that's not what the

2    constitution recognizes.  It's not what the Supreme Court

3    has recognized in cases like *Quinn* and *Watkins*, where they

4    say, All right, witness.  You decide that Congress doesn't

5    have this power over you.  You are taking the risk of

6    contempt.  That's your choice.

7        Finally, the defendant says the subpoena was void

8    because of these constitutional issues.  He couldn't have

9    counsel there or whatever it might be.  But that is not even

10   a defense to willfulness under the heightened standards.

11       When you have a legal duty, even under the highest

12   standard, set out by *Cheek* and *Ratzlaf*, the defendant cannot

13   say, for example in the tax context, Well, I know I didn't

14   report my taxes properly, but I think the tax laws are

15   invalid as applied to me.  *Cheek* makes very clear, that's

16   not a defense.  That's, essentially, a sovereign citizen who

17   walks in and says, I am not subject to the power of this

18   court.  I don't recognize it.

19       That's not a defense to willfulness even under the

20   highest standard.  So even if the intermediate or highest

21   standard applied here, the defendant wouldn't be able to

22   raise the defense that he is proffering.

23       So unless the Court has anything else on

24   willfulness, any questions for the government, that's all I

25   have.

1          **THE COURT:**  No.

2          **MS. VAUGHN:**  So I will turn to the discovery

3     issues, starting with the attorney issue.  Bottom line, the

4     defendant still has not identified what relief he would

5     seek.

6          **THE COURT:**  I think the defendant conceded he's

7     not seeking any relief in this case in the most specific

8     sense, but he would like something as to the conduct.  A

9     referral, an admonition, a determination by me, I suppose,

10    about the conduct.

11         **MS. VAUGHN:**  So in that way, if the defendant has

12    abandoned his request for discovery, then I guess that is a

13    different issue.

14         **THE COURT:**  I don't think he has.  I think he

15    said, I want the information I've been seeking, to make the

16    argument to you, as to what those steps should be.

17         **MS. VAUGHN:**  And I'm not aware of any authority in

18    the criminal discovery law that allows a defendant to get

19    internal government deliberations in a criminal case, on the

20    hope that they can make some kind of motion for a sanction

21    or something else.  And he still doesn't even identify what

22    that potential sanction would be.

23         He still has to identify some basis that he would

24    attack the indictment, in which case he needs to make a

25    colorable claim of his defense or attack the merits of the

1     offense at trial.  And he hasn't done either of those

2     things.

3              And, secondly, now defense is saying, Well,

4     everybody knew that Bannon knew about the subpoena.  That is

5     just a lot of Monday morning quarterbacking.  The

6     government's investigation is not limited to one form of

7     evidence.  And, frankly, the government is not required to

8     rely on Mr. Costello's representations.

9              The government's investigation can certainly try

10    to corroborate those claims, whatever he may have made.  It

11    can try to confirm them in some other way.  The government

12    is not limited.  And there is no per se bar on subpoenaing

13    records that do not contain privileged communications just

14    because those records might relate to an attorney.

15             **THE COURT:**  I get that.  Let's talk about the

16    arguments relating to the information that was provided to

17    the grand jury or was not provided to the grand jury or was

18    potentially -- the grand jury wasn't -- I guess the best way

19    to put it is, the grand jury was not fully apprised of the

20    whole situation.  And the indictment is, therefore,

21    potentially suspect.  And, therefore, I should order the

22    government to produce what it told the grand jury.

23             **MS. VAUGHN:**  So I --

24             **THE COURT:**  What's wrong with that argument?

25             **MS. VAUGHN:**  I understand the defendant's argument

1    to be about the government -- an allegation that the

2    government did not present exculpatory evidence to the grand

3    jury.  And the government's not required to do that.  And,

4    again, to show particularized need, it's not just, We don't

5    think the government did this.  You have to have a

6    particularized factual basis to believe that it did not.

7            And the government has no obligation to show

8    exculpatory information to the grand jury.  So just the

9    statement that maybe we didn't do it, doesn't provide any

10   basis to get those grand jury materials.

11           And the defendant still has not identified on what

12   basis they could even move to dismiss the indictment,

13   especially because the government has no obligation to

14   present that exculpatory material to the grand jury, to the

15   extent it even is exculpatory.

16           **THE COURT:**  Thanks.

17           So briefly on OLC opinions, to the extent there is

18   anything you want to say or, Congressional information.

19   Briefly.

20           **MS. VAUGHN:**  Yeah.  As I was listening I heard

21   maybe two new bases for seeking it.  One being the

22   government is estopped in making legal arguments about how

23   the statute applies.

24           So I take that to mean -- and I think Mr. Schoen

25   said it was some kind of due process challenge.  But, again,

1    that puts us right back in the camp of *Armstrong*.  The

2    defendant needs to make a colorable showing of the elements

3    of whatever due process claim he would raise before he's

4    entitled to get the government's internal files.  And that's

5    not just saying, Well, it's a due process violation.  That's

6    showing articulable, colorable claims about how that due

7    process violation may have occurred.

8         The other new argument I think I heard, was a

9    factual issue as to whether or not the defendant at trial

10   will say that he believed he had been authorized by the

11   government to not comply with the subpoena.

12        But, again, OLC internal opinions are privileged

13   attorney advice to its client.  There is nothing to suggest

14   that that would have any relevance to what was in the

15   defendant's mind at the time.  And as I said earlier, the

16   government has already provided everything of which it's

17   aware and has relating to what the defendant knew from the

18   executive branch and the Committee at the time he did not

19   comply.

20        So unless the Court has additional questions.

21        **THE COURT:**  Thank you.

22        **MS. VAUGHN:**  Thank you.

23        **THE COURT:**  Mr. Schoen, very briefly.  Because I

24   know the court reporter is running up against a couple of

25   deadline type of things.

83

1          **MR. SCHOEN:**  And I made her work too hard by

2      talking too fast.

3              Three points, just very quickly, Judge.  The

4      government said *Licavoli* is not distinguishable because of

5      privilege.  There are all kinds of privileges out there.

6      You know what?  There are.  But executive privilege is

7      different.  It's not his privilege.  It wasn't Mr. Bannon's

8      privilege.  His hands were tied by someone else's privilege.

9      Fifth Amendment, you make a decision.  Often they are

10     cautioned, If you make that position, we may hold you in

11     contempt.

12             But in this case it's not his privilege.  His

13     hands were tied, and that was what the advice of counsel

14     was.  And, in effect again, you would be giving Congress a

15     veto over the executive branch's decision about his

16     privilege; that's number one.

17             Number two, first of all, it's not a new argument

18     we've raised about the OLC opinions and entrapment by

19     estoppel.  It's in our papers.  We allude to it.  We will be

20     making it much more broadly, of course, in the Motion to

21     Dismiss.  But it goes not only to state of mind, it is a due

22     process basis.  Whatever.  I don't need to go into that

23     further.

24             Finally, the idea that if the Court changes the

25     standard of willfulness, it will affect courts all over the

1    place.  Let's be real clear, not every court agrees, in the

2    first place, that in the contempt situation, willfulness

3    just means, Did you show up or not show up?

4         There is a case, *Westbrooks*, for example, out of

5    the Fourth Circuit 2015, 780 Fed. 3d, 593.  Fourth Circuit

6    2015, in which they say, it's an open question.  Now, the

7    opinion treats it as if advice of counsel would apply.  But

8    it says it's an open question and they say, We, the Fourth

9    Circuit, have held in the past or at least considered that

10   advice of counsel applies.

11        Finally, this is in our brief at Document 30, Page

12   24, the law, even in this circuit, doesn't seem to be quite

13   as settled as the government would have it.

14        Why do I say that?  *United States versus Taylor*,

15   139 F. 3d 924, at Page 934, Note 10, D.C. Circuit, 1998.

16   The Court there said in their footnote, in the contempt

17   situation, We note that both sides appear to assume that

18   advice of counsel applies to a contempt -- criminal contempt

19   charge.  And we note that the District Court treated it as

20   if advice of counsel applies to a criminal contempt charge;

21   therefore, we, the D.C. Circuit, don't need to get into that

22   question today.

23        So I would suggest that the *Taylor* footnote

24   suggests that -- more than suggests -- that the D.C. Circuit

25   doesn't see it today -- or in 1998, as quite as settled a

1    question about *Licavoli* as the government would have the

2    Court believe.  Evan is going to make one point.

3              Thank you, Your Honor.

4          **MR. CORCORAN:**  Two very quick points.

5              One on the grand jury question.  Counsel is

6    talking about no need to present exculpatory evidence.  We

7    are not saying that that's the issue at all.  We agree that

8    that's -- although they said in their papers that it's their

9    practice to present exculpatory evidence, we make a

10   different point, which is the evidence that they did present

11   was misleading on two issues.  Whether or not there was a

12   request for a later date, misleading testimony on that, and

13   whether or not executive privilege was communicated to the

14   Select Committee, misleading testimony on that.

15             So it's not a matter of our hope that they would

16   have presented additional evidence to the grand jury.  We

17   get to see what the argument was based on the misleading

18   evidence that they presented.

19             My final point really just goes really to this

20   issue of intent.  You asked what we had in our brief,

21   particularly with regard to *Licavoli*.  Our focus in the

22   brief, really, was that *Licavoli*, both early on, says we are

23   relying on the *Sinclair* case.  And later on, right before

24   holding says, We are relying on the *Sinclair* case.  We say

25   the *Goudin* case, which says that *Sinclair* is totally

1    eviscerated and another reason, essentially, why it's not

2    good law.  Thank you, Your Honor.

3        **THE COURT:**  Thank you.

4        So here's what we are going to do:  We are going

5    to take a short recess.  I am going to come back, as I said,

6    and walk through where I am on all the motions.  To the

7    extent I can, I will decide some of them today orally.  To

8    the extent that I can't, but I have a view of what I would

9    like to do by way of next steps.  I will articulate them.

10   My guess is that this recess will be all of 10 minutes,

11   maybe 15 but that's the plan.

12       So we'll take a quick recess and we'll be back.

13       (Break.)

14       **THE COURT:**  Thank you for the arguments this

15   morning and early afternoon, Counsel.  As I said, I am going

16   to decide, to an extent, some of the issues that are in

17   front of me.

18       I will start first with the United States' Motion

19   in Limine to Exclude Evidence or Argument Relating to

20   Good-Faith Reliance on Law or Advice of Counsel at ECF No.

21   29.  As I think people heard me say earlier, I read all of

22   the briefing on this matter and am familiar with all of the

23   arguments and exhibits in the papers, as well as the cases

24   cited therein.

25       The defendant was charged with violating 2 US Code

1    Section 192.  As relevant here, that statute covers any

2    individual who "willfully makes default" on certain

3    Congressional summonses.

4          The defendant argues he's entitled to argue at

5    trial that he cannot have been "willfully" in default,

6    because he relied in good faith, on the advice of his

7    counsel, in not complying with the Congressional subpoena.

8    He points to many Supreme Court court cases defining

9    "willfully," including *Bryan v. United States*, 524 U.S. 184,

10   1998, to support his reading of the statute.

11         If this were a matter of first impression, the

12   Court might be inclined to agree with defendant and allow

13   this evidence in.  But there is binding precedent from the

14   Court of Appeals, *Licavoli v. United States*, 294 F.2d 207,

15   D.C. Circuit 1961, that is directly on point.  It involved

16   the conviction under the very same part of 2 U.S. Code

17   Section 192, with defendant arguing on appeal that, "good

18   faith reliance upon advice of counsel is a defense."  That

19   is at Page 207.

20         The Court of Appeals explained that, "an essential

21   part of that premise is that an evil motive, which can be

22   negative by bonafide advice of counsel, is an element of

23   'willfully' under the statute."  But it expressly rejected

24   that argument.

25         To quote the Court of Appeals, "Advice of counsel

1      cannot immunize a deliberate intentional failure to appear

2      pursuant to lawful subpoena lawfully served."  Rather, as it

3      explained, "All that is needed...is a deliberate intention

4      to do the act.  Advice of counsel does not immunize that

5      simple intention.  It might immunize if evil motive or

6      purpose were an element of offense.  But such motive or

7      purpose is not an element..."

8             The Court therefore held, "In the case at bar

9      there can be no serious dispute about the deliberate

10     intention of," the defendant there, "Licavoli not to appear

11     before the Committee pursuant to its subpoena.  That he

12     meant to stay away was made abundantly clear.  That he did

13     so upon advice of lawyer is no defense.  The Court

14     instructed the jury."

15            The defendant offered two reasons in his brief why

16     this Court should ignore the holding of *Licavoli*, but

17     neither of those arguments is persuasive.

18            First, defendant claims *Licavoli* relied on bad

19     law, specifically the now-disavowed Supreme Court case of

20     *Sinclair v. United States*.  It is true that subsequent

21     Supreme Court cases have cut back in some of the holdings of

22     *Sinclair*, but not the holding that *Licavoli* relies on.

23            And even if the Supreme Court had done so, the

24     defendant has cited to no authority and the Court has

25     located none on its own, that would allow me to ignore

1    otherwise binding precedent, just because some of the cases

2    on which it relied are no longer good law.

3        Second, the defendant notes that in the sixth

4    decade since *Licavoli*, the Supreme Court has provided

5    clarity on the meaning of "willfully" in criminal statutes.

6    Clarity that favors defendant.  That might very well be

7    true.  But none of that precedent dealt with the charge

8    under 2 U.S. Code, Section 192.  *Licavoli* did.  Thus, while

9    this precedent might furnish defendant with arguments to the

10   Court of Appeals on why *Licavoli* should be overruled, this

11   court has no power to disregard a valid and on-point or

12   seemingly on-point holding from a higher court.

13       The problem is, that a new argument was presented

14   today.  Did not appear in defendant's briefs.  I wasn't

15   prepared to think about it, let alone pass on it.  This

16   argument is not that *Licavoli* is no longer good law, but

17   that *Licavoli* is inapplicable here, because it did not

18   involve an executive privilege assertion, a Congressional

19   subpoena to a former member of the executive branch

20   communicating with the president and the like.

21       I have therefore not had time to consider whether,

22   assuming *Licavoli* is good law, which as I've held it is, it

23   nevertheless is inapplicable here because this case is

24   distinguishable.  I am not prepared to make that

25   determination on the fly here.

1          I am not happy that this argument came up for the
2     first time during argument.  It's an important question and
3     it should have been briefed.  Nevertheless, I am going to
4     give the parties an opportunity to brief it.  So what I
5     would like are supplemental briefs to be filed in the
6     following order, which is:  The defendant shall file a
7     supplemental brief on this question no later than March 22nd
8     to exceed no more than 10 pages, and limited to the question
9     of whether *Licavoli* applies to this case.  The government
10    will then have an opportunity to respond to that argument
11    and to brief whether that argument was somehow waived in its
12    own supplemental brief to be filed March 29th.
13         And I will then consider the question and make a
14    final determination as to the Motion in Limine in light of
15    those arguments.  That's that motion.  So I am taking that
16    motion under advisement.
17         As to the Motion to Compel regarding attorney
18    records, which is called Defendant's Motion to Compel
19    Disclosure of Government Efforts to Obtain Telephone and
20    Email Records of Mr. Bannon's Attorneys, ECF No. 26.
21         Again, I've read all briefing on this matter, and
22    I'm familiar with all of the parties' arguments and exhibits
23    and cases cited therein.  I've also ordered the production
24    of and reviewed the government's ex parte submission as to
25    the Google email order and application.

91

1          There are really two groups of information within

2     the defendant's request and motion.  The first is

3     information that the government obtained pertaining to an

4     unrelated Robert Costello, i.e., somebody who is not the

5     Costello who represented Mr. Bannon today.  To the extent

6     that the defendant seeks any discovery on that question or

7     information, his motion is denied, such records and

8     information are clearly immaterial to his case, as was

9     essentially conceded today.

10          As to records that the government obtained

11    relating to the actual Robert Costello, I am not yet

12    prepared to rule on the matter.  In its most recent filings,

13    the government has proffered the steps that it took in

14    obtaining Mr. Costello's subscriber information and phone

15    records.

16          As I noted, the government provided me its

17    application for an order pursuant to 18 US Code 2703(d) --

18    although I think it's undisputed that relates to a different

19    Costello -- and its surreply is offered to produce that

20    information to the defendant, if he agrees to treat that

21    application as sensitive under the protective order.

22          As I understood it, the defendant accepted that

23    proposal.  And therefore the government can produce that

24    application, which is -- I acknowledge is not -- did not end

25    up pertaining to the actual Costello here.  But I do think

**-547-**

1    it's relevant, because it has some information in it about

2    the reason the government articulated to at least one judge

3    for its application.  So the government shall produce that

4    information, as it has proposed, to Mr. Bannon.  And that

5    information shall be treated as sensitive under the

6    protective order.  I've seen that application, as I

7    mentioned.

8            I haven't, however, seen additional information

9    described in the government's surreply.  I will just order

10   the government to produce to me for my ex parte, in-camera

11   review, no later than March 18th, the subscriber information

12   the government obtained for what it describes as the Yahoo

13   account, the Comcast account and the Google account, as well

14   as the requests the government used to obtain that

15   information.  That is described at ECF No. 36-1 at 3.

16           And, I think most importantly, the subscriber and

17   toll records for the Westchester County phone number, as the

18   government puts it, that the government obtained, as well as

19   the requests that the government used to obtain that

20   information.  After the government has provided that

21   information to the Court under seal, I will rule on the

22   remainder of defendant's motion.

23           I'll turn last to defendant's Motion to Compel

24   discovery.  Again, I think it's pretty clear I've read all

25   of the briefing on this matter.  I'm familiar with all of

1    the parties' arguments and exhibits, as well as the cases

2    cited therein.  I will deny this motion in part and grant it

3    in part.

4        The defendant seeks many categories of

5    information.  First, citing to Federal Rule of Criminal

6    Procedure 16(a)(1)(E)(i) and the Supreme Court cases of

7    *Brady* and *Giglio* he seeks a broad swath of material that he

8    lumps together as, "Information that tends to show that the

9    indictment is invalid."  The Court will deny this part of

10   the motion.

11       Criminal Procedure Rule 16(a)(1)(E)(i) requires

12   the government to provide the defendant certain items

13   "within the government's possession, custody or control"

14   that are "material to preparing the defense."

15       It covers both inculpatory and exculpatory

16   evidence.  It's generally intended to cover a wide range of

17   material.  *Brady* and *Giglio* on the other hand, require the

18   government to disclose exculpatory and impeachment evidence.

19   The defendant need not make a request for such materials to

20   be disclosed.

21       With respect to what we have been referring to as

22   the grand jury materials, defendant has not shown that it

23   would be material to helping him prepare his defense or that

24   he's entitled to it under *Brady* or *Giglio*.  He attempts to

25   argue that this information might show grounds to dismiss

94

1    the indictment based on the failure to properly charge the

2    grand jury on applicable law.  But he bases this argument,

3    at least in substantial part, on the arguments in his brief

4    about what "willfully" means in the Circuit.  And at a

5    minimum, those arguments that were presented in brief, I

6    think are wrong.  And I certainly haven't concluded that

7    there is any reason to believe that *Locavoli* doesn't apply

8    here.

9           Regardless, the Court doesn't have some

10   wide-ranging supervisory authority to require the government

11   to give all potentially exculpatory evidence to the grand

12   jury when seeking indictment.  Even if that were not an

13   issue, defendant would still run into the problem of secrecy

14   of grand jury materials.

15          It is, of course, true that some evidence of the

16   grand jury has been released under seal to him.  But that

17   does not mean that no further grounds exist for maintaining

18   the secrecy of the remaining documents.  Quite to the

19   contrary, releasing grand jury documents is a serious step

20   for the Court to take, and not one that it does lightly.  It

21   requires case-by-case adjudication.  Allowing release of

22   some documents, does not mean it is appropriate to release

23   them.  As I have said, I do not believe defendant has made a

24   showing that the materials we are talking about would be

25   material to help him prepare his defense.

1    Next, defendant seeks "information that tends to

2  show that the subpoena was not lawfully authorized" as well

3  as, "information that tends to show bias or the invalidity

4  of the evidence."

5    Specifically, he seeks to have the Court order the

6  government to ask the Select Committee, U.S. House of

7  Representatives and other individuals, regarding the process

8  through which the subpoena was issued and the referral as

9  well.  He also seeks information relating to conversations

10  and communications regarding his interactions with the

11  Select Committee.  But Rule 16 only requires the government

12  to provide information "within the government's possession,

13  custody or control."  Those are quotes.

14    The government in this context refers to the

15  prosecuting office, not the entirety of the government,

16  including a separate branch.  And as the United States

17  notes, defendant has not tied any of the documents he seeks

18  to the possession of the prosecuting agency.

19    Of course, if the government does name an

20  individual from the House as a witness in this matter, it

21  will be obligated to provide discovery on that individual,

22  at least as impeachment evidence, as well as their potential

23  biases.  But we are not at that stage of this case yet.  To

24  the extent there is evidence that defendant seeks that is in

25  the government's possession, the Court notes that he has not

1    shown how it would be relevant to his defense.  At best, it

2    would relate to a selective prosecution claim.  But

3    defendant has not hinted that he will raise such a claim,

4    nor does the Court see how one would be colorable.

5           Accordingly, as to what defendant styles as

6    "information that tends to show that the subpoena was not

7    lawfully authorized," the Court will deny his motion.

8           Finally, defendant seeks what he styles as,

9    "Information That Tends To Negate Willfulness."  Some of

10   what defendant seeks in that way is not going to be

11   discoverable through an order of this Court.  For reasons

12   already discussed.  He seeks, for example, information, the

13   possession of the Select Committee and the Rules Committee

14   of the House of Representatives.  But for reasons I've also

15   discussed, that evidence is not discoverable under Rule 16.

16          But I recognize there are might be some relevancy

17   to defendant -- to this case, whether to an element of the

18   government's claim or defendant's defense for information

19   within the possession of the Department of Justice.

20   Specifically I will grant defendant's motion to the extent

21   it requests statements or writings reflecting official DOJ

22   policy, such as an opinion of the Office of Legal Counsel or

23   the position of an entire division or litigating group,

24   whether those statements are public or not, if such writings

25   relate to the department's policy on prosecuting or not

1    prosecuting government or former government officials

2    raising executive privilege claims or defenses of immunity

3    or similar issues.

4           I therefore will grant [sic] defendant's motion in

5    part and grant it in part.

6           Those are my current holdings.  Any questions?

7           **MS. VAUGHN:**  Your Honor, I just want to make sure

8    that I understood what you would like us to provide ex

9    parte, with respect to the attorney records.

10           **THE COURT:**  Yes.

11           **MS. VAUGHN:**  You said the subscriber information

12    the government actually received for the Yahoo, Google,

13    Comcast and Westchester County accounts?

14           **THE COURT:**  Yes, and how they were obtained.

15           **MS. VAUGHN:**  Okay.

16           **THE COURT:**  Here's -- I am just looking at Pages 3

17    and 4 of your supplemental brief.  The government says, In

18    an effort to confirm the use of these accounts by

19    Mr. Costello, the government first obtained subscriber

20    information for each of them.  Referring to Yahoo, Comcast

21    and Google.  I would like to know what request the

22    government used to get those subscriber information and then

23    the information.

24           **MS. VAUGHN:**  Got it, Your Honor.

25           **THE COURT:**  And then as to the -- what we've been

98

1    calling the "toll records" the phone records, the same

2    question.  I want to see the phone records and I want to see

3    the requests.  Likely grand jury subpoenas, based on the

4    discussion we had today.  I understand you are not

5    committing to that, but the requests that resulted in the

6    production of those records.

7            **MS. VAUGHN:**  Yes, Your Honor.  Thank you.

8            **THE COURT:**  Thank you.

9            **MR. SCHOEN:**  One question, Your Honor.  If we

10   might add, since the Court is allowing the government on the

11   29th to raise a possible waiver issue, if they deem it, I

12   would like three days to file a reply if they raise the

13   waiver issue.

14           **THE COURT:**  If the government raises a waiver

15   issue, you may respond to that issue and that issue only by

16   April 1st.

17           **MR. SCHOEN:**  Your Honor, housekeeping issue.

18   There is a typo in one of the briefs, just to note.  I had

19   cited -- on Document 38, Page 5 I cited Document 31 at Note

20   1.  It should have been Document 26 at Note 1.  Sorry.

21           **THE COURT:**  Thank you.

22           **MR. SCHOEN:**  Thank you, Your Honor.

23           **THE COURT:**  Thank you, Counsel.

24           (Proceedings adjourned at 1:23 p.m.)

25

1                    **C E R T I F I C A T E**

2

3           I, **Lorraine T. Herman, Official Court**

4   **Reporter,** certify that the foregoing is a true and correct

5   transcript of the record of proceedings in the

6   above-entitled matter.

7

8

9

10   ____March 18, 2022____        _/s/_____

              **DATE**                    **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :        Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

**DEFENDANT'S SURREPLY TO THE GOVERNMENT'S REPLY IN SUPPORT**
**OF ITS MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARUGMENT**
<u>**RELATING TO GOOD-FAITH RELIANCE ON LAW OR ADVICE OF COUNSEL**</u>

During oral argument on March 16, 2022, undersigned counsel, on behalf of Defendant Stephen K. Bannon, asked this Court for permission to file a Surreply in response to allegations made for the first time by the Government in the United States' Reply in Support of its Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel [Dk. 35]. This Court granted that request from the bench. The information set forth below constitutes our Surreply to those allegations.[1]

<u>**FALSE CLAIMS MADE BY THE USAO/DC**</u>

In the Government's recent submission in support of its motion *in limine*, the Government took the position that Stephen Bannon "and his attorney, Robert J. Costello, pursued a bad-faith strategy."  They claim that Bannon and his counsel Costello made false claims.  We respond to

---

[1] This Court also issued an Order, reflected in a Minute Entry filed on March 16, 2022, that set forth a briefing schedule on a Defense Supplemental Brief (due by March 22, 2022) and a Government Response (due by March 29, 2022). This filing is *not* that Defense Supplemental Brief – which we plan to file on March 22, 2022.

each instance where the Government alleges some wrongdoing on the part of Bannon's counsel and dispose of each and every one, as follows:

1. On page two, the Government states that the Defendant "*suggests that the Committee did not properly serve the subpoena.*"

In fact, we made no such claim.  We merely noted that the subpoena was sent to counsel before counsel had permission to accept, and that affidavit of service claimed it was served and accepted the day **before** counsel for Bannon actually accepted service.  We have not challenged service based on that misstatement by the Government.

2. On page two, the Government makes an irrelevant point that:  "*the Defendant was a private citizen; although he had been a White House advisor for seven months at the beginning of former President Donald J. Trump's term*".

This statement, while factually true, and consistent with the false legal claims Chairman Thompson was consistently making in his correspondence, is irrelevant to the question of whether Bannon can be guided by the invocation of Executive Privilege by President Trump.

3. On page three, the Government makes a very important and blatantly false statement that: "*the Committee provided the House of Representatives' established rules for deposition.*"

This statement is proven false by the discovery provided to Bannon's counsel by the same Government officials making the false statement.  The Government provided Bannon's counsel in discovery an FBI 302 Report of Investigation, dated November 2, 2021, which included an FBI interview of Doug Letter, the General Counsel of the House of Representatives.  In that 302 Report, the FBI states that Doug Letter made the following admissions:  "*LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members…there are no express rules for the Vice Chair (Cheney) as there would be for a Ranking Member.*"  Letter went on to add that "*A copy of Section 3 (b) was not provided to*

2

*COSTELLO with the subpoena.  He added that COSTELLO never raised any objections related to the requirement stipulated in paragraph 11."*

That statement by the General Counsel of the House is an admission that the Government's above representation that the Committee provided the House of Representatives established rules for deposition is false.  Additionally, it is an admission that pursuant to paragraph 11 of the 117th Congress Regulations For Use of Deposition Authority, Mr. Bannon **did not have to appear for deposition,** because paragraph 11 provides that when a subpoenaed person does not receive a copy of Rule 3 (b), as the General Counsel admitted that Bannon and Costello did not, then that person does not have to appear for a deposition.  Paragraph 11 reads:

"A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress and these regulations."  The provision does not require that the witness make a specific claim under this section.

4.   On page three, the next false statement claimed by the Government is that Costello failed to reveal that: *"in the eleven days after accepting service of the subpoena, instead of gathering and reviewing potentially responsive records, Mr. Costello had spent the time searching for an attorney representing former President Trump."*

There is simply no basis whatsoever for the Government reaching that conclusion, which is based entirely on speculation on their part and is in fact false, but there is no obligation for an attorney for Mr. Bannon to tell the Government what he was or was not doing at any time.

5.   The next false statement claimed by the Government, again on page three, is that:  *"Mr. Costello SEEMINGLY did so (failing to gather and review potentially responsive records) because he was trying to help the Defendant (Bannon) find a way to avoid compliance with the subpoena, indeed contrary to what the Defendant SUGGESTS to the Court, Mr. Costello told the Government that he believed he MAY have attempted to contact Clark first."*

Again, the Government is engaging in rank speculation about an irrelevant fact—i.e., who contacted who first—and ascribing falsity to Defendant's counsel.  I suggest they are projecting

3

-558-

and not factually reporting about irrelevant details. The issue is whether the former President invoked Executive Privilege, and he clearly did.

      6.    The next false statement claimed by the Government, found on page four, is that: *"the former President never properly (invoked executive privilege) and the Defendant and Mr. Costello knew this."*

Once again, this is clearly a false claim which is refuted by the very evidence the Government cites. Justin Clark telephoned Mr. Costello and orally stated that the President was invoking executive privilege and that he would later send a letter by email making the same invocation. The exhibits provided to the Government by Mr. Costello, and now provided to the Court by the Government, clearly show that Mr. Costello stated that he was confident that executive privilege had been invoked, despite Chairman Thompson's incorrect statements that President Trump had not formally or informally invoked executive privilege. The request to Mr. Clark to contact the Select Committee directly was simply to stop this silly argument over Chairman Thompsons' incorrect legal and factual position. The email Mr. Costello provided to the Government from him to Justin Clark on October 18, 2021 stated: "I believe it is clear that he (President Trump) has invoked (Executive Privilege). But Congressman Thompson appears confused as he continues to incorrectly reiterate that President Trump has yet to formally or informally invoke those privileges….To eliminate all doubt in the Committee's mind, please confirm to the Committee that President Trump has invoked executive and attorney-client privileges…"

      7.    Another false statement made by the Government was: *"This was not Mr. Costello's only recognition that the former President had not actually invoked executive privilege."* Then to allegedly prove that false claim, the Government added: *"As he told the Government over the course of the Defendant's dealings with the Committee, Mr. Costello reached out to Clark several times to try to have the former President make a direct invocation, but Mr. Clark refused."*

4

First, the statement as written by the Government does not prove that Mr. Costello ever recognized that President Trump had not invoked executive privilege. Mr. Costello never stated that President Trump failed to invoke executive privilege; he said the exact opposite, as stated in the email excerpt of October 18, 2021, referenced in 5 above. The false claim that was being made by Chairman Thompson, with no cited authority, was that President Trump had not formally or informally invoked executive privilege. Contrary to what Chairman Thompson was claiming, there is nothing that states that a President must invoke executive privilege in any specified way. Second, Mr. Costello, in contacting Mr. Clark by email which he voluntarily provided to the Government, was simply trying to stop Chairman Thompson from continuing to make this legally incorrect assertion. Third, Mr. Clark never refused to contact the Select Committee; he simply chose not to do so for reasons that were never stated.

8. The Government then, on the bottom of page four, and out of chronological sequence, makes the false claim that: "*the Defendants did this (failed to respond to the document requests), despite Mr. Costello having identified categories of information they understood could not possibly implicate executive privilege.*"

What the Government is attempting to convey is that Bannon did not have five categories of documents requested, a sixth category was a public podcast directly available to the Committee and the last category was material that clearly would be protected by attorney-client and work product privileges, even though it included General Flynn who was at that time working for Sidney Powell, Esq., one of the lawyers working for President Trump at that time. Costello explained that he agreed that executive privilege could not be claimed for categories of documents that did not exist.

9. The next category of false claims the Government is making pertains to the issue of the Select Committee's rules which prohibit any attorney other than the deponent's from attending the deposition. The effect of this rule is, in situations involving executive privilege, to prevent the President's counsel from attending and protecting the executive privilege on behalf of the privilege holder, the President of the United States. At the time of the statements to the

5

Committee that the Government references, Mr. Costello and Mr. Bannon were aware of several opinions of the Office of Legal Counsel ("OLC") which stated that when executive privilege was at stake, if the Congressional Committee had a rule which prohibited counsel for the President from being present to protect the privilege, the subpoena was unlawful, illegal and unconstitutional and therefore incapable of being enforced either civilly or criminally.  The net result of those opinions was that the Bannon subpoena was null and void, and Bannon was advised that he did not have to attend the deposition or produce documents because the subpoena was void.  The Government, in its alleged rendition of the facts for its motion, fails to discuss the OLC opinions at all, which were the major focus of the two video discussions seeking a declination.  With that omission by the Government in mind, let's turn to the false claims made by the Government:

> *"The Defendant claims that Mr. Costello informed Committee counsel in a call on October 13 that the Defendant could not appear if former President Trump's counsel were not allowed by the Committee to appear. (ECF No. 30 at 7)"*

The Government cites as its authority for the above statement ECF No. 30 at 7.  The reason they did not quote from that citation is the citation does not justify or even claim what the Government states.  The statement in that brief, by Bannon's counsel, specifically DOES NOT CLAIM THAT.  What that statement actually says is:

> **"On October 13, 2021, Mr. Costello spoke by telephone with Sean Tonolli, Esquire, Senior Investigative Counsel for the Select Committee.  Among other things, Mr. Tonolli told Mr. Costello that the Select Committee would not allow an attorney for former President Trump to be present and participate in the deposition of Mr. Bannon, or to assert privilege objections on behalf of President Trump.  Mr. Costello advised Mr. Bannon that, based upon the OLC opinions, Mr. Bannon need not appear for a congressional deposition at which President Trump's attorney could not be present to assert executive privilege because the subpoena was unconstitutional and a nullity."**

A plain reading of the above-quoted passage reveals that Mr. Costello never claimed to have advised the Select Committee; rather, it is plainly stated that Mr. Costello advised his client, Mr. Bannon, that he did not have to appear based upon the OLC opinion that said such a subpoena was illegal, unlawful, unconstitutional and incapable of being enforced either civilly or criminally and that the OLC opinion was binding upon the Executive Branch of Government, which includes the Unites States Attorneys.

10.    The next category is not technically a false statement by the Government; rather, they are misleading statements about what Mr. Costello **did not** tell the Court or the Government:

> *"Mr. Costello conceded that he did not ask Committee Counsel to change the rules because he noted that Committee Counsel was not in a position to do so."*

The above statement is literally true, but meaningless. Nevertheless, the Government offers it to support its false claim that Mr. Costello was hiding something that he should not have hidden. Mr. Costello did not make that request of Staff Counsel for several reasons: Costello was under no obligation to reveal to Staff Counsel that Mr. Bannon had a complete defense to the subpoena's demands based upon the OLC opinions; Costello was well aware that it was fruitless to make a request for a change of rules to the Staff Counsel, because Staff Counsel had no authority to so act.

11.    Additionally, the Government makes another misleading claim that:

> *"And, as Mr. Costello told the Government, but does not tell the Court, never did he ask Clark if counsel for former President Trump wanted to attend."*

The statement is literally true, but misleading to the extent it implies Mr. Costello was hiding something. Since the position of the Select Committee was that no one other than deponent's personal counsel could attend, there was no reason to ask that question; once again, the Government speculates that Justin Clark, Esq. would be that counsel, when they are well aware that President Trump had numerous lawyers.

12.    Finally, there is the Government's "Big Lie" that Costello's use of the word "Beware" in an email that Costello voluntarily provided to the Government:

> *"was to warn Bannon that his failure to comply could result in a referral to DOJ."*

The Government's claim is false. The warning was to Mr. Bannon to beware of Justin Clark. The email of October 14, 2021 actually stated: "I don't know what game Clark is playing, but it puts Steve Bannon in a dangerous position." There is one statement the Government made in its response that we are in total agreement with on page 9 of its 28-page presentation:

"*the record above is littered with bad faith*"

That statement aptly describes the Government's twelve false statements trying

unsuccessful to impugn the integrity and veracity of Mr. Costello.

**WHEREFORE**, for the foregoing reasons, Defendant Stephen K. Bannon respectfully

requests that this Court consider the foregoing Surreply as part of the record, and deny the

Government's Motion In Limine [Doc. 29].

Dated: March 17, 2022                    Respectfully submitted,

                                         SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                         ___/s/ M. Evan Corcoran_____
                                         M. Evan Corcoran (D.C. Bar No. 440027)
                                         400 East Pratt Street - Suite 900
                                         Baltimore, MD 21202
                                         Telephone: (410) 385-2225
                                         Facsimile: (410) 547-2432
                                         Email: ecorcoran@silvermanthompson.com

                                         ___/s/ Robert J. Costello_____
                                         Robert J. Costello (*pro hac vice*)
                                         Davidoff Hutcher & Citron LLP
                                         605 Third Avenue
                                         New York, New York 10158
                                         Telephone: (212) 557-7200
                                         Facsimile: (212) 286-1884
                                         Email: rjc@dhclegal.com

                                         ___/s/ David I. Schoen_____
                                         David I. Schoen (D.C. Bar No. 391408)
                                         David I. Schoen, Attorney at Law
                                         2800 Zelda Road, Suite 100-6
                                         Montgomery, Alabama 36106
                                         Telephone: (334) 395-6611
                                         Facsimile: (917) 591-7586
                                         Email: schoenlawfirm@gmail.com

                                         *Counsel for Defendant Stephen K. Bannon*

8

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of March, 2022, a copy of the foregoing

Surreply was served *via* the Court's CM/ECF system on all properly registered parties and counsel.


                      /s/ M. Evan Corcoran              

                    M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                              |   |                            |
|------------------------------|---|----------------------------|
| UNITED STATES OF AMERICA     | : |                            |
|                              | : | Criminal No. 21-670 (CJN)  |
|                              | : |                            |
| v.                           | : |                            |
|                              | : |                            |
| STEPHEN K. BANNON,           | : |                            |
|                              | : |                            |
| *Defendant*.                 | : |                            |
|                              | : |                            |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION
TO THE GOVERNMENT'S MOTION IN LIMINE ON ADVICE OF COUNSEL**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully submits this supplemental brief pursuant to the Court's March 16, 2022, minute order,[1] and states as follows:

### *Licavoli* **Is Inapposite**

This is a case of first impression. Never has a former top presidential advisor been prosecuted where: (1) he received a congressional subpoena; (2) the President he served asserted executive privilege; (3) counsel advised him that official Department of Justice policy required him not to comply; and (4) counsel communicated these legal principles to the committee and sought an accommodation allowing judicial resolution of the dispute between the two political branches. *Licavoli* is distinguishable. [2] It is dispositively distinguishable because it did not involve

---

[1] This Court allowed additional submissions on the application of *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961) [Tr. 3/16/2022 at 90, 98]. Our opposition distinguished *Licavoli* – and the other cases relied upon by the Government – because it did not involve a subpoena to a former top official asserting executive privilege on behalf of a President. [Doc. 30 at 3-4, 15-20].

[2] The *Licavoli* opinion includes few facts. The district court and court of appeals files are not accessible in the time available for supplemental briefing. Thus, we cite the facts of *Licavoli* as stated in official Senate records.

advice of counsel pertaining to an assertion of executive privilege, or the reliance upon official Department of Justice policies.

The assertion of executive privilege takes this case outside of the "willfulness" framework of *Licavoli*. Mr. Bannon's counsel advised him, based on official Department of Justice policies, that once executive privilege was asserted he could not exercise his free will to make any decision other than to honor the invocation of executive privilege. Mr. Bannon stood fast – caught between the competing interests of Congress and the executive branch. It is constitutionally impermissible as a matter of due process to subject Mr. Bannon to criminal punishment where he sought only judicial resolution of this interbranch dispute.[3] *See* [Ex. 5] (Rex Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. Rev. 231, 259).

Applying *Licavoli* to this case would have impermissible institutional effects as well. For instance, it would nullify the well-settled principle that a President's assertion of executive privilege is presumptively valid. *See Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-09 (1974). It would also violate the constitutional separation-of-powers principles that give the executive branch the authority to determine the privileged nature of its own communications.

In *Licavoli*, a Senate committee was investigating the infiltration of labor unions by organized crime in Detroit, Michigan. [Ex. 1 at 4]. Testimony before the committee suggested that Mr. Licavoli, a reputed mobster, had knowledge of the matters under investigation. [*Id*. at 3]. Mr. Licavoli was personally served with a lawful subpoena. [*Id*. at 1]. He did not respond with an

---

[3] On prior occasions when investigatory bodies sought Mr. Bannon's testimony, his counsel negotiated accommodations that protected executive privilege, and he appeared and testified.

assertion of privilege.[4] The committee later sent a telegram to Mr. Licavoli, which he refused to accept. [*Id*. at 2]. Mr. Licavoli's attorney acknowledged that his client was served with a subpoena. [*Id*. at 5.] Mr. Licavoli's attorney told the committee only that "he doubted that Mr. Licavoli was going to appear before the committee." [*Id*.].

In 1961, when *Licavoli* was decided, the official executive branch position was that 2 U.S.C. § 192 did *not* apply to executive branch officials when executive privilege was asserted.[5] That remains the official Department of Justice policy today, under published guidance that has not been withdrawn. The *Licavoli* panel could not have contemplated that they were establishing law on whether an advice of counsel defense is available to a former top presidential advisor who relied upon advice of counsel and asserted executive privilege on behalf of the President he served. The issue was not presented. This Court must look beyond *Licavoli* to resolve the complex constitutional issues presented here.[6] The Ninth Circuit has explained:

> Using the techniques developed at common law, a court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced. Insofar as there may be factual differences between the current case and the

---

[4] In *Sinclair v. United States*, 279 U.S. 263 (1929), the decision on which *Licavoli* is based, the witness affirmatively announced that he was not claiming any privileged reason for not complying with the subpoena, rather, he challenged the pertinency of the questions posed. *Id*. at 290-291. Thus, *Sinclair* is also distinguishable.

[5] In 1956, Deputy Attorney General William Rogers presented a report to Congress that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President had asserted executive privilege. [*See* Ex. 6 at 1] (*Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C.) at *2).

[6] Courts citing *Licavoli* have not adopted the restrictive definition of "willfulness" urged by the Government in this case. *See, e.g.*, *United States v. Myers*, 2008 U.S. Dist. LEXIS 43981, *4, 2008 WL 2275457 (N.D. W. Va., June 3, 2008) (quoting *Licavoli* on "willfulness" and explaining that "willfulness" in the criminal contempt context means "a volitional act done by one who knows or reasonably should be aware that his conduct is wrongful."). The question whether an advice of counsel defense is available in a 2 U.S.C. § 192 prosecution depends on the facts of the case. *See, e.g.*, *Townsend v. United States*, 95 F.2d 352, 359-60 (D.C. Cir.), ("There is nothing in the excluded evidence to indicate that appellant submitted the question of his duty to attend the committee hearings to an attorney and acted honestly upon that advice, relying upon it and believing it to be correct. There is nothing in the excluded evidence to indicate that there was any uncertainty in the mind of the appellant as to the law or as to his duty to attend.") *cert. denied*, 303 U.S. 664 (1938) *citing United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Williamson v. United States*, 207 U.S. 425, 453 (1908).

earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis.

*Hart v. Massanari*, 266 F.3d 1155, 1172-73 (9th Cir. 2001). The assertion of executive privilege, communicated by counsel for Mr. Bannon, changes everything. That advice was based on decades of official policy dictating that a witness cannot comply with a congressional subpoena where executive privilege is invoked. The advice was also based on official policy stating that congressional subpoenas that purport to require testimony by executive branch officials, but do not allow the presence of agency counsel to protect privilege, are invalid and unenforceable [Docs. 30-1; 34-1] (Decl. of Robert J. Costello, Esq.).

The sole reason that Mr. Bannon did not comply with the subpoena was the advice of counsel he received, based on the Department of Justice's long-established position that he was barred from complying. [*See* Ex. 7 at 22] (*Congressional Oversight of the White* House, 2021 WL 222744 (O.L.C.) at *33). Therefore, denying Mr. Bannon the opportunity to put forward an advice of counsel defense – the justification for his non-compliance – would deny him his right to a fair trial.  Foreclosing this defense would also mislead the jury on what occurred. It is the essence of why Mr. Bannon believed that he was acting in accordance with the law.

Once President Trump asserted executive privilege, Mr. Bannon was no longer free to act as he wished. As counsel advised him, consistent with official Department of Justice policy, he was not permitted to comply with the subpoena. [Doc. 34-1, Ex. C] (Declaration of Robert J. Costello, Esq.). Counsel also advised Mr. Bannon that, because the Select Committee would not allow the privilege holder's representative to be present at the deposition, the subpoena was constitutionally invalid. [*Id*.] (relying upon the May 23, 2019, Office of Legal Counsel Opinion,

Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees). Under these circumstances, Mr. Bannon could not act with volition.[7]

At that point, it became a dispute between two branches of government. Mr. Bannon could not lawfully disregard the executive branch's invocation of privilege.[8] Counsel advised Mr. Bannon that he could not *waive* executive privilege, because it was the President who held the privilege. Counsel also advised Mr. Bannon that, pursuant to official Department of Justice policy, he need not comply with the subpoena. Mr. Bannon relied upon that advice. [Doc. 34-1, (Decl. of Robert J. Costello)].

By contrast, in *Licavoli* the accused had freedom to decide how to proceed. He decided not to comply. Neither he nor his counsel provided *any* reason for non-compliance, and the accessible records do not note any request for accommodation. Nor do those records reflect any specific advice provided by counsel. Rather, Mr. Licavoli's counsel simply communicated to the committee that he "doubted" that his client would appear. Here, by contrast, counsel for Mr. Bannon clearly communicated to the Select Committee that President Donald J. Trump asserted executive privilege in response to the subpoena, and that he had therefore advised Mr. Bannon that, consistent with the official policy of the Department of Justice, Mr. Bannon could not lawfully comply. To accommodate the separation-of-powers interests involved, counsel for Mr. Bannon asked that a judge decide the issues.

---

[7] Denying Mr. Bannon, the right to rely on the defense of advice of counsel here, based as it was on long-established Department of Justice official policy – a factor not present in *Licavoli* – would be irreconcilable with this Circuit's decision in *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring) and with the Model Penal Code §2.04(3)(b).

[8] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 116 (1984) ("We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.").

Unlike in *Licavoli*, Mr. Bannon's counsel accepted service of the subpoena, engaged with committee counsel, presented applicable factual and legal arguments on the executive privilege issue and official Department of Justice policy, and advised the committee that Mr. Bannon *could not lawfully* appear. Because the two cases present entirely different factual and legal issues, *Licavoli* does not limit this Court's consideration of the constitutional considerations present here.

### Differences Between Licavoli And This Case

| Licavoli | Bannon |
|---|---|
| Subpoena served on Mr. Licavoli. Ex.1 at 3. | Counsel accepted service. [US-000257] |
| No assertion of executive privilege. | Counsel for Mr. Bannon received a letter from counsel for President Trump referencing the subpoena and stating that President Trump asserted executive privilege. [Doc. 31-2 (US-000971 to 000972)] |
| No attendance of counsel issue. | Counsel for Mr. Bannon confirmed that Select Committee would not allow President Trump's lawyer to attend to protect executive privilege and advised Mr. Bannon that official Department of Justice policy rendered the subpoena invalid and unenforceable. [US-001772, 001779 and US-000317 to 0003188] |
| No executive privilege issue. | Counsel advised the Select Committee in writing of the presidential assertion of executive privilege. [Doc. 29-1 (US-000418 to 000-419)] |
| No assertion of legal justification. Ex. 1 at 5 (counsel informed Senate committee only that "he doubted that Mr. Licavoli was going to appear before the committee"). | Counsel advised Select Committee that "[w]e will comply with the directions of the courts, when and if they rule on these claims both of executive and attorney client privileges. Since these privileges belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr. Bannon is legally unable to comply with your subpoena requests for documents and testimony." [Doc. 29-1 at US-000419] |

| | |
|---|---|
| No accommodation sought. | Counsel for Mr. Bannon requested an accommodation in several communications with the Select Committee, and sought an adjournment after the filing of a federal lawsuit, *Trump v. Thompson*, 21-cv-02769. [Doc. 31-3 SKB-000026] |

### *Licavoli* Does Not Foreclose This Court's Consideration Of Legal Principles Not Presented In That Case That Control Here

There are several reasons why this is a case of first impression. First, executive privilege presents unique issues. Where there is a dispute between coordinate branches over the disclosure of information, special rules apply. Courts must accord more deference to the asserting party than they would when considering statutory or common law privileges held by a private citizen. *See United States v. Nixon*, 418 U.S. 683, 708, 715 (1974). A President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with the ability to carry out constitutional responsibilities. *See Myers v. United States*, 272 U.S. 52 (1926).[9] Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege. [Doc. 28-11 at 134].

In addition, subjecting Mr. Bannon to criminal prosecution under these circumstances would violate his due process rights. He obeyed an express order of the President he had served. His actions were in accordance with official Department of Justice policies, which recognize that executive privilege is necessary to aid the President in the performance of constitutional duties.

---

[9] As then Assistant Attorney General Ted Olson wrote in his 1984 OLC opinion, "… if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 134 (1984); *see also* Ex. 7 at 10.

*See Cox v. Louisiana*, 379 U.S. 559 (1965); *Raley v. Ohio*, 360 U.S. 423 (1959). No court has considered these principles in the context of a 2 U.S.C. § 192 prosecution where executive privilege has been asserted. In this regard, this Court writes on a blank slate.

Another reason that this is a case of first impression is historical. *Licavoli* was decided in 1961 based upon actions in 1958. At that time, there was nothing to suggest to a panel of the D.C. Circuit Court of Appeals that they were establishing law on the question of whether an advice of counsel defense is either available or foreclosed where a former top presidential advisor rebuffs a congressional subpoena because a President has asserted executive privilege. In 1961 (and in the six decades after), there was no published opinion on how 2 U.S.C. § 192 applies in the face of an assertion of executive privilege.[10] The *Licavoli* panel could not have foreseen that 60 years later the Government would rely upon its opinion for the proposition that an advice of counsel instruction is not available in a situation involving the assertion of executive privilege by a former top presidential advisor. In 1961, the official view was that 2 U.S.C. § 192 did not apply to the executive branch where executive privilege is asserted. From a jurisprudential standpoint, a 1961 D.C. Circuit panel decision that *did not involve* executive privilege – at a time when the official government policy was that the statute was inapplicable where executive privilege was asserted – cannot control a case involving the assertion of executive privilege, and the attendance of counsel to protect the privilege, 60 years later.[11] No judicial decision published since *Licavoli* changes our view. To the contrary, numerous official Department of Justice pronouncements support our

---

[10] The notion that executive privilege stands alone and is a fundamental distinguishing factor in this case that must permit the defense of advice of counsel on the facts presented here is further supported by the absence of executive privilege from the privileges expressly identified in 28 U.S.C. §193 as not justifying noncompliance.

[11] The principle of desuetude provides further support for the notion that the dearth of authority even considering this issue over many decades provides further support, together with the development of the law on "willfulness" and the OLC Opinions on point, that *Licavoli* simply does not apply here.

position.[12] During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege." [Ex. 2 at 7] (*Application of 28 U.S.C. Sec. 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) (emphasis added)). Mr. Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." [*Id.*].[13]

Another reason why *Licavoli* is distinguishable involves politics. A core value in our criminal justice system is that politics plays no role in criminal charging decisions. This case challenges that truism. Congress has found other top executive branch officials in contempt, despite assertions of executive privilege in response to congressional subpoenas. The list includes distinguished public servants such as Attorney General William Barr and Attorney General Eric Holder. But in every prior case, the accused did not face criminal prosecution. In each case, the decision whether to pursue criminal charges rested in the hands of a political appointee (the U.S. Attorney) who was of the same political party as the political appointee found in contempt of Congress. This case is a unicorn – the rare case where the accused presidential advisor is affiliated

---

[12] In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would not present the matter to a grand jury (notwithstanding the mandatory language in 2 U.S.C. § 194). [Ex. 6 at 1]. In Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984), drawing on canons of statutory construction, including legislative history, and basic constitutional principles, including constitutional separation of powers principles, the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. [Doc. 28-11].

[13] *See also* [Ex. 3] (Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives (Feb. 29, 2008)); [Ex. 4] (*Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986)).

9

with one party (Republican), while both the referring house of congress and the U.S. Attorney (political appointee) are under the control of the other party (Democrat).

This Court stands as a bulwark against politically motivated criminal prosecutions. Official statements of government policy have been consistent over many decades, across political parties. The advice Mr. Bannon acted upon was sound.[14] In this unprecedented case – where a former executive branch official is subject to criminal punishment despite decades of official pronouncements stating that the conduct is not criminal – it is especially important to hold the executive branch to its prior official pronouncements on the law, regardless of politics.

---

[14] As the D.C. Circuit wrote in *Barker*, 546 F.2d at 952, it does not matter if the underlying position was wrong; it is reasonable and sufficient to rely on official pronouncements and directives of the Attorney General.

## CONCLUSION

**WHEREFORE**, Defendant Stephen K. Bannon respectfully requests that this Court deny

the Government's Motion In Limine On Advice Of Counsel.

Dated: March 22, 2022                        Respectfully submitted,

                                             **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                             ___/s/ M. Evan Corcoran___
                                             M. Evan Corcoran (D.C. Bar No. 440027)
                                             400 East Pratt Street – Suite 900
                                             Baltimore, MD 21202
                                             Telephone: (410) 385-2225
                                             Facsimile: (410) 547-2432
                                             Email: ecorcoran@silvermanthompson.com

                                             ___/s/ David I. Schoen___
                                             David I. Schoen (D.C. Bar No. 391408)
                                             David I. Schoen, Attorney at Law
                                             2800 Zelda Road, Suite 100-6
                                             Montgomery, Alabama 36106
                                             Telephone: (334) 395-6611
                                             Facsimile: (917) 591-7586
                                             Email: schoenlawfirm@gmail.com

                                             ___/s/ Robert J. Costello___
                                             Robert J. Costello (*pro hac vice*)
                                             Davidoff Hutcher & Citron LLP
                                             605 Third Avenue
                                             New York, New York 10158
                                             Telephone: (212) 557-7200
                                             Facsimile: (212) 286-1884
                                             Email: rjc@dhclegal.com
                                             *Counsel for Defendant Stephen K. Bannon*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of March, 2022, a copy of the foregoing Defendant's Supplemental Brief In Opposition To The Government's Motion In Limine On Advice Of Counsel was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

 /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

# EXHIBIT 1



## Calendar No. 2313

| 85TH CONGRESS 2d Session | } | SENATE | { | REPORT No. 2268 |

---

## PROCEEDINGS AGAINST PETER LICAVOLI FOR CONTEMPT OF THE SENATE

AUGUST 8, 1958.—Ordered to be printed

Mr. McCLELLAN, from the Senate Select Committee on Improper Activities in the Labor or Management Field, submitted the following

## REPORT

[To accompany S. Res. 364]

The Senate Select Committee on Improper Activities in the Labor Management Field, created and authorized by Senate Resolution 74, agreed to January 30, 1957, as amended by Senate Resolution 88, agreed to February 7, 1957, of the 85th Congress, 1st session, and further extended and authorized by Senate Resolution 221, agreed to January 29, 1958, of the 85th Congress, 2d session; and under the rules of procedure adopted by the committee on February 5, 1957, and under the Standing Rules of the Senate, caused to be issued a subpena to Peter Licavoli, which was duly served on him on July 28, 1958. Said subpena directed Peter Licavoli to appear forthwith before the committee at their committee room, Senate Office Building, Washington, D. C., and then and there to testify relative to the subject matter under consideration by the said Senate Select Committee on Improper Activities in the Labor or Management Field.

The subpena served upon the said Peter Licavoli is set forth as follows:

UNITED STATES OF AMERICA

CONGRESS OF THE UNITED STATES

L–4662

To PETER LICAVOLI, *Detroit, Mich., Greeting:*

Pursuant to lawful authority, you are hereby commanded to appear before the Senate Select Committee on Improper Activities in the Labor or Management Field of the Senate of the United States, forthwith, at their committee room 101, Senate Office Building, Washington, D. C., then and there to testify what you may know relative to the subject matters under consideration by said committee.

20008

2                    PROCEEDINGS AGAINST PETER LICAVOLI

Hereof fail not, as you will answer your default under the pains and penalties in such cases made and provided.

To _____ to serve and return.

Given under my hand, by order of the committee, this 25th day of July in the year of our Lord one thousand nine hundred and fifty-eight.

(Signed)   JOHN L. MCCLELLAN,
*Chairman, Senate Select Committee on Improper Activities in the Labor or Management Field.*

It is requested that you telephonically contact Mr. Robert F. Kennedy at Washington, D. C., Capitol 4–3121, extension 4828, for further instructions.

JULY 28, 1958.

I made service of the within subpena by personal service the wi.hin-named Peter Licavoli, at Detroit, Mich. (eighth floor lobby, Federal Building) at 10:42 a. m., on the 28th day of July 1958.

(Signed)   EDWARD M. JONES.

Peter Licavoli was served with a personal subpena requiring his forthwith appearance before this committee in Washington, D. C. He was called for the purpose of eliciting testimony from him concerning the subject matters then under consideration by the committee. Committee staff members contacted Joseph Louisell, attorney for Peter Licavoli, on July 28, 1958, and advised counsel that Mr. Licavoli's appearance would be required on the morning of July 31, 1958.

A telegram was directed to Peter Licavoli, at his home in Michigan, on July 29, 1958, again notifying him to appear on July 31, 1958. This committee was notified that the aforesaid telegram was refused by the addressee.

On July 31, 1958, at a regular session of the committee, Peter Licavoli was called as a witness.  He did not respond.

At all times from the service of the aforesaid subpena upon Peter Licavoli on July 28, 1958, until the present, Peter Licavoli has failed to communicate in any manner with this committee.

Excerpts from the meeting of the committee on July 31, 1958, and relevant documents, are annexed hereto as exhibit 1.

As a result of the refusal of said Peter Licavoli to appear and to answer questions pertinent to said inquiry, the committee was prevented from receiving testimony concerning the matters under inquiry by this committee in accordance with the terms of the subpena served upon this witness.

The Senate Select Committee on Improper Activities in the Labor or Management Field met on August 8, 1958, and after reviewing the facts in this matter as set forth in this report, resolved to present to the United States Senate for its immediate action a resolution requiring the United States attorney for the District of Columbia to proceed against the said Peter Licavoli in the manner and form prescribed by law.

-579-

PROCEEDINGS AGAINST PETER LICAVOLI          3

## EXHIBIT 1

### UNITED STATES OF AMERICA

#### CONGRESS OF THE UNITED STATES

L–4662

To PETER LICAVOLI, *Detroit, Michigan, Greeting:*

Pursuant to lawful authority, you are hereby commanded to appear before the Senate Select Committee on Improper Activities in the Labor or Management Field of the Senate of the United States, forthwith, at their committee room 101, Senate Office Building, Washington, D. C., then and there to testify what you may know relative to the subject matters under consideration by said committee.

Hereof fail not, as you will answer your default under the pains and penalties in such cases made and provided.

To _____ to serve and return.

Given under my hand, by order of the committee, this 25th day of July in the year of our Lord one thousand nine hundred and fifty-eight.

JOHN L. MCCLELLAN,
*Chairman, Senate Select Committee on Improper Activities in the Labor or Management Field.*

It is requested that you telephonically contact Mr. Robert F. Kennedy at Washington, D. C., Capitol 4–3121, extension 4828, for further instructions.

[Endorsement]

JULY 28, 1958.

I made service of the within subpena by personal service the within-named Peter Licavoli, at Detroit, Mich., eighth floor lobby, Federal Building, at 10:42 a. m., on the 28th day of July 1958.

EDWARD M. JONES.

———

PETER LICAVOLI,
*1154 Balfour, Grosse Pointe, Mich.:*

Following up on conversation with your attorney, Mr. Louisell, and pursuant to subpena served upon you, you are hereby notified to appear in room 101, Senate Office Building, Washington D. C., at 9 a. m., Thursday, July 31, 1958.

ROBERT F. KENNEDY,
*Chief Counsel, Senate Select Committee on Improper Activities in the Labor or Management Field.*

———

DETROIT, MICH., *July 29, 1958.*

ROBERT F. KENNEDY,
*Chief Counsel, Senate Select Committee on Improper Activities in Labor or Management Field:*

Your telegram July 29 to Peter Licavoli, 1154 Balfour, Grosse Pointe, Mich., is undelivered. Addressee refused to accept.

WESTERN UNION.

Digitized by Google

4      PROCEEDINGS AGAINST PETER LICAVOLI

## LINEN AND OVERALL INDUSTRIES IN DETROIT AREA

UNITED STATES SENATE,
SELECT COMMITTEE ON IMPROPER ACTIVITIES
IN THE LABOR OR MANAGEMENT FIELD,
*Washington, D. C., Thursday, July 31, 1958.*

The select committee met at 11 a. m., pursuant to Senate Resolution 74, agreed to January 30, 1957, in the caucus room, United States Senate, Senator John L. McClellan (chairman of the select committee) presiding.

Members of the select committee present: Senator John L. McClellan, Democrat, Arkansas; Senator Sam J. Ervin, Jr., Democrat, North Carolina; Senator Frank Church, Democrat, Idaho; Senator Irving M. Ives, Republican, New York; Senator Barry Goldwater, Republican, Arizona; and Senator Carl T. Curtis, Republican, Nebraska.

Members of the professional staff present: Robert F. Kennedy, chief counsel; John J. McGovern, assistant counsel; Pierre E. Salinger, staff member; and Ruth Young Watt, chief clerk.

(At this point, the following members were present: Senators McClellan, Ives, Ervin, and Goldwater.)

The CHAIRMAN. The hearing will be in order.

The Chair will make a brief statement regarding the next phase of its work. The committee now turns its attention to another specific phase in the continuing inquiry we are making into racketeer and hoodlum infiltration into legitimate business and union enterprises.

In our hearings into the gangland meeting at Apalachin, N. Y., and the infiltration of racketeers into management and labor in the Chicago restaurant industry, we have already established the existence of an organized conspiracy to control certain management and labor activities.

Evidence presented at the time of the Apalachin hearing confirmed the close ties between racketeers in New York, Cleveland, upper New York State, and Pennsylvania, with individuals in Detroit, Mich. Further testimony was to the effect that the Detroit group is a close-knit operation controlling illegal activities in a number of different fields, including gambling and narcotics.

Now we shall inquire into whether or not known racketeers, or associates of known racketeers, have established a base in the linen and overall industries in Detroit, Mich.

Mr. KENNEDY. Did you ever see any of these people in the headquarters of the new company?

Mr. MILLER. They met occasionally in the office of the building that I rented them.

Mr. KENNEDY. Did you ever see Pete Licavoli in there?

Mr. MILLER. On one occasion I was asked in to meet the boys, and Joe Lehr took me in, and introduced me. Bommarito, Licavoli, and Angelo Meli were there at the time. Of course, I was hustled in and introduced to them and hustled right out again.

Mr. KENNEDY. Was Mr. Angelo Meli in there on other occasions?

Mr. MILLER. Several times.

Mr. KENNEDY. You saw him a number of times?

Mr. MILLER. It seemed every time they were ready to take over a big stop, he would be in there meeting with them, I assume laying out some sort of strategy.

**-581-**

PROCEEDINGS AGAINST PETER LICAVOLI                5

(At this point, Senator Ives withdrew from the hearing room.)

Mr. KENNEDY. Why would these people be able to take over stops and get business for this new company?

Mr. MILLER. Well, I imagine with their underworld background, that a lot of small-business men and gas stations and garages would be afraid to give them an argument. A lot of people like to live on.

\*        \*        \*        \*        \*        \*        \*

Mr. MILLER. That is right. I understood it was a direct payoff.

(At this point, Senator Goldwater withdrew from the hearing room.)

Mr. KENNEDY. Mr. Chairman, we will have a good deal more testimony on this matter next week, starting early in the week, as to the recipient of the money. That is all for now.

The CHAIRMAN. Have you any questions, Senator Ervin?

Senator ERVIN. I have no questions.

The CHAIRMAN. Thank you very much, Mr. Miller.

Call the next witness.

Mr. KENNEDY. Mr. Peter Licavoli.

The CHAIRMAN. Mr. Licavoli, come around, please.

Do we have any information about him?

Does anyone present, anyone on the staff or anyone in the audience, the press, or anyone else, have any information about Mr. Peter Licavoli, of Detroit, Mich.?

Mr. KENNEDY. Mr. Chairman, we had a conversation with his attorney and also sent him a telegram. The telegram was returned with the notation that the addressee had refused to accept the telegram. We notified his attorney that he should be here and be prepared to testify, and the attorney stated at that time that as Mr. Licavoli was served at a time while he was in Detroit, Mich., while he was awaiting sentence, that he doubted if Mr. Licavoli was going to appear before the committee. He was notified at that time that that was no reason for his not appearing, and that he should be here.

He is being called at this time.

The CHAIRMAN. The Chair has before him the official subpena served on Mr. Licavoli; according to the return on it, it was served in Detroit, Mich., in the eighth floor lobby of the Federal Building, at 10:42 a. m. on the 28th day of July. It was served, according to the return, by Edward M. Jones. This subpena will be printed in the record at this point.

Unless Mr. Licavoli appears during the day I will ask counsel to make a further statement for the record, if he does not appear during the day, as to further contacts or contacts you had with his counsel and so forth.

Then the committee staff will be instructed to immediately prepare contempt action so that the committee may process it promptly.

UNITED STATES OF AMERICA

CONGRESS OF THE UNITED STATES

To PETER LICAVOLI, *Detroit, Mich., Greeting:*

Pursuant to lawful authority, you are hereby commanded to appear before the Senate Select Committee on Improper Activities in the Labor or Management Field of the Senate of the United States,

**6**        PROCEEDINGS AGAINST PETER LICAVOLI

forthwith, at their committee room 101, Senate Office Building, Washington, D. C., then and there to testify what you may know relative to the subject matters under consideration by said committee.

Hereof fail not, as you will answer your default under the pains and penalties in such cases made and provided.

To _____ to serve and return.

Given under my hand, by order of the committee, this 25th day of July in the year of our Lord one thousand nine hundred and fifty-eight.

(Signed)  JOHN L. McCLELLAN,

*Chairman, Senate Select Committee on Improper Activities in the Labor or Management Field.*

It is requested that you telephonically contact Mr. Robert F. Kennedy at Washington, D. C., Capitol 4–3121, extension 4848, for further instructions.

JULY 28, 1958.

I made service of the within subpena by personal service the within-named Peter Licavoli at Detroit, Mich. (eighth floor lobby, Federal Building), at 10:45 a. m., on the 28th day of July 1958.

(Signed)  EDWARD M. JONES.

Case 1:21-cr-00670-CJN   Document 41-2   Filed 03/22/22   Page 1 of 15

# EXHIBIT 2

# Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges

Section 458 of title 28 does not apply to presidential appointments of judges to the federal judiciary.

December 18, 1995

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On April 25, 1995, President Clinton nominated Mr. William A. Fletcher to be a judge on the United States Court of Appeals for the Ninth Circuit. *See* 141 Cong. Rec. 11,243 (1995). While Mr. Fletcher's nomination has been pending before the United States Senate, questions have arisen as to whether his appointment would violate 28 U.S.C. § 458 because Mr. Fletcher's mother, the Honorable Betty B. Fletcher, has served as a judge on the same court since her appointment in 1979. Section 458 of title 28 provides as follows: ''No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court.''

We have previously opined that 28 U.S.C. § 458 does not apply to presidential appointments of judges to the federal judiciary. *See* Memorandum for Eleanor D. Acheson, Assistant Attorney General, Office of Policy Development, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges* (Mar. 13, 1995). In light of subsequent questions, you have asked whether we adhere to that position. For the reasons that follow, we do.

## A

Two bedrock principles of statutory construction guide our analysis. First, ''we start, as we must, with the language of the statute.'' *Bailey v. United States*, 516 U.S. 137, 144 (1995). Second, ''the meaning of statutory language, plain or not, depends on context.'' [1] *Id.* at 145. In this case, the particularly relevant constituents of context upon which statutory meaning depends are the constitutional framework within which all statutes are drafted and enacted, *see, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (stating principle that statutes be read to protect ''the usual constitutional balance'' of power), the statutory language taken as a whole, *see, e.g., King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (stating

---

[1] As Learned Hand explained, ''words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their [meaning] from the setting in which they are used.'' *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (quoting *Federbush*); *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 25 n.6 (1988) (same).

350

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

the ''cardinal rule'' that a ''statute is to be read as a whole''), and the amendment history of the statute, *see, e.g., Bailey*, 516 U.S. at 144 (taking account of amendment history of 18 U.S.C. § 924(c)(1) to determine the meaning of the word ''use''). Based on our review, we conclude that the plain meaning of the statute precludes its application to presidential appointments to the federal judiciary.

We begin, as indicated, with the language of the statute. The current language of § 458 was adopted in 1911,[2] amending a statute originally enacted in 1887.[3] Quoting the language again, § 458 in its current form provides that: ''No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court.'' The statute does not by its express terms apply to the President, nor does it expressly name judgeships as one of the offices to which a related person may not be appointed. We believe that the inapplicability of this provision to presidential appointments of federal judges is conclusively established by the text of this provision, the history of its amendment, and the text of the Act of 1911 taken as a whole. We elaborate on these reasons in Parts II and III of this memorandum, which to a considerable degree recapitulate the analysis contained in our earlier memorandum. Before revisiting these points, however, in this part we analyze a feature of the constitutional framework within which statutes must be read that, in our view, also dictates the conclusion that § 458 does not apply to presidential appointments of federal judges, even if the text and its textual history did not conclusively establish the point.

Any argument that § 458 does apply to presidential appointments of federal judges depends entirely upon the fact that, while the statute refers to positions to which related persons may not be appointed, it makes no mention at all of the appointing authority, worded as it is in the passive voice. In this context, however, this silence must lead to just the opposite conclusion, because of the well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). We can refer to this principle as a clear statement rule, one that is very well-established and that dictates the plain meaning of § 458.

Then-Assistant Attorney General William H. Rehnquist articulated this principle without limiting it to cases in which application of the statute would raise a constitutional question, opining that statutes ''are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive.'' Memorandum for Egil Krogh, Staff Assistant to the Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Closing of Government Offices in Memory of Former President*

---

[2] Act of Mar. 3, 1911, ch. 231, § 297, 36 Stat. 1087, 1168 (''Act of 1911'').
[3] Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555.

351

*Eisenhower* at 3 (Apr. 1, 1969) ("Rehnquist Memorandum"). Even if this unqualified statement of the principle is overly broad, the narrower formulation given above clearly covers § 458, because its application to presidential appointments to the federal judiciary would raise serious constitutional questions regarding the President's authority under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, as we explain below. Therefore, under the precedents of the Supreme Court as well as of the Department of Justice, § 458 may not be read as applying to presidential appointments.

The principle that general statutes must be read as not applying to the President if they do not expressly apply where application would arguably limit the President's constitutional role has two sources. First, it is a long-recognized "cardinal principle" of statutory interpretation that statutes be construed to avoid raising serious constitutional questions. *See, e.g., Crowell v. Benson*, 285 U.S. 22 (1932). This canon of statutory construction is a cornerstone of judicial restraint in that it "not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The canon is equally applicable to executive branch interpretations. *Appropriations Limitation for Rules Vetoed by Congress*, 4B Op. O.L.C. 731, 732 n.3 (1980).

The second source is the constitutional principle of separation of powers. The fundamental device by which the framers sought to prevent tyranny was the division of power to prevent an excessive accumulation in any single repository. Thus, the Constitution divides power between the federal and the state governments as well as among the federal government's three coordinate and independent branches. *See Gregory*, 501 U.S. at 458. The clear statement rule exists in order to protect "th[is] 'usual constitutional balance'" of power. *See id.* at 460 (quoting *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985))), *Franklin*, 505 U.S. at 801 ("requir[ing] an express statement by Congress before assuming it intended" to subject presidential action to judicial review); *id.* ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."). Given the central position that the doctrines of federalism and separation of powers occupy in the Constitution's design, this rule also serves to "assure[ ] that the legislature has in fact faced, and intended to bring into issue, the critical matters" of the balance of power among the three branches of the federal government, in the context of separation of powers, and between the federal and state governments, in the context of federalism. *See Gregory*, 501 U.S. at 461; *United States v. Bass*, 404 U.S. 336, 349 (1971).

This clear statement rule has been applied frequently by the Supreme Court as well as the executive branch with respect to statutes that might otherwise be

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

susceptible of an application that would affect the President's constitutional prerogatives, were one to ignore the constitutional context. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act (''APA''), 5 U.S.C §§ 701–706, authorized ''abuse of discretion'' review of final actions by the President. The APA authorizes review of final actions by ''agencies,'' which it defines as ''each authority of the Government of the United States.'' 5 U.S.C. § 701(b)(1). From this definition, the APA expressly exempts Congress, the courts, the territories, and the District of Columbia government — but not the President.

Even though the statute defined agency in a way that could include the President and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court:

> [t]he President is not [expressly] excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

505 U.S. at 800–01. To amplify, she continued, ''[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.'' *Id.* at 801. If anything, the case for reading the APA provision as applying to the President was stronger than is the case with respect to § 458, because the APA contains a list of express exceptions to its broad coverage and that list does not include the President. One might have contended that the omission of the President from a list of persons excluded is sufficiently clear evidence of a congressional decision to include him within the reach of the APA to alter the otherwise applicable rule of constitutional context. To the contrary, however, the Court affirmed the principle that the inclusion of the President must be express.

In a case that is closely analogous and that involves the President's appointment power, the Supreme Court held that the Federal Advisory Committee Act (''FACA''), 5 U.S.C. app. § 2, does not apply to the judicial recommendation panels of the American Bar Association because interpreting the statute as applying to them would raise serious constitutional questions relating to the President's constitutional authority to appoint federal judges. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989). The FACA imposes open meeting and reporting requirements on advisory committees, which it defines to be any committee or similar group that is ''utilized by one or more agencies,

353

in the interest of obtaining advice or recommendations for the President.'' 5 U.S.C. app. § 3(2)(c). Two public interest groups, Public Citizen and the Washington Legal Foundation, sought to have FACA applied to the ABA judicial screening committees. The Court unanimously rejected the public interest groups' argument. The majority ruled that while a ''straightforward reading,'' *Public Citizen*, 491 U.S. at 453, of FACA would seem to require its application to the ABA committee, the ''cardinal principle'' of statutory interpretation that a statute be interpreted to avoid serious constitutional question drove the majority to interpret FACA as not applying to the ABA committee. *Id.* at 465–67. Notably, the majority stated, ''[o]ur reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government,'' and ''[t]hat construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable.'' [4] *Id.* at 466.

A recent Supreme Court case that applied the clear statement rule in protecting the constitutional separation of powers is *Sale v. Haitian Centers Council*, 509 U.S. 155 (1993). This case dealt with the extraterritorial application of the Refugee Act.[5] Prior to 1980, the act provided that the Attorney General was ''authorized to withhold deportation of any alien *within the United States*'' who was a refugee.[6] In 1980, the statute was amended to delete the ''within the United States'' language and to make it mandatory that the Attorney General not deport the refugee.[7] The petitioners, an organization advocating on behalf of Haitian refugees, plausibly argued that, by deleting ''within the United States,'' Congress plainly meant to give the act extraterritorial application. *See id.* at 170. The Court rejected this argument, holding that ''Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested. That presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility.'' *Id.* at 188.[8]

*Sale* is but another example of the clear statement principle: Statutes will be read to exclude what they do not explicitly include when the inclusionary reading would involve a possible conflict with the President's unique responsibilities, so as potentially to upset the constitutional balance of powers. The President's constitutional appointment power, expressly assigned to him and him alone in Article II, is similarly a unique responsibility of the President, one that has been recently

---

[4] The three concurring justices reached the merits and found that application of the FACA would violate the Appointments Clause (as opposed to raising a serious question). 491 U.S. at 482–89 (Kennedy, J., concurring).

[5] Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102, 107.

[6] Immigration and Nationality Act of 1952, Pub. L. No. 82–414, § 243(h), 66 Stat. 163, 214 (1952) (emphasis added).

[7] Pub. L. No. 96–212, § 203(e), 94 Stat. at 107.

[8] To the same effect, *see American Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989).

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

termed a "central feature" of the President's constitutional role under Article II. *Freytag v. Commissioner*, 501 U.S. 868, 902 (1991) (Scalia, J., concurring).

In addition to the numerous Supreme Court precedents,[9] this Department has frequently applied the clear statement rule in the context of the separation of powers between the executive and legislative branches. For example, we applied this rule to a closely analogous question. We were asked whether the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), prohibits the President from considering the age of judicial candidates when determining whom to nominate for federal judgeships. *See Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We concluded that the ADEA should not be read to apply to the presidential appointment of federal judges:

> The power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President. It provides one of the few administrative mechanisms through which the President can exert a long-term influence over the development and administration of law in the courts. The President's present power to exert that influence to the fullest by preferring candidates for appointment who are likely to have long, rather than short, careers on the bench is therefore a matter of constitutional significance. Whether Congress could deny the President that power by requiring him to disregard utterly the age of candidates for appointment has never been considered by the courts, but because of the gravity of the constitutional questions it raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way, absent a very clear indication in the [ADEA].

*Id.* at 389.

In another important instance, Congress sought to apply the criminal contempt of Congress statute against the administrator of the Environmental Protection Agency when she asserted a claim of executive privilege on behalf of the President. That statute has a broad formulation that is similar to the formulation of § 458. Specifically, it applies to "[e]very person who ha[s] been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers." 2 U.S.C. § 192.

---

[9] The foregoing discussion analyzes only a sample of these precedents. *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), is yet another such example. A former executive branch employee brought a variety of claims against former President Nixon arising from the employee's termination. The Court held that the President was immune from suit because Congress had failed to create a cause of action expressly against the President of the United States, stating "[w]e consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749; *see also id.* at 748 & n.27. Other examples include *United States ex rel. French v Weeks*, 259 U.S. 326, 332 (1922), and *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).

355

We concluded that, despite the broad language, the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984). First, we examined the legislative history of the contempt statute and determined that nothing in that history expressed an intent to apply the statute in the context of assertions of executive privilege. *Id.* at 129–32. We then cited the general rule that statutes are to be construed to avoid serious constitutional questions and further elaborated that, ''[w]hen a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation.'' *Id.* at 132. We then discussed how application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress. Because Congress had no ''compelling need'' to create this disruption, ''the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.'' *Id.* at 140.

Then-Assistant Attorney General William Barr opined that the Anti-Lobbying Act, 18 U.S.C. § 1913, does not apply fully against the President. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 304–06 (1989). The Anti-Lobbying Act prohibits any appropriated funds from being ''used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress.'' 18 U.S.C. § 1913. The statute provided an exception for communications by executive branch officers and employees if the communication was made pursuant to a request by a member of Congress or was a request to Congress for legislation or appropriations. Assistant Attorney General Barr concluded that applying the Act as broadly as its terms might otherwise allow would raise serious constitutional questions as an infringement of the President's Recommendations Clause power.

It is also the long-standing position of the Department of Justice that 18 U.S.C § 208 does not apply to the President. That statute prohibits any ''officer or employee of the executive branch'' from ''participat[ing] personally and substantially'' in any particular matter in which he or she has a personal financial interest. *Id.* In the leading opinion on the matter, then-Deputy Attorney General Laurence Silberman first determined that the legislative history disclosed no intention to cover the President and doing so would raise ''[s]ome doubt . . . as to the constitutionality'' of the statute, because the effect of applying the statute to the President would be to impose a qualification on his serving as President. *See* Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, *Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974).

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

In the Rehnquist Memorandum, we considered a statute the text of which is similar to § 458. 5 U.S.C. § 6105 provides that, ''[a]n Executive department may not be closed as a mark to the memory of a deceased former official of the United States.'' Then-Assistant Attorney General William Rehnquist first reviewed the legislative history and determined that there was nothing to indicate that Congress meant to prohibit the President from closing a department as a mark to the memory of a deceased former official and that instead the purpose of the act was to prevent department heads from closing their departments. He then noted the general rule that statutes ''are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive.'' Rehnquist Memorandum at 3.

In summary, there are numerous precedents of the Supreme Court as well as of the Department of Justice [10] holding that a statute that does not by its express terms apply to the President may not be applied to the President if doing so would raise a serious question under the separation of powers.[11] We believe there to be no dispute that such a serious question would be raised were § 458 read to apply to presidential appointments to the federal judiciary. In the next section we amplify on the reasons for that conclusion.

**B**

Congressional attempts to limit the class of persons from whom the President may appoint the highest officers of the government, including judges, raise serious constitutional concerns. The Appointments Clause provides that the President

---

[10] Again, the foregoing discussion covers a small sample of the Department's applications of this principle. Other significant examples include: *The President's Compliance with the 'Timely Notification' Requirement of Section 501(b) of the National Security Act,* 10 Op. O.L.C. 159 (1986); *Inter-Departmental Disclosure of Information Submitted under the Shipping Act of 1984,* 9 Op. O.L.C. 48 (1985); *Removal of Members of the Advisory Council on Historic Preservation,* 6 Op. O.L.C. 180, 185 n.7 (1982).

[11] The clear statement principle we have identified does not apply with respect to a statute that raises no separation of powers questions were it to be applied to the President. So, for instance, the Department of Justice has construed the federal bribery statute as applying to the President even though it does not expressly name the President. Memorandum for Laurence H. Silberman, Deputy Attorney General, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Whether Governor Rockefeller, If Appointed as Vice President, Is Required to Execute a Blind Trust in Order to Avoid Possible Violation of 18 U.S.C. § 208* at 2 (Aug. 20, 1974). 18 U.S.C § 201 establishes that ''[w]hoever, being a public official'' receives a bribe commits a criminal offense. *Id.* § 201(c)(1)(B). ''Public official'' is defined as a ''Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States . . . in any official function . . . .'' *Id.* § 201(a)(1). Application of § 201 raises no separation of powers question, let alone a serious one. The Constitution confers no power in the President to receive bribes; in fact, it specifically forbids any increase in the President's compensation for his service while he is in office, which is what a bribe would function to do. *See* U.S. Const. art. II, § 1, cl. 7. Moreover, the Constitution expressly authorizes Congress to impeach the President for, inter alia, bribery. *Id.* § 4. The Constitution further provides that any party impeached and convicted may ''nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.'' *Id.* art. I, § 3. We also opined that the Federal Advisory Committee Act applies to the Department of Justice Journal Board, because this application raises no separation of powers concerns. *See Application of Federal Advisory Committee Act to Editorial Board of Department of Justice Journal,* 14 Op. O.L.C. 53 (1990).

357

shall nominate, and by and with the Advice and Consent of the
Senate, shall appoint Ambassadors, other Public Ministers and Con-
suls, Judges of the supreme Court, and all other Officers of the
United States . . . but the Congress may by Law vest the Appoint-
ment of such inferior Officers, as they think proper, in the President
alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Because the Constitution gives the President alone
the power to nominate non-inferior officers of the United States, any attempt by
Congress to restrict his choice of nominees, otherwise than by the Senate's
refusing its consent to a nomination, is questionable under the Constitution. We
hasten to add that we do not take a final position on the difficult question of
whether, and under what circumstances, Congress has authority to impose a quali-
fication requirement on a constitutional office. It is sufficient for the purposes
of this memorandum to demonstrate that applying a restriction such as that con-
tained in § 458 to presidential appointment of federal judges would at a minimum
raise a serious constitutional question. This office has not had the occasion to
opine on this issue, and we cite previous statements for the sole purpose of dem-
onstrating the difficulty and seriousness of the questions that the issue raises.
  As the United States Court of Appeals for the District of Columbia Circuit
recently wrote, "Congressional limitations—even the placement of burdens—on
the President's appointment power may raise serious constitutional questions. . . .
Presidents have often viewed restrictions on their appointment power not to be
legally binding." *Federal Election Comm'n v. NRA Political Victory Fund*, 6 F.3d
821, 824 (D.C. Cir. 1993) (Silberman, J.), *cert. dismissed*, 513 U.S. 88 (1994).
To support this conclusion, the court cited, as examples, statements issued by
President Bush upon signing various pieces of legislation. *See Statement on
Signing the Cranston-Gonzalez National Affordable Housing Act*, 2 Pub. Papers
of George Bush 1699, 1701 (Nov. 28, 1990) ("National Affordable Housing Act
Statement"); *Statement on Signing the National and Community Service Act of
1990*, 2 Pub. Papers of George Bush 1613, 1614 (Nov. 16, 1990); *Statement on
Signing the Intelligence Authorization Act, Fiscal Year 1990*, 2 Pub. Papers of
George Bush 1609, 1610 (Nov. 30, 1989). President Bush asserted, for example,
that limitations set out in legislation "do[ ] not constrain the President's constitu-
tional authority to appoint officers of the United States, subject only to the advice
and consent of the Senate." National Affordable Housing Act Statement at 1701,
*quoted in part in NRA Political Victory Fund*, 6 F.3d at 824–25.[12]

---

  [12] The position taken by President Bush was based on the principles set out in Justice Kennedy's concurring
opinion in *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989), joined by Chief Justice Rehnquist
and Justice O'Connor. "By its terms," Justice Kennedy wrote, "the [Appointments] Clause divides the appointment
power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold
its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process
of choosing the person who will be nominated for appointment." *Id.* at 483. Furthermore, "where the Constitution
by explicit text commits the power at issue to the exclusive control of the President, we have refused to tolerate

358

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

There has been a particular concern about applying qualifications for appointments of Article III judges. In 1979, for example, our Office rejected the argument that the ADEA applied to the President's choice of nominees for judgeships. *Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We there accepted that Congress might impose some qualifications on some constitutional offices, but nevertheless noted that applying the ADEA to judicial nominations would constrain the President's ability to exercise a long-term influence on the development of the law. We concluded that, "because of the gravity of the constitutional questions [a requirement to ignore the age of potential nominees] raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way." *Id.* at 389. As we stressed, "[t]he power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President." *Id.*

The Constitution vests in the President the power to nominate judges and vests in the Senate the power to give, or refuse, its advice and consent to the nominations. Without taking a position on whether, and under what circumstances, Congress has authority to impose qualification requirements on constitutional offices, it is clear that, if a Congress tried to bind future Presidents and future Senates by imposing statutory constraints on eligibility, such legislation would raise serious constitutional questions.

## II

The clear statement rule settles the meaning of § 458. Section 458 does not apply to presidential appointments of federal judges. Even without applying this constitutionally based principle, however, analysis of the text of § 458, its predecessor, and the text of the Act of 1911 taken as a whole, establishes the same result. That result is further supported by every available piece of contemporaneous, extra-statutory evidence of the understanding of members of Congress, as well as by a consistent practice of non-application of the statute to the appointment of federal judges. In this part, we discuss the meaning of § 458 as it might be ascertained on the face of the statutes themselves, without reference to the clear statement principle. In the subsequent part, we review the contemporaneous congressional understandings of the statute's meaning. Finally, we review some of the instances in which related persons within the meaning of the statute have been appointed to the federal bench by the President.

As indicated earlier, the present statute appears to have originated as Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555. In its original form, the provision stated that:

---

*any* intrusion by the Legislative Branch." *Id.* at 485. With regard to the highest officers of the government, therefore, the President "has the sole responsibility" for making nominations, *id.* at 487, and Congress may not intrude.

359

no person related to any justice or judge of any court of the United States by affinity or consanguinity, within the degree of first cousin, shall hereafter be appointed *by such court or judge* to or employed by such court or judge in any office or duty in any court of which such justice or judge may be a member.

*Id.* (emphasis added). In that version, the statute referred specifically to appointments *by the courts or judges*, and could not be understood to encompass presidential appointments as well. In our constitutional scheme, judicial appointments are not made by judges, but rather have always been vested in the President with the advice and consent of the Senate.

The statute was next codified as Act of Aug. 13, 1888, ch. 866, §7, 25 Stat. 433, 437. In that form too, it prohibited only the appointment of any person related to any federal justice or judge within the degree of first cousin ''by such court or judge.''

This provision was repealed by the Act of Mar. 3, 1911, ch. 231, §297, 36 Stat. 1087, 1168.[13] The language substituted for the repealed provision did not, in terms, refer only to appointment ''by such court or judge.'' Instead, it stated:

No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to the judge of such court.

*Id.* §67, 36 Stat. at 1105.

The repeal and re-enactment in 1911 left the description of the offices or duties to which related persons may not be appointed unchanged. It did alter the description of the persons who may not make such appointments. Whereas prior to 1911 only a ''court or judge'' was prohibited from appointing related persons to such offices or duties, after 1911, the prohibition was simply that no related person could be appointed to such offices or duties. The evident purpose of the change was to remove an obvious loophole. Prior to 1911, the clerk of court, or the chief bailiff, or the chief stenographer, or any other official who worked in a court could appoint relatives of sitting judges to positions on his or her staff, without

_____

[13]The Act of Mar. 3, 1911, was designed to restructure the federal judicial system. As Senator, later Justice, Sutherland explained, the legislation was:

framed upon the theory that we shall hereafter have but one court of original jurisdiction, instead of two, as we have at present . . . . [W]e have to-day two separate and distinct courts of jurisdiction—a circuit court of the United States and a district court of the United States. Jurisdiction has been conferred upon the district court in a class of cases which might as well have been conferred upon the circuit court and jurisdiction has been conferred upon the circuit court which might as well have been conferred upon the district court . . . . There is absolutely no reason why the circuit court should possess a certain class of jurisdiction rather than that it should be possessed by the district court. The vital thing is to have a court of original jurisdiction for the trial of cases, and then a court of appellate jurisdiction, which may review the decisions of the trial court

46 Cong. Rec. 2137 (1911).

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

violating the statute. Because such individuals as these might possibly be susceptible to influence by sitting judges, the predecessor statute seemed to permit an evasion of the statute's anti-nepotistical purposes through the expedient of having a non-judge who worked in the court appoint a judge's relative.

Beyond closing this appointment loophole, the statute remained otherwise intact. Because the language of the statute describing the offices or duties to which related persons may not be appointed remained the same, no change was made in the class of offices or duties covered by the statute—a class that at no time included judges.

This conclusion is reinforced by a rule of construction that was written into the Act of 1911 itself, which reads as follows:

> [t]he provisions of this Act, so far as they are substantially the same as existing statutes, shall be construed as continuations thereof, and not as new enactments, and there shall be no implication of a change of intent by reason of a change of words in such statute, unless such change of intent shall be clearly manifest.

*Id.* § 294, 36 Stat. at 1167.

With respect to its description of the offices or duties to which related persons may not be appointed, section 297 of the Act is "substantially the same" as prior law. Nor is any "change of intent . . . clearly manifest" by reason of the linguistic change from the earlier provision. Accordingly, following the rule of construction set forth in the statute itself, we find that it does not vary prior law— judgeships were not in that class prior to 1911, and they are not in that class subsequent to 1911.[14]

---

[14] We note that our reading does not violate the maxim of statutory construction that words in a statute should not be construed so as to render them meaningless. It is true that the vast majority of the positions to which § 458 applies are "employments" rather than "offices." For a discussion of the difference between an employment and an office, see *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867); *United States v. Germaine*, 99 U.S. 508 (1878); *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice). Nevertheless, the Supreme Court long ago concluded that the clerk of a district court is an officer in the constitutional sense, *Ex Parte Hennen*, 38 U.S. (13 Pet.) 230 (1839), and has recently reaffirmed that view, *see Morrison v. Olson*, 487 U.S. 654 (1988). This office has traditionally been filled by an appointment "by [a] court[] of law," specifically by the chief judge of the relevant district or circuit. We believe that the provision would continue to apply to appointments to the office of clerk by a federal judge.

We also note that our view avoids a serious question regarding the legality of the recent designation of District Judge Gordon Thompson, Jr., to sit by designation on a panel of the United States Court of Appeals for the Ninth Circuit with his brother, Judge David Thompson. *See* Howard Mintz, *Nepotism Law Threatens Nomination; Mother and Child Reunion on Bench?*, Legal Times, Dec. 11, 1995, at 8. Because we do not believe that § 458 applies to the office of judge, it is our conclusion that Chief Judge J. Clifford Wallace could not have violated § 458 by exercising his authority under 28 U.S.C § 292(a) to designate District Judge Thompson to sit as a Judge on a Ninth Circuit panel with his brother.

*Opinions of the Office of Legal Counsel in Volume 19*

### III

We have reviewed the legislative debate over the Act of 1911, and have found no evidence that the textual alteration of the earlier statutory language was intended to work any change in the class of offices or duties covered, and certainly none that it was meant to reach presidential appointments to the federal bench. Moreover, contemporaneous and near contemporaneous evidence of Congress's own understanding clearly substantiates that Congress did not intend to extend the scope of the earlier prohibition to include judicial appointments by the President. Section 297 of the Act of Mar. 3, 1911, was to go into effect on January 1, 1912, abolishing the circuit courts and causing *the district courts to succeed* them, so that clerks would have to be appointed for the district courts. Shortly before the law went into effect, it was pointed out in Congress that these changes "would prevent any man who is related within certain degree by affinity or consanguinity to the district judge from being appointed clerk." 48 Cong. Rec. 309 (1911) (remarks of Rep. Clayton). Thus, even incumbents who had not been appointed to circuit court clerkships by judicial relatives would be ineligible to be appointed to clerkships in the succeeding district courts if it happened that their close relatives sat on those district courts. Several members of Congress objected to that unforeseen and unintended outcome. Legislation was introduced, and eventually adopted, to "grandfather in" such incumbents.[15]

In the course of the House debate on this amendatory measure, several members adverted to the prohibition of the then-recent prior law. Congressman Mann described section 297 as "providing that *the judge of the Federal court* shall not be permitted to appoint his first cousin an officer of the court . . . . It should be the policy of the country to uphold the dignity of the Federal bench, to guard against the possibility of favoritism *on the part of the judges* because of close kinship." 48 Cong. Rec. at 310 (remarks of Rep. Mann) (emphasis added). Similarly, in colloquy, Mr. Hardy asked if the proposed amendment "opposes the appointment of relatives by public officials?", and Mr. Bartlett, referring to section 297, responded that "[t]he original section, I apprehend, had that purpose in view." *Id.* Plainly, then, the members of the House interested in the amendment in the December 1911 debate understood that the March 1911 enactment had only restricted the power of judges to appoint their near kin to positions with their courts. Although these remarks occurred after the enactment of section 297, they were made only a few months after that section had become law, and thus provide useful evidence of what the enacting Congress intended by it.

Later codifications carried forward the language adopted in 1911, with changes not relevant here. *See* Act of June 25, 1948, ch. 646, §458, 62 Stat. 869, 908;

---

[15] *See* Act of Dec. 21, 1911, ch. 4, 37 Stat. 46 ("[N]o such person at present holding a position or employment in a circuit court shall be debarred from similar appointment or employment in the district court succeeding to such circuit court jurisdiction.").

362

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

H.R. Rep. No. 80–308, at A55 (1947). In light of this legislative history, we see no reason to suppose that Congress ever intended to do more than to make fully effective the original prohibition against nepotistical appointments *by judges*, and that the sole function of the change of 1911 was to close a loophole in the original statutory scheme.

IV

Finally, we note that the consistent practice since the present version of § 458 was enacted in 1911 has been to construe the statute as not applying to presidential appointments. On at least three occasions since 1911, the President has appointed and the Senate has confirmed relatives within the statutory degree of consanguinity to the same court. In 1914, President Woodrow Wilson, just three years after the enactment of § 458 in its present form, appointed Augustus Hand to be a District Judge for the Southern District of New York, even though his first cousin, Learned Hand, had been a District Judge of that court since 1909. In 1927, President Coolidge elevated Judge Augustus Hand to be a Circuit Judge on the United States Court of Appeals for the Second Circuit, even though Judge Learned Hand had been appointed to that court three years earlier. More recently, in 1992, President Bush appointed and the Senate confirmed Judge Morris Arnold to be a Circuit Judge on the United States Court of Appeals for the Eighth Circuit, although his brother, Judge Richard Arnold, was already a member of that body.

In addition, if the practical construction of § 458 by the President and the Senate were to hold that it applies to presidential appointments, there would be a significant question as to the validity of a number of appointments where one relative served on an appeals court while another served on a district court. Specifically, it is not clear whether, for purposes of § 458, a district court is a component of the court of appeals for the circuit in which the district is located. Most recently, Diana Motz was confirmed and appointed to the United States Court of Appeals for the Fourth Circuit in 1994, while her husband, Frederick Motz, was a judge for the District of Maryland.

We are not aware of anyone ever proposing that § 458 applies to presidential appointments of federal judges. In this light, applying § 458 to presidential appointments of federal judges would represent a novel construction of the statute. We do not reject this construction, however, because it is novel. We reject it because it is contrary to the statute's language, structure, and purpose, as well as the consistent practice under that statute from the date of its enactment.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

363

Case 1:21-cr-00670-CJN   Document 41-3   Filed 03/22/22   Page 1 of 2

# EXHIBIT 3



# Office of the Attorney General
Washington, D.C.

February 29, 2008

The Honorable Nancy Pelosi
Speaker
House of Representatives
Washington, D.C. 20515

Dear Madam Speaker:

As you know, the President, asserting executive privilege, directed that Joshua Bolten, Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, not release certain documents or provide related testimony subpoenaed by the Committee on the Judiciary of the House of Representatives. The President also directed Ms. Miers to invoke her constitutional immunity from compelled congressional testimony and to decline to appear before the Committee. These directives were based on legal opinions from the Department of Justice advising that the assertions of privilege and immunity were legally proper.

Notwithstanding the President's directives, on July 25, 2007, the House Committee on the Judiciary adopted a resolution recommending that the House of Representatives cite Mr. Bolten and Ms. Miers for contempt. On November 5, 2007, the Committee referred its report on the resolution to the full House. On February 14, 2008, the House adopted a contempt resolution, which you referred on February 28, 2008, to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

As explained in our July 24, 2007, letter to Judiciary Committee Chairman Conyers, a copy of which is enclosed, the Department of Justice's longstanding position taken during Administrations of both parties is "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984). Further, as we also explained in the letter to Chairman Conyers, the same principles that preclude prosecuting an Executive Branch official for abiding by a presidential claim of executive privilege also preclude prosecuting a senior presidential adviser for lawfully invoking her constitutional immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper.

# EXHIBIT 4

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

10 U.S. Op. Off. Legal Counsel 68 (O.L.C.), 1986 WL 213239

Office of Legal Counsel

U.S. Department of Justice

### RESPONSE TO CONGRESSIONAL REQUESTS FOR INFORMATION REGARDING DECISIONS MADE UNDER THE INDEPENDENT COUNSEL ACT

April 28, 1986

With one narrow exception, the Attorney General may not disclose to Congress the contents of any application or report filed with the court pursuant to the Independent Counsel Act unless the court agrees.All congressional requests for information about a decision regarding the appointment of an independent counsel must be supported by a legitimate legislative purpose. In addition, before such disclosures are made other considerations, such as whether or not to assert executive privilege, whether the information is covered by the attorney-client privilege, and whether the information must be kept confidential to preserve the integrity of the prosecutorial function, must be reviewed.Congress may not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure against the head of an Executive agency acting on the President's instructions to assert executive privilege in response to a congressional subpoena.An assertion of executive privilege must be based upon an evaluation of the Executive Branch's interest in keeping the requested information confidential, the strength of Congress' need for the information, and whether those needs can be accommodated in some other way.

**\*1**  MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

I. Introduction and Summary

You have asked this Office to review the legal principles that should inform the Department's response to congressional inquiries about any decision regarding appointment of an independent counsel under the Independent Counsel Act, 28 U.S.C. ss 591 et seq. (Act). The scope and nature of any such response would, of course, depend on the facts of the particular situation, including the scope and nature of the request, the congressional interests at stake, the status of the investigation and/or decision-making process within the Department, and your judgment as to the particular harm that would result from release of the requested information. To some extent the decision whether or how to respond to such congressional requests must weigh factors, such as political constraints that affect the Department's position vis- a-vis Congress, which are beyond our expertise. Our discussion here is therefore necessarily quite general and is limited to those constitutional and legal considerations that should be  **\*69**  reflected in the Department's response to possible congressional inquiries into decisions made under the Act. As we discuss below, we believe that the Department's response to any such inquiry must take account of: (1) the provisions of the Independent Counsel Act requiring that memoranda, reports, and other documents filed with the special division of the court remain confidential unless otherwise authorized by the court; (2) the scope of Congress' legitimate interest in obtaining the information; and (3) the Justice Department's responsibility to protect the integrity of ongoing criminal investigations and of prosecutorial decision-making. These considerations, which flow largely from the constitutionally mandated principle of separation of powers, would also shape any formal Presidential claim of executive privilege, in the unlikely event such a claim proves necessary to resist a congressional subpoena.

**\*2**  In addition to our discussion of the substantive legal principles, we outline below the procedural steps that would be involved if Congress pursued its requests through a subpoena, and possible defenses that could be raised to any such subpoena.

II. Confidentiality Requirements of the Independent Counsel Act

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

The Independent Counsel Act itself contains strict confidentiality requirements. Section 592(d)(2) broadly provides:
No application or any other documents, materials, or memorandums supplied to the division of the court . . . shall be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court.

28 U.S.C. s 592(d)(2).

Other, narrower provisions limit the disclosure of any report finding no grounds for appointment of an independent counsel,[B1][FN1]FN;F1 as well as the report required to be filed by the independent counsel at the completion of his investigation.[B2][FN2]FN;F2 Even the name and prosecutorial jurisdiction of any independent counsel appointed by the court remain confidential until an indictment is returned or a criminal information is filed, unless the Attorney General requests public disclosure prior to that time or the court determines "that disclosure of the identity and prosecutorial jurisdiction of such independent counsel would be in the best interests of justice." 28 U.S.C. s 593(b).

 *70  The confidentiality provisions were regarded as "crucial to the general scheme" of the Act. S. Rep. No. 170, 95th Cong., 2d Sess. 58 (1978). Congress recognized that "just because a person holds a high level position does not justify making unsubstantiated allegations of criminal conduct public, nor does it justify publicly announcing the initiation of a criminal investigation at a very early stage of the investigation." Id. In fact, Congress contemplated that there would be situations in which an independent counsel would be appointed "when the public is not at all aware that a criminal investigation is underway." Assuming that the independent counsel's investigation does not result in prosecution, "it is conceivable that this whole process could take place without the public even knowing that there were serious allegations against such a high level official." Id.

In cases in which there has already been considerable publicity about the allegations and the requirements of the Independent Counsel Act, Congress recognized that "there does not appear to be any purpose to keeping the fact that application for a special prosecutor has been made confidential." S. Rep. No. 170, supra, at 58. However, even if the court agrees to disclose that an application has been made or to announce the identity and jurisdiction of an independent counsel, "there may still be justification for keeping the contents of an application for a special prosecutor . . . confidential because of unsubstantiated allegations and other information which may be contained in the application for appointment." Id.

 **3  The language of the Act's confidentiality provisions that the documents "shall not be revealed to any individual outside the division of the court or the Department of Justice" is carefully drafted, and on its face prohibits disclosures to Congress no less than disclosures to the public. The legislative history of the Act supports this interpretation of the statute's unambiguous language. "The contents of the report by the Attorney General after a preliminary finding of some impropriety is to remain secret, available only to the court and I presume, to the special prosecutor, but may not be released to the public or to Congress without of special leave of this new court." 124 Cong. Rec. 3462 (1978) (remarks of Rep. Wiggins) (emphasis added).[B3][FN3]FN;F3

In general, then, the Act restricts the Attorney General's ability to disclose to Congress the contents of any application or report filed with of the court, unless and until the court agrees. This blanket confidentiality requirement, however, is subject to a narrow exception triggered when Congress requests under s 595(e)[B4][FN4]FN;F4 that the Attorney General apply for an independent counsel. If the Attorney General receives such a request, he is required to "provide written notification of any action . . . taken in response to such request, and if no  *71  application has been made to the division of the court, why such application was not made." 28 U.S.C. s 595(e). Because such a notification must necessarily disclose at least some information that is included in the confidential report filed with the court, s 595(e) appears to create a narrow exception to the general rule of confidentiality.[B5][FN5]FN;F5

The legislative history of this provision suggests, however, that the scope of the required notification is very limited; disclosure of particular details of the investigatory findings and the prosecutorial decision is not contemplated:
[T]he Attorney General might respond that he had already applied for the appointment of a special prosecutor or he might respond that upon the conclusion of a preliminary investigation, he made a finding and filed the requisite memorandum

indicating that the matter was so unsubstantiated as to not warrant further investigation or prosecution. If no application for the appointment of a special prosecutor has been made to the division of the court, the Attorney General is required to explain the specific reasons why a special prosecutor is not required under the standard set forth in s 592(e). If the reason for not appointing a special prosecutor is the fact that the matter is so unsubstantiated as to not warrant further investigation or prosecution, the Attorney General's explanation under this subsection need only state that fact. The Committee does not intend that the Attorney General go into any detail with regard to the basis for the decision made in the exercise of his prosecutorial discretion that a matter simply did not warrant any further investigation or prosecution after the conclusion of a preliminary investigation.

**4** S. Rep. No. 170, supra, at 72 (emphasis added). That history also makes clear that Congress contemplated that the names of implicated individuals would be included in the required notification.:B6[FN6]FN;F6

Based on this legislative history and the overriding concern reflected in the Act with preserving confidentiality, we believe that, unless the court has approved disclosure, the notification required by s 595(e) need (and may) encompass only a statement that an application for an independent counsel has been filed as to a particular individual or individuals, or that after investigation the Attorney General determined that the allegations against particular individuals did not warrant further investigation. Obviously, if the Attorney General determined, on some ground other than the sufficiency and credibility of the evidence, that he need not apply for an independent counsel -- for example, **72** if he determined that the facts, if true, would nonetheless not constitute a non- petty criminal offense or that the individual is not covered by the Act -- the notification to Congress would set forth that rationale.:B7[FN7]FN;F7

The Act also contemplates that the independent counsel will provide "from time to time" reports to Congress and to the public containing "such information as the independent counsel deems appropriate," 28 U.S.C. s 595(a), and that the independent counsel "shall advise the House of Representatives of any substantial and credible information which such independent counsel receives that may constitute grounds for an impeachment." Id. s 595(c). Oversight jurisdiction "with respect to the official conduct of any independent counsel" is given to the "appropriate committees of Congress" and the independent counsel "shall have the duty to cooperate with the exercise of such oversight jurisdiction." Id. s 595(d). The legislative history of these provisions governing disclosures by the independent counsel is sparse and provides little guidance as to what extent the independent counsel would be bound by the Act's confidentiality restrictions when making such disclosures.

III. Protecting the Integrity of Criminal Investigations

A separate consideration is how disclosure of information about any independent counsel decision would affect the Attorney General's responsibilities as the Nation's chief law enforcement officer and the ability of the Department to investigate and prosecute criminal offenses.:B8[FN8]FN;F8

There are a number of factors, arising out of the separation of powers between the executive and legislative branches, that should be weighed in making that determination.

A. Constitutional Division of Responsibilities

Article II of the Constitution places the power to enforce the laws solely in the Executive Branch of government. The executive therefore has the exclusive authority to enforce the laws adopted by Congress, and neither the judicial nor legislative branches may directly interfere with the prosecutorial discretion of the Executive Branch by directing the executive to prosecute particular individuals.:B9[FN9]FN;F9 United States v. Nixon, 418 U.S. 683, 693 (1974); Confiscation **73** Cases, 74 U.S. (7 Wall.) 454, 457 (1869); Smith v. United States, 375 F.2d 243, 247 (5th Cir.), cert. denied, 389 U.S. 841 (1967); United States v. Samango, 607 F.2d 877, 881 (9th Cir. 1979); accord Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific

individuals. See United States v. Lovett, 328 U.S. 303, 317 (1946); INS v. Chadha, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring).:B10[FN10]FN;F10 "'When the legislative and executive powers are united in the same person or body,' says (Montesquieu) 'there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner.'" The Federalist No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961) (emphasis in original).

**5   The constitutional role of Congress is to adopt general legislation that will be implemented "executed" by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136 (1810). The courts have recognized that this general legislative interest gives Congress broad rein to investigate. Both Houses of Congress have broad power, "through their own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." McGrain v. Daugherty, 273 U.S. 135, 160 (1927). The issuance of subpoenas in aid of this function "has long been held to be a legitimate use by Congress of its power to investigate," Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504 (1975), provided that the investigation is "related to, and in furtherance of, a legitimate task of the Congress." Watkins v. United States, 354 U.S. 178, 187 (1957). See also McGrain v. Daugherty, 273 U.S. at 177 (inquiry must pertain to a subject "on which legislation could be had"). This sphere of legitimate legislative activity "is as penetrating and far reaching as the potential power to enact and appropriate under the Constitution." Barenblatt v. United States, 360 U.S. 109, 111 (1959). See also Watkins v. United States, 354 U.S. at 187. The power of investigation can be delegated by either House of Congress to committees, subcommittees, or even individual legislators, see Eastland v. United States Servicemen's Fund, 421 U.S. at 505; Watkins v. United States, 354 U.S. at 200-01, as long as "the instructions to an **74 investigating committee spell out that group's jurisdiction and purpose with sufficient particularity." Id. at 201. The scope of judicial inquiry on these matters is narrow, and "'should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.'" Eastland v. United States Servicemen's Fund, 421 U.S. at 506, (quoting Tenny v. Brandhove, 341 U.S. 367, 378 (1951)).

Nonetheless, the investigative power of Congress is not unlimited. Congress cannot, for example, inquire into matters "which are within the exclusive province of one of the other branches of Government . . . . Neither can it supplant the Executive in what exclusively belongs to the Executive." Barenblatt v. United States, 360 U.S. at 111; see also Kilbourn v. Thompson, 103 U.S. 168, 192 (1881) (Congress cannot exercise judicial authority). Congress must be able to articulate a legitimate legislative purpose for its inquiry; if Congress lacks constitutional authority to legislate on the subject (or to authorize and appropriate funds), arguably Congress has no jurisdiction to inquire into the matter.:B11[FN11]FN;F11

**6   Accordingly, a threshold inquiry that should be made upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose.:B12[FN12]FN;F12 The clearest application of this constraint on congressional requests for information is with respect to matters that are vested exclusively in the President (such as is the removal of executive officers).:B13[FN13]FN;F13 Given the breadth of Congress' legislative jurisdiction, particularly its authority regarding the appropriation of funds, it may be difficult to articulate more precise limits. With respect to decisions made by the Attorney General under the Independent Counsel Act, we believe that Congress could not justify an investigation based on its disagreement with the prosecutorial decision regarding appointment of an independent counsel for a particular individual. Congress simply cannot constitutionally second-guess that decision. Congress does, however, have a legitimate legislative interest in overseeing the Department's enforcement of the Independent Counsel Act and relevant criminal statutes and in determining whether legislative revisions to the Act should be made. Given the general judicial reluctance to look behind congressional assertions of legislative purpose, such an assertion would likely be deemed sufficient to meet the threshold requirement for congressional inquiry.

*75   B. Executive Privilege

Assuming that Congress has a legitimate legislative purpose for its inquiry, the Executive Branch's interest in keeping the information confidential must be assessed. That interest is usually discussed in terms of "executive privilege," and we will use that convention here. The question, however, is not strictly speaking just one of executive privilege. Although the considerations that support the concept and assertion of executive privilege apply to any congressional request for information, the privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena; in responding to an informal congressional request for information, the Executive Branch is not necessarily bound by the limits of executive privilege.

1. Constitutional Basis of Executive Privilege

The Constitution nowhere states that the President, or the Executive Branch generally, enjoys a privilege against disclosing information requested by the courts, the public, or the legislative branch. The existence of such a privilege, however, is a necessary corollary of the executive function vested in the President by Article II of the Constitution, has been asserted by numerous Presidents from the earliest days of our Nation, and has been explicitly recognized by the Supreme Court. United States v. Nixon, 418 U.S. at 705-06.

2. Protection of Law Enforcement Files

Although the principle of executive privilege is well established, there are few clear guidelines regarding its practical application. The privilege has most frequently been asserted in the areas of foreign affairs and military and domestic secrets, but it has also been invoked in a variety of other contexts. In 1954, President Eisenhower asserted that the privilege extends to deliberative communications within the Executive Branch. In a letter to the Secretary of Defense, he stated:
  **7** Because it is essential to effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications or any documents or reproductions concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions . . . .

1954 Pub. Papers 483-84 (May 17, 1954).

  **76** Moreover, the policy of the Executive Branch throughout our Nation's history has generally been to decline to provide committees of Congress with access to, or copies of, open law enforcement files except in extraordinary circumstances. This policy with respect to Executive Branch investigations was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. No President, to our knowledge, has departed from this position affirming the confidentiality and privileged nature of open law enforcement files. See "History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress" (Part I), 6 Op. O.L.C. 751 (1982).

This policy is grounded primarily on the need to protect the government's ability to prosecute fully and fairly. Attorney General Robert H. Jackson articulated the basic position over forty years ago:
It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.

Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 182 of 512

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 7 of 18

40 Op. Att'y Gen. 45, 46 (1941). Similarly, this Office has explained that "the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation." Memorandum for Edward L. Morgan, Deputy Counsel to the President from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 19, 1969). Other grounds for objecting to the disclosure of law enforcement files include the potential damage to proper law enforcement that would be caused by the revelation of sensitive techniques, methods, or strategy; concern over the safety of confidential informants and the chilling effect on other sources of information; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality, and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process.

**8   *77   Quite apart from the concern that disclosure would prejudice the particular prosecution prompting congressional inquiry is the purely internal concern that disclosure might hamper prosecutorial decision- making in future cases. Cf. United States v. Nixon, 418 U.S. at 708. Employees of the Department would likely be reluctant to express candidly their views and recommendations on controversial and sensitive matters if those views could be exposed to public scrutiny by Congress upon request.

In addition, potential targets of enforcement actions are entitled to protection from premature disclosure of investigative information. It has been held that there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." Delaney v. United States, 199 F.2d 107, 114 (1st Cir. 1952). Pretrial publicity originating in Congress, therefore, can be attributed to the government as a whole and can require postponement or other modification of the prosecution on due process grounds. Ibid. Moreover, a person who is ultimately not prosecuted may be subjected to unfair and prejudicial publicity and thus suffer substantial and lasting damage to his professional and community standing based on unfounded allegations.[B14][FN14][FN;F14]

There are, of course, circumstances in which the Attorney General may decide to disclose to Congress information about his prosecutorial decisions. Once an investigation has been closed without further prosecution, many of the considerations previously discussed lose some of their force. Access by Congress to details of closed investigations does not pose as substantial a risk that Congress will be a partner in the investigation and prosecution or will otherwise seek to influence the outcome of the prosecution; likewise, if no prosecution will result, concerns about the effects of undue pretrial publicity on a jury would disappear. Still, such records should not automatically be disclosed to Congress. Obviously, much of the information in a closed criminal enforcement file such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods would continue to need protection (which may or may not be adequately afforded by a confidentiality agreement with Congress). In addition, the Department and the Executive Branch have a long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process. The Supreme Court has recognized that "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." United States v. Nixon, 418 U.S. at 705. It therefore is important to weigh the potential "chilling effect" of a disclosure of details of the deliberative process against the immediate needs of   *78   Congress and of the Department. After assessing all of these factors, on occasion the Department has briefed Congress on prosecutorial decisions and has disclosed some details of the underlying investigation, once the investigation has been closed.

3. Attorney-Client Communications

**9   Some of the communications relevant to an Independent Counsel Act decision could conceivably fall within the scope of the common law evidentiary privilege for attorney-client communications.[B15][FN15][FN;F15] Although the attorney-client privilege may be invoked by the government in litigation and under the Freedom of Information Act separately from any "deliberative process" privilege,[B16][FN16][FN;F16] it is not generally considered to be distinct from the executive privilege

in any dispute between the executive and legislative branches. The interests implicated under common law by the attorney-client privilege generally are subsumed by the constitutional considerations that shape executive privilege, and therefore it is not usually considered to constitute a separate basis for resisting congressional demands for information. As this Office has previously noted, for the purpose of responding to congressional requests, communications between the Attorney General, his staff, and other Executive Branch "clients" that might otherwise fall within the common law attorney-client privilege should be analyzed in the same fashion as any other intra-Executive Branch communications. See Confidentiality of the Attorney General's Communications in Counseling the President," 6 Op. O.L.C. 481, 490 & n.17, 494 & n.24 (1984).:B17[FN17]FN;F17

Nonetheless, when the Attorney General is acting in his role as the President's chief legal adviser, his communications to the President may warrant greater confidentiality than those of some other Cabinet advisers, in because of the nature of the Attorney General's responsibilities to the executive and his special areas of expertise, e.g., legal advice and law enforcement. This Office has previously emphasized the particular importance of protecting the President's ability to receive candid legal in advice:

 *79  The reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved. None of the President's obligations is more solemn than his duty to obey the law. The Constitution itself places this responsibility on him, in his oath of office and in the requirement of article II, section 3 that "he shall take Care that the laws be faithfully executed." Because this obligation is imposed by the Constitution itself, Congress cannot lawfully undermine the President's ability to carry it out. Moreover, legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice. As crucial as frank debate on policy matters is, "it is even more important that legal advice be candid, objective, and even blunt or harsh," see United States v. Nixon, 418 U.S. at 708 (1974), where necessary. Any other approach would jeopardize not just particular policies and programs but the principle that the government must obey the law. For these reasons, it is critical that the President and his be able to seek, and give, candid legal advice and opinions free of the fear of compelled disclosure.

 **10  Memorandum for the Attorney General re "The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee" (Jan. 13, 1981).

4. Independent Counsel Act Decisions

We believe that these considerations we have outlined apply to decisions whether to recommend appointment of an independent counsel no less than they apply to any other prosecutorial decision made by this Department. Although the ultimate decision whether to prosecute a particular individual rests with the independent counsel, the threshold decisions whether to investigate and whether to recommend appointment of an independent counsel are critical steps in that ultimate prosecutorial judgment. The decision whether "there are reasonable grounds to believe that further investigation or prosecution is warranted" is quintessentially a prosecutorial decision, akin to those made every day in the course of the Department's enforcement of the criminal laws. In fact, the Act specifically recognizes that the Attorney General's decision whether to seek appointment of an independent counsel is unreviewable by the courts, like any other exercise of prosecutorial discretion.:B18[FN18]FN;F18

 *80  A decision not to apply for an independent counsel could be treated as a closed investigation, in accordance with the Department's practice. If the Attorney General seeks appointment of an independent counsel, however, the investigation would be very much alive, as the independent counsel would step into the Department's shoes and continue the investigation into the allegations of wrongdoing.:B19[FN19]FN;F19 In fact, the Department could still be quite involved in assisting the independent counsel, including providing information, personnel, and other resources. See 28 U.S.C. s 594(d). It seems clear, therefore, that all the considerations that counsel against disclosure of information relevant to open investigations being conducted by the Department itself apply equally when the investigation is being conducted by the independent counsel.

The more difficult question is whether any distinction between "closed" and "open" investigations could or should be drawn in a case in which the Attorney General determines that the evidence warrants further investigation of some, but not all, of those individuals against whom allegations have been directed. That determination would rest in large part on the facts and documents at issue and would in most cases probably require a particularized judgment as to whether some information relating to "closed"

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 184 of 512

Case 1:21-cr-00670-CJN    Document 41-4    Filed 03/22/22    Page 9 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

cases could be reasonably segregated and disclosed to Congress without undue risk of prejudicing the independent counsel's "open" investigation. We are obviously not in a position to make that judgment, and would defer to the Criminal Division. It seems to us, however, that in many, perhaps most, cases the evidence may be so intertwined that no separation is possible. In other cases, especially those of a simple nature in which the allegations against particular individuals are only marginally related, separation may be feasible.

 **11  In addition, because the Attorney General's decision not to seek an independent counsel for particular individuals must be based on his determination that "there are no reasonable grounds to believe that further investigation or prosecution is warranted, "the interests of those individuals in continued confidentiality would seem particularly strong. Moreover, even though the decision by the Attorney General not to seek appointment of an independent counsel is nonreviewable, in an interrelated investigation the possibility always exists that the independent counsel's investigation may uncover new information that will result in further investigation.[B20][FN20][FN;F20]

 *81  Thus, we believe there are strong constitutional and policy considerations, flowing from the doctrine of separation of powers, the obligation to preserve the integrity of the prosecutorial function, and the need to protect the rights of those who are the target of criminal investigations, that should inform and guide the Department's response to a congressional request for information about independent counsel decisions. It may be that any such request could be accommodated through a process of negotiation with Congress. Only rarely do congressional requests for information result in a subpoena of an Executive Branch official or in any congressional action. In most cases the informal process of negotiation and accommodation mandated by President Reagan in his November 4, 1982, Memorandum for the Heads of Executive Departments and Agencies on "Procedures Governing Responses to Congressional Requests for Information" is sufficient to resolve any dispute.[B21][FN21][FN;F21] On occasion, however, the process breaks down, and a subpoena is issued by a congressional committee or subcommittee. At that point, it would be necessary to consider what procedures and defenses are available to the Executive Branch.

We outline below some of the issues that would be raised if Congress subpoenaed the Attorney General in connection with a congressional request for information about an independent counsel decision. Our particular focus here is on the House of Representatives, because it is far more likely that such action would be taken by the House than by the Senate.

IV. Subpoena Authority of the House of Representatives

A. Basis of Subpoena Authority

As previously noted, Congress has a broad, but not unlimited, investigative authority. See McGrain v. Daugherty, 273 U.S. at 174. This investigative  *82  authority necessarily presupposes some means of compelling the cooperation of contumacious witnesses:

A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it. Experience has taught that mere requests for such information are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

 **12  Id. at 175. Because the subpoena power is regarded as inherent in Congress' Article I power, it does not require enactment of a statute. Nonetheless, the exercise of subpoena power must be authorized by the relevant House. See, e.g., Reed v. County Commissioners, 277 U.S. 376, 389 (1928); McGrain v. Daugherty, 273 U.S. at 158.

Since 1974, the House Rules have given standing committees and subcommittees the authority to authorize and issue subpoenas.[B22][FN22][FN;F22] House Rule XI(m)(1)(B) authorizes any committee or subcommittee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as it deems necessary." Subpoenas may be issued by a committee or subcommittee "only

when authorized by a majority of the members voting, a majority being present," except that " the power to authorize and issue subpoenas . . . may be delegated to the chairman of the committee pursuant to such rules and under such limitations as the committee may prescribe." House Rule XI(m)(2)(A). Any authorized subpoena must be signed by the chairman of the committee or by a member designated by the chairman. Id. The rules of each standing committee flesh out somewhat the requirements for issuance of a subpoena, specifying in particular if, or under what circumstances, the chairman of the full committee may issue a subpoena without a vote of the committee.

B. Enforcement of Subpoenas

If a subpoenaed witness refuses to respond fully to a subpoena, the subcommittee or committee, as the case may be, can vote to hold the witness in contempt of Congress. As a matter of consistent historical practice, a contempt of Congress vote by a subcommittee is referred to the full committee, although there appears to be no technical requirement to interpose committee approval  **83**  between a subcommittee contempt resolution and referral to the full House.:B23[FN23]FN;F23

By operation of House Rule XI(m)(2)(B), any action to enforce compliance with a committee or subcommittee subpoena must be approved by and the House. See In re Beef Industry Antitrust Litigation, 589 F.2d 786, 790 (5th Cir. 1979) (House approval required for intervention in private antitrust suit to gain access to documents subpoenaed by subcommittee from d a party to the litigation); see generally Wilson v. United States, 369 F.2d 198, 201 (D.C. Cir. 1966) (suggesting that referrals under 2 U.S.C. ss 192-194 require a vote of the full House or Senate, except during adjournments).

The House would have three alternatives available to enforce the subpoena: (1) referral to the United States Attorney for prosecution under 2 U.S.C. ss 192-194; (2) arrest by the Sergeant-at-Arms; or (3) a civil suit seeking declaratory enforcement of the subpoena. The first two of these alternatives may well be foreclosed by advice previously rendered by this Office.

1. Referral Under 2 U.S.C. ss 192-194

 **13**  The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. ss 192 and 194.:B24[FN24]FN;F24 Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than 1 month nor more than 12 months.(:B25[FN25]FN;F25)

 **84**  Section 194 imposes certain responsibilities on the Speaker of the House or the President of the Senate, as the case may be, and on the United States Attorney to take actions leading to the prosecution of persons certified by a House of Congress to have failed to produce information in response to a subpoena. It provides:

Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failuree is reported and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the President of the Senate or Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States Attorney, whose duty it shall be to bring the matter before the Grand Jury for its action.

Under this provision, the committee would refer a resolution of contempt to the House, which would then have to approve the resolution and instruct the Speaker to certify the contempt to the United States Attorney for presentation to the grand jury.[B26][FN26][FN;F26]

The contempt of Congress procedure has been used only once against an Executive Branch official who refused to comply with a subpoena on executive privilege grounds. In 1982, EPA Administrator Burford, acting at the President's direction, refused to release certain enforcement sensitive documents in response to a subpoena from the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation. The Subcommittee and subsequently the full Committee approved a contempt of Congress resolution, and on December 16, 1982, the full House adopted the resolution. On December 17, Speaker O'Neill certified the contempt to the United States Attorney for the District of Columbia for prosecution under s 192. The United States Attorney declined to refer the contempt citation to the grand jury, pending resolution of a lawsuit filed by the Executive Branch to block enforcement of the subpoena,[B27][FN27][FN;F27] and completion of negotiations between the executive and legislative branches to reach a compromise settlement.[B28][FN28][FN;F28]

**14   *85  During the EPA matter, this Office rendered advice to the Attorney General, since memorialized in a memorandum, on the applicability of ss 192 and 194 to Executive Branch officials who assert claims of executive privilege on behalf of the President.[B29][FN29][FN;F29] In brief, we concluded that a United States Attorney is not required to refer a contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction to assert executive privilege. Our conclusion rested partly on the need to preserve sufficient prosecutorial discretion, i.e., that Congress may not direct the executive to prosecute a particular individual without leaving any discretion in the executive to determine whether a violation of the law has occurred. We also concluded more broadly, however, that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege. We noted that neither the legislative history nor the subsequent implementation of ss 192 and 194 suggest that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. Moreover, as a matter of constitutional law, we concluded that the threat of criminal prosecution would unduly chill the President's ability to protect presumptively privileged Executive Branch deliberations:

The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

8 Op. O.L.C. at ___. Therefore, Congress could not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure set out in 2 U.S.C. ss 192 and 194 against the head of an Executive Branch agency, if he acted on the instructions of the President to assert executive privilege in response to a congressional subpoena.

*86  2. Inherent Contempt Power of Congress

The second alternative is for the House to instruct the Sergeant-at-Arms to arrest the Executive Branch official and detain him in the Capitol guardroom. The arrest could then be challenged by application for a writ of habeas corpus. 28 U.S.C. ss 2241 et seq.

**15  The Supreme Court has ruled in the past that Congress has the inherent constitutional authority to imprison individuals for contempt. See Jurney v. MacCracken, 294 U.S. 125 (1935); Anderson v. Dunn, 19 U.S. (6 Wheat.) 204 (1821). The authority is one of self preservation and is accordingly limited to "the least possible power adequate to the end proposed." Id. at 231.

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 187 of 512

Case 1:21-cr-00670-CJN    Document 41-4    Filed 03/22/22    Page 12 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Although the authority has been cited by a court as recently as 1970, see United States v. Fort, 443 F.2d at 676, Congress has not attempted to use it for approximately 50 years.[B30][FN30][FN;F30] and it seems most unlikely that Congress would dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege. Moreover, while Supreme Court precedents support the right of Congress to imprison individuals for contempt, there is some question whether such authority would continue to be upheld. In recent years the Supreme Court has been more wary of Congress' exercising judicial authority:

Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

United States v. Lovett, 328 U.S. at 317; see also United States v. Brown, 381 U.S. 437 (1965); INS v. Chadha, 462 U.S. at 962, 966 (Powell, J., concurring). The Court has also been careful in recent cases to restrict Congress to its legislative functions and not to permit it to exercise authority belonging to another branch. See INS v. Chadha, supra; Buckley v. Valeo, 424 U.S. 1 (1976). The current Court therefore may not afford Congress the same latitude with respect to its inherent contempt power that was provided during the 19th and early 20th centuries. See Memorandum for the Deputy Attorney General from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel (Oct. 18, 1984).

In any event, the same considerations that inform the analysis of the applicability of ss 192 and 194 to Executive Branch officials are relevant to an exercise of Congress' inherent contempt power. In our 1984 memorandum to the Attorney General discussing ss 192 and 194, we noted that the reach of the criminal contempt statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect the penalties imposed), and concluded that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." 8 Op. O.L.C. at _ n.42.

**\*87** 3. Civil Suit for Enforcement of a Subpoena

The most likely route for Congress to take would be to file a civil action seeking enforcement of the subpoena. There is no statute that expressly grants the federal courts jurisdiction over such suits.[B31][FN31][FN;F31] There are, however, at least two precedents for bringing such civil suits under the grant of federal question jurisdiction in 28 U.S.C. s 1331. In 1973, the Senate Select Committee on Presidential Campaign Finances sought civil enforcement of its subpoena for tapes and documents; the Committee urged, inter alia, that s 1331 provided subject matter jurisdiction. The district court found that the $10,000 jurisdictional amount in controversy requirement was not met and held that jurisdiction was therefore lacking under section 1331. The court did not suggest that there was any other basis for denying federal question jurisdiction. Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F. Supp. 51, 59 61 (D.D.C. 1973). Legislation was subsequently enacted to authorize jurisdiction over that particular suit. See Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 727 (D.C. Cir. 1974). Section 1331 has since been amended to be eliminate the $10,000 amount in controversy limitation in actions brought against the United States. Pub. L. No. 96-486, s 2(a), 94 Stat. 2369 (1980).

**\*\*16** General federal question jurisdiction was also used as a basis for the be civil suit filed by the Department of Justice against the House in the EPA matter. See United States v. House of Representatives, C.A. No. 82-3583 (D.D.C. 1983). The Department took the position in that case that the controversy be arose under the Constitution and laws of the United States, because resolution "depended directly on construction of the Constitution and be the Court has consistently held such suits are authorized by section 1331." Powell v. McCormack, 395 U.S. 486, 515 (1969). Relying upon the decision in United States v. AT&T Co., 551 F.2d 384 (D.C. Cir. 1976), which held that an action brought by the United States to block a response by a third party to a congressional subpoena met the threshold jurisdictional requirements of section 1331, the Department argued **\*88** that subject matter jurisdiction similarly exists in a suit to halt enforcement of a subpoena addressed directly to the Executive Branch.[B32][FN32][FN;F32] The rationale used by the Department in that suit would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims.

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

In addition, the courts may be willing to entertain a civil suit brought by the House in order to avoid any question about the possible applicability of the criminal contempt provisions of ss 192 and 194. When a possible impairment of the President's constitutional prerogatives is involved, the courts are particularly careful to construe statutes to avoid a constitutional confrontation. In United States v. Nixon, for example, the Court construed the limitation in 28 U.S.C. s 1291 (that appeals be taken only from "final" decisions of a district court) to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court:

(T)he traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government.

418 U.S. at 691-92. The U.S. Court of Appeals for the District of Columbia has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. See Tobin v. United States, 306 F.2d 270 (D.C. Cir.), cert. denied, 371 U.S. 902 (1962); see also United States v. Fort, 443 F.2d at 677-78. The Fifth Circuit appears to have held that no government official need subject himself to contempt in order to obtain review of his claim that the government is privileged to refuse to comply with a court's demand for documents. See Cates v. LTV Aerospace Corp., 480 F.2d 620, 622 (5th Cir. 1973); Carr v. Monroe Manufacturing Co., 431 F.2d 384, 387 (5th Cir. 1970), cert. denied, 400 U.S. 1000 (1971); but see In re the Attorney General, 596 F.2d 58, 62 (2d Cir.), cert. denied, 444 U.S. 903 (1979). Thus, although the civil enforcement route has not been tried by the House, it would appear to be a viable option.:B33[FN33]FN;F33

**17   *89   It is also possible that Congress might attempt to invoke the provisions of the Independent Counsel Act, which require the Attorney General to conduct an investigation "whenever he receives information sufficient to constitute grounds to investigate" that any of the enumerated Executive Branch officials "has committed a violation of any Federal criminal law other than a violation constituting a petty offense." 28 U.S.C. s 591. The crime of contempt of Congress is a non-petty criminal offense. See 2 U.S.C. s 192; 18 U.S.C. s 1. Thus a contempt citation against a covered official would arguably trigger the Attorney General's obligation under the Act. Invocation of the Act would not, however, necessarily require the Attorney General to apply for the appointment of an independent counsel. As this Office has advised on prior occasions, the Attorney General retains a certain measure of discretion with respect to whether to apply for an independent counsel.

B. Defenses to Congressional Subpoenas

1. Lack of Jurisdiction

As we discussed above, Congress' investigative power, while broad, is not unlimited. Thus, short of asserting executive privilege, there may be other lines of defense against a subpoena. The most promising line is that the subcommittee has no jurisdiction to request the information, either because Congress as a whole has no authority to inquire into the matter, or because Congress has not given the committee the requisite authority.

a. Scope of Congress' Jurisdiction

The Supreme Court has not articulated with precision whether there are particular limits to the jurisdiction of Congress to request information from the Executive Branch. Nonetheless, as we have previously set forth, Congress must at a minimum be able to articulate a legitimate legislative purpose for its inquiry. We will not repeat that discussion here, except to say that if the matter either falls exclusively within the province of another branch, see Kilbourn v. Thompson, 103 U.S. at 192, or Congress cannot point to some rational nexus between the inquiry and its legislative power, see Barenblatt v. United States, 360 U.S. at 111, we believe the subpoena would be held invalid for lack of authority, and could be challenged on that basis.

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

### b. Scope of Committee's Jurisdiction

Not only must the investigation fall within Congress' jurisdiction, but the committee or subcommittee must also have been specifically authorized by the **\*90** relevant House to conduct the investigation. Since defiance of a subpoena raises the possibility of criminal prosecution, "a clear chain of authority from the House to the questioning body is an essential element of the offense." Gojack v. United States, 384 U.S. at 716. It "must appear that Congress empowered the Committee to act, and further that at the time the witness allegedly defied its authority the Committee was acting within the power granted to it." [B34][FN34]FN;F34 Id. (quoting United States v. Lamont, 18 F.R.D. 27 (S.D.N.Y. 1955), aff'd, 236 F.2d 312 (2d Cir. 1956)). See also Watkins v. United States, 354 U.S. at 204-05, 214-15; Eastland v. United States Servicemen's Fund, 421 U.S. at 505-06. Thus, a witness cannot be compelled to answer questions that fall outside of the investigative jurisdiction of a committee or subcommittee. See United States v. Rumely, 345 U.S. at 44-45; Bergman v. Senate Select Committee on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); United States v. Cuestra, 208 F. Supp. 401, 406 (D.P.R. 1962).

**\*\*18** Although this general principle is well recognized by the courts, in practice they have given considerable deference to a committee's definition of its jurisdiction. In cases in which the courts have refused to enforce a subpoena because the inquiry fell outside of the committee's jurisdiction, the primary defect was that the investigative authority given to the committee was simply so broad and ill defined that it gave the witness no fair notice of the scope of the inquiry. See, e.g., Watkins v. United States, 354 U.S. at 204; United States v. Rumely, 345 U.S. at 43. In many cases, the courts have considered the "legislative history" of the committee's investigation (e.g., the language and background of the authorizing resolution, remarks made by the chairman or members of the committee to outline the scope of the investigation, the existence and scope of similar investigations) to determine whether a particular matter falls within a committee's jurisdiction. "Just as legislation is often given meaning by the gloss of legislative reports, administrative interpretation and long usage, so the proper meaning of an authorization to a congressional committee is not to be derived alone from its abstract terms unrelated to the definite context furnished them by the course of congressional actions." Barenblatt v. United States, 360 U.S. at 117. See also Wilkinson v. United States, 365 U.S. at 408; Tobin v. United States, 306 F.2d at 275-76; United States v. Fort, 443 F.2d at 682. This analysis, of course, cuts both ways. If a committee has historically exercised investigative jurisdiction over a particular subject, and makes the nexus between its investigative jurisdiction and the n to particular subject matter clear, the courts may hesitate to second guess to that judgment. See, e.g., Barenblatt v. United States, 360 U.S. at 119-20. On the other hand, if the committee has not previously asserted investigative jurisdiction over the subject matter, and the subject matter is not clearly linked to the committee's jurisdiction, the courts may lean to in favor of protecting the **\*91** witness' prerogative to refuse to testify, particularly if constitutional interests are implicated. [B35][FN35]FN;F35 See Tobin v. United States, 306 F.2d at 275-76.

The courts have also suggested that the power of either the witness or to the court to define for itself the scope of a committee's jurisdiction is to limited. In Barenblatt, 360 U.S. at 124, the Court noted that it "goes to without saying that the scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of this Court." Similarly, "it is appropriate to observe o that just as the Constitution forbids the Congress to enter fields reserved o to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers." Hutcheson v. United States, 369 U.S. 599, 622 (1962). See also McSurely v. McClellan, 521 F.2d 1024, 1038 (D.C. Cir. 1975) (prerogative of the judiciary to determine whether the investigation is within the jurisdiction of a particular committee is "extremely limited").

**\*\*19** Nevertheless, it is clear that a witness may refuse to answer on the ground that the inquiry has not been authorized by the relevant House. Particularly where constitutional concerns are raised by compelled testimony, courts may be reluctant to countenance a far ranging inquiry by a particular committee or subcommittee that does not appear to fall within the jurisdiction granted by Congress.

### 2. Executive Privilege

-614-

Finally, the subpoena could be resisted on the ground that the information requested is protected by the executive privilege. It is important to remember, however, that assertion of the privilege does not just involve an evaluation of the Executive Branch's interest in keeping the information confidential; it also involves an evaluation of the strength of Congress' need for that information, and whether those needs can be accommodated in some other way.

Thus, Congress must be able to articulate its need for the particular materials to "point to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged documents (or testimony) it has requested, and to show that the material "is demonstrably critical to the responsible fulfillment of the Committee's functions." Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d at 731, 733. In Senate Select Committee, for example, the court held that the committee had not made a sufficient showing of need for copies of the Presidential tape recordings, given that the President had already released transcripts of the recordings. The committee argued that it  *92  needed the tape recordings "in order to verify the accuracy of" the transcripts, to supply the deleted portions, and to gain an understanding that could be acquired only by hearing the inflection and tone of voice of the speakers. But the court answered that in order to legislate a committee of Congress seldom needs a "precise reconstruction of past events." Id. at 732. "The Committee has . . . shown no more than thatt the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain." Id. at 733. For this reason, the court stated, "the need demonstrated by the Select Committee . . . is too attenuated and too tangential to its functions" to override the President's constitutional privilege. Id.

Moreover, in cases in which Congress has a legitimate need for information that will help it legislate and the Executive Branch has a legitimate, constitutionally recognized need to keep information confidential, the courts have referred to the obligation of each branch to accommodate the legitimate needs of the other. See United States v. AT&T Co., 567 F.2d 121, 130 (D.C. Cir. 1977).

 **20  Here, the considerations outlined above particularly the need to preserve the position of the Executive Branch as the sole entity that enforces the criminal laws would weigh strongly in favor of nondisclosure by the Executive Branch. Ultimately it would be those interests in maintaining confidentiality that must be balanced against Congress' interest in gaining access to particular information for legitimate legislative purposes. As noted above, it is difficult for us to speculate as to what legitimate interests Congress would have in gaining access to the details of a prosecutorial decision made by the Attorney General - - a decision that Congress constitutionally could not alter or interfere with. The decision to assert executive privilege in response to a congressional subpoena, however, is the President's to make. Under the terms of the Reagan Memorandum, executive privilege cannot be asserted vis-a-vis Congress without specific authorization by the President, based on recommendations made to him by the concerned department head, the Attorney General, and the Counsel to the President. That decision must be based on the specific facts of the situation, and therefore it is impossible to predict in advance whether executive privilege could or should be claimed as to any particular types of documents or information.

Charles J. Cooper
Assistant Attorney General
Office of Legal Counsel

Footnotes

1    If the Attorney General notifies the court under s 592(b)(1) that "there are no reasonable grounds to believe that further investigation or prosecution is warranted," the memorandum filed with the court summarizing the Department's investigation "shall not be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court." 28 U.S.C. s 592(b)(3).

2    The independent counsel must file a report with the court describing "fully and completely . . . the work of the independent counsel, including the disposition of all cases brought, and the reasons for not prosecuting any matter within the prosecutorial jurisdiction of such independent counsel which was not prosecuted." The court may release this report "to the Congress, the public, or to any

| | |
|---|---|
| | appropriate person," subject to "such orders as are appropriate to protect the rights of any individual named in such report and to prevent undue interference with any pending prosecution." 28 U.S.C. s 595(b)(2), (3). |
| 3 | Although the language of the confidentiality provisions refers only to documents actually filed with the court, the provisions obviously cannot lawfully be circumvented by disclosing the contents of the documents. See 124 Cong. Rec. at 3462 ("The contents of the report . . . are to remain secret . . . ."); S. Rep. No. 170, supra, at 58. |
| 4 | Section 595(e) of the Act authorizes "(a) majority of majority party members or a majority of all nonmajority party members of the Committee on the Judiciary of either House of the Congress" to request the Attorney General to apply for the appointment of an independent counsel. 28 U.S.C. s 595(e). |
| 5 | Disclosure is not authorized to the public, although the committee may, either "on its own initiative or upon the request of the Attorney General, make public such portion or portions of such notification as will not in the committee's judgment prejudice the rights of any individual." 28 U.S.C. s 595(e). |
| 6 | In discussing cases in which the information contained in the notification should be kept confidential by Congress, the Senate Report specifically notes that "the Committee . . . may decide to delete the names of individuals mentioned in the notification especially if those individuals are not the subject of alleged criminal activity." S. Rep. No. 170, supra, at 73. |
| 7 | Similarly, if the Attorney General applies for an independent counsel for an individual not named in s 591(b), because investigation by the Department "may result in a personal, financial, or political conflict of interest," 28 U.S.C. s 591(c), he would have to provide some specific description of the facts giving rise to the conflict. |
| 8 | Obviously, to the extent the confidentiality provisions of the Independent Counsel Act bar disclosure, the more generalized considerations we outline here need not be considered. However, there may be some information such as details of the deliberative process that is not encompassed by the confidentiality restrictions of the Act, or are not reflected in the report filed with the court. Moreover, at some point the court might authorize disclosure of some or all information contained in the report, which would remove any statutory bar to further disclosures. |
| 9 | For this reason the executive branch has expressed constitutional qualms about the Act itself, which allows an individual not appointed by the President or an officer of the executive branch nonetheless to carry out prosecutorial functions. Despite these doubts, the Department of Justice has thus far taken the position that it will abide by the provisions of the Independent Counsel Act. See Letter to Michael Davidson, Senate Legal Counsel from William French Smith, Attorney General (Apr. 17, 1981), reprinted in Hearings on the Ethics in Government Act Amendments of 1982 before the Subcomm. on Oversight of Government Management of the Senate Comm. on Governmental Affairs, 97th Cong., 2d Sess. 115 (1982). |
| 10 | In fact, the Constitution specifically excludes Congress from the decision whether to prosecute particular cases. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. See Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 853-54 (1984); United States v. Brown, 381 U.S. 437, 447 (1965); United States v. Lovett, 328 U.S. at 315. |
| 11 | Moreover, there must be a subject matter for the inquiry, the investigation must be authorized by Congress, there must be a valid legislative purpose, the witness must be accorded certain constitutional protections, and the information demanded must be pertinent to the inquiry. See Gojack v. United States, 384 U.S. 702, 704-05, 714 (1966); Wilkinson v. United States, 365 U.S. 399, 408-09 (1961); Barenblatt v. United States, 360 U.S. at 111; Watkins v. United States, 354 U.S. at 187; United States v. Rumely, 345 U.S. 41, 44-46 (1953); McGrain v. Daugherty, 273 U.S. at 173, 176; Kilbourn v. Thompson, 103 U.S. at 190. |
| 12 | The relevance of this inquiry is not limited to the question whether the Department should respond, but affects also how it should respond. If Congress' legitimate legislative interest is relatively narrow, the Department may be able to satisfy the inquiry without disclosing confidential information. |
| 13 | For example, the Director of the Office of Personnel Management recently refused to answer questions asked by a congressional subcommittee concerning the removal of the Deputy Director of OPM, on the ground that the removal was a judgment that rested exclusively with the President. The appointment of officers presents a somewhat more difficult problem, at least for those officers who must be appointed with the advice and consent of the Senate. In such cases, the Senate can claim a legitimate interest in obtaining information about the nominee. |
| 14 | Department of Justice officials, as attorneys, are directed to observe the Code of Professional Responsibility to the extent it does not prevent their loyal service to the United States. See 28 C.F.R. s 45.735-1. The Code prohibits a lawyer who is associated with an investigation from making or participating in making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration" already public or highly generalized information about the matter. Model Code of Professional Responsibility, DR 7-107(A) (1979). |
| 15 | The attorney-client privilege generally embraces confidential disclosures of a client to his attorney, made in order to obtain legal assistance and not for the purpose of committing a crime or tort. 8 Wigmore, Evidence s 2290 (McNaughton rev. 1961). In order |

USCA Case #22-3086     Document #1997762      Filed: 05/03/2023      Page 192 of 512

Case 1:21-cr-00670-CJN     Document 41-4     Filed 03/22/22     Page 17 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

to prevent inadvertent disclosures, either directly or by implication, of information which the client had previously confided to the attorney, as well as to foster the attorney's ability to give sound and informed professional advice, the privilege has generally been extended to include an attorney's communications to his client. Mead Data Central v. Department of the Air Force, 566 F.2d 242, 252-55 (D.C. Cir. 1977).

16    See, e.g., Brinton v. Department of State, 636 F.2d 600, 605 (D.C. Cir. 1980), cert. denied, 452 U.S. 905 (1981); Mead Data Central, Inc. v. Department of the Air Force, 566 F.2d at 252; Coastal States Gas Corp. v. DOE, 617 F.2d 854, 865 (D.C. Cir. 1980); 5 U.S.C. s 552(b)(5) (documents exempted from mandatory disclosure under the Freedom of Information Act include those "which would not be available by law to a party . . . in litigation with the agency").

17    Likewise, communications that would be protected in litigation or under the Freedom of Information Act by the work product privilege would generally be considered part of the government's deliberative process, and therefore subsumed under executive privilege, for the purpose of responding to congressional requests for information. See generally 6 Op. O.L.C. at 497-98 n.32.

18    The Act provides that the Attorney General's decision to apply for appointment of an independent counsel "shall not be reviewable in any court." 28 U.S.C. s 592(f). The nonreviewability provision applicable to the Attorney General's decision not to seek appointment is phrased in somewhat different terms. Under s 592(b)(1), if the Attorney General reports to the court that "there are no reasonable grounds to believe that further investigation or prosecution is warranted," the court "shall have no power to appoint an independent counsel." Id. s 592(b)(1). In Banzhaf v. Smith, 737 F.2d 1167, 1169 (D.C. Cir. 1984), the Court of Appeals held that this provision was intended by Congress to bar any "judicial review, at the behest of members of the public, of the Attorney General's decisions not to investigate particular allegations and not to seek appointment of independent counsel."

19    It could be argued that even if the Attorney General applies to the court for appointment of an independent counsel, the Department's investigations may technically be considered "closed," because s 597(a) requires the Department to "suspend all investigations and proceedings regarding a matter within the prosecutorial discretion of an independent counsel" unless the independent counsel "agrees in writing that such investigation or proceedings may be continued by the Department of Justice." For the reasons set forth above, we believe this argument is without merit.

20    The independent counsel's jurisdiction is, of course, limited to that specified by the court, based on the application filed by the Attorney General. See 28 U.S.C. ss 592(d)(1), 593(b), 594(a). Although the language of the Act, see 28 U.S.C. ss 592(d)(1), 593(b), and its legislative history, see S. Rep. No. 170, supra, at 64, suggest that the court may have some flexibility in defining the independent counsel's jurisdiction, we do not believe that the court can grant the independent counsel -- or that the independent counsel can assume -- any jurisdiction in excess of that recommended by the Attorney General. Any other interpretation would completely circumvent the clear congressional judgment that the Attorney General's decision whether to seek an independent counsel be unreviewable. In addition, the Act itself provides several avenues by which the jurisdiction of the independent counsel could be expanded, all of which require the participation of the Attorney General. For example, if the Attorney General receives additional information "sufficient to constitute grounds to investigate about the matter to which such memorandum related," his obligation to investigate and report is renewed, see 28 U.S.C. s 592(c)(2); the Attorney General may ask the independent counsel "to accept referral of a matter that relates to a matter within that independent counsel's prosecutorial jurisdiction," id. s 592(e); and the independent counsel himself may ask the Attorney General or the court to "refer matters related to his prosecutorial jurisdiction" or "may accept referral of a matter by the Attorney General," see id. s 594(e). Finally, our constitutional qualms about the role of the independent counsel would be considerably exacerbated if the critical decision as to what individuals and offenses may be prosecuted were taken completely out of the hands of the Attorney General.

21    That memorandum states that "(t)he policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . . . . (E)xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary. Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches."

22    Prior to adoption of the Hansen proposals in 1974, subpoena authority was granted only on a case-by- case basis. See Congressional Quarterly, Guide to the Congress 164 (1982).

23    The courts have underscored the importance of the procedural safeguards built into the contempt of Congress process and, in particular, the multiple steps of review that must take place before a contempt of Congress prosecution is brought. See Wilson v. United States, 369 F.2d 198, 203 (D.C. Cir. 1966); see also United States Fund v. Eastland, 488 F.2d 1252, 1260 (D.C. Cir. 1973), rev'd on other grounds, 421 U.S. 491 (1975); Sanders v. McClellan, 463 F.2d 894 (D.C. Cir. 1972); Ansara v. Eastland, 442 F.2d 751, 754 (D.C. Cir. 1971). It could therefore be argued that committee consideration of a subcommittee contempt resolution would be necessary in order to provide an additional check upon the contempt of Congress process. No court, however, has so held, and we have not found any requirement in the House or any committee rules for referral to the full committee. Neither have we found any instance in which a

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

subcommittee referred a contempt resolution directly to the House, without seeking approval from the full committee. For example, the contempt resolution voted by the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation against EPA Administrator Burford was referred to the full Committee, and reported by that Committee to the House.

24    A third provision, 2 U.S.C. s 193, denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that his testimony would disgrace him.

25    This statute has been found constitutionally valid as a punitive supplement to Congress' inherent coercive power to imprison for contempt. See, e.g., United States v. Fort, 443 U.S. 670, 677 (D.C. Cir. 1970), cert. denied, 403 U.S. 942 (1971).

26    By its terms, s 194 would permit the Speaker (or President pro tempore) to certify a contempt without the approval of the House, if the House were not in session. This option, however, would appear to be foreclosed by the House rules, which clearly require full House approval for any enforcement action.

27    United States v. House of Representatives, 556 F. Supp. 150 (D.D.C. 1983).

28    Those negotiations eventually resulted in an agreement and withdrawal of the contempt citation.

29    See "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege," 8 Op. O.L.C. ___ (1984).

30    See Marshall v. Gordon, 243 U.S. 521 (1917); Congressional Quarterly, Guide to the Congress 162 (1982).

31    Under 2 U.S.C. s 288d, the Senate Legal Counsel "(w)hen directed to do so (by the Senate) . . . shall bring a civil action . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened failure or refusal to comply with, any subpoena or order issued by the Senate or a committee or a subcommittee of the Senate authorized to issue a subpoena or order." The United States District Court for the District of Columbia has jurisdiction over such actions, but its jurisdiction does not extend to any actions brought "to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal to comply with, any subpoena or order issued to an officer or employee of the Federal Government acting within his official capacity." 28 U.S.C. s 1364(a). The argument could be made that this authority provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer. The legislative history of these statutes, however, counsels against that conclusion. The legislative history specifically notes that the jurisdictional exception for executive branch subpoenas "is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government," but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by private citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas. See S. Rep. No. 170, 95th Cong., 2d Sess. 88-89 (1978).

32    The decision of the district court in United States v. House of Representatives does not directly address the jurisdictional question, although it casts considerable doubt on whether the executive branch can seek review in a civil action, when the legislative branch has chosen to use the criminal contempt provisions. 556 F. Supp. at 153. Nonetheless, the court did not foreclose any civil actions by the House:

Judicial resolution of this constitutional claim, however, will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress.

Id. (emphasis added).

33    Any notion that the courts may not or should not review such disputes is dispelled by United States v. Nixon, 418 U.S. at 703-05, in which the Court clearly asserted its role as ultimate arbiter of executive privilege questions. The need for judicial review in fact was emphasized by this Department in the United States v. House of Representatives litigation as a basis for the court to entertain the suit. The Department argued that, in some circumstances, only judicial intervention can prevent a stalemate between the other two branches that could result in a partial paralysis of government operations.

34    Because the legality of the committee's action is judged as of the time the witness defies the subpoena, a subsequent vote by the full House to enforce the subpoena (through contempt or otherwise) will not cure any jurisdictional defect. Gojack, 384 U.S. at 175 n.12.

35    The judicial decisions dealing with Congress' subpoena authority have for the most part involved refusals by private individuals to testify. In those cases the courts have been sensitive to First, Fourth, and Fifth Amendment concerns raised by the defendants, and have weighed those interests in the balance in determining how specific Congress must be in authorizing a committee's investigation. See, e.g., United States v. Rumely, 345 U.S. at 45; Watkins v. United States, 354 U.S. at 204-05. Although the constitutional interests implicated by a subpoena of an executive branch official arise from Articles I and II, rather than the Bill of Rights, a court should be equally sensitive to those constitutional concerns.

10 U.S. Op. Off. Legal Counsel 68 (O.L.C.), 1986 WL 213239

---

End of Document                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

## BYU Law Review

Volume 1978 | Issue 2                                                Article 1

5-1-1978

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

Rex E. Lee

Follow this and additional works at: https://digitalcommons.law.byu.edu/lawreview

Part of the Constitutional Law Commons, and the Law and Politics Commons

Recommended Citation

Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 BYU L. Rev. 231 (1978).
Available at: https://digitalcommons.law.byu.edu/lawreview/vol1978/iss2/1

This Article is brought to you for free and open access by the Brigham Young University Law Review at BYU Law Digital Commons. It has been accepted for inclusion in BYU Law Review by an authorized editor of BYU Law Digital Commons. For more information, please contact hunterlawlibrary@byu.edu.

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

## *Rex E. Lee\**

In *United States v. Nixon,*[1] the United States Supreme Court recognized the existence of the President's right under appropriate circumstances to withhold certain kinds of information from coordinate branches of government.[2] The Court held that this right, which bears the label executive privilege, is based on separation of powers. One year later, in *Eastland v. United States Servicemen's Fund,*[3] the Court held that the issuance and enforcement of congressional subpoenas are protected under the speech or debate clause.[4]

A case now pending before the United States Court of Appeals for the District of Columbia Circuit, *United States v. American Telephone & Telegraph Co. (AT&T),*[5] raises additional important issues concerning executive privilege, congressional investigative power, and the broader separation of powers context out of which these issues arise. Described by the court of appeals as presenting "nerve-center constitutional questions,"[6] the case brings squarely into confrontation for the first time in history three potent prerogatives of our three branches of government:

---

\* Dean and Professor of Law, J. Reuben Clark Law School, Brigham Young University. B.A., 1960, Brigham Young University; J.D., 1963, University of Chicago. Assistant United States Attorney General, May 1975-January 1977. Dean Lee was personally involved in the *AT&T* case, and argued the case before the district court and the court of appeals. The views expressed herein do not necessarily represent those of the Department of Justice during the Ford administration.

The author acknowledges the valuable assistance of Allen D. Butler, a recent graduate of the J. Reuben Clark Law School, Brigham Young University.

1. 418 U.S. 683 (1974).

2. *Id.* at 706-07. In *Nixon* the Court held that, under the circumstances of the case, the President was obligated to comply with a judicial subpoena, because the President raised only generalized claims of confidentiality, as contrasted with the judiciary's specific need for the information in a criminal proceeding. While congressional subpoenas were not directly involved in *Nixon,* the fair inference to be drawn from the opinion is that executive privilege has applicability to attempts by either Congress or the courts to obtain information.

3. 421 U.S. 491 (1975).

4. *See* notes 43-58 and accompanying text *infra.*

5. The court of appeals has issued two opinions in the case. The first is reported at 551 F.2d 384 (D.C. Cir. 1976); and the second, at 567 F.2d 121 (D.C. Cir. 1977).

6. 551 F.2d at 394.

231

232    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

Congress' investigatory (subpoena) power, executive privilege exercised to protect foreign intelligence secrets, and judicial review.

Section I of this Article briefly examines that *AT&T* case. Subsequent sections will explore some of the issues that it raises. Section II will discuss the applicability of the speech or debate clause to congressional investigations and the scope of executive privilege when the information at issue is not in the government's possession. Secton III will explore the possible procedural avenues by which an executive privilege-congressional subpoena confrontation might arise, including the constitutional impediments to bringing such confrontations before the courts. Section IV deals with the constitutional authority of the courts to resolve these conflicts, and Section V examines the possible standards appropriate for their resolution.

I.    United States v. American Telephone & Telegraph Co.

### A.    *History of the Controversy*

For several decades, the United States has engaged in warrantless electronic surveillance (wiretapping) to protect national security interests.[7] Such surveillance is initiated only after ap-

---

7.  There is no authorizing statute for such surveillance. Its assumed legal basis is an inherent power in the President derived from his responsibilities as Commander in Chief of the Armed Forces, his responsibilities in the area of foreign relations, and his duty under article II, § 1 of the Constitution to "preserve, protect, and defend the Constitution of the United States." The Supreme Court held in United States v. United States District Court (Keith), 407 U.S. 297 (1972), that the President lacks such power at least insofar as domestic threats to national security are concerned. The *Keith* opinion left open the issue of inherent Presidential power to protect national security from foreign threats, including foreign powers, foreign agents, and agents of foreign powers. *Id.* at 308, 321-22. *See also* Zweibon v. Mitchell, 516 F.2d 594 (D.C. Cir. 1975) (held illegal a warrantless surveillance imposed on the Jewish Defense League whose activities were directed against foreign powers, but which is not itself a foreign power).

Further detail on the procedures involved in instituting such a surveillance is contained in United States v. AT&T, 419 F. Supp. 454, 456 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The lack of statutory authority for these foreign intelligence surveillances has been a source of concern for the Attorney General. To alleviate this problem, S. 3197, 94th Cong., 2d Sess., was proposed in 1976 with the support of the Ford administration, particularly Attorney General Levi. The bill was reported favorably by the Senate Judiciary Committee and by the Senate Committee on Intelligence, but died in the Senate at the close of the 94th Congress. Currently, the Foreign Intelligence Act of 1978, S. 1566, 95th Cong., 2d Sess., has been reported favorably by the same committees that reported S. 3197 during the 94th Congress. S. Rep. No. 701, 95th Cong., 2d Sess. 6-7 (1978).

S. 3197 recognized the possible existence of inherent Presidential authority, in addition to that authorized by the bill. The current bill, by contrast, specifies that its provisions constitute the "exclusive means by which electronic surveillance as defined . . . may be conducted." S. 1566, 95th Cong., 2d Sess. § 2511(2) (1978).

proval by the Attorney General, and is effected by the government leasing a telephone line which runs from the telephone of the surveillance target to an FBI monitoring station. Prior to 1969, the arrangements for these leased lines were handled orally.[8] Since then, however, all leased line arrangements have been memorialized by a "leased line letter," sometimes called a "national security request letter." This is a single-paragraph form letter identifying the points "from" and "to" which service is to be leased. It states that the service is to effect a foreign intelligence surveillance authorized in writing by the Attorney General, and cautions that the existence of the letter should not be disclosed lest the investigation be impeded.[9] These leased line letters have never been classified. The persons who handle them within the AT&T affiliate companies are all AT&T employees who have not undergone any formal governmental clearance procedure. The security afforded the letters has been described, however, as

---

8. United States v. AT&T, 551 F.2d at 388 n.5.
9. The leased line letter form is as follows:

Date

Addressee
Dear Mr. _____

In connection with an investigation being conducted by the Federal Bureau of Investigation, under its lawful and established jurisdiction, it is requested that you furnish to the Federal Bureau of Investigation, at the usual commercial rates, the facilities or services set out below. This request is made upon the specific written authorization of the Attorney General of the United States as a necessary investigative technique under the powers of the President to protect the national security against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities, in connection with an investigation of organizations or individuals suspected to be agents of or acting in collaboration with a foreign power. Your cooperation in this matter will be greatly appreciated.

It is requested that private line facilities be furnished as follows:
From:
To:
You are not to disclose the existence of this request. Any such disclosure could obstruct and impede the investigation.

Very truly yours,

Clarence M. Kelley,

Director

Joint Appendix at 48, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) [hereinafter cited as Joint Appendix].

The "from" portion of the form is followed by information identifying the surveillance target by telephone number, address, telephone pole or line number, or other more technical information from which the telephone company can identify the telephone to be tapped.

involving "the strictest security safeguards."[10]

On June 22, 1976, pursuant to its investigation into possible governmental abuse of section 605 of the Communications Act,[11] the House Committee on Interstate and Foreign Commerce issued a subpoena directing AT&T to deliver to that committee's Subcommittee on Oversight and Investigations four categories of documents.[12] The first category consisted of the leased line letters

---

10. *Id.* at 44. AT&T security safeguards were described by Robert L. Keuch, deputy assistant to the Attorney General, as follows:

> Upon information and belief AT&T receives and maintains all leased line letters under the strictest security safeguards. In the normal case not more than one individual per company is authorized to receive and have access to the request letter. In all cases the leased line letters are maintained within the security section of the corporation. Under company policies, members of AT&T's security organization are employed only after a full field investigation of the general nature utilized by the FBI in processing security clearances. Finally, all leased line letters are separately maintained in safes or secure compartments as would be required for classified information held by the Executive Branch. In all the years in which AT&T has performed this function, there is no evidence that the security of the leased line evidence has ever been compromised.

*Id.*

11. 47 U.S.C. § 605 (1970). Section 605 protects the privacy of radio or wire communications by prohibiting the interception of such communications or the divulgence of the contents of such communications. *Id.* The dual purpose of the investigation, as described by Congressman Moss, was "to determine whether existing law, specifically section 605 of the Communications Act, is being abused by the Executive Branch" and "the possible need for corrective legislation . . . relating to the protection and interception of private, interstate communications." Joint Appendix, *supra* note 9, at 193.

Certain activities by the President are excepted from § 605:

> Nothing . . . in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security information against foreign intelligence activities.

18 U.S.C. § 2511(3) (1970).

12. The four categories were:

> 1. Full and complete copies of Federal Bureau of Investigation (FBI) national security request letters, in the possession or control of American Telephone and Telegraph (AT&T) and its 24 operating companies listed below, for access to phone lines handling either verbal or non-verbal communications.
> 2. Copies of any and all records in the possession or control of AT&T or its operating companies prior to 1969 when written FBI requests were not routinely requested by AT&T and its operating companies.
> 3. Copies of any and all applicable Bell System Practices (BSP's) describing company policy regarding national security "taps" or "provision of facilities" to law enforcement or intelligence agencies. This should include both current BSP's and any BSP's on the subject which have since been revised or discontinued.
> 4. Copies of internal memoranda, correspondence, board minutes, or other records relative to AT&T, and/or any AT&T operating company, practice or

in the possession of AT&T and its affiliates. The White House responded to the AT&T subpoena by attempting to negotiate a compromise with the subcommittee. The principal focus of the negotiation efforts was to substitute copies of memoranda prepared by the FBI for the leased line letters. These memoranda describe the facts and circumstances relevant to the requested surveillance, and provide the basic information considered by the Attorney General in making his decision.

The general concept of such a substitution served the interests of both sides. One of the principal concerns underlying the congressional investigation was whether the wiretaps had been restricted to foreign intelligence matters or activities or whether some of the taps had been used for domestic purposes. The letters themselves contained no information concerning the background or activities of the person whose telephone had been tapped or why those activities qualified him—or failed to qualify him—as a legitimate foreign intelligence surveillance target.[13] By contrast, the backup memoranda would reveal to the subcommittee the circumstances and considerations that justified the surveillance. The executive branch also preferred to release the memoranda (with certain deletions to prevent identification of the specific targets) rather than the letters themselves. Release of the letters would increase the number of people having access to information that could identify every foreign intelligence target under United States surveillance since 1969.

Through a series of negotiations lasting nearly a month, agreement was reached on some, but not all points. It was agreed that AT&T would provide to the subcommittee, and the subcommittee in turn would provide to the FBI, a list of the dates of the leased line letters. From these dates, the FBI would identify the letters that pertained exclusively to domestic surveillances,[14] and the backup memoranda pertaining to domestic surveillances would be supplied with only such minor deletions as were neces-

---

policy with respect to national security "taps" or "provision of facilities" to law enforcement or intelligence agencies, covering the last 10 years.

United States v. AT&T, 419 F. Supp. 454, 455-56 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

13. It would be theoretically possible, of course, for the subcommittee to conduct its own investigation to determine whether a tap on a particular telephone was for legitimate foreign intelligence, but there is no suggestion that the subcommittee proposed, or felt itself qualified, to carry out that kind of highly secret and sensitive investigation.

14. Leased line letters in this category would be limited to those that occurred between 1969, when the leased line letter procedure began, and June 19, 1972, the date of the *Keith* decision. *See* note 7 *supra.*

236    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

sary to shield particularly sensitive ongoing investigations. With regard to foreign intelligence surveillances, the subcommittee would select a random sample of the backup memoranda for two selected years, 1972 and 1975. The FBI would make copies of these sample memoranda, substituting generic classifications or descriptions[15] for any information that might identify targets or sources. The subcommittee would then have access to the edited memoranda at the FBI.

The irreconcilable point of difference was the subcommittee's view that in order to verify the integrity of the expurgating process, the subcommittee would need to compare a subsample of the edited backup memoranda with unexpurgated originals. The subcommittee proposed that three representatives be allowed to compare the original and edited memoranda at the FBI, and that they be permitted to take their notes back to the subcommittee. The executive branch opposed this plan principally because the notes, if allowed to leave the FBI, would become subcommittee records, subject to examination by any House member under House Rule XI § 2(e)(2).[16]

On July 22, after nearly a month of negotiations and one day prior to the July 23 subpoena compliance date, the executive branch filed suit against AT&T to obtain a temporary restraining order.[17] At the temporary restraining order hearing, Congressman John Moss, chairman of the subcommittee, presented a motion to intervene which the court granted. After argument, the court issued an order restraining AT&T from releasing the letters.

---

15. For example, the term "Middle East Diplomat" might be substituted for the target's name.

16. Rule XI § 2(e)(2) provides: "All committee hearings, records, data, charts, and files shall be kept separate and distinct from the congressional office records of the member serving as chairman of the committee; and such records shall be the property of the House and all Members of the House shall have access thereto." W. Brown, Manual and Rules of the House of Representatives, H.R. Doc. No. 416, 93d Cong., 2d Sess. 420 (1975).

17. At the same time, the President sent a letter to Congressman Staggers, chairman of the full Committee on Interstate and Foreign Commerce, who had signed the subpoena. The letter constituted an invocation of executive privilege. It advised the chairman:

> I have determined that compliance with the subpoena would involve unacceptable risks of disclosure of extremely sensitive foreign intelligence and counterintelligence information and would be detrimental to the national defense and foreign policy of the United States and damaging to the national security. Compliance with the Committee's subpoena would, therefore, be contrary to the public interest.

United States v. AT&T, 419 F. Supp. 454, 458 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) (quoting letter from Gerald R. Ford to Harley O. Staggers (July 22, 1976)).

Eight days later the district court rendered final judgment for the executive branch.[18]

The court observed that the case involved an assertion of executive privilege having an effect on Congress' powers of speech or debate under *Eastland v. United States Servicemen's Fund*,[19] but rejected the position taken by Congressman Moss that the legislative authority to investigate is absolute. In the district court's view, "the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum."[20] The district court concluded not only that "[t]he helpfulness of the national security request letters in determining the basis on which the wire taps were instituted is minimal," but also that "the President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters." Because "[s]uch a determination by the Executive is generally accorded great deference by the courts,"[21] judgment was rendered for the executive and a permanent injunction issued.

The Court of Appeals for the District of Columbia Circuit[22] took a different approach. After holding that there was federal jurisdiction to consider the case under 28 U.S.C. § 1331,[23] the court held that it need not decide whether the case was moot,[24] whether it presented a nonjusticiable political question,[25] or how it should resolve the "patently conflicting assertions of absolute authority."[26] Following its earlier precedent in *Nixon v. Sirica*,[27]

---

18. United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

19. 421 U.S. 491 (1975).

20. 419 F. Supp. at 459.

21. *Id.* at 460.

22. United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

23. Section 1331 grants jurisdiction over cases arising under the Constitution, laws, or treaties of the United States, wherein the amount in controversy exceeds $10,000. 28 U.S.C. § 1331(a) (1970). The court found a federal question in the executive's claim that "its constitutional powers with respect to national security and foreign affairs included the right to prevent transmission of the request letters to Congress." 551 F.2d at 389. The $10,000 requirement was satisfied by the court's conclusion that "far more than $10,000 would be required to repair [the] damage" which would result from disclosure, such as "disruption of diplomatic relations and of our intelligence and counterintelligence programs, including possible danger to the lives of counterintelligence sources." *Id.*

24. 551 F.2d at 390. The subpoena would have expired with the adjournment of the House, since the House, unlike the Senate, is not a continuing body. Eastland v. United States Servicemen's Fund, 421 U.S. 491, 512 (1975).

25. 551 F.2d at 390-91. The court did face this issue in its second opinion. *See* notes 126-29 and accompanying text *infra*.

26. 551 F.2d at 391-92.

27. 487 F.2d 700 (D.C. Cir. 1973).

238    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

the court held that issues of such magnitude involving the consti-
tutional powers of its sister branches should not be judicially re-
solved until every opportunity for a negotiated settlement had
been exhausted, especially since (at least in the court's view) the
parties had already come so close to reaching a settlement.[28]
While observing that "[i]t would be the function of the parties
to propose the structure and its details," the court suggested in
some detail how the parties might proceed.[29] The court of appeals
ordered the district court "to report to us concerning the progress
of these negotiations within three months of the date of this opin-
ion, unless the executive and congressional parties jointly ask for
an extension or report an earlier impasse."[30]

Negotiations pursuant to the court of appeals' first opinion
and order extended over a period of two months, culminating in
a final offer by the Justice Department closely approximating the
suggestions contained in the court of appeals' opinion. The sub-
committee found this proposal unacceptable.

When the case came back before the court of appeals for the
second time,[31] that court held the controversy justiciable and re-
jected the claims of both parties that their respective substantive
positions were entitled to absolute constitutional protection. The
court declined, however, to render a final judgment in favor of
either side. Adhering to the fundamental premise of its earlier
opinion that, to the maximum extent possible, the conflict should
be resolved by negotiation between the article I and article II
branches rather than by decree from the article III branch, the
court elected "to continue our approach of gradualism."[32] The
court ordered that the parties experiment with the following pro-
cedure: Members of the subcommittee staff would be allowed to
examine a sample of ten unexpurgated memoranda, and would
be allowed to take notes. The notes, however, would remain under

28. "There was almost a settlement in 1976. It may well be attainable in 1977." 551
F.2d at 394. Earlier the court had observed: "It is an additional, if fortuitous, advantage
that under our decision, negotiations can be conducted not only by a new House but by a
new President." *Id.* at 390.

29. *Id.* at 395 n.18. The suggestion of the court was that a small number of congres-
sional staff investigators be given access to a subsample of the unexpurgated backup
memoranda. The President would be allowed to certify the investigators' security clear-
ance, and the investigators' notes would be held under seal and not revealed unless there
was a claim that there were discrepancies between the original and edited memoranda.
That claim would be submitted to the district court, which would base its decision on an
in camera comparison of both sets of memoranda and the investigators' sealed notes.

30. *Id.* at 395.

31. 567 F.2d 121 (D.C. Cir. 1977).

32. *Id.* at 131.

seal with the FBI. If inaccuracies were found, the subcommittee could take its claim to the district court, where the memoranda would be examined in camera. The executive would be allowed to make substitutions, but only upon an in camera showing that the memoranda were accurately edited and that the contents were extraordinarily sensitive. While this procedure was being carried out, the subcommittee was to have access to all memoranda for the sample years (1972 and 1975) in edited form.[33]

Thus, on the delicate and difficult ultimate issue in the case—accommodating the competing constitutional needs of two sister branches, and declaring a winner—commonsense practicality once again prevailed over traditional judicial form. In its second opinion as in its first, the court of appeals used the power and authority of the federal judiciary not to settle the dispute between the other two branches, but rather to intensify the incentive and the pressure on these branches to settle the dispute themselves. The theoretical and practical strengths of this approach are discussed in Section III, Subsection C of this Article.

### B.   Implications of the Controversy

The court of appeals in its first opinion expressed the view that "[t]he negotiations came close to success."[34] In one sense this is a correct statement. The information at issue—targets and sources contained in a subsample of original memoranda—constituted only a very small portion of the total information in the memoranda, viewed either from the standpoint of word count or substantive content.

From another vantage point, however, the disagreement over verification represented nothing less than a head-on conflict between the fundamental authority and responsibility of the article I and article II branches: congressional powers of investigation versus Presidential responsibility for preservation of foreign intelligence secrets. Chairman Moss insisted that the subcommittee's rights of investigation, as interpreted by the Supreme Court in *Eastland*, were absolute and that the subcommittee could not discharge its responsibility without verifying, at least on a sample basis, (1) that there were in fact original memoranda from which the expurgated copies had been made, and (2) the accuracy of the generic substitutes. The President, on the other hand, relied

---

33. *Id.* at 131-32.
34. 551 F.2d at 386.

240    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

upon *United States v. Nixon*[35] to his assertion that it was the executive's prerogative to decide whether sensitive intelligence information should be disclosed. From the executive's viewpoint, the proposed verification process raised the same concerns as did access to the leased line letters: identification of foreign intelligence surveillance targets. Though the problem was susceptible to resolution through negotiation, neither was willing to trust the other. Chairman Moss would not accept the President's assurance that no domestic surveillances were involved, and the President was unwilling to run the risk that out of 435 members of Congress having access to the information, not one would disclose it.[36] Thus, each side was in the unaccustomed position of having one of its constitutional responsibilities in a face-off with an equally clear constitutional responsibility of another branch. Accordingly, the prerequisite to a negotiated settlement was a concession by one branch of part of its constitutional authority to the corresponding benefit of the other branch.[37]

During the negotiations the dispute had centered around the allocation of authority between two branches of government. But once the suit was filed, the conflict expanded to embrace the authority of the article III branch as well. In the initial district court proceedings, counsel for Chairman Moss took the position that the court's restraining order would have no effect on Congress and that article I gave Congress exclusive jurisdiction over all aspects of the matter.[38] On the day following the temporary

---

35. 418 U.S. 683 (1974).

36. The court of appeals observed that such release could be forbidden either by the subcommittee, the committee, or the full House. 551 F.2d at 386. Any individual member of Congress, however, may publicize even the most sensitive information, and so long as he does so within the scope of congressional activity covered by the speech or debate clause—such as floor debate or committee hearings—that clause immunizes him from any civil or criminal consequences from such publication. Gravel v. United States, 408 U.S. 606 (1972).

37. An objective examiner of the record in *United States v. AT&T* might conclude that just such a concession was in fact made by the President and rejected by Chairman Moss. There was an offer to permit the chairman himself to compare the expurgated copies with the original documents from which they were copied. Joint Appendix, *supra* note 9, at 145-48. This might be viewed as effectively resolving the standoff in favor of the legislative branch. Nevertheless, the chairman rejected this offer. In his view the subcommittee had a right of access to the information, and the expurgated-copy-with-verification procedure was itself a compromise. Particularly significant in the chairman's view was the fact that "[w]e have been advised by the Federal Bureau of Investigation that at least 14 Executive Branch officials and staff have routine access to these documents, and an unknown number of additional staff have access on a 'need-to-know' basis." Joint Appendix, *supra* note 9, at 148 (letter from Chairman Moss to Assistant Attorney General Rex E. Lee).

38. At the outset of his argument at the temporary restraining order hearing, counsel for the subcommittee stated: "The issue is, I don't think your Honor with due respect,

restraining order hearing, however, the subcommittee elected not to enforce its subpoena and thus avoided placing AT&T in the difficult position of having to choose between being held in contempt of court or contempt of Congress.[39]

*United States v. AT&T* marks the second time in history that a case involving an assertion of executive privilege against a congressional subpoena has reached the federal court of appeals level.[40] It is the first such case where the purpose of the executive privilege assertion was to protect foreign intelligence secrets. In light of the holding in *United States v. Nixon*[41] that executive

---

with all due respect to Your Honor and to the Court, I don't think you have jurisdiction to block Article I of the Constitution where we have, where the Subcommittee has clear jurisdiction." Transcript of Oral Argument, Motion for Temporary Restraining Order at 20, United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The following colloquy occurred at the time the district court judge indicated that he would grant a temporary restraining order:

> THE COURT:   I am going to grant a TRO.
> MR. LEMOV:   That won't affect the Congress.
> THE COURT:   All Right.
> MR. LEMOV:   I am sorry, Your Honor.
> THE COURT:   All right. I am glad to know the position of your constituents.
> MR. LEMOV:   Our position is that Article One is self sufficient and it is not—
> THE COURT:   In other words, you are going to flaunt the TRO, is that it?
> MR. LEMOV:   I would not say we are going to flaunt the TRO. It is—
> THE COURT:   Well, what did you say?
> MR. LEMOV:   I would say that the TRO would not bind the Congress in the exercise of its legislative powers, but I would refer that matter to our Subcommittee.
> THE COURT:   Yes.
> MR. LEMOV:   To make that decision.

*Id.* at 29.

39.  The occasion was a subcommittee hearing held at the appointed time for compliance with the subpoena, Friday, July 23. The witnesses at the hearing were AT&T officials. Chairman Moss reiterated the view stated the evening before by his counsel that the courts had no authority to enjoin compliance with a properly issued congressional subpoena. Nevertheless, he announced that he would not precipitate the issue by holding AT&T officials in contempt of Congress:

> MR. MOSS:   Well, the Chair recognizes the very difficult position American Telephone and Telegraph is placed in because of the actions of the court, which were taken late yesterday afternoon.
> While the Subcommittee or the Chairman, does not recognize that the court has a lawful authority to interfere with this committee, it recognizes that to pursue this matter at this moment would place AT&T between the very difficult choices of being in contempt of the House or in contempt of the court.

Joint Appendix, *supra* note 9, at 95.

40.  The first was Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974). *See* text accompanying notes 90-105 *infra*.

41.  418 U.S. 683 (1974).

privilege is constitutionally based, and the holding in *Eastland v. United States Servicemen's Fund*[42] one year later that at least some aspects of the issuance and enforcement of congressional subpoenas are included within the speech or debate immunity, issues raised by the confrontation between these two constitutionally based prerogatives are likely to be increasingly important in the future. In *AT&T*, and potentially in future cases, the scope of these competing congressional and executive prerogatives has an important bearing on the conflict between them. Two issues involved with the scope of these prerogatives are discussed in Section II.

## II.  Scope of Speech or Debate and Executive Privilege

The final issue with which this Article will deal concerns the standards by which federal courts should resolve conflicts between Congress' investigative powers and a Presidential assertion of executive privilege.[43] Before such standards can be delineated, however, the scope of the two competing powers and the constitutional anchorage of each must be explored. Accordingly, this Section will examine two problems. The first concerns the scope of the speech or debate clause as it relates to congressional investigations. The second involves the scope of the executive privilege doctrine when the information is in the hands of a private third party.

### A.  *Speech or Debate and Congressional Investigations*

Congress' investigative powers are not expressly authorized by the Constitution. The Supreme Court has long recognized, however, that they are so essential to the legislative function as to be implied by the general vesting of legislative power in Congress.[44] *Eastland v. United States Servicemen's Fund* contains

---

42. 421 U.S. 491 (1975).

43. Section V *infra*.

44. Watkins v. United States, 354 U.S. 178, 187 (1957); McGrain v. Daugherty, 273 U.S. 135, 174-75 (1927). The investigatory powers are not unlimited, however, and may be employed only "in aid of the legislative function." Kilbourn v. Thompson, 103 U.S. 168, 189 (1881). In addition, a congressional committee must show that it has been authorized to make the investigation and that the information sought is pertinent. Watkins v. United States, 354 U.S. at 201, 208-09. *Cf.* Barenblatt v. United States, 360 U.S. 109 (1959) (giving a much more liberal interpretation of the authorization requirement).

The protection afforded by the speech or debate clause has similar limitations in that it protects only those activities which fall within the "sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376 (1951). *See* Doe v. McMillian, 412 U.S. 306 (1973) (clause did not bar suit against person who, with authorization from Congress,

arguable bases for an inference that the speech or debate clause, where applicable, affords an even larger measure of support for congressional investigative activity than are implied by Congress' general investigative powers.[45]

The speech or debate clause appears in the first paragraph of article I, section 6 of the Constitution. That paragraph provides:

> The Senators and Representatives Shall receive a Compensation for their services, to be ascertained by Law, and Paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

Both the context and also the language of the speech or debate clause imply that its fundamental purpose is to prevent the kind of interference with the discharge of congressional responsibilities that would result from Senators and Representatives being involuntarily involved in legal proceedings while Congress is in session.[46] The thrust of the clause is to protect members of the Congress (or their aides) from arrest or litigation *as defendants*. This

---

distributed allegedly injurious materials to the public rather than limiting distribution solely to legislative activities); Gravel v. United States, 408 U.S. 606 (1972) (clause would bar questioning of congressional aide, but would not preclude an inquiry into alleged arrangements for the private publication of the Pentagon Papers); United States v. Brewster, 408 U.S. 501 (1972) (clause did not bar prosecution for acceptance of a bribe).

45. One of these inferential bases is provided by Justice Marshall's concurring opinion, analyzed in this Section. Another is the Court's distinction of its earlier holdings in Watkins v. United States, 354 U.S. 178 (1957), and Barenblatt v. United States, 360 U.S. 109 (1959). *See* note 51 *infra.* A third is the bare fact that the Court decided the case under the speech or debate clause. Whether speech or debate extends to congressional investigative activities other than the issuance and enforcement of subpoenas, and whether those components of congressional investigations that are included within speech or debate (assuming there is a difference) enjoy greater constitutional protection, are questions outside the reach of this Article. For reasons discussed in Section V, the controlling consideration for present purposes is the fact that Congress' investigative powers which come into confrontation with assertions of executive privilege are constitutionally based.

46. Powell v. McCormack, 395 U.S. 486, 505 (1969). *See also* Dombrowski v. Eastland, 387 U.S. 82, 84-85 (1967); Tenney v. Brandhove, 341 U.S. 367, 377 (1951) (same immunity accorded state legislators); LIBRARY OF CONGRESS, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ANALYSIS AND INTERPRETATION, S. DOC. No. 82, 92d Cong., 2d Sess. 117-20 (1973). For a detailed history of the speech or debate clause, see Reinstein & Silvergate, *Legislative Privilege and the Separation of Powers,* 86 HARV. L. REV. 1113 (1973). For a complete discussion of all Supreme Court decisions regarding the clause, see Suarez, *Congressional Immunity: A Criticism of Existing Distinctions and a Proposal for a New Definitional Approach,* 20 VILL. L. REV. 97 (1974).

244    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

is the only application of speech or debate that has ever been made by Supreme Court holdings.

In *Eastland* the Court held that the speech or debate clause precluded a federal court from enjoining the issuance of a congressional subpoena duces tecum directing a bank to produce records of an organization, notwithstanding the Court's apparent acceptance of the argument that the disclosure of such records would infringe upon the plaintiff's first amendment rights of association.[47] An issue left unresolved by *Eastland* is whether speech or debate protection is applicable in those cases where no congressional person or entity is named as a defendant. Alternatively stated, the issue is whether speech or debate creates only an immunity from suit for Congressmen and their aides, or whether it constitutes a positive constitutional guarantee that can be asserted either defensively or affirmatively. The issue is present in cases involving an assertion of executive privilege where the executive branch can simply refuse to disclose information in its possession, thus forcing Congress to go to court as a plaintiff to enforce its subpoena. The issue also arises in the *AT&T* situation since the executive branch can achieve its nondisclosure objective through a judicial decree that runs only to noncongressional parties to the litigation, thus forcing Congress into the role of intervenor.

Although the issue was not raised in *Eastland,* some support can be found in that case for the proposition that speech or debate protects all congressional investigations from judicial interference.[48] Rather than resting the decision upon the simple fact that

---

47. *Eastland* involved a subpoena issued by the Senate Subcommittee on Internal Security. The subcommittee was investigating the activities of the United States Servicemen's Fund (USSF) and, pursuant to that investigation, issued a subpoena to the bank where USSF had an account, commanding the bank to produce " 'any records appertaining to or involving the account or accounts of [USSF].' " 421 U.S. at 494. USSF and its members brought suit to enjoin implementation of the subpoena. Named as defendants were Subcommittee Chairman Eastland, nine other Senators, the subcommittee's chief counsel, and the bank. *Id.* at 495. The bank did not participate in the action. *Id.* at 495 n.5.

48. The issue would have been raised in *Eastland* if the suit had been pursued exclusively against the bank. (Although the bank was named as a defendant, it did not participate in the action—apparently because it was never served. *Id.* at 494-95 nn.4 & 5.) Although the majority opinion does not deal with the issue, the theoretical complications from the presence of the bank—a nongovernmental entity—as a defendant in the case were the focus of some concern at the oral argument. During the rebuttal argument, the Court persisted in questioning Mr. Miller, attorney for the subcommittee and Senator Eastland, concerning the nonavailability of the speech or debate immunity to the bank, until it finally extracted from him the following concession:

MR. MILLER:  The Court of Appeals decision authorizes a judgment

231]                    SEPARATION OF POWERS                    245

the decree in that case ran only to Senators and their aides, the Court emphasized the disruption and delay of the legislative process occasioned by judicial review. At one point the Court stated:

> This case illustrates vividly the harm that judicial interference may cause. A legislative inquiry has been frustrated for nearly five years, during which the Members and their aide have been obliged to devote time to consultation with their counsel concerning the litigation, and have been distracted from the purpose of their inquiry. The Clause was written to prevent the need to be confronted by such "questioning" and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority.[49]

Also instructive is the Court's approach to the issue in *Eastland.* As the Court framed the issue, "[t]he question to be resolved is whether the actions of [Congress] fall within the 'sphere of legitimate legislative activity.' If they do, [Congress] 'shall not be questioned in any other Place' about those activities since the prohibitions of the Speech or Debate Clause are absolute . . . ."[50] The significance of these two sentences, is of course, their confinement of the relevant issues in the case to the scope of the speech or debate clause. The Court found that the power to investigate and the subpoena power plainly fell within the "legitimate legislative sphere" protected by speech or debate. Having found that, the Court refused to balance the speech or debate interests against the plaintiff's countervailing first amendment claim.[51]

---

against the Senators. And if I say so myself, it would be the only time, to my knowledge, that any such type—
 QUESTION: But if we should reverse that, Mr. Miller, there will still be, in this lawsuit, something that involves the banks?
 MR. MILLER: The banks are, as I understand it, are still defendants, and—
 QUESTION: So even if you win, this lawsuit is not completely over?
 MR. MILLER: I assume that they could still proceed against the banks, to—the banks are defendants unless—
 QUESTION: And if they do in that circumstance, your victory on the Speech or Debate Clause will not assist the banks any, in their defense of the lawsuit.
 MR. MILLER: I would think not, Your Honor. I would think not.
Joint Appendix, *supra* note 9, at 68-68a.
 49. 421 U.S. at 511 (footnote omitted).
 50. *Id.* at 501 (footnote omitted).
 51. The Court recognized that in two earlier opinions, Watkins v. United States, 354 U.S. 178, 198 (1957), and Barenblatt v. United States, 360 U.S. 109, 126 (1959), first amendment rights had been balanced against congressional investigatory power. Those cases were distinguishable, however, because they were criminal prosecutions, wherein the

On the other hand, Justice Marshall's concurring opinion in *Eastland* (joined by Justices Brennan and Stewart) contains language that appears squarely supportive of the view that the speech or debate clause provides immunity only in suits against Congressmen or their aides. The following excerpts are illustrative:

> As our cases have consistently held, . . . the Speech or Debate Clause protects legislators and their confidential aides from suit; it does not immunize congressional action from judicial review.[52]

> [T]he protection of the Speech or Debate Clause is personal. It extends to Members and their counsel acting in a legislative capacity; it does not preclude judicial review of their decisions in an appropriate case, whether they take the form of legislation or a subpoena.[53]

> Our prior cases arising under the Speech or Debate Clause indicate that only a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all.[54]

The language cited above, taken either alone or in context,[55]

---

defendants asserted their first amendment rights to justify their refusals to answer congressional inquiries, and thus Congress had sought the aid of the judiciary in enforcing its will. *Eastland*, on the other hand, was "an attempt to interfere with an ongoing activity by Congress, and that activity is . . . within the legitimate legislative sphere"; thus balancing would not be applied. 421 U.S. at 509 n.16. Another commentator suggests that the import of *Eastland* "is not simply that particular defendants were immune from suit, but rather that pre-enforcement review of a congressional subpoena may not be available at all." *The Supreme Court, 1974 Term,* 89 HARV. L. REV. 47, 136 (1975) (footnote omitted).

52. 421 U.S. at 513 (Marshall, J., concurring).

53. *Id.* at 515.

54. *Id.* at 516.

There may be another explanation for the apparent neatness with which these and other excerpts from Justice Marshall's concurrence fit the argument that the speech or debate immunity applies only where Congressmen or their aides are the actual defendants. The peculiar problem in *Eastland* was that the persons whose first amendment rights were allegedly threatened did not have custody over the documents whose disclosure would constitute the alleged invasion of first amendment interests. As a consequence, the usual procedure for challenging a subpoena on constitutional grounds—refusal to comply followed by litigation of the legal issues in the enforcement proceeding—was not available to the United States Servicemen's Fund, "since a neutral third party could not be expected to resist the subpoena by placing itself in contempt." *Id.* at 514. Thus, it may be that the purpose of Justice Marshall's concurrence in *Eastland* was simply to emphasize that, notwithstanding the absolute nature of the speech or debate guarantee, it was proper for the district court to entertain the suit brought by the servicemen's fund. Because the fund was not subject to the subpoena it could not assert its constitutional interests in the customary way, by resisting compliance.

55. Particularly if that context includes the concession extracted from counsel for the

implies that at least three members of the United States Supreme Court have concluded that the speech or debate clause provides only immunity from suit to Congressmen and their aides. While Justice Marshall's opinion stops short of an assertion that the speech or debate clause would be unavailing in a suit where the only relief sought was an injunction against a private party, that is its necessary import. The opinion recognizes and approves the absolute nature of the speech or debate guarantee which, where applicable, puts an end to judicial inquiry. It also approves the district court's entertaining the suit under the peculiar procedural posture of that case. But both of these propositions were also recognized by the majority, and Mr. Justice Marshall's concurrence appears to be written for the principal purpose of expressing a view on an issue that is not covered by the majority opinion.

The issue whether the speech or debate clause guarantees only an immunity for members of Congress and their aides when they are joined as defendants in litigation, or whether it constitutes an affirmative grant of power, was raised in *United States v. AT&T* because the documents at issue were in the possession of a private party, and disclosure could be enjoined without naming a member of Congress or congressional aide as a defendant.

In its brief in *AT&T* the executive argued:

> Both by its express language and by Supreme Court interpretation, the Speech or Debate Clause creates nothing more than an immunity of Congress in actions *against them*. It is not a tool that Congress may use to prevent judicial determination of Constitutional issues. It is a defense to either criminal or civil liability and available only to members of Congress and their aides. It cannot be asserted for the benefit of private parties or entities, either by those private parties, or by members of Congress.[56]

The district court rejected the executive's position:

> The plaintiff has taken the position that this action should be considered one seeking solely to restrain a private entity, AT&T, from releasing documents in its possession. In this way, plaintiff argues, the Court need not consider the applicability of the Speech or Debate Clause, since the immunity of that constitutional provision runs only to members of Congress and their

---

subcommittee at oral argument—*see* note 48 *supra.*

56. Brief for Plaintiff-Appellee at 50-51, United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

248    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

close aides when defending against a lawsuit, and does not afford any protection to a private entity such as AT&T. This argument is advanced so that the Court can avoid dealing with a constitutional confrontation between two of the three branches of our Government. But to take this avenue would be to place form over substance. The effect of any injunction entered by this Court enjoining the release of materials by AT&T to the Subcommittee would have the same effect as if this Court were to quash the Subcommittee's subpoena. In this sense the action is one against the power of the Subcommittee and should be treated as such, assuming that Representative Moss has authority to speak for the Subcommittee.[57]

Neither of the court of appeals' opinions reached the ultimate issue on the merits, but the second opinion appears to agree with the executive branch on the *Eastland* issue.[58]

Justice Marshall's concurrence in *Eastland* and the court of appeals' opinion in *United States v. AT&T* notwithstanding, the speech or debate protection should not be limited to cases in which relief is sought against members of Congress and their aides. The reasons for this position can be best appreciated in connection with the somewhat comparable problem of the applicability of executive privilege to information outside the control of the government.

---

57. 419 F. Supp. at 458.

The reach of speech or debate immunity was not dispositive in *AT&T*. The district court held that even though speech or debate is not limited to suits against Congressmen or their aides, and even though *Eastland* imparted to speech or debate a potency that gives it absolute powers of infringement on first amendment rights, it does not necessarily follow that speech or debate powers are similarly absolute when pitted against the constitutionally based prerogatives of another branch. *Id.* at 459-61.

58. The court of appeals' second opinion states:

The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena. *See Eastland,* 421 U.S. at 513, . . . Justice Marshall concurring.

567 F.2d at 129. The court went on to say:

In sum, while this case is similar in several respects to the situation in *Eastland,* . . . for purposes of considering whether the Executive's claim is entitled to at least some judicial consideration, we emphasize that no member of the Subcommittee in the present dispute has been made a defendant in a judicial proceeding. The courts do not accept the concept that Congress' investigatory power is absolute. What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

*Id.* at 130.

*B.  Executive Privilege: Applicability Where the Information
Is Not in the Possession of the Government*

One view of executive privilege is that it is a narrowly lim-
ited, strictly defensive doctrine, applicable only in circumstances
where the executive branch declines to supply information in its
possession. On the other hand, executive privilege may be viewed
as an affirmative power to prevent disclosure of information
whose disclosure would be harmful to the interests of government.
In most circumstances, the difference in the two views is of no
practical significance, because the information sought is in the
executive's possession. This is not always the case, however. In
order to carry out certain governmental functions the United
States must enter into contracts with private companies and
share with them highly secret information. Probably the most
common example of this practice is in the manufacture of mili-
tary equipment, which is frequently accomplished through con-
tracts with private companies. Pursuant to such contracts, the
government makes available to the private contractor design
data, construction details, and other secret information. Another
example is of course the line-leasing arrangement involved in
*United State v. AT&T* which required the executive to share the
location of its wiretapping activities with the telephone company.
In these and other contexts, so long as the government elects not
to go into the business of running the nation's telephone service,
or building its own national defense hardware, it must enter into
contractual arrangements with private entities and often share
highly secret information with them. Is that information—which
originated from the government, and which would not be in the
possession of the private entity but for the governmental function
performed by that entity—subject to executive privilege?

The limited judicial authority on this question would appear
to answer it in the affirmative. Although the only case squarely
on point is *United States v. AT&T,* and none of the opinions in
that case discusses the issue, the district court held in favor of the
executive. Additionally, the court of appeals' second opinion ap-
pears to rest on the premise that the invocation of executive privi-
lege is not impeded by the fact that the information is in nongov-
ernmental possession. And, two earlier cases have implied an
affirmative executive privilege to restrain third-party disclosures.

In *E.W. Bliss Co. v. United States,*[59] the Supreme Court

---

59. 248 U.S. 37 (1918).

affirmed an order enjoining a government contractor "from exhibiting or communicating the construction and operation of a torpedo known as the Bliss-Leavitt torpedo."[60] The government in the *Bliss* case was enforcing an explicit contract, but the Supreme Court quoted with approval this observation of the lower court:

> Throughout the entire record, in the contracts, correspondence and dealings of the parties, the importance of secrecy is everywhere manifest. *The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation.* The very nature of the service makes the construction urged by the defendant untenable.[61]

Similarly, in *United States v. Marchetti,*[62] the Fourth Circuit Court of Appeals upheld an injunctive order against a former CIA official enforcing an agreement not to publish certain information concerning the Central Intelligence Agency.[63] It would thus appear that executive privilege can be used affirmatively to prevent the disclosure of sensitive information in the hands of third parties.

There are similarities between this issue and the issue discussed in Subsection A of this Section, the scope of the speech or debate clause as it relates to congressional investigations. In both instances the issue is raised in cases where a nongovernmental third party is involved: In the speech or debate cases, the private party (rather than Congress) is the potential defendant in a suit

---

60. *Id.* at 39.

61. *Id.* at 46 (emphasis added).

62. 466 F.2d 1309 (4th Cir.), *cert. denied,* 409 U.S. 1063 (1972).

63. The court stated:

[T]he agency requires its employees as a condition of employment to sign a secrecy agreement, and such agreements are entirely appropriate to a program in implementation of the congressional direction of secrecy. Marchetti, of course, could have refused to sign, but then he would have not been employed, and he would not have been given access to the classified information he may now want to broadcast.

Confidentiality inheres in the situation and the relationship of the parties. *Since information highly sensitive to the conduct of foreign affairs and the national defense was involved, the law would probably imply a secrecy agreement had there been no formally expressed agreement,* but it certainly lends a high degree of reasonableness to the contract in its protection of classified information from unauthorized disclosure.

*Id.* at 1316 (emphasis added).

to prevent compliance with the congressional subpoena—the bank in *Eastland,* the telephone company in *AT&T.* In the executive privilege context, the private party (rather than the President) is the one in possession of the information whose disclosure an assertion of executive privilege seeks to prevent. In both settings the question is whether the doctrines are limited to defensive uses, relieving the particular branch from the necessity of taking action that it views as undesirable, or whether the doctrines can also be used to require action or forbearance on the part of someone else. The most important similarity is that in each case the fundamental issue is whether the reach of a constitutionally based doctrine central to the operation of one of the branches of government should be determined by conceptual considerations or by the policy on which the doctrine is founded.

With both speech or debate and executive privilege, the arguments for a narrow interpretation are largely conceptual. In the case of executive privilege, the premise concept is a privilege to refrain from divulging information within one's own control. In the case of speech or debate, the premise concept is an immunity against being joined as a defendant in a lawsuit. On the other hand, policy considerations in both cases eschew a restrictive view. A basic purpose of executive privilege is to permit the President to withhold information whose dissemination, in his considered view, would be sufficiently detrimental to the public interest that such extraordinary action as assertion of executive privilege is warranted. Physical possession of the information is irrelevant to the considerations that the President takes into account. This does not mean that the President can prevent the disclosure of any information in the possession of any private person or entity upon a determination by him that its disclosure would be detrimental to the national interest. Certainly the President could not prevent a private corporation from disclosing information whose existence and development were unrelated to government, no matter how detrimental to governmental interests the disclosure might be. But in cases such as *Bliss, Marchetti,* and *AT&T,* the information came from the government, the only reason that the information is in the possession of the private party is because it is essential to the performance by that private party of a governmental function, and but for the performance of that essential governmental function the information would never have been supplied. In that kind of case the President should have the same power to prevent disclosure as if the information were in the

252    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

possession of one of his subordinates.[64]

Similar policy considerations apply in delineating the scope of the speech or debate clause. The applicability of that constitutional guarantee to congressional investigations should not turn on the fortuity of whether Congress participates in the litigation as plaintiff, defendant, or intervenor. While it is true that in *Eastland* the congressional litigants were defendants, it is also true that the impact on congressional activity (and therefore on speech or debate) will be the same when the executive can prevent third parties from disclosing, without naming Congress as a defendant, as in *AT&T*. Thus, the district court in *AT&T* was correct in concluding that to draw a distinction between members of Congress (or their aides) as defendants and as intervenors "would be to place form over substance."[65]

For these policy reasons, the applicability of either executive privilege or speech or debate should not be foreclosed in those cases where the documents or other information are in the possession of a private party or where the congressional entity participates in the litigation as plaintiff or intervenor. In considering the conflicting interests of the two doctrines, as discussed in Section V, the courts should afford a generous interpretation that will give full effect to the underlying purpose of each.

In fact, however, very few executive privilege-congressional subpoena cases have reached the courts. One of the reasons is that there are significant roadblocks—constitutional and otherwise—to each of the avenues by which such disputes can reach the courts. Some of the problems attendant upon bringing executive privilege-congressional subpoena problems before the courts constitute the subject of Sections III and IV.

---

64. During the early stages of the AT&T litigation, the government relied on an agency theory. The complaint squarely alleged that "defendant AT&T has participated as an agent of the United States in effectuating certain national security investigations." Joint Appendix, *supra* note 9, at 16-17. The agency argument was not pursued beyond the pleading stage, and the agency analogy is not very helpful. Whether an agency relationship exists or not is simply irrelevant to the competing interests on both sides of the information disclosure issue. Mr. Marchetti was quite clearly an agent of the CIA and of the United States. The Bliss Company, at least for purposes of torpedo manufacture, was an agent of the United States. AT&T's agency is more questionable. But the important point is that focusing on the agency issue diverts attention away from the relevant issues, the involvement of the government in the creation of the information, and whether the government as a matter of public interest and constitutional doctrine should be able to prevent its disclosure.

65. 419 F. Supp. at 458.

### III.  CONGRESSIONAL ENFORCEMENT POWERS IN EXECUTIVE PRIVILEGE CASES

The typical executive privilege-congressional subpoena conflict arises because the executive has determined not to give information to the Congress. The conflict is usually resolved either by negotiation or by eventual abandonment of the attempt to obtain the information. In a small number of cases, however, a negotiated settlement will not be possible. Since the executive usually has possession of the documents, the next move is up to Congress. There are there three procedures available to Congress to implement its investigatory objective:[66] (1) direct punishment for contempt by the appropriate House of Congress; (2) criminal prosecution by the appropriate United States Attorney under 2 U.S.C. § 194; or (3) a civil suit to enforce the subpoena. Each of these alternatives presents separate but significant hurdles.

#### A.  Direct Punishment for Contempt

Although the Constitution does not expressly confer upon Congress the power to punish for contempt,[67] Congress' power to do so was early established by Congress itself[68] and also by the Supreme Court. In *Anderson v. Dunn* the Court held that to deny

---

66. Of course Congress has indirect means available for enforcing its will. It can cut off funds or attempt to impeach the President for failure to respond to its wishes. Even an appropriation cutoff, however, is not always successful, as demonstrated by President Eisenhower's response to a cutoff of foreign aid funds because the executive failed to reveal information. Eisenhower simply instructed the Secretary of the Treasury to disregard the cutoff and to draw on federal funds to make the payments. *See* R. BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 306 (1974); C. MOLLENHOFF, WASHINGTON COVER-UP 173-74 (1962).

67. Article I, § 5 of the Constitution deals with such internal affairs as the authority of each House to judge the elections, returns, and qualifications of its members, the constitution of a quorum to do business, compelling the attendance of absent members, punishing members for disorderly behavior, expulsion of members, and adjournment; but it says nothing about punishment for contempt.

68. The first attempt by Congress to respond in an official way to contumacious conduct occurred in 1795. It arose out of an alleged bribery of certain members of the House by Robert Randall and his chief associate, Charles Whitney. Under authority of a warrant signed by the Speaker of the House, Randall and Whitney were arrested and appeared before the bar of the House. Their request to be represented by counsel and for time to prepare a defense was granted, and the full House considered both direct and cross-examination testimony. At the conclusion of the hearing, the House adopted a resolution declaring Randall guilty of contempt, resulting in a reprimand by the Speaker and commitment to the custody of the Sergeant at Arms. He was finally discharged a week later. The Randall-Whitney case is recorded in 5 ANNALS OF CONG. 166-230 (1795). *See* C. BECK, CONTEMPT OF CONGRESS 3, 191 app. (1959). A summary of the major contempt cases initiated between 1795 and 1943 and a list of all prosecutions from 1944 through 1958 are set forth in appendixes A and B of C. BECK, *supra*.

254   BRIGHAM YOUNG UNIVERSITY LAW REVIEW   [1978:

the legislature such powers would lead to "the total annihilation of the power of the House of Representatives to guard itself from contempts, and [leave] it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it."[69] The procedure basically involves a resolution by the affected House of Congress and the subsequent issuance of a warrant signed by its presiding officer. The alleged contemnor is then arrested by the Sergeant at Arms. The accused may be represented by counsel, and may be given time to prepare a defense. The entire House hears the testimony, both direct and cross-examination, and then adopts a resolution as to the guilt or innocence of the accused. If guilt is found, the resolution prescribes an appropriate punishment.[70]

Although the constitutionality of the direct contempt proceeding appears to be well established, there are several reasons why it is not the most appropriate vehicle for the enforcement of a congressional inquiry. There is something unseemly about a House of Congress getting into the business of trial and punishment. Congress is simply not geared to the determination of guilt or innocence or the meting out of punishment for improper conduct. Though the constitutionality of the direct contempt proceeding has been upheld, there is an uncomfortable similarity between the direct contempt proceeding and a bill of attainder. Both involve the legislative branch in determining whether certain conduct should be punished and what punishment is appropriate. It is true that access to the courts is ultimately available through a habeas corpus proceeding, but at least in the first instance it is a House of Congress that determines guilt and prescribes punishment. Moreover, in a case involving an assertion of executive privilege the alleged contemnor is usually a prominent officer of the executive branch. Use of the direct contempt proceeding in that setting might degrade not only the alleged contemnor, but also government in general, including Congress.[71]

---

69. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 228 (1821). *See also Ex parte* Nugent, 18 F. Cas. 471 (C.C.D.D.C. 1848) (No. 10,375). Nugent had obtained and given to the *New York Herald* a copy of the secret treaty between the United States and Mexico. He was called to the bar of the Senate and sworn as a witness, but refused to answer questions concerning his publication. Imprisoned on order of the President of the Senate, Nugent applied, unsuccessfully, for a writ of habeas corpus.

70. *See* C. Beck, *supra* note 68, at 3-5, 191-95 app.

71. Some scholars evidently do not feel that this approach should be avoided.

This need not be regarded as unseemly or punitive but merely as the mechanism that opens the door to judicial review. Once the recalcitrant official is in Congress' custody he can obtain his freedom by filing a petition with a court for a

Finally, the direct contempt proceeding has been virtually replaced by criminal prosecution for contempt. No direct contempt proceeding has been brought since 1945.[72]

## B.  Criminal Prosecution for Contempt

Prior to 1857 the only means for punishing congressional contempt was the direct contempt procedure. In 1857 Congress established contempt as a statutory crime,[73] thus shifting to the courts the major responsibility for determining contempt. Over the intervening century, the 1857 statute has been modified, but its basic provisions have remained the same. The current version, 2 U.S.C. § 192, provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.[74]

---

writ of habeas corpus, which poses the issue of Congress' constitutional power to insist that the information be supplied.

R. BERGER, *supra* note 66, at 310. *But see* Levi, *Some Aspects of Separation of Powers,* 76 COLUM. L. REV. 371, 390 (1976):

Either course [the direct contempt procedure or statutory prosecution under § 194] would be, at the least, unedifying, the more so when punishment rather than clarification is sought. It would be an attempt by one branch to assert its authority by imposing personal sanctions on officials who seek to perform their duty for another branch equal to the Congress in its responsibility to serve the people. This is neither the level of statesmanship which created our republic, nor is it justified by past abuses. Such an attempt would not rectify abuses; it would supplant them with new ones.

The one arguable advantage of the direct contempt procedure is that there are no barriers to getting the controversy into court. For reasons set forth in Subsection C, I do not regard as salutary the absence of such barriers. The principal disadvantage, discussed above, is that it vests in Congress the initial responsibility for determining guilt or innocence and for imposing punishment. Such functions do not mesh well with congressional structure or duties. The congressional role is to make general policy, not to determine individual wrongdoing. Congress' organization and institutional mind-set is oriented toward the achievement of the former, but not the latter.

72. C. BECK, *supra* note 68, at 7.

73. Act of Jan. 24, 1857, Ch. 19, 11 Stat. 155 (current version at 2 U.S.C. 192 (1970)).

74. 2 U.S.C. § 192 (1970).

256    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

Section 192 is a criminal statute. Therefore, in contrast to direct contempt procedures, which are the exclusive province of Congress, implementation of section 192 is the responsibility of the executive branch, carried out by enlisting the machinery of the judiciary. Whenever a violation of section 192 is reported to the appropriate House of Congress, 2 U.S.C. § 194 provides that the President of the Senate or Speaker of the House is to refer the matter "to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."[75] The establishment of a statutory contempt proceeding did not diminish Congress' direct contempt power; it simply provided Congress with an alternative means of dealing with contempts.[76]

Use of the statutory contempt proceeding creates no particular separation of powers problem where the alleged contemnor is a private party. But it is a different case where the alleged contempt results from a government officer's refusal to give testimony or deliver documents on the ground that the information sought is subject to an assertion of executive privilege. Referring that kind of case to "the appropriate United States attorney," who by statute has an unqualified obligation to prosecute, places the Attorney General on the horns of a dilemma. One of the horns is statutory, the other ethical. The "appropriate United States attorney" is an officer of the Justice Department. His file leader is the Attorney General. By statute the conduct of litigation in which the United States is a party (which would of course include section 194 suits) is vested in the Attorney General.[77] Therefore, the command of section 194 to United States attorneys is also a command to the Attorney General. But, ethically, the Attorney General may not be able to obey that command. The assertion of executive privilege by the President is a weighty and solemn matter. Before taking such a step, it is virtually certain that the President will have conferred with his chief legal officer, the Attorney General; indeed, since 1969 this has been a formal requirement by presidential directive.[78] Having consulted the President

---

75. *Id.* § 194.

76. "[T]he purpose of the statute was merely to supplement the power of contempt by providing for additional punishment." Jurney v. MacCracken, 294 U.S. 125, 151 (1935).

77. 28 U.S.C. § 516 (1970).

78. In 1969 President Nixon issued the following memorandum:

The policy of this Administration is to comply to the fullest extent possible with Congressional requests for information. While the Executive branch has the responsibility of withholding certain information the disclosure of which would

about the assertion, the Attorney General could not then ethically bring an action against the President or one of the President's subordinate officers in connection with a matter on which the Attorney General earlier gave his advice as a lawyer.[79]

The statute, however, permits no exceptions: the case is certified to the United States attorney, "whose duty it shall be to bring the matter before the grand jury for its action."[80] Utilizing the statutory procedure in an executive privilege case would therefore force the nation's chief legal officer either to refuse to obey an unqualified statutory command or to bring a criminal prosecution against one whose sole criminal conduct consists of obedience to a Presidential order, in connection with which the

---

be incompatible with the public interest, this Administration will invoke this authority only in the most compelling circumstances and after a rigorous inquiry into the actual need for its exercise. For those reasons Executive privilege will not be used without specific Presidential approval. The following procedural steps will govern the invocation of Executive privilege:

1.  If the head of an Executive department or agency (hereafter referred to as "department head") believes that compliance with a request for information from a Congressional agency addressed to his department or agency raises a substantial question as to the need for invoking Executive privilege, he should consult the Attorney General through the Office of Legal Counsel of the Department of Justice.

2.  If the department head and the Attorney General agree, in accordance with the policy set forth above, that Executive privilege shall not be invoked in the circumstances, the information shall be released to the inquiring Congressional agency.

3.  If the department head and the Attorney General agree that the circumstances justify the invocation of Executive privilege, or if either of them believes that the issue should be submitted to the President, the matter shall be transmitted to the Counsel to the President, who will advise the department head of the President's decision.

4.  In the event of a Presidential decision to invoke Executive privilege, the department head should advise the Congressional agency that the claim of Executive privilege is being made with the specific approval of the President.

5.  Pending a final determination of the matter, the department head should request the Congressional agency to hold its demand for the information in abeyance until such determination can be made. Care shall be taken to indicate that the purpose of this request is to protect the privilege pending the determination, and that the request does not constitute a claim of privilege.

R. Nixon, Memorandum for the Heads of Executive Departments and Agencies: Establishing a Procedure to Govern Compliance with Congressional Demands for Information (Mar. 24, 1969).

79.  "A lawyer should never represent in litigation multiple clients with differing interests . . . ." ABA CODE OF PROFESSIONAL RESPONSIBILITY EC 5-15 (1975). "No one could conscionably contend that the same attorney may represent both the plaintiff and defendant in an adversary action." *Id.* n.19 (quoting Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 235, 135 A.2d 252, 254 (1957), *cert. denied,* 355 U.S. 966 (1958)).

80.  2 U.S.C. § 194 (1970).

258    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

Attorney General was consulted, and whose issuance he probably counseled.[81]

Referring section 194 cases involving executive privilege to a special prosecutor would not solve the problem. A special prosecutor within the executive branch would have some of the same ethical problems discussed above. Vesting the enforcement of section 192 in a special prosecutor attached to Congress or the courts would raise other serious constitutional questions since the executive branch has exclusive authority and absolute discretion to decide whether to prosecute a case.[82]

A theoretically possible solution—though not an adequate one—might be to establish a special prosecutor with powers analogous to those of an independent regulatory agency, appointed by the President, but not subject to his removal powers. Currently, the conduct of litigation in which the United States is a

---

81. The dilemma implicit in statutorily mandating the Attorney General to criminally prosecute conduct which he has advised in his capacity as a governmental lawyer arose in 1975 when the problem approached the crisis stage in two cases involving members of the President's Cabinet.

The first case involved an assertion of executive privilege by Secretary Kissinger. The House Select Committee on Intelligence had subpoenaed "[a]ll documents relating to State Department recommending covert action made to the National Security Council and the Forty Committee and its predecessor committees from January 20, 1961, to the present." House Select Comm. on Intelligence, Report of the Select Committee on Intelligence Citing Henry A. Kissinger, H.R. Doc. No. 693, 94th Cong., 1st Sess. 5 (1975). President Ford asserted executive privilege as to these documents. The House Select Committee then recommended that the Speaker certify its report to the United States Attorney for the District of Columbia "to the end that Henry A. Kissinger, as Secretary of State, may be proceeded against in the manner and form provided by law." Id. at 2. In subsequent briefings the information was supplied to the committee, and as a result Chairman Pike reported to the House that "substantial compliance has been achieved" and by unanimous consent the committee's report recommending contempt proceedings was recommitted. 121 Cong. Rec. 39730 (1975).

The second case arose at about the same time. On Nov. 11, 1975, the Subcommittee on Oversight and Investigations of the House Interstate and Foreign Commerce Committee voted to recommend to the full committee that Secretary of Commerce Rogers Morton be cited for contempt for refusing to deliver to the subcommittee documents concerning compliance by American companies with the Arab boycott. Secretary Morton's position was not based on executive privilege, but was grounded in part on an opinion from the Attorney General that the subcommittee was not entitled to receive the reports in question unless, in exercising the discretion granted him by § 7(c) of the Export Administration Act, 50 U.S.C. app. § 2406(c) (1970), the Secretary determined that withholding them would be contrary to the national interest. Once again, crisis was averted through negotiation, this time on the eve of a full committee vote. See Contempt Proceedings Against Secretary of Commerce, Rogers C. B. Morton including Hearings and Related Documents Before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 94th Cong. 1st Sess. (1975).

82. See United States v. Nixon, 418 U.S. 683, 694 (1974); Confiscation Cases, 74 U.S. (7 Wall.) 454 (1869); United States v. Cox, 342 F.2d 167, 171 (5th Cir.), cert. denied, 381 U.S. 935 (1965).

party—which of course includes criminal litigation—is vested in the Attorney General.[83] This could be changed by statute. There is at least some question, however, whether a function located as close to the core of executive responsibility as enforcement of a criminal statute could constitutionally be vested in an entity possessing an element of insulation from the executive branch comparable to the independent regulatory agencies. Moreover, as a matter of practical policy and politics, it is highly doubtful that Congress would create a special prosecutor with such independent powers in order to solve a problem that exists only in theory, and has never ripened into an actual prosecution in spite of the fact that the statute has been in existence for almost a century and a quarter.

The best solution would be to interpret the mandatory language of section 194 as inapplicable to executive privilege cases or any other cases in which the allegedly contumacious conduct consists of obedience to legal advice given by the Attorney General. Although on its face the statutory language permits no such exception, and there is nothing in the legislative history to indicate that Congress thought about this problem, it is certainly not an unreasonable interpretation in light of the wrenching effect that a literal reading of section 194 would have on separation of powers problems and the Attorney General's ethical responsibilities. The scope of this exception would be limited, and nonapplicability of section 192 within such a limited sphere does not offend basic notions of fair play. At issue is not the general power of the executive branch to punish violations of criminal statutes by persons within the executive branch. The Justice Department clearly possesses and exercises that power. But when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

---

83. 28 U.S.C. § 516 (1970).

260    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

There is such an alternative: a civil suit to enforce a congressional subpoena ordering delivery of the desired information. Assuming a continuation of congressional declination to use its direct contempt powers, this is the only feasible vehicle by which conflicts between congressional investigative powers and Presidential assertions of executive privilege can be resolved.

## C.    Civil Enforcement of Congressional Subpoenas

Even though civil enforcement is the preferred route to the resolution of executive privilege-congressional subpoena disputes (assuming the failure of negotiation), such a procedure also raises constitutional questions. Does the initiation of a civil suit by Congress constitute a usurpation of the executive's law enforcement function? Does a federal court have jurisdiction to decide the issue? And, assuming that the court has jurisdiction, is the issue justiciable? The law enforcement and jurisdiction issues are discussed in this Section, while the broader justiciability issue is discussed in Section IV.

### 1.    Congressional suit as law enforcement

The constitution declares that the President "shall take Care that the Laws be faithfully executed."[84] The Supreme Court reaffirmed, in *Buckley v. Valeo,* that the executive responsibility includes bringing litigation to implement federal policy: "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' Art. II § 3."[85] One issue that must be faced, therefore, is whether a civil suit to enforce a congressional subpoena is an unconstitutional usurpation of the executive's law enforcement responsibility. Analogies can be drawn to direct contempt proceedings, the constitutionality of which has been upheld. On one hand, civil action, unlike direct contempt, requires the filing of a lawsuit enlisting the federal judicial machinery in the vindication of congressional interests. In this sense civil action involves an element of enforcement not present in direct contempt cases. On the other hand, while either civil enforcement or direct contempt proceedings may be used to obtain information, direct contempt involves the infliction of punishment for offenses against

---

84. U.S. Const. art. II, § 3.
85. 424 U.S. 1, 138 (1976).

a governmental entity. In this respect direct contempt bears a closer resemblance to law enforcement than does a civil proceeding to enforce a subpoena.

The controlling consideration, however, is that civil enforcement suits, like direct contempt and unlike bills of attainder or law enforcement, generally are brought for the sole purpose of vindicating internal congressional prerogatives, not enforcing criminal statutes or other laws or policies of the United States. A civil proceeding to enforce a subpoena is not a suit "vindicating public rights"[86] or implementing official federal policy; seen in that light, such a proceeding is not forbidden by the Court's holding in *Buckley v. Valeo.* Additionally, it has been held that a Congressman has a right to sue in his representative capacity as a Congressman to enforce rights inherent in his position, and from this right a congressional power to bring civil enforcement suits can be extrapolated. *Kennedy v. Sampson*[87] held that because of his interest in protecting the effectiveness of his vote, Senator Kennedy had standing to challenge an attempted "pocket veto" of a bill for which he had voted. Similarly, in *Mitchell v. Laird*[88] the Court of Appeals for the District of Columbia Circuit held that a Congressman had standing to challenge executive action taken in prosecuting the war in Indochina without congressional approval. While standing is a separate issue from separation of powers, the constitutionality of civil enforcement actions would seem to follow a fortiori from the holding in *Kennedy* and *Mitchell.* In those cases lawsuits were initiated by individual members of Congress, and the courts entertained them even though they involved vindication of public policy because the suits related to the performance of their duties as Congressmen. If individual Congressmen can sue, certainly Congress itself can authorize a similar remedy, so long as the suit is for vindication of interests internal to Congress, and not for enforcement of general national policy.[89]

---

86. *Id.* at 140.

87. 511 F.2d 430 (D.C. Cir. 1974). *See also* Kennedy v. Jones, 412 F. Supp. 353 (D.D.C. 1976); Note, *Congressional Access to the Federal Courts,* 90 HARV. L. REV. 1632 (1977); Comment, *Congressional Standing to Challenge Executive Action,* 122 U. PA. L. REV. 1366 (1974); Note, *Standing to Sue for Members of Congress,* 83 YALE L.J. 1665 (1974).

88. 488 F.2d 611 (D.C. Cir. 1973). *Cf.* Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973), *cert. denied,* 416 U.S. 936 (1974) (holding that a Congresswoman did not have standing to obtain an injunction against United States participation in military activities in or over Cambodia).

89. The court of appeals in its first *AT&T* opinion observed: "It is clear that the

262    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

*2. Jurisdiction*

Another impediment to a civil enforcement action is federal court jurisdiction to entertain it. The only authority on the subject to date is the district court's opinion in *Senate Select Committee on Presidential Campaign Activities v. Nixon*.[90] In that case Judge Sirica held that such jurisdiction is not supported by any general jurisdictional statute. *Senate Select Committee* was a suit by the Senate Select Committee and its chairman, Senator Ervin, to compel compliance with two subpoenas: one seeking certain tapes, and the other requiring the production of certain documents and other materials the committee considered relevant to its investigation. The plaintiffs "deliberately chose not to attempt an adjudication of the matter by resort to a [criminal] contempt proceeding . . . or via Congressional common law powers which permit the Sergeant at Arms to forcibly secure attendance of the offending party."[91]

Four jurisdictional bases were urged by the plaintiffs: 28 U.S.C. § 1345[92] (suits by the United States as plaintiff), 28 U.S.C. § 1361[93] (suits in the nature of mandamus to compel an officer of the United States to perform his duty), 5 U.S.C. §§ 701-706[94] (the Administrative Procedure Act), and 28 U.S.C. § 1331[95] (the "federal question" jurisdictional statute). Judge Sirica rejected all four grounds: section 1345 because 28 U.S.C. § 516 "reserves to the Attorney General and the Department of Justice authority to litigate as United States,"[96] the mandamus statute because "the Court cannot in good conscience hold that any duty defendant may have as President is 'plainly defined as preemptory,' "[97] and the Administrative Procedure Act because "the rule in this Circuit precludes use of this Act altogether as an independent basis of jurisdiction."[98] Federal question jurisdiction was unavailable because the case was not "capable of valuation in dollars and cents"[99] and thus failed to satisfy the requirement that the

---

House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391.

90. 366 F. Supp. 51 (D.D.C. 1973).
91. *Id.* at 54.
92. (1970).
93. (1970).
94. (1970).
95. (1970).
96. 366 F. Supp. at 56.
97. *Id.* at 57.
98. *Id.* at 58 (footnote omitted).
99. *Id.* at 59.

amount in controversy exceed the sum or value of $10,000. Since "[n]o jurisdictional statute known to the Court, including the four which plaintiffs name[d], warrant[ed] an assumption of jurisdiction,"[100] the action was dismissed.

While the appeal in the *Senate Select Committee* case was pending, Congress passed a special statute conferring jurisdiction on the District Court for the District of Columbia over any civil action brought by the Senate Select Committee "to enforce or secure a declaration concerning the validity of any subpoena."[101] After the new statute took effect, the court of appeals remanded[102] the case to the district court which ruled against the committee on other grounds.[103] An appeal was taken only as to the subpoena seeking the tapes, but the court of appeals did not reach the jurisdictional issue.[104]

The solution to the jurisdictional problem in *Senate Select Committee* may seem to suggest that it would be advisable to enact a general statute conferring jurisdiction on federal courts over all civil suits to enforce congressional subpoenas.[105] Disputes over congressional subpoenas typically involve issues of law—issues that touch on the most fundamental powers of two branches of government. Does it not follow that disputes of such magnitude should be regularly resolved by the third branch, whose powers are not directly at issue and whose core functions include interpretation of the laws and the Constitution and the resolution of disputes?

---

100. *Id.* at 61.

101. Act of Dec. 18, 1973, Pub. L. No. 93-190, 87 Stat. 736 (1973).

102. *See* Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 727-28 & n.11 (D.C. Cir. 1974).

103. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 370 F. Supp. 521 (D.D.C.), *aff'd*, 498 F.2d 725 (D.C. Cir. 1974) (ruling on the subpoena requesting the tapes); *id.* at 522 n.1 (ruling on the subpoena requesting the documents).

104. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974).

105. Indeed, somewhat comparable legislation has been proposed. During the 93d Congress, a bill was introduced containing the following provision:

The District Court for the District of Columbia shall have original, exclusive jurisdiction for any civil action brought by either House of Congress, a joint committee of Congress, or any committee of either House of Congress with respect to any claim of executive privilege asserted before either such House or any such joint committee or committee.

*Hearings Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations and the Subcomms. on Separation of Power and Administrative Practice and Procedure of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. 534-35 (1973) (S. 2073, § 1364). A companion section of the bill authorized any Senate, House, or joint committee to bring suit to contest claims of executive privilege. *Id.* at 536-37 (§ 3103).

On balance, I think not.

There is an observable reluctance on the part of both the article I and article II branches to submit issues for resolution by the third branch that go to the core of their respective constitutional authority. This may be due in part to interbranch territorial instincts or to a residual discomfort over some of the implications of *Marbury v. Madison.*[106] Whatever the reason for this reluctance, the result contributes to good government. Notwithstanding the judiciary's final authority in matters of constitutionality, all three branches are concerned with constitutional issues which they are called upon to resolve as a regular part of their duties. Moreover, it is in the interest of each branch individually—and in the interest of the nation as a whole—that disputes concerning overlapping or allegedly inconsistent powers conferred by article I and article II be resolved, if possible, by the branches whose powers are implicated. This is not only because negotiated settlements are usually more effective than litigation in accommodating the competing interests of both sides,[107] whether in the government or nongovernment context. It is also because there is something of an inverse relationship between the effectiveness of article III's heavy artillery for dispute resolution and the frequency of its use. Particularly in areas involving conflicts over interbranch powers, saving the judiciary for the few cases in which Congress and the President are absolutely unable to resolve their own differences will sharpen the issues that must go to litigation and will magnify respect for the judicial decision in the rare case in which it must be rendered.

Recognition of the superiority of a negotiated settlement over a judicially imposed settlement appears to be an underlying premise of the court of appeals' approach in both of its opinions in *United States v. AT&T.* The facts of that case illustrate the correctness of the premise. The competing interests of the two branches in *AT&T* were, on the one hand, the need to protect foreign intelligence secrets, and on the other, the need for information relevant to possible legislation. The depth and breadth of those needs are matters that lie peculiarly within the expertise of the executive and legislative branches. The extent to which the provisions of a judicial decree might adversely affect these or other important governmental interests are also peculiarly within

---

106. 5 U.S. (1 Cranch) 137 (1803).

107. *See* Levi, *Some Aspects of Separation of Powers,* 76 COLUM. L. REV. 371, 385-86 (1976); Comment, United States v. AT&T: *Judicially Supervised Negotiation and Political Questions,* 77 COLUM. L. REV. 466 (1977).

the ken of the disputants. While the approach taken by the court of appeals in *AT&T* does not mesh nicely with traditional judicial forms or procedures, it does combine judicial creativity and flexibility with the fundamental values of judicial restraint. The portions of the second opinion dealing with the steps that the district court is to take in implementing the court of appeals' decision demonstrate the essentially nonjudicial aspects of the task.[108] The skills that this opinion requires of the district court are more the skills of the mediator, or even the manager, than the federal judge. And yet, just as the court of appeals' approach is characterized by creativity and flexibility, it also achieves the fundamental values of judicial restraint. There was a dispute between parties to a lawsuit. Based upon applicable precedents, the court correctly held that it was a justiciable case or controversy under article III of the Constitution. The court discharged its responsibility to resolve the controversy by utilizing its judicial power only to the minimum extent necessary, leaving the maximum opportunity for the parties before it—its sister branches of government—to apply their own superior knowledge concerning their own peculiar needs. This is the essence of judicial restraint.

Ironically, then, it is not in the interest of good government to make it easier for two coordinate branches to have differences over their respective constitutional powers readily resolved by the third. Accordingly, enactment of a statute generally conferring federal court jurisdiction over the enforcement of congressional subpoenas would not be in the public interest. Such disputes are best resolved by ad hoc enactment of narrow jurisdictional statutes such as the Senate Watergate Committee obtained. Direct punishment should be left in its present dormant state, and 2 U.S.C. § 194 should be used only for non-executive-privilege cases which do not confront the Attorney General with the dilemma discussed above. With the only avenue for judicial relief in executive privilege-congressional subpoena confrontations requiring an act of Congress, the pressure on both sides[109] to reach a negotiated settlement will be just about right—not insuperable, as the Senate Watergate Committee experience shows, but nevertheless sufficient to provide real incentive.

The preferability of negotiation over adjudication as a means

---

108. 567 F.2d at 131-32. *See* text accompanying note 33 *supra*.

109. In one sense, the "pressures" are greater on Congress, because the disputed information is in the possession of the executive branch. It is Congress, however, that can elect judicial resolution as an alternative to a negotiated settlement by enacting a jurisdictional statute.

266    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

of settling interbranch disputes is also fundamental to the issues of the justiciability of such disputes. These issues are the subject of Section IV of this Article.

### IV.  JUSTICIABILITY OF EXECUTIVE PRIVILEGE-CONGRESSIONAL SUBPOENA CONFLICTS

Whether a conflict between a President's exercise of executive privilege and a congressional assertion of investigative power is a justiciable "case or controversy"[110] that the federal courts are authorized by article III to adjudicate depends principally on whether such an issue is a "political question." In 1958, when the reach of the political question doctrine was far broader than it is today, no lesser an authority than Judge Learned Hand expressed the view that such a dispute between two branches of government was a clear example of a nonjusticiable constitutional question.[111]

The leading case dealing with the political question issue, *Baker v. Carr*,[112] contains a general statement that "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' "[113] Judicial accommodation of the doctrines of executive privilege and congressional subpoena power fits rather neatly within the Court's general description, "the relationship between the judiciary and the coordinate branches of the Federal Government." Necessarily, however, any time the federal courts are called upon to determine the scope of the constitutional authority of a coordinate branch, "the relationship between the judiciary and the coordinate branches of the Federal Government" is involved. On several occasions over the past half century, the Court has been required to make decisions having the effect of allocating authority between the legislative and executive branches. *A.L.A. Schechter Poultry Corp. v. United States*[114] and *Panama Refining*

---

110. *See* U.S. CONST. art. III, § 2, cl. 1. In earlier years a dispute between Congress and the executive might have been thrown out of court on the grounds that the same party—the United States—cannot be both plaintiff and defendant. The Gray Jacket, 72 U.S. (5 Wall.) 342, 371 (1866) (Treasury Department could not ordinarily oppose the Attorney General). In recent years, however, the courts have entertained intergovernmental suits. *See, e.g.*, United States *ex rel* Chapman v. Federal Power Comm'n, 345 U.S. 153 (1953); ICC v. Jersey City, 322 U.S. 503 (1944). *See also* R. BERGER, *supra* note 66, at 313-20.

111. L. HAND, THE BILL OF RIGHTS 15-18 (1962).

112. 369 U.S. 186 (1962) (holding that equal protection challenges to legislative apportionment were justiciable).

113. *Id.* at 210.

114. 295 U.S. 495 (1935) (invalidating as an unconstitutional delegation of legislative

*Co. v. Ryan*[115] involved allocations of constitutional power be-
tween the Congress and the President where there was no dispute
between the branches. *Buckley v. Valeo,*[116] *Youngstown Sheet &
Tube Co. v. Sawyer,*[117] *United States v. Lovett,*[118] *Humphrey's
Executor v. United States,*[119] and *Meyers v. United States*[120] all
involved, in one form or another, issues of allocation of authority
between Congress and the President that the third branch was
called upon to resolve. These are the clearest kinds of cases in-
volving "the relationship between the judiciary and the coordi-
nate branches of the Federal Government."

  *Baker v. Carr* also described some of the characteristics
"[p]rominent on the surface of any case held to involve a politi-
cal question."[121] They are,

> a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or a lack of judicially
> discoverable and manageable standards for resolving it; or the
> impossibility of deciding without an initial policy determination
> of a kind clearly for nonjudicial discretion; or the impossibility
> of a court's undertaking independent resolution without ex-
> pressing lack of the respect due coordinate branches of govern-
> ment; or an unusual need for unquestioning adherence to a po-
> litical decision already made; or the potentiality of embarrass-
> ment from multifarious pronouncements by various depart-
> ments on one question.[122]

The "lack of judicially discoverable and manageable standards

---

powers portions of the National Industrial Recovery Act authorizing the President to
approve "codes of fair competition").

115. 293 U.S. 388 (1935) (striking down the "Petroleum Code" of the National In-
dustrial Recovery Act as excessive delegation of legislative powers to the executive).

116. 424 U.S. 1 (1976) (holding that Congress may not appoint federal executive
officers, in this case, members of a federal elections commission; the power to appoint
officers of the United States is an article II executive power and the Constitution prohibits
Congress from performing that function).

117. 343 U.S. 579 (1952) (invalidating a Presidential order nationalizing the steel
industry as a usurpation of the lawmaking authority of Congress).

118. 328 U.S. 303 (1946) (invalidating as a bill of attainder a provision of an appropri-
ation bill requiring that no funds could be used to compensate three named government
employees).

119. 295 U.S. 602 (1935) (holding that Congress could limit the President's power to
remove members of the Federal Trade Commission, an independent regulatory agency).

120. 272 U.S. 52 (1926) (holding that Congress could not constitutionally prohibit the
President from removing executive officers).

Powell v. McCormack, 395 U.S. 486 (1969), another prominent political question case,
dealt solely with the issue of congressional power asserted with respect to internal congres-
sional affairs, and did not implicate the powers of the executive branch.

121. 369 U.S. at 217.

122. *Id.*

268    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

for resolving" the issue and the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" would appear particularly descriptive of executive privilege-congressional subpoena confrontations. In the few instances in which federal courts have faced such issues, however, they have decided them. A conflict between a congressional subpoena and a Presidential assertion of executive privilege was involved in *Senate Select Committee on Presidential Campaign Activities v. Nixon.*[123] Neither the court of appeals nor the district court opinions in that case discussed justiciability, but both courts reached the merits. Necessarily, therefore, both held the case justiciable.[124]

Although the *Senate Select Committee* decisions were rendered prior to *Eastland's* very deferential treatment of congressional activities,[125] the same conflict between executive privilege and congressional investigations was involved in *United States v. AT&T* and, in that case, both courts held it justiciable. The court of appeals dealt at length with the justiciability issue in its second opinion. The court first noted that the Constitution did not commit the resolution of the issue to either branch.[126] It then rejected both the executive's claim that the "Constitution confers on the executive absolute discretion in the area of national security"[127] and Congress' claim that the speech or debate clause prevented judicial interference with its actions.[128] As to the question whether the court should abstain for lack of "judicially discoverable and manageable standards," the court concluded that negotiations

---

123. 498 F.2d 725 (D.C. Cir. 1974). This appeal involved only the subpoena seeking disclosure of certain tape recordings. No appeal was taken from the district court's earlier order quashing a subpoena seeking certain records and documents. *See* notes 102-04 and accompanying text *supra.*

124. Judge Wilkey took the position that the case presented a nonjusticiable political question; however, because that conclusion was foreclosed by the court's earlier holding in Nixon v. Sirica, 487 F.2d 700 (1973), he concurred in the court's opinion. 498 F.2d at 734 (Wilkey, J., concurring).

125. *See* notes 44-58 and accompanying text *supra.*

126. 567 F.2d at 126.

127. *Id.* at 128. The court noted that the Constitution confers powers related to national security upon both the President and Congress, and that "the question of allocation of powers associated with foreign affairs and national security" falls within a "zone of twilight" in which the President and Congress share authority. *Id.*

128. *Id.* at 128-29. In refuting Congress' claim that the speech or debate clause immunized congressional action from judicial interference, the court relied upon *Senate Select Committee* and the *Eastland* Court's observation that in prior cases the Court had balanced congressional investigatory powers against first amendment rights. *Id.* at 129. *See* note 51 *supra.*

between the parties had "largely obviated this problem by bringing into sharper focus the needs of the parties."[129]

The Court in *United States v. Nixon* observed in connection with the justiciability argument in that case that "[i]n the Constitutional sense, controversy means more than disagreement and conflict; rather it means the kind of controversy courts traditionally resolve."[130] If "the kind of controversy courts traditionally resolve" means historic judicial practice and not just frequency of occurrence, it would seem quite clear that *United States v. Nixon* also supports the view that article III authorizes judicial resolution of disputes concerning allocation of authority between the article I and the article II branches.[131] The instances in which such disputes have reached the courts have been rare. But when they have, the courts historically have resolved them, as illustrated by the cases discussed above.

The controversy in *Nixon* was between two officials of the executive branch. Other things being equal, the case for justiciability of an intrabranch dispute is harder than that of a dispute between coordinate branches of government. Most of the criteria prescribed by *Baker v. Carr*—including particularly "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question"[132]—are clearly more pronounced when the dispute involves only a single branch. Disagreements between two executive departments or two committees of Congress would seem clearly nonjusticiable under the *Baker v. Carr* guidelines and under the dictates of common sense. In an intrabranch dispute there is a final, nonjudicial authority over the disputants (the President or the congressional leadership) and the controversy should be resolved within the branch in which it arises. Even so, *United States v. Nixon* and *Powell v.*

---

129. 567 F.2d at 127.

130. 418 U.S. at 696.

131. Professor Archibald Cox takes a different view as to the meaning of this phrase:

But the Chief Justice probably meant to limit these sentences by the preceding sentence which points out that the evidence whose production is sought and resisted is "deemed by the Special Prosecutor to be relevant and admissible *in a pending criminal case*"—an element that satisfied the need for the "kind of controversy courts traditionally resolve."

Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1423-24 (1974) (emphasis in original) (footnote omitted).

132. 369 U.S. at 217.

*McCormack*[133] were both intrabranch controversies that were held justiciable. In those cases, however, the concept of an intrabranch final authority was inapplicable because the President in *Nixon* and the congressional leadership in *McCormack* were parties to the disputes. Moreover, there is serious question whether *United States v. Nixon* would have been justiciable absent the regulation delegating authority "to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure."[134]

Professor Cox argues that "[t]he absence of a material private stake in the outcome may prove . . . important"[135] to the justiciability issue. He points out that in *Schechter Poultry, Panama Refining, Meyers, Humphrey's Executor, Youngstown Sheet & Tube,* and *Lovett* "[e]ach of the . . . cases was brought by or against a state or a private person who had a material stake in the outcome."[136] By contrast, he points out, "[t]he named parties in an action to enforce a subpoena against a claim of executive privilege might be the Congress or a congressional body and the President."[137] It is probably true that there will be some kind of private stake in the outcome in most cases (other than executive privilege-congressional subpoena conflicts) wherein the underlying issue concerns the distribution of power between two branches of government. This was true in *Powell v. McCormack*, as well as in the cases cited by Professor Cox. It was technically true in *United States v. AT&T*, though the interest of the telephone company in that case was only a formal one.[138] But, the presence of a private stake in the outcome of interbranch disputes should have no bearing on justiciability. No more important questions come before federal courts than how the Constitution distributes power among the branches of government. The com-

---

133. 395 U.S. 486 (1969).

134. 418 U.S. at 694 (footnote omitted).

135. Cox, *supra* note 131, at 1423.

136. *Id.*

137. *Id.*

138. Professor Cox seems to argue that even in *United States v. Nixon* there was something like a private controversy. *Id.* at 1423-24. He finds significant the language of the opinion describing the evidence at issue as "deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case." 418 U.S. at 697. In my view, the interest of the special prosecutor did not impart to *United States v. Nixon* "a material private stake in the outcome." However his peculiar relation to the executive branch is defined, the special prosecutor was clearly an officer of government and an officer of the executive branch. He was performing functions that no one outside the executive branch could constitutionally perform. Buckley v. Valeo, 424 U.S. 1, 138 (1976). And his interest in the litigation rested exclusively on his official governmental responsibilities.

parative magnitude of the relevant governmental interests do not vary in the slightest according to whether some private party also has a stake in the outcome. Therefore, the existence or nonexistence of private interests should be irrelevant to the justiciability question.

A characteristic of executive privilege-congressional subpoena cases that arguably cuts against justiciability is that withholding judicial relief will not result in failure of resolution. The case will usually be resolved by the President's deciding to comply or not comply with the subpoena. While the President is an elected officer and is presumed to act in the public interest, this approach is not at all satisfactory because it commits the resolution of the dispute to one of the disputants.[139] Moreover, where, as in AT&T, the documents at issue are in the possession of a private corporation, a holding of nonjusticiability shifts the effective decisional authority, not to a governmental entity, but to a corporation which has neither an interest in the dispute nor any reason to have considered—much less weighed—the competing governmental values.

There is another characteristic—unique to executive privilege-congressional subpoena cases—which, taken alone, makes the case for justiciability of such disputes more difficult than in other instances where the judiciary is called upon to resolve competing claims to constitutional authority by its sister branches. For reasons discussed in Section V below, the preferable method for judicial resolution of executive privilege-congressional investigation conflicts is to have the courts balance the competing interests without creating a presumption in favor of either. Admittedly, that kind of balancing will significantly involve the federal courts in reexamining underlying policy choices in substantive areas quite clearly committed to one or both of the other branches of government. It is, however, the alternative that is most consistent, both in theory and in application, with underlying separation of powers precepts. In this respect, the issue of justiciability is closely linked to the final issue

---

139. The court of appeals in its second AT&T opinion stated:

Where the dispute consists of a clash of authority between two branches, however, judicial abstention does not lead to orderly resolution of the dispute. No one branch is identified as having final authority in the area of concern. If the negotiation fails—as in a case where chance circumstance, has no need to compromise—a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

567 F.2d at 126.

to be discussed by this Article: If federal courts are constitutionally empowered to resolve confrontations between assertions of executive privilege and exercise of congressional investigatory powers, by what standards should they perform that task? The final discussion of justiciability will therefore be deferred and considered in connection with the issue of appropriate judicial standards.

## V.  STANDARDS FOR JUDICIAL RESOLUTION OF INTERBRANCH EXECUTIVE PRIVILEGE-CONGRESSIONAL SUBPOENA CONFLICTS

One approach to constitutional law is to divide the entire field into two broad components. The first deals with the powers of government, state or federal, and the second with the protection of individual interests against the exercise of those governmental powers. The lines separating the two are not always rigid. The diffusion of power and authority among the three branches, as well as between the national and state governments, helps to assure against arbitrary infringement of individual rights by lessening the concentration of power in any one group, and by setting off some governmental entities as checks and balances against the powers of others.

This view of constitutional law as divisible into two broad categories is helpful in determining the proper standards by which federal courts should decide cases involving conflicts between executive privilege and congressional investigations. Such conflicts fall within the realm of the first category of constitutional law, the powers of government. Determination of the proper standards for resolution of these conflicts, however, is aided by examination of the judicial struggles and the results of those struggles in connection with the second category, the protection of individual interests against the exercise of governmental powers.

In attempting to achieve a constitutional accommodation of governmental-societal and individual interests, the courts have used a single overarching approach. That approach has been to balance in some fashion the competing sets of interests—those of the individual, and those of society (as determined by society's elected legislative representatives). Not all of the opinions describe their approach as involving balancing, and in most cases the balancing has not been evenhanded in the sense that the inquiry is usually not whether the interests on the one side or the other preponderate. Rather, the courts generally inquire into whether the interests on one side are sufficient to overcome a

predetermined weighting favoring the other. But it is a balancing approach in the sense that the conflicting interests of the individual and society are reconciled by taking into account in some fashion the comparative strengths of those conflicting interests in each particular case. Indeed, the only alternative to some kind of balance between governmental and individual interests is an absolutist, per se approach, which would prescribe that in certain contexts either the legislative decision will always be honored or the constitutionally recognized individual rights will always be protected. While the absolutist approach has been advocated in cases involving individual versus societal interests,[140] it has rarely if ever been followed.

The question has not been whether to balance, but how. Some of the most important issues over the long range of our experience with constitutional adjudication have concerned the weighting of the balance scales either in favor of the individual or the government. This weighting is not that which results from a consideration of the merits of the individual case, but rather that which occurs before the court reaches the merits for all cases of that kind, so that in the particular case one side or the other will have more than a fifty-fifty burden to overcome.

In areas where there have been a substantial number of cases involving a conflict between governmental and individual interests—including the first amendment, equal protection, due process, and the commerce clause—this pre-merits weighting has occurred. Some of the most important developments in American constitutional history have centered on whether the weighting should favor government or the individual. In determining the constitutionality of state-imposed burdens on interstate commerce resulting from exercises of the police power, the balance scales were at one time weighted heavily in favor of the legislative judgment.[141] The weighting probably still favors state government, though not as much as before.[142] In cases involving the first

---

140. Its most vigorous advocates in recent years have been Justices Black and Douglas, who have argued for such an approach in favor of government in commerce clause cases, *see, e.g.,* Southern Pac. Co. v. Arizona, 325 U.S. 761, 789 (1945) (Black, J., dissenting); *id.* at 795 (Douglas, J., dissenting); J. HELLERSTEIN & W. HELLERSTEIN, STATE AND LOCAL TAXATION, 250-51 (4th ed. 1978), and in favor of the individual in first amendment cases, *see, e.g.,* Konigsberg v. State Bar, 366 U.S. 36, 64-74 (1961) (Black, J., dissenting); Black, *The Bill of Rights,* 35 N.Y.U. L. REV. 865, 867, 875-81 (1960). *See also* Brandenburg v. Ohio, 395 U.S. 444, 450-57 (1969) (Douglas, J., concurring). On the general issue of the absolutist versus the balancing approach see L. TRIBE, AMERICAN CONSTITUTIONAL LAW 582-84 (1978).

141. South Carolina Highway Dep't v. Barnwell Bros., 303 U.S. 177 (1938).

142. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 524 (1959): "These safety

274    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

amendment and other "fundamental" rights, the pre-merits weighting favors the individual.[143] In substantive due process cases, individual interests, both economic and noneconomic, were given a heavy preference for many years.[144] At least as to economic matters this has now been reversed, and the judicially imposed weighting favors the government;[145] indeed, the opinions in some cases even suggest an absolutist standard.[146] As to certain noneconomic matters, the eradication of the earlier substantive due process approach is less clear.[147] In equal protection cases the general rule has been for many years,[148] and still is,[149] that the state may distinguish among persons or classes so long as the distinction is not irrelevant to the achievement of a legitimate state objective. Two exceptions have been rather firmly established, however. If either (1) the classification itself falls into a "suspect" category,[150] or (2) the individual interest affected is "fundamental,"[151] the weighting is reversed and the balance scale, prior to consideration of the merits of the individual case, is tipped in favor of the individual. Thus, the consistent judicial approach to cases constituting one of the two broad components of constitutional law—the accommodation of individual and gov-

---

measures carry a strong presumption of validity when challenged in court." Southern Pac. Co. v. Arizona, 325 U.S. 761, 770 (1945): "There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce."

143. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621 (1969); Shapiro v. Thompson, 394 U.S. 618 (1969); Sherbert v. Verner, 374 U.S. 398 (1963).

144. Pierce v. Society of Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923); Coppage v. Kansas, 236 U.S. 1 (1915); Adair v. United States, 208 U.S. 161 (1908); Lochner v. New York, 198 U.S. 45 (1905); Allgeyer v. Louisiana, 165 U.S. 578 (1897).

145. Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421 (1952); West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937); Nebbia v. New York, 291 U.S. 502 (1934).

146. Fergusson v. Skrupa, 372 U.S. 726, 731 (1963): "Unquestionably, there are arguments showing that the business of debt adjusting has social utility, but such arguments are properly addressed to the legislature, not to us." Williamson v. Lee Optical Co., 348 U.S. 483, 487 (1955): "The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement."

147. Vlandis v. Kline, 412 U.S. 441 (1973); Roe v. Wade, 410 U.S. 113 (1973); Griswold v. Connecticut, 381 U.S. 479 (1965). *See also Constitutional Law Symposium: Allocation of Policymaking Authority Between Court and Legislature*, 1976 B.Y.U. L. Rev. 37.

148. McGowan v. Maryland, 366 U.S. 420 (1961); Kotch v. Board of River Pilot Comm'rs, 330 U.S. 552 (1947).

149. Mathews v. De Castro, 429 U.S. 181 (1976).

150. The categories which have been defined as "suspect" include race, alienage, and national origin. Graham v. Richardson, 403 U.S. 365, 371-72 (1971). *But see* Foley v. Connelie, 98 S. Ct. 1067 (1978) (holding that limiting state police appointments to U.S. citizens does not violate equal protection rights of aliens).

151. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 626 (1969).

ernmental interests—has been to balance and to identify in advance of the balance which set of interests is to be preferred.

In those cases involving conflicts between governmental interests and individual interests, there are sound theoretical and practical reasons for pre-merits weighting of the balance scales. The practical reason is that cases calling for a choice between competing interests are easier to decide if the court is called upon, not to decide which of the two is in fact heavier, but whether one is sufficiently heavy to overcome a predetermined handicap. The theoretical support for a pre-merits weighting of governmental-versus-individual-interests cases is that the competing interests are of different quality and come from readily distinguishable sources. With the governmental set of interests being rooted in a legislative judgment and the individual set of interests in the Constitution, good arguments can be made for preferring either.

The basic argument for weighting the scale in the individual's favor is that his position is based on the Constitution and is therefore entitled to greater weight than his opponent's competing claim based on a statute. As Hamilton observed in *No. 78* of *The Federalist,* "If there should happen to be an irreconcilable variance between [the Constitution and a statute] that which has the superior obligation and validity ought of course to be preferred; or in other words, the Constitution ought to be preferred to the statute."[152] This familiar statement is probably the best contemporary support for the argument that judicial review was contemplated by the original Constitution-makers. Its underlying and undisputed premise—the superiority of the Constitution over legislative acts—also provides a theoretical basis for a general pre-merits weighting in favor of individual interests.

On the other hand, it can be argued that the legislature should have the scales tipped in its favor, since the competing considerations underlying all legislative judgments involve issues of public policy. The accommodation of competing policy interests is the single most important responsibility of legislative bodies. Legislators, like judges, are sworn to uphold the Constitution, and to the extent constitutional issues are involved, these will be taken into account by the legislators in making the final choices among policy alternatives. Therefore, the argument runs, though legislators' decisions should not be immune from judicial review, their judgments should be given deference.

For present purposes, the important point is not which of

---

152. The Federalist No. 78, at 492 (A. Hamilton) (B. Wright ed. 1961).

276    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

these positions is more persuasive, or whether what the court has in fact done—giving the preference to the state in some contexts and to the individual in others—is in accord with sound constitutional principles. The important point is that there is a sound theoretical basis for giving a preference either way, and good practical reasons for doing so.

There is a difference between this kind of case and executive privilege-congressional subpoena cases, however. Executive privilege-congressional subpoena cases involve questions of the constitutional allocation of power among coequal branches of the federal government, rather than protection of constitutionally based individual interests against the exercise of governmental powers. The conflict in first amendment, fourteenth amendment, and commerce clause cases is between governmental and nongovernmental parties. The claim of one is based on the Constitution, and the other on the judgment of the legislature in matters of public policy choice. By contrast, in executive privilege-congressional subpoena cases, the conflicting interests are rooted in the same source and are of the same general type. The dispute is between two of three coordinate branches of the federal government, each of which bases its claim on a grant of power contained in the United States Constitution.

In selecting the appropriate standard for deciding executive privilege-congressional subpoena conflicts, the courts have three basic choices. They are:

(1.) An absolute, per se rule, under which the interests of one of the branches will always prevail, regardless of the comparative strengths of the parties' positions in the case.

(2.) A balancing approach similar to that employed in the governmental interests versus individual interests context, assigning a predetermined preference either to congressional subpoena power or executive privilege.

(3.) A true, evenhanded balance, weighing the impact of alternative outcomes on the underlying objectives of both executive privilege and congressional investigations without any pre-merits weighting.

These three alternatives for judicial resolution of executive privilege-congressional subpoena cases will now be considered, including, as to each, an examination of its supporting authority and the theoretical and practical implications of its adoption. These alternatives assume that the substance of the controversy is to be resolved by the courts. The alternative of resolution by another branch (by hypothesis one of the parties to the dispute), the policy and constitutional issues posed by that alternative,

and its similarities to the absolutist approach will also be considered in connection with the examination of the alternative standards.

### A.  The Absolutist Standard

There are three basic arguments favoring adoption of an absolutist approach. The first is that it is simple to apply. Second, it yields consistent, predictable results with consequent planning benefits to government and nongovernment individuals and institutions. The third argument is similar to the position that executive privilege-congressional subpoena cases are not justiciable: either of the other approaches necessarily involves the judiciary to some degree in a reexamination of the underlying policy considerations made by one or both of the other branches in issuing the subpoena or asserting executive privilege. These are matters that are not only "committ[ed] . . . to a coordinate political department,"[153] they lie at the very core of the responsibilities of the other branches.

The strongest support for vesting final decisional authority in the Congress comes from Professor Cox, who would vest that authority in either House of Congress that considers the matter. Judges MacKinnon and Wilkey of the Court of Appeals for the District of Columbia Circuit have advocated that the President should have that authority.

### 1.  Professor Cox and absolute deference to Congress

In the subsection of his article on executive privilege entitled "Modern Need to Invest the Court With Enforcement Jurisdiction," Professor Cox reviews three developments that in his view "furnish persuasive evidence of a need to increase the power of Congress to compel the President and others in the executive branch to produce information."[154] He then proposes the following:

> These trends probably make it desirable to put the force of law behind some congressional subpoenas addressed to the President, his aides or other executive officials. Ideally, I think, the legislative right should prevail in every case in which either the Senate or House of Representatives votes to override the Executive's objections, provided that the information is relevant to a

---

153. Baker v. Carr, 369 U.S. at 217.
154. Cox, *supra* note 131, at 1432.

matter which is under inquiry and within the jurisdiction of the body issuing the subpoena, including its constitutional jurisdiction. A single committee or subcommittee, because it offers little guaranty of restraint, is the greatest threat to the values of confidentiality and carries the great danger of oppression. The very need for a vote of an entire chamber would not only provide a forum in which the Executive's arguments could be fairly considered, but the uncertainty of the outcome would press all concerned to negotiate a resolution. A vote of the entire Senate or House of Representatives is required to cite a private person for contempt. The requirement has proved useful in the past. If either House did vote to require the information, the President should have no constitutional right to withhold it and the Judiciary should not go behind the voted demand except to decide questions of relevance and jurisdiction. This would avoid the difficulty of developing nonpolitical, judicial standards of decision and thus would meet the chief constitutional objection to other legislative proposals.[155]

Under Professor Cox's proposal, the judicial role would be limited to deciding the threshold questions of relevance and jurisdiction. Any issues concerning the conflicting policy demands of the legislative and executive branches would presumably be left to the final decision of the particular House of Congress, as would the persuasiveness of the executive's arguments, which are to be "fairly considered."

### 2. Judges MacKinnon and Wilkey and absolute deference to the President

The positions of Judges MacKinnon and Wilkey are set forth in separate opinions concurring in part and dissenting in part from the en banc per curiam opinion of the Court of Appeals for the District of Columbia Circuit in *Nixon v. Sirica*.[156] At issue in *Nixon v. Sirica* was an order entered by District Judge Sirica to enforce a grand jury subpoena duces tecum directing President Nixon to produce certain tapes and documents. The legality of Judge Sirica's order was challenged by both the President and also the special prosecutor, then Mr. Archibald Cox. Because of serious questions concerning its jurisdiction to consider the special prosecutor's petition under the "all writs" statute,[157] the

---

155. *Id.* at 1434. *See also* P. KURLAND, WATERGATE AND THE CONSTITUTION 130 (1978).
156. 487 F.2d 700, 729-62 (D.C. Cir. 1973) (MacKinnon, J., concurring in part, dissenting in part); *id.* at 762-99 (Wilkey, J., dissenting).
157. "The Supreme Court and all courts established by Act of Congress may issue

court exercised its discretion to consider only the President's petition.[158]

Having asserted executive privilege with regard to the items sought by the grand jury, President Nixon's counsel contended, *inter alia,* "that Executive privilege is absolute with respect to presidential communications, so that disclosure is at the sole discretion of the President."[159] The majority rejected the President's argument that the privilege is absolute, observing that throughout history "there have frequently been conflicts between independent organs of the federal government"[160] and that "[w]hen such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them—one Supreme Court."[161] In response to the contention that the President's position was sustained by the doctrine of separation of powers, the court responded that "[t]o leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing, rather than a separation of Executive and Judicial functions."[162]

In place of absolute deference, the majority applied a weighted balancing test, discussed further in Subsection B, with the pre-merits presumption favoring the executive. The court observed that "such conversations are presumptively privileged"[163] but held that the presumption "must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case."[164]

Judges MacKinnon and Wilkey wrote separate opinions and each concurred in the other's opinion. Judge MacKinnon's opinion contains a lengthy and scholarly review of the history of Presidential assertions of executive privilege and an analysis of some of the relevant Supreme Court opinions, from which he concludes there is a sound basis for "an absolute, evidentiary privilege for conversations and deliberations of the President with his close advisors," and further that "the privilege also has constitutional dimensions."[165]

---

all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1970).

158. 487 F.2d at 706-08.
159. *Id.* at 708.
160. *Id.* at 715.
161. *Id.*
162. *Id.*
163. *Id.* at 717.
164. *Id.*
165. *Id.* at 750 (MacKinnon, J., concurring in part, dissenting in part).

In Judge Wilkey's view, the issue in the case was as follows:

> The *Per Curiam* here never confronts the fundamental Constitutional question of separation of powers, but instead prefers to treat the case as if all were involved was a weighing and balancing of conflicting public interests. There *are* conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that. Therefore, the most fundamental, necessarily decisive issue is, Who Does [sic] the weighing and balancing of conflicting public interests? The District Judge or the President? The answer to this question necessarily involves the Constitutional question of separation of powers.[166]

Addressing the issue "Who decides?" Judge Wilkey concluded:

> I thus reach the conclusion, differing from the majority of my colleagues, that the privilege asserted by the President here derives *both* from the Constitutional principle of separation of powers and from the common sense-common law, statutory privilege of confidentiality of Governmental decision-making, whatever the Branch. The latter may be subject to weighing and balancing of conflicting public interests, as many of the cases have done, but never in a case involving the President as a party. But where the privilege of the Chief Executive is derived from the *Constitutional principle* of separation of powers, it is no more subject to weighing and balancing than any other Constitutional privilege can be weighed  and balanced by extraneous third parties.
>
> Every President, beginning with Washington and Jefferson, has asserted that the privilege and the scope and applicability are for him alone to decide. This is precisely what Congress does when it either grants or withholds documents in response to the request of a court for evidence in a criminal case. This is what no doubt *this court* would do if confronted with a demand by a Congressional committee for any of our internal documents. We would weigh and decide and assert the privilege as *we* saw it, not as a Congressional committee would see it. *We* would do so on the Constitutional ground of separation of powers. And this is what the President has done here.[167]

*Nixon v. Sirica* did not involve a conflict between executive privilege interests and congressional investigative interests. While there was no confrontation of executive and legislative branch prerogatives, there was a straight confrontation between

---

166. *Id.* at 763 (Wilkey, J., dissenting) (emphasis in original).
167. *Id.* at 773-74 (Wilkey, J., dissenting) (emphasis in original).

the judiciary and the executive.[168] Thus, Judges MacKinnon and Wilkey contended for absolute deference to the Presidential judgment in asserting executive privilege against the judiciary. There is no reason to conclude they would take any other position vis-à-vis Congress. Moreover, in his concurring opinion in *Senate Select Committee on Presidential Campaign Activities v. Nixon*,[169] which involved a confrontation between congressional investigative power and executive privilege, Judge Wilkey referred to his opinion in *Nixon v. Sirica* as taking the position that actions challenging Presidential assertions of executive privilege are nonjusticiable.[170]

The positions taken by advocates of the absolutist approach demonstrate the close linkage between the issues of justiciability and the substantive standards by which courts should resolve the dispute. If the judicial decision on the merits runs in favor of the executive, then in the majority of cases the net effect will be the same as if the court held either that (1) the case is not justiciable, or (2) even though justiciable the courts should withhold judicial relief as a matter of prudence. In the typical executive privilege-congressional subpoena case it is Congress that needs affirmative judicial action because the executive has possession of the documents. If the courts do not act, that possession remains unaffected, and the executive wins. The result is the same if the courts decide the case, but defer absolutely to the executive. Thus, it should not be surprising that the opinions of the two principal advocates of absolute deference to the executive judgment, Judges MacKinnon and Wilkey, do not sharply distinguish between issues of justiciability and substantive standards for decision. Rather, they concentrate on the propriety—as a matter of history, policy, and good constitutional adjudication—of leaving the final judgment to the President. Similarly, while Professor Cox's view is that ultimate resolution should be left to a full vote of the appropriate House of Congress, it is not clear whether his position is (1) that Congress should pass a statute authorizing such a procedure, and the courts should hold the statute constitutional; (2) that absent such a statute, courts should hold that since another branch of government is better suited to resolve

---

168. The tapes were to be examined in camera by the district judge "and the grand jury may never see or hear any of them after the District Judge's review *in camera.*" *Id.* at 788. As a consequence, "the Judiciary-Executive confrontation is there at the outset, whatever the character of the grand jury." *Id.*

169. 498 F.2d 725 (D.C. Cir. 1974).

170. *Id.* at 734 (Wilkey, J., concurring).

282     BRIGHAM YOUNG UNIVERSITY LAW REVIEW     [1978:

such disputes the courts will refrain from decision and will if necessary enforce the judgment of the House of Congress when made; or (3) that if a House of Congress has passed on the issue, courts should refrain from taking any action. As in the case of the positions taken by Judges MacKinnon and Wilkey, any of these views results in shifting the real decisional authority from the courts to another branch of government.[171]

### B.   Weighted Balancing

Three federal judicial opinions have considered on the merits square conflicts between a Presidential assertion of executive privilege and a congressional subpoena. They are the district court's and court of appeals' opinions in *Senate Select Committee on Presidential Campaign Activities v. Nixon,*[172] and the district court opinion in *United States v. AT&T.*[173] At least two of the three opinions (and perhaps all three) have applied a weighted balancing standard, with the pre-merits weighting favoring the President. This is the only approach, therefore, that is clearly supported by a majority opinion of a federal court.

The *Senate Select Committee* case was a suit by the Ervin committee seeking access to five tape recordings of conversations between President Nixon and John Dean. The committee had served a subpoena duces tecum on the President, who responded by asserting executive privilege. On the first go-around of attempted judicial enforcement, Judge Sirica ruled that the district court lacked jurisdiction. Congress thereupon passed a special statute giving the district court jurisdiction to enforce the select committee's subpoenas.[174] In the subsequent enforcement action the district court (Judge Gesell) dismissed the complaint without prejudice. Whether he gave any pre-merits weight to the assertion of executive privilege is not clear from the opinion. On the one hand, the opinion made the observation that "[i]t has not been demonstrated to the Court's satisfaction that the Committee has *a pressing need* for the subpoenaed tapes or that further public hearings before the Committee concerning the content of those

---

171. If shifted to a House of Congress, this will mean that the legislative branch wins. There may, however, be some occasions when a House of Congress would decide to deny to one of its constituent committees the information requested from the executive branch, but this would rarely occur.

172. The district court opinion is reported at 370 F. Supp. 521 (D.D.C. 1974) and the court of appeals opinion at 498 F.2d 725 (D.C. Cir. 1974).

173. 419 F. Supp. 454 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

174. *See* text accompanying note 101 *supra.*

tapes will at this time serve the public interest."[175] On the other hand, the concluding paragraph stated that "while the controversy presented is justiciable, the Select Committee *has not established by a preponderance of the evidence* that it is entitled at this particular time to an injunction directing the President to comply with its subpoena for the five tape recordings."[176]

By contrast, the court of appeals in the *Senate Select Committee* case quite clearly followed a weighted balancing approach. That court held applicable the same basic approach that it had followed in *Nixon v. Sirica:* a generalized assertion of executive privilege by the President is "presumptively privileged,"[177] and the presumption can be overcome "only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access [to the documents sought]."[178] Thus, the court of appeals in *Senate Select Committee* (1) adopted as the governing rule a weighted balancing approach with the presumption favoring the Presidential assertion of privilege in cases involving conflicts between congressional subpoenas and assertions of executive privilege based on confidential communications; (2) relied as precedent on its earlier ruling in *Nixon v. Sirica,* thus suggesting that the same standard is applicable whether the Presidential assertion conflicts with fundamental functions of either of the other branches; and (3) rejected the district court's opinion insofar as it followed a contrary approach.[179] By the time the case reached the court of appeals, the House Committee on the Judiciary had begun its inquiry into Presidential impeachment. Under these circumstances, the court held that "the Select Committee has failed to make the requisite showing"[180] because its "immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative."[181] With regard to the weight of the burden, the court observed that the committee had not shown that "the subpoenaed evidence is demonstrably

---

175. 370 F. Supp. at 522 (emphasis added).

176. *Id.* at 524 (emphasis added).

177. 498 F.2d at 730.

178. *Id.*

179. The "apparent understanding" of the district court opinion which the court of appeals rejected was probably the district court's failure to weight the scales in the President's favor. *Id.*

180. *Id.* at 731.

181. *Id.* at 732. With regard to congressional oversight, the opinion observed, "In the circumstances of this case, we need neither deny that the Congress may have, quite apart from its legislative responsibilities, a general oversight power, nor explore what the lawful reach of that power might be under the Committee's constituent resolution." *Id.*

284    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

critical to the responsible fulfillment of the Committee's functions."[182]

The court of appeals opinion in *Senate Select Committee v. Nixon* was issued just about a year before the Supreme Court held in *Eastland v. United States Servicemen's Fund* that the issuance and enforcement of congressional subpoenas are included within the speech or debate clause immunity. *United States v. AT&T* is the only post-*Eastland* case to consider on the merits a square conflict between executive privilege and congressional subpoena power. The magnitude of the conflict was sharpened by the fact that the asserted executive interest was the protection of foreign intelligence secrets, an area of Presidential responsibility in which the United States Supreme Court declared in *United States v. Nixon* that "courts have traditionally shown the utmost deference."[183] Moreover, the congressional interest in *AT&T* was enforcement of a subpoena, held by *Eastland* to be included within speech or debate, and the *Eastland* opinion had declared that "the prohibitions of the Speech or Debate Clause are absolute."[184]

While the formal parties in *United States v. AT&T* were the United States (the executive branch) as plaintiff and AT&T as defendant, the telephone company had no interest in the outcome of the suit, filed no pleadings, and neither briefed nor argued any of the issues. The position adverse to that of the President was vigorously advanced by the intervenor and the real party in interest, Chairman Moss, who initially appeared on behalf of himself, and later on behalf of the entire House of Representatives. Chairman Moss took the absolutist position that the judicial inquiry should end with a determination that the subpoena was issued for a legitimate legislative purpose. The district court rejected this view and stated that the appropriate test was to balance the competing interests:

> The Court accepts the position of the intervenor that the subpoenaed materials are sought pursuant to a legitimate legislative investigation. Contrary to the intervenor's argument, however, the Court's inquiry cannot conclude at this point. The legislative authority to investigate is not absolute. In our system of government the Constitution is supreme, but no one portion of the Constitution is sacrosanct. Here, the nature, the extent

---

182. *Id.* at 731.
183. 418 U.S. at 710.
184. 421 U.S. at 501.

and the relative importance of the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum.[185]

The district court listed three factors it felt should appropriately be taken into account in affecting the balance: (1) "whether the information requested is essential to 'the responsible fulfillment of the committee's functions,' *Senate Select Committee v. Nixon, . . .* 498 F.2d 725, 731 (1974)"; (2) "whether there is 'an available alternative' which might provide the required information 'without forcing a showdown on the claim of privilege,' *United States v. Reynolds*, 345 U.S. 1, 11 . . . (1953)"; and (3) "the circumstances surrounding and the basis for the Presidential assertion of privilege. [*United States v. Reynolds*, 345 U.S. at 11]; *United States v. Nixon*, 418 U.S. 683, 710-11 . . . (1974)."[186]

As to the first two factors, the court commented that "[t]he helpfulness of the national security request letters in determining the basis on which the wiretaps were instituted is minimal."[187] However, the backup memoranda, even though subject to deletion of specific information, would "ostensibly afford the Subcommittee relevant information upon which to determine whether the wiretaps were instituted for foreign intelligence surveillance rather than domestic surveillance and to make the determination as to whether new legislation should be drawn."[188]

With regard to the third factor, the court observed:

[T]he President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters. The possible effect of such disclosure has been detailed above. Such a determination by the Executive is generally accorded great deference by the courts.[189]

The court's final conclusion was as follows:

[I]f a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role in these areas

---

185. 419 F. Supp. at 459.
186. *Id.* at 460.
187. *Id.*
188. *Id.*
189. *Id.* (citing United States v. Nixon, 418 U.S. 683, 710-11 (1974); United States v. Reynolds, 345 U.S. 1, 10 (1953); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)).

286    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

is entrusted. In the areas of national security and foreign policy, that role is given to the Executive.[190]

The same considerations discussed above as supporting an absolutist approach also support the position that if the court is to balance the interests of one branch against those of another, pre-merits weighting is better than a straight balancing. It is easier, it yields more consistent and predictable results, and it requires lesser judicial involvement in policy matters clearly committed to another branch. Weighted balancing also has the support of the limited judicial precedents dealing with the issue. The conceded materiality of these considerations notwithstanding, they are insufficient to carry the day. They bear more heavily on justiciability and on the wisdom of the court of appeals' efforts in the *AT&T* and *Nixon v. Sirica* cases to achieve a negotiated settlement than on the standards for judicial decision.

I believe that the preferred approach is an evenhanded balancing with no pre-merits weighting. Unlike the other two approaches, it has been advocated by neither judicial nor scholarly opinion. Some of the reasons why it is the best approach are closely linked to the issue of justiciability. Accordingly, the final Subsection of this Article will discuss my views concerning justiciability (discussed earlier in Section IV) and nonweighted balancing as the appropriate standard for judicial resolution of executive privilege-congressional subpoena cases.

## C.   *Justiciability and Nonweighted Balancing*

### 1.   *Justiciability*

All three opinions that have resolved on their merits conflicts between executive privilege and the congressional subpoena power—the district court and the court of appeals in *Senate Select Committee* and the district court in *AT&T*—have necessarily held that such conflicts are justiciable. The court of appeals' second opinion in *AT&T* also held such disputes justiciable, thus providing the basis for its creative attempts to achieve a negotiated solution, if possible, and for its ultimate disposition of the merits of the case, if necessary.

---

190. *Id.* at 461. This case demonstrates that the three standards suggested above—absolute deference, weighted balancing, and straight balancing—may shade into each other. Judge Gasch's final paragraph, quoted above, suggested that in carrying out his stated purpose to balance the competing considerations he may have weighted the scales so heavily in the executive's favor that the end result was absolute deference to the President's decision, the approach advocated by Judges Wilkey and MacKinnon.

The arguments against justiciability, discussed in Section IV above, highlight the problems that result from judicial attempts to resolve confrontations between executive privilege and congressional investigative power. If the appropriate judicial standard is to balance without a pre-merits weighting, judicial resolution will not only involve consideration of matters that are "commit[ed] . . . to a coordinate political department;"[191] in the usual case courts will be required to reevaluate the policy judgments reached by the other branches. Moreover, in the usual executive privilege-congressional subpoena case, these policy judgments are not only central to the other branches' constitutional duties; they are also judgments that the other branches are much more qualified to make.

What this counsels, however, is not that executive privilege-congressional subpoena cases are nonjusticiable, but rather that courts should follow the lead of the court of appeals in *AT&T*: decline to reach the merits in such suits until all reasonable efforts to bring about a negotiated settlement have been exhausted. Manifestly, the parties understand better than the courts which aspects of their positions can be compromised without working serious damage to their own particular needs and to important governmental objectives. Moreover, because of the case or controversy limitation on judicial fact finding, courts lack the fine-tuning capability to achieve through judicial decree a resolution that would serve the competing interests as well as would a negotiated compromise. It is therefore consistent with article III's case or controversy limitation, as well as with basic separation of powers principles, for courts to afford the parties to interbranch disputes every reasonable opportunity to achieve—and sometimes pressure them toward achieving—a compromise, prior to and as a precondition of judicial resolution.

It must be recognized, however, that even the most creative judicial efforts to maximize the opportunity and the incentive for a negotiated settlement will not always bear fruit. While it is in the interest of good government to have the disputant branches resolve their own differences if they can, it is not in the interest of good government to leave the dispute unresolved. Indeed, leaving such disputes "unresolved" does not really leave them unresolved. A holding of nonjusticiability means victory for the defendant; in most executive privilege-congressional subpoena cases this will be the President. The conflict in these cases is real and

---

191. Baker v. Carr, 369 U.S. at 217.

the stakes are high; the relevant issues are central to governmental functions. Such issues deserve consideration on the merits rather than decision by default. It is unthinkable, for example, that the dispute in *Youngstown Sheet & Tube Co. v. Sawyer*[192]—a pure vanilla dispute over the respective powers of Congress and the President—should have been left unresolved.

It is therefore necessary that there be a final decisional authority. Such authority should—and does—rest with the courts. The issues in interbranch controversies concern the interpretation of the Constitution for the purpose of settling disputes between disagreeing parties. Both the resolution of disputes and the declaration of constitutional doctrine are the traditional province of the judiciary. And whatever the difficulties or potential improprieties posed by the federal judiciary's attempting to resolve such disputes and fashion an appropriate remedy, they are certainly no greater than in legislative apportionment or busing cases. Judicial resolution of interbranch disputes should be a last resort. But in those rare cases where judicial resolution is necessary, decision of such cases on the merits is not only consistent with the case or controversy limitation of article III, it is the most important thing federal courts do.

### 2.   *Nonweighted balancing: the preferred judicial approach*

Just as courts should avoid deciding executive privilege-congressional subpoena cases as long as there is any reasonable possibility that judicial efforts to induce a negotiated settlement may be successful, a court faced with the necessity of deciding such cases should apply a rule of decision that recognizes the equality of its sister branches of government who are the litigants in its courtroom. The standard that achieves maximum fidelity to this objective is a straight balance with no pre-merits weighting given to either side.

As discussed above, an absolutist standard would be the easiest to apply and would yield the most consistent and predictable results. But it is a standard that places the judiciary in the position of having to decide which of its sister branches is to receive such automatic and inflexible favor at the expense of the other. That kind of judicial decision is unseemly, unwise, and inconsistent with sound separation of powers theory. A fundamental premise of separation of powers theory is that even though each branch enjoys spheres of activity within which it is supreme, in

---

192. 343 U.S. 579 (1952).

their interbranch relationships and in the status to which each is entitled before other branches, all are equal. This is especially true when the position of each branch in a litigated interbranch dispute is solidly grounded on settled constitutional principles. An absolute, never-changing preference of one of these positions over the other regardless of the circumstances of the individual case is inconsistent with the premise that each branch is equal in its relationships with other branches.

Based perhaps on notions of separation of powers, there is a decided and understandable judicial reluctance to reexamine a policy judgment made by a coordinate branch within its own particular sphere of responsibility. For example, in support of his "Who decides?" approach in *Nixon v. Sirica* (and his conclusion that the one who decides is the President), Judge Wilkey reasons, "There *are* conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that."[193] Judge Wilkey's conclusion is:

> Thus, the real issue, even by the analysis in other parts of the *Per Curiam* opinion, is whether it is appropriate for the court to determine the legal validity of a claim of privilege by the President, or whether the Constitutional principle of separation of powers requires the court to yield to the President's judgment as to where the public interest lies. My answer would be the latter.[194]

The final paragraph of District Judge Gasch's opinion in *United States v. AT&T* states the same basic approach:

> The Court is not implying that the members of the Sub-committee, or of the House of Representatives, will act negli-

---

193. 487 F.2d 700, 763 (D.C. Cir. 1973) (Wilkey, J., dissenting) (emphasis in original). The foregoing analysis assumes, for reasons set forth and discussed in text accompanying notes 168-70 *supra*, that Judges Wilkey and MacKinnon would apply the same rationale as contained in their *Nixon v. Sirica* opinions to a controversy involving conflicting prerogatives of the legislative and executive branches. In any event, the analysis set forth above is also applicable to the dispute in *Nixon v. Sirica*, since the conflict there was between the powers of the executive and judicial branches. Arguably, the hardest case for justiciability of interbranch conflicts and for the application of a nonweighted balancing approach occurs in those cases where one of the branches involved in the interbranch conflict is the judiciary. In such cases, the courts act, in a sense, as judges of their own case. Notwithstanding this conceptual concern, the conclusions reached in the text are equally applicable where judicial powers are in conflict with those of another branch. The underlying premise of the "rule of necessity," Evans v. Gore, 253 U.S. 245, 247-48 (1920); Atkins v. United States, 556 F.2d 1028, 1040 (Ct. Cl. 1977), is that when there is no other alternative, judicial decision of cases in which the judiciary may have an institutional interest poses lesser net drawbacks than leaving important issues, particularly constitutional issues, unresolved.

194. 487 F.2d at 794 (Wilkey, J., dissenting).

gently or in bad faith if they have access to these documents. But it does appear to the Court that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure must be made, it should be made by the constituent branch of government to which the primary role of these areas is entrusted. In areas of national security and foreign policy, that role is given to the Executive.[195]

This reluctance to reevaluate the policy judgments of another branch is appropriate in the vast majority of contexts. Indeed, on many issues within areas of exclusive executive or legislative responsibility, the judicial standard ought to be nothing less than absolute deference.[196] But that kind of approach breaks down where the interests on both sides of the conflict are supported by policy determinations made by officials of two separate branches of government, each acting in his own particular sphere of governmental responsibility. Judge Wilkey is right: The President has balanced the competing national interest considerations. He has done so in the exercise of his constitutional responsibilities, and he has reached a final conclusion. If the President were the only governmental entity and if his decision were the only public policy judgment involved in the litigation, then absolute deference or something approaching it would be the appropriate standard. But where the litigated interests in conflict with those of the President are also supported by a policy judgment made by a coequal branch of government, the supporting rationale for absolute deference is missing and the absolutist approach is inappropriate.

Professor Cox's position that "the legislative right should prevail in every case in which either the Senate or the House of Representatives votes to override the Executive's objections"[197] suffers from the same defect. His assurance that "[t]he very need for a vote of an entire chamber would . . . provide a forum in which the Executive's arguments could be fairly considered"[198] might or might not be realized in any given case. A fair forum notwithstanding, vesting the final decisional authority over disputes between the Congress and the President with either of the

---

195. 419 F. Supp. at 461.
196. Eastland v. United States Servicemen's Fund, 421 U.S. 491 (1975); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 431-33 (1964); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp. 333 U.S. 103 (1948).
197. Cox, *supra* note 131, at 1434.
198. *Id.*

SEPARATION OF POWERS

disputants is still fundamentally unfair and the unfairness strikes at the very roots of coequality and separation of powers.

The district court in *AT&T* concluded

> that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role [in the areas of national security and foreign policy] is entrusted.[199]

There is a parallel, equally persuasive article I-based position that if a final decision as to the need of these materials for legitimate legislative purposes—and the ability of a subcommittee to adequately safeguard them—must be made, it should be made by the constituent branch of government to which the primary responsibility for policymaking is entrusted.[200] Thus, litigation involving interbranch conflicts places the court in a genuine theoretical dilemma. Choosing between the conflicting positions of sister branches and reviewing the substance of policy decisions made by those branches are not the kinds of functions that courts perform best. But the alternatives are even worse: adopting the absolutist approach and thus yielding automatically in every case to the judgment of one branch and rejecting that of the other; or simply staying out of the matter, which necessarily results in a de facto holding in favor of one branch or the other.

A weighted balancing approach is also inappropriate for the resolution of executive privilege-congressional subpoena cases. When the competing interests requiring judicial resolution are those of society on one hand and the individual on the other, there are both practical and theoretical reasons for giving a preference to one set of interests.[201] There is no adequate basis for such a distinction, however, when the competing interests are those of

---

199. 419 F. Supp. at 461.

200. Indeed Chairman Moss took just such a position. His first brief before the court of appeals states:

> The plain mandate of existing judicial authority . . . makes clear that the responsibility of courts in a case such as this is limited to a determination of whether Congress is acting within its jurisdiction, as opposed to usurping powers exclusively vested elsewhere. Conversely, those authorities make abundantly clear that, having made such determination, the principle of separation of powers precludes the courts from substituting their judgment for that of Congress as to the specific need for particular information that Congress seeks in a course of a valid legislative investigation.

Brief for Intervenor-Appellant at 49-50, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

201. *See* text following note 151 *supra*.

coordinate branches of government and when both sets of interests are rooted in the Constitution.

While there are other possible arguments for preferring one set of interests over another, they fall short of justifying a pre-merits weighting in favor of either the legislature or the executive. In favor of Congress it might be asserted that congressional investigative powers fall under the speech or debate immunity[202] which is expressly guaranteed by the Constitution while executive privilege is only implied. Although a true statement, it is unpersuasive for several reasons. First, even though the Constitution expressly provides for speech or debate immunity, it does not expressly extend such immunity to the issuance and enforcement of congressional subpoenas. Second, the Court has not traditionally assigned a higher constitutional value to express rights and principles than to implicit ones and is not likely to do so. The premier power and function of the federal courts, judicial review, is implicit rather than express. Some of the individual rights that the Court has held to be "fundamental," such as the right to travel[203] and various aspects of the right of privacy,[204] must be inferred from more explicit provisions.

For the executive, it might be argued that a decision by the President, in whom all article II authority is vested, does not really stand on the same footing as a decision by a single committee of one House of Congress (or in some cases, a single subcommittee or subcommittee chairman, vested with authority to issue subpoenas). This argument also is insufficiently persuasive. The functioning of each branch within itself and the level of approval that must be obtained before official action is to be taken are matters internal to that branch, as long as the requirements of the Constitution are met. Even if one were to assume that the Constitution requires such symmetry that the decision of a President is under all circumstances to be preferred to that of a congressional committee or subcommittee, the needs of such conceptual symmetry would be satisfied by the fact that the reason subpoenas can be approved by the action of a committee, subcommittee, or a chairman is that the entire House of Congress has arranged its internal structure to permit such a procedure.

Finally then, these two postulates remain: (1) Each branch enjoys primary responsibility and authority over certain govern-

---

202. *See* notes 44-58 and accompanying text *supra*.
203. Shapiro v. Thompson, 394 U.S. 618 (1969).
204. Roe v. Wade, 410 U.S. 113 (1973); NAACP v. Alabama, 357 U.S. 449 (1958).

mental functions (lawmaking, law enforcement, and law interpre-
tation, including judicial review). Nevertheless, in their inter-
branch relationships, in the deference that each branch owes to
the other two, and in the standing that each enjoys before the
others, the three branches are equal. (2) It is fundamentally in-
consistent with that principle of coequality for the judiciary to
resolve cases or controversies involving competing constitution-
ally based claims of the other two branches by according absolute
deference to the judgment of either. It is equally inconsistent with
coequality for the courts to hold such a case nonjusticiable
(thereby effecting the same net result as absolute deference) or
to employ a balancing approach that weights the balance scales
in favor of one branch or the other.

Thus, the remaining alternative is a genuine balancing ap-
proach without any predetermined preference for either side, with
the victor to be determined on the basis of a simple preponder-
ance of relevant considerations. This approach will be the most
difficult of all possible judicial approaches and will provide the
least predictable results. Since executive privilege-congressional
subpoena controversies so rarely call for judicial resolution, how-
ever, and since the governmental stakes involved are so large,
judicial ease and predictability do not seem as important as in
other contexts.

Whenever an executive privilege-congressional subpoena
case comes before a court, both parties will have already made
certain judgments and reached certain conclusions. In the *AT&T*
case, for example, the subcommittee had determined that access
to the leased line letters was necessary to the subcommittee's
oversight function and to enable it to determine whether amend-
ments to the Communications Act should be enacted. On the
other side of the balance scale was the President's determination
that compliance with the subpoena would involve unacceptable
risks of disclosure. In attempting to achieve a balance between
these two competing determinations, there are several levels of
possible judicial reevaluation of underlying policy judgments,
and concomitantly, judicial intrusion into substantive policy
areas committed to other branches.

The first level, involving the least judicial intrusion, would
be for the court to accept the correctness of the judgments made
by each of its sister branches and—taking these judgments as
correct—balance the one against the other. Because it involves
less judicial intrusion into the affairs of the other branches, this
would be the preferable approach, provided that it would satis-
factorily resolve the case. I suspect that in many executive

privilege-congressional subpoena cases, however, it will not. Applying such an approach to the facts of the *AT&T* case, it might be contended that the President's determination has a broad sweep involving detriment "to the national defense and foreign policy of the United States and damag[e] to the national security." Accepting this determination at full value, it has a greater impact on national interests than the oversight of one subcommittee and consideration of the possible need to amend section 605 of the Communications Act. This is an unduly formalistic kind of analysis, however, and would simply invite broader congressional definitions of the legislative investigative purpose. In *AT&T*, for example, the purpose of the investigation could have been described as a determination of the extent to which the United States government is infringing upon the constitutionally guaranteed rights of its own citizens. This could have been coupled with a legislative determination that access to the documents was indispensable to the achievement of the legislative objective. Thus, taking the policy judgments of the respective branches totally at face value as articulated by Congress or the President and attempting to balance them may be a futile exercise.

The level of judicial inquiry at the opposite extreme would involve the court in a complete redetermination of the policy judgments made by the other two branches. In the *AT&T* case, reexamination of the underlying legislative policy judgments would have involved such inquiries as, "Why is this information really important to the legislative inquiry?" or "What kind of legislation does the subcommittee have in mind, and how do these documents bear on that legislation?" A more extreme inquiry—which I assume no court would ever make—would be, "Are any amendments to section 605 really necessary?" On the Presidential side, a reevaluating court might ask what the "risks of disclosure" really are, and why they are "unacceptable." Neither Mr. Moss nor anyone on the subcommittee ever indicated an intent to disclose anything in the subpoenaed documents. Indeed, the subcommittee pointed to its own excellent record in maintaining the security of secret information. On what, then, does the President base his judgment that there are risks of disclosure and that they are unacceptable? This kind of reevaluation of Presidential decisions could lead the court into other areas which most courts would quite clearly want to avoid and which in most cases they should avoid. But, in some cases, certain such questions might be appropriate for in camera review, such as: What do the documents really contain? And, why is it that their disclosure

(assuming that there are risks of disclosure) would be detrimental to national interests?[205]

In most cases, total judicial abstinence from substantive examination of the competing determinations of the other branches would provide an insufficient basis for deciding the case, but complete judicial reevaluation of those judgments would involve more judicial intrusion than is necessary. There is an intermediate level of judicial inquiry that I believe in most cases will enable the court to satisfactorily perform its constitutional duty to decide cases or controversies, without unduly intruding into the constitutional domain of the other branches. In most—possibly all—executive privilege-congressional subpoena cases the court could accept as its premise the correctness of the competing policy judgments made by the Congress and the President. It could then focus on possible alternatives to the withholding or disclosure of the information at issue, and in the process determine which alternatives would serve the policy objectives of one of the branches without significantly diminishing those of the other.

The *AT&T* case is again illustrative. The President determined that compliance with the subpoena would involve unacceptable risks of disclosure. Without reexamining that judgment, are there alternative means for protecting against the risks of disclosure, other than total withholding? Would it be possible to limit the examination of the documents to a secure place provided by the executive branch, or to limit the number of legislative branch personnel who will make the examination and who

---

205. There are persons whose general orientation opposes exposure of secret material to persons outside the executive branch. Certainly, it is in the interest of government and its citizens to limit the number of persons, no matter how reliable, who have access to secret information. But, there is no magical linkage between executive branch employment and reliability with regard to secret information. For reasons set forth below, it is preferable for courts applying a balancing test to executive privilege-congressional subpoena cases to do so at a level that will involve the least possible intrusion into underlying policy judgments of sister branches, so long as such intrusion minimization can be achieved without sacrificing the court's ability satisfactorily to decide the case. The subjective impression born of my personal experience is that courts generally are very cautious about examining government secrets, and that when such examination has been necessary, the judicial security record is at least as good as that of either of the other branches. It is true that federal judges have not signed—as executive branch personnel have—a written undertaking not to disclose, and it would be unseemly to ask them to do so. But they have taken an oath to uphold and defend the Constitution. In those few cases where it may be necessary for a court to conduct a limited in camera investigation of secret material, including material of the sensitivity involved in the *AT&T* case, such an examination should be made. The reason that executive branch personnel have access to such information is that it is necessary to the performance of the governmental responsibilities. There are circumstances under which the same would be true with the federal judge. In such a case, the court should make the examination.

will have access to the results of that study? On the legislative side, the subcommittee determined that the information contained in the leased line letters is essential to the performance of its legislative duties of oversight and possible statutory revision. Accepting the correctness of that determination, are there means of supplying the information other than providing access to the leased line letters? Are there other documents whose delivery to the subcommittee (accepting also at face value the President's determination concerning risks of disclosure) would pose lesser risks, but would be just as helpful or even more helpful to the committee?

The foregoing questions certainly do not exhaust the alternatives in *AT&T,* and any executive privilege-congressional subpoena case will present its own unique set of alternative solutions. What these examples illustrate is that in *AT&T* the consideration of alternatives would permit the court to apply a nonweighted balancing approach at a level that would minimize substantive reexamination of the underlying policy judgments made by its sister branches. This should be true in most executive privilege-congressional subpoena cases. The ultimate issue in those cases will always be whether information should be delivered to Congress, where a component of Congress has decided that it should be delivered and the President has decided that it should not. Thus, just as in *AT&T* and in the *Senate Select Committee* case (where the court of appeals considered alternatives to the information sought by the committee and ultimately based its decision on the existence of such alternatives), any executive privilege-congressional subpoena case should present opportunities for consideration of alternative solutions. The consideration of alternatives does not completely extricate courts from the business of policy reevaluation, but at the very least, it shifts the reevaluation to a less intrusive level. In *AT&T,* consideration of alternatives could be undertaken without disturbing either the Presidential judgments concerning the disclosure risks, or the congressional judgments concerning the need for information.

In other contexts, consideration of alternatives has been found relevant to the resolution of constitutional issues.[206] In executive privilege-congressional subpoena cases, such an approach would permit the courts to balance the competing governmental

---

206. Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85 (1977); United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976); Dean Milk Co. v. City of Madison, 340 U.S. 349 (1951).

interests, but with minimal reevaluation of the policy judgments made by other branches. It would therefore seem to be the approach that best satisfies the judicial responsibility to decide cases or controversies without undue intrusion into functions that are equally central to constitutional duties of the other two branches.

## VI. Conclusion

The germs of executive privilege and congressional investigatory powers were contained in the 1787 Constitution. Nevertheless, principles for dealing with the interactions between these two doctrines have only recently begun to emerge.

Probably the least satisfactory judicial approach to the accommodation of the competing needs of these two constitutional doctrines would be to hold the issue nonjusticiable. Such an approach would in fact resolve the conflict on a general, all-encompassing basis, without any opportunity for taking into account the particular characteristics of the individual case.

It is important that courts resolve these or any other conflicts between Congress and the President in a way that not only decides the case, but also recognizes the equality of the article I and article II branches as they appear before the article III branch. The only approach that is faithful to this objective is a straight balance of the competing interests, with no pre-merits weighting. For this reason it is the preferred approach, even though to date no court has applied it, and no judge or scholar has advocated it.

# EXHIBIT 6

2008 WL 11489049 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

# WHETHER THE DEPARTMENT OF JUSTICE MAY PROSECUTE WHITE HOUSE OFFICIALS FOR CONTEMPT OF CONGRESS

February 29, 2008

The Department of Justice may not bring before a grand jury criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or former White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony.

**\*1**  Memorandum Opinion for the Attorney General

You have asked whether the Department of Justice ("Department" or "DOJ") may bring before a grand jury criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or former White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony. We conclude it may not.

I.

The President has asserted executive privilege and directed that certain documents and related testimony not be provided in response to subpoenas issued to Joshua Bolten, the Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, by the Committee on the Judiciary of the House of Representatives in connection with its inquiry into the decision of the Department of Justice to request the resignations of several United States Attorneys in 2006. The President also directed Ms. Miers to invoke her immunity as a senior presidential adviser from compelled congressional testimony and decline to appear in response to the subpoena from the Judiciary Committee. These directives were based on legal opinions from the Department advising that the assertions of privilege and immunity were legally proper. *See Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1 (2007) (addressing assertion of executive privilege); *Immunity of Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007) ("*Immunity of Former Counsel to the President"*).

Notwithstanding the President's directives asserting executive privilege and instructing Ms. Miers not to testify, the House of Representatives cited Mr. Bolten and Ms. Miers for contempt of Congress, and the Speaker of the House yesterday referred the contempt citations to the United States Attorney for the District of Columbia for prosecution pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).[1] *See* Letter for Michael B. Mukasey, Attorney General, from Nancy Pelosi, Speaker of the House of Representatives (Feb. 28, 2008).

II.

**\*2**  The Department of Justice has long taken the position, during administrations of both political parties, that "the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) (""*Application of 28 U.S.C. § 458*"). In 1956, Deputy Attorney General (and later Attorney General) William Rogers presented to Congress a

-689-

Department of Justice study that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President had asserted executive privilege. *See Availability of Information From Federal Departments and Agencies: Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong. 2891, 2933 (1956). Twenty years later, Assistant Attorney General for the Civil Division Rex Lee stated in testimony before the Subcommittee on the Separation of Powers of the Senate Judiciary Committee that if Congress cited an Executive Branch official for contempt of Congress because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim was rightfully made, it would not, in the exercise of its prosecutorial discretion, present the matter to a grand jury." *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

The Department reaffirmed these principles in a detailed 1984 opinion prepared by Assistant Attorney General for the Office of Legal Counsel Theodore Olson. In that opinion, this Office explained that when an Executive Branch official complies in good faith with the President's assertion of executive privilege, "a United States Attorney is not required to refer a contempt citation ... to a grand jury or otherwise to prosecute [the] Executive Branch official who is carrying out the President's instruction." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt of Congress*". Drawing upon the principles explained by Mr. Rogers and Mr. Lee, canons of statutory construction, and basic constitutional principles, we explained that at least two legal conclusions supported the Department's longstanding interpretation of the criminal contempt statute:
First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

   **\*3**  *Id.*

During the Clinton Administration, the Department explicitly reiterated in a published opinion issued by Assistant Attorney General for the Office of Legal Counsel Walter Dellinger that the "criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. § 458*, 19 Op. O.L.C. at 356. To apply "the contempt statute against an assertion of executive privilege," Mr. Dellinger explained, "would seriously disrupt the balance between the President and Congress." *Id.*

Accordingly, based on this longstanding position, the refusal by Mr. Bolten and Ms. Miers to produce documents or testimony over which the President has asserted executive privilege did not constitute a crime, and therefore the Department may not pursue criminal contempt of Congress charges against them.

**III**.

We believe that the same reasoning necessarily applies to Ms. Miers' invocation of immunity from compelled congressional testimony. The principles that protect an Executive Branch official from prosecution for declining to comply with a congressional subpoena based on a directive from the President asserting executive privilege similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper. *See Immunity of Former Counsel to the President*, 31 Op. O.L.C. at 192-93 (explaining Ms. Miers' immunity from compelled congressional testimony). In reaching the conclusion that a United States Attorney is not required to prosecute an Executive Branch official complying with the President's assertion of executive privilege, the Department reasoned that the separation of powers principles protected by executive privilege would be eviscerated if reliance on the privilege carried with it criminal liability:

USCA Case #22-3086     Document #1997762         Filed: 05/03/2023     Page 266 of 512
Case 1:21-cr-00670-CJN   Document 41-6   Filed 03/22/22   Page 4 of 4

WHETHER THE DEPARTMENT OF JUSTICE MAY..., 2008 WL 11489049...

Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the [ [criminal contempt] statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege.

*Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 136.

 **\*4**  In this respect, a senior presidential adviser's invocation of his or her immunity from compelled testimony is no different. Subjecting that adviser to prosecution for raising in good faith the President's separation of powers objection to a congressional subpoena would impermissibly undermine the President's constitutional authority. As Assistant Attorney General Olson's opinion analyzing this principle in the context of an assertion of executive privilege observed:

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

*Id.* at 142. The prosecution of a senior presidential adviser who has lawfully invoked her constitutional immunity from compelled congressional testimony would likewise be inconsistent with the Constitution.

In sum, based on the longstanding Justice Department position discussed above, the non-compliance with the Judiciary Committee subpoenas by Mr. Bolten and Ms. Miers did not constitute a crime. Accordingly, the Department may not bring the criminal contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers for criminal contempt of Congress.

Steven G. Bradbury
Principal Deputy Assistant Attorney General
Office of Legal Counsel

Footnotes

1     Sections 192 and 194 of title 2 of the U.S. Code provide, in relevant part:

      Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers ... willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

      ....

      Whenever a witness summoned as mentioned [above] fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House ... a statement of fact constituting such failure is reported to and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or Speaker of the House ... to certify ... the statement of facts aforesaid under the seal of the Senate or House ... to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.

2008 WL 11489049 (O.L.C.)

---

**End of Document**                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cr-00670-CJN   Document 41-7   Filed 03/22/22   Page 1 of 30

# EXHIBIT 7

2021 WL 222744 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

## CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE

January 8, 2021

Congressional oversight of the White House is subject to greater constitutional limitations than oversight of the departments and agencies of the Executive Branch, in light of the White House staff's important role in advising and assisting the President in the discharge of his constitutional responsibilities, the need to ensure the independence of the Presidency, and the heightened confidentiality interests in White House communications.

**\*1**  Memorandum Opinion for the Counsel to the President

This memorandum opinion summarizes the principles and practices governing congressional oversight of the White House. The White House, as we use the term here, refers to those components within the Executive Office of the President ("EOP"), such as the White House Office and the National Security Council, whose principal function is to advise and assist the President in the discharge of the duties of his office. All three branches of government have recognized that the White House has a role and status distinct from the executive branch departments and agencies, and this Office has long recognized those distinctions to be critical to the development of principles and practices for congressional oversight addressed to the White House.

The Constitution vests all of "[t]he executive Power" in the President and charges him alone with the responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In carrying out that charge, the President necessarily depends on "the assistance of subordinates," *Myers v. United States*, 272 U.S. 52, 117 (1926), most of whom are his appointed officials in the executive departments and agencies. Yet the size and complexity of modern federal administration have required the establishment of the White House as an organizational apparatus to directly support the President in the discharge of his responsibilities. White House personnel work in close proximity to the President and advise and assist him in the development of presidential policy, in supervising and guiding the affairs of the executive branch departments and agencies, and in communicating with Congress, the American public, and foreign governments.

The White House's important role in advising and assisting the President has special significance for congressional oversight. Each House of Congress has, as an adjunct to its legislative power, the constitutional authority to obtain information, a power typically carried out through its committees. But this investigative authority, often referred to as "oversight" authority, is subject to limitations. A congressional information request "is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress."" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)). Consequently, the Executive Branch must scrutinize the asserted legislative purpose underlying a congressional request by examining the objective fit between that purpose and the information sought. Because Congress may conduct oversight investigations only with respect to "'subject[s] on which legislation could be had,'" *id.* (quoting *Eastland v. U.S.Servicemen's Fund*, 421 U.S. 491, 506 (1975)), Congress may not conduct such investigations for the purpose of reviewing the discharge of functions exclusively entrusted to the President by the Constitution. *See, e.g., Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (Reno, Att'y Gen.) (%7F*"Clemency Decision"*).[1] It follows that the activities of White House advisers are less likely than the activities of the departments' and agencies' staffs to involve matters within Congress's oversight authority.

**\*2**  Even when Congress operates within the appropriate scope of its oversight authority, the Constitution places additional separation of powers constraints on inquiries directed at the White House. The Supreme Court has recognized the importance

USCA Case #22-3086      Document #1997762      Filed: 05/03/2023      Page 269 of 512
Case 1:21-cr-00670-CJN      Document 41-7      Filed 03/22/22      Page 3 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

of "the Executive Branch's interests in maintaining the autonomy of [the Presidency] and safeguarding the confidentiality of its communications." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004). These concerns are particularly acute with respect to White House advisers. Congressional oversight directed at the White House must be conducted in a way that protects the ability of the White House to function effectively in advising and assisting the President as he carries out his responsibilities under the Constitution.

Congressional inquiries are also constrained by the heightened confidentiality interests in White House communications. *See id.* At the core of those interests is the presidential communications component of executive privilege, which covers many White House communications involving presidential decision-making. Congressional inquiries directed to the White House must take account of the presumptive application of executive privilege to White House communications, as well as the President's interests in autonomy and independence. Even when the White House may have relevant information, these separation of powers and privilege concerns weigh in favor of Congress seeking available information first from the departments and agencies before proceeding with White House requests.[2]

This memorandum proceeds in four Parts. Part I describes the development of the White House as an organization and its central role in advising and assisting the President. Part II discusses the scope of congressional oversight authority and the limits on that authority as it applies to matters related to the discharge of the President's constitutional functions. Part III explains that when Congress directs its oversight requests to the White House, the constitutionally mandated "accommodation process" should take into account the limitations imposed on those requests by separation of powers principles and the heightened executive privilege interests attending the communications of the White House.

Finally, Part IV assesses the mechanisms for enforcing congressional subpoenas and discusses legal issues commonly raised by congressional subpoenas directed to White House staff. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational demands. Although congressional committees have recently sued to enforce several subpoenas against executive officials, those lawsuits lack a foundation in our Nation's history and fall outside the constitutional and statutory jurisdiction of the federal courts. Congress and the Executive Branch have traditionally worked out their disputes through negotiation and compromise, and the Department of Justice believes that those time-tested methods are the appropriate means for resolving disputes over congressional information requests, no matter whether directed at the White House or the departments and agencies within the Executive Branch.

**I. Historical Background**

 **\*3** Article II of the Constitution establishes a unitary Executive Branch headed by the President, and it assigns to him an array of important functions, including responsibility for the Nation's foreign relations, military affairs, and law enforcement. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) ("The entire 'executive Power' belongs to the President alone."); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 550-51 (1977) (Rehnquist, J., dissenting) ("[T]he President is made the sole repository of the executive powers of the United States, and the powers entrusted to him as well as the duties imposed upon him are awesome indeed."). It is no surprise that, in a "world of extraordinary administrative complexity and near-incalculable presidential responsibilities," Presidents have consistently and increasingly turned to the "assistance of close aides" in the White House to carry out their duties. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2273 (2001).

The White House's modern organizational form traces to the EOP's creation in 1939 as "an institutional response to needs felt by every occupant of the Oval Office .... [T]hese were, and remain, needs for advice and assistance." Harold C. Relyea, *The Executive Office Concept*, in *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 4 (Harold C. Relyea ed., 1997). As one leading scholar put it a decade after its establishment, "[t]he creation of the Executive Office of the President was a milestone in the history of the Presidency." George A. Graham, *The Presidency and the Executive Office of the President*, 12 J. Pol. 599, 603 (1950); *see also* Wayne Coy, *Federal Executive Reorganization Re-examined: Basic Problems*, 40 Am. Pol. Sci. Rev. 1124, 1131-32 (1946) ("[T]he largest step toward enabling the President to 'take care' of

the effective operation of the administrative system occurred in 1939, with the establishment of the Executive Office of the President.").

Long before the EOP's establishment, Presidents received confidential advice and assistance from individuals other than department and agency heads. President Jackson sought help from a group of informal advisers known as the ""Kitchen Cabinet," which "performed most of the functions of a modern staff, serving his personal and political needs." Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 J. Am. Hist. 367, 379 (1978). Historians have characterized this group of informal advisers "as an early prototype of the President's White House staff, a group of personal aides providing the President with a variety of services." *Id.* at 378; *see also id.* (noting that Jackson's informal advisers shared his "perspective in overseeing the general direction of his administration, instead of the more limited perspective of department heads"). The tradition of Jackson-style kitchen cabinets continued for nearly a century: "John Tyler had his 'Virginia Schoolmasters'; Grover Cleveland maintained a 'Fishing Cabinet'; Teddy Roosevelt sported the 'Tennis Cabinet'; Warren Harding encouraged a 'Poker Cabinet'; [and] Herbert Hoover instituted a 'Medicine Ball Cabinet.'"D' Relyea, *The Executive Office Concept* at 43.

 **\*4**  During the 1920s, Congress considered several proposals to more formally establish the "administrative machinery" needed "to enable the President to discharge his managerial duties." Edward H. Hobbs, *An Historical Review of Plans for Presidential Staffing*, 21 L. & Contemp. Probs. 663, 670 (1956). Although these initial proposals were not adopted, the advent of the New Deal spurred lasting action. As the administrative state dramatically expanded, President Franklin D. Roosevelt realized that he needed more staff to enable him to carry out his mounting responsibilities. In early 1936, he established a three-member committee charged with "investigat[ing] and report[ing]" upon "the organization for the performance of the duties imposed upon the President in exercising the executive power vested in him by the Constitution of the United States." President's Committee on Administrative Management, *Administrative Management in the Government of the United States* 2 (1937) ("Brownlow Report"). The President's Committee on Administrative Management, more commonly known as the Brownlow Committee after its chair, "surveyed the landscape immediately after the spate of New Deal reforms, [and] found a President who although 'now ha[ving] popular responsibility' for the "direction and control of all departments and agencies of the Executive Branch ... [was] not equipped with adequate legal authority or administrative machinery to enable him to exercise it.'" Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2275.

The Brownlow Committee "drafted a blueprint for an administrative staff agency, which [it] labeled the Executive Office." Hobbs, *Plans for Presidential Staffing*, 21 L. & Contemp. Probs. at 674. The Committee's final report recommended that Congress "[e]xpand the White House staff so that the President may have a sufficient group of able assistants in his own office to keep him in closer and easier touch with the widespread affairs of administration and to make a speedier clearance of the knowledge needed for executive decision." Brownlow Report at 46. Stressing the urgent need for reform, the Committee included in its report a warning: "The President needs help. His immediate staff assistance is entirely inadequate." *Id.* at 5.[3]

President Roosevelt strongly endorsed the Committee's recommendations. He stated that "[t]he plain fact is that the present organization and equipment of the Executive Branch of the Government defeat the Constitutional intent that there be a single responsible Chief Executive to coordinate and manage the departments and activities in accordance with the laws enacted by the Congress." *A Recommendation for Legislation to Reorganize the Executive Branch of the Government* (Jan. 12, 1937), 5 Pub. Papers of Pres. Franklin D. Roosevelt 668, 670 (1938).

 **\*5**  Congress authorized President Roosevelt to establish the EOP under the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; soon thereafter, he issued Reorganization Plan No. 1, which became effective in July 1939, 4 Fed. Reg. 2727, 53 Stat. 1423. President Roosevelt implemented the reorganization plan by executive order, organizing the EOP into five divisions, each charged with a distinct mission. Notably, the White House Office would "serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." Exec. Order No. 8248, 4 Fed. Reg. 3864, 3864 (Sept. 8, 1939). The Order provided that presidential assistants would hold "no authority over anyone in any department or agency" and should "[i]n no event ... be interposed between the President and the head of any department or agency." *Id.*

EOP officials soon came to take a leading role in developing and coordinating policy recommendations for the President. Within its first decade, the EOP expanded to include entities specifically created for those purposes. The Council of Economic Advisers, for example, was established in the EOP in 1946 to "analyze and interpret economic developments" and "formulate and recommend national economic policy to promote full employment, production, and purchasing power under free competitive enterprise." Employment Act of 1946, Pub. L. No. 79-304, § 4(a), 60 Stat. 23, 24. A year later, the National Security Council was created to "advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving the national security." National Security Act of 1947, Pub. L. No. 80-253, § 101(a), 61 Stat. 495, 496.[4] By the end of the Truman Administration, the EOP had grown to eleven principal units. Harold C. Relyea, Cong. Research Serv., 98-606 GOV, *The Executive Office of the President: An Historical Overview* 9 (updated Nov. 26, 2008).

As the White House developed as an organization, all three branches of government recognized that it should be viewed differently from the departments and agencies of the Executive Branch. With respect to congressional oversight specifically, in the 1970s Assistant Attorneys General William Rehnquist and Antonin Scalia, among others, recognized that the President's immediate White House advisers must be treated differently from officials of the departments and agencies when Congress seeks their testimony. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974); *see also infra* Part IV.B.

**\*6** Congress and the federal courts similarly recognized the need to treat the President's inner circle of advisers differently under other federal laws. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). Thus, although the Freedom of Information Act ("FOIA") by its terms applies to the EOP, 5 U.S.C. § 552(f )(1), the Supreme Court held that Congress did not include "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quoting H.R. Rep. 93-1380, at 15 (1974) (Conf. Rep.)). Federal courts have accordingly limited FOIA to exclude various EOP components, making this determination by considering "how close operationally the [component] is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure." *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993); *see also, e.g., Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) (holding that Secret Service logs of visitors to such advise-and-assist EOP offices are not "agency records" for purposes of FOIA).

Congress similarly recognized that the President should have plenary discretion when it comes to hiring, paying, and organizing certain White House staff. In 1978, Congress authorized the President "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law." Pub. L. No. 95-570, 92 Stat. 2445, 2445 (codified at 3 U.S.C. § 105(a)). As this Office later observed, that statute "reflect[s] Congress's judgment that the President should have complete discretion in hiring staff with whom he interacts on a continuing basis." *Applicability of the Presidential Records Act to the White House Usher's Office*, 31 Op. O.L.C. 194, 197 (2007). As in the FOIA context, Congress thus viewed the advise-and-assist components of the White House as not only different from the departments and agencies, but also different from the other components of the EOP. *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009). Congress has continued to recognize that distinction up to the present day. *See, e.g.*, Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2(e), 128 Stat. 2003, 2006-07 (codified at 44 U.S.C. § 2209) (prohibiting "the immediate staff of the President" and any "unit or individual of the Executive Office of the President whose function is to advise and assist the President" from sending presidential records using nonofficial electronic message accounts).

**\*7** The White House continues to play a unique role in the Executive Branch, providing the President with close and confidential advice and assistance on a daily basis. The White House acts as the President's primary information-gathering and policy-development arm, and serves as "something of a central nervous system of the executive branch .... [It] is a 'force

multiplier.' Without it, the President would be greatly weakened in his struggle to instantiate his preferences within the executive branch." Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 714, 716 (2009). This memorandum opinion's remaining Parts explain how the White House's special status affects congressional oversight.

## II. Scope of Congressional Oversight Authority

Although "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," each House has implied authority to secure the information "needed" to legislate. *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted); *McGrain v. Daugherty*, 273 U.S. 135, 160-61 (1927). Each House may "make investigations and exact testimony, to the end that it may exercise its legislative function advisedly and effectively." *McGrain*, 273 U.S. at 161; *see also Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985) ("*Scope of Congressional Oversight*") ("It is beyond dispute that Congress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws."). The House and Senate typically exercise their investigative functions through delegations to committees, each of which has jurisdiction over identified legislative subjects and agencies. The investigative authority of each committee is bounded by its subject matter jurisdiction, as identified by the rules and resolutions of the relevant congressional chamber.

Congress's authority to investigate in furtherance of its power to legislate has come to be known as its "oversight" authority, but that shorthand term does not imply a general authority to review the actions of the Executive Branch. Congress may direct the departments and agencies through the enactment of appropriate legislation, but the Constitution does not otherwise confer on Congress or its committees an authority to "oversee" or direct the Executive Branch in the conduct of its assigned duties and responsibilities under Article II. Rather, because Congress enjoys an implied power of investigation that "is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 197). Two of these limitations have particular significance for congressional oversight of the White House. First, because a congressional oversight request "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress,'" it "must serve a 'valid legislative purpose.'" *Id.* (quoting *Watkins*, 354 U.S. at 187; *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Second, and relatedly, the scope of oversight authority is limited to subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, and therefore Congress "cannot inquire into matters which are within the exclusive province of one of the other branches of the Government," *Barenblatt v. United States*, 360 U.S. 109, 112 (1959), including any function committed exclusively to the President by the Constitution.[5]

### A. Legitimate Legislative Purpose

  **\*8**  Congress may conduct investigations only for legitimate legislative purposes. This Office has long counseled that "a threshold inquiry that should be made [by the Executive] upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986) ("*Independent Counsel Act Requests*"). As Assistant Attorney General William Barr explained, the Executive Branch need only assess its "interest in keeping [[requested] information confidential" after "it is established that Congress has a legitimate legislative purpose for its oversight inquiry" in the first place. *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*"); *see also Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. ___, at \*21 (June 13, 2019) ("*President's Tax Returns*") (reiterating this position).

Because Congress may obtain information only where it will advance a legitimate legislative purpose, the other branches of government must review congressional information requests to ensure that they are not motivated by an illegitimate purpose. As the Supreme Court recently explained in *Trump v. Mazars*:

-697-

Congress has no "'general' power to inquire into private affairs and compel disclosures," [*McGrain*, 273 U.S.] at 173-174, and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* at 187.

140 S. Ct. at 2032; *see also Branzburg v. Hayes*, 408 U.S. 665, 699 - 700 (1972) (a legislative committee "abuse[s] its proper function" when it exposes for the sake of exposure). Without these limits, the Court cautioned, "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense[.]" *Mazars*, 140 S. Ct. at 2034 (quoting *The Federalist* No. 71, at 484 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).[6]

Although courts, in reviewing subpoenas directed at private parties, have traditionally deferred to Congress's perceptions of its need for the information being sought, *see, e.g., Barenblatt*, 360 U.S. at 132, the Supreme Court in *Mazars* suggested that such a deferential approach does not extend to congressional subpoenas directed at the President's personal information because of the separation of powers principles at stake in any such request, *see* 140 S. Ct. at 2031; *see also id.* at 2034-36. In such cases, a court must "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose"; "[t]he more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* at 2036. Moreover, "unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation," it will be "impossible to conclude that a subpoena is designed to advance a valid legislative purpose." *Id.* (internal quotation marks omitted); *see also Watkins*, 354 U.S. at 201, 205-06 (reversing a contempt charge due to, among other things, a "vague" and "'broad" committee charter that rendered it "impossible ... to ascertain whether any legislative purpose justifie[d] the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function").

**\*9** The Supreme Court's review in *Mazars* of a House committee's pursuit of the President's financial information was consistent with how the Executive Branch has reviewed similar requests from Congress directed at the Executive Branch. Although the Executive Branch should seek to accommodate legitimate requests for information concerning the departments and agencies, this Office has advised that such accommodation may not be required where congressional committees' requests appear to fall outside their delegated legislative jurisdiction or lack a legitimate legislative purpose.

For instance, shortly before the *Mazars* decision, we concluded, based on reasoning similar to *Mazars*, that a request from the House Ways and Means Committee to the Department of the Treasury for the President's tax returns was not supported by a legitimate legislative purpose. *President's Tax Returns*, 43 Op. O.L.C. ___, at \*3. Although the committee sought records similar to those at issue in *Mazars*, the Chairman proffered a different reason for the request, claiming that the committee sought to evaluate the Internal Revenue Service's practice of auditing Presidents' tax returns. *Id.* at \*2, \*26-27. We advised that executive branch officials were not obliged simply to accept the committee's proffered legislative purpose at face value, but instead must "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *Id.* at \*17; *see also id.* at \*20 (noting the Executive Branch's obligation to "confirm[] the legitimacy of an investigative request," especially "when deferring to the request would effectively surrender the Executive's obligations to a Member of Congress"). In that case, the Chairman and other House leaders had made numerous public statements suggesting that the request was aimed at publicly exposing the President's tax returns, so "[n]o one could reasonably believe that the Committee [sought] six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process." *Id.* at \*16-17. We also stressed that the institutional reasons that have sometimes led courts to defer to Congress's stated legislative purpose in cases involving private parties do not apply to the Executive Branch, "which operates as a politically accountable check on the Legislative Branch." *Id.* at \*25. We concluded that the Chairman's stated legislative purpose for his request for the President's tax returns "blink[ed] reality" and was "pretextual," *id.* at \*16, and therefore was not legitimate.

This Office similarly questioned the legislative purpose underlying three House committees' joint request for documents related to American foreign and defense policy with respect to Ukraine. There, the three committees had announced an investigation

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

into the impeachment of the President, even though the full House had not delegated any such investigative jurisdiction to any of them. *House Committees' Authority to Investigate for Impeachment*, 44 Op. O.L.C. ___, at *47-49 (Jan. 19, 2020) ("*Authority to Investigate for Impeachment*"). In view of this basic legal defect in the requests, *see id.*, the committees supplemented them by claiming that they fell within their """"oversight and legislative jurisdiction." *Id.* at *8, *47 (internal quotation marks omitted).

  **\*10**  We concluded that this attempt to justify the request did not establish a legitimate legislative purpose, even though some of the requested materials might well have fallen within the oversight jurisdiction of one or more of the committees. The committee chairs had "made clear" in their official correspondence "that the committees were interested in the requested materials to support an investigation into the potential impeachment of the President, not to uncover information necessary for potential legislation within their respective areas of legislative jurisdiction." *Id.* at *48. We explained that "[t]he Executive Branch need not presume that [a legislative] purpose exists or accept a makeweight assertion of legislative jurisdiction." *Id.* at *47 (internal quotation marks omitted). We thus found that the committee chairmen were "seeking to do precisely what they said— compel the production of information to further an impeachment inquiry." *Id.* at *48. The inquiry therefore was made not to advance a legitimate legislative purpose, but instead to further an impeachment investigation that had not been authorized at the time the subpoenas were issued. *Id.* at *48-49.

We also emphasized the importance of committee jurisdiction, noting that "[a] congressional committee's 'right to exact testimony and to call for the production of documents' is limited by the 'controlling charter' the committee has received from the House." *Id.* at *2 (quoting *United States v. Rumely*, 345 U.S. 41, 44 (1953)); *see also id.* at *18-19 (discussing the committee jurisdiction requirement in the oversight and impeachment contexts); *Watkins*, 354 U.S. at 206 ("Plainly [the House's] committees are restricted to the missions delegated to them .... No witness can be compelled to make disclosures on matters outside that area.").

We think that the separation of powers principles described in *Mazars* and our recent opinions guide the appropriate approach to congressional oversight requests directed at the White House, which inherently raise separation of powers concerns. "[I]n assessing whether a subpoena directed" at the White House "is related to, and in furtherance of, a legitimate task of Congress," the White House "must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President." *Mazars*, 140 S. Ct. at 2035 (internal quotation marks omitted). Although *Mazars* addressed a subpoena that sought the President's personal financial information—requests that bear even more closely upon interests of confidentiality and the autonomy of the Executive Branch. The Court made clear that "congressional subpoenas for the President's information unavoidably pit the political branches against one another," *id.* at 2034, and therefore, all such requests necessarily raise separation of powers concerns. *See also id.* at 2030 (describing certain congressional requests for official documents as seeking "the President's information"). And the case for closely scrutinizing such requests is even stronger where it is not, as in *Mazars*, a court that is evaluating the request, but instead the Executive Branch during the constitutionally required accommodation process—one purpose of which is to provide a process for the Executive Branch to check an implied investigative power that otherwise has limited counterweights. *See President's Tax Returns*, 43 Op. O.L.C. ___, at *25-26; *see also infra* Part III.C (discussing the accommodation process).

  **\*11**  In such instances, we have advised that Congress may be expected to clearly articulate its legislative purpose, and the Executive Branch may independently review the proffered purpose. In considering a committee's legislative purpose, the White House should "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "The more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* The White House may fairly expect that the committee will provide a statement that "adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Id.* In reviewing such a statement, the White House may take into account all relevant facts and circumstances in ensuring that the congressional request serves a legitimate legislative purpose within the appropriate authority of the requesting committee.

## B. Exclusive Executive Functions

**-699-**

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 275 of 512
Case 1:21-cr-00670-CJN    Document 41-7    Filed 03/22/22    Page 9 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

Because congressional requests for information must "concern[] a subject on which legislation could be had," *U.S. Servicemen's Fund*, 421 U.S. at 506 (internal quotation marks omitted), Congress may not conduct oversight of the President's discharge of his exclusive constitutional authority. "Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 111?12; *see also Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain"). Congressional requests to the White House often run into this limitation to the extent they are directed at the President's exercise of his constitutional, rather than statutory, authorities.

This Office has observed that "[t]he Constitution assigns a variety of powers exclusively to the President" and "Congress may not intrude upon the President's exercise of [those] exclusive powers." Letter for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Inspector General for the Executive Office of the President* at 3 (July 24, 1996) (advising that proposed legislation to establish an inspector general for the EOP raised serious constitutional concerns). As we explained, "where the President is exercising, or has exercised, exclusive constitutional authority, Congress is wholly without authority to impose [disclosure] requirements on the President or the President's advisors." *Id.* Because Congress may not legislate with respect to the President's discharge of his exclusive constitutional functions, it similarly may not seek information from White House staff concerning the decision-making process in connection with the President's performance of those functions in particular matters.

 **\*12**   Attorney General Janet Reno drew this line in advising President Clinton with respect to a congressional subpoena seeking predecisional documents relating to a grant of clemency. The President's clemency decision, which is rooted in the pardon power, is a quintessential example of an exclusive executive power. *See Schick v. Reed*, 419 U.S. 256, 266 (1974) (the pardon power "flows from the Constitution ... and ... cannot be modified, abridged, or diminished by the Congress"). Attorney General Reno advised that Congress lacked the authority to subpoena the documents in question, because "[t]he granting of clemency pursuant to the pardon power is unquestionably an exclusive province of the executive branch," and thus "[a] compelling argument can be made ... that Congress has no authority whatsoever to review a President's clemency decision." *Clemency Decision*, 23 Op. O.L.C. at 2.[7] Consistent with this conclusion, she explained, "it appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision." *Id.* at 3-4.[8]

In 2007, Acting Attorney General Paul Clement cited the President's exclusive constitutional powers in advising President Bush regarding an assertion of executive privilege with respect to internal White House communications concerning the possible exercise of the President's exclusive authority to nominate and to dismiss U.S. Attorneys: "[T]here is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 3 (2007). As Acting Attorney General Clement explained:

The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults with members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.

*Id.*

This principle limiting the scope of Congress's oversight authority is consistent with the Supreme Court's refusal to tolerate legislation that intrudes on the President's exclusive constitutional powers and duties. Where the Constitution's text commits a power to the President exclusively, courts "refuse[] to tolerate *any* intrusion by the Legislative Branch." *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 485 (1989) (Kennedy, J., concurring in the judgment, joined by Rehnquist, C.J., and O'Connor, J.); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803) ("By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.").

**\*13**  The President's exclusive powers include the powers to pardon, to sign or veto legislation, to nominate and appoint officers of the United States, and to remove officers and other officials. *See Schick*, 419 U.S. at 266; *INS v. Chadha*, 462 U.S. 919, 946-48, 957-59 (1983) (holding the legislative veto an unconstitutional interference with President's duties pursuant to the Presentment Clause); *Buckley v. Valeo*, 424 U.S. 1, 138-39 (1976) (per curiam) ("Congress' power under [the Necessary and Proper] Clause is inevitably bounded by the express language of [the Appointments Clause]," and consequently Congress cannot provide for the appointment of "'Officers of the United States'DD" except through a procedure that "comports with" the Appointments Clause); *Myers*, 272 U.S. at 161 ("The authority of Congress given by the excepting clause to vest the appointment of such inferior officers in the heads of departments" does not "enable[] Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be ... to infringe the constitutional principle of the separation of governmental powers."). Thus, while Congress may request information pertaining to the broad range of matters about which it may legislate, that authority does not extend to authorities exclusively vested in the President, including the work that the White House staff does in advising and assisting the President in connection with the execution of those constitutional authorities.

The President's exclusive authorities also include his powers in the area of diplomacy and national defense, although in many cases those powers closely abut areas in which Congress may legislate. The Constitution entrusts the President with the "'vast share of responsibility for the conduct of our foreign relations'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). And that responsibility includes the "exclusive authority to conduct diplomacy on behalf of the United States." *Congressionally Mandated Notice Period for Withdrawing from the Open Skies Treaty*, 44 Op. O.L.C. ___, at \*11 (Sept. 22, 2020) (internal quotation marks omitted); *see also Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 121 (2011) (recognizing the President's "exclusive authority to determine the time, scope, and objectives of international negotiations" (internal quotation marks omitted)). The President's authority as Commander in Chief and Chief Executive also includes broad authority over the deployment and control of the military in protecting American persons and interests abroad. *See, e.g., Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61-62 (1941) (Jackson, Att'y Gen.); *Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 185 (1996) ( "It is for the President alone, as Commander-in-Chief, to make the choice of the particular personnel who are to exercise operational and tactical command functions over the U.S. Armed Forces."); *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 465 (1855) (Cushing, Att'y Gen.) (because the President "alone" is the "supreme commander-in-chief," Congress cannot "authorize or create any military officer not subordinate to the President"). The Executive Branch has consistently asserted the President's exclusive authority in these areas, and the Supreme Court has endorsed those principles.[9]

**\*14**  At the same time, Congress also has overlapping authority to legislate in matters touching upon foreign affairs and the national defense. Congress "clearly possesses significant Article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225-26 (2009). Congress established and is responsible for funding the Department of State and the Department of Defense— two departments that the President relies upon in the discharge of his constitutional powers— and Congress also has express legislative authority under Article I, Section 8, with respect to foreign trade; the raising, supporting, and regulation of the armed

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 277 of 512
Case 1:21-cr-00670-CJN    Document 41-7    Filed 03/22/22    Page 11 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

forces; and the declaration of war, among other powers. Congress's legislative authority in these areas provides a basis for seeking information in connection with these areas, and such oversight requests may sometimes reach the White House.

We have previously advised on these areas of exclusive and overlapping authority in connection with congressional oversight requests related to the protection of classified information. The Supreme Court has explained that the President may "classify and control access to information bearing on national security and ... determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information[.]" *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). This exclusive power primarily derives from his constitutional authority as "'Commander in Chief of the Army and Navy of the United States,'" *id.* (quoting U.S. Const. art. II, § 2, cl. 1), and "exists quite apart from any explicit congressional grant," *id.* Although Congress does not "entirely lack[[[]] authority to legislate in a manner that touches upon disclosure of classified information," it cannot intrude—through legislation or oversight— upon the President's control over national security information. *Security Clearance Adjudications by the DOJ Access Review Committee*, 35 Op. O.L.C. 86, 95-96 (2011); *see The Department of Defense's Authority to Conduct Background Investigations for Its Personnel*, 42 Op. O.L.C. ___, at *9 (Feb. 7, 2018) ("while Congress is not entirely disabled from participating in the system for protecting classified information, Congress may not impair the President's control over national security information").

In summary, because Congress's oversight authority extends only to those subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, the Executive Branch may properly review an oversight request directed at the White House to evaluate whether the request is directed at the discharge of an exclusive constitutional authority of the President or instead concerns a subject about which Congress may legislate.

### III. Constitutional Limits on Congressional Oversight of the White House

**\*15** Even when a congressional inquiry advances a legitimate legislative purpose, the separation of powers imposes other constraints on oversight of the White House. The accommodation process requires that "each branch ... take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.* ("AT&T"), 567 F.2d 121, 127 (D.C. Cir. 1977). As discussed below, the President's strong interests in the independence and autonomy of his office, as well as the confidentiality of his communications, justify corresponding restrictions on oversight of the White House.

Congressional requests for information from the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of [the] office [of the President] and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. In addition, oversight directed at the White House implicates heightened executive branch confidentiality interests, which are particularly strong with respect to White House communications. Accordingly, when oversight involves the White House, congressional committees and the White House must work to respect these constraints while accommodating the committees' legitimate information needs. These considerations mean that oversight requests directed to the White House are typically the exception, rather than the norm. Congress should generally seek information from the departments and agencies first before turning to the White House, and oversight requests to the White House must be tailored to accommodate the President's need for autonomy and confidentiality.

### A. Separation of Powers Principles

The President is the head of a co-equal branch of government. Congress and the President thus "have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Mazars*, 140 S. Ct. at 2033-34 (quoting *The Federalist* No. 51, at 349 (James Madison)). Consequently, congressional requests for information directed at the President and the White House are not "run-of-the-mill legislative effort[s]" and ""differ markedly" from" congressional requests directed toward others. *Id.* at 2034. The "significant separation of powers issues" raised by such requests ""'"necessarily inform[]"" the scope of and manner in which Congress may request such information. *Id.* at 2026, 2033. If Congress could freely demand the President's information, it would "''exert an imperious controul' over the Executive Branch and aggrandize itself at the

President's expense, just as the Framers feared." *Id.* at 2034 (quoting *The Federalist* No. 71, at 484). In the same way that the President must respect Congress's institutional prerogatives, Congress too must conduct oversight mindful of the independence and autonomy of the office of the President.

 **\*16**  Although the Supreme Court's opinion in *Mazars* discussed these principles in the context of congressional requests for the President's personal information, these separation of powers concerns also apply to requests for information from White House advisers, who assist the President "on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. ___, at \*5 (May 20, 2019) ("*Immunity of the Former Counsel*") (internal quotation marks omitted).

The Supreme Court recognized as much in *Cheney*, which addressed the special consideration owed to the White House in connection with demands for information made in a civil action. The Court held that the Judicial Branch must treat civil discovery requests directed at the President's senior advisers differently from discovery matters involving other executive branch personnel:

This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who ... give advice and make recommendations to the President. The Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives .... [S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated. This Court has held, on more than one occasion, that "[t]he high respect that is owed to the office of the Chief Executive ... is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and that the Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of litigation against it.

542 U.S. at 385 (citations omitted). While the purposes of congressional oversight and civil discovery are distinct, both involve requests from outside the Executive Branch. Just as separation of powers principles require the Judicial Branch to adjust the "timing and scope of discovery" directed at presidential advisers in civil litigation, congressional committees and White House personnel also must tailor the timing and scope of their oversight accommodations in ways that respect the President's interests in autonomy and confidentiality.

In *Cheney*, the Supreme Court reviewed the D.C. Circuit's denial of the Vice President's petition for a writ of mandamus vacating certain discovery orders issued by a district court. The plaintiffs had sued the Vice President and others alleging that the President's National Energy Policy Development Group had not complied with the disclosure requirements of the Federal Advisory Committee Act, 5 U.S.C. app. §§ 1-15. The district court ordered the plaintiffs to "submit a proposed discovery plan" for the court's approval. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 56 (D.D.C. 2002). Under the Federal Rules of Civil Procedure, a litigant "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Pursuant to this broad standard governing civil discovery, the plaintiffs in *Cheney* proposed a wide-ranging discovery plan, which called for the production of all documents and information concerning communications between individual National Energy Policy Development Group members outside the context of group meetings, between members and agency personnel, and between members and non-governmental individuals. The plaintiffs tried to use discovery to uncover confidential information concerning the deliberations of the President's closest advisers. The Government objected to the plan to the extent that it sought documents from the Vice President and White House officials and argued, among other things, "that in order to protect the separation of powers, the President should not be forced to consider the [executive] privilege question in response to unnecessarily broad or otherwise improper discovery." *See In re Cheney*, 334 F.3d 1096, 1105 (D.C. Cir. 2003) (internal quotation marks omitted).

 **\*17**  The district court nonetheless approved the discovery plan and directed that the Vice President and White House officials either "fully comply with" the discovery requests, "file detailed and precise objections to particular requests," or "identify and

-703-

explain their invocations of privilege with particularity." *Id.* at 1000 (internal quotation marks omitted). The Vice President petitioned the D.C. Circuit for a writ of mandamus vacating the discovery orders on the ground that the broad requests violated the separation of powers by unduly interfering with the President's constitutional prerogatives, but the D.C. Circuit denied the petition. *See id.* at 1109.

The Supreme Court reversed and remanded for the D.C. Circuit to consider whether the discovery orders "constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney,* 542 U.S. at 390. In so holding, the Court rejected the lower courts' view that executive branch interests could have been adequately protected by "invoking executive privilege and filing objections to the discovery orders with 'detailed precision.'" *Id.* at 377 (quoting *In re Cheney,* 334 F.3d at 1105). The Court explained that "special considerations control" when White House staff and other high-level officials are the subject of civil discovery requests, and that separation of powers concerns might necessitate narrowing or denying requests for information directed to such officials before there should arise any need to consider invoking executive privilege. *See id.* at 385, 390. Because the information "requests [were] directed to the Vice President and other senior Government officials who served on the [Group] to give advice and make recommendations to the President," the broad discovery orders threatened to impinge on the Executive's "interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Id.* at 385. Therefore, the D.C. Circuit was obliged to consider whether allowing the requests to go forward would be "an unwarranted impairment" of the Executive Branch's discharge of its constitutional responsibilities. *Id.* at 390.

The Court's reasoning in *Cheney,* which instructs courts to consider the President's interests in autonomy and confidentiality when fashioning orders authorizing civil discovery directed at the White House, applies with at least equal force to congressional oversight requests for information from the White House. Both congressional oversight and civil litigation often concern wide-ranging information requests that involve the production of documents and the taking of testimony. Just as civil litigation against the "Vice President and other senior Government officials who ... give advice and make recommendations to the President" does not entail "a routine discovery dispute," neither may congressional oversight of the White House be viewed as comparable to routine oversight of executive branch agencies. *Cf. Immunity of the Former Counsel,* 43 Op. O.L.C. ___, at *4 ("[T]he President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies."). In both situations, far-reaching inquiries threaten presidential autonomy and confidentiality. Thus, the separation of powers concerns recognized in *Cheney* support significant limitations on the timing and scope of congressional oversight inquiries directed to the White House.

**\*18**  If anything, the concerns underlying the Court's decision in *Cheney* apply with even greater force to congressional inquiries. Congress is the President's constitutional "rival" in a manner distinct from the Judiciary. *Mazars,* 140 S. Ct. at 2033 (internal quotation marks omitted). When Congress conducts oversight, a neutral decision-maker is not readily available to appropriately balance each party's interests. And unlike the courts' express authority to order discovery, Congress's subpoena power is an implied adjunct to its legislative powers that is justified as "an essential and appropriate auxiliary to the legislative function." *Id.* at 2031 (quoting *McGrain,* 273 U.S. 174); *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 559 (2012)* (opinion of Roberts, C.J.) (implied powers under the Necessary and Proper Clause are "incidental" and cannot be "great substantive and independent powers" (internal quotation marks omitted)). A plaintiff in a civil action, moreover, may well have a greater need for documents and other information than a congressional committee conducting oversight. Congressional oversight gathers information so that Congress may "exercise its legislative function advisedly and effectively," *McGrain,* 273 U.S. at 161; *see also Mazars,* 140 S. Ct. at 2031-32, while the purpose of civil discovery is to disclose "the basic issues and facts" to "the fullest practicable extent," *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682 (1958). As the D.C. Circuit thus has recognized, "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability[[] than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc). "[E]fforts to craft legislation involve predictive policy judgments that are not hampered in quite the same way when every scrap of potentially relevant evidence is not available [to Congress]." *Mazars,* 140 S. Ct. at 2036 (alterations and internal quotation marks omitted).

-704-

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

Furthermore, because Congress may not conduct oversight of the President's exclusive constitutional functions, legitimate congressional oversight inquiries will almost always pertain to executive branch implementation of statutory programs. But the departments and agencies, not the White House, principally administer such programs, and thus it is generally unnecessary for congressional committees to request information directly from the White House unless they are unable to obtain the information from agencies. As *Mazars* determined with respect to the President's personal information, to avoid unnecessary confrontation between the branches, "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs." *Id.* at 2035-36. That reasoning also applies to congressional requests for White House information. Because congressional oversight needs generally may be satisfied through requests to the departments and agencies, requests for information about programs administered outside the White House should be directed there in the first instance.

**\*19** *Mazars* and *Cheney* are the latest in a line of judicial precedent recognizing the separation of powers concerns underlying litigation or related requests directed at the President. But the Supreme Court has long recognized that safeguarding presidential autonomy and confidentiality is critical to honoring the separation of powers. *See Cheney*, 542 U.S. at 385. This principle was first articulated in *United States v. Burr*, where Chief Justice John Marshall, sitting at trial as a Circuit Justice, stated that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." 25 F. Cas. 187, 192 (C.C. Va. 1807) (No. 14,694). In *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Court held that a sitting or former President is absolutely immune from civil actions for damages arising from his official acts. Underlying this bright-line rule is the rationale that "[b]ecause of the singular importance of the President's duties, diversion of his energies ... would raise unique risks to the effective functioning of government." *Id.* at 751.[10] The President's energies may be inappropriately diverted by congressional oversight just as they may be by private litigation. *See Immunity of the Former Counsel*, 43 Op. O.L.C. ___, at \*5 (explaining that permitting congressional committees to compel the President's immediate advisers to testify would allow the committees to "harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain" and would force the advisers "to divert time and attention from their duties to the President" (internal quotation marks omitted)).

In the oversight context, the President's interest in the White House's autonomy may be compromised not only by congressional inquiries that distract personnel and drain critical resources, but also by the potential "chilling effect" such demands would have on the interactions between the President and his advisers. *See Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C. ___, at \*2 (July 12, 2019) ("Congressional questioning of the President's senior advisers would ... undermine the independence and candor of executive branch deliberations."). Intrusive congressional oversight of the White House's interaction with departments and agencies may cause White House staff members to conform their information-gathering and policy-formulation processes to the demands of Congress instead of the needs of the President. Yet the President needs his staff to provide him with frank and candid judgments to "accomplish[[[] [his] constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at 443. There is little doubt that intrusive oversight inquiries could chill and otherwise undermine these kinds of White House staff activities. *See Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 ("Congress' power of inquiry must not be permitted to negate the President's constitutional responsibility for managing and controlling affairs committed to the Executive Branch.").

**\*20** Closely related to the President's interest in securing the White House's autonomy is his interest in "safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. The Supreme Court has made clear that the President's interest in the confidentiality of his decisionmaking is a central component of the constitutional separation of powers. In *United States v. Nixon*, the Court stressed that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. 683, 708 (1974). Although *Nixon* concerned a judicial demand for documents protected by executive privilege, this Office has long expressed the view that "[the] reasons for the constitutional privilege have at least as much force when it is Congress, instead of a court, that is seeking information." *Congressional Requests*, 13 Op. O.L.C. at 156. Indeed, "the prospect that predecisional deliberative communications will be disclosed to Congress is, if anything, more likely to chill internal debate among executive branch advisers than the possibility of disclosure to the judicial branch." Memorandum for Janet Reno, Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demands to Interview Prosecutors*

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 281 of 512
Case 1:21-cr-00670-CJN    Document 41-7    Filed 03/22/22    Page 15 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

and Review Deliberative Documents in Closed Cases at 14-15 (Nov. 23, 1993).[11] Because many White House staff members enjoy extensive access to the President, play important roles in developing presidential policy, and often serve as the President's alter ego, the President's interest in the confidentiality of White House activities must be afforded considerable weight in assessing the legitimacy of an exercise of Congress's oversight functions.

## B. Executive Privilege and White House Information

The heightened executive privilege interests that apply to White House communications provide an additional basis for distinguishing oversight inquiries directed at the White House from oversight of departments and agencies. Presidents have invoked executive privilege since the earliest days of the Republic, and the Supreme Court has recognized the privilege and held it to be an implied power under the Constitution. *See Nixon*, 418 U.S. at 705, 708; *see also id.* at 711 ("Nowhere in the Constitution ... is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based."); *Congressional Requests*, 13 Op. O.L.C. at 154 (explaining that the existence of executive privilege is a "necessary corollary of the executive function vested in the President by Article II of the Constitution"). The Court has described the privilege as "deriv[ing] from the supremacy of each branch within its own assigned area of constitutional duties," "fundamental to the operation of Government," "and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 705, 708. The privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch," and, as a result, "information subject to executive privilege deserves the greatest protection consistent with the fair administration of justice." *Mazars*, 140 S. Ct. at 2032 (internal quotation marks omitted).

**\*21** There are at least five well-recognized, and sometimes overlapping, components of executive privilege: national security and foreign affairs, law enforcement, deliberative process, attorney-client communications and attorney work product, and presidential communications. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. ___, at \*8 & n.2 (May 23, 2019) ("*Exclusion of Agency Counsel*"); *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 8 (2008); *Executive Privilege: The With-holding of Information by the Executive: Hearing on S. 1125 Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92nd Cong. 420 (1971) (statement of William Rehnquist, Assistant Attorney General, Office of Legal Counsel). Generally speaking, the national security and foreign affairs component is *absolute* protection for materials the release of which would jeopardize sensitive diplomatic, national security, or military matters, including classified information and diplomatic communications.[12] Similarly, the law enforcement component of the privilege gives the Executive Branch a near-absolute right to withhold from Congress information that would compromise ongoing law enforcement activities.[13] Both of these components of executive privilege are deeply rooted in the Constitution and the Nation's history.

Congressional inquiries to the White House more often implicate the deliberative process, the attorney-client communications and attorney work product, and particularly the presidential communications components of executive privilege. These components are also deeply rooted, and they protect from disclosure internal communications and information concerning presidential and other executive branch decision-making. They are based on the principle that the effective operation of the Executive Branch depends on shielding deliberative communications and advice from disclosure. *See Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 484-97 (1982) ("*Attorney General's Communications*").

The deliberative process component of executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" and protects all executive branch documents that reflect advisory opinions, recommendations, and other deliberative communications generated during governmental decision-making. *Mazars*, 140 S. Ct. at 2032; *see In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see also Congressional Requests*, 13 Op. O.L.C. at 156-57 & n.3 (explaining the applicability of this component in the context of congressional requests for information). The deliberative process component is premised on the fact that disclosing the "communications and the ingredients of the decisionmaking process" would inevitably

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

cause "injury to the quality of agency decisions" by inhibiting """"frank discussion of legal or policy matters."DD' *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 151 (1975) (citation omitted). As the Supreme Court explained in *Nixon*:

**\*22**  [There is a] valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.

418 U.S. at 705; *see also Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (explaining that the deliberative process component "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them" (internal quotation marks and citation omitted)). The deliberative process component of executive privilege applies especially strongly when the deliberations in question are ongoing. *See Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security*, 44 Op. O.L.C. ___, at *10-11 (Jan. 17, 2020) ("*Publication of Report on Imports*"). But the deliberative process component has certain limits: It protects predecisional and deliberative materials and typically does not "shield documents that simply state or explain a decision the government has already made or protect material that is purely factual." *Sealed Case*, 121 F.3d at 737. Agencies may withhold factual information only to the extent it is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Id.*

The attorney-client communications and attorney work product component of executive privilege protects executive branch communications and documents that involve legal analysis, legal advice, and other attorney communications or work product. *See Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (Reno, Att'y Gen.) (recognizing that "[e]xecutive privilege applies" to certain documents "because of their deliberative nature, and because they fall within the scope of the attorney-client privilege and the work-product doctrine"). Often, such communications will be protected by the deliberative process component in addition to the attorney-client and attorney work product component. Yet "'the reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved,'" because "'legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice.'" *Attorney General's Communications*, 6 Op. O.L.C. at 490 n.17 (citation omitted); *see also Constitutionality of the OLC Reporting Act of 2008*, 32 Op. O.L.C. 14, 17 (2008) (Mukasey, Att'y Gen.) ("[I]f executive branch officials are to execute their constitutional and statutory responsibilities, they must have access to candid and confidential legal advice and assistance.").

**\*23**  The presidential communications component of executive privilege, which is the most salient component for White House purposes, protects communications made in connection with presidential decision-making. *See Nixon*, 418 U.S. at 708 (explaining importance of presidential communications privilege in government operations); *Sealed Case*, 121 F.3d at 746 (explaining that the "presidential [communications] privilege affords greater protection against disclosure" than the deliberative process privilege); Memorandum for the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee* at 13 (Jan. 13, 1981) ("*Executive Branch Deliberations*"). Although the presidential communications component applies only to presidential decision-making, it is broader than the deliberative process component in terms of the types of communications that are protected. *All* presidential communications are "presumptively privileged" and protected from disclosure, including post-decisional exchanges and documents conveying purely factual information. *Nixon*, 418 U.S. at 708, 713-14 (explaining that a presumptive privilege applies to the President's """"conversations and correspondence"); *see also Sealed Case*, 121 F.3d at 745 ("[U]nlike the deliberative process privilege, the presidential communications privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."). In addition, this component of executive privilege covers communications between the President and agencies concerning presidential decision-making, including communications concerning the exercise of statutory authority. *See Publication of Report on Imports*, 44 Op. O.L.C. ___, at *7-9.

-707-

The presidential communications component of executive privilege is not limited to exchanges directly involving the President. The Supreme Court emphasized in *Nixon* that the "President *and those who assist him* must be free to explore alternatives in the process of shaping policies and making decisions," *418 U.S. at 708* (emphasis added), and explicitly described the privilege as protecting communications within the President's "office," *id.* at 712-13. We have consistently recognized that for the President to obtain full, frank, and complete advice, the presidential communications component must apply to deliberations among the President's advisers and their staffs. *See, e.g., Attorney General's Communications*, 6 Op. O.L.C. at 485-86 & n.11 (explaining that the presidential communications privilege protects the presidential "decisionmaking process" and, therefore, can apply to the work of presidential advisers).

The D.C. Circuit agreed in 1997, when it held that "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President." *Sealed Case*, 121 F.3d at 751-52. In reaching this conclusion, the court, echoing the Supreme Court's analysis in *Nixon*, warned that "[i]f presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered, but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems." *Id.* at 750. Excluding presidential advisers and their staffs from the presidential communications component would hinder the President's "access to honest and informed advice" and limit his "ability to explore possible policy options." *Id.* at 751. A narrower privilege would "impede ... the presidency," *id.*, and diminish the quality of presidential decisions:

*24  Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air—if they do, their advice is not likely to be worth much. Rather, the most valuable advisers will investigate the factual context of a problem in detail, obtain input from all others with significant expertise in the area, and perform detailed analyses of several different policy options before coming to closure on a recommendation for the Chief Executive. The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.

*Id.* at 750.[14]

Against this backdrop, communications within the White House and between White House staff and other EOP components that concern possible presidential decision-making will normally fall under the presidential communications component of executive privilege, and not just the deliberative process or attorney-client communications and attorney work product components that apply to all government agencies and that are most commonly implicated when congressional committees make oversight requests of executive agencies. *See Executive Branch Deliberations* at 12 (concluding that "'presidential' communications ... presumably [include] discussions among the President's aides and *officials in the Executive Office of the President*" (emphasis added)). Consequently, a congressional request for internal White House communications and intraEOP communications will frequently implicate the presidential communications component of executive privilege. As a result, oversight directed at the White House will typically involve privilege interests that are, on the whole, considerably greater than those arising solely in the agency context, where other components are more commonly implicated.

### C. The Accommodation Process for Oversight of the White House

Given the President's interests in autonomy and confidentiality, the accommodation process will often lead to a different balance when applied to the White House as compared to the departments and agencies. It is long-standing executive branch policy that upon receipt of an authorized oversight request that is in furtherance of a legitimate legislative purpose, departments and agencies should "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Memorandum for Heads of Executive Departments and Agencies from Ronald Reagan, *Re: Procedures Governing Responses to Congressional Requests for Information* at 1 (Nov. 4, 1982) ("Reagan Memorandum"). The manner of that compliance is determined by the operation of the accommodation process mandated by the Constitution, recognized by the Judicial Branch, and practiced by the Executive and Legislative Branches. "Historically, good

faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege," and "this tradition of accommodation" has remained "the primary means of resolving conflicts between the Branches." *Id.*

**\*25** The Supreme Court has also recognized that disputes over congressional demands for executive documents ordinarily "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting *Executive Privilege— Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel)). Since the Washington Administration, the Executive Branch has resisted congressional information demands that were overly burdensome or threatened to impair "the public good." *Id.* at 2029-30 (internal quotation marks omitted). Executive branch resistance, in turn, has often been met by congressional pressure, which was then followed by subsequent negotiations between the branches. In most instances, Congress and the Executive Branch have reached a compromise in which Congress might, for example, narrow the scope of its request or better articulate its needs, and the Executive Branch might, for example, supply a subset of the requested documents, provide summaries of the information requested, or permit *in camera* review of particular documents. *Id.* This long-standing "tradition of negotiation and compromise" stands at the heart of the accommodation process. *Id.* at 2031.

In *AT&T*, the D.C. Circuit discussed the constitutional foundations for the accommodation process. 567 F.2d 121. There, the Department of Justice sought to enjoin AT&T from complying with a congressional subpoena that the Executive Branch believed implicated highly classified information, the disclosure of which would be detrimental to national security. The D.C. Circuit declined to decide the case on the merits and instead mandated a "procedure giv[ing] promise of satisfying the substantial needs of both [branches]." *Id.* at 123. The court stated:

The framers ... expect[ed] that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system .... [E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.

*Id.* at 127. "[T]he resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system." *Id.* at 130.

In light of this history and precedent, both the Executive Branch and Congress have recognized their respective constitutional obligations to seek accommodation through good faith negotiations over their respective interests. *See, e.g.*, Elizabeth B. Bazan & Morton Rosenberg, Cong. Research Serv., *Congressional Oversight of Judges and Justices* 10 (May 31, 2005) ("Although the accommodation process between Congress and the Executive Branch is conducted in a highly political atmosphere, the arguments made by each side are usually grounded in legal doctrine and rely heavily on their interpretations and past experiences. At times, the Executive Branch is able to persuade Congress that a particular request is insufficiently weighty[.]"); *Congressional Requests*, 13 Op. O.L.C. at 159 ("The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other."); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (Smith, Att'y Gen.) ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."). The accommodation process has usually proved successful in reconciling congressional informational needs with the Executive Branch's interests, and so congressional committees rarely pursue citing executive branch officials for contempt of Congress to enforce their document and testimonial subpoenas, *see infra* Part IV.A, and Presidents rarely invoke executive privilege.

**\*26** Because the accommodation process is premised upon working out each branch's needs and interests, the outcome of that process may differ when it comes to the White House. As explained in Part I, the White House functions separately from the departments and agencies and historically has been "a combined administrative, advisory, planning, and policy-formulating

office serving the President in an intimate, indispensable capacity." Clinton L. Rossiter, *The Constitutional Significance of the Executive Office of the President*, 43 Am. Pol. Sci. Rev. 1206, 1215 (1949). To a much greater degree than other parts of the Executive Branch, the White House serves to advise and assist the President, particularly in the discharge of his constitutional functions. Although there may be occasions when a congressional committee can appropriately seek information from the White House, particularly where the President is charged with the discharge of statutory functions, the separation of powers principles discussed above impose significant constraints on White House oversight, as reflected in long-standing practice.[15] The timing and scope of inquiries directed to the White House, and the accommodations offered by the White House, must be sensitive to the President's interests in autonomy and confidentiality, as well as the heightened confidentiality interests in White House communications. They also must reflect the different balance of needs and interests that applies to oversight of the White House: Congressional needs are often more attenuated (because it is the departments and agencies that administer most statutory programs), and the Executive Branch's institutional interests are greater (based on the President's need for autonomy and the heightened confidentiality interests).

As with all oversight requests, the White House may properly insist that a congressional committee articulate a legitimate legislative purpose for inquiries directed at the White House. *See Barenblatt*, 360 U.S. at 111-12; *Watkins*, 354 U.S. at 187. The committee's legislative purpose should be ""carefully assess[ed]," whether or not the information sought is likely to be protected by executive privilege. *Mazars*, 140 S. Ct. at 2035. The White House should independently "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *President's Tax Returns*, 43 Op. O.L.C. ___, at *17. If the legitimate purpose underlying the oversight request appears unclear, White House staff may request that the committee clarify that purpose. *See id.* at *26 ("The separation of powers would be dramatically impaired were the Executive required to ... accept[] the legitimacy of any reason proffered by Congress, even in the face of clear evidence to the contrary."). The White House must take care to ensure that the requests involve a legitimate legislative purpose and do not intrude upon the exclusive constitutional prerogatives of the President.

 *27  In addition, because any congressional inquiry must respect the ""autonomy" of the President's close advisers and "the confidentiality of [[[their) communications," *Cheney*, 542 U.S. at 385, a congressional committee seeking information about a statutory program should generally be directed first to the agency that administers the program in question. *See Mazars*, 140 S. Ct. at 2035-36 (explaining that "[o]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible" and that "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs" (internal quotation marks omitted)). This practice of exhaustion is rooted in separation of powers principles and the practical realities of White House operations. It is crucial to the functioning of the Executive Branch that White House staff members be able to perform their functions independently and effectively in service of the President. Congressional efforts to conduct extensive and time-consuming oversight of the White House could seriously interfere with that mission. When information Congress seeks is available from an agency, there is no reason to subject the President's advisers to potentially burdensome oversight requests, especially because aspects of their work are far more likely to implicate the presidential communications component of executive privilege.[16]

Accordingly, when faced with a congressional request for information that reasonably could be acquired from a department or agency, White House staff often advise the relevant committee that it should pursue its request there. Only if the committee has exhausted the possibility of obtaining the necessary information elsewhere, and has determined that the necessary information may be obtained only from the White House, should the committee direct its inquiry to the White House.

When a committee's request to the White House concerns statutory functions, is within the committee's delegated oversight authority, and rests on a legitimate legislative purpose—and after the committee has attempted to seek such information from any relevant agencies—then the White House should consider how to accommodate the committee's needs in a manner consistent with the interests of the Executive Branch. *See AT&T*, 567 F.2d at 127. An important feature of the accommodation process is the dialogue that takes place between the committee and the White House to ensure that information requests are not "unnecessarily broad." *Cheney*, 542 U.S. at 390. Given the separation of powers principles at stake, these negotiations can help "narrow the

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

scope of possible conflict between the branches," and ensure that a request is "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

**\*28** The accommodation process has several rules of the road. First, the White House may properly demand that Congress's request be reasonably specific. "The specificity of [a committee's] request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney*, 542 U.S. at 387). A committee should clearly explain the nature and scope of its request and provide the White House with an opportunity to seek further explanation if the White House believes that the request is vague or otherwise ambiguous. Second, the "burdens imposed by a congressional [request] should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas [or other requests] for institutional advantage." *Id.* Finally, given the relatively small staff and resources available in the White House, the committee must afford the White House sufficient time to respond to its inquiry and flexibility in its manner and mode of response.

In light of these considerations, the White House typically seeks to accommodate congressional requests by providing written responses or oral briefings on relevant activities or policies, supplemented sometimes by the production of specific non-privileged documents. The White House does not ordinarily undertake the burden of reviewing and producing e-mails and other documents, which generally will consist primarily of deliberative communications within the White House or between the White House and other parts of the Executive Branch. Searching through and processing the thousands of presumptively privileged e-mails likely to be responsive to a single request undoubtedly would divert the relatively small White House staff from its important work for the President. Further, the practice of providing written responses and oral briefings instead of e-mails and other internal communications helps preserve the President's ability to obtain full and frank advice from White House staff. This is critical to avoid chilling the candor of White House communications, since "[t]he President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers." *Sealed Case*, 121 F.3d at 750.

Such responses and briefings, in lieu of documents, are generally sufficient to satisfy the legitimate information needs of congressional committees. As noted above, because the purpose of oversight is to enable Congress to "exercise its legislative function advisedly and effectively," *McGrain*, 273 U.S. at 161, rarely do the "legislative judgments" informed by the oversight process depend on a "precise reconstruction of past events," *Senate Select Comm.*, 498 F.2d at 732; *see Mazars*, 140 S. Ct. at 2036; *Authority to Investigate for Impeachment*, 44 Op. O.L.C., at \*10. Moreover, "'Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.'" *Congressional Requests*, 13 Op. O.L.C. at 159 (citation omitted). Although in appropriate circumstances agencies may offer the accommodation of access to deliberative materials (permitting them to be read but not copied, for example), such an accommodation would be quite unusual for internal White House and intra-EOP deliberative communications because of the President's unique need for autonomy and heightened confidentiality interests.

### IV. Congressional Subpoenas to the White House

**\*29** We next turn to consider the procedures by which congressional committees may issue and seek to enforce subpoenas. Drawing on the constitutional principles discussed in the prior Parts, we outline some of the grounds on which the Executive Branch has commonly objected to the scope or enforceability of congressional subpoenas.

### A. Issuance and Enforcement of Subpoenas

Congress's subpoena power is inherent in its investigative authority. *See Mazars*, 140 S. Ct. at 2031; *U.S. Servicemen's Fund*, 421 U.S. at 504 (observing that the issuance of subpoenas "has long been held to be a legitimate use by Congress of its power to investigate"); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 81-82 (discussing congressional authority to issue subpoenas). Because the authority to issue subpoenas is an inherent constitutional power, Congress does not need statutory authorization to issue a subpoena, but any "exercise of subpoena power must be authorized by the relevant House." *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82 (citing *Reed v. Cty. Comm'rs*, 277 U.S. 376, 389 (1928); *McGrain*, 273 U.S. at 158);

*see also Authority to Investigate for Impeachment*, 44 Op. O.L.C. ___, at *19 ("a committee's authority to compel the production of documents and testimony depends entirely upon the jurisdiction provided by the terms of the House's delegation").

The Senate rules provide committees with the authority to subpoena witnesses, "correspondence, books, papers, and documents," Senate Rule XXVI(1), and similarly the rules of the House of Representatives authorize committees to subpoena "witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as [they] consider[] necessary," House Rule XI.2(m)(1)(B). The precise procedures for issuing a subpoena vary depending on the rules of the chamber and committee involved. *See* Michael L. Koempel, Cong. Research Serv., R44247, *A Survey of House and Senate Committee Rules on Subpoenas* 5- 16 (Jan. 29, 2018) ("*Survey of Committee Rules*") (detailing House and Senate chamber and committee rules on subpoena procedures). In the House, subpoenas generally may be issued by a committee "only when authorized by the committee ..., a majority being present," but committees may delegate that power to "the chair of the committee under such rules and under such limitations as the committee may prescribe." House Rule XI.2(m)(3)(A)(i); *see also Survey of Committee Rules* at 1 ("[m]ost House committees" have delegated subpoena power to their chairs). The Senate's standing rules delegate to each committee responsibility for establishing subpoena procedures, and the procedures vary widely. *See* Senate Rule XXVI(2).

During Watergate and on several occasions more recently, congressional committees have turned to the federal courts seeking the enforcement of subpoenas against executive branch officials. This is a marked departure from long-standing practice: "Historically, disputes over congressional demands for presidential documents have not ended up in court." *Mazars*, 140 S. Ct. at 2029; *see Comm. on the Judiciary v. McGahn*, 968 F.3d 755, 777 (D.C. Cir. 2020) (en banc) (noting that "there have been relatively few" such cases). The Supreme Court has recognized that "Congress and the Executive have nonetheless managed for over two centuries to resolve" privilege disputes without recourse to the Supreme Court. *Mazars*, 140 S. Ct. at 2031. And although *Mazars* arose in an unusual posture that made it justiciable—because the President in his personal capacity sought to require his accountants to comply with their confidentiality obligations—that case was the first such dispute to reach the Supreme Court. *See id.* ("we have never considered a dispute over a congressional subpoena for the President's records").

 **\*30**  In recent decades, the Department of Justice has maintained that a congressional suit to enforce a subpoena against the Executive Branch is not justiciable.[17] First, such a lawsuit typically alleges an abstract "type of institutional injury (the diminution of legislative power)" that does not constitute a "'concrete and particularized'DD' legal injury as required for Article III standing—a doctrine that applies "especially rigorous[ly]" in separation of powers cases. *Raines v. Byrd*, 521 U.S. 811, 819-21 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Second, as noted above, such suits were nearly unprecedented as a historical matter, despite the history of oversight disputes between Congress and the Executive Branch going back to the First Congress, and thus are not "'traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008) ("history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider"). It was not until 1974— almost two centuries after the Constitution's ratification—that a committee of Congress appears to have first brought a civil action attempting to compel executive branch compliance with a subpoena. *See Senate Select Comm.*, 498 F.2d 725. In that case, a statute purported to give the District Court for the District of Columbia jurisdiction in "any civil action" brought by the Senate committee investigating the Watergate scandal to "enforce and secure a declaration concerning the validity of any subpoena." Pub. L. No. 93-190, § (a), 87 Stat. 736, 736 (1973); *see also Senate Select Comm.*, 498 F.2d at 727-28 (explaining the jurisdiction conferred by the special law). The court of appeals did not address whether the case was justiciable as a constitutional matter. No committee of Congress brought a subpoenaenforcement action again until 2008, when House committees began filing such suits with some regularity.[18]

Earlier this year, a panel of the D.C. Circuit agreed with the Department and dismissed a congressional suit seeking enforcement of a subpoena to the former Counsel to the President. *Comm. on the Judiciary v. McGahn*, 951 F.3d 510 (D.C. Cir. 2020), *vacated on reh'g en banc*, 968 F.3d 755. The panel concluded that "separation-of-powers principles and historical practice" bar federal courts from exercising jurisdiction over committee suits "to enforce a congressional subpoena against the Executive Branch." *Id.* at 522. The court reheard the case en banc and vacated that ruling, holding that congressional committees could

assert informational injuries no less than private parties because the constitutional separation of powers erects no "structural barrier to judicial involvement in informational disputes between the elected branches." *McGahn*, 968 F.3d at 768. *But see id.* at 783-84 (Griffith, J., dissenting) (faulting the majority for "its neglect of the interbranch nature of this dispute"). On remand, however, the panel held that congressional committees nonetheless lack a cause of action to seek judicial enforcement of a subpoena in this context. *McGahn*, 973 F.3d 121 (D.C. Cir. 2020), *reh'g en banc granted*, No. 19-5331 (Oct. 15, 2020).

 **\*31**  As the panel recognized, even if congressional suits to enforce subpoenas to the Executive Branch were justiciable, they fall outside the statutory jurisdiction of the federal courts and are unsupported by any cause of action. Although committees have relied upon the federal-question statute, 28 U.S.C. § 1331, as a basis for subject-matter jurisdiction, a more specific statute governs jurisdiction over congressional subpoena-enforcement suits, *id.* § 1365(a). This latter statute provides jurisdiction only for Senate actions, and more importantly excludes all actions to enforce subpoenas against executive branch officials who raise "a governmental privilege." *Id.; see McGahn*, 951 F.3d at 522 ("The obvious effect of section 1365(a)'s carve-out is to keep interbranch information disputes like this one out of court."). Indeed, the carve-out sought to accommodate the Executive Branch's view, expressed by then-Assistant Attorney General Scalia, that "the Supreme Court should not and would not undertake to adjudicate the validity of the assertion of executive privilege against the Congress." *Executive Privilege— Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 83 (1975) (statement of Assistant Attorney General Scalia); *see also id.* at 84 ("[T]he courts are precisely not the forum in which this issue should be resolved.").

Moreover, in addition to lacking a statutory basis for jurisdiction, House committees lack any cause of action to enforce their subpoenas. The statute that provides a cause of action to enforce Senate subpoenas, 2 U.S.C. § 288d, like section 1365(a), applies only to the Senate (and imposes various restrictions). That limitation (among other considerations) also makes clear, as the *McGahn* panel explained, that neither an implied cause of action under Article I of the Constitution nor an equitable cause of action is available to the House in this context. *See* 973 F.3d at 123-24; *see also id.* at 124-25 (applying Supreme Court and circuit precedent to reject the argument that the Declaratory Judgment Act, 28 U.S.C. § 2201, provides a cause of action). As the Supreme Court has recognized, Congress's authority "to compel production of evidence differs widely from authority to invoke judicial power for that purpose." *Reed*, 277 U.S. at 389.

In the 1980s, this Office opined that these civil suits do lie within the constitutional and statutory jurisdiction of the federal courts and are appropriate for judicial resolution. *See Independent Counsel Act Requests*, 10 Op. O.L.C. at 87-89; *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 (1984) ("*Prosecution for Contempt of Congress*").[19] But those statements preceded significant decisions in which the Supreme Court clarified the requirements of Article III standing (most notably *Raines v. Byrd* ) and amendments to 28 U.S.C. § 1365(a) enacted in 1996 that confirm Congress's intent to bar inter-branch informational disputes from federal court. *See McGahn*, 951 F.3d at 522 (discussing 1996 legislative history). In fact, the author of one such OLC opinion, Assistant Attorney General Theodore Olson, argued while later serving as Solicitor General that these developments in the law undermined the Department's earlier view. *See* Defendant's Memorandum of Points & Auths. in Reply to Plaintiff's Opposition to Motion to Dismiss, *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002) (No. 02-340), 2002 WL 32388026 (relying on *Raines* to argue that a suit brought by the Comptroller General against executive branch officials was nonjusticiable). This Office was consulted on that brief at the time, and we continue to think that these developments in the law support the Department's current view that Congress may not properly seek to enforce its subpoenas in federal court against executive branch officials.

 **\*32**  Congress has increasingly turned to civil enforcement suits as an alternative to traditional efforts to compel executive branch officials to provide information that Congress has requested. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational demands. Congress has the power of the purse, *see* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"), as well as the power to impeach and remove executive officers, *see id.* § 2, cl. 5; *id.* § 3, cls. 6-7, and the Senate's consent is necessary for the appointments of many senior executive officers, *see id.* art. II, § 2, cl. 2. Congress also may press its case directly to the press and to the public at large. Those powers have frequently been deployed

-713-

**CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)**

as a means of ensuring that the Executive Branch acts in accord with the "tradition of negotiation and compromise," *Mazars, 140 S. Ct. at 2031*, that has led to the successful resolution of many oversight disputes.

Congress also has other, more direct means of ensuring compliance with subpoenas. One theoretical option would be for the House or Senate to invoke its inherent contempt powers and instruct the Sergeant-at-Arms to arrest an individual cited for contempt. *See Jurney v. MacCracken*, 294 U.S. 125 (1935); *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821). How-ever, Congress has not sought to arrest any person for contempt in more than 80 years, *see Independent Counsel Act Requests*, 10 Op. O.L.C. at 86, and has not sought to arrest an executive branch official in more than a century, *see McGahn*, 968 F.3d at 776. Any effort by Congress to arrest a White House official for noncompliance with a subpoena based upon a legitimate separation of powers objection would, besides raising serious practical concerns, likely be unconstitutional. *See Immunity of the Former Counsel*, 43 Op. O.L.C. ___, at *20-21 ("The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." (internal quotation marks omitted)). Congressional authority to arrest executive officials for actions properly taken to protect the prerogatives of the Executive Branch is the type of "great substantive and independent power[]" that the Constitution would not have left to mere implication. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 559 (opinion of Roberts, C.J.) (internal quotation marks omitted).

To complement its inherent contempt power, Congress in the midnineteenth century enacted a criminal statute to prohibit defiance of a congressional subpoena. *See* 2 U.S.C. § 192. Under the statute, where a person who is summoned to give testimony or to produce papers and "willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry," *id.*, the President of the Senate or the Speaker of the House may refer to an "appropriate United States attorney" for prosecution an individual who refuses to comply with a subpoena. *Id.* § 194. Congress has invoked the criminal contempt statute against private parties and executive branch officials as well.

 **\*33**  We have long maintained, however, that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch. *See Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 129-42. Moreover, given that the prosecution authority is part of the executive power, Congress may only *refer* an individual to a United States Attorney for a contempt prosecution; the Department of Justice ultimately has the prosecutorial discretion to decide whether a person should be indicted and prosecuted. *See Nixon*, 418 U.S. at 693 ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 119-20 (Department of Justice controls whether any contempt prosecution will be brought). In response to criminal referrals for two White House officials in 2008, for instance, Attorney General Michael Mukasey notified the Speaker of the House that the Department of Justice would "not bring the congressional contempt citations before a grand jury or take any other action to prosecute," because, in light of the President's assertions of executive privilege, the "non-compliance by [the President's Chief of Staff] and [the former Counsel to the President] ... did not constitute a crime." Letter for Nancy Pelosi, Speaker of the House, from Michael B. Mukasey, Attorney General at 2 (Feb. 29, 2008); *see also Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 128 (contempt statute does not override the Executive's prosecutorial discretion); *Prosecutorial Discretion Regarding Citations for Contempt of Congress*, 38 Op. O.L.C. 1, 2-3 (2014) (same).

Congressional committees have generally sought enforcement of subpoenas against noncompliant witnesses only with an authorization from the *full* House or Senate. *See* 2 U.S.C. § 288b(b) (requiring "adoption of a resolution by the Senate" to authorize a Senate subpoena-enforcement suit); House Rule XI.2(m)(3)(C) ("Compliance with a subpoena issued by a [House] committee or subcommittee ... may be enforced only as authorized or directed by the House."); Cong. Research Serv., RL30548, *Hearings in the U.S. Senate: A Guide for Preparation and Procedure* 11 (Mar. 18, 2010) ("Compliance with a [Senate committee] subpoena can be enforced only at the direction of the Senate."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82-83 (discussing procedures for enforcing House subpoenas).[20] If the committee seeks to enforce the subpoena by holding the recipient in contempt, the committee (by a majority vote) must seek such approval by "report[ing] a resolution of contempt to the floor." Louis Fisher, Cong. Research Serv., *Congressional Investigations: Subpoenas and Contempt Power* 7 (Apr. 2,

-714-

2003) ("*Subpoenas and Contempt Power* "); *see also* 2 U.S.C. § 194 (requiring, for a contempt of Congress prosecution, that noncompliance with a subpoena be reported to the House or Senate, or House or Senate leadership if Congress is not in session). The full House or Senate must then "vote in support of the contempt citation" before the contempt may be referred to the U.S. Attorney. *Subpoenas and Contempt Power* at 7; *see also* Wilson v. United States, 369 F.2d 198, 203 (D.C. Cir. 1966) (explaining that a chamberwide vote provides "a 'check' on hasty action by a committee" and avoids a situation where "the allegedly insulted committee ... provide[s] the sole legislative determination whether to initiate proceedings to prosecute for contempt").

**\*34**  Committees of Congress have issued and likely will continue to issue subpoenas for documents and testimony to White House personnel. Less certain, however, is whether congressional entities have any authority to seek to compel compliance with such subpoenas in court. We believe that congressional suits to enforce subpoenas to executive branch officials fall outside the constitutional and statutory jurisdiction of the federal courts; the inherent contempt mechanism appears to have fallen into desuetude, and would present grave constitutional concerns if deployed against executive branch officials acting to protect the lawful prerogatives of the Executive; and the Executive Branch has discretion to refuse to bring a contempt of Congress criminal prosecution against one of its officials in such circumstances.

**B. Validity of Subpoenas Issued to the White House**

It is the Executive Branch's settled policy to work to accommodate congressional requests for information in a manner consistent with the Executive's constitutional and statutory obligations. Historically, however, congressional subpoenas to executive branch officials have raised a variety of separation of powers concerns. This section identifies and discusses a number of legal defects, several of which are discussed at greater length above, that have commonly arisen in subpoenas involving the White House. These limitations on Congress's oversight powers are rooted in the separation of powers, and observing them serves to prevent Congress from "aggrandiz[ing] itself at the [[[Executive's] expense." Mazars, 140 S. Ct. at 2034.

*Lack of Oversight Authority or Legitimate Legislative Purpose*. As we have discussed, all congressional oversight inquiries must be conducted in support of Congress's legislative authority under Article I of the Constitution. *See id.* at 2031-32, 2035-36; McGrain, 273 U.S. at 177. A subpoena that seeks material or testimony on matters beyond Congress's legislative authority, such as the exercise of a constitutional power vested exclusively in the Executive Branch, is beyond Congress's oversight authority. *See* Barenblatt, 360 U.S. at 111-12.

*Infringement of Presidential Autonomy and Confidentiality*. Congressional inquiries to the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." Cheney, 542 U.S. at 385. In certain circumstances, compliance with a congressional subpoena directed at the White House may unduly impair the Executive's "ability to discharge its constitutional responsibilities." Id. at 382. For example, compliance with a subpoena that is excessively broad or intrusive might burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties. In that circumstance, it would be unconstitutional to enforce such an unduly broad subpoena. Of course, the accommodation process serves to ensure that congressional requests are tailored or narrowed so as to avoid infringement of presidential autonomy and confidentiality while satisfying Congress's legitimate needs for relevant information.

**\*35**  *Immunity of White House Officials from Compelled Testimony*. Relatedly, the White House has consistently resisted subpoenas that seek to compel the President's immediate advisers to testify before congressional committees. The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity—that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel*, 43 Op. O.L.C. ___, at \*3 (internal quotation marks omitted).[21] As Assistant Attorney General Rehnquist explained:

-715-

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis — should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971); *see also Immunity of the Former Counsel*, 43 Op. O.L.C., at *7-11 (listing historical examples of immediate presidential advisers refusing to testify); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, att. at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").

Consequently, in addition to invoking executive privilege over particular questions, the President "can also direct them not even to appear before the committee." Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* app. at 7 (Aug. 11, 1977). For example, in 1981, Martin Anderson, President Reagan's assistant for policy development, refused to appear before a House appropriations subcommittee responsible for funding his office. White House Counsel Fred F. Fielding explained that "[f]rom the Administration of George Washington to the present day, it has been a central tenet of the doctrine of separation of powers among the three branches of the Federal Government that the President is not subject to questioning as to the manner in which he formulates Executive policy"; this principle "founded in practicality as well as tradition and law" "has also been applied to senior members of the President's personal staff, who participate in the deliberative process through which such policies are developed." Letter for Edward R. Roybal, Chairman, Subcommittee on Treasury, Postal Service, General Government, U.S. House of Representatives, from Fred F. Fielding, Counsel to the President (July 8, 1981), *reprinted in* H.R. Rep. No. 97-171, at 61 (1981). This testimonial immunity safeguards the constitutional separation of powers by protecting the independence and autonomy of the Presidency from congressional interference; it also "protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice." *Immunity of the Former Counsel*, 43 Op. O.L.C., at *5; *accord Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 7-9 (2014).

**\*36**  Immediate advisers to the President remain immune from compelled testimony about their official duties in that capacity even after they leave the White House. *See Immunity of the Former Counsel*, 43 Op. O.L.C., at *15-16 (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure"). In determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President. Although most members of the White House staff do not qualify for immunity from compelled testimony, as a matter of policy the White House has generally opposed making any members of the White House staff available to testify, subject to the accommodation process.

The Executive Branch's position on immunity is well established by our precedent and practice, but the federal courts have looked less favorably on this position in the two cases in which the House sought to test it in court. The district courts to consider the question have held that senior presidential advisers do not, at least as a categorical matter, enjoy absolute immunity from compelled congressional testimony. *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105-06 (D.D.C. 2008); *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 200-14 (D.D.C. 2019). But the first of those decisions was stayed pending appeal, *Comm. on the Judiciary v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) (per curiam), and then settled without enforcement of the subpoena, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009). The second decision remains under review in the D.C. Circuit. In the latter case, two judges sitting on the D.C. Circuit panel similarly expressed doubt about the existence of this absolute immunity. *See McGahn*, 951 F.3d at 538-42 (Henderson, J., concurring); *id.* at 558 (Rogers, J., dissenting). No precedential ruling has addressed the Executive Branch's position, however, which for decades has governed the Executive Branch's negotiations with congressional committees seeking the testimony of the President's immediate advisers.

***Exclusion of Counsel from Depositions***. Although historically Congress has sought to obtain testimony from executive branch officials by means of voluntary interviews and public hearings, committees in recent years have made increasing use of depositions. *See, e.g.*, H.R. Res. 6, 116th Cong. § 103(a)(1) (2019) (authorizing committee chairs to "order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee"). And certain committees, based on the current House rules governing depositions, have attempted to bar executive branch witnesses from being accompanied by agency counsel at their depositions, allowing only private counsel. 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ("counsel for government agencies ... may not attend"); *see also, e.g.*, H. Comm. on Oversight & Reform Rule 15(e), 116th Cong. (2019) (counsel "for agencies under investigation ... may not attend"). The Executive Branch has repeatedly resisted this practice and sought to maintain the "[l]ongstanding Executive Branch policy and practice" of agency counsel accompanying agency officials when they are questioned by Congress. Letter for Henry Waxman, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives, from Dinah Bear, General Counsel, Council on Environmental Quality at 2 (Mar. 12, 2007).

**\*37** This Office has advised that barring agency counsel from congressional depositions is unconstitutional because it "compromise[s] the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities." *Exclusion of Agency Counsel*, 43 Op. O.L.C. ___, at \*2; *see also Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. ___, at \*5 n.6 (Jan. 18, 2017) (noting that excluding agency counsel may raise "constitutional concerns" but reserving the question). This principle of course applies to depositions of White House officials. In *Exclusion of Agency Counsel*, for example, we advised that a subpoena issued by the House Committee on Oversight and Reform to the former head of the White House Personnel Security Office was invalid on this basis. *See* 43 Op. O.L.C. ___, at \*2, \*6. Subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients. *See id.* at \*13-14.

***Failure to Exhaust the Accommodation Process***. The White House often has responded to congressional requests by insisting that committees engage in the accommodation process. *See supra* Part III.C. A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course. Thus, White House officials have often cited a committee's failure to exhaust the accommodation process in objecting to a congressional subpoena.

The accommodation process encompasses the exhaustion principle that we have discussed above. The White House may object to a committee's refusal to seek necessary information from the relevant executive branch departments and agencies before directing requests to the White House. *See Mazars*, 140 S. Ct. at 2035-36 ("Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective."). Where a committee declines to honor its obligation to accommodate the legitimate needs of the White House, the committee may not lawfully begin the contempt process based upon good faith objections raised by White House officials.

***Assertion of Executive Privilege***. An assertion of executive privilege authorized by the President is a well-established ground for resisting a congressional subpoena. *See id.* at 2032 ("recipients [of legislative subpoenas] have long been understood to retain common law and constitutional privileges with respect to certain materials, such as ... governmental communications protected by executive privilege"). Executive privilege consists of several components, which vary in scope and the extent of protection from disclosure. *See supra* Part III.B. As relevant to the White House, a congressional committee may overcome an assertion of executive privilege based on the presidential communications component of the privilege only by "demonstrat[ing] that the information sought is 'demonstrably critical to the responsible fulfillment of the Committee's functions.'" *Assertion of Executive Privilege for Documents Concerning Conduct of Foreign Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 6 (1996) (Reno, Att'y Gen.) (quoting *Senate Select Comm.*, 498 F.2d at 731). White House officials have an obligation to minimize the disclosure of privileged information and to protect the President's authority to determine when it would be in the public interest to provide such information as an accommodation.

**\*38**  This is not to say that the Executive Branch must or should claim executive privilege as a prerequisite to asserting any confidentiality interests in connection with congressional oversight. A formal assertion of executive privilege is a last resort in the sense that it is typically only needed when the Executive Branch has already asserted its confidentiality interests, but the accommodation process has failed to produce a resolution and the relevant committee moves to initiate enforcement action by voting to recommend that the recipient of the subpoena be cited for contempt of Congress.[22] However, a formal assertion of privilege does not preclude the possibility of further negotiation and accommodation.

***Unreasonable Burden to Comply***. White House officials also may decline to comply fully with the terms of a subpoena based on a concern that compliance would be unreasonably burdensome or impossible. Compared to the departments and agencies, White House components have small staffs who are primarily devoted to advising and assisting the President. Exempt from FOIA, these White House components do not have trained standing units devoted to document review and response work. Instead, these White House components need to divert staff from their work for the President to process congressional oversight requests. The White House is thus less likely than other parts of the Executive Branch to have the resources available to comply fully with subpoenas that are broad in scope and have urgent return dates.

The federal courts' rules of procedure for both civil and criminal cases relieve parties of the obligation to comply with a subpoena where the scope of the request and the return date make compliance unreasonably burdensome or impossible. *See* Fed. R. Civ. P. 45(d)(3)(A) (court "must quash or modify a subpoena that ... fails to allow a reasonable time to comply"); Fed. R. Crim. P. 17(c)(2) ("court may quash or modify the subpoena if compliance would be unreasonable or oppressive"). Further, a party may not be held in contempt for noncompliance with a subpoena when compliance is an impossibility. *See, e.g., In re Marc Rich & Co.*, 736 F.2d 864, 866 (2d Cir. 1984) (noting that the district court "made it perfectly clear that [a contemnor] simply had to produce appropriate affidavits attesting to the impossibility of compliance and the [contempt] judgment would be lifted"). Similar principles apply in the context of congressional subpoenas, particularly given that "Congress and the courts have similar subpoena powers." *Nixon v. Sirica*, 487 F.2d 700, 731 (D.C. Cir. 1973) (en banc) (per curiam).

\* \* \* \* \*

It has long been the Executive Branch's policy to "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Reagan Memorandum at 1. But the critical functions that White House staff members play when advising and assisting the President in the performance of his constitutional duties require that congressional oversight of the White House be conducted differently from oversight of the departments and agencies. The necessary approach has been described at length in this memorandum opinion, but the core principle is that congressional committees and the White House must work together to accommodate congressional needs for information about the Executive Branch's discharge of statutory obligations in a manner that does not undermine the White House staff's ability to advise and assist the President.

 **\*39**  Steven A. Engel

Assistant Attorney General

Office of Legal Counsel

Footnotes

1      This memorandum addresses Congress's authority to investigate in furtherance of its power to legislate. *See McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). We do not consider Congress's parallel authority to obtain the information necessary to the discharge of its other powers, such as the House's power to impeach, although we have recognized that similar principles apply in those areas. *See, e.g., Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. ___, at \*3 (Nov. 1, 2019) (recognizing "that a congressional committee must likewise make a showing of need that is sufficient to overcome [executive] privilege in connection with an impeachment inquiry"); Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel,

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 294 of 512
Case 1:21-cr-00670-CJN    Document 41-7    Filed 03/22/22    Page 28 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

Assistant Attorney General, Office of Legal Counsel at 2 (Nov. 3, 2019) (recognizing that the immunity of certain presidential advisers from compelled congressional testimony "applies in an impeachment inquiry just as it applies in a legislative oversight inquiry").

2    Although this memorandum addresses the EOP components whose principal function is to advise and assist the President, many of the principles discussed here would apply as well to so-called "dual hat" presidential advisers in other components who "exercise substantial independent authority or perform other functions in addition to advising the President." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). To the extent that Congress directs oversight efforts at activities implicating the advising "hat" of those officials, many of the same principles governing oversight would apply.

3    Louis Brownlow later recounted that the EOP's mission as contemplated by his Committee was to ensure that the President could "control the policies of his departments, while leaving to the head of each department the decisions which are peculiar to its activity and the work incidental thereto." Louis Brownlow, *The Executive Office of the President: A General View*, 1 Pub. Admin. Rev. 101, 104 (1941).

4    The National Security Council formally became an EOP component upon the adoption of Reorganization Plan No. 4 of 1949, 63 Stat. 1067.

5    Congressional oversight authority may encompass inquiries into the Executive Branch's use of appropriated funds with respect to statutory programs as well as inquiries relevant to future appropriations. However, as *Barenblatt* makes clear, the fact that the President or the federal courts may rely upon appropriated funds to carry out their activities does not mean that everything they do falls within the scope of the oversight authority. Otherwise, no matter would fall within the "exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 112. Rather, "[s] ince Congress may only investigate into those areas in which it may potentially *legislate or appropriate*, it cannot inquire into matters which are within the [[[Executive's] exclusive province[.]" *Id.* at 111-12 (emphasis added). Therefore, the limits placed on Congress when conducting oversight pursuant to its general legislative power also apply to oversight conducted pursuant to its appropriations authority. While Congress may, pursuant to its appropriations authority, review manpower statistics and other non-substantive data regarding the resources that Presidents historically invest in areas of exclusive executive authority, Congress lacks the authority to inquire into the Executive's substantive decision-making in these areas.

6    In the course of its oversight activities, Congress may "inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins*, 354 U.S. at 200 n.33. It may not, however, conduct oversight solely for the purpose of making information public. The Supreme Court has made clear that Congress "may only investigate into those areas in which it may potentially legislate or appropriate," *Barenblatt*, 360 U.S. at 111, and transmitting information "to inform the public ... is not a part of the legislative function," *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979).

7    As a formal matter, the President asserted executive privilege in declining to provide the subpoenaed documents, which related to the deliberations over the President's grant of clemency to sixteen members of the FALN terrorist group. Letter for Dan Burton, Chairman, Committee on Government Reform, U.S. House of Representatives, from Cheryl Mills, Deputy Counsel to the President at 1 (Sept. 16, 1999) (relying on the "vital public interest in assuring that the President receives candid advice from his advisors"). But the White House Counsel's Office also raised the jurisdictional issue in objecting to the subpoena, stating that "[p]ursuant to the Constitution and the separation of powers doctrine, the President's authority to grant clemency is not subject to legislative oversight." *Id.*

8    This position also served as the basis for the Justice Department's refusal the next year to answer certain questions posed by the House Judiciary Committee regarding a pending clemency petition. *See* Letter for Henry J. Hyde, Chairman, Committee on Judiciary, U.S. House of Representatives, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (June 21, 2000) ("[B]ecause Congress cannot legislate regarding the process by which the Department assists the President on clemency matters, Congress' oversight authority does not extend to that process.").

9    *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("[J]udicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate[.]"); *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign relations and ensuring the Nation's defense are "central Presidential domains" (internal quotation marks omitted)); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring in judgment, joined by Wayne, Swayne, and Miller, JJ.) (Congress has no authority to ""'interfere[] with the command of the forces and the conduct of campaigns" because "[t]hat power and duty belong to the President as commander-in-chief"); *In re Hennen*, 38 U.S. (13 Pet.) 230, 235 (1839) ("As the executive magistrate of the country, [the President] is the only functionary intrusted with the foreign relations of the nation.").

10    The Supreme Court has held that presidential aides are generally treated differently from the President for purposes of immunity in civil litigation, receiving qualified immunity rather than absolute immunity. *Harlow*, 457 U.S. at 809. *But see id.* at 812 & n.19 (acknowledging that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest"). Yet that distinction is entirely consistent with *Cheney*'s holding that "special considerations" apply to civil discovery requests directed to White House officials and others who "give advice and make recommendations to the President." 542 U.S. at 385. As we have explained in

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 295 of 512
Case 1:21-cr-00670-CJN    Document 41-7    Filed 03/22/22    Page 29 of 30

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

declining to apply *Harlow* to narrow the traditional constraints governing the congressional testimony of senior presidential advisers, "the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party." *Immunity of the Former Counsel*, 43 Op. O.L.C. ___, at *13. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* (internal quotation marks omitted).

11    As this Office has explained more fully:

> When the Supreme Court held that the need for presidential communications in the criminal trial of President Nixon's close aides outweighed the constitutional privilege, an important premise of its decision was that it did not believe that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. By contrast, congressional requests for executive branch deliberative information are anything but infrequent. Moreover, compared to a criminal prosecution, a congressional investigation is usually sweeping; its issues are seldom narrowly defined, and the inquiry is not restricted by the rules of evidence. Finally, when Congress is investigating, it is by its own account often in an adversarial position to the executive branch and initiating action to override judgments made by the executive branch. This increases the likelihood that candid advice from executive branch advisers will be taken out of context or misconstrued.

*Congressional Requests*, 13 Op. O.L.C. at 156-57 (internal quotation marks and citations omitted).

12    *See, e.g., Egan*, 484 U.S. at 527 (explaining that the President's "authority to classify and control access to information bearing on national security ... flows primarily from th[e] constitutional investment of [the Commander in Chief] power in the President"); *United States v. Reynolds*, 345 U.S. 1, 10-11 (1953) (recognizing the national security component of the privilege in civil litigation involving military equipment); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (explaining that the privilege provides absolute protection for information the release of which would impair the Nation's defense, disclose intelligence activities, or disrupt diplomatic relations with foreign governments); *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) (explaining that "matters the revelation of which reasonably could be seen as a threat to the military or diplomatic interests of the nation ... are *absolutely privileged* from disclosure in the courts"); *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 97 (1998) ("[S]ince the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information."); Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* at 2-11 (Dec. 21, 1989) (explaining the absolute scope of the national security component in the context of congressional investigations); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, and John R. Stevenson, Legal Adviser, Department of State, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969) ("[N]ational security and foreign relations considerations have been considered the strongest possible basis upon which to invoke the privilege of the executive."); *see also Nixon*, 418 U.S. at 706 (recognizing that executive privilege may be absolute "to protect military, diplomatic, or sensitive national security secrets").

13    *See Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992*, 41 Op. O.L.C. ___ (Oct. 26, 2017); *Investigative Authority of the General Accounting Office*, 12 Op. O.L.C. 171, 177 (1988) ("With respect to open law enforcement files, it has been the policy of the executive branch throughout our Nation's history to protect these files from any breach of confidentiality, except in extraordinary circumstances."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 75- 78 (explaining the Executive Branch's authority to withhold open and closed law enforcement files from Congress); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 117 (1984) ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature."); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 32-33 (1982) (same concerning law enforcement files of the Environmental Protection Agency); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 47 (1941) (same concerning investigative files of the Federal Bureau of Investigation).

14    In *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108 (D.C. Cir. 2004), the D.C. Circuit in dictum construed *Sealed Case*'s use of the phrase "White House adviser" when describing the scope of the presidential communications privilege as restricting the privilege to the President's "immediate advisers in the Office of the President" (a component of the EOP also called the White House Office). *Id. at 1123; see id.* at 1109 n.1, 1116-17, 1123-24. This assumption misinterprets *Sealed Case*. Its explicit holding that communications by "presidential advisers" and "their staff" made "in the course of preparing advice for the President come under the presidential communications privilege" indicates that the privilege must encompass advisers in EOP entities outside the Office of the President whose primary function is to advise and assist the President. *See* 121 F.3d at 751-52.

-720-

CONGRESSIONAL OVERSIGHT OF THE WHITE HOUSE, 2021 WL 222744 (2021)

15    *See, e.g.*, Letter for John W. Byrnes, House of Representatives, from Joseph Campbell, Comptroller General of the United States at 2 (Sept. 18, 1962) ("[W]e are certain you understand that [Comptroller General] investigations of White House activities are not subject to the same techniques as those conducted in the various departments and agencies. Files of the White House Office, with the exception of financial records, are normally not available to us. Also, White House personnel are not always available for interview. This has been the situation in all recent Administrations."); *see also* Cong. Research Serv., RL31351, *Presidential Advisers' Testimony Before Congressional Committees: An Overview* 21 (Dec. 15, 2014) ("Given the tradition of comity between the executive and legislative branches, Congress often elects not to request the appearance of presidential aides. When Congress has requested the appearance of such aides, Presidents and their aides have at times resisted, asserting the separation of powers doctrine and/or executive privilege." (footnote omitted)); Louis Fisher, *White House Aides Testifying Before Congress*, 27 Presidential Stud. Q. 139, 151 (1997) ("The White House is usually insulated from congressional inquiry because of a long-standing comity that exists between Congress and the presidency. By and large, each branch concedes a certain amount of autonomy to the other. Only in clear cases of abuse and obvious bad faith will Congress insist that White House aides appear and give an account of their activities.").

16    Courts have credited these concerns in a series of cases discussing FOIA requests. The D.C. Circuit, for instance, has declined to allow FOIA requests for the President's White House visitor logs—even though the logs were held by the Secret Service, which is housed within the Department of Homeland Security, rather than the White House— because such requests "could render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d at 226.

17    Although a congressional committee may not seek judicial enforcement of a subpoena against the Executive Branch, there are some cases, such as *Mazars*, where a suit involving a congressional subpoena would be justiciable. The dispute there no doubt presented "significant separation of powers issues" and was in meaningful respects an inter-branch dispute, 140 S. Ct. at 2033-34, but as noted, it involved the President's private right in his personal papers and the legal obligations owed to him by third parties that were the actual recipients of the subpoenas, *see id.* at 2027-28; *see also Comm. on the Judiciary v. McGahn*, 951 F.3d 510, 531 (D.C. Cir. 2020) ("we may adjudicate cases concerning congressional subpoenas if they implicate the rights of private parties"), *vacated on reh'g en banc*, 968 F.3d 755; *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 390-91 (D.C. Cir. 1976) (holding that an executive branch suit to enjoin a third party from complying with a congressional subpoena was justiciable).

18    *See* Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. Miers*, No. 08-0409 (D.D.C. Mar. 10, 2008); Complaint, *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-1332 (D.D.C. Aug. 13, 2012); Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. McGahn*, No. 19-2379 (D.D.C. Aug. 7, 2019); Complaint for Declaratory and Injunctive Relief, *Comm. on Oversight & Reform v. Barr*, No. 19-3557 (D.D.C. Nov. 26, 2019).

19    The Department of Justice even attempted to bring an analogous suit against the House in 1983. *See United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) (dismissing, on prudential grounds, a suit seeking a declaratory judgment that the Administrator of the Environmental Protection Agency had lawfully withheld privileged documents from Congress).

20    Where recourse has been made to the courts, the House or Senate has typically authorized such an action by resolution. Todd Garvey, Cong. Research Serv., R45653, *Congressional Subpoenas: Enforcing Executive Branch Compliance* 5 (Mar. 27, 2019); *see, e.g.*, H.R. Res. 706, 112th Cong. (2012) (authorizing suit to enforce subpoena to Attorney General Holder). In the 116th Congress, however, the House broke from this practice by adopting a resolution enabling committees to file suit whenever authorized by the Bipartisan Legal Advisory Group, H.R. Res. 430 (2019), which comprises the House Speaker and majority and minority leaderships, House Rule II.8(b).

21    Although this Office has spoken of this protection from compelled congressional testimony in terms of "immunity," it may equally be viewed as a limitation on the breadth of Congress's implied power to compel testimony. *Cf. New York v. United States*, 505 U.S. 144, 159 (1992) ("it makes no difference whether one views" a federalism question as turning upon "the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution" or the scope of "the sovereignty retained by the States under the Tenth Amendment").

22    When this course of events moves too quickly to allow for an adequate executive privilege review, the President may make a "protective" assertion of executive privilege over a class of documents in order "to ensure [his] ability to make a final decision, after consultation with the Attorney General, as to which specific documents are deserving of a conclusive claim of executive privilege." *Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1, 1 (1996) (Reno, Att'y Gen.); *accord Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files*, 43 Op. O.L.C. ___ (May 8, 2019) (Barr, Att'y Gen.).

2021 WL 222744 (O.L.C.)

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

-721-

# EXHIBIT 3
## *Amended*



# Office of the Attorney General
### Washington, D.C.

February 29, 2008

The Honorable Nancy Pelosi
Speaker
House of Representatives
Washington, D.C.  20515

Dear Madam Speaker:

As you know, the President, asserting executive privilege, directed that Joshua Bolten, Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, not release certain documents or provide related testimony subpoenaed by the Committee on the Judiciary of the House of Representatives. The President also directed Ms. Miers to invoke her constitutional immunity from compelled congressional testimony and to decline to appear before the Committee. These directives were based on legal opinions from the Department of Justice advising that the assertions of privilege and immunity were legally proper.

Notwithstanding the President's directives, on July 25, 2007, the House Committee on the Judiciary adopted a resolution recommending that the House of Representatives cite Mr. Bolten and Ms. Miers for contempt. On November 5, 2007, the Committee referred its report on the resolution to the full House. On February 14, 2008, the House adopted a contempt resolution, which you referred on February 28, 2008, to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

As explained in our July 24, 2007, letter to Judiciary Committee Chairman Conyers, a copy of which is enclosed, the Department of Justice's longstanding position taken during Administrations of both parties is "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984). Further, as we also explained in the letter to Chairman Conyers, the same principles that preclude prosecuting an Executive Branch official for abiding by a presidential claim of executive privilege also preclude prosecuting a senior presidential adviser for lawfully invoking her constitutional immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper.

Accordingly, the Department has determined that the non-compliance by Mr. Bolten and Ms. Miers with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers.

Please do not hesitate to contact me if you would like to discuss this matter further.

Sincerely,

Michael B. Mukasey
Attorney General

Enclosure

cc:   The Honorable John Boehner
      The Honorable John Conyers, Jr.
      The Honorable Lamar Smith

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO THE UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE AND ARGUMENT RELATING TO GOOD-FAITH RELIANCE ON LAW OR ADVICE OF COUNSEL

In his supplemental brief, ECF No. 41, the Defendant, Stephen K. Bannon, asks this Court to adopt an approach to criminal law under which the elements of a criminal offense change based on the factual circumstances of a particular violation. That is not how the criminal law works. Advice of counsel is available as a defense only where it negates the intent element of an offense, and it can negate the intent element of a willfulness offense only where the intent element requires proof that a defendant knew his conduct was unlawful. Under controlling Supreme Court and D.C. Circuit precedents, the intent element for contempt of Congress does not require such proof, and, therefore, advice of counsel is not available as a defense. The Defendant's supplemental brief does nothing to overcome this controlling law and the Government's Motion to Exclude Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel, ECF No. 29, must be granted.

**I.  The Availability of an Advice-of-Counsel Defense Depends on the Intent Element of the Offense, Not the Factual Circumstances of the Specific Violation.**

The Defendant claims that *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), is distinguishable and therefore inapplicable to this case because the defendant in *Licavoli* did not rely on a purported assertion of executive privilege to avoid compliance with a congressional

subpoena.  ECF No. 41 at 1-2.  The Defendant's claim misunderstands the advice-of-counsel defense, *Licavoli,* and the Supreme Court and D.C. Circuit precedents establishing the elements of the offense under 2 U.S.C. § 192.

An advice-of-counsel defense is one in which a defendant claims he mistakenly believed his conduct was lawful because he, in good faith, relied on the advice his attorney gave him about what the law required.  The availability of an advice-of-counsel defense turns, therefore, on the intent element applicable to the offense—specifically, whether the offense requires proof that the Defendant knew he was acting unlawfully.  *See United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002) ("[I]f a criminal statute requires proof that the defendant knew he was violating the statute in order to be criminally liable for the violation, and it is unclear whether the statute forbade his conduct, the fact that he was acting on the advice of counsel is relevant because it bears on whether he knew that he was violating the statute."); *United States v. Mathes*, 151 F.3d 251, 255 (5th Cir. 1998) ("Reliance on counsel's advice excuses a criminal act only to the extent it negates willfulness and to negate willfulness counsel's advice must create (or perpetuate) an honest misunderstanding of one's legal duties." (internal quotation marks and citation omitted)).  The availability of the defense is a question of law, not fact, *cf. United States v. Armstrong*, 781 F.2d 700, 706 (9th Cir. 1986) ("[T]he issue whether good faith reliance on the advice of counsel is a defense to a charge of criminal contempt [of court] involves a question of law."), and does not, therefore, change with the specific factual circumstances of the offense.

The intent element of Section 192 requires proof only of a deliberate and intentional failure to appear or produce records.  This was established not by *Licavoli* but by the Supreme Court's decisions in *United States v. Bryan*, 339 U.S. 323 (1950), and *United States v. Fleischman*, 339 U.S. 349 (1950), *see Licavoli*, 294 F.2d at 208, and the D.C. Circuit's opinions in *Dennis v. United*

2

-726-

*States*, 171 F.2d 986, 990-91 (D.C. Cir. 1948), and *Fields v. United States*, 164 F.2d 97, 99-100 (D.C. Cir. 1947). As the D.C. Circuit affirmed in *Fields*, under Section 192, "[t]he word 'willful' does not mean that the failure or refusal to comply with the order of the committee must necessarily be for an evil or a bad purpose. The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident." 164 F.2d at 100 (affirming jury instruction on the meaning of "willful" under Section 192). Because the intent element of Section 192 does not require proof that the Defendant knew his conduct was unlawful, any advice his counsel may have given him about the legality of his conduct is irrelevant to establishing the elements of the offense. The *Licavoli* court clearly articulated this link between the availability of an advice-of-counsel defense and the intent element of contempt: "All that is needed in either event is a deliberate intention to do the act. Advice of counsel does not immunize that simple intention. It might immunize if evil motive or purpose were an element of the offense. But such motive or purpose is not an element of [contempt of Congress]." 294 F.2d at 209.

There is thus no factual basis on which to distinguish *Licavoli*'s application to this case. *Licavoli* decided that an advice-of-counsel defense to contempt of Congress was not available as a matter of law given the offense's intent element. The holding did not turn on the nature of the advice or law on which Licavoli relied to refuse compliance with a congressional subpoena. The court did not even identify the substance of the advice Licavoli received, and there is no evidence in the opinion that the D.C. Circuit ever considered it—because it did not need to do so. The court's legal holding was controlled by the definition of the term "willful" in Section 192 as determined by the Supreme Court, not by Licavoli's factual claims about what legal advice he received and followed. *See id.* at 208. Contrary to the Defendant's protestations, therefore, he

cannot escape *Licavoli*'s controlling legal precedent.  How a term is defined in a criminal statute is a question of law wholly separate from the underlying factual allegations.  *See Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016).  The meaning of a statute's terms dictates what conduct constitutes an offense under that statute—not the other way around.

By advocating to allow him to raise an advice-of-counsel defense in his case, even though it is not available to others charged with contempt of Congress, the Defendant necessarily is advocating that the intent element of the offense should change depending on the factual circumstances of the crime.  In other words, the word "willful" in Section 192, under the Defendant's approach, would mean one thing for someone claiming their attorney advised them not to comply with a congressional subpoena under a Fifth Amendment right against self-incrimination and would mean something different for someone claiming their attorney had advised them not to comply with a subpoena under a claim of executive privilege.  Such an approach to defining the bounds of a criminal statute is contrary to law.  *See United States v. Santos*, 553 U.S. 507, 522 (2008) (opinion of Scalia, J.) ("[T]he meaning of words in a statute cannot change with the statute's application.") (citing *Clark v. Martinez*, 543 U.S. 371, 378 (2005)); *cf. Ratzlaf v. United States* 510 U.S. 135, 143 (1994) ("We have even stronger cause to construe a single formulation, here § 5322(a), the same way each time it is called into play.") (rejecting argument that the penalty provision applicable to multiple offenses takes on a different meaning depending on the offense to which it is applied).  The word "willful" as used in Section 192 means what it means.  It does not shift from case to case or from defendant to defendant.[1]

---

[1] As the Government pointed out in its reply brief, under the Supreme Court's decision in *Cheek v. United States*, 498 U.S. 192, 204-06 (1991), the defense the Defendant wishes to raise as an advice-of-counsel defense—that his attorney told him the subpoena itself was invalid—is not available even if a heightened willfulness standard applied.  *See* ECF No. 35 at 20 n.2.

**II.      The Defendant's Attempts to Distinguish *Licavoli* Do Not Relate to an Advice-of-Counsel Defense.**

The Defendant's efforts to distinguish *Licavoli* demonstrate again his confusion of various legal and factual defenses.  First, the Defendant claims he is entitled to an advice-of-counsel defense because, according to the Defendant, unlike Licavoli who "had freedom to decide how to proceed," ECF No. 41 at 5, the Defendant was advised that, after a purported assertion of executive privilege, "he could not exercise his free will" to comply, *id*. at 2; that he "was no longer free to act as he wished," *id*. at 4; and that he "*could not lawfully* appear," *id*. at 6 (emphasis in original). He claims that enforcing the subpoena against him would violate separation of powers principles, *id*. at 7, and that "[t]he *Licavoli* panel could not have contemplated that they were establishing law on whether an advice of counsel defense is available to a former top presidential advisor who relied upon advice of counsel and asserted executive privilege on behalf of the President he served," *id*. at 3.  But the Defendant's claims to this effect are not an advice-of-counsel defense, even if the intent element of contempt of Congress made such a defense available.  The Defendant is not claiming that he mistakenly believed he was complying with the subpoena based on his attorney's advice.  The Defendant is claiming that the subpoena was supposedly rendered legally invalid as applied to him by some purported assertion of executive privilege—an assertion the Defendant has yet to establish actually occurred or was valid.

If the Defendant wishes to move to dismiss the indictment because the subpoena itself was invalid based on a purported assertion of executive privilege, he is free to do that.[2]  His assertion

---

[2] The Defendant is similarly free to move to dismiss the indictment based on his claims of selective prosecution, *see* ECF No. 41 at 9-10, but those claims too are irrelevant to the elements of the offense and have nothing to do with whether *Licavoli* is controlling in this case.  *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.").

of such a defense will fail for several reasons, including that there was no valid assertion of executive privilege, *see Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) ("We think it abundantly clear . . . that any claim of privilege, whether of executive or Presidential privilege . . . , must be made with particularity."); the Defendant was never directed not to appear—indeed, former President Donald Trump's counsel expressly told the Defendant he was not being directed to engage in total noncompliance, ECF No. 35-6 at US-000987-88; ECF No. 35-7 at US-000985; and the Defendant, as a private citizen, cannot assert executive privilege, *see, e.g.*, *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (The executive privilege is "a privilege held by the Executive Branch.").  But the Defendant can make the motion nonetheless, and his purported concern for protecting the separation of powers and executive privilege will thereby be properly addressed.  If there was a valid assertion of executive privilege that allowed the Defendant's total noncompliance, the privilege will be protected and the indictment dismissed; if there was not, the lack of a valid assertion will not invalidate Congress's investigative power.  This is no different from a defendant claiming Congress's effort to compel answers to a congressional committee's questions was invalid in the face of a legitimate assertion of a Fifth Amendment privilege.  *See Emspak v. United States*, 349 U.S. 190, 198-201 (1955) (reversing conviction for contempt of Congress for refusing to answer certain questions after finding the defendant had properly invoked a valid Fifth Amendment privilege against self-incrimination in refusing to answer).  Once the Defendant's claim of executive privilege is rejected, however, the Defendant cannot then rely on his mistaken belief, whether from his counsel's advice or another source, that it applied to rebut evidence of his intent at trial.  Allowing him to do so would do nothing to vindicate the privilege and instead would undermine Congress's constitutional authority in a manner contrary to controlling Supreme Court and D.C. Circuit precedent.

Second, the Defendant argues that due process requires the Court to ignore *Licavoli*, because, unlike Licavoli, the Defendant claims, he "obeyed an express order of the President he had served" and he was acting "in accordance with official Department of Justice policies." ECF No. 41 at 7. To support this claim, the Defendant cites the Supreme Court's decisions in *Cox v. Louisiana*, 379 U.S. 559 (1965), and *Raley v. Ohio*, 360 U.S. 423 (1959). *Id.* at 8. But *Cox* and *Raley* do not support the notion that different intent standards apply to criminal statutes based on the factual circumstances of particular violations. Instead, they address an entirely different issue: the due process defense of entrapment by estoppel. *See Cox*, 379 U.S. at 571 ("As in *Raley* . . . after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him.' The Due Process Clause does not permit convictions to be obtained under such circumstances." (quoting *Raley*, 360 U.S. at 426)). A concurring opinion on which the Defendant relies elsewhere in his brief, ECF No. 41 at 5 n.7 (citing *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring)), addresses a version of this defense as well. *See Barker*, 546 F.2d at 955 (allowing a defense of official misstatement of the law where a defendant "(1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.").[3]

Entrapment by estoppel is not an advice-of-counsel defense. Entrapment by estoppel does not negate the intent element of an offense. Instead, it is an affirmative defense that is available

---

[3] The D.C. Circuit has since noted that "[t]he exact precedential effect of Judge Merhige's opinion is unclear." *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994).

under the Due Process Clause even where all the elements of an offense are established. *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1165-66 (10th Cir. 1999) (noting that in raising an estoppel defense, the defendant did not contest that the government had proven every element of the offense). The defense "focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by law. The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized." *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995) (citations omitted). The defense "applies where 'the defendant establishes by a preponderance of the evidence that (1) a government official (2) told the defendant that certain criminal conduct was legal, (3) the defendant actually relied on the government official's statements, (4) and the defendant's reliance was in good faith and reasonable in light of the identity of the government official, the point of law represented, and the substance of the official's statement.'" *United States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009) (quoting *United States v. W. Indies Transport, Inc.*, 127 F.3d 299, 313 (3d Cir. 1997)). "[T]he defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization." *Abcasis*, 45 F.3d at 43-44. As an affirmative defense, the Defendant bears the burden of establishing it. *Id.* at 44. Moreover, the Defendant cannot rely on his attorney's interpretation of the law to raise this defense. It is only representations by an authorized government agent that can provide a basis for entrapment by estoppel. *Gutierrez-Gonzalez*, 184 F.3d at 1167-68. Accordingly, the Defendant's ability to make the due process claim he identifies

in his brief has nothing to do with and is unaffected by *Licavoli*'s holding regarding the intent element of contempt of Congress and available defenses to it.[4]

Finally, the Defendant claims that *Licavoli* is inapplicable because the Department of Justice has taken the position that the contempt of Congress statute is unenforceable against executive branch officials acting on an assertion of executive privilege. *See* ECF No. 41 at 8-9. As an initial matter, the Defendant was not summonsed by Congress in his capacity as an executive branch official or in relation to any activity during his time as an executive branch official—the insurrection on January 6, 2021, occurred well over three years after the Defendant resigned from his White House position. Department positions with respect to individuals summonsed in relation to their service as executive branch officials are irrelevant. Moreover, the Department's position about the constitutionality of a criminal statute as applied to various fact patterns does not change the elements of the offense. That the Department might take the position that the statute cannot be applied to the White House Counsel, for example, does not change the meaning of "willful" as used in Section 192. *Licavoli* decided available defenses given the meaning of "willful" under Section 192. Its holding regarding the availability of those defenses stands regardless of whether the Government believes it cannot enforce the statute against certain individuals. And, as described above, the Defendant's ability to make an estoppel argument based on Department policies is entirely different from the question of what evidence is relevant to establishing or negating the elements of the charged offenses.

---

[4] There are several reasons the Defendant cannot present an entrapment by estoppel defense to a jury in this case, which the Government will address as required by a later motion at the time established by the Court's scheduling order.

9

## III.     Waiver

In its March 16, 2022, Order, the Court also allowed the Government to brief whether the Defendant has waived his claim that *Licavoli* is distinguishable from the present case.  While the Defendant did not raise this argument in his opposition, and at least one other judge in this district has suggested in the context of a criminal case that failing to do so is a basis for disregarding the argument, *see United States v. Devaugh*, 422 F. Supp. 3d 104, 118 n.10 (D.D.C. 2019), the Government does not believe the Court has to address this issue, because the Defendant has, in any event, failed to establish that *Licavoli* can be disregarded.

## IV.     Conclusion

*Licavoli* decided that advice of counsel was unavailable as a defense to contempt of Congress as a matter of law.  It is controlling in this case and the Government's Motion to Exclude Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel must be granted.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant*. | : | |

### DEFENDANT'S SUPPLEMENTAL REPLY ON WAIVER

On February 4, 2022, the Government filed a Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel [Doc. 29].   On February 25, 2022, Defendant, Stephen K. Bannon, filed his Opposition to the motion [Doc. 30]. Following the March 16, 2022 oral argument on this and other motions, as the Court directed, Mr. Bannon filed a supplemental brief, limited to the issue of whether the invocation of Executive Privilege in this case materially distinguishes the instant case from *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961) on the question of how "willfully makes default" is to be construed and the associated question of whether the advice of counsel may be presented at trial [Doc. 41].   On March 29, 2022, the Government filed its response [Doc. 43].   In its response, the Government asserted that, while the Court need not address the issue, Mr. Bannon, nevertheless, waived this argument by purportedly not raising it in his initial opposition [Doc. 43 at 10].   Since the Government has asserted this waiver claim, Mr. Bannon now replies exclusively to that erroneous assertion.[1]

---

[1] The Court gave Mr. Bannon permission to file a reply limited to the waiver claim if the Government were to make such a claim [Tr. 3/16/2022 Oral Argument at 98].  The Government

**The Argument Was Presented Not Waived**

Mr. Bannon expressly made the argument in his Opposition to the Government's Motion *in limine* ("Opposition") that the holding in *Licavoli* (and other cases the Government claimed supported *Licavoli*) construing "willfully makes default" and on the right to an advice of counsel defense in a prosecution under 2 U.S.C. § 192 should not be applied in the instant case because at the heart of the instant case and the advice of counsel at issue here is the invocation of Executive Privilege by the former President and that is a materially distinguishing factor on these issues [Doc. 30 at 3-4; 4-9; 15-20].

Mr. Bannon explained in the Opposition that the invocation of Executive Privilege,  unlike any fact present in *Licavoli* or any other case cited by the Government, (1) triggered the OLC opinions by this prosecuting agency (the DOJ) on which the advice of counsel was based, (2) introduced constitutional issues, including a separation of powers confrontation, that were not present in the other cases, and (3) tied the hands of the Defendant, as directed through the advice of counsel, such that the dynamic surrounding "willfully makes default" is completely outside the *Licavoli* framework or any factor contemplated by the *Licavoli* Court  [Doc. 30 at 3-4; 4-9; 15-20].  There can be no waiver under the circumstances presented here; nor has the Government presented any authority to support a waiver claim under these circumstances in this procedural posture.

---

cites one case in support of its claim of waiver here.  That case, *United States v. Devaugh*, 422 F. Supp. 3d 104, 118 n. 10 (D.D.C. 2019), is completely inapposite.  In *Devaugh*, the question of waiver arose in the context of a motion to suppress, in which, among other things, the defendant sought the suppression of statements that were elicited after he was unlawfully handcuffed.  The Court noted that in response to the defendant's argument that the statements should be suppressed, the Government wrote merely that it disagreed, but that, in any event, it did not intend to use the defendant's statements in its case in chief, so any argument against suppression of the statements was waived.  *Id.*  That bears absolutely no relationship to the instant context.

**How and Where in the Opposition the Argument was Presented:**

In his Opposition, Mr. Bannon made several arguments as to why the Government's Motion to exclude the advice of counsel defense should be denied.  Those arguments included (1) that *Licavoli* is no longer good law in light of subsequent relevant developments related to the definition of "willfulness" [Doc. 30 at 3; 9-14]; (2) that contempt of court cases relied on by the government are not applicable [Doc. 30 at 2; 22-24]; (3) that to apply *Licavoli's* strict liability "willfulness" definition here, rendering the invocation of Executive Privilege meaningless, would violate the constitutional separation of powers doctrine [Doc. 30 at 3; 15]; AND (4) that this case is different from *Licavoli* because this case involves the material factual distinction of the invocation of Executive Privilege (Doc. 30 at 4; 15-20), along with other arguments.  Each argument was previewed at the beginning of the Opposition and then was further developed. Only the fourth argument is at issue here.

On Page 3 of his Opposition, Mr. Bannon first addressed the Government's position that a person is guilty under 2 U.S.C. § 192 if he receives a congressional subpoena and does not appear or produce documents, no matter what the reason is and that this position is based on a "60-year old case," referring to *Licavoli* [Doc. 30 at 3].  Then, after noting the additional argument that *Licavoli* has been rendered obsolete by subsequent decisions on "willfully," Mr. Bannon immediately emphasized the exact argument at issue here – that the primary material distinguishing factor between *Licavoli* and the instant case on the issue of "willfully" and the legal relevance of advice of counsel is the invocation of Executive Privilege by former President Trump in the instant case.  The Opposition reads, in pertinent part, as follows:

"Notably, none of the cases cited by the Government involves a former top Presidential advisor facing demands from a Congressional committee on one hand, and an assertion of

executive privilege by a former President on the other hand. U.S. Department of Justice policy provides clear direction. In such circumstances, Mr. Costello's advice to Mr. Bannon about what the law requires and Mr. Bannon's reliance and right to rely on the advice of his attorney is highly relevant in a subsequent criminal prosecution."

[Doc. 30 at 4] (Emphasis added).

To demonstrate the material distinction between the instant case and the *Licavoli* scenario, the Opposition devoted several pages to a recitation of the facts regarding the invocation of Executive Privilege and the basis for the advice by counsel that Mr. Bannon could not legally comply with the subpoena because of Executive Privilege [Doc. 30 at 4-9; Doc. 30-1].

The Opposition then further provided legal arguments why the invocation of Executive Privilege and the advice of counsel based on Executive Privilege present a materially distinguishable circumstance [Doc. 30 at 15-20], emphasizing (1) that the "*specific circumstances of this case*" [Doc. 30 at 15] (emphasis in original) distinguish this case on advice of counsel; (2) that the OLC Opinions regarding Executive Privilege and the rights and duties flowing from them set this case apart in requiring the advice of counsel and making it directly relevant [Doc. 30 at 16-20] and (3) that in this case alone, the advice of counsel, because of the invocation of Executive Privilege and the applicable OLC Opinions, is at the heart of the question of "willfully makes default" unlike any failure to comply for any other reason, as in *Licavoli* [Doc. 30 at 18-20].

The Opposition addressed these issues specifically because (1) there is limited judicial precedent construing the relevant statutory terms; (2) *Licavoli* and the other cases cited by the Government did not involve any such unique and constitutionally significant factor; and (3) because it is well-settled that material factual distinctions make all the difference when determining whether past decisions applying a statute should be given binding precedential effect under the principle of *stare decisis*. *See Nippon Shinyaku Co. v. Iancu*, 369 F. Supp. 3d 226, 237

(D.D.C. 2019).[2]   Accordingly, Mr. Bannon did not waive the argument that this case is materially distinguishable from *Licavoli* and that *Licavoli* does not apply here for that reason.

<u>**CONCLUSION**</u>

Although a finer point was put on the issue, with the benefit of the Court's focused questioning at oral argument, Mr. Bannon did not waive the argument that *Licavoli* is distinguishable from the instant case because it did not involve the invocation of Executive Privilege, and that this case is, therefore, outside the framework for "willfulness" and advice of counsel contemplated by the court in *Licavoli* or any other case relied on by the Government. While the Opposition certainly addressed other reasons as well for why *Licavoli's* holding on "willfulness" does not apply, distinguishing this case from *Licavoli* on the constitutionally significant invocation of Executive Privilege and the advice of counsel based on that invocation definitely was raised and argued in the Opposition.

Dated: March 30, 2022                         Respectfully submitted,

<span style="font-variant: small-caps;">**Silverman|Thompson|Slutkin|White, LLC**</span>

   /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
210 N. Charles Street, 26th Floor
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

---

[2] "Stare decisis compels adherence to a prior factually indistinguishable decision of a controlling court." *Brewster v. Comm'r*, 607 F.2d 1369, 1373, 197 U.S. App. D.C. 184 (D.C. Cir. 1979). The rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents. *Nat'l R.R. Passenger v. ExpressTrak, LLC*, Civil Action No. 02-1773, 2006 U.S. Dist. LEXIS 74923, 2006 WL 2947558 at *6 (D.D.C. Oct. 16, 2006) (citations omitted); *see also Supernus Pharm., Inc. v. Iancu*, 913 F.3d 1351, 1357 (Fed. Cir. 2019) (finding that a prior decision with different facts and a different legal question was not controlling in that action)." *Nippon Shinyaku Co. v. Iancu*, 369 F. Supp. 3d 226, 237 (D.D.C. 2019).

Email: ecorcoran@silvermanthompson.com

_____/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

_____/s/ Robert J. Costello_____
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of March 2022, a copy of the foregoing Defendant's Supplemental Reply On Waiver was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

_____/s/ M. Evan Corcoran_____
M. Evan Corcoran (D.C. Bar No. 440027)

6

**-740-**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     v.

STEPHEN K. BANNON,

     *Defendant.*

Criminal Action No. 1:21-cr-00670 (CJN)

**<u>ORDER</u>**

Pending before the Court is the government's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel, ECF No. 29. For the reasons given on the record at the March 16 hearing and discussed below, the Court grants the Motion.

In *Licavoli v. United States*, the Court of Appeals held:

> Since, as we have remarked, it has been established since the *Sinclair* case, *supra*, that reliance upon advice of counsel is no defense to a charge of refusing to answer a question, *such reliance is not a defense to a charge of failure to respond* [*to a Congressional subpoena*]. *The elements of intent are the same in both cases. All that is needed in either event is a deliberate intention to do the act. Advice of counsel does not immunize that simple intention. It might immunize if evil motive or purpose were an element of the offense. But such motive or purpose is not an element of either of these offenses.* We are of opinion that the doctrine laid down in *Sinclair* applies also to a charge of willfully making default. *Advice of counsel cannot immunize a deliberate, intentional failure to appear pursuant to a lawful subpoena lawfully served.*
>
> In the case at bar there can be no serious dispute about the deliberate intention of Licavoli not to appear before the Committee pursuant to its subpoena. That he meant to stay away was made abundantly clear. That he did so upon the advice of a lawyer is no defense. The trial judge correctly instructed the jury.

294 F.2d 207, 209 (D.C. Cir. 1961) (emphasis added).

In his opposition to the government's Motion, Bannon argued that *Licavoli* was no longer binding on this Court.  *See* Def.'s Opp. to Gov't Mot. in Limine, ECF No. 30, at 13–14.  At the March 16 hearing, the Court rejected these arguments, holding that:

> The defendant offered two reasons in his brief why this Court should ignore the holding of *Licavoli*, but neither of those arguments is persuasive.
>
> First, defendant claims *Licavoli* relied on bad law, specifically the now-disavowed Supreme Court case of *Sinclair v. United States*.  It is true that subsequent Supreme Court cases have cut back on some of the holdings of *Sinclair*, but not the holding that *Licavoli* relies on.
>
> And even if the Supreme Court had done so, the defendant has cited to no authority[,] and the Court has located none of its own, that would allow me to ignore otherwise binding precedent, just because some of the cases on which it relied are no longer good law.
>
> Second, the defendant notes that in the six[ ] decade[s] since *Licavoli*, the Supreme Court has provided clarity on the meaning of 'willfully' in criminal statutes.  Clarity that favors defendant.  That might very well be true.  But none of that precedent dealt with the charge under 2 U.S. Code. Section 192.  *Licavoli* did.  Thus, while this precedent might furnish defendant with arguments to the Court of Appeals on why *Licavoli* should be overruled, this court has no power to disregard a valid and on-point or seemingly on-point holding from a higher court.

Trans. of Oral Arg., March 16, 2022 ("Trans."), at 88:15–89:12.

But at the hearing, Bannon also raised a new argument:  that *Licavoli* is inapplicable because it did not involve a claim of executive privilege.  *See id.* at 89:13–90:16.  Since this argument had not been briefed, the Court asked the parties for supplemental briefing.  *See* Def.'s Supp, Br. in Opp. (Def.'s Supp."), ECF No. 41; United States' Resp. to Def.'s Supp. Br. ("Gov't Resp."), ECF No. 43.

In his supplemental brief, Bannon notes the differences between his reliance on a claimed invocation of executive privilege and *Licavoli*, which included no claim of privilege.  *See* Def.'s Supp. at 1–7.  And Bannon argues that, because this case involves an inter-branch dispute, while

*Licavoli* did not, it is not binding here. *See id.* at 7–10.  The government disagrees.  It argues that *Licavoli*'s rejection of the advice of counsel defense turned on the *mens rea* element of 2 U.S.C. § 192, which cannot be different depending on the specific circumstances of the case, and which requires proof only of a deliberate and intentional failure to appear or produce records.  *See* Gov't Resp. at 2–4.[1]  As the government puts it, "[b]y advocating to allow him to raise an advice-of-counsel defense in his case, even though it is not available to others charged with contempt of Congress, the Defendant necessarily is advocating that the intent element of the offense should change depending on the factual circumstances of the crime."  *Id.* at 4.  And, the government argues, the differences that Bannon points to do not relate to the *mens rea* element or an advice-of-counsel defense.  *See id.* at 5–9.

The Court agrees with the government.  As the Court noted at the March 16 hearing, "[i]f this were a matter of first impression, the Court might be inclined to agree with defendant and allow this evidence in."  Trans. at 87:11–13.  But for the reasons stated on the record during the March 16 hearing, *Licavoli* remains binding, and Bannon has failed to demonstrate that it is inapplicable here.  After all, *Licavoli* involved a prosecution under the exact statute that Bannon is charged with violating, *see Licavoli*, 294 F.2d at 207, and the Court of Appeals expressly held that an advice-of-counsel defense is unavailable for that charge.  *See id* at 207–09.  Just as important, the Court of Appeals rejected the availability of that defense because of the *mens rea*

---

[1] Other courts have held that 2 U.S.C. § 192 requires only a deliberate and intentional failure to appear or produce records.  *See, e.g.*, *United States v. Bryan*, 339 U.S. 323 (1950); *United States v. Fleischman*, 339 U.S. 349 (1950); *Dennis v. United States*, 171 F.2d 986, 990–91 (D.C. Cir. 1948); *Fields v. United States*, 164 F.2d 97, 99–100 (D.C. Cir. 1947).

required for a violation of 2 U.S.C. § 192, and Bannon has provided no reason to believe that the

*mens rea* element can or should be different depending on the circumstances of specific cases.[2]

Accordingly, it is

**ORDERED** that the government's Motion in Limine to Exclude Evidence or Argument

Relating to Good-Faith Reliance on Law or Advice of Counsel, ECF No. 29, is **GRANTED**.

DATE: April 6, 2022

_____

CARL J. NICHOLS
United States District Judge

---

[2] Because the Court concludes that the government is correct, it need not reach the question whether Bannon waived the arguments in his supplemental brief by failing to include them in his original opposition to the government's Motion.

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF DEPARTMENT OF JUSTICE OPINIONS AND WRITINGS

The Defendant has indicated that he intends to offer at trial evidence of Department of Justice ("the Department") opinions and writings relating to the Department's evaluation of whether Executive Branch officials are subject to subpoena by Congress or prosecution under 2 U.S.C. § 192 when acting on a presidential assertion of executive privilege. The Department's opinions and writings are irrelevant, however, to establishing the elements of the charged offenses. Nor do they support the affirmative defenses of entrapment by estoppel or public authority that the Defendant has suggested he wishes to raise. The Defendant was not subpoenaed in relation to his time as an Executive Branch official and he was never directed by the Executive Branch or former President Donald Trump to engage in total noncompliance with the January 6th Select Committee's ("the Committee") subpoena as he chose to do. Given the evidence's irrelevance, the Court should exclude it.

## I.    FACTUAL BACKGROUND

In his pre-indictment interactions with the Government and his post-indictment pleadings, the Defendant has cited a number of Department opinions and writings that he has claimed are relevant to this case. His attorney, Robert Costello, has also made several statements regarding his personal interpretation of the Department opinions and writings and what, based on those

interpretations, he communicated to the Defendant. Specifically, the Defendant at various times

has cited the following Department records:

1) Prosecutorial Discretion Regarding Citations for Contempt of Congress, 38 Op. O.L.C. 1 (2014). *See* ECF No. 34-1 at 20.

2) Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, Letter from Paul Clement to the President, June 27, 2007. *See* ECF No. 34-1 at 23.

3) Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees, 43 Op. O.L.C. __ (May 23, 2019). *See* ECF No. 34-1 at 21[1]; ECF No. 28-12.

4) Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress, 32 Op. O.L.C. 65 (2008). *See* ECF No. 34-1 at 21-22.

5) Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101 (May 30, 1984). *See* ECF No. 28-11.

6) Letter from U.S. Attorney Ronald Machen to Speaker of the U.S. House of Representatives John Boehner, Mar. 31, 2015. ECF No. 28-10.

The Government now has also provided additional Department records on the scope of the

contempt of Congress statute and its relation to a valid assertion of executive privilege. The

Government moves to exclude all of this evidence—all Department opinions and writings and

counsel's interpretation of them.

**II.     ARGUMENT**

At various times, the Defendant has suggested Department opinions and writings on the

scope of the contempt statute and the effect of executive privilege on congressional subpoenas is

admissible for three purposes. First, he has claimed the records are relevant to negating evidence

of his intent. Mot. to Compel, ECF No. 28, at 20-22; Mot. Hrg., 3/16/22, Tr. at 44:5-23. Second,

---

[1] The Defendant does not provide a citation to the opinion in the memorandum and cites the date of the opinion as May 13, 2019, but, based on the quoted text the Defendant included, the Government believes he was referring to the May 23, 2019, OLC opinion.

he has claimed they are admissible to support an entrapment-by-estoppel defense.  ECF No. 28 at

22 n.2; *see also* Mot. Hrg., 3/16/22, Tr. at 42:2-43:14; *id.* at 53:10-54:5.  Third, the Defendant has

claimed they are relevant to a public authority defense.  ECF No. 28 at 22 n.2.  Department records

evaluating the contempt statute and Congress's subpoena power in the face of a valid assertion of

executive privilege cannot be used for any of these purposes.  They are irrelevant to resolving the

charges in this case and should be excluded.

### A.      Only Relevant Evidence is Admissible.

Only relevant evidence is admissible at trial.  Fed. R. Evid. 402.  Relevant evidence is that

which has any tendency to make a fact of consequence in determining the action more or less

probable than it would be without the evidence.  Fed. R. Evid. 401.  In addition, even relevant

evidence may be excluded "if its probative value is substantially outweighed by a danger of one

or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

That admissible evidence is limited to relevant evidence applies to a defendant's right to

present a defense just as it applies to the government's presentation of its case.  *See, e.g.*, *Taylor

v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer

testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of

evidence."); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 127 (2d Cir.

2008) ("When putting his case to the jury, for example, a defendant 'must comply with established

rules of procedure and evidence.'" (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973));

*United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004) ("The right to present a defense,

however, is not without limits.  At a minimum, a defendant is limited to presenting relevant

evidence."); *United States v. Libby*, 475 F. Supp. 2d 73, 91 (D.D.C. 2007) ("[A]lthough the

Constitution entitles a defendant an opportunity 'to present [his] version of the facts . . . to the jury so it may decide where the truth lies,' that guarantee extends only to relevant evidence." (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)) (other citations omitted)). "[E]ven '[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions,' including restrictions imposed by the other rules of evidence such as Rule 403." *Libby*, 475 F. Supp. 2d at 91 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (citing *Taylor*, 484 U.S. at 410). Moreover, where a defendant wishes to raise an affirmative defense that does not negate the elements of the offense, but justifies its commission, the defendant bears the burden of proof. *Smith v. United States*, 568 U.S. 106, 110-12 (2013).

Applying the rules of admissibility for relevant evidence here, the Court should preclude the Defendant from offering the Department's opinions and writings relating to contempt of Congress and executive privilege at trial. They are irrelevant to establishing the elements of the charged offenses and they cannot support the affirmative defenses to which the Defendant has claimed they are relevant.

### B. The Department's Evaluation of the Law is Irrelevant to Proving Whether the Defendant Committed the Charged Offenses.

The Defendant has claimed Department opinions and writings on the scope of the contempt of Congress statute and executive privilege in relation to congressional subpoenas are relevant to negating evidence of willfulness. Mot. to Compel, ECF No. 28, at 20-22; Mot. Hrg., 3/16/22, Tr. 44:5-23. This Court, however, has now granted the Government's Motion to Exclude All Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel. ECF No. 49. Any reliance the Defendant may have placed on Department opinions and writings summarizing the Department's view of the law when he made the deliberate and intentional decision not to comply with the subpoena, therefore, is irrelevant to the intent element of the offense and is inadmissible

under the Court's order.  *See also Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) ("The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident.") (affirming jury instruction).  The Department's opinions and writings must be excluded to the extent the Defendant wishes to offer them to negate intent.

### C.    Department Opinions or Writings on Contempt of Congress and Executive Privilege Do Not Support an Entrapment-by-Estoppel Defense.

The Defendant also has indicated he intends to use Department opinions and writings in support of an entrapment-by-estoppel defense.  ECF No. 28 at 22 n.2; *see also* Mot. Hrg., 3/16/22, Tr. at 42:2-43:14; *id*. at 53:10-54:5.  The Defendant, however, cannot make the required prima facie showing of the defense's elements with this evidence and, therefore, cannot present it to the jury.  Any evidence he claims is related to such a defense must be excluded.

The entrapment-by-estoppel defense "arises when an individual criminally prosecuted for an offense reasonably relied on statements made by a government official charged with 'interpreting, administering, or enforcing the law defining the offense' and those statements actively misled the individual to believe that his or her conduct was legal."  *United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).  The defense arose from the Supreme Court's decisions in three cases: *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp. ("PICCO")*, 411 U.S. 655 (1973).

In *Raley*, the Court reversed the defendants' convictions under state law for refusing to answer questions before a state commission where the defendants had relied on the commission's representation that they could refuse to answer based on their right against self-incrimination.  360 U.S. at 425.  The Court found that the Commission's statements constituted "active misleading"

from a body acting as the agent of the state on the matter and that it therefore could not "hold that the Due Process Clause permits convictions to be obtained under such circumstances." *Id*. at 438-39; *see also id*. at 438 ("[T]o sustain the judgment . . . on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State— convicting a citizen for exercising a privilege which the State clearly had told him was available to him.")

In *Cox*, the Court reversed the defendant's conviction for violating a statute which prohibited protesting "near" a courthouse. 379 U.S. at 564-65. The Court found that, because "near" was not defined in the statute, the statute foresaw "a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and that "demonstrators . . . would justifiabl[y] tend to rely on this administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id*. at 568-69. Accordingly, given the authority of the police to interpret "near," the Court found that its prior opinion in *Raley* barred prosecution of the defendant for protesting where the police told him he could do so. *Id*. at 571. The Court found that, by instructing the defendant that he could protest in a certain location, "[i]n effect, appellant was advised that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute." *Id*.

Finally, in *PICCO*, a corporation was convicted for releasing refuse into navigable waters in violation of federal law. 411 U.S. at 657-60. The Court found that the defendant was entitled to present evidence that an Army Corps of Engineers regulation defining the term "refuse" in the relevant statute to exclude the type of refuse the defendant had released had "affirmatively misled" the company into believing its conduct was legal. *Id*. at 674-75. In reaching this conclusion, the Court found that the Army Corp of Engineers was "the responsible administrative agency" under

the relevant statutory scheme and that the defendant could properly resort to its regulations for guidance on "the meaning and requirements of the statute." *Id*. at 674.

Applying these precedents, courts have found an entrapment-by-estoppel defense to require proof of the following elements:  "(1) that a government agent actively misled [the defendant] about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Chrestman*, 525 F. Supp. 3d at 31 (quoting *Cox*, 906 F.3d at 1191); *see also United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) ("This defense applies when [1] a government official [2] tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime [3] in reasonable reliance on the official's representation." (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994))); *United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996) ("[W]e have required that [1] the government official 'actively mislead the defendant; and that the defendant's reliance be [2] actual and [3] reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation.'" (citation omitted)).  The defense is available only in "limited circumstances," *Chrestman*, 525 F. Supp. 3d at 30, where "the government actors in question provided relatively narrow misstatements of the law that bore directly on a defendant's specific conduct," *id*. at 32 (describing this premise as "central" to *Raley*, *Cox*, and *PICCO*).

Entrapment by estoppel is an affirmative defense for which the Defendant bears the burden. *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995); *United States v. Khanu*, 664 F. Supp. 2d

35, 41 (D.D.C. 2009) (citing *United States v. W. Indies Transport, Inc.*, 127 F.3d 299, 313 (3d Cir. 1997)).  Further, the Defendant is not entitled to present evidence or argument relating to entrapment by estoppel to the jury unless he first makes a prima facie showing of the defense to the court.  *United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (affirming exclusion of defense at trial where defendant could not make prima facie case); *Abcasis*, 45 F.3d at 44 (finding that "once they presented a prima facie defense," the defendants could present the defense to the jury); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (upholding order granting motion in limine precluding evidence).  Here, the Defendant cannot make the required prima facie showing because he was never affirmatively misled by a government official, his attorney's interpretation of Department opinions cannot substitute for those of a government official, and the Defendant's purported reliance was not objectively reasonable.  Accordingly, there is no basis for admitting the Department's opinions or writings at trial to support an entrapment-by-estoppel defense.

      **1.**    ***No government official affirmatively misled the Defendant that his default was legal.***

First, the Defendant cannot show that any government official "affirmatively assured [him] that certain conduct [was] legal."  *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *see also United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal").  To satisfy this element, the Defendant must put forth evidence that the government affirmatively told him that his specific conduct was legal under Section 192.  *See Pardue*, 385 F.3d at 108-09 ("In order to establish a prima facie case for entrapment by estoppel, a defendant must put forth an affirmative representation by a government official that his conduct was or would be legal."); *United States v. Ramirez-Valencia*, 202 F.3d

1106, 1109 (9th Cir. 2000) (explaining that the defendant "must do more than show that the government made 'vague or even contradictory statements'" and "must show that the government affirmatively told him the proscribed conduct was permissible" (quoting *Raley*, 360 U.S. at 438)); *United States v. Aquino–Chacon*, 109 F.3d 936, 938 (4th Cir. 1997) ("A criminal defendant may assert an entrapment-by-estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues.").

Further, courts are clear that a defendant cannot extrapolate the government's statement of the law in one scenario as a free pass to commit crimes in another and then claim the defense. *See West Indies Transp.*, 127 F.3d at 314 (rejecting claim that a placard from the U.S. Coast Guard about discharging "nonplastic trash" a certain distance from shore allowed an entrapment-by-estoppel defense where it "ma[de] no representations about the legality of the defendants' conduct—dumping scrap metal off-shore" and "expressly states that other . . . restrictions may apply, putting defendants on notice to make further inquiries"); *Abcasis*, 45 F.3d at 43-44 ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization."). Nor can a defendant claim entrapment by estoppel by implication. *See Ramirez-Valencia*, 202 F.3d at 1109 (finding form notifying defendant that it was a felony to reenter the United States within five years of deportation did not qualify as an affirmative government statement that reentry after five years was lawful).

Here, even assuming the Defendant actually read and considered all the Department opinions or writings to which he has cited, none of those Department opinions or writings state that a private citizen summoned by congressional subpoena to produce records and appear for

testimony in relation to his conduct while a private citizen has absolute immunity from complying in any way with that subpoena.  Instead, the Department opinions and writings that address the application of the contempt statute state only that the statute does not reach a refusal to testify or the withholding of particular documents where Congress subpoenas 1) a specifically identified current or former high-ranking Executive Branch official, 2) in relation to that person's official duties within the Executive Branch, and 3) the official has been directed by the President not to appear or produce certain records under an assertion of executive privilege.  *See, e.g.*, *Prosecution of Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 O.L.C. Op. 101, 102 (1984) (addressing the issue of "whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege"); *id.* at 142 ("In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official."); *see also* 43 O.L.C. Op. __, at * 14 (May 23, 2019) ("[A]gency employees . . . who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully.").  Indeed, the Office of Legal Counsel opinion first articulating the position that the contempt statute could not reach an Executive Branch official acting at the President's direction made clear that, "we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983.  Constitutional conflicts within the federal government must be resolved carefully, based upon the facts of each specific case.  . . . [O]ur conclusions . . . should be limited to controversies similar to the one to which this

memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis." 8 O.L.C. Op. at 102-03. Even those opinions that do not address the contempt statute's reach—and therefore could tell the Defendant nothing about whether his defiance was lawful under the statute—but instead discuss only whether executive privilege applies to certain records or testimony nowhere state that a private citizen summoned in relation to events occurring during his time as a private citizen is excused entirely from compliance in any way with a congressional document and testimony demand. They also nowhere state that the Defendant, even if he believed he had a privilege, did not have to submit a privilege log or appear and assert privilege on a question-by-question basis as required by the subpoena.

Unlike the Executive Branch officials at issue in the documents the Defendant has cited, the Defendant did not seek out or receive an individualized assessment from government officials about the lawfulness of the particular circumstances of his conduct before defying the congressional subpoena. And, unlike those Executive Branch officials, he 1) was not subpoenaed in his capacity as a current or former White House official or in relation to his official duties when he worked in the White House, and 2) he did not receive a direction from the Executive Branch— either the current or former administration—not to appear or produce records in response to the subpoena, *see* Ex. 1 (October 18, 2021, letter from White House Deputy Counsel to Costello stating that President Joseph Biden had determined an assertion of executive privilege was not justified and that this determination applied to the Defendant's deposition testimony and any documents concerning subjects relating to January 6); Ex. 2 (October 6, 2021, letter from Justin Clark to Costello stating only that the Defendant should "where appropriate" invoke privileges and not provide documents or testimony concerning privileged material); Ex. 3 (emails from Justin Clark to Costello stating that the October 6 letter "didn't indicate that we believe there is immunity

from testimony for your client" and stating that, while the Defendant had told the Committee the former President "has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved," Clark had "simply reiterated the instruction" from his October 6 letter).  Moreover, not only do the Department opinions and writings not sanction the specific conduct in which the Defendant engaged, they include warnings that their reasoning is limited to the particular circumstances they address.  And the Defendant never provided any government official with the facts of his specific situation or sought the government's opinion of it.  *See West Indies Transp.*, 127 F.3d at 313 (affirming exclusion of defense where defendant had sought the government's advice on one scenario but not the scenario for which the defendant was charged).

The Defendant is left, therefore, only with his guess that the government might ultimately extend its reasoning with respect to one class of conduct to an entirely different class of conduct.  But that cannot support an entrapment-by-estoppel defense.  Nothing in the documents supports such a prediction, and even if it did, the mere possibility that the government might view certain conduct as lawful in the future does not mean that a defendant who engages in such conduct today has been entrapped.   Such an outcome would not serve the due process concerns underlying the entrapment-by-estoppel defense and should be rejected.

> **2.      The Defendant's attorney's interpretation of Department opinions provides no basis for the defense because his attorney is not a government official.**

Second, to the extent the Defendant's attorney attempted to predict what position the Department might take with respect to the Defendant's circumstances based on the attorney's interpretation of Department opinions and writings in relation to different circumstances, that cannot support an estoppel defense either because the Defendant's attorney is not a government official.  The defense is focused on the unfairness of a government agent telling a defendant his

proposed conduct is legal and then prosecuting him for that very conduct. It is limited, therefore, to affirmative statements of the law by the government. Mr. Costello was not a government agent, so his mistaken conclusions about the reach of the contempt statute cannot be attributed to the government. *United States v. Hardridge*, 379 F.3d 1188, 1194 (10th Cir. 2004) ("[W]here, as here, the alleged unfairness to the defendant arises out of private conduct and not from government action, it is not the *government* that has denied due process." (emphasis in original)); *W. Indies Transp., Inc.*, 127 F.3d 299 at 314 ("The entrapment by estoppel defense applies only to representations made by government officials, not to asserted reliance on legal advice or representations from non-governmental actors. Representations made by [a] private entity as to the legality of [the defendant's conduct] cannot remotely establish a valid entrapment by estoppel defense."). And allowing the Defendant to rely on Mr. Costello's legal conclusions about how the Department might apply the law to his situation given its conclusions in other situations would do nothing to serve the due process concerns that underly such a defense. *See Raley*, 360 U.S. at 438 ("[T]o sustain the judgment . . . would be to sanction the most indefensible sort of entrapment by the *State*—convicting a citizen for exercising a privilege *which the State clearly had told him* was available to him." (emphasis added)). Instead, it would simply allow the Defendant to back-door the good-faith reliance defenses that this Court has already found unavailable based on controlling Supreme Court and Circuit precedents.

### 3.    The Defendant cannot show his reliance on Department records, if any, was objectively reasonable.

Finally, the Defendant cannot show his reliance on the Department opinions and writings was reasonable. "[R]easonable reliance means a defendant must establish that 'a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *W. Indies Transp., Inc.*, 127 F.3d at 313 (quoting *United*

*States v. Trevino–Martinez*, 86 F.3d 65, 69 (5th Cir. 1996); *Brebner*, 951 F.2d at 1024.  Given that

none of the opinions or writings address the Defendant's specific conduct, that both the current

White House Counsel's Office and the former President's counsel informed the Defendant he was

not being directed to completely disregard Congress's demand for testimony and documents, and

that the opinions and writings cabin their conclusions to the specific circumstances of the cases

they address, at best the Defendant was on notice that further inquiry was required before he could

conclude the government viewed his default as falling outside the bounds of Section 192.  Reliance

under those circumstances is not reasonable and the Defendant cannot make a prima facie showing

of this element either.  Accordingly, the Department's records are inadmissible to support an

entrapment-by-estoppel defense.

### D.    Department Opinions and Writings and the Defendant's Interpretation of Them Do Not Support a Public Authority Defense.

The Defendant has also suggested he believes the evidence supports a public-authority

defense.  ECF No. 28 at 22 n.2.  It does not.

The public-authority defense applies only to a "defendant who knows the conduct he has

been authorized to commit is illegal," but believes he is acting as an agent of a government official

who possessed actual authority to order his conduct.  *United States v. Alvarado*, 808 F.3d 474, 485

(11th Cir. 2015); *see also United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) ("The

public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he

reasonably relied" on the "actual authority of a government official to engage him in a covert

activity.'" (citations omitted)).  Like entrapment by estoppel, the defendant bears the burden of

proof, *United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011), and he must make a prima

facie showing of the defense to present it to the jury,[2] *see Alvarado*, 808 F.3d at 484 ("[A]

defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it,

unless he meets certain evidentiary prerequisites."); *United States v. Kuai Li*, 475 F. Supp. 2d 590,

593 (E.D. Va. 2007) (excluding evidence of a public-authority defense where the defendant could

not establish that the official whose direction he claimed to follow had the actual authority to

engage the defendant in the illegal conduct).  The defense requires proof of the following elements:

1) "a federal law enforcement officer must have actually authorized the defendant to commit the

particular criminal act at issue," 2) "the defendant must have reasonably relied on that

authorization when engaging in that conduct," and 3) "the government official on whom the

defendant purportedly relied must have actually had the authority to permit a cooperating

individual to commit the criminal act in question." *Alvarado*, 818 F.3d at 484.  The Department's

opinions or writings do not satisfy these elements here.

### 1.  *The Defendant never received a direction from law enforcement to engage in total noncompliance with the subpoena.*

First, the Department's opinions and writings do not constitute a direction from a law

enforcement official to the Defendant to refuse to comply with the congressional subpoena.

Indeed, the Defendant never sought the authorization of a law enforcement official.  The only

communication he had with any Executive Branch official was with the White House Counsel's

Office and, in that instance, the communication consisted of an unsolicited letter from the

Counsel's Office explicitly advising the Defendant that the President had decided not to assert

---

[2] Under Federal Rule of Criminal Procedure 12.3, the Defendant must provide notice of a public authority defense by the pretrial motion deadline set by the Court.  The Defendant has not, to date, provided any such notice.  The Government believes that, even without proper notice, the Court can decide now that the Department's opinions and writings are not admissible in support of such a defense.  The Government does not, by this motion, however, intend to waive any rights to discovery and notice under Fed. R. Crim. P. 12.3.

executive privilege over the Defendant's deposition testimony or any documents he possessed regarding January 6.  Ex. 1.  The Defendant was not an informant engaged in covert activities at the direction of a law enforcement agent in furtherance of a criminal investigation.  He was a private citizen who attempted to predict, based on inapposite Department writings, whether the Department would prosecute him.  The public authority defense is not available in these circumstances.

2.    **The Department's opinions and writings were not authored by law enforcement officials with actual authority to direct the Defendant to defy the subpoena.**

Second, even if the Department writings had directed the Defendant not to comply in any way with the subpoena, the authors of those writings—representatives of the Department of Justice—do not have the actual authority to direct the Defendant not to comply with a congressional subpoena on the basis of executive privilege.  Every court to have decided the issue has held that, for the public authority defense to be available, a defendant must have received a direction to commit a crime from a law enforcement agent who had "actual, not apparent authority" to so direct him.  *United States v. Sariles*, 645 F.3d 315, 318-19 (5th Cir. 2011); *see also Fulcher*, 250 F.3d at 254 ("[W]e adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official"); *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017) (finding the defense is limited "to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question"); *United States v. Holmquist*, 36 F.3d 154, 161 nn. 6-7 (1st Cir. 1994) (characterizing as "nonexistent" and "not a defense at all" the "'defense' of apparent public authority" based "on a mistaken but good-faith belief that one's conduct is authorized by the government"); *United States*

*v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) ("The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the "public authority"; reliance on the apparent authority of a government official is not a defense in this circuit, because it is deemed a mistake of law, which generally does not excuse criminal conduct."); *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (declining to adopt view that "a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real").[3]

The Office of Legal Counsel and other representatives of the Department of Justice do not have the authority to invoke executive privilege and direct a private citizen, subpoenaed in his capacity as such, to ignore completely a congressional subpoena's document and testimony requirements.[4] Even if the Defendant had been subpoenaed by the Select Committee in his capacity as a White House official, as the Department's writings make clear, it is only the President

---

[3] In *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), the D.C. Circuit reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *See United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990). The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id.* (quoting *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *United States v. North* subsequently rejected Oliver North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id.* at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here.

[4] Although OLC's interpretation of a President's direction and the law is binding on Department personnel, this does not render it a direction to a private citizen to default by a law enforcement officer with actual authority to give such a direction.

that has the authority to direct a subordinate not to comply on the basis of executive privilege, not Department officials. *See, e.g.*, *Prosecution of Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("[T]he contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts *the President's claim* of executive privilege." (emphasis added)); *id.* ("[T]he President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents."). The Defendant cannot show, therefore, that he received authorization to engage in contempt from an official with actual authority based on Department opinions and statements.

### 3. The Defendant cannot show that his reliance on Department records, if any, was objectively reasonable.

Finally, the Defendant cannot show that, even if Department writings qualified as an authorized law enforcement agent's direction to engage in criminal conduct, he relied on their direction reasonably. The public authority defense is based on a defendant's "objectively reasonable reliance on the authority of a government official." *Fulcher*, 250 F.3d at 254; *see also Sariles*, 645 F.3d at 318-19. This reasonableness requirement is necessary to ensure the "uniform enforcement of law"; otherwise, anyone could claim they interpreted a public official's actions or statements as authorizing them to engage in criminal conduct, no matter how unreasonable that belief, and avoid accountability. *See Burrows*, 36 F.3d at 882 (citing *United States v. Lansing*, 424 F.2d 225 (9th Cir. 1970) (internal quotation marks omitted)). The Defendant cannot show his reliance on Department writings was reasonable to support a public-authority defense for the same reason he cannot do so with respect to entrapment by estoppel. None of the writings to which he points were directed to him and none can be read to have directed him to engage in total noncompliance with either the subpoena's document demand or the testimonial demand—

particularly where neither the current nor former President directed total noncompliance.  The Defendant cannot satisfy this element of the public-authority defense based on the Department's writings and opinions and they must be excluded.

**E.      Allowing the Defendant to Present Evidence of the Department's Opinions and Writings Would Confuse the Issues and Mislead the Jury.**

Even relevant evidence is inadmissible where its probative value is substantially outweighed by a danger of "undue prejudice, confusion of the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  As outlined above, the Department's opinions and writings relating to contempt of Congress and executive privilege have no probative value here.  Yet, allowing the Defendant to admit evidence of them carries a substantial risk of confusing the issues and misleading the jury.  If the Defendant is allowed to admit inapposite Department opinions directed at different individuals in different circumstances—some or all of which the Defendant may never have read himself—to argue that he should be acquitted, the jury necessarily will be asked to parse the Department's legal conclusions to determine if they have application to the facts of the Defendant's contempt.  Not only would this distract the jury from the consequential issue in this case—whether the Defendant deliberately and intentionally refused to show up—but it could invite nullification or invite the jury to substitute the Department's opinions on the law for this Court's instructions on the law, neither of which are tenable outcomes.  *See United States v. Wilkerson*, 966 F.3d 828, 835 (D.C. Cir. 2020) ("[I]t is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence." (quoting *Sparf v. United States*, 156 U.S. 51, 102 (1895)) (internal quotation marks omitted))).  Federal Rule of Evidence 403 bars the admission of such unduly prejudicial evidence.

III.     **CONCLUSION**

The Department of Justice's opinions and writings relating to the reach of the contempt of Congress statute and the assertion of executive privilege in response to congressional subpoenas have no relevance to resolving the charges in this case.  They provide no evidence relevant to any of the elements of the charged offenses and they cannot support the affirmative defenses the Defendant has suggested he intends to assert.  The evidence must be excluded.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

# EXHIBIT 1



**THE WHITE HOUSE**
WASHINGTON

October 18, 2021

Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, NY 10158

Dear Mr. Costello:

I write regarding the subpoena for documents and deposition testimony issued on September 23, 2021, by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") to your client, Stephen K. Bannon.

As you are aware, Mr. Bannon's tenure as a White House employee ended in 2017. To the extent any privileges could apply to Mr. Bannon's conversations with the former President or White House staff after the conclusion of his tenure, President Biden has already determined that an assertion of executive privilege is not in the public interest, and therefore is not justified, with respect to certain subjects within the purview of the Select Committee. Specifically, President Biden determined that an assertion of executive privilege is not justified with respect to a set of documents shedding light on events within the White House on and about January 6, 2021,[1] and with respect to documents and testimony concerning the former President's efforts to use the Department of Justice to advance a false narrative that the 2020 election was tainted by widespread fraud.[2] President Biden's determination that an assertion of privilege is not justified with respect to these subjects applies to your client's deposition testimony and to any documents your client may possess concerning either subject.

Please contact me if you have questions about the matters described herein. Please note, however, that at this point we are not aware of any basis for your client's refusal to appear for a deposition.

Sincerely,

Jonathan C. Su
*Deputy Counsel to the President*

cc:    Kristin L. Amerling
       Chief Counsel and Deputy Staff Director
       Select Committee to Investigate the January 6th Attack on the United States Capitol

---

[1] *See* Letter to David S. Ferriero, Archivist of the United States, from Dana A. Remus, Counsel to the President (Oct. 8, 2021).
[2] *See* Letter to Jeffrey A. Rosen from G. Bradley Weinsheimer, Associate Deputy Attorney General, Department of Justice (July 26, 2021).

SKB-000029

US-000998

# EXHIBIT 2

# Elections, LLC

**Attorneys at Law**
**Justin R. Clark**
**E** Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, NY 10158
rjc@dhclegal.com

Dear Mr. Costello:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Steven Bannon (the "Subpoena"). The Subpoena requests that Mr. Bannon produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena.

1000 Maine Avenue, SW, 4th Floor  |  Washington, D.C. 20024

SKB-000002

US-000971

# EXHIBIT 3

**From:** Justin Clark <justin.clark@electionlawllc.com>
**Sent:** Saturday, October 16, 2021 12:24 PM
**To:** Costello, Robert J. <rjc@dhclegal.com>
**Subject:** Re: October 13, 2021 Benny Thompson Letter


**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Bob - In light of press reports regarding your client I wanted to reach out.  Just to reiterate, our letter
referenced below didn't indicate that we believe there is immunity from testimony for your client.  As I
indicated to you the other day, we don't believe there is.  Now, you may have made a different
determination.  That is entirely your call.  But as I also indicated the other day other avenues to invoke the
privilege - if you believe it to be appropriate - exist and are your responsibility.

If you haven't already I'd encourage you again to contact counsel for the committee to discuss it further.

Justin



On Oct 14, 2021, at 4:48 PM, Justin Clark <justin.clark@electionlawllc.com> wrote:



Bob – I just read your letter dated October 13, 2021 to Congressman Benny Thompson.  In that letter you
stated that "[a]s recently as today, counsel for President Trump, Justin Clark Esq., informed us that
President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce
documents or testify until the issue of executive privilege is resolved."

To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated
October 6, 2021, and attached below.

Best Regards,

Justin Clark



<Bannon Letter.pdf>


**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,<u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number
you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*************************************************************
STATEMENT OF CONFIDENTIALITY

SKB-000016

US-000985

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE**
**RELATING TO OBJECTIONS TO SUBPOENA THAT DEFENDANT WAIVED**

In various filings and in statements before this Court, the Defendant, Stephen K. Bannon, has stated an intention to challenge the contempt of Congress charges against him through assertions that the congressional subpoena on which he defaulted was rendered invalid based on supposed procedural defects in the January 6th Select Committee's ("the Committee") work and issuance of the subpoena. Specifically, the Defendant claims that the Committee's composition did not comply with its authorizing resolution; that Committee rules improperly barred counsel other than the Defendant's from appearing at the required deposition; and that the Committee failed to follow its rules in the administration of the Defendant's subpoena. But the Defendant never raised any of these objections to the Committee, and in failing to do so, he has waived the right to raise them now. The Defendant's waiver means that he cannot present evidence or argument relating to these objections at trial. The Court should thus preclude the Defendant from introducing evidence or making arguments at trial relating to his waived procedural objections to the Committee's subpoena.

## I.      FACTUAL BACKGROUND

When the Defendant refused to produce documents or appear for testimony before the Committee, he raised only one basis for his noncompliance: an alleged assertion of executive

-771-

privilege by former President Donald J. Trump.  After a federal grand jury in the District of Columbia returned a two-count indictment against him for contempt of Congress, however, the Defendant began to advance multiple other objections to the Committee's subpoena.  Through his failure to make these objections to the Committee, however, the Defendant has waived them as a defense at trial.

### A.    The Defendant's Refusal to Appear or Produce Documents

On June 30, 2021, the U.S. House of Representatives adopted House Resolution 503, which created the Committee and set forth publicly the Committee's rules and procedures.  Indictment, ECF No. 1, at ¶¶ 1-5; *see also* H. Res. 503, ECF No. 28-7.  On September 23, 2021, as part of its investigation, the Committee issued a subpoena to the Defendant requiring him to appear and produce documents to the Committee on October 7, 2021, and to appear for a deposition before the Committee on October 14, 2021.  Indictment ¶¶ 7-8.  The cover letter to the subpoena explained why the Committee believed the Defendant had information pertinent to its investigation, *id*. ¶ 7, and the subpoena included directions and rules regarding how to comply with both its document and testimonial demands, *id*. ¶¶ 12, 14.

The Defendant did not comply with the subpoena in any way.  *Id*. ¶ 21.  Instead, on October 7, 2021, after the deadline for producing documents to the Committee had passed, his attorney, Robert Costello, sent a letter to the Committee's Chief Counsel claiming that the Defendant could not comply because former President Trump had claimed that the subpoena sought records and information potentially protected by executive and other privileges.  *Id*. ¶ 16.  The Committee Chair responded the following day, rejecting this basis for noncompliance and reminding the Defendant that in order to properly assert privileges and objections to the Committee, he was

required to provide a privilege log for withheld documents and to appear and assert privileges on a question-by-question basis at his deposition. *Id.* ¶ 17.

The Defendant still did not comply. Instead, the evening before the deposition date, Mr. Costello transmitted a letter to the Committee Chair announcing that the Defendant would not produce documents or appear for a deposition until the Committee reached an agreement with the former President or secured a court ruling regarding "the extent, scope, and application of the executive privilege." *Id.* ¶ 18. The Defendant then did not appear for a deposition the next day, October 14, 2021, as required by the subpoena. *Id.* ¶ 19. In sum, at the time he defaulted, the Defendant had raised only former President Trump's alleged invocation of executive and other privileges as a basis for his noncompliance. *See* ECF No. 29-1 (compilation of all of the Defendant's correspondence with the Committee in advance of his default).

### B.    The Defendant's Post-Indictment Objections

Since the Defendant was charged in this case, he has suggested in pleadings and hearings that he intends to raise new, procedural objections to the Committee subpoena. Specifically, he has suggested that his noncompliance was excused because (1) the Committee operated using titles for its leading members of "Chair" and "Vice Chair" rather than "Chair" and "Ranking Member," *see* ECF No. 28 at 19-20 (stating that the Committee "did not act within its legal authority with regard to the subpoena and deposition of Mr. Bannon, because there was no consultation with the ranking minority member. Simply put, the Select Committee does not have a ranking member."); (2) the Committee's rules did not permit former President Trump's counsel to attend his deposition, *see* ECF No. 30 at 18 (stating that counsel advised the Defendant that the "subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege"); and (3) the Committee did not provide the Defendant with

a copy of Section 3(b) of H. Res. 8, *see* ECF No. 39 at 3 ("Mr. Bannon did not have to appear for deposition, because paragraph 11 provides that when a subpoenaed person does not receive a copy of Rule 3(b) . . . then that person does not have to appear for a deposition."). But as set forth in detail below, the Defendant cannot now raise for the first time these novel objections to the Committee's subpoena.

## II.    ARGUMENT

### A.    A Defendant Who Fails to Raise an Assertion of Privilege or Objection to a Subpoena With the Committee That Issued It Waives the Privilege or Objection.

It is settled law in the contempt of Congress context that a subpoenaed witness who fails to raise an apparent objection or privilege to a subpoena to the issuing committee has waived it as a defense to contempt. In *United States v. Bryan*, the Supreme Court rejected the defendant's ability to raise as a defense that there was a "defect in composition" of the committee that had issued her subpoena because a quorum of the committee was not present on the date and time her response was due. 339 U.S. 323, 330-334 (1950). The Court found the defendant had waived the objection because she had only raised it for the first time at the contempt trial, two years after her default. *Id*. In reaching this conclusion, the Court emphasized that a subpoenaed witness must raise any objections to compliance to the relevant congressional committee at the time of the witness's refusal to comply to allow the committee to consider it or ameliorate it. *Id*. at 333 ("To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of authority and an obstruction of its processes." (citing *Bevan v. Krieger*, 289 U.S. 459, 464-465 (1933))). Accordingly, the failure to voice an objection or privilege in the face of a congressional subpoena before its issuing committee results in waiver. *Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (explaining that a constitutional objection "must be adequately raised before

the inquiring committee if [it] is to be fully preserved for review in this Court.  To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer." (internal citations omitted)); *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (finding the defendant could not use as a defense to willful default that he did not have the subpoenaed records when he had never made such a claim to the relevant committee).

Consistent with the general principle of good-faith and fair-dealing between a witness and a congressional committee, however, a witness will not be deemed to have waived an objection based on a procedural defect about which he could not have known.  *See Yellin v. United States*, 374 U.S. 109, 122-23 (1963) (no waiver of objection where defendant could not have known that the relevant committee did not follow its procedures to consider it when the defendant first raised it); *Liveright v. United States*, 347 F.2d 473, 474-76 (D.C. Cir. 1965) (no waiver where defendant was not aware, and had no reason to be aware, of improper issuance of his subpoena).

**B.    The Defendant Has Waived Objections That He Failed to Raise Before the Committee and Should Be Precluded From Raising Them at Trial.**

When dealing directly with the Committee, the Defendant raised only one claimed basis for his noncompliance with its subpoena: an alleged assertion of executive privilege by former President Trump.  That being the only basis the Defendant identified to the Committee for his reason for not complying with its subpoena, under the Supreme Court's precedents outlined above, the Defendant has waived any other objections based on claimed procedural defects or other privileges of which he was on notice at the time he defaulted.  This waiver includes the three additional supposed procedural defects that the Defendant raise during this litigation.  As outlined below, he has waived these new claims as a defense against the charges because the Defendant did not inform the Committee that he refused to comply with its subpoena because its ranking

5

-775-

Republican member is referred to as a Vice Chair rather than a Ranking Member.  He did not

notify the Committee that he objected to the Committee rules' exclusion of counsel other than his

own from attendance at depositions.  And he did not tell the Committee that his noncompliance

was based on the fact that the Committee had not provided him with a copy of Rule 3(b).  Because

all of these issues were apparent on their face at the time the Defendant defaulted, and he did not

object based on them, he has waived the right to raise them now.

   1.   ***The Defendant has waived any objection to the subpoena based on the Committee's use of the term "Vice Chair" for its ranking minority member.***

The Defendant has suggested that he will raise objections before this Court to the

Committee's subpoena because the Committee does not have a Ranking Minority Member.  *See*

ECF No. 28 at 19 ("The Select Committee did not act within its legal authority with regard to the

subpoena and the deposition of Mr. Bannon, because there was no consultation with the ranking

minority member.  Simply put, the Select Committee does *not have a ranking minority member*."

(emphasis in original)).  The Defendant's after-the-fact assertion of this objection, then, appears

to be based on an immaterial difference in nomenclature between the Committee's authorizing

resolution, House Resolution 503 (which refers to the ranking Republican member as a Ranking

Minority Member), and the Committee's use of the title "Vice Chair" to refer to ranking member

Rep. Liz Cheney.

Even to the extent the semantics of Rep. Cheney's title could constitute a procedural defect

in the Committee's operations, the Defendant did not raise this objection before the Committee

and has thus waived it because all of the information necessary to make it was available to him at

the time he defaulted.  The Committee's authorizing resolution, which used the title "Ranking

Minority Member," was a public law whose entire text appears on the Committee's website.[1]  Also

public was the fact that Rep. Cheney used the equivalent title of "Vice Chair."  For instance, on

September 2, 2021, the Committee issued a press release titled, "Chairman Thompson Announces

Representative Cheney As Select Committee Vice Chair."[2]  And on October 7, 2021, when the

Defendant defaulted on the document deadline, but before he defaulted on his deposition deadline,

the Committee Chair and Vice Chair Cheney jointly issued a statement condemning Bannon's

noncompliance.[3]  Further, the Defendant cannot exploit this newfound distinction without a

difference to excuse his noncompliance when he continues to insist—as he did at the time of his

default—that his true reason for refusing to appear was the alleged assertion of executive privilege.

*See Bryan*, 339 U.S. at 333-334 ("[T]he fact that the alleged defect upon which respondent now

insists is, in her own estimation, an immaterial one, is clearly shown by her reliance before the

Committee upon other grounds for failing to produce the records.  She does not deny . . . that she

would not have complied with the subpoenas no matter how the Committee had been constituted

at the time.").  The Defendant should be foreclosed from introducing evidence or making argument

at trial about the Committee's use of the term "Vice Chair" rather than "Ranking Minority

Member" because he has waived the objection.

      **2.**       **The Defendant has waived any objection to the subpoena based on the committee's rule regarding the presence of counsel other than his own.**

The Defendant's pleadings repeatedly assert that the subpoena to him "was invalid, based

on long-standing U.S. Department of Justice authority, because the Committee would not allow

---

[1] *See* https://january6th.house.gov/about (last accessed April 15, 2022).

[2] *See* https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (last accessed April 15, 2022).

[3] *See* https://january6th.house.gov/news/press-releases/thompson-cheney-statement-subpoena-deadline (last accessed April 15, 2022).

former President Donald J. Trump's counsel to be present at Mr. Bannon's deposition, so as to protect executive privilege." ECF No. 30 at 2.  But the Defendant has conceded that even though he and his counsel believed that the Committee rule provided a basis on which to object to the subpoena, he chose not to do so.  The Defendant's surreply to the Government's motion in limine regarding a good-faith reliance defense asserted that Mr. Costello "was under no obligation to reveal to Staff Counsel that Mr. Bannon had a complete defense to the subpoena's demands based upon the OLC opinions; Costello was well aware that it was fruitless to make a request for a change of rules to the Staff Counsel, because Staff Counsel had no authority to so act." ECF No. 39 at 7. Although it is true that Mr. Costello and the Defendant could choose not to raise any specific objection to the Committee, their decision not to do so constitutes waiver, and the Defendant cannot now raise the objection as a defense at trial.  It is inconsistent with the authority of the Committee and the requirement that witnesses make timely assertions of any good-faith objections they may have to allow the Defendant to formulate secret objections that he holds in abeyance and raises only before a court.  "To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Bryan*, 339 U.S. at 333 (internal citation omitted).

### 3.     The Defendant has waived any objection to the subpoena based on whether the Committee provided a copy of Rule 3(b).

Finally, in his surreply to the Government's motion in limine regarding an advice-of-counsel defense, the Defendant argues that "pursuant to paragraph 11 of the 117th Congress Regulations For Use of Deposition Authority, Mr. Bannon did not have to appear for deposition, because paragraph 11 provides that when a subpoenaed person does not receive a copy of Rule 3(b) . . . then that person does not have to appear for a deposition." ECF No. 39 at 3.  As an initial matter, the Defendant misquotes the rule.  The rule does not excuse the Defendant's appearance,

it only states that "[a] witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress." 117th Cong. Regulations for Deposition Authority, ECF No. 28-8 at US-000963. And what the Defendant fails to mention is that consistent with these rules, the Committee was prepared to provide the Defendant with a copy of Section 3(b) when he appeared for his deposition. *See* Interview Report, Committee Counsel, ECF No. 35-2 at US-000362 (Committee counsel "had also prepared a manila folder of documents to be provided to Bannon should he appear. This manila folder contained a copy of House Resolution 503, Section 3(b) of House Resolution 8, and a copy of the 117th Congress Regulations for Use of Deposition Authority."). The only reason the Defendant did not receive a copy of Section 3(b), then, is because he failed to appear as required by the subpoena.

Moreover, the rules requiring the Committee to provide Section 3(b) were attached to the subpoena with which the Defendant was served, Ex. 1 at US-000417, so, even to the extent there was a procedural defect, the Defendant was on notice of the requirement but waived his opportunity to object by not raising it with the Committee. "A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity." *Bryan*, 339 U.S. at 331. The Defendant cannot refuse to appear for his deposition or to raise good-faith objections to the Committee's subpoena, and then fault the Committee for failing to corner him. His claim with respect to Section 3(b) is, like his other eleventh-hour objections, waived.

## III.    CONCLUSION

The only objection the Defendant asserted to the Committee as a basis for his noncompliance with its subpoena was a purported assertion of executive privilege by former President Trump.  Accordingly, the Defendant waived all other objections of which he was on notice at the time of his default, including those he has raised for the first time in the criminal contempt proceedings.  He should be precluded from introducing evidence or arguments regarding these waived objections at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

# EXHIBIT 1

## SUBPOENA

### BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Stephen K. Bannon
c/o Robert Costello, Esq., Davidson, Hutcher and Citron, LLP
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑  **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: October 7, 2021 _____        Time: 10:00 a.m.

☑  **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: October 14, 2021 _____        Time: 10:00 a.m.

☐  **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____        Time: _____

*To* any authorized staff member or the United States Marshals Service
_____
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 23ᵈ day of September , 2021.

_____
*Chairman or Authorized Member*

Attest: _____

*Clerk*

**Jan. 6 Sel. Comm. 0001**

US-000408

## PROOF OF SERVICE

Subpoena for Stephen K. Bannon
        c/o Robert Costello, Esq., Davidson, Huthcher and Citron, LLP

Address 605 Third Avenue, 34th Floor

New York, NY 10158

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name)  *Kristin Amerling*

Title  *Chief Counsel + deputy staff director*

Manner of service  *email to attorney for Mr. Bannon,*
*Robert Costello at rjc@dhclegal.com*

Date  *9/23/21*

Signature of Server  *[signature]*

Address  *House Select Comm. Hee to Investigate the 1/6th Hack, 1540A*
*Longworth HoB, Washington, DC 20515*

Jan. 6 Sel. Comm. 0002

US-000409

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
## Select Committee to Investigate the January 6th Attack on the United States Capitol

September 23, 2021

Mr. Stephen K. Bannon
c/o Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Bannon:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena compelling you to produce the documents set forth in the accompanying schedule by October 7, 2021, and to appear for a deposition on October 14, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. This inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The Select Committee has reason to believe that you have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021. For example, you have been identified as present at the Willard Hotel on January 5, 2021, during an effort to persuade Members of Congress to block the certification of the election the next day, and in relation to other activities on January 6.[1] You are also described as communicating with then-President Trump on December 30, 2020, and potentially other occasions, urging him to plan for and focus his efforts on January 6.[2] Moreover, you are quoted as stating, on January 5, 2021, that "[a]ll hell is going to break loose tomorrow."[3] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and multiple other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[1] *E.g.*, BOB WOODWARD & ROBERT COSTA, PERIL at 233 (2021).
[2] *Id.* at 207.
[3] Rob Kuznia, Curt Devine, & Drew Griffin, *How Trump Allies Stoked the Flames Ahead of Capitol Riot*, CNN (Jan. 18, 2021), https://www.cnn.com/2021/01/18/politics/trump-bannon-stone-giuliani-capitol-riot-invs/index.html.

**Jan. 6 Sel. Comm. 0003**

US-000410

Mr. Stephen K. Bannon
Page 2

## SCHEDULE

In accordance with the attached Definitions and Instructions, you, Stephen K. Bannon, are hereby required to produce all documents and communications in your possession, custody, and control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal or campaign accounts, and/or on personal or campaign applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.:

1. The January 6, 2021, rally on the mall and Capitol grounds in Washington, D.C., in support of President Donald J. Trump and opposition to certification of the results of the 2020 presidential election, including any permitting, planning, objectives, financing, and conduct, as well as any communications to or from any person or group involved in organizing or planning for the January 6, 2021, rally.

2. Then-President Trump's participation in the January 6, 2021, rally, including any communications with President Trump or any paid or unpaid attorney, advisor, aide, or assistant to President Trump relating to the nature, context, or content of President Trump's intended or actual remarks to those attending the January 6, 2021, rally.

3. Communications referring or relating to the nature, planning, conduct, message, context, or participation in the January 6, 2021, rally between or among any person who, during the administration of President Donald J. Trump, worked in the White House complex, including any employee or detailee.

4. Documents or other materials referring or relating to the financing or fundraising to assist any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the January 6, 2021, rally.

5. "The 'War Room' podcast," insofar as at any time you communicated through it statements referring or relating to efforts to contest the election results, including planning for the January 6, 2021, rally, including all statements concerning its planning, objectives, purpose, organization, message, or sponsorship.

6. The organization or group named "March for Trump" and its activities relating to the January 6, 2021, rally, including any communications you had with any officer or member of "March for Trump" relating in any way to the planning, objectives, organization, message, sponsorship, and participation in the January 6, 2021, rally.

7. Your presence, purpose, statements, and activities at a meeting at the Willard Hotel on January 5, 2021, or the presence, purpose, statements, or activities of others in attendance, related to that meeting.

8. Your communications with President Donald J. Trump concerning events on January 6, 2021, including but not limited to communications on December 30, 2020.

9. Your communications with President Donald J. Trump between November 3 and January 20, 2021, concerning efforts to contest the election results or delay or impede the electoral count.

10. Anyone with whom you communicated by any means with respect to any aspect of the planning, objectives, conduct, or participation in the January 6, 2021, rally, including but not limited to Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

**Jan. 6 Sel. Comm. 0004**

US-000411

Mr. Stephen K. Bannon
Page 3

11. Anyone with whom you communicated by any means with respect to efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count, including but not limited to communications with Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

12. All public relations, advertising, or other communications efforts to persuade Americans that the election was stolen or to attend the rally on January 6.

13. The role of the Vice President as the Presiding Officer in the certification of the votes of the electoral college.

14. Any communication with any employees of President Trump's 2020 presidential campaign, the Republican National Committee, or any Trump Administration personnel including appointees, employees, and interns, about any of the foregoing topics.

15. Any communication regarding any of the foregoing topics with Proud Boys, Oath Keepers, Three Percenters, and Alex Jones.

16. Any communications with Representative Scott Perry and/or other Members of Congress about any of the foregoing topics.

17. Any communications with Rudolph Giuliani, John Eastman, Michael Flynn, Jenna Ellis, or Sydney Powell about any of the foregoing topics.

**Jan. 6 Sel. Comm. 0005**

US-000412

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

**Jan. 6 Sel. Comm. 0006**

US-000413

6.   Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.   Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.   When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.   The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.   The pendency of or potential for litigation shall not be a basis to withhold any information.

11.   In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.   Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.   If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.   In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.   If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.   If a date or other descriptive detail set forth in this request referring to a document

**Jan. 6 Sel. Comm. 0007**

US-000414

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.    This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.    All documents shall be Bates-stamped sequentially and produced sequentially.

19.    Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

### Definitions

1.    The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

**Jan. 6 Sel. Comm. 0008**

US-000415

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.    The term "including" shall be construed broadly to mean "including, but not limited to."

5.    The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.    The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.    The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.    The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.    The term "individual" means all natural persons and all persons or entities acting on their behalf.

**Jan. 6 Sel. Comm. 0009**

US-000416

*January 4, 2021*        CONGRESSIONAL RECORD—HOUSE        H41

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*
MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.
Sincerely,
JAMES P. McGOVERN,
*Chairman, Committee on Rules.*
REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session as such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*
MADAM SPEAKER: Pursuant to section 4(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.
Sincerely,
JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception to regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

Jan. 6 Sel. Comm. 0010

US-000417

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

<u>**UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE**</u>
<u>**DEFENDANT'S PRIOR EXPERIENCE WITH SUBPOENAS**</u>

The Defendant has indicated that evidence of his experiences testifying before other congressional committees and the Special Counsel's Office of Robert S. Mueller, III, undermines evidence of his willfulness in this case. The Defendant has suggested that, because he (allegedly) was not contemptuous in the past, he is not a contemptuous person and was not, therefore, contemptuous here. That is an improper propensity argument. The Defendant's conduct in response to prior subpoenas or requests for information is irrelevant to evaluating his willfulness in this case. And admission of evidence relating to his prior conduct risks confusing the jury and would serve only to advance the very sort of advice-of-counsel/good-faith defense this Court has already concluded is unavailable under the law. The Defendant's prior experience with subpoenas or testifying before government bodies should be excluded.

**I.    BACKGROUND**

The Defendant failed to produce any documents or appear for testimony under a subpoena issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee"). The straightforward question in this prosecution, therefore, is whether his noncompliance was deliberate and intentional and thus constitutes contempt under 2 U.S.C. § 192.

In his October 13, 2021, letter to the Committee, informing it that he would not appear or produce records until the Committee reached an agreement with former President Donald Trump,

the Defendant asserted that his position "is not in defiance of your Committee's subpoena" and noted that he had testified on three prior occasions, "before the Mueller Investigation, The House Intelligence Committee, and the Senate Intelligence Committee" after the former President "waived his invocation of the executive privileges."   ECF No. 29-1 at US-000423.   After the Defendant was referred for contempt, in a November 3, 2021, interview with the FBI and U.S. Attorney's Office, the Defendant's attorney, Robert Costello, asserted that the Defendant is not a contemptuous person and pointed to the fact that the Defendant had testified on four previous occasions in circumstances that he claimed involved communications with the former President and the possible issue of executive privilege. *See* Interview Report, Robert Costello, ECF No. 28-4, at US-001771-72.   Specifically, Mr. Costello advised that the Defendant had testified once before the Special Counsel's Office of Robert S. Mueller, III (the "SCO"), although Mr. Costello did not specify whether the pertinent appearance was before the grand jury or in some other context; once before the U.S. Senate Select Committee on Intelligence; and twice before the U.S. House of Representatives Permanent Select Committee on Intelligence. *See id.*   Although, in his letter to the Committee and his interview, Mr. Costello said nothing about whether the Defendant was subpoenaed for documents by those authorities and whether the Defendant did produce any, and he did not say whether those other subpoenas or requests were limited to communications with the former President or involved other topics as well, the Defendant and Mr. Costello have asserted, essentially, that the Defendant's alleged prior compliance demonstrates that he understands the process of navigating executive privilege, illustrates his willingness to comply with subpoenas involving communications with the former President, and rebuts evidence that his total noncompliance with the Committee's subpoena was willful. *See id.*; ECF No. 29-1 at US-000423; *see also* Mot. Hrg., 3/16/22, Tr. at 65:17-22 (Mr. Costello: "With respect to the issue of

willfulness.  I mean, when somebody has a lot of experience they are often referred to – they make a comment that 'this isn't my first rodeo.'  Well, this isn't Mr. Bannon's first rodeo when it comes to executive privilege and the Congress.  In fact, it's his fifth rodeo.").

## II.    ARGUMENT

The Defendant cannot defend the charges in this case by offering evidence of his experience with and alleged prior compliance with requests or subpoenas for information issued by Congress and the SCO.

First, to be admissible, evidence must be relevant, which is to say that it must have some "tendency to make a fact more or less probable than it would be without the evidence; and the fact [must be] of consequence in determining the action."  Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Irrelevant evidence is inadmissible.").  The Defendant's alleged prior compliance with subpoenas or requests for information is of no consequence in determining whether he was contemptuous here.  The only conceivable argument he could make to the jury from such evidence is that he is not predisposed to be contemptuous—which is exactly what Mr. Costello contended to the Committee, during his November 3, 2021, interview, and at the March 16, 2022, motions hearing.  Such "prior good acts" evidence is nothing more than classic improper propensity evidence offered to show that, because the Defendant was not contemptuous at other times and in other circumstances, he was not contemptuous here.  *See* Fed. R. Evid. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); Fed. R. Evid. 405(b) (allowing for the introduction of specific instances of conduct to prove a character or character

trait only when it "is an essential element of a charge, claim, or defense").[1]

Specifically, the Defendant's alleged compliance with other demands for testimony is not probative of his state of mind in failing to respond to the Committee's subpoena, and his alleged non-contemptuous character is not an element of the contempt offenses charged in this case.  *See United States v. Washington*, 106 F.3d 983, 999-1000 (D.C. Cir. 1997) (affirming district court's exclusion of evidence of defendant-police officer's prior commendations in prosecution of bribes-for-drug-security scheme because the officer's "'dedication, aggressiveness and assertiveness' in investigating drug dealing and carjacking is neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged"); *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) (affirming district court's exclusion of evidence that defendant-public official assisted constituents who had not bribed him because conduct "in situations unrelated to the charges" was not probative of intent, and "prior 'good acts' generally may not be used to show a predisposition not to commit crimes"); *United States v. Ellisor*, 522 F.3d 1255, 1270-71 (11th Cir. 2008) (affirming district court's exclusion of evidence that defendant had actually put on prior events, in prosecution for fraudulently selling tickets to an event that did not occur, because "evidence of good conduct is not admissible to negate criminal intent" (internal quotation marks and citation omitted)); *United States v. Marrero*, 904 F.2d 251, 259-60 (5th Cir. 1990) ("The fact that [the defendant] did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").  Just as the fact that a person did not rob a bank on

---

[1] To the extent the Defendant seeks to introduce evidence of his general character for law-abidingness, *see In re Sealed Case*, 352 F.3d 409, 412 (D.C. Cir. 2003), he cannot use evidence of his alleged prior subpoena compliance to do so.  Evidence of "pertinent traits," such as law-abidingness, only can be introduced through reputation or opinion testimony, not by evidence of specific acts.  *See* Fed. R. Evid. 404(a)(2)(A); Fed. R. Evid. 405(a); *Washington*, 106 F.3d at 999.

one day is irrelevant to determining whether he robbed a bank on another, whether the Defendant complied with other subpoenas or requests for testimony—even those involving communications with the former President—is irrelevant to determining whether he unlawfully refused to comply with the Committee's subpoena here.

Second, whatever probative value the Defendant's alleged prior compliance in other circumstances might serve, that value is substantially outweighed by the trial-within-a-trial it will prompt and the confusion it will inevitably cause the jury. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The Defendant would have the jury receive evidence of and evaluate the Defendant's conduct on four prior occasions, in response to four different subpoenas or requests, relating to different investigations and circumstances; compare that conduct and those circumstances to the conduct and circumstances in this case; and then try to ascertain what light, if any, the Defendant's prior conduct—good or bad, compliant or contemptuous—sheds on his conduct here. Such an exercise would be time-consuming and offer no serious insight into whether the Defendant's decision not to produce documents or appear to testify in response to the Committee's subpoena was willful. The Defendant's prior subpoena experience—to the extent they did include some issue relating to communications with the former President—would also inject tangential and irrelevant issues of executive privilege into the trial, requiring the jury to parse whether an assertion or lack of assertion of privilege and the response by the Defendant and the subpoenaing authority has some bearing on the circumstances of his non-compliance here. The evidence, argument, and necessary instructions would distract the jury from the straightforward issues it must decide in this case.

Finally, it appears that the purpose for which the Defendant would admit evidence regarding his prior experience with testifying would be to promote an advice-of-counsel or good-faith defense—*i.e.*, that the Defendant, allegedly, worked with his attorneys to navigate executive privilege issues in the past and tried to do so here, thereby excusing his noncompliance. This Court has already concluded that such a defense is unavailable to the Defendant under Supreme Court precedent. Order (Apr. 6, 2022), ECF No. 49. The Defendant's reliance on counsel and/or his alleged good faith in response to prior subpoenas is thus not pertinent to any available defense and is irrelevant to determining whether his failure to produce documents and appear for testimony in response to the Committee's subpoena was willful.

## III.   CONCLUSION

Whether the Defendant complied with other subpoenas or requests for information—from Congress, a grand jury, or elsewhere—has nothing to do with whether his noncompliance with the Committee's subpoena was willful. The Defendant should therefore be prohibited from introducing any evidence of his prior subpoena experience.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## NOTICE PURSUANT TO RULE 12.3, FEDERAL RULES OF CRIMINAL PROCEDURE

Defendant Stephen K. Bannon, through his undersigned counsel, hereby gives notice, pursuant to Rule 12.3 of the Federal Rules of Criminal Procedure, that he intends to assert defenses of public authority in this case, including actual and apparent authority.  Mr. Bannon also intends to assert the defense of entrapment by estoppel.

At all times since the receipt of the subpoena underlying the charges in this case, the Defendant has acted in all regards with respect to that subpoena based upon (1) the authority of former United States President Donald J. Trump, arising from his invocation of executive privilege regarding Mr. Bannon and the subpoena and (2) the authority of the United States Department of Justice (and its constituent parts and branches), reflected in directly relevant, applicable, and legally binding, authoritative Opinions from the DOJ's Office of Legal Counsel and materials from other DOJ officials.  Many of the relevant OLC Opinions and other DOJ materials reflect official DOJ policy going back consistently over six decades.  The official materials include, but are not limited, to the written position of the former U.S. Attorney for the District of Columbia.  Mr. Bannon has at all relevant times acted in reliance on and in conformity with all of the above.  The official positions reflected therein prohibit his prosecution.

1

Dated: April 15, 2022                    Respectfully submitted,

                                  SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                    ___/s/ M. Evan Corcoran___
                                    M. Evan Corcoran (D.C. Bar No. 440027)
                                    400 East Pratt Street – Suite 900
                                    Baltimore, MD 21202
                                    Telephone: (410) 385-2225
                                    Facsimile: (410) 547-2432
                                    Email: ecorcoran@silvermanthompson.com

                                    ___/s/ David I. Schoen___
                                    David I. Schoen (D.C. Bar No. 391408)
                                    David I. Schoen, Attorney at Law
                                    2800 Zelda Road, Suite 100-6
                                    Montgomery, Alabama 36106
                                    Telephone: (334) 395-6611
                                    Facsimile: (917) 591-7586
                                    Email: schoenlawfirm@gmail.com

                                    ___/s/ Robert J. Costello___
                                    Robert J. Costello (*Pro Hac Vic Pending*)
                                    Davidoff Hutcher & Citron LLP
                                    605 Third Avenue
                                    New York, New York 10158
                                    Telephone: (212) 557-7200
                                    Facsimile: (212) 286-1884
                                    Email: rjc@dhclegal.com

                                    *Counsel for Defendant*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 15th day of April 2022, a copy of the foregoing Rule 12.3 Notice was filed through the Court's CM/ECF system and was served *via* electronic delivery on counsel of record.

                                    ___/s/ M. Evan Corcoran___
                                    M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## DEFENDANT'S MOTION TO EXCLUDE EVIDENCE

Defendant Stephen K. Bannon, by and through his undersigned counsel and pursuant to the Fifth Amendment of the United States Constitution, respectfully requests that this Court preclude the Government at trial from using: (a) any information obtained via the subpoenas and 2703(d) order seeking Mr. Robert Costello's phone and email records; (b) any information obtained by through the Government's surreptitious FBI interviews of Mr. Costello on November 3 and 8, 2021; (c) any information obtained from Mr. Costello in his November 4, 2021, provision of documents to Government counsel; and (d) any information obtained by virtue of investigative leads provided by the aforementioned improperly obtained information.[1] In support of this Motion, we state the following:

---

[1] Any Order precluding the Government from introducing these materials as evidence, or use in cross-examination, should not preclude the defense from informing the jury of the Government's misconduct in this case.

## **BACKGROUND**

On October 21, 2021, the House made a contempt referral involving Mr. Bannon to DOJ. [US-000459-504]. On October 25, 2021, Mr. Costello – counsel for Mr. Bannon – emailed AUSA Cooney to initiate efforts to seek a declination of any criminal charges. Mr. Costello identified himself as the attorney for Mr. Bannon. [US-001136]. On November 1, 2021, Mr. Costello sent AUSA Cooney a legal memorandum outlining the reasons for declination. A video conference was held on November 3, 2021, so that Mr. Costello and counsel for the Government could further discuss the matter. Mr. Costello believed – as is customary in criminal cases – the back-and-forth between himself and counsel for the Government was a good faith effort to persuade DOJ not to prosecute his client, Mr. Bannon.

However, Government counsel misled Mr. Costello. They suggested to Mr. Costello that they were interested in hearing his arguments on declination. However, at the same time, they were improperly using the power of the grand jury to collect evidence about Mr. Costello, in the hope that they could use it against his client Mr. Bannon. The very day of the initial contact with the U.S. Attorney's Office, October 25, 2021, the Government began issuing grand jury subpoenas to third party providers seeking Mr. Costello's phone and email records. Some of these grand jury subpoenas sought records dating to September 1, 2021 – 22 days before the Select Committee issued its subpoena. [2] This was improper. Section 9-13.410(A) of the U.S. Attorneys' Manual requires main DOJ approval in such circumstances. No approval was obtained by counsel for the Government here. In addition, counsel for the Government obtained a 2703(d) Order from a magistrate judge, seeking additional records of Mr. Costello.

---

[2] And the records obtained via the § 2703(d) Order date back to March 5, 2021. [US-001151-001249].

2

**-801-**

Moreover, counsel for the Government misled Mr. Costello by staging two surreptitious "interviews" of him, all the while suggesting to him that he was engaged in advocacy on behalf of his client. There was never any intention to consider declination – the issuance of the first subpoena before Mr. Costello ever met with anyone from the U.S. Attorney's Office established that. During videoconferences on November 3 and 8, 2021, counsel for the Government had FBI agents listen in and later draft FBI 302 "interview reports" capturing statements made by Mr. Costello. Finally, counsel for the Government requested, and Mr. Costello provided (on November 4, 2021), more than 100 pages of documents – including attorney work product produced during the representation of Mr. Bannon – without divulging that Mr. Costello was being treated by the Government as a witness against Mr. Bannon, not his counsel.

The Government's intrusion into the attorney-client relationship was knowing and deliberate.[3] Incredibly, the Government has offered two different explanations for its conduct, neither of which make any sense. Moreover, Mr. Bannon been prejudiced by the Government's actions. First, even if the toll and email records did not give the Government the contents of Mr. Costello's communications, having a record of who Mr. Costello spoke to and when provides significant insight into the defense's strategy and theory of the case that the Government would not have access to but for their improper intrusion. In addition, the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate. The Government contended that Mr. Costello was "a witness to the Defendant's deliberate decision to ignore the subpoena's requirements." [Doc. 31 at 12-13]. Then at oral argument they claimed they

---

[3] Pending before this Court is the Defendant's Motion to Compel Disclosure of Government Efforts to Obtain Telephone and Email Records of Mr. Bannon's Attorneys. [Doc 26].

3

needed the information to determine if Mr. Costello informed Mr. Bannon of the subpoena. Both claims are false.

The Government's knowing, deliberate, and unjustified intrusion into the attorney-client relationship constituted outrageous misconduct and violated Mr. Bannon's Fifth Amendment right to due process. One remedy is to preclude the Government from benefitting at trial from its improper conduct.

## ARGUMENT

In determining whether governmental interference into an attorney-client relationship violates due process, courts analyze: (1) the government's objective awareness of ongoing, personal attorney-client relationship between its informant and defendant; (2) whether the government's intrusion into that relationship was deliberate; and (3) actual and substantial prejudice to defendant. *United States v. Hsia*, 81 F.Supp.2d 7, 19 (D.D.C. 2000). Prejudice can "result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial." *U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980); *see also United States v. Schell*, 775 F.2d 559, 565 (4th Cir. 1985) (holding that it is "fundamentally unfair and inherently prejudicial" to the defendant when defense counsel is turned into a prosecution witness and "without question" compromises the defendant's Fifth and Fourteenth Amendment rights to a fair trial). Suppression of evidence is an appropriate remedy for a Fifth Amendment violation. *United States v. Rogers*, 751 F.2d 1704, 1078 (9th Cir. 1985).

It is beyond dispute that the Government knew that Mr. Costello represented Mr. Bannon. It is also beyond dispute that the Government deliberately interfered with that attorney-client

relationship. As a result of the Government's actions with respect to the subpoenas for Mr. Costello's records, Mr. Bannon suffered substantial prejudice because he could no longer trust that the information he communicated to his attorneys would be free from Government interference and interception. *See Schell*, 775 F.2d 565. Additionally, although the Government contends that it did not receive the contents of Mr. Costello's communications, the information obtained allowed the Government insight into the defense's strategy.

Furthermore, the Government's attempt to turn Mr. Costello into a prosecution witness through covert FBI interviews was inherently prejudicial. Mr. Bannon will suffer further prejudice at trial if the Government is allowed to introduce information obtained via a surreptitious FBI "interview" of defense counsel about the same matter for which Mr. Bannon is on trial.

## **CONCLUSION**

WHEREFORE, the Defendant Stephen K. Bannon respectfully requests that this Court grant the instant Motion.

Dated: April 15, 2022                    Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

        /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

        /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586

5

Email: schoenlawfirm@gmail.com

___/s/ Robert J. Costello_____
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of April 2022, a copy of the foregoing Defendant's Motion To Exclude Evidence was filed through the Court's CM/ECF system and was served *via* electronic delivery on counsel of record.

___/s/ M. Evan Corcoran_____
M. Evan Corcoran (D.C. Bar No. 440027)

6

**-805-**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant*. | : |

Criminal No. 21-670 (CJN)

## ORDER

Based upon the representations in the Defendant's Motion To Exclude Evidence and upon consideration of the entire record, it is hereby:

**ORDERED** that the Motion is GRANTED; it is further

**ORDERED** that Government is precluded at trial from using: (a) any information obtained via the subpoenas and 2703(d) order seeking Mr. Robert Costello's phone and email records; (b) any information obtained by through the Government's surreptitious FBI interviews of Mr. Costello on November 3 and 8, 2021; (c) any information obtained from Mr. Costello in his November 4, 2021, provision of documents to Government counsel; and (d) any information obtained by virtue of investigative leads provided by the aforementioned improperly obtained information.

Dated: _____

_____
Hon. Carl J. Nichols
*United States District Judge*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant*. | : | |

## <u>MOTION TO DISMISS THE INDICTMENT</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................iii

I.    BACKGROUND.................................................................................2

II.   THE SUBPOENA WAS NOT LAWFULLY ISSUED.............................2

      A.    The Composition of the Select Committee Invalidates the Subpoena..........4

      B.    The Select Committee Exceeded Its Subpoena Authority – By
            Violating Rules Which Mandate Ranking Minority Member
            Consultation and Providing Protective Rules to the Deponent.....................5

            1.    Limits on Subpoena and Deposition Authority................................6

            2.    The Select Committee Has No Ranking Minority Member..............9

      C.    The Subpoena was a Misguided and Unconstitutional Effort to Make
            an Example of Mr. Bannon.....................................................................12

      D.    Count II Must be Dismissed Because the Select Committee Has No
            Authority to Compel Production of a Privilege Log or Certification.........14

III.  THIS PROSECUTION VIOLATES DUE PROCESS.............................16

      A.    Mr. Bannon Relied on Official, Binding, Authoritative DOJ Policy..........17

      B.    OLC Opinions are Binding, Authoritative Statements Reflecting the
            Official Policy of the Department of Justice.............................................22

      C.    This Prosecution is Barrd by the Doctrines of Entrapment by
            Estoppel, Actual Public Authority, and Apparent Public Authority...........27

            1.    Entrapment by Estoppel.............................................................32

            2.    Public Authority........................................................................35

                  a. Actual Authority..........................................................34

                  b. Apparent Authority......................................................35

      D.    The Government Should Be Estopped from Prosecuting This Case..........37

IV.   2 U.S.C. § 192 IS UNCONSTITUTIONAL AS APPLIED TO THE FACTS OF
        THIS CASE .................................................................................................. 39

    A.   Statutory Interpretation Problems .............................................................. 42

    B.   2 U.S.C. § 192 as Applied Violates the Separation of Powers
         Doctrine, is Unconstitutional, Over Broad, and is Void for
         Vagueness ................................................................................................. 43

         1.   The Statute as Applied Violates the Constitutional Separation
              of Powers Doctrine.......................................................................... 43

         2.   The Statute as Applied is Unconsitutionally Overbroad and
              Void for Vagueness.......................................................................... 44

VI.   PROSECUTORIAL OVER-REACHING REQUIRES DISMISSAL OF THE
        INDICTMENT .............................................................................................. 48

    A.   Targeting Mr. Bannon's Counsel Requires Dismissal ............................... 48

    B.   Misleading the Grand Jury Requires Dismissal ......................................... 52

VI.   CONCLUSION ............................................................................................. 53

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Ansara v. Eastland,*
　　442 F.2d 751 (D.C.Cir.1971) ................................................................ 47

*Barenblatt v. United States,*
　　360 U.S. 109 (1959) ............................................................................. 47

*Boyce Motor Lines v. United States,*
　　342 U.S. 337, 343 n. 16 (1952) ............................................................. 2

*Calautti v. Franklin,*
　　439 U.S. 379, 395 (1979) ...................................................................... 45

*Casa de Maryland v. United States Dep't of Homeland Sec,*
　　924 F.3d 684, 718 n.1 (4th Cir. 2019) .................................................. 24

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
　　542 U.S. 367, 370 (2004) ...................................................................... 15

*\*Christoffel v. United States,*
　　338 U.S. 84 (1949) ........................................................................... 2, 5

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
　　846 F.3d 1235, 1238 (D.C. Cir. 2017) .................................................. 23

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
　　922 F.3d 480, 483 (D.C. Cir. 2019) ................................................. 23, 24

*City of Chicago v. Morales,*
　　527 U.S. 41, 74-81 (1999) .................................................................... 39

*Comm. On the Judiciary of the United States House of Representatives v. McGahn,*
　　968 F.3d 755 (2020) .............................................................................. 20

*\*Cox v. Louisiana,*
　　379 U.S. 559, 575 (1965) ......................................................... 30, 32, 33

iii

*Exxon Corp. v. FTC*,
    589 F.2d 582, 592 (D.C. Cir. 1978) ........................................................... 5

*I.N.S. v. Chadha*,
    462 U.S. 919, 944 (1983) ................................................................... 15, 44

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880), .......................................................................... 3, 13

*Kolender v. Lawson*,
    U.S. 352, 357 (1983) ............................................................................ 45

*Lanzetta v. New Jersey*,
    306 U.S. 451, 453 (1939), ...................................................................... 45

*McGrain v. Daugherty*,
    273 U.S. 135, 161 (1927) .................................................................... 6, 13

*\*Nixon v. Adm'r of General Services*,
    433 U.S. 425, 448-449 (1977) .............................................................. 17, 44

*Nixon v. Fitzgerald*,
    457 U.S. 731, 749 (1982) ...................................................................... 13

*Nixon v. Sirica*,
    487 F.2d 700 (1973) ............................................................................ 15

*NLRB v. Sears Roebuck & Co.*,
    421 U.S. 132, 153 (1975) ...................................................................... 24

*\*Raley v. State of Ohio*,
    360 U.S. 423 (1959 ...................................................................... 32, 33, 46

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725, 730 (D.C. Cir. 1974) ........................................................ 15, 17

*Setser v. United States*,
    566 U.S. 231, 239 (2012) ...................................................................... 43

*Stirone v. United States,*
   361 U.S. 212, 217 (1960) ................................................................. 52

*Tobin v. United States,*
   306 F.2d 270, 276 (D.C.Cir.1962) ................................................... 47

*Trump v. Mazars USA, LLP,*
   140 S. Ct. 2019, 2031 (2020) ........................................... 6, 12, 13, 43, 46

*Trump v. Thompson,*
   20 F.4th 10, 41 (D.C. Cir. 2021) ................................................. 13, 17, 47

*Trump v. Thompson,*
   142 S. Ct. 680 (2022)……………………………………………………17

*United States v. Abcassis,*
   45 F.3d 39 (2d Cir 1995) ................................................................. 29

*United States v. AT&T,*
   *567 F.2d 121, 127 (D.C. Cir. 1977)* ................................................. 47

*United States v. Baker,*
   438 F.3d 749 (7th Cir. 2006)…………………………………………..35

*United States v. Baptista-Rodriguez,*
   17 F.3d 1354, 1368 n.18 (11th Cir. 1994) ......................................... 35

*United States v. Batres-Santolino,*
   521 F.Supp. 744, 750-53 (N.D. Cal. 1981) ....................................... 50

*United States v. Barker,*
   546 F.2d 940, 952 (D.C. Cir. 1976) ...............................28, 29, 30, 36, 37

*United States v. Baird,*
   29 F.3d 647, 654 (D.C. Cir. 1994) ................................................... 36

*United States v. Ballin,*
   144 U.S. 1 (1892) ............................................................................ 2

v

**-812-**

*United States v. Ciambrone,*
  601 F.2d 616, 623 (2d Cir. 1979) ............................................................. 53

*United States v. Brown,*
  381 U.S. 437, 443 (1965) ......................................................................... 53

*\*United States v. Davis,*
  139 S. Ct. 2319, 2325 (2019) ................................................................... 45

*United States v. House of Representatives,*
  556 F. Supp. 150, 152-153 (D.D.C. 1983) ............................................... 47

*United States v. Hsia,*
  81 F.Supp.2d 7, 19 (D.D.C. 2000) ........................................................... 51

*United States v. Irwin,*
  612 F.2d 1182, 1187 (9th Cir. 1980) ....................................................... 51

*United States v. Levin,*
  973 F.2d 463, 468 (6th Cir. 1992) .............................................. 28, 29, 30

*\*United States v. Marshank,*
  777 F. Supp. 1507, 1524 (N.D. Cal. 1991) ........................................ 50, 52

*United States v. Miller,*
  2022 U.S. Dist. LEXIS 45696, *16-*17 (D. D.C., March 7, 2022) ............. 42

*\*United States v. Nixon,*
  418 U.S. 683, 708-709 (1974) ....................................................... 17, 42, 44

*United States v. Nobles,*
  422 U.S. 225, 232 (1975) ......................................................................... 42

*United States v. Lawson,*
  502 F. Supp. 158, 172 (D. Md. 1980) ...................................................... 53

*United States v. Licavoli,*
  294 F.2d 207 (D.C. Cir. 1961) ................................................................. 40

vi

**-813-**

*United States v. Pennsylvania Industrial Chemical Corp,*
    411 U.S. 655, 673-675 (1973)......................................................................... 29, 32, 34

*United States v. Pitt,*
    193 F.3d 751, 756-758 (3d Cir. 1999)..................................................................... 35

*United States v. Reyes-Vasquez,*
    905 F.2d 1497, 1500 n.5 (11th Cir. 1990)............................................................... 35

*United States v. Salerno,*
    481 U.S. 739, 745 (1987)......................................................................................... 39

*United States v. Schell,*
    775 F.2d 559 (4th Cir. 1985)............................................................................. 51, 52

*United States v. Smith,*
    286 U.S. 6 (1932) ...................................................................................................... 2

*United States v. Stevens,*
    569 U.S. 460, 473 (2010) ......................................................................................... 45

*United States v. Tobias,*
    662 F.2d 381, 387 (5th Cir. 1981)........................................................................... 51

*United States v. Viola,*
    2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017)........... 38

*United States v. Viola,*
    2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017)........... 38

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc,*
    455 U.S. 489, 498-99 (1982)................................................................................... 45

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442, 449-451 (2008)................................................................................. 39

*Watkins v. United States,*
    354 U.S. 178, 200 (1957) ......................................................................................... 13

*Yellin v. United States,*
  374 U.S. 109, 114 (1963) ...................................................................................... 2,3

## RULES

Fed. R. Crim. P. 12(b)(3)(A) .......................................................................... 2, 4, 5, 48
Fed. R. Crim. P. 12(b)(3)(B) ...................................................................................... 2
Fed. R. Civ. P. 26(b)(5)(A)(ii) .................................................................................. 14

## STATUTES

2 U.S.C. § 192 .......................................................... 3, 16, 26, 30, 38, 39, 42, 43, 45, 52
2 U.S.C. § 193 ............................................................................................... 42, 43
2 U.S.C. § 194 ....................................................................................................... 44
Model Penal Code § 2.04(3)(b) (1962) ................................................................. 31, 37

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court dismiss the Indictment. In support of this motion, we state as follows:

## I.     Background

On November 12, 2021, Mr. Bannon was charged in a two count Indictment based on his conduct after receiving a subpoena dated September 23, 2021, issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").[1] [Doc. 1] Mr. Bannon now seeks dismissal of both counts based on defects in instituting the prosecution, Fed. R. Crim. P. 12(b)(3)(A), and defects in the Indictment, Fed. R. Crim. P. 12(b)(3)(B). A court considering a motion to dismiss an indictment assumes the truth of the indictment's factual allegations. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16 (1952).

## II.     The Subpoena Was Not Lawfully Issued

The indictment must be dismissed because the subpoena commanding Mr. Bannon to appear and produce documents was not lawfully issued. Mr. Bannon cannot be prosecuted for failing to comply with an unlawful subpoena. The Constitution vests the legislative power in Congress. U.S. Const. Art. I. Article I provides that "[e]ach House may determine the rules of its proceedings." U.S. Const. Art. I § 5. The current House of Representatives is the 117th Congress – which upon convening established the Rules that govern its actions. The "rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109, 114 (1963).[2] The

---

[1] Count One alleged that Mr. Bannon "refused to appear to give testimony" while Count Two alleged that he "refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way . . .." [Doc. 1 at ¶¶ 23, 25].

[2] *Citing Christoffel v. United States*, 338 U.S. 84 (1949); *United States v. Smith,* 286 U.S. 6 (1932); and *United States v. Ballin*, 144 U.S. 1 (1892).

rules provide an essential safeguard because they operate as a check and control on the actions of the majority.[3] When a committee violates the rules by exceeding its authorized power in a way that threatens the liberty interest of an individual, the judiciary must protect that individual. *See Yellin v. United States*, 374 U.S. 109, 117-119 (1963) (reversing 2 U.S.C. § 192 conviction where congressional subcommittee violated its rules by (a) failing to consider injury to the witness' reputation and (b) failing to address his request for an executive session).

The House Rules that apply to this case were established on January 4, 2021, when the House approved H. Res. 8 (adopting Rules for the 117th Congress).[4] [Ex. A]. The House Rules establish certain committees – to which the full House has delegated much of its power to act – as well as rules that govern the procedures of those committees. A committee may only act within the authority that has been delegated to it by the full House. This delegation of authority to a committee is set forth in the resolution establishing the committee. If a committee acts beyond its delegated authority, that action is *ultra vires* and invalid.

As reflected in ¶ 1 of the Indictment, the Select Committee was established by the passage of H. Res. 503 on June 30, 2021. [Ex. B]. The authority of the Select Committee is set forth in that authorizing resolution, together with the House Rules. In other words, in determining whether an action by the Select Committee is authorized, one looks to its authorizing resolution (the grant of authority by the House), and to the House Rules that govern the operations of all committees. Any action by the Select Committee that is inconsistent with the procedures authorized by the full

---

[3] *See Jefferson's Manual of Parliamentary Practice*, § I – Importance of Adhering To Rules ("It is much more material that there should be a rule to go by than what that rule is; that there may be a uniformity of proceeding in business not subject to the caprice of the Speaker or captiousness of the members") (available at https://www.govinfo.gov/content/pkg/HMAN-117/pdf/HMAN-117.pdf).

[4] H. Res. 8 adopted and modified certain House Rules from the 116th Congress.

House is *ultra vires* and invalid. *See*, *e.g.*, *Kilbourn v. Thompson*, Kilbourn v. Thompson, (congressional compulsory process may not exceed the limit of its own authority). In addition, the Select Committee, like any committee, may only act within the bounds set forth by the Constitution. Select Committee actions that infringe upon an individual's constitutional rights, or that implicate separation-of-powers issues, are invalid.

### A.  The Composition Of The Select Committee Invalidates The Subpoena.

The Select Committee that issued the subpoena to Mr. Bannon was not composed consistent with the authority granted to the Select Committee by the full House. Because its membership was not authorized, the subpoena to Mr. Bannon was not valid, and the Indictment must be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A). The resolution authorizing the Select Committee provided, in pertinent part, as follows:

**Sec. 2. COMPOSITION.**

> (a) Appointment of Members. – The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

[Ex. B at 3] (H. Res. 503, 117th Cong. (2021) at § 2) (emphasis added). The word "shall" provides no discretion to the Speaker. Nonetheless, the Speaker did not follow this mandatory language. In an unprecedented step,[5] the Speaker rejected the nominees suggested by the Minority Leader[6] and

---

[5] *See* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021) ("Speaker Nancy Pelosi has taken the unprecedented step of denying the minority party's picks for the Select Committee on January 6. This represents an egregious abuse of power and will irreparably damage this institution.") available at https://www.republicanleader.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/; Press Release by Speaker Nancy Pelosi (D-CA), *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol* (Jul. 21, 2021) (acknowledging that the rejection of the Minority Leader's nominees was an "unprecedented decision."), available at https://www.speaker.gov/newsroom/7212-2.

[6] The Minority Leader recommended Reps. Jim Banks (R-IN), Rodney Davis (R-IL), Jim Jordan (R-OH), Kelly Armstrong (R-ND), and Troy Nehls (R-TX).

instead appointed 9 members to the Select Committee of her own choosing.[7]

In a political body such as the House, procedural safeguards have been established to protect the rights of deposition witnesses and the rights of the minority party. These procedures are especially important where, as here, a select committee was created to inquire into events that took place following a disputed Presidential election. Nonetheless, the Speaker decided to appoint members of the Select Committee in a manner that violated the authorizing resolution. The result was that the Select Committee's membership was composed – according to the Minority Leader – to advance the Speaker's political objectives, without regard for the rights of the minority.[8] To act under a lawful grant of authority, however, the Select Committee "must conform strictly to [its authorizing] resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Because the Select Committee was not composed as authorized, the subpoena to Mr. Bannon is invalid, and the indictment must be dismissed. *See Christoffel v. United States*, 338 U.S. 84, 90 (1949) (reversing perjury conviction before House committee because rule requiring quorum ignored – the Supreme Court held that "[a] tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction.").

### B. The Select Committee Exceeded Its Subpoena Authority – By Violating Rules Which Mandate Ranking Minority Member Consultation And <u>Providing Protective Rules To The Deponent.</u>

---

[7] The Speaker appointed Reps. Bennie Thompson (D-MS), Zoe Lofgren (D-CA), Adam Schiff (D-CA), Pete Aguilar (D-CA), Stephanie Murphy (D-FL), Jamie Raskin (D-MD), Elaine Luria (D-VA), Liz Cheney (R-WY), and Adam Kinzinger (R-IL). 167 CONG. REC. H3597 (daily ed. July 1, 2021).

[8] *See* Chelsey Cox, *Who has been subpoenaed so far by the Jan. 6 committee?*, USA TODAY (Nov. 10, 2021, 8:22 P.M.), https://www.usatoday.com/story/news/politics/2021/11/10/jan-6-committee-whos-been-subpoenaed/6378975001/ (last updated Mar. 3, 2022, 4:52 P.M.) (Minority Leader stated that "Speaker Pelosi's rejection of the Republican nominees to serve on the committee and self-appointment of members who share her pre-conceived narrative will not yield a serious investigation. The Speaker has structured this select committee to satisfy her political objectives.").

On its face, the Indictment fails to allege that the subpoena was issued to Mr. Bannon in compliance with the subpoena authority granted to the Select Committee – which requires consultation with the ranking minority member. The Select Committee has no ranking minority member. Because the Select Committee violated the grant of subpoena authority provided by the full House, the Indictment must be dismissed under Fed. R. Crim. P. 12(b)(3)(A).

### 1.  Limits On Subpoena And Deposition Authority

In exercising its legislative power, the House of Representatives has delegated certain powers to committees. For instance, House committees have the power to secure information via subpoena. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (citing *McGrain v. Daugherty,* 273 U.S. 135, 161 (1927)). However, that grant of authority is limited. The rules protect the rights of deponents, as well as the rights of the minority.

There are three sources of authority for the rules that govern the Select Committee's exercise of subpoena and deposition power: (a) the resolution that created the Select Committee (H. Res. 503); (b) the Rules of the House for the 117th Congress; and (c) and the regulations for the use of deposition authority in the 117th Congress.

H. Res. 503 provides, in pertinent part, as follows:

**SEC. 5. PROCEDURE.**

\* \* \*

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES
OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to
the Select Committee except as follows:

> \* \* \*(6)(A) The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

[Ex. B at 9-11] (H. Res. 503, 117th Cong. (2021) at § 5) (emphasis added).Thus, the authorizing resolution only allows depositions, pursuant to subpoena, after consultation with the Select Committee's ranking minority member. The authorizing resolution also incorporates both the House Rules and the separate regulations on use of deposition authority, which both require consultation with the ranking minority member before seeking depositions pursuant to subpoena.

H. Res. 8 (adopting rules for the 117th Congress) provides, in pertinent part, as follows:

**SEC. 3. SEPARATE ORDERS.**

\* \* \*

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, *upon consultation with the ranking minority member* of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

[Ex. A at 16] (H. Res. 8, 117th Cong. (2021) at § 3(b)) (emphasis added). The deposition regulations referenced in both H. Res. 503 and H. Res. 8 also require ranking minority member consultation. They read, in pertinent part, as follows:

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

\* \* \*

2. Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken.

\* \* \*

7

3. . . . Observers or counsel for other persons, including counsel for government agencies, may not attend.

\* \* \*

5. . . . When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the *ranking minority member* per round.

6. Deposition questions shall be propounded in rounds . . . equal time to the majority and minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the *ranking minority member* shall ask questions second.

\* \* \*

10. The chair and *ranking minority member* shall consult regarding the release of transcripts . . ..

11. A witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress, and these regulations.

[Ex. C] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

As demonstrated in the mandatory rules quoted above, the applicable rules and regulations limit the use of subpoena and deposition authority in ways designed to protect witnesses, and the rights of the minority. Among other things, the rules require consultation with the ranking minority member before issuance of a subpoena for deposition testimony, participation by counsel designated by the ranking minority member in questioning a deponent, and consultation with the ranking minority member before release of a deposition transcript.

The safeguards mandating consultation with the ranking minority member are so important that if a witness is not provided with a copy of the rules, then they need not testify. Paragraph 11 of the Regulations For Use Of Deposition Authority clearly states that "a witness shall not be required to testify unless the witness has been provided with" a copy of Section 3(b) (describing deposition authority) and the regulations for use of deposition (which include the witness protections involving the ranking minority member). The Indictment on its face does not allege

that the Select Committee followed the mandatory rule and provided him with a copy of Rule 3(b).

Nor could the Indictment so allege, because it is undisputed that Mr. Bannon was *not* provided

with a copy of Section 3(b).

In serving the subpoena on Mr. Bannon via his counsel Mr. Costello, Select Committee

Chief Counsel and Deputy Staff Director Kristin Amerling provided 10 pages of detailed and

arcane instructions, including the subpoena. She did not, however, provide the specific document

required by the House Rules before a witness was required to testify. *See* Ex. D (November 10,

2021, FBI Report of Interview of Kristin Amerling) ("A copy of Section 3(b) was not provided to

COSTELLO with the subpoena."). That unequivocal statement was made on November 2, 2021,

in the presence of all three prosecutors in this case – just 10 days before the Indictment in this case

was filed. Because Mr. Bannon was not provided with a copy of Section 3(b), the House Rules

authorizing depositions makes explicit that he "shall not be required to testify." Given that, and

the failure of the Indictment to explain the lack of lawful authority for the subpoena under those

circumstances, the Indictment must be dismissed.[9]

## 2.  The Select Committee Has No Ranking Minority Member

The Indictment does not allege that the subpoena to Mr. Bannon was issued after

consultation with the Select Committee's ranking minority member, as required by the

committee's authorizing resolution. Nor could it. There is no ranking minority member on the

Select Committee. Doug Letter, the General Counsel for the U.S. House of Representatives,

---

[9] The House Rules further state that "[c]ompliance with a subpoena issued by a committee or subcommittee under subparagraph (1)(B) may be enforced only as authorized or directed by the House." [Ex. E at 20] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2(m)(1)(3)(C)). Compliance with the subpoena issued to Mr. Bannon could only be enforced under the authority of the House after providing him with Rule 3(b), which was not done.

acknowledged this in an FBI interview, in the presence of all three prosecutors in this case, as follows:

> Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess [sic] procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

*See* Ex. D at 4 (Nov. 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter). Accordingly, the subpoena issued to Mr. Bannon was invalid. It was not in accord with the subpoena and deposition authority granted by the House to the Select Committee.

The Speaker designated Rep. Bennie Thompson (D-MS) chair of the Select Committee. The chair designated Rep. Liz Cheney (R- WY) as vice chair.[10] H. Res. 502 does not reference a vice chair. The authorizing resolution does not grant any power to a vice chair. The resolution uses the term "ranking minority member" a term with a long history. A vice chair is not a ranking minority member – and cannot fulfill the authorized duties of a ranking minority member that are set forth in the resolution creating the Select Committee and the subpoena and deposition rules that apply to the Select Committee.[11]

---

[10] *See* January 6 Select Committee, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021), available at https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-Cheney-select-committee-vice-chair.

[11] The House Rules reveal that vice chairs and ranking minority members are different. For instance, Rule XI, which sets forth committee procedures, provides that committees can continue their work in the temporary absence of a committee chair as follows: "If the chair and vice chair of a committee or subcommittee are not present at any meeting of the committee or subcommittee, the ranking majority member who is present shall preside at that meeting." [Ex. E at 17-18] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2 (d)).

10

A committee's ranking minority member is designated by the minority party.[12] Ranking minority members have significant roles that protect the rights of deposition witnesses and the rights of the minority in the legislative process.[13] By long-standing practice, it is the role of each party to, in accordance with its own procedures, determine how committee chairs and ranking members are designated. This role cannot be usurped by the other party.

Republicans are in the minority in the 117th Congress. Accordingly, Republican Conference rules set forth the procedures for the recommendation of select committee members, and the designation of ranking minority members.[14] Under these rules, the Republican Leader recommends Republican members for select committees and designates the Ranking Republican Member of select committees. [Ex. F at Rule 13 & 14].

Thus, the Speaker's "unprecedented" decision to appoint 9 members to the Select Committee (in contravention of the mandatory language of the authorizing resolution), and to reject the Republican Leader's nominees, including his nominee as ranking minority member, had unforeseen consequences. The Select Committee has no ranking minority member. It follows that the grant of subpoena power from the House to the Select Committee – which was contingent upon

---

[12] *See generally* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021)        4

[13] *See A Guide To The Rules, Precedents, and Procedures of the House* (2017) at 806 ("Under long-standing practice, special orders of business give control of general debate in the House or in the Committee of the Whole to the chair and ranking minority member of the reporting committee(s), and recognition is extended accordingly."), available at https://www.govinfo.gov/content/pkg/GPO-HPRACTICE-115/pdf/GPO-HPRACTICE-115.pdf.

[14] Understanding these rules requires some transposition. While Republicans are in the minority, reference in the rules to "Speaker" becomes "Republican Leader," "Chair" becomes "Ranking Republican Member," and the authority vested under the rules to the "Speaker" and "Chair" are vested in the "Republican Leader" or "Ranking Republican Member." *See* [Ex. F] (House Republican Conference Rule 2(d)).

consultation between the chair and the ranking minority member before issuance of a deposition subpoena – cannot be lawfully exercised.[15]

### C. The Subpoena Was A Misguided And Unconstitutional Effort To Make An Example Of Mr. Bannon.

H. Res. 503 describes three functions of the Select Committee, namely: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for correct measures described in the subsection (c) as it may deem necessary." The subpoena issued to Mr. Bannon, however, did not advance any of those authorized functions. Instead, the subpoena was an unconstitutional attempt to usurp the executive branch's authority to enforce the law, and an effort to impede Mr. Bannon's first amendment rights to association and free speech. As made clear in the Indictment, the Select Committee targeted Mr. Bannon because on January 5, 2021, he was present at the Willard Hotel with others, and because he made statements on his podcast about what might occur on January 6, 2021. [Doc. 1 at ¶ 7]. Select Committee members have articulated that Mr. Bannon was targeted to send a message to other potential deponents. The Select Committee is not authorized to issue a subpoena for that purpose.

Congress' subpoena power is ancillary to its legislative authority. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031(2020). Accordingly, a congressional committee may only issue

---

[15] The procedural safeguard involving consultation with the ranking minority member before seeking a deposition is the rule, not an exception made just for the Select Committee. *See* [Ex. A] (H. Res. 8 §3(b) 117th Cong. (2021)) ("During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.").

a subpoena that serves a valid legislative purpose. Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional – such as an impermissible infringement on the authority of the executive branch. *See McGrain v. Daugherty*, 273 U.S. 135, 171 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 195 (1880); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

Courts considering whether a subpoena serves a valid legislative purpose consider whether a particular subpoena serves a valid purpose, not whether the committee has a valid legislative purpose. *See Mazars*, 140 S. Ct. at 2031. A committee subpoena issued in order to create a record of alleged violations of law, or to harass witnesses or send a message, is not valid. A congressional subpoena issued to investigate and punish perceived criminal wrongdoing unconstitutionally intrudes on the powers of the Executive Branch. Similarly, a desire to "expose for the sake of exposure" in not a valid purpose of a congressional subpoena. *See Watkins v. United States*, 354 U.S. 178, 200 (1957).The Indictment fails to allege how the subpoena issued to Mr. Bannon could validly inform legislation.[16] Rather, the statements of Select Committee members reveal that the subpoena issued to Mr. Bannon had an invalid purpose.[17] Because the subpoena was not issued in furtherance of a valid legislative purpose, the Indictment must be dismissed.

---

[16] While the D.C. Circuit has noted that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021) (quoting *Trump v. Mazars USA*, *LLP*, 140 S. Ct. 2019, 2031-32 (2020)), *injunction denied*, 142 S. Ct. 680 (Jan. 19, 2022), *cert. denied*, No. 21-932 (Feb. 22, 2022), we raise a different argument – that the subpoena *issued to Mr. Bannon* served no valid legislative purpose.

[17] Rep. Elain Luria – "[I]f we determine that criminal actions were taken … that will be forwarded from the committee and the appropriate manner [sic] to the Department of Justice …. [T]hat's exactly why we're conducting the investigation to find out all the facts, … and … hold people accountable who are responsible." Rep. Jamie Raskin – Select Committee seeks to "expose each and every level of it … the closer you get to Donald Trump … a religious and political cult of personality … outside of our Constitutional order.", CNN POLITICS, Expose Each and Every Level: Lawmaker Makes Promise for Jan. 6 Hearings, (Jan. 16, 2022), https://www.cnn.com/videos/politics/2022/01/16/rep-jamie-raskin-january-6th-

### D. Count II Must Be Dismissed Because The Select Committee Has No <u>Authority To Compel Production Of A Privilege Log Or Certification</u>.

Count II must be dismissed because there is no House Rule that authorizes a committee to require a deponent to create a privilege log of documents withheld on the basis of privilege, or a "written certification that a diligent search has been completed." [Doc. 1 at ¶ 12]. Even if such a rule existed, its application to a former presidential advisor asserting executive privilege on behalf of the President he served would raise serious separation of powers issues.

The Select Committee's purported commands to Mr. Bannon were more onerous and posed a higher risk of disclosure of privileged material than the obligations imposed on civil litigants under Fed. R. Civ. P. 26(b)(5)(A)(ii), which requires that a party asserting privilege to "describe the nature of documents, communications, or tangible things not produced or disclose – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." By contrast, the Committee's instructions demanded specific details about the withheld materials that may in themselves be privileged. For example, requiring the privilege log to specify the name of the "author, addressee, and any other recipient(s)" as the "relationship of the author and addressee to each other" reveals significant information regarding confidential matters being contemplated by the President. Allowing the Select Committee to

---

hearings-dotb-acostanr-vpx.cnn). Rep. Bennie Thompson – "Witnesses who assert 5th Amendment rights before Select Committee should be considered "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty"*, REALCLEAR                    POLITICS(Dec.                    2,                    2021), https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_i f_you_plead_the_fifth_youre_part_and_parcel_guilty.html. Rep. Bennie Thompson – "[W]e'll let the evidence based on what we look at determine guilt or innocence." Rep. Bernie Thompson (D-MS), Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, available    at    https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

undermine the assertion of executive privilege in this manner would effectively eliminate all checks on Congress's ability to interfere with the prerogatives of the Executive Branch.

Controlling Supreme Court precedent directs that "[s]pecial considerations control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 370 (2004). Thus, presidential communications are presumptively privileged, and this presumption can be overcome "only by an appropriate showing of public need by the party seeking access to the conversations." *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (applying the standard from *Nixon v. Sirica*, 487 F.2d 700 (1973)). As explained by the Court of Appeals in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, the showing required to overcome the presumption favoring confidentiality turns "solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions." *Id.* at 731. The purpose of this required showing is to ensure that Congress cannot intrude upon the prerogatives and autonomy of the Executive unless doing so is "critical to performance of its legislative functions." *Id.* at 732. The Select Committee cannot circumvent this invaluable constitutional safeguard by demanding that Mr. Bannon produce an exhaustive privilege log detailing materials withheld pursuant to President Trump's invocation of executive privilege. *See generally*, *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

**III.**    **This Prosecution Violates Due Process**

The prosecution in this case under 2 U.S.C. § 192 violates Mr. Bannon's right to due process of law, guaranteed under the Fifth Amendment to the United States Constitution.  As Mr. Bannon already has made clear in previous submissions in this case [*e.g.*, Doc. 30 at 16-21; Doc. 41; Doc. 44], his response to the subpoena on which this prosecution is based was at all times a function of the former President's invocation of executive privilege and was based on, pursuant to, and in reasonable, good-faith reliance upon the official published policy of the United States Department of Justice, through binding, authoritative legal opinions of that Department's Office of Legal Counsel ("OLC") and was fully consistent with the same.  The Department of Justice, of course, is the same agency that is prosecuting this case.  The OLC opinions were brought to Mr. Bannon's attention by his attorney, Robert J. Costello, Esquire, who advised Mr. Bannon that the OLC opinions were binding authority on the Department of Justice and that they were controlling authority in the circumstances he faced.  Mr. Costello provided Mr. Bannon with legal advice, based on the OLC opinions and Mr. Bannon acted at all relevant times in the manner Mr. Costello directed him, based on the OLC opinions and Mr. Bannon at all relevant times reasonably relied on the OLC opinions.

The OLC opinions provided Mr. Bannon with the actual, implied, and apparent public authority to proceed as he did with respect to the subpoena on which this prosecution is based, and his reasonable, good-faith reliance on the invocation of executive privilege and the OLC opinions at all times with respect to his actions vis a vis the subpoena further gives rise to the complete, due process-based defense of entrapment by estoppel, prohibiting the Department of Justice from prosecuting Mr. Bannon in this case.  All previous submissions by Mr. Bannon are incorporated

herein.  Mr. Bannon assumes the Court's familiarity with the relevant facts for these purposes.  [*See also e.g.*, Docs. 30, 30-1, 39].

### A.  Mr. Bannon Relied On Official, Binding, Authoritative DOJ Policy.

At all relevant times, Mr. Bannon proceeded with respect to the subpoena at issue in reliance upon and in conformity with former President Trump's invocation of executive privilege and the official, legally binding, authoritative policy of the Department of Justice, as reflected in its Office of Legal Counsel ("OLC") Opinions and related materials.

First**,** when former President Trump, through his attorney, Mr. Clark, advised Mr. Bannon, through Mr. Costello, that he was invoking executive privilege with respect to the subject matter of the subpoena, Mr. Bannon was duty bound under the OLC opinions (and relevant case law) to presume that the former President was within his authority to invoke executive privilege[18] and to presume that the matters so designated by former President Trump were, indeed, privileged.[19]

Second**,** Mr. Bannon was entitled to rely on binding DOJ policy, as reflected in the OLC opinions, for his conclusion that executive privilege can be and was properly invoked with respect to former employees, no longer working in the Executive Branch, and even to people from outside the Executive Branch whose privileged counsel the President might seek.[20]  The governing legal

---

[18] Mr. Bannon certainly was entitled to rely on the principle that a former President retains the right to invoke executive privilege as to communications that occurred during the time he was President.  *Nixon v. Adm'r of General Services*, 433 U.S. 425, 448-449 (1977); *Trump v. Thompson*, 142 S. Ct. 680; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring).

[19] [Ex. G] *Congressional Oversight of The White House*, 45 Op. O.L.C. slip op., at *34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main.  *See also*, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-709 (1974).

[20] Consider the following official DOJ policy statement:
". . . communications between White House officials and individual outside the Executive Branch, including with individuals in the Legislative Branch . . . fall within the scope of executive privilege . . .

principles apply even after a Presidential advisor leaves the White House.[21]

Third**,** Mr. Bannon relied further on binding, authoritative DOJ OLC opinions that expressly provided that the Select Committee subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege. As Mr. Costello explained to Mr. Bannon when he went over the OLC opinions with Mr. Bannon, OLC opinions hold that under these unique circumstances, non-compliance with a congressional subpoena is lawful.[22] [Doc. 30-1 at §§ 14, 22].  Mr. Bannon relied on this OLC opinion in reasonably believing that the subpoena was not valid and that compliance was not, therefore, either appropriate or required as a matter of fact and law.

Fourth**,** Mr. Bannon also relied on long-standing, definitive OLC opinions that not only advised him not to comply once executive privilege was invoked and that the matter was out of

---

Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."

*Letter from Paul D. Clement, Solic. Gen./Acting Att'y Gen., to President George W. Bush* (June 27, 2007), https://www.hsdl.org/?view&did=741974; *See also, Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys* at 5 (June 27, 2007) [Ex. H] (recognizing right to invoke Executive Privilege over communications with former employees and outside consultants never formally employed by the Executive               Branch.               Available               at: https://www.justice.gov/file/451161/download#:~:text=Executive%20privilege%20may%20properly%20 be%20asserted%20over%20the,that%20have%20been%20subpoenaed%20by%20congressional%20com mit-%20tees.

[21] *See* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. __, at *2 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main; *See* [Ex. G] *also Congressional Oversight of the White House* , 45 Op. O.L.C. __, at *15-16 (Jan. 8, 2021) , *available at* https://www.justice.gov/olc/opinions-main (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure").

[22] *See* [Ex. G] *Congressional Oversight of The White House*, *supra*, at *56 ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

his hands, but he relied as well on express, definitive DOJ OLC opinions and the long-standing policy of the Department of Justice, that, under any circumstances (and certainly the circumstances present here) non-compliance with the subpoena would be lawful and could not subject him to criminal prosecution.[23] [Doc. 41-7 at 22]

Indeed, the Department of Justice has "long maintained . . . that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." [Ex. G] *Congressional Oversight of The White House,* at 50. As recently as 2021, an official binding OLC opinion declared as follows:

> The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity – that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).

> As Assistant Attorney General Rehnquist explained:
> The President and his immediate advisers – that is, those who customarily meet with the President on a regular or frequent basis – should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb.

---

[23] *See* [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (1984) ("We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it.); [Ex. G] *Congressional Oversight of the White House*, 2021 WL 222744 (O.L.C.) at *33. *See also* [Ex. P] Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House John A. Bohner, (March 31, 2015) at 6 ("It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege.").

5, 1971); *see also* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. slip op. at *7-11 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main (listing historical examples of immediate presidential advisors refusing to testify); *Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel*, at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisors "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").[24]

_____

[24] Even if the conclusion of the OLC opinions as to the absolute immunity of an executive branch employee has been undermined in this Circuit by, for example, the decision in *Comm. On the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755 (2020) (*en banc*), Mr. Bannon maintains his right to immunity in reliance on the OLC Opinions, in addition to the other arguments advanced here. The 2021 OLC opinion post-dates *McGahn*. Mr. Bannon's reliance need not be correct, nor need the OLC opinion be a correct statement of the law for entrapment by estoppel or apparent authority purposes. *United States v. Barker*, 546 F.2d 940, 952 (D.C. Cir. 1976). The decision in *McGahn* is significant for at least two other reasons. First, it clearly reflects the central role OLC opinions play within the Department of Justice and for Executive Branch employees or former employees who rely on them. Indeed, the Court in *McGahn* expressly cited the OLC opinions on which Mr. Bannon relied for his reasonable and correct conclusion that it is long-standing DOJ policy that no criminal charges under 2 U.S.C. §192 will lie when an executive branch or former executive branch member fails to comply with a congressional subpoena and Executive Privilege is invoked. *McGahn,* 968 F.3d at 773 ("Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor."). *See, e.g.,* [Ex. N] *Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019); [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) Cooper Opinion, 10 Op. O.L.C. at 83; Olson Opinion, 8 Op. O.L.C. at 142").

Secondly, the *McGahn* Court makes clear that it is the role of the judiciary – not Congress itself - to act as the arbiter, in the context of a civil matter, over a dispute between Congress and the Executive Branch in just such a matter as this, when there is a tension between Congress's subpoena power and the interests underlying executive privilege. *See McGahn*, 968 F.3d at 766 ("Further, the OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas."). *See* [Ex. O] *Response to Congressional Requests for Information Regarding Decisions Made under the Independent Counsel Act,* 10 Op. O.L.C. 68, 83 (1986) ("Cooper Opinion"); [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 137 (1984) ("Olson Opinion")"). Indeed, the McGahn Court expressly noted that the DOJ has opined at least twice in OLC opinions that a civil enforcement action, not a criminal contempt indictment, is the "only practicable" way to proceed when non-compliance with a congressional subpoena by a current or former Executive Branch employee is at issue. *McGahn*, 968 F.3d at 776.

The DOJ's definitive position that the criminal contempt statute does not apply where Executive Privilege has been invoked goes back well over six decades. Mr. Bannon relied on that in his response to the subpoena and he was entitled to rely on that official policy. The DOJ must be estopped from prosecuting this case, in light of its official, published policy on this exact issue.

As the OLC opinion, [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C. at *2) expressly reports, in 1956, Deputy Attorney General William Rogers presented a report to Congress that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President has asserted executive privilege. [See Doc. 41-6].

In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would not present the matter to a grand jury (notwithstanding the mandatory language in Sec. 194).[25] In Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion,[26] drawing on canons of statutory construction, legislative history, and basic constitutional principles, (including constitutional separation of powers principles), the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege." [Ex. L] *Application of 28 U.S.C. Sec. 458*, 19 Op. O.L.C. at 356 (emphasis added).

---

[25] *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

[26] [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("Prosecution for Contempt of Congress")

Professor Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Id.*[27] These are the binding DOJ policies on which Mr. Bannon reasonably relied.

### B. OLC Opinions Are Binding, Authoritative Statements Reflecting The Official Policy Of The Department Of Justice.

Under Article II of the Constitution, the President must "take Care that the Laws be faithfully executed." *U.S. Const. art. II, §* 3. The President exercises the power of legal interpretation to carry out this textually specified duty. "In doing so, he must first construe the law in order to enforce it."[28] It is, of course, the Attorney General who aids the President in fulfilling this function. (*See* Note 11, *infra*.).

Under the Judiciary Act of 1789, Congress created the office of Attorney General which was charged with the obligation to "give … advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments." *Judiciary Act of 1789,* Ch. 20 § 35:  *see,* 28 U.S.C. §§ 511-513.

Until the mid-20th Century, the opinions under the Judiciary Act were prepared primarily by the Solicitor General or Assistant Solicitor General.[29] Starting in 1950, the OLC took on the task of writing opinions under the Judiciary Act.[30] The OLC was assigned the role of "preparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the

---

[27] *See also*, [Ex. Q] *Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives* (Feb. 28, 2008); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) (by Assistant Attorney General Charles Cooper).

[28] *See* [Ex. DD] Note, *The Immunity-Conferring Power of the Office of Legal Counsel*, 121 Harv. L. Rev. 2086, 2087 (June 2008).

[29] *See*, [Ex. CC] Griffin B. Bell, *The Attorney General:  The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?*  46 Fordham L. Rev. 1049, 1064 (1978).
[30] *Id.*

various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal advisor to the President." 28 C.F.R. § 0.25(a) (2007). Today the OLC opinions form "the largest body of official interpretation of the Constitution and Statutes outside the volumes of the Federal Court Reporters."[31] As Judge Randolph D. Moss has written, OLC Opinions "define … the meaning of the law for an entire branch of government and that branch of government has an obligation to get the law right." [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev 1303, 1321, (2000). OLC advice has been treated "as conclusive and binding since [the Nineteenth Century]." *Id.* at 1320.

As the Court wrote in *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 483 (D.C. Cir. 2019) (CREW II), *quoting from*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (CREW I),  [T]he authority of the Office of Legal Counsel (OLC) is "nearly as old as the Republic itself." "Since the Judiciary Act of 1789, the United States Attorney General has had the authority "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching on matters that may concern their departments." *Id. quoting from,* Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511-513).  Since then, the Attorney General has "delegated much of his authority to the OLC."  *CREW II*, at 483. "Over the years, the OLC has opined on 'some of the weightiest matters in our public life ….'"  *CREW II*, at 483, *quoting from CREW I*, 846 F.3d at 1238.  OLC opinions "reflect the legal position of the executive branch" and "provide binding interpretive

---

[31] *See*, [Ex. BB] John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 Cardozo L. Rev 375, 376 (1993).

guidance for executive agencies." *Casa de Maryland v. United States Dep't of Homeland Sec*., 924 F.3d 684, 718 n.1 (4th Cir. 2019).

The OLC "considers its written formal opinions to be 'one particularly important form of controlling legal advice.'" *CREW II*, 922 F.3d at 484, *quoting from* [Ex. U] Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel, [Ex. U] *Best Practices of OLC Legal Advice and Written Opinions 1-2* (July 16, 2010) at 1. The OLC's informal legal advice, often taking the form of letters or memoranda, along with the formal written opinions have been described by a former head of the OLC, Karl Thompson, as "authoritative" and "binding by custom and practice in the executive branch." Indeed, specifically referring to both the formal written OLC opinions and the informal OLC advice, given orally or in emails, OLC Head Thompson said, both are "authoritative," and "binding" in the executive branch. He said that both reflect the "official view of the office" and that [P]eople are supposed to and do follow it." *See CREW II*, 922 F.3d at 484, *citing*, Josh Gerstein, *Official:  FOIA Worries Dampen Requests for Formal Legal Opinions*, at 2, POLITICO, Under the Radar, November 5, 2015).[32] The OLC opinions at issue in this case, reflect the OLC's legally binding, authoritative position on matters directly related to its own agency, the Department of Justice, and they reflect consistent policy directives extending back over six decades, having long ago been adopted by the DOJ. They are, in short, the DOJ's "working law," with the full "force and effect of law." *See e.g., NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 153 (1975), *quoting* H.R. Rep. No. 1497.

One leading legal commentator has written, "[F]or decades, the Office of Legal Counsel (OLC) has been the most significant centralized source of legal advice within the Executive

---

[32]    https://www.politico.com/blogs/under-the-radar/2015/11/official-foia-worries-dampen-requests-for-formal-legal-opinions-215567

Branch." [Ex. S] Trevor W. Morrison, *Stare Decisis in the Office of Legal* Counsel, 110 Colum. L. Rev. 1448, 1451 (2010).  *See CREW* I, 846 F.3d at 1238.

    The OLC itself has gone to great lengths to ensure the reliability and correctness of its process and the substance of its opinions. Professor Morrison, an OLC veteran, cites three significant memoranda that reflect the emphasis on the integrity, mission, and goals of the OLC opinion-generating process.  *Id.* at 1452-1455.

    These are (1) "Principles to Guide the Office of Legal Counsel" ("OLC Guidelines), a 2004 memorandum written principally by Professor Walter Dellinger and eighteen other members of the OLC (including Judge Moss of this Court) who served during the Clinton Administration, and some of whom worked in other administrations as well. These Guidelines provide, *inter alia*, that "OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President" and they issue the directive that "OLC should provide an accurate and honest appraisal of applicable law, even if the advice will constrain the administration's pursuit of desired policies." *See* [Ex. T] Walter Dellinger, *et al.*, Principles to Guide the Office of Legal Counsel (2004); (2) An official OLC memorandum from May 2005 entitled "Best Practices for OLC Opinions" written by Principal Deputy Assistant Attorney General Steven G. Bradbury on May 16, 2005 ("OLC Best Practices Memorandum"). This memorandum provides, *inter alia*, that "Subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch." *Id*. at 1.  It further provides that "OLC's interest is simply to provide the correct answer on the law …." *Id.* at 3.  Mr. Bradbury describes a detailed, careful process to make sure the OLC gets the law right, and especially on separation of powers issues, among all questions; *Id*.[33] and

---

[33] Mr. Bradbury is the author of one of the OLC Opinions on which Mr. Bannon relied.  *See Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress* (February 29, 2008).

(3) the July 16, 2010 David J. Barron Memorandum, referred to above, that updates the Bradbury "Best Practices Memorandum.[34]" This Memorandum reiterates that "OLC's core function … is to provide controlling advice to Executive Branch officials on questions of law…." Then Acting Assistant Attorney General Barron emphasizes the importance of the OLC's work and the central goal of getting the law right in every OLC Opinion, in a manner that is faithful to the substance and values reflected in the Constitution. *Id.  See also,* [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation:  A Perspective From the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1318-20 (noting that for over two hundred years "agencies have in practice treated (OLC) opinions as binding."). Professor Morrison persuasively argues that it is precisely because OLC Opinions always have been treated as binding within the executive branch that the principle of *stare decisis* should be applied and he emphasizes that "especially on issues of the constitutional separation of powers," the OLC Opinions play a particularly important role.  110 Colum. L. Rev. 1448 at 1493, 1496.

The legal authority that Mr. Bannon relied upon in this case reflects the formal, official, binding, authoritative position of the Department of Justice, the very agency that is prosecuting this case in direct contravention of its own formal, binding, published official policy.  The policies relied upon reflect the legally binding, official, authoritative position adopted by the Department of Justice extending back over six decades and across every administration since at least 1956.  It

---

Mr. Bradbury's OLC Opinion provides in no uncertain terms, drawing on OLC official policy papers going back at least to 1956, and across all administrations, the OLC's official, binding, authoritative conclusion, as a matter of binding policy, that former or current White House advisors who decline to provide documents or testimony, or who decline to appear to testify, in response to a subpoena from a congressional committee, based on the President's assertion of executive privilege, absolutely **cannot** be criminally prosecuted by the Department of Justice under the statute charged here, 2 U.S.C. § 192. https://www.justice.gov/opinion/file/832851/download

[34] https://www.justice.gov/sites/default/files/olc/legacy/2010/08/26/olc-legal-advice-opinions.pdf

was objectively reasonable and absolutely appropriate as a matter of fact and law for Mr. Bannon to rely on the OLC opinions.

**D. This Prosecution Is Barred By The Doctrines Of Entrapment By Estoppel, Actual Public Authority, And Apparent Public Authority.**

This case emphatically presents the hallmark case in which the prosecuting authority must be prohibited from prosecuting the Defendant because its own formal, official, binding, published policy statements (OLC Opinions) licensed/directed the Defendant's conduct for which he is being prosecuted and assured the Defendant that if he were to engage in the conduct at issue – non-compliance with the subpoena based on the invocation of Executive Privilege – he absolutely could not lawfully be criminally prosecuted and would not be prosecuted.

This prosecution must be dismissed under the indisputably extraordinary circumstances of this case. There can be no legitimate material dispute that (1) Mr. Bannon is a former close Executive Branch advisor of former U.S. President Trump, that (2) former President Trump invoked Executive Privilege with respect to the subpoena at issue in this case, that (3) Mr. Bannon, through counsel, advised the Committee that his non-compliance was based on the invocation of Executive Privilege and the relevant OLC opinions, that (4) counsel for Mr. Bannon asked the Committee whether the privilege holder's representative would be permitted to attend Mr. Bannon's deposition to which the subpoena was directed and was told that no privilege holder representative could attend, that it was not permitted under the Committee's rules and that (5) Mr. Bannon relied on OLC Opinions that provided, *inter alia*, that (A) the invocation by the former of current President is presumptively valid; that (B) Executive privilege validly can be invoked by a former President and can validly be invoked with respect to communications with a former Executive Branch employee/close advisor or any outside party consulted by the President (or former); and that (C) a person who refuses to comply with a congressional subpoena based on the

invocation of Executive Privilege cannot be criminally prosecuted – and specifically not under 2 U.S.C. § 192 and that (D) the refusal to let a privilege holder representative attend the deposition rendered the subpoena unlawful and invalid.

Under the circumstances presented here, it would be fundamentally unfair and a clear due process violation to permit this prosecution to go forward. It must be dismissed. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (granting pre-trial motion to dismiss). Here, as in *Levin*, there can be no factual dispute about what the written, binding, authoritative OLC Opinions provided on the matters directly at issue, nor can there be any factual dispute about Mr. Bannon's reliance on them. Dismissal, therefore, is the appropriate remedy. This is even more emphatically the case here, where Mr. Bannon also received a direct order from the former President requiring that he fully honor the invocation of executive privilege and where the authority relied upon is actually from the very agency now prosecuting the case. This prosecution is in direct contravention of its own binding, published, authoritative positions.

A due process-based prohibition on prosecuting a case under the operative facts presented in this case has long been established by the United States Supreme Court and this Circuit has led the way in acknowledging these principles. *See United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976).

**Preliminary Note:**

As a preliminary note, Government counsel appear to recognize the defenses discussed here, as of course they must,[35] but their apparently evolving view, as they have presented it to the

---

[35] The U.S. Attorneys' Criminal Resource Manual has recognized these defenses that a defendant might assert if he or she is charged with committing a crime that arguably is committed in reliance upon the position taken by a government agency. *See* [Ex. EE] U.S. Attorneys' Manual, Title 9:  Criminal Resource Manual § 2055 (archives).    https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense.

Court most recently, reflects a fundamental misunderstanding on at least three issues. First, the

Government has represented to the Court that the defenses of public authority and entrapment by

estoppel require and turn on some direct interaction, a sort of question-and-answer session between

a specific government agent and the defendant [Doc. 46 at 2-3]. The Government is absolutely

wrong. *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675

(1973) ("PICCO") (reliance on agency's administrative regulations); *United States v. Barker*, 546

F.2d 940, 951-952 (D.C. Cir. 1976) (reliance on a "legal theory espoused by this and all past

Attorneys General for forty years").[36]

Secondly, Government counsel have represented to the Court that these defenses are "not

legal defenses the Court decides on a motion to dismiss." [Doc. 46 at 2]. Again, the Government

is wrong. Government counsel simply fail to acknowledge the decision in *United States v. Levin*,

973 F.2d 463, 468-470 (6th Cir. 1992), in which the Sixth Circuit expressly approved the district

court's decision to grant a motion to dismiss at the pre-trial stage, based on the fundamental

unfairness of prosecuting a defendant for conduct that the relevant agency's policy, reflected in

opinion letters to others, indicated would be legal conduct. *See also Id.* at 465 (expressly noting

that the defendants "initiated no inquiry of their own concerning the legality of (their conduct)").

---

[36] The Government repeatedly cites the landmark Second Circuit decision in *United States v. Abcassis*, 45
F.3d 39 (2d Cir 1995) in support of its thesis that direct inquiry and representations between the defendant
and a government agent are required to support the defenses of public authority and entrapment by estoppel.
[E.g., Doc. 43 at 8; Doc. 46 at 2]. *Abcassis* did, indeed, involve direct contact between the defendants,
former government informants, and a government agent who they believed gave them license to pursue an
illegal heroin importation deal and their convictions and sentences of 30, 12, and 5 years in prison were
reversed, based on the district court's agreement to give an actual authority jury instruction, but refusal to
give an entrapment by estoppel instruction. However, the fact that that was the scenario in that case or any
other, or even if that is the paradigm scenario for public authority and entrapment by estoppel defenses,
neither *Abcassis* nor any other decision stands for the proposition that this is the only kind of scenario that
supports these defenses. Indeed, in *Abcassis*, 45 F.3d at 43, the Court expressly referred to the Sixth
Circuit's decision in *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) in support of its conclusion, and
the defendant in *Levin*, of course, made no inquiry and received no personal assurances; rather he relied on
official written agency policy statements. *See Levin*, 973 F.2d at 465.

Also, in several other cases, once the Court found that the government's position was as the defendant understood it, the Court held that a prosecution under those circumstances would be totally unfair and could not be pursued, and the courts reversed the convictions. They did not remand for the defense to be put before a judge or jury at a new trial. *Cox v. Louisiana*, 379 U.S. 559, 575 (1965); *United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987).  The defense clearly is not just a trial defense and the instant case presents the strongest case possible for pre-trial dismissal on this issue.

Third, Government counsel has asserted to the Court that OLC and other DOJ "records" that support Mr. Bannon's defense, which he "did not already know about" "could not be relevant to (the public authority and entrapment by estoppel defenses) and thus have no bearing on his ability to make motions related to them." [Doc. 46 at 3]. Once again, the Government is absolutely wrong. The formulation of the elements of an entrapment by estoppel defense in this Circuit and elsewhere includes a requirement that the reliance by the Defendant was "reasonable." *See, e.g.*, *United States v. Barker*, 546 F.2d at 951-952 (reasonable to rely on forty years of the Attorney General's position); *United States v. Levin,* 973 F.2d at 468 (defendant's reliance must be reasonable); *United States v. Tallmadge*, 829 F.2d 767, 773-775 (same; reversing conviction for defendant, based on entrapment by estoppel, finding it reasonable for defendant to rely on representations by licensed firearms dealer and defendant's attorney).[37]

---

[37] *See also,* The Model Penal Code, which provides in pertinent part as follows:

"A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when … [the defendant] acts in *reasonable reliance* upon an official statement of the law … contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) *an official interpretation of the public officer of body charged by law with responsibility for the interpretation or enforcement of the law defining the offense."*

The history of the DOJ's OLC opinions writings and position on the subjects at hand is directly relevant to the question of "reasonableness." It is more "reasonable" for the Defendant to have relied on the OLC Opinions he saw and to have believed them to be legally binding, adopted, authoritative positions of the DOJ and the Executive Branch charged with enforcing the statute if the positions taken reflect the same positions taken and adopted over the course of six decades. Those historic "records" he might not have seen are directly relevant.  Similarly, say for example, the Defendant read an OLC Opinion that stated that employees of the Executive Branch cannot be prosecuted criminally under 2 U.S.C. § 192 for failing to comply with a subpoena when executive privilege is invoked, and the Defendant believed from the rationale of the OLC Opinion that it included former employees or even outside consultants who have communications with the President. OLC Opinions the Defendant might not have seen that expressly provide that former employees and outside consultants are covered as well are directly relevant to the "reasonableness" of his belief (and reliance on) regarding the ambit of the OLC Opinion he did see. Similarly, of course, as the Court in *Tallmadge* expressly found, the advice by Mr. Bannon's experienced attorney, Mr. Costello, is independently relevant to support the "reasonableness" of Mr. Bannon's belief in what the OLC Opinions provided and the "reasonableness" of his reliance on them. *Tallmadge*, 829 F.2d at 775. The historic "records" of the DOJ on the matters relevant to the issues before the Court are also independently relevant to demonstrate the adoption by the DOJ of the positions reflected in the OLC Opinions and other writings and as further evidence of actual and apparent authority.  Each of the OLC Opinions also should be deemed party admissions.

   1. **<u>Entrapment by Estoppel</u>**

---

Model Penal Code § 2.04(3)(b) (1962) (emphasis added).

The doctrine of entrapment by estoppel was first recognized and explained in two decisions from the United States Supreme Court handed down many years ago: *Raley v. State of Ohio*, 360 U.S. 423 (1959) and *Cox v. Louisiana*, 379 U.S. 559 (1965).

In *Raley,* 360 U.S. 423, 438 (1959), the Court held that the government may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him." *Id*. The case involved an accused charged with failing to answer questions put to him by the Un-American Activities Commission of the State of Ohio. *Id*. at 424. The accused had invoked the privilege against self-incrimination on advice that the privilege applied. *Id*. at 425. The accused was indicted for refusing to answer the questions, even though certain Commission members stated that it was acceptable to invoke privilege rather than answer the questions posed. *Id*. The Supreme Court reversed, holding that due process does not permit the criminal conviction of a person who acts in reliance on authoritative pronouncements by relevant government officials or a government agency. *Id*. at 438-39.

In *Cox v. Louisiana*, the Supreme Court reiterated the principles enunciated in *Raley*, making clear that due process of law does not permit a criminal prosecution for conduct a State official or agency indicated was lawful. 379 U.S. 559, 571 (1965).  In *Cox*, a group of people engaged in a demonstration across from a courthouse to protest what they believed to be the illegal arrest of 23 students. *Id*. at 564-65. Reverend B. Elton Cox, a civil rights leader, was convicted under a Louisiana statute that made it a crime to picket or demonstrate near a courthouse for the purpose of influencing a judge, juror, witness, or court officer. *Id*. at 559. The evidence was undisputed that, notwithstanding the term "near" in the statute, the State had made clear that demonstrating across the street from the courthouse was a permissible distance. *Id*. The *Cox* Court, relying on *Raley*, held that a conviction under those circumstances could not stand, even though

the Sheriff, at some point, ordered the demonstrators to disperse and leave. The Court in *Cox*

opined:

> In *Raley v. Ohio*, 360 U.S. 423, this Court held that the Due Process Clause
> prevented conviction of persons for refusing to answer questions of a state
> investigating commission when they relied upon assurances of the commission,
> either express or implied, that they had a privilege under state law to refuse to
> answer, though in fact this privilege was not available to them. The situation
> presented here is analogous to that in *Raley*, which we deem to be controlling. As
> in *Raley*, under all the circumstances of this case, after the public officials acted as
> they did, to sustain appellant's later conviction for demonstrating where they told
> him he could "would be to sanction an indefensible sort of entrapment by the State
> -- convicting a citizen for exercising a privilege which the State had clearly told
> him was available to him." The Due Process Clause does not permit convictions to
> be obtained under such circumstances.

*Id.* at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959) (internal citations omitted).

 In *United States v. Pennsylvania Industrial Chemical Corp.*, 461 F.2d 468 (3d Cir.

1972), *modified and remanded*, 411 U.S. 655 (1973), the Third Circuit first recognized and applied

the defense of entrapment by estoppel. The defendant was charged with discharging pollution into

the Monongahela River, in violation of the Rivers and Harbors Act, 33 U.S.C. § 407. At trial, the

defendant sought to present evidence that its allegedly criminal acts had been authorized by Army

regulations and the federal government's long-term interpretation of the statute. The district court

prohibited the defendant from introducing the evidence and refused to instruct a jury that the

defendant should be acquitted if his actions resulted from affirmative government representations

that its acts were lawful.

Citing due process grounds, the Third Circuit reversed on appeal. The Court wrote that the

concept of fair play is implicit in our basic notions of what is meant by due process of law. In this

regard, an individual or corporation should not be held criminally responsible for activities which

could not reasonably have been anticipated to be illegal based on 70 years of consistent

government interpretation and subsequent behavior. *Id.* 461 F.2d at 479. Because the defendant had not been allowed to present the evidence nor had the jury been instructed on the entrapment by estoppel defense, the Court of Appeals granted a new trial. *Id.*

The Supreme Court agreed with the Third Circuit's statement of the law, holding "it was error for the District Court to refuse to permit PICCO to present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute." *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 675 (1973) ("PICCO"). The Court also held that the defense applies where there is reliance on a government agency's position or interpretation of the law it is charged with enforcing or on the enforcing agency's behavior with respect to the activity at issue and that reliance was reasonable under the circumstances. *Id.*  In *PICCO,* there was no direct inquiry by the defendants to the agency nor any communication from the agency directly to the defendants.  The decision in PICCO prohibits this prosecution on due process grounds.  Mr. Bannon was entitled to rely on the former President's invocation and directive and on the OLC Opinions and he reasonably did so.  His prosecution is barred by the Due Process Clause, based on the defense of entrapment by estoppel.

### 2. Public Authority

The defenses of entrapment by estoppel and public authority are closely related, with some courts questioning the meaningfulness of the difference between the two. *See e.g.*, *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006).  Nevertheless, there are some subtle differences. Mr. Bannon raises the defenses of actual authority and apparent authority in addition to the defense of entrapment by estoppel.

### A. Actual Authority

It is beyond dispute that the President – and therefore OLC – has the authority to interpret laws.[38] Further, the President has, pursuant to the Oath Clause and the Take Care Clause, the power to "decline to enforce a statute that he views as unconstitutional."[39] The defense of actual authority is consistent with the common law defense's recognition that actions taken "under color of public authority" are lawful and cannot be prosecuted criminally.[40] It requires reasonable reliance on the actual authority of an official with respect to the conduct at issue. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994).

Mr. Bannon received actual authority in this case for his non-compliance with the subpoena directly from former President Trump's invocation of executive privilege and corresponding directive to Mr. Bannon, that Mr. Bannon must honor that invocation with respect to the subpoena. The OLC Opinions referred to herein also provided a source of the actual authority Mr. Bannon received to the effect that the subpoena was unlawful and invalid, in light of the committee's rules (and refusal to permit a privilege holder representative to attend the deposition), that it would be unlawful for a congressional committee to try to compel production or testimony from a person so situated once executive privilege was invoked, and that it would be unconstitutional for a person so situated to be criminally prosecuted under the statute charged in this case. Mr. Bannon reasonably relied on both sources of actual authority, both the former President and the OLC Opinions carried with them actual authority in the situation at issue. Mr. Bannon cannot be

---

[38] *See* [Ex. V] Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 905 (1990) ("Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.").

[39] [Ex. W] Memorandum from Walter Dellinger, Assistant Att'y Gen. to Abner J. Mikva, Counsel to the President (Nov. 2, 1994). https://www.justice.gov/sites/default/files/olc/opinions/1994/11/31/op-olc-v018-p0199_0.pdf    *See Id.* at ¶ 6, concluding that the President has an "enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency."

[40] *See United States v. Pitt*, 193 F.3d 751, 756-758 (3d Cir. 1999); *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001); *United States v. Reyes-Vasquez*, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990).

criminally prosecuted on the undisputed operative facts in this case, based on the due process-based defense of actual authority.

### B. __Apparent Authority__

This Circuit's landmark decision in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) also supports the dismissal of the indictment in this case on due process grounds.[41]

In *Barker*, the defenses of entrapment by estoppel and apparent authority truly converged. The defendants purportedly believed that their Watergate-era warrantless burglary of psychiatrist Daniel Ellsberg's office was authorized by their C.I.A. recruiter E. Howard Hunt, who they believed had the authority to authorize such conduct (apparent authority) and they further relied on a policy espoused by the President and put forward by the Attorney General as official policy for at least forty years. *Barker*, 546 F.2d at 951-954. The defense of apparent authority requires a reasonable belief (whether correct or mistaken) that the source for the information relied upon had the authority to license the conduct at issue and did so. *Barker*, 546 F.2d at 947-948, 954-957; Model Penal Code § 2.04(3)(b).[42]

---

[41] To the extent the Government has attempted to cast some question on the continued viability of the landmark *Barker* decision by quoting out of context a line in *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994) – *See* Doc. 43 at 7 n.3 ("The D.C. Circuit has since noted that '[t]he exact precedential effect of Judge Merhige's opinion is unclear'") – any such suggestion is misleading.  Judge Merhige wrote a concurring opinion in *Barker* that would have narrowed the availability of the defense, from Judge Wilkey's broader formulation.  *Barker*, 546 F.2d at 955.  The instant case qualifies for the defenses of entrapment by estoppel and public authority under either judge's formulation of the defenses and their underlying principles.  Moreover, the Court in *Baird*, in large part based on its reliance on *Barker*, reversed the defendant's conviction, expressly because the trial court had excluded testimony that would have included the position of the agency's legal and contracting officers, as transmitted to the defendant's superior officer, concerning the legality of the conduct for which the defendant was charged and convicted.  *Baird*, like *Barker*, certainly supports Mr. Bannon's position in the instant case.

[42] Judge Merhige's Opinion specifically mentions "opinions of the Attorney General" as among the "strongest" bodies sources for authority, consistent with the policy fostered by the defense of apparent authority – obedience to the decisions issued by bodies put in "positions of prominence in the governing structure." *Barker*, 546 F.2d at 956.

Mr. Bannon was entitled as a matter of law to reasonably rely, as he did, on the directive from former President Trump when he invoked Executive Privilege and on the OLC Opinions ("the Attorney General's Lawyer")[43] described herein in proceeding as he did with respect to the congressional committee subpoena at issue and to reasonably believe that those two sources had the authority to license his conduct. He acted at all times consistently with the positions directed by those two sources of apparent authority as he reasonably believed their policies to provide.

3.  **The Government Should Be Estopped From Prosecuting This Case.**

Mr. Bannon respectfully submits that, while the leading entrapment by estoppel cases do not spend a great deal of time focused on the estoppel implications of the decisions, the instant case presents the perfect vehicle through which this Court should order the Government estopped from pursuing this prosecution, based on the long line of OLC Opinions referenced herein, going back decades in their consistency for the propositions relied upon herein.  Separate from the doctrine of entrapment by estoppel, Mr. Bannon asks the Court to find that as a matter of due process, the Government is estopped from prosecuting this case because it is irreconcilable with the legally binding policy and practice of this same prosecuting agency.  Mr. Bannon respectfully submits that the principles underlying equitable estoppel, judicial estoppel, estoppel by opinion, and estoppel by selective non-enforcement (including the principle of desuetude) should bar this prosecution or if the Court rejects applying criminal estoppel, the Court permit evidentiary consequences from the Government's inconsistent and truly irreconcilable positions between its long-established policy and the pursuit of this prosecution.[44]

---

[43] [Ex. X] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive*, 15 Cardozo L. Rev. 337 (1993).

[44] *See e.g.*, [Ex. Y] *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046 (1969); Anne Bowen Poulin, [Ex. Z] *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 18 Cal. L. Rev. 1423 (2001).

In the instant case, the full circle is closed.  It was the "State," through the former President of the United States, that told Mr. Bannon that executive privilege had been invoked and that he was legally required to honor such invocation with respect to the subpoena and it was the "State," through the Department of Justice – the exact same federal agency now prosecuting Mr. Bannon[45] - whose official policy provided that, under the circumstances presented, (1) the subpoena was legally invalid, (2) the invocation of the privilege was the former President's sole prerogative and not Congress's, (3) the invocation was presumptively valid, (4) it applies to former employees and outside consultants, (5) that bringing a criminal prosecution against a person in Mr. Bannon's situation would violate the separation of powers doctrine and would be unlawful, and (6) that, for a variety of reasons, a person so situated cannot be prosecuted criminally under 2 U.S.C. § 192 as a matter of law. As all of the authority cited herein establishes, prosecuting Mr. Bannon under this statute, in light of the legally binding authoritative OLC Opinions and related writings and the former President's invocation of Executive Privilege, is prohibited as a matter of fundamental fairness and due process of law.  The defenses of actual and apparent public authority and entrapment by estoppel compel the dismissal of the indictment in this case.

## IV.    2 U.S.C. § 192 is Unconstitutional As Applied to the Facts of this Case.

Mr. Bannon respectfully moves to dismiss the indictment in this case on the ground that 2 U.S.C. § 192 is unconstitutional as applied to Mr. Bannon and the facts of this case.[46]

---

[45] *See e.g., United States v. Viola*, 2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) (emphasizing the relevance of reliance on a federal authoritative source for the defense of entrapment by estoppel to apply to a federally charged crime).

[46] When mounting a facial challenge to a statute, a movant must, of course, establish "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-451 (2008).  An as-applied challenge, raised here, asks a court simply to find the statute at issue unconstitutional as applied to the facts and the party before the court.  *See e.g., City of Chicago v. Morales*, 527 U.S. 41, 74-81 (1999) (Scalia, J.,

2 U.S.C. § 192 provides as follows:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, *willfully makes default*, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2 U.S.C. § 192. (emphasis added).

On April 6, 2022, the Court unqualifiedly granted [Doc. 49] the Government's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel [Docs. 29; 35].  The impact of the Court's decision is that all that needs to be proven to establish a violation of the statute is that the defendant received a valid subpoena and did not comply with it.  The reason for the non-compliance is legally irrelevant, according to the Government's motion and the Court's decision, unless the non-compliance was a function of an accident. No bad purpose or motive is required; nor does the Government need to prove even that the defendant had some awareness that his conduct was wrong or in violation of the law. *Id.*[47]

This, the Court concluded, is required by the decision in *United States v. Licavoli*, 294 F.2d 207 (D.C. Cir. 1961), and it applies to all defendants and circumstances surrounding the failure to

---

Dissenting) (explaining the difference between facial and as-applied challenges, favoring the latter, while suggesting the former should be impermissible); see also, Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000) ("[a]s-applied challenges are the basic building blocks of constitutional adjudication.").

[47] The rejection of a *mens rea* that includes some consciousness of the wrongfulness of the conduct, in favor of the standard adopted by the Court, has come under sustained criticism for many years in especially compelling terms where a term of incarceration is the possible consequence of conviction, with commentators asserting that the error in permitting the same is of constitutional dimensions. *See e.g.,* H. Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107, 147-152 (1962); Dubin, *Mens Rea Reconsidered:  A Plea for a Due Process of Criminal Responsibility*, 18 Stan. L. Rev. 322 (1966); Note, *Criminal Liability Without Fault:  A Philosophical Perspective*, 75 Colm. L. Rev. 1517 (1975).  This also supports a dismissal.

comply with a congressional committee. [Docs. 29, 35, 49]. Based on the Court's Order, a defendant who fails to comply on a whim or for no reason at all, is legally situated vis a vis criminal liability under the statute, identically to the defendant who (1) fails to comply because his lawyer told him the subpoena was invalid, (2) fails to comply because he was directed not to comply in connection with the invocation of Executive Privilege by a former President of the United States or (3) fails to comply in reliance on and consistent with the official, legally binding position of the Department of Justice. Indeed, the Government expressly argued in its motion that privilege provides no excuse for non-compliance under the applicable definition of "willfully." [Doc. 29 at 1; 8]. The failure to differentiate between the invocation of Executive Privilege and other situations vis a vis the application of this statute is completely contrary to the DOJ's long-standing official policy on this subject.[48]

The Court held that the reason or motivation for not complying is simply legally irrelevant under this criminal statute which carries a mandatory sentence of incarceration upon conviction. [Doc. 29 at 1, 8; 3/16/22 Hearing Tr. at 4, 5, 6, 7, 8; Doc. 49].[49]

---

[48] [Ex. J] The DOJ has made clear its view that the invocation of Executive Privilege stands alone and is different from a subpoena that triggers any other privilege, because of the separation of powers issues it implicates. Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* (OLC Opinion May 30, 1984) at 131, 134. ("Olson Memo"),https://www.justice.gov/sites/default/files/olc/opinions/1984/05/31/op-olc-v008-p0101_0.pdf#:~:text=As%20a%20matter%20of%20statutory%20construction%20and%20separation,of%20executive%20privilege%20before%20a%20committee%20of%20Congress. *See also,* [Ex. AA] Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. Rev. 231, 259 (1978) (suggesting that the §§ 192 & 194 should not apply where Executive Privilege is invoked).

[49] The Government's motion expressly asserts the following: [T]he Defendant's excuses for non-compliance are without merit, and his erroneous reliance on privileges and purported advice of counsel is no defense to contempt. The deliberate failure to comply with a congressional subpoena – *regardless of motivation* – constitutes the crime of contempt." [Doc. 29 at 1] (emphasis added). The Government's motion, again granted by the Court without qualification, goes even further than just referring to an advice of counsel defense (and jury instruction). The Government urged the Court to take the following extraordinary position:

Based on the Court's Order construing the statute in this regard, 2 U.S.C. § 192 is

unconstitutional as applied to Mr. Bannon and the circumstances of this case because it (1) violates

the separation of powers doctrine; (2) is unconstitutionally overbroad, criminalizing lawful

conduct (e.g., non-compliance based on the invocation of Executive Privilege and reliance on the

OLC Opinions) within its ambit; (3) is unconstitutionally void for vagueness (e.g. when considered

with the DOJ's official position as reflected in the OLC Opinions, it fails adequately to give notice

_____

"But even if his contempt were based on an erroneous but good-faith belief that he had a valid legal excuse for ignoring the subpoena's demands, whether by his own determination or his attorney's, it is no defense. All evidence and argument related to good-faith reliance on the law or an attorney's advice should therefore be excluded at trial." [Doc. 29 at 8].

At oral argument, the Government reiterated its position that, other than an accident, there is no legal justification for failing to comply with a congressional subpoena. Government counsel put it as follows: "So contempt of Congress for willful default is about whether or not you showed up; that is whether to produce records or to testify." [3/16/22 Hearing Tr. at 4] (emphasis added). "So if a defendant makes a deliberate and intentional decision not to appear, he has the requisite intent for contempt; that is, does the defendant know he's been summonsed and does he intentionally, knowing that, not show up? That is all that is required." [*Id*. at 5] (emphasis added). "And what the Supreme Court made clear is that that intentional choice not to comply, that is inherently a criminal choice. There is no innocent way that someone decides they are just not going to comply with the statute. [*Id*. at 6] (emphasis added). "And that's where contempt of Congress draws (sic), between someone who accidentally does not comply with their obligations, and someone who makes an intentional and deliberate choice not to do so." [*Id*. at 7]. Finally, in response to the Court's direct question as to what the Government needs to prove in this case on *mens rea*, the Government summed up its position as follows:

"The government would need to demonstrate that the defendant knew he had been summonsed; so that means, knew that Congress was requiring him to show up and produce records on October 7th; and that Congress was requiring him to show up and testify on October 14th. And that he knew that that was the obligation; and that despite knowing that, he decided not to comply. He has to have – the government has to prove that he was given a clear choice from Congress. Either show up or you are in contempt. That would be all that the government is required to show there." … "And it's no different from in the contempt of court context. A witness gets a summons to appear before a grand jury or to appear for testimony in trial. And if they deliberately decide, I will not appear, they are subject to prosecution for contempt. It's the same principle in the contempt of Congress." [*Id*. at 8].

as to what conduct is subject to criminal prosecution); (4) unconstitutionally prohibits Mr. Bannon from telling the entire story of his case.[50]

### A. Statutory Interpretation Problems

There is a fundamental statutory interpretation problem with such a reading, when one considers the associated statute found in 2 U.S.C. § 193 which provides as follows:

> No witness is privileged to refuse to testify to any fact, or to produce any paper, respecting which he shall be examined by either House of Congress, or by any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or by any committee of either House, upon the ground that his testimony to such fact or his production of such paper may tend to disgrace him or otherwise render him infamous.

Construing the term "willfully" as used in § 192, the statute to which § 193 refers, as this Court has - making any reason for the failure to comply and any *mens rea*, other than that the witness "deliberately" and "intentionally" failed to comply, and thereby making a claimed justification of privilege for the failure to comply legally irrelevant, renders § 193 nothing more than surplusage. As this Court has noted, "[W]hen possible, of course, the Court must give effect to every word in a statute." *United States v. Miller*, 2022 U.S. Dist. LEXIS 45696, *16-*17 (D. D.C., March 7, 2022) (Nichols, J.), *citing, Setser v. United States*, 566 U.S. 231, 239 (2012). There would be no reason for Congress to have added § 193, if the invocation of privilege, like any other reason or motivation for the failure to comply, were legally irrelevant. "Willfully makes default," we already have been told, is not concerned with why the witness did not comply – what is in his mind as to why he did not have to comply; so there would be no need for Congress to identify what kind of privilege will not avail the witness.

---

[50] *See, e.g., United States v. Nixon*, 418 U.S. 683, 709 (1974) ("the need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system depends on full disclosure of all the facts, within the framework of the rules of evidence."); *United States v. Nobles*, 422 U.S. 225, 232 (1975).

If, on the other hand, § 193 were intended to serve some legally cognizable purpose, then the Court's construction of § 192 would fail under fundamental *expressio unius* analysis, with its identification of one particular type of privilege – a claim that compliance would "tend to disgrace" or otherwise render the witness "infamous" – as being inapplicable, implying that other privileges, like executive privilege, would be a privilege that would permit the witness to refuse to testify or produce a document. The constitutional infirmities of 2 U.S.C. § 192, though, as applied to Mr. Bannon and the circumstances, where Executive Privilege is invoked and is relied on for noncompliance, go well beyond matters of statutory interpretation.

B. **2 U.S.C. § 192 As Applied Violates the Separation of Powers Doctrine, Is Unconstitutionally Over Broad, And Is Void For Vagueness.**

1. **The Statute As Applied Violates The Constitutional Separation Of Powers Doctrine.**

The Court's decision makes the invocation of Executive Privilege by the former President of the United States and the associated directive to Mr. Bannon not to comply with the subpoena, based on executive privilege legally irrelevant.  It gives Congress a veto over a President's invocation of privilege.  That position cannot be reconciled with the United States Supreme Court's holding in *Trump v. Mazars USA,* LLP, 140 S. Ct. 2019, *2032; 207 L. Ed. 2d 951 (2020) that executive privilege absolutely applies in the context of a congressional subpoena and its invocation provides a basis for noncompliance with a congressional subpoena. The validity of the invocation surely can be challenged in a civil enforcement proceeding; but it is presumed to be valid when made and provides a lawfully recognized basis for the witness's failure, indeed, inability, to comply. *Id*. The statute as applied also violates the separation of powers doctrine by directly infringing on the President's right to determine which communications he deems to be appropriately covered by executive privilege. Doing so is contrary to established constitutional

43

principles that a statute that "disrupts the proper balance between the coordinate branches" is unconstitutional and that the President's invocation of executive privilege is presumptively valid and must be honored by Congress.[51] As the Olson Memo provides, subjecting executive officials to prosecution for criminal contempt when they are carrying out the President's claim of Executive Privilege, "would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Olson Memo* at 134.

2 U.S.C. § 194 is unconstitutional as applied because its mandatory terms, especially where Executive Privilege is invoked, violate the separations of powers doctrine by encroaching on prosecutorial decisions reposited under the Constitution exclusively in the Executive branch.[52] Members of the Committee have made clear their belief that the prosecution is mandatory under the statute. Bess Levin, *January 6 Panel Politely Requests That Merrick Garland Do His F—king Job*, Vanity Fair (Mar. 29, 2022), ( https://www.vanityfair.com/news/2022/03/january-6-committee-merrick-garland-donald-trump.    That renders the statute unconstitutional under *Chadha*.

**2.    The Statute As Applied Is Unconstitutionally Overbroad And Void For Vagueness.**

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[53]    The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process

---

[51] *Nixon v. Admin. of General Services*, 433 U.S. 425, 443 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974).

[52] *See, e.g., United States v. Brown*, 381 U.S. 437, 443 (1965); *INS v. Chadha*, 462 U.S. 917 (1983).

[53] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id.* "Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id.* (citations omitted). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.[54] Issues, like those here, with the *mens rea* element of the statute, exacerbate vagueness problems.[55] Vagueness concerns are intensified where a statute imposes criminal penalties.[56] A statute is unconstitutionally overbroad where, as here, it risks including within its prohibition fully lawful conduct undertaken in good-faith or because of the uncertainty of the definition of material terms (like "willfully" or "default").[57]

2 U.S.C. § 192, and specifically the phrase "willfully makes default" as this Court has interpreted it and has the elements of the offense charged have been characterized, is void for vagueness and overbroad, as applied to the instant case or any case in which executive privilege is invoked, especially in light of the OLC Opinions referred to in this motion to dismiss. The Government's position on the elements of the crime and that any reason for noncompliance, other than accident, is legally irrelevant, adopted by the Court in unqualifiedly granting its motion in limine [Docs. 29; 35; 49], is directly at odds with long-established authority that the invocation of

---

[54] *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

[55] *Calautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision … the statute is little more than a 'trap for those who act in good faith.'").

[56] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has … expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

[57] *See, e.g., United States v. Stevens*, 569 U.S. 460, 473 (2010)

executive privilege must be permitted as a legally cognizable reason for non-compliance. *See e.g.*, *Mazars*, 140 S. Ct. at 2032.

Moreover, in light of the legally binding, published, authoritative position of the Department of Justice, reflected in the OLC Opinions cited herein that the criminal statute does not apply and cannot be applied to a current or former executive branch employee when executive privilege is invoked, the statute, as applied, is void for vagueness; for it does not give constitutionally sufficient notice of what conduct will expose a person so situated to criminal sanction.

Statements by the Government, through its agents or officials, concerning criminal sanctions, which are contradictory or so vague and undefined "as to afford no fair warning as to what might transgress (the statute)" render the statute unconstitutionally vague, much in the same way contradictory statements within a criminal statute render the statute unconstitutional. *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In the instant case, the OLC Opinions go well beyond mere "contradictory" or "vague" statements – they absolutely give full license, indeed they command, the very course of conduct Mr. Bannon took in response to the subpoena (and that was ordered by the invocation of Executive privilege); yet now he faces criminal prosecution for actions consistent with published DOJ policy. This renders the statute, at best, void for vagueness.

The statute is unconstitutionally overbroad as applied because, as the Court has defined "willfully makes default" and the elements of the crime, it unconstitutionally includes within its ambit, fully legal and constitutionally protected conduct – noncompliance based on the invocation of Executive Privilege and reliance on the OLC Opinions. Moreover, the Court's decision, granting the Government's motion, which included a prohibition on the Defendant's reliance "on law" is

irreconcilable with the well settled principle that in the criminal setting, all constitutional and other applicable defenses must be afforded the Defendant.[58]

The statute also is void for vagueness because the key phrase "willfully makes default" gives insufficient notice as to what constitutes a "default" in light of the long line of authority that raises to a constitutional level the imperative that Congress and the Executive branches must work toward an accommodation in situations like the one presented here.[59]  Mr. Bannon, through Mr. Costello, went to extraordinary lengths to try to come to an accommodation with the Committee. [Doc. 30-1, ¶¶ 13-20].  Among other steps, he advised the Committee that Mr. Bannon would testify if the Committee worked out the executive privilege issue with former President Trump or if they went before a judge and a judge ordered Mr. Bannon to comply, after considering the executive privilege claim.  Mr. Costello asked the Committee for a one-week adjournment to consider the impact of the lawsuit former President Trump filed against the Committee, involving issues of executive privilege, with the exact same issue present in this case.[60]

On October 18, 2021, notwithstanding his conclusion based on the OLC Opinions that the subpoena was unlawful and invalid, in a further effort to accommodate, Mr. Costello drafted a

---

[58] *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983); *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.C.Cir.1971); *Tobin v. United States*, 306 F.2d 270, 276 (D.C.Cir.1962).

[59] *See e.g., United States v. AT&T, 567 F.2d 121, 127 (D.C. Cir. 1977) (*Congress and Executive Branch "should take cognizance of an implicit constitutional mandate to seek optimal accommodation" to resolve disputes*).*

[60] In the lawsuit former President Trump filed, a primary issue was whether a current President's decision to deny executive privilege can override a former President's invocation of executive privilege.  *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021).  In the instant case on October 18, 2021, after the return dates for the subpoena had passed, a representative of President Biden wrote to Mr. Costello, purporting to override former President Trump's invocation of executive privilege [Ex. GG] [U.S. 000313].  That same day, Mr. Costello asked the committee for a one-week extension to allow him to consider the matter and the impact of the lawsuit.  The committee summarily denied the request or any accommodation and set the following day for a vote on a contempt referral.

letter to the committee identifying categories of materials in the subpoena for which Mr. Bannon clearly had no responsive materials or testimony to offer. [U.S. 000992-000993]. The committee's response to Mr. Costello's accommodation efforts and request for a one-week extension of time to consider the Trump lawsuit and the executive privilege issue, was to set a committee vote on contempt the following day. The Select Committee made clear that they had no interest in an accommodation with Mr. Bannon (in sharp contrast to other witnesses who, for example, upon information and belief, the Select Committee permitted a privilege holder representative to appear at a deposition, and for whom extensions of time were granted, etc.). Under these circumstances and the institutional interests in working toward an accommodation, the term "willfully makes default" is unconstitutionally void for vagueness and the indictment should be dismissed based on the Select Committee's refusal to work toward any accommodation.

For the foregoing reasons, this statute is unconstitutional as applied and the indictment must be dismissed.

## V.    Prosecutorial Over-Reaching Requires Dismissal Of The Indictment

Counsel for the Government improperly targeted Mr. Costello – counsel for Mr. Bannon – during the grand jury investigation in a manner that drove a wedge between attorney and client. Moreover, counsel for the Government misled the grand jury on key evidence. These errors require the dismissal of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(A)(v).

### A.    Targeting Mr. Bannon's Counsel Requires Dismissal.

On October 21, 2021, the House made a contempt referral involving Mr. Bannon to DOJ.[61] [US-000459-504]. On October 25, 2021, Mr. Costello – counsel for Mr. Bannon – emailed AUSA

---

[61] The defense has moved to compel disclosure of Government efforts to obtain the telephone and email records of Mr. Costello, Mr. Bannon's attorney. [Doc. 26]. Certain documents have been provided, but the motion remains under advisement. Nonetheless, we move for dismissal of the Indictment based on the Government's conduct – and intend to supplement this motion if additional information is forthcoming.

48

Cooney to initiate efforts to seek a declination of any criminal charges. Mr. Costello identified himself as the attorney for Mr. Bannon. [US-001136]. On November 1, 2021, Mr. Costello sent AUSA Cooney a legal memorandum outlining the reasons for declination. A video conference was held on November 3, 2021, so that Mr. Costello and counsel for the Government could further discuss the matter. Mr. Costello believed – as is customary in criminal cases – that the back-and-forth between himself and counsel for the Government was a good faith effort to persuade DOJ not to prosecute his client, Mr. Bannon.

However, Government counsel misled Mr. Costello. They suggested to Mr. Costello that they were interested in hearing his arguments on declination. However, at the same time they were improperly using the power of the grand jury to collect evidence about Mr. Costello, in the hope that they could use it against his client Mr. Bannon. The very day of the initial contact with the U.S. Attorney's Office, October 25, 2021, the Government began issuing grand jury subpoenas to third party providers seeking Mr. Costello's phone and email records. Some of these grand jury subpoenas sought records dating to September 1, 2021 – 22 days before the Select Committee issued its subpoena.[62] This was improper. Section 9-13.410(A) of the U.S. Attorneys' Manual requires main DOJ approval in such circumstances. No approval was obtained by counsel for the Government here. In addition, counsel for the Government obtained a 2703(d) Order from a magistrate judge, seeking additional records of Mr. Costello.[63]

---

[62] And the records obtained via the § 2703(d) Order date back to March 5, 2021. [US-001151-001249].

[63] Incredibly, counsel for the Government represented to the Court that these records were necessary to the investigation, and that some grand jury subpoenas were for records of "other" Bob Costellos. Their purported reason has no basis in fact as they already knew that there was never a claim that Mr. Bannon did not accept service of the subpoena.

Moreover, counsel for the Government misled Mr. Costello by staging two surreptitious "interviews" of him, all the while suggesting to him that he was engaged on advocacy on behalf of his client. There was never any intention to consider declination – the issuance of the first subpoena before Mr. Costello ever met with anyone from the U.S. Attorney's Office established that. During videoconferences on November 3 and 8, 2021, counsel for the Government had FBI agents listen in and later draft FBI 302 "interview reports" capturing statements made by Mr. Costello. Finally, counsel for the Government requested, and Mr. Costello provided (on November 4, 2021), more than 100 pages of documents – including attorney work product created during the representation of Mr. Bannon – without divulging that Mr. Costello was being treated by the Government as a witness against Mr. Bannon, not his counsel.

This Court can, in its supervisory power, dismiss the Indictment as a sanction for the Government's improper conduct. *See*, *e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *United States v. Batres-Santolino*, 521 F.Supp. 744, 750-53 (N.D. Cal. 1981). Dismissal is appropriate where, as here, the improper tactics by the Government drove a wedge between a defendant and his attorney. *United States v. Marshank*, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991) (doctrine permitting dismissal of indictment on basis of outrageous government misconduct is grounded in due process clause of Fifth Amendment and is therefore applicable to cases where government interference in attorney-client relationship is so shocking to universal sense of justice that it violates due process); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985). In determining whether governmental interference into an attorney-client relationship is outrageous enough to violate due process courts analyze: (1) the government's objective awareness of ongoing, personal attorney-client relationship between its informant and defendant; (2) whether the government's intrusion into that relationship was deliberate; and (3) actual and substantial

prejudice to defendant. *United States v. Hsia*, 81 F.Supp.2d 7, 19 (D.D.C. 2000); *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981) (whether outrageous government conduct exists depends on the totality of the circumstances). Prejudice can "result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial." *U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).

The Government's intrusion into the attorney-client relationship was knowing and deliberate. The Government misled this Court and counsel with two different explanations for its conduct, neither of which make any sense. Moreover, Mr. Bannon been prejudiced by it. First, even if the toll and email records did not give the Government the contents of Mr. Costello's communications, having a record of who Mr. Costello spoke to and when provides significant insight into the defense's strategy and theory of the case that the Government would not have access to but for their improper intrusion. In addition, the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate. The Government contended that Mr. Costello was "a witness to the Defendant's deliberate decision to ignore the subpoena's requirements." [Doc. 31 at 12-13]. Then at oral argument they claimed they needed the information to determine if Mr. Costello informed Mr. Bannon of the subpoena. Both claims are false. Courts have held that due process is violated when the government turns the defendant's attorney into a prosecution witness. *See United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985). "Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances." *Schell*, 775 F.2d at 565.

**B.  <u>Misleading The Grand Jury Requires Dismissal</u>.**

To return a valid indictment, a grand jury must consider evidence that satisfies all elements of the offense charged. *Stirone v. United States*, 361 U.S. 212, 217 (1960). 2 U.S.C. § 192 includes the element "willfully makes default." The grand jury here was misled in three ways by counsel for the Government, such that the grand jury could not have found evidence supporting that element of the offense.[64]

First, the grand jury was misled about Mr. Bannon's communication to the Select Committee that President Trump has asserted executive privilege. In testimony on November 12, 2021, the Government's sole grand jury witness – an FBI agent – suggested to the grand jury that a witness could not validly assert executive privilege before the Select Committee unless the President himself (or his representative) directly communicated the assertion of executive privilege to the Select Committee. [Exhibit FF at 44]  (filed under seal in accordance with Protective Order). This was misleading testimony and Mr. Costello sent President Trump's counsel's letter invoking executive privilege to the Select Committee.

Second, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon never sought an adjournment of his deposition. *See* [Exhibit FF at 32-36] (filed under seal in accordance with Protective Order). This was false testimony. A request for a one-week adjournment was denied.

Third, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon received (through his attorney Mr. Costello) a complete copy of the House deposition

---

[64] We also move to dismiss the Indictment on the ground that the grand jury was not properly instructed as to the element of "willfully makes default" and the applicability of the advice of counsel doctrine. But given the Court's Order [Doc. 49] on the Government's motion in limine on advice of counsel [Doc. 29], we do not fully brief the issue again here.

rules along with the subpoena. *See* [Exhibit FF at 20-21] (filed under seal in accordance with Protective Order). This was false testimony as the General Counsel of the House, Doug Letter, informed the FBI and all three prosecutors more than a week before the grand jury testimony. As described in greater detail above, Mr. Bannon was not provided with section 3(b) of H. Res. 8, 117th Congress, even though the House Rules make explicit that "a witness *shall not be required to testify* unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations." [Ex. C ] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

In short, the Indictment must be dismissed because the grand jury was misled about three key issues that bear on whether Mr. Bannon "willfully [made] default." *See U.S. v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979) ("[T]he prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it."); *U.S. v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980) ("By intentionally and repeatedly asking misleading questions, while failing to disclose known, exculpatory evidence on the issue of [defendants'] guilty knowledge, the prosecutor denied defendants their constitutional right to an 'unbiased' grand jury.").

## VI.    **CONCLUSION**

Accordingly, Mr. Bannon respectfully requests that the Court grant this Motion and dismiss the Indictment.

Dated: April 15, 2022                    Respectfully submitted,

                                        **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                         ___/s/ M. Evan Corcoran_____
                                        M. Evan Corcoran (D.C. Bar No. 440027)
                                        400 East Pratt Street – Suite 900
                                        Baltimore, MD 21202
                                        Telephone: (410) 385-2225

Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

    /s/ Robert J. Costello
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of April 2022, a copy of the foregoing Motion

To Dismiss The Indictment was filed through the Court's CM/ECF system and was served *via*

electronic delivery on counsel of record.

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

Case 1:21-cr-00670-CJN   Document 58-1   Filed 04/15/22   Page 1 of 43

# EXHIBIT A

# H. Res. 8

## *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

### SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

(1) strike the designation of subparagraph (1); and

(2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

2

(1) ESTABLISHMENT.—In rule II, add at the end the following new clauses:

**"Office of Diversity and Inclusion**

"9.(a) There is established an Office of Diversity and Inclusion. The Speaker, in consultation with the Minority Leader, shall appoint a Director of the Office from recommendations provided by the chair of the Committee on House Administration in consultation with the ranking minority member of such committee.

"(b) Subject to the policy direction and oversight of the Committee on House Administration, the Office of Diversity and Inclusion shall—

"(1) direct and guide House employing offices to recruit, hire, train, develop, advance, promote, and retain a diverse workforce;

"(2) survey and evaluate diversity in House employing offices;

"(3) through the Director of the Office at the end of each session of Congress, submit a House of Representatives diversity report to the Speaker, the Majority Leader, the Minority Leader, the chair and ranking minority member of the Committee on House Administration, and the chair and ranking minority member of the Subcommittee on the Legislative Branch of the Committee on Appropriations; and

3

''(4) provide consultation and guidance in further-
ance of increasing diversity and inclusion in the House.

**''Office of the Whistleblower Ombuds**

''10.(a) There is established an Office of the Whistle-
blower Ombuds. The Speaker, in consultation with the chairs
and ranking minority members of the Committee on House
Administration and the Committee on Oversight and Reform,
shall appoint a Director of the Office.

''(b) Subject to the policy direction and oversight of the
Committee on House Administration, and in consultation
with any other committee (at the request of the chair or
ranking minority member of such other committee), the Of-
fice of the Whistleblower Ombuds shall—

''(1) promulgate best practices for whistleblower in-
take for offices of the House; and

''(2) provide training for offices of the House on
whistleblower intake, including establishing an effective
reporting system for whistleblowers, maintaining whistle-
blower confidentiality, advising staff of relevant laws and
policies, and protecting information provided by whistle-
blowers.''.

(2) CONFORMING AMENDMENT.—In clause
4(d)(1)(A) of rule X—

(A) strike ''and the Inspector General'' and in-
sert '', the Inspector General, the Office of Diver-

4

sity and Inclusion, and the Office of the Whistle-
blower Ombuds''; and

(B) strike ''and Inspector General'' and insert
''Inspector General, Office of Diversity and Inclu-
sion, and Office of the Whistleblower Ombuds''.

(c) Continuing Authority to Act in Litigation
Matters.—In clause 8(c) of rule II, strike ''appropriate''
and insert ''appropriate, including, but not limited to, the
issuance of subpoenas,''.

(d) Admittance to the Hall of the House.—

(1) In clause 2(a)(14) of rule IV, insert ''and the
Mayor of the District of Columbia'' after ''Territories''.

(2) In clause 4(a) of rule IV—

(A) in subparagraph (2) strike ''committee; or''
and insert ''committee;'';

(B) in subparagraph (3) strike the period and
insert ''; or''; and

(C) add at the end the following new subpara-
graph:

''(4) has been convicted by a court of record for the com-
mission of a crime in relation to that individual's election to,
or service to, the House.''.

(e) Gender-Inclusive Language.—

(1) In clause 1(c)(9) of rule X, strike ''seamen'' and
insert ''seafarers''.

5

(2) In clause 4(a)(1)(B) of rule X, strike "Chairman" and insert "Chair".

(3) In clause 8(c)(3) of rule XXIII, strike "father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, half sister, grandson, or granddaughter" and insert "parent, child, sibling, parent's sibling, first cousin, sibling's child, spouse, parent-in-law, child-in-law, sibling-in-law, stepparent, stepchild, stepsibling, half-sibling, or grandchild".

(4) In clause 10(b) of rule XXIII—

(A) strike "submit his or her resignation" and insert "resign";

(B) strike "he or she serves" and insert "such Member, Delegate, or Resident Commissioner serves"; and

(C) strike "he or she holds" and insert "such Member, Delegate, or Resident Commissioner holds".

(5) In clause 15(d)(2) of rule XXIII, strike "father, mother, son, daughter, brother, sister, husband, wife, fa-

6

ther-in-law, or mother-in-law'' and insert ''parent, child, sibling, spouse, or parent-in-law''.

(6) In clause 4 of rule XXVII, strike ''himself or herself'' and insert ''themself''.

(7) In rule XXIX, clause 2 is amended to read as follows:

''2. (Reserved.)''.

(f) COMMITTEE ON ARMED SERVICES.—In clause 1(c) of rule X—

(1) in subparagraph (1) strike ''and Air Force'' and insert ''Marine Corps, Air Force, and Space Force''; and

(2) in subparagraph (13), strike ''and Air Force'' and insert ''Air Force, and Space Force''.

(g) COMMITTEE OVERSIGHT PLANS.—In clause 2(d)(2) of rule X—

(1) in subdivision (D), strike ''and'';

(2) in subdivision (E), strike the period and insert ''; and''; and

(3) add at the end the following new subdivision:

''(F) give priority consideration to including in the plan a discussion of how the committee's work will address issues of inequities on the basis of race, color, ethnicity, religion, sex, sexual orientation, gender identity, disability, age, or national origin.''.

(h) PRINTING AND AVAILABILITY REQUIREMENTS.—

7

(1) In clause 6 of rule X, strike "printed" each place that it appears.

(2) In clause 8(b)(1)(A) of rule XXII, insert "or pursuant to clause 3 of rule XXIX" after "Congressional Record".

(i) COMMITTEE VOTE AVAILABILITY.—In clause 2(e)(1)(B) of rule XI—

(1) in item (i), strike "made available by the committee for inspection by the public at reasonable times in its offices and also";

(2) in item (i), strike "subdivision (B)(ii)" and insert "item (ii)"; and

(3) in item (ii), strike "available for inspection by the public" and insert "publicly available".

(j) AMENDMENT AVAILABILITY.—In clause 2(e)(6) of rule XI, insert ", or 48 hours after the disposition or withdrawal of any other amendment," after "any amendment".

(k) TRUTH-IN-TESTIMONY REFORM.—In clause 2(g)(5) of rule XI—

(1) amend subdivision (B) to read as follows:

"(B) In the case of a witness appearing in a non-governmental capacity, a written statement of proposed testimony shall include—

"(i) a curriculum vitae;

8

"(ii) a disclosure of any Federal grants or con-
tracts, or contracts, grants, or payments originating with
a foreign government, received during the past 36
months by the witness or by an entity represented by the
witness and related to the subject matter of the hearing;
and

"(iii) a disclosure of whether the witness is a fidu-
ciary (including, but not limited to, a director, officer,
advisor, or resident agent) of any organization or entity
that has an interest in the subject matter of the hear-
ing.";

(2) in subdivision (C), strike "subdivision (B)" and
insert "subdivision (B)(ii)"; and

(3) in subdivision (D), insert "24 hours before the
witness appears to the extent practicable, but" before
"not later".

(l) ELECTRONIC FILING OF REPORTS AND ELECTRONIC
SIGNATURES.—

(1) In clause 2(l) of rule XI, insert "(including in
electronic form)" after "signed views".

(2) In clause 2(a) of rule XIII—

(A) in subparagraph (1), strike "subparagraph
(2)" and insert "subparagraphs (2) and (3)"; and

(B) add the following new subparagraph:

9

"(3) All reports of committees may be delivered to the Clerk in electronic form.".

(3) In clause 5(b) of rule XIII, insert ", pursuant to clause 2(a)(3), or pursuant to clause 2(c)," after "from the floor".

(4) In clause 5 of rule XXV, insert "(including in electronic form)" after "signed" each place that it appears.

(5) In clause 1 of rule XXVII, insert "(including in electronic form)" after "signed".

(m) Subpoena Authority.—In clause 2(m)(3) of rule XI, add the following new subdivision:

"(D) Subpoenas for documents or testimony may be issued to any person or entity, whether governmental, public, or private, within the United States, including, but not limited to, the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or Executive Office of the President.".

(n) Committee on Ethics.—

(1) In clause 5(a)(3)(C) of rule X, insert "or fifth" after "fourth".

(2) In clause 3 of rule XI—

10

(A) in paragraph (b)(8)(A), insert ", Delegate, Resident Commissioner" after "Member" each place it appears;

(B) in paragraph (b)(8)(B)(iii), insert ", Delegate, Resident Commissioner" after "Member";

(C) in paragraph (k)(1)(A), insert ", Delegate, Resident Commissioner" after "Member";

(D) in paragraph (m)(1)(A), insert ", Delegates, or the Resident Commissioner" after "Members";

(E) in paragraph (n), insert ", Delegate, Resident Commissioner" after "Member"; and

(F) in paragraph (r), insert ", Delegate, Resident Commissioner" after "Member".

(o) AUDIO AND VIDEO RECORDINGS.—In clause 4(b) of rule XI, strike "radio and television tapes and television film" and insert "audio and video recordings".

(p) COSPONSORSHIP WITHDRAWAL.—In clause 7(b)(2) of rule XII, strike the first two sentences and insert the following: "The name of a cosponsor of a bill or resolution may be deleted only by a demand from the floor made by the Member, Delegate, or Resident Commissioner whose name is to be deleted, or by a unanimous-consent request from the sponsor. The Speaker may only entertain such a demand or request until the last committee authorized to consider and

11

report the bill or resolution reports it to the House or is discharged from its consideration.''.

(q) COMPARATIVE PRINTS.—In rule XXI, strike clause 12.

(r) REQUIRING COMMITTEE HEARING AND MARKUP ON BILLS AND JOINT RESOLUTIONS.—

(1) In clause 3(c) of rule XIII, add the following new subparagraph:

''(6)(A) On a bill or joint resolution to be considered pursuant to a special order of business reported by the Committee on Rules—

''(i) a list of related committee and subcommittee hearings; and

''(ii) a designation of at least one committee or subcommittee hearing that was used to develop or consider such bill or joint resolution.

''(B) Subdivision (A) shall not apply to a bill or joint resolution—

''(i) continuing appropriations for a fiscal year; or

''(ii) containing an emergency designation under section 251(b)(2) or section 252(e) of the Balanced Budget and Emergency Deficit Control Act of 1985.''.

(2) In rule XXI, add at the end the following new clause:

12

"12.(a) It shall not be in order to consider a bill or joint resolution pursuant to a special order of business reported by the Committee on Rules that has not been reported by a committee.

"(b) Paragraph (a) shall not apply to a bill or joint resolution—

"(1) continuing appropriations for a fiscal year;

"(2) containing an emergency designation under section 251(b)(2) or section 252(e) of the Balanced Budget and Emergency Deficit Control Act of 1985;

"(3) designated pursuant to clause 7(a) of rule XV; or

"(4) not referred to committee.

"(c) Paragraph (a) does not apply before March 1 of an odd-numbered year.".

(s) MOTION TO RECOMMIT.—

(1) In clause 6(c) of rule XIII, strike ", including a motion to recommit with instructions to report back an amendment otherwise in order".

(2) In clause 2 of rule XIX—

(A) in paragraph (a), strike "with or";

(B) amend paragraph (b) to read as follows:

"(b) The previous question shall be considered as ordered on any motion to recommit (or commit, as the case may be).".; and

13

(C) strike paragraph (c).

(3) In clause 7(d) of rule XXII, strike "or in a motion to recommit to conference".

(t) District of Columbia Business.—In rule XV—

(1) clause 4 is amended to read as follows:

"4. (Reserved.)".

(2) in clause 4, strike the caption.

(u) Title Amendments.—In clause 6 of rule XVI, insert ", shall be in order only if offered by the Majority Leader or a designee," after "adoption".

(v) Reconciliation Directives.—Clause 7 of rule XXI is amended to read as follows:

"7. (Reserved.)".

(w) Availability of Measures.—In clause 11 of rule XXI, insert "the text of" before "such measure".

(x) Prohibited Service.—Clause 19(c) of rule XXIII is amended to read as follows: "A Member, Delegate, Resident Commissioner, officer, or employee of the House shall comply with regulations issued and revised, as necessary, by the Committee on Ethics regarding types of prohibited service or positions that could lead to conflicts of interest.".

(y) Code of Official Conduct.—In rule XXIII—

(1) redesignate clause 20 as clause 22; and

(2) insert after clause 19 the following new clauses:

14

"20. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not, directly or indirectly, take any actions to prevent any individual from or retaliate against any individual for providing truthful information to the Committee on Ethics, the Office of Congressional Ethics, the Office of Congressional Workplace Rights, or any law enforcement official, provided that the disclosure of such information is not otherwise prohibited by law or House rules.

"21.(a) Except as provided in paragraphs (b) and (c), a Member, Delegate, Resident Commissioner, officer, or employee of the House shall not knowingly and willfully disclose publicly the identity of, or personally identifiable information about, any individual who has reported allegations of possible wrongdoing, including retaliation, under processes and protections provided by the Civil Service Reform Act of 1978, the Whistleblower Protection Act of 1989, the Intelligence Community Whistleblower Protection Act of 1998, or any other Federal law that establishes the right for individuals to make protected disclosures to Congress.

"(b) The limitation in paragraph (a) shall not apply to any disclosure of an individual's identity or personally identifiable information if—

"(1) the individual has provided express written consent prior to such disclosure;

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 459 of 512
Case 1:21-cr-00670-CJN    Document 58-1    Filed 04/15/22    Page 16 of 43

15

''(2) the individual has already voluntarily and publicly disclosed their identity; or

''(3) the disclosure is by the chair of a committee after an affirmative vote by two-thirds of the members of the committee that such disclosure is in the public interest.

''(c) Nothing in this clause shall prevent—

''(1) an investigation of any allegation of wrongdoing disclosed by any individual; or

''(2) the public disclosure of substantive information shared by any individual that is not personally identifiable to that individual.

''(d) Disclosures made pursuant to paragraph (b)(3) shall be subject to appropriate safeguards, including that the individual be provided timely advance notice if possible before their identity or any personally identifiable information is disclosed prior to the vote described in paragraph (b)(3), unless such information would jeopardize the related investigations. When providing such notice to the individual the committee chair shall send the individual a written explanation of the reasons for the disclosure.''.

(z) Communications Standards Commission.—In clause 5 of rule XXIV, strike ''Commission on Congressional Mailing Standards'' and insert ''Communications Standards Commission''.

16

**SEC. 3. SEPARATE ORDERS.**

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War

17

Powers Resolution (50 U.S.C. 1545–46) shall not be subject to a motion to table.

(d) EXERCISE FACILITIES FOR FORMER MEMBERS.—During the One Hundred Seventeenth Congress—

(1) The House of Representatives may not provide access to any exercise facility which is made available exclusively to Members and former Members, officers and former officers of the House of Representatives, and their spouses to any former Member, former officer, or spouse who is a lobbyist registered under the Lobbying Disclosure Act of 1995 or any successor statute or who is an agent of a foreign principal as defined in clause 5 of rule XXV. For purposes of this subsection, the term ''Member'' includes a Delegate or Resident Commissioner to the Congress.

(2) The Committee on House Administration shall promulgate regulations to carry out this subsection.

(e) EMPANELING INVESTIGATIVE SUBCOMMITTEE OF THE COMMITTEE ON ETHICS.—The text of House Resolution 451, One Hundred Tenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such provision applied in the One Hundred Tenth Congress, except that references to the Committee on Standards of Official Conduct shall be construed as references to the Committee on Ethics.

18

(f) NON-DISCLOSURE AGREEMENTS.—Any non-disclosure agreement imposed by any employing or contracting authority in the House of Representatives to which a paid or unpaid employee or contractor is or was required to agree as a term of employment shall—

(1) provide clear guidance that the employee or contractor may communicate concerning any matter with the Committee on Ethics, the Office of Congressional Workplace Rights, or any other office or entity designated by the Committee on House Administration without prior, concurrent, or subsequent notice or approval; and

(2) not be binding and shall have no legal effect to the extent to which it requires prior, concurrent, or subsequent notice or approval from anyone on any matter with respect to communications from an employee or contractor to any of the committees, offices, or entities described in paragraph (1).

(g) REQUIRING MEMBERS TO PAY FOR DISCRIMINATION SETTLEMENTS.—

(1) IN GENERAL.—In the case of a settlement of a complaint under the Congressional Accountability Act of 1995 in connection with a claim alleging a violation described in paragraph (2) which is committed personally by a Member, Delegate, or Resident Commissioner, if

19

the Member, Delegate, or Resident Commissioner is not required under law to reimburse the Treasury for the amount of the settlement, the chair and ranking minority member of the Committee on House Administration may not approve the settlement pursuant to clause 4(d)(2) of rule X unless, under the terms and conditions of the settlement, the Member, Delegate, or Resident Commissioner is required to reimburse the Treasury for the amount of the settlement.

(2) VIOLATIONS DESCRIBED.—A violation described in this paragraph is—

(A) a violation of section 201(a) or section 206(a) of the Congressional Accountability Act of 1995; or

(B) a violation of section 207 of such Act which consists of intimidating, taking reprisal against, or otherwise discriminating against any covered employee under such Act because of a claim alleging a violation described in subparagraph (A).

(h) MANDATORY ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICIES FOR HOUSE OFFICES.—

(1) REQUIRING OFFICES TO ADOPT POLICY.—Each employing office of the House of Representatives under the Congressional Accountability Act of 1995 shall adopt

20

an anti-harassment and anti-discrimination policy for the office's workplace.

(2) REGULATIONS.—Not later than April 1, 2021, the Committee on House Administration shall promulgate regulations to carry out this subsection, and shall ensure that such regulations are consistent with the requirements of the Congressional Accountability Act of 1995, rule XXIII, and other relevant laws, rules, and regulations.

(i) DISPLAYING STATEMENT OF RIGHTS AND PROTECTIONS PROVIDED TO HOUSE EMPLOYEES.—The Committee on House Administration shall issue regulations to provide that each employing office of the House of Representatives shall post in a prominent location in the office (including, in the case of the office of a Member, Delegate, or the Resident Commissioner, a prominent location in each district office) a statement of the rights and protections provided to employees of the House of Representatives under the Congressional Accountability Act of 1995, including the procedures available to employees of the House under such Act for responding to and adjudicating allegations of violations of such rights and protections.

(j) BROADENING AVAILABILITY AND UTILITY OF LEGISLATIVE DOCUMENTS IN MACHINE-READABLE FORMATS.— The Committee on House Administration, the Clerk, and

21

other officers and officials of the House shall continue efforts to broaden the availability and utility of legislative documents in machine readable formats in the One Hundred Seventeenth Congress in furtherance of the institutional priorities of—

>    (1) improving public availability and use of legislative information produced by the House and its committees; and

>    (2) enabling all House staff to produce comparative prints showing the differences between versions of legislation, how proposed legislation will amend existing law, and how an amendment may change proposed legislation.

(k) IMPROVING THE COMMITTEE ELECTRONIC DOCUMENT REPOSITORY.—The Clerk, the Committee on House Administration, and other officers and officials of the House shall undertake efforts to improve the electronic document repository operated by the Clerk for use by committees of the House in the One Hundred Seventeenth Congress, in furtherance of the institutional priority of increasing public availability and identification of legislative information produced and held by House committees, including votes, amendments, and witness disclosure forms.

(l) INCLUSION OF CITATIONS FOR PROPOSED REPEALS AND AMENDMENTS.—To the maximum extent practicable

22

and consistent with established drafting conventions, an in-
struction in a bill or joint resolution proposing to repeal or
amend any law or part thereof not contained in a codified
title of the United States Code shall include, in parentheses
immediately following the designation of the matter proposed
to be repealed or amended, the applicable United States Code
citation (which may be a note in the United States Code), or,
if no such citation is available, an appropriate alternative ci-
tation to the applicable law or part.

(m) PROVIDING FOR TRANSPARENCY WITH RESPECT TO
MEMORIALS SUBMITTED PURSUANT TO ARTICLE V OF THE
CONSTITUTION OF THE UNITED STATES.—With respect to
any memorial presented under clause 3 of rule XII pur-
porting to be an application of the legislature of a State call-
ing for a convention for proposing amendments to the Con-
stitution of the United States pursuant to Article V, or a re-
scission of any such prior application—

(1) the chair of the Committee on the Judiciary
shall, in the case of a memorial presented in the One
Hundred Fourteenth Congress or succeeding Congresses,
and may, in the case of such a memorial presented prior
to the One Hundred Fourteenth Congress, designate any
such memorial for public availability by the Clerk; and

(2) the Clerk shall make such memorials as are des-
ignated pursuant to paragraph (1) publicly available in

23

electronic form, organized by State of origin and year of receipt, and shall indicate whether the memorial was designated as an application or a rescission.

(n) SUBCOMMITTEES.—Notwithstanding clause 5(d) of rule X, during the One Hundred Seventeenth Congress the Committee on Agriculture may have not more than six subcommittees.

(o) CONGRESSIONAL MEMBER ORGANIZATION TRANSPARENCY REFORM.—

(1) PAYMENT OF SALARIES AND EXPENSES THROUGH ACCOUNT OF ORGANIZATION.—A Member of the House of Representatives and an eligible Congressional Member Organization may enter into an agreement under which—

(A) an employee of the Member's office may carry out official and representational duties of the Member by assignment to the Organization; and

(B) to the extent that the employee carries out such duties under the agreement, the Member shall transfer the portion of the Members' Representational Allowance (MRA) of the Member which would otherwise be used for the salary and related expenses of the employee to a dedicated account in the House of Representatives which is administered by the Organization, in accordance with the regula-

24

tions promulgated by the Committee on House Administration under paragraph (2).

(2) REGULATIONS.—The Committee on House Administration (hereafter referred to in this subsection as the ''Committee'') shall promulgate regulations as follows:

(A) USE OF MRA.—Pursuant to the authority of section 101(d) of the House of Representatives Administrative Reform Technical Corrections Act (2 U.S.C. 5341(d)), the Committee shall prescribe regulations to provide that an eligible Congressional Member Organization may use the amounts transferred to the Organization's dedicated account under paragraph (1)(B) for the same purposes for which a Member of the House of Representatives may use the Members' Representational Allowance, except that the Organization may not use such amounts for franked mail, official travel, or leases of space or vehicles.

(B) MAINTENANCE OF LIMITATIONS ON NUMBER OF SHARED EMPLOYEES.—Pursuant to the authority of section 104(d) of the House of Representatives Administrative Reform Technical Corrections Act (2 U.S.C. 5321(d)), the Committee shall prescribe regulations to provide that an employee of

25

the office of a Member of the House of Representatives who is covered by an agreement entered into under paragraph (1) between the Member and an eligible Congressional Member Organization shall be considered a shared employee of the Member's office and the Organization for purposes of such section, and shall include in such regulations appropriate accounting standards to ensure that a Member of the House of Representatives who enters into an agreement with such an Organization under paragraph (1) does not employ more employees than the Member is authorized to employ under such section.

(C) PARTICIPATION IN STUDENT LOAN REPAYMENT PROGRAM.—Pursuant to the authority of section 105(b) of the Legislative Branch Appropriations Act, 2003 (2 U.S.C. 4536(b)), relating to the student loan repayment program for employees of the House, the Committee shall promulgate regulations to provide that, in the case of an employee who is covered by an agreement entered into under paragraph (1) between a Member of the House of Representatives and an eligible Congressional Member Organization and who participates in such pro-

26

gram while carrying out duties under the agreement—

    (i) any funds made available for making payments under the program with respect to the employee shall be transferred to the Organization's dedicated account under paragraph (1)(B); and

    (ii) the Organization shall use the funds to repay a student loan taken out by the employee, under the same terms and conditions which would apply under the program if the Organization were the employing office of the employee.

(D) ACCESS TO HOUSE SERVICES.—The Committee shall prescribe regulations to ensure that an eligible Congressional Member Organization has appropriate access to services of the House.

(E) OTHER REGULATIONS.—The Committee shall promulgate such other regulations as may be appropriate to carry out this subsection.

(3) ELIGIBLE CONGRESSIONAL MEMBER ORGANIZATION DEFINED.—In this subsection, the term "eligible Congressional Member Organization" means, with respect to the One Hundred Seventeenth Congress, an organization meeting each of the following requirements:

27

(A) The organization is registered as a Congressional Member Organization with the Committee on House Administration.

(B) The organization designates a single Member of the House of Representatives to be responsible for the administration of the organization, including the administration of the account administered under paragraph (1)(B), and includes the identification of such Member with the statement of organization that the organization files and maintains with the Committee on House Administration.

(C) At least 3 employees of the House are assigned to perform some work for the organization.

(D) During the One Hundred Sixteenth Congress, at least 15 Members of the House of Representatives used a portion of the Members' Representational Allowance of the Member for the salary and related expenses of an employee who was a shared employee of the Member's office and the organization.

(E) The organization files a statement with the Committee on House Administration and the Chief Administrative Officer of the House of Representatives certifying that it will administer an account in accordance with paragraph (1)(B).

•HRES 8 EH

28

(p) Budget Matters.—During the first session of the One Hundred Seventeenth Congress, pending the adoption of a concurrent resolution on the budget for fiscal year 2021, the allocations, aggregates, and other appropriate levels as contained in the statement of the chair of the Committee on the Budget of the House of Representatives in the Congressional Record of May 1, 2020, as adjusted in the One Hundred Sixteenth Congress, shall be considered for all purposes in the House to be the allocations, aggregates, and other appropriate levels under titles III and IV of the Congressional Budget Act of 1974.

(q) Reissuance of Subpoenas Prior to Committee Organization.—(1) The House authorizes the chair of the Committee on Oversight and Reform (when elected), on behalf of the Committee on Oversight and Reform and until such committee has adopted rules pursuant to clause 2(a) of rule XI, to issue subpoenas related to the investigation into the accuracy and timing of the 2020 decennial census and related matters.

(2) The House authorizes the chair of the Select Subcommittee on the Coronavirus Crisis (when designated), on behalf of the Select Subcommittee on the Coronavirus Crisis and until the Committee on Oversight and Reform has adopted rules pursuant to clause 2(a) of rule XI, to issue subpoenas related to the investigation into political interference

29

in the response to the coronavirus pandemic at the Department of Health and Human Services and Centers for Disease Control and Prevention and related matters.

(r) Numbering of Bills.—In the One Hundred Seventeenth Congress, the first 10 numbers for bills (H.R. 1 through H.R. 10) shall be reserved for assignment by the Speaker and the second 10 numbers for bills (H.R. 11 through H.R. 20) shall be reserved for assignment by the Minority Leader.

(s) Remote Voting by Proxy and Remote Committee Activity.—House Resolution 965, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such resolution applied in the One Hundred Sixteenth Congress, except that—

(1) the notification and availability requirements of section 2 do not apply to revocation letters submitted to the Clerk after an automatic revocation pursuant to section 2(a)(2)(B);

(2) section 4(b) shall not apply; and

(3) the chair of the Committee on House Administration, in consultation with the ranking minority member, shall identify and submit to the Speaker and to the chair and ranking minority member of the Committee on Rules specific operable and secure technology that may be used to conduct remote voting in the House and shall

30

provide certification of such submission to the House as though pursuant to section 5(a).

(t) WITNESS DIVERSITY.—Not later than July 1, 2021, the Office of Diversity and Inclusion shall submit a report to the Committee on House Administration and the Committee on Rules recommending a method to survey the diversity of witness panels at committee hearings. Not later than July 31, 2021, the Committee on House Administration and the Committee on Rules shall take such steps as may be necessary to ensure the implementation of such method.

(u) REQUIREMENTS FOR COMMITTEE HEARING AND MARKUP.—During the One Hundred Seventeenth Congress, notwithstanding clause 12(c) of rule XXI (as added by section 2(r)), clause 12(a) of rule XXI shall not apply before April 1, 2021.

(v) EXEMPTIONS.—The chair of the Committee on the Budget may adjust an estimate under clause 4 of rule XXIX to—

(1) exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID–19 pandemic; and

(2) exempt the budgetary effects of measures to prevent, prepare for, or respond to economic, environ-

31

mental, or public health consequences resulting from climate change.

(w) FURTHER EXPENSES FOR RESOLVING CONTESTED ELECTIONS.—

(1) AMOUNTS FOR EXPENSES OF COMMITTEE ON HOUSE ADMINISTRATION.—There shall be paid out of the applicable accounts of the House of Representatives such sums as may be necessary for further expenses of the Committee on House Administration for the One Hundred Seventeenth Congress for resolving contested elections.

(2) SESSION LIMITATION.—The amount specified in paragraph (1) shall be available for expenses incurred during the period beginning at noon on January 3, 2021, and ending immediately before noon on January 3, 2022.

(3) VOUCHERS.—Payments under this subsection shall be made on vouchers authorized by the Committee on House Administration, signed by the chair of the Committee, and approved in the manner directed by the Committee.

(4) REGULATIONS.—Amounts made available under this subsection shall be expended in accordance with regulations prescribed by the Committee on House Administration.

32

(x) SUPPORT FOR SENATE MEASURES.—Not later than February 1, 2021, the Clerk shall submit to the chair of the Committee on Rules regulations establishing a process for Members to indicate their support for Senate measures that have been received by the House. Such process shall include the maintenance of a publicly available list of Members supporting each such Senate measure. Upon receipt of such regulations, the chair of the Committee on Rules shall cause them to be printed in the Congressional Record, and Members shall be permitted to indicate their support for Senate measures accordingly.

(y) DISSEMINATION OF MANIPULATED MEDIA.—The Committee on Ethics is directed to report to the House, not later than December 31, 2021, any recommended amendments to the Code of Official Conduct, as well as any accompanying regulations, intended to address the circumstances and instances, if any, for which a Member, Delegate, Resident Commissioner, officer, or employee of the House may be subject to discipline for the dissemination by electronic means, including by social media, of any image, video, or audio file that has been distorted or manipulated with the intent to mislead the public.

**SEC. 4. COMMITTEES, COMMISSIONS, AND HOUSE OFFICES.**

(a) HOUSE DEMOCRACY PARTNERSHIP.—House Resolution 24, One Hundred Tenth Congress, shall apply in the

33

One Hundred Seventeenth Congress in the same manner as such resolution applied in the One Hundred Tenth Congress, except that the commission concerned shall be known as the House Democracy Partnership.

(b) TOM LANTOS HUMAN RIGHTS COMMISSION.—Sections 1 through 7 of House Resolution 1451, One Hundred Tenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such provisions applied in the One Hundred Tenth Congress, except that—

(1) the Tom Lantos Human Rights Commission may, in addition to collaborating closely with other professional staff members of the Committee on Foreign Affairs, collaborate closely with professional staff members of other relevant committees;

(2) the resources of the Committee on Foreign Affairs which the Commission may use shall include all resources which the Committee is authorized to obtain from other offices of the House of Representatives; and

(3) any amounts authorized to provide full-time professional staff and resources to the Tom Lantos Human Rights Commission shall be in addition to and separate from the amounts authorized for salaries and expenses of the Committee on Foreign Affairs as provided by resolution of the House, shall be administered by the Committee on Foreign Affairs, and shall be dis-

34

tributed equally between the co-chairs of the Commission.

(c) OFFICE OF CONGRESSIONAL ETHICS.—Section 1 of House Resolution 895, One Hundred Tenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such provision applied in the One Hundred Tenth Congress, except that—

(1) the Office of Congressional Ethics shall be treated as a standing committee of the House for purposes of section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 4301(i));

(2) references to the Committee on Standards of Official Conduct shall be construed as references to the Committee on Ethics;

(3) any requirement for concurrence in section 1(b)(1) shall be construed as a requirement for consultation;

(4) the second sentence of section 1(b)(6)(A) shall not apply;

(5) members subject to section 1(b)(6)(B) may be reappointed for a fourth additional term;

(6) any individual who is the subject of a preliminary review or second-phase review by the board shall be informed of the right to be represented by counsel and

35

invoking that right should not be held negatively against such individual; and

(7) the Office may not take any action that would deny any person any right or protection provided under the Constitution of the United States.

(d) SELECT COMMITTEE ON THE CLIMATE CRISIS.— Section 104(f) of House Resolution 6, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such section applied in the One Hundred Sixteenth Congress, except that—

(1) the investigative jurisdiction of the Select Committee on the Climate Crisis shall consist of policies, strategies, and innovations to achieve substantial and permanent reductions in pollution and other activities that contribute to the climate crisis which will honor our responsibility to be good stewards of the planet for future generations and advance environmental justice;

(2) the Select Committee shall coordinate with and advise standing committees with relevant jurisdiction with respect to such policies, strategies, and innovations;

(3) any records obtained by a standing committee pursuant to a subpoena or deposition recommended by the Select Committee pursuant to section 104(f)(3)(B)(iii) may be transferred to the Select Committee; and

36

(4) the Select Committee shall submit all policy recommendations referenced in section 104(f)(5) by December 31, 2021, and all reports referenced in section 104(f)(5) by December 31, 2022.

(e) SELECT COMMITTEE ON THE MODERNIZATION OF CONGRESS.—Section 201 of House Resolution 6, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such section applied in the One Hundred Sixteenth Congress, except that—

(1) the Select Committee shall submit the final report under section 201(f)(3) not later than December 31, 2022; and

(2) section 201(g)(1) shall not apply.

(f) SELECT SUBCOMMITTEE ON THE CORONAVIRUS CRISIS.—Sections 1 through 7 of House Resolution 935, One Hundred Sixteenth Congress, shall apply in the One Hundred Seventeenth Congress in the same manner as such provisions applied in the One Hundred Sixteenth Congress.

(g) SELECT COMMITTEE ON ECONOMIC DISPARITY AND FAIRNESS IN GROWTH.—

(1) ESTABLISHMENT; COMPOSITION.—

(A) ESTABLISHMENT.—There is hereby established a Select Committee on Economic Disparity

37

and Fairness in Growth (hereafter in this sub-section referred to as the ''Select Committee'').

(B) COMPOSITION.—The Select Committee shall be composed of 15 Members, Delegates, or the Resident Commissioner appointed by the Speaker, of whom 6 shall be appointed on the recommendation of the Minority Leader. The Speaker shall designate one member of the Select Committee as its chair. A vacancy in the membership of the Select Committee shall be filled in the same manner as the original appointment.

(2) JURISDICTION; FUNCTIONS.—

(A) LEGISLATIVE JURISDICTION.—The Select Committee shall not have legislative jurisdiction and shall have no authority to take legislative action on any bill or resolution.

(B) INVESTIGATIVE JURISDICTION.—The sole authority of the Select Committee shall be to investigate, study, make findings, and develop recommendations on policies, strategies, and innovations to make our economy work for everyone, empowering American economic growth while ensuring that no one is left out or behind in the 21st Century Economy. The Select Committee shall coordinate with and advise standing committees with rel-

38

evant jurisdiction with respect to policy related to economic fairness, access to education, and workforce development. The Select Committee may, at its discretion, hold public hearings in connection with any aspect of its investigative functions.

(3) PROCEDURE.—(A) Except as specified in subparagraph (B), the Select Committee shall have the authorities and responsibilities of, and shall be subject to the same limitations and restrictions as, a standing committee of the House, and shall be deemed a committee of the House for all purposes of law or rule.

(B)(i) Rules X and XI shall apply to the Select Committee where not inconsistent with this subsection.

(ii) Service on the Select Committee shall not count against the limitations in clause 5(b)(2) of rule X.

(iii) Clause 2(m)(1)(B) of rule XI, clause 2(m)(3) of rule XI, and section 3(b) of this resolution shall not apply to the Select Committee, but the Select Committee may recommend subpoenas and depositions and submit such recommendations to the relevant standing committee. Any records obtained by a standing committee pursuant to a subpoena or deposition recommended by the Select Committee pursuant to this clause may be transferred to the Select Committee.

39

(iv) Clause 2(d) of rule X shall not apply to the Select Committee.

(4) AMOUNTS FOR INITIAL EXPENSES.—

(A) PAYMENT OF EXPENSES.—There shall be paid out of the applicable accounts of the House of Representatives not more than $500,000 for the expenses of the Select Committee, to be available during the period beginning at noon on January 3, 2021, and ending on March 31, 2021.

(B) VOUCHERS.—Payments under this paragraph shall be made on vouchers authorized by the Select Committee, signed by the chair of the Select Committee, and approved in the manner directed by the Committee on House Administration.

(C) REGULATIONS.—Amounts made available under this paragraph shall be expended in accordance with regulations prescribed by the Committee on House Administration.

(5) USE OF STAFF.—To enable the Select Committee to carry out the purposes of this subsection, the Select Committee may use the services of staff of the House.

(6) REPORTING.—The Select Committee may report to the House or any committee of the House from time to time the results of its investigations and studies, to-

40

gether with such detailed findings and policy recommendations as it may deem advisable. All such reports shall be submitted to the House by December 31, 2022. All such policy recommendations shall be submitted to the relevant standing committees not later than December 31, 2021.

(7) PUBLICATION.—The Select Committee shall ensure that reports and proposals prepared in accordance with this subsection shall, upon completion, be made available to the general public in widely accessible formats not later than 30 calendar days following the respective dates for completion set forth in paragraph (6).

## SEC. 5. ORDERS OF BUSINESS.

(a)(1) On any legislative day during the period from January 3, 2021 through January 28, 2021—

(A) the Journal of the proceedings of the previous day shall be considered as approved; and

(B) the Chair may at any time declare the House adjourned to meet at a date and time, within the limits of clause 4, section 5, article I of the Constitution, to be announced by the Chair in declaring the adjournment.

(2) The Speaker may appoint Members to perform the duties of the Chair for the duration of the period addressed by paragraph (1) as though under clause 8(a) of rule I.

•HRES 8 EH

41

(3) Each day during the period addressed by paragraph (1) shall not constitute a calendar day for purposes of section 7 of the War Powers Resolution (50 U.S.C. 1546).

(4) Each day during the period addressed by paragraph (1) shall not constitute a legislative day for purposes of clause 7 of rule XIII.

(5) Each day during the period addressed by paragraph (1) shall not constitute a calendar or legislative day for purposes of clause 7(c)(1) of rule XXII.

(6) Each day during the period addressed by paragraph (1) shall not constitute a legislative day for purposes of clause 7 of rule XV.

(b) It shall be in order at any time through the legislative day of January 28, 2021, for the Speaker to entertain motions that the House suspend the rules as though under clause 1 of rule XV. The Speaker or her designee shall consult with the Minority Leader or his designee on the designation of any matter for consideration pursuant to this subsection.

(c) The requirement of clause 6(a) of rule XIII for a two-thirds vote to consider a report from the Committee on Rules on the same day it is presented to the House is waived

42

with respect to any resolution reported through the legislative
day of January 28, 2021.

Attest:

*Clerk.*

# EXHIBIT B

# H. Res. 503

## *In the House of Representatives, U. S.,*

*June 30, 2021.*

Whereas January 6, 2021, was one of the darkest days of our democracy, during which insurrectionists attempted to impede Congress's Constitutional mandate to validate the presidential election and launched an assault on the United States Capitol Complex that resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among staff, institutional employees, press, and Members;

Whereas, on January 27, 2021, the Department of Homeland Security issued a National Terrorism Advisory System Bulletin that due to the "heightened threat environment across the United States," in which "[S]ome ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives, could continue to mobilize to incite or commit violence." The Bulletin also stated that—

(1) "DHS is concerned these same drivers to violence will remain through early 2021 and some DVEs [domestic violent extremists] may be emboldened by the January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C. to target elected officials and government facilities."; and

2

(2) "Threats of violence against critical infrastructure, including the electric, telecommunications and healthcare sectors, increased in 2020 with violent extremists citing misinformation and conspiracy theories about COVID–19 for their actions";

Whereas, on September 24, 2020, Director of the Federal Bureau of Investigation Christopher Wray testified before the Committee on Homeland Security of the House of Representatives that—

(1) "[T]he underlying drivers for domestic violent extremism – such as perceptions of government or law enforcement overreach, sociopolitical conditions, racism, anti-Semitism, Islamophobia, misogyny, and reactions to legislative actions – remain constant.";

(2) "[W]ithin the domestic terrorism bucket category as a whole, racially-motivated violent extremism is, I think, the biggest bucket within the larger group. And within the racially-motivated violent extremists bucket, people subscribing to some kind of white supremacist-type ideology is certainly the biggest chunk of that."; and

(3) "More deaths were caused by DVEs than international terrorists in recent years. In fact, 2019 was the deadliest year for domestic extremist violence since the Oklahoma City bombing in 1995";

Whereas, on April 15, 2021, Michael Bolton, the Inspector General for the United States Capitol Police, testified to the Committee on House Administration of the House of Representatives that—

(1) "The Department lacked adequate guidance for operational planning. USCP did not have policy and procedures in place that communicated which personnel were responsible for operational planning, what type of oper-

3

ational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents."; and

(2) "USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021."; and

Whereas the security leadership of the Congress under-prepared for the events of January 6th, with United States Capitol Police Inspector General Michael Bolton testifying again on June 15, 2021, that—

(1) "USCP did not have adequate policies and procedures for FRU (First Responder Unit) defining its overall operations. Additionally, FRU lacked resources and training for properly completing its mission.";

(2) "The Department did not have adequate policies and procedures for securing ballistic helmets and vests strategically stored around the Capitol Complex."; and

(3) "FRU did not have the proper resources to complete its mission.": Now, therefore, be it

*Resolved,*

**SECTION 1. ESTABLISHMENT.**

There is hereby established the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter referred to as the "Select Committee").

**SEC. 2. COMPOSITION.**

(a) APPOINTMENT OF MEMBERS.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

4

(b) DESIGNATION OF CHAIR.—The Speaker shall designate one Member to serve as chair of the Select Committee.

(c) VACANCIES.—Any vacancy in the Select Committee shall be filled in the same manner as the original appointment.

**SEC. 3. PURPOSES.**

Consistent with the functions described in section 4, the purposes of the Select Committee are the following:

(1) To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the ''domestic terrorist attack on the Capitol'') and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process.

(2) To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted vi-

5

olence and domestic terrorism relevant to such terrorist attack.

(3) To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack.

**SEC. 4. FUNCTIONS.**

(a) FUNCTIONS.—The functions of the Select Committee are to—

(1) investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to—

(A) activities of intelligence agencies, law enforcement agencies, and the Armed Forces, including with respect to intelligence collection, analysis, and dissemination and information sharing among the branches and other instrumentalities of government;

(B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing,

6

and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and

(C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation;

(2) identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding—

(A) the command, control, and communications of the United States Capitol Police, the Armed Forces, the National Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021;

(B) the structure, coordination, operational plans, policies, and procedures of the Federal Government, including as such relate to State and local governments and nongovernmental entities, and particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism;

7

(C) the structure, authorities, training, manpower utilization, equipment, operational planning, and use of force policies of the United States Capitol Police;

(D) the policies, protocols, processes, procedures, and systems for the sharing of intelligence and other information by Federal, State, and local agencies with the United States Capitol Police, the Sergeants at Arms of the House of Representatives and Senate, the Government of the District of Columbia, including the Metropolitan Police Department of the District of Columbia, the National Guard, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021, and the related policies, protocols, processes, procedures, and systems for monitoring, assessing, disseminating, and acting on intelligence and other information, including elevating the security posture of the United States Capitol Complex, derived from instrumentalities of government, open sources, and online platforms; and

(E) the policies, protocols, processes, procedures, and systems for interoperability between the United States Capitol Police and the National

8

Guard, the Metropolitan Police Department of the District of Columbia, and other Federal, State, and local law enforcement agencies in the National Capital Region on or before January 6, 2021; and

(3) issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary.

(b) REPORTS.—

(1) INTERIM REPORTS.—In addition to the final report addressing the matters in subsection (a) and section 3, the Select Committee may report to the House or any committee of the House from time to time the results of its investigations, together with such detailed findings and legislative recommendations as it may deem advisable.

(2) TREATMENT OF CLASSIFIED OR LAW ENFORCEMENT-SENSITIVE MATTER.—Any report issued by the Select Committee shall be issued in unclassified form but may include a classified annex, a law enforcement-sensitive annex, or both.

(c) CORRECTIVE MEASURES DESCRIBED.—The corrective measures described in this subsection may include changes in law, policy, procedures, rules, or regulations that could be taken—

9

(1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions;

(2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and

(3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

(d) No Markup of Legislation Permitted.—The Select Committee may not hold a markup of legislation.

**SEC. 5. PROCEDURE.**

(a) Access to Information From Intelligence Community.—Notwithstanding clause 3(m) of rule X of the Rules of the House of Representatives, the Select Committee is authorized to study the sources and methods of entities described in clause 11(b)(1)(A) of rule X insofar as such study is related to the matters described in sections 3 and 4.

(b) Treatment of Classified Information.—Clause 11(b)(4), clause 11(e), and the first sentence of clause 11(f) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(c) Applicability of Rules Governing Procedures of Committees.—Rule XI of the Rules of the House of

10

Representatives shall apply to the Select Committee except as follows:

(1) Clause 2(a) of rule XI shall not apply to the Select Committee.

(2) Clause 2(g)(2)(D) of rule XI shall apply to the Select Committee in the same manner as it applies to the Permanent Select Committee on Intelligence.

(3) Pursuant to clause 2(h) of rule XI, two Members of the Select Committee shall constitute a quorum for taking testimony or receiving evidence and one-third of the Members of the Select Committee shall constitute a quorum for taking any action other than one for which the presence of a majority of the Select Committee is required.

(4) The chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of rule XI in the investigation and study conducted pursuant to sections 3 and 4 of this resolution, including for the purpose of taking depositions.

(5) The chair of the Select Committee is authorized to compel by subpoena the furnishing of information by interrogatory.

(6)(A) The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to

11

subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

(7) Subpoenas authorized pursuant to this resolution may be signed by the chair of the Select Committee or a designee.

(8) The chair of the Select Committee may, after consultation with the ranking minority member, recognize—

(A) Members of the Select Committee to question a witness for periods longer than five minutes as though pursuant to clause 2(j)(2)(B) of rule XI; and

(B) staff of the Select Committee to question a witness as though pursuant to clause 2(j)(2)(C) of rule XI.

(9) The chair of the Select Committee may postpone further proceedings when a record vote is ordered on questions referenced in clause 2(h)(4) of rule XI, and

12

may resume proceedings on such postponed questions at any time after reasonable notice. Notwithstanding any intervening order for the previous question, an underlying proposition shall remain subject to further debate or amendment to the same extent as when the question was postponed.

(10) The provisions of paragraphs (f)(1) through (f)(12) of clause 4 of rule XI shall apply to the Select Committee.

**SEC. 6. RECORDS; STAFF; TRAVEL; FUNDING.**

(a) SHARING RECORDS OF COMMITTEES.—Any committee of the House of Representatives having custody of records in any form relating to the matters described in sections 3 and 4 shall provide copies of such records to the Select Committee not later than 14 days of the adoption of this resolution or receipt of such records. Such records shall become the records of the Select Committee.

(b) STAFF.—The appointment and the compensation of staff for the Select Committee shall be subject to regulations issued by the Committee on House Administration.

(c) DETAIL OF STAFF OF OTHER OFFICES.—Staff of employing entities of the House or a joint committee may be detailed to the Select Committee to carry out this resolution and shall be deemed to be staff of the Select Committee.

13

(d) USE OF CONSULTANTS PERMITTED.—Section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 4301(i)) shall apply with respect to the Select Committee in the same manner as such section applies with respect to a standing committee of the House of Representatives.

(e) TRAVEL.—Clauses 8(a), (b), and (c) of rule X of the Rules of the House of Representatives shall apply to the Select Committee.

(f) FUNDING; PAYMENTS.—There shall be paid out of the applicable accounts of the House of Representatives such sums as may be necessary for the expenses of the Select Committee. Such payments shall be made on vouchers signed by the chair of the Select Committee and approved in the manner directed by the Committee on House Administration. Amounts made available under this subsection shall be expended in accordance with regulations prescribed by the Committee on House Administration.

**SEC. 7. TERMINATION AND DISPOSITION OF RECORDS.**

(a) TERMINATION.—The Select Committee shall terminate 30 days after filing the final report under section 4.

(b) DISPOSITION OF RECORDS.—Upon termination of the Select Committee—

(1) the records of the Select Committee shall become the records of such committee or committees designated by the Speaker; and

•HRES 503 EH

14

(2) the copies of records provided to the Select Committee by a committee of the House under section 6(a) shall be returned to the committee.

Attest:

*Clerk.*

# EXHIBIT C

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# EXHIBIT D

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    11/10/2021

KRISTIN AMERLING, Chief Counsel and Deputy Staff Director, U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol, was interviewed at the Thomas P. O'Neill Jr. Federal Building, 200 C Street SW, Washington, DC.  AMERLING was accompanied by U.S. House of Representatives General Counsel DOUG LETTER, and by U.S. House of Representative Deputy General Counsel TODD TATELMAN, who joined via phone.  AMERLING was interviewed by Assistant United States Attorney (AUSA) J.P. Cooney, US Attorney's Office for the District of Columbia (USAO-DC), AUSA Molly Gaston USAO-DC, AUSA Amanda Vaughn USAO-DC, FBI Special Agent Katherine E. Pattillo, FBI Special Agent Frank G. D'Amico, and FBI Special Agent Stephen R. Hart. After being advised of the identity of the interviewing AUSAs and Agents and the nature of the interview, AMERLING provided the following information (AMERLING was shown various numbered exhibits during the interview.  These will be referenced when shown during the interview and will be maintained in the 1A section of the file.):

AMERLING's current role was as the Chief Counsel and Deputy Staff Director for the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the Select Committee).  In her role she worked directly with Staff Director DAVID BUCKLEY to staff the Select Committee.  Also, as a part of the investigative team, she oversaw any legal issues which arose during the investigation process.

AMERLING was previously the legislative assistant for Representative Ted Weiss from 1988-1990.  AMERLING was then the press secretary for Senator George Mitchell from 1990-1991.  AMERLING then attended law school and worked for a private firm subsequent to graduation.  From 1997-2012, AMERLING worked for Representative Henry Waxman on the House Committee for Reform and Oversight.  During her tenure with Representative Waxman's office, Representative Waxman moved to the Energy and Commerce Committee

| | |
|---|---|
| Investigation on  11/02/2021  at  Washington, District Of Columbia, United States (In Person) | |
| File #  72-WF-3513323 | Date drafted  11/02/2021 |
| by  HART STEPHEN R, SA FRANK G. DAMICO, Katherine E. Pattillo | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-000245

72-WF-3513323

FD-302a (Rev. 5-8-10)

where he eventually became the Ranking Member.  From 2013-2014, AMERLING was
the Director of Investigations for the Senate Commerce Committee which was
chaired by Senator Rockefeller.  AMERLING then went to work in the
Administration of President Obama and then separately became the General
Counsel for the Senate Energy and the House Oversight Committees.

The Select Committee was composed of three primary teams: the
investigative teams, the admin teams, and the communications teams.  The
investigative teams were led by Chief Investigative Counsel TIM HEAPHY.  The
various Chief Counsels had subject matter expert roles and the teams were
staffed with additional attorneys and research staff.  The Communications
Director had an assistant and the Admin staff facilitated the personnel
assignments.  The Staff Director and the investigative teams were comprised
of non partisan staff who worked collaboratively on subpoenas and other
tasks. AMERLING was not sure if she could further describe the upper
hierarchy or committee processes, but stated that all senior staff, which
included herself and the Staff Director, worked together.

(AMERLING was shown Exhibit 1.)  This document, House Resolution 503 (HR
503), along with the U.S. House of Representative Rules describe where the
Select Committee get its authorities.  HR 503 is the main source of the
Select Committee's authority.  This document is the primary source in which
the purpose of the Select Committee is articulated.  House Resolution 8 (HR
8) also contains rules for guiding the Select Committee's actions and
authorities.

For document requests or subpoenas issued by the Select Committee,
AMERLING reviews the initial proposal and provides input to the Staff
Director and the Chair of the Select Committee.  In the case of the Select
Committee's subpoena to STEPHEN BANNON (BANNON), AMERLING served the
subpoena to the attorney representing BANNON.  AMERLING worked together with
the investigative staff to put together the substantive request and with the
administrative staff to "get the subpoena out the door."

LETTER advised all subpoenas issued by the Select Committee are reviewed
by himself or members of the General Counsel's office as well as leadership
of the U.S. House of Representatives.  This process applies to subpoenas
issued by every House committee.  All subpoenas issued by all House

US-000246

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of (U) November 2, 2021 Interview of Kristin Amerling ,On 11/02/2021 ,Page 3 of 8

committees are issued and signed by the Clerk for the U.S. House
of Representatives.  The Clerk will only sign subpoenas if they have been
reviewed by LETTER. AMERLING explained the subpoenas were first signed by
the Chair of the Select Committee, then reviewed by the General Counsel's
Office, and then sent on to the Clerk for signature.  LETTER further
explained subpoenas were prepared by committee staff, signed by the Chair,
reviewed by the Office of General Counsel, logged in, and then walked over
to the Clerk.

    (AMERLING was shown Exhibit 2.)  AMERLING noted the subpoena called for
BANNON to appear and testify, not just to appear.  Document production is
not always required to be done in person.  Typically, after a subpoena is
issued, document production from the recipient can be provided by hand, mail
service, or via email.  The subpoena commanded document production be
completed by 10am on October 7, 2021, and that BANNON appear for a
deposition on October 14, 2021.  The subpoena was signed by both the Chair
of the Select Committee and the Clerk of the U.S. House of Representatives.
AMERLING confirmed she sent the subpoena via email to BANNON's defense
attorney, ROBERT COSTELLO (COSTELLO).  The letter that accompanied the
subpoena was designed to inform the witness of the subpoena and to describe
the range of information being requested in the subpoena.  The letter
summarizes the information commanded, whereas the attachment gives a
detailed list of records and documents requested.

    Neither the letter nor the attachment described the full accounting of
the public records the Select Committee possesses and / or has reviewed.
The subpoena schedule reflected a broad set of categories of information
requested from BANNON, but the categories were not an exhaustive list of
topics which might be covered in his deposition.  Many of the categories had
nothing to do with former President DONALD TRUMP.  All of these categories
were listed in the contempt report issued by the U.S. House of
Representatives and covered a wide range of topics not dealing with former
President TRUMP.  AMERLING advised the last page of Exhibit 2, which
described the Select Committee Regulations for Use of Deposition Authority,
was provided to BANNON and COSTELLO so they would have a full understanding
of BANNON's rights in regards to depositions and other proceedings of the
Select Committee.  The Select Committee was aware the email was sent to

US-000247

72-WF-3513323

Continuation of FD-302 of ___(U) November 2, 2021 Interview of Kristin Amerling___, On _11/02/2021_, Page _4 of 8_

COSTELLO.

Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

A copy of Section 3(b) was not provided to COSTELLO with the subpoena. However, the section would have been provided to the witness at deposition when the witness was reminded of their rights.  COSTELLO received a copy of 117th Congress Regulations For Use of Deposition Authority with the letter accompanying the subpoena.  COSTELLO never raised any objections related to the requirement stipulated in paragraph 11.

(AMERLING was shown Exhibit 3.)  JENNA HOPKINS was a professional staff member of the Select Committee assigned to assist the research staff of the investigative teams.  AMERLING did not recall anyone from the Select Committee directly contacting BANNON or an attorney representing BANNON before September 22, 2021. "Tim, Yoni, and Jacob" mentioned in Exhibit 3 were likely TIM HEAPHY, senior investigative counsel; YONI MOSKOWITZ, staff attorney; and JACOB NELSON, research assistant.  Nothing outside of what was included in the email was discussed between AMERLING and HOPKINS.

(AMERLING was shown Exhibit 4.)  AMERLING did not recall much of the conversation beyond what she cited in the email to COSTELLO.  COSTELLO did not raise any objections during their phone call and advised he would get back to her after confirming with BANNON that COSTELLO was authorized to accept subpoena service.  AMERLING sent the subpoena in a subsequent email to COSTELLO.  At that time, AMERLING believed COSTELLO represented BANNON based upon COSTELLO's reply email.

US-000248

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin
_Amerling_____ , On _11/02/2021_ , Page _5 of 8_

   (AMERLING was shown Exhibit 5.)  AMERLING first became aware of
COSTELLO's objections to the subpoena through his correspondence with the
Select Committee.  AMERLING was not sure if COSTELLO's objection was public
at that time.

   (AMERLING was shown Exhibit 6.)  To date, neither AMERLING nor the Select
Committee had received the letter from JUSTIN CLARK referenced in the
exhibit.  AMERLING had not herself received nor was she aware of any
objections or privilege assertions submitted to the Select Committee from
former President TRUMP or his representatives.

   (AMERLING was shown Exhibit 7.)  The letter was specifically sent to
remind BANNON of his obligation to respond to the subpoena as well as the
requirement for a privilege log if warranted.  The letter also fully
identified the criminal statutes BANNON would violate if he failed to comply
with the Select Committee's subpoena.  AMERLING was not aware of any
additional communications with COSTELLO leading up to the October 7, 2021,
document deadline.

   (AMERLING was shown Exhibit 8.)  SEAN TONOLLI (TONOLLI) was responsible
for conducting BANNON'S deposition.  TONOLLI is the leader of one of the
investigative subgroups. It would be logical for someone in TONOLLI's
position to reach out to COSTELLO to confirm logistical arrangements prior
to the scheduled appearance.  LETTER interjected that different House
committees use different processes; there were no standardized procedures in
place governing the logistics of these arrangements.  AMERLING stated that
different teams within the Select Committee handled different subjects and
it would be logical for senior staff, like TONOLLI, to lead depositions and
testimony.  The Chair of the Select Committee was aware of work
assignments.  AMERLING could not recall the process by which TONOLLI was
designated as the staff member to cover BANNON, but it was normally done
with the knowledge of the Chair and other Members.  KEVIN ELLIKER,
referenced in Exhibit 8, was a staff attorney on one of the investigative
teams.

   AMERLING believed she and TONOLLI discussed TONOLLI's conversations with
COSTELLO.  She could not recall the precise details of those discussions but
believed, based on her communication with TONOLLI in Exhibit 8, the

US-000249

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin
_____Amerling_____, On  11/02/2021 , Page   6 of 8

discussions were confined to the logistics of BANNON's arrival and
testimony.  LETTER noted AMERLING was currently managing subpoenas to a
number of different individuals, some of whom were going to appear before
the Select Committee and some of whom may not appear before the Select
Committee.  AMERLING did not know the TOM KAVALER referenced in a separate
email between TONOLLI and COSTELLO.  AMERLING did not think there was any
other correspondence memorializing any additional interactions between
TONOLLI and COSTELLO.  AMERLING was not certain but she believed she had
been made aware of the discussions between TONOLLI and COSTELLO prior to the
email sent by TONOLLI to AMERLING, BUCKLEY, and HEAPHY on October 13, 2021
(Exhibit 8).

   In Exhibit 8, TONOLLI referred to COSTELLO's "two questions for future
reference."  AMERLING confirmed that neither BANNON nor COSTELLO were
provided with other or alternative dates on which BANNON could testify.  It
was AMERLING's understanding that these questions did not prompt negotiation
or discussion about alternate deposition dates.  AMERLING believed
COSTELLO was suggesting a general discussion point regarding a future
appearance related to the subpoena, but no discussion ever occurred.
TONOLLI was not authorized to offer or to say anything different than what
had been sent in the October 8, 2021 email.  AMERLING did not recall any
other communications with TONOLLI about this issue.  AMERLING did not
formally accept COSTELLO's letter to Chairman THOMPSON as it was sent via
email.

   (AMERLING was shown Exhibit 10.)  The Select Committee communicated
with COSTELLO prior to receiving this particular letter.  This letter
offered no new objections and failed to address the Chair's points made on
October 8, 2021, about  testimony on topics unrelated to former President
TRUMP.

   (AMERLING was shown Exhibit 12.)  Both AMERLING and TONOLLI attended the
deposition on October 14, 2021. AMERLING believed Representative ADAM SCHIFF
attended the hearing virtually.  Other Select Committee staff who attended
the hearing were: HEAPHY, ELLIKER, BARRY POMP, Select Committee
parliamentarian, and EVAN MALDER, clerk.  AMERLING advised she should be
able to get interviewing agents and attorneys an un-redacted copy of the
transcript.  The Select Committee was prepared to proceed with the

US-000250

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of ___(U) November 2, 2021 Interview of Kristin Amerling___ , On __11/02/2021__ , Page __7 of 8__

deposition had BANNON appeared.  AMERLING's role for the hearing would have been to serve as a consultative legal resource.  AMERLING was highly confident the Select Committee's Parliamentarian, POMP, would have brought the House Rules to the hearing.

   AMERLING did not have any communication with BANNON or any party representing him on October 14, 2021.  No one from the Select Committee suggested to BANNON or anyone representing him that he did not have to appear before the Select Committee.  In fact, the Select Committee did quite the opposite.  No staff member told BANNON or anyone representing him they could work out privilege issues prior to BANNON being deposed.  The letters sent to BANNON and his counsel made it clear that BANNON had to appear at the hearing where he would be permitted to vocalize and memorialize his objections.  The Chair was available for contact during the scheduled hearing in case BANNON had arrived and voiced objections.  However, it was not required to resolve the objections during the hearing, it was only required to document them for the record.

   (AMERLING was shown Exhibit 11.)  There was no communications between the Select Committee and BANNON or his representatives indicating that the prospect of a Contempt of Congress charge would change their response to the subpoena.  The email sent by AMERLING to COSTELLO on October 19, 2021, was the only communication subsequent to the deposition date.

   (AMERLING was shown Exhibit 14.)  AMERLING received the letter from the White House via email.  AMERLING did not know if either BANNON or COSTELLO also received the letter from the White House.  AMERLING also did not receive any letters from the Department of Justice.  AMERLING was not aware of any sort of communication between the White House and BANNON or COSTELLO.  Correspondence from COSTELLO described a letter from an attorney representing former President TRUMP, however, AMERLING has not received a copy of that letter.  AMERLING believed the extent of President JOE BIDEN's knowledge of the proceedings was in Exhibit 14.  AMERLING was not aware of any other requests from COSTELLO to JUSTIN CLARK.

   (AMERLING was shown Exhibit 13.)  She was aware of this letter and of the adjournment request.

US-000251

FD-302a (Rev. 5-8-10)

72-WF-3513323

(U) November 2, 2021 Interview of Kristin

Continuation of FD-302 of ___Amerling_____ , On __11/02/2021__ , Page __8 of 8__

 

 

(AMERLING was shown Exhibit 15.)  The Select Committee issued two letters to COSTELLO; one before and one after the Select Committee hearing on October 19, 2021 (Exhibits 15 and 16).  AMERLING was not aware of any other communication or correspondence with COSTELLO after those letters. AMERLING was not aware of any additional objections raised by COSTELLO not captured by correspondence between COSTELLO and the Select Committee.

US-000252