**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## STEPHEN K. BANNON,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

## JOINT APPENDIX
## Volume III of XII
## (Pages: 938 - 1354)

_____

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

**Gibson Moore Appellate Services, LLC**
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
### Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Indictment**
      **filed November 12, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
      **on November 15, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
      **on November 18, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
      **on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
      **filed February 4, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

    **Exhibits:**

    1.    **Letter**
            **dated January 14, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . 186

    2.    **Letter**
            **dated January 28, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . 194

**Exhibits** to

**Defendant's Motion to Compel Discovery**
      **filed February 4, 2022, Continued:**

3.      **Letter**
      **dated October 7, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.      **FBI Interview of Robert J. Costello, Esquire**
      **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.      **H. Res. 503, Sec. 5(c)(6)(A) & (B)**
      **dated June 20, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.      **Procedures Adopted by 117th Congress**
      **Regulations for Use of Deposition Authority**
      **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.      **FBI Interview of U.S. House of Representatives**
      **General Counsel Doug Letter**
      **dated November 2, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.      **Letter from Ronald C. Machen Jr., U.S. Attorney,**
      **to Speaker of the House John A. Bohner**
      **dated March 31, 2015.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.      **Prosecution for Contempt of Congress of an**
      **Executive Branch Official Who Has Asserted a**
      **Claim of Executive Privilege**
      **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.      **Attempted Exclusion of Agency Counsel from**
      **Congressional Depositions of Agency**
      **Employees, Slip Op.**
      **dated May 23, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,
     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

    Attachment:

    Letter
        dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,
     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

    Exhibit:

    1.    Declaration of Robert J. Costello, Esquire
        sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,
     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

    Exhibit:

    1.    Table That Sets Forth the Positions
        Taken by the Government and Defense. . . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,**

**With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**<u>Exhibits:</u>**

1.    **E-mail Correspondence [US-001038-40]**
         **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark**
         **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel**
         **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello**
         **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel**
         **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain**
         **dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange**
         **dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
         **on March 16, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion** *in Limine* **to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
         **filed March 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel,**
**With Exhibits,**
         **filed March 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

         **Exhibits:**

         1.     **Senate Committee Investigation**
                    **dated August 8, 1958.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 577

         2.     **Application of 28 U.S.C. § 458 to Presidential**
                **Appointments of Federal Judges**
                    **dated December 18, 1995.**. . . . . . . . . . . . . . . . . . . . . . . . . 584

         3.     **Letter from Michael B. Mukasey, Attorney**
                **General, to the Hon. Nancy Pelosi, Speaker of the**
                **House of Representatives**
                    **dated February 29, 2008.**. . . . . . . . . . . . . . . . . . . . . . . . . . 599

**Exhibits** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
        filed March 22, 2022, Continued:

    **4.**    **Response to Congressional Requests for**
          **Information Regarding Decisions Made Under the**
          **Independent Counsel Act,**
                **10 Op. O.L.C. 68 (1986)**.............................. **601**

    **5.**    **Rex Lee, Executive Privilege, Congressional Subpoena**
          **Power, and Judicial Review: Three Branches,**
          **Three Powers, and Some Relationships,**
                **1978 B.Y.U. L. Rev. 231, 259**......................... **619**

    **6.**    **Whether the Department of Justice May Prosecute**
          **White House Officials for Contempt of Congress,**
                **2008 WL 11489049 (O.L.C.)**. ........................ **688**

    **7.**    **Congressional Oversight of the White House,**
                **2021 WL 222744 (O.L.C.)**. ......................... **692**

**Amended Exhibit** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
        filed March 23, 2022:

    **3.**    **Letter from Michael B. Mukasey, Attorney**
          **General, to the Hon. Nancy Pelosi, Speaker of the**
          **House of Representatives**
                **dated February 29, 2008**.......................... **722**

**Government's Response to Defendant's Supplemental Brief in**
**Opposition to the Government's Motion** *in Limine* **to Exclude**
**Evidence and Argument Relating to Good-faith**
**Reliance on Law or Advice of Counsel**
        filed March 29, 2022. ...................................... **725**

**Defendant's Supplemental Reply on Waiver**

> filed March 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

**Order**

> filed April 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

**Government's Motion** *in Limine* **to Exclude Evidence of Department of Justice Opinions and Writings, With Exhibits,**

> filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

> **Exhibits:**

> 1.    **Letter from White House Deputy Counsel to Costello**

> dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

> 2.    **Letter from Justin Clark to Costello**

> dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

> 3.    **Emails from Justin Clark to Costello**

> various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

**Government's Motion** *in Limine* **to Exclude Evidence Relating to Objections to Subpoena That Defendant Waived, With Exhibit,**

> filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

> **Exhibit:**

> 1.    **Subpoena**

> dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 781

**Government's Motion** *in Limine* **to Exclude Evidence of the Defendant's Prior Experience with Subpoenas**

> filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**


**Defendant's Motion to Exclude Evidence**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**


**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

   <u>**Exhibits:**</u>

   **A.** **H. Res. 8 (Adoption of Rules for 117th Congress)**
       **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

   **B.** **H. Res. 503 (Authorizing House Select Committee)**
       **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

   **C.** **Regulations For Use Of Deposition Authority**
       **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

   **D.** **Amerling and Letter FBI 302**
       **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
## Joint Appendix Volume III of XII

**Page:**

**Exhibits** **to**
**Defendant's Motion to Dismiss the Indictment**
> **filed April 15, 2022, Continued:**

**E.** **Rules of the 117th Congress**
> **dated February 2, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **938**

**F.** **Republican Conference Rules of the 117th Congress**. . . . . . **991**

**G.** **Congressional Oversight of The White House,**
> **45 Op. O.L.C. slip op. (Jan. 8, 2021)**. . . . . . . . . . . . . . . **1005**

**H.** **Assertion of Executive Privilege Concerning the**
**Dismissal and Replacement of U.S. Attorneys**
> **dated June 27, 2007**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1065**

**I.** **Immunity of the Former Counsel to the President from**
**Compelled Congressional Testimony,**
> **43 Op. O.L.C. slip op. (July 10, 2007)**. . . . . . . . . . . . . . **1075**

**J.** **Prosecution for Contempt of Congress of an Executive**
**Branch Official Who Has Asserted a Claim of Privilege,**
> **8 Op. O.L.C. 101 (1984)**. . . . . . . . . . . . . . . . . . . . . . . . . . **1079**

**K.** **Whether the Department of Justice May Prosecute**
**White House Officials for Contempt of Congress,**
> **32 Op. O.L.C 65 (2008)**. . . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

**L.** **Application of 28 U.S.C. Sec. 458 to Presidential**
**Appointments of Federal Judges,**
> **19 Op. O.L.C slip op. (December 18, 1995)**. . . . . . . . . . **1128**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
　　　**filed April 15, 2022, Continued:**

**M.**　　**Randolph D. Moss, Executive Branch Legal Interpretation:**
　　　**A Perspective from the Office of Legal Counsel,**
　　　　　**52 Admin. L. Rev. 1303 (2000)**. . . . . . . . . . . . . . . . . . . . . **1143**

**N.**　　**Testimonial Immunity Before Congress of the**
　　　**Former Counsel to the President,**
　　　　　**43 Op. O.L.C. slip op. (May 20, 2019)**. . . . . . . . . . . . . **1172**

**O.**　　**Response to Congressional Requests for**
　　　**Information Regarding Decisions Made**
　　　**Under the Independent Counsel Act,**
　　　　　**10 Op. O.L.C. 68 (1986)**. . . . . . . . . . . . . . . . . . . . . . . . . . . **1194**

**P.**　　**Letter from Ronald C. Machen Jr., U. S. Attorney, to**
　　　**Speaker John A. Boehner**
　　　　　**dated March 31, 2015.** . . . . . . . . . . . . . . . . . . . . . . . . . . **1220**

**Q.**　　**Letter from Michael B. Mukasey, Attorney General, to**
　　　**Speaker of the House, Hon. Nancy Pelosi**
　　　　　**dated February 29, 2008.**. . . . . . . . . . . . . . . . . . . . . . . . . **1228**

**R.**　　**Steven G. Bradbury, Memorandum for Attorneys of the**
　　　**Office Re: Best Practices for OLC Opinions**
　　　　　**May 16, 2005.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1231**

**S.**　　**Trevor W. Morrison, Stare Decisis in the**
　　　**Office of Legal Counsel,**
　　　　　**110 COLUM. L. REV. 1448 (2010)**. . . . . . . . . . . . . . . . . **1237**

**T.**　　**Walter Dellinger, et al., Principles to**
　　　**Guide the Office of Legal Counsel**
　　　　　**dated Dec. 21, 2004.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1261**

**<u>Exhibits</u> to**

**Defendant's Motion to Dismiss the Indictment**

   **filed April 15, 2022, Continued:**

U.  **David J. Barron, Memorandum for Attorneys of the**
    **Office Re: Best Practices for OLC Legal**
    **Advice and Written Opinions**
       **dated July 16, 2010.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1268**

V.  **Frank H. Easterbrook, Presidential Review,**
    **40 CASE W. RES. L. REV. 905 (1990).** . . . . . . . . . . . . . . **1275**

W.  **Presidential Authority to Decline to Execute**
    **Unconstitutional Statutes, OLC Mem. Op.**
       **dated November 2, 1984.** . . . . . . . . . . . . . . . . . . . . . . . . **1302**

X.  **Douglas W. Kmiec, OLC's Opinion Writing Function:**
    **The Legal Adhesive for a Unitary Executive,**
       **15 CARDOZO L. REV. 337 (1993).** . . . . . . . . . . . . . . . . **1316**

## TABLE OF CONTENTS
## Joint Appendix Volume IV of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
   **filed April 15, 2022, Continued:**

Y.   Applying Estoppel Principles in Criminal Cases,
      78 YALE L.J. 1046 (1969)........................... 1355

Z.   Anne Bowen Pouliun, Prosecutorial Inconsistency,
      Estoppel, and Due Process: Making the
      Prosecution Get its Story Straight,
      18 Cal. L. Rev. 1423 (2001)......................... 1384

AA.  Rex E. Lee, Executive Privilege, Congressional Subpoena
      Power, and Judicial Review: Three Branches, Three
      Powers, and Some Relationships,
      1978 B.Y.U. L. REV. 231 (1978)...................... 1441

BB.  John O. McGinnis, Models of the Opinion Function of the
      Attorney General: A Normative, Descriptive, and
      Historical Prolegomenon,
      15 CARDOZO L. REV 375 (1993).................. 1510

CC.  Griffin B. Bell, The Attorney General: The Federal
      Government's Chief Lawyer and Chief Litigator, or
      One Among Many?,
      46 FORDHAM L. REV. 1049 (1978)............... 1572

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
  filed April 15, 2022, Continued:

  DD. Notes, The Immunity-Conferring
    Power of the Office of Legal Counsel,
     121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . . 1596

  EE. U.S. Department of Justice, Criminal
    Resource Manual § 2055 (Public Authority Defense). . . . . 1621

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
  filed April 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
  filed April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

**Defendant's Opposition to the Government's**
**Motion *in Limine* Based on Waiver**
  filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
  filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709

**Defendant's Response to Government's Motion *in***
***Limine* to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
  filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720

Government's Opposition to Defendant's Motion to Dismiss,
With Exhibits,

filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1745

**Exhibits:**

1.    Letter from Chairman Bennie G. Thompson to
      Mr. Stephen K. Bannon
            dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1793

2.    E-mail from Cooney to Costello
            dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1796

3.    E-mail from Costello to Cooney
            dated November 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1800

4.    E-mail from Cooney to Costello
            dated November 5, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1803

# TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

Government's Opposition to
Defendant's Motion to Exclude Evidence
       filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

Defendant's Reply in Support of His Motion to Exclude Evidence
       filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of Department of Justice Opinions and Writings
       filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

Government's Reply in Support of Motion *in Limine* to
Exclude Evidence Relating to Objections to
Subpoena That Defendant Waived
       filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of the Defendant's Prior Experience with Subpoenas
       filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

Defendant's Reply in Support of His Motion to Dismiss Indictment,
With Exhibits,
       filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

       Exhibits:

       1.    Letter from Chairman Bennie G. Thompson to
             Mr. Stephen K. Bannon
                    dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1885

       2.    Transcript of Oral Argument
             Before the Honorable Carl J. Nichols
                    on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to

**Defendant's Reply in Support of His Motion to Dismiss Indictment**
       **filed May 17, 2022, Continued:**

3.      **Letter from Costello to Congressman Thompson**
              **dated October 18, 2021**........................... 1994

4.      **Letter from Congressman Thompson to Costello**
              **dated October 19, 2021**........................... 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
       **filed May 25, 2022.**..................................... 2002

       **Attachment:**

       **Brief of United States House of Representatives as**
       *Amicus Curiae* **In Support of the Department of Justice**
              **dated May 10, 2022.**............................. 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
       **filed May 25, 2022.**..................................... 2035

       **Attachment:**

       **Brief of the U.s. House of Representatives Minority Leader**
       **Kevin O. Mccarthy and the U.s. House of Representatives**
       **Minority Whip Stephen J. Scalise as Amicus Curiae**
              **dated May 24, 2022.**............................. 2050

**Defendant's Notice Regarding Amicus Briefs**

 **filed June 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2065**


**Motion to Quash,**

**With Attachment,**

 **filed June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2072**


 **<u>Attachment:</u>**


 **Memorandum of Points and Authorities**

 **In Support of Motion to Quash,**

 **With Exhibits,**

  **dated June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
  **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
  **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
  **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

  <u>**Exhibits:**</u>

  1. **Letter from Bannon's Counsel to Prosecutors**
    **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

  2. **Letter from Prosecutors to Bannon's Counsel**
    **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

  3. **Letter from Justin Clark to Scott Gast**
    **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **2448**

  4. **Letter from Pat Cipollone to Chairman Nadler**
    **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . . . **2453**

  5. **Plaintiff's Motion for Judgment on the Pleadings, or in the**
    **Alternative, for Summary Judgment, & in Opposition to**
    **Defendants' Motion for Summary Judgment**
    **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
  **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

# TABLE OF CONTENTS
## Joint Appendix Volume VII of XII

Page:

**Government's Opposition to Defendant's Motion to Compel**
    filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

**Joint Proposed Jury Instructions,**
**With Attachment,**
    filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

    Attachment:

    **Manual of Model Criminal Jury Instructions**
        dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

**Government's Objections to Defendant's Proposed Jury Instructions**
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

**Defendant's Opposition to Government's Omnibus Motion *in Limine***
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

**Office of General Counsel U.S. House of Representatives'**
**Reply in Support of Motion to Quash,**
**With Exhibits,**
    filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

    Exhibits:

    A.    Order - *U.S. v. Moussaoui*
            dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

    B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
            dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

    C.    Order Granting Motion to Quash Subpoena on
            U.S. Representative Maxine Waters - *D.C. v. Hayes*
            dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

     filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

     **Exhibit:**

     1.     **Memorandum**

               dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion** *in Limine*

     filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion** *in Limine* **to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

     filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

     on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony,**
**With Exhibits,**

     filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

     **Exhibits:**

     1.     **Letters from former President Trump to Mr. Costello and**
             **Mr. Costello's Letter to Chairman Thompson**

               dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

     2.     **Certification**

               dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
      **filed July 13, 2022, Continued:**

    3.    **Subpoena**
            **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3090

    4.    **Letter from Thompson to Costello**
            **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 3092

    5.    **Indictment**
            **dated November 12, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3096

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence or Argument Relating to the Defendant's Eleventh-hour**
**Assertion That He Is Willing to Testify Before the Select Committee,**
**With Exhibits,**
      **filed July 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

      **Exhibits:**

    1.    **Letter from Thompson to Costello**
            **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 3114

    2.    **Letter from Thompson to Costello**
            **dated October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . 3118

**Government's Objections to Defendant's Trial Exhibits**
      **filed July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols
   on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,
   filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

  <u>Exhibits:</u>

  1. Transcript Jury Trial
    Before the Honorable Kurt D. Engelhardt
    *U.S. v. Rainey*, No. 12-291
      on June 1, 2015.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

  2. Congressional Gamesmanship Leads To An
    Acquittal In Deepwater Horizon Case,
    U.S. v. David Rainey: A Case Study
      dated 2016.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash
   filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions
   filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**
>    filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**
>    filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
>    filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**
>    filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**
>    filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
>    on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

# TABLE OF CONTENTS
## Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      **on July 18, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3577**

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
      **on July 19, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3784**

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      **on July 19, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3868**

**Testimony of <u>Kristin Amerling</u>:**

    **Direct Examination by Ms. Vaugn.**. . . . . . . . . . . . . . . . . . . . . . . . . . . **3942**

## TABLE OF CONTENTS
## Joint Appendix Volume X of XII

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
      **on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994**

      **Testimony of <u>Kristin Amerling</u>:**

      **Direct Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . . . 4014**
      **Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . . 4078**

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      **on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143**

      **Testimony of <u>Kristin Amerling</u>:**

      **Cross Examination by Mr. Corcoran (Continued). . . . . . . . . . . . 4149**
      **Redirect Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . 4211**

      **Testimony of <u>Stephen Hart</u>:**

      **Direct Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . . . . 4233**
      **Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . . 4252**
      **Redirect Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . . 4264**

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
      **filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289**

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
      **on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295**

# TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
>       **filed July 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4422**

**Defendant's Notice Regarding Congressional Hearings**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4432**

**Notice of Defendant's Objection to Jury Instruction Number 27**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4435**

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
>       **on July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4438**

**Jury Instructions**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4555**

**Counsels' Acknowledgment Concerning Trial Exhibits**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4585**

**Government's Exhibit List**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4586**

**Defendant's Exhibit List**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4588**

**Note from Jury**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4591**

**Verdict Form**
>       **filed July 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4592**

Order
    filed July 27, 2022........................................ 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
    filed July 28, 2022........................................ 4595

    <u>Exhibits:</u>

    1.    Screenshot of Episode 1996, War Room
        dated July 12, 2022. ............................. 4598

    2.    Bannon's Gettr Repost CNN Ad
        dated July 17, 2022. ............................. 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
    filed August 5, 2022....................................... 4600

Defendant's Motion for a New Trial
    filed August 5, 2022....................................... 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
    filed August 12, 2022...................................... 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
    filed August 19, 2022...................................... 4649

**Government's Opposition to Defendant's Motion for a New Trial**

      filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657

**Defendant's Reply to Opposition to Motion for a New Trial**

      filed August 26, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676

**Order**

      filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**

      on October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687

**Judgment in a Criminal Case**

      filed October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767

**Defendant's Notice of Appeal**

      filed November 4, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772

**Order Staying Sentence Pending Appeal**

      filed November 7, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

## TABLE OF CONTENTS
### Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

9B.  **H41 Congressional Record - House**
         dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4780

30.  **Letter from Former President Donald Trump to**
      **Stephen K. Bannon**
         dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4781

31.  **Letter from Robert J. Costello to**
      **Chairman Bennie Thompson**
         dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4782

32.  **Letter from Chairman Bennie Thompson to**
      **Robert J. Costello**
         dated July 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4784

39.  **Article from Rolling Stone**
         dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . . . . 4786

40.  **Daily Mail Article**
         dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 4804

**Government's Exhibits:**

1.  **House Resolution 503.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4808

2.  **Subpoena to Stephen Bannon**
         dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 4822

**Government's Exhibits, Continued:**

3.    **Emails re Service of Subpoena
        dated September 23 and 24, 2021**. . . . . . . . . . . . . . . . . . 4832

4.    **Letter from Costello to
      Chairman Thompson and Cover Email
        dated October 7, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4835

5.    **Letter from Chairman Thompson to Costello
        dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4838

6.    **Letter from Costello to Chairman Thompson
        dated October 13, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4841

7.    **Letter from Chairman Thompson to Costello
        dated October 15, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4843

8.    **Letter from Costello to
      Chairman Thompson and Cover Email
        dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4846

9.    **Letters from Chairman Thompson to Costello
        dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4848

10.   **Post on Stephen Bannon's Gettr Account
        dated September 24, 2021**. . . . . . . . . . . . . . . . . . . . . . . . 4851

11A.  **Post on Stephen Bannon's Gettr Account
        dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4852

11B.  **DailyMail Article Linked in October 8, 2021
      Post on Stephen Bannon's Gettr Account**. . . . . . . . . . . . . . 4853

# EXHIBIT E

# RULES

### *of the*

# HOUSE OF REPRESENTATIVES

————

ONE HUNDRED SEVENTEENTH CONGRESS

————



PREPARED BY

Cheryl L. Johnson

Clerk of the House of Representatives

FEBRUARY 2, 2021

(Rev. 02–02–21)

# CONTENTS

————

| | Page |
|---|---|
| RULE I.—The Speaker | 1 |
| II.—Other Officers and Officials | 2 |
| III.—The Members, Delegates, and Resident Commissioner of Puerto Rico | 4 |
| IV.—The Hall of the House | 4 |
| V.—Broadcasting the House | 5 |
| VI.—Official Reporters and News Media Galleries | 5 |
| VII.—Records of the House | 5 |
| VIII.—Response to Subpoenas | 6 |
| IX.—Questions of Privilege | 6 |
| X.—Organization of Committees | 6 |
| XI.—Procedures of Committees and Unfinished Business | 17 |
| XII.—Receipt and Referral of Measures and Matters | 25 |
| XIII.—Calendars and Committee Reports | 26 |
| XIV.—Order and Priority of Business | 28 |
| XV.—Business in Order on Special Days | 29 |
| XVI.—Motions and Amendments | 30 |
| XVII.—Decorum and Debate | 31 |
| XVIII.—The Committee of the Whole House on the state of the Union | 32 |
| XIX.—Motions Following the Amendment Stage | 33 |
| XX.—Voting and Quorum Calls | 33 |
| XXI.—Restrictions on Certain Bills | 35 |
| XXII.—House and Senate Relations | 37 |
| XXIII.—Code of Official Conduct | 39 |
| XXIV.—Limitations on Use of Official Funds | 41 |
| XXV.—Limitations on Outside Earned Income and Acceptance of Gifts | 42 |
| XXVI.—Financial Disclosure | 46 |
| XXVII.—Disclosure by Members and Staff of Employment Negotiations | 47 |
| XXVIII.—Statutory Limit on the Public Debt | 47 |
| XXIX.—General Provisions | 47 |

Case 1:21-cr-00670-CJN   Document 58-5   Filed 04/15/22   Page 5 of 53

# RULES OF THE HOUSE OF REPRESENTATIVES

————

## ONE HUNDRED SEVENTEENTH CONGRESS

### RULE I

#### THE SPEAKER

##### Approval of the Journal

1. The Speaker shall take the Chair on every legislative day precisely at the hour to which the House last adjourned and immediately call the House to order. Having examined and approved the Journal of the last day's proceedings, the Speaker shall announce to the House approval thereof. The Speaker's approval of the Journal shall be deemed agreed to unless a Member, Delegate, or Resident Commissioner demands a vote thereon. If such a vote is decided in the affirmative, it shall not be subject to a motion to reconsider. If such a vote is decided in the negative, then one motion that the Journal be read shall be privileged, shall be decided without debate, and shall not be subject to a motion to reconsider.

##### Preservation of order

2. The Speaker shall preserve order and decorum and, in case of disturbance or disorderly conduct in the galleries or in the lobby, may cause the same to be cleared.

##### Control of Capitol facilities

3. Except as otherwise provided by rule or law, the Speaker shall have general control of the Hall of the House, the corridors and passages in the part of the Capitol assigned to the use of the House, and the disposal of unappropriated rooms in that part of the Capitol.

##### Signature of documents

4. The Speaker shall sign all acts and joint resolutions passed by the two Houses and all writs, warrants, and subpoenas of, or issued by order of, the House. The Speaker may sign enrolled bills and joint resolutions whether or not the House is in session.

##### Questions of order

5. The Speaker shall decide all questions of order, subject to appeal by a Member, Delegate, or Resident Commissioner. On such an appeal a Member, Delegate, or Resident Commissioner may not speak more than once without permission of the House.

##### Form of a question

6. The Speaker shall put a question in this form: "Those in favor (of the question), say 'Aye.'"; and after the affirmative voice is expressed, "Those opposed, say 'No.'". After a vote by voice under this clause, the Speaker may use such voting procedures as may be invoked under rule XX.

##### Discretion to vote

7. The Speaker is not required to vote in ordinary legislative proceedings, except when such vote would be decisive or when the House is engaged in voting by ballot.

##### Speaker pro tempore

8. (a) The Speaker may appoint a Member to perform the duties of the Chair. Except as specified in paragraph (b), such an appointment may not extend beyond three legislative days.

(b)(1) In the case of illness, the Speaker may appoint a Member to perform the duties of the Chair for a period not exceeding 10 days, subject to the approval of the House. If the Speaker is absent and has omitted to make such an appointment, then the House shall elect a Speaker pro tempore to act during the absence of the Speaker.

(2) With the approval of the House, the Speaker may appoint a Member to act as Speaker pro tempore only to sign enrolled bills and joint resolutions for a specified period of time.

(3)(A) In the case of a vacancy in the Office of Speaker, the next Member on the list described in subdivision (B) shall act as Speaker pro tempore until the election of a Speaker or a Speaker pro tempore. Pending such election the Member acting as Speaker pro tempore may exercise such authorities of the Office of Speaker as may be necessary and appropriate to that end.

(B) As soon as practicable after the election of the Speaker and whenever appropriate thereafter, the Speaker shall deliver to the Clerk a list of Members in the order in which each shall act as Speaker pro tempore under subdivision (A).

(C) For purposes of subdivision (A), a vacancy in the Office of Speaker may exist by reason of the physical inability of the Speaker to discharge the duties of the office.

##### Other responsibilities

9. The Speaker, in consultation with the Minority Leader, shall develop through an appropriate entity of the House a system for drug testing in the House. The system may provide for the testing of a Member, Delegate, Resident Commissioner, officer, or employee of the House, and otherwise shall be comparable in scope to the system for drug testing in the executive branch pursuant to Executive Order 12564 (Sept. 15, 1986). The expenses of the system may be paid from applicable accounts of the House for official expenses.

##### Designation of travel

10. The Speaker may designate a Member, Delegate, Resident Commissioner, officer, or employee of the House to travel on the business of the House within or without the United States, whether the House is meeting, has recessed, or has adjourned. Expenses for such travel may be paid from applicable accounts of the House described in clause 1(k)(1) of rule X on vouchers approved and signed solely by the Speaker.

##### Committee appointment

11. The Speaker shall appoint all select, joint, and conference committees ordered by the House. At any time after an original appointment, the Speaker may remove Members, Delegates, or the Resident Commissioner from, or appoint additional Members, Delegates, or the Resident Commissioner to, a select or conference committee. In appointing Members, Delegates, or the Resident Commissioner to conference committees, the Speaker shall appoint no less than a majority who generally supported the House position as determined by the Speaker, shall name those who are primarily responsible for the legislation, and shall, to the fullest extent feasible, include the principal proponents of the major provisions of the bill or resolution passed or adopted by the House.

##### Recess and convening authorities

12. (a) To suspend the business of the House for a short time when no question is pending before the House, the Speaker may declare a recess subject to the call of the Chair.

(b)(1) To suspend the business of the House when notified of an imminent threat to its safety, the Speaker may declare an emergency recess subject to the call of the Chair.

(2) To suspend the business of the Committee of the Whole House on the state of the Union when notified of an imminent threat to its safety, the chair of the Committee of the Whole may declare an emergency recess subject to the call of the Chair.

(c) During any recess or adjournment of not more than three days, if the Speaker is notified by the Sergeant-at-Arms of an imminent impairment of the place of reconvening at the time previously appointed, then the Speaker may, in consultation with the Minority Leader—

1

# RULES OF THE

(1) postpone the time for reconvening within the limits of clause 4, section 5, article I of the Constitution and notify Members, Delegates, and the Resident Commissioner accordingly; or

(2) reconvene the House before the time previously appointed solely to declare the House in recess within the limits of clause 4, section 5, article I of the Constitution and notify Members, Delegates, and the Resident Commissioner accordingly.

(d) The Speaker may convene the House in a place at the seat of government other than the Hall of the House if, in the opinion of the Speaker, the public interest shall warrant it.

(e) During any recess or adjournment of not more than three days, if in the opinion of the Speaker the public interest so warrants, then the Speaker, after consultation with the Minority Leader, may reconvene the House at a time other than that previously appointed, within the limits of clause 4, section 5, article I of the Constitution, and notify Members, Delegates, and the Resident Commissioner accordingly.

(f) The Speaker may name a designee for purposes of paragraphs (c), (d), and (e).

## RULE II

### OTHER OFFICERS AND OFFICIALS

*Elections*

1. There shall be elected at the commencement of each Congress, to continue in office until their successors are chosen and qualified, a Clerk, a Sergeant-at-Arms, a Chief Administrative Officer, and a Chaplain. Each of these officers shall take an oath to support the Constitution of the United States, and for the true and faithful exercise of the duties of the office to the best of the knowledge and ability of the officer, and to keep the secrets of the House. Each of these officers shall appoint all of the employees of the department concerned provided for by law. The Clerk, Sergeant-at-Arms, and Chief Administrative Officer may be removed by the House or by the Speaker.

*Clerk*

2. (a) At the commencement of the first session of each Congress, the Clerk shall call the Members, Delegates, and Resident Commissioner to order and proceed to record their presence by States in alphabetical order, either by call of the roll or by use of the electronic voting system. Pending the election of a Speaker or Speaker pro tempore, and in the absence of a Member acting as Speaker pro tempore pursuant to clause 8(b)(3)(A) of rule I, the Clerk shall preserve order and decorum and decide all questions of order, subject to appeal by a Member, Delegate, or Resident Commissioner.

(b) At the commencement of every regular session of Congress, the Clerk shall make and cause to be delivered to each Member, Delegate, and the Resident Commissioner a list of the reports

that any officer or Department is required to make to Congress, citing the law or resolution in which the requirement may be contained and placing under the name of each officer the list of reports required to be made by such officer.

(c) The Clerk shall—

(1) note all questions of order, with the decisions thereon, the record of which shall be appended to the Journal of each session;

(2) enter on the Journal the hour at which the House adjourns;

(3) complete the distribution of the Journal to Members, Delegates, and the Resident Commissioner, together with an accurate and complete index, as soon as possible after the close of a session; and

(4) send a copy of the Journal to the executive of and to each branch of the legislature of every State as may be requested by such State officials.

(d)(1) The Clerk shall attest and affix the seal of the House to all writs, warrants, and subpoenas issued by order of the House and certify the passage of all bills and joint resolutions.

(2) The Clerk shall examine all bills, amendments, and joint resolutions after passage by the House and, in cooperation with the Senate, examine all bills and joint resolutions that have passed both Houses to see that they are correctly enrolled and forthwith present those bills and joint resolutions that originated in the House to the President in person after their signature by the Speaker and the President of the Senate, and report to the House the fact and date of their presentment.

(e) The Clerk shall cause the calendars of the House to be distributed each legislative day.

(f) The Clerk shall—

(1) retain in the library at the Office of the Clerk for the use of the Members, Delegates, Resident Commissioner, and officers of the House, and not to be withdrawn therefrom, two copies of all the books and printed documents deposited there; and

(2) deliver to any Member, Delegate, or the Resident Commissioner an extra copy of each document requested by that Member, Delegate, or Resident Commissioner that has been printed by order of either House of Congress in any Congress in which the Member, Delegate, or Resident Commissioner served.

(g) The Clerk shall provide for the temporary absence or disability of the Clerk by designating an official in the Office of the Clerk to sign all papers that may require the official signature of the Clerk and to perform all other official acts that the Clerk may be required to perform under the rules and practices of the House, except such official acts as are provided for by statute. Official acts performed by the designated official shall be under the name of the Clerk. The designation shall be in writing and shall be laid be-

fore the House and entered on the Journal.

(h) The Clerk may receive messages from the President and from the Senate at any time when the House is in recess or adjournment.

(i) The Clerk shall supervise the staff and manage the office of a Member, Delegate, or Resident Commissioner who has died, resigned, or been expelled until a successor is elected. The Clerk shall perform similar duties in the event that a vacancy is declared by the House in any congressional district because of the incapacity of the person representing such district or other reason. When acting as a supervisory authority over such staff, the Clerk shall have authority to terminate employees and, with the approval of the Committee on House Administration, may appoint such staff as is required to operate the office until a successor is elected.

(j) In addition to any other reports required by the Speaker or the Committee on House Administration, the Clerk shall report to the Committee on House Administration not later than 45 days following the close of each semiannual period ending on June 30 or on December 31 on the financial and operational status of each function under the jurisdiction of the Clerk. Each report shall include financial statements and a description or explanation of current operations, the implementation of new policies and procedures, and future plans for each function.

(k) The Clerk shall fully cooperate with the appropriate offices and persons in the performance of reviews and audits of financial records and administrative operations.

*Sergeant-at-Arms*

3. (a) The Sergeant-at-Arms shall attend the House during its sittings and maintain order under the direction of the Speaker or other presiding officer. The Sergeant-at-Arms shall execute the commands of the House, and all processes issued by authority thereof, directed to the Sergeant-at-Arms by the Speaker.

(b) The symbol of the Office of the Sergeant-at-Arms shall be the mace, which shall be borne by the Sergeant-at-Arms while enforcing order on the floor.

(c) The Sergeant-at-Arms shall enforce strictly the rules relating to the privileges of the Hall of the House and be responsible to the House for the official conduct of employees of the Office of the Sergeant-at-Arms.

(d) The Sergeant-at-Arms may not allow a person to enter the room over the Hall of the House during its sittings and, from 15 minutes before the hour of the meeting of the House each day until 10 minutes after adjournment, shall see that the floor is cleared of all persons except those privileged to remain.

(e) In addition to any other reports required by the Speaker or the Committee on House Administration, the

# HOUSE OF REPRESENTATIVES

Sergeant-at-Arms shall report to the Committee on House Administration not later than 45 days following the close of each semiannual period ending on June 30 or on December 31 on the financial and operational status of each function under the jurisdiction of the Sergeant-at-Arms. Each report shall include financial statements and a description or explanation of current operations, the implementation of new policies and procedures, and future plans for each function.

(f) The Sergeant-at-Arms shall fully cooperate with the appropriate offices and persons in the performance of reviews and audits of financial records and administrative operations.

(g)(1) The Sergeant-at-Arms is authorized and directed to impose a fine against a Member, Delegate, or the Resident Commissioner for the use of an electronic device for still photography or for audio or visual recording or broadcasting in contravention of clause 5 of rule XVII and any applicable Speaker's announced policy on electronic devices.

(2) A fine imposed pursuant to this paragraph shall be $500 for a first offense and $2,500 for any subsequent offense.

(3)(A) The Sergeant-at-Arms shall promptly notify the Member, Delegate, or the Resident Commissioner, the Speaker, the Chief Administrative Officer, and the Committee on Ethics of any such fine.

(B) Such Member, Delegate, or Resident Commissioner may appeal the fine in writing to the Committee on Ethics not later than 30 calendar days or five legislative days, whichever is later, after notification pursuant to subdivision (A).

(C) Upon receipt of an appeal pursuant to subdivision (B), the Committee on Ethics shall have a period of 30 calendar days or five legislative days, whichever is later, to consider the appeal. The fine will be upheld unless the appeal is agreed to by a majority of the Committee. Upon a determination regarding the appeal or if no appeal has been filed at the expiration of the period specified in subdivision (B), the chair of the Committee on Ethics shall promptly notify the Member, Delegate, or the Resident Commissioner, the Speaker, the Sergeant-at-Arms, and the Chief Administrative Officer, and shall make such notification publicly available. The Speaker shall promptly lay such notification before the House.

(4) The Sergeant-at-Arms and the Committee on Ethics are authorized to establish policies and procedures for the implementation of this paragraph.

### Chief Administrative Officer

4. (a) The Chief Administrative Officer shall have operational and financial responsibility for functions as assigned by the Committee on House Administration and shall be subject to the policy direction and oversight of the Committee on House Administration.

(b) In addition to any other reports required by the Committee on House Administration, the Chief Administrative Officer shall report to the Committee on House Administration not later than 45 days following the close of each semiannual period ending on June 30 or December 31 on the financial and operational status of each function under the jurisdiction of the Chief Administrative Officer. Each report shall include financial statements and a description or explanation of current operations, the implementation of new policies and procedures, and future plans for each function.

(c) The Chief Administrative Officer shall fully cooperate with the appropriate offices and persons in the performance of reviews and audits of financial records and administrative operations.

(d)(1) Upon notification from the chair of the Committee on Ethics pursuant to clause 3(g)(3)(C), the Chief Administrative Officer shall deduct the amount of any fine levied under clause 3(g) from the net salary otherwise due the Member, Delegate, or the Resident Commissioner.

(2) The Chief Administrative Officer is authorized to establish policies and procedures for such salary deductions.

### Chaplain

5. The Chaplain shall offer a prayer at the commencement of each day's sitting of the House.

### Office of Inspector General

6. (a) There is established an Office of Inspector General.

(b) The Inspector General shall be appointed for a Congress by the Speaker, the Majority Leader, and the Minority Leader, acting jointly.

(c) Subject to the policy direction and oversight of the Committee on House Administration, the Inspector General shall only—

(1) provide audit, investigative, and advisory services to the House and joint entities in a manner consistent with government-wide standards;

(2) inform the officers or other officials who are the subject of an audit of the results of that audit and suggesting appropriate curative actions;

(3) simultaneously notify the Speaker, the Majority Leader, the Minority Leader, and the chair and ranking minority member of the Committee on House Administration in the case of any financial irregularity discovered in the course of carrying out responsibilities under this clause;

(4) simultaneously submit to the Speaker, the Majority Leader, the Minority Leader, and the chair and ranking minority member of the Committee on Appropriations and the Committee on House Administration a report of each audit conducted under this clause; and

(5) report to the Committee on Ethics information involving possible violations by a Member, Delegate, Resident Commissioner, officer, or

employee of the House of any rule of the House or of any law applicable to the performance of official duties or the discharge of official responsibilities that may require referral to the appropriate Federal or State authorities under clause 3(a)(3) of rule XI.

### Office of the Historian

7. There is established an Office of the Historian of the House of Representatives. The Speaker shall appoint and set the annual rate of pay for employees of the Office of the Historian.

### Office of General Counsel

8. (a) There is established an Office of General Counsel for the purpose of providing legal assistance and representation to the House. Legal assistance and representation shall be provided without regard to political affiliation. The Speaker shall appoint and set the annual rate of pay for employees of the Office of General Counsel. The Office of General Counsel shall function pursuant to the direction of the Speaker, who shall consult with the Bipartisan Legal Advisory Group.

(b) There is established a Bipartisan Legal Advisory Group composed of the Speaker and the majority and minority leaderships. Unless otherwise provided by the House, the Bipartisan Legal Advisory Group speaks for, and articulates the institutional position of, the House in all litigation matters.

(c) The House, the Speaker, a committee or the chair of a committee authorized during a prior Congress to act in a litigation matter is authorized to act as the successor in interest to the House, the Speaker, such committee or the chair of such committee of a prior Congress, respectively, with respect to such litigation matter, and to take such steps as may be appropriate, including, but not limited to, the issuance of subpoenas, to ensure continuation of such litigation matter.

### Office of Diversity and Inclusion

9. (a) There is established an Office of Diversity and Inclusion. The Speaker, in consultation with the Minority Leader, shall appoint a Director of the Office from recommendations provided by the chair of the Committee on House Administration in consultation with the ranking minority member of such committee.

(b) Subject to the policy direction and oversight of the Committee on House Administration, the Office of Diversity and Inclusion shall—

(1) direct and guide House employing offices to recruit, hire, train, develop, advance, promote, and retain a diverse workforce;

(2) survey and evaluate diversity in House employing offices;

(3) through the Director of the Office at the end of each session of Congress, submit a House of Representatives diversity report to the Speaker, the Majority Leader, the Minority Leader, the chair and ranking minority member of the Committee on

USCA Case #22-3086     Document #1997762          Filed: 05/03/2023     Page 40 of 448
Case 1:21-cr-00670-CJN     Document 58-5     Filed 04/15/22     Page 9 of 53

Rule II, clause 9                          RULES OF THE                          Rule IV, clause 6

House Administration, and the chair and ranking minority member of the Subcommittee on the Legislative Branch of the Committee on Appropriations; and

(4) provide consultation and guidance in furtherance of increasing diversity and inclusion in the House.

*Office of the Whistleblower Ombuds*

10. (a) There is established an Office of the Whistleblower Ombuds. The Speaker, in consultation with the chairs and ranking minority members of the Committee on House Administration and the Committee on Oversight and Reform, shall appoint a Director of the Office.

(b) Subject to the policy direction and oversight of the Committee on House Administration, and in consultation with any other committee (at the request of the chair or ranking minority member of such other committee), the Office of the Whistleblower Ombuds shall—

(1) promulgate best practices for whistleblower intake for offices of the House; and

(2) provide training for offices of the House on whistleblower intake, including establishing an effective reporting system for whistleblowers, maintaining whistleblower confidentiality, advising staff of relevant laws and policies, and protecting information provided by whistleblowers.

RULE III

THE MEMBERS, DELEGATES, AND RESIDENT COMMISSIONER OF PUERTO RICO

*Voting*

1. Every Member shall be present within the Hall of the House during its sittings, unless excused or necessarily prevented, and shall vote on each question put, unless having a direct personal or pecuniary interest in the event of such question.

2. (a) A Member may not authorize any other person to cast the vote of such Member or record the presence of such Member in the House or the Committee of the Whole House on the state of the Union.

(b) No other person may cast a Member's vote or record a Member's presence in the House or the Committee of the Whole House on the state of the Union.

*Delegates and the Resident Commissioner*

3. (a) In a Committee of the Whole House on the State of the Union, each Delegate and the Resident Commissioner shall possess the same powers and privileges as Members of the House. Each Delegate and the Resident Commissioner shall be elected to serve on standing committees in the same manner as Members and shall possess in such committees the same powers and privileges as the other members of the committee.

(b) The Delegates and the Resident Commissioner may be appointed to any select committee, joint committee, or conference committee.

RULE IV

THE HALL OF THE HOUSE

*Use and admittance*

1. The Hall of the House shall be used only for the legislative business of the House and for caucus and conference meetings of its Members, except when the House agrees to take part in any ceremonies to be observed therein.

2. (a) Only the following persons shall be admitted to the Hall of the House or rooms leading thereto:

(1) Members of Congress, Members-elect, Delegates, Delegates-elect, the Resident Commissioner, and the Resident Commissioner-elect.

(2) Contestants in election cases during the pendency of their cases on the floor.

(3) The President and Vice President of the United States and their private secretaries.

(4) Justices of the Supreme Court.

(5) Elected officers and minority employees nominated as elected officers of the House.

(6) The Parliamentarian.

(7) Staff of committees when business from their committee is under consideration, and staff of the respective party leaderships when so assigned with the approval of the Speaker.

(8) Not more than one person from the staff of a Member, Delegate, or Resident Commissioner when that Member, Delegate, or Resident Commissioner has an amendment under consideration (subject to clause 5).

(9) The Architect of the Capitol.

(10) The Librarian of Congress and the assistant in charge of the Law Library.

(11) The Secretary and Sergeant-at-Arms of the Senate.

(12) Heads of departments.

(13) Foreign ministers.

(14) Governors of States and of the Territories and the Mayor of the District of Columbia.

(15) Former Members, Delegates, and Resident Commissioners; former Parliamentarians of the House; and former elected officers and minority employees nominated as elected officers of the House (subject to clause 4).

(16) One attorney to accompany a Member, Delegate, or Resident Commissioner who is the respondent in an investigation undertaken by the Committee on Ethics when a recommendation of that committee is under consideration in the House.

(17) Such persons as have, by name, received the thanks of Congress.

(b) The Speaker may not entertain a unanimous consent request or a motion to suspend this clause or clauses 1, 3, 4, or 5.

3. (a) Except as provided in paragraph (b), all persons not entitled to the privilege of the floor during the session shall be excluded at all times from the Hall of the House and the cloakrooms.

(b) Until 15 minutes of the hour of the meeting of the House, persons employed in its service, accredited members of the press entitled to admission to the press gallery, and other persons on request of a Member, Delegate, or Resident Commissioner by card or in writing, may be admitted to the Hall of the House.

4. (a) A former Member, Delegate, or Resident Commissioner; a former Parliamentarian of the House; or a former elected officer of the House or former minority employee nominated as an elected officer of the House shall not be entitled to the privilege of admission to the Hall of the House and rooms leading thereto if such individual—

(1) is a registered lobbyist or agent of a foreign principal as those terms are defined in clause 5 of rule XXV;

(2) has any direct personal or pecuniary interest in any legislative measure pending before the House or reported by a committee;

(3) is in the employ of or represents any party or organization for the purpose of influencing, directly or indirectly, the passage, defeat, or amendment of any legislative proposal; or

(4) has been convicted by a court of record for the commission of a crime in relation to that individual's election to, or service to, the House.

(b) The Speaker may promulgate regulations to carry out this rule including regulations that exempt ceremonial or educational functions from the restrictions of this clause.

5. A person from the staff of a Member, Delegate, or Resident Commissioner may be admitted to the Hall of the House or rooms leading thereto under clause 2 only upon prior notice to the Speaker. Such persons, and persons from the staff of committees admitted under clause 2, may not engage in efforts in the Hall of the House or rooms leading thereto to influence Members with regard to the legislation being amended. Such persons are admitted only to advise the Member, Delegate, Resident Commissioner, or committee responsible for their admission. A person who violates this clause may be excluded during the session from the Hall of the House and rooms leading thereto by the Speaker.

*Gallery*

6. (a) The Speaker shall set aside a portion of the west gallery for the use of the President, the members of the Cabinet, justices of the Supreme Court, foreign ministers and suites, and the members of their respective families. The Speaker shall set aside another portion of the same gallery for the accommodation of persons to be admitted on the cards of Members, Delegates, or the Resident Commissioner.

(b) The Speaker shall set aside the southerly half of the east gallery for the use of the families of Members of Congress. The Speaker shall control one bench. On the request of a Member, Delegate, Resident Commissioner, or

# HOUSE OF REPRESENTATIVES

Senator, the Speaker shall issue a card of admission to the family of such individual, which may include their visitors. No other person shall be admitted to this section.

### Prohibition on campaign contributions

7. A Member, Delegate, Resident Commissioner, officer, or employee of the House, or any other person entitled to admission to the Hall of the House or rooms leading thereto by this rule, may not knowingly distribute a political campaign contribution in the Hall of the House or rooms leading thereto.

## RULE V

### BROADCASTING THE HOUSE

1. The Speaker shall administer, direct, and control a system for closed-circuit viewing of floor proceedings of the House in the offices of all Members, Delegates, the Resident Commissioner, and committees and in such other places in the Capitol and the House Office Buildings as the Speaker considers appropriate. Such system may include other communications functions as the Speaker considers appropriate. Any such communications shall be subject to rules and regulations issued by the Speaker.

2. (a) The Speaker shall administer, direct, and control a system for complete and unedited audio and visual broadcasting and recording of the floor proceedings of the House. The Speaker shall provide for the distribution of such broadcasts and recordings to news media, for the storage of audio and video recordings of the proceedings, and for the closed-captioning of the proceedings for hearing-impaired persons.

(b) All television and radio broadcasting stations, networks, services, and systems (including cable systems) that are accredited to the House Radio and Television Correspondents' Galleries, and all radio and television correspondents who are so accredited, shall be provided access to the live coverage of the House.

(c) Coverage made available under this clause, including any recording thereof—

(1) may not be used for any partisan political campaign purpose;

(2) may not be used in any commercial advertisement; and

(3) may not be broadcast with commercial sponsorship except as part of a bona fide news program or public affairs documentary program.

3. The Speaker may delegate any of the responsibilities under this rule to such legislative entity as the Speaker considers appropriate.

## RULE VI

### OFFICIAL REPORTERS AND NEWS MEDIA GALLERIES

#### Official reporters

1. Subject to the direction and control of the Speaker, the Clerk shall appoint, and may remove for cause, the official reporters of the House, including stenographers of committees, and shall supervise the execution of their duties.

#### News media galleries

2. A portion of the gallery over the Speaker's chair as may be necessary to accommodate representatives of the press wishing to report debates and proceedings shall be set aside for their use. Reputable reporters and correspondents shall be admitted thereto under such regulations as the Speaker may prescribe from time to time. The Standing Committee of Correspondents for the Press Gallery, and the Executive Committee of Correspondents for the Periodical Press Gallery, shall supervise such galleries, including the designation of its employees, subject to the direction and control of the Speaker. The Speaker may admit to the floor, under such regulations as the Speaker may prescribe, not more than one representative of each press association.

3. A portion of the gallery as may be necessary to accommodate reporters of news to be disseminated by radio, television, and similar means of transmission, wishing to report debates and proceedings, shall be set aside for their use. Reputable reporters and correspondents shall be admitted thereto under such regulations as the Speaker may prescribe. The Executive Committee of the Radio and Television Correspondents' Galleries shall supervise such gallery, including the designation of its employees, subject to the direction and control of the Speaker. The Speaker may admit to the floor, under such regulations as the Speaker may prescribe, not more than one representative of each media outlet.

## RULE VII

### RECORDS OF THE HOUSE

#### Archiving

1. (a) At the end of each Congress, the chair of each committee shall transfer to the Clerk any noncurrent records of such committee, including the subcommittees thereof.

(b) At the end of each Congress, each officer of the House elected under rule II shall transfer to the Clerk any noncurrent records made or acquired in the course of the duties of such officer.

2. The Clerk shall deliver the records transferred under clause 1, together with any other noncurrent records of the House, to the Archivist of the United States for preservation at the National Archives and Records Administration. Records so delivered are the permanent property of the House and remain subject to this rule and any order of the House.

#### Public availability

3. (a) The Clerk shall authorize the Archivist to make records delivered under clause 2 available for public use, subject to clause 4(b) and any order of the House.

(b)(1) A record shall immediately be made available for public use if it was previously made available for public use by the House or a committee or a subcommittee.

(2) An investigative record that contains personal data relating to a specific living person (the disclosure of which would be an unwarranted invasion of personal privacy), an administrative record relating to personnel, or a record relating to a hearing that was closed under clause 2(g)(2) of rule XI shall be made available if it has been in existence for 50 years.

(3) A record for which a time, schedule, or condition for availability is specified by order of the House shall be made available in accordance with that order. Except as otherwise provided by order of the House, a record of a committee for which a time, schedule, or condition for availability is specified by order of the committee (entered during the Congress in which the record is made or acquired by the committee) shall be made available in accordance with the order of the committee.

(4) A record (other than a record referred to in subparagraph (1), (2), or (3)) shall be made available if it has been in existence for 30 years.

4. (a) A record may not be made available for public use under clause 3 if the Clerk determines that such availability would be detrimental to the public interest or inconsistent with the rights and privileges of the House. The Clerk shall notify in writing the chair and ranking minority member of the Committee on House Administration of any such determination.

(b) A determination of the Clerk under paragraph (a) is subject to later orders of the House and, in the case of a record of a committee, later orders of the committee.

5. (a) This rule does not supersede rule VIII or clause 11 of rule X and does not authorize the public disclosure of any record if such disclosure is prohibited by law or executive order of the President.

(b) The Committee on House Administration may prescribe guidelines and regulations governing the applicability and implementation of this rule.

(c) A committee may withdraw from the National Archives and Records Administration any record of the committee delivered to the Archivist under this rule. Such a withdrawal shall be on a temporary basis and for official use of the committee.

#### Definition of record

6. (a) In this rule the term "record" means any official, permanent record of the House (other than a record of an individual Member, Delegate, or Resident Commissioner as described in paragraph (b)), including—

(1) with respect to a committee, an official, permanent record of the committee (including any record of a legislative, oversight, or other activity of such committee or a subcommittee thereof); and

(2) with respect to an officer of the House elected under rule II, an offi-

**RULES OF THE**

cial, permanent record made or acquired in the course of the duties of such officer.

(b) Records created, generated, or received by the congressional office of a Member, Delegate, or the Resident Commissioner in the performance of official duties are exclusively the personal property of the individual Member, Delegate, or the Resident Commissioner and such Member, Delegate, or Resident Commissioner has control over such records.

### Withdrawal of papers

7. A memorial or other paper presented to the House may not be withdrawn from its files without its leave. If withdrawn certified copies thereof shall be left in the Office of the Clerk. When an act passes for the settlement of a claim, the Clerk may transmit to the officer charged with the settlement thereof the papers on file in the Office of the Clerk relating to such claim. The Clerk may lend temporarily to an officer or bureau of the executive departments any papers on file in the Office of the Clerk relating to any matter pending before such officer or bureau, taking proper receipt therefor.

### RULE VIII

RESPONSE TO SUBPOENAS

1. (a) When a Member, Delegate, Resident Commissioner, officer, or employee of the House is properly served with a judicial subpoena or order, such Member, Delegate, Resident Commissioner, officer, or employee shall comply, consistently with the privileges and rights of the House, with the judicial subpoena or order as hereinafter provided, unless otherwise determined under this rule.

(b) For purposes of this rule, ''judicial subpoena or order'' means a judicial subpoena or judicial order directing appearance as a witness relating to the official functions of the House or for the production or disclosure of any document relating to the official functions of the House.

2. (a) Upon receipt of a properly served judicial subpoena or order, a Member, Delegate, Resident Commissioner, officer, or employee of the House shall promptly notify the Speaker in writing of its receipt together with either:

(1) a determination as to whether the issuance of the judicial subpoena or order is a proper exercise of jurisdiction by the court and is consistent with the privileges and rights of the House; or

(2) a statement that such Member, Delegate, Resident Commissioner, officer, or employee of the House intends to make a determination with respect to the matters described in subparagraph (1).

(b) The notification required by paragraph (a) shall promptly be laid before the House by the Speaker.

3. (a) Except as specified in paragraph (b) or otherwise ordered by the House, upon notification to the House that a

judicial subpoena or order is a proper exercise of jurisdiction by the court and is consistent with the privileges and rights of the House, the Member, Delegate, Resident Commissioner, officer, or employee of the House shall comply with the judicial subpoena or order by supplying copies.

(b) Under no circumstances may minutes or transcripts of executive sessions, or evidence of witnesses in respect thereto, be disclosed or copied. During a period of recess or adjournment of longer than three days, the Speaker may authorize compliance or take such other action as the Speaker considers appropriate under the circumstances. Upon the reconvening of the House, all matters that transpired under this clause shall promptly be laid before the House by the Speaker.

4. Nothing in this rule shall be construed to deprive, condition, or waive the constitutional or legal privileges or rights applicable or available at any time to a Member, Delegate, Resident Commissioner, officer, or employee of the House, or of the House itself, or the right of such Member, Delegate, Resident Commissioner, officer, or employee, or of the House itself, to assert such privileges or rights before a court in the United States.

### RULE IX

QUESTIONS OF PRIVILEGE

1. Questions of privilege shall be, first, those affecting the rights of the House collectively, its safety, dignity, and the integrity of its proceedings; and second, those affecting the rights, reputation, and conduct of Members, Delegates, or the Resident Commissioner, individually, in their representative capacity only.

2. (a)(1) A resolution reported as a question of the privileges of the House, or offered from the floor by the Majority Leader or the Minority Leader as a question of the privileges of the House, or offered as privileged under clause 1, section 7, article I of the Constitution, shall have precedence of all other questions except motions to adjourn. A resolution offered from the floor by a Member, Delegate, or Resident Commissioner other than the Majority Leader or the Minority Leader as a question of the privileges of the House shall have precedence of all other questions except motions to adjourn only at a time or place, designated by the Speaker, in the legislative schedule within two legislative days after the day on which the proponent announces to the House an intention to offer the resolution and the form of the resolution. Oral announcement of the form of the resolution may be dispensed with by unanimous consent.

(2) The time allotted for debate on a resolution offered from the floor as a question of the privileges of the House shall be equally divided between (A) the proponent of the resolution, and (B) the Majority Leader, the Minority Leader, or a designee, as determined by the Speaker.

(3) A resolution causing a vacancy in the Office of Speaker shall not be privileged except if offered by direction of a party caucus or conference.

(b) A question of personal privilege shall have precedence of all other questions except motions to adjourn.

### RULE X

ORGANIZATION OF COMMITTEES

### Committees and their legislative jurisdictions

1. There shall be in the House the following standing committees, each of which shall have the jurisdiction and related functions assigned by this clause and clauses 2, 3, and 4. All bills, resolutions, and other matters relating to subjects within the jurisdiction of the standing committees listed in this clause shall be referred to those committees, in accordance with clause 2 of rule XII, as follows:

(a) **Committee on Agriculture.**

(1) Adulteration of seeds, insect pests, and protection of birds and animals in forest reserves.

(2) Agriculture generally.

(3) Agricultural and industrial chemistry.

(4) Agricultural colleges and experiment stations.

(5) Agricultural economics and research.

(6) Agricultural education extension services.

(7) Agricultural production and marketing and stabilization of prices of agricultural products, and commodities (not including distribution outside of the United States).

(8) Animal industry and diseases of animals.

(9) Commodity exchanges.

(10) Crop insurance and soil conservation.

(11) Dairy industry.

(12) Entomology and plant quarantine.

(13) Extension of farm credit and farm security.

(14) Inspection of livestock, poultry, meat products, and seafood and seafood products.

(15) Forestry in general and forest reserves other than those created from the public domain.

(16) Human nutrition and home economics.

(17) Plant industry, soils, and agricultural engineering.

(18) Rural electrification.

(19) Rural development.

(20) Water conservation related to activities of the Department of Agriculture.

(b) **Committee on Appropriations.**

(1) Appropriation of the revenue for the support of the Government.

(2) Rescissions of appropriations contained in appropriation Acts.

(3) Transfers of unexpended balances.

(4) Bills and joint resolutions reported by other committees that

## HOUSE OF REPRESENTATIVES

provide new entitlement authority as defined in section 3(9) of the Congressional Budget Act of 1974 and referred to the committee under clause 4(a)(2).

(5) Bills and joint resolutions that provide new budget authority, limitation on the use of funds, or other authority relating to new direct loan obligations and new loan guarantee commitments referencing section 504(b) of the Congressional Budget Act of 1974.

(c) **Committee on Armed Services.**

(1) Ammunition depots; forts; arsenals; and Army, Navy, Marine Corps, Air Force, and Space Force reservations and establishments.

(2) Common defense generally.

(3) Conservation, development, and use of naval petroleum and oil shale reserves.

(4) The Department of Defense generally, including the Departments of the Army, Navy, and Air Force, generally.

(5) Interoceanic canals generally, including measures relating to the maintenance, operation, and administration of interoceanic canals.

(6) Merchant Marine Academy and State Maritime Academies.

(7) Military applications of nuclear energy.

(8) Tactical intelligence and intelligence-related activities of the Department of Defense.

(9) National security aspects of merchant marine, including financial assistance for the construction and operation of vessels, maintenance of the U.S. shipbuilding and ship repair industrial base, cabotage, cargo preference, and merchant marine officers and seafarers as these matters relate to the national security.

(10) Pay, promotion, retirement, and other benefits and privileges of members of the armed forces.

(11) Scientific research and development in support of the armed services.

(12) Selective service.

(13) Size and composition of the Army, Navy, Marine Corps, Air Force, and Space Force.

(14) Soldiers' and sailors' homes.

(15) Strategic and critical materials necessary for the common defense.

(16) Cemeteries administered by the Department of Defense.

(d) **Committee on the Budget.**

(1) Concurrent resolutions on the budget (as defined in section 3(4) of the Congressional Budget Act of 1974), other matters required to be referred to the committee under titles III and IV of that Act, and other measures setting forth appropriate levels of budget totals for the United States Government.

(2) Budget process generally.

(3) Establishment, extension, and enforcement of special controls over the Federal budget, including the budgetary treatment of off-budget Federal agencies and measures providing exemption from reduction under any order issued under part C of the Balanced Budget and Emergency Deficit Control Act of 1985.

(e) **Committee on Education and Labor.**

(1) Child labor.

(2) Gallaudet University and Howard University and Hospital.

(3) Convict labor and the entry of goods made by convicts into interstate commerce.

(4) Food programs for children in schools.

(5) Labor standards and statistics.

(6) Education or labor generally.

(7) Mediation and arbitration of labor disputes.

(8) Regulation or prevention of importation of foreign laborers under contract.

(9) Workers' compensation.

(10) Vocational rehabilitation.

(11) Wages and hours of labor.

(12) Welfare of miners.

(13) Work incentive programs.

(14) Organization, administration, and general management of the Department of Education.

(15) Organization, administration, and general management of the Department of Labor.

(f) **Committee on Energy and Commerce.**

(1) Biomedical research and development.

(2) Consumer affairs and consumer protection.

(3) Health and health facilities (except health care supported by payroll deductions).

(4) Interstate energy compacts.

(5) Interstate and foreign commerce generally.

(6) Exploration, production, storage, supply, marketing, pricing, and regulation of energy resources, including all fossil fuels, solar energy, and other unconventional or renewable energy resources.

(7) Conservation of energy resources.

(8) Energy information generally.

(9) The generation and marketing of power (except by federally chartered or Federal regional power marketing authorities); reliability and interstate transmission of, and ratemaking for, all power; and siting of generation facilities (except the installation of interconnections between Government waterpower projects).

(10) General management of the Department of Energy and management and all functions of the Federal Energy Regulatory Commission.

(11) National energy policy generally.

(12) Public health and quarantine.

(13) Regulation of the domestic nuclear energy industry, including regulation of research and development reactors and nuclear regulatory research.

(14) Regulation of interstate and foreign communications.

(15) Travel and tourism.

The committee shall have the same jurisdiction with respect to regulation of nuclear facilities and of use of nuclear energy as it has with respect to regulation of nonnuclear facilities and of use of nonnuclear energy.

(g) **Committee on Ethics.**

The Code of Official Conduct.

(h) **Committee on Financial Services.**

(1) Banks and banking, including deposit insurance and Federal monetary policy.

(2) Economic stabilization, defense production, renegotiation, and control of the price of commodities, rents, and services.

(3) Financial aid to commerce and industry (other than transportation).

(4) Insurance generally.

(5) International finance.

(6) International financial and monetary organizations.

(7) Money and credit, including currency and the issuance of notes and redemption thereof; gold and silver, including the coinage thereof; valuation and revaluation of the dollar.

(8) Public and private housing.

(9) Securities and exchanges.

(10) Urban development.

(i) **Committee on Foreign Affairs.**

(1) Relations of the United States with foreign nations generally.

(2) Acquisition of land and buildings for embassies and legations in foreign countries.

(3) Establishment of boundary lines between the United States and foreign nations.

(4) Export controls, including nonproliferation of nuclear technology and nuclear hardware.

(5) Foreign loans.

(6) International commodity agreements (other than those involving sugar), including all agreements for cooperation in the export of nuclear technology and nuclear hardware.

(7) International conferences and congresses.

(8) International education.

(9) Intervention abroad and declarations of war.

(10) Diplomatic service.

(11) Measures to foster commercial intercourse with foreign nations and to safeguard American business interests abroad.

(12) International economic policy.

USCA Case #22-3086    Document #1997762        Filed: 05/03/2023    Page 44 of 448
Case 1:21-cr-00670-CJN    Document 58-5    Filed 04/15/22    Page 13 of 53

# RULES OF THE

(13) Neutrality.

(14) Protection of American citizens abroad and expatriation.

(15) The American National Red Cross.

(16) Trading with the enemy.

(17) United Nations organizations.

(j) **Committee on Homeland Security.**

(1) Overall homeland security policy.

(2) Organization, administration, and general management of the Department of Homeland Security.

(3) Functions of the Department of Homeland Security relating to the following:

(A) Border and port security (except immigration policy and non-border enforcement).

(B) Customs (except customs revenue).

(C) Integration, analysis, and dissemination of homeland security information.

(D) Domestic preparedness for and collective response to terrorism.

(E) Research and development.

(F) Transportation security.

(k) **Committee on House Administration.**

(1) Appropriations from accounts for committee salaries and expenses (except for the Committee on Appropriations); House Information Resources; and allowance and expenses of Members, Delegates, the Resident Commissioner, officers, and administrative offices of the House.

(2) Auditing and settling of all accounts described in subparagraph (1).

(3) Employment of persons by the House, including staff for Members, Delegates, the Resident Commissioner, and committees; and reporters of debates, subject to rule VI.

(4) Except as provided in paragraph (r)(11), the Library of Congress, including management thereof; the House Library; statuary and pictures; acceptance or purchase of works of art for the Capitol; the Botanic Garden; and purchase of books and manuscripts.

(5) The Smithsonian Institution and the incorporation of similar institutions (except as provided in paragraph (r)(11)).

(6) Expenditure of accounts described in subparagraph (1).

(7) Franking Commission.

(8) Printing and correction of the Congressional Record.

(9) Accounts of the House generally.

(10) Assignment of office space for Members, Delegates, the Resident Commissioner, and committees.

(11) Disposition of useless executive papers.

(12) Election of the President, Vice President, Members, Senators, Delegates, or the Resident Commissioner; corrupt practices; contested elections; credentials and qualifications; and Federal elections generally.

(13) Services to the House, including the House Restaurant, parking facilities, and administration of the House Office Buildings and of the House wing of the Capitol.

(14) Travel of Members, Delegates, and the Resident Commissioner.

(15) Raising, reporting, and use of campaign contributions for candidates for office of Representative, of Delegate, and of Resident Commissioner.

(16) Compensation, retirement, and other benefits of the Members, Delegates, the Resident Commissioner, officers, and employees of Congress.

(l) **Committee on the Judiciary.**

(1) The judiciary and judicial proceedings, civil and criminal.

(2) Administrative practice and procedure.

(3) Apportionment of Representatives.

(4) Bankruptcy, mutiny, espionage, and counterfeiting.

(5) Civil liberties.

(6) Constitutional amendments.

(7) Criminal law enforcement and criminalization.

(8) Federal courts and judges, and local courts in the Territories and possessions.

(9) Immigration policy and non-border enforcement.

(10) Interstate compacts generally.

(11) Claims against the United States.

(12) Meetings of Congress; attendance of Members, Delegates, and the Resident Commissioner; and their acceptance of incompatible offices.

(13) National penitentiaries.

(14) Patents, the Patent and Trademark Office, copyrights, and trademarks.

(15) Presidential succession.

(16) Protection of trade and commerce against unlawful restraints and monopolies.

(17) Revision and codification of the Statutes of the United States.

(18) State and territorial boundary lines.

(19) Subversive activities affecting the internal security of the United States.

(m) **Committee on Natural Resources.**

(1) Fisheries and wildlife, including research, restoration, refuges, and conservation.

(2) Forest reserves and national parks created from the public domain.

(3) Forfeiture of land grants and alien ownership, including alien ownership of mineral lands.

(4) Geological Survey.

(5) International fishing agreements.

(6) Interstate compacts relating to apportionment of waters for irrigation purposes.

(7) Irrigation and reclamation, including water supply for reclamation projects and easements of public lands for irrigation projects; and acquisition of private lands when necessary to complete irrigation projects.

(8) Native Americans generally, including the care and allotment of Native American lands and general and special measures relating to claims that are paid out of Native American funds.

(9) Insular areas of the United States generally (except those affecting the revenue and appropriations).

(10) Military parks and battlefields, national cemeteries administered by the Secretary of the Interior, parks within the District of Columbia, and the erection of monuments to the memory of individuals.

(11) Mineral land laws and claims and entries thereunder.

(12) Mineral resources of public lands.

(13) Mining interests generally.

(14) Mining schools and experimental stations.

(15) Marine affairs, including coastal zone management (except for measures relating to oil and other pollution of navigable waters).

(16) Oceanography.

(17) Petroleum conservation on public lands and conservation of the radium supply in the United States.

(18) Preservation of prehistoric ruins and objects of interest on the public domain.

(19) Public lands generally, including entry, easements, and grazing thereon.

(20) Relations of the United States with Native Americans and Native American tribes.

(21) Trans-Alaska Oil Pipeline (except ratemaking).

(n) **Committee on Oversight and Reform.**

(1) Federal civil service, including intergovernmental personnel; and the status of officers and employees of the United States, including their compensation, classification, and retirement.

(2) Municipal affairs of the District of Columbia in general (other than appropriations).

(3) Federal paperwork reduction.

(4) Government management and accounting measures generally.

(5) Holidays and celebrations.

8

# HOUSE OF REPRESENTATIVES

(6) Overall economy, efficiency, and management of government operations and activities, including Federal procurement.

(7) National archives.

(8) Population and demography generally, including the Census.

(9) Postal service generally, including transportation of the mails.

(10) Public information and records.

(11) Relationship of the Federal Government to the States and municipalities generally.

(12) Reorganizations in the executive branch of the Government.

(o) **Committee on Rules.**

(1) Rules and joint rules (other than those relating to the Code of Official Conduct) and the order of business of the House.

(2) Recesses and final adjournments of Congress.

(p) **Committee on Science, Space, and Technology.**

(1) All energy research, development, and demonstration, and projects therefor, and all federally owned or operated nonmilitary energy laboratories.

(2) Astronautical research and development, including resources, personnel, equipment, and facilities.

(3) Civil aviation research and development.

(4) Environmental research and development.

(5) Marine research.

(6) Commercial application of energy technology.

(7) National Institute of Standards and Technology, standardization of weights and measures, and the metric system.

(8) National Aeronautics and Space Administration.

(9) National Space Council.

(10) National Science Foundation.

(11) National Weather Service.

(12) Outer space, including exploration and control thereof.

(13) Science scholarships.

(14) Scientific research, development, and demonstration, and projects therefor.

(q) **Committee on Small Business.**

(1) Assistance to and protection of small business, including financial aid, regulatory flexibility, and paperwork reduction.

(2) Participation of small-business enterprises in Federal procurement and Government contracts.

(r) **Committee on Transportation and Infrastructure.**

(1) Coast Guard, including lifesaving service, lighthouses, lightships, ocean derelicts, and the Coast Guard Academy.

(2) Federal management of emergencies and natural disasters.

(3) Flood control and improvement of rivers and harbors.

(4) Inland waterways.

(5) Inspection of merchant marine vessels, lights and signals, lifesaving equipment, and fire protection on such vessels.

(6) Navigation and laws relating thereto, including pilotage.

(7) Registering and licensing of vessels and small boats.

(8) Rules and international arrangements to prevent collisions at sea.

(9) The Capitol Building and the Senate and House Office Buildings.

(10) Construction or maintenance of roads and post roads (other than appropriations therefor).

(11) Construction or reconstruction, maintenance, and care of buildings and grounds of the Botanic Garden, the Library of Congress, and the Smithsonian Institution.

(12) Merchant marine (except for national security aspects thereof).

(13) Purchase of sites and construction of post offices, customhouses, Federal courthouses, and Government buildings within the District of Columbia.

(14) Oil and other pollution of navigable waters, including inland, coastal, and ocean waters.

(15) Marine affairs, including coastal zone management, as they relate to oil and other pollution of navigable waters.

(16) Public buildings and occupied or improved grounds of the United States generally.

(17) Public works for the benefit of navigation, including bridges and dams (other than international bridges and dams).

(18) Related transportation regulatory agencies (except the Transportation Security Administration).

(19) Roads and the safety thereof.

(20) Transportation, including civil aviation, railroads, water transportation, transportation safety (except automobile safety and transportation security functions of the Department of Homeland Security), transportation infrastructure, transportation labor, and railroad retirement and unemployment (except revenue measures related thereto).

(21) Water power.

(s) **Committee on Veterans' Affairs.**

(1) Veterans' measures generally.

(2) Cemeteries of the United States in which veterans of any war or conflict are or may be buried, whether in the United States or abroad (except cemeteries administered by the Secretary of the Interior).

(3) Compensation, vocational rehabilitation, and education of veterans.

(4) Life insurance issued by the Government on account of service in the Armed Forces.

(5) Pensions of all the wars of the United States, general and special.

(6) Readjustment of servicemembers to civil life.

(7) Servicemembers' civil relief.

(8) Veterans' hospitals, medical care, and treatment of veterans.

(t) **Committee on Ways and Means.**

(1) Customs revenue, collection districts, and ports of entry and delivery.

(2) Reciprocal trade agreements.

(3) Revenue measures generally.

(4) Revenue measures relating to insular possessions.

(5) Bonded debt of the United States, subject to the last sentence of clause 4(f).

(6) Deposit of public monies.

(7) Transportation of dutiable goods.

(8) Tax exempt foundations and charitable trusts.

(9) National social security (except health care and facilities programs that are supported from general revenues as opposed to payroll deductions and except work incentive programs).

*General oversight responsibilities*

2. (a) The various standing committees shall have general oversight responsibilities as provided in paragraph (b) in order to assist the House in—

(1) its analysis, appraisal, and evaluation of—

(A) the application, administration, execution, and effectiveness of Federal laws; and

(B) conditions and circumstances that may indicate the necessity or desirability of enacting new or additional legislation; and

(2) its formulation, consideration, and enactment of changes in Federal laws, and of such additional legislation as may be necessary or appropriate.

(b)(1) In order to determine whether laws and programs addressing subjects within the jurisdiction of a committee are being implemented and carried out in accordance with the intent of Congress and whether they should be continued, curtailed, or eliminated, each standing committee (other than the Committee on Appropriations) shall review and study on a continuing basis—

(A) the application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction;

(B) the organization and operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction;

(C) any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction (whether or not a bill or resolution has been introduced with respect thereto); and

9

RULES OF THE

(D) future research and forecasting on subjects within its jurisdiction.

(2) Each committee to which subparagraph (1) applies having more than 20 members shall establish an oversight subcommittee, or require its subcommittees to conduct oversight in their respective jurisdictions, to assist in carrying out its responsibilities under this clause. The establishment of an oversight subcommittee does not limit the responsibility of a subcommittee with legislative jurisdiction in carrying out its oversight responsibilities.

(c) Each standing committee shall review and study on a continuing basis the impact or probable impact of tax policies affecting subjects within its jurisdiction as described in clauses 1 and 3.

(d)(1) Not later than March 1 of the first session of a Congress, the chair of each standing committee (other than the Committee on Appropriations, the Committee on Ethics, and the Committee on Rules) shall—

(A) prepare, in consultation with the ranking minority member, an oversight plan for that Congress;

(B) provide a copy of that plan to each member of the committee for at least seven calendar days before its submission; and

(C) submit that plan (including any supplemental, minority, additional, or dissenting views submitted by a member of the committee) simultaneously to the Committee on Oversight and Reform and the Committee on House Administration.

(2) In developing the plan, the chair of each committee shall, to the maximum extent feasible—

(A) consult with other committees that have jurisdiction over the same or related laws, programs, or agencies with the objective of ensuring maximum coordination and cooperation among committees when conducting reviews of such laws, programs, or agencies and include in the plan an explanation of steps that have been or will be taken to ensure such coordination and cooperation;

(B) review specific problems with Federal rules, regulations, statutes, and court decisions that are ambiguous, arbitrary, or nonsensical, or that impose severe financial burdens on individuals;

(C) give priority consideration to including in the plan the review of those laws, programs, or agencies operating under permanent budget authority or permanent statutory authority;

(D) have a view toward ensuring that all significant laws, programs, or agencies within the committee's jurisdiction are subject to review every 10 years;

(E) have a view toward insuring against duplication of Federal programs; and

(F) give priority consideration to including in the plan a discussion of how the committee's work will ad-

dress issues of inequities on the basis of race, color, ethnicity, religion, sex, sexual orientation, gender identity, disability, age, or national origin.

(3) Not later than April 15 in the first session of a Congress, after consultation with the Speaker, the Majority Leader, and the Minority Leader, the Committee on Oversight and Reform shall report to the House the oversight plans submitted under subparagraph (1) together with any recommendations that it, or the House leadership group described above, may make to ensure the most effective coordination of oversight plans and otherwise to achieve the objectives of this clause.

(e) The Speaker, with the approval of the House, may appoint special ad hoc oversight committees for the purpose of reviewing specific matters within the jurisdiction of two or more standing committees.

*Special oversight functions*

3. (a) The Committee on Appropriations shall conduct such studies and examinations of the organization and operation of executive departments and other executive agencies (including an agency the majority of the stock of which is owned by the United States) as it considers necessary to assist it in the determination of matters within its jurisdiction.

(b) The Committee on Armed Services shall review and study on a continuing basis laws, programs, and Government activities relating to international arms control and disarmament and the education of military dependents in schools.

(c) The Committee on the Budget shall study on a continuing basis the effect on budget outlays of relevant existing and proposed legislation and report the results of such studies to the House on a recurring basis.

(d) The Committee on Education and Labor shall review, study, and coordinate on a continuing basis laws, programs, and Government activities relating to domestic educational programs and institutions and programs of student assistance within the jurisdiction of other committees.

(e) The Committee on Energy and Commerce shall review and study on a continuing basis laws, programs, and Government activities relating to nuclear and other energy and nonmilitary nuclear energy research and development including the disposal of nuclear waste.

(f) The Committee on Foreign Affairs shall review and study on a continuing basis laws, programs, and Government activities relating to customs administration, intelligence activities relating to foreign policy, international financial and monetary organizations, and international fishing agreements.

(g)(1) The Committee on Homeland Security shall review and study on a continuing basis all Government activities relating to homeland security, including the interaction of all depart-

ments and agencies with the Department of Homeland Security.

(2) In addition, the committee shall review and study on a primary and continuing basis all Government activities, programs and organizations related to homeland security that fall within its primary legislative jurisdiction.

(h) The Committee on Natural Resources shall review and study on a continuing basis laws, programs, and Government activities relating to Native Americans.

(i) The Committee on Oversight and Reform shall review and study on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President.

(j) The Committee on Rules shall review and study on a continuing basis the congressional budget process, and the committee shall report its findings and recommendations to the House from time to time.

(k) The Committee on Science, Space, and Technology shall review and study on a continuing basis laws, programs, and Government activities relating to nonmilitary research and development.

(l) The Committee on Small Business shall study and investigate on a continuing basis the problems of all types of small business.

(m) The Permanent Select Committee on Intelligence shall review and study on a continuing basis laws, programs, and activities of the intelligence community and shall review and study on an exclusive basis the sources and methods of entities described in clause 11(b)(1)(A).

*Additional functions of committees*

4. (a)(1)(A) The Committee on Appropriations shall, within 30 days after the transmittal of the Budget to Congress each year, hold hearings on the Budget as a whole with particular reference to—

(i) the basic recommendations and budgetary policies of the President in the presentation of the Budget; and

(ii) the fiscal, financial, and economic assumptions used as bases in arriving at total estimated expenditures and receipts.

(B) In holding hearings under subdivision (A), the committee shall receive testimony from the Secretary of the Treasury, the Director of the Office of Management and Budget, the Chair of the Council of Economic Advisers, and such other persons as the committee may desire.

(C) A hearing under subdivision (A), or any part thereof, shall be held in open session, except when the committee, in open session and with a quorum present, determines by record vote that the testimony to be taken at that hearing on that day may be related to a matter of national security. The committee may by the same procedure close one subsequent day of hearing. A transcript of all such hearings

10

## HOUSE OF REPRESENTATIVES

shall be printed and a copy thereof furnished to each Member, Delegate, and the Resident Commissioner.

(D) A hearing under subdivision (A), or any part thereof, may be held before a joint meeting of the committee and the Committee on Appropriations of Senate in accordance with such procedures as the two committees jointly may determine.

(2) Pursuant to section 401(b)(2) of the Congressional Budget Act of 1974, when a committee reports a bill or joint resolution that provides new entitlement authority as defined in section 3(9) of that Act, and enactment of the bill or joint resolution, as reported, would cause a breach of the committee's pertinent allocation of new budget authority under section 302(a) of that Act, the bill or joint resolution may be referred to the Committee on Appropriations with instructions to report it with recommendations (which may include an amendment limiting the total amount of new entitlement authority provided in the bill or joint resolution). If the Committee on Appropriations fails to report a bill or joint resolution so referred within 15 calendar days (not counting any day on which the House is not in session), the committee automatically shall be discharged from consideration of the bill or joint resolution, and the bill or joint resolution shall be placed on the appropriate calendar.

(3) In addition, the Committee on Appropriations shall study on a continuing basis those provisions of law that (on the first day of the first fiscal year for which the congressional budget process is effective) provide spending authority or permanent budget authority and shall report to the House from time to time its recommendations for terminating or modifying such provisions.

(4) In the manner provided by section 302 of the Congressional Budget Act of 1974, the Committee on Appropriations (after consulting with the Committee on Appropriations of the Senate) shall subdivide any allocations made to it in the joint explanatory statement accompanying the conference report on such concurrent resolution, and promptly report the subdivisions to the House as soon as practicable after a concurrent resolution on the budget for a fiscal year is agreed to.

(b) The Committee on the Budget shall—

(1) review on a continuing basis the conduct by the Congressional Budget Office of its functions and duties;

(2) hold hearings and receive testimony from Members, Senators, Delegates, the Resident Commissioner, and such appropriate representatives of Federal departments and agencies, the general public, and national organizations as it considers desirable in developing concurrent resolutions on the budget for each fiscal year;

(3) make all reports required of it by the Congressional Budget Act of 1974;

(4) study on a continuing basis those provisions of law that exempt Federal agencies or any of their activities or outlays from inclusion in the Budget of the United States Government, and report to the House from time to time its recommendations for terminating or modifying such provisions;

(5) study on a continuing basis proposals designed to improve and facilitate the congressional budget process, and report to the House from time to time the results of such studies, together with its recommendations; and

(6) request and evaluate continuing studies of tax expenditures, devise methods of coordinating tax expenditures, policies, and programs with direct budget outlays, and report the results of such studies to the House on a recurring basis.

(c)(1) The Committee on Oversight and Reform shall—

(A) receive and examine reports of the Comptroller General of the United States and submit to the House such recommendations as it considers necessary or desirable in connection with the subject matter of the reports;

(B) evaluate the effects of laws enacted to reorganize the legislative and executive branches of the Government; and

(C) study intergovernmental relationships between the United States and the States and municipalities and between the United States and international organizations of which the United States is a member.

(2) In addition to its duties under subparagraph (1), the Committee on Oversight and Reform may at any time conduct investigations of any matter without regard to clause 1, 2, 3, or this clause conferring jurisdiction over the matter to another standing committee. The findings and recommendations of the committee in such an investigation shall be made available to any other standing committee having jurisdiction over the matter involved.

(3)(A) The Committee on Oversight and Reform may adopt a rule authorizing and regulating the taking of depositions by a member or counsel of the committee, including pursuant to subpoena under clause 2(m) of rule XI (which hereby is made applicable for such purpose).

(B) A rule adopted by the committee pursuant to this subparagraph—

(i) may provide that a deponent be directed to subscribe an oath or affirmation before a person authorized by law to administer the same; and

(ii) shall ensure that the minority members and staff of the committee are accorded equitable treatment with respect to notice of and a reasonable opportunity to participate in any proceeding conducted thereunder.

(C) Information secured pursuant to the authority described in subdivision (A) shall retain the character of discovery until offered for admission in evidence before the committee, at which time any proper objection shall be timely.

(d)(1) The Committee on House Administration shall—

(A) provide policy direction for the Chief Administrative Officer, the Inspector General, the Office of Diversity and Inclusion, and the Office of the Whistleblower Ombuds and oversight of the Clerk, Sergeant-at-Arms, Chief Administrative Officer, Inspector General, Office of Diversity and Inclusion, and Office of the Whistleblower Ombuds;

(B) oversee the management of services provided to the House by the Architect of the Capitol, except those services that lie within the jurisdiction of the Committee on Transportation and Infrastructure under clause 1(r);

(C) have the function of accepting on behalf of the House a gift, except as otherwise provided by law, if the gift does not involve a duty, burden, or condition, or is not made dependent on some future performance by the House;

(D) promulgate regulations to carry out subdivision (C); and

(E) establish and maintain standards for making documents publicly available in electronic form by the House and its committees.

(2) An employing office of the House may enter into a settlement of a complaint under the Congressional Accountability Act of 1995 that provides for the payment of funds only after receiving the joint approval of the chair and ranking minority member of the Committee on House Administration concerning the amount of such payment.

(e)(1) Each standing committee shall, in its consideration of all public bills and public joint resolutions within its jurisdiction, ensure that appropriations for continuing programs and activities of the Federal Government and the government of the District of Columbia will be made annually to the maximum extent feasible and consistent with the nature, requirement, and objective of the programs and activities involved. In this subparagraph programs and activities of the Federal Government and the government of the District of Columbia includes programs and activities of any department, agency, establishment, wholly owned Government corporation, or instrumentality of the Federal Government or of the government of the District of Columbia.

(2) Each standing committee shall review from time to time each continuing program within its jurisdiction for which appropriations are not made annually to ascertain whether the program should be modified to provide for annual appropriations.

### Budget Act responsibilities

(f)(1) Each standing committee shall submit to the Committee on the Budg-

Rule X, clause 4            RULES OF THE            Rule X, clause 6

et not later than six weeks after the submission of the budget by the President, or at such time as the Committee on the Budget may request—

(A) its views and estimates with respect to all matters to be set forth in the concurrent resolution on the budget for the ensuing fiscal year that are within its jurisdiction or functions; and

(B) an estimate of the total amounts of new budget authority, and budget outlays resulting therefrom, to be provided or authorized in all bills and resolutions within its jurisdiction that it intends to be effective during that fiscal year.

(2) The views and estimates submitted by the Committee on Ways and Means under subparagraph (1) shall include a specific recommendation, made after holding public hearings, as to the appropriate level of the public debt that should be set forth in the concurrent resolution on the budget.

*Election and membership of standing committees*

5. (a)(1) The standing committees specified in clause 1 shall be elected by the House within seven calendar days after the commencement of each Congress, from nominations submitted by the respective party caucus or conference. A resolution proposing to change the composition of a standing committee shall be privileged if offered by direction of the party caucus or conference concerned.

(2) The Committee on the Budget shall be composed of members as follows:

(A) Members, Delegates, or the Resident Commissioner who are members of other standing committees, including five from the Committee on Appropriations, five from the Committee on Ways and Means, and one from the Committee on Rules;

(B) one Member designated by the elected leadership of the majority party; and

(C) one Member designated by the elected leadership of the minority party.

(3)(A) The Committee on Ethics shall be composed of 10 members, five from the majority party and five from the minority party.

(B) Except as permitted by subdivision (C), a member of the Committee on Ethics may not serve on the committee during more than three Congresses in a period of five successive Congresses (disregarding for this purpose any service for less than a full session in a Congress).

(C) A member of the Committee on Ethics may serve on the committee during a fourth or fifth Congress in a period of five successive Congresses only as either the chair or the ranking minority member of the committee.

(4)(A) At the beginning of a Congress, the Speaker or a designee and the Minority Leader or a designee each shall name 10 Members, Delegates, or the Resident Commissioner from the re-

spective party of such individual who are not members of the Committee on Ethics to be available to serve on investigative subcommittees of that committee during that Congress. The lists of Members, Delegates, or the Resident Commissioner so named shall be announced to the House.

(B) Whenever the chair and the ranking minority member of the Committee on Ethics jointly determine that Members, Delegates, or the Resident Commissioner named under subdivision (A) should be assigned to serve on an investigative subcommittee of that committee, each of them shall select an equal number of such Members, Delegates, or Resident Commissioner from the respective party of such individual to serve on that subcommittee.

(b)(1) Membership on a standing committee during the course of a Congress shall be contingent on continuing membership in the party caucus or conference that nominated the Member, Delegate, or Resident Commissioner concerned for election to such committee. Should a Member, Delegate, or Resident Commissioner cease to be a member of a particular party caucus or conference, that Member, Delegate, or Resident Commissioner shall automatically cease to be a member of each standing committee to which elected on the basis of nomination by that caucus or conference. The chair of the relevant party caucus or conference shall notify the Speaker whenever a Member, Delegate, or Resident Commissioner ceases to be a member of that caucus or conference. The Speaker shall notify the chair of each affected committee that the election of such Member, Delegate, or Resident Commissioner to the committee is automatically vacated under this subparagraph.

(2)(A) Except as specified in subdivision (B), a Member, Delegate, or Resident Commissioner may not serve simultaneously as a member of more than two standing committees or more than four subcommittees of the standing committees.

(B)(i) Ex officio service by a chair or ranking minority member of a committee on each of its subcommittees under a committee rule does not count against the limitation on subcommittee service.

(ii) Service on an investigative subcommittee of the Committee on Ethics under paragraph (a)(4) does not count against the limitation on subcommittee service.

(iii) Any other exception to the limitations in subdivision (A) may be approved by the House on the recommendation of the relevant party caucus or conference.

(C) In this subparagraph the term "subcommittee" includes a panel (other than a special oversight panel of the Committee on Armed Services), task force, special subcommittee, or other subunit of a standing committee that is established for a cumulative pe-

riod longer than six months in a Congress.

(c) One of the members of each standing committee shall be elected by the House, on the nomination of the majority party caucus or conference, as chair thereof. In the absence of the member serving as chair, the member next in rank (and so on, as often as the case shall happen) shall act as chair. Rank shall be determined by the order members are named in resolutions electing them to the committee. In the case of a vacancy in the elected chair of a committee, the House shall elect another chair.

(d)(1) Except as permitted by subparagraph (2), a committee may have not more than five subcommittees.

(2)(A) A committee that maintains a subcommittee on oversight may have not more than six subcommittees.

(B) The Committee on Appropriations may have not more than 13 subcommittees.

(C) The Committee on Armed Services may have not more than seven subcommittees.

(D) The Committee on Foreign Affairs may have not more than seven subcommittees.

(E) The Committee on Oversight and Reform may have not more than seven subcommittees.

(F) The Committee on Transportation and Infrastructure may have not more than six subcommittees.

(e) The House shall fill a vacancy on a standing committee by election on the nomination of the respective party caucus or conference.

*Expense resolutions*

6. (a) Whenever a committee, commission, or other entity (other than the Committee on Appropriations) is granted authorization for the payment of its expenses (including staff salaries) for a Congress, such authorization initially shall be procured by one primary expense resolution reported by the Committee on House Administration. A primary expense resolution may include a reserve fund for unanticipated expenses of committees. An amount from such a reserve fund may be allocated to a committee only by the approval of the Committee on House Administration. A primary expense resolution reported to the House may not be considered in the House unless a report thereon was available on the previous calendar day. For the information of the House, such report shall—

(1) state the total amount of the funds to be provided to the committee, commission, or other entity under the primary expense resolution for all anticipated activities and programs of the committee, commission, or other entity; and

(2) to the extent practicable, contain such general statements regarding the estimated foreseeable expenditures for the respective anticipated activities and programs of the committee, commission, or other entity as may be appropriate to provide the

# HOUSE OF REPRESENTATIVES

House with basic estimates of the expenditures contemplated by the primary expense resolution.

(b) After the date of adoption by the House of a primary expense resolution for a committee, commission, or other entity for a Congress, authorization for the payment of additional expenses (including staff salaries) in that Congress may be procured by one or more supplemental expense resolutions reported by the Committee on House Administration, as necessary. A supplemental expense resolution reported to the House may not be considered in the House unless a report thereon was available on the previous calendar day. For the information of the House, such report shall—

(1) state the total amount of additional funds to be provided to the committee, commission, or other entity under the supplemental expense resolution and the purposes for which those additional funds are available; and

(2) state the reasons for the failure to procure the additional funds for the committee, commission, or other entity by means of the primary expense resolution.

(c) The preceding provisions of this clause do not apply to—

(1) a resolution providing for the payment from committee salary and expense accounts of the House of sums necessary to pay compensation for staff services performed for, or to pay other expenses of, a committee, commission, or other entity at any time after the beginning of an odd-numbered year and before the date of adoption by the House of the primary expense resolution described in paragraph (a) for that year; or

(2) a resolution providing each of the standing committees in a Congress additional office equipment, airmail and special-delivery postage stamps, supplies, staff personnel, or any other specific item for the operation of the standing committees, and containing an authorization for the payment from committee salary and expense accounts of the House of the expenses of any of the foregoing items provided by that resolution, subject to and until enactment of the provisions of the resolution as permanent law.

(d) From the funds made available for the appointment of committee staff by a primary or additional expense resolution, the chair of each committee shall ensure that sufficient staff is made available to each subcommittee to carry out its responsibilities under the rules of the committee and that the minority party is treated fairly in the appointment of such staff.

(e) Funds authorized for a committee under this clause and clauses 7 and 8 are for expenses incurred in the activities of the committee.

## Interim funding

7. (a) For the period beginning at noon on January 3 and ending at mid-night on March 31 in each odd-numbered year, such sums as may be necessary shall be paid out of the committee salary and expense accounts of the House for continuance of necessary investigations and studies by—

(1) each standing and select committee established by these rules; and

(2) except as specified in paragraph (b), each select committee established by resolution.

(b) In the case of the first session of a Congress, amounts shall be made available for a select committee established by resolution in the preceding Congress only if—

(1) a resolution proposing to reestablish such select committee is introduced in the present Congress; and

(2) the House has not adopted a resolution of the preceding Congress providing for termination of funding for investigations and studies by such select committee.

(c) Each committee described in paragraph (a) shall be entitled for each month during the period specified in paragraph (a) to 9 percent (or such lesser percentage as may be determined by the Committee on House Administration) of the total annualized amount made available under expense resolutions for such committee in the preceding session of Congress.

(d) Payments under this clause shall be made on vouchers authorized by the committee involved, signed by the chair of the committee, except as provided in paragraph (e), and approved by the Committee on House Administration.

(e) Notwithstanding any provision of law, rule of the House, or other authority, from noon on January 3 of the first session of a Congress until the election by the House of the committee concerned in that Congress, payments under this clause shall be made on vouchers signed by the ranking member of the committee as it was constituted at the expiration of the preceding Congress who is a member of the majority party in the present Congress.

(f)(1) The authority of a committee to incur expenses under this clause shall expire upon adoption by the House of a primary expense resolution for the committee.

(2) Amounts made available under this clause shall be expended in accordance with regulations prescribed by the Committee on House Administration.

(3) This clause shall be effective only insofar as it is not inconsistent with a resolution reported by the Committee on House Administration and adopted by the House after the adoption of these rules.

## Travel

8. (a) Local currencies owned by the United States shall be made available to the committee and its employees engaged in carrying out their official duties outside the United States or its territories or possessions. Appropriated funds, including those authorized under this clause and clause 6, may not be expended for the purpose of defraying expenses of members of a committee or its employees in a country where local currencies are available for this purpose.

(b) The following conditions shall apply with respect to travel outside the United States or its territories or possessions:

(1) A member or employee of a committee may not receive or expend local currencies for subsistence in a country for a day at a rate in excess of the maximum per diem set forth in applicable Federal law.

(2) A member or employee shall be reimbursed for the expenses of such individual for a day at the lesser of—

(A) the per diem set forth in applicable Federal law; or

(B) the actual, unreimbursed expenses (other than for transportation) incurred during that day.

(3) Each member or employee of a committee shall make to the chair of the committee an itemized report showing the dates each country was visited, the amount of per diem furnished, the cost of transportation furnished, and funds expended for any other official purpose and shall summarize in these categories the total foreign currencies or appropriated funds expended. Each report shall be filed with the chair of the committee not later than 60 days following the completion of travel for use in complying with reporting requirements in applicable Federal law and shall be open for public inspection.

(c)(1) In carrying out the activities of a committee outside the United States in a country where local currencies are unavailable, a member or employee of a committee may not receive reimbursement for expenses (other than for transportation) in excess of the maximum per diem set forth in applicable Federal law.

(2) A member or employee shall be reimbursed for the expenses of such individual for a day, at the lesser of—

(A) the per diem set forth in applicable Federal law; or

(B) the actual unreimbursed expenses (other than for transportation) incurred during that day.

(3) A member or employee of a committee may not receive reimbursement for the cost of any transportation in connection with travel outside the United States unless the member or employee actually paid for the transportation.

(d) The restrictions respecting travel outside the United States set forth in paragraph (c) also shall apply to travel outside the United States by a Member, Delegate, Resident Commissioner, officer, or employee of the House authorized under any standing rule.

## Committee staffs

9. (a)(1) Subject to subparagraph (2) and paragraph (f), each standing committee may appoint, by majority vote,

not more than 30 professional staff members to be compensated from the funds provided for the appointment of committee staff by primary and additional expense resolutions. Each professional staff member appointed under this subparagraph shall be assigned to the chair and the ranking minority member of the committee, as the committee considers advisable.

(2) Subject to paragraph (f) whenever a majority of the minority party members of a standing committee (other than the Committee on Ethics or the Permanent Select Committee on Intelligence) so request, not more than 10 persons (or one-third of the total professional committee staff appointed under this clause, whichever is fewer) may be selected, by majority vote of the minority party members, for appointment by the committee as professional staff members under subparagraph (1). The committee shall appoint persons so selected whose character and qualifications are acceptable to a majority of the committee. If the committee determines that the character and qualifications of a person so selected are unacceptable, a majority of the minority party members may select another person for appointment by the committee to the professional staff until such appointment is made. Each professional staff member appointed under this subparagraph shall be assigned to such committee business as the minority party members of the committee consider advisable.

(b)(1) The professional staff members of each standing committee—

(A) may not engage in any work other than committee business during congressional working hours; and

(B) may not be assigned a duty other than one pertaining to committee business.

(2)(A) Subparagraph (1) does not apply to staff designated by a committee as "associate" or "shared" staff who are not paid exclusively by the committee, provided that the chair certifies that the compensation paid by the committee for any such staff is commensurate with the work performed for the committee in accordance with clause 8 of rule XXIII.

(B) The use of any "associate" or "shared" staff by a committee other than the Committee on Appropriations shall be subject to the review of, and to any terms, conditions, or limitations established by, the Committee on House Administration in connection with the reporting of any primary or additional expense resolution.

(c) Each employee on the professional or investigative staff of a standing committee shall be entitled to pay at a single gross per annum rate, to be fixed by the chair and that does not exceed the maximum rate of pay as in effect from time to time under applicable provisions of law.

(d) Subject to appropriations hereby authorized, the Committee on Appropriations may appoint by majority vote such staff as it determines to be

necessary (in addition to the clerk of the committee and assistants for the minority). The staff appointed under this paragraph, other than minority assistants, shall possess such qualifications as the committee may prescribe.

(e) A committee may not appoint to its staff an expert or other personnel detailed or assigned from a department or agency of the Government except with the written permission of the Committee on House Administration.

(f) If a request for the appointment of a minority professional staff member under paragraph (a) is made when no vacancy exists for such an appointment, the committee nevertheless may appoint under paragraph (a) a person selected by the minority and acceptable to the committee. A person so appointed shall serve as an additional member of the professional staff of the committee until such a vacancy occurs (other than a vacancy in the position of head of the professional staff, by whatever title designated), at which time that person is considered as appointed to that vacancy. Such a person shall be paid from the applicable accounts of the House described in clause 1(k)(1) of rule X. If such a vacancy occurs on the professional staff when seven or more persons have been so appointed who are eligible to fill that vacancy, a majority of the minority party members shall designate which of those persons shall fill the vacancy.

(g) Each staff member appointed pursuant to a request by minority party members under paragraph (a), and each staff member appointed to assist minority members of a committee pursuant to an expense resolution described in clause 6(a), shall be accorded equitable treatment with respect to the fixing of the rate of pay, the assignment of work facilities, and the accessibility of committee records.

(h) Paragraph (a) may not be construed to authorize the appointment of additional professional staff members of a committee pursuant to a request under paragraph (a) by the minority party members of that committee if 10 or more professional staff members provided for in paragraph (a)(1) who are satisfactory to a majority of the minority party members are otherwise assigned to assist the minority party members.

(i) Notwithstanding paragraph (a)(2), a committee may employ nonpartisan staff, in lieu of or in addition to committee staff designated exclusively for the majority or minority party, by an affirmative vote of a majority of the members of the majority party and of a majority of the members of the minority party.

### Select and joint committees

10. (a) Membership on a select or joint committee appointed by the Speaker under clause 11 of rule I during the course of a Congress shall be contingent on continuing membership in the party caucus or conference of which the Member, Delegate, or Resi-

dent Commissioner concerned was a member at the time of appointment. Should a Member, Delegate, or Resident Commissioner cease to be a member of that caucus or conference, that Member, Delegate, or Resident Commissioner shall automatically cease to be a member of any select or joint committee to which assigned. The chair of the relevant party caucus or conference shall notify the Speaker whenever a Member, Delegate, or Resident Commissioner ceases to be a member of a party caucus or conference. The Speaker shall notify the chair of each affected select or joint committee that the appointment of such Member, Delegate, or Resident Commissioner to the select or joint committee is automatically vacated under this paragraph.

(b) Each select or joint committee, other than a conference committee, shall comply with clause 2(a) of rule XI unless specifically exempted by law.

### Permanent Select Committee on Intelligence

11. (a)(1) There is established a Permanent Select Committee on Intelligence (hereafter in this clause referred to as the "select committee"). The select committee shall be composed of not more than 22 Members, Delegates, or the Resident Commissioner, of whom not more than 13 may be from the same party. The select committee shall include at least one Member, Delegate, or the Resident Commissioner from each of the following committees:

(A) the Committee on Appropriations;

(B) the Committee on Armed Services;

(C) the Committee on Foreign Affairs; and

(D) the Committee on the Judiciary.

(2) The Speaker and the Minority Leader shall be ex officio members of the select committee but shall have no vote in the select committee and may not be counted for purposes of determining a quorum thereof.

(3) The Speaker and Minority Leader each may designate a respective lead-ership staff member to assist in the capacity of the Speaker or Minority Leader as ex officio member, with the same access to committee meetings, hearings, briefings, and materials as employees of the select committee and subject to the same security clearance and confidentiality requirements as employees of the select committee under this clause.

(4)(A) Except as permitted by subdivision (B), a Member, Delegate, or Resident Commissioner, other than the Speaker or the Minority Leader, may not serve as a member of the select committee during more than four Congresses in a period of six successive Congresses (disregarding for this purpose any service for less than a full session in a Congress).

# HOUSE OF REPRESENTATIVES

(B) In the case of a Member, Delegate, or Resident Commissioner appointed to serve as the chair or the ranking minority member of the select committee, tenure on the select committee shall not be limited.

(b)(1) There shall be referred to the select committee proposed legislation, messages, petitions, memorials, and other matters relating to the following:

(A) The Central Intelligence Agency, the Director of National Intelligence, and the National Intelligence Program as defined in section 3(6) of the National Security Act of 1947.

(B) Intelligence and intelligence-related activities of all other departments and agencies of the Government, including the tactical intelligence and intelligence-related activities of the Department of Defense.

(C) The organization or reorganization of a department or agency of the Government to the extent that the organization or reorganization relates to a function or activity involving intelligence or intelligence-related activities.

(D) Authorizations for appropriations, both direct and indirect, for the following:

(i) The Central Intelligence Agency, the Director of National Intelligence, and the National Intelligence Program as defined in section 3(6) of the National Security Act of 1947.

(ii) Intelligence and intelligence-related activities of all other departments and agencies of the Government, including the tactical intelligence and intelligence-related activities of the Department of Defense.

(iii) A department, agency, subdivision, or program that is a successor to an agency or program named or referred to in (i) or (ii).

(2) Proposed legislation initially reported by the select committee (other than provisions solely involving matters specified in subparagraph (1)(A) or subparagraph (1)(D)(i)) containing any matter otherwise within the jurisdiction of a standing committee shall be referred by the Speaker to that standing committee. Proposed legislation initially reported by another committee that contains matter within the jurisdiction of the select committee shall be referred by the Speaker to the select committee if requested by the chair of the select committee.

(3) Nothing in this clause shall be construed as prohibiting or otherwise restricting the authority of any other committee to study and review an intelligence or intelligence-related activity to the extent that such activity directly affects a matter otherwise within the jurisdiction of that committee.

(4) Nothing in this clause shall be construed as amending, limiting, or otherwise changing the authority of a standing committee to obtain full and

prompt access to the product of the intelligence and intelligence-related activities of a department or agency of the Government relevant to a matter otherwise within the jurisdiction of that committee.

(c)(1) For purposes of accountability to the House, the select committee shall make regular and periodic reports to the House on the nature and extent of the intelligence and intelligence-related activities of the various departments and agencies of the United States. The select committee shall promptly call to the attention of the House, or to any other appropriate committee, a matter requiring the attention of the House or another committee. In making such report, the select committee shall proceed in a manner consistent with paragraph (g) to protect national security.

(2) The select committee shall obtain annual reports from the Director of National Intelligence, the Director of the Central Intelligence Agency, the Secretary of Defense, the Secretary of State, and the Director of the Federal Bureau of Investigation. Such reports shall review the intelligence and intelligence-related activities of the agency or department concerned and the intelligence and intelligence-related activities of foreign countries directed at the United States or its interests. An unclassified version of each report may be made available to the public at the discretion of the select committee. Nothing herein shall be construed as requiring the public disclosure in such reports of the names of persons engaged in intelligence or intelligence-related activities for the United States or the divulging of intelligence methods employed or the sources of information on which the reports are based or the amount of funds authorized to be appropriated for intelligence and intelligence-related activities.

(3) Within six weeks after the President submits a budget under section 1105(a) of title 31, United States Code, or at such time as the Committee on the Budget may request, the select committee shall submit to the Committee on the Budget the views and estimates described in section 301(d) of the Congressional Budget Act of 1974 regarding matters within the jurisdiction of the select committee.

(d)(1) Except as specified in subparagraph (2), clauses 8(a), (b), and (c) and 9(a), (b), and (c) of this rule, and clauses 1, 2, and 4 of rule XI shall apply to the select committee to the extent not inconsistent with this clause.

(2) Notwithstanding the requirements of the first sentence of clause 2(g)(2) of rule XI, in the presence of the number of members required under the rules of the select committee for the purpose of taking testimony or receiving evidence, the select committee may vote to close a hearing whenever a majority of those present determines that the testimony or evidence would endanger the national security.

(e) An employee of the select committee, or a person engaged by contract or otherwise to perform services for or at the request of the select committee, may not be given access to any classified information by the select committee unless such employee or person has—

(1) agreed in writing and under oath to be bound by the Rules of the House, including the jurisdiction of the Committee on Ethics and of the select committee concerning the security of classified information during and after the period of the employment or contractual agreement of such employee or person with the select committee; and

(2) received an appropriate security clearance, as determined by the select committee in consultation with the Director of National Intelligence, that is commensurate with the sensitivity of the classified information to which such employee or person will be given access by the select committee.

(f) The select committee shall formulate and carry out such rules and procedures as it considers necessary to prevent the disclosure, without the consent of each person concerned, of information in the possession of the select committee that unduly infringes on the privacy or that violates the constitutional rights of such person. Nothing herein shall be construed to prevent the select committee from publicly disclosing classified information in a case in which it determines that national interest in the disclosure of classified information clearly outweighs any infringement on the privacy of a person.

(g)(1) The select committee may disclose publicly any information in its possession after a determination by the select committee that the public interest would be served by such disclosure. With respect to the disclosure of information for which this paragraph requires action by the select committee—

(A) the select committee shall meet to vote on the matter within five days after a member of the select committee requests a vote; and

(B) a member of the select committee may not make such a disclosure before a vote by the select committee on the matter, or after a vote by the select committee on the matter except in accordance with this paragraph.

(2)(A) In a case in which the select committee votes to disclose publicly any information that has been classified under established security procedures, that has been submitted to it by the executive branch, and that the executive branch requests be kept secret, the select committee shall notify the President of such vote.

(B) The select committee may disclose publicly such information after the expiration of a five-day period following the day on which notice of the vote to disclose is transmitted to the

# RULES OF THE

President unless, before the expiration of the five-day period, the President, personally in writing, notifies the select committee that the President objects to the disclosure of such information, provides reasons therefor, and certifies that the threat to the national interest of the United States posed by the disclosure is of such gravity that it outweighs any public interest in the disclosure.

(C) If the President, personally in writing, notifies the select committee of objections to the disclosure of information as provided in subdivision (B), the select committee may, by majority vote, refer the question of the disclosure of such information, with a recommendation thereon, to the House. The select committee may not publicly disclose such information without leave of the House.

(D) Whenever the select committee votes to refer the question of disclosure of any information to the House under subdivision (C), the chair shall, not later than the first day on which the House is in session following the day on which the vote occurs, report the matter to the House for its consideration.

(E) If the chair of the select committee does not offer in the House a motion to consider in closed session a matter reported under subdivision (D) within four calendar days on which the House is in session after the recommendation described in subdivision (C) is reported, then such a motion shall be privileged when offered by a Member, Delegate, or Resident Commissioner. In either case such a motion shall be decided without debate or intervening motion except one that the House adjourn.

(F) Upon adoption by the House of a motion to resolve into closed session as described in subdivision (E), the Speaker may declare a recess subject to the call of the Chair. At the expiration of the recess, the pending question, in closed session, shall be, ''Shall the House approve the recommendation of the select committee?''.

(G) Debate on the question described in subdivision (F) shall be limited to two hours equally divided and controlled by the chair and ranking minority member of the select committee. After such debate the previous question shall be considered as ordered on the question of approving the recommendation without intervening motion except one motion that the House adjourn. The House shall vote on the question in open session but without divulging the information with respect to which the vote is taken. If the recommendation of the select committee is not approved, then the question is considered as recommitted to the select committee for further recommendation.

(3)(A) Information in the possession of the select committee relating to the lawful intelligence or intelligence-related activities of a department or agency of the United States that has

been classified under established security procedures, and that the select committee has determined should not be disclosed under subparagraph (1) or (2), may not be made available to any person by a Member, Delegate, Resident Commissioner, officer, or employee of the House except as provided in subdivision (B).

(B) The select committee shall, under such regulations as it may prescribe, make information described in subdivision (A) available to a committee or a Member, Delegate, or Resident Commissioner, and permit a Member, Delegate, or Resident Commissioner to attend a hearing of the select committee that is closed to the public. Whenever the select committee makes such information available, it shall keep a written record showing, in the case of particular information, which committee or which Member, Delegate, or Resident Commissioner received the information. A Member, Delegate, or Resident Commissioner who, and a committee that, receives information under this subdivision may not disclose the information except in a closed session of the House.

(4) The Committee on Ethics shall investigate any unauthorized disclosure of intelligence or intelligence-related information by a Member, Delegate, Resident Commissioner, officer, or employee of the House in violation of subparagraph (3) and report to the House concerning any allegation that it finds to be substantiated.

(5) Upon the request of a person who is subject to an investigation described in subparagraph (4), the Committee on Ethics shall release to such person at the conclusion of its investigation a summary of its investigation, together with its findings. If, at the conclusion of its investigation, the Committee on Ethics determines that there has been a significant breach of confidentiality or unauthorized disclosure by a Member, Delegate, Resident Commissioner, officer, or employee of the House, it shall report its findings to the House and recommend appropriate action. Recommendations may include censure, removal from committee membership, or expulsion from the House, in the case of a Member, or removal from office or employment or punishment for contempt, in the case of an officer or employee.

(h) The select committee may permit a personal representative of the President, designated by the President to serve as a liaison to the select committee, to attend any closed meeting of the select committee.

(i) Subject to the Rules of the House, funds may not be appropriated for a fiscal year, with the exception of a bill or joint resolution continuing appropriations, or an amendment thereto, or a conference report thereon, to, or for use of, a department or agency of the United States to carry out any of the following activities, unless the funds shall previously have been authorized by a bill or joint resolution passed by

the House during the same or preceding fiscal year to carry out such activity for such fiscal year:

(1) The activities of the Director of National Intelligence and the Office of the Director of National Intelligence.

(2) The activities of the Central Intelligence Agency.

(3) The activities of the Defense Intelligence Agency.

(4) The activities of the National Security Agency.

(5) The intelligence and intelligence-related activities of other agencies and subdivisions of the Department of Defense.

(6) The intelligence and intelligence-related activities of the Department of State.

(7) The intelligence and intelligence-related activities of the Federal Bureau of Investigation.

(8) The intelligence and intelligence-related activities of all other departments and agencies of the executive branch.

(j)(1) In this clause the term ''intelligence and intelligence-related activities'' includes—

(A) the collection, analysis, production, dissemination, or use of information that relates to a foreign country, or a government, political group, party, military force, movement, or other association in a foreign country, and that relates to the defense, foreign policy, national security, or related policies of the United States and other activity in support of the collection, analysis, production, dissemination, or use of such information;

(B) activities taken to counter similar activities directed against the United States;

(C) covert or clandestine activities affecting the relations of the United States with a foreign government, political group, party, military force, movement, or other association;

(D) the collection, analysis, production, dissemination, or use of information about activities of persons within the United States, its territories and possessions, or nationals of the United States abroad whose political and related activities pose, or may be considered by a department, agency, bureau, office, division, instrumentality, or employee of the United States to pose, a threat to the internal security of the United States; and

(E) covert or clandestine activities directed against persons described in subdivision (D).

(2) In this clause the term ''department or agency'' includes any organization, committee, council, establishment, or office within the Federal Government.

(3) For purposes of this clause, reference to a department, agency, bureau, or subdivision shall include a reference to any successor department, agency, bureau, or subdivision to the extent that a successor engages in in-

# HOUSE OF REPRESENTATIVES

telligence or intelligence-related activities now controlled by the department, agency, bureau, or subdivision referred to in this clause.

(k) Clause 12(a) of rule XXII does not apply to meetings of a conference committee respecting legislation (or any part thereof) reported by the Permanent Select Committee on Intelligence.

## RULE XI

### Procedures of Committees and Unfinished Business

#### In general

1. (a)(1)(A) The Rules of the House are the rules of its committees and subcommittees so far as applicable.

(B) Each subcommittee is a part of its committee and is subject to the authority and direction of that committee and to its rules, so far as applicable.

(2)(A) In a committee or subcommittee—

(i) a motion to recess from day to day, or to recess subject to the call of the Chair (within 24 hours), shall be privileged; and

(ii) a motion to dispense with the first reading (in full) of a bill or resolution shall be privileged if printed copies are available.

(B) A motion accorded privilege under this subparagraph shall be decided without debate.

(b)(1) Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X. Subject to the adoption of expense resolutions as required by clause 6 of rule X, each committee may incur expenses, including travel expenses, in connection with such investigations and studies.

(2) A proposed investigative or oversight report shall be considered as read in committee if it has been available to the members for at least 24 hours (excluding Saturdays, Sundays, or legal holidays except when the House is in session on such a day).

(3) A report of an investigation or study conducted jointly by more than one committee may be filed jointly, provided that each of the committees complies independently with all requirements for approval and filing of the report.

(4) After an adjournment sine die of the last regular session of a Congress, an investigative or oversight report may be filed with the Clerk at any time, provided that a member who gives timely notice of intention to file supplemental, minority, additional, or dissenting views shall be entitled to not less than seven calendar days in which to submit such views for inclusion in the report.

(c) Each committee may have printed and bound such testimony and other data as may be presented at hearings held by the committee or its subcommittees. All costs of stenographic services and transcripts in connection with a meeting or hearing of a committee shall be paid from the applica-

ble accounts of the House described in clause 1(k)(1) of rule X.

(d)(1) Not later than January 2 of each odd-numbered year, a committee shall submit to the House a report on the activities of that committee.

(2) Such report shall include—

(A) separate sections summarizing the legislative and oversight activities of that committee under this rule and rule X during the Congress;

(B) a summary of the oversight plans submitted by the committee under clause 2(d) of rule X;

(C) a summary of the actions taken and recommendations made with respect to the oversight plans specified in subdivision (B);

(D) a summary of any additional oversight activities undertaken by that committee and any recommendations made or actions taken thereon; and

(E) a delineation of any hearings held pursuant to clauses 2(n), (o), or (p) of this rule.

(3) After an adjournment sine die of the last regular session of a Congress, or after December 15 of an even-numbered year, whichever occurs first, the chair of a committee may file the report described in subparagraph (1) with the Clerk at any time and without approval of the committee, provided that—

(A) a copy of the report has been available to each member of the committee for at least seven calendar days; and

(B) the report includes any supplemental, minority, additional, or dissenting views submitted by a member of the committee.

#### Adoption of written rules

2. (a)(1) Each standing committee shall adopt written rules governing its procedure. Such rules—

(A) shall be adopted in a meeting that is open to the public unless the committee, in open session and with a quorum present, determines by record vote that all or part of the meeting on that day shall be closed to the public;

(B) may not be inconsistent with the Rules of the House or with those provisions of law having the force and effect of Rules of the House;

(C) shall in any event incorporate all of the succeeding provisions of this clause to the extent applicable; and

(D) shall include provisions to govern the implementation of clause 4 as provided in paragraph (f) of such clause.

(2) Each committee shall make its rules publicly available in electronic form and submit such rules for publication in the Congressional Record not later than 60 days after the chair of the committee is elected in each odd-numbered year.

(3) A committee may adopt a rule providing that the chair be directed to offer a motion under clause 1 of rule

XXII whenever the chair considers it appropriate.

#### Regular meeting days

(b) Each standing committee shall establish regular meeting days for the conduct of its business, which shall be not less frequent than monthly. Each such committee shall meet for the consideration of a bill or resolution pending before the committee or the transaction of other committee business on all regular meeting days fixed by the committee if notice is given pursuant to paragraph (g)(3).

#### Additional and special meetings

(c)(1) The chair of each standing committee may call and convene, as the chair considers necessary, additional and special meetings of the committee for the consideration of a bill or resolution pending before the committee or for the conduct of other committee business, subject to such rules as the committee may adopt. The committee shall meet for such purpose under that call of the chair.

(2) Three or more members of a standing committee may file in the offices of the committee a written request that the chair call a special meeting of the committee. Such request shall specify the measure or matter to be considered. Immediately upon the filing of the request, the clerk of the committee shall notify the chair of the filing of the request. If the chair does not call the requested special meeting within three calendar days after the filing of the request (to be held within seven calendar days after the filing of the request) a majority of the members of the committee may file in the offices of the committee their written notice that a special meeting of the committee will be held. The written notice shall specify the date and hour of the special meeting and the measure or matter to be considered. The committee shall meet on that date and hour. Immediately upon the filing of the notice, the clerk of the committee shall notify all members of the committee that such special meeting will be held and inform them of its date and hour and the measure or matter to be considered. Such notice shall also be made publicly available in electronic form and shall be deemed to satisfy paragraph (g)(3)(A)(ii). Only the measure or matter specified in that notice may be considered at that special meeting.

#### Temporary absence of chair

(d) A member of the majority party on each standing committee or subcommittee thereof shall be designated by the chair of the full committee as the vice chair of the committee or subcommittee, as the case may be, and shall preside during the absence of the chair from any meeting. If the chair and vice chair of a committee or subcommittee are not present at any meeting of the committee or subcommittee, the ranking majority mem-

## RULES OF THE

ber who is present shall preside at that meeting.

### Committee records

(e)(1)(A) Each committee shall keep a complete record of all committee action which shall include—

(i) in the case of a meeting or hearing transcript, a substantially verbatim account of remarks actually made during the proceedings, subject only to technical, grammatical, and typographical corrections authorized by the person making the remarks involved; and

(ii) a record of the votes on any question on which a record vote is taken.

(B)(i) Except as provided in item (ii) and subject to paragraph (k)(7), the result of each such record vote shall be made publicly available in electronic form within 48 hours of such record vote. Information so available shall include a description of the amendment, motion, order, or other proposition, the name of each member voting for and each member voting against such amendment, motion, order, or proposition, and the names of those members of the committee present but not voting.

(ii) The result of any record vote taken in executive session in the Committee on Ethics may not be made publicly available without an affirmative vote of a majority of the members of the committee.

(2)(A) Except as provided in subdivision (B), all committee records (including hearings, data, charts, and files) shall be kept separate and distinct from the congressional office records of the member serving as its chair. Such records shall be the property of the House, and each Member, Delegate, and the Resident Commissioner shall have access thereto.

(B) A Member, Delegate, or Resident Commissioner, other than members of the Committee on Ethics, may not have access to the records of that committee respecting the conduct of a Member, Delegate, Resident Commissioner, officer, or employee of the House without the specific prior permission of that committee.

(3) Each committee shall include in its rules standards for availability of records of the committee delivered to the Archivist of the United States under rule VII. Such standards shall specify procedures for orders of the committee under clause 3(b)(3) and clause 4(b) of rule VII, including a requirement that nonavailability of a record for a period longer than the period otherwise applicable under that rule shall be approved by vote of the committee.

(4) Each committee shall make its publications available in electronic form to the maximum extent feasible.

(5) To the maximum extent practicable, each committee shall—

(A) provide audio and video coverage of each meeting or meeting for the transaction of business in a man-

ner that allows the public to easily listen to and view the proceedings; and

(B) maintain the recordings of such coverage in a manner that is easily accessible to the public.

(6) Not later than 24 hours after the adoption of any amendment, or 48 hours after the disposition or withdrawal of any other amendment, to a measure or matter considered by a committee, the chair of such committee shall cause the text of each such amendment to be made publicly available in electronic form.

### Prohibition against proxy voting

(f) A vote by a member of a committee or subcommittee with respect to any measure or matter may not be cast by proxy.

### Open meetings and hearings

(g)(1) Each meeting for the transaction of business, including the markup of legislation, by a standing committee or subcommittee thereof (other than the Committee on Ethics or its subcommittees) shall be open to the public, including to radio, television, and still photography coverage, except when the committee or subcommittee, in open session and with a majority present, determines by record vote that all or part of the remainder of the meeting on that day shall be in executive session because disclosure of matters to be considered would endanger national security, would compromise sensitive law enforcement information, would tend to defame, degrade, or incriminate any person, or otherwise would violate a law or rule of the House. Persons, other than members of the committee and such noncommittee Members, Delegates, Resident Commissioner, congressional staff, or departmental representatives as the committee may authorize, may not be present at a business or markup session that is held in executive session. This subparagraph does not apply to open committee hearings, which are governed by clause 4(a)(1) of rule X or by subparagraph (2).

(2)(A) Each hearing conducted by a committee or subcommittee (other than the Committee on Ethics or its subcommittees) shall be open to the public, including to radio, television, and still photography coverage, except when the committee or subcommittee, in open session and with a majority present, determines by record vote that all or part of the remainder of that hearing on that day shall be closed to the public because disclosure of testimony, evidence, or other matters to be considered would endanger national security, would compromise sensitive law enforcement information, or would violate a law or rule of the House.

(B) Notwithstanding the requirements of subdivision (A), in the presence of the number of members required under the rules of the committee for the purpose of taking testimony, a majority of those present may—

(i) agree to close the hearing for the sole purpose of discussing whether testimony or evidence to be received would endanger national security, would compromise sensitive law enforcement information, or would violate clause 2(k)(5); or

(ii) agree to close the hearing as provided in clause 2(k)(5).

(C) A Member, Delegate, or Resident Commissioner may not be excluded from nonparticipatory attendance at a hearing of a committee or subcommittee (other than the Committee on Ethics or its subcommittees) unless the House by majority vote authorizes a particular committee or subcommittee, for purposes of a particular series of hearings on a particular article of legislation or on a particular subject of investigation, to close its hearings to Members, Delegates, and the Resident Commissioner by the same procedures specified in this subparagraph for closing hearings to the public.

(D) The committee or subcommittee may vote by the same procedure described in this subparagraph to close one subsequent day of hearing, except that the Committee on Appropriations, the Committee on Armed Services, the Committee on Homeland Security, and the Permanent Select Committee on Intelligence, and the subcommittees thereof, may vote by the same procedure to close up to five additional, consecutive days of hearings.

(3)(A) The chair of a committee shall announce the date, place, and subject matter of—

(i) a committee hearing, which may not commence earlier than one week after such notice; or

(ii) a committee meeting, which may not commence earlier than the third calendar day (excluding Saturdays, Sundays, or legal holidays except when the House is in session on such a day) on which members have notice thereof.

(B) A hearing or meeting may begin sooner than specified in subdivision (A) in either of the following circumstances (in which case the chair shall make the announcement specified in subdivision (A) at the earliest possible time):

(i) the chair of the committee, with the concurrence of the ranking minority member, determines that there is good cause; or

(ii) the committee so determines by majority vote in the presence of the number of members required under the rules of the committee for the transaction of business.

(C) An announcement made under this subparagraph shall be published promptly in the Daily Digest and made publicly available in electronic form.

(D) This subparagraph and subparagraph (4) shall not apply to the Committee on Rules.

(4) At least 24 hours prior to the commencement of a meeting for the markup of legislation, or at the time of an announcement under subparagraph

Rule XI, clause 2

## HOUSE OF REPRESENTATIVES

Rule XI, clause 2

(3)(B) made within 24 hours before such meeting, the chair of the committee shall cause the text of such legislation to be made publicly available in electronic form.

(5)(A) Each committee shall, to the greatest extent practicable, require witnesses who appear before it to submit in advance written statements of proposed testimony and to limit their initial presentations to the committee to brief summaries thereof.

(B) In the case of a witness appearing in a non-governmental capacity, a written statement of proposed testimony shall include—

(i) a curriculum vitae;

(ii) a disclosure of any Federal grants or contracts, or contracts, grants, or payments originating with a foreign government, received during the past 36 months by the witness or by an entity represented by the witness and related to the subject matter of the hearing; and

(iii) a disclosure of whether the witness is a fiduciary (including, but not limited to, a director, officer, advisor, or resident agent) of any organization or entity that has an interest in the subject matter of the hearing.

(C) The disclosure referred to in subdivision (B)(ii) shall include—

(i) the amount and source of each Federal grant (or subgrant thereof) or contract (or subcontract thereof) related to the subject matter of the hearing; and

(ii) the amount and country of origin of any payment or contract related to the subject matter of the hearing originating with a foreign government.

(D) Such statements, with appropriate redactions to protect the privacy or security of the witness, shall be made publicly available in electronic form 24 hours before the witness appears to the extent practicable, but not later than one day after the witness appears.

(6)(A) Except as provided in subdivision (B), a point of order does not lie with respect to a measure reported by a committee on the ground that hearings on such measure were not conducted in accordance with this clause.

(B) A point of order on the ground described in subdivision (A) may be made by a member of the committee that reported the measure if such point of order was timely made and improperly disposed of in the committee.

(7) This paragraph does not apply to hearings of the Committee on Appropriations under clause 4(a)(1) of rule X.

### Quorum requirements

(h)(1) A measure or recommendation may not be reported by a committee unless a majority of the committee is actually present.

(2) Each committee may fix the number of its members to constitute a quorum for taking testimony and re-

ceiving evidence, which may not be less than two.

(3) Each committee (other than the Committee on Appropriations, the Committee on the Budget, and the Committee on Ways and Means) may fix the number of its members to constitute a quorum for taking any action other than one for which the presence of a majority of the committee is otherwise required, which may not be less than one-third of the members.

(4)(A) Each committee may adopt a rule authorizing the chair or a committee or subcommittee—

(i) to postpone further proceedings when a record vote is ordered on the question of approving a measure or matter or on adopting an amendment; and

(ii) to resume proceedings on a postponed question at any time after reasonable notice.

(B) A rule adopted pursuant to this subparagraph shall provide that when proceedings resume on a postponed question, notwithstanding any intervening order for the previous question, an underlying proposition shall remain subject to further debate or amendment to the same extent as when the question was postponed.

### Limitation on committee sittings

(i) A committee may not sit during a joint session of the House and Senate or during a recess when a joint meeting of the House and Senate is in progress.

### Calling and questioning of witnesses

(j)(1) Whenever a hearing is conducted by a committee on a measure or matter, the minority members of the committee shall be entitled, upon request to the chair by a majority of them before the completion of the hearing, to call witnesses selected by the minority to testify with respect to that measure or matter during at least one day of hearing thereon.

(2)(A) Subject to subdivisions (B) and (C), each committee shall apply the five-minute rule during the questioning of witnesses in a hearing until such time as each member of the committee who so desires has had an opportunity to question each witness.

(B) A committee may adopt a rule or motion permitting a specified number of its members to question a witness for longer than five minutes. The time for extended questioning of a witness under this subdivision shall be equal for the majority party and the minority party and may not exceed one hour in the aggregate.

(C) A committee may adopt a rule or motion permitting committee staff for its majority and minority party members to question a witness for equal specified periods. The time for extended questioning of a witness under this subdivision shall be equal for the majority party and the minority party and may not exceed one hour in the aggregate.

### Hearing procedures

(k)(1) The chair at a hearing shall announce in an opening statement the subject of the hearing.

(2) A copy of the committee rules and of this clause shall be made available to each witness on request.

(3) Witnesses at hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

(4) The chair may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure and exclusion from the hearings; and the committee may cite the offender to the House for contempt.

(5) Whenever it is asserted by a member of the committee that the evidence or testimony at a hearing may tend to defame, degrade, or incriminate any person, or it is asserted by a witness that the evidence or testimony that the witness would give at a hearing may tend to defame, degrade, or incriminate the witness—

(A) notwithstanding paragraph (g)(2), such testimony or evidence shall be presented in executive session if, in the presence of the number of members required under the rules of the committee for the purpose of taking testimony, the committee determines by vote of a majority of those present that such evidence or testimony may tend to defame, degrade, or incriminate any person; and

(B) the committee shall proceed to receive such testimony in open session only if the committee, a majority being present, determines that such evidence or testimony will not tend to defame, degrade, or incriminate any person.

In either case the committee shall afford such person an opportunity voluntarily to appear as a witness, and receive and dispose of requests from such person to subpoena additional witnesses.

(6) Except as provided in subparagraph (5), the chair shall receive and the committee shall dispose of requests to subpoena additional witnesses.

(7) Evidence or testimony taken in executive session, and proceedings conducted in executive session, may be released or used in public sessions only when authorized by the committee, a majority being present.

(8) In the discretion of the committee, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The committee is the sole judge of the pertinence of testimony and evidence adduced at its hearing.

(9) A witness may obtain a transcript copy of the testimony of such witness given at a public session or, if given at an executive session, when authorized by the committee.

### Supplemental, minority, additional, or dissenting views

(l) If at the time of approval of a measure or matter by a committee (other than the Committee on Rules) a

# RULES OF THE

member of the committee gives notice of intention to file supplemental, minority, additional, or dissenting views for inclusion in the report to the House thereon, all members shall be entitled to not less than two additional calendar days after the day of such notice (excluding Saturdays, Sundays, and legal holidays except when the House is in session on such a day) to file such written and signed views (including in electronic form) with the clerk of the committee.

***Power to sit and act; subpoena power***

(m)(1) For the purpose of carrying out any of its functions and duties under this rule and rule X (including any matters referred to it under clause 2 of rule XII), a committee or subcommittee is authorized (subject to subparagraph (3)(A))—

(A) to sit and act at such times and places within the United States, whether the House is in session, has recessed, or has adjourned, and to hold such hearings as it considers necessary; and

(B) to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary.

(2) The chair of the committee, or a member designated by the chair, may administer oaths to witnesses.

(3)(A)(i) Except as provided in subdivision (A)(ii), a subpoena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of an investigation or series of investigations or activities only when authorized by the committee or subcommittee, a majority being present. The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe. Authorized subpoenas shall be signed by the chair of the committee or by a member designated by the committee.

(ii) In the case of a subcommittee of the Committee on Ethics, a subpoena may be authorized and issued only by an affirmative vote of a majority of its members.

(B) A subpoena duces tecum may specify terms of return other than at a meeting or hearing of the committee or subcommittee authorizing the subpoena.

(C) Compliance with a subpoena issued by a committee or subcommittee under subparagraph (1)(B) may be enforced only as authorized or directed by the House.

(D) Subpoenas for documents or testimony may be issued to any person or entity, whether governmental, public, or private, within the United States, including, but not limited to, the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the

President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or Executive Office of the President.

(n)(1) Each standing committee, or a subcommittee thereof, shall hold at least one hearing during each 120-day period following the establishment of the committee on the topic of waste, fraud, abuse, or mismanagement in Government programs which that committee may authorize.

(2) A hearing described in subparagraph (1) shall include a focus on the most egregious instances of waste, fraud, abuse, or mismanagement as documented by any report the committee has received from a Federal Office of the Inspector General or the Comptroller General of the United States.

(o) Each committee, or a subcommittee thereof, shall hold at least one hearing in any session in which the committee has received disclaimers of agency financial statements from auditors of any Federal agency that the committee may authorize to hear testimony on such disclaimers from representatives of any such agency.

(p) Each standing committee, or a subcommittee thereof, shall hold at least one hearing on issues raised by reports issued by the Comptroller General of the United States indicating that Federal programs or operations that the committee may authorize are at high risk for waste, fraud, and mismanagement, known as the "high-risk list" or the "high-risk series."

***Committee on Ethics***

3. (a) The Committee on Ethics has the following functions:

(1) The committee may recommend to the House from time to time such administrative actions as it may consider appropriate to establish or enforce standards of official conduct for Members, Delegates, the Resident Commissioner, officers, and employees of the House. A letter of reproval or other administrative action of the committee pursuant to an investigation under subparagraph (2) shall only be issued or implemented as a part of a report required by such subparagraph.

(2) The committee may investigate, subject to paragraph (b), an alleged violation by a Member, Delegate, Resident Commissioner, officer, or employee of the House of the Code of Official Conduct or of a law, rule, regulation, or other standard of conduct applicable to the conduct of such Member, Delegate, Resident Commissioner, officer, or employee in the performance of the duties or the discharge of the responsibilities of such individual. After notice and hearing (unless the right to a hearing is waived by the Member, Delegate, Resident Commissioner, officer, or employee), the committee shall report to the House its findings of fact and recommendations, if any, for the

final disposition of any such investigation and such action as the committee may consider appropriate in the circumstances.

(3) The committee may report to the appropriate Federal or State authorities, either with the approval of the House or by an affirmative vote of two-thirds of the members of the committee, any substantial evidence of a violation by a Member, Delegate, Resident Commissioner, officer, or employee of the House, of a law applicable to the performance of the duties or the discharge of the responsibilities of such individual that may have been disclosed in a committee investigation.

(4) The committee may consider the request of a Member, Delegate, Resident Commissioner, officer, or employee of the House for an advisory opinion with respect to the general propriety of any current or proposed conduct of such Member, Delegate, Resident Commissioner, officer, or employee. With appropriate deletions to ensure the privacy of the person concerned, the committee may publish such opinion for the guidance of other Members, Delegates, the Resident Commissioner, officers, and employees of the House.

(5) The committee may consider the request of a Member, Delegate, Resident Commissioner, officer, or employee of the House for a written waiver in exceptional circumstances with respect to clause 4 of rule XXIII.

(6)(A) The committee shall offer annual ethics training to each Member, Delegate, Resident Commissioner, officer, and employee of the House. Such training shall—

(i) involve the classes of employees for whom the committee determines such training to be appropriate; and

(ii) include such knowledge of the Code of Official Conduct and related House rules as may be determined appropriate by the committee.

(B)(i) A new Member, Delegate, Resident Commissioner, officer, or employee of the House shall receive training under this paragraph not later than 60 days after beginning service to the House.

(ii) Not later than January 31 of each year, each Member, Delegate, Resident Commissioner, officer, and employee of the House shall file a certification with the committee that the Member, Delegate, Resident Commissioner, officer or employee attended ethics training in the last year as established by this subparagraph.

(b)(1)(A) Unless approved by an affirmative vote of a majority of its members, the Committee on Ethics may not report a resolution, report, recommendation, or advisory opinion relating to the official conduct of a Member, Delegate, Resident Commissioner, officer, or employee of the House, or, except as provided in sub-

## HOUSE OF REPRESENTATIVES

paragraph (2), undertake an investigation of such conduct.

(B)(i) Upon the receipt of information offered as a complaint that is in compliance with this rule and the rules of the committee, the chair and ranking minority member jointly may appoint members to serve as an investigative subcommittee.

(ii) The chair and ranking minority member of the committee jointly may gather additional information concerning alleged conduct that is the basis of a complaint or of information offered as a complaint until they have established an investigative subcommittee or either of them has placed on the agenda of the committee the issue of whether to establish an investigative subcommittee.

(2) Except in the case of an investigation undertaken by the committee on its own initiative, the committee may undertake an investigation relating to the official conduct of an individual Member, Delegate, Resident Commissioner, officer, or employee of the House only—

(A) upon receipt of information offered as a complaint, in writing and under oath, from a Member, Delegate, or Resident Commissioner and transmitted to the committee by such Member, Delegate, or Resident Commissioner;

(B) upon receipt of information offered as a complaint, in writing and under oath, from a person not a Member, Delegate, or Resident Commissioner provided that a Member, Delegate, or Resident Commissioner certifies in writing to the committee that such Member, Delegate, or Resident Commissioner believes the information is submitted in good faith and warrants the review and consideration of the committee; or

(C) upon receipt of a report regarding a referral from the board of the Office of Congressional Ethics.

If a complaint is not disposed of within the applicable periods set forth in the rules of the Committee on Ethics, the chair and ranking minority member shall establish jointly an investigative subcommittee and forward the complaint, or any portion thereof, to that subcommittee for its consideration. However, if at any time during those periods either the chair or ranking minority member places on the agenda the issue of whether to establish an investigative subcommittee, then an investigative subcommittee may be established only by an affirmative vote of a majority of the members of the committee.

(3) The committee may not undertake an investigation of an alleged violation of a law, rule, regulation, or standard of conduct that was not in effect at the time of the alleged violation. The committee may not undertake an investigation of such an alleged violation that occurred before the third previous Congress unless the committee determines that the alleged violation is directly related to an alleged violation that occurred in a more recent Congress.

(4) A member of the committee shall be ineligible to participate as a member of the committee in a committee proceeding relating to the member's official conduct. Whenever a member of the committee is ineligible to act as a member of the committee under the preceding sentence, the Speaker shall designate a Member, Delegate, or Resident Commissioner from the same political party as the ineligible member to act in any proceeding of the committee relating to that conduct.

(5) A member of the committee may seek disqualification from participating in an investigation of the conduct of a Member, Delegate, Resident Commissioner, officer, or employee of the House upon the submission in writing and under oath of an affidavit of disqualification stating that the member cannot render an impartial and unbiased decision in the case in which the member seeks to be disqualified. If the committee approves and accepts such affidavit of disqualification, the chair shall so notify the Speaker and request the Speaker to designate a Member, Delegate, or Resident Commissioner from the same political party as the disqualifying member to act in any proceeding of the committee relating to that case.

(6) Information or testimony received, or the contents of a complaint or the fact of its filing, may not be publicly disclosed by any committee or staff member unless specifically authorized in each instance by a vote of the full committee.

(7) The committee shall have the functions designated in titles I and V of the Ethics in Government Act of 1978, in sections 7342, 7351, and 7353 of title 5, United States Code, and in clause 11(g)(4) of rule X.

(8)(A) Except as provided by subdivisions (B), (C), and (D), not later than 45 calendar days or 5 legislative days, whichever is later, after receipt of a written report and any findings and supporting documentation regarding a referral from the board of the Office of Congressional Ethics or of a referral of the matter from the board pursuant to a request under paragraph (r), the chair of the Committee on Ethics shall make public the written report and findings of the board unless the chair and ranking member, acting jointly, decide or the committee votes to withhold such information for not more than one additional period of the same duration, in which case the chair shall—

(i) upon the termination of such additional period, make public the written report and findings; and

(ii) upon the day of such decision or vote, make a public statement that the matter, relating to the referral made by the board of the Office of Congressional Ethics regarding the Member, Delegate, Resident Commissioner, officer, or employee of the House who is the subject of the applicable referral, has been extended.

At least one calendar day before the committee makes public any written report and findings of the board, the chair shall notify such board and the applicable Member, Delegate, Resident Commissioner, officer, or employee of that fact and transmit to such individual a copy of the statement on the committee's disposition of, and any committee report on, the matter.

(B)(i) Notwithstanding subdivision (A)(i), if the committee votes to dismiss a matter which is the subject of a referral from the board of the Office of Congressional Ethics, the committee is not required to make public the written report and findings described in such subdivision unless the committee's vote is inconsistent with the recommendation of the board. For purposes of the previous sentence, a vote by the committee to dismiss a matter is not inconsistent with a report from the board respecting the matter as unresolved due to a tie vote.

(ii) Notwithstanding subdivision (A)(ii), if the board transmits a report respecting any matter with a recommendation to dismiss or as unresolved due to a tie vote, and the the matter is extended for an additional period as provided in subdivision (A), the committee is not required to make a public statement that the matter has been extended.

(iii) Except as provided by subdivision (E), if the committee establishes an investigative subcommittee respecting any such matter, then the report and findings of the board shall not be made public until the conclusion of the investigative subcommittee process and the committee shall issue a public statement of the establishment of an investigative subcommittee, which statement shall include the name of the applicable Member, Delegate, Resident Commissioner, officer, or employee, and shall set forth the alleged violation. If any such investigative subcommittee does not conclude its review within one year after the board transmits a report respecting any matter, then the committee shall make public the report and upon the expiration of the Congress in which the report is made public, the committee shall make public any findings.

(C)(i) If, after receipt of a written report and any findings and supporting documentation regarding a referral from the board of the Office of Congressional Ethics or of a referral of the matter from the board pursuant to a request under paragraph (r), the committee agrees to a request from an appropriate law enforcement or regulatory authority to defer taking action on the matter—

(I) notwithstanding subdivision (A)(i), the committee is not required to make public the written report and findings described in such subdivision, except that if the recommendation of the board with respect to the report is that the matter requires further review, the com-

**Rule XI, clause 3**

# RULES OF THE

mittee shall make public the written report but not the findings; and

(II) before the end of the first day (excluding Saturdays, Sundays, and public holidays) after the day that the committee agrees to the request, the committee shall make a public statement that it is deferring taking action on the matter at the request of such authority.

(ii) If, upon the expiration of the one-year period that begins on the date the committee makes the public statement described in item (i)(II), the committee has not acted on the matter, the committee shall make a new public statement that it is still deferring taking action on the matter, and shall make a new statement upon the expiration of each succeeding one-year period during which the committee has not acted on the matter.

(D) The committee may not receive any referral from the board of the Office of Congressional Ethics within 60 days before a Federal, State, or local election in which the subject of the referral is a candidate. The committee may delay any reporting requirement under this subparagraph that falls within that 60-day period until the end of such period and in that case, for purposes of subdivision (A), days within the 60-day period shall not be counted.

(E) If, at the close of any applicable period for a reporting requirement under this subparagraph with respect to a referral from the board of the Office of Congressional Ethics within 60 days before a Federal, State, or local election in which the subject of the referral is a candidate, the vote of the committee is a tie or the committee fails to act, the report and the findings of the board shall be made public by the committee, along with a public statement by the chair explaining the status of the matter.

(c)(1) Notwithstanding clause 2(g)(1) of rule XI, each meeting of the Committee on Ethics or a subcommittee thereof shall occur in executive session unless the committee or subcommittee, by an affirmative vote of a majority of its members, opens the meeting to the public.

(2) Notwithstanding clause 2(g)(2) of rule XI, each hearing of an adjudicatory subcommittee or sanction hearing of the Committee on Ethics shall be held in open session unless the committee or subcommittee, in open session by an affirmative vote of a majority of its members, closes all or part of the remainder of the hearing on that day to the public.

(d) Before a member, officer, or employee of the Committee on Ethics, including members of a subcommittee of the committee selected under clause 5(a)(4) of rule X and shared staff, may have access to information that is confidential under the rules of the committee, the following oath (or affirmation) shall be executed:

"I do solemnly swear (or affirm) that I will not disclose, to any person or entity outside the Committee on Ethics, any information received in the course of my service with the committee, except as authorized by the committee or in accordance with its rules.''

Copies of the executed oath shall be retained by the Clerk as part of the records of the House. This paragraph establishes a standard of conduct within the meaning of paragraph (a)(2). Breaches of confidentiality shall be investigated by the Committee on Ethics and appropriate action shall be taken.

(e)(1) If a complaint or information offered as a complaint is deemed frivolous by an affirmative vote of a majority of the members of the Committee on Ethics, the committee may take such action as it, by an affirmative vote of a majority of its members, considers appropriate in the circumstances.

(2) Complaints filed before the One Hundred Fifth Congress may not be deemed frivolous by the Committee on Ethics.

*Committee agendas*

(f) The committee shall adopt rules providing that the chair shall establish the agenda for meetings of the committee, but shall not preclude the ranking minority member from placing any item on the agenda.

*Committee staff*

(g)(1) The committee shall adopt rules providing that—

(A) the staff be assembled and retained as a professional, nonpartisan staff;

(B) each member of the staff shall be professional and demonstrably qualified for the position for which hired;

(C) the staff as a whole and each member of the staff shall perform all official duties in a nonpartisan manner;

(D) no member of the staff shall engage in any partisan political activity directly affecting any congressional or presidential election;

(E) no member of the staff or outside counsel may accept public speaking engagements or write for publication on any subject that is in any way related to the employment or duties with the committee of such individual without specific prior approval from the chair and ranking minority member; and

(F) no member of the staff or outside counsel may make public, unless approved by an affirmative vote of a majority of the members of the committee, any information, document, or other material that is confidential, derived from executive session, or classified and that is obtained during the course of employment with the committee.

(2) Only subdivisions (C), (E), and (F) of subparagraph (1) shall apply to shared staff.

(3)(A) All staff members shall be appointed by an affirmative vote of a majority of the members of the committee. Such vote shall occur at the first meeting of the membership of the committee during each Congress and as necessary during the Congress.

(B) Subject to the approval of the Committee on House Administration, the committee may retain counsel not employed by the House of Representatives whenever the committee determines, by an affirmative vote of a majority of the members of the committee, that the retention of outside counsel is necessary and appropriate.

(C) If the committee determines that it is necessary to retain staff members for the purpose of a particular investigation or other proceeding, then such staff shall be retained only for the duration of that particular investigation or proceeding.

(D) Outside counsel may be dismissed before the end of a contract between the committee and such counsel only by an affirmative vote of a majority of the members of the committee.

(4) In addition to any other staff provided for by law, rule, or other authority, with respect to the committee, the chair and ranking minority member each may appoint one individual as a shared staff member from the respective personal staff of the chair or ranking minority member to perform service for the committee. Such shared staff may assist the chair or ranking minority member on any subcommittee on which the chair or ranking minority member serves.

*Meetings and hearings*

(h) The committee shall adopt rules providing that—

(1) all meetings or hearings of the committee or any subcommittee thereof, other than any hearing held by an adjudicatory subcommittee or any sanction hearing held by the committee, shall occur in executive session unless the committee or subcommittee by an affirmative vote of a majority of its members opens the meeting or hearing to the public; and

(2) any hearing held by an adjudicatory subcommittee or any sanction hearing held by the committee shall be open to the public unless the committee or subcommittee by an affirmative vote of a majority of its members closes the hearing to the public.

*Public disclosure*

(i) The committee shall adopt rules providing that, unless otherwise determined by a vote of the committee, only the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof.

*Requirements to constitute a complaint*

(j) The committee shall adopt rules regarding complaints to provide that whenever information offered as a complaint is submitted to the committee, the chair and ranking minority member shall have 14 calendar days or five legislative days, whichever is sooner, to determine whether the information meets the requirements of the rules of the committee for what constitutes a complaint.

# HOUSE OF REPRESENTATIVES

   

### Duties of chair and ranking minority member regarding properly filed complaints

(k)(1) The committee shall adopt rules providing that whenever the chair and ranking minority member jointly determine that information submitted to the committee meets the requirements of the rules of the committee for what constitutes a complaint, they shall have 45 calendar days or five legislative days, whichever is later, after that determination (unless the committee by an affirmative vote of a majority of its members votes otherwise) to—

(A) recommend to the committee that it dispose of the complaint, or any portion thereof, in any manner that does not require action by the House, which may include dismissal of the complaint or resolution of the complaint by a letter to the Member, Delegate, Resident Commissioner, officer, or employee of the House against whom the complaint is made;

(B) establish an investigative subcommittee; or

(C) request that the committee extend the applicable 45-calendar day or five-legislative day period by one additional 45-calendar day period when they determine more time is necessary in order to make a recommendation under subdivision (A).

(2) The committee shall adopt rules providing that if the chair and ranking minority member jointly determine that information submitted to the committee meets the requirements of the rules of the committee for what constitutes a complaint, and the complaint is not disposed of within the applicable time periods under subparagraph (1), then they shall establish an investigative subcommittee and forward the complaint, or any portion thereof, to that subcommittee for its consideration. However, if, at any time during those periods, either the chair or ranking minority member places on the agenda the issue of whether to establish an investigative subcommittee, then an investigative subcommittee may be established only by an affirmative vote of a majority of the members of the committee.

### Duties of chair and ranking minority member regarding information not constituting a complaint

(l) The committee shall adopt rules providing that whenever the chair and ranking minority member jointly determine that information submitted to the committee does not meet the requirements of the rules of the committee for what constitutes a complaint, they may—

(1) return the information to the complainant with a statement that it fails to meet the requirements of the rules of the committee for what constitutes a complaint; or

(2) recommend to the committee that it authorize the establishment of an investigative subcommittee.

### Investigative and adjudicatory subcommittees

(m) The committee shall adopt rules providing that—

(1)(A) an investigative subcommittee shall be composed of four Members, Delegates, or the Resident Commissioner (with equal representation from the majority and minority parties) whenever such a subcommittee is established pursuant to the rules of the committee;

(B) an adjudicatory subcommittee shall be composed of the members of the committee who did not serve on the pertinent investigative subcommittee (with equal representation from the majority and minority parties) whenever such a subcommittee is established pursuant to the rules of the committee; and

(C) notwithstanding any other provision of this clause, the chair and ranking minority member of the committee may consult with an investigative subcommittee either on their own initiative or on the initiative of the subcommittee, shall have access to information before a subcommittee with which they so consult, and shall not thereby be precluded from serving as full, voting members of any adjudicatory subcommittee;

(2) at the time of appointment, the chair shall designate one member of a subcommittee to serve as chair and the ranking minority member shall designate one member of the subcommittee to serve as the ranking minority member; and

(3) the chair and ranking minority member of the committee may serve as members of an investigative subcommittee, but may not serve as non-voting, ex officio members.

### Standard of proof for adoption of statement of alleged violation

(n) The committee shall adopt rules to provide that an investigative subcommittee may adopt a statement of alleged violation only if it determines by an affirmative vote of a majority of the members of the subcommittee that there is substantial reason to believe that a violation of the Code of Official Conduct, or of a law, rule, regulation, or other standard of conduct applicable to the performance of official duties or the discharge of official responsibilities by a Member, Delegate, Resident Commissioner, officer, or employee of the House of Representatives, has occurred.

### Subcommittee powers

(o)(1) The committee shall adopt rules providing that an investigative subcommittee or an adjudicatory subcommittee may authorize and issue subpoenas only when authorized by an affirmative vote of a majority of the members of the subcommittee.

(2) The committee shall adopt rules providing that an investigative subcommittee may, upon an affirmative vote of a majority of its members, expand the scope of its investigation when approved by an affirmative vote of a majority of the members of the committee.

(3) The committee shall adopt rules to provide that—

(A) an investigative subcommittee may, upon an affirmative vote of a majority of its members, amend its statement of alleged violation anytime before the statement of alleged violation is transmitted to the committee; and

(B) if an investigative subcommittee amends its statement of alleged violation, the respondent shall be notified in writing and shall have 30 calendar days from the date of that notification to file an answer to the amended statement of alleged violation.

### Due process rights of respondents

(p) The committee shall adopt rules to provide that—

(1) not less than 10 calendar days before a scheduled vote by an investigative subcommittee on a statement of alleged violation, the subcommittee shall provide the respondent with a copy of the statement of alleged violation it intends to adopt together with all evidence it intends to use to prove those charges which it intends to adopt, including documentary evidence, witness testimony, memoranda of witness interviews, and physical evidence, unless the subcommittee by an affirmative vote of a majority of its members decides to withhold certain evidence in order to protect a witness; but if such evidence is withheld, the subcommittee shall inform the respondent that evidence is being withheld and of the count to which such evidence relates;

(2) neither the respondent nor the counsel of the respondent shall, directly or indirectly, contact the subcommittee or any member thereof during the period of time set forth in paragraph (1) except for the sole purpose of settlement discussions where counsel for the respondent and the subcommittee are present;

(3) if, at any time after the issuance of a statement of alleged violation, the committee or any subcommittee thereof determines that it intends to use evidence not provided to a respondent under paragraph (1) to prove the charges contained in the statement of alleged violation (or any amendment thereof), such evidence shall be made immediately available to the respondent, and it may be used in any further proceeding under the rules of the committee;

(4) evidence provided pursuant to paragraph (1) or (3) shall be made available to the respondent and the counsel of the respondent only after each agrees, in writing, that no document, information, or other materials obtained pursuant to that paragraph shall be made public until—

# RULES OF THE

(A) such time as a statement of alleged violation is made public by the committee if the respondent has waived the adjudicatory hearing; or

(B) the commencement of an adjudicatory hearing if the respondent has not waived an adjudicatory hearing;

but the failure of respondent and the counsel of the respondent to so agree in writing, and their consequent failure to receive the evidence, shall not preclude the issuance of a statement of alleged violation at the end of the period referred to in paragraph (1);

(5) a respondent shall receive written notice whenever—

(A) the chair and ranking minority member determine that information the committee has received constitutes a complaint;

(B) a complaint or allegation is transmitted to an investigative subcommittee;

(C) an investigative subcommittee votes to authorize its first subpoena or to take testimony under oath, whichever occurs first;

(D) an investigative subcommittee votes to expand the scope of its investigation; or

(E) the committee or an investigative subcommittee determines to take into evidence the trial transcript or exhibits admitted into evidence at a criminal trial pursuant to subparagraph (9);

(6) whenever an investigative subcommittee adopts a statement of alleged violation and a respondent enters into an agreement with that subcommittee to settle a complaint on which that statement is based, that agreement, unless the respondent requests otherwise, shall be in writing and signed by the respondent and respondent's counsel, the chair and ranking minority member of the subcommittee, and the outside counsel, if any;

(7) statements or information derived solely from a respondent or the counsel of a respondent during any settlement discussions between the committee or a subcommittee thereof and the respondent shall not be included in any report of the subcommittee or the committee or otherwise publicly disclosed without the consent of the respondent;

(8) whenever a motion to establish an investigative subcommittee does not prevail, the committee shall promptly send a letter to the respondent informing the respondent of such vote; and

(9) in any investigation permitted by House or committee rules, in addition to any other evidence which the committee or an investigative subcommittee may consider, if the respondent has been convicted by a court of record for a crime which is related to the subject of the investigation, the committee or investigative subcommittee may take into

evidence the trial transcript and all exhibits admitted into evidence at the trial.

*Committee reporting requirements*

(q) The committee shall adopt rules to provide that—

(1) whenever an investigative subcommittee does not adopt a statement of alleged violation and transmits a report to that effect to the committee, the committee may by an affirmative vote of a majority of its members transmit such report to the House of Representatives;

(2) whenever an investigative subcommittee adopts a statement of alleged violation, the respondent admits to the violations set forth in such statement, the respondent waives the right to an adjudicatory hearing, and the respondent's waiver is approved by the committee—

(A) the subcommittee shall prepare a report for transmittal to the committee, a final draft of which shall be provided to the respondent not less than 15 calendar days before the subcommittee votes on whether to adopt the report;

(B) the respondent may submit views in writing regarding the final draft to the subcommittee within seven calendar days of receipt of that draft;

(C) the subcommittee shall transmit a report to the committee regarding the statement of alleged violation together with any views submitted by the respondent pursuant to subdivision (B), and the committee shall make the report together with the respondent's views available to the public before the commencement of any sanction hearing; and

(D) the committee shall by an affirmative vote of a majority of its members issue a report and transmit such report to the House of Representatives, together with the respondent's views previously submitted pursuant to subdivision (B) and any additional views respondent may submit for attachment to the final report; and

(3) members of the committee shall have not less than 72 hours to review any report transmitted to the committee by an investigative subcommittee before both the commencement of a sanction hearing and the committee vote on whether to adopt the report.

(r) Upon receipt of any written notification from the board of the Office of Congressional Ethics that the board is undertaking a review of any alleged conduct of any Member, Delegate, Resident Commissioner, officer, or employee of the House and if the committee is investigating such matter, the committee may at any time so notify the board and request that the board cease its review and refer the matter to the committee for its consideration. If at the end of the applicable time period (including any permissible

extension) the committee has not reached a final resolution of the matter or has not referred the matter to the appropriate Federal or State authorities, the committee shall so notify the board of the Office of Congressional Ethics in writing. The committee may not request the same matter from the board more than one time.

(s) The committee may not take any action that would deny any person any right or protection provided under the Constitution of the United States.

*Audio and visual coverage of committee proceedings*

4. (a) The purpose of this clause is to provide a means, in conformity with acceptable standards of dignity, propriety, and decorum, by which committee hearings or committee meetings that are open to the public may be covered by audio and visual means—

(1) for the education, enlightenment, and information of the general public, on the basis of accurate and impartial news coverage, regarding the operations, procedures, and practices of the House as a legislative and representative body, and regarding the measures, public issues, and other matters before the House and its committees, the consideration thereof, and the action taken thereon; and

(2) for the development of the perspective and understanding of the general public with respect to the role and function of the House under the Constitution as an institution of the Federal Government.

(b) In addition, it is the intent of this clause that audio and video recordings of any coverage under this clause may not be used for any partisan political campaign purpose or be made available for such use.

(c) It is, further, the intent of this clause that the general conduct of each meeting (whether of a hearing or otherwise) covered under authority of this clause by audio or visual means, and the personal behavior of the committee members and staff, other Government officials and personnel, witnesses, television, radio, and press media personnel, and the general public at the hearing or other meeting, shall be in strict conformity with and observance of the acceptable standards of dignity, propriety, courtesy, and decorum traditionally observed by the House in its operations, and may not be such as to—

(1) distort the objects and purposes of the hearing or other meeting or the activities of committee members in connection with that hearing or meeting or in connection with the general work of the committee or of the House; or

(2) cast discredit or dishonor on the House, the committee, or a Member, Delegate, or Resident Commissioner or bring the House, the committee, or a Member, Delegate, or Resident Commissioner into disrepute.

(d) The coverage of committee hearings and meetings by audio and visual

# HOUSE OF REPRESENTATIVES

means shall be permitted and conducted only in strict conformity with the purposes, provisions, and requirements of this clause.

(e) Whenever a hearing or meeting conducted by a committee or subcommittee is open to the public, those proceedings shall be open to coverage by audio and visual means. A committee or subcommittee chair may not limit the number of television or still cameras to fewer than two representatives from each medium (except for legitimate space or safety considerations, in which case pool coverage shall be authorized).

(f) Written rules adopted by each committee pursuant to clause 2(a)(1)(D) shall contain provisions to the following effect:

(1) If audio or visual coverage of the hearing or meeting is to be presented to the public as live coverage, that coverage shall be conducted and presented without commercial sponsorship.

(2) The allocation among the television media of the positions or the number of television cameras permitted by a committee or subcommittee chair in a hearing or meeting room shall be in accordance with fair and equitable procedures devised by the Executive Committee of the Radio and Television Correspondents' Galleries.

(3) Television cameras shall be placed so as not to obstruct in any way the space between a witness giving evidence or testimony and any member of the committee or the visibility of that witness and that member to each other.

(4) Television cameras shall operate from fixed positions but may not be placed in positions that obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(5) Equipment necessary for coverage by the television and radio media may not be installed in, or removed from, the hearing or meeting room while the committee is in session.

(6)(A) Except as provided in subdivision (B), floodlights, spotlights, strobelights, and flashguns may not be used in providing any method of coverage of the hearing or meeting.

(B) The television media may install additional lighting in a hearing or meeting room, without cost to the Government, in order to raise the ambient lighting level in a hearing or meeting room to the lowest level necessary to provide adequate television coverage of a hearing or meeting at the current state of the art of television coverage.

(7) If requests are made by more of the media than will be permitted by a committee or subcommittee chair for coverage of a hearing or meeting by still photography, that coverage shall be permitted on the basis of a fair and equitable pool arrangement devised by the Standing Committee of Press Photographers.

(8) Photographers may not position themselves between the witness table and the members of the committee at any time during the course of a hearing or meeting.

(9) Photographers may not place themselves in positions that obstruct unnecessarily the coverage of the hearing by the other media.

(10) Personnel providing coverage by the television and radio media shall be currently accredited to the Radio and Television Correspondents' Galleries.

(11) Personnel providing coverage by still photography shall be currently accredited to the Press Photographers' Gallery.

(12) Personnel providing coverage by the television and radio media and by still photography shall conduct themselves and their coverage activities in an orderly and unobtrusive manner.

## Pay of witnesses

5. Witnesses appearing before the House or any of its committees shall be paid the same per diem rate as established, authorized, and regulated by the Committee on House Administration for Members, Delegates, the Resident Commissioner, and employees of the House, plus actual expenses of travel to or from the place of examination. Such per diem may not be paid when a witness has been summoned at the place of examination.

## Unfinished business of the session

6. All business of the House at the end of one session shall be resumed at the commencement of the next session of the same Congress in the same manner as if no adjournment had taken place.

## RULE XII

### RECEIPT AND REFERRAL OF MEASURES AND MATTERS

## Messages

1. Messages received from the Senate, or from the President, shall be entered on the Journal and published in the Congressional Record of the proceedings of that day.

## Referral

2. (a) The Speaker shall refer each bill, resolution, or other matter that relates to a subject listed under a standing committee named in clause 1 of rule X in accordance with the provisions of this clause.

(b) The Speaker shall refer matters under paragraph (a) in such manner as to ensure to the maximum extent feasible that each committee that has jurisdiction under clause 1 of rule X over the subject matter of a provision thereof may consider such provision and report to the House thereon. Precedents, rulings, or procedures in effect before the Ninety-Fourth Congress shall be applied to referrals under this clause only to the extent that they will con-

tribute to the achievement of the objectives of this clause.

(c) In carrying out paragraphs (a) and (b) with respect to the referral of a matter, the Speaker—

(1) shall designate a committee of primary jurisdiction (except where the Speaker determines that extraordinary circumstances justify review by more than one committee as though primary);

(2) may refer the matter to one or more additional committees for consideration in sequence, either initially or after the matter has been reported by the committee of primary jurisdiction;

(3) may refer portions of the matter reflecting different subjects and jurisdictions to one or more additional committees;

(4) may refer the matter to a special, ad hoc committee appointed by the Speaker with the approval of the House, and including members of the committees of jurisdiction, for the specific purpose of considering that matter and reporting to the House thereon;

(5) may subject a referral to appropriate time limitations; and

(6) may make such other provision as may be considered appropriate.

(d) A bill for the payment or adjudication of a private claim against the Government may not be referred to a committee other than the Committee on Foreign Affairs or the Committee on the Judiciary, except by unanimous consent.

## Petitions, memorials, and private bills

3. If a Member, Delegate, or Resident Commissioner has a petition, memorial, or private bill to present, the Member, Delegate, or Resident Commissioner shall sign it, deliver it to the Clerk, and may specify the reference or disposition to be made thereof. Such petition, memorial, or private bill (except when judged by the Speaker to be obscene or insulting) shall be entered on the Journal with the name of the Member, Delegate, or Resident Commissioner presenting it and shall be printed in the Congressional Record.

4. A private bill or private resolution (including an omnibus claim or pension bill), or amendment thereto, may not be received or considered in the House if it authorizes or directs—

(a) the payment of money for property damages, for personal injuries or death for which suit may be instituted under the Tort Claims Procedure provided in title 28, United States Code, or for a pension (other than to carry out a provision of law or treaty stipulation);

(b) the construction of a bridge across a navigable stream; or

(c) the correction of a military or naval record.

## Prohibition on commemorations

5. (a) A bill or resolution, or an amendment thereto, may not be introduced or considered in the House if it

## RULES OF THE

establishes or expresses a commemoration.

(b) In this clause the term "commemoration" means a remembrance, celebration, or recognition for any purpose through the designation of a specified period of time.

### Excluded matters

6. A petition, memorial, bill, or resolution excluded under this rule shall be returned to the Member, Delegate, or Resident Commissioner from whom it was received. A petition or private bill that has been inappropriately referred may, by direction of the committee having possession of it, be properly referred in the manner originally presented. An erroneous reference of a petition or private bill under this clause does not confer jurisdiction on a committee to consider or report it.

### Sponsorship

7. (a) Bills, memorials, petitions, and resolutions, endorsed with the names of Members, Delegates, or the Resident Commissioner introducing them, may be delivered to the Speaker to be referred. The titles and references of all bills, memorials, petitions, resolutions, and other documents referred under this rule shall be entered on the Journal and printed in the Congressional Record. An erroneous reference may be corrected by the House in accordance with rule X on any day immediately after the Pledge of Allegiance to the Flag by unanimous consent or motion. Such a motion shall be privileged if offered by direction of a committee to which the bill has been erroneously referred or by direction of a committee claiming jurisdiction and shall be decided without debate.

(b)(1) The sponsor of a public bill or public resolution may name cosponsors. The name of a cosponsor added after the initial printing of a bill or resolution shall appear in the next printing of the bill or resolution on the written request of the sponsor. Such a request may be submitted to the Speaker at any time until the last committee authorized to consider and report the bill or resolution reports it to the House or is discharged from its consideration.

(2) The name of a cosponsor of a bill or resolution may be deleted only by a demand from the floor made by the Member, Delegate, or Resident Commissioner whose name is to be deleted, or by a unanimous-consent request from the sponsor. The Speaker may only entertain such a demand or request until the last committee authorized to consider and report the bill or resolution reports it to the House or is discharged from its consideration. The Speaker may not entertain a request to delete the name of the sponsor of a bill or resolution. A deletion shall be indicated by date in the next printing of the bill or resolution.

(3) The addition or deletion of the name of a cosponsor of a bill or resolution shall be entered on the Journal and printed in the Congressional Record of that day.

(4) A bill or resolution shall be reprinted on the written request of the sponsor. Such a request may be submitted to the Speaker only when 20 or more cosponsors have been added since the last printing of the bill or resolution.

(5) When a bill or resolution is introduced "by request," those words shall be entered on the Journal and printed in the Congressional Record.

(c)(1) A bill or joint resolution may not be introduced unless the sponsor submits for printing in the Congressional Record a statement citing as specifically as practicable the power or powers granted to Congress in the Constitution to enact the bill or joint resolution. The statement shall appear in a portion of the Record designated for that purpose and be made publicly available in electronic form by the Clerk.

(2) Before consideration of a Senate bill or joint resolution, the chair of a committee of jurisdiction may submit the statement required under subparagraph (1) as though the chair were the sponsor of the Senate bill or joint resolution.

### Executive communications

8. Estimates of appropriations and all other communications from the executive departments intended for the consideration of any committees of the House shall be addressed to the Speaker for referral as provided in clause 2 of rule XIV.

## RULE XIII

### CALENDARS AND COMMITTEE REPORTS

### Calendars

1. (a) All business reported by committees shall be referred to one of the following three calendars:

(1) A Calendar of the Committee of the Whole House on the state of the Union, to which shall be referred public bills and public resolutions raising revenue, involving a tax or charge on the people, directly or indirectly making appropriations of money or property or requiring such appropriations to be made, authorizing payments out of appropriations already made, or releasing any liability to the United States for money or property.

(2) A House Calendar, to which shall be referred all public bills and public resolutions not requiring referral to the Calendar of the Committee of the Whole House on the state of the Union.

(3) A Private Calendar as provided in clause 5 of rule XV, to which shall be referred all private bills and private resolutions.

(b) There is established a Calendar of Motions to Discharge Committees as provided in clause 2 of rule XV.

(c) There is established a Consensus Calendar as provided in clause 7 of rule XV.

### Filing and printing of reports

2. (a)(1) Except as provided in subparagraphs (2) and (3), all reports of committees (other than those filed from the floor) shall be delivered to the Clerk for printing and reference to the proper calendar under the direction of the Speaker in accordance with clause 1. The title or subject of each report shall be entered on the Journal and printed in the Congressional Record.

(2) A bill or resolution reported adversely (other than those filed as privileged) shall be laid on the table unless a committee to which the bill or resolution was referred requests at the time of the report its referral to an appropriate calendar under clause 1 or unless, within three days thereafter, a Member, Delegate, or Resident Commissioner makes such a request.

(3) All reports of committees may be delivered to the Clerk in electronic form.

(b)(1) It shall be the duty of the chair of each committee to report or cause to be reported promptly to the House a measure or matter approved by the committee and to take or cause to be taken steps necessary to bring the measure or matter to a vote.

(2) In any event, the report of a committee on a measure that has been approved by the committee shall be filed within seven calendar days (exclusive of days on which the House is not in session) after the day on which a written request for the filing of the report, signed by a majority of the members of the committee, has been filed with the clerk of the committee. The clerk of the committee shall immediately notify the chair of the filing of such a request. This subparagraph does not apply to a report of the Committee on Rules with respect to a rule, joint rule, or order of business of the House, or to the reporting of a resolution of inquiry addressed to the head of an executive department.

(c) All supplemental, minority, additional, or dissenting views filed under clause 2(l) of rule XI by one or more members of a committee shall be included in, and shall be a part of, the report filed by the committee with respect to a measure or matter. When time guaranteed by clause 2(l) of rule XI has expired (or, if sooner, when all separate views have been received), the committee may arrange to file its report with the Clerk not later than one hour after the expiration of such time. This clause and provisions of clause 2(l) of rule XI do not preclude the immediate filing or printing of a committee report in the absence of a timely request for the opportunity to file supplemental, minority, additional, or dissenting views as provided in clause 2(l) of rule XI.

### Content of reports

3. (a)(1) Except as provided in subparagraph (2), the report of a committee on a measure or matter shall be printed in a single volume that—

26

## HOUSE OF REPRESENTATIVES

Rule XIII, clause 3                                                      Rule XIII, clause 3

(A) shall include all supplemental, minority, additional, or dissenting views that have been submitted by the time of the filing of the report; and

(B) shall bear on its cover a recital that any such supplemental, minority, additional, or dissenting views (and any material submitted under paragraph (c)(3)) are included as part of the report.

(2) A committee may file a supplemental report for the correction of a technical error in its previous report on a measure or matter. A supplemental report only correcting errors in the depiction of record votes under paragraph (b) may be filed under this subparagraph and shall not be subject to the requirement in clause 4 or clause 6 concerning the availability of reports.

(b) With respect to each record vote on a motion to report a measure or matter of a public nature, and on any amendment offered to the measure or matter, the total number of votes cast for and against, and the names of members voting for and against, shall be included in the committee report. The preceding sentence does not apply to votes taken in executive session by the Committee on Ethics, and applies only to the maximum extent practicable to a report by the Committee on Rules on a rule, joint rule, or the order of business.

(c) The report of a committee on a measure that has been approved by the committee shall include, separately set out and clearly identified, the following:

(1) Oversight findings and recommendations under clause 2(b)(1) of rule X.

(2) The statement required by section 308(a) of the Congressional Budget Act of 1974, except that an estimate of new budget authority shall include, when practicable, a comparison of the total estimated funding level for the relevant programs to the appropriate levels under current law.

(3) An estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974 if timely submitted to the committee before the filing of the report.

(4) A statement of general performance goals and objectives, including outcome-related goals and objectives, for which the measure authorizes funding.

(5) On a bill or joint resolution that establishes or reauthorizes a Federal program, a statement indicating whether any such program is known to be duplicative of another such program, including at a minimum an explanation of whether any such program was included in a report to Congress pursuant to section 21 of Public Law 111–139 or whether the most recent Catalog of Federal Domestic Assistance (published pursuant to section 6104 of title 31, United States

Code) identified other programs related to the program established or reauthorized by the measure.

(6)(A) On a bill or joint resolution to be considered pursuant to a special order of business reported by the Committee on Rules—

(i) a list of related committee and subcommittee hearings; and

(ii) a designation of at least one committee or subcommittee hearing that was used to develop or consider such bill or joint resolution.

(B) Subdivision (A) shall not apply to a bill or joint resolution—

(i) continuing appropriations for a fiscal year; or

(ii) containing an emergency designation under section 251(b)(2) or section 252(e) of the Balanced Budget and Emergency Deficit Control Act of 1985.

(d) Each report of a committee on a public bill or public joint resolution shall contain the following:

(1)(A) An estimate by the committee of the costs that would be incurred in carrying out the bill or joint resolution in the fiscal year in which it is reported and in each of the five fiscal years following that fiscal year (or for the authorized duration of any program authorized by the bill or joint resolution if less than five years);

(B) a comparison of the estimate of costs described in subdivision (A) made by the committee with any estimate of such costs made by a Government agency and submitted to such committee; and

(C) when practicable, a comparison of the total estimated funding level for the relevant programs with the appropriate levels under current law.

(2)(A) In subparagraph (1) the term "Government agency" includes any department, agency, establishment, wholly owned Government corporation, or instrumentality of the Federal Government or the government of the District of Columbia.

(B) Subparagraph (1) does not apply to the Committee on Appropriations, the Committee on House Administration, the Committee on Rules, or the Committee on Ethics, and does not apply when a cost estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974 has been included in the report under paragraph (c)(3).

(e)(1) Whenever a committee reports a bill or joint resolution proposing to repeal or amend a statute or part thereof, it shall include in its report or in an accompanying document (showing by appropriate typographical devices the omissions and insertions proposed)—

(A) the entire text of each section of a statute that is proposed to be repealed; and

(B) a comparative print of each amendment to the entire text of a

section of a statute that the bill or joint resolution proposes to make.

(2) If a committee reports a bill or joint resolution proposing to repeal or amend a statute or part thereof with a recommendation that the bill or joint resolution be amended, the comparative print required by subparagraph (1) shall reflect the changes in existing law proposed to be made by the bill or joint resolution as proposed to be amended.

(f)(1) A report of the Committee on Appropriations on a general appropriation bill shall include—

(A) a concise statement describing the effect of any provision of the accompanying bill that directly or indirectly changes the application of existing law; and

(B) a list of all appropriations contained in the bill for expenditures not currently authorized by law for the period concerned (excepting classified intelligence or national security programs, projects, or activities), along with a statement of the last year for which such expenditures were authorized, the level of expenditures authorized for that year, the actual level of expenditures for that year, and the level of appropriations in the bill for such expenditures.

(2) Whenever the Committee on Appropriations reports a bill or joint resolution including matter specified in clause 1(b)(2) or (3) of rule X, it shall include—

(A) in the bill or joint resolution, separate headings for "Rescissions" and "Transfers of Unexpended Balances"; and

(B) in the report of the committee, a separate section listing such rescissions and transfers.

(g) Whenever the Committee on Rules reports a resolution proposing to repeal or amend a standing rule of the House, it shall include in its report or in an accompanying document—

(1) the text of any rule or part thereof that is proposed to be repealed; and

(2) a comparative print of any part of the resolution proposing to amend the rule and of the rule or part thereof of proposed to be amended, showing by appropriate typographical devices the omissions and insertions proposed.

(h) It shall not be in order to consider a bill or joint resolution reported by the Committee on Ways and Means that proposes to amend the Internal Revenue Code of 1986 unless—

(1) the report includes a tax complexity analysis prepared by the Joint Committee on Taxation in accordance with section 4022(b) of the Internal Revenue Service Restructuring and Reform Act of 1998; or

(2) the chair of the Committee on Ways and Means causes such a tax complexity analysis to be printed in the Congressional Record before consideration of the bill or joint resolution.

27

RULES OF THE

*Availability of reports*

4. (a)(1) Except as specified in sub-paragraph (2), it shall not be in order to consider in the House a measure or matter reported by a committee until the proposed text of each report (except views referred to in clause 2(l) of rule XI) of a committee on that measure or matter has been available to Members, Delegates, and the Resident Commissioner for 72 hours.

(2) Subparagraph (1) does not apply to—

(A) a resolution providing a rule, joint rule, or order of business reported by the Committee on Rules considered under clause 6;

(B) a resolution providing amounts from the applicable accounts described in clause 1(k)(1) of rule X reported by the Committee on House Administration considered under clause 6 of rule X;

(C) a resolution presenting a question of the privileges of the House reported by any committee;

(D) a measure for the declaration of war, or the declaration of a national emergency, by Congress; and

(E) a measure providing for the disapproval of a decision, determination, or action by a Government agency that would become, or continue to be, effective unless disapproved or otherwise invalidated by one or both Houses of Congress. In this subdivision the term "Government agency" includes any department, agency, establishment, wholly owned Government corporation, or instrumentality of the Federal Government or of the government of the District of Columbia.

(b) A committee that reports a measure or matter shall make every reasonable effort to have its hearings thereon (if any) printed and available for distribution to Members, Delegates, and the Resident Commissioner before the consideration of the measure or matter in the House.

*Privileged reports, generally*

5. (a) The following committees shall have leave to report at any time on the following matters, respectively:

(1) The Committee on Appropriations, on general appropriation bills and on joint resolutions continuing appropriations for a fiscal year after September 15 in the preceding fiscal year.

(2) The Committee on the Budget, on the matters required to be reported by such committee under titles III and IV of the Congressional Budget Act of 1974.

(3) The Committee on House Administration, on enrolled bills, on contested elections, on matters referred to it concerning printing for the use of the House or the two Houses, on expenditure of the applicable accounts of the House described in clause 1(k)(1) of rule X, and on matters relating to preservation and availability of noncurrent records of the House under rule VII.

(4) The Committee on Rules, on rules, joint rules, and the order of business.

(5) The Committee on Ethics, on resolutions recommending action by the House with respect to a Member, Delegate, Resident Commissioner, officer, or employee of the House as a result of an investigation by the committee relating to the official conduct of such Member, Delegate, Resident Commissioner, officer, or employee.

(b) A report filed from the floor, pursuant to clause 2(a)(3), or pursuant to clause 2(c), as privileged under paragraph (a) may be called up as a privileged question by direction of the reporting committee, subject to any requirement concerning its availability to Members, Delegates, and the Resident Commissioner under clause 4 or concerning the timing of its consideration under clause 6.

*Privileged reports by the Committee on Rules*

6. (a) A report by the Committee on Rules on a rule, joint rule, or the order of business may not be called up for consideration on the same day it is presented to the House except—

(1) when so determined by a vote of two-thirds of the Members voting, a quorum being present;

(2) in the case of a resolution proposing only to waive a requirement of clause 4 or of clause 8 of rule XXII concerning the availability of reports; or

(3) during the last three days of a session of Congress.

(b) Pending the consideration of a report by the Committee on Rules on a rule, joint rule, or the order of business, the Speaker may entertain one motion that the House adjourn but may not entertain any other dilatory motion until the report shall have been disposed of.

(c) The Committee on Rules may not report a rule or order that would prevent the motion to recommit a bill or joint resolution from being made as provided in clause 2(b) of rule XIX, if offered by the Minority Leader or a designee, except with respect to a Senate bill or joint resolution for which the text of a House-passed measure has been substituted.

(d) The Committee on Rules shall present to the House reports concerning rules, joint rules, and the order of business, within three legislative days of the time when they are ordered. If such a report is not considered immediately, it shall be referred to the calendar. If such a report on the calendar is not called up by the member of the committee who filed the report within seven legislative days, any member of the committee may call it up as a privileged question on the day after the calendar day on which the member announces to the House intention to do so. The Speaker shall recognize a member of the committee who seeks recognition for that purpose.

(e) An adverse report by the Committee on Rules on a resolution proposing a special order of business for the consideration of a public bill or public joint resolution may be called up as a privileged question by a Member, Delegate, or Resident Commissioner on the second and fourth Mondays of a month.

(f) If the House has adopted a resolution making in order a motion to consider a bill or resolution, and such a motion has not been offered within seven calendar days thereafter, such a motion shall be privileged if offered by direction of all reporting committees having initial jurisdiction of the bill or resolution.

(g) Whenever the Committee on Rules reports a resolution providing for the consideration of a measure, it shall to the maximum extent possible specify in the accompanying report any waiver of a point of order against the measure or against its consideration.

*Resolutions of inquiry*

7. A report on a resolution of inquiry addressed to the head of an executive department may be filed from the floor as privileged. If such a resolution is not reported to the House within 14 legislative days after its introduction, a motion to discharge a committee from its consideration shall be privileged.

RULE XIV

ORDER AND PRIORITY OF BUSINESS

1. The daily order of business (unless varied by the application of other rules and except for the disposition of matters of higher precedence) shall be as follows:

First. Prayer by the Chaplain.

Second. Reading and approval of the Journal, unless postponed under clause 8 of rule XX.

Third. The Pledge of Allegiance to the Flag.

Fourth. Correction of reference of public bills.

Fifth. Disposal of business on the Speaker's table as provided in clause 2.

Sixth. Unfinished business as provided in clause 3.

Seventh. The morning hour for the consideration of bills called up by committees as provided in clause 4.

Eighth. Motions that the House resolve into the Committee of the Whole House on the state of the Union subject to clause 5.

Ninth. Orders of the day.

2. Business on the Speaker's table shall be disposed of as follows:

(a) Messages from the President shall be referred to the appropriate committees without debate.

(b) Communications addressed to the House, including reports and communications from heads of departments and bills, resolutions, and messages from the Senate, may be referred to the appropriate committees in the same manner and with the same right of correction as public bills and public resolutions presented

28

# HOUSE OF REPRESENTATIVES

by Members, Delegates, or the Resident Commissioner.

(c) Motions to dispose of Senate amendments on the Speaker's table may be entertained as provided in clauses 1, 2, and 4 of rule XXII.

(d) Senate bills and resolutions substantially the same as House measures already favorably reported and not required to be considered in the Committee of the Whole House on the state of the Union may be disposed of by motion. Such a motion shall be privileged if offered by direction of all reporting committees having initial jurisdiction of the House measure.

3. Consideration of unfinished business in which the House may have been engaged at an adjournment, except business in the morning hour and proceedings postponed under clause 8 of rule XX, shall be resumed as soon as the business on the Speaker's table is finished, and at the same time each day thereafter until disposed of. The consideration of all other unfinished business shall be resumed whenever the class of business to which it belongs shall be in order under the rules.

4. After the unfinished business has been disposed of, the Speaker shall call each standing committee in regular order and then select committees. Each committee when named may call up for consideration a bill or resolution reported by it on a previous day and on the House Calendar. If the Speaker does not complete the call of the committees before the House passes to other business, the next call shall resume at the point it left off, giving preference to the last bill or resolution under consideration. A committee that has occupied the call for two days may not call up another bill or resolution until the other committees have been called in their turn.

5. After consideration of bills or resolutions under clause 4 for one hour, it shall be in order, pending consideration thereof, to entertain a motion that the House resolve into the Committee of the Whole House on the state of the Union or, when authorized by a committee, that the House resolve into the Committee of the Whole House on the state of the Union to consider a particular bill. Such a motion shall be subject to only one amendment designating another bill. If such a motion is decided in the negative, another such motion may not be considered until the matter that was pending when such motion was offered is disposed of.

6. All questions relating to the priority of business shall be decided by a majority without debate.

## RULE XV

BUSINESS IN ORDER ON SPECIAL DAYS

### Suspensions

1. (a) A rule may not be suspended except by a vote of two-thirds of the Members voting, a quorum being present. The Speaker may not entertain a motion that the House suspend the rules except on Mondays, Tuesdays, and Wednesdays and during the last six days of a session of Congress.

(b) Pending a motion that the House suspend the rules, the Speaker may entertain one motion that the House adjourn but may not entertain any other motion until the vote is taken on the suspension.

(c) A motion that the House suspend the rules is debatable for 40 minutes, one-half in favor of the motion and one-half in opposition thereto.

### Discharge motions

2. (a)(1) A Member may present to the Clerk a motion in writing to discharge—

(A) a committee from consideration of a public bill or public resolution that has been referred to it for 30 legislative days; or

(B) the Committee on Rules from consideration of a resolution that has been referred to it for seven legislative days and that proposes a special order of business for the consideration of a public bill or public resolution that has been reported by a committee or has been referred to a committee for 30 legislative days.

(2) Only one motion may be presented for a bill or resolution. A Member may not file a motion to discharge the Committee on Rules from consideration of a resolution providing for the consideration of more than one public bill or public resolution or admitting or effecting a nongermane amendment to a public bill or public resolution.

(b) A motion presented under paragraph (a) shall be placed in the custody of the Clerk, who shall arrange a convenient place for the signatures of Members. A signature may be withdrawn by a Member in writing at any time before a motion is entered on the Journal. The Clerk shall make the signatories a matter of public record, causing the names of the Members who have signed a discharge motion during a week to be published in a portion of the Congressional Record designated for that purpose on the last legislative day of the week and making cumulative lists of such names available each day for public inspection in an appropriate office of the House. The Clerk shall devise a means for making such lists available to offices of the House and to the public in electronic form. When a majority of the total membership of the House shall have signed the motion, it shall be entered on the Journal, published with the signatories thereto in the Record, and referred to the Calendar of Motions to Discharge Committees.

(c)(1) A motion to discharge that has been on the calendar for at least seven legislative days (except during the last six days of a session of Congress) shall be privileged only at a time or place, designated by the Speaker, in the legislative schedule within two legislative days after the day on which a Member whose signature appears thereon announces to the House an intention to offer the motion. When such a motion is called up, the House shall proceed to its consideration under this paragraph without intervening motion except one motion to adjourn. Privileged motions to discharge shall have precedence in the order of their entry on the Journal.

(2) When a motion to discharge is called up, the bill or resolution to which it relates shall be read by title only. The motion is debatable for 20 minutes, one-half in favor of the motion and one-half in opposition thereto.

(d)(1) If a motion prevails to discharge the Committee on Rules from consideration of a resolution, the House shall immediately consider the resolution, pending which the Speaker may entertain one motion that the House adjourn but may not entertain any other dilatory motion until the resolution has been disposed of. If the resolution is adopted, the House shall immediately proceed to its execution.

(2) If a motion prevails to discharge a committee from consideration of a public bill or public resolution, a motion that the House proceed to the immediate consideration of such bill or resolution shall be privileged if offered by a Member whose signature appeared on the motion to discharge. The motion to proceed is not debatable. If the motion to proceed is adopted, the bill or resolution shall be considered immediately under the general rules of the House. If unfinished before adjournment of the day on which it is called up, the bill or resolution shall remain the unfinished business until it is disposed of. If the motion to proceed is rejected, the bill or resolution shall be referred to the appropriate calendar, where it shall have the same status as if the committee from which it was discharged had duly reported it to the House.

(e)(1) When a motion to discharge originated under this clause has once been acted on by the House, it shall not be in order to entertain during the same session of Congress—

(A) a motion to discharge a committee from consideration of that bill or resolution or of any other bill or resolution that, by relating in substance to or dealing with the same subject matter, is substantially the same; or

(B) a motion to discharge the Committee on Rules from consideration of a resolution providing a special order of business for the consideration of that bill or resolution or of any other bill or resolution that, by relating in substance to or dealing with the same subject matter, is substantially the same.

(2) A motion to discharge on the Calendar of Motions to Discharge Committees that is rendered out of order under subparagraph (1) shall be stricken from that calendar.

### Adverse report by the Committee on Rules, second and fourth Mondays

3. An adverse report by the Committee on Rules on a resolution proposing a special order of business for

RULES OF THE

the consideration of a public bill or public joint resolution may be called up under clause 6(e) of rule XIII as a privileged question by a Member, Delegate, or Resident Commissioner on the second and fourth Mondays of a month.

4. (RESERVED.)

*Private Calendar*

5. (a) On the first Tuesday of a month, the Speaker shall direct the Clerk to call the bills and resolutions on the Private Calendar after disposal of such business on the Speaker's table as requires reference only. If two or more Members, Delegates, or the Resident Commissioner object to the consideration of a bill or resolution so called, it shall be recommitted to the committee that reported it. No other business shall be in order before completion of the call of the Private Calendar on this day unless two-thirds of the Members voting, a quorum being present, agree to a motion that the House dispense with the call.

(b)(1) On any day, after the disposal of such business on the Speaker's table as requires reference only, the Speaker may direct the Clerk to call any bill or resolution that has been on the Private Calendar for at least seven days, but only on the second legislative day after the legislative day on which the Speaker or a designee announces to the House an intention to do so. Preference shall be given to omnibus bills containing the texts of bills or resolutions that have previously been objected to on a call of the Private Calendar. If two or more Members, Delegates, or the Resident Commissioner object to the consideration of a bill or resolution so called (other than an omnibus bill), it shall be recommitted to the committee that reported it. Two-thirds of the Members voting, a quorum being present, may adopt a motion that the House dispense with the call on this day.

(2) Omnibus bills shall be read for amendment by paragraph. No amendment shall be in order except to strike or to reduce amounts of money or to provide limitations. An item or matter stricken from an omnibus bill may not thereafter during the same session of Congress be included in an omnibus bill. Upon passage such an omnibus bill shall be resolved into the several bills and resolutions of which it is composed. The several bills and resolutions, with any amendments adopted by the House, shall be engrossed, when necessary, and otherwise considered as passed severally by the House as distinct bills and resolutions.

(c) The Speaker may not entertain a reservation of the right to object to the consideration of a bill or resolution under this clause. A bill or resolution considered under this clause shall be considered in the House as in the Committee of the Whole. A motion to dispense with the call of the Private Calendar under this clause shall be privileged. Debate on such a motion shall be limited to five minutes in support and five minutes in opposition.

*Calendar Call of Committees, Wednesdays*

6. (a) On Wednesday of each week, business shall not be in order before completion of the call of those committees (except as provided by clause 4 of rule XIV) whose chair, or other member authorized by the committee, has announced to the House a request for such call on the preceding legislative day.

(b) A bill or resolution on either the House or the Union Calendar, except bills or resolutions that are privileged under the Rules of the House, may be called under this clause. A bill or resolution called up from the Union Calendar shall be considered in the Committee of the Whole House on the state of the Union without motion, subject to clause 3 of rule XVI. General debate on a measure considered under this clause shall be confined to the measure and may not exceed two hours equally divided between a proponent and an opponent.

(c) This clause does not apply during the last two weeks of a session of Congress.

(d) Precedents, rulings, or procedures in effect before the One Hundred Eleventh Congress regarding the priority of business and the availability of other business on Wednesday shall be applied only to the extent consistent with this clause.

*Consensus Calendar*

7. (a)(1) At least once during any week in which the House convenes, the House shall consider a measure on the Consensus Calendar as designated by the Speaker.

(2) This paragraph does not apply before March 1 of an odd-numbered year or after September 30 of an even-numbered year.

(b)(1) The sponsor of a measure that has accumulated 290 cosponsors and has not been reported by the committee of primary jurisdiction may present to the Clerk a motion in writing to place that measure on the Consensus Calendar.

(2) A proper motion presented under subparagraph (1) shall be placed in the custody of the Clerk, and shall appear in a portion of the Congressional Record designated for that purpose. The Clerk shall maintain a cumulative list of such motions, and shall make such list publicly available in electronic form.

(3) A motion presented under subparagraph (1) shall be considered as withdrawn if the measure is reported by the committee of primary jurisdiction prior to its placement on the Consensus Calendar.

(c) After a measure has maintained at least 290 cosponsors for a cumulative period of 25 legislative days after the presentation of a motion under paragraph (b)(1), the measure shall be placed on the Consensus Calendar. Such measure shall remain on the Consensus Calendar until it is—

(1) considered in the House; or

(2) reported by the committee of primary jurisdiction.

RULE XVI

MOTIONS AND AMENDMENTS

*Motions*

1. Every motion entertained by the Speaker shall be reduced to writing on the demand of a Member, Delegate, or Resident Commissioner and, unless it is withdrawn the same day, shall be entered on the Journal with the name of the Member, Delegate, or Resident Commissioner offering it. A dilatory motion may not be entertained by the Speaker.

*Withdrawal*

2. Before a motion is entertained, the Speaker shall state it or cause it to be read aloud by the Clerk before it is debated. The motion then shall be in the possession of the House but may be withdrawn at any time before a decision or amendment thereon.

*Question of consideration*

3. When a motion or proposition is entertained, the question, "Will the House now consider it?" may not be put unless demanded by a Member, Delegate, or Resident Commissioner.

*Precedence of motions*

4. (a) When a question is under debate, only the following motions may be entertained (which shall have precedence in the following order):

(1) To adjourn.

(2) To lay on the table.

(3) For the previous question.

(4) To postpone to a day certain.

(5) To refer.

(6) To amend.

(7) To postpone indefinitely.

(b) A motion to adjourn, to lay on the table, or for the previous question shall be decided without debate. A motion to postpone to a day certain, to refer, or to postpone indefinitely, being decided, may not be allowed again on the same day at the same stage of the question.

(c)(1) It shall be in order at any time for the Speaker, in the discretion of the Speaker, to entertain a motion—

(A) that the Speaker be authorized to declare a recess; or

(B) that when the House adjourns it stand adjourned to a day and time certain.

(2) Either motion shall be of equal privilege with the motion to adjourn and shall be decided without debate.

*Divisibility*

5. (a) Except as provided in paragraph (b), a question shall be divided on the demand of a Member, Delegate, or Resident Commissioner before the question is put if it includes propositions so distinct in substance that, one being taken away, a substantive proposition remains.

(b)(1) A motion or resolution to elect members to a standing committee of

# HOUSE OF REPRESENTATIVES

the House, or to a joint standing committee, is not divisible.

(2) A resolution or order reported by the Committee on Rules providing a special order of business is not divisible.

(c) A motion to strike and insert is not divisible, but rejection of a motion to strike does not preclude another motion to amend.

*Amendments*

6. When an amendable proposition is under consideration, a motion to amend and a motion to amend that amendment shall be in order, and it also shall be in order to offer a further amendment by way of substitute for the original motion to amend, to which one amendment may be offered but which may not be voted on until the original amendment is perfected. An amendment may be withdrawn in the House at any time before a decision or amendment thereon. An amendment to the title of a bill or resolution shall not be in order until after its passage or adoption, shall be in order only if offered by the Majority Leader or a designee, and shall be decided without debate.

*Germaneness*

7. No motion or proposition on a subject different from that under consideration shall be admitted under color of amendment.

*Readings*

8. Bills and joint resolutions are subject to readings as follows:

(a) A first reading is in full when the bill or joint resolution is first considered.

(b) A second reading occurs only when the bill or joint resolution is read for amendment in a Committee of the Whole House on the state of the Union under clause 5 of rule XVIII.

(c) A third reading precedes passage when the Speaker states the question: "Shall the bill [or joint resolution] be engrossed [when applicable] and read a third time?" If that question is decided in the affirmative, then the bill or joint resolution shall be read the final time by title and then the question shall be put on its passage.

## RULE XVII
### DECORUM AND DEBATE

*Decorum*

1. (a) A Member, Delegate, or Resident Commissioner who desires to speak or deliver a matter to the House shall respectfully address the Speaker and, on being recognized, may address the House from any place on the floor. When invited by the Chair, a Member, Delegate, or Resident Commissioner may speak from the Clerk's desk.

(b) Remarks in debate (which may include references to the Senate or its Members) shall be confined to the question under debate, avoiding personality.

*Recognition*

2. When two or more Members, Delegates, or the Resident Commissioner seek recognition, the Speaker shall name the Member, Delegate, or Resident Commissioner who is first to speak. A Member, Delegate, or Resident Commissioner may not occupy more than one hour in debate on a question in the House or in the Committee of the Whole House on the state of the Union except as otherwise provided in this rule.

*Managing debate*

3. (a) The Member, Delegate, or Resident Commissioner who calls up a measure may open and close debate thereon. When general debate extends beyond one day, that Member, Delegate, or Resident Commissioner shall be entitled to one hour to close without regard to the time used in opening.

(b) Except as provided in paragraph (a), a Member, Delegate, or Resident Commissioner may not speak more than once to the same question without leave of the House.

(c) A manager of a measure who opposes an amendment thereto is entitled to close controlled debate thereon.

*Call to order*

4. (a) If a Member, Delegate, or Resident Commissioner, in speaking or otherwise, transgresses the Rules of the House, the Speaker shall, or a Member, Delegate, or Resident Commissioner may, call to order the offending Member, Delegate, or Resident Commissioner, who shall immediately sit down unless permitted on motion of another Member, Delegate, or the Resident Commissioner to explain. If a Member, Delegate, or Resident Commissioner is called to order, the Member, Delegate, or Resident Commissioner making the call to order shall indicate the words excepted to, which shall be taken down in writing at the Clerk's desk and read aloud to the House.

(b) The Speaker shall decide the validity of a call to order. The House, if appealed to, shall decide the question without debate. If the decision is in favor of the Member, Delegate, or Resident Commissioner called to order, the Member, Delegate, or Resident Commissioner shall be at liberty to proceed, but not otherwise. If the case requires it, an offending Member, Delegate, or Resident Commissioner shall be liable to censure or such other punishment as the House may consider proper. A Member, Delegate, or Resident Commissioner may not be held to answer a call to order, and may not be subject to the censure of the House therefor, if further debate or other business has intervened.

*Comportment*

5. When the Speaker is putting a question or addressing the House, a Member, Delegate, or Resident Commissioner may not exit or cross the Hall. When a Member, Delegate, or Resident Commissioner is speaking, a Member, Delegate, or Resident Com-

missioner may not pass between the person speaking and the Chair. During the session of the House, a Member, Delegate, or Resident Commissioner may not wear non-religious headdress or a hat or remain by the Clerk's desk during the call of the roll or the counting of ballots. A person on the floor of the House may not smoke or use a mobile electronic device that impairs decorum. The Sergeant-at-Arms is charged with the strict enforcement of this clause.

*Exhibits*

6. When the use of an exhibit in debate is objected to by a Member, Delegate, or Resident Commissioner, the Chair, in the discretion of the Chair, may submit the question of its use to the House without debate.

*Galleries*

7. During a session of the House, it shall not be in order for a Member, Delegate, or Resident Commissioner to introduce to or to bring to the attention of the House an occupant in the galleries of the House. The Speaker may not entertain a request for the suspension of this rule by unanimous consent or otherwise.

*Congressional Record*

8. (a) The Congressional Record shall be a substantially verbatim account of remarks made during the proceedings of the House, subject only to technical, grammatical, and typographical corrections authorized by the Member, Delegate, or Resident Commissioner making the remarks.

(b) Unparliamentary remarks may be deleted only by permission or order of the House.

(c) This clause establishes a standard of conduct within the meaning of clause 3(a)(2) of rule XI.

*Legislative Proceedings*

9.(a) A Member, Delegate, the Resident Commissioner, officer, or employee of the House may not engage in disorderly or disruptive conduct in the Chamber, including—

(1) intentionally obstructing or impeding the passage of others in the Chamber;

(2) the use of an exhibit to impede, disrupt, or disturb the proceedings of the House; and

(3) the denial of legislative instruments to others seeking to engage in legislative proceedings.

(b) This clause establishes a standard of conduct within the meaning of clause 3(a)(2) of rule XI.

*Secret sessions*

10. When confidential communications are received from the President, or when the Speaker or a Member, Delegate, or Resident Commissioner informs the House that such individual has communications that such individual believes ought to be kept secret for the present, the House shall be cleared of all persons except the Members, Delegates, Resident Commissioner, and officers of the House for the

reading of such communications, and debates and proceedings thereon, unless otherwise ordered by the House.

## RULE XVIII

### THE COMMITTEE OF THE WHOLE HOUSE ON THE STATE OF THE UNION

#### *Resolving into the Committee of the Whole*

1. Whenever the House resolves into the Committee of the Whole House on the state of the Union, the Speaker shall leave the chair after appointing a Member, Delegate, or the Resident Commissioner as Chair to preside. In case of disturbance or disorderly conduct in the galleries or lobby, the Chair may cause the same to be cleared.

2. (a) Except as provided in paragraph (b) and in clause 6 of rule XV, the House resolves into the Committee of the Whole House on the state of the Union by motion. When such a motion is entertained, the Speaker shall put the question without debate: ''Shall the House resolve itself into the Committee of the Whole House on the state of the Union for consideration of this matter?'', naming it.

(b) After the House has adopted a resolution reported by the Committee on Rules providing a special order of business for the consideration of a measure in the Committee of the Whole House on the state of the Union, the Speaker may at any time, when no question is pending before the House, declare the House resolved into the Committee of the Whole for the consideration of that measure without intervening motion, unless the special order of business provides otherwise.

#### *Measures requiring initial consideration in the Committee of the Whole*

3. All public bills, resolutions, or Senate amendments (as provided in clause 3 of rule XXII) involving a tax or charge on the people, raising revenue, directly or indirectly making appropriations of money or property or requiring such appropriations to be made, authorizing payments out of appropriations already made, or releasing any liability to the United States for money or property, shall be first considered in the Committee of the Whole House on the state of the Union. A bill, resolution, or Senate amendment that fails to comply with this clause is subject to a point of order against its consideration.

#### *Order of business*

4. (a) Subject to subparagraph (b) business on the calendar of the Committee of the Whole House on the state of the Union may be taken up in regular order, or in such order as the Committee may determine, unless the measure to be considered was determined by the House at the time of resolving into the Committee of the Whole.

(b) Motions to resolve into the Committee of the Whole for consideration of bills and joint resolutions making general appropriations have precedence under this clause.

#### *Reading for amendment*

5. (a) Before general debate commences on a measure in the Committee of the Whole House on the state of the Union, it shall be read in full. When general debate is concluded or closed by order of the House, the measure under consideration shall be read for amendment. A Member, Delegate, or Resident Commissioner who offers an amendment shall be allowed five minutes to explain it, after which the Member, Delegate, or Resident Commissioner who shall first obtain the floor shall be allowed five minutes to speak in opposition to it. There shall be no further debate thereon, but the same privilege of debate shall be allowed in favor of and against any amendment that may be offered to an amendment. An amendment, or an amendment to an amendment, may be withdrawn by its proponent only by the unanimous consent of the Committee of the Whole.

(b) When a Member, Delegate, or Resident Commissioner offers an amendment in the Committee of the Whole House on the state of the Union, the Clerk shall promptly transmit five copies of the amendment to the majority committee table and five copies to the minority committee table. The Clerk also shall deliver at least one copy of the amendment to the majority cloakroom and at least one copy to the minority cloakroom.

#### *Quorum and voting*

6. (a) A quorum of a Committee of the Whole House on the state of the Union is 100 Members, Delegates, and the Resident Commissioner. The first time that a Committee of the Whole finds itself without a quorum during a day, the Chair shall invoke the procedure for a quorum call set forth in clause 2 of rule XX, unless the Chair elects to invoke an alternate procedure set forth in clause 3 or clause 4(a) of rule XX. If a quorum appears, the Committee of the Whole shall continue its business. If a quorum does not appear, the Committee of the Whole shall rise, and the Chair shall report the names of absentees to the House.

(b)(1) The Chair may refuse to entertain a point of order that a quorum is not present during general debate.

(2) After a quorum has once been established on a day, the Chair may entertain a point of order that a quorum is not present only when the Committee of the Whole House on the state of the Union is operating under the five-minute rule and the Chair has put the pending proposition to a vote.

(3) Upon sustaining a point of order that a quorum is not present, the Chair may announce that, following a regular quorum call under paragraph (a), the minimum time for electronic voting on the pending question shall be not less than two minutes.

(c) When ordering a quorum call in the Committee of the Whole House on the state of the Union, the Chair may announce an intention to declare that a quorum is constituted at any time during the quorum call when the Chair determines that a quorum has appeared. If the Chair interrupts the quorum call by declaring that a quorum is constituted, proceedings under the quorum call shall be considered as vacated, and the Committee of the Whole shall continue its sitting and resume its business.

(d) A quorum is not required in the Committee of the Whole House on the state of the Union for adoption of a motion that the Committee rise.

(e) In the Committee of the Whole House on the state of the Union, the Chair shall order a recorded vote on a request supported by at least 25 Members, Delegates, and the Resident Commissioner.

(f) In the Committee of the Whole House on the state of the Union, the Chair may reduce to not less than two minutes the minimum time for electronic voting on any or all pending amendments after a record vote has been taken on the first pending amendment, if in the discretion of the Chair Members, Delegates, and the Resident Commissioner would be afforded an adequate opportunity to vote.

(g) The Chair may postpone a request for a recorded vote on any amendment. The Chair may resume proceedings on a postponed request at any time. The Chair may reduce to not less than two minutes the minimum time for electronic voting—

(1) on any postponed question that follows another electronic vote, provided that the minimum time for electronic voting on the first in any series of questions shall be 15 minutes; or

(2) on any postponed question taken after the Committee of the Whole resumes its sitting if in the discretion of the Chair Members, Delegates, and the Resident Commissioner would be afforded an adequate opportunity to vote.

(h) Whenever a recorded vote on any question has been decided by a margin within which the votes cast by the Delegates and the Resident Commissioner have been decisive, the Committee of the Whole shall rise and the Speaker shall put such question de novo without intervening motion. Upon the announcement of the vote on that question, the Committee of the Whole shall resume its sitting without intervening motion.

#### *Dispensing with the reading of an amendment*

7. It shall be in order in the Committee of the Whole House on the state of the Union to move that the Committee of the Whole dispense with the reading of an amendment that has been printed in the bill or resolution as reported by a committee, or an amendment that a Member, Delegate, or Resident Commissioner has caused to be printed in the Congressional Record.

# HOUSE OF REPRESENTATIVES

Rule XVIII, clause 7 — Rule XX, clause 1

Such a motion shall be decided without debate.

## Closing debate

8. (a) Subject to paragraph (b) at any time after the Committee of the Whole House on the state of the Union has begun five-minute debate on amendments to any portion of a bill or resolution, it shall be in order to move that the Committee of the Whole close all debate on that portion of the bill or resolution or on the pending amendments only. Such a motion shall be decided without debate. The adoption of such a motion does not preclude further amendment, to be decided without debate.

(b) If the Committee of the Whole House on the state of the Union closes debate on any portion of a bill or resolution before there has been debate on an amendment that a Member, Delegate, or Resident Commissioner has caused to be printed in the Congressional Record at least one day before its consideration, the Member, Delegate, or Resident Commissioner who caused the amendment to be printed in the Record shall be allowed five minutes to explain it, after which the Member, Delegate, or Resident Commissioner who shall first obtain the floor shall be allowed five minutes to speak in opposition to it. There shall be no further debate thereon.

(c) Material submitted for printing in the Congressional Record under this clause shall indicate the full text of the proposed amendment, the name of the Member, Delegate, or Resident Commissioner proposing it, the number of the bill or resolution to which it will be offered, and the point in the bill or resolution or amendment thereto where the amendment is intended to be offered. The amendment shall appear in a portion of the Record designated for that purpose. Amendments to a specified measure submitted for printing in that portion of the Record shall be numbered in the order printed.

## Striking the enacting clause

9. A motion that the Committee of the Whole House on the state of the Union rise and report a bill or resolution to the House with the recommendation that the enacting or resolving clause be stricken shall have precedence of a motion to amend, and, if carried in the House, shall constitute a rejection of the bill or resolution. Whenever a bill or resolution is reported from the Committee of the Whole with such adverse recommendation and the recommendation is rejected by the House, the bill or resolution shall stand recommitted to the Committee of the Whole without further action by the House. Before the question of concurrence is submitted, it shall be in order to move that the House refer the bill or resolution to a committee, with or without instructions. If a bill or resolution is so referred, then when it is again reported to the House it shall be referred to the

Committee of the Whole without debate.

## Concurrent resolution on the budget

10. (a) At the conclusion of general debate in the Committee of the Whole House on the state of the Union on a concurrent resolution on the budget under section 305(a) of the Congressional Budget Act of 1974, the concurrent resolution shall be considered as read for amendment.

(b) It shall not be in order in the House or in the Committee of the Whole House on the state of the Union to consider an amendment to a concurrent resolution on the budget, or an amendment thereto, unless the concurrent resolution, as amended by such amendment or amendments—

(1) would be mathematically consistent except as limited by paragraph (c); and

(2) would contain all the matter set forth in paragraphs (1) through (5) of section 301(a) of the Congressional Budget Act of 1974.

(c)(1) Except as specified in subparagraph (2), it shall not be in order in the House or in the Committee of the Whole House on the state of the Union to consider an amendment to a concurrent resolution on the budget, or an amendment thereto, that proposes to change the amount of the appropriate level of the public debt set forth in the concurrent resolution, as reported.

(2) Amendments to achieve mathematical consistency under section 305(a)(5) of the Congressional Budget Act of 1974, if offered by direction of the Committee on the Budget, may propose to adjust the amount of the appropriate level of the public debt set forth in the concurrent resolution, as reported, to reflect changes made in other figures contained in the concurrent resolution.

## Applicability of Rules of the House

11. The Rules of the House are the rules of the Committee of the Whole House on the state of the Union so far as applicable.

## RULE XIX

### MOTIONS FOLLOWING THE AMENDMENT STAGE

### Previous question

1. (a) There shall be a motion for the previous question, which, being ordered, shall have the effect of cutting off all debate and bringing the House to a direct vote on the immediate question or questions on which it has been ordered. Whenever the previous question has been ordered on an otherwise debatable question on which there has been no debate, it shall be in order to debate that question for 40 minutes, equally divided and controlled by a proponent of the question and an opponent. The previous question may be moved and ordered on a single question, or a series of questions allowable under the rules, or on an amendment or amendments, or may embrace all authorized motions or amendments and

include the bill or resolution to its passage, adoption, or rejection.

(b) Incidental questions of order arising during the pendency of a motion for the previous question shall be decided, whether on appeal or otherwise, without debate.

(c) Notwithstanding paragraph (a), when the previous question is operating to adoption or passage of a measure pursuant to a special order of business, the Chair may postpone further consideration of such measure in the House to such time as may be designated by the Speaker.

### Recommit

2. (a) After the previous question has been ordered on passage or adoption of a measure, or pending a motion to that end, it shall be in order to move that the House recommit (or commit, as the case may be) the measure, without instructions, to a standing or select committee. For such a motion to recommit, the Speaker shall give preference in recognition to a Member, Delegate, or Resident Commissioner who is opposed to the measure.

(b) The previous question shall be considered as ordered on any motion to recommit (or commit, as the case may be).

### Reconsideration

3. When a motion has been carried or lost, it shall be in order on the same or succeeding day for a Member on the prevailing side of the question to enter a motion for the reconsideration thereof. The entry of such a motion shall take precedence over all other questions except the consideration of a conference report or a motion to adjourn, and may not be withdrawn after such succeeding day without the consent of the House. Once entered, a motion may be called up for consideration by any Member. During the last six days of a session of Congress, such a motion shall be disposed of when entered.

4. A bill, petition, memorial, or resolution referred to a committee, or reported therefrom for printing and recommitment, may not be brought back to the House on a motion to reconsider.

## RULE XX

### VOTING AND QUORUM CALLS

1. (a) The House shall divide after the Speaker has put a question to a vote by voice as provided in clause 6 of rule I if the Speaker is in doubt or division is demanded. Those in favor of the question shall first rise or otherwise indicate from their seats and be counted, and then those opposed.

(b) If a Member, Delegate, or Resident Commissioner requests a recorded vote, and that request is supported by at least one-fifth of a quorum, the vote shall be taken by electronic device unless the Speaker invokes another procedure for recording votes provided in this rule. A recorded vote taken in the House under this paragraph shall be considered a vote by the yeas and nays.

(c) In case of a tie vote, a question shall be lost.

33

# RULES OF THE

2. (a) Unless the Speaker directs otherwise, the Clerk shall conduct a record vote or quorum call by electronic device. In such a case the Clerk shall enter on the Journal and publish in the Congressional Record, in alphabetical order in each category, the names of Members recorded as voting in the affirmative, the names of Members recorded as voting in the negative, and the names of Members answering present as if they had been called in the manner provided in clause 3. Except as otherwise permitted under clause 8 or 9 of this rule or under clause 6 of rule XVIII, the minimum time for a record vote or quorum call by electronic device shall be 15 minutes.

(b) When the electronic voting system is inoperable or is not used, the Speaker or Chair may direct the Clerk to conduct a record vote or quorum call as provided in clause 3 or 4.

3. The Speaker may direct the Clerk to conduct a record vote or quorum call by call of the roll. In such a case the Clerk shall call the names of Members, alphabetically by surname. When two or more have the same surname, the name of the State (and, if necessary to distinguish among Members from the same State, the given names of the Members) shall be added. After the roll has been called once, the Clerk shall call the names of those not recorded, alphabetically by surname. Members appearing after the second call, but before the result is announced, may vote or announce a pair.

4. (a) The Speaker may direct a record vote or quorum call to be conducted by tellers. In such a case the tellers named by the Speaker shall record the names of the Members voting on each side of the question or record their presence, as the case may be, which the Clerk shall enter on the Journal and publish in the Congressional Record. Absentees shall be noted, but the doors may not be closed except when ordered by the Speaker. The minimum time for a record vote or quorum call by tellers shall be 15 minutes.

(b) On the demand of a Member, or at the suggestion of the Speaker, the names of Members sufficient to make a quorum in the Hall of the House who do not vote shall be noted by the Clerk, entered on the Journal, reported to the Speaker with the names of the Members voting, and be counted and announced in determining the presence of a quorum to do business.

5. (a) In the absence of a quorum, a majority comprising at least 15 Members, which may include the Speaker, may compel the attendance of absent Members.

(b) Subject to clause 7(b) a majority described in paragraph (a) may order the Sergeant-at-Arms to send officers appointed by the Sergeant-at-Arms to arrest those Members for whom no sufficient excuse is made and shall secure and retain their attendance. The House shall determine on what condition they

shall be discharged. Unless the House otherwise directs, the Members who voluntarily appear shall be admitted immediately to the Hall of the House and shall report their names to the Clerk to be entered on the Journal as present.

(c)(1) If the House should be without a quorum due to catastrophic circumstances, then—

(A) until there appear in the House a sufficient number of Representatives to constitute a quorum among the whole number of the House, a quorum in the House shall be determined based upon the provisional number of the House; and

(B) the provisional number of the House, as of the close of the call of the House described in subparagraph (3)(C), shall be the number of Representatives responding to that call of the House.

(2) If a Representative counted in determining the provisional number of the House thereafter ceases to be a Representative, or if a Representative not counted in determining the provisional number of the House thereafter appears in the House, the provisional number of the House shall be adjusted accordingly.

(3) For the purposes of subparagraph (1), the House shall be considered to be without a quorum due to catastrophic circumstances if, after a motion under paragraph (a) has been disposed of and without intervening adjournment, each of the following occurs in the stated sequence:

(A) A call of the House (or a series of calls of the House) is closed after aggregating a period in excess of 72 hours (excluding time the House is in recess) without producing a quorum.

(B) The Speaker—

(i) with the Majority Leader and the Minority Leader (or their respective designees), receives from the Sergeant-at-Arms (or a designee) a catastrophic quorum failure report, as described in subparagraph (4);

(ii) consults with the Majority Leader and the Minority Leader (or their respective designees) on the content of that report; and

(iii) announces the content of that report to the House.

(C) A further call of the House (or a series of calls of the House) is closed after aggregating a period in excess of 24 hours (excluding time the House is in recess) without producing a quorum.

(4)(A) For purposes of subparagraph (3), a catastrophic quorum failure report is a report advising that the inability of the House to establish a quorum is attributable to catastrophic circumstances involving natural disaster, attack, contagion, or similar calamity rendering Representatives incapable of attending the proceedings of the House.

(B) Such report shall specify the following:

(i) The number of vacancies in the House and the names of former Representatives whose seats are vacant.

(ii) The names of Representatives considered incapacitated.

(iii) The names of Representatives not incapacitated but otherwise incapable of attending the proceedings of the House.

(iv) The names of Representatives unaccounted for.

(C) Such report shall be prepared on the basis of the most authoritative information available after consultation with the Attending Physician to the Congress and the Clerk (or their respective designees) and pertinent public health and law enforcement officials.

(D) Such report shall be updated every legislative day for the duration of any proceedings under or in reliance on this paragraph. The Speaker shall make such updates available to the House.

(5) An announcement by the Speaker under subparagraph (3)(B)(iii) shall not be subject to appeal.

(6) Subparagraph (1) does not apply to a proposal to create a vacancy in the representation from any State in respect of a Representative not incapacitated but otherwise incapable of attending the proceedings of the House.

(7) For purposes of this paragraph:

(A) The term "provisional number of the House" means the number of Representatives upon which a quorum will be computed in the House until Representatives sufficient in number to constitute a quorum among the whole number of the House appear in the House.

(B) The term "whole number of the House" means the number of Representatives chosen, sworn, and living whose membership in the House has not been terminated by resignation or by the action of the House.

(d) Upon the death, resignation, expulsion, disqualification, removal, or swearing of a Member, the whole number of the House shall be adjusted accordingly. The Speaker shall announce the adjustment to the House. Such an announcement shall not be subject to appeal. In the case of a death, the Speaker may lay before the House such documentation from Federal, State, or local officials as the Speaker deems pertinent.

6. (a) When a quorum fails to vote on a question, a quorum is not present, and objection is made for that cause (unless the House shall adjourn)—

(1) there shall be a call of the House;

(2) the Sergeant-at-Arms shall proceed forthwith to bring in absent Members; and

(3) the yeas and nays on the pending question shall at the same time be considered as ordered.

(b) The Clerk shall record Members by the yeas and nays on the pending question, using such procedure as the Speaker may invoke under clause 2, 3, or 4. Each Member arrested under this

# HOUSE OF REPRESENTATIVES

clause shall be brought by the Sergeant-at-Arms before the House, whereupon the Member shall be noted as present, discharged from arrest, and given an opportunity to vote; and such vote shall be recorded. If those voting on the question and those who are present and decline to vote together make a majority of the House, the Speaker shall declare that a quorum is constituted, and the pending question shall be decided as the requisite majority of those voting shall have determined. Thereupon further proceedings under the call shall be considered as dispensed with.

(c) At any time after Members have had the requisite opportunity to respond by the yeas and nays ordered under this clause, but before a result has been announced, a motion that the House adjourn shall be in order if seconded by a majority of those present, to be ascertained by actual count by the Speaker. If the House adjourns on such a motion, all proceedings under this clause shall be considered as vacated.

7. (a) The Speaker may not entertain a point of order that a quorum is not present unless a question has been put to a vote.

(b) Subject to paragraph (c) the Speaker may recognize a Member, Delegate, or Resident Commissioner to move a call of the House at any time. When a quorum is established pursuant to a call of the House, further proceedings under the call shall be considered as dispensed with unless the Speaker recognizes for a motion to compel attendance of Members under clause 5(b).

(c) A call of the House shall not be in order after the previous question is ordered unless the Speaker determines by actual count that a quorum is not present.

## Postponement of proceedings

8. (a)(1) When a recorded vote is ordered, or the yeas and nays are ordered, or a vote is objected to under clause 6—

(A) on any of the questions specified in subparagraph (2), the Speaker may postpone further proceedings to a designated place in the legislative schedule within two additional legislative days; and

(B) on the question of agreeing to the Speaker's approval of the Journal, the Speaker may postpone further proceedings to a designated place in the legislative schedule on that legislative day.

(2) The questions described in subparagraph (1) are as follows:

(A) The question of passing a bill or joint resolution.

(B) The question of adopting a resolution or concurrent resolution.

(C) The question of agreeing to a motion to instruct managers on the part of the House (except that proceedings may not resume on such a motion under clause 7(c) of rule XXII

if the managers have filed a report in the House).

(D) The question of agreeing to a conference report.

(E) The question of adopting a motion to recommit.

(F) The question of adopting a motion to concur in a Senate amendment, with or without amendment.

(G) The question of agreeing to an amendment.

(H) The question of ordering the previous question on a question described in subdivisions (A) through (G).

(I) The question of agreeing to a motion to suspend the rules.

(J) The question of agreeing to a motion to reconsider or the question of agreeing to a motion to lay on the table a motion to reconsider.

(b) At the time designated by the Speaker for further proceedings on questions postponed under paragraph (a), the Speaker shall resume proceedings on each postponed question.

(c) If the House adjourns on a legislative day designated for further proceedings on questions postponed under this clause without disposing of such questions, then on the next legislative day the unfinished business is the disposition of such questions.

## Five-minute votes

9. (a) The Speaker may reduce to five minutes the minimum time for electronic voting on any question that follows another electronic vote or a report from the Committee of the Whole, if in the discretion of the Speaker Members would be afforded an adequate opportunity to vote.

(b) To the maximum extent practicable, notice of possible five-minute voting for a given series of votes shall be issued prior to the first electronic vote in the series.

## Automatic yeas and nays

10. The yeas and nays shall be considered as ordered when the Speaker puts the question on passage of a bill or joint resolution, or on adoption of a conference report, making general appropriations, or on final adoption of a concurrent resolution on the budget or conference report thereon.

## Ballot votes

11. In a case of ballot for election, a majority of the votes shall be necessary to an election. When there is not such a majority on the first ballot, the process shall be repeated until a majority is obtained. In all balloting blanks shall be rejected, may not be counted in the enumeration of votes, and may not be reported by the tellers.

## RULE XXI

### RESTRICTIONS ON CERTAIN BILLS

#### Reservation of certain points of order

1. At the time a general appropriation bill is reported, all points of order against provisions therein shall be considered as reserved.

#### General appropriation bills and amendments

2. (a)(1) An appropriation may not be reported in a general appropriation bill, and may not be in order as an amendment thereto, for an expenditure not previously authorized by law, except to continue appropriations for public works and objects that are already in progress.

(2) A reappropriation of unexpended balances of appropriations may not be reported in a general appropriation bill, and may not be in order as an amendment thereto, except to continue appropriations for public works and objects that are already in progress. This subparagraph does not apply to transfers of unexpended balances within the department or agency for which they were originally appropriated that are reported by the Committee on Appropriations.

(b) A provision changing existing law may not be reported in a general appropriation bill, including a provision making the availability of funds contingent on the receipt or possession of information not required by existing law for the period of the appropriation, except germane provisions that retrench expenditures by the reduction of amounts of money covered by the bill (which may include those recommended to the Committee on Appropriations by direction of a legislative committee having jurisdiction over the subject matter) and except rescissions of appropriations contained in appropriation Acts.

(c) An amendment to a general appropriation bill shall not be in order if changing existing law, including an amendment making the availability of funds contingent on the receipt or possession of information not required by existing law for the period of the appropriation. Except as provided in paragraph (d), an amendment proposing a limitation not specifically contained or authorized in existing law for the period of the limitation shall not be in order during consideration of a general appropriation bill.

(d) After a general appropriation bill has been read for amendment, a motion that the Committee of the Whole House on the state of the Union rise and report the bill to the House with such amendments as may have been adopted shall, if offered by the Majority Leader or a designee, have precedence over motions to amend the bill. If such a motion to rise and report is rejected or not offered, amendments proposing limitations not specifically contained or authorized in existing law for the period of the limitation or proposing germane amendments that retrench expenditures by reductions of amounts of money covered by the bill may be considered.

(e) A provision other than an appropriation designated an emergency under section 251(b)(2) or section 252(e) of the Balanced Budget and Emergency Deficit Control Act, a rescission of budget authority, or a reduction in di-

# RULES OF THE

rect spending or an amount for a designated emergency may not be reported in an appropriation bill or joint resolution containing an emergency designation under section 251(b)(2) or section 252(e) of such Act and may not be in order as an amendment thereto.

(f) During the reading of an appropriation bill for amendment in the Committee of the Whole House on the state of the Union, it shall be in order to consider en bloc amendments proposing only to transfer appropriations among objects in the bill without increasing the levels of budget authority or outlays in the bill. When considered en bloc under this paragraph, such amendments may amend portions of the bill not yet read for amendment (following disposition of any points of order against such portions) and are not subject to a demand for division of the question in the House or in the Committee of the Whole.

3. It shall not be in order to consider a general appropriation bill or joint resolution, or conference report thereon, that—

(a) provides spending authority derived from receipts deposited in the Highway Trust Fund (excluding any transfers from the General Fund of the Treasury); or

(b) reduces or otherwise limits the accruing balances of the Highway Trust Fund,

for any purpose other than for those activities authorized for the highway or mass transit categories.

## Appropriations on legislative bills

4. A bill or joint resolution carrying an appropriation may not be reported by a committee not having jurisdiction to report appropriations, and an amendment proposing an appropriation shall not be in order during the consideration of a bill or joint resolution reported by a committee not having that jurisdiction. A point of order against an appropriation in such a bill, joint resolution, or amendment thereto may be raised at any time during pendency of that measure for amendment.

## Tax and tariff measures and amendments

5. (a)(1) A bill or joint resolution carrying a tax or tariff measure may not be reported by a committee not having jurisdiction to report tax or tariff measures, and an amendment in the House or proposed by the Senate carrying a tax or tariff measure shall not be in order during the consideration of a bill or joint resolution reported by a committee not having that jurisdiction. A point of order against a tax or tariff measure in such a bill, joint resolution, or amendment thereto may be raised at any time during pendency of that measure for amendment.

(2) For purposes of subparagraph (1), a tax or tariff measure includes an amendment proposing a limitation on funds in a general appropriation bill for the administration of a tax or tariff.

## Consideration of retroactive tax rate increases

(b) It shall not be in order to consider a bill, joint resolution, amendment, or conference report carrying a retroactive Federal income tax rate increase. In this paragraph—

(1) the term ''Federal income tax rate increase'' means any amendment to subsection (a), (b), (c), (d), or (e) of section 1, or to section 11(b) or 55(b), of the Internal Revenue Code of 1986, that imposes a new percentage as a rate of tax and thereby increases the amount of tax imposed by any such section; and

(2) a Federal income tax rate increase is retroactive if it applies to a period beginning before the enactment of the provision.

## Designation of public works

6. It shall not be in order to consider a bill, joint resolution, amendment, or conference report that provides for the designation or redesignation of a public work in honor of an individual then serving as a Member, Delegate, Resident Commissioner, or Senator.

7. (RESERVED.)

8. With respect to measures considered pursuant to a special order of business, points of order under title III of the Congressional Budget Act of 1974 shall operate without regard to whether the measure concerned has been reported from committee. Such points of order shall operate with respect to (as the case may be)—

(a) the form of a measure recommended by the reporting committee where the statute uses the term ''as reported'' (in the case of a measure that has been so reported);

(b) the form of the measure made in order as an original bill or joint resolution for the purpose of amendment; or

(c) the form of the measure on which the previous question is ordered directly to passage.

9. (a) It shall not be in order to consider—

(1) a bill or joint resolution reported by a committee unless the report includes a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the bill or in the report (and the name of any Member, Delegate, or Resident Commissioner who submitted a request to the committee for each respective item included in such list) or a statement that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits;

(2) a bill or joint resolution not reported by a committee unless the chair of each committee of initial referral has caused a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the bill (and the name of any Member, Delegate, or Resident Commissioner who submitted a request to the committee for each respective item included in such list) or a statement

that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits to be printed in the Congressional Record prior to its consideration;

(3) an amendment to a bill or joint resolution to be offered at the outset of its consideration for amendment by a member of a committee of initial referral as designated in a report of the Committee on Rules to accompany a resolution prescribing a special order of business unless the proponent has caused a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the amendment (and the name of any Member, Delegate, or Resident Commissioner who submitted a request to the proponent for each respective item included in such list) or a statement that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits to be printed in the Congressional Record prior to its consideration; or

(4) a conference report to accompany a bill or joint resolution unless the joint explanatory statement prepared by the managers on the part of the House and the managers on the part of the Senate includes a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the conference report or joint statement (and the name of any Member, Delegate, Resident Commissioner, or Senator who submitted a request to the House or Senate committees of jurisdiction for each respective item included in such list) or a statement that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits.

(b) It shall not be in order to consider a conference report to accompany a regular general appropriation bill unless the joint explanatory statement prepared by the managers on the part of the House and the managers on the part of the Senate includes—

(1) a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the conference report or joint statement (and the name of any Member, Delegate, Resident Commissioner, or Senator who submitted a request to the House or Senate committees of jurisdiction for each respective item included in such list) that were neither committed to the conference committee by either House nor in a report of a committee of either House on such bill or on a companion measure; or

(2) a statement that the proposition contains no such congressional earmarks, limited tax benefits, or limited tariff benefits.

(c) It shall not be in order to consider a rule or order that waives the application of paragraph (a) or (b). As disposition of a point of order under this paragraph or paragraph (b), the Chair shall put the question of consideration with respect to the rule or order or conference report, as applicable. The ques-

# HOUSE OF REPRESENTATIVES

tion of consideration shall be debatable for 10 minutes by the Member initiating the point of order and for 10 minutes by an opponent, but shall otherwise be decided without intervening motion except one that the House adjourn.

(d) In order to be cognizable by the Chair, a point of order raised under paragraph (a) may be based only on the failure of a report, submission to the Congressional Record, or joint explanatory statement to include a list required by paragraph (a) or a statement that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits.

(e) For the purpose of this clause, the term "congressional earmark" means a provision or report language included primarily at the request of a Member, Delegate, Resident Commissioner, or Senator providing, authorizing or recommending a specific amount of discretionary budget authority, credit authority, or other spending authority for a contract, loan, loan guarantee, grant, loan authority, or other expenditure with or to an entity, or targeted to a specific State, locality or Congressional district, other than through a statutory or administrative formula-driven or competitive award process.

(f) For the purpose of this clause, the term "limited tax benefit" means—

(1) any revenue-losing provision that—

(A) provides a Federal tax deduction, credit, exclusion, or preference to 10 or fewer beneficiaries under the Internal Revenue Code of 1986, and

(B) contains eligibility criteria that are not uniform in application with respect to potential beneficiaries of such provision; or

(2) any Federal tax provision which provides one beneficiary temporary or permanent transition relief from a change to the Internal Revenue Code of 1986.

(g) For the purpose of this clause, the term "limited tariff benefit" means a provision modifying the Harmonized Tariff Schedule of the United States in a manner that benefits 10 or fewer entities.

10. (a)(1) Except as provided in paragraphs (b) and (c), it shall not be in order to consider any bill, joint resolution, amendment, or conference report if the provisions of such measure affecting direct spending and revenues have the net effect of increasing the deficit or reducing the surplus for either the period comprising—

(A) the current fiscal year, the budget year, and the four fiscal years following that budget year; or

(B) the current fiscal year, the budget year, and the nine fiscal years following that budget year.

(2) The effect of such measure on the deficit or surplus shall be determined on the basis of estimates made by the Committee on the Budget relative to baseline estimates supplied by the Congressional Budget Office consistent with section 257 of the Balanced Budget and Emergency Deficit Control Act of 1985.

(b) If a bill, joint resolution, or amendment is considered pursuant to a special order of the House directing the Clerk to add as new matter at the end of such measure the provisions of a separate measure as passed by the House, the provisions of such separate measure as passed by the House shall be included in the evaluation under paragraph (a) of the bill, joint resolution, or amendment.

(c)(1) Except as provided in subparagraph (2), the evaluation under paragraph (a) shall exclude a provision expressly designated as an emergency for purposes of pay-as-you-go principles in the case of a point of order under this clause against consideration of—

(A) a bill or joint resolution;

(B) an amendment made in order as original text by a special order of business;

(C) a conference report; or

(D) an amendment between the Houses.

(2) In the case of an amendment (other than one specified in subparagraph (1)) to a bill or joint resolution, the evaluation under paragraph (a) shall give no cognizance to any designation of emergency.

(3) If a bill, joint resolution, an amendment made in order as original text by a special order of business, a conference report, or an amendment between the Houses includes a provision expressly designated as an emergency for purposes of pay-as-you-go principles, the Chair shall put the question of consideration with respect thereto.

(d) For the purpose of this clause, the terms "budget year" and "current year" have the meanings specified in section 250 of the Balanced Budget and Emergency Deficit Control Act of 1985, and the term "direct spending" has the meaning specified in such section 250 except that such term shall also include provisions in appropriations Acts that make outyear modifications to substantive law as described in section 3(4)(C) of the Statutory Pay-As-You-Go Act of 2010.

11. It shall not be in order to consider a bill or joint resolution which has not been reported by a committee until the text of such measure has been available to Members, Delegates, and the Resident Commissioner for 72 hours.

12. (a) It shall not be in order to consider a bill or joint resolution pursuant to a special order of business reported by the Committee on Rules that has not been reported by a committee.

(b) Paragraph (a) shall not apply to a bill or joint resolution—

(1) continuing appropriations for a fiscal year;

(2) containing an emergency designation under section 251(b)(2) or section 252(e) of the Balanced Budget and Emergency Deficit Control Act of 1985;

(3) designated pursuant to clause 7(a) of rule XV; or

(4) not referred to committee.

(c) Paragraph (a) does not apply before March 1 of an odd-numbered year.

## RULE XXII

### HOUSE AND SENATE RELATIONS

*Senate amendments*

1. A motion to disagree to Senate amendments to a House proposition and to request or agree to a conference with the Senate, or a motion to insist on House amendments to a Senate proposition and to request or agree to a conference with the Senate, shall be privileged in the discretion of the Speaker if offered by direction of the primary committee and of all reporting committees that had initial referral of the proposition.

2. A motion to dispose of House bills with Senate amendments not requiring consideration in the Committee of the Whole House on the state of the Union shall be privileged.

3. Except as permitted by clause 1, before the stage of disagreement, a Senate amendment to a House bill or resolution shall be subject to the point of order that it must first be considered in the Committee of the Whole House on the state of the Union if, originating in the House, it would be subject to such a point under clause 3 of rule XVIII.

4. When the stage of disagreement has been reached on a bill or resolution with House or Senate amendments, a motion to dispose of any amendment shall be privileged.

5. (a) Managers on the part of the House may not agree to a Senate amendment described in paragraph (b) unless specific authority to agree to the amendment first is given by the House by a separate vote with respect thereto. If specific authority is not granted, the Senate amendment shall be reported in disagreement by the conference committee back to the two Houses for disposition by separate motion.

(b) The managers on the part of the House may not agree to a Senate amendment described in paragraph (a) that—

(1) would violate clause 2(a)(1) or (c) of rule XXI if originating in the House; or

(2) proposes an appropriation on a bill other than a general appropriation bill.

6. A Senate amendment carrying a tax or tariff measure in violation of clause 5(a) of rule XXI may not be agreed to.

*Conference reports; amendments reported in disagreement*

7. (a) The presentation of a conference report shall be in order at any time except during a reading of the Journal or the conduct of a record vote, a vote by division, or a quorum call.

(b)(1) Subject to subparagraph (2) the time allotted for debate on a motion to

# RULES OF THE

instruct managers on the part of the House shall be equally divided between the majority and minority parties.

(2) If the proponent of a motion to instruct managers on the part of the House and the Member, Delegate, or Resident Commissioner of the other party identified under subparagraph (1) both support the motion, one-third of the time for debate thereon shall be allotted to a Member, Delegate, or Resident Commissioner who opposes the motion on demand of that Member, Delegate, or Resident Commissioner.

(c)(1) A motion to instruct managers on the part of the House, or a motion to discharge all managers on the part of the House and to appoint new conferees, shall be privileged after a conference committee has been appointed for 45 calendar days and 25 legislative days without making a report, but only on the day after the calendar day on which the Member, Delegate, or Resident Commissioner offering the motion announces to the House intention to do so and the form of the motion.

(2) The Speaker may designate a time in the legislative schedule on that legislative day for consideration of a motion described in subparagraph (1).

(3) During the last six days of a session of Congress, a motion under subparagraph (1) shall be privileged after a conference committee has been appointed for 36 hours without making a report and the proponent meets the notice requirement in subparagraph (1).

(d) Instructions to conferees in a motion to instruct may not include argument.

(e) Each conference report to the House shall be printed as a report of the House. Each such report shall be accompanied by a joint explanatory statement prepared jointly by the managers on the part of the House and the managers on the part of the Senate. The joint explanatory statement shall be sufficiently detailed and explicit to inform the House of the effects of the report on the matters committed to conference.

8. (a)(1) Except as specified in subparagraph (2), it shall not be in order to consider a conference report until—

(A) the conference report and the accompanying joint explanatory statement have been available to Members, Delegates, and the Resident Commissioner for 72 hours in the Congressional Record pursuant to clause 3 of rule XXIX; and

(B) printed or electronic copies of the conference report and the accompanying joint explanatory statement have been available to Members, Delegates, and the Resident Commissioner for at least two hours.

(2) Subparagraph (1)(A) does not apply during the last six days of a session of Congress.

(b)(1) Except as specified in subparagraph (2), it shall not be in order to consider a motion to dispose of a Senate amendment reported in disagreement by a conference committee until—

(A) the report in disagreement and any accompanying statement have been available to Members, Delegates, and the Resident Commissioner for 72 hours in the Congressional Record or pursuant to clause 3 of rule XXIX; and

(B) copies of the report in disagreement and any accompanying statement, together with the text of the Senate amendment, have been available to Members, Delegates, and the Resident Commissioner for at least two hours.

(2) Subparagraph (1)(A) does not apply during the last six days of a session of Congress.

(3) During consideration of a Senate amendment reported in disagreement by a conference committee on a general appropriation bill, a motion to insist on disagreement to the Senate amendment shall be preferential to any other motion to dispose of that amendment if the original motion offered by the floor manager proposes to change existing law and the motion to insist is offered before debate on the original motion by the chair of the committee having jurisdiction of the subject matter of the amendment or a designee. Such a preferential motion shall be separately debatable for one hour equally divided between its proponent and the proponent of the original motion. The previous question shall be considered as ordered on the preferential motion to its adoption without intervening motion.

(c) A conference report or a Senate amendment reported in disagreement by a conference committee that has been available as provided in paragraph (a) or (b) shall be considered as read when called up.

(d)(1) Subject to subparagraph (2), the time allotted for debate on a conference report or on a motion to dispose of a Senate amendment reported in disagreement by a conference committee shall be equally divided between the majority and minority parties.

(2) If the floor manager for the majority and the floor manager for the minority both support the conference report or motion, one-third of the time for debate thereon shall be allotted to a Member, Delegate, or Resident Commissioner who opposes the conference report or motion on demand of that Member, Delegate, or Resident Commissioner.

(e) Under clause 6(a)(2) of rule XIII, a resolution proposing only to waive a requirement of this clause concerning the availability of reports to Members, Delegates, and the Resident Commissioner may be considered by the House on the same day it is reported by the Committee on Rules.

9. Whenever a disagreement to an amendment has been committed to a conference committee, the managers on the part of the House may propose a substitute that is a germane modification of the matter in disagreement. The introduction of any language presenting specific additional matter not

committed to the conference committee by either House does not constitute a germane modification of the matter in disagreement. Moreover, a conference report may not include matter not committed to the conference committee by either House and may not include a modification of specific matter committed to the conference committee by either or both Houses if that modification is beyond the scope of that specific matter as committed to the conference committee.

10. (a)(1) A Member, Delegate, or Resident Commissioner may raise a point of order against nongermane matter, as specified in subparagraph (2), before the commencement of debate on—

(A) a conference report;

(B) a motion that the House recede from its disagreement to a Senate amendment reported in disagreement by a conference committee and concur therein, with or without amendment; or

(C) a motion that the House recede from its disagreement to a Senate amendment on which the stage of disagreement has been reached and concur therein, with or without amendment.

(2) A point of order against nongermane matter is one asserting that a proposition described in subparagraph (1) contains specified matter that would violate clause 7 of rule XVI if it were offered in the House as an amendment to the underlying measure in the form it was passed by the House.

(b) If a point of order under paragraph (a) is sustained, a motion that the House reject the nongermane matter identified by the point of order shall be privileged. Such a motion is debatable for 40 minutes, one-half in favor of the motion and one-half in opposition thereto.

(c) After disposition of a point of order under paragraph (a) or a motion to reject under paragraph (b), any further points of order under paragraph (a) not covered by a previous point of order, and any consequent motions to reject under paragraph (b), shall be likewise disposed of.

(d)(1) If a motion to reject under paragraph (b) is adopted, then after disposition of all points of order under paragraph (a) and any consequent motions to reject under paragraph (b), the conference report or motion, as the case may be, shall be considered as rejected and the matter remaining in disagreement shall be disposed of under subparagraph (2) or (3), as the case may be.

(2) After the House has adopted one or more motions to reject nongermane matter contained in a conference report under the preceding provisions of this clause—

(A) if the conference report accompanied a House measure amended by the Senate, the pending question shall be whether the House shall recede and concur in the Senate

# HOUSE OF REPRESENTATIVES

amendment with an amendment consisting of so much of the conference report as was not rejected; and

(B) if the conference report accompanied a Senate measure amended by the House, the pending question shall be whether the House shall insist further on the House amendment.

(3) After the House has adopted one or more motions to reject nongermane matter contained in a motion that the House recede and concur in a Senate amendment, with or without amendment, the following motions shall be privileged and shall take precedence in the order stated:

(A) A motion that the House recede and concur in the Senate amendment with an amendment in writing then available on the floor.

(B) A motion that the House insist on its disagreement to the Senate amendment and request a further conference with the Senate.

(C) A motion that the House insist on its disagreement to the Senate amendment.

(e) If, on a division of the question on a motion described in paragraph (a)(1)(B) or (C), the House agrees to recede, then a Member, Delegate, or Resident Commissioner may raise a point of order against nongermane matter, as specified in paragraph (a)(2), before the commencement of debate on concurring in the Senate amendment, with or without amendment. A point of order under this paragraph shall be disposed of according to the preceding provisions of this clause in the same manner as a point of order under paragraph (a).

11. It shall not be in order to consider a conference report to accompany a bill or joint resolution that proposes to amend the Internal Revenue Code of 1986 unless—

(a) the joint explanatory statement of the managers includes a tax complexity analysis prepared by the Joint Committee on Taxation in accordance with section 4022(b) of the Internal Revenue Service Restructuring and Reform Act of 1998; or

(b) the chair of the Committee on Ways and Means causes such a tax complexity analysis to be printed in the Congressional Record before consideration of the conference report.

12. (a)(1) Subject to subparagraph (2), a meeting of each conference committee shall be open to the public.

(2) In open session of the House, a motion that managers on the part of the House be permitted to close to the public a meeting or meetings of their conference committee shall be privileged, shall be decided without debate, and shall be decided by the yeas and nays.

(3) In conducting conferences with the Senate, managers on the part of the House should endeavor to ensure—

(A) that meetings for the resolution of differences between the two Houses occur only under circumstances in which every manager on the part of the House has notice of

the meeting and a reasonable opportunity to attend;

(B) that all provisions on which the two Houses disagree are considered as open to discussion at any meeting of a conference committee; and

(C) that papers reflecting a conference agreement are held inviolate to change without renewal of the opportunity of all managers on the part of the House to reconsider their decisions to sign or not to sign the agreement.

(4) Managers on the part of the House shall be provided a unitary time and place with access to at least one complete copy of the final conference agreement for the purpose of recording their approval (or not) of the final conference agreement by placing their signatures (or not) on the sheets prepared to accompany the conference report and joint explanatory statement of the managers.

(b) A point of order that a conference committee failed to comply with paragraph (a) may be raised immediately after the conference report is read or considered as read. If such a point of order is sustained, the conference report shall be considered as rejected, the House shall be considered to have insisted on its amendments or on disagreement to the Senate amendments, as the case may be, and to have requested a further conference with the Senate, and the Speaker may appoint new conferees without intervening motion.

13. It shall not be in order to consider a conference report the text of which differs in any way, other than clerical, from the text that reflects the action of the conferees on all of the differences between the two Houses, as recorded by their placement of their signatures (or not) on the sheets prepared to accompany the conference report and joint explanatory statement of the managers.

## RULE XXIII

### CODE OF OFFICIAL CONDUCT

There is hereby established by and for the House the following code of conduct, to be known as the "Code of Official Conduct":

1. A Member, Delegate, Resident Commissioner, officer, or employee of the House shall behave at all times in a manner that shall reflect creditably on the House.

2. A Member, Delegate, Resident Commissioner, officer, or employee of the House shall adhere to the spirit and the letter of the Rules of the House and to the rules of duly constituted committees thereof.

3. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not receive compensation and may not permit compensation to accrue to the beneficial interest of such individual from any source, the receipt of which would occur by virtue of influence improperly exerted from the position of such individual in Congress.

4. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept gifts except as provided by clause 5 of rule XXV.

5. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept an honorarium for a speech, a writing for publication, or other similar activity, except as otherwise provided under rule XXV.

6. A Member, Delegate, or Resident Commissioner—

(a) shall keep the campaign funds of such individual separate from the personal funds of such individual;

(b) may not convert campaign funds to personal use in excess of an amount representing reimbursement for legitimate and verifiable campaign expenditures; and

(c) except as provided in clause 1(b) of rule XXIV, may not expend funds from a campaign account of such individual that are not attributable to bona fide campaign or political purposes.

7. A Member, Delegate, or Resident Commissioner shall treat as campaign contributions all proceeds from testimonial dinners or other fundraising events.

8. (a) A Member, Delegate, Resident Commissioner, or officer of the House may not retain an employee who does not perform duties for the offices of the employing authority commensurate with the compensation such employee receives.

(b) In the case of a committee employee who works under the direct supervision of a member of the committee other than a chair, the chair may require that such member affirm in writing that the employee has complied with clause 8(a) (subject to clause 9 of rule X) as evidence of compliance by the chair with this clause and with clause 9 of rule X.

(c)(1) Except as specified in subparagraph (2)—

(A) a Member, Delegate, or Resident Commissioner may not retain the relative of such individual in a paid position; and

(B) an employee of the House may not accept compensation for work for a committee on which the relative of such employee serves as a member.

(2) Subparagraph (1) shall not apply in the case of a relative whose pertinent employment predates the One Hundred Thirteenth Congress.

(3) As used in this paragraph, the term "relative" means an individual who is related to the Member, Delegate, or Resident Commissioner as parent, child, sibling, parent's sibling, first cousin, sibling's child, spouse, parent-in-law, child-in-law, sibling-in-law, stepparent, stepchild, stepsibling, half-sibling, or grandchild.

9. A Member, Delegate, Resident Commissioner, officer, or employee

# RULES OF THE

of the House may not discharge and may not refuse to hire an individual, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the race, color, religion, sex (including marital or parental status), sexual orientation, gender identity, disability, age, or national origin of such individual, including by committing an act of sexual harassment against such individual, but may take into consideration the domicile or political affiliation of such individual.

10. (a) A Member, Delegate, or Resident Commissioner who has been convicted by a court of record for the commission of a crime for which a sentence of two or more years' imprisonment may be imposed should refrain from participation in the business of each committee of which such individual is a member, and a Member should refrain from voting on any question at a meeting of the House or of the Committee of the Whole House on the state of the Union, unless or until judicial or executive proceedings result in reinstatement of the presumption of the innocence of such Member or until the Member is reelected to the House after the date of such conviction.

(b) A Member, Delegate, or Resident Commissioner who has been indicted for or otherwise formally charged with criminal conduct in any Federal, State, or local court punishable as a felony for which a sentence of two or more years' imprisonment may be imposed should resign from any standing, select, joint or ad hoc committee, and any subcommittee thereof, on which such Member, Delegate, or Resident Commissioner serves, and should step aside from any party caucus or conference leadership position such Member, Delegate, or Resident Commissioner holds, unless or until judicial or executive proceedings result in acquittal or the charges are dismissed or reduced to less than a felony as described in this paragraph.

11. A Member, Delegate, or Resident Commissioner may not authorize or otherwise allow an individual, group, or organization not under the direction and control of the House to use the words ''Congress of the United States,'' ''House of Representatives,'' or ''Official Business,'' or any combination of words thereof, on any letterhead or envelope.

12. (a) Except as provided in paragraph (b), an employee of the House who is required to file a report under rule XXVI may not participate personally and substantially as an employee of the House in a contact with an agency of the executive or judicial branches of Government with respect to nonlegislative matters affecting any nongovernmental person in which the employee has a significant financial interest.

(b) Paragraph (a) does not apply if an employee first advises the employing authority of such employee of a significant financial interest described in paragraph (a) and obtains from such employing authority a written waiver stating that the participation of the employee in the activity described in paragraph (a) is necessary. A copy of each such waiver shall be filed with the Committee on Ethics.

13. Before a Member, Delegate, Resident Commissioner, officer, or employee of the House may have access to classified information, the following oath (or affirmation) shall be executed:

''I do solemnly swear (or affirm) that I will not disclose any classified information received in the course of my service with the House of Representatives, except as authorized by the House of Representatives or in accordance with its Rules.''

Copies of the executed oath (or affirmation) shall be retained as part of the records of the House, in the case of a Member, Delegate, or the Resident Commissioner, by the Clerk, and in the case of an officer or employee of the House, by the Sergeant-at-Arms. The Clerk shall make the signatories a matter of public record, causing the names of each Member, Delegate, or Resident Commissioner who has signed the oath during a week (if any) to be published in a portion of the Congressional Record designated for that purpose on the last legislative day of the week and making cumulative lists of such names available each day for public inspection in an appropriate office of the House.

14. A Member, Delegate, or Resident Commissioner may not, with the intent to influence on the basis of partisan political affiliation an employment decision or employment practice of any private entity—

(a) take or withhold, or offer or threaten to take or withhold, an official act; or

(b) influence, or offer or threaten to influence, the official act of another.

15. (a) Except as provided in paragraphs (b) and (c), a Member, Delegate, or Resident Commissioner may not use personal funds, official funds, or campaign funds for a flight on an aircraft.

(b) Paragraph (a) does not apply if—

(1) the aircraft is operated by an air carrier or commercial operator certificated by the Federal Aviation Administration and the flight is required to be conducted under air carrier safety rules, or, in the case of travel which is abroad, by an air carrier or commercial operator certificated by an appropriate foreign civil aviation authority and the flight is required to be con-

ducted under air carrier safety rules;

(2) the aircraft is owned or leased by a Member, Delegate, Resident Commissioner or a family member of a Member, Delegate, or Resident Commissioner (including an aircraft owned by an entity that is not a public corporation in which the Member, Delegate, Resident Commissioner or a family member of a Member, Delegate, or Resident Commissioner has an ownership interest, provided that such Member, Delegate, or Resident Commissioner does not use the aircraft any more than the Member, Delegate, Resident Commissioner, or family member's proportionate share of ownership allows);

(3) the flight consists of the personal use of an aircraft by a Member, Delegate, or the Resident Commissioner that is supplied by—

(A) an individual on the basis of personal friendship; or

(B) another Member, Delegate, or the Resident Commissioner;

(4) the aircraft is operated by an entity of the Federal government or an entity of the government of any State; or

(5) the owner or operator of the aircraft is paid a pro rata share of the fair market value of the normal and usual charter fare or rental charge for a comparable plane of comparable size as determined by dividing such cost by the number of Members, Delegates, or the Resident Commissioner, officers, or employees of Congress on the flight.

(c) An advance written request for a waiver of the restriction in paragraph (a) may be granted jointly by the chair and ranking minority member of the Committee on Ethics, subject to such conditions as they may prescribe.

(d) In this clause—

(1) the term ''campaign funds'' includes funds of any political committee under the Federal Election Campaign Act of 1971, without regard to whether the committee is an authorized committee of the Member, Delegate, or Resident Commissioner involved under such Act;

(2) the term ''family member'' means an individual who is related to the Member, Delegate, or Resident Commissioner, as parent, child, sibling, spouse, or parent-in-law; and

(3) the term ''on the basis of personal friendship'' has the same meaning as in clause 5 of rule XXV and shall be determined as under clause 5(a)(3)(D)(ii) of rule XXV.

16. A Member, Delegate, or Resident Commissioner may not condition the inclusion of language to provide funding for a congressional earmark, a limited tax benefit, or a limited tariff benefit in any bill or joint resolution (or an accompanying re-

# HOUSE OF REPRESENTATIVES

port) or in any conference report on a bill or joint resolution (including an accompanying joint explanatory statement of managers) on any vote cast by another Member, Delegate, or Resident Commissioner. For purposes of this clause and clause 17, the terms "congressional earmark," "limited tax benefit," and "limited tariff benefit" shall have the meanings given them in clause 9 of rule XXI.

17. (a) A Member, Delegate, or Resident Commissioner who requests a congressional earmark, a limited tax benefit, or a limited tariff benefit in any bill or joint resolution (or an accompanying report) or in any conference report on a bill or joint resolution (or an accompanying joint statement of managers) shall provide a written statement to the chair and ranking minority member of the committee of jurisdiction, including—

(1) the name of the Member, Delegate, or Resident Commissioner;

(2) in the case of a congressional earmark, the name and address of the intended recipient or, if there is no specifically intended recipient, the intended location of the activity;

(3) in the case of a limited tax or tariff benefit, identification of the individual or entities reasonably anticipated to benefit, to the extent known to the Member, Delegate, or Resident Commissioner;

(4) the purpose of such congressional earmark or limited tax or tariff benefit; and

(5) a certification that the Member, Delegate, or Resident Commissioner or spouse has no financial interest in such congressional earmark or limited tax or tariff benefit.

(b) Each committee shall maintain the information transmitted under paragraph (a), and the written disclosures for any congressional earmarks, limited tax benefits, or limited tariff benefits included in any measure reported by the committee or conference report filed by the chair of the committee or any subcommittee thereof shall be open for public inspection.

18. (a) A Member, Delegate, or Resident Commissioner may not engage in a sexual relationship with any employee of the House who works under the supervision of the Member, Delegate, or Resident Commissioner, or who is an employee of a committee on which the Member, Delegate, or Resident Commissioner serves. This paragraph does not apply with respect to any relationship between two people who are married to each other.

(b) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not engage in unwelcome sexual advances or conduct towards another Member, Delegate,

Resident Commissioner, officer, or employee of the House.

(c) In this clause, the term "employee" includes an applicant for employment, a paid or unpaid intern (including an applicant for an internship), a detailee, and an individual participating in a fellowship program.

19. (a) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not serve as an officer or director of any public company.

(b) In paragraph (a), the term "public company" means an issuer as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)—

(1) the securities of which are required to be registered under section 12 of such Act (15 U.S.C. 78l); or

(2) that is required to file reports under section 15(d) of such Act (15 U.S.C. 78o(d)).

(c) A Member, Delegate, Resident Commissioner, officer, or employee of the House shall comply with regulations issued and revised, as necessary, by the Committee on Ethics regarding types of prohibited service or positions that could lead to conflicts of interest.

20. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not, directly or indirectly, take any actions to prevent any individual from or retaliate against any individual for providing truthful information to the Committee on Ethics, the Office of Congressional Ethics, the Office of Congressional Workplace Rights, or any law enforcement official, provided that the disclosure of such information is not otherwise prohibited by law or House rules.

21. (a) Except as provided in paragraphs (b) and (c), a Member, Delegate, Resident Commissioner, officer, or employee of the House shall not knowingly and willfully disclose publicly the identity of, or personally identifiable information about, any individual who has reported allegations of possible wrongdoing, including retaliation, under processes and protections provided by the Civil Service Reform Act of 1978, the Whistleblower Protection Act of 1989, the Intelligence Community Whistleblower Protection Act of 1998, or any other Federal law that establishes the right for individuals to make protected disclosures to Congress.

(b) The limitation in paragraph (a) shall not apply to any disclosure of an individual's identity or personally identifiable information if—

(1) the individual has provided express written consent prior to such disclosure;

(2) the individual has already voluntarily and publicly disclosed their identity; or

(3) the disclosure is by the chair of a committee after an affirmative vote by two-thirds of the members

of the committee that such disclosure is in the public interest.

(c) Nothing in this clause shall prevent—

(1) an investigation of any allegation of wrongdoing disclosed by any individual; or

(2) the public disclosure of substantive information shared by any individual that is not personally identifiable to that individual.

(d) Disclosures made pursuant to paragraph (b)(3) shall be subject to appropriate safeguards, including that the individual be provided timely advance notice if possible before their identity or any personally identifiable information is disclosed prior to the vote described in paragraph (b)(3), unless such information would jeopardize the related investigations. When providing such notice to the individual the committee chair shall send the individual a written explanation of the reasons for the disclosure.

22. (a) In this Code of Official Conduct, the term "officer or employee of the House" means an individual whose compensation is disbursed by the Chief Administrative Officer.

(b) An individual whose services are compensated by the House pursuant to a consultant contract shall be considered an employee of the House for purposes of clauses 1, 2, 3, 4, 8, 9, and 13 of this rule. An individual whose services are compensated by the House pursuant to a consultant contract may not lobby the contracting committee or the members or staff of the contracting committee on any matter. Such an individual may lobby other Members, Delegates, or the Resident Commissioner or staff of the House on matters outside the jurisdiction of the contracting committee. In the case of such an individual who is a member or employee of a firm, partnership, or other business organization, the other members and employees of the firm, partnership, or other business organization shall be subject to the same restrictions on lobbying that apply to the individual under this paragraph.

## RULE XXIV

LIMITATIONS ON USE OF OFFICIAL FUNDS

### Limitations on use of official and unofficial accounts

1. (a) Except as provided in paragraph (b), a Member, Delegate, or Resident Commissioner may not maintain, or have maintained for the use of such individual, an unofficial office account. Funds may not be paid into an unofficial office account.

(b)(1) Except as provided in subparagraph (2), a Member, Delegate, or Resident Commissioner may defray official expenses with funds of the principal campaign committee of such individual under the Federal Election Campaign Act of 1971 (2 U.S.C. 431 et seq.).

(2) The funds specified in subparagraph (1) may not be used to defray of-

RULES OF THE

ficial expenses for mail or other communications, compensation for services, office space, office furniture, office equipment, or any associated information technology services (excluding handheld communications devices).

2. Notwithstanding any other provision of this rule, if an amount from the Official Expenses Allowance of a Member, Delegate, or Resident Commissioner is paid into the House Recording Studio revolving fund for telecommunications satellite services, the Member, Delegate, or Resident Commissioner may accept reimbursement from nonpolitical entities in that amount for transmission to the Chief Administrative Officer for credit to the Official Expenses Allowance.

3. In this rule the term "unofficial office account" means an account or repository in which funds are received for the purpose of defraying otherwise unreimbursed expenses allowable under section 162(a) of the Internal Revenue Code of 1986 as ordinary and necessary in the operation of a congressional office, and includes a newsletter fund referred to in section 527(g) of the Internal Revenue Code of 1986.

### Limitations on use of the frank

4. A Member, Delegate, or Resident Commissioner shall mail franked mail under section 3210(d) of title 39, United States Code at the most economical rate of postage practicable.

5. Before making a mass mailing, a Member, Delegate, or Resident Commissioner shall submit a sample or description of the mail matter involved to the House Communications Standards Commission for an advisory opinion as to whether the proposed mailing is in compliance with applicable provisions of law, rule, or regulation.

6. A mass mailing that is otherwise frankable by a Member, Delegate, or Resident Commissioner under the provisions of section 3210(e) of title 39, United States Code, is not frankable unless the cost of preparing and printing it is defrayed exclusively from funds made available in an appropriation Act.

7. A Member, Delegate, or Resident Commissioner may not send a mass mailing outside the congressional district from which elected.

8. In the case of a Member, Delegate, or Resident Commissioner, a mass mailing is not frankable under section 3210 of title 39, United States Code, when it is postmarked less than 90 days before the date of a primary or general election (whether regular, special, or runoff) in which such individual is a candidate for public office. If the mail matter is of a type that is not customarily postmarked, the date on which it would have been postmarked, if it were of a type customarily postmarked, applies.

9. In this rule the term "mass mailing", means, with respect to a session of Congress, a mailing of newsletters or other pieces of mail with substantially identical content (whether such pieces

of mail are deposited singly or in bulk, or at the same time or different times), totaling more than 500 pieces of mail in that session, or any other unsolicited communication of substantially identical content which is transmitted to 500 or more persons in that session or, in the case of a digital communication of substantially identical content, which is disseminated at a cost exceeding a designated amounts provided under regulations of the House Communications Standards Commission, except that such term does not include a mailing—

(a) of matter in direct response to a communication from a person to whom the matter is mailed;

(b) from a Member, Delegate, or Resident Commissioner to other Members, Delegates, the Resident Commissioner, or Senators, or to Federal, State, or local government officials; or

(c) of a news release to the communications media.

### Prohibition on use of funds by Members not elected to succeeding Congress

10. Funds from the applicable accounts described in clause 1(k)(1) of rule X, including funds from committee expense resolutions, and funds in any local currencies owned by the United States may not be made available for travel by a Member, Delegate, Resident Commissioner, or Senator after the date of a general election in which such individual was not elected to the succeeding Congress or, in the case of a Member, Delegate, or Resident Commissioner who is not a candidate in a general election, after the earlier of the date of such general election or the adjournment sine die of the last regular session of the Congress.

### RULE XXV

LIMITATIONS ON OUTSIDE EARNED
INCOME AND ACCEPTANCE OF GIFTS

### Outside earned income; honoraria

1. (a) Except as provided by paragraph (b), a Member, Delegate, Resident Commissioner, officer, or employee of the House may not—

(1) have outside earned income attributable to a calendar year that exceeds 15 percent of the annual rate of basic pay for level II of the Executive Schedule under section 5313 of title 5, United States Code, as of January 1 of that calendar year; or

(2) receive any honorarium, except that an officer or employee of the House who is paid at a rate less than 120 percent of the minimum rate of basic pay for GS–15 of the General Schedule may receive an honorarium unless the subject matter is directly related to the official duties of the individual, the payment is made because of the status of the individual with the House, or the person offering the honorarium has interests that may be substantially affected by the performance or nonperformance

of the official duties of the individual.

(b) In the case of an individual who becomes a Member, Delegate, Resident Commissioner, officer, or employee of the House, such individual may not have outside earned income attributable to the portion of a calendar year that occurs after such individual becomes a Member, Delegate, Resident Commissioner, officer, or employee that exceeds 15 percent of the annual rate of basic pay for level II of the Executive Schedule under section 5313 of title 5, United States Code, as of January 1 of that calendar year multiplied by a fraction, the numerator of which is the number of days the individual is a Member, Delegate, Resident Commissioner, officer, or employee during that calendar year and the denominator of which is 365.

(c) A payment in lieu of an honorarium that is made to a charitable organization on behalf of a Member, Delegate, Resident Commissioner, officer, or employee of the House may not be received by that Member, Delegate, Resident Commissioner, officer, or employee. Such a payment may not exceed $2,000 or be made to a charitable organization from which the Member, Delegate, Resident Commissioner, officer, or employee or a parent, sibling, spouse, child, or dependent relative of the Member, Delegate, Resident Commissioner, officer, or employee, derives a financial benefit.

2. A Member, Delegate, Resident Commissioner, officer, or employee of the House may not—

(a) receive compensation for affiliating with or being employed by a firm, partnership, association, corporation, or other entity that provides professional services involving a fiduciary relationship except for the practice of medicine;

(b) permit the name of such individual to be used by such a firm, partnership, association, corporation, or other entity;

(c) receive compensation for practicing a profession that involves a fiduciary relationship except for the practice of medicine;

(d) serve for compensation as an officer or member of the board of an association, corporation, or other entity; or

(e) receive compensation for teaching, without the prior notification and approval of the Committee on Ethics.

### Copyright royalties

3. (a) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not receive an advance payment on copyright royalties. This paragraph does not prohibit a literary agent, researcher, or other individual (other than an individual employed by the House or a relative of a Member, Delegate, Resident Commissioner, officer, or employee) working on behalf of a Member, Delegate, Resident Commissioner, officer, or employee with re-

# HOUSE OF REPRESENTATIVES

spect to a publication from receiving an advance payment of a copyright royalty directly from a publisher and solely for the benefit of that literary agent, researcher, or other individual.

(b) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not receive copyright royalties under a contract entered into on or after January 1, 1996, unless that contract is first approved by the Committee on Ethics as complying with the requirement of clause 4(d)(1)(E) (that royalties are received from an established publisher under usual and customary contractual terms).

*Definitions*

4. (a)(1) In this rule, except as provided in subparagraph (2), the term "officer or employee of the House" means an individual (other than a Member, Delegate, or Resident Commissioner) whose pay is disbursed by the Chief Administrative Officer, who is paid at a rate equal to or greater than 120 percent of the minimum rate of basic pay for GS–15 of the General Schedule, and who is so employed for more than 90 days in a calendar year.

(2)(A) When used with respect to an honorarium, the term "officer or employee of the House" means an individual (other than a Member, Delegate, or Resident Commissioner) whose salary is disbursed by the Chief Administrative Officer.

(B) When used in clause 5 of this rule, the terms "officer" and "employee" have the same meanings as in rule XXIII.

(b) In this rule the term "honorarium" means a payment of money or a thing of value for an appearance, speech, or article (including a series of appearances, speeches, or articles) by a Member, Delegate, Resident Commissioner, officer, or employee of the House, excluding any actual and necessary travel expenses incurred by that Member, Delegate, Resident Commissioner, officer, or employee (and one relative) to the extent that such expenses are paid or reimbursed by any other person. The amount otherwise determined shall be reduced by the amount of any such expenses to the extent that such expenses are not so paid or reimbursed.

(c) In this rule the term "travel expenses" means, with respect to a Member, Delegate, Resident Commissioner, officer, or employee of the House, or a relative of such Member, Delegate, Resident Commissioner, officer, or employee, the cost of transportation, and the cost of lodging and meals while away from the residence or principal place of employment of such individual.

(d)(1) In this rule the term "outside earned income" means, with respect to a Member, Delegate, Resident Commissioner, officer, or employee of the House, wages, salaries, fees, and other amounts received or to be received as compensation for personal services actually rendered, but does not include —

(A) the salary of a Member, Delegate, Resident Commissioner, officer, or employee;

(B) any compensation derived by a Member, Delegate, Resident Commissioner, officer, or employee of the House for personal services actually rendered before the adoption of this rule or before such individual became a Member, Delegate, Resident Commissioner, officer, or employee;

(C) any amount paid by, or on behalf of, a Member, Delegate, Resident Commissioner, officer, or employee of the House to a tax-qualified pension, profit-sharing, or stock bonus plan and received by such individual from such a plan;

(D) in the case of a Member, Delegate, Resident Commissioner, officer, or employee of the House engaged in a trade or business in which such individual or the family of such individual holds a controlling interest and in which both personal services and capital are income-producing factors, any amount received by the Member, Delegate, Resident Commissioner, officer, or employee, so long as the personal services actually rendered by such individual in the trade or business do not generate a significant amount of income; or

(E) copyright royalties received from established publishers under usual and customary contractual terms; and

(2) outside earned income shall be determined without regard to community property law.

(e) In this rule the term "charitable organization" means an organization described in section 170(c) of the Internal Revenue Code of 1986.

*Gifts*

5. (a)(1)(A)(i) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not knowingly accept a gift except as provided in this clause.

(ii) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not knowingly accept a gift from a registered lobbyist or agent of a foreign principal or from a private entity that retains or employs registered lobbyists or agents of a foreign principal except as provided in subparagraph (3) of this paragraph.

(B)(i) A Member, Delegate, Resident Commissioner, officer, or employee of the House may accept a gift (other than cash or cash equivalent) not prohibited by subdivision (A)(ii) that the Member, Delegate, Resident Commissioner, officer, or employee reasonably and in good faith believes to have a value of less than $50 and a cumulative value from one source during a calendar year of less than $100. A gift having a value of less than $10 does not count toward the $100 annual limit. The value of perishable food sent to an office shall be allocated among the individual recipients and not to the Member, Delegate, or Resident Commissioner. Formal recordkeeping is not

required by this subdivision, but a Member, Delegate, Resident Commissioner, officer, or employee of the House shall make a good faith effort to comply with this subdivision.

(ii) A gift of a ticket to a sporting or entertainment event shall be valued at the face value of the ticket or, in the case of a ticket without a face value, at the highest cost of a ticket with a face value for the event. The price printed on a ticket to an event shall be deemed its face value only if it also is the price at which the issuer offers that ticket for sale to the public.

(2)(A) In this clause the term "gift" means a gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value. The term includes gifts of services, training, transportation, lodging, and meals, whether provided in kind, by purchase of a ticket, payment in advance, or reimbursement after the expense has been incurred.

(B)(i) A gift to a family member of a Member, Delegate, Resident Commissioner, officer, or employee of the House, or a gift to any other individual based on that individual's relationship with the Member, Delegate, Resident Commissioner, officer, or employee, shall be considered a gift to the Member, Delegate, Resident Commissioner, officer, or employee if it is given with the knowledge and acquiescence of the Member, Delegate, Resident Commissioner, officer, or employee and the Member, Delegate, Resident Commissioner, officer, or employee has reason to believe the gift was given because of the official position of such individual.

(ii) If food or refreshment is provided at the same time and place to both a Member, Delegate, Resident Commissioner, officer, or employee of the House and the spouse or dependent thereof, only the food or refreshment provided to the Member, Delegate, Resident Commissioner, officer, or employee shall be treated as a gift for purposes of this clause.

(3) The restrictions in subparagraph (1) do not apply to the following:

(A) Anything for which the Member, Delegate, Resident Commissioner, officer, or employee of the House pays the market value, or does not use and promptly returns to the donor.

(B) A contribution, as defined in section 301(8) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431) that is lawfully made under that Act, a lawful contribution for election to a State or local government office, or attendance at a fundraising event sponsored by a political organization described in section 527(e) of the Internal Revenue Code of 1986.

(C) A gift from a relative as described in section 109(16) of title I of the Ethics in Government Act of 1978 (5 U.S.C. App. 109(16)).

(D)(i) Anything provided by an individual on the basis of a personal friendship unless the Member, Delegate, Resident Commissioner, officer,

**Rule XXV, clause 5**　　　　RULES OF THE　　　　**Rule XXV, clause 5**

or employee of the House has reason to believe that, under the circumstances, the gift was provided because of the official position of such individual and not because of the personal friendship.

(ii) In determining whether a gift is provided on the basis of personal friendship, the Member, Delegate, Resident Commissioner, officer, or employee of the House shall consider the circumstances under which the gift was offered, such as:

(I) The history of the relationship of such individual with the individual giving the gift, including any previous exchange of gifts between them.

(II) Whether to the actual knowledge of such individual the individual who gave the gift personally paid for the gift or sought a tax deduction or business reimbursement for the gift.

(III) Whether to the actual knowledge of such individual the individual who gave the gift also gave the same or similar gifts to other Members, Delegates, the Resident Commissioners, officers, or employees of the House.

(E) Except as provided in paragraph (e)(3), a contribution or other payment to a legal expense fund established for the benefit of a Member, Delegate, Resident Commissioner, officer, or employee of the House that is otherwise lawfully made in accordance with the restrictions and disclosure requirements of the Committee on Ethics.

(F) A gift from another Member, Delegate, Resident Commissioner, officer, or employee of the House or Senate.

(G) Food, refreshments, lodging, transportation, and other benefits—

(i) resulting from the outside business or employment activities of the Member, Delegate, Resident Commissioner, officer, or employee of the House (or other outside activities that are not connected to the duties of such individual as an officeholder), or of the spouse of such individual, if such benefits have not been offered or enhanced because of the official position of such individual and are customarily provided to others in similar circumstances;

(ii) customarily provided by a prospective employer in connection with bona fide employment discussions; or

(iii) provided by a political organization described in section 527(e) of the Internal Revenue Code of 1986 in connection with a fundraising or campaign event sponsored by such organization.

(H) Pension and other benefits resulting from continued participation in an employee welfare and benefits plan maintained by a former employer.

(I) Informational materials that are sent to the office of the Member, Delegate, Resident Commissioner, officer, or employee of the House in the form of books, articles, periodicals, other written materials, audiotapes, videotapes, or other forms of communication.

(J) Awards or prizes that are given to competitors in contests or events open to the public, including random drawings.

(K) Honorary degrees (and associated travel, food, refreshments, and entertainment) and other bona fide, nonmonetary awards presented in recognition of public service (and associated food, refreshments, and entertainment provided in the presentation of such degrees and awards).

(L) Training (including food and refreshments furnished to all attendees as an integral part of the training) if such training is in the interest of the House.

(M) Bequests, inheritances, and other transfers at death.

(N) An item, the receipt of which is authorized by the Foreign Gifts and Decorations Act, the Mutual Educational and Cultural Exchange Act, or any other statute.

(O) Anything that is paid for by the Federal Government, by a State or local government, or secured by the Government under a Government contract.

(P) A gift of personal hospitality (as defined in section 109(14) of the Ethics in Government Act) of an individual other than a registered lobbyist or agent of a foreign principal.

(Q) Free attendance at an event permitted under subparagraph (4).

(R) Opportunities and benefits that are—

(i) available to the public or to a class consisting of all Federal employees, whether or not restricted on the basis of geographic consideration;

(ii) offered to members of a group or class in which membership is unrelated to congressional employment;

(iii) offered to members of an organization, such as an employees' association or congressional credit union, in which membership is related to congressional employment and similar opportunities are available to large segments of the public through organizations of similar size;

(iv) offered to a group or class that is not defined in a manner that specifically discriminates among Government employees on the basis of branch of Government or type of responsibility, or on a basis that favors those of higher rank or rate of pay;

(v) in the form of loans from banks and other financial institutions on terms generally available to the public; or

(vi) in the form of reduced membership or other fees for participation in organization activities offered to all Government employees by professional organizations if the only restrictions on membership relate to professional qualifications.

(S) A plaque, trophy, or other item that is substantially commemorative in nature and that is intended for presentation.

(T) Anything for which, in an unusual case, a waiver is granted by the Committee on Ethics.

(U) Food or refreshments of a nominal value offered other than as a part of a meal.

(V) Donations of products from the district or State that the Member, Delegate, or Resident Commissioner represents that are intended primarily for promotional purposes, such as display or free distribution, and are of minimal value to any single recipient.

(W) An item of nominal value such as a greeting card, baseball cap, or a T-shirt.

(4)(A) A Member, Delegate, Resident Commissioner, officer, or employee of the House may accept an offer of free attendance at a widely attended convention, conference, symposium, forum, panel discussion, dinner, viewing, reception, or similar event, provided by the sponsor of the event, if—

(i) the Member, Delegate, Resident Commissioner, officer, or employee of the House participates in the event as a speaker or a panel participant, by presenting information related to Congress or matters before Congress, or by performing a ceremonial function appropriate to the official position of such individual; or

(ii) attendance at the event is appropriate to the performance of the official duties or representative function of the Member, Delegate, Resident Commissioner, officer, or employee of the House.

(B) A Member, Delegate, Resident Commissioner, officer, or employee of the House who attends an event described in subdivision (A) may accept a sponsor's unsolicited offer of free attendance at the event for an accompanying individual.

(C) A Member, Delegate, Resident Commissioner, officer, or employee of the House, or the spouse or dependent thereof, may accept a sponsor's unsolicited offer of free attendance at a charity event, except that reimbursement for transportation and lodging may not be accepted in connection with the event unless—

(i) all of the net proceeds of the event are for the benefit of an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code;

(ii) reimbursement for the transportation and lodging in connection with the event is paid by such organization; and

44

## HOUSE OF REPRESENTATIVES

(iii) the offer of free attendance at the event is made by such organization.

(D) In this paragraph the term "free attendance" may include waiver of all or part of a conference or other fee, the provision of local transportation, or the provision of food, refreshments, entertainment, and instructional materials furnished to all attendees as an integral part of the event. The term does not include entertainment collateral to the event, nor does it include food or refreshments taken other than in a group setting with all or substantially all other attendees.

(5) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept a gift the value of which exceeds $250 on the basis of the personal friendship exception in subparagraph (3)(D) unless the Committee on Ethics issues a written determination that such exception applies. A determination under this subparagraph is not required for gifts given on the basis of the family relationship exception in subparagraph (3)(C).

(6) When it is not practicable to return a tangible item because it is perishable, the item may, at the discretion of the recipient, be given to an appropriate charity or destroyed.

(b)(1)(A) A reimbursement (including payment in kind) to a Member, Delegate, Resident Commissioner, officer, or employee of the House for necessary transportation, lodging, and related expenses for travel to a meeting, speaking engagement, factfinding trip, or similar event in connection with the duties of such individual as an officeholder shall be considered as a reimbursement to the House and not a gift prohibited by this clause when it is from a private source other than a registered lobbyist or agent of a foreign principal or a private entity that retains or employs registered lobbyists or agents of a foreign principal (except as provided in subdivision (C)), if the Member, Delegate, Resident Commissioner, officer, or employee—

(i) in the case of an employee, receives advance authorization, from the Member, Delegate, Resident Commissioner, or officer under whose direct supervision the employee works, to accept reimbursement; and

(ii) discloses the expenses reimbursed or to be reimbursed and the authorization to the Clerk within 15 days after the travel is completed.

(B) For purposes of subdivision (A), events, the activities of which are substantially recreational in nature, are not considered to be in connection with the duties of a Member, Delegate, Resident Commissioner, officer, or employee of the House as an officeholder.

(C) A reimbursement (including payment in kind) to a Member, Delegate, Resident Commissioner, officer, or employee of the House for any purpose described in subdivision (A) also shall be considered as a reimbursement to the House and not a gift prohibited by this

clause (without regard to whether the source retains or employs registered lobbyists or agents of a foreign principal) if it is, under regulations prescribed by the Committee on Ethics to implement this provision—

(i) directly from an institution of higher education within the meaning of section 101 of the Higher Education Act of 1965; or

(ii) provided only for attendance at or participation in a one-day event (exclusive of travel time and an overnight stay).

Regulations prescribed to implement this provision may permit a two-night stay when determined by the committee on a case-by-case basis to be practically required to participate in the one-day event.

(2) Each advance authorization to accept reimbursement shall be signed (including in electronic form) by the Member, Delegate, Resident Commissioner, or officer of the House under whose direct supervision the employee works and shall include—

(A) the name of the employee;

(B) the name of the person who will make the reimbursement;

(C) the time, place, and purpose of the travel; and

(D) a determination that the travel is in connection with the duties of the employee as an officeholder and would not create the appearance that the employee is using public office for private gain.

(3) Each disclosure made under subparagraph (1)(A) shall be signed (including in electronic form) by the Member, Delegate, Resident Commissioner, or officer (in the case of travel by that Member, Delegate, Resident Commissioner, or officer) or by the Member, Delegate, Resident Commissioner, or officer under whose direct supervision the employee works (in the case of travel by an employee) and shall include—

(A) a good faith estimate of total transportation expenses reimbursed or to be reimbursed;

(B) a good faith estimate of total lodging expenses reimbursed or to be reimbursed;

(C) a good faith estimate of total meal expenses reimbursed or to be reimbursed;

(D) a good faith estimate of the total of other expenses reimbursed or to be reimbursed;

(E) a determination that all such expenses are necessary transportation, lodging, and related expenses as defined in subparagraph (4);

(F) a description of meetings and events attended; and

(G) in the case of a reimbursement to a Member, Delegate, Resident Commissioner, or officer, a determination that the travel was in connection with the duties of such individual as an officeholder and would not create the appearance that the Member, Delegate, Resident Commissioner, or officer is using public office for private gain.

(4) In this paragraph the term "necessary transportation, lodging, and related expenses"—

(A) includes reasonable expenses that are necessary for travel for a period not exceeding four days within the United States or seven days exclusive of travel time outside of the United States unless approved in advance by the Committee on Ethics;

(B) is limited to reasonable expenditures for transportation, lodging, conference fees and materials, and food and refreshments, including reimbursement for necessary transportation, whether or not such transportation occurs within the periods described in subdivision (A);

(C) does not include expenditures for recreational activities, nor does it include entertainment other than that provided to all attendees as an integral part of the event, except for activities or entertainment otherwise permissible under this clause; and

(D) may include travel expenses incurred on behalf of a relative of the Member, Delegate, Resident Commissioner, officer, or employee.

(5) The Clerk of the House shall make all advance authorizations, certifications, and disclosures filed pursuant to this paragraph available for public inspection as soon as possible after they are received.

(c)(1)(A) Except as provided in subdivision (B), a Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept a reimbursement (including payment in kind) for transportation, lodging, or related expenses for a trip on which the traveler is accompanied on any segment by a registered lobbyist or agent of a foreign principal.

(B) Subdivision (A) does not apply to a trip for which the source of reimbursement is an institution of higher education within the meaning of section 101 of the Higher Education Act of 1965.

(2) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept a reimbursement (including payment in kind) for transportation, lodging, or related expenses under the exception in paragraph (b)(1)(C)(ii) of this clause for a trip that is financed in whole or in part by a private entity that retains or employs registered lobbyists or agents of a foreign principal unless any involvement of a registered lobbyist or agent of a foreign principal in the planning, organization, request, or arrangement of the trip is de minimis under rules prescribed by the Committee on Ethics to implement paragraph (b)(1)(C) of this clause.

(3) A Member, Delegate, Resident Commissioner, officer, or employee of the House may not accept a reimbursement (including payment in kind) for transportation, lodging, or related expenses for a trip (other than a trip permitted under paragraph (b)(1)(C) of this clause) if such trip is in any part planned, organized, requested, or ar-

RULES OF THE

ranged by a registered lobbyist or agent of a foreign principal.

(d) A Member, Delegate, Resident Commissioner, officer, or employee of the House shall, before accepting travel otherwise permissible under paragraph (b)(1) of this clause from any private source—

(1) provide to the Committee on Ethics before such trip a written certification signed (including in electronic form) by the source or (in the case of a corporate person) by an officer of the source—

(A) that the trip will not be financed in any part by a registered lobbyist or agent of a foreign principal;

(B) that the source either—

(i) does not retain or employ registered lobbyists or agents of a foreign principal; or

(ii) is an institution of higher education within the meaning of section 101 of the Higher Education Act of 1965; or

(iii) certifies that the trip meets the requirements specified in rules prescribed by the Committee on Ethics to implement paragraph (b)(1)(C)(ii) of this clause and specifically details the extent of any involvement of a registered lobbyist or agent of a foreign principal in the planning, organization, request, or arrangement of the trip considered to qualify as de minimis under such rules;

(C) that the source will not accept from another source any funds earmarked directly or indirectly for the purpose of financing any aspect of the trip;

(D) that the traveler will not be accompanied on any segment of the trip by a registered lobbyist or agent of a foreign principal (except in the case of a trip for which the source of reimbursement is an institution of higher education within the meaning of section 101 of the Higher Education Act of 1965); and

(E) that (except as permitted in paragraph (b)(1)(C) of this clause) the trip will not in any part be planned, organized, requested, or arranged by a registered lobbyist or agent of a foreign principal; and

(2) after the Committee on Ethics has promulgated the regulations mandated in paragraph (i)(1)(B) of this clause, obtain the prior approval of the committee for such trip.

(e) A gift prohibited by paragraph (a)(1) includes the following:

(1) Anything provided by a registered lobbyist or an agent of a foreign principal to an entity that is maintained or controlled by a Member, Delegate, Resident Commissioner, officer, or employee of the House.

(2) A charitable contribution (as defined in section 170(c) of the Internal Revenue Code of 1986) made by a registered lobbyist or an agent of a foreign principal on the basis of a des-

ignation, recommendation, or other specification of a Member, Delegate, Resident Commissioner, officer, or employee of the House (not including a mass mailing or other solicitation directed to a broad category of persons or entities), other than a charitable contribution permitted by paragraph (f).

(3) A contribution or other payment by a registered lobbyist or an agent of a foreign principal to a legal expense fund established for the benefit of a Member, Delegate, Resident Commissioner, officer, or employee of the House.

(4) A financial contribution or expenditure made by a registered lobbyist or an agent of a foreign principal relating to a conference, retreat, or similar event, sponsored by or affiliated with an official congressional organization, for or on behalf of Members, Delegates, the Resident Commissioner, officers, or employees of the House.

(f)(1) A charitable contribution (as defined in section 170(c) of the Internal Revenue Code of 1986) made by a registered lobbyist or an agent of a foreign principal in lieu of an honorarium to a Member, Delegate, Resident Commissioner, officer, or employee of the House is not considered a gift under this clause if it is reported as provided in subparagraph (2).

(2) A Member, Delegate, Resident Commissioner, officer, or employee who designates or recommends a contribution to a charitable organization in lieu of an honorarium described in subparagraph (1) shall report within 30 days after such designation or recommendation to the Clerk—

(A) the name and address of the registered lobbyist who is making the contribution in lieu of an honorarium;

(B) the date and amount of the contribution; and

(C) the name and address of the charitable organization designated or recommended by the Member, Delegate, or Resident Commissioner.

The Clerk shall make public information received under this subparagraph as soon as possible after it is received.

(g) In this clause—

(1) the term ''registered lobbyist'' means a lobbyist registered under the Federal Regulation of Lobbying Act or any successor statute;

(2) the term ''agent of a foreign principal'' means an agent of a foreign principal registered under the Foreign Agents Registration Act; and

(3) the terms ''officer'' and ''employee'' have the same meanings as in rule XXIII.

(h) All the provisions of this clause shall be interpreted and enforced solely by the Committee on Ethics. The Committee on Ethics is authorized to issue guidance on any matter contained in this clause.

(i)(1) Not later than 45 days after the date of adoption of this paragraph and at annual intervals thereafter, the

Committee on Ethics shall develop and revise, as necessary—

(A) guidelines on judging the reasonableness of an expense or expenditure for purposes of this clause, including the factors that tend to establish—

(i) a connection between a trip and official duties;

(ii) the reasonableness of an amount spent by a sponsor;

(iii) a relationship between an event and an officially connected purpose; and

(iv) a direct and immediate relationship between a source of funding and an event; and

(B) regulations describing the information it will require individuals subject to this clause to submit to the committee in order to obtain the prior approval of the committee for any travel covered by this clause, including any required certifications.

(2) In developing and revising guidelines under subparagraph (1)(A), the committee shall take into account the maximum per diem rates for official Government travel published annually by the General Services Administration, the Department of State, and the Department of Defense.

*Claims against the Government*

6. A person may not be an officer or employee of the House, or continue in its employment, if acting as an agent for the prosecution of a claim against the Government or if interested in such claim, except as an original claimant or in the proper discharge of official duties.

7. A Member, Delegate, or Resident Commissioner shall prohibit all staff employed by that Member, Delegate, or Resident Commissioner (including staff in personal, committee, and leadership offices) from making any lobbying contact (as defined in section 3 of the Lobbying Disclosure Act of 1995) with that individual's spouse if that spouse is a lobbyist under the Lobbying Disclosure Act of 1995 or is employed or retained by such a lobbyist for the purpose of influencing legislation.

8. During the dates on which the national political party to which a Member (including a Delegate or Resident Commissioner) belongs holds its convention to nominate a candidate for the office of President or Vice President, the Member may not participate in an event honoring that Member, other than in the capacity as a candidate for such office, if such event is directly paid for by a registered lobbyist under the Lobbying Disclosure Act of 1995 or a private entity that retains or employs such a registered lobbyist.

RULE XXVI

FINANCIAL DISCLOSURE

1. The Clerk shall send a copy of each report filed with the Clerk under title I of the Ethics in Government Act of 1978 within the seven-day period beginning on the date on which the report is filed to the Committee on Ethics.

# HOUSE OF REPRESENTATIVES

2. For the purposes of this rule, the provisions of title I of the Ethics in Government Act of 1978 shall be considered Rules of the House as they pertain to Members, Delegates, the Resident Commissioner, officers, and employees of the House.

3. Members of the board of the Office of Congressional Ethics shall file annual financial disclosure reports with the Clerk of the House on or before May 15 of each calendar year after any year in which they perform the duties of that position. Such reports shall be on a form prepared by the Clerk that is substantially similar to form 450 of the Office of Government Ethics. The Clerk shall send a copy of each such report filed with the Clerk within the seven-day period beginning on the date on which the report is filed to the Committee on Ethics and shall have them printed as a House document and made available to the public by August 1 of each year.

## RULE XXVII

### Disclosure by Members and Staff of Employment Negotiations

1. A Member, Delegate, or Resident Commissioner shall not directly negotiate or have any agreement of future employment or compensation unless such Member, Delegate, or Resident Commissioner, within 3 business days after the commencement of such negotiation or agreement of future employment or compensation, files with the Committee on Ethics a statement, which must be signed (including in electronic form) by the Member, Delegate, or Resident Commissioner, regarding such negotiations or agreement, including the name of the private entity or entities involved in such negotiations or agreement, and the date such negotiations or agreement commenced.

2. An officer or an employee of the House earning in excess of 75 percent of the salary paid to a Member shall notify the Committee on Ethics that such individual is negotiating or has any agreement of future employment or compensation.

3. The disclosure and notification under this rule shall be made within 3 business days after the commencement of such negotiation or agreement of future employment or compensation.

4. A Member, Delegate, or Resident Commissioner, and an officer or employee to whom this rule applies, shall recuse themself from any matter in which there is a conflict of interest or an appearance of a conflict for that Member, Delegate, Resident Commissioner, officer, or employee under this rule and shall notify the Committee on Ethics of such recusal. A Member, Delegate, or Resident Commissioner making such recusal shall, upon such recusal, submit to the Clerk for public disclosure the statement of disclosure under clause 1 with respect to which the recusal was made.

## RULE XXVIII

### Statutory Limit on the Public Debt

1. Upon adoption by the House of a concurrent resolution on the budget under section 301 or 304 of the Congressional Budget Act of 1974, the Clerk shall prepare an engrossment of a joint resolution suspending the statutory limit on the public debt in the form prescribed in clause 2. Upon engrossment of the joint resolution, the vote by which the concurrent resolution on the budget was adopted by the House shall also be considered as a vote on passage of the joint resolution in the House, and the joint resolution shall be considered as passed by the House and duly certified and examined. The engrossed copy shall be signed by the Clerk and transmitted to the Senate for further legislative action.

2. The matter after the resolving clause in a joint resolution described in clause 1 shall be as follows: "Section 3101(b) of title 31, United States Code, shall not apply for the period beginning on the date of enactment and ending on September 30, _____." with the blank being filled with the budget year for the concurrent resolution.

3. Nothing in this rule shall be construed as limiting or otherwise affecting—

(a) the power of the House or the Senate to consider and pass bills or joint resolutions, without regard to the procedures under clause 1, that would change the statutory limit on the public debt; or

(b) the rights of Members, Delegates, the Resident Commissioner, or committees with respect to the introduction, consideration, and reporting of such bills or joint resolutions.

4. In this rule the term "statutory limit on the public debt" means the maximum face amount of obligations issued under authority of chapter 31 of title 31, United States Code, and obligations guaranteed as to principal and interest by the United States (except such guaranteed obligations as may be held by the Secretary of the Treasury), as determined under section 3101(b) of such title after the application of section 3101(a) of such title, that may be outstanding at any one time.

## RULE XXIX

### General Provisions

1. The provisions of law that constituted the Rules of the House at the end of the previous Congress shall govern the House in all cases to which they are applicable, and the rules of parliamentary practice comprised by Jefferson's Manual shall govern the House in all cases to which they are applicable and in which they are not inconsistent with the Rules and orders of the House.

2. (Reserved.)

3. If a measure or matter is publicly available at an electronic document repository operated by the Clerk, it shall be considered as having been available to Members, Delegates, and the Resident Commissioner for purposes of these rules.

4. Authoritative guidance from the Committee on the Budget concerning the impact of a legislative proposition on the levels of new budget authority, outlays, direct spending, new entitlement authority and revenues may be provided by the chair of the committee.

○

Case 1:21-cr-00670-CJN   Document 58-5   Filed 04/15/22   Page 53 of 53

# EXHIBIT F

# Conference Rules of the 117th Congress

**CONFERENCE RESOLUTION**

*Resolved*, that the following shall be the rules of the House Republican Conference for the 117th Congress:

**Rule 1—Conference Membership**

(a) Inclusion.—All Republican Members of the House of Representatives (including Delegates and the Resident Commissioner) and other Members of the House as determined by the Republican Conference of the House of Representatives ("the Conference") shall be Members of the Conference.

(b) Expulsion.—A ⅔ vote of the entire membership shall be necessary to expel a Member of the Conference. Proceedings for expulsion shall follow the rules of the House of Representatives, as nearly as practicable.

## Rule 2—Republican Leadership

(a) Elected Leadership.—The Elected Republican Leaders of the House of Representatives are—

(1) the Speaker;

(2) the Republican Leader;

(3) the Republican Whip;

(4) the Chair of the Republican Conference;

(5) the Chair of the National Republican Congressional Committee;

(6) the Chair of the Committee on Policy;

(7) the Vice-Chair of the Republican Conference; and,

(8) the Secretary of the Republican Conference.

(b) Designated Leadership.—The designated Republican Leaders of the House of Representatives are—

(1) the Chair of the House Committee on Rules;

(2) the Chair of the House Committee on Ways and Means;

(3) the Chair of the House Committee on Appropriations;

(4) the Chair of the House Committee on the Budget;

(5) the Chair of the House Committee on Energy and Commerce;

(6) the Chief Deputy Whip;

(7) one member of the sophomore class elected by the sophomore class; and,

(8) one member of the freshman class elected by the freshman class.

(c) Leadership Committee Limitation.—

(1) The Speaker, Republican Leader, Whip, and the Chairs of the Republican Conference and the National Republican Congressional Committee shall not serve on more than one standing committee or subcommittee of the House of Representatives and in no case shall any of these individuals serve as chair of a standing committee of the House of Representatives. Upon the recommendation of the Steering Committee and the approval of the Conference this provision may be waived.

(2) If a Member shall, at any time, cease to serve in any of the Leadership positions named above, he or she may resume his or her position on the standing committee on which he or she previously served.

(3) If a member of Elected Republican Leadership as described in rule 2(a) publicly announces his or her intention to seek other elected office in Federal, state, or local government, that Member shall resign from such leadership position. That position shall be filled pursuant to rule 2(e) of the Conference rules.

(d) Authority and Responsibilities in the Minority.—

(1) The Speaker and Republican Leader.—During any time that the Republican Party is not the majority party of the House of Representatives, the office of Speaker shall be considered as vacant, and any reference to, or authority vested in, the Speaker under these rules shall be considered references to and authority vested in the Republican Leader.

(2) Committee Chairs and Ranking Republican Members.—During any time that the Republican Party is not the majority party of the House of Representatives, any reference to, responsibility of, or authority vested in, the chair of a committee of the House in these rules shall be considered a reference to, responsibility of, or authority vested in the Ranking

Republican Member of such committee.

(e) Vacancies in Elected Leadership.—In the event of a vacancy in an office described in paragraph (a) (other than a vacancy addressed by rule 26), that vacancy shall be filled in the manner described in rules 3 and 4 as though as a continuation of the organizational meeting under rule 3(a).

## Rule 3—Organizing Conference

(a) Organizing Conference.—The organizational meeting of the Conference shall be called by the Speaker, except as otherwise provided by law. The meeting shall be held not later than the 20th day of December.

(b) Order of Elections.—At the organizational meeting of the Republican Conference, the Conference shall nominate and elect the Elected Leadership for that Congress in the following order—

(1) the Speaker;

(2) the Republican Leader;

(3) the Republican Whip;

(4) the Chair of the Republican Conference;

(5) the Chair of the National Republican Congressional Committee;

(6) the Chair of the Committee on Policy;

(7) the Vice-Chair of the Republican Conference; and,

(8) the Secretary of the Republican Conference.

Except that during any time that the Republican Party is not the majority party of the House of Representatives, there shall be no election held for the office of Speaker.

(c) Prior to the convening of the organizational meeting called pursuant to paragraph (a), the current Chair of the Republican Conference shall call a meeting to provide each of the announced candidates for Elected Leadership time to make an oral presentation and entertain questions from Members of the Conference. In establishing the time, date, and format of such meeting, the Chair shall consult with all announced candidates for Elected Leadership and a cross-section of Members of the Conference.

## Rule 4—Conference Election Procedures

(a) Votes by Secret Ballot.—All contested elections shall be decided by secret ballot, and no proxy voting shall be allowed.

(b) Nominations.—

(1) Candidates for office shall be nominated in alphabetical surname order.

(2) For each Leadership nomination there shall be one nominating speech (not to exceed three minutes in length), and there may be two seconding speeches (each not to exceed one minute in length).

(c) Balloting Procedures.—When there are more than two candidates for any office and none receives a majority of the votes on the first ballot, a quorum being present, the candidate with the lowest number of votes on that and each succeeding ballot will be dropped from the ballot until one candidate receives a majority of the votes, a quorum being present.

## Rule 5—Conference Meetings

(a) Call and Notice.— Meetings of the Republican Conference may be called at any time by the chair of the Conference, after consultation with the Speaker.

(b) Speaker's Annual Meeting.—The Speaker shall hold an annual Meeting at the beginning of each session of Congress at which the Republican Leadership shall report to the Membership on their plans for the upcoming session.

(c) With respect to a meeting called under this rule, whenever possible, at least 24 hours notice of the time, place, and agenda of a meeting shall be given to Members of the Conference.

(d) Decorum.—Meetings of the Republican Conference shall be conducted in accordance with the applicable provisions of the Rules of the House of Representatives, including rule XVII, that govern decorum and the personal behavior of the Members of the Conference.

## Rule 6—Rules of Procedure and Order of Business

(a) Rules of the House.—The Rules of the House of Representatives, insofar as they are applicable, shall govern the proceedings of the Republican Conference.

(b) Motions.—

(1) No motion shall be available other than those described in clause 4 of rule XVI (relating to the precedence of motions) or rule XIX (relating to motions after the amendment stage) of the Rules of the House of Representatives.

(2) When a motion has been made and carried or lost, it shall be in order for any member of the prevailing side, in the same or succeeding meeting of the Republican Conference, to move for the reconsideration thereof. The procedures for reconsideration shall be consistent with the Rules of the House.

(c) Resolutions.—

(1) Any matter to be considered by the Republican Conference shall be in the form of a resolution.

(2)(A) Referral of resolutions, generally.—Except as provided in subparagraph (3), all resolutions brought before the Republican Conference shall be referred by the Chair to the appropriate committee for consideration.

(B) Resolutions proposing a change in Republican Conference rules.—

(i) A resolution proposing a change to the rules of the Republican Conference shall be referred to an ad hoc committee for the purpose of consideration of that measure.

(ii) The committee shall be appointed by the Speaker and chaired by the senior Republican member of the Committee on Rules of the House.

(iii) In making the appointments under this subparagraph, the Speaker shall appoint at least one Member who is a proponent of the resolution.

(3) Precedence of resolutions offered by the Speaker.—The Speaker, or a designee, may present any resolution to the Conference for its immediate consideration.

(d) Petitions.—

(1) Discharge of committee of the Republican Conference.—

(A) A resolution which has 25 or more signatures of Members shall be considered by the appropriate committee of the Republican Conference as soon as practicable, but not later than 10 legislative days, and reported back to the Conference.

(B) If the resolution is not acted on by the committee to which it was referred as soon as practicable, but not later than 10 legislative days, a petition of 50 or more Members will discharge the resolution for consideration before the Conference.

(2) Petition for a special meeting.—

(A) If 20 percent of the Members of the Republican Conference petition the Chair for a special meeting of the Conference, the Chair shall schedule such special meeting as soon as practicable, but not later than 10 legislative days.

(B) The Chair shall provide a means by which Members may submit such a petition or other evidence of support electronically.

(e) Suspension Procedure.—Two-thirds of the Members voting, a quorum being present, may suspend the Conference rules. All motions to suspend the rules shall be seconded by a majority, if demanded. The consideration of a motion to suspend the rules, to the extent practicable, shall follow the rules of the House.

### Rule 7—Conference Meetings: Quorum

A majority of the Members of the Conference shall constitute a quorum.

### Rule 8—Conference Meetings: Secret Ballot

On demand of one Member, with the support of five others, the vote on any matter properly pending before the Conference shall be taken by secret ballot.

### Rule 9—Conference Meetings: Admittance

(a) The Chair may decide whether meetings of the Conference shall be open or closed to the public, subject to an appeal by any Member.

(b) The Chair may designate Leadership staff or other eligible persons to attend Conference meetings which are closed to the public. Those individuals shall be excused at the discretion of the Chair.

(c) Upon timely notice from the Chair, an executive session of the Conference may be called. This meeting shall be closed to all persons except Members of the Conference.

(d) On the demand of one Member, with the support of 25 others, a Conference meeting shall be taken into executive session.

### Rule 10—Conference Meetings: Journal

The Secretary of the Conference shall keep a journal of the Conference proceedings and each journal entry shall be signed by the Conference Secretary and the Conference Chair. The journal shall be open for inspection at the request of any Member of the Conference.

### Rule 11—Republican Steering Committee

(a) Establishment and Purpose.—

(1) There is hereby established a Republican Steering Committee which shall recommend to the Republican Conference—

(i) the membership of the standing committees; and

(ii) the chairs of the standing committees.

(2) The Republican Steering Committee shall interview each Member seeking election as chair of a standing committee before making its recommendation, even if that Member served as chair of such standing committee in the prior congress.

(3) This subsection shall not apply to a standing committee listed in rule 12.

(b) Composition.—The Republican Steering Committee shall be comprised of—

(1) the Speaker, who shall serve as its chair;

(2) the Republican Leader;

(3) the Republican Whip;

(4) the Chief Deputy Whip;

(5) the Chair of the Republican Conference;

(6) the Chair of the National Republican Congressional Committee;

(7) the Chair of the Committee on Policy;

(8) the Vice-Chair of the Republican Conference;

(9) the Secretary of the Republican Conference;

(10) the former Chair of the National Republican Congressional Committee;

(11) the chair of a standing committee when the Steering Committee is considering members for election to or removal from such standing committee;

(12) a Member designated by the Speaker;

(13) Members elected by geographic regions of the conference;

(14) a Member elected by the sophomore class;

(15) a Member elected by the freshman class; and

(16) the Dean of the House, when the Dean is a member of the House Republican Conference.

(c) Election of Regional and Class Representatives.—

(1)(A) Prior to the election of the Members elected pursuant to subsection (b)(13) of this rule, the Republican Conference shall adopt a resolution establishing the structure of such regions.

(B)(i) The Speaker shall appoint a task force of Members to recommend a regional plan.

(ii) If the task force is unable to recommend a regional plan to the Speaker, the Speaker shall recommend a regional plan to the Republican Conference.

(C) It shall not be in order to consider the regional plan until the third calendar day (exclusive of Saturdays, Sundays, and Federal holidays, unless the House is in session on such day) on which the regional plan has been available to Members.

(D) Any proposed amendments to the regional plan shall be submitted to the Republican Conference not later than the calendar day prior to consideration of the regional plan by the Republican Conference. The Chair of the Republican Conference shall make all such amendments available to the Members of the Republican Conference prior to consideration of any such amendment.

(2) It shall not be in order to elect regional and class representatives to the Republican Steering Committee until the second calendar day (exclusive of Saturdays, Sundays, and Federal holidays, unless the House is in session on such day) after adoption of the regional plan. Any such election shall be conducted by secret ballot.

(d) Voting Strength.—Each member of the Republican Steering Committee shall have a single vote, except the Speaker, who shall have 4, and the Republican Leader, who shall have 2. During any time that the Republican Party is not the majority party of the House of Representatives, the Republican Leader shall have 4 votes and the Republican Whip shall have 2 votes.

(e) Definition.— For purposes of this rule, the term "regional plan" shall mean a plan establishing geographic regions for purposes of electing representatives under subsection (b)(13) of this rule.

**Rule 12—Election Procedures for Standing Committees**

(a) In General.—

(1) The Republican Steering Committee shall recommend to the Republican Conference the Republican Members of the standing committees of the House of Representatives, except as otherwise provided in this rule.

(2) In those cases where the Steering Committee nominated Members for membership on standing committees, the Steering Committee shall recommend directly to the House of Representatives the Republican Members to fill vacancies on standing committees which occur following the organization of a Congress. Whenever possible, a vacancy shall be filled within thirty days while Congress is in session.

(b) Election of Members of the Committee on Rules.—

(1) Nomination.—The Speaker shall nominate the Republican Members of the Committee on Rules, including the chair. These nominations shall be submitted to the Conference along with the other nominees from the Steering Committee.

(2) Rejection and New Nomination.—If the Republican Conference rejects the nominee for Chair of the Committee on
Rules, the Speaker shall again submit a nomination to the Conference.

(3) Retention of Seniority Rights.—A Member newly assigned to the Rules Committee shall have the option of being "on
leave with seniority" from one standing committee on which he or she served previously. At such time as service on the
Rules Committee shall cease, such member shall have the right to return to active membership on that standing
committee with the relative seating and seniority accumulated during his or her tenure on the Rules Committee.

(c) Election of the Members of the Committee on the Budget.—

(1) Chair.—The Republican Steering Committee shall nominate the Member to serve as the Chair of the Committee on
the Budget. Limits on the term of service for the Chair shall be determined by the Rules of the House.

(2) Leadership Member.—The Speaker shall appoint one member to serve on the committee. That Member will serve as
the second highest-ranking Republican on the committee.

(3) Nomination of other Members.—The Steering Committee shall recommend members from the Committee on
Appropriations, the Committee on Ways and Means, and the Committee on Rules for service on the Committee on the
Budget in such numbers as may be consistent with the Rules of the House. Chairs and Leadership Members are
considered towards these requirements if that member also happens to serve on the Committee on Appropriations, the
Committee on Ways and Means, or the Committee on Rules.

(d) Election of the Members of the Committee on House Administration.—

(1) Nomination.—The Speaker shall nominate the Republican Members of the Committee on House Administration,
including the Chair. These nominations shall be submitted to the Conference along with the other nominees from the
Steering Committee.

(2) Rejection and New Nomination.—If the Republican Conference rejects the nominee for Chair to the Committee on
House Administration, the Speaker shall again submit a nomination to the Conference.

### Rule 13—Appointments to Joint and Select Committees

The Speaker shall recommend to the House all Republican Members of such joint, select, and ad hoc committees as shall
be created by the House, in accordance with law.

### Rule 14—Nomination and Election of Committee Chairs

(a) Nominations by the Steering Committee.—

(1) The Republican Steering Committee shall nominate the Republican Members who shall serve as chairs, except as
provided in rules 12 and 13. The Member nominated by the Steering Committee for this position need not be the Member
with the longest consecutive service on the Committee, and such nominations shall be out of order except as
recommended in the report of the Steering Committee.

(2) The Republican Steering Committee may also designate the Republican Members who shall serve as Vice Chair. The
Member designated by the Steering Committee for this position need not be the Member with the longest consecutive
service on the Committee.

(b) Voting Procedure.—The Conference shall vote on the recommendation of the House Republican Steering Committee
for the position of Chair. The call of the Conference at which such voting will take place shall name and list the individuals
recommended by the Committee. Nothing in this rule shall be construed to limit the ability of any member to request a
secret ballot under Rule 8.

(c) Rejection and new nominations.—If the Republican Conference fails to approve a recommendation of the Steering
Committee with respect to a nomination for the position of Chair, the matter shall be automatically recommitted without
instructions to that Committee.

(d) Obligation of committee chairs.—

(1) The Republican Chair of each committee has an obligation to ensure that each measure on which the Republican Conference has taken a position is managed in accordance with such position on the Floor of the House of Representatives.

(2)(A) If the chair of a committee receives a written request from the sponsor of a measure requesting a hearing on that measure and the measure is—

(i) primarily referred to such committee;

(ii) cosponsored by a majority of the members of the Republican Conference; and

(iii) cosponsored by not fewer than 1/3 of the Republican members of such committee;

then the chair of such committee shall schedule a hearing on the measure within 15 legislative days and hold such hearing not later than 30 legislative days after receipt of such request or prior to the sine die adjournment of the congress in which such request is made, whichever occurs first.

(B) This provision shall not apply to a measure directing the Secretary of the Treasury to strike and issue a commemorative coin or strike a Congressional Gold Medal, or a measure naming a postal facility.

(e) Term limitation.—No individual shall serve more than three consecutive terms as chair or Ranking Member of a standing, select, joint, or ad hoc Committee or Subcommittee.

(f) Candidates for other offices.—If a Chair of a committee addressed by rule 14 or a subcommittee addressed by rule 19(b) publicly announces his or her intention to seek other elected office in Federal, State, or local government, that Member shall resign as chair of such committee or subcommittee and the next ranking Republican Member shall serve as acting chair until such time as the Committee on Steering nominates a replacement consistent with this rule. This paragraph may be waived by an affirmative vote of the Steering Committee.

## Rule 15—Limitation on Number of Committee Chairs and Subcommittee Chairs

No individual shall serve as chair of more than one standing Committee or Subcommittee except for the Committee on Standards of Official Conduct; or the Committee on House Administration; or any joint, select, or ad hoc Committee; or any subcommittee thereof. Provided, however, that upon recommendation of the Steering Committee and approval of the Conference this provision shall be waived.

## Rule 16—Vacancies in Committee Chair Positions

A vacancy which occurs during a session of Congress for the position of Chair shall be filled in accordance with rule 14. Whenever possible, a vacancy shall be filled within thirty days while Congress is in session.

## Rule 17—Committee Organizing Caucuses

(a) Each Committee shall have an organizing caucus of the Republican Members before the organizing meeting of the full Committee. The committee chair shall call the meeting, giving at least three days written notice to all Republican Members of the committee.

(b) During any time in which the Republican Party is the majority party in the House of Representatives, the chair of a committee shall seek to the maximum extent possible to avoid overlapping scheduling of subcommittee meetings in order to assure maximum Member participation.

## Rule 18—Periodic Committee Caucuses

Meetings of a committee caucus shall be called if requested by a majority of the Republican Members of the Committee or at any time by the chair. A majority of the Members may request a meeting provided the request to the chair is in writing and states the subject matter to be discussed at the meeting. A meeting so requested must be called by the chair within ten days after receipt of the written request, and after notice to all committee caucus Members.

## Rule 19—Election of Subcommittee Chairs

(a) In General.—

(1) In accordance with rule 15, the method for the selection of chairs of the Committee's subcommittees shall be at the discretion of the full Committee chair, unless a majority of the Republican Members of the full Committee disapprove the action of the chair.

(2) The chair shall formalize in writing for the other Republican Members of the Committee the procedures to be followed in selecting subcommittee chairs and individual subcommittee assignments and shall do so in advance of the Committee's organization. The procedures may be modified by a majority vote of the Republican Members of the full Committee.

(b) Appropriations Subcommittee Chairs.—The Chair of the Committee on Appropriations shall bring his nominations for the subcommittee chairs to the Republican Steering Committee for approval.  If any nomination is rejected by the Steering Committee, the Chair shall submit the new nomination(s) in a timely fashion.

### Rule 20—Vacancies in the Position of Subcommittee Chairs

Vacancies in the position of subcommittee chairs shall be filled according to the procedures established by the various Committees in accordance with rule 19.

### Rule 21—Committee on Standards of Official Conduct

No Member shall serve on the Committee on Standards of Official Conduct for more than three consecutive terms.

### Rule 22—Committee on Policy

(a) In general.—

(1) The Committee on Policy shall be an advisory Committee to the Membership of the House Republican Conference. The Committee on Policy shall meet at the call of the Chair of the Committee on Policy or the Speaker, and shall discuss legislative proposals with Republican Members of the appropriate standing and special committees and with such other Republican Members as the Chair may invite to meetings.

(2) The Committee on Policy shall report its suggestions for Republican action and policy to the Republican Members of the House. The Chair of the Committee on Policy may appoint, in consultation with the Speaker, such subcommittees from the Republican Members of the House for such purposes as may be deemed appropriate.

(b) Composition.—The Committee on Policy shall be composed of—

(1) One Member elected from each region, State, or group of States under the Steering Committee structure;

(2) Two Members elected by the sophomore class and one Member elected by the freshman class;

(3) The House Republican Leadership, as designated by rule 2;

(4) One Member from each standing committee of the House appointed by the Speaker; and,

(5) Such Members-at-large as may be appointed by the Speaker.

(c) Seniority.—The traditions and privileges of seniority shall not apply to membership of the Committee on Policy and the Committee may, at its direction, make such rules as are necessary for conduct of its business.

### Rule 23—The National Republican Congressional Committee

(a) Composition.—The National Republican Congressional Committee ("NRCC") shall be composed of an executive committee of 38 members, to be composed of—

(1) the Speaker;

(2) the Republican Leader;

(3) the Republican Whip;

(4) the Chair of the Republican Conference;

(5) the Chair of the National Republican Congressional Committee;

(6) the Chair of the Committee on Policy;

(7) the Vice Chair of the Republican Conference;

(8) the Secretary of the Republican Conference; and,

(9) Thirty members appointed to serve on the executive committee by the Chair of the National Republican Congressional Committee.

(A) Appointments pursuant to this subparagraph shall be reported to the Conference for its approval, and the executive committee roster shall be made publicly available upon approval.

(B) The Conference shall vote on such recommendation. Nothing in this rule shall be construed to limit the ability of any member to request a secret ballot under Rule 8.

(C) If the Republican Conference fails to approve a recommendation of the Chair of the NRCC with respect to a nomination, the matter shall be automatically recommitted to the Chair of the NRCC without instructions.

(b) Duties.—The duties of the National Republican Congressional Committee shall be to—

(1) act as counsel and advisor to the Members of the House Republican Conference;

(2) furnish support services to the extent consistent with the Rules of the House; and,

(3) have oversight in election campaigns in all general and special elections for membership in the House of Representatives.

### Rule 24—Republican Personnel

(a) The House Republican Conference hereby vests in the Speaker supervisory authority over all Republican employees of the House of Representatives, and direct authority over the Republican Floor Assistants and Republican Cloakroom.

(b) The Speaker is hereby empowered to offer recommendations and advise the Republican Conference as to the location and use of all personnel and funds, appropriated or otherwise, of the Republican Conference or any committee or officer thereof including but not limited to: the Republican Whip, the Republican Committee on Policy and the National Republican Congressional Committee, to avoid duplication and improve coordination and best utilization of those assets.

(c) The funds appropriated for the offices of the Republican Leader, the Republican Whip, and the Republican Conference may be allocated and utilized by the Republican Leader, the Republican Whip and the Chair of the Republican Conference, respectively, only after a budget, prepared in consultation with the Speaker, detailing the proposed use of such funds has been established.

(d) The Speaker shall provide general personnel referral services to Republican Members and such other services as he or she deems necessary.

(e) The staff employed by the elected Republican Leadership as defined under rule 2, or under the direct authority of the Speaker, will be considered a unified staff, although directly responsible to the employing office, will work for all others of the Leadership as directed by the Speaker in consultation with the employing office.

### Rule 25—Temporary Step Aside of a Member who is Indicted

(a) A member of a standing, select, joint or ad hoc committee, or any subcommittee thereof, who is indicted for a felony for which a sentence of two or more years imprisonment may be imposed, shall submit his or her resignation from any such committees to the House promptly. Vacancies created by this paragraph shall be filled pursuant to rule 12.

(b) In the case of the resignation of a chair pursuant to this rule, the next ranking Republican member of the committee or subcommittee concerned shall serve as acting chair for the remainder of the Congress, unless the Steering Committee nominates a Member consistent with rule 14, or unless the chair resumes his position in accord with paragraphs (c) or (d) of this rule.

(c) If a committee member or chair resigns pursuant to this rule, and subsequently during that Congress is acquitted or the charges are dismissed or reduced to less than a felony as described in paragraph (a), the Chair of the Republican Conference shall take such steps as may be necessary to promptly reinstate the Member to such committees at the same

seniority as when the Member resigned, including the position of chair if applicable, unless the Republican Conference decides otherwise within 10 legislative days.

(d) The Conference may waive the provisions of this rule at any time by majority vote.

### Rule 26—Temporary Step Aside of a Member of Leadership who is Indicted

(a) A member of the Republican Leadership shall step aside if indicted for a felony for which a sentence of two or more years imprisonment may be imposed.

(b) If a member of the Republican Elected Leadership is indicted, the Republican Conference shall meet and elect a Member to temporarily serve in that position.

(c) If a member of the Republican Leadership resigns pursuant to this rule, and subsequently during that Congress is acquitted or the charges are dismissed or reduced to less than a felony as described in paragraph (a), such Member shall resume the position from which they resigned, unless the Republican Conference decides otherwise within 10 legislative days.

### Rule 27—Removal of a Committee Member who is Convicted

A member of a standing, select, joint or ad hoc committee, or any subcommittee thereof, who is convicted of a felony for which a sentence of two or more years imprisonment is imposed, shall be removed from any such committee within 10 legislative days.  The Chair of the Republican Conference shall take such steps as may be necessary to facilitate the removal from committees of such Member in the House. Vacancies created by this paragraph shall be filled pursuant to rule 12.

### Rule 28—Automatic Replacement of a Chair who is Censured

(a) The chair of a standing, select, joint or ad hoc committee, or subcommittee thereof, who is censured by a vote of the House when the Republican Party is the majority party in the House of Representatives, shall cease to exercise the powers of such position. The Chair of the Republican Conference shall take such steps as may be necessary to facilitate the removal from the position of chair in the House.  Vacancies created by this paragraph shall be filled pursuant to the applicable rule.

(b) The Conference may waive the provisions of this rule at any time by majority vote.

### Rule 29—Guidelines on Suspension of House Rules

(a) The Republican Leader shall not schedule, or request to have scheduled, any bill or resolution for consideration under suspension of the Rules which—

(1) fails to include a cost estimate;

(2) has not been the subject of a notification to the minority;

(3) creates a new program, unless it also eliminates or reduces a program of equal or greater size;

(4) authorizes appropriations without including a sunset provision;

(5) authorizes an increase in authorizations, appropriations, or direct spending in any given year, unless fully offset by at least an equal reduction in current spending;

(6) expresses appreciation, commends, congratulates, celebrates, recognizes the accomplishments of, or celebrates the anniversary of, an entity, event, group, individual, institution, team or government program; or acknowledges or recognizes a period of time for such purposes; or

(7) directs the Secretary of the Treasury to strike a Congressional Gold Medal unless—

(A) the recipient is a natural person;

(B) the recipient has performed an achievement that has an impact on American history and culture that is likely to be recognized as a major achievement in the recipient's field long after the achievement;

(C) the recipient has not received a medal previously for the same or substantially the same achievement;
(D) the recipient is living or, if deceased, has not been deceased for less than five years or more than twenty-five years;

(E) the achievements were performed in the recipient's field of endeavor, and represent either a lifetime of continuous superior achievements or a single achievement so significant that the recipient is recognized and acclaimed by others in the same field, as evidenced by the recipient having received the highest honors in the field; and

(F) adoption of such measure does not cause the total number of measures authorizing the striking of such medals in that congress to substantially exceed the average number of such measures enacted in prior congresses.

(b) A waiver of this rule can be granted by the majority of the Elected Leadership as defined under rule 2.

**Rule 30—Transparency**

(a) To the maximum extent practicable, the Chair shall make the text of matters adopted during the organizational conference held pursuant to rule 3 publicly available in electronic form.

(b) Not later than January 31 of each odd-numbered year, the Chair shall make available in electronic form to all Members of the Conference a listing of the various boards, commissions, and committees that include appointees by the Speaker or the Majority Leader.

**Standing Orders for the 117th Congress**

Article I Funding Requests

(a) In order to responsibly execute Congress' Article I authority to control the power of the purse, it is the policy of the House Republican Conference that no Member shall request a congressional earmark, limited tax benefit, or limited tariff benefit, as such terms have been described in the Rules of the House, unless the following accountability criteria are met:

(1)        the request is publicly disclosed at the time the request is made, including a written justification for why the project is an appropriate use of taxpayer funds and the name of the requesting Member;

(2)        neither the Member nor his or her immediate family has a financial interest in the request; and

(3)        the request comports with any further regulations and guidance the Republican Chairs or Ranking Members of the committees of jurisdiction shall promulgate.

(b) It is further the policy of the Republican Conference that Republican Chairs or Ranking Members shall not give consideration to a Member's seniority, committee assignments, or position in the elected leadership when facilitating a request made pursuant to this order.

Policy Statements on Article I Powers

(a) It is the policy of the Republican Conference that all Members of the Republican Conference shall, to the maximum extent practicable, draft legislation so as to preserve Congress' authorities under Article I of the Constitution.  It is further the policy of the Republican Conference that authorizing committees shall, as agencies and programs are reauthorized—

(1)        seek opportunities to move, where appropriate, mandatory programs with automatic funding streams to the annual appropriations process to increase oversight and accountability; and

(2)        limit agency discretion in implementing statutes and rulemaking through more effective drafting practices for bills and committee reports, including, to the maximum extent practicable, provisions to allow congressional review of new major regulations as defined in the Congressional Review Act, so as to limit executive overreach.

(b) It is further the policy of the Republican Conference that—

(1)        the Majority Leader shall prioritize measures that seek to preserve Congress' authorities under Article I of the Constitution when scheduling the House Floor, which should periodically include, after receiving concurrence from the appropriate committee chairs of primary jurisdiction, designated floor time for consideration of single-issue bills related to exercising such authorities; and

(2)     the Republican Conference shall periodically schedule Planning Conferences to include the topic of preserving and exercising Article I of the Constitution.

Government-to-Government Land Conveyances

It shall not be a violation of House Republican Conference rules, House rules, or any general protocols to enact a government-to-government land conveyance.

Case 1:21-cr-00670-CJN   Document 58-7   Filed 04/15/22   Page 1 of 60

# EXHIBIT G

(Slip Opinion)

# Congressional Oversight of the White House

Congressional oversight of the White House is subject to greater constitutional limitations than oversight of the departments and agencies of the Executive Branch, in light of the White House staff's important role in advising and assisting the President in the discharge of his constitutional responsibilities, the need to ensure the independence of the Presidency, and the heightened confidentiality interests in White House communications.

January 8, 2021

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum opinion summarizes the principles and practices governing congressional oversight of the White House. The White House, as we use the term here, refers to those components within the Executive Office of the President ("EOP"), such as the White House Office and the National Security Council, whose principal function is to advise and assist the President in the discharge of the duties of his office. All three branches of government have recognized that the White House has a role and status distinct from the executive branch departments and agencies, and this Office has long recognized those distinctions to be critical to the development of principles and practices for congressional oversight addressed to the White House.

The Constitution vests all of "[t]he executive Power" in the President and charges him alone with the responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In carrying out that charge, the President necessarily depends on "the assistance of subordinates," *Myers v. United States*, 272 U.S. 52, 117 (1926), most of whom are his appointed officials in the executive departments and agencies. Yet the size and complexity of modern federal administration have required the establishment of the White House as an organizational apparatus to directly support the President in the discharge of his responsibilities. White House personnel work in close proximity to the President and advise and assist him in the development of presidential policy, in supervising and guiding the affairs of the executive branch departments and agencies, and in communicating with Congress, the American public, and foreign governments.

45 Op. O.L.C. __ (Jan. 8, 2021)

The White House's important role in advising and assisting the President has special significance for congressional oversight. Each House of Congress has, as an adjunct to its legislative power, the constitutional authority to obtain information, a power typically carried out through its committees. But this investigative authority, often referred to as "oversight" authority, is subject to limitations. A congressional information request "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)). Consequently, the Executive Branch must scrutinize the asserted legislative purpose underlying a congressional request by examining the objective fit between that purpose and the information sought. Because Congress may conduct oversight investigations only with respect to "'subject[s] on which legislation could be had,'" *id.* (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975)), Congress may not conduct such investigations for the purpose of reviewing the discharge of functions exclusively entrusted to the President by the Constitution. *See, e.g.*, *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (Reno, Att'y Gen.) ("*Clemency Decision*").[1] It follows that the activities of White House advisers are less likely than the activities of the departments' and agencies' staffs to involve matters within Congress's oversight authority.

Even when Congress operates within the appropriate scope of its oversight authority, the Constitution places additional separation of powers constraints on inquiries directed at the White House. The Supreme Court

_____

[1] This memorandum addresses Congress's authority to investigate in furtherance of its power to legislate. *See McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). We do not consider Congress's parallel authority to obtain the information necessary to the discharge of its other powers, such as the House's power to impeach, although we have recognized that similar principles apply in those areas. *See, e.g.*, *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *3 (Nov. 1, 2019) (recognizing "that a congressional committee must likewise make a showing of need that is sufficient to overcome [executive] privilege in connection with an impeachment inquiry"); Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 2 (Nov. 3, 2019) (recognizing that the immunity of certain presidential advisers from compelled congressional testimony "applies in an impeachment inquiry just as it applies in a legislative oversight inquiry").

2

*Congressional Oversight of the White House*

has recognized the importance of "the Executive Branch's interests in maintaining the autonomy of [the Presidency] and safeguarding the confidentiality of its communications." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004). These concerns are particularly acute with respect to White House advisers. Congressional oversight directed at the White House must be conducted in a way that protects the ability of the White House to function effectively in advising and assisting the President as he carries out his responsibilities under the Constitution.

Congressional inquiries are also constrained by the heightened confidentiality interests in White House communications. *See id.* At the core of those interests is the presidential communications component of executive privilege, which covers many White House communications involving presidential decision-making. Congressional inquiries directed to the White House must take account of the presumptive application of executive privilege to White House communications, as well as the President's interests in autonomy and independence. Even when the White House may have relevant information, these separation of powers and privilege concerns weigh in favor of Congress seeking available information first from the departments and agencies before proceeding with White House requests.[2]

This memorandum proceeds in four Parts. Part I describes the development of the White House as an organization and its central role in advising and assisting the President. Part II discusses the scope of congressional oversight authority and the limits on that authority as it applies to matters related to the discharge of the President's constitutional functions. Part III explains that when Congress directs its oversight requests to the White House, the constitutionally mandated "accommodation process" should take into account the limitations imposed on those requests by separation of powers principles and the heightened executive privilege interests attending the communications of the White House.

_____

[2] Although this memorandum addresses the EOP components whose principal function is to advise and assist the President, many of the principles discussed here would apply as well to so-called "dual hat" presidential advisers in other components who "exercise substantial independent authority or perform other functions in addition to advising the President." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). To the extent that Congress directs oversight efforts at activities implicating the advising "hat" of those officials, many of the same principles governing oversight would apply.

3

45 Op. O.L.C. __ (Jan. 8, 2021)

Finally, Part IV assesses the mechanisms for enforcing congressional subpoenas and discusses legal issues commonly raised by congressional subpoenas directed to White House staff. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational demands. Although congressional committees have recently sued to enforce several subpoenas against executive officials, those lawsuits lack a foundation in our Nation's history and fall outside the constitutional and statutory jurisdiction of the federal courts. Congress and the Executive Branch have traditionally worked out their disputes through negotiation and compromise, and the Department of Justice believes that those time-tested methods are the appropriate means for resolving disputes over congressional information requests, no matter whether directed at the White House or the departments and agencies within the Executive Branch.

## I. Historical Background

Article II of the Constitution establishes a unitary Executive Branch headed by the President, and it assigns to him an array of important functions, including responsibility for the Nation's foreign relations, military affairs, and law enforcement. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) ("The entire 'executive Power' belongs to the President alone."); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 550–51 (1977) (Rehnquist, J., dissenting) ("[T]he President is made the sole repository of the executive powers of the United States, and the powers entrusted to him as well as the duties imposed upon him are awesome indeed."). It is no surprise that, in a "world of extraordinary administrative complexity and near-incalculable presidential responsibilities," Presidents have consistently and increasingly turned to the "assistance of close aides" in the White House to carry out their duties. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2273 (2001).

The White House's modern organizational form traces to the EOP's creation in 1939 as "an institutional response to needs felt by every occupant of the Oval Office . . . . [T]hese were, and remain, needs for advice and assistance." Harold C. Relyea, *The Executive Office Concept*, in *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 4 (Harold C. Relyea ed., 1997). As one leading scholar

4

*Congressional Oversight of the White House*

put it a decade after its establishment, "[t]he creation of the Executive Office of the President was a milestone in the history of the Presidency." George A. Graham, *The Presidency and the Executive Office of the President*, 12 J. Pol. 599, 603 (1950); *see also* Wayne Coy, *Federal Executive Reorganization Re-examined: Basic Problems*, 40 Am. Pol. Sci. Rev. 1124, 1131–32 (1946) ("[T]he largest step toward enabling the President to 'take care' of the effective operation of the administrative system occurred in 1939, with the establishment of the Executive Office of the President.").

Long before the EOP's establishment, Presidents received confidential advice and assistance from individuals other than department and agency heads. President Jackson sought help from a group of informal advisers known as the "Kitchen Cabinet," which "performed most of the functions of a modern staff, serving his personal and political needs." Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 J. Am. Hist. 367, 379 (1978). Historians have characterized this group of informal advisers "as an early prototype of the President's White House staff, a group of personal aides providing the President with a variety of services." *Id.* at 378; *see also id.* (noting that Jackson's informal advisers shared his "perspective in overseeing the general direction of his administration, instead of the more limited perspective of department heads"). The tradition of Jackson-style kitchen cabinets continued for nearly a century: "John Tyler had his 'Virginia Schoolmasters'; Grover Cleveland maintained a 'Fishing Cabinet'; Teddy Roosevelt sported the 'Tennis Cabinet'; Warren Harding encouraged a 'Poker Cabinet'; [and] Herbert Hoover instituted a 'Medicine Ball Cabinet.'" Relyea, *The Executive Office Concept* at 43.

During the 1920s, Congress considered several proposals to more formally establish the "administrative machinery" needed "to enable the President to discharge his managerial duties." Edward H. Hobbs, *An Historical Review of Plans for Presidential Staffing*, 21 L. & Contemp. Probs. 663, 670 (1956). Although these initial proposals were not adopted, the advent of the New Deal spurred lasting action. As the administrative state dramatically expanded, President Franklin D. Roosevelt realized that he needed more staff to enable him to carry out his mounting responsibilities. In early 1936, he established a three-member committee charged with "investigat[ing] and report[ing]" upon "the organization for the perfor-

45 Op. O.L.C. __ (Jan. 8, 2021)

mance of the duties imposed upon the President in exercising the executive power vested in him by the Constitution of the United States." President's Committee on Administrative Management, *Administrative Management in the Government of the United States* 2 (1937) ("Brownlow Report"). The President's Committee on Administrative Management, more commonly known as the Brownlow Committee after its chair, "surveyed the landscape immediately after the spate of New Deal reforms, [and] found a President who although 'now ha[ving] popular responsibility' for the 'direction and control of all departments and agencies of the Executive Branch . . . [was] not equipped with adequate legal authority or administrative machinery to enable him to exercise it.'" Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2275.

The Brownlow Committee "drafted a blueprint for an administrative staff agency, which [it] labeled the Executive Office." Hobbs, *Plans for Presidential Staffing*, 21 L. & Contemp. Probs. at 674. The Committee's final report recommended that Congress "[e]xpand the White House staff so that the President may have a sufficient group of able assistants in his own office to keep him in closer and easier touch with the widespread affairs of administration and to make a speedier clearance of the knowledge needed for executive decision." Brownlow Report at 46. Stressing the urgent need for reform, the Committee included in its report a warning: "The President needs help. His immediate staff assistance is entirely inadequate." *Id.* at 5.[3]

President Roosevelt strongly endorsed the Committee's recommendations. He stated that "[t]he plain fact is that the present organization and equipment of the Executive Branch of the Government defeat the Constitutional intent that there be a single responsible Chief Executive to coordinate and manage the departments and activities in accordance with the laws enacted by the Congress." *A Recommendation for Legislation to Reorganize the Executive Branch of the Government* (Jan. 12, 1937), 5 Pub. Papers of Pres. Franklin D. Roosevelt 668, 670 (1938).

---

[3] Louis Brownlow later recounted that the EOP's mission as contemplated by his Committee was to ensure that the President could "control the policies of his departments, while leaving to the head of each department the decisions which are peculiar to its activity and the work incidental thereto." Louis Brownlow, *The Executive Office of the President: A General View*, 1 Pub. Admin. Rev. 101, 104 (1941).

6

*Congressional Oversight of the White House*

Congress authorized President Roosevelt to establish the EOP under the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; soon thereafter, he issued Reorganization Plan No. 1, which became effective in July 1939, 4 Fed. Reg. 2727, 53 Stat. 1423. President Roosevelt implemented the reorganization plan by executive order, organizing the EOP into five divisions, each charged with a distinct mission. Notably, the White House Office would "serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." Exec. Order No. 8248, 4 Fed. Reg. 3864, 3864 (Sept. 8, 1939). The Order provided that presidential assistants would hold "no authority over anyone in any department or agency" and should "[i]n no event . . . be interposed between the President and the head of any department or agency." *Id.*

EOP officials soon came to take a leading role in developing and coordinating policy recommendations for the President. Within its first decade, the EOP expanded to include entities specifically created for those purposes. The Council of Economic Advisers, for example, was established in the EOP in 1946 to "analyze and interpret economic developments" and "formulate and recommend national economic policy to promote full employment, production, and purchasing power under free competitive enterprise." Employment Act of 1946, Pub. L. No. 79-304, § 4(a), 60 Stat. 23, 24. A year later, the National Security Council was created to "advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving the national security." National Security Act of 1947, Pub. L. No. 80-253, § 101(a), 61 Stat. 495, 496.[4] By the end of the Truman Administration, the EOP had grown to eleven principal units. Harold C. Relyea, Cong. Research Serv., 98-606 GOV, *The Executive Office of the President: An Historical Overview* 9 (updated Nov. 26, 2008).

As the White House developed as an organization, all three branches of government recognized that it should be viewed differently from the departments and agencies of the Executive Branch. With respect to congressional oversight specifically, in the 1970s Assistant Attorneys General

---

[4] The National Security Council formally became an EOP component upon the adoption of Reorganization Plan No. 4 of 1949, 63 Stat. 1067.

45 Op. O.L.C. __ (Jan. 8, 2021)

William Rehnquist and Antonin Scalia, among others, recognized that the President's immediate White House advisers must be treated differently from officials of the departments and agencies when Congress seeks their testimony. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974); *see also infra* Part IV.B.

Congress and the federal courts similarly recognized the need to treat the President's inner circle of advisers differently under other federal laws. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). Thus, although the Freedom of Information Act ("FOIA") by its terms applies to the EOP, 5 U.S.C. § 552(f)(1), the Supreme Court held that Congress did not include "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quoting H.R. Rep. 93-1380, at 15 (1974) (Conf. Rep.)). Federal courts have accordingly limited FOIA to exclude various EOP components, making this determination by considering "how close operationally the [component] is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure." *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993); *see also, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) (holding that Secret Service logs of visitors to such advise-and-assist EOP offices are not "agency records" for purposes of FOIA).

Congress similarly recognized that the President should have plenary discretion when it comes to hiring, paying, and organizing certain White House staff. In 1978, Congress authorized the President "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law." Pub. L. No. 95-570, 92 Stat. 2445, 2445 (codified at 3 U.S.C. § 105(a)). As this Office later observed, that statute "reflect[s] Congress's judgment that the President should have complete discretion

*Congressional Oversight of the White House*

in hiring staff with whom he interacts on a continuing basis." *Applicability of the Presidential Records Act to the White House Usher's Office*, 31 Op. O.L.C. 194, 197 (2007). As in the FOIA context, Congress thus viewed the advise-and-assist components of the White House as not only different from the departments and agencies, but also different from the other components of the EOP. *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009). Congress has continued to recognize that distinction up to the present day. *See, e.g.*, Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2(e), 128 Stat. 2003, 2006–07 (codified at 44 U.S.C. § 2209) (prohibiting "the immediate staff of the President" and any "unit or individual of the Executive Office of the President whose function is to advise and assist the President" from sending presidential records using non-official electronic message accounts).

The White House continues to play a unique role in the Executive Branch, providing the President with close and confidential advice and assistance on a daily basis. The White House acts as the President's primary information-gathering and policy-development arm, and serves as "something of a central nervous system of the executive branch. . . . [It] is a 'force multiplier.' Without it, the President would be greatly weakened in his struggle to instantiate his preferences within the executive branch." Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 714, 716 (2009). This memorandum opinion's remaining Parts explain how the White House's special status affects congressional oversight.

## II. Scope of Congressional Oversight Authority

Although "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," each House has implied authority to secure the information "needed" to legislate. *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted); *McGrain v. Daugherty*, 273 U.S. 135, 160–61 (1927). Each House may "make investigations and exact testimony, to the end that it may exercise its legislative function advisedly and effectively." *McGrain*, 273 U.S. at 161; *see also Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985) ("*Scope of Congressional Oversight*") ("It is

45 Op. O.L.C. __ (Jan. 8, 2021)

beyond dispute that Congress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws."). The House and Senate typically exercise their investigative functions through delegations to committees, each of which has jurisdiction over identified legislative subjects and agencies. The investigative authority of each committee is bounded by its subject matter jurisdiction, as identified by the rules and resolutions of the relevant congressional chamber.

Congress's authority to investigate in furtherance of its power to legislate has come to be known as its "oversight" authority, but that shorthand term does not imply a general authority to review the actions of the Executive Branch. Congress may direct the departments and agencies through the enactment of appropriate legislation, but the Constitution does not otherwise confer on Congress or its committees an authority to "oversee" or direct the Executive Branch in the conduct of its assigned duties and responsibilities under Article II. Rather, because Congress enjoys an implied power of investigation that "is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 197). Two of these limitations have particular significance for congressional oversight of the White House. First, because a congressional oversight request "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress,'" it "must serve a 'valid legislative purpose.'" *Id.* (quoting *Watkins*, 354 U.S. at 187; *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Second, and relatedly, the scope of oversight authority is limited to subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, and therefore Congress "cannot inquire into matters which are within the exclusive province of one of the other branches of the Government," *Barenblatt v. United States*, 360 U.S. 109, 112 (1959), including any function committed exclusively to the President by the Constitution.[5]

-------------------

[5] Congressional oversight authority may encompass inquiries into the Executive Branch's use of appropriated funds with respect to statutory programs as well as inquiries relevant to future appropriations. However, as *Barenblatt* makes clear, the fact that the President or the federal courts may rely upon appropriated funds to carry out their activities does not mean that everything they do falls within the scope of the oversight authority. Otherwise, no matter would fall within the "exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 112. Rather, "[s]ince Congress may

10

*Congressional Oversight of the White House*

## A. Legitimate Legislative Purpose

Congress may conduct investigations only for legitimate legislative purposes. This Office has long counseled that "a threshold inquiry that should be made [by the Executive] upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986) ("*Independent Counsel Act Requests*"). As Assistant Attorney General William Barr explained, the Executive Branch need only assess its "interest in keeping [requested] information confidential" after "it is established that Congress has a legitimate legislative purpose for its oversight inquiry" in the first place. *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*"); *see also Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f )*, 43 Op. O.L.C. __, at \*21 (June 13, 2019) ("*President's Tax Returns*") (reiterating this position).

Because Congress may obtain information only where it will advance a legitimate legislative purpose, the other branches of government must review congressional information requests to ensure that they are not motivated by an illegitimate purpose. As the Supreme Court recently explained in *Trump v. Mazars*:

> Congress has no "'general' power to inquire into private affairs and compel disclosures," [*McGrain*, 273 U.S.] at 173–174, and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200. "Investigations conducted solely for the per-

---

only investigate into those areas in which it may potentially *legislate or appropriate*, it cannot inquire into matters which are within the [Executive's] exclusive province[.]" *Id.* at 111–12 (emphasis added). Therefore, the limits placed on Congress when conducting oversight pursuant to its general legislative power also apply to oversight conducted pursuant to its appropriations authority. While Congress may, pursuant to its appropriations authority, review manpower statistics and other non-substantive data regarding the resources that Presidents historically invest in areas of exclusive executive authority, Congress lacks the authority to inquire into the Executive's substantive decision-making in these areas.

45 Op. O.L.C. __ (Jan. 8, 2021)

> sonal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* at 187.

140 S. Ct. at 2032; *see also Branzburg v. Hayes*, 408 U.S. 665, 699–700 (1972) (a legislative committee "abuse[s] its proper function" when it exposes for the sake of exposure). Without these limits, the Court cautioned, "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense[.]" *Mazars*, 140 S. Ct. at 2034 (quoting *The Federalist* No. 71, at 484 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).[6]

Although courts, in reviewing subpoenas directed at private parties, have traditionally deferred to Congress's perceptions of its need for the information being sought, *see, e.g.*, *Barenblatt*, 360 U.S. at 132, the Supreme Court in *Mazars* suggested that such a deferential approach does not extend to congressional subpoenas directed at the President's personal information because of the separation of powers principles at stake in any such request, *see* 140 S. Ct. at 2031; *see also id.* at 2034–36. In such cases, a court must "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose"; "[t]he more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* at 2036. Moreover, "unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation," it will be "impossible to conclude that a subpoena is designed to advance a valid legislative purpose." *Id.* (internal quotation marks omitted); *see also Watkins*, 354 U.S. at 201, 205–06 (reversing a contempt charge due to, among other things, a "vague" and "broad" committee charter that rendered it "impossible . . . to ascertain whether any legislative purpose justifie[d] the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function").

---

[6] In the course of its oversight activities, Congress may "inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins*, 354 U.S. at 200 n.33. It may not, however, conduct oversight solely for the purpose of making information public. The Supreme Court has made clear that Congress "may only investigate into those areas in which it may potentially legislate or appropriate," *Barenblatt*, 360 U.S. at 111, and transmitting information "to inform the public . . . is not a part of the legislative function," *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979).

12

*Congressional Oversight of the White House*

The Supreme Court's review in *Mazars* of a House committee's pursuit of the President's financial information was consistent with how the Executive Branch has reviewed similar requests from Congress directed at the Executive Branch. Although the Executive Branch should seek to accommodate legitimate requests for information concerning the departments and agencies, this Office has advised that such accommodation may not be required where congressional committees' requests appear to fall outside their delegated legislative jurisdiction or lack a legitimate legislative purpose.

For instance, shortly before the *Mazars* decision, we concluded, based on reasoning similar to *Mazars*, that a request from the House Ways and Means Committee to the Department of the Treasury for the President's tax returns was not supported by a legitimate legislative purpose. *President's Tax Returns*, 43 Op. O.L.C. __, at *3. Although the committee sought records similar to those at issue in *Mazars*, the Chairman proffered a different reason for the request, claiming that the committee sought to evaluate the Internal Revenue Service's practice of auditing Presidents' tax returns. *Id.* at *2, *26–27. We advised that executive branch officials were not obliged simply to accept the committee's proffered legislative purpose at face value, but instead must "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *Id.* at *17; *see also id.* at *20 (noting the Executive Branch's obligation to "confirm[] the legitimacy of an investigative request," especially "when deferring to the request would effectively surrender the Executive's obligations to a Member of Congress"). In that case, the Chairman and other House leaders had made numerous public statements suggesting that the request was aimed at publicly exposing the President's tax returns, so "[n]o one could reasonably believe that the Committee [sought] six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process." *Id.* at *16–17. We also stressed that the institutional reasons that have sometimes led courts to defer to Congress's stated legislative purpose in cases involving private parties do not apply to the Executive Branch, "which operates as a politically accountable check on the Legislative Branch." *Id.* at *25. We concluded that the Chairman's stated legislative purpose for his request for the President's

13

45 Op. O.L.C. __ (Jan. 8, 2021)

tax returns "blink[ed] reality" and was "pretextual," *id.* at \*16, and therefore was not legitimate.

This Office similarly questioned the legislative purpose underlying three House committees' joint request for documents related to American foreign and defense policy with respect to Ukraine. There, the three committees had announced an investigation into the impeachment of the President, even though the full House had not delegated any such investigative jurisdiction to any of them. *House Committees' Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at \*47–49 (Jan. 19, 2020) ("*Authority to Investigate for Impeachment*"). In view of this basic legal defect in the requests, *see id.*, the committees supplemented them by claiming that they fell within their "oversight and legislative jurisdiction." *Id.* at \*8, \*47 (internal quotation marks omitted).

We concluded that this attempt to justify the request did not establish a legitimate legislative purpose, even though some of the requested materials might well have fallen within the oversight jurisdiction of one or more of the committees. The committee chairs had "made clear" in their official correspondence "that the committees were interested in the requested materials to support an investigation into the potential impeachment of the President, not to uncover information necessary for potential legislation within their respective areas of legislative jurisdiction." *Id.* at \*48. We explained that "[t]he Executive Branch need not presume that [a legislative] purpose exists or accept a makeweight assertion of legislative jurisdiction." *Id.* at \*47 (internal quotation marks omitted). We thus found that the committee chairmen were "seeking to do precisely what they said— compel the production of information to further an impeachment inquiry." *Id.* at \*48. The inquiry therefore was made not to advance a legitimate legislative purpose, but instead to further an impeachment investigation that had not been authorized at the time the subpoenas were issued. *Id.* at \*48–49.

We also emphasized the importance of committee jurisdiction, noting that "[a] congressional committee's 'right to exact testimony and to call for the production of documents' is limited by the 'controlling charter' the committee has received from the House." *Id.* at \*2 (quoting *United States v. Rumely*, 345 U.S. 41, 44 (1953)); *see also id.* at \*18–19 (discussing the committee jurisdiction requirement in the oversight and impeachment contexts); *Watkins*, 354 U.S. at 206 ("Plainly [the House's] committees

14

*Congressional Oversight of the White House*

are restricted to the missions delegated to them . . . . No witness can be compelled to make disclosures on matters outside that area.").

We think that the separation of powers principles described in *Mazars* and our recent opinions guide the appropriate approach to congressional oversight requests directed at the White House, which inherently raise separation of powers concerns. "[I]n assessing whether a subpoena directed" at the White House "is related to, and in furtherance of, a legitimate task of Congress," the White House "must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President." *Mazars*, 140 S. Ct. at 2035 (internal quotation marks omitted). Although *Mazars* addressed a subpoena that sought the President's personal financial information, there is no reason to think that a lesser standard would apply to oversight requests directed at the White House and its staff—requests that bear even more closely upon interests of confidentiality and the autonomy of the Executive Branch. The Court made clear that "congressional subpoenas for the President's information unavoidably pit the political branches against one another," *id.* at 2034, and therefore, all such requests necessarily raise separation of powers concerns. *See also id.* at 2030 (describing certain congressional requests for official documents as seeking "the President's information"). And the case for closely scrutinizing such requests is even stronger where it is not, as in *Mazars*, a court that is evaluating the request, but instead the Executive Branch during the constitutionally required accommodation process—one purpose of which is to provide a process for the Executive Branch to check an implied investigative power that otherwise has limited counterweights. *See President's Tax Returns*, 43 Op. O.L.C. __, at *25–26; *see also infra* Part III.C (discussing the accommodation process).

In such instances, we have advised that Congress may be expected to clearly articulate its legislative purpose, and the Executive Branch may independently review the proffered purpose. In considering a committee's legislative purpose, the White House should "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "The more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* The White House may fairly expect that the committee will provide a statement that "adequately identifies its aims and explains why the Presi-

45 Op. O.L.C. __ (Jan. 8, 2021)

dent's information will advance its consideration of the possible legislation." *Id.* In reviewing such a statement, the White House may take into account all relevant facts and circumstances in ensuring that the congressional request serves a legitimate legislative purpose within the appropriate authority of the requesting committee.

### B. Exclusive Executive Functions

Because congressional requests for information must "concern[] a subject on which legislation could be had," *U.S. Servicemen's Fund*, 421 U.S. at 506 (internal quotation marks omitted), Congress may not conduct oversight of the President's discharge of his exclusive constitutional authority. "Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 111–12; *see also Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain"). Congressional requests to the White House often run into this limitation to the extent they are directed at the President's exercise of his constitutional, rather than statutory, authorities.

This Office has observed that "[t]he Constitution assigns a variety of powers exclusively to the President" and "Congress may not intrude upon the President's exercise of [those] exclusive powers." Letter for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Inspector General for the Executive Office of the President* at 3 (July 24, 1996) (advising that proposed legislation to establish an inspector general for the EOP raised serious constitutional concerns). As we explained, "where the President is exercising, or has exercised, exclusive constitutional authority, Congress is wholly without authority to impose [disclosure] requirements on the President or the President's advisors." *Id.* Because Congress may not legislate with respect to the President's discharge of his exclusive constitutional functions, it similarly may not seek information from White House staff concerning the decision-making process in connection with the President's performance of those functions in particular matters.

16

*Congressional Oversight of the White House*

Attorney General Janet Reno drew this line in advising President Clinton with respect to a congressional subpoena seeking predecisional documents relating to a grant of clemency. The President's clemency decision, which is rooted in the pardon power, is a quintessential example of an exclusive executive power. *See Schick v. Reed*, 419 U.S. 256, 266 (1974) (the pardon power "flows from the Constitution . . . and . . . cannot be modified, abridged, or diminished by the Congress"). Attorney General Reno advised that Congress lacked the authority to subpoena the documents in question, because "[t]he granting of clemency pursuant to the pardon power is unquestionably an exclusive province of the executive branch," and thus "[a] compelling argument can be made . . . that Congress has no authority whatsoever to review a President's clemency decision." *Clemency Decision*, 23 Op. O.L.C. at 2.[7] Consistent with this conclusion, she explained, "it appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision." *Id.* at 3–4.[8]

In 2007, Acting Attorney General Paul Clement cited the President's exclusive constitutional powers in advising President Bush regarding an assertion of executive privilege with respect to internal White House communications concerning the possible exercise of the President's

---

[7] As a formal matter, the President asserted executive privilege in declining to provide the subpoenaed documents, which related to the deliberations over the President's grant of clemency to sixteen members of the FALN terrorist group. Letter for Dan Burton, Chairman, Committee on Government Reform, U.S. House of Representatives, from Cheryl Mills, Deputy Counsel to the President at 1 (Sept. 16, 1999) (relying on the "vital public interest in assuring that the President receives candid advice from his advisors"). But the White House Counsel's Office also raised the jurisdictional issue in objecting to the subpoena, stating that "[p]ursuant to the Constitution and the separation of powers doctrine, the President's authority to grant clemency is not subject to legislative oversight." *Id.*

[8] This position also served as the basis for the Justice Department's refusal the next year to answer certain questions posed by the House Judiciary Committee regarding a pending clemency petition. *See* Letter for Henry J. Hyde, Chairman, Committee on Judiciary, U.S. House of Representatives, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (June 21, 2000) ("[B]ecause Congress cannot legislate regarding the process by which the Department assists the President on clemency matters, Congress' oversight authority does not extend to that process.").

45 Op. O.L.C. __ (Jan. 8, 2021)

exclusive authority to nominate and to dismiss U.S. Attorneys: "[T]here is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 3 (2007). As Acting Attorney General Clement explained:

> The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults with members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.

*Id.*

This principle limiting the scope of Congress's oversight authority is consistent with the Supreme Court's refusal to tolerate legislation that intrudes on the President's exclusive constitutional powers and duties. Where the Constitution's text commits a power to the President exclusively, courts "refuse[] to tolerate *any* intrusion by the Legislative Branch." *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 485 (1989) (Kennedy, J., concurring in the judgment, joined by Rehnquist, C.J., and O'Connor, J.); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.").

The President's exclusive powers include the powers to pardon, to sign or veto legislation, to nominate and appoint officers of the United States, and to remove officers and other officials. *See Schick*, 419 U.S. at 266; *INS v. Chadha*, 462 U.S. 919, 946–48, 957–59 (1983) (holding the legisla-

18

*Congressional Oversight of the White House*

tive veto an unconstitutional interference with President's duties pursuant to the Presentment Clause); *Buckley v. Valeo*, 424 U.S. 1, 138–39 (1976) (per curiam) ("Congress' power under [the Necessary and Proper] Clause is inevitably bounded by the express language of [the Appointments Clause]," and consequently Congress cannot provide for the appointment of "'Officers of the United States'" except through a procedure that "comports with" the Appointments Clause); *Myers*, 272 U.S. at 161 ("The authority of Congress given by the excepting clause to vest the appointment of such inferior officers in the heads of departments" does not "enable[] Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be . . . to infringe the constitutional principle of the separation of governmental powers."). Thus, while Congress may request information pertaining to the broad range of matters about which it may legislate, that authority does not extend to authorities exclusively vested in the President, including the work that the White House staff does in advising and assisting the President in connection with the execution of those constitutional authorities.

   The President's exclusive authorities also include his powers in the area of diplomacy and national defense, although in many cases those powers closely abut areas in which Congress may legislate. The Constitution entrusts the President with the "'vast share of responsibility for the conduct of our foreign relations.'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). And that responsibility includes the "exclusive authority to conduct diplomacy on behalf of the United States." *Congressionally Mandated Notice Period for Withdrawing from the Open Skies Treaty*, 44 Op. O.L.C. __, at *11 (Sept. 22, 2020) (internal quotation marks omitted); *see also Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 121 (2011) (recognizing the President's "exclusive authority to determine the time, scope, and objectives of international negotiations" (internal quotation marks omitted)). The President's authority as Commander in Chief and Chief Executive also includes broad authority over the deployment and control of the military in protecting American persons and interests abroad. *See, e.g.*, *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61–62 (1941)

45 Op. O.L.C. __ (Jan. 8, 2021)

(Jackson, Att'y Gen.); *Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 185 (1996) ("It is for the President alone, as Commander-in-Chief, to make the choice of the particular personnel who are to exercise operational and tactical command functions over the U.S. Armed Forces."); *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 465 (1855) (Cushing, Att'y Gen.) (because the President "alone" is the "supreme commander-in-chief," Congress cannot "authorize or create any military officer not subordinate to the President"). The Executive Branch has consistently asserted the President's exclusive authority in these areas, and the Supreme Court has endorsed those principles.[9]

At the same time, Congress also has overlapping authority to legislate in matters touching upon foreign affairs and the national defense. Congress "clearly possesses significant Article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225–26 (2009). Congress established and is responsible for funding the Department of State and the Department of Defense—two departments that the President relies upon in the discharge of his constitutional powers—and Congress also has express legislative authority under Article I, Section 8, with respect to foreign trade; the raising, supporting, and regulation of the armed forces; and the declaration of war, among other powers. Congress's legislative authority in these areas provides a basis for seeking information in connection with these areas, and such oversight requests may sometimes reach the White House.

---

[9] *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("[J]udicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate[.]"); *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign relations and ensuring the Nation's defense are "central Presidential domains" (internal quotation marks omitted)); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring in judgment, joined by Wayne, Swayne, and Miller, JJ.) (Congress has no authority to "interfere[] with the command of the forces and the conduct of campaigns" because "[t]hat power and duty belong to the President as commander-in-chief"); *In re Hennen*, 38 U.S. (13 Pet.) 230, 235 (1839) ("As the executive magistrate of the country, [the President] is the only functionary intrusted with the foreign relations of the nation.").

20

**-1025-**

*Congressional Oversight of the White House*

We have previously advised on these areas of exclusive and overlapping authority in connection with congressional oversight requests related to the protection of classified information. The Supreme Court has explained that the President may "classify and control access to information bearing on national security and . . . determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information[.]" *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). This exclusive power primarily derives from his constitutional authority as "'Commander in Chief of the Army and Navy of the United States,'" *id.* (quoting U.S. Const. art. II, § 2, cl. 1), and "exists quite apart from any explicit congressional grant," *id.* Although Congress does not "entirely lack[] authority to legislate in a manner that touches upon disclosure of classified information," it cannot intrude—through legislation or oversight—upon the President's control over national security information. *Security Clearance Adjudications by the DOJ Access Review Committee*, 35 Op. O.L.C. 86, 95–96 (2011); *see The Department of Defense's Authority to Conduct Background Investigations for Its Personnel*, 42 Op. O.L.C. __, at *9 (Feb. 7, 2018) ("while Congress is not entirely disabled from participating in the system for protecting classified information, Congress may not impair the President's control over national security information").

In summary, because Congress's oversight authority extends only to those subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, the Executive Branch may properly review an oversight request directed at the White House to evaluate whether the request is directed at the discharge of an exclusive constitutional authority of the President or instead concerns a subject about which Congress may legislate.

### III. Constitutional Limits on
### Congressional Oversight of the White House

Even when a congressional inquiry advances a legitimate legislative purpose, the separation of powers imposes other constraints on oversight of the White House. The accommodation process requires that "each branch . . . take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am.*

45 Op. O.L.C. __ (Jan. 8, 2021)

*Tel. & Tel. Co.* ("*AT&T*"), 567 F.2d 121, 127 (D.C. Cir. 1977). As discussed below, the President's strong interests in the independence and autonomy of his office, as well as the confidentiality of his communications, justify corresponding restrictions on oversight of the White House.

Congressional requests for information from the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of [the] office [of the President] and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. In addition, oversight directed at the White House implicates heightened executive branch confidentiality interests, which are particularly strong with respect to White House communications. Accordingly, when oversight involves the White House, congressional committees and the White House must work to respect these constraints while accommodating the committees' legitimate information needs. These considerations mean that oversight requests directed to the White House are typically the exception, rather than the norm. Congress should generally seek information from the departments and agencies first before turning to the White House, and oversight requests to the White House must be tailored to accommodate the President's need for autonomy and confidentiality.

## A. Separation of Powers Principles

The President is the head of a co-equal branch of government. Congress and the President thus "have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Mazars*, 140 S. Ct. at 2033–34 (quoting *The Federalist* No. 51, at 349 (James Madison)). Consequently, congressional requests for information directed at the President and the White House are not "run-of-the-mill legislative effort[s]" and "differ markedly from" congressional requests directed toward others. *Id.* at 2034. The "significant separation of powers issues" raised by such requests "necessarily inform[]" the scope of and manner in which Congress may request such information. *Id.* at 2026, 2033. If Congress could freely demand the President's information, it would "'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Id.* at 2034 (quoting *The Federalist* No. 71, at 484). In the same way that the President must respect Congress's institutional prerogatives, Congress

22

*Congressional Oversight of the White House*

too must conduct oversight mindful of the independence and autonomy of the office of the President.

Although the Supreme Court's opinion in *Mazars* discussed these principles in the context of congressional requests for the President's personal information, these separation of powers concerns also apply to requests for information from White House advisers, who assist the President "on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *5 (May 20, 2019) ("*Immunity of the Former Counsel*") (internal quotation marks omitted).

The Supreme Court recognized as much in *Cheney*, which addressed the special consideration owed to the White House in connection with demands for information made in a civil action. The Court held that the Judicial Branch must treat civil discovery requests directed at the President's senior advisers differently from discovery matters involving other executive branch personnel:

> This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who . . . give advice and make recommendations to the President. The Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives. . . . [S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated. This Court has held, on more than one occasion, that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and that the Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of litigation against it.

542 U.S. at 385 (citations omitted). While the purposes of congressional oversight and civil discovery are distinct, both involve requests from outside the Executive Branch. Just as separation of powers principles require the Judicial Branch to adjust the "timing and scope of discovery"

45 Op. O.L.C. __ (Jan. 8, 2021)

directed at presidential advisers in civil litigation, congressional committees and White House personnel also must tailor the timing and scope of their oversight accommodations in ways that respect the President's interests in autonomy and confidentiality.

In *Cheney*, the Supreme Court reviewed the D.C. Circuit's denial of the Vice President's petition for a writ of mandamus vacating certain discovery orders issued by a district court. The plaintiffs had sued the Vice President and others alleging that the President's National Energy Policy Development Group had not complied with the disclosure requirements of the Federal Advisory Committee Act, 5 U.S.C. app. §§ 1–15. The district court ordered the plaintiffs to "submit a proposed discovery plan" for the court's approval. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 56 (D.D.C. 2002). Under the Federal Rules of Civil Procedure, a litigant "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Pursuant to this broad standard governing civil discovery, the plaintiffs in *Cheney* proposed a wide-ranging discovery plan, which called for the production of all documents and information concerning communications between individual National Energy Policy Development Group members outside the context of group meetings, between members and agency personnel, and between members and non-governmental individuals. The plaintiffs tried to use discovery to uncover confidential information concerning the deliberations of the President's closest advisers. The Government objected to the plan to the extent that it sought documents from the Vice President and White House officials and argued, among other things, "that in order to protect the separation of powers, the President should not be forced to consider the [executive] privilege question in response to unnecessarily broad or otherwise improper discovery." *See In re Cheney*, 334 F.3d 1096, 1105 (D.C. Cir. 2003) (internal quotation marks omitted).

The district court nonetheless approved the discovery plan and directed that the Vice President and White House officials either "fully comply with" the discovery requests, "file detailed and precise objections to particular requests," or "identify and explain their invocations of privilege with particularity." *Id.* at 1000 (internal quotation marks omitted). The Vice President petitioned the D.C. Circuit for a writ of mandamus vacating the discovery orders on the ground that the broad requests violated the

*Congressional Oversight of the White House*

separation of powers by unduly interfering with the President's constitutional prerogatives, but the D.C. Circuit denied the petition. *See id.* at 1109.

The Supreme Court reversed and remanded for the D.C. Circuit to consider whether the discovery orders "constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390. In so holding, the Court rejected the lower courts' view that executive branch interests could have been adequately protected by "invoking executive privilege and filing objections to the discovery orders with 'detailed precision.'" *Id.* at 377 (quoting *In re Cheney*, 334 F.3d at 1105). The Court explained that "special considerations control" when White House staff and other high-level officials are the subject of civil discovery requests, and that separation of powers concerns might necessitate narrowing or denying requests for information directed to such officials before there should arise any need to consider invoking executive privilege. *See id.* at 385, 390. Because the information "requests [were] directed to the Vice President and other senior Government officials who served on the [Group] to give advice and make recommendations to the President," the broad discovery orders threatened to impinge on the Executive's "interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Id.* at 385. Therefore, the D.C. Circuit was obliged to consider whether allowing the requests to go forward would be "an unwarranted impairment" of the Executive Branch's discharge of its constitutional responsibilities. *Id.* at 390.

The Court's reasoning in *Cheney*, which instructs courts to consider the President's interests in autonomy and confidentiality when fashioning orders authorizing civil discovery directed at the White House, applies with at least equal force to congressional oversight requests for information from the White House. Both congressional oversight and civil litigation often concern wide-ranging information requests that involve the production of documents and the taking of testimony. Just as civil litigation against the "Vice President and other senior Government officials who . . . give advice and make recommendations to the President" does not entail "a routine discovery dispute," neither may congressional oversight of the White House be viewed as comparable to routine oversight of executive branch agencies. *Cf. Immunity of the Former Counsel*,

45 Op. O.L.C. __ (Jan. 8, 2021)

43 Op. O.L.C. __, at *4 ("[T]he President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies."). In both situations, far-reaching inquiries threaten presidential autonomy and confidentiality. Thus, the separation of powers concerns recognized in *Cheney* support significant limitations on the timing and scope of congressional oversight inquiries directed to the White House.

If anything, the concerns underlying the Court's decision in *Cheney* apply with even greater force to congressional inquiries. Congress is the President's constitutional "rival" in a manner distinct from the Judiciary. *Mazars*, 140 S. Ct. at 2033 (internal quotation marks omitted). When Congress conducts oversight, a neutral decision-maker is not readily available to appropriately balance each party's interests. And unlike the courts' express authority to order discovery, Congress's subpoena power is an implied adjunct to its legislative powers that is justified as "an essential and appropriate auxiliary to the legislative function." *Id.* at 2031 (quoting *McGrain*, 273 U.S. 174); *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (opinion of Roberts, C.J.) (implied powers under the Necessary and Proper Clause are "incidental" and cannot be "great substantive and independent powers" (internal quotation marks omitted)). A plaintiff in a civil action, moreover, may well have a greater need for documents and other information than a congressional committee conducting oversight. Congressional oversight gathers information so that Congress may "exercise its legislative function advisedly and effectively," *McGrain*, 273 U.S. at 161; *see also Mazars*, 140 S. Ct. at 2031–32, while the purpose of civil discovery is to disclose "the basic issues and facts" to "the fullest practicable extent," *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958). As the D.C. Circuit thus has recognized, "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability[] than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc). "[E]fforts to craft legislation involve predictive policy judgments that are not hampered in quite the same way when every scrap of potentially relevant evidence is not available [to Congress]." *Mazars*, 140 S. Ct. at 2036 (alterations and internal quotation marks omitted).

Furthermore, because Congress may not conduct oversight of the President's exclusive constitutional functions, legitimate congressional over-

*Congressional Oversight of the White House*

sight inquiries will almost always pertain to executive branch implementation of statutory programs. But the departments and agencies, not the White House, principally administer such programs, and thus it is generally unnecessary for congressional committees to request information directly from the White House unless they are unable to obtain the information from agencies. As *Mazars* determined with respect to the President's personal information, to avoid unnecessary confrontation between the branches, "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs." *Id.* at 2035–36. That reasoning also applies to congressional requests for White House information. Because congressional oversight needs generally may be satisfied through requests to the departments and agencies, requests for information about programs administered outside the White House should be directed there in the first instance.

*Mazars* and *Cheney* are the latest in a line of judicial precedent recognizing the separation of powers concerns underlying litigation or related requests directed at the President. But the Supreme Court has long recognized that safeguarding presidential autonomy and confidentiality is critical to honoring the separation of powers. *See Cheney*, 542 U.S. at 385. This principle was first articulated in *United States v. Burr*, where Chief Justice John Marshall, sitting at trial as a Circuit Justice, stated that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." 25 F. Cas. 187, 192 (C.C. Va. 1807) (No. 14,694). In *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Court held that a sitting or former President is absolutely immune from civil actions for damages arising from his official acts. Underlying this bright-line rule is the rationale that "[b]ecause of the singular importance of the President's duties, diversion of his energies . . . would raise unique risks to the effective functioning of government." *Id.* at 751.[10] The Presi-

_____

[10] The Supreme Court has held that presidential aides are generally treated differently from the President for purposes of immunity in civil litigation, receiving qualified immunity rather than absolute immunity. *Harlow*, 457 U.S. at 809. *But see id.* at 812 & n.19 (acknowledging that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest"). Yet that distinction is entirely consistent with *Cheney*'s holding that "special considerations" apply to civil discovery requests directed to White House officials and others who "give advice

27

45 Op. O.L.C. __ (Jan. 8, 2021)

dent's energies may be inappropriately diverted by congressional oversight just as they may be by private litigation. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *5 (explaining that permitting congressional committees to compel the President's immediate advisers to testify would allow the committees to "harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain" and would force the advisers "to divert time and attention from their duties to the President" (internal quotation marks omitted)).

In the oversight context, the President's interest in the White House's autonomy may be compromised not only by congressional inquiries that distract personnel and drain critical resources, but also by the potential "chilling effect" such demands would have on the interactions between the President and his advisers. *See Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C. __, at *2 (July 12, 2019) ("Congressional questioning of the President's senior advisers would . . . undermine the independence and candor of executive branch deliberations."). Intrusive congressional oversight of the White House's interaction with departments and agencies may cause White House staff members to conform their information-gathering and policy-formulation processes to the demands of Congress instead of the needs of the President. Yet the President needs his staff to provide him with frank and candid judgments to "accomplish[] [his] constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at 443. There is little doubt that intrusive oversight inquiries could chill and otherwise undermine these kinds of White House staff activities. *See Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 ("Congress' power of inquiry must not be permitted to negate the President's constitutional

---

and make recommendations to the President." 542 U.S. at 385. As we have explained in declining to apply *Harlow* to narrow the traditional constraints governing the congressional testimony of senior presidential advisers, "the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *13. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* (internal quotation marks omitted).

*Congressional Oversight of the White House*

responsibility for managing and controlling affairs committed to the Executive Branch.").

Closely related to the President's interest in securing the White House's autonomy is his interest in "safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. The Supreme Court has made clear that the President's interest in the confidentiality of his decision-making is a central component of the constitutional separation of powers. In *United States v. Nixon*, the Court stressed that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. 683, 708 (1974). Although *Nixon* concerned a judicial demand for documents protected by executive privilege, this Office has long expressed the view that "[the] reasons for the constitutional privilege have at least as much force when it is Congress, instead of a court, that is seeking information." *Congressional Requests*, 13 Op. O.L.C. at 156. Indeed, "the prospect that predecisional deliberative communications will be disclosed to Congress is, if anything, more likely to chill internal debate among executive branch advisers than the possibility of disclosure to the judicial branch." Memorandum for Janet Reno, Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demands to Interview Prosecutors and Review Deliberative Documents in Closed Cases* at 14–15 (Nov. 23, 1993).[11] Because many White House

---

[11] As this Office has explained more fully:

> When the Supreme Court held that the need for presidential communications in the criminal trial of President Nixon's close aides outweighed the constitutional privilege, an important premise of its decision was that it did not believe that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. By contrast, congressional requests for executive branch deliberative information are anything but infrequent. Moreover, compared to a criminal prosecution, a congressional investigation is usually sweeping; its issues are seldom narrowly defined, and the inquiry is not restricted by the rules of evidence. Finally, when Congress is investigating, it is by its own account often in an adversarial position to the executive branch and initiating action to override judgments made by the executive branch. This increases the likelihood that candid advice from executive branch advisers will be taken out of context or misconstrued.

*Congressional Requests*, 13 Op. O.L.C. at 156–57 (internal quotation marks and citations omitted).

45 Op. O.L.C. __ (Jan. 8, 2021)

staff members enjoy extensive access to the President, play important roles in developing presidential policy, and often serve as the President's alter ego, the President's interest in the confidentiality of White House activities must be afforded considerable weight in assessing the legitimacy of an exercise of Congress's oversight functions.

### B. Executive Privilege and White House Information

The heightened executive privilege interests that apply to White House communications provide an additional basis for distinguishing oversight inquiries directed at the White House from oversight of departments and agencies. Presidents have invoked executive privilege since the earliest days of the Republic, and the Supreme Court has recognized the privilege and held it to be an implied power under the Constitution. *See Nixon*, 418 U.S. at 705, 708; *see also id.* at 711 ("Nowhere in the Constitution . . . is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based."); *Congressional Requests*, 13 Op. O.L.C. at 154 (explaining that the existence of executive privilege is a "necessary corollary of the executive function vested in the President by Article II of the Constitution"). The Court has described the privilege as "deriv[ing] from the supremacy of each branch within its own assigned area of constitutional duties," "fundamental to the operation of Government," "and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 705, 708. The privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch," and, as a result, "information subject to executive privilege deserves the greatest protection consistent with the fair administration of justice." *Mazars*, 140 S. Ct. at 2032 (internal quotation marks omitted).

There are at least five well-recognized, and sometimes overlapping, components of executive privilege: national security and foreign affairs, law enforcement, deliberative process, attorney-client communications and attorney work product, and presidential communications. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *8 & n.2 (May 23, 2019) ("*Exclusion of Agency Counsel*"); *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 8 (2008); *Executive Privilege: The With-*

*Congressional Oversight of the White House*

*holding of Information by the Executive: Hearing on S. 1125 Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92nd Cong. 420 (1971) (statement of William Rehnquist, Assistant Attorney General, Office of Legal Counsel). Generally speaking, the national security and foreign affairs component provides *absolute* protection for materials the release of which would jeopardize sensitive diplomatic, national security, or military matters, including classified information and diplomatic communications.[12] Similarly, the law enforcement component of the privilege gives the Executive Branch a near-absolute right to withhold from Congress information that would compromise ongoing law enforcement activities.[13] Both of these components of executive privilege are deeply rooted in the Constitution and the Nation's history.

---

[12] *See, e.g.*, *Egan*, 484 U.S. at 527 (explaining that the President's "authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of [the Commander in Chief] power in the President"); *United States v. Reynolds*, 345 U.S. 1, 10–11 (1953) (recognizing the national security component of the privilege in civil litigation involving military equipment); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (explaining that the privilege provides absolute protection for information the release of which would impair the Nation's defense, disclose intelligence activities, or disrupt diplomatic relations with foreign governments); *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) (explaining that "matters the revelation of which reasonably could be seen as a threat to the military or diplomatic interests of the nation . . . are *absolutely privileged* from disclosure in the courts"); *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 97 (1998) ("[S]ince the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information."); Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* at 2–11 (Dec. 21, 1989) (explaining the absolute scope of the national security component in the context of congressional investigations); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, and John R. Stevenson, Legal Adviser, Department of State, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969) ("[N]ational security and foreign relations considerations have been considered the strongest possible basis upon which to invoke the privilege of the executive."); *see also Nixon*, 418 U.S. at 706 (recognizing that executive privilege may be absolute "to protect military, diplomatic, or sensitive national security secrets").

[13] *See Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992*, 41 Op. O.L.C. __ (Oct. 26, 2017); *Investigative Authority of the General Accounting Office*, 12 Op. O.L.C. 171, 177 (1988) ("With respect to open

31

45 Op. O.L.C. __ (Jan. 8, 2021)

Congressional inquiries to the White House more often implicate the deliberative process, the attorney-client communications and attorney work product, and particularly the presidential communications components of executive privilege. These components are also deeply rooted, and they protect from disclosure internal communications and information concerning presidential and other executive branch decision-making. They are based on the principle that the effective operation of the Executive Branch depends on shielding deliberative communications and advice from disclosure. *See Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 484–97 (1982) ("*Attorney General's Communications*").

The deliberative process component of executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" and protects all executive branch documents that reflect advisory opinions, recommendations, and other deliberative communications generated during governmental decision-making. *Mazars*, 140 S. Ct. at 2032; *see In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see also Congressional Requests*, 13 Op. O.L.C. at 156–57 & n.3 (explaining the applicability of this component in the context of congressional requests for information). The deliberative process component is premised on the fact that disclosing the "communications and the ingredients of the decisionmaking process" would inevitably cause "injury to the quality of agency decisions" by inhibiting "'frank discussion of legal or policy

---

law enforcement files, it has been the policy of the executive branch throughout our Nation's history to protect these files from any breach of confidentiality, except in extraordinary circumstances."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 75–78 (explaining the Executive Branch's authority to withhold open and closed law enforcement files from Congress); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 117 (1984) ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature."); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 32–33 (1982) (same concerning law enforcement files of the Environmental Protection Agency); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 47 (1941) (same concerning investigative files of the Federal Bureau of Investigation).

*Congressional Oversight of the White House*

matters.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 151 (1975) (citation omitted). As the Supreme Court explained in *Nixon*:

> [There is a] valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.

418 U.S. at 705; *see also Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (explaining that the deliberative process component "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them" (internal quotation marks and citation omitted)). The deliberative process component of executive privilege applies especially strongly when the deliberations in question are ongoing. *See Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security*, 44 Op. O.L.C. __, at *10–11 (Jan. 17, 2020) (*"Publication of Report on Imports"*). But the deliberative process component has certain limits: It protects predecisional and deliberative materials and typically does not "shield documents that simply state or explain a decision the government has already made or protect material that is purely factual." *Sealed Case*, 121 F.3d at 737. Agencies may withhold factual information only to the extent it is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Id.*

The attorney-client communications and attorney work product component of executive privilege protects executive branch communications and documents that involve legal analysis, legal advice, and other attorney communications or work product. *See Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (Reno, Att'y Gen.) (recognizing that "[e]xecutive privilege applies" to certain documents "because of their deliberative nature, and

45 Op. O.L.C. __ (Jan. 8, 2021)

because they fall within the scope of the attorney-client privilege and the work-product doctrine"). Often, such communications will be protected by the deliberative process component in addition to the attorney-client and attorney work product component. Yet "'the reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved,'" because "'legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice.'" *Attorney General's Communications*, 6 Op. O.L.C. at 490 n.17 (citation omitted); *see also Constitutionality of the OLC Reporting Act of 2008*, 32 Op. O.L.C. 14, 17 (2008) (Mukasey, Att'y Gen.) ("[I]f executive branch officials are to execute their constitutional and statutory responsibilities, they must have access to candid and confidential legal advice and assistance.").

The presidential communications component of executive privilege, which is the most salient component for White House purposes, protects communications made in connection with presidential decision-making. *See Nixon*, 418 U.S. at 708 (explaining importance of presidential communications privilege in government operations); *Sealed Case*, 121 F.3d at 746 (explaining that the "presidential [communications] privilege affords greater protection against disclosure" than the deliberative process privilege); Memorandum for the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee* at 13 (Jan. 13, 1981) ("*Executive Branch Deliberations*"). Although the presidential communications component applies only to presidential decision-making, it is broader than the deliberative process component in terms of the types of communications that are protected. *All* presidential communications are "presumptively privileged" and protected from disclosure, including post-decisional exchanges and documents conveying purely factual information. *Nixon*, 418 U.S. at 708, 713–14 (explaining that a presumptive privilege applies to the President's "conversations and correspondence"); *see also Sealed Case*, 121 F.3d at 745 ("[U]nlike the deliberative process privilege, the presidential communications privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative

34

*Congressional Oversight of the White House*

ones."). In addition, this component of executive privilege covers communications between the President and agencies concerning presidential decision-making, including communications concerning the exercise of statutory authority. *See Publication of Report on Imports*, 44 Op. O.L.C. __, at *7–9.

The presidential communications component of executive privilege is not limited to exchanges directly involving the President. The Supreme Court emphasized in *Nixon* that the "President *and those who assist him* must be free to explore alternatives in the process of shaping policies and making decisions," 418 U.S. at 708 (emphasis added), and explicitly described the privilege as protecting communications within the President's "office," *id.* at 712–13. We have consistently recognized that for the President to obtain full, frank, and complete advice, the presidential communications component must apply to deliberations among the President's advisers and their staffs. *See, e.g.*, *Attorney General's Communications*, 6 Op. O.L.C. at 485–86 & n.11 (explaining that the presidential communications privilege protects the presidential "decisionmaking process" and, therefore, can apply to the work of presidential advisers).

The D.C. Circuit agreed in 1997, when it held that "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President." *Sealed Case*, 121 F.3d at 751–52. In reaching this conclusion, the court, echoing the Supreme Court's analysis in *Nixon*, warned that "[i]f presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered, but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems." *Id.* at 750. Excluding presidential advisers and their staffs from the presidential communications component would hinder the President's "access to honest and informed advice" and limit his "ability to explore possible policy options." *Id.* at 751. A narrower privilege would "impede . . . the presidency," *id.*, and diminish the quality of presidential decisions:

> Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air—if they do, their advice is not likely to be worth much. Rather,

45 Op. O.L.C. __ (Jan. 8, 2021)

the most valuable advisers will investigate the factual context of a problem in detail, obtain input from all others with significant expertise in the area, and perform detailed analyses of several different policy options before coming to closure on a recommendation for the Chief Executive. The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.

*Id.* at 750.[14]

Against this backdrop, communications within the White House and between White House staff and other EOP components that concern possible presidential decision-making will normally fall under the presidential communications component of executive privilege, and not just the deliberative process or attorney-client communications and attorney work product components that apply to all government agencies and that are most commonly implicated when congressional committees make oversight requests of executive agencies. *See Executive Branch Deliberations* at 12 (concluding that "'presidential' communications . . . presumably [include] discussions among the President's aides and *officials in the Executive Office of the President*" (emphasis added)). Consequently, a congressional request for internal White House communications and intra-EOP communications will frequently implicate the presidential communications component of executive privilege. As a result, oversight directed at the White House will typically involve privilege interests that are, on the whole, considerably greater than those arising solely in the agency context, where other components are more commonly implicated.

---

[14] In *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108 (D.C. Cir. 2004), the D.C. Circuit in dictum construed *Sealed Case*'s use of the phrase "White House adviser" when describing the scope of the presidential communications privilege as restricting the privilege to the President's "immediate advisers in the Office of the President" (a component of the EOP also called the White House Office). *Id.* at 1123; *see id.* at 1109 n.1, 1116–17, 1123–24. This assumption misinterprets *Sealed Case*. Its explicit holding that communications by "presidential advisers" and "their staff" made "in the course of preparing advice for the President come under the presidential communications privilege" indicates that the privilege must encompass advisers in EOP entities outside the Office of the President whose primary function is to advise and assist the President. *See* 121 F.3d at 751–52.

36

*Congressional Oversight of the White House*

## C. The Accommodation Process
## for Oversight of the White House

Given the President's interests in autonomy and confidentiality, the accommodation process will often lead to a different balance when applied to the White House as compared to the departments and agencies. It is long-standing executive branch policy that upon receipt of an authorized oversight request that is in furtherance of a legitimate legislative purpose, departments and agencies should "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Memorandum for Heads of Executive Departments and Agencies from Ronald Reagan, *Re: Procedures Governing Responses to Congressional Requests for Information* at 1 (Nov. 4, 1982) ("Reagan Memorandum"). The manner of that compliance is determined by the operation of the accommodation process mandated by the Constitution, recognized by the Judicial Branch, and practiced by the Executive and Legislative Branches. "Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege," and "this tradition of accommodation" has remained "the primary means of resolving conflicts between the Branches." *Id.*

The Supreme Court has also recognized that disputes over congressional demands for executive documents ordinarily "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel)). Since the Washington Administration, the Executive Branch has resisted congressional information demands that were overly burdensome or threatened to impair "the public good." *Id.* at 2029–30 (internal quotation marks omitted). Executive branch resistance, in turn, has often been met by congressional pressure, which was then followed by subsequent negotiations between the branches. In most instances, Congress and the Executive Branch have reached a compromise in which Congress might, for example, narrow the scope of its request or better articulate its needs, and

45 Op. O.L.C. __ (Jan. 8, 2021)

the Executive Branch might, for example, supply a subset of the requested documents, provide summaries of the information requested, or permit *in camera* review of particular documents. *Id.* This long-standing "tradition of negotiation and compromise" stands at the heart of the accommodation process. *Id.* at 2031.

In *AT&T*, the D.C. Circuit discussed the constitutional foundations for the accommodation process. 567 F.2d 121. There, the Department of Justice sought to enjoin AT&T from complying with a congressional subpoena that the Executive Branch believed implicated highly classified information, the disclosure of which would be detrimental to national security. The D.C. Circuit declined to decide the case on the merits and instead mandated a "procedure giv[ing] promise of satisfying the substantial needs of both [branches]." *Id.* at 123. The court stated:

> The framers . . . expect[ed] that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system. . . . [E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.

*Id.* at 127. "[T]he resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system." *Id.* at 130.

In light of this history and precedent, both the Executive Branch and Congress have recognized their respective constitutional obligations to seek accommodation through good faith negotiations over their respective interests. *See, e.g.*, Elizabeth B. Bazan & Morton Rosenberg, Cong. Research Serv., *Congressional Oversight of Judges and Justices* 10 (May 31, 2005) ("Although the accommodation process between Congress and the Executive Branch is conducted in a highly political atmosphere, the arguments made by each side are usually grounded in legal doctrine and rely heavily on their interpretations and past experiences. At times, the Executive Branch is able to persuade Congress that a particular request is insufficiently weighty[.]"); *Congressional Requests*, 13 Op. O.L.C. at 159

38

*Congressional Oversight of the White House*

("The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other."); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (Smith, Att'y Gen.) ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."). The accommodation process has usually proved successful in reconciling congressional informational needs with the Executive Branch's interests, and so congressional committees rarely pursue citing executive branch officials for contempt of Congress to enforce their document and testimonial subpoenas, *see infra* Part IV.A, and Presidents rarely invoke executive privilege.

Because the accommodation process is premised upon working out each branch's needs and interests, the outcome of that process may differ when it comes to the White House. As explained in Part I, the White House functions separately from the departments and agencies and historically has been "a combined administrative, advisory, planning, and policy-formulating office serving the President in an intimate, indispensable capacity." Clinton L. Rossiter, *The Constitutional Significance of the Executive Office of the President*, 43 Am. Pol. Sci. Rev. 1206, 1215 (1949). To a much greater degree than other parts of the Executive Branch, the White House serves to advise and assist the President, particularly in the discharge of his constitutional functions. Although there may be occasions when a congressional committee can appropriately seek information from the White House, particularly where the President is charged with the discharge of statutory functions, the separation of powers principles discussed above impose significant constraints on White House oversight, as reflected in long-standing practice.[15] The timing and

---

[15] *See, e.g.*, Letter for John W. Byrnes, House of Representatives, from Joseph Campbell, Comptroller General of the United States at 2 (Sept. 18, 1962) ("[W]e are certain you understand that [Comptroller General] investigations of White House activities are not subject to the same techniques as those conducted in the various departments and agencies. Files of the White House Office, with the exception of financial records, are normally not available to us. Also, White House personnel are not always available for interview. This has been the situation in all recent Administrations."); *see also* Cong. Research

45 Op. O.L.C. __ (Jan. 8, 2021)

scope of inquiries directed to the White House, and the accommodations offered by the White House, must be sensitive to the President's interests in autonomy and confidentiality, as well as the heightened confidentiality interests in White House communications. They also must reflect the different balance of needs and interests that applies to oversight of the White House: Congressional needs are often more attenuated (because it is the departments and agencies that administer most statutory programs), and the Executive Branch's institutional interests are greater (based on the President's need for autonomy and the heightened confidentiality interests).

As with all oversight requests, the White House may properly insist that a congressional committee articulate a legitimate legislative purpose for inquiries directed at the White House. *See Barenblatt*, 360 U.S. at 111–12; *Watkins*, 354 U.S. at 187. The committee's legislative purpose should be "carefully assess[ed]," whether or not the information sought is likely to be protected by executive privilege. *Mazars*, 140 S. Ct. at 2035. The White House should independently "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *President's Tax Returns*, 43 Op. O.L.C. __, at *17. If the legitimate purpose underlying the oversight request appears unclear, White House staff may request that the committee clarify that purpose. *See id.* at *26 ("The separation of powers would be dramatically impaired were the Executive required to . . . accept[] the legitimacy of any reason proffered by Congress, even in the face of clear evidence to the contrary."). The White House must take care to ensure that the requests involve a legitimate legislative purpose

Serv., RL31351, *Presidential Advisers' Testimony Before Congressional Committees: An Overview* 21 (Dec. 15, 2014) ("Given the tradition of comity between the executive and legislative branches, Congress often elects not to request the appearance of presidential aides. When Congress has requested the appearance of such aides, Presidents and their aides have at times resisted, asserting the separation of powers doctrine and/or executive privilege." (footnote omitted)); Louis Fisher, *White House Aides Testifying Before Congress*, 27 Presidential Stud. Q. 139, 151 (1997) ("The White House is usually insulated from congressional inquiry because of a long-standing comity that exists between Congress and the presidency. By and large, each branch concedes a certain amount of autonomy to the other. Only in clear cases of abuse and obvious bad faith will Congress insist that White House aides appear and give an account of their activities.").

**-1045-**

*Congressional Oversight of the White House*

and do not intrude upon the exclusive constitutional prerogatives of the President.

In addition, because any congressional inquiry must respect the "autonomy" of the President's close advisers and "the confidentiality of [their] communications," *Cheney*, 542 U.S. at 385, a congressional committee seeking information about a statutory program should generally be directed first to the agency that administers the program in question. *See Mazars*, 140 S. Ct. at 2035–36 (explaining that "[o]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible" and that "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs" (internal quotation marks omitted)). This practice of exhaustion is rooted in separation of powers principles and the practical realities of White House operations. It is crucial to the functioning of the Executive Branch that White House staff members be able to perform their functions independently and effectively in service of the President. Congressional efforts to conduct extensive and time-consuming oversight of the White House could seriously interfere with that mission. When information Congress seeks is available from an agency, there is no reason to subject the President's advisers to potentially burdensome oversight requests, especially because aspects of their work are far more likely to implicate the presidential communications component of executive privilege.[16]

Accordingly, when faced with a congressional request for information that reasonably could be acquired from a department or agency, White House staff often advise the relevant committee that it should pursue its request there. Only if the committee has exhausted the possibility of obtaining the necessary information elsewhere, and has determined that the necessary information may be obtained only from the White House, should the committee direct its inquiry to the White House.

---

[16] Courts have credited these concerns in a series of cases discussing FOIA requests. The D.C. Circuit, for instance, has declined to allow FOIA requests for the President's White House visitor logs—even though the logs were held by the Secret Service, which is housed within the Department of Homeland Security, rather than the White House—because such requests "could render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d at 226.

45 Op. O.L.C. __ (Jan. 8, 2021)

When a committee's request to the White House concerns statutory functions, is within the committee's delegated oversight authority, and rests on a legitimate legislative purpose—and after the committee has attempted to seek such information from any relevant agencies—then the White House should consider how to accommodate the committee's needs in a manner consistent with the interests of the Executive Branch. *See AT&T*, 567 F.2d at 127. An important feature of the accommodation process is the dialogue that takes place between the committee and the White House to ensure that information requests are not "unnecessarily broad." *Cheney*, 542 U.S. at 390. Given the separation of powers principles at stake, these negotiations can help "narrow the scope of possible conflict between the branches," and ensure that a request is "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

The accommodation process has several rules of the road. First, the White House may properly demand that Congress's request be reasonably specific. "The specificity of [a committee's] request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney*, 542 U.S. at 387). A committee should clearly explain the nature and scope of its request and provide the White House with an opportunity to seek further explanation if the White House believes that the request is vague or otherwise ambiguous. Second, the "burdens imposed by a congressional [request] should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas [or other requests] for institutional advantage." *Id.* Finally, given the relatively small staff and resources available in the White House, the committee must afford the White House sufficient time to respond to its inquiry and flexibility in its manner and mode of response.

In light of these considerations, the White House typically seeks to accommodate congressional requests by providing written responses or oral briefings on relevant activities or policies, supplemented sometimes by the production of specific non-privileged documents. The White House does not ordinarily undertake the burden of reviewing and producing e-mails and other documents, which generally will consist primarily of deliberative communications within the White House or between the

42

**-1047-**

*Congressional Oversight of the White House*

White House and other parts of the Executive Branch. Searching through and processing the thousands of presumptively privileged e-mails likely to be responsive to a single request undoubtedly would divert the relatively small White House staff from its important work for the President. Further, the practice of providing written responses and oral briefings instead of e-mails and other internal communications helps preserve the President's ability to obtain full and frank advice from White House staff. This is critical to avoid chilling the candor of White House communications, since "[t]he President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers." *Sealed Case*, 121 F.3d at 750.

Such responses and briefings, in lieu of documents, are generally sufficient to satisfy the legitimate information needs of congressional committees. As noted above, because the purpose of oversight is to enable Congress to "exercise its legislative function advisedly and effectively," *McGrain*, 273 U.S. at 161, rarely do the "legislative judgments" informed by the oversight process depend on a "precise reconstruction of past events," *Senate Select Comm.*, 498 F.2d at 732; *see Mazars*, 140 S. Ct. at 2036; *Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at *10. Moreover, "'Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.'" *Congressional Requests*, 13 Op. O.L.C. at 159 (citation omitted). Although in appropriate circumstances agencies may offer the accommodation of access to deliberative materials (permitting them to be read but not copied, for example), such an accommodation would be quite unusual for internal White House and intra-EOP deliberative communications because of the President's unique need for autonomy and heightened confidentiality interests.

### IV. Congressional Subpoenas to the White House

We next turn to consider the procedures by which congressional committees may issue and seek to enforce subpoenas. Drawing on the constitutional principles discussed in the prior Parts, we outline some of the grounds on which the Executive Branch has commonly objected to the scope or enforceability of congressional subpoenas.

45 Op. O.L.C. __ (Jan. 8, 2021)

## A. Issuance and Enforcement of Subpoenas

Congress's subpoena power is inherent in its investigative authority. *See Mazars*, 140 S. Ct. at 2031; *U.S. Servicemen's Fund*, 421 U.S. at 504 (observing that the issuance of subpoenas "has long been held to be a legitimate use by Congress of its power to investigate"); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 81–82 (discussing congressional authority to issue subpoenas). Because the authority to issue subpoenas is an inherent constitutional power, Congress does not need statutory authorization to issue a subpoena, but any "exercise of subpoena power must be authorized by the relevant House." *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82 (citing *Reed v. Cty. Comm'rs*, 277 U.S. 376, 389 (1928); *McGrain*, 273 U.S. at 158); *see also Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at *19 ("a committee's authority to compel the production of documents and testimony depends entirely upon the jurisdiction provided by the terms of the House's delegation").

The Senate rules provide committees with the authority to subpoena witnesses, "correspondence, books, papers, and documents," Senate Rule XXVI(1), and similarly the rules of the House of Representatives authorize committees to subpoena "witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as [they] consider[] necessary," House Rule XI.2(m)(1)(B). The precise procedures for issuing a subpoena vary depending on the rules of the chamber and committee involved. *See* Michael L. Koempel, Cong. Research Serv., R44247, *A Survey of House and Senate Committee Rules on Subpoenas* 5–16 (Jan. 29, 2018) ("*Survey of Committee Rules*") (detailing House and Senate chamber and committee rules on subpoena procedures). In the House, subpoenas generally may be issued by a committee "only when authorized by the committee . . . , a majority being present," but committees may delegate that power to "the chair of the committee under such rules and under such limitations as the committee may prescribe." House Rule XI.2(m)(3)(A)(i); *see also Survey of Committee Rules* at 1 ("[m]ost House committees" have delegated subpoena power to their chairs). The Senate's standing rules delegate to each committee responsibility for establishing subpoena procedures, and the procedures vary widely. *See* Senate Rule XXVI(2).

*Congressional Oversight of the White House*

During Watergate and on several occasions more recently, congressional committees have turned to the federal courts seeking the enforcement of subpoenas against executive branch officials. This is a marked departure from long-standing practice: "Historically, disputes over congressional demands for presidential documents have not ended up in court." *Mazars*, 140 S. Ct. at 2029; *see Comm. on the Judiciary v. McGahn*, 968 F.3d 755, 777 (D.C. Cir. 2020) (en banc) (noting that "there have been relatively few" such cases). The Supreme Court has recognized that "Congress and the Executive have nonetheless managed for over two centuries to resolve" privilege disputes without recourse to the Supreme Court. *Mazars*, 140 S. Ct. at 2031. And although *Mazars* arose in an unusual posture that made it justiciable—because the President in his personal capacity sought to require his accountants to comply with their confidentiality obligations—that case was the first such dispute to reach the Supreme Court. *See id.* ("we have never considered a dispute over a congressional subpoena for the President's records").

In recent decades, the Department of Justice has maintained that a congressional suit to enforce a subpoena against the Executive Branch is not justiciable.[17] First, such a lawsuit typically alleges an abstract "type of institutional injury (the diminution of legislative power)" that does not constitute a "'concrete and particularized'" legal injury as required for Article III standing—a doctrine that applies "especially rigorous[ly]" in separation of powers cases. *Raines v. Byrd*, 521 U.S. 811, 819–21 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Second, as noted above, such suits were nearly unprecedented as a historical matter, despite the history of oversight disputes between Congress and the Execu-

_____

[17] Although a congressional committee may not seek judicial enforcement of a subpoena against the Executive Branch, there are some cases, such as *Mazars*, where a suit involving a congressional subpoena would be justiciable. The dispute there no doubt presented "significant separation of powers issues" and was in meaningful respects an inter-branch dispute, 140 S. Ct. at 2033–34, but as noted, it involved the President's private right in his personal papers and the legal obligations owed to him by third parties that were the actual recipients of the subpoenas, *see id.* at 2027–28; *see also Comm. on the Judiciary v. McGahn*, 951 F.3d 510, 531 (D.C. Cir. 2020) ("we may adjudicate cases concerning congressional subpoenas if they implicate the rights of private parties"), *vacated on reh'g en banc*, 968 F.3d 755; *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 390–91 (D.C. Cir. 1976) (holding that an executive branch suit to enjoin a third party from complying with a congressional subpoena was justiciable).

45 Op. O.L.C. __ (Jan. 8, 2021)

tive Branch going back to the First Congress, and thus are not "'tradition-ally thought to be capable of resolution through the judicial process.'" *Id.* at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008) ("history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider"). It was not until 1974—almost two centuries after the Constitution's ratification—that a committee of Con-gress appears to have first brought a civil action attempting to compel executive branch compliance with a subpoena. *See Senate Select Comm.*, 498 F.2d 725. In that case, a statute purported to give the District Court for the District of Columbia jurisdiction in "any civil action" brought by the Senate committee investigating the Watergate scandal to "enforce and secure a declaration concerning the validity of any subpoena." Pub. L. No. 93-190, § (a), 87 Stat. 736, 736 (1973); *see also Senate Select Comm.*, 498 F.2d at 727–28 (explaining the jurisdiction conferred by the special law). The court of appeals did not address whether the case was justiciable as a constitutional matter. No committee of Congress brought a subpoena-enforcement action again until 2008, when House committees began filing such suits with some regularity.[18]

    Earlier this year, a panel of the D.C. Circuit agreed with the Depart-ment and dismissed a congressional suit seeking enforcement of a sub-poena to the former Counsel to the President. *Comm. on the Judiciary v. McGahn*, 951 F.3d 510 (D.C. Cir. 2020), *vacated on reh'g en banc*, 968 F.3d 755. The panel concluded that "separation-of-powers principles and historical practice" bar federal courts from exercising jurisdiction over committee suits "to enforce a congressional subpoena against the Execu-tive Branch." *Id.* at 522. The court reheard the case en banc and vacated that ruling, holding that congressional committees could assert informa-tional injuries no less than private parties because the constitutional separation of powers erects no "structural barrier to judicial involvement in informational disputes between the elected branches." *McGahn*, 968

---

[18] *See* Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. Miers*, No. 08-0409 (D.D.C. Mar. 10, 2008); Complaint, *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-1332 (D.D.C. Aug. 13, 2012); Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. McGahn*, No. 19-2379 (D.D.C. Aug. 7, 2019); Complaint for Declaratory and Injunctive Relief, *Comm. on Oversight & Reform v. Barr*, No. 19-3557 (D.D.C. Nov. 26, 2019).

*Congressional Oversight of the White House*

F.3d at 768. *But see id.* at 783–84 (Griffith, J., dissenting) (faulting the majority for "its neglect of the interbranch nature of this dispute"). On remand, however, the panel held that congressional committees nonetheless lack a cause of action to seek judicial enforcement of a subpoena in this context. *McGahn*, 973 F.3d 121 (D.C. Cir. 2020), *reh'g en banc granted*, No. 19-5331 (Oct. 15, 2020).

As the panel recognized, even if congressional suits to enforce subpoenas to the Executive Branch were justiciable, they fall outside the statutory jurisdiction of the federal courts and are unsupported by any cause of action. Although committees have relied upon the federal-question statute, 28 U.S.C. § 1331, as a basis for subject-matter jurisdiction, a more specific statute governs jurisdiction over congressional subpoena-enforcement suits, *id.* § 1365(a). This latter statute provides jurisdiction only for Senate actions, and more importantly excludes all actions to enforce subpoenas against executive branch officials who raise "a governmental privilege." *Id.*; *see McGahn*, 951 F.3d at 522 ("The obvious effect of section 1365(a)'s carve-out is to keep interbranch information disputes like this one out of court."). Indeed, the carve-out sought to accommodate the Executive Branch's view, expressed by then-Assistant Attorney General Scalia, that "the Supreme Court should not and would not undertake to adjudicate the validity of the assertion of executive privilege against the Congress." *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 83 (1975) (statement of Assistant Attorney General Scalia); *see also id.* at 84 ("[T]he courts are precisely not the forum in which this issue should be resolved.").

Moreover, in addition to lacking a statutory basis for jurisdiction, House committees lack any cause of action to enforce their subpoenas. The statute that provides a cause of action to enforce Senate subpoenas, 2 U.S.C. § 288d, like section 1365(a), applies only to the Senate (and imposes various restrictions). That limitation (among other considerations) also makes clear, as the *McGahn* panel explained, that neither an implied cause of action under Article I of the Constitution nor an equitable cause of action is available to the House in this context. *See* 973 F.3d at 123–24; *see also id.* at 124–25 (applying Supreme Court and circuit precedent to reject the argument that the Declaratory Judgment Act, 28

47

45 Op. O.L.C. __ (Jan. 8, 2021)

U.S.C. § 2201, provides a cause of action). As the Supreme Court has recognized, Congress's authority "to compel production of evidence differs widely from authority to invoke judicial power for that purpose." *Reed*, 277 U.S. at 389.

In the 1980s, this Office opined that these civil suits do lie within the constitutional and statutory jurisdiction of the federal courts and are appropriate for judicial resolution. *See Independent Counsel Act Requests*, 10 Op. O.L.C. at 87–89; *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 (1984) ("*Prosecution for Contempt of Congress*").[19] But those statements preceded significant decisions in which the Supreme Court clarified the requirements of Article III standing (most notably *Raines v. Byrd*) and amendments to 28 U.S.C. § 1365(a) enacted in 1996 that confirm Congress's intent to bar inter-branch informational disputes from federal court. *See McGahn*, 951 F.3d at 522 (discussing 1996 legislative history). In fact, the author of one such OLC opinion, Assistant Attorney General Theodore Olson, argued while later serving as Solicitor General that these developments in the law undermined the Department's earlier view. *See* Defendant's Memorandum of Points & Auths. in Reply to Plaintiff's Opposition to Motion to Dismiss, *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002) (No. 02-340), 2002 WL 32388026 (relying on *Raines* to argue that a suit brought by the Comptroller General against executive branch officials was nonjusticiable). This Office was consulted on that brief at the time, and we continue to think that these developments in the law support the Department's current view that Congress may not properly seek to enforce its subpoenas in federal court against executive branch officials.

Congress has increasingly turned to civil enforcement suits as an alternative to traditional efforts to compel executive branch officials to provide information that Congress has requested. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational de-

---

[19] The Department of Justice even attempted to bring an analogous suit against the House in 1983. *See United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) (dismissing, on prudential grounds, a suit seeking a declaratory judgment that the Administrator of the Environmental Protection Agency had lawfully withheld privileged documents from Congress).

*Congressional Oversight of the White House*

mands. Congress has the power of the purse, *see* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"), as well as the power to impeach and remove executive officers, *see id.* § 2, cl. 5; *id.* § 3, cls. 6–7, and the Senate's consent is necessary for the appointments of many senior executive officers, *see id.* art. II, § 2, cl. 2. Congress also may press its case directly to the press and to the public at large. Those powers have frequently been deployed as a means of ensuring that the Executive Branch acts in accord with the "tradition of negotiation and compromise," *Mazars*, 140 S. Ct. at 2031, that has led to the successful resolution of many oversight disputes.

Congress also has other, more direct means of ensuring compliance with subpoenas. One theoretical option would be for the House or Senate to invoke its inherent contempt powers and instruct the Sergeant-at-Arms to arrest an individual cited for contempt. *See Jurney v. MacCracken*, 294 U.S. 125 (1935); *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821). However, Congress has not sought to arrest any person for contempt in more than 80 years, *see Independent Counsel Act Requests*, 10 Op. O.L.C. at 86, and has not sought to arrest an executive branch official in more than a century, *see McGahn*, 968 F.3d at 776. Any effort by Congress to arrest a White House official for noncompliance with a subpoena based upon a legitimate separation of powers objection would, besides raising serious practical concerns, likely be unconstitutional. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *20–21 ("The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." (internal quotation marks omitted)). Congressional authority to arrest executive officials for actions properly taken to protect the prerogatives of the Executive Branch is the type of "great substantive and independent power[]" that the Constitution would not have left to mere implication. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 559 (opinion of Roberts, C.J.) (internal quotation marks omitted).

To complement its inherent contempt power, Congress in the mid-nineteenth century enacted a criminal statute to prohibit defiance of a

45 Op. O.L.C. __ (Jan. 8, 2021)

congressional subpoena. *See* 2 U.S.C. § 192. Under the statute, where a person who is summoned to give testimony or to produce papers and "willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry," *id.*, the President of the Senate or the Speaker of the House may refer to an "appropriate United States attorney" for prosecution an individual who refuses to comply with a subpoena. *Id.* § 194. Congress has invoked the criminal contempt statute against private parties and executive branch officials as well.

We have long maintained, however, that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch. *See Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 129–42. Moreover, given that the prosecution authority is part of the executive power, Congress may only *refer* an individual to a United States Attorney for a contempt prosecution; the Department of Justice ultimately has the prosecutorial discretion to decide whether a person should be indicted and prosecuted. *See Nixon*, 418 U.S. at 693 ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 119–20 (Department of Justice controls whether any contempt prosecution will be brought). In response to criminal referrals for two White House officials in 2008, for instance, Attorney General Michael Mukasey notified the Speaker of the House that the Department of Justice would "not bring the congressional contempt citations before a grand jury or take any other action to prosecute," because, in light of the President's assertions of executive privilege, the "non-compliance by [the President's Chief of Staff] and [the former Counsel to the President] . . . did not constitute a crime." Letter for Nancy Pelosi, Speaker of the House, from Michael B. Mukasey, Attorney General at 2 (Feb. 29, 2008); *see also Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 128 (contempt statute does not override the Executive's prosecutorial discretion); *Prosecutorial Discretion Regarding Citations for Contempt of Congress*, 38 Op. O.L.C. 1, 2–3 (2014) (same).

Congressional committees have generally sought enforcement of subpoenas against noncompliant witnesses only with an authorization from the *full* House or Senate. *See* 2 U.S.C. § 288b(b) (requiring "adoption of a resolution by the Senate" to authorize a Senate subpoena-enforcement

*Congressional Oversight of the White House*

suit); House Rule XI.2(m)(3)(C) ("Compliance with a subpoena issued by a [House] committee or subcommittee . . . may be enforced only as authorized or directed by the House."); Cong. Research Serv., RL30548, *Hearings in the U.S. Senate: A Guide for Preparation and Procedure* 11 (Mar. 18, 2010) ("Compliance with a [Senate committee] subpoena can be enforced only at the direction of the Senate."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82–83 (discussing procedures for enforcing House subpoenas).[20] If the committee seeks to enforce the subpoena by holding the recipient in contempt, the committee (by a majority vote) must seek such approval by "report[ing] a resolution of contempt to the floor." Louis Fisher, Cong. Research Serv., *Congressional Investigations: Subpoenas and Contempt Power* 7 (Apr. 2, 2003) ("*Subpoenas and Contempt Power*"); *see also* 2 U.S.C. § 194 (requiring, for a contempt of Congress prosecution, that noncompliance with a subpoena be reported to the House or Senate, or House or Senate leadership if Congress is not in session). The full House or Senate must then "vote in support of the contempt citation" before the contempt may be referred to the U.S. Attorney. *Subpoenas and Contempt Power* at 7; *see also Wilson v. United States*, 369 F.2d 198, 203 (D.C. Cir. 1966) (explaining that a chamber-wide vote provides "a 'check' on hasty action by a committee" and avoids a situation where "the allegedly insulted committee . . . provide[s] the sole legislative determination whether to initiate proceedings to prosecute for contempt").

Committees of Congress have issued and likely will continue to issue subpoenas for documents and testimony to White House personnel. Less certain, however, is whether congressional entities have any authority to seek to compel compliance with such subpoenas in court. We believe that congressional suits to enforce subpoenas to executive branch officials fall outside the constitutional and statutory jurisdiction of the federal courts;

_____

[20] Where recourse has been made to the courts, the House or Senate has typically authorized such an action by resolution. Todd Garvey, Cong. Research Serv., R45653, *Congressional Subpoenas: Enforcing Executive Branch Compliance* 5 (Mar. 27, 2019); *see, e.g.*, H.R. Res. 706, 112th Cong. (2012) (authorizing suit to enforce subpoena to Attorney General Holder). In the 116th Congress, however, the House broke from this practice by adopting a resolution enabling committees to file suit whenever authorized by the Bipartisan Legal Advisory Group, H.R. Res. 430 (2019), which comprises the House Speaker and majority and minority leaderships, House Rule II.8(b).

45 Op. O.L.C. __ (Jan. 8, 2021)

the inherent contempt mechanism appears to have fallen into desuetude, and would present grave constitutional concerns if deployed against executive branch officials acting to protect the lawful prerogatives of the Executive; and the Executive Branch has discretion to refuse to bring a contempt of Congress criminal prosecution against one of its officials in such circumstances.

## B. Validity of Subpoenas Issued to the White House

It is the Executive Branch's settled policy to work to accommodate congressional requests for information in a manner consistent with the Executive's constitutional and statutory obligations. Historically, however, congressional subpoenas to executive branch officials have raised a variety of separation of powers concerns. This section identifies and discusses a number of legal defects, several of which are discussed at greater length above, that have commonly arisen in subpoenas involving the White House. These limitations on Congress's oversight powers are rooted in the separation of powers, and observing them serves to prevent Congress from "aggrandiz[ing] itself at the [Executive's] expense." *Mazars*, 140 S. Ct. at 2034.

*Lack of Oversight Authority or Legitimate Legislative Purpose*. As we have discussed, all congressional oversight inquiries must be conducted in support of Congress's legislative authority under Article I of the Constitution. *See id.* at 2031–32, 2035–36; *McGrain*, 273 U.S. at 177. A subpoena that seeks material or testimony on matters beyond Congress's legislative authority, such as the exercise of a constitutional power vested exclusively in the Executive Branch, is beyond Congress's oversight authority. *See Barenblatt*, 360 U.S. at 111–12.

*Infringement of Presidential Autonomy and Confidentiality*. Congressional inquiries to the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. In certain circumstances, compliance with a congressional subpoena directed at the White House may unduly impair the Executive's "ability to discharge its constitutional responsibilities." *Id.* at 382. For example, compliance with a subpoena that is excessively broad or intrusive might burden White House personnel to a degree that prevents them from effec-

52

*Congressional Oversight of the White House*

tively advising and assisting the President in the performance of his constitutional duties. In that circumstance, it would be unconstitutional to enforce such an unduly broad subpoena. Of course, the accommodation process serves to ensure that congressional requests are tailored or narrowed so as to avoid infringement of presidential autonomy and confidentiality while satisfying Congress's legitimate needs for relevant information.

***Immunity of White House Officials from Compelled Testimony.*** Relatedly, the White House has consistently resisted subpoenas that seek to compel the President's immediate advisers to testify before congressional committees. The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity—that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).[21] As Assistant Attorney General Rehnquist explained:

> The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971); *see also Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *7–

---

[21] Although this Office has spoken of this protection from compelled congressional testimony in terms of "immunity," it may equally be viewed as a limitation on the breadth of Congress's implied power to compel testimony. *Cf. New York v. United States*, 505 U.S. 144, 159 (1992) ("it makes no difference whether one views" a federalism question as turning upon "the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution" or the scope of the "sovereignty retained by the States under the Tenth Amendment").

45 Op. O.L.C. __ (Jan. 8, 2021)

11 (listing historical examples of immediate presidential advisers refusing to testify); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, att. at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").

Consequently, in addition to invoking executive privilege over particular questions, the President "can also direct them not even to appear before the committee." Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* app. at 7 (Aug. 11, 1977). For example, in 1981, Martin Anderson, President Reagan's assistant for policy development, refused to appear before a House appropriations subcommittee responsible for funding his office. White House Counsel Fred F. Fielding explained that "[f]rom the Administration of George Washington to the present day, it has been a central tenet of the doctrine of separation of powers among the three branches of the Federal Government that the President is not subject to questioning as to the manner in which he formulates Executive policy"; this principle "founded in practicality as well as tradition and law" "has also been applied to senior members of the President's personal staff, who participate in the deliberative process through which such policies are developed." Letter for Edward R. Roybal, Chairman, Subcommittee on Treasury, Postal Service, General Government, U.S. House of Representatives, from Fred F. Fielding, Counsel to the President (July 8, 1981), *reprinted in* H.R. Rep. No. 97-171, at 61 (1981). This testimonial immunity safeguards the constitutional separation of powers by protecting the independence and autonomy of the Presidency from congressional interference; it also "protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *5; *accord Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 7–9 (2014).

Immediate advisers to the President remain immune from compelled testimony about their official duties in that capacity even after they leave the White House. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __,

54

**-1059-**

*Congressional Oversight of the White House*

at *15–16 (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure"). In determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President. Although most members of the White House staff do not qualify for immunity from compelled testimony, as a matter of policy the White House has generally opposed making any members of the White House staff available to testify, subject to the accommodation process.

The Executive Branch's position on immunity is well established by our precedent and practice, but the federal courts have looked less favorably on this position in the two cases in which the House sought to test it in court. The district courts to consider the question have held that senior presidential advisers do not, at least as a categorical matter, enjoy absolute immunity from compelled congressional testimony. *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105–06 (D.D.C. 2008); *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 200–14 (D.D.C. 2019). But the first of those decisions was stayed pending appeal, *Comm. on the Judiciary v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) (per curiam), and then settled without enforcement of the subpoena, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009). The second decision remains under review in the D.C. Circuit. In the latter case, two judges sitting on the D.C. Circuit panel similarly expressed doubt about the existence of this absolute immunity. *See McGahn*, 951 F.3d at 538–42 (Henderson, J., concurring); *id.* at 558 (Rogers, J., dissenting). No precedential ruling has addressed the Executive Branch's position, however, which for decades has governed the Executive Branch's negotiations with congressional committees seeking the testimony of the President's immediate advisers.

***Exclusion of Counsel from Depositions.*** Although historically Congress has sought to obtain testimony from executive branch officials by means of voluntary interviews and public hearings, committees in recent years have made increasing use of depositions. *See, e.g.*, H.R. Res. 6, 116th Cong. § 103(a)(1) (2019) (authorizing committee chairs to "order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee"). And certain committees, based on the current House rules governing depositions, have attempted to bar executive

45 Op. O.L.C. __ (Jan. 8, 2021)

branch witnesses from being accompanied by agency counsel at their depositions, allowing only private counsel. 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ("counsel for government agencies . . . may not attend"); *see also, e.g.*, H. Comm. on Oversight & Reform Rule 15(e), 116th Cong. (2019) (counsel "for agencies under investigation . . . may not attend"). The Executive Branch has repeatedly resisted this practice and sought to maintain the "[l]ongstanding Executive Branch policy and practice" of agency counsel accompanying agency officials when they are questioned by Congress. Letter for Henry Waxman, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives, from Dinah Bear, General Counsel, Council on Environmental Quality at 2 (Mar. 12, 2007).

This Office has advised that barring agency counsel from congressional depositions is unconstitutional because it "compromise[s] the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities." *Exclusion of Agency Counsel*, 43 Op. O.L.C. __, at *2; *see also Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *5 n.6 (Jan. 18, 2017) (noting that excluding agency counsel may raise "constitutional concerns" but reserving the question). This principle of course applies to depositions of White House officials. In *Exclusion of Agency Counsel*, for example, we advised that a subpoena issued by the House Committee on Oversight and Reform to the former head of the White House Personnel Security Office was invalid on this basis. *See* 43 Op. O.L.C. __, at *2, *6. Subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients. *See id.* at *13–14.

*Failure to Exhaust the Accommodation Process*. The White House often has responded to congressional requests by insisting that committees engage in the accommodation process. *See supra* Part III.C. A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course. Thus, White House officials have often cited a committee's failure to exhaust the accommodation process in objecting to a congressional subpoena.

*Congressional Oversight of the White House*

The accommodation process encompasses the exhaustion principle that we have discussed above. The White House may object to a committee's refusal to seek necessary information from the relevant executive branch departments and agencies before directing requests to the White House. *See Mazars*, 140 S. Ct. at 2035–36 ("Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective."). Where a committee declines to honor its obligation to accommodate the legitimate needs of the White House, the committee may not lawfully begin the contempt process based upon good faith objections raised by White House officials.

*Assertion of Executive Privilege*. An assertion of executive privilege authorized by the President is a well-established ground for resisting a congressional subpoena. *See id.* at 2032 ("recipients [of legislative subpoenas] have long been understood to retain common law and constitutional privileges with respect to certain materials, such as . . . governmental communications protected by executive privilege"). Executive privilege consists of several components, which vary in scope and the extent of protection from disclosure. *See supra* Part III.B. As relevant to the White House, a congressional committee may overcome an assertion of executive privilege based on the presidential communications component of the privilege only by "demonstrat[ing] that the information sought is 'demonstrably critical to the responsible fulfillment of the Committee's functions.'" *Assertion of Executive Privilege for Documents Concerning Conduct of Foreign Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 6 (1996) (Reno, Att'y Gen.) (quoting *Senate Select Comm.*, 498 F.2d at 731). White House officials have an obligation to minimize the disclosure of privileged information and to protect the President's authority to determine when it would be in the public interest to provide such information as an accommodation.

This is not to say that the Executive Branch must or should claim executive privilege as a prerequisite to asserting any confidentiality interests in connection with congressional oversight. A formal assertion of executive privilege is a last resort in the sense that it is typically only needed when the Executive Branch has already asserted its confidentiality interests, but the accommodation process has failed to produce a resolution and the relevant committee moves to initiate enforcement action by voting

45 Op. O.L.C. __ (Jan. 8, 2021)

to recommend that the recipient of the subpoena be cited for contempt of Congress.[22] However, a formal assertion of privilege does not preclude the possibility of further negotiation and accommodation.

*Unreasonable Burden to Comply*. White House officials also may decline to comply fully with the terms of a subpoena based on a concern that compliance would be unreasonably burdensome or impossible. Compared to the departments and agencies, White House components have small staffs who are primarily devoted to advising and assisting the President. Exempt from FOIA, these White House components do not have trained standing units devoted to document review and response work. Instead, these White House components need to divert staff from their work for the President to process congressional oversight requests. The White House is thus less likely than other parts of the Executive Branch to have the resources available to comply fully with subpoenas that are broad in scope and have urgent return dates.

The federal courts' rules of procedure for both civil and criminal cases relieve parties of the obligation to comply with a subpoena where the scope of the request and the return date make compliance unreasonably burdensome or impossible. *See* Fed. R. Civ. P. 45(d)(3)(A) (court "must quash or modify a subpoena that . . . fails to allow a reasonable time to comply"); Fed. R. Crim. P. 17(c)(2) ("court may quash or modify the subpoena if compliance would be unreasonable or oppressive"). Further, a party may not be held in contempt for noncompliance with a subpoena when compliance is an impossibility. *See, e.g.*, *In re Marc Rich & Co.*, 736 F.2d 864, 866 (2d Cir. 1984) (noting that the district court "made it perfectly clear that [a contemnor] simply had to produce appropriate affidavits attesting to the impossibility of compliance and the [contempt] judgment would be lifted"). Similar principles apply in the context of

---

[22] When this course of events moves too quickly to allow for an adequate executive privilege review, the President may make a "protective" assertion of executive privilege over a class of documents in order "to ensure [his] ability to make a final decision, after consultation with the Attorney General, as to which specific documents are deserving of a conclusive claim of executive privilege." *Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1, 1 (1996) (Reno, Att'y Gen.); *accord Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files*, 43 Op. O.L.C. __ (May 8, 2019) (Barr, Att'y Gen.).

*Congressional Oversight of the White House*

congressional subpoenas, particularly given that "Congress and the courts have similar subpoena powers." *Nixon v. Sirica*, 487 F.2d 700, 731 (D.C. Cir. 1973) (en banc) (per curiam).

\* \* \* \* \*

It has long been the Executive Branch's policy to "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Reagan Memorandum at 1. But the critical functions that White House staff members play when advising and assisting the President in the performance of his constitutional duties require that congressional oversight of the White House be conducted differently from oversight of the departments and agencies. The necessary approach has been described at length in this memorandum opinion, but the core principle is that congressional committees and the White House must work together to accommodate congressional needs for information about the Executive Branch's discharge of statutory obligations in a manner that does not undermine the White House staff's ability to advise and assist the President.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*

59

# EXHIBIT H

# Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys

*Executive privilege may properly be asserted over the documents and testimony concerning the dismissal and replacement of U.S. Attorneys that have been subpoenaed by congressional committees.*

June 27, 2007

THE PRESIDENT
    THE WHITE HOUSE

Dear Mr. President:

The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several U.S. Attorneys in 2006. Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys. In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter. It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

## I.

The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials. The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive

1

**-1066-**

*Opinions of the Office of Legal Counsel in Volume 31*

privilege. The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim. For the reasons discussed below, I concur with both assessments.

### A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1, 2 (2001) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("*Clemency Decision*") ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Clemency Decision*, 23 Op. O.L.C. at 2–3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution").

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults with members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1] Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Clemency Decision*, 23 Op. O.L.C. at 3–4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue. The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were

---

[1] *See, e.g.*, *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

selected to be fired." Letter for Fred F. Fielding, Counsel to the President, from John Conyers, Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter. *Senate Select Comm.*, 498 F.2d at 732. Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard. Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Id*. at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2] This information has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g.*, *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758–59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland

---

[2] During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations. The Department has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for Patrick Leahy, U.S. Senate, et al., from Fred F. Fielding, Counsel to the President at 1–2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for Patrick Leahy, U.S. Senate, and John Conyers, Jr., U.S. House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for Patrick Leahy, U.S. Senate, John Conyers, Jr., U.S. House of Representatives, and Linda T. Sanchez, U.S. House of Representatives, from Fred F. Fielding, Counsel to the President at 1–2 (June 7, 2007).

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from John Conyers, Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732–33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 751–52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such

5

as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

**C.**

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

deliberative and clearly fall within the scope of executive privilege.[4] *See supra* p. 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751–52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed,

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 752–53 (describing heightened protection provided to presidential communications).

these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732–33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Clemency Decision*, 23 Op. O.L.C. at 3–4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative responsibilities. *Senate Select Comm.*,

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

PAUL D. CLEMENT
*Solicitor General & Acting Attorney General*

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

# EXHIBIT I

## Immunity of the Former Counsel to the President From Compelled Congressional Testimony

The former Counsel to the President is immune from compelled congressional testimony about matters that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity and is not required to appear in response to a subpoena to testify about such matters.

July 10, 2007

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether Harriet Miers, the former Counsel to the President, is legally required to appear and provide testimony in response to a subpoena issued by the Committee on the Judiciary of the House of Representatives. The Committee, we understand, seeks testimony from Ms. Miers about matters arising during her tenure as Counsel to the President and relating to her official duties in that capacity. Specifically, the Committee wishes to ask Ms. Miers about the decision of the Justice Department to request the resignations of several United States Attorneys in 2006. *See* Letter for Harriet E. Miers, from John Conyers, Jr., Chairman, House Committee on the Judiciary (June 13, 2007). For the reasons discussed below, we believe that Ms. Miers is immune from compulsion to testify before the Committee on this matter and, therefore, is not required to appear to testify about this subject.

Since at least the 1940s, administrations of both political parties have taken the position that "'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee.'" *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno) (quoting Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977)). This immunity "is absolute and may not be overborne by competing congressional interests." *Id.*

Assistant Attorney General William Rehnquist succinctly explained this position in a 1971 memorandum:

> The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal

*Opinions of the Office of Legal Counsel in Volume 31*

Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971). In a 1999 opinion for President Clinton, Attorney General Reno concluded that the Counsel to the President "serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 4.

The rationale for the immunity is plain. The President is the head of one of the independent branches of the federal government. If a congressional committee could force the President's appearance, fundamental separation of powers principles—including the President's independence and autonomy from Congress—would be threatened. As the Office of Legal Counsel has explained, "[t]he President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

The same separation of powers principles that protect a President from compelled congressional testimony also apply to senior presidential advisers. Given the numerous demands of his office, the President must rely upon senior advisers. As Attorney General Reno explained, "in many respects, a senior advisor to the President functions as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5.[1] Thus, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned functions*." Id.; see also* Olson Memorandum at 2 ("The President's close advisors are an extension of the President.").[2]

The fact that Ms. Miers is a former Counsel to the President does not alter the analysis. Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional

---

[1] In an analogous context, the Supreme Court held that the immunity provided by the Speech or Debate Clause of the Constitution to members of Congress also applies to congressional aides, even though the Clause refers only to "Senators and Representatives." U.S. Const. art I, § 6, cl. 1. In justifying expanding the immunity, the Supreme Court reasoned that "the day to day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos." *Gravel v. United States*, 408 U.S. 606, 616–17 (1972). Any other approach, the Court warned, would cause the constitutional immunity to be "inevitably . . . diminished and frustrated." *Id.* at 617.

[2] *See also History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 771–72 (1982) (documenting how President Truman directed Assistant to the President John Steelman not to respond to a congressional subpoena seeking information about confidential communications between the President and one of his "principal aides").

*Immunity of Former Counsel to President From Compelled Congressional Testimony*

testimony about official matters that occurred during their time as President or senior presidential advisers. Former President Truman explained the need for continuing immunity in November 1953, when he refused to comply with a subpoena directing him to appear before the House Committee on Un-American Activities. In a letter to that committee, he warned that "if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting November 12, 1953 letter by President Truman). "The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." *Id*. In a radio speech to the Nation, former President Truman further stressed that it "is just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26.

Because a presidential adviser's immunity is derivative of the President's, former President Truman's rationale directly applies to former presidential advisers. We have previously opined that because an "immediate assistant to the President may be said to serve as his alter ego . . . the same considerations that were persuasive to former President Truman would apply to justify a refusal to appear [before a congressional committee] by . . . a former [senior presidential adviser], if the scope of his testimony is to be limited to his activities while serving in that capacity." Memorandum for the Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972).

Accordingly, we conclude that Ms. Miers is immune from compelled congressional testimony about matters, such as the U.S. Attorney resignations, that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity, and therefore she is not required to appear in response to a subpoena to testify about such matters.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT J

## Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege

As a matter of statutory construction and separation of powers analysis, a United States Attorney is not required to refer a congressional contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who carries out the President's instruction to invoke the President's claim of executive privilege before a committee of Congress.

May 30, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### I. Introduction

This memorandum memorializes our formal response to your request for our opinion whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194, a United States Attorney must prosecute or refer to a grand jury a citation for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of executive privilege in response to written instructions from the President of the United States. Your inquiry originally arose in the context of a resolution adopted by the House of Representatives on December 16, 1982, during the final days of the 97th Congress, which instructed the Speaker of the House of Representatives to certify the report of the Committee on Public Works and Transportation concerning the "contumacious conduct of [the] Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee . . . to the United States Attorney for the District of Columbia, to the end that the Administrator . . . may be proceeded against in the manner and form provided by law." H.R. Res. 632, 97th Cong., 2d Sess. (1982).[1] Section 192 of Title 2, United States Code, provides, in general, that willful failure to produce documents in response to a congressional subpoena shall be a misdemeanor. Section 194 provides that if such a failure is reported to either house of Congress it "shall" be certified to the "appropriate United States attorney whose duty it shall be to bring the matter before the grand jury for its action."

---

[1] Although the December 1982 dispute is now a matter of history, it raises recurring issues.

101

Your inquiry presents a number of complex issues that will be considered in this memorandum. The first issue is whether the Executive retains some discretion with respect to referral of a contempt of Congress citation to a grand jury. This issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion. The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege. This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983.

102

Constitutional conflicts within the federal government must be resolved care-fully, based upon the facts of each specific case. Although tensions and friction between coordinate branches of our government are not novel and were, in fact, anticipated by the Framers of the Constitution, they have seldom led to major confrontations with clear and dispositive resolutions.

> The accommodations among the three branches of the govern-ment are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitu-tion. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory.

Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts*, 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original). "The great ordinances of the Constitution do not estab-lish and divide fields of black and white." *Springer* v. *Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are confident of our conclusions, prudence suggests that they should be limited to controversies similar to the one to which this memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis.

## II. Background

Because the difficult and sensitive constitutional issues that we consider in this opinion could conceivably be resolved differently depending upon the specific facts of a controversy, this analysis is presented in the context of the December 16, 1982, actions of the House of Representatives. The facts sur-rounding this dispute will be set out in detail in the following pages.

### A. EPA's Enforcement of the Superfund Act

On December 16, 1982, the House of Representatives cited the Administra-tor of the Environmental Protection Agency (EPA) because she declined to produce, in response to a broad subcommittee subpoena, a small portion of the subpoenaed documents concerning the Comprehensive Environmental Re-sponse, Compensation, and Liability Act, 42 U.S.C. §§ 9601, 9657 (Supp. V 1981) (Superfund Act). The Superfund Act, adopted in December of 1980, authorizes the federal government to take steps to remedy the hazards posed by abandoned and inactive hazardous waste sites throughout the United States.[2] The EPA, which was delegated part of the President's authority to enforce the Superfund Act in August of 1981,[3] has considerable flexibility with respect to

---

[2] Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, provides federal authority to deal with the current disposal of hazardous industrial wastes.

[3] See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

103

how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an "imminent and substantial endangerment to the public health or welfare or the environment." *See* 42 U.S.C. § 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. *See* 42 U.S.C. § 9631. If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages. *See* 42 U.S.C. § 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances. *See* 42 U.S.C. §§ 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release. *See* 42 U.S.C. § 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and evaluating the evidence that exists or that must be generated to support government action. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983). Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents. *Id.*

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment.[4] EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites. *See* 47 Fed. Reg. 20664 (1982).

Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act. As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a

---

[4] Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up. *See* 47 Fed. Reg. 58476 (1982)

clean up plan. These negotiations may involve hundreds of potentially responsible parties and millions of dollars in clean up costs. Depending upon the strengths and weaknesses of individual cases and the effect on the overall enforcement effort, EPA may decide to settle with some but not all parties and proceed to litigation with a certain number of potential defendants. If EPA decides to bring a lawsuit, it refers the case to the Land and Natural Resources Division of this Department, which is responsible for conducting the actual litigation.[5]

During EPA's enforcement of the Superfund Act, the agency created or received hundreds of thousands of documents concerning various aspects of the enforcement process. Many of these documents concerned the facts relating to specific hazardous waste sites; others involved general agency strategy and policies with respect to the Superfund Act; still others, a small portion of the enforcement files, were attorney and investigator memoranda and notes that contained discussions of subjects such as EPA's enforcement strategy against particular defendants, analyses of the strengths and weaknesses of the government's case against actual or potential defendants, consideration of negotiation and settlement strategy, lists of potential witnesses and their anticipated testimony, and other litigation planning matters. Enforcement officials at both the career and policy level at EPA and in the Land and Natural Resources Division at the Department of Justice determined that some of those documents, which concerned the legal merits and tactics with respect to individual defendants in open enforcement files, were particularly sensitive to the enforcement process and could not be revealed outside the agencies directly involved in the enforcement effort without risking injury to EPA's cases against these actual and potential defendants in particular and the EPA enforcement process in general.[6]

*B. The House Subcommittee's Demands for Enforcement Files*

In the midst of EPA's ongoing enforcement efforts under the Superfund Act, the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation (Public Works Subcommittee), chaired by Rep. Levitas, began hearings to review EPA enforcement of the Act. In the course of these hearings, the Public Works Subcommittee first demanded access to, and then subpoenaed, a wide range of documents concerning enforcement of the Superfund Act with respect to the 160 sites that were on the

---

[5] We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken Superfund financed action at 112 sites involving the obligation of in excess of $236 million, instituted Superfund claims in 25 judicial actions, and obtained one criminal conviction. As of the early months of 1983, EPA and the Department of Justice had reached settlements in 23 civil actions providing for the expenditure of more than $121 million to conduct clean up operations and were actively negotiating with responsible parties concerning the clean up of 56 sites throughout the country. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel of the EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983).

[6] *Id.*

105

agency's interim priorities list. The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants.[7] The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982. The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena.[8] The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, *see* Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed. A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials. Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation. The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive

---

[7] The subpoena required the EPA Administrator to produce: all books, records, correspondence, memoranda, papers, notes and documents drawn or received by the Administrator and/or her representatives since December 11, 1980, the date of enactment of the Superfund Act, including duplicates and excepting shipping papers and other commercial or business documents, contractor and/or other technical documents, for those sites listed as national priorities pursuant to Section 105(8)(B) of the Superfund Act. *See United States* v. *House of Representatives*, 556 F. Supp. 150, 151 (D.D.C. 1983).

[8] *See* Testimony of Administrator Gorsuch before the Public Works Subcommittee, attached as Exhibit C to Declaration of Robert M. Perry, *supra*.

106

as of the return date of the subpoena that their disclosure might adversely affect pending investigations and open enforcement proceedings. The President implemented this decision in a memorandum dated November 30, 1982, to the EPA Administrator, which instructed her to withhold the particularly sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions. The legal basis for this decision was explained in letters from the Attorney General on November 30, 1982, to the House Public Works Subcommittee and one other House subcommittee.[9] On December 2, 1982, 64 of the most sensitive documents were withheld from the Subcommittee.[10]

## C. The Contempt of Congress Proceedings in the House of Representatives

The President's assertion of executive privilege, and the Attorney General's explanation of the law enforcement considerations and constitutional justification for the decision not to release the documents outside the Executive Branch while enforcement proceedings were ongoing, did not dissuade the congressional subcommittees from pressing their demands for the withheld material. After the EPA Administrator asserted the President's claim of privilege at a December 2, 1982, Public Works Subcommittee hearing, the Subcommittee immediately approved a contempt of Congress resolution against her. The full Committee did likewise on December 10, 1982, and rejected a further proposal by the Department of Justice to establish a formal screening process and briefings regarding the contents of the documents.[11] The full House adopted the contempt of Congress resolution on December 16, 1982,[12] and the follow-

---

[9] *See* Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney General William French Smith (Nov. 30, 1982). The Subcommittee on Oversight and Investigations of the House Energy and Commerce Committee (Energy and Commerce Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel demand for similar documents relating to enforcement of the Superfund Act with respect to certain specific sites that were among the 160 on the interim priorities list. While the Energy and Commerce Subcommittee sought documents relative to three specific hazardous waste sites, the Public Works Subcommittee subpoena demanded production of virtually all documents for all 160 sites. The President's assertion of executive privilege applied to both subpoenas. Although the Energy and Commerce Subcommittee approved a contempt of Congress resolution against the EPA Administrator, this resolution never reached the full Committee or the floor of the House of Representatives.

[10] As of that date, EPA had been able to examine only a portion of the hundreds of thousands of pages of documents that had been subpoenaed. The 64 documents that were withheld were those among the subpoenaed documents that had been reviewed and determined to fall within the President's instruction not to produce documents the release of which would adversely affect ongoing enforcement proceedings *See* Amended Declaration of Robert M. Perry, *supra*

[11] *See* Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs (Dec. 9, 1982).

[12] The contempt resolution stated:
    Resolved, That the Speaker of the House of Representatives certify the report of the Committee on Public Works and Transportation as to the contumacious conduct of Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, and as ordered by the subcommittee, together with all of the facts in
    Continued

107

ing day Speaker O'Neill certified the contempt citation to the United States
Attorney for the District of Columbia for prosecution under the criminal
contempt of Congress statute.

### D. The Criminal Contempt of Congress Statute

The criminal contempt of Congress statute contains two principal sections, 2
U.S.C. §§ 192 & 194.[13] Section 192, which sets forth the criminal offense of
contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the
> authority of either House of Congress to give testimony or to
> produce papers upon any matter under inquiry before either
> House . . . or any committee of either House of Congress, will-
> fully makes default, or who, having appeared, refuses to answer
> any question pertinent to the question under inquiry, shall be
> deemed guilty of a misdemeanor, punishable by a fine of not
> more than $1,000 nor less than $100 and imprisonment in a com-
> mon jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House
or the President of the Senate, as the case may be, and the United States
Attorney, to take certain actions leading to the prosecution of persons certified
by a house of Congress to have failed to produce information in response to a
subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192
> of this title fails to appear to testify or fails to produce any
> books, papers, records, or documents, as required, or whenever
> any witness so summoned refuses to answer any question perti-
> nent to the subject under inquiry before either House . . . or any
> committee or subcommittee of either House of Congress, and
> the fact of such failure or failures is reported to either House
> while Congress is in session or when Congress is not in session,
> a statement of fact constituting such failure is reported and filed
> with the President of the Senate or the Speaker of the House, *it
> shall be the duty of the said President of the Senate or the
> Speaker of the House*, as the case may be, *to certify, and he shall
> so certify, the statement of facts* aforesaid under the seal of the

---

[12] (. . . continued)
    connection therewith, under seal of the House of Representatives, to the United States attorney
    for the District of Columbia, to the end that Anne M. Gorsuch, as Administrator, United States
    Environmental Protection Agency, may be proceeded against in the manner and form provided
    by law.
128 Cong. Rec. 31754 (1982).
    [13] A third provision, 2 U.S.C. § 193, which denies the existence of any testimonial privilege for a witness to
refuse to testify on the ground that this testimony would disgrace him, is not relevant to the issues discussed
in this memorandum.

108

> Senate or House, as the case may be, *to the appropriate United
> States attorney, whose duty it shall be to bring the matter before
> the grand jury for its action.*

(Emphasis added.)

*E. The Department of Justice Civil Suit*

Immediately after the House passed the resolution adopting the finding that
the EPA Administrator was in contempt of Congress, the Department of Justice
filed a civil suit in the United States District Court for the District of Columbia
to obtain a ruling that "insofar as [the EPA] Administrator . . . did not comply
with the Subpoena, her non-compliance was lawful" because of a valid Presi-
dential claim of executive privilege.[14] The House moved to dismiss the
Department's complaint on jurisdictional grounds, and the Department cross
moved for summary judgment on the merits. In a letter to Speaker O'Neill
dated December 27, 1982, the United States Attorney indicated that during the
pendency of the lawsuit, he would take no further action with respect to the
Speaker's referral of the contempt citation. The Speaker responded in a letter
dated January 4, 1983, in which he took the position that the United States
Attorney must, as a matter of law, immediately refer the matter to a grand jury.

The trial court responded to the cross-motions for dismissal and summary
judgment by exercising its discretion under equitable rules of judicial restraint not to
accept jurisdiction over the lawsuit, and it dismissed the suit. The court concluded:

> When constitutional disputes arise concerning the respective
> powers of the Legislative and Executive Branches, judicial in-
> tervention should be delayed until all possibilities for settlement
> have been exhausted. . . .

> The difficulties apparent in prosecuting [the] Administrator . . .
> for contempt of Congress should encourage the two branches to
> settle their differences without further judicial involvement.

*United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C.
1983). No appeal was taken.[15]

---

[14] *See* Amended Complaint in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Dec.
29, 1982).

[15] Although the United States Court of Appeals for the District of Columbia Circuit previously had been
willing to entertain a civil action to resolve a conflict between a congressional subpoena for documents and a
Presidential claim of executive privilege when the action was brought by a congressional committee, *Senate
Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir 1974) (en banc), the
trial court decision in the EPA matter casts some doubt on the viability of such an action when Congress, as in
this case, does not wish to resolve the controversy in a civil suit. We must assume, for the purpose of this
opinion, that a civil suit is an avenue that is open to Congress, but closed to the Executive, absent a legislature
willing to have the matter resolved in a civil proceeding.

Of course, the courts might be more amenable to a civil action challenging a contempt citation if they felt
that a criminal prosecution in this context was untenable. The district court judge in the EPA matter noted but
did not attempt to consider in depth the "difficulties" of prosecuting an executive official for carrying out the
President's constitutional responsibility.

109

*F. Resolution of the EPA Dispute*

Subsequent to the trial court decision, the two branches engaged in negotiations to reach a compromise settlement. The parties eventually reached an agreement under which the Public Works Subcommittee would have limited access to the withheld documents and would sponsor a resolution to "withdraw" the contempt citation against the EPA Administrator. Pursuant to the agreement, the Subcommittee reviewed the documents, and the House later adopted a resolution withdrawing the contempt citation. H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983). The issue whether the House of Representatives in the 98th Congress could "withdraw" the contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the United States Attorney for the District of Columbia refrained from referring the contempt citation to the grand jury. The United States Attorney took the position that referral would have been inappropriate during that period and that the statute left him with discretion to withhold referral. *See* Testimony of Stanley S. Harris before the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. 100–07 (June 16, 1983). Following the passage of the resolution withdrawing the contempt citation, "the relevant facts and documents were presented . . . to a federal grand jury, which voted unanimously not to indict [the EPA Administrator]." Letter from Stanley S. Harris, United States Attorney, District of Columbia, to Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5, 1983).

### III. Generally Applicable Legal Principles: The Separation of Powers, the Duties of the Executive to Enforce the Law, and the Derivation and Scope of the Principles of Prosecutorial Discretion and Executive Privilege

*A. The Separation of Powers*

The basic structural concept of the United States Constitution is the division of federal power among three branches of government. Although the expression "separation of powers" does not actually appear in the Constitution, the Supreme Court has emphasized that the separation of powers "is at the heart of our Constitution," and has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976). It needs little emphasis that the separation of powers doctrine is vital to any analysis of the relative responsibilities of the branches of our government, *inter se*. In *The Federalist* No. 47, James Madison, who believed that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the concept of the separation of powers, defended this tripartite arrangement in the Constitution by citing

110

Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

> The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*."

*The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); *see Buckley* v. *Valeo*, 424 U.S. at 120–21.[16]

Of the three branches of the new government created in Philadelphia in 1787, the legislature was regarded as the most intrinsically powerful, and the branch with powers that required the exercise of the greatest precautions.

Madison warned that the "legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist* No. 48, *supra*, at 309. He admonished that because of their experiences in England, the founders of the thirteen colonies had focused keenly on the danger to liberty from an "overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority," but had tended to ignore the very real dangers from "legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations." *Id.* Reflecting the views of many of his colleagues, Madison believed that although the risk of tyranny would naturally come from the King in an hereditary monarchy, in a representative republic, like that created by the constitutional convention, in which executive power was "carefully limited, both in the extent and duration of its power," the threat to liberty would come from the legislature,

> which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

*Id.*

---

[16] Madison characterized Montesquieu as the "oracle who is always consulted and cited on [the] subject [of the separation of powers]." *See The Federalist* No. 47, *supra*, at 301.

111

The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. *Id*. at 310. The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments." *United States* v. *Brown*, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown." *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id*. at 962.

Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An *elective despotism* was not the government we fought for." T. Jefferson, *Notes on the State of Virginia* 120 (Univ. N.C. Press ed. 1955)[17] The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id*. The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its consti-

---

[17] It is noteworthy, at least from an historical perspective, that the House of Representatives, because of its immense powers, was considered to be the governmental body least vulnerable to encroachments by other segments of government and, at the same time, because of its popular origin and frequent renewal of authority by the people, the body whose encroachment on the other branches would be least distrusted by the public. The Supreme Court later noted:

> It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositories of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.

*Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881).

112

tutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. *Id.* at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." *Buckley* v. *Valeo*, 424 U.S. at 121, 123. Therefore, although the Constitution does not contemplate "a complete division of authority between the three branches," each branch retains certain core prerogatives upon which the other branches may not transgress. *Nixon* v. *Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977). Each branch must not only perform its own delegated functions, but each has an additional duty to resist encroachment by the other branches. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, *must* be resisted." *INS* v. *Chadha*, 462 U.S. at 951 (emphasis added).

## B. The Duties of the Executive to Enforce the Law

The fundamental responsibility and power of the Executive Branch is the duty to execute the law. Article II, § 1 of the Constitution expressly vests the executive power in the President. Article II, § 3 commands that the President "take Care that the Laws be faithfully executed." Enforcement of the laws is an inherently executive function, and by virtue of these constitutional provisions, the Executive Branch has the exclusive constitutional authority to enforce federal laws. Since the adoption of the Constitution, these verities have been at the heart of the general understanding of the Executive's constitutional authority. During the debates on the Constitution, James Wilson noted that the "only powers he conceived strictly executive were those of executing the laws." 1 M. Farrand, *The Records of the Federal Convention of 1787*, at 65–66 (1937). During the first Congress, James Madison stated that "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 *Annals of Congress* 481 (1789). The Supreme Court has recognized this fundamental constitutional principle. In *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928), the Court observed:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

*Id.* at 202. More recently, Judge Wilkey, writing for a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit in a decision later affirmed by the Supreme Court, recognized that the Constitution

113

prevents Congress from exercising its power of "oversight, with an eye to legislative revision," in a manner that amounts to "shared administration" of the law. *Consumer Energy Council of America* v. *Federal Energy Regulatory Commission*, 673 F.2d 425, 474 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America*, 43 U.S. 1216 (1983). It thus seems apparent that the drafters of the Constitution intended clearly to separate the power to adopt laws and the power to enforce them and intended to place the latter power exclusively in the Executive Branch.[18] As a practical matter, this means that there are constitutional limits on Congress' ability to take actions that either disrupt the ability of the Executive Branch to enforce the law or effectively arrogate to Congress the power of enforcing the laws.

## C. The Derivation and Scope of Prosecutorial Discretion and Executive Privilege

The issues addressed by this memorandum involve two important constitutional doctrines that spring from the constitutional limits imposed by the separation of powers and the Executive's duty to enforce the laws: prosecutorial discretion and executive privilege.

### 1. Prosecutorial Discretion

The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress. That principle was reaffirmed by the Supreme Court in *Buckley* v. *Valeo*, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President *pro tempore* of the Senate and the Speaker of the House. In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed." Art. II, § 3.

424 U.S. at 138.

---

[18] Of equal concern was the need to separate the judicial power from the executive power. The drafters intended to preserve the impartiality of the judiciary as "neutral arbiters in the criminal law" by separating the judiciary from the prosecutorial function. *Nader* v. *Saxbe*, 497 F.2d 676, 679 n.18 (D.C Cir. 1974).

114

The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals. This principle was explained in *Smith* v. *United States*, 375 F.2d 243 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. . . . This discretion is required in all cases.

> We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246–47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." *Id.* at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below. At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

2. Executive Privilege

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch. If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional preroga-

115

tives. This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States* v. *Nixon*, 418 U.S. 683, 708 (1974). We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch. *United States* v. *Nixon*, 418 U.S. at 713; *see also Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc). Nevertheless, the unanimous Supreme Court decision in *Nixon* clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities.[19]

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws. First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. *United States* v. *Nixon*, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." *United States* v. *Nixon*, 418 U.S. 683, 706 (1974). In *Nixon*, the Court stated:

> As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. In *C. & S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111

---

[19] Presidents have invoked the privilege throughout our history for a variety of reasons. *See, e.g.*, "History of Refusals by Executive Branch to Provide Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz, Counsel to the President (June 8, 1977); Position of the Executive Department Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

116

(1948), dealing with Presidential authority involving foreign policy considerations, the Court said:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

In *United States* v. *Reynolds*, 345 U.S. 1 (1953), dealing with a claimant's demand for evidence in a Tort Claims Act case against the Government, the Court said:

> "It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.* at 10.

> No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. at 710–11.

An additional important application of executive privilege, which, as noted earlier, relates centrally to the discharge of the President's constitutional duties, involves open law enforcement files. Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature.[20] The basis for this application

---

[20] As explained by Attorney General (later, Supreme Court Justice) Robert Jackson in April 1941:
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.

40 Op. Att'y Gen. 45, 46 (1941). As similarly expressed a few years later by Deputy Assistant Attorney General Kauper:
> Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most impor-
> Continued

117

of the privilege is essentially the same as for all aspects of executive privilege; the Executive's ability to enforce the law would be seriously impaired, and the impermissible involvement of other branches in the execution and enforcement of the law would be intolerably expanded, if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files.

## IV. The Duty of the Executive Branch When an Executive Official Has Been Cited for Contempt of Congress for Asserting the President's Claim of Executive Privilege

### A. Prosecutorial Discretion

The first specific question that is presented by the circumstances that gave rise to this memorandum is whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. This question raises issues of statutory construction as well as the constitutional limits of prosecutorial discretion. We deal first with the statutory questions.

As a preliminary matter, we note that § 194 does not on its face actually purport to require the United States Attorney to proceed with the prosecution of a person cited by a house of Congress for contempt; by its express terms the statute discusses only referral to a grand jury. Even if a grand jury were to return a true bill, the United States Attorney could refuse to sign the indictment and thereby prevent the case from going forward. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965); *In re Grand Jury, January, 1969*, 315 F. Supp. 662 (D. Md. 1970). *See* Hamilton & Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury.[21]

---

[20] (. . . continued)
tant, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969). This significant constitutional privilege provides a foundation for our discussion below of the penalties that Congress may attach to the President's assertion of the privilege in response to a congressional subpoena.

[21] Although it is by no means certain as a matter of law, if the case were referred to a grand jury, the United States Attorney might be required to take certain steps short of signing the indictment, and the grand jury's decision might well become public. In *Cox*, a majority of the court (made up of the three dissenting judges and one concurring judge) took the view that the United States Attorney could be required to prepare an indictment for use by the grand jury. In addition, the district court in *In re Grand Jury*, *supra*, held that even though the United States Attorney could not be required to sign an indictment, in the circumstances of that case "the substance of the charges in the indictment should be disclosed, omitting certain portions as to which

Continued

118

1. Previous Department of Justice Positions Concerning Prosecutorial
   Discretion Under the Contempt of Congress Statute

In the past, the Department of Justice has taken the position that if Congress cited an executive officer for contempt because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim was rightfully made, it would not, in the exercise of its prosecutorial discretion, present the matter to a grand jury." Testimony of Assistant Attorney General (now Solicitor General) Rex Lee, *Hearings on Representation of Congress and Congressional Interests in Court, Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong., 2d Sess. 8 (1976).

This principle of prosecutorial discretion under the contempt of Congress statute was followed by the Department in the cases of three officials of the Port of New York Authority who were cited for contempt of Congress in 1960 for refusing to produce documents to the House Judiciary Committee. As a part of an investigation of the Port Authority, which had been established by an interstate compact approved by Congress, the Judiciary Committee subpoenaed a large number of documents concerning the Port Authority's operations, most of which the Port Authority declined to produce on the orders of the governors of New York and New Jersey (the states within which the Port Authority was located). Because of the failure to produce the documents, the Committee recommended, and the House adopted, contempt resolutions against three principal officials of the Port Authority.[22] On August 23, 1960, these resolutions were referred to the United States Attorney for prosecution. *See* N.Y. Times, Aug. 24, 1960, at 1. The United States Attorney never referred any of these citations to the grand jury. On November 16, 1960, the Department of Justice announced that it would proceed against the officials by information

---

[21] (. . . continued)

the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the private prejudice to the persons involved, none of whom are charged with any crime in the proposed indictment." 315 F Supp. at 678–79. Under this analysis, if the contempt citation were to reach a grand jury and the grand jury were to vote a true bill, a court might be able to require the United States Attorney to prepare an indictment and then might order the disclosure of that indictment as voted by the grand jury. For the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the United States Attorney to prosecute.

Because the contempt of Congress statute does not require the United States Attorney to refer to a grand jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim of executive privilege, we have not attempted to determine definitively what additional steps, if any, the United States Attorney could be required to take if such a matter were referred to a grand jury.

[22] See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority); *id.* at 17316 (citation against S. Sloan Colt, Chairman of the Board); *id.* at 17319 (citation against Joseph G. Carty, Secretary). The contempt resolution in each case read as follows:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee on the Judiciary as to the contumacious conduct of [name] in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon him and as ordered by the subcommittee, together with all of the facts in connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that [name] may be proceeded against in the manner and form provided by law.

119

rather than indictment, and therefore would not present the citations to a grand jury. *See* N.Y. Times, Nov. 17, 1960, at 1. On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials. *See* N.Y. Times, Nov. 26, 1960, at 1. The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so. Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962).[23]

In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute.[24] For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.

### 2. Judicial Opinions Interpreting the Language of § 194

Section 194 imposes similarly worded, nominally mandatory, referral obligations on both the Speaker of the House (or the President of the Senate) and the United States Attorney once a contempt of Congress resolution has been adopted by the House or Senate:

> *it shall be the duty* of the said President of the Senate or the Speaker of the House as the case may be, to certify, *and he shall so certify*, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States attorney, *whose duty it shall be* to bring the matter before the grand jury for its action.

(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be," might suggest a nondiscretionary obligation, the United States Court of Appeals for the District of Columbia Circuit has expressly held, at least with respect to the Speaker of the House, that the duty is *not* mandatory, and that, in fact, the Speaker has an obligation under the law, at least in some cases, to exercise his discretion in determining whether to refer a contempt citation. *Wilson* v. *United States*, 369 F.2d 198 (D.C. Cir. 1966). In *Wilson*, the court reversed a conviction for contempt of Congress on the ground that the Speaker had assumed that the statute did not permit any exercise of discretion by him

---

[23] The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

[24] We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice. *See* Department of Justice File No. 51–51–484 (1956). The file was closed because the Department concluded that there was an insufficient basis for prosecution.

120

and he had therefore automatically referred a contempt citation to the United States Attorney while Congress was not in session. The court based its conclusion that the Speaker was required to exercise his discretion on the longstanding practice of both the House and Senate and on congressional debates on contempt citations in which the houses had recognized their own discretion not to approve a contempt resolution. The court concluded that because full House approval of a contempt citation is necessary when Congress was in session, the Speaker is required to exercise some discretion when the House is not in session. 369 F.2d at 203–04.

Although the reasons underlying the court's decision not to impose a mandatory duty on the Speaker in *Wilson* do not necessarily require the same conclusion with respect to the United States Attorney, the decision at least supports the proposition that the seemingly mandatory language of § 194 need not be construed as divesting either the Speaker or the United States Attorney of all discretion.[25]

In several cases, the United States Court of Appeals for the District of Columbia Circuit has at least assumed that the United States Attorney retains discretion not to refer a contempt of Congress citation to a grand jury. In these cases, the court refused to entertain challenges to congressional subpoenas, at least in part on the ground that the prospective witnesses would have adequate subsequent opportunities to challenge a committee's contempt finding, including the opportunity to persuade the United States Attorney not to refer the case to a grand jury. For example, in *Ansara* v. *Eastland*, 442 F.2d 751 (D.C. Cir. 1971), the court declined to entertain a suit to quash a congressional subpoena on the ground that it would be inappropriate, as a matter of the exercise of its equitable power, to interfere with an ongoing congressional process. The court stated that protections were available "within the legislative branch or elsewhere," and then in a footnote indicated that these protections resided "perhaps in the Executive Branch *which may decide not to present the matter to the grand jury* (as occurred in the case of the officials of the New York Port Authority); or perhaps in the Grand Jury which may decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added).[26] *See also Sanders* v. *McClellan*,

---

[25] In this respect, we believe that *Wilson* implicitly disapproved the *dictum* of *Ex parte Frankfeld*, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

> It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it. He is required, under the language of the statute, to submit the facts to the grand jury.

*Id* at 916. The *Frankfeld* court expressly linked the responsibilities of the Speaker and the United States Attorney *Wilson* ruled that the Speaker's duty is discretionary, at least when the House is not in session. Therefore, since the Speaker's duty is *in pari materia* with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

[26] *Ansara* v. *Eastland* was cited with approval three times by Judge Smith in *United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C. 1983). Thus, although the opinion made a passing reference to the mandatory nature of referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

121

**-1100-**

463 F.2d 894 (D.C. Cir. 1972). In *United States Servicemen's Fund* v. *Eastland*, 488 F.2d 1252 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1974), the court agreed to review a challenge to a congressional subpoena brought by a third party, and it distinguished *Ansara* and *McClellan* on the ground that, because the congressional subpoena was issued to a third party, the plaintiffs had no alternative means to vindicate their rights. 488 F.2d at 1260. Among the alternative means the court cited was the right to "seek to convince the executive (the attorney general's representative) not to prosecute." *Id.*

These cases emphasize the particular significance of prosecutorial discretion in the context of the contempt of Congress statute. In general, with respect to any criminal allegation, prosecutorial discretion plays an important role in protecting the rights of the accused by providing an additional level of review with respect to the factual and legal sufficiency of the charges. This role is even more important when dealing with the contempt of Congress statute because, as the above cases demonstrate, witnesses generally have no opportunity to challenge congressional subpoenas directly. Thus, as the cases indicate, prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena.

Thus, the practice of the Congress and the available judicial authority support the proposition that the seemingly mandatory duties imposed on congressional officials by 2 U.S.C. § 194 are and were intended to be discretionary. The practice of the Executive Branch and the court decisions reflect a similarly discretionary role under the statute for the United States Attorney. Because, as the balance of this memorandum reveals, these interpretations are consistent with other common-law principles and avoid conclusions that would be at odds with the separation of powers, we believe that a correct reading of 2 U.S.C. § 194 requires recognition of the prosecutor's discretion with respect to referral to a grand jury.

3. Common-Law Prosecutorial Discretion

In addition to the court decisions that suggest that the United States Attorney may decide not to refer a contempt citation to a grand jury, the common-law doctrine of prosecutorial discretion weighs heavily against and, in our opinion, precludes an interpretation that the statute requires automatic referral. Because of the wide scope of a prosecutor's discretion in determining which cases to bring, courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated. The general rule is that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States* v. *Nixon*, 418 U.S. 683, 693 (1974). *See also Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869). The Attorney General and his subordinates, including the United States Attorneys, have the authority to exercise this discretion reserved to the Executive. *United States* v. *San Jacinto Tin Co.*, 125 U.S. 273 (1888); *The Gray*

122

*Jacket*, 72 U.S. (5 Wall.) 370 (1866). In general, courts have agreed with the view of Judge (now Chief Justice) Burger:

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). *See also United States* v. *Batchelder*, 442 U.S. 114 (1979); *Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. § 547, which states in part that "each United States Attorney, within his district, *shall* . . . prosecute *for all* offenses against the United States." (Emphasis added.) For example, in *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank. The court ruled: "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion." *Id.* at 234. *See also United States* v. *Brown*, 481 F.2d 1035 (8th Cir. 1973); *Bass Anglers Sportsman's Society* v. *Scholze Tannery, Inc.*, 329 F. Supp. 339 (E.D. Tenn. 1971); *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961); *United States* v. *Brokaw*, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications. For example, 42 U.S.C. § 1987 states that United States Attorneys are "authorized *and required* . . . to initiate prosecutions against all persons violating any of the provisions of [the federal criminal civil rights statutes]." (Emphasis added.) Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, *see* Note, *Discretion to Prosecute Federal Civil Rights Crimes*, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case. For example, in *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in § 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes." 477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "[s]uch language has never been thought to preclude the exercise of prosecutorial discretion." *Id.* Accord *Peek* v. *Mitchell*, 419 F.2d 575 (6th Cir. 1970); *Moses* v. *Kennedy*, 219 F. Supp. 762 (D.D.C. 1963), *aff'd sub nom. Moses* v. *Katzenbach*, 342 F.2d 931 (D.C. Cir. 1965). The language employed in 2 U.S.C. § 194 is neither stronger

123

nor more clearly mandatory than the language of § 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. *See* 2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double Jeopardy Clause under the criminal laws, even if the defendant had already been punished by Congress, because the act created two separate offenses, one against Congress and one against the United States). This principle was adopted by the Supreme Court when it upheld the constitutionality of the contempt of Congress statute. *In re Chapman*, 166 U.S. 661 (1897). In *Chapman*, the Court held that the contempt statute did not violate the Double Jeopardy Clause even though a defendant could be punished through Congress' inherent contempt power as well as under the contempt statute. The Court concluded that a refusal to testify involved two separate offenses, one against Congress and one against the United States, and that

> it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together.

166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent contempt power is the remedy for the offense against Congress, and that remedy remains within Congress' control. The crime of contempt of Congress, like any other federal statutory crime, is an offense against the United States that should be prosecuted as is any other crime. This criminal offense against the United States properly remains subject to the prosecutorial control of the Executive Branch. Therefore, because the contempt statute should be treated as are other federal criminal statutes, we do not believe that § 194 should be read to limit the common law prosecutorial discretion of the United States Attorney. There is nothing in the legislative history of the contempt of Congress statute that is inconsistent with this conclusion. *See* 42 Cong. Globe, 34th Cong., 3d Sess. 4030–44 (1857).

4. Constitutional Considerations

Our construction of § 194 is reinforced by the need to avoid the constitutional problems that would result if § 194 were read to require referral to a

124

grand jury. As discussed above, the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law. Although most cases expressly avoid this constitutional question by construing statutes not to limit prosecutorial discretion, the cases that do discuss the subject make it clear that common law prosecutorial discretion is strongly reinforced by the constitutional separation of powers. *See, e.g., Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966).

A number of courts have expressly relied upon the constitutional separation of powers in refusing to force a United States Attorney to proceed with a prosecution. For example, in *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961), the court declined to order the United States Attorney to commence a prosecution for violation of federal wiretap laws on the ground that it was

> clear beyond question that it is not the business of the Courts to tell the United States Attorney to perform what they conceive to be his duties.
>
> Article II, § 3 of the Constitution, provides that "[the President] shall take Care that the Laws [shall] be faithfully executed." The prerogative of enforcing the criminal law was vested by the Constitution, therefore, not in the Courts, nor in private citizens, but squarely in the executive arm of the government.

193 F. Supp. at 634. *See also Goldberg* v. *Hoffman*, 225 F.2d 463, 464–65 (7th Cir. 1955).[27]

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). In *Cox*, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:

> The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceed-

---

[27] These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. *See Rinaldi* v. *United States*, 434 U.S. 22 (1977); *United States* v. *Hamm*, 659 F.2d 624 (5th Cir. 1981); *United States* v. *Ammidown*, 497 F.2d 615 (D.C. Cir. 1973). The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." *United States* v. *Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483 (S.D.N.Y. 1964).

> ings and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

342 F.2d at 171 (footnotes omitted). *See also id.* at 182–83 (Brown, J. concurring); *id.* at 190–93 (Wisdom, J., concurring). Even the three dissenting judges in *Cox* conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward." *Id.* at 179. *See United States* v. *Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, *inter alia, Cox*).

Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies. *See Nader* v. *Saxbe*, 497 F.2d 676 (D.C. Cir. 1974); *Adams* v. *Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (per curiam); *NAACP* v. *Levi*, 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, § 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.'" *Nader* v. *Saxbe*, 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free

126

speech. *See, e.g., Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980); *Oyler* v. *Boles*, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is *not* to be performed by a given branch." *United States* v. *Brown*, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions. *See Buckley* v. *Valeo*, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See United States* v. *Brown*, 381 U.S. 437 (1965); *United States* v. *Lovett*, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810); *see United States* v. *Brown*, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

127

**-1106-**

328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. *A fortiori*, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment. A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment. The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all. *See Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Smith* v. *United States*, 375 F.2d 243, 248 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967). In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case.[28]

For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury. It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

---

[28] A statute giving one house of Congress the power to *direct* an Executive Branch official to take any particular action also raises a separate issue under the Supreme Court's decision in *INS* v. *Chadha*, 462 U.S. 917 (1983). Under the current contempt statute, the role of the House or Senate in simply referring a matter to the United States Attorney for possible prosecution raises no substantial issue under *Chadha* because the House or Senate is acting, in a sense, as a private citizen would — by reporting a possible violation of federal criminal law. Thus, *Chadha's* proscription of actions by one house (or two houses or a congressional committee) that are designed to have "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch" would be inapplicable. *Id* at 952. If the contempt statute precluded prosecutorial discretion, however, one house would be empowered to impose on the United States Attorney an affirmative legal duty to initiate a prosecution and to take certain steps in that prosecution. To empower one house of Congress in that manner would appear to be contrary to the clear language and rationale of *Chadha*. This is not, of course, to say that Congress' attempt to impose such an obligation on the United States Attorney by plenary legislation in a specific case would be constitutional; it is to say that a permanent mechanism to be triggered by the vote of one house raises a significant additional constitutional concern.

128

*B. Whether the Criminal Contempt of Congress Statute Applies to an*
   *Executive Official Who Asserts, On Direct Orders of the President,*
   *the President's Claim of Executive Privilege*

We next consider, aside from the issue of prosecutorial discretion, whether the criminal contempt of Congress statute is intended to apply, or constitutionally could be applied, to Presidential claims of executive privilege.

### 1. Previous Department of Justice Interpretations of the Contempt of Congress Statute

The Department of Justice has previously taken the position that the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President. In 1956, Deputy Attorney General (subsequently Attorney General) William P. Rogers took this position before a congressional subcommittee investigating the availability of information from federal departments and agencies. In a lengthy memorandum of law, Deputy Attorney General Rogers set forth the historical basis of executive privilege and concluded that in the context of Presidential assertions of the privilege, the contempt of Congress statute was "inapplicable to the executive departments." *See Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong., 2d Sess. 2933 (1956).[29] We are not aware of any subsequent Department position that reverses or weakens this conclusion, and we have found no earlier Department position to the contrary.

We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers.

### 2. The Legislative History of the Contempt of Congress Statute

Neither the legislative history nor the historical implementation of the contempt statute supports the proposition that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. The criminal contempt statute was originally enacted in 1857 during proceedings in the House of Representatives to consider a contempt of Congress citation against a New York Times correspondent who had refused to

---

[29] The memorandum cited, *inter alia*, a 1909 Senate debate over the issue of executive privilege in which Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the United States to order an executive department about like a servant." 43 Cong. Rec. 3732 (1909) Other historical examples cited by the report are discussed below.

129

answer questions put to him by a select committee appointed by the House to investigate charges of bribery of certain Representatives. As a result of the committee's unavailing efforts to obtain the reporter's testimony, the committee chairman introduced a bill designed "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to deliver testimony." 42 Cong. Globe 404 (1857). The bill was supported as a necessary tool in the House's efforts to investigate the allegations of bribery. *See id.* at 405 (remarks of the Speaker), 426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen. Brown). The bill was rushed through Congress in less than a week in order to permit the House to bring greater pressure on the reporter to reveal the alleged source of the congressional corruption. That the bill was sponsored by the select committee, and not the Judiciary Committee, further demonstrates that the bill was not the result of a general consideration of Congress' contempt power, but was enacted as an expedient to aid a specific investigation. Thus, the circumstances of the bill's passage certainly do not affirmatively suggest that Congress anticipated application of the statute to instances in which the President asserted a claim of executive privilege.

In fact, the sponsor of the bill disclaimed any such far-reaching implications. Representative Dunn asked the sponsor, Representative Orr, what impact the proposed bill would have on diplomatic secrets, one of the principal areas in which the President had historically asserted a privilege of confidentiality. Representative Dunn stated that use of the contempt statute by Congress to force disclosure of such material "might be productive of great mischief, and in time of war of absolute ruin of the country." 42 Cong. Globe 431 (remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a case" and emphasized that the bill should not be attacked "by putting instances of the extremest cases" because the "object which this committee had in view was, where there was corruption in either House of Congress, to reach it." *Id.* at 431 (remarks of Rep. Orr). The implication is that Congress did not intend the bill to apply to Presidential assertions of privilege.[30]

---

[30] The legislative history contains one reference to the application of the statute against executive officials. During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people." 42 Cong. Globe at 429. This statement does not, however, suggest that the statute was intended to apply to Presidential assertions of executive privilege. Indeed, virtually all previous assertions of executive privilege against Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt provisions against the President. Representative Marshall's statement, therefore, simply lends support to the proposition, with which we agree, that there are certain circumstances in which the congressional contempt statute might be utilized against an executive official, such as instances in which an executive official, acting on his own, engaged in disruptive and contumacious conduct during a congressional hearing, or in which an executive official, acting on his own, committed an offense. *See Marshall v. Gordon*, 243 U.S. 521 (1917). As the remainder of Representative Marshall's remarks demonstrate, the principal force driving the bill was Congress' desire to obtain an expeditious method for investigating questions regarding the integrity of Congress and not to provide Congress with a statute requiring the President to prosecute criminally those who had asserted the President's constitutionally based claim of executive privilege. We have found no evidence in the legislative history that supports an intention to apply the proposed statute in such a context.

130

In the years preceding the adoption of the statute, the President had, on a number of occasions, withheld documents from Congress under a claim of executive privilege, and many of these instances had been hotly contested in the public arena, and at least five of these instances occurred within the decade immediately preceding the enactment of the congressional contempt statute. *See supra* note 19 (collecting authorities). In spite of these highly visible battles over the subject of executive privilege, we have located no indication in the legislative history of the criminal contempt statute that Congress intended the statute to provide a remedy for refusals to produce documents pursuant to a Presidential claim of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is reinforced by Congress' failure, as far as we know, *ever* to utilize its inherent power of arrest to imprison Executive Branch officials for contempt of Congress for asserting claims of executive privilege, even though Congress had previously asserted and exercised its clearly recognized right to do so with respect to other instances of contempt by private citizens. *See Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821); *Ex Parte Nugent*, 18 F. Cas. 471 (C.C.D.C. 1848). The absence of any congressional discussion of the use of the contempt power against Presidential claims of executive privilege and Congress' previous failure ever to attempt to use its inherent contempt power in such cases, strongly suggest that the statute was not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional contempt statute. Since enactment of the statute in 1857, there have been numerous instances in which the President has withheld documents from Congress under a claim of executive privilege. Despite the fact that many of these disputes were extraordinarily controversial, until the citation of the EPA Administrator in December 1982, 125 years after the contempt statute was enacted, neither house of Congress had ever voted to utilize the contempt statute against a Presidential assertion of executive privilege. In fact, during congressional debates over Presidential refusals to produce documents to Congress, there have been express acknowledgements by members of Congress that Congress had no recourse against the Executive if the President asserted executive privilege. In 1886, the Senate engaged in a prolonged debate over President Cleveland's order to his Attorney General not to produce to Congress documents concerning the dismissal of a United States Attorney. The debate was intense, controversial, and memorable; 23 years after the debate a Senator termed it the "most remarkable discussion which was ever had upon this question [of the President's right to withhold documents from Congress]." 43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon). During this debate, even Senators who insisted upon the Senate's right to receive the documents recognized that if the President ordered them not to be produced, "there is no remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); *see also id.* at 2737 (1886) (remarks of Sen. Voorhees).[31]

---

[31] The only remedy then recognized by the Senators was the ultimate sanction of impeachment. *See* 17

Continued

131

Congress' failure to resort to the contempt statute during any of the multitude of robust conflicts over executive privilege during the previous century and one quarter and Congress' own explicit recognition that it was without a remedy should the President order the withholding of documents, strongly suggest that Congress never understood the statute to apply to an executive official who asserted the President's claim of executive privilege.[32]

### 3. Prudential Reasons for Construing the Contempt Statute Not To Apply to Presidential Assertions of Privilege

Courts traditionally construe statutes in order to avoid serious doubts about a statute's constitutionality. *Califano* v. *Yamasaki*, 442 U.S. 682, 693 (1979); *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932). As stated by the United States Court of Appeals for the District of Columbia Circuit, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of contrary legislative intent." *United States* v. *Brown*, 483 F.2d 1314, 1317 (D.C. Cir. 1973) (quoting *United States* v. *Thompson*, 452 F.2d 1333, 1337 (D.C. Cir. 1971), *cert. denied*, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation. A highly significant example may be found in the procedural history and holding of *United States* v. *Nixon*, 418 U.S. 683 (1974), in which the Court construed the limitation in 28 U.S.C. § 1291 (that appeals be taken only from "final" decisions of a district court) in order to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court. Although the plain language of that statute seemed to preclude an appeal of a lower court's

---

[31] (. . . continued)

Cong. Rec. 2737, 2800 (1886). As we note below, a much more effective and less controversial remedy is available — a civil suit to enforce the subpoena — which would permit Congress to acquire the disputed records by judicial order. *See also Senate Select Committee on Presidential Campaign Practices* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

[32] Congress' practices with respect to the contempt statute and the absence of any previous application of the statute to an Executive Branch official in these circumstances are highly probative of the meaning and applicability of the statute. In general, the Supreme Court has examined historical practice to determine the scope of Congress' powers. For example, in determining the scope of Congress' power to call and examine witnesses, the Court looked to the historical experience with respect to investigations and concluded:

> when [Congress'] practice in the matter is appraised according to the circumstances in which it was begun and to those in which it has been continued, it falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers; and therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful.

*McGrain* v. *Daugherty*, 273 U.S. 135, 174 (1927); *see also Fairbank* v. *United States*, 181 U.S. 283, 308 (1901). Moreover, the Court traditionally gives great weight to a contemporaneous construction of a statute by the agency charged with its execution. *See Power Reactor Development Co.* v. *Electricians*, 367 U.S. 396, 408 (1961); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U.S. 143, 153 (1946). In this instance, Congress is responsible for taking the first step in implementing the contempt statute. Therefore, Congress' previous interpretations and past uses of the statute are analogous to the contemporaneous construction of the agency charged with implementation of the statute, and are of significance in determining the meaning of the statute.

132

interlocutory ruling on an evidentiary matter, the Court construed the statute to permit an immediate appeal, without going through the otherwise required contempt proceeding:

> The traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the government.

418 U.S. at 691–92.

Congress itself has previously recognized the impropriety of resolving executive privilege disputes in the context of criminal contempt proceedings. During the dispute over the Watergate tapes, Congress provided a civil enforcement mechanism through which to test the President's claim of executive privilege. Senator Ervin, the sponsor of the bill, noted in his explanatory statement to the Senate that the use of criminal contempt "may be inappropriate, unseemly, or nonefficacious where executive officers are involved." 119 Cong. Rec. 35715 (1973). In defending the civil enforcement procedure before the district court, Congress argued that in that case the contempt procedures would be "inappropriate methods for the presentation and resolution of the executive privilege issue," and that a criminal proceeding would be "a manifestly awkward vehicle for determining the serious constitutional question here presented." Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, Civ. No. 1593–73, at 5 (D.D.C. Aug. 28, 1973).

The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. In *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction on the ground that the congressional subpoena had gone beyond the investigative authority delegated to the committee that issued the subpoena. After deciding this issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal contempt of Congress case against a public official. In *dictum*, the court noted that the "conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.

133

> Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

306 F.2d at 276. *See also United States* v. *Fort*, 443 F.2d 670, 677–78 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 932 (1971).

The analysis contained in *United States* v. *Nixon* demonstrates that principles of the separation of powers compel the application of special rules when a Presidential claim of a constitutional privilege is in tension with the request of another branch for confidential Executive Branch records. In discussing the issue of executive privilege in that case in response to a judicial subpoena, the Court stressed that the President's assertion of privilege was not to be treated as would a claim of a statutory or common law privilege by a private citizen. 418 U.S. at 708, 715. The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. *See, e.g.*, *Myers* v. *United States*, 272 U.S. 52 (1926) (upholding the President's removal power against limitations Congress sought to impose). The same special attention is provided, of course, to the other two branches when they assert responsibilities or prerogatives peculiar to their constitutional duties. *See, e.g.*, *Gravel* v. *United States*, 408 U.S. 606 (1972) (extending immunity of Speech and Debate Clause to congressional assistants); *Pierson* v. *Ray*, 386 U.S. 547 (1967) (granting absolute civil immunity for judges' official actions).

In this case, the congressional contempt statute must be interpreted in light of the specific constitutional problems that would be created if the statute were interpreted to reach an Executive Branch official such as the EPA Administrator in the context considered here.[33] As explained more fully below, if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.[34]

---

[33] The same principle applies to protect the constitutional functions of the other branches. The separation of powers would similarly seem to require that a statute that made it a crime to disregard a statute passed by Congress be read not to apply to a judge who struck down a congressional enactment as unconstitutional.

[34] In addition to the encroachment on the constitutionally required separation of powers that prosecution of an Executive Branch official in this context would entail, there could be a serious due process problem if such an official were subjected to criminal penalties for obeying an express Presidential order, an order which was accompanied by advice from the Attorney General that compliance with the Presidential directive was not only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in order to aid the President in the performance of his constitutional obligations to take care that the law was faithfully executed. *See Cox* v. *Louisiana*, 379 U.S. 559 (1965); *Raley* v. *Ohio*, 360 U.S. 423 (1959).

Continued

134

4. The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch Officials Who Assert the President's Claim of Privilege

The Supreme Court has stated that, in determining whether a particular statute

> disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon*, 418 U.S. at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Nixon* v. *Administrator of General Services*, 433 U.S. 425, 443 (1977). Thus, in analyzing this separation of powers issue, one must look first to the impact that application of the congressional contempt statute to Presidential assertions of executive privilege would have on the President's ability to carry out his constitutionally assigned functions. Then, if there is a potential for disruption, it is necessary to determine whether Congress' need to impose criminal contempt sanctions in executive privilege disputes is strong enough to outweigh the impact on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to enforce the laws of the United States and the necessarily included ability to protect the confidentiality of information vital to the performance of that task. As explained earlier in this memorandum, the authority to maintain the integrity of certain information within the Executive Branch has been considered by virtually every President to be essential to his capacity to fulfill the responsibilities assigned to him by the Constitution. Thus, as discussed above, and as the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is *presumptively valid* and can be overcome only by a clear showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information. *United States* v. *Nixon*, 418 U.S. at 708. In *Nixon*, the Court stated that "upon receiving a claim

---

[34] (. . . continued)

Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States* v. *Murdock*, 290 U.S. 389, 397–98 (1933); *Townsend* v. *United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See* Model Penal Code § 2.04(3)(b); *United States* v. *Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).

135

of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged." 418 U.S. at 713. The United States Court of Appeals for the District of Columbia Circuit has stated that this presumptive privilege initially protects documents "even from the limited intrusion represented by *in camera* examination of the conversations by a court." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc). The court went on to note:

> So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

*Id.* at 730. In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." *Id.* at 731 (emphasis added). Thus, the President's assertion of executive privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties.

Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility that he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege. As Judge Learned Hand stated with respect to the policy justifications for a prosecutor's immunity from civil liability for official actions,

> to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to [sic] satisfy a jury of his good faith.

*Gregoire* v. *Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949 (1950). The Supreme Court has noted, with respect to the similar issue of

136

executive immunity from civil suits, that "among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 752 n.32 (1982); *see also Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982); *Butz* v. *Economou*, 438 U.S. 478 (1978). Thus, the courts have recognized that the risk of civil liability places a pronounced burden on the ability of government officials to accomplish their assigned duties, and have restricted such liability in a variety of contexts. *Id.*[35] The even greater threat of criminal liability, simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair his ability to enforce the law, would unquestionably create a significant obstacle to the assertion of that privilege. *See United States* v. *Nixon*, 418 U.S. 683 (1974).

By contrast, the congressional interest in applying the criminal contempt sanctions to a Presidential assertion of executive privilege is comparatively slight. Although Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function, Congress could obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena.[36] Congress' use of civil enforcement power instead of the criminal contempt statute would not adversely affect Congress' ultimate interest in obtaining the documents. Indeed, a conviction of an Executive Branch official for contempt of Congress for failing to produce subpoenaed documents would not result in any order for the production of the documents.[37] A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate a legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process. Although

---

[35] *See also Barr* v. *Matteo*, 360 U.S. 564 (1959), *Spalding* v. *Vilas*, 161 U.S. 483 (1896) Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts. *Imbler* v. *Pachtman*, 424 U.S. 409 (1976), *Pierson* v. *Ray*, 386 U.S. 547 (1967).

[36] It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U S C. § 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under § 1331 in a previous civil enforcement action brought by the Senate. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 366 F. Supp. 51 (D.D.C. 1973). In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C Cir. 1974) (en banc); Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J on Legis. 145 (1984).

[37] *See* Hamilton and Grabow, *supra*, 21 Harv J. on Legis. at 151.

137

this significant *in terrorem* effect would surely reduce claims of executive privilege and, from Congress' perspective, would have the salutary impact of virtually eliminating the obstacles to the obtaining of records, it would be inconsistent with the constitutional principles that underlie executive privilege to impose a criminal prosecution and criminal penalties on the President's exercise of a presumptively valid constitutional responsibility. The *in terrorem* effect may be adequate justification for Congress' use of criminal contempt against private individuals, but it is an inappropriate basis in the context of the President's exercise of his constitutional duties. In this respect it is important to recall the statement of Chief Justice Marshall, sitting as a trial judge in the *Burr* case, concerning the ability of a court to demand documents from a President: "In no case of this kind would a court be required to proceed against the President as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807).[38] This fundamental principle, arising from the constitutionally prescribed separation of powers, precludes Congress' use against the Executive of coercive measures that might be permissible with respect to private citizens. The Supreme Court has stated that the fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential equality. *Humphrey's Executor* v. *United States*, 295 U.S. 602, 629–30 (1935).

Congress' use of the coercive power of criminal contempt to prevent Presidential assertions of executive privilege is especially inappropriate given the presumptive nature of the privilege. In cases involving congressional subpoenas against private individuals, courts start with the presumption that Congress has a right to all testimony that is within the scope of a proper legislative inquiry. *See Barenblatt* v. *United States*, 360 U.S. 109 (1959); *McGrain* v. *Daugherty*, 273 U.S. 135 (1927). As noted above, however, the President's assertion of executive privilege is presumptively valid, and that presumption may be overcome only if Congress establishes that the requested information "is demonstrably critical to the responsible fulfillment of the Committee's functions." *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d at 731; *see also United States* v. *Nixon*, 418 U.S. at 708–09. If Congress could use the power of criminal contempt to coerce the President either not to assert or to abandon his right to assert executive privilege, this clearly established presumption would be reversed and the presumptive privilege nullified.

Congress has many weapons at its disposal in the political arena, where it has clear constitutional authority to act and where the President has corresponding political weapons with which to do battle against Congress on equal terms. By wielding the cudgel of criminal contempt, however, Congress seeks to invoke

---

[38] The *Nixon* Court thought this statement significant enough in the context of an executive privilege dispute to quote it in full at two separate places in its decision *United States* v. *Nixon*, 418 U.S. at 708, 715.

138

the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried out the President's constitutionally authorized commands,[39] for asserting a constitutional privilege. That effort is inconsistent with the "spirit of dynamic compromise" that requires accommodation of the interests of both branches in disputes over executive privilege. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). In the AT&T case, the court insisted on further efforts by the two branches to reach a compromise arrangement on an executive privilege dispute and emphasized that

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*Id.* at 130. Congress' use of the threat of criminal penalties against an executive official who asserts the President's claim of executive privilege, flatly contradicts this fundamental principle.[40]

The balancing required by the separation of powers demonstrates that the contempt of Congress statute cannot be constitutionally applied to an executive official in the context under consideration. On the one hand, Congress has no

---

[39] One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

> when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y U. L. Rev. 231, 259.

[40] Even when a privilege is asserted by a cabinet official, and not the President, courts are extremely reluctant to impose a contempt sanction and are willing to resort to it only in extraordinary cases and only after all other remedies have failed. In *In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903 (1979), the court granted the government's mandamus petition to overturn a district court's civil contempt citation against the Attorney General for failing to turn over documents for which he had asserted a claim of privilege. The court recognized that even a *civil* contempt sanction imposed on an Executive Branch official "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted. *Id.* at 65. In the case of a Presidential claim of executive privilege, there is even more reason to avoid contempt proceedings because the privilege claim has been made as a constitutionally based claim by the President himself and the sanction involved is criminal and not civil contempt. The use of criminal contempt is especially inappropriate in the context under discussion because Congress has the clearly available alternative of civil enforcement proceedings.

139

compelling need to employ criminal prosecution in order to vindicate its rights. The Executive, however, must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance. Thus, when the major impact on the President's ability to exercise his constitutionally mandated function is balanced against the relatively slight imposition on Congress in requiring it to resort to a civil rather than a criminal remedy to pursue its legitimate needs,[41] we believe that the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.[42]

The construction of the statute that is dictated by the separation of powers is consistent with the legislative history of the statute and the subsequent legislative implementation of the statute. Although at the time the criminal statute was enacted, Congress was well aware of the recurring assertions of the right to protect the confidentiality of certain Executive Branch materials, it gave no indication that it intended the contempt statute to tread upon that constitutionally sensitive area. In the many debates on executive privilege since the adoption of the statute, Congress at times has questioned the validity of a Presidential assertion of privilege, but, until December of 1982, it never attempted to utilize the criminal contempt sanction to punish someone for a President's assertion of privilege. Regardless of the merits of the President's action, the fundamental balance required by the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution. We therefore conclude that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including predecisional Executive Branch deliberations, national security information, and sensitive law enforcement proceedings, from disclosure to Congress. No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege has recognized its validity and importance in the constitutional scheme. Executive privilege, properly asserted, is as important to the President as is the need for confidenti-

---

[41] *See* Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas,* 21 Harv. J. on Legis. 145 (1984).

[42] We believe that this same conclusion would apply to any attempt by Congress to utilize its inherent "civil" contempt powers to arrest, bring to trial, and punish an executive official who asserted a Presidential claim of executive privilege. The legislative history of the criminal contempt statute indicates that the reach of the statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect to the penalties imposed). *See* 42 Cong. Globe 406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well.

140

ality at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory element to an already explosive environment. We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution. The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials.[43] Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by [the Constitution]. In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.

---

[43] The Tenure of Office Act was, of course, later declared to have been unconstitutional. *Myers* v. *United States*, 272 U.S. 52 (1926).

141

\*         \*         \*

> How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no *right* to *defend* it against an act of Congress, sincerely believed by him to have been passed in violation of it?[44]

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt. Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury. In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[44] R. Warden, *An Account of the Private Life and Public Services of Salmon Portland Chase* 685 (1874). Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. *Id. See* M. Benedict, *The Impeachment and Trial of Andrew Johnson* 154–55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. *Id.* at 156.

142

# EXHIBIT K

# Whether the Department of Justice May Prosecute
# White House Officials for Contempt of Congress

The Department of Justice may not bring before a grand jury criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or former White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony.

February 29, 2008

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have asked whether the Department of Justice ("Department" or "DOJ") may bring before a grand jury criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or former White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony. We conclude it may not.

## I.

The President has asserted executive privilege and directed that certain documents and related testimony not be provided in response to subpoenas issued to Joshua Bolten, the Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, by the Committee on the Judiciary of the House of Representatives in connection with its inquiry into the decision of the Department of Justice to request the resignations of several United States Attorneys in 2006. The President also directed Ms. Miers to invoke her immunity as a senior presidential adviser from compelled congressional testimony and decline to appear in response to the subpoena from the Judiciary Committee. These directives were based on legal opinions from the Department advising that the assertions of privilege and immunity were legally proper. *See Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1 (2007) (addressing assertion of executive privilege); *Immunity of Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007) ("*Immunity of Former Counsel to the President*").

Notwithstanding the President's directives asserting executive privilege and instructing Ms. Miers not to testify, the House of Representatives cited Mr. Bolten and Ms. Miers for contempt of Congress, and the Speaker of the House yesterday referred the contempt citations to the United States Attorney for the District of

*Opinions of the Office of Legal Counsel in Volume 32*

Columbia for prosecution pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).[1] *See* Letter for Michael B. Mukasey, Attorney General, from Nancy Pelosi, Speaker of the House of Representatives (Feb. 28, 2008).

## II.

The Department of Justice has long taken the position, during administrations of both political parties, that "the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("*Application of 28 U.S.C. § 458*"). In 1956, Deputy Attorney General (and later Attorney General) William Rogers presented to Congress a Department of Justice study that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President had asserted executive privilege. *See Availability of Information From Federal Departments and Agencies: Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong. 2891, 2933 (1956). Twenty years later, Assistant Attorney General for the Civil Division Rex Lee stated in testimony before the Subcommittee on the Separation of Powers of the Senate Judiciary Committee that if Congress cited an Executive Branch official for contempt of Congress because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim was rightfully made, it would not, in the exercise of its prosecutorial discretion, present the matter to a grand jury." *Representation of Congress and Congressional Interests in Court:*

---

[1] Sections 192 and 194 of title 2 of the U.S. Code provide, in relevant part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers . . . willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

> . . . .

> Whenever a witness summoned as mentioned [above] fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . a statement of fact constituting such failure is reported to and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or Speaker of the House . . . to certify . . . the statement of facts aforesaid under the seal of the Senate or House . . . to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.

*Whether DOJ May Prosecute White House Officials for Contempt of Congress*

*Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

    The Department reaffirmed these principles in a detailed 1984 opinion prepared by Assistant Attorney General for the Office of Legal Counsel Theodore Olson. In that opinion, this Office explained that when an Executive Branch official complies in good faith with the President's assertion of executive privilege, "a United States Attorney is not required to refer a contempt citation . . . to a grand jury or otherwise to prosecute [the] Executive Branch official who is carrying out the President's instruction." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt of Congress*"). Drawing upon the principles explained by Mr. Rogers and Mr. Lee, canons of statutory construction, and basic constitutional principles, we explained that at least two legal conclusions supported the Department's longstanding interpretation of the criminal contempt statute:

> First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

*Id*.

    During the Clinton Administration, the Department explicitly reiterated in a published opinion issued by Assistant Attorney General for the Office of Legal Counsel Walter Dellinger that the "criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. § 458*, 19 Op. O.L.C. at 356. To apply "the contempt statute against an assertion of executive privilege," Mr. Dellinger explained, "would seriously disrupt the balance between the President and Congress." *Id.*

    Accordingly, based on this longstanding position, the refusal by Mr. Bolten and Ms. Miers to produce documents or testimony over which the President has asserted executive privilege did not constitute a crime, and therefore the Department may not pursue criminal contempt of Congress charges against them.

### III.

We believe that the same reasoning necessarily applies to Ms. Miers' invocation of immunity from compelled congressional testimony. The principles that protect an Executive Branch official from prosecution for declining to comply with a congressional subpoena based on a directive from the President asserting executive privilege similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper. *See Immunity of Former Counsel to the President*, 31 Op. O.L.C. at 192–93 (explaining Ms. Miers' immunity from compelled congressional testimony). In reaching the conclusion that a United States Attorney is not required to prosecute an Executive Branch official complying with the President's assertion of executive privilege, the Department reasoned that the separation of powers principles protected by executive privilege would be eviscerated if reliance on the privilege carried with it criminal liability:

> Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the [criminal contempt] statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege.

*Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 136.

In this respect, a senior presidential adviser's invocation of his or her immunity from compelled testimony is no different. Subjecting that adviser to prosecution for raising in good faith the President's separation of powers objection to a congressional subpoena would impermissibly undermine the President's constitutional authority. As Assistant Attorney General Olson's opinion analyzing this principle in the context of an assertion of executive privilege observed:

> If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise

*Whether DOJ May Prosecute White House Officials for Contempt of Congress*

of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

*Id.* at 142. The prosecution of a senior presidential adviser who has lawfully invoked her constitutional immunity from compelled congressional testimony would likewise be inconsistent with the Constitution.

In sum, based on the longstanding Justice Department position discussed above, the non-compliance with the Judiciary Committee subpoenas by Mr. Bolten and Ms. Miers did not constitute a crime. Accordingly, the Department may not bring the criminal contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers for criminal contempt of Congress.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT L

# Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges

Section 458 of title 28 does not apply to presidential appointments of judges to the federal judiciary.

December 18, 1995

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On April 25, 1995, President Clinton nominated Mr. William A. Fletcher to be a judge on the United States Court of Appeals for the Ninth Circuit. *See* 141 Cong. Rec. 11,243 (1995). While Mr. Fletcher's nomination has been pending before the United States Senate, questions have arisen as to whether his appointment would violate 28 U.S.C. § 458 because Mr. Fletcher's mother, the Honorable Betty B. Fletcher, has served as a judge on the same court since her appointment in 1979. Section 458 of title 28 provides as follows: "No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court."

We have previously opined that 28 U.S.C. § 458 does not apply to presidential appointments of judges to the federal judiciary. *See* Memorandum for Eleanor D. Acheson, Assistant Attorney General, Office of Policy Development, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges* (Mar. 13, 1995). In light of subsequent questions, you have asked whether we adhere to that position. For the reasons that follow, we do.

## A

Two bedrock principles of statutory construction guide our analysis. First, "we start, as we must, with the language of the statute." *Bailey v. United States*, 516 U.S. 137, 144 (1995). Second, "the meaning of statutory language, plain or not, depends on context." [1] *Id.* at 145. In this case, the particularly relevant constituents of context upon which statutory meaning depends are the constitutional framework within which all statutes are drafted and enacted, *see, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (stating principle that statutes be read to protect "the usual constitutional balance" of power), the statutory language taken as a whole, *see, e.g., King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (stating

---

[1] As Learned Hand explained, "words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their [meaning] from the setting in which they are used." *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (quoting *Federbush*); *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 25 n.6 (1988) (same).

350

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

the "cardinal rule" that a "statute is to be read as a whole"), and the amendment history of the statute, *see, e.g., Bailey*, 516 U.S. at 144 (taking account of amendment history of 18 U.S.C. § 924(c)(1) to determine the meaning of the word "use"). Based on our review, we conclude that the plain meaning of the statute precludes its application to presidential appointments to the federal judiciary.

We begin, as indicated, with the language of the statute. The current language of § 458 was adopted in 1911,[2] amending a statute originally enacted in 1887.[3] Quoting the language again, § 458 in its current form provides that: "No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court." The statute does not by its express terms apply to the President, nor does it expressly name judgeships as one of the offices to which a related person may not be appointed. We believe that the inapplicability of this provision to presidential appointments of federal judges is conclusively established by the text of this provision, the history of its amendment, and the text of the Act of 1911 taken as a whole. We elaborate on these reasons in Parts II and III of this memorandum, which to a considerable degree recapitulate the analysis contained in our earlier memorandum. Before revisiting these points, however, in this part we analyze a feature of the constitutional framework within which statutes must be read that, in our view, also dictates the conclusion that § 458 does not apply to presidential appointments of federal judges, even if the text and its textual history did not conclusively establish the point.

Any argument that § 458 does apply to presidential appointments of federal judges depends entirely upon the fact that, while the statute refers to positions to which related persons may not be appointed, it makes no mention at all of the appointing authority, worded as it is in the passive voice. In this context, however, this silence must lead to just the opposite conclusion, because of the well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). We can refer to this principle as a clear statement rule, one that is very well-established and that dictates the plain meaning of § 458.

Then-Assistant Attorney General William H. Rehnquist articulated this principle without limiting it to cases in which application of the statute would raise a constitutional question, opining that statutes "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Memorandum for Egil Krogh, Staff Assistant to the Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Closing of Government Offices in Memory of Former President*

---

[2] Act of Mar. 3, 1911, ch. 231, § 297, 36 Stat. 1087, 1168 ("Act of 1911").

[3] Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555.

351

*Opinions of the Office of Legal Counsel in Volume 19*

*Eisenhower* at 3 (Apr. 1, 1969) (''Rehnquist Memorandum''). Even if this unqualified statement of the principle is overly broad, the narrower formulation given above clearly covers §458, because its application to presidential appointments to the federal judiciary would raise serious constitutional questions regarding the President's authority under the Appointments Clause, U.S. Const. art. II, §2, cl. 2, as we explain below. Therefore, under the precedents of the Supreme Court as well as of the Department of Justice, §458 may not be read as applying to presidential appointments.

The principle that general statutes must be read as not applying to the President if they do not expressly apply where application would arguably limit the President's constitutional role has two sources. First, it is a long-recognized ''cardinal principle'' of statutory interpretation that statutes be construed to avoid raising serious constitutional questions. *See, e.g., Crowell v. Benson*, 285 U.S. 22 (1932). This canon of statutory construction is a cornerstone of judicial restraint in that it ''not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution.'' *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The canon is equally applicable to executive branch interpretations. *Appropriations Limitation for Rules Vetoed by Congress*, 4B Op. O.L.C. 731, 732 n.3 (1980).

The second source is the constitutional principle of separation of powers. The fundamental device by which the framers sought to prevent tyranny was the division of power to prevent an excessive accumulation in any single repository. Thus, the Constitution divides power between the federal and the state governments as well as among the federal government's three coordinate and independent branches. *See Gregory*, 501 U.S. at 458. The clear statement rule exists in order to protect ''th[is] 'usual constitutional balance' '' of power. *See id.* at 460 (quoting *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985))), *Franklin*, 505 U.S. at 801 (''requir[ing] an express statement by Congress before assuming it intended'' to subject presidential action to judicial review); *id.* (''As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.''). Given the central position that the doctrines of federalism and separation of powers occupy in the Constitution's design, this rule also serves to ''assure[ ] that the legislature has in fact faced, and intended to bring into issue, the critical matters'' of the balance of power among the three branches of the federal government, in the context of separation of powers, and between the federal and state governments, in the context of federalism. *See Gregory*, 501 U.S. at 461; *United States v. Bass*, 404 U.S. 336, 349 (1971).

This clear statement rule has been applied frequently by the Supreme Court as well as the executive branch with respect to statutes that might otherwise be

352

*Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges*

susceptible of an application that would affect the President's constitutional prerogatives, were one to ignore the constitutional context. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act ("APA"), 5 U.S.C §§701–706, authorized "abuse of discretion" review of final actions by the President. The APA authorizes review of final actions by "agencies," which it defines as "each authority of the Government of the United States." 5 U.S.C. §701(b)(1). From this definition, the APA expressly exempts Congress, the courts, the territories, and the District of Columbia government — but not the President.

Even though the statute defined agency in a way that could include the President and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court:

> [t]he President is not [expressly] excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

505 U.S. at 800–01. To amplify, she continued, "[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements." *Id.* at 801. If anything, the case for reading the APA provision as applying to the President was stronger than is the case with respect to §458, because the APA contains a list of express exceptions to its broad coverage and that list does not include the President. One might have contended that the omission of the President from a list of persons excluded is sufficiently clear evidence of a congressional decision to include him within the reach of the APA to alter the otherwise applicable rule of constitutional context. To the contrary, however, the Court affirmed the principle that the inclusion of the President must be express.

In a case that is closely analogous and that involves the President's appointment power, the Supreme Court held that the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. §2, does not apply to the judicial recommendation panels of the American Bar Association because interpreting the statute as applying to them would raise serious constitutional questions relating to the President's constitutional authority to appoint federal judges. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989). The FACA imposes open meeting and reporting requirements on advisory committees, which it defines to be any committee or similar group that is "utilized by one or more agencies,

353

*Opinions of the Office of Legal Counsel in Volume 19*

in the interest of obtaining advice or recommendations for the President." 5 U.S.C. app. § 3(2)(c). Two public interest groups, Public Citizen and the Washington Legal Foundation, sought to have FACA applied to the ABA judicial screening committees. The Court unanimously rejected the public interest groups' argument. The majority ruled that while a "straightforward reading," *Public Citizen*, 491 U.S. at 453, of FACA would seem to require its application to the ABA committee, the "cardinal principle" of statutory interpretation that a statute be interpreted to avoid serious constitutional question drove the majority to interpret FACA as not applying to the ABA committee. *Id.* at 465–67. Notably, the majority stated, "[o]ur reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government," and "[t]hat construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable." [4] *Id.* at 466.

A recent Supreme Court case that applied the clear statement rule in protecting the constitutional separation of powers is *Sale v. Haitian Centers Council*, 509 U.S. 155 (1993). This case dealt with the extraterritorial application of the Refugee Act.[5] Prior to 1980, the act provided that the Attorney General was "authorized to withhold deportation of any alien *within the United States*" who was a refugee.[6] In 1980, the statute was amended to delete the "within the United States" language and to make it mandatory that the Attorney General not deport the refugee.[7] The petitioners, an organization advocating on behalf of Haitian refugees, plausibly argued that, by deleting "within the United States," Congress plainly meant to give the act extraterritorial application. *See id.* at 170. The Court rejected this argument, holding that "Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested. That presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility." *Id.* at 188.[8]

*Sale* is but another example of the clear statement principle: Statutes will be read to exclude what they do not explicitly include when the inclusionary reading would involve a possible conflict with the President's unique responsibilities, so as potentially to upset the constitutional balance of powers. The President's constitutional appointment power, expressly assigned to him and him alone in Article II, is similarly a unique responsibility of the President, one that has been recently

---

[4] The three concurring justices reached the merits and found that application of the FACA would violate the Appointments Clause (as opposed to raising a serious question). 491 U.S. at 482–89 (Kennedy, J., concurring).

[5] Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102, 107.

[6] Immigration and Nationality Act of 1952, Pub. L. No. 82–414, § 243(h), 66 Stat. 163, 214 (1952) (emphasis added).

[7] Pub. L. No. 96–212, § 203(e), 94 Stat. at 107.

[8] To the same effect, *see American Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989).

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

termed a "central feature" of the President's constitutional role under Article II. *Freytag v. Commissioner*, 501 U.S. 868, 902 (1991) (Scalia, J., concurring).

In addition to the numerous Supreme Court precedents,[9] this Department has frequently applied the clear statement rule in the context of the separation of powers between the executive and legislative branches. For example, we applied this rule to a closely analogous question. We were asked whether the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), prohibits the President from considering the age of judicial candidates when determining whom to nominate for federal judgeships. *See Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We concluded that the ADEA should not be read to apply to the presidential appointment of federal judges:

> The power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President. It provides one of the few administrative mechanisms through which the President can exert a long-term influence over the development and administration of law in the courts. The President's present power to exert that influence to the fullest by preferring candidates for appointment who are likely to have long, rather than short, careers on the bench is therefore a matter of constitutional significance. Whether Congress could deny the President that power by requiring him to disregard utterly the age of candidates for appointment has never been considered by the courts, but because of the gravity of the constitutional questions it raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way, absent a very clear indication in the [ADEA].

*Id.* at 389.

In another important instance, Congress sought to apply the criminal contempt of Congress statute against the administrator of the Environmental Protection Agency when she asserted a claim of executive privilege on behalf of the President. That statute has a broad formulation that is similar to the formulation of § 458. Specifically, it applies to "[e]very person who ha[s] been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers." 2 U.S.C. § 192.

---

[9] The foregoing discussion analyzes only a sample of these precedents. *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), is yet another such example. A former executive branch employee brought a variety of claims against former President Nixon arising from the employee's termination. The Court held that the President was immune from suit because Congress had failed to create a cause of action expressly against the President of the United States, stating "[w]e consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749; *see also id.* at 748 & n.27. Other examples include *United States ex rel. French v Weeks*, 259 U.S. 326, 332 (1922), and *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).

355

*Opinions of the Office of Legal Counsel in Volume 19*

We concluded that, despite the broad language, the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984). First, we examined the legislative history of the contempt statute and determined that nothing in that history expressed an intent to apply the statute in the context of assertions of executive privilege. *Id.* at 129–32. We then cited the general rule that statutes are to be construed to avoid serious constitutional questions and further elaborated that, ''[w]hen a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation.'' *Id.* at 132. We then discussed how application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress. Because Congress had no ''compelling need'' to create this disruption, ''the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.'' *Id.* at 140.

Then-Assistant Attorney General William Barr opined that the Anti-Lobbying Act, 18 U.S.C. § 1913, does not apply fully against the President. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 304–06 (1989). The Anti-Lobbying Act prohibits any appropriated funds from being ''used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress.'' 18 U.S.C. § 1913. The statute provided an exception for communications by executive branch officers and employees if the communication was made pursuant to a request by a member of Congress or was a request to Congress for legislation or appropriations. Assistant Attorney General Barr concluded that applying the Act as broadly as its terms might otherwise allow would raise serious constitutional questions as an infringement of the President's Recommendations Clause power.

It is also the long-standing position of the Department of Justice that 18 U.S.C § 208 does not apply to the President. That statute prohibits any ''officer or employee of the executive branch'' from ''participat[ing] personally and substantially'' in any particular matter in which he or she has a personal financial interest. *Id.* In the leading opinion on the matter, then-Deputy Attorney General Laurence Silberman first determined that the legislative history disclosed no intention to cover the President and doing so would raise ''[s]ome doubt . . . as to the constitutionality'' of the statute, because the effect of applying the statute to the President would be to impose a qualification on his serving as President. *See* Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, *Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974).

356

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

In the Rehnquist Memorandum, we considered a statute the text of which is similar to § 458. 5 U.S.C. § 6105 provides that, "[a]n Executive department may not be closed as a mark to the memory of a deceased former official of the United States." Then-Assistant Attorney General William Rehnquist first reviewed the legislative history and determined that there was nothing to indicate that Congress meant to prohibit the President from closing a department as a mark to the memory of a deceased former official and that instead the purpose of the act was to prevent department heads from closing their departments. He then noted the general rule that statutes "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Rehnquist Memorandum at 3.

In summary, there are numerous precedents of the Supreme Court as well as of the Department of Justice [10] holding that a statute that does not by its express terms apply to the President may not be applied to the President if doing so would raise a serious question under the separation of powers.[11] We believe there to be no dispute that such a serious question would be raised were § 458 read to apply to presidential appointments to the federal judiciary. In the next section we amplify on the reasons for that conclusion.

**B**

Congressional attempts to limit the class of persons from whom the President may appoint the highest officers of the government, including judges, raise serious constitutional concerns. The Appointments Clause provides that the President

---

[10] Again, the foregoing discussion covers a small sample of the Department's applications of this principle. Other significant examples include: *The President's Compliance with the 'Timely Notification' Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159 (1986); *Inter-Departmental Disclosure of Information Submitted under the Shipping Act of 1984*, 9 Op. O.L.C. 48 (1985); *Removal of Members of the Advisory Council on Historic Preservation*, 6 Op. O.L.C. 180, 185 n.7 (1982).

[11] The clear statement principle we have identified does not apply with respect to a statute that raises no separation of powers questions were it to be applied to the President. So, for instance, the Department of Justice has construed the federal bribery statute as applying to the President even though it does not expressly name the President. Memorandum for Laurence H. Silberman, Deputy Attorney General, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Whether Governor Rockefeller, If Appointed as Vice President, Is Required to Execute a Blind Trust in Order to Avoid Possible Violation of 18 U.S.C. § 208* at 2 (Aug. 20, 1974). 18 U.S.C § 201 establishes that "[w]hoever, being a public official" receives a bribe commits a criminal offense. *Id.* § 201(c)(1)(B). "Public official" is defined as a "Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States . . . in any official function . . . ." *Id.* § 201(a)(1). Application of § 201 raises no separation of powers question, let alone a serious one. The Constitution confers no power in the President to receive bribes; in fact, it specifically forbids any increase in the President's compensation for his service while he is in office, which is what a bribe would function to do. *See* U.S. Const. art. II, § 1, cl. 7. Moreover, the Constitution expressly authorizes Congress to impeach the President for, inter alia, bribery. *Id.* § 4. The Constitution further provides that any party impeached and convicted may "nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Id.* art. I, § 3. We also opined that the Federal Advisory Committee Act applies to the Department of Justice Journal Board, because this application raises no separation of powers concerns. *See Application of Federal Advisory Committee Act to Editorial Board of Department of Justice Journal*, 14 Op. O.L.C. 53 (1990).

357

*Opinions of the Office of Legal Counsel in Volume 19*

> shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint Ambassadors, other Public Ministers and Con-
> suls, Judges of the supreme Court, and all other Officers of the
> United States . . . but the Congress may by Law vest the Appoint-
> ment of such inferior Officers, as they think proper, in the President
> alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Because the Constitution gives the President alone
the power to nominate non-inferior officers of the United States, any attempt by
Congress to restrict his choice of nominees, otherwise than by the Senate's
refusing its consent to a nomination, is questionable under the Constitution. We
hasten to add that we do not take a final position on the difficult question of
whether, and under what circumstances, Congress has authority to impose a quali-
fication requirement on a constitutional office. It is sufficient for the purposes
of this memorandum to demonstrate that applying a restriction such as that con-
tained in § 458 to presidential appointment of federal judges would at a minimum
raise a serious constitutional question. This office has not had the occasion to
opine on this issue, and we cite previous statements for the sole purpose of dem-
onstrating the difficulty and seriousness of the questions that the issue raises.

As the United States Court of Appeals for the District of Columbia Circuit
recently wrote, "Congressional limitations — even the placement of burdens — on
the President's appointment power may raise serious constitutional questions. . . .
Presidents have often viewed restrictions on their appointment power not to be
legally binding." *Federal Election Comm'n v. NRA Political Victory Fund*, 6 F.3d
821, 824 (D.C. Cir. 1993) (Silberman, J.), *cert. dismissed*, 513 U.S. 88 (1994).
To support this conclusion, the court cited, as examples, statements issued by
President Bush upon signing various pieces of legislation. *See Statement on
Signing the Cranston-Gonzalez National Affordable Housing Act*, 2 Pub. Papers
of George Bush 1699, 1701 (Nov. 28, 1990) ("National Affordable Housing Act
Statement"); *Statement on Signing the National and Community Service Act of
1990*, 2 Pub. Papers of George Bush 1613, 1614 (Nov. 16, 1990); *Statement on
Signing the Intelligence Authorization Act, Fiscal Year 1990*, 2 Pub. Papers of
George Bush 1609, 1610 (Nov. 30, 1989). President Bush asserted, for example,
that limitations set out in legislation "do[] not constrain the President's constitu-
tional authority to appoint officers of the United States, subject only to the advice
and consent of the Senate." National Affordable Housing Act Statement at 1701,
*quoted in part in NRA Political Victory Fund*, 6 F.3d at 824–25.[12]

---

[12] The position taken by President Bush was based on the principles set out in Justice Kennedy's concurring
opinion in *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989), joined by Chief Justice Rehnquist
and Justice O'Connor. "By its terms," Justice Kennedy wrote, "the [Appointments] Clause divides the appointment
power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold
its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process
of choosing the person who will be nominated for appointment." *Id.* at 483. Furthermore, "where the Constitution
by explicit text commits the power at issue to the exclusive control of the President, we have refused to tolerate

358

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

There has been a particular concern about applying qualifications for appointments of Article III judges. In 1979, for example, our Office rejected the argument that the ADEA applied to the President's choice of nominees for judgeships. *Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We there accepted that Congress might impose some qualifications on some constitutional offices, but nevertheless noted that applying the ADEA to judicial nominations would constrain the President's ability to exercise a long-term influence on the development of the law. We concluded that, "because of the gravity of the constitutional questions [a requirement to ignore the age of potential nominees] raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way." *Id.* at 389. As we stressed, "[t]he power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President." *Id.*

The Constitution vests in the President the power to nominate judges and vests in the Senate the power to give, or refuse, its advice and consent to the nominations. Without taking a position on whether, and under what circumstances, Congress has authority to impose qualification requirements on constitutional offices, it is clear that, if a Congress tried to bind future Presidents and future Senates by imposing statutory constraints on eligibility, such legislation would raise serious constitutional questions.

## II

The clear statement rule settles the meaning of § 458. Section 458 does not apply to presidential appointments of federal judges. Even without applying this constitutionally based principle, however, analysis of the text of § 458, its predecessor, and the text of the Act of 1911 taken as a whole, establishes the same result. That result is further supported by every available piece of contemporaneous, extra-statutory evidence of the understanding of members of Congress, as well as by a consistent practice of non-application of the statute to the appointment of federal judges. In this part, we discuss the meaning of § 458 as it might be ascertained on the face of the statutes themselves, without reference to the clear statement principle. In the subsequent part, we review the contemporaneous congressional understandings of the statute's meaning. Finally, we review some of the instances in which related persons within the meaning of the statute have been appointed to the federal bench by the President.

As indicated earlier, the present statute appears to have originated as Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555. In its original form, the provision stated that:

---

*any* intrusion by the Legislative Branch." *Id.* at 485. With regard to the highest officers of the government, therefore, the President "has the sole responsibility" for making nominations, *id.* at 487, and Congress may not intrude.

359

> no person related to any justice or judge of any court of the United
> States by affinity or consanguinity, within the degree of first cousin,
> shall hereafter be appointed *by such court or judge* to or employed
> by such court or judge in any office or duty in any court of which
> such justice or judge may be a member.

*Id.* (emphasis added). In that version, the statute referred specifically to appointments *by the courts or judges*, and could not be understood to encompass presidential appointments as well. In our constitutional scheme, judicial appointments are not made by judges, but rather have always been vested in the President with the advice and consent of the Senate.

The statute was next codified as Act of Aug. 13, 1888, ch. 866, §7, 25 Stat. 433, 437. In that form too, it prohibited only the appointment of any person related to any federal justice or judge within the degree of first cousin "by such court or judge."

This provision was repealed by the Act of Mar. 3, 1911, ch. 231, §297, 36 Stat. 1087, 1168.[13] The language substituted for the repealed provision did not, in terms, refer only to appointment "by such court or judge." Instead, it stated:

> No person shall be appointed to or employed in any office or duty
> in any court who is related by affinity or consanguinity within the
> degree of first cousin to the judge of such court.

*Id.* §67, 36 Stat. at 1105.

The repeal and re-enactment in 1911 left the description of the offices or duties to which related persons may not be appointed unchanged. It did alter the description of the persons who may not make such appointments. Whereas prior to 1911 only a "court or judge" was prohibited from appointing related persons to such offices or duties, after 1911, the prohibition was simply that no related person could be appointed to such offices or duties. The evident purpose of the change was to remove an obvious loophole. Prior to 1911, the clerk of court, or the chief bailiff, or the chief stenographer, or any other official who worked in a court could appoint relatives of sitting judges to positions on his or her staff, without

---

[13]The Act of Mar. 3, 1911, was designed to restructure the federal judicial system. As Senator, later Justice, Sutherland explained, the legislation was:

> framed upon the theory that we shall hereafter have but one court of original jurisdiction, instead of two, as we have at present . . . . [W]e have to-day two separate and distinct courts of jurisdiction — a circuit court of the United States and a district court of the United States. Jurisdiction has been conferred upon the district court in a class of cases which might as well have been conferred upon the circuit court and jurisdiction has been conferred upon the circuit court which might as well have been conferred upon the district court . . . . There is absolutely no reason why the circuit court should possess a certain class of jurisdiction rather than that it should be possessed by the district court. The vital thing is to have a court of original jurisdiction for the trial of cases, and then a court of appellate jurisdiction, which may review the decisions of the trial court

46 Cong. Rec. 2137 (1911).

*Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges*

violating the statute. Because such individuals as these might possibly be suscep-
tible to influence by sitting judges, the predecessor statute seemed to permit an
evasion of the statute's anti-nepotistical purposes through the expedient of having
a non-judge who worked in the court appoint a judge's relative.

Beyond closing this appointment loophole, the statute remained otherwise intact.
Because the language of the statute describing the offices or duties to which
related persons may not be appointed remained the same, no change was made
in the class of offices or duties covered by the statute—a class that at no time
included judges.

This conclusion is reinforced by a rule of construction that was written into
the Act of 1911 itself, which reads as follows:

> [t]he provisions of this Act, so far as they are substantially the same
> as existing statutes, shall be construed as continuations thereof, and
> not as new enactments, and there shall be no implication of a
> change of intent by reason of a change of words in such statute,
> unless such change of intent shall be clearly manifest.

*Id.* §294, 36 Stat. at 1167.

With respect to its description of the offices or duties to which related persons
may not be appointed, section 297 of the Act is ''substantially the same'' as prior
law. Nor is any ''change of intent . . . clearly manifest'' by reason of the lin-
guistic change from the earlier provision. Accordingly, following the rule of
construction set forth in the statute itself, we find that it does not vary prior law—
judgeships were not in that class prior to 1911, and they are not in that class
subsequent to 1911.[14]

---

[14] We note that our reading does not violate the maxim of statutory construction that words in a statute should
not be construed so as to render them meaningless. It is true that the vast majority of the positions to which §458
applies are ''employments'' rather than ''offices.'' For a discussion of the difference between an employment and
an office, see *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867); *United States v. Germaine*, 99 U.S. 508
(1878); *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice). Never-
theless, the Supreme Court long ago concluded that the clerk of a district court is an officer in the constitutional
sense, *Ex Parte Hennen*, 38 U.S. (13 Pet.) 230 (1839), and has recently reaffirmed that view, *see Morrison v. Olson*,
487 U.S. 654 (1988). This office has traditionally been filled by an appointment ''by [a] court[ ] of law,'' specifically
by the chief judge of the relevant district or circuit. We believe that the provision would continue to apply to appoint-
ments to the office of clerk by a federal judge.

We also note that our view avoids a serious question regarding the legality of the recent designation of District
Judge Gordon Thompson, Jr., to sit by designation on a panel of the United States Court of Appeals for the Ninth
Circuit with his brother, Judge David Thompson. *See* Howard Mintz, *Nepotism Law Threatens Nomination; Mother
and Child Reunion on Bench?*, Legal Times, Dec. 11, 1995, at 8. Because we do not believe that §458 applies
to the office of judge, it is our conclusion that Chief Judge J. Clifford Wallace could not have violated §458 by
exercising his authority under 28 U.S.C §292(a) to designate District Judge Thompson to sit as a Judge on a Ninth
Circuit panel with his brother.

### III

We have reviewed the legislative debate over the Act of 1911, and have found no evidence that the textual alteration of the earlier statutory language was intended to work any change in the class of offices or duties covered, and certainly none that it was meant to reach presidential appointments to the federal bench. Moreover, contemporaneous and near contemporaneous evidence of Congress's own understanding clearly substantiates that Congress did not intend to extend the scope of the earlier prohibition to include judicial appointments by the President. Section 297 of the Act of Mar. 3, 1911, was to go into effect on January 1, 1912, abolishing the *circuit courts* and causing the *district courts* to succeed them, so that clerks would have to be appointed for the district courts. Shortly before the law went into effect, it was pointed out in Congress that these changes "would prevent any man who is related within certain degree by affinity or consanguinity to the district judge from being appointed clerk." 48 Cong. Rec. 309 (1911) (remarks of Rep. Clayton). Thus, even incumbents who had not been appointed to circuit court clerkships by judicial relatives would be ineligible to be appointed to clerkships in the succeeding district courts if it happened that their close relatives sat on those district courts. Several members of Congress objected to that unforeseen and unintended outcome. Legislation was introduced, and eventually adopted, to "grandfather in" such incumbents.[15]

In the course of the House debate on this amendatory measure, several members adverted to the prohibition of the then-recent prior law. Congressman Mann described section 297 as "providing that *the judge of the Federal court* shall not be permitted to appoint his first cousin an officer of the court . . . . It should be the policy of the country to uphold the dignity of the Federal bench, to guard against the possibility of favoritism *on the part of the judges* because of close kinship." 48 Cong. Rec. at 310 (remarks of Rep. Mann) (emphasis added). Similarly, in colloquy, Mr. Hardy asked if the proposed amendment "opposes the appointment of relatives by public officials?", and Mr. Bartlett, referring to section 297, responded that "[t]he original section, I apprehend, had that purpose in view." *Id.* Plainly, then, the members of the House interested in the amendment in the December 1911 debate understood that the March 1911 enactment had only restricted the power of judges to appoint their near kin to positions with their courts. Although these remarks occurred after the enactment of section 297, they were made only a few months after that section had become law, and thus provide useful evidence of what the enacting Congress intended by it.

Later codifications carried forward the language adopted in 1911, with changes not relevant here. *See* Act of June 25, 1948, ch. 646, §458, 62 Stat. 869, 908;

---

[15] *See* Act of Dec. 21, 1911, ch. 4, 37 Stat. 46 ("[N]o such person at present holding a position or employment in a circuit court shall be debarred from similar appointment or employment in the district court succeeding to such circuit court jurisdiction.").

362

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*

H.R. Rep. No. 80–308, at A55 (1947). In light of this legislative history, we see no reason to suppose that Congress ever intended to do more than to make fully effective the original prohibition against nepotistical appointments *by judges*, and that the sole function of the change of 1911 was to close a loophole in the original statutory scheme.

IV

Finally, we note that the consistent practice since the present version of § 458 was enacted in 1911 has been to construe the statute as not applying to presidential appointments. On at least three occasions since 1911, the President has appointed and the Senate has confirmed relatives within the statutory degree of consanguinity to the same court. In 1914, President Woodrow Wilson, just three years after the enactment of § 458 in its present form, appointed Augustus Hand to be a District Judge for the Southern District of New York, even though his first cousin, Learned Hand, had been a District Judge of that court since 1909. In 1927, President Coolidge elevated Judge Augustus Hand to be a Circuit Judge on the United States Court of Appeals for the Second Circuit, even though Judge Learned Hand had been appointed to that court three years earlier. More recently, in 1992, President Bush appointed and the Senate confirmed Judge Morris Arnold to be a Circuit Judge on the United States Court of Appeals for the Eighth Circuit, although his brother, Judge Richard Arnold, was already a member of that body.

In addition, if the practical construction of § 458 by the President and the Senate were to hold that it applies to presidential appointments, there would be a significant question as to the validity of a number of appointments where one relative served on an appeals court while another served on a district court. Specifically, it is not clear whether, for purposes of § 458, a district court is a component of the court of appeals for the circuit in which the district is located. Most recently, Diana Motz was confirmed and appointed to the United States Court of Appeals for the Fourth Circuit in 1994, while her husband, Frederick Motz, was a judge for the District of Maryland.

We are not aware of anyone ever proposing that § 458 applies to presidential appointments of federal judges. In this light, applying § 458 to presidential appointments of federal judges would represent a novel construction of the statute. We do not reject this construction, however, because it is novel. We reject it because it is contrary to the statute's language, structure, and purpose, as well as the consistent practice under that statute from the date of its enactment.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

363

# EXHIBIT M

# EXECUTIVE BRANCH LEGAL INTERPRETATION: A PERSPECTIVE FROM THE OFFICE OF LEGAL COUNSEL

RANDOLPH D. MOSS[*]

## TABLE OF CONTENTS

Introduction ........................................................................... 1303
   I. The Neutral Expositor Model ...................................... 1306
  II. Counterarguments and Refinements ............................ 1316
      A. The Respective Roles of Lawyer and Client ......... 1316
      B. Legal Indeterminacy ............................................. 1321
      C. Democratic Accountability .................................... 1326
Conclusion ............................................................................ 1330

## INTRODUCTION

Much has been written about the role of the courts in interpreting the law. In contrast, executive branch legal interpretation has received considerably less attention.[1] The relative inattention to the executive branch as an

---

   * Assistant Attorney General, Office of Legal Counsel, United States Department of Justice. I am grateful to Evan Caminker, Maame Ewusi-Mensah, Vicki Jackson, Dawn Johnsen, Dan Koffsky, Marty Lederman, Trevor Morrison, Jeff Powell, and Bill Treanor for helpful comments on drafts of this Article.

   1. A number of scholars have recently directed their attention to executive branch legal interpretation. Among these important contributions is the first "case book" collecting and considering legal opinions of the Attorneys General. *See* H. JEFFERSON POWELL, THE CONSTITUTION AND THE ATTORNEYS GENERAL (1999); *see also Symposium: Executive Branch Interpretation of the Law*, 15 CARDOZO L. REV. 21-523 (1993); 1 LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 264-67 (3d ed. 2000); Michael Stokes Paulsen, *The Most Dangerous Branch: Executive Power to Say What the Law Is*, 83 GEO. L.J. 217 (1994) [hereinafter Paulsen, *The Most Dangerous Branch*]; Christopher L. Eisgruber, *The Most Competent Branches: A Response to Professor Paulsen*, 83 GEO. L.J. 347 (1994); Sanford Levison, *Constitutional Protestantism in Theory and Practice: Two Questions for Michael Stokes Paulsen and One for His Critics*, 83 GEO. L.J. 373 (1994); Larry Alexander & Frederick Schauer, *On Extrajudicial Constitutional Interpretation*, 110 HARV. L. REV. 1359 (1997); *Symposium, Elected Branch Influences in Constitutional Decisionmaking*, 56 LAW & CONTEMP. PROBS. 1 (Autumn 1993); John Harrison, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 371 (1988).

expositor of the law is striking given the extraordinary breadth and signifi-
cance of executive branch legal interpretation.  In the process of executing
the laws, the executive branch is perpetually involved in giving the law
meaning.  From questions as profound as the circumstances under which
the United States may commit its troops overseas[2] or assert executive
privilege,[3] to issues as mundane as when a regulation is deemed "promul-
gated" under the Administrative Procedure Act,[4] the executive branch has
historically interpreted—and thereby helped define—the law.  In the vast
majority of cases, moreover, executive branch interpretation is not sub-
jected to judicial review.  At times, no particular individuals are adversely
affected by an executive branch legal interpretation.  At others times, indi-
viduals are adversely affected, but either do not care to bring suit, or are
foreclosed from doing so due to lack of a cause of action, lack of standing,
mootness, ripeness, or other rules of non-justiciability.

    Given the prevalence, importance, and frequent finality of executive
branch legal interpretation, it is important to consider the standards gov-
erning that interpretative process.[5]  Among the far-ranging questions this
subject raises are issues as fundamental as the extent to which the executive
branch should consider judicial pronouncements (and judgments) control-

----

    2  *See, e.g.,* Deployment of United States Armed Forces into Haiti, 18 Op. Off. Legal
Counsel 173, 179 (1994) (concluding that the President possessed legal authority to order
deployment of troops into Haiti); Presidential Power to Use the Armed Forces Abroad
Without Statutory Authorization, 4A Op. Off. Legal Counsel 185, 186 (1980) (considering
President's authority to deploy armed forces abroad without direct congressional authoriza-
tion).

    3.  *See, e.g.,* 1 WRITINGS OF THOMAS JEFFERSON 303-05 (Andrew A. Lipscomb ed.,
1904) (discussing President Washington's request for advice from his cabinet regarding
propriety of withholding from the House of Representatives documents related to the failure
of General St. Clair's military expedition of 1791); *see also* HOUSE PERMANENT SELECT
COMM. ON INTELLIGENCE, 106TH CONG. 1ST SESS., RECORD OF PROCEEDINGS ON H.R. 3829,
THE INTELLIGENCE COMMUNITY WHISTLEBLOWER PROTECTION ACT 8 (Comm. Print 1998)
(statement of Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Coun-
sel) (stating precedent for executive authority to control secret documents).

    4.  *See* Memorandum Opinion for the Attorney General: Federal Register Act—Date
of "Promulgation" of Law Enforcement Assistance Administration Regulations, 1 Op. Off.
Legal Counsel 12 (1977) (opining that filing of a regulation with the Federal Register con-
stitutes promulgation).

    5.  This question is distinct from consideration of what standards should govern in de-
ciding whether and how the Department of Justice defends a statute or executive action,
once challenged.  *See, e.g.,* The Attorney General's Role as Chief Litigator for the United
States, 6 Op. Off. Legal Counsel 47, 48 (1982); Drew S. Days III, *In Search of the Solicitor
General's Clients: A Drama with Many Characters,* 83 KY. L.J. 485, 487 (1995); Mark B.
Stern & Alisa B. Klein, *The Government's Litigator, Taking Clients Seriously,* 52 ADMIN. L.
REV. 1409, 1410 (2000).

ling on its interpretation of the law[6] and whether the executive branch may appropriately decline to execute a constitutionally dubious statute.[7] This Article, however, offers some thoughts on the antecedent question of the role of the executive branch lawyer.

To be sure, not all lawyers who work in the executive branch perform the same roles, and not all need—or should—approach this question from the same perspective. It is appropriate and worthwhile to have some lawyers in government who, for example, are charged with nothing more than thinking creatively, testing assumptions, and ensuring that other executive branch lawyers do not needlessly hinder the effectuation of executive branch policy. I will focus here on the role of the executive branch lawyer, however, from the perspective of the lawyers in the Department of Justice's Office of Legal Counsel. When the views of the Office of Legal Counsel are sought on the question of the legality of a proposed executive branch action, those views are typically treated as conclusive and binding within the executive branch. The legal advice of the Office, often embodied in formal, written opinions, constitutes the legal position of the executive branch, unless overruled by the President or the Attorney General.[8] It is in this sense—the sense of the lawyer who is responsible for making decisions on behalf of the government regarding the interpretation of the laws—that I use the phrase "executive branch lawyer" in this Article.[9]

While the role of the executive branch lawyer cannot be reduced to any single model, it is helpful to consider two fundamentally distinct conceptions of how executive branch lawyers might approach legal interpretation. Under the first model, the executive branch lawyer acts as an advocate, proffering any reasonable argument in support of his client's policy objec-

---

6.  *See* Paulsen, *The Most Dangerous Branch, supra* note 1, at 263; Michael Stokes Paulsen, *The* Merryman *Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81, 83 (1993) [hereinafter Paulsen, *The* Merryman *Power*]; Eisgruber, *supra* note 1, at 347-49; Burt Neuborne, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 375, 377 (1998).

7.  *See, e.g.*, Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 924 (1989-90); Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200-03 (1994); Dawn E. Johnson, *Presidential Non-Enforcement of Constitutionality Objectionable Statutes*, 63 LAW & CONTEMP. PROBS., 2000, at (forthcomming 2000).

8.  Since January 1977, the Office of Legal Counsel has, at the direction of the Attorney General, published selected opinions "for the convenience of the executive, legislative, and judicial branches of the Government, and for the convenience of the professional bar and the general public." Leon Ulman, *Foreward* to 1 Op. Off. Legal Counsel, at v (1977); *see also* 28 U.S.C. § 521 (1994).

9.  I do not address the distinct, but equally important, responsibility of executive branch lawyers to help implement and explicate legal determinations made by the President.

tives.[10]  Only when no reasonable argument may be formed should the lawyer opine that action should not be taken. The lawyer may candidly assess the relative merits of competing arguments for his client, but ultimately should not stand as a roadblock to the effectuation of administration policy unless the legal hurdles are clearly insurmountable.[11]  Under the second model, the executive branch lawyer acts more as a judge than as an advocate.[12]  He rejects legal arguments, even if reasonable, that do not represent the *best* view of the law. Like a judge, the lawyer shuns consideration of his client's desired policy goals and acts instead with complete impartiality.[13]

Each of these models is, of course, a caricature, both overstating and understating the obligations of the executive branch lawyer. The lawyer as advocate model overstates the lawyer's obligation to promote his client's policy objectives, and understates the obligation neutrally to interpret the law. The lawyer as neutral expositor model, in contrast, is too quick to equate the executive branch lawyer with an Article III judge. As developed below, in my view, the executive branch lawyer should work within the framework and tradition of executive branch legal interpretation and seek ways to further the legal and policy goals of the administration he serves. He should do so, however, within the framework of the *best* view of the law and, in that sense should take the obligation neutrally to interpret the law as seriously as a court. This is particularly so for to the Attorney General, and by delegation, the Office of Legal Counsel, who bear a distinct responsibility in executive branch legal interpretation.

## I. THE NEUTRAL EXPOSITOR MODEL

When Congress created the office of Attorney General in the final section of the Judiciary Act of 1789, it assigned to that office only two duties: "to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned," and "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments."[14]  Although the duties of the

---

10. *See* John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 CARDOZO L. REV. 375, 377, 402-03 (1993) (labeling this the "situational model" of opinion writing).

11. *See id.* at 403.

12. *See, e.g.*, HOMER CUMMINGS & CARL MCFARLAND, FEDERAL JUSTICE: CHAPTERS IN THE HISTORY OF JUSTICE AND THE FEDERAL EXECUTIVE 90 (1970) (quoting letter from Attorney General William Wirt to Secretary of War Calhoun).

13. *See id.*

14. Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 (1845) (codified as amended in

2000]    *EXECUTIVE BRANCH LEGAL INTERPRETATION*    1307

Attorney General have undergone dramatic expansion, over two hundred years later she retains the duty to "give [her] advice and opinion on questions of law when required by the President,"[15] and to provide her "opinion . . . on questions of law arising in the administration of [a] department" when requested by the head of that department.[16] In more recent years, Presidents have, by executive order, added two important refinements to these general duties. First, the President has directed that the Attorney General resolve interagency legal disputes.[17] Under this Executive Order, agencies are "encouraged" to submit to the Attorney General for resolution all legal disputes that the agencies are "unable to resolve . . . between them[selves]," and, under certain circumstances, are *required* to submit such disputes to the Attorney General for resolution.[18] Second, the President has directed that the Director of the Office of Management and Budget transmit all proposed executive orders and proclamations to the Attorney General for her legal review prior to transmission to the President.[19]

---

28 U.S.C. § 511 (1994)).

    15.   28 U.S.C. § 511 (1994).

    16.   *Id.* § 512. Without this provision, it is not clear that the Attorney General would possess statutory authority to provide legal advice to the various executive departments. *See* Duties of the Attorney General, 1 Op. Att'y Gen. 335, 336 (1820) (opining that if the Attorney General enlarges the sphere of official duties beyond that prescribed in the Judiciary Act he/she violates the oath of office).

    17.   *See* Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979).

    18.   The Executive Order provides in relevant part:

1-4.  Resolution of Interagency Legal Disputes.

1-401.  Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.

1-402.  Whenever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a dispute, the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.

*Id.*

    19.   Executive Order No. 11,030, 3 C.F.R. 610, 611 (1959-63), *reprinted in* 44 U.S.C. § 1505 (1994), provides in relevant part:

Sec. 2(b).  If the Director of the Bureau of the Budget approves [a] proposed Executive order or proclamation, he shall transmit it to the Attorney General for [her] consideration as to both form and legality.

(c)  If the Attorney General approves the proposed Executive order or proclamation, [s]he shall transmit it to the Director of the Office of the Federal Register, National Archives and Records Service, General Services Administration: *Provided*, that in cases involving sufficient urgency the Attorney General may transmit it directly to the President; and *provided further*, that the authority vested in the Attorney General by this section may be delegated by [her], in whole or in part, to the Deputy Attorney General, Solicitor General, or to such Assistant Attorney General as [s]he may desig-

1308          *ADMINISTRATIVE LAW REVIEW*          [52:4

The Attorney General has delegated each of these responsibilities to the Office of Legal Counsel.  Under Department regulations, the Office of Legal Counsel is authorized, among other things, to provide legal advice within the executive branch, to prepare and render legal opinions, and to advise "as to [the] form and legality [of proposed executive orders and proclamations] prior to their transmission to the President."[20]  Today, the Office of Legal Counsel renders all but a small portion of the formal legal opinions of the Department of Justice.

Few have addressed how the Attorney General and, more recently, the Office of Legal Counsel, should go about discharging these duties.  It has been reported that President Washington informed the Nation's first Attorney General, Edmund Randolph, that he wanted "to find a skilled, neutral expounder of the law rather than a political advisor,"[21] and Randolph's service as Attorney General demonstrates that he, in fact, adopted that approach.[22]  Other Attorneys General have echoed this view of their role and have followed suit.[23]

---

nate.

    . . . .

(e) If the proposed Executive order or proclamation is disapproved by . . . the Attorney General, it shall not thereafter be presented to the President unless it is accompanied by a statement of the reasons for such disapproval.

    20.  28 C.F.R. § 0.25(b) (1999).

    21.  Griffin B. Bell, *Office of Attorney General's Client Relationship*, 36 BUS. LAW. 791, 791 (1981).

    22. *See, e.g.*, Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The Attorney General's First Constitutional Law Opinions*, 44 DUKE L.J. 110, 112 (1994) ("Randolph, far more than either Hamilton or Jefferson, made a conscious attempt to distinguish his professional judgment about the legal question of constitutionality from his political judgment about the desirability of a national bank.").

    23.  Attorney General William Wirt wrote in a letter to Secretary of War Calhoun:
"I do not consider myself as the advocate of the government . . . but as a judge, called to decide a question of law with the impartiality and integrity which characterizes the judiciary.  I should consider myself as dishonoring the high-minded character, whose officer I am, in permitting my judgment to be warped in deciding any question officially by the one sided artifice of the professional advocate."
CUMMINGS & McFARLAND, *supra* note 12, at 90 (citation omitted); *see also* GRIFFIN B. BELL & RONALD J. OSTROW, TAKING CARE OF THE LAW 185 (1982) (referring to "attorney general's duty to define the legal limits of executive action in a neutral manner"); William P. Barr, *Attorney General's Remarks, Benjamin Cardozo School of Law, November 15, 1992*, 15 CARDOZO L. REV. 31, 34-35 (1993) (emphasizing that "Attorney General's ultimate allegiance must be to the rule of law"); DAVID R. DEENER, THE UNITED STATES ATTORNEYS GENERAL AND INTERNATIONAL LAW 81 (1957) (quoting former Solicitor General Charles Fahy: "'The Attorney General is under the responsibility of giving the President his legal opinion, rather than giving an opinion to meet the policy view of the President.'").

In a particularly expansive statement by an Attorney General regarding his interpretative duties, Attorney General Caleb Cushing wrote to President Pierce in 1854, concluding that his duty to provide advice and opinions on questions of law was "quasi-judicial" in nature, and that "whether it be so or not, he feels, in the performance of . . . his duty [to provide advice and opinion], that he is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation."[24]   Attorney General Cushing explained:

> In the discharge of the [statutory duty to provide legal advice and opinions], . . . the action of the Attorney General is quasi-judicial. His opinions officially define the law, in a multitude of cases, where his decision is in practice final and conclusive,— not only as respects the action of public officers in administrative matters, who are thus relieved from the responsibility which would otherwise attach to their acts,—but also in questions of private right, inasmuch as parties, having concerns with the Government, possess in general no means of bringing a controverted matter before the courts of law, and can obtain a purely legal decision of the controversy, as distinguished from an administrative one, only by reference to the Attorney General.[25]

Unfortunately, Attorney General Cushing's analysis does not clearly identify the source of the Attorney General's "quasi-judicial" role. Before exploring the strength of Cushing's position, I will consider the possible foundations for this view of the role of the Attorney General, and, by extension, the Office of Legal Counsel. Three possibilities exist.

First, the Attorney General's quasi-judicial role could be said to exist by virtue of statute. Although Congress has never expressly charged the Attorney General with providing objective, quasi-judicial advice, Congress may implicitly have done so in creating it's office of "Attorney General," and charging that office with the duty of giving "opinion[s] on questions of law." By using the phrase "Attorney General," Congress apparently in-

---

In the heat of a Senate debate over the legitimacy of various Attorney General opinions on the scope of the Recess Appointments Clause, former Attorney General Reverdy Johnson, then a member of the Senate, responded to the suggestion that "their opinions were not entitled to the weight that should be otherwise accorded to them because they held their office under the President, and they may have fashioned their opinions to suit the views of the President." CONG. GLOBE, 39th Cong., 1st Sess. 2116 (1866). With a touch of fight, he noted that the former Attorneys General were "men as far incapable of being influenced by any political consideration, and certainly as far from being influenced by any opinion which the President might entertain, as the honorable member from Illinois, or anybody else, could be in any situation in which they might be placed." *Id.* He added, this time with perhaps a touch of hyperbole, that the Attorneys General "are . . . *quasi-judicial* officers, and as far as I am advised . . . there never has been an opinion given by any incumbent of that office upon any question which he did not believe to be in itself sound." *Id.*

24. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).

25. *Id.* at 333-34.

*ADMINISTRATIVE LAW REVIEW*          [52:4

tended to reference the functions of "the similar office with the same des-
ignation existing under English law,"[26] an office that, among other func-
tions, carried a tradition of providing objective legal advice to the govern-
ment.[27]   Similarly, in using the statutory term "opinion[s]," Congress
seems, at least implicitly, to have required some level of objectivity.  Liter-
ally, the term requires a "persuasion of mind,"[28] and not merely the ability
to articulate a colorable argument.  Moreover, the congressional debate
preceding adoption of the legislation that created the Department of Justice
in 1870, and that re-enacted the provision authorizing the Attorney General
to provide legal opinions to the heads of the executive departments, lends
some support to this view.  The proponents of the legislation were princi-
pally concerned with consolidating the legal offices of the executive branch
to promote greater consistency and efficiency.[29]  They also expressed con-
cern, however, that counsel within particular agencies, who are

> [s]ubject to the control of the heads of the Departments, in some instances give ad-
> vice which seems to have been instigated by the heads of the Department, or at least
> advice which seems designed to strengthen the resolution to which the head of the
> Department may have come in a particular instance.[30]

The very notion of a system designed to promote consistency and uniform-
ity in legal advice, moreover, seems to presuppose that the advice provided
will be objective and not colored by the exigencies of a particular circum-
stance or policy goal.  In transferring ultimate responsibility for the rendi-
tion of legal opinions from a dispersed group of executive branch legal of-
ficers to the Attorney General, then, the Congress seems at least implicitly

---

26.   United States v. San Jacinto Tin Co., 125 U.S. 273, 280 (1888).

27.   *See, e.g.*, Sir Elwyn Jones, The Office of Attorney-General, 27 CAMBRIDGE L.J. 43,
50 (1969) ("[T]he basic requirement of our constitution is that however much of a political
animal [the Attorney General] may be when he is dealing with political matters, he must not
allow political considerations to affect his actions in those matters in which he has to act in
an impartial and even quasi-judicial way.").

28.   1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) (defining
"opinion" to mean "[p]ersuasion of the mind, without proof or certain knowledge"); *see also*
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1582 (Philip Babcock Groove ed.,
1993) (defining "opinion" to mean "a view, judgment, or appraisal formed in the mind about
a particular matter or particular matters" and "the formal expression (as by a judge, court,
referee) of the legal reasons and principles upon which a legal decision is based").

29.   *See, e.g.*, CONG. GLOBE, 41st Cong., 2d Sess. 3065 (1870) (statement of Rep. Law-
rence) ("[T]he bill is necessary to secure uniformity in the legal opinions given to the Presi-
dent, and the heads of Departments, the heads of bureaus, and other officers of the Govern-
ment for the guidance of their official action" and "to save the unnecessary expenditure of
more than one hundred thousand dollars annually for extra official fees to counsel"); *Id.* at
3035-36 (1870) (statement of Rep. Jenckes) (stating the purpose of bill to "cut off . . . out-
side work" and establish a "unity of jurisprudence").

30.   *Id.* at 3036 (statement of Rep. Jenckes).

to have endorsed the "quasi-judicial" role of the Attorney General.[31]

Second, there are strong prudential reasons for the Attorney General and the Office of Legal Counsel to strive to find the best view of the law, rather than to accept (and endorse) any reasonable argument that promotes the goals and interests of the President and his senior policy advisers. Objectivity and balance in providing legal advice are the currency of the Attorney General and the Office of Legal Counsel. That is, the legal opinions of the Attorney General and the Office of Legal Counsel will likely be valued only to the extent they are viewed by others in the executive branch, the courts, the Congress, and the public as fair, neutral, and well-reasoned. It is less likely, for example, that an Office of Legal Counsel opinion will conclusively resolve a long-standing interagency dispute if that opinion, or the typical approach of the Office, is seen as unobjective or tilted. Likewise, Congress is less likely to take seriously a constitutional objection to proposed legislation if that objection, or the general approach of the Office, is seen as policy—as opposed to legally—driven. For similar reasons, there is little reason for clients of the Office of Legal Counsel to ask whether a proposed action is legally colorable, as opposed to whether the action is authorized under the best view of the law. While posing the question in the former fashion might increase the likelihood of obtaining a favorable response, such a response will do little to assist the client in the face of subsequent criticism. A candid statement by the Attorney General

---

31. The fact that the 1870 legislation was ultimately unsuccessful in consolidating the rendition of legal advice in the Department of Justice does not undermine this conclusion. The 1870 legislation transferred "several solicitors from the Departments in which they [were then] located and [placed] them under the control of the Attorney General." *Id.* at 3036 (statement of Rep. Jenckes). The law further contemplated "that any advice or legal opinion which may be sought by any officer of the Government shall be sought" from the Attorney General, who could then, in turn, refer questions to the solicitors who had been transferred to the Department of Justice. *Id.* Confusion arose, however, regarding the status of the transferred solicitors, who continued to maintain their offices in their former departments and who continued to provide advice exclusively on questions posed by their former departments. *See* DEENER, *supra* note 23, at 28. As a result, the legislation failed to change "the 'practical relations' between the departmental law officers and their respective department heads." *Id.* at 29. By 1924, the Joint Committee on Reorganization of the Executive Departments recommended that the law be revised to reflect the practical reality that the departmental solicitors maintained only a nominal connection to the Department of Justice, and, in fact, continued to serve as legal advisers for particular departments, and, subsequently, the various departmental solicitors were transferred to the respective agencies they served. *See id.* at 29-30 ("'Their status in the departments where they perform their duties is precisely the same, in effect, as that of the regular officers of those departments.'" (footnote omitted)). There is no evidence, however, that the return of the solicitors to the various departments is at odds with the conclusion that the Attorney General's statutory responsibility to provide legal opinions derives, in part, from a desire to promote consistency and uniformity in executive branch legal interpretation.

or the Office of Legal Counsel that the action was supported by reasonable arguments, as opposed to a statement that the action was, under the best view of the law, legally authorized, would invite more questions than it would answer. The question would still remain whether the official acted legally, and a new question might be posed: why didn't the official seek advice on the best view of the law?

The third, and most compelling reason why the Attorney General and the Office of Legal Counsel must accept only the strongest legal arguments is that the Constitution mandates that the Executive branch interpret and apply the law—no less than the courts—as objectively and accurately as possible. There can be little doubt that the Framers understood that in charging the President with executing the law, they were necessarily conferring on the Executive the incidental authority to interpret the law. As Hamilton observed in *Federalist No. 33*, "the national government . . . must [be the] judge, in the first instance, of the proper exercise of its powers."[32] Joseph Story subsequently noted that constitutional structure, which provides a limited grant of powers, necessarily contemplates that government "functionaries must, in the first instance, decide" whether they possess the constitutional authority to act.[33] And, more recently, the Supreme Court has emphasized that there is "[n]o doubt the political branches have a role in interpreting and applying the Constitution,"[34] and that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."[35] Both the text and structure of the Constitution strongly support the view that this interpretive function requires objectivity and should not, absent at least implicit authorization,[36] be swayed by extraneous considerations, such as a the desirability of a particular policy outcome.

Two particular provisions of Article II of the Constitution support this conclusion. First, the Take Care Clause seems, on its face, to speak directly to the question. It provides that the President "shall take care that the laws be faithfully executed."[37] The Framers reasonably could have omitted the word "faithfully" and charged that the President "take Care that the Laws be executed." The addition of the word "faithfully" demonstrates the

---

32. The Federalist No. 33, at 85 (Alexander Hamilton) (Roy P. Fairfield ed., 2d ed. 1966).

33. 1 Joseph Story, Commentaries on the Constitution of the United States 345 (1833).

34. United States v. Morrison, 120 S. Ct. 1740, 1753 n.7 (2000).

35. Bowsher v. Synar, 478 U.S. 714, 733 (1986).

36. For a discussion of congressional delegation of authority to interpret statutory provisions in light of policy considerations see *infra* at Part II.C.

37. U.S. Const. art. II, § 3.

Framer's intent to stress the President's obligation to perform his duties with a steadfast and principled adherence to the law.[38]  The obligation is not to execute the law in a *reasonable* or *colorable* manner, but in a *faithful* manner.

Although the meaning of the Take Care Clause is, in some respects, unsettled,[39] at a minimum, the Clause should be understood to stand for the proposition that "whatever valid legal requirements might exist" must be conscientiously followed.[40]  As Attorney General Civiletti observed in a 1980 letter to the Chairman of a Senate subcommittee, the Framers were well aware of "the 17th century dispute between Parliament and the Stuart kings over the so-called 'dispensing power'"—that is, the power to defy a legislative act—"and it is clear that they intended to deny our President any discretionary power of the sort that the Stuarts claimed."[41]  The Take Care Clause resolves any ambiguity on this point and makes clear that the President lacks a general dispensing power.[42]

---

38.  *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 YALE L.J. 1725, 1794 (1996) (stating that the Take Care Clause mandates "that the executive remain faithful to something other than his whim—presumably federal laws and the Constitution"); Paulsen, *The Most Dangerous Branch*, *supra* note 1, at 261 ("'Faithful' execution of the laws implies execution in accordance with a proper interpretation of those laws and applicable constitutional principles."); *see also* JOHNSON, *supra* note 28 (defining "faithfully" to mean "[w]ith strict adherence to duty and allegiance").

39.  *See, e.g.*, Evan Caminker, *The Constitutionality of* Qui Tam *Actions*, 99 YALE L.J. 341, 356 (1989) (noting that "[t]he Supreme Court has suggested occasionally that the 'take Care' clause vests the President with prosecutorial discretion," but arguing that the "clause is better viewed as a mandate to follow the will of Congress than as a grant of exogenously defined power").

40.  Memoranda of the Office of Legal Counsel, Constitutional Limitations on Federal Government Participation in Binding Arbitration 24 (Sept. 7, 1995) <http://www.usdoj.gov/olc/1995opinions.htm>; Memoranda of the Office of Legal Counsel, Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion 1, 15 (June 15, 1999) <http://www.usdoj.gov/olc/ 1999opinions.htm>; *see also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("[T]he embracing function of the President is that 'he shall take Care that the Laws be faithfully executed . . . .' Art. II, § 3.  The nature of that authority has for me been comprehensively indicated by Mr. Justice Holmes. 'The duty of the President to see that the laws be faithfully executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.'" (quoting Myers v. United States, 272 U.S. 52, 177 (1926)).

41.  The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 57 (1980).

42.  Memoranda of the Office of Legal Counsel, Constitutional Limitations on Federal Government Participation in Binding Arbitration 23 n.29, 24 nn.30 & 31 (Sept. 7, 1995) <http://www.usdoj.gov/olc/1995opinions.htm>; Angelus Milling Co. v. Commissioner of Internal Revenue, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of . . . offi-

1314                     *ADMINISTRATIVE LAW REVIEW*                     [52:4

The question whether the President has the authority to "dispense" with disfavored statutes is of a kind with the question whether the President must strive to find the best interpretation of the law or may settle for a reasonable interpretation that supports his policy goals. As to both questions, the Take Care Clause makes clear that the President must execute the law embodied in the Constitution and statutes of the United States, and may not substitute his judgment for that embodied in the law. If there is a better view of the law, which is rejected for policy reasons, the President has, in essence, dispensed with the law as established and substituted his own standard.[43]

Second, the Presidential Oath Clause emphasizes the gravity of the requirement that the President "faithfully" discharge his duties. While all federal and state officials are required under Article VI of the Constitution to take an oath to support the Constitution,[44] the President is required to take a special oath. He must "solemnly" swear or affirm that he "will faithfully execute the Office of the President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States."[45] In only one other place in the Constitution is a special oath required, and that is where the Senate exercises its extraordinary duty to sit as a court of impeachment.[46] And in no other constitutional provision are the precise words of the actual oath to be taken themselves set forth, as opposed to a general command that there be some oath.

There is, of course, a significant similarity between the command of the Take Care Clause that the President see to it "that the laws are faithfully executed," and the first portion of the Presidential Oath Clause, which requires that the President "solemnly" commit to "faithfully execute the Of-

---

cials."); Chadha v. INS, 462 U.S. 919, 953 n.16 (1983) ("'[I]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.'" (citation omitted)). The lack of a dispensing power, however, does not suggest that the President must execute unconstitutional statutes. As the Office of Legal Counsel has observed: "In those rare instances in which the Executive may lawfully act in contravention of a statute, it is the Constitution that dispenses with the operation of the statute. The Executive cannot." The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 60 (1980); *see also* Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200 (1994).

43.  To be sure, as discussed *infra*, Congress may implicitly or explicitly delegate to the executive branch authority to resolve legislative ambiguity based on policy considerations. The judgment of whether Congress has done so, however, requires an analysis of the best view of the law, and cannot act as a substitute for it.

44.  *See* U.S. CONST. art. VI, cl. 3 (stating that state and federal officials "shall be bound by oath or affirmation" to support the Constitution).

45.  U.S. CONST. art. II, § 1, cl. 8.

46.  *See* U.S. CONST. art. I, § 3, cl. 6.

fice of the President of the United States." Strikingly, when read together, these clauses require the President to take an oath that he will "faithfully execute" his duties, including his duty "faithfully" to execute the law. To this, the Oath Clause adds the requirement that the President "preserve, protect, and defend the Constitution" to "the *best of his ability*." This language is best understood to require the President to use all of his abilities— including his ability objectively to interpret and apply the Constitution—to "preserve" the Constitution. That is, a President prepared to interpret and apply the Constitution without regard for its best construction and application, but rather based on the expediency of the day, could hardly be said to be preserving the Constitution to the best of his ability.

Even without the Take Care and Presidential Oath Clauses, a compelling argument can be made that the Constitution demands that the executive branch approach its interpretive duties with strict objectivity. The Constitution does not expressly assign to the courts the power to interpret the law.[47] Rather, that power is ancillary to, and arises by implication from, the function of Article III courts to decide particular cases and controversies.[48] The same is true for the executive branch. Although the Constitution does not expressly assign to the executive branch the power to interpret the law, that power is necessarily ancillary to, and arises by implication from, the function of the President in the performance of his Article II duties, including the execution of the law.[49]

Just as each of the branches possesses an ancillary duty to interpret the law, each must, as a matter of constitutional principle, strive to do so in an objective manner. The objectivity of the courts in interpreting the law is, of course, protected by the life tenure and fixed compensation provisions of Article III. These provisions, however, do not, by their terms, themselves give rise to the obligation of federal judges to find the best view of the law, and they do not imply that the other branches lack a similar obligation. Rather, like the Take Care and Presidential Oath Clauses, they reinforce what is already implicit in the Constitution and the very structure of government. The courts, the executive branch and the Congress are established, and bound, by the Constitution and laws of the United States.[50] Those who hold government office do so based exclusively on the constitutional and statutory provisions that give rise to that office and that define

---

47.  *See* TRIBE, *supra* note 1, at 722 (stating that the Constitution does not "expressly assign the power" to interpret federal law "to any of the three branches of government").

48.  *See* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("Those who apply [a legal] rule to a particular case must of necessity expound and interpret that rule.").

49.  *See* TRIBE, *supra* note 1, at 726-27.

50.  *Cf.* Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200 (1994).

its authorities and responsibilities. They are empowered to act only to the extent the Constitution or laws of the United States provide that authority; any other act, taken without such authority, is, by definition, ultra vires.

Against this background, the duty of the executive branch lawyer to provide the best, as opposed to a merely colorable, view of the law to his or her client is plain. In the vast majority of cases, that is the only question that is relevant. The executive branch has no authority to act beyond the authority provided by the Constitution or statutes of the United States, and, if the Constitution and relevant statutes are *best* construed to preclude a proposed policy or action, it is largely irrelevant whether a *reasonable* argument might be made in favor of the legality of the proposal. To act beyond the best view of the law is to act beyond those instruments that grant the official the status and authority that he or she seeks to employ. A reasonable argument might diminish the political cost of the contemplated action and it might avoid embarrassment in the courts, but it cannot provide the authority to act. Only the best view of the law can do that.

## II. COUNTERARGUMENTS AND REFINEMENTS

The neutral expositor model, as articulated by Attorney General Cushing, thus finds considerable support in the Constitution, as well as in other legal and prudential considerations. The model, however, is not without significant counterarguments. These counterarguments elucidate the strengths and weaknesses of the model, and suggest important refinements to it. Most significantly, they highlight the fact that the role of the executive branch lawyer cannot entirely be equated with that of an Article III judge. At the same time, however, none of the counterarguments undermines the fundamental recognition that the executive branch lawyer must always strive to find the best view of the law. In the end, the role of the executive branch lawyer is best understood as requiring both a firm allegiance to the rule of law and a respect for the unique structure of the executive branch, including the ultimate authority and democratic accountability of the President.

### A. *The Respective Roles of Lawyer and Client*

One might first take issue with the premise that the role of the executive branch lawyer is, in any significant way, distinct from the role of a lawyer in private practice. Both have clients, and both have an obligation to provide their clients with candid, considered advice. Absent extraordinary circumstances, moreover, it is for the client to determine what advice to seek and to decide how to proceed in light of that advice. As one commentator has observed:

> Like clients in private practice, the President is responsible for his own decisions, and in fact he has the authority either to make his own legal determinations without consulting any particular lawyer or to proceed in the face of contrary advice from any lawyer he does consult. Accordingly, there is no obvious reason for him to have less freedom than private clients to require from his lawyers the kind of legal advice he thinks will be most useful to him. It is true that the President has legal obligations that are different from those of any private citizen, but they are *his* obligations, not those of his lawyers or other subordinates.[51]

In short, the neutral expositor model is flawed, according to this counterargument, because it would support an arrogation of authority from client to lawyer. It is the President, and the agency heads based on his general direction, who must make the ultimate decision whether to go forward with particular initiatives, and it is the role of the lawyer merely to provide these clients with relevant information that will help them weigh the costs—including legal risks—and benefits of proposed actions.[52]

It is undoubtedly true that the President is entitled to reserve to himself many significant—and even trivial—questions of executive branch legal interpretation, and that he is entitled to seek whatever advice he believes appropriate to help inform his decisions. President Washington, for example, on a number of occasions sought the advice of multiple members of his cabinet on important questions of law. He sought and obtained written opinions from Secretary of the Treasury Alexander Hamilton, Secretary of State Thomas Jefferson, and Attorney General Randolph on the constitutionality of the national bank,[53] and he sought advice from his entire cabinet before invoking executive privilege for the first time.[54] Even more to the point, President Roosevelt signed his own opinion (drafted by a Justice Department lawyer) declaring unconstitutional what we term today the legislative veto, despite the contrary view of Attorney General Robert Jackson,[55] and President Taft heard extensive argument, reviewed 1,200 pages of testimony, and then issued an opinion defining the term "whiskey" for purposes of the pure food laws, in which he disagreed with the view taken by his Attorney General.[56]

---

51. Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 CARDOZO L. REV. 437, 449 (1993) (citations omitted).

52. Professor Lund argues that the President can decide, and can permit the heads of departments to decide, whether to take "a cautious or aggressive approach to the law" in light of Administration goals and the "circumstances and the judgment of the people involved." *Id.* at 450.

53. *See* Dellinger & Powell, *supra* note 22, at 112.

54. *See* THE WRITINGS OF THOMAS JEFFERSON, *supra* note 3, at 303-05.

55. *See* Robert H. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353, 1353-54 (1953). *Cf.* Chadha v. INS, 462 U.S. 919, 966 n.9 (1983).

56. *See* Lund, *supra* note 51, at 449 n.23.

The fact that the President may reserve to himself the last word on executive branch legal interpretation, however, does not fundamentally alter the role of the Attorney General and the Office of Legal Counsel in providing advice. In the overwhelming majority of cases, when the views of the Attorney General or the Office of Legal Counsel are sought, all understand that those views will conclusively resolve the legal question presented, short of subsequent judicial review.[57] The President, of course, typically has authority to overrule the Department of Justice on a question of law, and has done so on very rare occasions.[58] The President might also make clear that he intends to resolve a particular legal question, and, in that context, might seek input of whatever type he regards helpful. He might, for example, conclude that he believes a particular action is legally permissible, but seek the assurance of the Attorney General that she, at the very least, agrees that the argument he finds convincing is a reasonable one. Such cases, however, are extraordinarily unusual, and the Department, accordingly, must typically assume that, when its legal views are sought, they will become the final view of the executive branch of government.

Similarly, although the heads of departments are not generally required to seek legal guidance from the Department of Justice, when they do so, it is understood that the opinion provided will become the controlling view of the executive branch. Although subject to almost two hundred years of debate and consideration, the question of whether (and in what sense) the opinions of the Attorney General, and, more recently, the Office of Legal Counsel, are *legally* binding within the executive branch remains somewhat unsettled.[59] Some have argued that Attorney General opinions "should be considered as law,"[60] binding on executive branch officials "until with-

---

57. The Office of Legal Counsel most frequently provides legal advice to the President in the context of the Office's review of proposed executive orders for form and legality. Under the governing Executive Order, neither a proposed executive order nor proposed proclamation may be forwarded to the President without the approval of either the Attorney General or the Office of Legal Counsel or a statement of their reasons for disapproval. *See* Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979). I am unaware of any case in which an executive order or proclamation has been forwarded to the President over the legal disapproval of the Attorney General or the Office of Legal Counsel.

58. President Washington, for example, rejected the view of Attorney General Edmund Randolph regarding the constitutionality of the National Bank, in favor of the view argued by Secretary of Treasury Alexander Hamilton, see Dellinger & Powell, *supra* note 22, at 112, and President Roosevelt disagreed with the view of Attorney General Robert Jackson regarding the constitutionality of the legislative veto, see Jackson, *supra* note 55, at 1353.

59. *See* Rita W. Nealon, *The Opinion Function of the Federal Attorney General*, 25 N.Y.U. L. REV. 825, 839, 840 & n.83 (1950).

60. Opinions of Attorneys General and Decisions of Auditors, 5 Op. Att'y Gen. 97, 97 (1849) (opining that the practice of the government has been to follow the opinions of the attorney general, and that these opinions should be considered law) (Attorney General John-

drawn by the Attorney-General or overruled by the courts."[61]   Others, in contrast, have taken the view that Attorney General opinions are "merely advisory,"[62] available to aid the heads of departments "in forming a judgment on questions of law."[63]   Still others, including the Supreme Court, have taken the view that the opinions of the Attorney General *should* be followed within the executive branch, without addressing whether that normative judgment is legally derived.[64]   Few, however, dispute the proposition that whether for legal reasons, to promote uniformity and stability in executive branch legal interpretation, or to avoid the personal risk of being

---

son); *see also* Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854) ("[T]he opinions of successive Attorneys General, possessed of greater or less amount of legal acumen, acquirement, and experience, have come to constitute a body of legal precedents and exposition, having authority the same in kind, if not the same in degree, with decisions of the courts of justice.") (Attorney General Cushing).

    61.   Comptroller—Solicitor of the Treasury—Attorney-General, 20 Op. Att'y Gen. 654, 659 (1893) (Attorney General Olney); *see also* Attorney-General—Opinions—Detail of Registry Clerk to the White House, 25 Op. Att'y Gen. 301, 304 (1904) (stating that the Attorney General's opinion "is final and authoritative under the law, and should be so treated"); CONG. GLOBE, 41st Cong., 2d Sess. 3036 (1870) (statement by Rep. Jenckes) ("Whether the opinion of the Attorney General be right or wrong, it is an opinion that ought to be followed by all the officers of the Government until it is reversed by the decision of some competent court."). *But cf.* CONG. GLOBE, 36th Cong., 2d Sess. 3065 (1870) (statement of Rep. Jenckes) ("The heads of Departments may act on their own discretion; but when they take advice we want to know what that advice is, so that the law department of the Government shall not be giving different advice to different heads of Departments or different bureaus.").

    62.   Grant of Land on Des Moines River to Iowa, 5 Op. Att'y Gen. 390, 391 (1851) ("The opinions of the Attorney General are merely advisory. No law gives them any technical, specific, or official consequence or effect.") (Attorney General Crittenden); *see also* Duties of Attorney General—Claims Under Cherokee Treaty, 3 Op. Att'y Gen. 367, 369 (1838) ("Even had the questions been properly referable to this office, the opinions given here would only have been advisory, and would not have bound the department, or the commissioners, on a point in which they might have been deemed erroneous.") (Attorney General Butler).

    63.   Collins's Line of Steamships, 9 Op. Att'y Gen. 32, 36 (1857) ("The duty of the Attorney General is to advise, not to decide. . . . You may disregard his opinion if you are sure it is wrong.   He aids you in forming a judgment on questions of law; but still the judgment is yours, not his.   You are not bound to see with his eyes, but only to use the light which he furnishes, in order to see the better with your own.") (Attorney General Black).

    64.   *See* Smith v. Jackson, 246 U.S. 388, 389-91 (1918) (finding that Auditor did not have power to refuse to carry out law and any doubt he may have had should have been subordinated to ruling of the Attorney General); *see also* Jurisdiction of Attorney General to Determine Meaning of the Term "Adjustments" as Used in Executive Order No. 6440 of November 18, 1933, as Amended, and Inclusion of Definition of Term in Proposed Order, 37 Op. Att'y Gen. 562, 563 (1934) ("The opinions of the Attorney General as the chief law officer of the Government should be respected and followed in the administration of the executive branch of the Government.") (Attorney General Cummings).

"subject to the imputation of disregarding the law as officially pronounced,"[65] executive branch agencies have treated Attorney General (and later the Office of Legal Counsel) opinions as conclusive and binding since at least the time of Attorney General William Wirt.[66] Indeed, we have been able to go for over two hundred years without conclusively determining whether the law demands adherence to Attorney General Opinions because agencies have in practice treated these opinions as binding.[67]

The finality of the Department's views, whether legally required or merely observed in practice, dictates the standard that must govern when the Attorney General and the Office of Law Counsel render legal opinions. As Attorney General Cushing observed, the Attorney General's "opinions

---

65. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854) (Attorney General Cushing).

66. Letter from William Wirt, Attorney General, to Hugh Nelson, Chairman of the Judiciary Committee, House of Representatives, *in* 2 JOHN P. KENNEDY, MEMOIRS OF THE LIFE OF WILLIAM WIRT 62 (1850) ("[I]n relation, at least, to questions on municipal law, which are incessantly occurring, it is understood that the heads of the departments consider the advice of the law officer conclusive."); Attorney-General, 20 Op. Att'y Gen. 383, 384 (1892) (explaining that "the general practice of the Government has been to follow" opinions of the Attorney General) (Acting Attorney General Aldrich).

67. In certain areas, it seems plain that the law does require that agencies adhere to Attorney General and Office of Legal Counsel opinions. Executive Order 12,146, for example, provides for the submission of interagency legal disputes to the Attorney General (and, by delegation, the Office of Legal Counsel) for resolution. Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979). The very concept of "*resolution* of interagency legal disputes," requires a binding determination, absent which the dispute would almost certainly continue. *Id.* (emphasis added).

Although far less clear, it might also be argued that a 1918 executive order issued by President Wilson's requires that all agencies treat Attorney General opinions as binding. In that executive order, President Wilson declared: "[I] do hereby order . . . that any opinion or ruling by the Attorney General upon any question of law arising in any Department, executive bureau, agency or office shall be treated as binding upon all departments, bureaus, agencies or offices therewith concerned." Exec. Order No. 2877 (1918). The status of this executive order, however, is unclear. As indicated in the preamble, the executive order was premised on the President's authority "as Chief Executive" and on a May 20, 1918 statute "authorizing the President to coordinate or consolidate executive bureaus, agencies and offices, and for other purposes, in the interest of economy and the more efficient concentration of the Government." *Id.* The May 20, 1918 statute, however, was a wartime measure that expired six months after the end of the war, and it provided that "[u]pon termination of this Act all executive or administrative agencies, departments, commissions, bureaus, offices, or officers shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this Act to the contrary notwithstanding." § 6, ch. 78, 40 Stat. 556, 557 (1918). Although the statutory basis for the executive order thus no longer exists, it might reasonably be argued that the President exercised his non-statutory authority as "Chief Executive" to order that agencies treat Attorney General opinions as binding and that there is no indication that President Wilson intended the executive order to lapse upon the expiration of the separately cited statutory authority.

officially define the law, in a multitude of cases, where his decision is in practice final and conclusive."[68]  Put somewhat differently, because the Attorney General's opinions are treated as "final and conclusive" they necessarily become the executive branch interpretation of the law.  Indeed, as Cushing further suggested, because in many cases private parties have "no means of bringing a controverted matter before the courts," the Attorney General's opinion will define the law more generally.[69]  If one combines this role with the further recognition, discussed above, that the executive branch has an obligation to adopt only the best view of the law, then the role of the Attorney General and the Office of Legal Counsel becomes clear.  That role is distinct from that of the typical private attorney because, at least in practice, the Attorney General and the Office of Legal Counsel define, through their opinions, the meaning of the law for an entire branch of government, and that branch of government has an obligation to get the law right.

## B.  Legal Indeterminacy

The second counterargument challenges the neutral expositor model on the most fundamental of grounds.  That model, so goes this counterargument, rests on the assumption that there, in fact, exists a *best* view of the law and that the government lawyer is able to discover that view.  Greater humility, however, might caution that the law is far from certain and that only a degree of arrogance would permit a government lawyer to permit his own legal views to stand, in the face of a reasonable argument to the contrary, as a roadblock to achieving the policy goals of the President.  Although the significance of this counterargument cannot be discounted, like the first counterargument, it does not require abandonment of the core notion that the executive branch lawyers must strive to find the best view of the law.  It does say something, however, about how he or she should go about doing so.

Scholars have labored for years over the question whether the law is determinate—that is, whether legal dilemmas admit of right and wrong answers.  In one sense, this question is more theoretical than real.  Lawyers, legislators, and judges operate on a daily basis on the understanding that there are right and wrong answers in the law, or, at least, answers that do and must govern relevant conduct.  Theory, moreover, in my view, comports with this reality.  The law involves a vast array of principles and precedents.  The best view of the law is that which provides the most coherent explanation of those principles and precedents.  To be sure, certain

---

68.  Office and Duties of Attorney General, 6 Op. Att'y Gen. at 334.
69.  *Id.*

1322          *ADMINISTRATIVE LAW REVIEW*          [52:4

principles and precedents may be discarded or overruled when they themselves no longer fit within the most coherent overall understanding of the law. The objective of legal reasoning remains, however, to find the view of the law that best reconciles the relevant body of text, principle and precedent. A judicial opinion that provides the most coherent explanation of the governing text, principles and precedent can be said to represent the *best* view of the law. One that fails to reconcile the proffered result with important text, principles and precedents does not.[70]

Whether premised on mere practice or more considered theory, this conception of legal reasoning and the ability to find the *best* view of the law holds as true for executive branch lawyers as for judges. To be sure, it may prove exceedingly difficult at times to find the best view of the law. Compelling arguments might support opposing conclusions, relevant principles and precedents might conflict, or there might exist very little positive law upon which to draw. Where such uncertainty exists, an executive branch lawyer, like a judge, can seek input from concerned parties, can reconsider conclusions in light of further developments, and can apply legal rules, like the rule of lenity,[71] designed to address uncertainty. Yet, if there exists a *best* view of the law that judges are capable of finding through reasoned analysis, then there is no reason to conclude that executive branch lawyers are any less able, or under a lesser duty, to do so.

Judges, it might be argued in response, must decide hard cases, but executive branch lawyers can, in essence, rely on the judiciary ultimately to achieve the best resolution of difficult legal issues. The premise of this argument is also faulty. In many cases, executive branch legal interpretation is not subject to subsequent judicial review, and, in still others, the executive branch lawyer simply will not know whether suit will be brought. The executive branch lawyer, accordingly, must typically act on the assumption that his or her legal determination will constitute the final word on the meaning of the law at issue. The argument fails, moreover, for an even more fundamental reason. Since all executive and judicial power is derived exclusively from the Constitution and other federal laws, executive and ju-

---

70. *Cf.* RONALD DWORKIN, LAW'S EMPIRE 225 (1986) ("The adjudicative principle of integrity instructs judges to identify legal rights and duties, so far as possible, on the assumption that they were all created by a single author—the community personified—expressing a coherent conception of justice and fairness. . . . According to law as integrity, propositions of law are true if they figure in or follow from the principles of justice, fairness, and procedural due process that provide the best constructive interpretation of the community's legal practice.").

71. *See, e.g.*, Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts, 13 Op. Off. Legal Counsel 300, 304 (1989) ("Under the widely recognized 'rule of lenity,' criminal provisions subject to more than one reasonable construction should be interpreted narrowly, and ambiguity should be resolved in favor of lenience.").

dicial officers, alike, are without power to act beyond the best view of the law. To recognize those limits and to strive to define them as best one can does not constitute an act of arrogance, but of humility. Indeed, to take from that uncertainty the liberty to issue an executive branch legal opinion endorsing a governmental action that is inconsistent with the lawyer's best view of the law—e.g., the lawyer's best understanding of the meaning of a statute—would constitute a fundamental usurpation of authority. Such an opinion, in essence, would constitute an avowal by the lawyer that a government official can engage in some action that the lawyer believes neither the Framers nor the Congress authorized.

This is not to say that the executive branch lawyer should allow his or her personal legal views to dictate the scope of executive branch authority, a point that this counterargument properly highlights. Rather, the executive branch lawyer must approach his or her duty to interpret the law with due respect, not only for judicial precedent, but also for the existing body of executive branch practice and precedent. This rich body of precedent is important for at least three reasons. First, as Justice Frankfurter observed in the Steel Seizure Cases, "[d]eeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them[,]" and can, as a result, make "such exercise of power part of the structure of our government."[72] Thus, for example, the Supreme Court relied on a long-standing executive practice, supported by a number of Attorney General opinions, to uphold an implied presidential power to withdrawn public lands from private acquisition,[73] and relied on "the history of acquiescence in executive claims settlement" in upholding an executive order that suspended those "claims" against Iran that were made subject to resolution before the Iran-United States Claims Tribunal.[74] Similarly, the Office of Legal Counsel has relied upon "constitutional practice over two centuries" to support "the existence of broad constitutional power" of the President to use "military forces abroad in the absence of prior congressional approval."[75] In these, and

---

72. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring).

73. *See* United States v. Midwest Oil Co., 236 U.S. 459, 469-75 (1915). In 1976, Congress "repealed" "the implied authority of the President to make withdrawals and reservations [of public lands] resulting from acquiescence of the Congress." Federal Land Policy and Management Act of 1976, § 704(a), Pub. L. No. 95-579, 90 Stat. 2743, 2792.

74. Dames & Moore v. Regan, 453 U.S. 654, 686 (1981).

75. Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization, 4A Op. Off. Legal Counsel 185, 187 (1980); *see also* Deployment of United States Armed Forces into Haiti, 18 Op. O.L.C. 173, 178 (1994) (citing various instances of executive use of the military without congressional approval, and illustrating that "[s]uch a pattern of executive conduct, made under claim of right, extended over many decades and engaged

other areas, executive branch practice and precedent may help define the scope of presidential authority.[76]

Second, in an important respect, the advice that the executive branch lawyer provides does not come from the individual lawyer, but from the office that he or she holds. When a question is posed to the executive branch lawyer, he or she must, accordingly, provide the office's best view of the law, which in turn requires consideration of relevant office precedents, executive practice, and statements of the law from other executive branch officials, including, most notably, the President.[77] In this sense, for the executive branch lawyer, the best view of the law is not only that which finds coherence in the general body of law, but also finds consistency and principle in the more specific body of executive branch legal interpretation.[78] In writing about the role of judges, Ronald Dworkin observed that the process of judicial interpretation is akin to the writing of a chain novel, an "enterprise [in which] a group of novelists writes a novel *seriatim*; each novelist in the chain interpret[ing] the chapters he has been given in order to write a new chapter, which is then added to what the next novelist receives, and so on."[79] In a similar fashion, Dworkin continues, a judge must take the law as given to him and provide the next chapter.[80] The "interpretation he takes up must . . . flow throughout the text; it must have general explanatory

---

in by Presidents of both parties, 'evidences the existence of broad constitutional power.'").

76.  *See* HAROLD HONGJU KOH, THE NATIONAL SECURITY CONSTITUTION: SHARING THE POWER AFTER THE IRAN-CONTRA AFFAIR 70-71 (1990).

77.  For example, on signing a bill into law, the President might issue a statement providing his view of how the law is properly construed. Although not binding on a court, such a signing statement would "have the effect of binding the statutory interpretation of other executive branch officials." Legal Significance of Presidential Signing Statements, 18 Op. Off. Legal Counsel 131, 132 (1993).

78.  One recent episode involving the Office of Legal Counsel illustrates this point. In September 1994, Assistant Attorney General Walter Dellinger issued a letter to Senators Dole, Simpson, Thurmond and Cohen explaining his conclusion that the President possessed legal authority to deploy the United States military forces in Haiti. *See* Deployment of United States Armed Forces into Haiti, 18 Op. Off. Legal Counsel 173, 173 (1994). Some took issue with Assistant Attorney General Dellinger's conclusion, and, in that context, argued that he had taken a position while a Professor at Duke Law School regarding the commitment of U.S. troops in the Persian Gulf that they believed was in tension with his view as Assistant Attorney General regarding the proposed Haiti deployment. In response, Assistant Attorney General Dellinger noted, first, that the inference that he would have held a different view regarding the Haiti deployment if not a government official was not at all clear, and, second, that "unlike an academic lawyer, an executive branch attorney may have an obligation to work within a tradition of reasoned, executive branch precedent, memorialized in formal written opinions." Walter Dellinger, *After The Cold War: Presidential Power and the Use of Military Force*, 50 U. MIAMI L. REV. 107, 109-10 (1995).

79.  DWORKIN, *supra* note 70, at 229.

80.  *See id.*

power, and it is flawed if it leaves unexplained major structural aspects of the text."[81]  The same is true for the executive branch lawyer, who must provide legal advice in light of what both judges and executive branch lawyers have previously concluded.[82]  To be sure, an executive branch lawyer is not legally bound by most prior executive branch interpretation. He or she may appropriately disavow prior advice, but, like a court, the executive branch lawyer should have a compelling reason to do so, should not lightly cast aside "the secure foundation of [legal interpretation] laid by others who have gone before him,"[83] and should be prepared to explain why the precedent was discarded.[84]

Although a full treatment of this issue is beyond the scope of this Article, this notion of the role of the executive branch lawyer provides some insight regarding the meaning of "the best view of the law" in executive branch interpretation.  Scholars, for example, have debated whether the executive branch is bound by existing judicial pronouncements and judgments.[85]  The answers to this question may be found, at least in part, in long-standing executive branch practice.  Overwhelming executive branch practice and precedent support the conclusions that the executive branch should, and will, treat final judicial judgments as binding in particular cases,[86] will generally follow established Supreme Court precedents re-

---

81.  *Id.*

82.  *See* H. Jefferson Powell, *The President's Authority over Foreign Affairs: An Executive Branch Perspective*, 67 GEO. WASH. L. REV. 527, 536-37 (1999) ("[P]residential assertions of authority and executive branch legal opinions interpreting the Constitution, are legal authorities that shape the contours within which lawyers should address constitutional issues . . . . The tradition of formal legal arguments by presidents and their legal advisors is . . . central to the executive's fulfillment over time of the President's duty to interpret and ensure the faithful execution of the Constitution.").

83.  Runyon v. McCrary, 427 U.S. 160, 191 (1976) (Stevens, J., concurring) (quoting BENJAMIN CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 149 (1921)); *see also* Harold Hongju Koh, *Protecting the Office of Legal Counsel from Itself*, 15 CARDOZO L. REV. 513, 516 (1993).

84.  *Id.* at 523.

85.  *See supra* note 6.

86.  *See* Powell, *supra* note 82, at 532-33 (noting "executive's long-acknowledged duty to execute particular judicial orders," dating back to James Madison's conclusion that the executive must enforce the decisions of the judiciary).  *But see* Paulsen, *The* Merryman *Power*, *supra* note 6, at 83 (discussing President Abraham Lincoln's refusal to honor a writ of habeas corpus issued by Chief Justice Roger Taney in *Ex Parte Merryman*, 17 F. Cas. 144 (C.C.D. Md. 1861) (No. 9,487)).  In a subsequent article, Professor Paulsen notes that another scholar, Professor Issacharoff, argued that "saying that the executive may refuse to enforce judgments because that's what Lincoln did in *Merryman* is a little like saying that the best way to go to Atlanta is to take a huge army and march there, burning everything in your path, because that's what Sherman did." Paulsen, *The Most Dangerous Branch*, *supra* note 1, at 282.

1326            *ADMINISTRATIVE LAW REVIEW*            [52:4

solving particular questions,[87] and will typically rely upon more general guidance from the Supreme Court in addressing unresolved questions, absent a strong, executive branch conviction that such guidance is not well-founded.[88] Although not necessarily conclusive, this practice and precedent provide substantial guidance regarding the scope of the executive branch obligation to look to the courts in defining the law, and, like acquiescence by the other branches in long-standing executive branch authority,[89] constitutes a form of executive branch acquiescence in the relative primacy, but non-exclusivity, of the courts in defining the law.

### C. Democratic Accountability

Finally, one might argue that the neutral expositor model is flawed to the extent it fails to take into account the constitutional significance of democratic accountability. Because the President and his senior advisers are most directly accountable to the People, the government lawyer should, if at all possible, leave them with discretion to decide how to proceed. Indeed, one might argue that Attorney General Cushing's notion of the Attorney General as a "quasi-judicial" officer, insulated from political influence,[90] is at odds with the political responsibility of the executive branch. As Professor McGinnis has observed, it might be argued that the Framers consciously did not insulate the President "from public passions in the same way that life tenure insulates the Article III judiciary," and "at least some of the Framers believed it important that the people influence constitutional interpretation through their political representatives: only in this

---

87. The Office of Legal Counsel has opined that the Department:
[B]elieve[s] that the constitutional structure obligates the executive branch to adhere to settled judicial doctrine that limits executive and legislative power. While the Supreme Court's decisions interpreting the Constitution cannot simply be *equated* with the Constitution, we are mindful of the special role of the courts in the interpretation of the law of the Constitution.
Memoranda of the Office of Legal Counsel, The Constitutional Separation of Power Between the President and Congress 3 (May 7, 1996) <http://www.usdoj.gov/olc/1996opinions.htm>; *see also* Powell, *supra* note 82, at 532.

88. *See id.*; *see also* Memoranda of the Office of Legal Counsel, The Constitutional Separation of Powers Between the President and Congress, 52 n.115, 54 (May 7, 1996) <http://www.usdoj.gov/olc/1996opinions.htm> (concluding that the rationale of the Court's decision in *Wiener v. United States*, 357 U.S. 349 (1958)—that the Court should infer a "for-cause removal restriction when *the Court* believes the functions of the agency demand tenure protection"—seemed "questionable" and stating "that the executive branch should resist any further application of the *Wiener* rationale . . . except with respect to officers whose only functions are adjudicatory").

89. *See supra* notes 73-76 and accompanying text.

90. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).

way can people correct constitutional usurpations."[91]

This counterargument might be taken in one of two ways. First, it might be taken to suggest that the executive branch lawyer should adopt any reasonable view of the law that furthers the policies of the President and his senior advisers, even if it is not the best view. Alternatively, it might suggest that such policy and political considerations may, at times, help define the best view of the law. To the extent the counterargument is understood in the former manner, it cannot withstand scrutiny. The later approach, however, points to an important qualification on the role of the executive branch lawyer.

The notion that political—that is, non-legal—considerations may at times override the best view of the law is at odds with the very nature of law itself. As Alexander Hamilton observed in the *Federalist Papers*: "A law, by the very meaning of the term, includes supremacy. It is a rule which those to whom it is prescribed are bound to observe."[92] This is true at the margin, as well as at the core of the law. To allow political or policy considerations to trump the best view of the law in favor of a reasonable, but ultimately less persuasive view, is fundamentally inconsistent with the concept of law itself.

This is not to say, however, that legal interpretation is divorced from a political debate about the proper meaning of the Constitution and laws. To the contrary, the public may elect a President based, in part, on his view of the law, and that view should appropriately influence legal interpretation in that President's administration. Due respect for the democratic principle and the President's status as Chief Executive demands that executive branch lawyers not substitute their own views for the views of the President, who is directly responsible to the People. Indeed, the Framer's belief that the electoral process would provide a check on legal interpretation by the political branches, at least to the extent that government might "make a tyrannical use of its powers,"[93] assures that the public may appropriately influence legal interpretation by electing officials who share their view of the law. The President, and the lawyers who serve in his administration, must maintain a principled and coherent view of the law, but the American people influence the fundamental constitutional and legal norms that govern in the executive branch through their choice of President. In this man-

---

91. McGinnis, *supra* note 10, at 397 (citation omitted).

92. THE FEDERALIST NO. 33, at 86 (Alexander Hamilton) (Roy P. Fairfield ed., 2d ed. 1961).

93. *Id.* at 85-86; *see also* STORY, *supra* note 33, at 373 ("[I]f the usurpation should be by the president, an adequate check may be found, not only in the elective franchise, but also in the controlling power of congress, in its legislative or impeaching capacity, and in an appeal to the judicial department.").

1328            *ADMINISTRATIVE LAW REVIEW*            [52:4

ner, the democratic process informs Constitutional interpretation.[94]

The importance of democratic accountability also requires recognition of the limits of the law. Most fundamentally, the best view of the law will, at times, require the conclusion that a question is one of policy and not law. This point is perhaps most clearly made in the Supreme Court's seminal decision in *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, in which the Court considered whether the Environmental Protection Agency acted within its authority under the Clean Air Act Amendments of 1977 in defining a key statutory term to permit the grouping of all "pollution-emitting devices within the same industrial grouping . . . within a single 'bubble.'"[95] In upholding the agency's decision, the Court set forth the now familiar two-part analysis of administrative discretion. First, the court must consider "whether Congress has directly spoken to the precise question at issue."[96] If it has, the inquiry ends there, and congressional intent controls.[97] Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[98] The court need not determine whether the agency's "construction was the only one it permissibly could have adopted," but merely a reasonable one.[99]

The Court premised this framework on two points. First, Congress may either expressly or implicitly delegate authority to an administrative agency to make appropriate rules implementing a regulatory program or to "fill gaps" left in a statutory scheme.[100] Second, in contrast to judges, it is entirely appropriate for an agency to consider the policy views of "the incumbent administration" in deciding how best to exercise congressionally delegated policy-making responsibilities.[101] The Court wrote:

> While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with administration of the statute in light of everyday realities.[102]

As a result, *Chevron* is best understood to stand for the proposition that genuine gaps and ambiguities in statutes, which cannot readily be resolved

---

94. *See* TRIBE, *supra* note 1, at 262; *see also id.* at 267.
95. 467 U.S. 837, 840 (1984).
96. *Id.* at 842.
97. *See id.* at 842-43.
98. *Id.* at 843.
99. *Id.* at 843 n.11.
100. *See id.* at 843-44.
101. *Chevron*, 467 U.S. at 865.
102. *Id.* at 865-66.

2000]    *EXECUTIVE BRANCH LEGAL INTERPRETATION*    1329

applying the traditional tools of statutory interpretation,[103] are generally best treated as congressional delegations to the politically accountable officials in the executive branch responsible for implementing the relevant administrative programs.

Under the reasoning of the *Chevron* case, an executive branch lawyer might at times appropriately conclude that a statute that he or she has been asked to construe does not answer the question at issue, and that, within defined bounds, the question may be resolved based on the policy priorities of the administration. In practice, this approach at times can be a perilous one for the executive branch lawyer, who must insure that an articulated "gap" or "ambiguity" in a statute is a genuine one, and not the sort of ambiguity that a good lawyer can find in almost any statutory text. Where a true gap exists, *Chevron* analysis creates an express or implied delegation to the executive branch of authority to resolve a question as a matter of policy, and the lawyer should not usurp a decision that the Congress has committed to policymakers. More generally, the obligation to find the best view of the law includes the duty to identify where either the Constitution or a relevant statute vests the President or another executive branch official with a zone of discretion in which to act, and to avoid conflating questions of law and policy.

Finally, the executive branch lawyer can serve the interest of democratic accountability, without departing from the best view of the law, in one additional and equally important manner. When the lawyer concludes that a proposed course of action is not legally available, he or she can explore what legally available alternatives might exist. On almost a daily basis, the Office of Legal Counsel works with its clients to refine and reconceptualize proposed executive branch initiatives in the face of legal constraints. This dynamic process is only rarely evidenced in the Office of Legal Counsel's written opinions[104] because the Office's formal opinions typically focus on the end product of any such process. It nonetheless constitutes a critical

---

103. *See id.* at 843 n.9.

104. On occasion, however, the Office of Legal Counsel opinions identify both legal obstacles and legally available alternatives. *See, e.g.,* Procedures for Investigating Allegations Concerning Senior Administration Officials, 6 Op. Off. Legal Counsel 626, 626 (1982) (concluding that the Inspector General Act does not authorize an Inspector General from one agency to investigate misconduct in another, but that the President possesses inherent authority to supervise and direct the conduct of his appointees, and he may delegate that authority to others in his administration); Disclosure of Grand Jury Matters to the President and Other Officials, 17 Op. Off. Legal Counsel 59, 59 (1993) (concluding that Federal Rule of Criminal Procedure 6(e) does not typically permit disclosures for non-criminal law enforcement purposes, but that such disclosures may be permissible when necessary to the President's discharge of his Article II responsibilities, such as where the Attorney General learns through the grand jury process of a grave threat of terrorism).

part of the work of the Office of Legal Counsel and provides a means by which the executive branch lawyer can contribute to the ability of the popularly-elected President and his administration to achieve important policy goals. In this manner, the executive branch lawyer can balance the duty to work within the framework of the best view of the law with the obligation to assist those who are most directly accountable to the People in achieving their policy objectives.

## CONCLUSION

Long ago, Attorney General Cushing observed that, in providing advice and opinions on questions of law, the Attorney General's role is "quasi-judicial" in nature and that "whether it be so or not, he feels, in the performance of this part of his duty [to provide advice and opinion], that he is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all of the solemn responsibilities of conscience and of legal obligation."[105] Cushing's focus on the obligation of the Attorney General—and, by more recent implication, the Office of Legal Counsel—to find the best view of the law is well-taken but incomplete. Unlike a court, the executive branch lawyer is part of an administration that is accountable to the People and should thus strive, within the bounds of the best view of the law, to achieve its policy goals. He or she should do so with due respect not only for relevant judicial precedent, but also for the tradition of the executive branch legal interpretation and the substantial body of non-judicial precedent that informs that process. In the end, because the law is by its very nature supreme, the best view of the law must trump other interests.

---

105. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).

# EXHIBIT N

(Slip Opinion)

# Testimonial Immunity Before Congress of the Former Counsel to the President

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers. This immunity applies to former senior advisers such as the former White House Counsel. Accordingly, the former Counsel is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. The disclosure's impact on executive privilege does not ultimately bear on any underlying immunity from compelled testimony.

Because Congress may not constitutionally compel the former Counsel to testify about his official duties, he may not be civilly or criminally penalized for following a presidential directive not to appear. The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

May 20, 2019

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III. You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades: Congress may not constitutionally compel the President's senior advisers to testify about their official duties. This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress. As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion"). Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House. *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from

1

*Opinions of the Office of Legal Counsel in Volume 43*

Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum"). The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration. *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) ("*Immunity of the Former Counsel*").

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

2

*Testimonial Immunity Before Congress of the Former Counsel to the President*

## I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony,* 20 Op. O.L.C. 308, 308 (1996) ("*Immunity of the Counsel to the President*"); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) ("*Congressional Demand for Deposition of Counsel*"); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant*

3

*Opinions of the Office of Legal Counsel in Volume 43*

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

### A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles

---

*Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Testimonial Immunity Before Congress of the Former Counsel to the President*

to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id*. at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses. Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities. It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees. This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President. *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except

*Opinions of the Office of Legal Counsel in Volume 43*

privately." *Nixon*, 418 U.S. at 708. While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser—whose sole and daily responsibility is to advise and

*Testimonial Immunity Before Congress of the Former Counsel to the President*

assist the President—would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

## B.

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4–6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id*. at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of*

*Opinions of the Office of Legal Counsel in Volume 43*

the *S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3, at 611–28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695–740. *The New York Times* reported that "[w]ith Mr. Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347–53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675–76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712–40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associ-

8

*Testimonial Immunity Before Congress of the Former Counsel to the President*

ate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1. Our disposition was clear: "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties." *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade." At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees." Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979)

---

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session. *See* Remarks Announcing Procedures and Developments in Connection with the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973). President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings. *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* 547, 554 (1973). He therefore waived the testimonial immunity to authorize those appearances.

*Opinions of the Office of Legal Counsel in Volume 43*

("Weddington Letter"). She offered, however, to meet informally with committee members or staff to discuss related programs and proposals. *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*. President Carter directed Mr. Aaron not to appear. The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath. Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1–2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan. Mr. Fielding declined to appear and testify. *See* Olson Memorandum at 1–4 (explaining the legal basis for that decision). Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries. Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2–3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow, Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision.

10

*Testimonial Immunity Before Congress of the Former Counsel to the President*

President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1–2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id*., and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These

11

*Opinions of the Office of Legal Counsel in Volume 43*

examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity—just like the practice of asserting executive privilege—has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

### C.

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616–17. The Court

*Testimonial Immunity Before Congress of the Former Counsel to the President*

reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id*. at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id*. at 616–17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id*. at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id*. at 810–11, 813–15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id*. at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id*. By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and

13

**-1185-**

*Opinions of the Office of Legal Counsel in Volume 43*

ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100–03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910–11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g.*, *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional

*Testimonial Immunity Before Congress of the Former Counsel to the President*

testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192–93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential

15

advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5–6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

## III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from com-

*Testimonial Immunity Before Congress of the Former Counsel to the President*

pelled testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2–3; Weddington Letter at 1–2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

17

**-1189-**

*Opinions of the Office of Legal Counsel in Volume 43*

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id*. at 9–13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id*. at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the

*Testimonial Immunity Before Congress of the Former Counsel to the President*

"release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id*. ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6–7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id*. at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g*., *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege with respect to particular subjects does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of*

*Opinions of the Office of Legal Counsel in Volume 43*

*an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136). In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'" *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity. The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasura-

*Testimonial Immunity Before Congress of the Former Counsel to the President*

bly burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136. This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Id.* at 140 n.42. Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege." *Id.* The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

## V.

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers. This immunity applies to the former White House Counsel. Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*

21

# EXHIBIT O

## Response to Congressional Requests for Information Regarding Decisions made Under the Independent Counsel Act

With one narrow exception, the Attorney General may not disclose to Congress the contents of any application or report filed with the court pursuant to the Independent Counsel Act unless the court agrees.

All congressional requests for information about a decision regarding the appointment of an independent counsel must be supported by a legitimate legislative purpose. In addition, before such disclosures are made other considerations, such as whether or not to assert executive privilege, whether the information is covered by the attorney-client privilege, and whether the information must be kept confidential to preserve the integrity of the prosecutorial function, must be reviewed.

Congress may not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure against the head of an Executive agency acting on the President's instructions to assert executive privilege in response to a congressional subpoena.

An assertion of executive privilege must be based upon an evaluation of the Executive Branch's interest in keeping the requested information confidential, the strength of Congress' need for the information, and whether those needs can be accommodated in some other way.

April 28, 1986

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### I. Introduction and Summary

You have asked this Office to review the legal principles that should inform the Department's response to congressional inquiries about any decision regarding appointment of an independent counsel under the Independent Counsel Act, 28 U.S.C. §§ 591 *et seq.* (Act). The scope and nature of any such response would, of course, depend on the facts of the particular situation, including the scope and nature of the request, the congressional interests at stake, the status of the investigation and/or decision-making process within the Department, and your judgment as to the particular harm that would result from release of the requested information. To some extent the decision whether or how to respond to such congressional requests must weigh factors, such as political constraints that affect the Department's position vis-a-vis Congress, which are beyond our expertise. Our discussion here is therefore necessarily quite general and is limited to those constitutional and legal considerations that should be

68

reflected in the Department's response to possible congressional inquiries into decisions made under the Act. As we discuss below, we believe that the Department's response to any such inquiry must take account of: (1) the provisions of the Independent Counsel Act requiring that memoranda, reports, and other documents filed with the special division of the court remain confidential unless otherwise authorized by the court; (2) the scope of Congress' legitimate interest in obtaining the information; and (3) the Justice Department's responsibility to protect the integrity of ongoing criminal investigations and of prosecutorial decision-making. These considerations, which flow largely from the constitutionally mandated principle of separation of powers, would also shape any formal Presidential claim of executive privilege, in the unlikely event such a claim proves necessary to resist a congressional subpoena.

In addition to our discussion of the substantive legal principles, we outline below the procedural steps that would be involved if Congress pursued its requests through a subpoena, and possible defenses that could be raised to any such subpoena.

## II. Confidentiality Requirements of the Independent Counsel Act

The Independent Counsel Act itself contains strict confidentiality requirements. Section 592(d)(2) broadly provides:

> No application or any other documents, materials, or memorandums supplied to the division of the court . . . shall be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court.

28 U.S.C. § 592(d)(2).

Other, narrower provisions limit the disclosure of any report finding no grounds for appointment of an independent counsel,[1] as well as the report required to be filed by the independent counsel at the completion of his investigation.[2] Even the name and prosecutorial jurisdiction of any independent counsel appointed by the court remain confidential until an indictment is returned or a criminal information is filed, unless the Attorney General requests public disclosure prior to that time or the court determines "that disclosure of the identity and prosecutorial jurisdiction of such independent counsel would be in the best interests of justice." 28 U.S.C. § 593(b).

---

[1] If the Attorney General notifies the court under § 592(b)(1) that "there are no reasonable grounds to believe that further investigation or prosecution is warranted," the memorandum filed with the court summarizing the Department's investigation "shall not be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court." 28 U.S.C. § 592(b)(3).

[2] The independent counsel must file a report with the court describing "fully and completely . . . the work of the independent counsel, including the disposition of all cases brought, and the reasons for not prosecuting any matter within the prosecutorial jurisdiction of such independent counsel which was not prosecuted." The court may release this report "to the Congress, the public, or to any appropriate person," subject to "such orders as are appropriate to protect the rights of any individual named in such report and to prevent undue interference with any pending prosecution." 28 U.S.C. § 595(b)(2), (3).

69

The confidentiality provisions were regarded as "crucial to the general scheme" of the Act. S. Rep. No. 170, 95th Cong., 2d Sess. 58 (1978). Congress recognized that "[j]ust because a person holds a high level position does not justify making unsubstantiated allegations of criminal conduct public, no[r] does it justify publicly announcing the initiation of a criminal investigation at a very early stage of the investigation." *Id.* In fact, Congress contemplated that there would be situations in which an independent counsel would be appointed "when the public is not at all aware that a criminal investigation is underway." Assuming that the independent counsel's investigation does not result in prosecution, "[i]t is conceivable that this whole process could take place without the public even knowing that there were serious allegations against such a high level official." *Id.*

In cases in which there has already been considerable publicity about the allegations and the requirements of the Independent Counsel Act, Congress recognized that "there does not appear to be any purpose to keeping the fact that application for a special prosecutor has been made confidential." S. Rep. No. 170, *supra*, at 58. However, even if the court agrees to disclose that an application has been made or to announce the identity and jurisdiction of an independent counsel, "there may still be justification for keeping the contents of an application for a special prosecutor . . . confidential because of unsubstantiated allegations and other information which may be contained in the application for appointment." *Id.*

The language of the Act's confidentiality provisions that the documents "shall not be revealed to any individual outside of the court or the Department of Justice" is carefully drafted, and on its face prohibits disclosures to Congress no less than disclosures to the public. The legislative history of the Act supports this interpretation of the statute's unambiguous language. "The contents of the report by the Attorney General after a preliminary finding of some impropriety is to remain secret, available only to the court and I presume, to the special prosecutor, but may not be released to the public *or to Congress* without of special leave of this new court." 124 Cong. Rec. 3462 (1978) (remarks of Rep. Wiggins) (emphasis added).[3]

In general, then, the Act restricts the Attorney General's ability to of disclose to Congress the contents of any application or report filed with of the court, unless and until the court agrees. This blanket confidentiality requirement, however, is subject to a narrow exception triggered when Congress requests under § 595(e)[4] that the Attorney General apply for an independent counsel. If the Attorney General receives such a request, he is required to "provide written notification of any action . . . taken in response to such request and, if no

---

[3] Although the language of the confidentiality provisions refers only to documents actually filed with the court, the provisions obviously cannot lawfully be circumvented by disclosing the contents of the documents. *See* 124 Cong. Rec. at 3462 ("The contents of the report . . . [are] to remain secret . . . ."); S. Rep. No. 170, *supra*, at 58.

[4] Section 595(e) of the Act authorizes "[a] majority of majority party members or a majority of all nonmajority party members of the Committee on the Judiciary of either House of the Congress" to request the Attorney General to apply for the appointment of an independent counsel. 28 U.S.C. § 595(e).

70

application has been made to the division of the court, why such application was not made." 28 U.S.C. § 595(e). Because such a notification must necessarily disclose at least some information that is included in the confidential report filed with the court, § 595(e) appears to create a narrow exception to the general rule of confidentiality.[5]

The legislative history of this provision suggests, however, that the scope of the required notification is very limited; disclosure of particular details of the investigatory findings and the prosecutorial decision is not contemplated:

> [T]he Attorney General might respond that he had already applied for the appointment of a special prosecutor or he might respond that upon the conclusion of a preliminary investigation, he made a finding and filed the requisite memorandum indicating that the matter was so unsubstantiated as to not warrant further investigation or prosecution. If no application for the appointment of a special prosecutor has been made to the division of the court, the Attorney General is required to explain the specific reasons why a special prosecutor is not required under the standard set forth in § 592(e). *If the reason for not appointing a special prosecutor is the fact that the matter is so unsubstantiated as to not warrant further investigation or prosecution, the Attorney General's explanation under this subsection need only state that fact. The Committee does not intend that the Attorney General go into any detail with regard to the basis for the decision made in the exercise of his prosecutorial discretion that a matter simply did not warrant any further investigation or prosecution after the conclusion of a preliminary investigation.*

S. Rep. No. 170, *supra*, at 72 (emphasis added). That history also makes clear that Congress contemplated that the names of implicated individuals would be included in the required notification.[6]

Based on this legislative history and the overriding concern reflected in the Act with preserving confidentiality, we believe that, unless the court has approved disclosure, the notification required by § 595(e) need (and may) encompass only a statement that an application for an independent counsel has been filed as to a particular individual or individuals, or that after investigation the Attorney General determined that the allegations against particular individuals did not warrant further investigation. Obviously, if the Attorney General determined, on some ground other than the sufficiency and credibility of the evidence, that he need not apply for an independent counsel — for example,

---

[5] Disclosure is not authorized to the public, although the committee may, either "on its own initiative or upon the request of the Attorney General, make public such portion or portions of such notification as will not in the committee's judgment prejudice the rights of any individual." 28 U.S.C. § 595(e).

[6] In discussing cases in which the information contained in the notification should be kept confidential by Congress, the Senate Report specifically notes that "the Committee . . . may decide to delete the names of individuals mentioned in the notification especially if those individuals are not the subject of the alleged criminal activity." S. Rep. No. 170, *supra*, at 73.

71

if he determined that the facts, if true, would nonetheless not constitute a non-petty criminal offense or that the individual is not covered by the Act — the notification to Congress would set forth that rationale.[7]

The Act also contemplates that the independent counsel will provide "from time to time" reports to Congress and to the public containing "such information as [the] independent counsel deems appropriate," 28 U.S.C. § 595(a), and that the independent counsel "shall advise the House of Representatives of any substantial and credible information which such independent counsel receives that may constitute grounds for an impeachment." *Id.* § 595(c). Oversight jurisdiction "with respect to the official conduct of any independent counsel" is given to the "appropriate committees of Congress" and the independent counsel "shall have the duty to cooperate with the exercise of such oversight jurisdiction." *Id.* § 595(d). The legislative history of these provisions governing disclosures by the independent counsel is sparse and provides little guidance as to what extent the independent counsel would be bound by the Act's confidentiality restrictions when making such disclosures.

### III. Protecting the Integrity of Criminal Investigations

A separate consideration is how disclosure of information about any independent counsel decision would affect the Attorney General's responsibilities as the Nation's chief law enforcement officer and the ability of the Department to investigate and prosecute criminal offenses.[8] There are a number of factors, arising out of the separation of powers between the executive and legislative branches, that should be weighed in making that determination.

#### A. Constitutional Division of Responsibilities

Article II of the Constitution places the power to enforce the laws solely in the Executive Branch of government. The executive therefore has the exclusive authority to enforce the laws adopted by Congress, and neither the judicial nor legislative branches may directly interfere with the prosecutorial discretion of the Executive Branch by directing the executive to prosecute particular individuals.[9] *United States* v. *Nixon*, 418 U.S. 683, 693 (1974); *Confiscation*

---

[7] Similarly, if the Attorney General applies for an independent counsel for an individual not named in § 591(b), because investigation by the Department "may result in a personal, financial, or political conflict of interest," 28 U.S.C. § 591(c), he would have to provide some specific description of the facts giving rise to the conflict.

[8] Obviously, to the extent the confidentiality provisions of the Independent Counsel Act bar disclosure, the more generalized considerations we outline here need not be considered. However, there may be some information such as details of the deliberative process that are not encompassed by the confidentiality restrictions of the Act, or are not reflected in the report filed with the court. Moreover, at some point the court might authorize disclosure of some or all information contained in the report, which would remove any statutory bar to further disclosures.

[9] For this reason the executive branch has expressed constitutional qualms about the Act itself, which allows an individual not appointed by the President or an officer of the executive branch nonetheless to carry out prosecutorial functions. Despite these doubts, the Department of Justice has thus far taken the position
Continued

72

*Cases*, 74 U.S. (7 Wall.) 454, 457 (1869); *Smith* v. *United States*, 375 F.2d 243, 247 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967); *United States* v. *Samango*, 607 F.2d 877, 881 (9th Cir. 1979); *accord Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. *See United States* v. *Lovett*, 328 U.S. 303, 317 (1946); *INS* v. *Chadha*, 462 U.S. 919, 961–62 (1983) (Powell, J., concurring).[10] "'When the legislative and executive powers are united in the same person or body,' says [Montesquieu] 'there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner.'" *The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961) (emphasis in original).

The constitutional role of Congress is to adopt general legislation that will be implemented — "executed" — by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810). The courts have recognized that this general legislative interest gives Congress broad rein to investigate. Both Houses of Congress have broad power, "through their own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." *McGrain* v. *Daugherty*, 273 U.S. 135, 160 (1927). The issuance of subpoenas in aid of this function "has long been held to be a legitimate use by Congress of its power to investigate," *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 504 (1975), provided that the investigation is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins* v. *United States*, 354 U.S. 178, 187 (1957). *See also McGrain* v. *Daugherty*, 273 U.S. at 177 (inquiry must pertain to a subject "on which legislation could be had"). This sphere of legitimate legislative activity "is as penetrating and far reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt* v. *United States*, 360 U.S. 109, 111 (1959). *See also Watkins* v. *United States*, 354 U.S. at 187. The power of investigation can be delegated by either House of Congress to committees, subcommittees, or even individual legislators, *see Eastland* v. *United States Servicemen's Fund*, 421 U.S. at 505; *Watkins* v. *United States*, 354 U.S. at 200–01, as long as "the instructions to an

___

[9] (. . . continued)
that it will abide by the provisions of the Independent Counsel Act. *See* Letter to Michael Davidson, Senate Legal Counsel from William French Smith, Attorney General (Apr. 17, 1981), *reprinted in Hearings on the Ethics in Government Act Amendments of 1982 before the Subcomm. on Oversight of Government Management of the Senate Comm. on Governmental Affairs*, 97th Cong., 2d Sess. 115 (1982).

[10] In fact, the Constitution specifically excludes Congress from the decision whether to prosecute particular cases. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 853–54 (1984); *United States* v. *Brown*, 381 U.S. 437, 447 (1965); *United States* v. *Lovett*, 328 U.S. at 315.

73

investigating committee spell out that group's jurisdiction and purpose with sufficient particularity." *Id.* at 201. The scope of judicial inquiry on these matters is narrow, and "'should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.'" *Eastland* v. *United States Servicemen's Fund*, 421 U.S. at 506 (quoting *Tenny* v. *Brandhove*, 341 U.S. 367, 378 (1951)).

Nonetheless, the investigative power of Congress is not unlimited. Congress cannot, for example, inquire into matters "which are within the exclusive province of one of the other branches of Government . . . . Neither can it supplant the Executive in what exclusively belongs to the Executive." *Barenblatt* v. *United States*, 360 U.S. at 111; *see also Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881) (Congress cannot exercise judicial authority). Congress must be able to articulate a legitimate legislative purpose for its inquiry; if Congress lacks constitutional authority to legislate on the subject (or to authorize and appropriate funds), arguably Congress has no jurisdiction to inquire into the matter.[11]

Accordingly, a threshold inquiry that should be made upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose.[12] The clearest application of this constraint on congressional requests for information is with respect to matters that are vested exclusively in the President (such as the removal of executive officers).[13] Given the breadth of Congress' legislative jurisdiction, particularly its authority regarding the appropriation of funds, it may be difficult to articulate more precise limits. With respect to decisions made by the Attorney General under the Independent Counsel Act, we believe that Congress could not justify an investigation based on its disagreement with the prosecutorial decision regarding appointment of an independent counsel for a particular individual. Congress simply cannot constitutionally second-guess that decision. Congress does, however, have a legitimate legislative interest in overseeing the Department's enforcement of the Independent Counsel Act and relevant criminal statutes and in determining whether legislative revisions to the Act should be made. Given the general judicial reluctance to look behind congressional assertions of legislative purpose, such an assertion would likely be deemed sufficient to meet the threshold requirement for congressional inquiry.

---

[11] Moreover, there must be a subject matter for the inquiry, the investigation must be authorized by Congress, there must be a valid legislative purpose, the witness must be accorded certain constitutional protections, and the information demanded must be pertinent to the inquiry. *See Gojack* v. *United States*, 384 U.S. 702, 704–05, 714 (1966); *Wilkinson* v. *United States*, 365 U.S. 399, 408–09 (1961); *Barenblatt* v. *United States*, 360 U.S. at 111; *Watkins* v. *United States*, 354 U.S. at 187; *United States* v. *Rumely*, 345 U.S. 41, 44–46 (1953); *McGrain* v. *Daugherty*, 273 U.S. at 173, 176; *Kilbourn* v. *Thompson*, 103 U.S. at 190.

[12] The relevance of this inquiry is not limited to the question *whether* the Department should respond, but affects also *how* it should respond. If Congress' legitimate legislative interest is relatively narrow, the Department may be able to satisfy the inquiry without disclosing confidential information.

[13] For example, the Director of the Office of Personnel Management recently refused to answer questions asked by a congressional subcommittee concerning the removal of the Deputy Director of OPM, on the ground that the removal was a judgment that rested exclusively with the President. The *appointment* of officers presents a somewhat more difficult problem, at least for those officers who must be appointed with the advice and consent of the Senate. In such cases, the Senate can claim a legitimate interest in obtaining information about the nominee.

74

*B. Executive Privilege*

Assuming that Congress has a legitimate legislative purpose for its inquiry, the Executive Branch's interest in keeping the information confidential must be assessed. That interest is usually discussed in terms of "executive privilege," and we will use that convention here. The question, however, is not strictly speaking just one of executive privilege. Although the considerations that support the concept and assertion of executive privilege apply to any congressional request for information, the privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena; in responding to an informal congressional request for information, the Executive Branch is not necessarily bound by the limits of executive privilege.

1. Constitutional Basis of Executive Privilege

The Constitution nowhere states that the President, or the Executive Branch generally, enjoys a privilege against disclosing information requested by the courts, the public, or the legislative branch. The existence of such a privilege, however, is a necessary corollary of the executive function vested in the President by Article II of the Constitution, has been asserted by numerous Presidents from the earliest days of our Nation, and has been explicitly recognized by the Supreme Court. *United States* v. *Nixon*, 418 U.S. at 705–06.

2. Protection of Law Enforcement Files

Although the principle of executive privilege is well established, there are few clear guidelines regarding its practical application. The privilege has most frequently been asserted in the areas of foreign affairs and military and domestic secrets, but it has also been invoked in a variety of other contexts. In 1954, President Eisenhower asserted that the privilege extends to deliberative communications within the Executive Branch. In a letter to the Secretary of Defense, he stated:

> Because it is essential to effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications or any documents or reproductions concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions . . . .

1954 *Pub. Papers* 483–84 (May 17, 1954).

75

Moreover, the policy of the Executive Branch throughout our Nation's history has generally been to decline to provide committees of Congress with access to, or copies of, open law enforcement files except in extraordinary circumstances. This policy with respect to Executive Branch investigations was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. No President, to our knowledge, has departed from this position affirming the confidentiality and privileged nature of open law enforcement files. *See* "History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress" (Part I), 6 Op. O.L.C. 751 (1982).

This policy is grounded primarily on the need to protect the government's ability to prosecute fully and fairly. Attorney General Robert H. Jackson articulated the basic position over forty years ago:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.
>
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941). Similarly, this Office has explained that "the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation." Memorandum for Edward L. Morgan, Deputy Counsel to the President from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 19, 1969). Other grounds for objecting to the disclosure of law enforcement files include the potential damage to proper law enforcement that would be caused by the revelation of sensitive techniques, methods, or strategy; concern over the safety of confidential informants and the chilling effect on other sources of information; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality, and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process.

76

-1203-

Quite apart from the concern that disclosure would prejudice the particular prosecution prompting congressional inquiry is the purely internal concern that disclosure might hamper prosecutorial decision-making in *future* cases. *Cf. United States* v. *Nixon*, 418 U.S. at 708. Employees of the Department would likely be reluctant to express candidly their views and recommendations on controversial and sensitive matters if those views could be exposed to public scrutiny by Congress upon request.

In addition, potential targets of enforcement actions are entitled to protection from premature disclosure of investigative information. It has been held that there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." *Delaney* v. *United States*, 199 F.2d 107, 114 (1st Cir. 1952). Pretrial publicity originating in Congress, therefore, can be attributed to the government as a whole and can require postponement or other modification of the prosecution on due process grounds. *Id.* Moreover, a person who is ultimately not prosecuted may be subjected to unfair and prejudicial publicity — and thus suffer substantial and lasting damage to his professional and community standing — based on unfounded allegations.[14]

There are, of course, circumstances in which the Attorney General may decide to disclose to Congress information about his prosecutorial decisions. Once an investigation has been closed without further prosecution, many of the considerations previously discussed lose some of their force. Access by Congress to details of closed investigations does not pose as substantial a risk that Congress will be a partner in the investigation and prosecution or will otherwise seek to influence the outcome of the prosecution; likewise, if no prosecution will result, concerns about the effects of undue pretrial publicity on a jury would disappear. Still, such records should not automatically be disclosed to Congress. Obviously, much of the information in a closed criminal enforcement file, such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods, would continue to need protection (which may or may not be adequately afforded by a confidentiality agreement with Congress). In addition, the Department and the Executive Branch have a long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process. The Supreme Court has recognized that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States* v. *Nixon*, 418 U.S. at 705. It therefore is important to weigh the potential "chilling effect" of a disclosure of details of the deliberative process against the immediate needs of

---

[14] Department of Justice officials, as attorneys, are directed to observe the Code of Professional Responsibility to the extent it does not prevent their loyal service to the United States. *See* 28 C.F.R. § 45 735–1. The Code prohibits a lawyer who is associated with an investigation from making or participating in making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration" already public or highly generalized information about the matter. Model Code of Professional Responsibility, DR 7–107(A) (1979).

77

Congress and of the Department. After assessing all of these factors, on occasion the Department has briefed Congress on prosecutorial decisions and has disclosed some details of the underlying investigation, once the investigation has been closed.

### 3. Attorney-Client Communications

Some of the communications relevant to an Independent Counsel Act decision could conceivably fall within the scope of the common law evidentiary privilege for attorney-client communications.[15] Although the attorney-client privilege may be invoked by the government in litigation and under the Freedom of Information Act separately from any "deliberative process" privilege,[16] it is not generally considered to be distinct from the executive privilege in any dispute between the executive and legislative branches. The interests implicated under common law by the attorney-client privilege generally are subsumed by the constitutional considerations that shape executive privilege, and therefore it is not usually considered to constitute a separate basis for resisting congressional demands for information. As this Office has previously noted, for the purpose of responding to congressional requests, communications between the Attorney General, his staff, and other Executive Branch "clients" that might otherwise fall within the common law attorney-client privilege should be analyzed in the same fashion as any other intra-Executive Branch communications. *See* "Confidentiality of the Attorney General's Communications in Counseling the President," 6 Op. O.L.C. 481, 490 & n.17, 494 & n.24 (1982).[17]

Nonetheless, when the Attorney General is acting in his role as the President's chief legal adviser, his communications to the President may warrant greater confidentiality than those of some other Cabinet advisers because of the nature of the Attorney General's responsibilities to the executive and his special areas of expertise, *e.g.*, legal advice and law enforcement. This Office has previously emphasized the particular importance of protecting the President's ability to receive candid legal in advice:

---

[15] The attorney-client privilege generally embraces confidential disclosures of a client to his attorney, made in order to obtain legal assistance and not for the purpose of committing a crime or tort. 8 Wigmore, *Evidence* § 2290 (McNaughton rev. 1961). In order to prevent inadvertent disclosures, either directly or by implication, of information which the client had previously confided to the attorney, as well as to foster the attorney's ability to give sound and informed professional advice, the privilege has generally been extended to include an attorney's communications to his client. *Mead Data Central* v. *Department of the Air Force*, 566 F.2d 242, 252–55 (D.C. Cir. 1977).

[16] *See, e.g., Brinton* v. *Department of State*, 636 F.2d 600, 605 (D.C. Cir. 1980), *cert. denied*, 452 U.S. 905 (1981); *Mead Data Central, Inc.* v. *Department of the Air Force*, 566 F.2d at 252; *Coastal States Gas Corp.* v. *DOE*, 617 F.2d 854, 865 (D.C. Cir. 1980); 5 U.S.C. § 552(b)(5) (documents exempted from mandatory disclosure under the Freedom of Information Act include those "which would not be available by law to a party . . . in litigation with the agency").

[17] Likewise, communications that would be protected in litigation or under the Freedom of Information Act by the work product privilege would generally be considered part of the government's deliberative process, and therefore subsumed under executive privilege, for the purpose of responding to congressional requests for information. *See generally* 6 Op. O.L.C. at 497–98 n.32.

78

> [T]he reasons for the constitutional privilege against the com-
> pelled disclosure of executive branch deliberations have special
> force when legal advice is involved. None of the President's
> obligations is more solemn than his duty to obey the law. The
> Constitution itself places this responsibility on him, in his oath
> of office and in the requirement of article II, section 3 that "he
> shall take Care that the Laws be faithfully executed." Because
> this obligation is imposed by the Constitution itself, Congress
> cannot lawfully undermine the President's ability to carry it out.
> Moreover, legal matters are likely to be among those on which
> high government officials most need, and should be encouraged
> to seek, objective, expert advice. As crucial as frank debate on
> policy matters is, it is even more important that legal advice be
> "candid, objective, and even blunt or harsh," *see United States*
> v. *Nixon*, 418 U.S. 683, 708 (1974), where necessary. Any other
> approach would jeopardize not just particular policies and pro-
> grams but the principle that the government must obey the law.
> For these reasons, it is critical that the President and his advisers
> be able to seek, and give, candid legal advice and opinions free
> of the fear of compelled disclosure.

Memorandum for the Attorney General from John M. Harmon, Assistant
Attorney General, Office of Legal Counsel 26 (Jan. 13, 1981).

4. Independent Counsel Act Decisions

We believe that these considerations we have outlined apply to decisions
whether to recommend appointment of an independent counsel no less than
they apply to any other prosecutorial decision made by this Department.
Although the ultimate decision whether to prosecute a particular individual
rests with the independent counsel, the threshold decisions whether to investi-
gate and whether to recommend appointment of an independent counsel are
critical steps in that ultimate prosecutorial judgment. The decision whether·
"there are reasonable grounds to believe that further investigation or prosecu-
tion is warranted" is quintessentially a prosecutorial decision, akin to those
made every day in the course of the Department's enforcement of the criminal
laws. In fact, the Act specifically recognizes that the Attorney General's
decision whether to seek appointment of an independent counsel is unreviewable
by the courts, like any other exercise of prosecutorial discretion.[18]

---

[18] The Act provides that the Attorney General's decision to apply for appointment of an independent
counsel "shall not be reviewable in any court." 28 U.S.C. § 592(f). The nonreviewability provision applicable
to the Attorney General's decision not to seek appointment is phrased in somewhat different terms  Under
§ 592(b)(1), if the Attorney General reports to the court that "there are no reasonable grounds to believe that
further investigation or prosecution is warranted," the court "shall have no power to appoint an independent
Continued

79

A decision not to apply for an independent counsel could be treated as a closed investigation, in accordance with the Department's practice. If the Attorney General seeks appointment of an independent counsel, however, the investigation would be very much alive, as the independent counsel would step into the Department's shoes and continue the investigation into the allegations of wrongdoing.[19] In fact, the Department could still be quite involved in assisting the independent counsel, including providing information, personnel, and other resources. *See* 28 U.S.C. § 594(d). It seems clear, therefore, that all the considerations that counsel against disclosure of information relevant to open investigations being conducted by the Department itself apply equally when the investigation is being conducted by the independent counsel.

The more difficult question is whether any distinction between "closed" and "open" investigations could or should be drawn in a case in which the Attorney General determines that the evidence warrants further investigation of some, but not all, of those individuals against whom allegations have been directed. That determination would rest in large part on the facts and documents at issue and would in most cases probably require a particularized judgment as to whether some information relating to "closed" cases could be reasonably segregated and disclosed to Congress without undue risk of prejudicing the independent counsel's "open" investigation. We are obviously not in a position to make that judgment, and would defer to the Criminal Division. It seems to us, however, that in many, perhaps most, cases the evidence may be so intertwined that no separation is possible. In other cases, especially those of a simple nature in which the allegations against particular individuals are only marginally related, separation may be feasible.

In addition, because the Attorney General's decision not to seek an independent counsel for particular individuals must be based on his determination that "there are no reasonable grounds to believe that further investigation or prosecution is warranted, "the interests of those individuals in continued confidentiality would seem particularly strong. Moreover, even though the decision by the Attorney General not to seek appointment of an independent counsel is nonreviewable, in an interrelated investigation the possibility always exists that the independent counsel's investigation may uncover new information that will result in further investigation.[20]

---

[18] (. . . continued)
counsel." *Id.* § 592(b)(1). In *Banzhaf* v *Smith*, 737 F.2d 1167, 1169 (D.C. Cir. 1984), the Court of Appeals held that this provision was intended by Congress to bar any "judicial review, at the behest of members of the public, of the Attorney General's decisions not to investigate particular allegations and not to seek appointment of independent counsel."

[19] It could be argued that even if the Attorney General applies to the court for appointment of an independent counsel, the Department's investigations may technically be considered "closed," because § 597(a) requires the Department to "suspend all investigations and proceedings regarding [a] matter [within the prosecutorial discretion of an independent counsel]" unless the independent counsel "agrees in writing that such investigation or proceedings may be continued by the Department of Justice." For the reasons set forth above, we believe this argument is without merit.

[20] The independent counsel's jurisdiction is, of course, limited to that specified by the court, based on the application filed by the Attorney General. *See* 28 U.S.C. §§ 592(d)(1), 593(b), 594(a). Although the language
Continued

80

Thus, we believe there are strong constitutional and policy considerations, flowing from the doctrine of separation of powers, the obligation to preserve the integrity of the prosecutorial function, and the need to protect the rights of those who are the target of criminal investigations, that should inform and guide the Department's response to a congressional request for information about independent counsel decisions. It may be that any such request could be accommodated through a process of negotiation with Congress. Only rarely do congressional requests for information result in a subpoena of an Executive Branch official or in any congressional action. In most cases the informal process of negotiation and accommodation mandated by President Reagan in his November 4, 1982, Memorandum for the Heads of Executive Departments and Agencies on "Procedures Governing Responses to Congressional Requests for Information" is sufficient to resolve any dispute.[21] On occasion, however, the process breaks down, and a subpoena is issued by a congressional committee or subcommittee. At that point, it would be necessary to consider what procedures and defenses are available to the Executive Branch.

We outline below some of the issues that would be raised if Congress subpoenaed the Attorney General in connection with a congressional request for information about an independent counsel decision. Our particular focus here is on the House of Representatives, because it is far more likely that such action would be taken by the House than by the Senate.

### IV. Subpoena Authority of the House of Representatives

#### A. *Basis of Subpoena Authority*

As previously noted, Congress has a broad, but not unlimited, investigative authority. *See McGrain* v. *Daugherty*, 273 U.S. at 174. This investigative

---

[20] (. . . continued)

of the Act, *see* 28 U.S.C. §§ 592(d)(1), 593(b), and its legislative history, *see* S Rep. No. 170, *supra*, at 64, suggest that the court may have some flexibility in defining the independent counsel's jurisdiction, we do not believe that the court can grant the independent counsel — or that the independent counsel can assume — any jurisdiction in excess of that recommended by the Attorney General. Any other interpretation would completely circumvent the clear congressional judgment that the Attorney General's decision whether to seek an independent counsel be unreviewable. In addition, the Act itself provides several avenues by which the jurisdiction of the independent counsel could be expanded, all of which require the participation of the Attorney General For example, if the Attorney General receives additional information "sufficient to constitute grounds to investigate about the matter to which such memorandum related," his obligation to investigate and report is renewed, *see* 28 U.S.C. § 592(c)(2); the Attorney General may ask the independent counsel "to accept referral of a matter that relates to a matter within that independent counsel's prosecutorial jurisdiction," *id.* § 592(e); and the independent counsel himself may ask the Attorney General or the court to "refer matters related to [his] prosecutorial jurisdiction" or "may accept referral of a matter by the Attorney General," *see id.* § 594(e). Finally, our constitutional qualms about the role of the independent counsel would be considerably exacerbated if the critical decision as to what individuals and offenses may be prosecuted were taken completely out of the hands of the Attorney General

[21] That memorandum states that "[t]he policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . . . . [E]xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary. Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches."

81

authority necessarily presupposes some means of compelling the cooperation of contumacious witnesses:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it. Experience has taught that mere requests for such information are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

*Id.* at 175. Because the subpoena power is regarded as inherent in Congress' Article I power, it does not require enactment of a statute. Nonetheless, the exercise of subpoena power must be authorized by the relevant House. *See, e.g., Reed* v. *County Commissioners*, 277 U.S. 376, 389 (1928); *McGrain* v. *Daugherty*, 273 U.S. at 158.

Since 1974, the House Rules have given standing committees and subcommittees the authority to authorize and issue subpoenas.[22] House Rule XI(m)(1)(B) authorizes any committee or subcommittee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as it deems necessary." Subpoenas may be issued by a committee or subcommittee "only when authorized by a majority of the members voting, a majority being present," except that " the power to authorize and issue subpoenas . . . may be delegated to the chairman of the committee pursuant to such rules and under such limitations as the committee may prescribe." House Rule XI(m)(2)(A). Any authorized subpoena must be signed by the chairman of the committee or by a member designated by the chairman. *Id.* The rules of each standing committee flesh out somewhat the requirements for issuance of a subpoena, specifying in particular if, or under what circumstances, the chairman of the full committee may issue a subpoena without a vote of the committee.

*B. Enforcement of Subpoenas*

If a subpoenaed witness refuses to respond fully to a subpoena, the subcommittee or committee, as the case may be, can vote to hold the witness in contempt of Congress. As a matter of consistent historical practice, a contempt of Congress vote by a subcommittee is referred to the full committee, although there appears to be no technical requirement to interpose committee approval

---

[22] Prior to adoption of the Hansen proposals in 1974, subpoena authority was granted only on a case-by-case basis. *See* Congressional Quarterly, *Guide to the Congress* 164 (1982).

82

between a subcommittee contempt resolution and referral to the full House.[23]

By operation of House Rule XI(m)(2)(B), any action to enforce compliance with a committee or subcommittee subpoena must be approved by and the House. *See In re Beef Industry Antitrust Litigation*, 589 F.2d 786, 790 (5th Cir. 1979) (House approval required for intervention in private antitrust suit to gain access to documents subpoenaed by subcommittee from a party to the litigation); *see generally Wilson* v. *United States*, 369 F.2d 198, 201 (D.C. Cir. 1966) (suggesting that referrals under 2 U.S.C. §§ 192–194 require a vote of the full House or Senate, except during adjournments).

The House would have three alternatives available to enforce the subpoena: (1) referral to the United States Attorney for prosecution under 2 U.S.C. §§ 192–194; (2) arrest by the Sergeant-at-Arms; or (3) a civil suit seeking declaratory enforcement of the subpoena. The first two of these alternatives may well be foreclosed by advice previously rendered by this Office.

### 1. Referral Under 2 U.S.C. §§ 192–194

The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. §§ 192 and 194.[24] Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than 1 month nor more than 12 months.[25]

---

[23] The courts have underscored the importance of the procedural safeguards built into the contempt of Congress process and, in particular, the multiple steps of review that must take place before a contempt of Congress prosecution is brought. *See Wilson* v. *United States*, 369 F.2d 198, 203 (D.C. Cir. 1966); *see also United States Fund* v. *Eastland*, 488 F.2d 1252, 1260 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1975); *Sanders* v. *McClellan*, 463 F.2d 894 (D.C. Cir. 1972); *Ansara* v. *Eastland*, 442 F.2d 751, 754 (D.C. Cir. 1971). It could therefore be argued that committee consideration of a subcommittee contempt resolution would be necessary in order to provide an additional check upon the contempt of Congress process. No court, however, has so held, and we have not found any requirement in the House or any committee rules for referral to the full committee. Neither have we found any instance in which a subcommittee referred a contempt resolution directly to the House, without seeking approval from the full committee. For example, the contempt resolution voted by the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation against EPA Administrator Burford was referred to the full Committee, and reported by that Committee to the House.

[24] A third provision, 2 U.S.C. § 193, denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that his testimony would disgrace him.

[25] This statute has been found constitutionally valid as a punitive supplement to Congress' inherent coercive power to imprison for contempt. *See, e.g.*, *United States* v. *Fort*, 443 U.S. 670, 677 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 942 (1971).

83

Section 194 imposes certain responsibilities on the Speaker of the House or the President of the Senate, as the case may be, and on the United States Attorney to take actions leading to the prosecution of persons certified by a House of Congress to have failed to produce information in response to a subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the President of the Senate or Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States Attorney, whose duty it shall be to bring the matter before the Grand Jury for its action.

Under this provision, the committee would refer a resolution of contempt to the House, which would then have to approve the resolution and instruct the Speaker to certify the contempt to the United States Attorney for presentation to the grand jury.[26]

The contempt of Congress procedure has been used only once against an Executive Branch official who refused to comply with a subpoena on executive privilege grounds. In 1982, EPA Administrator Burford, acting at the President's direction, refused to release certain enforcement sensitive documents in response to a subpoena from the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation. The Subcommittee and subsequently the full Committee approved a contempt of Congress resolution, and on December 16, 1982, the full House adopted the resolution. On December 17, Speaker O'Neill certified the contempt to the United States Attorney for the District of Columbia for prosecution under § 192. The United States Attorney declined to refer the contempt citation to the grand jury, pending resolution of a lawsuit filed by the Executive Branch to block enforcement of the subpoena[27] and completion of negotiations between the executive and legislative branches to reach a compromise settlement.[28]

---

[26] By its terms, § 194 would permit the Speaker (or President *pro tempore*) to certify a contempt without the approval of the House, if the House were not in session. This option, however, would appear to be foreclosed by the House rules, which clearly require full House approval for any enforcement action

[27] *United States* v. *House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983).

[28] Those negotiations eventually resulted in an agreement and withdrawal of the contempt citation.

84

During the EPA matter, this Office rendered advice to the Attorney General, since memorialized in a memorandum, on the applicability of §§ 192 and 194 to Executive Branch officials who assert claims of executive privilege on behalf of the President.[29] In brief, we concluded that a United States Attorney is not required to refer a contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction to assert executive privilege. Our conclusion rested partly on the need to preserve traditional prosecutorial discretion, *i.e.*, that Congress may not direct the executive to prosecute a particular individual without leaving any discretion in the executive to determine whether a violation of the law has occurred. We also concluded more broadly, however, that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege. We noted that neither the legislative history nor the subsequent implementation of §§ 192 and 194 suggest that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. Moreover, as a matter of constitutional law, we concluded that the threat of criminal prosecution would unduly chill the President's ability to protect presumptively privileged Executive Branch deliberations:

> The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

8 Op. O.L.C. at 102. Therefore, Congress could not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure set out in 2 U.S.C. §§ 192 and 194 against the head of an Executive Branch agency, if he acted on the instructions of the President to assert executive privilege in response to a congressional subpoena.

---

[29] *See* "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege," 8 Op. O.L.C. 101 (1984).

85

## 2. Inherent Contempt Power of Congress

The second alternative is for the House to instruct the Sergeant-at-Arms to arrest the Executive Branch official and detain him in the Capitol guardroom. The arrest could then be challenged by application for a writ of habeas corpus. 28 U.S.C. §§ 2241 *et seq.*

The Supreme Court has ruled in the past that Congress has the inherent constitutional authority to imprison individuals for contempt. *See Jurney* v. *MacCracken*, 294 U.S. 125 (1935); *Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821). The authority is one of self preservation and is accordingly limited to "the least possible power adequate to the end proposed." *Id.* at 231.

Although the authority has been cited by a court as recently as 1970, *see United States* v. *Fort*, 443 F.2d at 676, Congress has not attempted to use it for approximately 50 years[30] and it seems most unlikely that Congress would dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege. Moreover, while Supreme Court precedents support the right of Congress to imprison individuals for contempt, there is some question whether such authority would continue to be upheld. In recent years the Supreme Court has been more wary of Congress' exercising judicial authority:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

*United States* v. *Lovett*, 328 U.S. at 317; *see also United States* v. *Brown*, 381 U.S. 437 (1965); *INS* v. *Chadha*, 462 U.S. at 962, 966 (Powell, J., concurring). The Court has also been careful in recent cases to restrict Congress to its legislative functions and not to permit it to exercise authority belonging to another branch. *See INS* v. *Chadha, supra; Buckley* v. *Valeo*, 424 U.S. 1 (1976). The current Court therefore may not afford Congress the same latitude with respect to its inherent contempt power that was provided during the 19th and early 20th centuries. *See* Memorandum for the Deputy Attorney General from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel (Oct. 18, 1984).

In any event, the same considerations that inform the analysis of the applicability of §§ 192 and 194 to Executive Branch officials are relevant to an exercise of Congress' inherent contempt power. In our 1984 memorandum to the Attorney General discussing §§ 192 and 194, we noted that the reach of the criminal contempt statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect the penalties imposed), and concluded that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." 8 Op. O.L.C. at 140 n.42.

---

[30] *See Marshall* v. *Gordon*, 243 U.S. 521 (1917); Congressional Quarterly, *Guide to the Congress* 162 (1982).

86

### 3. Civil Suit for Enforcement of a Subpoena

The most likely route for Congress to take would be to file a civil action seeking enforcement of the subpoena. There is no statute that expressly grants the federal courts jurisdiction over such suits.[31] There are, however, at least two precedents for bringing such civil suits under the grant of federal question jurisdiction in 28 U.S.C. § 1331. In 1973, the Senate Select Committee on Presidential Campaign Finances sought civil enforcement of its subpoena for tapes and documents; the Committee urged, *inter alia*, that § 1331 provided subject matter jurisdiction. The district court found that the $10,000 jurisdictional amount in controversy requirement was not met and held that jurisdiction was therefore lacking under section 1331. The court did not suggest that there was any other basis for denying federal question jurisdiction. *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 366 F. Supp. 51, 59–61 (D.D.C. 1973). Legislation was subsequently enacted to authorize jurisdiction over that particular suit. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974). Section 1331 has since been amended to be eliminate the $10,000 amount in controversy limitation in actions brought against the United States. Pub. L. No. 96–486, § 2(a), 94 Stat. 2369 (1980).

General federal question jurisdiction was also used as a basis for the be civil suit filed by the Department of Justice against the House in the EPA matter. *See United States* v. *House of Representatives*, C.A. No. 82–3583 (D.D.C. 1983). The Department took the position in that case that the controversy arose under the Constitution and laws of the United States, because resolution "depend[ed] directly on construction of the Constitution [and the] Court has consistently held such suits are authorized by [section 1331]." *Powell* v. *McCormack*, 395 U.S. 486, 516 (1969). Relying upon the decision in *United States* v. *AT&T Co.*, 551 F.2d 384 (D.C. Cir. 1976), which held that an action brought by the United States to block a response by a third party to a congressional subpoena met the threshold jurisdictional requirements of section 1331, the Department argued

---

[31] Under 2 U.S.C. § 288d, the Senate Legal Counsel "[w]hen directed to do so [by the Senate] . . . shall bring a civil action . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened failure or refusal to comply with, any subpoena or order issued by the Senate or a committee or a subcommittee of the Senate authorized to issue a subpoena or order." The United States District Court for the District of Columbia has jurisdiction over such actions, but its jurisdiction does not extend to any actions brought "to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal to comply with, any subpoena or order issued to an officer or employee of the Federal Government acting within his official capacity." 28 U.S.C. § 1364(a).

The argument could be made that this authority provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer. The legislative history of these statutes, however, counsels against that conclusion. The legislative history specifically notes that the jurisdictional exception for executive branch subpoenas "is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government," but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by private citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas. *See* S. Rep. No. 170, 95th Cong., 2d Sess. 88–89 (1978).

87

that subject matter jurisdiction similarly exists in a suit to halt enforcement of a subpoena addressed directly to the Executive Branch.[32] The rationale used by the Department in that suit would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims.

In addition, the courts may be willing to entertain a civil suit brought by the House in order to avoid any question about the possible applicability of the criminal contempt provisions of §§ 192 and 194. When a possible impairment of the President's constitutional prerogatives is involved, the courts are particularly careful to construe statutes to avoid a constitutional confrontation. In *United States* v. *Nixon*, for example, the Court construed the limitation in 28 U.S.C. § 1291 (that appeals be taken only from "final" decisions of a district court) to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court:

> [T]he traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government.

418 U.S. at 691–92. The U.S. Court of Appeals for the District of Columbia has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. *See Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962); *see also United States* v. *Fort*, 443 F.2d at 677–78. The Fifth Circuit appears to have held that no government official need subject himself to contempt in order to obtain review of his claim that the government is privileged to refuse to comply with a court's demand for documents. *See Cates* v. *LTV Aerospace Corp.*, 480 F.2d 620, 622 (5th Cir. 1973); *Carr* v. *Monroe Manufacturing Co.*, 431 F.2d 384, 387 (5th Cir. 1970), *cert. denied*, 400 U.S. 1000 (1971); *but see In re the Attorney General*, 596 F.2d 58, 62 (2d Cir.), *cert. denied*, 444 U.S. 903 (1979). Thus, although the civil enforcement route has not been tried by the House, it would appear to be a viable option.[33]

---

[32] The decision of the district court in *United States* v *House of Representatives* does not directly address the jurisdictional question, although it casts considerable doubt on whether the Executive Branch can seek review in a civil action, when the legislative branch has chosen to use the criminal contempt provisions. 556 F. Supp. at 153. Nonetheless, the court did not foreclose any civil actions by the House:

> Judicial resolution of this constitutional claim, however, will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding *or other legal action taken by Congress*

*Id.* (emphasis added).

[33] Any notion that the courts may not or should not review such disputes is dispelled by *United States* v. *Nixon*, 418 U.S. at 703–05, in which the Court clearly asserted its role as ultimate arbiter of executive

Continued

88

It is also possible that Congress might attempt to invoke the provisions of the Independent Counsel Act, which require the Attorney General to conduct an investigation "whenever he receives information sufficient to constitute grounds to investigate" that any of the enumerated Executive Branch officials "has committed a violation of any Federal criminal law other than a violation constituting a petty offense." 28 U.S.C. § 591. The crime of contempt of Congress is a non-petty criminal offense. *See* 2 U.S.C. § 192; 18 U.S.C. § 1. Thus a contempt citation against a covered official would arguably trigger the Attorney General's obligation under the Act. Invocation of the Act would not, however, necessarily require the Attorney General to apply for the appointment of an independent counsel. As this Office has advised on prior occasions, the Attorney General retains a certain measure of discretion with respect to whether to apply for an independent counsel.

### B. Defenses to Congressional Subpoenas

#### 1. Lack of Jurisdiction

As we discussed above, Congress' investigative power, while broad, is not unlimited. Thus, short of asserting executive privilege, there may be other lines of defense against a subpoena. The most promising line is that the subcommittee has no jurisdiction to request the information, either because Congress as a whole has no authority to inquire into the matter, or because Congress has not given the committee the requisite authority.

#### a. Scope of Congress' Jurisdiction

The Supreme Court has not articulated with precision whether there are particular limits to the jurisdiction of Congress to request information from the Executive Branch. Nonetheless, as we have previously set forth, Congress must at a minimum be able to articulate a legitimate legislative purpose for its inquiry. We will not repeat that discussion here, except to say that if the matter either falls exclusively within the province of another branch, *see Kilbourn* v. *Thompson*, 103 U.S. at 192, or Congress cannot point to some rational nexus between the inquiry and its legislative power, *see Barenblatt* v. *United States*, 360 U.S. at 111, we believe the subpoena would be held invalid for lack of authority, and could be challenged on that basis.

#### b. Scope of Committee's Jurisdiction

Not only must the investigation fall within Congress' jurisdiction, but the committee or subcommittee must also have been specifically authorized by the

---

[33] (. . . continued)

privilege questions. The need for judicial review in fact was emphasized by this Department in the *United States* v. *House of Representatives* litigation as a basis for the court to entertain the suit. The Department argued that, in some circumstances, only judicial intervention can prevent a stalemate between the other two branches that could result in a partial paralysis of government operations.

89

relevant House to conduct the investigation. Since defiance of a subpoena raises the possibility of criminal prosecution, "a clear chain of authority from the House to the questioning body is an essential element of the offense." *Gojack* v. *United States*, 384 U.S. at 716. It "must appear that Congress empowered the Committee to act, and further that at the time the witness allegedly defied its authority the Committee was acting within the power granted to it."[34] *Id.* (quoting *United States* v. *Lamont*, 18 F.R.D. 27 (S.D.N.Y. 1955), *aff'd*, 236 F.2d 312 (2d Cir. 1956)). *See also Watkins* v. *United States*, 354 U.S. at 204–05, 214–15; *Eastland* v. *United States Servicemen's Fund*, 421 U.S. at 505–06. Thus, a witness cannot be compelled to answer questions that fall outside of the investigative jurisdiction of a committee or subcommittee. *See United States* v. *Rumely*, 345 U.S. at 44–45; *Bergman* v. *Senate Select Committee on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); *United States* v. *Cuestra*, 208 F. Supp. 401, 406 (D.P.R. 1962).

Although this general principle is well recognized by the courts, in practice they have given considerable deference to a committee's definition of its jurisdiction. In cases in which the courts have refused to enforce a subpoena because the inquiry fell outside of the committee's jurisdiction, the primary defect was that the investigative authority given to the committee was simply so broad and ill-defined that it gave the witness no fair notice of the scope of the inquiry. *See, e.g., Watkins* v. *United States*, 354 U.S. at 204; *United States* v. *Rumely*, 345 U.S. at 43. In many cases, the courts have considered the "legislative history" of the committee's investigation (*e.g.*, the language and background of the authorizing resolution, remarks made by the chairman or members of the committee to outline the scope of the investigation, the existence and scope of similar investigations) to determine whether a particular matter falls within a committee's jurisdiction. "Just as legislation is often given meaning by the gloss of legislative reports, administrative interpretation and long usage, so the proper meaning of an authorization to a congressional committee is not to be derived alone from its abstract terms unrelated to the definite context furnished them by the course of congressional actions." *Barenblatt* v. *United States*, 360 U.S. at 117. *See also Wilkinson* v. *United States*, 365 U.S. at 408; *Tobin* v. *United States*, 306 F.2d at 275–76; *United States* v. *Fort*, 443 F.2d at 682. This analysis, of course, cuts both ways. If a committee has historically exercised investigative jurisdiction over a particular subject, and makes the nexus between its investigative jurisdiction and the particular subject matter clear, the courts may hesitate to second guess to that judgment. *See, e.g., Barenblatt* v. *United States*, 360 U.S. at 119–20. On the other hand, if the committee has not previously asserted investigative jurisdiction over the subject matter, and the subject matter to is not clearly linked to the committee's jurisdiction, the courts may lean to in favor of protecting the

---

[34] Because the legality of the committee's action is judged as of the time the witness defies the subpoena, a subsequent vote by the full House to enforce the subpoena (through contempt or otherwise) will not cure any jurisdictional defect. *Gojack*, 384 U.S. at 175 n.12.

90

witness' prerogative to refuse to testify, particularly if constitutional interests are implicated.[35] *See Tobin* v. *United States*, 306 F.2d at 275–76.

The courts have also suggested that the power of either the witness or the court to define for itself the scope of a committee's jurisdiction is limited. In *Barenblatt*, 360 U.S. at 124, the Court noted that it "goes without saying that the scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of this Court." Similarly, "it is appropriate to observe that just as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers." *Hutcheson* v. *United States*, 369 U.S. 599, 622 (1962). *See also McSurely* v. *McClellan*, 521 F.2d 1024, 1038 (D.C. Cir. 1975) (prerogative of the judiciary to determine whether the investigation is within the jurisdiction of a particular committee is "extremely limited").

Nevertheless, it is clear that a witness may refuse to answer on the ground that the inquiry has not been authorized by the relevant House. Particularly where constitutional concerns are raised by compelled testimony, courts may be reluctant to countenance a far-ranging inquiry by a particular committee or subcommittee that does not appear to fall within the jurisdiction granted by Congress.

### 2. Executive Privilege

Finally, the subpoena could be resisted on the ground that the information requested is protected by the executive privilege. It is important to remember, however, that assertion of the privilege does not just involve an evaluation of the Executive Branch's interest in keeping the information confidential; it also involves an evaluation of the strength of Congress' need for that information, and whether those needs can be accommodated in some other way.

Thus, Congress must be able to articulate its need for the particular materials — to "point[ ] to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged documents (or testimony) it has requested, and to show that the material "is demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d at 731, 733. In *Senate Select Committee*, for example, the court held that the committee had not made a sufficient showing of need for copies of the Presidential tape recordings, given that the President had already released transcripts of the recordings. The committee argued that it

---

[35] The judicial decisions dealing with Congress' subpoena authority have for the most part involved refusals by private individuals to testify. In those cases the courts have been sensitive to First, Fourth, and Fifth Amendment concerns raised by the defendants, and have weighed those interests in the balance in determining how specific Congress must be in authorizing a committee's investigation. *See, e.g., United States* v. *Rumely*, 345 U.S. at 45; *Watkins* v. *United States*, 354 U.S. at 204–05. Although the constitutional interests implicated by a subpoena of an executive branch official arise from Articles I and II, rather than the Bill of Rights, a court should be equally sensitive to those constitutional concerns.

91

needed the tape recordings "in order to verify the accuracy of" the transcripts, to supply the deleted portions, and to gain an understanding that could be acquired only by hearing the inflection and tone of voice of the speakers. But the court answered that in order to legislate a committee of Congress seldom needs a "precise reconstruction of past events." *Id*. at 732. "The Committee has . . . shown no more than that the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain." *Id*. at 733. For this reason, the court stated, "the need demonstrated by the Select Committee . . . is too attenuated and too tangential to its functions" to override the President's constitutional privilege. *Id*.

Moreover, in cases in which Congress has a legitimate need for information that will help it legislate and the Executive Branch has a legitimate, constitutionally recognized need to keep information confidential, the courts have referred to the obligation of each branch to accommodate the legitimate needs of the other. *See United States* v. *AT&T Co.*, 567 F.2d 121, 130 (D.C. Cir. 1977).

Here, the considerations outlined above — particularly the need to preserve the position of the Executive Branch as the sole entity that enforces the criminal laws — would weigh strongly in favor of nondisclosure by the Executive Branch. Ultimately it would be those interests in maintaining confidentiality that must be balanced against Congress' interest in gaining access to particular information for legitimate legislative purposes. As noted above, it is difficult for us to speculate as to what legitimate interests Congress would have in gaining access to the details of a prosecutorial decision made by the Attorney General — a decision that Congress constitutionally could not alter or interfere with. The decision to assert executive privilege in response to a congressional subpoena, however, is the President's to make. Under the terms of the Reagan Memorandum, executive privilege cannot be asserted vis-a-vis Congress without specific authorization by the President, based on recommendations made to him by the concerned department head, the Attorney General, and the Counsel to the President. That decision must be based on the specific facts of the situation, and therefore it is impossible to predict in advance whether executive privilege could or should be claimed as to any particular types of documents or information.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

92

# EXHIBIT P



U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 31, 2015

The Honorable John A. Boehner
Speaker
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Speaker:

On May 7, 2014, you referred the matter of Lois G. Lerner, former Director, Exempt Organizations, Internal Revenue Service (IRS), to the United States Attorney's Office for the District of Columbia, after the U.S. House of Representatives voted to hold Ms. Lerner in contempt of Congress under 2 U.S.C. § 192. *See* H.R. Res. 574, 113th Cong. (2014). As you know, the House did so after Ms. Lerner, on March 5, 2014, asserted her Fifth Amendment privilege not to testify at a hearing held by the House Committee on Oversight and Government Reform. The Committee had previously determined that Ms. Lerner waived this privilege when she made an opening statement during an appearance before the Committee on May 22, 2013. *See* H.R. Rep. No. 113-415, at 11-12 (2014) (the "Committee Report").

Under 2 U.S.C. § 192, a person is guilty of contempt of Congress if he or she, "having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before . . . any committee of either House of Congress, willfully . . . refuses to answer any question pertinent to the question under inquiry." Where the House of Representatives has voted to find a witness in contempt, 2 U.S.C. § 194 directs the Speaker of the House to "certify" the matter "to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."

Upon receipt of your referral, a team of experienced career prosecutors in this United States Attorney's Office was assigned to assess the matter. As discussed in more detail below, after extensive analysis of the facts of this matter and the applicable law, it was the team's conclusion that the Committee followed proper procedures in notifying Ms. Lerner that it had rejected her claim of privilege and gave her an adequate opportunity to answer the Committee's questions. Thus, Ms. Lerner's refusal to answer would be "willful" under Section 192 unless otherwise excused. However, the team also concluded that Ms. Lerner did not waive her Fifth Amendment privilege by making an opening statement on May 22, 2013, because she made only general claims of innocence. Thus, the Fifth Amendment to the Constitution would provide Ms.

Lerner with an absolute defense should she be prosecuted under Section 192 for her refusal to testify.

Given this assessment, we have further concluded that it is not appropriate for a United States Attorney to present a matter to the grand jury for action where, as here, the Constitution prevents the witness from being prosecuted for contempt. We respectfully inform you that we will therefore not bring the Congressional contempt citation before a grand jury or take any other action to prosecute Ms. Lerner for her refusal to testify on March 5, 2014.

## I.    Factual and Procedural Background

The proceedings at issue arose from the Committee's investigation of complaints that IRS employees had delayed for partisan political reasons the approval of applications by certain organizations for status as tax-exempt entities. On May 14, 2013, the chairman of the Committee, Representative Darrell E. Issa, sent a letter inviting Ms. Lerner to testify at a hearing on May 22, 2013. After Ms. Lerner's counsel informed Committee staff members that Ms. Lerner would refuse to answer questions on Fifth Amendment grounds, Chairman Issa issued a subpoena on May 20, 2013, compelling Ms. Lerner to testify two days later.

Ms. Lerner appeared at the hearing on May 22, 2013, and gave an opening statement that included the following:

> I have not done anything wrong. I have not broken any laws. I have not violated any IRS rules or regulations, and I have not provided false information to this or any other congressional committee.

> And while I would very much like to answer the Committee's questions today, I've been advised by my counsel to assert my constitutional right not to testify or answer questions related to the subject matter of this hearing. After very careful consideration, I have decided to follow my counsel's advice and not testify or answer any of the questions today.

Chairman Issa responded that he believed Ms. Lerner had waived her Fifth Amendment privilege and asked her to reconsider her position on testifying. Ms. Lerner, however, continued to refuse to answer any questions, and the chairman excused her, reserving the right to recall her as a witness at a later date.

On June 28, 2013, the Committee held a business meeting at which it approved a resolution determining that the opening statement offered by Ms. Lerner constituted a waiver of her Fifth Amendment privilege. On February 25, 2014, Chairman Issa sent a letter informing Ms. Lerner that the Committee had rejected her Fifth Amendment privilege claim, and that she was expected to appear and answer the Committee's questions at a reconvened hearing on March 5, 2014. Ms. Lerner's counsel responded by letter, stating that although he and his client understood that the Committee believed that Ms. Lerner waived her rights, Ms. Lerner would

continue to assert her Fifth Amendment privilege at any subsequent hearing. The Committee, however, insisted that Ms. Lerner appear at the reconvened hearing.

When the hearing reconvened on March 5, 2014, with Ms. Lerner and her counsel present, Chairman Issa stated for the record that the Committee had voted and found that Ms. Lerner had waived her Fifth Amendment privilege by making a voluntary opening statement on May 22, 2013. *See The IRS: Targeting Americans for Their Political Beliefs, Hearing Before the H. Comm. on Oversight and Government Reform*, 113th Cong. 2 (Mar. 5, 2014) ("March 5, 2014 Hearing"). Chairman Issa added that "if Ms. Lerner continued to refuse to answer" the Committee's questions, the Committee "may proceed to consider whether she should be held in contempt." *Id.* at 3.

Chairman Issa then proceeded to ask a series of factual questions about the matters under investigation by the Committee. To each question, Ms. Lerner stated that she declined to answer based on the advice of her counsel that she had not waived her Fifth Amendment privilege. Each time Ms. Lerner provided such a response, Chairman Issa proceeded to his next question. Eventually, Chairman Issa adjourned the hearing upon determining that Ms. Lerner would not cooperate with the Committee. The May 7, 2014, referral to this Office followed.

## II.    Legal Analysis

### A.    The Committee Followed Proper Procedures in Notifying Ms. Lerner That It Had Rejected Her Claim of Privilege, and Thereafter Gave Her an Adequate Opportunity to Answer the Committee's Questions.

The Supreme Court has held that Section 192 "requires a criminal intent – in this instance, a deliberate, intentional refusal to answer." *Quinn v. United States*, 349 U.S. 155, 165 (1955). Thus, where a witness objects to a question, *e.g.*, by asserting a privilege, the questioning committee may either "sustain the objection and abandon the question, even though the objection might actually be without merit," or "disallow the objection and thus give the witness the choice of answering or not." *Id.* However, "unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under [Section] 192 for refusal to answer that question." *Id.* at 166.

Both Ms. Lerner's counsel and some Members of the Committee have argued that Ms. Lerner cannot be prosecuted under Section 192 because the Committee did not follow procedures designed to ensure that a witness is "clearly apprised" that her testimony is required. Specifically, they have argued that when a witness asserts a claim of privilege, the questioning committee should, with respect to each question, specifically overrule the claim, warn the witness that she will be held in contempt if she continues to refuse to answer, and then give the witness another opportunity to answer.

We agree with the view of the Committee majority, however, that Ms. Lerner was given notice that her claim of privilege had been rejected and sufficient opportunity to answer the Committee's questions after receiving that notice. In three Supreme Court cases relied upon by Ms. Lerner, the relevant Congressional committee never actually made a ruling disallowing the

3

claim of privilege. *See Quinn*, 349 U.S. at 166; *Emspak v. United States*, 349 U.S. 190, 202 (1955); *Bart v. United States*, 349 U.S. 219, 222 (1955). As the Court explained in *Quinn*, this meant the witness "was never confronted with a clear-cut choice between compliance and noncompliance, between answering the question and risking prosecution for contempt. At best he was left to guess whether or not the committee had accepted his objection." 349 U.S. at 166. The Court went on to state, however, that

> [j]ust as the witness need not use any particular form of words to present his objection, so also the committee is not required to resort to any fixed verbal formula to indicate its disposition of the objection. So long as the witness is not forced to guess the committee's ruling, he has no cause to complain.

*Id.* at 170.

The Supreme Court and other federal courts have accordingly reversed contempt convictions where defendants were not informed that their objections had been rejected before the relevant questions were asked, but generally affirmed them where defendants were so informed. *Compare, e.g., Raley v. Ohio*, 360 U.S. 423, 437-42 (1959), and *Grossman v. United States*, 229 F.2d 775, 776 (D.C. Cir. 1956) *with Barenblatt v. United States*, 240 F.2d 875, 879-80 (D.C. Cir. 1957), *vacated and remanded on other grounds, Barenblatt v. United States*, 354 U.S. 930 (1957); *Davis v. United States*, 269 F.2d 357, 362-63 (6th Cir. 1959); *Wollam v. United States*, 244 F.2d 212, 215 (9th Cir. 1957), *rev'd on other grounds, Simpson v. United States*, 355 U.S. 7 (1957). In this matter, the Committee (1) informed Ms. Lerner, both in writing and in person, that it had rejected her claim of privilege; (2) warned Ms. Lerner that she could be held in contempt if she continued to refuse to answer; and (3) then posed questions to her (which she continued to refuse to answer on grounds of privilege). Thus, at the time the Committee posed the questions, Ms. Lerner was not "forced to guess" the Committee's position on her claim of privilege, and it would have been an unnecessary "form of words" for the Chairman to continue to repeat the Committee's ruling and warning for each question. Ms. Lerner's refusal thereafter to answer was accordingly "willful" under Section 192.

**B.    Ms. Lerner Did Not Waive Her Fifth Amendment Privilege.**

The Supreme Court has made clear that witnesses who testify before Congress are protected by the Fifth Amendment to the Constitution. *See Quinn*, 349 U.S. at 161. Thus, it is undisputed that Ms. Lerner had the right not to testify at the Committee hearing, given the possibility that her answers could be used against her in a subsequent criminal proceeding. *See, e.g., Hoffman v. United States*, 341 U.S. 479, 486 (1951); *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984); *United States v. Balsys*, 524 U.S. 666, 672 (1998). The only question is whether she waived that right by giving her opening statement on May 22, 2013.

In finding that Ms. Lerner waived her Fifth Amendment privilege, the Committee focused on her assertions that she had done nothing wrong, had broken no laws, had violated no IRS rules, and had provided no false information to Congress. Citing the Supreme Court's decisions in *Brown v. United States*, 356 U.S. 148, 154-55 (1958), and *Mitchell v. United States*,

4

526 U.S. 314, 321 (1999), the Committee found that these "four specific denials" amounted to voluntary testimony about the subject matter of the hearing, which Ms. Lerner could not then refuse to be questioned about. *See* Committee Report, at 11, 36-37.

We respectfully disagree with this conclusion, however, because case law establishes that Ms. Lerner's general denials of wrongdoing did not amount to "testimony" about the actual facts under the Committee's review. In *Brown*, the defendant in a civil immigration proceeding voluntarily took the stand and gave substantive testimony on direct examination, but refused to answer pertinent questions about that testimony on cross-examination. 356 U.S. at 150-52. The Court upheld the defendant's contempt conviction for that refusal, noting that a party may not put a "one-sided account of the matters in dispute" before the trier of fact, which could not be tested by adversarial cross-examination. *Id.* at 155. *See also Mitchell*, 526 U.S. at 321 (noting that "a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details").

Where witnesses do not offer *substantive* testimony, however, and instead merely make general denials or summary assertions, federal courts have been unwilling to infer a waiver of the Fifth Amendment privilege. *See, e.g., Isaacs v. United States*, 256 F.2d 654, 656-57, 660-61 (8th Cir. 1958) (witness before grand jury who repeatedly stated that he had committed no crime did not waive his Fifth Amendment privilege); *Ballantyne v. United States*, 237 F.2d 657, 665 (5th Cir. 1956) (concluding that "the United States Attorney could not, by thus skillfully securing from appellant a general claim of innocence, preclude him from thereafter relying upon his constitutional privilege when confronted with specific withdrawals"); *United States v. Hoag*, 142 F. Supp. 667, 669 (D.D.C. 1956) (witness who generally denied being a spy or saboteur before Congressional committee did not waive Fifth Amendment privilege).

In her opening statement before the Committee, Ms. Lerner offered no account or explanation of what occurred and revealed no facts about the matters under the Committee's review. Instead, she made general assertions lacking substantive content. She did not purport to explain why she believed she was innocent or why any information she had previously provided was not false. This matter therefore appears materially indistinguishable from cases like *Isaacs*, *Ballantyne*, and *Hoag*, in which defendants were held not to have waived Fifth Amendment protection simply by asserting general innocence or even denying guilt of specific offenses.

There is likely an additional barrier to finding that Ms. Lerner waived her Fifth Amendment privilege through her general denials of wrongdoing. Unlike the civil defendant in *Brown* and defendants in criminal cases (who similarly subject themselves to wide-ranging cross-examination if they voluntarily take the stand), Ms. Lerner was an ordinary witness who had been compelled to testify by subpoena. The Supreme Court has held that "where the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him." *McCarthy v. Arndstein*, 262 U.S. 355, 359 (1923); *see also, e.g., United States v. Powell*, 226 F.2d 269, 276 (D.C. Cir. 1955); *accord Rogers v. United States*, 340 U.S. 367, 368, 373 (1951). Ms. Lerner did not testify to any incriminatory facts during her opening statement but, to the contrary, asserted her innocence. Thus, like the defendant in *Arndstein*, she had the right to "stop[] short" after making her self-exculpatory statement.

The Committee found that Ms. Lerner's opening statement was the equivalent of the "voluntary" testimony at issue in *Brown*, presumably because she did not have to make the statement at all. Although in theory this could render the *Arndstein* line of cases inapplicable, that conclusion is doubtful. Ms. Lerner was compelled by subpoena to appear before the Committee on May 22, 2013 after she declined an invitation to appear voluntarily and informed the Committee that she would invoke her Fifth Amendment privilege. Courts have not found waiver under such circumstances. *See, e.g., Hoag*, 142 F. Supp. at 669-71.

### C.    A United States Attorney Retains Discretion To Decline To Present a Matter to the Grand Jury Under 18 U.S.C. § 194 When He Determines that a Witness Is Shielded From Prosecution by the Constitution.

Because Ms. Lerner did not waive her Fifth Amendment privilege before refusing to answer the Committee's questions, a conviction under Section 192 for that refusal would be unconstitutional. The question thus arises whether Section 194 requires this matter to be presented to a grand jury even though no prosecution can constitutionally proceed. We have concluded that it does not.

This conclusion follows from the Justice Department's longstanding interpretation of Section 194 as preserving the exercise of prosecutorial discretion in the Executive Branch. It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege. The fullest explanation of the legal basis for the Department's position was provided during the Reagan Administration by Assistant Attorney General for the Office of Legal Counsel Theodore Olson. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984) (the "1984 Opinion"). Although the 1984 Opinion was issued to address the specific question of contempt citations made against Executive Branch officials asserting executive privilege, the opinion addressed the more general question of whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. As to that question, the opinion concluded that "as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury." *Id.* at 128.

The 1984 Opinion reached this conclusion for several reasons. First, the opinion noted that the Department had previously taken the position, in a case where the President's executive privilege was not at issue, that it was not required to refer a contempt-of-Congress matter to a grand jury. *Id.* at 119-20. Second, the opinion noted that a number of judicial decisions implicitly recognized that a United States Attorney retained discretion not to make a referral to a grand jury, despite the apparently mandatory language of Section 194. *Id.* at 120-22. The opinion explained that the cited cases indicate that "prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena." *Id.* at 122. Third,

6

**-1226-**

the opinion cited the common-law doctrine of prosecutorial discretion, which precludes an interpretation that the statute requires automatic referral. *Id.* Because the "general rule is that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[,]'" the opinion noted that "courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated." *Id.* Finally, the opinion noted that interpreting Section 194 to require referral to a grand jury would raise serious constitutional problems in light of separation-of-powers principles. *Id.* at 124-25. The opinion cited cases in which courts had refused to issue, or overturned on appeal, orders purporting to compel United States Attorneys to prosecute individuals. *Id.* at 125-26. Noting the Supreme Court's admonition that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," the opinion further stated that "[a] legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based." *Id.* at 126-27 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

Thus, for at least three decades it has been the Department's position that Section 194 does not eliminate a United States Attorney's traditional prosecutorial discretion not to bring a specific matter before a grand jury. And, in light of the Department's criminal charging policy, which provides that a federal prosecutor should "commence or recommend Federal prosecution" of a person only "if he/she believes that the person's conduct constitutes a Federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction," *see* United States Attorneys' Manual § 9-27.220A, we have concluded it would not be proper to commence grand jury proceedings against a witness whose prosecution for contempt is barred by the Constitution.

## III.    Conclusion

We wish to assure you that the Department of Justice does not question the authority of Congress "to summon witnesses before either House or before their committees," or "to pass laws 'necessary and proper' to carry into effect its power to get testimony." *See Adams v. Maryland*, 347 U.S. 179, 183 (1954) (citing U.S. Const. art. I, § 8). Thus, in appropriate circumstances, a United States Attorney's Office will refer to a grand jury under Section 192 witnesses who contumaciously withhold testimony or other information that Congress has legitimately sought to compel in the exercise of its legislative or oversight responsibilities. Because, however, the authority of any branch of the United States government to compel witness testimony is limited by the protections of the Constitution, and Ms. Lerner did not waive those protections in this matter, the United States Attorney's Office will not bring the instant contempt citation before a grand jury.

Sincerely,

Ronald C. Machen Jr.
United States Attorney

7

# EXHIBIT Q



# Office of the Attorney General
Washington, D.C.

February 29, 2008

The Honorable Nancy Pelosi
Speaker
House of Representatives
Washington, D.C. 20515

Dear Madam Speaker:

As you know, the President, asserting executive privilege, directed that Joshua Bolten, Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, not release certain documents or provide related testimony subpoenaed by the Committee on the Judiciary of the House of Representatives. The President also directed Ms. Miers to invoke her constitutional immunity from compelled congressional testimony and to decline to appear before the Committee. These directives were based on legal opinions from the Department of Justice advising that the assertions of privilege and immunity were legally proper.

Notwithstanding the President's directives, on July 25, 2007, the House Committee on the Judiciary adopted a resolution recommending that the House of Representatives cite Mr. Bolten and Ms. Miers for contempt. On November 5, 2007, the Committee referred its report on the resolution to the full House. On February 14, 2008, the House adopted a contempt resolution, which you referred on February 28, 2008, to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

As explained in our July 24, 2007, letter to Judiciary Committee Chairman Conyers, a copy of which is enclosed, the Department of Justice's longstanding position taken during Administrations of both parties is "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984). Further, as we also explained in the letter to Chairman Conyers, the same principles that preclude prosecuting an Executive Branch official for abiding by a presidential claim of executive privilege also preclude prosecuting a senior presidential adviser for lawfully invoking her constitutional immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper.

Accordingly, the Department has determined that the non-compliance by Mr. Bolten and Ms. Miers with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers.

Please do not hesitate to contact me if you would like to discuss this matter further.

Sincerely,

Michael B. Mukasey
Attorney General

Enclosure

cc:    The Honorable John Boehner
       The Honorable John Conyers, Jr.
       The Honorable Lamar Smith

2

# EXHIBIT R



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Principal Deputy Assistant Attorney General      *Washington, D.C. 20530*

May 16, 2005

**MEMORANDUM FOR ATTORNEYS OF THE OFFICE**

*Re: Best Practices for OLC Opinions*

By delegation, the Office of Legal Counsel exercises the Attorney General's authority under the Judiciary Act of 1789 to advise the President and executive agencies on questions of law. OLC is authorized to provide legal advice only to the Executive Branch; we do not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch. OLC's primary function is to provide formal advice through written opinions signed by the Assistant Attorney General or (with the approval of the AAG) a Deputy Assistant Attorney General. Our Office is frequently called upon to address issues of central importance to the functioning of the federal Government, and, subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch. Accordingly, it is imperative that our opinions be clear, accurate, thoroughly researched, and soundly reasoned. The value of an OLC opinion depends on the strength of its analysis. Over the years, OLC has earned a reputation for giving candid, independent, and principled advice—even when that advice may be inconsistent with the desires of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in preparing the formal opinions of the Office.

*Evaluating opinion requests*. Each opinion request is assigned to a Deputy and an Attorney-Adviser, who will review the question presented and any relevant statutory materials, prior OLC opinions, and leading cases to determine preliminarily whether the question is appropriate for OLC advice and whether it appears to merit a written opinion, as distinct from informal advice. The legal question presented should be focused and concrete; OLC generally avoids undertaking a general survey of an area of law or a broad, abstract legal opinion. There also should be a practical need for the opinion; OLC particularly should avoid giving unnecessary advice where it appears that policymakers are likely to move in a different direction. A formal opinion is more likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies. If we are asked to provide an opinion to an executive agency whose head does not serve at the pleasure of the President (i.e., an agency whose head is subject to a "for cause" removal restriction), our practice is to receive in writing from that agency an agreement to be bound by our opinion. As a prudential matter, OLC should avoid opining on questions likely to be at issue in pending or imminent litigation involving the United States as a party (except where there is a need to resolve a dispute within the Executive Branch over a position to be taken in litigation). Finally, the opinions of the Office should address legal questions prospectively; OLC avoids opining on the

legality of past conduct (though from time to time we may issue prospective opinions that confirm or memorialize past advice or that necessarily bear on past conduct).

***Soliciting the views of interested agencies***.  Before we proceed with an opinion, our general practice is to ask the requesting agency for a detailed memorandum setting forth the agency's own analysis of the question—in many cases, there will be preliminary discussions with the requesting agency before the formal opinion request is submitted to OLC, and the agency will be able to provide its analysis along with the opinion request.  (A detailed analysis is not required when the request comes from the Counsel to the President, the Attorney General, or one of the three other Senior Management Offices of the Department of Justice.)  In the case of an interagency dispute, we will ask each side to submit such a memorandum.  Ordinarily, we expect the agencies on each side of a dispute to share their memoranda with the other side, or permit us to share them, so that we may have the benefit of reply comments, when necessary.  When appropriate and helpful, and consistent with the confidentiality interests of the requesting agency, we will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented.  For example, when the question involves the interpretation of a treaty or a matter of foreign relations, our practice is to seek the views of the State Department; when it involves the interpretation of a criminal statute, we will usually seek the views of the Justice Department's Criminal Division.  We will not, however, circulate a copy of an opinion request to third-party agencies without the prior consent of the requesting agency.

***Researching, outlining, and drafting***.  An OLC opinion is the product of a careful and deliberate process.  After reviewing agency submissions and relevant statutes, OLC opinions and leading cases, the Deputy and Attorney-Adviser should meet to map out a plan for researching the issues and preparing an outline and first draft of the opinion.  The Deputy and Attorney-Adviser should set target deadlines for each step in the process and should meet regularly to review progress on the opinion.  A thorough working outline of the opinion will help to focus the necessary research and the direction of the analysis.  An early first draft often will help identify weaknesses or holes in the analysis requiring greater attention than initially anticipated.  As work on the opinion progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time to time with the AAG to discuss the status and direction of the opinion project.

An OLC opinion should focus intensively on the central issues raised by a question of law and should, where possible, avoid addressing issues not squarely presented.  On any issue involving a constitutional question, OLC's analysis should focus principally on the text of the Constitution and the historical record illuminating the original meaning of the text and should be faithful to that historical understanding.  Where the question relates to the authorities of the President or other executive officers or the separation of powers between the Branches of the Government, past precedents and historical practice are often highly relevant.  On questions of statutory and treaty interpretation, OLC's analysis will be guided by the text and will rely on traditional tools of construction in interpreting the text.  OLC opinions should also consider and apply the past opinions of Attorneys General and this Office, which are ordinarily given great weight.  The Office will not lightly depart from such past decisions, particularly where they directly address and decide a point in question. Decisions of the Supreme Court and courts of appeals directly on point often provide guiding authority and should be thoroughly addressed,

particularly where the issue is one that is likely to become the subject of litigation.  Many times, however, our Office will be asked to opine on an issue of first impression or one that is unlikely to be resolved by the courts; in such instances, court decisions in relevant or analogous areas may serve as persuasive authority, depending on the strength of their analysis.

In general, we strive in our opinions for clarity and conciseness in the analysis and a balanced presentation of arguments on each side of an issue.  If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides; in doing so, it is best, to the extent practicable, to avoid ascribing particular points of view to the agencies in a way that might suggest that one side is the "winner" and one the "loser."  OLC's interest is simply to provide the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not.  It is therefore often not necessary or desirable to cite or quote agencies' views letters.

*Secondary review of draft opinions*.  Before an OLC opinion is finalized it undergoes rigorous review by the Front Office within OLC and often by others outside the Office.  When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, the opinion is generally assigned to a second Deputy for a "second Deputy read."  Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, key cases, relevant prior OLC opinions, and the views memoranda received from interested agencies.  Once the second Deputy read is complete and the second Deputy's comments have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies, and any particular attorneys within the Office with relevant expertise.

Once OLC's internal review is complete, a draft of the opinion may be shared outside the Office.  In some cases, because of time constraints, OLC may circulate a draft opinion before the internal review is complete.  Our general practice is to circulate draft opinions to the Office of the Attorney General and the Office of the Deputy Attorney General for review and comment.  When and as warranted, we also circulate an informational copy of the draft opinion to the Office of the Counsel to the President.  In addition, in most cases, we will circulate a draft to the requesting agency (or, in cases where we are resolving a dispute between agencies, to those agencies that are parties to the dispute) for review, primarily to ensure that the opinion does not misstate the facts or the legal points of interest to the agencies.  On certain occasions, where we determine it appropriate, we may circulate a draft opinion to one or more other agencies that have special expertise or interest in the subject matter of the opinion, particularly if they have offered views on the question.

*Finalizing opinions*.  Once all substantive work on the opinion is complete, it must undergo a thorough cite check by our paralegal staff to ensure the accuracy of all citations and consistency with the Office's rules of style.  After all cite-checking changes have been approved and made, the final opinion should be printed on bond paper for signature.  Each opinion ready for signature should include a completed opinion control sheet signed by the primary Deputy, the Attorney-Adviser, and the Deputy who did the second Deputy read.  After it is signed and issued, if the opinion is unclassified, it will be loaded into our ISYS database and included in the Office's unclassified Day Books.  A separate file containing a copy of the signed opinion, the

opinion control sheet, and copies of key materials not readily available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, will also be retained in our files for future reference.

*Opinion publication*.  Most OLC opinions consist of confidential legal advice for senior Executive Branch officials.  Maintaining the confidentiality of OLC opinions is often necessary to preserve the deliberative process of decisionmaking within the Executive Branch and attorney-client relationships between OLC and other executive offices; in some cases, the disclosure of OLC advice also may interfere with federal law enforcement efforts.  These confidentiality interests are especially great for OLC opinions relating to the President's exercise of his constitutional authorities, including his authority as Commander in Chief.  It is critical to the discharge of the President's constitutional responsibilities that he and the officials under his supervision are able to receive confidential legal advice from OLC.

At the same time, many OLC opinions address issues of relevance to a broader circle of Executive Branch lawyers or agencies than just those officials directly involved in the opinion request.  In some cases, the President or an affected agency may have a programmatic interest in putting other agencies, Congress, or the public on notice of the legal conclusion reached by OLC and the supporting reasoning.  In addition, some OLC opinions will be of significant practical interest and benefit to lawyers outside the Executive Branch, or of broader interest to the general public, including historians.  In such cases, and when consistent with the legitimate confidentiality interests of the President and the Executive Branch, it is the policy of our Office to publish OLC opinions.  This publication program is in accordance with a directive from the Attorney General to OLC to publish selected opinions on an annual basis for the convenience of the Executive, Legislative, and Judicial Branches of the Government, and of the professional bar and the general public.

At the time an opinion is signed, the attorneys responsible for the opinion will make a preliminary recommendation as to whether it may be appropriate for eventual publication.  Thereafter, on a rolling or periodic basis, each opinion issued by the Office is reviewed for possible publication by the OLC Publication Review Committee.  If the Publication Review Committee decides that the opinion meets the Office's basic criteria for publication, the Committee will solicit the views of the agency or Justice Department component that requested the opinion, and any agency or component likely to be affected by its publication, as to whether the opinion is appropriate for current publication, whether its publication should be deferred, or whether it should not be published.  OLC gives due weight to the publication recommendations of interested agencies and components, particularly where they raise specific concerns about programmatic or litigation interests that might be advanced or compromised by publication of the opinion.  OLC also generally solicits the views of the Office of the Attorney General and the Office of the Counsel to the President on publication questions, particularly with respect to significant opinions of the Office.

After the final decision is made to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm.  All opinions posted on the Web site are eventually published in OLC's hardcover bound volumes.

\*      \*      \*

Please let me know if you have any questions about the principles set forth above or any suggestions for revising or adding to the guidance provided in this memorandum.

Steven G. Bradbury
Principal Deputy Assistant Attorney General

# EXHIBIT S

# STARE DECISIS IN THE OFFICE OF LEGAL COUNSEL

*Trevor W. Morrison\**

*Legal interpretation within the Executive Branch has attracted increased interest in recent years, much of it focused on the Justice Department's Office of Legal Counsel (OLC). The most significant centralized source of legal advice within the Executive Branch, OLC has also been plagued by charges of undue politicization—especially in connection with various issues relating to the "war on terror." Yet there has been little consideration of the role in OLC of one of the main devices thought to constrain political and ideological preferences within the Judicial Branch—stare decisis.*

*This Article provides the first sustained descriptive and normative examination of the role of stare decisis in OLC. Descriptively, it analyzes all of OLC's publicly available legal opinions from the beginning of the Carter Administration through the end of the first year of the Obama Administration. The data show that OLC rarely openly departs from its prior opinions, but that an express request for overruling from the executive entity most affected by the opinion is a good predictor of such a departure. Normatively, the Article considers whether OLC should employ something like a rule of stare decisis with respect to its prior opinions, and, if so, in what circumstances it is justified in departing from those precedents. It argues that stare decisis has a legitimate place in OLC, but that OLC's location within the Executive Branch affects both the weight it should accord its precedents and the circumstances in which it should depart from them.*

INTRODUCTION ................................................. 1449
I. THE SUPPLY AND DEMAND OF OLC LEGAL ADVICE .......... 1458
    A. Background ......................................... 1458
    B. Particular Features of OLC's Work ................... 1460
        1. Formally Nonmandatory Jurisdiction .............. 1460
        2. Formal Requests, Binding Answers, and Lawful
            Alternatives .................................... 1463
        3. Written versus Oral Advice ..................... 1468
II. A HISTORICAL AND EMPIRICAL PICTURE OF OLC
    PRECEDENT ............................................. 1470
    A. Early Attorney General Accounts of Precedent ........ 1470

---

\* Professor of Law, Columbia Law School. For helpful comments on earlier drafts, I thank Bruce Ackerman, Bill Dailey, John Dehn, Walter Dellinger, Ariela Dubler, Jamal Greene, Philip Hamburger, Bert Huang, Marty Lederman, John Manning, Gillian Metzger, Henry Monaghan, Nate Persily, Jeff Powell, Fred Schauer, Bill Simon, Norman Spaulding, Kevin Stack, Peter Strauss, Matt Waxman, and participants in faculty workshops and colloquia at Columbia, Michigan, Northwestern, and UCLA Law Schools. I am grateful to Kevin Angle, Beth Bates, Adam Carlis, Andrew Davis, Matt Guarnieri, Kristin Olson, and Arvind Ravichandran for superb research assistance, and to Adam Klein of the *Columbia Law Review* for outstanding editorial support. I served in the Office of Legal Counsel in 2000–2001 and in the White House Counsel's Office in 2009. The views presented here are solely my own and should not be taken to represent the views of any part of the federal government.

1448

   B. The Practice of Precedent at OLC ................... 1475
      1.   The Data ....................................... 1476
      2.   Findings ....................................... 1479
           a.   Overall Treatment .......................... 1480
           b.   Statutory versus Constitutional Precedent ..... 1481
           c.   Party Affiliation and Presidential
                Administration ............................. 1484
           d.   Requests for Reconsideration ................ 1488
  III. TOWARD A THEORY OF PRECEDENT IN OLC ............... 1492
   A. Reasons for Following Precedent ..................... 1494
      1.   The Standard Stare Decisis Values ............... 1494
      2.   Stare Decisis and Executive Power ............... 1497
   B. Overruling ........................................... 1504
      1.   The *Casey* Factors ............................ 1504
      2.   The President's Constitutional Views ............ 1511
      3.   Disclosure ..................................... 1518
   C. An Objection ........................................ 1520
CONCLUSION ................................................. 1524

### INTRODUCTION

The doctrine of precedent, or stare decisis,[1] is a staple of American law. In barest form, it holds that a prior authoritative decision to resolve an issue in a particular way provides a reason to continue resolving the issue that way, without regard to the apparent correctness of the prior decision.[2] There is a vast academic literature on the topic, almost all of which focuses on the courts.[3] Yet just as legal interpretation in general is not the exclusive province of the judiciary, so too do questions of precedent extend beyond the courts.

This point is underappreciated. To be sure, there is a substantial literature—generally pitting "judicial supremacy" against "departmentalism"—on the extent to which judicial interpretations of the Constitution

---

1. In full, "stare decisis et non quieta movere"—"[t]o stand by things decided, and not to disturb settled points." Black's Law Dictionary 1443 (8th ed. 2004).

2. This is a version of Frederick Schauer's account: "The previous treatment of occurrence *X* in manner *Y* constitutes, *solely because of its historical pedigree*, a reason for treating *X* in manner *Y* if and when *X* again occurs." Frederick Schauer, Precedent, 39 Stan. L. Rev. 571, 571 (1987) [hereinafter Schauer, Precedent].

3. See, e.g., Saul Brenner & Harold J. Spaeth, Stare Indecisis: The Alteration of Precedent on the Supreme Court, 1946–1992 (1995); Thomas G. Hansford & James F. Spriggs II, The Politics of Precedent on the U.S. Supreme Court (2006); Larry Alexander, Constrained by Precedent, 63 S. Cal. L. Rev. 3 (1989); Richard H. Fallon, Jr., Stare Decisis and the Constitution: An Essay on Constitutional Methodology, 76 N.Y.U. L. Rev. 570 (2001); Henry Paul Monaghan, Stare Decisis and Constitutional Adjudication, 88 Colum. L. Rev. 723 (1988); Caleb Nelson, Stare Decisis and Demonstrably Erroneous Precedents, 87 Va. L. Rev. 1 (2001); Schauer, Precedent, supra note 2; Jeffrey A. Segal & Harold J. Spaeth, The Influence of Stare Decisis on the Votes of United States Supreme Court Justices, 40 Am. J. Pol. Sci. 971 (1996).

ought to bind the other branches, and, conversely, on the weight courts should give to the constitutional judgments of those branches.[4] But those questions all focus one way or another on the courts. What about the role of *non*judicial precedent in *non*judicial legal interpretation, constitutional and otherwise?[5] Do nonjudicial actors called upon to answer legal questions employ anything like a stare decisis rule with respect to their own prior decisions? Should they?

Neither the descriptive nor the normative answer is likely to be uniform across all domains.[6] What is true in Congress may not be true in the Executive Branch. And even within the latter, differences in function, power, and accountability mean that not only the content but also the

---

4. See, e.g., Congress and the Constitution (Neal Devins & Keith E. Whittington eds., 2005); Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review (2004); Mark Tushnet, Taking the Constitution Away from the Courts (1999); Larry Alexander & Frederick Schauer, Defending Judicial Supremacy: A Reply, 17 Const. Comment. 455 (2000); Larry Alexander & Frederick Schauer, On Extrajudicial Constitutional Interpretation, 110 Harv. L. Rev. 1359 (1997); Michael C. Dorf & Barry Friedman, Shared Constitutional Interpretation, 2000 Sup. Ct. Rev. 61; Dawn E. Johnsen, Faithfully Executing the Laws: Internal Legal Constraints on Executive Power, 54 UCLA L. Rev. 1559 (2007); Sanford Levinson, Constitutional Protestantism in Theory and Practice: Two Questions for Michael Stokes Paulsen and One for His Critics, 83 Geo. L.J. 373 (1994); Thomas W. Merrill, Judicial Deference to Executive Precedent, 101 Yale L.J. 969 (1992); Michael Stokes Paulsen, Abrogating Stare Decisis by Statute: May Congress Remove the Precedential Effect of *Roe* and *Casey*?, 109 Yale L.J. 1535 (2000) [hereinafter Paulsen, Abrogating Stare Decisis by Statute]; Michael Stokes Paulsen, Lincoln and Judicial Authority, 83 Notre Dame L. Rev. 1227 (2008); Michael Stokes Paulsen, The Most Dangerous Branch: Executive Power to Say What the Law Is, 83 Geo. L.J. 217 (1994); Cornelia T.L. Pillard, The Unfulfilled Promise of the Constitution in Executive Hands, 103 Mich. L. Rev. 676 (2005); Kermit Roosevelt III, Polyphonic Stare Decisis: Listening to Non-Article III Actors, 83 Notre Dame L. Rev. 1303 (2008); Frederick Schauer, Judicial Supremacy and the Modest Constitution, 92 Calif. L. Rev. 1045 (2004); Larry Alexander & Lawrence B. Solum, Popular? Constitutionalism? 118 Harv. L. Rev. 1594 (2005) (reviewing Kramer, supra); David Barron, Constitutionalism in the Shadow of Doctrine: The President's Non-Enforcement Power, Law & Contemp. Probs., Winter/Spring 2000, at 61. My own contributions include Trevor W. Morrison, Suspension and the Extrajudicial Constitution, 107 Colum. L. Rev. 1533 (2007) [hereinafter Morrison, Suspension] and Trevor W. Morrison, Constitutional Avoidance in the Executive Branch, 106 Colum. L. Rev. 1189 (2006) [hereinafter Morrison, Avoidance].

5. The very few academic treatments of this question include a chapter on "Nonjudicial Precedent" in Michael J. Gerhardt, The Power of Precedent 111 (2008); Harold Hongju Koh, Protecting the Office of Legal Counsel from Itself, 15 Cardozo L. Rev. 513, 515–16 (1993); and Mark Tushnet, Legislative and Executive Stare Decisis, 83 Notre Dame L. Rev. 1339 (2008) [hereinafter Tushnet, Stare Decisis].

6. See Schauer, Precedent, supra note 2, at 603 ("When Congress considers a private bill, precedent is rarely mentioned, but when Congress impeaches and tries a president or a judge, precedent rightfully comes into play. . . . [T]he Department of Justice may rely less on precedent when establishing prosecutorial priorities than when giving advice to the president with respect to constitutional responsibilities." (footnote omitted)); Philip Bobbitt, War Powers: An Essay on John Hart Ely's *War and Responsibility: Constitutional Lessons of Vietnam and its Aftermath*, 92 Mich. L. Rev. 1364, 1383–84 (1994) (book review) ("[T]here are as many kinds of precedent as there are constitutional institutions creating them.").

role of precedent may (and likely should) vary from one executive component and function to the next. Thus, the study of nonjudicial precedent should be context-sensitive. Proceeding from that premise, this Article focuses on the role of precedent in the provision of legal advice by the Justice Department's Office of Legal Counsel (OLC).

Of course, OLC is not just any executive office. For decades, it has been the most significant centralized source of legal advice within the Executive Branch.[7] Exercising authority delegated by the Attorney General, it provides legal advice to the President and other executive components. The questions OLC addresses are often among the most vexing in the Executive Branch. Its answers sometimes take the form of written legal opinions which, together with the legal opinions issued directly by Attorneys General themselves, "comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters."[8] And because many of the issues addressed by OLC are unlikely ever to come before a court in justiciable form, OLC's opinions often represent the final word in those areas unless later overruled by OLC itself, the Attorney General, or the President.

The role of precedent at OLC has become a matter of increased interest in recent years, spurred in part by the leak in 2004 of an OLC opinion concluding that the federal anti-torture statute only minimally constrained the government's use of "enhanced interrogation techniques" on suspected terrorists.[9] Known colloquially as the "Torture Memorandum," it became the target of withering public criticism and was soon disavowed by the Justice Department.[10] Some critics saw in the

---

7. See Pillard, supra note 4, at 710 ("[T]he head of the Office of Legal Counsel is the executive branch's chief legal advisor."). Other executive offices with important legal advisory roles extending beyond their own departments or agencies include the Office of the Legal Adviser in the State Department.

8. John O. McGinnis, Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon, 15 Cardozo L. Rev. 375, 376 (1993) [hereinafter McGinnis, Attorney General]. Although Attorneys General still do occasionally issue legal opinions under their own name, "[a]s a matter of practice, since the beginning of the 1960s the Assistant Attorney General for OLC, or on occasion a deputy assistant attorney general, has signed all but a tiny percentage of the Justice Department's legal opinions." H. Jefferson Powell, The Constitution and the Attorneys General, at xv n.2 (1999).

9. See Memorandum from Jay S. Bybee, Assistant Att'y Gen., Office of Legal Counsel, to Alberto R. Gonzales, Counsel to the President, Re: Standards of Conduct for Interrogation Under 18 U.S.C. §§ 2340–2340A, at 34 (Aug. 1, 2002) [hereinafter Torture Memorandum], available at http://www.washingtonpost.com/wp-srv/politics/documents/cheney/torture_memo_aug2002.pdf (on file with the *Columbia Law Review*), subsequently withdrawn and replaced by Memorandum from Daniel Levin, Acting Assistant Att'y Gen., Office of Legal Counsel, to James B. Comey, Deputy Att'y Gen., Re: Legal Standards Applicable Under 18 U.S.C. §§ 2340–2340A (Dec. 30, 2004), available at http://www.justice.gov/olc/18usc23402340a2.htm (on file with the *Columbia Law Review*).

10. See Office of Prof'l Responsibility, U.S. Dep't of Justice, Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected

1452            *COLUMBIA LAW REVIEW*            [Vol. 110:1448]

opinions an abandonment of what they viewed as OLC's proper role, replaced by a willingness to adopt implausible and even professionally irresponsible legal positions in order to please the client—in that case, the White House Counsel.[11] That in turn prompted broader discussion of the procedures OLC should follow when providing legal advice, including the weight it should accord to its own precedents.

Current and past members of OLC have made three noteworthy contributions to the dialogue. The first, called "Principles to Guide the Office of Legal Counsel" (which I will call the Guidelines), was issued in late 2004 by a group of former OLC lawyers in their personal capacities.[12] The second is an official OLC memorandum from May 2005, entitled

---

Terrorists 121–23 (July 29, 2009) [hereinafter OPR Report], available at http:// judiciary.house.gov/hearings/pdf/OPRFinalReport090729.pdf (on file with the *Columbia Law Review*). For a collection of criticisms of the Torture Memorandum, see Morrison, Avoidance, supra note 4, at 1231 n.182.

11. Whether any of the underlying legal advice constituted professional misconduct became the subject of a five-year formal investigation by the Justice Department's Office of Professional Responsibility (OPR). OPR Report, supra note 10. OPR ultimately concluded that former Assistant Attorney General Jay Bybee and former Deputy Assistant Attorney General John Yoo had committed "professional misconduct" (Bybee recklessly and Yoo intentionally) in connection with their work on the Torture Memorandum and related opinions. Id. at 11. In response to objections lodged by Bybee and Yoo, Associate Deputy Attorney General David Margolis reviewed the OPR Report and advised the Attorney General that he did not adopt the professional misconduct findings and would not authorize OPR to refer its findings to relevant state bar authorities. Memorandum from David Margolis, Assoc. Deputy Att'y Gen., to Eric Holder, Att'y Gen., Re: Memorandum of Decision Regarding the Objections to the Findings of Professional Misconduct in the Office of Professional Responsibility's Report of Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists 2 (Jan. 5, 2010) [hereinafter Margolis Memorandum], available at http://judiciary.house.gov/hearings/ pdf/DAGMargolisMemo100105.pdf (on file with the *Columbia Law Review*). Of course, whether these attorneys committed professional misconduct is not the same as whether they followed what anyone would call best practices for OLC. As to the latter, Margolis called the Torture Memorandum and related opinions "an unfortunate chapter in the history of the Office of Legal Counsel." Id. at 67. He suggested that Yoo allowed his "loyalty to his own ideology and convictions [to] clou[d] his view of his obligation to his client and [lead] him to author opinions that reflected his own extreme, albeit sincerely held, views of executive power while speaking for an institutional client." Id. at 67.

12. Walter Dellinger, et al., Principles to Guide the Office of Legal Counsel (2004) [hereinafter OLC Guidelines], reprinted in Dawn E. Johnsen, supra note 4, 1603 app. 2 (2007). The nineteen signatories to the Guidelines all served in OLC during the Clinton Administration. Some also served in previous Republican administrations or held over into the George W. Bush Administration. Five now serve or have served in the Obama Administration, including two in OLC. I note that I have worked with some of the signatories on related projects, including congressional testimony endorsing the Guidelines. See Restoring the Rule of Law: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 110th Cong. 180 (2008) [hereinafter Hearing, Restoring the Rule of Law] (joint statement of David J. Barron, Walter E. Dellinger, Dawn E. Johnsen, Neil J. Kinkopf, Martin S. Lederman, Trevor W. Morrison, and Christopher H. Schroeder). I also worked with several of the signatories during my time at OLC in 2000–2001 and the White House Counsel's Office in 2009.

"Best Practices for OLC Opinions."[13] And the third, issued when this Article was in final editing, is a July 2010 OLC memorandum that "updates" the one from 2005, entitled "Best Practices for OLC Legal Advice and Written Opinions."[14] All three are in substantial agreement on a number of points,[15] including general statements about the importance of precedent. As the 2010 Best Practices Memorandum puts it, "OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question . . . ."[16] Similarly, the Guidelines call for "due respect for the precedential value of OLC opinions from administrations of both parties," and urge "careful consideration and detailed explanation" of any decision to overrule a prior opinion.[17]

But a general acknowledgement of "due respect" for precedent leaves many important questions unresolved. First, does OLC in fact treat its past decisions as presumptively binding without regard to whether it now deems them correct? Or does OLC instead see its precedents as

---

13. Memorandum from Steven G. Bradbury, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to Attorneys of the Office, Re: Best Practices for OLC Opinions (May 16, 2005) [hereinafter 2005 OLC Best Practices Memorandum], available at http://www.justice.gov/olc/best-practices-memo.pdf (on file with the *Columbia Law Review*).

14. Memorandum from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, to Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions 1 n.* (Jul. 16, 2010) [hereinafter 2010 OLC Best Practices Memorandum], available at http://www.justice.gov/olc/pdf/olc-legal-advice-opinions.pdf (on file with the Columbia Law Review) ("This memorandum updates a prior memorandum, 'Best Practices for OLC Opinions,' issued May 16, 2005.").

15. The author of the 2005 OLC Best Practices Memorandum, Steven Bradbury, expressed substantial agreement with the Guidelines during the Senate hearings on his nomination to head OLC. See Confirmation Hearings on Federal Appointments: Hearings Before the S. Comm. on the Judiciary, 109th Cong. 766 (2005) (written responses of Steven Bradbury, nominee to the position of Assistant Attorney General for OLC, to questions from Senator Leahy) ("The [Guidelines] generally reflect operating principles that have long guided OLC in both Republican and Democratic administrations."). Other lawyers who occupied senior positions in the Bush Administration have expressed similar agreement. See, e.g., Confirmation Hearing on the Nomination of Timothy Elliott Flanigan to be Deputy Att'y Gen.: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 120 (2005) (written responses of Timothy Flanigan to questions from Senator Kennedy) ("I have reviewed generally the [Guidelines] and agree with much of the document. I believe that the document reflects operating principles that have long guided OLC in both Republican and Democratic administrations."); Jack Goldsmith, The Terror Presidency 33–34 (2007) (expressing agreement with the Guidelines' statement of OLC's basic institutional posture).

16. 2010 OLC Best Practices Memorandum, supra note 14, at 2. The 2010 Memorandum here follows the position marked out in the 2005 Memorandum, which provides that "OLC opinions should . . . consider and apply the past opinions of Attorneys General and this Office, which are ordinarily given great weight. The Office will not lightly depart from such past decisions, particularly where they directly address and decide a point in question." 2005 OLC Best Practices Memorandum, supra note 13, at 2.

17. OLC Guidelines, supra note 12, at 1608–09.

1454            *COLUMBIA LAW REVIEW*            [Vol. 110:1448

merely helpful resources worth consulting, on the theory that past occupants of the office were thoughtful lawyers whose work is liable to be illuminating even though not binding?[18] If the answer lies somewhere in between, where on the continuum between presumptive bindingness and mere illumination does it fall? And moving from the descriptive to the normative, to what extent should OLC treat its precedents as binding?

A second and related question also has both descriptive and normative components: How strong is OLC's tendency to follow precedent, and how strong should it be? The 2010 Best Practices Memorandum says that, "as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes."[19] But what are the appropriate cases? When are the values supporting OLC's adherence to precedent outweighed by other considerations, and when should they be? The classic competing consideration is a belief that the precedent is wrong. If mere error in a precedent were always sufficient to overrule, OLC would have no operative doctrine of stare decisis.[20] But does that mean error should *never* be sufficient to overrule? The Guidelines do not take that position, suggesting instead that "OLC's current best view of the law sometimes will require repudiation of OLC precedent."[21] On this point the drafters likely had in mind the Torture Memorandum. We now know that shortly after Jack Goldsmith became head of OLC in late 2003, he reviewed both the Torture Memorandum and a follow-on opinion[22] and concluded that both were so "deeply flawed," "sloppily reasoned, overbroad, and incautious" that they had to be withdrawn.[23] Goldsmith reached that conclusion even though he supported OLC's "powerful tradition of adhering to

---

18. The latter circumstance involves treating a past decision as a source of what Frederick Schauer calls experience, not precedent. With arguments from experience, "a present array of facts similar to some previous array leads a decisionmaker to draw on experience in reaching a conclusion," as where "a physician sees a certain array of symptoms that in the past have indicated typhoid," and on the basis of that experience "diagnose[s] typhoid when those symptoms again appear." Schauer, Precedent, supra note 2, at 575. Experience, in other words, is consulted on the theory that it is likely to reveal something helpful to the resolution of the present issue. It has no independent weight beyond what it can teach about the present.

19. 2010 OLC Best Practices Memorandum, supra note 14, at 2.

20. See United States ex rel. Fong Foo v. Shaughnessy, 234 F.2d 715, 719 (2d Cir. 1955) ("Stare decisis has no bite when it means merely that a court adheres to a precedent it considers correct."); Schauer, Precedent, supra note 2, at 575 ("[I]f we are truly arguing from precedent, then the fact that something was decided before gives it present value despite our current belief that the previous decision was erroneous.").

21. OLC Guidelines, supra note 12, at 1609.

22. Memorandum from John C. Yoo, Deputy Assistant Att'y Gen., Office of Legal Counsel, to William J. Haynes II, Gen. Counsel, Dep't of Def., Re: Military Interrogation of Alien Unlawful Combatants Held Outside the United States (Mar. 14, 2003), available at http://www.justice.gov/olc/docs/memo-combatantsoutsideunitedstates.pdf (on file with the *Columbia Law Review*).

23. Goldsmith, supra note 15, at 10; see also OPR Report, supra note 10, at 112–13 (describing withdrawal of Yoo Memorandum).

its past opinions, even when a head of the office concludes that they are wrong."[24] Thus the question: How grave must an error be to warrant departing from this tradition? Should error *alone* ever be enough?

Another competing consideration warrants special mention, and will receive extended attention in this Article: the views of the President.[25] The Guidelines state that OLC's work should "reflect the institutional traditions and competencies of the executive branch as well as the views of the President who currently holds office."[26] But what happens when these factors do not align—when OLC precedent is at odds with the views of the current President? The Guidelines recognize but do not resolve this potential tension, stating merely that OLC "serves both the institution of the presidency and a particular incumbent, democratically elected President in whom the Constitution vests the Executive power."[27] In a similar vein, Goldsmith has noted that "OLC is not entirely neutral to the President's agenda," and has suggested OLC should keep "the political dimension in view" when providing legal advice.[28] How should OLC do this? We can fairly predict that OLC will face great pressure to conform its views to those of the President, and it is worth attending to those pressures.[29] But as a matter of best practice, should OLC ever overrule itself in deference to the President's views?

This Article addresses the descriptive and the normative questions posed above. Descriptively, it provides the first empirical survey of OLC's published opinions to determine how often and in what circumstances it departs from its prior opinions. Normatively, it considers whether and to what extent OLC ought to follow a rule of stare decisis. There is a wide range of potential answers to the normative question. At one end of the spectrum, granting "due respect"[30] to OLC's precedents might mean considering them in each case, but following them only to the extent they now appear correct on the merits. At the other end, "due respect" might mean treating past opinions as binding in all cases, even when they conflict with the views of the President—thus requiring him to reverse OLC if he insists on another course. I ultimately defend a middle position. Stare decisis, I argue, has a legitimate place in OLC, but OLC's location within the Executive Branch affects both the weight it should accord its precedents and the circumstances in which it should depart from them.

In elaborating and defending that position, I proceed from two distinct but equally critical premises: that OLC's legal advice is treated as binding within the Executive Branch unless "overruled" by the Attorney General or the President, and that OLC provides advice based on its best

---

24. Goldsmith, supra note 15, at 145.

25. See infra Part III.B.2.

26. OLC Guidelines, supra note 12, at 1606.

27. Id.

28. Goldsmith, supra note 15, at 35.

29. See infra Part I.B.

30. OLC Guidelines, supra note 12, at 1608–09.

view of the law. OLC has consistently embraced both premises when describing its role,[31] and I accept them here. Yet in doing so, I do not mean to suggest there is anything constitutionally inevitable about them. At least in theory, OLC's job could be defined in very different terms.[32] Rather than considering those potential differences here, I take OLC roughly as I find it—or at least as OLC presents itself—and ask what role OLC's precedents should play in its work, accepting that its job is to provide binding legal advice based on its best view of the law.[33] As I explain later in the Article,[34] it is also critical that the formulation here is *OLC's* best view of the law, not *the* best view.[35] This reflects the idea that, as an office within the Executive Branch, OLC views the law through a particular lens, and thus that its best view of the law might legitimately differ on some issues from that of a differently situated actor. With these points in

---

31. See 2010 OLC Best Practices Memorandum, *supra* note 14, at 1 ("OLC's core function . . . is to provide controlling advice to Executive Branch officials on questions of law . . . ."); 2005 OLC Best Practices Memorandum, *supra* note 13, at 1 ("[S]ubject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch."); id. at 3 ("OLC's interest is simply to provide the correct answer on the law . . . ."); OLC Guidelines, *supra* note 12, at 1603 ("OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President."); id. at 1604 ("OLC should provide an accurate and honest appraisal of applicable law, even if that advice will constrain the administration's pursuit of desired policies."). As I describe below in Part I.B.2, there is actually some uncertainty whether OLC's opinions are truly binding within the Executive Branch as a technical matter. But there is a longstanding practice of *treating* them as binding. That practice is the premise on which I rely here.

32. Many other offices in the Justice Department operate in an advocacy mode. Their job is to provide the best defense before a court of an already-passed law or an already-determined position. See generally Seth P. Waxman, Defending Congress, 79 N.C. L. Rev. 1073 (2001) (describing role of Solicitor General in defending laws passed by Congress). OLC could conceivably operate in a similar mode. See, e.g., McGinnis, Attorney General, *supra* note 8, at 377, 402 (identifying three "plausible" models for Attorney General and OLC opinions, including "situational model" in which opinions would be written "in the situational interest of [the] client without any obligation to preserve legal principles whether autonomous or court-centered"). But that is not how OLC has depicted its role. My focus here is on how the actual OLC operates or purports to operate; I do not take up the situational or any other more advocacy-focused model not espoused by OLC itself.

33. I thus do not consider the extent of Congress's power to change OLC's role—by, for example, requiring OLC to provide legal advice based on something other than its best view of the law, or requiring OLC to ignore certain factors (like the views of the President) when providing legal advice, or limiting the power of even the Attorney General or President to overrule OLC's advice. I leave questions of that order for another day. Full consideration of them would require examination of the line of Supreme Court decisions culminating in Free Enterprise Fund v. Public Co. Accounting Oversight Board, 130 S. Ct. 3138 (2010), as well as competing claims about the constitutional contours of presidential law-interpreting authority tracing as far back as the Pacificus-Helvidius debates.

34. See infra Part III.

35. See 2010 OLC Best Practices Memorandum, *supra* note 14, at 1 ("OLC must provide advice based on its best understanding of what the law requires . . . .").

2010]            *STARE DECISIS IN OLC*            1457

mind, my goal is to elaborate a realistic best practice for OLC's treatment
of its precedents.[36]

The Article proceeds in three parts. Part I situates OLC and its work
in institutional context, looking in particular at the incentives and con-
straints OLC faces in its work. The recent history of the Torture
Memorandum and other "war on terror" opinions notwithstanding, ad-
ministrations of both political parties have recognized the instrumental
value of ensuring OLC is broadly perceived as reasonably independent
and credible. An OLC that too readily answers "yes" to its clients is an
OLC whose advice is not worth seeking. To that end, OLC has developed
a number of procedural and other tools to preserve its reputation for
independence, some of which harness political forces to help insulate
OLC rather than to threaten it. In the end, though, those tools are only
as reliable as the OLC personnel employing them.

Against that background, Part II provides a historical and empirical
account. After surveying statements by early Attorneys General describ-
ing their views of the deference due to the legal opinions of their prede-
cessors, I then undertake to provide a descriptive account of precedent—
or, more precisely, the limits of precedent—in OLC. I examine all pub-
licly available, written OLC opinions from the start of the Carter
Administration to the end of the Obama Administration's first year, 1,191
opinions in all, to determine how frequently OLC overrules or substan-

---

36. To be clear, it *is* a premise of this Article that although it may be difficult for OLC
to follow its best view of the law, it is not impossible. I thus reject the idea that OLC is so
completely beholden to the policy or ideological agenda of the incumbent presidential
administration that its advice is best viewed as "invariably and exclusively lawyers'
rationalizations for the policy preferences of the President." Powell, supra note 8, at xvi
(describing and rejecting this view). Throughout its history, OLC has opposed the
President on nontrivial matters. Jack Goldsmith's withdrawal of the Torture Memorandum
is one dramatic example. Others include OLC's conclusion during the Nixon
Administration that the President lacks the inherent authority to impound funds
appropriated by Congress, see Memorandum from William H. Rehnquist, Assistant Att'y
Gen., Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated
for Assistance to Federally Impacted Schools (Dec. 1, 1969), reprinted in Executive
Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of
Powers of the S. Comm. on the Judiciary, 92d Cong. 279 (1971), its conclusion during the
Reagan Administration that the President lacks inherent line-item veto authority, see The
President's Veto Power, 12 Op. O.L.C. 128, 128 (1988), and its conclusion near the end of
the Clinton Administration that a former President can be prosecuted for the same
offenses that had been the focus of an unsuccessful impeachment proceeding against him,
see Memorandum from Randolph D. Moss, Assistant Att'y Gen., Office of Legal Counsel,
to the Att'y Gen., Re: Whether a Former President May Be Indicted and Tried for the
Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate
(Aug. 18, 2000), available at http://www.justice.gov/olc/expresident.htm (on file with the
*Columbia Law Review*). I do not mean to infer too much from anecdotal evidence like this,
but it does show the *possibility* of opposing the President on important issues. Moreover, as
I discuss in Part I.B, OLC has developed a number of practices that help protect it in
situations where its best view of the law departs from the President's (or any other client's)
initially preferred position, so that it can both adhere to that best view and avoid direct,
outcome-determinative confrontations with the President.

tially amends its precedents, and to identify the factors that correlate with overruling. The data suggest that OLC does not often overrule itself and that it is most likely to do so when urged by the executive department or agency most directly affected by the precedent in question.

Moving from the descriptive to the normative, Part III considers the extent to which OLC should follow a rule of stare decisis. I show that most of the values associated with judicial stare decisis—including consistency, predictability, reliance, efficiency, and credibility—are also important in OLC's work. There is thus good reason for OLC to maintain at least a strong presumption in favor of its precedents. I also suggest that OLC's location within the Executive Branch gives it a special reason to grant added weight to its precedents on issues of executive power. Moreover, consideration of that factor helps illuminate what it means for OLC to provide legal advice based on *its* best view of the law.

Part III then turns to the factors OLC should consider when deciding whether to overrule itself. Part of the answer lies in the factors considered by courts, which turn out to be generally applicable in OLC as well. Those factors support, for example, Goldsmith's decision to withdraw the Torture Memorandum. But I also argue that OLC's institutional location introduces an additional legitimate basis for dispensing with the constraints imposed by an earlier opinion: the views of the President. I suggest that although the fact that the current head of OLC disagrees with a precedent is not sufficient to warrant overruling it, in at least some instances the settled and publicly expressed views of the President can be enough. This factor is admittedly difficult to manage; there is a risk that the President's preferences could become dispositive in a way that rendered OLC legal advice no longer truly *its* advice. I offer some thoughts for how to protect against that risk while according appropriate weight to the President's views.

## I. The Supply and Demand of OLC Legal Advice

OLC's work should be viewed in its institutional context. In this Part, I describe the structural, procedural, and other features of that work and discuss some of the incentives created by those features. The goal is to provide a picture of OLC in its institutional context, as a backdrop for the precedent-focused discussions to follow.

### A. *Background*

OLC's core function is to provide "formal advice through written opinions."[37] Its clients range across the Executive Branch, though the White House and the Attorney General are the most frequent.[38] The

---

37. 2005 OLC Best Practices Memorandum, supra note 13, at 1.

38. Pillard, supra note 4, at 711. OLC is authorized to provide legal advice only to the Executive Branch and "do[es] not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch." 2005 OLC

responsibility to advise such clients is assigned by statute to the Attorney General, but is delegated to OLC by regulation.[39]  That delegation is a relatively recent phenomenon.  Indeed, from the earliest days of the Union until the mid-twentieth century, Attorneys General themselves regularly provided legal advice to the President and others in the Executive Branch.[40]

---

Best Practices Memorandum, supra note 13, at 1. However, OLC lawyers do occasionally testify before congressional committees to explain legal positions or practices of the office or other elements of the Executive Branch. See, e.g., The Use of Presidential Signing Statements: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 98–108 (2006) (statement of Michelle E. Boardman, Deputy Assistant Att'y. Gen., Office of Legal Counsel); Federalism Accountability Act of 1999: Hearing on S. 1214 Before the S. Comm. on Governmental Affairs, 106th Cong. 296–305 (1999) (prepared statement of Randolph D. Moss, Acting Assistant Att'y Gen., Office of Legal Counsel). From time to time, OLC lawyers also communicate with congressional staffers in more informal ways to discuss constitutional or other legal issues raised by proposed legislation.

    39. See 28 U.S.C. § 511 (2006) ("The Attorney General shall give his advice and opinion on questions of law when required by the President."); id. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."); id. § 513 ("When a question of law arises in the administration of [one of the military departments] . . . , the cognizance of which is not given by statute to some other officer . . . , the Secretary of the military department shall send it to the Attorney General for disposition."); 28 C.F.R. § 0.25(a) (2009) (assigning to Assistant Attorney General for OLC the task of "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet"); id. § 0.25(c) (tasking Assistant Attorney General for OLC with "[r]endering opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department"); see also 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("By delegation, [OLC] exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law."); 4A Opinions of the Office of Legal Counsel of the United States Department of Justice Consisting of Selected Memorandum Opinions Advising the President of the United States, the Attorney General, and Other Executive Officers of the Federal Government in Relation to Their Official Duties, at v (Margaret Colgate Love ed., 1980) [hereinafter Opinions of the Office of Legal Counsel] (summarizing history of vesting of this responsibility in OLC).

    40. When section 35 of the Judiciary Act of 1789 created the office of Attorney General of the United States, one of the two duties it imposed on that officer was "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments." Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93. Perhaps the most important early exercises of that authority came in 1791, when Attorney General Randolph issued two opinions to President Washington on the constitutionality of the bill to incorporate a Bank of the United States. Powell, supra note 8, at 3–10. Randolph concluded that the bill exceeded Congress's authority. The competing opinions of Secretary of the Treasury Hamilton and Secretary of State Jefferson on the issue are relatively well known; Randolph's analysis has received less attention, but in many ways may be "closer in terms of method and approach to the mainstream of contemporaneous legal thought than the ideologically charged opinions of either Jefferson or Hamilton." Id. at 10. In the end Washington was persuaded by Hamilton's

1460             *COLUMBIA LAW REVIEW*             [Vol. 110:1448

In 1870, Congress created the position of Solicitor General and included among his responsibilities the provision of legal opinions on matters referred by the Attorney General.[41] Starting in the 1920s, that function was performed by a specialized Assistant Solicitor General.[42] In 1933, Congress made that Assistant subject to presidential nomination and Senate confirmation.[43] It was not until 1950 that Congress replaced that position with a separate office (first known as the Executive Adjudications Division and then renamed the Office of Legal Counsel in 1953) led by its own presidentially nominated and Senate confirmed Assistant Attorney General.[44]

Today, OLC is a fairly small office of about two dozen lawyers. In addition to the Assistant Attorney General who heads the office, there are also several politically appointed (but not Senate confirmed) Deputy Assistant Attorneys General along with one Deputy who is not politically appointed. The rest of the lawyers in the office are "career" civil service lawyers. Most are called Attorney-Advisers; a few are members of the elite Senior Executive Service with the title Senior Counsel.[45] Many Attorney-Advisers serve in the office for only a few years, although some remain for much longer.

## B. *Particular Features of OLC's Work*

OLC's legal advisory function is not subject to the justiciability constraints applicable to courts, but neither is it the self-directed work of an academic. Its perspective is not that of a life-tenured judge, but neither is it that of an avowedly partial advocate. And its opinions are not back-stopped by a court's contempt power, but neither are they merely precatory. In short, its work "is something inevitably, and uncomfortably, in between."[46] Here I describe some aspects of that in-between space.

1. *Formally Nonmandatory Jurisdiction.* — With a few exceptions, there is no formal requirement that legal questions within the Executive Branch be submitted to OLC. One exception is for certain questions arising within the military, another is for jurisdictional or other disputes between agencies or departments, and a third involves review of proposed executive orders for form and legality. In those circumstances, statutes or regulations either require or strongly encourage the submission of the

---

arguments defending the bill, and signed it into law. And of course the Supreme Court ultimately upheld Congress's power to charter a national bank in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).

41. Act of June 22, 1870, ch. 150, §§ 1–2, 16 Stat. 162.

42. See Pillard, supra note 4, at 710.

43. Fourth Deficiency Act, Fiscal Year 1933, Pub. L. No. 73-78, § 16, 48 Stat. 283, 307–08; Pillard, supra note 4, at 710.

44. Reorganization Plan No. 2 of 1950, § 4, 15 Fed. Reg. 3173, 3173–74, reprinted in 64 Stat. 1261, 1261 (1950); see also Opinions of the Office of Legal Counsel, supra note 39, at v; Pillard, supra note 4, at 710.

45. Pillard, supra note 4, at 716 n.125.

46. Goldsmith, supra note 15, at 35.

matter to OLC.[47]  But otherwise, as a formal matter OLC's involvement is a function of client choice.

That discretionary function gives OLC an incentive to provide legal advice in a way that encourages its clients to return with more requests in the future.[48]  And that, in turn, creates a risk that OLC may be tempted to say "yes" too readily—concluding on dubious grounds that the client possesses the legal authority to take the action in question, or that it does not have certain legal obligations it would like to avoid.  Clients like good news, and may be more likely to return if OLC is perceived as a reliable source of such news.

On the other hand, an OLC that says "yes" too often is not in the client's long-run interest.[49]  Virtually all of OLC's clients have their own legal staffs, including the White House Counsel's Office in the White House and the general counsel's offices in other departments and agencies.  Those offices are capable of answering many of the day-to-day issues that arise in those components.  They typically turn to OLC when the issue is sufficiently controversial or complex (especially on constitutional questions) that some external validation holds special value.[50]  For example, when a department confronts a difficult or delicate constitutional question in the course of preparing to embark upon a new program or course of action that raises difficult or politically sensitive legal questions, it has an interest in being able to point to a credible source affirming the

---

47. See 28 U.S.C. § 513 (2006) ("When a question of law arises in the administration of [one of the military departments] . . . , the cognizance of which is not given by statute to some other officer . . . , the Secretary of the military department shall send it to the Attorney General for disposition."); Management of Federal Legal Resources, Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1980), reprinted in 28 U.S.C. § 509 (1982) (providing that "[w]henever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is *encouraged* to submit the dispute to the Attorney General," and that "[w]henever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies *shall* submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere" (emphasis added)).  The power to resolve all these is part of the power delegated by the Attorney General to OLC. See 28 C.F.R. § 0.25(b) (2009) (delegating to OLC the task of "[p]reparing and making necessary revisions of proposed Executive orders and proclamations, and advising as to their form and legality prior to their transmission to the President").

48. Cf. Pillard, supra note 4, at 716–17 ("Because it lacks mandatory jurisdiction, OLC decides only those issues that the [P]resident, the Attorney General, or the heads of agencies . . . decide to bring to it. . . . [T]he more critically OLC examines executive conduct, the more cautious its clients are likely to be in some cases about seeking its advice.").

49. See Goldsmith, supra note 15, at 38 (quoting Walter Dellinger, former head of OLC during the Clinton Administration, as saying: "You won't be doing your job well, and you won't be serving your client's interests, if you rubber-stamp everything the client wants to do.").

50. See Pillard, supra note 4, at 714 (describing reasons why OLC's advice might be sought).

legality of its actions.[51]  The in-house legal advice of the agency's general
counsel is unlikely to carry the same weight.[52]  Thus, even though those
offices might possess the expertise necessary to answer at least many of
the questions they currently send to OLC, in some contexts they will not
take that course because a "yes" from the in-house legal staff is not as
valuable as a "yes" from OLC.  But that value depends on OLC maintain-
ing its reputation for serious, evenhanded analysis, not mere advocacy.[53]

The risk, however, is that OLC's clients will not internalize the long-
run costs of taxing OLC's integrity.  This is in part because the full mea-
sure of those costs will be spread across all of OLC's clients, not just the
client agency now before it.  The program whose legality the client wants
OLC to review, in contrast, is likely to be something in which the client
has an immediate and palpable stake.  Moreover, the very fact that the
agency has come to OLC for legal advice will often mean it thinks there is

---

51.  This might happen when a representative of the agency or department is called to
testify before Congress, or when its actions are scrutinized by the press, or, on litigable
issues, when it is defending its position in court.

52.  There are countervailing considerations, however.  On statutory issues that are
likely to be litigated, an agency's request for advice from OLC might cause the courts to be
less inclined to defer to the agency's ultimate position under Chevron U.S.A. Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The theory of *Chevron* is
that statutory ambiguity constitutes an implicit congressional delegation to the agency
responsible for administering the statute to resolve matters implicating that ambiguity on
the basis of their particular expertise.  By seeking OLC's advice on a legal issue and
agreeing to be bound by it, an agency arguably does not exercise the expertise that *Chevron*
contemplates, and thus may be ineligible for deference from the courts.  Thus, on statutory
questions involving the statute(s) an agency administers, the decision whether to seek
OLC's advice can be somewhat more complicated.  I thank Gillian Metzger for
emphasizing this point to me.  Cf. New Process Steel v. NLRB, 130 S. Ct. 2635, 2638–40
(2010) (holding delegee group of NLRB could not continue to exercise its delegated
authority once its and NLRB's membership fell to two and rejecting (with no mention of
*Chevron*) NLRB's argument to the contrary, which was based on an OLC opinion to which
NLRB had agreed to be bound).

53.  As explained by Randolph Moss, head of OLC at the end of the Clinton
Administration:

[T]he legal opinions of the Attorney General and the Office of Legal Counsel will
likely be valued only to the extent they are viewed by others in the executive
branch, the courts, the Congress, and the public as fair, neutral, and well-
reasoned . . . . For similar reasons, there is little reason for clients of the Office of
Legal Counsel to ask whether a proposed action is legally colorable, as opposed to
whether the action is authorized under the best view of the law.  While posing the
question in the former fashion might increase the likelihood of obtaining a
favorable response, such a response will do little to assist the client in the face of
subsequent criticism.

Randolph D. Moss, Executive Branch Legal Interpretation: A Perspective From the Office
of Legal Counsel, 52 Admin. L. Rev. 1303, 1311 (2000); see also Tushnet, Stare Decisis,
supra note 5, at 1352 (noting OLC's agency clients "are under no obligation to seek the
views of OLC about the lawfulness of their policy initiatives," and that they therefore "will
seek out OLC's advice only if they believe that OLC will provide them with a more
disinterested view of the law's content than they received from within").

at least a plausible argument that the program is lawful. In that circumstance, the agency is unlikely to see any problem in a "yes" from OLC.

Still, it would be an overstatement to say that OLC risks losing its client base every time it contemplates saying "no." One reason is custom. In some areas, there is a longstanding tradition—rising to the level of an expectation—that certain executive actions or decisions will not be taken without seeking OLC's advice. One example is OLC's bill comment practice, in which it reviews legislation pending in Congress for potential constitutional concerns. If it finds any serious problems, it writes them up and forwards them to the Office of Management and Budget, which combines OLC's comments with other offices' policy reactions to the legislation and generates a coordinated administration position on the legislation.[54] That position is then typically communicated to Congress, either formally or informally. While no statute or regulation mandates OLC's part in this process, it is a deeply entrenched, broadly accepted practice. Thus, although some within the Executive Branch might find it frustrating when OLC raises constitutional concerns in bills the administration wants to support as a policy matter, and although the precise terms in which OLC's constitutional concerns are passed along to Congress are not entirely in OLC's control, there is no realistic prospect that OLC would ever be cut out of the bill comment process entirely. Entrenched practice, then, provides OLC with some measure of protection from the pressure to please its clients.

But there are limits to that protection. Most formal OLC opinions do not arise out of its bill comment practice, which means most are the product of a more truly voluntary choice by the client to seek OLC's advice. And as suggested above, although the Executive Branch at large has an interest in OLC's credibility and integrity, the preservation of those virtues generally falls to OLC itself. OLC's nonlitigating function makes this all the more true. Whereas, for example, the Solicitor General's aim of prevailing before the Supreme Court limits the extent to which she can profitably pursue an extreme agenda inconsistent with current doctrine, OLC faces no such immediate constraint. Whether OLC honors its oft-asserted commitment to legal advice based on its best view of the law depends largely on its own self-restraint.

2. *Formal Requests, Binding Answers, and Lawful Alternatives.* — Over time, OLC has developed practices and policies that help maintain its independence and credibility. First, before it provides a written opinion,[55] OLC typically requires that the request be in writing from the head or general counsel of the requesting agency, that the request be as specific and concrete as possible, and that the agency provide its own written

---

54. See Morrison, Avoidance, *supra* note 4, at 1244–45 (describing bill comment process); Pillard, *supra* note 4, at 711–12 (same).

55. See *infra* Part I.B.3 for a discussion of oral versus written advice.

views on the issue as part of its request.[56] These requirements help con-
strain the requesting agency. Asking a high-ranking member of the
agency to commit the agency's views to writing, and to present legal argu-
ments in favor of those views, makes it more difficult for the agency to
press extreme positions.

Second, as noted in the Introduction,[57] OLC's legal advice is treated
as binding within the Executive Branch until withdrawn or overruled.[58]
As a formal matter, the bindingness of the Attorney General's (or, in the
modern era, OLC's) legal advice has long been uncertain.[59] The issue
has never required formal resolution, however, because by longstanding
tradition the advice is *treated* as binding.[60] OLC protects that tradition
today by generally refusing to provide advice if there is any doubt about
whether the requesting entity will follow it.[61] This guards against "advice-
shopping by entities willing to abide only by advice they like."[62] More
broadly, it helps ensure that OLC's answers matter. An agency displeased
with OLC's advice cannot simply ignore the advice. The agency might

---

56. See OLC Guidelines, supra note 12, at 1608; Pillard, supra note 4, at 711. There
are exceptions, especially when OLC's advice is needed quickly and the client seeks only an
oral response. In addition, OLC does not require a detailed written analysis accompanying
requests from the White House Counsel, the Attorney General, or the heads of other
senior management offices within the Justice Department. See 2005 OLC Best Practices
Memorandum, supra note 13, at 2.

57. See supra text accompanying note 31.

58. See 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("OLC's core
function . . . is to provide controlling advice to Executive Branch officials on questions of
law . . . ."); 2005 OLC Best Practices Memorandum, supra note 13, at 1 ("[S]ubject to the
President's authority under the Constitution, OLC opinions are controlling on questions
of law within the Executive Branch."); OLC Guidelines, supra note 12, at 1603 ("OLC's
legal determinations are considered binding on the executive branch, subject to the
supervision of the Attorney General and the ultimate authority of the President."); OPR
Report, supra note 10, at 15 ("OLC opinions are binding on the Executive Branch."); see
also Pillard, supra note 4, at 727 (quoting former OLC head Ted Olson as stating "it is not
our function to prepare an advocate's brief or simply to find support for what we or our
clients might like the law to be," but instead to produce "the clearest statement of what we
believe the law provides").

59. See Moss, supra note 53, at 1318–19 ("Although subject to almost two hundred
years of debate and consideration, the question of whether (and in what sense) the
opinions of the Attorney General, and, more recently, the Office of Legal Counsel, are
*legally* binding within the executive branch remains somewhat unsettled."); Peter L.
Strauss, Overseer, or "The Decider"? The President in Administrative Law, 75 Geo. Wash.
L. Rev. 696, 739–41 (2007) [hereinafter Strauss, Overseer] (collecting early Attorney
General statements that their opinions were "advisory, not legally binding").

60. See Moss, supra note 53, at 1318–20 ("[W]e have been able to go for over two
hundred years without conclusively determining whether the law demands adherence to
Attorney General Opinions because agencies have in practice treated these opinions as
binding."). As Moss notes, the regulations that provide for the submission of
interdepartmental and interagency disputes to OLC for "resolution" imply that OLC's
answer will constitute a "binding determination, absent which the dispute would almost
certainly continue." Id. at 1320 n.67.

61. See Pillard, supra note 4, at 711; Strauss, Overseer, supra note 59, at 742–43.

62. Pillard, supra note 4, at 711.

construe any ambiguity in OLC's advice to its liking, and in some cases might even ask OLC to reconsider its advice.[63] But the settled practice of treating OLC's advice as binding ensures it is not simply ignored.

In theory, the very bindingness of OLC's opinions creates a risk that agencies will avoid going to OLC in the first place, relying either on their general counsels or even other executive branch offices to the extent they are perceived as more likely to provide welcome answers. This is only a modest risk in practice, however. As noted above, legal advice obtained from an office other than OLC—especially an agency's own general counsel—is unlikely to command the same respect as OLC advice.[64] Indeed, because OLC is widely viewed as "the executive branch's chief legal advisor,"[65] an agency's decision *not* to seek OLC's advice is likely to be viewed by outside observers with skepticism, especially if the in-house advice approves a program or initiative of doubtful legality.

OLC has also developed certain practices to soften the blow of legal advice not to a client's liking. Most significantly, after concluding that a client's proposed course of action is unlawful, OLC frequently works with the client to find a lawful way to pursue its desired ends.[66] As the OLC Guidelines put it, "when OLC concludes that an administration proposal is impermissible, it is appropriate for OLC to go on to suggest modifications that would cure the defect, and OLC should stand ready to work with the administration to craft lawful alternatives."[67] This is a critical component of OLC's work, and distinguishes it sharply from the courts. In addition to "provid[ing] a means by which the executive branch lawyer can contribute to the ability of the popularly-elected President and his administration to achieve important policy goals,"[68] in more instrumental terms the practice can also reduce the risk of gaming by OLC's clients. And that, in turn, helps preserve the bindingness of OLC's opinions.[69]

---

63. See infra Part II.B.2.d.

64. See supra notes 51–53 and accompanying text.

65. Pillard, supra note 4, at 710.

66. See 2010 OLC Best Practices Memorandum, supra note 14, at 2 ("[U]nlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful."); Moss, supra note 53, at 1329 ("On an almost daily basis, the Office of Legal Counsel works with its clients to refine and reconceptualize proposed executive branch initiatives in the face of legal constraints.").

67. OLC Guidelines, supra note 12, at 1609.

68. Moss, supra note 53, at 1330.

69. In the course of its investigation into whether the OLC attorneys responsible for the 2002 Torture Memorandum and related opinions committed professional misconduct, the Justice Department's Office of Professional Responsibility considered as a "threshold matter . . . whether the attorneys were aware of the result that the client wanted"—the suggestion being that such awareness would compromise the integrity of OLC's legal analysis. Margolis Memorandum, supra note 11, at 14 (discussing OPR's treatment of this issue) (internal quotation marks omitted). But as both John Yoo and Jay Bybee (the subjects of the investigation) pointed out in their objections to the draft report, OLC lawyers virtually always know what the client wants, and there is nothing untoward about that. Id. at 14–15. Indeed, as noted supra at notes 66–68 and accompanying text, both the

To be sure, OLC's opinions are treated as binding only to the extent they are not displaced by a higher authority. A subsequent judicial decision directly on point will generally be taken to supersede OLC's work, and always if it is from the Supreme Court. OLC's opinions are also subject to "reversal" by the President or the Attorney General.[70] Such reversals are rare, however. As a formal matter, Dawn Johnsen has argued that "[t]he President or attorney general could lawfully override OLC only pursuant to a good faith determination that OLC erred in its legal analysis. The President would violate his constitutional obligation if he were to reject OLC's advice solely on policy grounds."[71] *Solely* is a key word here, especially for the President. Although his oath of office obliges him to uphold the Constitution,[72] it is not obvious he would violate that oath by pursuing policies that he thinks are plausibly constitutional even if he has not concluded they fit his best view of the law. It is not clear, in other words, that the President's oath commits him to seeking and adhering to a single best view of the law, as opposed to any reasonable or plausible view held in good faith. Yet even assuming the President has some space here, it is hard to see how his oath permits him to reject OLC's advice *solely* on policy grounds if he concludes that doing so is indefensible as a legal matter.[73] So the President needs at least a plausible legal basis for

---

2010 OLC Best Practices Memorandum and the 2004 Guidelines endorse working with the client to find lawful ways to achieve the client's desired ends. In light of the widespread endorsement of this practice, the final version of OPR's report omitted any criticism of Yoo and Bybee on this particular point. Margolis Memorandum, supra note 11, at 14–15.

70. See Goldsmith, supra note 15, at 79 ("[T]he President [stands] atop the executive branch and [can] in theory reverse any OLC decision and set legal policy for the executive branch."); Johnsen, supra note 4, at 1577 ("OLC's legal interpretations typically are considered binding within the executive branch, unless overruled by the attorney general or the President (an exceedingly rare occurrence)."). I think it is best to refer to this action as a reversal, not an overruling, as it is more analogous to an appellate court reversing a lower court in the same proceeding than to a later-in-time determination in some other context to overrule the earlier decision.

71. Johnsen, supra note 4, at 1577.

72. See U.S. Const. art. II, § 1, cl. 8 ("Before . . . enter[ing] on the Execution of his Office, [the President] shall . . . swear (or affirm) that [he] will faithfully execute the Office of President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States.").

73. Of course, even in those circumstances there would remain the theoretical possibility of extralegal action—of defying legal constraints during an emergency and later seeking approval of, or at least forgiveness for, the violation. As Jefferson famously observed: "A strict observance of the written laws is doubtless *one* of the high duties of a good citizen, but it is not *the highest*. The laws of necessity, of self-preservation, of saving our country when in danger, are of higher obligation." Letter from Thomas Jefferson to J.B. Colvin (Sept. 20, 1810), *in* 12 The Writings of Thomas Jefferson 418 (Andrew A. Lipscomb ed., 1904). But this is not a theory of *lawful* authority; it is instead an assertion of a "need, if not [a] right, to act *contra legem, at least in an emergency*." Henry P. Monaghan, The Protective Power of the Presidency, 93 Colum. L. Rev. 1, 24 (1993); see also id. at 25 ("[E]mergency conduct, either not authorized by statute or contrary to statute, is extraconstitutional in nature."). The idea of a presidential prerogative to act extralegally is thus not a theory of the President's *lawful* authority.

disagreeing with OLC's advice, which itself would likely require some other source of legal advice for him to rely upon.

The White House Counsel's Office might seem like an obvious candidate. But despite recent speculation that the size of that office during the Obama Administration might reflect an intention to use it in this fashion,[74] it continues to be virtually unheard of for the White House to reverse OLC's legal analysis. For one thing, even a deeply staffed White House Counsel's Office typically does not have the time to perform the kind of research and analysis necessary to produce a credible basis for reversing an OLC opinion.[75] For another, as with attempts to rely in the first place on in-house advice in lieu of OLC, any reversal of OLC by the White House Counsel is likely to be viewed with great skepticism by outside observers. If, for example, a congressional committee demands to know why the Executive Branch thinks a particular program is lawful, a response that relies on the conclusions of the White House Counsel is unlikely to suffice if the committee knows that OLC had earlier concluded otherwise. Rightly or wrongly, the White House Counsel's analysis is likely to be treated as an exercise of political will, not dispassionate legal analysis. Put another way, the same reasons that lead the White House to seek OLC's legal advice in the first place—its reputation for

---

There is also the related idea, often associated with Lincoln, that "measures, otherwise unconstitutional, might become lawful, by becoming indispensable to the preservation of the constitution, through the preservation of the nation." Letter from Abraham Lincoln to Albert G. Hodges (Apr. 4, 1864), *in* 7 The Collected Works of Abraham Lincoln 281 (Roy P. Basler ed., 1953); cf. Abraham Lincoln, Message to Congress in Special Session (July 4, 1861), *in* 6 A Compilation of the Messages and Papers of the Presidents 1789–1897, at 20, 25 (James D. Richardson ed., 1897) ("Are all the laws *but one* to go unexecuted, and the Government itself go to pieces lest that one be violated?"). Although the merits and limits of that idea have seen extensive and important debate, I do not address them here. For present purposes, it suffices to note that a President pursuing this tack would not be defending a policy or action he acknowledged was illegal but would instead be insisting on its legality in virtue of the needs of the moment.

74. See, e.g., Jon Ward, White House Beefs up Legal Staff; Officials Cite Need to Tackle 'Nightmare' Vetting Process, Wash. Times, July 21, 2009, at B1 (reporting that White House Counsel's Office in the first year of the Obama Administration contained more than forty lawyers). This number is misleading, as it includes a number of lawyers who, though formally deemed to be part of the White House Counsel's Office, are actually part of a separate sub-office focused exclusively on vetting presidential nominees for positions within the Executive Branch. The core attorneys in the White House Counsel's Office number in the low twenties. See Press Release, The White House Office of the Press Sec'y, President Obama Announces Key Additions to the Office of the White House Counsel (Jan. 28, 2009), at http://www.whitehouse.gov/the_press_office/Obama AnnouncesKeyAdditionstotheOfficeoftheWhiteHouseCounsel (on file with the *Columbia Law Review*) (announcing appointment of twenty-two attorneys to positions in White House Counsel's office).

75. See Goldsmith, supra note 15, at 79–80 (noting challenges President would face if he overruled an OLC opinion).

providing candid, independent legal advice based on its best view of the law—make an outright reversal highly unlikely.[76]

Of course, the White House Counsel's Office may well be in frequent contact with OLC on an issue OLC has been asked to analyze, and in many cases is likely to make it abundantly clear what outcome the White House prefers.[77] But that is a matter of presenting arguments to OLC in support of a particular position, not discarding OLC's conclusion when it comes out the other way.[78] The White House is not just any other client, and so the nature of—and risks posed by—communications between it and OLC on issues OLC is analyzing deserve special attention. I take that up in Part III.[79] My point at this stage is simply that the prospect of literal reversal by the White House is remote and does not meaningfully threaten the effective bindingness of OLC's decisions.

3. *Written versus Oral Advice.* — A final point concerns the form of OLC's advice. Not all of it is memorialized in a formal opinion; some of it is oral, and some is communicated by email.[80] At least in theory, this variation presents gaming opportunities. An agency seeking OLC's advice on the legality of a proposed program might first seek oral advice. If

---

76. The same point holds for the Attorney General. Early in the Obama Administration, the press reported that after seeing a preliminary opinion from OLC concluding that a bill giving the District of Columbia a voting member in the House of Representatives was unconstitutional, the Attorney General "ordered up a second opinion from other lawyers in his department and determined that the legislation would pass muster." Carrie Johnson, A Split at Justice on D.C. Vote Bill; Holder Overrode Ruling that Measure is Unconstitutional, Wash. Post, Apr. 1, 2009, at A1. Although no one doubted the Attorney General's formal authority to overrule OLC, press reports of his actions in this matter triggered substantial criticism of the way he had exercised his authority, including charges that he had engaged in "a sham review" that "abused OLC for partisan political purposes." Edward Whelan, Op-Ed., Look Who's Politicizing Justice Now, Wash. Post, Apr. 5, 2009, at B3; see also John McGinnis, An End Run Around the Rule of Law, Executive Watch: A Weblog of the Duke Law Program in Public Law (Apr. 6, 2009, 12:52 PM), at http://executivewatch.net/2009/04/06/an-end-run-around-the-rule-of-law (on file with the *Columbia Law Review*). The heat of that criticism—whether justified or not—helps explain why the Attorney General so rarely exercises his reversal authority. But see William R. Dailey, Who is the Attorney General's Client? A Model for Understanding the Attorney General's Role 48–49 (unpublished manuscript) (on file with the *Columbia Law Review*) (defending idea of such Attorney General interventions).

77. See Bruce Ackerman, The Decline and Fall of the American Republic (forthcoming 2010) (manuscript at 173 n.43) (on file with author) (reporting Elena Kagan's and Walter Dellinger's recollections of "lengthy phone calls in which Kagan, then in the White House Counsel's Office, tried to convince Dellinger, the head of OLC, to change his mind about legal issues").

78. Thus, when Jack Goldsmith informed White House Counsel Alberto Gonzales and Counsel to the Vice President David Addington that he could not support the legality of an important counterterrorism program, there was no real prospect that the White House would reverse him. See Goldsmith, supra note 15, at 79. Goldsmith recounts that Addington was furious with his decision and told him that "the blood of the hundred thousand people who die in the next attack will be on *your* hands," id. at 71, but that simply underscores the fact that reversal by the White House was not a realistic possibility.

79. See infra Part III.B.2.

80. Pillard, supra note 4, at 713.

OLC advises that the program is lawful, the agency could then ask for a written opinion memorializing the advice. But if OLC returns with a negative answer, the agency might want to minimize the damage by not asking for a written opinion.

There are at least two reasons why the agency might respond this way. The first is both the most brazen and the least likely: If the program in question is important to the agency, it might choose to ignore OLC's advice and press forward anyway. If OLC's advice is merely oral, there will be less of a paper trail on the issue, making it less likely that an external monitor like Congress will know about the agency's defiance of OLC. This risk is more theoretical than real, however. As discussed above, there is a longstanding and robust norm in favor of treating OLC's advice as binding, and OLC has a strong interest in the preservation of that norm.[81] If OLC learned that its oral advice was being ignored, it could take a number of countermeasures: alerting the Attorney General, who might raise an objection at the Cabinet level or even with the President; refusing to provide future advice to the agency without its advance express agreement to be bound; and insisting that any future advice to the agency be in writing. These are powerful tools. Because virtually all of OLC's clients are repeat customers, outright defiance of even oral advice is highly unlikely.

There is a second, more plausible reason why an agency might seek oral advice first and ask for a written version only when it likes the answer: precedent. Oral advice is typically more cursory and less far-reaching than written advice. The very act of writing often exposes side issues that need addressing, and justifying a position in writing may require a fuller articulation of the principle supporting the outcome. Thus, an agency willing to adhere to OLC's negative advice in the matter immediately at hand may worry that the written version of that advice could impose a broader set of constraints going forward. The agency in this scenario treats the advice it receives from OLC as binding, and precisely for that reason it desires to receive relatively less rather than more advice.

This sort of gaming can go together with OLC's well-established practice, discussed above, of working with its clients to find lawful ways to achieve their aims.[82] OLC's initial advice that the proposed program is unlawful could be oral, but if OLC is able to work with the client to find a lawful alternative way to pursue its desired ends, that conclusion might then be memorialized as a formal written opinion. If this mechanism is at work, the body of OLC's written precedents could become weighted more toward client-friendly conclusions than the totality of all its legal advice, oral and written combined.

---

81. See supra text accompanying notes 57–62.

82. See supra notes 66–69 and accompanying text.

1470            *COLUMBIA LAW REVIEW*            [Vol. 110:1448

\* \* \*

The picture of OLC that emerges here is of an office that is not immune to various external pressures, but that can also rely on a range of well-established procedural devices to deflect or at least lessen those pressures. What those devices cannot do, however, is guarantee OLC's own commitment to integrity, independence, and excellence in its work. Although that commitment is critical to OLC's value within the Executive Branch, it ultimately depends upon what Jack Goldsmith has called "the cultural norms in the office."[83]

This suggests a point to which I return in Part III: Publicity may be the best means of motivating OLC's lawyers to preserve the independence and integrity of the office. With publicity comes the possibility of public scrutiny, and with that comes an incentive for OLC's lawyers to uphold the stated standards of the office lest they tarnish their own professional reputations. And if this is true of OLC's work in general, it should also be true of its treatment of precedent in particular. Publicity, then, may be the best way to ensure OLC takes proper account of its precedents—whatever we ultimately determine "proper" to mean.

Of course, it remains to be seen just how OLC treats its precedents, and how it should treat them. Those questions are the preoccupation of Parts II and III.

## II. A HISTORICAL AND EMPIRICAL PICTURE OF OLC PRECEDENT

This Part examines the question of OLC precedent from a historical and empirical perspective. I begin by discussing how early Attorneys General described the role of precedent in their legal advisory work. The early Attorneys General frequently described that work in quasi-judicial terms, and thought adherence to precedent was appropriate in their work just as it was appropriate in the courts. With that history as a backdrop, I seek to provide an empirical picture of precedent in the modern OLC. Specifically, I look at the frequency with which OLC explicitly overrules or modifies its prior opinions, and I attempt to identify the kinds of cases in which it is most likely to do so. The focus is on outcomes: Without regard to how OLC justifies its decisions, when does it overrule itself?

### A. *Early Attorney General Accounts of Precedent*

The modern OLC is the inheritor of a legal advisory function originally performed by the Attorney General. And although OLC today operates in a very different institutional context from that of the virtually solo-practitioner Attorneys General of the early nineteenth century, heads of OLC often look to statements by those Attorneys General to describe

---

83. Goldsmith, supra note 15, at 37.

# EXHIBIT T

**Principles to Guide the Office of Legal Counsel**
**December 21, 2004**

The Office of Legal Counsel (OLC) is the Department of Justice component to which the Attorney General has delegated the function of providing legal advice to guide the actions of the President and the agencies of the executive branch. OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President. From the outset of our constitutional system, Presidents have recognized that compliance with their constitutional obligation to act lawfully requires a reliable source of legal advice. In 1793, Secretary of State Thomas Jefferson, writing on behalf of President Washington, requested the Supreme Court's advice regarding the United States' treaty obligations with regard to the war between Great Britain and France. The Supreme Court declined the request, in important measure on the grounds that the Constitution vests responsibility for such legal determinations within the executive branch itself: "[T]he three departments of government … being in certain respects checks upon each other, and our being judges of a court in the last resort, are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to, especially as the power given by the Constitution to the President, of calling on the heads of departments for opinions seems to have been purposely as well as expressly united to the executive departments." Letter from John Jay to George Washington, August 8, 1793, *quoted in* 4 The Founders' Constitution 258 (Philip B. Kurland & Ralph Lerner, eds. 1987).

From the Washington Administration through the present, Attorneys General, and in recent decades the Office of Legal Counsel, have served as the source of legal determinations regarding the executive's legal obligations and authorities. The resulting body of law, much of which is published in volumes entitled Opinions of the Attorney General and Opinions of the Office of Legal Counsel, offers powerful testimony to the importance of the rule-of-law values that President Washington sought to secure and to the Department of Justice's profound tradition of respect for the rule of law. Administrations of both political parties have maintained this tradition, which reflects a dedication to the rule of law that is as significant and as important to the country as that shown by our courts. As a practical matter, the responsibility for preserving this tradition cannot rest with OLC alone. It is incumbent upon the Attorney General and the President to ensure that OLC's advice is sought on important and close legal questions and that the advice given reflects the best executive branch traditions. The principles set forth in this document are based in large part on the longstanding practices of the Attorney General and the Office of Legal Counsel, across time and administrations.

*1. When providing legal advice to guide contemplated executive branch action, OLC should provide an accurate and honest appraisal of applicable law, even if that advice will constrain the administration's pursuit of desired policies. The advocacy model of lawyering, in which lawyers craft merely plausible legal arguments to support their clients' desired actions, inadequately promotes the President's constitutional obligation to ensure the legality of executive action.*

OLC's core function is to help the President fulfill his constitutional duty to uphold the Constitution and "take care that the laws be faithfully executed" in all of the varied work of the

**-1262-**

executive branch.  OLC provides the legal expertise necessary to ensure the lawfulness of presidential and executive branch action, including contemplated action that raises close and difficult questions of law.  To fulfill this function appropriately, OLC must provide advice based on its best understanding of what the law requires.  OLC should not simply provide an advocate's best defense of contemplated action that OLC actually believes is best viewed as unlawful.  To do so would deprive the President and other executive branch decisionmakers of critical information and, worse, mislead them regarding the legality of contemplated action.  OLC's tradition of principled legal analysis and adherence to the rule of law thus is constitutionally grounded and also best serves the interests of both the public and the presidency, even though OLC at times will determine that the law precludes an action that a President strongly desires to take.

*2.  OLC's advice should be thorough and forthright, and it should reflect all legal constraints, including the constitutional authorities of the coordinate branches of the federal government–the courts and Congress–and constitutional limits on the exercise of governmental power.*

The President is constitutionally obligated to "preserve, protect and defend" the Constitution in its entirety–not only executive power, but also judicial and congressional power and constitutional limits on governmental power–and to enforce federal statutes enacted in accordance with the Constitution.  OLC's advice should reflect all relevant legal constraints.  In addition, regardless of OLC's ultimate legal conclusions concerning whether proposed executive branch action lawfully may proceed, OLC's analysis should disclose, and candidly and fairly address, the relevant range of legal sources and substantial arguments on all sides of the question.

*3.  OLC's obligation to counsel compliance with the law, and the insufficiency of the advocacy model, pertain with special force in circumstances where OLC's advice is unlikely to be subject to review by the courts.*

In formulating its best view of what the law requires, OLC always should be mindful that the President's legal obligations are not limited to those that are judicially enforceable.  In some circumstances, OLC's advice will guide executive branch action that the courts are unlikely to review (for example, action unlikely to result in a justiciable case or controversy) or that the courts likely will review only under a standard of extreme deference (for example, some questions regarding war powers and national security).  OLC's advice should reflect its best view of all applicable legal constraints, and not only legal constraints likely to lead to judicial invalidation of executive branch action.  An OLC approach that instead would equate "lawful" with "likely to escape judicial condemnation" would ill serve the President's constitutional duty by failing to describe all legal constraints and by appearing to condone unlawful action as long as the President could, in a sense, get away with it.  Indeed, the absence of a litigation threat signals special need for vigilance:  In circumstances in which judicial oversight of executive branch action is unlikely, the President–and by extension OLC–has a special obligation to ensure compliance with the law, including respect for the rights of affected individuals and the constitutional allocation of powers.

*4. OLC's legal analyses, and its processes for reaching legal determinations, should not simply mirror those of the federal courts, but also should reflect the institutional traditions and competencies of the executive branch as well as the views of the President who currently holds office.*

As discussed under principle 3, jurisdictional and prudential limitations do not constrain OLC as they do courts, and thus in some instances OLC appropriately identifies legal limits on executive branch action that a court would not require. Beyond this, OLC's work should reflect the fact that OLC is located in the executive branch and serves both the institution of the presidency and a particular incumbent, democratically elected President in whom the Constitution vests the executive power. What follows from this is addressed as well under principle 5. The most substantial effects include the following: OLC typically adheres to judicial precedent, but that precedent sometimes leaves room for executive interpretive influences, because doctrine at times genuinely is open to more than one interpretation and at times contemplates an executive branch interpretive role. Similarly, OLC routinely and, appropriately, considers sources and understandings of law and fact that the courts often ignore, such as previous Attorney General and OLC opinions that themselves reflect the traditions, knowledge and expertise of the executive branch. Finally, OLC differs from a court in that its responsibilities include facilitating the work of the executive branch and the objectives of the President, consistent with the requirements of the law. OLC therefore, where possible and appropriate, should recommend lawful alternatives to legally impermissible executive branch proposals. Notwithstanding these and other significant differences between the work of OLC and the courts, OLC's legal analyses always should be principled, thorough, forthright, and not merely instrumental to the President's policy preferences.

*5. OLC advice should reflect due respect for the constitutional views of the courts and Congress (as well as the President). On the very rare occasion when the executive branch—usually on the advice of OLC—declines fully to follow a federal statutory requirement, it typically should publicly disclose its justification.*

OLC's tradition of general adherence to judicial (especially Supreme Court) precedent and federal statutes reflects appropriate executive branch respect for the coordinate branches of the federal government. On very rare occasion, however, Presidents, often with the advice of OLC, appropriately act on their own understanding of constitutional meaning (just as Congress at times enacts laws based on its own constitutional views). To begin with relatively uncontroversial examples, Presidents at times veto bills they believe are unconstitutional and pardon individuals for violating what Presidents believe are unconstitutional statutes, even when the Court would uphold the statute or the conviction against constitutional challenge. Far more controversial are rare cases in which Presidents decide to refuse to enforce or otherwise comply with laws they deem unconstitutional, either on their face or in some applications. The precise contours of presidential power in such contexts are the subject of some debate and beyond the scope of this document. The need for transparency regarding interbranch disagreements, however, should be beyond dispute. At a bare minimum, OLC advice should fully address

applicable Supreme Court precedent, and, absent the most compelling need for secrecy, any time the executive branch disregards a federal statutory requirement on constitutional grounds, it should publicly release a clear statement explaining its deviation. Absent transparency and clarity, client agencies might experience difficulty understanding and applying such legal advice, and the public and Congress would be unable adequately to assess the lawfulness of executive branch action. Indeed, federal law currently requires the Attorney General to notify Congress if the Department of Justice determines either that it will not enforce a provision of law on the grounds that it is unconstitutional or that it will not defend a provision of law against constitutional challenge.

*6. OLC should publicly disclose its written legal opinions in a timely manner, absent strong reasons for delay or nondisclosure.*

OLC should follow a presumption in favor of timely publication of its written legal opinions. Such disclosure helps to ensure executive branch adherence to the rule of law and guard against excessive claims of executive authority. Transparency also promotes confidence in the lawfulness of governmental action. Making executive branch law available to the public also adds an important voice to the development of constitutional meaning–in the courts as well as among academics, other commentators, and the public more generally–and a particularly valuable perspective on legal issues regarding which the executive branch possesses relevant expertise. There nonetheless will exist some legal advice that properly should remain confidential, most notably, some advice regarding classified and some other national security matters. OLC should consider the views regarding disclosure of the client agency that requested the advice. Ordinarily, OLC should honor a requestor's desire to keep confidential any OLC advice that the proposed executive action would be unlawful, where the requestor then does not take the action. For OLC routinely to release the details of all contemplated action of dubious legality might deter executive branch actors from seeking OLC advice at sufficiently early stages in policy formation. In all events, OLC should in each administration consider the circumstances in which advice should be kept confidential, with a presumption in favor of publication, and publication policy and practice should not vary substantially from administration to administration. The values of transparency and accountability remain constant, as do any existing legitimate rationales for secret executive branch law. Finally, as discussed in principle 5, Presidents, and by extension OLC, bear a special responsibility to disclose publicly and explain any actions that conflict with federal statutory requirements.

*7. OLC should maintain internal systems and practices to help ensure that OLC's legal advice is of the highest possible quality and represents the best possible view of the law.*

OLC systems and processes can help maintain high legal standards, avoid errors, and safeguard against tendencies toward potentially excessive claims of executive authority. At the outset, OLC should be careful about the form of requests for advice. Whenever possible, agency requests should be in writing, should include the requesting agency's own best legal views as well as any relevant materials and information, and should be as specific as circumstances allow. Where OLC determines that advice of a more generally applicable nature would be helpful and

appropriate, it should take special care to consider the implications for its advice in all foreseeable potential applications. Also, OLC typically should provide legal advice in advance of executive branch action, and not regarding executive branch action that already has occurred; legal "advice" after the fact is subject to strong pressures to follow an advocacy model, which is an appropriate activity for some components of the Department of Justice but not usually for OLC (though this tension may be unavoidable in some cases involving continuing or potentially recurring executive branch action). OLC should recruit and retain attorneys of the highest integrity and abilities. OLC should afford due respect for the precedential value of OLC opinions from administrations of both parties; although OLC's current best view of the law sometimes will require repudiation of OLC precedent, OLC should never disregard precedent without careful consideration and detailed explanation. Ordinarily OLC legal advice should be subject to multiple layers of scrutiny and approval; one such mechanism used effectively at times is a "two deputy rule" that requires at least two supervising deputies to review and clear all OLC advice. Finally, OLC can help promote public confidence and understanding by publicly announcing its general operating policies and procedures.

*8. Whenever time and circumstances permit, OLC should seek the views of all affected agencies and components of the Department of Justice before rendering final advice.*

The involvement of affected entities serves as an additional check against erroneous reasoning by ensuring that all views and relevant information are considered. Administrative coordination allows OLC to avail itself of the substantive expertise of the various components of the executive branch and to avoid overlooking potentially important consequences before rendering advice. It helps to ensure that legal pronouncements will have no broader effect than necessary to resolve the question at hand. Finally, it allows OLC to respond to all serious arguments and thus avoid the need for reconsideration.

*9. OLC should strive to maintain good working relationships with its client agencies, and especially the White House Counsel's Office, to help ensure that OLC is consulted, before the fact, regarding any and all substantial executive branch action of questionable legality.*

Although OLC's legal determinations should not seek simply to legitimate the policy preferences of the administration of which it is a part, OLC must take account of the administration's goals and assist their accomplishment within the law. To operate effectively, OLC must be attentive to the need for prompt, responsive legal advice that is not unnecessarily obstructionist. Thus, when OLC concludes that an administration proposal is impermissible, it is appropriate for OLC to go on to suggest modifications that would cure the defect, and OLC should stand ready to work with the administration to craft lawful alternatives. Executive branch officials nonetheless may be tempted to avoid bringing to OLC's attention strongly desired policies of questionable legality. Structures, routines and expectations should ensure that OLC is consulted on all major executive branch initiatives and activities that raise significant legal questions. Public attention to when and how OLC generally functions within a particular administration also can help ensure appropriate OLC involvement.

*10. OLC should be clear whenever it intends its advice to fall outside of OLC's typical role as the source of legal determinations that are binding within the executive branch.*

OLC sometimes provides legal advice that is not intended to inform the formulation of executive branch policy or action, and in some such circumstances an advocacy model may be appropriate. One common example: OLC sometimes assists the Solicitor General and the litigating components of the Department of Justice in developing arguments for presentation to a court, including in the defense of congressional statutes. The Department of Justice typically follows a practice of defending an act of Congress against constitutional challenge as long as a reasonable argument can be made in its defense (even if that argument is not the best view of the law). In this context, OLC appropriately may employ advocacy-based modes of analysis. OLC should ensure, however, that all involved understand whenever OLC is acting outside of its typical stance, and that its views in such cases should not be taken as authoritative, binding advice as to the executive branch's legal obligations. Client agencies expect OLC to provide its best view of applicable legal constraints and if OLC acts otherwise without adequate warning, it risks prompting unlawful executive branch action.

The following former Office of Legal Counsel attorneys prepared and endorse this document:

*Walter E. Dellinger*, Assistant Attorney General 1993-96
*Dawn Johnsen*, Acting Assistant Attorney General 1997-98; Deputy AAG 1993-97
*Randolph Moss*, Assistant Attorney General 2000-01, Acting 1998-2000; Deputy AAG 1996-98
*Christopher Schroeder*, Acting Assistant Attorney General 1997; Deputy AAG 1994-96
*Joseph R. Guerra*, Deputy Assistant Attorney General 1999-2001
*Beth Nolan*, Deputy Assistant Attorney General 1996-99; Attorney Advisor 1981-85
*Todd Peterson*, Deputy Assistant Attorney General 1997-99; Attorney Advisor 1982-85
*Cornelia T.L. Pillard*, Deputy Assistant Attorney General 1998-2000
*H. Jefferson Powell*, Deputy Assistant Attorney General and Consultant 1993-2000
*Teresa Wynn Roseborough*, Deputy Assistant Attorney General 1994-1996
*Richard Shiffrin*, Deputy Assistant Attorney General, 1993-97
*William Michael Treanor*, Deputy Assistant Attorney General 1998-2001
*David Barron*, Attorney Advisor 1996-99
*Stuart Benjamin*, Attorney Advisor 1992-1995
*Lisa Brown*, Attorney Advisor 1996-97
*Pamela Harris*, Attorney Advisor 1993-96
*Neil Kinkopf*, Attorney Advisor 1993-97
*Martin Lederman*, Attorney Advisor 1994-2002
*Michael Small*, Attorney Advisor 1993-96

# EXHIBIT U



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

July 16, 2010

### MEMORANDUM FOR ATTORNEYS OF THE OFFICE

*Re: Best Practices for OLC Legal Advice and Written Opinions*[*]

By delegation, the Office of Legal Counsel (OLC) exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law. OLC's core function, pursuant to the Attorney General's delegation, is to provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government. In performing this function, OLC helps the President fulfill his or her constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." It is thus imperative that the Office's advice be clear, accurate, thoroughly researched, and soundly reasoned. The value of OLC advice depends upon the strength of its analysis. OLC must always give candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in all of their work, and then addresses the best practices OLC attorneys should follow in providing one particularly important form of controlling legal advice the Office conveys: formal written opinions.

### I. Guiding Principles

Certain fundamental principles guide all aspects of the Office's work. As noted above, OLC's central function is to provide, pursuant to the Attorney General's delegation, controlling legal advice to Executive Branch officials in furtherance of the President's constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." To fulfill this function, OLC must provide advice based on its best understanding of what the law requires—not simply an advocate's defense of the contemplated action or position proposed by an agency or the Administration. Thus, in rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain the Administration's or an agency's pursuit of desired practices or policy objectives. This practice is critically important to the Office's effective performance of its assigned role, particularly because it is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts—a circumstance in which OLC's advice may effectively be the final word on the controlling law.

---

[*] This memorandum updates a prior memorandum, "Best Practices for OLC Opinions," issued May 16, 2005.

In providing advice, the Office should focus intensively on the central issues raised by a request and avoid addressing issues not squarely presented by the question before it. As much as possible, the Office should be attentive to the particular facts and circumstances at issue in the request, and should avoid issuing advice on abstract questions that lack the concrete grounding that can help focus legal analysis. And regardless of the Office's ultimate legal conclusions, it should strive to ensure that it candidly and fairly addresses the full range of relevant legal sources and significant arguments on all sides of a question. To be sure, the Office often operates under severe time constraints in providing advice. In such instances, the Office should make clear when it needs additional time to permit proper and thorough review of the relevant issues. If additional time is not available, the Office should make clear that its advice has been given with only limited time for review, and thus that more thorough consideration of the issue has not been possible.

On any issue involving a constitutional question, OLC's analysis should focus on traditional sources of constitutional meaning, including the text of the Constitution, the historical record illuminating the text's meaning, the Constitution's structure and purpose, and judicial and Executive Branch precedents interpreting relevant constitutional provisions. Particularly where the question relates to the authorities of the President or other executive officers or the allocation of powers between the Branches of the Government, precedent and historical practice are often of special relevance. On other questions of interpretation, OLC's analysis should be guided by the texts of the relevant documents, and should use traditional tools of construction in interpreting those texts. Because OLC is part of the Executive Branch, its analyses may also reflect the institutional traditions and competencies of that branch of the Government. For example, OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question, but as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes.

Finally, OLC's analyses may appropriately reflect the fact that its responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law. As a result, unlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful. Notwithstanding this aspect of OLC's mission, however, its legal analyses should always be principled, forthright, as thorough as time permits, and not designed merely to advance the policy preferences of the President or other officials.

## II. Opinion Preparation

While the Office frequently conveys its controlling legal advice in less formal ways, including through oral presentations and by e-mail, the best practices for preparing the Office's formal written opinions merit particular attention. These opinions take the form of signed memoranda, issued to an Executive Branch official who has requested the Office's opinion.

**A. *Evaluating opinion requests*.** Each opinion request is assigned initially to at least one Deputy Assistant Attorney General and one Attorney-Adviser, who will review the question

2

**-1270-**

presented and any relevant primary materials, prior OLC opinions, and leading cases to determine preliminarily whether the question is appropriate for OLC advice and whether it appears to merit a signed written opinion. The legal question presented should be focused and concrete; OLC generally avoids providing a general survey of an area of law or issuing broad, abstract legal opinions. There should also be a practical need for the written opinion; OLC should avoid giving unnecessary advice, such as where it appears that policymakers are likely to move in a different direction. A written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies. If we are asked to provide an opinion to an executive agency the head of which does not serve at the pleasure of the President (*e.g.*, an agency head subject to a "for cause" removal restriction), our practice is to issue our opinion only if we have received in writing from that agency an agreement that it will conform its conduct to our conclusion. As a prudential matter, OLC generally avoids opining on questions likely to arise in pending or imminent litigation involving the United States as a party (although the Office may provide assistance to Justice Department divisions engaged in ongoing litigation). Finally, the opinions of the Office should address legal questions prospectively; OLC avoids opining on the legality of past conduct (though from time to time we may issue prospective opinions that confirm or memorialize past advice or that necessarily bear on past conduct in addressing an ongoing legal issue).

**B.  *Soliciting the views of interested agencies*.** Before we proceed with an opinion, our general practice is to ask the requesting agency for a detailed memorandum setting forth the agency's own analysis of the question; in many cases, we will have preliminary discussions with the requesting agency before it submits a formal opinion request to OLC, and the agency will be able to provide its analysis along with the opinion request. (A detailed analysis is not required when the request comes from the Counsel to the President, the Attorney General, or one of the other senior management offices of the Department of Justice.) In the case of an interagency dispute, we will ask each side to submit such a memorandum. We expect the agencies on each side of a dispute to share their memoranda with the other side, or permit us to share them, so that we may have the benefit of reply comments, when necessary. When appropriate and helpful, and consistent with the confidentiality interests of the requesting agency, we will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented. We will not, however, circulate a copy of an opinion request to third-party agencies without the prior consent of the requesting agency.

**C.  *Researching, outlining, and drafting*.** A written OLC opinion is the product of a careful and deliberate process. After reviewing agency submissions and relevant primary materials, including prior OLC opinions and leading judicial decisions, the Deputy and Attorney-Adviser should meet to map out a plan for researching the issues and preparing an outline and first draft of the opinion. The Deputy and Attorney-Adviser should set target deadlines for each step in the process and should meet regularly to review progress on the opinion. Consultation with others in the Office is encouraged, as are meetings, as needed, with other Deputies and the Assistant Attorney General (AAG). An early first draft often will help identify weaknesses or holes in the analysis requiring greater attention than initially anticipated. As work on the opinion progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time to time with the AAG to discuss the status and direction of the draft opinion.

3

The Office must strive in our opinions for clear and concise analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides. In doing so, we generally avoid characterizing agencies with differing views as the "prevailing" and "losing" parties. OLC's obligation is to provide its view of the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not.

**D.  *Review of draft opinions*.**  Before an OLC opinion is signed it undergoes rigorous review within OLC. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, they should provide the draft opinion to a second Deputy for review. Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, important cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy review is complete and the second Deputy's comments and proposed edits have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies (though it is not necessary in each case for each of them to review an opinion), and any other attorneys within the Office with relevant expertise.

Because OLC issues opinions pursuant to the Attorney General's delegated authority, the Office keeps the Office of the Attorney General and the Office of the Deputy Attorney General apprised of its work through regular meetings and other communications. This practice ensures that the leadership offices are kept informed about OLC's work, and also permits OLC to benefit from suggestions about additional interests OLC should consider or views OLC should solicit before finalizing its opinions, which are nevertheless based on its own independent analysis and judgment. The Office also keeps the Office of the Counsel to the President appropriately apprised of its work.

Consistent with its tradition of providing advice that reflects its own independent judgment, OLC does not ordinarily circulate draft opinions outside the Office. However, as part of our process, we may share an aspect of a draft opinion's analysis with the requestor or others who will be affected by the opinion, particularly when their submissions have not addressed issues that arise in the draft. In some other cases, OLC may share the substance of an entire draft opinion or the opinion itself within the Department of Justice or with others, primarily to ensure that the opinion does not misstate any facts or legal points of interest.

**E.  *Finalizing opinions*.**  Once all substantive work on an opinion is complete, it must undergo a thorough cite-check by our paralegal staff to ensure that all citations are accurate and that the opinion is consistent with the Office's rules of style. After all cite-checking changes have been approved and implemented, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary and secondary Deputies and the Attorney-Adviser. If the opinion is unclassified, after it is signed and issued to the requesting agency it must be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the opinion control sheet, and copies of key materials not readily

available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, should also be retained in our files for future reference.

### III. Opinion Publication and Other Public Disclosure

Pursuant to Executive Order 12146 and directives from the Attorney General, OLC has a longstanding internal process in place for regular consideration and selection of significant opinions for official publication. At the first stage of the process, the attorneys who have worked on an opinion and the front-office personnel who have reviewed it are asked for a recommendation about whether the opinion should be published. After these recommendations are collected, the opinion is forwarded to an internal publication review committee, made up of attorneys from the front office, as well as at least one career attorney. If the committee makes a preliminary judgment that the opinion should be published, the opinion is circulated to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication, to solicit their views on whether there are reasons why the opinion should not be published. Taking this input into account, the publication committee then makes a final judgment about whether the Office should publish the opinion. After the Office makes a final decision to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site as published opinions of the Office are eventually published in OLC's hardcover bound volumes.

In deciding whether an opinion is significant enough to merit publication, the Office considers such factors as the potential importance of the opinion to other agencies or officials in the Executive Branch; the likelihood that similar questions may arise in the future; the historical importance of the opinion or the context in which it arose; and the potential significance of the opinion to the Office's overall jurisprudence. In applying these factors, the Office operates from the presumption that it should make its significant opinions fully and promptly available to the public. This presumption furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action. Timely publication of OLC opinions is especially important where the Office concludes that a federal statutory requirement is invalid on constitutional grounds and where the Executive Branch acts (or declines to act) in reliance on such a conclusion. In such situations, Congress and the public benefit from understanding the Executive's reasons for non-compliance, so that Congress can consider those reasons and respond appropriately, and so that the public can be assured that Executive action is based on sound legal judgment and in furtherance of the President's obligation to take care that the laws, including the Constitution, are faithfully executed.

At the same time, countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication. For example, OLC will decline to publish an opinion when disclosure would reveal classified or other sensitive information relating to national security. (Declassification decisions are made by the classifying agency, not OLC.) Similarly, OLC will decline to publish an opinion if doing so would interfere with federal law enforcement efforts or is prohibited by law. OLC will also

decline to publish opinions when doing so is necessary to preserve internal Executive Branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices. The President and other Executive Branch officials, like other public- and private-sector clients, sometimes depend upon the confidentiality of legal advice in order to fulfill their duties effectively. An example is when an agency requests advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken. If OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests. Some OLC opinions also may concern issues that are of little interest to the public or others besides the requesting agency. OLC's practice of circulating opinions selected for publication to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication helps ensure that the Office is aware of these competing considerations. In cases where delaying publication may be sufficient to address any of these concerns, OLC will reconsider the publication decision at an appropriate time.

OLC also receives a large number of Freedom of Information Act (FOIA) requests for its unpublished legal opinions. The volume of such requests has increased substantially in recent years, particularly with respect to opinions concerning national security matters. By definition, these requests seek disclosure of documents that the Office has not yet chosen to release pursuant to its own internal publication procedures. In responding to these requests, OLC is guided by President Obama's January 21, 2009 FOIA Memorandum and Attorney General Holder's March 19, 2009 FOIA memorandum. As the Attorney General's memorandum observes, various FOIA exemptions protect "national security, . . . privileged records, and law enforcement interests." OLC will consult with relevant agencies in determining whether particular requested documents fall within and should be withheld under any applicable FOIA exemptions. If a requested document does not fall within an exemption, OLC will disclose it promptly. In addition, OLC will consider disclosing documents even if they technically fall within the scope of a FOIA exemption. As the Attorney General also stated in his March 19, 2009 memorandum, "an agency should not withhold information simply because it may do so legally." In particular, consistent with President Obama's directions, the Office will not withhold an opinion merely to avoid embarrassment to the Office or to individual officials, to hide possible errors in legal reasoning, or "because of speculative or abstract fears."

OLC has a unique mission, and a long-established tradition—sustained across many administrations—as to how its work should be carried out. The Office depends not only upon its leadership but also upon each of its attorneys to ensure that this tradition continues.

David J. Barron
Acting Assistant Attorney General

6

# EXHIBIT V

ARTICLES

# PRESIDENTIAL REVIEW

### Frank H. Easterbrook*

JUDGES ARE FOND of claiming the power to say what the law is. As the Supreme Court held in *Marbury v. Madison*,[1] the power to interpret the law includes the power to interpret the Constitution. Sometimes judges make the bolder claim that *only* they may interpret the law — or at least the Constitution.

No one would take seriously an assertion that the President may not interpret federal law. After all, the President must carry out the law, and faithful execution is the application of law to facts. Before he can implement he must interpret. Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.[2] But what of the Constitution? Perhaps that is the exclusive preserve of judges. I shall discuss the extent to which the President may act on views at variance with statutory law, when persuaded that the

---

* Judge, United States Court of Appeals for the Seventh Circuit; Senior Lecturer, The Law School, The University of Chicago. This essay grows out of the Twelfth Sumner Canary Lecture presented at the Law School of Case Western Reserve University on February 7, 1990, and is Copyright by Frank H. Easterbrook. I thank Akhil R. Amar, Ruth Bader Ginsberg, Larry Kramer, Hans A. Linde, Alan Meese, Geoffrey P. Miller, Richard Murphy, Richard A. Posner, and Geoffrey R. Stone for helpful comments on earlier drafts.

1. 5 U.S. (1 Cranch) 137 (1803).

2. One example is when the statute leaves play in the joints and delegates to an agency. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984); Chicago Mercantile Exchange v. SEC, 883 F.2d 537, 547-48 & n.4 (7th Cir. 1989); Anthony, *Which Agency Interpretations Should Bind Citizens and Courts?*, 7 YALE J. REG. 1 (1990); Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511.

law departs from the Constitution.

Before I begin, the obligatory disclaimer. A federal judge is like a ghost. He must be present and absent at the same time. I speak to you with the knowledge that other judges may disagree, and that when a case comes before me I shall try to divine the view prevailing among my superiors rather than insist on an idiosyncratic one. On top of that, I may have to apply qualifications that I do not spell out here. All that said, however, I shall use a broad brush, so that you may see the forest while remembering that in the event of litigation I will not walk into a tree.

Example: President Reagan refused to implement part of the Competition in Contracting Act of 1984, which requires protests over the awards of certain contracts to be referred to the Comptroller General, who is not part of the Executive Branch. President Reagan thought the statute an unconstitutional intrusion on powers reserved to him by Article II. The Ninth Circuit, by contrast, thought the President presumptuous—more, thought it *un*-constitutional for the President to prefer the Constitution to a statute. According to the court, the President not only violated the take care clause but also invaded the judicial domain.[3] On occasion the Supreme Court has said similar things, although always in *dicta*.[4]

## I

There is a long history of presidential action on the basis of

---

3. Lear Siegler, Inc. v. Lehman, 842 F.2d 1102, 1119-26 (9th Cir. 1988), *vacated in immaterial part*, 893 F.2d 205 (1989) (in banc). The District of Columbia Circuit took a related view in Rafeedie v. Immigration and Naturalization Serv., 880 F.2d 506, 513-15 (D.C. Cir. 1989), and Continental Air Lines, Inc. v. Department of Transp., 843 F.2d 1444, 1455-56 (D.C. Cir. 1988). *See* Gressman, *Take Care, Mr. President*, 64 N.C.L. REV. 381 (1986). On the other hand, the District of Columbia circuit in National Wildlife Fed'n v. ICC, 850 F.2d 694, 708 (D.C. Cir. 1988), remanded a case so that the agency could consider a constitutional objection to its decision, and a series of cases dealing with the "fairness doctrine" invited the FCC to junk its rules on constitutional grounds, *e.g.*, Meredith Corp. v. FCC, 809 F.2d 863, 872-74 (D.C. Cir. 1987), a course it ultimately adopted. Syracuse Peace Council v. FCC, 867 F.2d 654 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 717 (1990); *see* Marozsan v. United States, 852 F.2d 1469, 1492 n.4 (7th Cir. 1988) (in banc) (Easterbrook, J., with Coffey and Manion, JJ., dissenting).

4. See Weinberger v. Salfi, 422 U.S. 749, 765 (1975), saying in dictum that "the constitutionality of a statutory requirement [is] a matter which is beyond his jurisdiction to determine." "His" referred to the Secretary of Health, Education, and Welfare. Many similar assertions may be found in the cases, every last one of them as unreasoned. *But see United States v. Nixon*, 418 U.S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the government must initially interpret the Constitution . . . .").

constitutional views, sometimes views at variance with those of the courts.[5] Four categories are unproblematic: pardons, vetoes, additions, and proposals for legislation. I give examples of presidential actions in these categories without the slightest effort to be comprehensive.

1. Pardons. A Federalist Congress enacted, and Federalist judges enforced, the Sedition Act of 1798. On taking office President Jefferson first instructed the United States Attorneys to cease prosecuting violators and then pardoned all who had been convicted while the Federalists held sway. This effectively nullified the statutes, as much as if the Supreme Court had held them unconstitutional — which it was to do, on grounds similar to Jefferson's, 163 years later.[6]

2. Vetoes. The Nation's inaugural veto was cast exclusively on constitutional grounds. President Washington vetoed the first bill apportioning representatives among states, calling it unconstitutional because it gave too many representatives to the smaller states, implying that it left too few for Virginia.[7] Secretary of State Jefferson, another prominent Virginian, wrote the veto message. President Madison vetoed on constitutional grounds a bill chartering a church in the District of Columbia.[8] Then there was a cause célèbre: after the Supreme Court held in *Osborn v. Bank of the United States*[9] that Congress has the power to establish a national bank, Congress reauthorized the Bank. President Jackson vetoed the bill, concluding that the Supreme Court was wrong and the statute unconstitutional.[10] Jackson's veto was controversial — but because he invoked reasons in addition to constitutional ones!

---

5.  G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 22-26 (11th ed. 1985) and Lee, *The Provinces of Constitutional Interpretation*, 61 TUL. L. REV. 1009, 1012-14 (1987) collect presidential views on the subject. *See* A. BICKEL, THE LEAST DANGEROUS BRANCH 260-64 (1962).

6.  New York Times Co. v. Sullivan, 376 U.S. 254, 273-76 (1964); *see* H. KALVEN, A WORTHY TRADITION: FREEDOM OF SPEECH IN AMERICA 63-68 (1988).

7.  1 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789-1897 124 (J. Richardson ed. 1896) [hereinafter COMPILATION] (veto message Apr. 5, 1792). Both the bill and the veto created a national stir, and Washington's cabinet was sorely divided. *See* 5 J. MARSHALL, THE LIFE OF GEORGE WASHINGTON 279-84 (1807).

8.  1 COMPILATION, *supra* note 7, at 489-90 (veto message Feb. 21, 1811); *see* American Jewish Congress v. Chicago, 827 F.2d 120, 136-37 (7th Cir. 1987) (Easterbrook, J., dissenting).

9.  22 U.S. (9 Wheat.) 738 (1824).

10.  2 COMPILATION, *supra* note 7, at 581-91 (veto message July 10, 1832).

Until Jackson's bold step, many believed that the veto should be exercised exclusively on constitutional grounds.[11]

3.  Additions. If a statute says "do at least X," the President may decide to do more because he believes the Constitution requires more. This is a common response to procedural shortcomings. The Lloyd-LaFollette Act, the charter of the civil service system, provides hearings on discharge, which became inadequate in light of revisionist interpretations of the due process clause. The President may add the necessary procedures. Presidents may add procedures and do "more," in other ways, on instrumental grounds too; not all decisions depend on constitutional imperatives.[12]

4.  Proposals for new legislation. President Franklin Roosevelt asked Congress to enact laws that were out of step with *Lochner* because he did not accept the soundness of that case and the skein of substantive due process results. He wanted to strike off on a different course and asked Congress to go with him. It did, and during the next four years the Court held the central components of the package unconstitutional, triggering the Court-packing plan and sorely tempting him to decline to implement one of its decisions.[13]

Pardons, vetoes, additions, and proposals for laws are not problematic because they do not subvert the take care clause. Proposals ask for laws the President may execute faithfully; vetoes

---

11.  Black, *On the Veto*, 40 L. & Contemp. Prob. 87 (1976); *see* R. Remini, Andrew Jackson and the Bank War: A Study in the Growth of Presidential Power (1967).

12.  See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-49 (1978), pointedly saying that agencies may adopt procedures exceeding statutory minima, while courts have no power to demand that they do so.

13.  President Roosevelt prepared a speech to deliver if the Court should strike down the legislation abrogating "gold clauses" in federal obligations. He planned to quote from Lincoln's First Inaugural Address (to be discussed below) and add:

> To stand idly by and to permit the decision of the Supreme Court to be carried through to its logical, inescapable conclusion would so imperil the economic and political security of this nation that the legislative and executive officers of the Government must look beyond the narrow letter of contractual obligations, so that they may sustain the substance of the promise originally made in accord with the actual intention of the parties."

F.D.R. — His Personal Letters 1928-1945 459-60 (E. Roosevelt ed. 1950) (Proposed Speech on the Gold Clause Cases (Feb. 1935)). The Court sustained the legislation, *Perry v. United States*, 294 U.S. 330 (1935), so the President did not deliver the speech. *See* Dam, *From the Gold Clause Cases to the Gold Commission: A Half Century of American Monetary Law*, 50 U. Chi. L. Rev. 504, 509-18 (1983).

stop bills from becoming laws; in neither case is the take care clause activated. Additional process also does not "violate" or "invalidate" a statute. Pardons do frustrate the implementation of laws, but as *all* pardons do so to some degree, the existence of the pardon clause must authorize nonenforcement, at least at retail rather than wholesale. So too with the President's ability to decline criminal prosecution in the first place. What one President may omit, a successor may countermand and nullify.

Casting vetoes and granting pardons on grounds of politics or prudence is acceptable;[14] how odd it would be if a President, free to consider the welfare of donors in casting vetoes, could not consider the Constitution! That would reverse the original practice, in which Presidents gave exclusively constitutional grounds for their vetoes.

Presidents often justify their vetoes, pardons, additions, and proposals on broader grounds. Consider President Thomas Jefferson's explanation for the pardons of those convicted under the Sedition Act:

> [N]othing in the Constitution has given [the judiciary] a right to decide for the Executive, more than to the executive to decide for them. Both magistracies are equally independent in the sphere of action assigned to them. The judges, believing the [law] constitutional, had a right to pass a sentence of fine and imprisonment, because that power was placed in their hands by the Constitution. But the executive, believing the law unconstitutional, was bound to remit the execution of it; because that power had been confided to him by the Constitution. That instrument meant that its coordinate branches should be checks on each other. But the opinion which give to the judges the right to decide what laws are constitutional, and what are not, not only for themselves in their own sphere of action, but for the Legislature & Executive also, in their spheres, would make the judiciary a despotic branch.[15]

Or consider President Andrew Jackson's explanation for his veto of the bill chartering the second Bank of the United States.

---

14. *See* C. Black, The People and the Court 81 (1960) ("the President can veto for any reason that appeals to him"). Chester J. Antieau, in THE EXECUTIVE VETO (1988), collects vetoes and the Presidents' grounds for their decisions.

15. 8 The Writings of Thomas Jefferson 310-11 (P. Ford ed. 1897) (letter to Abigail Adams dated Sept. 11, 1804); *see* G. HASKINS & H. JOHNSON, 2 HISTORY OF THE SUPREME COURT OF THE UNITED STATES 148-49 (1981); C. PATTERSON, THE CONSTITUTIONAL PRINCIPLES OF THOMAS JEFFERSON 117-25 (1953).

> The Congress, the Executive, and the Court must each for itself be guided by its own opinion of the Constitution. Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it, and not as it is understood by others. It is as much the duty of the House of Representatives, of the Senate, and of the President to decide upon the constitutionality of any bill or resolution which may be presented to them for passage or approval as it is of the supreme judges when it may be brought before them for judicial decision. The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both. The authority of the Supreme Court must not, therefore, be permitted to control the Congress or the Executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve.[16]

Both Presidents Jefferson and Jackson contended that no law may go into force unless all three branches agree that it is constitutional. Each, acting within its sphere, has the power to say no: Congress not to enact, the President not to approve in his legislative role or enforce in his executive role, and the Court to set aside.

President Abraham Lincoln expressed stronger thoughts in his debates with Stephen Douglas, allowing on the one hand that *Dred Scott*[17] bound Scott to his master and asserting on the other that the case had no broader significance:

> We nevertheless do oppose [that decision] as a political rule which shall be binding on the voter, to vote for nobody who thinks it wrong, which shall be binding on the members of Congress or the President to favor no measure that does not actually concur with the principles of that decision. . . . If I were in Congress, and a vote should come up on a question whether slavery should be prohibited in a new Territory, in spite of the *Dred Scott* decision, I would vote that it should.[18]

In his First Inaugural Address President Lincoln reaffirmed that view when explaining that he would propose and enforce legislation inconsistent with the principle underlying *Dred Scott*: that as a matter of substantive due process, no person of African origin

---

16. 2 COMPILATION, *supra* note 7, at 582.
17. Scott v. Sandford, 60 U.S. (19 How.) 393 (1856).
18. Sixth Lincoln-Douglas debate at Quincy, Oct. 13, 1858, in 3 THE COLLECTED WORKS OF ABRAHAM LINCOLN 255 (R. Basler ed. 1953).

could be a citizen of the United States. Lincoln said:

> [T]he candid citizen must confess that if the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made in ordinary litigation between private parties in personal actions, the people will have ceased to be their own rules, having to that extent practically resigned their Government into the hands of that eminent tribunal.[19]

Here we encounter the assertion that a law deemed constitutional by legislative and executive branches may go into force without the judiciary's approbation, a much broader claim of executive authority than either Jefferson or Jackson advanced.

## II

A brief detour is appropriate. People sometimes find assertions of presidential power irksome because they think such a power would give the President the upper hand in the struggle with Congress. If the executive department has this power, would it not gain too much at the expense of Congress? When this thought comes to mind, it is well to remember that the legislative branch has its own role in interpreting the Constitution.[20] Legislative constitutional interpretive powers parallel those of the President, and some of these are also non-controversial.

(1) Any legislator may vote against a bill on constitutional grounds, including grounds that the Supreme Court has rejected.

(2) Legislators may vote for a bill that the Court has held unconstitutional, in order to prompt change. Roosevelt's Congress of 100 Days challenged *Lochner* in this fashion; after the Court held much of the program unconstitutional, Congress reenacted the laws with a thin veneer; it eventually prevailed. Congress challenged the Supreme Court's decision that it may not regulate the wages and hours of state and local officials by enacting more such

---

19. First Inaugural Address, Mar. 6, 1861, in 4 THE COLLECTED WORKS OF ABRAHAM LINCOLN, *supra* note 18, at 268.

20. *See* Brest, *Congress as Constitutional Decisionmaker and its Powers to Counter Judicial Doctrine*, 21 GA. L. REV. 57 (1986); Brest, *The Conscientious Legislator's Guide to Constitutional Interpretation*, 27 STAN. L. REV. 585 (1985); Fisher, *Constitutional Interpretation by Understanding Members of Congress*, 63 N.C.L. REV. 707 (1985); Hickok, *The Framers' Understanding of Constitutional Deliberation in Congress*, 21 GA. L. REV. 217 (1986); Ross, *Legislative Enforcement of Equal Protection*, 72 MINN. L. REV. 311 (1987); Note, *The Senate and the Constitution*, 97 YALE L. J. 1111 (1988).

laws. It has prevailed in this fight.[21] State legislatures regularly enact laws concerning abortion in order to challenge *Roe v. Wade*,[22] and the contours of that decision have changed under pressure.[23] Legislation that bumps against accepted bounds is a force for change as legitimate as the arguments of lawyers who try to curtail governmental powers by asking for the invalidation of laws previously sustained. There is no ratchet in constitutional law.

(3) Congress may impeach and remove from office all who violate the Constitution, as Congress understands it. The principal efforts —the impeachment and acquittal of Samuel Chase and Andrew Johnson, the campaigns to impeach Earl Warren and William O. Douglas — came to naught, but the power is there. The impeachment of Richard Nixon fits this pattern, although his resignation prevented resolution.

(3A) Impeachment does not exhaust the tools for enforcing the legislature's view of the Constitution. If Congress enacts a War Powers Act and the President goes his merry way in reliance on a more expansive view of executive power (and a stingy view of legislative power), Congress need not give up. It may refuse to enact defense appropriations bills or may take away the President's helicopters or enact a national health bill the President's supporters abhor. For two hundred years, the House of Representatives has enforced its constitutional prerogative to initiate tax legislation by the mundane expedient of refusing to approve tax bills devised by the Senate.[24] The power of the purse is potent, and Congress has *carte blanche* at every turn. It is why the Framers feared Congress above all other internal dangers to the Republic.

(4) There is the extraordinary power to interpret *and change the meaning of* the 14th and 15th Amendments. Congress may enact laws expressly disagreeing with the Supreme Court's view of

---

21. National League of Cities v. Usery, 426 U.S. 833 (1976), *overruled by* Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985).

22. 410 U.S. 113 (1973).

23. *See* Webster v. Reproductive Health Services, 109 S. Ct. 3040 (1989).

24. *E.g.*, 132 Cong. Rec. 26,202 (1986); 106 Cong. Rec. 15,818-19 (1960); Cong. Globe, 35th Cong., 2d Sess. 1666-67 (1859). Authorities are collected in C. CANNON, 6 CANNON'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES §§ 314-15 (1935); L. DESCHLER, 3 DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF REPRESENTATIVES ch. 13, §3 (1974); A. HINDS, 2 HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES ch. 47 (1907).

these amendments — and the Court has said it will acquiesce in light of the power to legislate those amendments confer.[25]

Given this assortment of constitutional powers, the legislature is in no danger if we recognize in the President some scope for constitutional decision.

### III

Now for a fifth presidential example that is not controversial in practice but should be so in theory. A President may refuse to enforce a law that is "like" one held invalid by the courts. In the 1970s the Court struck down sex differences in social welfare laws.[26] The Department of Justice trudged through these statutes identifying similar gender-based rules and instructing the Executive Branch not to follow them. In the end the Supreme Court decided only five or six Social Security sex discrimination cases, and the remainder of the sex-based provisions were carved out of the law by administrative decision, or on occasion by decisions of district judges that were not appealed and were acquiesced in nationwide — a step that is functionally a final constitutional decision by the Executive Branch.

The Attorney General, on the advice of the Solicitor General and the Assistant Attorney General for the Office of Legal Counsel, decided not to enforce so *many* statutes that Congress required the Department of Justice to notify counsel for House and Senate when the Administration decided not to appeal from a decision holding a statute unconstitutional.[27] A few of these non-enforcement decisions even reached the Supreme Court by the back door, and the Court did not seem restive that constitutional questions had been resolved by another branch. One of these came up when the Department of Justice stopped enforcing a sex-based rule in the Social Security Act after "the Solicitor General . . . concluded that the statutory presumption could not be defended under the standards announced by this Court."[28] Disputes about

---

25. Oregon v. Mitchell, 400 U.S. 112, 128-29 (1971); Katzenbach v. Morgan, 384 U.S. 641 (1966). See Carter, *The Morgan "Power" and the Forced Reconsideration of Constitutional Decisions*, 53 U. CHI. L. REV. 819 (1986), treating *Morgan* as a privilege in Congress to disagree with the Court and compel it to re-think, with a slant in Congress' favor.

26. *See, e.g.,* Califano v. Westcott, 443 U.S. 76 (1979); Califano v. Goldfarb, 430 U.S. 199 (1977).

27. *E.g.,* 2 U.S.C. §288k(b) (1988) (notice to Senate counsel).

28. Heckler v. Edwards, 465 U.S. 870, 873 n.2 (1984).

the appropriate remedy took the case to the Court, which held that because the Executive Branch quit enforcing the law, a remedy for persons claiming injury would not be deemed one based on the Constitution.

Assuming the Court's opinions have generality and force beyond the parties, the President must have the ability to declare laws unconstitutional in the course of applying the governing rules. To apply the rules includes the power to interpret them. I shall come back to this, because it is illuminating. If the President may go beyond a decision's four corners to implement "the principle" found there, he must have the ability to implement a principle even when others disagree with his interpretation. Next we shall wonder what counts as a "similar" decision. That will depend on the level of generality selected, a question to which there is no right answer. To grant the President the power to generalize is to grant him the power to make independent constitutional decisions.

## IV

Now for some controversial decisions. Let me give several, all involving a decision by the President not to enforce a law even when there is no decision on point by the Supreme Court.

1. President Reagan's decision not to enforce the part of the Competition in Contracting Act requiring references to the Comptroller General.

2. Many presidents' decisions not to carry out laws with one-house veto provisions, in advance of the decision holding all such laws unconstitutional.[29]

3. Congress enacted the Federal Advisory Committee Act, requiring open meetings by groups "utilized by one or more agencies, on the interest of obtaining advice or recommendations for the President."[30] Does the Act apply to the ABA's Standing Committee on the Judiciary, which advises the President, before he makes nominations, whether someone would be a good federal judge? President Ford concluded that it does but refused to enforce the law because he thought it an unconstitutional restriction on his ability to make nominations. He did so on the advice of Attorney General Levi, who acted on advice of Assis-

---

29. Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919 (1983); *see* Elliott, *The Administrative Constitution, The Constitution, and the Legislative Veto*, 1983 S. Ct. Rev. 125.

30. 5 U.S.C. App. § 3(2)(c) (1988).

tant Attorney General Scalia.[31] Fifteen years later the question reached the Supreme Court. Three Justices agreed with this view; five turned handsprings to construe the law as inapplicable in order to avoid the problem.[32] One member of the Court kept his thoughts to himself: Justice Scalia.

4. President Wilson appoints a postmaster, later changes his mind and fires him despite a law giving him tenure; President Truman appoints a member of the War Claims Commission, whom President Eisenhower fires despite statutory tenure. Former President Taft, who lost the election to President Wilson in 1912, was Chief Justice by the time the controversy over his successor's action reached the Court. Taft vindicated Wilson. Justice Frankfurter rebuffed Eisenhower. Neither suggested that the President transgressed constitutional limits on his role in putting the statute to a test.[33]

5. Ongoing disputes about intelligence operations and the War Powers Act. No President has implemented the War Powers Act. Many have given notices that they call "consistent" with it, in order to compromise political disputes, but not one has conceded that the Act binds him in the event he has a view of the international situations that differs from the one held by Congress.

6. The patriarch of cases of defiance: President Andrew Johnson sacks Secretary of War Edwin Stanton despite the Tenure of Office Act, which provided that no cabinet secretary could be relieved until his successor had been confirmed. Secretary Stanton refused to budge; President Johnson was impeached; only his acquittal by the Senate persuaded Stanton to vamoose.[34] Just as the Court declared the Sedition Act unconstitutional 163 years after President Jefferson issued his blanket pardon, so the Court sustained President Andrew Johnson's constitutional views 60 years later, in the course of vindicating President Wilson's discharge of Postmaster Myers.[35]

---

31. Letter from Attorney General William B. Saxbe to the American Bar Association, *discussed in* History of Appointments to Supreme Court, 4B Op. Off. Legal Counsel 457, 473 & n.54 (1980).

32. Public Citizen v. Department of Justice, 109 S. Ct. 2558 (1989).

33. The two cases are Myers v. United States, 272 U.S. 52 (1926), and Wiener v. United States, 357 U.S. 349 (1958). *See* Carter, *The Independent Counsel Mess*, 102 HARV. L. REV. 105, 129-34 (1988); Entin, *The Removal Power and the Federal Deficit: Form, Substance, and Administrative Independence*, 75 KY. L.J. 699 (1987). *Myers* and *Wiener* present different executive claims; in *Myers* to be free of legislative control, and in *Wiener* to operate a unitary executive. *See* Bowsher v. Synar, 478 U.S. 714 (1986). For current purposes the distinction is unimportant.

34. H. TREFOUSSE, ANDREW JOHNSON 276-78, 293-334 (1989).

35. *Myers*, 272 U.S. at 164-76.

A Case #22-3086      Document #1997762        Filed: 05/03/2023      Page 381 of

Case 1:21-cr-00670-CJN  Document 58-22  Filed 04/15/22  Page 13 of 27
*916*      *CASE WESTERN RESERVE LAW REVIEW*      *[Vol. 40:903*

Must Presidents comply with such laws until 60 or 160 years have gone by and a justiciable case or controversy reaches the Supreme Court? The argument that the President must do so follows one of five lines: (1) the take care clause; (2) expertise — judges have it and Executive Branch doesn't; (3) chaos, which devours us if there are competing voices on constitutional issues; (4) Congress' greater power not to enact the statute implies the power to have it enforced as written; and occasionally (5) signing the bill waives the right to object to it.

A

Four of these five are makeweights. Start with the fourth: the greater power includes the lesser. Justice Holmes once advanced this argument.[36] Greater-includes-the-lesser failed to carry the day when Holmes used it to explain why you could fire a policeman on account of speech, and the approach that defeated Holmes's position came to be known as the "unconstitutional conditions doctrine." The contention fares no better when dealing with the apportionment of powers among branches. It implies that all laws satisfy the Constitution, which Holmes did not believe. It also implies that judges, too, are without authority to question the constitutionality of statutes. Holmes did not believe that either. The argument is equally unsuccessful even if recast as an assertion that the capacious power of Congress makes the law constitutional, not that it defeats the power of the President to express a view.

Now for "expertise." Here's an irrelevant characteristic. The Supreme Court did not invalidate one federal statute during the 50 years between *Marbury* and *Dred Scott*; many judges of state courts rarely consider constitutional questions; in neither case does power evaporate with lack of experience. Judges have disinterest more than they have expertise, yet they engage in judicial review even when their own posers are at stake. Professors of constitutional law have both disinterest and expertise yet no power. Governmental powers go with the office, not with professional skills. Be that as it may, if expertise is important it parades down the halls of the executive branch.

The President (or anyone else in the Executive Branch) acts on the advice of the Attorney General, who relies on the Solicitor

---

36. *Id.* at 177 (Holmes, J., dissenting).

General and the Assistant Attorney General for the Office of Legal Counsel. To say that the President lacks expertise is to say that these people — the real decision-makers — lack expertise. Yet in the last 20 years the occupants of these offices include Griffin B. Bell (AG 1977-79), Robert H. Bork (SG 1973-77), Wade H. McCree, Jr. (SG 1977-81), William H. Rehnquist (OLC 1969-71), Antonin Scalia (OLC 1974-77), and Kenneth F. Starr (SG 1989- ), to list only those who were federal judges before or since. Others were or are distinguished professors of law; still others were or are at the top of the bar. Earlier occupants-turned-judge include William Howard Taft, Charles Evans Hughes, Robert Jackson, Stanley Reed, Thurgood Marshall, Charles Fahy, Simon Sobeloff, George Thomas Washington, my colleague Walter J. Cummings — and the man who wrote the President's veto message on the Bank of the United States, Roger Brooke Taney! It is said in the halls of Congress that what goes around comes around. President Lincoln was to treat Taney's opinion in *Dred Scott* with the same tender mercies that Taney and President Jackson reserved for Marshall's opinion in *Osborn*.

Next comes waiver. One could say that a President consents by signing the bill, that refusal to comply is a form of line-item veto. To insist that the President's signature on a bill compels him to enforce the law is to say that with the stroke of a pen a President may eliminate constitutional objections — may create extra-constitutional (perhaps contra-constitutional) institutions on his own volition. "Agreement" of this character does not override limitations in the fundamental document. No one may consent to violate the Constitution, or bind his successor to do so.[37] Anyway, Presidents often sign bills despite objections to some portions of them, because the remainder is beneficial or even necessary.[38] Sticking an unconstitutional proviso into the bill setting the debt ceiling — a bill the President must sign to keep the government in operation — does not dispatch the constitutional problem.[39]

As for chaos: There is only one President. The Executive

---

37. Although it is out of place in this essay to answer an argument by relying on the Supreme Court, I'll succumb this one time. *Myers* allowed President Wilson to refuse, on constitutional grounds, to carry out a bill he signed into law. *See* Buckley v. Valeo, 424 U.S. 1 (1976); Nixon v. Administrator of General Services, 433 U.S. 425, 556-57 (1977) (Rehnquist, J., dissenting).

38. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353 (1953).

39. Sidak & Smith, *Four Faces of the Line Item Veto: A Reply to Tribe and Kurland*, 84 NW. U.L. REV. 437, 452-57 (1990).

Branch can act in a unified way. Someone desiring chaos could do no better than to delegate constitutional questions to more than 20,000 state judges, or 600 federal district judges, whose work is reviewed by more than 150 circuit judges sitting in panels of three! That way lies babble — and we have fulfilled all expectations. A unitary Executive always does better at avoiding chaos than does a hydra-headed, uncoordinated judiciary.[40] This was, after all, one of the principal arguments for a unitary executive in 1787.

People commonly overstate the extent to which divergence of opinion and practice breeds "chaos." Tension and enduring disagreement are not chaos. Presidents are at loggerheads with Congress repeatedly, and the two houses of Congress with each other. Separation of powers — the inability of any one person or branch to have its way — was thought to be an essential component of a free republic, not a hindrance to good government. We know from the supremacy clause that *state* executive officials must put the Constitution ahead of state and federal law.[41] Is this acceptable while the similar decision of a single President produces chaos? Unlikely.

Other nations have taken separation further. France has three systems of courts, each supreme within its province. The *Conseil Constitutionnel* may declare laws unconstitutional before they go into force but not thereafter; the *Cour de Cassation* and the *Counseil d'État* owe no respect to the decisions of the *Counseil Constitutionnel* and lack the powers that we identify with judicial review. Chaos has not broken out in France as a result.

Civilian legal systems also deny precedential force to judicial decisions. They insist that the code — the statute or constitution — is the only law, and that judicial decisions are glosses with the same force as scholarly commentary, maybe a little less.[42] In these legal systems professors have more prestige than judges.[43] The ab-

---

40. See generally Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802 (1982), for an explanation why an unitary decision-maker will do better than any multiple-member political body, a category that includes the Supreme Court.

41. Alleghany Corp. v. Haase, 896 F.2d 1046, 1054-56 (7th Cir. 1990) (Easterbrook, J., concurring); Cooper v. Eugene School Dist. No. 4J, 301 Or. 358, 361 & n.7, 723 P.2d 299, 302-03 & n.7 (1986).

42. *See* J. MERRYMAN & D. CLARK, COMPARATIVE LAW: WESTERN EUROPE AND LATIN AMERICAN LEGAL SYSTEMS 551-87 (1978).

43. A point forcefully brought home to one of Justice Scalia's children, who proudly told a European family with whom she was staying that her father had become a judge, only to learn that her hosts assumed that her father must have been disgraced to accept

sence of "precedent" as we know it greatly enlarges the discretion of the legislative and executive branches, again without bringing civilization to a close. The great western democracies have very different legal systems but fundamentally similar economic and legal realms.

B

This leaves the take care clause. The President must enforce, not negate. Simple — and very misleading.

For the President must take Care that the "Laws" are executive. Is the Constitution a "law"? If so, then the President must execute it too. In any contest between statute and Constitution, the Constitution wins.

To tell whether the President may put the Constitution over a law, step back and ask: Why may a *judge* put the Constitution first? The answer Chief Justice Marshall gave in *Marbury* is simple: that the Constitution is law.[44]

— We departed from the United Kingdom by having a written and therefore an enforceable constitution.

— The Constitution establishes a structure of separated and limited powers, implying enforceable limits.

— The supremacy clause gives a hierarchy, with the Constitution on top. Although technically it refers to state judges rather than federal ones, the clause implies a structure binding every public officer, one in which the Constitution prevails over competing sources of legal obligation.

— All officers take an oath to that hierarchy.

So in the event of conflict the Constitution wins. The tough question in *Marbury* was not *whether* the Constitution trumps a statute, but *who* interprets the meaning of the Constitution: Congress when it enacts the law, the President when he executes, or the Court when it decides cases and controversies? Why not say that the legislature or President, on acting, resolved the constitutional questions?

John Marshall's answer was essentially: "Every man for himself." Each official owes the same duty to the hierarchy and must

---

such a demotion. *See* R.B. Ginsburg, *Thoughts on Writing Separately*, 65 Wash. L. Rev. 133, 136 (1990).

44. *See* Easterbrook, *Approaches to Judicial Review*, in The Blessings of Liberty: An Enduring Constitution in a Changing World 147 (J. David & R. McKay eds. 1989).

make his own decision. Judges can't knuckle under to the view of others, it is the Constitution, not someone else's view about the Constitution, that governs.

The claim is especially strong when the decision is self-denying. Ability to construe *for myself* is at its apex when an actor is denying his own power. *Marbury* did not impose duties on other branches or proclaim that others must agree. The Justices said only that Congress cannot compel them to hear a case that they believe the Constitution does not allow them to decide.

Now translate to the President the rationales of constitutional review.

If we accept Alexander Hamilton's justification for judicial review — that unconstitutional enactments are simply not "law" and do not bind anyone[45] — then there is no distinction between judge and President. The Supreme Court has said more times than one can count that unconstitutional statutes are "no law at all."[46] Add the observation that what is "no law" can't bind the Executive Branch, and the argument is complete. *Marbury* itself used functional rather than formal arguments, however, and these carry over completely.

— The Constitution is *law*, a source of rules.
— The hierarchy is the same.
— The duty is to Constitution and its structure.
— Every man for himself: the President can't kowtow to Congress' view any more than the Court will. Especially given the unique presidential oath to the Constitution in article II, section 1, clause 7: "I do solemnly swear that I will faithfully execute the office of President of the United States and will, to the best of my Ability, preserve, protect, and defend the Constitution of the United States." Nothing there about executing laws while ignoring the Constitution!
— Non-enforcement of a law is a modest, self-denying power along the lines of *Marbury*. Even when the power is invoked in support of one's own position (a President protects executive powers, as he perceives them, from legislative encroachment), the President does not insist that anyone else agree.

Self-denial is the sort of power that even Jefferson approved.[47] Jefferson was not at the constitutional convention, but

---

45. THE FEDERALIST No. 78, at 491-93 (A. Hamilton) (B. Wright ed. 1961).
46. *E.g.*, Norton v. Shelby County, 118 U.S. 425, 442 (1886).
47. As Jefferson wrote to Spencer Roane, "[e]ach of the three departments has equally the right to decide for itself what is its duty under the constitution, without any

Madison was and approved of this view:

> [E]ach [department] must in the exercise of its functions be
> guided by the text of the Constitution according to his own in-
> terpretation of it; and that consequently in the event of irrecon-
> cilable interpretations, the prevalence of one or the other depart-
> ment must depend on the nature of the case, as receiving its
> final decision from one or the other, and passing from that deci-
> sion into effect, without involving the functions of any other.[48]

James Wilson, the author of article III of the Constitution, saw
things the same way. During the debates in Pennsylvania on the
ratification of the Constitution, Wilson had this to say:

> I say, under this constitution, the legislature may be restrained
> and kept within its prescribed bounds by the interposition of the
> judicial department. . . . I had occasion on a former day to
> state that the power of the constitution was paramount to the
> power of the legislature acting under that constitution. For it is
> possible that the legislature, when acting in that capacity, may
> transgress the bounds assigned to it, and an act may pass in the
> usual *mode* notwithstanding that transgression; but when it
> comes to be discussed before the judges, when they consider its
> principles, and find it to be incompatible with the superior pow-
> ers of the constitution, it is their duty to pronounce it void; and
> judges independent, and not obliged to look to every session for
> a continuance of their salaries, will behave with intrepidity and
> refuse to the act the sanction of judicial authority. In the same
> manner the President of the United States could shield himself
> and refuse to carry into effect an act that violates the
> constitution.[49]

---

regard to what the others may have decided for themselves under a similar question."
Letter from Thomas Jefferson to Spencer Roane (Sept. 6, 1819) *reprinted in* 12 WORKS OF
THOMAS JEFFERSON 139 (P. Ford ed. 1905). Jefferson was consistent. In his NOTES ON THE
STATE OF VIRGINIA (1784), written before the drafting of the Constitution and discussed
by Madison in the 49th Federalist. Madison stated that the "several departments, being
perfectly coördinate by the terms of their common commission, none of them, it is evident,
can pretend to an exclusive or superior right of settling the boundaries between their re-
spective powers." THE FEDERALIST No. 49, at 348 (J. Madison) (B. Wright ed. 1961). The
quotation is from Madison's exposition of Jefferson's views. Madison disputes Jefferson's
conclusion that because the departments have equal powers all disputes must be resolved
by the people; he does not, however, disagree with Jefferson's view of the right of each
department to equal claim to determine the limits of its powers.

    48.  E. Burns, JAMES MADISON: PHILOSOPHER OF THE CONSTITUTION 187 (1968) (re-
print of 1938 original) quoting from one of Madison's unpublished memoranda. See id. at
159-60 186-89 for Burns's summary of Madison's approach.

    49.  PENNSYLVANIA AND THE FEDERAL CONSTITUTION OF 1787-1788 304-05 (J. Mc-
Master & F. Stone eds. 1888).

Notice that Wilson first justifies judicial review and then equates the President with the judges in ability and authority to set the Constitution over a statute.[50]

C

If arid logic and history do not persuade, what about an example? Inflamed by the latest scandal in defense procurement, Congress passes this law:

> Section 1. The President shall execute the CEO of Apex Missiles Corporation and the claque that surrounds him, and he shall confiscate their property, and none of their lineal descendents shall be eligible for any office under the United States, or any of them.
>
> Section 2. No court of the United States shall have jurisdiction to review acts required by Section 1.

This is a bill of attainder (with the corruption-of-blood feature that the Framers detested). Whether or not the view-preclusion section works, the President must decide whether to dispatch the firing squad. Is the President obliged to rub out the CEO and dispossess his heirs? Or could (must) he say: This is a bill of attainder, and my duty to carry out the Constitution trumps any obligation to carry out this law? This is a self-answering question. Even Jefferson, who thought ill of judicial review in general, and John Marshall in particular, conceded the power of each Department to decide *for itself* whether the law is consistent with constitutional imperatives.

If there is doubt, how about the next question in line: The Supreme Court holds the law unconstitutional as applied to the CEO, but a member of the claque (call him Lovett) did not obtain judicial review. Must the President execute Lovett, or may he say that the constitutional principle has been established in the CEO's case? If the President may not set the Constitution above the law, why may he spare Lovett on the basis of a decision in a stranger's case? Why, indeed, could he spare the CEO? The judicial decision is just an interpretation of the Constitution, and if for the Executive Branch the law is superior to the Constitution then it trumps the judicial decision too! But if the President may spare Lovett on the basis of the decision in the CEO's lawsuit, why can't

---

50.   S. SNOWISS, JUDICIAL REVIEW AND THE LAW OF THE CONSTITUTION 23-44, 72-89 (1990), collects similar statements from Wilson and other of the Constitution's authors.

the President decide other constitutional issues on the basis of existing law? The concession that a decision about one statute discriminating on account of sex allows the President to cease enforcing others "like" it carries powerful implications.

Perhaps the response is that all of this supposes that the Constitution is "law," to be respected in the same way as other law. If Congress passes inconsistent laws, the President must choose one to implement; so too if the law collides with the Constitution. If, however, we abandon the view that the Constitution is law, treating it as "policy" made up by judges, then of course the President must carry out the statute 'til a court makes up the policy. There isn't any "Constitution" that can collide with the law until the court establishes it.

Sure enough, only judges have "the power" when the Constitution is *solely* "what the judges say it is" — by definition. Still, if "the Constitution" is in flux, if our written Constitution is no more *the* Constitution than is the Magna Carta or the Bill of Rights of 1689 or the latest treatise on moral philosophy, it need not follow that judges have primacy. In other lands without written, binding constitutions, there is no judicial review at all. A judge's claim to interpret such an unwritten tradition (or to propose a new one) is no greater than a President's, or a philosopher's. Presidents should not be able to disregard laws on the basis of philosophical developments — but then judges should not have this power either.

It is one thing to say that "as a political matter, if not as a matter of strict legal theory, judicial review of Acts of Congress for federal constitutionality no longer rests wholly on the arguments of *Marbury v. Madison*, or on those of Federalist No. 78," but "rests also on the visible active, and long-continued acquiescence of Congress,"[51] a rearrangement after the fashion of nations (such as England) that lack written constitutions. It is quite something else again to say that this transformation (if indeed it has occurred) shuts off powers other branches exercise. Presidents have not become passive; every President in this century has used the power of presidential review to refuse to enforce statutes, and the more recent Presidents have been aggressive about it. Congress has acquiesced in this practice no less than in the Court's adventurism.

---

51. C. Black, STRUCTURE AND RELATIONSHIP IN CONSTITUTIONAL LAW 70-71 (1969).

I happen to think that a view of Constitution-as-policy logically defeats all claims for judicial review rather than the Executive Branch's ability to prefer Constitution to law. Judicial review — a unique institution in which a public official is entitled to disregard statutory law in preference to some other source of legal rules — depends on the view that the Constitution is law. *Marbury* says it is, and *Marbury* is right.

If we grant case law any generative force — any effect beyond the parties — that must be because the Constitution in general prevails over the law. Any given decision illuminates the meaning of the Constitution. It is then the Constitution and not the decision that the President implements in analogous cases.

If the President may act on the strength of a "similar" decision, he may act without one — for it is still the Constitution that supplies the rules. It is the Constitution itself, and not the view of temporary officeholders, that authorizes action.

### D

Defense of presidential constitutional power sends chills up many spines. Some fear that Presidents will confuse the Constitution with their parties' platforms. Others remember the struggle to carry out *Brown v. Board of Education*[52] and equate a power to decide constitutional questions with the power to nullify the Constitution. *Cooper v. Aaron*[53] settled *that* question, the refrain goes, so why reopen old wounds?

There is a big difference between a power in the President and a power in Orville Faubus. The President is one of three co-equal branches of the federal government. The supremacy clause explicitly requires states to follow the Constitution and other federal law. Binding national law is essential to any nation. I have been concerned with the allocation of powers within the national government, not with the relation between the federal government and the states.

There is also a gulf between a power to implement and a power to nullify the Constitution. Rhetoric being what it is, one man's implementation is another's nullification. Justice McReynolds is reputed to have declaimed from the bench during the announcement of the gold clause cases that "the Constitution, as we

---

52. 347 U.S. 483 (1954).
53. 358 U.S. 1 (1958).

have know it, is gone." The projects are different in principle, though. Real "nullifiers" assert that the Constitution does not govern state and local affairs, and none of the arguments I have advanced would give comfort to a nullifier. Interpretation and nullification have nothing in common.

To say that a power to interpret may be used as cover for the power to nullify is not condemn it. Powers of all sorts may be put to poor use, and those wielding power may dissemble about their reasons and objectives. The same power of judicial review that gave us *Brown v. Board of Education* also gave us *Dred Scott*, *Plessy v. Ferguson*, and *Lochner v. New York*. If disputes about interpretation counsel against the exercise of constitutional review, we shall have to abandon the project: the great majority of constitutional opinions in the Supreme Court these days come with dissenting opinions.[54] If misuse of power in the name of the Constitution is enough to condemn it, then we shall have to abandon judicial review: *Lochner* and *Plessy* reigned longer than *Brown*.

I grant that the President is more likely to find in the Constitution a rule favorable to his political program than is the Court: Justices do not have political programs. Presidents declare invalid statutes that allocate more power to Congress. Ability to hand yourself, or your political allies, additional power in the name of the Constitution is a temptation, and the Framers understood that politicians yield to temptations all too often. Yet Justices find themselves in the same position. Constitutional cases rarely diminish the power of *courts* while enhancing that of the political branches. Statutory interpretation follows suit. Judges have given themselves immunity from damages under both Constitution and statutes, while deciding that members of other branches must pay. Judges also make decisions that promote their own conceptions of proper government, a form of self-interested behavior.[55] If judges may (and do) look after the interests of the judicial branch, there is no principled objection to the like power — and the like potential for misuse — in the President.[56]

---

54. Easterbrook, *Agreement Among the Justices: An Empirical Note*, 1984 S. Ct. Rev. 389, 392-95.

55. *See* Easterbrook, *What's So Special About Judges?*, ___ Colo. L. Rev. ___ (1990) (forthcoming).

56. Rauol Berger, who believes that Presidents generally must enforce laws that they think are unconstitutional, makes an exception when the President's own powers are at stake. *See* R. Berger, Executive Privilege: A Constitutional Myth 306-09 (1974). Limiting the power of presidential review to those in which the President's self-interest

Now for the other bogeyman: the belief that if the President may entertain constitutional views at all, he may ignore the Supreme Court. President Lincoln once did this (he refused to release a prisoner despite Chief Justice Taney's writ of habeas corpus), but no other President has followed suit. None should — and the arguments I have been discussing do not allow for disobedience. There is a fundamental difference between carrying out an order of the court, rendered in a case within the court's jurisdiction, and acquiescing in a rule of decision, a difference Lincoln cleaved to in calmer moments. Article III of the Constitution creates the "judicial Power of the United States," and a "judicial Power" is one to render dispositive judgements. People may disagree about the meaning of the Constitution or the generality of its commends without doubting that a judgment conclusively resolves the case. Orville Faubus was more than a nullifier; he denied the power of the Supreme Curt to resolve a case to which the state was a party.

The difference between the binding force of a decision and the rule of decision that produced it underlies much of jurisprudence Courts frequently explain their judgments in novel or sweeping ways, and no one expects the President to streak off in whatever direction an opinion pointed most recently. Justices themselves do not do so, and a number of doctrines confine the power of judgments. Non-parties are free to disregard them. The Executive Branch, party to thousands of lawsuits, may stick to its (legal) guns, asserting in tomorrow's case theories that were rejected in yesterday's.[57] President Lincoln dealt with *Dred Scott* in a way we would today call "nonacquiescence." He told members of the executive branch to treat African-Americans as citizens, despite that case, whenever possible: they received passports, patents, and other recognition available only to citizens, although the Court had said they could not be citizens.[58]

---

makes his judgment least dispassionate is a curious inversion. Self-interested decisions are the hardest to justify.

57. *United States v. Mendoza*, 464 U.S. 154 (1984), holds that the Executive Branch need not follow the legal views of the lower courts beyond the bounds of the case. See Diller & Morawetz, *Intracircuit Nonacquiescence and the Breakdown of the Rule of Law: A Response to Estreicher and Revesz*, 99 YALE L.J. 801 (1990); Estreicher & Revesz, *The Uneasy Case Against Intracircuit Nonacquiescence: A Reply*, 99 YALE L.J. 831 (1990); Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679 (1989).

58. 5 THE WORKS OF CHARLES SUMNER 497-98 (D. Donald ed. 1880); 6 *id.* at 144.

This leads to a related objection: presidential review will prevent the courts from deciding constitutional questions. If the President declines to enforce a law, there may be no occasion for the Supreme Court to give its own opinion. It follows, the argument would go, that the President must at least direct the Solicitor General to press the law with enough vigor to obtain a constitutional decision, a course followed in *Lovett* and *Chadha*.

Prudence may counsel this course, but the Constitution does not compel it. For one thing, litigation is apt to ensue even if the President refuses all enforcement. A beneficiary of the law could file suit in an effort to obtain what Congress bestowed. Whether or not a private party has standing does not matter, however. Judges exist to decide cases, not to resolve issues. Constitutional decisions are byproducts of real cases, not the *raison d'être* of the judicial system. Decrees are the ends of live controversies, not a means to settle abstract questions.[59] If the political branches arrange their affairs so as to eliminate occasions for litigation, neither the courts nor the people have a complaint.

E

Presidential review is neither a power to nullify nor a power to disregard judgments. It is important and beneficial in five principal classes of disputes that raise neither problem:

(1) Constitutional limitations constrain governmental power. No one may go to jail — the government may not act in many other ways — unless multiple holders of power concur in the constitutionality of that decision. Congress must enact the law; the executive branch must prosecute; the court must convict. At each step the person exercising the power of government must decide whether the Constitution authorizes the step. This is plain enough in criminal cases. Acknowledging the power of presidential review shows that it holds throughout the system of government. Each branch brings to the problem its distinctive perspective, enriching our civic discourse, and consensus supports any action eventually taken.

(2) Many disputes do not entail much prospect of judicial resolution, given the case-or-controversy requirement of Article

---

59. Rhodes v. Stewart, 488 U.S. 1 (1988); Hewitt v. Helms, 482 U.S. 755 (1987); Alliance to End Repression v. Chicago, 820 F.2d 873 (7th Cir. 1987).

III.[60] Foreign policy and fiscal affairs rarely end up in court, making the President's constitutional decision the end of the line — as Congress's constitutional decision would be, if we were to deny the existence of presidential review.

(3) Many more disputes fester for years, decades, even centuries between enactment of the legislation and authoritative resolution by a court. The Sedition Act took 163 years, the Tenure of Office Act 60 years, and these are not isolated examples. In the interim legislative and executive officials must decide whether the law is constitutional or not, and act accordingly. No one doubts that Senators could vote yea or nay on the articles of impeachment laid against President Johnson on the basis of their conclusion that the Tenure of Office Act was (or was not) constitutional. President Johnson needed the same power of decision, lest the limitations in article III ensnare the political branches into enduring disregard of the Constitution.

(4) Once the Court resolves a point of constitutional law, a power of presidential review ensures quick compliance. The winnowing of the social security laws for sex-based classifications is a case in point. *Brown* provides an even more vivid example (at the expense of moving to state-federal relations, which I promised not to do). Getting as far as we have in eliminating segregation and its vestiges has taken almost two generations and hundreds of suits. But the volume of litigation is as nothing compared with the number of school districts that desegregated on their own. If executive officials must follow the law until slapped with an injunction, then recalcitrant officials were *right* to drag their heels, and the many who took *Brown* seriously and desegregated were violating their duties! Once the Court held that states may not exclude women from jury venires,[61] it was unnecessary to bring 49 more suits, or perhaps 3,041 more (one per county), to achieve compliance throughout the nation. There were 83,186 local governments in the United States in 1987 and oodles of state agencies;[62] I shudder to think that none of them need comply with the Constitution until told to by a judge, one clause at a time. Presidential review, executive review in general, speeds up the process of com-

---

60. *See* Casper, *Constitutional Constraints on the Conduct of Foreign and Defense Policy: A Nonjudicial Model*, 43 U. Chi. L. Rev. 463 (1976); Dam, *The American Fiscal Constitution*, 44 U. Chi. L. Rev. 271 (1977).

61. Duren v. Missouri, 439 U.S. 357 (1979).

62. 1990 Statistical Abstract of the United States table 454.

pliance with constitutional norms.

(5) The disagreeable corollary, to many, is the belief that presidential review *can* have the reverse effect. It can't. Presidential review will not speed up compliance if the President does not agree with the Court — but even then compliance, coming one case at a time, will be no slower than it would be if there were no power of presidential review. It is the duty to put the Constitution ahead of the law that requires *compliance* without one suit per school district. If executive officials are forbidden to place Constitution over law, that produces the ultimate in heel-dragging, for no one acts until a judge orders him to. What presidential review (and legislative review) does is facilitate *challenges* to judicial decisions. Those who resisted *Lochner* by enacting and carrying out laws could claims that they were acting within their powers when disagreeing with the Court.

Presidential review is in this sense a counterweight to judicial review. Life tenure has conflicting effects on the judicial system. It is designed to (and does) liberate judges from current politics. This could lead them to carry out their personal agendas. It is suppose to have the former effect; an unpleasant byproduct is that for some portion of judges it has the latter. Separated and overlapping powers of review can help control the phenomenon.

We live in a constitutional republic in which many actors hold overlapping powers. Powers are not so much separated as duplicated and distributed, so that concurrent approval is necessary to action. This is not an efficient system; it is designed to frustrate all claims of power. Presidential review fits neatly in such a framework. We live in a constitutional republic. Contemporary officeholders are but squatters in that mansion. All owe their duties to the real owners.

# EXHIBIT W

## Presidential Authority to Decline to Execute
## Unconstitutional Statutes

This memorandum discusses the President's constitutional authority to decline to execute unconstitutional statutes.

November 2, 1994

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

I have reflected further on the difficult questions surrounding a President's decision to decline to execute statutory provisions that the President believes are unconstitutional, and I have a few thoughts to share with you. Let me start with a general proposition that I believe to be uncontroversial: there are circumstances in which the President may appropriately decline to enforce a statute that he views as unconstitutional.

First, there is significant judicial approval of this proposition. Most notable is the Court's decision in *Myers v. United States*, 272 U.S. 52 (1926). There the Court sustained the President's view that the statute at issue was unconstitutional without any member of the Court suggesting that the President had acted improperly in refusing to abide by the statute. More recently, in *Freytag v. Commissioner*, 501 U.S. 868 (1991), all four of the Justices who addressed the issue agreed that the President has "the power to veto encroaching laws . . . or even to disregard them when they are unconstitutional." *Id.* at 906 (Scalia, J., concurring); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (recognizing existence of President's authority to act contrary to a statutory command).

Second, consistent and substantial executive practice also confirms this general proposition. Opinions dating to at least 1860 assert the President's authority to decline to effectuate enactments that the President views as unconstitutional. *See, e.g.*, *Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469-70 (1860) (asserting that the President need not enforce a statute purporting to appoint an officer); *see also* attached annotations of Attorney General and Office of Legal Counsel opinions. Moreover, as we discuss more fully below, numerous Presidents have provided advance notice of their intention not to enforce specific statutory requirements that they have viewed as unconstitutional, and the Supreme Court has implicitly endorsed this practice. *See INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) (noting that Presidents often sign legislation containing constitutionally objectionable provisions and indicate that they will not comply with those provisions).

199

*Opinions of the Office of Legal Counsel*

While the general proposition that in some situations the President may decline to enforce unconstitutional statutes is unassailable, it does not offer sufficient guidance as to the appropriate course in specific circumstances. To continue our conversation about these complex issues, I offer the following propositions for your consideration.

1.    The President's office and authority are created and bounded by the Constitution; he is required to act within its terms. Put somewhat differently, in serving as the executive created by the Constitution, the President is required to act in accordance with the laws — including the Constitution, which takes precedence over other forms of law. This obligation is reflected in the Take Care Clause and in the President's oath of office.

2.    When bills are under consideration by Congress, the executive branch should promptly identify unconstitutional provisions and communicate its concerns to Congress so that the provisions can be corrected. Although this may seem elementary, in practice there have been occasions in which the President has been presented with enrolled bills containing constitutional flaws that should have been corrected in the legislative process.

3.    The President should presume that enactments are constitutional. There will be some occasions, however, when a statute appears to conflict with the Constitution. In such cases, the President can and should exercise his independent judgment to determine whether the statute is constitutional. In reaching a conclusion, the President should give great deference to the fact that Congress passed the statute and that Congress believed it was upholding its obligation to enact constitutional legislation. Where possible, the President should construe provisions to avoid constitutional problems.

4.    The Supreme Court plays a special role in resolving disputes about the constitutionality of enactments. As a general matter, if the President believes that the Court would sustain a particular provision as constitutional, the President should execute the statute, notwithstanding his own beliefs about the constitutional issue. If, however, the President, exercising his independent judgment, determines both that a provision would violate the Constitution and that it is probable that the Court would agree with him, the President has the authority to decline to execute the statute.

5.    Where the President's independent constitutional judgment and his determination of the Court's probable decision converge on a conclusion of unconstitutionality, the President must make a decision about whether or not to comply with the provision. That decision is necessarily specific to context, and it should be

200

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

reached after careful weighing of the effect of compliance with the provision on the constitutional rights of affected individuals and on the executive branch's constitutional authority. Also relevant is the likelihood that compliance or non-compliance will permit judicial resolution of the issue. That is, the President may base his decision to comply (or decline to comply) in part on a desire to afford the Supreme Court an opportunity to review the constitutional judgment of the legislative branch.

6.    The President has enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency. Where the President believes that an enactment unconstitutionally limits his powers, he has the authority to defend his office and decline to abide by it, unless he is convinced that the Court would disagree with his assessment. If the President does not challenge such provisions (i.e., by refusing to execute them), there often will be no occasion for judicial consideration of their constitutionality; a policy of consistent Presidential enforcement of statutes limiting his power thus would deny the Supreme Court the opportunity to review the limitations and thereby would allow for unconstitutional restrictions on the President's authority.

Some legislative encroachments on executive authority, however, will not be justiciable or are for other reasons unlikely to be resolved in court. If resolution in the courts is unlikely and the President cannot look to a judicial determination, he must shoulder the responsibility of protecting the constitutional role of the presidency. This is usually true, for example, of provisions limiting the President's authority as Commander in Chief. Where it is not possible to construe such provisions constitutionally, the President has the authority to act on his understanding of the Constitution.

One example of a Presidential challenge to a statute encroaching upon his powers that did result in litigation was *Myers v. United States*, 272 U.S. 52 (1926). In that case, President Wilson had defied a statute that prevented him from removing postmasters without Senate approval; the Supreme Court ultimately struck down the statute as an unconstitutional limitation on the President's removal power. *Myers* is particularly instructive because, at the time President Wilson acted, there was no Supreme Court precedent on point and the statute was not manifestly unconstitutional. In fact, the constitutionality of restrictions on the President's authority to remove executive branch officials had been debated since the passage of the Tenure of Office Act in 1867 over President Johnson's veto. The closeness of the question was underscored by the fact that three Justices, including Justices Holmes and Brandeis, dissented in *Myers*. Yet, despite the unsettled constitutionality of President Wilson's action, no member of the Court in *Myers* suggested that Wilson overstepped his constitutional authority — or even acted improperly — by refusing to comply with a statute he believed was unconstitutional. The Court in *Myers* can be seen to have implicitly vindicated the view that the President may

201

*Opinions of the Office of Legal Counsel*

refuse to comply with a statute that limits his constitutional powers if he believes it is unconstitutional. As Attorney General Civiletti stated in a 1980 opinion,

> *Myers* is very nearly decisive of the issue [of Presidential denial of the validity of statutes]. *Myers* holds that the President's constitutional duty does not require him to execute unconstitutional statutes; nor does it require him to execute them provisionally, against the day that they are declared unconstitutional by the courts. He cannot be required by statute to retain postmasters against his will unless and until a court says that he may lawfully let them go. If the statute is unconstitutional, it is unconstitutional from the start.

*The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 59 (1980).

7.    The fact that a sitting President signed the statute in question does not change this analysis. The text of the Constitution offers no basis for distinguishing bills based on who signed them; there is no constitutional analogue to the principles of waiver and estoppel. Moreover, every President since Eisenhower has issued signing statements in which he stated that he would refuse to execute unconstitutional provisions. *See* annotations of attached signing statements. As we noted in our memorandum on Presidential signing statements, the President "may properly *announce* to Congress and to the public that he will not enforce a provision of an enactment he is signing. If so, then a signing statement that challenges what the President determines to be an unconstitutional encroachment on his power, or that announces the President's unwillingness to enforce (or willingness to litigate) such a provision, can be a valid and reasonable exercise of Presidential authority." *The Legal Significance of Presidential Signing Statements*, 17 Op. O.L.C. 131, 134 (1993). (Of course, the President is not obligated to announce his reservations in a signing statement; he can convey his views in the time, manner, and form of his choosing.) Finally, the Supreme Court recognized this practice in *Chadha*, 462 U.S. at 942 n.13: the Court stated that "it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds" and then cited the example of President Franklin Roosevelt's memorandum to Attorney General Jackson, in which he indicated his intention not to implement an unconstitutional provision in a statute that he had just signed. These sources suggest that the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof.

    In accordance with these propositions, we do not believe that a President is limited to choosing between vetoing, for example, the Defense Appropriations Act and executing an unconstitutional provision in it. In our view, the President has the

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

authority to sign legislation containing desirable elements while refusing to execute a constitutionally defective provision.

We recognize that these issues are difficult ones. When the President's obligation to act in accord with the Constitution appears to be in tension with his duty to execute laws enacted by Congress, questions are raised that go to the heart of our constitutional structure. In these circumstances, a President should proceed with caution and with respect for the obligation that each of the branches shares for the maintenance of constitutional government.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

### Brief Description of Materials

Attorney General Opinions

1) *Memorial of Captain Meigs, 9 Op. Att'y Gen. 462 (1860)*: In this opinion the Attorney General concluded that the President is permitted to disregard an unconstitutional statute. Specifically, Attorney General Black concluded that a statute purporting to appoint an officer should not be enforced: "Every law is to be carried out so far forth as is consistent with the Constitution, and no further. The sound part of it must be executed, and the vicious portion of it suffered to drop." *Id.* at 469.

2) *Constitutionality of Congress' Disapproval of Agency Regulations by Resolutions Not Presented to the President, 4A Op. O.L.C. 21 (1980)*: In this opinion Attorney General Civiletti instructed Secretary of Education Hufstedler that she was authorized to implement regulations that had been disapproved by concurrent congressional resolutions, pursuant to a statutory legislative veto. The Attorney General noted that "the Attorney General must scrutinize with caution any claim that he or any other executive officer may decline to defend or enforce a statute whose constitutionality is merely in doubt." *Id.* at 29. He concluded, however, that "[t]o regard these concurrent resolutions as legally binding would impair the Executive's constitutional role and might well foreclose effective judicial challenge to their constitutionality. More important, I believe that your recognition of these concurrent resolutions as legally binding would constitute an abdication of the responsibility of the executive branch, as an equal and coordinate branch of government with the legislative branch, to preserve the integrity of its functions against constitutional encroachment." *Id.*

203

*Opinions of the Office of Legal Counsel*

3) *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. O.L.C. 55 (1980)*:  Attorney General Civiletti, in answer to a congressional inquiry, observed that "*Myers* holds that the President's constitutional duty does not require him to execute unconstitutional statutes; nor does it require him to execute them provisionally, against the day that they are declared unconstitutional by the courts." *Id.* at 59.  He added as a cautionary note that "[t]he President has no 'dispensing power,'" meaning that the President and his subordinates "may not lawfully defy an Act of Congress if the Act is constitutional. . . . In those rare instances in which the Executive may lawfully act in contravention of a statute, it is the Constitution that dispenses with the operation of the statute.  The Executive cannot." *Id.* at 59-60.

4) *Letter for Peter W. Rodino, Jr., Chairman, House Judiciary Committee from William French Smith, Attorney General (Feb. 22, 1985)*:  This letter discussed the legal precedent and authority for the President's refusal to execute a provision of the Competition in Contracting Act.  The Attorney General noted that the decision "not to implement the disputed provisions has the beneficial byproduct of increasing the likelihood of a prompt judicial resolution.  Thus, far from unilaterally nullifying an Act of Congress, the Department's actions are fully consistent with the allocation of judicial power by the Constitution to the courts." *Id.* at 8.  The letter also stated that "the President's failure to veto a measure does not prevent him subsequently from challenging the Act in court, nor does presidential approval of an enactment cure constitutional defects." *Id.* at 3.

## Office of Legal Counsel Opinions

1) *Memorandum for the Honorable Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Sept. 27, 1977)*:  This opinion concluded that the President may lawfully disregard a statute that he interprets to be unconstitutional.  We asserted that "cases may arise in which the unconstitutionality of the relevant statute will be certain, and in such a case the Executive could decline to enforce the statute for that reason alone." *Id.* at 13.  We continued, stating that "[u]nless the unconstitutionality of a statute is clear, the President should attempt to resolve his doubts in a way that favors the statute, and he should not decline to enforce it unless he concludes that he is compelled to do so under the circumstances." *Id.*  We declined to catalogue all the considerations that would weigh in favor of non-enforcement, but we identified two:  first the extent of the harm to individuals or the government resulting from enforcement; and, second, the creation of an opportunity for a court challenge through non-enforcement (*e.g.*, *Myers*).

204

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

2) *Appropriations Limitation for Rules Vetoed by Congress, 4B Op. O.L.C. 731 (1980):* In this opinion we rejected the constitutionality of a proposed legislative veto, prior to the Court's decision in *Chadha*. We opined that "[t]o regard this provision as legally binding would impair the Executive's constitutional role and would constitute an abdication of the responsibility of the Executive Branch." *Id.* at 734. It should be noted that the legislation in question was pending in Congress, and the possibility that President Carter would sign the legislation did not affect our analysis of the constitutional issue. We simply stated that, "if enacted, the [legislative veto provision] will not have any legal effect." *Id.*

3) *Issues Raised by Foreign Relations Authorization Bill, 14 Op. O.L.C. 37 (1990):* This opinion also addressed then-pending legislation, in this case the foreign relations authorization bill for fiscal years 1990 and 1991. The opinion found that a provision of the bill was unconstitutional and severable. Regarding non-execution, the opinion stated that "at least in the context of legislation that infringes the separation of powers, the President has the constitutional authority to refuse to enforce unconstitutional laws." *Id.* at 50. The opinion concluded that "if the President chooses to sign H.R. 3792, he would be constitutionally authorized to decline to enforce" the constitutionally objectionable section. *Id.* at 37.

4) *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports, 16 Op. O.L.C. 18 (1992):* This opinion concluded that two statutory provisions that limited the issuance of official and diplomatic passports were unconstitutional and were severable from the remainder of the two statutes. On the question of non-execution, the opinion rejected "the argument that the President may not treat a statute as invalid prior to a judicial determination." *Id.* at 36. The opinion concluded that the Constitution authorizes the President to refuse to enforce a law that he believes is unconstitutional.

5) *The Legal Significance of Presidential Signing Statements, 17 Op. O.L.C. 131 (1993):* This opinion discusses different categories of signing statements, including those construing bills to avoid constitutional problems and those in which the President declares "that a provision of the bill before him is flatly unconstitutional, and that he will refuse to enforce it." *Id.* at 133. The opinion concludes that such "uses of Presidential signing statements generally serve legitimate and defensible purposes." *Id.* at 137.

### Presidential Signing Statements

1) *Statement by the State Department (Announcing President Wilson's Refusal to Carry Out the Section of the Jones Merchant Marine Act of June 5, 1920, directing him to terminate treaty provisions restricting the Government's right to impose*

205

**-1309-**

*Opinions of the Office of Legal Counsel*

*discriminatory tonnage dues and tariff duties), 17 A Compilation of the Messages and Papers of the Presidents 8871 (Sept. 24, 1920) (Pres. Wilson)*: The State Department announced that it "has been informed by the President that he does not deem the direction contained in Section 34 of the so-called Merchant Marine Act an exercise of any constitutional power possessed by the Congress." *Id.* The statement also defended President Wilson's decision to sign the bill and noted that "the fact that one section of the law involves elements of illegality rendering the section inoperative need not affect the validity and operation of the Act as a whole." 5 Green Haywood Hackworth, *Digest of International Law* 324 (1943).

2) *Special Message to the Congress Upon Signing the Department of Defense Appropriation Act, Pub. Papers of Dwight D. Eisenhower 688 (July 13, 1955)*: President Eisenhower, in signing a bill (H.R. 6042) that contained a legislative veto, stated that the legislative veto "will be regarded as invalid by the executive branch of the Government in the administration of H.R. 6042, unless otherwise determined by a court of competent jurisdiction." *Id.* at 689.

3) *Memorandum on Informing Congressional Committees of Changes Involving Foreign Economic Assistance Funds, Pub. Papers of John F. Kennedy 6 (Jan. 9, 1963)*: President Kennedy stated that a provision in the bill he was signing contained an unconstitutional legislative veto. He announced that "[i]t is therefore my intention . . . to treat this provision as a request for information." *Id.*

4) *Statement by the President Upon Approving the Public Works Appropriations Act, Pub. Papers of Lyndon B. Johnson 104 (Dec. 31, 1963)*: President Johnson also found that a legislative veto provision was unconstitutional and stated that he would treat it as a request for information.

5) *Statement About Signing the Public Buildings Amendments of 1972, Pub. Papers of Richard Nixon 686 (June 17, 1972)*: President Nixon stated that a clause conditioning the use of authority by the executive branch on the approval of a congressional committee was unconstitutional. He ordered the agency involved to comply with "the acceptable procedures" in the bill "without regard to the unconstitutional provisions I have previously referred to." *Id.* at 687.

6) *Statement on Signing the Department of Defense Appropriation Act of 1976, Pub. Papers of Gerald R. Ford 241 (Feb. 10, 1976)*: President Ford stated that a committee approval mechanism was unconstitutional and announced that he would "treat the unconstitutional provision . . . to the extent it requires further Congressional committee approval, as a complete nullity." *Id.* at 242.

206

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

7) *Statement on Signing Coastal Zone Management Improvement Act of 1980, Pub. Papers of Jimmy Carter 2335 (Oct. 18, 1980)*: President Carter stated that a legislative veto provision was unconstitutional and that any attempt at a legislative veto would "not [be] regarded as legally binding." *Id.*

8) *Statement on Signing the Union Station Redevelopment Act of 1981, Pub. Papers of Ronald Reagan 1207 (Dec. 29, 1981)*: President Reagan stated that a legislative veto was unconstitutional and announced that "[t]he Secretary of Transportation will not . . . regard himself as legally bound by any such resolution." *Id.*

9) *Statement On Signing the National and Community Service Act of 1990, Pub. Papers of George Bush 1613 (Nov. 16, 1990)*: President Bush rejected the constitutionality of provisions that required a Presidentially appointed board exercising executive authority to include, among its 21 members, "seven members nominated by the Speaker of the House of Representatives . . . [and] seven members nominated by the Majority Leader of the Senate." *Id.* at 1614. He announced that the restrictions on his choice of nominees to the board "are without legal force or effect." *Id.*

10) *7 A Compilation of the Messages and Papers of the Presidents 377 (Aug. 14, 1876) (Pres. Grant)*: This is one of the earliest of many instances of a President "construing" a provision (to avoid constitutional problems) in a way that seems to amount to a refusal to enforce a provision of it. An 1876 statute directed that notices be sent to certain diplomatic and consular officers "to close their offices." President Grant, in signing the bill, stated that, "[i]n the literal sense of this direction it would be an invasion of the constitutional prerogatives and duty of the Executive." *Id.* In order to avoid this problem, President Grant "constru[ed]" this provision "only to exercise the constitutional prerogative of Congress over the expenditures of the Government," not to "imply[] a right in the legislative branch to direct the closing or discontinuing of any of the diplomatic or consular offices of the Government." *Id.* at 378.

### Other Presidential Documents

1) *A Presidential Legal Opinion, 66 Harv. L. Rev. 1353 (1953)*: This was a legal opinion from President Franklin Roosevelt to Attorney General Jackson. President Roosevelt stated that he was signing the Lend-Lease Act despite a provision providing for a legislative veto, "a provision which, in my opinion, is clearly unconstitutional." *Id.* at 1357. The President stated that, "[i]n order that I may be on record as indicating my opinion that the foregoing provision of the so-called Lend-Lease Act is unconstitutional, and in order that my approval of the bill, due to the

207

*Opinions of the Office of Legal Counsel*

existing exigencies of the world situation, may not be construed as a tacit acquies-
cence in any contrary view, I am requesting you to place this memorandum in the
official files of the Department of Justice. I am desirous of having this done for the
further reason that I should not wish my action in approving the bill which includes
this invalid clause, to be used as a precedent for any future legislation comprising
provisions of a similar nature." *Id.* at 1358.

2) *Message to the Congress on Legislative Vetoes, Pub. Papers of Jimmy Carter
1146 (Jun. 21, 1978)*: In this memorandum President Carter expressed his strong
opposition to legislative vetoes and stated that "[t]he inclusion of [a legislative
veto] in a bill will be an important factor in my decision to sign or to veto it." *Id.*
at 1148. He further stated that, "[a]s for legislative vetoes over the execution of
programs already prescribed in legislation and in bills I must sign for other rea-
sons, the Executive Branch will generally treat them as 'report-and-wait' provi-
sions. In such a case, if Congress subsequently adopts a resolution to veto an
Executive action, we will give it serious consideration, but we will not, under our
reading of the Constitution, consider it legally binding." *Id.* at 1149.

### Historical Materials

1) *Statement of James Wilson on December 1, 1787 on the Adoption of the Fed-
eral Constitution, reprinted in 2 Jonathan Elliot, Debates on the Federal Consti-
tution 418 (1836)*: Wilson argued that the Constitution imposed significant — and
sufficient — restraints on the power of the legislature, and that the President would
not be dependent upon the legislature. In this context, he stated that "the power of
the Constitution was paramount to the power of the legislature acting under that
Constitution; for it is possible that the legislature . . . may transgress the bounds
assigned to it, and an act may pass, in the usual *mode*, notwithstanding that trans-
gression; but when it comes to be discussed before *the judges*,— when they con-
sider its principles, and find it to be incompatible with the superior power of the
Constitution,— it is their duty to pronounce it *void* . . . . In the same manner, the
President of the United States could shield himself, and refuse to carry into effect
an act that *violates* the Constitution." *Id.* at 445-46.

2) *Letter from Chief Justice Chase to Gerrit Smith (Apr. 19, 1868), quoted in J.
Schuckers, The Life and Public Services of Salmon Portland Chase 577 (1874)*:
Chase stated that President Johnson took the proper action in removing Secretary
of War Stanton without Senate approval, in light of Johnson's belief that the statu-
tory restriction on his removal authority was unconstitutional. In this regard, Chase
commented that "the President had a perfect right, and indeed was under the high-
est obligation, to remove Mr. Stanton, if he made the removal not in wanton disre-
gard of a constitutional law, but with a sincere belief that the Tenure-of-Office Act

208

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

was unconstitutional and for the purpose of bringing the question before the Supreme Court." *Id.* at 578.

## Congressional Materials

1) *The President's Suspension of the Competition in Contracting Act is Unconstitutional, H.R. Rep. No. 99-138, 1st Sess. (1985)*: The House Committee on Government Operations concluded that the President lacked the authority to refuse to implement any provision of the Competition in Contracting Act. The Committee stated that, "[t]o adopt the view that one's oath to support and defend the Constitution is a license to exercise any available power in furtherance of one's own constitutional interpretation would quickly destroy the entire constitutional scheme. Such a view, whereby the President pledges allegiance to the Constitution but then determines what the Constitution means, inexorably leads to the usurpation by the Executive of the others' roles." *Id.* at 11. The Committee also stated that "[t]he Executive's suspension of the law circumvents the constitutionally specified means for expressing Executive objections to law and is a constitutionally impermissible absolute veto power." *Id.* at 13.

2) *Memorandum from the Congressional Research Service to the Committee on Government Operations concerning "The Executive's Duty to Enforce the Laws" (Feb. 6, 1985), reprinted in Constitutionality of GAO's Bid Protest Function: Hearings Before a Subcomm. of the House Comm. on Government Operations, 99th Cong. 544 (1985)*: This memorandum stated that the President lacks the authority to decline to enforce statutes. The CRS argued that "[t]he refusal of the President to execute the law is indistinguishable from the power to suspend the laws. That power, as is true of the power to amend or to revive an expired law, is a legislative power." *Id.* at 554.

## Cases

1) *Myers v. United States, 272 U.S. 52 (1926)*: The President refused to comply with — that is, enforce — a limitation on his power of removal that he regarded as unconstitutional, even though the question had not been addressed by the Supreme Court. A member of Congress, Senator Pepper, urged the Supreme Court to uphold the validity of the provision. The Supreme Court vindicated the President's interpretation without any member of the Court indicating that the President had acted unlawfully or inappropriately in refusing to enforce the removal restriction based on his belief that it was unconstitutional.

2) *United States v. Lovett, 328 U.S. 303 (1946)*: The President enforced a statute that directed him to withhold compensation from three named employees, even

209

*Opinions of the Office of Legal Counsel*

though the President believed the law to be unconstitutional. The Justice Depart-
ment argued against the constitutionality of the statute in the ensuing litigation.
(The Court permitted an attorney to appear on behalf of Congress, *amicus curiae*,
to defend the statute.)

3) *INS v. Chadha, 462 U.S. 919 (1983)*:  This case involved the withholding of
citizenship from an applicant pursuant to a legislative veto of an Attorney General
decision to grant citizenship.  Despite a Carter Administration policy against com-
plying with legislative vetoes (*see* Carter Presidential memorandum, *supra*), the
executive branch enforced the legislative veto, and, in so doing, allowed for judi-
cial review of the statute.  As with *Lovett*, the Justice Department argued against
the constitutionality of the statute.

4) *Morrison v. Olson, 487 U.S. 654 (1988)*:  The President viewed the independ-
ent counsel statute as unconstitutional.  The Attorney General enforced it, making
findings and forwarding them to the Special Division.  In litigation, however, the
Justice Department attacked the constitutionality of the statute and left its defense
to the Senate Counsel, as *amicus curiae*, and the independent counsel herself.

5) *Freytag v. Commissioner, 501 U.S. 868 (1991)*:  A unanimous Court ruled that
the appointment of special trial judges by the Chief Judge of the United States Tax
Court did not violate the Appointments Clause.  Five Justices concluded that the
Tax Court was a "Court of Law" for Appointments Clause purposes, despite the
fact that it was an Article I court, so that the Tax Court could constitutionally ap-
point inferior officers.  Four Justices, in a concurrence by Justice Scalia, contended
that the Tax Court was a "Department" under the Appointments Clause.  The con-
currence stated that "Court of Law" did not include Article I courts and that the
Framers intended to prevent Congress from having the power both to create offices
and to appoint officers.  In this regard, the concurrence stated that "it was not
enough simply to repose the power to execute the laws (or to appoint) in the Presi-
dent; it was also necessary to provide him with the means to resist legislative en-
croachment upon that power.  The means selected were various, including a
separate political constituency, to which he alone was responsible, and the power
to veto encroaching laws, see Art. I, § 7, or even to disregard them when they are
unconstitutional." *Id.* at 906 (Scalia, J., concurring).

6) *Lear Siegler, Inc., Energy Prods. Div. v. Lehman, 842 F.2d 1102 (9th Cir.
1988), withdrawn in part 893 F.2d 205 (9th Cir. 1990) (en banc)*:  The President
refused to comply with provisions of the Competition in Contracting Act that he
viewed as unconstitutional and thereby allowed for judicial resolution of the issue.
The Ninth Circuit rejected the President's arguments about the constitutionality of
the provisions.  The court further determined that Lear Siegler was a prevailing

210

*Presidential Authority to Decline to Execute Unconstitutional Statutes*

party and was entitled to attorneys' fees, because the executive branch acted in bad faith in refusing to execute the contested provisions. In this regard, the court stated that the President's action was "utterly at odds with the texture and plain language of the Constitution," because a statute is part of the law of the land that the President is obligated to execute. *Id.* at 1121, 1124. On rehearing en banc, the court ruled that Lear Siegler was not a prevailing party and withdrew the sections of the opinion quoted above.

# EXHIBIT X

# OLC's OPINION WRITING FUNCTION: THE LEGAL ADHESIVE FOR A UNITARY EXECUTIVE

## Douglas W. Kmiec [*]

From the Judiciary Act of 1789 onward, the Attorney General's primary duty has been to advise the President and the heads of executive departments on legal matters.[1]   A biography of James Monroe's Attorney General, William Wirt, suggests that it is the importance of this opinion function which sets the Attorney General apart from all others in the President's cabinet:

> There is a peculiarity in the responsibilities of this officer, which requires the exercise of more than common care in his selection. He does not deal with ordinary routine of business which inferior intelligence and system can manage, but when doubts and difficulties intervene upon the powers conferred by law, or the rights intended to be secured, the appeal is made to him.[2]

The Office of Legal Counsel ("OLC") has been known throughout government as "the Attorney General's Lawyer."[3]  This is an apt description of an office that has been delegated virtually all of the Attorney General's contemporary opinion writing.  OLC originated as the Office of the Assistant Solicitor General, but was statutorily separated in 1933 and renamed twenty years later.[4]  OLC has been credited with guiding Presidents "in many famous executive decisions."[5]  Luther Huston offers the following examples:

> [I]n 1940, the "Lend-Lease" opinion of Attorney General Robert H. Jackson gave President Roosevelt legal authority to transfer American destroyers to England in return for the right to establish naval and air bases in British possessions.  In 1957, the Office of

---

[*]  Professor of Law, University of Notre Dame; former Assistant Attorney General, Office of Legal Counsel, United States Department of Justice.

[1]  28 U.S.C. §§ 511, 512 (corresponds to Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92-93).

[2]  S.L. Southard, Discourse on the Professional Character and Virtues of William Wirt, Pronounced in the House of Representatives, March 18, 1834, on the Occasion of the Death of Attorney General William Wirt 32-33 (Gales & Seaton, Washington, 1834), *cited in* Rita Nealon, Contributions of the Attorneys General to the Constitutional Development of the American Presidency 35 (1949) (unpublished Ph.D. thesis, New York University, on file with author).

[3]  A title respectfully borrowed for a recent book, DOUGLAS W. KMIEC, THE ATTORNEY GENERAL'S LAWYER: INSIDE THE MEESE JUSTICE DEPARTMENT (1992).

[4]  LUTHER HUSTON, THE DEPARTMENT OF JUSTICE 60 (1967).

[5]  *Id.*

337

Legal Counsel justified the use of federal troops in Little Rock, Arkansas, to enforce a court order that the schools be [de]segregated. And in 1963, the Office devised the basis for the quarantine of Cuba during the missile crisis.[6]

A description of OLC's contemporary advice giving role follows. It is informed by my service as head of this office in the later years of the Reagan administration. This sampling includes OLC's review of pending and enrolled legislation, its advice on the legality of the President's program, including the review and preparation of executive orders, the handling of executive privilege matters, and OLC's vital dispute settlement function among executive agencies. Critics of past Attorneys General often speculate that this law officer requires greater independence from the partisanship of the White House.[7] This survey of the recent work of OLC concludes by exploring whether the scope of the Attorney General's delegation to OLC, together with the autonomy with which OLC typically analyzes and renders opinions, effectively creates an "independent" Attorney General—at least in the few functional areas where independence may be warranted.

## I. OLC AND CONGRESS' PROGRAM

### A. *Legislative Review of Pending Legislation*

Much of OLC's work table is arranged by the legislative activity of Congress. OLC is asked to review any piece of pending legislation that may raise questions of constitutionality. In form, OLC opinions on pending legislative matters are often prepared as letters to the director of the Office of Management and Budget ("OMB") over the signature of the head of the Justice Department's Legislative Affairs division. Upon receipt, OMB is expected to transmit OLC's legal views to the appropriate committee in Congress.

The question may be raised as to why both Legislative Affairs and OMB intervene in the transmission of OLC's legal wisdom to Congress. It is not by and large, as might be thought from outside government, to substantively alter or review the advice. While it is not unheard of for Legislative Affairs or OMB to question some aspect of OLC's thinking, there is an operating assumption that if OLC confirms its advice upon questioning, it stands. Rather, the role of Legislative Affairs is simply to ensure that there is a singular point of

---

6 *Id.*

7 NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE, 1789-1990, at 166 (1992).

contact dealing with Congress concerning the vast activities of the Department on a day-to-day basis. So too, OMB plays a similar coordination or contact function for the executive branch as a whole. Thus, in many instances, OLC's legal advice pertaining to pending legislation is often transmitted together with the policy or administrative commentary from other affected agencies. In those cases where the legal issues predominate, OMB will instruct Legislative Affairs to transmit OLC's thinking directly to Congress in its own departmental letter.

While this all may seem like so much bureaucracy, this procedural routine does yield noticeable benefits. OLC seldom has to concern itself with the "political fallout" from its advice. Insofar as OMB or Legislative Affairs receives, by virtue of their legislative contact function, the Congressional reaction, OLC is arguably freer to give a dispassionate reading of the law without concern that opinions will immediately ensnare staff in testy confrontations with counterparts on Capitol Hill. To be sure, this is not total immunity from political reality. Both Legislative Affairs and OMB are apt to remind the head of OLC of the political cost to the administration of defending unpopular OLC advice. Yet, even this is more palatable than having OLC staff lawyers chilled or chastened by such criticism. On occasion, OLC is asked to testify to explain its legal thinking, but such activity is rare.

The use of intermediaries to transmit OLC legal advice to Congress does pose some problems. First, Legislative Affairs, and certainly OMB, is not always fully conversant with the legal argumentation underlying an OLC opinion. This is only natural since the personnel in these entities do not perform the research. Second, OMB cannot always be relied upon to fully divulge OLC's legal thinking to Congress. From OMB's perspective, a constitutional question might need to be sacrificed or horse-traded for an administration policy goal. This, of course, is constitutional blasphemy to OLC, and it has, on occasion, misled the Congress or placed the President in the awkward position of later being presented with enacted legislation he could not, at least as a constitutional matter, accept. One such occasion was the Whistleblower Protection legislation.

### The "Whistleblower" Legislation

Those familiar with the details of the legislative process know well that legislation is seldom fully comprehended by its popular name or public description. President Bush's lack of success in explaining how legislation denominated as a cable price control measure

actually raises cable prices is illustrative. This political axiom also applied to legislation protecting "whistleblowers," those federal employees reporting fraud, waste or abuse in an executive agency. On the surface, the purpose of such legislation was benign, if not salutary. In operation, however, Congress's whistleblower legislation contained elements designed to fractionate the executive branch contrary to the constitutional design.[8]

Under the Civil Service Reform Act of 1978,[9] a special counsel was designated to receive and investigate complaints by whistleblowers who thought they were retaliated against for reporting government mismanagement. If this special counsel concluded that retaliation or other prohibited personnel practice had occurred, he could request the Merit Systems Protection Board to take corrective action.

OLC has no brief for impermissible personnel practices, but it does have a special mandate to ensure that the legislative branch does not encroach on executive function. This is an OLC interest that cuts across party lines, and indeed, the dedication with which it is pursued by OLC is one of its most tangible contributions to advancing a rule of law. Thus, it was not surprising that Jimmy Carter's head of OLC, John Harmon, protested the removal limitations on the proposed special counsel. Harmon wrote: "the functions of the Special Counsel would be predominantly executive in character. . . . If the Special Counsel is appointed by the President, since he will be performing largely executive functions, [OLC] believe[s] that Congress may impose no restrictions on the President's power to remove him."[10]

Nevertheless, the special counsel position, removal limitation and all, was written into law. It only took a few years for Congress to aggravate this encroachment. In early 1986, the House undertook consideration of a bill to authorize the special counsel to file suit against executive agencies in court.[11] Picking up Harmon's previous objection, OLC contended that this would place the President "in the untenable position of speaking with two conflicting voices in the federal courts."[12] Both the special counsel and the defendant executive agency are subordinate parts of the executive branch, and the Presi-

---

[8] *See*, KMIEC, *supra* note 3, at 60-63.

[9] Civil Service Reform Act of 1978, 5 U.S.C. § 1101 (1988).

[10] Letter from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Senator Abraham Ribicoff, Chairman of the Senate Committee on Governmental Affairs 6 (June 14, 1978) (on file with author).

[11] Whistleblower Protection Act of 1986, H.R. 4033, 99th Cong., 2d Sess. (1986).

[12] Memorandum regarding H.R. 4033 from Douglas W. Kmiec, Office of Legal Counsel 8 (Feb. 11, 1986) (on file with author).

dent must be able to resolve disputes between executive agencies without having to go to court.[13]

Beyond this trespass upon the President's supervisory authority, the intrabranch legislation contemplated in the whistleblower legislation also offended the separation of powers in another way. Federal courts may not render advisory opinions.[14] Since both the special counsel and any defendant executive agency are subject to presidential direction, a lawsuit between them would not have the concrete adversity of interest that is necessary to make a dispute a "case or controversy" within the meaning of Article III.[15]

OLC is ever watchful for legislation usurping the President's ability to maintain the confidentiality of executive branch information. The whistleblower legislation did this as well. Specifically, the legislation authorized the special counsel to transmit executive branch material to Congress "without review, clearance, or approval by any other administrative authority."[16] OLC assumed, correctly as it turned out, that the intent of this provision was to prevent the President, or a designee like OMB, from reviewing the special counsel's submissions to Congress. Again, such legislative intrusion into the mundane functioning of the executive branch could not be constitutionally tolerated. After all, Article II, Section 3 provides that the President shall "recommend to [Congress the] consideration of such Measures as he shall judge necessary and expedient"; it does not contemplate the special counsel doing the same.

In the normal process described above, OLC advised Legislative Affairs and OMB of its opposition to the legislation on constitutional grounds. Had the process functioned well, this would have opened a

---

13 Executive Order 12,146 provides that the Attorney General must resolve disputes between "two or more Executive agencies whose heads serve at the pleasure of the President." Agencies are "encouraged" to submit all other disputes to the Attorney General. Exec. Order No. 12,146, 3 C.F.R. 409 (1979), *reprinted in* 28 U.S.C. § 509 (1988).

14 Hayburn's Case, 2 U.S. (2 Dall.) 409, 410 n.(a) (1792). *See also* GERALD GUNTHER, CONSTITUTIONAL LAW 1593-94 (12th ed. 1985) (discussing the Supreme Court's early refusal to interpret treaties for President Washington absent a bona fide judicial controversy, especially since the President can call upon the heads of executive departments for opinions).

15 Admittedly, there has been some intrabranch litigation, but it has been confined to disputes involving the executive and a so-called independent agency. *See, e.g.,* Udall v. Fed. Power Comm'n, 387 U.S. 428 (1967). The denomination of agencies as "independent" is overly facile and conclusory. Usually, the only "independence" is for designated officers not to be removable at will.

However, it is now clear, after Morrison v. Olson, 487 U.S. 654 (1988), that such agencies exercise executive power, and not some hybrid power as was previously thought in Humphrey's Ex'r v. United States, 295 U.S. 602 (1935). Given that recognition by the Court, nothing precludes, indeed I would argue that the President has a duty to undertake, supervision of the day-to-day decision making of such agencies. *See* KMIEC, *supra* note 3 at 58-59.

16 H.R. 4033, 99th Cong., 2d Sess. § 3 (1986).

342              *CARDOZO LAW REVIEW*              [Vol. 15:337

conversation between the executive and the legislative branches over what amendments might be mutually acceptable. However, the process did not function well as OLC's objections were muffled by OMB personnel. Some of the motivation for doing so was wholly political, insofar as a few late-in-the-term Reagan OMB appointees apparently wanted to make the transition to the Bush Administration. Thinking that a "kinder-gentler" Bush would be more tolerant of legislative usurpations, these individuals informally signalled Congress that OLC's constitutional concerns need not control the legislative outcome.

The legislative process was not completed until late 1988. But the outcome was the unanimous passage of the "Whistleblower Protection Act of 1988." OLC was appalled. In carrying out its review of the enrolled bill, OLC reiterated its objection to the removal limitation on the special counsel first stated by John Harmon a decade earlier. The Court's subsequent decision in *Morrison v. Olson*[17] could not be read as approving such "for cause" limitations. The Court in *Morrison* limited its approval of removal limitations to an independent counsel that served for a limited time and with a limited jurisdiction.[18] By contrast, the special counsel in the whistleblower context would serve a minimum five year term and have jurisdiction to review the personnel actions of the entire executive branch. While the Supreme Court might tolerate moderate for cause limitations on the removal of limited purpose independent counsels rationalizing that such do not "interfere impermissibly" with the President's ability to faithfully execute the laws, OLC was of the strong belief that limiting the removal of an executive official with a broader scope of authority clearly did. Moreover, to OLC, such removal restrictions could not be analyzed in isolation, since the accretion of additional removal restrictions in a host of new legislation might cumulatively erode the President's oversight authority.

OLC, of course, restated its constitutional objections to intrabranch litigation and for good measure reminded OMB that historically the Department of Justice had opposed any legislative proposal eroding the Attorney General's statutory litigating authority.[19] While this aspect of OLC's objection was not a matter of constitutional law per se, it had constitutional underpinnings since centralizing litigation

---

[17] 487 U.S. 654 (1988).

[18] Theoretically, at least. Lawrence Walsh, the Independent Counsel in the Iran-Contra matter, has been serving for over six years. *See* Douglas W. Kmiec, *Pardoning Weinberger Was Right*, Nat'l L.J. Feb. 8, 1993, at 15, 17.

[19] *See* 28 U.S.C. §§ 516, 519 (1992).

1993]            *OLC'S OPINION WRITING*                    343

authority in the Attorney General allows for the presentation of uniform positions on important legal issues, the selection of test cases which produce results most favorable to the interests of the United States, more objective handling of cases by attorneys unaffected by narrow agency missions, and the facilitation of presidential supervision of executive policies affected by government litigation.

OLC recommended a veto and forwarded a draft veto message to the Counsel to the President. OMB was nonplussed. Efforts were made again to downplay OLC's constitutional concerns. The President was told that he would be creating an enormous public relations problem for George Bush who was in the final weeks of his 1988 campaign. "Think of it, Mr. President," the argument went, "this will supply the Dukakis campaign with an example of how neither you nor your Vice-President are interested in punishing government mismanagement or abuse." In a presidential campaign dominated by so-called "ethics" issues, this was not an inconsiderable image concern.

But that was all it was, an image and public relations concern. In the end, OMB admitted that it had failed to transmit to Congress OLC's constitutional misgivings in a full and timely manner. If apologies to the Congressional leadership in the President's party were needed, so be it. In pocket vetoing the legislation, Ronald Reagan realized that his duty was to protect the office of the Presidency, not to justify the expedient, mistaken actions of his subordinates. In this action, Reagan gave life to the sage counsel of Attorney General Caleb Cushing who said:

> I hold that no Head of Department can lawfully perform an official act against the will of the President; and that will is by the Constitution to govern the performance of all such acts. If it were not thus, Congress might by statute so divide and transfer the executive power as utterly to subvert the government, and to change it into a parliamentary despotism, like that of Venice . . . with a nominal executive Chief utterly powerless.[20]

In his memorandum of disapproval, President Reagan directed the Attorney General and others "to prepare constitutional and effective whistleblower protection legislation for me to submit at the beginning of the next session of the Congress."[21] Thus, OLC's role would continue. Over the next several months OLC met with legislative staff in Congress in an effort to reach agreement on language that would

---

[20] *Finally Awake at the Wheel*, WALL ST. J., Oct. 31, 1988, at A18 (quoting Attorney General Caleb Cushing).

[21] Memorandum of Disapproval for the Whistleblower Protection Act of 1988, 24 WEEKLY COMP. PRES. DOC. 1377 (Oct. 26, 1988).

protect whistleblowers without infringing on executive authority. OLC was successful, and the Whistleblower Protection Act of 1989 became the first piece of legislation signed into law by President Bush on April 10, 1989. In his signing statement, Bush observed that the new legislation

> addresses the chief constitutional concerns raised by earlier versions of this legislation. The most substantial improvement in the bill is the deletion of provisions that would have enabled the Special Counsel, an executive branch official, to oppose other executive branch agencies in court. Under our constitutional system, the executive branch cannot sue itself.[22]

OLC did not get everything it wanted in its negotiations with Congress. In particular, the new legislation retained provisions authorizing the special counsel to transmit executive branch materials to Congress. Unlike the original legislation, however, this material was now to be submitted "concurrently" to the President (or his designee) and Congress, eliminating the provision that it be "without review." In the signing statement OLC drafted for President Bush, an effort was made to give this provision an acceptable constitutional interpretation. Specifically, the President stated: "I do not interpret these provisions to interfere with my ability to provide for appropriate prior review of transmittals by the Special Counsel to the Congress."[23] With these words, the President, as advised by OLC, was signalling how the new legislation was to be implemented. OLC's legislative function had thus traveled the full executive route, from reviewer and disapproving critic to draftsman and implementing agent.

Yet, OLC's words, adopted by the President in his message of approval, are not without their inconsistencies. How, after all, was executive branch material to be submitted "concurrently but only following prior review"? At a minimum, this is a metaphysical challenge. Some in Congress would say it is the manipulation, even disregard, of the public law. OLC, of course, would argue that it is merely construing public law under the higher command of the Constitution. Putting either pejorative or supportive terminology to one side, it is certainly a practical attempt to allow for presidential approval of legislation that is not constitutionally perfect. The signing statement has become the coverlet hiding constitutional imperfections or disagreements in much the same way diplomatic vagary is employed to achieve a basic level of agreement in a treaty among sover-

---

22 Statement on the Signing of the Whistleblower Protection Act of 1989, 25 WEEKLY COMP. PRES. DOC. 516 (Apr. 10, 1989).

23 *Id.*

*OLC'S OPINION WRITING*

eigns. This use of such statements and related questions is discussed next.

## B. *Signing Statements*

While the history of signing statements can be traced back to 1830 when Andrew Jackson employed the device to give his interpretation of a road appropriation,[24] they were infrequently used by early presidents. John Tyler was the second President to issue such approval commentary,[25] but his comments questioning the constitutionality of an apportionment bill provoked the displeasure of the House of Representatives. In this regard, a select committee strongly objected to President Tyler's temerity in going beyond the simple act of approving a bill by his signature.[26] The committee opined that presidential statements should "be regarded in no other light than a defacement of the public records and archives."[27] Notwithstanding this Congressional back of the hand, presidents since Tyler, and especially in the last half century, have frequently issued signing statements upon their approval of a bill.

Presidents have issued signing statements for several purposes. In a few instances, presidents have issued formal statements simply to underscore approval. In most instances, though, a President has issued a statement objecting to a provision in a bill which he nonetheless signed. These objections are either based upon policy disagreements about the wisdom of the measure or, as in the case of George Bush's treatment of the whistleblower legislation, described above, upon constitutional concerns.[28]

The majority of presidential signing statements express policy rather than constitutional objections to a provision in the legislation.[29] These objections do not originate in OLC and are not discussed here. Where constitutional objections have been raised, however, it has fallen to OLC to set forth in a draft signing statement how the unconstitutional feature will be handled. In outlining these courses, OLC first assesses how serious the constitutional problem is. Something of

---

[24] 2 A Compilation of The Messages and Papers of the Presidents, 1789-1897 at 493 (James D. Richardson ed., 1897). *See also* Douglas W. Kmiec, *Judges Should Pay Attention To Statements By Presidents*, Nat'l L. J., Nov. 10, 1986 at 13.

[25] 4 A Compilation of The Messages and Papers of the Presidents, 1789-1897 159-60 (James D. Richardson ed., 1897).

[26] H.R. Rep. No. 909, 27th Cong., 2d Sess. (1842).

[27] *Id.* at 2.

[28] *See supra* note 23 and accompanying text.

[29] *See, e.g.*, 1 A Compilation of The Messages and Papers of the Presidents, 1789-1897, at 265 (James D. Richardson ed., 1897) (Jan. 27, 1885 statement of President Arthur expressing a belief that too much money is appropriated for a particular purpose).

an OLC lexicon has arisen, ranging from a conclusion of "clear un-constitutionality" to "serious constitutional concerns" to mere "constitutional questions." A problem is more likely to be denominated as serious if it affects the core purpose of a statute or if the provision alters the separation of powers in a way that is not likely to be subject to challenge by a private party.

The seriousness of a problem may be mitigated by a severability clause. However, in the limited time frame available to OLC in its review of enrolled legislation, it is not always possible to undertake a severability analysis. In this regard, the enrolled legislation's legislative history is seldom, if ever, available for review before the President is asked to approve or disapprove a measure. In some cases, a bill's history is not completely written, even though Congress sometimes purports to bind the executive to its hidden, unenacted content. Along these lines, OMB Director James Miller in the later years of the Reagan presidency advocated that the President inform Congress that the executive need not follow lists of spending instructions appearing only in committee reports.[30] President Bush made this point explicit in one signing statement, reciting that "Congress cannot create legal obligations through report language" and "such language has no legal force or effect."[31]

With some legislation, a signing statement can be used to espouse a construction that avoids the constitutional problem altogether. For example, OLC frequently drafted statements construing legislative veto provisions as "report and wait" requirements to avoid the implication of executive approval of this constitutionally-unauthorized method of legislative "enactment." This approach received constitutional approval in *INS v. Chadha*.[32] These OLC-inspired objections predate even the Court's decision in *Chadha* which insisted upon the importance of bicameral passage and presentment.[33] Other constitutional problems also have been finessed with construction. Many of these have related to Congress' proclivity to direct, rather than request, that the President undertake some foreign affairs responsibility.[34] Still others have related to Congress' inability to comprehend

---

[30] James C. Miller, *A Presidential Veto for Pork Spending*, WALL ST. J., Jan. 30, 1990, at A18.

[31] Statement on Signing the Department of Defense Appropriations Act, 1990, PUB. PAPERS 1572 (Nov. 21, 1989).

[32] 462 U.S. 919, 925 (1983).

[33] *Id.* at 919. President Carter used a signing statement for this purpose over a dozen times. As early as 1963, President Johnson employed the same device. *See* Statement by the President Upon Approving the Public Works Appropriations Act, PUB. PAPERS 104 (Dec. 31, 1963).

[34] *See, e.g.*, Statement on Signing H.R. 3363 Into Law, PUB. PAPERS 1434 (Aug. 15, 1979)

the niceties of the Appointments Clause.[35]

OLC practice in these cases is thus highly analogous to that of the judiciary. The Court construes a law to be constitutional where possible.[36] Of course, the construction must actually be a possible one. OLC, like the Court, should not be about the business of rewriting the statute. So long as there is more than one possible construction of the statute, however, the principle may have application.

Less serious constitutional matters also may be handled by having the President direct the Attorney General to work with agencies to implement the statute in a constitutional fashion. Similarly, the President can recommend repeal legislation. If constitutional difficulties cannot be construed away or avoided by careful executive implementation, the President's only choice may be to veto.[37] In *The Attorney General's Lawyer*, however, it is explained at some length why the veto may be practically unavailable in the face of Congress'

---

(statement of President Carter construing a provision relating to the closure of U.S. consulates to be a recommendation rather than a requirement); Statement by the President Upon Signing the Mutual Security Appropriations Act, PUB. PAPERS 753-54 (Aug. 2, 1955) (statement of President Eisenhower interpreting a provision to avoid a restriction on his ability to conduct negotiations with certain foreign governments).

[35] U.S. CONST. art. I, § 3, cl. 2. *See, e.g.*, Statement on Signing the Arts and Artifacts Indemnity Act, PUB. PAPERS 1990-91 (Dec. 20, 1975) (statement of President Ford avoiding an Appointments Clause problem by employing alternative statutory authority to alter the membership on the Federal Council on the Arts and the Humanities).

[36] *See* NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937).

[37] President Reagan followed this course when the free-standing Fairness in Broadcasting Act of 1987 was presented to him in June 1987. This Act would have codified the so-called "fairness doctrine" authorizing federal officials to supervise the editorial practices of broadcasters. Even though the Supreme Court sanctioned such content-censorship because of the (now out-dated) understanding that the broadcast medium is technologically limited, *see* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969), the President exercised his independent constitutional judgment in vetoing the legislation. He noted straightforwardly: "[t]his type of content-based regulation by the Federal Government is, in my judgment, antagonistic to the freedom of expression guaranteed by the First Amendment." Message to the Senate Returning Without Approval the Fairness in Broadcasting Bill, PUB. PAPERS 690 (June 19, 1987).

Even when legislation is not presented in a free-standing form and the President is forced to sign a multisubject bill with a provision he believes is unconstitutional, in order to give proper deference to the role of the Court in matters of constitutionality, the President should seek a judicial determination. Only where the provision is not likely to give rise to a case or controversy or where the provision is manifestly repugnant to the Constitution should nonenforcement be considered. In all events, occasions for nonenforcement must be strictly limited to serious constitutional flaws, not policy disagreements. Thus, for example, Richard Nixon's impoundment of funds because he disagreed with certain educational assistance was without constitutional warrant. William Rehnquist shared this view when he was head of OLC. *See* William H. Rehnquist, Memorandum Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary*, 92d Cong., 1st Sess. 283-84 (1971). *See also* Kendall v. United States, 37 U.S. (12 Pet.) 524 (1838).

practice of lumping together numerous unrelated provisions in omnibus bills, often inserting the most controversial provisions in emergency appropriations measures passed at, or after, fiscal deadlines.[38] The following extended excerpt from the book explains matters as well as I am able:

> The greatest dilemma faced by a president is when needed legislation is presented with serious constitutional defect. The most notable historical example, perhaps, was Franklin Roosevelt's approval of the Lend-Lease Act, which provided vital support to our allies in World War II. As presented to the President, the Act contained a provision for the termination of the President's authority upon the passage of a "concurrent resolution of the two Houses. . . ."[39] Roosevelt correctly thought this an unconstitutional infringement of the presidential office because it provided for repeal without following the required procedure for new or repeal legislation set out in the Constitution, which included presentment to the president. Interestingly, then Attorney General Robert Jackson, later a justice of the Supreme Court, was more equivocal speculating that the statutory limitation on the president's authority might be viewed not as a repeal but "a reservation or limitation by which the granted power would expire or terminate."[40] Roosevelt would have none of it, and in a rare twist, issued a legal opinion to his Attorney General stating that he "felt constrained to sign the measure [to meet a momentous emergency of great magnitude in world affairs], in spite of the fact that it contained a provision which, in [his] opinion, is clearly unconstitutional."[41] Roosevelt directed the Attorney General to put his legal opinion in the "official files of the Department of Justice" in order to preclude his approval of the Act from being used "as a precedent for any future legislation comprising provisions of a similar nature."[42] Roosevelt was right about the unconstitutionality of this type of provision, as was confirmed later by the Supreme Court in *Chadha* in 1983.[43] He also correctly anticipated that Congress would continue its efforts to circumvent the presidential judgment and veto in similar ways.

> As dramatic as the Lend-Lease case is, it did not pose as great a problem as it might have because there was little chance that the Congress was going to implement its illicit authority in the midst of a world war. But what if there is an unconstitutional provision

---

[38] KMIEC, *supra* note 3, at 53-57.

[39] Lend-Lease Act, Pub. L. No. 11, 55 Stat. 32 (1941), *quoted in* Robert H. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353 (1953).

[40] *Id.* at 1355.

[41] *Id.* at 1357.

[42] *Id.* at 1358.

[43] INS v. Chadha, 462 U.S. 919 (1983).

in needed legislation that ostensibly requires immediate implementation, is the President obligated to enforce it? This problem confronted President Reagan with the passage of the Competition in Contracting Act of 1984 ("CICA").[44]  CICA gave executive authority to stay a procurement to a legislative officer, the Comptroller General.[45]  Seeing this, the Department objected while CICA was pending. Congress ignored the objection and presented CICA to the President as part of a much larger Deficit Reduction Act. Once again seemingly caught in an impossible position, Reagan signed the measure, but in his signing statement directed the Department to inform executive branch agencies how they might comply with CICA in a manner consistent with the Constitution.[46]

OLC examined the law. . . . [and] determined that no constitutional construction was possible. Quite simply, under the Court's decision in *Chadha*,[47] the vesting of a legislative officer with the power to affect the legal rights, duties, and relations of individuals outside of Congress without following of the prescribed legislative process is impermissible.[48]  There was no getting around it; this is what CICA did.

Having made the determination that CICA could not be enforced consistently with the Constitution, then-Attorney General Bill Smith notified Congress that CICA would not be defended in court by the Department and would not be implemented by the administration.[49]  Subsequently, a few district and appellate courts in dubiously reasoned opinions found CICA constitutional and a nomination-battered Meese replaced Smith. Notwithstanding the lower court determinations, Meese still felt that CICA was unconstitutional under Supreme Court precedent, and he maintained the nonenforcement posture, until Congressman Peter Rodino, then chairman of the House Judiciary Committee, threatened to deny funding for the entire Department unless Meese would implement the disputed provision. The Attorney General relented, even though the CICA issue remains judicially disputed and not finally resolved by the Court.[50]

---

44 Competition in Contracting Act, 31 U.S.C. §§ 3551-56 (1984).

45 31 U.S.C. § 3553(c)-(d) (1988).

46 Statement on Signing the Deficit Reduction Act of 1984, PUB. PAPERS 1053 (July 18, 1984).

47 462 U.S. 919 (1983):

48 *Chadha* makes this point clear, but the exact application of *Chadha* to CICA remains curiously mired in the lower courts. *See infra* note 50.

49 Letter from William F. Smith to Thomas P. O'Neill, Speaker of the House, (Nov. 21, 1984) (on file with author). Since 1979, conditions in Department appropriations have required the Department to notify Congress when it will either not enforce or defend statutes it believes to be unconstitutional. *See, e.g.*, Pub. L. No. 98-411, § 203(a), 98 Stat. 1545 (1985).

50 *See* Ameron v. United States Army Corps of Engineers, 809 F.2d 979 (3d Cir. 1986) (holding that the Comptroller General's stay of contract award was a legitimate use of legisla-

Should the President and the Attorney General enforce stat-utes that they believe are unconstitutional? It may be remembered that Andrew Johnson didn't think so, and this thinking nearly got him impeached. Congress had passed the Tenure-of-Office Act over Johnson's veto. The Act precluded Johnson from freely re-moving members of his cabinet. Notwithstanding the law's pas-sage, Johnson removed Secretary of War Stanton and this became one of the articles of impeachment. In Johnson's defense, his coun-sel stated:

> If the law be upon its very face in flat contradiction of the plain expressed provisions of the Constitution, as if a law should forbid the President to grant a pardon in any case, or if the law should declare that he should not be Com-mander-in-Chief, or if the law should declare that he should take no part in making of a treaty, I say the Presi-dent, without going to the Supreme Court of the United States, maintaining the integrity of his department, which for the time being is entrusted to him, is bound to execute no such legislation; and he is cowardly and untrue to the responsibility of his position if he should execute it.[51]

Johnson's counsel had a winning argument. Chief Justice Salmon P. Chase, casting the deciding vote against Johnson's impeach-ment, declared that the president has no duty to execute a statute that "directly attacks and impairs the executive power confided to him by [the Constitution]."[52]

Was CICA such an occasion? Bill Smith and Ed Meese thought so. Smith, for example, pointed out to Congressman Rodino that "historical examples of refusals by the Executive to enforce or defend an Act of Congress have been precipitated for the most part by Congress's attempt to alter the distribution of constitutional power by arrogating to itself a power which the Ex-ecutive believes the Constitution does not confer on Congress but, instead, reposes in him."[53] Encroachments on the executive were especially apt for nonenforcement since it is unlikely that anyone would have the legal standing to challenge the disputed statute.[54]

---

tive power but CICA did not authorize the Comptroller General to execute procurement laws or interfere with the executive's performance of procurement duties); Lear Siegler, Inc., En-ergy Products Div. v. Lehman, 842 F.2d 1102 (9th Cir. 1988) (holding that the CICA stay provisions did not violate the separation of powers, and the government's refusal to comply with the provisions was in bad faith).

[51] 2 TRIAL OF ANDREW JOHNSON 200 (DeCapo Press 1970) (1868).

[52] ROBERT B. WARDEN, AN ACCOUNT OF THE PRIVATE LIFE AND PUBLIC SERVICES OF SALMON PORTLAND CHASE 685 (Cincinnati, Wiltach, Baldwin & Co. 1874).

[53] Letter from William French Smith to Peter Rodino 5 (Feb. 22, 1985) (on file with author).

[54] See RAOUL BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 208 (1974) (arguing that nonenforcement is only appropriate where the president's power is infringed).

Predictably, the *New Republic* and a host of liberal law professors opined that nonenforcement might be appropriate, but only if a statute would "significantly infringe individual liberties."[55]  But constitutional principle cannot depend on whose ox is being gored.

If John Marshall was correct that "an act of the legislature, repugnant to the Constitution, is void,"[56] and insofar as the president has the express responsibility to "take care that the Laws [including the Constitution as the supreme law] be faithfully executed,"[57] enforcing an invalid law would be contrary to a president's constitutional duty and oath.  This is a proposition as old as the founding.  For example, James Wilson, a principal drafter and advocate of the Constitution, wrote that "the President of the United States could shield himself and refuse to carry into effect an act that violates the Constitution."[58]

It can be argued, of course, that it is not within the province of the Attorney General, OLC, or even the President, to pass upon questions of constitutionality.  This is a conundrum as old as the Republic.  Andrew Jackson emphatically stated that "[t]he Congress, the Executive, and the Court must each be guided by its own opinion of the Constitution."[59]  Abraham Lincoln and the cousins Roosevelt indulged much the same view.  By contrast, James Buchanan watched as the southern states announced their secessions lamenting that the President "is not more than the chief executive officer of the government.  His province is not to make the laws but to execute the laws . . . ."[60]  An Attorney General opinion at the turn of the century took the view that "it is not within the province of the Attorney General to declare an Act of Congress unconstitutional—at least, where it does not involve any conflict between the prerogatives of the legislative department and those of the executive department."[61]  It is certainly sound advice to limit strictly the occasions for executive nonenforce-

---

[55] Murray Waas & Jeffrey Toobin, *Meese's Power Grab*, THE NEW REPUBLIC, May 19, 1986, at 16 (quoting Professor Sanford Levinson).

[56] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

[57] The President promises to "preserve, protect and defend the Constitution of the United States." U.S. CONST. art. II, § 1, cl. 8. Chief Justice Chase concluded that sincere presidential belief that an act was unconstitutional meant that "it was a proper and peaceful, if not the only proper and peaceful mode of protecting and defending the Constitution," to not enforce the disputed act. J.W. SCHUCKERS, THE LIFE AND PUBLIC SERVICES OF SALMON PORTLAND CHASE 578 (Mnemosyne Pub. Co. 1969) (1874).

[58] 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 451 (Merrill Jensen ed., 1976) (statement of James Wilson on Dec. 1, 1787). KMIEC, *supra* note 3 at 53-57 (citations renumbered).

[59] ARTHUR B. TOURTELLOT, THE PRESIDENTS ON THE PRESIDENCY 268 (1964).

[60] *Id.* at 417.

[61] 31 Op. Att'y Gen. 476 (1919).

ment to examples of manifest unconstitutionality[62] or transgressions of the separation of powers.[63] However, to the extent that the Constitution is a necessary part of the written law that the President by oath and duty is to "take care to faithfully execute," no Attorney General or OLC can entirely escape constitutional and statutory conflicts of this nature.

Putting the difficult issue of nonenforcement of unconstitutional provisions to one side, the use of signing statements allows a president to properly direct the executive branch in matters of statutory interpretation. A president either guides his subordinate executive officers or, consciously or unconsciously, accepts the direction announced by his subordinates. OLC's heightened use of signing statements made it plain that the primary guidance for a law's enforcement, consistent with legislative terms and purposes of course, was to originate with the President. While the Counsel to the House of Representatives[64] and other commentators have from time-to-time erroneously sought to deny that the President can exercise this supervisory role, presidential direction via signing statement is no more illegitimate, and every bit as necessary, as presidential supervision of executive rulemaking or litigation.[65]

---

[62] *See, e.g.*, Simpkins v. Moses H. Cone Memorial Hosp., 211 F. Supp. 628 (M.D.N.C. 1962), *rev'd* 323 F.2d 959 (4th Cir. 1963), *cert. denied*, 376 U.S. 938 (1984) (U.S. intervention in private civil rights litigation successfully contesting the constitutionality of statutes providing for "separate but equal" facilities).

[63] *See, e.g.*, Buckley v. Valeo, 424 U.S. 1 (1976) (Attorney General successfully argued that certain congressional appointments to the Federal Election Commission transgressed the Appointments Clause); United States v. Lovett, 328 U.S. 303 (1946) (Justice Department successfully contested the constitutionality of a statute directing that salaries of certain officials not be paid); Myers v. United States, 272 U.S. 52 (1926) (successful argument that Congress could not limit the President's power of removal of a local postmaster).

[64] *See* Linda Greenhouse, *In Signing Bills, Reagan Tries to Write History*, N.Y. Times, Dec. 9, 1986, at B14 (quoting Steven R. Ross, Counsel to the House of Representatives, as saying that the President's role is "limited to thumbs up or thumbs down, with no shades of gray [in between]").

[65] Congress presently indulges the bizarre notion that it can deny presidential supervision, and therefore accountability, over the execution of the law by assigning authority to specific subordinate executive officers or departments. This is untenable. *See* Kmiec, *supra* note 3, at 47-65. Nevertheless, Congress continues to disregard the President's assertion of control over "a unitary executive." Thus, in one Senate Report, it is stated:

> The Office of Management and Budget has never been given any legislative authority over marketing orders. OMB has attempted to become involved in the management of marketing order programs through the President's task force on regulatory review in recent years. The Committee has included language prohibiting OMB from acting with regard to marketing orders.

S. Rep. No. 105, 101st Cong., 1st Sess. 57 (1989). President Bush properly responded that this would "impair [his] ability as President to supervise the executive branch." Statement on Signing the Treasury, Postal Service and General Government Appropriations Act, 25 Weekly Comp. Pres. Doc. 1669, 1670 (Nov. 3, 1989).

*OLC'S OPINION WRITING*

## II.  OLC AND THE PRESIDENT'S PROGRAM

### A.  *The Item Veto*

The discussion thus far has concentrated upon OLC's advice regarding pending or enrolled legislation. But OLC is also regularly consulted with regard to the legality of some desired aspect of the President's program. Both Presidents Reagan and Bush repeatedly requested line-item veto authority. This sought-after authority is not unrelated to the problem of nonenforcement since a president with item-veto authority could selectively excise provisions deemed to be unconstitutional.

During the Reagan and Bush presidencies, item-veto authority was sought primarily for fiscal reasons. At one point, public commentary suggested that this authority was "inherent" in the Constitution.[66] This argument naturally intrigued President Reagan, and the Attorney General and OLC were called upon to respond.

The public argument for the inherent item-veto relied heavily upon Article I, Section 7, Clause 3 of the Constitution which provides:

> Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.[67]

The uniformly understood intent of this provision was to preclude the Congress from engaging in maneuvers to defeat the President's veto power by avoiding presentment by styling a bill under another name. In light of the craftiness of modern legislative practice, it is claimed that the clause also supports a president approving or disapproving parts of aggregated, or so-called "bundled," legislation.

After painstaking research, OLC concluded that this claim for an inherent veto was unsustainable.[68] In so doing, OLC was exhibiting its highly cautious approach to the rendering of legal advice. The negative answer was a great disappointment to the President. But, properly, OLC advice is not driven by policy disappointment. Ironically, however, OLC's negative view of the inherent item veto did co-

---

[66] Stephen Glazier, *Reagan Already Has Line-Item Veto*, WALL ST. J., Dec. 4, 1987, at 14.
[67] U.S. CONST. art. I, § 7, cl. 3.
[68] 12 Op. Off. Legal Counsel 159 (Prelim. Print 1988); *see also* Charles J. Cooper, *The Line-Item Veto: The Framers' Intentions*, *in* PORK BARRELS AND PRINCIPLES: THE POLITICS OF THE PRESIDENTIAL VETO 29 (1988).

incide with the conclusion of the usually adventuresome views of the President's liberal opposition.[69] This article does not rehearse the inherent item-veto arguments, but the curiosity of the OLC result may be usefully explored as an example of how OLC's "belt and suspenders" methodology can act as a brake upon the pursuit of policy.

OLC readily admitted that the Constitution did not define the term "Bill." However, from the country's inception bills have combined separate items of appropriation.[70] Moreover, it was the view of George Washington that he "must approve all the parts of a Bill, or reject it in toto."[71] While this has the appearance of being highly relevant, even dispositive, in fact, it may disclose little. Indeed, the framers' acceptance of omnibus or combined appropriations actually says nothing about whether the framers believed the President could disaggregate those combinations and veto part. As several writers have since put it succinctly, "[t]he same constitutional silence that sanctions the bundling of bills may *also* sanction their veto on something other than an all-or-nothing basis."[72] In this regard, the assumption by Washington and some later presidents that they could not veto parts of bills may be said to beg the very question in issue: namely, what is a bill?

Perhaps because of this, OLC carefully examined the proceedings of the constitutional convention of 1787. The convention, OLC found, did express some concern over the practice of tacking unrelated riders to money bills. But it was a concern over legislative, not

---

[69] *See* Letter from Laurence Tribe, Professor, Harvard Law School, & Philip Kurland, Professor, University of Chicago, to Senator Edward Kennedy (Oct. 31, 1989), *reprinted in* J. Gregory Sidak & Thomas Smith, *Four Faces of the Item Veto: A Reply to Tribe and Kurland*, 84 Nw. U. L. Rev. 437, 437 n.1 (1990).

[70] Even though omnibus appropriations are present throughout this country's history, the practice of inserting substantive riders in appropriations—in essence, imposing unpalatable or arguably unconstitutional provisions with money—did not arise until the midpoint in our nation's history. *See infra* text accompanying note 81. So too, the practice of bundling or aggregating nongermane substantive matters did not exist at the founding. British precedents held the practice of aggregation in great reproach:

> Even where the propositions are separately not liable to objection in either House, the heaping together in one law such a variety of unconnected and discordant subjects, is unparliamentary . . . . But to do this in cases where it is known that one of the component parts of the Bill will be disagreeable to the Crown, or to the Lords; and that, if it was sent up alone, it would not be agreed to—for this reason, and with a view to secure the Royal assent, or the concurrence of the Lords, to tack it to a Bill of Supply which the exigencies of the State make necessary—is a proceeding highly dangerous and unconstitutional.

3 John Hatsell, Precedents and Proceedings in the House of Commons 222 (photo. reprint 1971) (3d ed. 1818).

[71] 33 The Writings of George Washington 96 (John C. Fitzpatrick ed., 1940).

[72] Sidak & Smith, *supra* note 69, at 469.

1993]                    *OLC'S OPINION WRITING*                    355

executive, parity. Since money bills were to originate in the House,[73] the convention members focused on how the Senate, not the President, might protect itself against the House. The Framers' solution was to provide the Senate with unlimited power of amendment. This rendered the Senate coequal in legislative deliberations, and according to OLC, created a negative implication against inherent item-veto authority in the President. To imply such authority in the President, OLC reasoned, would arguably not make him coequal, but more powerful because an item veto could be affirmed by one-third plus one of a single chamber (the number needed to block an override). By contrast, for a Senate amendment to be affirmed—that is, included in the legislation—it would have to be agreed to by a majority of the House.

OLC's analysis also included a thorough review of practices before and after the adoption of the Constitution. OLC found that omnibus appropriation measures existed in the colonial and confederation experience, and that there was objection to the aggregation of unrelated substantive matters or the insertion of substantive riders in appropriations measures. Nonetheless, OLC found no evidence that these objections prompted recipient executives to disaggregate the bundled measures.

This is fine, lawyerly parsing; however, it is important to recognize that OLC's caution in the face of uncertainty can be misunderstood by a nonlawyer president as an unalterable and highly certain legal requirement. For all of OLC's item-veto reasoning, it was able only to prove that the Constitution was textually silent and that there was no explicit prior executive claim of item-veto authority. There have, however, been implicit presidential claims of item-veto authority. In modern practice, presidents, aided and abetted by OLC itself, have exercised a de facto item veto, at least in those limited circumstances where provisions of enrolled bills are manifestly unconstitutional[74] or they encroach upon executive power. Indeed, the consequences of OLC's formal conclusion that no inherent item veto exists produces the constitutional anomaly that Congress has less direct opportunity to react to executive nonenforcement than if inherent

---

73 U.S. CONST. art. I, § 7, cl. 1.

74 See, for example, the Statement on Signing the Treasury, Postal Service and General Government Appropriations Act, 1990, 25 WEEKLY COMP. PRES. DOC. 1669, 1670 (Nov. 3, 1989), where President Bush states:

[N]umerous provisions of H.R. 2989 purport to condition my authority, and the authority of affected executive branch officials, to use funds otherwise appropriated by the Act on the approval of various committees of the House of Representatives and the Senate. These provisions constitute legislative veto devices of the kind declared unconstitutional in *INS v. Chadha* . . . . Accordingly, I will treat them as having no legal force or effect in this or any other legislation in which they appear.

356        *CARDOZO LAW REVIEW*        [Vol. 15:337

item-veto authority had been acknowledged. Two commentators have observed that "[r]eturning an unconstitutional measure to Congress for another vote (if Congress so decides) would at least continue a constitutional colloquy between co-equal branches, a debate which is not always well-suited to the courts."[75]

In other contexts, OLC has been careful to observe that while Congress' appropriation power is expansive, it cannot be used to decimate the presidency. In the OLC filing in *United States v. North*,[76] OLC wrote:

> Congress' appropriation power is quite broad, and includes as a general matter the authority to attach conditions to appropriations, [but] it is not limitless. . . . That Congress appropriates money for the Army, however, does not mean that it can constitutionally require, as a condition on appropriations, that the armed forces conduct a specific tactical operation.[77]

The same point arguably can be made concerning the item veto. Just as there is no explicit provision in the Constitution governing the misuse of the appropriations power, there is no explicit provision in the Constitution addressing abuse of legislative presentment. OLC's role in both cases is to construe the Constitution in a fashion that preserves its underlying structure, not necessarily to extrapolate from silence a constitutional prohibition.

Where there is constitutional silence, there must be careful attention to constitutional purpose. James Madison identified the primary objects of the veto power as "restrain[ing] the Legislature from encroaching on the coordinate Departments, or on the rights of the people at large; or from passing laws unwise in their principle, or incorrect in their form."[78] As Hamilton echoed in *The Federalist*:

> The primary inducement to conferring the power in question upon

---

[75] Sidak & Smith, *supra* note 69, at 455-56. The authors insightfully note that:

> the power of the President to excise unconstitutional parts of legislation either by an item veto or by refusal to enforce unconstitutional laws, or by both, is fundamentally similar to the other great implicit power in the Constitution—judicial review. Indeed, the concepts are so interrelated that the framers debated (but ultimately rejected) the idea of having the executive and the judiciary *jointly* exercise the "revisionary" power. While one could argue that *all* of the revisionary power subsequently was vested in the judiciary, this view seems implausible in light of the framers' discussion of the President's veto as a "revisionary" power.

*Id.* (citations omitted).

[76] 910 F.2d 843 (D.C. Cir. 1990).

[77] Amicus brief of the United States filed by the Department of Justice at 24, United States v. North, 910 F.2d 843 (D.C. Cir. 1990) (No. 88-0080-02) (*cited in* KMIEC, *supra* note 3, at 186).

[78] JAMES MADISON, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787, at 80 (1966).

the executive is to enable him to defend himself; the secondary, is to increase the chances in favor of the community against the passing of bad laws, through haste, inadvertence, or design. The oftener the measure is brought under consideration, . . . the less must be the danger of those errors which flow from want of due deliberation, or those missteps which proceed from the contagion of some common passion or interest.[79]

Historical acquiescence by earlier presidents is informative, but not dispositive. Later presidents cannot be estopped from returning to the original understanding. The Supreme Court recognized as much in holding that the President has the power to sign bills subsequent to the adjournment of Congress, even though long established practice was to the contrary.[80] Moreover, history is not quite as categorical as OLC's austere conclusion against the item-veto suggests. Indeed, it is reasonably clear that for the first seventy years of the Republic, substantive riders were not inserted into appropriations measures. The mere contemplation of such action in the 1850s triggered strong opposition within the legislative branch, itself.[81] True, as an expedient in a time of national emergency, Lincoln did accept appropriations with "friendly" substantive riders. However, it was not until a weakened Andrew Johnson signed into law an appropriations bill that effectively denied him control of the Army that the "historical practice" of conditioning appropriations on substantive riders took hold in a constitutionally offensive form. As noted earlier, OLC decried this very type of illicit appropriation condition in its filing in *United States v. North*. Even Johnson lamented:

> [t]hose provisions are out of place in an appropriation act. I am compelled to defeat these necessary appropriations if I withhold my signature to the act. Pressed by these considerations, I feel constrained to return the bill with my signature, but to accompany it with my protest against the sections which I have indicated.[82]

OLC in rendering its item-veto opinion refers to Johnson's lament for support. But given that Johnson—a President in extremis—raised a protest at all, arguably supports, not detracts from, the exercise of an item veto. OLC also references a series of vetoes by Presi-

---

79 THE FEDERALIST No. 73, at 443 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

80 *See* Edwards v. United States, 286 U.S. 482, 483 (1932).

81 Senator Benton insisted that no foreign matter be tacked onto legislation admitting California because doing so would "impede the free working of the Constitution . . . ." CONG. GLOBE, 31st Cong., 1st Sess. 794 (1850).

82 6 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS, 1789-1897, at 472 (James D. Richardson ed., 1897).

dent Hayes in reaching its conclusion. Yet, again Hayes made it plain that

> [i]t is clearly the constitutional duty of the President to exercise his discretion and judgment upon all bills presented to him without constraint or duress from any other branch of the Government. To say that a majority of either or both of the Houses of Congress may insist upon the approval of a bill under the penalty of stopping all of the operations of the Government . . . is to deny to the Executive that share of the legislative power which is plainly conferred by the second section of the seventh article of the Constitution. It strikes from the Constitution the qualified negative of the President.[83]

Hayes chose to veto—several times—all of the bundled measures in an effort to stop what he clearly viewed as an unconstitutional practice—the bundling itself. Hayes' decision to employ this undifferentiated veto does not ipso facto deny a later President the very constitutional authority assumed in the Hayes' protests, namely the discretion to evaluate legislation individually. OLC does note that Johnson, Hayes, Grant, Taft and several other Presidents all complained of the aggregation of legislative matters, but OLC emphasizes that these Presidents never vetoed, at least formally, parts of these bundled measures. This is OLC's chosen emphasis, not necessarily that of history. It may well be that OLC put the emphasis on the wrong constitutional syllable.

In brief, OLC was not obliged to conclude as a matter of law that Congress may deny a president's exercise of independent judgment by the clever means of wrapping an entire legislative program into a single instrument or an instrument necessary for continued government operations. As others have commented, "[c]ritics of the item veto apparently would have us believe that, if Congress can come up with any way not specifically anticipated by the framers to evade the veto power, the President must simply put up with it."[84] It is thus an unsatisfactory answer for OLC to say that a more vigorous exercise of the veto of aggregated measures is sufficient to deter this pernicious practice. It has not been. In any event, it again begs the question, or at least the President's dilemma, of not being practically able to veto the whole. And lest it be overlooked, as a veto of the whole defeats that which is constitutionally obnoxious, it also deprives the nation of salutary measures within that whole. The framers envisioned the veto as stopping the passage of "bad laws," not the converse.

---

[83] 7 A Compilation of The Messages and Papers of The Presidents 1789-1897, at 531 (James D. Richardson ed., 1897).
[84] Sidak & Smith, *supra* note 69, at 478.

In the end, OLC's legal conclusion against this part of the President's program assumed the entire burden of persuasion rests with the President. Given the long period in our history where substantive riders in appropriations were never tolerated, the benign manner in which they arose out of the exigencies of the Civil War, and the repeated presidential objection to their more insidious continuation, the case for the inherent item veto may be more tenable than not. Put differently, the constitutional text or principle that affirmatively justifies the Congressional practice of inserting substantive riders in appropriations, and the aggregation of nongermane matters generally, is far more dubious. OLC's abundance of caution in the face of uncertainty, while often admirable for its implicit respect for our constitutional system, may have in this instance perpetuated an unintended constitutional imbalance.

### III.  THE PRESIDENT'S PROGRAM AND THE EXECUTIVE ORDER

Nowhere does OLC speak more directly to the President than in its review of "form and legality" of all presidential executive orders. There is something chastening in directly sending and signing letters: "My dear Mr. President," even as many of these letters may be viewed by some, outside of OLC, as mere legal "formalities." As the head of OLC in Lyndon Johnson's administration commented:

> OLC's review of executive orders is no mere formality. Many of those drafted in other departments are modified in OLC, sometimes in minor ways but often substantially. . . .
>
> The authority of the President to "make law" by executive order does not exist in mid-air. It must find its taproot in Article II of the Constitution or in statutes enacted by the Congress. In some instances, . . . a proposed executive order has been blocked on the ground that it exceeded the legal authority of the President . . . .[85]

The discussion here will focus on OLC's review of two of the many executive orders that were studied, modified, blocked, or issued, during my tenure in OLC. In the first case, the abundantly cautious OLC approach led to no order being issued; in the second, OLC approved an executive order that resulted in a vast expansion of the nation's territory.

#### A.  *Pornography At The Government Store*

The Attorney General's Commission on Pornography recom-

---

[85] Frank M. Wozencraft, *OLC: The Unfamiliar Acronym*, 57 A.B.A. J. 33, 35 (1971).

mended a variety of ways in which the impact of pornography on society and its denigration of women and abuse of minor children might be contained consistent with constitutional guarantees.[86] In its deliberations, the Commission learned of a troubling fact: "[t]he Federal Government is one of the single largest distributors of sexually explicit material, some of which may be legally obscene. The General Services Administration licenses 526 shops in federal buildings. . . . The military operates 413 major retail stores and thousands of smaller retail outlets throughout the world."[87] To address this embarrassment, the White House requested that OLC draft an executive order to rid federal establishments "of obscenity and child pornography, as well as restricting minors' access to indecent or sexually explicit materials, on federal lands and in federal stores, both military and civilian."[88]

The order to accomplish the above purposes was completed and approved as to form and legality by OLC. At that point, however, Congress, in the person of Senator Armstrong, learned of the effort and pressed for a more expansive executive order that would rid federal property of all sexually explicit material, even that like *Playboy*, which by judicial decree would be within the ambit of protected speech. It fell to OLC to evaluate whether this more sweeping order would be constitutional.

OLC hedged. It concluded that there was a plausible constitutional argument not directly precluded by precedent that, where the government acts as a proprietor and must of necessity choose to sell some publications and not others, the exercise of that choice (deciding not to sell publications dealing with sexually explicit speech) should not be thought to violate the First Amendment. Nevertheless, OLC cautioned that it was unable to conclude that the courts would indulge this view and uphold the more expansive order. As a result, the more expansive order was not issued.

In retrospect, several things are troubling about OLC's answer.[89] First, it understates the wisdom of the "government as proprietor" position. It is important to pursue this because, in the wake of the military's "Tailhook" scandal, new legal inquiries are being made by the Pentagon as to its authority to ban sexually explicit magazines

---

[86] U.S. ATT'Y GEN. COMM'N ON PORNOGRAPHY FINAL REP. 215 (1986).

[87] *See* KMIEC, *supra* note 3, at 90 (*quoting* OFFICE OF POLICY DEV., REP. TO THE DOMESTIC POL. COUNCIL ON THE FAMILY 11 (1988)).

[88] *Id.*

[89] For which I take responsibility.

from military bases.[90] Common sense dictates that the government must, in proprietary circumstances, select some publications and exclude others. In doing so as a proprietor, content is necessarily relevant. "Logically, if one thought of a federal bookstore at the Gettysburg Memorial, few would think the government obliged to sell books there unrelated to the Civil War."[91] The same is generally true everywhere from the public school to the public library.[92]

Arguably, this proprietary discretion has since been more clearly articulated by the Supreme Court itself in *Rust v. Sullivan*,[93] upholding speech-related conditions on government funds. As the Court observed, "[w]hen Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as Communism and Fascism."[94] While some limiting arguments may be made pursuant to the Court's public forum cases[95] to distinguish government property from government money, in general, they are both fairly understood as subsidies. While the government may not condition the use of federal property or federal money on a citizen foregoing speech with personal resources, government necessarily must have the leeway to allocate its own resources to the interests and issues it favors.[96] This is part and parcel of governance.

Second, and more troubling for purposes of the present discussion, the OLC conclusion was driven more by the risk of adverse litigation than a dispassionate appraisal of the constitutional requirements. Like OLC's handling of the item veto, the opinion seems more calculated to preserve the status quo, than to fully demarcate the extent of the President's authority. Thus, this is more than a case of hindsight being clearer. Rather, it is another example of OLC's institutionalized reluctance to sanction practices other than those that are so thoroughly established as to be beyond all legal question.

There is nothing wrong with narrowly focused, highly cautious

---

[90] Charles Aldinger, *Pentagon to Study Whether Adult Magazines Can Be Banned*, Reuters, Oct. 15, 1992, *available in* LEXIS, Nexis Library, Wires file.

[91] KMIEC, *supra* note 3, at 91.

[92] *Cf.* Board of Education v. Pico, 457 U.S. 853, 870-71 (1982) (plurality ruling that a school board could not remove library books for narrowly partisan or political reasons).

[93] 111 S. Ct. 1759 (1991).

[94] *Id.* at 1773.

[95] In most cases, government stores are not public fora.

[96] For a discussion of the proper constitutional treatment of government speech, see Douglas W. Kmiec, *In the Aftermath of* Johnson *and* Eichman: *The Constitution Need Not Be Mutilated to Preserve the Government's Speech and Property Interests in the Flag*, 1990 B.Y.U. L. REV. 577, 624-37.

362            *CARDOZO LAW REVIEW*            [Vol. 15:337

legal advice, if the client understands that the advice originates from this perspective. However, having directly discussed the pornography executive order with President Reagan, I am not convinced that OLC legal advice is always received in this fashion. I suspect that President Bush may have been equally baffled by *his* OLC's negative response to recent public commentary by a former OLC head—to the effect that administrative authority exists, without new legislation, for the President to index the tax treatment of capital gains.[97]

Not every OLC review results in a negative answer as the OLC review of the executive order on the expansion of the territorial sea reveals.

### B.  *The Territorial Sea*

Prior to December 1988, the United States claimed a three-mile territorial sea. Quaintly based upon the distance a cannonball could be shot,[98] the U.S. position was at odds with the twelve-mile limit claimed by the signatories to the United Nation's Law of the Sea Convention, which the United States generally observes, but has not ratified. The more conservative U.S. claim created a number of national security difficulties, not the least of which was the presence of then-Soviet intelligence submarines 3.1 nautical miles offshore from San Diego, Norfolk and elsewhere. In addition, the smaller territorial claim provided only a limited secure area in which U.S. vessels could maneuver and train.

President Reagan formed an interagency group to address the policy issue of expanding the territorial sea claim of the United States. While these policy deliberations were highly favorable, substantial legal questions arose over how, and even whether, the President could unilaterally declare the new territorial area. In mid-August 1988, President Reagan asked OLC to examine the issue.

The issues presented were novel and difficult ones. The territorial sea is treated under international law as the equivalent of a nation's land territory. Because of this, the proposed expansion of the territorial sea raised the issue of the ways in which the United States may acquire and assert sovereignty over territory in general. Senator (later Justice) Sutherland observed, "[t]here is no provision in the Constitution by which the national government is specifically author-

---

[97] *See* Charles J. Cooper, *Capital Gains, as Seen by Congress in 1918*, WALL ST. J., Sept. 4, 1992, at A8; Charles J. Cooper, *Capital Gains Tax and Presidential Power*, WALL ST. J., Aug. 31, 1992, at A10.

[98] *See* The Ann, 1 F. Cas. 926 (C.C.D. Mass. 1812) (No. 397); *see generally* SWARZ-TRAUBER, THE THREE-MILE LIMIT OF TERRITORIAL SEAS 23-35 (1972).

ized to acquire territory; and only by a great effort of the imagination can the substantive power to do so be found in the terms of any or all of the enumerated powers."[99] Thus the territorial sea question was similar to that addressed by OLC in the matter of the item veto. This time, however, constitutional silence did not defeat the President's initiative.

OLC concluded that despite the absence of explicit constitutional direction, the President could extend the territorial sea from three to twelve miles by proclamation.[100] In reaching this conclusion, OLC was assisted by prior presidential action that was perceived as less timorous than that which constrained OLC's analysis of the item veto, namely the broad authority exercised by the President in matters of foreign relations, some of which has been traced by the Supreme Court to originate outside the constitutional document.[101] In particular, the Court has recognized that it is the President who has "the power to determine how far this country will claim territorial rights in the marginal sea as against other nations."[102] But claims of territorial sea may either be claims of limited jurisdiction, that is, for particular purposes like sea-bed mining, or claims of full sovereignty. It was the desire of the President to assert the latter, which would require, as it turned out, closer analysis.

The authority of the federal government to acquire and assert sovereignty over new territory was seriously questioned in the years immediately following the adoption of the Constitution. It was argued that the Constitution's silence reserved this power to the States.[103] This issue and others, of course, bedeviled Thomas Jefferson's Louisiana Purchase.[104] By 1828, however, Chief Justice John Marshall could observe that "[t]he Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty."[105] The question

---

[99] GEORGE SUTHERLAND, CONSTITUTIONAL POWER AND WORLD AFFAIRS 52 (Johnson Reprint Corp. 1970) (1919).

[100] The OLC opinion can be found in Douglas W. Kmiec, *Legal Issues Raised by the Proposed Presidential Proclamation to Extend the Territorial Sea*, 1 TERR. SEA J. 1 (1990) and 12 Op. Off. Legal Counsel 301 (Prelim. Print 1988). OLC opinions, like Attorney General opinions, have been officially published by the government through 1992.

[101] *See* United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315-22 (1936).

[102] United States v. Louisiana, 363 U.S. 1, 35 (1960).

[103] 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1317 (3d ed. Boston, Little, Brown & Co. 1858).

[104] For a discussion of the history of the Louisiana Purchase see 1 THE WRITINGS OF ALBERT GALLATIN 114 (Henry Adams ed., J.B. Lippincott & Co. 1879); Downes v. Bidwell, 182 U.S. 244, 251-53 (1901).

[105] American Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 542 (1828).

for OLC was whether sovereignty over new territory could also be asserted by presidential proclamation.

It is here that past presidential practice became significant. It can be argued that President Washington's three-mile limit claim was one of full sovereignty. There is little in the correspondence of Secretary of State Jefferson, who implemented Washington's proclamation, to suggest otherwise.[106] In addition, John Marshall and Joseph Story both later viewed the territorial sea premised upon this proclamation, as part of the territory of the United States.[107] Beyond the venerable historical example of Washington's proclamation, however, there were only a handful of instances in which presidents acting alone had acquired territory. Most territorial claims can be traced to treaty. Nevertheless, in 1869, the United States formally took possession of the Midway Islands by order of the Secretary of the Navy.[108] The Navy vessel U.S.S. Bennington laid claim to Wake Island on January 17, 1899.[109] Finally, Trivial Pursuit buffs may remember Millard Fillmore's unilateral acquisition of Horseshoe Reef near Buffalo for a lighthouse.[110]

The occasions for unilateral presidential acquisition may be sparse, but reasoning from the structural position occupied by the President in the constitutional scheme—our "sole organ" in matters of foreign affairs—OLC was right to accord them significance. Moreover, OLC could find no example where the Congress had asserted jurisdiction or sovereignty over territory, apart, of course, from the Senate's formal treaty ratification role. Congress does have the constitutional power to admit new states[111] and to dispose of and regulate the property of the United States,[112] but upon close examination, neither authority proved wholly apposite. While the Supreme Court has never definitively settled the issue, it has suggested that Congress cannot establish a state boundary greater than the territorial sea established by the President.[113]

On December 27, 1988, the territory of the United States, in the

---

[106] Letter from Jefferson to British Minister George Hammond (Nov. 8, 1793), *reprinted in* H.R. Exec. Doc. No. 324, 42d Cong., 2d. Sess. 553-54 (1872).

[107] Church v. Hubbart, 6 U.S. (2 Cranch) 187, 234 (1804) (Marshall, C.J.); The Ann, 1 F. Cas. at 926-27 (Story, J.).

[108] S. Rep. No. 194, 40th Cong., 3d Sess. 1 (1869).

[109] 1 Moore, International Law Digest § 111, at 554-55 (1906).

[110] 5 T.I.A.S. No. 145 (1937).

[111] U.S. Const. art. IV, § 3, cl. 1.

[112] U.S. Const. art. IV, § 3, cl. 2.

[113] *See, e.g.*, United States v. Louisiana, 363 U.S. 1, 35, 51 (1960). For a view asserting a larger Congressional role, see Jack H. Archer & Joan M. Bondareff, *The Role of Congress In Establishing U.S. Sovereignty Over the Expanded Territorial Sea*, 1 Terr. Sea J. 117 (1990).

form of the territorial sea, was extended from three to twelve miles.[114] The proclamation was largely drafted, and as with all executive orders, approved for form and legality by OLC. In the spring of 1992, the House Merchant Marines and Fisheries Committee and the Foreign Affairs Committee approved legislation designed to further the implementation of the proclamation. The legislation recites that it "ratifies" President Reagan's acquisition order.[115]

Not every OLC action is embraced by Congress as the following discussion of OLC's role in executive privilege claims suggests.

## IV. THE ASSERTION OF EXECUTIVE PRIVILEGE

In *United States v. Nixon*,[116] the Supreme Court acknowledged the "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties"[117] stating that "the importance of this confidentiality is too plain to require further discussion."[118] As a matter of political reality, however, justification for maintaining the confidentiality of executive branch material has seldom been "too plain" for Congress. OLC is repeatedly called upon to advise executive agencies confronted with congressional requests for confidential information. By memorandum, President Reagan specifically directed cabinet officers to consult with the head of OLC handling these requests.[119]

In March 1989, OLC responded to a request for guidance by an interagency group composed mostly of Inspectors General ("IG")—that is, internal agency auditors charged under law to keep the heads of agencies and Congress apprised of agency fraud or other serious problems and abuses. In particular, this group inquired as to the proper framework for responding to congressional requests for confidential information about open criminal investigations.

There are three generally recognized components of executive privilege: state secrets, law enforcement, and deliberative process. The Court in *Nixon* opined that the state secrets component is entitled to the greatest deference, but the others are hardly insignificant. While confidentiality is often sought for executive deliberations gener-

---

114 Proclamation No. 5928, 54 Fed. Reg. 777 (1988).
115 H.R. 3842 *discussed in* 9 OCEAN POL. NEWS 4 (1992).
116 418 U.S. 683 (1974).
117 *Id.* at 705.
118 *Id.*
119 Memorandum for the Heads of Executive Departments and Agencies (Nov. 4, 1982), *reprinted in* PETER M. SHANE & HAROLD H. BRUFF, THE LAW OF PRESIDENTIAL POWER 182-83 (1988) [hereinafter Memorandum].

366            *CARDOZO LAW REVIEW*                [Vol. 15:337

ally in order to invite candor, the need for maintaining the privilege in law enforcement can be paramount. As Attorney General Robert Jackson opined:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.
>
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.[120]

Beyond being of aid to defendants, premature disclosure of open law enforcement files raises the risk of revealing sensitive techniques, methods, or strategies, as well as the identities of informants. Public perception of fairness might also be damaged, as a grant of access may imply inappropriate executive responsiveness to efforts to either advance or impede prosecution. Relatedly, consideration must also be given to the rights of innocent parties who may be discussed in law enforcement files. The fact that an information request originates with Congress does not obviate these concerns. As one court commented, there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm."[121]

This is not to say that congressional requests should be disregarded. Congress has legitimate oversight authority that is "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."[122] Thus, each chamber of Congress has power, "through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution."[123] Nevertheless, the Court has recognized that "[b]road as it is, the power [of Congress] is not, however, without limitations. Since Congress may only investigate into those

---

[120] 40 Op. Att'y Gen. 45, 46 (1941).
[121] Delaney v. United States, 199 F.2d 107, 114 (1st Cir. 1952).
[122] Barenblatt v. United States, 360 U.S. 109, 111 (1959).
[123] McGrain v. Daugherty, 273 U.S. 135, 160 (1927).

areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government."[124]

In short, each request for executive material from Congress contemplates a balancing of a number of factors arising out of the separation of powers. The key factors to be assessed are the nature of the Congress's oversight interest in the information and the interest of the executive in maintaining confidentiality. A fair application of this balancing formula thus instructs OLC to make every effort to accommodate requests within legitimate congressional oversight authority while remaining faithful to its law enforcement responsibilities. President Reagan underscored this posture by stating that it was the policy of his "Administration to comply with Congressional requests for information to the fullest extent consistent with constitutional and statutory obligations of the Executive Branch."[125]

Because of this accommodation posture, only rarely do congressional requests for information result in a subpoena. In most cases, the informal process of negotiation and accommodation is sufficient to resolve any dispute. That said, for accommodation to work, each side must carefully identify its particular interests. As one federal court put it in the Watergate matter, Congress must be able to "point[ ] to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged executive materials.[126] For its part, the executive does have strong law enforcement interests in maintaining the integrity of an ongoing investigation.[127] These interests recede to some extent after an investigation is closed because there is then less worry about Congress appearing to be an illicit partner in a prosecution or about improper pretrial publicity. However, some concerns remain even with closed investigations. For example, there is still the risk of disclosing informants or innocent parties mentioned in the course of an investigation.

Based on the above considerations, OLC advised the interagency group of Inspectors General that except in extraordinary circumstances an IG must decline to provide confidential information about open criminal investigations. This prompted a sharp response from the Counsel to the House of Representatives. The OLC opinion was

---

[124] *Barenblatt*, 360 U.S. at 111-12.

[125] Memorandum, *supra* note 119, at 182-83.

[126] Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 733 (D.C. Cir. 1974).

[127] *See supra* text accompanying notes 119-21.

characterized as "gratuitous" and a "blanket stonewalling of Congressional inquiries" that was "plainly without merit."[128] It was further asserted that the Inspector General Act of 1978[129] specifically required Inspectors General to provide information to Congress on open criminal investigations. OLC had addressed this point as well, finding that neither the text nor legislative history of this Act imposed such a requirement.[130] Nor could it, given the constitutional basis for maintaining the confidentiality of this executive branch information.

It may be that the House reacted this strongly to the OLC opinion in order to test the mettle of the new Bush administration. The House Counsel highlighted that this was "the first official pronouncement during the Bush Administration regarding withholding of information from Congress."[131] Whatever its motivation, the congressional reaction greatly exaggerated the disagreement between Congress and the Executive and it seemed calculated more to confront than foster the sensitive balancing and accommodation necessary to resolve executive privilege disputes.

## V.  THE SETTLEMENT OF INTRABRANCH DISPUTES

One of the most important functions performed by the Attorney General and, by delegation, OLC, is the resolution of legal disputes among executive agencies. By law, "[t]he head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."[132] There are few limitations on the availability of this dispute resolution capacity, other than that the issue presented must actually arise in the administration of an executive department.[133] This statutory authority has been embellished by two executive orders. Executive Order 2877 provides that "any opinion or ruling by the Attorney General upon any question of law arising in any department, executive bureau, agency or office shall be treated as binding upon all departments, bu-

---

128 Memorandum from Steven R. Ross & Charles Tiefer, General Counsel & Deputy General Counsel to the Clerk of the House of Representatives to Congressman Jack Brooks, Chairman, Committee on the Judiciary, 2, 4 (May 2, 1989) (copy on file with author).

129 Pub. L. No. 95-452, *reprinted as amended in* 5 U.S.C. app. (1988 & Supp. III 1992).

130 For example, OLC quoted the legislative history: "It would be highly improper and often a violation of due process for an [IG's] report to list the names of those under investigation or to describe them with sufficient precision to enable the identities of the targets to be easily ascertained." 124 CONG. REC. 30,949 (1978); S. REP. No. 1071, 95th Cong., 2d Sess. 30 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2705.

131 Memorandum, *supra* note 119, at 1.

132 28 U.S.C. § 512 (1988).

133 *See, e.g.*, 31 Op. Att'y Gen. 234, 236 (1918); 31 Op. Att'y Gen. 127, 131 (1917); 20 Op. Att'y Gen. 178, 181 (1891).

reaus or offices therewith concerned."[134]  In addition, Executive Order 12,146[135] "encourages" all executive agencies to submit legal disputes to the Attorney General,[136] and requires executive agencies "whose heads serve at the pleasure of the President" to submit such disputes to the Attorney General "prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere."[137]

The scope of authority exercised by OLC at the delegation of the Attorney General under these provisions was directly challenged in several matters in the late 1980s.  At issue were disputes between the Department of Labor ("Labor") and the Department of Housing and Urban Development ("HUD") and the Veterans Administration ("VA") over the proper application of the Davis-Bacon Act.[138]  Davis-Bacon provides generally that contractors and subcontractors performing construction work financed by federal money shall be paid a "prevailing wage" rate set by the Secretary of Labor.  This prevailing wage is often far higher than the wage that could be negotiated on the open market in fair competition.[139]

HUD and the VA argued that Labor had misapplied the law in a number of contexts.  HUD argued that Labor could not properly require Davis-Bacon wages under the Housing and Community Development Act where federal money was not being used for actual construction work, but only for site acquisition, the purchase of equipment, or "soft costs," like engineering and architectural fees.  Labor initially took the position that all of these items triggered the payment of Davis-Bacon wages on the subsequent construction be-

---

[134] Exec. Order No. 2,877 (1918), *discussed in* BAKER, *supra* note 7, at 9.

[135] Exec. Order No. 12,146 § 1-401, *supra* note 13, at 409.

[136] *Id.* at § 1-401.

[137] *Id.* at § 1-402. The distinction between executive agencies and executive agencies with heads removable by the President arguably enables the Attorney General to resolve a dispute between independent agencies or between an independent agency and an executive agency. It has been OLC's practice to issue legal opinions to independent agencies if, in advance of resolution, they agree to abide by the result.

Executive Order 12,146 may have been issued because previous Attorneys General felt that their opinion function under 28 U.S.C. § 512 was limited to executive agencies fully within one of the executive departments. *See, e.g.,* 20 Op. Att'y Gen. 312, 313 (1892), stating that:

> The Civil Service Commission is not included within any of the great Departments of Government . . . . Until the Commission shall request the President, to whom they are directly responsible, to present the question of law arising in the discharge of their duties to the Attorney General, he is not called upon to give, and should not under the law give, his opinion.

[138] 42 U.S.C. § 5310 (Supp. II 1991).

[139] *See, e.g.,* John T. Berg & Ralph C. Erickson, *An Evaluation of the Impact of the Davis-Bacon Act,* 6 GOV'T UNION REV., Summer 1985, at 1.

370                     *CARDOZO LAW REVIEW*                [Vol. 15:337

cause they were "integrally and proximately related" to the construction.[140] Similarly, in a separate instance, Labor demanded the retroactive payment of Davis-Bacon wages by the VA where the VA had entered into a lease pursuant to which the lessor chose to construct a new facility to lease to the VA.[141]

The legal issues in each of these cases were being closely monitored by interested parties outside government, and the respective positions were vigorously argued in the briefs or position papers submitted to OLC by the contending sides. OLC's resolution of the matter, however, was slowed by two factors. While OLC assiduously maintains a "judicial" posture in resolving executive branch disputes, and thus shuns ex parte contacts with either side, political pressure was brought by Labor on the Deputy Attorney General to try to "settle" the HUD dispute without the issuance of a formal OLC opinion. This proved largely unsuccessful, and not surprisingly therefore, HUD continued to press OLC for a definitive resolution.

With informal settlement impossible, Labor directly challenged the opinion-writing jurisdiction of the Attorney General and OLC. In the HUD matter, Labor contended that a government reorganization plan placed the proper interpretation of Davis-Bacon solely with the Secretary of Labor.[142] OLC conceded that the reorganization plan allowed Labor to coordinate the application of Davis-Bacon, but by virtue of the separate statutory directive to the Attorney General to render legal advice, it could not preclude the head of another department from asking for an opinion with regard to a question of law arising in the administration of his department. OLC cited an opinion by Attorney General Levi[143] in an analogous matter in support of its determination.

Labor then tried to circumvent OLC jurisdiction by modifying its previous opinion which had triggered HUD concern and the broad application of Davis-Bacon, even to site acquisition. OLC denied that this change in position precluded it from issuing an opinion, maintain-

---

[140] 11 Op. Off. Legal Counsel 119 (Prelim. Print 1987).
[141] 12 Op. Off. Legal Counsel 109 (Prelim. Print 1988).
[142] The referenced plan provides:
  In order to assure coordination of administration and consistency of enforcement of the labor standards provisions of each of the [several federal laws including the Housing and Community Development Act of 1974 among others] by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations, and procedures, which shall be observed by these agencies . . . .
Reorg. Plan No. 14 of 1950, 15 Fed. Reg. 3176 (1950), *reprinted as amended in* 5 U.S.C. app. at 1261 (1988), *and in* 64 Stat. 1267 (1970).
[143] 43 Op. Att'y Gen. No. 8 (1977).

ing that since the Secretary of HUD continued to ask OLC for an opinion with respect to a legal question arising in the administration of his department, it did not matter whether a present dispute existed. OLC reasoned that under Title 28 the Attorney General is required to answer the legal query of a cabinet member, and the withdrawal of the previous Labor view "is simply irrelevant" to the exercise of the statutory right.[144]

OLC buttressed its jurisdictional conclusion by referencing the Attorney General's litigating authority,[145] and the general prohibition against the head of an executive department employing an attorney for the agency litigation, rather than referring the matter to the Department of Justice.[146] OLC argued that merely because Congress had provided a solicitor for Labor did not change this general prohibition, for his authority is narrowly circumscribed. In any event, the Labor Solicitor cannot displace the Attorney General's authority to render the exclusive and ultimate view of the position of the United States on the proper interpretation of statutes before the courts.[147]

In the VA matter, OLC similarly sustained its own jurisdiction. Here, Labor argued that Executive Order 12,146 allowing the Attorney General to resolve a dispute did not apply because only the VA had submitted the dispute for resolution, not Labor. OLC found this to be a misreading of the Executive Order, reasoning that while section 1-401 of the order states that each agency is encouraged to submit disputes, it does not require that every agency involved in a dispute request an opinion from the Attorney General. OLC reiterated that the Attorney General's statutory authority to provide the VA with an opinion on a legal question arising in the course of the administration of its work could not be finessed.

On the merits of both matters, OLC found Labor's broad application of Davis-Bacon to be contrary to the plain text and legislative history of the respective statutory provisions under review.

While the VA opinion request was pending in OLC, a union rushed into court and moved for summary judgment characterizing Labor's view as "final agency action." The district court, in *Building*

---

[144] 11 Op. Off. Legal Counsel 119, 122 (Prelim. Print 1987).

[145] 28 U.S.C. § 516 (1988).

[146] 5 U.S.C. § 3106 (1988).

[147] OLC observed that the HUD-Labor dispute over the proper application of the Davis-Bacon Act in the housing context had spilled into the courts in pending litigation. OLC referenced that fact here as support for having the Attorney General resolve the matter. However, this is a bit unusual. OLC generally refrains from issuing an opinion when a matter is in litigation. *See* Wozencraft, *supra* note 85, at 34 (citing LAGELUTTIG, THE DEPARTMENT OF JUSTICE OF THE UNITED STATES xi (1927)).

372                    *CARDOZO LAW REVIEW*                [Vol. 15:337

*and Construction Trades Department, AFL-CIO v. Turnage*,[148] upheld Labor's interpretation on the theory articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[149] *Chevron* requires judicial deference to reasonable agency interpretation of a statute in the absence of a clear and unambiguous indication of Congressional intent to the contrary. The *AFL-CIO* court did not refer to the OLC opinion, even though it was subsequently made aware of it in petition for review submitted by the VA. Unfortunately, the court assumed, incorrectly, that the Labor view continued to be the final executive agency action, and that the OLC opinion was merely a statement of litigation position. Thus, the trial judge failed to perceive the extent to which, by statute and executive order, the OLC opinion necessarily supplanted the Labor decision.

OLC believed the district court decision to be wrong as a matter of law and that Labor's interpretation was not entitled to *Chevron* deference. Nevertheless, because of the trial court's confused understanding of the procedural history, the Civil Division, with OLC concurrence, did not pursue an appeal.[150] OLC acknowledged that Labor must abide by the decision in the particular case adjudicated; however, it informed Labor that it expected it to adhere to the holding of the OLC opinion in all future cases.

The HUD and VA disputes with Labor reveal the extent to which OLC serves as the legal adhesive for the unitary executive, and the extent to which it vigorously defends the privilege and the responsibility of that role.

### A.  *Afterword: An "Independent" Attorney General?*

There has been a longstanding debate over whether the Attorney General is the President's advocate or an impartial interpreter of the law. The debate has gone unresolved, and the nation has done well, though at different times, under both types. Attorneys General as advocates bring intellectual coherence to the legal direction of a political administration. They get things done. By contrast, these advocates are thought to be ill-suited for times of self-doubt or divisive conflict. Here, an Attorney General above the political fray, as it were, is the order of the day. In this regard, it is not surprising to find the immediate Attorneys General of the post-Watergate era to be described as nonpartisan or independent. During the 1976 campaign, Griffin Bell

---

[148] 705 F. Supp. 5 (D.D.C. 1988).

[149] 467 U.S. 837 (1983); *see* Douglas W. Kmiec, *Judicial Deference to Executive Agencies and the Decline of the Nondelegation Doctrine*, 2 ADMIN. L.J. 269, 271-80 (1988).

[150] Letter to Thorn from Kmiec (Jan. 23, 1989) (copy on file with author).

persuaded Jimmy Carter to announce on "Meet the Press" that if elected he would establish an independent Department of Justice, with an Attorney General serving a longer term than the President.[151] Unfortunately, when Attorney General Bell asked OLC to implement the suggestion, Bell reports that OLC concluded that it would be unconstitutional insofar as it would interfere with the President's constitutional duty to "take care that the laws be faithfully executed."[152]

Bell was not the first to suggest the creation of an independent Attorney General. Then Senator Lloyd Bentsen at one time attached an amendment to the Ethics in Government Act to preclude the President from nominating anyone for Attorney General who had served as a high-level campaign adviser to the President.[153] One institutional reform that has taken root was to separate the Attorney General from the day-to-day handling of federal litigation by creating the assistant attorneys general for the civil and criminal divisions.[154]

OLC was not created to separate the Attorney General from his opinion function. However, this separation has largely occurred. It is probably fair to describe the modern experience of the heads of OLC in the last thirty years as one of remarkable independence and latitude. Opinion requests seldom come through the Attorney General, but rather directly to OLC, and they are seldom "cleared" by the Attorney General in any formal way before their release.[155] Indeed, OLC's quasi-judicial stance allows OLC to regularly rebuff the inquiries of curious members of the Attorney General's personal staff and certainly "lesser mortals" in other departmental divisions or outside the Department. In a few cases, even the Attorney General has adopted a level of deference to OLC's—delegated, it should be remembered—opinion function. Griffin Bell's recollection in his memoir of how OLC decided against his independent Attorney General notion on constitutional grounds suggests that he viewed the issue as "decided by OLC," not as an issue for further legal examination.

Of course, if the Attorney General is unquestioning of OLC decisions, it is likely that the President will be as well.[156] One former

[151] Griffin B. Bell & Ronald J. Ostrow, Taking Care of the Law 28 (1982).
[152] *Id.*
[153] 33 Cong. Q. Almanac 581, 583 (1977).
[154] Baker, *supra* note 7, at 169, citing *Senate Hearings Before the Select Comm. on Investigation of Att'y Gen. Harry M. Daugherty*, 68th Cong., 1st Sess., pt. 9, at 2565 (1924).
[155] This is reported to be the experience of OLC dating back to Lyndon Johnson. *Id.* at 11.
[156] A former OLC attorney observed: "Sometimes I wondered whether the attorney general had any idea what legal advice the president was relying on, or the president, where it [the advice] came from. He may assume it comes from the attorney general, but ninety-nine times out of one hundred times, it does not." *Id.* at 12 (citing an interview with Thomas Kauper

OLC attorney in the Nixon administration reports how President Nixon announced the abolition of the U.S. Board of Tea Tasters to demonstrate "his seriousness about cutting the budget."[157] The decision was overridden, however, by an OLC opinion that this statutory board could not be eliminated by unilateral executive action.

If any further evidence of OLC's independence were needed, it can be gleaned from the declining number of formal Attorney General opinions. A search of the LEXIS data base reveals that since 1974, less than ten percent of the opinions of the Department of Justice have been signed by the Attorney General. The database records contain no opinions by Attorneys General Thornburgh or Barr.[158]

Is this OLC independence a salutary development? The answer may depend on the function being performed by OLC. In matters of dispute settlement, OLC's carefully circumscribed quasi-judicial role does enhance impartiality and lend credibility to its opinions. In contrast, when OLC is asked to legally review aspects of the President's program or pending legislation, this guise of impartiality is seldom appreciated by those outside the executive branch, and as is suggested by OLC's handling of the item veto and pornography executive order matters, possibly misleading to OLC's client, the President.

Scholars who have examined the issue of whether an Attorney General should be an advocate for the President or an impartial judicial decisionmaker have concluded that a successful Attorney General may well require both qualities: "His Advocate features must be tempered with this important Neutral trait."[159] Yet, few argue that the Attorney General can merely be the President's judge. At his confirmation hearing, Griffin Bell [a former judge] stated: "I will be an advocate attorney general, not an arbiter as I was as a judge."[160]

The fact that OLC relieves the Attorney General of virtually all of the internal executive branch dispute settlement function should lessen the conflicting loyalties felt by an Attorney General. But this then may aggravate the conflicts for OLC. After all, if an Attorney General must be both an advocate and impartial, OLC can only faithfully and effectively serve the Attorney General by being sensitive to when it is appropriate for OLC, as the Attorney General's lawyer, to play one role or the other.

---

who served as an attorney-advisor in OLC and assistant attorney general in the Antitrust Division in the Nixon and Ford Administrations).

[157] *Id.* at 6.

[158] Excluding, of course, opinions written by Attorney General Barr while he headed OLC.

[159] BAKER, *supra* note 7, at 179.

[160] *Hearings on Griffin Bell, Attorney General Designate*, 95th Cong., 1st Sess. 144 (1977).