**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

## JOINT APPENDIX
### Volume V of XII
### (Pages: 1806 - 2228)

———————————

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

*Counsel for Appellant*

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellee*

## TABLE OF CONTENTS
## Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Indictment**
**filed November 12, 2021.**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
**on November 15, 2021.**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
**on November 18, 2021.**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
**on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
**filed February 4, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **158**

**Exhibits:**

**1.    Letter**
**dated January 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **186**

**2.    Letter**
**dated January 28, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **194**

**Exhibits** to

**Defendant's Motion to Compel Discovery**
     **filed February 4, 2022, Continued:**

3.      Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.      FBI Interview of Robert J. Costello, Esquire
          dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 169

7.      H. Res. 503, Sec. 5(c)(6)(A) & (B)
          dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.      Procedures Adopted by 117th Congress
      Regulations for Use of Deposition Authority
          dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.      FBI Interview of U.S. House of Representatives
      General Counsel Doug Letter
          dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 231

10.    Letter from Ronald C. Machen Jr., U.S. Attorney,
      to Speaker of the House John A. Bohner
          dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.    Prosecution for Contempt of Congress of an
      Executive Branch Official Who Has Asserted a
      Claim of Executive Privilege
          8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.    Attempted Exclusion of Agency Counsel from
      Congressional Depositions of Agency
      Employees, Slip Op.
          dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,

     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

    Attachment:

    Letter

       dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,

     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

    Exhibit:

    1.    Declaration of Robert J. Costello, Esquire

       sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,

     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

    Exhibit:

    1.    Table That Sets Forth the Positions

       Taken by the Government and Defense. . . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel, With Exhibits,**

    filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**Exhibits:**

1.    **E-mail Correspondence [US-001038-40]**
        **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark**
        **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain**
        **dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange**
        **dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
      **on March 16, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **457**

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion** *in Limine* **to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
      **filed March 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **556**

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel,**
**With Exhibits,**
      **filed March 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **565**

      <u>**Exhibits:**</u>

    **1.**    **Senate Committee Investigation**
          **dated August 8, 1958.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **577**

    **2.**    **Application of 28 U.S.C. § 458 to Presidential**
        **Appointments of Federal Judges**
          **dated December 18, 1995.**. . . . . . . . . . . . . . . . . . . . . . . . . **584**

    **3.**    **Letter from Michael B. Mukasey, Attorney**
        **General, to the Hon. Nancy Pelosi, Speaker of the**
        **House of Representatives**
          **dated February 29, 2008.**. . . . . . . . . . . . . . . . . . . . . . . . . **599**

**<u>Exhibits</u> to**
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion *in Limine* on Advice of Counsel**
        **filed March 22, 2022, Continued:**

    4.    **Response to Congressional Requests for**
          **Information Regarding Decisions Made Under the**
          **Independent Counsel Act,**
                **10 Op. O.L.C. 68 (1986)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **601**

    5.    **Rex Lee, Executive Privilege, Congressional Subpoena**
          **Power, and Judicial Review: Three Branches,**
          **Three Powers, and Some Relationships,**
                **1978 B.Y.U. L. Rev. 231, 259** . . . . . . . . . . . . . . . . . . . . . . . . **619**

    6.    **Whether the Department of Justice May Prosecute**
          **White House Officials for Contempt of Congress,**
                **2008 WL 11489049 (O.L.C.).** . . . . . . . . . . . . . . . . . . . . . . . . **688**

    7.    **Congressional Oversight of the White House,**
                **2021 WL 222744 (O.L.C.).** . . . . . . . . . . . . . . . . . . . . . . . . . . **692**

**<u>Amended Exhibit</u> to**
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion *in Limine* on Advice of Counsel**
        **filed March 23, 2022:**

    3.    **Letter from Michael B. Mukasey, Attorney**
          **General, to the Hon. Nancy Pelosi, Speaker of the**
          **House of Representatives**
                **dated February 29, 2008** . . . . . . . . . . . . . . . . . . . . . . . . . . . **722**

**Government's Response to Defendant's Supplemental Brief in**
**Opposition to the Government's Motion *in Limine* to Exclude**
**Evidence and Argument Relating to Good-faith**
**Reliance on Law or Advice of Counsel**
        **filed March 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **725**

Defendant's Supplemental Reply on Waiver
      filed March 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

Order
      filed April 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

Government's Motion *in Limine* to Exclude Evidence of
Department of Justice Opinions and Writings,
With Exhibits,
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

      <u>Exhibits:</u>

      1.    Letter from White House Deputy Counsel to Costello
             dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

      2.    Letter from Justin Clark to Costello
             dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

      3.    Emails from Justin Clark to Costello
             various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

Government's Motion *in Limine* to Exclude Evidence
Relating to Objections to Subpoena That Defendant Waived,
With Exhibit,
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

      <u>Exhibit:</u>

      1.    Subpoena
             dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 781

Government's Motion *in Limine* to Exclude Evidence of the
Defendant's Prior Experience with Subpoenas
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**
    **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

    <u>**Exhibits:**</u>

    **A.**    **H. Res. 8 (Adoption of Rules for 117th Congress)**
        **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

    **B.**    **H. Res. 503 (Authorizing House Select Committee)**
        **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

    **C.**    **Regulations For Use Of Deposition Authority**
        **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

    **D.**    **Amerling and Letter FBI 302**
        **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
### Joint Appendix Volume III of XII

**Page:**

**<u>Exhibits</u> to**
**Defendant's Motion to Dismiss the Indictment**
**filed April 15, 2022, Continued:**

E.    **Rules of the 117th Congress**
      **dated February 2, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938

F.    **Republican Conference Rules of the 117th Congress**. . . . . . 991

G.    **Congressional Oversight of The White House,**
      **45 Op. O.L.C. slip op. (Jan. 8, 2021)**. . . . . . . . . . . . . . . 1005

H.    **Assertion of Executive Privilege Concerning the**
      **Dismissal and Replacement of U.S. Attorneys**
      **dated June 27, 2007**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1065

I.    **Immunity of the Former Counsel to the President from**
      **Compelled Congressional Testimony,**
      **43 Op. O.L.C. slip op. (July 10, 2007)**. . . . . . . . . . . . . . 1075

J.    **Prosecution for Contempt of Congress of an Executive**
      **Branch Official Who Has Asserted a Claim of Privilege,**
      **8 Op. O.L.C. 101 (1984)**. . . . . . . . . . . . . . . . . . . . . . . . . . . 1079

K.    **Whether the Department of Justice May Prosecute**
      **White House Officials for Contempt of Congress,**
      **32 Op. O.L.C 65 (2008)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122

L.    **Application of 28 U.S.C. Sec. 458 to Presidential**
      **Appointments of Federal Judges,**
      **19 Op. O.L.C slip op. (December 18, 1995)**. . . . . . . . . . 1128

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**
        **filed April 15, 2022, Continued:**

M.    Randolph D. Moss, Executive Branch Legal Interpretation:
      A Perspective from the Office of Legal Counsel,
            52 Admin. L. Rev. 1303 (2000)...................... 1143

N.    Testimonial Immunity Before Congress of the
      Former Counsel to the President,
            43 Op. O.L.C. slip op. (May 20, 2019). ............. 1172

O.    Response to Congressional Requests for
      Information Regarding Decisions Made
      Under the Independent Counsel Act,
            10 Op. O.L.C. 68 (1986)........................... 1194

P.    Letter from Ronald C. Machen Jr., U. S. Attorney, to
      Speaker John A. Boehner
            dated March 31, 2015. ............................ 1220

Q.    Letter from Michael B. Mukasey, Attorney General, to
      Speaker of the House, Hon. Nancy Pelosi
            dated February 29, 2008........................... 1228

R.    Steven G. Bradbury, Memorandum for Attorneys of the
      Office Re: Best Practices for OLC Opinions
            May 16, 2005...................................... 1231

S.    Trevor W. Morrison, Stare Decisis in the
      Office of Legal Counsel,
            110 COLUM. L. REV. 1448 (2010)................... 1237

T.    Walter Dellinger, et al., Principles to
      Guide the Office of Legal Counsel
            dated Dec. 21, 2004. .............................. 1261

Exhibits to

Defendant's Motion to Dismiss the Indictment
    filed April 15, 2022, Continued:

U.    David J. Barron, Memorandum for Attorneys of the
      Office Re: Best Practices for OLC Legal
      Advice and Written Opinions
              dated July 16, 2010. .............................. 1268

V.    Frank H. Easterbrook, Presidential Review,
              40 CASE W. RES. L. REV. 905 (1990).............. 1275

W.    Presidential Authority to Decline to Execute
      Unconstitutional Statutes, OLC Mem. Op.
              dated November 2, 1984. ......................... 1302

X.    Douglas W. Kmiec, OLC's Opinion Writing Function:
      The Legal Adhesive for a Unitary Executive,
              15 CARDOZO L. REV. 337 (1993). ................ 1316

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

Y.    **Applying Estoppel Principles in Criminal Cases,**
        **78 YALE L.J. 1046 (1969)**. . . . . . . . . . . . . . . . . . . . . . . . . **1355**

Z.    **Anne Bowen Pouliun, Prosecutorial Inconsistency,**
       **Estoppel, and Due Process: Making the**
       **Prosecution Get its Story Straight,**
        **18 Cal. L. Rev. 1423 (2001)**. . . . . . . . . . . . . . . . . . . . . . . . **1384**

AA.   **Rex E. Lee, Executive Privilege, Congressional Subpoena**
       **Power, and Judicial Review: Three Branches, Three**
       **Powers, and Some Relationships,**
        **1978 B.Y.U. L. REV. 231 (1978)**. . . . . . . . . . . . . . . . . . . . . . **1441**

BB.   **John O. McGinnis, Models of the Opinion Function of the**
       **Attorney General: A Normative, Descriptive, and**
       **Historical Prolegomenon,**
        **15 CARDOZO L. REV 375 (1993)**. . . . . . . . . . . . . . . . . **1510**

CC.   **Griffin B. Bell, The Attorney General: The Federal**
       **Government's Chief Lawyer and Chief Litigator, or**
       **One Among Many?,**
        **46 FORDHAM L. REV. 1049 (1978)**. . . . . . . . . . . . . . . **1572**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
     **filed April 15, 2022, Continued:**

    DD.  Notes, The Immunity-Conferring
         Power of the Office of Legal Counsel,
            121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . . 1596

    EE.  U.S. Department of Justice, Criminal
         Resource Manual § 2055 (Public Authority Defense). . . . . 1621

Defendant's Notice of Filing,
With Attached Motion to Dismiss the Indictment and Exhibits Index,
    filed April 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

Government's Response to Defendant's
Notice under Federal Rule of Procedure 12.3
    filed April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

Defendant's Opposition to the Government's
Motion *in Limine* Based on Waiver
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698

Defendant's Opposition to the Government's
Motion to Exclude Prior Subpoena Evidence
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709

Defendant's Response to Government's Motion *in
Limine* to Exclude Evidence of Department of
Justice Opinions and Writings [Doc. 52]
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**

> **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

**<u>Exhibits:</u>**

> 1.  **Letter from Chairman Bennie G. Thompson to**
>     **Mr. Stephen K. Bannon**
>     > **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1793**

> 2.  **E-mail from Cooney to Costello**
>     > **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1796**

> 3.  **E-mail from Costello to Cooney**
>     > **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1800**

> 4.  **E-mail from Cooney to Costello**
>     > **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1803**

# TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

**Government's Opposition to**
**Defendant's Motion to Exclude Evidence**
   filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

**Defendant's Reply in Support of His Motion to Exclude Evidence**
   filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of Department of Justice Opinions and Writings**
   filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

**Government's Reply in Support of Motion *in Limine* to**
**Exclude Evidence Relating to Objections to**
**Subpoena That Defendant Waived**
   filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of the Defendant's Prior Experience with Subpoenas**
   filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

**Defendant's Reply in Support of His Motion to Dismiss Indictment,**
**With Exhibits,**
   filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

   Exhibits:

   1.    **Letter from Chairman Bennie G. Thompson to**
         **Mr. Stephen K. Bannon**
            dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 1885

   2.    **Transcript of Oral Argument**
         **Before the Honorable Carl J. Nichols**
            on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to
**Defendant's Reply in Support of His Motion to Dismiss Indictment**
        **filed May 17, 2022, Continued:**

3.     **Letter from Costello to Congressman Thompson**
                **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1994

4.     **Letter from Congressman Thompson to Costello**
                **dated October 19, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
        **filed May 25, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2002

        **Attachment:**

        **Brief of United States House of Representatives as**
        *Amicus Curiae* **In Support of the Department of Justice**
                **dated May 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
        **filed May 25, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2035

        **Attachment:**

        **Brief of the U.s. House of Representatives Minority Leader**
        **Kevin O. Mccarthy and the U.s. House of Representatives**
        **Minority Whip Stephen J. Scalise as Amicus Curiae**
                **dated May 24, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2050

**Defendant's Notice Regarding Amicus Briefs**

    **filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2065**


**Motion to Quash,**

**With Attachment,**

    **filed June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2072**


    <u>**Attachment:**</u>


    **Memorandum of Points and Authorities**

    **In Support of Motion to Quash,**

    **With Exhibits,**

        **dated June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
  on June 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2229

**Government's Omnibus Motion** *in Limine*
  filed June 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2408

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
  filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2425

  <u>Exhibits:</u>

  1. **Letter from Bannon's Counsel to Prosecutors**
    dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2442

  2. **Letter from Prosecutors to Bannon's Counsel**
    dated June 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2445

  3. **Letter from Justin Clark to Scott Gast**
    dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2448

  4. **Letter from Pat Cipollone to Chairman Nadler**
    dated September 16, 2019. . . . . . . . . . . . . . . . . . . . . . . . 2453

  5. **Plaintiff's Motion for Judgment on the Pleadings, or in the**
    **Alternative, for Summary Judgment, & in Opposition to**
    **Defendants' Motion for Summary Judgment**
    dated May 20, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2459

**Defendant's Opposition to Motion to Quash**
  filed June 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2597

## TABLE OF CONTENTS
### Joint Appendix Volume VII of XII

Page:

Government's Opposition to Defendant's Motion to Compel
    filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

Joint Proposed Jury Instructions,
With Attachment,
    filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

    Attachment:

    Manual of Model Criminal Jury Instructions
        dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

Government's Objections to Defendant's Proposed Jury Instructions
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

Defendant's Opposition to Government's Omnibus Motion *in Limine*
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

Office of General Counsel U.S. House of Representatives'
Reply in Support of Motion to Quash,
With Exhibits,
    filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

    Exhibits:

    A.    Order - *U.S. v. Moussaoui*
        dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

    B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
        dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

    C.    Order Granting Motion to Quash Subpoena on
        U.S. Representative Maxine Waters - *D.C. v. Hayes*
        dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel Meadows and Scavino Declination Discovery, With Exhibit,**

     filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

     <u>Exhibit:</u>

     1.    **Memorandum**

           dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion** *in Limine*

     filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion** *in Limine* **to Exclude Evidence or Argument Relating to the Defendant's Eleventh-hour Assertion That He Is Willing to Testify Before the Select Committee**

     filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing Before the Honorable Carl J. Nichols**

     on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony, With Exhibits,**

     filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

     <u>Exhibits:</u>

     1.    **Letters from former President Trump to Mr. Costello and Mr. Costello's Letter to Chairman Thompson**

           dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

     2.    **Certification**

           dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
  **filed July 13, 2022, Continued:**


3.  **Subpoena**
      **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3090


4.  **Letter from Thompson to Costello**
      **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3092


5.  **Indictment**
      **dated November 12, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3096


**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence or Argument Relating to the Defendant's Eleventh-hour**
**Assertion That He Is Willing to Testify Before the Select Committee,**
**With Exhibits,**
  **filed July 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106


**Exhibits:**


1.  **Letter from Thompson to Costello**
      **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3114


2.  **Letter from Thompson to Costello**
      **dated October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 3118


**Government's Objections to Defendant's Trial Exhibits**
  **filed July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols
   on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,
   filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

  Exhibits:

  1.  Transcript Jury Trial
     Before the Honorable Kurt D. Engelhardt
     *U.S. v. Rainey*, No. 12-291
       on June 1, 2015.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

  2.  Congressional Gamesmanship Leads To An
     Acquittal In Deepwater Horizon Case,
     U.S. v. David Rainey: A Case Study
       dated 2016.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash
   filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions
   filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**

       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**

       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**

       filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**

       filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**

       filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**

       on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS

### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of <u>Kristin Amerling</u>:**

      Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . . . 3942

## TABLE OF CONTENTS
## Joint Appendix Volume X of XII

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
>      on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

>    **Testimony of <u>Kristin Amerling</u>:**

>    **Direct Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . . . 4014
>    **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . . . 4078

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
>      on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

>    **Testimony of <u>Kristin Amerling</u>:**

>    **Cross Examination by Mr. Corcoran (Continued).** . . . . . . . . . . . . 4149
>    **Redirect Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . 4211

>    **Testimony of <u>Stephen Hart</u>:**

>    **Direct Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . . 4233
>    **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . . . 4252
>    **Redirect Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . 4264

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
>      filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
>      on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

# TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
      **filed July 21, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4422**

**Defendant's Notice Regarding Congressional Hearings**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4432**

**Notice of Defendant's Objection to Jury Instruction Number 27**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4435**

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
      **on July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4438**

**Jury Instructions**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4555**

**Counsels' Acknowledgment Concerning Trial Exhibits**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4585**

**Government's Exhibit List**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4586**

**Defendant's Exhibit List**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4588**

**Note from Jury**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4591**

**Verdict Form**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4592**

Order
        filed July 27, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
        filed July 28, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

        <u>Exhibits:</u>

        1.      Screenshot of Episode 1996, War Room
                dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

        2.      Bannon's Gettr Repost CNN Ad
                dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
        filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
        filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
        filed August 12, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
        filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**
      filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657


**Defendant's Reply to Opposition to Motion for a New Trial**
      filed August 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676

**Order**
      filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
      on October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687

**Judgment in a Criminal Case**
      filed October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767

**Defendant's Notice of Appeal**
      filed November 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772

**Order Staying Sentence Pending Appeal**
      filed November 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

# TABLE OF CONTENTS
## Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

9B.  H41 Congressional Record - House
     dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4780

30.  Letter from Former President Donald Trump to
     Stephen K. Bannon
     dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4781

31.  Letter from Robert J. Costello to
     Chairman Bennie Thompson
     dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4782

32.  Letter from Chairman Bennie Thompson to
     Robert J. Costello
     dated July 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4784

39.  Article from Rolling Stone
     dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4786

40.  Daily Mail Article
     dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4804

**Government's Exhibits:**

1.  House Resolution 503. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4808

2.  Subpoena to Stephen Bannon
    dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 4822

**<u>Government's Exhibits</u>, Continued:**

3.   **Emails re Service of Subpoena
       dated September 23 and 24, 2021**. . . . . . . . . . . . . . . . . . **4832**

4.   **Letter from Costello to
     Chairman Thompson and Cover Email
       dated October 7, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **4835**

5.   **Letter from Chairman Thompson to Costello
       dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **4838**

6.   **Letter from Costello to Chairman Thompson
       dated October 13, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . **4841**

7.   **Letter from Chairman Thompson to Costello
       dated October 15, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . **4843**

8.   **Letter from Costello to
     Chairman Thompson and Cover Email
       dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . **4846**

9.   **Letters from Chairman Thompson to Costello
       dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . **4848**

10.  **Post on Stephen Bannon's Gettr Account
       dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **4851**

11A. **Post on Stephen Bannon's Gettr Account
       dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . **4852**

11B. **DailyMail Article Linked in October 8, 2021
     Post on Stephen Bannon's Gettr Account.** . . . . . . . . . . . . . . **4853**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S**
**MOTION TO EXCLUDE EVIDENCE**

The Defendant moves to exclude various categories of evidence collected during the investigation of his contempt—toll records of his attorney, Robert Costello; email records belonging to an individual the Defendant has previously claimed has no relation to his attorney; statements Mr. Costello made to the Government; documents the Defendant voluntarily produced to the Government through Mr. Costello; and any investigative leads derived from that information—on the ground that the information was collected through improper investigative steps that intruded the attorney-client relationship and constituted outrageous conduct in violation of the Fifth Amendment.  ECF No. 56.  The alleged facts and legal arguments underpinning this motion are virtually identical to the ones the Defendant leveled in his motion to dismiss.  *Compare* Def.'s Mot. to Exclude Evidence, ECF No. 56 at 2-5, *with* Def.'s Mot. to Dismiss Indictment, ECF No. 59-1 at 48-51.  Because the Defendant's misconduct allegations are false and he identifies no basis under the law to apply the exclusionary rule to any of the categories of evidence, the motion must be rejected.

**ARGUMENT**

The exclusion of evidence is an extraordinary remedy, and the Supreme Court has instructed that the use of that "supervisory power is applied with some caution even when the

defendant asserts a violation of his own rights." *United States v. Payner*, 447 U.S. 727, 734-35 (1980) (refusing to extend the exclusionary rule to suppress otherwise admissible evidence on the ground that it was seized from a third party in violation of the Fourth Amendment). "Because the [exclusionary] rule's social costs are considerable, suppression is warranted only where the rule's 'remedial objectives are thought most efficaciously served.'" *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006) (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984) (additional quotation marks and citation omitted); *see also Nardone v. United States*, 308 U.S. 338, 340 (1939) ("Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land."). In the Fourth Amendment context, for example, "[t]he principal purpose of the exclusionary rule is the deterrence of unlawful police conduct, the theory being that such deterrence tends to foster obedience to the mandate of (sic) Fourth Amendment." *United States v. Mount*, 757 F.2d 1315, 1317 (D.C. 1985) (citing *United States v. Janis*, 428 U.S. 433, 446 (1976)).

Here, the Defendant sets forth no legal authority addressing whether and in what circumstances it would be appropriate to exclude evidence based on an alleged Fifth Amendment violation for outrageous government conduct in general or his allegations specifically. Instead, the Defendant cites the general standard for dismissing indictments based on outrageous government conduct relating to the attorney-client privilege, citing the same inapposite caselaw the Government addressed and distinguished in its opposition to the Defendant's dismissal motion, *see* ECF No. 65 at 43-44, and then asserts, baldly, that "[s]uppression of evidence is an appropriate remedy for a Fifth Amendment violation." ECF No. 56 at 4 (citing *United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir. 1985)). But the usual remedy for outrageous government conduct is "dismissal of the charges, rather than suppression of specific evidence." *United States v.*

2

*Bouchard*, 886 F. Supp. 111, 121 (D. Maine 1995). And, even if outrageous conduct provides a basis for exclusion in certain circumstances, it is appropriate only "where the court can identify and isolate the evidence obtained in violation of the defendant's Fifth Amendment due process rights." *United States v. Marshank*, 777 F. Supp. 1507, 1522 (N.D. Cal. 1991). The Defendant cites no authority supporting the extension of the exclusionary rule to the non-privileged toll and email records obtained and the voluntary information the Defendant provided to the Government during its investigation here.

As an initial matter, the Defendant has failed to demonstrate that the Government improperly obtained any of the evidence he seeks to exclude, let alone in violation of his rights. The Defendant first seeks exclusion of Mr. Costello's toll records and any information obtained pursuant to the 2703(d) Order for an email account that the Defendant has claimed does not relate to Mr. Costello. ECF No. 56 at 1. As detailed in the Government's pleadings in opposition to the Defendant's motions to compel and to dismiss, *see* ECF No. 31 at 10-15; ECF No. 36-1 at 2-5; ECF No. 65 at 42-43, the records were obtained through lawful grand jury subpoenas and an order issued pursuant to 18 U.S.C. § 2703(d), and none of the records are privileged.

The Defendant next seeks exclusion of Mr. Costello's statements to the Government during his November 3 and 8, 2021, interviews and of the documents he produced on November 4, before the case was indicted. ECF No. 56 at 1. But Mr. Costello's interviews and production of records were voluntary and unconditional. *See* ECF No. 28-4 at US-001769; ECF No. 65-3 (sealed); ECF No. 65-4 (sealed). Although the Defendant claims Mr. Costello was tricked into cooperating with the Government, he is unable to allege a single improper act undertaken by government agents to induce his cooperation. The fact of the matter is that, as criminal subjects frequently do, the Defendant voluntarily disclosed documents and information to try and convince the Government

not to prosecute this case.  That the strategy failed is not a basis on which to accuse the Government of misconduct or to try to take back information he voluntarily produced.  Nor does the fact that the Defendant has chosen to retain the same attorney who was a witness to his crime in this case mean the prosecution somehow turned Mr. Costello into a witness—he already was.  For all the reasons explained in the Government's opposition to the Defendant's dismissal motion, ECF No. 40-45, the Government did not commit misconduct or otherwise intrude the attorney-client relationship between the Defendant and Mr. Costello by receiving the information Mr. Costello voluntarily provided.

Having failed to demonstrate that the Government obtained any information unlawfully, at bottom, the Defendant is asking the Court to extend the exclusionary rule to all legally obtained evidence that relates to an attorney and to voluntary productions of evidence from a subject in a criminal investigation whenever the subject later decides having done so harms his position.  The Defendant's efforts to extend the exclusionary rule in this way should be rejected.

In any event, the attorney-client privilege does not fall within the type of Constitutional and other federal rights that the Supreme Court has indicated the exclusionary rule should be used to protect with the force suggested by the Defendant here.  *See Sanchez-Llamas*, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").  Even if it did and even if the Government had improperly obtained a privileged communication, the Defendant cites no authority for why all non-privileged material also would be subject to exclusion.  Instead, only the privileged communication would be subject to exclusion; and it would be inappropriate to apply the exclusionary rule to other categories of evidence.  *See United States v. Apodaca*, 287 F. Supp. 3d 21, 36 (D.D.C. 2017) (declining to suppress an entire wiretap where just seven files were improperly minimized because "total suppression is not appropriate unless

4

the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief . . . and is reserved for the particularly horrendous case . . . where the government has made effectively no efforts towards minimization whatsoever" (internal quotation marks and citation omitted)).  Because the attorney-client privilege is applied narrowly, *see United States v. Singhal*, 800 F. Supp. 2d 1, 6 (D.D.C. 2011) (explaining that the privilege is applied narrowly because it "obstructs the search for truth" (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976))), the Court should decline the Defendant's apparent invitation to exclude lawfully obtained evidence to try and send a message about the privilege's importance—especially where no misconduct occurred in the first place.

Without any analysis, the Defendant cites just one case, *United States v. Rogers*, 751 F.2d 1074 (9th Cir. 1985), *see* ECF No. 56 at 4, that he did not cite in his motion to dismiss and which the Government has not already distinguished, to support his claim that exclusion is an appropriate remedy for outrageous government conduct.  *Rogers*, however, involved review of a district court's dismissal decision and not review of a suppression decision.  751 F.2d at 1078-80 (reversing dismissal where defendant failed to establish requisite prejudice and, in any event, government agent's conduct was not "patently" egregious where, in questioning defense counsel in investigation, he "openly talked with [defense counsel], identified himself as an IRS agent, [ ] stated the purpose of his investigation," and "employed no subterfuge to deprive [defense counsel] of the opportunity to decline to answer because of his ethical duty of confidentiality").  Although on remand the *Rogers* court left open the possibility that the district court could exclude evidence obtained from the attorney, there, the government agent interviewed the defendant's attorney twice without the defendant's knowledge, asked questions that elicited privileged communications, and suggested that the defense attorney may have been a criminal subject himself.  *Id.* at 1076-77.

Here, in contrast, the defendant was aware of Mr. Costello's interactions with the government, the Government did not elicit confidential communications, and at no time did the Government state or imply that Mr. Costello was in legal jeopardy.  The dicta in *Rogers* lends no support to the Defendant's position.

## <u>CONCLUSION</u>

The factual allegations underpinning the Defendant's motion to exclude evidence are false and there is no basis under the law to apply the exclusionary rule to any of the evidence he seeks to suppress.  The motion must be denied.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
> D.C. Bar No. 481052
>
> By:  */s/ Amanda R. Vaughn*
> J.P. Cooney (D.C. 494026)
> Molly Gaston (VA 78506)
> Amanda R. Vaughn (MD)
> Assistant United States Attorneys
> United States Attorney's Office
> 601 D Street, N.W.
> Washington, D.C. 20530
> (202) 252-1793 (Vaughn)
> amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                              |   |                              |
|------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,    | : |                              |
|                              | : | Criminal No. 21-670 (CJN)    |
|                              | : |                              |
| v.                           | : |                              |
|                              | : |                              |
| STEPHEN K. BANNON,           | : |                              |
|                              | : |                              |
| *Defendant.*                 | : |                              |
|                              | : |                              |

**REPLY IN SUPPORT OF
DEFENDANT'S MOTION TO EXCLUDE EVIDENCE**

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully submits this Reply in support of his Motion To Exclude Evidence [Doc. 56], and states as follows:

The Government opposes the Defendant's Motion for two reasons. [Doc. 67]. First, the Government argues that *even if* Mr. Bannon's due process rights were violated – when the Government obtained his lawyer's telephone records via grand jury subpoena; his lawyer's email records pursuant to a court order; and additional records after a surreptitious FBI "interview" of his lawyer – *nonetheless* the exclusion of evidence obtained is not the preferred remedy. [*Id.* at 2-3]. Second, the Government contends that their efforts to obtain evidence in this case by targeting Mr. Bannon's lawyer constituted a run-of-the-mill investigative technique, such that no sanction is warranted. [*Id.* at 2-3]. Such reckless disregard for the sanctity of the attorney-client privilege should not be endorsed by this Court.

As to the first argument, we agree. Dismissal of the Indictment is preferred, and we have moved for dismissal on that ground. [Doc. 58 at 48-51]. In the event that this Court does not dismiss the Indictment, the exclusion at trial of evidence obtained through the Government's

over-reaching is warranted. As discussed below, it is well settled that this Court may exclude evidence where, as here, it was obtained after the Government violated a defendant's constitutional rights. The Government's second argument is troubling. They could have taken the high road by admitting their error and asking this Court for forgiveness. But even after a hearing on this issue, the Government maintains that – in a misdemeanor case – they are allowed to interfere with the attorney-client relationship and seek an attorney's telephone and email records, all while using good-faith declination discussions to surreptitiously "interview" the defendant's attorney to secure evidence against the defendant.

History teaches us that what is permitted will come to be expected. If no sanction is imposed for this gross abuse of power, then years from now the *Bannon* case will stand for the proposition that a federal prosecutor is just doing a thorough investigation when he or she: (a) seeks a grand jury subpoena for the attorney's phone records; (b) seeks a court order for the attorney's email records; and (c) surreptitiously "interviews" a defendant's attorney under the guise of participating in counsel discussions regarding a proposed declination, when all the while the prosecution was considering the lawyer a witness to a purported "crime" rather than an advocate on behalf of a client. What is permitted will come to be expected. We ask this Court to remind the U.S. Attorney's Office that it is not an ordinary party. To remind them that their mission is *not* to win at all costs. The Government's sole interest *should be* to see that justice is done.

Decades of jurisprudence hold that in order to effectuate the guarantees provided to criminal defendants under the U.S. Constitution, evidence obtained in violation of constitutional rights must be excluded from trial. Suppression of such evidence is an important tenet of our criminal justice system and ensures that our system prioritizes justice over a prosecutor's case stats. For example, when police conduct a custodial interrogation without first advising the suspect of their

2

**-1813-**

constitutional rights, the suspect's statement cannot be used against them. *Miranda v. Arizona*, 384 U.S. 436 (1966). Similarly, where the government has obtained evidence after an unreasonable search and seizure, the evidence must be excluded from trial. *See Weeks v. United States*, 232 U.S. 383 (1914). Likewise, the Constitution protects the attorney-client relationship. Protecting the integrity of the attorney-client relationship is a justification for excluding evidence under the Fifth Amendment. Contrary to the Government's assertions, the law is clear that the right to effective assistance of counsel is guaranteed by the Sixth Amendment of the Constitution, and deliberate Governmental intrusions into the defendant's attorney-client relationship – as happened here – violate due process. *United States v. Hsia*, 81 F.Supp.2d 7, 19 (D.D.C. 2000); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985).

The Government's actions here to surreptitiously investigate Mr. Costello, and to try to make him appear to be a witness against Mr. Bannon, compromised Mr. Bannon's constitutional right to counsel. *See U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (prejudice to defendant can "result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney and from other actions designed to give the prosecution an unfair advantage at trial."). In addition, courts have found that an accused's right to counsel is compromised where, as here, the prosecution tries to turn the lawyer into a witness against the accused. *See United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *U.S. v. Schell*, 775 F.2d 559, 565 (4th Cir. 1985) ("Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.").

The Government has acknowledged that they viewed Mr. Bannon's attorney, Mr. Costello, as a witness. [Doc. 31 at 12-13] (Costello was "a witness to the Defendant's deliberate decision to

3

**-1814-**

ignore the subpoena's requirements."). The Government further stated that Mr. Costello was a witness on the issue of whether Mr. Bannon was served with the Select Committee subpoena, see Hr'g Tr. 11:25-12:7, Mar. 16, 2022], a fact that has never been in dispute in this case, nor was it an issue raised in the two sessions that Mr. Costello participated in with these same prosecutors. As discussed in our other filings and at oral arguments on March 16, 2022 [Docs. 26 at 13-14; Hr'g Tr. 58:13-61:15], any fact that the Government hoped to prove through Mr. Costello could have been proved without serving a subpoena for his telephone records, obtaining a court order for his email records, or conducting a surreptitious "interview" of him. Thus, the Government's tactics in this case were wholly unnecessary and designed solely to interfere with Mr. Bannon's attorney-client relationship.

As a practical matter, if the Government is allowed to intrude into a defendant's attorney-client relationship every time they believe that defense counsel might have information relevant to a defendant's alleged criminal culpability, then the attorney-client privilege would be rendered meaningless. Here, the Government drove a wedge between Mr. Bannon and his attorney. Under similar circumstances, the *Marshank* court dismissed the indictment, noting that:

> The government's decision to use [Defense Counsel] and [Defense Counsel's] clients to develop a case against Stephen Marshank created a conflict of interest between [Defense Counsel] and Marshank. The government was aware of this conflict and took advantage of it. The government did nothing to alert the court or the defendant of the conflict of interest.

777 F. Supp. At 1519.

In addition, the Government seeks to excuse its actions here with regard to the § 2703(d) Order by stating that some of the records belong to an "individual the Defendant has previously claimed has no relation to his attorney." [Doc. 67 at 1,3]. But a near miss does not excuse them

from firing a bad shot. Instead, it merely demonstrates that the Government was so reckless in their pursuit of Mr. Costello's records that they subpoenaed the wrong email accounts.

While we agree with the Government that pre-indictment meetings between AUSAs and defense counsel are a common practice, it is highly irregular for the Government to surreptitiously turn these meetings into FBI interviews, complete with FBI 302 reports that make it appear as though the defense attorney agreed to give a witness interview without the consent of his client. The defense team – with many decades of collective white-collar defense experience – has never heard of that practice. To be sure, if the Government is allowed to employ this subterfuge, it would have a chilling effect on any such negotiations. In the future, no defense attorney would risk communicating with the prosecution for fear of being subjected to such intrusive tactics. Will this Court allow the *Bannon* case stand for the proposition that in negotiations, prosecutors can employ whatever tactics they wish, while defense attorneys must employ the adage *caveat emptor*?

That the Defense has moved for dismissal of the Indictment in a separate motion does not preclude it from moving, in the alternative, to exclude the illegally obtained evidence. However, if this Court finds, as the Government suggests it should, that dismissal of the Indictment is the appropriate remedy for a constitutional violation, the Defense will not complain. [*See* Doc. 67] at 2 ("But the usual remedy for outrageous government conduct is 'dismissal of the charges, rather than suppression of the evidence.'") (citing *United States v. Bouchard*, 886 F. Supp. 111,121 (D. Maine 1995).

WHEREFORE, for the reasons set forth in our filings, together with argument presented at the hearing on this Motion, Defendant Stephen K. Bannon respectfully requests that this Court grant the Motion To Exclude Evidence.

Dated: May 17, 2022                 Respectfully submitted,
                                    SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                        /s/ M. Evan Corcoran
                                    M. Evan Corcoran (D.C. Bar No. 440027)
                                    400 East Pratt Street – Suite 900
                                    Baltimore, MD 21202
                                    Telephone: (410) 385-2225
                                    Facsimile: (410) 547-2432
                                    Email: ecorcoran@silvermanthompson.com

                                        /s/ David I. Schoen
                                    David I. Schoen (D.C. Bar No. 391408)
                                    David I. Schoen, Attorney at Law
                                    2800 Zelda Road, Suite 100-6
                                    Montgomery, Alabama 36106
                                    Telephone: (334) 395-6611
                                    Facsimile: (917) 591-7586
                                    Email: schoenlawfirm@gmail.com

                                        /s/ Robert J. Costello
                                    Robert J. Costello (*Pro Hac Vic Pending*)
                                    Davidoff Hutcher & Citron LLP
                                    605 Third Avenue
                                    New York, New York 10158
                                    Telephone: (212) 557-7200
                                    Facsimile: (212) 286-1884
                                    Email: rjc@dhclegal.com

                                    *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of May 2022, a copy of the foregoing Reply In Support Of Motion To Exclude Evidence was filed through the Court's CM/ECF system and served *via* electronic delivery on counsel of record.

                                        /s/ M. Evan Corcoran
                                    M. Evan Corcoran (D.C. Bar No. 440027)

6

**-1817-**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE**
**EVIDENCE OF DEPARTMENT OF JUSTICE OPINIONS AND WRITINGS**

In his opposition to the Government's Motion in Limine to Exclude Evidence of Department of Justice Opinions and Writings, the Defendant repeatedly asserts, as he has in his previous pleadings, that he must be allowed to present evidence of Department writings relating to contempt of Congress because he is entitled under the Constitution to "present his complete defense." ECF No. 64 at 5. He fails to acknowledge, however, that there is no constitutional right to put on any defense a Defendant wants. Instead, the Defendant's evidence, just like the Government's, is limited to that which is admissible under the Rules of Evidence and other relevant law, including the rules limiting admissible evidence to relevant evidence and the law establishing the burden and elements for affirmative defenses. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); ECF No. 52, at 3-4 (collecting cases). Despite now filing two briefs on the issue, ECF No. 59-1; ECF No. 64, the Defendant still has failed to meet his burden to show he is entitled to present defenses of entrapment by estoppel and public authority. Having failed to do so, and failing to identify any other purpose for which they are admissible, the Department writings to which the Defendant has cited must be excluded at trial and the Government's motion in limine to exclude them should be granted.

I.    **THE DEFENDANT HAS FAILED TO DEMONSTRATE THE ELEMENTS OF ENTRAPMENT BY ESTOPPEL.**

Although the Defendant has now made two attempts—in his motion to dismiss and his opposition—to show he has met his burden to present an entrapment-by-estoppel defense to the jury, he still has failed to meet the threshold requirement: that a Department statement affirmatively sanctioned a private citizen's total refusal to comply with a congressional subpoena, directed at him in his personal capacity and in relation to his personal activities. Instead, the Defendant's opposition suggests he wishes to substitute his attorney's interpretation of Department writings for the affirmative government statement he must identify. This he cannot do. Having failed to identify even one Department statement that would support an estoppel defense, he cannot present irrelevant evidence of an unsupported and inadmissible defense at trial. *See, e.g.*, *United States v. Pardue*, 385 F.3d 101, 108 (5th Cir. 2004) ("In order to establish a prima facie case for entrapment by estoppel, a defendant must put forth an affirmative representation by a government official that his conduct was or would be legal."); ECF No. 52 at 8-9 (collecting cases).

A.    **The Defendant Has Failed to Demonstrate that Any Department Statement on the Contempt of Congress Statute Affirmatively Misled Him as to the Legality of His Default.**

The Defendant concedes that his estoppel argument is not based on a claim that Department writings sanctioned his conduct by implication, ECF No. 64 at 9 n.6, or on a claim that the Department's conclusions in one scenario could properly be applied to his, a different scenario, *id*. at 9. Instead, he asserts that the Department writings on which he claims to have relied "apply directly," *id*. at 9, and "expressly address every relevant aspect" of the circumstances of his default, *id*. at 10. He is wrong. In his motion to dismiss, the Defendant identified four Department writings on which he claims to have relied when deciding to ignore the Committee's subpoena. *See* Gov't Opp'n to Mot. to Dismiss, ECF No. 65, at 11-12 (citing ECF No. 59-1). The four writings,

however, do not "expressly address" the contempt statute's application to a private citizen's decision to ignore entirely a subpoena issued to him in relation to his activities in his private capacity. Indeed, the Defendant never once engages with, or even acknowledges, all the ways in which the Department writings to which he cites differ from his circumstances and why these differences do not render them irrelevant. He never once explains why their differences are not material. But their differences are material—as the Government explained in its opposition to the Defendant's motion to dismiss, the subpoenaed witnesses considered in the Department writings are differently situated and the nature and validity of the assertion of executive privilege is different. *See* ECF No. 65 at 12-16. Being so different, the four Department writings cannot serve as "affirmative statements" by the Government on the Defendant's specific conduct and they cannot serve to support an entrapment-by-estoppel defense in this case. *See United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 313 (3d Cir. 1997) (affirming exclusion of defense where defendant had sought the government's advice on one scenario but not the scenario for which the defendant was charged); *United States v. Abcasis*, 45 F.3d 39, 43-44 (2d Cir. 1995) ("[T]he defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization.").

Instead of addressing the significant differences between his conduct and that addressed by the Department writings on which he claims to have relied, the Defendant offers nothing more than broad assertions that when a President, even a former President, invokes executive privilege— an invocation the Defendant still has not proven in this case—a witness does not have to comply in any way. *See, e.g.*, ECF No. 64 at 8-9 (claiming Department writings "affirmatively provided authoritative positions on the rights and duties of a witness facing a congressional committee

subpoena when executive privilege is invoked" and that the contempt statute "does not and cannot apply to a person so situated."). But the Defendant does not cite a single Department writing that supports such a sweeping statement. Nor could he. The very writings on which he claims to have relied make clear that executive privilege, when actually and properly invoked by a sitting President, is not an automatic free pass to engage in total noncompliance even for executive branch officials subpoenaed in their official capacities, let alone for private parties subpoenaed in their capacity as such. *See Congressional Oversight of the White House*, 45 Op. O.L.C. __, at \*55 (Jan. 8, 2021) (noting that even "most members of the White House staff do not qualify for immunity from compelled testimony"); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 106 (1984) (noting that the Environmental Protection Agency offered to produce 787,000 pages of documents in response to a congressional subpoena while withholding a "limited number" pursuant to the sitting President's claim of executive privilege).

Finally, the Defendant addresses an argument the Government has not made—that the Defendant must have personally spoken with a Government representative to be entitled to an entrapment-by-estoppel defense. ECF No. 64 at 8-9. The Defendant does not, in fact, have to have spoken personally with a Government representative. But the Defendant certainly has to demonstrate it was a Government statement of the law on which he relied and that it was the Government statement that affirmatively sanctioned his conduct. He has not done that.

The Defendant continues to speak in broad, conclusory ways about how Department opinions of the contempt of Congress statute apply to the circumstances of his default. The Government submits he does so because any direct engagement with the Department's writings

would quickly reveal their inapplicability.  This is not sufficient to satisfy the requisite showing

he must make to present an estoppel defense to the jury.

> **B.      The Lack of Department Opinions Directly Addressing Default on a Congressional Subpoena by Private Citizens Subpoenaed for Information Relating to their Activities as Such Does Not Render the Contempt of Congress Statute Vague.**

The Defendant claims that, to the extent a Department writing did not address the

Department's view of whether the contempt of Congress statute reached his conduct, the contempt

of Congress statute is vague.  ECF No. 64 at 14 (citing Def.'s Mot. to Dismiss, ECF No. 59-1, at

45-48).  To support his claim, the Defendant relies on the Supreme Court's decisions in *United

States v. Pennsylvania Indus. Chemical Corp* *("PICCO")*, 411 U.S. 655, 670-75 (1973), *Cox v.

State of La.*, 379 U.S. 559, 571-72 (1965), and *Raley v. State of Ohio*, 360 U.S. 423, 437-42 (1959).

But the Supreme Court has never held that a government entity entrusted with interpreting or

enforcing criminal statutes must articulate its views of every scenario under which someone might

violate a given statute to render a statute sufficiently clear on the whole or as-applied.  And it did

not do so in *PICCO*, *Cox*, or *Raley*.  The Supreme Court in those cases was concerned only with

"affirmative" misstatements of the law by the Government that misled individuals and entities into

believing their conduct was legal.  In none of the opinions did the Court suggest that, without an

affirmative statement, the underlying statute could not be applied to the conduct at issue.  Indeed,

the Court in *PICCO* expressly noted that the defendant in that case "[did] not contend, therefore,

that it was ignorant of the law or that the statute is impermissibly vague, but rather that it was

affirmatively misled by the responsible administrative agency."  411 U.S. at 674 (internal citations

omitted); *see also Cox*, 379 U.S. at 571-72 (finding that the defendant's conviction would be

subject to "quite different considerations" than the due process one addressed had the defendant

on his own decided to engage in the conduct for which he was prosecuted instead of acting on

government advisement); *Raley*, 360 U.S. at 437-48 (finding defendants' convictions for contempt during a state commission hearing must be reversed because they were told by commission members during the hearing that they had immunity allowing them to refuse to answer certain questions). The standard for which the Defendant advocates would essentially nullify any criminal statute's application to a particular violation absent a corresponding interpretation from the executive or judicial branches of the statute's application to the specific factual circumstances. Such a case-by-case analysis of a law is not what due process requires. *See United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) ("To provide 'fair notice,' '[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982))).

   **C.    Robert Costello's Proffered Testimony Impermissibly Substitutes His View of the Law for the Government's.**

   The Defendant seeks to enter his attorney's testimony at trial to prove the Defendant's "reasonableness" in purportedly relying on Department writings when he decided to default. ECF No. 64 at 15. He claims that Mr. Costello should be allowed to testify about "how he communicated to Mr. Bannon the substance and import of the OLC Opinions and other DOJ writings" and their "impact." *Id.* The proffered testimony seems to affirm what the Defendant's other pleadings suggested—that for some, if not all, of the Department writings on which he claims to have relied, the Defendant did not actually read or consider their substance himself. *See* Gov't Opp'n, ECF No. 65, at 18-19 (citing Def.'s Mot. to Dismiss, ECF No. 59-1, at 16; Costello Decl., ECF No. 30-1 ¶¶ 7, 12, 23-24). Thus, while the Defendant claims his attorney's testimony would be to prove reasonableness, the testimony he describes is just an advice-of-counsel defense in disguise—an effort to substitute the Defendant's reliance on his attorney's interpretation of how

Department writings might apply to the Defendant's conduct for the writings themselves. And, as described in the Government's opposition to the Defendant's motion to dismiss, Mr. Costello's estimation of how OLC opinions might apply extended beyond the scope of the decisions themselves. ECF No. 65 at 19.

For this reason, the Ninth Circuit's opinion in *United States v. Tallmadge*, 829 F.2d 767 (9th Cir. 1987), to which the Defendant cites to support the admissibility of Mr. Costello's proffered testimony, does not help the Defendant. To support his estoppel defense, the defendant in *Tallmadge* did not rely on his attorney's interpretation of what a government official told the attorney. The defendant in *Tallmadge* received an interpretation of the law directly from an individual the court found to be an appropriate government representative. 829 F.2d at 770. It was only after establishing that the defendant had received a misleading statement from a government representative that the court cited the independent statements to the defendant from his attorney and two other state officials as evidence of the defendant's reasonableness in relying on the statement of law he had received from the government. *Id.* at 775. Here, the Defendant wishes to substitute his attorney's statements for the required government statement that he cannot identify. As he concedes, ECF No. 64 at 14-15, this is something the Defendant cannot do to support an entrapment-by-estoppel defense, *see United States v. Hardridge,* 379 F.3d 1188, 1194 (10th Cir. 2004) ("[W]here, as here, the alleged unfairness to the defendant arises out of private conduct and not from government action, it is not the *government* that has denied due process." (emphasis in original)); *W. Indies Transp., Inc.*, 127 F.3d 299 at 314 ("The entrapment by estoppel defense applies only to representations made by government officials, not to asserted reliance on legal advice or representations from non-governmental actors. Representations made by [a]

private entity as to the legality of [the defendant's conduct] cannot remotely establish a valid entrapment by estoppel defense.").

   D.    **The Defendant Has Failed to Establish Reasonable Reliance to Support an Entrapment-by-Estoppel Defense.**

The Defendant claims that his reliance on Department writings to support an entrapment-by-estoppel defense meets the required reasonableness element because the writings "speak for themselves." ECF No. 64 at 16 (citing various Department writings attached to the Defendant's motion to dismiss). But that is exactly why the Defendant's reliance is unreasonable. None of the OLC opinions or other Department writings to which the Defendant cites sanctions default by a private citizen, subpoenaed in his private capacity, for documents and testimony based on a purported assertion of executive privilege over unidentified material and with a clear direction from both the former and current President that the Defendant needed to comply. Moreover, several of the opinions discuss the individualized nature of their assessments. The Defendant notably does not acknowledge these caveats or explain why, in the face of them, he was not on notice that he should inquire further. He cannot establish reasonableness under these circumstances. *W. Indies Transp., Inc.*, 127 F.3d at 313 ("[R]easonable reliance means a defendant must establish that 'a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'").

Moreover, to the extent the Defendant's failure to acknowledge or address the clear caveats within the OLC opinions to which he cites is because he did not read them, it only further establishes why his counsel's testimony about the opinions is inappropriate and inadmissible. If his counsel did not share the caveats with the Defendant, his half-summaries of the opinions—to the extent he summarized them and did not simply provide his own interpretation of how they

might be extended—cannot be attributed to the Government.  *Hardridge,* 379 F.3d at 1194; *W.*

*Indies Transp., Inc.*, 127 F.3d 299 at 314.

## II.   THE DEFENDANT HAS NOT IDENTIFIED A LAW ENFORCEMENT OFFICIAL WHO DIRECTED HIM TO ENGAGE IN CONTEMPT.

The Defendant cannot present a public-authority defense because he still—despite raising

the defense in his motion to dismiss, his opposition, and filing a notice under Federal Rule of

Criminal Procedure 12.3—has not identified a law enforcement official with authority who

directed the Defendant to commit the crime of contempt of Congress.  This is a necessary pre-

requisite to presenting the defense to the jury, and the Defendant's failure to meet it bars him from

using irrelevant Department writings to support such a defense at trial.  *See, e.g.*, *United States v.*

*Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015) ("[A] federal law enforcement officer must have

actually authorized the defendant to commit the particular criminal act at issue.").

### A.   The Defendant Has Failed to Demonstrate that the Office of Legal Counsel Directed Him and Had the Authority to Direct Him to Engage in Contempt.

The Defendant does not appear to contest that OLC never directed him to engage in

contempt of Congress.  As the Government pointed out in its motion in limine, the only direction

he received from anyone associated with the Executive Branch was an unsolicited letter from the

Office of White House Counsel informing the Defendant that the Government was providing him

no basis to avoid compliance.  ECF No. 52 at 15-16.  The Defendant offers nothing to rebut this

fact.

Instead, the Defendant suggests that a general policy document is sufficient for a public

authority defense, relying on Judge Wilkey's opinion in *United States v. Barker*.  ECF No. 64 at

18 (citing *Barker*, 546 F.2d 940, 951-52 (D.C. Cir. 1976) (Wilkey, J.)), in which the defendants

were recruited by White House employee E. Howard Hunt to break into a psychiatrist's office to

seek evidence that could be used to discredit a leaker. Putting aside that the Defendant identifies no policy document directing him to commit contempt, even Judge Wilkey's version of a public-authority defense would not relieve the Defendant of his burden to establish that he received a direction from a law enforcement officer to violate the law. In *Barker*, Judge Wilkey cited the Department's prior legal positions not as evidence of the direction the defendants in that case received, but as evidence of the reasonableness of their belief that Hunt, who directed them to commit the burglary, was authorized to do so. *See Barker*, 546 F.2d at 949 (describing the elements of Judge Wilkey's apparent authority defense as requiring proof of "facts justifying their reasonable reliance on Hunt's apparent authority" and "a legal theory on which to base a reasonable belief that Hunt possessed such authority"); *id*. at 951-52 ("As to the reasonableness of the legal theory on which Barker's and Martinez's actions rest, they thus have at least the position of the Attorney General behind them."). A public-authority defense is not an estoppel defense. It is for individuals acting as government agents in ongoing covert activity. *See United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) ("The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'" (citations omitted)). The Defendant cannot rely on OLC opinions directed to others concerning what does not constitute contempt as a direction to him to commit a crime.

Instead of identifying a law enforcement official within OLC who directed him to commit a crime, the Defendant skips straight to the next element of the offense—actual authority—and argues that OLC employees are "law enforcement officials with actual authority to direct the Defendant to defy the subpoena." ECF No. 64 at 19-20 (quoting Gov't Mot. in Limine, ECF No. 52, at 16) (internal quotation marks omitted). Addressing the Defendant's claim about OLC's

authority is unnecessary because the Defendant has failed to show he received any direction from OLC in the first place.  In any event, the Defendant does not cite any regulation, statute, or other authority giving OLC the power to independently direct individuals to engage in contempt of Congress, or to commit any other crime.  Instead, he first argues, without support, that OLC is authorized to direct witnesses with respect to congressional subpoenas because it is authorized to act on behalf of the Attorney General, who, in turn, is authorized to act on behalf of the President. *Id*. at 20 (describing the relationship between the Department of Justice and the President).  But a memorandum outlining OLC's authority, which the Defendant attached to his motion to dismiss, clearly states that "the Office of Legal Counsel exercises the Attorney General's authority . . . to advise the President and executive agencies on questions of law.  OLC is authorized to provide legal advice only to the Executive Branch; we do not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch."  ECF No. 58-18 at 1.  The Defendant is a private party.  OLC does not even have authorization to advise him on the law.  It certainly does not have authorization to direct him to break the law.

The Defendant also claims that it is "nonsensical to assert that the DOJ lacks the authority to give assurances that a person acting in conformity with its policy as enunciated through OLC Opinions will not and cannot be criminally prosecuted."  ECF No. 64 at 20.  The Government does not make such an assertion.  The Government does not dispute that there may be instances in which the Department, as an agency authorized to enforce various laws, may issue an opinion on the legality of certain conduct that would then be binding on the Department.  But the Department's authority to interpret and enforce laws goes to the availability of an estoppel defense.  Indeed, much of what the Defendant cites to support his claim about OLC's authority discusses an estoppel defense, not a public authority one.  *See* ECF No. 64 at 21 n.10 (citing Judge Merhige's opinion

in *Barker* and a later D.C. Circuit opinion in *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994), discussing the defense of "reliance on an official misstatement of law").  Public authority is a different defense from entrapment by estoppel, and it requires actual authority to direct an individual to commit a crime.  *United States v. Jumah*, 493 F.3d 868, 875 n.4 (7th Cir. 2007) ("In the case of the public authority defense, the defendant engages in conduct at the request of a government official that the defendant knows to be otherwise illegal, while in the case of entrapment by estoppel, because of the statements of an official, the defendant believes that his conduct constitutes no offense.").  The Defendant has not shown that he received any direction to commit a crime from OLC, let alone from any authorized official.

**B.    The Former President's Directions to the Defendant as a Private Citizen Cannot Support a Public Authority Defense.**

The Defendant asserts that he can support a public authority defense based on the former President's authority to invoke executive privilege.  *See, e.g.*, ECF No. 64 at 18-19 ("Former President Trump . . . had the authority to invoke executive privilege and Mr. Bannon was entitled to rely on that authority.  . . . Mr. Bannon reasonably relied on President Trump's actual and apparent authority.").  The authority to invoke a privilege to avoid answering a congressional subpoena, whatever the former President's authority might have been under these circumstances, is not an authority to direct an individual to commit a crime.  In arguing otherwise, the Defendant conflates executive privilege as a defense to a contempt charge and a public authority defense.  Courts are clear.  A public authority defense is available to an individual who has been directed by an authorized law enforcement agent to engage in activity that otherwise would be a crime.  *See supra* Part II.A; ECF No. 52 at 14; ECF No. 65 at 23.  It is a defense available to those acting under "color of public authority," as the Defendant conceded in his motion to dismiss.  ECF No. 59-1 at 35 (quoting *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001)).  Whether a

subpoenaed witness has a valid privilege excusing him from compliance is a separate question from whether he can raise a public authority defense.

    **C.**    **The Defendant Has Failed to Show Reasonable Reliance to Support a Public-Authority Defense**.

The Defendant does not provide independent evidence or analysis to support the reasonableness element of his proffered public-authority defense.  Instead, he claims that his reliance on the former President, a private citizen at the time the Defendant was subpoenaed, and his reliance on a non-existent direction from OLC was reasonable for the same reasons his reliance on Department writings was reasonable to support an entrapment-by-estoppel defense, ECF No. 64 at 24—apparently that the Department writings to which he has cited "speak for themselves." But the Defendant does not identify any Department writings that authorize a private citizen to act with the authority of the Government to direct an individual to commit a crime, and the only Department document the Defendant cites outlining OLC's authority expressly states its sole role is to interpret the law, *see* ECF No. 58-18 at 1.  Even under his desired apparent-authority defense, therefore, the Defendant has not established any "facts justifying [his] reasonable reliance" on a private citizen or a government department he concedes is tasked only with interpreting the law, nor does he identify "a legal theory on which to base a reasonable belief" that they are so authorized.  *Barker*, 546 F.2d at 949 (Wilkey, J.).

**III.**    **THE DEFENDANT'S CONTINUED EFFORT TO INTRODUCE EVIDENCE IN SUPPORT OF A GOOD-FAITH RELIANCE DEFENSE SHOULD BE REJECTED.**

In accordance with controlling precedent, this Court has ruled that good-faith reliance on the law is not available as a defense to the charged offenses.  Order, ECF No. 49.  Nevertheless, the Defendant claims that his "reasonable belief regarding [OLC opinions and writings] and regarding the authority of the former President to direct him to withhold compliance based on

executive privilege are directly relevant" to the Defendant's intent in this case.  ECF No. 64 at 7.  To be relevant to his intent, however, the Defendant is raising nothing more than a good-faith reliance claim—that he relied on a purported assertion of executive privilege and that this therefore negates his deliberate and intentional decision to refuse compliance with the subpoena.  Such a defense is counter to controlling law and this Court's Order.

To support his assertion otherwise, the Defendant first relies on a non-controlling, concurring opinion in *Keeney v. United States*, 218 F.2d 843 (D.C. Cir. 1954).  But even that opinion does not support the Defendant's continued assertion that this Court should ignore controlling law and allow him to raise good-faith defenses at trial.  In *Keeney*, the D.C. Circuit reversed the defendant's contempt of Congress conviction because the district court had erroneously admitted evidence at trial relating to pertinency, which, under the controlling precedent of the time, was a question left to the judge, not the jury.  *Id.* at 845.  The three judges on the panel then split over their view of whether the defendant's refusal to answer the question that was the subject of the conviction was excused by a privilege.  *Compare id.* at 843-45 (Edgerton, J.) *with id.* at 848-49 (Danaher, J.) *and id.* at 849-50 (Prettyman, J.).  It is one of those judge's opinions on that issue, that of Judge Prettyman, on which the Defendant relies.  In his opinion, Judge Prettyman found that whether the defendant did, in fact, have a privilege depended on the answer to the question posed, *id.* at 849, and that, when the defendant raised a question as to her ability to answer given the respective privilege, she may be deemed not to have refused to answer, *id.* at 850.  With respect to the latter finding, Judge Prettyman compared the situation to that which both the D.C. Circuit and the Supreme Court have found to be a potential defense to contempt charges—that is, whether a witness raises an objection and the relevant committee sufficiently indicates whether it wants the witness to answer despite the objection such that the

witness is on notice he had a choice between compliance and contempt. *Id.* (citing *Bart v. United States*, 203 F.2d 45, 49 (D.C. Cir. 1952), *overruled* 349 U.S. 219 (1955))[1]; *see also Quinn v. United States*, 349 U.S. 155, 166 (1955) ("[U]nless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under s 192 for refusal to answer that question.").

Judge Prettyman was concerned, therefore, with whether a defendant-witness had sufficiently alerted or raised a privilege in order for it to be clearly decided by the relevant committee. He did not suggest, as the Defendant does, that mere reliance on a claim of privilege renders a default unintentional or not deliberate. In fact, the D.C. Circuit in *Bart v. United States*, the case on which Judge Prettyman relied for his opinion in *Keeney*, held, consistent with its earlier opinions in *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947), and *Dennis v. United States*, 171 F.2d 986, 990 (D.C. Cir. 1948), and its later opinion in *Licavoli v. United States*, 294 F.2d 207, 209 (D.C. Cir. 1961), that it does not. *See Bart*, 203 F.2d at 49 ("When [a witness] deliberately and intentionally refuses to answer upon a stated ground, he assumes the risk that the ground is unsound. This was the holding of the Supreme Court in the *Sinclair* case. If he refuses to answer because he says the answer would incriminate him, or says the question is not pertinent, or says that the question is improper because violative of First Amendment guaranties, he assumes the risk that a court in a later proceeding may find that his stated reason was not valid."). Here, the

---

[1] In *Bart*, the defendant objected to questions on claims that they were not pertinent and was later convicted for not answering. 349 U.S. at 220-21. The D.C. Circuit held, in part, that, because the defendant abandoned claims of pertinency once he was before the court, it did not matter whether the relevant congressional committee had clearly overruled or addressed the objection. *Id.* at 221. The Supreme Court reversed on these grounds, finding that when a witness raises an objection, the committee must make clear whether it is directing the witness to comply nonetheless in order for the refusal to be subject to a contempt charge. *Id.* at 221-23 (citing *Quinn*, 349 U.S. 155).

Defendant made his claim of executive privilege repeatedly.  The Committee repeatedly and explicitly rejected the Defendant's objection and directed him to comply with the subpoena.  Nevertheless, he still chose not to comply.  Even under Judge Prettyman's concurring opinion, the Defendant cannot raise the good-faith defense he wishes.

To support his position that his good-faith reliance is a defense to the intent element of contempt, the Defendant also cites an archived and expressly disavowed Criminal Resource Manual published by the Department of Justice in 1997.  ECF No. 64 at 7 n.4 (citing Criminal Resource Manual § 2055, available at *https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense* (last visited May 13, 2022)); *see also United States Attorney's Manual & Resource Manual Archives*, available at https://www.justice.gov/archive/usao/usam/index.html (last visited May 13, 2022) (informing visitors that the Criminal Resource Manual to which the Defendant cites "ha[s] no current application").  Indeed, at the top of the webpage the Defendant cites, it states clearly that it contains archived material and may be outdated.  In any event, the Defendant cites a section of the page discussing Eleventh Circuit cases predating the 1997 manual in which that circuit found an "innocent intent" defense to be available to defendants who had a good-faith, but mistaken, belief that they were committing crimes in cooperation with the government.  *See* Criminal Resource Manual § 2055 (citing *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363-68 (11th Cir. 1994); *United States v. Anderson*, 872 F.2d 1508, 1517-18 & n.4 (11th Cir.), *cert. denied*, 493 U.S. 1004 (1989); *United States v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985)).  The Eleventh Circuit has since recognized that its view has not been adopted by other circuits—and, instead, expressly questioned by others.  *See United States v. Alvarado*, 808 F.3d 474, 786-87 (11th Cir. 2015) (citing *United States v. Giffen*, 473 F.3d 30, 43 (2d Cir. 2006) (finding the court had "great difficulty with

16

this proposition [of an innocent intent defense], which would swallow the actual public authority and entrapment-by-estoppel defenses"); *United States v. Wilson*, 721 F.2d 967, 975 (4th Cir. 1983) ("Such an unwarranted extension of the good faith defense would grant any criminal carte blanche to violate the law should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries.")).  The Eleventh Circuit's holdings, however, have no bearing on the charged offenses in this case.  Not only has the D.C. Circuit never recognized the defense in any case the government can find, but the D.C. Circuit has made it clear that, in the context of contempt of Congress, the reason for a Defendant's deliberate and intentional default are irrelevant to determining his criminal intent.  Moreover, as articulated by the Eleventh Circuit, the "innocent intent" defense is one based on a good-faith belief that one's conduct was "done at the direction, and with the permission, of an appropriate governmental agency," *Alvarado*, 808 F.3d at 486.  Even if a good-faith defense were available to the Defendant, therefore, he has never identified any government official, or agency, that directed him to commit a crime, as discussed above, *supra* Part II.A & B.

Finally, the Defendant claims that his alleged efforts to reach an accommodation with the Committee justify admission of Department opinions and writings to rebut the intent element of the offense.  ECF No. 64 at 7.  The Defendant appears to rely on the judicial admonition that the legislative and executive branches try to reach a compromise when they disagree over each other's authority to compel information and withhold it, respectively.  *Id*. (citing ECF No. 59-1 at 47 (citing *United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977))).  Whatever the obligations of the legislative and executive branches may be to reach an accommodation, however, the Defendant fails to explain why they are relevant to proving or disproving his deliberate decision not to show up.  Nor does he explain why his compliance with the subpoena that the Committee issued to him,

a private citizen, should be excused after the Committee repeatedly rejected his requests for alternatives and directed him to comply.  The Defendant does not have the power to dictate to the Committee how it should exercise its investigative authority.  His effort to do so and refusal to comply once the Committee did not follow his directions subjected him to contempt.  *Quinn*, 349 U.S. at 165-66 (describing the choice a witness faces between contempt and following a Committee's decisions regarding raised objections).

The Defendant's effort to use Department writings at trial in support of the unavailable good-faith reliance defense should be rejected.

**IV.    THE DEFENDANT OFFERS NO REBUTTAL TO THE GOVERNMENT'S SHOWING THAT EVIDENCE OF IRRELEVANT DEPARTMENT WRITINGS WILL UNDULY CONFUSE THE ISSUES AT TRIAL AND MISLEAD THE JURY.**

In response to the Government's argument that the Department writings to which the Defendant has cited are inadmissible under Federal Rule of Evidence 403, the Defendant offers nothing but a personal attack on the Government attorneys' character and a conclusory claim that the Government's position is "unfounded, offensive to the fundamental constitutional principles at issue," and "has no basis in law and fact."  ECF No. 64 at 24.  The Defendant offers no explanation of these claims and no explanation of why, given the inapposite nature of the Department writings to which he cites and their irrelevance to any issue to be decided at trial, the Government is incorrect in asserting that it would be confusing and misleading to require the jury to parse them and decide their relevance and applicability to the Defendant's conduct.  The Defendant's conclusory claims cannot overcome the Government's showing of undue prejudice.

18

**-1835-**

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  /s/ Amanda R. Vaughn
     J.P. Cooney (D.C. 494026)
     Molly Gaston (VA 78506)
     Amanda R. Vaughn (MD)
     Assistant United States Attorneys
     United States Attorney's Office
     555 4th Street, N.W.
     Washington, D.C. 20530
     (202) 252-1793 (Vaughn)
     amanda.vaughn@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' REPLY IN SUPPORT OF MOTION IN LIMINE**
**TO EXCLUDE EVIDENCE RELATING TO OBJECTIONS TO**
**SUBPOENA THAT DEFENDANT WAIVED**

In the face of a subpoena issued by the U.S. House of Representatives' Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"), the Defendant chose to default. He did not produce a single subpoenaed document or appear for a deposition on the required date. Now, facing the consequences of that decision, he wishes to bring before the jury various procedural objections to the Committee's subpoena that he did not raise before the Committee at the time of his default. But precedent makes clear that he cannot do so because he waived these objections by failing to assert them to the Committee. To get around his waiver, the Defendant claims that the procedures to which he only now is objecting relate to elements of the charged offenses. They do not. Nothing in the Defendant's opposition to the United States' Motion in Limine to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived distinguishes his circumstances from those of other witnesses deemed to have waived their objections. The Government's motion in limine should be granted.

I.    **THE DEFENDANT'S WAIVED PROCEDURAL OBJECTIONS DO NOT BEAR ON THE ELEMENT OF WHETHER THE SUBPOENA FELL WITHIN THE SCOPE OF AN AUTHORIZED INVESTIGATION.**

First, the Defendant claims that the objections that he failed to make before the Committee bear on whether the Defendant was "summoned as a witness by the authority" of the Committee. ECF No. 62 at 3. He is wrong. The Defendant misunderstands the element relating to the Committee's authority that the Government must prove at trial. The authority that the Government must prove at trial is the Committee's authority to conduct the inquiry into the subject matter to which the subpoena issued to the Defendant relates.

The very case on which the Defendant primarily relies to make his arguments, *Gojack v. United States*, makes this clear, finding that "a specific, properly authorized subject of inquiry is an essential element of the offense under Section 192." 384 U.S. 702, 708 (1966). Beginning from this proposition, the *Gojack* Court reversed the defendant's conviction in that case because the committee investigating him had not, as required by its rules, authorized the particular investigation under which it had issued the defendant a subpoena. *Id*. at 708-09. As the Court explained, the "authority" element of contempt of Congress is the authority to investigate a particular subject matter because it is the pre-requisite question to determining whether the information sought from a witness can be properly extracted. *Id*. at 712 ("Otherwise, it is not possible for witnesses to judge the appropriateness of questions addressed to them, or for the Committee, the Congress, or the courts to make the essential judgment which Section 192 requires: whether the accused person has refused 'to answer any question pertinent to the question under inquiry.'"). The *Gojack* decision had nothing to do with a witness's objections to how a Committee operated in carrying out its authorized investigation.

Other contempt of Congress cases decided by the Supreme Court and other courts similarly have made clear that the authority element of the contempt of Congress offense that must be proven at trial is a given committee's authority to investigate a certain subject matter.  In *Russell v. United States*, for example, the Court found that indictments charging witnesses with contempt of Congress for refusing to answer questions were insufficient where they did not allege the subject matter into which the relevant committee was authorized to inquire.  369 U.S. 749, 771-72 (1962). The *Russell* Court found that allegations relating to the authorized subject of inquiry was essential to sufficiently putting the defendant on notice of what he must meet because it was "the obvious first step in determining whether the questions asked were pertinent," *id*. at 758, an element without which there can be no criminality under the contempt statute, *id*. at 755, and was "also an essential preliminary to the determination of a host of other issues which typically arise in prosecutions under the statute," *id*. at 758.  *See also Barenblatt v. United States*, 360 U.S. 109, 116-23 (1959) (examining the authorized subject matter of a committee's inquiry to determine if it was legislatively authorized to compel production of the information it sought); *United States v. Rumley*, 345 U.S. 41, 42-44 (1953) (looking to the portion of the authorizing resolution describing the subject matter of the authorized inquiry to determine if the relevant committee was authorized to obtain the information it sought); *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962) (describing the offense of contempt of Congress as requiring "that the committee or subcommittee was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority"); *United States v. Orman*, 207 F.2d 148, 153 (3d Cir. 1953) (describing the offense of contempt of Congress as requiring evidence that the material sought from a witness "fell within the grant of authority actually made by Congress to the investigating committee").

In none of these cases did the courts hold that, in addition to alleging and proving the scope of the relevant inquiry, the Government also must allege and prove that the relevant committee followed all of its procedural rules. Yet that is the principle for which the Defendant advocates by arguing that it is an essential element of the offense—meaning something the Government must prove—that the Committee operated pursuant to its various procedural requirements. Such a conclusion would be contrary, however, to numerous holdings that establish that witnesses can waive protections they receive from a committee's procedural requirements. *See Yellin v. United States*, 374 U.S. 109, 122 n.8 (1963) (collecting cases "in which a witness' defense has been rejected because he failed to make timely objection"—including objections based on whether questions posed by the committee are pertinent to the subject matter under inquiry, which is an element of the offense); *United States v. Bryan*, 339 U.S. 323, 335 (1950) ("We hold that the Government is not required to prove that a quorum of the Committee was present when the default occurred, and that under the circumstances disclosed by this record a defense of lack of a quorum was not open to respondent.").

The Court's opinion in *Yellin v. United States*, another case on which the Defendant relies, further clarifies that procedural protections provided by a committee's operational rules is not part of the "authority" element that the Government must prove. There, the Court examined whether the relevant committee had followed its rules relating to how and when it considered requests for non-public testimony. *Yellin*, 374 U.S. at 115-16, 123. The Court found that, because the committee had not followed its rules, and that the defendant could not have been aware of this at the time he defaulted, the defendant was entitled to prove the violation at trial. *Id*. at 123. In reaching this conclusion, the Court was not concerned with whether the committee's investigation was properly authorized; it was concerned with whether the defendant had a remedy to address the

denial of protections afforded under the committee's rules. *Id*. The *Yellin* Court nowhere held that the Government must prove compliance with a committee's rules as an essential element.

In addition, *Yellin* serves to undermine the Defendant's position on waiver, not support it; the defense that the *Yellin* Court left available to the defendant regarding procedural objections was one based on a procedural objection about which the defendant in that case could not have known at the time of his default. *Id*. at 123. *Yellin* acknowledged and did not disturb the holdings of prior cases in which the Court held that a defendant forfeits objections when he fails to make them to "immediately apparent deviations from Committee rules." *Id*. at 122. Here, all of the objections the Government moves to preclude the Defendant from raising at trial were known to him at the time he refused to comply with the Committee's subpoena. *Yellin* does not provide a basis for the Defendant to present evidence at trial of his secret objections to rebut the evidence of his default.

## II. THE DEFENDANT'S WAIVED PROCEDURAL OBJECTIONS DO NOT BEAR ON WHETHER HE WILLFULLY DEFAULTED.

Next, the Defendant argues that his waived objections go to the intent element of the charged offenses as well. ECF No. 62 at 6-7. Not so. The D.C. Circuit's binding holding in *Licavoli v. United States*, as this Court has recognized, ECF No. 49, was that "willfully make default" means simply that "all that is needed . . . is a deliberate intention" to default on the subpoena. 294 F.2d 207, 209 (D.C. Cir. 1961). The Defendant nowhere explains why his waived objections change his deliberate decision not to comply with the Committee's subpoena to an accidental one. To the extent he wishes to raise procedural objections in relation to the intent element of the offense, the Defendant instead appears to merely be searching for an end-run around the Court's order that he cannot present a good-faith reliance defense. The Defendant cannot

claim, however, that he believed his intentional default was excused because he was harboring secret objections to the Committee's operations.

Instead of establishing why his various procedural objections relate to his deliberate and intentional decision to ignore the Committee's subpoena, the Defendant simply asserts other reasons why he believes he is entitled to raise his objections. None of his arguments have merit. First, he claims that the Government is improperly attempting to place a burden on the Defendant under which he had "an obligation to notify the Select Committee" of its alleged procedural defects, ECF No. 62 at 7, but that is not the Government's position. The Defendant had no such obligation unless he wanted to preserve an objection for this Court. Because the Defendant did not raise the objections before the Committee and allow the Committee to resolve them, the Defendant did not preserve the issue for this Court to review. For this reason, his reliance on *United States v. Bart*, 349 U.S. 219, 220-22 (1955), and *Quinn v. United States*, 349 U.S. 155, 164 (1955), ECF No. 62 at 7-8, is misplaced. The Court in those cases held that a committee must clearly overrule an objection once made in order for a witness's refusal to comply to be subject to contempt. It never held that a congressional committee must guess at the ways a witness might object to a committee's operations months or years later.

Next, the Defendant argues that he did, in fact, put the Committee "on notice" regarding the supposed "defect" in the Committee's rule on outside counsel because his lawyer asked Committee counsel questions about the Committee rule. ECF No. 62 at 7-8. But asking if a rule exists is not the same as objecting to its application. The Defendant's attorney, Robert Costello, has made clear that the Defendant specifically chose not to raise the objection. *See* Interview Report, Robert Costello, ECF No. 28-4, at US-001774 ("Costello did not ask [Committee Counsel] to change the rules [regarding outside counsel]. Costello noted [Committee Counsel] was not in a

position to change the Select Committee's rules anyway.  Costello did not communicate his issues with the Select Committee's rules to anyone in the Select Committee who actually had the ability to change the rules."); Def.'s Surreply, ECF No. 39, at 6, 7 (stating that "Mr. Costello never claims to have advised the Select Committee" that the Defendant would not attend the deposition absent it allowing the former President's counsel to attend and that "Mr. Costello did not make that request of Staff Counsel" because "Costello was under no obligation to reveal to Staff Counsel that Mr. Bannon had a complete defense to the subpoena's demands based upon the OLC opinions").  The Defendant cannot now play a game of "gotcha" with the Committee.  *See Bryan*, 339 U.S. at 331 ("A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase.  If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity.").

Finally, the Defendant complains again that he did not receive a copy of Section 3(b) of H. Res. 8, ECF No. 62 at 8-9, but this assertion falls flat because the Committee was prepared to provide it to him before beginning his deposition on October 14, 2021, even though the Defendant never raised it as an objection, *see* Interview Report, Committee Counsel, ECF No. 35-2 at US-000362, and specifically advised the Defendant of his right to receive a copy of Section 3(b) by attaching to his subpoena the rules regarding the Committee's deposition authority, ECF No. 53-1 at US-000417.  The Defendant's claim that the Committee "misled" him on this front is baseless.

## III.    THE DEFENDANT'S ATTEMPTS TO DISTINGUISH WAIVER PRECEDENT FAIL.

Finally, the Defendant claims that two of the cases to which the Government cites for the principle that witnesses can waive objections to a congressional committee's procedures are inapposite, ECF No. 62 at 4-6, but he fails to support his assertion.  He argues that *Bryan*, 339 U.S.

323 (1950), is a "completely different circumstance" from his because the waived procedural objection in *Bryan* was to whether there was a Committee quorum present at the time of the witness's scheduled appearance, and the *Bryan* Court found that the Government was not required to prove quorum.  ECF No. 62 at 5.  The Defendant's case is no different, though—here, the Government is not required to prove to the jury that Rep. Cheney uses the title "ranking minority member," or furnish evidence on the Committee's rules on outside counsel or Section 3(b) of H. Res. 8.  These are not elements of the offense.  They are procedural issues that the Defendant could have raised before the Committee but did not.

Next, the Defendant argues that *Hutcheson v. United States*, 369 U.S. 599 (1962) "does not involve what evidence may be presented at trial."  ECF No. 62 at 5.  But *Hutcheson* does not condition waiver on whether the judge or the jury will decide the issue.  The opinion does not even note whether the relevant objection in that case was considered before or during trial in the district court.  Instead, the *Hutcheson* Court held that an objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court."  369 U.S. at 611 ("To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer.").  The Court did not specify any difference between whether it is an issue for the judge or jury once "in this Court."  Indeed, the Supreme Court has found waiver to apply even where the issue arises in relation to the evidence to be presented to the jury at trial.  *See Bryan* 339 U.S. at 326-27; *McPhaul*, 364 U.S. at 378-79.  *Hutcheson* only affirms that the Defendant cannot raise his waived objections before the jury here.

IV.    **CONCLUSION**

The Defendant failed to raise any of his procedural objections to the subpoena to the Committee at the time of his default.  He waived them and should not be permitted to confuse the jury with irrelevant evidence and arguments about them.  The Government's motion in limine should be granted.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

9

**-1845-**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**UNITED STATES' REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE**</u>
<u>**EVIDENCE OF THE DEFENDANT'S PRIOR EXPERIENCE WITH SUBPOENAS**</u>

The Defendant fails to meet his burden to establish the admissibility of his prior subpoena experience. He provides no details about what prior subpoena experience he wants to introduce, how he would present it at trial, or how the jury would be instructed to consider the evidence. He argues only that the evidence is relevant and admissible to negate his willfulness. He is wrong. As a matter of fact and law, the Defendant's prior subpoena experience bears no relevance to whether the Defendant's default was deliberate, the question the jury will be charged to decide. The Defendant's relevance and admissibility arguments are nothing short of an attempted end-run around the Federal Rules of Evidence's ban on propensity evidence and controlling precedent, including this Court's order, excluding defenses based on good faith. The Government's motion in limine should be granted.

**I.     THE DEFENDANT FAILS TO ADDRESS AND MEET HIS BURDEN TO ESTABLISH THE ADMISSIBILITY OF HIS PRIOR SUBPOENA EXPERIENCE.**

The Defendant bears the burden of establishing the admissibility of evidence he intends to present at trial. *See United States v. Zeese*, 437 F. Supp. 3d 86, 93 (D.D.C. 2020) ("'[T]he burden is on the introducing party to establish relevancy,' . . . as well as admissibility under evidentiary rules." (quoting *Dowling v. United States*, 493 U.S. 342, 351, n.3 (1990))). The Defendant concedes—as he must—that his prior subpoena experience is inadmissible to prove that "his

character is such that he is a testifier" or that "he acted *in conformity with* those prior actions when he responded to the Select Committee subpoena."  ECF No. 63 at 2 (emphasis in original); *see also id.* at 8.  Having abandoned those other justifications, the Defendant offers just one reason to admit evidence of his prior subpoena experience: to negate willfulness.  In so doing, however, the Defendant supplies no details about the prior subpoenas and his experience with them.

For example, nowhere in his papers does the Defendant proffer the nature of the prior subpoenas involved—such as whether they commanded the production of documents in addition to testimony.  The Defendant does not discuss what information the subpoenas sought—such as whether they pertained only to his official duties.  He does not state whether he engaged in total noncompliance with the subpoenas and was informed that he risked a contempt citation for doing so.  And  he does not state what, if any, objections he or the then-President asserted, whether those objections were resolved, and the extent of the testimony or other information he ultimately provided.  Moreover, the Defendant fails to specify what prior subpoena experience he intends to introduce; provides no description of how he intends to introduce that evidence and connect it to his intent in this case; makes no proposal about how the jury should be instructed about the evidence; and offers only the baldest of claims about how his prior subpoena experience is relevant to his intent at all.  Finally, the Defendant makes no effort to address how any evidence of his prior subpoena experience is admissible as a matter of law considering controlling precedent excluding the defense of good faith.

The Defendant does not meaningfully address, and therefore does not carry, his burden of establishing the evidence's admissibility.  The reason, as explained below, is clear: the Defendant cannot muster the factual or legal support to carry that burden.

II.     **THE DEFENDANT'S PRIOR SUBPOENA EXPERIENCE IS IRRELEVANT AND INADMISSIBLE TO NEGATE HIS WILLFULNESS.**

The Defendant contends that his prior subpoena experience "reflects [his] life experience that informed his thinking—his intent—upon receipt of the Select Committee subpoena." ECF No. 63 at 2. He elaborates that evidence that he "was previously summoned to appear for testimony, and testified after an accommodation was reached involving executive privilege issues, directly bears on his state of mind and intent upon receipt of the Special (sic) Committee subpoena"; *i.e.*—that if "he believed that the executive privilege issues would be resolved through accommodation, then this 'tends' to negate [his] guilt by showing that he did not have a 'deliberate intention not to appear.'" ECF No. 63 at 5 (quoting *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961)). That the Defendant merely asserts that the evidence's purpose is to negate his intent, rather than to promote an improper propensity argument, does not make it so.

First, any argument by the Defendant at trial that he believed his default was excused by the expectation that executive privilege issues would be resolved by "accommodation"[1]—whether

---

[1] The Defendant claims that he sought three accommodations from the Committee: (1) having the Committee and the former President reach accommodation on executive privilege; (2) letting a court decide the executive privilege issues; and (3) allowing a one-week extension so that the parties could assess the implications of the complaint in *Trump v. Thompson*, 20 F.4th 10 (D.C. 2021). *See* ECF No. 63 at 3 n.6. But the facts are: (1) the former President never sought accommodation from the Committee, *see* ECF 29-1; (2) there is no requirement that Congress seek a court's intervention before referring a witness's default for potential criminal prosecution; and (3) the Defendant's request for more time based on *Trump* came after he had already defaulted, *see* ECF No. 31-2. Moreover, the Defendant represents neither the legislative nor executive branches such that he could demand the accommodation constitutionally contemplated for them. The Defendant did not, as he alleges, seek accommodation—he defaulted. In any event, the Defendant's papers lack any discussion of how his prior subpoena experience and his handling of those subpoenas compare to his approach here and his decision to engage in total noncompliance, even in the face of explicit warnings from the Committee about the potential consequences. *See, e.g.*, ECF No. 29-1. And even if he could, as noted above and in the Government's pleadings litigating the willfulness standard for contempt of Congress, such evidence would not negate his criminal intent. *See* ECF No. 29 at 4 ("A deliberate and intentional decision not to comply with a

that belief was based on prior subpoena experience or something else—would relate only to the good-faith defense barred by controlling precedent and already excluded by this Court. *See e.g.*, *Yellin v. United States*, 374 U.S. 109, 123 (1963); *Licavoli*, 294 F.2d at 209; Order (Apr. 6, 2022), ECF No. 49. Although the Defendant quotes *Licavoli* for the proposition that his default must be deliberate in the same breath that he argues that his prior subpoena experience is relevant to negate that intent, he does not acknowledge the sentence immediately before the one he quotes, which affirms that "[e]vil motive is not a necessary ingredient of willfulness under [18 U.S.C. § 192]." *Licavoli* thereby renders inadmissible as a defense any mistaken belief on the Defendant's part, whatever the source, that hoped-for "accommodation" between the executive and legislative branches would substitute for compliance with the subpoena's plain terms, particularly in the face of the Committee's written rejection of his executive privilege claim, ECF No. 29-1. *See also Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) (affirming district court instruction on contempt of Congress that "[t]he reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident.").

Second, the Defendant's "state of mind and intent upon receipt" of the subpoena is not an issue the jury must decide. The jury must decide not what the Defendant thought when he received the subpoena, but rather whether he had a "deliberate intention" to default—*i.e.*, whether he knew the subpoena the Committee issued to him required him to produce records and appear for testimony and whether, knowing that, he deliberately chose not to produce documents and

_____

congressional subpoena based on the subpoenaed party's erroneous belief that the law excused compliance constitutes a willful default.") (citing *Yellin v. United States*, 374 U.S. 109, 123 (1963)).

deliberately chose not to appear for testimony. *See, e.g.*, *Licavoli*, 294 F.2d at 209. The Defendant's desire to adduce evidence of what he thought "upon receipt" of the subpoena exposes a prohibited purpose—the suggestion that he was not predisposed to be contemptuous based on his alleged prior compliance with other subpoenas.

The Defendant further contends that his prior subpoena experience—his "life experience"—reflects the circumstances surrounding his default, from which "[i]ntent is routinely proved." ECF No. 63 at 3. But even to the extent the circumstances of the Defendant's prior subpoena experience can be argued as relevant, in the broadest sense, to his approach to the Committee subpoena here, those prior circumstances can hardly be said to "surround" his default. Here, the Defendant was summoned to produce documents and to appear for a deposition related to events spanning April 2020 to October 2021, *see* ECF No. 53-1 at US-000411, years after he departed the former President's White House. In his prior subpoena experience—about which the Defendant offers no details—the Defendant was apparently either serving as an Executive Branch official or was subpoenaed for information related to his official capacity. The circumstances of those prior subpoenas do not "surround" the subpoena at issue in this case—in fact, they are distinct from the circumstances the Defendant confronted here, eroding the prior subpoenas' relevance to this case even under the most generous evidentiary standards.

The Defendant also argues that his prior subpoena experience is admissible under Federal Rule of Evidence 404(b), characterizing it as "other acts" evidence admissible to establish his intent. ECF No. 63 at 7-9. His analysis and reasoning fall flat. First, for the reasons explained above, evidence of the Defendant's prior subpoena experience is inadmissible to negate his willfulness. Second, Rule 404(b) and the cases on which the Defendant relies are inapplicable to his admissibility argument. For example, the Defendant cites to *United States v. Edwards*, 901 F.

Supp. 2d 12 (D.D.C. 2012), for the proposition that defendants, like prosecutors, "can avail themselves" of Rule 404(b), and further contends that *Edwards* supports a more relaxed standard of admissibility for defendants offering Rule 404(b) evidence.  ECF No. 63 at 8.  But *Edwards* addresses what is often referred to as "reverse 404(b)" evidence—that is, "[o]ther crimes evidence relating to witnesses," which is offered for some purpose other than to establish the witness's character or propensity to engage in a bad act or crime, and which, "along with other evidence," is exculpatory for the defendant.  *Id.* at 16-18 (citing *United States v. Alayeto*, 628 F.3d 917, 921 (7th Cir. 2010)); *see also United States v. Young*, No. 12-cr-00042, 2013 WL 12430555, *6 (D.D.C. Apr. 22, 2013) (cited at ECF No. 63 at 8) (addressing a defense request to cross-examine a cooperating witness about his involvement in prior uncharged narcotics conspiracies).  The Defendant's prior subpoena experience relates to his own conduct, not the conduct of a witness.  Moreover, *Edwards* did not adopt a relaxed standard for admissibility, emphasizing that a defendant "still must articulate some non-propensity purpose for the evidence that would tend to negate his guilt."  *Id.* at 17.  The Defendant's characterization of his prior subpoena experience as relevant to intent does not satisfy that requirement—it simply reflects a recasting of prohibited propensity evidence and an effort to mount the good-faith defense the controlling cases preclude.

### III.    THE PROBATIVE VALUE OF THE DEFENDANT'S PRIOR SUBPOENA EXPERIENCE IS OUTWEIGHED BY THE RISK OF UNDUE PREJUDICE.

The Defendant maintains that, under Federal Rule of Evidence 403, the evidence of his prior subpoena experience is sufficiently probative to outweigh any unduly prejudicial effect it may have.  ECF No. 63 at 5-7.  If admitted, however, there exists needless risk that the jury will conflate the Defendant's prior subpoenas with the subpoena at issue in this case, distracting it from the straightforward issue it must decide—namely, whether the Defendant's default was deliberate.

Relying on *United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004), the Defendant contends that wading through unspecified evidence of his conduct on four prior occasions—his response to four different subpoenas, relating to different investigations and circumstances—and then sorting out what that conduct has to do with the subpoena at issue in this case, is "precisely" the fact-finding role of the jury that is "central to our jurisprudence."  ECF No. 63 at 7 (quoting *Ayeni*, 374 F.3d at 1320).  But *Ayeni*—much like the other authorities the Defendant cites—has nothing to do with the issue presented here.  First, the Defendant omits from his citation the fact that he quotes from a concurring opinion, not the majority controlling opinion.  Second, *Ayeni* is factually and legally inapposite.  There, the Circuit reversed a fraud conviction because the district court abused its discretion in affording the parties supplemental jury addresses to respond to factual questions, explaining that the procedure invaded the jury's deliberative process because it allowed the attorneys to develop arguments "as if they were sitting in the jury room themselves."  *Ayeni*, 374 F.3d at 1316.  That has nothing whatsoever to do with the admissibility of other-acts evidence and the appropriate evidentiary boundaries district courts are obligated to enforce to ensure that the jury can make factual determinations free from confusion and unnecessary complexity.  The Defendant's citation to *Ayeni* is the perfect metaphor for what he seeks to accomplish by introducing evidence of his prior subpoena experience—to conflate, confuse, and distract.

The Defendant argues that evidence of his prior subpoena experience "can be presented concisely and efficiently" and that "proper instruction" can reduce confusion.  ECF No. 63 at 7.  But, as discussed above, the Defendant does not identify what evidence of his prior subpoena experience he intends to introduce, how he intends to introduce it, and how the jury should be instructed to consider it.  The Defendant just nakedly asserts that his prior subpoena experience is readily admissible and that it can easily be presented and considered.  His apparent unwillingness

to specify the details of his alleged prior subpoena compliance and the manner of his presentation illustrate the confusion and delay it risks injecting into the trial—and further demonstrates his failure to carry his burden to admit the evidence.

Finally, the Defendant implies that excluding evidence of his prior subpoena experience would violate his Sixth Amendment right to present a defense. *See* ECF No. 63 at 1-2, 7. Citing *Washington v. Texas*, 388 U.S. 14, 19 (1967), the Defendant asserts that he "has a fundamental due process right to present a defense by offering his version of the facts to the jury." *Id.* at 7. But excluding evidence of the Defendant's prior subpoena experience does not come close to implicating his Sixth Amendment right to present a defense; *Washington*, along with the Defendant's entire argument, is far-flung from the circumstances here. In *Washington*, the Supreme Court reversed a murder conviction where the defendant was prohibited by state law from calling as a witness an alleged coparticipant in the offense—who would have testified that the defendant ran away before the murder occurred—even though the same prohibition did not apply to the prosecution. 388 U.S. at 16. The Supreme Court held that "[t]he right of an accused to have compulsory process for obtaining witnesses in his favor" is an essential component of the Sixth Amendment, *id.* at 18, and that that right is offended by "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief," *id.* at 22. The question here does not involve a statutory or other prohibition on an entire category of witnesses or evidence; in fact, it does not even involve a witness to or other direct evidence of the Defendant's default. This motion involves the black-letter application of the Federal Rules of Evidence to the proposed admission of conduct occurring years before the Defendant's default, under subpoenas issued by Congressional committees or the Special Counsel's Office pertaining to issues completely unrelated to the January 6th Select

Committee and the Defendant's handling of that Committee's subpoena.  The exclusion of the Defendant's prior subpoena experience does not violate his Sixth Amendment right to present a defense.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.") (citing *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.")); *United States v. Libby*, 475 F. Supp. 2d 73, 90-91 (D.D.C. 2007) (rejecting defendant's argument that it violated the Sixth Amendment to exclude under Federal Rule of Evidence 403 evidence of specific national security matters on which he worked to advance a memory defense to a false statements prosecution).

## IV.   CONCLUSION

The Defendant's prior subpoena experience is irrelevant to whether his default was deliberate and its admission at trial would only serve to distract the jury from the straightforward issue it must decide.  The Government's motion in limine should be granted.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**REPLY IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Defendant Stephen K. Bannon ("Mr. Bannon"), through undersigned counsel, files this Reply in support of our Motion To Dismiss The Indictment [Doc. 58] and states as follows:

### I.    Summary Of Reply

The Government tries to excuse the missteps it made in instituting this prosecution. None of the Government's belated excuses, however, can cure the fatal defects in the Indictment. Nor can *post hac* rationalizations remedy the Government's errors in pursuing this criminal case. For example, the Government tries to recast the lack of legal authority of the Select Committee as a "procedural objection" that can be waived. [Doc. 65 at 1]. A criminal defendant does not waive an element of the offense by pre-indictment action or inaction. The Government, not the Defendant, has the burden of proving – as an element of the offense – that the Select Committee acted within the authority granted by the full House of Representatives. As detailed in our Motion, the Select Committee's subpoena to Mr. Bannon was *ultra vires*. No valid explanation has been offered by the Government, so the Indictment must be dismissed on that basis.

The Government's attempt to devalue the OLC opinions is also misguided.  Their first gambit was to argue that the OLC opinions are irrelevant. They have shifted course. Now, without

providing any authority, the Government contends that the OLC opinions do not apply once a person leaves federal service. The Government's position is flawed for at least two reasons. First, the OLC opinions, read together, clearly apply to situations involving a *former* top Presidential advisor. Second, the Government has lost sight of *who holds* executive privilege. It is the President. So even if a conversation takes place at a time when one party to the conversation is not a federal employee, if the President is still in office – as here – then executive privilege may be asserted.

Finally, the Government hopes to conceal serious flaws in the Indictment and the prosecution of this case with sweeping assertions that: Section 192 has been applied for years without constitutional challenge; Mr. Bannon waived objections to the Select Committee's unauthorized actions; and that prosecutorial interference with the attorney-client relationship by seeking attorney telephone and email records is no big deal. As detailed below, because the Government's excuses are inconsistent with the facts and controlling law, the Indictment must be dismissed.

## II. Mr. Bannon Cannot Waive The Requirement That The Select Committee Must Act Within Its Grant Of Authority

Words have meaning. H. Res. 503 [Doc. 58-2] is an "authorizing" resolution that established the Select Committee. Since this is a criminal case, unlike other challenges made to the authorization of this Select Committee, the Government has the burden of proof which requires it to establish that the Select Committee has been constituted properly pursuant to its enabling legislation.  The words of that resolution delimit the "authority" of the Select Committee. H. Res. 503 is explicitly referenced in the Indictment as the starting point for this prosecution. [Doc. 1 at ¶¶ 1 – 5]. Both Counts of the Indictment include language that addresses the "authority" element of 2 U.S.C. § 192, as follows: "STEPHEN K. BANNON, having been summoned as a witness by

the authority of the U.S. House of Representatives . . . ." [Doc. 1 at ¶¶ 23 & 25]. However, Mr. Bannon was *not* summoned as a witness by the authority of the U.S. House of Representatives. He was summoned as a witness by a Select Committee subpoena that was outside of the authority granted to the Select Committee by the House. No authority identified by the Government allows a congressional committee, as here, to exceed its grant of authority from the full House.[1] The Government's novel theory – that through silence a criminal defendant can somehow empower a congressional committee to act beyond the scope of its authorizing resolution – is nonsensical and should be rejected.

Moreover, the Government's argument that the Select Committee would have cured all defects if Mr. Bannon had just raised them earlier defies logic. [Doc. 65 at 33-34]. Again, it stretches the imagination to think that – had Mr. Bannon echoed the heated debate about the Select Committee formation ("The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader") [Doc. 58-2 at 3] – the Select Committee would have rushed out to obtain the required four additional members. The Government argues that this Court should follow lead of the district court in *Republican Nat'l Comm. V. Pelosi,* Civil Case No. 22-659 (TJK), but of course the discussion of issues in that civil case are not controlling authority here. In that case, Judge Kelly found that "on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes." Memorandum Opinion at 33 (May 1, 2022) (Civil Action No. 22-659 (TJK) (Document 33)). The parties in that civil lawsuit did "not dispute that

---

[1] This Court may construe the term "ranking minority member" as used in H. Res. 503 because the term is clear and unambiguous. *See U.S. v. Rostenkowski,* 313 U.S. App. D.C. 303, 318-320 (D.C. Cir. 1995) (courts may construe unambiguous House rules). To the extent that this Court finds any House Rule ambiguous in the factual circumstances of this criminal case, the rule of lenity requires that the ambiguity be resolved in favor of Mr. Bannon. *See, e.g.,* *Liparota v. United States,* 471 U.S 491, 427 (1985).

Chairman Thompson consulted with Representative Cheney before issuing the subpoena" at issue in that case to a third party. *Id*. at 32. No such record, and no such concession, exist in this criminal case. Here, the situation is quite different, because the Government has to prove all of the elements of this offense, and they cannot.

The record here is clear that Rep. Cheney was not acting as the "ranking minority member" with respect to the subpoena to Mr. Bannon. *See* [Doc. 58-4 at 4] (Nov. 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter)[2] ("LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.").[3] It strains credulity to argue that if Mr. Bannon had pointed out what was painfully apparent to Select Committee members already – that they lacked a "ranking minority member" – then committee members could have somehow persuaded the Minority Leader to reverse course and designate a Select Committee member as the "ranking minority member."[4]

Nor is there any merit to the Government's waiver argument [Doc. 65 at 34 – 35] pertaining to Section 3(b). The language of the House rule does not allow the Government any room for creative, after-the-fact interpretation. It mandates that "[a] witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress,

---

[2] FBI 302, dated November 2, 2021, of interview conducted in the presence of the entire prosecution team: AUSA's J.P. Cooney, Molly Gaston, and Amanda Vaughn.

[3] The statements made by House General Counsel Doug Letter were subject to the penalties that attach to 18 U.S.C. § 1001. A false statement would constitute a felony.

[4] The district court in *Republican Nat'l Comm.* was not apprised of Mr. Letter's concession, made under penalty of 18 U.S.C. § 1001, that the Select Committee has no "ranking minority member."

and these regulations." [Doc. 58-3 at ¶ 11]. The Indictment explicitly references the cover letter from Chairman Bennie G. Thompson to Mr. Stephen K. Bannon that accompanied the September 23, 2021, subpoena and misleadingly states that Mr. Bannon was provided with the required deposition rules. [Doc. 1 at ¶¶ 7 & 14 ]. That statement was clearly false. There can be no waiver where, as here, Mr. Bannon was affirmatively misled by the Select Committee about being provided the required deposition rules. *See* [Ex. 1, Letter from Chairman Bennie G. Thompson to Mr. Stephen K. Bannon (Sept. 23, 2021) at 1 ]("A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached.") This was a false statement, as the one rule that *must be given to every deponent* was not attached, or ever provided to Mr. Bannon.

Finally, the Government argues that Mr. Bannon waived any objection to Rep. Liz Cheney serving as "vice chair" of the Select Committee. The Government misapprehends our argument. We do not seek dismissal on the ground that the Speaker appointed Rep. Cheney as "vice chair." But "vice chairs" and "ranking minority members" are different animals. *See* [Doc. 58 at footnote 11] (quoting House Rule XI, cl. 2(d), which distinguishes the two positions). No action by Rep. Cheney could remedy the gap in authority created by the fact that the Select Committee has no "ranking minority member." "Ranking minority member" is a term of art, with decades of usage, and describes a position that protects the rights of the minority party. The absence of a "ranking minority member" is significant, in that no criminal prosecution can follow the issuance of a subpoena by the Select Committee, given that the authorizing resolution only allows the issuance

of such subpoenas after consultation with the "ranking minority member." Thus, the Indictment

must be dismissed. *See Yellin v. United States*, 374 U.S. 109, 117-119 (1963).[5]

### III.  This Prosecution Violates Due Process

The Government attempts to argue that: (a) executive privilege was not properly invoked

in this matter; (b) executive privilege does not provide a basis for Mr. Bannon's noncompliance

with the subpoena; (c) the defenses of public authority and entrapment by estoppel do not apply;

and (d) 2 U.S.C. § 192 is constitutional as applied. [Doc. 65 at 3-31]. The Government's

submission is without merit and in many instances is frivolous. Notably, the Government failed to

even attempt to address Mr. Bannon's compelling fair notice/due process and estoppel arguments

that require dismissal.  [*See* Doc. 58 at 21 & 46; 37-38].

The Government's submission on these issues suffers from the same defects that have

characterized each of its previous filings on these subjects. It makes factual assertions that bear

little relationship to the facts. It conflates legal concepts (*e.g.* immunity and executive privilege).

It attempts to draw distinctions that have no actual legal significance in this context (e.g. "private

citizen"), it misrepresents the legal principles attending the defenses of public authority and

entrapment by estoppel, and fails to address directly relevant OLC Opinions that Mr. Bannon has

identified. The Government also continues to improperly defy its own binding departmental

authority that is directly contrary to its arguments in this case.

Most of the Government's argument has already been addressed in previous submissions

(*e.g.*, Docs. 58, 58, 64). To avoid repetition, Mr. Bannon incorporates herein by reference all prior

---

[5] Similarly, the Government's waiver argument pertaining to a privilege log misses the mark. We argue – and the Government seems to concede – that the Select Committee *does not have authority to* require a potential deponent to draft a privilege log.

submissions. To the extent any portion of the Government's Opposition is not addressed herein, it
is because it already has been adequately briefed in other filings or it is meritless.

On the matter of whether the OLC opinions apply to a private citizen, we note that a former
executive branch official, no longer in government service is, by definition, a "private citizen."
The Government's attempt to somehow draw a distinction throughout its response, for purposes
of the application of the OLC Opinions, between a "private citizen" and current executive branch
employee is unavailing. As has been discussed at length in our previous submission, the OLC
Opinions expressly provide that the principles that are relevant here fully apply to current and
former executive branch employees as well as outside consultant "private citizens" never
employed as executive branch employees for obvious reasons, expressly enunciated in those OLC
Opinions, including the need for the President to be able to consult whoever he believes would be
helpful on the matter at hand, while being able to assure that person of confidentiality, and the
needs of the outside consultant to have his or her communications kept confidential.  [*See e.g.*,
Doc. 58-8 at 5] ("Paul Clement Letter"].

The Government seems to pretend that this key OLC document and others simply do not
exist.  *See also, United States v. Nixon*, 418 U.S. 683, 705 (1974) (recognizing need for
communications to be kept confidential; *In Re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997)
(ensuring confidentiality promotes candor); *Nixon v. Administrator of General Services*, 433 U.S.
425, 448-49 (1977) (recognizing need to maintain former President's ability to assert privilege
after leaving office to foster full and frank advice when in office). OLC Opinions already cited are
to the same effect. *See also*, *Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to
a Former Government Official Representing a Former President or Vice President in Connection
with the Presidential Records Act* (June 20, 2001, Memorandum Opinion for the Associate

Counsel to the President by Daniel L. Koffsky Acting Assistant Attorney General). https://irp.fas.org/agency/doj/olc/pra-post.pdf; *Letter from Attorney General Eric Holder to President Barack Obama* (June 19, 2012).

The Government's attempt to characterize the subpoena as being directed to Mr. Bannon in his private citizen capacity is similarly unavailing. It is the former President's prerogative to determine whether communications with a former executive branch employee were privileged or not; it is not a matter dictated by a committee's subpoena or the Government's post-hoc characterization of that subpoena. The privilege is not a function of the employee's status at the time; it is based on the nature of the communications between the witness and the President. *See* Doc. 58 at 17-18 & n. 20; 18 & n. 21 and OLC Opinions cited therein. The former President considered the subpoena and determined that it implicated executive privilege and he therefore invoked executive privilege and his invocation is presumptively valid as a matter of law, no matter how many times the Government characterizes Mr. Bannon as a "private citizen" or the materials sought as "private records" concerning his "private affairs."  [See e.g. Doc. 65 at 9].

Mr. Bannon certainly was entitled to rely on the principle that a former President retains the right to invoke executive privilege as to communications that occurred during the time he was President.  *Nixon v. Adm'r of General Services*, 433 U.S. 425, 448-449 (1977); *Trump v. Thompson*, 142 S. Ct. 680; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring) and that the privilege invocation was presumptively valid. *Congressional Oversight of The White House*, 45 Op. O.L.C. __, at *34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main.

8

*See also*, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-709 (1974). [6]

**The Government's Arguments On Executive Privilege are Wrong and Irrelevant.**

The Government speciously argues that executive privilege does not apply here. [Doc. 65 at 3-10]. It appears to argue that executive privilege was not properly invoked, citing former President Trump's invocation of executive privilege to Mr. Bannon, rather than to the committee (a position the committee clearly could have and should have raised in a civil enforcement

---

[6] Justice Kavanaugh recently summed up the state of the law on the subject in his concurrence with the denial of certiorari in *Trump v. Thompson*, 142 S. Ct. 680, 680-681; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring):

"… A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim. Concluding otherwise would eviscerate the executive privilege for Presidential communications.

As this Court stated in *United States v. Nixon*, 418 U. S. 683, 708, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974), the executive privilege for Presidential communications is rooted in Article II of the Constitution and is "fundamental to the operation of Government." The *Nixon* Court explained that the "importance" of "confidentiality" to the Presidency was "too plain to require" further discussion. *Id.,* at 705. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Ibid.* Yet a President "and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.,* at 708. By protecting the confidentiality of those internal communications, the Presidential communications privilege facilitates candid advice and deliberations, and it leads to more informed and better Presidential decisionmaking.

The *Nixon* Court noted, by way of historical example, that the Constitutional Convention was conducted "in complete privacy" and that the records of the Convention remained confidential for more than 30 years. *Id.,* at 705, n. 15. As was true at the Constitutional Convention, the Presidential communications privilege cannot fulfill its critical constitutional function unless Presidents and their advisers can be confident in the present *and* future confidentiality of their advice. If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends…."

proceeding if it believed it to be true). [7] This argument ignores the part of the directive from former President Trump to Mr. Bannon that expressly invokes executive privilege with respect to the specified documents, and it ignores Mr. Costello's phone call with President Trump's attorney in which President Trump's invocation of executive privilege was unequivocally communicated.[8] The Government also confuses the concepts of immunity (which is conferred by operation of law and not by a President or former President) with executive privilege (which can be and was invoked by the former President). [Doc. 65 at 3-10].

### **As Mr. Bannon Reasonably Believed, Executive Privilege Was Properly Invoked.**

The record demonstrates that former President Trump, through his attorney, contacted Mr. Costello, first by telephone on October 5, 2021, and again by letter on October 6, 2021, and advised Mr. Costello that the former President was invoking executive privilege as to the documents and testimony sought in the subpoena. In the October 6, 2021, letter, President Trump advised Mr.

---

[7] Former President Trump properly invoked executive privilege. It was in part, by necessity, a fully recognized "protective assertion" at this stage without having a chance to fully analyze what materials would and would not be covered and with the committee refusing to grant adequate time. It was invoked consistent with long-standing and accepted practice of notifying the witness or the holder or documents and testimony of its invocation as a matter of first issue. *See e.g., Trump v. Thompson*, 20 F.4th 10, 20 (2021) (Former President Trump asserted executive privilege to the Archivist and President Biden asserted his determination that executive privilege was not in the country's best interest also to the Archivist).

For purposes of the defenses of entrapment by estoppel and public authority, it does not matter whether executive privilege was properly invoked or even whether it actually would have been found by a judge in a civil enforcement proceeding to apply to all materials in the subpoena. What is relevant is: (1) that Mr. Bannon was advised by the former President, through his lawyer, that executive privilege was being invoked with respect to the subpoena the committee issued and that he was to comply with that invocation by not producing any documents or providing any testimony "to the fullest extent permitted by law" [See Doc. 35-6]; (2) that Mr. Bannon reasonably believed the former President properly invoked executive privilege and that such an invocation is presumptively valid *see In Re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997); and (3) that Mr. Bannon acted with respect to the subpoena in a manner that he believed was fully consistent with the directives he received from the former President and with what he reasonably believed the binding authoritative policy statements of the DOJ, through its OLC Opinions and other authoritative writings, provided, based on his circumstances, as these elements are more fully explained in his motion to dismiss [Docs. 58 and exhibits; 58]. The Government's argument has no bearing on the issues now before the Court regarding the defenses raised by Mr. Bannon. It is significant to note here, though, that the OLC has recognized that executive privilege concerns can arise and require protection from congressional inquiry, even before executive privilege has been asserted. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *8 (May 23, 2019)  *https://www.justice.gov/olc/file/1215056/download*.

[8] *See* Costello Declaration [Doc. 30-1 at ¶10]; Doc. 39 at ¶6; Doc. 34-1 at ECF Page 17; Doc. 29-1 at 6].

Bannon (through their respective attorneys) that he considered the subpoena to be seeking "records and testimony … which is potentially protected from disclosure by the executive and other privileges…" and that "President Trump is prepared to defend these fundamental privileges in court." [Doc. 35-6 at 4]. President Trump's letter went on to provide that, "to the fullest extent permitted by law, President Trump instructs Mr. Bannon to … (b) not produce and documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena." [*Id*.]. This letter and the previous day's telephone call clearly demonstrate former President Trump's invocation of executive privilege. The Government believes that President Trump's invocation of executive privilege was somehow invalid because he did not specify in granular detail the exact documents and testimony over which he was asserting privilege and because in a later email, President Trump's lawyer advised Mr. Costello that he did not "believe there is immunity for your client" [Doc. 65 at 7, citing Doc. 52-3]. The Government is wrong. The invocation of executive privilege in and of itself triggers the OLC Opinions that were relied upon by Mr. Bannon, including the OLC Opinions on immunity. It was therefore reasonable for Mr. Bannon to believe that these opinions applied once executive privilege was invoked, especially given his role as a former top adviser to President Trump.

The Government's characterization of the invocation of executive privilege as an "intention" to invoke privilege [Doc. 65 at 5] is factually incorrect and legally irrelevant. Indeed, when the President recognizes that a subpoena is directed toward materials and information that might implicate executive privilege, it is well recognized that the President can make a "protective" assertion of privilege to give him the opportunity to determine exactly what documents and

information are subject to executive privilege.[9] Once again, the Government's position is premised on a misunderstanding of the legal principles underpinning this case and deliberate blindness to the expressly stated bases for Mr. Bannon's noncompliance with the subpoena.[10]

As discussed in previous filings, Mr. Bannon's reasonable belief that he was neither obligated nor legally permitted to comply with the subpoena was based on four separate principles contained in the DOJ's own OLC Opinions:

---

[9] *See Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents, 20 Op. O.L.C. 1, 1 (1996) (Reno, Att'y Gen.)* https://www.justice.gov/file/20056/download; *accord Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files, 43 Op. O.L.C. __ (May 8, 2019) (Barr, Att'y Gen.)* https://www.justice.gov/olc/opinion/file/1350191/download. *See also* Doc. 58-7 at 58, n.22.

[10] Unfortunately, the Government's submission is also characterized by misrepresentations of fact once again and, as in the past, there is, of course, no record citation for the misrepresentation because the facts do not exist [*See* Doc. 39, citing past occasions]. For example, the Government writes "[I]n fact, in later correspondence, Mr. Clark admonished that the former President had neither asserted privilege in a manner to allow, nor instructed the Defendant to engage in, total noncompliance." [Doc. 65 at 6]. This never occurred. In the same paragraph, Government counsel writes, [I]n an October 16, 2021, email to Mr. Costello, Mr. Clark made clear that the former President did not invoke executive privilege in any way to bar the Defendant from appearing for a deposition or to direct him not to attend, stating, 'Just to reiterate, our letter referenced below [the October 6, 2021 letter] didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is.' ECF No. 52-3" [Doc. 65 at 6-7]. It simply is not true that President Trump's lawyer conveyed to Mr. Bannon a limitation on the invocation of executive privilege and the cited passage does not support the Government's assertion. It simply refers to "immunity" and that is not a concept that is up to a President or former President to assign or convey. It arises by operation of law, once executive privilege is invoked, as one after another OLC Opinion makes clear. It arises by operation of law for several reasons which the OLC Opinions set out, but among them is the fact that the witness cannot determine which documents or testimony the invocation of executive privilege would cover and compelling a witness's testimony after executive privilege has been invoked risks a separation of powers intrusion and an unlawful intrusion into the President's (or former President's) deliberative process and prerogative. [See e.g., Doc. 58-7 at 53-55; 58, n.22]. The relevant OLC Opinions previously have been cited.

Finally, on this point, Government counsel's additional representation to the Court: "In any event, the Government is aware of no authority, and the Defendant points to none, supporting the notion that a private citizen subpoenaed in that capacity is entitled to absolute immunity from testimony based on executive privilege" [Doc. 65 at 7] is wrong and very disturbing for several reasons. First, there is crystal clear binding authority from OLC Opinions which Mr. Bannon has, indeed, pointed to, which absolutely provide that a former executive branch official (a "private citizen") is entitled to "immunity from testimony" (actually, immunity from being compelled to even appear) when executive privilege is invoked. If Government counsel is not "aware" of it, then they need to re-read the cited OLC Opinions. Secondly, the relevant OLC Opinions on this subject both pre-date and post-date the decisions in *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 202-03 (D.D.C. 2019), *overruled on other grounds*, 951 F.3d 510 (D.C. Cir. 2020) and *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 99-107 (D.D.C. 2008), which the Government cites [Doc. 65 at 8]. These are binding authoritative OLC Opinions from these prosecutors' own Department and Mr. Bannon was entitled to rely on them. Third, as has been stated, and as will be discussed further, Mr. Bannon was not only relying on the OLC Opinions on "immunity" for his response to the subpoena.

12

**-1866-**

First, OLC Opinions direct that once executive privilege has been invoked, the witness is immune from being compelled to comply with a committee subpoena. The OLC Opinions further provide that once executive privilege has been invoked, a current or former executive branch official cannot be charged under 2 U.S.C. § 192 for not complying with a subpoena that implicates privileged materials.[11]

---

[11] In the OLC Opinion, *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, for example, OLC Assistant Attorney General Charles J. Cooper recounted the OLC's historic analysis of the consequences when a witness fails to comply with a congressional subpoena based on a claim of executive privilege and wrote the following at https://www.justice.gov/file/23826/download (Page 85) (relying in part *on "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,"* 8 Op. O.L.C. 101 (1984) ("Olson Opinion"):

> "During the EPA matter, this Office rendered advice to the Attorney General, since memorialized in a memorandum on the applicability of §§ 192 and 194 to Executive Branch officials who assert claims of executive privilege on behalf of the President. … *We also concluded more broadly, however, that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege. We noted that neither the legislative history nor the subsequent implementation of §§ 192 and 194 suggest that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. Moreover, as a matter of constitutional law, we concluded that the threat of criminal prosecution would unduly chill the President's ability to protect presumptively privileged Executive Branch deliberations … If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution. 8 Op. O.L.C. at 102. Therefore, Congress could not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure set out in 2 U.S.C. §§ 192 and 194 against the head of an Executive Branch agency, if he acted on the instructions of the President to assert executive privilege in response to a congressional subpoena."* (Emphasis added) (citation omitted).

> *See also, Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019)[Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) [Doc. 58-11]; *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Privilege*, 8 Op. O.L.C. 101 (1984) [Doc. 58-10]; *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. slip op. (July 10, 2007) [Doc. 58-9]; *Application of 28 U.S.C. §458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. slip op. at 356 (December 18, 1995) [Doc. 58-12] ("Despite the broad language, the criminal contempt of Congress statute does not apply to the President or to presidential subordinates who assert executive privilege."), q*uoting*, Doc. 58-12]. In 2021, after the decision in *McGahn*, the OLC reiterated its long-standing position on immunity, and provided several other principles that it considers a bar to compelling current or former Executive Branch officials from testifying before Congress when executive privilege has been invoked, specifically noting why it applies to former officials with equal force and noting its firm position that the failure to permit the privilege holder's representative to attend any deposition renders the subpoena invalid and unconstitutional. *Congressional Oversight of the White House*, 45 Op. O.L.C. slip op. at 50-57 (January 8, 2021) [Doc. 58-7].

Secondly, OLC Opinions direct that once executive privilege has been invoked, if the committee will not permit a representative of the privilege holder to be present during the taking of testimony, the subpoena is invalid and cannot constitutionally be enforced and the witness cannot constitutionally be charged with criminal contempt. [Doc. 58 at 18].

> Subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"; "This Office has advised that barring agency counsel from congressional depositions is unconstitutional because it 'compromise[s] the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities.'");

*Congressional Oversight of The White House*, *supra*, at \*56. [Doc. 58-7 at 56]; *see also Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at \*1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

The Select Committee was unequivocal in its communications to Mr. Costello that its rules prohibited a representative for President Trump to be present for Mr. Bannon's testimony. Mr. Bannon has always made clear that once the committee communicated this prohibition, he reasonably relied on the applicable OLC Opinions that direct that a congressional subpoena is invalid and unconstitutional under these circumstances.

Third, Mr. Bannon is not the privilege holder. The privilege belongs to former President Trump. Therefore, as the OLC Opinions make clear, Mr. Bannon lacked any legal authority to decide what materials or information that President Trump deemed privileged. As explained by the OLC Opinions, Mr. Bannon appearing for testimony or producing documents under these

_____

circumstances presented both an untenable risk of intrusion into the President's privilege and an abrogation by the legislature of the executive branch's autonomy. Mr. Bannon was therefore obligated to observe President's invocation of executive privilege and could not produce documents or testify without further guidance as to the scope of the materials and information over which President Trump asserted executive privilege.  [*See* Ex. 2, Mar. 16, 2022 Hearing Tr. at 66].[12]

Fourth, Mr. Bannon was duty bound to honor the constitutional mandate to work toward an accommodation, as reflected in the case law, the OLC Opinions, and congressional practice.[13] Mr. Bannon also relied on his four previous experiences with a committee subpoena for which the accommodation process was used and was allowed to run its course, leading to his testimony. He attempted to reach an accommodation from the outset, with his letter to Chairman Thompson

---

[12] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees, 2019 WL 2563045 (O.L.C.) at \*8 (May 23, 2019)* https://www.justice.gov/olc/file/1215056/download.

"Even if the President has not yet asserted a particular privilege, excluding agency counsel would diminish the President's ability to decide whether a privilege should be asserted. The Executive Branch cannot foresee every question or topic that may arise during a deposition, but if questions seeking privileged information are asked, agency counsel, if present, can ensure that the employee does not impermissibly disclose privileged information. See Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore may be unable to confine his remarks only to those which do not impair the deliberative process."). The President, through his subordinates, must be able to intervene before that information is disclosed, lest the effectiveness of the 3 See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, 31 Op. O.L.C. 1 (2007) (opinion of Acting Attorney General Paul D. Clement) (concluding that the President may assert executive privilege with respect to testimony by two former White House officials). Attempted Exclusion of Agency Counsel from Congressional Depositions 11 privilege be diminished. See Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 2 (Sept. 8, 1986) (agency counsel attending congressional interviews can advise "about the sensitivity of particular information and, if need be, to terminate the interview to avoid disclosure of privileged information"). Accordingly, Committee Rule 15(e) unduly interferes with the President's supervision of the disclosure of privileged information by barring agency counsel from the deposition of an agency employee concerning official activities."

[13] *See e.g., United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977); Doc. 58-7 at 38 (OLC Opinion of Jan. 8, 2021).

advising that he would comply if the privilege issue were resolved with President Trump and that he would comply if a judge determined that Mr. Bannon must comply with the subpoena notwithstanding the invocation of executive privilege. Mr. Bannon later received a letter from Deputy White House Counsel Jonathan Su, advising, in effect, that President Biden had decided to try to override President Trump's invocation of executive privilege. When Mr. Bannon learned about the filing of *Trump v. Thompson*, in which this priority question was directly at issue, Mr. Bannon simply asked the committee for a one-week adjournment to determine whether the Court's decision in that case yielded any guidance for Mr. Bannon's predicament. The committee denied that request for no reason, other than apparently the already scheduled televised contempt referral vote it wanted to capitalize on for political purposes.  [See Doc. 30-1, ¶¶12-16].  Mr. Bannon never engaged in "total noncompliance" as the Government asserts. He simply requested the same extension of time that the committee has afforded to other witnesses in this investigation. Mr. Bannon expressly advised the committee through counsel that he was not ignoring or acting in defiance of the subpoena and was committed to working out a way to comply, if possible, consistent with his legal duties.  [See e.g., Doc. 29-1 at ECF Pages 6-7l Doc. 30-1, ¶¶12-16]. He fulfilled his accommodation obligations; the committee completely rejected theirs.[14]

For these reasons, the Government's argument that Mr. Bannon is not entitled to rely on the defenses of entrapment by estoppel or public authority because executive privilege was not properly invoked has no merit and its argument at Opposition pages 3-10 must be rejected.

---

[14] "A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course."  [Doc. 58-7 at 56; see also *Id.* at 37-40, discussing the constitutional foundations for the accommodation process].

Furthermore, Pages 10-27 of the Government's Opposition make specious arguments reflecting its position that the defenses of entrapment by estoppel and public authority do not apply. The Government has argued throughout this case that, contrary to express authority from the United States Supreme Court and this Circuit, the defense of entrapment by estoppel only applies when a defendant has made direct inquiry of an agency and received direct, personalized advice. This is a fundamental error which undermines the Government's arguments on entrapment by estoppel across the board. Its repeated assertions that Mr. Bannon cannot reasonably rely on OLC Opinions that were not issued in response to his direct inquiry or that the impact of OLC Opinions is limited to the facts on which the OLC was asked to opine is belied by the decision in *Comm. on the Judiciary v. United States v. McGahn*, 968 F.3d 755 (2020) (*en banc*). In *McGahn*, the Court repeatedly refers to and credits OLC Opinions as reflecting binding DOJ policy on the legal principle involved and did not limit the applicability of that legal principle to the specific facts that necessitated the OLC Opinion in the first place. In fact, the Court expressly notes long-established DOJ policy, reflected in OLC Opinions (upon which Mr. Bannon relies in this case), as support for its conclusion that a civil enforcement action is only viable course of action to compel compliance with a subpoena once executive privilege has been invoked, specifically because the OLC has made clear the DOJ's position that the criminal contempt statute does not and cannot apply. *McGahn*, 968 F.3d at 773, 775.[15] The very purpose of OLC Opinions is to guide the DOJ in their prosecution of cases and to give binding authoritative notice of their departmental policy. It would therefore be anomalous to hold that the legal principles espoused in OLC Opinions, which

---

[15] "Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor. *See, e.g., Testimonial Immunity Before Congress of the Former Counsel to the President, 2019 OLC LEXIS 2, 2019 WL 2315338, at \*14 (O.L.C. May 20, 2019)* [Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress, 32 Op. O.L.C. 65, 68-69 (2008)* [Doc. 58-11] Cooper Opinion, 10 Op. O.L.C. at 83 [Doc. 58-15]; Olson Opinion, 8 Op. O.L.C. at 142." [Doc. 58-10].

are based on legislative history, caselaw, and painstaking research by some of the foremost legal scholars at DOJ, cannot be applied to cases implicating the very same legal principles . [*See* Doc. 58 at 22-27].

Unfortunately, throughout their Opposition, Government counsel choose to substitute condescension and offensive tone for relevant substantive argument. Their arguments are frivolous. They are based on false factual and legal premises[16] and a mistaken presentation of the role and authority of the OLC Opinions. The conclusions and principles of law arising from many of the directly relevant binding OLC Opinions and other authoritative DOJ writings on the exact subjects at issue are badly misrepresented or ignored. Mr. Bannon need not burden the Court at any great length with a reply to these issues. He will rely on his motion to dismiss and will be prepared to address these other matters at oral argument.  After one general comment, he will focus

---

[16]For its entire argument that the defenses of entrapment by estoppel and public authority do not apply, the Government uses a false factual construct of a subpoena directed toward a "private citizen" seeking his "private records" and for which no claim of executive privilege has been asserted. [Doc. 65 at 4-27]. That is not this case. The Government's submission simply does not address the issues in the case based on the actual relevant facts and law.

With respect to the OLC Opinions and other DOJ writings, the Government limits the universe of relevant authoritative writings to four [Doc. 65 at 11-17], without any legitimate basis for doing so, and it presents a skewed picture of those four, ignoring or unduly limiting the principles for which they stand. Indeed, the Government ignores the clear overriding authoritative, binding principles enunciated in these four, as it does for other applicable OLC Opinions and consistently ignores or misrepresents legal principles clearly set out in the authoritative writings.

For example, a central underlying theme of the Government's argument is that the authority of the relevant OLC Opinions that provides that when a witness receives a committee subpoena and executive privilege is invoked he cannot be compelled to comply and he cannot be prosecuted under §192 does not apply to a "private citizen."  [Doc. 65 at 11-17].

Putting aside that that characterization of Mr. Bannon fatally ignores his role as a former top executive branch advisor to President Trump, the Government's attempt to narrow the principles for which the OLC Opinions stand finds no support in the law and does not reflect the actual standing and impact of the OLC Opinions as a matter of binding policy.  [See Doc. 58 at 17-27].  Multiple OLC Opinions cited by Mr. Bannon expressly provide that these protections that flow from the invocation of executive privilege apply in full force to former executive branch employees and to outside consultants with whom the President communicated, all of whom are at that point "private citizens."  [See e.g., citations at Doc. 30 at 18; Doc. 58 at 17-18, n. 20].  Moreover, independent of the OLC Opinions, the Government's thesis makes no sense.  It cites no authority for the absurd proposition that a President (or former President) cannot assert executive privilege regarding communications with an outside consultant or that the legislative branch has the right to override the President's prerogative as to what communications he deems privileged. Yet the Government's entire argument is based on that unsupportable thesis.

on two important arguments in his motion to dismiss that the Government failed to address in its opposition.

The Government has argued throughout this case, against express authority from the Supreme Court and D.C. Circuit, that the defense of entrapment by estoppel only applies when a defendant has made direct inquiry of an agency and received direct, personalized advice. This is a fundamental error which undermines the Government's arguments on entrapment by estoppel across the board. Its repeated assertions that Mr. Bannon cannot reasonably rely on OLC Opinions that were not issued in response to his direct inquiry or that the impact of OLC Opinions is limited to the facts on which the OLC was asked to opine and cannot be applied more broadly based on the principles they enunciate, are belied, among numerous other sources, by the decision in *Comm. on the Judiciary v. United States*, 968 F.3d 755 (2020) (*en banc*). In *McGahn*, the Court repeatedly referred to and credited OLC Opinions as reflecting binding DOJ policy on the legal principle involved and not limited to the facts at issue in the OLC Opinion. In fact, the Court expressly noted long-established DOJ policy, reflected in OLC Opinions relied upon by Mr. Bannon, as support for its conclusion a civil enforcement action is the only viable course of action with respect to a subpoena when executive privilege has been invoked – specifically because the OLC has made clear the DOJ's position that the criminal contempt statute, §192, does not and cannot apply. *McGahn*, 968 F.3d at 773, 775.[17] This makes sense, of course, given the bases for deserved stature of the OLC Opinions and the DOJ's intention that they serve as formal, binding, policy statements for the DOJ.   [See Doc. 58 at 22-27]. The Government sacrifices important jurisprudential

---

[17] "Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor. *See, e.g., Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019) [Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) [Doc. 58-11] Cooper Opinion, 10 Op. O.L.C. at 83 [Doc. 58-15]; Olson Opinion, 8 Op. O.L.C. at 142." [Doc. 58-10].

principles for political expedience in attempting to narrow or diminish the OLC Opinions, in furtherance of its "anything goes" misuse of the criminal justice system to advance a partisan political agenda in this case.[18]

### IV.    2 U.S.C. § 192 Is Unconstitutional As Applied

**The Fair Notice Requirement of Due Process Requires Dismissal in Light of the OLC Opinions**

At Pages 43-48 of his motion to dismiss, Mr. Bannon argues that 2 U.S.C. §192, as applied, is unconstitutionally overbroad and is void for vagueness. [Doc. 58 at 43-48]. Among the several arguments Mr. Bannon makes as to why the statute is unconstitutional as applied, perhaps the most directly compelling one that demands the indictment's dismissal is that the statute, when considered with the relevant OLC Opinions, which reflect official, binding, authoritative DOJ policy, violates the constitutional right to due process of law by failing adequately to give fair notice of what conduct will subject a person to criminal liability or prosecution under the statute. [Doc. 58 at 44-46].

Statements by the Government, through its agents or officials, concerning criminal sanctions, which are contradictory or so vague and undefined "as to afford no fair warning as to what might transgress (the statute)" render the statute unconstitutionally vague, much in the same way contradictory statements within a criminal statute render the statute unconstitutional. *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 674 (1973), the Supreme Court expressly highlighted the due process concerns implicated by agency writings in the context of a criminal prosecution. The Court wrote that fair warning of criminality must be provided, even where the agency's writings do not purport

---

[18] There are many additional errors and misrepresentations of material facts and legal principles throughout the balance of the Government's Opposition. The defense can address any of these at oral argument, if the Court so requires.

to "create or define the statutory offense at issue" but nonetheless can be interpreted as a guide to future conduct. *Id.* The Court wrote that such agency policy writings as were at issue there, "deprived (PICCO) of fair warning as to what conduct the Government intended to make criminal" and that when that occurs, as it undeniably has here, "… there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution." *Id.* (citations omitted). *See also, United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (pre-trial dismissal ordered under the Due Process Clause); Floyd D. Shimomura, *Federal Misrepresentation:  Protecting the Reliance Interest*, 60 Tul. L. Rev. 596, 636-641 (1986); SueAnn D. Billimack, *Reliance on an Official Interpretation of the Law: The Defense's Appropriate Dimensions*, 1993 U. Ill. L. Rev. 565, 578 (1993) (fair notice/due process).

The situation here is far more violative of due process than just failing to give adequate notice of what will constitute criminal conduct. The OLC Opinions first give license to the course of action Mr. Bannon took in response to the subpoena and the assertion of executive privilege. As described in detail, with citations provided throughout the motion to dismiss, the OLC Opinions make clear that a witness who receives a congressional subpoena with respect to which executive privilege is asserted, must presume the invocation of privilege to be valid, must honor the privilege and cannot be compelled to comply with the subpoena. The OLC Opinions further provide that when, in connection with a subpoena in such a circumstance the committee refuses to allow the privileged holder's representative to attend the taking of any testimony, the subpoena is rendered invalid, unconstitutional, and unenforceable. These clear, binding, authoritative OLC Opinions, consistent over decades and adopted by the DOJ, guided and licensed Mr. Bannon's conduct. But most directly relevant for the instant fair notice/due process issue that requires dismissal, the OLC Opinions, in place since at least 1984 (based on even earlier official DOJ writings), unequivocally

provide that the criminal contempt statute cannot be applied in this exact situation – Mr. Bannon cannot be subjected to criminal prosecution under the attending circumstances.

It has been official DOJ policy since at least 1984 that the criminal prosecution of a current *or former* executive branch official under 2 U.S.C. §192 is prohibited where, as here, executive privilege was invoked.[19] Six decades of official consistent DOJ policy, reflected in its OLC Opinions, is that when an executive branch official (or former executive branch official) receives a congressional subpoena and the President (or former President) invokes executive privilege in connection with the subpoena, that person cannot be prosecuted under §192.[20] Mr. Bannon was, of course, a close and top advisor to former President Trump in the executive branch and former President Trump, in the exercise of his exclusive prerogative, invoked executive privilege with respect to the subpoena Mr. Bannon received and that underlies this prosecution.

Under the operative circumstances here, in light of the binding, authoritative OLC Opinions, Mr. Bannon could not possibly have had the fair notice due process requires to know or even have reason to believe that his conduct in response to the subpoena could expose him to criminal liability. Quite to the contrary, the OLC Opinions assured Mr. Bannon, and anyone

---

[19] As noted earlier, as recently as 2020, the D.C. Circuit confirmed that it is the consistent long-standing official position of the DOJ, reflected in multiple OLC Opinions, that the criminal contempt statute "does not and could not apply to a close Presidential advisor." *McGahn*, 968 F.3d 755 at 773, 776 (D.C. Cir. 2020) (en banc) (citing OLC Opinions).

[20] *See e.g.*, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (May 30, 1984) [Doc. 58-10]:

"We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers."

*See also*, *Congressional Oversight of the White House*, 2021 WL 222744 O.L.C. 2021 WL 222744 at \*33 (O.L.C.) [Doc. 58-7]; Machen letter of March 31, 2015 [Doc. 58-16].

similarly situated that it would be absolutely prohibited to charge a person so situated who refuses to comply with the subpoena under such circumstances as this case presents with a violation of the statute charged in this case, 2 U.S.C. §192.  In fact, the OLC Opinions and other authoritative DOJ writings have provided this assurance consistently across all administrations.

A relevant section from the motion to dismiss, which the Government has failed to oppose bears reiterating: The DOJ's definitive position that the criminal contempt statute does not apply where Executive Privilege has been invoked goes back well over six decades.  Mr. Bannon relied on that in his response to the subpoena and he was entitled to rely on that official policy.  The DOJ must be estopped from prosecuting this case, in light of its official, published policy on this exact issue.

As the OLC opinion, *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C. at *2) expressly reports, in 1956, Deputy Attorney General William Rogers presented a report to Congress that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President has asserted executive privilege.  [See Doc. 41-6].

In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would not present the matter to a grand jury (notwithstanding the mandatory language in Sec. 194).[21]  In Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion,[22] drawing on

---

[21] *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

[22] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt of Congress*").

canons of statutory construction, legislative history, and basic constitutional principles, (including constitutional separation of powers principles), the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. Sec. 458*, 19 Op. O.L.C. at 356 (emphasis added). Professor Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Id.*[23] Mr. Bannon would respectfully commend the Court's attention to Pages 129-142 of the Olson Opinion, provided to the Court at Doc. 58-10, to see just how forcefully the OLC Opinions make the point that §192 does not and cannot apply to Mr. Bannon's situation, with full detailed support and careful reasoning by Mr. Olson provided.

In light of the cited OLC Opinions (and other DOJ writings consistent with them), which Mr. Bannon, as a former executive branch employee who received a subpoena to which President Trump invoked executive privilege, was entitled to consult and rely and did so, Mr. Bannon unquestionably was deprived of the fair notice that his conduct could give rise to criminal liability that due process requires. In fact, the DOJ writings assured him that he could not and would not face criminal liability. The constitutional guarantee of due process demands the dismissal of the indictment. [*See also* Doc. 58 at 19 & n. 23].

---

[23] *See also*, *Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives* (Feb. 28, 2008); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) (by Assistant Attorney General Charles Cooper).

### The Government Must Be Estopped From Pursuing This Criminal Prosecution.

The Government also failed to respond to Mr. Bannon's conceptually similar, but independent argument that, in any event, the Government, acting through the Department of Justice, should be estopped from prosecuting this case as a matter of due process and equity, if the accepted principle that OLC Opinions are binding authority on the DOJ is to have any meaning at all. [Doc. 58 at 37-38]. Mr. Bannon incorporates by reference that argument here.

Mr. Bannon has demonstrated that the official, formal, binding authority in the DOJ's OLC Opinions unequivocally establish as long-standing, consistent DOJ policy that (1) the subpoena in this case was legally invalid, unconstitutional, and unenforceable because, notwithstanding the invocation of executive privilege, the committee rules refused to allow the privilege holder's representative to be present for the subpoenaed deposition and the committee confirmed that it would follow that rule; (2) the invocation of the privilege was the former President's sole prerogative and not Congress's, (3) the invocation was presumptively valid, (4) it applies to former employees and outside consultants, (5) that bringing a criminal prosecution against a person in Mr. Bannon's situation would violate the separation of powers doctrine and would be unlawful, and (6) that, for a variety of reasons, a person so situated cannot be prosecuted criminally under 2 U.S.C. § 192 as a matter of law. It is inconceivable that any just system could allow the same prosecutorial authority that formulated those positions as a matter of law, through binding enactments, to now prosecute Mr. Bannon in direct contravention of those binding principles. The Government must be estopped.[24] The indictment must be dismissed.

---

[24] *See*, *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046, 1069 (1969) (Citing two "interrelated advantages for a rational system of criminal justice" of the "development of a full-blown defense of criminal estoppel."); John T. Parry, *Culpability, Mistake, and Official Interpretations of Law*, 25 Am. J. Crim. L. 1, 78 (Fall 1997) (Asserting that the criminal law will be better served if courts recognize both the "moral culpability" and due process rationales for applying estoppel in criminal cases).

V.    **Prosecutorial Over-Reaching Requires Dismissal**

Throughout the course of this case, the Government has taken the brazen position that they did nothing wrong by seeking Mr. Costello's telephone and email records, and surreptitiously "interviewing" him in order to obtain evidence against his client, Mr. Bannon. *See* [Ex. 2, Mar. 16, 2022, Hearing Tr. at 12] ("So Mr. Costello is the intermediary here. He is the only one interfacing with the Committee. So as the government is starting its investigation, it could possibly be that Mr. Costello just never fully communicated with the defendant about what the Committee was requiring of him."). It is outrageous that the Government tries to excuse their highly unusual actions by characterizing Mr. Costello as an "intermediary" and not a lawyer. Outrageous government conduct is, as the Government acknowledges, grounds for dismissing an indictment. *See United State v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991).

The Government argues that for this Court to dismiss the Indictment, the record must establish: (a) Government awareness of an attorney-client relationship; (b) deliberate intrusion into that relationship; and (c) prejudice. [Doc. 65 at 39] (citing *United States v. Hsia*, 81 F. Supp. 2d 7, 18-19 (D.D.C. 2000). These factors are established in the record here. The Government deliberately sought the telephone and email records of Mr. Costello precisely because they knew that he served as counsel to Mr. Bannon in his interactions with the Select Committee. The Government deliberately interfered with that relationship, by seeking – without main DOJ authorization – Mr. Costello's records to obtain evidence that could be used against Mr. Bannon in this very prosecution.

Mr. Bannon was prejudiced by the Government's action because they drove a wedge between him and his lawyer. *See* [Ex. 2, Mar. 16, 2022, Hearing Tr. at 68] (Mr. Costello: "Now, I can't think of any way to put a wedge between a lawyer and his client than to say that that guy that

you thought, Mr. Bannon, was your lawyer, is now going to be a witness against you; that's what they were doing here."); *Id*. at 71-72 (Mr. Costello: "But I certainly was not advised that this is going to be an FBI interview . . . When Mr. Bannon found out about that, he was irritated because he thought I gave an interview to the FBI because of the 302. So that's the kind of wedge I'm talking about here that they drive between a lawyer and his client, by making that lawyer look like he's not a lawyer representing you. In fact, he's going to be a witness against you.").

History teaches us that what is permitted will come to be expected. If no sanction is imposed for the Government's gross abuse of power and interference with Mr. Bannon's Sixth Amendment right to counsel, then years from now the *Bannon* case will stand for the proposition that a federal prosecutor is just doing a thorough investigation when he or she: (a) seeks a grand jury subpoena for the attorney's phone records; (b) seeks a court order for the attorney's email records; and (c) surreptitiously "interviews" a defendant's attorney under the guise of participating in counsel discussions regarding a proposed declination, when all the while, the prosecution was considering the lawyer a witness to a purported "crime" rather than an advocate on behalf of a client. Unless the Indictment is dismissed, prosecutors across the country will be emboldened to copy the outrageous Government conduct here. The Constitution guarantees an accused the right to counsel; no authority allows the prosecutor to decide by fiat to turn an accused's lawyer into a witness against him.

On the misleading grand jury testimony, again the Government mischaracterizes our brief. Our quarrel is not with *whether* the grand jury was informed about the assertion of execution privilege in any form. The misleading grand jury testimony was by the sole grand jury witness, who testified upon prompting by the prosecutor that neither former President Donald J. Trump nor his representative communicated *directly with* the Select Committee to assert executive privilege.

[Doc. Ex. FF – grand jury transcript filed under seal – at 44]. That testimony suggested, improperly, that the Select Committee had not received a formal or informal assertion of privilege by President Trump, which was false and misleading. Similarly, the grand jury testimony about an adjournment is misleading, and the Government's opposition brief is misleading to the extreme. The Government knows that the request for adjournment was not a "post-default effort to delay a contempt citation" [Doc. 65 at 46], because Chairman Thompson invited Mr. Costello to submit the October 18, 2021, letter, [Ex. 3 at 1], and after receiving it, the Chairman explicitly noted that it was a "letter requesting a one-week 'adjournment.'" [Ex. 4 at 1 (US-000275)]. The Government had this in their position – yet did not present it to the grand jury. Instead, they presented false testimony that Mr. Bannon never sought an adjournment. [Doc. Ex. FF – grand jury transcript filed under seal – at 32-36]. Based upon the presentation of false testimony on key issues. The Indictment should be dismissed. *See U.S. v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980).


## CONCLUSION

WHEREFORE, Defendant Stephen K. Bannon respectfully requests that this Court grant his Motion To Dismiss The Indictment, for the reasons set forth in the filings, together with any offered if at the hearing on this motion, and the entire record in this matter.


*(Signature block on next page)*

Dated: May 17, 2022                    Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

   /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

   /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

   /s/ Robert J. Costello
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of May 2022, a copy of the foregoing Reply In Support Of Motion To Dismiss The Indictment was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

        /s/ M. Evan Corcoran
        M. Evan Corcoran (D.C. Bar No. 440027)

# EXHIBIT 1

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

One Hundred Seventeenth Congress

Select Committee to Investigate the January 6th Attack on the United States Capitol

September 23, 2021

Mr. Stephen K. Bannon
c/o Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Bannon:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena compelling you to produce the documents set forth in the accompanying schedule by October 7, 2021, and to appear for a deposition on October 14, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. This inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The Select Committee has reason to believe that you have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021. For example, you have been identified as present at the Willard Hotel on January 5, 2021, during an effort to persuade Members of Congress to block the certification of the election the next day, and in relation to other activities on January 6.[1] You are also described as communicating with then-President Trump on December 30, 2020, and potentially other occasions, urging him to plan for and focus his efforts on January 6.[2] Moreover, you are quoted as stating, on January 5, 2021, that "[a]ll hell is going to break loose tomorrow."[3] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and multiple other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[1] *E.g.,* BOB WOODWARD & ROBERT COSTA, PERIL at 233 (2021).
[2] *Id.* at 207.

Rob Kuznia, Curt Devine, & Drew Griffin, *How Trump Allies Stoked the Flames Ahead of Capitol Riot*, CNN (Jan. 18, 2021), https://www.cnn.com/2021/01/18/politics/trump-bannon-stone-giuliani-capitol-riot-invs/index.html.

**Jan. 6 Sel. Comm. 0003**

US-000375

Mr. Stephen K. Bannon
Page 2

## SCHEDULE

In accordance with the attached Definitions and Instructions, you, Stephen K. Bannon, are hereby required to produce all documents and communications in your possession, custody, and control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal or campaign accounts, and/or on personal or campaign applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.:

1. The January 6, 2021, rally on the mall and Capitol grounds in Washington, D.C., in support of President Donald J. Trump and opposition to certification of the results of the 2020 presidential election, including any permitting, planning, objectives, financing, and conduct, as well as any communications to or from any person or group involved in organizing or planning for the January 6, 2021, rally.

2. Then-President Trump's participation in the January 6, 2021, rally, including any communications with President Trump or any paid or unpaid attorney, advisor, aide, or assistant to President Trump relating to the nature, context, or content of President Trump's intended or actual remarks to those attending the January 6, 2021, rally.

3. Communications referring or relating to the nature, planning, conduct, message, context, or participation in the January 6, 2021, rally between or among any person who, during the administration of President Donald J. Trump, worked in the White House complex, including any employee or detailee.

4. Documents or other materials referring or relating to the financing or fundraising to assist any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the January 6, 2021, rally.

5. "The 'War Room' podcast," insofar as at any time you communicated through it statements referring or relating to efforts to contest the election results, including planning for the January 6, 2021, rally, including all statements concerning its planning, objectives, purpose, organization, message, or sponsorship.

6. The organization or group named "March for Trump" and its activities relating to the January 6, 2021, rally, including any communications you had with any officer or member of "March for Trump" relating in any way to the planning, objectives, organization, message, sponsorship, and participation in the January 6, 2021, rally.

7. Your presence, purpose, statements, and activities at a meeting at the Willard Hotel on January 5, 2021, or the presence, purpose, statements, or activities of others in attendance, related to that meeting.

8. Your communications with President Donald J. Trump concerning events on January 6, 2021, including but not limited to communications on December 30, 2020.

9. Your communications with President Donald J. Trump between November 3 and January 20, 2021, concerning efforts to contest the election results or delay or impede the electoral count.

10. Anyone with whom you communicated by any means with respect to any aspect of the planning, objectives, conduct, or participation in the January 6, 2021, rally, including but not limited to Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

**Jan. 6 Sel. Comm. 0004**

US-000376

Mr. Stephen K. Bannon
Page 3

11. Anyone with whom you communicated by any means with respect to efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count, including but not limited to communications with Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

12. All public relations, advertising, or other communications efforts to persuade Americans that the election was stolen or to attend the rally on January 6.

13. The role of the Vice President as the Presiding Officer in the certification of the votes of the electoral college.

14. Any communication with any employees of President Trump's 2020 presidential campaign, the Republican National Committee, or any Trump Administration personnel including appointees, employees, and interns, about any of the foregoing topics.

15. Any communication regarding any of the foregoing topics with Proud Boys, Oath Keepers, Three Percenters, and Alex Jones.

16. Any communications with Representative Scott Perry and/or other Members of Congress about any of the foregoing topics.

17. Any communications with Rudolph Giuliani, John Eastman, Michael Flynn, Jenna Ellis, or Sydney Powell about any of the foregoing topics.

**Jan. 6 Sel. Comm. 0005**

US-000377

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.   In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.   Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.   In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.   The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.   Electronic document productions should be prepared according to the following standards:

   a.   If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.   All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

**Jan. 6 Sel. Comm. 0006**

US-000378

6. Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

**Jan. 6 Sel. Comm. 0007**

**-1890-**

US-000379

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.    This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.    All documents shall be Bates-stamped sequentially and produced sequentially.

19.    Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

### Definitions

1.    The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

Jan. 6 Sel. Comm. 0008

US-000380

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.    The term "including" shall be construed broadly to mean "including, but not limited to."

5.    The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.    The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.    The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.    The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.    The term "individual" means all natural persons and all persons or entities acting on their behalf.

**Jan. 6 Sel. Comm. 0009**

US-000381

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 119 of 454

Case 1;21-cr-00670-CJN   Document 73-1   Filed 05/17/22   Page 9 of 9

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

**Jan. 6 Sel. Comm. 0010**

US-000382

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

              Plaintiff,

      vs.

STEPHEN K. BANNON,

              Defendant.

                            CR Action
                            No. 1:21-670

                            Washington, D.C.
                            March 16, 2022

                            11:05 a.m.


TRANSCRIPT OF ORAL ARGUMENT
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE




APPEARANCES:

| | |
|---|---|
| **For the Plaintiff:** | **AMANDA ROSE VAUGHN** |
| | **J.P. COONEY** |
| | **MOLLY GASTON** |
| | U.S. ATTORNEY'S OFFICE FOR D.C. |
| | 555 4th Street NW |
| | Washington, DC 20001 |
| | 202-252-1793 |
| | |
| **For the Defendant:** | **DAVID I. SCHOEN** |
| | 2800 Zelda Road, Suite 100-6 |
| | Montgomery, AL 36106 |
| | 334-395-6611 |
| | |
| | **MATTHEW EVAN CORCORAN** |
| | SILVERMAN THOMPSON SLUTKIN WHITE |
| | 201 N Charles Street, 25th Floor |
| | Baltimore, MD 21201 |
| | 410-385-2225 |
| | |
| | **ROBERT J. COSTELLO** |
| | DAVIDOFF HUTCHER & CIRTON LLP |
| | 605 Third Avenue |
| | New York, NY 10158 |
| | 646-428-3238 |

**Reported By:**          **LORRAINE T. HERMAN, RPR, CRC**
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 6720
                          Washington, DC 20001
                          202-354-3196

         Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

USCA Case #22-3086    Document #1997762      Filed: 05/03/2023     Page 123 of 454
Case 1:21-cr-00670-CJN   Document 73-2   Filed 05/17/22   Page 4 of 100

3

1            **P R O C E E D I N G S**

2            **COURTROOM DEPUTY:**  Good morning, Your Honor.  This

3    is criminal case year 2021-670, *United States of America*

4    *versus Stephen K. Bannon*.

5            Counsel, please come forward and introduce

6    yourselves for the record, beginning with the government.

7            **THE COURT:**  And let me just note my view, at least

8    currently, on non-jury matters, that is to say arguments,

9    status conferences and the like, is that whoever is at the

10   podium, please take your mask off.  It's easier for me to

11   hear, easier for opposing counsel to hear, the court

12   reporter and the like.  And then just put your mask back on

13   when you sit down.

14           **MS. VAUGHN:**  Yes, Your Honor.

15           Good morning, Your Honor.  Amanda Vaughn, Molly

16   Gaston and J.P. Cooney for the United States.

17           **THE COURT:**  Good morning.

18           **MR. SCHOEN:**  Good morning, Your Honor.  David

19   Schoen, Evan Corcoran and Robert Costello for Mr. Bannon,

20   Your Honor.

21           **THE COURT:**  Good morning, Counsel.

22           **MR. SCHOEN:**  Good morning.  Thank you.

23           **THE COURT:**  So I've reviewed all of the papers

24   that have been submitted, including the supplemental

25   materials filed over the last day or two.

4

1          Obviously, we have cross motions, in a sense.  I

2    don't want to have argument on the motions individually.  I

3    want to take them in a somewhat more efficient manner, which

4    is I want to hear from the government on all questions

5    first, and then the defendant all questions.  I'll allow the

6    government then, essentially, a short rebuttal; and then the

7    defendant a short surrebuttal.

8          With that, Ms. Vaughn, will you be taking the

9    lead?

10         **MS. VAUGHN:**  Yes, Your Honor.

11         **THE COURT:**  I think I'd like to start with your

12   Motion in Limine, but then I'd like to proceed through

13   Mr. Bannon's motions as well.

14         **MS. VAUGHN:**  Yes, Your Honor.

15         So starting with the government's Motion to

16   Exclude all Evidence in Argument Relating to Advice of

17   Counsel.  So contempt of Congress for willful default is

18   about whether or not you showed up; that is whether to

19   produce records or to testify.

20         The summoned witness doesn't get to decide if

21   Congress can make them show up.  If the witness were able to

22   decide that, it would mean Congress had no subpoena power at

23   all.  And these are the principles that are reflected in the

24   meaning of willfulness, under the contempt of Congress

25   statute, as the Supreme Court and the D.C. Circuit defined

1    that term more than half a century ago.

2            So if a defendant makes a deliberate and

3    intentional decision not to appear, he has the requisite

4    intent for contempt; that is, Does the defendant know he's

5    been summonsed and does he intentionally, knowing that, not

6    show up?  That's all that is required.

7            **THE COURT:**  Don't you agree that seems

8    inconsistent with more recent case law about what

9    "willfully" means from the Supreme Court?

10           **MS. VAUGHN:**  Well, Your Honor, I think the more

11   recent case law in *Bryan* and *Ratzlaf* and *Cheek*, didn't deign

12   to rewrite the meaning of willfulness as it might appear in

13   other criminal laws.  Those cases were limited to the

14   specific laws that arose in those specific cases.  And in

15   *Cheek* and *Ratzlaf*, obviously, that's the highest standard,

16   which I don't think anyone is arguing for here.

17           Even the intermediate standard, in *Bryan* it dealt

18   with the statute that you needed to be licensed to sell

19   firearms.  That too is more of a regulatory scheme.  And the

20   Court even expressed its view in that case that that statute

21   was intended to divide innocent conduct from criminal

22   conduct.  So that's really where the dividing line is.  And

23   that's what "willful," as defined by the Supreme Court, in

24   the 1950 *Bryan* and the D.C. Circuit in *Licavoli*, that's

25   where "willful" draws the line under the contempt of

1    Congress statute.

2            THE COURT:  What seems anomalous to me, is that

3    that means, I think, that the mens rea requirement for

4    making default and refusing to answer any questions is the

5    same, even though the term "willfully" applies only to

6    making default.

7            MS. VAUGHN:  So I think what the D.C. Circuit

8    found in *Licavoli*, which I think still applies, is without

9    willful before default, you are in a sense creating a strict

10   liability statute.  Because someone could be on their way to

11   Congress, break down in their car.  They know they are not

12   showing up.  They know they've committed the acts

13   constituting default.  And without that word "willful"

14   there, they would be subject to criminal prosecution under

15   the statute.

16           So "willful" separates that kind of accident,

17   where the person still knows they are making default, but it

18   wasn't intentional or deliberate.  From an intentional and

19   deliberate choice to show up.  And what the Supreme Court

20   made clear is that that intentional choice not to comply,

21   that is inherently a criminal choice.  There is no innocent

22   way that someone decides they are just not going to comply

23   with the statute.

24           THE COURT:  Right.  But that sounds a lot like

25   intentional rather than willful.  And those two terms

1    typically mean different things.

2            **MS. VAUGHN:**  Well, intentional and deliberate is

3    the definition of "willful" that's been determined for this

4    statute under the controlling precedent from the Supreme

5    Court and the D.C. Circuit.

6            And to your question --

7            **THE COURT:**  Does the government think that if

8    *Licavoli* had not been decided the way it is, that that is

9    still correct interpretation of the statute?

10           **MS. VAUGHN:**  The government does think that is

11    still the correct.  And *Licavoli* was relying on the Supreme

12    Court's decision earlier in *Bryan* and *Fleischman*.  Because,

13    again, I think what the Supreme Court talks about in *Cheek*

14    *Ratzlaf* and 1998 *Bryan*, is that these intent standards are

15    intended to divide criminal conduct from citizens who

16    innocently, sort of, get caught up in these regulatory

17    schemes.  And that's where willful and contempt of Congress

18    draws, between someone who accidentally does not comply with

19    their obligations, and someone who makes an intentional and

20    deliberate choice not to do so.

21           **THE COURT:**  So as a practical matter, assuming I

22    grant your motion, this motion, what proof does the

23    government need to make on mens rea?  What's showing?

24           **MS. VAUGHN:**  The government would need to

25    demonstrate that the defendant knew he had been summonsed;

1    so that means, knew that Congress was requiring him to show

2    up and produce records on October 7th; and that Congress was

3    requiring him to show up and testify on October 14th.  And

4    that he knew that that was the obligation; and that despite

5    knowing that, he decided not to comply.

6           He has to have -- the government has to prove that

7    he was given a clear choice from Congress.  Either show up

8    or you are in contempt.  That would be all that the

9    government is required to show there.

10          **THE COURT:**  And that would be -- the willful

11   there, really, to the extent that it does any work here goes

12   to the latter, because if a defendant knew he had or she had

13   a summons, and mistakenly missed the date, or had his or her

14   car break down, then that defendant would not act willfully

15   in the government's view.

16          **MS. VAUGHN:**  That's right, Your Honor.

17          And it's no different from in the contempt of

18   court context.  A witness gets a summons to appear before a

19   grand jury or to appear for testimony in trial.  And if they

20   deliberately decide, I will not appear, they are subject to

21   prosecution for contempt.  It's the same principle in the

22   contempt of Congress.

23          **THE COURT:**  Okay.

24          So let's move on to -- unless you have anything to

25   say on that, anything more to say on that subject, on that

USCA Case #22-3086    Document #1997762        Filed: 05/03/2023      Page 129 of 454
Case 1:21-cr-00670-CJN   Document 73-2   Filed 05/17/22   Page 10 of 100

9

```
 1    motion.

 2              MS. VAUGHN:  Not unless the Court has questions.

 3              THE COURT:  So let's move on to defendant's

 4    motions.  I think I'd like to start first with the motion

 5    relating to Mr. Costello's records or the records that

 6    turned out to be a different Costello's records.

 7              MS. VAUGHN:  Yes, Your Honor.

 8              THE COURT:  So that suite of issues.

 9              MS. VAUGHN:  So I think they raise different

10    issues.  Now we are talking about two categories of records.

11    The first is Mr. Costello's toll records.  So these are

12    simply phone records showing who the subscriber is, and then

13    showing to and from phone numbers, dates and times.

14              And the defendant's request there, as I understand

15    it now, is that they would like all of the underlying grand

16    jury subpoenas, all of the government's internal

17    deliberations and records about its decisionmaking with

18    respect to seeking those records.

19              THE COURT:  So let me just pause there, because it

20    wasn't clear from the government's brief.  You just said,

21    "grand jury subpoenas."  Can you state publicly how those

22    toll records were obtained?

23              MS. VAUGHN:  I don't think there is an issue with

24    saying that it was part of the grand jury investigation that

25    we obtained those records, Your Honor.
```

**-1903-**

1        **THE COURT:**  Okay.

2        **MS. VAUGHN:**  So the defendant is seeking those

3    grand jury subpoenas, copies of the subpoenas, which would

4    obviously show which records the grand jury sought.

5        **THE COURT:**  You just said grand -- so are we

6    talking about grand jury subpoenas --

7        **MS. VAUGHN:**  Yes, Your Honor.

8        **THE COURT:**  -- for Mr. Costello's toll records?

9        **MS. VAUGHN:**  Yes, Your Honor.

10       Also the defendant is asking for the government's,

11   sort of, internal processes --

12       **THE COURT:**  Yes.  Understood.

13       **MS. VAUGHN:**  -- in doing that.

14       So, obviously, what subpoenas were issued has no

15   bearing on establishing or disproving the facts of the

16   offense; that is, did the defendant receive a subpoena?  Did

17   it require him to show up?  Did he intentionally and

18   deliberately decide to ignore that demand?  Because it

19   doesn't go to any of those facts, those records are not

20   discoverable under Rule 16 or *Brady*.

21       So the defendant has to identify another basis to

22   be entitled to those records.  With respect to the grand

23   jury materials, he needs to show a particularized need.  And

24   the defendant's relying on the provision of Rule 6, that

25   it's needed because it may support a Motion to Dismiss.

1        But in order to pierce secrecy of the grand jury,

2    the defendant needs to do more than just allege there's

3    misconduct here.  He needs to identify what grounds he will

4    be moving to dismiss.  And he hasn't done that.

5        THE COURT:  So on that, as I understand it,

6    whether it's about toll records or email records, the

7    government's argument is, At the time we sought those

8    records, we needed to prove -- still need to prove -- well,

9    it may be stipulated now or conceded now -- but at one point

10   we knew that we needed to prove that Mr. Bannon knew about

11   the subpoenas or the summons from Congress.

12       And so we sought Mr. Costello's email and phone

13   toll records to what?  To help create a -- I'm missing the

14   next part.  Because it's not at all apparent to me how even

15   knowing with whom Mr. Costello was communicating would prove

16   or tend to prove that Mr. Bannon knew about the subpoena

17   from Congress.

18       MS. VAUGHN:  Well --

19       THE COURT:  If that was even a disputed issue at

20   that point.

21       MS. VAUGHN:  Your Honor, so obviously the scope of

22   the grand jury's investigation is not limited.  They can act

23   on suspicion, rumor, whatever they need to do to investigate

24   every lead --

25       THE COURT:  Is there really any dispute by the

1    time these subpoenas or the Stored Communication Act order

2    was issued that -- was there any dispute that Mr. Bannon

3    didn't know about the subpoena?  I mean, the world knew

4    about it.  The world knew about the contempt proceeding.

5           **MS. VAUGHN:**  Your Honor, the world did know about

6    it, but the government still has an obligation to make sure

7    that it has evidence to prove each of the elements.

8           **THE COURT:**  But what's unique here is that the

9    government didn't just go get -- I'll put it this way --

10   regular old records.  It sought records of the person whom

11   the government knew was serving as counsel to Bannon.  Why

12   is that an appropriate first move as a source for

13   information, where it seems to me those records are pretty

14   darn attenuated from that element of knowledge that the

15   government had to prove -- has to prove?

16          **MS. VAUGHN:**  So Mr. Costello is the intermediary

17   here.  He is the only one interfacing with the Committee.

18   So as the government is starting its investigation, it could

19   possibly be that Mr. Costello just never fully communicated

20   with the defendant about what the Committee was requiring of

21   him.

22          So the government needed to investigate whether

23   those communications had happened.  And Mr. Costello wasn't

24   the only person the government sought records for.  We also

25   sought records for the defendant.  But, obviously, we may

**-1906-**

1    not be able to find all of the defendant's phone numbers or

2    email accounts.

3            So even though we don't have the content through

4    the tolls -- which we never sought content of any

5    communications -- the fact that a call might happen, let's

6    say, between the defendant and his intermediary with the

7    Committee, on the same day that the Committee counsel tells

8    Mr. Costello, again, No, he has to show up.  That is,

9    obviously, evidence that Mr. Costello was communicating that

10   direction to the defendant.  It may not be the most direct

11   evidence, but it is certainly relevant evidence in proving

12   that the defendant was engaged in this process with the

13   Committee, even though he was not directly engaging with it.

14           **THE COURT:**  Did the investigation team need to get

15   senior approval at DOJ to seek those toll and email records?

16           **MS. VAUGHN:**  The Justice Manual, Your Honor, only

17   requires approval for issuing subpoenas directly to an

18   attorney or a law firm.

19           **THE COURT:**  So under the Justice Manual, as I

20   understand it, the government could seek the contents of an

21   attorney's emails with a client, so long as the request is

22   posed to an internet provider?

23           **MS. VAUGHN:**  Well, obvious, we are --

24           **THE COURT:**  I mean, without seeking senior

25   approval.

1          **MS. VAUGHN:**  Yes.  And, obviously, we would go

2      through a filter process because we are not just Hoovering

3      up privileged materials; and that's the difference here too.

4      The government's only getting toll records.  There is no

5      content.  It's not a privileged communication that we are

6      collecting.  It's merely the fact that a conversation -- or

7      maybe the conversation didn't even happen.  It can be a

8      missed phone call, that it happened at a certain date and

9      time.  It doesn't tell us anything about the confidential

10     communications.  It is only that confidential communication

11     that is potentially protected.  So the government never even

12     sought that.

13          **THE COURT:**  Now, I note in the final footnote to

14     the supplemental brief the government lodged that you've

15     offered to let the defense see the application for the Gmail

16     account, so long as the defendant agrees to treat it as

17     sensitive under the protective order or otherwise is willing

18     to modify the protective order to see it.  I didn't see a

19     response to that question or proposal in Mr. Bannon's

20     response to the supplemental filing.  Would the government

21     be willing to make that same offer as to the toll records

22     subpoenas?

23          **MS. VAUGHN:**  I'm not sure that the government is

24     in the same position to be able to make that offer, because

25     the subpoenas would be controlled by Rule (6)(e).  And

USCA Case #22-3086    Document #1997762       Filed: 05/03/2023      Page 135 of 454
Case 1:21-cr-00670-CJN    Document 73-2    Filed 05/17/22    Page 16 of 100

15

1    *McKeever* made clear that unless there's a basis to provide

2    it under (6)(e) or disclose grand jury material under

3    (6)(e), the government can't do that.  And so that goes back

4    to the defendant's obligation to show a particularized need

5    for those subpoenas.

6        **THE COURT:**  Would the government object to

7    producing those requests, subpoenas, as I understand it, to

8    me for ex parte review?

9        **MS. VAUGHN:**  The government would be happy to

10   provide it to the Court for ex parte review, if the Court

11   would require that.

12       **THE COURT:**  Okay.

13       To summarize, there is obviously the question of

14   those records, the requests.  And on the -- so you've

15   provided me with the Stored Communication Act application,

16   ex parte.  I've reviewed it.  You've offered to make that

17   available to the defense team, so long as they are willing

18   to agree to certain protections.

19       You are willing to provide me the other requests,

20   the toll records and the like.  I'm not sure you can do that

21   to the defense, given (6)(e).  But then let's just go back

22   to, essentially, the two buckets of information.  You have

23   some of this turns up, as we all know now, email records for

24   a Costello, who is not Mr. Bannon's counsel.

25       **MS. VAUGHN:**  Uh-huh.

1        **THE COURT:**  The government's view, I assume is,

2    those are wholly irrelevant here, because they have nothing

3    do to with any communication between Mr. Bannon and anyone.

4        **MS. VAUGHN:**  That's right, Your Honor.

5        **THE COURT:**  And they quite plainly are not going

6    to be in this case.

7        **MS. VAUGHN:**  That's right, Your Honor.

8        **THE COURT:**  And as to the toll records of the

9    actual Mr. Costello, the government's position is that --

10    especially now that the question of Mr. Bannon's knowledge

11    and the like is essentially undisputed, the government

12    doesn't intend to use those?

13        **MS. VAUGHN:**  I hesitate to predict how trial

14    evidence might come in.  The government obviously doesn't

15    anticipate that it would need to use it affirmatively in its

16    case-in-chief.

17        Obviously, if the defendant were to start to

18    suggest, through its cross-examination of government

19    witnesses, or through any case that the defendant might

20    choose to put on, it might become necessary to the extent --

21        **THE COURT:**  In any event, that information is in

22    -- the government has produced that to the defendant.

23        **MS. VAUGHN:**  (Nodded)

24        **THE COURT:**  And beyond that the, I will put it

25    this way, methods through which the government went about

17

1      obtaining that information, is not in the government's view,

2      discoverable now.  But might be *Giglio* material, to the

3      extent that anyone who testifies touched that information?

4            **MS. VAUGHN:**  So to the extent we have impeachment

5      material relating to a witness that might testify.  Let's

6      say a government agent testifies.

7            **THE COURT:**  Yep.

8            **MS. VAUGHN:**  We would turn that over.

9            The government is not aware of any impeachment

10     material that would go to that, that it knows of or has

11     position of at this time, but if we became aware of it, we

12     would obviously turn it over.

13           **THE COURT:**  So now let's go to the rest -- unless

14     there is something else you would like to say on the

15     attorney records point.

16           **MS. VAUGHN:**  I -- well, I think the bottom line of

17     the attorney records is the defendant still needs to -- to

18     go rummaging around in the government's files, the defendant

19     still needs to identify on what basis he would use it.

20           So the Supreme Court's decision in *Armstrong* dealt

21     with a selective prosecution claim, where the defendant

22     wanted to go searching in the government's files for

23     evidence that its prosecution was racially motivated.

24           The Supreme Court there said, This is a burden on

25     the government, number one; and it intrudes on the executive

18

1    branch's independence in its prosecutorial decisionmaking.

2              The D.C. Circuit has applied that same logic to

3    other situations where the defendant wants to go rummaging

4    around in the government's internal files.  For example, in

5    *US v. Rashed*, that's 234 F. 3d 1280, there the defendant

6    wanted to make a due process claim about a sham prosecution.

7    And the D.C. Circuit, because it was a constitutional attack

8    on the indictment said, You still need to make a colorable

9    showing of the defense you intend to raise, before we let

10   you go diving into the government's records.

11             So I think that's really the starting line for all

12   of the defendant's requests here for the government's

13   internal records is, Have they made a colorable showing in

14   any defense that they would raise a Motion to Dismiss, some

15   kind of constitutional attack?  And they just haven't done

16   that with respect to the attorney bucket or to the

17   irrelevant records.

18             **THE COURT:**  Okay.  Thank you.

19             So now let's talk about the other -- the motion

20   that is broader, in a sense, because it's not related to the

21   government's efforts to get Mr. Costello's toll records and

22   email records.

23             **MS. VAUGHN:**  Uh-huh.

24             **THE COURT:**  So, obviously there are a number of

25   categories.  I don't want to foreclose you from walking

1    through them in whatever order you like.  I have questions,

2    but feel free to tackle the different components of that in

3    whatever order you would prefer.

4           **MS. VAUGHN:**  I think the best way for me to do

5    that is to walk through, sort of, the individual problems

6    with each of the requests.

7           So first is, he has a bucket of requests that are

8    completely untethered from proving or disproving the

9    elements of the offense at trial.  Did this defendant give

10   subpoena?  Did he understand the requirement to show up?

11   Did he intentionally decide not to?

12          And that is the defendant's request for the

13   internal deliberations about what the law requires for

14   contempt of Congress, and the government's internal

15   deliberations and advice from the Office of Legal Counsel,

16   about under what circumstances the executive branch may or

17   may not seek to prosecute individuals who have committed

18   contempt of Congress.  None of that is relevant to proving

19   or disproving these specific factual elements.

20          So, again, it goes back to the defendant wants to

21   get into the internal records of the government.  He needs

22   to under *Armstrong* and as has been applied later, make a

23   colorable showing of what defense --

24          **THE COURT:**  So -- I want to understand the

25   government's argument here.  It has been long-standing

1    Department of Justice policy that very close current

2    advisors of the president are absolutely immune from

3    Congressional subpoenas.

4            Imagine, hypothetically, that tomorrow -- I know

5    this is a counterfactual but Ron Klain gets a subpoena from

6    Congress to show up.  And he and the department take the

7    position that he is absolutely immune.

8            Congress doesn't like that.  Makes a contempt

9    referral.  And for whatever reason, the department -- again,

10   this is counterfactual given the parties -- but the

11   department says, We are prosecuting Mr. Klain for willfully

12   not showing up.  And Mr. Klain says, What are you talking

13   about?  The OLC opinion says, I have absolute immunity.

14           The government's view is that is irrelevant to the

15   case?

16           **MS. VAUGHN:**  That is irrelevant, Your Honor,

17   because, again -- that is the government's --

18           **THE COURT:**  But the government would be saying, We

19   have binding OLC opinion that someone has absolute immunity,

20   but we are nevertheless the same department authorized to

21   prosecute that person.

22           **MS. VAUGHN:**  Our -- the department's views on when

23   and under what circumstances it should prosecute someone is

24   different from --

25           **THE COURT:**  But how are those consistent

1    positions?  In other words, how can the department, assuming

2    the OLC opinion I just talked about has not been rescinded,

3    I don't think it has -- how can the department

4    simultaneously say someone in that position has absolute

5    immunity from showing up, and can be prosecuted for failing

6    to show up?

7            **MS. VAUGHN:**  Well, I guess the department --

8            **THE COURT:**  Those two positions would be held at

9    the same time by the same department.

10           **MS. VAUGHN:**  I think the department certainly

11   might have an inconsistent legal view at that point.  But as

12   far as whether the elements are met under the statute,

13   that's a different question --

14           **THE COURT:**  Isn't there an estoppel argument at

15   that point that the defendant might want to make and/or the

16   defendant argues that that goes to whether he has made

17   default?

18           **MS. VAUGHN:**  Well, the issue of whether or not the

19   defendant has made default, in an estoppel argument, this

20   idea that he was given permission somehow to make default;

21   that again goes to what was in the defendant's mind at the

22   time.

23           The defendant's request here is not about, We

24   think you have evidence about what was in my mind at the

25   time.  We've provided everything we have about

**-1915-**

1    communications between the defendant and his representative

2    and the Committee, and the defendant's representative and

3    the White House.  We have provided all of that.  The

4    defendant's request is broader than that.  He says,

5    Government, I know that you have decided before that you

6    wouldn't prosecute people like me -- obviously the

7    government disagrees we ever said that.

8              **THE COURT:**  I understand there is a difference of

9    opinion about where Mr. Bannon fits within those OLC

10   opinions.  I'm testing the proposition on the assumption

11   that there is an express OLC opinion covering the person in

12   Mr. Bannon's shoes and -- that is why I am using Mr. Klain

13   as an example.  Chief of Staff to the President.  It fits

14   within the OLC opinions quite clearly -- and the

15   government's position here is that OLC opinion is altogether

16   irrelevant.

17             **MS. VAUGHN:**  It is.  Well, first, this goes back

18   to the government's Motion to Exclude Advice of Counsel --

19             **THE COURT:**  Partly.

20             **MS. VAUGHN:**  -- because of a mistake of law.  A

21   mistake of law, a mistake that you were not committing

22   contempt when you were --

23             **THE COURT:**  Right.  And your view is --

24             **MS. VAUGHN:**  -- is not an offense here.

25             **THE COURT:**  -- because of your position on advice

USCA Case #22-3086    Document #1997762        Filed: 05/03/2023    Page 143 of 454
Case 1:21-cr-00670-CJN    Document 73-2    Filed 05/17/22    Page 24 of 100

23

1    of counsel, Mr. Klain could not argue that he relied on -- I

2    assume he could not rely on what a lawyer told him about the

3    OLC opinions.  But you are saying he could not rely on the

4    OLC opinions themselves.

5            **MS. VAUGHN:**  Because practically at trial, how

6    would that OLC opinion come in?  He's testifying about --

7    Well, I knew I got a subpoena.  I decided not to show up --

8    or the government is presenting evidence that that's the

9    case.  There is no relevance that that OLC opinion has to

10    establishing or disproving those elements.

11            **THE COURT:**  Is it relevant -- assuming there is a

12    Motion to Dismiss the Indictment here, is it relevant or can

13    it be relevant to my consideration of that, understanding

14    the various positions OLC, at least, has taken on these

15    issues.  Not to say that they have, necessarily, taken a

16    crystal-clear position as to someone in Mr. Bannon's shoes.

17    But OLC has taken positions on issues around Congressional

18    subpoenas and executive privilege and people in certain

19    positions in the White House, are those official OLC

20    opinions?  I'll put it that way.  Are they relevant, at

21    least to my consideration, if there is a Motion to Dismiss

22    the Indictment?

23            **MS. VAUGHN:**  Your Honor, that is -- they are

24    internal department advice, and I don't think that they

25    would be controlling in any way on this Court's decisions.

1    In fact, I think sometimes courts have disagreed with the

2    DOJ's view.

3          **THE COURT:**  I agree they are not controlling.  The

4    question is whether they are relevant.

5          **MS. VAUGHN:**  I don't think that they would be.

6    The executive branch, obviously, doesn't decide what the law

7    is in a court of law.

8              And so the executive branch internally, all of the

9    time, takes views on what the law requires and does not

10   require.  But that, at the end of the day, is not

11   determinative, once we are before a judge.  And I think

12   courts before have, actually, rejected some of the reasoning

13   in DOJ OLC opinions.

14         **THE COURT:**  I know of one case very well.

15         **MS. VAUGHN:**  So I think what the defendant is

16   after here is not evidence of his intent, it's evidence of

17   the way we internally, at the Department of Justice, view

18   the law.  And that wouldn't provide him any basis for relief

19   either before trial or during trial.

20         **THE COURT:**  But isn't -- isn't there something

21   anomalous -- and I'm not sure what the right legal hook for

22   it is -- but for DOJ, the official DOJ policy to be, We say

23   someone has absolute immunity in this context and/or, We

24   will not prosecute someone in this context.  And then to say

25   that those statements of official DOJ policy are irrelevant

1    altogether in such a prosecution?

2            **MS. VAUGHN:**  I don't think it is, Your Honor, and

3    here's why.  I think the Department, as the executive, the

4    one enforcing the law through prosecutions is making

5    decisions all of the time about what it believes merits

6    prosecution and what does not.  And that is sometimes based

7    on the department's interpretation of the law.

8            DOJ OLC opinions around contempt of Congress are

9    really no different.  They are about, Under what

10   circumstances do we, the Department of Justice, believe that

11   someone is subject to prosecution under the law?

12           The analysis might change.  I guess, if we are at

13   the point we are prosecuting Ron Klain, it definitely has

14   changed.  But at the end of the day, that still is not --

15   it's just the department's view on whether prosecution is

16   appropriate.

17           **THE COURT:**  Okay.  I understand the government's

18   position.

19           Obviously my hypothetical is pointed because it

20   assumes a crystal-clear inconsistency, one would say,

21   between the OLC opinion and the later prosecution.  And I

22   understand the government's position here is there is no

23   such inconsistency, at least as to public OLC opinions.

24           **MS. VAUGHN:**  That's right, Your Honor.

25           So that's, sort of, the first bucket of what the

1    defendant is seeking, the things that are internal

2    government deliberations.

3          Second, he seeks materials in Congress'

4    possession.  Obviously we, as the executive branch, cannot

5    compel Congress to provide records to us.  In fact, it might

6    be that some of the records the defendant wants are

7    potentially protected by the Speech or Debate Clause.  So

8    even if we wanted to, we could not force Congress to turn

9    those records over.

10         Just because they are, essentially, the

11   complainant in this case, does not make them part of the

12   prosecution team, and we don't have the ability to go

13   searching in their files to produce those records.  So his

14   request relating to further searches for records in

15   Congressional files, has to be denied on that basis.

16         **THE COURT:**  But to circle back to a question that

17   arose from, my perspective at least, first in the context of

18   the attorney records, if hypothetically the government were

19   to call a witness who is a Congressional employee,

20   whether -- you know, a member of the Committee or a staff

21   person or whatever, it would have an obligation to turn over

22   impeachment evidence, if any.

23         **MS. VAUGHN:**  Anything we have or are aware of,

24   yes, it would have an obligation to turn that over.

25         **THE COURT:**  Does the government have a view about

1      whether statements about the political nature, from

2      Mr. Bannon's perspective of this prosecution, if somebody

3      said, you know, we need to go after Mr. Bannon for X-reason

4      that that would be considered *Giglio* impeachment material?

5              **MS. VAUGHN:**  If a witness said that, we would

6      certainly turn that over as potential impeachment material.

7              **THE COURT:**  Okay.  But we are not there yet,

8      obviously, because under the current schedule, there's a

9      later process for turning over impeachment information.

10             **MS. VAUGHN:**  Yes, Your Honor.

11             And our practice is, as soon as we get it, we will

12     turn it over as soon as practicable.  We won't sit on things

13     until the last minute.

14             And, actually, that's another bucket of

15     information.  Obviously his request for impeachment

16     information is essentially moot, because we provided

17     everything that we are aware of currently, and we haven't

18     even identified our trial witnesses yet.

19             The other two categories really go to what we

20     already discussed with respect to the attorney records and

21     the irrelevant email records.  It's either grand jury

22     material or it's material going to the government's internal

23     deliberations that don't go to any kind of defense pretrial

24     or during trial.

25             So unless the Court has other questions, I think

**-1921-**

28

1    we've addressed all of the buckets.

2              **THE COURT:**  Yes, I agree.  I would like to hear

3    from defense counsel now.

4              **MS. VAUGHN:**  Thank you.

5              **MR. SCHOEN:**  Judge, my first role is sort of

6    emcee.  I just want to explain how we will proceed, if we

7    might.

8              **THE COURT:**  Yes.

9              **MR. SCHOEN:**  I intend to address the Costello

10   motions and Mr. Corcoran, possibly, in addition from me, is

11   going to address the other two motions.

12             So given the order the Court started in before, if

13   the Court would rather hear from Mr. Corcoran on advice of

14   counsel first, we can do that.

15             **THE COURT:**  Why don't we do that.  These are all

16   interrelated, to an extent, but since I started there, and

17   then in some ways ended with something it sounds like

18   Mr. Corcoran is going to address as well, why don't we begin

19   with him and then we will come to you.

20             **MR. SCHOEN:**  Yes, Your Honor.

21             **THE COURT:**  Very well.  Mr. Corcoran.

22             **MR. SCHOEN:**  Your Honor, Mr. Costello may also

23   address the Court on the Costello motion issue.

24             **THE COURT:**  Fair enough.

25             **MR. SCHOEN:**  By the way, the legal hook that we

29

1    intend to use is entrapment by estoppel, just a little plug.

2            **MR. CORCORAN:**  Good morning, Your Honor.

3            **THE COURT:**  Good morning.

4            **MR. CORCORAN:**  Your Honor, your questions on

5    advice of counsel tend to track the way that I think about

6    it in terms of the elements of the offense; that's sort of

7    how I always start with every case.  And here it's not so

8    much a defense, but it goes to this issue of "willfully

9    makes default."

10           I think one interesting thing is that you raise a

11   hypothetical, which is not so far from happening, and that

12   is, this particular statute has been used.  And Congress has

13   voted to hold in contempt a lot of top public officials.

14           On June 28th of 2012, Attorney General Eric Holder

15   was held in contempt by Congress, and a referral was made

16   under the statute to the U.S. Attorney's Office.  About

17   seven years after that, Attorney General William Barr, was

18   held by the House of Representatives in contempt of

19   Congress.  And a referral was made to the U.S. Attorney's

20   Office.  Long before that, EPA Administrator, Ann Gorsuch,

21   in 1982, was held in contempt by the House, by a House vote,

22   and a referral was made to the U.S. Attorney's Office.

23           And the odd thing is, given the elements of the

24   offense, as described by the government, if any of those

25   three top government officials were prosecuted and appeared

**-1923-**

1    in court, they would be limited to saying, I received the

2    subpoena, which each of them obviously did; and I made a

3    decision not to comply with the subpoena, which each of them

4    obviously did.

5          All three of those top government officials would

6    be guilty of the crime.  And they would not, under the

7    government's theory, be able to say -- in the case, for

8    instance of the Attorney Generals, Look, we got the best

9    lawyers in the world here at the Department of Justice.

10   They've given me advice I don't need to appear.  The jury

11   should hear that is the way I acted the way I did.  They

12   wouldn't be able to do that.

13         So I think there's a real element of unfairness in

14   the position that the government has taken.

15         **THE COURT:**  But do you agree that if *Licavoli* is

16   binding, that it forecloses at least a component of that

17   argument?  In other words, *Licavoli* says, Advice of counsel

18   is not a defense.

19         **MR. CORCORAN:**  Right.  I don't.

20         First of all, I think it's clear, and you asked

21   the direct question, Is *Licavoli* correct?  And I am not here

22   to say that the D.C. Circuit is incorrect.  I think it is

23   clear that the case would be decided differently today.

24         **THE COURT:**  But that is not a reason that I can

25   ignore it.

31

1          **MR. CORCORAN:**  Oh, I understand that.  And I'm not

2    suggesting that, other than to say, you know, sometimes we

3    have to go with what's right.

4          I think what's clear in *Locavoli* is that it's

5    totally distinguishable from the case here; and that is,

6    *Licavoli* did not involve an assertion of a

7    constitutionally-based privilege.  Totally distinguishable.

8          I will read this sentence from *Licavoli* that

9    caught my eye.  It says, "Advise of counsel cannot immunize

10   a deliberate, intentional failure to appear, pursuant to a

11   lawful subpoena, lawfully served."  That's the distinction.

12         Here, as you identified, OLC opinions give

13   absolute immunity to a top presidential adviser, when the

14   president they serve asserts executive privilege.

15   Therefore, *Locavoli* is distinguishable.  It's not a case of

16   lawful opinion, lawfully served.

17         What we are talking about is a subpoena that was

18   void because of the situation that Mr. Bannon was put in,

19   and asked to protect the privilege.

20         **THE COURT:**  You can argue that the subpoena was

21   void and was unlawful for other reasons.  In fact, you've

22   suggested that you might, violation of the rules, the

23   failure to have somebody, a minority, you know, ranking

24   member or whatever.

25         But if the subpoena was lawfully served, doesn't

1    -- and that's -- that's probably a legal question.  If the

2    subpoena was lawfully served, are you saying that the fact

3    that Mr. Bannon says that he would have been testifying

4    about privileged information made the subpoena unlawful?

5        **MR. CORCORAN:**  I think that in -- yes.  In terms

6    of distinguishing *Locavoli* --

7        **THE COURT:**  In the cases that the -- so my

8    recollection is in OLC opinions about absolute immunity,

9    they don't say that by seeking the testimony of the senior

10   adviser to the president or whatever, that the subpoena is

11   unlawful or was lawfully served.  They say, You have an

12   immunity from responding to it.

13       Is your view that a subpoena as to which someone

14   has immunity is an unlawful subpoena?

15       **MR. CORCORAN:**  I'm not sure -- I'm using that

16   language because that is the language in *Locavoli*.  What I

17   would say is, Receipt of a subpoena from someone in -- it's

18   not unlawful to ignore based on OLC opinions.  If you are in

19   Mr. Bannon's shoes, it's not unlawful to ignore a subpoena,

20   even if it is validly served.

21       We have got other reasons -- and, again, for

22   purposes of deciding what the elements of the offense are,

23   we don't necessarily -- we aren't necessarily in a position

24   of having to prove each of the items that we would -- that

25   the subpoena is about.

1          I'll give you another example.  There are OLC

2     opinions, to go to the question of whether a subpoena is

3     valid, if it is served on an executive branch person.  But

4     counsel -- the president's counsel in this case -- can't

5     attend the hearing in order to assert privilege.  In our

6     view, because of OLC opinions, that subpoena is void.  The

7     person in receipt of that subpoena doesn't need to appear.

8          I am listing these things only to say *Locavoli*,

9     which did not deal with somebody asserting executive

10    privilege, asserting even a Fifth Amendment privilege, which

11    wasn't an issue here.  But a constitutionally-based

12    privilege totally distinguishes the case.

13         **THE COURT:**  Let's assume that -- assume that I

14    think that *Locavoli* is on all fours with this case or at

15    least that it's holding covers.  It's not distinguishable.

16         What is your best argument for why I need not

17    follow it?

18         **MR. CORCORAN:**  I don't think this court is a

19    potted plant, such that you have to ignore the law as it's

20    been developed and been articulated.  Not just by the D.C.

21    Circuit, but by the Supreme Court, on the keyword at issue

22    in the statute, which is "willfully."

23         The Supreme Court, in *Bryan*, was crystal clear

24    that "willfully" in a criminal context means, knowing you

25    are doing something wrong.  Knowing that you are doing

**-1927-**

34

1    something unlawful.

2              THE COURT:  That's not the statute, that *Bryan*,

3    the 1998 *Bryan*.  And I don't think there is any Supreme

4    Court decision post *Locavoli* that says, Willfully in the

5    context of this statute means something different.

6              MR. COSTELLO:  That's very true.  These cases come

7    up, thankfully, once a decade.  So the Supreme --

8              THE COURT:  Don't you think the D.C. Circuit would

9    find itself bound by *Locavoli*, whatever it stands for,

10   whether it is distinguishable or not, but at least as to its

11   terms, unless and until it takes that question en banc?

12             MR. CORCORAN:  I don't think so.  I think that --

13   and we cited --

14             THE COURT:  So what's the legal -- what's the rule

15   of law principle that allows me to ignore a D.C. Circuit

16   opinion that has not been overruled by the D.C. Circuit or

17   the Supreme Court in the years since it's been decided?

18             MR. CORCORAN:  Well, I think the legal -- well, I

19   think, first of all, it's a distinguishable case.  But

20   you're assuming, and you are asking me if it's on fours, and

21   it's 60 years old, and the Supreme Court has spoken to the

22   very word that's contained in the statute, are you bound

23   with a 60-year-old D.C. Circuit opinion?  My answer is, You

24   are not.

25             THE COURT:  Why?

**-1928-**

1          **MR. CORCORAN:**  Because you are allowed to --

2          **THE COURT:**  I'm allowed to ignore D.C. Circuit

3     opinions that have not been overruled.

4          **MR. CORCORAN:**  No.  No.  But you are allowed to

5     follow the guidance of the Supreme Court in a context of a

6     criminal statute where the rule of lenity applies, where if

7     there are multiple readings, the -- you know, the winner is

8     the defendant, et cetera, et cetera.

9          I see my co-counsel approaching --

10         **THE COURT:**  I really don't want to be doing a

11    back-and-forth.  I will let you speak when we get there, but

12    I would rather hear from Mr. Corcoran.

13         So your answer is, I can ignore a binding D.C.

14    Circuit precedent, so long as I don't think it's right and

15    it's old.

16         **MR. CORCORAN:**  My answer is, Where the Supreme

17    Court has spoken, specifically in the criminal context to

18    the meaning of the word "willfully" --

19         **THE COURT:**  I don't think anybody disagrees that

20    willfully does mean different things in different contexts.

21         **MR. CORCORAN:**  Absolutely.  And here, when it's

22    paired with default, that only adds to our position, which

23    is it is something more than intentional.  It's something

24    more than knowing.

25         **THE COURT:**  I think that the D.C. Circuit may very

**-1929-**

1  well have gotten this wrong; that makes sense to me, what

2  you just said.  The problem is, I'm not writing on a clean

3  slate here.

4      **MR. CORCORAN:**  Well, I think the slate that you

5  are writing on is one that has already been prepared by the

6  Supreme Court in *Bryan* and by the D.C. Circuit in the cases

7  that we cite that go into great detail about the use of the

8  word "willingly" in criminal statutes.  So I don't think we

9  are asking the Court to do anything --

10     **THE COURT:**  Did you argue in your brief that

11 *Locavoli* was distinguishable from this case because it did

12 not involve the context of executive privilege and former

13 executive branch employees?

14     **MR. CORCORAN:**  I think we did.  I can't point to

15 the page right now, but that's clearly -- you know, that's

16 clearly a distinction.

17     And if you look at these cases, and many of them

18 come from the 50s and the 60s, House -- Committee on

19 Un-American Activities.  One of the things that I found,

20 where there is an assertion of a constitutionally-based

21 privilege, those cases the defendant wins.

22     And in some of the cases where it is just an

23 expression where even if a lawyer says, Well, that's not

24 within the purview of the Committee.  So we are not going to

25 answer that question, the defendant loses.

1          None of the cases deal with this specific question

2     where there's a constitutionally-based privilege that's

3     asserted from the outset by counsel to Committee counsel.

4     And a request is made, Let's let a judge decide this.  It's

5     just a different situation, Your Honor.

6          **THE COURT:**  I have that one.

7          So let's do the rest of the non-Costello email

8     discovery issues.  And I'm happy to have you walk me through

9     them in whatever order you would like to take them.

10         **MR. CORCORAN:**  Okay.

11         Well, the first -- anything that applies to the

12    grand jury -- again, I take a very practical view of this.

13    There's no doubt that the cases talk about secrecy of the

14    grand jury, the specific federal rule, Rule (6)(e) pertains

15    to it.  But there's a suggestion in the writing and the oral

16    argument of the government that somehow the grand jury is an

17    impenetrable fortress.  And it's not.

18         In this case, the government in their briefs have

19    said, We gave you all of the testimony already.  And we gave

20    you all of the exhibits already.  And they are covered by

21    the protective order.  And that's protecting -- whatever

22    secrecy interest remains is protected by the protective

23    order.

24         What they are now saying is, We are not going to

25    give you the actual subpoena, a piece of paper to a phone

38

1    company; that is pretty vanilla, frankly.  We are not going

2    to give you the order, which the Court has already reviewed

3    --

4         **THE COURT:**  That's not true.  They offered to give

5    you the order.

6         **MR. CORCORAN:**  Well, we will accept that offer

7    under the protective order.

8         **THE COURT:**  Okay.  So that's moot.

9         **MR. CORCORAN:**  That's moot.

10        But key -- they said is, We don't want to give you

11   the instructions or the argument of counsel.  Essentially

12   saying, grand jury members, you heard the evidence.  Here

13   are the instructions.  Read the instructions.  This is what

14   you should find.  Please return an indictment.  We will type

15   it up for you and hand it to you.  Please return it.

16        That information -- first of all, the instructions

17   themselves in most cases would just be Red Book.  This

18   statute is not a Red Book statute because it only comes

19   along every ten years.

20        The notion that Red Book jury instructions are

21   somehow secret, does not make sense to me.  I can say that.

22   Particularly when there is a protective order in place, we

23   believe that they should be given to us.  And we cite a case

24   from the Northern District of California.

25        **THE COURT:**  So why?  What's your hook for why you

**-1932-**

39

1      think that you should get them?  Beyond just, There's a

2      protective order and we --

3              **MR. CORCORAN:**  Right.  We set forth our -- you

4      know, when you used the words "particularized need."  What

5      are our hooks?  What are our needs?  And we've identified

6      several of them.  One is -- and it's not speculative.  We

7      believe that the government provided an -- the instructions

8      on the elements of the offense, that it is wrong; that's the

9      incorrect law.

10             It's the same knowledge that they've provided here

11     today.  And we believe --

12             **THE COURT:**  So if you lose the Motion in Limine,

13     do you lose that argument as to the instructions?

14             **MR. CORCORAN:**  I don't think so, because we would

15     still want the materials --

16             **THE COURT:**  I'm sure you'd want it, but what's the

17     argument for it?

18             **MR. CORCORAN:**  No.  I'm saying we should still be

19     entitled to them for examination.

20             **THE COURT:**  But why?

21             **MR. CORCORAN:**  Because there's enough there --

22     there's enough there for us to show a particularized need.

23     In other words, to state with some specificity that it may

24     -- and that's what the rule says -- may allow us to dismiss

25     the indictment.

1              It doesn't say that we have to prove that the

2      grand jury instructions will result in a dismissal of the

3      indictment.  That would be impossible, because they are

4      secret.  The word is "may."  And we identify a number of

5      different things that suggest that the instructions are

6      wrong.  And if they are wrong, the indictment should be

7      dismissed and we'd move on that basis.

8              The other thing is we identify the grand jury

9      testimony talking about an adjournment where Mr. Costello

10     sent a letter to the Committee and said, Can we have a

11     one-week adjournment?  A case was just filed that may have

12     bearing on this issue.  We've asked all along to ask a judge

13     decide this legal issue of privilege.

14             Well, in the grand jury, that was not the

15     testimony.  The suggestion was that no request had ever been

16     made for a later date to appear.  And if that was argued, if

17     there was argument by the AUSA that said, You know what, you

18     heard there was no request for a later date, when they had

19     in their position a letter seeking an adjournment, that

20     would be a basis for the dismissal of the indictment.

21             The final issue is there's testimony before the

22     grand jury that suggests to the grand jury that President

23     Trump did not validly assert or communicate an assertion of

24     executive privilege to the Select Committee.  That was done

25     by a letter from Mr. Costello that quoted a letter from

**-1934-**

1    counsel to the president.

2          So it would be a basis for the dismissal of the

3    indictment if the prosecutors, in telling the grand jury,

4    Well, this is a willful default here.  And by the way, there

5    was no valid assertion of executive privilege because the

6    president didn't himself communicate that to the Select

7    Committee.  If that was the argument, it would be a basis to

8    dismiss the indictment.  It is not speculative.  There is

9    grand jury testimony right on point, which we cite in our

10   motion.

11         So I think, overall in these grand jury materials,

12   particularized need just aren't magic words.  It just means

13   we need to specify why we need it.  In each of the cases

14   that I've just run through, if we get the information, we

15   believe it's a basis for dismissal of the indictment.

16         Certainly, it's a balancing.  How does that

17   balance -- how does what I said -- even if you don't believe

18   it word for word in terms of what we are going to get, how

19   does it balance with the secrecy interest?

20         There is a general secrecy interest for the grand

21   jury, it's going to be totally protected because we are

22   talking about instructions and argument by counsel to the

23   grand jury by the protective order.

24         **THE COURT:**  Okay.  You also seek non-grand jury

25   discovery.

**-1935-**

USCA Case #22-3086   Document #1997762      Filed: 05/03/2023     Page 162 of 454
Case 1:21-cr-00670-CJN   Document 73-2   Filed 05/17/22   Page 43 of 100

42

1          **MR. CORCORAN:**  Yes, Your Honor.

2          **THE COURT:**  Why don't we start with executive

3    branch OLC opinions.

4          **MR. CORCORAN:**  Yes, the OLC opinions.  The cases

5    are pretty clear.  There are a bunch of them cited in our

6    brief and in the government's; that the US District Court

7    cases from this court are really instructive on this kind of

8    guidance.

9          *Naegel*, 468 F.Supp 2d. required the discovery of

10   guidance materials and policy statements from numerous US

11   trustee offices.  *O'Keefe*, 2007 West Law 123, 9204 said,

12   Decisions and policies on expedited visas at six

13   international consulates had to be turned over.

14         The *Poindexter* case involving the Iran Contra

15   issues, before Judge Greene, there were 300,000 pages of

16   documents turned over by the government before the defense

17   moved for additional discovery.  And Judge Greene said, All

18   documents in the executive branch on the applicability of

19   the Boland amendment, must be searched for and disclosed to

20   Mr. Poindexter.

21         In addition, all documents showing that executive

22   branch official had knowledge of the National Security

23   Counsel activities, had to be searched for and provided.  We

24   are asking for a much, much more narrow set of information.

25   Take our letter.  Email it to the US House of

1    Representatives' General Counsel.  Please search for these

2    materials.  Send it to Main Justice Office of Legal Counsel.

3    Please provide any information that's responsive to this

4    request.

5              THE COURT:  Would you be willing to limit that to,

6    what I would consider to be OLC opinions, published or not?

7    I mean, is an email from an attorney adviser to a deputy in

8    OLC discoverable if it's not an official OLC opinion?  Or

9    why should I permit that type of thing?

10             MR. CORCORAN:  Well, it is discoverable.

11             THE COURT:  On what ground?

12             MR. CORCORAN:  Under the local rules.

13             THE COURT:  What issue does it go to?

14             MR. CORCORAN:  Well, estoppel, essentially.

15             THE COURT:  So an email from an attorney adviser

16   to the Deputy Assistant Attorney General of OLC, would estop

17   the United States government from taking some position in

18   litigation?  That can't be right.

19             MR. CORCORAN:  Let's say the email said, You know

20   what?  It's our long-standing policy here at the Department

21   of Justice not to prosecute former, even former, top

22   presidential advisers when the president asserts privilege.

23   But let's make an example of Mr. Bannon.  That, we believe,

24   the government should search for and provide emails along

25   those lines, because they would tend to negate an element of

**-1937-**

1      offense.

2                The local rule requires that.  It's broader than

3      *Giglio*.  It's broader than *Brady*.  The local rule that

4      applies to the courts that --

5            **THE COURT:**  So what element of the prosecution or

6      what defense does such an email go to?  It's even better for

7      you.  Imagine, hypothetically --

8            **MR. CORCORAN:**  Yes.

9            **THE COURT:**  -- there is an official, but

10     not-published OLC opinion, that is 100 percent on all fours

11     with this case.  Right?  Former executive branch employee

12     discussing things with the current president, Congressional

13     subpoena, assertion of privilege --

14           **MR. CORCORAN:**  Yes.

15           **THE COURT:**  -- and that OLC opinion is as strong

16     with respect to immunity or non-prosecution as one can

17     imagine.  I'm not saying there is such an opinion.  I am

18     just hypothesizing it.  The government says, That's

19     irrelevant because it doesn't go to an element of the charge

20     or a defense.  So what does it go to?

21           **MR. CORCORAN:**  Well, I think it does go to an

22     element of the charge of the offense.  Willfully makes

23     default.

24           **THE COURT:**  But why?  If that is a non-public OLC

25     opinion, then by definition neither Mr. Costello nor

45

1   Mr. Bannon would have known about them.

2          **MR. CORCORAN:**  Well, first of all, the discovery

3   rules do not require -- relevance is a concept for trial.

4          **THE COURT:**  I'm just trying to understand how the

5   opinion would be relevant in your view --

6          **MR. CORCORAN:**  Right.

7          **THE COURT:**  -- to something either the government

8   has to prove or you would want to say in your defense.

9          **MR. CORCORAN:**  Just to be very clear in my answer,

10  that document doesn't have to be admissible in trial.

11  Relevance is not a consideration when considering discovery.

12  The rules make clear that even if it's inadmissible, but

13  could lead to admissible evidence, then it has to be turned

14  over.

15         So for instance, in the *Safavian* case -- that was

16  Judge Friedman -- he required turning over -- it was a GSA

17  case and ethics and the government in that case for a White

18  House official.  He required at 233 FRD 12, he required the

19  turning over internal GSA guidelines and procedures

20  regarding ethics opinions and disciplinary actions.  He

21  required -- it involved Abramoff.  He said, Even emails by

22  Abramoff and Associates, even if unknown to the defendant,

23  must be turned over, because they may lead to admissible

24  evidence.

25         So for your hypothetical, a request to OLC, give

**-1939-**

46

```
1    us emails, give us drafts, give us information, may lead to

2    admissible evidence.  So it doesn't have to be relevant.

3    And it doesn't have to be something that's in -- you know,

4    in the mind of either Mr. Bannon or counsel.  And that's,

5    you know, that's the nature.

6             In Trie, another case we cite, the judge required

7    both DOJ and Federal Election Commission, internal memoranda

8    had to be searched for and turned over on the topic of

9    whether a specific statute applied to conduct like the

10   defendant's.

11            In other words, it's analogous.  We are asking

12   for, not internal deliberations, but statements within the

13   government that talk about whether a certain statute applies

14   to Mr. Bannon.

15            THE COURT:  Okay.  So now let's turn to the other

16   bucket, which I guess is statements, documents, et cetera,

17   to suggest that this is a political prosecution.  And I

18   don't mean to limit your argument.

19            MR. CORCORAN:  Yes, I understand.

20            THE COURT:  That's a different category, I think.

21            MR. CORCORAN:  Well, I think, first of all, on

22   Congressional documents.  And I understand there are cases

23   that talk about Congress being, you know, obviously the

24   constitution talks -- has Congress in a different building

25   so to speak, than the Court.
```

**-1940-**

1          We are not asking the Court to compel Congress to

2     do anything.  We are asking the Court to compel a litigant,

3     the United States Attorney's Office, which is prosecuting

4     our client criminally, to seek records.

5          In other words, again, from just a practical

6     standpoint, all they need to do is send to the general

7     counsel of the U.S. House of Representatives our letter.

8     Say, We are engaged in litigation.  We followed the criminal

9     contempt vote of the House, and we are proceeding with the

10    prosecution.

11         Please search for and give us from the Select

12    Committee staff, Select Committee members, the Speaker of

13    the House, because she had a role in certifying the vote to

14    the U.S. Attorney's Office.  Please search for these

15    materials and give them to us.

16         And the reason why it's -- so it's more like --

17    it's not just that the Select Committee is a complainant

18    here.  They initiated the prosecution.  The statutory scheme

19    gives the Select Committee and the U.S. House of

20    Representatives the power to initiate this prosecution.

21         The statutes, 2 U.S.C. 192 but 2 U.S.C. 194 says

22    that once the certification is made, the U.S. Attorney's

23    Office "shall" present the information to a grand jury.  In

24    other words, there is no choice.

25         Now, I know that different cases and OLC opinion

1    at different times has taken a different position on it.

2    But from our perspective, it's not just a complainant.  They

3    sit in the -- they are in the shoes of any other

4    investigatory or partner in a prosecution.  That's why we

5    are seeking the documents from them.  They've already made a

6    lot of public statements, members of the Committee, that

7    they are trying to make an example of Mr. Bannon.  Obviously

8    we are trying to present a defense and develop a defense,

9    prepare a defense.  And that is important information to

10   know if the reason that he -- you know, that Attorney

11   General Barr and U.S. Attorney General Holder were not

12   criminally prosecuted, but Mr. Bannon is.  And the reason is

13   they want to make an example of him, we are entitled to that

14   information from the Committee.  And it's not -- it's not a

15   burdensome request.  Again, it's sending an email with our

16   attachment and asking for them to do it.

17          Now, again, as I stated, we are not asking the

18   Court to compel Congress to do anything.  They could respond

19   to the email that they get from the AUSAs and say, You know

20   what?  We are not going to give you that.  We are not going

21   to give you that information.  Then we are in a different

22   posture.  And we'll have to decide as a defense team, what

23   do we do in that posture?

24          We are not asking you to compel them to do

25   anything.  We are saying, If we are going to have a fair

49

1    trial and it's initiated by members of Congress, and they

2    made statements to the effect they want to make an example

3    of him, we need their private conversations on that as well,

4    on that topic.

5           **THE COURT:**  So you are not asking me to order the

6    production of anything.  You are asking me to order the

7    government to ask Congress to "pretty please" give them

8    these materials?

9           **MR. CORCORAN:**  Yes.  You don't have to use that

10   exact language.

11          **THE COURT:**  And I wouldn't.  But if Congress

12   refuses?

13          **MR. CORCORAN:**  Then we as a defense team will have

14   to take the next step.  But we may seek, in some way, to get

15   an evidentiary benefit from that.  We may seek to foreclose

16   certain positions that might be taken at trial by the

17   government.

18          But right now we are in discovery.  Discovery is

19   all about, How do we get what we need to prepare a defense?

20   We don't have the ability to go -- we are not talking about

21   rummaging in their files.  That's the words that the

22   prosecutor used.

23          We have discrete requests that will take very

24   little time to search and fulfill.  And we believe it's

25   necessary for a fair trial.


**-1943-**

1          **THE COURT:**  Thank you, Mr. Corcoran.  I would like

2     to hear from Mr. Schoen on the Costello emails.

3          **MR. SCHOEN:**  Your Honor, first of all, I want to

4     apologize for the protocol breach earlier.

5          **THE COURT:**  No problem.

6          **MR. SCHOEN:**  Fundamental rule, I suppose.

7          Having said that, to explain, our original plan

8     was to divide up that issue, the advice of counsel.  But I

9     wanted to respect of course the Court's wishes announced

10    this morning.

11         Can I have 20 seconds, though -- the Court asked

12    the question what is the best argument.

13         **THE COURT:**  Yes.  Yes, please.

14         **MR. SCHOEN:**  I want to give you what I believe.

15    To crystalize it, the Court's question really was, If I find

16    *Licavoli* is best law still, what is your best argument

17    around it?  Because here I am in District Court, and I am

18    bound by that.

19         I think the best argument is -- Mr. Corcoran

20    alluded to toward the end -- executive privilege takes this

21    case out of *Licavoli*.  Why?  Because it raises a separation

22    of power issues, not contemplated in *Licavoli*.  And all of

23    that is based on the advice of counsel in this case.

24         In other words, the advice of counsel, with

25    respect to executive privilege is, Bannon, your hands are

51

1    tied.  You don't have the will.  Willfulness is removed from

2    this equation.  Once executive privilege is invoked, there

3    is nothing volitional --

4         **THE COURT:**  This argument is that *Licavoli* can

5    still be perfectly good law and binding, but it's not

6    applicable.  So where in your brief did you make this

7    argument?

8         **MR. SCHOEN:**  I don't think that argument, in that

9    form, is made.

10        **THE COURT:**  Are you close to that form?

11        **MR. SCHOEN:**  Your Honor, I think it is sort of

12   close to it.

13        **THE COURT:**  Point me to where that is in your

14   brief.

15        **MR. SCHOEN:**  I think after you get to the *Licavoli*

16   discussion, and we talk about separation of powers, it

17   doesn't make the argument that, By the way, if you buy into

18   *Licavoli*, here is why *Licavoli* is different.

19        **THE COURT:**  No.  It just says, *Licavoli* is no

20   longer good law.  It doesn't say, Even if it is good law, we

21   win.  Because it is completely irrelevant to the question at

22   hand.

23        **MR. SCHOEN:**  I think that's right, Your Honor.  I

24   think we address that when we say *Licavoli*, that standard

25   has been replaced by *Zeese* and *Ratzlaf* and all of that.  But

**-1945-**

52

1    this is an argument.

2              I personally think it's the best argument; and

3    that is -- and we do make the point about executive

4    privilege in the brief.  But the point here is, the jury

5    deserves to know what really happened.  And, in fact, if we

6    believe what Mr. Costello has said in his declaration, what

7    really happened is, he on behalf of Bannon, tried to find a

8    way to accommodate the subpoena, the opposite of "lack of

9    willfullness."  He was willing to testify.

10             He didn't default.  He didn't willfully make

11   default.  He said, Work it out with the president or take me

12   before a judge and let the judge tell me it doesn't apply.

13   I need to testify.  He was willing to do those things.  But

14   his lawyer said, You can't -- absent those things, you

15   cannot go forward.  Your hands are tied.  That's what the

16   law is, Bannon, and you've got to follow the law.

17             The jury deserves to hear that.  And if they don't

18   hear it, all they hear is, well, let's see.  Bannon got a

19   subpoena.  And Bannon didn't show up.

20             It gives Congress, in a sense, a veto power over

21   the executive privilege.  The executive branch has the right

22   to determine for itself what's a privileged matter.  The

23   ultimate arbitor would be you or the court; and that's what

24   the courts have said in a number of cases.  The ultimate

25   arbitor -- I'm sorry I'm talking too fast.  The ultimate

53

1    arbiter on executive privilege is the Court.

2              And so we need advice of counsel here because

3    Mr. Costello was the only -- they like to call intermediary

4    or point of contact.  He was the only person who ever dealt

5    with this Committee on Mr. Bannon's behalf.

6              To tell the story of this case, and specifically

7    on willfulness, we need to have Mr. Bannon -- we need to

8    have the evidence go in on advice of counsel.  That's, I

9    think, the best answer on that.

10             The other thing, the OLC opinions of course, is a

11   conceptually different argument.  It may be relevent to

12   wilfulness, but it's a due-process-based argument.  That is,

13   the government is estopped.  This is the classic entrapment

14   by estoppel.  The government is estoped from taking a

15   position inconsistent with these publicly-issued, binding on

16   the Department of Justice, legal opinions.

17             When they say things like, If you get -- former

18   member of the executive branch -- if you get a subpoena and

19   the rules or by Fiat, Congress committee won't allow the

20   privilege holder invoker, that subpoena is invalid -- (A

21   sneeze.)  God bless you -- that subpoena is invalid.  That's

22   a position taken in OLC opinion.

23             If an OLC opinion says, An executive branch member

24   or former executive branch member cannot be prosecuted by

25   the Department of Justice, if that person invokes executive

**-1947-**

54

1          privilege, that's a binding, publicly-issued opinion, that

2          Mr. Bannon and everybody else is entitled to rely on.  And

3          that the government is estopped from prosecuting or from

4          violating, put it that way.  And that's a due-process-based

5          argument.

6                    All right.  Back to my agenda, Your Honor.

7                    Just a couple things.  I know, first of all, the

8          Court clearly has read all of the papers, knows all of the

9          arguments and is very familiar with all of the facts, which

10         is extraordinarily impressive in and of itself.  But I don't

11         need to go into the facts.  And the Court's questions at the

12         beginning of this discussion with the AUSA pointed that out.

13                   I do think we have to ask the question, which the

14         Court asked, Why?  The Court knows what happened here.  They

15         went after emails -- well, we are still not clear exactly.

16         I gather from the discussion today, there is only one Stored

17         Communication Act application in order.  I'm not clear why

18         there is only one, when they went after several email

19         accounts.  And 2703(d) clearly contemplates using the Stored

20         Communications Act to get other email accounts.  So I don't

21         know what happened there on their end.

22                   And I'm not sure, by the way -- it's a little bit

23         of a side issue I don't think we need to deal with today.

24         I'm not sure -- and some commendators have suggested what I

25         am going to say -- that after *Carpenter*, just getting a

**-1948-**

1    Stored Communications Act order is enough, even for records,

2    non-content records.  But that's a question for another day

3    and another Court, I suppose.

4            But today we look at what they got, these email

5    records, none of which were Mr. Costello.  So it's not in

6    the posture of a Motion to Suppress.  And the telephone

7    records that are of Mr. Costello.

8            And, of course, you know, we hear the government

9    dismiss all of this as, Well, we didn't get any contents.

10   We don't know what he said in the conversation, which

11   undercuts the very basis they have for trying to get these.

12   But these are still very important.  And this is why the

13   Department of Justice's policy says, A subpoena to an

14   attorney related to the representation of clients.  It

15   doesn't require just when it relates to contents.

16           The position, by the way, since I want to try to

17   cut to what the questions and answers were earlier -- the

18   positions, by the way, that the position only applies if you

19   serve the subpoena on the attorney himself, and not to a

20   third party -- for which no authority is cited in the

21   government's brief -- is absurd on its face.

22           The principles behind the policy are reflected in

23   the policy.  There is a special relationship between

24   attorney and client.  You risk imposing and interfering with

25   that relationship by going after an attorney's records of

1     any kind by subpoena.  And that doesn't depend on whether

2     you handed it to Bob Costello or you handed it to TMobile.

3                In fact, there is no reason in this case not to

4     give notice to Mr. Costello.  His phone records were not

5     going away.  There is no reason in this case not to have

6     abided by the DOJ policy that requires the government to

7     seek those records voluntarily, as a matter of first course.

8                Now, you know, the government said, This policy

9     isn't binding on the Court; that's absolutely right.  The

10    Court can't enforce that policy.  I'm hopeful the Inspector

11    General will see things differently from how the government

12    presents in this case but that's also beyond the purview.

13               **THE COURT:**  So let's cut to the chase.

14               **MR. SCHOEN:**  Yes, sir.

15               **THE COURT:**  As to emails, email records, at least

16    as the record reflects, no email records for Mr. Bannon's

17    lawyer, Costello -- to be distinguished from other Costellos

18    in the world -- were collected.  I assume you agree, the

19    email records from other Costellos are completely irrelevant

20    here.

21               **MR. SCHOEN:**  The records themselves are

22    irrelevant.

23               **THE COURT:**  The records themselves.

24               **MR. SCHOEN:**  Any representation made to a federal

25    judge to get those records, under 2703(d) specific,

1    articulable facts that --

2              **THE COURT:**  Just hold on.

3              **MR. SCHOEN:**  Yes.

4              **THE COURT:**  The government has offered, and

5    Mr. Corcoran accepted the offer to produce that application

6    to you.  So you are getting that.

7              **MR. SCHOEN:**  I understand.

8              **THE COURT:**  So at least as to that question, you

9    have a set of irrelevant emails that you already have, and

10   you have an application that you are about to get.  It seems

11   to me that that's -- at least for present purposes, that's

12   the email stuff.  Now, you may want to do something with

13   that application, but in terms of discovery, you got it.

14             **MR. SCHOEN:**  Yes, Your Honor.

15             **THE COURT:**  Now, as to the phone records, you have

16   the phone records.  I'm relying on the government's

17   representations that all records that were collected have

18   been produced.  I can't do anything other than rely on that.

19   The government has said there were subpoenas as to those

20   records, and they will produce them to me for my in-camera

21   review but not to you.

22             What more do you want?

23             **MR. SCHOEN:**  I tell you what I think is relevant,

24   to some degree, I was surprised to hear today the government

25   say, Well, these telephone subpoenas really go to the grand

1    jury investigation.

2          I would be surprised, to put it mildly, if the

3    grand jury actually requested subpoenas for Bob Costello's

4    telephone records for the purposes stated here.

5          In my imagination, at least, I believe it is

6    possible that the government decided that they wanted to

7    subpoena those records.  And so I think there -- if it's

8    otherwise, if the grand jury really asked for Bob Costello's

9    telephone records, then I think we are back to

10   Mr. Corcoran's argument on another reason we need grand jury

11   minutes, because what on earth were they told about what the

12   government knew at this point?

13         Let me try to bring that home.  The Court asked

14   earlier to the government, Well, you know, certainly

15   today -- by today the defense has conceded that Mr. Bannon

16   got the subpoena and so, you know, today you wouldn't really

17   need to get those records, would you?

18         Two answers to that.  Bologna, is one.  They knew

19   -- the referral in this case was made on October 21st to the

20   Justice Department.  Banners about Bannon were in newspapers

21   all over the world.  Everybody knew that Bannon's position

22   was he wasn't complying with the subpoena because executive

23   privilege had been invoked and he couldn't.

24         There's never been any discussion that Mr. Bannon

25   never received the subpoena or that Mr. Bannon showed up in

**-1952-**

59

1    the wrong place or that this was a matter of accident and

2    that's what really happened.  And it's disingenuous to

3    suggest otherwise.  These subpoenas went out after that

4    referral.  The earliest one we know about is October 25th.

5            Putting aside all of the other interaction, on

6    November 1st -- it's in the record.  I think it's 34-1 at

7    Pages 15 to 24 -- Mr. Costello put in writing to the

8    government his whole defense in the case.  The defense that

9    Bannon would raise and why the government shouldn't

10   prosecute this case.

11           No one on this planet could read that by November

12   1st and conclude in any way that either Mr. Bannon was or

13   could consider taking the defense that he never received the

14   subpoena or that there was some accident involved here.

15           But here we are in March, with the government

16   telling the Court that that's the reason they went after

17   these records.  In fact, they gave two different answers.

18   One was in document 30 -- well, one was Document 31, Page 12

19   they say, "Costello is a witness to Bannon's decision not to

20   comply."  That was on February 25th.  Then on March 14th

21   they say they have into prove deliberate non-compliance, it

22   wasn't an accident.  And Costello's a witness to establish

23   that Bannon had knowledge of the subpoena and his

24   communications are relevant to the government's

25   investigation.  And then the government tells you, at 36-1,

**-1953-**

1   Page 2, Bannon finally has conceded in his post-indictment

2   pleadings that he knew of the demands.

3          Again, we have in the record already Bannon -- a

4   letter from Costello to the Committee that he accepted the

5   subpoena for Bannon.  But more than that, we have in writing

6   on November 1st the whole scenario of the defense.

7          According to the papers we have so far, and of

8   course now we will get the order.  The order referred to the

9   Stored Communications Act order referred to was dated

10  November 11th.  It's impossible that by November 11th the

11  government could have thought that Mr. Bannon's defense was

12  going to be, I never got the subpoena or that it was an

13  accident.

14          Putting all of that to the side, what on earth

15  were they going to tell from the records that they got?

16  From the metadata, from who we sent it to, who we got it

17  from, all of those things.  Nothing about whether he

18  received --

19          THE COURT:  Isn't the government allowed to, as

20  part of its investigation, look for cumulative evidence?

21          MR. SCHOEN:  First of all, this wouldn't be

22  cumulative, Your Honor, in my view.  But secondly --

23          THE COURT:  Why not?

24          MR. SCHOEN:  Cumulative of the fact that Bannon

25  actually received the subpoena?

61

1          **THE COURT:**  Or at least that Bannon and Costello

2     were talking on particular dates, which would be cumulative

3     of whether Costello had told Bannon there was a subpoena or

4     whatever.

5          **MR. SCHOEN:**  Could be, Judge.

6          Getting subpoena for attorney records wouldn't be

7     the way to do it and certainly not a matter of first course.

8     They knew he was communicating, from his written --

9     (indiscernible) -- so the Court says, Okay.  How about

10    cumulative?

11         Well, again, if Costello is going to be a witness,

12    you've got it in writing from him.  You've got in your 302s

13    that you took when you were interviewing him and all of

14    that.  But we have rules around, and ethical concepts,

15    around subpoenaing attorney records.

16         Consider this, for example --

17         **THE COURT:**  So assuming that is all true, how does

18    it impact this case?

19         **MR. SCHOEN:**  I will tell you how it impacts this

20    case, it's obviously, you know, the $64 million question, in

21    some sense.  So why am I not wasting the Court's time with

22    all of this?  I hope I am not waisting the Court's time,

23    because I think what happened is outrageous.  But I also

24    think if it's allowed to stand without being addressed, then

25    it will be accepted practice in the future.

**-1955-**

62

1              **THE COURT:**  What do you mean by "without being

2      addressed"?

3              **MR. SCHOEN:**  Without being --

4              **THE COURT:**  Do you think it goes to a substantive

5      question in the case?

6              **MR. SCHOEN:**  No.  No, your Honor.

7              Right now, from what we know, I think that it goes

8      to a matter within the Court's supervisory power, to send a

9      clear message on, that this was inappropriate what happened

10     here.  The reasons given don't make any sense, and the

11     methods used don't make any sense, to try to achieve those

12     goals.  And I think that's crystal clear.  I think that

13     message has to be sent.

14             The other reason, Judge, that I thought it was

15     important to still raise this issue, once -- even though we

16     know now, we hope, what happened.  And I'm hoping that what

17     we have is a representation that Mr. Bannon's other lawyer,

18     Adam Katz's records were not going over.  I think we have

19     that representation in some earlier writing.

20             But, in any event, I think that the other reason

21     it's important is because notwithstanding what the

22     government says about -- since they didn't get the contents,

23     it doesn't affect privilege issues.  It interferes with the

24     attorney/client relationship.  And there is a long line of

25     authority going back, way back, talking about the importance

1    and the sometimes tenuous nature of that relationship, and

2    how attorney subpoenas, pitting an attorney against a

3    client, or just attorney subpoenas, puts that delicate

4    relationship at issue.  And I'm thinking of cases like *Maine*

5    *versus Moulton*, a whole host of case of cases, Judge.  You

6    are as familiar with them or more probably than I am.

7    Probably more.

8              I think that's it.  The last thing I want to talk

9    about is remedy.  The government says that we are trying to

10   get at all of their internal deliberations about all of this

11   process.  I looked at the relief we asked for.  I don't see

12   that.

13             I am looking at Document 34, Pages 24 and 25.  We

14   asked for, you know, a copy of all of the subpoenas that

15   were issued, directed at third parties, to get the email and

16   telephone records, along with all of the applications for

17   those things.

18             Then a list -- number two, "A list of third

19   parties on whom a subpoena, court order or other process was

20   served."  And I say "other process" because Google at that

21   time referred to it as an SCA order or equivalent.

22             **THE COURT:**  Uh-huh.

23             **MR. SCHOEN:**  Number three, "A list of all people

24   in the Department of Justice for whom authorization to seek

25   and obtain the email and telephone records was received."

1          I mean, I guess that's going to look something

2     like this.  (Showed the Court a blank page.) I don't know

3     that we have to follow it.  Sorry.  (Turned around and

4     displayed to opposing counsel.)

5          I asked for them to disclose to us -- or we asked

6     them to disclose to us, "Whether the email records and

7     telephone records that were obtained were shown to or

8     referred to in front of the grand jury."

9          Now, I'm led to believe today they must have been.

10    Because we heard earlier that this is all part of the grand

11    jury investigation.  So the grand jury asked for it, and

12    they must have been told something about it.

13         I think that's all I have, Judge.  I think it is

14    an important issue to take up with the Court, even if it

15    doesn't impact substantively on the case.

16         Thank you, very much, Your Honor.

17         **THE COURT:**  Thank you, Counsel.

18         Mr. Costello?

19         **MR. COSTELLO:**  Thank you, Your Honor.

20         I am the actual Robert Costello that they were

21    looking for.

22         I am kind of the cleanup hitter here.  I have a

23    couple points that I want to make about presentations we've

24    already made.

25         Your Honor was discussing the issue of willfulness

1      and the fact that I asked for an accommodation in not one,

2      not two, but three or four of my correspondence with

3      Chairman Bennie Thompson.  And then at the end, I asked for

4      an extension of time, because that very day -- I think it

5      was October the 18th -- President Trump filed a lawsuit that

6      presumably would have a lot to do with what we were doing.

7              So I said to them, We would like to look at the

8      lawsuit.  We don't know anything about it.  Can you give us

9      a week?  This was the night of the 18th.  They didn't reply

10     that night.  They waited until the next morning and they

11     said, No.  The reason they said no is that was the day they

12     had a televised performance of the vote to hold Mr. Bannon

13     in criminal contempt.  And after that vote, Bennie Thompson

14     and Ms. Cheney both said on television -- I watched it live

15     -- that they were doing this to make an example of

16     Mr. Bannon.

17             With respect to the issue of willfulness.  I mean,

18     when somebody has a lot of experience they are often

19     referred to -- they make a comment that "this isn't my first

20     rodeo."  Well, this isn't Mr. Bannon's first rodeo when it

21     comes to executive privilege and the Congress.  In fact,

22     it's his fifth rodeo.

23             Four times previously he was in a situation where

24     executive privilege was invoked, he was asked to answer

25     questions before the Mueller Committee, before the Senate

1    Intelligence Committee and twice before the House

2    Intelligence Committee.

3            Why is the House Intelligence Committee important?

4    Because the Chairman of the House Intelligence Committee

5    during both of these occasions is Adam Schiff, who sits on

6    the Select Committee.  So he certainly was aware that

7    Mr. Bannon, when pressed on the issue of executive

8    privilege, asked the Committee, on four previous occasions,

9    please talk to the president.  This is not our battle.

10   Executive privilege doesn't belong to Steve Bannon.  This is

11   not our battle.  Please talk to the President's counsel and

12   work something out or if you can't, go to the District Court

13   and have the District Court tell us what's executive

14   privilege, what isn't.  It's not his position or mine to

15   decide what questions are covered by executive privilege.

16           In this particular instance, we were facing a

17   committee that was going to hold a private deposition

18   pursuant to the subpoena.  That private deposition,

19   according to their rules, would not allow the president's

20   counsel to be present, in order to invoke executive

21   privilege, as to what questions he was willing to let

22   Mr. Bannon answer.

23           There is a case -- you talked about the Office of

24   Legal Counsel.  There is a decision, binding upon the

25   executive department, not binding upon the Court, but

67

1    binding upon the executive branch of the government, of

2    which the U.S. Attorney's Office is part, that says, When

3    Congress issues a subpoena to a man like Mr. Bannon, an

4    executive privilege is involved.  If they do not let the

5    president's lawyer attend the deposition, then that subpoena

6    is -- and this is a quote -- "unlawful, illegal" -- I don't

7    know why they used both words but they did -- "unlawful,

8    illegal and incapable of enforcement either civilly or

9    criminally."  That's information from the OLC opinion that

10    certainly I communicated to Mr. Bannon.

11          Now, let me talk for a moment about the Costello

12    issue and why is that important?  I think it's important

13    because, quite frankly, it shows terrible abuse of the grand

14    jury process.  It is not the ordinary course of business.  I

15    was a federal prosecutor myself.  I was Deputy Chief of the

16    criminal division in the Southern District of New York.  I

17    have a lot of experience in this area.  It is, by far, not

18    the normal experience to turn around and subpoena a defense

19    lawyer's records.

20          And in this case, we first asked -- when I saw

21    that, one night looking at the discovery and realized that

22    the phone number I was looking at is my personal cell phone.

23    Which, as you might imagine, during COVID season became my

24    personal phone and my business cell phone.  And when you

25    further consider that I represent not just Mr. Bannon, but I

**-1961-**

1      also represent Rudy Giuliani, who is involved in these same

2      issues.  They subpoenaed those records the very day I

3      reached out to the U.S. Attorney's Office and said, I want

4      to make a presentation seeking a declination -- because

5      there was a long history of declinations in that office --

6      and who is the contact person I should be in touch with?

7      That day, October 25th, they issued the subpoena for my

8      personal cell phone records, which is also my business

9      records.  They went on to subpoena my office direct line in

10     New York City and my home number.  What information could

11     they be looking for?  Well, we asked that question.  And at

12     first they said, Costello is a witness.

13            Now, I can't think of any way to put a wedge

14     between a lawyer and his client than to say that that guy

15     that you thought, Mr. Bannon, was your lawyer, is now going

16     to be a witness against you; that's what they were doing

17     here.

18            The first time we asked that question, they said,

19     He's going to be a witness.  Recently when that question was

20     asked they said, Oh, we have to check to make sure that

21     Mr. Costello told Mr. Bannon about the subpoena; that this

22     isn't all just a big mistake.  First of all, you know

23     somebody is not telling the truth when they give you two

24     explanations for the same thing that are inconsistent with

25     one another.

-1962-

69

1           Second of all, that position is preposterous.

2     They should be embarrassed to make that.  It's an insult to

3     the Court.  It's an insult to defense counsel.

4           The question of whether I communicated the fact of

5     the subpoena to Mr. Bannon is mind boggling, because it was

6     the Select Committee that contacted me, in the first

7     instance, and said, Do you represent Mr. Bannon?  Yes, I do.

8     Will you accept service of his subpoena?  I said, Well, I

9     will have to talk to Mr. Bannon about that, of course.  I

10    said, I will get back to you.  I called Mr. Bannon, spoke to

11    him about it, explained it.  He said, Sure.  Accept service

12    of the subpoena.

13          I then sent an email, which is on the record, back

14    to Select Committee saying, I am Mr. Bannon's counsel, and I

15    am accepting service of a subpoena.

16          If you allow this office to do what they did to me

17    to every other lawyer in the system, which is what is going

18    to happen if we just poo-poo this, then no lawyer in his

19    right mind is ever going to accept service or process.

20          Second of all, part of this equation is, because I

21    was acting in good faith, and I said in my first email --

22    that's why I want to talk about the people in U.S.

23    Attorney's Office about a declination.  I was aware of the

24    OLC opinions, aware of the long history of that office not

25    prosecuting.  I was aware of attorney generals, like Mike

1    Mukasey saying, I won't refer it to the U.S. Attorney's

2    Office.

3              So I sat down with them for, I am going to guess

4    because I wasn't keeping close track, maybe a total of five

5    hours on two occasions.  If they really wanted to find out

6    whether -- I mean, first of all, would I do that if I hadn't

7    given Mr. Bannon the subpoena?  Of course not.

8              **THE COURT:**  Do you remember what dates --

9              **MR. COSTELLO:**  I'm sorry?

10             **THE COURT:**  Do you remember what dates those two

11   meetings --

12             **MR. COSTELLO:**  Yeah.  November 3rd and November

13   8th.  November 3rd was the first meeting and November 8th

14   was the second meeting.

15             During that period of time never once said to me,

16   By the way, Mr. Costello, did you give Mr. Bannon the

17   subpoena?  Did you ever tell him about the subpoena?  Of

18   course it was a ludicrous question.  Because I presented

19   them, they wanted to meet right away.  I said, No, I have a

20   better idea.  I am writing a legal memo on why I think your

21   office should decline prosecution.  I would like to send

22   that to you, and then have a day or two go by so you can

23   review it, check the OLC cites, and then we can sit down and

24   have a meaningful discussion.

25             What I didn't know was they viewed that as an

**-1964-**

1      opportunity to try to turn me into a witness.  At that Zoom

2      conference, I am looking at a table consisting of four

3      people sitting at the table.  Mr. Cooney, the two other

4      Assistant US Attorneys and in the back was a young man who

5      was a paralegal taking notes.

6              I was told, Oh, by the way, we have FBI agents

7      that are going to be listening in to the conversation.  I

8      could care less who listened in to the conversation.  I was

9      making a legal presentation on a declination.

10             Then when we get to discovery, I see there is an

11     FBI 302 Report of Investigation, pretending to be an

12     interview of me.  The interview of me that is conducted

13     while I'm conducting a Zoom conference with the U.S.

14     Attorney's Office seeking a declination.

15             Part of that FBI 302 said that I was advised of

16     the identity of the agents; that's true.  They introduced

17     themselves orally.  They weren't in the picture at any time.

18     My recollection is they didn't ask any questions.  But I

19     certainly was not advised that this is going to be an FBI

20     interview of you.  I would have been out of my mind to do

21     that.

22             When Mr. Bannon found out about that, he was

23     irritated because he thought I gave an interview to the FBI

24     because of the 302.  So that's the kind of wedge I'm talking

25     about here that they drive between a lawyer and his client,

72

1    by making that lawyer look like he's not a lawyer

2    representing you.  In fact, he's going to be a witness

3    against you.  To top it off, at the same time, they make a

4    Motion in Limine to deprive Mr. Bannon of the defense of

5    advice of counsel.

6            Well, I think you touched upon this earlier.  With

7    respect to the advice of counsel, especially when I am

8    talking to him about OLC opinions, that information is going

9    to come in in any event.

10           Even if you decide advice of counsel doesn't come

11   in, it's coming in under an estoppel ground because it was

12   presented to Mr. Bannon.  And that's one OLC opinion that so

13   far we haven't discussed, because that's the opinion that

14   says, with executive privilege, that subpoena is dead on

15   arrival.  It is null and void.  It's incapable of being

16   enforced civilly or criminally.

17           That's why Mr. Bannon didn't show up.  Mr. Bannon

18   said, If you can make an accommodation, work out something

19   with the president, I'll show up.  And there's proof of his

20   word.  He did that four times previously.

21           Now, with respect to grand jury materials, we are

22   pretty certain they never said anything to the grand jury

23   about the fact that Mr. Bannon had been down this road four

24   times previously, and in each occasion had ultimately

25   testified when an accommodation was worked out.

73

1            But there is something even more important that

2       we are almost certain they forgot to tell the grand jury.

3       In reading the FBI 302, I discovered they were interviewing

4       Doug Letter, the general counsel of the House of

5       Representatives.  He represents both democrats and

6       republicans.

7            Mr. Letter pointed out that when I accepted

8       service of the subpoena, the Select Committee did not

9       provide me with Section (3)(a) -- excuse me -- Section

10      (3)(b) of House Resolution 8, adopted January 4th, 2021.

11           Why is that important?  What they did give me was

12      The Congress' Regulations for the Use of Deposition

13      Authority, which contains Paragraph 11 that says, "A witness

14      shall not" -- excuse me.  I'll quote this again.  "A witness

15      shall not be required to testify unless the witness has been

16      provided with a copy of Section (3)(b) of House Resolution

17      8, 117th Congress, and these regulations."

18           What this says is, Because they didn't give us

19      this, (indicated) Mr. Bannon did not have to appear for his

20      deposition.  You can bet your bottom dollar that that grand

21      jury that indicted him for failure to appear, never heard

22      about that.  That's why we need to know what the grand jury

23      was told.  What they were instructed.

24           I think that's everything.  Oh, I'm sorry.  There

25      is one other thing.

1              In talking about this abuse of grand jury process,

2      along the way, trying to put this wedge, they now have

3      written an awful lot of stuff.  They wrote a reply to their

4      in limine motion that for the first nine pages doesn't have

5      anything to do with the in limine motion.  What it has to do

6      with, it's a nine-page, ad hominem attack on me, claiming

7      that I misspoke this or said that or I failed to say this.

8      They call it bad faith.

9              **THE COURT:**  I think both parties decided that it

10     helps their positions to throw a bunch of facts about the

11     underlying issues in their briefs.  So I wouldn't spend a

12     lot of time criticizing --

13             **MR. COSTELLO:**  I don't want to spend a lot of

14     time, Your Honor.  I want to do, unlike what the government

15     did the other night, which is to file a surreply and ask

16     permission.  It's already on the public record.  All the

17     reporters have already read it.

18             I want your permission to file a surreply just to

19     those factual issues where they are impugning my integrity.

20     And I have -- they made 12 allegations.  I can prove all 12

21     of them false.  And one of them is a fraud on the Court,

22     because they cite something from a previous filing, that I

23     quote.  They failed to quote it.  I quote it.  It's directly

24     contrary to the position the US Attorney's Office took.

25             So I don't want you to sit there and deciding

1    things and think, Maybe this guy Costello doesn't tell the

2    truth.  I do.

3            **THE COURT:**  Thank you, Counsel.

4            **MR. COSTELLO:**  Do I have permission, Your Honor?

5            **THE COURT:**  Yes.

6            **MR. CORCORAN:**  Thank you.

7            **THE COURT:**  So here's what I would like to do:  As

8    you can imagine, Madam Court Reporter would like a break.  I

9    would like to finish the argument, and so what I'm thinking

10   of is a brief rebuttal from the government.  A very brief

11   rebuttal from the defendant.  I know the issues.  I just

12   want you to focus on the most pertinent things you've heard.

13           We will then take a break.  And my plan is to then

14   come back after the break and decide some, if not all of the

15   issues that are before me, or at least have a notional way

16   forward to the extent that I am not deciding issues.

17           So with that, a brief rebuttal from the

18   government, please.

19           **MS. VAUGHN:**  Your Honor, I will start with the

20   issue of willfulness.  And there were four brief points I

21   wanted to address.

22           First this idea that *Licavoli* is distinguishable.

23   It's not.  *Licavoli* decided the meaning of willfulness under

24   the statute as a matter of law.  And because the meaning is

25   deliberate and intentional, as a matter of law, a mistaken

**-1969-**

1    reliance on the law, whether that is through the defendant

2    reading the law himself or getting it from his attorney is

3    not a defense.  So *Licavoli* cannot be distinguished.

4              There's another reason it is not distinguishable.

5    The defendant claims it is different here because he raised

6    constitutional privilege of some kind.

7              Defendants in these contempt of Congress cases

8    raise constitutional privileges all of the time as a

9    defense.  Fifth Amendment.  First Amendment.  They've raised

10   the gamut.  The defendant is not barred from filing a Motion

11   to Dismiss to argue that the subpoena was invalid for some

12   constitutional violation.  That's a different question than

13   whether his mistaken reliance on the law is a defense.  And

14   *Licavoli* says "as a matter of law."  It's not.  So *Licavoli*

15   is not different.

16             Second, this idea that the Court cannot follow --

17   can decide not to follow controlling precedent in *Bryan* 1950

18   or *Fleischman* or as it was applied in *Licavoli*.  The

19   defendant's position is not that *Bryan* 1998 applies somehow

20   differently in this case because of the specific statute.

21             The defendant's position appears to be that *Bryan*

22   rewrote willfulness across the criminal law.  So if the

23   Court were to apply *Bryan*, it wouldn't be just rewriting

24   willfulness under the Contempt of Congress Statute, it would

25   be rewriting willfulness among many different statutes.  And

1    courts have addressed those post *Bryan* 1998, and find they

2    still require the lowest level of willfulness, which is

3    deliberate and intentional.

4           The defendant is really asking the Court to

5    redefine it in a number of statutes, including Contempt of

6    Congress and the Contempt of Court Statute.  And, again, the

7    Supreme Court's made clear, it does not overturn its

8    precedence by implication.  But that is what the defendant

9    is asking this Court to find and that's not allowed under

10   the law.

11          Third, the defendant suggests that there is an

12   element of unfairness in this, in not allowing him to raise

13   advice of counsel as a defense.  I think at bottom that

14   argument really goes to the fact that the defendant just

15   didn't recognize the constitutional power of Congress to

16   compel witnesses, in the same way that someone might

17   recognize the Court's power to compel witnesses.  But it is

18   a coordinate branch of government.  This is a constitutional

19   power it has, and the witness does not get to decide when

20   and how Congress gets to exercise that.

21          I think what's most telling about the defendant's

22   position is he says, Well, I told Congress that I would

23   comply, if they went to court and got an order telling me

24   to.  He is essentially saying that Congress' constitutional

25   authority to compel testimony is completely subordinate to

1    the power of the courts.  And that's not what the

2    constitution recognizes.  It's not what the Supreme Court

3    has recognized in cases like *Quinn* and *Watkins*, where they

4    say, All right, witness.  You decide that Congress doesn't

5    have this power over you.  You are taking the risk of

6    contempt.  That's your choice.

7              Finally, the defendant says the subpoena was void

8    because of these constitutional issues.  He couldn't have

9    counsel there or whatever it might be.  But that is not even

10   a defense to willfulness under the heightened standards.

11             When you have a legal duty, even under the highest

12   standard, set out by *Cheek* and *Ratzlaf*, the defendant cannot

13   say, for example in the tax context, Well, I know I didn't

14   report my taxes properly, but I think the tax laws are

15   invalid as applied to me.  *Cheek* makes very clear, that's

16   not a defense.  That's, essentially, a sovereign citizen who

17   walks in and says, I am not subject to the power of this

18   court.  I don't recognize it.

19             That's not a defense to willfulness even under the

20   highest standard.  So even if the intermediate or highest

21   standard applied here, the defendant wouldn't be able to

22   raise the defense that he is proffering.

23             So unless the Court has anything else on

24   willfulness, any questions for the government, that's all I

25   have.

79

1          **THE COURT:** No.

2          **MS. VAUGHN:** So I will turn to the discovery

3      issues, starting with the attorney issue.  Bottom line, the

4      defendant still has not identified what relief he would

5      seek.

6          **THE COURT:** I think the defendant conceded he's

7      not seeking any relief in this case in the most specific

8      sense, but he would like something as to the conduct.  A

9      referral, an admonition, a determination by me, I suppose,

10     about the conduct.

11         **MS. VAUGHN:** So in that way, if the defendant has

12     abandoned his request for discovery, then I guess that is a

13     different issue.

14         **THE COURT:** I don't think he has.  I think he

15     said, I want the information I've been seeking, to make the

16     argument to you, as to what those steps should be.

17         **MS. VAUGHN:** And I'm not aware of any authority in

18     the criminal discovery law that allows a defendant to get

19     internal government deliberations in a criminal case, on the

20     hope that they can make some kind of motion for a sanction

21     or something else.  And he still doesn't even identify what

22     that potential sanction would be.

23          He still has to identify some basis that he would

24     attack the indictment, in which case he needs to make a

25     colorable claim of his defense or attack the merits of the

1    offense at trial.  And he hasn't done either of those

2    things.

3                And, secondly, now defense is saying, Well,

4    everybody knew that Bannon knew about the subpoena.  That is

5    just a lot of Monday morning quarterbacking.  The

6    government's investigation is not limited to one form of

7    evidence.  And, frankly, the government is not required to

8    rely on Mr. Costello's representations.

9                The government's investigation can certainly try

10   to corroborate those claims, whatever he may have made.  It

11   can try to confirm them in some other way.  The government

12   is not limited.  And there is no per se bar on subpoenaing

13   records that do not contain privileged communications just

14   because those records might relate to an attorney.

15               **THE COURT:**  I get that.  Let's talk about the

16   arguments relating to the information that was provided to

17   the grand jury or was not provided to the grand jury or was

18   potentially -- the grand jury wasn't -- I guess the best way

19   to put it is, the grand jury was not fully apprised of the

20   whole situation.  And the indictment is, therefore,

21   potentially suspect.  And, therefore, I should order the

22   government to produce what it told the grand jury.

23               **MS. VAUGHN:**  So I --

24               **THE COURT:**  What's wrong with that argument?

25               **MS. VAUGHN:**  I understand the defendant's argument

81

1   to be about the government -- an allegation that the

2   government did not present exculpatory evidence to the grand

3   jury.  And the government's not required to do that.  And,

4   again, to show particularized need, it's not just, We don't

5   think the government did this.  You have to have a

6   particularized factual basis to believe that it did not.

7           And the government has no obligation to show

8   exculpatory information to the grand jury.  So just the

9   statement that maybe we didn't do it, doesn't provide any

10  basis to get those grand jury materials.

11          And the defendant still has not identified on what

12  basis they could even move to dismiss the indictment,

13  especially because the government has no obligation to

14  present that exculpatory material to the grand jury, to the

15  extent it even is exculpatory.

16          **THE COURT:**  Thanks.

17          So briefly on OLC opinions, to the extent there is

18  anything you want to say or, Congressional information.

19  Briefly.

20          **MS. VAUGHN:**  Yeah.  As I was listening I heard

21  maybe two new bases for seeking it.  One being the

22  government is estopped in making legal arguments about how

23  the statute applies.

24          So I take that to mean -- and I think Mr. Schoen

25  said it was some kind of due process challenge.  But, again,

**-1975-**

1    that puts us right back in the camp of *Armstrong*.  The

2    defendant needs to make a colorable showing of the elements

3    of whatever due process claim he would raise before he's

4    entitled to get the government's internal files.  And that's

5    not just saying, Well, it's a due process violation.  That's

6    showing articulable, colorable claims about how that due

7    process violation may have occurred.

8            The other new argument I think I heard, was a

9    factual issue as to whether or not the defendant at trial

10   will say that he believed he had been authorized by the

11   government to not comply with the subpoena.

12           But, again, OLC internal opinions are privileged

13   attorney advice to its client.  There is nothing to suggest

14   that that would have any relevance to what was in the

15   defendant's mind at the time.  And as I said earlier, the

16   government has already provided everything of which it's

17   aware and has relating to what the defendant knew from the

18   executive branch and the Committee at the time he did not

19   comply.

20           So unless the Court has additional questions.

21           **THE COURT:**  Thank you.

22           **MS. VAUGHN:**   Thank you.

23           **THE COURT:**  Mr. Schoen, very briefly.  Because I

24   know the court reporter is running up against a couple of

25   deadline type of things.

83

1          **MR. SCHOEN:**  And I made her work too hard by

2     talking too fast.

3          Three points, just very quickly, Judge.  The

4     government said *Licavoli* is not distinguishable because of

5     privilege.  There are all kinds of privileges out there.

6     You know what?  There are.  But executive privilege is

7     different.  It's not his privilege.  It wasn't Mr. Bannon's

8     privilege.  His hands were tied by someone else's privilege.

9     Fifth Amendment, you make a decision.  Often they are

10     cautioned, If you make that position, we may hold you in

11     contempt.

12          But in this case it's not his privilege.  His

13     hands were tied, and that was what the advice of counsel

14     was.  And, in effect again, you would be giving Congress a

15     veto over the executive branch's decision about his

16     privilege; that's number one.

17          Number two, first of all, it's not a new argument

18     we've raised about the OLC opinions and entrapment by

19     estoppel.  It's in our papers.  We allude to it.  We will be

20     making it much more broadly, of course, in the Motion to

21     Dismiss.  But it goes not only to state of mind, it is a due

22     process basis.  Whatever.  I don't need to go into that

23     further.

24          Finally, the idea that if the Court changes the

25     standard of willfulness, it will affect courts all over the

**-1977-**

1    place.  Let's be real clear, not every court agrees, in the

2    first place, that in the contempt situation, willfulness

3    just means, Did you show up or not show up?

4           There is a case, *Westbrooks*, for example, out of

5    the Fourth Circuit 2015, 780 Fed. 3d, 593.  Fourth Circuit

6    2015, in which they say, it's an open question.  Now, the

7    opinion treats it as if advice of counsel would apply.  But

8    it says it's an open question and they say, We, the Fourth

9    Circuit, have held in the past or at least considered that

10    advice of counsel applies.

11           Finally, this is in our brief at Document 30, Page

12    24, the law, even in this circuit, doesn't seem to be quite

13    as settled as the government would have it.

14           Why do I say that?  *United States versus Taylor*,

15    139 F. 3d 924, at Page 934, Note 10, D.C. Circuit, 1998.

16    The Court there said in their footnote, in the contempt

17    situation, We note that both sides appear to assume that

18    advice of counsel applies to a contempt -- criminal contempt

19    charge.  And we note that the District Court treated it as

20    if advice of counsel applies to a criminal contempt charge;

21    therefore, we, the D.C. Circuit, don't need to get into that

22    question today.

23           So I would suggest that the *Taylor* footnote

24    suggests that -- more than suggests -- that the D.C. Circuit

25    doesn't see it today -- or in 1998, as quite as settled a

85

1          question about *Licavoli* as the government would have the

2          Court believe.  Evan is going to make one point.

3                    Thank you, Your Honor.

4                    **MR. CORCORAN:**  Two very quick points.

5                    One on the grand jury question.  Counsel is

6          talking about no need to present exculpatory evidence.  We

7          are not saying that that's the issue at all.  We agree that

8          that's -- although they said in their papers that it's their

9          practice to present exculpatory evidence, we make a

10         different point, which is the evidence that they did present

11         was misleading on two issues.  Whether or not there was a

12         request for a later date, misleading testimony on that, and

13         whether or not executive privilege was communicated to the

14         Select Committee, misleading testimony on that.

15                   So it's not a matter of our hope that they would

16         have presented additional evidence to the grand jury.  We

17         get to see what the argument was based on the misleading

18         evidence that they presented.

19                   My final point really just goes really to this

20         issue of intent.  You asked what we had in our brief,

21         particularly with regard to *Licavoli*.  Our focus in the

22         brief, really, was that *Licavoli*, both early on, says we are

23         relying on the *Sinclair* case.  And later on, right before

24         holding says, We are relying on the *Sinclair* case.  We say

25         the *Goudin* case, which says that *Sinclair* is totally

**-1979-**

1    eviscerated and another reason, essentially, why it's not

2    good law.  Thank you, Your Honor.

3              **THE COURT:**  Thank you.

4              So here's what we are going to do:  We are going

5    to take a short recess.  I am going to come back, as I said,

6    and walk through where I am on all the motions.  To the

7    extent I can, I will decide some of them today orally.  To

8    the extent that I can't, but I have a view of what I would

9    like to do by way of next steps.  I will articulate them.

10   My guess is that this recess will be all of 10 minutes,

11   maybe 15 but that's the plan.

12             So we'll take a quick recess and we'll be back.

13             (Break.)

14             **THE COURT:**  Thank you for the arguments this

15   morning and early afternoon, Counsel.  As I said, I am going

16   to decide, to an extent, some of the issues that are in

17   front of me.

18             I will start first with the United States' Motion

19   in Limine to Exclude Evidence or Argument Relating to

20   Good-Faith Reliance on Law or Advice of Counsel at ECF No.

21   29.  As I think people heard me say earlier, I read all of

22   the briefing on this matter and am familiar with all of the

23   arguments and exhibits in the papers, as well as the cases

24   cited therein.

25             The defendant was charged with violating 2 US Code

1    Section 192.  As relevant here, that statute covers any

2    individual who "willfully makes default" on certain

3    Congressional summonses.

4         The defendant argues he's entitled to argue at

5    trial that he cannot have been "willfully" in default,

6    because he relied in good faith, on the advice of his

7    counsel, in not complying with the Congressional subpoena.

8    He points to many Supreme Court court cases defining

9    "willfully," including *Bryan v. United States*, 524 U.S. 184,

10   1998, to support his reading of the statute.

11        If this were a matter of first impression, the

12   Court might be inclined to agree with defendant and allow

13   this evidence in.  But there is binding precedent from the

14   Court of Appeals, *Licavoli v. United States*, 294 F.2d 207,

15   D.C. Circuit 1961, that is directly on point.  It involved

16   the conviction under the very same part of 2 U.S. Code

17   Section 192, with defendant arguing on appeal that, "good

18   faith reliance upon advice of counsel is a defense."  That

19   is at Page 207.

20        The Court of Appeals explained that, "an essential

21   part of that premise is that an evil motive, which can be

22   negative by bonafide advice of counsel, is an element of

23   'willfully' under the statute."  But it expressly rejected

24   that argument.

25        To quote the Court of Appeals, "Advice of counsel

1    cannot immunize a deliberate intentional failure to appear

2    pursuant to lawful subpoena lawfully served."  Rather, as it

3    explained, "All that is needed...is a deliberate intention

4    to do the act.  Advice of counsel does not immunize that

5    simple intention.  It might immunize if evil motive or

6    purpose were an element of offense.  But such motive or

7    purpose is not an element..."

8            The Court therefore held, "In the case at bar

9    there can be no serious dispute about the deliberate

10   intention of," the defendant there, "Licavoli not to appear

11   before the Committee pursuant to its subpoena.  That he

12   meant to stay away was made abundantly clear.  That he did

13   so upon advice of lawyer is no defense.  The Court

14   instructed the jury."

15           The defendant offered two reasons in his brief why

16   this Court should ignore the holding of *Licavoli*, but

17   neither of those arguments is persuasive.

18           First, defendant claims *Licavoli* relied on bad

19   law, specifically the now-disavowed Supreme Court case of

20   *Sinclair v. United States*.  It is true that subsequent

21   Supreme Court cases have cut back in some of the holdings of

22   *Sinclair*, but not the holding that *Licavoli* relies on.

23           And even if the Supreme Court had done so, the

24   defendant has cited to no authority and the Court has

25   located none on its own, that would allow me to ignore

1      otherwise binding precedent, just because some of the cases

2      on which it relied are no longer good law.

3             Second, the defendant notes that in the sixth

4      decade since *Licavoli*, the Supreme Court has provided

5      clarity on the meaning of "willfully" in criminal statutes.

6      Clarity that favors defendant.  That might very well be

7      true.  But none of that precedent dealt with the charge

8      under 2 U.S. Code, Section 192.  *Licavoli* did.  Thus, while

9      this precedent might furnish defendant with arguments to the

10     Court of Appeals on why *Licavoli* should be overruled, this

11     court has no power to disregard a valid and on-point or

12     seemingly on-point holding from a higher court.

13            The problem is, that a new argument was presented

14     today.  Did not appear in defendant's briefs.  I wasn't

15     prepared to think about it, let alone pass on it.  This

16     argument is not that *Licavoli* is no longer good law, but

17     that *Licavoli* is inapplicable here, because it did not

18     involve an executive privilege assertion, a Congressional

19     subpoena to a former member of the executive branch

20     communicating with the president and the like.

21            I have therefore not had time to consider whether,

22     assuming *Licavoli* is good law, which as I've held it is, it

23     nevertheless is inapplicable here because this case is

24     distinguishable.  I am not prepared to make that

25     determination on the fly here.

1              I am not happy that this argument came up for the

2       first time during argument.  It's an important question and

3       it should have been briefed.  Nevertheless, I am going to

4       give the parties an opportunity to brief it.  So what I

5       would like are supplemental briefs to be filed in the

6       following order, which is:  The defendant shall file a

7       supplemental brief on this question no later than March 22nd

8       to exceed no more than 10 pages, and limited to the question

9       of whether *Licavoli* applies to this case.  The government

10      will then have an opportunity to respond to that argument

11      and to brief whether that argument was somehow waived in its

12      own supplemental brief to be filed March 29th.

13             And I will then consider the question and make a

14      final determination as to the Motion in Limine in light of

15      those arguments.  That's that motion.  So I am taking that

16      motion under advisement.

17             As to the Motion to Compel regarding attorney

18      records, which is called Defendant's Motion to Compel

19      Disclosure of Government Efforts to Obtain Telephone and

20      Email Records of Mr. Bannon's Attorneys, ECF No. 26.

21             Again, I've read all briefing on this matter, and

22      I'm familiar with all of the parties' arguments and exhibits

23      and cases cited therein.  I've also ordered the production

24      of and reviewed the government's ex parte submission as to

25      the Google email order and application.

1              There are really two groups of information within

2    the defendant's request and motion.  The first is

3    information that the government obtained pertaining to an

4    unrelated Robert Costello, i.e., somebody who is not the

5    Costello who represented Mr. Bannon today.  To the extent

6    that the defendant seeks any discovery on that question or

7    information, his motion is denied, such records and

8    information are clearly immaterial to his case, as was

9    essentially conceded today.

10             As to records that the government obtained

11   relating to the actual Robert Costello, I am not yet

12   prepared to rule on the matter.  In its most recent filings,

13   the government has proffered the steps that it took in

14   obtaining Mr. Costello's subscriber information and phone

15   records.

16             As I noted, the government provided me its

17   application for an order pursuant to 18 US Code 2703(d) --

18   although I think it's undisputed that relates to a different

19   Costello -- and its surreply is offered to produce that

20   information to the defendant, if he agrees to treat that

21   application as sensitive under the protective order.

22             As I understood it, the defendant accepted that

23   proposal.  And therefore the government can produce that

24   application, which is -- I acknowledge is not -- did not end

25   up pertaining to the actual Costello here.  But I do think

**-1985-**

1    it's relevant, because it has some information in it about

2    the reason the government articulated to at least one judge

3    for its application.  So the government shall produce that

4    information, as it has proposed, to Mr. Bannon.  And that

5    information shall be treated as sensitive under the

6    protective order.  I've seen that application, as I

7    mentioned.

8             I haven't, however, seen additional information

9    described in the government's surreply.  I will just order

10   the government to produce to me for my ex parte, in-camera

11   review, no later than March 18th, the subscriber information

12   the government obtained for what it describes as the Yahoo

13   account, the Comcast account and the Google account, as well

14   as the requests the government used to obtain that

15   information.  That is described at ECF No. 36-1 at 3.

16            And, I think most importantly, the subscriber and

17   toll records for the Westchester County phone number, as the

18   government puts it, that the government obtained, as well as

19   the requests that the government used to obtain that

20   information.  After the government has provided that

21   information to the Court under seal, I will rule on the

22   remainder of defendant's motion.

23            I'll turn last to defendant's Motion to Compel

24   discovery.  Again, I think it's pretty clear I've read all

25   of the briefing on this matter.  I'm familiar with all of

1    the parties' arguments and exhibits, as well as the cases

2    cited therein.  I will deny this motion in part and grant it

3    in part.

4            The defendant seeks many categories of

5    information.  First, citing to Federal Rule of Criminal

6    Procedure 16(a)(1)(E)(i) and the Supreme Court cases of

7    *Brady* and *Giglio* he seeks a broad swath of material that he

8    lumps together as, "Information that tends to show that the

9    indictment is invalid."  The Court will deny this part of

10   the motion.

11           Criminal Procedure Rule 16(a)(1)(E)(i) requires

12   the government to provide the defendant certain items

13   "within the government's possession, custody or control"

14   that are "material to preparing the defense."

15           It covers both inculpatory and exculpatory

16   evidence.  It's generally intended to cover a wide range of

17   material.  *Brady* and *Giglio* on the other hand, require the

18   government to disclose exculpatory and impeachment evidence.

19   The defendant need not make a request for such materials to

20   be disclosed.

21           With respect to what we have been referring to as

22   the grand jury materials, defendant has not shown that it

23   would be material to helping him prepare his defense or that

24   he's entitled to it under *Brady* or *Giglio*.  He attempts to

25   argue that this information might show grounds to dismiss

**-1987-**

1    the indictment based on the failure to properly charge the

2    grand jury on applicable law.  But he bases this argument,

3    at least in substantial part, on the arguments in his brief

4    about what "willfully" means in the Circuit.  And at a

5    minimum, those arguments that were presented in brief, I

6    think are wrong.  And I certainly haven't concluded that

7    there is any reason to believe that *Locavoli* doesn't apply

8    here.

9         Regardless, the Court doesn't have some

10   wide-ranging supervisory authority to require the government

11   to give all potentially exculpatory evidence to the grand

12   jury when seeking indictment.  Even if that were not an

13   issue, defendant would still run into the problem of secrecy

14   of grand jury materials.

15        It is, of course, true that some evidence of the

16   grand jury has been released under seal to him.  But that

17   does not mean that no further grounds exist for maintaining

18   the secrecy of the remaining documents.  Quite to the

19   contrary, releasing grand jury documents is a serious step

20   for the Court to take, and not one that it does lightly.  It

21   requires case-by-case adjudication.  Allowing release of

22   some documents, does not mean it is appropriate to release

23   them.  As I have said, I do not believe defendant has made a

24   showing that the materials we are talking about would be

25   material to help him prepare his defense.

USCA Case #22-3086    Document #1997762        Filed: 05/03/2023      Page 215 of 454
Case 1:21-cr-00670-CJN    Document 73-2    Filed 05/17/22    Page 96 of 100

95

1          Next, defendant seeks "information that tends to

2     show that the subpoena was not lawfully authorized" as well

3     as, "information that tends to show bias or the invalidity

4     of the evidence."

5          Specifically, he seeks to have the Court order the

6     government to ask the Select Committee, U.S. House of

7     Representatives and other individuals, regarding the process

8     through which the subpoena was issued and the referral as

9     well.  He also seeks information relating to conversations

10    and communications regarding his interactions with the

11    Select Committee.  But Rule 16 only requires the government

12    to provide information "within the government's possession,

13    custody or control."  Those are quotes.

14          The government in this context refers to the

15    prosecuting office, not the entirety of the government,

16    including a separate branch.  And as the United States

17    notes, defendant has not tied any of the documents he seeks

18    to the possession of the prosecuting agency.

19          Of course, if the government does name an

20    individual from the House as a witness in this matter, it

21    will be obligated to provide discovery on that individual,

22    at least as impeachment evidence, as well as their potential

23    biases.  But we are not at that stage of this case yet.  To

24    the extent there is evidence that defendant seeks that is in

25    the government's possession, the Court notes that he has not

1    shown how it would be relevant to his defense.  At best, it

2    would relate to a selective prosecution claim.  But

3    defendant has not hinted that he will raise such a claim,

4    nor does the Court see how one would be colorable.

5           Accordingly, as to what defendant styles as

6    "information that tends to show that the subpoena was not

7    lawfully authorized," the Court will deny his motion.

8           Finally, defendant seeks what he styles as,

9    "Information That Tends To Negate Willfulness."  Some of

10   what defendant seeks in that way is not going to be

11   discoverable through an order of this Court.  For reasons

12   already discussed.  He seeks, for example, information, the

13   possession of the Select Committee and the Rules Committee

14   of the House of Representatives.  But for reasons I've also

15   discussed, that evidence is not discoverable under Rule 16.

16          But I recognize there are might be some relevancy

17   to defendant -- to this case, whether to an element of the

18   government's claim or defendant's defense for information

19   within the possession of the Department of Justice.

20   Specifically I will grant defendant's motion to the extent

21   it requests statements or writings reflecting official DOJ

22   policy, such as an opinion of the Office of Legal Counsel or

23   the position of an entire division or litigating group,

24   whether those statements are public or not, if such writings

25   relate to the department's policy on prosecuting or not

97

1      prosecuting government or former government officials

2      raising executive privilege claims or defenses of immunity

3      or similar issues.

4              I therefore will grant [sic] defendant's motion in

5      part and grant it in part.

6              Those are my current holdings.  Any questions?

7          **MS. VAUGHN:**  Your Honor, I just want to make sure

8      that I understood what you would like us to provide ex

9      parte, with respect to the attorney records.

10         **THE COURT:**  Yes.

11         **MS. VAUGHN:**  You said the subscriber information

12     the government actually received for the Yahoo, Google,

13     Comcast and Westchester County accounts?

14         **THE COURT:**  Yes, and how they were obtained.

15         **MS. VAUGHN:**  Okay.

16         **THE COURT:**  Here's -- I am just looking at Pages 3

17     and 4 of your supplemental brief.  The government says, In

18     an effort to confirm the use of these accounts by

19     Mr. Costello, the government first obtained subscriber

20     information for each of them.  Referring to Yahoo, Comcast

21     and Google.  I would like to know what request the

22     government used to get those subscriber information and then

23     the information.

24         **MS. VAUGHN:**  Got it, Your Honor.

25         **THE COURT:**  And then as to the -- what we've been

**-1991-**

98

1  calling the "toll records" the phone records, the same

2  question.  I want to see the phone records and I want to see

3  the requests.  Likely grand jury subpoenas, based on the

4  discussion we had today.  I understand you are not

5  committing to that, but the requests that resulted in the

6  production of those records.

7          **MS. VAUGHN:**  Yes, Your Honor.  Thank you.

8          **THE COURT:**  Thank you.

9          **MR. SCHOEN:**  One question, Your Honor.  If we

10  might add, since the Court is allowing the government on the

11  29th to raise a possible waiver issue, if they deem it, I

12  would like three days to file a reply if they raise the

13  waiver issue.

14          **THE COURT:**  If the government raises a waiver

15  issue, you may respond to that issue and that issue only by

16  April 1st.

17          **MR. SCHOEN:**  Your Honor, housekeeping issue.

18  There is a typo in one of the briefs, just to note.  I had

19  cited -- on Document 38, Page 5 I cited Document 31 at Note

20  1.  It should have been Document 26 at Note 1.  Sorry.

21          **THE COURT:**  Thank you.

22          **MR. SCHOEN:**  Thank you, Your Honor.

23          **THE COURT:**  Thank you, Counsel.

24          (Proceedings adjourned at 1:23 p.m.)

25

**-1992-**

1                    **C E R T I F I C A T E**

2

3             I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8

9

10    _____March 18, 2022_____        __/s/_____
                  **DATE**                      **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

| | |
|---|---|
| **From:** | Costello, Robert J. |
| **To:** | Amerling, Kristin |
| **Subject:** | Letter to Hon. Bennie Thompson (00934684x7F7DD).pdf |
| **Date:** | Monday, October 18, 2021 6:02:44 PM |
| **Attachments:** | Letter to Hon. Bennie Thompson (00934684x7F7DD).pdf |

Sent from my iPhone

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,<u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number
you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.
*************************************************************************

Jan. 6 Sel. Comm. 0044



US-000289

**-1995-**



### DAVIDOFF HUTCHER & CITRON LLP

ATTORNEYS AT LAW

605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 286-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914) 381-7400

WEST PALM BEACH
ATTORNEYS AT LAW
1107 NORTH OLIVE AVENUE
WEST PALM BEACH, FL 33401
(561) 567-8488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

October 18, 2021

Hon. Bennie G. Thompson
Chairman
House Select Committee to Investigate the January 6th Attack
c/o Kirstin Amerling, Esq.
1540 A Longworth HOB
Washington, DC 20515

Re:    The Subpoena for Stephen K. Bannon dated September 23, 2021

Dear Congressman Thompson:

We write on behalf of Stephen Bannon. We have just been advised of the filing of a lawsuit in federal court for the District of Columbia entitled Donald J. Trump v. Bennie Thompson, et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we respectfully request a one-week adjournment of our response to your latest letter so that we might thoughtfully assess the impact of this pending litigation.

Very truly yours,

/s/ Robert J. Costello

RJC/nc

**Jan. 6 Sel. Comm. 0045**

US-000290

# EXHIBIT 4

| | |
|---|---|
| From: | Amerling, Kristin |
| To: | Costello, Robert J. |
| Cc: | Buckley, David |
| Subject: | RE: Letter to Hon. Bennie Thompson (00934684x7F7DD).pdf |
| Date: | Tuesday, October 19, 2021 10:46:00 AM |
| Attachments: | 10 - 19 - 2021 Response to Costello.pdf |

Dear Mr. Costello,

Thank you for your letter of October 18 on behalf of Stephen K. Bannon to the House Select Committee to Investigate the January 6th Attack on the United States Capitol. Please find attached a response from Chairman Thompson.

Sincerely,
Kristin Amerling

**From:** Costello, Robert J. <rjc@dhclegal.com>
**Sent:** Monday, October 18, 2021 6:03 PM
**To:** Amerling, Kristin <Kristin.Amerling@mail.house.gov>
**Subject:** Letter to Hon. Bennie Thompson (00934684x7F7DD).pdf

Sent from my iPhone

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should never wire money to any bank account that our office provides to you via email without first speaking with our office. Further,do not accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. Please call us first at a number you know to be correct for this office to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
*********************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron

Jan. 6 Sel. Comm. 0046



LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.

IRS DISCLOSURE NOTICE
In accordance with Internal Revenue Service Circular 230, we inform
you that any discussion of a federal tax issue contained in this
communication (including any attachments) is not intended or written
to be used, and it cannot be used, by any recipient for the purpose of
(i) avoiding penalties that may be imposed on the recipient under
United States federal tax laws, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.
*********************************************************************

Jan. 6 Sel. Comm. 0047

US-000274

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

One Hundred Seventeenth Congress
Select Committee to Investigate the January 6th Attack on the United States Capitol

October 19, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

The Select Committee to Investigate the January 6th Attack on the United States Capitol
("Select Committee") is in receipt of your October 18, 2021, letter requesting a one-week
"adjournment" of your response to my October 15, 2021, letter. The only basis for your request
is yesterday's filing of litigation by former President Trump against the Chairman, Select
Committee, Archivist of the United States, and the National Archives and Records
Administration. That litigation relates to the Select Committee's requests for documents in the
possession of the National Archives and is immaterial to the Select Committee's demand for
documents and testimony from Mr. Bannon. The investigation of the Select Committee is
extremely important and urgent for the nation, and further delay in compliance by Mr. Bannon
undermines the ability of the Committee to timely complete its essential responsibilities.
Accordingly, no grounds exist for any "adjournment" or other delay and your request is denied.

Sincerely,

Bennie G. Thompson
Chairman

**Jan. 6 Sel. Comm. 0048**

US-000275

US-000276

Leave to file granted.

Hon. Carl J. Nichols

*May 25, 2022*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-670 (CJN) |
| | ) | |
| STEPHEN K. BANNON, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |

**UNITED STATES HOUSE OF REPRESENTATIVES' MOTION FOR LEAVE TO FILE**
**AMICUS CURIAE BRIEF**

Pursuant to Rule 47 of the Federal Rules of Criminal Procedure and Rule 47 of the Local

Criminal Rules, the United States House of Representatives[1] moves the Court for leave to file an

amicus curiae brief in support of the United States' Opposition to Defendant's Motion to

Dismiss, ECF No. 65, and in support of the United States' Motion in Limine, ECF No. 53.  The

proposed amicus brief is attached to this motion.

As explained below, Defendant's motion raises various arguments of immense interest

and importance to the House not only in this specific case, but also more broadly because

Defendant has attacked the institutional interests of the House in various ways.  The Justice

Department addressed these attacks only very briefly in its filings, and the House of

Representatives seeks to provide the Court with more thorough facts and argument on these

points.  *See Commonwealth of the N. Mariana Islands v. United States*, No. 08-1572, 2009 WL

596986, at *1 (D.D.C. Mar. 6, 2009) ("The filing of an amicus brief should be permitted if it will

assist the judge 'by presenting ideas, arguments, theories, insights, facts or data that are not to be

found in the parties' briefs.'") (quoting *Voices for Choices v. Ill. Bell Tel. Co.*, 339 F.3d 542, 545

(7th Cir. 2003)); *Hard Drive Prods., Inc. v. Does 1-1,495*, 892 F. Supp. 2d 334, 337 (D.D.C.

2012) ("Amicus participation is normally appropriate when . . . 'the amicus has an interest in

some other case that may be affected by the decision in the present case,' or . . . 'when the

amicus has unique information or perspective that can help the court beyond the help that the

---

[1] The United States House of Representatives Bipartisan Legal Advisory Group (BLAG) voted to authorize the filing of this motion and the attached amicus brief for the House.  The BLAG consists of the Speaker, Majority Leader and Whip, and Minority Leader and Whip, and "speaks for, and articulates the institutional position of the House in all litigation matters."  Rule II.8(b), Rules of the U.S. House of Representatives, 117th Cong. (2021).  The Republican Leader and the Republican Whip decline to support this filing out of concern for damaging institutional prerogatives, as the Committee failed to adhere to the "shall" requirements prescribed by H. Res. 503 as required by the Rules of the House of Representatives and as required by the Supreme Court in *Yellin v. United States*, 374 U.S. 109 (1963).

lawyers for the parties are able to provide.'") (quoting *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 137 (D.D.C. 2008)).

Although Rule 47 does not require consultation with opposing parties, out of courtesy for the parties here and in an effort to narrow any areas of possible disagreement and promote efficiency, the House informed both parties of its intent to file this motion and sought their consent. The United States requested that we report the following: "The Department of Justice believes that the interests of the federal government in this criminal prosecution are adequately represented by the U.S. Attorney's Office. We do not believe that any of the pending legal issues are particularly complex or novel such that an amicus brief would be necessary. That said, we recognize that the point of an amicus brief is to assist the Court. If the Court believes that it would be helpful to have the House of Representatives weigh in on any particular issue, we will defer to the Court."

Counsel for Defendant asked that we inform the Court that they do not consent, and they request a reasonable opportunity to file a formal opposition to this motion.

The Court should grant this motion because the House's amicus brief would materially aid the Court in resolving issues raised in this case in at least two ways.

*First*, the House is uniquely situated to address many of Defendant's challenges. Defendant argues, among other points, that the Select Committee: (1) was formed in a manner that (Defendant believes) is inconsistent with the House resolution that created it, ECF No. 58 at 4-12; (2) did not follow certain procedures for seeking Defendant's deposition, ECF No. 58 at 6-9; (3) does not have a valid legislative purpose for the subpoena, ECF No. 58 at 12-13; and (4) did not have authority to require a privilege log, ECF No. 58 at 14-15.

A thorough response to these arguments requires extensive knowledge and understanding of House Rules, parliamentary precedents, and internal procedures, as well as the details of the

Select Committee's structure, formation, and operation.  The House of Representatives seeks to provide this essential information, particularly because the Justice Department's brief did not provide such details.  Indeed, the D.C. Circuit has made clear that descriptions by the House of Representatives in briefing and oral argument concerning the scope and meaning of House internal rules can be dispositive in ruling on the merits of a claim.  *Barker v. Conroy*, 921 F.3d 1118, 1124, 1130-32 (D.C. Cir. 2019).  Given this principle, it clearly is appropriate for this Court to hear from the House of Representatives on issues that Defendant has raised.

*Second*, the House has a strong institutional interest in addressing Defendant's challenge to a Congressional committee's subpoena; the House has an obvious inherent interest in the interpretation of its own rules.  Moreover, should this Court adopt Defendant's arguments (which strike at the core of the work done by a House select committee), it could open the door to sweeping challenges to the Select Committee's work overall, and the work of other House committees.

Further, this request has substantial precedent.  Courts have often accepted amicus briefs from the House in criminal cases, particularly when (as here) they involve issues affecting the House's institutional and constitutional interests.[2]  The proposed amicus brief should cause little

---

[2] *See, e.g.*, Order, *United States v. Collins*, No. 18-cr-567 (S.D.N.Y. Apr. 3, 2019), ECF 77 (granting motion of the U.S. House of Representatives for leave to file as amicus curiae); *In the Matter of the Search of: Electronic Communications (Both Sent and Received) in the Account of Chakafattah@gmail.com at Internet Service Provider Google, Inc.*, No. 14-mj-617 (E.D. Pa. July 24, 2017); Sealed Text Order, *In re Grand Jury Subpoena #0714-SGJ-002330*, 15-MC-3005 (C.D. Ill. July 28, 2015) (granting motion of the U.S. House of Representatives for leave to file as amicus curiae); *United States v. Renzi*, No. 13-10588 (9th Cir. Apr. 15, 2014), ECF 34; Order, *United States v. Renzi*, No. 08-cr-00212 (D. Ariz. Nov. 4, 2008), ECF 152 (granting motion of the U.S. House of Representatives for leave to file as amicus curiae); *In re Search of The Rayburn House Off. Bldg. Room No. 2113*, 432 F. Supp. 2d 100, 105 n.2 (D.D.C. 2006), *rev'd sub nom. United States v. Rayburn House Off. Bldg., Room 2113*, Washington, D.C. 20515, 497 F.3d 654 (D.C. Cir. 2007) (noting that "[t]he Court granted the [House's] motion for leave to file a brief as *amicus curiae* in support of [a party's] motion in recognition of the importance of the House's interest in and position on the questions of serious constitutional magnitude that are raised in this matter").

4

or no inconvenience for Defendant, who still has seven days to file his reply brief; the House

seeks leave to file its amicus brief, which is only 20 pages long, two business days following the

filing of the Justice Department's brief.

**CONCLUSION**

For the reasons set forth above, the United States House of Representatives should be

granted leave to file an amicus brief in support of the United States' Opposition to Defendant's

Motion to Dismiss the Indictment and in support of the United States' Motion in Limine.  A

proposed order is attached.


/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

May 10, 2022

5

**-2006-**

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2022, I caused the foregoing document to be filed with

the Court and served on the parties via electronic mail.


*/s/ Douglas N. Letter*
Douglas N. Letter

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-670 (CJN) |
| | ) | |
| STEPHEN K. BANNON, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |

## [PROPOSED] ORDER GRANTING THE UNITED STATES HOUSE OF REPRESENTATIVES' MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

UPON CONSIDERATION of the United States House of Representatives' Motion for

Leave to File Amicus Curiae Brief, it is hereby

**ORDERED** that the motion is **GRANTED**.  The Clerk is directed to file the House's

amicus curiae brief on the docket in this matter.

**SO ORDERED**.

Dated: _____

_____
The Honorable Carl J. Nichols
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>STEPHEN K. BANNON, )<br>)<br>*Defendant*. )<br>)<br>) | Criminal No. 21-670 (CJN) |

## BRIEF OF UNITED STATES HOUSE OF REPRESENTATIVES AS AMICUS CURIAE IN SUPPORT OF THE DEPARTMENT OF JUSTICE

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION AND STATEMENT OF INTEREST ............................................. 1

ARGUMENT .................................................................................................................... 2

I.     Defendant's Efforts To Undermine The Select Committee And Its Subpoena
Are Mistaken ......................................................................................................... 2

       A.     The Constitution's Rulemaking Clause Forecloses Defendant's Arguments ........ 3

       B.     Defendant Advances A Flawed Reading Of H. Res. 503,
Asking This Court To Improperly Substitute Its View Of
The Requirements Of That Provision For Those Of The House ........................... 3

       C.     The Select Committee Properly Sought Defendant's Deposition ......................... 8

       D.     The Select Committee Has A Valid Legislative Purpose For
The Subpoena .......................................................................................................... 11

II.    The Select Committee Has the Authority To Compel Production Of A
Privilege Log Or Certification, And Such Authority Does Not Violate
the Separation of Powers ...................................................................................... 14

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. F.B.I.*,
    198 F.R.D. 306 (D.D.C. 2000)....................................................................16

*Avery Dennison Corp. v. Four Pillars*,
    190 F.R.D. 1 (D.D.C. 1999)......................................................................16

*\*Barker v. Conroy*,
    921 F.3d 1118 (D.C. Cir. 2019) ..................................................................1

*Barry v. United States ex rel. Cunningham*,
    279 U.S. 597 (1929)....................................................................................2

*\*Budowich v. Pelosi*,
    No. 21-3366 (D.D.C. Jan. 20, 2022) ...................................................7, 12

*\*Comm. on Judiciary, U.S. House of Representatives v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019) ...................................................15, 19

*Comm. on Judiciary, U.S. House of Representatives v. McGahn*,
    968 F.3d 775 (D.C Cir. 2020) (en banc) ....................................................15

*\*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008)....................................15, 17, 18, 19

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008)...........................................................15, 18

*Comm. on Oversight and Government Reform v. Holder*,
    No. 12-1332, 2014 WL 12662665 (D.D.C. Aug. 20, 2014) ..............17, 19

*\*Eastman v. Thompson*,
    No. 8:22-00099 (C.D. Cal. Jan 25., 2022) ...................................7, 12, 19

*In re Grand Jury Subpoena*,
    274 F.3d 563 (1st Cir. 2001)......................................................................16

*In re Search of The Rayburn House Off. Bldg. Room No. 2113*,
    432 F. Supp. 2d 100 (D.D.C. 2006)..........................................................19

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)..................................................................................14

*Northrop Corp. v. McDonnell Douglas Corp.*,
    751 F.2d 395 (D.C. Cir. 1984)..................................................................19

ii

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) ......................................................................1, 3

*Repub. Nat'l Comm. v. Pelosi*,
    No. 22-659, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022)........................6, 7, 9

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    No. 16-621, 2016 WL 11681577 (D.D.C. Sept. 30, 2016)...............................15, 17

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021)...........................................................................11, 14, 18

*United States v. Am. Tel. & Tel. Co.*,
    551 F.2d 384 (D.C. Cir. 1976).................................................................................15

*U.S. v. Constr. Prods. Rsch., Inc.*,
    73 F.3d 464 (2d Cir. 1996)......................................................................................16

*United States v. Durenberger*,
    48 F.3d 1239 (D.C. Cir. 1995)...................................................................................7

*United States v. Nixon*,
    418 U.S. 683 (1974).................................................................................................18

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995)..............................................................................1, 6

*Vander Jagt v. O'Neil*,
    699 F.2d 1166 (D.C. Cir. 1982).................................................................................3

*Yellin v. United States*,
    374 U.S. 109 (1963)...................................................................................................8

## Constitution

U.S. Const., Art. I, § 5, cl. 2.........................................................................................1

## Statutes and Rules

2 U.S.C. § 192...............................................................................................................2

26 U.S.C. §§ 8001-05...................................................................................................4

Fed. R. Civ. P. 45........................................................................................................16

## Legislative Authorities

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) .........................................................4

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) .................................................4

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ...............................................11

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021).........................................5

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ...................................6

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ........................................5

167 Cong. Rec. H7793(daily ed. Dec. 14, 2021) .........................................5

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) ...................................6

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ..........................................5

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) .....................................6

H. Rep. No. 109-377 (2006) .....................................................................4, 5

H. Rep. No. 117-152 (2021) ......................................................................12

H. Res. 8, 117th Cong. (2021) .................................................................9, 10

H. Res. 10, 117th Cong. (2021) ..................................................................9

H. Res. 437, 109th Cong. (2005) ................................................................4

H. Res. 503, 117th Cong. (2021) ...............................................3, 4, 5, 8, 12

H. Res. 730, 117th Cong. (2021) ................................................................6

H. Res. 851, 117th Cong. (2021) ................................................................6

H. Res. 1037, 117th Cong. (2022) ..............................................................6

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I....................................................................................................4

    Rule X ..................................................................................................4

    Rule XI ...............................................................................................15

**Other**

Aaron Blake, *Who could have predicted the Capitol riot? Plenty of people –*
    *including Trump allies*, Wash. Post (Jan. 28, 2021), https://perma.cc/QRC6-WV5H ...........13

Glossary of Legislative Terms, https://perma.cc/83HA-3DKY ....................................9

Steve Bannon, *War Room: Pandemic, EP 634 – Tuesday Special (with Maggie VandenBerghe, Ben Berquam, and Peter Navarro)* (Jan. 5, 2021), https://perma.cc/5SPG-BCQ4 .................13

## INTRODUCTION AND STATEMENT OF INTEREST

The United States House of Representatives files this *amicus curiae* brief in support of the position of the U.S. Department of Justice that this Court should deny Defendant Stephen Bannon's motion to dismiss his indictment. The House is in the best position to provide this Court with the House's interpretation of its own rules and procedures, which Defendant has put at issue. Indeed, the D.C. Circuit has held that explanations by the House in court briefs and at oral argument concerning the scope and meaning of House internal rules and procedures can be dispositive in ruling on the merits of claims involving those rules. *See Barker v. Conroy*, 921 F.3d 1118, 1124, 1130-32 (D.C. Cir. 2019).

In so holding, the D.C. Circuit relied on the Constitution's Rulemaking Clause, which states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const., Art. I, § 5, cl. 2. The *Barker* court explained that this Clause " 'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.' " 921 F.3d at 1130 (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).

Because the Rulemaking Clause bars federal courts from usurping the House's rulemaking process and from invalidating House actions when a litigant (or even a court) might read the relevant House rules differently, it is important for this Court to have before it the official position of the House regarding the meaning of its rules, which often turns on historical practice and traditions of the House—areas well within the House's expertise. Likewise, the House is uniquely positioned to elaborate on the legitimate legislative purpose and authority of

1

the House Select Committee to Investigate the January 6th Attack on the United States Capitol,

as well as the validity of the Select Committee subpoena that Defendant defied.

Defendant's attacks against the validity of the subpoena are deeply flawed:  They ignore

the deference that a court owes the House regarding the meaning and application of its own rules

and procedures, and the presumption of regularity due Congress.  *See Barry v. United States ex*

*rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot

be denied to the proceedings of the houses of Congress, when acting upon matters within their

constitutional authority.").  And they have already been rejected by the three courts to have

considered them.  Defendant's defiance of the Select Committee's subpoena constitutes criminal

conduct under 2 U.S.C. § 192, and his motion to dismiss his indictment should therefore be

denied.

## ARGUMENT

## I.    Defendant's Efforts To Undermine The Select Committee And Its Subpoena Are Mistaken

Besides other arguments (which the Justice Department fully addresses in its brief),

Defendant contends that he could wholly ignore the Select Committee's subpoena because the

Select Committee: (1) was formed in a manner that (Defendant believes) is inconsistent with the

House resolution that created it; (2) did not follow certain procedures for seeking his deposition;

and (3) does not have a valid legislative purpose for the subpoena.

As a preliminary matter, Defendant did not communicate any of these challenges to the

Select Committee as a basis for resisting the subpoena, and those arguments were therefore

waived, as the Justice Department has explained.  *See* Gov't Mot. in Limine to Exclude

Evidence, ECF No. 53 at 5-9; Gov't Opp'n to Def's MTD, ECF No. 65 at 31-37.  In any event,

Defendant's challenges to the Select Committee's formation and authority are mistaken, and did not free him to defy with impunity the subpoena he received.

A.    **The Constitution's Rulemaking Clause Forecloses Defendant's Arguments**

Defendant's demand that this Court override the actions of the House and its Speaker for assertedly not following House rules violates important Constitutional separation of powers principles.  As explained above, the Rulemaking Clause is a critical aspect of the Legislative Branch's constitutional design because it "grants the House the power to make its own Rules about its internal proceedings." *Rangel*, 20 F. Supp. 3d at 167.  Accordingly, the D.C. Circuit has pointed out that it is a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (citation and internal quotation marks omitted).

B.    **Defendant Advances A Flawed Reading Of H. Res. 503, Asking This Court To Improperly Substitute Its View Of The Requirements Of That Provision For Those Of The House**

Defendant argues that, because the Select Committee's authorizing resolution uses the word "shall," the Speaker had "no discretion" in appointing Members to the Select Committee. Mot. to Dismiss Indictment, ECF No. 58 at 4.[1]  He claims that, because the Speaker did not simply accept the nominees suggested by the Minority Leader, but "instead appointed 9 members to the Select Committee of her own choosing," the "Select Committee was not composed as authorized" and "the subpoena to Mr. Bannon is invalid."  ECF No. 58 at 4-5.

The House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See,*

---

[1] H. Res. 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503, 117th Cong. § 2(a) (2021).

*e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (House Rules) (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503, 117th Cong. § 1 (2021) (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31). The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here. *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."). And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House." *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Defendant's attack on the appointment and composition of the Select Committee is wrong. The Resolution does not require that *all* thirteen Members be appointed in order for the Select Committee to function, and we are aware of no rule or law providing that the authorization to appoint thirteen Members required appointment by the Speaker of that precise number. Given the way that the House operates and interprets its rules (by paying close attention to prior practice), it is critical to note that precedent supports a House select committee operating with fewer than its full allotment of Members being appointed by the Speaker. In the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using language analogous to the Resolution here. *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]"). Then-House Speaker Dennis Hastert

appointed only eleven Members, all of whom were from the then-majority Republican Party.

*See* H. Rep. No. 109-377, at ii (2006) (listing Members).

The Katrina Select Committee also issued subpoenas. *See* H. Rep. No. 109-377, at 23

(2006) (noting that the Katrina Select Committee issued a subpoena to the Department of

Defense, and that the Department complied). This precedent strongly supports the Speaker's

actions here in appointing the Members of the January 6th Select Committee.

House Resolution 503 itself contemplates the possibility of "vacancies," but provides no

specific timeline for filling them. *See* H. Res. 503 § 2(c). Nor does House Resolution 503

provide that the Select Committee would become invalid, or that it must suspend all action,

should a vacancy occur—even though, by definition, it would have fewer than thirteen members.

*Id.*

Moreover, the full House affirmatively ratified the relevant actions of the Select

Committee, in the face of challenges raised by Members on the House floor identical to what

Defendant here raises.[2] As Judge Kelly of this district recently ruled on this very point, "the

---

[2] For example, when the resolution on Mark Meadows's contempt was debated before the full House, several Members of Congress raised the argument about the composition of the Select Committee. *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate. It has violated its own rules of creation. It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. You can't have a committee to find out what happened because you are interested. You can't do that. And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Reg. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Defendant, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose") (statement of Rep. Banks). The interpretive arguments Defendant now presents have been rejected by the Select

---

House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members. This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Repub. Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022). *See* H. Res. 851, 117th Cong. (2021) (approving Select Committee's referral for contempt of Congress); H. Res. 730, 117th Cong. (2021) (same).

In rejecting the argument that House rules mandated that the Speaker had to appoint thirteen Members to the Select Committee, Judge Kelly explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate." *RNC*, 2022 WL 1294509, at *15. Judge Kelly concluded that if he accepted the argument (which is identical to Defendant's argument) about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than . . . the [House] itself' and

_____

Committee, the Rules Committee, the Parliamentarian, the Speaker, and the full House of Representatives. Moreover, the full House has since approved the Select Committee's referrals of Defendant, Meadows, Navarro, and Scavino for contempt of Congress. *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino). These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee and approved by the full House. *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Defendant); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino). The full House's ratification of the referrals reinforces that Defendant's objections to the Select Committee's composition cannot be accepted.

'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Id.* at 31 (quoting *Rostenkowski*, 59 F.3d at 1306-07).[3]

Judge Kelly was not the first judge to find the argument being made here by Defendant unconvincing; he was the third judge to do so, and no judge has ruled differently.

In *Budowich v. Pelosi,* Judge Boasberg also rejected the same challenge that Defendant brings here concerning the composition of the Select Committee.  He held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 33-34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022).

Furthermore, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  "A court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order Denying Pl.'s Mot. for Prelim. Inj. at 9 n.12, *Eastman v. Thompson*, No. 8:22-00099 (C.D. Cal. Jan. 25,

---

[3] In *RNC v. Pelosi*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest."  No. 22-659, 2022 WL 1294509, at *2 (D.D.C. May 1, 2022) (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF No. 15.

7

2022), ECF No. 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).

Under such circumstances, Defendant's demand that this Court tell the House the meaning of its own internal rules and procedures is in plain contravention of the separation of powers and the House's constitutionally assigned authority to set its own rules.

Although Defendant heavily relies on the Supreme Court's decision in *Yellin v. United States*, 374 U.S. 109 (1963) (*see* ECF No. 58 at 2-3), to try to overcome this problem, his reliance is misplaced.  There, the Court overturned a criminal conviction because a Congressional committee had failed to comply with two of its own rules, thereby excusing a witness's refusal to answer questions.  Unlike in the case at bar, in *Yellin*, the Congressional committee's "practice . . . in construing its rules"—to which the Court gave "weight"—actually *reinforced* that the committee had violated its own rule.  374 U.S. at 116-17.  Critically, the committee there did not challenge the witness's interpretation of the committee's rules; it assumed that those rules had indeed been violated.  *See id.* at 116-19.  The Court therefore had no occasion to defer to the committee in its interpretation of its own rules.  The *Yellin* decision is therefore irrelevant here.

### C.    The Select Committee Properly Sought Defendant's Deposition

Defendant next contends that the Select Committee exceeded its authority because: (1) House Resolution 503 allows depositions only after consultation with the Select Committee's ranking minority member and (according to Defendant) the Select Committee has no such member; and (2) the Select Committee did not provide Defendant with a copy of Section 3(b) of H. Res. 8, 117th Cong. (2021).  Defendant is wrong on both scores.

1.    House Resolution 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including

pursuant to subpoena." H. Res. 503 § 5(c)(6)(A). Defendant incorrectly argues (ECF No. 58 at 9-12) that his subpoena violated the Resolution because the Select Committee has no ranking minority member for purposes of the Resolution. In fact, though, the Resolution's consultation requirement was satisfied by the Chair's consultation with Vice Chair Liz Cheney.

Consistent with House practice and precedent, the term "ranking minority member" means the first member of the minority party appointed to the Select Committee by the Speaker. *See, e.g.*, *Ranking Member*, Glossary of Legislative Terms, https://perma.cc/83HA-3DKY (defining "ranking member" as "[t]he most senior (though not necessarily the longest-serving) member of the minority party on a committee"); H. Res. 10, 117th Cong. (2021) (containing ranking minority member appointments to the standing Committees of the House, colloquially referred to as "ranking members").

Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee. Accordingly, pursuant to the House's longstanding interpretation of "ranking minority member," House Resolution 503 was satisfied by consultation with Vice Chair Cheney. And, to the extent there is any ambiguity, the House's interpretation should control. *See* pp. 1, 3, *supra*; *RNC*, 2022 WL 1294509, at *16 ("on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes").

Defendant relies on the report of an informal FBI discussion with the General Counsel for the House of Representatives (ECF No. 58 at 9-10), but that reliance is misplaced. Defendant's argument takes the General Counsel's statement that the Select Committee does not have a ranking minority member out of context. As a practical matter, the Select Committee is

functioning differently than other House Committees.  Here, there is no formalistic division between majority Members and minority Members, or majority staff and minority staff.  Rather, the Select Committee is functioning as a single, unified body with a joint staff.  There is thus no Member who uses the formal title "ranking member," and matters like the division of time and questioning in depositions are not governed by party affiliation.  The General Counsel did *not* say that there was no Select Committee Member who would be considered the "ranking minority member" for purposes of the deposition provisions of House Resolution 503.

In any event, the paraphrased statements of the General Counsel in notes from an informal discussion between the FBI and the General Counsel cannot and do not override the House's longstanding interpretation of the term "ranking minority member" to mean the first Member of the minority party appointed to a select committee.

2.  Defendant also argues (ECF No. 58 at 8-9) that the Indictment must be dismissed because the Select Committee did not provide him with a copy of Section 3(b) of H. Res. 8, 117th Cong. (2021), which concerns deposition procedures.  But the Select Committee's standard practice is to provide deponents with copies of this document at their deposition, consistent with the 117th Congress Regulations for Use of Deposition Authority.  In fact, on the morning of the deposition, Select Committee counsel had "a manila folder of documents to be provided to Bannon should he appear," which "contained a copy of House Resolution 503, Section 3(b) of House Resolution 8, and a copy of the 117th Congress Regulations for Use of Deposition Authority."  ECF No. 35-2 at 6; *see also* ECF No. 58-4 at 5 ("[T]he section would have been provided to the witness at deposition when the witness was reminded of their rights.").  As the Department of Justice has explained, "[t]he only reason the Defendant did not receive a

copy of Section 3(b) . . . is because he failed to appear as required by the subpoena."  ECF No.

53 at 9.

Defendant cites no authority that supports his assertion that a copy of Section 3(b) needed

to be provided further in advance of the deposition, and no such authority exists.  Instead, the

Regulations indicate only that "[a] witness shall not be required to *testify* unless the witness has

been provided with a copy of [S]ection 3(b)"—not that the witness need not *appear* at the

deposition, unless the witness has received a copy.  167 Cong. Rec. H41 (daily ed. Jan. 4, 2021)

(117th Cong. Reguls. for Use of Dep. Auth.); ECF No. 28-8 at 2; ECF No. 53 at 8-9 (emphasis

added).

Indeed, Defendant's attorney was provided with a copy of the Regulations prior to the

deposition (*see* ECF No. 58-4 at 5), and thus was on notice of Section 3(b).  Yet Defendant's

attorney never raised any objections related to the requirement.  ECF No. 53 at 6 (noting that

Defendant did not inform the Select Committee that his noncompliance with the subpoena was

due to not having been provided with a copy of Section 3(b)); *see also* ECF No. 58-4 at 5.  As

with his other challenges to the Select Committee and its composition, Defendant has waived his

opportunity to object in this forum by not raising any such objection with the Select Committee.

*See* ECF No. 53 at 9.

> **D.  The Select Committee Has A Valid Legislative Purpose For The Subpoena**

Defendant notably does not contest the legislative purpose of the Select Committee itself,

and for good reason.  The D.C. Circuit has already squarely held that "the January 6th

Committee plainly has a valid legislative purpose and its inquiry concerns a subject on which

legislation could be had."  *Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021), *cert. denied*,

142 S. Ct. 1350 (2022) (internal quotation marks and citation omitted).  The D.C. Circuit

emphasized "Congress's uniquely vital interest in studying the January 6th attack on itself to

formulate remedial legislation and to safeguard its constitutional and legislative operations." *Id.*
at 17.[4]  Defendant challenges the legislative purpose of the subpoena served on him specifically,
arguing that the subpoena was intended "to make an example of Mr. Bannon."  ECF No. 58 at
12.  Not so.

Defendant is important for the Select Committee's investigation.  House Resolution 503
expressly authorizes the Select Committee to: (1) "investigate the facts, circumstances, and
causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate
the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3)
"issue a final report to the House containing such findings, conclusions, and recommendations
for corrective measures . . . as it may deem necessary."  H. Res. 503, 117th Cong. § 4(a)(1)-(3)
(2021).  Information from Defendant is central to the work of the Select Committee, and his
refusal to cooperate with the Select Committee interferes with its work.

Defendant was a central player in the lead-up to the January 6th attack on the Capitol.  He
played a pivotal role in constructing and participating in the "stop the steal" public relations
effort that motivated the attack, and he planned certain other activities in advance of January 6th
that are of interest to the Select Committee.  H. Rep. No. 117-152, at 6-7 (2021).  And, on at
least one occasion, Defendant spoke directly with President Trump about the plans for January
6th.  *Id.*

Notably, Defendant made multiple public statements leading up to the attack, predicting
and encouraging unprecedented and violent events on January 6th.  On the day before the attack,

---

[4] *See also* Oral Arg. Tr. at 33, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022);
Order Denying Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 8:22-00099 (C.D.
Cal. Jan. 25, 2022), ECF No. 43 (holding that "the issues surrounding the 2020 election and the
January 6th attacks" are "clearly 'subjects on which legislation could be had'").

12

he stated that the country was facing a "constitutional crisis" and "that crisis is about to go up about five orders of magnitude tomorrow."[5]  Defendant told his podcast listeners, "It's not going to happen like you think it's going to happen.  OK, it's going to be quite extraordinarily different.  And all I can say is, strap in. [. . .]  You have made this happen and tomorrow it's game day.  So strap in.  Let's get ready."[6]  Defendant elaborated, "[i]t's all converging, and now we're on the point of attack tomorrow."[7]  He also predicted "[a]ll hell is going to break loose tomorrow" and stated, "[s]o many people said, 'Man, if I was in a revolution, I would be in Washington.'  Well, this is your time in history."[8]

The Select Committee's subpoena sought documents related to Defendant's involvement in the events of January 6th.  The documents at issue include those related to:

- Defendant's presence, purpose, statements, and activities at a meeting with Members of Congress at the Willard Hotel on January 5, 2021, or the presence, purpose, statements, or activities of others in attendance related to that meeting;

- People with whom Defendant communicated with respect to any aspect of the planning, objectives, conduct, or participation in the January 6, 2021 rally;

- People with whom Defendant communicated with respect to efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count;

- Communications efforts to persuade Americans that the election was stolen;

- The January 6, 2021 rally on The National Mall and Capitol grounds in Washington, D.C., in support of Former President Trump and opposition to the counting of the results of the 2020 Presidential election;

---

[5] Steve Bannon, *War Room: Pandemic, EP 634 – Tuesday Special (with Maggie VandenBerghe, Ben Berquam, and Peter Navarro)* (Jan. 5, 2021), https://perma.cc/5SPG-BCQ4.

[6] *Id.*

[7] Aaron Blake, *Who could have predicted the Capitol riot? Plenty of people – including Trump allies*, Wash. Post (Jan. 28, 2021), https://perma.cc/QRC6-WV5H.

[8] *Id.*

- The financing or fundraising to assist travelers to attend or participate in the January 6, 2021 rally;

- The organization or group named "March for Trump" and its activities relating to the January 6, 2021, rally.

ECF No. 53-1 at 5-6 (subpoena). As its contents make clear, the subpoena was plainly served to advance the Select Committee's important work, rather than to harass or punish Defendant.

Moreover, the subpoena does not reflect an effort "to create a record of alleged violations of law." ECF No. 58 at 13. The Select Committee has been clear that it is not conducting a criminal investigation of anyone, and "[t]he mere prospect that misconduct might be exposed does not make the [Select] Committee's request prosecutorial." *Trump*, 20 F.4th at 42; *see also McGrain v. Daugherty*, 273 U.S. 135, 179-80 (1927) (explaining that it is not a "valid objection" to a Congressional investigation that "it might possibly disclose crime or wrongdoing").

To the extent that Defendant has become an "example" of a person facing prosecution by the Department of Justice for defying the Select Committee's subpoena, it is an example of Defendant's own making that resulted from his decision to blatantly defy the subpoena and to refuse to work in good faith with the Select Committee.

II.     **The Select Committee Has the Authority To Compel Production Of A Privilege Log Or Certification, And Such Authority Does Not Violate the Separation of Powers**

Defendant next argues (ECF No. 58 at 14) that Count II of the indictment must be dismissed because "no House Rule . . . authorizes a committee to require a deponent to create a privilege log of documents withheld on the basis of privilege, or a 'written certification.'" To the contrary, a Congressional committee has ample authority to seek a privilege log when the recipient of a subpoena expresses an intent to withhold requested documents on the basis of privilege.

14

-2028-

"Congress has a right—derived from its Article I legislative function—to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas." *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 84 (D.D.C. 2008). Courts have thus held that Congressional committees have "the right to direct the performance of another with respect to the production of documents," *Comm. on Judiciary, U. S. House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 167 (D.D.C. 2019)[9]—as well as "to investigate and *acquire* information by subpoena." *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 393 (D.C. Cir. 1976) (emphasis added), *appeal after remand on other grounds*, 567 F.2d 121 (D.C. Cir. 1977).

Indeed, a Congressional committee's authority to issue subpoenas allows it to "direct[] the nature of the response required." *Senate Permanent Subcomm. on Investigations v. Ferrer*, No. 16-621, 2016 WL 11681577, at *4 (D.D.C. Sept. 30, 2016); *see also id.* at *1. According to House Rules, a committee can request "the production of such books, records, correspondence, memoranda, papers, and documents as [the Committee] considers necessary." House Rule XI.2(m)(1)(B). A committee's "right to direct the performance . . . with respect to the production of documents," *McGahn*, 415 F. Supp. 3d at 167, and corresponding right to "acquire information," *AT&T*, 551 F.2d at 393, thus plainly include the right to require creation of a privilege log in order to evaluate withholding of any information that is subject to the subpoena.

Consistent with the foregoing authority, the Select Committee's subpoena to Defendant included a schedule specifying the categories of documents to be produced and providing

---

[9] The district court's conclusion in *McGahn* that the House Committee had standing to bring suit to enforce its subpoena was affirmed by the *en banc* D.C. Circuit. *See* 968 F.3d 755 (D.C. Cir. 2020) (en banc). The *en banc* court did not reach the other issues in the case, and the appeal was ultimately dismissed as moot after Mr. McGahn appeared voluntarily before the Judiciary Committee.

15

instructions and specifications regarding the production.  ECF No. 53-1 at 5-6.  As relevant here,

the schedule instructed:  "In the event that a document is withheld on any basis, provide a log

containing the following information concerning any such document: (a) the reason it is being

withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general

subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of

the author and addressee to each other; and (f) the basis for the withholding."  *Id.* at 8.  The

Select Committee's authority to request such a privilege log for any documents withheld is

simply part and parcel of its authority to request the production of documents.  And such

authority is consistent with the principle that a subpoena recipient should engage in good faith

accommodation negotiations in response to Congressional investigations.

Indeed, a privilege log is the traditional means for identifying and supporting privilege

claims so that the requesting party (or a court) can evaluate those claims.  In other contexts,

when deponents "resist[ ] disclosure" of the information required by subpoena based on a

qualified privilege, courts require them to provide enough information to "facilitate" privilege

"determination[s]" and to resolve privilege claims.  *In re Grand Jury Subpoena*, 274 F.3d 563,

575 (1st Cir. 2001); *U.S. v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).  Privilege

logs promote "the interests of justice" by "inform[ing] the requestor of the character of the

information being withheld."  *Alexander v. F.B.I.*, 198 F.R.D. 306, 312 (D.D.C. 2000).

Notably, the federal rules provide that a party who withholds subpoenaed documents in

the litigation context must "describe the nature of the withheld documents . . . in a manner

that . . . will enable the parties to assess the claim. Fed. R. Civ. P. 45(e)(2)(A)(ii).  Courts have

"consistently . . . held that this rule requires a party resisting disclosure to produce a document

index or privilege log."  *In re Grand Jury Subpoena*, 274 F.3d at 575.  Put simply, privilege logs

are "the universally accepted means of asserting privileges[.]" *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, at *1 (D.D.C. 1999) (internal quotation marks omitted).

A committee's authority to seek a privilege log is thus implicit in its authority to compel documents and direct the manner of production.  The Select Committee was well within its authority to seek the "universally accepted means" of a privilege log in its subpoena to Defendant.

In other cases involving Congressional subpoenas, courts have required subpoena recipients to produce detailed descriptions of their privilege claims.  In *Committee on Oversight and Government Reform v. Holder*, for example, another court in this district held that, "[t]o facilitate judicial review of any claims of privilege that remain," the defendant Attorney General "must prepare a detailed list that identifies and describes the material in a manner sufficient to enable resolution of any privilege claims."  No. 12-1332, 2014 WL 12662665, at *2 (D.D.C. Aug. 20, 2014).  The court specified that "[t]he list should set forth not only the author and recipient(s) and the general subject matter of the record being withheld, but the basis for the assertion of the privilege; in particular, defendant should specify the decision that the deliberations contained in the document precede."  *Id.*  Likewise, in *Senate Permanent Subcomm. on Investigations v. Ferrer*, the court stated that a Senate committee's request for a privilege log "was not a suggestion or a recommendation," and concluded that the defendant had waived his privilege claims by failing to provide a privilege log.  Order at 4, No. 16-mc-621 (D.D.C. Sept. 16, 2016), ECF No. 29.

Even before *Holder* and *Ferrer*, in *Miers*, the district court held that that the defendants (the White House counsel and Chief of Staff)—who had received subpoenas from a Congressional committee—must "produce a more detailed list and description of the nature and

scope of the documents [they] seek[ ] to withhold on the basis of executive privilege sufficient to enable resolution of any privilege claims."  558 F. Supp. 2d at 107.  (The D.C. Circuit referred to this as a "privilege log."  *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 910 (D.C. Cir. 2008).)

The *Miers* court speculated in dicta that it did not "have a ready ground by which to *force*" the defendants to produce a privilege log "strictly in response to a congressional subpoena."  558 F. Supp. 2d at 107.  But the court ultimately did "not decide that question" because it ordered production of a detailed list of privilege claims as part of the litigation.  *Id.* Here, the Select Committee is not asking this Court to *force* Defendant to produce a privilege log.  Rather, Defendant faces prosecution for contempt due to his outright defiance of the Select Committee's subpoena, which included valid instructions for a privilege log describing any documents Defendant was attempting to withhold.  As the *Miers* court recognized, a privilege log is "a tremendous aid during the negotiation and accommodation process," because it "may lead the Committee to conclude that it has no need for certain categories of documents, thus helping to narrow the dispute between the parties and enhance the possibility of resolution."  *Id.* It is thus no surprise that, incident to its well-settled subpoena power, a Congressional committee can require such a widely accepted aid in evaluating privilege claims.

Defendant also argues that allowing the Select Committee to require a privilege log would "undermine the assertion of executive privilege" and "effectively eliminate" the checks and balances system between these two co-equal branches.  ECF No. 58 at 14-15.  This concern is misplaced.  As courts have recognized, executive privilege is a *qualified* privilege; "generalized concerns for Executive Branch confidentiality" must yield to a specific, demonstrated need for disclosure.  *Trump*, 20 F.4th at 33.  In other words, "broad,

undifferentiated claim[s] of public interest" are not sufficient to invoke the privilege. *United States v. Nixon*, 418 U.S. 683, 706 (1974).

The information requested by the Select Committee—"the name of the 'author, addressee, and any other recipient(s)'" and "the 'relationship of the author and addressee to each other'"—was necessary to evaluate any claims of qualified privilege.  Defendant's assertions that such information may itself be privileged or would be unduly burdensome to provide (ECF No. 58 at 14) lack any support.  In fact, federal district courts have ordered production of similar details in other matters concerning Congressional subpoenas, including one involving the Select Committee.  *See* Order at 3, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal. Jan. 26, 2022), ECF 50 (ordering that the privilege log shall include dates, recipients, general descriptions, and client names); *Holder*, 2014 WL 12662665, at *2.  Such details are especially pertinent in the context of claims of executive privilege because Congress's "need for [ ] information cannot be balanced against" the "sensitiv[ity]" of the Executive's information "without any indication of what the information is," and "[t]he power to determine the scope of one's own privilege is not available to . . . [even] the President of the United States."  *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 405 (D.C. Cir. 1984); *In re Search of The Rayburn House Off. Bldg Room No. 2113*, 432 F. Supp. 2d 100, 115 (D.D.C. 2006).

*     *     *     *     *

Finally, the House underscores that Defendant cannot rely on any absolute immunity to avoid prosecution for contempt of Congress here.  Unlike the Department of Justice, the House maintains that the Office of Legal Counsel opinions discussing the doctrine of absolute immunity for Presidential aides are incorrect and have no basis in the law, as two courts in this district have already held.  *See Miers*, 558 F. Supp. 2d at 99-107; *McGahn*, 415 F. Supp. 3d at 202-03.  In any

19

event, the House fully agrees with the Department of Justice that those Office of Legal Counsel

opinions, by their own terms, do not apply here (*see* ECF No. 65 at 3-10), and thus this Court has

no reason to address their merits.

## <u>CONCLUSION</u>

For the reasons stated above, the House submits this brief in support of the Department of

Justice's position that Defendant's motion to dismiss his indictment should be denied.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

May 10, 2022

Leave to file granted.

*Carl J. Nichols*

Hon. Carl J. Nichols

*May 25, 2022*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES,** | ) | |
| | ) | |
| **v.** | ) | No. 21-cr-00670-CJN |
| | ) | |
| **STEPHEN K. BANNON,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**

U.S. House of Representatives Minority Leader O. Kevin McCarthy and U.S. House of

Representatives Minority Whip Stephen J. Scalise (hereinafter the "House Minority

Leadership"), by and through the undersigned counsel, respectfully seek this Court's Leave to

file an amicus curiae brief, a copy of which is attached hereto.

As the Court is aware, on May 10, 2022, Douglas N. Letter, Esq., General Counsel to the

U.S. House of Representatives, hand-filed a Motion with the Clerk of the Court seeking leave to

file an amicus curiae brief in support of the government's opposition to defendant Stephen K.

Bannon's Motion to Dismiss, *United States v. Bannon*, No. 21-cr-670 (D.D.C. May 6, 2022)

(ECF No. 65), as well as in support of its Motion in Limine to exclude evidence relating to

objections to the subpoena.  *United States v. Bannon*, No. 21-cr-670 (D.D.C. April 15, 2022)

(ECF No. 53).  Also on May 10, 2022, the Speaker of the U.S. House of Representatives issued a

press release highlighting the proposed amicus curiae brief as well as the position taken by the

House General Counsel in that brief.  Press Release, Nancy Pelosi, Speaker of the U.S. House of

Representatives (May 10, 2022).[1]  Specifically, Speaker Pelosi advised the public that, "the

House filed a motion to submit an amicus brief in the D.C. District Court case of *United States v.*

---

[1] *Available at* https://www.speaker.gov/newsroom/51022-1.

*Bannon*," that through its vote to hold Mr. Bannon in contempt, *see* H. Res. 730, the House, "upheld the genius of our Constitution: the separation of powers, which safeguards the Congress' authority to conduct necessary and appropriate oversight," and that, "[b]y addressing many of Bannon's baseless arguments before the D.C. District Court, the House continues to defend this Constitutional power as well as its essential prerogative to establish its own rules and practices." *Id.*

The House General Counsel's involvement in this action was authorized by a majority of the House Bipartisan Legal Advisory Group ("BLAG"), which, pursuant to House Rule II.8(b), is exclusively authorized to "speak[] for, and articulate[] the institutional position of, the House in all litigation matters" unless "otherwise provided by the House." The BLAG is composed of the Speaker of the House, the House Majority and Minority Leaders, and the House Majority and Minority Whips. *Id.* Of note, after declining to support the BLAG's authorization, neither the House Minority Leader nor the House Minority Whip were provided drafts of the House General Counsel's filings before they were submitted to the Court and the articulated basis for their opposition is relegated to a footnote within the motion, which was conspicuously not published by Speaker Pelosi, noting that such opposition was: "out of concern for damaging institutional prerogatives, as the Committee failed to adhere to the 'shall' requirements proscribed by H. Res. 503 as required by the Rules of the House of Representatives and as required by the Supreme Court in *Yellin v. United States*, 374 U.S. 109 (1963)."

Since the House General Counsel's submission to this Court, the House Minority Leadership understands the Court to have advised the parties that it would accept only electronically filed motions in this matter. However, there is no indication that the House General Counsel has endeavored to properly re-file any motion seeking leave to file an amicus

curiae brief while the House Speaker's press release and the accompanying proposed amicus brief remains publicly available.  Accordingly, the Minority Leadership submit this motion and accompanying amicus brief so as to clarify for the Court the complete position of the U.S. House of Representatives and to correct misstatements of law contained within the House General Counsel's proposed amicus brief.

### I.    Argument

Although neither the Federal Criminal Rules of Procedure nor this Court's Local Criminal Rules expressly authorize the Court to accept brief of amicus curiae in criminal cases, this District's Local Civil Rules include numerous provisions that are applicable in both civil and criminal cases.  *See* LCvR 1.1 ("These Rules govern *all* proceedings in the United States District Court for the District of Columbia.  These Rules supplement the Federal Rules of Civil *and Criminal* Procedure and shall be construed in harmony therewith." (emphasis added)).  *See also* LCvR 16.2(b) ("Actual trials of civil or *criminal* cases in this Court or in the Superior Court will be accorded priority over any nontribal matters in either court." (emphasis added)); LCvR 40.1 ("Unless otherwise provided in these Rules, each civil and *criminal* case shall be assigned to a single judge in the manner provided herein." (emphasis added)); LCvR Rule 40.5(a)(1) ("*Criminal* cases are deemed related when . . . ." (emphasis added)).  Thus, courts in this District have authorized the submission of amicus curiae briefs pursuant to Local Rule 7(o).  *See* Minute Order, *United States v. Clinesmith*, No. 20-cr-00165-JEB (D.D.C. Dec. 22, 2020) (granting motion for leave to file brief of amicus curiae, which argued that LCvR 7(o) permitted the same).  Similarly, Courts in this District have routinely requested (and accepted) such briefs.  *See United States v. Caplinger*, No. 21-cr-00342-PLF (D.D.C. Feb. 23, 2022) (ECF No. 53); Minute Order, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. May 12, 2020).  *See also* Mot. for Leave to File Amicus Curiae, *United States v. Clinesmith*, No. 20-cr-00165-JEB (D.D.C. Dec. 17, 2020) (ECF

No. 28) (citing examples).  Even apart from these specific rules, "precedent and experience have recognized the authority of courts to appoint an amicus to assist their decision-making in similar circumstances, including in criminal cases . . . ."  *In re Flynn*, 973 F.3d 74, 81 (D.C. Cir. 2020).

"An *amicus* brief should normally be allowed . . . when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 137 (D.D.C. 2008). Courts allow "parties to file *amicus* briefs where the brief will assist the judges by presenting ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs." *In re Search of Info.*, 13 F. Supp. 3d 157, 167 (D.D.C. 2014).  Local Civil Rule 7(o) requires a motion for leave to file an amicus brief to, "concisely state the nature of the movant's interest; identify the party or parties supported, if any; and set forth the reasons why the matters asserted are relevant to the disposition of the case."

> A.  *House Minority Leadership Have an Institutional Interest in Defending House Prerogatives.*

Historically, the BLAG has unanimously agreed to intervene or otherwise involve itself in matters that involve the institutional prerogative of the House.  *See generally* Mot. Leave File *Amicus Curiae*, *United States v. Collins et al.*, No. 1:18-cr-00567-VSB (S.D.N.Y. Apr. 4, 2019) (ECF No. 76) (addressing privilege of non-disclosure under the Speech or Debate Clause); Mot. Leave Intervene, *Am. Oversight v. U.S. Dep't Treasury, et al.*, No. 1:17-cv-02078-RBW (D.D.C. Apr. 13, 2018) (ECF No. 15) (addressing inapplicability of the Freedom of Information Act to congressional communications with federal agencies); Mot. Leave Intervene, *Am. Oversight v. U.S. Dep't Health Human Servs., et al.*, No. 1:17-cv-00827-EGS, (D.D.C. Sept. 15, 2017) (ECF No. 19) (same).  Recently, BLAG authorization has been partisan, with the Minority Leadership opposing any authorization of the House General Counsel to engage in any particular litigation.

*See* U.S. House *Amicus Curiae* Brief, *State of New York, et al., v. U.S. Dep't Health Human Servs., et al.*, No. 1:20-cv-5583-AKH, (S.D.N.Y. 2020) (ECF No. 72) (one of many cases where BLAG issued amicus briefs relating to the Trump administration's attempt to limit the Affordable Care Act's antidiscrimination section noting, "The Republican Leader and Republican Whip dissented"); U.S. House *Amicus Curiae* Brief, *Ass'n for Cmty. Affiliated Plans, et al. v. U.S. Dep't Treasury, et al.*, No. 19-5212 (D.C. Cir. Nov. 12, 2019) (addressing validity of short-term limited duration insurance plans under the Affordable Care Act noting, "The Republican Leader and Republican Whip dissented"); Mot. Leave Intervene, *Trump, et al. v. Deutsche Bank AG, et al.*, No. 1:19-cv-03826 (S.D.N.Y. May 3, 2019) (ECF No. 25) (addressing validity of subpoenas for incumbent President's financial records noting, "The Republican Leader and the Republican Whip decline to join in this motion").  Only rarely, however, has the House Minority Leadership separately sought to provide its perspective or otherwise assist the Court in such matters.  *See*, *e.g.*, *Amicus Curiae* Brief of Objecting Members of the Bipartisan Legal Advisory Group, *Windsor v. United States*, No. 12-2435 (2nd Cir. Sep. 7, 2012) (arguing Section 3 of the Defense of Marriage Act is unconstitutional).

House Minority Leadership does so again now because of an institutional concern for the prerogatives of the House.  Specifically, the House General Counsel's publicly disclosed, yet unfiled, amicus brief misstates the law and misleads the Court (and the public) concerning *any* legal interest of the House in a criminal prosecution for contempt of congress under Section 192 of Title 2 of the United States.  Like the Speaker's press release, the House General Counsel's proposed amicus submits that, "[t]he House is in the best position to provide this Court with the House's interpretation of its own rules and procedures, with Defendant has put at issue" and "[b]ecause the Rulemaking Clause bars federal courts from usurping the House's rulemaking

process and from invalidating House actions when a litigant (or even a court) might read the

relevant House rules differently, it is important for this Court to have before it the official

position of the House regarding the meaning of its rules."

Contrary to the assertion of the House General Counsel, however, this case is not one that

implicates either the Rulemaking Clause of the Constitution, *see United States v. Rostenkowski*,

59 F.3d 1291, 1305 (D.C. Cir. 1995), nor the important doctrine of separation of powers. *See*

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 500 (1975).

This is so because, as Supreme Court Justice Frankfurter eloquently articulated in

concurring with the Court's *Watkins* majority: "By . . . making the federal judiciary the

affirmative agency for enforcing the authority that underlies the congressional power to punish

for contempt, Congress necessarily brings into play the specific provisions of the Constitution

relating to the prosecution of offenses and those implied restrictions under which courts

function." *Watkins v. United States*, 354 U.S. 178, 216 (1957) (Frankfurter, J., concurring). The

"restrictions" to which Justice Frankfurter referred were articulated by the Court's majority: "the

same degree of explicitness and clarity that the Due Process Clause requires in the expression of

any element of a criminal offense." *Id.* at 209.

Moreover, "it is perfectly clear that the Rulemaking Clause is not an absolute bar to

judicial interpretation of the House Rules." *Rostenkowski*, 59 F.3d at 1305 (quoting *Yellin*, 374

U.S. at 114 (1963)); *Yellin*, 374 at 114 ("It has long been settled . . . that rules of Congress and its

committees are judicially cognizable."); *Eastland*, 421 U.S. at 509 n.16 ("Our task [is] to

perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the

predicates of [such] criminal prosecutions."). Similarly, more than merely finding congressional

rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization

for an inquiry, it "must be strictly observed." *Gojack v. United States*, 384 U.S. 702, 708 (1966).

Thus, the Supreme Court has recognized, in "criminal prosecutions," "[d]fferent problems [are]

presented" than in "attempts by private parties to impede congressional action," which

necessarily implicates the important doctrine of separation of powers. *Eastland*, 421 U.S. at 509

n.16. As the Court further noted in cases of alleged contempt, "[a]ny interference with

congressional action has already occurred when the cases reached us, and Congress was seeking

the aid of the judiciary to enforce its will." *Id.* Here too, scrutiny of the House rules does not

"interfere with the discretionary decisions of Congress." *Rostenkowski*, 59 F.3d at 1304.

Nevertheless, "a sufficiently ambiguous House Rule is non-justiciable" and judicial scrutiny is

permitted only where a Rule, "is sufficiently clear that [the court] can be confident [in its]

interpretation." *Id.* at 1306.

And so, it is the Congress that has invited judicial scrutiny of its rules and its adherence

thereto when it asks the judiciary to deprive one of their liberty. *See Christoffel v. United States*,

338 U.S. 84, 88 (1949) ("The question is neither what rules Congress may establish for its own

governance, nor whether presumptions of continuity may protect the validity of its legislative

conduct. The question is rather what rules the House has established and whether they have

followed them.").

### B. *Minority Leadership Deliberately Supports Neither Party*

To support either party in this action would contravene the House prerogative defended

by the House Minority Leadership with this filing. As Justice Frankfurter articulated in his

*Watkins* concurrence, since 1857 the House has delegated to the judiciary the task of enforcing

the authority that "underlies the congressional power to punish for contempt." *Watkins*, 354 U.S.

at 216 (Frankfurter, J., concurring). "The powers of the legislature are defined, and limited; and

that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v.*

*Madison*, 5 U.S. 137 (1803).  Thus, it is now for the judiciary to oversee a determination of guilt and not for the House, including the Minority Leadership.

> C.  *The House General Counsel Misstates the Law and Misleads the Court (and the Public).*

The judiciary's oversight includes the obligation to ensure the preservation of those rights afforded by the Due Process Clause of the Fifth Amendment to the Constitution.  The House General Counsel's *ipsit dixit* assertion that House Resolution 503 "does not require that *all* thirteen Members be appointed in order for the Select Committee to function, and [the House General Counsel is] aware of no rule or law providing that authorization to appoint thirteen Members required appointment by the Speaker of that precise number" both misstates the law and misleads the Court (and the public).

Tellingly, the House General Counsel cites no authority *for* the proposition that where a House Resolution establishing a select committee directs the House Speaker to appoint a specific number of committee Members – "The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader, H. Res. 503 § 2(a) (emphasis added) – that such a mandate is merely discretionary.  Indeed, the lack of any ambiguity in Resolution 503's plain language is what makes the language "judicially cognizable."  At best, the House General Counsel's proffered contradictory interpretation of the plain language of the Resolution renders it "sufficiently ambiguous" so as to "run[] the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution."  *Rostenkowski*, 59 F.3d at 1306.

Similarly, the House General Counsel's assertion that the term "ranking minority member" – a term that is nowhere defined in the House Rules, Resolution 503 or the House

deposition regulations and whose practical use differs as between the Democratic caucus[2] and

the Republican conference rules[3] – also is mere *ipsit dixit.*  Nor is the requirement that both the

Majority and the Minority have representation on the select committee a matter of form over

substance.  Minority representation ensures Select Committee deponents are afforded oversight

of adherence to congressional rules, precedents, and established decorum.  *See* Constitution,

Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. No. 116-177, 117th

Cong., 2d Sess., § 284 ("So far the maxim is certainly true and is founded in good sense that as it

is always in the power of the majority, by their numbers, to stop any improper measures

proposed on the part of their opponents, the only weapons by which the minority can defend

themselves against similar attempts from those in power are the firms and rules of proceeding

which have been adopted as they were found necessary, from time to time, and are become law

of the House by a strict adherence to which the weaker party can only be protected from these

irregularities which these forms were intended to check and which the wantonness of power is

but too often apt to suggest to large and successful majorities.").  Jefferson's Manual is

incorporated into House Rules and a continuing source of authority for its proceedings.  As the

annotated text provides, since 1837 the Manual should "govern the House in all cases to which

they are applicable and in which they are not inconsistent with the standing rules and orders of

the House . . ."  Accordingly, House Rules routinely make reference to the importance of

participation by the minority so as to avoid the abuse recognized by the Manual as a danger in

any parliamentary body.  *See* House Rule XI(2)(j)(1) ("Whenever a hearing is conducted by a

---

[2] House Democratic Caucus Rules Rule 21 (D)(1)(a) discusses selecting Ranking Member and Vice-Ranking member by election or secret ballot, with no reference to order of appointment to the Committee.

[3] House Republican Conference Rules Rule 14 (e) discusses term limits of Chairs or Ranking Members to no more than three terms with no reference to seniority or order of appointment to the Committee.

committee on a measure or matter, *the minority members* shall be entitled, upon request to the chair *by a majority of them* before the completion of the hearing, to call witnesses selected by the minority to testify with respect to that measure or matter during at least one day of hearing thereon.").

The Select Committee's authority is limited to its authorizing resolution and failure to adhere to that resolution dooms any subsequent contempt prosecution. *See Liveright v. United States*, 347 F.2d 473, 474-476 (D.C. Cir. 1965) (invalidating contempt conviction where "the Subcommittee itself[,] [as opposed to its Chairman,] never decided, or even considered, whether appellant Liveright should be compelled to testify before it"); *Shelton v. United States*, 327 F.2d 601, 606 (D.C. Cir. 1963) ("Since the Subcommittee [as opposed to its Chief Counsel] did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid."). Had the House desired the Select Committee's subpoena authority to "function[] differently than other House Committees" it should have explicitly so said. Absent unambiguity, "judicial interpretation . . . runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution. *Rostenkowski*, 59 F.3d at 1307.

House General Counsel also misleads the Court with respect to the requirement that a subpoenaed witness be provided a copy of Section 3(b) of House Resolution 8, 117th Cong. (2021), which concerns deposition procedures. The D.C. Circuit confronted a similar challenge in *United States v. Reinecke*, 524 F.2d 435 (D.C. Cir. 1975). There, a witness challenged his conviction for perjury based on the Senate Judiciary Committee's failure to publish its revised rule concerning the requirement of a quorum in the Federal Register. *See id.* at 438-440. Although the government argued the proper publication of the relevant rule would not have impacted the witness's decision to not comply with the subpoena in question, the court

nevertheless vacated his conviction because where, "competence [of the tribunal] is not shown, the crime of perjury is not established regardless of whether the witness relied on the absence of a quorum." *Id.* at 440 n.15 (citing *Christoffel*, 338 U.S. at 88).

\* \* \*

Having delegated to the judiciary the task of enforcing the authority that "underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring), the House has "limited" its role in any subsequent prosecution. *Marbury v. Madison*, 5 U.S. 137 (1803). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution, and any defendant in a prosecution for criminal contempt of congress is entitled to "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins v. United States*, 354 U.S. 178, 209 (1957). To that end, judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel*, 338 U.S. at 88, is permissible where said rules are "sufficiently clear." *Rostenkowski*, 59 F.3d at 1306. *See Yellin v. United States*, 374 U.S. 109, 123 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules."). However, "for a court to interpret a House Rule in the absence of 'judicially discoverable and manageable standards' would require the court to make 'an initial policy determination of a kind clearly for nonjudicial discretion,' and would run the risk of intrusion into the legislative sphere." *Rostenkowski*, 59 F.3d at 1307.

**CONCLUSION**

For the foregoing reasons, the House Minority Leadership respectfully requests leave to

file the attached amicus brief.

[SIGNATURE ON NEXT PAGE]

Dated: May 24, 2022                    Respectfully submitted,

                                       _____/s/ Stanley E. Woodward, Jr._____
                                       Stan M. Brand (D.C. Bar No. 213082)
                                       Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                       BRAND WOODWARD, ATTORNEYS AT LAW
                                       1808 Park Road NW
                                       Washington, DC  20010
                                       202-996-7447 (telephone)
                                       202-996-0113 (facsimile)
                                       Stanley@BrandWoodwardLaw.com

                                       *Counsel to the House Minority Leadership*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | No. 21-cr-00670-CJN |
| **v.** | ) | |
| | ) | |
| **STEPHEN K. BANNON,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |

### <u>CERTIFICATE OF SERVICE</u>

On May 24, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.


       */s/ Stanley E. Woodward, Jr.*
Stan M. Brand (D.C. Bar No. 213082)
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD, ATTORNEYS AT LAW
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel to the House Minority Leadership*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | No. 21-cr-00670-CJN |
| | ) | |
| **STEPHEN K. BANNON,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |

**[PROPOSED] ORDER**

Upon consideration of Motion of The U.S. House of Representatives Minority Leader

Kevin O. McCarthy and The U.S. House of Representatives Minority Whip Stephen J. Scalise

("House Minority Leadership") for Leave to File an Amicus Curiae Brief, it is this ____ day of

May, 2022, hereby:

**ORDERED** that the Motion is **GRANTED**; and it is further

**ORDERED** that the Amicus Curiae Brief attached to the House Minority Leadership's

Motion shall be docketed by the Clerk of the Court as filed..

**SO ORDERED.**

_____
The Honorable Carl J. Nichols
United States District Court Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES,** | ) | |
| | ) | |
| | ) | No. 21-cr-00670-CJN |
| **v.** | ) | |
| | ) | |
| **STEPHEN K. BANNON,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |

## BRIEF OF

### THE U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER KEVIN O. McCARTHY

### AND

### THE U.S. HOUSE OF REPRESENTATIVES MINORITY WHIP STEPHEN J. SCALISE

### AS AMICUS CURIAE

## TABLE OF CONTENTS

**Table of Authorities** .................................................................................................3

**Introduction and Statement of Interest** ..................................................................4

**Argument** ..................................................................................................................4

    A. The Competence of the House Select Committee Requires the Appointment of Thirteen Members ......................................................................................................................7

    B. "Ranking Minority Member" is a Term Sufficiently Ambiguous so as to Render it Non-Justiciable ......................................................................................................... 10

    C. Adherence to House Rules is a Necessary Predicate to Criminal Prosecution for Contempt of Congress ............................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) ........................................................6

*Christoffel v. United States*, 338 U.S. 84 (1949) ........................................ 5, 8, 9, 14

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) ......................... 6, 7, 8, 13

*Gojack v. United States*, 384 U.S. 702 (1966) ........................................................5, 8

*Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965) ...............................................12

*Marbury v. Madison*, 5 U.S. 137 (1803) ........................................................5, 14

*RNC v. Pelosi*, 2022 U.S. Dist. LEXIS 78501 (D.D.C. May 1, 2022) ...............................7

*SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118 (1981) ..........................................6

*United States v. Reinecke*, 524 F.2d 435 (D.C. Cir. 1975) .................................. 9, 13, 14

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) ........................... 5, 6, 7, 8, 9, 13

*Watkins v. United States*, 354 U.S. 178 (1957) ........................................ 4, 5, 6, 8, 14

*Yellin v. United States*, 374 U.S. 109 (1963) ........................................................5, 8, 9

**Statutes**

2 U.S.C. § 192 ........................................................4, 12

**Rules**

Constitution, Jefferson's Manual and the Rules of the House of Repesentatives, H.R. Doc. No. 116-177, 117th Cong., 2d Sess., § 284 ........................................................12

House Resolution § 503 ........................................................ 6, 7, 8, 10

**Regulations**

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) (117th Cong. Reguls. For Use of Dep. Auth.) . 10, 13

**Constitutional Provisions**

Article I § 5 Cl. 2 of the Constitution ........................................................10

INTRODUCTION AND STATEMENT OF INTEREST

U.S. House of Representatives Minority Leader Kevin McCarthy and U.S. House of

Representatives Minority Whip Steve Scalise (hereinafter the "House Minority Leadership"),[1]

submit this amicus curiae brief out of concern for the potential damage to House institutional

prerogatives resulting from a decision of this Court in the above-captioned matter.  The House

Minority Leadership represent the only Members of the House Bipartisan Legal Advisory Group

not to vote to authorize the House General Counsel to articulate any institutional position in this

matter.

ARGUMENT

> The power of the Congress to punish for contempt of its authority is
> . . . rooted in history.  It has been acknowledged by [the Supreme
> Court] since 1821.  Until 1857, Congress was content to punish for
> contempt through its own process.  By the Act of January 24, 1857,
> as amended by the Act of January 24, 1862, Congress provided that,
> 'in addition to the pains and penalties now existing' (referring of
> course to the power of Congress itself to punish for contempt),
> 'contumacy in a witness called to testify is a matter properly under
> consideration by either House, and deliberately refusing to answer
> questions pertinent thereto, shall be a misdemeanor against the
> United States.'  This legislation is now 2 U.S.C. § 192.  *By thus
> making the federal judiciary the affirmative agency for enforcing the
> authority that underlies the congressional power to punish for
> contempt, Congress necessarily brings into play the specific
> provisions of the Constitution relating to the prosecution of offenses
> and those implied restrictions under which courts function.*

*Watkins v. United States*, 354 U.S. 178, 216-217 (1957) (Frankfurter, J., concurring) (citations

omitted) (emphasis added).

---

[1] Pursuant to Rule 7(o)(5) of the Local Rules for the U.S. District Court for the District of Columbia and Rule 29(a)(4) of the Federal Rules of Appellate Procedure the House Minority Leadership advise that no party or person other than the House Minority Leadership or their counsel participated in or contributed money for the drafting of this brief.

Having delegated to the judiciary the task of enforcing the authority that "underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring), the House has "limited" its role in any subsequent prosecution. *Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("The powers of the legislature are defined, and limited; and those limits may not be mistaken, or forgotten, the constitution is written."). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution and any defendant in a prosecution for criminal contempt of congress is entitled to, "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 209.

To that end, the judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949), including those rules conferring the lawful authorization of any inquiry, *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized."), is permissible where said rules are "sufficiently clear." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). *See Christoffel*, 338 at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have followed them."). *See also Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules."). However, "[w]here . . . a court cannot be confident that its interpretation is correct, there is too

great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-1307.

Here, Douglas N. Letter, Esq., General Counsel to the U.S. House of Representatives, seeks to "elaborate on the legitimate legislative purpose and authority of the House Select Committee to Investigate the January 6th Attack on the United States Capitol, as well as the validity of the Select Committee subpoena [at issue]." The House General Counsel's interference with the judiciary's "affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (1957) (Frankfurter, J., concurring), is improper in that once a referral for contempt has been made the provenance of the House has concluded, *see Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 509 n.16 (1975) ("Any interference with congressional action has already occurred when the cases reached us, and Congress was seeking the aid of the judiciary to enforce its will."),[2] and further involvement risks interference with the alleged contemnors due process rights. *See SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (1981) ("[A]n agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge."). Moreover, the House General Counsel's Brief misstates the law and misrepresents the complete position of the U.S. House of Representatives with respect to House prerogatives.

Specifically, this Amicus Brief addresses: (i) the House General Counsel's assertion that "[House Resolution § 503] does not require that *all* thirteen Members be appointed in order for

---

[2] *Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019), cited by the House General Counsel, is not to the contrary. There, the appellant, the U.S. House of Representatives Chaplin, was represented by the House General Counsel who necessarily provided his view of the "scope and meaning of House internal rules and procedures." Moreover, that case did not involve the delegation of authority by the House to the judiciary.

the Select Committee to function;" (ii) the House General Counsel's assertion that, "Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee" and (iii) the House General Counsel's assertion that House Rules require only that a deponent be provided with a copy of House deposition procedures immediately prior to the deposition in question.

A.  *The Competence of the House Select Committee Requires the Appointment of Thirteen Members.*

House Resolution 503 § 2(a) provides:  "The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader." (emphasis added).  It is undisputed that the Speaker of the House failed to appoint 13 Members to the Select Committee.

In its *post-hac* attempt to defend its contempt referral, the House General Counsel submits that the Resolution's language "does not require that *all* thirteen Members be appointed in order for the Select Committee to function" and cites the ruling of a court in this District finding that:  "If the Court reads § 2(a)'s 'shall' as mandatory, it would be 'interpret[ing] the Rule differently than . . . the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *RNC v. Pelosi*, 2022 U.S. Dist. LEXIS 78501, at *45 (D.D.C. May 1, 2022) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)).

However, as the Supreme Court has recognized, in "criminal prosecutions," "[d]ifferent problems [are] presented" than in "attempts by private parties to impede congressional action," which necessarily implicates the important doctrine of separation of powers.  *Eastland*, 421 U.S. at 509 n.16.  Thus, in criminal prosecutions, "[the court's] task [is] to perform the judicial

function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions." *Id. See also See Christoffel*, 338 U.S. at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have been followed.").

Where a House Rule is "sufficiently clear" such that the court, "can be confident of [its] interpretation," "the risk of the court introducing into the sphere of influence reserved to the legislative branch under the Constitution . . . is acceptably low." *Rostenkowski*, 59 F.3d at 1306. Here, the word "shall" in House Resolution 503 § 2(a) is not permissive; it does not mean "may." The House, through a vote of its Members in the House Chamber, established the Select Committee, dictated its composition, and described its purposes and functions. This Court has no obligation to defer to the *post-hac* rationalization of the House or its General Counsel now that it has been delegated the task of enforcing the authority that "underlies the congressional power to punish for contempt." *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring). *See also Rostenkowski*, 59 F.3d at1305 ("[I]t is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." (citing *Yellin*, 374 U.S. at 114 (1963)); *Yellin*, 374 at 114 ("It has long been settled . . . that rules of Congress and its committees are judicially cognizable."); *Eastland*, 421 U.S. at 509 n.16 ("Our task [is] to perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions."). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack*, 384 U.S. at 708.

Failure of the House Speaker to "appoint 13 Members to the Select Committee" deprives the Select Committee of its competence and no criminal prosecution arising from conduct (or lack thereof) before the Select Committee can lie. *United States v. Reinecke*, 524 F.2d 435, 440 n.15 (D.C. Cir. 1975) ("[T]he competence of the tribunal must be proved as an independent element of the crime. If the competence is not shown, the crime of perjury is not established regardless of whether the witness relied on the absence of a quorum."). *See Christoffel*, 338 U.S. at 90 ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."). That a congressional committee must adhere to applicable Rules in pursuit of the enforcement of its subpoenas has similarly resulted in convictions for contempt of congress being overturned. *See Yellin v. United States*, 374 U.S. 109 (1963). Indeed, the House Speaker herself has acknowledged the "unprecedented" approach to forming the Select Committee and it is therefore not at all extraordinary that the House failed to contemplate the possibility of less than thirteen (13) Members being appointed upon passage of Resolution 503. *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[3]

Alternatively, were the Court to consider the House General Counsel's *post-hac* assertion that the Select Committee is properly constituted under House Rules, then, at the very least, Section 2(a) of House Resolution 503 is too vague for judicial interpretation. As the D.C. Circuit held in *Rostenkowski*: "Where . . . a court cannot be confident that its interpretation [of a Rule giving rise to criminal prosecution] is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively

---

[3] *Available at* https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

be making the Rules—a power that the Rulemaking Clause reserves to each House alone."

*Rostenkowski*, 59 F.3d at 1306.

Of course, the House is not without recourse. The House Speaker could appoint all thirteen (13) Members to the Select Committee as was dictated by the passage of House Resolution 503. Or the House could amend Resolution 503 so as to specify whether the appointment of 13 Members is required. What the House may not do is disregard the precept of Article I § 5 Cl. 2 of the Constitution, disregard the plain language of the Resolution it passed by a majority vote of its Members in the House Chamber, and substitute the *post-hac* interpretation of the House Speaker's General Counsel for the plain meaning of the House-passed resolution.

> B.   *"Ranking Minority Member" is a Term Sufficiently Ambiguous so as to Render it Non-Justiciable.*

With respect to the taking of depositions, House Resolution 503 provides, in pertinent part, that: "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8 . . . ." (emphasis added). House Resolution 8 Section 3(b)(1), in turn, provides, in relevant part, that: "the chair of a standing committee . . ., *upon consultation with the ranking minority member of such committee*, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee." (emphasis added). Finally, the regulations governing the taking of depositions as issued by the chair of the Committee on Rules reference the role to be played by the ranking minority member in such depositions no less than eight (8) separate times. 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) (117th Cong. Reguls. For Use of Dep. Auth.) ("Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken;" "Only members, committee staff

designated by the chair or *ranking minority member*, an official reporter, the witness, and the witness's counsel are permitted to attend;" "If [designation of a deposition as part of a joint investigation between committees] is made, the chair and *the ranking minority member* of the additional committee(s) may designate committee staff to attend pursuant to regulation 3;" "A deposition shall be conducted by any member or committee counsel designated by the chair or *ranking minority member* of the Committee that noticed the deposition;" "In each round [of deposition questioning], the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by *the ranking minority member* shall ask questions second;" "The chair and *the ranking minority member* shall be provided with a copy of the transcripts of the deposition at the same time;" "The chair and the *ranking minority member* shall consult regarding the release of deposition testimony, transcripts, or recording, and portions thereof." (emphasis added)).

The House General Counsel also asserts that, "Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee." Yet nowhere in the House Rules, Resolution 503, or the House deposition regulations is the term "ranking minority member" defined. Even the Democratic caucus[4] and Republican conference rules[5] differ on the practical use of "ranking member."[6] Again, Speaker Pelosi herself has acknowledged the

---

[4] House Democratic Caucus Rules Rule 21 (D)(1)(a) discusses selecting Ranking Member and Vice-Ranking member by election or secret ballot, with no reference to order of appointment to the Committee.

[5] House Republican Conference Rules Rule 14 (e) discusses term limits of Chairs or Ranking Members to no more than three terms with no reference to seniority or order of appointment to the Committee.

[6] The House General Counsel cites no authority for the proposition that the "first minority party Member appointed" to any given committee necessarily is the senior ranking minority member of said committee. Although the House General Counsel cites the definition of "ranking member" provided by Congress.gov, "the official website for U.S. federal legislative information," even if authoritative, the website tellingly defines neither "ranking minority member" nor "senior member."

"unprecedented" nature of the Select Committee's formation.  *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[7]  Importantly, this distinction is not without a difference.  Minority leadership on any given committee ensures that deponents are afforded oversight of adherence to congressional rules, precedents, and established decorum. *See* Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. No. 116-177, 117th Cong., 2d Sess., § 284 ("So far the maxim is certainly true and is founded in good sense that as it is always in the power of the majority, by their numbers, to stop any improper measures proposed on the part of their opponents, the only weapons by which the minority can defend themselves against similar attempts from those in power are the firms and rules of proceeding which have been adopted as they were found necessary, from time to time, and are become law of the House by a strict adherence to which the weaker party can only be protected from these irregularities which these forms were intended to check and which the wantonness of power is but too often apt to suggest to large and successful majorities.").

The Select Committee's authority is limited to its authorizing resolution and had the House desired the Select Committee's subpoena authority to "function[] differently than other House Committees," as the House General Counsel suggests, it should have explicitly so stated. The D.C. Circuit has similarly observed that House rules limiting authority serve an important purpose:  "[B]y requiring all decisions to compel attendance of witnesses to be made by the Subcommittee, and not by an individual member thereof, the resolution served to protect the right of all persons to be free from unnecessary invasions of their privacy."  *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965) (reversing conviction under 2 U.S.C. § 192 despite the deponent's failure to object to the propriety of the subpoena's authorization at the time of his

---

[7] *Available at* https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

deposition).  Absent unambiguity, "judicial interpretation . . . runs the risk of the court intruding

into the sphere of influence reserved to the legislative branch under the Constitution.

*Rostenkowski*, 59 F.3d at 1307.

### C.  Adherence to House Rules is a Necessary Predicate to Criminal Prosecution for Contempt of Congress.

Clause 11 of the House Regulations governing the taking of depositions provides:  "A

witness *shall not be required to testify* unless the witness has been provided with a copy of

section 3(b) of H. Res. 8, 117th Congress, and these regulations."  167 Cong. Rec. H41 (daily ed.

Jan. 4, 2021) (117th Cong. Reguls. For Use of Dep. Auth.).  This requirement is not a matter of

form over substance.  Specifically, the promulgation of these regulations was delegated to the

Rules Committee by the House, through a vote of its Members in the House Chamber.  H. Res. 8

§ 3(b).  The regulations were arduously negotiated over several years with the Committee's

Minority Members.[8]  However technical the requirement may be, it is nevertheless an

unambiguous rule promulgated by the House, adherence to which this Court "may properly

scrutinize."  *Eastland*, 421 U.S. at 509 n.16.  Indeed, when confronted with a similarly technical

argument, the D.C. Circuit vacated a perjury conviction based on the Senate Judiciary

Committee's *failure to publish in the Federal Register* its revised rule concerning the

requirement of a quorum.  *Reinecke*, 524 F.2d at 438-440.  Although the government argued the

proper publication of the relevant rule would not have impacted the witness's decision to not

comply with the subpoena in question, the court nevertheless vacated his conviction because

where, "competence [of the tribunal] is not shown, the crime of perjury is not established

---

[8] Of note, the regulations include the requirement that subpoenas for depositions issue only upon, "[c]onsultation with the ranking minority member."  Thus, the regulations themselves cast doubt on the propriety of the Select Committee's deposition authority, at least where judicial interpretation of the term "ranking minority member" is required to deprive one of liberty upon a finding of contempt.  *See Rostenkowski,* 59 F.3d at 1307.

regardless of whether the witness relied on the absence of a quorum." *Id.* at 440 n.15 (citing *Christoffel*, 338 U.S. at 88).

* * *

For nearly two-hundred-fifty years, the experiment of our democracy has persisted despite frequent challenges to the "genius" that is the doctrine of separation of powers inherent in our constitution. "The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. 137 (1803). It is with great appreciation for the judiciary's assumption of the responsibility for enforcing the authority that "underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (Frankfurther, J. concurring), that the House Minority Leadership submits this amicus curiae brief for consideration by the Court.

[SIGNATURE ON NEXT PAGE]

Dated: May 24, 2022                    Respectfully submitted,

                                       _____/s/ Stanley E. Woodward, Jr._____
                                       Stan M. Brand (D.C. Bar No. 213082)
                                       Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                       BRAND WOODWARD, ATTORNEYS AT LAW
                                       1808 Park Road NW
                                       Washington, DC  20010
                                       202-996-7447 (telephone)
                                       202-996-0113 (facsimile)
                                       Stanley@BrandWoodwardLaw.com

                                       *Counsel to the House Minority Leadership*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

## DEFENDANT'S NOTICE REGARDING AMICUS BRIEFS

On May 25, 2022, with the Court's permission, an amicus brief was filed styled Brief of the United States House of Representatives as Amicus Curiae in Support of the Department of Justice [ECF# 76-2].  Also on May 25, 2022, with the Court's permission, an amicus brief styled Brief of U.S. House of Representatives Minority Leader Kevin O. McCarthy and Brief of U.S. House of Representatives Minority Whip Stephen J. Scalise as Amicus Curiae was filed [ECF# 77-2].  The Court has not directed the parties to address the substance of the Briefs filed by these amici curiae and so Mr. Bannon will not address their substance unless and until the Court so directs.  Mr. Bannon herein provides notice to the Court of his position on the amicus briefs.

## Mr. Bannon Adopts the House Minority Leadership Amicus Brief Insofar as It is Not Inconsistent with the Arguments He Has Advanced in His Motion to Dismiss and Related Documents

With this filing, Mr. Bannon gives notice to the Court that he adopts the positions reflected in the amicus brief filed by the House Minority Leadership to the extent they are not

inconsistent with the positions on the issues addressed in Mr. Bannon's own submissions on these issues [See e.g. ECF## 58, 59, 62, 63, 64, 69, 73].[1]

### Mr. Bannon Objects to the House's Amicus Brief to the Extent it is Based on Factual Assertions Advanced Without Any Affidavit, Declaration, or Otherwise Admissible Evidentiary Support

Mr. Bannon, of course, vigorously opposes the substantive arguments made in the House's amicus brief and believes they are legally unsupportable.  However, as noted, the Court has not directed briefing by the parties on the substantive positions advanced in the amicus briefs and therefore none will be submitted unless and until the Court so directs.

However, throughout the House's amicus brief, General Counsel for the House makes factual assertions without any affidavit, declaration, or otherwise admissible evidentiary support.[2]  These factual assertions have no place in this process and should be wholly ignored by the Court, with no weight whatsoever given to them.[3]

---

[1] The House Minority Leadership amicus brief addresses only some of the arguments advanced by Mr. Bannon in his motion to dismiss that relate to the violation of House Rules with respect to the composition of the January 6th Select Committee, the issue surrounding the lack of a "Ranking Minority Member" on the Committee, and the importance of adherence to the House Rules in a criminal prosecution of this nature [ECF# 77-2].  It does not address all of the Rules-based arguments made by Mr. Bannon in his motion to dismiss and related documents filed by Mr. Bannon or any of Mr. Bannon's other arguments for dismissal [See e.g., ECF## 58, 62, 73]. The House Minority Leadership amicus brief makes an alternative argument to Mr. Bannon's argument regarding the "Ranking Minority Member" issue [Compare, for example, ECF# 76-2 at 10-13 with ECF# 58 at 5-12].  Mr. Bannon respectfully submits that his argument on the lack of a "Ranking Minority Member" is correct.

[2] See e.g., ECF# 76-2 at 10 ("But the Select Committee's standard practice is to provide deponents with copies of this document (Section 3(b) of H. Res. 8, 117th Cong. (2021)) at their deposition."); ECF# 76-2 at 12 ("Defendant is important for the Select Committee's investigation"; "Defendant was a central player in the lead-up to the January 6th attack on the Capitol").

[3] It is axiomatic that factual assertions by an attorney in a brief that are completely unsupported by an affidavit, declaration, or otherwise admissible evidentiary support carry no weight and are to be disregarded.  *See e.g., Oviedo v. Wash. Metro. Area Transit Authority*, 948 F.3d 386. 391

2

Mr. Bannon expressly lodges this objection because the unsupported factual assertions by House Counsel in the amicus brief risk badly misleading the Court on a material issue and are directly contradicted by House Counsel's earlier statement in an FBI interview and by the Chairman of the January 6th Select Committee.  The Court would have no reason to suspect this from the amicus brief and that creates a very dangerous situation, highlighting the very reason such unsupported attorney assertions on material facts have no place in a brief and must be disregarded by the Court.

The following is but one prominent example that strikingly demonstrates the danger arising from House Counsel's unsupported assertions in the amicus brief:

House Counsel expressly asserts in the amicus brief, without any affidavit, declaration, or other admissible evidentiary support, that "Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee."  [ECF# 76-2 at 9].

However, in a statement made during a formal interview with the Federal Bureau of Investigation in furtherance of the decision to prosecute Mr. Bannon under the criminal contempt of Congress statute charged in this case, this same House Counsel made an absolutely irreconcilable assertion of fact to the FBI.  During that formal interview, Mr. Letter is reported as providing the following assertion, as reflected in the Report of Investigation (FBI 302) generated from that interview:

> "Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority

(D.C. Cir. 2020); *Capalbo v. United States*, 2012 U.S. Dist. 24005, *14, n.9; 2012 WL 611539 (S.D.N.Y., February 24, 2012) ("An attorney's unsworn statements in a brief are not evidence"); *I.N.S. v. Phinpathya*, 464 U.S. 183, 188, n.6 (1984) (Accord).

3

```
member in a House committee and typically possess procedural
powers.  LETTER explained that the Select Committee was
specifically appointed by the Speaker of the House and there
were no majority or ranking members. Representative LIZ
CHENEY is acknowledged to be the Vice Chair of the Select
Committee; since the Select Committee has a Chair and a Vice
Chair, there are no express rules for the Vice Chair as
there would be for a Ranking Member." (emphasis added).⁴
```

It is impossible to reconcile House Counsel Letter's unsupported assertion in the amicus

brief that Representative Cheney is the ranking member with his earlier assertion to the FBI in

furtherance of Mr. Bannon's prosecution.

Perhaps even more significantly, though, and more emphatically demonstrating the danger in

relying on a lawyer's unsupported factual assertions in a brief is the fact that House Counsel's

assertion in his amicus brief that Representative Cheney is the ranking minority member (in

contradiction to his statement to the FBI that there is no ranking member on this Committee) is

directly and expressly contradicted by the Chairman of the January 6th Select Committee who

publicly announced in unequivocal terms that Representative Cheney **is not** the ranking member

of the Committee.⁵

---

⁴ See ECF# 58-4 at 5.

⁵ The Atlantic Magazine accurately reported that Chairman Thompson expressly announced that
Representative Cheney **is not the ranking member**.

"Thompson made clear at the opening hearing that Representative Liz Cheney "is not the ranking
member, …."

https://www.theatlantic.com/ideas/archive/2021/08/congress-can-subpoena-its-own-members/619888/

Here is exactly what Chairman Thompson said in his opening press conference introducing the
January 6th Select Committee to the media and the public:

"**My distinguished colleague from Wyoming, Ms. Cheney, is not the ranking member of
this Select Committee.** But because this investigation is bipartisan, it's important that we hear
Republican voices as well."  (emphasis added).

4

**-2068-**

House Counsel cites to Judge Kelly's decision in *Repub. Nat'l Comm. ("RNC") v. Pelosi*, 2022 WL 1294509 at *16 (D.D.C., May 1, 2022), for support of his assertion that Rep. Cheney is the ranking member [ECF# 76-2 at 9]; but a review of the briefs and the transcript of the oral argument in the *RNC* case reveal that Judge Kelly was never advised of Mr. Letter's statement to the FBI that the Committee has no ranking member; nor was he advised that Chairman Thompson expressly announced that Rep. Cheney is not the ranking member.[6]

To the extent House Counsel emphasizes throughout his amicus brief that ultimately the Court must defer to the House's construction or interpretation of its own Rules, [ECF# 76-2 at 3, 6, 7, 8], it is truly remarkable and certainly inappropriate and unsupported by any authority for House Counsel to urge the Court to accept his newly arrived at bare assertion that there is a ranking minority member on the Select Committee and that it is Representative Cheney, over his

---

https://www.cnn.com/2021/07/27/politics/thompson-statement-072721/index.html

The audio and video of Chairman Thompson's announcement that Representative Cheney **is not the ranking member** is found at the 16:37 mark of the following YouTube video of the Chairman's press conference:
https://www.youtube.com/watch?v=vHrt44ANHIA

[6] In *RNC*, in response to the argument that there was no consultation with a ranking member, House counsel responded simply that there is no requirement for consultation with a ranking member when a subpoena is just for *documents* [22-cv-659, Doc. 17 at 37]. The Plaintiff understood this to constitute an admission that there is no ranking member [22-cv-659, Doc. 21 at 20; April 1, oral argument Tr. at 38]. Nevertheless, House Counsel later asserted to the Court without any evidentiary support that "Ms. Cheney is clearly the ranking minority member." [22-cv-659 April 1 oral argument Tr. at 93]. While it is accurate that Judge Kelly then found that the court had to "defer to the Select Committee's decision to treat Representative Cheney as the ranking member for consultation purposes," *RNC*, 2022 WL 1294509 at *16, [cited in the House amicus brief in the instant case at ECF# 76-2 at 9], unfortunately, Judge Kelly apparently never was advised that the Select Committee's Chairman, Rep. Thompson expressly announced that Representative Cheney **is not** the ranking member; nor was the Court advised that House Counsel represented to the FBI in the instant case that there is no ranking member on the Select Committee. Finally, it must be noted that *RNC* is a civil case in contrast to the instant case and the due process considerations attending the instant case.

5

earlier statement to the FBI, subject to the sanctions provided in 18 U.S.C. §1001, that there is no

ranking minority member on the Select Committee [ECF# 58-4 at 5] and, more significantly,

over the unequivocal assertion by the Select Committee's Chairman, that Representative Cheney

**is not** the ranking member on this Select Committee [See Note 5 herein].  House Counsel's

unsupported assertions as to material facts must be entirely disregarded by the Court.

Dated: June 10, 2022                    Respectfully submitted,

                                        SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                        ___/s/ M. Evan Corcoran_____
                                        M. Evan Corcoran (D.C. Bar No. 440027)
                                        210 N. Charles Street, 26th Floor
                                        Baltimore, MD 21201
                                        Telephone: (410) 385-2225
                                        Facsimile: (410) 547-2432
                                        Email: ecorcoran@silvermanthompson.com


                                        ___/s/ David I. Schoen_____
                                        David I. Schoen (D.C. Bar No. 391408)
                                        David I. Schoen, Attorney at Law
                                        2800 Zelda Road, Suite 100-6
                                        Montgomery, Alabama 36106
                                        Telephone: (334) 395-6611
                                        Facsimile: (917) 591-7586
                                        Email: schoenlawfirm@gmail.com


                                        ___/s/ Robert J. Costello_____
                                        Robert J. Costello (*pro hac vice*)
                                        Davidoff Hutcher & Citron LLP
                                        605 Third Avenue
                                        New York, New York 10158
                                        Telephone: (212) 557-7200
                                        Facsimile: (212) 286-1884
                                        Email: rjc@dhclegal.com


                                        *Counsel for Defendant Stephen K. Bannon*

6

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of June, 2022, a copy of the foregoing Motion

to Dismiss the Indictment was served *via* the Court's CM/ECF system on all properly registered

parties and counsel.


                     <u>    /s/ M. Evan Corcoran                    </u>

                     M. Evan Corcoran (D.C. Bar No. 440027)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE NON-PARTY SUBPOENAS ) ) ) ) ) ) | Case: 1:22−mc−00060<br>Assigned To : Nichols, Carl J.<br>Assign. Date : 6/13/2022<br>Description: Misc.<br><br>Case No. _____ |
| UNITED STATES OF AMERICA ) ) ) v. ) ) STEPHEN K. BANNON, ) ) *Defendant.* ) ) ) | Criminal No. 21-670 (CJN) |

## MOTION TO QUASH

Pursuant to Rule 47 and Rule 17 of the Federal Rules of Criminal Procedure and Rule 47 of the Local Criminal Rules, the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable James B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, the Honorable Jim Clyburn, the Honorable Steny Hoyer, David Buckley, Douglas Letter, Kristen Amerling, and Sean Tonolli respectfully move to quash the subpoenas issued to them by Defendant Stephen K. Bannon. *See* Exs. A-P. For the reasons set forth in the accompanying Memorandum of Points and Authorities, the subpoenas should be quashed.

A proposed order is attached.

Respectfully submitted,

DOUGLAS N. LETTER
*General Counsel*
TODD B. TATELMAN
*Principal Deputy General Counsel*
ERIC R. COLUMBUS
*Special Litigation Counsel*
MICHELLE S. KALLEN
*Special Litigation Counsel*
STACIE M. FAHSEL
*Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

June 13, 2022

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| IN RE NON-PARTY SUBPOENAS | ) | |
| | ) | Case No. _____ |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Criminal No. 21-670 (CJN) |
| STEPHEN K. BANNON, | ) | |
| *Defendant*. | ) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIEES
IN SUPPORT OF MOTION TO QUASH**</u>

3

**-2074-**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

GOVERNING LEGAL STANDARDS ..................................................................... 3

ARGUMENT ......................................................................................................... 5

I.  The Speech or Debate Clause Requires That All the Subpoenas Be Quashed ................. 6

    A.  The Subpoenas Implicate the Speech or Debate Clause ........................................ 6

    B.  The Speech or Debate Clause Applies to All of the Testimony and Most of the Documents Sought by Bannon ........................................ 11

II.  The Subpoenas Do Not Comply with Rule 17 ................................................ 15

    A.  Bannon Failed to Obtain Court Approval ............................................ 15

    B.  The Subpoenas Seek Testimony and Documents That Are Irrelevant, and the Subpoenas Lack the Requisite Specificity ........................................ 16

III.  Bannon Cannot Show "Extraordinary Circumstances" That Would Require the Testimony of High-Ranking Government Officials ........................................ 23

IV.  The Subpoena to the House General Counsel Improperly Seeks Privileged Information ........................................ 27

CONCLUSION ..................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bardoff v. United States*,
    628 A.2d 86 (D.C. 1993) ...........................................................................24, 25, 26

*Barenblatt v. United States*,
    360 U.S. 109 (1959) ...................................................................................................8

*Benford v. Am. Broad. Cos.*,
    102 F.R.D. 208 (D. Md. 1984) .............................................................................13

*Blankenship v. Fox News Network, LLC*,
    No. 19-CV-00236, 2020 WL 7234270 (S.D. W.Va. Dec. 8, 2020).................25, 27

*Bogan v. Bos.*,
    489 F.3d 417 (1st Cir. 2007)..............................................................23, 24, 26

*Bowman Dairy Co. v. United States*,
    341 U.S. 214, 220 (1951)........................................................................4, 21

*Brennan v. Phila.*,
    388 F. Supp. 3d 516 (E.D. Pa. 2019) ....................................................................27

*Brown & Williamson Tobacco Corp. v. Williams*,
    542 F.3d 909 (D.C. Cir. 2008) ...............................................................8, 11, 13, 14

*Cano v. Davis*,
    No. 01-CV-08477 (C.D. Cal. Mar. 28, 2002) ......................................................25

*Dennis v. Sparks*,
    449 U.S. 24 (1980).................................................................................................11

*Doe v. McMillan*,
    412 U.S. 306 (1973)...........................................................................7, 8, 10, 12

*Dombrowski v. Burbank*,
    358 F.2d 821 (D.C. Cir. 1966) .............................................................................11

*\*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)...........................................6, 7, 8, 9, 10, 11, 12, 14, 15

*Equal Emp. Opportunity Comm'n v. Lutheran Soc. Servs.*,
    186 F.3d 959 (D.C. Cir. 1999) .............................................................................28

*Feldman v. Bd. of Educ. Sch. Dist. #1 City & Cnty. of Denver*,
    No. 09-CV-01049, 2010 WL 383154 (D. Colo. Jan. 28, 2010)............................25

*Franklin Sav. Ass'n v. Ryan*,
    922 F.2d 209 (4th Cir. 1991) .............................................................23

*F.T.C. v. Atl. Richfield Co.*,
    567 F.2d 96 (D.C. Cir. 1977) .............................................................16

*\*Gravel v. United States*,
    408 U.S. 606 (1972) .................................................6, 7, 9, 10, 11, 15

*Hankins v. Phila.*,
    No. 95-CV-1449, 1996 WL 524334 (E.D. Pa. Sept. 12, 1996) ...........27

*Helstoski v. Meanor*,
    442 U.S. 500 (1979) .............................................................................7

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ...........................................................................28

*In re F.D.I.C.*,
    58 F.3d 1055 (5th Cir. 1995) .........................................................23, 27

*In re Grand Jury Subpoenas*,
    571 F.3d 1200 (D.C. Cir. 2009) ..........................................................11

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) ..........................................................28

*In re Martin Marietta Corp.*,
    856 F.2d 619 (4th Cir. 1988) ..............................................................21

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................18

*In re United States ("Bernanke")*,
    542 F. App'x 944 (Fed. Cir. 2013) ..................................................23, 24

*In re United States ("Kessler")*,
    985 F.2d 510 (11th Cir. 1993) ......................................................23, 24, 27

*In re United States ("Reno & Holder")*,
    197 F.3d 310 (8th Cir. 1999) .......................................................23, 24, 27

*Jewish War Veterans of the U.S., Inc. v. Gates*,
    506 F. Supp. 2d 30 (D.D.C. 2007) ..................................................11, 13

*Jud. Watch, Inc. v. U.S. Dep't of Justice*,
    800 F. Supp. 2d 202 (D.D.C. 2011) .....................................................29

iii

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880).........................................................................7

*Kyle Eng'g Co. v. Kleppe*,
  600 F.2d 226 (9th Cir. 1979) .........................................................23

*\*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
  731 F.3d 199 (2d Cir. 2013)...............................................5, 23, 24, 26

*McCarthy v. Pelosi*,
  5 F.4th 34 (D.C. Cir. 2021) ...........................................................9

*McGrain v. Daugherty*,
  273 U.S. 135 (1927)......................................................................8, 9

*McNamee v. Mass.*,
  No. 12-40050, 2012 WL 1665873 (D. Mass. May 10, 2012)................25

*McSurely v. McClellan*,
  553 F.2d 1277 (D.C. Cir. 1976) ...................................................8, 15

*Miller v. Transam. Press, Inc.*,
  709 F.2d 524 (9th Cir. 1983) .......................................................8, 11

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
  844 F.2d 856 (D.C. Cir. 1988) ...................................................11, 14

*Moriah v. Bank of China Ltd.*,
  72 F. Supp. 3d 437 (S.D.N.Y. 2014)...........................................24, 25

*Rangel v. Boehner*,
  785 F.3d 19 (D.C. Cir. 2015) ...................................................9, 10, 15

*Simplex Time Recorder Co. v. Sec'y of Labor*,
  766 F.2d 575 (D.C. Cir. 1985) .....................................................5, 23

*Springfield Terminal Ry. Co. v. United Transp. Union*,
  No. 89-0073, 1989 WL 225031 (D.D.C. May 18, 1989)......................25

*Stern v. D. Mass.*,
  214 F.3d 4 (1st Cir. 2000)...........................................................4, 17

*Tavoulareas v. Piro*,
  527 F. Supp. 676 (D.D.C. 1981) .......................................................8

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)......................................................................10

iv

*United States v. Beasley*,
    479 F.2d 1124 (5th Cir. 1973) ................................................5

*\*United States v. Bebris*,
    4 F.4th 551 (7th Cir.) ................................................4, 5, 17, 19

*United States v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988) ................................................14

*United States v. Bibby*,
    752 F.2d 1116 (6th Cir. 1985) ................................................23

*\*United States v. Binh Tang Vo*,
    78 F. Supp. 3d 171 (D.D.C. 2015) ................................................2, 4, 15, 16

*United States v. Brewster*,
    408 U.S. 501 (1972) ................................................10, 15

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992) ................................................21

*United States v. Dean*,
    55 F.3d 640 (D.C. Cir. 1995) ................................................11

*United States v. Doe*,
    455 F.2d 753 (1st Cir. 1972) ................................................15

*United States v. Dowdy*,
    440 F. Supp. 894 (W.D. Va. 1977) ................................................24
    479 F.2d 213 (4th Cir. 1973) ................................................13, 14

*United States v. Edwards*,
    191 F. Supp. 2d 88 (D.D.C. 2002) ................................................4

*United States v. Ferguson*,
    37 F.R.D. 6 (D.D.C 1965) ................................................16

*United States v. Finn*,
    919 F. Supp. 1305 (D. Minn. 1995) ................................................16

*United States v. Gaudin*,
    515 U.S. 506 (1995) ................................................20

*United States v. Hardy*,
    224 F.3d 752 (8th Cir. 2000) ................................................23

*\*United States v. Helstoski*,
    442 U.S. 477 (1979) ................................................6, 10, 15

*United States v. Hoeffner*,
   254 F.R.D. 302 (S.D. Tex. 2008).................................................................28

*United States v. Jefferson*,
   546 F.3d 300 (4th Cir. 2008) ....................................................................15

*United States v. Johnson*,
   383 U.S. 169 (1966)..........................................................................6, 7, 10

*United States v. Koubriti*,
   305 F. Supp. 2d 723 (E.D. Mich. 2003)....................................................24

*United States v. Kumar*,
   No. 17-CR-5-FL-1, 2019 WL 1486365 (E.D.N.C. Apr. 3, 2019) .............19

*\*United States v. Libby*,
   432 F. Supp. 2d 26 (D.D.C. 2006) ..........................................4, 17, 19, 23

*United States v. Louis*,
   No. 04-203, 2005 WL 180885 (S.D.N.Y. Jan. 27, 2005) .........................22

*United States v. Mays*,
   246 F.3d 677, 2000 WL 1860727 (9th Cir. Dec. 18, 2000)......................22

*United States v. McDade*,
   28 F.3d 283 (3d Cir. 1994)........................................................................15

*\*United States v. Morgan*,
   313 U.S. 409 (1941)...................................................................................23

*United States v. Myers*,
   635 F.2d 932 (2d Cir. 1980)........................................................................7

*\*United States v. Nixon*,
   418 U.S. 683 (1974)..........................................................2, 4, 17, 21, 22

*United States v. Noriega*,
   764 F. Supp. 1480 (S.D. Fla. 1991) ..........................................................16

*\*United States v. North*,
   713 F. Supp. 1448 (D.D.C. 1989).........................................................5, 19
   708 F. Supp. 402 (D.D.C. 1989).................................................................24

*United States v. Peoples Temple of the Disciples of Christ*,
   515 F. Supp. 246 (D.D.C. 1981)................................................................14

*United States v. Rayburn House Off. Bldg. Room No. 2113*,
   497 F.3d 654 (D.C. Cir. 2007)...................................................................10

*United States v. Reyes*,
    239 F.R.D. 591 (N.D. Cal. 2006) .................................................................28

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ....................................................1, 15, 25

*United Transp. Union v. Springfield Terminal Ry. Co.*,
    Nos. 87-03442 P & 88-0117 P, 1989 WL 38131 (D. Me. Mar. 13, 1989) ..............................13

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) .................................................................................28

*Warren Bank v. Camp*,
    396 F.2d 52 (6th Cir. 1968) .....................................................................23

*Watkins v. United States*,
    354 U.S. 178 (1957) ...............................................................................8, 9

*Webster v. Sun Co., Inc.*,
    561 F.Supp 1184 (D.D.C. 1983) ............................................................13

**Constitution**

U.S. Const., Art. I, § 6, cl. 1 ..............................................................................2, 5

**Statutes and Rules**

2 U.S.C. § 192 ..........................................................................................9, 17, 18

Fed. R. Crim. P. 17 ...........................................................................................2, 4

**Legislative Authorities**

H. Rep. No. 117-152 (2021) ..............................................................................3, 18

H. Res. 503, 117th Cong. (2021) .........................................................................18

H. Res. 730, 117th Cong. (2021) ..........................................................................3

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I.................................................................................................18

    Rule II ...............................................................................................26

**Other**

2 Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Crim. (4th ed. 2022) ....................16

## **INTRODUCTION**

"[S]ervice in the United States Congress is not a job like any other, it is a constitutional role to be played upon a constitutional stage." *United States v. Rostenkowski*, 59 F.3d 1291, 1312 (D.C. Cir.), *op. suppl. on denial of reh'g*, 68 F.3d 489 (D.C. Cir. 1995).  For this reason, a criminal trial subpoena to a Member of Congress, the General Counsel of the House, or Congressional staff seeking documents and testimony is no trivial matter.

Defendant Stephen Bannon subpoenaed twelve Members of Congress, the General Counsel of the House of Representatives, and three senior staff members from the Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) seeking broad categories of documents and trial testimony.  The subpoenas to the Members went to the Speaker of the House, the Majority Leader, the Majority Whip, and all of the Members of the Select Committee.

Each subpoena seeks at least twenty broad categories of documents, some of which mention Bannon and some of which sweep far beyond him.  For example, Requests 1, 3, 9, and 10 seek "[a]ll documents . . . regarding the establishment of the January 6th Select Committee"; "[a]ll documents . . . regarding the issuance of a subpoena to Mr. Bannon"; "[a]ny private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee"; "[a]ll documents . . . regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual."  Exs. A-P.  And Request 15 seeks "All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date)."  *Id.*

1

All twelve subpoenaed Members, the House General Counsel, and the three Select Committee staff members (Non-Party Movants) move to quash these improper subpoenas for three independent reasons.

*First*, as governing precedent from the Supreme Court and the D.C. Circuit clearly establishes, all of the subpoena recipients are entitled to absolute immunity under the Constitution's Speech or Debate Clause.  *See* U.S. Const., Art. I, § 6, cl. 1.

*Second*, the subpoenas are improper under Federal Rule of Criminal Procedure 17.  Not only did Bannon improperly bypass court approval for these requests—*see United States v. Binh Tang Vo*, 78 F. Supp. 3d 171, 178 (D.D.C. 2015) ("Rule 17 provides a limited grant of authority, mentioning pretrial production only in connection with court approval.")—but these requests are precisely the sort of broad "fishing expeditions" (akin to civil discovery) prohibited by *United States v. Nixon*, 418 U.S. 683, 700 (1974).  And, to the extent Bannon seeks testimony about the Select Committee's subpoena to him or the Select Committee's interactions with him or his counsel, testimony from any Member of Congress is unnecessary and unduly burdensome because that information is available from Select Committee staff.

*Third*, the subpoena recipients are protected by the "high-ranking government official" doctrine.

In addition, as to the House General Counsel, the subpoena demands privileged information between the General Counsel and his client.

To the extent testimony about Bannon's subpoena from the Select Committee or his interactions with the Select Committee are material to his defense at trial, two Select Committee staff members—Chief Counsel and Deputy Staff Director Kristin Amerling and Senior Investigative Counsel Sean Tonolli—will voluntarily be made available by the Select Committee

despite their Speech or Debate immunity to testify as to the narrow topics that are relevant to the elements of the charged crime and available defenses. These two witnesses will also likely be providing testimony at trial as witnesses for the prosecution.

## BACKGROUND

The House of Representatives has already provided extensive background on the January 6th attack on the United States Capitol, Bannon's role in the lead-up to that attack, and the Select Committee's unsuccessful effort to obtain his cooperation with the Select Committee's investigation. *See* H. Rep. No. 117-152, at 6-7 (2021); H. Res. 730, 117th Cong. (2021).

On June 2, Bannon served sixteen subpoenas seeking documents and trial testimony from House Members and senior Committee staff. The subpoenas demand numerous broad categories of documents, some specific to Bannon and some that make no mention of him. *See* Exs. A-P. These subpoenas demand that the recipients "provide the documents in electronic format . . . at any time prior to **July 14, 2022**" or alternatively "bring the documents . . . to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**" *Id.*

Upon receiving the subpoenas, House General Counsel reached out to Bannon's counsel to confer about potentially narrowing the areas in dispute. Counsel met, but were unable to agree on any withdrawal or narrowing of the subpoenas.

## GOVERNING LEGAL STANDARDS

"Rule 17 first creates a general rule: Subpoenas are issued without the court's involvement when they command the recipient's presence and possibly the production of documents at a particular hearing." *Binh Tang Vo*, 78 F. Supp. 3d at 178. "Rule 17(c) creates a limited exception to this rule, declaring that '[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.'" *Id.* (quoting Fed. R. Crim. P. 17(c)). Rule 17(c) permits a criminal defendant to subpoena "books, papers,

documents, data, or other objects . . . designate[d]" for use at trial so long as compliance with the subpoena would not be "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(1)-(2).

"Rule 17 provides a limited grant of authority," for document production "mentioning pretrial production only in connection with court approval." *Binh Tang Vo*, 78 F. Supp. 3d at 178. "While a Rule 17(c) subpoena duces tecum is a legitimate device to obtain evidentiary material, it was never intended to be a broad discovery device going beyond that which is required either by Rule 16 of the Federal Rules of Criminal Procedure or by *Brady*." *United States v. Edwards*, 191 F. Supp. 2d 88, 89 (D.D.C. 2002); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) ("Rule 17(c) was not intended to provide an additional means of discovery.").

"[T]o compel production of documents under Rule 17(c), the party seeking production 'must clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity.'" *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (quoting *Nixon*, 418 U.S. at 700). If a subpoena does not satisfy these three requirements, it "will be deemed unreasonable or oppressive and must be either quashed or modified." *Id.*

As to a subpoena's demand for trial testimony, the subpoenaing party—here, Bannon—must establish that the testimony and documents sought are "relevant and material." *Stern v. D. Mass.*, 214 F.3d 4, 17 (1st Cir. 2000); *see also, e.g.*, *United States v. Bebris*, 4 F.4th 551, 559-60 (7th Cir.), *cert. denied*, 142 S. Ct. 489 (2021). In other words, Bannon must "demonstrate with requisite specificity in concrete terms" that the subpoenaed individual could supply information "that would be material and essential to the defense"—*i.e.*, "that [the individual's] appearance is necessary to assure defendant a fair trial." *United States v. North*, 713 F. Supp. 1448, 1449 (D.D.C. 1989). "Where the sought testimony is cumulative or immaterial, a court does not abuse

4

its discretion by quashing a Rule 17(a) subpoena." *Bebris*, 4 F.4th at 559-60 (citing *United States v. Beasley*, 479 F.2d 1124, 1128 (5th Cir. 1973)).

If the subpoena is directed to high-ranking government officials, the party seeking the trial testimony must establish "extraordinary" or "exceptional" circumstances and show that the information cannot be obtained elsewhere. *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586-87 (D.C. Cir. 1985); *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) ("high-ranking government official[s] should not—absent exceptional circumstances—be deposed or called to testify regarding the reasons for taking official action").

In this case, the Constitution by its clear terms also imposes on Bannon a substantial limitation: The Speech or Debate Clause states that "[t]he Senators and Representatives . . . shall . . . be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." U.S. Const., Art. I, § 6, cl. 1.

## **ARGUMENT**

As noted at the outset of this brief, Bannon's subpoenas cannot be enforced for multiple reasons. *First*, the compelled testimony and production of documents he seeks are barred by the Speech or Debate Clause. *Second*, these subpoenas fall far short of Rule 17's specificity and reasonableness requirements; the subpoenas are too broad, and they seek testimony and documents irrelevant to the issues at trial. *Third*, to the extent Bannon can identify any testimony relevant to live issues at trial, he has not established the exceptional circumstances necessary to obtain testimony from high-ranking government officials that he could not obtain elsewhere. *Finally*, the subpoena to the House General Counsel improperly seeks privileged information.

To the extent testimony about the Select Committee's subpoena to Bannon or his interactions with the Select Committee is necessary for the prosecution or defense of this case, the Select Committee will make available two of its staff so that they can address those limited issues that are relevant to the crimes charged.

**I.   The Speech or Debate Clause Requires That All the Subpoenas Be Quashed**

**A.   The Subpoenas Implicate the Speech or Debate Clause**

Simply put, Bannon is attempting to misuse the powers of this Court in order to cause an obvious violation of the Speech or Debate Clause. His effort disregards extensive precedent from the Supreme Court and the D.C. Circuit applying this Clause in a manner that vindicates its critical role in our system of democratic government.

"The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently*. . . . [T]he 'central role' of the Clause is to 'prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary.'" *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (emphasis added) (quoting *Gravel v. United States*, 408 U.S. 606, 617 (1972)); *see also United States v. Helstoski*, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere."). The Clause "serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 178 (1966); *see also Helstoski*, 442 U.S. at 491 ("[The] purpose [of the Clause] was to preserve the constitutional structure of separate, coequal, and independent branches of government."); *United States v. Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980) ("Like the Speech or Debate Clause, the doctrine of separation of powers serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the

6

Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen.").

Because "the guarantees of th[e] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, . . . read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.[1] The Clause applies to all activities "within the 'legislative sphere,'" *Doe v. McMillan*, 412 U.S. 306, 312 (1973) (quoting *Gravel*, 408 U.S. at 624-25), which includes all actions considered to be

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625; *accord Eastland*, 421 U.S. at 504.

Courts have broadly construed the concept of "legislative activity" and have "not taken a literalistic approach in applying the privilege . . . . Committee reports, resolutions, and the act of voting are equally covered." *Gravel*, 408 U.S. at 617. Of particular relevance here, Congressional committee investigations and Congressional hearings are activities within the legislative sphere, as is the collecting of information in furtherance of legislative responsibilities because "'[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland*, 421 U.S. at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)); *McMillan*, 412 U.S. at

---

[1] *Accord Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *Johnson*, 383 U.S. at 179; *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880); *Myers*, 635 F.2d at 937.

7

313.  Protected information-gathering encompasses both formal Congressional committee processes and less formal inquiries by committees and individual Members.  *See Eastland*, 421 U.S. at 504; *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 411-12, 423 (D.C. Cir. 1995) (documents voluntarily delivered to committee by private citizen protected).[2]

These instructions from the Supreme Court and D.C. Circuit are instrumental to the constitutional and common-sense principle that Congress's authority to investigate and obtain information is a fundamental feature of its Article I legislative function.  *See, e.g.*, *Eastland*, 421 U.S. at 504 n.15 ("[T]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (quotation marks omitted; ellipsis in original)).  "That power is broad.  It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes."  *Watkins v. United States*, 354 U.S. 178, 187 (1957).[3]  Indeed, the Supreme Court has emphasized that:

> It is unquestionably the duty of *all citizens* to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation . . . to respect the dignity of the Congress and its committees

---

[2]  *Accord Miller v. Transam. Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the 'things generally done in a session of the House,' concerning matters within the 'legitimate legislative sphere.'" (citations omitted)); *McSurely v. McClellan*, 553 F.2d 1277, 1287 (D.C. Cir. 1976) (en banc) ("[A]cquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the [Speech or Debate] privilege so that congressmen are able to discharge their constitutional duties properly." (quotation omitted)); *Tavoulareas v. Piro*, 527 F. Supp. 676, 680 (D.D.C. 1981) ("[A]cquisition of information by congressional staff, whether formally or informally, is an activity within the protective ambit of the [S]peech or [D]ebate [C]lause.").

[3]  *Accord Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate."); *see also Watkins*, 354 U.S. at 187 ("The power of the Congress to conduct investigations is inherent in the legislative process."); *McGrain*, 273 U.S. at 174 ("[The] power to secure needed information by such means [i.e., compulsory process] has long been treated as an attribute of the power to legislate . . . .  We are of [the] opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.").

and to testify fully with respect to matters within the province of proper investigation.

*Id.* at 187-88 (emphasis added).

Moreover, nothing in 2 U.S.C. § 192, the statute that provides for criminal prosecution when an individual defies a Congressional subpoena (thereby depriving Congress of information relevant to its legislative functions), can possibly be read as eliminating Speech or Debate Clause immunity as a condition for a successful conviction under that statute.

It is also critical to the proper operation of the Speech or Debate Clause that its protections encompass Congressional staff and House Officers. *See, e.g.*, *Eastland*, 421 U.S. at 507 ("no distinction between the Members and Chief Counsel"); *Gravel*, 408 U.S. at 616-18 (in applying Clause, a "Member and his aide are to be treated as one" and "the conduct of the [aide] would be a protected legislative act if performed by the Member himself") (internal quotation marks and citation omitted); *Rangel v. Boehner*, 785 F.3d 19, 24-25 (D.C. Cir. 2015) ("Indeed, the Supreme Court has extended the Speech or Debate Clause to aides from all walks of legislative life, including committee staffers.").

As the D.C. Circuit recently reiterated, "[t]he key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor." *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021) (internal quotation marks and citation omitted).

Just as important here is that the Speech or Debate Clause bars any "inquiry into . . . the motivation for [legislative] acts." *Helstoski*, 442 U.S. at 489 (quoting *United States v. Brewster*, 408 U.S. 501, 512 (1972)); *see also Johnson*, 383 U.S. at 180, 184-85 (such inquiry "necessarily contravenes the . . . Clause").

Moreover, the D.C. Circuit has flatly rejected the oft-repeated idea that claims that Members of Congress, or Committees, Officers, or staff members acted unlawfully or with an

9

unworthy purpose override Speech or Debate Clause immunity.  That court has, citing Supreme

Court rulings, explained that "[t]his 'familiar' argument—made in almost every Speech or

Debate Clause case—has been rejected time and again . . . . An act does not lose its legislative

character simply because a plaintiff alleges that it violated the House Rules, . . . or even the

Constitution." *Rangel*, 785 F.3d at 24 (internal quotation marks omitted).  *See, e.g.*, *McMillan*,

412 U.S. at 312-13 (Clause applies to all legislative activities "even though the[] conduct, if

performed in other than legislative contexts, would in itself be unconstitutional or otherwise

contrary to criminal or civil statutes"); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

Both the Supreme Court and the D.C. Circuit have stated unequivocally that, when the

Clause applies, its protections are "absolute," a result that governs equally in both the civil and

criminal contexts:

> The question to be resolved is whether the actions of the petitioners fall within the
> "sphere of legislate legislative activity."  If they do, the petitioners "shall not be
> questioned in any other Place" about those activities since the prohibitions of the
> Speech or Debate Clause are absolute.

*Eastland*, 421 U.S. at 501 (footnote omitted; quoting *McMillan*, 412 U.S. at 312-13); *see also*,

*e.g.*, *Gravel*, 408 U.S. at 623 n.14 (the Clause, where applicable, is "absolute"); *Rangel*, 785 F.3d

at 24 ("Such is the nature of absolute immunity, which is—in a word—absolute."); *United States*

*v. Rayburn House Off. Bldg. Room No. 2113*, 497 F.3d 654, 660 (D.C. Cir. 2007) ("The bar on

compelled disclosure is absolute, and there is no reason to believe that the bar does not apply in

the criminal . . . context." (citation omitted)).

Finally, of great importance here, the Clause provides both a non-disclosure and a

testimonial immunity that protects Members and Congressional staff from being compelled to

10

testify about actions tied to the legislative process, *see, e.g.*, *Gravel*, 408 U.S. at 615-16,[4] as well as from being compelled to produce legislative records, *see, e.g.*, *Brown & Williamson*, 62 F.3d at 419-21.[5]

The subpoenas issued here by Bannon utilizing this Court's processes violate all of these firmly established and important constitutional principles.

### B.   The Speech or Debate Clause Applies to All of the Testimony and Most of the Documents Sought by Bannon

All of the testimony sought by Bannon from the twelve Members of Congress, the three Select Committee staffers, and the House General Counsel directly relates to the legislative activity that is absolutely protected by the Speech or Debate Clause.[6]  The documents Bannon seeks also concern quintessentially Speech-or-Debate-protected activities and the subpoenas for them must be quashed.[7]

All of the information Bannon seeks to compel concerns the Congressional power of inquiry, specifically: (1) the authority of the Select Committee to conduct an investigation into

---

[4]  *See also, e.g.*, *Dennis v. Sparks*, 449 U.S. 24, 30 (1980); *Miller*, 709 F.2d at 528-29.

[5]  *See also, e.g.*, *In re Grand Jury Subpoenas*, 571 F.3d 1200 (D.C. Cir. 2009); *United States v. Dean*, 55 F.3d 640, 663 n.14 (D.C. Cir. 1995) (noting trial court's quashing of testimonial subpoena on Speech or Debate grounds); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988); *Dombrowski v. Burbank*, 358 F.2d 821, 823-24 (D.C. Cir. 1966), *aff'd in part & rev'd in part on other grounds sub nom. Dombrowski v. Eastland*, 387 U.S. 82 (1967); *Jewish War Veterans of the U.S., Inc. v. Gates*, 506 F. Supp. 2d 30, 52-62 (D.D.C. 2007).

[6]  As noted above, *see supra* p. 6, staff members Kristin Amerling and Sean Tonolli will nevertheless be made available by the Select Committee to testify at trial regarding certain relevant topics.  Those individuals will separately move for a protective order from this Court to limit the topics on which Bannon's counsel may properly ask questions.  *See infra* p. 18 n.12.

[7]  To the extent that a limited number of documents sought by Bannon are not covered by the Speech or Debate Clause and not absolutely privileged (such as communications by Members to the press) the subpoena recipients move to quash those requests on other grounds. *See infra* Sections II-IV.

11

the actions on and related to the January 6, 2021 attack on the United States Capitol; (2) the involvement of the Select Committee and House Leadership in seeking information from Bannon related to that investigation; and (3) decisions regarding coordination efforts between the Select Committee and House Leadership regarding holding Bannon in contempt of Congress and the filing of an amicus brief in his pending criminal proceeding.

Supreme Court precedent dictates that "the act 'of authorizing an investigation pursuant to which . . . materials were gathered' is an integral part of the legislative process," *Eastland*, 421 U.S. at 505 (quoting *McMillan*, 412 U.S. at 313). Therefore, all documents and any testimony sought related to the establishment, membership, staffing, authority, and operation of the Select Committee is absolutely protected by the Speech or Debate Clause.

Moreover, as explained above, that Clause protects the information gathered by the Select Committee Members, its staff, and the House General Counsel in furtherance of the Select Committee's investigation. Here, this includes any information: (1) obtained about or concerning Bannon; (2) regarding claims or assertions of executive privilege by President Biden or former President Trump; (3) related to actual or potential arguments, claims, accommodations, and/or defenses that Bannon or other individuals may have advanced; (4) regarding the investigative methods used or the strategy of either the Select Committee or the full House concerning contempt of Congress proceedings related to Bannon; (5) related to the filing of any civil litigation or amicus briefs in this or any other cases involving the Select Committee's investigation; and (6) with respect to any bias, animosity, or conflicts of interest between or among the Select Committee Members, staff, or other House employees.

Such information is absolutely privileged regardless of by what method—formal or informal—or from what source the material or information was obtained. *See, e.g., Brown &*

12

**-2093-**

*Williamson*, 62 F.3d at 422-23 (documents delivered to committee by private citizen held protected); *United States v. Dowdy*, 479 F.2d 213, 221, 224 (4th Cir. 1973) (Member's informal gathering of information from federal agencies in furtherance of legislative functions held protected).[8]

The Court's role regarding this motion to quash is thus limited to determining whether the relevant activities of the subpoena recipients were an integral part of the legislative process: "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Eastland*, 421 U.S. at 506 (quotation marks omitted).[9]

---

[8]  *Accord Jewish War Veterans*, 506 F. Supp. at 54 (privileged "information gathering may take the form of communications with organizations, constituents, or officials of a coordinate branch"); *id.* at 56 ("[T]he informality or passivity of the method through which Congress acquired the information did not lessen or negate the applicability of the Clause's protections."); *Webster v. Sun Co., Inc.*, 561 F. Supp. 1184, 1189-90 (D.C. Cir. 1984) (receipt of memorandum from lobbyist "was still well within the bounds of the speech or debate clause privilege"), *vacated & remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984); *United Transp. Union v. Springfield Terminal Ry. Co.*, Nos. 87-03442 P & 88-0117 P, 1989 WL 38131, at *1 (D. Me. Mar. 13, 1989) (Senator and Congressman's "monitoring" of a labor strike held protected); *Benford v. Am. Broad. Cos.*, 102 F.R.D. 208, 210 (D. Md. 1984) ("[I]nformation possessed by [unpaid, volunteer Congressional committee investigators] and transmitted to, or received by, them in the execution of legislative functions, including legitimate information-gathering, is Constitutionally privileged from discovery in this lawsuit . . . .").

[9]  *See also, e.g.*, *Brown & Williamson*, 62 F.3d at 418-19 (quashing document subpoena to subcommittee Members: "Once the legislative-act test is met, … the privilege is absolute." (quotation marks omitted)); *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) ("[T]he Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, even to determine if they are legislative in fact[] . . ." (quotation marks omitted)); *MINPECO*, 844 F.2d at 861 (quashing subpoena for Subcommittee documents: "As the [activity] was part of the legislative process, that is the end of the matter."); *Dowdy*, 479 F.2d at 226 ("Once it [i]s determined . . . that the legislative function . . . was *apparently* being performed, the propriety and the motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry."); *United States v. Peoples Temple of the Disciples of Christ*, 515 F. Supp. 246, 249 (D.D.C. 1981) (quashing subpoena for Congressional documents: "The Supreme Court has rarely spoken with greater clarity.  Once it is determined . . . that [the congressional individual or entity's] actions

13

That test easily is met here; indeed, the question is not remotely close because all the matters into which Bannon seeks to probe are manifestly an integral part of the legislative process. This is true regardless of whether any legislation is actually produced. *See Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces. The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result."). Accordingly, all information regarding the Select Committee's investigation and all of the material related to it plainly falls within the definition of legitimate legislative activity, for which the protections of the Speech or Debate Clause are absolute.

*       *       *

In sum, the Speech or Debate Clause "absolutely" protects each of the subpoena recipients in this case from being compelled to testify or produce documents[10] about the matters on which Bannon seeks information. While that constitutional protection undeniably is broad, the Supreme Court long ago acknowledged and accepted the potential costs associated with those broad protections, which were deemed essential by the Framers of the Constitution, based on the abuse by British monarchs of their powers and of judicial powers against Members of Parliament. *See, e.g.*, *Helstoski*, 442 U.S. at 488 ("[W]ithout doubt the exclusion of such evidence will make [litigation] more difficult."); *Rangel*, 785 F.3d at 24 ("Although absolute

---

fall within the legitimate legislative sphere, judicial inquiry is at an end." (quotation marks omitted)).

   [10] With limited exceptions, *see supra* p. 11 n.7.

14

immunity creates 'a potential for abuse,' that potential 'was the conscious choice of the Framers buttressed and justified by history.'" (quoting *Eastland*, 421 U.S. at 510)).[11]

## II.     The Subpoenas Do Not Comply with Rule 17

The subpoenas should be quashed because they do not meet the requirements of Rule 17. *First*, as a threshold matter, the requests for documents are improper because Bannon failed to obtain court approval as required by Rule 17.  *Second*, the subpoenas fail Rule 17's relevance and specificity requirements.

### A.     Bannon Failed to Obtain Court Approval

"Rule 17 provides a limited grant of authority, mentioning pretrial production only *in connection with court approval*."  *Binh Tang Vo*, 78 F. Supp. 3d at 178 (emphasis added); *see also* 2 Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Crim. § 275 n.10 (4th ed. 2022) ("Leave is required for a pre-trial subpoena duces tecum.").

This requirement in Rule 17, "'leaving advance production to the court's discretion[,] is no mere technicality.  It is a vital protection against misuse or improvident use of such subpoenas.'"  *Binh Tang Vo*, 78 F. Supp. 3d at 178-79 (quoting *United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991)).  A subpoena "is issued by a court, bears a court's seal, and is backed by the threat of court-imposed sanctions for non-compliance.  It is not the tool of a party to use as desired; rather, it is a tool provided by Rule 17 and limited to those uses authorized by Rule 17."  *Id.* at 180; *accord F.T.C. v. Atl. Richfield Co.*, 567 F.2d 96, 105 (D.C. Cir. 1977) (A

---

[11] Indeed, the courts are so solicitous of the protections provided by the Speech or Debate Clause that they afford immediate appellate review of orders that infringe those protections.  *See, e.g.*, *Meanor*, 442 U.S. at 505-06; *accord United States v. Jefferson*, 546 F.3d 300, 308-09 (4th Cir. 2008); *Rostenkowski*, 59 F.3d at 1297; *United States v. McDade*, 28 F.3d 283, 288-89 (3d Cir. 1994) (Alito, J.); *McSurely*, 521 F.2d at 1030-32; *United States v. Doe*, 455 F.2d 753, 756-57 (1st Cir. 1972), *vacated on other grounds sub nom. Gravel*, 408 U.S. 606.

15

"subpoena is the subpoena of the court, not the subpoena of the interested party.  It is the court

which must authorize . . . the issuance of the subpoena[.]").

   Without such court supervision, "Rule 17(c) would lend itself to discovery of the

broadest sort—a result that the drafters of the Rule decried."  *Binh Tang Vo*, 78 F. Supp. 3d at

179 (quoting *United States v. Finn*, 919 F. Supp. 1305, 1329 (D. Minn. 1995)).  That is precisely

what happened here.  Rather than seek this Court's approval, Bannon sought broad categories of

documents from 13 Members, the House General Counsel, and two staffers that read more like

discovery requests than trial subpoenas.  Courts in this district, however, have long made clear

that "Rule 17 is not a rule for discovery.  The only discovery and inspection permitted in a

criminal case is that provided by Rule 16, and it is of a very limited nature."  *United States v.

Ferguson*, 37 F.R.D. 6, 7 (D.D.C 1965).  Rule 17 "does not create a separate procedure for

inviting pretrial production."  *Binh Tang Vo*, 78 F. Supp. 3d at 179.  "The Rule describes only

one scenario under which a subpoena may be used to obtain pretrial production—when the Court

so directs"—and, to our knowledge, Bannon received no such direction from the Court here.  *Id.*

As far as the subpoena recipients are aware, this Court has not sanctioned the subpoena to the

Speaker, any other Member, the House General Counsel, or Congressional staff.  Because

Bannon neglected to secure the required Court approval, the provisions of the subpoenas seeking

documents should be quashed.

   **B.    The Subpoenas Seek Testimony and Documents That Are Irrelevant, and
          the Subpoenas Lack the Requisite Specificity**

   Even if Bannon could cure the deficiency discussed above, his subpoenas should be

quashed for the additional and independent reason that Bannon has not shown—and cannot

show—that the testimony and documents he seeks are "relevant and material."  *Stern*, 214 F.3d

at 17; *see also, e.g.*, *Nixon*, 418 U.S. at 699-700; *Bebris*, 4 F.4th at 559-60.  Further, the

16

subpoenas' sweeping document requests demonstrate that the subpoenas are improper requests for discovery poorly disguised as subpoenas under Rule 17.  *See Nixon*, 418 U.S. at 699; *Libby*, 432 F. Supp. 2d at 31.

    **1.**  With the narrow exception of the limited testimony of specific Select Committee staff members as to certain topics, the testimony and documents sought by Bannon's subpoenas are irrelevant and immaterial to the issues at trial.  At trial, the Department of Justice will be required to prove to the jury the following elements for the charged crimes of contempt under Section 192: (1) that Bannon was "summoned as a witness . . . to give testimony or to produce papers"; (2) that the Select Committee subpoena was issued "by the authority of [the Select Committee] upon [a] matter under inquiry"; (3) that the information sought was "pertinent to the question under inquiry"; and (4) that Bannon "willfully [made] default."  2 U.S.C. § 192.  As we have already noted, to the extent there is a need at trial for testimony about the subpoena to Bannon, two senior staff members on the Select Committee—Ms. Amerling and Mr. Tonolli— can provide relevant testimony regarding those elements or any available defenses, and the Select Committee will not assert Speech or Debate immunity as to those staff Members for such limited testimony.  *See supra* pp. 2-3, 6.

    For example, Ms. Amerling and Mr. Tonolli can testify regarding the service of the Select Committee's subpoena on Bannon's attorney, the communications with his attorney, and why the subpoenaed information and testimony from him would have been "pertinent" to the Select Committee's work.  2 U.S.C. § 192.  We note that the support for the latter factor is already fully set out in the House's public official contempt report.  *See* H. Rep. No. 117-152, at 2-4 (2021).  Accordingly, to the extent that Bannon seeks the testimony of Ms. Amerling and Mr. Tonolli regarding such topics, the Select Committee will make them available, but a protective

order should be imposed by the Court to properly confine the questions asked of Ms. Amerling and Mr. Tonolli to information material to the elements of the offense and available defenses.[12]

Aside from that limited testimony, none of the testimony or documents sought by Bannon's subpoenas are relevant and material to his guilt or innocence of the charged crimes. *See In re Sealed Case*, 121 F.3d 729, 754–55 (D.C. Cir. 1997) ("Rule 17(c) precludes use of a trial subpoena to obtain evidence that is not relevant to the charges being prosecuted or where the claim that subpoenaed materials will contain such evidence represents mere speculation."). For example, the House Majority Leader and the Majority Whip had no authority to appoint Members to the Select Committee (*see* Rule I.11, Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules")) nor do they have any involvement in the issuance of subpoenas by the Select Committee (*see* H. Res. 503, 117th Cong. § 5(c)(4) (2021)). And the other subpoenaed individuals—the Speaker of the House, the Select Committee Members, the House Counsel, and other staff members—do not have relevant information beyond the information that can be provided by Ms. Amerling or Mr. Tonolli.

Nor are the subpoenas' extremely broad document requests likely to produce any non-cumulative evidence relevant and material to the charges. That is especially true given that the Department of Justice has already provided Bannon with all records it has obtained from the House, *see* ECF No. 31 at 17, and to the extent the Department of Justice names any House individuals from the House as witnesses for trial, "it will be obligated to provide discovery" of any documents in its possession going to impeachment or bias for those individuals. Oral Arg. Tr. at 95:19-23 (Mar. 16, 2022).

---

[12] Ms. Amerling and Mr. Tonolli intend to move separately for a protective order.

18

**-2099-**

Indeed, Bannon has failed to identify the precise testimony he seeks from the subpoenaed individuals or explain how the subpoenaed testimony or documents would produce evidence material to his defense at trial. The subpoenas are thus plainly improper under Rule 17. *See, e.g.*, *Bebris*, 4 F.4th at 559 (holding that district court did not abuse its discretion in quashing a Rule 17(a) subpoena seeking testimony that would be "cumulative or immaterial"); *Libby*, 432 F. Supp. 2d at 34-35 (quashing subpoena requests for documents because "the defendant has not provided this Court with any basis upon which it can draw a reasonable inference that there is a real likelihood that the telephone records and calendar would contain relevant and admissible evidence"); *North*, 713 F. Supp. at 1449 (quashing subpoena served on President Reagan because defendant failed to "demonstrate with requisite specificity in concrete terms what further information only President Reagan could supply that would be material and essential to the defense"); *United States v. Kumar*, No. 17-CR-5-FL-1, 2019 WL 1486365, at *4-5 (E.D.N.C. Apr. 3, 2019) (granting motion to quash subpoena where defendant "failed to offer any argument or information as to the relevance of the testimony sought").

Bannon cannot satisfy Rule 17 by contending that the subpoenaed testimony and documents will provide information about the scope of the Select Committee's authority and the subpoena's validity. This Court has recognized that Bannon has not yet demonstrated that such information—*i.e.*, "information that tends to show that the subpoena was not lawfully authorized"—"would be relevant to his defense" at trial. Oral Arg. Tr. at 95:1--96:2 (Mar. 16, 2022). He cannot do so. As the Department of Justice has explained, Bannon has waived any argument that the Select Committee's subpoena was invalid due to asserted defects in the Select Committee's authority, composition, or procedures by failing to raise those arguments to the Select Committee. *See generally* ECF No. 53.

19

Regardless, even if the arguments had not been waived, the scope of Congress's and the Select Committee's authority—and the validity of the subpoena—are questions of law, not of fact. And questions of law are for this Court to decide, not the jury at trial. *See United States v. Gaudin*, 515 U.S. 506, 513 (1995). Although Bannon can challenge the indictment on these grounds in a motion to dismiss, as he has now done, there is no relevant testimony or evidence relating to these issues for the jury to consider at trial.

To the extent this Court disagrees and holds that Bannon can present evidence to the jury regarding the scope of the Select Committee's authority and the validity of its subpoena, any relevant testimony can be obtained from Ms. Amerling and Mr. Tonolli. There is no basis to believe that any of the other subpoenaed individuals would have additional relevant evidence.

Moreover, any suggestion by Bannon that application of the Speech or Debate Clause would result in the violation of his right to a fair trial would be misplaced. To the extent this Court concludes Bannon is constitutionally entitled to testimony by House personnel, the availability of Ms. Amerling and Mr. Tonolli will suffice. And to the extent that Bannon seeks more, his inability to meet the standard articulated in Rule 17(c)—which "implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor," *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988)—demonstrates that the Constitution requires nothing more.

**2.** Bannon's subpoenas also contravene Rule 17 because their numerous document requests lack the requisite specificity. *See Nixon*, 418 U.S. at 699-700. Indeed, the document requests are extraordinarily broad and are thinly veiled discovery requests, further flouting Rule 17. *See Bowman Dairy Co.*, 341 U.S. at 220 (explaining that Rule 17(c) "was not intended to provide an additional means of discovery"); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C.

20

Cir. 1992) (district court did not abuse discretion in quashing subpoena because the defendant "was improperly trying to use the subpoena as a discovery tool").

Each subpoena seeks the production of at least twenty categories of documents, most of which require the subpoenaed parties to make legal judgments to determine the documents to which they relate and which, collectively, would encompass every single document not only regarding the Select Committee's subpoena to Bannon and his contempt charge, but also the Select Committee's "membership," "staffing," "budget," and "authority . . . to issue subpoenas." *See, e.g.*, Subpoena to Nancy Pelosi, Speaker, U.S. House of Representatives, Ex. L; Subpoena to Bennie Thompson, Chairman, Select Committee, Ex. O; Subpoena to Kristin Amerling, Chief Counsel & Deputy Staff Director, Select Committee, Ex. C.

Further, Bannon's subpoenas seek documents created or received on or after January 6, 2021—covering well over a year—and each category of documents begins by seeking to compel "all documents," "all drafts," or "any" statements. *See id.* For example, the subpoenas seek "[a]ll documents . . . regarding the establishment of the January 6th Select Committee"; "[a]ll documents . . . regarding the issuance of a subpoena to Mr. Bannon"; "[a]ny private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee"; "[a]ll documents . . . regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual"; "all documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff"; [a]ll documents . . . pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Defendant's subpoena in this matter"; and "[a]ll documents in your possession pertaining to the decision to seek to file an

amicus brief on behalf of the U.S. House of Representatives in this criminal case, and its contents." *Id.*

These expansive requests make plain that the subpoenas are not particularized demands for evidentiary material that Bannon can use at trial; they are instead a classic prohibited "fishing expedition." *Nixon*, 418 U.S. at 699-700; *see also United States v. Mays*, 246 F.3d 677, 2000 WL 1860727, at *1 (9th Cir. Dec. 18, 2000) (affirming district court's quashing of a Rule 17(c) subpoena because it requested "*all* documents relating to *any and all* disciplinary action taken by" various entities); *United States v. Louis*, No. 04-203, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005) (quashing Rule 17(c) subpoena that sought " 'any and all' documents relating to several categories of subject matter (some of them quite large), rather than specific evidentiary items"). As another court in this district has explained, "[I]f the [subpoenaing] party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused." *Libby*, 432 F. Supp. 2d at 31 (internal quotation marks omitted); *see also United States v. North*, 708 F. Supp. 402, 404 (D.D.C. 1989).

Compliance with the Bannon subpoenas would impose a mammoth burden on the Select Committee, which here is sufficient reason to quash. Under Rule 17, a court may determine that "the burden of producing subpoenaed records greatly outweighs any relevance they may have to the case." *United States v. Hardy*, 224 F.3d 752, 756 (8th Cir. 2000); *see also United States v. Bibby*, 752 F.2d 1116, 1125 (6th Cir. 1985) (affirming court's decision not to issue Rule 17 subpoena where record showed that "defendants would not be able to accomplish that which they wished to accomplish with the subpoena and that compliance with the subpoena would indeed be burdensome"). As Bannon's subpoenas' far-reaching requests illustrate, he is not focused on a

particularized search for relevant evidence: he seeks broad swaths of documents with the hope that something helpful might turn up. That is not how Rule 17 works, and his subpoenas must be quashed.

## III. Bannon Cannot Show "Extraordinary Circumstances" That Would Require the Testimony of High-Ranking Government Officials

Bannon's subpoenas should be quashed for an additional reason: high-ranking government officials may not be forced to testify about their official actions in litigation to which they are not a party, absent "extraordinary" or "exceptional" circumstances. *See, e.g.*, *United States v. Morgan*, 313 U.S. 409, 422 (1941); *Simplex*, 766 F.2d at 586-87.[13] "This rule is based on the notion that '[h]igh ranking government officials have greater duties and time constraints than other witnesses' and that, without appropriate limitations, such officials will spend an inordinate amount of time tending to pending litigation." *Bogan v. Bos.*, 489 F.3d 417, 423 (1st Cir. 2007) (quoting *In re United States ("Kessler")*, 985 F.2d 510, 512 (11th Cir. 1993). The subpoenaing party "bears the burden of proving extraordinary circumstances." *In re United States ("Bernanke")*, 542 F. App'x 944, 948 (Fed. Cir. 2013); *accord Lederman*, 731 F.3d at 203; *In re United States ("Reno & Holder")*, 197 F.3d 310, 316 (8th Cir. 1999).

The high-ranking official doctrine applies in the criminal context as well as in the civil context. *See, e.g.*, *Reno & Holder*, 197 F.3d at 310-11, 313-14, 316 (quashing capital defendant's subpoenas seeking to compel testimony of Attorney General Janet Reno and Deputy

---

[13] *Accord Warren Bank v. Camp*, 396 F.2d 52, 56-57 (6th Cir. 1968); *see also In re United States ("Bernanke")*, 542 F. App'x 944, 948 (Fed. Cir. 2013); *Lederman*, 731 F.3d at 203; *Bogan v. Bos.*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States ("Reno & Holder")*, 197 F.3d 310, 313-14 (8th Cir. 1999); *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th Cir. 1995); *In re United States ("Kessler")*, 985 F.2d 510, 512-13 (11th Cir. 1993); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979).

23

**-2104-**

Attorney General Eric Holder in support of defendant's motion to set aside jury's verdict).[14]

And it applies even after the official leaves office. *See, e.g., Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437, 440-41 (S.D.N.Y. 2014).

Members of Congress, as constitutional officers of the United States, are quintessential high-ranking government officials. *See, e.g., Springfield Terminal Ry. Co. v. United Transp. Union*, No. 89-0073, 1989 WL 225031, at *2 (D.D.C. May 18, 1989) (refusing to compel "ranking Minority Member of the House Appropriations Committee" either to testify at deposition or to produce documents because such discovery would "disrupt [his] work"); *accord Blankenship v. Fox News Network, LLC*, No. 19-CV-00236, 2020 WL 7234270, at *5-8 (S.D. W.Va. Dec. 8, 2020) (granting motion to prohibit depositions of Senators Mitch McConnell and Cory Gardner); *Moriah*, 72 F. Supp. 3d at 440-41 (granting motion to quash deposition of former Representative Eric Cantor); *Feldman v. Bd. of Educ. Sch. Dist. #1 City & Cnty. of Denver*, No. 09-CV-01049, 2010 WL 383154, at *1 (D. Colo. Jan. 28, 2010) (granting motion to prevent deposition of Senator Michael Bennet); Order Granting Mots. to Quash Subpoenas Ad Testificandum & Duces Tecum Served on Congressmen Berman, Filner, & Sherman at 2-3,

---

[14] *See also Kessler*, 985 F.2d at 511-13 (quashing criminal defendants' subpoena seeking to compel testimony of FDA commissioner in support of motion to dismiss indictment on ground of selective prosecution); *United States v. Dowdy*, 440 F. Supp. 894, 896-97 (W.D. Va. 1977) (quashing criminal defendant's subpoena seeking to compel trial testimony of district court judge whose actions, defendant claimed, "coerced her into testifying and relinquishing her Fifth Amendment privilege against self-incrimination before the grand jury" and thus whose testimony, defendant claimed, would "provid[e] her with a defense to the charge of making false statements before [the] grand jury"); *Bardoff v. United States*, 628 A.2d 86, 90 (D.C. 1993) (affirming trial court's quashal of criminal defendants' subpoenas seeking to compel testimony of Senators and Senate Committee counsel because, *inter alia*, defendants "failed to proffer any reason why others present who did not hold such high office could not provide the testimony"); *cf. United States v. Koubriti*, 305 F. Supp. 2d 723, 754, 765 (E.D. Mich. 2003) (denying criminal defendants' motion to require Attorney General John Ashcroft to show cause why he should not be held in contempt for violating court order prohibiting public communications about prosecution).

*Cano v. Davis*, No. 01-CV-08477 (C.D. Cal. Mar. 28, 2002) (recognizing that "exceptional

circumstances" needed to compel discovery from Members of Congress), attached as Ex. Q;

*Bardoff v. United States*, 628 A.2d 86, 90, 93 (D.C. 1993) (recognizing that Senators

"hold . . . high office" for purpose of this doctrine).

As the D.C. Circuit has noted, "service in the United States Congress is not a job like any

other."  *Rostenkowski*, 59 F.3d at 1312. "[T]he life of a congressman—as incumbent legislator

and perpetual candidate for office," is one in which the Member's "official day ends only after a

round of nominally 'social' events at which he is obliged to appear, and whose weekends and

holidays are only an opportunity to reconnect with his constituents."  *Id.*

High-level Congressional staff, such as Mr. Buckley and the House General Counsel are

also shielded by this doctrine.  *See McNamee v. Mass.*, No. 12-40050, 2012 WL 1665873, at *2

(D. Mass. May 10, 2012) (quashing subpoena served on House Member's former chief of staff,

who "held a position of substantial importance to the operation of that governmental body");

*Bardoff*, 628 A.2d at 90 (quashing subpoena to House Select Committee counsel); *cf. Lederman*,

731 F.3d at 203 (quashing subpoena to former deputy mayor).  As Staff Director to the Select

Committee, Mr. Buckley reports directly to Chairman Thompson, works with all Members of the

Select Committee, and supervises a large staff.  He is responsible for supervising all staff work

regarding planning and preparation for future Select Committee hearings, planning and

supervising investigative work, and overseeing production of the Select Committee's upcoming

final report.

The General Counsel to the House of Representatives reports directly to the Speaker of

the House; provides legal advice and assistance to House committees, officers and employees on

matters related to their official duties; represents the House, Members, committees, officers and

employees, both as parties and witnesses, in litigation and in connection with requests for

information arising from or relating to the performance of their official duties and

responsibilities; and supervises the staff of the Office of General Counsel.  *See* House Rule II.8.

Requiring testimony from Mr. Buckley and the House General Counsel would interfere

significantly with their official duties, which are expected to continue unabated during the period

of the trial.

Bannon plainly cannot establish "extraordinary circumstances" to justify these

subpoenas.  Ms. Amerling and Mr. Tonolli will be available to testify to relevant questions from

Bannon's counsel.  There should be no questions material to Bannon's defense that the other

subpoenaed individuals would uniquely be able to answer.  Accordingly, Bannon cannot

establish that the information he seeks is not available elsewhere.  *See, e.g.*, *Bogan*, 489 F.3d at

423 ("Depositions of high ranking officials may be permitted where the official has first-hand

knowledge related to the claim being litigated," but "even in such cases, discovery is permitted

only where it is shown that other persons cannot provide the necessary information."); *Reno &*

*Holder*, 197 F.3d at 314 ("If other persons can provide the information sought, discovery will not

be permitted against such an official."); *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir.1995) ("We

think it will be the rarest of cases . . . in which exceptional circumstances can be shown where

the testimony is available from an alternate witness."); *Kessler*, 985 F.2d at 512 (no

extraordinary circumstances where "[t]he record discloses that testimony was available from

alternate witnesses").

Furthermore, the information Bannon seeks cannot properly be deemed essential to his

case.  *See Reno & Holder*, 197 F.3d at 314 (requiring subpoenaing party to establish that high

level governmental official "possess[es] information essential to his case which is not obtainable

from another source"); *accord Blankenship*, 2020 WL 7234270, at *6; *Brennan v. Phila.*, 388 F.

Supp. 3d 516, 520 (E.D. Pa. 2019); *Hankins v. Phila.*, No. 95-1449, 1996 WL 524334, at *1

(E.D. Pa. Sept. 12, 1996).  Bannon has not established (and cannot establish) that any of the

subpoenaed Members, or Mr. Buckley, or the House General Counsel, will, in fact, provide

testimony that is in any way exculpatory or otherwise supportive of his position.  Indeed, we

have no reason to believe that this is the case.  *See* Brief of United States House of

Representatives as *Amicus Curiae* in Support of the Department of Justice (May 25, 2022) (ECF

No. 76-2).  Furthermore, as noted above, *see supra* p. 20, the issues as to which Bannon

apparently seeks this testimony are issues for the Court, not the jury.  For these reasons, Bannon

cannot satisfy his burden of proving "extraordinary circumstances."

IV.    **The Subpoena to the House General Counsel Improperly Seeks Privileged
        Information**

Request #16 in the subpoena to the House General Counsel, seeks: "All documents in

your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S.

House of Representatives in this criminal case, and it[s] contents."  Subpoena to Douglas Letter,

General Counsel, U.S. House of Representatives, Ex. B.  Request #22 seeks:

> All documents in your possession that informed the position you took in your
> November 2, 2021, FBI interview that the Select Committee lacked a ranking
> minority member, as well as all documents that lead you to change this position in
> the amicus brief filed in this matter on May 10, 2022, wherein you state that Rep.
> Liz Cheney (WY) is the ranking minority member.

*Id.*  These requests seek information protected by the attorney-client privilege and work-protect

protection, and should be quashed.  *See, e.g.*, *United States v. Hoeffner*, 254 F.R.D. 302, 307

(S.D. Tex. 2008) (quashing Rule 17(c)(2) subpoena to non-party because compliance "would

require the disclosure of privileged and protected matter"); *United States v. Reyes*, 239 F.R.D.

591, 598 (N.D. Cal. 2006) (a Rule 17(c) subpoena "should be quashed or modified if it calls for privileged matter") (internal quotation marks omitted).

Bannon is free to have his counsel present to this Court arguments against the points made in that amicus brief.  But to the extent he requests communications between the House General Counsel and House personnel, they are obviously protected by the attorney-client privilege.  *See, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1269 (D.C. Cir. 1998) (discussing government attorney-client privilege); *Upjohn Co. v. United States*, 449 U.S. 383, 389-97 (1981).  To the extent documents exist that are responsive to this request, but do not include such communications, they constitute attorney work-product, because they will reflect the "mental impressions" of the House General Counsel.  *See generally Hickman v. Taylor*, 329 U.S. 495 (1947).  Work protect protection extends to documents "prepared or obtained because of the prospect of litigation."  *Equal Emp. Opportunity Comm'n v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (internal quotation marks omitted).  By definition, all documents relating to the prosecution of Bannon, and the House's decision to file an amicus brief, meet this test.  Indeed, "disclosing information that reveals a behind-the-scenes account of the [House's] litigation decisions could also undermine the adversary process, something the work-product privilege is designed to protect."  *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 800 F. Supp. 2d 202, 216-17 (D.D.C. 2011).  While the work product doctrine is not absolute, Bannon does not and cannot make any showing as to why he can defeat it here.

## CONCLUSION

For the reasons stated above, the subpoenas to the Members of Congress, Select Committee staff members, and the House General Counsel should be quashed.  As explained above, the Select Committee is willing to make staff members Kristin Amerling and Sean Tonolli available for appropriately tailored testimony at Bannon's request.

Respectfully submitted,

DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

June 13, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2022, I caused the foregoing document to be filed with

the Court and served on the parties via electronic mail.

Douglas N. Letter

# Exhibit A

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   David Buckley
      Staff Director, January 6th Select Committee
      United States House of Representatives

       **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

       You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).

       _(SEAL)_

Date:   _06/07/2022_

                                                    _CLERK OF COURT_

                                                    _____
                                                    Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)              David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202     2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                           Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com              Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*    David Buckley, Staff Director, Jan. 6th Select Comm.

was received by me on *(date)*    06/02/2022    .

☑ I served the subpoena by delivering a copy to the named person as follows:    Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.    on *(date)*    06/03/2022    ; or

☐ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    06/10/2022                              /s/ Robert J. Costello
                                                    *Server's signature*

                              Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                    *Printed name and title*

                                          605 Third Avenue
                                          New York, New York 10158

                                                    *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL**

**IN A CRIMINAL CASE**, to bring with you documents and electronically stored information

that pertain to your appearance as a witness in this matter, described in detail below. Please

provide the documents in electronic format to dcaimona@silvermanthompson.com at any time

prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial

Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after

**January 6, 2021**, up to the present date.

The term "**document**" –  used in the numbered paragraphs below – means any written,

recorded, or graphic matter of any nature whatsoever, regardless of classification level, how

recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy,

including, but not limited to, the following: memoranda, reports, expense reports, books,

manuals, instructions, financial reports, data, working papers, records, notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses,

communications, electronic mail (email), contracts, cables, notations of any type of conversation,

telephone call, meeting or other inter-office or intra-office communication, bulletins, printed

matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes,

invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates,

projections, comparisons, messages, correspondence, press releases, circulars, financial

statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and

work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes,

and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation,

photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures),

and electronic, mechanical, and electric records or representations of any kind (including,

without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or

other graphic or recorded matter of any kind or nature, however produced or reproduced, and

whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any

notation not a part of the original text is to be considered a separate document. A draft or non-

identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all

documents in your custody, and control — including any documents or communications stored

or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in

personal, professional, or campaign accounts, and/or on personal, professional, or campaign

applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit B

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.   21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Douglas Letter, Esq.
       General Counsel
       United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.:  19 |
|---|---|---|
| | | Date and Time:  07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:   06/07/2022

                                                    *CLERK OF COURT*

                                                    _____
                                                    *Signature of Clerk or Deputy Clerk*

---

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)                David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202      2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                             Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com               Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

**-2120-**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Douglas Letter, Esq., General Counsel, U.S. House of Reps.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

personally accepted by Douglas Letter, Esq., General Counsel, U.S. House of Representatives.

_____   on *(date)*   06/03/2022   ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                         /s/ Robert J. Costello
                                        *Server's signature*

                         Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                        *Printed name and title*
                                          605 Third Avenue
                                      New York, New York 10158

                                        *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M**.

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation,

photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures),

and electronic, mechanical, and electric records or representations of any kind (including,

without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or

other graphic or recorded matter of any kind or nature, however produced or reproduced, and

whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any

notation not a part of the original text is to be considered a separate document. A draft or non-

identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all

documents in your custody, and control — including any documents or communications stored

or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in

personal, professional, or campaign accounts, and/or on personal, professional, or campaign

applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

21. All documents in your possession pertaining to your November 2, 2021, FBI interview, including, but not limited to, any subpoenas served upon you to secure your appearance, any statement you prepared in advance of the interview, and any documents you produced to the FBI pursuant to this interview.

22. All documents in your possession that informed the position you took in your November 2, 2021, FBI interview that the Select Committee lacked a ranking minority member, as well as all documents that lead you to change this position in the amicus brief filed in this matter on May 10, 2022, wherein you state that Rep. Liz Cheney (WY) is the ranking minority member.

Case 1:22-mc-00060-CJN   Document 1-1   Filed 06/13/22   Page 15 of 116

# Exhibit C

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:  Kristen Amerling, Esq.
     Chief Counsel and Deputy Staff Director, January 6th Select Committee
     United States House of Representatives

   **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

   You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).

   _(SEAL)_

Date: _06/07/2022_

_CLERK OF COURT_

_Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_    Stephen K. Bannon
_____, who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)          David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202    2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                        Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com           Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*    Kristen Amerling, Esq.

was received by me on *(date)*    06/02/2022    .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                              on *(date)*        06/03/2022      ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:    06/10/2022                         /s/ Robert J. Costello
_____                  _____
                                        *Server's signature*

                                   Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                   _____
                                        *Printed name and title*

                                        605 Third Avenue
                                        New York, New York 10158

                                   _____
                                        *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit D

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Pete Aguilar (CA)
       Member, January 6th Select Committee
       United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:  ___06/07/2022___

                                                        *CLERK OF COURT*

                                                        _____
                                                        *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  ___Stephen K. Bannon___
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)                David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202       2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                              Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com                 Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

**-2134-**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Pete Aguilar (CA), Member, Jan. 6th Select Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                              on *(date)*      06/03/2022      ; or

☐ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:      06/10/2022                          /s/ Robert J. Costello
                                        _____
                                              *Server's signature*

                                        Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                        _____
                                              *Printed name and title*

                                              605 Third Avenue
                                              New York, New York 10158

                                        _____
                                              *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL**

**IN A CRIMINAL CASE**, to bring with you documents and electronically stored information

that pertain to your appearance as a witness in this matter, described in detail below. Please

provide the documents in electronic format to dcaimona@silvermanthompson.com at any time

prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial

Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after

**January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written,

recorded, or graphic matter of any nature whatsoever, regardless of classification level, how

recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy,

including, but not limited to, the following: memoranda, reports, expense reports, books,

manuals, instructions, financial reports, data, working papers, records, notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses,

communications, electronic mail (email), contracts, cables, notations of any type of conversation,

telephone call, meeting or other inter-office or intra-office communication, bulletins, printed

matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes,

invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates,

projections, comparisons, messages, correspondence, press releases, circulars, financial

statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and

work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes,

and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14.  All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit E

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Liz Cheney (WY)
       Vice-Chair, January 6th Select Committee
       United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:    06/07/2022

                                                        *CLERK OF COURT*

                                                        _____
                                                        *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)              David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202    2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                            Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com              Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Liz Cheney (WY), Vice-Chair, Jan. 6th Select Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                         on *(date)*      06/03/2022      ; or

☐ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:     06/10/2022                                    /s/ Robert J. Costello
                                                    _____
                                                              *Server's signature*

                                                    Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                    _____
                                                              *Printed name and title*

                                                              605 Third Avenue
                                                         New York, New York 10158
                                                    _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

**SCHEDULE A**

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

Case 1:22-mc-00060-CJN   Document 1-1   Filed 06/13/22   Page 36 of 116

# Exhibit F

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Jim Clyburn (SC)
        United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

(SEAL)

Date:    06/07/2022

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt St., Suite 900, Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com

David I. Schoen (D.C. Bar No. 391408)
2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (334) 395-6611
Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

**-2148-**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

### PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Jim Clyburn (SC), House Majority Whip

was received by me on *(date)*   06/02/2022   .

❑  I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.   on *(date)*   06/03/2022   ; or

❑  I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                                   /s/ Robert J. Costello
                                                   *Server's signature*

                                   Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                   *Printed name and title*

                                                   605 Third Avenue
                                                   New York, New York 10158

                                                   *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation,

photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures),

and electronic, mechanical, and electric records or representations of any kind (including,

without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or

other graphic or recorded matter of any kind or nature, however produced or reproduced, and

whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any

notation not a part of the original text is to be considered a separate document. A draft or non-

identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all

documents in your custody, and control — including any documents or communications stored

or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in

personal, professional, or campaign accounts, and/or on personal, professional, or campaign

applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit G

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Stephen K. Bannon | ) Case No.  21-cr-670 |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Steny Hoyer (MD)
       United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:    06/07/2022
       _____

                                                   *CLERK OF COURT*

                                                   _____
                                                   *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)                David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202       2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                              Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com                 Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*    Rep. Steny Hoyer (MD), House Majority Leader

was received by me on *(date)*    06/02/2022    .

☑ I served the subpoena by delivering a copy to the named person as follows:    Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.    on *(date)*    06/03/2022    ; or

❑ I returned the subpoena unexecuted because:

_____    .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____    for travel and $ _____    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    06/10/2022                                    /s/ Robert J. Costello
                                                    *Server's signature*

                                        Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                    *Printed name and title*

                                                    605 Third Avenue
                                                    New York, New York 10158

                                                    *Server's address*

Additional information regarding attempted service, etc:

<u>**SCHEDULE A**</u>

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7. All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8. All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9. Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit H

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Representative Adam Kinzinger (IL)
      Member, January 6th Select Committee
      United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:   06/07/2022

                                                *CLERK OF COURT*

                                                _____
                                                *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)              David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202     2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                           Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com              Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*    Rep. Adam Kinzinger (IL), Member, Jan. 6th Select Comm.

was received by me on *(date)*    06/02/2022    .

☑ I served the subpoena by delivering a copy to the named person as follows:    Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.    on *(date)*    06/03/2022    ; or

☐ I returned the subpoena unexecuted because:

.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____    for travel and $ _____    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    06/10/2022    /s/ Robert J. Costello

*Server's signature*

Robert J. Costello, Esq., Attorney for Stephen K. Bannon

*Printed name and title*

605 Third Avenue
New York, New York 10158

*Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit I

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:  Representative Zoe Lofgren (CA)
     Member, January 6th Select Committee
     United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).

        _(SEAL)_

Date:    06/07/2022

                                                        _CLERK OF COURT_

                                                        _Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt St., Suite 900, Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com

David I. Schoen (D.C. Bar No. 391408)
2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (334) 395-6611
Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* ___Rep. Zoe Lofgren (CA), Member, Jan. 6th Select Comm.___

was received by me on *(date)* ___06/02/2022___ .

☑ I served the subpoena by delivering a copy to the named person as follows: ___Sent via electronic means and___

___accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,___

___U.S. House of Representatives.___ on *(date)* ___06/03/2022___ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: ___06/10/2022___                          ___/s/ Robert J. Costello___
                                                            *Server's signature*

                                              ___Robert J. Costello, Esq., Attorney for Stephen K. Bannon___
                                                            *Printed name and title*

                                                          605 Third Avenue
                                                    New York, New York 10158

                                                _____
                                                            *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation,

photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures),

and electronic, mechanical, and electric records or representations of any kind (including,

without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or

other graphic or recorded matter of any kind or nature, however produced or reproduced, and

whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any

notation not a part of the original text is to be considered a separate document. A draft or non-

identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all

documents in your custody, and control — including any documents or communications stored

or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in

personal, professional, or campaign accounts, and/or on personal, professional, or campaign

applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7. All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8. All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9. Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit J

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Elaine Luria (VA)
       Member, January 6th Select Committee
       United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:    06/07/2022

                                                          *CLERK OF COURT*

                                                          _____
                                                          *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)               David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202      2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                             Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com                Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Elaine Luria (VA), Member, Jan. 6th Select Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                        on *(date)*        06/03/2022        ; or

❒ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____  .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                             /s/ Robert J. Costello
                                            _____
                                                        *Server's signature*

                                            Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                            _____
                                                        *Printed name and title*

                                                        605 Third Avenue
                                                        New York, New York 10158

                                            _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

**<u>SCHEDULE A</u>**

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL**

**IN A CRIMINAL CASE**, to bring with you documents and electronically stored information

that pertain to your appearance as a witness in this matter, described in detail below. Please

provide the documents in electronic format to dcaimona@silvermanthompson.com at any time

prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial

Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after

**January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written,

recorded, or graphic matter of any nature whatsoever, regardless of classification level, how

recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy,

including, but not limited to, the following: memoranda, reports, expense reports, books,

manuals, instructions, financial reports, data, working papers, records, notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses,

communications, electronic mail (email), contracts, cables, notations of any type of conversation,

telephone call, meeting or other inter-office or intra-office communication, bulletins, printed

matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes,

invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates,

projections, comparisons, messages, correspondence, press releases, circulars, financial

statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and

work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes,

and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

## Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14.  All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit K

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Stephanie Murphy (FL)
        Member, January 6th Select Committee
        United States House of Representatives


    **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.:  19 |
|---|---|---|
| | | Date and Time:  07/18/2022 9:00 am |

    You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).


    _(SEAL)_


Date:  ___06/07/2022___

                                                        _CLERK OF COURT_

                                                        _____
                                                        _Signature of Clerk or Deputy Clerk_


The name, address, e-mail, and telephone number of the attorney representing _(name of party)_    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)            David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202    2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                            Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com            Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Stephanie Murphy (FL), Member, Jan. 6th Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                        on *(date)*        06/03/2022         ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:    06/10/2022                          /s/ Robert J. Costello
                                          *Server's signature*

                              Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                          *Printed name and title*

                                          605 Third Avenue
                                          New York, New York 10158

                                          *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL**

**IN A CRIMINAL CASE**, to bring with you documents and electronically stored information

that pertain to your appearance as a witness in this matter, described in detail below. Please

provide the documents in electronic format to dcaimona@silvermanthompson.com at any time

prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial

Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after

**January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written,

recorded, or graphic matter of any nature whatsoever, regardless of classification level, how

recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy,

including, but not limited to, the following: memoranda, reports, expense reports, books,

manuals, instructions, financial reports, data, working papers, records, notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses,

communications, electronic mail (email), contracts, cables, notations of any type of conversation,

telephone call, meeting or other inter-office or intra-office communication, bulletins, printed

matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes,

invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates,

projections, comparisons, messages, correspondence, press releases, circulars, financial

statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and

work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes,

and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

**Documents That Must Be Produced**

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14.  All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit L

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Nancy Pelosi (CA)
       Speaker of the House
       United States House of Representatives

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

*(SEAL)*

Date:   06/07/2022

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*      Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt St., Suite 900, Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com

David I. Schoen (D.C. Bar No. 391408)
2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (334) 395-6611
Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Nancy Pelosi (CA), Speaker of the House

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                          on *(date)*   06/03/2022   ; or

☐ I returned the subpoena unexecuted because:

.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$                          .

My fees are $                     for travel and $                     for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                               /s/ Robert J. Costello
                                                *Server's signature*

                                      Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                *Printed name and title*

                                                605 Third Avenue
                                                New York, New York 10158


                                                *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL**

**IN A CRIMINAL CASE**, to bring with you documents and electronically stored information

that pertain to your appearance as a witness in this matter, described in detail below. Please

provide the documents in electronic format to dcaimona@silvermanthompson.com at any time

prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial

Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after

**January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written,

recorded, or graphic matter of any nature whatsoever, regardless of classification level, how

recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy,

including, but not limited to, the following: memoranda, reports, expense reports, books,

manuals, instructions, financial reports, data, working papers, records, notes, letters, notices,

confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses,

communications, electronic mail (email), contracts, cables, notations of any type of conversation,

telephone call, meeting or other inter-office or intra-office communication, bulletins, printed

matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes,

invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates,

projections, comparisons, messages, correspondence, press releases, circulars, financial

statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and

work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes,

and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation,

photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures),

and electronic, mechanical, and electric records or representations of any kind (including,

without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or

other graphic or recorded matter of any kind or nature, however produced or reproduced, and

whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any

notation not a part of the original text is to be considered a separate document. A draft or non-

identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all

documents in your custody, and control — including any documents or communications stored

or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in

personal, professional, or campaign accounts, and/or on personal, professional, or campaign

applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1.  All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2.  All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3.  All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4.  All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5.  All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6.  All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

# Exhibit M

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| _____ | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Jamie Raskin (MD)
       Member, January 6th Select Committee
       United States House of Representatives

       **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

       You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

       *(SEAL)*

Date:    06/07/2022
_____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)            David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202    2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                         Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com            Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Jamie Raskin (MD), Member, Jan. 6th Select Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                          on *(date)*   06/03/2022   ; or

☐ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                                   /s/ Robert J. Costello
                                                    *Server's signature*

                                   Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                    *Printed name and title*

                                                    605 Third Avenue
                                                    New York, New York 10158

                                                    *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M**.

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14.  All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with Mr. Bannon in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

21. All contracts and agreements in your possession pertaining to your book, *Unthinkable: Trauma, Truth, and the Trials of American Democracy*.

# Exhibit N

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Representative Adam Schiff (CA)
      Member, January 6th Select Committee
      United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:
See Schedule A (attached).

        *(SEAL)*

Date:   06/07/2022

                                              *CLERK OF COURT*

                                              _____
                                              *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt St., Suite 900, Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com

David I. Schoen (D.C. Bar No. 391408)
2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (334) 395-6611
Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*  Rep. Adam Schiff (CA), Member, Jan. 6th Select Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                              on *(date)*      06/03/2022        ; or

☐ I returned the subpoena unexecuted because:

.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$                          .

My fees are $                    for travel and $                    for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date:      06/10/2022                              /s/ Robert J. Costello
                                                   *Server's signature*

                                    Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                   *Printed name and title*

                                                   605 Third Avenue
                                                   New York, New York 10158

                                                   *Server's address*

Additional information regarding attempted service, etc:

**-2205-**

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M**.

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

## Documents That Must Be Produced

1. All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2. All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3. All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4. All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5. All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6. All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

21. All contracts and agreements in your possession pertaining to your book, *Midnight in Washington: How We Almost Lost Our Democracy and Still Could*.

# Exhibit O

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    Representative Bennie Thompson (MS)
       Chairman, January 6th Select Committee
       United States House of Representatives

      **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

      You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).

       _(SEAL)_

Date:    06/07/2022

                                        _CLERK OF COURT_

                                        _____
                                        Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)              David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202     2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                            Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com               Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

**-2211-**

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Rep. Bennie Thompson (MS), Chairman, Jan. 6th Comm.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                             on *(date)*        06/03/2022        ; or

❏ I returned the subpoena unexecuted because:

.

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:        06/10/2022                                    /s/ Robert J. Costello
                                                   _____
                                                            *Server's signature*

                                                   Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                                   _____
                                                            *Printed name and title*

                                                            605 Third Avenue
                                                   New York, New York 10158

                                                   _____
                                                            *Server's address*

Additional information regarding attempted service, etc:

<u>**SCHEDULE A**</u>

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M**.

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" – used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1.  All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2.  All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3.  All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4.  All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5.  All drafts in your possession of the October 8, 2021, letter from you to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6.  All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7. All drafts in your possession of the October 15, 2021, letter from you to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8. All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9. Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14. All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from you to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in your October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

21. All documents in your possession which support the allegations made in your Complaint in *Hon. Bennie G. Thompson, et al. v. Donald J. Trump, et al.*, 1:21-cv-0400-APM (D.D.C. 2021).

# Exhibit P

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Stephen K. Bannon | ) | Case No.  21-cr-670 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Sean Tonolli, Esq.
      Senior Investigative Counsel, January 6th Select Committee
      United States House of Representatives

        **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court for the District of Columbia | Courtroom No.: | 19 |
|---|---|---|---|
| | | Date and Time: | 07/18/2022 9:00 am |

        You must also bring with you the following documents, electronically stored information, or objects _(blank if not applicable)_:
See Schedule A (attached).

(SEAL)

Date:  _06/07/2022_

                                                        _CLERK OF COURT_

                                                        _____
                                                        Signature of Clerk or Deputy Clerk_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_    Stephen K. Bannon
_____ , who requests this subpoena, are:

M. Evan Corcoran (D.C. Bar No. 440027)          David I. Schoen (D.C. Bar No. 391408)
400 E. Pratt St., Suite 900, Baltimore, MD 21202     2800 Zelda Rd., Suite 100-6, Montgomery, AL 36106
Telephone: (410) 385-2225                        Telephone: (334) 395-6611
Email: ecorcoran@silvermanthompson.com           Email: schoenlawfirm@gmail.com

Robert J. Costello (Pro Hac Vic Pending)
605 Third Ave., New York, NY 10158
Telephone: (212) 557-7200
Email: rjc@dhclegal.com

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   21-cr-670

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)*   Sean Tonolli, Esq.

was received by me on *(date)*   06/02/2022   .

☑ I served the subpoena by delivering a copy to the named person as follows:   Sent via electronic means and

accepted on behalf of named individual by authorized representative Douglas Letter, Esq., General Counsel,

U.S. House of Representatives.                    on *(date)*     06/03/2022     ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:   06/10/2022                    /s/ Robert J. Costello
                                _____
                                        *Server's signature*

                                Robert J. Costello, Esq., Attorney for Stephen K. Bannon
                                _____
                                        *Printed name and title*

                                        605 Third Avenue
                                        New York, New York 10158

                                _____
                                        *Server's address*

Additional information regarding attempted service, etc:

**-2219-**

## SCHEDULE A

**YOU ARE COMMANDED**, pursuant to this **SUBPOENA TO TESTIFY AT TRIAL IN A CRIMINAL CASE**, to bring with you documents and electronically stored information that pertain to your appearance as a witness in this matter, described in detail below. Please provide the documents in electronic format to dcaimona@silvermanthompson.com at any time prior to **July 14, 2022**, or, in the alternative, please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022, at 9:00 A.M.**

The **COMMAND** for production is limited to documents created or received on or after **January 6, 2021**, up to the present date.

The term "**document**" –  used in the numbered paragraphs below – means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and

graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recording and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

The phrase "**in your possession**" – used in the numbered paragraphs below – means all documents in your custody, and control — including any documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal, professional, or campaign accounts, and/or on personal, professional, or campaign applications (e.g. email accounts, contact lists, calendar entries, etc.).

### Documents That Must Be Produced

1.  All documents in your possession regarding the establishment of the January 6th Select Committee ("Select Committee"), its membership, its staffing, its budget, its authority and functioning, and the authority of the Select Committee to issue subpoenas.

2.  All documents in your possession regarding Mr. Bannon's appearance as a witness and/or production of documents.

3.  All documents in your possession regarding the issuance of a subpoena to Mr. Bannon.

4.  All documents in your possession regarding President Donald J. Trump's assertion of executive privilege in response to any request of the Select Committee.

5.  All drafts in your possession of the October 8, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

6.  All documents and information in your possession regarding attendance on October 14, 2021, by Select Committee members and staff at the hearing room designated for the appearance of Mr. Bannon.

7.  All drafts in your possession of the October 15, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel for Mr. Bannon.

8.  All documents in your possession regarding what constitutes a default by a witness in response to a Select Committee subpoena, and/or what does not constitute a default by a witness in response to a Select Committee subpoena.

9.  Any private or public statement(s) by you and/or in your possession regarding Mr. Bannon's interaction with the Select Committee.

10. All documents in your possession regarding the factors to be considered in determining whether to bring a civil or criminal action or other sanction for an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

11. All documents in your possession pertaining to the consideration of whether to pursue a civil enforcement proceeding with respect to Mr. Bannon's subpoena and the invocation of executive privilege.

12. All documents in your possession regarding the applicability of the advice of counsel defense to an alleged failure to comply with a Congressional subpoena, involving Mr. Bannon or any other individual.

13. All documents in your possession that reference making an example of Mr. Bannon, punishing him, hoping to influence or affect the conduct of other potential witnesses before the Select Committee, or words or similar meaning and effect.

14.  All documents in your possession which tend to show the bias of any Select Committee member or staff (including animosity toward Mr. Bannon, or animosity toward a group with which Mr. Bannon is affiliated).

15. All documents in your possession which tend to show a conflict of interest involving any Select Committee member or staff (including but not limited to documents that pertain to payments for a book that was written by and/or promoted by any Select Committee member or staff from January 6, 2021, up until the present date).

16. All documents in your possession pertaining to the decision to seek to file an amicus brief on behalf of the U.S. House of Representatives in this criminal case, and it contents.

17. All documents in your possession reflecting any efforts by the Select Committee to work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

18. All documents in your possession pertaining to the Select Committee's decision to deviate from precedent and not work towards an accommodation with respect to Mr. Bannon's subpoena in this matter.

19. All drafts in your possession of the October 19, 2021, letter from the Select Committee Chair to Robert J. Costello, Esquire, counsel to Mr. Bannon.

20. All documents in your possession pertaining to the Select Committee's decision, as memorialized in the Select Committee Chair's October 19, 2021, letter to Mr. Costello, to not grant Mr. Bannon a one-week adjournment to assess the impact of the *Donald J. Trump v. Bennie Thompson, et al.*, 21-cv-02769 (D.D.C. 2021) lawsuit.

Case 1:22-mc-00060-CJN   Document 1-1   Filed 06/13/22   Page 113 of 116

# Exhibit Q

**UNITED STATES DISTRICT COURT**                    **P SEND**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES - GENERAL**</u>

Case No.: CV 01-08477 MMM (RCx)                    Date: March 28, 2002

Title:  *Cano, et al. v. Davis, et al.*

---

**DOCKET ENTRY**

---

**PRESENT:**

**HONORABLE STEPHEN REINHARDT, UNITED STATES CIRCUIT JUDGE;**
**HONORABLE CHRISTINA SNYDER, UNITED STATES DISTRICT JUDGE;**
**HONORABLE MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE**

|  |  |
|---|---|
| **Anel Huerta** | **N/A** |
| **Deputy Clerk** | **Court Reporter** |

Attorneys Present for Plaintiff(s):        Attorneys Present for Defendant(s):
None                                        None

**PROCEEDINGS:**  **Order Granting Motions To Quash Subpoenas Ad Testificandum And**
                  **Duces Tecum Served On Congressmen Berman, Filner, And Sherman**

      Pursuant to the stipulation of counsel, Local Rule 7-15 and Rule 78 of the Federal Rules of Civil Procedure, the court vacated the March 26, 2002 hearing on the motions of Congress Members Howard Berman, Brad Sherman and Bob Filner to quash the subpoenas ad testificandum and duces tecum served on them by plaintiffs, and found the matter suitable for decision without oral argument.  Having considered the briefs submitted by counsel, the court grants the motions as set forth below.

      On February 13, 2002, plaintiffs served a staff member in Congress Member Sherman's Woodland Hills office with subpoenas compelling him to appear for deposition and produce documents.[1]  The subpoena ad testificandum noticed Sherman's deposition in Los Angeles on March 14, 2002, when Sherman was scheduled to be in Washington D.C.[2]  The subpoena duces tecum required production by Sherman, his agents and staff of a broad range of documents

---

    [1]See Memorandum of Law In Support of motion to Quash Third Party Subpoenas to Congressman Brad Sherman ("Sherman Mot.") at 3:16-19.

    [2]See *id.* at 4:34; Ex. A.

APR - 4 2002

regarding the 2000-2001 redistricting process.[3]  On February 14, 2002, plaintiffs served subpoenas on Congress Member Berman's District Office in Mission Hills.  While plaintiffs notified the parties that they planned to serve subpoenas on Congress Member Filner, such service has not been effected to date.[4]

        "Exceptional circumstances" are necessary to compel discovery from high ranking government officials.  See *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993) (per curiam) (holding that high ranking government officials ". . . 'should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.'. . . [They] have greater duties and time constraints than other witnesses . . . ," quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985)).  See also *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (affirming "a settled rule . . . that 'exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted,'" quoting *In re Officer of Inspector General,* 933 F.2d 276, 278 (5th Cir. 1991)); *Kyle Engineering Company v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) ("Heads of government agencies are not normally subject to deposition").

        Courts have articulated a variety of factors relevant in assessing whether exceptional circumstances are present.  Among the factors courts examine is whether the high ranking official "possess information essential to [the] case which is not obtainable from another source . . . ." *In re United States (Reno)*, 197 F.3d 310, 314 (8th Cir. 1999) (citing *In re FDIC*, *supra*, 58 F.3d at 1062).  The Eighth Circuit, in fact, has gone so far as to state that the party seeking discovery must "show an entitlement to the relief sought in the case."  *In re United States (Reno)*, *supra*, 197 F.3d at 314.  See also *In re FDIC*, *supra*, 58 F.3d at 1062 (denying defendants the right to depose high ranking officials of the FDIC after the agency brought a declaratory relief action because there was not "a strong showing of bad faith or improper behavior" in the record, "notwithstanding Pacific Union's allegations of misconduct (including conspiracy and cover-up) and assertions of gross abuse of power by government agencies and officials").

        Plaintiffs assert that the Congress Members possess evidence relevant to the California Legislature's intent in enacting the redistricting plan, and that such evidence is relevant both to their Fourteenth Amendment and Voting Rights Act claims.  It is clear, however, that with respect to both species of claim, plaintiffs must, in addition to proving intent, also prove that the Legislature's redistricting plan had a discriminatory effect on Latino voters. See, e.g., *Voinovich v. Quilter*, 507 U.S. 146, 155 (1993) ("Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter"); *Davis*

---

[3]See *id.* at 4:5-8; Ex. B.

[4]See Memorandum in Support of Motion of Congressmen Filner and Berman to Quash Subpoenas ("Berman/Filner Mot.") at 5:14-24.  Neither the Berman nor the Sherman subpoena was properly served as required by Rule 45 of the Federal Rules of Civil Procedure.

*v. Bandemer*, 478 U.S. 109, 127 (1986) (to prevail on Fourteenth Amendment vote dilution claim, plaintiffs must prove intentional discrimination against an identifiable political group; and an actual discriminatory effect on that group); *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) ("Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result").

The Senate defendants have filed motions for summary judgment asserting that plaintiffs cannot raise a triable issue of fact regarding the discriminatory effect of the redistricting plan in the challenged State Senate and Congressional districts. Defendants' motions also challenge, *inter alia*, the legal merit of plaintiffs' claim under *Shaw v. Reno*, 509 U.S. 630 (1993). The Congress Members argue that, until these motions are decided, and it is determined both that plaintiffs have adduced sufficient evidence of discriminatory effect to move beyond summary judgment, and that plaintiffs' *Shaw* claim is legally tenable,[5] they cannot demonstrate that the Congress Members' deposition testimony is "essential" to their case. They argue further that plaintiffs cannot make a sufficient showing of entitlement to relief on the merits to warrant compelling the discovery under the "exceptional circumstances" standard applicable to high ranking officials.

The Supreme Court has cautioned that district courts adjudicating legislative redistricting claims must be mindful of "the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at various stages of litigation and determining whether to permit discovery or trial to proceed." *Miller v. Johnson*, 515 U.S. 900, 916-17 (1995). Coupled with the "exceptional circumstances" standard applicable to depositions and discovery requests served on high ranking government officials, *Miller* counsels that the present subpoenas be quashed until such time following disposition of defendants' summary judgment motions as the court determines that discovery regarding issues of intent is appropriate.[6]



Initials of Deputy Clerk

cc:     Counsel of record (or parties)

---

[5]Defendants have raised substantial questions as to whether the challenged districts are of the type that can be the subject of a successful *Shaw* claim. The court believes it prudent to resolve that legal issue before addressing the factual merits of the claim or authorizing discovery relevant to it.

[6]It is true, as plaintiffs note, that the court, in its order denying plaintiffs' application for temporary restraining order, stated that it believed plaintiffs presented sufficiently serious questions to make the case a fair ground for litigation. The court also stated, however, that it could not conclude on the limited record before it that plaintiffs would probably succeed on the merits of their claims. It is precisely the limited nature of the temporary restraining order record that leads the court to conclude that any assessment as to whether the Congress Members' testimony is "essential" should await resolution of the pending summary judgment motions.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE NON-PARTY SUBPOENAS ) ) ) ) ) ) | Case No. _____ |
| UNITED STATES OF AMERICA ) ) ) v. ) STEPHEN K. BANNON, ) ) *Defendant*. ) ) ) | Criminal No. 21-670 (CJN) |

### [PROPOSED] ORDER GRANTING
### MOTION TO QUASH

UPON CONSIDERATION of the Motion to Quash by the Honorable Nancy Pelosi, the

Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B.

Schiff, the Honorable James B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine

G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable

Adam D. Kinzinger, the Honorable Jim Clyburn, the Honorable Steny Hoyer, David Buckley,

Douglas Letter, Kristen Amerling, and Sean Tonolli, it is hereby

**ORDERED** that the motion is **GRANTED**.

**SO ORDERED.**

Dated: _____

_____
THE HONORABLE CARL J. NICHOLS
United States District Judge