**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————

## JOINT APPENDIX
### Volume VI of XII
### (Pages: 2229 - 2693)

————————

David I. Schoen
LAW OFFICE OF
 DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

## TABLE OF CONTENTS
## Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Indictment**
    **filed November 12, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
    **on November 15, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
    **on November 18, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
    **on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
    **filed February 4, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **158**

    **Exhibits:**

    1.    **Letter**
            **dated January 14, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **186**

    2.    **Letter**
            **dated January 28, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . **194**

**Exhibits** to
**Defendant's Motion to Compel Discovery**
**filed February 4, 2022, Continued:**

3.    Letter
        dated October 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.    **FBI Interview of Robert J. Costello, Esquire**
        dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.    **H. Res. 503, Sec. 5(c)(6)(A) & (B)**
        dated June 20, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.    **Procedures Adopted by 117th Congress**
      **Regulations for Use of Deposition Authority**
        dated January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.    **FBI Interview of U.S. House of Representatives**
      **General Counsel Doug Letter**
        dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.    **Letter from Ronald C. Machen Jr., U.S. Attorney,**
      **to Speaker of the House John A. Bohner**
        dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.    **Prosecution for Contempt of Congress of an**
      **Executive Branch Official Who Has Asserted a**
      **Claim of Executive Privilege**
        8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.    **Attempted Exclusion of Agency Counsel from**
      **Congressional Depositions of Agency**
      **Employees, Slip Op.**
        dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

**Government's Motion** *in Limine* **to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,**

**With Attachment,**

  filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

  Attachment:

  Letter

   dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

**Defendant's Opposition to Government Motion** *in Limine* **on Advice of Counsel,**

**With Exhibit,**

  filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

  Exhibit:

  1.   Declaration of Robert J. Costello, Esquire
     sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

**Defendant's Reply in Support of His Motion to Compel Discovery,**

**With Exhibit,**

  filed March 8, 2022.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

  Exhibit:

  1.   Table That Sets Forth the Positions
     Taken by the Government and Defense. . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel, With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**Exhibits:**

1.    **E-mail Correspondence [US-001038-40]**
**various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark**
**dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel**
**dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello**
**dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel**
**dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain**
**dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange**
**dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument
Before the Honorable Carl J. Nichols
        on March 16, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **457**

**Defendant's Surreply to the Government's Reply in Support of its
Motion** *in Limine* **to Exclude Evidence or Argument Relating to
Good-faith Reliance on Law or Advice of Counsel
        filed March 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **556**

**Defendant's Supplemental Brief in Opposition to the
Government's Motion** *in Limine* **on Advice of Counsel,
With Exhibits,
        filed March 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **565**

        **Exhibits:**

    1.    **Senate Committee Investigation
                dated August 8, 1958.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **577**

    2.    **Application of 28 U.S.C. § 458 to Presidential
        Appointments of Federal Judges
                dated December 18, 1995.**. . . . . . . . . . . . . . . . . . . . . . . . . . . **584**

    3.    **Letter from Michael B. Mukasey, Attorney
        General, to the Hon. Nancy Pelosi, Speaker of the
        House of Representatives
                dated February 29, 2008.**. . . . . . . . . . . . . . . . . . . . . . . . . . . **599**

**Exhibits** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
  filed March 22, 2022, Continued:

4.  Response to Congressional Requests for
    Information Regarding Decisions Made Under the
    Independent Counsel Act,
      10 Op. O.L.C. 68 (1986)............................. 601

5.  Rex Lee, Executive Privilege, Congressional Subpoena
    Power, and Judicial Review: Three Branches,
    Three Powers, and Some Relationships,
      1978 B.Y.U. L. Rev. 231, 259........................ 619

6.  Whether the Department of Justice May Prosecute
    White House Officials for Contempt of Congress,
      2008 WL 11489049 (O.L.C.). ........................ 688

7.  Congressional Oversight of the White House,
      2021 WL 222744 (O.L.C.). ......................... 692

**Amended Exhibit** to
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
  filed March 23, 2022:

3.  Letter from Michael B. Mukasey, Attorney
    General, to the Hon. Nancy Pelosi, Speaker of the
    House of Representatives
      dated February 29, 2008........................... 722

**Government's Response to Defendant's Supplemental Brief in**
**Opposition to the Government's Motion** *in Limine* **to Exclude**
**Evidence and Argument Relating to Good-faith**
**Reliance on Law or Advice of Counsel**
  filed March 29, 2022. ...................................... 725

**Defendant's Supplemental Reply on Waiver**

      **filed March 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735


**Order**

      **filed April 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741


**Government's Motion *in Limine* to Exclude Evidence of
Department of Justice Opinions and Writings,
With Exhibits,**

      **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745


      <u>**Exhibits:**</u>


      1.    **Letter from White House Deputy Counsel to Costello**

             **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765


      2.    **Letter from Justin Clark to Costello**

             **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767


      3.    **Emails from Justin Clark to Costello**

             **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769


**Government's Motion *in Limine* to Exclude Evidence
Relating to Objections to Subpoena That Defendant Waived,
With Exhibit,**

      **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771


      <u>**Exhibit:**</u>


      1.    **Subpoena**

             **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 781


**Government's Motion *in Limine* to Exclude Evidence of the
Defendant's Prior Experience with Subpoenas**

      **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

<u>**Exhibits:**</u>

**A.    H. Res. 8 (Adoption of Rules for 117th Congress)**

**dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

**B.    H. Res. 503 (Authorizing House Select Committee)**

**dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

**C.    Regulations For Use Of Deposition Authority**

**dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

**D.    Amerling and Letter FBI 302**

**dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
### Joint Appendix Volume III of XII

**Page:**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

    E.    **Rules of the 117th Congress**
        **dated February 2, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **938**

    F.    **Republican Conference Rules of the 117th Congress.** . . . . . **991**

    G.    **Congressional Oversight of The White House,**
        **45 Op. O.L.C. slip op. (Jan. 8, 2021).** . . . . . . . . . . . . . . . **1005**

    H.    **Assertion of Executive Privilege Concerning the**
    **Dismissal and Replacement of U.S. Attorneys**
        **dated June 27, 2007.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1065**

    I.    **Immunity of the Former Counsel to the President from**
    **Compelled Congressional Testimony,**
        **43 Op. O.L.C. slip op. (July 10, 2007).** . . . . . . . . . . . . . . **1075**

    J.    **Prosecution for Contempt of Congress of an Executive**
    **Branch Official Who Has Asserted a Claim of Privilege,**
        **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . **1079**

    K.    **Whether the Department of Justice May Prosecute**
    **White House Officials for Contempt of Congress,**
        **32 Op. O.L.C 65 (2008).** . . . . . . . . . . . . . . . . . . . . . . . . . . . **1122**

    L.    **Application of 28 U.S.C. Sec. 458 to Presidential**
    **Appointments of Federal Judges,**
        **19 Op. O.L.C slip op. (December 18, 1995).** . . . . . . . . . **1128**

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**

**filed April 15, 2022, Continued:**

**M.**  Randolph D. Moss, Executive Branch Legal Interpretation:
A Perspective from the Office of Legal Counsel,
52 Admin. L. Rev. 1303 (2000)...................... 1143

**N.**  Testimonial Immunity Before Congress of the
Former Counsel to the President,
43 Op. O.L.C. slip op. (May 20, 2019). ............. 1172

**O.**  Response to Congressional Requests for
Information Regarding Decisions Made
Under the Independent Counsel Act,
10 Op. O.L.C. 68 (1986)........................... 1194

**P.**  Letter from Ronald C. Machen Jr., U. S. Attorney, to
Speaker John A. Boehner
dated March 31, 2015. ........................... 1220

**Q.**  Letter from Michael B. Mukasey, Attorney General, to
Speaker of the House, Hon. Nancy Pelosi
dated February 29, 2008.......................... 1228

**R.**  Steven G. Bradbury, Memorandum for Attorneys of the
Office Re: Best Practices for OLC Opinions
May 16, 2005.................................... 1231

**S.**  Trevor W. Morrison, Stare Decisis in the
Office of Legal Counsel,
110 COLUM. L. REV. 1448 (2010)................ 1237

**T.**  Walter Dellinger, et al., Principles to
Guide the Office of Legal Counsel
dated Dec. 21, 2004. ............................. 1261

**<u>Exhibits</u> to**

**Defendant's Motion to Dismiss the Indictment**
**    filed April 15, 2022, Continued:**

U.    David J. Barron, Memorandum for Attorneys of the
       Office Re: Best Practices for OLC Legal
       Advice and Written Opinions
            dated July 16, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268

V.    Frank H. Easterbrook, Presidential Review,
       40 CASE W. RES. L. REV. 905 (1990). . . . . . . . . . . . . . . 1275

W.    Presidential Authority to Decline to Execute
       Unconstitutional Statutes, OLC Mem. Op.
            dated November 2, 1984. . . . . . . . . . . . . . . . . . . . . . . . . 1302

X.    Douglas W. Kmiec, OLC's Opinion Writing Function:
       The Legal Adhesive for a Unitary Executive,
            15 CARDOZO L. REV. 337 (1993). . . . . . . . . . . . . . . . . 1316

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

Y.    Applying Estoppel Principles in Criminal Cases,
    78 YALE L.J. 1046 (1969)........................... 1355

Z.    Anne Bowen Pouliun, Prosecutorial Inconsistency,
    Estoppel, and Due Process: Making the
    Prosecution Get its Story Straight,
    18 Cal. L. Rev. 1423 (2001)........................ 1384

AA.    Rex E. Lee, Executive Privilege, Congressional Subpoena
    Power, and Judicial Review: Three Branches, Three
    Powers, and Some Relationships,
    1978 B.Y.U. L. REV. 231 (1978). ...................... 1441

BB.    John O. McGinnis, Models of the Opinion Function of the
    Attorney General: A Normative, Descriptive, and
    Historical Prolegomenon,
    15 CARDOZO L. REV 375 (1993)................... 1510

CC.    Griffin B. Bell, The Attorney General: The Federal
    Government's Chief Lawyer and Chief Litigator, or
    One Among Many?,
    46 FORDHAM L. REV. 1049 (1978)................ 1572

**<u>Exhibits</u> to**
**Defendant's Motion to Dismiss the Indictment**
>    **filed April 15, 2022, Continued:**

>    **DD.  Notes, The Immunity-Conferring**
>         **Power of the Office of Legal Counsel,**
>              **121 HARV. L. REV. 2086 (2008).** . . . . . . . . . . . . . . . . . . **1596**

>    **EE.  U.S. Department of Justice, Criminal**
>         **Resource Manual § 2055 (Public Authority Defense).** . . . . **1621**

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
>    **filed April 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1627**

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
>    **filed April 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1695**

**Defendant's Opposition to the Government's**
**Motion *in Limine* Based on Waiver**
>    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1698**

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
>    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1709**

**Defendant's Response to Government's Motion *in***
***Limine* to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
>    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1720**

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**
   **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

**<u>Exhibits:</u>**

1.   **Letter from Chairman Bennie G. Thompson to**
     **Mr. Stephen K. Bannon**
          **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1793**

2.   **E-mail from Cooney to Costello**
          **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1796**

3.   **E-mail from Costello to Cooney**
          **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1800**

4.   **E-mail from Cooney to Costello**
          **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1803**

## TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

**Government's Opposition to**
**Defendant's Motion to Exclude Evidence**
        filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

**Defendant's Reply in Support of His Motion to Exclude Evidence**
        filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of Department of Justice Opinions and Writings**
        filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

**Government's Reply in Support of Motion *in Limine* to**
**Exclude Evidence Relating to Objections to**
**Subpoena That Defendant Waived**
        filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

**Government's Reply in Support of Motion *in Limine* to Exclude**
**Evidence of the Defendant's Prior Experience with Subpoenas**
        filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

**Defendant's Reply in Support of His Motion to Dismiss Indictment,**
**With Exhibits,**
        filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

        **Exhibits:**

        1.    **Letter from Chairman Bennie G. Thompson to**
              **Mr. Stephen K. Bannon**
                    dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1885

        2.    **Transcript of Oral Argument**
              **Before the Honorable Carl J. Nichols**
                    on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to

**Defendant's Reply in Support of His Motion to Dismiss Indictment**
       **filed May 17, 2022, Continued:**

    **3.**      **Letter from Costello to Congressman Thompson**
               **dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1994

    **4.**      **Letter from Congressman Thompson to Costello**
               **dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1997

**United States House of Representatives'**
**Motion for Leave to File *Amicus Curiae* Brief,**
**With Attachment**
       **filed May 25, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2002

    **Attachment:**

    **Brief of United States House of Representatives as**
    ***Amicus Curiae* In Support of the Department of Justice**
               **dated May 10, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2009

**United States House Minority Leadership**
**Motion for Leave to File *Amicus Curiae* Brief,**
**With Attachment,**
       **filed May 25, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2035

    **Attachment:**

    **Brief of the U.s. House of Representatives Minority Leader**
    **Kevin O. Mccarthy and the U.s. House of Representatives**
    **Minority Whip Stephen J. Scalise as Amicus Curiae**
               **dated May 24, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2050

**Defendant's Notice Regarding Amicus Briefs**

 **filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2065**


**Motion to Quash,**

**With Attachment,**

 **filed June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2072**


 <u>**Attachment**</u>**:**


 **Memorandum of Points and Authorities**

 **In Support of Motion to Quash,**

 **With Exhibits,**

  **dated June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
> **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
> **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
> **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

> **Exhibits:**

> 1.   **Letter from Bannon's Counsel to Prosecutors**
> > **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

> 2.   **Letter from Prosecutors to Bannon's Counsel**
> > **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

> 3.   **Letter from Justin Clark to Scott Gast**
> > **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **2448**

> 4.   **Letter from Pat Cipollone to Chairman Nadler**
> > **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . **2453**

> 5.   **Plaintiff's Motion for Judgment on the Pleadings, or in the**
> > **Alternative, for Summary Judgment, & in Opposition to**
> > **Defendants' Motion for Summary Judgment**
> > **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
> **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

## TABLE OF CONTENTS
### Joint Appendix Volume VII of XII

Page:

**Government's Opposition to Defendant's Motion to Compel**
    **filed June 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

**Joint Proposed Jury Instructions,**
**With Attachment,**
    **filed June 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

    **Attachment:**

    **Manual of Model Criminal Jury Instructions**
        **dated March 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

**Government's Objections to Defendant's Proposed Jury Instructions**
    **filed July 1, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

**Defendant's Opposition to Government's Omnibus Motion *in Limine***
    **filed July 1, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

**Office of General Counsel U.S. House of Representatives'**
**Reply in Support of Motion to Quash,**
**With Exhibits,**
    **filed July 5, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

    **Exhibits:**

    A.    **Order - *U.S. v. Moussaoui***
        **dated March 2, 2006.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

    B.    **Order - *U.S. v. Arthur Andersen, L.L.P.***
        **dated May 14, 2002.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

    C.    **Order Granting Motion to Quash Subpoena on**
        **U.S. Representative Maxine Waters - *D.C. v. Hayes***
        **dated November 16, 2007.** . . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

> filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

**Exhibit:**

1.   **Memorandum**

> dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion** *in Limine*

> filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion** *in Limine* **to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

> filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

> on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony,**
**With Exhibits,**

> filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

**Exhibits:**

1.   **Letters from former President Trump to Mr. Costello and**
**Mr. Costello's Letter to Chairman Thompson**

> dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

2.   **Certification**

> dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

Exhibits to

Defendant's Opposition to Motion *in Limine* to Bar Testimony
    filed July 13, 2022, Continued:

3.    Subpoena
        dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 3090

4.    Letter from Thompson to Costello
        dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 3092

5.    Indictment
        dated November 12, 2021. . . . . . . . . . . . . . . . . . . . . . 3096

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence or Argument Relating to the Defendant's Eleventh-hour
Assertion That He Is Willing to Testify Before the Select Committee,
With Exhibits,

    filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

Exhibits:

1.    Letter from Thompson to Costello
        dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 3114

2.    Letter from Thompson to Costello
        dated October 15, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3118

Government's Objections to Defendant's Trial Exhibits

    filed July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols
  on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,
  filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

  Exhibits:

  1.   Transcript Jury Trial
       Before the Honorable Kurt D. Engelhardt
       *U.S. v. Rainey*, No. 12-291
         on June 1, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

  2.   Congressional Gamesmanship Leads To An
       Acquittal In Deepwater Horizon Case,
       U.S. v. David Rainey: A Case Study
         dated 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash
  filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions
  filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**

      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**

      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**

      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS
### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
 on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
 on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
 on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of <u>Kristin Amerling</u>:**

 Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . 3942

**TABLE OF CONTENTS**
**Joint Appendix Volume X of XII**

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
          on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

          **Testimony of <u>Kristin Amerling</u>:**

          **Direct Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . . . 4014**
          **Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . 4078**

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
          on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

          **Testimony of <u>Kristin Amerling</u>:**

          **Cross Examination by Mr. Corcoran (Continued). . . . . . . . . . . . 4149**
          **Redirect Examination by Ms. Vaughn. . . . . . . . . . . . . . . . . . . . . . 4211**

          **Testimony of <u>Stephen Hart</u>:**

          **Direct Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . . . 4233**
          **Cross Examination by Mr. Corcoran. . . . . . . . . . . . . . . . . . . . . . . 4252**
          **Redirect Examination by Ms. Gaston. . . . . . . . . . . . . . . . . . . . . . 4264**

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
          filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
          on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

## TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
      filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4422

**Defendant's Notice Regarding Congressional Hearings**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4432

**Notice of Defendant's Objection to Jury Instruction Number 27**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4435

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
      on July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4438

**Jury Instructions**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4555

**Counsels' Acknowledgment Concerning Trial Exhibits**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4585

**Government's Exhibit List**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4586

**Defendant's Exhibit List**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4588

**Note from Jury**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4591

**Verdict Form**
      filed July 22, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4592

Order
> filed July 27, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
> filed July 28, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

> <u>Exhibits:</u>

> 1.    Screenshot of Episode 1996, War Room
> dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

> 2.    Bannon's Gettr Repost CNN Ad
> dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
> filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
> filed August 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
> filed August 12, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
> filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**

    filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657


**Defendant's Reply to Opposition to Motion for a New Trial**

    filed August 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676


**Order**

    filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682


**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**

    on October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687


**Judgment in a Criminal Case**

    filed October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767


**Defendant's Notice of Appeal**

    filed November 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772


**Order Staying Sentence Pending Appeal**

    filed November 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

## TABLE OF CONTENTS
### Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

    **9B.**   **H41 Congressional Record - House**
               **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **4780**

    **30.**   **Letter from Former President Donald Trump to**
         **Stephen K. Bannon**
               **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4781**

    **31.**   **Letter from Robert J. Costello to**
         **Chairman Bennie Thompson**
               **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4782**

    **32.**   **Letter from Chairman Bennie Thompson to**
         **Robert J. Costello**
               **dated July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4784**

    **39.**   **Article from Rolling Stone**
               **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **4786**

    **40.**   **Daily Mail Article**
               **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **4804**

**Government's Exhibits:**

    **1.**   **House Resolution 503.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4808**

    **2.**   **Subpoena to Stephen Bannon**
               **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . **4822**

**<u>Government's Exhibits</u>, Continued:**

3.    **Emails re Service of Subpoena
dated September 23 and 24, 2021**................... 4832

4.    **Letter from Costello to
Chairman Thompson and Cover Email
dated October 7, 2021**............................ 4835

5.    **Letter from Chairman Thompson to Costello
dated October 8, 2021**............................ 4838

6.    **Letter from Costello to Chairman Thompson
dated October 13, 2021**........................... 4841

7.    **Letter from Chairman Thompson to Costello
dated October 15, 2021**........................... 4843

8.    **Letter from Costello to
Chairman Thompson and Cover Email
dated October 18, 2021**........................... 4846

9.    **Letters from Chairman Thompson to Costello
dated October 19, 2021**........................... 4848

10.   **Post on Stephen Bannon's Gettr Account
dated September 24, 2021.** ....................... 4851

11A. **Post on Stephen Bannon's Gettr Account
dated October 8, 2021**............................ 4852

11B. **DailyMail Article Linked in October 8, 2021
Post on Stephen Bannon's Gettr Account.** .............. 4853

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

                                    CR Action
                                    No. 1:21-670

        vs.                         Washington, DC
                                    June 15, 2022
STEPHEN K. BANNON,
                                    10:04 a.m.
            Defendant.


        TRANSCRIPT OF IN-PERSON MOTIONS HEARING
        **BEFORE THE HONORABLE CARL J. NICHOLS**
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the U.S.:**          **AMANDA ROSE VAUGHN**
                           **J.P. COONEY**
                           **MOLLY GULLAND GASTON**
                             U.S. ATTORNEYS OFC. FOR D.C.
                             555 4th Street NW
                             Washington, DC  20001
                             202-252-1793


**For the Defendant:**     **DAVID I. SCHOEN**
                             DAVID I. SCHOEN, ATTORNEY AT LAW
                             2800 Zelda Road, Suite 100-6
                             Montgomery, AL  36106
                             334-395-6611

                           **MATTHEW EVAN CORCORAN**
                             SILVERMAN THOMPSON SLUTKIN WHITE
                             201 N. Charles Street, 25th Floor
                             Baltimore, MC  21201
                             410-385-2225

                           **ROBERT J. COSTELLO**
                             DAVIDOFF HUTCHER & CIRTON LLP
                             605 Third Avenue
                             New York, NY  10158
                             646-428-3238

Reported By:                    **LORRAINE T. HERMAN, RPR, CRC**
                                Official Court Reporter
                                U.S. District & Bankruptcy Courts
                                333 Constitution Avenue, NW
                                Room 4700-C
                                Washington, DC 20001
                                lorraine_herman@dcd.uscourts.gov


*** Proceedings recorded by stenotype shorthand and this
transcript was produced by computer-aided transcription.

1                **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  Please be seated and come to order.

3              Good morning, Your Honor.  This is criminal case

4    year 2021-670, *United States of America vs. Stephen K.*

5    *Bannon*.

6              Counsel, please come forward and introduce

7    yourselves for the record, beginning with the government.

8              **MS. VAUGHN:**  Good morning, Your Honor.  Amanda

9    Vaughn, Molly Gaston, and J.P. Cooney for the United States.

10             **THE COURT:**  Good morning, Counsel.

11             **MR. SCHOEN:**  Good morning, Your Honor.

12             I'm David Schoen, Matthew Corcoran, Bob Costello,

13   Mr. Bannon, Riane White; that's for the defense.

14             **THE COURT:**  Good morning, Counsel.

15             **MR. SCHOEN:**  Thank you.

16             **THE COURT:**  We are here on five motions, I

17   believe.  We are here on, obviously, Mr. Bannon's Motion to

18   Dismiss, which is ECF No. 58 and then a series of other

19   motions, ECF Nos. 52, 54, 55 and 56.

20             Here is how I would like to proceed.  I would like

21   to hear first from Mr. Bannon's counsel on all of the

22   topics; that is to say, on the arguments Mr. Bannon has

23   advanced to dismiss the indictment and to exclude evidence

24   obtained from Mr. Costello, and then also to respond to what

25   the government has argued in its motions.  A number of the

4

1    questions are obviously interrelated, so I don't think that

2    is a problem to do.

3             I will then hear from the government on all of the

4    issues.  I will allow Mr. Bannon's counsel to have a brief

5    opportunity to respond, and then the government, as

6    warranted, can have a very short surrebuttal.

7             Everyone should know that obviously this is not

8    the first time I've taken up a motion in this case.  I'm

9    very familiar with the papers, so the parties need not

10   repeat everything that's in them.  I'd like to focus on the

11   most salient arguments.

12            As you can expect, I have a series of questions

13   for each side, but I also don't have a strict time limit.  I

14   don't want this to be an overly long hearing, because I do

15   have a pretty good idea of the issues, but I don't want to

16   unduly limit anybody's opportunity to make arguments they

17   would like.

18            So, Mr. Schoen, is that going to be you first, at

19   least?

20            **MR. SCHOEN:**  I'm the emcee, Your Honor.

21            **THE COURT:**  You're the emcee.  Okay.

22            **MR. SCHOEN:**  We're going to split it up if you

23   don't mind, Your Honor, so I'm going to deal with the

24   constitutional issues, entrapment by, you know, the --

25   sorry.

5

1      **THE COURT:**  Yes, you may remove your mask for sure

2   at the podium, please.

3      **MR. SCHOEN:**  Yes, Your Honor.

4      I am going to deal with two issues, the what we'll

5   call public authority entrapment by estoppel issues, and the

6   constitutional challenge as applied issues, and then

7   Mr. Corcoran is going to deal with everything else, their

8   motions and the rest of ours, the rules-based arguments and

9   all the rest of it.

10      **THE COURT:**  Very well.

11      **MR. SCHOEN:**  I think it's better if he goes first.

12      **THE COURT:**  Happy to hear from Mr. Corcoran first.

13      **MR. SCHOEN:**  Thank you, Your Honor.

14      **MR. CORCORAN:**  Good morning, Your Honor.

15      **THE COURT:**  Good morning.

16      **MR. SCHOEN:**  I think the key point with regard to

17   our Motion to Dismiss and the rules-based arguments is that

18   the rules matter, and the Supreme Court has said, um, that

19   in a criminal context, the rules of the House of

20   Representatives should be strictly construed.

21      That's really what we're asking for.  We talk

22   about the composition of the Committee.  We talk about the

23   lack of a ranking minority member, and then -- so I want to

24   essentially address those two things first.

25      Our raising the composition of the Committee is

1    not asking the Court to substitute your judgment for who

2    should sit on that Committee.  Instead, it's to require --

3    in order for there to be a criminal prosecution that follows

4    the issuance of a subpoena, require the House to abide by

5    its own rules.  And in terms of the composition of the

6    Committee, the word "shall" was used.  "The Committee shall

7    have 13 members," and it doesn't.  It has nine.

8         From time to time, other Committees don't have the

9    allotted members where there's a death or somebody resigns

10   and so on and so forth, but that's not what happened here.

11   Thirteen members were required, and there are only nine

12   members.

13        An analogy, I guess -- and you might say, Well,

14   what's the prejudice to Mr. Bannon from not having the

15   additional four members?  And the key there is that he

16   doesn't have to show prejudice.  It's sort of like the

17   Supreme Court cases in the same criminal context, where a

18   quorum was not present or, you know, where a perjury

19   conviction follows the lack of a quorum.

20        The Court doesn't ask, Well, what if there had

21   been the additional members that made up a quorum?  How are

22   you prejudiced?  Maybe those members wouldn't have been in

23   your favor anyway.  It's the actual violation of the rule.

24        **THE COURT:**  Do you concede that the word "shall"

25   can sometimes mean "may"?

1            **MR. CORCORAN:**  No.

2            **THE COURT:**  No?  But didn't the Supreme Court say,

3    in cases like *Gutierrez de Martinez*, this is a quote,

4    "Though 'shall' generally means 'must', legal writers

5    sometimes use 'shall' to mean 'should, 'will' or even

6    'may'." The Supreme Court said that.

7            **MR. CORCORAN:**  I understand that, but in context,

8    "shall appoint 13 members" is not the same kind of wiggle

9    room where "shall" is used as described by the Supreme

10   Court.  It's -- you know, there's not a lot of room for

11   leeway.

12           When the House voted on the resolution, there was

13   an understanding that there were going to be -- that there

14   was going to be some minority representation that would be

15   substantial to protect the rights of the minority.

16           **THE COURT:**  If the House, after House Resolution

17   503 and after the Committee was composed said, Expressly, we

18   believe the Committee, as composed by nine members, is

19   consistent with House Resolution 503 -- imagine that

20   hypothetical -- wouldn't I have to defer to that House view

21   of its own rules, assuming they said it expressly?

22           **MR. CORCORAN:**  I think if the House -- for

23   instance, if there was a vote on it and the House voted -- a

24   majority of the House voted that nine members satisfied the

25   authorizing resolution, yes.

8

1        **THE COURT:** But don't the contempt resolutions and

2 referrals, as to Mr. Bannon, Mr. Navarro, Mr. Meadows,

3 Mr. Scavino, at least implicitly conclude that the rules

4 were complied with?

5        **MR. CORCORAN:** Not at all.

6        **THE COURT:** Why is that?

7        **MR. CORCORAN:** Because members, when each of those

8 contemporary resolutions were debated, specifically said

9 that the Select Committee was not properly authorized.

10        **THE COURT:** But those arguments were -- did not

11 prevail, so that issue was discussed at the full House

12 level. It was not not discussed. And the House,

13 nevertheless, voted to make or voted to take those actions

14 notwithstanding those arguments.

15        So why don't we view -- why shouldn't I view that

16 as the full House having rejected, at that time, the

17 argument that the Committee was invalidly constituted?

18        **MR. CORCORAN:** Because it wasn't squarely

19 presented to the House for a vote.

20        I understand your question. I do. But unless the

21 specific question is put to the House, which it may be in

22 the next Congress, you know, something like that may be

23 considered.

24        But to say that a contempt resolution means that

25 the House of Representatives is on record as saying that the

1    Select Committee with nine members is duly authorized under

2    the rules of the House, would not be proper.

3             **THE COURT:**  Is this a jury question?  Isn't an

4    element of the offense here that the Subpoena had to have

5    been validly issued?

6             And we know, from Justice Scalia's opinion in

7    *Gaudin*, that pertinency, which used to be a judge question,

8    is actually a question for the jury.  And at least the

9    background, very strong background, principle is that

10   elements of the offense go to the jury.

11            Is the question of whether the Subpoena was

12   validly issued here a jury question?

13            **MR. CORCORAN:**  I don't think.  Let me answer it

14   this way:  I don't think the Court is precluded from finding

15   that the Committee, the Select Committee, lacked proper

16   authority or that the Subpoena was not validly issued.

17            **THE COURT:**  Wouldn't that be taking an issue away

18   from the jury?

19            **MR. CORCORAN:**  Not at all if it's raised in the

20   defendant's favor.

21            Now, it's a different question if you decide not

22   grant our motion on that basis, then we wouldn't be able to

23   still present evidence on that to the jury.  So it's a

24   slightly different issue.  So our position on the Committee

25   goes beyond, obviously, the 9 members or the 13 members.

1          **THE COURT:**  Understood.  That's the easiest one to

2     talk about.

3          **MR. CORCORAN:**  Right.

4          **THE COURT:**  But your argument is, at least in

5     general, equally applicable with respect to ranking minority

6     member, for example.  I mean, there are slightly different

7     versions of the same general argument.

8          **MR. CORCORAN:**  I think so.  It's a little bit

9     stronger or more specific to a criminal defendant, the

10    ranking minority member issue, because ranking minority

11    member appears at many places in the rules.  And in each

12    case it's meant to protect the rights of the minority as

13    well as the rights of the witness.

14          When there's questioning of a witness, for

15    instance, the ranking minority member has the ability to

16    participate in that questioning or to designate counsel to

17    participate.  So these are things that were negotiated over

18    decades -- you know, decades, really, in order to protect

19    the rights of the minority and the rights of witnesses.  And

20    so it's a really -- it's a very, very important thing.

21          I know that the government has said at different

22    times that, in their view, it's -- ranking minority members

23    is only senior members of the minority, but that's not true.

24          And this Court, again, is well positioned to not

25    make rules for Congress but interpret the rules that they've

1    made and hold them to those rules.

2            **THE COURT:**  What's the standard that I should be

3    applying in this case in reviewing whether and to what

4    extent Congress or the January 6th Committee was constituted

5    consistent with the rules?  Is it *de novo* or do I have to

6    defer, in some respect, to either the Committee, the Speaker

7    or the House as a whole?

8            **MR. CORCORAN:**  Well, on questions of construction

9    of the language of a statute, it's *de novo*.

10           **THE COURT:**  I'm talking about construction of

11   House Res 503.

12           **MR. CORCORAN:**  Yeah, absolutely and I'd say it's

13   *de novo*.

14           **THE COURT:**  But wouldn't that run afoul of the

15   rulemaking clause in the constitution?

16           **MR. CORCORAN:**  No.  We're not --

17           **THE COURT:**  But isn't that my usurping the power

18   of Congress to, or the House, to decide what its own rules

19   mean?

20           **MR. CORCORAN:**  Not at all.

21           We're not asking you to impose any rule on

22   Congress.  What we are asking you to do is, before

23   Mr. Bannon is -- faces the removal of his liberty, based on

24   actions by Congress, that you accord to him due process,

25   which requires notice, for instance, notice that, if he's

1    going to be held in contempt by the Congress, that they are

2    going to have to follow their rules, issue a valid subpoena,

3    have consultation with the ranking minority member,

4    et cetera, et cetera.

5              And so you don't owe any deference to the House's

6    construction of their rules when you're deciding how they

7    play out.  It's been handed over to the criminal justice

8    system.  And you're in a position, *de novo*, to see what

9    those rules mean.

10         **THE COURT:**  So the -- so that means that the

11   deference an Article III Judge, like me, would give to the

12   House's interpretation of its own rules is different in the

13   criminal than in the civil context?

14         **MR. CORCORAN:**  Absolutely.

15         **THE COURT:**  Why?  What's your authority for that

16   proposition?

17         **MR. CORCORAN:**  Well, my authority is that -- I

18   believe we cite in our brief *Yellin*, which says that the

19   Committee must be "meticulous in obeying its own rules."

20   That's *Yellin*, 374 U.S. at 124.

21             We also cite *Christoffel*, which it says, "the

22   question is" -- delete the next part -- "what rules the

23   House has established and whether they have followed them."

24   And that's 338 U.S. at 86 to 89.  Those are criminal cases

25   and --

1          **THE COURT:**  But did the Court say that, in

2     deciding those questions, that no deference is due?

3          **MR. CORCORAN:**  No, not at all.

4          Just as any time you're interpreting or construing

5     language, they didn't get into deference, basically.  But --

6     I mean, I think that a key case on deference in -- or what

7     standard would apply would be the *Rostenkowski* case.  In

8     that case, a member of Congress was facing criminal charges,

9     and the issue was, did he properly use his House clerk's

10    allowance for official duties or for personal things?

11         And the Court of Appeals of D.C. Circuit basically

12    looked at the House rules and recognized that, in some

13    context, the nature of a Congressman's life might make it

14    hard, it might make it somewhat ambiguous to read a rule and

15    apply it in a criminal case.

16         However, when it's unambiguous, then the Court

17    said, We're going to do what we've always done since *Marbury*

18    *versus Madison* --

19         **THE COURT:**  What was the rule at issue in

20    *Rostenkowski*?

21         **MR. CORCORAN:**  What was the rule?  It had to do

22    with official duties.  Were the funds drawn on official

23    duties?

24         **THE COURT:**  Right.  So in a way, that was the

25    substantive question that was presented to the Court.  Here,

1  we are presented with essentially a procedural question

2  about whether the House complied with its own rules

3  procedurally.  Why isn't that at least arguably different?

4          In other words, if the House has some substantive

5  rule, you shall not use money for this purpose, and then

6  they say that someone did and there's -- maybe there's even

7  a criminal sanction being sought for the person having done

8  that, then you have to look hard at whether substantively

9  the rule is ambiguous or not.

10          But here we're talking about a procedural

11  question.  The procedural question isn't imported, really, I

12  don't think, into the -- not directly at least in the same

13  way -- to the elements of the charge here.

14          Why isn't some deference due by me to the House

15  saying, Our rules mean, in our view, X, and we complied with

16  them here or procedural rules.

17          **MR. CORCORAN:**  Well, I don't just see it just as a

18  procedural issue.  I see it as an element of the offense.

19          As you started our questioning, it's in the

20  Indictment itself that it's got to be Stephen K. Bannon,

21  having been summoned as a witness by the authority of the

22  U.S. House of Representatives; and that's going to have to

23  be an element of offense.

24          **THE COURT:**  For purposes of Motion to Dismiss the

25  Indictment, aren't I supposed to look at only the four

1    corners of the Indictment?  Doesn't the Indictment, at least

2    by its terms, state that the Subpoena was validly issued?

3         **MR. CORCORAN:**  Well, that could never be -- in

4    that case, the government would simply put a paragraph in

5    every indictment saying, This indictment is valid.  And you

6    wouldn't be able to look any further.

7         **THE COURT:**  No, I think they have to do more than

8    that.  I've held in another case that the government has an

9    obligation to have some meat on the bone of the facts.

10        **MR. CORCORAN:**  Yea.

11        **THE COURT:**  But did the government have to allege

12   here, for example, that there were 13 members of the

13   Committee in your view?

14        **MR. CORCORAN:**  I don't think so.  But when we

15   challenge it, you can certainly look at that.  You can

16   certainly look at the authority of the Committee and whether

17   it was properly filed, and the same with the ranking

18   minority member.

19        On the ranking minority member issue, I just want

20   to emphasize that, you know, it's a term of art.  But two of

21   the words are pretty straightforward.  Member means a member

22   of the Committee.  Minority means somebody in the minority.

23   So what does ranking mean?  Well, it's not seniority.

24        In the Army, if you -- rank is conferred.  Rank is

25   granted.  Rank is earned.  And so, in the same way under

1    both the democratic rules and the republican rules in the

2    House, there is a process for granting the rank of the

3    ranking minority member on the Committee.  And that process

4    is either, for the democratic, if they're a minority, it's a

5    secret ballot.  If it's in the republicans --

6    **THE COURT:**  Is the implication of this argument

7    that everything the January 6th Committee has done is

8    invalid?

9    **MR. CORCORAN:**  No.  I'm speaking directly to one

10    subpoena that was --

11    **THE COURT:**  But every subpoena that this Committee

12    issued would be challengeable and unlawful on this argument.

13    Correct?

14    **MR. CORCORAN:**  Yes.

15    **THE COURT:**  And if someone wished not to appear

16    because of this argument, they would have a legitimate

17    argument not to do so.  Correct?

18    **MR. CORCORAN:**  Absolutely.

19    **THE COURT:**  There is no distinction between the

20    Subpoena here and any other subpoena the Committee has

21    issued, as far as you know?  The implication of the holding

22    would be that every single subpoena, request for

23    information, deposition that the Select Committee has taken

24    was unlawful, unauthorized.  Correct?

25    **MR. CORCORAN:**  I'd have to see all of the

1  subpoenas, but I think --

2      **THE COURT:**  But if the Committee has never had 13

3  members --

4      **MR. CORCORAN:**  Correct.

5      **THE COURT:**  -- in your view, it is -- the

6  Committee has never been validly constituted.

7      **MR. CORCORAN:**  That's correct.

8      **THE COURT:**  Then unless the House had taken the

9  express step that we discussed earlier, then every single

10  subpoena, unless there's something unique about a particular

11  subpoena, would be unlawful in your view?

12      **MR. CORCORAN:**  In my view, any person who received

13  a subpoena by the Select Committee, as it's currently

14  constituted, could move to quash that subpoena as invalid.

15      **THE COURT:**  The government argues that Mr. Bannon

16  waived at least some of these objections by not presenting

17  them to the Committee.  So can you walk me through your

18  argument against that position?

19      **MR. CORCORAN:**  Well, yeah.  Well, again, a

20  defendant can't waive an element of the offense.  It's

21  always going to be -- the burden is always going to be on

22  the government to prove beyond a reasonable doubt every

23  element of the offense.  And as I've said, authority of the

24  House -- that this subpoena was issued on the authority of

25  the U.S. House of Representatives is an element of the

1    offense.  You can't waive that.

2          They've raised -- I think the only area where

3    they've raised an objection and said, You should have raised

4    it at the time, was (3)(b), Section (3)(b), and the receipt

5    of the rules on deposition authority.  And there, again, the

6    language of that rule is not open to interpretation.  It

7    says, A witness doesn't have to testify unless they receive

8    those materials.  And it's not in dispute that he didn't

9    receive those materials here.

10          **THE COURT:**  You're talking about the materials

11   before testifying?  I think the House, through its amicus

12   brief and the government, say, Well, we could have complied

13   with that rule by handing the materials to Mr. Bannon before

14   his testimony if he had showed up; and that would be

15   consistent with the rule.

16          **MR. CORCORAN:**  Absolutely.

17          There are other rules of the House, for instance,

18   that deal with hearings.  And those rules -- and I think

19   it's Rule 10 of the Rules of the House -- in that case it's

20   a different rule.  It says, A witness must be provided with

21   the Rules of the Committee, comma, upon request.

22          In other words, Congress knows how to make a rule

23   that has an out.

24          **THE COURT:**  No, I get that.  I think I'm asking

25   you a different question, which is that your argument was

1   that Mr. Bannon was required to have been provided with

2   certain information before he testified at the deposition or

3   the requested deposition.  And the government's response is,

4   We didn't violate that rule.  If he had shown up, we would

5   have provided it to him; that was the plan or at least we

6   can prove that was the plan at trial.

7           So there's not even going to be a legitimate

8   argument that that rule was violated.

9           **MR. CORCORAN:**  I don't think that's correct.  I

10  mean, I think we have looked at --

11          **THE COURT:**  Why?

12          **MR. CORCORAN:**  Because, I don't think that's what

13  the rule requires.  I don't think that handing a potential

14  deponent complicated Rules of Procedure on his or her way in

15  to testify in front of a Congressional Committee is what's

16  contemplated by that rule.

17          I want to say one thing, because you did reference

18  the amicus brief.  And when I read the two briefs, one by

19  the majority and one by the minority, I was reminded of

20  Lincoln's famous adage, "A house divided against itself

21  cannot stand."

22          And the reason I thought of that is because, when

23  the minority filed their brief, they said that adopting the

24  position, if this Court --

25          **THE COURT:**  Well, let me just be clear --

1           **MR. CORCORAN:**  Yeah?

2           **THE COURT:**  In your view, is that amicus brief

3    from the minority or is it just from two members of the

4    minority?

5           **MR. CORCORAN:**  It's from the minority whip and the

6    minority leader, so two members.

7           **THE COURT:**  Well, I don't know whether the

8    minority party can act as an entity.

9           **MR. CORCORAN:**  Absolutely.

10          **THE COURT:**  I don't think it matters but for

11   nomenclature purposes it is styled as a brief from two

12   people.

13          **MR. CORCORAN:**  Absolutely.  And they're not just

14   anyone --

15          **THE COURT:**  Yes.  Understood.

16          **MR. CORCORAN:**  -- in the sense that they're

17   members of this bipartisan legal advisory group, which has

18   five members.  And so they are the two minority members on

19   that group, which gets to decide whether a brief can be

20   filed in litigation on behalf of the House.

21          When that group, BLAG, met to decide whether to

22   file an amicus brief in this case, two of the members, the

23   minority members, said -- and it's in a footnote in their

24   motion to relieve to file -- that the filing of that brief

25   would harm the institution of Congress.

1          They then decided, We're going to file our own

2     brief.  And in that brief, they stated that adopting the

3     position of the majority brief could damage the institution

4     of Congress.

5          And I say that -- and that's what led me to this,

6     "House divided against itself cannot stand" -- for the Court

7     to rely on an amicus brief under circumstances where two

8     members of the bipartisan legal advisory group have said

9     it's going to harm -- that adopting the position in the

10    amicus brief would harm the institution of Congress is not

11    something that is advisable.

12         **THE COURT:**  I mean, the House is litigating as a

13    party in a bunch of cases in this district right now.  The

14    House or the Committee.  I assume it's not doing so with 100

15    percent bipartisan support as a party even.

16         **MR. CORCORAN:**  This is a criminal case.  It's

17    totally different.  This is not a curling match on ice where

18    the members of the majority get to sweep to try to make the

19    rock go into the circle.

20         They let go of -- they should have let go of this

21    when the vote was done on contempt and let this Court do its

22    job.  And that's why we're chal -- that's why we found it

23    highly unusual that these amicus briefs were filed, and we

24    find it incredibly helpful that the brief filed by the

25    minority whip and the minority leader states, "The House

1    general counsel's brief misstates the law and misrepresents

2    the complete position of the House."  That's Doc. 75-2, *et*

3    *seq.*  And I'm just saying that, under those circumstances,

4    it would be, in our view, a grave error to rely on what's in

5    that brief.

6         **THE COURT:**  I don't think you should worry about

7    me relying heavily on what's in either of those briefs.

8    They are amicus briefs.  They are arguments presented by

9    nonparties.

10        **MR. CORCORAN:**  Yeah, sometimes we have to say no

11   to friends.

12        Okay, let me turn to the other part of the -- I

13   think what we'll do, I'm going to direct my comments right

14   now to the Motion to Dismiss as it relates to the Costello

15   records.

16        **THE COURT:**  Yes.

17        **MR. CORCORAN:**  And then Mr. Schoen can speak to

18   the OLC issues and ambiguity.

19        **THE COURT:**  Yes.

20        **MR. CORCORAN:**  And then I'll come back and talk

21   about the Motions to Exclude at the end.  So Motion to

22   Dismiss first.  Okay.

23        **THE COURT:**  So what of the issues in the Motions

24   in Limine do you intend to address?

25        **MR. CORCORAN:**  Any that the Court has questions

1    about.  I mean, I think our overall -- if the Court

2    doesn't --

3            **THE COURT:**  So it seems to me that the Motions in

4    Limine cover three topics generally.

5            **MR. CORCORAN:**  Yes.

6            **THE COURT:**  One is a hot topic that Mr. Schoen is

7    very likely going to discuss.

8            **MR. CORCORAN:**  Right.

9            **THE COURT:**  The next one is about Mr. Bannon's

10   prior experience with subpoenas.

11           **MR. CORCORAN:**  Right.

12           **THE COURT:**  Are you going to address that?

13           **MR. CORCORAN:**  I can address that.

14           **THE COURT:**  I think I'd like you to address that

15   after you address the Costello question.

16           **MR. CORCORAN:**  Okay.

17           **THE COURT:**  And then we've already been discussing

18   waiver.  I don't know that there's much to add on that

19   question.

20           So here's what I'd like to do, if it's okay with

21   you, is to have you address the Costello question.  You

22   address the Motion in Limine relating to Mr. Bannon's

23   experience with subpoenas, and then we can go to Mr. Schoen

24   to do all of the other legal issues and as it relates to the

25   indictment question and the Motions in Limine.  Okay?

1          **MR. CORCORAN:**  Okay.  Yes, Your Honor.

2          With regard to the government's using the

3    outrageous investigative technique of going after

4    Mr. Costello's phone and email records, we would ask this

5    Court to dismiss the Indictment on that basis.  And the

6    reason is that, if they're allowed to do it here, they'll do

7    it in every case.

8          **THE COURT:**  What's the prejudice?

9          **MR. CORCORAN:**  Well, the prejudice --

10         **THE COURT:**  The actual prejudice in this case?

11         **MR. CORCORAN:**  The actual prejudice is that a

12   wedge was driven between Mr. Bannon and his lawyer.

13         I grew up on a farm, Your Honor, in Illinois.

14   There was an electric fence on the farm.  As a little boy, I

15   was asked to test it and touch it to make sure that it was

16   on, and I would do that occasionally.

17         Once you've done that, you remember how it feels.

18   And the animals, for instance, the horses and the cows, once

19   they touch the electric fence, they know how it feels.  It's

20   not that they keep running into it and that stops them each

21   time.  Once they've touched it once, they don't have to do

22   it again, otherwise we would have been repairing the fences

23   all of the time.

24         The reason I mention that is, once Mr. Bannon

25   learned that the government was going to the extraordinary

1    and outrageous step of going after Mr. Costello's phone

2    records for a month before the Subpoena was even issued by

3    the Select Committee.  Once Mr. Bannon learned that the

4    government had gone to the extraordinary steps of trying to

5    get his email information, every conversation and

6    communication that followed was like somebody having touched

7    an electric fence.  There is a chilling effect that affected

8    his representation.

9          **THE COURT:**  What's the closest case you have where

10   conduct of this type resulted in dismissal of an indictment

11   as opposed to exclusion of the evidence at trial, post-trial

12   sanctions, some other step?

13         **MR. CORCORAN:**  I think *Marshank*, which we cite in

14   the brief.

15         **THE COURT:**  And what happened there, exactly?  How

16   is that analogous to this case?

17         **MR. CORCORAN:**  Well, it was analogous because the

18   government in that case essentially turned an attorney into

19   a witness against the defendant, which is precisely what

20   they tried to do here.  And they've said that in the prior

21   hearings, and they've said it in their briefs.  They viewed

22   Mr. Costello not as an attorney but as an intermediary with

23   the Committee, as a witness to the crime.

24         And the reason why this is so outrageous for those

25   of us who spent decades doing white collar work, both

1    prosecution and defense, is that it's not the ordinary

2    course of business.

3          In a misdemeanor case, if the government is

4    allowed to, at the very start of the case, without any hint

5    or allegation or suspicion that the attorney was involved in

6    any wrongdoing at all, or was given -- you know, for them to

7    try to turn him into a witness at that point is outrageous

8    and shouldn't be allowed.

9          And if it is allowed, as we've said in our brief,

10   years from now, whenever something like that happens, the

11   *Bannon* case is going to stand for "No harm.  No foul."

12   Because that's what the government is saying, that unless

13   there is blood from what we did, we shouldn't be punished.

14   And the answer is, They should be punished.  It's

15   outrageous.

16        **THE COURT:**  I mean, the government -- I'll hear

17   from them again, I suppose, on this question.  The

18   government's view is they did nothing wrong and, in any

19   event, even if they did -- though -- I think their argument

20   is -- the relevant argument is something short of dismissal

21   of the Indictment.

22        The government is taking the position, certainly

23   as before, and I think has again, that they -- to prove an

24   element of their claims, they needed to show that Mr. Bannon

25   knew about the existence of the Subpoena.  This goes to

1    that.  Obviously, you've heard these arguments before.

2            And that, to some extent, I'm paraphrasing their

3    argument for them, they did not seek -- they didn't get to

4    the point where they sought content of communications.  And

5    so this isn't as bad at least as *Marshank*.

6        **MR. CORCORAN:**  It's not an argument that I can

7    understand how they would make with a straight face because,

8    from the very outset, from the very first communication

9    between the Select Committee and Robert Costello, he

10   acknowledged that he accepted service of the Subpoena on

11   behalf of Mr. Bannon.

12           In other words, for them to go and seek records

13   that predate that by a month is simply unbelievable.  I

14   understand that they can come into court today and say,

15   Well, Your Honor, it's routine and we're trying to prove an

16   element of the offense.  But that was not an issue in the

17   case; that's a post-hoc rationalization, I have to say.

18       **THE COURT:**  Thank you.

19           Let's discuss briefly, before we go to Mr. Schoen

20   on the Motion in Limine, about Mr. Bannon's prior experience

21   with subpoenas.

22       **MR. CORCORAN:**  Yeah, the government's motion is

23   trying to suggest that that is -- that we're trying to show

24   that his actions in this case were in conformity with prior

25   actions, and that's not it at all.

1          What we're trying to do is show what actually

2   happened here.  I mean, that's part of our mission, and we

3   should be allowed to do it in terms of presenting a defense.

4   And what actually happened here, because a key element of

5   the offense is going to be intent, what was in Mr. Bannon's

6   mind when he received the Subpoena?

7          What was in his mind when he communicated back and

8   forth with the Committee through Mr. Costello?  The

9   government's going to have to prove beyond a reasonable

10  doubt that he willfully made default.  In other words, that

11  he got the Subpoena and, whatever intent element is

12  required, that he willfully made default.  That will be

13  something that the jury will have to decide.

14         So that's saying, What was in his mind?  What was

15  in Mr. Bannon's mind?  And his prior experience is that he

16  had previously been subpoenaed to testify before committees,

17  the House Intelligence Committee, the Senate Intelligence

18  Committee, and the Mueller investigation.

19         After receiving the subpoenas, he went through a

20  process with counsel to deal with privilege issues.

21  Accommodations were reached and he testified.

22         Those prior experiences informed his thinking when

23  he received this subpoena.  And the jury has got to be able

24  to hear that.  It's not a matter of us saying, Well, he

25  testified before entities three times before.  So you should

1    think it's more likely on the fourth time he was going to

2    testify at all.  It's not conformity.

3              **THE COURT:**  In your view, it goes to his mens rea,

4    whatever that is here.

5              **MR. CORCORAN:**  Absolutely.  Which is key.  It's

6    key.  It is going to be a key issue in trial.

7              **THE COURT:**  The government argues that the mens

8    rea here, the standard is pretty low, deliberate and

9    intentional.  Although I'm not sure that that's what the

10   jury will be instructed.  It seems to be that maybe more

11   detail than that is required.

12             But assuming the government is right about that,

13   and obviously the government is relying on cases that have

14   at least said that, how does deliberate and intentional fit

15   with Mr. Bannon's experience before?

16             **MR. CORCORAN:**  Well, whatever -- that's why I sort

17   of used the term, Whatever the intent that is proved at

18   trial.  What's in his mind is critical.  And we're talking

19   about receiving a subpoena, having accommodations reached

20   and testifying.  So even if it's the level of knowing,

21   deliberate, that's going to be a key issue, and we should be

22   able to present it.

23             I mean, the trial is not -- to exclude it, I think

24   you'd have to find that it was somehow confusing to a jury

25   to hear that when it -- the instructions could handle that.

1    I mean, we're not afraid of an instruction that says, Just

2    because he did it three times before, it doesn't mean he's

3    going to do it the fourth time.  The key is what was in his

4    mind, and we have to be able to show that to the jury.

5              Again, in simple terms, a big part of our position

6    and our evidence to the jury is going to be, What really

7    happened here?

8              **THE COURT:**  Uh-huh.  Thank you, Counsel.

9              **SPEAKER6:**  Thank you.

10             **THE COURT:**  Mr. Schoen?

11             **MR. SCHOEN:**  May I proceed, Your Honor?

12             **THE COURT:**  Please.

13             **MR. SCHOEN:**  Your Honor, first of all, I'm a

14   little disheartened that we're talking about how the jury

15   might be instructed, because I'm here to tell Your Honor why

16   this case ought to be dismissed.  It's not me telling Your

17   Honor why it ought to be dismissed.  It's the Department of

18   Justice telling Your Honor why the case must be dismissed.

19             First of all, let me back up a step.  Our briefs,

20   in my view, on the entrapment by -- what we'll call public

21   authority and entrapment by estoppel defenses and on the

22   constitutional as applied on due process grounds are like

23   two ships passing in the night.  Not even close.  I don't

24   think we really joined issue on them.

25             On the due process issue, we certainly don't,

1      because I don't really even think what I am about to talk to

2      you about is even addressed in their brief.  On the

3      entrapment by estoppel, as we wrote in the brief, seems to

4      be an evolving understanding of the law by the government.

5              In the early papers, including an unrelated paper,

6      the Court was told that, for this defense to apply, there

7      has to be direct advice given by an official to the

8      defendant.  Well, that's just not right.  That ignores the

9      *PICCO* case, P-I-C-C-O, and the *Levin* case and, in my view,

10     *Barker* in this circuit.

11             But -- and I have to say, Judge, you know, again,

12     it's, in a sense, neither here nor there, but I read over

13     and over again in their briefs that we simply don't

14     understand entrapment by estoppel.

15             With all due respect, the landmark case they cite,

16     this *Abcassis* case, is my case.  I thought up the defense.

17     I made the defense.  I won the case.  Most issues in this

18     world I don't know much about, but I know something about

19     entrapment by estoppel.

20             **THE COURT:**  So let me ask you this:  I think I

21     understand the parties' respective positions, but has the

22     Department, the Department of Justice, ever said officially

23     it would not prosecute someone who was a nongovernment

24     employee at the time of the potentially privileged

25     communication for refusing altogether to appear for a

1    deposition or for refusing to produce altogether any

2    documents?

3              **MR. SCHOEN:**  Well, Judge, two things about that --

4              **THE COURT:**  Or what's the single best OLC opinion

5    you have or government opinion that says, We will not

6    prosecute someone --

7              **MR. SCHOEN:**  We have to put them together.

8              Can I just back up a step though, Judge?  I want

9    to tell you why we don't even have to get to the public

10   authority offense and entrapment by estoppel.  I want to

11   tell you why this case has to be dismissed based on due

12   process, fair notice grounds.

13             And there's zero question in my mind that this

14   argument applies.  It doesn't -- it's not affected by

15   whether the defendant is a former member, an outside member

16   and so on.  This private citizen distinction is not

17   availing, even in the entrapment by estoppel realm.

18             But for the due process argument, it's not even

19   relevant.  The due process argument is triggered when

20   executive privilege is invoked.  Period.  That's what OLC

21   has made abundantly clear since at least 1956.

22             If I could just take the Court through it for --

23   it will take me just a few minutes.

24             **THE COURT:**  Okay.  I mean --

25             **MR. SCHOEN:**  All right.

33

1      **THE COURT:** I hope it's going to be tight and, I
2    guess -- sure. Go ahead.
3      **MR. SCHOEN:** Okay, Judge. Here's where we go.
4    And this is the most straightforward argument for why this
5    case has to be dismissed.
6      Background. Long-standing, fundamental tenet in
7    criminal law -- and I know the Court knows this, but I think
8    it's still  relevant to give the background -- is the
9    requirement of fair notice to the public of what conduct is
10   going to violate the criminal law and risk subjecting that
11   person to criminal liability and punishment.
12      A person has to be given fair notice of the
13   conduct that's prohibited or the law doesn't comport with
14   the Fifth Amendment. The Fifth Amendment is due process
15   guarantee. That's *United States versus Williams*; that's
16   *Kolender versus Lawson* and, more recently. That's *United
17   States versus Davis*, and here we have even a little
18   different twist on that issue, but I'll get into that.
19      The question is, as the Court knows, if a person
20   of ordinary intelligence is left to guess at whether he'll
21   be subjected to prosecution or not, then the law violates
22   due process. It's void for vagueness. It also violates the
23   separation of powers doctrine. That's *Connally versus
24   General Construction*; that's sort of the landmark case.
25      Now, the doctrine is not something new. It goes

34

1   way back.  Roman law recognized it.  The maxim nullum crimen

2   sine lege -- I'll spell it afterwards -- with no crime

3   there's no law.  There's no crime without law.

4           Madison spoke about it in Federalist 62.  We would

5   have a calamitous situation if people didn't understand what

6   the law prohibited.  Montesquieu addressed it, so on.  We

7   don't need any more history lesson probably about it.

8           But by way of introduction, here, what the Supreme

9   Court has said, in *Raley versus Ohio*, is that, when we

10  consider whether fair notice is provided as to whether a

11  person is subjected to a criminal -- the coverage of the

12  criminal statute, statements by the government through its

13  agents and officials concerning criminal sanctions, which

14  are contradictory or so vague and undefined as to afford no

15  fair warning as to what might transgress a given statute,

16  renders the statute unconstitutionally vague, much in the

17  same way contradictory statements within a criminal statute

18  render the statute unconstitutional.  Now that's *Raley*, at

19  Page 438.

20          In *Raley*, they recognized that a step even further

21  in rendering a criminal prosecution unlawful and a violation

22  of due process is when government statements, vis-a-vis the

23  criminal statute, go beyond simply being vague or

24  contradictory, and they are actively misleading, indicating

25  the conduct, which is later prosecuted, was legal.  That's

1    *Raley* again at 438.

2         Such conduct is even -- is more akin to the

3    conduct by the government in cases like *Sorrells*, standard

4    entrapment cases, *Johnson*.  So that brings us to

5    Mr. Bannon's case.

6         This very principle and the suggestion that the

7    longstanding OLC opinions that have been reiterated over and

8    over again that, when executive privilege is invoked, the

9    criminal contempt of Congress statute charged here, 192,

10   cannot lawfully be charged.  It renders such -- when the

11   executive privilege is invoked, it renders such prosecution

12   unlawful.  The criminal statute doesn't apply and can't be

13   applied for two reasons.

14        **THE COURT:**  So let me ask you this question:

15   Assume that's all true.

16        **MR. SCHOEN:**  Yes.

17        **THE COURT:**  Isn't it a disputed question whether

18   former President Trump invoked executive privilege here?

19        **MR. SCHOEN:**  Not a seriously disputed question,

20   Your Honor.

21        **THE COURT:**  Well, the letters are, at best,

22   ambiguous on this question, are they not?

23        **MR. SCHOEN:**  No, they're not, Your Honor.

24   Executive privilege is invoked.  There is a later letter

25   that says, I'm not telling you -- Justin Clark writes, "I'm

36

1    not telling you you have immunity.  You may not have

2    immunity."  Separate question.  Separate question.  Related

3    question in this context that I can get into, but it's a

4    separate question.  He doesn't need to have immunity.

5            Executive privilege is invoked.  Executive

6    privilege is presumptively valid as a matter of law.  They

7    wanted to challenge the invocation of executive privilege.

8    As they have said, the Department of Justice has said over

9    and over again, Go to a civil enforcement proceeding.

10   Challenge it there.  Don't use the criminal statute.

11           Judge, I just want to --

12           **THE COURT:**  Is it clear that President Trump --

13   former President Trump invoked executive privilege?

14           **MR. SCHOEN:**  Yes, Your Honor.

15           **THE COURT:**  That's clear --

16           **MR. SCHOEN:**  That's clear, Your Honor.

17           **THE COURT:**  -- from the letters?

18           **MR. SCHOEN:**  Yes, Your Honor.

19           **THE COURT:**  Assuming it's a jury question, how

20   would that be established at trial?  I know you don't want

21   to go to trial, but how would it be established that

22   President Trump invoked the privilege rather than the lawyer

23   who communicated that?

24           **MR. SCHOEN:**  Well, Justin Clark could testify,

25   number one.  Number two --

1          **THE COURT:**  What does the letter say about

2   President Trump's invocation of privilege?

3          **MR. SCHOEN:**  I can pull the letter, if Your Honor

4   wants.

5          **THE COURT:**  I'd like to know what it says.

6          **MR. SCHOEN:**  May I?

7          **THE COURT:**  Yes.

8       (Brief pause)

9          **MR. SCHOEN:**  Your Honor, Mr. Costello reminds me

10   there was also a phone call with Justin Clark in which

11   Justin Clark made clear that the President invoked --

12          **THE COURT:**  Well, I can't rely on an out-of-court

13   phone call that isn't in the record to conclude that

14   executive privilege was invoked by the former president, not

15   sitting here, can I?

16          **MR. SCHOEN:**  Well, for these purposes, Your Honor,

17   there's certainly no requirement that we've seen that

18   requires President Trump to appear before the Committee or

19   to personally address the Committee.

20          **THE COURT:**  I'm not saying that.  I want to know

21   what the best statement in the record, that is at least

22   before me in this context, is that the President had invoked

23   executive privilege.  I'm not saying it didn't happen.  I

24   just want to know what the best statement is.

25          **MR. SCHOEN:**  I'm reading now from Document 35-6.

1    This is Justin Clark's letter.  He writes in reference to

2    the Subpoena.  The Subpoena asks Bannon to produce

3    documents, what President Trump thinks about that.

4            Then President Trump vigorously objects to the

5    overbreadth and scope of these requests and believe they are

6    a threat to the institution of the presidency and the

7    independence of the --

8            **THE COURT:**  I see it.  Thank you.

9            **MR. SCHOEN:**  Oh.

10            **THE COURT:**  Yes.  Thank you.  Yes.

11            **MR. SCHOEN:**  Thank you, Your Honor.

12            **THE COURT:**  Right.  It's the next paragraph, To

13    the fullest extent permitted by law, President Trump

14    instructs Mr. Bannon to...

15            Yes, thank you for that.

16            **MR. SCHOEN:**  Thank you, Your Honor.

17            And by the way, I have to say that it's the

18    Department of Justice, as we'll see in a second from their

19    Office of Legal Counsel opinions, that saw -- sees a problem

20    with beyond just the general principle.  You cannot use this

21    criminal statute.  It sees a problem when given its

22    long-standing OLC opinions.  That's expressly addressed in

23    an OLC opinion.

24            But, Judge, let me skip ahead then.  Here's the

25    thesis of this presentation.  This case has to be dismissed

1    for the prosecution and violation of due process and

2    separation of powers as applied to Mr. Bannon for the

3    reasons I'm going to outline.  They're outlined in the

4    Motion to Dismiss and in the Reply.

5           The OLC opinions, consistently for decades,

6    reflect the prosecuting authority's position, the Department

7    of Justice official binding position, as a matter of law

8    that, that when executive privilege has been invoked in

9    connection with a congressional subpoena, the privilege is

10   presumptively valid.  And the criminal statute cannot be

11   applied for several reasons.

12          I'm going to give the Court a few examples of why

13   the case has to be dismissed based on this argument, the

14   fair notice argument.  Starting in 1956, the Department of

15   Justice addressed this.  Ted Olson reiterated it in 1984.

16   And his opinion, like the others, are authoritative and have

17   been consistently reiterated since.

18          Think, for example, in the context of fair notice,

19   Judge, as to take the name Bannon out of it.  Joe Q. Public,

20   David Schoen, whoever, is faced with a subpoena from

21   Congress, and the former President -- we know, under *Nixon*

22   *versus GSA*, a former President can invoke privilege.

23          There's a question now from *Trump versus Thompson*

24   whether the current President can supersede it.  Justice

25   Kavanaugh addressed it in the cert denial and so on.  Let's

1    put that aside for a second.  For these purposes, the former

2    President can invoke executive privilege and, in any event,

3    Mr. Bannon understood him to invoke executive privilege.

4         So executive privilege is invoked.  Mr. Bannon's

5    hands are tied.  And the OLC opinions talk about a person

6    situated like Mr. Bannon as a pawn, and they're offended by

7    the idea that that pawn could then face criminal prosecution

8    for assisting the President or for adhering at least to the

9    President or former President's invocation of privilege.

10        And so that person -- put aside, now, I'm not

11   talking about reliance or any of those things.  I'm talking

12   about fair notice.  This person now needs to know whether

13   this person is subject to prosecution, criminal prosecution,

14   if he adheres to executive privilege and doesn't comply with

15   the Subpoena.

16        So he looks then to the OLC opinion.  These are

17   published opinions.  And the prosecuting authority in this

18   case has said, No, once executive privilege is invoked, it

19   cannot be applied.

20        So let me give the Court a couple examples, just

21   chapter and verse.  The Court has these documents in the

22   record and there are many more --

23        **THE COURT:**  No, this is helpful.  I would like to

24   talk about them.

25        **MR. SCHOEN:**  Yes, Your Honor.  And there are many

1    more in the record and outside the record, a couple of which

2    I'll mention in a second.

3        So I want to go -- 58-14.  This is the OLC opinion

4    from Steven Engle, May 20th, 2019.  I'm reading now:  "The

5    Department of Justice has long recognized, 'that the

6    contempt of Congress statute was not intended to apply and

7    could not constitutionally be applied to an executive branch

8    official who asserts the President's claim of executive

9    privilege.'"  And he cites a string of OLC opinions.

10       **THE COURT:**  Okay.  But that's not Mr. Bannon.  You

11   acknowledge Mr. Bannon is not an executive branch official.

12       **MR. SCHOEN:**  First of all, he is a former

13   executive branch official.

14       **THE COURT:**  But that --

15       **MR. SCHOEN:**  I'm going to get to that, Judge.  The

16   OLC opinions address current, former.  They address the idea

17   that --

18       **THE COURT:**  I recognize that they address them,

19   but we need to be really careful about what they say in the

20   context that we're talking about.

21       **MR. SCHOEN:**  Yes, Your Honor.

22       **THE COURT:**  It says you cannot prosecute someone

23   who is a current government employee where privilege is

24   asserted or there's a claim of immunity.

25       **MR. SCHOEN:**  Right.  That's what it says here,

42

1    Your Honor, "an executive branch official".

2        **THE COURT:**  Okay.

3        **MR. SCHOEN:**  The criminal contempt of Congress

4    statute does not apply to the President or presidential

5    subordinates who assert executive privilege.  As Assistant

6    Attorney General Olson explained, The constitution does not

7    permit Congress to make it a crime for an official to assist

8    the President in asserting a constitutional privilege that

9    is an integral part of the President's responsibilities

10   under the constitution.

11       To do so would be to deter the President from

12   asserting executive privilege and to make it difficult for

13   him to enlist the aid of his subordinates in the process,

14   thereby burdening and immeasurably impairing the President's

15   ability to fulfill his constitutional duties.

16       And, of course, Walter Dellinger -- the other side

17   of the aisle you might say -- says the same thing.  He says,

18   in 1995, "The application of the contempt statute against an

19   assertion of executive privilege would seriously disrupt the

20   balance between the President and Congress."

21       Now, continuing on with Mr. Engel, same OLC

22   opinion, "This office has further confirmed that the same

23   'principles...similarly shield a current or former senior

24   advisor to the President from prosecution for lawfully

25   invoking his or her immunity from compelled congressional

-2270-

1    testimony.'"

2            Now that's the question of immunity we talked

3    about.  A little bit different from executive privilege.

4    They use the terms interchangeably.  But as the Court will

5    see, and the Court may certainly be aware, the Department of

6    Justice took the position, even after *Miers*, M-I-E-R-S, an

7    OLC opinion, that a person so-situated as has immunity.

8    Immunity.  But we're focused here mainly on executive

9    privilege.  That's the triggering event.  And again in --

10           **THE COURT:**  And that opinion, the 2008 opinion, is

11   also talking about someone who was communicating with the

12   President when a government employee.  Correct?

13           **MR. SCHOEN:**  The communication occurred when the

14   person was a government employee.

15           **THE COURT:**  Yeah.

16           **MR. SCHOEN:**  Let me just go to the logical

17   conclusion of this.  It clearly can't be limited to someone

18   who's a current official or a former official, as the OLC

19   says, by the way, in one of the opinions expressly, the one

20   on the information about U.S. attorneys.  But I'll get to

21   it.

22           They can't just be talking about -- take, for

23   example, President Biden thinks for some reason the economy

24   is not doing so great.  So he calls in the CEO of a company

25   that's doing really great, and he wants to talk about, where

44

1    am I going wrong, Joe?  Susie?  What do I need to do?  Give

2    me some secrets.  He wants to keep that confidential.

3        Congress says, what did Joe or Susie tell you,

4    Mr. President?  He says, Joe or she says, President invoked

5    executive privilege.  It clearly can't just be limited to

6    current and former officials.  That's why Congress has

7    said -- that's why the OLC has said --

8        **THE COURT:**  Well, has OLC ever said that a person

9    in that circumstance would not be prosecuted for failing to

10   show up altogether?

11       **MR. SCHOEN:**  Well, they say in other opinions

12   that, once executive privilege is invoked, that such a

13   person has no obligation to appear.

14       **THE COURT:**  Well, they are talking about executive

15   privilege asserted in a context where the person talking to

16   the President is a current government employee when the

17   communication occurred.  It seems to me there is no OLC

18   opinion -- I think you would concede this.  There is no OLC

19   opinion saying expressly, The government will not prosecute

20   a nongovernment, someone for failing to appear before

21   Congress on executive privilege grounds if the relevant

22   communication occurred when the person was a nongovernment

23   employee.

24       **MR. SCHOEN:**  I don't agree with that at all, Your

25   Honor.

-2272-

45

1          **THE COURT:**  What was the opinion that says that?

2    I know you have threads.

3          **MR. SCHOEN:**  Congressional oversight opinion and

4    the U.S. Attorney's opinion deal with a situation in which

5    the person is not a government employee at the time the

6    conversation occurred.

7          **THE COURT:**  And does it say, We will not prosecute

8    or does it -- some of these, of course, say that executive

9    privilege can exist as between the President and a

10   nongovernment employee.  I don't think anybody disputes

11   that.  The question is, has the government said, The

12   contempt doesn't reach that question in that context?

13          **MR. SCHOEN:**  Absolutely.  Judge --

14          **THE COURT:**  Can you point me to that --

15          **MR. SCHOEN:**  One second.

16          **THE COURT:**  -- that document?

17          **MR. SCHOEN:**  I just want to be clear.

18          What the OLC opinions all say is that once --

19   executive privilege is the triggering concept.  We assume --

20          **THE COURT:**  Okay.

21          **MR. SCHOEN:**  Your Honor, respectfully.

22          **THE COURT:**  I understand your argument.  You're

23   not -- you're fighting my question.

24          **MR. SCHOEN:**  I'm not fighting your question, Your

25   Honor.  I'm intending to --

1          **THE COURT:**  I'm asking you whether any opinion

2     addresses the context of executive privilege in the context

3     of a nongovernment employee and whether a person in that

4     context will be prosecuted or not?

5          **MR. SCHOEN:**  I'll have to pull the U.S. Attorney

6     opinion that I'm referring to and the congressional

7     oversight opinion.  One second, Your Honor.

8          I got a lot more to read that I'd like to read to

9     you, if the Court -- because it's going to tie all of these

10    issues together, I think.  Experts from these opinions.

11         **THE COURT:**  Sure.

12         **MR. SCHOEN:**  But let me answer this --

13         **THE COURT:**  Well, I mean, I get --

14         **MR. SCHOEN:**  If we accept that the privilege is

15    presumptively valid, we don't refer them for criminal

16    prosecution.  If they want to challenge that, if they want

17    to say --

18         **THE COURT:**  But to get an indictment dismissed,

19    you agree you have an incredibly high bar that really has to

20    show that any reasonable person in Mr. Bannon's shoes would

21    have -- would have not been on fair notice that he might be

22    prosecuted or that the government is estopped from taking a

23    contrary position for something it said before.

24         So we have to be really clear about what the

25    government has or hasn't said.  It seems to be pretty

1     foundational to all of these arguments.

2          **MR. SCHOEN:**  Your Honor, any reasonable person

3     would read these OLC opinions and say a person situated like

4     Mr. Bannon, a former top official advisor to the President,

5     who is then called back in by the President afterwards and

6     has a discussion with him, which the President then deems to

7     be privileged, that person would have every reason to

8     believe, from the OLC opinions, that the criminal contempt

9     statute cannot apply because it would infringe on separation

10    of powers issues.

11          It's asking Congress to determine, then, whether

12    the President can invoke his privilege in that circumstance.

13    And the Court --

14          **THE COURT:**  How should I be thinking about the

15    Subpoena topics that don't, on their face, seem to call for

16    anything that would approach privilege?

17          **MR. SCHOEN:**  Anything that would approach?

18          **THE COURT:**  Privilege, executive privilege

19    communications.  I get the privilege would cover certain

20    topics that Mr. Bannon may have been communicating with the

21    President about, but the Subpoena asks for a broader set of

22    information.

23          **MR. SCHOEN:**  As Your Honor is aware from the other

24    OLC opinion that we cite, that's relevant to this issue as

25    opposed to the other on appearance, and that is the OLC says

1    in two opinions, but one is the exclusion of agency counsel

2    opinion, that if the Subpoena is issued and doesn't -- and

3    the rules or the Committee expressly doesn't permit the

4    agency representative to be present, the Subpoena is null

5    and void and unconstitutional.  And there is no obligation

6    to appear.

7        **THE COURT:**  But isn't that really to police what

8    is or isn't privileged?  And it seems to me that this is a

9    subpoena where you've got some categories that are

10   potentially privileged and some categories that aren't at

11   all.  And how should I think about these arguments?

12       I get your argument that agency counsel or

13   government counsel needs or someone needs to be there to

14   police privilege lines.  But what if there's entire

15   categories that are inarguably never going to be privileged?

16       **MR. SCHOEN:**  Two answers.  They chose to issue one

17   subpoena.  The second answer is, the OLC, the Department of

18   Justice chose to use the language that the Subpoena is

19   invalid and unconstitutional and can be ignored completely.

20   That's the OLC Justice Department's language, not mine.

21       Now --

22       **THE COURT:**  Yes, I've distracted you.  My

23   apologies.

24       **MR. SCHOEN:**  It's not a distraction if it's

25   important to the Court.  I'm referring, of course, Your

1    Honor to the Paul Clement -- this is -- the Paul Clement

2    letter is the one that refers most directly to a person

3    outside.

4         Oh, I did want to say this:  This notion, by the

5    way, that outside people, private citizens, are included in

6    the circle of coverage here, that is, the Court knows what I

7    mean.  The circle of coverage here.

8         **THE COURT:**  Yes.

9         **MR. SCHOEN:**  Is not a new one, but it's not just

10   the OLC opinions, by the way.  There is a CRS report that

11   goes to some length -- there's a series of CRS reports

12   called Presidential Advisors' Testimony before Congressional

13   Committees and Overview.  They go back at least to 2002.

14        But in 2014, they ran an update.  They ran a

15   compilation of opinions from between the years of 2002 and

16   2014.  I don't mean to say opinions.  I mean to say facts

17   and relevant circumstances.

18        And in that, they specifically refer to this

19   concept of the importance of a President organizing outside

20   advisors and the importance of confidentiality and privilege

21   in that context.

22        Now, according to the report, the practice started

23   with President Jackson and then continued throughout.  So

24   this idea of a President not being limited to relying on his

25   cabinet or formerly employed employees for privileged

50

1    conversation is discussed in that CRS report.

2         **THE COURT:**  I don't think there's any serious --

3    I'm certainly not in any doubt that executive privilege

4    could cover people who were not government employees at the

5    time of the communication.

6         **MR. SCHOEN:**  And if that's the case, Your Honor,

7    then Mr. Bannon, whether you consider him a former employee

8    or the Court takes him out of that realm because the

9    conversation didn't occur then, or he is a private citizen

10   or used to be a senior advisor and is called in, then he has

11   every reason to believe he should not be, cannot be,

12   prosecuted under the statute because executive privilege --

13   because of all of the rationale behind the other decisions.

14   If I were to go on and read the experts, the rationale is --

15        **THE COURT:**  I'm still going back to my question,

16   which is --

17        **MR. SCHOEN:**  Is there an opinion --

18        **THE COURT:**  Yeah.

19        **MR. SCHOEN:**  -- that expressly says the outside

20   guy, a private citizen --

21        **THE COURT:**  If President Biden calls the CEO of

22   Exxon and has a privileged communication or communication

23   and then Congress subpoenas the CEO of Exxon, and President

24   Biden says, Your testimony is covered by executive

25   privilege, and the CEO of Exxon says to the House, I'm not

-2278-

1  showing up, executive privilege has been asserted, and then

2  is prosecuted not for showing up and taking privileged calls

3  as they go, but just for not coming, he would rely on what

4  OLC opinion?  There is no OLC opinion --

5          **MR. SCHOEN:**  First of all, it doesn't have to rely

6  on -- that's a separate question, in my view.

7          **THE COURT:**  I mean to rely on for his argument.

8          **MR. SCHOEN:**  The reading of all of the OLC

9  opinions, since 1956, leads absolutely, logically, to that

10 conclusion.  There would be no distinction drawn based on

11 the fact that -- as we know, we don't have to have an

12 opinion that has Mr. Bannon's name on it of course.

13         **THE COURT:**  I agree.

14         **MR. SCHOEN:**  That's right.  And we use all of

15 these opinions that have been reiterated.  That's why they

16 all refer back to Ted Olson.  They all say, you know, former

17 officials and all of that, but give the reasons then, the

18 separation of powers issues.

19         If you dare to challenge the invocation of the

20 President's privilege, do it in a civil proceeding, not in a

21 criminal case in which you subject the person who was told

22 executive privilege has been invoked, you subject a person,

23 like Mr. Bannon, that's subordinate, to the risks of a

24 criminal trial.

25         That's what these opinions say.  They say it

52

1    expressly.  And that certainly applies no less to any person

2    on the outside.  And they talk about it in private citizen

3    language.  They talk about encouraging people to meet with

4    the President.

5            That U.S. Attorney's OLC opinion talks about the

6    potential chilling effect if you weren't to consider

7    consultations with outside counsel -- outside person

8    privilege.  And I know Your Honor said I accept the

9    principle, at least for purposes of this argument, that they

10   could be privileged.

11           **THE COURT:**  Yes.

12           **MR. SCHOEN:**  If the Court accepts the principle

13   they could be privileged, then the OLC opinions absolutely

14   apply because they turn on privilege.  They turn on that

15   separation of powers issue that's relevant when privilege is

16   invoked and privilege is deemed to be valid.  And all they

17   say is, Don't use the criminal process.  The criminal

18   statute doesn't apply.

19           We have two other things:  Accommodation,

20   constitutionally mandated according to the OLC opinions and

21   implied at least in the cases; and the other is the civil

22   enforcement proceeding.  And they explain in the OLC

23   opinions why they, the Department of Justice, the folks

24   prosecuting this case, say these things.  And they say why

25   there would be a problem in prosecuting someone criminally

53

1    under this statute based on *Raley*.

2             And whether, if a person is not complying because

3    executive privilege has been invoked, then can that person

4    have the mens rea to violate a criminal statute, even if

5    that mens rea doesn't include willfulness?  That is an OLC

6    opinion.  In an OLC opinion.

7             **THE COURT:**  Would that be a jury question then?

8             **MR. SCHOEN:**  Pardon, Your Honor?

9             **THE COURT:**  Would that be a jury question?

10            **MR. SCHOEN:**  Would it be a jury question --

11            **THE COURT:**  Yes.

12            So imagine hypothetically -- I know you disagree

13   with this, but imagine I concluded that dismissal of the

14   Indictment wasn't warranted, but the government still has to

15   prove that Mr. Bannon acted with the relevant mens rea.

16            Would, in your view, these issues come in to

17   establish that one couldn't have the relevant mens rea if

18   executive privilege had been invoked?

19            **MR. SCHOEN:**  Could be.  Could be.

20            But, again, we have to look at this specific

21   context.  This is the prosecuting authority saying it.  We

22   don't subject a person to jeopardy under those

23   circumstances.

24            Judge, can I just -- can I just run through the

25   excerpts I want to read, see if something hits the Court?

54

1          **THE COURT:**  Yes.  Please.

2          **MR. SCHOEN:**  All right.  Let's take a look now at

3    Chuck Cooper's -- Chuck Cooper's opinion, referred to

4    generally, you know, as the Cooper Memo.

5          **THE COURT:**  Yes.

6          **MR. SCHOEN:**  And, again, these all arise in

7    specific circumstances.  The government would construe these

8    OLC opinions ultra narrowly.  Well, again, there's nobody --

9    they don't say this, but effectively nobody with Bannon's

10   name on it.  That's just not how it works.  The *McGahn* case

11   refers to OLC opinions reflecting the Justice Department

12   decision.  They have nothing to do with the *McGahn* case.

13          I will say this as a general proposition, Judge,

14   by the way, the government's motion on barring the evidence

15   of the OLC opinions and other writings is a nonstarter.  I

16   mean, the Court is the fastest gun in the west.  Whatever

17   the Court says we're going to do, we're going to do.  But it

18   should be a nonstarter that those opinions go out.

19          This case is either going to be dismissed, or

20   the -- jury's going to hear about the OLC opinions that

21   Mr. Bannon relied on; that's my view of the case.  Anything

22   else is in a frivolous argument.

23          All right.

24          **THE COURT:**  You were just talking about Chuck

25   Cooper's opinion.

1        **MR. SCHOEN:**  Yes.

2        **THE COURT:**  Can you point me to the ECF number?

3        **MR. SCHOEN:**  Yes, Your Honor.  Chuck Cooper's

4   opinion is 58-15.

5            Now, it repeats some of the language that the

6   Court, you know, noted earlier, in other words, executive

7   branch official.  But I want to -- this is all -- you know,

8   it builds.

9            "We also concluded" -- he said, Chuck Cooper

10  wrote, "We also concluded more broadly, however, that the

11  contempt of Congress statute simply was not intended to

12  apply and could not constitutionally be applied to an

13  executive branch official who asserts the President's claim

14  of executive privilege.

15           "We noted that the legislative history, nor the

16  subsequent implementation of Sections 192 and 194, suggest

17  that Congress intended the statute to apply to executive

18  officials who carry out a presidential assertion of

19  executive privilege.

20           "Moreover" -- and this applies, again, whether

21  current official, not official or otherwise -- "Moreover, as

22  a matter of constitutional law, we concluded that the threat

23  of criminal prosecution would unduly chill the President's

24  ability to protect presumptively privileged executive branch

25  deliberations."

56

1           Those deliberations occur whether with an outside

2     person or with an inside person.  They're presidential

3     deliberations, and that's what we cannot infringe on.

4           I would next go to Ted Olson's opinion, which is

5     at 58-10 in the record, Your Honor.  Ted Olson, as the Court

6     is aware, goes into this in great detail.  This is the most

7     comprehensive of the OLC opinions on it, and it's cited over

8     and over again and has never been withdrawn.

9           So he has a section he calls "Previous Department

10    of Justice Interpretations of the Contempt of Congress

11    Statute."

12          "The Department of Justice has previously taken

13    the position that the criminal contempt of Congress statute

14    does not apply to executive officials who assert claims of

15    executive privilege at the direction of the President."

16          He then goes on to talk about the 1956 Bill

17    Rogers --

18          **THE COURT:**  Can you just tell me what page you're

19    on?

20          **MR. SCHOEN:**  Yeah.  I'm on my own notes.  There's

21    a heading that says "Previous Department of Justice

22    Interpretations".  I can grab my --

23          **THE COURT:**  No, I can find it.

24          You can keep going.  I'll find it as you go.

25          **MR. SCHOEN:**  All right.

57

1          Anyway, he says, "Not aware of any subsequent

2    department position that reverses or weakens his

3    conclusion," so on.

4          We believe that the Department's long-standing

5    position that the contempt of Congress statute does not

6    apply to executive officials who assert presidential claims

7    of executive privilege is sound, and we concur with it.

8          Conclusion is based on the legislative history

9    that demonstrates it was not intended to apply to

10   presidential assertions of executive privilege.  That's not

11   limited, in his formulation there at least, to current

12   executive branch employees or even former executive branch

13   employees.

14         And, he says, number two, "If the statute were

15   construed to apply to presidential assertions of executive

16   privilege, it would so inhibit the President's ability to

17   make such claims as to violate the separation of powers."

18         Again, that's not based on whether that privileged

19   conversation, deemed presumptively privileged, presumptively

20   valid, is with Joe, Susie or a current employee.

21         He then goes on, several pages later, on a related

22   issue.  He says -- he writes:  "Congress itself has

23   previously recognized the impropriety of resolving executive

24   privilege disputes in the context of criminal contempt

25   proceedings."

1           And he talks about Senator Ervin introducing a

2    bill and indicating, in his comments at least, "it may be

3    inappropriate, unseemly or nonefficacious where executive

4    officers are involved."

5           Then he writes:  "The United States Court of

6    Appeals for the District of Columbia Circuit has stated on

7    several occasions that criminal contempt proceedings are an

8    inappropriate means for resolving document disputes,

9    especially when they involve another governmental entity."

10          He talks about the duality.  He quotes from

11   district judge, and he says, "Especially where the context

12   is between different governmental units, the representative

13   of one unit in conflict with another should not have to risk

14   jail to vindicate his constituencies' rights."

15          Now, Judge, I am saying here, because the OLC, the

16   Department of Justice, says that this idea of accommodation

17   is constitutionally mandated; that's in DOJ opinions.

18          But I'm not just asking the Court to dismiss this

19   case because there wasn't a sufficient accommodation.  I

20   could hear how that could be a jury question whether it

21   constitutes a default to offer -- to testify, as Mr. Bannon

22   did, if you work out the privilege issue with the President

23   and so on.

24          But it's important for the Court to be aware, at

25   least, that this is what the Department of Justice, the

59

1    prosecuting authority, has written, that we have to exhaust

2    that process and -- the accommodation process -- and that

3    it's constitutionally mandated.

4            The opinion goes on to talk about why executive

5    privilege for the President is different.  It's different

6    from any other privilege.  It implicates separation of

7    powers principles.  And we simply don't have -- we cannot

8    have Congress determining whether the President's invocation

9    of privilege is valid or not valid.

10           And, of course, the Court in *McGahn* said just

11   about the same thing.  There the Court was considering

12   whether even a court would be appropriate.  And the Court

13   said, Yes, at the end of the day, I think a court is

14   appropriate because -- because Justice Department is not

15   going to prosecute him criminally.  We have the OLC opinions

16   that say that, and we want to possibly get at this stuff so

17   we'll consider a civil enforcement proceeding.

18           All right.  Here's what the Court says now about

19   this similar situation:  In addition to the encroachment --

20   one second.

21           On the separation of powers question, the Court

22   says -- the DOJ says:  "If executive officials were subject

23   to prosecution for criminal contempt whenever they carried

24   out the President's claim of executive privilege, it would

25   significantly burden and immeasurably impair the President's

60

1    ability to fulfill his constitutional duties.  Therefore,

2    the separation of powers principles that underlie the

3    doctrine of executive privilege would also preclude -- would

4    preclude an application of the contempt of Congress statute

5    to punish officials for aiding the President in asserting

6    his constitutional privilege."

7         Now, again, I hear the Court's out on that one is

8    the word "officials".  But, again, we have to read all of

9    these opinions in pari materia.

10   **THE COURT:**  It seems to me that the issue is, to

11   boil it down, you have a set of what are, in effect,

12   holdings by OLC.  I know they're not holdings.  They're

13   addressing particular contexts.  And they are saying, We

14   interpret -- for example, the Olson opinion says, We

15   interpret the contempt of Congress statute to not authorize

16   prosecutions of current executive branch officials who are

17   in the context in which executive privilege is being --

18   asserted.

19        And there's a bunch of reasons for that and some,

20   or maybe all of those reasons, might apply to Mr. Bannon, at

21   least potentially.  But OLC has never said, And, therefore,

22   the criminal contempt statute could not apply to the context

23   of Mr. Bannon.

24        You agree with that.  Right?

25   **MR. SCHOEN:**  But, Judge, again, we're talking

1    about fair notice.  If Mr. Bannon were to read that and also

2    read the Paul Clement letter, in which he makes clear why

3    there should be no distinction, because often a President

4    has to call on outside people for counsel and those

5    conversations --

6        **THE COURT:**  The Clement letter doesn't really have

7    anything to do with the contempt statute on the question.

8    Right?  It's about whether executive privilege can apply to

9    outside employees, nonemployees.  I understand that's an

10   important part --

11       **MR. SCHOEN:**  Whether the person has to appear to

12   respond to the Subpoena, the outside person.  Whether

13   Congress ought to even be able to have that person come in

14   and ask that person questions; and that's Mr. Bannon.

15           At worst case scenario, I say it's more than that.

16   I say he's a former senior advisor who the President then

17   calls in.  He may not have had a formal employment contract

18   at the time.  But it's, in my view, silly to suggest that --

19   and I don't mean to characterize anything the Court has said

20   as silly --

21       **THE COURT:**  No, I understand.

22       **MR. SCHOEN:**  It's silly to suggest that a person

23   then who's called in for -- who was a senior advisor and is

24   now called in, we certainly can't draw any conclusion he was

25   called in to talk about the local bingo game.

1           So if the President says, He was called in for a

2    privileged discussion, I'm invoking privilege, Congress is

3    stuck with that, at least in terms of the application of the

4    criminal statute.

5           And Mr. Bannon is entitled to believe, I cannot be

6    subject to criminal prosecution.  You don't like the

7    privilege invocation, take me to court, take me to civil

8    court and let's talk about it.  Federal court has

9    jurisdiction.  In fact, as we know, Mr. Bannon's lawyer

10   wrote to them and said, Work out the privilege issue, I'll

11   testify.  I'll produce the documents.

12          By the way, Your Honor, to be clear on the record,

13   towards this accommodation process, the Court said, Well,

14   what about some things you could turn over without, in any

15   way, waiving the argument that he had no obligation to

16   appear, both because of the fair notice question and the

17   specific OLC opinion that says the Subpoena was invalid and

18   unconstitutional.

19          Mr. Costello drafted a letter to Congress that he

20   was prepared to give to them, and it said in there -- let me

21   tell you, there are certain categories here he has nothing

22   on at all.  That was part of the accommodation process.

23          Anyway, I'll wrap it up, Judge.  I hear the

24   issues.  I just want the Court to hear these excerpts that I

25   am focusing on because, again, they have to be read -- it's

63

1    the principle that applies.  And it's the principle on fair

2    notice --

3              **THE COURT:**  So I understand -- I don't think you

4    have to go through all of them.  I have the foundations on

5    which your argument and the OLC opinions rest.  The issue

6    that I think -- the issue for you is, if OLC has never said,

7    if the government has never said, we would not prosecute

8    someone who is in Mr. Bannon's shoes, can he get this

9    indictment dismissed?

10             The component parts of your argument are there,

11   but you don't have a conclusion from the government ever

12   saying, the statute would not be applied in this context.

13   We would never prosecute someone in this context.

14             I think you have to admit that OLC has never said,

15   they never expressly said, in the context of a nongovernment

16   employee communicating with a President -- who

17   parenthetically, is now a former President, but not clear to

18   me that that is actually particularly material here.

19             Just assume, right, in the context of a former

20   government or even a nongovernment employee communicating

21   with the President, that we construe the contempt statute

22   not to apply to this context.

23             **MR. SCHOEN:**  My answer --

24             **THE COURT:**  You don't have that.

25             **MR. SCHOEN:**  My answer to that would be it would

64

1      be absurd for any person of ordinary intelligence to read

2      these opinions to talk about the importance of having

3      privileged conversation with outside people and also read

4      the opinions that say, because of the invocation of

5      privilege, the criminal statute doesn't apply to then say,

6      Well, what we didn't mean that it doesn't apply to

7      privileged conversations with people no longer in the

8      executive branch.  It's the institution of the Presidency's

9      privilege that's being invoked; that's a key here.

10             And by the way, I did want to say, in this 2008

11     opinion, whether the Department of Justice may prosecute

12     White House officials for contempt of Congress, February 29,

13     2008, 58-11, they did say this.  And again, it may not

14     satisfy the Court, but it says, "The Department of Justice

15     may not bring before a grand jury criminal contempt of

16     Congress citations or take any other prosecutorial action

17     with respect to current or former White House officials who

18     declined to provide documents or testimony or who

19     declined" --

20             **THE COURT:**  I know this opinion very well.

21             **MR. SCHOEN:**  I know, Your Honor.  But it's --

22             **THE COURT:**  This is about communications by people

23     who were, at the time of the relevant communication --

24             **MR. SCHOEN:**  That's right.

25             **THE COURT:**  -- a close advisor to the President in

65

1    employment in the executive branch.

2              **MR. SCHOEN:**  That's right, Your Honor.

3              **THE COURT:**  There's nothing in this that says -- I

4    understand -- there is reasoning that one might conclude

5    that the statements apply to someone who was not an employee

6    at the time of the relevant communications, but the holding,

7    in the sense that we're talking about holding, is it's

8    applicable to someone who was a government employee at the

9    time of the relevant communications.

10             **MR. SCHOEN:**  Yep.

11             Respectfully, Your Honor, I think that the

12   construction suggested is a far too narrow construction for

13   the use of OLC opinions.  Not what they're entitled to.  The

14   Court knows better than I do -- I don't mean to put words in

15   the Court's mouth.  The Court understands OLC opinions and

16   their rules better than I do.  Let me say that.

17             **THE COURT:**  Okay.  They're not binding on me.

18             **MR. SCHOEN:**  Of course not.

19             **THE COURT:**  They are statements of the

20   Department's view.  So then the question is, What does the

21   statement of the Department's view about a congressional

22   statute mean for a criminal defendant?  Can you --

23             **MR. SCHOEN:**  I --

24             **THE COURT:**  So you have to have a defense or an

25   element of the crime as to which a government statement

1    becomes relevant.  And that's why, of course, you have

2    arguments about entrapment by estoppel and notice and public

3    authority.

4        But because they're not binding, they don't just

5    mean that we apply them.  They have to have some effect.  So

6    the question is, imagine, hypothetically -- well, I think

7    it's true.  OLC said a number of things in justifying its

8    conclusions that have some relevance here, no doubt.

9        But their conclusion -- they have never concluded,

10   to my knowledge, that the contempt statute doesn't apply in

11   a context like this or that the government would never

12   prosecute someone in the context like this.  You can infer

13   that, but they've never said it.

14       **MR. SCHOEN:**  Respectfully, Judge, that inference

15   is fair and the logical one to make.  And there are

16   statements --

17       **THE COURT:**  Is it the only one?

18       **MR. SCHOEN:**  Yeah, I think it is, Your Honor,

19   absolutely, because of the reasons that the principle

20   applies.  The principle applies so that we don't undercut

21   the President's invocation of privilege, the President's

22   determination of privilege; that doesn't turn on who he's

23   talking to.

24       He could talk to someone who has never been

25   employed in the government or otherwise.  It's just as

1    privileged.  And it's just as presumptively valid in

2    invocation of privilege.

3                  And the underlying principle behind all of these

4    opinions is that it -- the contempt statute, criminal

5    contempt statute cannot be applied because privilege was

6    invoked.  That's the triggering factor.

7                  And by the way, in my view at least, these

8    statements are more than just the government's view.  This

9    is -- what's unique about this case in a sense is, this is

10   the prosecuting authority in this case --

11             **THE COURT:**  I understand all of that.  I get it.

12             **MR. SCHOEN:**  Okay.  I don't know that I need to

13   say anything further --

14             **THE COURT:**  I think I'd like to hear from the

15   government --

16             **MR. SCHOEN:**  -- about the entrapment by estoppel

17   and all of that.

18             **THE COURT:**  No, I'd like to hear from the

19   government on this point.

20             **MR. SCHOEN:**  Thank you, Your Honor.

21             **THE COURT:**  Thank you.

22             **MR. SCHOEN:**  Tired of hearing my voice.

23             **MR. COSTELLO:**  Your Honor, before you hear from

24   the government --

25             **THE COURT:**  Mr. Costello?

1      **MR. COSTELLO:**  Thank you, Your Honor.

2          Just a couple of very brief points that came up in

3      your questioning of Mr. Schoen.  First of all, you talked

4      about a phone call that I had with counsel for President

5      Trump, and you said it's not in the record.  It is, in fact,

6      in the record in Docket 30, the motion -- this is our

7      response.

8          My affirmation, Paragraph 10, "On October 5, 2021,

9      I received a phone call, from an attorney representing

10     former President Trump, advising me that the former

11     President was invoking executive privilege with respect to

12     the Select Committee's subpoena directed to Mr. Bannon.  I

13     immediately communicated that information to Mr. Bannon."

14     So it is in the record.

15         Number two, with respect to your questions about

16     no ranking member, one thing that dropped out and that is,

17     in this case, we have an unusual situation because the

18     Chairman of the Select Committee has admitted in videotape

19     in a public document that Ms. Cheney is not the ranking

20     member of this Committee.  So that admission stands.

21         Number two, we have an admission by Doug Letter,

22     the general counsel at the House of Representatives, that

23     Ms. Cheney is not the ranking member.  And that statement

24     was made to the FBI, memorialized in a 302 in the presence

25     of all three prosecutors that are here today.  So they were

1    aware of that.

2          Number three, we talked about Section (3)(b).  I

3    was the recipient of the Subpoena package because Mr. Bannon

4    authorized me to accept service on his behalf.  In that

5    subpoena package there was no Section (3)(b), which was part

6    of House Resolution 8, if I remember correctly.

7          If you look at -- and I'm sure you have -- the

8    regulations on the use of deposition authority at Paragraph

9    11, it says, "That a witness shall not be required to

10    testify, unless the witness has been provided with a copy of

11    Section (3)(b) of House Resolution 8, 117th Congress and

12    these regulations."

13          The government's defense here, which you

14    reference, is that, Oh, we would have given him that when he

15    showed up for the deposition that he didn't have to show up

16    for.

17          **THE COURT:**  How can I consider any of this on a

18    Motion to Dismiss?

19          **MR. COSTELLO:**  I'm sorry.  I didn't hear that.

20          **THE COURT:**  How can I consider any of this on a

21    Motion to Dismiss an indictment?

22          **MR. COSTELLO:**  These are admissions in the record,

23    Your Honor.  There's an admission in the record that Section

24    (3)(b) wasn't issued.  The documents, the rules and

25    regulations of the House are in the record.  They say that

70

1       the witness doesn't have to show up.  That's how you can

2       consider any of this motion.

3              **THE COURT:**  How does this mean that the Indictment

4       on its face is insufficient?

5              **MR. COSTELLO:**  If he doesn't have to testify, how

6       can he be indicted for refusing to testify?  House

7       regulations say he doesn't have to testify.  He wasn't given

8       (3)(b).  I wasn't given (3)(b) on his behalf.

9              **THE COURT:**  That seems like an affirmative

10      defense.  Why it that a ground for dismissing the

11      Indictment?

12             **MR. COSTELLO:**  I'm going to repeat what I said.

13      It is in the record, and it's certainly something that you

14      can consider.  They have no excuse for this other than to

15      say, Well, if he came to testify, we would have given him

16      the notice that he didn't have to come to testify because he

17      didn't have (3)(b).  I mean, that's just frivolous.

18             Thank you.  That's all I wanted to add.

19             **THE COURT:**  Thank you, Mr. Costello.

20             **MS. VAUGHN:**  Good morning, Your Honor.

21             **THE COURT:**  Ms. Vaughn.

22             **MS. VAUGHN:**  I can pick up with the estoppel

23      issue, if that's where the Court would like to begin.

24             **THE COURT:**  Estoppel, due process, public

25      authority --

1          **MS. VAUGHN:**  Altogether.

2          **THE COURT:**  It is the case, do you agree, that the

3     OLC opinions have relied on a number of principles that

4     apply here?

5          **MS. VAUGHN:**  I think that that jumps ahead of what

6     the defendant has to show to make this an issue at trial or

7     to even raise it as a defense to the Indictment at the

8     Motion to Dismiss stage.

9          Because Mr. Schoen seemed to suggest that there is

10    a separate due process defense from entrapment by estoppel,

11    but it really is an entrapment by estoppel case.  And

12    entrapment by estoppel is the defense that embodies the due

13    process concern.

14         **THE COURT:**  I think the argument has shifted some.

15    I think the argument is now, everyone agrees that to be

16    prosecuted under a relevant criminal statute, you have to

17    have fair notice that your conduct is covered by it.

18         Mr. Bannon, the argument goes, could not have had

19    such fair notice because OLC said his conduct doesn't fit

20    within the statute.  That's a due process problem.  It's

21    actually not -- it may not be only entrapment by estoppel.

22    It's a the statute plus the OLC opinions did not put me on

23    fair notice that my conduct fit within the criminal

24    prohibition here.

25         **MS. VAUGHN:**  That is the entrapment defense.  It's

1    the statute -- I don't think -- I haven't heard the

2    defendant to be arguing that the statute is vague on its

3    face.  The argument he seems to be making is that OLC, by

4    their statements, has told me my conduct is lawful and

5    therefore you can't prosecute me for that.

6         **THE COURT:**  So, in your view, these arguments

7    basically all do collapse to a version of, "Pick the bucket

8    you want, but OLC has told me that the statute, which does

9    cover my conduct, nevertheless is inapplicable."

10        **MS. VAUGHN:**  And that's what happened in *Raley*.

11   The commission in front of which the defendants there were

12   testifying erroneously told them that they had a privilege

13   excusing them from answering certain questions.  And the

14   *Raley* Court said, That's a problem.

15        Because even though, under the statute, they were

16   subject to prosecution for not answering, the government

17   affirmatively mislead them into believing that they were

18   acting lawfully when they refused to answer.

19        So over the course of the entrapment

20   jurisprudence, elements have been established where

21   defendant has to show not only as an initial matter to even

22   present it to the jury, but then in front of the jury once

23   you get there.  And if you look at those elements, the

24   defendant has not even satisfied the threshold question of

25   identifying what statements in particular he is relying on.

73

1          Based on his Motion to Dismiss, the government

2     thought that it was four opinion-- or three opinions from

3     the OLC and a letter from the U.S. Attorney.  He said in the

4     reply that that was incorrect, and he still hasn't

5     identified what those statements were.  And that's fatal,

6     right there.  We don't even need to proceed beyond that.

7          **THE COURT:**  Do you agree that if Mr. Bannon

8     were -- and I'm not suggesting he's not.  I've heard

9     counsel's argument -- but if Mr. Bannon were squarely within

10    the four corners of an OLC holding, quote/unquote -- in

11    other words, if, for example, Mr. Bannon had been, at the

12    time of the relevant communications, the counsel to the

13    President, and there was an invocation of privilege, and he

14    is nevertheless being prosecuted now, that he would have a

15    defense of some sort?

16         **MS. VAUGHN:**  We agree with that, Your Honor.

17         **THE COURT:**  What is the legal bucket for that

18    defense?

19         **MS. VAUGHN:**  So -- well, it's two -- he's charged

20    with two different offenses, I guess.  One is not producing

21    documents, and one is not appearing.

22         If he had been counsel to the President during the

23    time period for which he was subpoenaed for testimony, under

24    OLC opinions, he would have -- the DOJ views him as having a

25    potential immunity claim --

74

1          **THE COURT:**  Okay.  Let's imagine it's not

2     immunity, but let's imagine that he -- was not someone so

3     close to the President who would have been immune.  I just

4     want to make this simple.

5          He's someone communicating with the President as a

6     current executive branch employee at the time, privileged

7     communications, assertion of privilege, notwithstanding the

8     OLC opinions, there's a prosecution for two offenses,

9     failing to show up and failing to produce documents.

10          So he fits within the four corners of an OLC

11     holding, so to speak.  He's prosecuted, nevertheless.  What

12     is his defense?

13          **MS. VAUGHN:**  His defense could potentially --

14     again, depending on the circumstances and how it matches up

15     with the opinions --

16          **THE COURT:**  I'm assuming there's, like, a --

17     perfect alignment between OLC's statement that this is not a

18     crime or it will not be prosecuted, and the situation we're

19     presented with.  You could make an altogether different

20     hypothetical.

21          Again, I sort of posed this last time, imagine

22     that a head of an agency is subpoenaed tomorrow, and

23     President Biden says, Don't show up.  Our communications are

24     privileged.  And that person is, nevertheless, prosecuted

25     and says, I have a defense.

1        All I want to know is when, in the government's

2    view, assuming there's perfect alignment, what is that

3    defense called?

4        **MS. VAUGHN:**  That defense is called entrapment by

5    estoppel.  It is --

6        **THE COURT:**  So even though there isn't a specific

7    statement -- to that person by a government official, as

8    you've argued, nevertheless, that defense would apply?

9        **MS. VAUGHN:**  If it's within the four corners of an

10    OLC opinion --

11        **THE COURT:**  And so really this question comes down

12    to whether Mr. Bannon -- fits within the government's or his

13    view whether he fits within the OLC opinions or not?

14        **MS. VAUGHN:**  Yes.  And I think that the case law

15    on entrapment by estoppel is clear that it has to be a fit.

16    The defendant can't start extrapolating and guessing at how

17    the government might extend its reasoning.

18        Because the whole purpose of this defense is to

19    prevent the government from essentially tricking someone

20    into committing an offense by saying, No.  Please.  Go

21    ahead.  That's fine.  You can do that.  You won't be

22    prosecuted.  And then turning around and prosecuting them.

23        **THE COURT:**  But Mr. Bannon says that's what

24    happened here.  You have OLC opinions that say executive

25    privilege matters.  We don't prosecute for executive

76

1    privilege.  And there's a bunch of statements that are not

2    limited, in the sentences at least, that they're written to

3    people who were then government employees.

4        There are OLC opinions that talk about executive

5    privilege applies to even nongovernment employees.  There's

6    a whole host of statements in these documents that are not

7    limited by their terms to the context of current government

8    employees when the communication occurred.

9        **MS. VAUGHN:**  He says that, but that's not actually

10   what the opinions stand for.  And here, the defendant

11   again -- I'm still not clear on which statements he's

12   relying on because he hasn't clearly identified which

13   statements he claims to have relied on at the time he

14   decided to engage in this conduct, as he's required to show

15   under the defense.

16       But he's not relying on just a regulation that's a

17   couple of lines and is clear in its scope.  He's relying on

18   30-, 40-page opinions.  He can't start cherrypicking

19   sentences out of those and relying on them.  The entire

20   opinion represents sort of "the holding" of the office of

21   Legal Counsel.

22       And so that takes it to the other issue is, it's

23   not even clear whether he read these directly, whether he

24   was told about them by his attorney.  And if he was told

25   about them by his attorney, what he was told about them?

77

1    Because if he's told by his attorney something that is

2    inconsistent with the government's statement or goes beyond

3    the four corners of the government's statement, it's no

4    longer a government statement.

5         Another element of the offense is that it has to

6    be a statement by someone authorized in the government to

7    interpret or enforce the law.  His attorney doesn't fit that

8    category, and at that point, it becomes an advice of counsel

9    defense.

10   **THE COURT:**  What's your answer to Mr. Schoen's

11   argument that maybe on entrapment by estoppel there has to

12   be reliance or knowledge or whatever, but for, more broadly

13   speaking, due process arguments, this is about notice, and

14   notice is notice.

15   **MS. VAUGHN:**  Notice is notice.  And the statute is

16   clear.  The word "default" is clear.  The word being

17   summoned by a Committee is clear.  The statute is clear.

18        And so the statements of the OLC do not start to

19   invalidate that statute's application in areas on which OLC

20   has never commented.

21        So here, in the government's view, the Court

22   doesn't even have to reach the question of what the OLC

23   opinions actually say because the defendant hasn't met the

24   threshold questions of which ones he relied on and what he

25   was told about them, if he didn't read them himself.

-2305-

78

1          **THE COURT:**  But let's imagine I conclude that I do

2     have to reach that question.  In other words, I have to

3     conclude whether there's a fit between the OLC statements

4     and Mr. Bannon's case.  What's the government's argument on

5     that?

6          **MS. VAUGHN:**  So I think the defendant is

7     conflating two different issues in the OLC opinions.  One

8     is, When does executive privilege apply?  And the separate

9     question is, Can you be prosecuted for defying a

10    congressional subpoena under the contempt statute?  And you

11    have to address those with respect to the documents and

12    separately with respect to appearing for testimony.

13         So if you look at the opinions addressing

14    executive privilege assertions over particular documents,

15    they all are focused on particular assertions over

16    particular documents carried out by current executive branch

17    officials.

18         So, for example, in the 1984 opinion, the EPA

19    administrator being subpoenaed -- and assert -- going

20    through a review process within the executive branch,

21    concluding that there are 60-some documents over which they

22    should assert privilege, producing the remaining documents,

23    and then the OLC says, You can't be prosecuted for not

24    producing the remaining 62.

25         There's no OLC opinion that says that Mr. Bannon

1    didn't have to turn over his communications with the Proud

2    Boys or the Oath Keepers or didn't have to turn over records

3    he had in relation to a meeting he had with members of

4    Congress at the Willard Hotel on January 5th.  There's no --

5    OLC opinion that says a private party doesn't have to turn

6    over private records.  So that's -- the documents.

7          The testimony, OLC opinions are clear that

8    immunity from showing up applies to only the highest-ranking

9    White House officials, the closest advisors to the

10   President.  There is no OLC opinion that says a private

11   party has immunity from showing up.

12         On top of all of that, there is no OLC opinion

13   addressing a circumstance where you have a conflicting

14   assertion decision among -- between a former President and a

15   current President.  That's another distinguishing factor.

16         And, again, while there are OLC opinions that

17   certainly recognize the communications with outside parties

18   can be protected, those OLC opinions don't conclude that

19   those outside parties have absolute immunity from complying

20   in any way with a congressional subpoena.  Even if the Court

21   were to reach the merits of, "Does a statement apply here?",

22   there isn't one.

23         And again, that's the first element of the

24   offense.  If there's no statement from the government

25   telling you your conduct is sanctioned, you're not entitled

1   to this due process entrapment by estoppel defense.

2          And the standard for this defense that the

3   defendant is advocating for by arguing otherwise is one

4   without any limiting principle.  Under his approach, any

5   defendant could essentially find any government statement,

6   find a couple sentences within there that seem to apply to

7   his case, and then argue he has a free pass to commit

8   crimes.

9          That's not what the entrapment by estoppel defense

10  was intended to protect against.  It was intended to protect

11  against affirmative misleading by the government, in

12  relation to a specific course of conduct.

13         I think the best example of that is the *West

14  Indies Transport* case out of the Third Circuit.  There, they

15  were dumping scrap metal in the ocean.  They pointed to a

16  placard that said, You can dump nonplastic trash, and by the

17  way, there are other regulations.

18         Nonplastic trash, I mean, on its face, might apply

19  to scrap metal, but they were on notice that that wasn't the

20  full statement of the government.  Each of these opinions

21  also makes that clear.

22         The foundational opinion, in 1984, says this is

23  limited to the specific circumstances of this case.  The

24  2021 opinion on congressional oversight says not even all

25  the White House officials have immunity from showing up to

1    testify.  It's a fact-specific determination.

2            So because -- the defendant has failed to even

3    make a threshold showing of any of the elements of the

4    defense, he is certainly not entitled to dismissal, and he's

5    not entitled to present it to the jury.

6        **THE COURT:**  So I understand your argument about

7    the defense and the like, but why isn't Mr. Bannon's

8    knowledge of these OLC opinions potentially relevant on mens

9    rea?

10            And I don't have proposed jury instructions.

11    Obviously I know what the government has argued the general

12    standard is, but I don't know what the jury is -- I don't

13    yet know what the jury is going to be told specifically the

14    mens rea is here.

15            And why -- I get your argument about dismissal.

16    But as to the Motion in Limine, why isn't it at least

17    potentially relevant to say, Hey, look, I was not intending

18    to willfully default because I thought, based on these OLC

19    opinions, that the way to proceed was to proceed the way I

20    did?

21        **MS. VAUGHN:**  That's a good-faith reliance defense.

22    That's barred by *Licavoli* and *Bryan*.  The defendant in that

23    case would be saying --

24        **THE COURT:**  No, why isn't it, You have to prove,

25    government, that I acted with a particular state of mind; I

1    didn't act with that particular state of mind because I

2    acted for this reason?

3         **MS. VAUGHN:**  The government has to prove that the

4    defendant knew he was required to show up on a certain day

5    or knew he was required to produce documents, and

6    consciously chose not to do that, as opposed to it being by

7    accident or something else.

8         The reason he decided to deliberately not comply

9    is irrelevant, and there's a jury instruction that was

10   approved by the circuit in *Fields* exactly to this effect.

11        **THE COURT:**  Do you know what it says exactly?

12        **MS. VAUGHN:**  I don't have the wording exactly in

13   front of me, but it is something to the effect of, The

14   reason for his deliberate, intentional noncompliance doesn't

15   matter as long as it's not accidental.  You know, this goes

16   back to our argument last time about the metro breaking down

17   or something.

18        **THE COURT:**  I certainly understand *Licavoli* to

19   have said no advice of counsel.  I've held that.

20        It seemed to me, approaching this argument, that

21   whether these OLC opinions or some other questions might be

22   relevant at trial, if there is a trial here, on the question

23   of mens rea, depends on more granular information about the

24   jury instructions than I presently have.

25        Because if the jury instruction, even within the

1   framework of, you know, intentional, deliberate or knowing

2   deliberate or whatever, actually sounds a little bit more

3   like something where the knowledge of these OLC opinions

4   would be relevant, then maybe they come in.

5           **MS. VAUGHN:**  I -- we can get the *Fields*

6   instruction for the Court but essentially what the defense

7   would be saying is, I deliberately chose not to show up, but

8   I thought that executive privilege excused the requirement

9   that I had to show up.

10          So, basically, we would be arguing that there was

11  a justification for his decision, a legal justification.

12  That's no different from an advice of counsel defense.  My

13  lawyer told me I didn't have to go under the law.  It's a

14  good-faith reliance defense, not just by *Licavoli*, which

15  dealt with it specifically in the context of advice of

16  counsel, but by *Bryan* and *Fields* and *Dennis*, all in this

17  circuit -- or, sorry, *Bryan* is a Supreme Court case, but

18  *Fields* and *Dennis* in this circuit.

19          **THE COURT:**  Can we turn to the House res and the

20  rules?  Are you going to cover that as well?  Are you doing

21  the whole argument?

22          **MS. VAUGHN:**  Yes, I am going to cover everything

23  for the Court.

24          **THE COURT:**  The government concedes, I assume,

25  that there were never 13 members of this Committee.  And the

84

1    government concedes that, I assume, that at least the most

2    natural reading of the House res is that there were supposed

3    to be 13.  Do you agree with that?

4        **MS. VAUGHN:**  I think -- so we certainly concede

5    there were never 13 members.  As far as what was required

6    for the Committee to act, I think is a different question.

7        So given the ambiguity in the word "shall",

8    without an affirmative position from the House, it might

9    just be ambiguous and therefore nonjusticiable under lasting

10    custody.  But we have a position from the House.  Not only

11    in their ratification of the Committee's operations through

12    their contempt referrals, but in their filings in various

13    court cases where the House -- I understand the minority has

14    a different view, but they don't speak for the House --

15    where the House has spoken.

16        So under *Barker* and *Rostenkowski*, the Court has to

17    defer to those interpretations.  But the Court doesn't even

18    need to reach any of that, because, here, these are all

19    procedural objections that the defendant has waived.  He

20    didn't raise them for the Committee.  And there were --

21        **THE COURT:**  Well, some of them -- some of them

22    could not have been cured, could they have?

23        **MS. VAUGHN:**  So --

24        **THE COURT:**  And don't you -- let me ask a --

25    different question.  The government bears the burden of

1    proving that the Subpoena here was validly issued.  Do you

2    agree with that, that that's an element of the offense?

3         **MS. VAUGHN:**  So I think the element is a little

4    bit different.

5         **THE COURT:**  Okay.  What is the element?

6         **MS. VAUGHN:**  The element is whether the inquiry

7    under which the Subpoena has been issued is authorized.

8              And if you look at how the Second Circuit and the

9    Third Circuit and *Barenblatt*, which is the Second Circuit in

10   *Seeger*, the Third Circuit in *Orman*, the Supreme Court in

11   *Barenblatt*, they interpret that element of whether the

12   Subpoena has been issued under the authority of the

13   Committee as one concerning whether or not the inquiry has

14   been authorized.

15             And when you think about the Select Committee, the

16   Select Committee doesn't cease to exist when it has fewer

17   than 13 members.  The House resolution contemplates

18   vacancies.  Every Committee contemplates vacancies.  The

19   Committee doesn't cease to exist, so the question has

20   been --

21        **THE COURT:**  Can I just pause on the element

22   question?

23             What does a jury have to determine on that

24   element?  Is that a jury question, first of all?

25        **MS. VAUGHN:**  Yes.  The government --

86

1          **THE COURT:**  And what does the jury have to decide

2     on this element?

3          **MS. VAUGHN:**  The jury has to decide what was the

4     scope of the authorized inquiry?  And typically Courts look

5     to the House resolution authorizing it and then did the

6     Subpoena fall within the scope of that inquiry?

7          **THE COURT:**  So imagine, hypothetically, that the

8     House Resolution 503 was crystal clear and a hundred percent

9     unambiguous that there needed to be 13 members to be able to

10    issue subpoenas, and there were never 13 members.  And

11    assume Mr. Bannon raised that argument at the time, so we

12    don't have any of those issues either.  Is that irrelevant

13    for purposes of this case in that hypothetical?

14         **MS. VAUGHN:**  If the defendant had preserved it, it

15    would be a sort of pseudo-affirmative defense.  And I think

16    *Yellin*, the Supreme Court's opinion in *Yellin*, makes this

17    clear.

18         So to the extent that there are procedural

19    protections for the witness in the rules, that's things like

20    quorum requirements, um --

21         **THE COURT:**  Is having 13 members a procedural

22    protection for a subpoena recipient or isn't it something

23    broader about whether the Committee even has the power to do

24    anything?

25         **MS. VAUGHN:**  It's a procedural protection.  So --

1    although it doesn't -- there is not a procedural protection

2    here like that.  But, for example, in D.C. circuit cases,

3    *Liveright* and *Shelton*, those cases were both concerned with

4    whether or not the entire Committee had been consulted

5    before a subpoena had been issued.

6         The Court said the rules require that.  They

7    didn't do that consultation.  Therefore, it is a defense to

8    the charges.  And *Liveright* makes clear that it's not an

9    element of the defense, but it is a defense that the

10   defendant can raise.  And I think that's where *Yellin* comes

11   in.

12        So *Yellin* says, House Committees set out these

13   procedural rules.  They protect witnesses' rights.  And to

14   the extent the witness wants to vindicate those rights, that

15   can be a defense if the House doesn't comply.  So in a

16   circumstance like *Yellin* or *Liveright*, where the witness

17   can't know one way or another whether it's been complied

18   with, they get to raise it as a defense regardless.  In a

19   case like *Bryan*, where the defendant can know at the time

20   and doesn't preserve it, they waive it and they can't raise

21   it.

22        So here the defendant's dispute with the number of

23   members is really one about, Well, they didn't have enough

24   members to issue the Subpoena.  But House Res 503 doesn't

25   require 13 members to be sitting to issue subpoenas.  It

1    says that the Chair unilaterally can issue subpoenas.

2          So here it's a procedural rule, and it's not even

3    a procedural rule that provides any rights or protections to

4    the defendant, regardless of the number of members on the

5    Committee.  The House resolution gives the Chair the

6    authority, the sole authority, to issue subpoenas here.

7          Even if we got past the waiver, it wouldn't even

8    fall under the category of procedural objections that *Yellin*

9    recognizes that can be vindicated by raising it as a defense

10   at trial.

11         And the same goes for the objection to the ranking

12   minority member.  The ranking minority member has no role in

13   issuing the Subpoena.  So, again, there is no procedural

14   protection with respect to that title that the defendant

15   would have been entitled to just on the issuance of the

16   Subpoena.

17         So, one, he's waived all of these objections.

18   But, two, even if he hadn't, they're not the kinds of

19   objections that the Supreme Court has recognized as those a

20   defendant can raise in defense to contempt charges.

21         **THE COURT:**  Counsel, the court reporter would like

22   to take a break.  Is now an okay time to take 10 minutes --

23         **MS. VAUGHN:**  Absolutely, Your Honor.

24         **THE COURT:**  -- and then come back?  Okay.  We are

25   in recess for just 10 minutes.

1           **DEPUTY CLERK:**  All rise.  Court is now in recess.

2       (Break at 11:57 a.m. and resumed at 12:05 p.m.)

3           **DEPUTY CLERK:**  We are now back on the record.

4           **THE COURT:**  Ms. Vaughn.

5           **MS. VAUGHN:**  Your Honor, I have the jury

6   instruction that was approved in *Fields* on the meaning of

7   "willful" and it's as follows:  The word "willful" does not

8   mean that the failure or refusal to comply with the order of

9   the Committee must necessarily be for an evil or bad

10  purpose.

11          The reason or purpose of failure to comply or

12  refusal to comply is immaterial, so long as the refusal was

13  deliberate and intentional and was not a mere inadvertence

14  or an accident.

15          **THE COURT:**  Okay.  Thank you.

16          **MS. VAUGHN:**  So we left off with objections, just

17  to summarize the Government's view, all of these issues that

18  the defendant raises that he has waived.  And even if he had

19  not, things like the Committee not having 13 members and the

20  ranking minority member title, are not things that go to

21  rights that he could have vindicated -- before the Committee

22  with respect to the Subpoena's issuance, such that they

23  would even be defenses in the first place.

24          So unless the Court has any further questions on

25  that issue, I can move to the other.

90

1              **THE COURT:**  Please do.  Yes.

2              **MS. VAUGHN:**  Okay.

3              **THE COURT:**  Let me ask one question on the House's

4     view of whether the Committee was properly constituted,

5     notwithstanding the fact that it had 13 members or all of

6     these issues.

7              I understand your point about ratifying the view

8     and the contempt resolutions and the like.  Is your view

9     that the amicus brief that was filed with me is a place

10    where I could find the House's considered judgment on this

11    question?

12             **MS. VAUGHN:**  We think that the Court could look to

13    public filings in court cases by the House.  Since those

14    amicus briefs are made on behalf of the House and not any

15    individual member or on behalf of a particular committee, we

16    think under the -- under the rulemaking clause, they

17    represent statements of the House about the making of their

18    rules.

19             **THE COURT:**  And even if I didn't, I take it your

20    position is that I could look to party briefs filed by the

21    Committee -- although that probably wouldn't work.  It would

22    have to be party briefs filed by the House and cases here.

23    Are there any?

24             **MS. VAUGHN:**  I think that's right.  Party briefs

25    in other cases, I'm not --

1        **THE COURT:**  You mentioned before other cases

2    pending on this.

3        **MS. VAUGHN:**  Yeah.  Sorry.  My understanding is at

4    least some of those cases are cases in which the January 6th

5    Committee has taken a position on -- this question, but

6    that's not the House position.  Correct?

7        **MS. VAUGHN:**  Well, I think, in some of those

8    cases, the Speaker was a party.  And since the Speaker has

9    the authority -- to appoint the Committee, her position

10   would likely also be informative.

11       **THE COURT:**  Okay.

12       **MS. VAUGHN:**  I think under *Yellin*, they look to

13   the practice of the committee as well in determining what

14   the rule requires.  And here there's nothing inconsistent in

15   the record about how the Committee or the House has

16   interpreted or ratified these actions.

17       **THE COURT:**  Okay.  Thank you.

18       **MS. VAUGHN:**  So turning to -- I can turn to the

19   issues related to Mr. Costello next.

20       **THE COURT:**  Yes, that would be fine.

21       **MS. VAUGHN:**  There are two issues raised.  One is

22   whether there's a basis for dismissal, and the other is

23   whether there's a basis to exclude certain evidence.

24       And with respect to dismissal, for dismissal on

25   the basis of outrageous government conduct, you have to

-2319-

1    have, one, misconduct and then prejudice.

2            Here the government never chose Mr. Costello as a

3    witness.  The defendant did.  He was his attorney in

4    relation to the acts under investigation.  He was involved

5    in the acts under investigation.

6        **THE COURT:**  Let me just cut to probably what seems

7    to be the most important question, at least on the

8    evidentiary point.  Does the government intend to use any of

9    the evidence that was obtained relating to Mr. Costello's

10   accounts in the trial in this matter?

11       **MS. VAUGHN:**  Obviously not accounts that did not

12   belong to him.

13       **THE COURT:**  Clearly.  What about accounts that

14   did?

15       **MS. VAUGHN:**  The toll records, it's possible.

16   Sitting here right now, we haven't finalized our exhibits.

17   But to the extent that there are calls between --

18       **THE COURT:**  I mean, isn't it undisputed that

19   Mr. Bannon was aware of the Subpoena?  That's the

20   government's argument -- was the government's argument.  We

21   needed to look at this information to, in case we needed to

22   prove that Mr. Bannon knew about the Subpoena.  It is --

23       **MS. VAUGHN:**  Or subsequent communications with the

24   Committee.  If the defendant --

25       **THE COURT:**  Wait.  What?  That Mr. Bannon knew

1    about Mr. Costello's subsequent communications with the

2    Committee?

3            **MS. VAUGHN:**  For example, that the Committee had

4    rejected his basis for not appearing.

5            If the defendant wants to stipulate to these

6    things, that there's no factual question that he knew he had

7    to produce documents by October 7th, and he knew that he had

8    to appear on October 14th, we wouldn't need to use any of

9    this.  We could present the stipulation to the jury.

10            So it's possible that we would have to use tolls.

11    In sitting here, I can't tell you how many calls there are

12    in number or what have you.  And it's also possible that we

13    would have to use Mr. Costello's statements to the extent

14    that they present, either in cross of our witnesses or in

15    their own case in chief, evidence that's contradictory to

16    what Mr. Costello told us about the defendant's knowledge.

17            **THE COURT:**  Are you talking about, for example,

18    his declarations here or his statements to law enforcement?

19            **MS. VAUGHN:**  Either or both.

20            **THE COURT:**  Is that -- at least that's not --

21    that, at least, is not information that the government

22    obtained through subpoena or the process that we were

23    talking about last time --

24            **MS. VAUGHN:**  Right.

25            **THE COURT:**  -- right?

94

1          **MS. VAUGHN:**  That's right.

2          **THE COURT:**  Okay.

3          **MS. VAUGHN:**  But the foundational question for

4    dismissal is, Was there misconduct?  There wasn't.  There's

5    no privileged communications that the government obtained --

6    improperly.

7          And then the second question is, Was there

8    prejudice?  And the defendant still has not actually

9    identified actual and substantial prejudice.

10         They say that, I guess, the defendant was upset

11   with his attorney.  But, again, the government, from the

12   very beginning, raised this potential conflict in its first

13   call with Mr. Schoen and Mr. Corcoran, before Mr. Costello

14   ever entered an appearance.

15         Despite that, the defendant apparently decided to

16   waive any potential conflict and have Mr. Costello enter an

17   appearance.  And he can't now turn around and turn that into

18   a weapon against the government.  These are all his choices.

19   So he's completely failed to show misconduct, completely

20   failed to show prejudice. -- There's no basis for dismissal

21   here.

22         And on the exclusion issue, there's no basis for

23   that either.  He doesn't articulate any legal basis for

24   exclusion.  They were lawful grand jury subpoenas.  We're

25   not using anything in relation to the 2703(d), and there

1    were voluntary interviews in which Mr. Costello participated

2    with the government.

3          So there's no violation of any legal principle or

4    right, constitutional or otherwise, that the defendant is

5    identifying in the government's conduct here.

6          So he seems to want to fashion, instead, an

7    exclusionary rule for attorney/client privileged

8    information, but he doesn't actually even identify any

9    privileged information.

10          So without having identified any basis to exclude

11    this relevant, admissible evidence, to the extent it is at

12    trial, there's no basis to exclude it.

13          **THE COURT:**  Okay.

14          **MS. VAUGHN:**  I can turn now to the prior good acts

15    motion that the government filed.

16          **THE COURT:**  Yes.

17          **MS. VAUGHN:**  Standing here we still don't know the

18    circumstances or even the timing of the other subpoenas or

19    instances of testimony to which the defendant has alluded in

20    relation to the Mueller investigation, in relation to the

21    House Intelligence Committee or in relation to the Senate

22    Intelligence Committee.  As the party proffering the

23    evidence for admission, the defendant bears the burden of

24    showing its relevance.

25          The only thing he offers is that it's somehow

1    relevant to his intent, what was in his mind.  But the only

2    way that it would be relevant is to show that he believed

3    his decision not to show up or not to produce records was

4    somehow excused by executive privilege; that would be the

5    theory he would be suggesting to the jury.  And that theory

6    is barred under *Licavoli*, *Bryan*, et cetera, as we've already

7    discussed.

8          His reason for not showing up is not relevant, if

9    his -- decision was deliberate and intentional.  So the only

10   remaining purpose would be propensity evidence, and the

11   defendant concedes that is improper.  So that evidence

12   should just be excluded outright.

13         **THE COURT:**  It seems to me that this is one of the

14   questions where, putting aside the dismissal arguments, but

15   just whether the evidence can go to the jury depends, at

16   least in part, on what the jury instruction around mens rea

17   would be.

18         I understand you read me the *Fields* one.  I

19   haven't decided what the jury instruction will be.  Did the

20   D.C. Circuit in *Fields* actually say that that jury

21   instruction was correct --

22         **MS. VAUGHN:**  It --

23         **THE COURT:**  -- or did they just affirm the

24   conviction on other grounds?

25         **MS. VAUGHN:**  *Fields* was addressing the meaning of

97

1    wilfulness and found that that definition was correct.

2                **THE COURT:**  Was correct.  Okay.

3             **MS. VAUGHN:**  Uh-huh.

4                But even if -- even if the intent standard were

5    different, to enter other acts evidence, the defendant still

6    has to show a conformity in circumstance, in timing, in

7    parties.  And he hasn't even attempted to do that.

8

9                **THE COURT:**  Why wouldn't he -- I mean, if the mens

10   rea definition here -- I understand the government's

11   argument is that it is not -- were sufficiently capacious

12   that it included, for example, something like, you know, the

13   government had to prove -- it's a little hard to frame in

14   light of what your position is about *Fields*.

15               But if Mr. Bannon was entitled to argue or to at

16   least rebut the government's evidence that when he acted in

17   a way that he thought was consistent with how one is

18   supposed to behave when there is an executive privilege

19   assertion -- and not only did he do that here, but he had

20   been through these procedures before.  And in those

21   procedures he acted in a very similar way, all which goes to

22   show -- -- this in a technical legal sense -- his good

23   faith, his reasonableness, his nonintentional default.  I

24   guess -- would say with a different statute or a different

25   mens rea that might be relevant, but here it can't be?

1          **MS. VAUGHN:**  Even if it were here, the defendant

2     hasn't shown any similarities.  I mean, he hasn't proffered

3     anything.  And under Rule 404(b) --

4          **THE COURT:**  Well, wouldn't that be just a trial

5     question?

6          I mean, we don't have exhibits yet.  We don't have

7     a proffer at trial.  We haven't had someone say to me, Your

8     Honor, we'd like to ask Mr. Bannon questions about when he

9     was subpoenaed by the Mueller team.  And we would establish

10    that when he did that, he engaged in good faith with them,

11    and it was a four-month negotiated process, and they

12    protected privilege, and he was allowed to testify.  And we

13    want to show that that's how he would have approached this

14    one if permitted to do so.

15         **MS. VAUGHN:**  That would be admissible or

16    inadmissible under Rule 404(b), and for something to be

17    admissible under Rule 404(b), it has to be more than just --

18         **THE COURT:**  No, he would say, And my intent here

19    was to do the same thing, was to respond in the same

20    appropriate protective way.

21         **MS. VAUGHN:**  The problem is he hasn't shown any of

22    that.  He hasn't shown --

23         **THE COURT:**  Well, that's a trial question.

24         **MS. VAUGHN:**  Well, to even be able to present it

25    at trial, he has to make a -- under Rule 404(b), he has to

1    initially show that it would be --

2            **THE COURT:**  But wouldn't that be a proffer at

3    trial?

4            **MS. VAUGHN:**  So our Motion to Exclude the

5    Evidence, in our view, tees it up for the Court.

6            **THE COURT:**  Tees that up.

7            **MS. VAUGHN:**  It is our view --

8            **THE COURT:**  He was obligated, in your view, to

9    have provided more details in response to your motion that

10   would have acted as a proffer.

11           **MS. VAUGHN:**  Yes.  Under the Rules of Evidence, a

12   party can't say, I promise, Judge, I'm going to prove what I

13   have to prove.  Just let me ask all the questions and make

14   all the arguments.

15           Where the admissibility of evidence is challenged,

16   the party proffering it has to make some showing to the

17   Court initially that it is, in fact, admissible.

18           And here the defendant hasn't even told us when he

19   was subpoenaed in those other instances.  Was he even an

20   executive branch official?  Was he a private party?  There's

21   just nothing he's offered.  And so without that initial

22   offer, that evidence should be excluded.

23           **THE COURT:**  Okay.

24           **MS. VAUGHN:**  I think I've addressed everything,

25   unless the Court has other questions.

1        **THE COURT:**  No.  Thank you.  I'd like to hear from

2    defense counsel, very briefly, and then from the government,

3    briefly as well, as necessary.  And by "very briefly" I

4    mean, like, less than 10 minutes.

5        **MR. CORCORAN:**  Your Honor, one thing I wanted to

6    address, because you've asked it a couple of times about the

7    face of the Indictment, is our Motion to Dismiss Count 2.

8    The defense -- and basically because it would allow the

9    grand jury to indict Mr. Bannon for not providing a log of

10   withheld records.  That's not a crime and so that count

11   needs to be dismissed.  I think the government, in their

12   brief, has indicated that -- let me just grab that cite.

13        Their concession, at least with regard to the

14   Committee not compelling any executive branch official to

15   produce a privilege log, in the *Miers* case is at Document 65

16   at Page 36, and our basis for dismissal of Count 2, on that

17   basis would be the Supreme Court case *Miller*, 471 U.S. at

18   136.

19        The only thing that I would -- I think you've,

20   through the discussion with government counsel, come around

21   to a view or to an understanding in terms of the discussion

22   that the issue of the Subpoenas and so forth -- is something

23   that's going to have to be addressed at trial, not excluded.

24   There's certainly no obligation for a defendant to provide

25   any information to the government in advance of trial that

1    goes beyond the applicable rules of discovery.

2              So we don't have to, for instance, until the Court

3    requires us, even list our witnesses or notify the

4    government of the witnesses.  And a proffer about prior

5    subpoenas is not something that we -- that there's any

6    authority for our obligation to provide that.

7              I think the last point I wanted to make, and I'll

8    be brief, is that I don't believe that the briefs filed in

9    other cases in this courthouse can be considered the

10   position of the House on the issues that are being raised in

11   this case.

12             I don't know of any other -- I know we've talked

13   about the distinction between civil and criminal cases.  But

14   here, I think, that would be crucial.  And I think that

15   briefs that are filed as argument simply can't be viewed as

16   the official position of the House.

17             Thank you very much.

18             **THE COURT:**  Thank you.

19             Mr. Schoen.

20             **MR. SCHOEN:**  Yes, Your Honor.  Briefly.  I'm aware

21   of the time limit.  I'll talk faster.  Just a couple quick

22   points, Judge.

23             First of all, going back to the beginning of the

24   Court's discussion with the government lawyer, our position

25   hasn't shifted at all.  The issue of fair notice and due

1    process is a conceptually distinct argument from the

2    entrapment by estoppel.  And we raise it in our motion,

3    Pages 18 to 22 and 46; the Reply, 19 to 23 and 13.  A

4    critical difference which the Court pinpointed is, we don't

5    have to show any reliance for the fair notice; that's a

6    question for the public.  We don't have to show we ever read

7    the OLC opinions or otherwise.

8         We have to -- we look at it objectively.  Could a

9    reasonable person know that he's going to be subject to

10   criminal prosecution -- despite the fact that there are --

11   these OLC opinions?  The Department of Justice's position is

12   once privilege is invoked, you don't have to appear;

13   criminal contempt statute can't be applied.  And the reason

14   he should know he's subject to it is because at the time he

15   wasn't working for the government.

16        I would say, by the way, in reference to the

17   opinion I referred to, 58-8, the Assistant U.S. Attorney

18   ones, the Department of Justice there talks about the same

19   principles of privilege and why privilege -- not interfering

20   with privilege, through a congressional subpoena is just as

21   important for outside folks.

22        So, for example, on Page 6, when they say that the

23   communications involve individuals outside the executive

24   branch, does not undermine the President's confidentiality

25   interests.  The communications at issue occurred with the

1    understanding they'd be held in confidence.  That's the

2    underlying principle.  It applies whether they're outside

3    people or inside people.  And we don't construe these things

4    so narrowly.

5         Now, by the way -- you know, the test is, of

6    course, as the Court's aware, once privilege is invoked, in

7    order to get around that, Congress needs to show that the

8    material was demonstratively critical.  There's been no

9    showing of anything like that with Mr. Bannon.  But there

10   would have been if they really wanted the information, his

11   testimony or the documents.  They would have had a civil

12   enforcement proceeding.  Very simple question.  They never

13   wanted that.  They wanted to make an example out of him.

14        Now government counsel said, you know, -- The OLC

15   opinions don't fit squarely, therefore he can't raise

16   entrapment by estoppel.  The question for entrapment by

17   estoppel is whether it was reasonable for Mr. Bannon to

18   believe that the OLC opinions applied and that their

19   substance is what he should follow in the case.

20        With all due respect, it would be absurd --

21        **THE COURT:**  Would that be a jury question?

22        **MR. SCHOEN:**  Your Honor, if Your Honor doesn't

23   dismiss it on the entrapment by estoppel.

24        Look, under *the Levin* case, the Court said, in the

25   Sixth Circuit, We had enough here to dismiss it on a

1    pretrial motion.  The opinions were there and so on.

2         But if the Court didn't go that route -- which I

3    would advise the Court to be extremely cautious about.  If

4    the Court didn't go that route and the Court decided to go

5    forward with a trial, perhaps ill-advisedly, then yes, that

6    would be a jury question.

7         The reasonableness of Mr. Bannon's belief that

8    he's covered -- because once executive privilege was

9    invoked, he's covered -- that that OLC opinion that he made

10   clear to the government he relied on; that no agency counsel

11   and so on.  And again, for that inquiry, the history of the

12   OLC opinions would be relevant.  And Mr. Costello's

13   testimony would be directly relevant; and that's the

14   *Tallmadge* case.  But it makes sense, with or without that

15   case.

16        He has an experienced criminal defense lawyer who

17   tells him, These are the OLC opinions.  They apply in your

18   case.  I believe they apply.  Here's why they apply.  That

19   goes to the question of whether Mr. Bannon's belief was

20   reasonable, so does the continued reiteration by the

21   Department of Justice.

22        Okay.  I'm going to wrap it up.  Let's see.  The

23   government said that, Well, there's fair notice because the

24   statute's language is clear.  This is an as-applied

25   challenge.

1          And what *Raley* says is, We also use government

2    statements to determine whether there is fair notice.  So

3    it's not a question of just whether the language in the

4    statute is clear.  Everybody knows this statute has been

5    applied in other cases.

6          The Court asked -- this is an important thing, I

7    thought.  Everything the Court asked is important, but this

8    particularly is.  The Court asked whether it goes to a

9    matter of mens rea if he believed, for example, you know,

10   that executive privilege permitted him not to comply with

11   the Subpoena.

12         The government said -- I was surprised to hear it

13   still at this point.  It's in their opposition.  The

14   government said, No, that wouldn't matter.  The reason he

15   didn't show up doesn't matter.  That's not what the mens rea

16   in this case requires, right, under the statute.

17         In fact, I saw in their opposition, at Page 29 to

18   30, that's Document 65, they wrote, The government's motion

19   and the Court's order granting it, however, address an

20   entirely different question, that is, whether a defendant's

21   purported good faith but erroneous reliance on privilege or

22   his counsel's advice about it negates the intent element of

23   the offense.  As the Supreme Court and the D.C. Circuit and

24   now this Court has held, it does not because the intent

25   element of the statute requires only that the defendant's

1    failure to appear or produce records be deliberate and

2    intentional, whatever the reason is.

3            We're back to executive privilege doesn't matter.

4    Clearly it says it doesn't negate the intent.  If that's the

5    case, then I'm back to our argument in brief that we've got

6    a real separation of powers problem with this statute.  If

7    the reason doesn't matter, if the invocation of executive

8    privilege -- that's not *Fields*, by the way.  Executive

9    privilege is very different -- if the invocation by the

10   President of executive privilege doesn't matter, then this

11   statute, as applied, violates the separation of powers.  And

12   that's in our motion.

13           And by the way, here's what Ted Olson of the

14   Justice Department wrote in a binding authoritative opinion.

15   I think it's at Page 135, but I can't read my notes.  In his

16   opinion, he said, "Furthermore, a person can be prosecuted

17   under Section 192 only for a 'willful' failure to produce

18   documents in response to a congressional subpoena."  There

19   is some doubt --

20           **THE COURT:**  It seems like a number of people who

21   have said that about the statute were not reading *Licavoli*.

22           **MR. SCHOEN:**  May I, Your Honor?

23           Binding authority on the Justice Department.

24   Estoppel.  Here is what he goes on to say, which is

25   important.  "There is some doubt whether obeying the

1    President's direct order, to assert his constitutional claim

2    of executive privilege, would amount to a willful violation

3    of the statute."

4        Executive privilege is different.  All of the

5    cases say, Privilege must be allowed as a defense to

6    contempt of Congress statute.  Period.  The Supreme Court

7    has said it.

8        And so the government's position is it doesn't

9    matter.  The only thing that matters is something like

10   accident, you  know, you couldn't show up because you got

11   hit by a car, God forbid.  It's just wrong.  And that

12   violates the separation of powers.  All right.

13     (Brief pause)

14        The Court's aware we raised in ECF-82 -- I know

15   the Court made reference to the amicus brief -- we raised

16   our objection. --  The guy, Letter, has factual assertions

17   in there without any declaration.  And they contradict his

18   earlier assertion to the FBI that there is no ranking

19   member.  Maybe, more importantly, they contradict Chairman

20   Thompson's assertion, in a press conference, that Liz Cheney

21   is not the ranking member.  So unless -- well, anyway.  It's

22   not appropriate to have these factual assertions in there.

23        And then I guess all I would say is, again, for

24   me -- I guess I'm a cynic -- the idea that the government

25   was just trying to find out about Mr. Costello's

1    communications about the Subpoena, I would have thought they

2    would have actually subpoenaed his real email account that

3    they knew about, the one they used to communicate with him

4    but they didn't.  It's a shame.  It's an intimidation

5    tactic, Judge, I'm afraid.

6              Thank you, Your Honor.

7              **THE COURT:**  Thank you.  Thank you.

8              Ms. Vaughn, briefly.

9              **MS. VAUGHN:**  Just two points, Your Honor.

10             First, the government has never said that a

11   constitutional privilege cannot be a defense to contempt,

12   but a constitutional privilege is a legal question for this

13   Court to decide.

14             Once the Court decides that executive privilege

15   did not bar enforcement of the Subpoena in total, the

16   defendant cannot then argue at trial that his belief that it

17   did excuses his default.  Those are two different questions.

18   One is, Is it a legal defense?  That's a sole question for

19   the Court, not the jury.

20             **THE COURT:**  But the defense is not whether it was

21   privileged.  The defense that's been asserted is that there

22   was a due process problem or entrapment by estoppel.

23             You're not saying that -- or are you saying that

24   it's up to me to decide whether, in fact, the communications

25   between the President and Mr. Bannon were privileged; and if

1    they were, then he has a defense here?

2        **MS. VAUGHN:**  If the defendant were raising that as

3    a defense, saying executive privilege actually bars my

4    compliance with this subpoena, that would be --

5        **THE COURT:**  He is saying that in a way.  I'm just

6    trying to understand your argument.

7        **MS. VAUGHN:**  Uh-huh.

8        **THE COURT:**  Are you saying that if I concluded

9    that the communications between Mr. Bannon and the President

10   were, in fact, privileged, that that would be a defense

11   here?

12       **MS. VAUGHN:**  Well, it wouldn't be here, because he

13   engaged in total noncompliance.  So the question would be --

14       **THE COURT:**  I don't understand the point of your

15   argument then.

16       **MS. VAUGHN:**  So Mr. Schoen said that the

17   government is taking the position that executive privilege

18   doesn't matter; and that's not the position we're taking.

19       So maybe the Fifth Amendment would provide a good,

20   sort of, parallel.  If a witness that's summoned by a

21   committee says, I have a Fifth Amendment right not to

22   testify and not to appear.  And then they're charged with

23   contempt.  And they come before the Court and they say, Your

24   Honor, the Fifth Amendment excused all of my compliance, the

25   Court would decide as a matter of law whether that's right

1    or not.

2              Once the Court says, Actually, that's not right.

3    The Fifth Amendment didn't excuse your compliance.  At

4    trial, the defendant does not get to argue, Acquit me

5    because I believed it did.  I know I was wrong at this

6    point, but I believed it did.

7              **THE COURT:**  I suppose it depends on what the mens

8    rea of the relevant statute is.

9              **MS. VAUGHN:**  And here the mens rea --

10             **THE COURT:**  And if the statute used the term

11   "willfully" but just in a different statute or I didn't have

12   a D.C. Circuit opinion holding that "willfully" was really

13   light, then maybe it would be relevant.

14             **MS. VAUGHN:**  Right.  Maybe it would be, if it were

15   a willful statute where your reliance on the law could be a

16   defense, but here it's not.

17             **THE COURT:**  Right.

18             **MS. VAUGHN:**  And so I just wanted to clarify that

19   the government has never said that the executive privilege

20   can't be a defense.  It's just good faith reliance on it is

21   not.

22             **THE COURT:**  In this case because of this statute

23   and because of *Licavoli* --

24             **MR. SCHOEN:**  Yes, Your Honor.

25             **THE COURT:**  -- right?

-2338-

1          **MS. VAUGHN:**  Yes.

2          **THE COURT:**  I mean, it actually could be -- I know

3     this is the same question I just asked.  But if you had a

4     different statute and a different mens rea, it might

5     actually be -- not a defense.  It would be a refutation of

6     the government's attempt to prove the relevant mens rea, by

7     whatever the standard is in that other statutory context.

8          **MS. VAUGHN:**  For example, campaign finance

9     statutes.  The willfulness standard is knowledge that your

10    conduct was generally unlawful.

11         **THE COURT:**  Right.  In a specific way even.  Yes.

12         **MS. VAUGHN:**  Yeah.

13         **THE COURT:**  Okay.

14         **MS. VAUGHN:**  And then Mr. Corcoran also said that

15    there's no rule requiring the defendant to proffer evidence,

16    which the government is objecting to.  That's incorrect.

17         So Federal Rule of Evidence 104 says that the

18    Court must decide preliminary issues of whether evidence is

19    admissible.  And Federal Rule of Evidence 103 says that the

20    Court has to prevent inadmissible evidence from going to the

21    jury, from being presented to the jury.

22         So obviously the government can just raise this

23    objection again, but there's no rule allowing the defense to

24    just surprise at trial with its evidence.

25         That's all we have.

1        **THE COURT:**  Thank you.

2        **MS. VAUGHN:**  Thank you, Your Honor.

3        **THE COURT:**  Thank you, Ms. Vaughn.

4        **MR. SCHOEN:**  Request I have less than one minute?

5        **THE COURT:**  No.

6        **MR. SCHOEN:**  Thirty seconds?

7        **THE COURT:**  No.

8        **MR. SCHOEN:**  Ten?

9        **THE COURT:**  No.

10       **MR. SCHOEN:**  Five?

11       **THE COURT:**  No.  I'm good.

12       **MR. SCHOEN:**  Last offer.

13       **THE COURT:**  I'm going to take a brief recess.  I'm

14   going to give you my thoughts on where I am on these issues.

15   Okay?

16       **DEPUTY CLERK:**  All rise.  This Honorable Court now

17   stands in recess.

18       (Break at 12:35 p.m. and resumed at 12:44 p.m.)

19       **DEPUTY CLERK:**  We are now back on the record.

20       **THE COURT:**  Thank you, Ms. Lesley.

21       Counsel, thank you for the argument this morning.

22       As I indicated, I took a short recess because I

23   wanted to provide the parties with at least one decision and

24   then some reasons on the way I'd like to proceed on some

25   other issues.

1      So obviously we have five motions in front of us.

2   Four go to evidentiary questions and one is the Defendant's

3   Motion to Dismiss the Indictment or case; that's ECF-58.

4   I'll take that motion up first.  I'm going to deny that

5   motion.

6      Before trial, a criminal defendant may move to

7   dismiss a charge based on a "defect in the indictment."

8   This is not an easy showing for any defendant to make.  The

9   key question is whether the allegations in the indictment,

10  if proven, would permit a jury to find that the defendant

11  committed the criminal offense charged.  The Court is thus

12  limited to analyzing the language in the indictment itself

13  to see if it supports the counts charged by the grand jury.

14      Mr. Bannon first alleges that the Subpoena was not

15  lawfully issued.  He raises several arguments on this score,

16  but each falls short at this stage at least.

17      First, Mr. Bannon argues that the composition of

18  the Select Committee invalidates the Subpoena.  As he notes,

19  House Resolution 503, the resolution that authorized the

20  Select Committee, provides that, "The Speaker shall appoint

21  13 members to the Select Committee, -- five of whom shall be

22  appointed after consultation with the minority leader."

23      Mr. Bannon argues the Speaker rejected the

24  nominees suggested by the minority leader, and the Committee

25  has never operated with 13 members.

1          To begin, the Indictment states, And thus unless

2     the grand jury concluded there was probable cause that

3     Bannon was, "summoned as a witness by the authority of the

4     U.S. House of Representatives to give testimony upon a

5     matter under inquiry before a committee of the House."

6     Thus, on its face, the -- indictment does allege, albeit

7     implicitly, that the Select Committee was arranged under the

8     authority of the House.

9          Even assuming the truth of Mr. Bannon's contention

10    of there being less than 13 members of the Committee while,

11    of course, those numbers are not in the indictment, the

12    government at least does not dispute them.  It is not a

13    basis by which this Court can or will dismiss the

14    indictment.

15         And that is not to say that the argument is

16    unreasonable.  Indeed, I agree with Judge Kelly, who

17    recently dealt with similar arguments in another case that

18    this is "not an unreasonable -- position," as Judge Kelly

19    put it.  But the Court cannot conclude, as a matter of law,

20    that the Committee was invalidly constituted such that

21    dismissal of the indictment is warranted.

22         As noted by Judge Kelly in his opinion, the use of

23    the word "shall," although usually mandatory, can sometimes

24    mean "should," "will" or even "may," as the Supreme Court

25    stated in *Gutierrez de Martinez versus Lamagno*.  Though

1   "shall" generally means "must," legal writers sometimes use

2   or misuse "shall" to mean "should," "will" or even "may."

3   That's a quote from the Supreme Court.

4        So the fact that House Resolution 503 uses the

5   word "shall" is not conclusive to proving that 13 members

6   are required for the Select Committee to lawfully operate.

7        And given this potential ambiguity, the Court

8   agrees with Judge Kelly that it must give great weight to

9   the interpretation of those House members charged with

10   implementing the resolution and to the House itself.

11        This reading, the reading applied by the Speaker,

12   appears to be that in the context of this resolution, and

13   "the Committee shall" means "may or should"; that reading

14   appears to have been ratified by the full House several

15   times through the contempt resolution and prosecution

16   referrals with respect to Mr. Bannon, the contempt

17   resolution and referral from Mark Meadows, the contempt

18   resolution and referral for Peter Navarro and the contempt

19   resolution and referral for Dan Scavino.

20        As I've noted, this meaning of the word "shall"

21   has been recognized in various opinions, including opinions

22   of the Supreme Court, and there would be potential

23   separation of powers issues, should this or any court reject

24   a congressional interpretation of its own rule.

25        As the Court of Appeals as explained, "The

1    rulemaking clause of Article I clearly reserves to each

2    House of Congress the authority to make its own rules.  And

3    judicial interpretation of an ambiguous House Rule runs the

4    risk of the Court intruding into the sphere of influence

5    reserved to the legislative branch under the Constitution."

6    That's a quote from *Rostenkowski*.  As such, the Court cannot

7    conclude, as a matter of law, that the composition of the

8    Select Committee renders the Subpoena invalid such that

9    dismissal of the indictment is warranted.

10            Second, Mr. Bannon argues that the Select

11   Committee exceeded its subpoena authority.  He argues that

12   the Select Committee violated rules that mandate consulting

13   with the ranking minority member, as well as rules that

14   require deponents to be issued protective rules in advance

15   of testifying.  Neither argument warrants dismissal of the

16   indictment.

17            Mr. Bannon contends that "on its face, the

18   indictment fails to allege that the Subpoena was issued to

19   Mr. Bannon in compliance with the Subpoena authority granted

20   to the Select Committee, which requires consultation with

21   the ranking minority member."

22            True enough.  That is true.  And when assessing a

23   Motion to Dismiss the Indictment, the Court is limited to

24   the four corners of that document, as I've said, at least

25   generally speaking.

1          But the indictment does state, and thus the grand

2     jury concluded, that there was probable cause that Bannon

3     was, "Summoned as a witness by the authority of the House --

4     of Representatives to give testimony upon a matter under

5     inquiry before a Committee of the House."

6          Thus, again on its face, the indictment does

7     allege, albeit implicitly, that the Subpoena was issued in

8     compliance with the Subpoena authority granted to the

9     Committee.

10          But even if the Court can consider whether the

11     Select Committee exceeded its authority by not properly

12     consulting with a ranking minority member, it would still be

13     unable to accept Mr. Bannon's argument as a matter of law.

14          It is Mr. Bannon's position that ranking minority

15     member is a well-defined legislative term, meaning a member

16     designated by the minority party and responsible for

17     protecting the rights of the minority party.  Mr. Bannon

18     argues that the Select Committee has no one in that

19     position.

20          But the Committee does have a member of the

21     minority party, Representative Liz Cheney, who serves as

22     Vice Chair, and it appears that the House believes that the

23     Select Committee's composition is consistent with this

24     requirement as well, and thus that the Subpoena here was

25     validly issued.

1          After all, the full House approved referring

2     Mr. Bannon's alleged noncompliance to the Department of

3     Justice for prosecution.  And, again, it has reaffirmed this

4     view several times in the cases of Mark Meadows, Peter

5     Navarro and Dan Scavino.

6          One further note, Mr. Bannon suggests that the

7     failure of the Committee to provide him with a copy of

8     certain rules before he testified also mandates dismissal of

9     the charges against him.  But the rule that Mr. Bannon

10    relies on states simply that "a witness shall not be

11    required to testify unless the witness has been provided

12    with" a copy of those rules.

13         The indictment alleges that Mr. Bannon never

14    showed up to the deposition.  Nothing in the rule cited by

15    Mr. Bannon requires a copy of those rules to be provided

16    along with the Subpoena itself or before showing up to the

17    hearing.  And in any event, once again, the full House

18    appears to have ratified this conclusion.  On this argument,

19    again, I cannot conclude that as a matter of law the

20    indictment is invalid.

21         Mr. Bannon also argues that the Subpoena was a

22    misguided and unconstitutional effort to make an example of

23    him.  Specifically alleges that "the Subpoena was an

24    unconstitutional attempt to usurp the executive branch's

25    authority to enforce the law in an effort to impede

1    Mr. Bannon's First Amendment rights to association and free

2    speech."

3            Mr. Bannon is correct that Congress' subpoena

4    power is ancillary to its legislative authority.  Thus, no

5    congressional subpoena can be used to enforce laws or

6    conduct criminal investigations; that would invade on the

7    providence of the executive branch.  But Mr. Bannon's

8    incorrect when he faults the indictment for "failing to

9    allege how the Subpoena issued to Mr. Bannon could validly

10   inform legislation."

11           As I've already noted, when assessing a Motion to

12   Dismiss the Indictment, I'm generally limited to the

13   four corners of that document.  And the Indictment (at

14   Paragraphs 23 and 25) does state -- unless, again, the grand

15   jury did conclude there was probable cause -- that

16   Mr. Bannon had been subpoenaed to either give testimony or

17   produce papers to "a matter under inquiry before a committee

18   of the House."

19           To the extent more detail is necessary to meet the

20   strictures of the Sixth Amendment, the Court would find it

21   present:  The legislative purposes of the Committee are

22   detailed at length in Paragraphs, 2, 3, 4, 5 and 7 of the

23   indictment.  And as we know, the D.C. Circuit has already

24   concluded that these are valid legislative purposes; that's

25   the *Trump versus Thompson* case.

1          To the extent that Mr. Bannon alleges that there

2    was no valid legislative purpose for his subpoena in

3    particular, I cannot conclude that, as a matter of law, he

4    is correct.

5          As the indictment quotes, the Select Committee's

6    cover letter to the Subpoena detailed why it wished to talk

7    to him.  "The Select Committee has reason to believe that

8    you have information relevant to understanding important

9    activities that led to and informed the offense at the

10    Capitol on January 6th, 2021.  For example, you have been

11    identified as being present at the Willard Hotel on January

12    5, 2021, during an effort to persuade members of Congress to

13    block the certification of the election the next day and in

14    relation to other activities on January 6th."

15          The Select Committee continued, "Moreover, you are

16    quoted as saying on January 5, 1221 that 'all hell is going

17    to break loose tomorrow.'  Accordingly, the Select Committee

18    seeks both documents and your deposition testimony regarding

19    these and multiple other matters that are within the scope

20    of the Select Committee's inquiry."  Those statements are --

21    in the Indictment, Indictment Paragraph 7.

22          Thus, on its face, the Subpoena itself -- and then

23    appears to have sought information on topics germane to the

24    purposes identified by the Court of Appeals in the *Thompson*

25    case, "Investigating the January 6th attack on the Capitol

1    and obtaining information to allow meaningful legislation",

2    such as "passing laws imposing more serious criminal

3    penalties on those who engage in violence to prevent the

4    work of government institutions."

5         Finally, Mr. Bannon argues that Count 2 must be

6    dismissed because the Select Committee lacks the power to

7    compel the production of a privileged log or certification.

8    Specifically, Mr. Bannon argues that no House Rule

9    authorizes a committee to require subpoena recipient to

10   create a privileged log of documents withheld or a written

11   certification that a diligent search has been completed.

12   And, Mr. Bannon argues, even if such a rule existed, it's

13   application to a former presidential advisor asserting

14   executive privilege would raise "serious separation of

15   powers issues."

16        Fleshing this argument out, he notes that the

17   Committee's instructions demanded specific details about the

18   withheld materials that he believes are privileged, such as

19   the "author, addressee and any other recipients", as well as

20   the "recipient of the author and addressee to each other."

21   Providing this information, he argues would reveal

22   "significant information regarding confidential matters

23   being contemplated by the President."

24        I disagree.  Even if Mr. Bannon may have a basis

25   for invoking executive privilege over certain of the

1    communications responsive to the Subpoena or may have had,

2    listing the author and recipient of any information claimed

3    to be privileged, that itself does not reveal any privileged

4    material.  That aside, the basis of this charge, Count 2, is

5    Mr. Bannon's failure to comply with the document subpoena

6    altogether.

7        The Committee alleges that he failed to supply any

8    documents whatsoever.  Thus, whether the Committee had the

9    power to compel the privilege log does not really matter to

10   the validity of this count.  The basis of the charge is that

11   Mr. Bannon failed to comply altogether, either by producing

12   unprivileged documents or by providing a log of withheld

13   documents that would not reveal privileged information.  As

14   with the other arguments, this argument does not provide, as

15   a matter of law, a reason to dismiss Count 2.

16       Mr. Bannon's next category of objections -- this

17   is really a different category -- about notice, entrapment

18   or public authority all sound in Due Process.  But in my

19   view, none carries the day sufficient to warrant dismissal

20   of this indictment.

21       At a minimum, Mr. Bannon is arguing that "OLC

22   opinions are binding authoritative statements reflecting the

23   official policy of the Department of Justice;" that those

24   and other statements of DOJ policy provide that DOJ would

25   not prosecute for contempt of Congress someone who has

1    declined to comply with a congressional subpoena in a

2    situation like this one, and thus that this prosecution is

3    barred by the doctrines of due process/fair notice or

4    entrapment by estoppel, actual public authority and apparent

5    public authority.  But on the record before me, none of

6    those doctrines requires or supports dismissal of the

7    indictment.

8         Each of these arguments is an affirmative defense.

9    And assuming, for the sake of argument, that the OLC

10    opinions and other department documents on which Mr. Bannon

11    relies, represent the kinds of government actions that could

12    establish the foundation of one or more of these defenses.

13    And I do know that the government appears to have conceded

14    today that OLC opinion would count at least for the

15    entrapment by estoppel defense, that each of these defenses

16    really rests on two predicates:  First, that the OLC

17    opinions and other department statements on which Mr. Bannon

18    relies are clearly applicable to the situation here; and

19    second, that the former President unequivocally invoked

20    executive privilege over Mr. Bannon's testimony and records.

21    But neither can be established, in my view, at least not at

22    this stage.

23         As for the first predicate, none of the documents

24    that Mr. Bannon has pointed to concern a congressional

25    subpoena seeking communications between a nongovernmental

1    employee and a President who, at the time of the Subpoena,

2    was no longer in office and had not clearly directed the

3    Subpoena recipient to decline to comply altogether.

4            As I'll discuss in a second, that latter point is

5    a disputed question and thus, for purposes of the Motion to

6    Dismiss the Indictment, I cannot assume such direction

7    occurred.  To be sure certain lessons might be drawn from

8    the OLC opinions but is more than a stretch that they, as a

9    matter of law, address this specific situation such that

10   dismissal is warranted.  Instead, none involve the exact

11   situation presented here.

12           Now, let's take the second predicate.  At this

13   stage there is, as far as I can tell, factual question as to

14   whether former President Trump unequivocally directed

15   Mr. Bannon not to comply with the Subpoena and/or

16   unequivocally invoked executive privilege.

17           The letters from President Trump's counsel, on

18   which Mr. Bannon relies, instructed Mr. Bannon to, (a) --

19   and this is a quote -- "(a) where appropriate, invoke any

20   immunities and privileges you may have from compelled

21   testimony, the Subpoena; (b) not produce any documents

22   concerning privileged material in response to the Subpoena;

23   and (c), not provide any testimony concerning privileged

24   material in response to the Subpoena."

25           President Trump's counsel later clarified in an

1     email to Mr. Bannon's counsel that "just to reiterate, our

2     letter referenced below didn't indicate that we believe

3     there is immunity from testimony for your client."  And

4     President Trump's lawyer continued, "As I indicated to you

5     the other day, we don't believe there is."

6          Nothing in these letters unambiguously instructed

7     Mr. Bannon not to produce any documents whatsoever or not to

8     appear at all, did not assert privilege over -- nothing in

9     these letters asserted privilege over particular documents.

10    And beyond that, the letters do not reflect, in my view, an

11    unambiguous invocation of executive privilege.  At a

12    minimum, this appears to be a jury question, which I'll

13    discuss in a second.

14          And, of course, there are topics covered by the

15    Subpoena that might not have required the production of any

16    privileged information at all or testimony about any

17    privileged information at all.  There is thus an open

18    question at this stage of the proceedings over the extent to

19    which and over what executive privilege was even invoked.

20          On account of both of these shortcomings, none of

21    Mr. Bannon's due process entrapment by estoppel public

22    authority arguments warrants dismissal of the indictment.

23          Another category of objections raised by

24    Mr. Bannon is 2 U.S. Code, Section 192.  The statute here is

25    unconstitutional as applied to the facts of this case.  I

1      disagree.  This argument is based on the Court's previous

2      decision granting the government's Motion in Limine

3      regarding advice of counsel; that's ECF-29.

4              As I made clear at the time, that decision was

5      inescapable in light of the D.C. Circuit's binding decision

6      in *Licavoli*, which we discussed again today.  I noted in my

7      prior decision that I have serious questions as to whether

8      *Licavoli* correctly interpreted the mens rea requirement of

9      "willfully", but it nevertheless remains binding authority.

10     Mr. Bannon has certainly preserved his arguments as to why

11     that case should be overruled.

12             In light of my prior decision, however, Mr. Bannon

13     argues that this prosecution here is unconstitutional as

14     applied to him because it violates the separation of powers

15     doctrine, is unconstitutionally overbroad by criminalizing

16     lawful conduct such as noncompliance, based on the

17     invocation of executive privilege and reliance on OLC

18     opinions is void for vagueness, and unconstitutionally

19     prohibits Mr. Bannon from telling the entire story of his

20     case.  I'll address each argument in turn.

21             First, in what is essentially an attempt to

22     relitigate *Licavoli*, again, Mr. Bannon argues that the

23     Court's interpretation of Section 192 renders Section 193

24     "nothing more than surplusage."  That section, Section 193,

25     provides that a witness cannot ignore a subpoena "upon the

1      ground that is testimony to such fact or his production of

2      such paper may tend to disgrace him or otherwise render him

3      infamous."  To the extent that Mr. Bannon seeks to preserve

4      this argument, he has.  But nothing about it allows me to

5      ignore binding D.C. Circuit precedent.

6              Second, Mr. Bannon argues that Section 192, as

7      applied to him, violates the "constitutional separation of

8      powers doctrine."  Specifically, Mr. Bannon argues that this

9      Court's prior decision about the Motion in Limine "makes the

10     indication of executive privilege by the former President of

11     the United States and its associated directive to Mr. Bannon

12     not to comply with the Subpoena based on executive privilege

13     legally irrelevant."  This, he claims, "gives Congress a

14     veto over a President's invocation of privilege."

15             In my view though, this is, again, nothing more

16     than an attempt to relitigate *Licavoli*, which I cannot do or

17     reconsider it.  I have no power to reconsider that decision.

18     The argument also assumes what is, at this --, hardly an

19     undisputed fact that former President Trump directed

20     Mr. Bannon to act in response to the Subpoena in the way he

21     did.

22             Despite putting it under the heading of "Section

23     192 as applied by its separation of powers doctrine",

24     Mr. Bannon does also argue that, I believe, "Section 194 is

25     unconstitutional as applied."  And this is at ECF-58, at 44.

1    But, again, it appears that where we are talking about

2    Section 194, 192, this argument is based on Mr. Bannon's

3    belief that the statute abrogates prosecutorial discretion.

4         I don't believe that that is the case here.  There

5    is nothing that I've seen that would suggest that the

6    statute here abrogates prosecutorial discretion whatsoever.

7         Mr. Bannon also argues the statute as applied is

8    unconstitutionally overbroad and void for -- vagueness.  I

9    don't see it that way.  As Justice Gorsuch has explained,

10   vague laws invite arbitrary power.  There is nothing vague

11   about Section 192.

12        And, indeed, Mr. Bannon's do not sound in

13   vagueness, not really.  A vagueness challenge targets the

14   language of the statute.  Mr. Bannon's argument is that, in

15   light of the OLC opinions, the statute does not give

16   constitutionally sufficient notice of what conduct works for

17   a person so situated to criminal liability.

18        I've already addressed most of this argument

19   already.  But that the DOJ will decline to prosecute certain

20   executive branch employees in certain situations does not

21   make the language of Section 192 any less clear.  The

22   statute applies broadly and does so here.

23        As Mr. Bannon also argues that, "the statute is

24   also void for vagueness because the key phrase 'willfully

25   makes default' gives insufficient notice as to what

1    constitutes a default in light of the long line of authority

2    it raises to a constitutional level, the imperative that

3    Congress and the executive branches must work toward an

4    accommodation in situations like the one presented here."

5    But none of this, in my view, goes to show why the word

6    "default" is unconstitutionally vague.

7          As for overbreadth, Mr. Bannon argues that the

8    holding in *Licavoli* means that Section 192, "includes within

9    its ambit fully legal and constitutionally protected conduct

10   -- noncompliance based on the invocation of Executive

11   Privilege and reliance on the OLC opinions."  But that is

12   not what the prior Court's ruling addressed.  Rather, I

13   merely held Mr. Bannon, based on *Licavoli*, cannot testify as

14   to advice of counsel or erroneous belief that his conduct

15   was excused under the law.

16         The final argument raised by Mr. Bannon is that,

17   "prosecutorial overreaching requires dismissal of the

18   indictment."  Specifically, Mr. Bannon argues that the

19   government's targeting of his counsel, Mr. Costello, for

20   certain information requires dismissal of the charges

21   against him.  I do not see this argument as a valid basis

22   for dismissing the charges against Mr. Bannon, and I will

23   not use my sanctions authority to do so.

24         I do continue to have serious issues with how the

25   government treated the situation of Mr. Bannon's counsel and

1    also how the government does not appear to have any issue

2    with its conduct.  But, in my view, those issues are better

3    left to be addressed at a later date after trial.

4         In particular, I do not conclude that Mr. Bannon

5    has made the showing necessary that he was prejudiced by

6    this conduct, such that dismissal is warranted.  Relatedly,

7    Mr. Bannon also argues that the government mislead the grand

8    jury, also requiring dismissal.  But Mr. Bannon has made no

9    attempt to prove that these alleged errors prejudiced him in

10   any way and, as Courts in this district have found, that is

11   a fatal flaw.  For all of these reasons, then, I will deny

12   Mr. Bannon's Motion to Dismiss the Indictment.

13        But, as everyone knows, there are also four other

14   Motions in Limine pending before me.  I will be taking each

15   of these motions under advisement.  I don't think I need to

16   repeat the motions that we have in front of us from the

17   government.  Everyone understands that these are ECFs 52, 53

18   and 54.

19        The problem is, as I discussed with government

20   counsel, I have not yet decided exactly what the jury

21   instructions will look like for this offense.  Obviously, I

22   have already held, as required by *Licavoli*, that Mr. Bannon

23   cannot rely on or introduce evidence relating to advice he

24   received from his counsel.  But I have not yet decided,

25   because we are not at the point yet where the parties have

1    proposed or litigated what the specific jury instructions

2    will be for either the mens rea, willfully or actus reus/no

3    default elements of the charged offenses.

4         I have also not yet decided what, if any, jury

5    instructions might be permissible on the various affirmative

6    defenses that Mr. Bannon has identified.  In my view, while

7    I think there are serious -- there are many reasons to think

8    that the entrapment by estoppel defense would not result in

9    the introduction of this evidence and, in particular, I'm

10   talking about the Department of Justice's opinions and

11   writings, it is at least possible that some of this evidence

12   can go to whether Mr. Bannon acted willfully or whether

13   Mr. Bannon made default, and again perhaps even an

14   affirmative defense.

15        Until I hear from the parties about the specific

16   jury instructions on these topics and decide what those

17   instructions will say, it seems to me premature to resolve

18   whether any of this evidence might be relevant.

19        I know -- I understand that while the scheduling

20   order did require any Motions to Exclude Evidence to be

21   briefed on the schedule we have in front of us, other

22   Motions in Limine generally will not be fully briefed until

23   July 8th, it is my intention to handle those Motions in

24   Limine, together with the ones that are pending now,

25   together with the parties' Proposed Jury Instructions, which

1    are due on July 11th.

2         I am not stating that the jury instructions will

3    permit the evidence that we've been talking about today, but

4    what I am stating is that I am not prepared to hold that

5    evidence is altogether excluded because it may be that,

6    notwithstanding *Licavoli*, that there is a jury instruction

7    that would put either evidence relating to the OLC opinions

8    and writings or Mr. Bannon's prior experience with subpoenas

9    at issue and relevant for the trial here.  So I am taking

10   those motions under advisement to be resolved in connection

11   with the jury instructions.

12        And as for Mr. Bannon's motion, ECF No. 56, which

13   seeks to exclude evidence relating to Mr. Costello, I find

14   it highly unlikely that the toll record information will be

15   relevant here; and presenting that evidence would, I think,

16   cause significant concerns for me.

17        I know the government hasn't had to say whether it

18   intends to do so, but I would very much signal my

19   disinclination to have that evidence come in here.  But at

20   the time that Mr. Costello was engaged with the Committee,

21   he was acting on Mr. Bannon's behalf, and his communications

22   with the Committee may be relevant.

23        He did not know at the time that the government

24   had taken these steps, and he knowingly and intentionally

25   engaged with the Committee.  So I am not -- I'm not deciding

1    this question either, but it seems to me that that evidence

2    is different and, assuming the government or, frankly,

3    Mr. Bannon makes a showing that that evidence should come

4    in, it probably will come in.  And I'm reserving that

5    question as well for resolution closer to trial in light of

6    the jury instructions and any other Motions in Limine that

7    will be filed as we get there.

8           So the bottom line is the Motion to Dismiss the

9    Indictment is denied.  The Motions in Limine are all taken

10   under advisement for consideration in the way I've

11   indicated.

12          I do think it is very relevant to me, in thinking

13   about all of these evidentiary questions, to know exactly

14   what or to attempt to know exactly what the jury will be

15   instructed about the various elements of this offense.  The

16   schedule puts that question, the Proposed Jury Instructions,

17   somewhat late relative to all of this other briefing.

18          So what I would like to hear from the parties is

19   their view about whether we should modify the schedule in

20   light of where I am.  I realize both parties may think I

21   should have decided all of these issues now.  But in light

22   of the fact that I would like not to and to think about

23   these issues in light of the jury instructions, what do the

24   parties think about modifying the schedule to essentially

25   move up either to parallel the next Motions in Limine stage

1    or at least to make, earlier, the Proposed Jury Instructions

2    and litigation over them?

3              Ms. Vaughn, do you have a view on that?

4              **MS. VAUGHN:**  Your Honor, the government would be

5    happy to move up the deadline for filing the parties'

6    Proposed Jury Instructions.  Perhaps we could leave the voir

7    dire and things like that for the original deadline --

8              **THE COURT:**  Yes.

9              **MS. VAUGHN:**  -- and then --

10             **THE COURT:**  Yes.  It seems to me -- we may have a

11   bunch of fights over voir dire, but that's really --

12             **MS. VAUGHN:**  Yes.

13             **THE COURT:**  -- that's going to be about questions

14   that go to the jury and the like.  It's not an evidentiary

15   question.  To try to put more framework about what is or is

16   not in the case, it seems to me that I need to decide on the

17   elements in particular of the -- what are the elements

18   specifically and what are the jury instructions from each

19   parties' view on those elements?

20             And I would like to decide those issues in tandem

21   with the evidentiary questions because, again,

22   hypothetically, if I think the jury instruction on mens rea

23   is more capacious than the government thinks, then some of

24   this evidence may be irrelevant.  I know you have a

25   different view.

1          **MS. VAUGHN:**  The government would be happy to

2     resolve the jury instructions first and then file Motions in

3     Limine shortly thereafter.

4          **THE COURT:**  And when do you think you could --

5          What I typically like to have happen is for the

6     jury instructions, because some of them will likely be

7     undisputed altogether, I would like the parties to have at

8     least a period of meeting and conferring around the jury

9     instructions -- is typically how I contemplate -- and then

10     to essentially file their competing views.

11          By when do you think the parties could engage

12     in -- so let's just sort of take jury instructions out of

13     the current standing order and say, Parties shall exchange

14     their instructions, shall meet and confer, shall lodge their

15     respective views and arguments about disputed ones.

16          How long do you think you need for that?

17          **MS. VAUGHN:**  I think we could probably do that in

18     about a week and a half, get the proposal to the Court.

19          **THE COURT:**  And that would -- so that would be --

20     that would mean you would have to get to opposing counsel

21     your proposal.  They'd have to respond.  You'd have to have

22     a meet and confer and then you'd be prepared to file

23     something in roughly a week and a half?

24          **MS. VAUGHN:**  That's right.  Monday the 27th, I

25     think, might be a good date.

1          **THE COURT:**  Okay.  Let me hear from

2     Mr. Corcoran -- or I didn't mean to assume it was

3     Mr. Corcoran.

4          **MS. VAUGHN:**  Could I ask one question --

5          **THE COURT:**  Yes.

6          **MS. VAUGHN:**   -- to clarify the Court's order?

7     When you were talking about Mr. Costello and the

8     admissibility of communications between him, I think the

9     Court said between him and the Committee.  Did the Court

10    mean between him and the government?

11         **THE COURT:**  I apologize.  I didn't mean to make it

12    just the Committee.

13         **MS. VAUGHN:**  Okay.

14         **THE COURT:**  And to be very technical about it, I

15    am taking that motion entirely under advisement.  I was

16    basically giving you my general thoughts, which are the toll

17    records.  Everything that was received in response to those

18    government actions, seem to me -- I am going to be very

19    disinclined to allow that to come in.  But the other stuff,

20    his statements to the government, generally, I think of

21    those in a different category.

22         **MS. VAUGHN:**  Thank you, Your Honor.

23         **THE COURT:**  That's really all I meant to say.

24         Mr. Schoen, I'm sorry.  I didn't mean to assume it

25    was Mr. Corcoran.

1          **MR. SCHOEN:**  Age before beauty, Judge.

2          Judge, I think maybe something like June 30th, --

3   for the jury instructions.  I want to be clear, though, I'm

4   not sure that I understand the premise.  Our jury

5   instructions on entrapment by estoppel and all that aren't

6   based on the mens rea.  It's a due process defense.

7          **THE COURT:**  I understand that.

8          So in my view, you proposed -- -- have defenses,

9   entrapment by estoppel, but it also seems to me that there

10  is an argument that either the OLC opinions and/or

11  Mr. Bannon's prior experience with subpoenas go to mens rea

12  here.  A Motion in Limine excludes that evidence altogether

13  from the case on any theory.

14         And when I think about these questions, I want to

15  understand not only the defenses that you've talked about,

16  but also what the parties believe the mens rea instructions

17  will be.

18         **MR. SCHOEN:**  Okay.

19         And in formulating the instructions, is the

20  Court's order, the original order, barring Mr. Costello from

21  testifying as to reliance, reasonableness of reliance, the

22  reasonableness question on entrapment by estoppel?

23         **THE COURT:**  It's a very complicated question.

24         So, first of all, I think -- I have not resolved

25  that question.  You need to -- as I said, I am pretty

1    disinclined to think that there is a legitimate entrapment

2    by estoppel defense here.  I don't have to resolve that,

3    because all I've done is deny the Motion to Dismiss the

4    Indictment on that ground.

5          But I think what the parties need to do is, they

6    need to provide me with their jury instructions on, for

7    example, what that defense would be.  And I will then, once

8    I've resolved what, if any, the jury instructions on those

9    questions will be, I will also decide whether and to what

10    extent the evidence is going to be permitted at trial.

11          **MR. SCHOEN:**  All right.

12          Then I think, Your Honor, we would like to at

13    least make a proffer as to what our evidence would be.  If

14    the Court is going to deny entrapment by estoppel defense, I

15    want a very clear record on what our defense would have been

16    on that, what the belief was, why the belief was reasonable,

17    and so on.  I suppose we need to make a proffer then, if the

18    Court's inclined.

19          Are you considering not allowing entrapment by

20    estoppel defense in this case?

21          **THE COURT:**  Well, I mean the parties have briefed

22    that defense substantially.

23          **MR. SCHOEN:**  Yeah.

24          **THE COURT:**  The only thing I had before me on the

25    Motion to Dismiss the Indictment is whether the motion could

1    be granted.  A dismissal of the Indictment was warranted as

2    a matter of law.

3           I am holding, for my consideration in light of the

4    jury instructions, whether some or all evidence relating to

5    OLC opinions is in or out.  I don't have the jury

6    instructions on the entrapment by estoppel defense.  I don't

7    have it on mens rea.  I want to consider all of those

8    questions here together.

9           I could have granted the government's motion today

10   if I had thought it was warranted.  I am just taking that

11   question under advisement.

12           **MR. SCHOEN:**  I understand.

13           **THE COURT:**  Fair enough?

14           So, pure scheduling:  June 30th, you believe --

15   not working with the government -- but that the parties

16   could exchange materials and be in a position to file by

17   June 30th their respective views on the appropriate jury

18   instructions in this case?

19           **MR. SCHOEN:**  I'm only saying that because the

20   Court has indicated it feels it needs to move on a faster

21   track.  We also have many other obligations to other courts

22   and all that.  So I'm trying to just accommodate what the

23   Court has indicated what, you know, its needs are.

24           I want to be clear, so the Court doesn't feel that

25   somehow, you know, we've done something not contemplated.

1    There is a chance that we are going to file a motion to move

2    the trial date because of -- for example, every day we're

3    seeing on the television press conferences held by

4    Ms. Schiff and Raskin and this one and the other one, about

5    the importance of criminal charges here, and all sorts of

6    things exposing what happened, and things that exactly the

7    *Mazars* case said are not proper legislative purposes.

8             We need to make a record on all of those things,

9    and the news is coming out day by day.  So I don't want to

10    leave here and then we decide we have to make a motion to

11    continue the trial date and the Court says, wait a minute,

12    you didn't ask for that --

13             **THE COURT:**  No, I appreciate that.  I imagine the

14    government will oppose it, and I will take it up.

15             **MR. SCHOEN:**  Yes, Your Honor.

16             **THE COURT:**  This is -- I should say, I appreciate

17    your saying it so that I know that it's potentially coming.

18    I don't think I need to hear from the government on what its

19    views will be.  It will see the motion.

20             I do think it would be appropriate for you to

21    let -- just give the government a heads up about when the

22    motion is coming and perhaps work out a briefing schedule if

23    you can.

24             **MR. SCHOEN:**  Of course, Your Honor.

25             **THE COURT:**  Thank you.

1          So, Ms. Vaughn, do you have anything to say or are

2     you okay?

3          **MS. VAUGHN:**  Well, we were just thinking more

4     about how the Motions in Limine schedule would fit with all

5     of this.

6          **THE COURT:**  Yeah.

7          **MS. VAUGHN:**  Just to fit it all in, we think

8     waiting until the 30th might make it difficult to get all of

9     the briefing done.  So we could also file our Proposed Jury

10    Instructions and our Motions in Limine together on the 27th,

11    file Oppositions by July 5th, Replies, I guess, by the 11th

12    and then our final pretrial hearing on the 13th.

13         I don't know if that's compressing it too -- I

14    mean, we could -- I understand we're all busy, but we can

15    make that work.

16         **THE COURT:**  Absolutely.

17         The only thing I really care about, for my

18    purposes -- I don't mean to say I don't care about these.

19    What I want to do -- really, the only thing I really feel

20    the need to do, is to have the portion of what would have

21    been filed on July 7th, the jury instructions --

22         **MS. VAUGHN:**  Uh-huh.

23         **THE COURT:**  -- essentially shift that earlier so

24    that it doesn't come at the tailend, when that's the part of

25    this that I really feel like I need to have.

1           **MS. VAUGHN:**  Okay.

2           **THE COURT:**  But I don't have a magic date in mind.

3    I just want -- it seems to me that July 11th is just on the

4    late side, given all the other filings that will have had

5    happened, and the fact that I would like to have those when

6    I take up all these evidentiary issues.

7           **MS. VAUGHN:**  Okay.

8           **THE COURT:**  So, with that, it seems to me that

9    June 30th is acceptable, because that gets me those

10   materials eight days, approximately, before these other

11   Motions in Limine are fully briefed.  Obviously, the ones

12   that have already been briefed, I can consider them

13   altogether.

14          **MS. VAUGHN:**  Okay.

15          **THE COURT:**  So let's do this then:  The pretrial

16   order -- I suppose we could modify this, but the portion of

17   Paragraph 7 that requires the submission of the Proposed

18   Jury Instructions to be done on July 11th, we'll just change

19   that to June 30th; that's the only modification.  Okay?

20          **MS. VAUGHN:**  Thanks, Your Honor.

21          **THE COURT:**  Okay.  Thank you, Counsel.

22          **DEPUTY CLERK:**  All rise.

23          (Proceedings concluded at 1:25 p.m.)

24

25

1                    **C E R T I F I C A T E**

2

3                I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8

9

10    _____June 16, 2022_____      _/s/_____
                Date                    Lorraine T. Herman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPUTY CLERK:**
**[6]** 3/2 89/1 89/3
112/16 112/19
142/22
**MR.**
**CORCORAN: [59]**
5/14 7/1 7/7 7/22
8/5 8/7 8/18 9/13
9/19 10/3 10/8
11/8 11/12 11/16
11/20 12/14 12/17
13/3 13/21 14/17
15/3 15/10 15/14
16/9 16/14 16/18
16/25 17/4 17/7
17/12 17/19 18/16
19/9 19/12 20/1
20/5 20/9 20/13
20/16 21/16 22/10
22/17 22/20 22/25
23/5 23/8 23/11
23/13 23/16 24/1
24/9 24/11 25/13
25/17 27/6 27/22
29/5 29/16 100/5
**MR. COSTELLO:**
**[6]** 67/23 68/1
69/19 69/22 70/5
70/12
**MR. SCHOEN:**
**[104]** 3/11 3/15
4/20 4/22 5/3 5/11
5/13 5/16 30/11
30/13 32/3 32/7
32/25 33/3 35/16
35/19 35/23 36/14
36/16 36/18 36/24
37/3 37/6 37/9
37/16 37/25 38/9
38/11 38/16 40/25
41/12 41/15 41/21
41/25 42/3 43/13
43/16 44/11 44/24
45/3 45/13 45/15
45/17 45/21 45/24
46/5 46/12 46/14
47/2 47/17 47/23
48/16 48/24 49/9
50/6 50/17 50/19
51/5 51/8 51/14
52/12 53/8 53/10
53/19 54/2 54/6
55/1 55/3 56/20

56/25 60/25 61/11
61/22 63/23 63/25
64/21 64/24 65/2
65/10 65/18 65/23
66/14 66/18 67/12
67/16 67/20 67/22
101/20 103/22
106/22 110/24
112/4 112/6 112/8
112/10 112/12
137/1 137/18
138/11 138/23
139/12 139/19
140/15 140/24
**MS. VAUGHN:**
**[91]** 3/8 70/20
70/22 71/1 71/5
71/25 72/10 73/16
73/19 74/13 75/4
75/9 75/14 76/9
77/15 78/6 81/21
82/3 82/12 83/5
83/22 84/4 84/23
85/3 85/6 85/25
86/3 86/14 86/25
88/23 89/5 89/16
90/2 90/12 90/24
91/3 91/7 91/12
91/18 91/21 92/11
92/15 92/23 93/3
93/19 93/24 94/1
94/3 95/14 95/17
96/22 96/25 97/3
98/1 98/15 98/21
98/24 99/4 99/7
99/11 99/24 108/9
109/2 109/7
109/12 109/16
110/9 110/14
110/18 111/1
111/8 111/12
111/14 112/2
134/4 134/9
134/12 135/1
135/17 135/24
136/4 136/6
136/13 136/22
141/3 141/7
141/22 142/1
142/7 142/14
142/20
**SPEAKER6: [1]**
30/9
**THE COURT:**
**[260]**

'
**'all [1]** 120/16
**'may' [1]** 7/6
**'must' [1]** 7/4
**'principles...simil**
**arly [1]** 42/23
**'shall' [2]** 7/4 7/5
**'should [1]** 7/5
**'that [1]** 41/5
**'will' [1]** 7/5
**'willful' [1]** 106/17
**'willfully [1]**
128/24

/
**/s [1]** 143/10

1
**10 [5]** 18/19 56/5
68/8 88/22 88/25
**10 minutes [1]**
100/4
**100 [1]** 21/14
**100-6 [1]** 1/17
**10158 [1]** 1/24
**103 [1]** 111/19
**104 [1]** 111/17
**10:04 [1]** 1/6
**11 [2]** 64/13 69/9
**117th [1]** 69/11
**11:57 [1]** 89/2
**11th [4]** 132/1
141/11 142/3
142/18
**1221 [1]** 120/16
**124 [1]** 12/20
**12:05 [1]** 89/2
**12:35 [1]** 112/18
**12:44 [1]** 112/18
**13 [20]** 6/7 7/8
9/25 15/12 17/2
83/25 84/3 84/5
85/17 86/9 86/10
86/21 87/25 89/19
90/5 102/3 113/21
113/25 114/10
115/5
**135 [1]** 106/15
**136 [1]** 100/18
**13th [1]** 141/12
**14 [1]** 41/3
**14th [1]** 93/8
**15 [2]** 1/5 55/4
**16 [1]** 143/10

**1793 [1]** 1/15
**18 [1]** 102/3
**19 [1]** 102/3
**192 [11]** 35/9
55/16 106/17
125/24 126/23
127/6 127/23
128/2 128/11
128/21 129/8
**193 [2]** 126/23
126/24
**194 [3]** 55/16
127/24 128/2
**1956 [4]** 32/21
39/14 51/9 56/16
**1984 [3]** 39/15
78/18 80/22
**1995 [1]** 42/18
**1:21-670 [1]** 1/4
**1:25 [1]** 142/23

2
**20001 [2]** 1/14 2/4
**2002 [2]** 49/13
49/15
**2008 [3]** 43/10
64/10 64/13
**201 [1]** 1/20
**2014 [2]** 49/14
49/16
**2019 [1]** 41/4
**202-252-1793 [1]**
1/15
**2021 [4]** 68/8
80/24 120/10
120/12
**2021-670 [1]** 3/4
**2022 [2]** 1/5
143/10
**20th [1]** 41/4
**21201 [1]** 1/21
**22 [1]** 102/3
**2225 [1]** 1/21
**23 [2]** 102/3
119/14
**25 [1]** 119/14
**25th [1]** 1/20
**2703 [1]** 94/25
**27th [2]** 135/24
141/10
**2800 [1]** 1/17
**29 [3]** 64/12
105/17 126/3

3
**30 [3]** 68/6 76/18
105/18
**302 [1]** 68/24
**30th [6]** 137/2
139/14 139/1
141/8 142/9
142/19
**3238 [1]** 1/24
**333 [1]** 2/3
**334-395-6611 [1]**
1/18
**338 [1]** 12/24
**35-6 [1]** 37/25
**36 [1]** 100/16
**36106 [1]** 1/18
**374 [1]** 12/20

4
**40-page [1]** 76/18
**404 [4]** 98/3 98/16
98/17 98/25
**410-385-2225 [1]**
1/21
**438 [2]** 34/19 35/1
**44 [1]** 127/25
**46 [1]** 102/3
**4700-C [1]** 2/3
**471 [1]** 100/17
**4th [1]** 1/14

5
**503 [7]** 7/17 7/19
11/11 86/8 87/24
113/19 115/4
**52 [2]** 3/19 130/17
**53 [1]** 130/17
**54 [2]** 3/19 130/18
**55 [1]** 3/19
**555 [1]** 1/14
**56 [2]** 3/19 132/12
**58 [3]** 3/18 113/3
127/25
**58-10 [1]** 56/5
**58-11 [1]** 64/13
**58-14 [1]** 41/3
**58-15 [1]** 55/4
**58-8 [1]** 102/17
**5th [2]** 79/4
141/11

6
**60-some [1]**
78/21

-2372-

**6**

**605 [1]** 1/23
**62 [2]** 34/4 78/24
**646-428-3238 [1]** 1/24
**65 [2]** 100/15 105/18
**6611 [1]** 1/18
**670 [2]** 1/4 3/4
**6th [6]** 11/4 16/7 91/4 120/10 120/14 120/25

**7**

**75-2 [1]** 22/2
**7th [2]** 93/7 141/21

**8**

**82 [1]** 107/14
**86 [1]** 12/24
**89 [1]** 12/24
**8th [1]** 131/23

**A**

**a.m [2]** 1/6 89/2
**Abcassis [1]** 31/16
**abide [1]** 6/4
**ability [5]** 10/15 42/15 55/24 57/16 60/1
**able [8]** 9/22 15/6 28/23 29/22 30/4 61/13 86/9 98/24
**about [130]** 5/22 5/22 10/2 11/10 14/2 14/10 17/10 18/10 22/6 22/21 23/1 23/9 26/25 27/20 29/12 29/19 30/14 31/1 31/2 31/18 31/18 32/3 34/4 34/7 37/1 38/3 40/5 40/11 40/12 40/24 41/19 41/20 43/3 43/11 43/20 43/22 43/25 44/14 46/24 47/14 47/21 48/11 52/2 52/3 52/5 54/20 54/24 56/16 58/1 58/10 59/4 59/11 59/18 61/1 61/8

**61/25 62/8 62/14 64/2 64/22 65/7 65/21 66/2 67/9 67/16 68/4 68/15 69/2 76/4 76/24 76/25 76/25 77/13 77/25 81/6 81/15 82/16 82/23 85/15 86/23 87/23 90/7 90/17 91/15 92/13 92/22 93/1 93/16 93/17 93/23 97/14 98/8 100/6 101/4 101/13 102/18 104/3 105/22 106/21 107/25 108/1 108/3 121/17 122/17 125/16 127/4 127/9 128/1 128/11 131/10 131/15 132/3 133/13 133/15 133/19 133/22 133/24 134/13 134/15 135/15 135/18 136/7 136/14 137/14 137/15 140/4 140/21 141/4 141/17 141/18**
**above [1]** 143/6
**above-entitled [1]** 143/6
**abrogates [2]** 128/3 128/6
**absolute [1]** 79/19
**absolutely [13]** 11/12 12/14 16/18 18/16 20/9 20/13 29/5 45/13 51/9 52/13 66/19 88/23 141/16
**absurd [2]** 64/1 103/20
**abundantly [1]** 32/21
**accept [4]** 46/14 52/8 69/4 117/13
**acceptable [1]** 142/9
**accepted [1]** 27/10

**accepts [1]** 52/12
**accident [3]** 82/7 89/14 107/10
**accidental [1]** 82/15
**accommodate [1]** 139/22
**accommodation [7]** 52/19 58/16 58/19 59/2 62/13 62/22 129/4
**accommodations [2]** 28/21 29/19
**accord [1]** 11/24
**according [2]** 49/22 52/20
**Accordingly [1]** 120/17
**account [2]** 108/2 125/20
**accounts [3]** 92/10 92/11 92/13
**acknowledge [1]** 41/11
**acknowledged [1]** 27/10
**Acquit [1]** 110/4
**act [4]** 20/8 82/1 84/6 127/20
**acted [7]** 53/15 81/25 82/2 97/16 97/21 99/10 131/12
**acting [2]** 72/18 132/21
**action [2]** 1/3 64/16
**actions [7]** 8/13 11/24 27/24 27/25 91/16 123/11 136/18
**actively [1]** 34/24
**activities [2]** 120/9 120/14
**acts [4]** 92/4 92/5 95/14 97/5
**actual [5]** 6/23 24/10 24/11 94/9 123/4
**actually [16]** 9/8 28/1 28/4 63/18 71/21 76/9 77/23 83/2 94/8 95/8 96/20 108/2 109/3

**110/2 111/2 111/5**
**actus [1]** 131/2
**adage [1]** 19/20
**add [2]** 23/18 70/18
**addition [1]** 59/19
**additional [2]** 6/15 6/21
**address [17]** 5/24 22/24 23/12 23/13 23/14 23/15 23/21 23/22 37/19 41/16 41/16 41/18 78/11 100/6 105/19 124/9 126/20
**addressed [10]** 31/2 34/6 38/22 39/15 39/25 99/24 100/23 128/18 129/12 130/3
**addressee [2]** 121/19 121/20
**addresses [1]** 46/2
**addressing [4]** 60/13 78/13 79/13 96/25
**adheres [1]** 40/14
**adhering [1]** 40/8
**administrator [1]** 78/19
**admissibility [2]** 99/15 136/8
**admissible [5]** 95/11 98/15 98/17 99/17 111/19
**admission [4]** 68/20 68/21 69/23 95/23
**admissions [1]** 69/22
**admit [1]** 63/14
**admitted [1]** 68/18
**adopting [3]** 19/23 21/2 21/9
**advance [2]** 100/25 116/14
**advanced [1]** 3/23
**advice [9]** 31/7 77/8 82/19 83/12 83/15 105/22 126/3 129/14

**130/23**
**advisable [1]** 21/11
**advise [1]** 104/3
**advisedly [1]** 104/5
**advisement [5]** 130/15 132/10 133/10 136/15 139/11
**advising [1]** 68/10
**advisor [7]** 42/24 47/4 50/10 61/16 61/23 64/25 121/13
**advisors [2]** 49/20 79/9
**Advisors' [1]** 49/12
**advisory [2]** 20/17 21/8
**advocating [1]** 80/3
**affected [2]** 25/7 32/14
**affirm [1]** 96/23
**affirmation [1]** 68/8
**affirmative [7]** 70/9 80/11 84/8 86/15 123/8 131/5 131/14
**affirmatively [1]** 72/17
**afford [1]** 34/14
**afoul [1]** 11/14
**afraid [2]** 30/1 108/5
**after [10]** 7/16 7/17 23/15 24/3 25/1 28/19 43/6 113/22 118/1 130/3
**afterwards [2]** 34/2 47/5
**again [45]** 10/24 17/19 18/5 24/22 26/17 26/23 30/5 31/11 31/13 35/1 35/8 36/9 43/9 53/20 54/6 54/8 55/20 56/8 57/18 60/7 60/8 60/25**

# A

**again... [23]**
62/25 64/13 74/14
74/21 76/11 79/16
79/23 88/13 94/11
104/11 107/23
111/23 117/6
118/3 118/17
118/19 119/14
126/6 126/22
127/15 128/1
131/13 134/21
**against [11]**
17/18 19/20 21/6
25/19 42/18 80/10
80/11 94/18 118/9
129/21 129/22
**Age [1]** 137/1
**agency [5]** 48/1
48/4 48/12 74/22
104/10
**agents [1]** 34/13
**agree [10]** 44/24
46/19 51/13 60/24
71/2 73/7 73/16
84/3 85/2 114/16
**agrees [2]** 71/15
115/8
**ahead [4]** 33/2
38/24 71/5 75/21
**aid [1]** 42/13
**aided [1]** 2/7
**aiding [1]** 60/5
**aisle [1]** 42/17
**akin [1]** 35/2
**AL [1]** 1/18
**albeit [2]** 114/6
117/7
**alignment [2]**
74/17 75/2
**all [100]** 3/21 4/3
5/9 8/5 9/19 11/20
13/3 16/25 23/24
24/23 26/6 27/25
29/2 30/13 30/19
31/15 32/25 35/15
41/12 44/24 45/18
46/9 47/1 48/11
50/13 51/5 51/8
51/14 51/16 51/16
51/17 52/16 54/2
54/6 54/23 55/7
56/25 59/18 60/8
60/20 62/22 63/4

67/3 67/11 67/17
68/3 68/25 70/18
72/7 75/1 78/15
79/12 80/24 83/16
84/18 85/24 88/17
89/1 89/17 90/5
94/18 97/21 99/13
99/14 101/23
101/25 103/20
107/4 107/12
107/23 109/24
111/25 112/16
118/1 122/18
125/8 125/16
125/17 130/11
133/9 133/13
133/17 133/21
136/23 137/5
137/24 138/3
138/11 139/4
139/7 139/22
140/5 140/8 141/4
141/7 141/8
141/14 142/4
142/6 142/22
**allegation [1]**
26/5
**allegations [1]**
113/9
**allege [5]** 15/11
114/6 116/18
117/7 119/9
**alleged [2]** 118/2
130/9
**alleges [5]** 113/14
118/13 118/23
120/1 122/7
**allotted [1]** 6/9
**allow [4]** 4/4
100/8 121/1
136/19
**allowance [1]**
13/10
**allowed [7]** 24/6
26/4 26/8 26/9
28/3 98/12 107/5
**allowing [2]**
111/23 138/19
**allows [1]** 127/4
**alluded [1]** 95/19
**along [1]** 118/16
**already [8]** 23/17
96/6 119/11
119/23 128/18

128/19 130/22
142/12
**also [33]** 3/24
4/13 12/21 33/22
37/10 43/11 55/9
55/10 60/3 61/1
64/3 80/21 91/10
93/12 105/1
111/14 118/8
118/21 127/18
127/24 128/7
128/23 128/24
130/1 130/7 130/8
130/13 131/4
137/9 137/16
138/9 139/21
141/9
**although [4]** 29/9
87/1 90/21 114/23
**altogether [12]**
31/25 32/1 44/10
71/1 74/19 122/6
122/11 124/3
132/5 135/7
137/12 142/13
**always [3]** 13/17
17/21 17/21
**am [18]** 5/4 31/1
44/1 58/15 62/25
83/22 112/14
132/2 132/4 132/4
132/9 132/25
133/20 136/15
136/18 137/25
139/3 139/10
**AMANDA [2]** 1/12
3/8
**ambiguity [3]**
22/18 84/7 115/7
**ambiguous [5]**
13/14 14/9 35/22
84/9 116/3
**ambit [1]** 129/9
**Amendment [8]**
33/14 33/14
109/19 109/21
109/24 110/3
119/1 119/20
**AMERICA [2]** 1/3
3/4
**amicus [11]**
18/11 19/18 20/2
20/22 21/7 21/10
21/23 22/8 90/9

90/14 107/15
**among [1]** 79/14
**amount [1]** 107/2
**analogous [2]**
25/16 25/17
**analogy [1]** 6/13
**analyzing [1]**
113/12
**ancillary [1]**
119/4
**animals [1]** 24/18
**another [8]** 15/8
58/9 58/13 77/5
79/15 87/17
114/17 125/23
**answer [8]** 9/13
26/14 46/12 48/17
63/23 63/25 72/18
77/10
**answering [2]**
72/13 72/16
**answers [1]**
48/16
**any [77]** 11/21
12/5 13/4 15/6
16/20 17/12 22/25
26/4 26/6 26/18
32/1 34/7 40/2
40/11 46/1 46/20
47/2 50/2 50/3
52/1 57/1 59/6
61/24 62/14 64/1
64/16 69/17 69/20
70/2 79/20 80/4
80/4 80/5 81/3
84/18 86/12 88/3
89/24 90/14 90/23
92/8 93/8 94/16
94/23 95/3 95/8
95/10 98/2 98/21
100/14 100/25
101/5 101/12
102/5 107/17
113/8 115/23
118/17 121/19
122/2 122/3 122/7
124/19 124/21
124/23 125/7
125/15 125/16
128/21 130/1
130/10 131/4
131/18 131/20
133/6 137/13
138/8

**anybody [1]**
45/10
**anybody's [1]**
4/16
**anyone [1]** 20/14
**anything [11]**
47/16 47/17 54/21
61/7 61/19 67/13
86/24 94/25 98/3
103/9 141/1
**anyway [4]** 6/23
57/1 62/23 107/21
**apologies [1]**
48/23
**apologize [1]**
136/11
**apparent [1]**
123/4
**apparently [1]**
94/15
**Appeals [4]** 13/11
58/6 115/25
120/24
**appear [14]** 16/15
31/25 37/18 44/13
44/20 48/6 61/11
62/16 93/8 102/12
106/1 109/22
125/8 130/1
**appearance [3]**
47/25 94/14 94/17
**APPEARANCES
[1]** 1/11
**appearing [3]**
73/21 78/12 93/4
**appears [9]** 10/11
115/12 115/14
117/22 118/18
120/23 123/13
125/12 128/1
**applicable [4]**
10/5 65/8 101/1
123/18
**application [5]**
42/18 60/4 62/3
77/19 121/13
**applied [22]** 5/6
30/22 35/13 39/2
39/11 40/19 41/7
55/12 63/12 67/5
102/13 103/18
104/24 105/5
106/11 115/11
125/25 126/14

# A

**applied... [4]**
127/7 127/23
127/25 128/7
**applies [10]**
32/14 52/1 55/20
63/1 66/20 66/20
76/5 79/8 103/2
128/22
**apply [33]** 13/7
13/15 31/6 35/12
41/6 42/4 47/9
52/14 52/18 55/12
55/17 56/14 57/6
57/9 57/15 60/20
60/22 61/8 63/22
64/5 64/6 65/5
66/5 66/10 71/4
75/8 78/8 79/21
80/6 80/18 104/17
104/18 104/18
**applying [1]** 11/3
**appoint [3]** 7/8
91/9 113/20
**appointed [1]**
113/22
**appreciate [2]**
140/13 140/16
**approach [3]**
47/16 47/17 80/4
**approached [1]**
98/13
**approaching [1]**
82/20
**appropriate [7]**
59/12 59/14 98/20
107/22 124/19
139/17 140/20
**approved [3]**
82/10 89/6 118/1
**approximately [1]**
142/10
**arbitrary [1]**
128/10
**are [107]** 3/16
3/17 4/1 6/11 6/21
10/6 10/17 11/22
12/1 12/24 14/1
15/21 18/17 20/18
22/8 22/8 23/12
30/22 34/14 34/24
35/21 35/22 38/5
39/16 40/5 40/16
40/22 40/25 44/14

48/9 48/15 49/5
58/4 58/7 60/11
60/13 60/16 62/21
63/10 65/19 66/15
67/8 68/25 69/22
69/25 74/23 76/1
76/4 76/6 78/15
78/21 79/7 79/16
80/17 83/20 83/20
84/18 86/18 88/24
89/3 89/20 90/14
90/23 91/4 91/21
92/17 93/11 93/17
94/18 101/10
101/15 102/10
104/17 108/17
108/23 109/8
112/19 114/11
115/6 119/21
119/24 120/15
120/19 120/20
121/18 122/22
123/18 125/14
128/1 130/2
130/13 130/17
130/25 131/7
131/7 131/24
132/1 133/9
134/17 134/18
136/16 138/19
139/23 140/1
140/7 141/1
142/11
**area [1]** 18/2
**areas [1]** 77/19
**aren't [3]** 14/25
48/10 137/5
**arguably [1]** 14/3
**argue [5]** 80/7
97/15 108/16
110/4 127/24
**argued [3]** 3/25
75/8 81/11
**argues [21]** 17/15
29/7 113/17
113/23 116/10
116/11 117/18
118/21 121/5
121/8 121/12
121/21 126/13
126/22 127/6
127/8 128/7
128/23 129/7
129/18 130/7

**arguing [4]** 72/2
80/3 83/10 122/21
**argument [67]**
8/17 10/4 10/7
16/6 16/12 16/16
16/17 17/18 18/25
19/8 26/19 26/20
27/3 27/6 32/14
32/18 32/19 33/4
39/13 39/14 45/22
48/12 51/7 52/9
54/22 62/15 63/5
63/10 71/14 71/15
71/18 72/3 73/9
77/11 78/4 81/6
81/15 82/16 82/20
83/21 86/11 92/20
92/20 97/11
101/15 102/1
106/5 109/6
109/15 112/21
114/15 116/15
117/13 118/18
121/16 122/14
123/9 126/1
126/20 127/4
127/18 128/2
128/14 128/18
129/16 129/21
137/10
**arguments [23]**
3/22 4/11 4/16 5/8
5/17 8/10 8/14
22/8 27/1 47/1
48/11 66/2 72/6
77/13 96/14 99/14
113/15 114/17
122/14 123/8
125/22 126/10
135/15
**arise [1]** 54/6
**Army [1]** 15/24
**around [6]** 75/22
94/17 96/16
100/20 103/7
135/8
**arranged [1]**
114/7
**art [1]** 15/20
**Article [2]** 12/11
116/1
**articulate [1]**
94/23
**as [172]**

**as-applied [1]**
104/24
**aside [4]** 40/1
40/10 96/14 122/4
**ask [11]** 6/20 24/4
31/20 35/14 61/14
84/24 90/3 98/8
99/13 136/4
140/12
**asked [6]** 24/15
100/6 105/6 105/7
105/8 111/3
**asking [8]** 5/21
6/1 11/21 11/22
18/24 46/1 47/11
58/18
**asks [2]** 38/2
47/21
**assert [7]** 42/5
56/14 57/6 78/19
78/22 107/1 125/8
**asserted [6]**
41/24 44/15 51/1
60/18 108/21
125/9
**asserting [4]** 42/8
42/12 60/5 121/13
**assertion [7]**
42/19 55/18 74/7
79/14 97/19
107/18 107/20
**assertions [6]**
57/10 57/15 78/14
78/15 107/16
107/22
**asserts [2]** 41/8
55/13
**assessing [2]**
116/22 119/11
**assist [1]** 42/7
**Assistant [2]** 42/5
102/17
**assisting [1]** 40/8
**associated [1]**
127/11
**association [1]**
119/1
**assume [10]**
21/14 35/15 45/19
63/19 83/24 84/1
86/11 124/6 136/2
136/24
**assumes [1]**
127/18

**assuming [8]**
7/21 29/12 36/19
74/16 75/2 114/9
123/9 133/2
**attack [1]** 120/25
**attempt [6]** 111/6
118/24 126/21
127/16 130/9
133/14
**attempted [1]**
97/7
**attorney [16]** 1/17
25/18 25/22 26/5
42/6 46/5 68/9
73/3 76/24 76/25
77/1 77/7 92/3
94/11 95/7 102/17
**Attorney's [1]**
45/4 52/5
**attorney/client [1]**
95/7
**attorneys [2]** 1/13
43/20
**author [3]** 121/19
121/20 122/2
**authoritative [3]**
39/16 106/14
122/22
**authority [41]** 5/5
9/16 12/15 12/17
14/21 15/16 17/23
17/24 18/5 30/21
32/10 40/17 53/21
59/1 66/3 67/10
69/8 70/25 85/12
88/6 88/6 91/9
101/6 106/23
114/3 114/8 116/2
116/11 116/19
117/3 117/8
117/11 118/25
119/4 122/18
123/4 123/5
125/22 126/9
129/1 129/23
**authority's [1]**
39/6
**authorize [1]**
60/15
**authorized [8]** 8/9
9/1 69/4 77/6 85/7
85/14 86/4 113/19
**authorizes [1]**
121/9

-2375-

**A**

**authorizing [2]**
7/25 86/5
**availing [1]** 32/17
**Avenue [2]** 1/23
2/3
**aware [10]** 43/5
47/23 56/6 57/1
58/24 69/1 92/19
101/20 103/6
107/14
**away [1]** 9/17

**B**

**back [16]** 22/20
28/7 30/19 32/8
34/1 47/5 49/13
50/15 51/16 82/16
88/24 89/3 101/23
106/3 106/5
112/19
**background [4]**
9/9 9/9 33/6 33/8
**bad [2]** 27/5 89/9
**balance [1]** 42/20
**ballot [1]** 16/5
**Baltimore [1]**
1/21
**Bankruptcy [1]**
2/2
**BANNON [116]**
1/6 3/5 3/13 3/22
6/14 8/2 11/23
14/20 17/15 18/13
19/1 24/12 24/24
25/3 26/11 26/24
27/11 38/2 38/14
39/2 39/19 40/3
40/6 41/10 41/11
47/4 47/20 50/7
51/23 53/15 54/21
58/21 60/20 60/23
61/1 61/14 62/5
68/12 68/13 69/3
71/18 73/7 73/9
73/11 75/12 75/23
78/25 86/11 92/19
92/22 92/25 97/15
98/8 100/9 103/9
103/17 108/25
109/9 113/14
113/17 113/23
114/3 115/16
116/10 116/17

116/19 117/2
117/17 118/6
118/9 118/13
118/15 118/21
119/3 119/9
119/16 120/1
121/5 121/8
121/12 121/24
122/11 122/21
123/10 123/17
123/24 124/15
124/18 124/18
125/7 125/24
126/10 126/12
126/19 126/22
127/3 127/6 127/8
127/11 127/20
127/24 128/7
128/23 129/7
129/13 129/16
129/18 129/22
130/4 130/7 130/8
130/22 131/6
131/12 131/13
133/3
**Bannon's [40]**
3/17 3/21 4/4 23/9
23/22 27/20 28/5
28/15 29/15 35/5
40/4 46/20 51/12
54/9 62/9 63/8
78/4 81/7 104/7
104/19 114/9
117/13 117/14
118/2 119/1 119/7
122/5 122/16
123/20 125/1
125/21 128/2
128/12 128/14
129/25 130/12
132/8 132/12
132/21 137/11
**bar [2]** 46/19
108/15
**Barenblatt [2]**
85/9 85/11
**Barker [2]** 31/10
84/16
**barred [3]** 81/22
96/6 123/3
**barring [2]** 54/14
137/20
**bars [1]** 109/3
**based [19]** 5/8

5/17 11/23 32/11
39/13 51/10 53/1
57/8 57/18 73/1
81/18 113/7 126/1
126/16 127/12
128/2 129/10
129/13 137/6
**basically [6]** 13/5
13/11 72/7 83/10
100/8 136/16
**basis [18]** 9/22
24/5 91/22 91/23
91/25 93/4 94/20
94/22 94/23 95/10
95/12 100/16
100/17 114/13
121/24 122/4
122/10 129/21
**be [246]**
**bears [2]** 84/25
95/23
**beauty [1]** 137/1
**because [71]**
4/14 8/7 8/18
10/10 16/16 19/12
19/17 19/22 25/17
26/12 27/7 28/4
30/2 30/15 31/1
46/9 47/9 50/8
50/12 50/13 52/14
53/2 58/15 58/19
59/14 59/14 61/3
62/16 62/25 64/4
66/4 66/19 67/5
68/17 69/3 70/16
71/9 71/19 72/15
75/18 76/12 77/1
77/23 81/2 81/18
82/1 82/25 84/18
100/6 100/8
102/14 104/8
104/23 105/24
107/10 109/12
110/5 110/22
110/23 112/22
121/6 126/14
128/24 130/25
132/5 134/21
135/6 138/3
139/19 140/2
142/9
**becomes [2]** 66/1
77/8
**been [51]** 6/21

6/22 9/5 12/7
14/21 17/6 19/1
23/17 24/22 28/16
35/7 39/8 39/17
46/21 47/20 51/1
51/15 51/22 53/3
53/18 56/8 66/24
69/10 72/20 73/11
73/22 74/3 84/22
85/7 85/12 85/14
85/20 87/4 87/5
87/17 88/15 97/20
103/8 103/10
105/4 108/21
115/14 115/21
118/11 119/16
120/10 121/11
132/3 138/15
141/21 142/12
**before [38]** 1/9
11/22 18/11 18/13
19/2 25/2 26/23
27/1 27/19 28/16
28/25 28/25 29/15
30/2 37/18 37/22
44/20 46/23 49/12
64/15 67/23 87/5
89/21 91/1 94/13
97/20 109/23
113/6 114/5 117/5
118/8 118/16
119/17 123/5
130/14 137/1
138/24 142/10
**begin [2]** 70/23
114/1
**beginning [3]** 3/7
94/12 101/23
**behalf [7]** 20/20
27/11 69/4 70/8
90/14 90/15
132/21
**behave [1]** 97/18
**behind [2]** 50/13
67/3
**being [14]** 14/7
34/23 49/24 60/17
64/9 73/14 77/16
78/19 82/6 101/10
111/21 114/10
120/11 121/23
**belief [7]** 104/7
104/19 108/16
128/3 129/14

138/16 138/16
**believe [18]** 3/17
7/18 12/18 38/5
47/8 50/11 57/4
62/5 101/8 103/18
104/18 120/7
125/2 125/5
127/24 128/4
137/16 139/14
**believed [4]** 96/2
105/9 110/5 110/6
**believes [2]**
117/22 121/18
**believing [1]**
72/17
**belong [1]** 92/12
**below [1]** 125/2
**best [5]** 32/4
35/21 37/21 37/24
80/13
**better [4]** 5/11
65/14 65/16 130/2
**between [18]**
16/19 24/12 27/9
42/20 45/9 49/15
58/12 74/17 78/3
79/14 92/17
101/13 108/25
109/9 123/25
136/8 136/9
136/10
**beyond [9]** 9/25
17/22 28/9 34/23
38/20 73/6 77/2
101/1 125/10
**Biden [4]** 43/23
50/21 50/24 74/23
**big [1]** 30/5
**bill [2]** 56/16 58/2
**binding [9]** 39/7
65/17 66/4 106/14
106/23 122/22
126/5 126/9 127/5
**bingo [1]** 61/25
**bipartisan [3]**
20/17 21/8 21/15
**bit [4]** 10/8 43/3
83/2 85/4
**BLAG [1]** 20/21
**block [1]** 120/13
**blood [1]** 26/13
**Bob [1]** 3/12
**boil [1]** 60/11
**bone [1]** 15/9

# B

**both [8]** 16/1 25/25 62/16 87/3 93/19 120/18 125/20 133/20
**bottom [1]** 133/8
**boy [1]** 24/14
**Boys [1]** 79/2
**branch [21]** 41/7 41/11 41/13 42/1 55/7 55/13 55/24 57/12 57/12 60/16 64/8 65/1 74/6 78/16 78/20 99/20 100/14 102/24 116/5 119/7 128/20
**branch's [1]** 118/24
**branches [1]** 129/3
**break [4]** 88/22 89/2 112/18 120/17
**breaking [1]** 82/16
**brief [31]** 4/4 12/18 18/12 19/18 19/23 20/2 20/11 20/19 20/22 20/24 21/2 21/2 21/3 21/7 21/10 21/24 22/1 22/5 25/14 26/9 31/2 31/3 37/8 68/2 90/9 100/12 101/8 106/5 107/13 107/15 112/13
**briefed [5]** 131/21 131/22 138/21 142/11 142/12
**briefing [3]** 133/17 140/22 141/9
**briefly [6]** 27/19 100/2 100/3 100/3 101/20 108/8
**briefs [13]** 19/18 21/23 22/7 22/8 25/21 30/19 31/13 90/14 90/20 90/22 90/24 101/8 101/15
**bring [1]** 64/15

**brings [1]** 35/4
**broader [2]** 47/21 86/23
**broadly [3]** 55/10 77/12 128/22
**Bryan [5]** 81/22 83/16 83/17 87/19 96/6
**bucket [2]** 72/7 73/17
**builds [1]** 55/8
**bunch [4]** 21/13 60/19 76/1 134/11
**burden [4]** 17/21 59/25 84/25 95/23
**burdening [1]** 42/14
**business [1]** 26/2
**busy [1]** 141/14

# C

**cabinet [1]** 49/25
**calamitous [1]** 34/5
**call [9]** 5/5 30/20 37/10 37/13 47/15 61/4 68/4 68/9 94/13
**called [9]** 47/5 49/12 50/10 61/23 61/24 61/25 62/1 75/3 75/4
**calls [7]** 43/24 50/21 51/2 56/9 61/17 92/17 93/11
**came [2]** 68/2 70/15
**campaign [1]** 111/8
**can [73]** 4/6 4/12 6/25 15/15 15/15 17/17 19/6 20/8 20/19 22/17 23/13 23/23 27/6 27/14 32/8 36/3 37/3 37/15 39/22 39/24 40/2 45/9 45/14 47/12 48/19 53/3 53/24 53/24 55/2 56/18 56/22 56/23 56/24 61/8 63/8 65/22 66/12 69/17 69/20 70/1 70/6 70/14 70/22 75/21

78/9 79/18 80/16 83/5 83/19 85/21 87/10 87/15 87/19 88/1 88/9 88/20 89/25 91/18 95/14 96/15 101/9 106/16 111/22 114/13 114/23 117/10 119/5 123/21 124/13 131/12 140/23 141/14 142/12
**can't [23]** 17/20 18/1 35/12 37/12 43/17 43/22 44/5 61/24 72/5 75/16 76/18 78/23 87/17 87/20 93/11 94/17 97/25 99/12 101/15 102/13 103/15 106/15 110/20
**cannot [24]** 19/21 21/6 35/10 38/20 39/10 40/19 41/22 47/9 50/11 56/3 59/7 62/5 67/5 108/11 108/16 114/19 116/6 118/19 120/3 124/6 126/25 127/16 129/13 130/23
**capacious [2]** 97/11 134/23
**Capitol [2]** 120/10 120/25
**car [1]** 107/11
**care [2]** 141/17 141/18
**careful [1]** 41/19
**CARL [1]** 1/9
**carried [2]** 59/23 78/16
**carries [1]** 122/19
**carry [1]** 55/18
**case [87]** 3/3 4/8 10/12 11/3 13/6 13/7 13/8 13/15 15/4 15/8 18/19 20/22 21/16 24/7 24/10 25/9 25/16 25/18 26/3 26/4 26/11 27/17 27/24

30/16 30/18 31/9 31/9 31/15 31/16 31/16 31/17 32/11 33/5 33/24 35/5 38/25 39/13 40/18 50/6 51/21 52/24 54/10 54/12 54/19 54/21 58/19 61/15 67/9 67/10 68/17 71/2 71/11 75/14 78/4 80/7 80/14 80/23 81/23 83/17 86/13 87/19 92/21 93/15 100/15 100/17 101/11 103/19 103/24 104/14 104/15 104/18 105/16 106/5 110/22 113/3 114/17 119/25 120/25 125/25 126/11 126/20 128/4 134/16 137/13 138/20 139/18 140/7
**cases [23]** 6/17 7/3 12/24 21/13 29/13 35/3 35/4 52/21 84/13 87/2 87/3 90/13 90/22 90/25 91/1 91/4 91/4 91/8 101/9 101/13 105/5 107/5 118/4
**categories [4]** 48/9 48/10 48/15 62/21
**category [6]** 77/8 88/8 122/16 122/17 125/23 136/21
**cause [4]** 114/2 117/12 119/15 132/16
**cautious [1]** 104/3
**cease [2]** 85/16 85/19
**CEO [4]** 43/24 50/21 50/23 50/25
**cert [1]** 39/25
**certain [12]** 19/2 47/19 62/21 72/13

82/4 91/23 118/8 121/25 124/7 128/19 128/20 129/20
**certainly [16]** 15/15 15/16 26/22 30/25 37/17 43/5 50/3 52/1 61/24 70/13 79/17 81/4 82/18 84/4 100/24 126/10
**certification [3]** 120/13 121/7 121/11
**certify [1]** 143/4
**cetera [3]** 12/4 12/4 96/6
**Chair [3]** 88/1 88/5 117/22
**Chairman [2]** 68/18 107/19
**chal [1]** 21/22
**challenge [8]** 5/6 15/15 36/7 36/10 46/16 51/19 104/25 128/13
**challengeable [1]** 16/12
**challenged [1]** 99/15
**chance [1]** 140/1
**change [1]** 142/18
**chapter [1]** 40/21
**characterize [1]** 61/19
**charge [4]** 14/13 113/7 122/4 122/10
**charged [8]** 35/9 35/10 73/19 109/22 113/11 113/13 115/9 131/3
**charges [7]** 13/8 87/8 88/20 118/9 129/20 129/22 140/5
**Charles [1]** 1/20
**Cheney [4]** 68/19 68/23 107/20 117/21
**cherrypicking [1]** 76/18

# C

**chief [1]** 93/15
**chill [1]** 55/23
**chilling [2]** 25/7
52/6
**choices [1]** 94/18
**chose [5]** 48/16
48/18 82/6 83/7
92/2
**Christoffel [1]**
12/21
**Chuck [5]** 54/3
54/3 54/24 55/3
55/9
**circle [3]** 21/19
49/6 49/7
**circuit [18]** 13/11
31/10 58/6 80/14
82/10 83/17 83/18
85/8 85/9 85/9
85/10 87/2 96/20
103/25 105/23
110/12 119/23
127/5
**Circuit's [1]** 126/5
**circumstance [5]**
44/9 47/12 79/13
87/16 97/6
**circumstances [8]**
21/7 22/3 49/17
53/23 54/7 74/14
80/23 95/18
**CIRTON [1]** 1/23
**citations [1]**
64/16
**cite [6]** 12/18
12/21 25/13 31/15
47/24 100/12
**cited [2]** 56/7
118/14
**cites [1]** 41/9
**citizen [4]** 32/16
50/9 50/20 52/2
**citizens [1]** 49/5
**civil [8]** 12/13
36/9 51/20 52/21
59/17 62/7 101/13
103/11
**claim [6]** 41/8
41/24 55/13 59/24
73/25 107/1
**claimed [1]** 122/2
**claims [6]** 26/24
56/14 57/6 57/17

76/13 127/13
**clarified [1]**
124/25
**clarify [2]** 110/18
136/6
**Clark [4]** 35/25
36/24 37/10 37/11
**Clark's [1]** 38/1
**clause [3]** 11/15
90/16 116/1
**clear [32]** 19/25
32/21 36/12 36/15
36/16 37/11 45/17
46/24 61/2 62/12
63/17 75/15 76/11
76/17 76/23 77/16
77/16 77/17 77/17
79/7 80/21 86/8
86/17 87/8 104/10
104/24 105/4
126/4 128/21
137/3 138/15
139/24
**clearly [8]** 43/17
44/5 76/12 92/13
106/4 116/1
123/18 124/2
**Clement [4]** 49/1
49/1 61/2 61/6
**clerk's [1]** 13/9
**client [2]** 95/7
125/3
**close [3]** 30/23
64/25 74/3
**closer [1]** 133/5
**closest [2]** 25/9
79/9
**Code [1]** 125/24
**collapse [1]** 72/7
**collar [1]** 25/25
**COLUMBIA [2]**
1/1 58/6
**come [16]** 3/2 3/6
22/20 27/14 53/16
61/13 70/16 83/4
88/24 100/20
109/23 132/19
133/3 133/4
136/19 141/24
**comes [2]** 75/11
87/10
**coming [4]** 51/3
140/9 140/17
140/22

**comma [1]** 18/21
**commented [1]**
77/20
**comments [2]**
22/13 58/2
**commission [1]**
72/11
**commit [1]** 80/7
**committed [1]**
113/11
**committee [105]**
5/22 5/25 6/2 6/6
6/6 7/17 7/18 8/9
8/17 9/1 9/15 9/15
9/24 11/4 11/6
12/19 15/13 15/16
15/22 16/3 16/7
16/11 16/20 16/23
17/2 17/6 17/13
17/17 18/21 19/15
21/14 25/3 25/23
27/9 28/8 28/17
28/18 37/18 37/19
48/3 68/18 68/20
77/17 83/25 84/6
84/20 85/13 85/15
85/16 85/18 85/19
86/23 87/4 88/5
89/9 89/19 89/21
90/4 90/15 90/21
91/5 91/9 91/13
91/15 92/24 93/2
93/3 95/21 95/22
100/14 109/21
113/18 113/20
113/21 113/24
114/5 114/7
114/10 114/20
115/6 115/13
116/8 116/11
116/12 116/20
117/5 117/9
117/11 117/18
117/20 118/7
119/17 119/21
120/7 120/15
120/17 121/6
121/9 122/7 122/8
132/20 132/22
132/25 136/9
136/12
**Committee's [6]**
68/12 84/11
117/23 120/5

120/20 121/17
**committees [4]**
6/8 28/16 49/13
87/12
**committing [1]**
75/20
**communicate [1]**
108/3
**communicated
[3]** 28/7 36/23
68/13
**communicating
[5]** 43/11 47/20
63/16 63/20 74/5
**communication
[11]** 25/6 27/8
31/25 43/13 44/17
44/22 50/5 50/22
50/22 64/23 76/8
**communications
[22]** 27/4 47/19
64/22 65/6 65/9
73/12 74/7 74/23
79/1 79/17 92/23
93/1 94/5 102/23
102/25 108/1
108/24 109/9
122/1 123/25
132/21 136/8
**company [1]**
43/24
**compel [2]** 121/7
122/9
**compelled [2]**
42/25 124/20
**compelling [1]**
100/14
**competing [1]**
135/10
**compilation [1]**
49/15
**complete [1]** 22/2
**completed [1]**
121/11
**completely [3]**
48/19 94/19 94/19
**compliance [5]**
109/4 109/24
110/3 116/19
117/8
**complicated [2]**
19/14 137/23
**complied [5]** 8/4
14/2 14/15 18/12

87/17
**comply [13]**
40/14 82/8 87/15
89/8 89/11 89/12
105/10 122/5
122/11 123/1
124/3 124/15
127/12
**complying [2]**
53/2 79/19
**component [1]**
63/10
**comport [1]**
33/13
**composed [2]**
7/17 7/18
**composition [6]**
5/22 5/25 6/5
113/17 116/7
117/23
**comprehensive
[1]** 56/7
**compressing [1]**
141/13
**computer [1]** 2/7
**computer-aided
[1]** 2/7
**concede [3]** 6/24
44/18 84/4
**conceded [1]**
123/13
**concedes [3]**
83/24 84/1 96/11
**concept [2]** 45/19
49/19
**conceptually [1]**
102/1
**concern [2]** 71/13
123/24
**concerned [1]**
87/3
**concerning [4]**
34/13 85/13
124/22 124/23
**concerns [1]**
132/16
**concession [1]**
100/13
**conclude [12]** 8/3
37/13 65/4 78/1
78/3 79/18 114/19
116/7 118/19
119/15 120/3
130/4

**C**

**concluded [10]**
53/13 55/9 55/10
55/22 66/9 109/8
114/2 117/2
119/24 142/23
**concluding [1]**
78/21
**conclusion [8]**
43/17 51/10 57/3
57/8 61/24 63/11
66/9 118/18
**conclusions [1]**
66/8
**conclusive [1]**
115/5
**concur [1]** 57/7
**conduct [24]**
25/10 33/9 33/13
34/25 35/2 35/3
71/17 71/19 71/23
72/4 72/9 76/14
79/25 80/12 91/25
95/5 111/10 119/6
126/16 128/16
129/9 129/14
130/2 130/6
**confer [2]** 135/11
135/22
**conference [1]**
107/20
**conferences [1]**
140/3
**conferred [1]**
15/24
**conferring [1]**
135/8
**confidence [1]**
103/1
**confidential [2]**
44/2 121/22
**confidentiality [2]**
49/20 102/24
**confirmed [1]**
42/22
**conflating [1]**
78/7
**conflict [3]** 58/13
94/12 94/16
**conflicting [1]**
79/13
**conformity [3]**
27/24 29/2 97/6
**confusing [1]**

29/24
**Congress [46]**
8/22 10/25 11/4
11/18 11/22 11/24
12/1 13/8 18/22
20/25 21/4 21/10
35/9 39/21 41/6
42/3 42/7 42/20
44/3 44/6 44/21
47/11 50/23 55/11
55/17 56/10 56/13
57/5 57/22 59/8
60/4 60/15 61/13
62/2 62/19 64/12
64/16 69/11 79/4
103/7 107/6 116/2
120/12 122/25
127/13 129/3
**Congress' [1]**
119/3
**congressional
[16]** 19/15 39/9
42/25 45/3 46/6
49/12 65/21 78/10
79/20 80/24
102/20 106/18
115/24 119/5
123/1 123/24
**Congressman's
[1]** 13/13
**Connally [1]**
33/23
**connection [2]**
39/9 132/10
**consciously [1]**
82/6
**consider [11]**
34/10 50/7 52/6
59/17 69/17 69/20
70/2 70/14 117/10
139/7 142/12
**consideration [2]**
133/10 139/3
**considered [3]**
8/23 90/10 101/9
**considering [2]**
59/11 138/19
**consistent [5]**
7/19 11/5 18/15
97/17 117/23
**consistently [2]**
39/5 39/17
**constituencies'
[1]** 58/14

**constituted [6]**
8/17 11/4 17/6
17/14 90/4 114/20
**constitutes [2]**
58/21 129/1
**constitution [5]**
2/3 11/15 42/6
42/10 116/5
**constitutional
[14]** 4/24 5/6
30/22 42/8 42/15
55/22 60/1 60/6
95/4 107/1 108/11
108/12 127/7
129/2
**constitutionally
[7]** 41/7 52/20
55/12 58/17 59/3
128/16 129/9
**construction [6]**
11/8 11/10 12/6
33/24 65/12 65/12
**construe [3]** 54/7
63/21 103/3
**construed [2]**
5/20 57/15
**construing [1]**
13/4
**consultation [4]**
12/3 87/7 113/22
116/20
**consultations [1]**
52/7
**consulted [1]**
87/4
**consulting [2]**
116/12 117/12
**contemplate [1]**
135/9
**contemplated [3]**
19/16 121/23
139/25
**contemplates [2]**
85/17 85/18
**contemporary [1]**
8/8
**contempt [40]** 8/1
8/24 12/1 21/21
35/9 41/6 42/3
42/18 45/12 47/8
55/11 56/10 56/13
57/5 57/24 58/7
59/23 60/4 60/15
60/22 61/7 63/21

64/12 64/15 66/10
67/4 67/5 78/10
84/12 88/20 90/8
102/13 107/6
108/11 109/23
115/15 115/16
115/17 115/18
122/25
**contends [1]**
116/17
**content [1]** 27/4
**contention [1]**
114/9
**context [31]** 5/19
6/17 7/7 12/13
13/13 36/3 37/22
39/18 41/20 44/15
45/12 46/2 46/2
46/4 49/21 53/21
57/24 58/11 60/17
60/22 63/12 63/13
63/15 63/19 63/22
66/11 66/12 76/7
83/15 111/7
115/12
**contexts [1]**
60/13
**continue [2]**
129/24 140/11
**continued [4]**
49/23 104/20
120/15 125/4
**continuing [1]**
42/21
**contract [1]** 61/17
**contradict [2]**
107/17 107/19
**contradictory [4]**
34/14 34/17 34/24
93/15
**contrary [1]** 46/23
**conversation [6]**
25/5 45/6 50/1
50/9 57/19 64/3
**conversations [2]**
61/5 64/7
**conviction [2]**
6/19 96/24
**COONEY [2]** 1/12
3/9
**Cooper [2]** 54/4
55/9
**Cooper's [4]** 54/3
54/3 54/25 55/3

**copy [4]** 69/10
118/7 118/12
118/15
**CORCORAN [9]**
1/19 3/12 5/7 5/12
94/13 111/14
136/2 136/3
136/25
**corners [7]** 15/1
73/10 74/10 75/9
77/3 116/24
119/13
**correct [14]** 16/13
16/17 16/24 17/4
17/7 19/9 43/12
91/6 96/21 97/1
97/2 119/3 120/4
143/4
**correctly [2]** 69/6
126/8
**COSTELLO [24]**
1/22 3/12 3/24
22/14 23/15 23/21
25/22 27/9 28/8
37/9 62/19 67/25
70/19 91/19 92/2
93/16 94/13 94/16
95/1 129/19
132/13 132/20
136/7 137/20
**Costello's [7]**
24/4 25/1 92/9
93/1 93/13 104/12
107/25
**could [47]** 15/3
17/14 18/12 21/3
29/25 32/22 36/24
40/7 41/7 50/4
52/10 52/13 53/19
53/19 55/12 58/20
58/20 60/22 62/14
66/24 71/18 74/13
74/19 80/5 84/22
84/22 89/21 90/10
90/12 90/20 93/9
102/8 110/15
111/2 119/9
123/11 134/6
135/4 135/11
135/17 136/4
138/25 139/9
139/16 141/9
141/14 142/16
**couldn't [2]** 53/17

**C**

**couldn't... [1]**
107/10
**counsel [40]** 3/6
3/10 3/14 3/21 4/4
10/16 28/20 30/8
38/19 48/1 48/12
48/13 52/7 61/4
68/4 68/22 73/12
73/22 76/21 77/8
82/19 83/12 83/16
88/21 100/2
100/20 103/14
104/10 112/21
124/17 124/25
125/1 126/3
129/14 129/19
129/25 130/20
130/24 135/20
142/21
**counsel's [3]**
22/1 73/9 105/22
**count [8]** 100/7
100/10 100/16
121/5 122/4
122/10 122/15
123/14
**counts [1]** 113/13
**couple [7]** 40/20
41/1 68/2 76/17
80/6 100/6 101/21
**course [14]** 26/2
42/16 45/8 48/25
51/12 59/10 65/18
66/1 72/19 80/12
103/6 114/11
125/14 140/24
**court [132]** 1/1
2/2 5/18 6/1 6/17
6/20 7/2 7/6 7/10
9/14 10/24 13/1
13/11 13/16 13/25
19/24 21/6 21/21
22/25 23/1 24/5
27/14 31/6 32/22
33/7 33/19 34/9
37/12 39/12 40/20
40/21 43/4 43/5
46/9 47/13 48/25
49/6 50/8 52/12
53/25 54/16 54/17
55/6 56/5 58/5
58/18 58/24 59/10
59/11 59/12 59/12

59/13 59/18 59/21
61/19 62/7 62/8
62/8 62/13 62/24
64/14 65/14 65/15
70/23 72/14 77/21
79/20 83/6 83/17
83/23 84/13 84/16
84/17 85/10 87/6
88/19 88/21 89/1
89/24 90/12 90/13
99/5 99/17 99/25
100/17 101/2
102/4 103/24
104/2 104/3 104/4
104/4 105/6 105/7
105/8 105/23
105/24 107/6
107/15 108/13
108/14 108/19
109/23 109/25
110/2 111/18
111/20 112/16
113/11 114/13
114/19 114/24
115/3 115/7
115/22 115/23
115/25 116/4
116/6 116/23
117/10 119/20
120/24 135/18
136/9 136/9
138/14 139/20
139/23 139/24
140/11 143/3
**Court's [14]** 60/7
65/15 86/16
101/24 103/6
105/19 107/14
126/1 126/23
127/9 129/12
136/6 137/20
138/18
**courthouse [1]**
101/9
**courts [4]** 2/2
86/4 130/10
139/21
**cover [7]** 23/4
47/19 50/4 72/9
83/20 83/22 120/6
**coverage [3]**
34/11 49/6 49/7
**covered [5]** 50/24
71/17 104/8 104/9

125/14
**cows [1]** 24/18
**CR [1]** 1/3
**CRC [1]** 2/1
**create [1]** 121/10
**crime [7]** 25/23
34/2 34/3 42/7
65/25 74/18
100/10
**crimen [1]** 34/1
**crimes [1]** 80/8
**criminal [60]** 3/3
5/19 6/3 6/17 10/9
12/7 12/13 12/24
13/8 13/15 14/7
21/16 33/7 33/10
33/11 34/11 34/12
34/13 34/17 34/21
34/23 35/9 35/12
36/10 38/21 39/10
40/7 40/13 42/3
46/15 47/8 51/21
51/24 52/17 52/17
53/4 55/23 56/13
57/24 58/7 59/23
60/22 62/4 62/6
64/5 64/15 65/22
67/4 71/16 71/23
101/13 102/10
102/13 104/16
113/6 113/11
119/6 121/2
128/17 140/5
**criminalizing [1]**
126/15
**criminally [2]**
52/25 59/15
**critical [3]** 29/18
102/4 103/8
**cross [1]** 93/14
**CRS [3]** 49/10
49/11 50/1
**crucial [1]** 101/14
**crystal [1]** 86/8
**cured [1]** 84/22
**curling [1]** 21/17
**current [17]**
39/24 41/16 41/23
42/23 43/18 44/6
44/16 55/21 57/11
57/20 60/16 64/17
74/6 76/7 78/16
79/15 135/13
**currently [1]**

17/13
**custody [1]** 84/10
**cut [1]** 92/6
**cynic [1]** 107/24

**D**

**D.C [9]** 1/13 13/11
87/2 96/20 105/23
110/12 119/23
126/5 127/5
**damage [1]** 21/3
**Dan [2]** 115/19
118/5
**dare [1]** 51/19
**date [6]** 130/3
135/25 140/2
140/11 142/2
143/10
**DAVID [4]** 1/16
1/17 3/12 39/20
**DAVIDOFF [1]**
1/23
**Davis [1]** 33/17
**day [8]** 59/13 82/4
120/13 122/19
125/5 140/2 140/9
140/9
**days [1]** 142/10
**DC [3]** 1/5 1/14
2/4
**dcd.uscourts.gov**
**[1]** 2/4
**de [6]** 7/3 11/5
11/9 11/13 12/8
114/25
**deadline [2]**
134/5 134/7
**deal [6]** 4/23 5/4
5/7 18/18 28/20
45/4
**dealt [2]** 83/15
114/17
**death [1]** 6/9
**debated [1]** 8/8
**decades [4]**
10/18 10/18 25/25
39/5
**decide [16]** 9/21
11/18 20/19 20/21
28/13 86/1 86/3
108/13 108/24
109/25 111/18
131/16 134/16
134/20 138/9

140/10
**decided [10]** 21/1
76/14 82/8 94/15
96/19 104/4
130/20 130/24
131/4 133/21
**decides [1]**
108/14
**deciding [3]** 12/6
13/2 132/25
**decision [13]**
54/12 79/14 83/11
96/3 96/9 112/23
126/2 126/4 126/5
126/7 126/12
127/9 127/17
**decisions [1]**
50/13
**declaration [1]**
107/17
**declarations [1]**
93/18
**decline [2]** 124/3
128/19
**declined [3]**
64/18 64/19 123/1
**deemed [2]** 52/16
57/19
**deems [1]** 47/6
**default [11]** 28/10
28/12 58/21 77/16
81/18 97/23
108/17 129/1
129/6 131/3
131/13
**default' [1]**
128/25
**defect [1]** 113/7
**defendant [50]**
1/7 1/16 10/9
17/20 25/19 31/8
32/15 65/22 71/6
72/2 72/21 72/24
75/16 76/10 77/23
78/6 80/3 80/5
81/2 81/22 82/4
84/19 86/14 87/10
87/19 88/4 88/14
88/20 89/18 92/3
92/24 93/5 94/8
94/10 94/15 95/4
95/19 95/23 96/11
97/5 98/1 99/18
100/24 108/16

**D**

**defendant... [6]**
109/2 110/4
111/15 113/6
113/8 113/10
**defendant's [6]**
9/20 87/22 93/16
105/20 105/25
113/2
**defendants [1]**
72/11
**defense [68]** 3/13
26/1 28/3 31/6
31/16 31/17 65/24
69/13 70/10 71/7
71/10 71/12 71/25
73/15 73/18 74/12
74/13 74/25 75/3
75/4 75/8 75/18
76/15 77/9 80/1
80/2 80/9 81/4
81/7 81/21 83/6
83/12 83/14 86/15
87/7 87/9 87/9
87/15 87/18 88/9
88/20 100/2 100/8
104/16 107/5
108/11 108/18
108/20 108/21
109/1 109/3
109/10 110/16
110/20 111/5
111/23 123/8
123/15 131/8
131/14 137/6
138/2 138/7
138/14 138/15
138/20 138/22
139/6
**defenses [7]**
30/21 89/23
123/12 123/15
131/6 137/8
137/15
**defer [3]** 7/20
11/6 84/17
**deference [6]**
12/5 12/11 13/2
13/5 13/6 14/14
**defined [1]**
117/15
**definition [2]** 97/1
97/10
**defying [1]** 78/9

**delete [1]** 12/22
**deliberate [9]**
29/8 29/14 29/21
82/14 83/1 83/2
89/13 96/9 106/1
**deliberately [2]**
82/8 83/7
**deliberations [3]**
55/25 56/1 56/3
**Dellinger [1]**
42/16
**demanded [1]**
121/17
**democratic [2]**
16/1 16/4
**demonstrates [1]**
57/9
**demonstratively**
**[1]** 103/8
**denial [1]** 39/25
**denied [1]** 133/9
**Dennis [2]** 83/16
83/18
**deny [4]** 113/4
130/11 138/3
138/14
**department [31]**
30/17 31/22 31/22
36/8 38/18 39/6
39/14 41/5 43/5
48/17 52/23 54/11
56/9 56/12 56/21
57/2 58/16 58/25
59/14 64/11 64/14
102/11 102/18
104/21 106/14
106/23 118/2
122/23 123/10
123/17 131/10
**Department's [4]**
48/20 57/4 65/20
65/21
**depending [1]**
74/14
**depends [3]**
82/23 96/15 110/7
**deponent [1]**
19/14
**deponents [1]**
116/14
**deposition [9]**
16/23 18/5 19/2
19/3 32/1 69/8
69/15 118/14

120/18
**described [1]** 7/9
**designate [1]**
10/16
**designated [1]**
117/16
**despite [3]** 94/15
102/10 127/22
**detail [3]** 29/11
56/6 119/19
**detailed [2]**
119/22 120/6
**details [2]** 99/9
121/17
**deter [1]** 42/11
**determination [2]**
66/22 81/1
**determine [3]**
47/11 85/23 105/2
**determining [2]**
59/8 91/13
**did [36]** 8/10 13/1
13/9 14/6 15/11
19/17 26/13 26/18
26/19 27/3 30/2
44/3 49/4 58/22
64/10 64/13 71/22
81/20 86/5 92/3
92/11 92/14 96/19
96/23 97/19 98/10
108/15 108/17
110/5 110/6
119/15 125/8
127/21 131/20
132/23 136/9
**didn't [33]** 7/2
13/5 18/8 19/4
27/3 34/5 37/23
50/9 64/6 69/15
69/19 70/16 70/17
77/25 79/1 79/2
82/1 83/13 84/20
87/7 87/23 90/19
104/2 104/4
105/15 108/4
110/3 110/11
125/2 136/2
136/11 136/24
140/12
**difference [1]**
102/4
**different [36]**
9/21 9/24 10/6
10/21 12/12 14/3

18/20 18/25 21/17
33/18 43/3 58/12
59/5 59/5 73/20
74/19 78/7 83/12
84/6 84/14 84/25
85/4 97/5 97/24
97/24 105/20
106/9 107/4
108/17 110/11
111/4 111/4
122/17 133/2
134/25 136/21
**difficult [2]** 42/12
141/8
**diligent [1]**
121/11
**dire [2]** 134/7
134/11
**direct [3]** 22/13
31/7 107/1
**directed [4]** 68/12
124/2 124/14
127/19
**direction [2]**
56/15 124/6
**directive [1]**
127/11
**directly [5]** 14/12
16/9 49/2 76/23
104/13
**disagree [3]**
53/12 121/24
126/1
**discovery [1]**
101/1
**discretion [2]**
128/3 128/6
**discuss [4]** 23/7
27/19 124/4
125/13
**discussed [7]**
8/11 8/12 17/9
50/1 96/7 126/6
130/19
**discussing [1]**
23/17
**discussion [5]**
47/6 62/2 100/20
100/21 101/24
**disgrace [1]**
127/2
**disheartened [1]**
30/14
**disinclination [1]**

132/19
**disinclined [2]**
136/19 138/1
**dismiss [27]** 3/18
3/23 5/17 14/24
22/14 22/22 24/5
39/4 58/18 69/18
69/21 71/8 73/1
100/7 103/23
103/25 113/3
113/7 114/13
116/23 119/12
122/15 124/6
130/12 133/8
138/3 138/25
**dismissal [25]**
25/10 26/20 53/13
81/4 81/15 91/22
91/24 91/24 94/4
94/20 96/14
100/16 114/21
116/9 116/15
118/8 122/19
123/6 124/10
125/22 129/17
129/20 130/6
130/8 139/1
**dismissed [12]**
30/16 30/17 30/18
32/11 33/5 38/25
39/13 46/18 54/19
63/9 100/11 121/6
**dismissing [2]**
70/10 129/22
**dispute [3]** 18/8
87/22 114/12
**disputed [4]**
35/17 35/19 124/5
135/15
**disputes [3]**
45/10 57/24 58/8
**disrupt [1]** 42/19
**distinct [1]** 102/1
**distinction [5]**
16/19 32/16 51/10
61/3 101/13
**distinguishing [1]**
79/15
**distracted [1]**
48/22
**distraction [1]**
48/24
**district [8]** 1/1 1/1
1/9 2/2 21/13 58/6

**D**

**district... [2]**
58/11 130/10
**divided [2]** 19/20
21/6
**do [72]** 4/2 4/14
6/24 8/20 11/5
11/22 13/17 13/21
15/7 16/17 21/21
22/13 22/24 23/20
23/24 24/6 24/6
24/16 24/21 25/20
28/1 28/3 30/3
42/11 44/1 44/1
51/20 54/12 54/17
54/17 61/7 65/14
65/16 71/2 72/7
73/7 75/21 77/18
78/1 82/6 82/11
84/3 85/1 86/23
87/7 90/1 97/7
97/19 98/14 98/19
123/13 125/10
127/16 128/12
129/21 129/23
129/24 130/4
132/18 133/12
133/23 134/3
135/4 135/11
135/16 135/17
138/5 140/20
141/1 141/19
141/20 142/15
**Doc [1]** 22/2
**Docket [1]** 68/6
**doctrine [6]** 33/23
33/25 60/3 126/15
127/8 127/23
**doctrines [2]**
123/3 123/6
**document [9]**
37/25 45/16 58/8
68/19 100/15
105/18 116/24
119/13 122/5
**Document 65 [1]**
100/15
**documents [29]**
32/2 38/3 40/21
62/11 64/18 69/24
73/21 74/9 76/6
78/11 78/14 78/16
78/21 78/22 79/6
82/5 93/7 103/11

106/18 120/18
121/10 122/8
122/12 122/13
123/10 123/23
124/21 125/7
125/9
**does [36]** 15/23
29/14 37/1 42/4
42/6 45/7 45/8
56/14 57/5 65/20
70/3 72/8 78/8
79/21 85/23 86/1
89/7 92/8 102/24
104/20 105/24
110/4 114/6
114/12 117/1
117/6 117/20
119/14 122/3
122/9 122/14
127/24 128/15
128/20 128/22
130/1
**doesn't [50]** 6/7
6/16 6/20 15/1
18/7 23/2 30/2
32/14 33/13 35/12
36/4 40/14 45/12
48/2 48/3 51/5
52/18 53/5 61/6
64/5 64/6 66/10
66/22 70/1 70/5
70/7 71/19 77/7
77/22 79/5 82/14
84/17 85/16 85/19
87/1 87/15 87/20
87/24 94/23 95/8
103/22 105/15
106/3 106/4 106/7
106/10 107/8
109/18 139/24
141/24
**doing [5]** 21/14
25/25 43/24 43/25
83/20
**DOJ [6]** 58/17
59/22 73/24
122/24 122/24
128/19
**don't [88]** 4/1
4/13 4/14 4/15
4/23 6/8 8/1 8/15
9/13 9/14 12/5
14/12 14/17 15/14
19/9 19/12 19/13

20/7 20/10 22/6
23/18 24/21 30/23
30/25 31/1 31/13
31/18 32/9 34/7
36/10 36/20 44/24
45/10 46/15 47/15
49/16 50/2 51/11
52/17 53/22 54/9
59/7 61/19 62/6
63/3 63/11 63/24
65/14 66/4 66/20
67/12 72/1 73/6
74/23 75/25 79/18
81/10 81/12 81/12
82/12 84/14 84/24
86/12 95/17 98/6
98/6 101/2 101/8
101/12 102/4
102/6 102/12
103/3 103/15
109/14 125/5
128/4 128/9
130/15 138/2
139/5 139/6 140/9
140/18 141/13
141/18 141/18
142/2
**done [9]** 13/17
14/7 16/7 21/21
24/17 138/3
139/25 141/9
142/18
**doubt [6]** 17/22
28/10 50/3 66/8
106/19 106/25
**Doug [1]** 68/21
**down [3]** 60/11
75/11 82/16
**drafted [1]** 62/19
**draw [1]** 61/24
**drawn [3]** 13/22
51/10 124/7
**driven [1]** 24/12
**dropped [1]**
68/16
**duality [1]** 58/10
**due [27]** 11/24
13/2 14/14 30/22
30/25 31/15 32/11
32/18 32/19 33/14
33/22 34/22 39/1
70/24 71/10 71/12
71/20 77/13 80/1
101/25 103/20

108/22 122/18
123/3 125/21
132/1 137/6
**duly [1]** 9/1
**dump [1]** 80/16
**dumping [1]**
80/15
**during [2]** 73/22
120/12
**duties [5]** 13/10
13/22 13/23 42/15
60/1

**E**

**each [13]** 4/13 8/7
10/11 24/20 80/20
113/16 116/1
121/20 123/8
123/15 126/20
130/14 134/18
**earlier [5]** 17/9
55/6 107/18 134/1
141/23
**early [1]** 31/5
**earned [1]** 15/25
**easiest [1]** 10/1
**easy [1]** 113/8
**ECF [8]** 3/18 3/19
55/2 107/14 113/3
126/3 127/25
132/12
**ECF-29 [1]** 126/3
**ECF-58 [2]** 113/3
127/25
**ECF-82 [1]**
107/14
**ECFs [1]** 130/17
**economy [1]**
43/23
**effect [6]** 25/7
52/6 60/11 66/5
82/10 82/13
**effectively [1]**
54/9
**effort [3]** 118/22
118/25 120/12
**eight [1]** 142/10
**either [15]** 11/6
16/4 22/7 54/19
86/12 93/14 93/17
94/23 119/16
122/11 131/2
132/7 133/1
133/25 137/10

**election [1]**
120/13
**electric [3]** 24/14
24/19 25/7
**element [24]** 9/4
14/18 14/23 17/20
17/23 17/25 26/24
27/16 28/4 28/11
65/25 77/5 79/23
85/2 85/3 85/5
85/6 85/11 85/21
85/24 86/2 87/9
105/22 105/25
**elements [10]**
9/10 14/13 72/20
72/23 81/3 131/3
133/15 134/17
134/17 134/19
**else [3]** 5/7 54/22
82/7
**email [4]** 24/4
25/5 108/2 125/1
**embodies [1]**
71/12
**emcee [2]** 4/20
4/21
**emphasize [1]**
15/20
**employed [2]**
49/25 66/25
**employee [17]**
31/24 41/23 43/12
43/14 44/16 44/23
45/5 45/10 46/3
50/7 57/20 63/16
63/20 65/5 65/8
74/6 124/1
**employees [9]**
49/25 50/4 57/12
57/13 61/9 76/3
76/5 76/8 128/20
**employment [2]**
61/17 65/1
**encouraging [1]**
52/3
**encroachment [1]**
59/19
**end [2]** 22/21
59/13
**enforce [3]** 77/7
118/25 119/5
**enforcement [6]**
36/9 52/22 59/17
93/18 103/12

**E**

**enforcement... [1]** 108/15
**engage [3]** 76/14 121/3 135/11
**engaged [4]** 98/10 109/13 132/20 132/25
**Engel [1]** 42/21
**Engle [1]** 41/4
**enlist [1]** 42/13
**enough [4]** 87/23 103/25 116/22 139/13
**enter [2]** 94/16 97/5
**entered [1]** 94/14
**entire [4]** 48/14 76/19 87/4 126/19
**entirely [2]** 105/20 136/15
**entities [1]** 28/25
**entitled [8]** 62/5 65/13 79/25 81/4 81/5 88/15 97/15 143/6
**entity [2]** 20/8 58/9
**entrapment [40]** 4/24 5/5 30/20 30/21 31/3 31/14 31/19 32/10 32/17 35/4 66/2 67/16 71/10 71/11 71/12 71/21 71/25 72/19 75/4 75/15 77/11 80/1 80/9 102/2 103/16 103/16 103/23 108/22 122/17 123/4 123/15 125/21 131/8 137/5 137/9 137/22 138/1 138/14 138/19 139/6
**EPA [1]** 78/18
**equally [1]** 10/5
**erroneous [2]** 105/21 129/14
**erroneously [1]** 72/12
**error [1]** 22/4
**errors [1]** 130/9
**Ervin [1]** 58/1

**especially [2]** 58/9 58/11
**essentially [10]** 5/24 14/1 25/18 75/19 80/5 83/6 126/21 133/24 135/10 141/23
**establish [3]** 53/17 98/9 123/12
**established [5]** 12/23 36/20 36/21 72/20 123/21
**estopped [1]** 46/22
**estoppel [37]** 5/5 30/21 31/3 31/14 31/19 32/10 32/17 66/2 67/16 70/22 70/24 71/10 71/11 71/12 71/21 75/5 75/15 77/11 80/1 80/9 102/2 103/16 103/17 103/23 106/24 108/22 123/4 123/15 125/21 131/8 137/5 137/9 137/22 138/2 138/14 138/20 139/6
**et [4]** 12/4 12/4 22/2 96/6
**et cetera [2]** 12/4 96/6
**EVAN [1]** 1/19
**even [63]** 7/5 14/6 19/7 21/15 25/2 26/19 29/20 30/23 31/1 31/2 32/9 32/17 32/18 33/17 34/20 35/2 43/6 53/4 57/12 59/12 61/13 63/20 71/7 72/15 72/21 72/24 73/6 75/6 76/5 76/23 77/22 79/20 80/24 81/2 82/25 84/17 86/23 88/2 88/7 88/7 88/18 89/18 89/23 90/19 95/8 95/18 97/4 97/4 97/7 98/1 98/24 99/18 99/19 101/3 111/11

114/9 114/24 115/2 117/10 121/12 121/24 125/19 131/13
**event [4]** 26/19 40/2 43/9 118/17
**ever [5]** 31/22 44/8 63/11 94/14 102/6
**every [11]** 15/5 16/11 16/22 17/9 17/22 24/7 25/5 47/7 50/11 85/18 140/2
**Everybody [1]** 105/4
**everyone [4]** 4/7 71/15 130/13 130/17
**everything [7]** 4/10 5/7 16/7 83/22 99/24 105/7 136/17
**evidence [43]** 3/23 9/23 25/11 30/6 54/14 91/23 92/9 93/15 95/11 95/23 96/10 96/11 96/15 97/5 97/16 99/5 99/11 99/15 99/22 111/15 111/17 111/18 111/19 111/20 111/24 130/23 131/9 131/11 131/18 131/20 132/3 132/5 132/7 132/13 132/15 132/19 133/1 133/3 134/24 137/12 138/10 138/13 139/4
**evidentiary [6]** 92/8 113/2 133/13 134/14 134/21 142/6
**evil [1]** 89/9
**evolving [1]** 31/4
**exact [1]** 124/10
**exactly [8]** 25/15 82/10 82/11 82/12 130/20 133/13 133/14 140/6
**example [20]**

10/6 15/12 39/18 43/23 60/14 73/11 78/18 80/13 87/2 93/3 93/17 97/12 102/22 103/13 105/9 111/8 118/22 120/10 138/7 140/2
**examples [2]** 39/12 40/20
**exceeded [2]** 116/11 117/11
**excerpts [2]** 53/25 62/24
**exchange [2]** 135/13 139/16
**exclude [3]** 3/23 22/21 29/23 91/23 95/10 95/12 99/4 131/20 132/13
**excluded [4]** 96/12 99/22 100/23 132/5
**excludes [1]** 137/12
**exclusion [4]** 25/11 48/1 94/22 94/24
**exclusionary [1]** 95/7
**excuse [2]** 70/14 110/3
**excused [4]** 83/8 96/4 109/24 129/15
**excuses [1]** 108/17
**excusing [1]** 72/13
**executive [108]** 32/20 35/8 35/11 35/18 35/24 36/5 36/5 36/7 36/13 37/14 37/23 39/8 40/2 40/3 40/4 40/14 40/18 41/7 41/8 41/11 41/13 42/1 42/5 42/12 42/19 43/3 43/8 44/5 44/12 44/14 44/21 45/8 45/19 46/2 47/18 50/3 50/12 50/24 51/1 51/22 53/3 53/18

55/6 55/13 55/14 55/17 55/19 55/24 56/14 56/15 57/6 57/7 57/10 57/12 57/12 57/15 57/23 58/3 59/4 59/22 59/24 60/3 60/16 60/17 61/8 64/8 65/1 68/11 74/6 75/24 75/25 76/4 78/8 78/14 78/16 78/20 83/8 96/4 97/18 99/20 100/14 102/23 104/8 105/10 106/3 106/7 106/8 106/10 107/2 107/4 108/14 109/3 109/17 110/19 118/24 119/7 121/14 121/25 123/20 124/16 125/11 125/19 126/17 127/10 127/12 128/20 129/3 129/10
**exhaust [1]** 59/1
**exhibits [2]** 92/16 98/6
**exist [3]** 45/9 85/16 85/19
**existed [1]** 121/12
**existence [1]** 26/25
**expect [1]** 4/12
**experience [7]** 23/10 23/23 27/20 28/15 29/15 132/8 137/11
**experienced [1]** 104/16
**experiences [1]** 28/22
**experts [2]** 46/10 50/14
**explain [1]** 52/22
**explained [3]** 42/6 115/25 128/9
**exposing [1]** 140/6
**express [1]** 17/9
**expressly [9]**

**E**

expressly... [9]
7/17 7/21 38/22
43/19 44/19 48/3
50/19 52/1 63/15
extend [1] 75/17
extent [13] 11/4
27/2 38/13 86/18
87/14 92/17 93/13
95/11 119/19
120/1 125/18
127/3 138/10
extraordinary [2]
24/25 25/4
extrapolating [1]
75/16
extremely [1]
104/3
Exxon [3] 50/22
50/23 50/25

**F**

face [11] 27/7
40/7 47/15 70/4
72/3 80/18 100/7
114/6 116/17
117/6 120/22
faced [1] 39/20
faces [1] 11/23
facing [1] 13/8
fact [15] 51/11
62/9 68/5 81/1
90/5 99/17 102/10
105/17 108/24
109/10 115/4
127/1 127/19
133/22 142/5
fact-specific [1]
81/1
factor [2] 67/6
79/15
facts [3] 15/9
49/16 125/25
factual [4] 93/6
107/16 107/22
124/13
failed [5] 81/2
94/19 94/20 122/7
122/11
failing [5] 44/9
44/20 74/9 74/9
119/8
fails [1] 116/18
failure [6] 89/8

89/11 106/1
106/17 118/7
122/5
fair [22] 32/12
33/9 33/12 34/10
34/15 39/14 39/18
40/12 46/21 61/1
62/16 63/1 66/15
71/17 71/19 71/23
101/25 102/5
104/23 105/2
123/3 139/13
faith [6] 81/21
83/14 97/23 98/10
105/21 110/20
fall [2] 86/6 88/8
falls [1] 113/16
familiar [1] 4/9
famous [1] 19/20
far [4] 16/21
65/12 84/5 124/13
farm [2] 24/13
24/14
fashion [1] 95/6
faster [2] 101/21
139/20
fastest [1] 54/16
fatal [2] 73/5
130/11
faults [1] 119/8
favor [2] 6/23
9/20
FBI [2] 68/24
107/18
February [1]
64/12
Federal [3] 62/8
111/17 111/19
Federalist [1]
34/4
feel [3] 139/24
141/19 141/25
feels [3] 24/17
24/19 139/20
fence [3] 24/14
24/19 25/7
fences [1] 24/22
few [2] 32/23
39/12
fewer [1] 85/16
Fields [10] 82/10
83/5 83/16 83/18
89/6 96/18 96/20
96/25 97/14 106/8

**Fifth [6]** 33/14
33/14 109/19
109/21 109/24
110/3
fighting [2] 45/23
45/24
fights [1] 134/11
file [10] 20/22
20/24 21/1 135/2
135/10 135/22
139/16 140/1
141/9 141/11
filed [13] 15/17
19/23 20/20 21/23
21/24 90/9 90/20
90/22 95/15 101/8
101/15 133/7
141/21
filing [2] 20/24
134/5
filings [3] 84/12
90/13 142/4
final [2] 129/16
141/12
finalized [1]
92/16
Finally [1] 121/5
finance [1] 111/8
find [11] 21/24
29/24 56/23 56/24
80/5 80/6 90/10
107/25 113/10
119/20 132/13
finding [1] 9/14
fine [2] 75/21
91/20
first [28] 3/21 4/8
4/18 5/11 5/12
5/24 22/22 27/8
30/13 30/19 41/12
51/5 68/3 79/23
85/24 89/23 94/12
101/23 108/10
113/4 113/14
113/17 119/1
123/16 123/23
126/21 135/2
137/24
fit [9] 29/14 71/19
71/23 75/15 77/7
78/3 103/15 141/4
141/7
fits [3] 74/10
75/12 75/13

five [5] 3/16 20/18
112/10 113/1
113/21
flaw [1] 130/11
Fleshing [1]
121/16
Floor [1] 1/20
focus [1] 4/10
focused [2] 43/8
78/15
focusing [1]
62/25
folks [2] 52/23
102/21
follow [2] 12/2
103/19
followed [2]
12/23 25/6
follows [3] 6/3
6/19 89/7
footnote [1]
20/23
forbid [1] 107/11
foregoing [1]
143/4
formal [1] 61/17
former [29] 32/15
35/18 36/13 37/14
39/21 39/22 40/1
40/9 41/12 41/16
42/23 43/18 44/6
47/4 50/7 51/16
57/12 61/16 63/17
63/19 64/17 68/10
68/10 79/14
121/13 123/19
124/14 127/10
127/19
formerly [1] 49/25
formulating [1]
137/19
formulation [1]
57/11
forth [3] 6/10 28/8
100/22
forward [2] 3/6
104/5
foul [1] 26/11
found [3] 21/22
97/1 130/10
foundation [1]
123/12
foundational [3]
47/1 80/22 94/3

foundations [1]
63/4
four [12] 6/15
14/25 73/2 73/10
74/10 75/9 77/3
98/11 113/2
116/24 119/13
130/13
four corners [1]
119/13
four-month [1]
98/11
fourth [2] 29/1
30/3
frame [1] 97/13
framework [2]
83/1 134/15
frankly [1] 133/2
free [2] 80/7
119/1
friends [1] 22/11
frivolous [2]
54/22 70/17
front [7] 19/15
72/11 72/22 82/13
113/1 130/16
131/21
fulfill [2] 42/15
60/1
full [6] 8/11 8/16
80/20 115/14
118/1 118/17
fullest [1] 38/13
fully [3] 129/9
131/22 142/11
fundamental [1]
33/6
funds [1] 13/22
further [6] 15/6
34/20 42/22 67/13
89/24 118/6
Furthermore [1]
106/16

**G**

game [1] 61/25
GASTON [2] 1/13
3/9
Gaudin [1] 9/7
general [10] 10/5
10/7 22/1 33/24
38/20 42/6 54/13
68/22 81/11
136/16

# G

**generally [9]** 7/4
23/4 54/4 111/10
115/1 116/25
119/12 131/22
136/20
**germane [1]**
120/23
**get [27]** 13/5
18/24 21/18 25/5
27/3 32/9 33/18
36/3 41/15 43/20
46/13 46/18 47/19
48/12 59/16 63/8
67/11 72/23 81/15
83/5 87/18 103/7
110/4 133/7
135/18 135/20
141/8
**gets [2]** 20/19
142/9
**give [14]** 12/11
33/8 39/12 40/20
44/1 51/17 62/20
112/14 114/4
115/8 117/4
119/16 128/15
140/21
**given [12]** 26/6
31/7 33/12 34/15
38/21 69/14 70/7
70/8 70/15 84/7
115/7 142/4
**gives [3]** 88/5
127/13 128/25
**giving [1]** 136/16
**go [32]** 9/10
21/19 21/20 21/20
23/23 27/12 27/19
33/2 33/3 34/23
36/9 36/21 41/3
43/16 49/13 50/14
51/3 54/18 56/4
56/24 63/4 75/20
83/13 89/20 96/15
104/2 104/4 104/4
113/2 131/12
134/14 137/11
**God [1]** 107/11
**goes [20]** 5/11
9/25 26/25 29/3
33/25 49/11 56/6
56/16 57/21 59/4
71/18 77/2 82/15

88/11 97/21 101/1
104/19 105/8
106/24 129/5
**going [65]** 4/18
4/22 4/23 5/4 5/7
7/13 7/14 12/1
12/2 13/17 14/22
17/21 17/21 19/7
21/1 21/9 22/13
23/7 23/12 24/3
24/25 25/1 26/11
28/5 28/9 29/1
29/6 29/21 30/3
30/6 33/1 33/10
39/3 39/12 41/15
44/1 46/9 48/15
50/15 54/17 54/17
54/19 54/20 56/24
59/15 70/12 78/19
81/13 83/20 83/22
99/12 100/23
101/23 102/9
104/22 111/20
112/13 112/14
113/4 120/16
134/13 136/18
138/10 138/14
140/1
**gone [1]** 25/4
**good [19]** 3/3 3/8
3/10 3/11 3/14
4/15 5/14 5/15
70/20 81/21 83/14
95/14 97/22 98/10
105/21 109/19
110/20 112/11
135/25
**good-faith [2]**
81/21 83/14
**Gorsuch [1]**
128/9
**got [8]** 14/20
28/11 28/23 46/8
48/9 88/7 106/5
107/10
**government [120]**
3/7 3/25 4/3 4/5
10/21 15/4 15/8
15/11 17/15 17/22
18/12 24/25 25/4
25/18 26/3 26/12
26/16 26/22 29/7
29/12 29/13 31/4
32/5 34/12 34/22

35/3 41/23 43/12
43/14 44/16 44/19
45/5 45/11 46/22
46/25 48/13 50/4
53/14 54/7 63/7
63/11 63/20 65/8
65/25 66/11 66/25
67/15 67/19 67/24
72/16 73/1 75/7
75/17 75/19 76/3
76/7 77/4 77/6
79/24 80/5 80/11
80/20 81/11 81/25
82/3 83/24 84/1
84/25 85/25 91/25
92/2 92/8 93/21
94/5 94/14 94/18
95/2 95/15 97/13
100/2 100/11
100/20 100/25
101/4 101/24
102/15 103/14
104/10 104/23
105/1 105/12
105/14 107/24
108/10 109/17
110/19 111/16
111/22 114/12
121/4 123/11
123/13 129/25
130/1 130/7
130/17 130/19
132/17 132/23
133/2 134/4
134/23 135/1
136/10 136/18
136/20 139/15
140/14 140/18
140/21
**government's
[26]** 19/3 24/2
26/18 27/22 28/9
54/14 67/8 69/13
75/1 75/12 77/2
77/3 77/21 78/4
89/17 92/20 92/20
95/5 97/10 97/16
105/18 107/8
111/6 126/2
129/19 139/9
**governmental [2]**
58/9 58/12
**grab [2]** 56/22
100/12

**grand [8]** 64/15
94/24 100/9
113/13 114/2
117/1 119/14
130/7
**grant [1]** 9/22
**granted [5]** 15/25
116/19 117/8
139/1 139/9
**granting [3]** 16/2
105/19 126/2
**granular [1]**
82/23
**grave [1]** 22/4
**great [4]** 43/24
43/25 56/6 115/8
**grew [1]** 24/13
**ground [3]** 70/10
127/1 138/4
**grounds [4]**
30/22 32/12 44/21
96/24
**group [4]** 20/17
20/19 20/21 21/8
**GSA [1]** 39/22
**guarantee [1]**
33/15
**guess [9]** 6/13
33/2 33/20 73/20
94/10 97/24
107/23 107/24
141/11
**guessing [1]**
75/16
**GULLAND [1]**
1/13
**gun [1]** 54/16
**Gutierrez [2]** 7/3
114/25
**guy [2]** 50/20
107/16

# H

**had [44]** 6/20 9/4
13/21 17/2 17/8
18/14 19/4 25/4
28/16 37/22 53/18
61/17 62/15 68/4
71/18 72/12 73/11
73/22 79/3 79/3
83/9 86/14 87/4
87/5 89/18 90/5
93/3 93/6 93/7
97/13 97/19 98/7

103/11 103/25
111/3 119/16
122/1 122/8 124/2
132/17 132/24
138/24 139/10
142/4
**hadn't [1]** 88/18
**half [2]** 135/18
135/23
**handed [1]** 12/7
**handing [2]** 18/13
19/13
**handle [2]** 29/25
131/23
**hands [1]** 40/5
**happen [2]** 37/23
135/5
**happened [9]**
6/10 25/15 28/2
28/4 30/7 72/10
75/24 140/6 142/5
**happens [1]**
26/10
**happy [3]** 5/12
134/5 135/1
**hard [3]** 13/14
14/8 97/13
**hardly [1]** 127/18
**harm [4]** 20/25
21/9 21/10 26/11
**has [137]** 3/22
3/25 5/18 6/7
10/15 10/21 12/23
14/4 15/8 16/7
16/20 16/23 17/2
17/6 18/23 20/17
22/25 26/23 28/23
31/7 31/21 32/11
32/21 33/5 33/12
34/9 36/8 38/25
39/8 39/13 40/18
40/21 41/5 42/22
43/7 44/6 44/7
44/8 44/13 45/11
46/19 46/25 47/6
50/10 50/22 51/1
51/12 51/22 53/3
53/14 56/8 56/9
56/12 57/22 58/6
59/1 60/21 61/4
61/11 61/19 62/8
62/21 63/6 63/7
63/14 66/24 68/18
69/10 71/6 71/14

# H

**has... [67]** 72/4
72/8 72/21 72/24
75/15 77/5 77/11
77/20 79/11 80/7
81/2 81/11 82/3
84/13 84/15 84/16
84/19 85/7 85/12
85/13 85/16 85/19
86/3 86/23 88/12
88/19 89/18 89/24
91/5 91/8 91/15
94/8 95/19 97/6
98/17 98/25 98/25
99/16 99/25
100/12 104/16
105/4 105/24
107/7 107/16
108/10 109/1
110/19 111/20
113/25 115/21
117/18 118/3
118/11 119/23
120/7 121/11
122/25 123/24
126/10 127/4
128/9 130/5 130/8
131/6 139/20
139/23
**hasn't [12]** 46/25
73/4 76/12 77/23
97/7 98/2 98/2
98/21 98/22 99/18
101/25 132/17
**have [225]**
**haven't [4]** 72/1
92/16 96/19 98/7
**having [11]** 6/14
8/16 14/7 14/21
25/6 29/19 64/2
73/24 86/21 89/19
95/10
**he [172]**
**he'll [1]** 33/20
**he's [21]** 11/25
30/2 61/16 66/22
73/8 73/19 74/5
74/11 76/11 76/14
76/16 76/17 77/1
81/4 88/17 94/19
99/21 102/9
102/14 104/8
104/9
**head [1]** 74/22

**heading [2]** 56/21
127/22
**heads [1]** 140/21
**hear [21]** 3/21 4/3
5/12 26/16 28/24
29/25 54/20 58/20
60/7 62/23 62/24
67/14 67/18 67/23
69/19 100/1
105/12 131/15
133/18 136/1
140/18
**heard [3]** 27/1
72/1 73/8
**hearing [5]** 1/8
4/14 67/22 118/17
141/12
**hearings [2]**
18/18 25/21
**heavily [1]** 22/7
**held [8]** 12/1 15/8
82/19 103/1
105/24 129/13
130/22 140/3
**hell [1]** 120/16
**helpful [2]** 21/24
40/23
**her [3]** 19/14
42/25 91/9
**here [92]** 3/16
3/17 3/20 6/10 9/4
9/12 13/25 14/10
14/13 14/16 15/12
16/20 18/9 24/6
25/20 28/2 28/4
29/4 29/8 30/7
30/15 31/12 33/17
34/8 35/9 35/18
37/15 41/25 43/8
49/6 49/7 58/15
62/21 63/18 64/9
66/8 68/25 69/13
71/4 71/24 75/24
76/10 77/21 79/21
81/14 82/22 84/18
85/1 87/2 87/22
88/2 88/6 90/22
91/14 92/2 92/16
93/11 93/18 94/21
95/5 95/17 97/10
97/19 97/25 98/1
98/18 99/18
101/14 103/25
106/24 109/1

109/11 109/12
110/9 110/16
117/24 123/18
124/11 125/24
126/13 128/4
128/6 128/22
129/4 132/9
132/15 132/19
137/12 138/2
139/8 140/5
140/10
**here's [6]** 23/20
33/3 38/24 59/18
104/18 106/13
**herman [4]** 2/1
2/4 143/3 143/10
**Hey [1]** 81/17
**high [1]** 46/19
**highest [1]** 79/8
**highest-ranking**
**[1]** 79/8
**highly [2]** 21/23
132/14
**him [30]** 11/24
19/5 26/7 40/3
42/13 47/6 50/7
50/8 59/15 69/14
70/15 73/24 92/12
103/13 104/17
105/10 108/3
118/7 118/9
118/23 120/7
126/14 127/2
127/2 127/7
129/21 130/9
136/8 136/9
136/10
**himself [1]** 77/25
**hint [1]** 26/4
**his [76]** 11/23
13/9 18/14 19/14
24/12 25/5 25/8
27/24 28/7 28/14
28/15 28/22 29/3
29/18 30/3 39/16
42/13 42/15 42/25
47/12 49/24 51/7
57/2 57/11 58/2
58/14 60/1 60/6
69/4 70/8 71/19
73/1 74/12 74/13
75/12 76/24 76/25
77/1 77/7 79/1
80/4 80/7 82/14

83/11 92/3 93/4
93/18 93/18 94/11
94/18 96/1 96/1
96/3 96/8 96/9
97/22 97/23 97/23
103/10 105/22
106/15 107/1
107/17 108/2
108/16 108/17
114/22 120/2
126/10 126/19
127/1 129/14
129/19 130/24
132/21 136/20
**history [4]** 34/7
55/15 57/8 104/11
**hit [1]** 107/11
**hits [1]** 53/25
**hoc [1]** 27/17
**hold [2]** 11/1
132/4
**holding [9]** 16/21
65/6 65/7 73/10
74/11 76/20
110/12 129/8
139/3
**holdings [2]**
60/12 60/12
**Honor [71]** 3/3
3/8 3/11 4/20 4/23
5/3 5/13 5/14 24/1
24/13 27/15 30/11
30/13 30/15 30/17
30/18 35/20 35/23
36/14 36/16 36/18
37/3 37/9 37/16
38/11 38/16 40/25
41/21 42/1 44/25
45/21 45/25 46/7
47/2 47/23 49/1
50/6 52/8 53/8
55/3 56/5 62/12
64/21 65/2 65/11
66/18 67/20 67/23
68/1 69/23 70/20
73/16 88/23 89/5
98/8 100/5 101/20
103/22 103/22
106/22 108/6
108/9 109/24
110/24 112/2
134/4 136/22
138/12 140/15
140/24 142/20

**HONORABLE [2]**
1/9 112/16
**hope [1]** 33/1
**horses [1]** 24/18
**host [1]** 76/6
**hot [1]** 23/6
**Hotel [2]** 79/4
120/11
**house [92]** 5/19
6/4 7/12 7/16 7/16
7/19 7/20 7/22
7/23 7/24 8/11
8/12 8/16 8/19
8/21 8/25 9/2 11/7
11/11 11/18 12/23
13/9 13/12 14/2
14/4 14/14 14/22
16/2 17/8 17/24
17/25 18/11 18/17
18/19 19/20 20/20
21/6 21/12 21/14
21/25 22/2 28/17
50/25 64/12 64/17
68/22 69/6 69/11
69/25 70/6 79/9
80/25 83/19 84/2
84/8 84/10 84/13
84/14 84/15 85/17
86/5 86/8 87/12
87/15 87/24 88/5
90/13 90/14 90/17
90/22 91/6 91/15
95/21 101/10
101/16 113/19
114/4 114/5 114/8
115/4 115/9
115/10 115/14
116/2 116/3 117/3
117/5 117/22
118/1 118/17
119/18 121/8
**House's [4]** 12/5
12/12 90/3 90/10
**how [34]** 3/20
6/21 12/6 18/22
24/17 24/19 25/15
27/7 29/14 30/14
36/19 36/21 47/14
48/11 54/10 58/20
69/17 69/20 70/1
70/3 70/5 74/14
75/16 85/8 91/15
93/11 97/17 98/13
119/9 129/24

**H**

how... [4] 130/1 135/9 135/16 141/4
however [4] 13/16 55/10 105/19 126/12
huh [4] 30/8 97/3 109/7 141/22
hundred [1] 86/8
HUTCHER [1] 1/23
hypothetical [3] 7/20 74/20 86/13
hypothetically [4] 53/12 66/6 86/7 134/22

**I**

I'd [11] 4/10 11/12 16/25 23/14 23/20 37/5 46/8 67/14 67/18 100/1 112/24
I'll [17] 22/20 26/16 33/18 34/2 41/2 43/20 46/5 56/24 62/10 62/11 62/23 101/7 101/21 113/4 124/4 125/12 126/20
I'm [61] 3/12 4/8 4/20 4/23 11/10 16/9 18/24 22/3 22/13 27/2 29/9 30/13 30/15 35/25 35/25 37/20 37/23 37/25 39/3 39/12 40/10 40/11 41/4 41/15 45/24 45/25 46/1 46/6 48/25 50/3 50/15 50/25 56/20 58/18 62/2 69/7 69/19 70/12 73/8 74/16 76/11 90/25 99/12 101/20 104/22 106/5 107/24 108/5 109/5 112/11 112/13 112/13 113/4 119/12 131/9 132/25 133/4

136/24 137/3 139/19 139/22
I've [15] 4/8 15/8 17/23 48/22 73/8 82/19 99/24 115/20 116/24 119/11 128/5 128/18 133/10 138/3 138/8
ice [1] 21/17
idea [6] 4/15 40/7 41/16 49/24 58/16 107/24
identified [7] 73/5 76/12 94/9 95/10 120/11 120/24 131/6
identify [1] 95/8
identifying [2] 72/25 95/5
ignore [2] 126/25 127/5
ignored [1] 48/19
ignores [1] 31/8
Ill [1] 12/11
ill [1] 104/5
ill-advisedly [1] 104/5
Illinois [1] 24/13
imagine [10] 7/19 53/12 53/13 66/6 74/1 74/2 74/21 78/1 86/7 140/13
immaterial [1] 89/12
immeasurably [2] 42/14 59/25
immediately [1] 68/13
immune [1] 74/3
immunities [1] 124/20
immunity [15] 36/1 36/2 36/4 41/24 42/25 43/2 43/7 43/8 73/25 74/2 79/8 79/11 79/19 80/25 125/3
impair [1] 59/25
impairing [1] 42/14
impede [1] 118/25
imperative [1]

129/2
implementation [1] 55/16
implementing [1] 115/10
implicates [1] 59/6
implication [2] 16/6 16/21
implicitly [3] 8/3 114/7 117/7
implied [1] 52/21
importance [4] 49/19 49/20 64/2 140/5
important [10] 10/20 48/25 58/24 61/10 92/7 102/21 105/6 105/7 106/25 120/8
importantly [1] 107/19
imported [1] 14/11
impose [1] 11/21
imposing [1] 121/2
improper [1] 96/11
improperly [1] 94/6
impropriety [1] 57/23
inadmissible [2] 98/16 111/20
inadvertence [1] 89/13
inapplicable [1] 72/9
inappropriate [2] 58/3 58/8
inarguably [1] 48/15
inclined [1] 138/18
include [1] 53/5
included [2] 49/5 97/12
includes [1] 129/8
including [2] 31/5 115/21
inconsistent [2] 77/2 91/14

incorrect [3] 73/4 111/16 119/8
incredibly [2] 21/24 46/19
indeed [2] 114/16 128/12
independence [1] 38/7
indicate [1] 125/2
indicated [6] 100/12 112/22 125/4 133/11 139/20 139/23
indicating [2] 34/24 58/2
indication [1] 127/10
indict [1] 100/9
indicted [1] 70/6
indictment [53] 3/23 14/20 14/25 15/1 15/1 15/5 15/5 23/25 24/5 25/10 26/21 46/18 53/14 63/9 69/21 70/3 70/11 71/7 100/7 113/3 113/7 113/9 113/12 114/1 114/6 114/11 114/14 114/21 116/9 116/16 116/18 116/23 117/1 117/6 118/13 118/20 119/8 119/12 119/13 119/23 120/5 120/21 120/21 122/20 123/7 124/6 125/22 129/18 130/12 133/9 138/4 138/25 139/1
Indies [1] 80/14
individual [1] 90/15
individuals [1] 102/23
inescapable [1] 126/5
infamous [1] 127/3
infer [1] 66/12
inference [1]

66/14
influence [1] 116/4
inform [1] 119/10
information [24] 16/23 19/2 25/5 43/20 47/22 68/13 82/23 92/21 93/21 95/8 95/9 100/25 103/10 120/8 120/23 121/1 121/21 121/22 122/2 122/13 125/16 125/17 129/20 132/14
informative [1] 91/10
informed [2] 28/22 120/9
infringe [2] 47/9 56/3
inhibit [1] 57/16
initial [2] 72/21 99/21
initially [2] 99/1 99/17
inquiry [9] 85/6 85/13 86/4 86/6 104/11 114/5 117/5 119/17 120/20
inside [2] 56/2 103/3
instance [6] 7/23 10/15 11/25 18/17 24/18 101/2
instances [2] 95/19 99/19
instead [3] 6/2 95/6 124/10
institution [5] 20/25 21/3 21/10 38/6 64/8
institutions [1] 121/4
instructed [5] 29/10 30/15 124/18 125/6 133/15
instruction [10] 30/1 82/9 82/25 83/6 89/6 96/16 96/19 96/21 132/6 134/22

-2387-

160

**I**

**instructions [35]**
29/25 81/10 82/24
121/17 130/21
131/1 131/5
131/16 131/17
131/25 132/2
132/11 133/6
133/16 133/23
134/1 134/6
134/18 135/2
135/6 135/9
135/12 135/14
137/3 137/5
137/16 137/19
138/6 138/8 139/4
139/6 139/18
141/10 141/21
142/18
**instructs [1]**
38/14
**insufficient [2]**
70/4 128/25
**integral [1]** 42/9
**intelligence [6]**
28/17 28/17 33/20
64/1 95/21 95/22
**intend [2]** 22/24
92/8
**intended [6]** 41/6
55/11 55/17 57/9
80/10 80/10
**intending [2]**
45/25 81/17
**intends [1]**
132/18
**intent [9]** 28/5
28/11 29/17 96/1
97/4 98/18 105/22
105/24 106/4
**intention [1]**
131/23
**intentional [7]**
29/9 29/14 82/14
83/1 89/13 96/9
106/2
**intentionally [1]**
132/24
**interchangeably
[1]** 43/4
**interests [1]**
102/25
**interfering [1]**
102/19

**intermediary [1]**
25/22
**interpret [5]**
10/25 60/14 60/15
77/7 85/11
**interpretation [6]**
12/12 18/6 115/9
115/24 116/3
126/23
**interpretations [3]**
56/10 56/22 84/17
**interpreted [2]**
91/16 126/8
**interpreting [1]**
13/4
**interrelated [1]**
4/1
**interviews [1]**
95/1
**intimidation [1]**
108/4
**introduce [2]** 3/6
130/23
**introducing [1]**
58/1
**introduction [2]**
34/8 131/9
**intruding [1]**
116/4
**invade [1]** 119/6
**invalid [6]** 16/8
17/14 48/19 62/17
116/8 118/20
**invalidate [1]**
77/19
**invalidates [1]**
113/18
**invalidly [2]** 8/17
114/20
**Investigating [1]**
120/25
**investigation [4]**
28/18 92/4 92/5
95/20
**investigations [1]**
119/6
**investigative [1]**
24/3
**invite [1]** 128/10
**invocation [16]**
36/7 37/2 40/9
51/19 59/8 62/7
64/4 66/21 67/2
73/13 106/7 106/9

125/11 126/17
127/14 129/10
**invoke [5]** 39/22
40/2 40/3 47/12
124/19
**invoked [28]**
32/20 35/8 35/11
35/18 35/24 36/5
36/13 36/22 37/11
37/14 37/22 39/8
40/4 40/18 44/4
44/12 51/22 52/16
53/3 53/18 64/9
67/6 102/12 103/6
104/9 123/19
124/16 125/19
**invoking [4]**
42/25 62/2 68/11
121/25
**involve [3]** 58/9
102/23 124/10
**involved [3]** 26/5
58/4 92/4
**irrelevant [4]** 82/9
86/12 127/13
134/24
**is [486]**
**isn't [17]** 9/3
11/17 14/3 14/11
14/14 27/5 35/17
37/13 48/7 48/8
75/6 79/22 81/7
81/16 81/24 86/22
92/18
**issuance [3]** 6/4
88/15 89/22
**issue [39]** 8/11
9/17 9/24 10/10
12/2 13/9 13/19
14/18 15/19 27/16
29/6 29/21 30/24
30/25 33/18 47/24
48/16 52/15 57/22
58/22 60/10 62/10
63/5 63/6 70/23
71/6 76/22 86/10
87/24 87/25 88/1
88/6 89/25 94/22
100/22 101/25
102/25 130/1
132/9
**issued [20]** 9/5
9/12 9/16 15/2
16/12 16/21 17/24

25/2 48/2 69/24
85/1 85/7 85/12
87/5 113/15
116/14 116/18
117/7 117/25
119/9
**issues [34]** 4/4
4/15 4/24 5/4 5/5
5/6 22/18 22/23
23/24 28/20 31/17
46/10 47/10 51/18
53/16 62/24 78/7
86/12 89/17 90/6
91/19 91/21
101/10 111/18
112/14 112/25
115/23 121/15
129/24 130/2
133/21 133/23
134/20 142/6
**issuing [1]** 88/13
**it [288]**
**it's [116]** 5/11 6/2
6/16 6/23 7/10
9/19 9/21 9/23
10/8 10/12 10/20
10/20 10/22 11/9
11/12 12/7 13/16
14/19 14/20 15/20
15/23 16/4 16/5
17/13 17/20 18/8
18/19 18/19 20/5
20/23 21/9 21/14
21/16 23/20 24/19
26/1 26/14 27/6
27/15 28/24 29/1
29/2 29/5 29/20
30/16 30/17 31/12
32/14 32/18 33/1
33/8 33/22 36/3
36/19 38/12 38/17
46/9 47/11 48/24
48/24 49/9 56/7
58/24 59/3 59/5
61/8 61/15 61/18
61/22 62/25 63/1
64/8 64/21 65/7
66/7 66/25 67/1
68/5 70/13 71/20
71/22 71/25 73/19
74/1 75/9 76/22
77/3 81/1 82/15
83/13 86/25 87/8
87/17 88/2 88/2

89/7 92/15 93/10
93/12 95/25 97/13
105/3 105/13
106/15 107/11
107/21 108/4
108/4 108/24
110/16 110/20
121/12 134/14
137/6 137/23
140/17
**its [36]** 3/25 6/5
7/21 11/18 12/12
12/19 14/2 15/2
18/11 21/21 34/12
38/21 66/7 70/4
72/2 75/17 76/17
80/18 94/12 95/24
111/24 114/6
115/24 116/2
116/11 116/17
117/6 117/11
119/4 120/22
127/11 127/23
129/9 130/2
139/23 140/18
**itself [9]** 14/20
19/20 21/6 57/22
113/12 115/10
118/16 120/22
122/3

**J**

**J.P [2]** 1/12 3/9
**Jackson [1]**
49/23
**jail [1]** 58/14
**January [9]** 11/4
16/7 91/4 91/4
120/10 120/11
120/14 120/16
120/25
**jeopardy [1]**
53/22
**job [1]** 21/22
**Joe [5]** 39/19 44/1
44/3 44/4 57/20
**Johnson [1]** 35/4
**joined [1]** 30/24
**judge [28]** 1/9 9/7
12/11 31/11 32/3
32/8 33/3 36/11
38/24 39/19 41/15
45/13 53/24 54/13
58/11 58/15 60/25

**J**

**judge... [11]**
62/23 66/14 99/12
101/22 108/5
114/16 114/18
114/22 115/8
137/1 137/2
**judgment [2]** 6/1
90/10
**judicial [1]** 116/3
**July [6]** 131/23
132/1 141/11
141/21 142/3
142/18
**jumps [1]** 71/5
**June [7]** 1/5
137/2 139/14
139/17 142/9
142/19 143/10
**jurisdiction [1]**
62/9
**jurisprudence [1]**
72/20
**jury [84]** 9/3 9/8
9/10 9/12 9/18
9/23 28/13 28/23
29/10 29/24 30/4
30/6 30/14 36/19
53/7 53/9 53/10
58/20 64/15 72/22
72/22 81/5 81/10
81/12 81/13 82/9
82/24 82/25 85/23
85/24 86/1 86/3
89/5 93/9 94/24
96/5 96/15 96/16
96/19 96/20 100/9
103/21 104/6
108/19 111/21
111/21 113/10
113/13 114/2
117/2 119/15
125/12 130/8
130/20 131/1
131/4 131/16
131/25 132/2
132/6 132/11
133/6 133/14
133/16 133/23
134/1 134/6
134/14 134/18
134/22 135/2
135/6 135/8
135/12 137/3

137/4 138/6 138/8
139/4 139/5
139/17 141/9
141/21 142/18
**jury's [1]** 54/20
**just [79]** 13/4
14/17 14/17 15/19
19/25 20/3 20/13
22/3 30/1 31/8
32/8 32/22 32/23
36/11 37/24 38/20
40/20 43/16 43/22
44/5 45/17 49/9
51/3 53/24 53/24
54/10 54/24 56/18
58/18 59/10 62/24
63/19 66/4 66/25
67/1 67/8 68/2
70/17 74/3 76/16
83/14 84/9 85/21
88/15 88/25 89/16
92/6 96/12 96/15
96/23 98/4 98/17
99/13 99/21
100/12 101/21
102/20 105/3
107/11 107/25
108/9 109/5
110/11 110/18
110/20 111/3
111/22 111/24
125/1 135/12
136/12 139/10
139/22 140/21
141/3 141/7 142/3
142/3 142/18
**justice [30]** 9/6
12/7 30/18 31/22
36/8 38/18 39/7
39/15 39/24 41/5
43/6 48/18 48/20
52/23 54/11 56/10
56/12 56/21 58/16
58/25 59/14 64/11
64/14 102/18
104/21 106/14
106/23 118/3
122/23 128/9
**Justice Scalia's
[1]** 9/6
**Justice's [2]**
102/11 131/10
**justification [2]**
83/11 83/11

**justifying [1]** 66/7
**Justin [5]** 35/25
36/24 37/10 37/11
38/1

**K**

**Kavanaugh [1]**
39/25
**keep [3]** 24/20
44/2 56/24
**Keepers [1]** 79/2
**Kelly [4]** 114/16
114/18 114/22
115/8
**key [12]** 5/16 6/15
13/6 28/4 29/5
29/6 29/6 29/21
30/3 64/9 113/9
128/24
**kind [1]** 7/8
**kinds [2]** 88/18
123/11
**knew [8]** 26/25
82/4 82/5 92/22
92/25 93/6 93/7
108/3
**know [71]** 4/7
4/24 6/18 7/10
8/22 9/6 10/18
10/21 15/20 16/21
20/7 23/18 24/19
26/6 31/11 31/18
31/18 33/7 36/20
37/5 37/20 37/24
39/21 40/12 45/2
51/11 51/16 52/8
53/12 54/4 55/6
55/7 60/12 62/9
64/20 64/21 67/12
75/1 81/11 81/12
81/13 82/11 82/15
83/1 87/17 87/19
95/17 97/12
101/12 101/12
102/9 102/14
103/5 103/14
105/9 107/10
107/14 110/5
111/2 119/23
123/13 131/19
132/17 132/23
133/13 133/14
134/24 139/23
139/25 140/17

141/13
**knowing [2]**
29/20 83/1
**knowingly [1]**
132/24
**knowledge [6]**
66/10 77/12 81/8
83/3 93/16 111/9
**knows [7]** 18/22
33/7 33/19 49/6
65/14 105/4
130/13
**Kolender [1]**
33/16

**L**

**lack [2]** 5/23 6/19
**lacked [1]** 9/15
**lacks [1]** 121/6
**Lamagno [1]**
114/25
**landmark [2]**
31/15 33/24
**language [12]**
11/9 13/5 18/6
48/18 48/20 52/3
55/5 104/24 105/3
113/12 128/14
128/21
**last [5]** 74/21
82/16 93/23 101/7
112/12
**lasting [1]** 84/9
**late [2]** 133/17
142/4
**later [5]** 34/25
35/24 57/21
124/25 130/3
**latter [1]** 124/4
**law [31]** 1/17 22/1
31/4 33/7 33/10
33/13 33/21 34/1
34/3 34/3 34/6
36/6 38/13 39/7
55/22 75/14 77/7
83/13 93/18
109/25 110/15
114/19 116/7
117/13 118/19
118/25 120/3
122/15 124/9
129/15 139/2
**lawful [3]** 72/4
94/24 126/16

**lawfully [5]** 35/10
42/24 72/18
113/15 115/6
**laws [3]** 119/5
121/2 128/10
**Lawson [1]** 33/16
**lawyer [7]** 24/12
36/22 62/9 88/13
101/24 104/16
125/4
**leader [4]** 20/6
21/25 113/22
113/24
**leads [1]** 51/9
**learned [2]** 24/25
25/3
**least [43]** 4/19 8/3
9/8 10/4 14/3
14/12 15/1 17/16
19/5 27/5 29/14
32/21 37/21 40/8
49/13 52/9 52/21
57/11 58/2 58/25
60/21 62/3 67/7
76/2 81/16 84/1
91/4 92/7 93/20
93/21 96/16 97/16
100/13 112/23
113/16 114/12
116/24 123/14
123/21 131/11
134/1 135/8
138/13
**leave [2]** 134/6
140/10
**led [2]** 21/5 120/9
**leeway [1]** 7/11
**left [3]** 33/20
89/16 130/3
**legal [16]** 7/4
20/17 21/8 23/24
34/25 38/19 73/17
76/21 83/11 94/23
95/3 97/22 108/12
108/18 115/1
129/9
**legally [1]** 127/13
**lege [1]** 34/2
**legislation [2]**
119/10 121/1
**legislative [9]**
55/15 57/8 116/5
117/15 119/4
119/21 119/24

**L**

**legislative... [2]**
120/2 140/7
**legitimate [3]**
16/16 19/7 138/1
**length [2]** 49/11
119/22
**Lesley [1]** 112/20
**less [5]** 52/1
100/4 112/4
114/10 128/21
**lesson [1]** 34/7
**lessons [1]** 124/7
**let [22]** 9/13 19/25
21/20 21/20 21/21
22/12 30/19 31/20
35/14 38/24 40/20
43/16 46/12 62/20
65/16 84/24 90/3
92/6 99/13 100/12
136/1 140/21
**let's [11]** 27/19
39/25 54/2 62/8
74/1 74/2 78/1
104/22 124/12
135/12 142/15
**letter [13]** 35/24
37/1 37/3 38/1
49/2 61/2 61/6
62/19 68/21 73/3
107/16 120/6
125/2
**letters [6]** 35/21
36/17 124/17
125/6 125/9
125/10
**level [3]** 8/12
29/20 129/2
**Levin [2]** 31/9
103/24
**liability [2]** 33/11
128/17
**liberty [1]** 11/23
**Licavoli [14]**
81/22 82/18 83/14
96/6 106/21
110/23 126/6
126/8 126/22
127/16 129/8
129/13 130/22
132/6
**life [1]** 13/13
**light [11]** 97/14
110/13 126/5

126/12 128/15
129/1 133/5
133/20 133/21
133/23 139/3
**like [60]** 3/20 3/20
4/10 4/17 6/16 7/3
8/22 12/11 23/14
23/20 25/6 26/10
30/22 35/3 37/5
39/16 40/6 40/23
46/8 47/3 51/23
62/6 66/11 66/12
67/14 67/18 70/9
70/23 74/16 81/7
83/3 86/19 87/2
87/16 87/19 88/21
89/19 90/8 97/12
98/8 100/1 100/4
103/9 106/20
107/9 112/24
123/2 129/4
130/21 133/18
133/22 134/7
134/14 134/20
135/5 135/7 137/2
138/12 141/25
142/5
**likely [4]** 23/7
29/1 91/10 135/6
**Limine [19]** 22/24
23/4 23/22 23/25
27/20 81/16 126/2
127/9 130/14
131/22 131/24
133/6 133/9
133/25 135/3
137/12 141/4
141/10 142/11
**limit [3]** 4/13 4/16
101/21
**limited [10]** 43/17
44/5 49/24 57/11
76/2 76/7 80/23
113/12 116/23
119/12
**limiting [1]** 80/4
**Lincoln's [1]**
19/20
**line [2]** 129/1
133/8
**lines [2]** 48/14
76/17
**list [1]** 101/3
**listing [1]** 122/2

**litigated [1]** 131/1
**litigating [1]**
21/12
**litigation [2]**
20/20 134/2
**little [8]** 10/8
24/14 30/14 33/17
43/3 83/2 85/3
97/13
**Liveright [3]** 87/3
87/8 87/16
**Liz [2]** 107/20
117/21
**LLP [1]** 1/23
**local [1]** 61/25
**lodge [1]** 135/14
**log [6]** 100/9
100/15 121/7
121/10 122/9
122/12
**logical [2]** 43/16
66/15
**logically [1]** 51/9
**long [9]** 4/14 33/6
38/22 41/5 57/4
82/15 89/12 129/1
135/16
**long-standing [3]**
33/6 38/22 57/4
**longer [3]** 64/7
77/4 124/2
**longstanding [1]**
35/7
**look [20]** 14/8
14/25 15/6 15/15
15/16 53/20 54/2
69/7 72/23 78/13
81/17 85/8 86/4
90/12 90/20 91/12
92/21 102/8
103/24 130/21
**looked [2]** 13/12
19/10
**looks [1]** 40/16
**loose [1]** 120/17
**lorraine [4]** 2/1
2/4 143/3 143/10
**lot [2]** 7/10 46/8
**low [1]** 29/8

**M**

**M-I-E-R-S [1]** 43/6
**made [15]** 6/21
11/1 28/10 28/12

31/17 32/21 37/11
68/24 90/14 104/9
107/15 126/4
130/5 130/8
131/13
**Madison [2]**
13/18 34/4
**magic [1]** 142/2
**mainly [1]** 43/8
**majority [4]** 7/24
19/19 21/3 21/18
**make [34]** 4/16
8/13 10/25 13/13
13/14 18/22 21/18
24/15 27/7 42/7
42/12 57/17 66/15
71/6 74/4 74/19
81/3 98/25 99/13
99/16 101/7
103/13 113/8
116/2 118/22
128/21 134/1
136/11 138/13
138/17 140/8
140/10 141/8
141/15
**makes [8]** 61/2
80/21 86/16 87/8
104/14 127/9
128/25 133/3
**making [2]** 72/3
90/17
**mandate [1]**
116/12
**mandated [3]**
52/20 58/17 59/3
**mandates [1]**
118/8
**mandatory [1]**
114/23
**many [6]** 10/11
40/22 40/25 93/11
131/7 139/21
**Marbury [1]** 13/17
**Mark [2]** 115/17
118/4
**Marshank [2]**
25/13 27/5
**Martinez [2]** 7/3
114/25
**mask [1]** 5/1
**match [1]** 21/17
**matches [1]**
74/14

**materia [1]** 60/9
**material [5]** 63/18
103/8 122/4
124/22 124/24
**materials [7]** 18/8
18/9 18/10 18/13
121/18 139/16
142/10
**matter [30]** 5/18
28/24 36/6 39/7
55/22 72/21 82/15
92/10 105/9
105/14 105/15
106/3 106/7
106/10 107/9
109/18 109/25
114/5 114/19
116/7 117/4
117/13 118/19
119/17 120/3
122/9 122/15
124/9 139/2 143/6
**matters [5]** 20/10
75/25 107/9
120/19 121/22
**MATTHEW [2]**
1/19 3/12
**maxim [1]** 34/1
**may [30]** 5/1 6/25
8/21 8/22 30/11
36/1 37/6 41/4
43/5 47/20 58/2
61/17 64/11 64/13
64/15 71/21
106/22 113/6
114/24 115/2
115/13 121/24
122/1 124/20
127/2 132/5
132/22 133/20
134/10 134/24
**maybe [11]** 6/22
14/6 29/10 60/20
77/11 83/4 107/19
109/19 110/13
110/14 137/2
**Mazars [1]** 140/7
**MC [1]** 1/21
**McGahn [3]** 54/10
54/12 59/10
**me [71]** 9/13
12/11 14/14 17/17
19/25 21/5 22/7
22/12 23/3 30/16

163

# M

**me... [61]** 30/19 31/20 32/23 35/14 37/9 37/22 38/24 40/20 43/16 44/2 44/17 45/14 46/12 48/8 55/2 56/18 60/10 62/7 62/7 62/20 63/18 65/16 65/17 68/10 69/4 71/22 72/4 72/5 72/8 82/13 82/20 83/13 84/24 90/3 90/9 92/6 96/13 96/18 98/7 99/13 100/12 107/24 108/24 110/4 123/5 127/4 130/14 131/17 132/16 133/1 133/12 134/10 134/16 136/1 136/18 137/9 138/6 138/24 142/3 142/8 142/9

**Meadows [3]** 8/2 115/17 118/4

**mean [48]** 6/25 7/5 10/6 11/19 12/9 13/6 14/15 15/23 19/10 21/12 23/1 26/16 28/2 29/23 30/1 30/2 32/24 46/13 49/7 49/16 49/16 51/7 54/16 61/19 64/6 65/14 65/22 66/5 70/3 70/17 80/18 89/8 92/18 97/9 98/2 98/6 100/4 111/2 114/24 115/2 135/20 136/2 136/10 136/11 136/24 138/21 141/14 141/18

**meaning [4]** 89/6 96/25 115/20 117/15

**meaningful [1]** 121/1

**means [9]** 7/4 8/24 12/10 15/21 15/22 58/8 115/1

115/13 129/8

**meant [2]** 10/12 136/23

**meat [1]** 15/9

**meet [4]** 52/3 119/19 135/14 135/22

**meeting [2]** 79/3 135/8

**member [29]** 5/23 10/6 10/10 10/11 10/15 12/3 13/8 15/18 15/19 15/21 15/21 16/3 32/15 32/15 68/16 68/20 68/23 88/12 88/12 89/20 90/15 107/19 107/21 116/13 116/21 117/12 117/15 117/15 117/20

**members [46]** 6/7 6/9 6/11 6/12 6/15 6/21 6/22 7/8 7/18 7/24 8/7 9/1 9/25 9/25 10/22 10/23 15/12 17/3 20/3 20/6 20/17 20/18 20/18 20/22 20/23 21/8 21/18 79/3 83/25 84/5 85/17 86/9 86/10 86/21 87/23 87/24 87/25 88/4 89/19 90/5 113/21 113/25 114/10 115/5 115/9 120/12

**Memo [1]** 54/4

**memorialized [1]** 68/24

**mens [25]** 29/3 29/7 53/4 53/5 53/15 53/17 81/8 81/14 82/23 96/16 97/9 97/25 105/9 105/15 110/7 110/9 111/4 111/6 126/8 131/2 134/22 137/6 137/11 137/16 139/7

**mention [2]** 24/24 41/2

**mentioned [1]**

91/1

**mere [1]** 89/13

**merely [1]** 129/13

**merits [1]** 79/21

**met [2]** 20/21 77/23

**metal [2]** 80/15 80/19

**meticulous [1]** 12/19

**metro [1]** 82/16

**Miers [2]** 43/6 100/15

**might [21]** 6/13 13/13 13/14 30/15 34/15 42/17 46/21 60/20 65/4 75/17 80/18 82/21 84/8 97/25 111/4 124/7 125/15 131/5 131/18 135/25 141/8

**Miller [1]** 100/17

**mind [12]** 4/23 28/6 28/7 28/14 28/15 29/18 30/4 32/13 81/25 82/1 96/1 142/2

**mine [1]** 48/20

**minimum [2]** 122/21 125/12

**minority [42]** 5/23 7/14 7/15 10/5 10/10 10/10 10/12 10/15 10/19 10/22 10/23 12/3 15/18 15/19 15/22 15/22 16/3 16/4 19/19 19/23 20/3 20/4 20/5 20/6 20/8 20/18 20/23 21/25 21/25 84/13 88/12 88/12 89/20 113/22 113/24 116/13 116/21 117/12 117/14 117/16 117/17 117/21

**minute [2]** 112/4 140/11

**minutes [4]** 32/23 88/22 88/25 100/4

**misconduct [3]** 92/1 94/4 94/19

**misdemeanor [1]** 26/3

**misguided [1]** 118/22

**mislead [2]** 72/17 130/7

**misleading [2]** 34/24 80/11

**misrepresents [1]** 22/1

**mission [1]** 28/2

**misstates [1]** 22/1

**misuse [1]** 115/2

**modification [1]** 142/19

**modify [2]** 133/17 142/16

**modifying [1]** 133/24

**MOLLY [2]** 1/13 3/9

**Monday [1]** 135/24

**money [1]** 14/5

**Montesquieu [1]** 34/6

**Montgomery [1]** 1/18

**month [3]** 25/2 27/13 98/11

**more [28]** 10/9 15/7 29/1 29/10 33/16 34/7 35/2 40/22 41/1 46/8 55/10 61/15 67/8 77/12 82/23 83/2 98/17 99/9 107/19 119/19 121/2 123/12 124/8 126/24 127/15 134/15 134/23 141/3

**Moreover [3]** 55/20 55/21 120/15

**morning [9]** 3/3 3/8 3/10 3/11 3/14 5/14 5/15 70/20 112/21

**most [8]** 4/11 31/17 33/4 49/2 56/6 84/1 92/7 128/18

**motion [49]** 3/17 4/8 5/17 9/22 14/24 20/24 22/14 22/21 23/22 27/20 27/22 39/4 54/14 68/6 69/18 69/21 70/2 71/8 73/1 81/16 95/15 99/4 99/9 100/7 102/2 104/1 105/18 106/12 113/3 113/4 113/5 116/23 119/11 124/5 126/2 127/9 130/12 132/12 133/8 136/15 137/12 138/3 138/25 138/25 139/9 140/1 140/10 140/19 140/22

**motions [24]** 1/8 3/16 3/19 3/25 5/8 22/21 22/23 23/3 23/25 113/1 130/14 130/15 130/16 131/20 131/22 131/23 132/10 133/6 133/9 133/25 135/2 141/4 141/10 142/11

**mouth [1]** 65/15

**move [7]** 17/14 89/25 113/6 133/25 134/5 139/20 140/1

**Mr [9]** 40/3 41/10 44/4 93/1 122/5 126/22 128/14 129/13 136/7

**Mr. [188]**

**Mr. Bannon [104]** 3/13 3/22 6/14 8/2 11/23 17/15 18/13 19/1 24/12 24/24 25/3 26/24 27/11 38/14 39/2 40/6 41/11 47/4 47/20 50/7 51/23 53/15 54/21 58/21 60/20 60/23 61/1 61/14 62/5 68/12 68/13 69/3 71/18 73/7

**M**

**Mr. Bannon... [70]**
73/9 73/11 75/12
75/23 78/25 86/11
92/19 92/22 92/25
97/15 98/8 100/9
103/9 103/17
108/25 109/9
113/14 113/17
113/23 115/16
116/10 116/17
116/19 117/17
118/6 118/9
118/13 118/15
118/21 119/3
119/9 119/16
120/1 121/5 121/8
121/12 121/24
122/11 122/21
123/10 123/17
123/24 124/15
124/18 124/18
125/7 125/24
126/10 126/12
126/19 127/3
127/6 127/8
127/11 127/20
127/24 128/7
128/23 129/7
129/16 129/18
129/22 130/4
130/7 130/8
130/22 131/6
131/12 131/13
133/3
**Mr. Bannon's [37]**
3/17 3/21 4/4 23/9
23/22 27/20 28/5
28/15 29/15 35/5
40/4 46/20 51/12
62/9 63/8 78/4
81/7 104/7 104/19
114/9 117/13
117/14 118/2
119/1 119/7
122/16 123/20
125/1 125/21
128/2 128/12
129/25 130/12
132/8 132/12
132/21 137/11
**Mr. Corcoran [7]**
5/7 5/12 94/13
111/14 136/2

136/3 136/25
**Mr. Costello [17]**
3/24 25/22 28/8
37/9 62/19 67/25
70/19 91/19 92/2
93/16 94/13 94/16
95/1 129/19
132/13 132/20
137/20
**Mr. Costello's [6]**
24/4 25/1 92/9
93/13 104/12
107/25
**Mr. Engel [1]**
42/21
**Mr. Meadows [1]**
8/2
**Mr. Navarro [1]**
8/2
**Mr. Scavino [1]**
8/3
**Mr. Schoen [12]**
4/18 22/17 23/6
23/23 27/19 30/10
68/3 71/9 94/13
101/19 109/16
136/24
**Mr. Schoen's [1]**
77/10
**Ms [2]** 108/8
112/3
**Ms. [8]** 68/19
68/23 70/21 89/4
112/20 134/3
140/4 141/1
**Ms. Cheney [2]**
68/19 68/23
**Ms. Lesley [1]**
112/20
**Ms. Schiff [1]**
140/4
**Ms. Vaughn [4]**
70/21 89/4 134/3
141/1
**much [5]** 23/18
31/18 34/16
101/17 132/18
**Mueller [3]** 28/18
95/20 98/9
**multiple [1]**
120/19
**must [10]** 12/19
18/20 30/18 89/9
107/5 111/18

115/1 115/8 121/5
129/3
**my [48]** 11/17
12/17 17/12 22/13
30/20 31/9 31/16
32/13 45/23 48/22
50/15 51/6 54/21
56/20 56/22 61/18
63/23 63/25 66/10
67/7 67/22 68/8
71/23 72/4 72/9
83/12 91/3 98/18
106/15 109/3
109/24 112/14
122/18 123/21
125/10 126/6
126/12 127/15
129/5 129/23
130/2 131/6
131/23 132/18
136/16 137/8
139/3 141/17

**N**

**name [3]** 39/19
51/12 54/10
**narrow [1]** 65/12
**narrowly [2]** 54/8
103/4
**natural [1]** 84/2
**nature [1]** 13/13
**Navarro [3]** 8/2
115/18 118/5
**necessarily [1]**
89/9
**necessary [3]**
100/3 119/19
130/5
**need [20]** 4/9
34/7 36/4 41/19
44/1 67/12 73/6
84/18 93/8 130/15
134/16 135/16
137/25 138/5
138/6 138/17
140/8 140/18
141/20 141/25
**needed [4]** 26/24
86/9 92/21 92/21
**needs [7]** 40/12
48/13 48/13
100/11 103/7
139/20 139/23
**negate [1]** 106/4

**negates [1]**
105/22
**negotiated [2]**
10/17 98/11
**neither [3]** 31/12
116/15 123/21
**never [25]** 15/3
17/2 17/6 48/15
56/8 60/21 63/6
63/7 63/13 63/14
63/15 66/9 66/11
66/13 66/24 77/20
83/25 84/5 86/10
92/2 103/12
108/10 110/19
113/25 118/13
**nevertheless [7]**
8/13 72/9 73/14
74/11 74/24 75/8
126/9
**new [3]** 1/24
33/25 49/9
**news [1]** 140/9
**next [9]** 8/22
12/22 23/9 38/12
56/4 91/19 120/13
122/16 133/25
**NICHOLS [1]** 1/9
**night [1]** 30/23
**nine [5]** 6/7 6/11
7/18 7/24 9/1
**Nixon [1]** 39/21
**no [80]** 1/4 3/18
7/1 7/2 11/16 13/2
13/3 15/7 16/9
16/19 18/24 22/10
26/11 26/11 34/2
34/3 34/3 34/14
35/23 37/17 40/18
40/23 44/13 44/17
44/18 48/5 51/4
51/10 52/1 56/23
61/3 61/21 62/15
64/7 66/8 67/18
68/16 69/5 70/14
75/20 77/3 78/25
79/4 79/10 79/12
79/24 81/24 82/19
83/12 88/12 88/13
93/6 94/5 94/20
94/22 95/3 95/12
98/18 100/1
100/24 103/8
104/10 105/14

107/18 111/15
111/23 112/5
112/7 112/9
112/11 117/18
119/4 120/2 121/8
124/2 127/17
130/8 131/2
132/12 140/13
**nobody [2]** 54/8
54/9
**nomenclature [1]**
20/11
**nominees [1]**
113/24
**noncompliance**
**[5]** 82/14 109/13
118/2 126/16
129/10
**none [6]** 122/19
123/5 123/23
124/10 125/20
129/5
**nonefficacious**
**[1]** 58/3
**nonemployees [1]**
61/9
**nongovernment**
**[8]** 31/23 44/20
44/22 45/10 46/3
63/15 63/20 76/5
**nongovernmental**
**[1]** 123/25
**nonintentional [1]**
97/23
**nonjusticiable [1]**
84/9
**nonparties [1]**
22/9
**nonplastic [2]**
80/16 80/18
**nonstarter [2]**
54/15 54/18
**Nos [1]** 3/19
**not [278]**
**note [1]** 118/6
**noted [6]** 55/6
55/15 114/22
115/20 119/11
126/6
**notes [4]** 56/20
106/15 113/18
121/16
**nothing [14]**
26/18 54/12 62/21

**N**

nothing... [11] 65/3 91/14 99/21 118/14 125/6 125/8 126/24 127/4 127/15 128/5 128/10
notice [32] 11/25 11/25 32/12 33/9 33/12 34/10 39/14 39/18 40/12 46/21 61/1 62/16 63/2 66/2 70/16 71/17 71/19 71/23 77/13 77/14 77/14 77/15 77/15 80/19 101/25 102/5 104/23 105/2 122/17 123/3 128/16 128/25
notify [1] 101/3
notion [1] 49/4
notwithstanding [4] 8/14 74/7 90/5 132/6
novo [4] 11/5 11/9 11/13 12/8
now [38] 9/21 21/13 22/14 26/10 33/25 34/18 37/25 39/23 40/10 40/12 41/4 42/21 43/2 48/21 49/22 54/2 55/5 58/15 59/18 60/7 61/24 63/17 71/15 73/14 88/22 89/1 89/3 92/16 94/17 95/14 103/5 103/14 105/24 112/16 112/19 124/12 131/24 133/21
null [1] 48/4
nullum [1] 34/1
number [14] 3/25 36/25 36/25 55/2 57/14 66/7 68/15 68/21 69/2 71/3 87/22 88/4 93/12 106/20
numbers [1] 114/11
NW [2] 1/14 2/3
NY [1] 1/24

**O**

Oath [1] 79/2
obeying [2] 12/19 106/25
objecting [1] 111/16
objection [4] 18/3 88/11 107/16 111/23
objections [8] 17/16 84/19 88/8 88/17 88/19 89/16 122/16 125/23
objectively [1] 102/8
objects [1] 38/4
obligated [1] 99/8
obligation [6] 15/9 44/13 48/5 62/15 100/24 101/6
obligations [1] 139/21
obtained [4] 3/24 92/9 93/22 94/5
obtaining [1] 121/1
obviously [12] 3/17 4/1 4/7 9/25 27/1 29/13 81/11 92/11 111/22 113/1 130/21 142/11
occasionally [1] 24/16
occasions [1] 58/7
occur [2] 50/9 56/1
occurred [7] 43/13 44/17 44/22 45/6 76/8 102/25 124/7
ocean [1] 80/15
October [3] 68/8 93/7 93/8
October 14th [1] 93/8
October 7th [1] 93/7
OFC [1] 1/13
off [1] 89/16
offended [1] 40/6
offense [19] 9/4 9/10 14/18 14/23 17/20 17/23 18/1 27/16 28/5 32/10 75/20 77/5 79/24 85/2 105/23 113/11 120/9 130/21 133/15
offenses [3] 73/20 74/8 131/3
offer [3] 58/21 99/22 112/12
offered [1] 99/21
offers [1] 95/25
office [4] 38/19 42/22 76/20 124/2
officers [1] 58/4
official [24] 2/2 13/10 13/22 13/22 31/7 39/7 41/8 41/11 41/13 42/1 42/7 43/18 43/18 47/4 55/7 55/13 55/21 55/21 75/7 99/20 100/14 101/16 122/23 143/3
officially [1] 31/22
officials [15] 34/13 44/6 51/17 55/18 56/14 57/6 59/22 60/5 60/8 60/16 64/12 64/17 78/17 79/9 80/25
often [1] 61/3
Oh [3] 38/9 49/4 69/14
Ohio [1] 34/9
okay [38] 4/21 22/12 22/22 23/16 23/20 23/25 24/1 32/24 33/3 41/10 42/2 45/20 65/17 67/12 74/1 85/5 88/22 88/24 89/15 90/2 91/11 91/17 94/2 95/13 97/2 99/23 104/22 111/13 112/15 136/1 136/13 137/18 141/2 142/1 142/7 142/14 142/19 142/21
OLC [101] 22/18 32/4 32/20 35/7 38/22 38/23 39/5 40/5 40/16 41/3 41/9 41/16 42/21 43/7 43/18 44/7 44/8 44/17 44/18 45/18 47/3 47/8 47/24 47/25 48/17 48/20 49/10 51/4 51/4 51/8 52/5 52/13 52/20 52/22 53/5 53/6 54/8 54/11 54/15 54/20 56/7 58/15 59/15 60/12 60/21 62/17 63/5 63/6 63/14 65/13 65/15 66/7 71/3 71/19 71/22 72/3 72/8 73/3 73/10 73/24 74/8 74/10 75/10 75/13 75/24 76/4 77/18 77/19 77/22 78/3 78/7 78/23 78/25 79/5 79/7 79/10 79/12 79/16 79/18 81/8 81/18 82/21 83/3 102/7 102/11 103/14 103/18 104/9 104/12 104/17 122/21 123/9 123/14 123/16 124/8 126/17 128/15 129/11 132/7 137/10 139/5
OLC's [1] 74/17
Olson [6] 39/15 42/6 51/16 56/5 60/14 106/13
Olson's [1] 56/4
once [17] 24/17 24/18 24/21 24/21 24/24 25/3 40/18 44/12 45/18 72/22 102/12 103/6 104/8 108/14 110/2 118/17 138/7
one [54] 10/1 16/9 19/17 19/18 19/19 23/6 23/9 36/25 43/19 43/19
45/15 46/7 48/1 48/16 49/2 49/9 53/17 58/13 59/20 60/7 65/4 66/15 66/17 68/16 73/20 73/21 78/7 79/22 80/3 85/13 87/17 87/23 88/17 90/3 91/21 92/1 96/13 96/18 97/17 98/14 100/5 108/3 108/18 112/4 112/23 113/2 117/18 118/6 123/2 123/12 129/4 136/4 140/4 140/4
ones [5] 77/24 102/18 131/24 135/15 142/11
only [23] 6/11 10/23 14/25 18/2 66/17 71/21 72/21 79/8 84/10 95/25 96/1 96/9 97/19 100/19 105/25 106/17 107/9 137/15 138/24 139/19 141/17 141/19 142/19
open [2] 18/6 125/17
operate [1] 115/6
operated [1] 113/25
operations [1] 84/11
opinion [55] 9/6 32/4 32/5 38/23 39/16 40/16 41/3 42/22 43/7 43/10 43/10 44/18 44/19 45/1 45/3 45/4 46/1 46/6 46/7 47/24 48/2 50/17 51/4 51/4 51/12 52/5 53/6 53/6 54/3 54/25 55/4 56/4 59/4 60/14 62/17 64/11 64/20 73/2 75/10 76/20 78/18 78/25 79/5 79/10 79/12 80/22 80/24 86/16

**O**

opinion... [7]
102/17 104/9
106/14 106/16
110/12 114/22
123/14
opinions [81]
35/7 38/19 38/22
39/5 40/5 40/17
41/9 41/16 43/19
44/11 45/18 46/10
47/3 47/8 48/1
49/10 49/15 49/16
51/9 51/15 51/25
52/13 52/20 52/23
54/8 54/11 54/15
54/18 54/20 56/7
58/17 59/15 60/9
63/5 64/2 64/4
65/13 65/15 67/4
71/3 71/22 73/2
73/24 74/8 74/15
75/13 75/24 76/4
76/10 76/18 77/23
78/7 78/13 79/7
79/16 79/18 80/20
81/8 81/19 82/21
83/3 102/7 102/11
103/15 103/18
104/1 104/12
104/17 115/21
115/21 122/22
123/10 123/17
124/8 126/18
128/15 129/11
131/10 132/7
137/10 139/5
opportunity [2]
4/5 4/16
oppose [1]
140/14
opposed [3]
25/11 47/25 82/6
opposing [1]
135/20
opposition [2]
105/13 105/17
Oppositions [1]
141/11
order [13] 3/2 6/3
10/18 89/8 103/7
105/19 107/1
131/20 135/13
136/6 137/20

137/20 142/16
ordinary [3] 26/1
33/20 64/1
organizing [1]
49/19
original [2] 134/7
137/20
Orman [1] 85/10
other [61] 3/18
6/8 14/4 16/20
18/17 18/22 22/12
23/24 25/12 27/12
28/10 42/16 44/11
47/23 47/25 50/13
52/19 52/21 54/15
55/6 59/6 64/16
70/14 73/11 76/22
78/2 80/17 82/21
89/25 90/25 91/1
91/22 95/18 96/24
97/5 99/19 99/25
101/9 101/12
105/5 111/7
112/25 120/14
120/19 121/19
121/20 122/14
122/24 123/10
123/17 125/5
130/13 131/21
133/6 133/17
136/19 139/21
139/21 140/4
142/4 142/10
others [1] 39/16
otherwise [7]
24/22 55/21 66/25
80/3 95/4 102/7
127/2
ought [3] 30/16
30/17 61/13
our [40] 5/17 5/25
9/22 9/24 12/18
14/15 14/15 14/19
21/1 22/4 23/1
26/9 28/2 30/5
30/6 30/19 68/6
74/23 82/16 92/16
93/14 99/4 99/5
99/7 100/7 100/16
101/3 101/6
101/24 102/2
106/5 106/12
107/16 125/1
137/4 138/13

138/15 141/9
141/10 141/12
ours [1] 5/8
out [23] 12/7
18/23 37/12 39/19
50/8 54/18 55/18
58/22 59/24 60/7
62/10 68/16 76/19
78/16 80/14 87/12
103/13 107/25
121/16 135/12
139/5 140/9
140/22
outline [1] 39/3
outlined [1] 39/3
outrageous [6]
24/3 25/1 25/24
26/7 26/15 91/25
outright [1] 96/12
outset [1] 27/8
outside [19]
32/15 41/1 49/3
49/5 49/19 50/19
52/2 52/7 52/7
56/1 61/4 61/9
61/12 64/3 79/17
79/19 102/21
102/23 103/2
over [27] 10/17
12/7 31/12 31/13
35/7 35/8 36/8
36/9 56/7 56/8
62/14 72/19 78/14
78/15 78/21 79/1
79/2 79/6 121/25
123/20 125/8
125/9 125/18
125/19 127/14
134/2 134/11
overall [1] 23/1
overbreadth [2]
38/5 129/7
overbroad [2]
126/15 128/8
overly [1] 4/14
overreaching [1]
129/17
overruled [1]
126/11
oversight [3] 45/3
46/7 80/24
Overview [1]
49/13
owe [1] 12/5

own [11] 6/5 7/21
11/18 12/12 12/19
14/2 21/1 56/20
93/15 115/24
116/2

**P**

P-I-C-C-O [1] 31/9
p.m [4] 89/2
112/18 112/18
142/23
package [2] 69/3
69/5
page [7] 34/19
56/18 76/18
100/16 102/22
105/17 106/15
pages [2] 57/21
102/3
paper [2] 31/5
127/2
papers [3] 4/9
31/5 119/17
paragraph [6]
15/4 38/12 68/8
69/8 120/21
142/17
Paragraphs [2]
119/14 119/22
parallel [2]
109/20 133/25
paraphrasing [1]
27/2
Pardon [1] 53/8
parenthetically
[1] 63/17
pari [1] 60/9
part [10] 12/22
22/12 28/2 30/5
42/9 61/10 62/22
69/5 96/16 141/24
participate [2]
10/16 10/17
participated [1]
95/1
particular [14]
17/10 60/13 72/25
78/14 78/15 78/16
81/25 82/1 90/15
120/3 125/9 130/4
131/9 134/17
particularly [2]
63/18 105/8
parties [17] 4/9

79/17 79/19 97/7
112/23 130/25
131/15 133/18
133/20 133/24
135/7 135/11
135/13 137/16
138/5 138/21
139/15
parties' [4] 31/21
131/25 134/5
134/19
parts [1] 63/10
party [16] 20/8
21/13 21/15 79/5
79/11 90/20 90/22
90/24 91/8 95/22
99/12 99/16 99/20
117/16 117/17
117/21
pass [1] 80/7
passing [2] 30/23
121/2
past [1] 88/7
Paul [3] 49/1 49/1
61/2
Paul Clement [1]
49/1
pause [3] 37/8
85/21 107/13
pawn [2] 40/6
40/7
penalties [1]
121/3
pending [3] 91/2
130/14 131/24
people [13] 20/12
34/5 49/5 50/4
52/3 61/4 64/3
64/7 64/22 76/3
103/3 103/3
106/20
percent [2] 21/15
86/8
perfect [2] 74/17
75/2
perhaps [4] 104/5
131/13 134/6
140/22
period [4] 32/20
73/23 107/6 135/8
perjury [1] 6/18
permissible [1]
131/5
permit [4] 42/7

**P**

**permit... [3]** 48/3 113/10 132/3
**permitted [4]** 38/13 98/14 105/10 138/10
**person [44]** 1/8 14/7 17/12 33/11 33/12 33/19 34/11 40/5 40/10 40/12 40/13 43/7 43/14 44/8 44/13 44/15 46/20 47/2 47/3 47/7 49/2 51/21 51/22 52/1 52/7 53/2 53/3 53/22 56/2 56/2 61/11 61/12 61/13 61/14 61/22 64/1 74/24 75/7 102/9 106/16 128/17
**personal [1]** 13/10
**personally [1]** 37/19
**persuade [1]** 120/12
**pertinency [1]** 9/7
**Peter [2]** 115/18 118/4
**phone [6]** 24/4 25/1 37/10 37/13 68/4 68/9
**phrase [1]** 128/24
**PICCO [1]** 31/9
**pick [2]** 70/22 72/7
**pinpointed [1]** 102/4
**placard [1]** 80/16
**place [2]** 89/23 90/9
**places [1]** 10/11
**plan [2]** 19/5 19/6
**play [1]** 12/7
**please [7]** 3/2 3/6 5/2 30/12 54/1 75/20 90/1
**plus [1]** 71/22
**podium [1]** 5/2
**point [15]** 5/16 26/7 27/4 45/14 55/2 67/19 77/8

90/7 92/8 101/7 105/13 109/14 110/6 124/4 130/25
**pointed [2]** 80/15 123/24
**points [3]** 68/2 101/22 108/9
**police [2]** 48/7 48/14
**policy [2]** 122/23 122/24
**portion [2]** 141/20 142/16
**posed [1]** 74/21
**position [34]** 9/24 12/8 17/18 19/24 21/3 21/9 22/2 26/22 30/5 39/6 39/7 43/6 46/23 56/13 57/2 57/5 84/8 84/10 90/20 91/5 91/6 91/9 97/14 101/10 101/16 101/24 102/11 107/8 109/17 109/18 114/18 117/14 117/19 139/16
**positioned [1]** 10/24
**positions [1]** 31/21
**possible [4]** 92/15 93/10 93/12 131/11
**possibly [1]** 59/16
**post [2]** 25/11 27/17
**post-hoc [1]** 27/17
**post-trial [1]** 25/11
**potential [7]** 19/13 52/6 73/25 94/12 94/16 115/7 115/22
**potentially [7]** 31/24 48/10 60/21 74/13 81/8 81/17 140/17
**power [7]** 11/17 86/23 119/4 121/6

122/9 127/17 128/10
**powers [17]** 33/23 39/2 47/10 51/18 52/15 57/17 59/7 59/21 60/2 106/6 106/11 107/12 115/23 121/15 126/14 127/8 127/23
**practice [2]** 49/22 91/13
**precedent [1]** 127/5
**precisely [1]** 25/19
**preclude [2]** 60/3 60/4
**precluded [1]** 9/14
**predate [1]** 27/13
**predicate [2]** 123/23 124/12
**predicates [1]** 123/16
**prejudice [10]** 6/14 6/16 24/8 24/9 24/10 24/11 92/1 94/8 94/9 94/20
**prejudiced [3]** 6/22 130/5 130/9
**preliminary [1]** 111/18
**premature [1]** 131/17
**premise [1]** 137/4
**prepared [3]** 62/20 132/4 135/22
**presence [1]** 68/24
**present [11]** 6/18 9/23 29/22 48/4 72/22 81/5 93/9 93/14 98/24 119/21 120/11
**presentation [1]** 38/25
**presented [8]** 8/19 13/25 14/1 22/8 74/19 111/21 124/11 129/4
**presenting [3]**

17/16 28/3 132/15
**presently [1]** 82/24
**preserve [2]** 87/20 127/3
**preserved [2]** 86/14 126/10
**presidency [1]** 38/6
**Presidency's [1]** 64/8
**president [74]** 35/18 36/12 36/13 36/22 37/2 37/11 37/14 37/18 37/22 38/3 38/4 38/13 39/21 39/22 39/24 40/2 40/8 40/9 42/4 42/8 42/11 42/20 42/24 43/12 43/23 44/4 44/4 44/16 45/9 47/4 47/5 47/6 47/12 47/21 49/19 49/23 49/24 50/21 50/23 52/4 56/15 58/22 59/5 60/5 61/3 61/16 62/1 63/16 63/17 63/21 64/25 68/4 68/10 68/11 73/13 73/22 74/3 74/5 74/23 79/10 79/14 79/15 106/10 108/25 109/9 121/23 123/19 124/1 124/14 124/17 124/25 125/4 127/10 127/19
**President's [16]** 40/9 41/8 42/9 42/14 51/20 55/13 55/23 57/16 59/8 59/24 59/25 66/21 66/21 102/24 107/1 127/14
**presidential [8]** 42/4 49/12 55/18 56/2 57/6 57/10 57/15 121/13
**press [2]** 107/20 140/3
**presumptively [7]** 36/6 39/10 46/15

55/24 57/19 57/19 67/1
**pretrial [3]** 104/1 141/12 142/15
**pretty [5]** 4/15 15/21 29/8 46/25 137/25
**prevail [1]** 8/11
**prevent [3]** 75/19 111/20 121/3
**previous [3]** 56/9 56/21 126/1
**previously [3]** 28/16 56/12 57/23
**principle [13]** 9/9 35/6 38/20 52/9 52/12 63/1 63/1 66/19 66/20 67/3 80/4 95/3 103/2
**principles [4]** 59/7 60/2 71/3 102/19
**prior [14]** 23/10 25/20 27/20 27/24 28/15 28/22 95/14 101/4 126/7 126/12 127/9 129/12 132/8 137/11
**private [9]** 32/16 49/5 50/9 50/20 52/2 79/5 79/6 79/10 99/20
**privilege [132]** 28/20 32/20 35/8 35/11 35/18 35/24 36/5 36/6 36/7 36/13 36/22 37/2 37/14 37/23 39/8 39/9 39/22 40/2 40/3 40/4 40/9 40/14 40/18 41/23 42/5 42/8 42/12 42/19 43/3 43/9 44/5 44/12 44/15 46/2 46/14 47/12 47/16 47/18 47/18 47/19 48/14 49/20 50/3 50/12 50/25 51/1 51/20 51/22 52/8 52/14 52/15 52/16 53/3 53/18 55/14 55/19 56/15

# P

**privilege... [72]**
57/7 57/10 57/16
57/24 58/22 59/5
59/6 59/9 59/24
60/3 60/6 60/17
61/8 62/2 62/7
62/10 64/5 64/9
66/21 66/22 67/2
67/5 68/11 72/12
73/13 74/7 75/25
76/1 76/5 78/8
78/14 78/22 83/8
96/4 97/18 98/12
100/15 102/12
102/19 102/19
102/20 103/6
104/8 105/10
105/21 106/3
106/8 106/9
106/10 107/2
107/4 107/5
108/11 108/12
108/14 109/3
109/17 110/19
121/14 121/25
122/9 123/20
124/16 125/8
125/9 125/11
125/19 126/17
127/10 127/12
127/14 129/11
**privilege.' [1]**
41/9
**privileged [35]**
31/24 47/7 48/8
48/10 48/15 49/25
50/22 51/2 52/10
52/13 55/24 57/18
57/19 62/2 64/3
64/7 67/1 74/6
74/24 94/5 95/7
95/9 108/21
108/25 109/10
121/7 121/10
121/18 122/3
122/3 122/13
124/22 124/23
125/16 125/17
**privileges [1]**
124/20
**probable [3]**
114/2 117/2
119/15

**probably [5]** 34/7
90/21 92/6 133/4
135/17
**problem [10]** 4/2
38/19 38/21 52/25
71/20 72/14 98/21
106/6 108/22
130/19
**procedural [15]**
14/1 14/10 14/11
14/16 14/18 84/19
86/18 86/21 86/25
87/1 87/13 88/2
88/3 88/8 88/13
**procedurally [1]**
14/3
**Procedure [1]**
19/14
**procedures [2]**
97/20 97/21
**proceed [6]** 3/20
30/11 73/6 81/19
81/19 112/24
**proceeding [5]**
36/9 51/20 52/22
59/17 103/12
**proceedings [6]**
2/7 57/25 58/7
125/18 142/23
143/5
**process [34]**
11/24 16/2 16/3
28/20 30/22 30/25
32/12 32/18 32/19
33/14 33/22 34/22
39/1 42/13 52/17
59/2 59/2 62/13
62/22 70/24 71/10
71/13 71/20 77/13
78/20 80/1 93/22
98/11 102/1
108/22 122/18
123/3 125/21
137/6
**process/fair [1]**
123/3
**produce [13]** 32/1
38/2 62/11 74/9
82/5 93/7 96/3
100/15 106/1
106/17 119/17
124/21 125/7
**produced [1]** 2/7
**producing [4]**

73/20 78/22 78/24
122/11
**production [3]**
121/7 125/15
127/1
**proffer [7]** 98/7
99/2 99/10 101/4
111/15 138/13
138/17
**proffered [1]** 98/2
**proffering [2]**
95/22 99/16
**prohibited [2]**
33/13 34/6
**prohibition [1]**
71/24
**prohibits [1]**
126/19
**promise [1]** 99/12
**propensity [1]**
96/10
**proper [3]** 9/2
9/15 140/7
**properly [5]** 8/9
13/9 15/17 90/4
117/11
**proposal [2]**
135/18 135/21
**proposed [9]**
81/10 131/1
131/25 133/16
134/1 134/6 137/8
141/9 142/17
**proposition [2]**
12/16 54/13
**prosecute [14]**
31/23 32/6 41/22
44/19 45/7 59/15
63/7 63/13 64/11
66/12 72/5 75/25
122/25 128/19
**prosecuted [15]**
34/25 44/9 46/4
46/22 50/12 51/2
71/16 73/14 74/11
74/18 74/24 75/22
78/9 78/23 106/16
**prosecuting [8]**
39/6 40/17 52/24
52/25 53/21 59/1
67/10 75/22
**prosecution [21]**
6/3 26/1 33/21
34/21 35/11 39/1

40/7 40/13 40/13
42/24 46/16 55/23
59/23 62/6 72/16
74/8 102/10
115/15 118/3
123/2 126/13
**prosecutions [1]**
60/16
**prosecutorial [4]**
64/16 128/3 128/6
129/17
**prosecutors [1]**
68/25
**protect [7]** 7/15
10/12 10/18 55/24
80/10 80/10 87/13
**protected [3]**
79/18 98/12 129/9
**protecting [1]**
117/17
**protection [4]**
86/22 86/25 87/1
88/14
**protections [2]**
86/19 88/3
**protective [2]**
98/20 116/14
**Proud [1]** 79/1
**prove [14]** 17/22
19/6 26/23 27/15
28/9 53/15 81/24
82/3 92/22 97/13
99/12 99/13 111/6
130/9
**proved [1]** 29/17
**proven [1]** 113/10
**provide [10]**
64/18 100/24
101/6 109/19
112/23 118/7
122/14 122/24
124/23 138/6
**provided [8]**
18/20 19/1 19/5
34/10 69/10 99/9
118/11 118/15
**providence [1]**
119/7
**provides [3]** 88/3
113/20 126/25
**providing [3]**
100/9 121/21
122/12
**proving [2]** 85/1

115/5
**pseudo [1]** 86/15
**pseudo-affirmativ
e [1]** 86/15
**public [14]** 5/5
30/20 32/9 33/9
39/19 66/2 68/19
70/24 90/13 102/6
122/18 123/4
123/5 125/21
**published [1]**
40/17
**pull [2]** 37/3 46/5
**punish [1]** 60/5
**punished [2]**
26/13 26/14
**punishment [1]**
33/11
**pure [1]** 139/14
**purported [1]**
105/21
**purpose [6]** 14/5
75/18 89/10 89/11
96/10 120/2
**purposes [12]**
14/24 20/11 37/16
40/1 52/9 86/13
119/21 119/24
120/24 124/5
140/7 141/18
**put [10]** 8/21 15/4
32/7 40/1 40/10
65/14 71/22
119/14 132/7
134/15
**puts [1]** 133/16
**putting [2]** 96/14
127/22

# Q

**quash [1]** 17/14
**question [93]**
8/20 8/21 9/3 9/7
9/8 9/11 9/12 9/21
12/22 13/25 14/1
14/11 14/11 18/25
23/15 23/19 23/21
23/25 26/17 32/13
33/19 35/14 35/17
35/19 35/22 36/2
36/2 36/3 36/4
36/19 39/23 43/2
45/11 45/12 45/23
45/24 50/15 51/6

# Q

**question... [55]**
53/7 53/9 53/10
58/20 59/21 61/7
62/16 65/20 66/6
72/24 75/11 77/22
78/2 78/9 82/22
84/6 84/25 85/19
85/22 85/24 90/3
90/11 91/5 92/7
93/6 94/3 94/7
98/5 98/23 102/6
103/12 103/16
103/21 104/6
104/19 105/3
105/20 108/12
108/18 109/13
111/3 113/9 124/5
124/13 125/12
125/18 133/1
133/5 133/16
134/15 136/4
137/22 137/23
137/25 139/11

**questioning [4]**
10/14 10/16 14/19
68/3

**questions [24]**
4/1 4/12 11/8 13/2
22/25 61/14 68/15
72/13 77/24 82/21
89/24 96/14 98/8
99/13 99/25
108/17 113/2
126/7 133/13
134/13 134/21
137/14 138/9
139/8

**quick [1]** 101/21
**quorum [4]** 6/18
6/19 6/21 86/20
**quote [5]** 7/3
73/10 115/3 116/6
124/19
**quote/unquote [1]**
73/10
**quoted [1]** 120/16
**quotes [2]** 58/10
120/5

# R

**R O C E E D I N G
S [1]** 3/1
**raise [10]** 71/7

84/20 87/10 87/18
87/20 88/20 102/2
103/15 111/22
121/14
**raised [12]** 9/19
18/2 18/3 18/3
86/11 91/21 94/12
101/10 107/14
107/15 125/23
129/16
**raises [3]** 89/18
113/15 129/2
**raising [3]** 5/25
88/9 109/2
**Raley [8]** 34/9
34/18 34/20 35/1
53/1 72/10 72/14
105/1
**ran [2]** 49/14
49/14
**rank [4]** 15/24
15/24 15/25 16/2
**ranking [24]** 5/23
10/5 10/10 10/10
10/15 10/22 12/3
15/17 15/19 15/23
16/3 68/16 68/19
68/23 79/8 88/11
88/12 89/20
107/18 107/21
116/13 116/21
117/12 117/14
**Raskin [1]** 140/4
**rather [2]** 36/22
129/12
**ratification [1]**
84/11
**ratified [3]** 91/16
115/14 118/18
**ratifying [1]** 90/7
**rationale [2]**
50/13 50/14
**rationalization [1]**
27/17
**rea [25]** 29/3 29/8
53/4 53/5 53/15
53/17 81/9 81/14
82/23 96/16 97/10
97/25 105/9
105/15 110/8
110/9 111/4 111/6
126/8 131/2
134/22 137/6
137/11 137/16

139/7
**reach [5]** 45/12
77/22 78/2 79/21
84/18
**reached [2]** 28/21
29/19
**read [19]** 13/14
19/18 31/12 46/8
46/8 47/3 50/14
53/25 60/8 61/1
61/2 62/25 64/1
64/3 76/23 77/25
96/18 102/6
106/15
**reading [8]** 37/25
41/4 51/8 84/2
106/21 115/11
115/11 115/13
**reaffirmed [1]**
118/3
**real [2]** 106/6
108/2
**realize [1]** 133/20
**really [28]** 5/21
10/18 10/20 14/11
30/6 30/24 31/1
41/19 43/25 46/19
46/24 48/7 61/6
71/11 75/11 87/23
103/10 110/12
122/9 122/17
123/16 128/13
134/11 136/23
141/17 141/19
141/19 141/25
**realm [2]** 32/17
50/8
**reason [18]** 19/22
24/6 24/24 25/24
43/23 47/7 50/11
82/2 82/8 82/14
89/11 96/8 102/13
105/14 106/2
106/7 120/7
122/15
**reasonable [8]**
17/22 28/9 46/20
47/2 102/9 103/17
104/20 138/16
**reasonableness
[4]** 97/23 104/7
137/21 137/22
**reasoning [2]**
65/4 75/17

**reasons [10]**
35/13 39/3 39/11
51/17 60/19 60/20
66/19 112/24
130/11 131/7
**rebut [1]** 97/16
**receipt [1]** 18/4
**receive [2]** 18/7
18/9
**received [6]**
17/12 28/6 28/23
68/9 130/24
136/17
**receiving [2]**
28/19 29/19
**recently [2]** 33/16
114/17
**recess [5]** 88/25
89/1 112/13
112/17 112/22
**recipient [6]** 69/3
86/22 121/9
121/20 122/2
124/3
**recipients [1]**
121/19
**recognize [2]**
41/18 79/17
**recognized [7]**
13/12 34/1 34/20
41/5 57/23 88/19
115/21
**recognizes [1]**
88/9
**reconsider [2]**
127/17 127/17
**record [24]** 3/7
8/25 37/13 37/21
40/22 41/1 41/1
56/5 62/12 68/5
68/6 68/14 69/22
69/23 69/25 70/13
89/3 91/15 112/19
123/5 132/14
138/15 140/8
143/5
**recorded [1]** 2/7
**records [12]**
22/15 24/4 25/2
27/12 79/2 79/6
92/15 96/3 100/10
106/1 123/20
136/17
**refer [3]** 46/15

49/18 51/16
**reference [5]**
19/17 38/1 69/14
102/16 107/15
**referenced [1]**
125/2
**referral [3]** 115/17
115/18 115/19
**referrals [3]** 8/2
84/12 115/16
**referred [2]** 54/3
102/17
**referring [3]** 46/6
48/25 118/1
**refers [2]** 49/2
54/11
**reflect [2]** 39/6
125/10
**reflecting [2]**
54/11 122/22
**refusal [3]** 89/8
89/12 89/12
**refused [1]** 72/18
**refusing [3]** 31/25
32/1 70/6
**refutation [1]**
111/5
**regard [3]** 5/16
24/2 100/13
**regarding [3]**
120/18 121/22
126/3
**regardless [2]**
87/18 88/4
**regulation [1]**
76/16
**regulations [5]**
69/8 69/12 69/25
70/7 80/17
**reiterate [1]** 125/1
**reiterated [4]**
35/7 39/15 39/17
51/15
**reiteration [1]**
104/20
**reject [1]** 115/23
**rejected [3]** 8/16
93/4 113/23
**related [3]** 36/2
57/21 91/19
**Relatedly [1]**
130/6
**relates [2]** 22/14
23/24

**R**

**relating [6]** 23/22 92/9 130/23 132/7 132/13 139/4
**relation [8]** 79/3 80/12 92/4 94/25 95/20 95/20 95/21 120/14
**relative [1]** 133/17
**relevance [2]** 66/8 95/24
**relevant [35]** 26/20 32/19 33/8 44/21 47/24 49/17 52/15 53/15 53/17 64/23 65/6 65/9 66/1 71/16 73/12 81/8 81/17 82/22 83/4 95/11 96/1 96/2 96/8 97/25 104/12 104/13 110/8 110/13 111/6 120/8 131/18 132/9 132/15 132/22 133/12
**reliance [12]** 40/11 77/12 81/21 83/14 102/5 105/21 110/15 110/20 126/17 129/11 137/21 137/21
**relied [5]** 54/21 71/3 76/13 77/24 104/10
**relies [4]** 118/10 123/11 123/18 124/18
**relieve [1]** 20/24
**relitigate [2]** 126/22 127/16
**rely [7]** 21/7 22/4 37/12 51/3 51/5 51/7 130/23
**relying [8]** 22/7 29/13 49/24 72/25 76/12 76/16 76/17 76/19
**remaining [3]** 78/22 78/24 96/10
**remains [1]** 126/9
**remember [2]**

24/17 69/6
**reminded [1]** 19/19
**reminds [1]** 37/9
**removal [1]** 11/23
**remove [1]** 5/1
**render [2]** 34/18 127/2
**rendering [1]** 34/21
**renders [5]** 34/16 35/10 35/11 116/8 126/23
**repairing [1]** 24/22
**repeat [3]** 4/10 70/12 130/16
**repeats [1]** 55/5
**Replies [1]** 141/11
**reply [3]** 39/4 73/4 102/3
**report [3]** 49/10 49/22 50/1
**Reported [1]** 2/1
**reporter [3]** 2/2 88/21 143/4
**reports [1]** 49/11
**represent [2]** 90/17 123/11
**representation [2]** 7/14 25/8
**representative [3]** 48/4 58/12 117/21
**Representatives [7]** 5/20 8/25 14/22 17/25 68/22 114/4 117/4
**representing [1]** 68/9
**represents [1]** 76/20
**republican [1]** 16/1
**republicans [1]** 16/5
**request [3]** 16/22 18/21 112/4
**requested [1]** 19/3
**requests [1]** 38/5
**require [7]** 6/2 6/4 87/6 87/25 116/14 121/9 131/20

**required [13]** 6/11 19/1 28/12 29/11 69/9 76/14 82/4 82/5 84/5 115/6 118/11 125/15 130/22
**requirement [5]** 33/9 37/17 83/8 117/24 126/8
**requirements [1]** 86/20
**requires [13]** 11/25 19/13 37/18 91/14 101/3 105/16 105/25 116/20 118/15 123/6 129/17 129/20 142/17
**requiring [2]** 111/15 130/8
**res [4]** 11/11 83/19 84/2 87/24
**reserved [1]** 116/5
**reserves [1]** 116/1
**reserving [1]** 133/4
**resigns [1]** 6/9
**resolution [21]** 7/12 7/16 7/19 7/25 8/24 69/6 69/11 85/17 86/5 86/8 88/5 113/19 113/19 115/4 115/10 115/12 115/15 115/17 115/18 115/19 133/5
**resolutions [3]** 8/1 8/8 90/8
**resolve [3]** 131/17 135/2 138/2
**resolved [3]** 132/10 137/24 138/8
**resolving [2]** 57/23 58/8
**respect [13]** 10/5 11/6 31/15 64/17 68/11 68/15 78/11 78/12 88/14 89/22 91/24 103/20

115/16
**respectfully [3]** 45/21 65/11 66/14
**respective [3]** 31/21 135/15 139/17
**respond [5]** 3/24 4/5 61/12 98/19 135/21
**response [8]** 19/3 68/7 99/9 106/18 124/22 124/24 127/20 136/17
**responsibilities [1]** 42/9
**responsible [1]** 117/16
**responsive [1]** 122/1
**rest [3]** 5/8 5/9 63/5
**rests [1]** 123/16
**result [1]** 131/8
**resulted [1]** 25/10
**resumed [2]** 89/2 112/18
**reus [1]** 131/2
**reus/no [1]** 131/2
**reveal [3]** 121/21 122/3 122/13
**reverses [1]** 57/2
**review [1]** 78/20
**reviewing [1]** 11/3
**Riane [1]** 3/13
**right [39]** 10/3 13/24 21/13 22/13 23/8 23/11 29/12 31/8 32/25 38/12 41/25 51/14 54/2 54/23 56/25 59/18 60/24 61/8 63/19 64/24 65/2 73/6 90/24 92/16 93/24 93/25 94/1 95/4 105/16 107/12 109/21 109/25 110/2 110/14 110/17 110/25 111/11 135/24 138/11
**rights [12]** 7/15 10/12 10/13 10/19 10/19 58/14 87/13

87/14 88/3 89/21 117/17 119/1
**rise [3]** 89/1 112/16 142/22
**risk [3]** 33/10 58/13 116/4
**risks [1]** 51/23
**Road [1]** 1/17
**ROBERT [2]** 1/22 27/9
**rock [1]** 21/19
**Rogers [1]** 56/17
**role [1]** 88/12
**Roman [1]** 34/1
**room [3]** 2/3 7/9 7/10
**ROSE [1]** 1/12
**Rostenkowski [4]** 13/7 13/20 84/16 116/6
**roughly [1]** 135/23
**route [2]** 104/2 104/4
**routine [1]** 27/15
**RPR [1]** 2/1
**rule [35]** 6/23 11/21 13/14 13/19 13/21 14/5 14/9 18/6 18/13 18/15 18/19 18/20 18/22 19/4 19/8 19/13 19/16 88/2 88/3 91/14 95/7 98/3 98/16 98/17 98/25 111/15 111/17 111/19 111/23 115/24 116/3 118/9 118/14 121/8 121/12
**rulemaking [3]** 11/15 90/16 116/1
**rules [49]** 5/8 5/17 5/18 5/19 6/5 7/21 8/3 9/2 10/11 10/25 10/25 11/1 11/5 11/18 12/2 12/6 12/9 12/12 12/19 12/22 13/12 14/2 14/15 14/16 16/1 16/1 18/5 18/17 18/18 18/19 18/21 19/14 48/3 65/16 69/24 83/20

**R**

**rules... [13]** 86/19
87/6 87/13 90/18
99/11 101/1 116/2
116/12 116/13
116/14 118/8
118/12 118/15
**rules-based [2]**
5/8 5/17
**ruling [1]** 129/12
**run [2]** 11/14
53/24
**running [1]** 24/20
**runs [1]** 116/3

**S**

**said [66]** 5/18 7/6
7/17 7/21 8/8
10/21 13/17 17/23
18/3 19/23 20/23
21/8 25/20 25/21
26/9 29/14 31/22
34/9 36/8 36/8
40/18 44/7 44/7
44/8 45/11 46/23
46/25 52/8 55/9
59/10 59/13 60/21
61/19 62/10 62/13
62/20 63/6 63/7
63/14 63/15 66/7
66/13 68/5 70/12
71/19 72/14 73/3
80/16 82/19 87/6
103/14 103/24
104/23 105/12
105/14 106/16
106/21 107/7
108/10 109/16
110/19 111/14
116/24 136/9
137/25 140/7
**sake [1]** 123/9
**salient [1]** 4/11
**same [16]** 6/17
7/8 10/7 14/12
15/17 15/25 34/17
42/17 42/21 42/22
59/11 88/11 98/19
98/19 102/18
111/3
**sanction [1]** 14/7
**sanctioned [1]**
79/25
**sanctions [3]**

25/12 34/13
129/23
**satisfied [2]** 7/24
72/24
**satisfy [1]** 64/14
**saw [2]** 38/19
105/17
**say [70]** 3/22 6/13
7/2 8/24 11/12
13/1 14/6 18/12
19/17 21/5 22/10
27/14 27/17 31/11
37/1 38/17 41/19
42/17 44/11 45/7
45/8 45/18 46/17
47/3 49/4 49/16
49/16 51/16 51/25
51/25 52/17 52/24
52/24 54/9 54/13
59/16 61/15 61/16
64/4 64/5 64/10
64/13 65/16 67/13
69/25 70/7 70/15
75/24 77/23 81/17
94/10 96/20 97/24
98/7 98/18 99/12
102/16 102/22
106/24 107/5
107/23 109/23
114/15 131/17
132/17 135/13
136/23 140/16
141/1 141/18
**saying [25]** 8/25
14/15 15/5 22/3
26/12 28/14 28/24
37/20 37/23 44/19
53/21 58/15 60/13
63/12 75/20 81/23
83/7 108/23
108/23 109/3
109/5 109/8
120/16 139/19
140/17
**says [57]** 12/18
12/21 18/7 18/20
30/1 32/5 35/25
37/5 41/22 41/25
42/17 42/17 43/19
44/3 44/4 44/4
45/1 47/25 50/19
50/24 50/25 54/17
56/21 57/1 57/14
57/22 58/11 58/16

59/18 59/22 59/22
60/14 62/1 62/17
64/14 65/3 69/9
74/23 74/25 75/23
76/9 78/23 78/25
79/5 79/10 80/22
80/24 82/11 87/12
88/1 105/1 106/4
109/21 110/2
111/17 111/19
140/11
**Scalia's [1]** 9/6
**Scavino [3]** 8/3
115/19 118/5
**scenario [1]**
61/15
**schedule [6]**
131/21 133/16
133/19 133/24
140/22 141/4
**scheduling [2]**
131/19 139/14
**Schiff [1]** 140/4
**SCHOEN [16]**
1/16 1/17 3/12
4/18 22/17 23/6
23/23 27/19 30/10
39/20 68/3 71/9
94/13 101/14
109/16 136/24
**Schoen's [1]**
77/10
**scope [5]** 38/5
76/17 86/4 86/6
120/19
**score [1]** 113/15
**scrap [2]** 80/15
80/19
**search [1]** 121/11
**seated [1]** 3/2
**second [16]**
38/18 40/1 41/2
45/15 46/7 48/17
59/20 85/8 85/9
94/7 116/10
123/19 124/4
124/12 125/13
127/6
**seconds [1]**
112/6
**secret [1]** 16/5
**secrets [1]** 44/2
**section [19]** 18/4
56/9 69/2 69/5

69/11 69/23
106/17 125/24
126/23 126/23
126/24 126/24
127/6 127/22
127/24 128/2
128/11 128/21
129/8
**Sections [1]**
55/16
**see [13]** 12/8
14/17 14/18 16/25
38/8 38/18 43/5
53/25 104/22
113/13 128/9
129/21 140/19
**Seeger [1]** 85/10
**seeing [1]** 140/3
**seek [2]** 27/3
27/12
**seeking [1]**
123/25
**seeks [3]** 120/18
127/3 132/13
**seem [3]** 47/15
80/6 136/18
**seemed [2]** 71/9
82/20
**seems [20]** 23/3
29/10 31/3 44/17
46/25 48/8 60/10
70/9 72/3 92/6
95/6 96/13 106/20
131/17 133/1
134/10 134/16
137/9 142/3 142/8
**seen [2]** 37/17
128/5
**sees [2]** 38/19
38/21
**Select [29]** 8/9
9/1 9/15 16/23
17/13 25/3 27/9
68/12 68/18 85/15
85/16 113/18
113/20 113/21
114/7 115/6 116/8
116/10 116/12
116/20 117/11
117/18 117/23
120/5 120/7
120/15 120/17
120/20 121/6
**Senate [2]** 28/17

95/21
**Senator [1]** 58/1
**senior [5]** 10/23
42/23 50/10 61/16
61/23
**seniority [1]**
15/23
**sense [6]** 20/16
31/12 65/7 67/9
97/22 104/14
**sentences [3]**
76/2 76/19 80/6
**separate [6]** 36/2
36/2 36/4 51/6
71/10 78/8
**separately [1]**
78/12
**separation [17]**
33/23 39/2 47/9
51/18 52/15 57/17
59/6 59/21 60/2
106/6 106/11
107/12 115/23
121/14 126/14
127/7 127/23
**seq [1]** 22/3
**series [3]** 3/18
4/12 49/11
**serious [6]** 50/2
121/2 121/14
126/7 129/24
131/7
**seriously [2]**
35/19 42/19
**serves [1]** 117/21
**service [2]** 27/10
69/4
**set [3]** 47/21
60/11 87/12
**several [6]** 39/11
57/21 58/7 113/15
115/14 118/4
**shall [20]** 6/6 6/6
6/24 7/8 7/9 14/5
69/9 84/7 113/20
113/21 114/23
118/1 115/2 115/5
115/13 115/20
118/10 135/13
135/14 135/14
**shame [1]** 108/4
**she [1]** 44/4
**Shelton [1]** 87/3
**shield [1]** 42/23

**S**

**shift [1]** 141/23
**shifted [2]** 71/14
101/25
**ships [1]** 30/23
**shoes [2]** 46/20
63/8
**short [4]** 4/6
26/20 112/22
113/16
**shortcomings [1]**
125/20
**shorthand [1]** 2/7
**shortly [1]** 135/3
**should [31]** 4/7
5/20 6/2 11/2 18/3
21/20 22/6 26/14
28/3 28/25 29/21
47/14 48/11 50/11
54/18 58/13 61/3
78/22 96/12 99/22
102/14 103/19
114/24 115/2
115/13 115/23
126/11 133/3
133/19 133/21
140/16
**shouldn't [3]** 8/15
26/8 26/13
**show [31]** 6/16
26/24 27/23 28/1
30/4 44/10 46/20
69/15 70/1 71/6
72/21 74/9 74/23
76/14 82/4 83/7
83/9 94/19 94/20
96/2 96/3 97/6
97/22 98/13 99/1
102/5 102/6 103/7
105/15 107/10
129/5
**showed [3]** 18/14
69/15 118/14
**showing [14]**
51/1 51/2 79/8
79/11 80/25 81/3
95/24 96/8 99/16
103/9 113/8
118/16 130/5
133/3
**shown [4]** 19/4
98/2 98/21 98/22
**side [3]** 4/13
42/16 142/4

**signal [1]** 132/18
**significant [2]**
121/22 132/16
**significantly [1]**
59/25
**silly [3]** 61/18
61/20 61/22
**SILVERMAN [1]**
1/20
**similar [3]** 59/19
97/21 114/17
**similarities [1]**
98/2
**simple [3]** 30/5
74/4 103/12
**simply [8]** 15/4
27/13 31/13 34/23
55/11 59/7 101/15
118/10
**since [6]** 13/17
32/21 39/17 51/9
90/13 91/8
**sine [1]** 34/2
**single [3]** 16/22
17/9 32/4
**sit [1]** 6/2
**sitting [4]** 37/15
87/25 92/16 93/11
**situated [4]** 40/6
43/7 47/3 128/17
**situation [10]**
34/5 45/4 59/19
68/17 74/18 123/2
123/18 124/9
124/11 129/25
**situations [2]**
128/20 129/4
**Sixth [2]** 103/25
119/20
**skip [1]** 38/24
**slightly [2]** 9/24
10/6
**SLUTKIN [1]** 1/20
**so [159]**
**so-situated [1]**
43/7
**sole [2]** 88/6
108/18
**some [37]** 7/14
11/6 13/12 14/4
14/14 15/9 17/16
25/12 27/2 43/23
44/2 45/8 48/9
48/10 49/11 55/5

60/19 62/14 66/5
66/8 71/14 73/15
78/21 82/21 84/21
84/21 91/4 91/7
99/16 106/19
106/25 112/24
112/24 131/11
134/23 135/6
139/4
**somebody [3]** 6/9
15/22 25/6
**somehow [4]**
29/24 95/25 96/4
139/25
**someone [22]**
14/6 16/15 31/23
32/6 41/22 43/11
43/17 44/20 48/13
52/25 63/8 63/13
65/5 65/8 66/12
66/24 74/2 74/5
75/19 77/6 98/7
122/25
**something [25]**
8/22 17/10 21/11
26/10 26/20 28/13
31/18 33/25 46/23
53/25 70/13 77/1
82/7 82/13 82/17
83/3 86/22 97/12
98/16 100/22
101/5 107/9
135/23 137/2
139/25
**sometimes [5]**
6/25 7/5 22/10
114/23 115/1
**somewhat [2]**
13/14 133/17
**Sorrells [1]** 35/3
**sorry [5]** 4/25
69/19 83/17 91/3
136/24
**sort [9]** 6/16
29/16 33/24 73/15
74/21 76/20 86/15
109/20 135/12
**sorts [1]** 140/5
**sought [3]** 14/7
27/4 120/23
**sound [3]** 57/7
122/18 128/12
**sounds [1]** 83/2
**speak [3]** 22/17

74/11 84/14
**Speaker [6]** 11/6
91/8 91/8 113/20
113/23 115/11
**speaking [3]** 16/9
77/13 116/25
**specific [14]** 8/21
10/9 53/20 54/7
62/17 75/6 80/12
80/23 81/1 111/11
121/17 124/9
131/1 131/15
**specifically [9]**
8/8 49/18 81/13
83/15 118/23
121/8 127/8
129/18 134/18
**speech [1]** 119/2
**spell [1]** 34/2
**spent [1]** 25/25
**sphere [1]** 116/4
**split [1]** 4/22
**spoke [1]** 34/4
**spoken [1]** 84/15
**squarely [3]** 8/18
73/9 103/15
**stage [6]** 71/8
113/16 123/22
124/13 125/18
133/25
**stand [4]** 19/21
21/6 26/11 76/10
**standard [9]** 11/2
13/7 29/8 35/3
80/2 81/12 97/4
111/7 111/9
**standing [5]** 33/6
38/22 57/4 95/17
135/13
**stands [2]** 68/20
112/17
**start [4]** 26/4
75/16 76/18 77/18
**started [2]** 14/19
49/22
**Starting [1]** 39/14
**state [5]** 15/2
81/25 82/1 117/1
119/14
**stated [3]** 21/2
58/6 114/25
**statement [15]**
37/21 37/24 65/21
65/25 68/23 74/17

75/7 77/2 77/3
77/4 77/6 79/21
79/24 80/5 80/20
**statements [25]**
34/12 34/17 34/22
65/5 65/19 66/16
67/8 72/4 72/25
73/5 76/1 76/6
76/11 76/13 77/18
78/3 90/17 93/13
93/18 105/2
120/20 122/22
122/24 123/17
136/20
**states [12]** 1/1
1/3 1/9 3/4 3/9
21/25 33/15 33/17
58/5 114/1 118/10
127/11
**stating [2]** 132/2
132/4
**statute [73]** 11/9
34/12 34/15 34/16
34/17 34/18 34/23
35/9 35/12 36/10
38/21 39/10 41/6
42/4 42/18 47/9
50/12 52/18 53/1
53/4 55/11 55/17
56/11 56/13 57/5
57/14 60/4 60/15
60/22 61/7 62/4
63/12 63/21 64/5
65/22 66/10 67/4
67/5 71/16 71/20
71/22 72/1 72/2
72/8 72/15 77/15
77/17 78/10 97/24
102/13 105/4
105/4 105/16
105/25 106/6
106/11 106/21
107/3 107/6 110/8
110/10 110/11
110/15 110/22
111/4 125/24
128/3 128/6 128/7
128/14 128/15
128/22 128/23
**statute's [2]**
77/19 104/24
**statutes [1]** 111/9
**statutory [1]**
111/7

**S**

**stenotype [1]** 2/7
**step [6]** 17/9 25/1
25/12 30/19 32/8
34/20
**STEPHEN [3]** 1/6
3/4 14/20
**steps [2]** 25/4
132/24
**Steven [1]** 41/4
**still [11]** 9/23 33/8
50/15 53/14 73/4
76/11 94/8 95/17
97/5 105/13
117/12
**stipulate [1]** 93/5
**stipulation [1]**
93/9
**stops [1]** 24/20
**story [1]** 126/19
**straight [1]** 27/7
**straightforward
[2]** 15/21 33/4
**Street [2]** 1/14
1/20
**stretch [1]** 124/8
**strict [1]** 4/13
**strictly [1]** 5/20
**strictures [1]**
119/20
**string [1]** 41/9
**strong [1]** 9/9
**stronger [1]** 10/9
**stuck [1]** 62/3
**stuff [2]** 59/16
136/19
**styled [1]** 20/11
**subject [9]** 40/13
51/21 51/22 53/22
59/22 62/6 72/16
102/9 102/14
**subjected [2]**
33/21 34/11
**subjecting [1]**
33/10
**submission [1]**
142/17
**subordinate [1]**
51/23
**subordinates [2]**
42/5 42/13
**subpoena [93]**
6/4 9/4 9/11 9/16
12/2 15/2 16/10

16/11 16/20 16/20
16/22 17/10 17/11
17/13 17/14 17/24
25/2 26/25 27/10
28/6 28/11 28/23
29/19 38/2 38/2
39/9 39/20 40/15
47/15 47/21 48/2
48/4 48/9 48/17
48/18 61/12 62/17
68/12 69/3 69/5
78/10 79/20 85/1
85/7 85/12 86/6
86/22 87/5 87/24
88/13 88/16 92/19
92/22 93/22
102/20 105/11
106/18 108/1
108/15 109/4
113/14 113/18
116/8 116/11
116/18 116/19
117/7 117/8
117/24 118/16
118/21 118/23
119/3 119/5 119/9
120/2 120/6
120/22 121/9
122/1 122/5 123/1
123/25 124/1
124/3 124/15
124/21 124/22
124/24 125/15
126/25 127/12
127/20
**Subpoena's [1]**
89/22
**subpoenaed [8]**
28/16 73/23 74/22
78/19 98/9 99/19
108/2 119/16
**subpoenas [16]**
17/1 23/10 23/23
27/21 28/19 50/23
86/10 87/25 88/1
88/6 94/24 95/18
100/22 101/5
132/8 137/11
**subsequent [4]**
55/16 57/1 92/23
93/1
**substance [1]**
103/19
**substantial [2]**

7/15 94/9
**substantially [1]**
138/22
**substantive [2]**
13/25 14/4
**substantively [1]**
14/8
**substitute [1]** 6/1
**such [19]** 35/2
35/10 35/11 44/12
57/17 71/19 89/22
114/20 116/6
116/8 121/2
121/12 121/18
124/6 124/9
126/16 127/1
127/2 130/6
**sufficient [3]**
58/19 122/19
128/16
**sufficiently [1]**
97/11
**suggest [6]** 27/23
55/16 61/18 61/22
71/9 128/5
**suggested [2]**
65/12 113/24
**suggesting [2]**
73/8 96/5
**suggestion [1]**
35/6
**suggests [1]**
118/6
**Suite [1]** 1/17
**summarize [1]**
89/17
**summoned [5]**
14/21 77/17
109/20 114/3
117/3
**supersede [1]**
39/24
**supply [1]** 122/7
**support [1]** 21/15
**supports [2]**
113/13 123/6
**suppose [4]**
26/17 110/7
138/17 142/16
**supposed [3]**
14/25 84/2 97/18
**Supreme [16]**
5/18 6/17 7/2 7/6
7/9 34/8 83/17

85/10 86/16 88/19
100/17 105/23
107/6 114/24
115/3 115/22
**sure [8]** 5/1 24/15
29/9 33/2 46/11
69/7 124/7 137/4
**surplusage [1]**
126/24
**surprise [1]**
111/24
**surprised [1]**
105/12
**surrebuttal [1]**
4/6
**Susie [3]** 44/1
44/3 57/20
**suspicion [1]**
26/5
**sweep [1]** 21/18
**system [1]** 12/8

**T**

**tactic [1]** 108/5
**tailend [1]** 141/24
**take [18]** 8/13
32/22 32/23 39/19
43/22 54/2 62/7
62/7 64/16 88/22
88/22 90/19
112/13 113/4
124/12 135/12
140/14 142/6
**taken [7]** 4/8
16/23 17/8 56/12
91/5 132/24 133/9
**takes [2]** 50/8
76/22
**taking [10]** 9/17
26/22 46/22 51/2
109/17 109/18
130/14 132/9
136/15 139/10
**talk [19]** 5/21 5/22
10/2 22/20 31/1
40/5 40/24 43/25
52/2 52/3 56/16
59/4 61/25 62/8
64/2 66/24 76/4
101/21 120/6
**talked [5]** 43/2
68/3 69/2 101/12
137/15
**talking [22]** 11/10

14/10 18/10 29/18
30/14 40/11 40/11
41/20 43/11 43/22
44/14 44/15 54/24
60/25 65/7 66/23
93/17 93/23 128/1
131/10 132/3
136/7
**talks [4]** 52/5 58/1
58/10 102/18
**Tallmadge [1]**
104/14
**tandem [1]**
134/20
**targeting [1]**
129/19
**targets [1]** 128/13
**team [1]** 98/9
**technical [2]**
97/22 136/14
**technique [1]**
24/3
**Ted [5]** 39/15
51/16 56/4 56/5
106/13
**tees [2]** 99/5 99/6
**television [1]**
140/3
**tell [8]** 30/15 32/9
32/11 44/3 56/18
62/21 93/11
124/13
**telling [6]** 30/16
30/18 35/25 36/1
79/25 126/19
**tells [1]** 104/17
**Ten [1]** 112/8
**tend [1]** 127/2
**tenet [1]** 33/6
**term [4]** 15/20
29/17 110/10
117/15
**terms [8]** 6/5 15/2
28/3 30/5 43/4
62/3 76/7 100/21
**test [2]** 24/15
103/5
**testified [4]** 19/2
28/21 28/25 118/8
**testify [18]** 18/7
19/15 28/16 29/2
36/24 58/21 62/11
69/10 70/5 70/6
70/7 70/15 70/16

# T

**testify... [5]** 81/1
98/12 109/22
118/11 129/13
**testifying [5]**
18/11 29/20 72/12
116/15 137/21
**testimony [20]**
18/14 49/12 50/24
64/18 73/23 78/12
79/7 95/19 103/11
104/13 114/4
117/14 119/16
120/18 123/20
124/21 124/23
125/3 125/16
127/1
**testimony.' [1]**
43/1
**than [19]** 12/13
15/7 29/11 36/22
61/15 65/14 65/16
67/8 70/14 82/24
85/17 98/17 100/4
112/4 114/10
124/8 126/24
127/16 134/23
**thank [31]** 3/15
5/13 27/18 30/8
30/9 38/8 38/10
38/11 38/15 38/16
67/20 67/21 68/1
70/18 70/19 89/15
91/17 100/1
101/17 101/18
108/6 108/7 108/7
112/1 112/2 112/3
112/20 112/21
136/22 140/25
142/21
**Thanks [1]**
142/20
**that [856]**
**that's [128]** 3/13
4/10 5/21 6/10
10/1 10/23 12/20
12/24 14/22 17/7
19/9 19/12 21/5
21/22 21/22 22/2
26/12 27/17 27/25
28/2 28/14 29/9
29/16 29/21 31/8
32/20 33/13 33/15
33/15 33/16 33/23

33/24 34/18 34/25
35/15 36/15 36/16
38/22 41/10 41/25
43/2 43/9 43/25
44/6 44/7 47/24
48/20 50/6 51/6
51/14 51/15 51/23
51/25 52/15 54/10
54/21 56/3 57/10
57/18 58/17 61/9
61/14 64/9 64/9
64/24 65/2 66/1
67/6 70/1 70/17
70/18 70/23 71/20
72/10 72/14 73/5
75/21 75/23 76/9
76/16 79/6 79/15
79/23 80/9 81/21
81/22 83/12 85/2
86/19 87/10 90/24
91/6 92/19 93/15
93/20 94/1 98/13
98/23 100/10
100/23 102/5
103/1 104/13
105/15 105/18
106/4 106/8
106/12 108/18
108/21 109/18
109/20 109/25
110/2 111/16
111/25 113/3
115/3 116/6
119/24 126/3
134/11 134/13
135/24 136/23
141/13 141/24
142/19
**their [34]** 5/7
10/22 12/2 12/6
19/23 20/23 25/21
26/19 26/24 27/2
31/2 31/13 38/18
47/15 65/16 66/9
72/4 76/7 84/11
84/12 84/12 90/17
93/15 100/11
100/13 103/18
105/13 105/17
133/19 135/10
135/14 135/14
138/6 139/17
**them [37]** 4/10
11/1 12/23 14/16

17/17 24/20 26/6
26/17 27/3 27/12
30/24 32/7 40/24
41/18 46/15 62/10
62/20 63/4 66/5
72/12 72/13 72/17
75/22 76/19 76/24
76/25 76/25 77/25
77/25 84/20 84/21
84/21 98/10
114/12 134/2
135/6 142/12
**then [77]** 3/18
3/24 4/3 4/5 5/6
5/23 9/22 13/16
14/5 14/8 17/8
17/9 21/1 22/17
22/20 23/17 23/23
33/21 38/4 38/24
40/7 40/16 47/5
47/6 47/11 49/23
50/7 50/9 50/10
50/23 51/1 51/17
52/13 53/3 53/7
56/16 57/21 58/5
61/16 61/23 64/5
65/20 72/22 75/22
76/3 78/23 80/7
83/4 86/5 88/24
92/1 94/7 100/2
104/5 106/5
106/10 107/23
108/16 109/1
109/15 109/22
110/13 111/14
112/24 120/22
130/11 134/9
134/23 135/2
135/9 135/22
138/7 138/12
138/17 140/10
141/12 142/15
**theory [3]** 96/5
96/5 137/13
**there [112]** 6/3
6/11 6/15 6/20
7/12 7/13 7/13
7/23 10/6 15/12
16/2 16/19 18/5
18/17 24/14 25/7
25/15 26/13 31/6
31/12 35/24 36/10
37/10 40/22 40/25
44/17 44/18 48/5

48/13 49/10 50/17
51/4 51/10 52/25
57/11 58/19 59/11
61/3 62/20 62/21
63/10 65/4 66/15
69/5 71/9 72/11
72/23 73/6 73/13
75/6 76/4 77/11
78/21 79/10 79/12
79/16 79/22 80/6
80/14 80/17 82/22
83/10 83/25 84/2
84/5 84/20 86/9
86/10 86/18 87/1
88/13 90/23 91/21
92/17 93/11 94/4
94/4 94/7 94/25
97/18 102/10
102/18 103/9
104/1 105/2
106/18 106/25
107/17 107/18
107/22 108/21
114/2 114/10
115/22 117/2
119/15 120/1
124/13 125/3
125/5 125/14
125/17 128/4
128/10 130/13
131/7 131/7 132/6
133/7 137/9 138/1
140/1
**there's [48]** 6/9
7/10 10/14 14/6
14/6 17/10 19/7
23/18 32/13 34/3
34/3 37/17 39/23
41/24 48/14 49/11
50/2 54/8 56/20
60/19 65/3 69/23
74/8 74/16 75/2
76/1 76/5 78/3
78/25 79/4 79/24
82/9 91/14 91/22
91/23 93/6 94/4
94/20 94/22 95/3
95/12 99/20
100/24 101/5
103/8 104/23
111/15 111/23
**thereafter [1]**
135/3
**thereby [1]** 42/14

**therefore [6]** 60/1
60/21 72/5 84/9
87/7 103/15
**these [71]** 10/17
17/16 21/23 27/1
37/16 38/5 40/1
40/16 40/21 45/8
46/9 46/10 47/1
47/3 48/11 51/15
51/25 52/24 53/16
54/6 54/7 60/9
62/24 64/2 67/3
67/7 69/12 69/22
72/6 76/6 76/23
80/20 81/8 81/18
82/21 83/3 84/18
87/12 88/17 89/17
90/6 91/16 93/5
94/18 97/20
102/11 103/3
104/17 107/22
112/14 119/24
120/19 123/8
123/12 123/15
125/6 125/9
125/20 130/9
130/11 130/15
130/17 131/16
132/24 133/13
133/21 133/23
137/14 141/18
142/6 142/10
**thesis [1]** 38/25
**they [131]** 4/16
7/21 12/1 12/6
12/23 13/5 14/6
15/7 16/16 18/7
19/23 20/18 21/1
21/2 21/20 21/20
22/8 22/8 24/19
24/19 24/20 24/21
25/20 25/21 26/14
26/18 26/19 26/23
26/24 27/3 27/3
27/4 27/7 27/14
31/15 34/20 34/24
35/22 36/6 36/8
38/5 41/16 41/18
41/19 43/4 43/22
44/11 44/14 46/16
46/16 48/16 49/13
49/14 49/14 49/18
51/3 51/15 51/16
51/25 52/2 52/3

175

# T

**they... [70]** 52/9
52/13 52/14 52/14
52/16 52/22 52/23
52/24 54/9 54/12
58/9 59/23 60/13
62/25 63/15 64/13
65/19 66/4 66/5
66/9 68/25 69/25
70/14 72/12 72/15
72/17 72/18 78/15
78/21 80/14 80/15
80/19 83/4 84/14
84/22 85/11 87/6
87/13 87/18 87/20
87/20 87/23 89/22
90/16 91/12 93/14
94/10 94/24 96/23
98/11 102/22
103/10 103/11
103/12 103/13
104/17 104/18
104/18 105/18
107/17 107/19
108/1 108/3 108/3
108/4 109/1
109/23 109/23
124/8 138/5

**they'd [2]** 103/1
135/21

**they'll [1]** 24/6

**they're [17]** 16/4
20/13 20/16 24/6
35/23 39/3 40/6
56/2 60/12 60/12
65/13 65/17 66/4
76/2 88/18 103/2
109/22

**they've [7]** 10/25
18/2 18/3 24/21
25/20 25/21 66/13

**thing [14]** 10/20
19/17 42/17 59/11
68/16 95/25 98/19
100/5 100/19
105/6 107/9
138/24 141/17
141/19

**things [18]** 5/24
10/17 13/10 32/3
40/11 52/19 52/24
62/14 66/7 86/19
89/19 89/20 93/6
103/3 134/7 140/6

140/6 140/8
**think [98]** 4/1
5/11 5/16 7/22
9/13 9/14 10/8
13/6 14/12 15/7
15/14 17/1 18/2
18/11 18/18 18/24
19/9 19/10 19/12
19/13 20/10 22/6
22/13 23/1 23/14
25/13 26/19 26/23
29/1 29/23 30/24
31/1 31/20 33/7
39/18 44/18 45/10
46/10 48/11 50/2
59/13 63/3 63/6
63/14 65/11 66/6
66/18 67/14 71/5
71/14 71/15 72/1
75/14 78/6 80/13
84/4 84/6 85/3
85/15 86/15 87/10
90/12 90/16 90/24
91/7 91/12 99/24
100/11 100/19
101/7 101/14
101/14 106/15
130/15 131/7
131/7 132/15
133/12 133/20
133/22 133/24
134/22 135/4
135/11 135/16
135/17 135/25
136/8 136/20
137/2 137/14
137/24 138/1
138/5 138/12
140/18 140/20
141/7
**thinking [4]** 28/22
47/14 133/12
141/3
**thinks [3]** 38/3
43/23 134/23
**Third [4]** 1/23
80/14 85/9 85/10
**Thirteen [1]** 6/11
**Thirty [1]** 112/6
**this [231]**
**THOMPSON [4]**
1/20 39/23 119/25
120/24
**Thompson's [1]**

107/20
**those [61]** 5/24
6/22 8/7 8/10 8/13
8/14 11/1 12/9
12/24 13/2 18/8
18/9 18/18 22/3
22/7 25/24 28/22
40/11 53/22 54/18
56/1 60/20 61/4
72/23 73/5 76/19
78/11 79/18 79/19
84/17 86/12 87/3
87/14 88/19 90/13
91/4 91/7 97/20
99/19 108/17
114/11 115/9
118/12 118/15
120/20 121/3
122/23 123/6
130/2 131/16
131/23 132/10
134/19 134/20
136/17 136/21
138/8 139/7 140/8
142/5 142/9
**though [8]** 7/4
26/19 32/8 72/15
75/6 114/25
127/15 137/3
**thought [9]** 19/22
31/16 73/2 81/18
83/8 97/17 105/7
108/1 139/10
**thoughts [2]**
112/14 136/16
**threads [1]** 45/2
**threat [2]** 38/6
55/22
**three [6]** 23/4
28/25 30/2 68/25
69/2 73/2
**threshold [3]**
72/24 77/24 81/3
**through [15]**
17/17 18/11 28/8
28/19 32/22 34/12
53/24 63/4 78/20
84/11 93/22 97/20
100/20 102/20
115/15
**throughout [1]**
49/23
**thus [12]** 113/11
114/1 114/6 117/1

117/6 117/24
119/1 120/22
122/8 123/2 124/5
125/17
**tie [1]** 46/9
**tied [1]** 40/5
**tight [1]** 33/1
**time [34]** 4/8 4/13
6/8 6/8 8/16 13/4
18/4 24/21 24/23
29/1 30/3 31/24
45/5 50/5 61/18
64/23 65/6 65/9
73/12 73/23 74/6
74/21 76/13 82/16
86/11 87/19 88/22
93/23 101/21
102/14 124/1
126/4 132/20
132/23
**times [6]** 10/22
28/25 30/2 100/6
115/15 118/4
**timing [2]** 95/18
97/6
**Tired [1]** 67/22
**title [2]** 88/14
89/20
**today [6]** 27/14
68/25 123/14
126/6 132/3 139/9
**together [6]** 32/7
46/10 131/24
131/25 139/8
141/10
**told [14]** 31/6
51/21 72/4 72/8
72/12 76/24 76/24
76/25 77/1 77/25
81/13 83/13 93/16
99/18
**toll [3]** 92/15
132/14 136/16
**tolls [1]** 93/10
**tomorrow [1]**
74/22
**tomorrow.' [1]**
120/17
**too [2]** 65/12
141/13
**took [2]** 43/6
112/22
**top [2]** 47/4 79/12
**topic [1]** 23/6

**topics [7]** 3/22
23/4 47/15 47/20
120/23 125/14
131/16
**total [2]** 108/15
109/13
**totally [1]** 21/17
**touch [2]** 24/15
24/19
**touched [2]** 24/21
25/6
**toward [1]** 129/3
**towards [1]** 62/13
**track [1]** 139/21
**transcript [3]** 1/8
2/7 143/5
**transcription [1]**
2/7
**transgress [1]**
34/15
**Transport [1]**
80/14
**trash [2]** 80/16
80/18
**treated [1]** 129/25
**trial [33]** 19/6
25/11 25/11 29/6
29/18 29/23 36/20
36/21 51/24 71/6
82/22 82/22 88/10
92/10 95/12 98/4
98/7 98/23 98/25
99/3 100/23
100/25 104/5
108/16 110/4
111/24 113/6
130/3 132/3 133/5
138/10 140/2
140/11
**tricking [1]** 75/19
**tried [1]** 25/20
**triggered [1]**
32/19
**triggering [3]**
43/9 45/19 67/6
**true [6]** 10/23
35/15 66/7 116/22
116/22 143/4
**Trump [14]** 35/18
36/12 36/13 36/22
37/18 38/3 38/4
38/13 39/23 68/5
68/10 119/25
124/14 127/19

**T**

**Trump's [4]** 37/2 124/17 124/25 125/4

**truth [1]** 114/9

**try [3]** 21/18 26/7 134/15

**trying [8]** 25/4 27/15 27/23 27/23 28/1 107/25 109/6 139/22

**turn [15]** 22/12 26/7 52/14 52/14 62/14 66/22 79/1 79/2 79/5 83/19 91/18 94/17 94/17 95/14 126/20

**turned [1]** 25/18

**turning [2]** 75/22 91/18

**twist [1]** 33/18

**two [29]** 5/4 5/24 15/20 19/18 20/3 20/6 20/11 20/18 20/22 21/7 30/23 32/3 35/13 36/25 48/1 48/16 52/19 57/14 68/15 68/21 73/19 73/20 74/8 78/7 88/18 91/21 108/9 108/17 123/16

**type [1]** 25/10

**typically [3]** 86/4 135/5 135/9

**U**

**U.S [16]** 1/12 1/13 2/2 12/20 12/24 14/22 17/25 43/20 45/4 46/5 52/5 73/3 100/17 102/17 114/4 125/24

**Uh [4]** 30/8 97/3 109/7 141/22

**Uh-huh [4]** 30/8 97/3 109/7 141/22

**ultra [1]** 54/8

**um [2]** 5/18 86/20

**unable [1]** 117/13

**unambiguous [3]** 13/16 86/9 125/11

**unambiguously [1]** 125/6

**unauthorized [1]** 16/24

**unbelievable [1]** 27/13

**unconstitutional [9]** 34/18 48/5 48/19 62/18 118/22 118/24 125/25 126/13 127/25

**unconstitutionall y [5]** 34/16 126/15 126/18 128/8 129/6

**undefined [1]** 34/14

**under [47]** 9/1 15/25 21/7 22/3 39/21 42/10 50/12 53/1 53/22 71/16 72/15 73/23 76/15 78/10 80/4 83/13 84/9 84/16 85/7 85/12 88/8 90/16 90/16 91/12 92/4 92/5 96/6 98/3 98/16 98/17 98/25 99/11 103/24 105/16 106/17 114/5 114/7 116/5 117/4 119/17 127/22 129/15 130/15 132/10 133/10 136/15 139/11

**undercut [1]** 66/20

**underlie [1]** 60/2

**underlying [2]** 67/3 103/2

**undermine [1]** 102/24

**understand [27]** 7/7 8/20 27/7 27/14 31/14 31/21 34/5 45/22 61/9 61/21 63/3 65/4 67/11 81/6 82/18 84/13 90/7 96/18 97/10 109/6 109/14 131/19 137/4 137/7 137/15 139/12 141/14

**understanding [6]** 7/13 31/4 91/3 100/21 103/1 120/8

**understands [2]** 65/15 130/17

**understood [3]** 10/1 20/15 40/3

**undisputed [3]** 92/18 127/19 135/7

**unduly [2]** 4/16 55/23

**unequivocally [3]** 123/19 124/14 124/16

**unilaterally [1]** 88/1

**unique [2]** 17/10 67/9

**unit [1]** 58/13

**UNITED [9]** 1/1 1/3 1/9 3/4 3/9 33/15 33/16 58/5 127/11

**units [1]** 58/12

**unlawful [6]** 16/12 16/24 17/11 34/21 35/12 111/10

**unless [12]** 8/20 17/8 17/10 18/7 26/12 69/10 89/24 99/25 107/21 114/1 118/11 119/14

**unlikely [1]** 132/14

**unprivileged [1]** 122/12

**unquote [1]** 73/10

**unreasonable [2]** 114/16 114/18

**unrelated [1]** 31/5

**unseemly [1]** 58/3

**until [4]** 101/2 131/15 131/22 141/8

**unusual [2]** 21/23 68/17

**up [43]** 4/8 4/22 6/21 18/14 19/4 24/13 30/19 31/16

32/8 44/10 51/1 51/2 62/23 68/2 69/15 69/15 70/1 70/22 74/9 74/14 74/23 79/8 79/11 80/25 82/4 83/7 83/9 96/3 96/8 99/5 99/6 104/22 105/15 107/10 108/24 113/4 118/14 118/16 133/25 134/5 140/14 140/21 142/6

**update [1]** 49/14

**upon [4]** 18/21 114/4 117/4 126/25

**upset [1]** 94/10

**us [9]** 25/25 28/24 35/4 93/16 99/18 101/3 113/1 130/16 131/21

**use [19]** 7/5 13/9 14/5 36/10 38/20 43/4 48/18 51/14 52/17 65/13 69/8 92/8 93/8 93/10 93/13 105/1 114/22 115/1 129/23

**used [8]** 6/6 7/9 9/7 29/17 50/10 108/3 110/10 119/5

**uses [1]** 115/4

**using [2]** 24/2 94/25

**usually [1]** 114/23

**usurp [1]** 118/24

**usurping [1]** 11/17

**V**

**vacancies [2]** 85/18 85/18

**vague [7]** 34/14 34/16 34/23 72/2 128/10 128/10 129/6

**vagueness [6]** 33/22 126/18 128/8 128/13 128/13 128/24

**valid [13]** 12/2 15/5 36/6 39/10 46/15 52/16 57/20 59/9 59/9 67/1 119/24 120/2 129/21

**validity [1]** 122/10

**validly [8]** 9/5 9/12 9/16 15/2 17/6 85/1 117/25 119/9

**various [4]** 84/12 115/21 131/5 133/15

**VAUGHN [8]** 1/12 3/9 70/21 89/4 108/8 112/3 134/3 141/1

**verse [1]** 40/21

**version [1]** 72/7

**versions [1]** 10/7

**versus [10]** 13/14 33/15 33/16 33/17 33/23 34/9 39/22 39/23 114/25 119/25

**very [26]** 4/6 4/9 5/10 9/9 10/20 10/20 23/7 26/4 27/8 27/8 35/6 64/20 68/2 94/12 97/21 100/2 100/3 101/17 103/12 106/9 132/18 133/12 136/14 136/18 137/23 138/15

**veto [1]** 127/14

**Vice [1]** 117/22

**videotape [1]** 68/18

**view [49]** 7/20 8/15 8/15 10/22 14/15 15/13 17/5 17/11 17/12 20/2 22/4 26/18 29/3 30/20 31/9 51/6 53/16 54/21 61/18 65/20 65/21 67/7 67/8 72/6 75/2 75/13 77/21 84/14 89/17 90/4 90/7 90/8 99/5 99/7 99/8 100/21 118/4

**V**

**view...** [12]
122/19 123/21
125/10 127/15
129/5 130/2 131/6
133/19 134/3
134/19 134/25
137/8
**viewed** [2] 25/21
101/15
**views** [5] 73/24
135/10 135/15
139/17 140/19
**vigorously** [1]
38/4
**vindicate** [2]
58/14 87/14
**vindicated** [2]
88/9 89/21
**violate** [4] 19/4
33/10 53/4 57/17
**violated** [2] 19/8
116/12
**violates** [6] 33/21
33/22 106/11
107/12 126/14
127/7
**violation** [5] 6/23
34/21 39/1 95/3
107/2
**violence** [1]
121/3
**vis** [2] 34/22
34/22
**voice** [1] 67/22
**void** [5] 33/22
48/5 126/18 128/8
128/24
**voir** [2] 134/6
134/11
**voluntary** [1] 95/1
**vote** [3] 7/23 8/19
21/21
**voted** [5] 7/12
7/23 7/24 8/13
8/13
**vs** [2] 1/5 3/4

**W**

**wait** [2] 92/25
140/11
**waiting** [1] 141/8
**waive** [4] 17/20
18/1 87/20 94/16

**waived** [4] 17/16
84/19 88/17 89/18
**waiver** [2] 23/18
88/7
**waiving** [1] 62/15
**walk** [1] 17/17
**Walter** [1] 42/16
**want** [34] 4/14
4/15 5/23 15/19
19/17 32/8 32/10
36/11 36/20 37/20
37/24 41/3 45/17
46/16 46/16 49/4
53/25 55/7 59/16
62/24 64/10 72/8
74/4 75/1 95/6
98/13 137/3
137/14 138/15
139/7 139/24
140/9 141/19
142/3
**wanted** [9] 36/7
70/18 100/5 101/7
103/10 103/13
103/13 110/18
112/23
**wants** [5] 37/4
43/25 44/2 87/14
93/5
**warning** [1] 34/15
**warrant** [1]
122/19
**warranted** [8] 4/6
53/14 114/21
116/9 124/10
130/6 139/1
139/10
**warrants** [2]
116/15 125/22
**was** [172]
**Washington** [3]
1/5 1/14 2/4
**wasn't** [9] 8/18
53/14 58/19 69/24
70/7 70/8 80/19
94/4 102/15
**way** [37] 9/14
13/24 14/13 15/25
19/14 34/1 34/8
34/17 38/17 43/19
49/5 49/10 54/14
62/12 62/15 64/10
67/7 79/20 80/17
81/19 81/19 87/17

96/2 97/17 97/21
98/20 102/16
103/5 106/8
106/13 109/5
111/11 112/24
127/20 128/9
130/10 133/10
**we** [159]
**we'd** [1] 98/8
**we'll** [6] 5/4 22/13
30/20 38/18 59/17
142/18
**we're** [26] 4/22
5/21 11/16 11/21
13/17 14/10 21/1
21/22 27/15 27/23
28/1 29/18 30/1
30/14 41/20 43/8
54/17 54/17 60/25
65/7 74/18 94/24
106/3 109/18
140/2 141/14
**we've** [9] 13/17
23/17 26/9 37/17
96/6 101/12 106/5
132/3 139/25
**weakens** [1] 57/2
**weapon** [1] 94/18
**wedge** [1] 24/12
**week** [2] 135/18
135/23
**weight** [1] 115/8
**well** [56] 5/10
6/13 6/20 10/13
10/24 11/8 12/17
14/17 15/3 15/23
17/19 17/19 18/12
19/25 20/7 24/9
25/17 27/15 28/24
29/16 31/8 32/3
35/21 36/24 37/12
37/16 44/8 44/11
44/14 46/13 54/8
62/13 64/6 64/20
66/6 70/15 73/19
83/20 84/21 87/23
91/7 91/13 98/4
98/23 98/24 100/3
104/23 107/21
109/12 116/13
117/15 117/24
121/19 133/5
138/21 141/3
**well-defined** [1]

117/15
**went** [1] 28/19
**were** [50] 6/11
7/13 8/4 8/8 8/10
10/17 13/22 15/12
21/23 27/24 28/21
50/4 50/14 54/24
57/14 59/22 61/1
64/23 68/25 72/11
72/15 72/17 73/5
73/8 73/9 76/3
79/21 80/15 80/19
83/25 84/2 84/5
84/20 86/10 87/3
93/22 94/24 95/1
97/4 97/11 98/1
104/1 106/21
108/25 109/1
109/2 109/10
110/14 136/7
141/3
**weren't** [1] 52/6
**west** [2] 54/16
80/13
**what** [141] 3/24
5/4 5/21 6/10 6/20
11/3 11/18 11/22
12/8 12/22 13/6
13/17 13/19 13/21
15/23 19/12 21/5
22/13 22/23 23/20
25/15 25/19 26/12
26/13 28/1 28/1
28/4 28/5 28/7
28/14 28/14 29/9
30/3 30/6 30/20
31/1 32/20 33/9
34/5 34/8 34/15
37/1 37/5 37/21
37/24 38/3 41/19
41/25 44/1 44/3
45/1 45/18 46/24
48/7 48/14 49/6
51/3 51/25 56/3
56/18 58/25 59/18
60/11 62/14 64/6
65/13 65/20 70/12
71/5 72/10 72/25
73/5 73/17 74/11
75/2 75/23 76/10
76/25 77/22 77/24
80/9 81/11 81/12
81/13 82/11 83/6
84/5 85/5 85/23

86/1 86/3 91/13
92/6 92/13 92/25
93/12 93/16 96/1
96/16 96/19 97/14
99/12 103/19
105/1 105/15
106/13 106/24
110/7 125/19
126/21 127/18
128/16 128/25
129/12 130/20
131/1 131/4
131/16 132/4
133/14 133/14
133/18 133/23
134/15 134/17
134/18 135/5
137/16 138/5
138/7 138/8 138/9
138/13 138/15
138/16 139/22
139/23 140/6
140/18 141/19
141/20
**what's** [13] 6/14
11/2 12/15 19/15
22/4 22/7 24/8
25/9 29/18 32/4
67/9 77/10 78/4
**whatever** [9]
28/11 29/4 29/16
29/17 54/16 77/12
83/2 106/2 111/7
**whatsoever** [3]
122/8 125/7 128/6
**when** [50] 7/12
8/7 10/14 12/6
13/16 15/14 19/18
19/22 20/21 21/21
28/6 28/7 28/22
29/25 32/19 34/9
34/22 35/8 35/10
38/21 39/8 43/12
43/13 44/16 44/22
52/15 58/9 69/14
72/18 75/1 76/8
78/8 85/15 85/16
97/16 97/18 98/8
98/10 99/18
102/22 116/22
119/8 119/11
135/4 135/11
136/7 137/14
140/21 141/24

**W**

**when... [1]** 142/5
**whenever [2]**
26/10 59/23
**where [34]** 6/9
6/17 6/18 7/9 18/2
21/7 21/17 25/9
27/4 33/3 41/23
43/25 44/15 48/9
58/3 58/11 70/23
72/20 79/13 83/3
84/13 84/15 87/10
87/16 87/19 90/10
96/14 99/15
110/15 112/14
124/19 128/1
130/25 133/20
**whether [72]** 9/11
11/3 12/23 14/2
14/8 15/16 20/7
20/19 20/21 32/15
33/20 34/10 34/10
35/17 39/24 40/12
46/1 46/3 47/11
50/7 53/2 55/20
56/1 57/18 58/20
59/8 59/12 61/8
61/11 61/12 64/11
75/12 75/13 76/23
76/23 78/3 82/21
85/6 85/11 85/13
86/23 87/4 87/17
90/4 91/22 91/23
96/15 103/2
103/17 104/19
105/2 105/3 105/8
105/20 106/25
108/20 108/24
109/25 111/18
113/9 117/10
122/8 124/14
126/7 131/12
131/12 131/18
132/17 133/19
138/9 138/25
139/4
**which [58]** 3/18
8/21 9/7 11/25
12/18 12/21 18/25
20/17 20/19 25/13
25/19 29/5 34/13
34/25 37/10 41/1
45/4 47/6 50/16
51/21 56/4 60/17

61/2 63/5 65/25
69/5 69/13 72/8
72/11 73/23 76/11
76/12 77/19 77/24
78/21 83/14 85/7
85/9 91/4 95/1
95/19 97/21 102/4
104/2 106/24
111/16 114/13
116/20 123/10
123/17 124/18
125/12 125/19
126/6 127/16
131/25 132/12
136/16
**while [4]** 79/16
114/10 131/6
131/19
**whip [2]** 20/5
21/25
**white [7]** 1/20
3/13 25/25 64/12
64/17 79/9 80/25
**who [37]** 6/1
17/12 25/25 31/23
36/23 41/8 41/23
42/5 43/11 47/5
50/4 51/21 55/13
55/18 56/14 57/6
60/16 61/16 61/23
63/8 63/16 64/17
64/18 64/23 65/5
65/8 66/22 66/24
74/3 76/3 104/16
106/20 114/16
117/21 121/3
122/25 124/1
**who's [2]** 43/18
61/23
**whoever [1]**
39/20
**whole [4]** 11/7
75/18 76/6 83/21
**whom [1]** 113/21
**why [38]** 8/6 8/15
8/15 12/15 14/3
14/14 19/11 21/22
21/22 25/24 29/16
30/15 30/17 30/18
32/9 32/11 33/4
39/12 44/6 44/7
51/15 52/23 52/24
59/4 61/2 66/1
70/10 81/7 81/15

81/16 81/24 97/9
102/19 104/18
120/6 126/10
129/5 138/16
**wiggle [1]** 7/8
**wilfulness [1]**
97/1
**will [40]** 4/3 4/4
28/12 28/13 29/10
32/5 32/23 43/4
44/19 45/7 46/4
54/13 74/18 96/19
114/13 114/24
115/2 128/19
129/22 130/11
130/14 130/21
131/2 131/17
131/22 132/2
132/14 133/4
133/7 133/14
135/6 137/17
138/7 138/9 138/9
140/14 140/14
140/19 140/19
142/4
**Willard [2]** 79/4
120/11
**willful [4]** 89/7
89/7 107/2 110/15
**willfully [8]** 28/10
28/12 81/18
110/11 110/12
126/9 131/2
131/12
**willfulness [2]**
53/5 111/9
**Williams [1]**
33/15
**wished [2]** 16/15
120/6
**withdrawn [1]**
56/8
**withheld [4]**
100/10 121/10
121/18 122/12
**within [14]** 34/17
71/20 71/23 73/9
74/10 75/9 75/12
75/13 78/20 80/6
82/25 86/6 120/19
129/8
**without [9]** 26/4
34/3 62/14 80/4
84/8 95/10 99/21

104/14 107/17
**witness [21]**
10/13 10/14 14/21
18/7 18/20 25/19
25/23 26/7 69/9
69/10 70/1 86/19
87/14 87/16 92/3
109/20 114/3
117/3 118/10
118/11 126/25
**witnesses [4]**
10/19 93/14 101/3
101/4
**witnesses' [1]**
87/13
**won [1]** 31/17
**won't [1]** 75/21
**word [11]** 6/6
6/24 60/8 77/16
77/16 84/7 89/7
114/23 115/5
115/20 129/5
**wording [1]** 82/12
**words [9]** 14/4
15/21 18/22 27/12
28/10 55/6 65/14
73/11 78/2
**work [8]** 25/25
58/22 62/10 90/21
121/4 129/3
140/22 141/15
**working [2]**
102/15 139/15
**works [2]** 54/10
128/16
**world [1]** 31/18
**worry [1]** 22/6
**worst [1]** 61/15
**would [150]**
**wouldn't [14]**
6/22 7/20 9/17
9/22 11/14 15/6
88/7 90/21 93/8
97/9 98/4 99/2
105/14 109/12
**wrap [2]** 62/23
104/22
**writers [2]** 7/4
115/1
**writes [4]** 35/25
38/1 57/22 58/5
**writings [3]** 54/15
131/11 132/8
**written [3]** 59/1

76/2 121/10
**wrong [4]** 26/18
44/1 107/11 110/5
**wrongdoing [1]**
26/6
**wrote [5]** 31/3
55/10 62/10
105/18 106/14

**Y**

**Yea [1]** 15/10
**yeah [13]** 11/12
17/19 20/1 22/10
27/22 43/15 50/18
56/20 66/18 91/3
111/12 138/23
141/6
**year [1]** 3/4
**years [2]** 26/10
49/15
**Yellin [9]** 12/18
12/20 86/16 86/16
87/10 87/12 87/16
88/8 91/12
**Yep [1]** 65/10
**yes [44]** 5/1 5/3
7/25 16/14 20/15
22/16 22/19 23/5
24/1 35/16 36/14
36/18 37/7 38/10
38/10 38/15 40/25
41/21 48/22 49/8
52/11 53/11 54/1
54/5 55/1 55/3
59/13 75/14 83/22
85/25 90/1 91/20
95/16 99/11
101/20 104/5
110/24 111/1
111/11 134/8
134/10 134/12
136/5 140/15
**yet [6]** 81/13 98/6
130/20 130/24
130/25 131/4
**York [1]** 1/24
**you [210]**
**you'd [3]** 29/24
135/21 135/22
**you're [10]** 4/21
12/6 12/8 13/4
18/10 45/22 45/23
56/18 79/25
108/23

**Y**

**you've [7]**  24/17
27/1 48/9 75/8
100/6 100/19
137/15
**your [115]**  3/3 3/8
3/11 4/20 4/23 5/1
5/3 5/13 5/14 6/1
6/23 8/20 10/4
12/15 15/13 17/5
17/11 17/17 18/25
20/2 24/1 24/13
27/15 29/3 30/11
30/13 30/15 30/16
30/18 35/20 35/23
36/14 36/16 36/18
37/3 37/9 37/16
38/11 38/16 40/25
41/21 42/1 44/24
45/21 45/22 45/24
45/24 46/7 47/2
47/23 48/12 48/25
50/6 50/24 52/8
53/8 53/16 55/3
56/5 62/12 63/5
63/10 64/21 65/2
65/11 66/18 67/20
67/23 68/1 68/3
68/15 69/23 70/20
71/17 72/6 73/16
77/10 79/25 81/6
81/15 88/23 89/5
90/7 90/8 90/19
97/14 98/7 99/8
99/9 100/5 101/20
103/22 103/22
104/17 106/22
108/6 108/9 109/6
109/14 109/23
110/3 110/15
110/24 111/9
112/2 120/18
125/3 134/4
135/21 136/22
138/12 140/15
140/17 140/24
142/20
**yourselves [1]**
3/7

**Z**

**Zelda [1]**  1/17
**zero [1]**  32/13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' OMNIBUS MOTION IN LIMINE**

The question for the jury in this trial is a straightforward one: whether the Defendant, Stephen K. Bannon, deliberately refused to comply with a subpoena issued to him by the Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"). But in his filings, at oral argument, and during press conferences in front of the courthouse, the Defendant has repeatedly sought to inject into this case improper evidence and argument, make incendiary and baseless political attacks, and create a spectacle. To maintain proper order and keep the jury focused on its fact-finding duty, the Court should exclude any such improper evidence and argument at trial.

**I.    The Court Should Preclude the Defendant from Making Arguments, Presenting Evidence, or Questioning Witnesses about Politics, Baseless Government Misconduct Claims, and Other Incendiary and Irrelevant Topics.**

At a press conference in front of the courthouse after the Defendant's initial appearance in this case, defense counsel said of the Select Committee, "this thing was a scam from the beginning," and the Defendant said, "I'm telling you right now, this is going to be the misdemeanor from Hell," and that he was going on "offense." *"Misdemeanor from Hell": Watch Bannon Speak Out After He's Released*, CNN, Nov. 15, 2021.[1] In filings, the Defendant baselessly has accused

_____

[1] *Available at* http://www.youtube.com/watch?v=-diE7kCCidE (last accessed June 17, 2022).

the Government of misconduct and intimidation and has asserted, without support, that the prosecution is politically motivated. *See, e.g.*, ECF No. 34 at 4, 11 (claiming "outrageous misconduct by the Government . . . designed to intimidate and chill the attorney-client relationship" and asserting that the Government is "motived by a dangerous, politically motivated and misguided overzealousness"). As recently as this Wednesday, at another courthouse press conference following a motions hearing before the Court, the Defendant expressed interest in turning his trial into a political spectacle, referring to Members of Congress using derogatory nicknames, and saying, "I look forward to having Nancy Pelosi, and little Jamie Raskin, and shifty Schiff in here at trial answering questions under my . . . under the . . . tough thing about my lawyers." *Judge Rejects Bannon's Effort to Dismiss Criminal Case for Defying Jan. 6 Select Committee*, Politico, June 15, 2022.[2]

"[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.'" *United States v. Young*, 470 U.S. 1, 10 (1985) (quoting *Quercia v. United States,* 289 U.S. 466, 469 (1933)). Accordingly, the Court has broad discretion and authority to prevent a circus atmosphere at trial and must exclude improper evidence and argument that would create it. *See United States v. Morgan*, 581 F.2d 933, 936 (D.C. Cir. 1978) ("The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality"); *United States v. Tarantino*, 846 F.2d 1384, 1410 (D.C. Cir. 1988) (noting that a defendant could not introduce evidence that "bears no relevance to any elements of the crimes charged or to any affirmative defenses to those crimes"). Moreover, the Court must

---

[2] *Available at* http://www.politico.com/news/2022/06/15/judge-rejects-bannons-effort-to-dismiss-criminal-case-for-defying-jan-6-select-committee-00039888 (last accessed June 17, 2022) (video embedded in article).

guard against arguments that seek only to encourage jury nullification. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming trial court's exclusion of evidence relevant only to jury nullification) (citing *Sparf v. United States*, 156 U.S. 51, 106 (1895) (finding that the jury's function to apply the law as declared by the judge to the facts as found by the jury "cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights")); *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) ("[A] juror . . . who commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role."). The Defendant has given every indication he intends to create a circus atmosphere and seek a verdict based on improper nullification considerations instead of the relevant law and facts. His efforts should be rejected and his attempts to raise improper arguments during trial precluded.

### A.    The Defendant should be precluded from making improper arguments that politicize this case.

It should be uncontroversial that partisan politics has no place in a criminal trial. *See United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (identifying claims by defendants that they were victims of political persecution as "matters far beyond the scope of legitimate issues in a criminal trial"). At every turn, however, the Defendant has attempted to make this case and the issues in it about politics, not the law and the facts. His efforts began in his motion to compel discovery. There, he claimed, without support, that "[a]vailable information suggests that political considerations played an impermissible role in the events leading to the prosecution of Mr. Bannon" and requested "any information that tends to show that this prosecution was initiated or pursued because of political considerations." ECF No. 28 at 22-23. At the hearing on his motion, the Court noted that it did not see how a selective prosecution claim would be colorable. *See* Mot. Hrg., 3/16/22, Tr. at 96:1-4 (rejecting Defendant's request for records relating to the Committee's

bias and internal decisionmaking and noting that "[a]t best, it would relate to a selective prosecution claim" and that the Court did not "see how one would be colorable").  The Defendant has continued his baseless assertions anyway.  For example, in his Opposition to the Government's Motion in Limine to Exclude Evidence of Department of Justice Opinion and Writings, the Defendant asserted, again without support, that "[i]f the Government could put aside for a moment that the Defendant is Stephen K. Bannon and its associated political agenda with respect to Mr. Bannon and his followers, perhaps it would see the matter with common sense."  ECF No. 64 at 11; *see also* Def.'s Reply in Support of Mot. to Dismiss, ECF No. 73, at 20 (stating the Government's legal arguments regarding OLC opinions were made "in furtherance of its 'anything goes' misuse of the criminal justice system to advance a partisan political agenda in this case"). The Defendant also has repeatedly raised claims about partisan motives of members of the Committee. *See, e.g.*, Costello Decl., ECF No. 30-1, ¶¶ 19-20 (making claims in sworn statement regarding Reps. Thompson, Raskin, and Schiff and other Members' "partisan political agenda"); Def.'s Mot. to Dismiss, ECF No. 59-1 at 13 n.17 (claiming subpoena did not have a valid legislative purpose, in part, because of individual Members' political motivations).

"[T]he issue of selective prosecution is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged."  *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (internal citations omitted); *see also United States v. Abboud,* 438 F.3d 554, 579 (6th Cir. 2006) ("[T]he defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury.").  The Defendant's repeated and baseless claims that he is the victim of selective prosecution based on his politics is not proper argument for the jury, therefore, and should be excluded.

The political affiliations of Members of Congress and their staff are similarly irrelevant to the issues that will be raised at trial.  Claims about Members' politics were not relevant to any legal issue previously before the Court—*see Barenblatt v. United States*, 360 U.S. 109, 133 (1959); Mot. Hrg., 6/15/22, Tr. at 120:1-4 ("To the extent that Mr. Bannon alleges that there was no valid legislative purpose for his subpoena in particular, I cannot conclude that, as a matter of law, he is correct.")—and they are not relevant to determining whether, despite receiving a subpoena, the Defendant decided not to comply.

In addition, the Government anticipates that Committee staff with relevant testimony may be called as witnesses at trial, either by the Government or by the Defendant.  Should they be called by the Government, the Defendant will have the right to cross-examine them.  But the Court retains broad discretion to properly cabin the Defendant's cross-examinations.  *See Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (finding that the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis in original)); *United States v. Derr,* 990 F.2d 1330, 1334 (D.C. Cir. 1993) ("The Confrontation Clause does not bar a judge from imposing reasonable limits on a defense counsel's inquiries.").  To the extent that the Defendant seeks to cross-examine Committee staff about their personal political affiliations, about the political dynamics of the Committee, to suggest he was subpoenaed or referred for contempt because of improper political motivations, or to otherwise use the opportunity to inject politics into the trial, the Court should not permit him to do so.  None of these issues are relevant to whether the Defendant received a subpoena and defied it but would risk creating an improperly politically charged courtroom.  And separate and apart from their irrelevance to the Defendant's guilt, political affiliations of a Committee staffer—including those indicated by voter registration, the

political party of a Member of Congress for whom the staffer may have worked, or campaign contributions they may have made—are not an indication of bias against the Defendant that would constitute proper grounds for cross-examination in this case.  Bias is a relevant basis for cross-examination to the extent it goes to the witness's credibility, that is, "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Spencer*, 25 F.3d 1105, 1109 (D.C. Cir. 1994) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)) (internal quotation marks omitted). Nothing about the mere political affiliations of the staff of the Committee go to their truthfulness about the facts to which they will testify, such as their service of a subpoena on the Defendant and any ensuing communications with his counsel. *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1180 (11th Cir. 2006) ("Membership in a political party, by itself, does not necessarily signify anything about a person's truthfulness.").  Nor, for that reason, can the Defendant cross-examine witnesses about non-testifying witnesses' potential biases against the Defendant. Witnesses to the crime who do not testify are not providing any evidence to the jury that it must weigh.  Accordingly, their credibility is not at issue in the jury's considerations.  *Abel*, 469 U.S. at 52 ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

Finally, it would likewise be improper for the Defendant to call Members or staff for the sole purpose of questioning them about their biases against the Defendant.  "Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be employed as a mere subterfuge to get before the jury evidence not otherwise admissible." *United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986) (internal quotation marks and citation omitted).

Accordingly, "a witness cannot be called for the primary purpose of impeaching that witness."

*United States v. Libby*, 475 F. Supp. 2d 73, 83 (D.D.C. 2007) (citing *Johnson*, 802 F.2d at 1466);

*see also United States v. Giles*, 246 F.3d 966, 974 (7th Cir. 2001) ("[A] party may not call a witness

for the sole purpose of impeaching him.").  Any effort the Defendant makes to call witnesses

purely to question them about their political affiliations and views should be rejected.

**B.    Claims about government misconduct are not proper issues for the jury to decide.**

The Defendant, without identifying any legal basis for his claims, has repeatedly asserted

that the Government engaged in misconduct in this case by treating his attorney, who spoke on his

behalf to the Committee and an attorney for former President Trump, as the witness he has always

been.  Moreover, the Defendant has asserted that he intends to make his baseless claims of

government misconduct directly to the jury, in an effort to obtain an acquittal.  *See* Def.'s Mot. to

Exclude Evidence, ECF No. 56 at 1 n. 1 ("Any Order precluding the Government from introducing

these materials as evidence, or use in cross-examination, should not preclude the defense from

informing the jury of the Government's misconduct in this case.").  A claim of government

misconduct, however, "is, like a claim of selective prosecution, ultimately separate from the issue

of [a defendant's] factual guilt," and is not, therefore, an issue for the jury.  *United States v. Regan*,

103 F.3d 1072, 1082 (2d Cir. 1997); *see also United States v. Wylie*, 625 F.2d 1371, 1378-79 (9th

Cir. 1980) (holding that "outrageous involvement by the government agents" is a matter for the

court, not the jury).  The Defendant's desire to argue it to the jury anyway demonstrates his

intention to seek a nullified verdict.  He cannot be allowed to do so.

C.    **Should the Defendant's subpoenas to Members and staff of Congress be quashed, he cannot argue at trial that it provides a basis for acquittal or some adverse inference against the Government.**

The Government understands that the Defendant has issued trial subpoenas to various Members and staff of the House of Representatives ("the House"), and that the House has moved to quash them. *See In re Non-Party Subpoenas*, Misc. Case No. 22-mc-60. The House is not a party to this case and, indeed, is a separate branch of government from the prosecution team. Nevertheless, although it is not clear how the dispute between the Defendant and the House will be resolved, to the extent any of the subpoenas are quashed, the Defendant has indicated, in his ceaseless effort to make this case about anything other than the facts and the law, that he should be allowed to use his failure to secure the witnesses' appearances against the Government in this case. *See* "Steve Bannon Digs Into Roger Clemens' Playbook to Try to Beat Congress, *Daily Beast*, June 13, 2022 ("If they don't get the records, Schoen said his team is prepared to ask the judge to simply push back the trial or issue sanctions against the DOJ.").[3] But whether a certain witness was lawfully subject to subpoena under the Speech or Debate Clause or Rule 17's requirements of specificity, relevance, and materiality has nothing to do with the Government party in this case and nothing to do with the facts at issue that the jury must decide. *See United States v. Burnett*, 890 F.2d 1233, 1241 n. 13 (D.C. Cir. 1989) (noting that missing witness arguments are "prohibited if the opposing party did not 'peculiarly' have the power to produce the missing witness or if the missing witness' testimony would not 'elucidate the transaction'" (quoting *United States v. Young*, 463 F.2d 934, 939-40 (D.C. Cir. 1972))). The Defendant should be precluded from making irrelevant arguments about unavailable witnesses and quashed subpoenas at trial.

---

[3]    *Available at* http://www.thedailybeast.com/steve-bannon-digs-into-roger-clemens-playbook-to-try-to-beat-congress (last accessed June 17, 2022).

**D.    Evidence or argument relating to the misdemeanor nature of the charges or potential punishment is improper.**

In his November 15, 2021, press conference, defense counsel described the charges against the Defendant by saying, "It's a misdemeanor, but it's being treated as if it were a capital case." *"Misdemeanor from Hell": Watch Bannon Speak Out After He's Released*, CNN, Nov. 15, 2021.[4] The potential penalties or severity of the charged offenses are irrelevant to guilt and thus inadmissible. *Shannon v. United States,* 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is therefore irrelevant to the jury's task."); *United States v. Wade*, 962 F.3d 1004, 1012 (7th Cir. 2020) (finding arguments aimed at suggesting the charged crime was not serious or harmful were improper nullification claims).  The Defendant should be foreclosed, therefore, from importing his attorney's extrajudicial commentary on the importance or severity of the charges into the trial and suggesting to the jury that his crimes do not matter, that they are misdemeanors, or what the potential punishment would be should he be convicted.

**E.    The Defendant should be precluded from making claims about other individuals who have not been prosecuted for contempt of Congress.**

To the extent that the Defendant seeks to argue that contempt prosecutions are not frequently pursued, or that he has been charged while other individuals referred for contempt have not, he should not be allowed to do so.  Neither of these issues have any bearing on the elements of the contempt charges against the Defendant and are not relevant.  *See United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994) (finding that whether another individual was charged with the same crime as the defendant did "not make the facts relating to [defendant's] knowledge and

---

[4] *Available at* https://www.youtube.com/watch?v=-diE7kCCidE (last accessed June 17, 2022).

participation in the [crime] more or less probable" and affirming exclusion of such argument at trial).

> **F.    Defense counsel should be prohibited from making assertions to the jury based on their claimed experience.**

At various times in this prosecution, counsel to the Defendant have cited their previous experience as supposed evidence that their arguments are correct or are due more weight.  *See, e.g.*, Mot. Hrg., 3/16/2022, Tr. at 67:14-17 (Mr. Costello stated, "I was a federal prosecutor myself. I was Deputy Chief of the criminal division in the Southern District of New York.  I have a lot of experience in this area."); Mot. Hrg., 6/15/22, Tr. at 31:15-19 (Mr. Schoen stated, "With all due respect, the landmark case they cite, this *Abcassis* case, is my case.  I thought up the defense.  I made the defense.  I won the case.").  To the extent the Defendant wishes to cite this experience at trial as some evidence that his assertions regarding the facts and how the law applies to them are due more weight than the jury might give them otherwise, he should be precluded from doing so. *See United States v. Messino,* 873 F. Supp. 1177, 1182 (N.D. Ill. 1995) (finding subject of defense counsel's previous prosecution experience to be irrelevant and excluding it from trial).

**II.    The Defendant Should be Precluded from Presenting Evidence or Argument to the Jury Relating to the Merits of Purely Legal Issues.**

As he left the courthouse on June 15, 2022, after the hearing on his motion to dismiss, the Defendant was asked by the press why he continued to assert that the Committee was illegitimate when the Court rejected his claims at the hearing.  The Defendant responded that he would continue to argue the Committee's legitimacy in court.  *See* "While leaving court, Bannon threatens 'real investigation' of Jan. 6 after midterms," Politico, June 15, 2022.[5]  The Defendant's

---

[5] *Available at* http://www.politico.com/video/2022/06/15/while-leaving-court-bannon-threatens-real-investigation-of-jan-6-after-midterms-613085 (last accessed June 17, 2022).

claims about the Committee's constitutional and statutory validity, however, do not raise factual questions for the jury. Nor do his claims that executive privilege did, in fact, excuse his compliance with the Committee's subpoena. His legal claims on these issues did not have merit when he raised them in his motions to dismiss and they will be no more meritorious by the time of trial. To the extent the Defendant intends to raise the merits of his purely legal claims in front of the jury, it is improper and he should be precluded from doing so.

Federal Rule of Evidence 12(b) provides for courts to decide defenses and objections pretrial that do not require a trial on the merits. The rule further contemplates that courts can engage in fact-finding on such pretrial issues where necessary and where the facts needed to decide a pretrial motion are not "bound up with evidence about the alleged offense itself." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994); *see also* Fed. R. Crim. P. 12(d). Moreover, any defenses that raise purely legal questions are not appropriate to submit to the jury. *United States v. Gaudin*, 515 U.S. 506, 513 (1995) (noting that the jury in a criminal case does not have the power to decide "pure questions of law" (citing *Sparf*, 156 U.S. at 105-06)). Here, the Defendant raised several claims to support his motion to dismiss that involve pure questions of law that do not require this Court to resolve factual issues—even if they did, the factual issues do not go to any element or available defense such that they are bound up with the evidence of the offense itself. These arguments are not, therefore, appropriate fodder for the Defendant's arguments at trial and he should be precluded from raising them again before the jury.

### A.    The Committee's constitutional and statutory legitimacy are not factual questions for the jury.

The Defendant cannot argue to the jury that the Committee is unlawfully constituted— either under the Constitution or its authorizing resolution. Questions relating to the Committee's constitutional authority—specifically, whether the Committee or its actions have a legislative

purpose—is a legal question requiring the court to determine the bounds of Congress's authority to legislate. *See Barenblatt*, 360 U.S. at 111-12 ("The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution. Broad as it is, the power is not, however, without limitations. . . . [T]he Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action."). The bounds of Congress's constitutional authority is not, therefore, a jury question. And the D.C. Circuit has already found that the Committee has a legislative purpose, *Trump v. Thompson*, 20 F.4th 10, 41-42 (D.C. Cir. 2021), which the Defendant has conceded, ECF No. 59-1 at 13 n.16. Now, this Court has also found that, "on its face, the Subpoena . . . appears to have sought information on topics germane to the purposes identified by the Court of Appeals in the *Thompson* case." Mot. Hrg., 6/15/22, Tr. at 120:22-25.

Further, there are no facts that can undermine the legal conclusion based on the *Thompson* decision and the face of the subpoena that the subpoena fell within Congress's constitutional authority to investigate in aid of legislation. For example, the Defendant suggested in his motion to dismiss, ECF No. 59-1 at 13 n.17, and at the June 15 hearing, Mot. Hrg, Tr. at 140:2-7, that the individual motives of Members of Congress or the fact that the Committee's investigation may also reveal criminal conduct invalidates the investigation and the subpoena's legislative purpose. They cannot, as a matter of law. *See Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power. . . . Thus, in stating in the *Watkins* case that 'there is no congressional power to expose for the sake of exposure,' we at the same time declined to inquire into the 'motives of committee members,' and recognized that their 'motives alone

would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.'" (quoting *Watkins v. United States*, 354 U.S. 178, 200 (1957))); *McGrain v. Daugherty*, 273 U.S. 135, 179-80 (1927) ("Nor do we think it a valid objection to the investigation that it might possibly disclose crime or wrongdoing."). The D.C. Circuit has decided the issue of legislative purpose with respect to the Committee and the subpoena on its face is tied to that legislative purpose. The Defendant cannot relitigate the issue before the jury.

In addition, as the Court recognized in deciding the Defendant's motion to dismiss the Indictment, the House has already spoken on the meaning of the rules the Defendant challenges with respect to the number of members on the Committee, the meaning of "ranking minority member," and the requirements for providing Section 3(b) of House Resolution 8. Mot. Hrg., Tr. at 114-18. Although the Defendant has waived these procedural objections by not raising them before the Committee and they cannot, therefore, provide a defense to the charges, *see* ECF Nos. 53 & 71, even if he had not waived them, there is no factual question for the jury relating to these claims such that the Defendant can raise them at trial.[6] Submitting the question of the meaning of House rules to the jury would risk allowing the judicial branch to conclude the House rules have a meaning different from that given them by the House, a violation of the Rulemaking Clause. *See United States v. Rostenkowski*, 59 F.3d 1291, 1307-12 (D.C. Cir. 1995) (refusing to submit the

---

[6] As the Government also argued at the June 15 hearing, there are no rights under the Committee's rules that were conferred on the Defendant in the issuance of the subpoena relating to the Committee having 13 members or the status of a ranking minority member such that either would even provide a basis for a defense to the charged offenses if they had been preserved. Mot. Hrg., Tr. at 87-88; *see also Yellin v. United States*, 374 U.S. 109, 121-23 (1963) (discussing the need to provide a remedy for a witness's loss of procedural rights provided by a Committee's rules as the basis for allowing the violation of Committee rules aimed at protecting those rights to provide a defense to contempt of Congress).

meaning of House rules for the jury's consideration where it risked the jury coming to a different conclusion than the House).  Accordingly, to the extent the Defendant wishes to present to the jury his same arguments regarding how rules governing the composition of the Committee, the status of Representative Cheney, and the provision of Section 3(b) of House Resolution 8 should be interpreted to argue that he could not lawfully be required to comply with the subpoena, and therefore to submit the meaning of the relevant rules to the jury, he cannot do so.

> **B.      Whether executive privilege excused the Defendant from compliance with the subpoena is not a factual question for the jury.**

The Defendant cannot argue to the jury that executive privilege did, as a matter of law, excuse him from complying in any way with the subpoena.  The Defendant has never clearly raised executive privilege as a basis for dismissing the charges against him.  Instead, he has raised it primarily and most clearly in the context of arguing for a good-faith-reliance defense and in the context of his various estoppel and public authority assertions.  To the extent he wishes to assert that executive privilege, on the merits of the assertion, actually excused his compliance, this issue must be resolved pretrial, not by the jury.[7]

As the Government has acknowledged several times, ECF No. 35 at 22; ECF No. 43 at 5-6; ECF No. 65 at 28-29, and the Supreme Court has made clear, *Barenblatt*, 360 U.S. at 112; *Watkins*, 354 U.S. at 196-97, claims of constitutional privilege can provide a defense to contempt of Congress when the privilege has been asserted before the relevant congressional committee. But whether a privilege excuses compliance with a legal obligation that a defendant is later prosecuted for violating is a legal question, not a factual one, that must be resolved pretrial by the

---

[7] To the extent the Defendant has not sufficiently presented this issue for resolution by the Court, the Government does it now.  *See United States v. Bulger*, 816 F.3d 137, 146-48 (1st Cir. 2016) (finding Rule 12 does not bar the government from raising potential defenses for pretrial resolution where the defenses are capable of pretrial resolution under Rule 12(b) & (d)).

court. *Cf. United States v. Covington*, 395 U.S. 57, 59-60 (1969) (finding that, where the Fifth Amendment privilege against self-incrimination excused an individual from complying with a federal marijuana tax payment law, the question of whether the privilege actually excused compliance and therefore provided a basis for dismissal of criminal charges for not paying the tax was a question of law for the court to decide pretrial under Fed R. Crim. P. 12). The bounds of executive privilege is a legal question—a jury cannot decide how far or narrowly it extends.

Moreover, there are no questions of fact that are "bound up with evidence about the alleged offense itself" that must be decided in order to determine if executive privilege allowed the Defendant to withhold all potentially responsive documents and to refuse to appear for testimony. No party contests that the Defendant sufficiently preserved the issue for judicial review by telling the Committee it was the reason he refused to comply. And the jury is not in a position to decide if, as a matter of law, certain statements on behalf of former President Trump were sufficient to invoke the privilege. Further, any factual questions of what the former President's attorney told the Defendant in the first place do not go to any elements of the offense but only to whether the Defendant has immunity from prosecution. *Cf. Bulger*, 816 F.3d at 147-48 (finding the judge was the proper factfinder to determine if the defendant had been given immunity from prosecution by the government). In any event, any such factual questions do not have to be resolved to decide whether executive privilege provides a defense. Even assuming the former President validly asserted executive privilege to the maximum extent possible under the Constitution for even a sitting President, it does not provide a legal basis for the Defendant's noncompliance.

With respect to Count One, based on the Defendant's refusal to appear for testimony, the Executive Branch's constitutional equities do not provide the Defendant, an individual subpoenaed about his private affairs while a private citizen, with immunity from appearing in the first place.

*See Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 202-03 (D.D.C. 2019), *overruled on other grounds*, 951 F.3d 510 (D.C. Cir. 2020); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 99-107 (D.D.C. 2008).  Not even the Department's interpretation of the constitutional immunity that particular high-ranking White House officials enjoy reaches that far.  *See generally Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *55 (Jan. 8, 2021); Combined Mem. of Points and Authorities in Support of Def.'s Mot. for Summary Judgment and In Opp. To Pl.'s Mot. for Summary Judgment, *McGahn*, Case No. 1:19-cv-02379, ECF No. 33 at 58-61 (Oct. 1, 2019); Mem. in Support of Defs.' Mot. to Dismiss, *Miers*, Case No. 1:08-cv-00409, ECF No. 16-2 at 50-55 (May 9, 2008).

With respect to Count Two, based on the Defendant's refusal to produce records, there are categories of records sought by the subpoena that executive privilege simply cannot reach. Executive privilege reaches certain records and communications concerning the Executive Branch's activities.  *See Trump*, 20 F.4th at 25 ("[The presidential communications privilege] allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997))); *In re Sealed Case*, 121 F.3d at 737 ("[The deliberative process privilege] allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967))).  Here, the subpoena sought records that had nothing to do with the Executive Branch.  For example, it sought records relating to the Defendant's communications with various militia groups, such as the Proud Boys and the Oath Keepers; records relating to the Defendant's

meetings with Members of Congress; records relating to the Defendant's efforts to help people travel to Washington, D.C., for the January 6th rally; and records relating to the Defendant's podcast.

No matter what the facts might show, therefore, about the extent and breadth of the former President's invocation of executive privilege, as a matter of law, executive privilege provided no basis for what is alleged in the Indictment: total noncompliance. Like his claims relating to the Committee's and the subpoena's legislative purpose and the Committee's procedural rules, the Defendant must be barred from making arguments or presenting testimony or evidence relating to the merits of his executive privilege claim to the jury.

## III.   CONCLUSION

This case is about whether the Defendant was subpoenaed and whether he showed up thereafter. The Court should not allow him to make it about anything else and should grant this motion to exclude irrelevant evidence and argument at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

### DEFENDANT'S MOTION TO COMPEL
### MEADOWS & SCAVINO DECLINATION DISCOVERY

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully moves this Court for an Order compelling the Government to comply with its obligations and provide discovery as identified herein. The discovery sought is material to the preparation of Mr. Bannon's defense, falls within the Court's earlier oral Order directing production from the Government, and is believed to constitute *Brady/Giglio* material. Mr. Bannon expressly has requested the production of the material at issue and Government counsel has refused to provide it. This motion's focus on the specific material at issue should not in any way be deemed a withdrawal or waiver of the requests made in the earlier filed motion to compel [Docs. 28 & 33]. That motion to compel is incorporated herein by reference.

### Relevant Background

Recent media reports have indicated that, following the receipt of a criminal contempt referral from the House of Representatives for Mark Meadows and Dan Scavino for their purported refusal to comply with a subpoena from the January 6th Committee, the Department of Justice

1

**-2425-**

formally declined to bring criminal charges against either man.[1]  January 6th Committee members have questioned the decision, indicating that they do not understand there to be a material distinction, based on the relevant Office of Legal Counsel opinions, between these individuals and Mr. Bannon. – who faces criminal charges.[2]

        In light of those reports, on June 21, 2022, the undersigned wrote to the prosecutors in this case and requested a copy of the declination letters regarding Messrs. Meadows and Scavino, along with related materials on the decision concerning whether or not to prosecute Meadows or Scavino, both of whom relied on the invocation of executive privilege by former President Trump for their non-compliance with the subpoena issued to them [Exhibit 1].  Later on June 21, 2022, Government counsel wrote back advising that they have already "exceed(ed) (their) obligations under the various discovery rules and doctrines" and would not provide the requested materials [Exhibit 2].  This motion follows the Government's refusal to provide the requested materials and information.

Apparently, the New York Times has been provided with a copy of the declination letters and, based on their reporting on the matter, it might well be that the letters reflecting the decision not to prosecute either Mr. Meadows or Mr. Scavino were summary notices, without much, if any, analysis provided.[3]  However, even if that were the case, Mr. Bannon respectfully submits that

---

[1] *U.S. DOJ Declines to Charge Ex-Trump Officials Meadows and Scavino, NY Times Reports,* Reuters, June 3, 2022, https://www.usnews.com/news/top-news/articles/2022-06-03/u-s-doj-declines-to-charge-ex-trump-officials-meadows-and-scavino-ny-times-reports.

[2] Jacob Knutson, *Jan. 6 committee questions "puzzling" DOJ decision on top Trump aides*, Axios, June 4, 2022, https://www.axios.com/2022/06/04/doj-declines-indict-meadows-scavino-jan-6-probe.

[3] Alan Feuer and Luke Broadwater, *Navarro Indicted as Justice Dept. Opts Not to Charge Meadows and Scavino,* https://www.nytimes.com/2022/06/03/us/politics/peter-navarro-contempt-jan-6.html?partner=slack&smid=sl-share

2

these materials (and related documents) are discoverable, both under the Court's oral Order of

March 16, 2022, on the original Motion to compel and as *Brady/Giglio* materials.

**All Meadows & Scavino Declination Materials Constitute The Official**
**Position Of DOJ And Must Be Produced Under This Court's March 16, 2022 Order.**

On March 16, 2022, the Court's oral Order on Mr. Bannon's Motion to Compel provided,

in pertinent part, the following:

> Specifically, I will grant defendant's motion to the extent it requests statements or
> writings reflecting official DOJ policy, such as an opinion of the Office of Legal Counsel
> or the position of an entire division or litigating group, whether those statements are
> public or not, if such writings relate to the department's policy on prosecuting or not
> prosecuting government or former government officials raising executive privilege
> claims or defenses of immunity or similar issues.

Hearing Tr. March 16, 2022, at 96 – 97.

The Meadows and Scavino declination letters and related materials fall squarely within the

Court's Order requiring production by the Government of the specified kinds of materials.[4]  Both

men were government officials or former government officials, executive privilege was invoked

by former President Trump, through his counsel, Justin Clark, in the same manner, form, and

language as it was invoked for Mr. Bannon[5] [Compare Exhibit 3 with Doc. 35-6],[6] and the

---

[4] The material also must independently be produced under Rule 16(a)(1)(E)(i) of the Federal
Rules of Criminal Procedure.  It is unquestionably "material to preparing the defense" in this
case.

[5]  The letters from Justin Clark, invoking executive privilege on behalf of former President
Trump are attached hereto as consolidated Exhibit 3.

[6] Since executive privilege was invoked in the same manner and by the same person on behalf of
President Trump, the production of the DOJ materials declining to prosecute Meadows and
Scavino is independently relevant to a threshold issue the Court raised during the June 15, 2022
hearing.  The Court apparently is treating it as an open question as to whether executive privilege
even was actually invoked as to Mr. Bannon's subpoena [*See*, *e.g*., June 15, 2022, Tr. at 125].

Mr. Bannon respectfully submits that there should be no question about the invocation on this
record; but since the Court has raised it, it is independently relevant whether the decision not to

3

materials sought through this motion to compel are official writings from the Department of Justice

concerning prosecution or non-prosecution decisions when executive privilege has been invoked.

The materials must be provided under the Court's March 16, 2022, Order.

### The Meadows & Scavino Materials Must Independently
### Be Produced Pursuant To *Brady/Giglio* Obligations.

As the Court is aware, a fundamental feature of Mr. Bannon's defense theory is that he is

entitled to the defense of entrapment by estoppel, based on his reliance on multiple OLC opinions

and other official, authoritative Department of Justice/Executive Branch writings, read

independently and *in pari materia*, which he reasonably believed (consistent with his experienced

---

prosecute Meadows and Scavino was based even in part on the invocation of executive privilege.
To the extent the Court notes that "particular documents" were not specified [June 15, 2022
Hearing Tr. at 125], the Court appears to have ignored the assertion that the invocation, by
necessity, for Bannon, Meadows, and Scavino, was at least in part a "protective assertion" as
advised by the Office of Legal Counsel in such a circumstance. *See* ECF# 73 at notes 7 and 9
and OLC opinions and other authority cited therein. The Court also appears to have ignored the
well-settled principle that separation of powers concerns associated with executive
confidentiality issues attach even *before* executive privilege is invoked. *Cheney v. U.S. Dist. Ct.*,
542 U.S. 367, 390 (2004). In the instant case, former President Trump publicly announced his
intention to invoke executive privilege with respect to the Committee's subpoenas in no
uncertain terms. https://apnews.com/article/donald-trump-congress-subpoenas-capitol-siege-
4eb9ffd1e94550219f5acab9e3d3b162

The Court's June 15, 2022 oral Order also appears to ignore Mr. Bannon's argument that for his
entrapment by estoppel defense, it does not matter at all whether executive privilege was
properly invoked; rather it is what he reasonably believed [ECF# 73 at note 9]. The DOJ
declination papers for Meadows and Scavino are directly relevant to the reasonableness of Mr.
Bannon's belief if based in any part on the invocation of executive privilege.

Finally, on this question, the Court's oral Order of June 15, 2022, appears to indicate a view by
the Court that Justin Clark's view on the question of "immunity" is either relevant or somehow
undercuts the invocation of executive privilege. It certainly is not relevant – immunity, unlike,
executive privilege is not a legal concept for the President to invoke or confer and his view on
"immunity" is of no consequence at all on the question of whether executive privilege was
invoked. It was.

4

criminal defense lawyer's firmly expressed belief – *See, United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987) -  authorized/licensed the course of action he took with respect to the subpoena.[7]

 In support of one of his defenses,  Mr. Bannon has, of course, asserted that based on the clearly expressed and repeatedly reiterated rationale for the positions taken in the relevant OLC opinions, that there is no legally relevant basis for distinguishing between current and former executive branch officials on the one hand and "private citizens" (in this case a former top, close advisor to the President) on the other hand, with respect to the rights, duties, and obligations concerning a Congressional committee subpoena directed toward testimony and documents that arose or were developed while the former President was President and regarding which he has invoked executive privilege.  Whether or not the Government agrees with the defense theory, the materials at issue clearly are relevant and support the defense theory, bringing them within *Brady's* ambit.

 The clearly expressed rationale underlying each relevant OLC opinion and other authoritative DOJ writings on the subject, going back over six decades, makes it clear that the rights, duties, and obligations with respect to a congressional committee subpoena once executive privilege is invoked are based on (1) constitutional separation of powers principles (the assertion

---

[7] This, of course, is in addition to the defense theory that the statute charged, as applied, is unconstitutional, in that it violates the right to due process of law and other fair trial rights by not giving fair notice of the conduct that in the circumstance at issue in this case would give rise to criminal liability, in light of the relevant official DOJ writings and that it includes lawful, authorized conduct within its ambit, without fair notice. [Doc. 58 at 38-48; Doc. 73 at 20-24].  It is also in addition to Mr. Bannon's argument that the subpoena was invalid and unconstitutional based on the Committee's refusal to allow the privilege holder's representative to attend any deposition and that he reasonably believed that to be the case under the relevant OLC opinions. [Doc. 58 at 18 n.22 & 27; Doc. 58 at 14].

5

-2429-

of executive privilege is the sole prerogative of the President/former President);[8] (2) the unique

status and sanctity of executive privilege;[9] (3) the imperative interest in encouraging, and not

chilling the willingness of people (including current and former executive branch officials and

outside consultants never employed by the executive branch) to discuss important, sensitive issues

with the President, confident that the discussions will remain privileged and confidential;[10] (4) the

unfairness of subjecting to sanctions a subpoenaed witness who acts with respect to the subpoena

in a manner that respects the invocation of executive privilege and assists the President/former

---

[8] *See, e.g. Olson O.L.C. Opinion* of May 30, 1984, tracking the legislative history of 2 U.S.C. §192 and concluding: "… (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers." [Doc. 58-10 at 129 (pdf page 30 of 43)]. "The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. *Id*. at 129 (pdf page 35 of 43).

[9] "… [A]s the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President. For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is *presumptively valid* and can be overcome only by a showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information." [Doc. 58-10 at 135 (pdf page 36 of 43)] (emphasis in original). "…[I]nformation subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032, 207 L. ed. 2d 951, 966 (2020), *quoting from United States v. Nixon*, 418 U.S. 683, 715 (1974).

[10] Long before the establishment of the Executive office of the President, the President sought and received advice from outside parties as a regular matter and such discussions were, of course, understood to be confidential. *See Congressional Oversight of the White House*, 45 Op. O.L.C. at 5; Doc. 58-7 at 5, pdf page 6 of 60. See also, Olson OLC opinion, Doc. 58-10 at 135-136, pdf pages 36-37 of 43 regarding the impairment of the President's ability to get advisors to come forward if their communications would not be protected from Congession subpoena or criminal contempt of Congress prosecution.

6

**-2430-**

President;[11] and (5) the recognized inappropriateness of using the criminal contempt statute to resolve document disputes.[12]

Not one of these clearly expressed rationales applies with any less force to the "private citizen" whose confidential counsel the President seeks while in office and there is no reasonable or rationale basis for drawing a legal distinction based on the status of the witness vis a vis the rights, duties, and obligation with respect to a congressional committee subpoena, once executive privilege has been invoked, when one considers the clearly expressed rationale. [13]

---

[11] "Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to secure a responsibility that he found necessary to the performance of his constitutional duty." *Olson OLC Opinion* of May 30, 1984 at 136 [Doc. 58-10 at 136 (pdf page 37 of 43)]. "The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process." "… it would be inconsistent with the constitutional principles that underlie executive privilege to impose a criminal prosecution and criminal penalties on the President's exercise of a presumptively valid constitutional responsibility." *Id*. at 137-138 [Doc. 58-10 at 137-138 (pdf pages 38-39 of 43)].

[12] "Congress itself has previously recognized the impropriety of resolving executive privilege disputes in the context of criminal contempt proceedings… The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity…." *Olson OLC Opinion* of May 30, 1984. [Doc. 58-10 at 133 (pdf page 34 of 43)].

[13] Moreover, this is expressly addressed by the Office of Legal Counsel: "That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests." *Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*, (June 27, 2007) [Doc. 58-7 at 6, pdf page 7 of 10]. The OLC expressly concluded that such communications with outside consultants "retain their confidential and Executive Branch character and remain protected." [*Id*.]. The OLC further asserted that the communications with these outside consultants is subject to the same level of immunity as current Executive Branch officials, such that a congressional committee can only get access to privileged communications between White House officials and "individuals outside the Executive Branch" if the Committee establishes a "demonstrably critical" need in order to fulfill

Even more to the point here, it is perfectly reasonable for a person in Mr. Bannon's situation who reads the OLC opinions and the rationale expressed in all of them, together with OLC opinions and other official Executive Branch writings which clearly provide that executive privilege can and will be invoked in full force with respect to discussions between the President and people never employed at all by the Executive Branch ("private citizens"),[14] to have believed that the OLC opinions and other authoritative DOJ/Executive Branch writings authorized his conduct with respect to the subpoena underlying this case.

This is even more true in light of the additional OLC opinion he relied on that provided that when executive privilege is invoked and the committee refuses to allow the privilege holder to attend any taking of testimony, the subpoena is invalid and unconstitutional and can be disregarded altogether,[15] along with his experienced attorney's belief, unequivocally expressed to

_____

its functions.  "Absent such a showing, the Committees may not override an executive privilege claim (as to communications with individuals outside of the Executive Branch)" [*Id.*]  Of course, no such showing was ever even attempted by the January 6th Committee in regard to Mr. Bannon.

[14] Multiple OLC Opinions cited by Mr. Bannon expressly provide that these protections that flow from the invocation of executive privilege apply in full force to former executive branch employees and to outside consultants with whom the President communicated, all of whom are at that point "private citizens." [*See, e.g.*, citations at Doc. 30 at 18; Doc. 58 at 17-18, n. 20; Doc. 58-8].

In addition, White House counsel has made it clear that the Executive Branch views executive privilege to apply in full force to such communications and is not in any way limited to actual Executive Branch employees or former employees.  *See, e.g.*, consolidated Exhibit 4 hereto, letters from White House counsel, invoking executive privilege with respect to congressional committee subpoenas for two people never formally employed by the Executive Branch.  They further support the reasonableness of Mr. Bannon's belief that his communications were covered by executive privilege.

[15] *Congressional Oversight of The White House*, [Doc. 58-7 at 55-56 (pdf pages 56-57 of 60)] ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1, *13-*14 (May 23, 2019) ("Congressional

him that the course of action he took with respect to the subpoena was the authorized, correct, and only appropriate one he could take, given the invocation of executive privilege  [ECF# 30-1, Costello Declaration].

One must completely ignore the rationale behind all of the relevant OLC opinions, including those which deal with the question in the context of current or former Executive Branch employees as well as those authoritative writings that hold that executive privilege can be invoked in full force as to outside "private citizens" to conclude that Mr. Bannon's belief that the OLC opinions applied to him was unreasonable.  And by definition, if one were to ignore the rationale behind the decades of relevant OLC opinions and focus instead on the employment status of the subpoenaed witness for whom the President (or former President invoked executive privilege), one would similarly have to conclude that executive privilege would provide no protection to Henry Kissinger if he were consulted by the President on the Ukraine situation or the Exxon CEO on the economy, with the expectation that such communications would be privileged and confidential. That would be an absurd, illogical, and completely unsupportable conclusion. Every concern underlying each rationale for the relevant OLC opinions and other relevant authoritative DOJ writing on this subject applies with equal force to the communications with outside consultants so situated, including Mr. Bannon for which executive privilege is invoked.

The materials at issue here, therefore, concerning Messrs. Meadows and Scavino and the evaluation and decision not to prosecute them, are directly relevant to the defense theory and, whether or not the government agrees with that defense theory or the Court bars Mr. Bannon from putting it forward in this case through direct evidence, cross-examination, argument, and jury

---

subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

9

instructions, he is entitled to make a record in all regards and certainly with respect to evidence of the materials sought here, in which the non-prosecution decision is consistent with his theory of defense and therefore exculpatory and/or where the Government has made an arbitrary non-prosecution decision based on criteria Mr. Bannon believes to be legally irrelevant (e.g. current/former Executive Branch employment status vs. former top advisor consulted by the President when no longer employed by the Executive Branch).

Mr. Meadows, in his civil case, has made legal arguments that parallel those raised by Mr. Bannon in submissions before this Court – as to the deficiencies regarding the Committee's composition and its Rules violation,[16] as well as to the inapplicability of the criminal contempt

---

[16] This provides an additional basis for compelling the production of all papers related to the decision to decline prosecuting Meadows and Scavino.  Indeed, the Court expressly noted throughout its June 15, 2022 oral Order the similarities in all matters related to the Committee and its composition and contempt referral across the board for Messrs. Bannon, Meadows, and Scavino [June 15, 2022 Tr. at 114-118].  Accordingly, if the decision to not prosecute Meadows and Scavino was in any part based on a Rules issue, it certainly would be *Brady* material vis a vis Mr. Bannon's defense theory.  Mr. Bannon would note here that, notwithstanding the Court's repeated statement that the Court was joining Judge Kelly's recent decision on the Rules questions, to accept the notion that it is incumbent on the Court to defer to Congress on its Rules interpretations and applications, and specifically, to defer on the matter of finding that Representative Liz Cheney serves in the role intended for a ranking minority member [June 15, 2022 Tr. at 117], with all due respect, Judge Kelly did not have before him evidence that House Counsel Letter expressly told the FBI that there is no ranking minority member on the Committee [ECF# 58-4 at 5] nor did he have before him Committee Chairman Thompson's express statement that Representative Liz Cheney is **not** the ranking member. https://www.cnn.com/2021/07/27/politics/thompson-statement-072721/index.html This begs the question as to whose view in Congress exactly the Court was deferring on this question.

Moreover, Mr. Bannon respectfully submits and preserves his position, that this Court's decision was inappropriately overly deferential with respect to the Rules issues under the authority of *Christoffel v. United States*, 338 U.S. 84, 88-90 (1949) (holding that the validity of a congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932); *United States v. Ballin*, 144 U.S. 1 (1892); *Yellin v. United States*, 374 U.S. 109 (1963). The Court's view of the degree of deference to be accorded is difficult to reconcile with these decisions.

10

statute when executive privilege has been invoked and the applicability of the OLC opinions [Doc. ## 29-1 through 29-5; 38 in *Meadows v. Pelosi*, 1:21-cv-03217-CJN; Exhibit 5].    Moreover, executive privilege was invoked with respect to these two men in the exact same manner as it was for Mr. Bannon [ECF# 29-5 in *Meadows v. Pelosi;* Exhibit 3] and just as in the instant case, it was the witness's lawyer who conveyed former President Trump's invocation of Executive Privilege to the Committee [ECF# 29-4 in *Meadows v. Pelosi*; Exhibit 3].[17]  Mr. Bannon is entitled to know the basis for the DOJ's decision not to prosecute either man.[18]

---

[17] Notwithstanding the similar role played by counsel in the Meadows and Scavino cases with respect to the invocation of Executive Privilege and interaction with the Committee on behalf of the witness, Mr. Bannon is not aware of any action taken by the Government to obtain the email and telephone records of either attorney representing Mr. Meadows or Mr. Scavino.  As part of this motion to compel, given the similarities with respect to the interaction and the invocation of Executive Privilege, Mr. Bannon would respectfully ask the Court to compel Government counsel to advise whether any such steps were taken vis a vis those attorneys.

[18] On June 23, 2022, this Court entered a Minute Order in *Meadows v. Pelosi*, 21-cv-03217-CJN seeking to ascertain whether it is the DOJ's position that based on relevant OLC opinions, the DOJ deems Mr. Meadows to have immunity following the invocation of executive privilege. The Court's Minute Order provides as follows:

> MINUTE ORDER. Upon consideration of the record of this case, the Court notes that Plaintiff's arguments rely, in part, on certain opinions of the Office of Legal Counsel, including, *e.g.*, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014); and *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ (May 20, 2019). The Court therefore INVITES the United States Department of Justice to submit a statement of interest, pursuant to 28 U.S.C. § 517, addressing its view as to whether Plaintiff is entitled to absolute or qualified testimonial immunity from the subpoena at issue in this case. It is ORDERED that any such statement, if submitted, should be filed no later than July 15, 2022. If such a statement of interest is filed, the parties may

11

## **LEGAL ARGUMENT**

The D.C. Circuit has emphasized that the prosecution must disclose evidence which is material "to *the preparation of* the defendant's defense." *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998) (emphasis in original). The government must disclose both inculpatory and exculpatory evidence. *Id*. "Inculpatory evidence, after all, is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence" because "it is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." *Marshall*, 132 F.3d at 67; *accord United States v. O'Keefe*, No. 06-0249 (PLF), 2007 WL 1239204, at *2 (Apr. 27, 2007).

The discovery obligations of Rule 16 are "intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case.'" *O'Keefe*, 2007 WL 1239204, at *2 (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (materiality standard "is not a heavy burden" – information is material and must be disclosed if it has the potential to play an "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal"); *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (discovery materiality hurdle "is not a high one").

---

file responses on or before July 29, 2022. Signed by Judge Carl J. Nichols on June 23, 2022. (lccjn1) (Entered: 06/23/2022).

Even though Mr. Bannon's defense is not dependent on a finding that he has "immunity;" he is entitled to know the answer to the Court's inquiry, again, given the rationale in the OLC opinions for finding "immunity" with respect to a Congressional subpoena when executive privilege has been invoked.

"As a general matter, Rule 16 establishes the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." *United States v. Apodaca*, 287 F. Supp. 3d 21, 39 (D.D.C. 2017); *see also United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003) Moreover, "the government cannot take a narrow reading of the term material in making its decisions on what to disclose under Rule 16." *O'Keefe*, *supra*, 2007 WL 1239204, at *2.

Government disclosure of exculpatory and impeachment evidence is essential to the constitutional guarantee to a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* are constitutional obligations, *Brady/Giglio* evidence must be disclosed regardless of whether the defendant makes a request for the information. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Since it is sometimes difficult to assess the materiality of evidence before trial, prosecutors must err on the side of disclosure. *Kyles*, 514 U.S. at 439.

The Department of Justice ("DOJ") Manual, § 9-5.001, provides as follows:

**Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required**. Department policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence. As a result, this policy requires disclosure by prosecutors of information beyond that which is 'material' to guilt as articulated in Kyles v. Whitley, 514 U.S. 419 (1995), and Strickler v. Greene, 527 U.S. 263, 280-81 (1999). The policy recognizes, however, that a trial should not involve the consideration of information which is irrelevant or not significantly probative of the issues before the court and should not involve spurious issues or arguments which serve to divert the trial process from examining the genuine issues. Information that goes only to such matters does not advance the purpose of a trial and thus is13ubjectt to disclosure.

13

**-2437-**

**Additional exculpatory information that must be disclosed**. A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

**Additional impeachment information that must be disclosed.** A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence — including but not limited to witness testimony — the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

**Information**. Unlike the requirements of Brady and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

**Cumulative impact of items of information**. While items of information viewed in isolation may not reasonably be seen as meeting the standards outlined in paragraphs 1 and 2 above, several items together can have such an effect. If this is the case, all such items must be disclosed.

DOJ    Manual,    https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last visited on Feb. 4, 2022) (emphasis in original).

To ensure that prosecutors adhere to their discovery obligations, the United States District Court for the District of Columbia Local Rules of Criminal Procedure specify the types of information that must be disclosed. The rules provide, in pertinent part, that the Government must disclose to the defense:

(1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged;

(2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty;

(3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged;

(4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and

(5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness.

Local Rule Crim. P. 5.1(b).

Based on the foregoing, Mr. Bannon respectfully submits that the Court grant this motion and order the Government to produce the requested materials.

Dated: June 27, 2022                 Respectfully submitted,

                                     SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                         /s/ M. Evan Corcoran
                                     M. Evan Corcoran (D.C. Bar No. 440027)
                                     210 N. Charles Street, 26th Floor
                                     Baltimore, MD 21201
                                     Telephone: (410) 385-2225
                                     Facsimile: (410) 547-2432
                                     Email: ecorcoran@silvermanthompson.com


                                         /s/ David I. Schoen
                                     David I. Schoen (D.C. Bar No. 391408)
                                     David I. Schoen, Attorney at Law
                                     2800 Zelda Road, Suite 100-6
                                     Montgomery, Alabama 36106
                                     Telephone: (334) 395-6611
                                     Facsimile: (917) 591-7586
                                     Email: schoenlawfirm@gmail.com

                                         /s/ Robert J. Costello
                                     Robert J. Costello (*pro hac vice*)
                                     Davidoff Hutcher & Citron LLP
                                     605 Third Avenue
                                     New York, New York 10158
                                     Telephone: (212) 557-7200
                                     Facsimile: (212) 286-1884
                                     Email: rjc@dhclegal.com


                                     *Counsel for Defendant Stephen K. Bannon*

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of June, 2022, a copy of the foregoing

DEFENDANT'S MOTION TO COMPEL MEADOWS & SCAVINO DECLINATION

DISCOVERY was served *via* the Court's CM/ECF system on registered parties and counsel.


                       /s/ M. Evan Corcoran

                     M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant*. | : | |

**ORDER**

Upon consideration, it is hereby **ORDERED** that Defendant's Motion To Compel

Discovery Of Meadows & Scavino Declination Materials is **GRANTED**. All requested materials

shall be produced to the defense on or before _____.

**SO ODERED.**

_____
Hon. Carl J. Nichols
*United States District Judge*

Dated:

17

**-2441-**

**EXHIBIT 1**



A *Limited Liability Company*
400 East Pratt Street – Suite 900
Baltimore, Maryland 21202
Telephone 410.385.2225
Facsimile 410.547.2432
silvermanthompson.com
*Baltimore | Towson | New York | Washington, DC*

Writer's Direct Contact:
Evan Corcoran
410-385-2225
ecorcoran@silvermanthompson.com

June 21, 2022

***Via Electronic Mail***

Amanda Vaughn, Esquire
J.P. Cooney, Esquire
Molly Gaston, Esquire
U.S. Attorney's Office
555 4th Street NW
Washington, D.C. 20530

      Re:    *United States v. Stephen K. Bannon,* Criminal No. 21-670 (CJN)

Dear Counsel:

We write to request all memoranda and other writings, whether public or not, that reflect consideration of the contempt of Congress referrals and decision(s) not to charge Mark Meadows and Dan Scavino with Contempt of Congress, in violation of 2 U.S.C. § 192. Please provide us with the documents by *Friday, June 24, 2022,* so that if not provided we can move to compel their production.

As you know, at the March 16, 2022, hearing on our motion to compel production of such materials, Judge Carl J. Nichols ruled as follows:

> Specifically I will grant defendant's motion to the extent it requests statements or writings reflecting official DOJ policy, such as an opinion of the Office of Legal Counsel or the position of an entire division or litigating group, whether those statements are public or not, if such writings relate to the department's policy on prosecuting or not prosecuting government or former government officials raising executive privilege claims or defenses of immunity or similar issues.

Hearing Tr. March 16, 2022 at 96 – 97.

June 21, 2022
Page Two


Thank you for your attention to this request.

Sincerely,

M. Evan Corcoran
*Counsel for Stephen K. Bannon*

2

# EXHIBIT 2



**U.S. Department of Justice**

Matthew M. Graves
United States Attorney

*District of Columbia*

_____

*Patrick Henry Building*
*601 D St., N.W.*
*Washington, D.C.  20530*

June 21, 2022

**<u>DELIVERY VIA EMAIL</u>**
David I. Schoen
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
dschoen593@aol.com; schoenlawfirm@gmail.com

Robert J. Costello
Davidoff Hutcher & Cirton LLP
605 Third Ave.
New York, NY 10158
rjc@dhclegal.com

M. Evan Corcoran
Silverman Thompson Slutkin White
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201
ecorcoran@silvermanthompson.com

        RE:    *United States v. Stephen K. Bannon*, 21-cr-670 (CJN)

Dear Counsel:

        We write in response to your letter of June 21, 2022, in which you request "all memoranda and other writings, whether public or not, that reflect consideration of the contempt of Congress referrals and decision(s) not to charge Mark Meadows and Dan Scavino with Contempt of Congress."

        To date, we have provided you with material that exceeds our obligations under the various discovery rules and doctrines.  In addition, we have provided you all material we understand to be responsive to Judge Nichols's March 16, 2022, Order relating to official Department policies.  We have nothing to provide in response to your June 21 request that is discoverable under either our standard discovery obligations or Judge Nichols's Order.

        Please do not hesitate to contact us with any questions.

Sincerely,

MATTHEW M. GRAVES
United States Attorney

By:    /s/ *Amanda R. Vaughn*
J.P. Cooney
Molly Gaston
Amanda R. Vaughn
Assistant United States Attorneys
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

2

**EXHIBIT 3**

# ELECTIONS, LLC

**Attorneys at Law**
**Justin R. Clark**
E Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Scott Gast
Compass Legal Services
300 Independence Avenue, SE
Washington, D.C. 20003
sgast@compasslegal.org

Dear Mr. Gast:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Mark R. Meadows (the "Subpoena"). The Subpoena requests that Mr. Meadows produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court. Furthermore, President Trump believes that Mr. Meadows is immune from compelled congressional testimony on matters related to his official responsibilities. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Meadows to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning his official duties in response to the Subpoena; and (c) not provide any testimony concerning his official duties in response to the Subpoena.

1000 Maine Avenue, SW, 4th Floor | Washington, D.C. 20024

Page 2

Thank you for your attention to this matter.  Please do not hesitate to contact me if you have any questions or would like to discuss.

Sincerely,

Justin Clark
*Counsel to President Trump*

# ELECTIONS, LLC

**Attorneys at Law**
**Justin R. Clark**

October 6, 2021

Mr. Dan Scavino

Dear Mr. Scavino:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to you (the "Subpoena"). The Subpoena requests that you produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court. Furthermore, President Trump believes that you are immune from compelled congressional testimony on matters related to your official responsibilities. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs you to: (a) where appropriate, invoke any immunities and privileges you may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning your official duties in response to the Subpoena; and (c) not provide any testimony concerning your official duties in response to the Subpoena.

Thank you for your attention to this matter.  Please do not hesitate to contact me, or have your counsel contact me, if you have any questions or would like to discuss.

Sincerely,

Justin Clark
*Counsel to President Trump*

2

**EXHIBIT 4**

**THE WHITE HOUSE**

WASHINGTON

September 16, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Chairman Nadler:

I write concerning the subpoena issued by the Committee on the Judiciary (the "Committee") to Corey Lewandowski on August 14, 2019. The subpoena directs Mr. Lewandowski to testify before the Committee on Tuesday, September 17, 2019. I understand that the Committee seeks to question Mr. Lewandowski about events that are described in the Report prepared by Special Counsel Robert S. Mueller, III ("Report"), including Mr. Lewandowski's communications with the President and with senior advisers to the President. As explained below, Mr. Lewandowski's conversations with the President and with senior advisers to the President are protected from disclosure by long-settled principles protecting Executive Branch confidentiality interests and, as a result, the White House has directed Mr. Lewandowski not to provide information about such communications beyond the information provided in the portions of the Report that have already been disclosed to the Committee.

It is a well-established legal principle, rooted in the constitutional separation of powers, that the President's communications seeking advice or information in connection with the discharge of his duties are highly confidential and not ordinarily subject to disclosure. As the Supreme Court explained over forty years ago, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The protections for such Presidential communications include all communications relating to the President's performance of his official duties and responsibilities. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1977) (Executive Branch confidentiality interests cover "communications in performance of a President's responsibilities") (internal quotation marks and citation omitted). This position is consistent with governing Supreme Court precedent and the long-standing practice of administrations from both parties. *See, e.g., Assertion of Exec. Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 1-2 (1996) (citing *United States v. Nixon* to explain the Presidential communications privilege).

The confidentiality interests protecting Presidential communications are not limited solely to communications between the President and his advisers within the Executive Branch. Rather, a President must frequently consult with individuals outside of the Executive Branch, and it is well settled that those communications are also subject to protection. As the Office of Legal Counsel

The Honorable Jerrold Nadler
Page 2

has explained, under long-standing precedent, the fact that "communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 5 (2007); *see also* Letter from Pat A. Cipollone, Counsel to the President, to Elijah E. Cummings, Chairman, Committee on Oversight and Government Reform (June 3, 2019) (communications between an individual outside the Executive Branch and the President or senior White House advisers are protected from disclosure).

In addition, the same confidentiality interests extend beyond communications in which the President himself is involved. As the Office of Legal Counsel has explained, "in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch." *Id.* Accordingly, communications between a President's senior advisers and individuals outside the Executive Branch relating to information or advice that will inform the discharge of the President's responsibilities are equally protected from disclosure. *See also In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("Given the need to provide sufficient elbow room for [senior White House] advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").

The Committee has argued that any interest the Executive Branch has in protecting the confidentiality of presidential communications has been waived for matters discussed in the Report. To the contrary, while it is true that the President decided to permit disclosure of portions of the Report that would otherwise be protected by executive privilege, such a disclosure is not a waiver of any privilege or protection with respect to additional information on the same subject matters not contained in the Report. Allowing those who have had confidential conversations with the President to appear before Congress to answer additional questions relating to their communications with the President and with the President's senior advisers would create profound separation of powers concerns and would threaten the ability of future Presidents to protect the confidentiality of advice they receive and the communications their advisers have with others in order to advise the President.

Thus, in light of the long-settled principles discussed above, and in order to protect the prerogatives of the Office of President, the White House has directed Mr. Lewandowski not to discuss the substance of any conversations he had with the President or senior Presidential advisers about official government matters, unless the information is expressly contained in the Report. We are adhering to the well-established lines protecting the confidentiality of presidential communications to ensure that future Presidents can effectively execute the responsibilities of the Office of President.

We also understand the Committee may question Mr. Lewandowski about discussions he had with the President-elect during the presidential transition. Discussions during this period may relate to decisions the President-elect would be making once he assumed office. Accordingly, Mr. Lewandowski's responses to specific questions relating to this period may implicate deliberative process privilege and other Executive Branch confidentiality interests.

The Honorable Jerrold Nadler
Page 3

In order to preserve the President's ability to assert executive privilege over the information discussed above, and to protect the prerogatives of the Office of President, a member of my office will attend the hearing on September 17 and will advise, as necessary, with regard to specific questions that implicate privileged matters.

Please do not hesitate to contact me or Mike Purpura if you have any questions or would like to discuss this matter further.

Sincerely,

Pat A. Cipollone
*Counsel to the President*

cc:    The Honorable Doug Collins, Ranking Member

**THE WHITE HOUSE**

WASHINGTON

May 21, 2019

The Honorable Elijah E. Cummings
Chairman
Committee on Oversight and Reform
House of Representatives
Washington, D.C. 20515

Dear Chairman Cummings:

I write in response to the Committee's letters of April 29, 2019, and May 7, 2019, to former Kansas Secretary of State Kris Kobach. According to those letters, the Committee seeks to conduct a transcribed interview of Mr. Kobach regarding "the addition of a citizenship question to the 2020 Census." The Committee's letters indicate that topics covered during the interview will include Mr. Kobach's conversations with the President and other Administration officials. We understand that the interview will occur by telephone tomorrow at 9:30 a.m.

It is a well-established legal principle, rooted in the constitutional separation of powers, that the President's communications seeking advice or information in connection with the discharge of his duties are highly confidential and not ordinarily subject to disclosure. As the Supreme Court explained over forty years ago, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). In light of this long-standing precedent, Mr. Kobach's conversations with the President and with senior White House advisers who advise the President are confidential, and he would not be permitted to discuss those conversations during a transcribed interview. This position is consistent with governing Supreme Court precedent and the long-standing practice of administrations from both political parties.

The Committee claims that Mr. Kobach's conversations with the President and senior White House advisers are not subject to executive privilege because "Mr. Kobach was not an employee of the Executive Branch, and the communications at issue did not relate to presidential decision-making." However, the Executive Branch's confidentiality interests are not limited solely to communications directly involving the President and other Executive Branch officials. Rather, a President and his senior advisers must frequently consult with individuals outside of the Executive Branch, and those communications are also subject to protection. *See Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 5 (2007) ("That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests."). Moreover, contrary to the Committee's claim, the protections for presidential conversations are not limited to presidential decision-making. Rather, they sweep more broadly and include all communications relating to the President's performance of his official duties and responsibilities. *See Nixon v. Administrator of*

Chairman Cummings
Page 2

*General Services*, 433 U.S. 425, 449 (1977) (Executive Branch confidentiality interests cover "communications in performance of a President's responsibilities") (internal quotation marks and citation omitted). Of course, those duties and responsibilities include supervising federal agencies and having discussions with advisers about what actions those agencies should take.

Accordingly, if the Committee wishes to proceed with a transcribed interview of Mr. Kobach, the White House will instruct Mr. Kobach not to discuss the substance of any conversations he had with the President or senior White House advisers about official government matters, including "the addition of a citizenship question to the 2020 Census."

Finally, as a matter of basic courtesy and respect for a co-equal branch of our government, I request that you direct your staff to work through the Office of the White House Counsel to request information of the nature you seek from Mr. Kobach. Consulting with this office will ensure that the Committee efficiently obtains access to the information to which it is entitled and that any disclosure of privileged information to Congress is properly authorized. As always, I am happy to discuss any of the issues raised in this letter at your convenience.

Sincerely,

Michael M. Purpura
*Deputy Counsel to the President*

cc:    The Honorable Jim Jordan, Ranking Member

**EXHIBIT 5**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE**
**PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT,**
**& IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Mark Meadows, by and through his undersigned counsel, in accordance with the

Court's Oral Order of May 4, 2022, hereby:

    a)    moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings;

    b)    or, in the alternative, moves pursuant to Fed. R. Civ. P. 56(a) for summary

        judgment; and

    c)    opposes Defendants' Motion for Summary Judgment (ECF No. 15).

Plaintiff seeks the entry of judgment in his favor on all the claims in his amended complaint

(ECF No. 13). Specifically, Plaintiff seeks judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c) because no material fact is in dispute and Plaintiff is entitled to judgment as a matter of law

without resort to extrinsic evidence. In the alternative, Plaintiff seeks summary judgment pursuant

to Fed. R. Civ. P. 56(a) because there is no genuine dispute as to any material fact based on the

evidence presented in support of Plaintiff's motion and Plaintiff is entitled to judgment as a matter

of law.

Inasmuch as the issues and relevant points and authorities are joined as to these Motions and Defendants' pending Motion for Summary Judgment, Plaintiff is filing a combined Memorandum of Points and Authorities in support of both his Motions and in opposition to Defendants' Motion.  Attached to that Memorandum are Plaintiff's Statement of Undisputed Material Facts and his Response to Defendants' Statement of Undisputed Material Facts (ECF No. 15-28).

Wherefore, for the reasons stated in the above-referenced filings, Plaintiff asks the Court to: (i) enter judgment as a matter of law in favor of Plaintiff and against Defendants on all claims in Plaintiff's amended complaint; and (ii) deny Defendants' Motion for Summary Judgment, or in the alternative, grant Plaintiff's unopposed Motion filed pursuant to Fed. R. Civ. P. 56(d) (ECF No. 20), which the Court is holding in abeyance.

Dated: May 20, 2022

Respectfully submitted,
MARK R. MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

Case 1:21-cr-00670-JDB   Document 85   Filed 05/20/22   Page 4 of 138

## CERTIFICATE OF SERVICE

I certify that, on May 20, 2022, a copy of the foregoing was filed on the Court's CM/ECF

system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

_____

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT & IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 9

A.   AUTHORITY AND PURPOSES OF THE SELECT COMMITTEE ......................... 10

B.   COMPOSITION OF THE SELECT COMMITTEE ....................................... 11

C.   ACTIVITIES OF THE SELECT COMMITTEE ......................................... 12

D.   THE SELECT COMMITTEE'S SUBPOENA & MR. MEADOWS'S
     ACCOMMODATION EFFORTS ......................................................... 13

E.   THE SELECT COMMITTEE'S VERIZON SUBPOENA & BREAKDOWN OF
     ACCOMMODATION EFFORTS ......................................................... 15

STANDARD OF REVIEW ................................................................................... 17

ARGUMENT ................................................................................................... 18

I.    TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
      MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
      ABOUT HIS WHITE HOUSE SERVICE ............................................. 18

      A.   The Separation of Powers prohibits Congress from subpoenaing the White
           House Chief of Staff for testimony. ........................................... 19

      B.   Testimonial immunity applies, and Mr. Meadows is entitled to judgment,
           because the subpoenas targeted him based on his role as Chief of Staff. ........... 25

      C.   Even if factual questions about the "capacity" in which Mr. Meadows took
           certain actions were relevant, the Congressional Defendants would not be
           entitled to summary judgment because those factual questions are
           disputed. ..................................................................... 30

II.   THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
      PURPOSE FOR THE SUBPOENAS ..................................................... 31

III.  THE SUBPOENAS WERE NOT VALIDLY ISSUED ................................... 35

      A.   The Select Committee Is Not Properly Composed Under H. Res. 503
           § 2(a). ....................................................................... 36

      B.   The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6). ............. 37

IV.   ADDITIONAL ISSUES WITH THE SUBPOENAS PRECLUDE SUMMARY
      JUDGMENT IN FAVOR OF THE CONGRESSIONAL DEFENDANTS ............... 38

      A.   The Subpoenas Violate the Separation of Powers by Infringing Upon
           Executive Privilege. ......................................................... 38

      B.   The Select Committee Cannot Obtain Records under the Verizon
           Subpoena Consistent with the Stored Communications Act. ..................... 43

      C.   Compelled Production under the Verizon Subpoena Would Violate the
           Fourth Amendment. ........................................................... 44

D.    Compelled Production of Cell Phone Data under the Verizon Subpoena
      Would Violate the First Amendment. ................................................................. 46

CONCLUSION ............................................................................................................................. 47

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Air Line Pilots Ass'n v. Fed. Express Corp.*,
    139 F. Supp. 3d 320 (D.C. Cir. 2015)............................................................17, 18

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*,
    333 F.3d 168 (D.C. Cir. 2003) ...............................................................................46

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...........................................................................................17, 18

*Army Times Publ'g Co. v. Department of the Air Force*,
    998 F.2d 1067 (D.C. Cir. 1993) .............................................................................39

*Auer v. Robbins*,
    519 U.S. 452 (1997)...............................................................................................31

*Black Panther Party v. Smith*,
    661 F.2d 1243 (D.C. Cir. 1981) .............................................................................46

*Buckley v. Valeo*,
    424 U.S. 1 (1976)...................................................................................................46

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ..........................................................................................45

*Christoffel v. United States*,
    338 U.S. 84 (1949).................................................................................................2

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)...............................................................................................31

*Clinton v. City of New York*,
    524 U.S. 417 (1998)...............................................................................................42

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) ................................................................. *passim*

*Comm. on Judiciary, United States House of Representatives v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019) ....................................................7, 22, 23, 25

*Eastland v. United States Servicemen's Fund*,
    421 U.S. 491 (1975)...............................................................................................31

*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
    655 F.2d 380 (D.C. Cir. 1981)..........................................................................28, 29

*Forrester v. White*,
    484 U.S. 219 (1988)..................................................................................................26

*Gojack v. United States*,
    384 U.S. 702 (1966)..................................................................................................36

*Gravel v. United States*,
    408 U.S. 606 (1972)..................................................................................................20

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)..................................................................................................23

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983)..................................................................................................42

*Katz v. United States*,
    389 U.S. 347 (1967)..................................................................................................45

*Liveright v. United States*,
    347 F.2d 473 (D.C. Cir. 1965)..................................................................................36

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)..................................................................................................37

*Meadows v. Pelosi*,
    1:21cv3217 (D.D.C. Dec. 8, 2021) ...........................................................................16

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)..............................................................................................26, 27

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting)..............................................................26

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)...................................................................................8, 21, 28, 33

*Oklahoma Press Pub. Co. v. Walling*,
    327 U.S. 186 (1946)..................................................................................................45

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997)..............................................................................20, 39

*Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ..............................................................................28, 40

*Shelton v. United States*,
    327 F.2d 601 (D.C. Cir. 1963)..................................................................................36

* *Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) ................................................................................ *passim*

*Trump v. Thompson*,
  142 S. Ct. 680 (2022) (statement of Kavanaugh, J., respecting denial)............7, 13, 22, 24, 41

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ....................................................................34

*United States v. Bannon*,
  1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022)............................................9, 38

*United States v. Grumman*,
  227 F. Supp. 227 (D.D.C 1964) ............................................................36

*United States v. Nixon*,
  418 U.S. 683 (1974) ................................................................................ *passim*

* *Watkins v. United States*,
  354 U.S. 178 (1957) ................................................................................ *passim*

*Yellin v. United States*,
  374 U.S. 109 (1963) ....................................................................2, 9, 36, 38

**Statutes**

18 U.S.C. §§ 241-42 ....................................................................................28

18 U.S.C. § 2702(c)(1) ................................................................................44

18 U.S.C. § 2711 ........................................................................................43

52 U.S. Code §§ 10307, 20511 ..................................................................28

H.R. 3233 ..................................................................................................10

H. Res. 503, 117th Cong. (2021) ............................................8, 10, 11, 12, 33, 36, 37, 38

Presidential Records Act of 1978 ..............................................................13

Stored Communications Act ..................................................................43, 44

U.S. Const. amend. I ................................................................1, 19, 28, 29, 46

U.S. Const. amend. IV ............................................................1, 41, 44, 45, 46

U.S. Const. amend. V................................................................................1, 41

U.S. Const. amend. VI ................................................................................1

U.S. Const. art. I, § 5, cl. 2..................................................................................5

U.S. Const., art. II, § 3 ........................................................................................27

**Other Authorities**

Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*,
    Wash. Post (Apr. 15, 2022),
    https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/.......................4

Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump
    Figures*, N.Y. Times (Mar. 30, 2022) ..................................................................25

\* *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op.
    O.L.C. 1 (1999)................................................................................6, 18, 19, 20

Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to
    pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash.
    Post (Mar. 24, 2022)
    https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-
    meadows-texts/ .................................................................................................4

Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe
    (Jan. 5, 2022)...................................................................................................4

Edward-Isaac Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31,
    2014), https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-
    deliver-midterm-boost-112370 ..........................................................................30

Fed. R. Civ. P. 12(b)(6)........................................................................................17

Fed. R. Civ. P. 12(c) .................................................................................1, 17, 19

Fed. R. Civ. P. 56.........................................................................9, 17, 19, 30, 31

George Washington, *Message to the House Regarding Documents Relative to the
    Jay Treaty*, March 30, 1796. ...............................................................................7

House Rule XI, Cl. 2.......................................................................................4, 11

*Immunity of the Assistant to the President and Director of the Office of Political
    Strategy and Outreach from Congressional Subpoena*,
    38 Op. O.L.C. *5 (July 15, 2014) ....................................................6, 18, 20, 21

*Immunity of the Former Counsel to the President From Compelled Congressional
    Testimony*,
    31 Op. O.L.C. 191 (2007) ...................................................................6, 18, 21

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic
    Affairs, from William H. Rehnquist, Assistant Attorney General, Office of
    Legal Counsel, Re: *Power of Congressional Committee to Compel
    Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). ...................................6, 18

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has
    Asserted a Claim of Executive Privilege*,
    8 Op. O.L.C. 101 (1984) ...................................................................................6, 18

*READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and
    others sent to Mark Meadows*, CNN (Apr. 25, 2022),
    https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-
    hannity-ivanka-trump-marjorie-taylor-greene/index.html...........................................................4

Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr.
    texted Meadows ideas for overturning 2020 election before it was called*,
    CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-
    jr-meadows-text/index.html ....................................................................................4

Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s
    Transcript Request*, Associated Press (May 17, 2022),
    https://apnews.com/article/capitol-siege-government-and-politics-subpoenas-
    criminal-investigations-merrick-garland-
    73d8309734a5dad4532f96c53f14a403 ...........................................................................24

Max Rose for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube,
    https://youtu.be/4tKfqiBScaY .................................................................................29

Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*,
    Facebook (June 3, 2021),
    https://www.facebook.com/quarteyforcongress/videos/188080856538494............................29

SSCI, *Report of the Select Committee on Intelligence*, *United States Senate*, *on
    Russian Active Measures Campaigns & Interference in the 2016 U.S.
    Election*, Volume 5: Counterintelligence Threats and Vulnerabilities (116th
    Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/
    report_volume5.pdf..................................................................................................3

Yair Rosenberg, *Treasury's First Orthodox Chief,* Tablet (January 10, 2013),
    https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-
    chief................................................................................................................31

Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over
    100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021),
    https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-
    records/index.html ..................................................................................................3

## INTRODUCTION

The events at the U.S. Capitol building on January 6, 2021, were abhorrent and unjustified. But this case is not about that day. Rather, this case and the cross-motions now before the Court concern the maintenance of important safeguards established under Separation of Powers and other constitutional principles to ensure that those principles are respected and enforced when one of its committees seeks to compel testimony from and about the work of the Chief Executive and his senior aides. As the Supreme Court has made clear, heightened judicial scrutiny is required when congressional subpoenas implicate the Separation of Powers—especially where, as here, they implicate Executive Privilege. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032–35 (2020). A congressional committee witness remains fully protected by the rights specified in the First, Fourth, Fifth and Sixth Amendments, and his obligations under any subpoena are circumscribed by the necessity that those rights be respected. *See Watkins v. United States*, 354 U.S. 178, 188 (1957) ("The Bill of Rights is applicable to investigations as to all forms of governmental action."). Under any level of scrutiny, the Select Committee's subpoenas to Mr. Meadows and his cell phone carrier exceed its constitutional and statutory authority, and the Court can and should declare them without force or effect.

The Congressional Defendants' rushed summary judgment motion should be denied because, in the first instance, the facts upon which it relies are disputed as to material matters. Such purported facts merit testing through discovery. To do otherwise would deny Mr. Meadows the day in court he is due. Moreover, the Congressional Defendants are simply wrong on the law and cannot carry their burden to sustain the motion.

Conversely, Mr. Meadows's cross-motion presents purely legal issues that are ripe for judgment in his favor—either on the pleadings themselves under Rule 12(c) or, alternatively, on summary judgment. No court of authority has ever held that a former President or a senior

presidential aide, such as a White House Chief of Staff, can be compelled to appear before a congressional committee—let alone be compelled to also testify as to matters on which the former President claims Executive Privilege. Two District Court opinions which Defendants cite to the contrary are both distinguishable in context and, in any event, they are not controlling and do not persuasively address the Separation of Powers issues at play.

Testimonial immunity and Executive Privilege represent the clearest grounds for resolving this case in favor of Mr. Meadows. But two additional issues—the unauthorized composition of the Committee and its lack of a recognized legislative purpose for targeting Mr. Meadows—can also be a basis for judgment in Mr. Meadows's favor. As stand-alone issues, courts might prefer to leave such issues in the hands of the Congress that created them. But, here, they merit judicial review because the Court cannot avoid them without giving effect to subpoenas that provoke a Separation of Powers clash between the political branches. A congressional committee is subject to judicial review of its own rules when its conduct fails to abide by such rules to the detriment of a witness's rights. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949) ("The question is rather what rules the House has established and whether they have been followed.").  Likewise, the committee subpoena at issue here does not conform to the requirements for its issuance by the Select Committee's authorizing resolution and is invalid on that basis alone. Moreover, the subpoena here fails the test of serving a valid legislative purpose and cannot survive judicial scrutiny on that basis.  *See Mazars USA, LLP*, 140 S. Ct. at 2031.

The context of these issues heightens the need for judicial review. This case arises from an attempt by a Select Committee of the U.S. House of Representatives to target the Chief of Staff to a United States President with unprecedented investigative tactics. Federal courts have

2

traditionally opined on the scope of congressional investigative authority in cases involving investigations more restrained in scope and tactics than those presented by the Congressional Defendants' unprecedented overreach. The Select Committee's sweeping investigation is not the sort of modest investigation-to-inform-lawmaking that has defined most federal jurisprudence on Congress's investigative authority. Three features of the Select Committee's investigation—at least the portion that has swept in Mr. Meadows—highlight how different it is from an ordinary legislative investigation, and highlight the need for a thorough judicial review.

To start, the Select Committee's investigation more closely resembles a law enforcement investigation than a legislative inquiry.  The hallmarks of a law enforcement investigation also surround the Committee. The staff includes numerous former federal prosecutors, the Select Committee's members have publicly discussed the theories of criminal liability that they are pursuing, and they have employed tactics like confidential hold letters and cell phone metadata warrants that are hallmarks of a law enforcement investigation.[1]  These tactics color the character of the investigation, since it is firmly established that "Congress may not issue a subpoena for the

---

[1] Its tactics, particularly the far-reaching use of metadata subpoenas, represent an unprecedented expansion of Congressional investigative authority. In 2016, the Senate Select Committee on Intelligence pursued cellphone metadata, but noted that it was "not aware of any congressional committee that had pursued the production of such data."[1] SSCI, *Report of the Select Committee on Intelligence*, *United States Senate*, *on Russian Active Measures Campaigns & Interference in the 2016 U.S. Election*, Volume 5: Counterintelligence Threats and Vulnerabilities, at 21 (116th Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf ("SSCI Report"). And even in that instance, the Senate Select Committee was circumspect with its use of metadata subpoenas, using them only "in very limited situations in which other avenues for investigation had been foreclosed." SSCI Report, at 23. The Select Committee has not been so circumspect here, seeking the metadata of more than 100 individuals, many of whom are private persons hardly (if at all) connected to the Select Committee's jurisdiction. *See* Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021), https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html (last visited Dec. 21, 2021).

purpose of 'law enforcement.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)).

Next, the Select Committee's public actions have an unmistakably politically motivated "name and shame" element to them.  The Select Committee's investigation has so far been defined by leaks of private communications. Within days of his December 3 document production, the Select Committee began releasing Mr. Meadows's private documents, in apparent violation of House rules.[2] They have since waged a sustained campaign against Mr. Meadows in the press, fueled by these steady leaks of text messages.[3] And just recently, they cleared the cache by releasing ***all*** the text messages that Mr. Meadows produced to the Select Committee.[4]  Once again, these publicity leaks raise concerns about the Select Committee's motives because it is a settled rule that "'there is no congressional power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)).

---

[2] House Rule XI, Cl. 2(i) states, "[O]nly the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof." As discussed further below, there is no Ranking Member of the Select Committee with whom the Chair could consult as required, and in any event, the current record does not indicate whether any sort of consultation preceded these leaks.

[3] *See, e.g.*, Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*, Wash. Post (Apr. 15, 2022), https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/; Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr. texted Meadows ideas for overturning 2020 election before it was called*, CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-jr-meadows-text/index.html;     Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash. Post (Mar. 24, 2022) https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/; Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe (Jan. 5, 2022), https://www.bostonglobe.com/2022/01/05/nation/read-sean-hannitys-texts-mark-meadows/.

[4] S*ee READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and others sent to Mark Meadows*, CNN (Apr. 25, 2022), https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-hannity-ivanka-trump-marjorie-taylor-greene/index.html.

Finally, the Select Committee's procedures have deviated from the traditional bipartisan mechanisms that can restrain excess and insure fairness in legislative investigations, particularly those aimed at targets in the political sphere. While the Rulemaking Clause affords the House substantial autonomy in establishing its internal procedures, U.S. Const. art. I, § 5, cl. 2, that authority has long been leavened by minority participation in committee affairs, a check on the exercise of power that is glaringly absent here where the committee has in essence no minority participation. While as a standalone issue, that might be one for the House itself to consider, the Judiciary must step in where its "own duty to enforce the constitutionally protected rights of individuals is affected." *Watkins*, 354 U.S. at 205,

All these factors—the Separation of Powers implications, the Select Committee's use of law-enforcement tactics, including its quest for evidence to support allegations of alleged criminality and its media campaign through politicized leaks—counsel in favor of careful and deliberate judicial review, and against the Congressional Defendant's poorly supported suggestion that the Court should rush to judgment to accommodate their primetime hearings set to begin in less than a month.[5]

As summarized immediately below and on the basis of the points and authorities detailed herein, the Court should deny the Congressional Defendants' motion and grant judgment (either on the pleadings or on summary judgment) and declaratory relief to Mr. Meadows.

\*    \*    \*

*First*, testimonial immunity—long recognized by the U.S. Department of Justice in formal opinions under administrations of both parties as a core principle of the Separation of Powers—

---

[5] The June hearings themselves are likely to yield further evidence of the Defendants' and the Committee's purposes. The Court may therefore wish to defer final consideration of any motion for summary judgment until the parties have an opportunity to address such evidence.

protects Mr. Meadows, as former White House Chief of Staff, from compelled testimony before Congress arising out of his official position.  For decades, the Attorneys General of both parties and attorneys in DOJ's Office of Legal Counsel have, after careful analysis of the law, maintained that Congress may not constitutionally compel testimony from the President or his most senior aides[6]—including after their service has ended.  *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007) ("Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."); *see also Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008) (explaining the persuasive authority of OLC opinions and granting them "as much weight as the force of their reasoning will support").  As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).  While two district court opinions have questioned

---

[6] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). The testimonial immunity of senior White House advisors has enjoyed unanimous bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush, and Obama Justice Departments.

this immunity,[7] they have not squarely addressed the important Separation of Powers considerations that the Department of Justice has raised. And in any event, as the Congressional Defendants acknowledge, this immunity remains an open question that neither the Supreme Court nor the D.C. Circuit has ever addressed. *See* Defs.' Mot. for Summ. J., ECF No. 15 at 53.[8]

     *Second*, the subpoenas challenged here, to Mr. Meadows and his cell phone carrier, lack a "valid legislative purpose." *Mazars*, 140 S. Ct. at 2033. Dating back to George Washington's seminal invocation of executive privilege in 1796, it has been understood that Congress may only subpoena information relevant to a "purpose under the cognizance of the House of Representatives." George Washington, *Message to the House Regarding Documents Relative to the Jay Treaty*, March 30, 1796. Congress has the burden to "establish a 'demonstrated, specific need" for the [requested] information," *id.* at 2032 (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select

---

[7] *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019).

[8] As discussed further below, there is also no merit to the Congressional Defendants' suggestion that the privileges and immunities attaching to Mr. Meadows were not properly presented. They can cite no authority for the proposition that President Trump was required to invoke privilege or testimonial immunity in a communication directed to the Select Committee, as opposed to instructing Mr. Meadows to preserve them, as he did. And it is equally irrelevant that President Biden has not supported Mr. Meadows's claims of privilege and immunity, as Justice Kavanaugh recently explained: "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418 U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036. It is also clear that the Select Committee could not make that showing; by its own admission, it subpoenaed Mr. Meadows before it had even completed other efforts to collect relevant information from non-privileged sources. *See id.* at 2025 (holding that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). And if anything, the record shows that the Select Committee is targeting Mr. Meadows for two reasons that are squarely out of bounds: law enforcement and public exposure.

**Third**, the subpoenas are invalid because the Select Committee is not a validly constituted body authorized to issue Congressional subpoenas. The Select Committee was created by the passage of House Resolution 503, but neither the Select Committee nor the Speaker of the House have adhered to the resolution's dictates. Section 2(a) of the Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9 members, none of whom were appointed after consultation by the minority leader as required by § 2(a). In addition, § 5(c)(6) of the Resolution authorizes Chairman Thompson to order depositions by subpoena only "upon consultation with the ranking minority member." *Id.* But the counsel for the Select Committee has admitted that it has no ranking minority member—*i.e.*, no senior-most

8

member of the minority, appointed after consultation with the minority leader. *See* Mot. Compel Disc. Ex. 9 at 5, *United States v. Bannon*, 1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022). Chairman Thompson therefore could not satisfy the consultation requirement of § 5(c)(6) in purporting to subpoena Mr. Meadows to testify before the Select Committee. The Select Committee's failure to adhere to its own rules is judicially cognizable and results in invalidation of the Committee's actions. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *see also Watkins v. United States*, 354 U.S. 178 (1957) (holding that congressional subpoena could not be enforced where it exceeded "the constitutional requisites of fairness for witnesses").

\*      \*      \*

For these and other reasons set forth below, the subpoenas are invalid and cannot be enforced against Mr. Meadows.  The Court should therefore grant him judgment as a matter of law and enter a declaratory judgment invalidating the subpoenas. But if the Court should conclude that these issues are not determinative, then the proper course would be to take up Mr. Meadows's pending motion under Rule 56(d), defer ruling on the pending dispositive cross motions, and direct the parties to conduct reasonable discovery that would allow them to develop the factual record in a way that would allow the Court to resolve this dispute.

**BACKGROUND**

Plaintiff Mark R. Meadows served as Chief of Staff to President Donald J. Trump from March 31, 2020, until January 20, 2021, and before that as a Member of the U.S. House of Representatives, representing North Carolina's 11th Congressional District, from January 3, 2013, to March 30, 2020.  This case arises from two subpoenas issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol—one that seeks to compel Mr. Meadows to testify before Congress about his tenure as White House Chief of Staff, and one that

seeks his personal cell phone records from that time period directly from his telecommunications provider.

**A.      Authority and Purposes of the Select Committee**

After the well-known events of January 6, 2021, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex," which would have been a bipartisan, bicameral commission tasked with investigating those events and proposing "corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism." First Am. Compl. ¶ 28; Pl.'s Statement of Facts ¶ 1.  The bill to establish this bipartisan commission, H.R. 3233, passed the House on May 19, 2021, but a cloture motion in the Senate failed on May 28, 2021, and the measure died.  First Am. Compl. ¶¶ 29–30; Pl.'s Statement of Facts ¶ 1.

One month later, the House passed H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," on a near party-line vote.  First Am. Compl. ¶¶ 32-35; Pl.'s Statement of Facts ¶ 2. While the Select Committee established by H. Res. 503 has similar aims as the would-be Commission, it expressly provides that "[t]he Select Committee may not hold a markup of legislation," First Am. Compl. ¶ 36; Pl.'s Statement of Facts ¶ 3. Consistent with that limitation, House Speaker Pelosi and members of the Select Committee frequently describe the purposes of the committee as generating a public record of the events of January 6th and making criminal referrals to the U.S. Department of Justice. *See* First Am. Compl. ¶¶ 39–47; Pl.'s Statement of Facts ¶ 20–25.  The Select Committee's investigative staff is led by two former United States Attorneys, Timothy J. Heaphy and John Wood, and includes more than a dozen former federal prosecutors.  *See* First Am. Compl. ¶ 37; Pl.'s Statement of Facts ¶ 19.

### B.    Composition of the Select Committee

In contrast to the bipartisan Commission that failed to pass Congress, H. Res. 503 contemplates that the Select Committee will have thirteen members appointed by the Speaker, only five of whom are to be "appointed after consultation with the minority leader." First Am. Compl. ¶ 54; Pl.'s Statement of Facts ¶ 4. Speaker Pelosi appointed Chairman Thompson and six additional Democrat members: Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria. *See* First Am. Compl. ¶ 55; Pl.'s Statement of Facts ¶ 6. She appointed Republican Liz Cheney, one of the two Republicans who had voted in support of H. Res. 503, without designating any position for her. *See id.*

Consistent with H. Res. 503, House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, including Rep. Jim Banks of Indiana to serve as Ranking Member. *See* First Am. Compl. ¶ 56; Pl.'s Statement of Facts ¶ 7. Speaker Pelosi then made what she characterized as the "unprecedented decision" not to appoint any of the Republican members recommended by the Minority Leader as contemplated in H. Res. 503. *See* First Am. Compl. ¶ 57; Pl.'s Statement of Facts ¶ 8. Instead, she added Rep. Kinzinger, the only other Republican who voted in favor of H. Res. 503, and left four vacancies. *See* First Am. Compl. ¶ 58; Pl.'s Statement of Facts ¶ 8. Since there was no Ranking Member, Chairman Thompson subsequently designated Rep. Cheney to serve as "Vice Chair"—a title that nowhere appears in H. Res. 503. *See* First Am. Compl. ¶ 59; Pl.'s Statement of Facts ¶¶ 13–14. And while House Rule XI, cl. 2(d) contemplates the appointment of a committee vice chair, that position is for a "member of the majority party," which Rep. Cheney is not. First Am. Compl. ¶ 60; Pl.'s Statement of Facts ¶ 15–16.

Indeed, counsel for the Congressional Defendants has made clear elsewhere the position that Vice Chair Cheney *is not the Ranking Member* of the Select Committee.  *See* Pl.'s Statement of Facts ¶ 18.  The Ranking Member role is significant because H. Res. 503 provides that orders for the taking of depositions first require "consultation with the ranking minority member."  First Am. Compl. ¶ 53; Pl.'s Statement of Facts ¶ 17.

**C.   Activities of the Select Committee**

Since its inception in July 2021, the Select Committee has held only one public hearing. *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 25. The Select Committee has, however, gathered a substantial number of documents and testimony from private individuals and entities, much of which then leaked to the news media.  *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 26.  The Select Committee has issued more than one hundred wide-ranging subpoenas for documents and the testimony of witnesses, *see* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶ 27, and by its own account has interviewed more than 1,000 witnesses, *see* Pl.'s Statement of Facts ¶ 26. Unlike in ordinary congressional investigations, the Select Committee has demanded records of and sent preservation notices to social media companies, telecommunications companies, banking entities, and even the national party committee of their political opposition. *See* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶¶ 28–31. Many of those subpoenas were issued covertly to third parties who held the cell phone or banking data of the Select Committee's target. *See* First Am. Compl. ¶ 66; Pl.'s Statement of Facts ¶¶ 29, 31.

The Select Committee has also issued "sweeping" demands for presidential records from the National Archives and Records Administration (NARA) and seven other Executive Branch agencies. First Am. Compl. ¶¶ 67–68; Pl.'s Statement of Facts ¶ 32. Those document requests gave rise to a dispute between former President Trump, who asserted Executive Privilege over some of

the documents in NARA's custody pursuant to the procedures set forth in the Presidential Records Act of 1978, and President Biden who, through counsel, instructed NARA to produce the documents and purported to waive privilege. *See* First Am. Compl. ¶¶ 68–69; Pl.'s Statement of Facts ¶ 33. Following a months-long legal battle, NARA released at least some of the requested presidential records to the Select Committee, including some that were created or used by Mr. Meadows. *See* First Am. Compl. ¶ 70; Pl.'s Statement of Facts ¶ 34. In connection with that litigation, Justice Kavanaugh pointedly noted that "[a] former President must be able to successfully invoke the Presidential communications privilege for *communications* that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

**D.    The Select Committee's Subpoena & Mr. Meadows's Accommodation Efforts**

On September 23, 2021, the Select Committee served a subpoena on Mr. Meadows which included a sweeping set of document requests that related to his tenure as White House Chief of Staff and a demand that he appear for a deposition. *See* First Am. Compl. ¶¶ 71–74; Pl.'s Statement of Facts ¶ 37.

On October 6, 2021, former President Trump sent a letter to Mr. Meadows instructing him to maintain privilege and invoke any applicable immunities to resist the subpoena. Pl.'s Statement of Facts ¶ 40. Specifically, the letter instructed Mr. Meadows that he should "where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena . . . [and] not provide any testimony concerning his official duties in response to the Subpoena." First Am. Compl. ¶ 75; Ex. A. As a former member of Congress and former White House Chief of Staff, Mr. Meadows recognized the importance of the Separation of Powers and

respects the prerogatives of both the Legislative Branch and the Executive Branch. And he also appreciated that these sorts of disputes are traditionally resolved through a process of compromise and accommodation between the branches. He therefore for months communicated by and through counsel with the Select Committee in an effort to reach an accommodation that would allow him to provide information to the Select Committee without contradicting longstanding Executive Branch positions about testimonial immunity and Executive Privilege. *See* First Am. Compl. ¶¶ 76–104; Pl.'s Statement of Facts ¶ 46.[9]

Throughout extensive exchanges with the Select Committee, Mr. Meadows remained concerned that the Select Committee did not intend to respect the boundaries of Executive Privilege, but he strove to find a path forward. On November 22, Chairman Thompson rejected Mr. Meadows's latest proposal to answer written interrogatories before testifying. *See* First Am. Compl. ¶ 100; Pl.'s Statement of Facts ¶ 50. The Select Committee eventually accepted Mr. Meadows's proposal to provide a voluntary deposition on December 8, 2021, with certain conditions. *See* First Am. Compl. ¶ 103; Pl.'s Statement of Facts ¶ 51. Chairman Thompson in return demanded that Mr. Meadows produce all responsive documents by Friday, December 3. *See* First Am. Compl. ¶ 104; Pl.'s Statement of Facts ¶ 52.

Notwithstanding reservations about the Select Committee's intentions, Mr. Meadows agreed to produce responsive, non-privileged documents and to make a voluntary appearance for a deposition. *See* First Am. Compl. ¶¶ 101–02; Pl.'s Statement of Facts ¶ 52. His agreement to appear was based on the understanding that the Select Committee would limit its questions in good

---

[9] It is notable that the Committee, while claiming that Mr. Meadows should appear and raise objections to questions where Executive Privilege is claimed, has nowhere cited any evidence that the Committee Chair has or training experience or any other salient factor the expertise to rule substantively as to what is or is not subject to a valid claim of privilege. On the contrary, the subpoena the Chair issued expressly requires production of *prima facie* privileged information.

faith to matters outside the scope of privilege and that Mr. Meadows would have three business days to review any documents which the Select Committee intended to show him or question him about during the deposition. *See* First Am. Compl. ¶¶ 101; Pl.'s Statement of Facts ¶ 51. His document production included more than 1,000 emails and other documents from his personal Gmail account, as well as 2,319 text messages and metadata from his personal cell phone. *See* First Am. Compl. ¶¶ 102, 104; Pl.'s Statement of Facts ¶ 52.

**E.      The Select Committee's Verizon Subpoena & Breakdown of Accommodation Efforts**

The weekend prior to his planned deposition, Mr. Meadows received a letter from Verizon Wireless, the carrier for the personal cell phone he had used during his tenure as White House Chief of Staff. The letter notified him that Verizon had received a subpoena from the Select Committee requesting certain phone records. *See* First Am. Compl. ¶¶ 105–106; Pl.'s Statement of Facts ¶ 56. The Verizon Subpoena instructs Verizon to produce subscriber information and cell phone data associated with Mr. Meadows's prior personal cell phone number held during his time of service as Chief of Staff, including subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. *See* First Am. Compl. ¶ 107; Pl.'s Statement of Facts ¶ 57. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number and can be used for historic cell site analysis. *See id.* The Verizon Subpoena requested all Mr. Meadows's personal cell phone data for four months: October 1, 2020 to January 31, 2021. *See id.*

On December 7, 2021, Mr. Meadows notified the Select Committee that he would no longer appear voluntarily for a deposition. *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 58. This decision followed the revelation of the Verizon Subpoena and public statements by

Chairman Thompson and other Select Committee members, all of which indicated that the Select Committee viewed itself as conducting a law enforcement inquiry. *See* First Am. Compl. ¶¶ 109–110; Pl.'s Statement of Facts ¶ 58. He again offered, however, to respond to written interrogatories that would allow the Select Committee to develop a clear record of his answers to the Select Committee's questions while affording Mr. Meadows a meaningful opportunity to assess and assert privilege where appropriate. *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 50.

The next day, December 8, 2021, Mr. Meadows initiated this action to seek a judicial forum to resolve the important Separation of Powers and other issues presented by this dispute. *See* Compl., *Meadows v. Pelosi*, 1:21cv3217 (D.D.C. Dec. 8, 2021); Pl.'s Statement of Facts ¶ 59.

The House of Representatives voted to refer Mr. Meadows to the Department of Justice for contempt of congress on December 14, 2021. *See* First Am. Compl. ¶¶ 113; Pl.'s Statement of Facts ¶ 60. During the floor debate in the House, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6. *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 60. Rep. Cheney read Mr. Meadows's private text messages aloud before making an unmistakable accusation that Mr. Meadows knew former President Trump "through action or inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral votes." First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 61. Rep. Lofgren also read Mr. Meadows's text messages on the House floor, First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 62, as did Reps. Schiff, *id.*, Aguilar, *id.*, and Luria, *id.* And in the weeks following the vote, Mr. Meadows's private text messages dominated the news cycle, as the Select Committee intended. *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 63.

The leaks of Mr. Meadows's text messages have continued steadily ever since. *See* Pl.'s Statement of Facts ¶ 63. And just recently, ***all*** the text messages that Mr. Meadows produced to

the Select Committee have been provided to CNN and publicly released.  *See* Pl.'s Statement of Facts ¶ 64.

The Select Committee is the only plausible source of these leaked communications.  *See* First Am. Compl. ¶ 115.  Aside from his counsel, only the Select Committee members and staff possess Mr. Meadows's confidential production of emails and text messages.  *See id.*  And neither Mr. Meadows nor his counsel has provided these records to the press.  *See id.*; Pl.'s Statement of Facts ¶ 65.

## STANDARD OF REVIEW

Under Federal Rule of Procedure 12(c), a party is entitled to judgment on the pleadings when he can show "at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law" *Air Line Pilots Ass'n v. Fed. Express Corp.*, 139 F. Supp. 3d 320, 323 (D.C. Cir. 2015) (quoting *Konah v. District of Columbia*, 915 F. Supp. 2d 7, 18 (D.D.C. 2013)). The standard for Rule 12(c) is virtually indistinguishable from a Rule 12(b)(6) motion. The court views all factual allegations in the light most favorable to the non-moving party. *Id.* at 324. But in its review, the court is "limited to considering facts alleged in the [pleadings], any documents attached to or incorporated in the [pleadings], matters of which the court may take judicial notice, and matters of public record." *Id.* (quoting *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 47 (D.D.C. 2005)).

If the court does not accept that the moving party is entitled to judgment as a matter of law based on the pleadings, it can still grant summary judgment pursuant to Federal Rule of Procedure 56 when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they might affect the outcome of the case, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), and an issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Id.* at 248. "In determining whether

17

a genuine issue of fact exists, the court must view all inferences in favor of the non-moving party."

*Air Line Pilots Ass'n.*, 139 F. Supp. 3d at 324 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party opposing a motion for summary judgment must provide "affirmative evidence" that disputes of material fact exist and that there is a "genuine issue for trial." *Anderson*, 477 U.S. at 248.

## ARGUMENT

**I.  Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service**

The most straightforward basis for granting judgment in favor of Mr. Meadows is that he is constitutionally immune, as a matter of the Separation of Powers, from being compelled to testify before Congress about his service as White House Chief of Staff.  This has been the long-standing position of the U.S. Department of Justice, as articulated by Attorneys General of both major parties and by DOJ's Office of Legal Counsel.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971).  The testimonial immunity of senior White House advisors has enjoyed unanimous

bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush (43), and Obama Justice Departments.

Under the principles of testimonial immunity, the challenged subpoenas—which seek to compel testimony from Mr. Meadows arising from his service as White House Chief of Staff and to obtain cell phone records in support of his deposition—are constitutionally invalid.  The Congressional Defendants suggest that they can nevertheless question him about matters like campaign activity that supposedly fell outside the scope of his official duties.  *See* Defs.' Mot. Summ. J., ECF No. 15 at 42-43, 56-58.  But that contention fails on many levels:  it misconstrues the nature of testimonial immunity for senior White House advisors; it impinges on protected First Amendment activity and misconstrues the role of White House Chief of Staff; and it relies on disputed factual allegations that, at a minimum, would merit further discovery.  The Court should thus grant judgment in favor of Mr. Meadows under Rule 12(c) (or alternatively, under Rule 56) based on testimonial immunity. But even if the Court were not prepared to do so, there would be no basis for granting judgment in favor of the Congressional Defendants, and the proper course would be to allow further factual development on the relevant issues.

**A.    The Separation of Powers prohibits Congress from subpoenaing the White House Chief of Staff for testimony.**

The constitutional rationale for prohibiting congressional subpoenas to White House Chiefs of Staff is straightforward.  As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).  "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise

the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014). The challenged subpoenas here show precisely that danger: a congressional committee is targeting the former Chief of Staff to a President from the opposite party and has ***already shown*** that it intends to use the information it obtains from him for partisan gain, including in the run up to the 2022 midterm elections.

The testimonial immunity is also a matter of interbranch comity: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982). And again, as Attorney General Reno explained, a White House Chief of Staff for this purpose is the President's alter ego. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 5; *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."). Congress can no more compel testimony from a White House Chief of Staff than the President may compel testimony from a congressman's chief of staff. *Cf. Gravel v. United States*, 408 U.S. 606, 616–17 (1972) (holding that the Speech or Debate Clause covers congressional aides because "the day to day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos").

It is telling that, notwithstanding the more than 1,000 interviews it has apparently conducted, the Select Committee has never attempted to subpoena former President Trump. *See*

Pl.'s Statement of Facts ¶ 26.  And that has remained true even as the committee has taken the bold step of issuing subpoenas to fellow members of Congress.  *See* Pl.'s Statement of Facts ¶ 27.  The decision not to subpoena President Trump likely reflects the Congressional Defendants' awareness that to do so would plainly contravene the Separation of Powers.  But those concerns are not assuaged by going after his alter ego "[b]ecause a presidential adviser's immunity is derivative of the President's."  *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5.

The fact that Mr. Meadows is a former White House Chief of Staff does not change the calculus.  As the Office of Legal Counsel has opined, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."  *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007).  Without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).  President Truman succinctly explained how important it was for immunity to continue after a President's term in office nearly 70 years ago:

> "'[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President.  The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes.'"

*Immunity of the Former Counsel to the President* 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14).  And Justice Kavanaugh recently emphasized the related point that "[a] former President must be able to successfully invoke the

Presidential communications privilege for communications that occurred during his Presidency."

*Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

Id. at 681.  The logic of that expression of a separation of powers principle applies with equal force to maintenance of testimonial immunity.

In two prior cases, judges in this district have declined to apply testimonial immunity to senior advisers of a former president.  *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019).  But neither decision is binding on this Court, and the court in *Miers* explicitly limited its decision to the "the context of this particular subpoena dispute." 558 F. Supp. at 106 (admitting that "[t]here may be some instances where absolute (or qualified) immunity is appropriate for such advisors").  Even the Congressional Defendants acknowledge that "[n]either the Supreme Court nor the D.C. Circuit has decided whether any White House advisors could be immune from compulsory Congressional process in matters involving their official conduct."  Defs.' Mot. Summ. J., ECF No. 15 at 53.  And more importantly, neither the *Miers* decision nor the *McGahn* decision adequately explained how compelled congressional testimony for a senior Presidential aide could comport with relevant Separation of Powers precepts.

In *Miers*, the court rested its decision primarily on the notion that testimonial immunity was "entirely unsupported by existing case law."  558 F. Supp. 2d at 99.  But the lack of prior case

law just underscores how rare this particular clash of the Legislative and Executive Branches has been in our Nation's history. *See McGahn*, 415 F. Supp. 3d at 200 ("The dearth of cases involving compelled congressional process issued to Executive branch officials is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated."). As the Supreme Court has emphasized, the two Branches have historically been able to resolve this sort of clash through inter-branch accommodation rather than through recourse to the courts. *See Mazars*, 140 S. Ct. at 2029 (explaining that these types of disputes traditionally "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'") (quoting Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)).

The *Miers* decision also relied on the Supreme Court's holding in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), that Presidential aides enjoy qualified immunity, rather than absolute immunity, from civil damages claims, and suggested that "civil suits for money damages present a greater potential for such a chilling effect" than congressional subpoenas. 558 F. Supp. 2d at 101–02. But that conclusion ignores the heightened concerns that arise as a matter of the Separation of Powers whenever Congress targets a co-equal branch of government. *See Mazars*, 140 S. Ct. at 2033. Indeed, the Supreme Court in *Mazars* squarely rejected the Congressional Defendants' argument that congressional subpoenas targeting the President indirectly are no different than a congressional subpoena to any other individual. *Compare* Defs.' Mot. Summ. J., ECF No. 15 at 53 ("[C]ompliance with a Congressional subpoena is a legal requirement 'which every person within the jurisdiction of the Government is bound to perform when properly

summoned.'") (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)), *with Mazars*, 140 S. Ct. at 2033 ("The House . . . would have us ignore that these suits involve the President. . . . [But] [t]he House's approach fails to take adequate account of the significant separation of powers issues raised by congressional subpoenas for the President's information.").

The *Miers* decision further fails to grapple with the underlying purposes of immunity:  to protect against a chilling effect on the advice of current and future White House aides and to promote comity among the branches.  As Justice Kavanaugh explained in the context of Executive Privilege:  "Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends."  *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).  The prospect of compelled congressional testimony from a President' senior-most aides threatens the same chilling effect—even apart from the specific concerns raised by individual questions of Executive Privilege.  And it does not promote comity to create a clash between Legislative and Executive prerogatives—especially at a time when Congress is apparently unwilling to be cooperative with the Executive Branch either. *See* Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s Transcript Request*, Associated Press (May 17, 2022), https://apnews.com/article/capitol-siege-government-and-politics-subpoenas-criminal-investigations-merrick-garland-73d8309734a5dad4532f96c53f14a403.

The court also emphasized the necessity of the *Miers* congressional investigation because Congress was the only institution that could, in their oversight capacity, "investigate and respond" to possible "improper partisan influence" within the Department of Justice at that time.  558 F. Supp. 2d at 58.  That is remarkably dissimilar to the case here, where the Congressional

Defendants' investigation itself is undertaking an improperly partisan prosecutorial process and where the current Department of Justice—who is actually tasked with upholding our nation's laws—is investigating the very events on which the Select Committee claims to be seeking Mr. Meadows' testimony. *See* Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump Figures*, N.Y. Times (Mar. 30, 2022), https://www.nytimes.com/2022/03/30/us/politics/justice-dept-widens-jan-6-inquiry.html.

The *McGahn* decision relied principally on *Miers*, citing it as "the only recorded case in our Nation's history that directly addresses the legal argument that a senior-level presidential aide is immune to a legislative subpoena seeking testimony when the President directs him to ignore that congressional mandate." 415 F. Supp. 3d at 200. The court acknowledged that the sparse judicial record "is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated." *Id.* But then quizzically, the court expressed agreement with *Miers* that OLC's opinions were unpersuasive because they did not "cite[] to a single judicial opinion recognizing the asserted absolute immunity." *Id.* at 202 (quoting *Miers*, 558 F. Supp. 2d at 104). That reasoning is entirely circular, and one could just as easily point out that *Miers* failed to cite a single opinion (judicial or executive) authorizing Congress to subpoena a senior White House aide. Because the *McGahn* Court "adopt[ed] [*Miers'*] absolute testimonial immunity analysis in full," *id.*, it too failed to grasp the important constitutional considerations raised by a congressional subpoena to a senior White House aide.

> **B.**   **Testimonial immunity applies, and Mr. Meadows is entitled to judgment, because the subpoenas targeted him based on his role as Chief of Staff.**

It would seem fairly straightforward that, if testimonial immunity prohibits Congress from seeking to compel testimony from a former White House Chief of Staff, then the challenged subpoenas are invalid. But the Congressional Defendants contend otherwise, arguing that some

(but not all) of the topics on which they wish to question him "involve his role as a campaign functionary" rather than "Mr. Meadows's activities as an Executive Branch official." Defs.' Mot. Summ. J., ECF No. 15 at 52. This contention is wrong for several reasons.

*First*, in assessing the Separation of Powers concerns that give rise to testimonial immunity, the relevant inquiry is whether the Court has before it "congressional subpoenas for the President's information" which "unavoidably pit the political branches against one another," *Mazars*, 140 S. Ct. at 2034—not whether any given question Congress might ask entails Mr. Meadows's execution of a core Executive function. Indeed, the White House Chief of Staff, though the President's closest advisor and alter ego, does not carry out any core Executive function in his own capacity; his advice and actions bear weight only to the extent they inform or reflect the decision-making of the President. Testimonial immunity is thus, by necessity, different from areas like judicial immunity where "immunity is justified and defined by the functions it protects and serves." *Forrester v. White*, 484 U.S. 219, 227 (1988).[10] In the case of a White House Chief of Staff, the interbranch conflict and the chilling effect against which testimonial immunity protects arises whenever a Chief of Staff is targeted as a Chief of Staff to the President. There is no genuine dispute here that Congress has subpoenaed Mr. Meadows and his cellphone carrier

---

[10] The Supreme Court has also explained that "officials who are entitled to absolute immunity . . . are subject to other checks that help to prevent abuses of authority from going unredressed." *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985). For the White House Chief of Staff, the President himself provides the check, since the Chief of Staff cannot execute the laws in his own right, and the President is free to terminate the Chief of Staff at will. The President in turn is directly accountable under our Constitution. *See Morrison v. Olson*, 487 U.S. 654, 711 (1988) (Scalia, J., dissenting) ("The checks against any branch's abuse of its exclusive powers are twofold: First, retaliation by one of the other branch's use of *its* exclusive powers: Congress, for example, can impeach the executive who willfully fails to enforce the laws . . . . Second, and ultimately, there is the political check that the people will replace those in the political branches (the branches more 'dangerous to the political rights of the Constitution') who are guilty of abuse.") (quoting Federalist No. 78, p. 465).

precisely because he served as President Trump's Chief of Staff. Testimonial immunity therefore attaches.[11]

*Second*, even if the availability of testimonial immunity hinged on the relevant "function" of the targeted official,[12] the Congressional Defendants' distinction between "Mr. Meadows's activities as an Executive Branch official" and "his role as a campaign functionary," Defs.' Mot. Summ. J., ECF No. 15 at 52, would be wrong both as a matter of law and fact.

Without any legal or factual support, the Congressional Defendants breezily claim that "a typical White House Chief of Staff" limits his role to "advising the President on official matters of government policy" and would have nothing to do with an incumbent President's campaign or with post-election inquiries into the integrity of the election. Defs.' Mot. Summ. J., ECF No. 15 at 56. One might be tempted to think they are new to Washington. Administration of federal election law is just as squarely within the purview of the President (and thus his Chief of Staff), who has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art.

---

[11] The fact that the Office of Legal Counsel has distinguished instances in which a senior White House aide is subpoenaed over "'their private conduct,'" Defs.' Mot. Summ. J., ECF No. 15 at 58. (quoting Memorandum for the Honorable John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* 3 (Mar. 15, 1972)), is wholly irrelevant here. That is plainly not what the Select Committee has done with Mr. Meadows.

[12] The Congressional Defendants' argument assumes that the relevant role or function is the one that they now identify, in the course of defending civil litigation, as opposed to the one they identify in the subpoena itself. *See* Defs.' Mot. Summ. J., ECF No. 15 at 52. They cite no authority for that proposition, however, and it makes little sense as a practical matter. A White House Chief of Staff in receipt of a congressional subpoena for testimony must decide whether to comply before he learns what particular topics Congress might be interested in discussing. Moreover, to suggest that immunity cannot attach until particular questions are posed and assessed defeats the entire purpose of testimonial immunity. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[Qualified immunity] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."). By the time Congress has the Chief of Staff in the witness chair, the damage is done.

II, § 3—as is any other aspect of federal law. *See, e.g.*, 52 U.S. Code §§ 10307, 20511; 18 U.S.C.

§§ 241-42.  Moreover, an incumbent President running for reelection does not thereby forfeit his

First Amendment rights.  *See, e.g.*, *Fed. Election Comm'n v. Machinists Non-Partisan Pol.*

*League*, 655 F.2d 380, 388 (D.C. Cir. 1981) (explaining that "political expression and association

concerning federal elections and officeholding" represent "the very heart of the organism which

the first amendment was intended to nurture and protect" and therefore demand "heightened

judicial concern").  The combination of Separation of Powers concerns and First Amendment

protection only heightens Congress's burden in seeking Mr. Meadow's testimony about such

protected activity.

     The Congressional Defendants' argument is further refuted by the Watergate scandal,

which arose from President Nixon's alleged involvement in the cover-up of a break-in to the

Democratic National Committee headquarters.  The scandal sparked numerous proceedings and

led to some of the most significant cases involving Presidential records, privilege, and the

Separation of Powers.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977); *United States v.*

*Nixon*, 418 U.S. 683 (1974); *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*,

498 F.2d 725 (D.C. Cir. 1974).  In *Senate Select Committee*, the D.C. Circuit specifically held that

Congress could not compel production of taped discussions between Nixon and his senior aides.

*See* 498 F.2d at 726.  But in none of these cases did the Supreme Court or the D.C. Circuit ever

suggest that Separation of Powers protections were inapplicable because the Watergate break-in

involved a political activity rather than an official one.[13]

---

[13] *Mazars* further undermines their argument by establishing that the Separation of Powers limits
Congress's subpoena power even when the subject of the subpoena predates the President's tenure
and thus necessarily lacks any connection to his official duties.  *See* 140 S. Ct. at 2033 (holding
that heightened scrutiny applies even to "cases involving nonprivileged, private information,
which by definition does not implicate sensitive Executive Branch deliberations").

The Select Committee's own members surely appreciate that a clear line between official acts and election-related conduct is often untenable.  In fact, several Democrat candidates for Congress have used the events of January 6 in furtherance of their campaigns.  *See, e.g.*, Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*, Facebook (June 3, 2021), https://www.facebook.com/quarteyforcongress/videos/188080856538494;    Max    Rose    for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube, https://youtu.be/4tKfqiBScaY.  It takes little political savvy to understand the members of the Select Committee are using this investigation—one allegedly conducted in their official roles—to support their case against Republicans in the midterm elections.

Moreover, even if political activity was somehow hermetically sealed off from the official duties of the White House Chief of Staff, that would just take the Congressional Defendants out of the Separation of Powers frying pan and into the First Amendment fire.  *See Machinists Non-Partisan Pol. League*, 655 F.2d at 388; *see also Watkins v. United States*, 354 U.S. 178, 187–88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. . . . This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.").

The Congressional Defendants' bald assertion that discussions and actions related to President Trump 2020 campaign or integrity of the 2020 election were outside the scope of his work as the Chief of Staff therefore falls flat first as matter of law but also as a matter of fact.

C.     Even if factual questions about the "capacity" in which Mr. Meadows took
certain actions were relevant, the Congressional Defendants would not be
entitled to summary judgment because those factual questions are disputed.

Should the Court disagree and conclude that it is legally relevant whether Mr. Meadows

ever acted in a campaign capacity that exceeded his role as Chief of Staff, then the proper course

would be to allow a reasonable discovery period in which the relevant facts can be further

developed—after either denying the Congressional Defendants' summary judgment motion

outright or granting Mr. Meadows's pending motion under Rule 56(d).  *See* Pl.'s Mot. Deny

Without Prejudice or Defer Ruling Defs.' Mot. Summ. J., ECF No. 20.

While the Congressional Defendants contend, without citing any factual support, that

White House Chiefs of Staff do not get involved with an incumbent President's reelection

campaign, common sense and facts subject to judicial notice are to the contrary. The breadth of

the Chief of Staff's duties necessarily includes activities relevant to the President's reelection.  *See*

Pl.'s Statement of Facts ¶ 42.  And Mr. Meadows would prove that, if necessary, using facts

obtained through discovery.  Some of the potentially relevant records are in the Congressional

Defendants' custody or control, such as the Presidential records produced to the Select Committee

by the National Archives.  *See* Pl.'s Statement of Facts ¶ 34.  Other potentially relevant information

lies in the hands of non-parties, including the Executive Branch and former Chiefs of Staff

themselves, many of whom engaged in efforts related to their President's election efforts. The

public record readily reveals the existence of such evidence; two of President Barack Obama's

Chiefs of Staff, Denis McDonough and Jack Lew, engaged in public efforts to aid the President's

election efforts. McDonough's efforts to persuade Cabinet members to campaign on behalf of the

President's agenda in advance of the 2014 elections were widely publicized. *See* Edward-Isaac

Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31, 2014),

https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-deliver-midterm-boost-112370.

Lew was involved even more directly, engaging in policy debates and meeting with voters on the

campaign trail. *See* Yair Rosenberg, *Treasury's First Orthodox Chief,* Tablet (January 10, 2013),

https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-chief.          These

well-documented events demonstrate at least a dispute of fact as to the scope of the White Chief

of Staff's duties.

It would thus be premature for the Court to grant summary judgment in favor of the

Congressional Defendants, even if the Court were to somehow agree with their legal position that

campaign activities are categorically ineligible for testimonial immunity.[14]  The proper course in

that scenario would be for the Court to deny their motion, or to defer it by granting Mr. Meadows's

pending Rule 56(d) motion, and to allow for a reasonable period of discovery.

## II.    The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas

The subpoenas challenged here, to Mr. Meadows and his cellphone carrier, lack a "valid

legislative purpose." *Mazars*, 140 S. Ct. at 2033. The Select Committee has no freestanding

authority to issue subpoenas enforceable by contempt. Instead, its investigative powers are

ancillary to its legislative authority. *See id.* at 2031. Any subpoena not directly tied to a valid

legislative purpose is therefore beyond the scope of Congress's Article I authority. *See Eastland*

*v. United States Servicemen's Fund*, 421 U.S. 491, 506 (1975).

---

[14] As noted above, *see supra* n.11, the Court would also need to conclude that Congress may
narrow its subpoena in defensive litigation and define the capacity in which the respondent will be
questioned based on its *post hoc* litigating position. *Cf. Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142, 156–57 (2012) (holding that federal courts cannot defer to a federal agency's *post
hoc* litigating position, even if it otherwise would under *Auer v. Robbins*, 519 U.S. 452 (1997),
where doing so would create "unfair surprise").

31

In *Mazars*, the Supreme Court articulated a three-tiered approach to assessing the validity of Congress's aims in obtaining records through an investigation.  The lowest burden for Congress applies in cases "that do not involve the President's papers." 140 S. Ct. at 2033. Congress still must show that its requests "relate to a valid legislative purpose or concern a subject on which legislation could be had." *Id.* (internal quotations & alterations omitted). But it does not need to carry any additional burden. The highest burden for Congress applies where, as here, Congress goes after "information subject to executive privilege." *Id.* at 2032. In such cases, Congress "must establish a 'demonstrated, specific need'" for the [requested] information," *id.* (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). Finally, the *Mazars* Court articulated an intermediate tier of scrutiny that applies to "congressional subpoenas for the President's information" even when executive privilege is not at issue.  *Id.* at 2033.  Such requests still raise "significant separation of powers issues" since they "unavoidably pit the political branches against one another." *Id.* at 2034. Applying the ordinary "valid legislative purpose" standard to such cases is inadequate, the Court recognized: "Any personal paper possessed by a President could potentially 'relate to' a conceivable subject of legislation, for Congress has broad legislative powers that touch on a vast number of subjects." *Id*. The Court thus articulated "[a] balanced approach" which requires "a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the 'unique position' of the President."  *Id.* at 2035 (quoting *Clinton* v. *Jones*, 520 U.S. 681, 698 (1997)).

The Select Committee has not even tried to meet its burden under these standards. While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418 U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

Nor could they since the subpoenas targeting Mr. Meadows fall well short of the *Nixon* standard, or even the intermediate *Mazars* standard. The Committee subpoenaed Mr. Meadows before it had even completed other efforts to collect relevant information from non-privileged sources.[15] *See Mazars*, 140 S. Ct. at 2025 (holding that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). Indeed, the Select Committee now claims to be "laser-focused" on Mr. Meadows and the questions it seeks to ask him. *See* Tr. Status Conference May 4, 2022. But that contention just further highlights how woefully inadequate the Select

---

[15] *See, e.g.*, Letter from Chairman B. Thompson to G. Terwilliger (Nov. 5, 2021) ("[T]his list is non-exclusive and may be supplemented as our investigation continues …. We also continue to interview additional witnesses who have personal knowledge of these issues and Mr. Meadows's involvement."); Letter from G. Terwilliger to Chairman B. Thompson (Nov. 8, 2021) ("The courts have made clear that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information. If the Select Committee is already gathering documents and testimony about Mr. Meadows and his conduct during the relevant period, as your letter suggests, it is not clear why the Select Committee needs to gather that information again from him—in a posture that would threaten long-term effects for executive privilege.") (citations omitted).

Committee's predication was—whether measured by the heightened *Nixon* standard or the intermediate *Mazars* standard—when it issued the subpoenas in late 2021.

The subpoena also fails on legislative purpose because the record shows that the Select Committee has targeted Mr. Meadows for purposes that lie squarely outside its authority. The Supreme Court has firmly established that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)), and that "'there is no congressional power to expose for the sake of exposure,'" *id.* (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)). Both statements from members of the Select Committee and its choice of investigative tactics demonstrate that the Select Committee is pursuing a law enforcement objective—at least in its targeting of Mr. Meadows and other senior White House officials. Moreover, it is equally clear that the Select Committee is seeking information from Mr. Meadows for the purpose of public disclosure, as reflected in the Select Committee's release of his personal text messages.

The Congressional Defendants' reliance on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), is misplaced. The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *Mazars*, 140 S. Ct. at 2031. Though there may be legitimate purposes for the Select Committee's investigation, the Meadows Subpoena extends far beyond the scope of any legitimate legislative purpose. The Supreme Court has emphasized the need for specificity in Congress's stated legislative purpose. *See Mazars*, 140 S. Ct. at 2036. And in cases concerning the President, whom Mr. Meadows advised, "it is 'impossible' to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims." *Id.* at 2036. The Select Committee has failed to consider or recommend any draft legislation related to the topics provided in the Meadows

Subpoena, nor has it provided any explanation for how its requests to Mr. Meadows would further any specific legislative end.

The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." This statement could not conceivably be more impermissibly "vague" and "loosely worded." *Watkins v. United States*, 354 U.S. 178, 201 (1957). It is exactly the type of authority the Supreme Court criticized in *Watkins*, where a committee tried "in essence, to define its own authority, to choose the direction and focus of its activities." *Id.* at 205. The subpoena seeks Executive Branch deliberative material, information both temporally and logically disconnected from the events of January 6, and information that is irrelevant to any conceivable legislation. The Select Committee seeks to "radiate outward infinitely to any topic thought to be related in some way" to January 6. *Id.* at 204. Its effort to do so places it beyond its constitutional authority.

One need only look to "[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves" to see the Select Committee's true purpose. *Watkins*, 354 U.S. at 209. Any generalized purported legislative purpose for Mr. Meadows's testimony is entirely pretextual and unsupported by the statements and actions of members of the Select Committee. The subpoenas are relevant only to serve the purpose that members of the Select Committee have stated time and again: to engage in ad-hoc law enforcement and expose possible wrongdoings of their political adversary. *See* First Am. Compl. ¶¶ 26-39; *See* Pl.'s Statement of Facts ¶¶ 20–24. Neither are permissible.

## III.    The Subpoenas Were Not Validly Issued

The subpoenas are invalid because the Select Committee is not a validly constituted body authorized to issue Congressional subpoenas. The Select Committee was created by the passage of House Resolution 503, but the Select Committee and the Speaker of the House have failed to adhere to the Resolutions' dictates.

Contrary to the Congressional Defendants' assertions, "[i]t has been long settled, of course, that rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109 (1963). The same is true of authorizing resolutions, which are a jurisdictional limit on a committee's authority. *Watkins v. United States*, 354 U.S. 178, 206 (1957). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack v. United States*, 384 U.S. 702, 708 (1966). Putting that principle into practice, the DC Circuit and this Court have invalidated multiple convictions for contempt of Congress where a congressional committee failed to adhere to its own rules in issuing a subpoena. *See Liveright v. United States*, 347 F.2d 473, 474 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963); *United States v. Grumman*, 227 F. Supp. 227, 233 (D.D.C 1964). Particular scrutiny of the Select Committee's compliance with its own rules is justified here, where its use of compulsory process has sparked a separation of powers dispute during an investigation of the majority party's political opposition by an almost entirely partisan committee. To borrow language from the Supreme Court, the Congressional Defendants prepared meticulously to compel Mr. Meadows to testify. "It is not too exacting to require that the Committee be equally meticulous in obeying its own rules." *Yellin*, 374 U.S. at 124.

### A.    The Select Committee Is Not Properly Composed Under H. Res. 503 § 2(a).

The subpoenas are invalid because the Select Committee that issued them is not operating as a duly authorized committee of the House of Representatives.  The Select Committee was

established by H. Res. 503. Section 2(a) of that Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9 members: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP congressman put forth by Minority Leader Kevin McCarthy, as required by § 2(a). And in any event, it lacks even the lopsided 8-5 composition that H. Res. 503 calls for.

Nothing in our Constitution expressly authorizes Congress or its committees to issue subpoenas. The Supreme Court has held that an authority to investigate is inherent in Congress's lawmaking function, and that duly authorized congressional committees may exercise this subpoena authority implied by Article I. *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). But the Court has never held that this implied power extends to individual members or to ad hoc groups; only when an authorized committee follows the prescribed rules.

Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021). Further, of those nine members Speaker Pelosi has appointed, none was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a), 117th Cong. (2021). Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to exercise Congress's implied power to issue subpoenas in support of its lawmaking function.

**B.     The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6).**

The subpoenas are also invalid, aside from the composition of the Select Committee as a whole, because Chairman Thompson failed to "consult[] with the ranking minority member." H.

Res. 503 § 5(c)(6).   Section 5(c)(6) authorizes the Chair of the Select Committee to order

depositions by subpoena only "upon consultation with the ranking minority member." *Id.* But the

Select Committee has no ranking minority member—*i.e.*, no senior-most member of the minority,

appointed after consultation with the minority leader.   Indeed, Congress's clear position is that

Rep. Cheney—the senior-most Republican member of the Select Committee—serves as Vice

Chair and *not* as Ranking Member.  *See* Exhibit 9, Interview of Kristin Amerling at 5, ECF No.

28-9, *United States v. Bannon*, No. 1:21cr670 (D.D.C. Feb. 4, 2022).   Chairman Thompson

therefore could not satisfy the consultation requirement of § 5(c)(6) in purporting to subpoena Mr.

Meadows to testify before the Select Committee.  As noted above, the Select Committee's failure

to adhere to its own rules is judicially cognizable and can result in invalidation of the Committee's

actions. *See Yellin*, 374 U.S. at 114; *Watkins*, 354 U.S. at 206.

IV.    **Additional Issues with the Subpoenas Preclude Summary Judgment in Favor of the Congressional Defendants**

For each of the forgoing reasons, Mr. Meadows is entitled to judgment in his favor either

on the pleadings, or in the alternative, on summary judgment.  But if the Court were to disagree, it

would not follow that the Congressional Defendants are entitled to summary judgment.  There are

several additional issues that Mr. Meadows has raised in his complaint which, while perhaps not

amenable to summary disposition in his favor, nevertheless preclude summary disposition against

him.

A.    **The Subpoenas Violate the Separation of Powers by Infringing Upon Executive Privilege.**

Separate and apart from the issue of testimonial immunity addressed above, the Meadows

Subpoena is invalid to the extent it would require Mr. Meadows to breach Executive Privilege.

During his time as Chief of Staff, Mr. Meadows was among the most senior Executive

Branch officials and his communications and deliberations were covered by executive privilege.

That privilege reaches Mr. Meadows's communications "in the course of preparing advice for the President," *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997), and any materials that reveal his or other executive officials' predecisional deliberative processes. *See Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993). The subpoena served on Mr. Meadows clearly seeks information protected by executive privilege. Among other things, the subpoena expressly requests summaries of Mr. Meadows's conversations with the President, records of his conversations with other senior executive officials, and the contents of advice provided to the President by his senior advisors. *See* Am. Compl. Ex A, ECF No. 13-3.

Throughout the course of negotiations regarding potential accommodations, the Select Committee has repeatedly clarified that the subpoena seeks privileged information. Most notably, the Select Committee provided Mr. Meadows with a list of topics for his deposition, informing him that it believed these topics did not "implicate any cognizable claim of executive privilege." That list expressly included Mr. Meadows's conversations with the President, his communications with the Vice President, two Oval Office meetings, and White House Officials' deliberations regarding election security. *See* Am. Compl. Ex. G, ECF No. 13-9. Mr. Meadows's conversations with the President, Vice President, and other senior executive officials are covered by executive privilege, as is any information regarding executive officials' deliberative processes regarding election security. But the Select Committee's list of topics have varied dramatically over time. What began with 27 topics in the subpoena expanded to sixteen "non-exclusive" topics on November 5, followed by another eight topics on November 9. *See* Am. Compl. Exs. A, ECF No. 13-3, G, ECF No. 13-9, & I, 13-11. It appears the Congressional Defendants have currently settled on seven topics for the purposes of this litigation. *See* Defs.' Mot. Summ. J., ECF No. 15 at 14-15.

When a congressional committee uses its subpoena power to seek information covered by executive privilege, the subpoena will only be enforced where "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Select Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). The information sought by the Select Committee is not demonstrably critical to its functions as it is not relevant to any legislative purpose and could be obtained from alternative sources. Additionally, the vast majority of the information sought by the Select Committee could be obtained from other sources. Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. Much of it could obtained via subpoenas to individuals outside the Executive Branch or individuals who lie farther from the core of executive privilege.

The Select Committee has confirmed that its subpoena violates the Separation of Powers by seeking and obtaining a purported "waiver" of executive privilege from President Biden.  To support the efficacy of this waiver, they cite to the DC Circuit's holding in *Trump v. Thompson* that "the profound interests in disclosure advanced by President Biden and the January 6th Committee" exceed the "generalized concerns for Executive Branch confidentiality" asserted by President Trump in that case. *See* ECF No. 15 at 26–27. But Mr. Meadows has articulated specific issues of executive privilege and, to the extent his objections have been generalized, it has been because the Select Committee has refused to identify with particularity the questions it intends to ask. Additionally, as articulated above, the "profound interests" put forward in *Trump v. Thompson* ran to the documents at issue in that case; the subpoena to Mr. Meadows must stand on its own legs.

President Biden's purported waiver does not vitiate Mr. Meadows's assertion of privilege at the direction of former President Trump.  Nothing in the Constitution or laws of the United

States gives President Biden the authority to compel a former official (now private citizen) to divulge privileged communications from a former President's administration under the premise that he is simply waiving executive privilege.[16] As Justice Kavanaugh recently explained, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* Therefore, notwithstanding President Biden's purported waiver, Executive Privilege still applies.

Executive privilege does not expire with a President's term. The core purpose of executive privilege is to ensure that a President and his advisors are "free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). President Biden lacks both the legal authority to compel Mr. Meadows to divulge privileged information and the

---

[16] President Biden's justification for a wholesale waiver of then-President Trump's Executive Privilege does not withstand even a cursory test as matter of law. President Biden asserts that the "unique and extraordinary circumstances" justifies setting aside constitutional principle. Such an assertion should be viewed just as suspect as a claim that Fourth Amendment rights can be abridged by the non-exigent need for a search without warrant because the investigation concerns a "unique and extraordinary" case, or that Fifth Amendment protections can be cast aside because the alleged crime is particularly heinous. President Biden's justification is no justification at all to abandon constitutional principles.

knowledge necessary to making an informed judgment as to whether privilege should be maintained. It is clear that President Biden could not, of his own accord, compel Mr. Meadows to divulge privileged conversations with former President Trump; the President has no such authority over former officials either inherently or as a matter of federal law. Likewise, President Biden is in no position to judge whether it would or would not be in the national interest to "waive" Executive Privilege as to Mr. Meadow's potential testimony because he has no knowledge of the substance of privileged communications and deliberations at issue. Thus, President's Biden's purported waiver of President's Trump's Executive Privilege claims, whatever its effect, is not sufficient to vitiate Mr. Meadow's maintenance of privilege as a matter of law.

It is equally clear that Congress, acting on its own, could not obtain privileged information from Mr. Meadows without satisfying the stringent standards established by the Supreme Court in *United States v. Nixon*, 418 U.S. 683, 714 (1974). The Select Committee and President Biden cannot do collectively what neither can do alone. The Supreme Court has consistently held that two branches acting in concert are no more capable of altering the balance of the separation of powers than one acting alone. *Cf. Clinton v. City of New York*, 524 U.S. 417 (1998) (invalidating a line-item veto for violating the Separation of Powers notwithstanding both Congressional and Presidential consent to the statutory scheme); *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983) (same for a one-house legislative veto). If coordination between a subsequent President and one chamber of Congress were sufficient to overcome testimonial immunity or executive privilege, the very purpose of these constitutional protections would be subverted. A constitutional protection that does not survive a mere party-change in the political branches is no constitutional protection at all.

Mr. Meadows's conversations with former President Trump were protected by executive privilege and testimonial immunity while President Trump was in office, and they remain protected afterwards.

### B.     The Select Committee Cannot Obtain Records under the Verizon Subpoena Consistent with the Stored Communications Act.

The Stored Communications Act prohibits the Select Committee from obtaining the subpoenaed records from Verizon.  To the extent the Select Committee is seeking production of the contents of communications, that request is prohibited under Section 2702(a)(1) of Title 18.  The Stored Communications Act generally provides that "a person or entity providing electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).  Verizon is "a person or entity providing electronic communication service to the public," and the Select Committee qualifies as "any person or entity" within the meaning of the Stored Communications Act.  *See* 18 U.S.C. § 2711 (providing no specialized definition of "person" or "entity").Section 2702(a)(1) thus prohibits knowing disclosure of "the contents of a communication" stored by Verizon to the Select Committee absent an express statutory exception outlined in Section 2702(b).  None of the statutory exceptions in Section 2702(b) applies to the Select Committee's subpoena.

To the extent the Select Committee is seeking production only of non-communication records and information, that request is prohibited under Section 2702(c) of Title 18.  The Stored Communications Act provides that "[a] provider described in [Section 2702(a)] may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))" if one of seven criteria is

met.  Mr. Meadows is "a subscriber to or customer of [Verizon's] service" within the meaning of the Stored Communications Act.

The Select Committee cannot obtain the subpoenaed records under Section 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." 18 U.S.C. § 2702(c)(1). Specifically, on information and belief, the Select Committee has not obtained and cannot obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for one hundred days or less." *Id.* § 2703(a). Nor has the Select Committee provided Mr. Meadows with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage . . . for more than one hundred and eighty days." *Id.* § 2703(a), (b)(1).  The Select Committee does not have lawful consent to obtain the subpoenaed records. *See id.* § 2702(c)(2). The Select Committee does not constitute or represent "a law enforcement agency" within the meaning of the Stored Communications Act. *Id.* § 2702(c)(7).  The Select Committee may represent a "governmental entity" but, on information and behalf, have not shown and cannot demonstrate "in good faith" "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." *Id.* § 2702(c)(4), (6).

Thus, here too, even if the Court were not prepared to grant judgment in favor of Mr. Meadows at this juncture, these deficiencies in the Verizon Subpoena would preclude summary judgment in favor of the Congressional Defendants.

**C.**    **Compelled Production under the Verizon Subpoena Would Violate the Fourth Amendment.**

44

The Verizon Subpoena is also invalid because it violates Mr. Meadows's Fourth Amendment rights. That subpoena instructs Verizon to produce subscriber information and cell phone data associated with the phone number previously used by Mr. Meadows. This cell phone number was used by Mr. Meadows as his personal cell phone during his tenure as White House Chief of Staff. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested includes all calls, text messages, and other records of communications associated with that phone number, and it can be used for historic cell site analysis. The requested data covers four full months: October 1, 2020 through January 31, 2021.

Mr. Meadows has a reasonable expectation of privacy in his personal cell phone data. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967). The fact that a third party at least temporarily stores a person's cell phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946). If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. Mr. Meadows has not provided his consent for Verizon to produce his cell phone data to the Select Committee. And for the reasons discussed *supra*, the Select Committee's subpoenas are invalid.

Additionally, a congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents is unreasonable and falls outside the scope of Congress' legitimate legislative power. See *Mazars*, 140 S. Ct. at 2040. The subpoena contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights. For the Select Committee to subpoena Verizon for all Mr. Meadows's personal cell phone data over the course of four months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.

As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoenas would violate Mr. Meadows's Fourth Amendment protection against unlawful search and seizure.

### D.    Compelled Production of Cell Phone Data under the Verizon Subpoena Would Violate the First Amendment.

The subpoena of Mr. Meadows's private cell phone data violates his right to free association and chills the exercise of free speech rights. Mr. Meadows used his personal phone to engage in protected advocacy and other speech, including privileged speech with his attorneys and spouse. Mr. Meadows also used his personal phone to engage in private conversations with friends and family. All of these associational and expressive activities are protected by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003).

The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena, much less a compelling one. Mr. Meadows has already provided the Committee

with the substance and metadata of his responsive emails and text messages. Additional information will not meaningfully aid the Committee in any valid pursuit.

Even if had a valid reason to seek protected information, the Committee has put in place no safeguards to protect Mr. Meadows's rights. It provided Mr. Meadows with no notice of the subpoena and has provided him with no opportunity to assert claims of privilege or other legal protections over the demanded information. It also has no provisions for a taint team or analogous filter for privileged information. The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Committee to do with as it pleases.

The Verizon subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries. The body that issued this subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President under which Mr. Meadows served. Allowing an entirely partisan select committee of Congress to subpoena the personal cell phone data of executive officials would work a massive chilling of current and future Executive Branch officials' associational and free speech rights

The Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

**CONCLUSION**

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Defendants' motion for summary judgment.

Dated: May 20, 2022

Respectfully submitted,
MARK R. MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

Case 1:21-cv-00670-CJN   Document 89-1   Filed 05/27/22   Page 57 of 57

## CERTIFICATE OF SERVICE

I certify that, on May 20, 2022, a copy of the foregoing was filed on the Court's CM/ECF

system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK MEADOWS,      ) | |
|      ) | |
|      *Plaintiff*,      ) | |
|      ) | |
| v.      ) | Case No. 1:21CV3217 (CJN) |
|      ) | |
| NANCY PELOSI, et al.,      ) | |
|      ) | |
|      *Defendants*.      ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.      Before establishing the Select Committee, Congress considered and ultimately rejected a proposal to establish a bipartisan, bicameral commission to investigate the events of January 6, 2021 and to propose "corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism." H.R. 3233, 117th Cong. (2021).

2.      House Resolution 503, which the House of Representatives passed on a near party-line vote, authorized the Select Committee with goals similar to those of H.R. 3233. H. Res. 503, 117th Cong. (2021).

3.      Section 4 of House Resolution 503 provides that "The Select Committee may not hold a markup of legislation." H. Res. 503, 117th Cong. (2021).

4.      Section 2(a) of the Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021).

5.      The Select Committee has only nine members. *See* 167 Cong. Rec. H3597, H3885 (2021).

-2520-

6.      On July 1, 2021, Speaker Pelosi appointed Chairman Thompson and six additional Democrat members—Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria—and one Republican—Rep. Liz Cheney. *See* 167 Cong. Rec. H3597 (2021).

7.      Minority Leader McCarthy recommended Rep. Jim Banks to serve as Ranking Member of the Select Committee, alongside four more members of the Republican Conference. *See* Press Release, Jim Banks, Member, H.R., *McCarthy Taps Banks to Lead Republicans on Jan 6 Committee* (July 19, 2021), https://banks.house.gov/news/documentsingle.aspx?DocumentID=1921; Press Release, Kevin McCarthy, Minority Leader, H.R., *McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee* (Jul 21, 2021), https://www.republicanleader.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/ [hereinafter McCarthy Press Release].

8.      Speaker Pelosi made an "unprecedented decision" to decline to appoint some of those members recommended by Minority Leader McCarthy, appointing instead Rep. Adam Kinzinger. *See* Press Release, Nancy Pelosi, Speaker, H.R., *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol* (July 21, 2021), https://www.speaker.gov/newsroom/72121-2; 167 Cong. Rec. H3885 (2021) [hereinafter Pelosi Press Release].

9.      No member of the Select Committee was recommended by the minority leader or the Republican Conference. *See* McCarthy Press Release, *supra* ¶ 7.

10.     No other current committee of the House of Representatives—standing or select—is composed wholly of members appointed by the Speaker *without* the recommendation of the minority leader. *Compare, e.g*., Pelosi Press Release, *supra* ¶ 8, *with* House Rule X, cl.

2

5(a) *and* Michael Greene, Cong. Rsch. Serv., R46786, *Rules Governing House Committee and Subcommittee Assignment Procedures* 7 (2021).

11.    When Speaker Pelosi appointed certain members to the Select Committee on July 1, 2021, she named Rep. Thompson as "Chair." 167 Cong. Rec. H3597 (2021).

12.    Speaker Pelosi appointed Rep. Cheney without any designation. *See* 167 Cong. Rec. H3597 (2021).

13.    Chairman Thompson designated Rep. Cheney to serve as "Vice Chair" on September 2, 2021. *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair.

14.    The term "vice chair" never appears in House Resolution 503. *See generally* H. Res. 503, 117th Cong. (2021).

15.    House Rule XI, cl. 2(d) explains that the vice chair of a committee is to be a "member of the majority party."

16.    Rep. Cheney is a member of the Republican Conference, which is the minority party in the 117th Congress. *See, e.g.*, 167 Cong. Rec. H9 (2021) (statement of Rep. Cheney).

17.    To issue an order for the taking of depositions, House Resolution 503 requires the chair of the Select Committee to "consult[] with the ranking minority member."  H. Res. 503 (2021).

18.    A Federal Bureau of Investigation report dated November 10, 2021 states that Doug Letter, counsel for Defendants, admitted that the Select Committee has no ranking

3

member. *See* Mot. Compel Disc. Ex. 9 at 5, *United States v. Bannon*, 1:21cr670, ECF No. 28-9 at

5 (D.D.C. Feb. 4, 2022).

19.     The Select Committee's investigative staff is led by two former United States

Attorneys: Timothy J. Heaphy and John Wood. *See* Press Release, Bennie Thompson, Chairman,

Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Thompson Announces Chief*

*Investigative Counsel for Select Committee* (Aug. 12, 2021),

https://january6th.house.gov/news/press-releases/thompson-announces-chief-investigative-

counsel-select-committee; Press Release, Bennie Thompson, Chairman, Select Comm. to

Investigate the Jan. 6th Attack on the U.S. Capitol, *Thompson & Cheney Announce Senior*

*Investigative Counsel for the Select Committee* (Sept. 17, 2021),

https://january6th.house.gov/news/press-releases/thompson-cheney-announce-senior-

investigative-counsel-select-committee.

20.     The chairman of the Select Committee has described his intention to "bring

justice" to the "tragedy of January 6." Bennie Thompson (@BennieGThompson), Twitter, (Jan.

6, 2022 8:31 AM),

https://twitter.com/BennieGThompson/status/1479083311163232258?s=20&t=mgVdhFfyScMs

Fz-S8KzK4Q.

21.     Rep. Kinzinger has said he wants to "hold the guilty people accountable."

*Kinzinger: 'I want to hold the guilty people accountable' for Jan. 6*, CNN (December 19, 2021),

https://www.cnn.com/videos/tv/2021/12/19/sotu-kinzinger-full.cnn.

22.     Rep. Schiff has explained that he intends to "expose those responsible for Jan 6,"

Adam Schiff (@RepAdamSchiff), Twitter (Nov. 12, 2021, 4:54 PM),

https://twitter.com/RepAdamSchiff/status/1459278425118625794?s=20&t=m1I0kGXWVIOyM

FMBcXxZXw, and that "exposing all the malefactors and bloodshed that went on here is really important," Mary Clare Jalonick, *Capitol riot committee has interviewed 250 people so far*, Associated Press (Dec. 2, 2021), https://apnews.com/article/steve-bannon-donald-trump-elections-capitol-siege-36b68bd9e0c701fea8e6b11f00292604.

23.      The Select Committee hearings, Rep. Raskin has described, "will expose every facet of the assault against our democracy and Constitution on 1/6." Jamie Raskin (@jamie_raskin), Twitter (Apr. 29, 2022, 11:05 AM), https://twitter.com/jamie_raskin/status/1520056793942175744?s=20&t=Zd3m9rX_OVrwcjyIINCYOw.

24.      Speaker Pelosi explained in a press conference that "the next step for us has always been to seek and to find the truth." See Nancy Pelosi, Speaker, H.R., *Transcript of Pelosi Weekly Press Conference Today* (Jul. 1, 2021), https://www.speaker.gov/newsroom/7121-2.

25.      The Select Committee has held only one hearing, but others appear to be planned for June 2022 forward. *See The Law Enforcement Experience on January 6: Hearing Before the H. Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol*, 117th Cong.; Zak Hudak, *House January 6 committee plans eight hearings for June*, CBS News (Apr. 29, 2022), https://www.cbsnews.com/news/january-6-committee-hearings-june/.

26.      The Select Committee has interviewed nearly 1,000 witnesses. *See* Mychael Schnell & Harper Neidig, *Jan. 6 panel issues subpoenas to five GOP lawmakers*, The Hill (May 12, 2022), https://thehill.com/policy/national-security/3486269-jan-6-panel-issues-subpoenas-to-five-gop-lawmakers/ (citing Rep. Raskin).

27.      The Select Committee has issued more than one hundred subpoenas for documents and/or testimony of witnesses, including fellow members of Congress. *See generally*

Press Releases, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol,

https://january6th.house.gov/news/press-releases. *See also* Claudia Grisales, et al., *Jan. 6*

*subpoena tracker: Here's who the House panel wants to hear from*, NPR (last updated Mar. 3,

2022), https://www.npr.org/2021/11/06/1051652687/jan-6-panel-and-subpoenas-committee-

targets-witnesses-linked-to-day-of-attack.

      28.     The Select Committee has also sent preservation notices and demanded records to

social media companies, which seek "data, reports, analyses, and communications" of fifteen

private companies that "stretch[] back to spring of 2020," months before the 2020 Presidential

election and nearly a year before the January 6 attack.  Press Release, Bennie Thompson,

Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee*

*Demands Records Related to January 6th Attack from Social Media Companies* (Aug. 27, 2021),

https://january6th.house.gov/news/press-releases/select-committee-demands-records-related-

january-6th-attack-social-media-0. *See* Press Release, Bennie Thompson, Chairman, Select

Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas*

*Social Media Companies for Records Related to January 6th Attack* (Jan. 13, 2022),

https://january6th.house.gov/news/press-releases/select-committee-subpoenas-social-media-

companies-records-related-january-6th.

      29.     The Select Committee requested from telecommunications companies cellular

data from the personal phones of at least one hundred different individuals, many of whom

(including Mr. Meadows) the Select Committee knows was nowhere near the Capitol on January

6. *See, e.g.*, Compl., *Scavino v. Verizon Communications*, 1:22cv18 (D.D.C. Jan. 5, 2022);

Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas*

*for phone records*, CNN (Dec. 7, 2021) https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html.

30.     The Select Committee has also sought the fundraising data and tactics from their political adversary: the Republican National Committee. *See* Compl., *Repub. Nat'l Comm. v. Pelosi*, 1:22cv659 (D.D.C. Mar. 15, 2022).

31.     And finally, the Select Committee has subpoenaed the personal banking records of at least one individual associated with the Trump campaign. *See* Compl., *Budowich. v. Pelosi*, 1:21cv3366 (D.D.C. Dec. 24, 2021).

32.     The Select Committee also sent self-described "sweeping" demands for presidential records from the National Archives and Records Administration (NARA)—including records relating to Mr. Meadow specifically—and seven other Executive Branch agencies. Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Issues Sweeping Demand for Executive Branch Records* (Aug. 25, 2021), https://january6th.house.gov/news/press-releases/select-committee-issues-sweeping-demand-executive-branch-records.

33.     After former President Trump asserted Executive Privilege over certain NARA records, President Biden purported to overrule the privilege, given the "unique and extraordinary circumstances" of January 6. *See* Compl. Ex. 5, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. 2021); Second Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/13/second-letter-from-dana-a-remus-counsel-to-the-president-to-david-ferriero-archivist-of-the-united-states-datedoctober-8-2021/.

34.     After a legal battle over the records, NARA eventually released a number of records to the Select Committee, one or more of which related to Mr. Meadows. *See* Decl. George J. Terwilliger III ¶ 4.

35.     But the Select Committee has never called upon President Trump to testify—in fact, the Chairman has signaled he has no intention to do so. *See* Rebecca Beitsch, *Jan. 6 panel has no plans to call Trump*, The Hill (May 17, 2022), https://thehill.com/policy/national-security/3491576-jan-6-panel-has-no-plans-to-call-trump/.

36.     Mr. Meadows served as Chief of Staff to President Trump from March 31, 2020 until January 20, 2021. *See* First Am. Compl, Ex. A, ECF No. 13-3.

37.     The Select Committee issued Mr. Meadows a subpoena on September 23, 2021 demanding he produce documents and appear for a deposition about 27 discrete topics. First Am. Compl. Ex. A, ECF No. 13-3.

38.     The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." First Am. Compl. Ex. A, ECF No. 13-3.

39.     The U.S. Department of Justice under both Republican and Democrat administrations has researched and analyzed the law and opined officially  that as a matter of law Congress cannot compel testimony from senior advisors of the President. *See, e.g.*, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 131 (1984); *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).

40.     Mr. Meadows has been instructed by former President Trump "to not provide any testimony concerning his official duties in response to the Subpoena," as well as to maintain all applicable privileges and immunities. Ex. A.

41.     The administration of federal election laws, *see, e.g.*, 52 U.S.C. §§ 10307, 20511; 18 U.S.C. §§ 241-42, is squarely within the purview of the President (and his Chief of Staff) who has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3.

42.     The breadth of a Chief of Staff's duties may necessarily include activities, including political considerations, relevant to the President's reelection and legal matters pertaining to a presidential election. *See* Decl. George J. Terwilliger III ¶ 7.

43.     Counsel for Mr. Meadows informed Chief Investigative Counsel for the Select Committee, Timothy J. Heaphy, of former President Trump's invocation of privilege on multiple occasions. *See, e.g.*, Decl. George J. Terwilliger III ¶ 5.

44.     Counsel also enclosed this letter with his in his October 11, 2021 correspondence to White House Counsel Dana A. Remus, which was also sent to Heaphy. *See* First Am. Compl. Ex. C.

45.     Rules of the House of Representatives provide that if a witness invokes a privilege during his deposition, the chair of a committee ultimately rules on whether or not to override the privilege and order the witness to answer. *See* 167 Cong. Rec. H41 (Jan. 4, 2021).

46.     Mr. Meadows engaged in a months-long effort to try to reach an accommodation with the Select Committee concerning testimonial information Mr. Meadows could provide without being compelled to appear and/or unilaterally waiving claims by the former president of Executive Privilege . *See* First Am. Compl. Exs. B, D-K, M-R.

47.     Chairman Thompson on November 5, 2021 explained that Mr. Meadows would be questioned on sixteen "non-exclusive" topics. See First Am. Compl. Exs. A, ECF No. 13-3, G, ECF No. 13-9, & I, 13-11.

48.     For the purpose of this litigation, the Congressional Defendants have described a series of seven topics about which they seek Mr. Meadows's testimony. See Defs.' Mot. Summ. J., ECF No. 15 at 14-15.

49.     Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. For example, there were many individuals present for the Oval Office meeting discussed in the interview of Richard Donoghue, *see* Defs.' Mot. Summ. J. Ex. Q, ECF No. 15-18, and the meetings with members of Congress discussed during Cassidy Hutchinson's interview, *see* Defs.' Mot. Summ. J. Ex. P, ECF No. 15-17, some of whom have clearly already provided requested testimony to the Select Committee.

50.     Chairman Thompson twice rejected Mr. Meadows's offer to answer written interrogatories prior to or in lieu of testifying. *See* First Am. Compl. Exs. M, ECF No. 13-15, N, ECF No. 13-16, & T, ECF No. 13-22.

51.     Mr. Meadows and the Select Committee agreed that he would appear for a voluntary deposition on December 8, 2021 upon "certain preconditions," including that "Select Committee or its staff will in good faith limit the matters of inquiry and specific questions to that which it believes to be outside the scope of Executive Privilege" and that Mr. Meadows would have three business days to review any documents the Select Committee intended to question him about during the deposition. *See* First Am. Compl. Ex. O, ECF No. 13-17 (agreeing to appear for voluntary deposition upon certain preconditions); First Am. Compl. Ex. Q, ECF No. 13-19 (accepting Mr. Meadows's offer to appear).

52.    As demanded by the Select Committee, Mr. Meadows produced more than 1,000 non-privileged emails and documents, as well as 2,319 text messages from his personal devices. *See* First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

53.    Mr. Meadows's counsel noted in the cover letter accompanying each production that the production was "not intended to waive any of Mr. Meadows's privileges or rights" and that "production of any privileged or otherwise protected information which is not responsive to the subpoena is unintentional, and we request the prompt return of any such information if identified or upon our request." First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

54.    This caveat was particularly critical—as the Select Committee was aware—given that Mr. Meadows's counsel was unable to accurately determine the privileged nature of all communications because neither Mr. Meadows nor counsel could not identify the sender and/or recipient associated with text messages correspondent phone numbers. *See* Decl. George J. Terwilliger III ¶ 6.

55.    Counsel also requested that the produced materials be "treated as confidential and exempt from disclosure beyond the Select Committee." First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

56.    Mr. Meadows received a notification from Verizon the weekend before his scheduled deposition, explaining that the Select Committee had subpoenaed records from the personal cell phone he used during his tenure as Chief of Staff. *See* First Am. Compl. Ex. S, ECF No. 13-21.

57.    The Verizon Subpoena demands certain data from Mr. Meadows's personal cell phone from October 1, 2020 to January 31, 2021, including the following:  Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile

Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile

Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber

Identifiers ("IMS!"), or International Mobile Equipment Identities ("IMEI") associated with the

accounts, "[o]ther subscriber numbers or identities (including temporarily assigned network

addresses and registration Internet Protocol ("IP") addresses)" and "[a]ll call, message (SMS &

MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone

Numbers, including all phone numbers, IP addresses, or devices that communicated with the

Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages,

voicemail, and data connections." First Am. Compl. Ex. S, ECF No. 13-21.

58.    After considering the Verizon subpoena, along with other actions the Select

Committee had recently undertaken, including a statement by Chairman Thompson that those

who plead the Fifth Amendment are "part and parcel guilty," Mr. Meadows through counsel

informed the Committee he could no longer voluntarily appear for a deposition. *See* First Am.

Compl. Ex. T, ECF No. 13-22.

59.    The day after Mr. Meadows so informed the Select Committee of this decision, he

filed this action. *See* Compl., ECF No. 1.

60.    During the floor debate in the House to refer Mr. Meadows for contempt of

Congress, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6.

167 Cong. Rec. H7785.

61.    Rep. Cheney read Mr. Meadows's private text messages aloud before making an

unmistakable accusation that Mr. Meadows knew former President Trump "through action or

inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral

votes." 167 Cong. Rec. H7786.

62.     Rep. Lofgren also read Mr. Meadows's text messages on the House floor, 167

Cong. Rec. H7788, as did Reps. Schiff, *id.* at H7791, Aguilar, *id.,* and Luria, *id.* at H7792.

63.     Since Mr. Meadows produced his personal communications to the Select

Committee, it has  disclosed or caused the disclosure to the news media a steady stream of his

communications. *See, e.g.*, Aaron Blake, *The key texts between Mark Meadows, Mike Lee and

Chip Roy*, Wash. Post (Apr. 15, 2022), https://www.washingtonpost.com/politics/2022/04/15/lee-

roy-meadows-texts/; Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump

Jr. texted Meadows ideas for overturning 2020 election before it was called*, CNN (Apr. 9,

2022), https://www.cnn.com/2022/04/08/politics/donald-trump-jr-meadows-text/index.html; Bob

Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting

efforts to overturn the 2020 election, texts show*, Wash. Post (Mar. 24, 2022)

https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/;

Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe (Jan. 5, 2022),

https://www.bostonglobe.com/2022/01/05/nation/read-sean-hannitys-texts-mark-meadows/.

64.     On April 25, 2022, all of the 2,319 texts Meadows produced—no more and no

less—were provided to CNN and publicly released. *See READ: Text messages Sean Hannity,

Marjorie Taylor Greene, Ivanka Trump and others sent to Mark Meadows*, CNN (Apr. 25,

2022), https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-hannity-ivanka-

trump-marjorie-taylor-greene/index.html.

65.     Neither Mr. Meadows nor his counsel provided these texts to members of the

press. *See* Decl. George J. Terwilliger III ¶ 8.

66.     House Rule XI, cl. 2(i) states, "[O]nly the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof."

67.     Though Defendants deny their involvement in this and the many preceding leaks of Mr. Meadows's documents, *see* Answer First Am. Compl., ECF No. 17 at ¶ 115, no member of the Select Committee has condemned the severe breaches of Mr. Meadows's private, confidential communications, aside from the fact that such leaks detract from the drama of the Select Committee's final report. *See* Peter Nicholas, *Avalanche of leaks imperils Jan. 6 committee's delivering on blockbuster hearings*, NBC News (May 1, 2022), https://www.nbcnews.com/politics/congress/avalanche-leaks-risks-jan-6-committee-delivering-blockbuster-hearings-rcna26549.


Dated: May 20, 2022                      Respectfully submitted,
                                          MARK R. MEADOWS
                                          *By Counsel*

                                          /s/ George J. Terwilliger III
                                          George J. Terwilliger III
                                          MCGUIREWOODS LLP
                                          888 16th Street NW, Suite 500
                                          Washington, DC 20006
                                          Phone: (202) 857-1700
                                          Fax: (202) 857-1737
                                          gterwilliger@mcguirewoods.com

                                          Brooks H. Spears
                                          MCGUIREWOODS LLP
                                          1750 Tysons Boulevard, Suite 1800
                                          Tysons, VA 22102
                                          Phone: (703) 712-5000
                                          Fax: (703) 712-5050
                                          bspears@mcguirewoods.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

MARK MEADOWS,              )

                       )

        *Plaintiff,*      )

                       )

      v.              )     Case No. 1:21CV3217 (CJN)

                       )

NANCY PELOSI, et al.,      )

                       )

      *Defendants.*    )

_____)

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF**
**UNDISPUTED MATERIAL FACTS**

1.      Mr. Meadows does not dispute the fact that a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College on January 6, 2021. Mr. Meadows does not dispute that then-President Donald Trump spoke at the Stop the Steal rally that same day. And finally, Mr. Meadows does not dispute that some individuals who attended the rally went on to the U.S. Capitol that day. Mr. Meadows disputes any additional characterization in the Defendants' assertion that is not factual.

2.      Mr. Meadows does not dispute this assertion.

3.      a.[1] Mr. Meadows does not dispute these assertions.

3.      b. Mr. Meadows does not dispute this assertion. Section 2(a) states, "The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021).

_____

[1] Defendants' Statement of Undisputed Material Facts, ECF No. 15-28, listed two paragraphs as number 3. For ease of comparison, Plaintiff references those as "3a" and "3b." All other paragraph numbers should correspond accordingly.

4.      Mr. Meadows does not dispute these assertions.[2]

5.      Mr. Meadows disputes the assertions that Speaker Pelosi spoke with the Minority Leader, advised him on the referenced matter, and asked him to recommend two other Republicans. Mr. Meadows also disputes that the Minority Leader took any action "[r]ather than comply with that request." **Mr. Meadows seeks discovery on this and other disputed questions of fact.** The press release cited by the Defendants does not lend any support to their assertions that Speaker Pelosi spoke with the Minority Leader, advised him, and asked for further recommendations. Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

Mr. Meadows does not dispute the remaining cited actions by the Minority Leader.

---

[2] To the extent Defendants include multiple factual assertions in violation of ¶ 10(a) of the Standing Order, ECF No. 4, Plaintiff will attempt to separate and respond to each discrete allegation. If necessary citation is made to only one allegation within the numbered paragraph, Plaintiff will assume it was intended to lend support to all allegations within the paragraph.

6.      Mr. Meadows does not dispute that the Minority Leader declined to make further recommendations. But Mr. Meadows does dispute that Speaker Pelosi "interpreted House Resolution 503 and the relevant House Rules, and determined a course of action under House Resolution 503 and the House Rules." **Mr. Meadows seeks discovery on this and other disputed questions of fact.** Neither the Congressional Record nor the Amended Complaint cited by Defendants lend support to those facts. Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

Mr. Meadows does not dispute the fact that Speaker Pelosi named an additional Republican to the Select Committee.

7.      Mr. Meadows does not dispute that House Rule XI, cl. 2(h) and House Resolution 503 § 5(c)(3) provide requirements for a quorum. However Mr. Meadows disputes that these materials support any assertion about Speaker Pelosi's state of mind when she appointed nine Members to the Select Committee. **Mr. Meadows seeks discovery on this and other disputed questions of fact.** Defendants have not "include[d] references to the parts of the record relied on

3

to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A).Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

8.      Mr. Meadows does not dispute these assertions. But Mr. Meadows does dispute that these actions by the Select Committee are relevant, much less material, to the Defendants' motion for summary judgment, given that Mr. Meadows is not challenging these actions.

9.      Mr. Meadows does not dispute that the Select Committee issued him a subpoena on September 23, 2021 for deposition testimony and documentation. Mr. Meadows disputes that the testimony and documents demanded in the subpoena are limited to "the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day." *See, e.g.*, Am. Compl., Ex. A, ECF No. 13-3 at 6-7 ("From November 3, 2020, to January 20, 2021, all documents and communications reporting, summarizing, or detailing the voting returns and election results of the 2020 Presidential election.").

10.      Mr. Meadows does not dispute this assertion.

11.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

12.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

13.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

14.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

15.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content. However, Mr. Meadows disputes that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

16.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

17.     Mr. Meadows does not dispute that Defendants are characterizing documents and a privilege log from Mr. Meadows. Mr. Meadows states the documents speak for themselves,

refers to them for their full and complete contents, and disputes any assertion Defendants make

that are inconsistent with the content therein.

18.     Mr. Meadows does not dispute that Defendants are characterizing the referenced

privilege log. Mr. Meadows states the document speaks for itself, refers to it for its full and

complete contents, and disputes any assertion Defendants make that are inconsistent with its

content. Further, Mr. Meadows disputes that he identified *any* emails "he initiated or participated

in based on his role in the Trump campaign with people reported to be members of the Trump

campaign legal team or other Trump campaign staff." *See* Am. Compl. Ex. E, ECF No. 13-7.

The Defendants' cited documents also do not support this assertion. Thus, Defendants have not

"include[d] references to the parts of the record relied on to support the statement," a violation of

Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A).

Mr. Meadows disputes the distinction Defendants attempt to draw between actions Mr.

Meadows took as Chief of Staff to the President and those he took to reelect the President. *See*

Decl. George J. Terwilliger III ¶ 7.

Mr. Meadows does not dispute that he communicated with the state election official

Defendants cited. In support of Defendants' many other assertions about Mr. Meadows's actions,

they have made no other "reference[] to the parts of the record relied on to support the

statement[s]," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil

Procedure 56(c)(1)(A). Plaintiff therefore disputes these unsupported assertions.

19.    Mr. Meadows does not dispute that Defendants are characterizing the referenced

privilege log. Mr. Meadows states the document speaks for itself, refers to it for its full and

complete contents, and disputes any assertion Defendants make that are inconsistent with its

content. Further, the document cited by the Defendants does not indicate which parties the

Defendants claim are "lawyers acting for the campaign" or "other campaign staff."

20.    Mr. Meadows does not dispute that Defendants are characterizing a December 7,

2021[3] letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete

contents, and disputes any assertion Defendants make that are inconsistent with its content. Mr.

Meadows does not dispute that he agreed to appear for a deposition on December 8, 2021 upon

certain conditions. *See* Am. Compl. Ex. O, ECF No. 13-17. Mr. Meadows does not dispute that

he filed this suit, and he does not dispute that he did not appear before or provide testimony to

the Select Committee.

Mr. Meadows disputes that he had a "change of heart." Mr. Meadows has stated that it

was Defendants' actions that caused Mr. Meadows to decline to appear for a deposition. *See* Am.

Compl. ¶ 111.

21.    Mr. Meadows does not dispute that the House voted to hold him in contempt and

that members of the House made such arguments on the floor. Mr. Meadows also does not

dispute that the Rules Committee and full House adopted the Select Committee's contempt

---

[3] Defendants appear to have inadvertently stated that Plaintiff communicated with the Select
Committee on December 7, 2022. This communication occurred on December 7, *2021*.

report. Mr. Meadows does dispute that these assertions are accurate, complete, or relevant, much

less material, to the Defendants' motion for summary judgment.

Mr. Meadows does not dispute that the contempt report makes the referenced assertion.

Mr. Meadows does dispute that he and the Select Committee agree upon any "indisputably

non-privileged testimony." *See* Am. Compl. Ex. T, ECF No. 13-22 ("[F]rom the information

supplied to us last Friday – upon which Mr. Meadows could expect to be questioned[,] . . . the

Select Committee has no intention of respecting boundaries concerning Executive Privilege.").

22.    Mr. Meadows does not dispute that he has not testified before the Select

Committee. Mr. Meadows again disputes that he and the Select Committee agree on the scope of

"non-privileged information." *See* Am. Compl. Ex. T, ECF No. 13-22.

23.    Mr. Meadows does not dispute the assertion that the Verizon subpoena demands

"subscriber information and cell phone data associated with Mr. Meadows's personal cell phone

number." Mr. Meadows disputes that the subpoena does not demand the content of

communications and geo-location data. On its face, the Verizon subpoena fails to support

Defendants' assertion. Defendants also cite nothing to support the fact that Verizon has not

produced any subpoenaed information and that Verizon will not do so "absent a ruling from this

Court." **Mr. Meadows seeks discovery on these and other disputed questions of fact.** Thus,

Defendants have not "include[d] references to the parts of the record relied on to support the

statement[s]," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil

Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the

lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

24.     Mr. Meadows does not dispute this assertion. Mr. Meadows does dispute that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

25.     Mr. Meadows does not dispute this assertion. Mr. Meadows does dispute that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

26.     The statement Defendants cite here fails to support their assertion. Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Nonetheless, Mr. Meadows also disputes that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

27.     Mr. Meadows does not dispute that his book discloses some conversations he had with former President Trump. Mr. Meadows does dispute that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

28.     Mr. Meadows does not dispute that his book discloses some of his views and observations of events that occurred on January 6. Mr. Meadows does dispute that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

29.     Mr. Meadows does not dispute that he undertook efforts to reelect then-President Trump. Mr. Meadows again disputes the distinction Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President. *See* Decl. George J. Terwilliger III ¶ 7.


Dated: May 20, 2022                                    Respectfully submitted,
                                                       MARK R. MEADOWS
                                                       *By Counsel*

                                                       /s/ George J. Terwilliger III
                                                       George J. Terwilliger III
                                                       MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
                                                       888 16th Street NW, Suite 500
                                                       Washington, DC 20006
                                                       Phone: (202) 857-1700
                                                       Fax: (202) 857-1737
                                                       gterwilliger@mcguirewoods.com

                                                       Brooks H. Spears
                                                       MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
                                                       1750 Tysons Boulevard, Suite 1800
                                                       Tysons, VA 22102
                                                       Phone: (703) 712-5000
                                                       Fax: (703) 712-5050
                                                       bspears@mcguirewoods.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## <u>DECLARATION OF GEORGE J. TERWILLIGER III</u>

I, George J. Terwilliger III, pursuant to 28 U.S.C. § 1746, and Federal Rule of Civil Procedure 56(c)(4), declare as follows:

1.     I am over the age of 18 and competent to testify in this matter.

2.     I have personal knowledge about the matters stated in this Declaration.

3.     I am an attorney with the law firm of McGuireWoods LLP, and we represent Plaintiff Mark Meadows in the above-captioned matter.

4.     Based on public reporting, the Select Committee has received from the National Archives and Records Administration one or more documents relating to Mr. Meadows that constitute records created during his tenure as the Chief of Staff for President Trump.

5.     During an October 20, 2021 telephone call, I conveyed to counsel for the Select Committee the fact that former President Trump had instructed Mr. Meadows not to testify and to invoke privileges.

6.     During a November 29, 2021 telephone call with counsel for the Select Committee, counsel for Mr. Meadows explained that we had no access to Mr. Meadows's complete contact list in order for us to meaningfully review his text messages for appropriate privileges.

**-2544-**

7.    Upon information, belief, and personal experience, every chief of staff serving a President in the modern era may undertake—and most have undertaken—as part of their duties communicating and deliberating on political matters with the President whom they serve.

8.    To the best of my knowledge and belief, no one who serves as counsel to Mr. Meadows in this matter provided any of Mr. Meadows's private text messages for publication to the press.

9.    Attached hereto as Exhibit A is a true and accurate copy of the October 6, 2021 letter sent by Justin R. Clark, counsel to former President Trump, to Scott Gast, counsel to Mr. Meadows.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this, the 20th day of May, 2022.

/s/ George J. Terwilliger III
George J. Terwilliger III

Case 1:21-cv-03217-CJN Document 29-5 Filed 06/07/2022 Page 1 of 38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

# EXHIBIT A

# Elections, LLC

**Attorneys at Law**
**Justin R. Clark**
**E** Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Scott Gast
Compass Legal Services
300 Independence Avenue, SE
Washington, D.C. 20003
sgast@compasslegal.org

Dear Mr. Gast:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Mark R. Meadows (the "Subpoena"). The Subpoena requests that Mr. Meadows produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court. Furthermore, President Trump believes that Mr. Meadows is immune from compelled congressional testimony on matters related to his official responsibilities. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Meadows to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning his official duties in response to the Subpoena; and (c) not provide any testimony concerning his official duties in response to the Subpoena.

Page 2

Thank you for your attention to this matter.  Please do not hesitate to contact me if you have any questions or would like to discuss.

Sincerely,

Justin Clark
*Counsel to President Trump*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARK MEADOWS, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 1:21CV3217 (CJN) |
| ) | |
| NANCY PELOSI, et al., ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

### [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On April 22, 2022, Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56(a).  On April 29, 2022, Plaintiff moved to deny without prejudice or defer a ruling on Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(d).  Then, on May 20, 2022, Plaintiff moved for judgment as a matter of law under Fed. R. Civ. P. 12(c), or in the alternative, for summary judgment under Fed. R. Civ. P. 56(a).  Having considered the parties' briefing and evidence, as well as the argument of counsel, the Court:

### [PRIMARY OPTION]

GRANTS Plaintiff's motion for judgment on the pleadings, or in the alternative, for summary judgment and DENIES Defendants' motion for summary judgment for the reasons stated at the hearing and in any memorandum opinion.  The Court ENTERS judgment as a matter of law for Plaintiff and against Defendants by declaring as follows:

1. The Meadows Subpoena and the Verizon Subpoena (as those terms are defined in the Amended Complaint) are ultra vires, unlawful, and unenforceable;

**-2549-**

2. The Meadows Subpoena and the Verizon Subpoena serve no valid legislative purpose and exceed the Select Committee's Constitutional authority;

3. The Meadows Subpoena unconstitutionally compels testimony of a senior executive official and is therefore null, void, and unenforceable; and

4. Plaintiff properly resisted the Meadows and Verizon Subpoenas because they required testimony about matters subject to former President Trump's claim of executive privilege.

In light of the above rulings, the Court also DENIES AS MOOT Plaintiff's pending motion filed pursuant to Fed. R. Civ. P. 56(d).

It is so ORDERED.

[ALTERNATIVE OPTION]

DENIES Defendants' motion for summary judgment, DENIES Plaintiff's motion for judgment on the pleadings, or in the alternative, for summary judgment, and GRANTS Plaintiff's motion filed pursuant to Fed. R. Civ. P. 56(d) for the reasons stated at the hearing an in any memorandum opinion.

It is so ORDERED.

_____          _____
DATED                                                      THE HON. CARL J. NICHOLS
                                                                   U.S. DISTRICT JUDGE

Case 1:21-cv-03217-CJN Document 66-3 Filed 06/07/22 Page 93 of 138

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE**
**PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 9

I.    TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
      MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
      ABOUT HIS WHITE HOUSE SERVICE. ............................................................... 9

      A.    Testimonial Immunity Is Squarely Rooted in the Separation of Powers and
            Is Directly at Issue in this Case. ............................................................. 10

      B.    The Congressional Defendants' Post Hoc Litigation Effort to Narrow
            Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims. ........ 16

II.   THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
      PURPOSE FOR THE SUBPOENAS. ..................................................................... 20

III.  THE SUBPOENAS WERE NOT VALIDLY ISSUED. ................................................ 23

      A.    Select Committee's failure to adhere to H. Res. 503 is legally cognizable. ........ 23

      B.    The Select Committee's subpoenas were not issued in compliance with H.
            Res. 503 due to failed composition. ............................................................ 27

      C.    The Select Committee's subpoenas were not issued in compliance with H.
            Res. 503 due to lack of consultation with a ranking minority member. .............. 28

IV.   THE CONGRESSIONAL DEFENDANTS' PROCEDURAL ARGUMENTS
      ARE ALSO UNAVAILING. .................................................................................. 32

      A.    The recent developments in the RNC litigation show that the
            Congressional Defendants' rush to summary judgment in this case was
            misguided and unsupported. ..................................................................... 32

      B.    The Congressional Defendants have not identified defects in Mr.
            Meadows's statement of facts, and any material factual disputes would
            only support his still-pending Rule 56(d) motion. ....................................... 33

      C.    The Congressional Defendants improperly use their reply to claim new
            grounds for seeking summary judgment. ...................................................... 37

CONCLUSION ................................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Baker v. Conroy*,
   921 F.3d 1118 (D.C. Cir. 2019) ...........................................................26

*Bloche v. Dep't of Def.*,
   414 F. Supp. 3d 6 (D.D.C. 2019) ........................................................38

*Bush v. Lucas*,
   462 U.S. 367 (1983) ............................................................................39

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018) ........................................................................38

\* *Christoffel v. United States*,
   338 U.S. 84 (1949) ...........................................2, 24, 25, 26, 27, 28

*Clinton v. Jones*,
   520 U.S. 681 (1997) ............................................................................14

*Comm. on Judiciary, U.S.H.R. v. McGahn*,
   415 F. Supp. 3d 148 (D.D.C. 2019) .............................................12, 13

*Comm. on Judiciary, U.S.H.R. v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) ...........................................12, 13, 23

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ........................................................................22

*Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975) ............................................................................38

*English v. Trump*
   279 F. Supp. 3d 307, 323 (D.D.C. 2018) ...........................................27

*Firth Sterling Steel Co. v. Bethlehem Steel Co.*,
   199 F. 353 (E.D. Pa. 1912) ................................................................15

*Gravel v. United States*,
   408 U.S. 606 (1972) ............................................................................14

*In re Grove*,
   180 F. 62 (3d Cir. 1910) .....................................................................15

*Kalka v. Hawk*,
   215 F.3d 90 (D.C. Cir. 2000) ...............................................................1

*Liveright v. United States*,
    347 F.2d 473 (D.C. Cir. 1965) ......................................................................... 2, 24, 31

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ....................................................................................... 27

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting) ............................................. 13

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ....................................................................................... 15

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) .................................................................... 12

*Quinn v. United States*,
    349 U.S. 155 (1955) ....................................................................................... 21

*Rangel v. Boehner*
    20 F. Supp. 3d 148 (D.D.C. 2013) .............................................................. 26

*Republican Nat'l Comm. v. Pelosi*,
    No. 22-5123 (D.C. Cir. 2022) ...................................................... 6, 8, 21, 32, 33

*Republican Nat'l Comm. v. Pelosi*,
    No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022) .......... 6, 16, 20, 32

*Shelby Cnty., Alabama v. Holder*,
    43 F. Supp. 3d 47 (D.D.C. 2014) ............................................................... 39

*Shelton v. United States*,
    327 F.2d 601 (D.C. Cir. 1963) ......................................... 1, 24, 25, 26, 31

*Sitka Sound Seafoods, Inc. v. NLRB*,
    206 F.3d 1175 (D.C. Cir. 2000) .................................................................. 38

*Smith-Haynie v. D.C.*,
    155 F.3d 575 (D.C. Cir. 1998) .................................................................... 39

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ........................................................................ 11, 21, 22

*Trump v. Mazars USA, LLP*,
    940 F.3d 710 (D.C. Cir. 2019) .................................................................... 22

*Trump v. Thompson*,
    142 S. Ct. 680 (2022) ............................................................................ 5, 11, 12

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ...................................................................3, 6, 15, 20

*United States v. Ballin*,
    144 U.S. 1 (1892) .............................................................................................2

*United States v. Nixon*,
    418 U.S. 683 (1974) ...................................................................................10, 11

*United States v. Reynolds*,
    345 U.S. 1 (1953) ...........................................................................................15

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ...............................................................7, 26, 28

*United States v. Smith*,
    286 U.S. 6 (1932) .............................................................................................2

*Veg-Mix, Inc. v. U.S. Dep't of Agriculture*,
    832 F.2d 601 ..................................................................................................35

*Watkins v. United States*,
    354 U.S. 178 (1957) .......................................................................................21

* *Yellin v. United States*,
    374 U.S. 109 (1963) ............................................................1, 23, 24, 25, 26, 27, 31

**Statutes**

* H. Res. 503, 117th Cong. (2021) ....................................................... *passim*

**Other Authorities**

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ...................................................13

Fed. R. Civ. P. 56(c) ....................................................................................8, 37

Fed. R. Civ. P. 56(d) ..............................................................................8, 9, 33, 37

GOP H. Conf. R. 117th Cong. 14(e) .................................................................30

H. Rep. No. 114-887 (2016) ...........................................................................30

*Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate
    Comm. on the Judiciary*, 85th Cong., 2d Sess., at 33–146 (1958) (statement of
    Att'y Gen. Rogers)........................................................................................10

*Immunity of the Assistant to the President & Director of the Office of Political
    Strategy and Outreach from Congressional Subpoena,*
    38 Op. O.L.C 1 (2014) ..............................................................................14

* *Immunity of the Director of the Office of Political Strategy & Outreach,*
    38 Op. O.L.C. 5 (2014) .......................................................................13, 18

LCvR 7(h) ...........................................................................................................8

Letter from Elliot S. Berke, counsel for House Republican Leader Kevin
    McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate
    the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) ..........................30

Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S.
    Capitol, 117th Cong. (June 2, 2022) .......................................................7

*Presidential Department Descriptions,* The White House: President Barack
    Obama,
    https://obamawhitehouse.archives.gov/participate/internships/departments#:~:
    text=The%20Office%20of%20Political%20Strategy,on%20behalf%20of%20t
    he%20President (last visited June 1, 2022) .............................................18

Press Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names
    Democratic Members to House Select Committee on Benghazi* (May 21, 2014)..............30, 31

R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021) ................................30

*Representative Charles B. Rangel*, Congress.gov .......................................30

*Representative Sander M. Levin*, Congress.gov .........................................30

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
    O.L.C. slip op., at *4 (May 20, 2019) ........................................................16

v

## INTRODUCTION

No authoritative appellate court opinion has ever held that a senior aide to a President, or a President himself, can be compelled by Congress to appear and give testimony, let alone when there is claim of Executive Privilege.  In their briefing, the Congressional Defendants do not, because they cannot, dispute this fact.  Likewise, no court has ever held that a former President cannot claim Executive Privilege, or that any President, present or former, must personally communicate a claim of Executive Privilege to a congressional committee.  Nor can the Congressional Defendants identify any case holding that the current President may, as here, act unilaterally to vitiate a former President's claim of Executive Privilege as to testimonial evidence sought by Congress.  Thus, ripe for consideration in this case are these momentous issues of constitutional dimension as to which Mr. Meadows can properly seek declaratory judgment.

Even so, under the avoidance doctrine, where there is a non-constitutional issue before the Court that can resolve the matter without resort to the foregoing and related constitutional issues, the Court should resolve the matter on that basis if possible.  *See Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000) ("Federal courts should not decide constitutional questions unless it is necessary to do so."); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963) (applying constitutional avoidance to congressional subpoena challenge).  Doing so here would mean granting summary judgment in favor of Mr. Meadows based on the Select Committee's failure to satisfy its composition and consultation requirements (while necessarily denying summary judgment for the Congressional Defendants).  The Supreme Court and the D.C. Circuit have both ruled unmistakably that the courts are empowered to apply and enforce congressional rules that affect the rights of a congressional witness.  *See Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has been long settled, of course, that rules of Congress and its committees are judicially cognizable.

And a legislative committee has been held to observance of its rules, just as, more frequently, executive agencies have been.") (internal citations omitted).[1]

Here, Mr. Meadows has challenged the subpoena issued to him on the grounds that it was not issued in accordance with applicable congressional rules. The Congressional Defendants attempt to dismiss this issue as one of 'nitpicking titles' and maintain that it is off limits to judicial review pursuant to the Rulemaking Clause. ECF No. 35 at 29. Relevant authority is to the contrary. Under controlling Supreme Court precedent, the issue of whether the subpoenas to Mr. Meadows were validly issued and are thus enforceable is very much a question for the Court. Just as in *Christoffel v. United States*, "[t]he question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. ***The question is rather what rules the House has established and whether they have been followed***." 338 U.S. 84, 88–89 (1949) (emphasis added). As explained in detail below, the rules established for the Select Committee require that, for a deposition subpoena to issue, the Chair must consult with the Ranking Member. That rule was not followed because, as the Congressional Defendants have admitted (and as their dismissive "nitpicks the use of titles" comment confirms), ECF No. 35 at 24, the Select Committee has no designated Ranking Member. Thus, this non-constitutional issue is ripe for resolution and, under the Supreme Court and D.C.

---

[1] *See also Christoffel v. United States*, 338 U.S. 84, 88–90 (1949) (holding that validity of congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932) (holding that, where "the construction to be given to [Senate] rules affects persons other than members of the Senate, the question presented is of necessity a judicial one"); *United States v. Ballin*, 144 U.S. 1 (1892) (interpreting and applying congressional rules to determine whether a bill was properly enacted); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965) (holding that Senate subcommittee's subpoena was invalid where it was authorized only by the subcommittee chairman, with limited consultation, and not by that entire subcommittee as required by Senate resolution).

Circuit decisions on point, results in judgment for Mr. Meadows that the subpoena in question was not validly issued and is unenforceable because its issuance was not in accord with the relevant requirements of the Select Committee and House rules. *See infra* Part III.

The Congressional Defendants' "nitpicking" characterization is also consistent with their summary judgment briefing's cavalier treatment and dismissive rhetoric regarding the important constitutional issues outlined above. Their claim of entitlement to summary judgment *in their favor* is belied by the obvious weaknesses and lack of persuasive force of the arguments they advance. In the world of their arguments, long on rhetoric but short on authority:

- they can "support, rather than undermine," the Separation of Powers by pursuing this clash with a former Executive official, *see* ECF No. 35 at 10;

- the D.C. Circuit's ruling in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)—on the propriety of a *different* subpoena *for records* controlled by the Presidential Records Act— gives them a legal cudgel to extinguish constitutional obstacles to their obtaining *testimony* here asserted by a former President to be subject to Executive Privilege, *see* ECF No. 35 at 18–19;

- the current President can waive the former President's privilege in the context of an obviously political controversy, such that the incumbent alone has the final word on a privilege that the Congressional Defendants admit exists for the benefit of the Republic— leaving nothing to review because the President and the House control the question, *see id.* at 32–33;

- it is irrelevant that Mr. Meadows supplied thousands of non-privileged documents, and that the Congressional Defendants rebuffed any efforts to find exactly the kind of accommodation viewed by the Supreme Court favorably to resolve these issues, clearing

the way by their aim for him to be prosecuted for contempt of Congress and sent to prison, *see id.* at 11;

- finally and most pointedly perhaps, the Congressional Defendants maintain that Mr. Meadows cannot waive Executive Privilege yet somehow, at the same time, he is not competent to assert it either, *see id.* at 32, leaving him in exactly the legal no-man's land that justifies his coming to this Court asking it to "say what the law is," ECF No. 13 ¶ 6.

In sum, the Congressional Defendants' claimed highway to summary judgment is riddled with legal potholes, speed bumps, and dead-ends all together desperately lacking in authority or persuasion.

Fortunately for Mr. Meadows, and for the sound functioning of American government, our Constitution and laws do not give Congress the authority to demand whatever they wish and to ignore all constitutional principles that apply to their quest. To the contrary, it is well established that, when a congressional committee seeks to use the implied constitutional authority to compel testimony, it must respect the Separation of Powers; it must do so only in pursuit of a valid legislative purpose (and not for the purpose of generating publicity or pursuing law enforcement); and it must follow the rules associated with the delegation on which its claimed subpoena authority relies. Given its dismissive treatment of these legal guardrails in its brief, it is not surprising that the Congressional Defendants have overstepped them on the undisputed factual record.

\*     \*     \*

There are three straightforward grounds on which Mr. Meadows is entitled to relief, which would necessarily result in the Defendants' Summary Judgment motion being denied and Meadows motion being granted:

*First*, the Court should hold that, as a former Chief of Staff to then-President Trump, Mr. Meadows is immune from the Select Committee's effort to compel him to testify about his service in that role.  The Congressional Defendants do not and cannot dispute that no appellate precedent (from any Court of Appeals or from the Supreme Court) has ever held that a President's senior aide—or a President himself—can be compelled by Congress to appear and give testimony.  Nor does any such opinion hold, as the Congressional Defendants suggest, *see* ECF No. 35 at 32–33, that a former President cannot assert privilege or immunity, or that a President must personally communicate an assertion of privilege to a congressional committee.  Thus, at a minimum, these are open questions on important constitutional issues that merit judicial consideration and intervention.

But more than that, the soundest legal conclusions are that testimonial immunity does protect a former White House Chief of Staff like Mr. Meadows, as bipartisan Attorney General and OLC opinions have concluded; and that Separation of Powers concerns continue to require the protection of former President Trump and his most senior aide, even if the incumbent President does not support the assertion of privilege, as Justice Kavanaugh recently explained in his concurrence as to the denial of *certiorari* in *Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.) (statement of Kavanaugh, J., respecting denial of application).  And while the Congressional Defendants try to sidestep these important constitutional issues through a *post hoc* litigation effort to limit their subpoenas to "campaign activit[y]" supposedly outside his White House role, *see* ECF No. 35 at 20–22, that effort fails on both the facts and on the law.  *See infra* Part I.A.

Mr. Meadows is therefore entitled to declaratory relief based on testimonial immunity rooted in the constitutional Separation of Powers.

**Second**, the Court should also hold that the Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows. In opposition, the Congressional Defendants rely on the D.C. Circuit's opinion in *Thompson*, 20 F.4th 10, and on Judge Kelly's recent ruling in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022). But *Thompson* was about a very different case than this one and does not give the Select Committee the license it would take to avoid establishing that a valid legislative purpose underlies the particular subpoenas at issue in this case. The D.C. Circuit has granted the RNC injunctive relief pending its review of Judge Kelly's decision, a ruling that necessarily is based on its conclusion that the RNC is likely to succeed on the merits of its appeal. *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022).

Indeed, the Congressional Defendants' opposition brief further confirms what Mr. Meadows has argued from the beginning: that the Select Committee is improperly pursuing the off-limits purposes of publicity and law enforcement, rather than a valid legislative purpose, in targeting Mr. Meadows. The Congressional Defendants claim that they need Mr. Meadows's testimony in furtherance of their "task to determine the facts, circumstances, and causes related to the January 6th attack." ECF No. 35 at 24. But that is not a legislative purpose at all. The Congressional Defendants make no attempt to identify a single piece of draft legislation—or even a hypothetical bill—that would be better informed by Mr. Meadows's testimony. This only bolsters the conclusion, which was already obvious from the undisputed facts, that the Select Committee's goal is to gather information to make it public and/or for law enforcement purposes.[2]

---

[2] If anything, as Meadows's Amended Complaint avers and the still growing public record shows, the Select Committee is deeply engaged in the non-legislative purposes of exposure for the sake of exposure and/or in support of law enforcement, such as with its announced plans for several

Mr. Meadows is thus entitled to declaratory relief that the subpoenas are unenforceable for want of a valid legislative purpose.

*Third*, the Court should hold that the subpoenas are invalidly issued because the Select Committee is not compliant with the composition or consultation requirements of H. Res. 503. Indeed, this ground provides a narrow basis for invalidating the subpoenas that would allow the Court to avoid resolving the constitutional questions raised by testimonial immunity and legislative purpose.

While the Congressional Defendants make an effort to argue that the Court must take their word for it under the Rulemaking Clause, *see* ECF No. 35 at 26–29, they also cite *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), where the D.C. Circuit *rejected* the notion that House procedures are unreviewable and emphasized that "under Article III of the Constitution the courts are the final arbiters of the law and may not shirk their duty to interpret the law." *Id.* at 1306. Under *Rostenkowski*, in a separation of powers dispute over criminal prosecution of a Member of Congress for allegedly violating House rules, the interpretation of a House rule may be non-justiciable if it is genuinely ambiguous. *Id.* But in this case there is nothing ambiguous about H. Res. 503's direction that the Select Committee "shall" have 13 members, or the rule's requirement that a subpoena to appear for a deposition may only issue by the Chair after consultation with the Select Committee's "Ranking Member" (of which there is none). Not only may the Court apply the rules established for the Select Committee, it must do so.

---

days or prime time televised hearings. *See, e.g.,* Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, 117th Cong. (June 2, 2022), https://docs.house.gov/meetings/IJ/IJ00/20220609/114870/HHRG-117-IJ00-20220609-SD001.pdf. If he is not entitled to summary judgment now on this issue, Mr. Meadows is at the very least entitled to the discovery the civil process affords to fully develop this record.

Mr. Meadows is entitled to declaratory relief that the subpoenas are unenforceable based on these failures to comply with H. Res. 503.

The Congressional Defendants try to resist these straightforward grounds for granting relief to Mr. Meadows by claiming that he has failed to comply with Fed. R. Civ. P. 56(c) and LCvR 7(h).  *See* ECF No. 35 at 7–10.  But that argument misstates the record and misconstrues the grounds for relief favoring Mr. Meadows.  And just as importantly, it proves too little asking for too much.  Even if the Court were to agree with the Congressional Defendants that Mr. Meadows has not yet developed a sufficient record of admissible evidence to support summary judgment in his favor, the proper course would be to grant Mr. Meadows's still-pending Fed. R. Civ. P. 56(d) motion to allow him a meaningful opportunity to pursue discovery.

Indeed, the most recent developments in the *RNC* litigation demonstrate that the Congressional Defendants' rush to judgment here is misguided and unsupported.  There, as here, the Congressional Defendants claimed a pressing need for quick resolution ahead of scheduled "primetime" congressional hearings.  But after the RNC appealed and the D.C. Circuit issued an injunction pending appeal, the Congressional Defendants suddenly lost their appetite for expediting proceedings and pursued a motion to defer the D.C. Circuit's consideration of that case.  *See* Mot. Postponement Br. & Oral Arg., *RNC v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022).  The Court should not countenance such transparent gamesmanship and false claims of a need for haste by rushing past a plaintiff's entitlement to discovery where needed.  Indeed, that course would be all the more appropriate here because, unlike in other pending cases, the Congressional Defendants have waived any assertion of immunity under the Speech or Debate Clause since they have twice answered Mr. Meadows's complaints without asserting it.

Finally, it is important to note that the Congressional Defendants have improperly attempted to raise new grounds for summary judgment in *their* favor as part of their reply brief (which was understandably combined with their opposition to Mr. Meadows's own motion). *See infra* Part IV.C. But it is well established that such arguments are forfeited.

*   *   *

The Court thus has three distinct grounds on which it may grant judgment in Mr. Meadows's favor—testimonial immunity, valid legislative purpose, or compliance with H. Res. 503. The first two raise important constitutional questions about the Separation of Powers and Congress's implied subpoena authority, and the third involves a narrower ground that might avoid the need to resolve those issues. And if the Court should conclude that disputed facts bear on these issues, then it already has pending Mr. Meadow's Rule 56(d) motion to proceed to discovery.

**ARGUMENT**

**I.    Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service.**

The Congressional Defendants try to create the impression that Mr. Meadow's assertion of testimonial immunity is foreclosed by precedent. But it simply is not. Only two non-binding district court opinions have ever addressed the issue, and as Mr. Meadows previously explained, *see* ECF No. 29-1 at 30–33, neither opinion persuasively makes the case against testimonial immunity in these circumstances. Unable to gloss over the immunity issue, the Congressional Defendants also try to argue *around* it by questioning whether it was ever properly asserted and through a *post hoc* litigation effort to narrow the scope of their subpoenas to allegedly non-official topics. *See* ECF No. 35 at 30–31. But those efforts fail as well.

A.    *Testimonial Immunity Is Squarely Rooted in the Separation of Powers and Is Directly at Issue in this Case.*

The doctrine of testimonial immunity against congressional subpoenas for senior Presidential aides is not something that bipartisan Attorneys General and the Office of Legal Counsel made up from whole cloth. The notion that Presidential advisors and their papers enjoy constitutional protection dates back to the Nation's first President. *See generally Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess., at 33–146 (1958) (statement of Att'y Gen. Rogers). One of the many concerning features of government under the Articles of Confederation that our Founders rejected in adopting our Constitution was unfettered access by the Continental Congress to records of core executive functions, such as foreign affairs. *See id.* at 36–37. When a congressional committee tried to investigate President Washington's Administration for its handling of "a military expedition led by General St. Clair under the direction of the Secretary of War," President Washington announced clear limits on his Administration's cooperation—including that "neither the committee nor House had a right to call on the head of a department, who and whose papers were under the President alone." *Id.* at 37. Thus, while many of the earliest disputes focused on production of documents rather than testimony—almost certainly because both branches viewed document production as a *less intrusive* accommodation—and thus on principles of Executive Privilege, it is equally clear that the same principles were understood to prevent Congress from compelling testimony from senior executive officials "who . . . were under the President alone." *Id.*

At least since the 1970s, when the Supreme Court was required to resolve interbranch disputes of executive privilege, federal courts have time and again endorsed the need for Executive Privilege and related protections not only to promote the President's informed and efficient decision-making, but also to preserve the Separation of Powers. *See, e.g.*, *United States v. Nixon*,

418 U.S. 683, 704–05 (1974); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020). Mr. Meadows is uniquely situated even among executive officials. As former White House Chief of Staff, Mr. Meadows served as the most trusted official advisor to the President of the United States. He participated in some of the President's most delicate conversations, gave candid advice during the President's most private deliberations, and was privy to the innermost operations of the Executive Office. The documents and communications of such an advisor enjoy constitutional protections because, as the Supreme Court has noted, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." *Nixon*, 418 U.S. at 705.

As Justice Kavanaugh has explained in the context of the Presidential communications privilege (which is a particular species of Executive Privilege closely related to testimonial immunity), the same protection must continue to apply after a President's tenure ends, even if the new President disagrees. *See Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.) (statement of Kavanaugh, J., respecting denial of application).

> By protecting the confidentiality of . . . internal communications, the Presidential communications privilege facilitates candid advice and deliberations, and it leads to more informed and better Presidential decisionmaking. . . . [B]y way of historical example, . . . the Constitutional Convention was conducted in complete privacy and . . . the records of the Convention remained confidential for more than 30 years. As was true at the Constitutional Convention, the Presidential communications privilege cannot fulfill its critical constitutional function unless Presidents and their advisers can be confident in the present and future confidentiality of their advice. If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681 (quotation omitted).

The Congressional Defendants dismiss without evaluation the Justice's statement as lacking the "force of law," ECF No. 35 at 33; yet what the statement has is the force of reason, logic and common sense. The Congressional Defendants would have the Court breeze past that and all the authority underlying learned OLC opinions, boldly asserting that their position to strip Mr. Meadows (and thus former President Trump) of these core constitutional protections "support[s], rather than undermine[s]" the Separation of Powers. *Id.* at 10. But they are simply wrong.

The Congressional Defendants renew their reliance on *Miers* and *McGahn* and assert, as if wishing would make it so, that those decisions "thoroughly addressed—and persuasively rejected—" Mr. Meadow's arguments about testimonial immunity. *See id.* at 13. But they then cite Judge Bates's discussion of a strawman argument that recognizing testimonial immunity would allow a President to "deny access to all documents in all the Executive departments to all citizens and their representatives, *including Congress.*" *Id.* (quoting *Comm. on Judiciary, U.S.H.R. v. Miers*, 558 F. Supp. 2d 53, 103 (D.D.C. 2008)). That passage from *Miers* was quoting *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973), which held that a grand jury subpoena overcame Executive Privilege over documents; it of course had nothing to say about testimonial immunity, and it shows that the quoted language came in the context of deciding whether constitutional protection for the President's information had been *overcome* in a criminal context, where under the relevant precedent the justification for production is far different and, not whether it existed in the first place. Additionally, the Separation of Powers discussion in *McGahn* that they cite, *see* ECF No. 35 at 9 (citing *Comm. on Judiciary, U.S.H.R. v. McGahn*, 415 F. Supp. 3d 148, 212 (D.D.C. 2019), Judge Jackson opines without any citation or support that "the public spectacle of haling current

and former advisors to a sitting President before a committee of Congress" is not a Separation of Powers concern because "the power of inquiry resides with the Legislature." 415 F. Supp. 3d at 212 (cleaned up). That conclusion is at the very least grandly overstated, if not just downright erroneous. Article I of the Constitution conspicuously fails to enumerate any legislative "power of inquiry," and indeed, under our Constitution, the authority to investigate, and where appropriate to prosecute, past wrongdoing is quintessentially an Executive prerogative. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) (explaining that law enforcement is a governmental function which "has always and everywhere—if conducted by government at all— been conducted never by the legislature, never by the courts, and always by the executive"). The *McGahn* decision's reasoning is unpersuasive and offers the Court the thinnest of reeds upon which to rule on a fundamental constitutional question.

Moreover, neither *Miers*, nor *McGahn*, nor the Congressional Defendants' own brief addresses the important constitutional implications of forcing a former White House Chief of Staff to attend a hostile congressional deposition relating to his actions while serving the President. There are no guardrails to protect executive prerogatives in a congressional deposition. House regulations provided that Chairman Thompson serves as the ultimate arbiter of any claimed privilege. *See* 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ("If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer."). "[T]here is no judge or other neutral magistrate to whom a witness can turn for protection against questions seeking confidential and privileged information. The committee not only poses the questions to the witness, but also rules on any objections to its own questions according to procedures it establishes." *Immunity of the Director of the Office of Political Strategy & Outreach*, 38 Op. O.L.C. 5, 9 (2014). If a single member of Congress can

unilaterally override a deponent's valid assertion of privilege belonging to a coequal branch of government, the privilege might as well not even exist.  The Congressional Defendants offer nothing to assuage these concerns.

The Congressional Defendants tellingly avoid addressing—and thus seem to concede—that it would be a clear affront to the Separation of Powers for Congress to subpoena former President Trump himself to testify before the Select Committee.  *See* ECF No. 29-1 at 28–29.  And since "a presidential adviser's immunity [from compelled testimony] is derivative of the President's," *Immunity of the Assistant to the President & Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C 1, 5 (2014), it follows that the Select Committee cannot compel Mr. Meadows to testify either.  This is consistent with how the Supreme Court has interpreted the scope of the Speech or Debate protections afforded to Congress, which the courts have extended (without any textual warrant) to legislative aides.  *See Gravel v. United States*, 408 U.S. 606 (1972).  Mr. Meadows served as the "alter ego" of the President, *id.* at 616, arguably even more than a legislative aide would serve as the alter ego of a Member. "It is literally impossible for Members of Congress to perform their legislative tasks without the help of aides and assistants," *id.*, and the same goes *a fortiori* for the President who has far greater constitutional responsibilities as the one Executive, than any given Member does acting as one of 535 in Congress.[3]

---

[3] Their contention that, "[h]owever far testimonial immunity extends, it does not provide *more* protection to a President's aide than to a President," ECF No. 35 at 18, is another strawman.  They do not even contend that President Trump would not have immunity to congressional subpoena, and the supporting case they cite—*Clinton v. Jones*, 520 U.S. 681 (1997)—is wholly inapposite. It famously involved the question whether a sitting President could be sued as a defendant in a civil damages action *during* his Presidency for conduct that occurred *before* the presidency.  That holding has nothing to say about testimonial immunity.

The Congressional Defendants argue that President Trump is a "'private party'" who cannot assert Executive Privilege, ECF No. 35 at 32 (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)), and that "[a]ny assertions by Mr. Meadows alone are insufficient to invoke executive privilege," *id.* Those arguments invite egregious error. First, former President Trump is nothing like the corporation in *Firth Sterling Steel Co. v. Bethlehem Steel Co.*, 199 F. 353 (E.D. Pa. 1912), that the Supreme Court was referring to as a private party in *Reynolds*. *See* 345 U.S. at 7 n.16. Second, the Supreme Court decades ago squarely "reject[ed] the argument that only an incumbent President may assert [Executive Privilege] and [held] that … a former President[] may also be heard to assert [it]." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 439 (1977). And third, *Reynolds* if anything bolsters Mr. Meadows's position all along that, as a now private citizen who previously served President Trump, he is in no position to *waive* the privileges and immunities that the former President had instructed him to preserve. *See* 345 U.S. at 7 (stating that Executive Privilege "can neither be claimed *nor waived* by a private party") (emphasis added) (citing *In re Grove*, 180 F. 62 (3d Cir. 1910) (holding that navy contractor was not in contempt of Congress by refusing to produce information that he had been instructed to keep confidential by the Navy Department)).

The Congressional Defendants further argue that former President Trump has made only a "generalized" assertion of privilege, ECF No. 35 at 34, which fails to overcome the Select Committee's professed need for Mr. Meadow's testimony. Of course, as discussed further below, *see infra* Part II, one of the major problems here is that the Select Committee has *not* articulated any valid legislative need for his testimony. But even setting that aside, they miss the mark in calling for some more granular assertion of privilege. Unlike the assertion of Executive Privilege in response to a request for documents, as was as issue in *Trump v. Thompson*, which calls for a

document-by-document assessment, testimonial immunity is much simpler.    Testimonial immunity is "distinct from, and broader than, executive privilege" in that it "extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself." *Testimonial Immunity Before Congress of the Former Counsel to the President*, O.L.C. slip op., at *4 (May 20, 2019).

> **B.    The Congressional Defendants' Post Hoc Litigation Effort to Narrow Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims.**

The Congressional Defendants also argue that, "[e]ven if some form of testimonial immunity did exist, . . . the information sought by the Select Committee is outside the scope of any purported testimonial immunity." ECF No. 35 at 16.  That is flat wrong.

To start, we must briefly address the absurd argument that Mr. Meadows only opposes "the topics related to his role in former President Trump's reelection campaign" and did not contest the Congressional Defendants' other arguments on testimonial immunity.  *See* ECF No. 35 at 16–17. The Congressional Defendants apparently overlooked at a minimum an entire section of Mr. Meadows's brief.  *See* ECF No. 29-1 at 46–51 (Part IV.A).  As discussed in Mr. Meadows's opposition to the Congressional Defendants' motion, it is first improper for the Select Committee to now purport to narrow its lines of inquiry as it is convenient to current circumstances.  *See id.* at 39 n.14.

This is not the first time the Select Committee has at least claimed to narrow an overly broad subpoena when it is challenged in court.  *See also Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509, at *3 (D.D.C. May 1, 2022).  Setting that aside, Mr. Meadows has consistently asserted his position that each of the topics set forth by the Select Committee infringe upon former President Trump's valid assertion of Executive Privilege.  And

though it has been difficult to follow the ever-shifting goalpost of topics the Select Committee has put forward, to be certain, Mr. Meadows believes each of the topics of inquiry the Congressional Defendants claim in their motion would be covered by Executive Privilege, just as Mr. Meadows discussed at length in his May 20, 2022 brief.  *See* ECF No. 29-1 at 46–51 (Part IV.A).

Far from undermining Mr. Meadows's claims, this *post hoc* attempt to narrow the subpoena shows that Mr. Meadows is entitled—at a minimum—to relief on those portions of the subpoenas that the Select Committee now claims it is no longer pressing.  The only remaining question, then, is whether those topics somehow sidestep testimonial immunity and all the other legal defects that Mr. Meadows has raised.[4]  They do not.

As Mr. Meadows has explained, the nice distinction that the Congressional Defendants would have the Court draw between the White House Chief of Staff's official role and his actions that related in one way or another to the then-President's reelection campaign is illusory.  *See* ECF No. 29-1 at 35–37.  They argue that this view of the role is too broad and even accuse Mr. Meadows (in a footnote) of admitting to violations of the Hatch Act.  *See* ECF No. 35 at 18 n.7.  That accusation is completely off-base.

Mr. Meadows has made no such admission.  Rather, he has asserted time and again that the role of White House Chief of Staff inherently involves political considerations.  Mr. Meadows undertook each of the actions discussed in the Congressional Defendants' motion within the scope of his duties as White House Chief of Staff.  And, yes, it is untenable for either Mr. Meadows or the Select Committee to tease out which words he used or actions he took with respect to ensuring

---

[4] To be clear, even if the Congressional Defendants were correct that these narrowed topics fell outside the scope of testimonial immunity, the subpoenas would still fail for want of a valid legislative purpose, *see infra* Part II, for failure to comply with H. Res. 503, *see infra* Part III, and for all of the other reasons raised in Mr. Meadows's complaint that may not be appropriate for summary disposition but which nevertheless undermine the subpoenas' enforceability.

our Nation's safety or the integrity of our elections had more political significance than official. To paraphrase the Select Committee on legislative purpose, when the Executive is carrying out its official duties, courts generally do not look behind the curtain to penalize them for ulterior political motives. *See id.* at 25. If they did, the courts would hardly have time for anything other than adjudicating claims that this or that agency action was *really* done for a political bump.

Second, the Hatch Act does not purport to be a touchstone for distinguishing official duties from nonofficial duties for constitutional purposes. It is a focused and limited Act that limits use of official resources for campaign purposes and imposes certain specified restrictions that, frankly, have no bearing on the issues before the Court.

It is no secret that members of the White House serve political functions and do so within the confines of their official roles. For example, the Obama White House established an Office of Political Strategy and Outreach. White House Archives indicate that this Office "provides the President and Senior Staff with information about the political environment to help advance the President's agenda and coordinates constituent outreach efforts on behalf of the President."[5] Somewhat ironically, when the Director of that Office of Political Strategy and Outreach, David Simas, was called before a congressional committee to discuss possible Hatch Act violations, the Department of Justice Office of Legal Counsel issued yet another opinion reiterating the "Executive Branch's longstanding position, reaffirmed by numerous administrations of both political parties, is that the President's immediate advisers are absolutely immune from congressional testimonial process." 38 Op. O.L.C. 5, 5 (2014).

---

[5] *Presidential Department Descriptions*, The White House: President Barack Obama, https://obamawhitehouse.archives.gov/participate/internships/departments#:~:text=The%20Offic e%20of%20Political%20Strategy,on%20behalf%20of%20the%20President (last visited June 1, 2022).

As discussed in Mr. Meadows's brief in support of his motion, even if the Court is to find he took political actions outside the scope of his official duties, congressional actions to impinge on those rights should receive heightened judicial scrutiny. *See* ECF No. 29-1 at 40.  The Congressional Defendants cannot credibly contend that any of the actions by Mr. Meadows were simply that of a private citizen unrelated to his role as Chief of Staff.  When Mr. Meadows receives a text message on January 6, for instance, the Congressional Defendants' interest in that communication arises solely because Meadows served as Chief of Staff and had a role with the President, not that of some mere citizen interested in the happenings of that day.

While the Congressional Defendants' opposition again tries to assert a "compelling need for the information," as justification for overcoming constitutional obstacles to their demands, "their actions have indicated otherwise. *See* ECF No. 35 at 20.  They refused to even engage Mr. Meadows on his offers of interrogatories to further their investigation, *see* ECF No. 29-2 ¶¶ 46–55; they knowingly and falsely promised to limit questioning to matters outside the scope of Executive Privilege—only to show their true intentions days before the planned deposition, *see id.*; and instead of expressing gratitude for his cooperation with respect to documents, for the past six months they used Mr. Meadows's private communications as a reason to smear him and his Republican allies in the press based on selective leaks and speculative innuendo as to why he took certain actions.  Even if the Select Committee once had a compelling need for Mr. Meadows's testimony, it is now plain that the one-time "need" pales in comparison to the Select Committee's compelling need to advance a political agenda.[6]

---

[6] Because the Select Committee's purposes are a factual issue as to which its conduct continues to furnish relevant evidence, should the Court not rule dispositively otherwise, Mr. Meadows should clearly be accorded time and the use of discovery to fully develop the factual picture relevant to judicial determination of whether the Select Committee has a legitimate legislative purpose or is instead engaged for purpose the Supreme Court has already defined as exceeding the limitation on

The Congressional Defendants also dispute that Mr. Meadows needs discovery relating to his own political activity. It is the Congressional Defendants who have created the factual issue. Mr. Meadows maintains that the actions he took were properly undertaken as Chief of Staff. It is the Congressional Defendants who claim his actions were private conduct not covered by testimonial immunity or Executive Privilege. That makes the nature, purpose and extent of the conduct a relevant factual determination and one ripe for discovery. But such factual development would not necessarily require Mr. Meadows to conduct discovery on the Congressional Defendants themselves. For example, Mr. Meadows could conduct limited discovery by conducting a third-party deposition of the current White House Chief of Staff and ask which political, reelection, and/or election integrity considerations are excluded from his official duties. The Congressional Defendants have placed this factual question squarely at issue, and Mr. Meadows should be able to conduct discovery on these issues should the Court find them determinative.[7]

## II.     The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas.

The Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows.

Their legal arguments, which rely primarily on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), and *Republican Nat'l Comm. v. Pelosi*. No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), are misguided and unpersuasive. *Thompson* does not give the Select Committee license to subpoena whomever and whatever they want, nor does it excuse them from

---

congressional investigative authority, including leaks, by committee staff or otherwise, designed solely to expose for exposure's sake private information provided to the Select Committee. No court has held that press leaks are a valid legislative purpose.

[7] In any event, to the extent the Congressional Defendants contend in the context of summary judgment proceedings that certain avenues of discovery be foreclosed, their request is premature. The means and timing of discovery disputes are governed by Federal Rules of Civil Procedure, Local Rules, and the Court's Standing Order and come later in the process.

establishing the connection between a valid legislative purpose and the particular subpoenas at issue in this case. Judge Kelly's decision in the *RNC* case is not binding, and respectfully, wrong on legislative purpose. But more importantly, the D.C. Circuit has effectively stayed that ruling based on an apparent determination that the RNC is likely to succeed on the merits of its appeal. *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022). Neither decision provides any basis to gloss over the Select Committee's obligation to substantiate how Mr. Meadows's testimony would aid Congress in its lawmaking function. The Congressional Defendants must therefore live with the record in *this* case, not another case of their choosing. And on the record here, they have failed to carry their burden.

    Their own litigating position confirms that they are running afoul of settled precedent. The Supreme Court very recently reiterated that "'there is no congressional power to expose for the sake of exposure,'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)), and that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). And yet the Congressional Defendants run headlong into those barriers by arguing that the motivating purpose behind their investigation is to gather information about past events that they publicly allege to constitute criminal wrongdoing and to use that information to prepare a public report. *See* ECF No. 35 at 24 (arguing that compelling Mr. Meadows's testimony would further the Select Committee's "task to determine the facts, circumstances, and causes related to the January 6th attack"); *see also id.* at 25. To argue that an investigation provides a valid legislative purpose for a congressional investigation is the definition of circular reasoning.

    The Congressional Defendants do not identify any draft legislation that would be better informed by Mr. Meadows's testimony, or any conceivable legislative initiative that his testimony

might be needed to further.  And of course, the Select Committee has no authority to markup legislation in the first place.  *See* H. Res. 503 § 4(d), 117th Cong. (2021).  By contrast, in the litigation culminating in *Trump v. Mazars*, 140 S. Ct. 2019 (2019), the House was able to identify several pending legislative proposals related to the inquiry, including proposed legislation to require Presidential candidates to disclose tax returns (with President Trump's tax returns being the specific subject of the subpoena). *See generally Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019), vacated and remanded, 140 S. Ct. 2019 (2020).  There is no such legislation in this case.

Without even a fig leaf, the Congressional Defendants cannot hide their naked intentions. Thus, even if the existence of a valid legislative purpose would prevent a court from looking further into other motives, *see* ECF No. 35 at 25–26,[8] that principle would have no application here.  The very problem is that the Select Committee has not established a valid legislative purpose for its subpoenas targeting Mr. Meadows.

The Congressional Defendants also undermine their claim of a legislative purpose by claiming that they no longer seek to question Mr. Meadows about his official role. *See* ECF No. 35 at 16–20.  As explained above and elsewhere, it is impossible to draw the fine line the Congressional Defendants would have the Court to draw between Mr. Meadows's role as White House Chief of Staff and activities that might have helped with the President's effort to get reelected.  But even if the Congressional Defendants were right, that would just further undermine the notion that they are pursuing a valid legislative purpose.  To the extent the Select Committee

---

[8] *But see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–75 (2019) (holding that, while a court ordinarily "may not reject an agency's stated reasons for acting simply because the agency might also have other unstated reasons," a court may nevertheless look past an agency's stated reasons where they present a "significant mismatch" with what they are doing).

is directly targeting the campaign activity of its leadership's political opponent, that effort runs head long into the First Amendment, *see* ECF No. 29-1 at 37, and raises serious questions about what conceivable legislative purpose they could be pursuing.  It also means that they can no longer wrap themselves in the mantel of "'Congress's historical oversight function,'" ECF No. 35 at 13 (quoting *Miers*, 558 F. Supp. 2d at 103), since Congress has no oversight over conduct that they themselves claim to be outside the scope of the Executive Branch, *see, e.g.*, ECF No. 35 at 17 (arguing that they are now targeting Mr. Meadows only for "private conduct").

## III.    The Subpoenas Were Not Validly Issued.

The Select Committee has not complied with two key aspects of the rules governing Committee proceedings and as a result the subpoena issued to Meadows is invalid.  Both flaws are independently material to a judicially cognizable issue before the Court.

### A.    Select Committee's failure to adhere to H. Res. 503 is legally cognizable.

The Rules applicable to the Select Committee in pertinent part require (a) that the Select Committee be composed of 13 total members and (b) that a subpoena to a deposition can only be issued by the Chair in consultation with the Select Committee's "Ranking Member."[9] As the Supreme Court held in an analogous circumstance: "The Committee prepared the groundwork for prosecution in Yellin's case meticulously.  It is not too exacting that the Committee be equally meticulous in obeying its own rules." *Yellin v. United States*, 374 U.S. 109, 124 (1963).

In its brief, the Congressional Defendants boldly assert that Meadows "nitpicks … titles" of committee members and this does not even present a legitimate question for the Court, claiming that judicial consideration is barred by the Rulemaking Clause or some ill-defined deference to the Congressional Defendants' litigating positions.  *See* ECF No. 35 at 29–30.  They are wrong; what

---

[9] H. Res. 503 §§ 2(a), 5(c)(6), 117th Cong. (2021).

the Rulemaking Clause bars is judicial interpretation of congressional rules that would be rulemaking itself.  What the courts can, and in this instance must, do is hold the Select Committee to obeying the Rules that were made to govern its proceedings.  *See Christoffel*, 338 U.S. at 88–90.  The Rulemaking Clause is not a get out of jail free card for miscreant committees.  In closely analogous cases, the Supreme Court and D.C. Circuit have affirmed the role of courts in policing congressional compliance with its own requirements, including for its use of subpoena authority.  The best precedent strongly supports this Court's authority to declare judgment for Mr. Meadows.

Two Supreme Court opinions and two well-reasoned decisions from Judge J. Skelly Wright on the D.C. Circuit strongly support Mr. Meadows's position.  *See Christoffel*, 338 U.S. at 88–90; *Yellin*, 374 U.S. at 121; *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963).  There is no doubt: congressional subpoenas must comply with House rules in order to be valid.  Congress is free to create its own rules, including those delegating the implied authority to issue investigative subpoenas to a committee, but once it creates those rules, it must abide by them.  In *Christoffel*, for instance, the House rules required a quorum, and the defendant argued the committee lacked a quorum during the relevant time when statements challenged for perjury were made.  The committee argued that under the rules a quorum only need be present during the initiation of the testimony, not during the time of the challenged statements.  The Court, in ruling that Congressional rules required the presence of a quorum during the testimony, made clear where the line lies between judicially cognizable enforcement of congressional rules and judicial review barred by the Rulemaking Clause:

> Congressional practice in the transaction of ordinary legislative business is of course none of our concern, and by the same token the considerations which may lead Congress as a matter of legislative practice to treat as valid the conduct of its committees do not control the issue before us.  The question is neither what rules Congress may establish for its own governance, nor whether presumptions of

continuity may protect the validity of its legislative conduct. The question is rather
what rules the House has established and whether they have been followed.

*Christoffel*, 338 U.S. at 89.

Likewise, in a case where subpoena authorization was challenged, *Shelton v. United States,* the D.C. Circuit held that the committee's rules required the committee itself to issue a subpoena, not the chairman or staff of the committee acting alone. The committee claimed its rules allowed the chairman alone to issue a subpoena. The Court examined the relevant rules provisions and determined that the Rules expressly required that the committee as a whole authorize the subpoena (it did not blindly defer to the committee under the Rulemaking Clause, as the Congressional Defendants urge this Court to do). Relying on the Supreme Court's decision in *Yellin,* Judge Wright held: "Since the Subcommittee did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid." 327 F.2d at 606.

The teaching of these cases is plain and contradicts the Congressional Defendants' assertion that the issue of Select Committee adherence to its own rules is non-justiciable in this case. To the contrary, the rule from these decisions is that a congressional committee is bound by the plain terms of its own rules, and when adherence to those rules is challenged by a witness with rights before the committee, the question is a legal one fully cognizable by the courts. These cases all make clear that congressional committees must comply with their own rules, particularly those going to the authority to compel parties with subpoena power, and if they violate those rules, courts can and will declare the subpoena void.

Against this strong authority, the Select Committee here offers ancillary case law and a weak to non-existent response to the on-point precedent. First, the Rulemaking Clause does not work to give the Select Committee cart blanche to violate the terms of delegation from the House. The Select Committee's three primary authorities for broad deference are inapt and do nothing to

undermine the law established in the cases discussed above. In *Rangel v. Boehner*, the court merely rejected Congressman Rangel's attempt to challenge his censure as a political question primarily involving the Discipline Clause, and favorably cites the more on-point precedent from *Yellin* and *Christoffel*, where the Supreme Court decided committee power had been misused. *See* 20 F. Supp. 3d 148 (D.D.C. 2013). *Baker v. Conroy* fares no better. That decision focused on an atheist's Establishment Clause challenge to congressional rules governing prayer, and the court noted how the House's interpretation that "prayer" required "religious prayer" was accepted by the court. *Baker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019). This common-sense conclusion does not support any substantial deference on rules application, as the Select Committee suggests.

The Select Committee's reliance on *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), badly misses the mark. That case involved a criminal fraud case against a Congressman, not a challenge to committee investigative authority and use of subpoenas. And most all the House rules at issue were found to be judicially cognizable, even in that context. The case does not require deference to a congressional interpretation of rules and the court follows without qualification *Yellin*. *Id.* at 1305. If the Select Committee were correct, and any proffered interpretation of House Rules must be deferred to, then *Christoffel* and *Shelton* were wrongly decided, since the congressional interpretation offered therein was rejected by the courts. No rule of strong deference can be drawn from these cases.

The Select Committee also points to Judge Kelly's recent decision in active litigation between the Republican National Committee and the Select Committee, challenging a subpoena for some of the same reasons at issue in this case. Judge Kelly, respectfully, was mistaken by fashioning an ambiguity in H. Res. 503 that plainly does not exist, and by applying an unwarranted level of deference to the Select Committee's litigating positions, taking *Rostenkowski* out of

26

context and ignoring the more on-point authority of *Yellin* and *Christoffel*.  As explained below,

Judge Kelly also erred in how he interpreted H. Res. 503 on the merits.

> **B.      The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to failed composition.**

The Select Committee does not comply with H. Res. 503's requirements that the "Speaker

**shall appoint** 13 Members to the Select Committee, 5 of whom **shall be appointed** after

consultation with the minority leader."  H. Res. 503, 117th Cong. (2021) (emphasis added).  The

Speaker never appointed 13 members and the Speaker never appointed 5 members in consultation

with the Minority Leader.  There is no dispute about these facts, they are the status quo of the

Select Committee's make-up.  For both reasons, the Select Committee was not validly constituted

and cannot, as a matter of law, exercise delegated subpoena authority that belongs to Congress by

implication.  *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  The Select Committee has

almost no response to this.  It points to Judge Kelly's recent decision (stayed pending appeal by

the D.C. Circuit), as supporting an interpretation that "shall appoint 13 Members" doesn't mean

the Speaker shall appoint 13 members, it must mean "may."  It then makes the unprecedented and

novel claim that the House's action on contempt resolutions operates to "ratify" the view that the

Select Committee is validly constructed.

As to Judge Kelly's opinion, with respect, the better interpretation of H. Res. 503 is the

plain meaning of the words require the Speaker to appoint 13 members.  Nothing in the context of

the resolution supports a highly unusual interpretation that "shall" is optional and allows the

Speaker to constitute a committee with only nine members, not the 13 specified (with five from

the minority consultation process).  The only support for this strained interpretation of "shall" is a

fleeting citation to *English v. Trump,* where the word "shall" was interpreted in context with other

statutes, and otherwise notes that authority strongly supports the common sense view that shall "is

usually understood as mandatory." 279 F. Supp. 3d 307, 323 (D.D.C. 2018). The interrelationship between Dodd-Frank and the Federal Vacancies Reform Acts, at issue in *English*, says nothing about how the Speaker could possibly understand H. Res. 503 as anything other than a requirement to appoint 13 members. Judge Kelly then wrongly deferred to the House view that "shall" means "might," relying on a misreading of *Rostenkowski*. Unreasonable and erroneous House interpretation of rules can and should be rejected by this Court, as the interpretations were in *Christoffel* and its progeny.

The House vote on contempt resolutions cannot operate to "ratify" the Select Committee's legally deficient composition. *But see* ECF No. 35 at 28. There is no legal doctrine of ratification for such a fundamental error. If there were, then virtually all legal challenges to subpoenas would have come out otherwise since it is usually the case that a subpoena challenged in the context of contempt would have been subsequently subject to a referral vote outside the committee being challenged. In other words, failure to follow the rules in committee composition cannot be fixed by a mere contempt resolution vote; it would need to be addressed by amending H. Res. 503 or comply with the plain terms of the resolution by appointing 13 Members.

> **C.**     **The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to lack of consultation with a ranking minority member.**

In addition to lacking the requisite composition, the Select Committee failed to follow the rules for consultation with a ranking minority member before issuing the subpoena to Mr. Meadows. The Select Committee all but concedes it violated its own rules about consultation by claiming this argument is "nitpicking." On the contrary, protecting the rights of the minority party where they impact the Due Process rights of a committee witness, including by the common mechanism of allowing the minority party to designate a ranking member who exercises procedural rights, is precisely what the Supreme Court and the D.C. Circuit instruct that courts

must do.  As Mr. Meadows has shown, the Select Committee failed to consult with a "ranking

minority member" because *there is no ranking minority member*.  In response, the Select

Committee again relies on Judge Kelly's recent opinion (stayed pending appeal by the D.C.

Circuit), and also contends that Rep. Liz Cheney is "ranking minority member *for consultation*

*purposes*."  ECF No. 35 at 29 (emphasis added).  Where in House Resolution 503 is there a

provision for such a designation? Why the qualification?  Perhaps because the Select Committee

cannot bring itself to say what it knows to be false: Rep. Cheney is not the "ranking minority

member," period.

It is not surprising that counsel for the House would thus readily admit to the Federal

Bureau of Investigation that the Select Committee does not have a ranking minority member, and

that Rep. Cheney is "Vice Chair," as it was recorded:

> LETTER explained that the Select Committee was specifically appointed by the Speaker
> of the House and there were no majority or ranking members.  Representative LIZ
> CHENEY is acknowledged to the Vice Chair of the Select Committee … there are no
> express rules for the Vice Chair as there would be for a Ranking Member.

ECF No. 29-2 ¶ 18.  The Select Committee boldly says *nothing* in response to this quasi-judicial

admission that Rep. Cheney is not the ranking minority member.  This undisputed evidence

strongly supports Mr. Meadows's claim for judgment that the subpoenas at issue are invalid

because there can be no compliance with the ranking minority member consultation requirements.

The Select Committee's response to the ranking minority member defect amounts to

semantics.  In addition to mischaracterizing the clear legal requirement as "nitpicking," the Select

Committee attempts to demean the position and role of the ranking minority member by calling it

a "title."  Of course, both major parties regularly rely on appointment of ranking minority members

to protect substantive rights; not merely treating it as a title.  Regardless of characterization, the

Select Committee failed to follow its own clear rule.

In addition, the Select Committee again invokes Judge Kelly's recent opinion as having resolved the issue. The reasoning of that decision, not binding on this court and unsettled by the ongoing appeal, should be rejected. Judge Kelly, and the Select Committee, adopt the unreasonable and unprecedented view that the "ranking minority member" can be ascertained by simply looking at the member of a committee who is literally most senior in seniority, and party affiliation, without any role for the minority party and its leadership to designate the ranking position. Although it is true that Rep. Cheney was the first (of two) Republican members that Speaker Pelosi appointed to the Select Committee, that mechanical understanding of the ranking minority member position is entirely contrary to past congressional practice and at odds with the uncontested view of the Minority Leader Kevin McCarthy that Rep. Cheney is simply not the ranking minority member.[10]

---

[10] As Minority Leader Kevin McCarthy recently stated, Representative Cheney "is clearly not the ranking minority member." Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022), https://republicanleader.house.gov/wp-content/uploads/2022/05/McCarthyLetter-052722.pdf. Ranking members, distinct than most senior members, have always been understood as the member designated by the minority party, without regard to simple seniority (on the Select Committee or in the House). Both the Republican Conference Rules and Democrat Caucus Rules make this clear. The Republicans provide for term limits, with no reference for seniority, for ranking members. *See* GOP H. Conf. R. 117th Cong. 14(e), https://www.gop.gov/conference-rules-of-the-117th-congress/. The Democrat Caucus Rules are even more stark—calling for election or secret ballot, again without reference to simple seniority. *See* R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021), https://www.dems.gov/imo/media/doc/DEM_CAUCUS_RULES_117TH_April_2021.pdf. Both Rules are consistent with the longstanding practice of minority party selection or designation of the "ranking minority member." For example, in the 114th Congress, when the Democrats were in the minority, Representative Levin was ranking member of the House Ways & Means Committee, even though Representative Rangel had been more senior by 12 years. *See* H. Rep. No. 114-887, at (II), 20 (2016). *Compare Representative Sander M. Levin*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/sander-levin/L000263, *with Representative Charles B. Rangel*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/charles-rangel/R000053. Consistent with this longstanding practice, even in politically contentious situations, the minority party simply speaks of "appointing" or "selecting" members of committees and ranking members. *See, e.g.*, Press

In addition, the Select Committee argues the court *must* defer to the Select Committee and accept that Rep. Cheney was the "ranking minority member" *for consultation purposes*.   It is telling that the Select Committee cannot even bring itself to declaring Rep. Cheney the ranking minority member without qualification.   The case law regarding congressional authority to investigate by subpoena does not support the absolute deference the Select Committee demands. If such strong deference were required, then none of the challenges to congressional subpoenas would have succeeded.  *See, e.g.*, *Yellin v. United States*, 374 U.S. 109 (1963); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963). Especially when the requested deference is for an unreasonable and unprecedented position (declaring a ranking minority member contrary to the expressed position of the minority party), not only is deference not appropriate, it would constitute precisely the judicial intervention the Rulemaking Clause forecloses.

Finally, while the undisputed facts and public records subject to judicial notice strongly support Meadows position that Cheney is not the ranking minority member, if the Court has any doubt, then it should deny the Select Committee's motion for summary judgment and grant Mr. Meadows the opportunity conduct discovery and develop facts relevant to this issue.

---

Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names Democratic Members to House Select Committee on Benghazi* (May 21, 2014), https://web.archive.org/web/20141207010037/https://www.democraticleader.gov/newsroom/pelosi-names-democratic-members-house-select-committee-benghazi/.

IV.     **The Congressional Defendants' Procedural Arguments Are Also Unavailing.**

    A.     *The recent developments in the RNC litigation show that the Congressional Defendants' rush to summary judgment in this case was misguided and unsupported.*

The Congressional Defendants' brief in opposition relies heavily on Judge Kelly's recent decision in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), to justify their response to Mr. Meadows's arguments on invalid legislative purpose, the improper composition of the Select Committee, and the absentee ranking member. Just as they have done in Mr. Meadows's case, the Congressional Defendants in the *RNC* litigation asked the courts to rush to judgment on important constitutional concerns in order to meet their self-imposed (and likely politically motivated) deadlines.  But their reliance on *RNC* is flawed. First, the *RNC* case was not filed as a related case to Mr. Meadows's, and there are many critical factors distinguishing the *RNC* case from Mr. Meadows's.  In *RNC*, for example, there is no subpoena for testimony, nor are there claims of testimonial immunity or executive privilege.  Its ruling thus did not account for many of the important constitutional rights and protections at stake in this litigation.  For these reasons, the Court should decline the Congressional Defendants' pleas to adopt Judge Kelly's ruling on dispositive arguments of legislative purpose, the composition of the Select Committee, and the ranking member.

Second, with respect to the limited set of arguments shared by the RNC and Mr. Meadows, the Court should similarly be reluctant to adopt the findings in *RNC*.  Just as they did in the instant case, the Congressional Defendants made a dramatic appeal for the courts to quickly resolve their case so as "not to interrupt and delay the Select Committee's work at this critical juncture." Appellees' Corrected Resp. Appellant's Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 24, 2022).  Twelve days ago, the D.C. Circuit issued an injunction pending appeal of Judge Kelly's decision, an action both parties agreed require the Court to consider the

RNC's likelihood of success on the merits, and granted the Congressional Defendants their requested expedited briefing schedule.  *See id.*; Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022); Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 23, 2022).  And with that, it appears the juncture may not be so critical as the Congressional Defendants first suggested.  Undoubtedly recognizing their diminishing chances of success on appeal and out of concern for an appellate court ruling that would harm their likelihood of success in cases such as Mr. Meadows's, the Congressional Defendants changed their mind and moved the D.C. Circuit for a delay in briefing.  *See* Mot. Postponement Br. & Oral Arg., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022).  These recent actions by the Congressional Defendants in the *RNC* case indicate their real concern: that the D.C. Circuit may not appease their hasty, bullying tactics against witnesses and courts.  The Court should not indulge their feigned rush to judgment in this matter either.

> **B.**     **The Congressional Defendants have not identified defects in Mr. Meadows's statement of facts, and any material factual disputes would only support his still-pending Rule 56(d) motion.**

In their opposition to Mr. Meadows's statement of facts, the Congressional Defendants admit that Mr. Meadows disputes at least six paragraphs of their purported "undisputed" statement of facts.  *See* ECF No. 35 at 9.  That, in addition to their fit over Mr. Meadows's statement of facts in support of his motion and in opposition to the Congressional Defendants' motion for summary judgment, does nothing but emphasize Mr. Meadows's consistent refrain that, should he not be entitled to judgment as a matter of law, then there are clearly disputed material facts in this case that call for discovery.

Actually, Mr. Meadows disputed outright ten of the many allegations contained in the Congressional Defendants' 29 paragraphs of stated facts.  *See* ECF No. 35 at 9 (identifying the six disputed paragraphs); ECF No. 29-3 ¶¶ 9 ("Mr. Meadows disputes that the testimony and

documents demanded in the subpoena are limited to 'the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day.'"), 20 ("Mr. Meadows disputes that he had a 'change of heart.'"), 21 ("Mr. Meadows does dispute that he and the Select Committee agree upon any 'indisputably non-privileged testimony.'"), 22 ("Mr. Meadows again disputes that he and the Select Committee agree on the scope of 'non-privileged information.'"). And with another four allegations, Mr. Meadows contested the Congressional Defendants' characterization of the document referenced, stating that the Court may itself refer to the document, rather than accepting the Congressional Defendants' characterizations.  *See* ECF No. 29-3 ¶¶ 17–20.

The Congressional Defendants' opposition also contends that Mr. Meadows "appears to be ignoring the actual allegation, each of which includes a citation."  ECF No. 35 at 9.  But the Congressional Defendants apparently failed to understand Mr. Meadows's objection to each of these referenced statements, which note that the citations do not, in fact, support one or more aspects of the Congressional Defendants' statement.

The first example Congressional Defendants allege cannot be in dispute—that the privilege log "plainly includes communications between Mr. Meadows and well known members of the Trump campaign team" and campaign counsel—clearly ignores Mr. Meadows's argument.  The Congressional Defendants' statement in question was that Mr. Meadows's privilege logs, ECF No. 15-6, "identified more than 200 communications he initiated or participated in based on his role in the Trump campaign with people reported to be members of the Trump campaign legal team or other Trump campaign staff."  ECF No. 15-28 ¶ 18.  Mr. Meadows disputed this part of their allegation on two grounds.  First, neither the privilege logs nor the Congressional Defendants identified which individuals included in the privilege log were "reported to be members of the

Trump campaign legal team or other Trump campaign staff." *See* ECF No. 29-3 ¶ 18. In this way, the Congressional Defendants did not properly support their contention, as Mr. Meadows noted. And second, nothing in the Congressional Defendants' referenced document indicates that Mr. Meadows undertook these communications "based in his role in the Trump campaign." *See id.* Further, for the many reasons stated in Part I.B, Mr. Meadows has objected to "the distinction Congressional Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President." *See id.* So despite the Congressional Defendants' contentions otherwise, this is a material dispute.

The Congressional Defendants' other example, relating to Donald Trump's press release, is even more straightforward. Mr. Meadows disputes that the press release supports the Congressional Defendants' statement that "Former President Trump reviewed [Mr. Meadows's] book in advance and did not object to its publication." Nothing in the press statement Congressional Defendants cite, *see* ECF No. 35-3, states that former President Trump read Mr. Meadows's book. And even if the fact that former President Trump released the statement is alone sufficient to show he "did not object to its' publication" (which Mr. Meadows submits it is not) the Select Committee's own statements dispute the fact that former President Trump approved of Mr. Meadows's book prior to publication. *See* 167 Cong. Rec. H7645 (daily ed. Dec. 14, 2021) (statement of Rep. Raskin) ("Mark Meadows' book came out with tons of startling and eye-popping revelations about January 6th and the role that then-President Donald Trump played. Ex-President Trump exploded and called Mr. Meadows' book fake news.").

The Congressional Defendants next object to a number of Mr. Meadows's presented facts as hearsay and thus, not admissible in evidence. These objections include an official FBI report filed in another case before this very Court. *Compare* ECF No. 35-1 ¶ 18, *with Veg-Mix, Inc. v.*

*U.S. Dep't of Agriculture*, 832 F.2d 601, 607 ("Courts may take judicial notice of official court records."). It is unclear, for example, why the Congressional Defendants argue that Mr. Meadows's citations to press releases are inadmissible hearsay, *see, e.g.*, ECF No. 35-1 ¶ 7, but their own citations to press releases (not by any party to this case or subject to any other obvious hearsay example) are admissible, *see, e.g.*, ECF No. 15-28 ¶ 4, 5, 24. Mr. Meadows has disputed the relevant portions of these statements. The Congressional Defendants' objections are unavailing, and each of these statements is admissible.[11]

Unfortunately, Mr. Meadows has not had the benefit of purported subpoena power to support his arguments in opposition to the Congressional Defendants' motion, nor was he privy to much of the testimony and documents cited by and attached to their motion. As the Congressional Defendants point out in their opposition, ECF No. 35 at 9, without the benefit of any discovery, Mr. Meadows is unable to support factually his challenge to some of the Congressional Defendants' statements of fact, *see* ECF No. 29-3, and his own additional facts in opposition to the Congressional Defendants' motion, *see* ECF No. 29-2. For this reason, Mr. Meadows disputed each statement of alleged fact (and any accompanying commentary) that was unsupported by the Congressional Defendants' own citations. *See* ECF No. 29-3, ¶¶ 5, 6, 7, 18, 23, 26. For example, without additional discovery, Mr. Meadows is unable to support his dispute that Speaker Pelosi has fulfilled her duties pursuant to H. Res. 503. *See* ECF No. 29-3 ¶¶ 5, 6; *see also* Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) ("The Speaker did not appoint five members after consultation with the minority leader.").

---

[11] To the extent the Court seeks full briefing on each of the Congressional Defendants' twenty-six hearsay arguments, Mr. Meadows welcomes such opportunity.

It is for these reasons that Mr. Meadows filed a motion pursuant to Federal Rule of Civil Procedure 56(d), asking the Court to deny without prejudice or delay ruling on the Congressional Defendants' motion for summary judgment, ECF No. 20. But while the Court has held that motion in abeyance, Mr. Meadows continues to emphasize that he is entitled to summary judgment on the issues that Congressional Defendants label "irrelevant."

Specifically, the facts relating to "the formation, composition, operations, or investigative scope" and the legislative purpose and intent of the Select Committee are of utmost relevance to Mr. Meadows's motion. *See supra* Parts II–III. The Congressional Defendants' attempt to dismiss such claims as irrelevant due to a nonbinding and distinguishable court decision is unjustified. *See* Part IV.A *supra*.

And lastly, the Congressional Defendants object to counsel's declaration in support of some of the material facts. Counsel's declaration is based on his personal knowledge, the basis of which is provided in each of the specific declarations. *See* ECF No. 29-4. The declaration fully comports with the requirements of Federal Rule of Civil Procedure 56(c)(4).

### C.     *The Congressional Defendants improperly use their reply to claim new grounds for seeking summary judgment.*

The Congressional Defendants' arguments on the other issues which Mr. Meadows has raised in his complaint but on which he has not yet sought summary judgment—namely, the Stored Communications Act, the First Amendment, and the Fourth Amendment—are also misplaced.

To start, the Congressional Defendants have sought summary judgment on Mr. Meadows's Fourth Amendment claim based on absolute immunity for the first time in their reply. They argue that they are immune from Mr. Meadows's argument that the subpoena violates the Fourth Amendment. *See* ECF No. 35 at 36. According to the Congressional Defendants, they have

absolute immunity from this constitutional claim because of the protection afforded to congressional Speech or Debate. *Id.*

This argument is foreclosed as a ground for summary judgment in their favor because Congressional Defendants failed to raise it before their reply. Courts in this Circuit have "generally held that issues not raised until the reply brief are waived." *Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 24 n.4 (D.D.C. 2019) (quoting *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000)). Thus, a new argument for summary judgment will be rejected when raised for the first time in reply. *See id.*

The Congressional Defendants made no mention of absolute immunity as a defense to Mr. Meadows's Fourth Amendment claim in their motion for summary judgment and supporting memorandum. *See* ECF No. 15 at 62–65. Instead, they argued that the subpoena was not overbroad and that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), did not apply to the information sought. *Id.* The Congressional Defendants cited the case they now rely on to assert immunity—*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)—but only in a section of their memorandum discussing Mr. Meadows's First Amendment claim. *Id.* at 54. This mere reference to a related case in a different section of their memorandum falls far below the standard to raise immunity as a ground for judgment on the Fourth Amendment claim. *See Bloche*, 414 F. Supp. 3d at 24 n.4 (explaining that an argument is waived "when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief").

The argument further fails because the Congressional Defendants have waived their claim for absolute immunity under the Speech or Debate Clause against *any* of Mr. Meadows's claims since they failed to raise that defense in their Answer to Mr. Meadows' First Amended Complaint. *See* ECF No. 17 at 31–33. Constitutional immunity, including under the Speech or Debate Clause,

is an affirmative defense. *See Bush v. Lucas*, 462 U.S. 367, 377 (1983) (referring to an "affirmative defense based on the speech or Debate Clause of the Constitution"); *see also Shelby Cnty., Alabama v. Holder*, 43 F. Supp. 3d 47, 53 (D.D.C. 2014), *aff'd sub nom. Shelby Cnty., Ala. v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015) (explaining that sovereign immunity is an affirmative defense). "[A]n affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer." *Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998). Thus, the Congressional Defendants cannot rely on Speech of Debate immunity to defeat Mr. Meadows's claims.

## CONCLUSION

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Congressional Defendants' motion for summary judgment.

Dated: June 6, 2022

Respectfully submitted,
MARK MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

Case 1:21-cr-00670-CJN   Document 85-3   Filed 06/06/22   Page 468 of 638

## CERTIFICATE OF SERVICE

I certify that, on June 6, 2022, a copy of the foregoing was filed on the Court's CM/ECF

system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE NON-PARTY SUBPOENAS | : : : : | Misc. Case No. 22-60 (CJN) |
| UNITED STATES OF AMERICA | : : : : | Criminal No. 21-670 (CJN) |
| v. | : : | |
| STEPHEN K. BANNON, | : : | |
| *Defendant.* | : : | |

## OPPOSITION TO MOTION TO QUASH

Defendant Stephen K. Bannon, by and through his undersigned counsel and pursuant to the Fifth and Sixth Amendments to the United States Constitution, respectfully requests that this Court deny the Motion To Quash.[1] In support this Opposition we state as follows:

### Summary Of Argument

Mr. Bannon faces trial on criminal charges – two counts of Contempt of Congress, in violation of 2 U.S.C. § 192 – which stem from his conduct after receiving a subpoena dated September 23, 2021, issued on behalf of the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"). The Government in that case contends that

---

[1] Filed by the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable James B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, the Honorable Jim Clyburn, the Honorable Steny Hoyer, David Buckley, Douglas Letter, Kristen Amerling, and Sean Tonolli.

Congress is the "complainant."[2] The nine Select Committee members who are movants here –
Reps. Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, and Kinzinger – set
in motion Mr. Bannon's prosecution by failing to accept his assertion of executive privilege (on
orders of President Donald J. Trump, the holder of the privilege) and by failing to grant Mr.
Bannon's reasonable request for an accommodation that would have allowed a judge to resolve
the privilege issues in a civil enforcement proceeding (instead of facing criminal prosecution) or
for a one week extension to resolve the competing positions asserted on the executive privilege
issue by Presidents Trump and Biden, in light of the then pending lawsuit, *Trump v. Thompson*.

The Select Committee Members take a different view when a subpoena is served on them.
Now it is the Select Committee members who seek to invoke a privilege in the hope that they can
avoid testifying at Mr. Bannon's trial. Three other movants – Reps. Pelosi, Hoyer, and Clyburn –
also make an about-face. These three Members of Congress do so after having already waived
Speech or Debate Clause protection by submitting themselves to the jurisdiction of this Court in
Mr. Bannon's criminal case when they filed an amicus brief asserting arguments on factual and
legal issues involved in that criminal case.[3] The final four movants – Messrs. Buckley, Letter,
Tonolli, and Ms. Amerling – are key congressional staff. They, together with the Members of
Congress identified above, possess critical exculpatory evidence that is essential to Mr. Bannon's
ability to have a fair trial.  Mr. Letter already has served as a fact witness for the Government in

---

[2] *See* Criminal No. 21-670 (CJN), Hearing Tr. March 16, 2022, at 26 (Congress is "essentially, the complainant in this case").

[3] *See* Criminal No. 21-670 (CJN), Brief of the United States House of Representatives as Amicus Curiae in Support of the Department of Justice [Doc. 76-2].

the case [US-000245-000252] [4]; but now seeks to remove himself by invoking privilege when called upon to testify by the Defendant.

The Motion To Quash creates a fundamental conflict between Mr. Bannon's Fifth and Sixth Amendments rights to compulsory process and to present a defense at trial, and the Movants' Speech or Debate Clause privileges. Because Movants set in motion the prosecution of Mr. Bannon, they cannot now retreat behind the Speech or Debate Clause. Their assertion of privilege must yield to the due process and liberty interests of Mr. Bannon. If the Court grants Movant's Motion To Quash, then the only next step consistent with due process would be to either exclude all congressional evidence at Mr. Bannon's trial or dismiss the charges entirely to preserve Mr. Bannon's Fifth and Sixth Amendment Rights. *See* discussion of *Rainey* case *infra* pp. 14-15 (dismissal of obstruction of Congress charge where subpoenaed members of Congress validly asserted Speech or Debate privilege). Otherwise, there would be a one-sided presentation of "evidence" at the criminal trial that is wholly untested by cross-examination or the ability to elicit critical exculpatory evidence from key Members of Congress and staff. The Constitution requires either the attendance of these congressional witnesses, or the exclusion of all congressional evidence at the criminal trial.

**Factual Background**

On September 23, 2021, Kristen Amerling, Esquire, Chief Counsel and Deputy Staff Director of the Select Committee, served Mr. Bannon with a subpoena by email to his counsel,

---

[4] Bates Number references herein are to documents produced by the Government in Criminal No. 21-670 (CJN).

Robert J. Costello, Esquire. The subpoena directed Mr. Bannon to produce certain documents by

October 7, 2021, and to appear for testimony on October 14, 2021. [US-000002].

On October 6, 2021, Mr. Costello received an emailed letter from Justin Clark, Esquire,

counsel to President Trump, which stated in relevant part:

> President Trump vigorously objects to the overbreadth and scope of these requests
> and believes they are a threat to the institution of the Presidency and the
> independence of the Executive Branch.
>
> Through the Subpoenas, the Select Committee seeks records and testimony
> purportedly related to the events of January 6th, 2021, including but not limited to
> information which is potentially protected from disclosure by the executive and
> other privileges, including among others, the presidential communications,
> deliberative process, and attorney-client privileges. President Trump is prepared to
> defend these fundamental privileges in court
>
> Therefore to the fullest extent permitted by law, President Trump instructs Mr.
> Bannon to: (a) where appropriate, invoke any immunities and privileges he may
> have from compelled testimony in response to the Subpoena; (b) not produce any
> documents concerning privileged material in response to the Subpoena; and (c) not
> provide any testimony concerning privileged material in response to the Subpoena.

[US-000971].

On October 7, 2021, Mr. Costello sent Ms. Amerling a letter detailing the communication

from President Trump's counsel and further advised:

> It is therefore clear to us that since the executive privileges belong to President
> Trump, and he has, through his counsel, announced his intention to assert those
> executive privileges enumerated above, we must accept his direction and honor his
> invocation of executive privilege. As such, until these issues are resolved, we are
> unable to respond to your request for documents and testimony…We will comply
> with the directions of the courts, when and if they rule on these claims of both
> executive and attorney client privileges. Since these privileges belong to President
> Trump and not to Mr. Bannon, until these issues are resolved, Mr. Bannon is legally
> unable to comply with you subpoena requests for documents and testimony.

[US-000234 - 000235].

4

On October 8, 2021, Mr. Costello received a letter from Hon. Bennie G. Thompson, Chairman of the Select Committee, summarily rejecting all claims of privilege by President Trump with respect to Mr. Bannon. [US-000238 - 000239]. The letter advised that Mr. Bannon was obligated to produce documents "[r]egardless of any purported privilege assertion by Mr. Trump" and warned that if Mr. Bannon did not ignore President Trump's invocation of executive privilege and respond the subpoena, the Select Committee would view this as "willful non-compliance with the Subpoena….which could result in a referral from the House to the Department of Justice for criminal charges." *Id.*

In response to Chairman Thompson's October 8, 2021 letter, on October 13, 2021, Mr. Costello sent a letter to Chairman Thompson wherein he provided legal support for Mr. Bannon's reliance on President Trump's invocation of executive privilege and reiterated that Mr. Bannon would further respond to the subpoena if President Trump withdrew his claims of privilege, or if a court resolved the legal issues. [US-000315 – 000316]. The letter stated, in pertinent part, as follows:

> As an initial matter, your use of the word "defiance" is inappropriate. Mr. Bannon's position is not in defiance of your Committee's subpoena; rather, Mr. Bannon noted that President Trump's counsel stated that they were invoking executive and other privileges and therefore directed us not to produce documents or give testimony that might reveal information President Trump's counsel seeks to legally protect. Mr. Bannon has testified on three prior occasions, before the Mueller Investigation, The House Intelligence Committee and the Senate Intelligence Committee. In each of those instances, when President Trump waived his invocation of the executive privileges, Mr. Bannon testified. As recently as today, counsel for President Trump, Justin Clark, Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved. Your Committee will have the right to challenge that exercise or its scope. That is an issue between the Committee and President Trump's counsel and Mr. Bannon is not required to respond at this time. See *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019) ("The President can certainly identify sensitive information that he deems subject to executive privilege, and his doing so gives rise to a legal duty on the

part of the aide to invoke the privilege on the President's behalf when, in the course of his testimony, he is asked a question that would require disclosure of that information.")[.]

Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying. As noted previously, Mr. Bannon will revisit his position if President Trump's position changes or if a court rules on this matter.

*Id.*

On October 13, 2021, Mr. Costello telephoned Sean Tonolli, Senior Investigative Counsel for the Select Committee, to inquire (1) whether it was possible for one of President Trump's lawyers to attend the deposition and make privilege objections on President Trump's behalf; and (2) whether the deposition could be conducted remotely. [US-000317]. Mr. Tonolli understood that "the thrust of these questions" by Mr. Costello were consistent with an ongoing effort to reach accommodation that would allow Mr. Bannon to appear in response to the subpoena. *Id.*

Because no accommodation was accepted by the Select Committee, notwithstanding the constitutional imperative requiring the parties to try to reach one, Mr. Bannon did not produce the subpoenaed documents or appear for testimony on October 14, 2021. [US-000277 -000288]. On October 15, 2021, Chairman Thompson sent Mr. Costello a letter that included a blanket rejection of assertions of privilege by President Trump. [US-000299 - 000300]. The letter asked Mr. Bannon to provide any additional information he wished to the Select Committee by October 18, 2021. [US-000301].

On October 18, 2021, Mr. Costello sent Chairman Thompson a second letter, which stated:

We write on behalf of Stephen Bannon. We have just been advised of the filing of a lawsuit in federal court for the District Court of Columbia entitled Donald J. Trump v. Bennie Thompson, et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we respectfully request a one-week adjournment of our response to your latest letter so that we might thoughtfully assess the impact of this pending litigation.

6

[US-000290]. On October 19, 2021, Chairman Thompson sent Mr. Costello a letter that summarily rejected Mr. Costello's request for a one-week adjournment. [US-000275]. On October 21, 2021, the House of Representatives voted 229-202, largely along party lines, to hold Mr. Bannon in criminal contempt of Congress, and the matter was referred to the U.S. Attorney's Office for the District of Columbia. [US-000459 – 000504]. On November 12, 2021, a grand jury charged Mr. Bannon in a two-count indictment. [Criminal No. 21-670 (CJN), Doc. 1].[5]

Members of the Select Committee have made public statements that reveal their bias against Mr. Bannon. To note just a few examples:

- Those who have come forward to the @January6thCmte committee have chosen to do the right thing by showing up, speaking to Congress, and providing information. There is no one above the law, and we continue to gather information and facts about the events of January 6th." Elaine Luria (@RepElaineLuria), Twitter (Apr. 13,2022,10:30 PM),https://twitter.com/RepElaineLuria/status/1514430760996024321?ref_src=twsrc%5Etfw.

_____

[5] Count One charged Mr. Bannon with Contempt of Congress, in violation of 2 U.S.C. § 192, alleging that "having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House, did willfully make default – that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to appear to give testimony in response to a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to appear for a deposition at 10:00 a.m. on October 14, 2021." _Id_. at 8. Count Two also charged him with Contempt of Congress, in violation of 2 U.S.C. § 192, alleging that "having been summoned as a witness by the authority of the U.S. House of Representatives to produce papers upon a matter under inquiry before a committee of the House, did willfully make default – that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way with a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to produce documents and communications as delineated therein." _Id_. at 9.

7

- No one is above the law. No one can run out the clock. Our Select Committee will find the truth." Stephanie Murphy (@RepStephMurphy), Twitter (Dec. 1, 2021, 8:55 PM), https://twitter.com/repstephmurphy/status/1466224521371914243.

- No one is above the law. Sadly, a few of Mr. Trump's aides continue to think they are. Zoe Lofgren (@RepZoeLofgren), Twitter (Mar. 28, 2022, 6:30 PM), https://twitter.com/repzoelofgren/status/1508574278207393795.

- Steve Bannon was given every opportunity to comply with a lawful subpoena. He chose instead to make specious claims of executive privilege. Tonight, we voted to hold him in criminal contempt. Despite what he and Trump may believe, no one is above the law." Adam Schiff (@RepAdamSchiff), Twitter (Oct. 19, 2021, 7:58 PM), https://twitter.com/RepAdamSchiff/status/1450612312407257089.

- And to be a strong, self-sustaining, self-respecting democracy, we can't allow people to decide that they are above the law and that they are more important than our constitutional prophecies. Olafimihan Oshin, *Raskin: Pence was a Hero on Jan. 6 for Resisting 'Pressure Campaigns' and 'Coercive Efforts'*, The Hill (June 19, 2022, 11:37 AM), https://thehill.com/homenews/3529123-raskin-pence-was-a-hero-on-jan-6-for-resisting-pressure-campaigns-and-coercive-efforts/.

- Anyone who attempts to hinder our investigation, or who refuses to comply with a subpoena, can expect that we will use every tool at our disposal to ensure the Committee's work can continue. No one is above the law." Press Release, Pete Aguilar, Member, House Select Committee to Investigate the January 6th Attack on the United States Capitol, Aguilar Issues Statement on Grand Jury Indictment of Steve Bannon (Nov. 13, 2021) https://aguilar.house.gov/2021/11/13/aguilar-issues-statement-grand-jury-indictment-steve-bannon/

On May 10, 2022, Douglas N. Letter, Esq., General Counsel to the U.S. House of Representatives, hand-filed a Motion with the Clerk of the Court seeking leave to file an amicus curiae brief in support of both the government's Opposition to Mr. Bannon's Motion to Dismiss [Criminal No. 21-670 (CJN), Doc. 65] and the government's Motion in Limine to exclude evidence relating to objections to the subpoena [Criminal No. 21-670 (CJN), Doc. 53]. The House's decision

8

**-2604-**

to file an amicus curiae brief in this case was approved by the three Democrat members of the

House Bipartisan Legal Advisors Group ("BLAG") – namely, Reps. Pelosi, Hoyer, Clyburn.

Also on May 10, 2022, Speaker Pelosi issued a press release. Speaker Pelosi's press

statement asserted that the vote to hold Mr. Bannon in contempt of Congress "upheld the genius

of our Constitution[.]"[6] Speaker Pelosi further stated in the public statement, follows:

> The Department of Justice is to be commended for moving to hold Bannon accountable for
> his blatant defiance of a lawful subpoena.  Now, Bannon is seeking to dismiss the case,
> claiming that the Select Committee to Investigate the January 6th Attack does not have
> standing to compel his testimony.  By addressing many of Bannon's baseless arguments
> before the D.C. District Court, the House continues to defend this Constitutional power as
> well as its essential prerogative to establish its own rules and practices.
>
> No one is above the law. As the House's amicus brief makes crystal clear, *the subpoena of
> Steve Bannon issued by the Select Committee is legally valid, urgently needed and must be
> enforced.*

*Id.* (emphasis added).

On June 7, 2022, counsel for Mr. Bannon issued subpoenas for documents and testimony

to the Movants here. *See* Motion To Quash Ex. A to P. The subpoenas sought specific information

critical to Mr. Bannon's defense in this matter, which is not available from any other source.

On June 9, 2022, counsel for Mr. Bannon and counsel for the U.S. House of

Representatives met and conferred via telephone. The Motion to Quash states that "[c]ounsel met,

but were unable to agree on any withdrawal or narrowing of the subpoenas." Motion To Quash at

3. But that is not the whole story. Counsel for Mr. Bannon specifically offered to "make the process

as accommodating and unintrusive as possible" by offering to arrange the date of testimony so that

Members would not miss votes or be required to attend trial when the House was not in session.

In addition, counsel for Mr. Bannon specifically offered – among other accommodations to reduce

the burden of document production – to "work with individual Members on accommodations with

---

[6] Press Release, Nancy Pelosi, Speaker of the U.S. House of Representatives (May 10, 2022).

respect to the production of documents." Counsel for the U.S. House of Representatives did not take us up on those very broad offers of accommodation. House counsel acknowledged during that conference that none of the Committee's staffers has any decision-making authority. Therefore, by House Counsel's own admission, none of the staffers therefore would be competent witnesses to testify to some of the most fundamental issues Mr. Bannon seeks to raise in his defense, as detailed in earlier pleadings in this case. Only the Members of Congress would be competent witnesses on issues including the decision-making process concerning the composition of the Select Committee, the status of any "ranking minority member," the refusal to engage in the constitutionally mandated accommodation process, the rejection of executive privilege, and other key defense issues to be put before the jury at trial.

On June 13, 2022, Movants filed their Motion to Quash on the grounds that: (1) the subpoenas are barred by the Speech or Debate Clause; (2) that the subpoenas lack the specificity required by Fed. R. Crim. Pro. 17; (3) that Mr. Bannon has not established "extraordinary" or "exceptional" circumstances that would permit him to compel the appearance and testimony of a "high-ranking government official"; and (4) that the subpoena to House General Counsel seeks privileged information. Motion To Quash, Misc. Case No. 22-60 (CJN) [ECF 1 at 5].

Counsel for Mr. Bannon communicated with counsel for Movants in order to seek agreement on a consent briefing schedule on this Motion to Quash. Counsel for Movants offered Mr. Bannon *an extra 24 hours* within which to file an opposition. Counsel for Mr. Bannon declined this offer – hence our filing today.

Because each of Movant's arguments must yield to the due process and liberty interests of Mr. Bannon, we respectfully request that the Court deny the Motion to Quash. In the alternative,

10

should this Court grant the Motion to Quash in whole or in part, we ask the Court to exclude all congressional evidence at his criminal trial.

<u>**ARGUMENT**</u>

**Members Of Congress And Staff Cannot Initiate A Criminal Prosecution For Criminal Contempt Of Congress Only To Retreat Behind The Speech Or Debate <u>Clause When Summoned As Witnesses On The Alleged Contempt</u>.**

The Speech or Debate Clause provides as follows:

> The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. Art. I § 6, cl. 1. To understand the scope afforded by the Speech or Debate Clause, it is important to understand its history. The clause traces its roots to England, where centuries of monarchs used the criminal and civil court systems to control dissent in the legislature. *United States v. Johnson*, 383 U.S 169, 178 (1966). The language of the Speech or Debate Clause mirrors the language of its predecessor in the English Bill of Rights of 1689, which states "'[t]hat the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament' 1 W. & M., Sess. 2, c. 2." *Id.* The "predominate thrust" of the Speech or Debate Clause is to protect critical or disfavored legislators against criminal charges by a hostile executive branch, or criminal conviction by a hostile judiciary. *Johnson*, *supra*, 383 U.S. at 182. Thus, the Speech or Debate Clause protects members of Congress and their aides against prosecutions that directly impinge upon or threaten the legislative process." *Gravel v. United States* 408 U.S. 606, 614 (1972).

Because the Speech or Debate Clause "was designed to preserve legislative independence, not supremacy," *Johnson,* 383 U.S. at 178, there are circumstances where a member of Congress

11

(and staff) are subject to the compulsory process of the courts. For instance, in *Gravel v. United States*, the Supreme Court explicitly held that the Speech or Debate Clause does not immunize a member of Congress from service of process as a defendant in a civil matter or as a witness in a criminal case. 408 U.S. 606, 614 (1972); *see also United States v. Cooper*, 4 Dall., 341 (1800) ("The constitution gives to every man, charged with an offence, the benefit of compulsory process, to secure the attendance of his witnesses. I do not know of any privilege to exempt members of congress from the service, or the obligations, of a subpoena, in such cases.").

Where – as here – actions by a Member of Congress or staff infringe upon the constitutional rights of a citizen, their acts are not protected by the Speech or Debate Clause. *McSurely v. McClellan*, 553 F.2d 1277, 1288 (1976) (Speech or Debate Clause did not immunize senator and his aides were not immune from liability in private suit for damages in which plaintiffs alleged that documents taken in violation of Fourth Amendment from plaintiffs' home by state authorities, after being taken to Washington, DC, by investigator employed by Senate subcommittee, were disseminated outside halls of Congress).

The Select Committee violated Mr. Bannon's constitutional right to due process in several respects. First, the Select Committee issued its subpoena without lawful authority. An element of the offense in the criminal trial will be that Mr. Bannon was "summoned as a witness by the authority of the U.S. House of Representatives." [Criminal No. 21-670 (CJN), Doc. 1 at ¶¶ 23 & 25]. Each of the Movants has first-hand knowledge that is exculpatory on this element. Second, the Select Committee rejected Mr. Bannon's reasonable request for an accommodation (a one-week extension), even though much longer extensions were granted to many Select Committee deponents. Again, each Movant has first-hand knowledge that is exculpatory on this critical trial issue.

The Framers did not rank some constitutional protections as superior to others. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976). The Sixth Amendment entitles Mr. Bannon to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Inherent in this right is the right to offer testimony of witnesses and compel their attendance. *Washington v.* Texas, 388 U.S. 14, 19 (1967) (it is fundamental to due process that "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense"); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (few rights are more fundamental than that of an accused person to present witnesses in his own defense.). Therefore, if this Court concludes that the Speech or Debate Clause immunizes Movants from complying with the subpoenas, dismissal is the only appropriate remedy to safeguard Mr. Bannon's Fifth and Sixth Amendment rights.

Courts have held that dismissal of an indictment is the appropriate remedy when the government's assertion of a privilege prevents a criminal defendant from securing documents and testimony relevant and material to defense's case. *See Roviario v. United States*, 353 U.S. 53 (1957) (dismissal required where government refused to disclose identity of undercover witness who might be a material defense witness as to whether accused knowingly transported narcotics); *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) (dismissal of prosecution for making false statements to government about CIA activities in which defendant was involved because nature of defendant's assignments was central to the charges against him and government's assertion of State Secrets privilege with respect to same deprived defendant of his right to present a meaningful defense); *See also* [Ex. 1] Trial Trans., Day 1 Afternoon Session, *United States v. David Rainey*, Crim. No. 12-CR-00291-KDE-DEK (E.D. La. Jul. 14, 2015), ECF No. 510.

13

**-2609-**

In the *Rainey* case, (Crim. No. 12-CR-00291-KDE-DEK), the district court dismissed an

obstruction of Congress charge against a *Deepwater Horizon* executive because the Court found

that because the subpoenaed Members of Congress validly invoked their Speech or Debate

privilege and could not be compelled to testify, dismissal of the charge was the only way to

preserve the accused's right to a fair trial[7]:

> As seen earlier today, the Court found in favor of the House, and its ruling supported the
> House's long-standing constitutional privilege under the Speech or Debate Clause. The
> Court must now address what implication that ruling has on the defendant's right to a full
> trial and his constitutionally guaranteed rights, which I have just described.
>
> Thus, the Court finds that, similar to the holding in [*U.S. v. Fernandez*, 913 F.2d 148 which
> is a Fourth Circuit case, 1990, and consistent with the rulings in *Jencks v. United States*,
> 353 U.S. 657, and *Roviaro v. U.S.*, 353 U.S. 53, the government's prosecution of Count 1
> under § 1505 must give way where the defendant seeks relevant, material, noncumulative
> evidence related to his defense, but also where he has been precluded from obtaining this
> evidence due to the invocation of a constitutional privilege by a branch of the very same
> government involved in his prosecution. Because the defendant is not able to put on a full
> and fair defense, consistent with his constitutional rights and consistent with an element of
> the crime as described by the Fifth Circuit and set forth in the jurisprudence, under these
> circumstances the Court finds the only appropriate remedy is dismissal of Count 1.

[Ex. 1 at 29:17-30:1].

---

[7] *See* [Ex. 2] Brian M. Heberling, *Congressional Gamesmanship Leads To An Acquittal in
Deepwater Horizon Case: United States v. David Rainey: A Case Study*, 20 BERKELEY J. CRIM.
L. 260, 262 (Fall 2015) (noting the "lessons learned" from the *Rainey* case, including (1) there is
only one United States when it comes to a criminal prosecution, rendering the consequences of a
privilege assertion by Members of Congress attributable to the Executive Branch, (2) a criminal
defendant's right to compulsory process cannot be vindicated by voluntary testimony limited in
scope by the witness, (3) district courts have power to exclude all congressional evidence if a
selective invocation of the Speech or Debate Clause privilege leads to a one-sided, unfair
presentation of evidence, and may acquit a defendant if the ruling leads to a failure of proof on an
essential element, and (4) given the unpredictability and self-interest of Members of Congress and
their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should
not pursue a criminal charge that requires congressional testimony if any alternatives are
available.).

**All Questions Regarding The Breadth, Specificity, And Timing Of Production**
**Can Be Resolved Through Accommodation, Or Modification By This Court**

Movants complain because the subpoenas ask them to "please bring the documents with you to the Pretrial Conference scheduled in this matter for **July 14, 2022**" – rather than on the first day of trial four days later, on July 18, 2022. Movants are exaggerating to say that this was "improper." [ECF 1 at 15]. In fact, our approach is consistent with federal practice. Section 275 of Wright and Miller's Federal Practice and Procedure provides the following guidance:

> Leave of court is not ordinarily required for issuance of a subpoena duces tecum, except for a subpoena to a third party for personal or confidential information about a victim. It is discretionary with the court whether to require production prior to trial. Some courts hold that the court's discretion must be invoked by motion in advance if a subpoena is to be made returnable in advance of the trial. This is an orderly and desirable procedure and one frequently followed, but the rule does not require it, and the question can be raised as well on a motion to quash . . .

Wright & Miller, 2 Fed. Prac. & Proc. Crim § 275 (4th ed.); *see also Bowman Dairy Co. v. United States,* 341 U.S, 214, 220 (1951) ("[t]he Court may control the use of Rule 17(c) to that end by its powers to rule on motions to quash or modify."). As a practical matter, both the defense and the Government will want to review Movants' documents before trial. To the extent that any Movant needs that extra four days, we can accommodate. Should this Court want to modify the subpoenas, we have no problem with production on July 18, 2022.

Movants also complain about the breadth of the subpoenas and claim that the subpoenas request documents and materials that are irrelevant to Mr. Bannon's case. Counsel for Mr. Bannon tailored its requests narrowly to capture documents that reflect specific communications by each Movant related to Mr. Bannon, and specific documents that reflect the bias of the Movant against Mr. Bannon. [8] *See Welsh v. United States*, 404 F.2d 414, 417-418 (5th Cir.1968) ("if the accused

---

[8] For example, the subpoena directed to Chairman Thompson seeks information supporting the allegations he made in a lawsuit filed against President Trump, purporting to assess liability for

avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or 'unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous.' ... That test places the burden of showing frivolity or abuse of process on the Government, where it properly belongs.") (quoting *Greenwell v. United States*, 115 U.S. App. D.C. 44 (1963)).

The same response applies to Movant Douglas Letter's contention that he need not produce documents pertaining to his change in position regarding whether the Select Committee has a "ranking minority member." Mr. Letter voluntarily participated in an FBI interview where he stated that the Select Committee had no ranking minority member. He later changed his position and claimed that Representative Liz Cheney is the ranking member on the Select Committee; however, Select Committee Chairman Thompson has explicitly said that Representative Cheney is not the ranking member.[9] The jury in Mr. Bannon's criminal case is entitled to hear evidence on that issue – which is critical to the "authority" element of the offence. If there are specific

_____

the events of January 6, 2021, and claiming that he was personally injured by those events. *Thompson v. Trump*, 1:21-cv-00400(APM) (See e.g. Doc. 11-1 Amended Complaint). This hardly seems an appropriate prelude to service as the Chair of a Select Committee tasked with investigating those events. Furthermore, Select Committee Members Raskin and Schiff have each written books that they are currently marketing which assert their conclusions about liability for the events of January 6th, before they even began their purported "investigation" as members of the Select Committee. Subpoenas directed toward them seek to uncover personal, reputational, and financial conflicts of interests for these members, who clearly have a vested interest in ensuring that the Select Committee's conclusions are consistent with the conclusions they have drawn in their books.

[9]YOUTUBE, *Watch: Jan. 6 House Select Committee Holds First Hearing On Capitol Riot* (July 27, 2021), https://www.youtube.com/watch?v=vHrt44ANHIA at 16:37; *see also* ( Kimberly Wehle, *The Case for Subpoenaing Members of Congress to Testify on the January 6 Insurrection: Democrats have strong constitutional arguments on their side*, THE ATLANTIC (Aug. 26, 2021), (Thompson made clear at the opening hearing that Representative Liz Cheney "is not the ranking member," and Adam Kinzinger is the only other Republican on the committee).

16

documents that are covered by the attorney-client privilege, the proper course is to identify them and determine whether an accommodation can be reached as to those documents, or whether a modification to the subpoena to Mr. Letter should be made to excuse him from producing those documents. But it would be error to quash the subpoena on that basis, or excuse Mr. Letter's appearance as a trial witness on that basis.

As previously emphasized, if any Movant contends that production of documents pertaining to Mr. Bannon is overly burdensome, the remedy is accommodation or modification of that specific subpoena. As expressly communicated to counsel for the U.S. House of Representatives, counsel for Mr. Bannon will work with any Movant to minimize burden.

### Movants Are Not "Too Important" To Testify At Mr. Bannon's Trial

The Movants who are Members of Congress appear to think that a criminal trial is like a constituent event – where they can send a staff member if they believe that they are too busy or too important to attend themselves. There is no authority for that position. Where, as here, Movants each have first-hand knowledge of exculpatory information going to an element of the criminal offense charged, they are not allowed merely to designate an alternate.

Movants argue that, even though they initiated this prosecution, that they are "high-ranking government officials" who are too important and too busy to appear as trial witnesses. *See* [ECF 1 at 33, 38]. But Movants do not cite any authority which immunizes a Member of Congress from testifying at a criminal Contempt of Congress trial where they possess exculpatory information regarding whether the accused was summoned under the authority of the U.S. House of Representatives. Nor have Movants cited any authority for the proposition that a Member of Congress who is a "complainant" in a Contempt of Congress trial can avoid compliance with a trial subpoena because they are too important. The authority relied upon by Movants is

distinguishable. The cases pertain to civil depositions or criminal matters where the officials did

not have first-hand knowledge pertaining to an element of the offense, and did not personally take

steps to initiate the prosecution.[10] We do not dispute that every Member of Congress is important

---

[10] *See, e.g., Springfield Terminal Ry. Co. v. United Transp. Union*, 1989 WL 225031, at *1-2 (D.D.C. May 18, 1989) (civil case – court refused to compel ranking Minority Member of House Appropriations Committee to testify or produce documents in a dispute over an arbitral award where congressman was only tenuously connected to the issues in the lawsuit, and Plaintiff stonewalled all efforts congressman made to reach a less burdensome accommodation); *Simplex Time Recorder Co, v. Secretary of Labor*, 766 F.2d 575 (1985) (civil case – court refused to compel Department of Labor officials to testify regarding enforcement of the Occupational Safety and Health Act of 1970 where such decisions were discretionary and the information sought was available from other sources); *Bogan v. City of Boston*, 489 F.3d 417 (1st Cir. 2007) (civil case – district court did not abuse its discretion by issuing a protective order in civil rights case to prevent taking of deposition from mayor where other avenues for obtaining the requested information had not been exhausted); *In re U.S. ("Bernanke")*, 542 F. App'x 944 (Fed. Cir. 2013) (civil case – Chairman of Board of Governors of Federal Reserve entitled to protective order preventing his deposition because deposition created risks of disrupting significant ongoing government activities and probing into decision-making process of Federal Reserve without showing of extraordinary circumstances); *Blankenship v. Fox News Network, LLC*, 2020 WL 7234270 (S.D. Va. Dec. 8, 2020)( civil case – granting protective order to prevent deposition of Senators McConnell and Gardner where Plaintiff had not demonstrated Senators personal knowledge of facts at issue, and alternative avenues for securing information had not been exhausted); *Moriah v. Bank of China, Ltd.*, 72 F.Supp.3d 437 (S.D.N.Y. 2014) (civil case –victim of bombing which occurred in Israel and the personal representative of victim who was killed in bombing failed to demonstrate exceptional circumstances allowing deposition of the former House Majority Leader of the House of Representatives, where victim and personal representative could not establish former Leader had unique first-hand knowledge related to any matter in action against Chinese bank relating to bombing); *Feldman v. Bd. of Educ. School Dist. #1 City & Cnty of Denver*, No. 09-CV-01049, 383154 (D. Colo. Jan. 28, 2010) (civil case – granting motion to prevent deposition of Senator where Senator had no first-hand knowledge or participation in the facts at issue); *In re U.S. ("Reno & Holder")*, 197 F.3d 310 (8th Cir. 1999) (defendant sentenced to death was not entitled to subpoenas directing AG and her deputy to testify in decision  not to withdraw death notice; since record contained sufficient evidence to establish factual basis for defendant's claim, testimony of AG and her deputy was not necessary); *Cano v. Davis*, NO. 01-CV-08477 (C.D. Cal. March 28, 2022) (civil case –plaintiffs in California voter redistricting challenge had not adequately alleged that the subpoenaed senators had first-hand knowledge of the state's redistricting plan and that subpoenas should be quashed pending court's ruling on defendant's summary judgment motion as to propriety of discovery on issues of intent); *Lederman v. N.Y.C. Dept. of Parks and Recreation*, 731 F.3d 199 (2d. Cir. 2013) (civil case – district court did not abuse its discretion in issuing protective order barring depositions of Mayor and former Deputy Mayor of New York in suit by visual artists challenging constitutionality of time, place, and manner restrictions on selling art because artists did not demonstrate exceptional circumstances, identify with particularity the

---

18

– to someone. But that does not excuse appearance at trial by a Member of Congress or staff who possesses exculpatory information.

The cases that Movants rely upon are aimed at protecting the integrity of the administrative process and at ensuring that high-ranking officials are not dragged into civil lawsuits lawsuit that tangentially implicate their decisions or actions. *See United States v. Morgan*, 313 U.S. 409 (1941); *United States v. Newman*, 531 F. Supp.3d 181, 188 (D.D.C. 2021). That is not the situation in this criminal case. As detailed above, this is a case where the members have been subpoenaed have taken direct actions that resulted in prosecution of Mr. Bannon. In these circumstances, they are not merely high ranking official at the top of the pyramid but instead are, as the Government has stated to the Court, "complainants" in this case. By their actions directed at Mr. Bannon and aimed at subjecting him to criminal prosecution, they have necessarily waived any argument that they are too high ranking or too busy to testify at trial.

## Granting The Motion To Quash Will Require The Exclusion
## Of All Congressional Evidence At Mr. Bannon's Criminal Trial

If this Court accepts the position of the Movants that they have absolute immunity from subpoena process by a criminal defendant charged with Contempt of Congress under the Speech or Debate Clause, the only way to preserve Mr. Bannon's Fifth and Sixth Amendment rights is to exclude all congressional evidence at trial. In a criminal prosecution, the Government's ultimate

---

information they needed, or contend that Mayor and his Deputy had first-hand knowledge about litigated claims or that relevant information could not be obtained elsewhere); *Bardoff v. United States* , 628 A.2d 86 (D.C. 1993) (civil case – protestors who disrupted Iran-Conta hearing not entitled to subpoena senators and chief counsel to question them concerning conduct of hearing, including decision to adjourn, as subject fell within area of legislative activity protected from being "questioned in any other place" by speech or debate clause); *McNamee v. Mass.*, 2012 WL 1665873 (D. Mass. May 10, 2012) (civil case – granting motion to quash subpoenas directed at congressman and chief of staff in worker's compensation action because plaintiff had not demonstrated that congressman or chief of staff had personal knowledge of facts at issue).

responsibility is to ensure justice is done. *Jencks v. United States*, 353 U.S. 657, 670-71 (1957). It follows that under the circumstances presented by this Motion To Quash, the Government "can invoke its evidentiary privileges only at the price of letting the defendant go free." *Id.* (citing *United States v. Reynolds*, 345 U.S. 1, 12 (1953)). The Supreme Court has held, for instance, that a criminal action must be dismissed when the government, on the grounds of privilege, elects not to produce documents relevant and material to a government witness's testimony. *Jenks*, 353 U.S. at 657; *Id.* at 670-71 (holding that it is "unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."); *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (when disclosure of informer's identity, or of contents of his communication, is relevant and helpful to criminal defendant, or is essential to a fair determination of a cause, the trial court may require disclosure and, if government withholds the information on grounds of privilege, dismiss the action).

In a reversal of position, the same Members of Congress who initiated the prosecution of Mr. Bannon for asserting privilege when served with a subpoena now ask this Court to excuse them from compliance with trial subpoenas based upon their own assertion of privilege. Speaker Pelosi has made incendiary statements about Mr. Bannon that include the phrase – no one is above the law. But it is the Members of Congress and staff who claim to be above compliance with a trial subpoena in the very criminal case they started.

The Fifth and Sixth Amendments guarantee that Mr. Bannon, like every accused, be afforded the opportunity to put on a defense at trial, to confront his accusers in court, and to compel production of evidence in their possession. Permitting Movants to selectively participate in Mr. Bannon's prosecution would eviscerate those essential rights. Simply put, the House cannot have it both ways.

By filing an amicus curiae brief in support of the Government's position in this case, the subpoenaed witnesses have conceded the materiality and relevance of their testimony in Mr. Bannon's case. It would be contrary to fundamental fairness for them to avail themselves to the benefit of being heard by this Court and then hide behind legislative immunity to circumvent the legal and procedural protections afforded to the criminal defendants who come before it.

Dated: June 27, 2022                    Respectfully submitted,

                                        SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                            /s/ M. Evan Corcoran
                                        M. Evan Corcoran (D.C. Bar No. 440027)
                                        400 East Pratt Street – Suite 900
                                        Baltimore, MD 21202
                                        Telephone: (410) 385-2225
                                        Facsimile: (410) 547-2432
                                        Email: ecorcoran@silvermanthompson.com

                                            /s/ David I. Schoen
                                        David I. Schoen (D.C. Bar No. 391408)
                                        David I. Schoen, Attorney at Law
                                        2800 Zelda Road, Suite 100-6
                                        Montgomery, Alabama 36106
                                        Telephone: (334) 395-6611
                                        Facsimile: (917) 591-7586
                                        Email: schoenlawfirm@gmail.com

                                        *Counsel for Defendant Stephen K. Bannon*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 27th day of June 2022, a copy of the foregoing

Opposition To Motion To Quash was served *via* the Court's CM/ECF system on registered parties

and counsel.

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| IN RE NON-PARTY SUBPOENAS | : | |
| | : | Miscellaneous Case No. 22-60 (CJN) |
| | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**ORDER**

Upon consideration of Defendant's Opposition To Motion To Quash, and based upon the entire record in this miscellaneous case, it is **ORDERED** that the Motion to Quash is hereby **DENIED.**

_____
Hon. Carl J. Nichols
*United States District Judge*

Dated:

Case 1:22-mc-00060-CJN   Document 7-1   Filed 06/27/22   Page 1 of 44

**EXHIBIT 1**

```
1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
     UNITED STATES OF AMERICA        *       Criminal Action
5                                    *
     versus                          *       No. 12-291
6                                    *
     DAVID RAINEY                     *       Section N
7                                    *
                                     *       June 1, 2015
8    * * * * * * * * * * * * * * * *

9
                      DAY 1, AFTERNOON SESSION
10                TRANSCRIPT JURY TRIAL BEFORE
               THE HONORABLE KURT D. ENGELHARDT
11               UNITED STATES DISTRICT JUDGE

12
     Appearances:
13

14   For the United States:        U.S. Department of Justice
                                    BY:  LEO R. TSAO, ESQ.
15                                       ROBERT A. ZINK, ESQ.
                                    400 Poydras Street, Suite 1000
16                                  New Orleans, Louisiana 70130

17
     For David Rainey:             Jones Walker, LLP
18                                 BY:  MICHAEL W. MAGNER, ESQ.
                                   201 St. Charles Avenue, Suite 5100
19                                 New Orleans, Louisiana 70170

20
     For David Rainey:             Steptoe & Johnson, LLP
21                                 BY:  REID H. WEINGARTEN, ESQ.
                                        BRIAN M. HEBERLIG, ESQ.
22                                      SCOTT ARMSTRONG, ESQ.
                                   1330 Connecticut Avenue, N.W.
23                                 Washington, DC 20036

24

25
```

```
1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, B-275
2                                   New Orleans, Louisiana 70130
                                    (504) 589-7778
3

4

5   Proceedings recorded by mechanical stenography using
    computer-aided transcription software.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>I N D E X</u>

2                                                              <u>PAGE</u>

3    Preliminary Instructions                                  259

4    Motions                                                    271

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**AFTERNOON SESSION**

**(June 1, 2015)**

03:17   1

03:18   2

03:47   3        THE COURT:  Let me give you some general instructions

03:47   4   here.  I don't know whether there's much more that we can do

03:47   5   today because I have another matter with counsel to cover,

03:47   6   which you need not be concerned with.  But let me give you some

03:47   7   general instructions here today.

03:47   8              My job is to make sure that the jury pays

03:47   9   attention.  Please keep your eyes open during the trial.  If

03:47  10   you need a recess for any type of emergency, a personal

03:47  11   emergency, bathroom break, just so signal and we will try to

03:47  12   accommodate you.

03:47  13              As I indicated, the trial will proceed starting

03:47  14   at 8:30 in the morning.  We will take a midmorning break around

03:48  15   10:00 or 10:15 for about 10 or 15 minutes.  We'll take about an

03:48  16   hour for lunch.  Hopefully we can get you out of here a little

03:48  17   before noon so that you won't get caught up in any type of

03:48  18   crowd if you want to get lunch outside the building.

03:48  19              We will take a break about 3:00 or 3:15, and we

03:48  20   will conclude every day at 5:00 or a little before or after.

03:48  21   There may be some days where we finish early, like 4:30 or

03:48  22   4:15.  There may be a day when we ask you to go a few minutes

03:48  23   more, but it will not be longer than 5:15 or so unless we have

03:48  24   somebody on the stand that we want to finish, some business we

03:48  25   want to finish.

03:48  1            I will not keep you here until 6:00 or 7:00 at

03:48  2    night.  We will try to break at 5:00 or before.  That's my

03:48  3    commitment to you.  I know some of you are driving distances.

03:48  4    Some of you have parking.  We will have to give you some

03:48  5    information on parking -- which I sure wish we could

03:48  6    accommodate you on that, but the situation is as it is.

03:48  7            But I'm going to be sensitive to time in this

03:49  8    case, and I'd ask all of you-all to be very prompt.  I have

03:49  9    already warned the attorneys to make certain they are on time

03:49  10   and that their witnesses are on time so that there is as little

03:49  11   downtime in this case as possible.  I'm rather adamant that you

03:49  12   not be locked up in the jury room, which you're about to see,

03:49  13   longer than necessary.

03:49  14           I understand we are taking a break out of your

03:49  15   lives to sit in this case, and we are going to be very

03:49  16   deliberate in trying to get this case tried as quickly as

03:49  17   possible and as completely and fairly as possible.

03:49  18           I have no doubt that you as jurors -- and when I

03:49  19   make reference to jurors, I'm certainly referring to the

03:49  20   alternate jurors as well -- are mindful of your great

03:49  21   responsibilities and certainly aware that your conduct during

03:49  22   this trial will be observed by the Court, your fellow jurors,

03:49  23   the defendant, the attorneys for all the parties, and other

03:49  24   persons both inside and outside this courtroom.  I expect, and

03:49  25   your responsibility demands that you be extremely careful in

```
03:49    1    the manner in which you conduct yourselves, in order that no
03:49    2    one may doubt that this case is being fairly and impartially
03:50    3    tried and that, in the end, justice has been done.
03:50    4              For the same reason, the attorneys in this case,
03:50    5    the defendant, the witnesses, and all others who are identified
03:50    6    with or connected with this trial or its participants shall be
03:50    7    equally careful in their conduct.
03:50    8              During the course of the trial, jurors will not
03:50    9    engage -- or shall not engage or attempt to engage or have any
03:50   10    conversations or communications of any kind whatsoever with any
03:50   11    of the persons connected with this trial, including the
03:50   12    defendant, any relatives or family, the attorneys for the
03:50   13    government or the defendant, any witnesses or any other person
03:50   14    identified with this trial.
03:50   15              And likewise, any person identified with this
03:50   16    trial shall not engage or attempt to engage in any conversation
03:50   17    or communication whatsoever with any juror.  If this happens, I
03:50   18    ask that you report it to me immediately.
03:50   19              Further, you as jurors should avoid allowing
03:50   20    yourselves to be placed in a position, when outside of the
03:51   21    courtroom, where discussions about this case may be being
03:51   22    conducted by any of the parties to this trial.
03:51   23              Furthermore, the attorneys, the defendant, the
03:51   24    witnesses, and other persons who may be observing the trial or
03:51   25    are connected with it in any way must be particularly careful
```

03:51   1  not to discuss and shall not discuss the case where there is a

03:51   2  possibility that you, the jurors, may hear their remarks.  If

03:51   3  that occurs, again, I ask that you please notify me

03:51   4  immediately.

03:51   5          You should not take offense to the fact that

03:51   6  persons involved in this trial do not extend to you a friendly

03:51   7  greeting out in the hallway or wherever else you might happen

03:51   8  to cross paths.  The reason that such exchanges are not

03:51   9  permitted is because, although they may seem innocent enough,

03:51   10  they could, nonetheless, give the impression of a lack of

03:51   11  impartiality.  Creating an impression of being partial is as

03:51   12  bad as being biased, and that should be avoided.

03:51   13          I'd like at this time to give you the following

03:51   14  specific instructions:  During the course of the trial, you are

03:51   15  not to discuss this case with anyone.  That includes your

03:52   16  spouse, your children, your relatives, friends, strangers,

03:52   17  neighbors, anyone else you happen to come across during the

03:52   18  pendency of this trial.

03:52   19          Also, do not discuss this case among yourselves

03:52   20  until I have instructed you on the law and you have gone to the

03:52   21  jury room to make a decision at the end of the trial.

03:52   22  Otherwise, without realizing it, you may start forming opinions

03:52   23  before the trial is over and before the evidence has been fully

03:52   24  received.  It is important that you wait until all the evidence

03:52   25  is received and you have heard my instructions and the rules --

03:52   1   on the rules of law before you deliberate among yourselves.

03:52   2            Let me also add that during the course of the

03:52   3   trial, you will receive all of the evidence you may properly

03:52   4   consider to decide the case.  Because of this, do not

03:52   5   attempt -- do not attempt to gather any information on your own

03:52   6   which you think might be helpful.  Do not engage in any outside

03:52   7   reading on this case.  Do not attempt to visit any places

03:53   8   mentioned in this case.  And do not, in any other way, try to

03:53   9   learn about this case outside of this courtroom.

03:53   10           If any publicity about this case has come to

03:53   11   your attention before this moment, you must strike it from your

03:53   12   minds and completely disregard anything that has come to your

03:53   13   attention outside this courtroom.  This case is to be decided

03:53   14   only on the evidence and exhibits that have -- witness

03:53   15   testimony and exhibits that have been admitted here in this

03:53   16   courtroom.  It shall not be decided based upon anything that

03:53   17   occurs outside of the four walls of this courtroom.

03:53   18           From this moment on, you are not to read any

03:53   19   newspapers or other accounts of this trial, nor are you to view

03:53   20   or listen to any television news or radio reports or other

03:53   21   accounts of this trial, including those available on the

03:53   22   Internet, transmitted by other means, including Twitter.  This

03:53   23   is necessary because your verdict, as I said, must be based

03:53   24   solely on the evidence presented in this trial and in

03:53   25   accordance with what you hear and see in this courtroom and in

03:54  1   accordance with the Court's instructions on the law applicable

03:54  2   to the case.

03:54  3            I recognize that many of you use cell phones,

03:54  4   BlackBerrys, the Internet, and other tools of technology or

03:54  5   social media.  However, you must not use these tools to

03:54  6   communicate electronically with anyone about this case.  This

03:54  7   includes your family and friends; and you may not communicate

03:54  8   with anyone about this case on your cell phone through e-mail,

03:54  9   BlackBerry, iPhone, text messaging, or on Twitter or through

03:54  10  any blog or website, through any Internet chat room or by way

03:54  11  of any other social networking websites, including Facebook,

03:54  12  Myspace, LinkedIn, and YouTube.

03:54  13            Finally, you are not to reach any conclusions in

03:54  14  this case until all of the evidence has been presented, the

03:54  15  Court has instructed you on the law applicable to this case,

03:54  16  and it is given to you for your deliberation and your decision.

03:54  17            If you wish, during the course of this trial,

03:54  18  you may take notes.  We will provide you with a notebook and a

03:55  19  pen.  You need not take notes; but if you choose to do so, you

03:55  20  may.  If you do take notes, please leave them on your chairs

03:55  21  when you leave at night and also when you leave during the

03:55  22  breaks.  You can leave it seated upon your seat.  Remember that

03:55  23  notes are for your own personal use.  They are not to be given

03:55  24  or read to anyone else.

03:55  25            In the morning when you arrive and during the

```
03:55    1    day when you are in the building and the Court is in recess for
03:55    2    any reason that the jury is not required to be in the
03:55    3    courtroom, I ask that you please go to and remain in the jury
03:55    4    room, which we're about to show you, under the direct
03:55    5    supervision of the United States marshal, until the marshal
03:55    6    advises you to enter the courtroom.  Please do not remain in
03:55    7    the halls.  If you are in the halls, you are more likely to
03:55    8    come across someone involved in this trial, which would be in
03:55    9    violation of my prior instructions.
03:55   10              We will try to make the jury room comfortable
03:55   11    for you.  The jury room is the headquarters for the jury.
03:56   12    There will be cokes, coffee, restrooms, telephones, and other
03:56   13    refreshments and things that we can provide to you.  We try to
03:56   14    make you comfortable in there when you are not here in the
03:56   15    courtroom.
03:56   16              The trial in this case will proceed in the
03:56   17    following order.  First, counsel for the government and counsel
03:56   18    for the defendant have the opportunity to make an opening
03:56   19    statement.  The government will make its opening statement at
03:56   20    the beginning of this case.  The statement is nothing more than
03:56   21    an explanation of the government's theory of the case and
03:56   22    serves merely as an introduction to the evidence which the
03:56   23    government intends to produce during the course of the trial.
03:56   24              The defense may make an opening statement
03:56   25    following the opening statement of the government or may defer
```

03:56   1   the making of an opening statement until the close of the
03:56   2   government's case or may elect to make no opening statement at
03:56   3   all.  Like the government's opening statement, any defense
03:56   4   opening statement, if made, would be nothing more than an
03:56   5   explanation of the defendant's theory of the case.  No
03:56   6   defendant is required to make an opening statement but may do
03:57   7   so if he chooses.  He may choose not to do so and rest upon the
03:57   8   presumption of innocence to which he is entitled.
03:57   9           As I pointed out to you earlier, the defendant
03:57   10  is presumed innocent until proven guilty beyond a reasonable
03:57   11  doubt.  What is said in opening statements, whether by the
03:57   12  government or the defense, is not evidence and proves nothing.
03:57   13          Second, the government will introduce evidence
03:57   14  in support of the charge contained in the indictment.
03:57   15          Third, after the government has presented its
03:57   16  evidence, the defendant may present evidence, but the defendant
03:57   17  is not obliged to do so.  The burden is always on the
03:57   18  government to prove every element of the offense charged beyond
03:57   19  a reasonable doubt.  The law never imposes on any defendant in
03:57   20  a criminal case the burden of calling any witnesses or
03:57   21  introducing any evidence.
03:57   22          Fourth, rebuttal evidence may be introduced.
03:57   23          Fifth, at the conclusion of the evidence, the
03:57   24  parties will present oral argument in support of their
03:58   25  respective cases.  What is said in closing arguments is not

03:58    1    evidence just like what is said in opening statement is not

03:58    2    evidence.  The arguments are intended to present to you the

03:58    3    contentions of the respective parties as to what the evidence

03:58    4    has shown and what inferences may be drawn from the evidence.

03:58    5    Counsel for the government has the right to open and close the

03:58    6    arguments because the government has the burden of proof.

03:58    7            Finally, I will instruct you on the applicable

03:58    8    law, and you will then retire to deliberate and consider your

03:58    9    verdict, which must be unanimous, as to the defendant.

03:58    10           Although you as the jury are judges of the facts

03:58    11   in this case, you must accept and apply the law applicable to

03:58    12   this case as it is given to you by the Court.  The law

03:58    13   applicable to this case will be contained in the instructions

03:58    14   which I give you, both during the course of the trial and at

03:58    15   the conclusion of the trial following closing arguments, and it

03:58    16   is your duty to follow all such instructions.

03:58    17           I will provide a copy of the instructions to you

03:59    18   to take into the jury room at the time you deliberate.  It is

03:59    19   your duty to determine the facts and to determine them from the

03:59    20   evidence and the reasonable inferences arising from such

03:59    21   evidence; and in so doing, you must not indulge in guesswork or

03:59    22   speculation.  The evidence that you are to consider consists of

03:59    23   the testimony of witnesses and the exhibits admitted into

03:59    24   evidence.  The term "witness" means anyone who testifies in

03:59    25   person or by deposition.

03:59  1          The admission of evidence in court is governed
03:59  2  by rules of law.  From time to time it may be the duty of an
03:59  3  attorney in this case to make an objection to -- and my duty as
03:59  4  a judge to rule on the objection and, thus, whether you can
03:59  5  consider certain evidence.
03:59  6          You must not concern yourselves with the
03:59  7  objections or the Court's reasons for ruling on them.  Do not
03:59  8  hold it against lawyers who make objections.  You must not
03:59  9  consider testimony or exhibits to which an objection was
04:00 10  sustained or which has been ordered stricken.
04:00 11          There may be bench conferences, at which lawyers
04:00 12  and I will talk solo, that the jury cannot hear.  We try to
04:00 13  keep those to a minimum.  Some matters must be decided outside
04:00 14  of the hearing of the jury because they may not be admissible.
04:00 15  It is okay, during those bench conferences, if you wish to
04:00 16  stand at your seat and stretch when we do have those
04:00 17  conferences.  I will pledge to you I will keep those to a
04:00 18  minimum in number and also in length.  We will try to make
04:00 19  those as short as possible.
04:00 20          If I instruct you not to consider testimony or
04:00 21  evidence to which an objection is sustained or which has been
04:00 22  ordered stricken, you must completely ignore that material and
04:00 23  not take such evidence into consideration when deciding the
04:00 24  case or be influenced by it in any way.
04:00 25          There are two kinds of evidence, direct and

04:00   1    circumstantial.  Direct evidence is direct proof of a fact such
04:00   2    as testimony of an eyewitness.  Circumstantial evidence is
04:00   3    proof of facts from which you may infer or conclude that other
04:01   4    facts exist.  I will give you further instructions on these as
04:01   5    well as some other matters at the end of the case, but have in
04:01   6    mind that you may consider both kinds of evidence.
04:01   7            You must not be influenced in any degree by any
04:01   8    personal feeling of sympathy for or prejudice against any party
04:01   9    or any attorney.
04:01   10           No statement or ruling or remark which I may
04:01   11   make during the presentation of evidence is intended to
04:01   12   indicate my opinion as to what the facts are.  You are to
04:01   13   determine the facts.  In this determination, you alone must
04:01   14   decide on the believability of the evidence and its weight and
04:01   15   value.
04:01   16           As I indicated right now -- I think I said this
04:01   17   morning that we expected this trial to last perhaps two weeks.
04:01   18   What typically happens -- and this is not a promise, but
04:01   19   frequently the lawyers make decisions during the course of a
04:01   20   trial about things that might have been planned, and they may
04:02   21   change their minds about witnesses.  We will try to be -- my
04:02   22   point in pointing that out is that it's difficult for us to
04:02   23   give you an ending point of this trial other than the estimate
04:02   24   that I just gave you.
04:02   25           My pledge to you is that we will be efficient in

04:02  1   presenting this case.  We will follow the hours that I have

04:02  2   given you.  We will make the best use of your time.  We will

04:02  3   not keep you in the jury room any longer than is absolutely

04:02  4   necessary, and we will try this case efficiently and quickly to

04:02  5   its conclusion such that all of the attorneys can have into

04:02  6   evidence that which you are to consider in this case.

04:02  7            Let me -- before I send you into the jury

04:02  8   room -- I notice it's a little after 4:00.

04:02  9            Counsel, I don't believe there will be much more

04:02  10  for us to do.  I know we have another matter which we are about

04:02  11  to take up.  I would propose at this time to let these ladies

04:02  12  and gentlemen of the jury retire for the day after they go into

04:03  13  the jury room, and we will take care of our business and start

04:03  14  fresh tomorrow with the 15 of you.

04:03  15           So I'm going to go ahead and let you leave for

04:03  16  the day.  I will remind you of this, as I will every day and

04:03  17  before every break, please, please do not discuss the case with

04:03  18  anyone.  Please do not listen to or read any accounts of this

04:03  19  case or anything related to this case.  It's very important

04:03  20  that -- you have taken an oath to decide this case on the

04:03  21  evidence; and we have every reason to believe, after talking

04:03  22  with you and visiting with you, that you will do exactly that.

04:03  23           So at this point in time, we are going to let

04:03  24  you go.  Please be mindful of those rules.  We are going to

04:03  25  show you the jury room.  When you get here tomorrow, hopefully

| | |
|---|---|
| 04:03 | 1 |
| 04:03 | 2 |
| 04:03 | 3 |
| 04:03 | 4 |
| 04:04 | 5 |
| 04:04 | 6 |
| 04:04 | 7 |
| 04:04 | 8 |
| 04:04 | 9 |

04:03  1   everyone will be here by 8:30.  If you get here early, you will

04:03  2   have access to the jury room.  There's coffee and things in

04:03  3   there.  You can make yourself comfortable.

04:03  4          We would like to start right at 8:30.  And I'm

04:04  5   going to be very prompt unless one of you is missing.  So you

04:04  6   don't want to be the -- you know the old saying, there's one in

04:04  7   every crowd; don't be the one in every crowd.  If y'all are

04:04  8   here, we are going to start.  I know these folks will be here,

04:04  9   ready to go, and we will get this trial under way.

04:04  10         All right.  Thank all of you very much for your

04:04  11  patience today.

04:04  12         THE DEPUTY CLERK:  All rise.

04:04  13         (The jury exited.)

04:05  14         THE COURT:  You may be seated.  I apologize for the

04:05  15  delay.

04:05  16         The Court will now take up Record Document 419,

04:05  17  which is a motion to quash of nine nonparty subpoena

04:05  18  recipients.  If we may have counsel come forward for that

04:05  19  matter.

04:05  20         Make your appearances for the record, please.

04:05  21         Counsel, please make your appearances for the

04:05  22  record.

04:05  23         MR. TATELMAN:  Good afternoon, Your Honor.  Todd

04:05  24  Tatelman from the House General Counsel's Office.

04:06  25         THE COURT:  Good afternoon.

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
| 04:06 | 1  | Okay.  Counsel, we have already had our                   |
| 04:06 | 2  | appearance for defense counsel.  Mr. Heberlig, are you on this? |
| 04:06 | 3  | **MR. HEBERLIG:**  Yes, Your Honor.                        |
| 04:06 | 4  | **THE COURT:**  Okay.  I will advise you that I have read |
| 04:06 | 5  | all of the written materials submitted in connection with this |
| 04:06 | 6  | motion.  I have also been very familiar with the case law that |
| 04:06 | 7  | is cited.  As you all know, this is not the first time this |
| 04:06 | 8  | issue has arisen on the Court's docket in this case, so I'm |
| 04:06 | 9  | very, very familiar with the arguments and the jurisprudence |
| 04:06 | 10 | that has been cited by both sides.  I will specifically ask |
| 04:06 | 11 | that you not repeat anything that is in the written material. |
| 04:06 | 12 | You may assume that I have read it fully and completely and |
| 04:06 | 13 | that I understand it.                                      |
| 04:06 | 14 | I will also fully advise you, in the interest of |
| 04:06 | 15 | full disclosure, that I'm prepared to rule on it.  If anyone |
| 04:06 | 16 | would like to make any remarks regarding -- and specifically |
| 04:06 | 17 | this is Record Document 419, the motion to quash -- now is the |
| 04:07 | 18 | time to do it.  Anybody?                                   |
| 04:07 | 19 | **MR. TATELMAN:**  Nothing from the House, Your Honor.     |
| 04:07 | 20 | **MR. HEBERLIG:**  We rest on our papers, Your Honor.      |
| 04:07 | 21 | **THE COURT:**  Motion granted.                            |
| 04:07 | 22 | Let's move on.  The Court also has before it -- |
| 04:07 | 23 | Counsel, if you-all would come forward again, and Mr. Tsao.  I |
| 04:07 | 24 | know there's a motion for protective order as well, and I'll |
| 04:07 | 25 | take care of that too.  But let me ask you to hold one second |

04:07  1    on that.

04:07  2                  Mr. Tsao and Mr. Zink, if you would come

04:07  3    forward.

04:07  4                  The Court also has three pending motions to

04:07  5    dismiss Count 1.  Those motions are a motion to dismiss Count 1

04:07  6    of the second superseding indictment for lack of a due and

04:08  7    proper exercise of the power of congressional inquiry, which is

04:08  8    Record Document 188.  The government has responded in

04:08  9    Record Document 213, and the defendant has replied in

04:08  10   Record Document 247.

04:08  11                 There is also a motion to dismiss Count 1 of the

04:08  12   second superseding indictment because the May 4 briefing and

04:08  13   the May 14 letter were not part of a subcommittee

04:08  14   investigation, which is Record Document 190.  The government

04:08  15   responded at Record Document 214, and the defendant has replied

04:08  16   at Record Document 237.

04:08  17                 There is a motion to dismiss Count 1 of the

04:08  18   second superseding indictment for unconstitutional vagueness,

04:08  19   which appears as Record Document 192.  The government responded

04:08  20   at Record Document 215, and the defendant replied at Record

04:08  21   Document 239.

04:08  22                 The Court has also received the following

04:08  23   filings related to Count 1 and the pending motions.  First, the

04:09  24   defendant David Rainey's supplemental memorandum regarding

04:09  25   congressional witnesses and documents, which is

04:09    1    Record Document 392.

04:09    2                    Secondly, the Bipartisan Legal Advisory Group of

04:09    3    the U.S. House of Representatives' memorandum of amicus curiae,

04:09    4    Record Document 415.

04:09    5                    And third, the defendant's motion for remedial

04:09    6    relief in light of congressional subpoena recipient's refusal

04:09    7    to testify on speech or debate clause and high-ranking

04:09    8    government official grounds, which is Rec. Document 427, as

04:09    9    well as a handful of responses in opposition and replies to

04:09   10    each of the motions that I have just listed.

04:09   11                    I also have before me a motion for protective

04:09   12    order at Record Document 474 and the defendant's motion in

04:09   13    response, which recently filed, I believe, on Friday, which is

04:09   14    Record Document 488.

04:10   15                    Count 1 of the second superseding indictment

04:10   16    charges the defendant, himself as well as others, aiding and

04:10   17    abetting and causing others to do the same, with corruptly

04:10   18    endeavoring to influence, obstruct, and impede the due and

04:10   19    proper exercise of the power of inquiry under which an inquiry

04:10   20    and investigation was being had by a committee of the

04:10   21    United States House of Representatives, to wit:  The

04:10   22    Subcommittee on Energy and the Environment of the United States

04:10   23    House of Representatives Committee on Energy and Commerce, all

04:10   24    in violation of 18 U.S.C. § 1505, 2(a) and 2(b).

04:10   25                    In his motion to dismiss Count 1 for lack of due

04:10    1    and proper exercise of the power of congressional inquiry, the
04:10    2    defendant argues, first, that a general rule authorizing
04:10    3    committees to conduct investigations within their areas of
04:10    4    jurisdiction does not automatically afford a subcommittee
04:11    5    within that committee sufficient authorization to conduct such
04:11    6    an investigation.  Instead, a formal resolution is required to
04:11    7    instigate a due and proper inquiry or investigation.
04:11    8         Secondly, the defendant argues that no such
04:11    9    resolution authorizing the committee or subcommittee to
04:11    10   investigate the *Deepwater Horizon* oil spill exists.  And third,
04:11    11   even if the subcommittee was duly authorized to investigate the
04:11    12   spill, the request for information sent to BP by
04:11    13   Representative Markey, then chairman of the Subcommittee on
04:11    14   Energy and the Environment, were not part of any duly
04:11    15   authorized investigation.
04:11    16        Specifically, the defendant asserts that
04:11    17   specific authorization was required whereby the committee
04:11    18   affirmatively delegated authority to proceed with a particular
04:11    19   course of action.  Furthermore, the defendant contends that the
04:11    20   Subcommittee on Oversight and Investigations had the proper
04:11    21   jurisdiction to perform such investigations, not the
04:11    22   Subcommittee on Energy and Environment.
04:11    23        In response, the government argued, among other
04:12    24   positions taken in their opposition at Record Document 213, "As
04:12    25   the facts alleged in the superseding indictment make clear" --

04:12   1   and I'm quoting from the government's opposition:  "As the

04:12   2   facts alleged in the superseding indictment make clear, and as

04:12   3   the facts at trial will demonstrate, the inquiry or

04:12   4   investigation was carried out by the Subcommittee on Energy and

04:12   5   Environment led by the subcommittee chairman.  The defendant's

04:12   6   remaining arguments are based on factual challenges to the

04:12   7   second superseding indictment that are not cognizable on a

04:12   8   motion to dismiss, and instead must be resolved by the jury."

04:12   9           In his second motion to dismiss Count 1, because

04:12  10   the May 4 briefing and the May 14 letter were not part of a

04:12  11   subcommittee investigation, the defendant avers, first, that

04:12  12   the committee delegated its investigative authority to the

04:12  13   Subcommittee on Oversight and Investigation, not the

04:12  14   Subcommittee on Energy and Environment.

04:12  15           Second, the Committee and the Subcommittee on

04:12  16   Oversight and Investigation jointly conducted an investigation

04:13  17   into the spill, not the Subcommittee on Energy and the

04:13  18   Environment.  And third, even if the Subcommittee on Energy and

04:13  19   Environment were conducting an investigation, the May 4

04:13  20   briefing and the May 14 letter were not part of any such

04:13  21   investigation.

04:13  22           Notably, at oral argument before this Court on

04:13  23   December 3, 2014, the government conceded that the May 4

04:13  24   briefing was not part of the charged conduct contained in the

04:13  25   indictment or the second superseding indictment, leaving only

04:13  1    the representations and/or omissions made by the defendant and
04:13  2    contained in BP's response to the May 14 letter as grounds for
04:13  3    the 1505 violation.
04:13  4                In response, the government expressly argued
04:13  5    that "The defendant's motion requires the Court to resolve
04:13  6    issues of fact that are reserved for the jury.  It is
04:13  7    well-settled law that factual issues" -- I'm still quoting --
04:13  8    "concerning an essential element of the offense must be decided
04:14  9    by the jury.  The Court may decide purely legal issues of
04:14  10   whether a subcommittee inquiry or investigation qualifies under
04:14  11   § 1505; and indeed, the Fifth Circuit has already concluded
04:14  12   that one does.  But the Court may not resolve contested factual
04:14  13   issues over whether such an inquiry or investigation *in fact*
04:14  14   existed in this case or what actions were part of that inquiry
04:14  15   or investigation."  The Court is quoting from
04:14  16   Record Document 214.
04:14  17               The Court deferred ruling on these motions as
04:14  18   well as the motion for unconstitutional vagueness for a later
04:14  19   date.  In the meantime, the defendant propounded a number of
04:14  20   discovery requests and filed a motion for early-return
04:14  21   subpoenas duces tecum to be served on various members of
04:14  22   Congress and their staffers.  That is at Record Document 206.
04:14  23               The Court granted the request.  The House did
04:14  24   not respond by the return date.  The defendant then moved to
04:15  25   compel compliance; and the House responded, asserting, among

04:15    1    other arguments, speech and debate privilege as absolute

04:15    2    privilege.  The Court found in favor of the House on speech and

04:15    3    debate grounds.

04:15    4            Soon thereafter, the defendant withdrew a number

04:15    5    of his subpoenas, and the House then voluntarily produced a

04:15    6    number of documents without representing the scope of the

04:15    7    search performed, the terms used, or the extent to which it

04:15    8    would not produce certain documents as privileged.  There is no

04:15    9    representation in response that the document production was

04:15    10   otherwise in compliance with the scope of the subpoena that was

04:15    11   issued and then withdrawn.

04:15    12           Subsequently the defendant supplemented his

04:15    13   motion to dismiss, arguing that any alleged understanding

04:15    14   between the committee chairman and the subcommittee chairman as

04:15    15   to the delegation of investigative authority upon which the

04:15    16   government intended to rely in establishing the due and proper

04:15    17   authorization element is insufficient for purposes of § 1505.

04:16    18           In addition, the defendant contended that the

04:16    19   documents produced by the House further demonstrate that the

04:16    20   May 14 letter was not part of any duly authorized inquiry or

04:16    21   investigation.  In support of his argument, the defendant

04:16    22   points to a number of e-mails and letter correspondence

04:16    23   demonstrating, in the defendant's view, that the subcommittee

04:16    24   was not authorized to conduct an investigation into the spill,

04:16    25   nor was Representative Markey's letter a part of a duly

04:16    1    authorized investigation.  The Court would reference

04:16    2    Exhibits A through Y attached to Record Document 315.

04:16    3    At the very least, the defendant argues, the

04:16    4    letters and e-mails produced call into question whether the

04:16    5    Subcommittee on Energy and Environment was properly

04:16    6    investigating the spill and whether Representative Markey's

04:16    7    service as chairman of that subcommittee sent the May 14 letter

04:16    8    as a due and proper exercise of the power of inquiry.

04:17    9    The Court finds the defendant's arguments

04:17    10   related to the communications produced by the House to be a

04:17    11   reasonable reading of those documents and plausible under the

04:17    12   circumstances.

04:17    13   Based on the existence of these documents, the

04:17    14   defendant sought to interview certain members of Congress and

04:17    15   their staffers to seek out more potentially exculpatory

04:17    16   evidence.  The House declined.  On March 10, 2015, Mr. Rainey

04:17    17   served trial subpoenas on six staffers and three congressmen,

04:17    18   all related to the alleged investigation and, more importantly,

04:17    19   relevant to the communications disclosed by the House.  The

04:17    20   subpoenas were returnable on June 1, 2015, the first day of the

04:17    21   trial, which is, of course, today, and that is why the Court is

04:17    22   taking the matter up today.

04:17    23   The House filed a motion to quash the subpoenas

04:17    24   on speech and debate as well as "high ranking government

04:18    25   official" grounds.  Earlier today, just now, the Court granted

04:18    1    the motion to quash.

04:18    2            The defendant, anticipating that the Court would

04:18    3    conform its ruling on the motion to quash with its earlier

04:18    4    denial of the motion to compel subpoenas duces tecum based on

04:18    5    the speech and debate privilege, filed a motion for remedial

04:18    6    relief in light of congressional witnesses' refusal to testify.

04:18    7    That is Record Document 427.  The government filed a response

04:18    8    in opposition at Record Document 438.

04:18    9            In light of the Court's decision granting the

04:18   10    motion to quash, the motion for remedial relief is now ripe for

04:18   11    consideration.

04:18   12            In his motion for remedial relief, the defendant

04:18   13    relies on two fundamental arguments:

04:18   14            First, the Constitution and fundamental fairness

04:18   15    prohibit trying Mr. Rainey under Count 1 where the defendant is

04:19   16    unable to call congressional witnesses of his choosing, whose

04:19   17    testimony is relevant and material to whether the Subcommittee

04:19   18    on Energy and Environment was duly authorized to investigate BP

04:19   19    and whether Representative Markey's May 14 letter was part of a

04:19   20    due and proper investigation, all the while utilizing the

04:19   21    voluntary testimony of certain other congressional staffers who

04:19   22    have agreed to testify in the government's case in chief and to

04:19   23    be cross-examined within the limited scope of direct.

04:19   24            And second, at the very least -- and I have not

04:19   25    even mentioned the motion for protective order, which seems to

04:19    1    suggest that that limitation is even broader -- the limitation

04:19    2    on cross-examination is even broader, as argued by the House.

04:19    3            And second, at the very least, the Court should

04:19    4    exclude any evidence related to authorization of the

04:19    5    subcommittee investigation, specifically the testimony of the

04:19    6    congressional staffers who will voluntarily appear in the

04:19    7    government's case in chief, if the defendant is not permitted

04:20    8    to call witnesses of his choosing who may, and plausibly do,

04:20    9    hold exculpatory evidence critical to his defense.

04:20    10            In response, the government claims that a

04:20    11    criminal defendant does not have an unfettered right to call

04:20    12    witnesses and offer testimony that is incompetent, privileged,

04:20    13    or otherwise inadmissible, citing *Taylor v. Illinois*,

04:20    14    484 U.S. 400 (1988).  In support of this argument the

04:20    15    government asserts that under the Ninth Circuit case

04:20    16    *U.S. v. Renzi*, 769 F.2d 731, Courts are not permitted to weigh

04:20    17    the speech or debate privilege against a defendant's right to

04:20    18    compulsory process or to present a full defense.

04:20    19            Furthermore, the government avers that in order

04:20    20    for a defendant's right to present a defense to be implicated,

04:20    21    he must demonstrate that the evidence sought is both material

04:20    22    and favorable to his case, citing *U.S. v. Verrusio*, 762 F.3d 1,

04:21    23    a D.C. Circuit case from 2014.

04:21    24            The government further argues that the defendant

04:21    25    must offer definite and nonspeculative evidence that the

| | | |
|---|---|---|
| 04:21 | 1 | unavailable testimony is not cumulative, material, and |
| 04:21 | 2 | favorable, pursuant to *U.S. v. Valenzuela-Bernal*, 458 U.S. 858 |
| 04:21 | 3 | (1982). |
| 04:21 | 4 | Finally, the government claims that the cases |
| 04:21 | 5 | cited by the defendant are inapposite because any such remedy |
| 04:21 | 6 | sought should not be used to punish the government, i.e., the |
| 04:21 | 7 | Executive Branch, through the Department of Justice, for a |
| 04:21 | 8 | privilege asserted by a nonparty, in this case the legislative |
| 04:21 | 9 | branch. |
| 04:21 | 10 | As a preliminary matter, the Court finds that |
| 04:21 | 11 | few rights are more fundamental than the rights of due process |
| 04:21 | 12 | and compulsory process under the Fifth and Sixth Amendments. |
| 04:21 | 13 | The Court has serious constitutional and fairness concerns with |
| 04:22 | 14 | regard to the following: |
| 04:22 | 15 | First, the defendant received only a partial |
| 04:22 | 16 | production of documents from the House, absent a list of |
| 04:22 | 17 | searches performed, a list of search terms, or any |
| 04:22 | 18 | representations as to documents that were withheld under the |
| 04:22 | 19 | House's privilege, which was asserted and which this Court |
| 04:22 | 20 | ruled in favor of. |
| 04:22 | 21 | Secondly, certain House witnesses agreed to |
| 04:22 | 22 | voluntarily testify in the government's case in chief, but such |
| 04:22 | 23 | testimony, as the House proclaimed, would be limited to the |
| 04:22 | 24 | scope of direct, presumably determined at the whim of the |
| 04:22 | 25 | witness' or house counsel's own discretion. |

04:22  1          And third, the House, acting pursuant to its

04:22  2  privilege, refused defendant's subpoena request as to eight

04:22  3  other witnesses who, potentially and plausibly, hold material

04:22  4  and exculpatory information related to an essential element of

04:22  5  Count 1, which element has, in fact, already been identified by

04:22  6  the Fifth Circuit in this very case.

04:22  7          The Fifth Circuit explained, again, in this very

04:22  8  case, that an unauthorized frolic by a House entity or House

04:23  9  member might lose the protection afforded by § 1505 regardless

04:23  10  of its committee status because there would be no "due and

04:23  11  proper exercise of the power of inquiry."  That can be found in

04:23  12  *U.S. v. Rainey*, 757 F.3d 234, a Fifth Circuit opinion from this

04:23  13  year in this case.  By that same token, the Court finds that an

04:23  14  unauthorized frolic by an individual member would also lose the

04:23  15  protections afforded by § 1505 regardless of his status as

04:23  16  chairman of the subcommittee.  As seen repeatedly in the

04:23  17  government's briefing, these are factual issues that must be

04:23  18  developed at trial and must be submitted to the jury.

04:23  19          Each of these three areas of concern that I just

04:23  20  discussed directly implicate factual issues as they relate to

04:23  21  the defendant's right to present a full defense pursuant to the

04:24  22  Fifth and Sixth Amendments.  The Court finds that the evidence

04:24  23  sought by the defendant through documentary production and

04:24  24  testimony is highly relevant to his defense and material to the

04:24  25  issues before the Court for the jury's consideration.  The

04:24    1    Court, as I stated, that finds the evidence sought is material

04:24    2    noncumulative and, based on the evidence in the record,

04:24    3    including but not limited to a number of written

04:24    4    communications, both internal and external to the House,

04:24    5    favorable to his defense or at least plausibly and arguably and

04:24    6    quite conceivably favorably to the defendant in this case.

04:24    7         The Court has considered all of the pleadings,

04:24    8    the relevant record, all of the cases cited by the parties.

04:24    9    The Court also finds the ruling today is in accord with the

04:24   10    rulings in *Renzi* and *Verrusio*, which I have cited earlier.  To

04:24   11    be clear, the Court is not engaging in a balancing or weighing

04:25   12    of the speech and debate privilege, which I have already ruled

04:25   13    in favor of, with the defendant's Fifth and Sixth Amendment

04:25   14    rights, but is considering each on an independent basis in an

04:25   15    attempt to honor and reconcile those fundamental constitutional

04:25   16    privileges which are before the Court.

04:25   17         As seen earlier today, the Court found in favor

04:25   18    of the House, and its ruling supported the House's

04:25   19    long-standing constitutional privilege under the Speech or

04:25   20    Debate Clause.  The Court must now address what implication

04:25   21    that ruling has on the defendant's right to a full trial and

04:25   22    his constitutionally guaranteed rights, which I have just

04:25   23    described.

04:25   24         Thus the Court finds that, similar to the

04:25   25    holding in *U.S. v. Fernandez*, 913 F.2d 148, which is a

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 04:25 | 1  | Fourth Circuit case, 1990, and consistent with the rulings in       |
| 04:25 | 2  | *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*,     |
| 04:26 | 3  | 353 U.S. 53, the government's prosecution of Count 1 under          |
| 04:26 | 4  | § 1505 must give way where the defendant seeks relevant,            |
| 04:26 | 5  | material, noncumulative evidence related to his defense, but        |
| 04:26 | 6  | also where he has been precluded from obtaining this evidence       |
| 04:26 | 7  | due to the invocation of a constitutional privilege by a branch     |
| 04:26 | 8  | of the very same government involved in his prosecution.            |
| 04:26 | 9  | Because the defendant is not able to put on a full and fair         |
| 04:26 | 10 | defense, consistent with his constitutional rights and             |
| 04:26 | 11 | consistent with an element of the crime as described by the         |
| 04:26 | 12 | Fifth Circuit and set forth in the jurisprudence, under these       |
| 04:26 | 13 | circumstances the Court finds the only appropriate remedy is        |
| 04:26 | 14 | dismissal of Count 1.  The Court would reference the case of        |
| 04:26 | 15 | *Calley v. Callaway*, 519 F.2d 184, which is a Fifth Circuit        |
| 04:27 | 16 | opinion from 1975 in which the Court of Appeal expressed            |
| 04:27 | 17 | approval of dismissal where a congressional privilege is            |
| 04:27 | 18 | asserted prohibiting a defendant from evidence essential to his     |
| 04:27 | 19 | defense.                                                             |
| 04:27 | 20 | Accordingly, for the reasons I have previously             |
| 04:27 | 21 | stated, the defendant's motion for remedial relief is granted       |
| 04:27 | 22 | and Count 1 is hereby dismissed with prejudice.                     |
| 04:27 | 23 | In addition to its findings related to the               |
| 04:27 | 24 | defendant's constitutional rights, whereby the Court found that     |
| 04:27 | 25 | the defendant has put forth reasonable and plausible evidence       |

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 454 of 496
Case 1:22-cr-00096-CKK Document 510 Filed 06/27/24 Page 23 of 143

286

04:27   1   demonstrating a potentially unauthorized investigation by the

04:27   2   subcommittee and/or Representative Markey.  Without the ability

04:27   3   to fully examine those witnesses voluntarily testifying in the

04:27   4   government's case in chief and, more importantly, to call

04:27   5   witnesses in his favor, and lacking any knowledge as to the

04:27   6   scope of the documentary production performed by the House, the

04:27   7   Court, consistent with the Supreme Court's guidance in

04:28   8   *U.S. v. Nobles*, 422 U.S. 225, and *Davis v. Alaska*, found at

04:28   9   415 U.S. 308, as well as pursuant to the Federal Rules of

04:28   10  Evidence giving the District Court broad discretion over the

04:28   11  admission or preclusion of evidence, hereby excludes all

04:28   12  evidence related to the documentary production by the House and

04:28   13  any testimony that the four witnesses would provide in the

04:28   14  government's case in chief.

04:28   15          As a result, an examination of all the

04:28   16  surrounding circumstances, as indicated in the Fifth Circuit's

04:28   17  opinion in this very case and in *U.S v. Mitchell*, 877 F.2d 294,

04:28   18  a Fourth Circuit opinion from 1989, is rendered impossible.

04:28   19  Absent any evidence of an authorized investigation, the Court

04:28   20  would therefore find that the government could not meet its

04:28   21  burden of establishing an essential element of the crime

04:28   22  charged in Count 1.  Therefore, the defendant's motion to

04:29   23  dismiss Count 1 of the second superseding indictment for lack

04:29   24  of a due and proper exercise of the power of congressional

04:29   25  inquiry (Record Document 188) and his motion to dismiss Count 1

| | | |
|---|---|---|
| 04:29 | 1 | of the second superseding indictment because the May 4 briefing |
| 04:29 | 2 | and the May 14 letter were not part of a subcommittee |
| 04:29 | 3 | investigation, which is Record Document 190, must also |
| 04:29 | 4 | necessarily be and are hereby granted. |
| 04:29 | 5 | In light of all the circumstances, the Court |
| 04:29 | 6 | further believes that the motion to dismiss for |
| 04:29 | 7 | unconstitutional vagueness, which is Record Document 192, is, |
| 04:29 | 8 | under the circumstances, with merit, and the Court will grant |
| 04:29 | 9 | it as well. |
| 04:29 | 10 | Now, that leaves the Court with a variety of |
| 04:29 | 11 | motions that it had referred to trial and a motion for |
| 04:29 | 12 | protective order for nonparties Phil Barnett, Jeffrey Duncan, |
| 04:29 | 13 | Michael Goo, and Michal Freedhoff.  The Court would determine |
| 04:29 | 14 | that that motion is at this point denied as moot, unless |
| 04:30 | 15 | counsel disagrees, insofar as that testimony relates solely and |
| 04:30 | 16 | only to Count 1; and the defendant's motion, as set forth in |
| 04:30 | 17 | Record Document 488, the most recently filed motion, is also |
| 04:30 | 18 | moot at this point in light of the Court's ruling on the other |
| 04:30 | 19 | motions that I have identified as record document numbers. |
| 04:30 | 20 | Does any counsel disagree with regard to those |
| 04:30 | 21 | two motions? |
| 04:30 | 22 | Now, the Court also ruled on a number of motions |
| 04:30 | 23 | in limine relative to issues arising under Count 1, in |
| 04:30 | 24 | particular, evidentiary issues arising under Count 1.  I would |
| 04:30 | 25 | ask counsel, since we are finished with the jury today, maybe |

04:30   1   we can do this now on the record; or if you would like to
04:30   2   confer, maybe that would be the better thing to do.  I would
04:30   3   ask counsel to revisit certain of the motions that were filed
04:30   4   on a myriad of evidentiary issues that, in the Court's belief,
04:31   5   were related only to Count 1.
04:31   6               I, in particular, would ask that you confer on
04:31   7   those that are referred to trial first.  Those would be
04:31   8   Record Document 328, motion to admit lay opinion testimony of
04:31   9   Marcia McNutt; Record Document 333, which was pending and
04:31   10  referred to trial; motion to preclude task force from
04:31   11  mischaracterizing certain evidence as flow-rate estimates; a
04:31   12  motion to preclude hypothetical questions to lay witnesses,
04:31   13  which is Record Document 337; a motion in limine to preclude
04:31   14  improper lay opinion regarding Mr. Rainey's flow-rate
04:31   15  estimates, which is Record Document 420; Record Document 423,
04:31   16  motion in limine to admit defendant's proffer statements,
04:31   17  although I think that one was relative to not just Count 1 but
04:31   18  also Count 2.  That's my understanding.
04:32   19              And then there are other motions that are
04:32   20  pending, which I think I listed for you at the pretrial
04:32   21  conference -- I say pending.  There are motions in limine that
04:32   22  I have ruled on one way or another.  Some I have granted in
04:32   23  part and denied in part.  And those motions, insofar as they
04:32   24  pertain to the Count 2 trial we are going to have and commence
04:32   25  tomorrow morning, will need to be revisited in terms of whether

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 457 of 496
Case 1:22-cr-00096-CKD Document 510 Filed 06/07/2215 Page 253 of 443

289

04:32    1    they are even applicable at this date in light of the dismissal

04:32    2    of Count 1.  I would like, Counsel, to confer on that.

04:32    3             At this point, is there anything else we need to

04:32    4    cover on the record?  If not, I would like to see counsel, task

04:32    5    force counsel and defense counsel, in the conference room.

04:32    6             Thank you all.

04:33    7        **THE DEPUTY CLERK:**  All rise.

04:33    8        (Proceedings adjourned.)

04:33    9                         *  *  *

        10                    <u>**CERTIFICATE**</u>

        11        I, Toni Doyle Tusa, CCR, FCRR, Official Court

        12    Reporter for the United States District Court, Eastern District

        13    of Louisiana, certify that the foregoing is a true and correct

        14    transcript, to the best of my ability and understanding, from

        15    the record of proceedings in the above-entitled matter.

        16

        17

        18                         <u>*s/ Toni Doyle Tusa*</u>
                                    Toni Doyle Tusa, CCR, FCRR
        19                         Official Court Reporter

        20

        21

        22

        23

        24

        25

| 1 | 5 | afternoon [4] 256/9 259/1 271/23 271/25 |

**1**

10 [2]  259/15 279/16
1000 [1]  256/15
10:00 or [1]  259/15
10:15 [1]  259/15
12-291 [1]  256/5
1330 [1]  256/22
14 [8]  273/13 276/10 276/20 277/2
 278/20 279/7 280/19 287/2
148 [1]  284/25
15 [1]  270/14
15 minutes [1]  259/15
1505 [7]  274/24 277/3 277/11 278/17
 283/9 283/15 285/4
18 [1]  274/24
184 [1]  285/15
188 [2]  273/8 286/25
190 [2]  273/14 287/3
192 [2]  273/19 287/7
1975 [1]  285/16
1982 [1]  282/3
1988 [1]  281/14
1989 [1]  286/18
1990 [1]  285/1

**2**

20036 [1]  256/23
201 [1]  256/18
2014 [2]  276/23 281/23
2015 [4]  256/7 259/2 279/16 279/20
206 [1]  277/22
213 [2]  273/9 275/24
214 [2]  273/15 277/16
215 [1]  273/20
225 [1]  286/8
234 [1]  283/12
237 [1]  273/16
239 [1]  273/21
247 [1]  273/10
275 [1]  257/1
291 [1]  256/5
294 [1]  286/17

**3**

308 [1]  286/9
315 [1]  279/2
328 [1]  288/8
333 [1]  288/9
337 [1]  288/13
353 [1]  285/2
353 U.S [1]  285/3
392 [1]  274/1
3:00 or [1]  259/19
3:15 [1]  259/19

**4**

400 [2]  256/15 281/14
415 [1]  274/4
415 U.S. 308 [1]  286/9
419 [2]  271/16 272/17
420 [1]  288/15
422 [1]  286/8
423 [1]  288/15
427 [2]  274/8 280/7
438 [1]  280/8
458 [1]  282/2
474 [1]  274/12
484 U.S. 400 [1]  281/14
488 [2]  274/14 287/17
4:00 [1]  270/8
4:15 [1]  259/22
4:30 [1]  259/21

**5**

500 [1]  257/1
504 [1]  257/2
5100 [1]  256/18
519 [1]  285/15
53 [1]  285/3
589-7778 [1]  257/2
5:00 or [2]  259/20 260/2
5:15 [1]  259/23

**6**

657 [1]  285/2
6:00 [1]  260/1

**7**

70130 [2]  256/16 257/2
70170 [1]  256/19
731 [1]  281/16
757 F.3d [1]  283/12
762 [1]  281/22
769 F.2d [1]  281/16
7778 [1]  257/2
7:00 at [1]  260/1

**8**

858 [1]  282/2
877 [1]  286/17
8:30 [3]  259/14 271/1 271/4

**9**

913 [1]  284/25

**A**

abetting [1]  274/17
ability [2]  286/2 289/14
able [1]  285/9
about [13]  259/15 259/15 259/19 260/12
 261/21 263/9 263/10 264/6 264/8 265/4
 269/20 269/21 270/10
above [1]  289/15
above-entitled [1]  289/15
absent [2]  282/16 286/19
absolute [1]  278/1
absolutely [1]  270/3
accept [1]  267/11
access [1]  271/2
accommodate [2]  259/12 260/6
accord [1]  284/9
accordance [2]  263/25 264/1
Accordingly [1]  285/20
accounts [3]  263/19 263/21 270/18
across [2]  262/17 265/8
acting [1]  283/1
action [2]  256/4 275/19
actions [1]  277/14
adamant [1]  260/11
add [1]  263/2
addition [2]  278/18 285/23
address [1]  284/20
adjourned [1]  289/8
admissible [1]  268/14
admission [2]  268/1 286/11
admit [2]  288/8 288/16
admitted [2]  263/15 267/23
advise [2]  272/14 272/14
advises [1]  265/6
Advisory [1]  274/2
affirmatively [1]  275/18
afford [1]  275/4
afforded [2]  283/9 283/15
after [5]  259/20 266/15 270/8 270/12
 270/21

afternoon [4]  256/9 259/1 271/23 271/25
against [3]  268/8 269/8 281/17
agreed [2]  280/22 282/21
ahead [1]  270/15
aided [1]  257/5
aiding [1]  274/16
Alaska [1]  286/8
all [26]  260/8 260/8 260/23 261/5
 262/24 263/3 264/14 266/3 267/16
 270/5 271/10 271/10 271/12 272/5
 272/7 272/23 274/23 279/18 280/20
 284/7 284/8 286/11 286/15 287/5 289/6
 289/7
alleged [4]  275/25 276/2 278/13 279/18
allowing [1]  261/19
alone [1]  269/13
already [5]  260/9 272/1 277/11 283/5
 284/12
also [18]  262/19 263/2 264/21 268/18
 272/6 272/14 272/22 273/4 273/11
 273/22 274/11 283/14 284/9 285/6
 287/3 287/17 287/22 288/18
alternate [1]  260/20
although [3]  262/9 267/10 288/17
always [1]  266/17
Amendment [1]  284/13
Amendments [2]  282/12 283/22
AMERICA [1]  256/4
amicus [1]  274/3
among [4]  262/19 263/1 275/23 277/25
and/or [1]  277/1 286/2
another [3]  259/5 270/10 288/22
anticipating [1]  280/2
any [48]
Anybody [1]  272/18
anyone [8]  262/15 262/17 264/6 264/8
 264/24 267/24 270/18 272/15
anything [5]  263/12 263/16 270/19
 272/11 289/3
apologize [1]  271/14
Appeal [1]  285/16
appear [1]  281/6
appearance [1]  272/2
appearances [3]  256/12 271/20 271/21
appears [1]  273/19
applicable [6]  264/1 264/15 267/7
 267/11 267/13 289/1
apply [1]  267/11
appropriate [1]  285/13
approval [1]  285/17
are [49]
areas [2]  275/3 283/19
arguably [1]  284/5
argued [3]  275/23 277/4 281/2
argues [4]  275/2 275/8 279/3 281/24
arguing [1]  278/13
argument [4]  266/24 276/22 278/21
 281/14
arguments [9]  266/25 267/2 267/6
 267/15 272/9 276/6 278/1 279/9 280/13
arisen [1]  272/8
arising [3]  267/20 287/23 287/24
ARMSTRONG [1]  256/22
around [1]  259/14
arrive [1]  264/25
as [72]
ask [10]  259/22 260/8 261/18 262/3
 265/3 272/10 272/25 287/25 288/3
 288/6
asserted [3]  282/8 282/19 285/18
asserting [1]  277/25
asserts [2]  275/16 281/15

Case 1:23-cr-00006DEJ-TKO-2 Document 510 Filed 06/27/2018 Page 3 of 39243

assume [1] 272/12
at [40]
attached [1] 279/2
attempt [6] 261/9 261/16 263/5 263/5
263/7 284/15
attention [3] 259/9 263/11 263/13
attorney [2] 268/3 269/9
attorneys [6] 260/9 260/23 261/4 261/12
261/23 270/5
authority [3] 275/18 276/12 278/15
authorization [4] 275/5 275/17 278/17
281/4
authorized [7] 275/11 275/15 278/20
278/24 279/1 280/18 286/19
authorizing [2] 275/2 275/9
automatically [1] 275/4
available [1] 263/21
Avenue [2] 256/18 256/22
avers [2] 276/11 281/19
avoid [1] 261/19
avoided [1] 262/12
aware [1] 260/21

## B

B-275 [1] 257/1
bad [1] 262/12
balancing [1] 284/11
Barnett [1] 287/12
based [6] 263/16 263/23 276/6 279/13
280/4 284/2
basis [1] 284/14
bathroom [1] 259/11
be [62]
because [12] 259/5 262/9 263/4 263/23
267/6 268/14 273/12 276/9 282/5
283/10 285/9 287/1
been [11] 261/3 262/23 263/15 264/14
268/10 268/21 269/20 272/6 272/10
283/5 285/6
before [15] 256/10 259/17 259/20 260/2
262/23 262/23 263/1 263/11 270/7
270/17 272/22 274/11 276/22 283/25
284/16
beginning [1] 265/20
being [5] 261/2 261/21 262/11 262/12
274/20
belief [1] 288/4
believability [1] 269/14
believe [3] 270/9 270/21 274/13
believes [1] 287/6
bench [2] 268/11 268/15
Bernal [1] 282/2
best [2] 270/2 289/14
better [1] 288/2
between [1] 278/14
beyond [2] 266/10 266/18
biased [1] 262/12
Bipartisan [1] 274/2
BlackBerry [1] 264/9
BlackBerrys [1] 264/4
blog [1] 264/10
both [6] 260/24 267/14 269/6 272/10
281/21 284/4
BP [2] 275/12 280/18
BP's [1] 277/2
branch [3] 282/7 282/9 285/7
break [6] 259/11 259/14 259/19 260/2
260/14 270/17
breaks [1] 264/22
BRIAN [1] 256/21
briefing [6] 273/12 276/10 276/20

276/24 283/17 287/1
broader [2] 281/1 281/2
building [1] 259/18 265/1
burden [4] 266/17 266/20 267/6 286/21
business [2] 259/24 270/13
but [16] 259/6 259/23 260/6 260/7
264/19 266/6 266/16 269/5 269/18
272/25 277/12 282/22 284/3 284/14
285/5 288/17

## C

call [5] 279/4 280/16 281/8 281/11 286/4
Callaway [1] 285/15
Calley [1] 285/15
Calley v [1] 285/15
calling [1] 266/20
can [9] 259/4 259/16 264/22 265/13
268/4 270/5 271/3 283/11 288/1
cannot [1] 260/21
care [2] 270/13 272/25
careful [3] 260/25 261/7 261/25
carried [1] 276/4
case [59]
cases [3] 266/25 282/4 284/8
caught [1] 259/17
causing [1] 274/17
CCR [3] 257/1 289/11 289/18
cell [2] 264/3 264/8
certain [8] 260/9 268/5 278/8 279/14
280/21 282/21 288/3 288/11
certainly [2] 260/19 260/21
CERTIFICATE [1] 289/10
certify [1] 289/13
chairman [6] 275/13 276/5 278/14
278/14 279/7 283/16
chairs [1] 264/20
challenges [1] 276/6
change [1] 269/21
charge [1] 266/14
charged [3] 266/18 276/24 286/22
charges [1] 274/16
Charles [1] 256/18
chat [1] 264/10
chief [5] 280/22 281/7 282/22 286/4
286/14
children [1] 262/16
choose [2] 264/19 266/7
chooses [1] 266/7
choosing [2] 280/16 281/8
Circuit [10] 277/11 281/15 281/23 283/6
283/7 283/12 285/1 285/12 285/15
286/18
Circuit's [1] 286/18
circumstances [5] 279/12 285/13 286/16
287/5 287/8
circumstantial [2] 269/1 269/2
cited [5] 272/7 272/10 282/5 284/8
284/10
citing [2] 281/13 281/22
claims [2] 281/10 282/4
clause [2] 274/7 284/20
clear [3] 275/25 276/2 284/11
close [2] 266/1 267/5
closing [2] 266/25 267/15
coffee [2] 265/12 271/2
cognizable [1] 276/7
cokes [1] 265/12
come [6] 261/17 263/10 263/25 265/8
271/18 272/23 273/2
comfortable [3] 265/10 265/14 271/3
commence [1] 288/24
Commerce [1] 274/23

commitment [1] 260/3
committees [1] 275/3
communicate [2] 264/6 264/7
communication [1] 261/17
communications [4] 261/10 279/10
279/19 284/4
compel [2] 277/25 280/4
completely [4] 260/17 263/12 268/22
272/12
compliance [2] 277/25 278/10
compulsory [2] 281/18 282/12
computer [1] 257/5
computer-aided [1] 257/5
conceded [1] 276/23
conceivably [1] 284/6
concern [2] 268/6 283/19
concerned [1] 259/6
concerning [1] 277/8
concerns [1] 282/13
conclude [2] 259/20 269/3
concluded [1] 277/11
conclusion [3] 266/23 267/15 270/5
conclusions [1] 264/13
conduct [7] 260/21 261/1 261/7 275/3
275/5 276/24 278/24
conducted [1] 261/22 276/16
conducting [1] 276/19
confer [3] 288/2 288/6 289/2
conference [2] 288/21 289/5
conferences [3] 268/11 268/15 268/17
conform [1] 280/3
Congress [2] 277/22 279/14
congressional [10] 273/7 273/25 274/6
275/1 280/6 280/16 280/21 281/6
285/17 286/24
congressmen [1] 279/17
connected [3] 261/6 261/11 261/25
Connecticut [1] 256/22
connection [1] 272/5
consider [8] 263/4 267/8 267/22 268/5
268/9 268/20 269/6 270/6
consideration [3] 268/23 280/11 283/25
considered [1] 284/7
considering [1] 284/14
consistent [4] 285/1 285/10 285/11
286/7
consists [1] 267/22
Constitution [1] 280/14
constitutional [6] 282/13 284/15 284/19
285/7 285/10 285/24
constitutionally [1] 284/22
contained [4] 266/14 267/13 276/24
277/2
contended [1] 278/18
contends [1] 275/19
contentions [1] 267/3
contested [1] 277/12
conversation [1] 261/16
conversations [1] 261/10
copy [1] 267/17
correct [1] 289/13
correspondence [1] 278/22
corruptly [1] 274/17
could [3] 260/5 262/10 286/20
counsel [18] 259/5 265/17 265/17 267/5
270/9 271/18 271/21 272/1 272/2
272/23 287/15 287/20 287/25 288/3
289/2 289/4 289/5 289/5
counsel's [2] 271/24 282/25
Count [24] 273/5 273/5 273/11 273/17

**C**

Count... [20]  273/23 274/15 274/25
276/9 280/15 283/5 285/3 285/14
285/22 286/22 286/23 286/25 287/16
287/23 287/24 288/5 288/17 288/18
288/24 289/2
Count 1 [22]  273/5 273/5 273/11 273/17
273/23 274/15 274/25 276/9 280/15
283/5 285/3 285/14 285/22 286/22
286/23 286/25 287/16 287/23 287/24
288/5 288/17 289/2
Count 2 [2]  288/18 288/24
course [3]  261/8 262/14 263/2 264/17
265/23 267/14 269/19 275/19 279/21
court [54]
Court's [7]  264/1 268/7 272/8 280/9
286/7 287/18 288/4
courtroom [10]  260/24 261/21 263/9
263/13 263/16 263/17 263/25 265/3
265/6 265/15
Courts [1]  281/16
cover [2]  259/5 289/4
Creating [1]  262/11
crime [2]  285/11 286/21
criminal [3]  256/4 266/20 281/11
critical [1]  281/9
cross [3]  262/8 280/23 281/2
cross-examination [1]  281/2
cross-examined [1]  280/23
crowd [3]  259/18 271/7 271/7
cumulative [1]  282/1
curiae [1]  274/3

**D**

D.C. [1]  281/23
D.C. Circuit [1]  281/23
date [3]  277/19 277/24 289/1
DAVID [4]  256/6 256/17 256/20 273/24
Davis [4]  286/8
Davis v [1]  286/8
day [8]  256/9 259/20 259/22 265/1
270/12 270/16 270/16 279/20
days [1]  259/21
DC [2]  256/7 256/23
debate [8]  274/7 278/1 278/3 279/24
280/5 281/17 284/12 284/20
December [1]  276/23
December 3 [1]  276/23
decide [4]  263/4 269/14 270/20 277/9
decided [4]  263/13 263/16 268/13 277/8
deciding [1]  268/23
decision [3]  262/21 264/16 280/9
decisions [1]  269/19
declined [1]  279/16
Deepwater [1]  275/10
Deepwater Horizon [1]  275/10
defendant [45]
defendant's [18]  266/5 274/5 274/12
276/5 277/5 278/22/3 279/9 281/17
281/20 283/2 283/21 284/13 284/21
285/21 285/24 286/22 287/16 288/16
defense [14]  265/24 266/3 266/12 272/2
281/9 281/18 281/20 283/21 283/24
284/5 285/5 285/10 285/19 289/5
defer [1]  265/25
deferred [1]  277/17
definite [1]  281/25
degree [1]  269/7
delay [1]  271/15
delegated [2]  275/18 276/12
delegation [1]  278/15
deliberate [4]  260/16 263/1 267/8
267/18
demands [1]  260/25
demonstrate [3]  276/3 278/19 281/21
demonstrating [2]  278/23 286/1
denial [1]  280/4
denied [2]  287/14 288/23
Department [2]  256/14 282/7
deposition [1]  267/25
described [2]  284/23 285/11
determination [1]  269/13
determine [4]  267/19 267/19 269/13
287/13
determined [1]  282/24
developed [1]  283/18
did [1]  277/23
difficult [1]  269/22
direct [6]  265/4 268/25 269/1 269/1
280/23 282/24
directly [1]  283/20
disagree [1]  287/20
disagrees [1]  287/16
disclosed [1]  279/19
disclosure [1]  272/15
discovery [1]  277/20
discretion [2]  282/25 286/10
discuss [5]  262/1 262/1 262/15 262/19
270/17
discussed [1]  283/20
discussions [1]  261/21
dismiss [11]  273/5 273/5 273/11 273/17
274/25 276/8 276/9 278/13 286/23
286/25 287/6
dismissal [3]  285/14 285/17 289/1
dismissed [1]  285/22
disregard [1]  263/12
distances [1]  260/3
DISTRICT [6]  256/1 256/2 256/11
286/10 289/12 289/12
do [25]  259/4 262/6 262/19 263/4 263/5
263/6 263/7 263/8 264/19 264/20 265/6
266/6 266/7 266/17 268/7 268/16
270/10 270/17 270/18 270/22 272/18
274/17 281/8 288/1 288/2
docket [1]  272/8
document [31]  271/16 272/17 273/8
273/9 273/10 273/14 273/15 273/16
273/19 273/20 273/21 274/1 274/4
274/8 274/12 274/14 275/24 277/16
277/22 278/9 279/22 280/7 280/8 286/25
287/3 287/7 287/17 287/19 288/8 288/9
288/13 288/15 288/15
Document 213 [1]  275/24
Document 214 [1]  273/15
Document 215 [1]  273/20
Document 237 [1]  273/16
Document 239 [1]  273/21
Document 474 [1]  274/12
documentary [3]  283/23 286/6 286/12
documents [8]  273/25 278/6 278/8
278/19 279/11 279/13 282/16 282/18
does [4]  275/4 277/12 281/11 287/20
doing [1]  267/21
don't [4]  259/4 270/9 271/6 271/7
done [1]  261/3
doubt [4]  260/18 261/2 266/11 266/19
downtime [1]  260/11
Doyle [5]  257/1 289/11 289/18 289/18
drawn [1]  260/3
driving [1]  260/3
duces [2]  277/21 280/4
due [11]  273/6 274/18 274/25 275/7
278/16 279/8 280/20 282/11 283/10

285/7 286/24
Duncan [1]  287/12
during [14]  259/9 260/21 261/8 262/14
262/17 263/2 264/17 264/21 264/25
265/23 267/14 268/15 269/11 269/19
duty [4]  267/16 267/19 268/2 268/3

**E**

e-mail [1]  264/8
e-mails [2]  278/22 279/4
each [3]  274/10 283/19 284/14
earlier [6]  266/9 279/25 280/3 284/10
284/17
early [3]  259/21 271/1 277/20
early-return [1]  277/20
EASTERN [2]  256/2 289/12
efficient [1]  269/25
efficiently [1]  270/4
eight [1]  283/2
elect [1]  266/2
electronically [1]  264/6
element [7]  266/18 277/8 278/17 283/4
283/5 285/11 286/21
else [4]  262/7 262/17 264/24 289/3
emergency [2]  259/10 259/11
end [3]  261/3 262/21 269/5
endeavoring [1]  274/18
ending [1]  269/23
Energy [10]  274/22 274/23 275/14
275/22 276/4 276/14 276/17 276/18
279/5 280/18
engage [6]  261/9 261/9 261/9 261/16
261/16 263/6
engaging [1]  284/11
ENGELHARDT [1]  256/10
enough [1]  262/9
enter [1]  265/6
entitled [2]  266/8 289/15
entity [1]  283/8
Environment [9]  274/22 275/14 275/22
276/5 276/14 276/18 276/19 279/5
280/18
equally [1]  261/7
ESQ [6]  256/14 256/15 256/18 256/21
256/21 256/22
essential [4]  277/8 283/4 285/18 286/21
establishing [2]  278/16 286/21
estimate [1]  269/23
estimates [2]  288/11 288/15
even [6]  275/11 276/18 280/25 281/1
281/2 289/1
every [7]  259/20 266/18 270/16 270/17
270/21 271/7 271/7
everyone [1]  271/1
evidence [51]
evidentiary [2]  287/24 288/4
exactly [1]  270/22
examination [2]  281/2 286/15
examine [1]  286/3
examined [1]  280/23
exchanges [1]  262/8
exclude [1]  281/4
excludes [1]  286/11
exculpatory [3]  279/15 281/9 283/4
Executive [1]  282/7
exercise [6]  273/7 274/19 275/1 279/8
283/11 286/24
exhibits [5]  263/14 263/15 267/23 268/9
279/2
Exhibits A through Y [1]  279/2
exist [1]  269/4

Case 1:23-cr-00006-DLF Document 51-10 Filed 06/07/23 Page 463 of 498

**E**

existed [1] 277/14
existence [1] 279/13
exists [1] 275/10
exited [1] 271/13
expect [1] 260/24
expected [1] 269/17
explained [1] 283/7
explanation [2] 265/21 266/5
expressed [1] 285/16
expressly [1] 277/4
extend [1] 262/6
extent [1] 278/7
external [1] 284/4
extremely [1] 260/25
eyes [1] 259/9
eyewitness [1] 269/2

**F**

F.2d [4] 281/16 284/25 285/15 286/17
F.3d [2] 281/22 283/12
Facebook [1] 264/11
fact [5] 262/5 269/1 277/6 277/13 283/5
facts [9] 267/10 267/19 269/3 269/4
  269/12 269/13 275/25 276/2 276/3
factual [6] 276/6 277/7 277/12 283/17
  283/20
fair [1] 285/9
fairly [2] 260/17 261/2
fairness [2] 280/14 282/13
familiar [2] 272/6 272/9
family [2] 261/12 264/7
favor [5] 278/2 282/20 284/13 284/17
  286/5
favorable [3] 281/22 282/2 284/5
favorably [1] 284/6
FCRR [3] 257/1 289/11 289/18
Federal [1] 286/9
feeling [1] 269/8
fellow [1] 260/22
Fernandez [1] 284/25
few [2] 259/22 282/11
Fifth [11] 266/23 277/11 282/12 283/6
  283/7 283/12 283/22 284/13 285/12
  285/15 286/16
Fifth Circuit [6] 277/11 283/6 283/7
  283/12 285/12 285/15
Fifth Circuit's [1] 286/16
filed [7] 274/13 277/20 279/23 280/5
  280/7 287/17 288/3
filings [1] 273/23
Finally [3] 264/13 267/7 282/4
find [1] 280/20
findings [1] 285/23
finds [8] 279/9 282/10 283/13 283/22
  284/1 284/9 284/24 285/13
finish [1] 259/21 259/24 259/25
finished [1] 287/25
first [9] 265/17 272/7 273/3 275/2
  276/11 279/20 280/14 282/15 288/7
flow [1] 288/11 288/14
flow-rate [2] 288/11 288/14
folks [1] 271/8
follow [2] 267/16 270/1
following [6] 262/13 265/17 265/25
  267/15 273/22 282/14
force [2] 288/10 289/5
foregoing [1] 289/13
formal [1] 275/6
forming [1] 262/22
forth [3] 285/12 285/25 287/16
forward [3] 271/18 272/23 273/3

**G**

found [5] 278/2 283/11 284/17 285/24
four [2] 263/17 286/13
Fourth [3] 266/22 285/1 286/18
Fourth Circuit [2] 285/1 286/18
Freedhoff [1] 287/13
frequently [1] 269/19
fresh [1] 270/14
Friday [1] 274/13
friendly [1] 262/6
friends [2] 262/16 264/7
frolic [2] 283/8 283/14
full [5] 272/15 281/18 283/21 284/21
  285/9
fully [4] 262/23 272/12 272/14 286/3
fundamental [4] 280/13 280/14 282/11
  284/15
further [5] 261/19 269/4 278/19 281/24
  287/6
Furthermore [3] 261/23 275/19 281/19

gather [1] 263/5
gave [1] 269/24
general [4] 259/3 259/7 271/24 275/2
gentlemen [1] 270/12
get [7] 259/16 259/17 259/18 260/16
  270/25 271/1 271/9
give [3] 259/3 259/6 260/4 262/10
  262/13 267/14 269/4 269/23 285/4
given [4] 264/16 264/23 267/12 270/2
giving [1] 286/10
go [6] 259/22 265/3 270/12 270/15
  270/24 271/9
going [8] 260/7 260/15 270/15 270/23
  270/24 271/5 271/8 288/24
gone [1] 262/20
Goo [1] 287/13
Good [2] 271/23 271/25
governed [1] 268/1
government [29] 261/13 265/17 265/19
  265/23 265/25 266/12 266/13 266/15
  266/18 267/5 267/6 273/8 273/14
  273/19 274/8 275/23 276/23 277/4
  278/16 279/24 280/7 281/10 281/15
  281/19 281/24 282/4 282/6 285/8
  286/20
government's [11] 265/21 266/2 266/5
  276/1 280/22 281/7 282/22 283/17
  285/3 286/4 286/14
grant [1] 287/8
granted [6] 272/21 277/23 279/25
  285/21 287/4 288/22
granting [1] 280/9
great [1] 260/20
greeting [1] 262/7
grounds [4] 274/8 277/2 278/3 279/25
Group [1] 274/2
guaranteed [1] 284/22
guesswork [1] 267/21
guidance [1] 286/7
guilty [1] 266/10

**H**

had [4] 272/1 274/20 275/20 287/11
halls [2] 265/7 265/7
hallway [1] 274/7
handful [1] 274/9
happen [2] 262/7 262/17
happens [2] 261/17 269/18
has [27] 261/3 262/23 263/10 263/12
  264/14 264/15 266/15 267/4 267/5
  267/6 268/10 268/21 272/8 272/10

**I**

272/22 273/4 273/8 273/9 273/15
  272/22 273/4 273/8 273/9 273/15
  284/21 285/6 285/25
have [40]
he [5] 266/7 266/7 266/8 281/21 285/6
headquarters [1] 265/11
hear [3] 262/2 263/25 268/12
heard [1] 262/25
hearing [1] 268/14
HEBERLIG [2] 256/21 272/2
helpful [1] 263/6
here [11] 259/4 259/7 259/16 260/1
  263/15 265/14 270/25 271/1 271/1
  271/8 271/8
hereby [3] 285/22 286/11 287/4
high [2] 277/4 279/24
high-ranking [1] 274/7
highly [1] 283/24
himself [1] 274/16
his [20] 274/25 276/9 278/5 278/12
  278/21 280/12 280/16 281/8 281/9
  281/22 283/15 283/24 284/5 284/22
  285/5 285/8 285/10 285/18 286/5
  286/25
hold [4] 268/8 272/25 281/9 283/3
holding [1] 284/25
honor [5] 271/23 272/3 272/19 272/20
  284/15
HONORABLE [1] 256/10
hopefully [2] 259/16 270/25
Horizon [1] 275/10
hour [1] 259/16
hours [1] 270/1
house [26] 271/24 272/19 274/3 274/21
  274/23 277/23 277/25 278/22 278/5
  278/19 279/10 279/16 279/19 279/23
  281/2 282/16 282/21 282/23 282/25
  283/1 283/8 283/8 284/4 284/18 286/6
House's [2] 282/19 284/18
However [1] 264/5
hypothetical [1] 288/12

I'd [2] 260/8 262/13
I'll [1] 272/24
I'm [9] 260/7 260/11 260/19 270/15
  271/4 272/8 272/15 276/1 277/7
i.e [1] 282/6
identified [5] 261/5 261/14 261/15 283/5
  287/19
if [24] 259/9 259/18 261/17 262/2
  263/10 264/17 264/19 264/20 265/7
  266/4 266/7 268/15 268/20 271/1 271/7
  271/18 272/15 272/23 273/2 275/11
  271/18 281/7 288/1 289/4
ignore [1] 268/22
Illinois [1] 281/13
immediately [2] 261/18 262/4
impartiality [1] 262/11
impartially [1] 261/2
impede [1] 274/18
implicate [1] 283/20
implicated [1] 281/20
implication [1] 284/20
important [2] 262/24 270/19
importantly [2] 279/18 286/4
imposes [1] 266/19
impossible [1] 286/18
impression [2] 262/10 262/11
improper [1] 288/14
in [158]
inadmissible [1] 281/13

**I**

inapposite [1] 282/5
includes [2] 262/15 264/7
including [5] 261/11 263/21 263/22
 264/11 284/3
incompetent [1] 281/12
indeed [1] 277/11
independent [1] 284/14
indicate [1] 269/12
indicated [3] 259/13 269/16 286/16
indictment [12] 266/14 273/6 273/12
 273/18 274/15 275/25 276/2 276/7
 276/25 276/25 286/23 287/1
individual [1] 283/14
indulge [1] 267/21
infer [1] 269/3
inferences [2] 267/4 267/20
influence [1] 274/18
influenced [2] 268/24 269/7
information [4] 260/5 263/5 275/12
 283/4
innocence [1] 266/8
innocent [2] 262/9 266/10
inquiry [13] 273/7 274/19 274/19 275/1
 275/7 276/3 277/10 277/13 277/14
 278/20 279/8 283/11 286/25
inside [1] 260/24
insofar [2] 287/15 288/23
instead [2] 275/6 276/8
instigate [1] 275/7
instruct [2] 267/7 268/20
instructed [2] 262/20 264/15
instructions [10] 259/3 259/7 262/14
 262/25 264/1 265/9 267/13 267/16
 267/17 269/4
insufficient [1] 278/17
intended [3] 267/2 269/11 278/16
intends [1] 265/23
interest [1] 272/14
internal [1] 284/4
Internet [3] 263/22 264/4 264/10
interview [1] 279/14
into [9] 267/18 267/23 268/23 270/5
 270/7 270/12 276/17 278/24 279/4
introduce [1] 266/13
introduced [1] 266/22
introducing [1] 266/21
introduction [1] 265/22
investigate [3] 275/10 275/11 280/18
investigating [1] 279/6
investigation [24] 273/14 274/20 275/6
 275/7 275/15 276/4 276/11 276/13
 276/16 276/16 276/19 276/21 277/10
 277/13 277/15 278/21 278/24 279/1
 279/18 280/20 281/5 286/1 286/19
 287/3
investigations [1] 275/3 275/20 275/21
investigative [2] 276/12 278/15
invocation [1] 285/7
involved [3] 262/6 265/8 285/8
iPhone [1] 264/9
is [97]
issue [1] 272/8
issued [1] 278/11
issues [10] 277/6 277/7 277/9 277/13
 283/17 283/20 283/25 287/23 287/24
 288/4
it [26] 259/23 260/6 261/18 261/25
 262/22 262/24 263/11 263/16 264/16
 264/22 267/12 267/18 267/18 268/2
 268/8 268/15 268/24 272/12 272/13
 272/15 272/18 272/22 277/6 278/7

**J**

Jeffrey [1] 287/12
Jencks [1] 285/2
Jencks v [1] 285/2
job [1] 259/8
Johnson [1] 256/20
jointly [1] 276/16
Jones [1] 256/17
judge [2] 256/11 268/4
judges [1] 267/10
June [3] 256/7 259/2 279/20
June 1 [1] 279/20
jurisdiction [2] 275/4 275/21
jurisprudence [2] 272/9 285/12
juror [1] 261/17
jurors [7] 260/18 260/19 260/20 260/22
 261/8 261/19 262/2
jury [25] 256/10 259/8 260/12 262/21
 265/2 265/3 265/10 265/11 265/11
 267/10 267/18 268/12 268/14 270/3
 270/7 270/12 270/13 270/25 271/2
 271/13 276/8 277/6 277/9 283/18
 287/25
jury's [1] 283/25
just [8] 259/11 267/1 269/24 274/10
 279/25 283/19 284/22 288/17
justice [3] 256/14 261/3 282/7

**K**

keep [5] 259/9 260/1 268/13 268/17
 270/3
kind [1] 261/10
kinds [2] 268/25 269/6
know [7] 259/4 260/3 270/10 271/6
 271/8 272/7 272/24
knowledge [1] 286/5
KURT [1] 256/10

**L**

lack [4] 262/10 273/6 274/25 286/23
lacking [1] 286/5
ladies [1] 270/11
last [1] 269/17
later [1] 277/18
law [11] 262/20 263/1 264/1 264/15
 266/19 267/8 267/11 267/12 268/2
 272/6 277/7
lawyers [3] 268/8 268/11 269/19
lay [3] 288/8 288/12 288/14
learn [1] 263/9
least [4] 279/3 280/24 281/3 284/5
leave [5] 264/20 264/21 264/21 264/22
 270/15
leaves [1] 287/10
leaving [1] 276/25
led [1] 276/5
legal [2] 274/2 277/9
legislative [1] 282/8
length [1] 268/18
LEO [1] 256/14
let [8] 259/3 269/6 263/2 270/7 270/11
 270/15 270/23 272/25
Let's [1] 287/12
letter [10] 273/13 276/10 276/20 277/2
 278/20 278/22 278/25 279/7 280/19
 287/2
letters [1] 279/4

**light** [6] 274/6 280/6 280/9 287/5 287/18
 287/9 287/11
like [9] 259/21 262/13 266/3 267/1 271/4
 272/16 288/1 289/2 289/4
likely [1] 265/7
likewise [1] 261/15
limine [4] 287/23 288/13 288/16 288/21
limitation [2] 281/1 281/1
limited [3] 280/23 282/23 284/3
LinkedIn [1] 264/12
list [2] 282/16 282/17
listed [2] 274/10 288/20
listen [2] 263/20 270/18
little [4] 259/16 259/20 260/10 270/8
lives [2] 260/15
LLP [2] 256/17 256/20
locked [1] 260/12
long [1] 284/19
long-standing [1] 284/19
longer [3] 259/23 260/13 270/3
lose [2] 283/9 283/14
LOUISIANA [5] 256/2 256/16 256/19
 257/2 289/13
lunch [2] 259/16 259/18

**M**

made [2] 266/4 277/1
MAGNER [1] 256/18
mail [1] 264/8
mails [2] 278/22 279/4
make [23] 259/8 260/9 260/19 262/21
 265/10 265/14 265/18 265/19 265/24
 266/2 266/6 268/3 268/8 268/18 269/11
 269/19 270/2 271/3 271/20 271/21
 272/16 275/25 276/2
making [1] 266/1
manner [1] 261/1
many [1] 264/3
March [1] 279/16
March 10 [1] 279/16
Marcia [1] 288/9
Markey [2] 275/13 286/2
Markey's [3] 278/25 279/6 280/19
marshal [2] 265/5 265/5
material [9] 268/22 272/11 280/17
 281/21 282/1 283/3 283/24 284/1 285/5
materials [1] 272/5
matter [6] 259/5 270/10 271/19 279/22
 282/10 289/15
matters [2] 268/13 269/5
may [46]
May 14 [8] 273/13 276/10 276/20 277/2
 278/20 279/7 280/19 287/2
May 4 [5] 273/12 276/10 276/19 276/23
 287/1
maybe [2] 287/25 288/2
McNutt [1] 288/9
me [8] 259/3 259/6 261/18 262/3 263/2
 270/7 272/25 274/11
means [2] 263/22 267/24
meantime [1] 277/19
mechanical [1] 257/5
media [1] 264/5
meet [1] 286/20
member [2] 283/9 283/14
members [2] 277/21 279/14
memorandum [2] 273/24 274/3
mentioned [2] 263/8 280/25
merely [1] 265/22
merit [1] 287/8
messaging [1] 264/9
MICHAEL [2] 256/18 287/13
Michal [1] 287/13

Case 1:22-cr-00015-APM   Document 71-5   Filed 06/07/22   Page 28 of 43

**M**

midmorning [1]  259/14
might [4]  262/7 263/6 269/20 283/9
mind [1]  269/6
mindful [2]  260/20 270/24
minds [2]  263/12 269/21
minimum [2]  268/13 268/18
minutes [2]  259/15 259/22
mischaracterizing [1]  288/11
missing [1]  271/5
Mitchell [1]  286/17
moment [2]  263/11 263/18
moot [2]  287/14 287/18
more [10]  259/4 259/23 265/7 265/20
 266/4 270/9 279/15 279/18 282/11
 286/4
morning [4]  259/14 264/25 269/17
 288/25
most [1]  287/17
motion [40]
motions [13]  273/4 273/5 273/23 274/10
 277/17 287/11 287/19 287/21 287/22
 288/3 288/19 288/21 288/23
move [1]  272/22
moved [1]  277/24
Mr. [7]  272/2 272/23 273/2 273/2 279/16
 280/15 288/14
Mr. Heberlig [1]  272/2
Mr. Rainey [2]  279/16 280/15
Mr. Rainey's [1]  288/14
Mr. Tsao [2]  272/23 273/2
Mr. Zink [1]  272/2
much [3]  259/4 270/9 271/10
must [22]  261/25 263/11 263/23 264/5
 267/9 267/11 267/21 268/6 268/8
 268/13 268/22 269/7 269/13 276/8
 277/8 281/21 281/25 283/17 283/18
 284/20 285/4 287/3
my [10]  259/8 260/2 262/25 265/9 268/3
 269/12 269/21 269/25 288/18 289/14
myriad [1]  288/4
Myspace [1]  264/12

**N**

N.W [1]  256/22
necessarily [1]  287/4
necessary [3]  260/13 263/23 270/4
need [5]  259/6 259/10 264/19 288/25
 289/3
neighbors [1]  262/17
networking [1]  264/11
never [1]  266/19
New [3]  256/16 256/19 257/2
news [1]  263/20
newspapers [1]  263/19
night [2]  260/2 264/21
nine [1]  271/17
Ninth [1]  281/15
no [9]  256/5 260/18 261/1 266/2 266/5
 269/10 275/8 278/8 283/10
Nobles [1]  286/8
noncumulative [2]  284/2 285/5
nonetheless [1]  262/10
nonparties [1]  287/12
nonparty [2]  271/17 282/8
nonspeculative [1]  281/25
noon [1]  259/17
nor [2]  263/19 278/25
not [76]
Notably [1]  276/22
notebook [1]  264/18
notes [4]  264/18 264/19 264/20 264/23

nothing [4]  265/20 266/4 266/12 272/19
notification [1]  278/9
notify [1]  262/3
now [9]  269/16 271/16 272/17 279/25
 280/10 284/20 287/10 287/22 288/1
number [7]  268/18 277/19 278/4 278/6
 278/22 284/3 287/22
numbers [1]  287/19

**O**

oath [1]  270/20
objection [4]  268/3 268/4 268/9 268/21
objections [2]  268/7 268/8
obliged [1]  266/17
observed [1]  260/22
observing [1]  261/24
obstruct [1]  274/18
obtaining [1]  285/6
occurs [2]  262/3 263/17
offense [2]  262/5 266/18 277/8
offer [2]  281/12 281/25
Office [1]  271/24
official [5]  257/1 274/8 279/25 289/11
 289/19
oil [1]  275/10
okay [3]  268/15 272/1 272/4
old [1]  271/6
omissions [1]  277/1
on [74]
one [8]  261/2 271/5 271/6 271/7 272/25
 277/12 288/17 288/22
only [6]  263/14 276/25 282/15 285/13
 287/16 288/5
open [2]  259/9 267/5
opening [11]  265/18 265/19 265/24
 265/25 266/1 266/2 266/3 266/4 266/6
 266/11 267/1
opinion [7]  269/12 283/12 285/16
 286/17 286/18 288/8 288/14
opinions [1]  262/22
opportunity [1]  265/18
opposition [4]  274/9 275/24 276/1 280/8
or [76]
oral [2]  266/24 276/22
order [7]  261/1 265/17 272/24 274/12
 280/25 281/19 287/17
ordered [2]  268/10 268/22
Orleans [3]  256/16 256/19 257/2
other [19]  260/23 261/13 261/24 263/8
 263/19 263/20 263/22 264/4 264/11
 265/12 269/3 269/5 269/23 275/23
 278/1 280/21 283/3 287/18 288/19
others [3]  261/5 274/16 274/17
otherwise [3]  262/22 278/10 281/13
our [3]  270/13 272/1 272/20
out [7]  259/16 260/14 262/7 266/9
 269/22 276/4 279/15
outside [8]  259/18 260/24 261/20 263/6
 263/9 263/13 263/17 268/13
over [9]  262/23 277/13 286/10
Oversight [3]  275/20 276/13 276/16
own [3]  263/5 264/23 282/25

**P**

PAGE [1]  258/2
papers [1]  272/20
parking [2]  260/4 260/5
part [12]  273/13 275/14 276/10 276/20
 276/24 277/14 278/20 278/25 280/19
 287/2 288/23 288/23
partial [2]  262/11 282/15
participants [1]  261/6
particular [3]  275/18 287/24 288/6

particularly [1]  261/25
parties [3]  261/21 263/19 287/12
party [1]  269/8
paths [1]  262/8
patience [1]  271/11
pays [1]  259/8
pen [1]  264/19
pendency [1]  262/18
pending [6]  273/4 273/23 288/9 288/20
 288/21
perform [1]  275/21
performed [3]  278/7 282/17 286/6
perhaps [1]  269/17
permitted [3]  262/9 281/7 281/16
person [3]  261/13 261/15 267/25
personal [3]  259/10 264/23 269/8
persons [4]  262/24 261/11 261/24 262/6
pertain [1]  288/24
Phil [1]  287/12
phone [1]  264/8
phones [1]  264/3
placed [1]  261/20
places [1]  263/7
planned [1]  269/20
plausible [2]  279/11 285/25
plausibly [3]  281/8 283/3 284/5
pleadings [1]  284/7
please [11]  259/9 262/3 264/20 265/3
 265/6 270/17 270/17 270/18 270/24
 271/20 271/21
pledge [1]  268/17 269/25
point [6]  269/22 269/23 270/23 287/14
 287/18 289/3
pointed [1]  266/9
pointing [1]  269/22
points [1]  278/22
position [1]  261/20
positions [1]  275/24
possibility [1]  262/2
possible [4]  260/11 260/17 260/17
 268/19
potentially [3]  279/15 283/3 286/1
power [6]  273/7 274/19 275/1 279/8
 283/11 286/24
Poydras [2]  256/15 257/1
preclude [3]  288/10 288/12 288/13
precluded [1]  285/6
preclusion [1]  286/11
prejudice [2]  269/8 285/22
preliminary [1]  282/10
prepared [1]  272/15
present [6]  266/16 266/24 267/2 281/18
 281/20 283/21
presentation [1]  269/11
presented [3]  263/24 264/14 266/15
presenting [1]  270/1
presumably [1]  282/24
presumed [1]  266/10
presumption [1]  266/8
pretrial [1]  288/20
previously [1]  285/20
prior [1]  265/9
privilege [11]  278/1 278/2 280/5 281/17
 282/8 282/19 283/2 284/12 284/19
 285/7 285/17
privileged [2]  278/8 281/12
privileges [1]  284/16
proceed [3]  259/13 265/16 275/18
proceedings [3]  257/5 289/8 289/15
process [3]  281/18 282/11 282/12
proclaimed [1]  282/23
produce [2]  265/23 278/8

**P**

produced [4]  278/5 278/19 279/4 279/10
production [5]  278/9 282/16 283/23
 286/6 286/12
proffer [1]  288/16
prohibit [1]  280/15
prohibiting [1]  285/18
promise [1]  269/18
prompt [2]  260/8 271/5
proof [3]  267/6 269/1 269/3
proper [10]  273/7 274/19 275/1 275/7
 275/20 278/16 279/8 280/20 283/11
 286/24
properly [2]  263/3 279/5
propose [1]  270/11
propounded [1]  277/19
prosecution [2]  285/3 285/8
protection [1]  283/9
protections [1]  283/15
protective [4]  272/24 274/11 280/25
 287/12
prove [1]  266/18
proven [1]  266/10
proves [1]  266/12
provide [4]  264/18 265/13 267/17
 286/13
publicity [1]  263/10
punish [1]  282/6
purely [1]  277/9
purposes [1]  278/17
pursuant [4]  282/2 283/1 283/21 286/9
put [1]  285/9 285/25

**Q**

qualifies [1]  277/10
quash [6]  271/17 272/17 279/23 280/1
 280/3 280/10
question [1]  279/4
questions [1]  288/12
quickly [2]  260/16 270/4
quite [1]  284/6
quoting [3]  276/1 277/7 277/15

**R**

radio [1]  263/20
RAINEY [6]  256/6 256/17 256/20 279/16
 280/15 283/12
Rainey's [2]  273/24 288/14
ranking [2]  274/7 279/24
rate [2]  288/11 288/14
rather [1]  260/11
reach [1]  264/13
read [5]  263/18 264/24 270/18 272/4
 272/12
reading [2]  263/7 279/11
ready [1]  271/9
realizing [1]  262/22
reason [4]  261/4 262/8 265/2 270/21
reasonable [5]  266/10 266/19 267/20
 279/11 285/25
reasons [2]  268/7 285/20
rebuttal [1]  266/22
Rec. [1]  274/8
Rec. Document 427 [1]  274/8
receive [1]  263/3
received [4]  262/24 262/25 273/22
 282/15
recently [2]  274/13 287/17
recess [2]  259/10 265/1
recipient's [1]  274/6
recipients [1]  271/18
recognize [1]  264/3

reconcile [1]  284/15
Record Document 188 [2]  273/8 286/25
Record Document 190 [2]  273/14 287/3
Record Document 192 [1]  273/19
Record Document 213 [1]  273/9
Record Document 214 [1]  277/16
Record Document 247 [1]  273/10
Record Document 315 [1]  279/2
Record Document 328 [1]  288/8
Record Document 333 [1]  288/9
Record Document 337 [1]  288/13
Record Document 392 [1]  274/1
Record Document 415 [1]  274/4
Record Document 419 [2]  271/16
 272/17
Record Document 420 [1]  288/15
Record Document 423 [1]  288/15
Record Document 427 [1]  280/7
Record Document 488 [2]  274/14
 287/17
recorded [1]  257/5
reference [3]  260/19 279/1 285/14
referred [3]  287/11 288/7 288/10
referring [1]  260/19
refreshments [1]  265/13
refusal [2]  274/6 280/6
refused [1]  283/2
regard [2]  282/14 287/20
regarding [3]  272/16 273/24 288/14
regardless [2]  283/9 283/15
REID [1]  256/21
relate [1]  283/20
related [10]  270/19 273/23 279/10
 279/18 281/4 283/4 285/5 285/23
 286/12 288/5
relates [1]  287/23
relative [2]  287/23 288/17
relatives [2]  261/12 262/16
relevant [5]  279/19 280/17 283/24 284/8
 285/4
relief [5]  274/6 280/6 280/10 280/12
 285/21
relies [1]  280/13
rely [1]  278/16
remain [2]  265/3 265/6
remaining [1]  276/6
remark [1]  269/10
remarks [2]  262/2 272/16
remedial [5]  274/5 280/5 280/10 280/12
 285/21
remedy [2]  282/5 285/13
Remember [1]  264/22
remind [1]  270/16
rendered [1]  286/18
Renzi [2]  281/16 284/10
repeat [1]  272/11
repeatedly [1]  283/16
replied [3]  273/9 273/15 273/20
replies [1]  274/9
report [1]  261/18
Reporter [3]  257/1 289/12 289/19
reports [1]  263/20
representation [1]  278/9
representations [2]  277/1 282/18
Representative [5]  275/13 278/25 279/6
 280/19 286/2
Representative Markey [2]  275/13 286/2
Representative Markey's [1]  278/25
 279/6 280/19
Representatives [2]  274/21 274/23
Representatives' [1]  274/3
representing [1]  278/6

request [3]  275/12 277/23 283/2
required [4]  265/2 266/6 275/6 275/17
requires [1]  277/5
reserved [1]  277/24
resolution [2]  275/6 275/9
resolve [2]  277/5 277/12
resolved [1]  276/8
respective [2]  266/25 267/3
respond [1]  277/24
responded [4]  273/8 273/15 273/19
 277/25
response [7]  274/13 275/23 277/2 277/4
 278/9 280/7 281/10
responses [1]  274/9
responsibilities [1]  260/21
responsibility [1]  260/25
rest [2]  266/7 272/20
restrooms [1]  265/12
result [1]  286/15
retire [2]  267/8 270/12
return [2]  277/20 277/24
returnable [1]  279/20
revisit [1]  288/3
revisited [1]  288/25
right [9]  267/5 269/16 271/4 271/10
 281/11 281/17 281/20 283/21 284/22
 285/10 285/24
rights [6]  282/11 282/11 284/14 284/22
 285/10 285/24
ripe [1]  280/10
rise [2]  271/12 289/7
ROBERT [1]  256/15
room [13]  262/10 262/21 264/10 265/4
 265/10 265/11 267/18 270/3 270/8
 270/13 270/25 271/2 289/5
Roviaro [1]  285/2
Roviaro v [1]  285/2
rule [3]  268/4 272/15 275/2
ruled [4]  282/20 284/12 287/22 288/22
rules [5]  262/25 263/1 268/2 270/24
 286/9
ruling [8]  268/7 269/10 277/17 280/3
 284/9 284/18 284/21 287/18
rulings [2]  284/10 285/1

**S**

said [5]  263/23 266/11 266/25 267/1
 269/16
same [4]  261/4 274/17 283/13 285/8
say [1]  288/21
saying [1]  271/6
scope [5]  278/6 278/10 280/23 282/24
 286/6
SCOTT [1]  256/22
search [2]  278/7 282/17
searches [1]  282/17
seat [2]  264/22 268/16
seated [2]  264/22 271/14
second [14]  266/13 272/25 273/6
 273/12 273/18 274/15 276/7 276/9
 276/15 276/25 280/24 281/3 286/23
 287/1
Secondly [3]  274/2 275/8 282/21
Section [1]  256/6
see [3]  260/12 263/25 289/4
seek [1]  279/15
seeks [1]  285/4
seem [1]  262/9
seems [1]  280/25
seen [2]  283/16 284/17
send [1]  270/7
sensitive [1]  260/7
sent [2]  275/12 279/7

S

serious [1]  282/13
served [2]  277/21 279/17
serves [1]  265/22
service [1]  279/7
SESSION [2]  256/9 259/1
set [2]  285/12 287/16
settled [1]  277/7
shall [5]  261/6 261/9 261/16 262/1
 263/16
short [1]  268/19
should [5]  261/19 262/5 262/12 281/3
 282/6
show [2]  265/4 270/25
shown [1]  267/4
sides [1]  272/10
signal [1]  259/11
similar [1]  284/24
since [1]  287/25
sit [1]  260/15
situation [1]  260/6
six [1]  279/17
Sixth [3]  282/12 283/22 284/13
so [13]  259/11 259/17 259/23 260/10
 264/19 266/7 266/7 266/17 267/21
 270/15 270/23 271/5 272/8
social [2]  264/5 264/11
software [1]  257/5
solely [2]  263/24 287/15
solo [1]  268/12
some [10]  259/3 259/6 259/21 259/24
 260/3 260/4 260/4 268/13 269/5 288/22
somebody [1]  259/24
someone [1]  259/8
Soon [1]  278/4
sought [5]  279/14 281/21 282/6 283/23
 284/1
specific [2]  262/14 275/17
specifically [4]  272/10 272/16 275/16
 281/5
speculation [1]  267/22
speech [8]  274/7 278/1 278/2 279/24
 280/5 281/17 284/12 284/19
spill [5]  275/10 275/12 276/17 278/24
 279/6
spouse [1]  262/16
St [1]  256/18
staffers [5]  277/22 279/15 279/17
 280/21 281/6
stand [2]  259/24 268/16
standing [1]  284/19
start [4]  262/22 270/13 271/4 271/8
starting [1]  259/13
stated [2]  284/1 285/21
statement [12]  265/19 265/19 265/20
 265/24 265/25 266/1 266/2 266/3 266/4
 266/6 267/1 270/24
statements [2]  266/11 288/16
STATES [9]  256/1 256/4 256/11 256/14
 265/5 274/21 274/22 285/2 289/12
status [2]  283/10 283/15
stenography [1]  257/5
Steptoe [1]  256/20
still [1]  277/7
strangers [1]  262/16
Street [2]  256/15 257/1
stretch [1]  268/16
stricken [2]  268/10 268/22
strike [1]  263/11
subcommittee [26]  273/13 274/22 275/4
 275/9 275/11 275/13 275/20 275/22
 276/4 276/5 276/11 276/13 276/14

276/15 276/17 276/18 277/10 278/14
276/19 276/21 277/3 277/8 278/21 279/7
283/16 286/2 287/2
submitted [2]  272/5 283/18
subpoena [4]  271/17 274/6 278/10
 283/2
subpoenas [6]  277/21 278/5 279/17
 279/20 279/23 280/4
Subsequently [1]  278/12
such [13]  262/8 267/14 267/20 268/23
 269/1 270/5 275/5 275/8 275/21 276/20
 277/13 282/5 282/22
sufficient [1]  275/5
suggest [1]  281/1
Suite [2]  256/15 256/18
superseding [10]  273/6 273/12 273/18
 274/15 275/25 276/2 276/7 276/25
 286/23 287/1
supervision [1]  265/5
supplemental [1]  273/24
supplemented [1]  278/12
support [4]  266/14 266/24 278/21
 281/14
supported [1]  284/18
Supreme [1]  286/7
Supreme Court's [1]  286/7
sure [2]  259/8 260/5
surrounding [1]  286/16
sustained [2]  268/10 268/21
sympathy [1]  269/8

T

take [13]  259/14 259/15 259/19 262/5
 264/18 264/19 264/20 267/18 268/23
 270/11 270/13 271/16 272/25
taken [2]  270/20 275/24
taking [2]  260/14 279/22
talk [1]  268/12
talking [1]  270/21
task [2]  288/10 289/4
Tatelman [1]  271/24
Taylor [1]  281/13
technology [1]  264/4
tecum [2]  277/21 280/4
telephones [1]  265/12
television [1]  263/20
term [1]  267/24
terms [3]  278/7 282/17 288/25
testifies [1]  267/24
testify [4]  274/7 280/6 280/22 282/22
testifying [1]  286/3
testimony [15]  265/15 267/23 268/9
 268/20 269/2 280/17 280/21 281/5
 281/12 282/1 282/23 283/24 286/11
 287/15 288/8
text [1]  264/9
than [7]  259/23 260/13 265/20 266/4
 269/23 270/3 282/11
Thank [2]  271/10 289/6
that [128]
That's [2]  260/2 288/18
their [9]  260/10 261/7 262/2 266/24
 269/21 275/3 275/24 277/22 279/15
them [3]  264/20 267/19 268/7
then [6]  267/8 275/13 277/24 278/5
 278/11 288/19
theory [2]  265/21 266/5
there [17]  259/21 259/22 260/10 262/1
 265/12 265/14 265/20 265/25 270/9
 271/3 273/11 273/17 278/8 283/10
 288/19 288/21 289/3
there's [4]  259/4 271/2 271/6 272/24
thereafter [1]  278/4

therefore [2]  286/20 286/22

277/17 279/13 283/17 283/19 285/12
they [10]  260/9 262/9 262/10 264/23
 268/14 269/20 270/12 283/20 288/23
 289/1
thing [1]  288/2
things [3]  265/13 269/20 271/2
think [4]  263/6 269/16 288/17 288/20
third [6]  266/15 274/5 275/10 276/18
 283/1
this [88]
those [15]  263/21 268/13 268/15 268/16
 268/17 269/18 270/24 273/5 279/11
 284/15 286/3 287/20 288/7 288/7
 288/23
three [3]  273/4 279/17 283/19
through [6]  264/8 264/9 264/10 279/2
 282/7 283/23
thus [2]  268/4 284/24
time [12]  260/7 260/9 260/10 262/13
 267/18 268/2 268/2 270/2 270/11
 270/23 272/7 272/18
today [9]  259/5 259/7 271/11 279/21
 279/22 279/25 284/9 284/17 287/25
Todd [1]  271/23
token [1]  283/13
tomorrow [3]  270/14 270/25 288/25
Toni [1]  257/1 289/11 289/18 289/18
too [1]  272/25
tools [2]  264/4 264/5
transcript [2]  256/10 289/14
transcription [1]  257/5
transmitted [1]  263/22
trial [39]
tried [2]  260/16 261/3
true [1]  289/13
try [9]  259/11 260/2 263/8 265/10
 265/13 268/12 268/18 269/21 270/4
trying [2]  260/16 280/15
TSAO [3]  256/14 272/23 273/2
Tusa [4]  257/1 289/11 289/18 289/18
Twitter [2]  263/22 264/9
two [4]  268/25 269/17 280/13 287/21
type [2]  259/10 259/17
typically [1]  269/18

U

U.S [11]  256/14 274/3 281/22 282/2
 282/2 284/25 285/2 285/2 285/3 286/8
 286/17
U.S v [1]  286/17
U.S. [5]  281/14 281/16 283/12 286/8
 286/9
U.S. v [1]  283/12
U.S. v. Nobles [1]  286/8
U.S. v. Renzi [1]  281/16
U.S.C [1]  274/24
unable [1]  280/16
unanimous [1]  267/9
unauthorized [3]  283/8 283/14 286/1
unavailable [1]  282/1
unconstitutional [3]  273/18 277/18 287/7
under [15]  265/4 271/9 274/19 277/10
 279/11 280/15 281/15 282/12 282/18
 284/19 285/3 285/12 287/8 287/23
 287/24
understand [2]  260/14 272/13
understanding [3]  278/13 288/18 289/14
unfettered [1]  281/11
UNITED [9]  256/1 256/4 256/11 256/14
 265/5 274/21 274/22 285/2 289/12
United States [4]  265/5 274/21 274/22

## U

United States... [1]  285/2
unless [3]  259/23 271/5 287/14
until [7]  260/1 262/20 262/24 264/14
  265/5 266/1 266/10
up [5]  259/17 260/12 270/11 271/16
  279/22
upon [4]  263/16 264/22 266/7 278/15
us [2]  269/22 270/10
use [4]  264/3 264/5 264/23 270/2
used [2]  278/7 282/6
using [1]  257/5
utilizing [1]  280/20

## V

v. [2]  281/16 286/8
vagueness [3]  273/18 277/18 287/7
Valenzuela [1]  282/2
Valenzuela-Bernal [1]  282/2
value [1]  269/15
variety [1]  287/10
various [1]  277/21
verdict [2]  263/23 267/9
Verrusio [2]  281/22 284/10
versus [1]  256/5
very [15]  260/8 260/15 270/19 271/5
  271/10 272/6 272/9 272/9 279/3 280/24
  281/3 283/6 283/7 285/8 286/17
view [2]  263/19 278/23
violation [3]  265/9 274/24 277/3
visit [1]  263/7
visiting [1]  270/22
voluntarily [4]  278/5 281/6 282/22 286/3
voluntary [1]  280/21

## W

wait [1]  262/24
Walker [1]  256/17
walls [1]  263/17
want [4]  259/18 259/24 259/25 271/6
warned [1]  260/9
was [17]  268/9 274/20 275/11 275/17
  276/4 276/24 278/9 278/10 278/20
  278/24 278/25 279/5 280/18 280/19
  282/19 288/9 288/17
Washington [1]  256/23
way [7]  261/25 263/8 264/10 268/24
  271/9 285/4 288/22
we [46]
We'll [1]  259/15
we're [1]  265/4
website [1]  264/10
websites [1]  264/11
weeks [1]  269/17
weigh [1]  281/16
weighing [1]  284/11
weight [1]  269/14
WEINGARTEN [1]  256/21
well [10]  260/20 269/5 272/24 274/9
  274/16 277/7 277/18 279/24 286/9
  287/9
well-settled [1]  277/7
were [11]  273/13 275/14 276/10 276/19
  276/20 277/14 279/20 282/18 287/2
  288/3 288/5
what [10]  263/25 266/11 266/25 267/1
  267/3 267/4 269/12 269/18 277/14
  284/20
whatsoever [2]  261/10 261/17
when [11]  259/22 260/18 261/20 264/21
  264/21 264/25 265/1 265/14 268/16
  268/23 270/25

where [7]  259/21 261/21 262/1 280/15
  288/6
whereby [2]  275/17 285/24
wherever [1]  262/7
whether [10]  259/4 266/11 268/4 277/10
  277/13 279/4 279/6 280/17 280/19
  288/25
which [49]
while [1]  280/20
whim [1]  282/24
who [8]  261/5 261/24 267/24 268/8
  280/21 281/6 281/8 283/3
whose [1]  280/16
why [1]  279/21
will [51]
wish [3]  260/5 264/17 268/15
wit [1]  274/21
withdrawn [1]  278/11
withdrew [1]  278/4
withheld [1]  282/18
within [3]  275/3 275/5 280/23
without [3]  262/22 278/6 286/2
witness [2]  263/14 267/24
witness' [1]  282/25
witnesses [17]  260/10 261/5 261/13
  261/24 266/20 267/23 269/21 273/25
  280/16 281/8 281/12 282/21 283/3
  286/3 286/5 286/13 288/12
witnesses' [1]  280/6
won't [1]  259/17
would [25]  265/8 266/4 270/11 271/4
  272/16 272/23 273/2 278/8 279/1 280/2
  282/23 283/10 283/14 285/14 286/13
  286/20 287/13 287/24 288/1 288/2
  288/2 288/6 288/7 289/2 289/4
written [3]  272/5 272/11 284/3

## Y

y'all [1]  271/7
year [1]  283/13
Yes [1]  272/3
you [133]
you're [1]  260/12
you-all [2]  260/8 272/23
your [33]  259/9 260/14 260/20 260/21
  260/22 260/25 262/15 262/16 262/16
  263/5 263/11 263/11 263/12 263/23
  264/7 264/8 264/16 264/16 264/20
  264/22 264/23 267/8 267/16 267/19
  268/16 270/2 271/10 271/20 271/21
  271/23 272/3 272/19 272/20
Your Honor [4]  271/23 272/3 272/19
  272/20
yourself [1]  271/3
yourselves [5]  261/1 261/20 262/19
  263/1 268/6
YouTube [1]  264/12

## Z

ZINK [2]  256/15 273/2

**EXHIBIT 2**

20 Berkeley J. Crim. L. 260

Berkeley Journal of Criminal Law
Fall 2015

Article

Brian M. Heberlig[a1]

Copyright (c) 2015 Regents of the University of California; Brian M. Heberlig

**CONGRESSIONAL GAMESMANSHIP LEADS TO AN ACQUITTAL IN DEEPWATER HORIZON CASE**

**United States v. David Rainey: A Case Study**

| | |
|---|---|
| I. INTRODUCTION | 261 |
| II. BACKGROUND | 262 |
| A. The *Deepwater Horizon* Incident and Rainey's Involvement | 262 |
| B. The Indictment | 265 |
| C. The Original Dismissal Of Count One | 266 |
| III. PRETRIAL LITIGATION | 267 |
| A. Motions Practice Following The Remand | 267 |
| B. Dealings With The Congressional Parties And Additional Motions Practice | 270 |
| 1. Rainey's Subpoenas Duces Tecum to the Congressional Parties | 270 |
| 2. Rainey's Motion to Compel | 271 |
| 3. Negotiated Voluntary Productions of Documents from Individual Members of Congress Revealed Exculpatory Information | 274 |
| 4. The District Court Denied Rainey's Motion to Compel | 275 |
| 5. The Voluntary Production of Committee and Subcommittee Records With No Meaningful Assurances Regarding Completeness | 277 |
| 6. Rainey's Subpoenas For Trial Testimony to the Relevant Members of Congress and Committee Staff | 277 |
| 7. The Congressional Witnesses Resist Taking Any Position On The Trial Subpoenas | 279 |
| 8. The House of Representative's Amicus Brief in Opposition to Rainey's Motions to Dismiss | 281 |
| 9. The Congressional Witnesses' Motion to Quash | 282 |
| 10. Rainey's Motion for Remedial Relief | 283 |
| 11. The Motion for a Protective Order by the Congressional Witnesses Willing to Testify for the Prosecution | 288 |
| IV. THE DISTRICT COURT'S RULINGS | 289 |
| A. The Court's Order Granting the Congressional Witnesses' Motion To Quash Rainey's Trial Subpoenas | 289 |
| B. The Court's Order Granting Rainey's Pending Motions To Dismiss Count One and for Remedial Relief | 290 |
| C. The Task Force's Motion For Reconsideration | 294 |
| D. The Court's Order Denying the Task Force's Motion for Reconsideration | 295 |
| V. LESSONS LEARNED | 299 |

**\*261  I. INTRODUCTION**

After months of gamesmanship by Members of Congress and their staff, U.S. District Court Judge Kurt D. Engelhardt acquitted former BP executive David Rainey of the lead obstruction of Congress count on the first day of trial in *United States v. David Rainey*, Crim. No. 12-291 (E.D. La.). Rainey was the highest-ranking BP executive charged in the aftermath of the *Deepwater Horizon* oil spill. Even though a congressional subcommittee was the purported "victim" of Rainey's alleged crime, no Member of Congress or congressional staffer was willing to waive the protections of the Speech or Debate Clause of the U.S. Constitution and testify freely at Rainey's trial. Based on documents uncovered during pre-trial discovery, these congressional witnesses

-2665-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

possessed critical exculpatory evidence suggesting that the alleged congressional inquiry was not duly authorized and was simply a frolic by then-Representative, now Senator, Edward Markey (D-MA) acting as an individual Member. Although the court upheld the **\*262** congressional witnesses' assertion of legislative privilege as absolutely protected by the Speech or Debate Clause, it held that the consequences of that privilege assertion were devastating to Rainey's prosecution on the obstruction of Congress charge. To avoid a one-sided, unfair presentation of evidence from the handful of congressional staffers willing to testify as prosecution witnesses, the court excluded all evidence from congressional witnesses and acquitted Rainey of the obstruction of Congress charge on a number of grounds shortly after empaneling the jury. Less than a week later, a New Orleans jury acquitted Rainey of the sole remaining charge alleging that Rainey made a false statement to federal law enforcement agents during an interview a year after the *Deepwater Horizon* incident.

This article analyzes the pre-trial litigation that led to Rainey's acquittal on the obstruction of Congress charge. It also contains the district court's unreported oral decisions from the bench, which addressed an important issue of first impression: the consequences to a criminal case of a fundamental conflict between the Speech or Debate Clause privilege and a criminal defendant's Fifth and Sixth Amendment rights to compulsory process and to present a defense at trial. Finally, it addresses some of the lessons learned from this case, including (1) there is only one United States when it comes to a criminal prosecution, rendering the consequences of a privilege assertion by Members of Congress attributable to the Executive Branch, (2) a criminal defendant's right to compulsory process cannot be vindicated by voluntary testimony limited in scope by the witness, (3) district courts have power to exclude all congressional evidence if a selective invocation of the Speech or Debate Clause privilege leads to a one-sided, unfair presentation of evidence, and may acquit a defendant if the ruling leads to a failure of proof on an essential element, and (4) given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should not pursue a criminal charge that requires congressional testimony if any alternatives are available.

## II. BACKGROUND

### A. The Deepwater Horizon Incident and Rainey's Involvement

David Rainey was a Ph.D. geologist who worked for BP for more than 30 years. In 2010, he was BP's Vice President of Exploration **\*263** for the Gulf of Mexico, the number two exploration job in the company. On April 20, 2010, a blowout of oil and gas occurred on the *Deepwater Horizon* drilling rig in the Gulf of Mexico. Eleven men were killed in the explosion. Over the next 87 days, oil leaked from the damaged well.

After the blowout, Rainey abandoned his normal job responsibilities and worked full time responding to the oil spill. He served on behalf of BP as a Deputy Incident Commander within the Unified Command, the organization coordinating the response to the oil spill. Unified Command consisted of representatives from federal, state and local governments, as well as BP and Transocean, the designated "responsible parties" for the oil spill response.

Among the many responsibilities he handled within the Unified Command, Rainey prepared some early "flow rate" estimates of the number of barrels of oil per day leaking from the well. Rainey estimated flow rate by calculating the volume of the oil on the water using overflight maps and standard protocols that estimate the thickness of oil by color. This methodology was highly uncertain but it was the best available at the time. The unknown conditions of the damaged well prevented BP from using the sophisticated computer modeling programs normally used by reservoir engineers to calculate flow from completed production wells. To account for the uncertainty, Rainey calculated a range of flow rate estimates with a "low," "best guess," and "high" estimate. On April 27, 2010, using this methodology, Rainey estimated a range of flow rate estimates from roughly 1,000 to 6,000 to 14,000 barrels of oil per day.

On April 26, 2010, a scientist from the National Oceanic and Atmospheric Administration ("NOAA") prepared his own estimate of flow rate. Using two methods, the surface methodology relied on by Rainey and a video methodology, the NOAA scientist estimated that the flow rate was approximately 5,000 barrels of oil per day.

-2666-

On April 28, 2010, the Unified Command raised its initial flow rate estimate of 1,000 barrels of oil per day to 5,000 barrels of oil per day. This remained the official government estimate of flow rate until late-May 2010.[1]

 **\*264**  In mid-May 2010, BP released a video clip of the plume of oil leaking into the Gulf. This led various individuals to attempt to estimate the flow rate, including a university professor who estimated the flow rate at 70,000 barrels per day. Soon thereafter, BP's general counsel requested a summary of the efforts to estimate flow rate within the Unified Command that had led to the 5,000 barrels per day estimate. Rainey wrote an internal memorandum for counsel that summarized the flow rate work of which he was aware, which became known as the "Rainey Memo."[2] BP subsequently sent the Rainey Memo to government officials within the Unified Command.

On May 14, 2010, Rep. Markey sent a letter to BP on letterhead of the House of Representative's Committee on Energy and Commerce requesting a variety of information regarding flow rate, including BP's current flow rate estimate and all documents that related to estimates of the amount of oil being released.[3] Rainey was asked to use his recently prepared Rainey Memo to draft a response to Rep. Markey's questions. After he did so, a team of BP executives and in-house and outside counsel revised and finalized the draft, ultimately sending the response  **\*265**  to Rep. Markey on May 24, 2010 with a copy of the Rainey Memo.[4]

Months later, after the well was capped, the U.S. Department of Justice created the *Deepwater Horizon* Task Force (the "Task Force") to investigate the circumstances leading up to the blowout and BP's actions during the response to the oil spill. Among other issues, the Task Force investigated whether BP intentionally understated and attempted to mislead the public and government officials about the flow rate.

On April 6, 2011, the Task Force interviewed Rainey in New Orleans, Louisiana. A colleague and I represented Rainey during the all-day interview. Three prosecutors, two law enforcement agents, and a paralegal participated for the Task Force. The interview was not recorded or transcribed. An FBI agent was the sole government participant who took notes during the interview. The FBI subsequently generated a 33-page, single spaced Form FD-302 summarizing the interview.[5]

## B. The Indictment

On November 14, 2012, Rainey was charged in a two-count indictment.[6] The indictment alleged that after Rainey received the NOAA flow rate estimate of 5,000 barrels of oil per day, he "reverse engineered" his own flow rate estimates to achieve consistent results.  **\*266**  The indictment accused Rainey of lying about his flow rate estimates in the Rainey Memo, in BP's response to Rep. Markey's letter, and during his Task Force interview. Count One alleged that Rainey obstructed a congressional investigation, in violation of 18 U.S.C. § 1505. Count Two alleged that Rainey made a false statement during his interview with the Task Force, in violation of 18 U.S.C. § 1001.

The obstruction of Congress charge alleged that following the *Deepwater Horizon* blowout, the Subcommittee on Energy and Environment, a subcommittee of the U.S. House of Representatives' Committee on Energy and Commerce, initiated an investigation into the amount of oil flowing from the well. It alleged that the May 14, 2010 letter from Rep. Markey, the Subcommittee Chairman, was part of the Subcommittee's investigation. The indictment accused Rainey of misleading the team of BP in-house and outside lawyers working on BP's response to the letter, and thereby causing BP to submit a false and misleading response to Rep. Markey. Among other things, the indictment accused Rainey of withholding documents and information inconsistent with the 5,000 barrels per day flow rate estimate, and causing BP to provide Rep. Markey with the Rainey Memo that allegedly contained false and misleading statements defending his flow rate estimates.

Rainey pleaded not guilty to the charges. He maintained that he acted in good faith and his flow rate estimates were legitimate and honest. He also categorically denied making any misrepresentations about his flow rate estimates in any forum. On Rainey's

behalf, we also maintained that there was no basis for the obstruction of Congress charge because Rep. Markey sent his letter in an individual capacity and not as part of any authorized congressional inquiry.

## C. The Original Dismissal Of Count One

On May 20, 2013, Judge Engelhardt dismissed Count One of the indictment, holding that Section 1505 did not apply to subcommittee investigations.[7] Analyzing Section 1505's language prohibiting obstruction of "any inquiry or investigation . . . being had by . . . any committee of either House," the district court held: "after consulting the text, context, and legislative history, the Court cannot 'say with  **\*267**  certainty' that Congress intended section 1505 to reach subcommittee inquiries."[8]

On appeal, the Fifth Circuit reversed and remanded the case for trial.[9] In its ruling, however, the court noted a limitation on the scope of Section 1505 that would become central to the legal proceedings before the district court on remand. The court stated that "[a] successful prosecution under § 1505 must arise from the obstruction of 'the *due and proper exercise of the power of inquiry* under which any inquiry or investigation is being had.'"[10] The court cited a decision in which the Fourth Circuit held that: "'[t]he question of whether a given congressional investigation is a 'due and proper exercise of the power of inquiry' for purposes of § 1505 can not be answered with a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances."[11] The Fifth Circuit in *Rainey* went on to state:

> With this discernment in mind, we observe that unauthorized frolics by a House entity might lose protection regardless of its committee status because there would be no 'due and proper exercise of the power of inquiry' to obstruct. Indeed, Rainey invoked this statutory restraint below in a motion to dismiss count one, but the district court denied this motion without prejudice. In sum, § 1505 is powerful, but not without internal restraints.[12]

Although we were disappointed by the Fifth Circuit's ruling, we viewed this statement, which was not necessary to the court's holding, as a potential signal to the district court to credit our argument that Rep. Markey's letter was an individual frolic not covered by the obstruction of Congress statute.

## III. PRETRIAL LITIGATION

### A. Motions Practice Following The Remand

Following the remand, the Task Force secured a superseding indictment on September 19, 2014, which contained the same two charges with minor modifications.[13] On behalf of Rainey, we moved to  **\*268**  dismiss Count One on three distinct grounds.

First, we argued that there was no "due and proper exercise of the power of inquiry" by a subcommittee as required by Section 1505.[14] We contended that there was no specific authorization of the subcommittee investigation alleged in the indictment, and that the general authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment was insufficient to authorize an "investigation" for purposes of Section 1505. We also asserted that Rep. Markey's actions could not be automatically attributed to the Subcommittee solely based on his status as its chairman. We relied heavily on a series of cases from the McCarthy era involving the House Un-American Activities Committee and other aggressive congressional inquiries, in which the Supreme Court required clear and specific authorization of any congressional investigation before there could be a conviction under the related contempt of Congress statute.[15]

Second, we argued that Rep. Markey sent the May 14, 2010 letter as an individual Member of Congress and not pursuant to any investigation by the Subcommittee on Energy and Environment.[16] Moreover, we contended that the Committee on Energy

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

and Commerce carried out its investigation into the *Deepwater Horizon* incident through its Subcommittee on Investigations and Oversight, not the Subcommittee on Energy and Environment. Thus, BP's response to the May 14 letter was not within the scope of 18 U.S.C. § 1505. Although these arguments were fact-based, we supported them with documentary exhibits from the public domain and relied on a series of cases giving district courts the power to dismiss an indictment where the essential facts are undisputed and reveal that an element of the offense is missing.[17]

**\*269**  Third, we argued that Section 1505 was unconstitutionally vague as applied to the allegations in the case.[18] The obstruction statute vaguely defines "corruptly," the criminal intent standard required, as acting with an "improper purpose."[19] We asserted that this language did not give fair warning that failing to disclose information in response to a voluntary congressional request where there was no legal duty to disclose was covered by the statute.

We recognized that the district court might conclude that the issues we had raised in these motions were factual disputes to be resolved by the jury. Therefore, we took steps to aggressively pursue evidence supporting our claim that Rep. Markey acted on his own without proper authorization. Specifically, we moved for authorization to serve early-return subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities.[20] We knew the federal rules of criminal procedure limited the scope of discovery a defendant could obtain from third parties, and we anticipated that the congressional witnesses and entities would likely object to the subpoenas. As a result, we narrowly tailored the proposed subpoenas to seek documentary evidence solely regarding whether there was an authorized investigation within the scope of 18 U.S.C. § 1505. We deliberately failed to seek a broader set of documents relevant to our defense in order to maximize the likelihood that the district court would authorize the subpoenas.

The district court held a motions hearing on December 3, 2014. In discussing the motions related to Count One, the court noted that the Fifth Circuit had identified a "limiting principle" in Section 1505, that is "whether or not an investigation is duly authorized."[21] According to the court:

> **\*270**  The reason for that is to prevent a member of Congress, whether it's Senator McCarthy or somebody else, from hauling off and doing a solo act investigation . . . and issuing subpoenas to people to appear all over the place and putting them on the rack to question them.[22]

The court took under advisement the motions to dismiss Count One. With respect to the early-return subpoenas, the court stated: "I'm more convinced now that the information [sought in the subpoenas] is material both for pretrial motion purposes as well as trial purposes."[23] Thus, the court authorized Rainey to serve the early-return document subpoenas on the congressional entities and individuals.[24]

## B. Dealings With The Congressional Parties And Additional Motions Practice

### 1. Rainey's Subpoenas Duces Tecum to the Congressional Parties

In December 2014, Rainey served the subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities. On behalf of the congressional subpoena recipients, the U.S. House of Representatives General Counsel's office ("House Counsel") objected to the document subpoenas and declined to comply. Among other things, House Counsel asserted that the subpoena recipients were absolutely protected against making a compelled disclosure of legislative materials by the Speech or Debate Clause.[25] House Counsel offered to make a voluntary production of documents in lieu of subpoena compliance on behalf of the individual Members of Congress.

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

With respect to the Committee on Energy and Commerce and the Subcommittee on Energy and Environment, however, House Counsel flatly declined to comply on Speech or Debate Clause and other grounds.[26]

When these congressional witnesses and entities refused to  **\*271**  comply with Rainey's document subpoenas, we knew we had a real opportunity to challenge the viability of the obstruction of Congress count. Based on the discovery we received from the Task Force, it was apparent that the prosecutors had not fully explored the authorization issue during the investigation. The only congressional records in the Task Force's massive discovery production were a small set of materials obtained informally from one of Rep. Markey's staff members. Moreover, while the Task Force had interviewed a few Markey staffers during the investigation, they had not interviewed Rep. Markey himself or any other Members of the Committee or Subcommittee. Thus, aside from the opinions of a few Markey staffers, the Task Force possessed no evidence that Rep. Markey's letter was part of an authorized Subcommittee investigation. We were convinced that no such evidence existed. We also believed that truthful testimony from congressional witnesses who did not work for Rep. Markey would confirm as much. Yet we were faced with a serious problem: assuming the congressional witnesses would raise the same objections to testimonial subpoenas, Rainey had no ability to compel this favorable evidence if the district court upheld the objections. Our strategy going forward was designed to compel the production of this favorable congressional evidence or obtain the dismissal of the obstruction of Congress charge.

### 2. Rainey's Motion to Compel

On February 2, 2015, Rainey moved to compel compliance with the document subpoenas.[27] We maintained that the documents sought were central to a key element of the charged offense, whether the alleged investigation was a "due and proper exercise of the power of inquiry" by the Subcommittee. We also argued that Rainey's rights to compel the production of such evidence, and to present material evidence at trial, were guaranteed by the Fifth and Sixth Amendments.

We raised several arguments in response to the congressional parties' Speech or Debate Clause objections. First, relying on *Gravel v. United States*, 408 U.S. 606 (1972), we argued that the Speech or Debate Clause does not forbid disclosure of legislative act evidence if the evidence is "relevant to investigating possible third-party crime," where the legislative act is "in itself not criminal" and the legislator faces  **\*272**  neither criminal nor civil liability.[28] Specifically, we argued that the Speech or Debate Clause did not contain a non-disclosure privilege precluding the production of documents regarding legislative acts. The only circuit that had endorsed a "non-disclosure privilege" is the D.C. Circuit in *United States v. Rayburn House Office Building, Rm. 2113*, 497 F.3d 654 (D.C. Cir. 2007), where a divided panel concluded that the Executive Branch violated the Clause by executing a search warrant of Representative William Jefferson's congressional office. We relied on *In re Grand Jury Investigation (Eilberg)*, 587 F.2d 589 (3d Cir. 1978), where the Third Circuit enforced a grand jury subpoena for a congressman's telephone bills, stating that "the privilege when applied to records or third-party testimony is one of nonevidentiary use, not of non-disclosure."[29] We also relied on *United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011), where the Ninth Circuit similarly declined to recognize "some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize."[30]

Second, we argued that even if the Speech or Debate Clause applied to the production of documents in a third-party criminal case, Rainey's constitutional rights to compel production of evidence and present a defense under the Fifth and Sixth Amendments outweighed that interest. Noting that "the authors of the Bill of Rights did not undertake to assign priorities" between amendments, "ranking one as superior to the other,"[31] we urged the district court to balance the competing constitutional interests in Rainey's favor given the fundamental constitutional right of a criminal defendant to present a complete defense.[32] We relied on cases involving other analogous privileges, such as the state secrets privilege,[33] the warmaking power,[34]  **\*273** the executive privilege,[35] and the informers privilege,[36] where courts have held that those privileges cannot trump a criminal defendant's constitutional rights. We also relied on a long history of Supreme Court cases enforcing subpoenas for evidence served on both Members of Congress and Presidents.[37]

USCA Case #22-3086      Document #1997762         Filed: 05/03/2023      Page 474 of 496
Case 1:22-mc-00060-CJN    Document 7-2   Filed 06/27/22   Page 8 of 30

Finally, we argued that any Speech or Debate Clause privilege had been waived by selective invocation of the privilege, where the congressional parties had produced certain documents to the Task Force and permitted select congressional staff members to be interviewed during the investigation. We knew we faced an uphill battle given the Supreme Court's holding in *United States v. Helstoski*, 442 U.S. 477 (1979), that a waiver of the Speech or Debate Clause requires a "clear and unambiguous [] expression of waiver."[38] Nonetheless, we urged the district court to follow analogous precedent from the attorney-client and work product context holding that a privilege holder may not wield a privilege as both a sword and a shield in an unfair manner presenting a distorted view of the subject matter covered by the privilege assertion.[39]

**\*274  *3. Negotiated Voluntary Productions of Documents from Individual Members of Congress Revealed Exculpatory Information***

While the motion to compel was pending, we agreed to withdraw the document subpoenas to the individual Members of Congress in exchange for the voluntary production of documents responsive to the subpoena requests. We hoped that the voluntary productions would contain exculpatory evidence and knew that we would still be able to litigate the Speech or Debate Clause issues with the Committee and Subcommittee, which had flatly refused to provide any information responsive to the subpoenas. On behalf of the individual Members, House Counsel voluntarily produced documents with an express reservation that by doing so, the individual Members did not waive the protections of the Speech or Debate Clause. The ensuing voluntary productions contained a wealth of exculpatory evidence strongly suggesting that the May 14, 2010 letter from Rep. Markey was not part of any authorized investigation by the Subcommittee on Energy and Environment. We outlined this exculpatory evidence in a supplemental memorandum in support of Rainey's motions to dismiss Count One of the indictment.[40] Notably, the documents revealed that Rep. Markey and his staff did not seek authorization from the Committee on Energy and Commerce or the Subcommittee on Energy and Environment to send the May 14, 2010 letter to BP. The individuals who drafted and edited the May 14, 2010 letter were all Rep. Markey's personal staffers or staffers from a different committee that Markey chaired. These staffers originally drafted the letter to be sent by Rep. Markey on behalf of that different committee--the Select Committee on Energy Independence and Global Warming. Only at the last minute did they change the signature block to the Subcommittee on Energy and Environment.

More importantly, the documents revealed conclusively that Rep. Markey did not share the May 14, 2010 letter with the Committee or Subcommittee before he sent it to BP. Indeed, the ranking minority member of the Subcommittee possessed no documents responsive to Rainey's subpoena. Moreover, Rep. Markey failed even to notify Committee staff that he had sent a letter to BP requesting information  **\*275**  until hours after sending the letter to BP. Upon learning of Rep. Markey's request, committee staffers voiced disapproval of the unilateral manner in which Rep. Markey had sought information. An email from the Committee on Energy and Commerce's chief counsel to its majority staff director stated: "This doesn't seem like the way things ought to work. Markey sent a letter to BP as Chair of E&E on E&C letterhead asking for certain BP documents to be produced with 24 hours. We received no heads up until after the letter was sent (and I think in the press)." In addition, Rep. Markey's staffers noted that they had available "stashes" of Committee letterhead that could be used for the letter, calling into question claims by the Task Force that Rep. Markey's use of Committee on Energy and Commerce letterhead carried significance on the authorization issue.[41]

*4. The District Court Denied Rainey's Motion to Compel*

On February 23, 2015, the district court held a hearing on the motion to compel. House Counsel took the position that the Speech or Debate Clause barred Rainey from compelling production of the documents. However, House counsel suggested that Rainey should ask for the documents voluntarily and the Committee and Subcommittee might produce them.[42] Yet counsel was unwilling to make any commitments, stating: "I don't know that the committee has any additional responsive documents. We don't know that yet. The answer might be yes, might be no. I don't know whether the committee would be willing to produce that, would be willing to not assert its Speech or Debate rights."[43]

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 475 of 496

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....
Case 1:22-mc-00060-CJN    Document 7-2    Filed 06/27/22    Page 9 of 30

The district court noted that the Fifth Circuit in *Rainey* had suggested that the issue of whether a congressional investigation was duly authorized must be "answered by a careful examination of all the surrounding circumstances."[44] The court asked House Counsel: "So how would a defendant in Mr. Rainey's position be able to broach that issue **\*276** and present that issue to the Court or, if need be, to the jury without information such as what has been subpoenaed in this case?"[45] House Counsel declined to answer, deferring to the prosecutors to explain the impact of the Speech or Debate Clause assertion.[46]

At the end of the hearing, the district court denied Rainey's motion to compel from the bench, accepting the House Counsel's argument that the Speech or Debate Clause prevented Rainey from compelling the production of legislative documents for his defense. However, in a foreshadowing of the district court's ultimate decision, the court raised serious concerns with the implications of its ruling:

> I think there were portions of the argument today, the obvious questions are what the implications of the Court's ruling are in terms of Count 1 in this case, and I recited a passage from the Fifth Circuit's opinion in this case-- in this case--which troubles me greatly in terms of where we are.

> I think there are some evidentiary issues. There are issues relative to the viability of Count 1. And I might even add again, which I commented on a short while ago, on page 20 the Fifth Circuit has even seen fit to question whether § 1505 has a jurisdictional element, which touches upon some of the very documents which may or may not exist in connection with the subpoena that the Court cannot compel a response to.

> Moreover, my appreciation of the cases that are cited by counsel for the House are that the Court cannot even indulge in an ex parte or an in camera review of those documents for the same reasons that have been argued by the House here today. So we are sort of at a crossroads in the case, a very interesting one, and one that I think is troublesome in terms of the Fifth and Sixth Amendment arguments that have been made by the defendant.

> There is no request in this case for relief along those lines because, obviously, the Court hadn't made a decision on the subpoena. So now that we have a decision on the subpoena, we will go from here.[47]

The district court confirmed its ruling in a minute order issued the same day.[48]

### *277 5. The Voluntary Production of Committee and Subcommittee Records With No Meaningful Assurances Regarding Completeness

Following the district court's ruling, with no ability to compel the production of documents, Rainey asked the Committee on Energy and Commerce and Subcommittee on Energy and Environment to voluntarily produce all documents responsive to the document requests in his subpoenas *duces tecum*. Given the importance of the documents to the authorization element of 18 U.S.C. § 1505, we sought to ensure that the voluntary production would be as comprehensive as compliance with the subpoenas. Specifically, we requested that the House Counsel identify the nature and extent of hard copy and electronic records maintained by the Committee and Subcommittee, the document custodians whose hard copy and electronic records would be searched as part of the voluntary production, and the key words that would be used to search for responsive documents.[49]

-2672-

On behalf of the Committee and Subcommittee, House Counsel voluntarily produced a mere 57 pages of responsive documents, again with an express reservation that those entities were not waiving the Speech or Debate Clause privilege. However, House Counsel did not identify the custodians whose files were searched, the key words that were used for any electronic searches, or any of the other information requested by Rainey.[50] The voluntarily produced documents did not contain any discussion of an inquiry or investigation by the Subcommittee. The documents also failed to show any Committee or Subcommittee involvement in drafting Rep. Markey's May 14, 2010 letter to BP, or even awareness of the letter before Rep. Markey sent it to BP and the media.

*6. Rainey's Subpoenas For Trial Testimony to the Relevant Members of Congress and Committee Staff*

Based on the disclosure of exculpatory information, we asked to interview Rep. Markey, Rep. Henry Waxman (the Chairman of the Committee on Energy and Commerce), and Rep. Bart Stupak (the **\*278** Chairman of the Committee on Energy and Commerce's Subcommittee on Investigation and Oversight), as well as six Committee on Energy and Commerce staffers who sent or received the exculpatory emails in Rep. Markey's voluntary document production.[51] By 2015, neither Waxman nor Stupak was a Member of the House, and Markey was a U.S. Senator. On behalf of all nine witnesses, the House General Counsel's office informed Rainey that each of the Members and staffers declined to be interviewed.[52] Thereafter, on March 10, 2015, Rainey served subpoenas for trial testimony on Reps. Markey, Waxman, and Stupak, as well as the six Committee on Energy and Commerce staff members.[53]

The testimony of the Members was also relevant because the Task Force had asserted that there was an informal agreement between Reps. Waxman, Markey, and Stupak that authorized the Subcommittee investigation. Specifically, in a bill of particulars ordered by the district court, the Task Force alleged: "Chairman Markey of the Subcommittee, Chairman Henry Waxman of the Committee, and Chairman Bart Stupak of the Subcommittee on Oversight and Investigations, and their respective staff, reached an understanding on how to divide the jurisdiction of the Committee's overall investigation into the *Deepwater Horizon* blowout and oil spill."[54] Notably missing from the bill was any allegation specifying when the Members reached this purported understanding. Moreover, the documents voluntarily produced by Rep. Markey called into question this allegation. As a result, Rainey sought to compel trial testimony from the relevant individuals in support of his defense.

In early-April 2015, with the trial date less than two months away, we attempted to learn the congressional witnesses' position on Rainey's request for trial testimony and whether a motion to quash was forthcoming. In a telephone conversation, House Counsel indicated that **\*279** the subpoena recipients would likely move to quash, but might agree to voluntary testimony, although no decisions had been made and there was no timetable for the witnesses to decide. Accordingly, on April 13, 2015, Rainey asked the district court to set a deadline for the nine subpoenaed witnesses to file any motion to quash and to notify the parties whether they would voluntarily provide trial testimony without invoking the Speech or Debate Clause privilege.[55]

*7. The Congressional Witnesses Resist Taking Any Position On The Trial Subpoenas*

On April 16, 2015, on behalf of the nine congressional witnesses, House Counsel opposed Rainey's request that the district court set a deadline for any motion to quash and decisions concerning potential voluntary testimony.[56] House Counsel contended that because the trial subpoenas were not returnable until June 1, 2015, the first day of trial, the district court lacked any "coercive power" over the subpoena recipients, and the subpoena recipients were under no obligation to take any positions until that time. In addition, House Counsel maintained that Rainey's pending motions to dismiss Count One rendered his request premature, because a dismissal could moot any need for the requested testimony. House Counsel also noted that three congressional staffers on the Task Force's witness list had agreed to testify at trial on the authorization issue without asserting (but supposedly without waiving) the Speech or Debate Clause in response to the prosecutors' questions or cross-examination questions "within the scope of direct about those same issues." Thus, according to House Counsel, Rainey would have an opportunity to question

-2673-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

congressional witnesses about the authorization issue. House Counsel noted that they were "uncertain at this time" whether Reps. Markey and Waxman, who were also on the Task Force's witness list, would testify at trial.[57]

At a status conference on April 22, 2015, the district court indicated that it would not rule on Rainey's pending motions to dismiss until it understood whether the congressional witnesses subpoenaed by Rainey would testify at trial. During the status conference, the Task **\*280** Force represented that Reps. Waxman and Markey had not yet agreed to testify in the Task Force's case, and would not decide whether to testify until the district court resolved Rainey's pending motions to dismiss.[58] In other words, these Members of Congress who possessed critical evidence on the authorization issue wanted to "wait and see" before deciding whether to testify for either side. This was particularly galling in the case of Rep. Markey, who had repeatedly demanded information in real time from BP during the emergency response to the oil spill, including requiring executives to participate in briefings and hearings in Washington, D.C.[59] Yet when it came time for Rainey to defend himself, Rep. Markey was unwilling to commit to testifying for either the prosecution or the defense.

On April 23, 2015, Rainey formally moved the district court to set a deadline for the congressional witnesses.[60] Among other things, **\*281** Rainey argued that the parties needed to know the congressional witnesses' positions on trial testimony sufficiently far in advance of trial to permit Rainey to seek relief if those witnesses declined to testify.

Later that same day, House Counsel filed a notice of intent to file a motion to quash on behalf of the nine congressional witnesses.[61] However, House Counsel asked the court not to set any deadline for the congressional witnesses to decide whether, and under what conditions, they would be willing to voluntarily testify at trial without invoking the Speech or Debate Clause privilege.[62]

### 8. The House of Representative's Amicus Brief in Opposition to Rainey's Motions to Dismiss

In the middle of the subpoena litigation, the Bipartisan Legal Advisory Group of the U.S. House of Representatives (the "House") filed an amicus brief in opposition to Rainey's motions to dismiss Count One, authored by the same attorneys fighting Rainey's subpoenas for trial testimony from the congressional witnesses.[63] The House reiterated many of the same arguments advanced by the Task Force. Specifically, the House claimed that the standing authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment, as evidenced in their rules and a post-hoc "Activity Report" of the Committee, provided sufficient authority to initiate the investigation alleged in the indictment. The House's brief was remarkably strident and dismissive of Rainey's arguments, which the district court had been considering for months, removing any doubt that the House was a partisan supporting the Task Force's efforts to convict Rainey.[64]

### **\*282** 9. The Congressional Witnesses' Motion to Quash

On May 8, 2015, all nine congressional witnesses moved to quash the trial subpoenas served by Rainey.[65] The congressional witnesses principally contended that they were absolutely protected by the Speech or Debate Clause from being compelled by Rainey to testify in his criminal trial.[66] They argued that the testimony sought by Rainey regarding the authorization of the alleged congressional investigation related to core legislative acts squarely within the scope of the Clause.[67] In addition, the congressional witnesses observed that while the protection afforded by the Speech or Debate Clause "undeniably is broad, the Supreme Court long ago acknowledged and accepted the potential costs associated [with] those broad protections."[68] In other words, the congressional witnesses claimed that the Speech or Debate Clause trumped Rainey's right to present a meaningful defense in his criminal trial.

-2674-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

On May 13, 2015, Rainey opposed the motion to quash.[69] With respect to the Speech or Debate Clause, we reiterated many of the arguments we had advanced in our effort to compel compliance with Rainey's document subpoenas, namely that: (1) the Speech or Debate Clause allows questioning of legislators and their aides about legislative acts in third-party criminal cases that do not call into question the legality of those acts or assert liability against the witnesses; (2) the Speech or Debate Clause must be balanced against a criminal defendant's Fifth and Sixth Amendment rights, and such balancing favored Rainey's rights in this case; and (3) the congressional witnesses had waived the Speech or Debate Clause protection through selective **\*283** invocation of the privilege.[70] We acknowledged, however, that if the district court adhered to its earlier Speech or Debate Clause ruling, the same reasoning would support quashing the trial subpoenas.

### 10. Rainey's Motion for Remedial Relief

We anticipated that the district court was likely to adhere to its earlier reasoning and quash the trial subpoenas. Given the rapidly approaching trial date, however, we were concerned the district court would not have sufficient time to consider the consequences of that ruling on Rainey's criminal trial. As a result, on May 8, 2015, Rainey filed a motion for remedial relief in light of the congressional witnesses' refusal to testify.[71] House Counsel had indicated that congressional staffers closely associated with Rep. Markey would testify voluntarily for the Task Force without invoking privilege. At the same time, they maintained that the congressional witnesses subpoenaed by Rainey could not be compelled to testify and would not commit to testifying voluntarily without invoking the Speech or Debate Clause. No court had previously determined the proper remedy when witnesses with material, exculpatory, noncumulative evidence refuse to comply with a criminal defendant's trial subpoenas on Speech or Debate Clause grounds.[72] In our view, it made no difference that the Legislative Branch was asserting privilege while the Executive Branch was leading the prosecution, because the net result was the same: the United States was simultaneously prosecuting Rainey and relying on privilege assertions to deprive him of critical exculpatory evidence. Therefore, Rainey sought two forms of relief based on the unavailability of these congressional witnesses.

First, we argued that Rainey could not be tried for obstructing Congress, based in large part on the testimony of congressional witnesses favorable to the Task Force on the issue of a duly authorized investigation, while government privilege assertions simultaneously prevented Rainey from calling his own witnesses to challenge the Task **\*284** Force's case on that issue.[73] We relied on case law establishing that evidentiary privileges cannot trump a defendant's constitutional rights to compulsory process and due process. We analogized this case to charges dismissed where the government attempted to prosecute a defendant while declining on privilege grounds to produce witness statements of government informants,[74] or the identities of undercover agents.[75] In particular, we relied heavily on *United States v. Fernandez*, 913 F.2d 148, 163-64 (4th Cir. 1990), where the defendant was charged with making false statements about his work for the CIA but prevented by government privilege assertions from fully explaining the nature of his classified work and the context behind his statements. The Fourth Circuit affirmed the dismissal of the indictment, noting that "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution. . . . [C]ourts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence."[76] Similarly, in our case, where a government privilege assertion prevented Rainey from compelling witnesses with exculpatory information to testify in his defense, we argued that the proper remedy was dismissal of the charge.

Second, in the alternative, we argued that the district court should exclude any evidence offered by the Task Force on the issue of authorization. Relying on *United States v. Nobles*, 422 U.S. 225 (1975), **\*285** and other "sword and shield" cases prohibiting selective privilege assertions, we urged the court to prevent the Task Force from presenting a one-sided view of the evidence through a handful of favorable congressional staffers who did not intend to invoke the Speech or Debate Clause privilege, while Rainey was precluded based on government privilege assertions from compelling exculpatory testimony on the same subjects from other staffers and Members of Congress. Based on the subpoenaed congressional witnesses' advance notice that they were unwilling to waive the Speech or Debate Clause privilege, we requested a pretrial ruling excluding the one-sided testimony that the Task Force intended to offer on the authorization issue.[77]

On May 18, 2015, the Task Force opposed Rainey's motion for remedial relief on several grounds.[78] Relying on *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014), the Task Force argued that a defendant's right to present a defense must yield to the Speech or Debate Clause privilege and is not subject to any balancing.[79] In any event, the Task Force argued, Rainey had not sufficiently demonstrated that the Speech or Debate Clause privilege assertion was depriving him of specific material, exculpatory evidence necessary to present his defense. The Task Force also claimed the testimony sought by Rainey was cumulative because other congressional staffers who would be testifying at trial could be questioned on the authorization issue.

Significantly, the Task Force also maintained there was a distinction between a privilege assertion by the Executive Branch and the Legislative Branch of the government. The Task Force claimed that the Executive Branch did not control the Speech or Debate Clause privilege of the congressional witnesses and was not invoking privilege to deprive Rainey of evidence. Thus, the Task Force argued that the authority relied on by Rainey stood only for the proposition that the *Executive Branch* may be forced to elect between waiving a privilege or dismissing the prosecution. Similarly, the Task Force contended that the "sword and shield" doctrine applied only when a party asserts a **\*286** privilege selectively. According to the Task Force, where the *Legislative Branch* invokes the Speech or Debate Clause privilege, such action cannot be attributed to the Executive Branch and did not justify the relief sought by Rainey.

House Counsel also opposed Rainey's motion for remedial relief.[80] Most notably, House Counsel asserted in conclusory fashion that the testimony Rainey sought from the congressional witnesses would not be exculpatory because each of the witnesses would supposedly testify that he or she believed the alleged Subcommittee on Energy and Environment investigation was duly authorized.[81] These bald representations were not accompanied by any affidavits or statements from the witnesses, each of whom had declined even to be interviewed by Rainey's counsel.[82] In addition, House Counsel argued that the selective waiver or "sword and shield" doctrine was simply inapplicable in the Speech or Debate Clause context.[83] House Counsel also contended that the Legislative Branch controlled the Speech or Debate Clause assertions, which, in their view, "may not be attributed to, and should not be wielded so as to penalize, the prosecution."[84]

In our reply brief, we argued that it did not matter that the Legislative Branch, not the Executive Branch, was selectively invoking privilege to suppress evidence favorable to Rainey.[85] We relied principally on two cases for this proposition. First, in **\*287** *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ("*North I*"), where Congress granted Colonel Oliver North immunity over the objections of the Executive Branch, the court held that North was entitled to a full *Kastigar* hearing, and stated that:

> the Fifth Amendment requires that the government establish priorities before making the immunization decision. The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted.[86]

In a follow-up decision, the D.C. Circuit made clear that "the government" meant the United States as a whole, and not simply the Executive Branch. In response to the argument that penalizing prosecutors for congressional immunity decisions would unduly restrict Congress's investigative role, the court responded:

> When Congress grants immunity before the prosecution has completed preparing its "case," the prosecutor, whoever that may be, can warn that the grant of immunity has its institutional costs; in this case, the [Independent Counsel] indeed warned Congress that "any grant of use and derivative use immunity would create serious--and perhaps insurmountable--barriers to the prosecution of the immunized witness." . . . The decision as to whether the national interest justifies that institutional cost is, of course, a political one to be made by Congress. Once made,

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

however, that cost cannot be paid in the coin of a defendant's constitutional rights. That is simply not the way our system works. The political needs of the majority, or Congress, or the President never, never, never, should trump an individual's explicit constitutional protections.[87]

Second, we relied on *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975), a case involving the military prosecution of Lieutenant William Calley in connection with the My Lai incident during the Vietnam War. In that case, while Calley's military prosecution was pending, a House subcommittee conducted its own investigation of the My Lai incident, taking extensive evidence in executive session.[88] When Calley sought that evidence for use in his defense, the subcommittee refused to **\*288** disclose it, and the military court denied the request as a fishing expedition.[89] On appeal, the Fifth Circuit rejected Calley's claim of a Due Process violation because the defense had conceded the evidence was not exculpatory but merely relevant for impeachment of witnesses.[90] Importantly, however, the court stated:

> We do not consider whether the Hebert Subcommittee could properly invoke its congressional privilege and correctly refuse to furnish the requested testimony. The issue before us is not the legality of this action, but rather the effect of denying the testimony to the defense. Even if the privilege were properly invoked and the testimony validly withheld, the withholding of the material might require the Government to let the petitioner go free if he was denied evidence essential to his defense.[91]

Because a congressional invocation of privilege deprived Rainey of evidence critical for his defense, we argued that the required result should be dismissal--even though the privilege was invoked by a House Subcommittee, rather than the prosecutors.[92]

### *11. The Motion for a Protective Order by the Congressional Witnesses Willing to Testify for the Prosecution*

On May 27, 2015, three business days before trial was set to begin, the four congressional staffers willing to testify voluntarily for the prosecution moved for a protective order limiting the scope of their testimony to specific legislative activities outlined by the witnesses.[93] As to all other activities and topics, the staffers indicated that they intended to assert the Speech or Debate Clause privilege to decline to answer questions. We viewed this tactic as a gift that played right into our argument that gamesmanship by the congressional witnesses was depriving Rainey of critical defense evidence.

On May 29, 2015, we opposed the motion for protective order and cross-moved to exclude all testimony by the four congressional **\*289** staffers.[94] We argued that permitting the staffers to testify only on limited topics would violate Rainey's Sixth Amendment right to meaningfully cross-examine the witnesses against him, and countenance a fundamentally unfair sword-and-shield use of the Speech or Debate Clause.[95] Specifically, the list of enumerated topics would have prevented Rainey from cross-examining the staffers about several relevant topics, including the investigative actions taken by a different committee chaired by Rep. Markey, and actions taken during different investigations by the Subcommittee on Energy and Environment. These and other areas covered by the proposed protective order would have shown that the "investigation" alleged in the indictment was fundamentally different than a normal, duly authorized congressional investigation.[96] Limiting the staffers' testimony in the manner requested would have also prevented Rainey from asking the staffers about their and Rep. Markey's history of actions adverse to the oil and gas industry, which was relevant to the witnesses' bias and prejudice against Rainey.[97] Accordingly, we asked the district court to deny the motion for a protective order and exclude all evidence from the congressional staffers. We believed the Task Force would be unable to prove its case without this staffer testimony and sought to capitalize on what we viewed as a tactical blunder by House Counsel that would not be viewed favorably by the district court.

-2677-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

## IV. THE DISTRICT COURT'S RULINGS

On June 1, 2015, the district court engaged in the *voir dire* process and empaneled a jury by early afternoon. At that point, jeopardy attached to Rainey's trial on Counts One and Two of the indictment.[98]

### A. The Court's Order Granting the Congressional Witnesses' Motion To Quash Rainey's Trial Subpoenas

After sending the jury home for the day, the district court **\*290** addressed the congressional witnesses' motion to quash. The court first asked the parties and House Counsel if anyone had anything to add to the pleadings that had been filed. All parties rested on their papers. Thereafter, the court summarily granted the congressional witnesses' motion to quash Rainey's trial subpoenas.[99]

### B. The Court's Order Granting Rainey's Pending Motions To Dismiss Count One and for Remedial Relief

The district court next addressed Rainey's pending motions to dismiss and his motion for remedial relief in light of the unavailability of the congressional witnesses, as well as the motion for a protective order filed by the four congressional staffers willing to testify for the prosecution. The court issued its ruling orally from the bench.

After the court summarized the parties' arguments on Rainey's motions to dismiss, it explained that it had deferred ruling on the motions while Rainey pursued congressional documents through the subpoena process. Although the court had granted Rainey permission to serve subpoenas on the congressional witnesses, it ultimately upheld their assertion of the Speech or Debate Clause privilege and denied Rainey's motion to compel compliance with the subpoenas. Thereafter, Rainey could only obtain the documents that the congressional witnesses and entities agreed to provide voluntarily. The court appeared to recognize that these voluntary document productions were deficient, stating:

> [T]he House . . . voluntarily produced a number of documents without representing the scope of the search performed, the terms used, or the extent to which it would not produce certain documents as privileged. There is no representation in response that the document production was otherwise in compliance with the scope of the subpoena that was issued and then withdrawn.[100]

Nonetheless, the voluntarily produced documents proved invaluable to Rainey's case. Critically, the district court held that those documents could be reasonably and plausibly read to call into question the existence of an authorized inquiry by the Subcommittee:

> [T]he defendant contended that the documents produced by the House further demonstrate that the May 14 letter was not part of any duly authorized inquiry or investigation. In support of his **\*291** argument, the defendant points to a number of e-mails and letter correspondence demonstrating, in the defendant's view, that the subcommittee was not authorized to conduct an investigation into the spill, nor was Representative Markey's letter a part of a duly authorized investigation. . . .

> At the very least, the defendant argues, the letters and e-mails produced call into question whether the Subcommittee on Energy and Environment was properly investigating the spill and whether Representative Markey's service as chairman of that subcommittee sent the May 14 letter as a due and proper exercise of the power of inquiry.

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

The Court finds the defendant's arguments related to the communications produced by the House to be a reasonable reading of those documents and plausible under the circumstances.[101]

Having already quashed Rainey's trial subpoenas for the congressional witnesses who authored the documents at issue, the district court recognized that Rainey was "not permitted to call witnesses of his choosing who may, and plausibly do, hold exculpatory evidence critical to his defense."[102]

The district court then held as follows:

As a preliminary matter, the Court finds that few rights are more fundamental than the rights of due process and compulsory process under the Fifth and Sixth Amendments. The Court has serious constitutional and fairness concerns with regard to the following:

First, the defendant received only a partial production of documents from the House, absent a list of searches performed, a list of search terms, or any representations as to documents that were withheld under the House's privilege, which was asserted and which this Court ruled in favor of.

Secondly, certain House witnesses agreed to voluntarily testify in the government's case in chief, but such testimony, as the House proclaimed, would be limited to the scope of direct, presumably determined at the whim of the witness' or house counsel's own discretion.

And third, the House, acting pursuant to its privilege, refused defendant's subpoena request as to eight other witnesses who, potentially and plausibly, hold material and exculpatory **\*292** information related to an essential element of Count 1, which element has, in fact, already been identified by the Fifth Circuit in this very case.

The Fifth Circuit explained, again, in this very case, that an unauthorized frolic by a House entity or House member might lose the protection afforded by § 1505 regardless of its committee status because there would be no "due and proper exercise of the power of inquiry." That can be found in *U.S. v. Rainey*, 757 F.3d 234, a Fifth Circuit opinion from this year in this case. By that same token, the Court finds that an unauthorized frolic by an individual member would also lose the protections afforded by § 1505 regardless of his status as chairman of the subcommittee. As seen repeatedly in the government's briefing, these are factual issues that must be developed at trial and must be submitted to the jury.

Each of these three areas of concern that I just discussed directly implicate factual issues as they relate to the defendant's right to present a full defense pursuant to the Fifth and Sixth Amendments. The Court finds that the evidence sought by the defendant through documentary production and testimony is highly relevant to his defense and material to the issues before the Court for the jury's consideration. The Court, as I stated, [] finds the evidence sought is material noncumulative and, based on the evidence in the record, including but not limited to a number

-2679-

of written communications, both internal and external to the House, favorable to his defense or at least plausibly and arguably and quite conceivably favorabl[e] to the defendant in this case.

The Court has considered all of the pleadings, the relevant record, all of the cases cited by the parties. The Court also finds the ruling today is in accord with the rulings in *Renzi* and *Verrusio*, which I have cited earlier. To be clear, the Court is not engaging in a balancing or weighing of the speech and debate privilege, which I have already ruled in favor of, with the defendant's Fifth and Sixth Amendment rights, but is considering each on an independent basis in an attempt to honor and reconcile those fundamental constitutional privileges which are before the Court.

As seen earlier today, the Court found in favor of the House, and its ruling supported the House's long-standing constitutional privilege under the Speech or Debate Clause. The Court must now address what implication that ruling has on the defendant's right to a full trial and his constitutionally guaranteed rights, which I have just described.

Thus the Court finds that, similar to the holding in *U.S. v. Fernandez*, 913 F.2d 148, which is a Fourth Circuit case, 1990,  **\*293**  and consistent with the rulings in *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*, 353 U.S. 53, the government's prosecution of Count 1 under § 1505 must give way where the defendant seeks relevant, material, noncumulative evidence related to his defense, but also where he has been precluded from obtaining this evidence due to the invocation of a constitutional privilege by a branch of the very same government involved in his prosecution. Because the defendant is not able to put on a full and fair defense, consistent with his constitutional rights and consistent with an element of the crime as described by the Fifth Circuit and set forth in the jurisprudence, under these circumstances the Court finds the only appropriate remedy is dismissal of Count 1. The Court would reference the case of *Calley v. Callaway*, 519 F.2d 184, which is a Fifth Circuit opinion from 1975 in which the Court of Appeal expressed approval of dismissal where a congressional privilege is asserted prohibiting a defendant from evidence essential to his defense.

Accordingly, for the reasons I have previously stated, the defendant's motion for remedial relief is granted and Count 1 is hereby dismissed with prejudice.

In addition to its findings related to the defendant's constitutional rights, whereby the Court found that the defendant has put forth reasonable and plausible evidence demonstrating a potentially unauthorized investigation by the subcommittee and/or Representative Markey. Without the ability to fully examine those witnesses voluntarily testifying in the government's case in chief and, more importantly, to call witnesses in his favor, and lacking any knowledge as to the scope of the documentary production performed by the House, the Court, consistent with the Supreme Court's guidance in *U.S. v. Nobles*, 422 U.S. 225, and *Davis v. Alaska*, found at 415 U.S. 308, as well as pursuant to the Federal Rules of Evidence giving the District Court broad discretion over the admission or preclusion of evidence, hereby excludes all evidence related to the documentary production by the House and any testimony that the four witnesses would provide in the government's case in chief.

As a result, an examination of all the surrounding circumstances, as indicated in the Fifth Circuit's opinion in this very case and in *U.S v. Mitchell*, 877 F.2d 294, a Fourth Circuit opinion from 1989, is rendered impossible. Absent

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

any evidence of an authorized investigation, the Court would therefore find that the government could not meet its burden of establishing an essential element of the crime charged in Count 1. Therefore, the defendant's motion to dismiss Count 1 of the second superseding indictment for lack of a due and proper exercise of the power of **\*294** congressional inquiry (Record Document 188) and his motion to dismiss Count 1 of the second superseding indictment because the May 4 briefing and the May 14 letter were not part of a subcommittee investigation, which is Record Document 190, must also necessarily be and are hereby granted.

In light of all the circumstances, the Court further believes that the motion to dismiss for unconstitutional vagueness, which is Record Document 192, is, under the circumstances, with merit, and the Court will grant it as well.[103]

The district court subsequently entered a minute order confirming its rulings from the bench.[104]

Critically, the district court based its rulings, in part, on the Task Force's inability to "meet its burden of establishing an essential element of the crime charged" in Count One.[105] This ruling was an acquittal after jeopardy had attached on Count One.[106] As a result, the Task Force had no ability to appeal the district court's ruling,[107] and, indeed, did not file any notice of appeal.

The next day, on June 2, 2015, trial commenced on Count Two of the indictment with the parties delivering opening statements and the Task Force calling its first witnesses.

**C. The Task Force's Motion For Reconsideration**

On June 2, 2015, after the trial began, the Task Force filed a motion for reconsideration of the district court's order granting Rainey's motions to dismiss Count One and for remedial relief based on the **\*295** unavailability of the congressional witnesses.[108]

The Task Force represented that even though House Counsel declined to argue the motion to quash or make any other representations at the hearing the previous day, House Counsel was apparently "prepared" to represent to the court:

(1) that each of the subpoenaed staffers was willing to testify voluntarily, subject to certain scheduling conflicts some of them had and (2) that Senator Markey had indicated his willingness to be available for testimony voluntarily if he could testify via video conference or some other means that would allow him to remain in Washington, DC, where the Senate is in session.[109]

The Task Force also noted that it had informed the court on June 1, 2015--the first day of trial--that Rep. Waxman was willing to testify voluntarily. The Task Force had interviewed Rep. Waxman by telephone for the first time on May 31, 2015, and reported that Rep. Waxman was prepared to testify that he authorized the Subcommittee on Energy and Environment investigation in a personal conversation with Rep. Markey.[110] This supposed personal conversation was never memorialized or disclosed to Rainey at any point during the five years between the *Deepwater Horizon* incident and the start of his trial.

The Task Force claimed that reconsideration was warranted because the subpoenaed congressional witnesses, "while unwilling to respond to a subpoena," would have been willing to testify voluntarily for the defense though they had never indicated their willingness to Rainey. However, their willingness was subject to unspecified "scheduling issues" or, in the case of Rep.

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

---

Markey, the requirement that he testify by video or phone from Washington, D.C.[111] The Task Force failed to explain why the congressional witnesses had not previously disclosed their willingness to testify voluntarily during the weeks of pretrial litigation on these precise issues and only revealed it *after* the district court had dismissed Count One with prejudice.

**D. The Court's Order Denying the Task Force's Motion for Reconsideration**

On June 4, 2015, at the conclusion of the evidentiary portion of  **\*296**  the trial and prior to closing arguments the next day, the district court orally denied the Task Force's motion for reconsideration from the bench. The district court noted that it was "disappointed" by the motion because it ignored a number of the bases for the court's ruling. The court then made the following findings:

> Number 1: Congress is the complainant and alleged victim of the crime alleged in Count 1. 18 U.S.C. § 1505 was designed to protect Congress from the type of activity that was alleged in Count 1. Congressional--congressmen and congresswomen and staffers should have had the most interest in the pursuit of this count and should have been here voluntarily, had it been their intent to do so, without the need for subpoenas, in the first place.

> Both the government's attorneys, Mr. Tsao and Mr. Zink, as well as defense counsel--and to their credit, Mr. Tsao and Mr. Zink practically pleaded with the House to ensure the appearances of these witnesses at trial for months, months. And counsel will agree with me, for months the Court and the parties were left to speculate about the intentions of House members whose appearance was desired.

> I might state that there were various representations, which changed seemingly on a weekly basis, as to whether they would or would not appear here in court and, if had they appeared, to what extent they would be willing to testify. Thus the Court finds unacceptable and irresponsible this conduct, as it resulted in the unnecessary and considerable expense of time and resources, particularly in taxpayer money to the federal government, both through expenditures and time made in this Court handling Count 1 and to the Department of Justice, who spent considerable resources charging Count 1 and pursuing it, not to mention the defendant and the cost of defending Count 1.

> The House has continually refused to make a clear and explicit declaration as to the intent of these witnesses appearing voluntarily or otherwise to testify in this trial. The Court, as well as the government and the defendant, have been presented with communications that are equivocal, confusing, and even misleading as to the status of these witnesses' appearances and the willingness of them to testify.

> In fact, earlier in the day Monday, I was advised that one congressman might appear, and yet House counsel was here and did not mention that when I gave him the opportunity to clarify, in which case the motion to quash would have been moot if I had known witnesses were willing to appear voluntarily. We never got a representation that all material witnesses from Congress would testify voluntarily and without condition. Had we gotten that representation, there would have been no issue.

---

-2682-

**\*297**  The Court afforded House counsel the opportunity to provide any additional information that was not contained in the briefing. I specifically asked if there was anything else not in the briefs that counsel would like to say to the Court at the time of the motion to quash on Monday afternoon. However, House counsel remained silent.

House counsel was not here to serve as a potted plant, and I make reference to that quote because it is--it happened to be made during the *United States v. North* case, which was cited by all parties in an episode relating to that case. Informing the Court at that time that all witnesses would testify unconditionally, without reservation, would have mooted the question on the motion to quash.

Next, video or telephonic appearance of a witness in this Court is unacceptable. If a witness has been subpoenaed, the witness cannot substitute personal appearance absent consent of the parties and the Court, which was not forthcoming and which I would certainly not agree to had I known of any witness--is not acceptable, even if such a witness is a senator in the United States Senate.

I hardly think--I hardly think that had a congressman or senator issued a subpoena to appear before a House committee, a response that, well, I'm busy but I will appear before the House committee in a videoconference or in a telephone call, would have been acceptable to any member of the House committee, nor should it be.

The government indicates in its pleading that House counsel was prepared to advise the Court--prepared but did not--that certain House witnesses are now prepared to voluntarily appear and testify for the defendant. House counsel made no such representation when afforded the opportunity to do so.

Furthermore, the Court does not find that its rulings in any way called into question, when considering the representations contained in the motion--that is, the documentary production which occurred in February--the self-imposed limitation which the House sought to pursue in the protective order, had they appeared, and the failure to represent the intentions of Former Representative Stupak, who was also subpoenaed.

The Court's ruling remains valid, and the only appropriate remedy under the law and under the Constitution was to dismiss Count 1 in order to serve the constitutional interests of the Speech or Debate Clause, which the Court found to be meritful, as briefed by the House and the right under the Fifth and Sixth Amendments to confrontation, which the Court also found the defendant enjoyed under the Constitution, as do all defendants.

**\*298**  Neither the Court, the government, nor a criminal defendant are required to plead, implore, or solicit the voluntary testimony of witnesses that are material and possibly favorable to any party's case. The Sixth Amendment affords the right of not just process, compulsory process, not the right to merely request the attendance or beg for the witnesses to appear at trial. . . .

-2683-

It appears to the Court that only when the viability of Count 1 and its subsequent dismissal arose did the House concern itself then with offering the voluntary testimony of certain individuals. However, the Court will not tolerate any party or nonparty changing its mind after the consequences of a particular course of action become unfavorable to that party.[112]

The court conveyed the frustration that the parties had endured for months in dealing with the congressional witnesses. Despite repeated attempts to secure the appearance of the congressional witnesses, or to get them even to commit to positions on voluntary testimony, the congressional witnesses stonewalled Rainey, the Task Force, and the district court at every step of the way. These so-called "victims" of the alleged crime were unwilling to make decisions of fundamental consequence to Rainey's trial until it became apparent that the district court was poised to dismiss Count One. And even then, the congressional witnesses failed to communicate their positions until *after* the court dismissed the charge with prejudice. Worst of all was Rep. Markey, who had spearheaded the supposed "investigation" that Rainey was accused of obstructing. No court or criminal defendant on trial for serious charges would have deemed acceptable video testimony from Washington, D.C. Such a proposal was disrespectful of the judicial process and an insult to Rainey's constitutional rights. The district court correctly observed that if the tables were turned, Rep. Markey would have never permitted an important witness subpoenaed for one of his congressional hearings to appear by video conference.

The next day, on June 5, 2015, following a four-day trial on Count Two of the indictment, a New Orleans jury acquitted Rainey of that remaining false statements charge after less than two hours of deliberations. After the jury announced its verdict, the district court stated "I agree with the verdict" and characterized it as "a correct verdict based on the evidence."[113]

### *299  V. LESSONS LEARNED

There are many lessons to be learned from this case.

First, when it comes to a criminal prosecution, there is only one United States. Even where the Legislative Branch invokes privilege at its own initiative without the endorsement of the Executive Branch, a criminal prosecution cannot proceed where the privilege assertion interferes with a defendant's right to present an effective defense.

Second, a criminal defendant's right to compulsory process of defense evidence is critically important and must not be abridged by the government. This fundamental right cannot be vindicated by voluntary testimony with the scope of examination defined by the witness. Impeachment and bias are always fair game on cross-examination. If a privilege invocation limits the scope of cross-examination, the proper remedy is to exclude the witness's testimony in its entirety.

Third, where a valid but selective privilege assertion leads to a one-sided, incomplete or unfair presentation of evidence, the district court may exclude all evidence on the subject at issue. If the result is an obvious failure of proof on an essential element of the offense, the court has the power to acquit the defendant on the charge at the outset of trial for insufficiency of the evidence without waiting for the inevitable at the close of the government's case. Such a ruling may not be appealed by the government under the Double Jeopardy Clause.

Finally, given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should avoid using the obstruction of Congress statute or any other charge requiring congressional testimony if any alternatives are available. At a minimum, prosecutors should ensure that they have the full cooperation of the relevant Members of Congress and their staff *before* pursuing criminal charges that require testimony from congressional witnesses. In this case, there was no referral from Congress to the Department of Justice to pursue the obstruction charge against Rainey. Instead, the Department of Justice created a Task Force to pursue criminal charges that decided on its

USCA Case #22-3086     Document #1997762        Filed: 05/03/2023     Page 488 of 496
Case 1:22-mc-00060-CJN   Document 7-2   Filed 06/27/22   Page 22 of 30

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

own to charge Rainey with obstruction of a congressional investigation. Inexplicably, the Task Force never interviewed Rep. Markey during its investigation and only interviewed Rep. Waxman for the first time the day before trial was scheduled to begin. Had the prosecutors done so, they may well have determined that there was no duly authorized congressional investigation to support a criminal charge. Ultimately, however, the failure to perform this basic due diligence and the **\*300** gamesmanship of these Members of Congress and their staff, including their "wait and see" approach and unwillingness to take litigation positions or commit to unrestricted testimony, completely derailed a federal prosecution and wasted the time and resources of the parties and the Court. Such a debacle could have been avoided if the prosecutors had structured the case to avoid reliance on uncooperative, self-interested congressional witnesses.

Footnotes

a1    The author heads the white-collar criminal defense practice group at Steptoe & Johnson LLP and represented David Rainey at trial, together with Reid Weingarten of Steptoe & Johnson LLP and Mike Magner of Jones Walker LLP.

1    Even today, following years of scientific study and extensive multi-district litigation, there is significant uncertainty as to the actual flow rate. According to the final report from the Flow Rate Technical Group, which was created to estimate the flow rate and volume of oil released, the flow rate "decreased over the 87 days [of the oil spill] from an initial 62,000 to a final 53,000 barrels per day, for a total release of 4.9 million barrels of oil.... The estimated uncertainty on these flow values is also ±10%." National Incident Command, Interagency Solutions Group, Flow Rate Technical Group, Assessment of Flow Rate Estimates for the Deepwater Horizon / Macondo Well Oil Spill 1-2 (2011). In the multi-district litigation related to the oil spill, the U.S. government argued that the total release was 5 million barrels, while BP maintained that the total release was 3.26 million barrels. Findings of Fact and Conclusions of Law, Phase Two Trial, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 (MDL 2179), Case 2:10-md-02179-GJB-SS, at 39 (E.D. La. Jan. 15, 2015), ECF No. 14021. BP also argued that the "discharge began at a relatively low rate" and increased over time as various restrictions in the wellbore eroded. *Id.* at 40. The district court described the evidence related to flow rate as "voluminous, dense, highly technical, and conflicting," and stated "[t]here is no way to know with precision how much oil discharged into the Gulf of Mexico." *Id.* at 40-41. With minimal analysis, the court "split the baby" and held that the total release was 4 million barrels. *Id.* at 43.

2    Rainey Memo filed as part of Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

3    Letter from Chairman Edward Markey, Subcommittee on Energy and Environment, Committee on Energy and Commerce, to Lamar McKay, President and CEO, BP America, Inc. (May 14, 2010) filed as Ex. E to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (or, in the Alternative, Motion for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2.

4    BP's May 24, 2010 letter to Rep. Markey and production of documents filed as Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

5    FBI Form FD-302 summarizing Rainey's interview filed as Ex. 2 to Gov't's Mot. Concerning Potential Conflicts of Interest and "Unsworn Witness" Problems Arising from Defense Counsel's Status as a Witness to the Crime Charged in Count Two of the Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 7, 2013), ECF No. 99-2.

6    Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Nov. 14, 2012), ECF No. 1. The next day, the Department of Justice issued a press release announcing the charges and also stating that BP had agreed to plead guilty to a 14-count information, including an obstruction of Congress charge that mirrored Count One in Rainey's indictment, and pay a $4 billion criminal fine, the largest criminal fine in history as of that date. *See* Press Release, U.S. Dep't of Justice, BP Exploration and Production Inc. Agrees to Plead

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress Surrounding Deepwater Horizon Incident (Nov. 15, 2012), *available at* http://www.justice.gov/opa/pr/bp-exploration-and-production-inc-agrees-plead-guilty-felony-manslaughter-environmental; *see also* Information , United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012 ), ECF No. 1; Guilty Plea Agm., United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012), ECF No. 2.

7    United States v. Rainey, 946 F. Supp. 2d 518, 545-46 (E.D. La. 2013). The Court denied as moot our motion based on unconstitutional vagueness, and denied without prejudice our motion seeking a determination that Rep. Markey's letter on which Count One was based was not part of a congressional investigation. *Id.* at 545.

8    *Id.* at 542.

9    United States v. Rainey, 757 F.3d 234, 235 (5th Cir. 2014).

10    *Id.* at 246 (quoting 18 U.S.C. § 1505) (emphasis in original).

11    *Id.* (quoting United States v. Mitchell, 877 F.2d 294, 300-01 (4th Cir. 1989)).

12    *Rainey*, 757 F.3d at 246-47.

13    Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Sept. 19, 2014), ECF No. 179.

14    Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Lack of a Due and Proper Exercise of the Power of Congressional Inquiry, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 188.

15    *Id.* at 12-14 (citing Watkins v. United States, 354 U.S. 178 (1957) and Gojack v. United States, 384 U.S. 702 (1966)).

16    Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190.

17    *Id.* at 2 (citing United States v. Flores, 404 F.3d 320 (5th Cir. 2005) and United States v. Fontenot, 665 F.3d 640 (5th Cir. 2011)).

18    Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 192.

19    *See* 18 U.S.C. § 1515(b) ("As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.").

20    Def. David Rainey's Mot. for Issuance of Early-Return Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 206.

21    Transcript of Oral Argument at 13, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 3, 2014).

-2686-

22    *Id.*

23    *Id.* at 67.

24    Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 11, 2014), ECF No. 264.

25    U.S. Const. art. I, § 6, cl. 1 ("for any Speech or Debate in either House they [Senators and Representatives] shall be not questioned in any other Place").

26    House Counsel's letter objecting to the subpoenas filed as Ex. M to Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293-2.

27    Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293.

28    *Gravel*, 408 U.S . at 628-29.

29    *Eilberg*, 587 F.2d at 597.

30    *Renzi*, 651 F.3d at 1032.

31    Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 561 (1976).

32    Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

33    United States v. El-Mezain, 664 F.3d 467, 523 n.16 (5th Cir. 2011) (stating that the absolute privilege against disclosure of state secrets "will not succeed when the information is helpful to the defense or essential to a fair determination of the cause...").

34    United States v. Moussaoui, 382 F.3d 453, 469-74 (4th Cir. 2004) (holding any potential burden on the Executive Branch's war-making power under Article II does not outweigh a defendant's rights under the Fifth and Sixth Amendments, even though "no government interest is more compelling than the security of the nation") (citation omitted).

35    United States v. Nixon, 418 U.S. 683 (1974) (rejecting claim of absolute Executive Privilege, holding the privilege must be balanced against need for full factual disclosure in criminal proceedings).

36    Roviaro v. United States, 353 U.S. 53, 59-61 (1957) (holding government's "informer privilege" must give way to a defendant's rights if the informer's identity would be "relevant and helpful" to the defense).

37    *See* United States v. Cooper, 4 U.S. (4 Dall.) 341 (C.C.D. Pa. 1800) (Chase, J., sitting on Circuit) (approving subpoena issued by a criminal defendant to Members of Congress, stating that he "d[id] not know of any privilege to exempt member of congress from... the obligations, of a subpoena, in such cases."); United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (issuing subpoena duces tecum to President Jefferson, requiring production of a letter for use by the defense in Aaron Burr's treason trial); *Nixon*, 418 U.S.

at 707-16 (upholding grand jury's subpoena for the Watergate tapes); Clinton v. Jones, 520 U.S. 681, 701-02, 705 (1997) (upholding subpoena requiring President Clinton's testimony in Paula Jones's civil lawsuit).

38    *Helstoski*, 442 U.S. at 493.

39    *See, e.g., In re* Pacific Pictures, 679 F.3d 1121, 1125, 1131 (9th Cir. 2012) (rejecting selective waiver where disclosing party provided documents pursuant to subpoena to US Attorney's Office).

40    Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315.

41    We attached the relevant documents as Exs. D-Y to the Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315-1.

42    Transcript of Oral Argument at 40, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015) ("he can't compel the documents. He needs to ask for them.").

43    *Id.* at 42.

44    *Id.* at 44-45.

45    *Id.* at 45.

46    *Id.* at 46.

47    *Id.* at 63-64.

48    Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 320.

49    *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

50    *See* Exs. B & C to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

51    *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

52    *See* Ex. B to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

53    *See* Ex. D to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

54      Government's Bill of Particulars at 6, United States v. Rainey, Crim. No. 12-291 (E.D. La. Jan. 6, 2015), ECF No. 274.

55      Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs. at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392.

56      Opp'n to Defs. "Alternate or Interim" Request that the Court Order Nine Non-Party Witnesses to Respond Six Weeks Early to their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 16, 2015), ECF No. 400.

57      *Id.* at 4 n.4.

58      The Task Force later memorialized this representation in a pleading. *See* Gov't's Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify at 6 n.2, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438 ("What government counsel informed the Court and the defense was that, as of [April 22, 2015], Reps. Waxman and Markey had not agreed to testify, but rather had chosen to wait and see how the Court would resolve the defendant's pending motions to dismiss. Depending on the resolution of those motions, Reps. Waxman and Markey were willing to revisit the issue of trial testimony on a voluntary basis."). House Counsel confirmed this position. Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431 (confirming it had authorized the prosecutors to represent at the April 22 status conference that "Senator Markey and former Congressman Waxman would resist being compelled to testify, but [] would defer making any final decision regarding voluntary testimony until after this Court rules on Mr. Rainey's pending motions to dismiss.").

59      *See, e.g.,* Exs. E, L, M, N to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2. Rep. Markey even later cited his "one man" investigation as a reason he should be elected to the U.S. Senate. *See Pay* (Ed Markey for MA, TV Ad), *available at* http://www.edmarkey.com/video/page/2/ (last visited Oct. 27, 2014) (Narrator: "Eleven Dead. Communities ruined. The worst environmental disaster in American history. When BP tried to avoid responsibility, one man said no.... Ed Markey uncovered the extent of the damage, and when BP executives lied, Ed Markey held them accountable.").

60      Def. David Rainey's Mot. to Set Deadline for Cong. Witnesses to Respond to Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 405.

61      Notice of Nine Non-Party Subpoena Recipients of Intent to Move to Quash, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 406.

62      Resp. of Nine Non-Party Subpoena Recipients to Def.'s Mot. to Set Deadline, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 27, 2015), ECF No. 411. Counsel contended that if the district court granted the forthcoming motion to quash, the witnesses would "cease to be subject to the Court's jurisdiction (unless and until they, or some subset of them, voluntarily appear[ed] at trial)." *Id.* at 5.

63      Mem. of *Amicus Curiae* Bipartisan Legal Advisory Group of the U.S. House of Representatives, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 5, 2015), ECF No. 415.

64      *See id.* at 15 ("Mr. Rainey repeats *ad nauseum* an assertion that the E&E Subcommittee investigation lacked 'formal authorization.'... But that statement is false no matter how many times Mr. Rainey repeats it."); *id.* at 18 ("there is no logic to Mr. Rainey's argument"); *id.* at 19 (referring to one of Rainey's arguments: "This is nonsense."); *id.* at 21 ("Mr. Rainey offers no support for these extraordinary assertions, and... we are at a loss to understand how he could make them. Moreover, and in any event, asserting that the earth is flat does not make it so."); *id.* at 22 (denigrating Rainey's arguments as "quibbles").

-2689-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

65    Mot. to Quash of Nine Non-Party Subpoena Recipients, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419.

66    Mem. of P. & A. in Supp. of Mot. to Quash of Nine Non-Party Subpoena Recipients (Part I), United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419-1.

67    *Id.* at 16 (arguing that the application of the Clause was "not remotely close because all the matters into which Mr. Rainey seeks to probe are manifestly legislative.").

68    *Id.* at 16-17 (collecting cases).

69    Def. David Rainey's Opp'n to Nine Cong. Witnesses' Mot. to Quash their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 13, 2015), ECF No. 430.

70    *Id.* at 3.

71    Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427.

72    *See generally* United States v. Verrusio, 762 F.3d 1, 23-24 (D.C. Cir. 2014) (noting dearth of case law).

73    *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds at 11-21, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

74    *See* Jencks v. United States, 353 U.S. 657, 672 (1957) ("criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial.").

75    Roviaro v. United States, 353 U.S. 53, 60-61 (1957) ("[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause,... the trial court may require disclosure and, if the Government withholds the information, dismiss the action.").

76    *Fernandez*, 913 F.2d at 154; *see also id.* at 164 ("The district court acted within its discretion in determining that the government's attempt to exclude evidence necessary to demonstrate this background, as well as its effort to require the defendant to use abbreviated and lifeless substitutions for this crucial evidence, would have deprived Fernandez of any real chance to defend himself.").

77    *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Government Official" Grounds at 22-25, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

78    Gov't's Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438.

79    *Renzi*, 769 F.2d at 749-50.

-2690-

CONGRESSIONAL GAMESMANSHIP LEADS TO AN..., 20 Berkeley J. Crim....

80 Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash Their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431.

81 *Id.* at 6.

82 Moreover, House Counsel continued to be dismissive of Rainey's interpretation of the contemporaneous documents produced by Rep. Markey. *See id.* at 6 (stating Rainey's assertion that the investigation was not authorized "simply is not true, no matter how many times Mr. Rainey repeats it or how fervently he wishes it were so."); *id.* (claiming that the congressional witnesses did not believe the documents suggested the investigation was unauthorized, "notwithstanding Mr. Rainey's efforts to spin gold out of documents that clearly are mere straw.").

83 *Id.* at 4 ("there simply is no constitutional impediment to an individual Member or staffer to whom the Clause otherwise applies choosing to assert it in response to some questions and not assert it in response to others.... But, even if some sort of sword/shield argument were available to Mr. Rainey as to an individual privilege holder (which it emphatically is not), that argument would not function on the collective basis that Mr. Rainey postulates.").

84 *Id.* at 8-10.

85 Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 7, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.

86 *North I*, 910 F.2d at 862.

87 *United States v. North*, 920 F.2d 940, 945-46 (D.C. Cir. 1990) ("*North II*").

88 *Calley*, 519 F.2d at 219.

89 *Id.* at 220.

90 *Id.* at 222.

91 *Id.* at 220 n.60.

92 Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 9-10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.

93 Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 474.

94 Def. David Rainey's Opp'n to the Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, and Mem. in Supp. of Mr. Rainey's Cross Mot. to Exclude All Test. by Those Staffers, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 29, 2015), ECF No. 481-1.

95 *Id.* at 1.

96     *Id.* at 8.

97     *Id.* at 8-9.

98     "There are few if any rules of criminal procedure clearer than the rule that 'jeopardy attaches when the jury is empaneled and sworn.'" Martinez v. Illinois, 134 S. Ct. 2070, 2074 (2014) (quoting Crist v. Bretz, 437 U.S. 28, 35 (1978)).

99     Transcript of Jury Trial at 272, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015) ("Motion granted").

100     Transcript of Jury Trial at 278, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

101     Transcript of Jury Trial at 278-79, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

102     Transcript of Jury Trial at 281, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

103     Transcript of Jury Trial at 282-87, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

104     Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 4, 2015), ECF No. 499.

105     Transcript of Jury Trial at 286, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

106     As the Supreme Court has stated, "our cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." Evans v. Michigan, 133 S. Ct. 1069, 1074-75 (2013); *see also id.* at 1075 ("Thus an 'acquittal' includes 'a ruling by the court that the evidence is insufficient to convict,' a 'factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability,' and any other 'rulin[g] which relate[s] to the ultimate question of guilt or innocence.'") (quoting United States v. Scott, 437 U.S. 82, 91 (1978)).

107     *See* Sanabria v. United States, 437 U.S. 54, 68-69 (1978) (holding, in a case involving "an erroneous evidentiary ruling, which led to an acquittal for insufficient evidence," that the "judgment of acquittal, however erroneous, bars further prosecution on any aspect of the count and hence bars appellate review of the trial court's error.").

108     Gov't's Mot. to Reconsider Dismissal of Count 1 of the Second Superseding Indictment, *United States v. Rainey*, Crim. No. 12-291 (E.D. La. June 2, 2015), ECF No. 491.

109     *Id.* at 3.

110     *Id.* at 5.

111     *Id.* at 4.

112     Transcript of Jury Trial at 1059-64, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

113     Transcript of Jury Trial at 1142, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

20 BERKJCL 260

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government
Works.