**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

––––––––––––––––

**JOINT APPENDIX
Volume VII of XII
(Pages: 2694 - 3126)**

––––––––––––––––

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

*Counsel for Appellant*

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellee*

**Gibson Moore Appellate Services, LLC**
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
### Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Indictment**
   **filed November 12, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
   **on November 15, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
   **on November 18, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
   **on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
   **filed February 4, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **158**

   **Exhibits:**

   1.   **Letter**
      **dated January 14, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . **186**

   2.   **Letter**
      **dated January 28, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . **194**

**Exhibits** to

**Defendant's Motion to Compel Discovery**
**filed February 4, 2022, Continued:**

3.      Letter
            dated October 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.      **FBI Interview of Robert J. Costello, Esquire**
            dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.      **H. Res. 503, Sec. 5(c)(6)(A) & (B)**
            dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.      **Procedures Adopted by 117th Congress**
        **Regulations for Use of Deposition Authority**
            dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.      **FBI Interview of U.S. House of Representatives**
        **General Counsel Doug Letter**
            dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.     **Letter from Ronald C. Machen Jr., U.S. Attorney,**
        **to Speaker of the House John A. Bohner**
            dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.     **Prosecution for Contempt of Congress of an**
        **Executive Branch Official Who Has Asserted a**
        **Claim of Executive Privilege**
            8 Op. O.L.C. 101 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.     **Attempted Exclusion of Agency Counsel from**
        **Congressional Depositions of Agency**
        **Employees, Slip Op.**
            dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,

     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     <u>Attachment</u>:

     Letter

          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,

     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     <u>Exhibit</u>:

     1.    Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,

     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     <u>Exhibit</u>:

     1.    Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel, With Exhibits,**

**filed March 8, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **390**

**Exhibits:**

1.    **E-mail Correspondence [US-001038-40]**
      **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **418**

2.    **Letter from Justin Clark**
      **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **422**

3.    **Email from Committee Counsel**
      **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **428**

4.    **Email from Costello**
      **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **430**

5.    **Email from Committee Counsel**
      **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **436**

6.    **Costello Email Chain**
      **dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **439**

7.    **Costello and Clark Email Exchange**
      **dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **444**

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
        on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion** *in Limine* **to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
        filed March 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel,**
**With Exhibits,**
        filed March 22, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

        <u>Exhibits:</u>

    1.    **Senate Committee Investigation**
                dated August 8, 1958.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 577

    2.    **Application of 28 U.S.C. § 458 to Presidential**
            **Appointments of Federal Judges**
                dated December 18, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . 584

    3.    **Letter from Michael B. Mukasey, Attorney**
            **General, to the Hon. Nancy Pelosi, Speaker of the**
            **House of Representatives**
                dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . 599

Exhibits **to**
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
        **filed March 22, 2022, Continued:**

4.      **Response to Congressional Requests for**
        **Information Regarding Decisions Made Under the**
        **Independent Counsel Act,**
                **10 Op. O.L.C. 68 (1986)**............................. **601**

5.      **Rex Lee, Executive Privilege, Congressional Subpoena**
        **Power, and Judicial Review: Three Branches,**
        **Three Powers, and Some Relationships,**
                **1978 B.Y.U. L. Rev. 231, 259**......................... **619**

6.      **Whether the Department of Justice May Prosecute**
        **White House Officials for Contempt of Congress,**
                **2008 WL 11489049 (O.L.C.)**. ......................... **688**

7.      **Congressional Oversight of the White House,**
                **2021 WL 222744 (O.L.C.)**. ......................... **692**

Amended Exhibit **to**
**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion** *in Limine* **on Advice of Counsel**
        **filed March 23, 2022:**

3.      **Letter from Michael B. Mukasey, Attorney**
        **General, to the Hon. Nancy Pelosi, Speaker of the**
        **House of Representatives**
                **dated February 29, 2008**........................... **722**

**Government's Response to Defendant's Supplemental Brief in**
**Opposition to the Government's Motion** *in Limine* **to Exclude**
**Evidence and Argument Relating to Good-faith**
**Reliance on Law or Advice of Counsel**
        **filed March 29, 2022.** ...................................... **725**

**Defendant's Supplemental Reply on Waiver**
      filed March 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

**Order**
      filed April 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

**Government's Motion** *in Limine* **to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

      **Exhibits:**

      1.    **Letter from White House Deputy Counsel to Costello**
                  dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 765

      2.    **Letter from Justin Clark to Costello**
                  dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 767

      3.    **Emails from Justin Clark to Costello**
                  various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

**Government's Motion** *in Limine* **to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

      **Exhibit:**

      1.    **Subpoena**
                  dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 781

**Government's Motion** *in Limine* **to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
      filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**


**Defendant's Motion to Exclude Evidence**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**


**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

   **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**


   <u>**Exhibits:**</u>

   **A.    H. Res. 8 (Adoption of Rules for 117th Congress)**

   **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**


   **B.    H. Res. 503 (Authorizing House Select Committee)**

   **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**


   **C.    Regulations For Use Of Deposition Authority**

   **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**


   **D.    Amerling and Letter FBI 302**

   **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
### Joint Appendix Volume III of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
   **filed April 15, 2022, Continued:**

E.   **Rules of the 117th Congress**
         **dated February 2, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938

F.   **Republican Conference Rules of the 117th Congress.**. . . . . . 991

G.   **Congressional Oversight of The White House,**
         **45 Op. O.L.C. slip op. (Jan. 8, 2021).** . . . . . . . . . . . . . . . 1005

H.   **Assertion of Executive Privilege Concerning the**
      **Dismissal and Replacement of U.S. Attorneys**
         **dated June 27, 2007.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1065

I.   **Immunity of the Former Counsel to the President from**
      **Compelled Congressional Testimony,**
         **43 Op. O.L.C. slip op. (July 10, 2007).** . . . . . . . . . . . . . . 1075

J.   **Prosecution for Contempt of Congress of an Executive**
      **Branch Official Who Has Asserted a Claim of Privilege,**
         **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . 1079

K.   **Whether the Department of Justice May Prosecute**
      **White House Officials for Contempt of Congress,**
         **32 Op. O.L.C 65 (2008).** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122

L.   **Application of 28 U.S.C. Sec. 458 to Presidential**
      **Appointments of Federal Judges,**
         **19 Op. O.L.C slip op. (December 18, 1995)..** . . . . . . . . . 1128

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
       **filed April 15, 2022, Continued:**

**M.**     **Randolph D. Moss, Executive Branch Legal Interpretation:**
         **A Perspective from the Office of Legal Counsel,**
                  52 Admin. L. Rev. 1303 (2000). . . . . . . . . . . . . . . . . . . . . . 1143

**N.**     **Testimonial Immunity Before Congress of the**
         **Former Counsel to the President,**
                  43 Op. O.L.C. slip op. (May 20, 2019). . . . . . . . . . . . . . 1172

**O.**     **Response to Congressional Requests for**
         **Information Regarding Decisions Made**
         **Under the Independent Counsel Act,**
                  10 Op. O.L.C. 68 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 1194

**P.**     **Letter from Ronald C. Machen Jr., U. S. Attorney, to**
         **Speaker John A. Boehner**
                  dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1220

**Q.**     **Letter from Michael B. Mukasey, Attorney General, to**
         **Speaker of the House, Hon. Nancy Pelosi**
                  dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . 1228

**R.**     **Steven G. Bradbury, Memorandum for Attorneys of the**
         **Office Re: Best Practices for OLC Opinions**
                  May 16, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1231

**S.**     **Trevor W. Morrison, Stare Decisis in the**
         **Office of Legal Counsel,**
                  110 COLUM. L. REV. 1448 (2010). . . . . . . . . . . . . . . . . 1237

**T.**     **Walter Dellinger, et al., Principles to**
         **Guide the Office of Legal Counsel**
                  dated Dec. 21, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1261

**Exhibits to**

**Defendant's Motion to Dismiss the Indictment**
**filed April 15, 2022, Continued:**

U.      David J. Barron, Memorandum for Attorneys of the
        Office Re: Best Practices for OLC Legal
        Advice and Written Opinions
                dated July 16, 2010. .............................. 1268

V.      Frank H. Easterbrook, Presidential Review,
                40 CASE W. RES. L. REV. 905 (1990)............... 1275

W.      Presidential Authority to Decline to Execute
        Unconstitutional Statutes, OLC Mem. Op.
                dated November 2, 1984. ......................... 1302

X.      Douglas W. Kmiec, OLC's Opinion Writing Function:
        The Legal Adhesive for a Unitary Executive,
                15 CARDOZO L. REV. 337 (1993). ................ 1316

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits** **to**
**Defendant's Motion to Dismiss the Indictment**
   **filed April 15, 2022, Continued:**

Y.  Applying Estoppel Principles in Criminal Cases,
   78 YALE L.J. 1046 (1969).......................... 1355

Z.  Anne Bowen Pouliun, Prosecutorial Inconsistency,
   Estoppel, and Due Process: Making the
   Prosecution Get its Story Straight,
   18 Cal. L. Rev. 1423 (2001)........................ 1384

AA.  Rex E. Lee, Executive Privilege, Congressional Subpoena
   Power, and Judicial Review: Three Branches, Three
   Powers, and Some Relationships,
   1978 B.Y.U. L. REV. 231 (1978). ..................... 1441

BB.  John O. McGinnis, Models of the Opinion Function of the
   Attorney General: A Normative, Descriptive, and
   Historical Prolegomenon,
   15 CARDOZO L. REV 375 (1993)................... 1510

CC.  Griffin B. Bell, The Attorney General: The Federal
   Government's Chief Lawyer and Chief Litigator, or
   One Among Many?,
   46 FORDHAM L. REV. 1049 (1978)............... 1572

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
> **filed April 15, 2022, Continued:**

**DD.  Notes, The Immunity-Conferring**
**Power of the Office of Legal Counsel,**
> **121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . . 1596**

**EE.  U.S. Department of Justice, Criminal**
**Resource Manual § 2055 (Public Authority Defense). . . . . 1621**

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
> **filed April 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627**

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
> **filed April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695**

**Defendant's Opposition to the Government's**
**Motion *in Limine* Based on Waiver**
> **filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698**

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
> **filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709**

**Defendant's Response to Government's Motion *in***
***Limine* to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
> **filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720**

**Government's Opposition to Defendant's Motion to Dismiss,
With Exhibits,**

    **filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1745**

**Exhibits:**

    1.    **Letter from Chairman Bennie G. Thompson to
Mr. Stephen K. Bannon
dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 1793**

    2.    **E-mail from Cooney to Costello
dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 1796**

    3.    **E-mail from Costello to Cooney
dated November 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 1800**

    4.    **E-mail from Cooney to Costello
dated November 5, 2021. . . . . . . . . . . . . . . . . . . . . . . . . 1803**

# TABLE OF CONTENTS
## Joint Appendix Volume V of XII

Page:

Government's Opposition to
Defendant's Motion to Exclude Evidence
    filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

Defendant's Reply in Support of His Motion to Exclude Evidence
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of Department of Justice Opinions and Writings
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

Government's Reply in Support of Motion *in Limine* to
Exclude Evidence Relating to Objections to
Subpoena That Defendant Waived
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of the Defendant's Prior Experience with Subpoenas
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

Defendant's Reply in Support of His Motion to Dismiss Indictment,
With Exhibits,
    filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

    Exhibits:

    1.    Letter from Chairman Bennie G. Thompson to
        Mr. Stephen K. Bannon
           dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . 1885

    2.    Transcript of Oral Argument
        Before the Honorable Carl J. Nichols
           on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to
**Defendant's Reply in Support of His Motion to Dismiss Indictment**
     filed May 17, 2022, Continued:

3.     **Letter from Costello to Congressman Thompson**
     **dated October 18, 2021**............................ 1994

4.     **Letter from Congressman Thompson to Costello**
     **dated October 19, 2021**............................ 1997

**United States House of Representatives'**
**Motion for Leave to File *Amicus Curiae* Brief,**
**With Attachment**
     **filed May 25, 2022.** ........................................ 2002

     **Attachment:**

     **Brief of United States House of Representatives as**
     ***Amicus Curiae* In Support of the Department of Justice**
     **dated May 10, 2022.** ............................. 2009

**United States House Minority Leadership**
**Motion for Leave to File *Amicus Curiae* Brief,**
**With Attachment,**
     **filed May 25, 2022.** ........................................ 2035

     **Attachment:**

     **Brief of the U.s. House of Representatives Minority Leader**
     **Kevin O. Mccarthy and the U.s. House of Representatives**
     **Minority Whip Stephen J. Scalise as Amicus Curiae**
     **dated May 24, 2022.** ................................... 2050

**Defendant's Notice Regarding Amicus Briefs**

    **filed June 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2065**


**Motion to Quash,**

**With Attachment,**

    **filed June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2072**


    <u>**Attachment:**</u>


    **Memorandum of Points and Authorities**

    **In Support of Motion to Quash,**

    **With Exhibits,**

        **dated June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
     **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
     **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
     **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

     **Exhibits:**

     1.    **Letter from Bannon's Counsel to Prosecutors**
             **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

     2.    **Letter from Prosecutors to Bannon's Counsel**
             **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

     3.    **Letter from Justin Clark to Scott Gast**
             **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2448**

     4.    **Letter from Pat Cipollone to Chairman Nadler**
             **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . **2453**

     5.    **Plaintiff's Motion for Judgment on the Pleadings, or in the**
             **Alternative, for Summary Judgment, & in Opposition to**
             **Defendants' Motion for Summary Judgment**
             **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
     **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

## TABLE OF CONTENTS
### Joint Appendix Volume VII of XII

**Page:**

Government's Opposition to Defendant's Motion to Compel
  filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

Joint Proposed Jury Instructions,
With Attachment,
  filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

  Attachment:

  Manual of Model Criminal Jury Instructions
    dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

Government's Objections to Defendant's Proposed Jury Instructions
  filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

Defendant's Opposition to Government's Omnibus Motion *in Limine*
  filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

Office of General Counsel U.S. House of Representatives'
Reply in Support of Motion to Quash,
With Exhibits,
  filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

  Exhibits:

  A.    Order - *U.S. v. Moussaoui*
          dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

  B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
          dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

  C.    Order Granting Motion to Quash Subpoena on
        U.S. Representative Maxine Waters - *D.C. v. Hayes*
          dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

     filed July 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

     **Exhibit:**

     1.    **Memorandum**

            dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion *in Limine***

     filed July 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion *in Limine* to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

     filed July 11, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

     on July 11, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion *in Limine* to Bar Testimony,**
**With Exhibits,**

     filed July 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

     **Exhibits:**

     1.    **Letters from former President Trump to Mr. Costello and**
            **Mr. Costello's Letter to Chairman Thompson**

            dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

     2.    **Certification**

            dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
          **filed July 13, 2022, Continued:**

  3.     **Subpoena**
              **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . 3090

  4.     **Letter from Thompson to Costello**
              **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3092

  5.     **Indictment**
              **dated November 12, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3096

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence or Argument Relating to the Defendant's Eleventh-hour**
**Assertion That He Is Willing to Testify Before the Select Committee,**
**With Exhibits,**
          **filed July 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

  **Exhibits:**

  1.     **Letter from Thompson to Costello**
              **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3114

  2.     **Letter from Thompson to Costello**
              **dated October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . 3118

**Government's Objections to Defendant's Trial Exhibits**
          **filed July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

**Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols**
on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

**Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,**
filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

**Exhibits:**

1.    **Transcript Jury Trial
Before the Honorable Kurt D. Engelhardt**
*U.S. v. Rainey*, No. 12-291
on June 1, 2015.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

2.    **Congressional Gamesmanship Leads To An
Acquittal In Deepwater Horizon Case,
U.S. v. David Rainey: A Case Study**
dated 2016.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

**Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash**
filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

**Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions**
filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash**

      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**

      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**

      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session
Before the Honorable Carl J. Nichols**

      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS
### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
     **on July 18, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3577**

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
     **on July 19, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3784**

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
     **on July 19, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3868**

**Testimony of <u>Kristin Amerling</u>:**

     **Direct Examination by Ms. Vaugn.**. . . . . . . . . . . . . . . . . . . . . . . . . . . **3942**

## TABLE OF CONTENTS
## Joint Appendix Volume X of XII

Page:

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
          on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

          **Testimony of <u>Kristin Amerling</u>:**

          **Direct Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . 4014
          **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4078

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
          on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

          **Testimony of <u>Kristin Amerling</u>:**

          **Cross Examination by Mr. Corcoran (Continued).** . . . . . . . . . . . . 4149
          **Redirect Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . 4211

          **Testimony of <u>Stephen Hart</u>:**

          **Direct Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . 4233
          **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4252
          **Redirect Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . 4264

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
          filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
          on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

## TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
      **filed July 21, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4422**

**Defendant's Notice Regarding Congressional Hearings**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4432**

**Notice of Defendant's Objection to Jury Instruction Number 27**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4435**

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
      **on July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4438**

**Jury Instructions**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4555**

**Counsels' Acknowledgment Concerning Trial Exhibits**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4585**

**Government's Exhibit List**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4586**

**Defendant's Exhibit List**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4588**

**Note from Jury**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4591**

**Verdict Form**
      **filed July 22, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4592**

Order
     filed July 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
     filed July 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

     <u>Exhibits:</u>

     1.    Screenshot of Episode 1996, War Room
           dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

     2.    Bannon's Gettr Repost CNN Ad
           dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
     filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
     filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
     filed August 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
     filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**
   **filed August 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4657**


**Defendant's Reply to Opposition to Motion for a New Trial**
   **filed August 26, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4676**

**Order**
   **filed September 2, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4682**

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
   **on October 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4687**

**Judgment in a Criminal Case**
   **filed October 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4767**

**Defendant's Notice of Appeal**
   **filed November 4, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4772**

**Order Staying Sentence Pending Appeal**
   **filed November 7, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4779**

## TABLE OF CONTENTS
### Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

9B.     H41 Congressional Record - House
              dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4780

30.     Letter from Former President Donald Trump to
        Stephen K. Bannon
              dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4781

31.     Letter from Robert J. Costello to
        Chairman Bennie Thompson
              dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4782

32.     Letter from Chairman Bennie Thompson to
        Robert J. Costello
              dated July 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4784

39.     Article from Rolling Stone
              dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . . . 4786

40.     Daily Mail Article
              dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 4804

**Government's Exhibits:**

1.      House Resolution 503. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4808

2.      Subpoena to Stephen Bannon
              dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 4822

**Government's Exhibits**, Continued:

3.    **Emails re Service of Subpoena**
      **dated September 23 and 24, 2021**. . . . . . . . . . . . . . . . . . 4832

4.    **Letter from Costello to**
      **Chairman Thompson and Cover Email**
      **dated October 7, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4835

5.    **Letter from Chairman Thompson to Costello**
      **dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4838

6.    **Letter from Costello to Chairman Thompson**
      **dated October 13, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4841

7.    **Letter from Chairman Thompson to Costello**
      **dated October 15, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4843

8.    **Letter from Costello to**
      **Chairman Thompson and Cover Email**
      **dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4846

9.    **Letters from Chairman Thompson to Costello**
      **dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4848

10.   **Post on Stephen Bannon's Gettr Account**
      **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 4851

11A.  **Post on Stephen Bannon's Gettr Account**
      **dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4852

11B.  **DailyMail Article Linked in October 8, 2021**
      **Post on Stephen Bannon's Gettr Account.** . . . . . . . . . . . . . . 4853

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL**</u>

The Defendant, Stephen K. Bannon, has filed a motion to compel production of the Government's internal deliberations with respect to two additional referrals for contempt of Congress that the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee") made to the U.S. Attorney's Office.  ECF No. 86.  The Defendant claims he is entitled to the materials under the Court's March 16, 2022, discovery order, *id*. at 3-4, and to support a purported entrapment-by-estoppel defense, *id*. at 4-11.  He is wrong on both counts and his motion should be denied.

First, the Court's March 16 Order required the Government to produce records reflecting "official DOJ policy."  No such records exist in connection with the Department's consideration of the congressional contempt referrals of Mark Meadows or Daniel Scavino.   And the Government has never understood the Court to have required the Government to provide internal analysis and attorney work product material relating to its prosecutorial decisionmaking in particular criminal matters, which is what the Defendant seeks here, particularly given courts' well-established recognition that delving into such matters intrudes on a "special province" of the Executive.  *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (discussing the high bar litigants must meet to be entitled to government records regarding prosecutorial decisionmaking in the context of selective prosecution claims).  Instead, consistent with its understanding of the

Court's order, the Government has provided records reflecting the Department's official view of the criminal penalties applicable to current or former government officials raising executive privilege claims or immunity in response to congressional process—including letters explaining declinations that referenced "official DOJ policy." It provided all of these records on April 1 and 4, 2022, and has nothing further in its possession to provide.

Second, the Defendant claims that the Government's internal deliberations are discoverable to support his purported entrapment-by-estoppel defense. They are not.

At this stage, despite taking yet another bite at the apple to make out such a defense under the guise of a motion to compel, the Defendant still cannot identify specific Office of Legal Counsel ("OLC") opinions on which he allegedly relied in deciding to defy the Committee's subpoena. He has not even identified a single OLC opinion that sanctions his conduct, even putting aside for a moment whether he relied on it. The Defendant's motion to compel instead suggests that his purported defense now is that he and his attorney independently extrapolated from inapplicable OLC opinions to conclude that he could lawfully defy the Committee's subpoena. *See, e.g.*, ECF No. 86 at 5 (claiming that based on the "rationale" for OLC opinions "there is no legally relevant basis for distinguishing between current and former executive branch officials on the one hand and 'private citizens'"); *id*. at 7 (claiming the "rationales" of various OLC opinions do not "appl[y] with any less force to the 'private citizen'"). That is not an entrapment-by-estoppel defense. It is a mistake-of-law defense that is unavailable to him under the contempt statute. *See Watkins v. United States*, 354 U.S. 178, 208 (1957) ("[T]he witness acts at his peril. he is '* * * bound rightly to construe the statute.' An erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry." (quoting *Sinclair v. United States*, 279 U.S. 263, 299

(1929) ("The refusal to answer was deliberate. . . . He was bound rightly to construe the statute. His mistaken view of the law is no defense."))).  There is no estoppel defense available to criminal defendants under which they can cobble together out-of-context one-liners from disparate government writings and claim their conduct was legal—such a defense would have no limits and would erase criminal accountability across the board.

The Defendant's failure, across multiple briefings and in oral argument, to identify even a single statement by the government sanctioning his conduct is fatal to his ability to present an entrapment-by-estoppel defense at trial—and the internal deliberative material that he now seeks regarding other individuals in other circumstances does nothing to advance his cause.  The threshold requirement to present an estoppel defense at trial is that the Defendant present some evidence that he relied on a government statement that the Defendant's total defiance—not the White House Chief of Staff's or the White House Counsel's, but the Defendant's total defiance, in his particular circumstances—was lawful.  *See United States v. Abcasis*, 45 F.3d 39, 43-44 (2d Cir. 1995) ("[T]he defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization."); *United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (explaining that the defendant "must do more than show that the government made 'vague or even contradictory statements'" and "must show that the government affirmatively told him the proscribed conduct was permissible" (quoting *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959))); Gov't Mot. in Limine, ECF No. 52, at 8-9 (collecting cases).  The Defendant has not met that threshold requirement, and the Government's internal deliberations on other contempt matters, regarding differently-situated individuals, referred to the U.S. Attorney's Office weeks and months after the Defendant's willful default, do

nothing to correct his failure.  Indeed, given that the materials he seeks were generated after his default and are purely internal deliberative materials, the Defendant cannot possibly show that he relied upon them when he made his deliberate decision to default.  *Cf. United States v. Libby*, 475 F. Supp 2d 73, 87-88 (D.D.C. 2007) (excluding evidence where its relevance depended on evidence that the defendant had relied on it and the defendant failed to establish that he had done so).  Having failed to meet the first element of the defense, he cannot present it at trial and any evidence relating to a purported entrapment-by-estoppel defense, therefore, is not relevant, let alone material, to either party's case-in-chief and not discoverable.  *See Armstrong*, 517 U.S. at 462 ("[I]n the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (requiring disclosure of material favorable to the Defendant only if it is "material either to guilt or punishment"); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (finding information material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); Fed. R. Crim. P. 16(a)(1)(E)(i) (allowing discovery of records that are "material to preparing the defense"); *see also* Fed. R. Crim. P. 16(a)(2) (Rule 16(a)(1)(E) "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."); *United States v. Safavian*, 233 F.R.D. 12, 20 (D.D.C. 2005) ("[T]he internal deliberative processes of the Department of Justice, the FBI, and the GSA-OIG are irrelevant to the preparation of a defense.").[1]

---

[1] As he did in his prior motion to compel, ECF No. 28 at 7-8, the Defendant again cites internal Department policies and Local Rule 5.1(b) as additional authorities for his request, ECF No. 86 at 13-15.  As the Government has previously pointed out, internal Department policies create no enforceable rights against the Government and Local Rule 5.1(b) does not purport to expand the Government's *Brady* obligations and could not do so under federal law.  *See* Gov't

Moreover, even if the Defendant had identified some Department writing that concluded total defiance of both a document and testimonial demand was allowed by a private citizen subpoenaed in relation to his private affairs, the Defendant still has not shown why the Department's internal deliberations relating to the former Chief of Staff and former Deputy Chief of Staff, subpoenaed for information relating to the time during which they served in those roles, would have any bearing on the reasonableness of his reliance.  Tellingly, the Defendant does not cite to the standard for reasonableness under an entrapment-by-estoppel theory, which requires that the Defendant show that "a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *United States v. W. Indies Transport, Inc.*, 127 F.3d 299, 313 (3d Cir. 1997) (internal quotation marks and citation omitted).  Materials generated after the Defendant's default could not possibly have informed the reasonableness of his actions at the time he took them.  In any event, as the Government has identified before, OLC opinions are consistent in their admonishments that whether the law excuses someone from complying with a congressional subpoena is a fact-based inquiry, even with respect to current or former executive branch officials subpoenaed in their capacity as such.

Finally, the Defendant suggests in passing, with no analysis, that the information he seeks is discoverable to the extent it may relate to a selective prosecution claim.  *See* ECF No. 86 at 9-11 (claiming the Defendant "is entitled to make a record . . . where the Government has made an arbitrary non-prosecution decision . . . .  Mr. Bannon is entitled to know the basis for the DOJ's decision not to prosecute [Meadows and Scavino]").  To be entitled to discovery relating to a selective prosecution claim, the Defendant must offer "some evidence tending to show the

---

Opp'n to Mot. to Compel, ECF No. 31 at 5, 7.

existence of the essential elements of the defense," *Armstrong*, 517 U.S. at 468 (citation omitted), that is, "some evidence of both discriminatory effect and discriminatory intent," *United States v. Bass*, 536 U.S. 862, 863 (2002).  The Defendant has not done so.  To show discriminatory effect, the Defendant must show "that the Government afforded 'different treatment' to persons 'similarly situated' to him." *United States v. Judd*, -- F. Supp. 3d --, 2021 WL 6134590, at *2 (D.D.C. 2021) (quoting *Armstrong*, 517 U.S. at 470).  "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."  *United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009) (quoting *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008)) (internal quotation marks omitted).  The Defendant does not identify of what "protected class" he believes Mark Meadows and Dan Scavino are a part that he is not or why they are similarly situated to him. Having failed to show the first prong, his request for discovery fails.  *See United States v. Blackley*, 986 F. Supp. 616, 618 (D.D.C. 1997) (noting that both prongs must be met to sustain request for discovery on selective prosecution claim) (citing *Attorney General of U.S. v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982)).  In any event, the Defendant has made no effort to meet the second prong of discriminatory intent, which requires that he show "the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, or was designed to prevent or paralyze his exercise of constitutional rights."  *United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982) (internal citations and quotation marks omitted); *see also Wayte v. United States*, 470 U.S. 598, 610, (1985) (noting that discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" (citations and internal quotation marks omitted) (alteration in original)).  The Defendant is not entitled to

discovery of the Department's internal prosecutorial deliberations on his baseless suggestion of selective prosecution.

The Defendant has provided no ground on which he is entitled to go fishing in the Department's internal deliberative and work product files.  His motion to compel disclosure of the Government's analysis relating to contempt prosecutions of other individuals must be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Amanda R. Vaughn
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Case No: 21-cr-670 (CJN)** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

## JOINT PROPOSED JURY INSTRUCTIONS

The United States and Defendant hereby propose the following jury instructions.  The parties understand that certain instructions may change, subject to issues that arise during trial or additional pretrial motions and orders.  Instructions from the Criminal Jury Instructions for the District of Columbia ("Redbook") are listed below only by citation.  The parties are in agreement with respect to all but one of the proposed Redbook instructions.  The parties were not able to reach agreement on any proposed instructions not found in the Redbook.  These disputed instructions are included in their entirety on the subsequent pages and are identified by the party proposing the instruction, with the other party's specific objections below the proposal.

The Defendant provided two of their proposed instructions to the Government at 12:15 p.m. on June 30, 2022.  These are "Defense Theory – Defense Proposal" and "Elements – Defense Proposal."  They are included in this filing.  The Government has not had an adequate opportunity to review, consider, or determine what objections it may have to these instructions. The Government does not anticipate that it agrees to the instructions as written, and will submit objections by Friday, July 1, 2022.  The Defendant consents to that additional filing by the Government on July 1, 2022 (but does not consent to the content of the filing, as it will be the Government's position).

### **Agreed Redbook Instructions**

- Instruction No. 1.102 (Preliminary Instruction Before Trial)

- Instruction No. 1.105 (Notetaking by Jurors)

- Instruction No. 1.107 (Preliminary Instruction to Jury Where Identity of Alternates Is Not Disclosed)

- Instruction No. 1.108 (A Juror's Recognition of a Witness or Other Party Connected To The Case)

- Instruction No. 1.202 (Cautionary Instruction on the Use of the Internet and Publicity)

- Instruction No. 2.100 (Furnishing the Jury with a Copy of the Instructions)

- Instruction No. 2.101 (Function of the Court)

- Instruction No. 2.102 (Function of the Jury)

- Instruction No. 2.103 (Jury's Recollection Controls)

- Instruction No. 2.104 (Evidence in the Case – Judicial Notice, Stipulations) (*if applicable*)

- Instruction No. 2.105 (Statements of Counsel)

- Instruction No. 2.106 (Indictment Not Evidence)

- Instruction No. 2.107 (Burden of Proof – Presumption of Innocence)

- Instruction No. 2.108 (Reasonable Doubt – Instruction for U.S. District Court)

- Instruction No. 2.109 (Direct and Circumstantial Evidence)

- Instruction No. 2.110 (Nature of Charges Not to be Considered)

- Instruction No. 2.112 (Inadmissible and Stricken Evidence) (*if applicable*)

- Instruction No. 2.200 (Credibility of Witnesses)

- Instruction No. 2.207 (Law Enforcement Officer's Testimony) (*if applicable*)

- Instruction No. 2.208 (Right of Defendant Not To Testify) (*if applicable*)

- Instruction No. 2.209 (Defendant as Witness) (*if applicable*)

- Instruction No. 2.216 (Evaluation of Prior Inconsistent Statement of Witness) (*if applicable*)

- Instruction No. 2.217 (Evaluation of Prior Consistent Statement of Witness) (*if applicable*)

- Instruction No. 2.307 (Motive)

- Instruction No. 2.402 (Multiple Counts, One Defendant)

- Instruction No. 2.405 (Unanimity – General)

- Instruction No. 2.407 (Verdict Form Explanation)

- Instruction No. 2.500 (Redacted Documents) (*if applicable*)

- Instruction No. 2.501 (Exhibits During Deliberations)

- Instruction No. 2.502 (Selection of Foreperson)

- Instruction No. 2.508 (Cautionary Instruction on Publicity, Communication, and Research)

- Instruction No. 2.509 (Communication Between Court and Jury During Jury's Deliberations)

- Instruction No. 2.511 (Excusing Alternate Jurors)

- Instruction No. 3.101 (Proof of State of Mind)

**Disputed Redbook Instruction**

- Instruction No. 2.300 (Missing Witness or Other Evidence) (*if applicable*)

The Defendant proposes the use, if applicable, of the Redbook "Missing Witness or Other Evidence" instruction.

**United States' Objection to Defendant's Proposed Instruction—
Missing Witness or Other Evidence**

The Government objects to the Defendant's use of the Redbook instruction for a "Missing Witness" because the Defendant is not entitled to a missing witness instruction in this case as there are no witnesses whom the Government "has it peculiarly within [its] power to produce" who "would elucidate the transaction" that it has failed to produce. *Burgess v. United States*, 440 F.2d 226, 231 (D.C. Cir. 1970) (citations omitted). To date, the Defendant has not responded to the Government's request for confirmation that he proposes this instruction with respect to House of Representatives witnesses whom he has subpoenaed, and who have moved to quash his subpoenas on multiple grounds, including based on their privilege under the Speech or Debate Clause of the Constitution. But if that is his intention, as outlined in the Government's motion in limine, ECF No. 85 at 8, the Defendant cannot make missing witness arguments or lay the predicate for a missing witness instruction when the witness in question is as unavailable to the Government as to him—as is the case with witnesses from the House of Representatives here. To the extent that the Defendant is unable to compel congressional witnesses to testify or produce documents because of their privilege against compelled disclosure under the Speech or Debate Clause, the Executive Branch does not "'peculiarly' have the power", *Burnett*, 890 F.2d at 1241 n. 13, to overcome that constitutional right any more than the defense.

In analogous situations, the D.C. Circuit has declined to find a missing witness instruction appropriate when a witness, by invoking his constitutional right against self-incrimination, made himself unavailable to either party. In *Bowles v. United States*, for instance, the Circuit found no

error in the trial court's decisions to prevent the defense from calling a witness who would assert his Fifth Amendment right on the witness stand, deny the defendant's subsequent request for a missing witness instruction because the witness's invocation made him unavailable to either party, and determine that neither party could argue to the jury about the witness's absence. 439 F.2d 536, 541–42 (D.C. Cir. 1970) ("It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense.") (citation omitted). A missing witness instruction would similarly be improper here, where congressional witnesses are unavailable to the Defendant and Government alike where they assert a constitutional privilege, and where it would be improper to permit the jury to draw inferences from the unavailable witnesses' decision to assert privileges against compulsion. Nor, to the extent the subpoenas are quashed because they do not comply with Rule 17's requirements of relevancy and specificity, is it in the Government's power to make irrelevant evidence relevant.

**<u>Other Disputed Instructions</u>**

**<u>Government's Proposed Instruction</u>**

- Contempt of Congress – Elements of the Offense


**<u>Defendant's Proposed Instructions</u>**

- Willfulness

- Advice of Counsel

- Default – Accommodation Requirement

- Authority of the House

- Entrapment by Estoppel

- Public Authority

- Apparent Authority

- Crimes Not Charged

- Elements of the Offense

- Defense Theory

## GOVERNMENT PROPOSED INSTRUCTION: CONTEMPT OF CONGRESS – ELEMENTS OF THE OFFENSE

Counts One and Two of the Indictment charge the Defendant with the crime of contempt of Congress for willfully failing to provide testimony and information to the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol, which I'll refer to as the Select Committee. Count One charges the Defendant with a willful failure to provide testimony. Count Two charges the Defendant with a willful failure to produce records.

To find the Defendant guilty of contempt of Congress, you must find that the Government proved each of the following elements beyond a reasonable doubt:

*First*, that the Defendant was subpoenaed by the Select Committee to provide testimony or produce papers;

*Second*, that the subpoena sought testimony or information pertinent to the investigation that the Select Committee was authorized to conduct[1];

*Third*, that the Defendant failed to comply or refused to comply with the subpoena[2]; and

*Fourth*, that the Defendant's failure or refusal to comply was willful, that is, that it was deliberate and intentional.

With respect to the second element, for the testimony or information sought by the subpoena to be "pertinent," the Government must prove that, at the time the Select Committee

---

[1] *See Gojack v. United States*, 384 U.S. 702, 716 (1966) ("It can hardly be disputed that a specific, properly authorized subject of inquiry is an essential element of the offense under § 192."); *United States v. McSurely*, 473 F.2d 1178, 1203 (D.C. Cir. 1972) (describing "one of the necessary elements of [the Government's] case" as the "pertinency of its demands to the valid subject of the legislative inquiry"); *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962) (requiring that the committee was "duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority" (citing *United States v. Rumely*, 345 U.S. 41, 42-43 (1953); *United States v. Lamont*, 236 F.2d 312, 315 (2d Cir. 1956); *United States v. Orman*, 207 F.2d 148, 153 (3d Cir. 1953))).

[2] *See United States v. Bryan*, 339 U.S. 323, 327 (1950) ("'Default' is, of course, a failure to comply with the summons."); *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) (affirming jury instruction on meaning of willful as it defined a "failure or refusal to comply").

issued the subpoena, the testimony or information sought could have related to the Select Committee's investigation in some way.[3]

With respect to the fourth element, the word "willful" does not mean that the Defendant's failure or refusal to comply with the Select Committee's subpoena must necessarily be for an evil or a bad purpose. The reason or the purpose of failure or refusal to comply is immaterial, so long as the failure or refusal was deliberate and intentional and was not a mere inadvertence or an accident.[4]

It is not a defense to contempt of Congress that the Defendant failed or refused to comply based on the advice he received from his attorney or someone else. It is also not a defense to contempt of Congress that the Defendant failed or refused to comply based on his understanding or belief of what the law required or allowed or on his understanding or belief that he had a privilege excusing him from complying. All that is required is that the Defendant's failure or refusal to comply was deliberate and intentional.[5]

---

[3] *See Watkins v. United States*, 354 U.S. 178, 214-15 (1957) (requiring, where witness objects on pertinency grounds, that congressional committee explain pertinence of a question by "describing what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it"); *Rumley v. United States*, 197 F.2d 166, 267 (D.C. Cir. 1952), *aff'd*, 346 U.S. 41 (1953) (finding that "pertinent," as used in the statute, means "pertinent to a subject matter properly under inquiry, not generally pertinent to the person under interrogation"); *Orman*, 207 F.2d at 153-54 (affirming instruction to jury that it did not matter for pertinency whether the information the witness refused to provided actually would have been pertinent, and that all that was required was that it could have been pertinent at the time Congress sought the information).

[4] Adapted from *Fields*, 164 F.2d at 100 (affirming jury instruction on meaning of "willful" under the statute); *see also Quinn v. United States*, 349 U.S. 155, 165 (1955) (explaining that the "criminal intent" required under § 192 is "a deliberate, intentional refusal to answer"); *Bryan*, 339 U.S. at 330 ("[W]hen the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default.").

[5] *See Yellin v. United States*, 374 U.S. 109, 123 (1963) ("Of course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake

_____

of law would be no defense."); *Watkins*, 354 U.S. at 208 ("[T]he witness acts at his peril. he is '* * * bound rightly to construe the statute.'  An erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry." (quoting *Sinclair v. United States*, 279 U.S. 263, 299 (1929))); *Sinclair*, 279 U.S. at 299 ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel.  The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt. There was no misapprehension as to what was called for. The refusal to answer was deliberate. . . . He was bound rightly to construe the statute. His mistaken view of the law is no defense."); *Licavoli v. United States*, 294 F.2d 207, 209 (D.C. Cir. 1961) ("Since, as we have remarked, it has been established since the *Sinclair* case that reliance upon advice of counsel is no defense to a charge of refusing to answer a question, such reliance is not a defense to a charge of failure to respond. The elements of intent are the same in both cases. All that is needed in either event is a deliberate intention to do the act. Advice of counsel does not immunize that simple intention."); *Bart v. United States*, 203 F.2d 45, 49-50 (D.C. Cir. 1952), *reversed on other grounds*, 349 U.S. 219 (1955) ("A witness does not insulate himself from contempt by asserting a reason for a refusal to answer, or by objecting to the question, or by querying its propriety."); *Fields*, 164 F.2d at 100 ("The apparent objective of the statute involved here would be largely defeated if, as appellant contends, a person could appear before a congressional investigating committee and by professing willingness to comply with its requests for information escape the penalty for subsequent default.").

9

**<u>Defendant's Objection to Government Proposed Instruction—</u>**
**<u>Contempt of Congress: Elements of the Offense</u>**

The Defendant objects to the Government's Proposed Instruction: Contempt of Congress – Elements of The Offense because it erroneously defines the elements of this offense. The Defendant has stated in specific detail, in briefing and argument, its objections to the position taken by the Government as to the elements of the offense of Contempt of Congress. These are set forth in the briefing on Defendant's Motion To Dismiss The Indictment [Doc. 58] and accompanying exhibits, and Reply [Doc. 73], as well as Defendant's Opposition To Government Motion In Limine On Advice Of Counsel [Doc. 30] and exhibits, and supplemental brief on *Licavoli* [Doc. 41]. The briefs and exhibits that set forth our position stacked together are approximately 9 inches in height. Thus, for the convenience of the Court and counsel, we do not understand it to be necessary to include that information again herein, but incorporate it by reference. On the other hand, we are not trying to hide a truffle underground – to the extent that greater specificity is required as to why we oppose the Government's instruction, we are happy to provide it in writing or at argument. Simply put, our objection to the Government's proposed instruction in also set forth in our competing instruction, "Elements Of The Offense – Defense Proposed Instruction," which is included herein, together with supporting authority.

We note two specific objections that are emphasized by the Government's proposed instruction. First, the Government's proposed instruction provides that a defendant's understanding or belief that he had a privilege that excused him from complying is not a defense is fundamentally wrong as a matter of law. The Government's formulation is wrong to the extent it refers to the witness's privilege. More to the point here, it is wrong to the extent it refers to the constitutionally based executive privilege.  The United States Supreme Court found in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032, 207 L.Ed. 2d 951, 965 (2020) that "... recipients of

10
**-2710-**

[legislative subpoenas] have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege." (citations omitted). Likewise, D.C. Circuit has found in *United States v. House of Representatives of the United States*, 556 F. Supp. 150, 152 (D.D.C. 1983), that: "[t]he statutory provisions concerning penalties for contempt of Congress, 2 U.S.C. Sec. 192 and Sec. 194, constitute an 'orderly and often approved means of vindicating constitutional claims arising from a legislative investigation.' Under these provisions, constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution." See also note 3 to the Defendant's proposed instruction on "willfulness."

Second, the Government's proposed instruction would mislead the jury that a "misunderstanding" is not a defense. That is a misstatement of the law. In its decision in *United States v. Licavoli*, 294 F.2d 207, 208 (D.C. Cir. 1961), the Circuit expressly provided the example of "misunderstanding" as a reason for subpoena noncompliance that would not come within the definition of "willful." The court found that: "a failure to respond to a subpoena might be due to many causes other than deliberate intention, e.g., illness, travel trouble, misunderstanding, etc." *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961).

## DEFENSE PROPOSED INSTRUCTION: WILLFULNESS

The government is required to prove beyond a reasonable doubt that Mr. Bannon acted "willfully" in his response to the subpoena. In order to prove that a defendant acted "willfully" within the meaning of a criminal statute, the Government must prove beyond a reasonable doubt that the defendant acted on his own violation and knew or should reasonably have known that his conduct was unlawful.[1] In order to find Mr. Bannon guilty, the government must prove beyond a reasonable doubt that he was conscious of wrongdoing.[2] It is up to you to determine whether Mr. Bannon acted "willfully." In making that determination, you may consider whether Mr. Bannon acted as he did with respect to the subpoena because executive privilege was invoked by former President Trump, as well as any other evidence admitted during the trial.[3]

---

[1] *Ratzlaf v. United States*, 510 U.S. 135, 138 (1994); *United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir. 2019); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020); United States v. Myers, 2008 U.S. Dist. LEXIS 43981, *4, 2008 WL 2275457 (N.D. W. Va., June 3, 2008) (quoting Licavoli on "willfulness" and explaining that "willfulness" in the criminal contempt context means "a volitional act done by one who knows or reasonably should be aware that his conduct is wrong.").

[2] *Elonis v. United States*, 575 U.S. ___ (2015), slip. op. at 9 (rule of construction for criminal statute that did not specify mental state reflects the basic principle that "wrongdoing must be conscious to be criminal."), quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952).

[3] "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).*See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring).

<u>**United States' Objection to Defendant's Proposed Instruction—Willfulness**</u>

The Government objects to the Defendant's Proposed Instruction "Willfulness" because it erroneously defines the element of this offense, stands in contravention to the Court's order recognizing as binding precedent *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), *see* ECF No. 49, and advances a mistake-of-law defense that is unavailable under *Licavoli* and other controlling Supreme Court precedents.

First, the proper definition of willfulness under the criminal contempt statute is simply a deliberate and intentional failure to appear. *See Licavoli,* 294 F.2d at 209 ("All that is needed is a deliberate intention to do the act"); *Quinn v. United States*, 349 U.S. 155, 165 (1955) (explaining that the "criminal intent" required under § 192 is "a deliberate, intentional refusal to answer"); *United States v. Bryan*, 339 U.S. 323, 330 (1950) ("[W]hen the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default.").

Next, the Defendant's proposed instruction incorrectly asserts that "willful" in the contempt of Congress context means that a defendant must know that his conduct is unlawful in order to have acted willfully. For this proposition, he cites to several cases requiring heightened states of willfulness that he also cited in his earlier briefing on this issue, before the Court rejected his argument that *Licavoli* is not controlling law, including *Cheek v. United States*, 498 U.S. 192, 199-201 (1991) (applying heightened standard to criminal tax offenses) and *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) (requiring the government under structuring statutes to prove that the defendant knew the structuring in which he was engaged was unlawful). As the Court has

already determined, these cases are not applicable to the Defendant's case because *Licavoli* remains binding precedent, and citing to them is erroneous.

Lastly, the Defendant's proposed instruction would erroneously instruct the jury that the Defendant's mistake of law—his alleged belief that executive privilege somehow excused his noncompliance—negates his willfulness. But precedent and the Court's order preclude this argument as well. *See Yellin v. United States*, 374 U.S. 109, 123 (1963) ("Of course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense."); *Watkins v. United States*, 354 U.S. 178, 208 (1957) ("[T]he witness acts at his peril. he is '* * * bound rightly to construe the statute.' An erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry." (quoting *Sinclair v. United States*, 279 U.S. 263, 299 (1929))); *Sinclair*, 279 U.S. at 299 ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel. The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt. There was no misapprehension as to what was called for. The refusal to answer was deliberate. . . . He was bound rightly to construe the statute. His mistaken view of the law is no defense."); *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) (affirming instruction to the jury that "[t]he reason or the purpose of failure or refusal to comply is immaterial").

### <u>DEFENSE PROPOSED INSTRUCTION: ADVICE OF COUNSEL</u>

Stephen K. Bannon asserts that he is not guilty of the willful wrongdoing as charged in both counts of the indictment because he acted on the basis of advice from his attorney.

If before taking any action with respect to the subpoena at issue, Mr. Bannon, while acting in good faith and for the purpose of securing advice on the lawfulness of his future conduct, sought and obtained the advice of an attorney whom he considered to be competent, and made a full and accurate report or disclosure to this attorney of all important and material facts of which he had knowledge or had the means of knowing, and then acted strictly in accordance with the advice his attorney gave following this full report or disclosure, then Mr. Bannon would not have willfully done wrong in performing or failing to perform some act the law forbids or requires as those terms are used in these instructions.

Whether Mr. Bannon acted in good faith for the purpose of truly seeking guidance as to questions about which he was in doubt, whether he made a full and complete report or disclosure to his attorney, and whether he acted strictly in accordance with the advice received, are all questions for you to determine.[1]

A defendant relies in good faith on the advice of counsel if:

- Before taking action, he in good faith seeks the advice of an attorney whom he considers competent to advise him on the matter; and

- He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct;

- He makes a full and accurate report to his attorney of all material facts that he knew; and

---

[1]  1A Fed. Jury Prac. & Instr. § 19:08 (6th ed.) (West January 2022)

- He then acts strictly in accordance with the advice of this attorney.

The defendant does not have to prove his good faith. Rather, the government must prove beyond a reasonable doubt that the defendant acted willfully as charged in both counts of the indictment.[2]

---

[2] *United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017) (cited in source in Note 1).

## <u>United States' Objection to Defendant's Proposed Instruction—Advice of Counsel</u>

The Government objects to the Defendant's Proposed Instruction "Advice of Counsel" because the Court has already ruled that the Defendant cannot present a defense of advice of counsel in this case, ECF No. 49, and it is improper for the Defendant to request a jury instruction on an excluded defense.

Even if the Defendant were not barred by both precedent and the Court's order from advancing such a defense, he has not established that he would be entitled to it. He would need to proffer in detail all of the elements of such a defense, including that he made full disclosure of all material facts to his attorney before receiving advice and that he relied in good faith on the advice he received. *United States v. Gray-Burriss*, 920 F.3d 61, 66 (D.C. Cir. 2019). In asserting such a defense, the Defendant would be deemed to have waived privilege and be required to provide the Government with extensive discovery. *See United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) (reliance on advice-of-counsel defense waives attorney-client privilege); *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) ("Moreover, even otherwise-privileged communications that defendants do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their entirety." (internal emphasis, quotation marks, and citation omitted)).

### DEFENSE PROPOSED INSTRUCTION: DEFAULT – ACCOMODATION REQUIREMENT

When a congressional committee issues a subpoena to a prospective witness and executive privilege is invoked, the committee has an obligation to work toward an accommodation with the witness before referring the matter for criminal prosecution.[1] If you conclude that executive privilege was invoked by former President Trump with respect to the subpoena Mr. Bannon received from the Committee, you may also consider whether the Select Committee fulfilled its obligation to try to reach an accommodation.[2]

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged. One of the elements that the government must prove beyond a reasonable doubt is that by his actions in response to the subpoena, Mr. Bannon willfully made default. It is up to you to determine whether he willfully made default. In making that determination, you may consider whether the Select Committee tried to reach an accommodation with Mr. Bannon before a criminal referral of the matter was made to the U.S. Attorney's Office, as well as any other evidence admitted during this trial.

---

[1] *Congressional Oversight of the White House*, 45 Op. O.L.C. at 37-43 [Doc. 58-7 at pdf 38 of 60 to 44 of 60]; *United States v. American Tel & Tel Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977).

[2] *Congressional Oversight of the White House*, 45 Op. O.L.C. at 37-43 [Doc. 58-7 at 56, pdf 57of 60] ("A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course.").

18

### United States' Objection to Defendant's Proposed Instruction—
### Accommodation Requirement

The Government objects to the Defendant's Proposed Instruction "Accommodation Requirement" because it has no basis in law and would confuse and mislead the jury.

First, neither the OLC opinion nor the single case that the Defendant cites in support of the instruction stand for the proposition that a congressional committee has a legal "obligation to work toward an accommodation with the witness before referring the matter for criminal prosecution." The OLC opinion discusses the traditional accommodations process in which the Executive and Legislative branches have engaged when Congress seeks information from the Executive Branch. The *AT&T* case similarly discusses separation of powers concerns regarding information requests made between two branches of government, but does not support the Defendant's claim that there is an obligation for the Committee to work to accommodate a private party before referring him or her upon his or her willful default.  And the Defendant's proposed instruction provides no support for what is, essentially, shifting the Defendant's responsibility under the contempt of Congress statute—to respond to the subpoena—to some obligation on the Committee's part, creating out of thin air a legal requirement on the part of the Committee that does not exist.

Moreover, the instruction improperly suggests it is in the purview of the jury to decide whether executive privilege has been invoked—a purely legal question—and whether the Committee properly worked toward an accommodation.  Neither of these issues is an element of the offense and neither is relevant to an element of the offense, so they are not issues relevant to the jury's considerations.

Finally, in the Defendant's instruction's statement that "you may consider whether the Select Committee tried to reach an accommodation with Mr. Bannon before a criminal referral was made" and that the jury may do so in connection with whether the Defendant willfully made

default, the Defendant's instruction improperly allows the jury to consider mistake-of-law defense arguments, which is, as stated above, unavailable to him—that is, the Defendant wishes to have the jury consider whether he defaulted because he believed he was entitled to the accommodation process under the law of executive privilege.  The defense being unavailable, the instruction does nothing more than invite jury nullification, which is improper.  *See United States v. Wilkerson*, 966 F.3d 828, 835436 (D.C. Cir. 2020) (citing *United States v. Dougherty*, 473 F.2d 1113, 1130–37 (D.C. Cir. 1972)).

**DEFENSE PROPOSED INSTRUCTION: AUTHORITY OF U.S. HOUSE OF REPRESENTATIVES**

The statute under which Mr. Bannon is charged, 2 U.S.C. § 192, provides as follows:

> *Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of [Contempt of Congress] . . ..*

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged. One of the elements that the government must prove beyond a reasonable doubt is that the subpoena Mr. Bannon received was a valid subpoena, lawfully authorized by the U.S. House of Representatives.

Mr. Bannon asserts that the subpoena was issued without valid, lawful authority because the Rules of the House of Representatives were not followed, and because the Select Committee did not adhere to the House resolution establishing it and empowering it to act. It is up to you to determine whether the subpoena was lawfully authorized. In making that determination, you may consider the Rules established by the U.S. House of Representatives, the House resolution establishing it and empowering it to act, and any evidence that bears upon whether the Rules and authorizing resolution have been followed.[1]

---

[1] *Christoffel v. United States*, 338 U.S. 84, 88-90 (1949) (holding that the validity of a congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932); *United States v. Ballin*, 144 U.S. 1 (1892); *Yellin v. United States*, 374 U.S. 109 (1963); *Shelton v. United*

<u>**United States' Objection to Defense Proposed Instruction—**</u>
<u>**Authority of U.S. House of Representatives**</u>

The Government objects to the Defendant's proposed instruction "Authority of U.S. House

of Representatives" for three reasons: 1) it erroneously defines an element of the offense; 2) it

seeks an instruction on a defense that the Defendant has waived; and 3) it creates the possibility

that the Judicial Branch, acting through the jury, will interpret House Rules differently from the

House itself, in violation of the Rulemaking Clause.

First, the Defendant proposes instructing the jury that it is an element of the offense that

the subpoena the Defendant received was "valid" and "lawfully authorized by the U.S. House of

Representatives."  The Defendant's proposed instruction does not define what "valid" and

"lawfully authorized" means.  It appears, based on his proposed statement of his defense theory in

the following paragraph, however, that he intends "valid" and "lawfully authorized" to mean that

the jury must find, as an essential element of the offense, that the Committee complied with all of

its rules when issuing the subpoena.  This is not, however, an element of the offense.  As the

Government has briefed and argued before, *see, e.g.*, ECF No. 71 at 2-5, courts considering rules

violations in the functions of a congressional committee have never held that the Government must

prove full compliance with the rules as an essential element of the offense.  *Yellin v. United States*,

to which the Defendant cites, makes this clear.  The Supreme Court found there that the alleged

rules violation could be a defense to contempt of Congress "were [the defendant] able to prove his

defense."  374 U.S. 109, 123 (1963).  If rules compliance were part of the essential elements of

the offense, the Government would bear the burden of proving compliance and its mere failure to

---

*States*, 327 F.2d 601, 606 (D.C. Cir. 1963) (adherence to rules may be considered when
determining the validity of a subpoena); *Watkins v. United States*, 354 U.S. 178 (1957); *Gojack v. United States*, 384 U.S. 702 (1966).

do so would be sufficient for an acquittal, *see United States v. Bailey*, 209 F. Supp. 3d 55, 63 (D.D.C. 2016) (noting that "the burden of proof rest[s] upon the Government to prove guilt to [the jury's] satisfaction beyond a reasonable doubt, [and] that this burden extend[s] to each and all essential elements of the offense charged" (quoting *Lawson v. United States*, 248 F.2d 654, 655 (D.C. Cir. 1957) (internal quotation marks omitted) (alterations in original))—there would be no burden of proof on a defendant, as *Yellin* finds there is. Similarly, in *Liveright v. United States*, the D.C. Circuit noted that it had previously found a subcommittee's failure to comply with its authorizing resolution's requirement that all members be consulted before issuance of a subpoena could provide a "defense" to contempt and that this was consistent with Supreme Court precedent finding that rules violations are not essential to the offense but potentially valid defenses. 347 F.2d 473, 474-75, 475 n.5 (D.C. Cir. 1965) (citing *United States v. Bryan*, 339 U.S. 323, 327-335 (1950); *Shelton v. United States*, 327 F.2d 601, 606 (D.C. Cir. 1963)). Indeed, defendants can waive rules violations in certain circumstances by not raising them before the Committee, *see Bryan*, 339 U.S. at 327-335, further indicating that it is not the Government's burden to establish rules compliance.

The other cases the Defendant cites do not support an instruction that rules compliance is an essential element of the offense of contempt of Congress either. For example, the Supreme Court in *Christoffel v. United States*, was addressing only the offense of perjury, which required, as an element of the offense, that the tribunal before which the defendant appeared be a "competent tribunal"—the statute at issue expressly limited the offense to perjury before a "competent tribunal." 338 U.S. 84, 88-90 (1949). Accordingly, the court found rules governing what constituted a competent sitting of a congressional committee were essential to the offense. *Id.* The case did not address what was required to show the validity of a congressional subpoena, as the

Defendant claims, nor did it address the elements of contempt of Congress.  In fact, the Supreme Court, in *United States v. Bryan*, later rejected the notion that *Christoffel* had any applicability when it was deciding whether the defendant in a contempt of Congress case was entitled to raise as a defense the lack of a quorum of the relevant committee.  339 U.S. at 329 (1950) ("The *Christoffel* case is inapposite.  For that decision, which involved a prosecution for perjury before a congressional committee, rests in part upon the proposition that the applicable perjury statute requires that a 'competent tribunal' be present when the false statement is made.  There is no such requirement in R.S. s 102.  It does not contemplate some affirmative act which is made punishable only if performed before a competent tribunal, but an intentional failure to testify or produce papers, however the contumacy is manifested.").

Second, the Defendant is only entitled to an instruction on a theory of the defense "if the record contains sufficient evidence from which a reasonable jury could find for the defendant on his theory."  *United States v. Akhigbe*, 642 F.3d 1078, 1083 (D.C. Cir. 2011) (internal quotation marks and citation omitted).  Here, there will be no evidence at trial of violations of the House rules because the Defendant has waived all of the purported violations he has identified, to the extent they constituted violations, since the Defendant was on notice of them at the time he defaulted and did not object to compliance on that basis.  *See, e.g.*, *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960); *Bryan*, 339 U.S. at 330-34; *Liveright*, 347 F.2d at 475-76 (describing the "Bryan-McPhaul rule" for waiver of objections where the basis for the objection was apparent at the time of default)  Moreover, at least two of the objections the Defendant has previously identified—the number of members on the committee and Representative Cheney's title—have no bearing on his rights as a witness in the issuance of the subpoena such that they provide a basis for acquittal if they were violated and if the Defendant had not waived them.  *See Yellin*, 374 U.S. at

123 (noting that allowing acquittal for rules violation in that case was the only means to provide a remedy for violation of congressional rules that confer rights on witnesses); *Liveright*, 347 F.2d at 474-75 (noting that where a rule "served to protect the right of all persons to be free from unnecessary invasions of their privacy," allowing a defense to prosecution for contempt based on a violation of that rule gave effect to the concern that such procedures be followed before anyone was required to forfeit the right). Accordingly, an instruction inviting the jury to acquit the Defendant if it finds rules violations is improper because there appear to be no rules violations the Defendant intends to assert that were properly preserved or are otherwise available for the jury's consideration at trial.

Third, to the extent the Defendant seeks the proposed instruction so he can argue for acquittal on the basis of the House rules he has identified in his prior briefing (e.g., the number of members on the Committee or Representative Cheney's title), the instruction improperly risks allowing the Judicial Branch, through the jury, to construe the House's rules in a manner contrary to how the House has done so, which is a violation of the Rulemaking Clause. *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) ("[A]s we have explained, interpreting a congressional rule 'differently than would the Congress itself' is tantamount to 'making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)). Specifically, under the Defendant's proposal, the jury would first have to determine what the rules required and then determine whether the Committee complied. Because, as the Court has recognized, at least some of the rules the Defendant has previously disputed reasonably could have more than one interpretation, without further instruction, the jury may reach a conclusion that differs from the House. *Rostenkowski*, 59 F.3d at 1306-07 Cir. 1995) ("[T]he Rulemaking Clause of Article I clearly reserves to each House of the

Congress the authority to make its own rules, and judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution.  Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.").  But the House has made clear its interpretation of the rules the Defendant has raised.  Accordingly, any instruction allowing the jury to consider whether the Committee followed its rules must include instructions that direct the jury to use the House's interpretation for any that have more than one reasonable interpretation.  *See Barker*, 921 F.3d at 1130 ("Accordingly, we accept the House's interpretation of its own rules . . . , thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles.").

Finally, the Government does not have an objection to reading the contempt of Congress statute to the jury, but believes that, if the Defendant wants it read, it would be more appropriate to do so at the beginning of the Court's charge defining the elements of the offense, not at the beginning of a single defense theory instruction.

## DEFENSE PROPOSED INSTRUCTION: ENTRAPMENT BY ESTOPPEL

Mr. Bannon has raised the affirmative defense of entrapment by estoppel. The defense of entrapment by estoppel is based on the legal principle, under the due process clause of the United States Constitution, that a person cannot be convicted of a crime for action he took based on his reasonable reliance on a statement by an authorized government official or on official written statements by an authorized government agency that led him to believe his conduct would be lawful.[1]

"The defense of entrapment by estoppel does not depend solely on the absence of criminal intent.  Nor is it limited to the circumstances of actual authorization.  It focuses on the *conduct of the government* leading the defendant to believe reasonably that he was authorized (to take the action he took)."[2]  "The doctrine (of entrapment by estoppel) depends on the unfairness of prosecuting one who has been led by (official government agency statements) to believe his acts were authorized."[3]

Mr. Bannon asserts that he responded to the Committee's subpoena as he did by relying on official statements by the United States Department of Justice, in the form of Office of Legal Counsel, or OLC Opinions, and other official Department of Justice writings regarding the duties, rights, and obligations that apply when executive privilege has been invoked with respect to the subpoena.

I instruct you that upon receipt of the subpoena and the invocation of executive privilege by the former President of the United States, Mr. Bannon was entitled to look to the Department

---

[1] *Raley v. Ohio*, 360 U.S. 423, 438 (1959); *Cox v. Louisiana*, 379 U.S. 559, 571-72 (1965).

[2] *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995).

[3] *Id.*, citing *United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir. 1991); *United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991).

of Justice's OLC opinions and other Department of Justice authoritative writings for guidance as to what his rights, obligations, and duties were with respect to the subpoena, to reasonably rely on the guidance provided in the OLC opinions and other Department of Justice authoritative writings, and to act in a manner he reasonably believed the OLC opinions and other authoritative writings authorized.[4]

To find Mr. Bannon not guilty based on his defense of entrapment by estoppel, you must find that:

(1) Mr. Bannon reasonably believed that executive privilege was invoked regarding the Committee's subpoena to him;

(2) The OLC opinions and other authoritative Department of Justice writings give rise to a reasonable belief that Mr. Bannon was authorized to respond to the subpoena in the manner in which he did;

(3) Mr. Bannon relied on the OLC opinions and other authoritative Department of Justice writings; and

(4) Mr. Bannon's reliance was reasonable.[5]

---

[4] *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675 (1973).

[5] *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992), citing *United States v. Smith*, 940 F.2d 710 (1st Cir. 1990). *See also, United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J.) (defense simply requires reasonable reliance on a conclusion of statement of law issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field). Judge Merhige also relies on Section 2.04(3)(b) of the Model Penal Code which provides as follows:

A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when … (b) he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision; (iii) an administrative order or grant of permission; of (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."

I instruct you that the defense of entrapment by estoppel applies even if the official government statements the defendant reasonably relied on were misstatements of the law.[6]

If you find that he has satisfied these elements by a preponderance of the evidence, then prosecuting him would be unfair, it would violate the constitutional right to due process of law and you must find him not guilty.[7]

A defendant must prove this affirmative defense by a preponderance of the evidence. A preponderance of the evidence means that you must be persuaded that the things the defendant seeks to prove are more probably true than not true. This is a lesser burden of proof than the government's burden to prove beyond a reasonable doubt each element of the crimes charged.[8]

If you find that the opinions of the Office of Legal Counsel of the United States Department of Justice or other official Department of Justice writings that Mr. Bannon relied on were such that they served to assure him that his conduct with respect to the subpoena in this case was legal, and if you find that the defendant reasonably relied on any opinion of the Office of Legal Counsel of

---

*Barker*, 546 F.2d at 955.

*See also United States v. Jenkins*, 701 F.2d 850, 857-859 (10th Cir. 183); *United States v. North*, 910 F.2d 843, 886-887 (D.C. Cir. 1990) (where defendant is entitled to "believed authority" defense, unreasonable belief is okay since standard is subjective. Even no belief at all regarding lawfulness of conduct results in acquittal; no need to show clear, direct instruction to act in a given time in a given way); *See also United States v. Cheek*, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

[6] *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994); *United States v. North*, 910 F.2d 843, 881, n.10, modified on other grounds, 920 F.2d 940 (D.C. Cir. 1990).

[7] *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992); *United States v. Smith*, 940 F.2d 710 (1st Cir. 1990), both cited with approval in *United States v. Abcasis*, 45 F.3d 39, 43 (2d Cir. 1995).

[8] *United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004); *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994).

the United States Department of Justice in taking the course of action he took, you must find him not guilty.[9]

In considering whether Mr. Bannon reasonably relied on the Office of Legal Counsel opinions and other official Department of Justice writings in believing that his response to the subpoena he received was authorized and lawful, you are entitled to consider the testimony of his lawyer and the advice his lawyer gave him on this subject on the question of whether such reliance was reasonable.[10]

---

[9] *See United States v. Smith*, 940 F2d 710 (1st. Cir. 1991) (entrapment by estoppel applies regardless of the intent nature of the crime charged or the defendant's mental state regarding intent; it rests, instead, on principles of fairness); *United States v. Hedges*, 912 F2d 1397 (11th Cir. 1990); *United Sates v. Clegg*, 846 F2d 1221 (9th Cir. 1988); *United States v. Tallmadge*, 829 F2d 767 (9th Cir. 1987). Adapted from requested jury instruction in *United States v. Abcasis,* 45 F.3d 39 (2d Cir. 1995) (convictions reversed for failure to give defense requested jury instruction on entrapment by estoppel).

[10] *United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987).

**United States' Objection to Defense Proposed Instruction—Entrapment by Estoppel**

The Government objects to the Defendant's proposed instruction on entrapment by estoppel for two reasons: 1) the Defendant has not made the requisite showing to present the defense at trial as an initial matter and so is not entitled to an instruction for a defense he cannot present; and 2) even if he had made the requisite showing and could present the defense at trial, his proposed instruction is a misstatement of the law and instead allows the jury to acquit him on a good-faith reliance defense that is barred by the definition of "willfulness" under the contempt of Congress statute.

*The Defendant Is Not Entitled to Present the Defense at Trial*

First, the Defendant is not entitled to any instruction on entrapment by estoppel because he cannot present such a defense at trial. At the end of trial, defendants are entitled to instructions on their theory of the case, including their affirmative defenses, only "if the record contains sufficient evidence from which a reasonable jury could find" for the defendant on his theory." *Akhigbe*, 642 F.3d at 1083 (internal quotation marks and citation omitted); *see also United States v. Nwoye*, 663 F.3d 460, 462-63 (D.C. Cir. 2011) (applying this standard to affirmative defense). The Defendant can only present evidence in support of an entrapment-by-estoppel defense at trial in the first place, however, if he has made a prima facie showing of the defense. *See United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (affirming exclusion of defense at trial where defendant could not make prima facie case); *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995) (finding that "once they presented a prima facie defense," the defendants could present the defense to the jury); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (upholding order granting motion in limine precluding evidence).

In ruling on the Defendant's motion to dismiss, the Court found he had not shown the predicate requirement for an estoppel defense of an on-point statement from the government sanctioning his conduct. *6/15/22 Mot. Hrg., Tr. at 123-124; see also* ECF No. 52 at 5-14; ECF No. 65 at 10-20; ECF No. 70 at 2-9 (Government's briefing relating to Defendant's failure to make the required prima facie showing). Having failed to make a prima facie showing of the defense, the Defendant cannot present evidence of the defense at trial, and there will accordingly be no basis in the record to allow the jury to be instructed on the elements of an entrapment-by-estoppel defense.

<u>*The Defendant's Proposal is a Misstatement of the Law*</u>

Second, even if the Defendant had made the threshold showing necessary to present his purported entrapment-by-estoppel defense at trial, and if her were subsequently to make the requisite showing at trial to be entitled to an instruction on the defense, the instruction he proposes is an inaccurate statement of the elements the jury must find to acquit him on such a basis. Several circuits, including those from which the Defendant has relied on caselaw to support his estoppel arguments, have model criminal jury instructions on an entrapment-by-estoppel defense. *See, e.g.*, 9th Cir. Model Crim. Jury Instr. 5.4 (2022); 8th Cir. Model Crim. Jury Instr. 9.01A (2021). The Defendant does not submit or adapt any of these, as is the normal course when model instructions are available. The Defendant does not explain why using or adapting these models would fail to properly instruct the jury, despite the Government's efforts to confer on this issue in preparation of this filing. But it seems clear he does not do so because reference to them demonstrates instantly that his proposed instruction is not in line with how courts have consistently applied the defense—and that the defense is inapplicable to this case. The Government submits, however, that these models, such as the Ninth Circuit model attached here as an example, Exhibit 1, are the appropriate

formulation of the defense, particularly in light of the numerous ways in which the Defendant's proposed instruction misleads and misstates the law.

As a general matter, the Defendant's instruction allows the jury to acquit him without first finding that the government affirmatively misled him as to his specific course of conduct. This is contrary to the law. As is evident in most of the cases the parties have cited in their briefing on this matter, the entrapment-by-estoppel defense typically arises in circumstances where a defendant speaks directly with a government official about his intended course of action. *See, e.g.*, *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995). And courts in those cases consistently require that the statement from the government official be directly on point to the conduct for which the Defendant has been charged. *See id.* ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization."). This requirement reflects the purpose of the defense to prevent government misconduct in which the government actively misleads a person into committing a criminal offense. *See, e.g.*, *United States v. Benning*, 248 F.3d 772, 775 (8th Cir. 2001) ("A government official must be guilty of affirmative misconduct in order for a defendant to put forth a viable defense of entrapment by estoppel.").

The Defendant has never claimed he spoke directly with any government official about his conduct here. But the Defendant's reliance on government guidance documents does not erase the legal requirement that whatever government statement he claims to have relied on at the time of his crime be specific in its sanctioning of the Defendant's particular conduct. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 32 (D.D.C. 2021) ("Central to *Raley*, *Cox*, and *PICCO* is the fact that the government actors in question provided relatively narrow misstatements of the law that

bore directly on a defendant's specific conduct.") (citing *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp. ("PICCO")*, 411 U.S. 655 (1973)). In the few cases in which defendants have claimed reliance on government statements of general applicability—found in regulations, policies, or forms—it is only in those circumstances in which the statement was directly on point to the circumstances of the defendant's criminal violation that courts have found the defense to be available. *See PICCO*, 411 U.S. at 670 n.22, 672-74 (finding defendant-corporation was entitled to present defense that it was "actively misled" by a regulation defining "refuse" in statute barring certain releases of waste into navigable waters as "materials that are obstructive or injurious to navigation" where parties conceded the refuse released by defendant "was not of a nature that would impede or obstruct navigation"); *United States v. Levin*, 973 F.2d 463, 464-65, 468 (6th Cir. 1992) (finding the defendants' reliance on statements from the relevant regulatory agency satisfied the elements of entrapment-by-estoppel where the statements they relied on "declared the sales promotion program, which was the predicate for the indictment, to be legal"). Where the government statement only addresses one course of conduct, however, or where the defendant's reliance depends on conclusions by implication, courts have refused to find the defense is available. *See Pardue*, 385 F.3d at 108-109 (affirming exclusion of defense where defendant's claim was that he relied on waiver of prior conviction to carry firearm during Marines service to carry one once he was a civilian after his discharge because the defendant had "disclosed no affirmative representation from any government official regarding the legality of possessing ammunition in civilian life. He merely assumed, without being told, that he could possess ammunition after his discharge from the Marines"); *Benning*, 248 F.3d at 775, 775 n.4, 776 (finding a Bureau of Alcohol, Tobacco, and Firearms form delineating exceptions to bar on obtaining a firearm for

individuals previously convicted of crime could not provide basis for entrapment-by-estoppel defense for defendant who unlawfully obtained firearm as prohibited person where there was "no evidence that a government official ever informed [the defendant] that he could legally own or possess a firearm" and "[a]t most, [the defendant] suffered from a lack of explanation rather than an affirmative misleading interpretation of the statute"); *United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (finding form notifying defendant that it was a felony to reenter the United States within five years of deportation did not qualify as an affirmative government statement that reentry after five years was lawful); *United States v. W. Indies Transp.*, 127 F.3d 313, 314 (3d Cir. 1997) (affirming district court's refusal to instruct jury on entrapment-by-estoppel defense where the placard from the U.S. Coast Guard on which the defendants claimed to have relied to illegally dump material in the ocean addressed the discharge of "nonplastic trash" a certain distance from shore and "ma[de] no representations about the legality of the defendants' conduct—dumping scrap metal off-shore").

The Defendant's instruction does not hew to the required specificity of the defense and instead repeatedly instructs the jury that all it must find is that the Defendant was "led to believe" his conduct was lawful. This improperly suggests to the jury that it can find the Defendant is entitled to acquittal even where all the Defendant can offer is his own extrapolations from inapposite government statements. This risk is particularly great given the Defendant's complete failure to identify even a single government statement on-point and his clear intention to argue that he concluded he could defy the subpoena based on his application of the "rationales" underlying various, disparate government documents, *see* ECF No. 86 at 5-7. Such a defense, however, is just a good-faith reliance defense because it erases the need for affirmative conduct from the government and leaves only the Defendant's belief that the law excused his conduct. Good-faith

reliance defenses are not available under the charged statute, *see, e.g.*, *Bart v. United States*, 203 F.2d 45, 49-50 (D.C. Cir. 1952), *reversed on other grounds*, 349 U.S. 219 (1955) ("A witness does not insulate himself from contempt by asserting a reason for a refusal to answer."); *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) ("The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident."), and the instruction is, therefore, improper.

In addition to this general objection to the Defendant's proposed instruction, the Government also identifies here the ways in which specific paragraphs in the proposed instruction are misstatements of the law:

Objection to Paragraph 1

The Government objects to the first paragraph because it erroneously states that the defense requires only that government statements "led him to believe his conduct would be lawful."  This is objectionable for the reasons outlined above.

Objection to Paragraph 2

The Government objects to the second paragraph because it does not actually instruct the jury in relation to anything it must find but instead provides unnecessary background on the legal underpinnings of the defense.  It includes numerous legal terms like "actual authorization" that are not further defined in the instruction and purports to quote from various cases but edits the quotations in ways that are misleading and misstate the defense.  For example, the Defendant includes a quote from *Abcasis* that reads in the actual case as follows: "The defense of entrapment by estoppel does not depend solely on absence of criminal intent.  Nor is it limited to the circumstance of actual authorization.  It focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by law."  45 F.3d

at 44.  The Defendant replaces the clause of "to do the act forbidden by law," however, with "to take the action he took."  This misstates the nature of the offense, which is one premised on the fact that the government has erroneously instructed someone that his criminal conduct is lawful.  As an initial matter, there is no basis for including such cherry-picked, miscellaneous quotes from cases that do nothing but provide unnecessary legal background.  Even if there were, such cherry-picked quotes should not be misleadingly altered.  *See United States v. Pray*, 869 F. Supp. 2d 44, 50 (D.D.C. 2012) ("A defendant has no right to have any instruction on [the defendant's defense theory] given in the particular form he desired, or with any special emphasis." (internal quotation marks and citation omitted) (alteration in original)).

Objection to Paragraph 3

The Government objects to the third paragraph because it suggests the defense is available in circumstances broader than the law allows—specifically, it suggests to the jury that the defense relates to a defendant's interpretation of his mere "duties, rights, and obligations" and not to statements that his conduct was not a crime.  The Defendant does not explain why the general summary of the defense provided in the various model instructions that several circuits have already written is not adequate.  *See, e.g.*, 9th Cir. Model Crim. Jury Instr. 5.4 ("The defendant contends that [if] [although] [he] [she] committed the acts charged in the indictment, [he] [she] did so reasonably relying upon the affirmative advice of an authorized [federal government official] [agent of the federal government].").

Objection to Paragraph 4

The Government objects to the fourth paragraph because it erroneously instructs the jury that, as a matter of law, the Defendant was "entitled to look to the Department of Justice's OLC opinions and other Department of Justice authoritative writings for guidance as to what his rights,

obligations, and duties were with respect to the subpoena, to reasonably rely on the guidance provided in the OLC opinions and other Department of Justice authoritative writings, and to act in a manner he reasonably believed the OLC opinions and other authoritative writings authorized." This instruction removes necessary factual findings from the jury's consideration. For example, two elements of the defense that the Defendant must prove to the jury are that a government agent "affirmatively assured [him] that certain conduct [was] legal," *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *see also United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal"), and that the government agent "was responsible for interpreting, administering, or enforcing the law defining the offense," *Chrestman*, 525 F. Supp. 3d at 31 (citation omitted). Instructing the jury that the Defendant was "entitled" to look to, rely on, and violate the law based on Department writings, as he requests, improperly relieves the Defendant of his burden with respect to these two elements.

For authority to support his proposed fourth paragraph, the Defendant cites the Supreme Court's opinion in *PICCO*. As noted above, the Court in that case found that a regulation from the relevant government agency could provide the basis for an estoppel defense. In finding as such, the Court concluded, among other things that the defendant "had a right to look to [the agency's] regulations for guidance" because it "is the responsible administrative agency" with respect to the relevant law. 411 U.S. at 674. The Court did not, however, suggest that, as a matter of law, anytime a defendant claims he relied on a statement from an agency he is entitled to have done so, yet that is what the Defendant's proposed instruction would communicate to the jury. And doing so would run contrary to all of the court decisions following *Raley*, *Cox*, and *PICCO* holding that the authority of the government agent to make statements on the law and the existence of the statement are elements for the jury to find.

38

<u>Objection to Elements of the Defense</u>

The Government objects to the elements of the defense as articulated in the Defendant's proposed instruction.   The first element the Defendant proposes is erroneous because the Defendant's belief about whether executive privilege was invoked as a general matter is irrelevant to the elements of entrapment by estoppel.   As outlined above, the question the jury must answer under an estoppel defense is whether OLC sanctioned the specific circumstances of the Defendant's conduct—which includes the specifics of what he was and was not told by Justin Clark, on behalf of President Trump, as well as what he was told by the White House Counsel's Office, and how what he was told and by whom aligned with the conduct addressed in the OLC opinions.

The second element proposed by the Defendant also is erroneous.   As he does at other points in the proposed instruction, the Defendant seeks an instruction that the defense is available where government statements merely "give rise to a reasonable belief" that an individual's conduct is legal.  This stretches the defense too far, as outlined above.  Indeed, this element along with the first the Defendant proposed provides nothing more than a mistake-of-law defense, because under the Defendant's proposed instruction all the Defendant would have to show is that he believed his conduct was sanctioned, not that it was affirmatively represented to him that it was.  His proposal completely eliminates from the defense the principle that the defense is focused on affirmative misleading statements/conduct by the government.   All of the defendants in the cases cited above—*Benning*, *Pardue*, *Ramirez-Valencia*, and *W. Indies Transp.*—made essentially the same claims for relief and they were uniformly rejected.  The Defendant's formulation is so broad, in fact, that any defendant could argue that the wording of the relevant criminal statute "gave rise to a reasonable belief" that his conduct was legal and avoid accountability for his crimes.

The Defendant cites the Sixth Circuit's opinion in *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992), and a concurring opinion from *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J.), as support for his proposed elements, but the elements he proposes are nowhere articulated in either *Levin* or *Barker*. In fact, the Sixth Circuit has promulgated its own model instruction on an entrapment-by-estoppel defense based on *Levin*, which the Defendant does not acknowledge or offer. And *Levin* and the Sixth Circuit model make clear the Defendant must prove that a government agent "announced that the charged criminal act was legal." *Levin*, 973 F.2d at 468; *see also* 6th Cir. Model Crim. Jury Instr. 6.09 (same). Moreover, both *Levin* and Judge Merhige's concurring opinion in *Barker* articulate the elements in a manner similar to other courts in this circuit, *see Chrestman*, 525 F. Supp. 3d at 31 (*United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)); *United States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009) (citing *W. Indies Transp.*, 127 F.3d at 313); numerous other cases the Government has cited throughout its pleadings, *see, e.g.*, ECF No. 52 at 7; and in the various pattern instructions the circuits have issued on the defense. The Defendant's proposal aligns with none of these.

        Objection to Penultimate Paragraph

The Government objects to the penultimate paragraph of the Defendant's proposed instruction because it improperly instructs that "if you find that the defendant reasonably relied on any opinion of the Office of Legal Counsel of the United States Department of Justice in taking the course of action he took, you must find him not guilty." This instruction to acquit the Defendant based on reliance on "any" OLC opinion eliminates the requirement that the government statement at issue address the Defendant's specific criminal conduct and again invites acquittal on a mere good-faith reliance basis.

Objection to Last Paragraph

The Government objects to the last paragraph of the Defendant's proposed instruction for three reasons. First, the proposed instruction that the jury can consider the Defendant's attorney's testimony is erroneously broad because it does not foreclose the Defendant from suggesting to the jury that his attorney's independent opinion of what the OLC opinions may or may not allow can provide a basis for acquittal. As the Government has pointed out before, this improperly risks having the jury substitute the Defendant's attorney's conclusions about what the law might allow for the government's statements of what the law allows. *See, e.g.*, *W. Indies Transp.*, 127 F.3d 299 at 314 ("The entrapment by estoppel defense applies only to representations made by government officials, not to asserted reliance on legal advice or representations from non-governmental actors. Representations made by [a] private entity as to the legality of [the defendant's conduct] cannot remotely establish a valid entrapment by estoppel defense."); *see also* Gov't Reply, ECF No. 70, at 6-8 (discussing the improper substitution of the Defendant's counsel's statements for the government's). Second, the instruction allows the jury to consider "the advice" the Defendant's attorney gave him but does not specify that the advice is only relevant if the Defendant has first received an affirmative statement from the government that his planned course of conduct is lawful. The very case on which the defendant relies to support his request only noted the relevance of a defendant's attorney's advice to reasonableness after it found he had established he had been affirmatively misled by an authorized government agent. *See United States v. Tallmadge*, 829 F.2d 767, 770, 775 (9th Cir. 1987). Finally, the Defendant's proposed instruction artificially narrows what the jury is to consider to determine reasonableness to his attorney's conclusions. *See, e.g.*, *Chrestman*, 525 F. Supp. 3d at 31 (requiring that the defendant's reliance be reasonable "in light of the identity of the agent, the point of law misrepresented, and the

41

substance of the misrepresentation"); *W. Indies Transp., Inc.*, 127 F.3d at 313 ("[R]easonable reliance means a defendant must establish that 'a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'"); *see also* 9th Cir. Model Crim. Jury Instr. 5.4 (instructing that, in deciding whether the defendant has made out an estoppel defense, "you should consider all of the relevant circumstances, including the identity of the federal government [official] [agent], what the [official] [agent] said to the defendant, and how closely the defendant followed any instructions the [official] [agent] gave").

The Defendant's proposed instruction on entrapment by estoppel should be rejected. The Defendant has failed to make out a prima facie case of the defense and so cannot present it to jury in any event, such that there will be no basis at trial to give the instruction. Even if he had, however, his proposal is completely untethered from the established elements of the defense and his far-reaching departures from standard instructions on the defense that have been adopted across circuits include erroneous and misleading statements of the law.

## <u>DEFENSE PROPOSED INSTRUCTION: PUBLIC AUTHORITY</u>

Mr. Bannon asserts that he acted in reliance on public authority. Specifically, he contends that he took action with respect to the subpoena in this case in reliance on the former President of the United States's invocation of Executive Privilege and on official writings of the United States Department of Justice on the impact of the invocation of executive privilege on the rights, duties, and obligations of the recipient of a subpoena concerning which executive privilege has been invoked.

A defendant who commits an offense in reliance on public authority does not act willfully and should be found not guilty.[1]

To be found not guilty based on reliance on public authority, the defendant must prove that each of the following things are more likely true than not true:

- That former President Trump requested, directed, or authorized Mr. Bannon to engage in the conduct charged against him [or that former President of the United States, Donald Trump, through his authorized agent, Justin Clark, advised Mr. Bannon that he was invoking executive privilege as to the subpoena the Select Committee served on Mr. Bannon and instructed Mr. Bannon that based on his invocation of executive privilege, to the fullest extent permitted by law, Mr. Bannon

---

[1] "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring). *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).

43

was to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena;; and (c) not provide any testimony concerning privileged material in response to the Subpoena];

- That former President Trump had the actual authority to grant authorization for the defendant to engage in this conduct; On this point, I instruct you that a former President of the United States has the authority to invoke executive privilege concerning his communications with others and that once he invokes executive privilege, it is presumptively valid;[2] and

- In engaging in this conduct, the defendant reasonably relied on the former President's authorization, along with authorization from legal opinions from the Department of Justice's Office of Legal Counsel and other official Justice Department writings authorization. In deciding this, you should consider all of the relevant circumstances, including what the former President instructed, what the Department of Justice OLC opinions and other authoritative writings said, and how closely the defendant followed any instructions the official gave.[3]

---

[2] *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974; *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); Olson OLC Opinion of May 30, 1984 [Doc. 58-10] at 136: "In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that 'the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions.'"  "Thus the President's assertion of privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties."

[3] Adapted from Fed. Crim. Jury Instr. 7th Cir. 6.06 (2020 ed.).

**United States' Objection to Defense Proposed Instruction—Public Authority**

The Government objects to the Defendant's proposed instruction on public authority for two reasons: 1) he has not made the requisite showing to present the defense at trial as an initial matter and so is not entitled to an instruction for a defense he cannot present; and 2) even if he had made the requisite showing and could present the defense at trial, his proposed instruction is a misstatement of the law.

First, the Defendant is not entitled to any instruction on public authority because he cannot present such a defense at trial.  As noted in the Government's objection to the Defendant's proposed instruction on entrapment by estoppel, at the end of trial, defendants are entitled to instructions on their theory of the case, including their affirmative defenses, only "if the record contains sufficient evidence from which a reasonable jury could find" for the defendant on his theory."  *Akhigbe*, 642 F.3d at 1083 (internal quotation marks and citation omitted); *see also Nwoye*, 663 F.3d at 462-63 (applying this standard to affirmative defense).  The Defendant can only present evidence in support of a public-authority defense at trial in the first place, however, if he has made a prima facie showing of the defense to the Court.  *See, e.g.*, *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015) ("[A] defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Kuai Li*, 475 F. Supp. 2d 590, 593 (E.D. Va. 2007) (excluding evidence of a public-authority defense where the defendant could not establish that the official whose direction he claimed to follow had the actual authority to engage the defendant in the illegal conduct).  For the reasons the Government has briefed several times, the Defendant has failed to do that here because he has not identified any authorized government agent who directed him to commit the crime of contempt of Congress.  *See* ECF No. 52 at 14-19; ECF No. 65 at 20-24; ECF

No. 70 at 9-14.  Having failed to make a prima facie showing of the defense, the Defendant cannot present evidence of the defense at trial, and there will therefore be no basis in the record to allow the jury to be instructed on the elements of a public-authority defense.

Second, even if the Defendant had met his burden to present the defense at trial, and subsequently met his burden to be entitled to an instruction on it, the instruction he proposes should be rejected because it does not require that the jury find the Defendant received an instruction to commit the crime at the direction of an authorized government agent.  The public authority defense is not available for individuals acting at the direction of private individuals.  It is available only for those told to engage in criminal conduct by a government agent authorized to direct them as such.  *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) ("The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'" (citations omitted)).  The Defendant's instruction erases this requirement.

The Defendant claims the proposed instruction is "adapted" from the Seventh Circuit's pattern jury instruction, but, in fact, the Defendant's proposal replaces the pattern instruction's requirements that a direction to commit a crime come from an authorized government agent with a requirement that the instruction come from the former President, who was a private citizen.  Specifically, the Seventh Circuit pattern requires the jury to find that the Defendant has proven by a preponderance that:

1. An [agent; representative; official; name] of the [United States] government [requested; directed; authorized] the defendant to engage in the conduct charged against the defendant in Count[s] __; and

2. This [agent; representative; official; name] had the actual authority to grant authorization for the defendant to engage in this conduct; and

3. In engaging in this conduct, the defendant reasonably relied on the [agent's; representative's; official's; name] authorization. In deciding this, you should consider all the relevant circumstances, including the identity of the government official, what that official said to the defendant, and how closely the defendant followed any instructions the official gave.

7th Cir. Model Crim. Jury Instr. 6.06 (2020). Clearly, the former President was not a government official at the time the Defendant was served with and defied the subpoena—which is why the Defendant cannot present a public-authority defense in the first place. The Defendant appears to understand this given that he seeks to change the elements of the defense in his proposed instruction.

The alternative wording the Defendant proposes for the first element is also erroneous because it requires the jury not to find that the Defendant was directed to commit the offense as required—that is, that the Defendant received an instruction that he must defy the subpoena in total—but that the Defendant was instructed to make various privilege assertions in response to the subpoena.

The Defendant's proposed instruction that the defense is available if the jury finds that the Defendant reasonably relied on Department writings is erroneous because this instruction is untethered to the identity of the government official who directed the Defendant to commit contempt. In a public-authority defense, it is a defendant's reasonable reliance on the authorization they receive from the public official directing them that is at issue, not their reasonable reliance on ancillary statements from other government actors. *See Alvardo*, 808 F.3d at 484 (requiring proof that "the defendant . . . reasonably relied on that authorization when engaging in that conduct"); *see also supra* 7th Cir. Model Crim. Jury Instr. 6.06.

Finally, the Defendant's proposed instruction is barred by controlling law on the meaning of "willful" in the contempt of Congress statute because, at bottom, it is merely a good-faith

reliance defense in disguise.  That is, the Defendant wishes the jury to be instructed that he had a reasonable belief executive privilege had been asserted and that it therefore excused his compliance.  Reliance on the law is not a defense to contempt of Congress, as noted numerous times above.  The instruction therefore invites the jury to acquit on a basis not available under the law and cannot be provided.

### DEFENSE PROPOSED INSTRUCTION: APPARENT AUTHORITY

Mr. Bannon has asserted the defense of apparent authority, among other defenses to the charges against him. The defense of apparent authority requires a reasonable belief, whether that belief is correct or mistaken, that the source for the information relied upon had the authority to license the conduct at issue and did so.[1]

I instruct you that if you find that Mr. Bannon reasonably believed that he was authorized to respond to the subpoena as he did, based on former President Donald J. Trump's invocation of executive privilege and his belief that the former President had the authority to license him to respond as he did, you must find him not guilty, even if his belief in the former President's authority was mistaken.

Similarly, I instruct you that if you find that Mr. Bannon reasonably believed that he was authorized to respond to the subpoena as he did, based on the Office of Legal Counsel's opinions of other Department of Justice authoritative writings and his belief that these OLC opinions and other writings had the authority to license him to respond as he did, even if his belief in the authority of these sources was mistaken, then you must find him not guilty.

---

[1] *United States v. Barker*, 546 F.2d 940, 947-948, 954-957 (D.C. Cir. 1976); Model Penal Code § 2.04(3)(b).

**<u>United States' Objection to Defense Proposed Instruction—Apparent Authority</u>**

The Government objects to the Defendant's proposed instruction on apparent authority for three reasons: 1) a defense of apparent authority is not available under the law and, even if it were, the Defendant has not met the threshold requirement to present it to a jury; 2) the instruction he proposes is not supported even by the single concurring opinion he claims to establish the defense; and 3) the instruction is actually a good-faith reliance defense instruction which is not available under the statute.

First, as the Government has briefed previously, ECF No. 65 at 24-26, there is no apparent public authority defense. Indeed, the D.C. Circuit has rejected it. *United States v. North*, 910 F.2d 843, 878-81 & n.10 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990). An instruction on a defense that does not exist under the law is not appropriate. *Cf. United States v. Tarantino*, 846 F.2d 1384, 1403-04 (D.C. Cir. 1988) (finding defendant was not entitled to an instruction on the law that was not legally relevant to the charged offense).

Second, even if an apparent authority defense did exist, it is a species of a public authority defense that relies on apparent instead of actual authority and requires therefore that it be a government official's apparent authority on which a defendant acts, not a private individual. As articulated by Judge Wilkey in the concurring opinion in *Barker* that the Defendant relies on, it also requires the jury to find that the Defendant's belief was not only subjectively reasonably, but objectively so. *See United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 n.9 (D.C. Cir. 1991) (noting that, assuming the defense exists, "a defendant must show at least that he 'honestly and reasonably' believed that his actions were being committed pursuant to lawful authority, and the belief must be 'objectively reasonable.'" (quoting *Barker*, 546 F.2d at 947–49)); *Barker*, 546 F.2d

at 949 (Wilkey, J.) (requiring "both (1) facts justifying [his] reasonable reliance on [the official's] apparent authority and (2) a legal theory on which to base a reasonable belief that [the official] possessed such authority.").  The Defendant's proposed instruction includes neither of these elements and, with respect to his proposal regarding the former President, suffers from the same infirmity as his public authority proposal in that it allows the jury to acquit the Defendant simply if he believed a private individual told him he could commit the crime.

Finally, the Government objects to the instruction because it, like the Defendant's other proposed instructions is simply a good-faith reliance instruction that is not available in contempt of Congress cases.  Specifically, like his public-authority proposal, the Defendant's proposal with respect to the former President invites the jury to acquit if they find that the Defendant believed executive privilege excused his compliance.  In addition, his proposal with respect to OLC opinions does not require that the jury make any findings that there was an objective basis for believing that OLC had the authority to direct him to commit crimes.

**DEFENSE PROPOSED INSTRUCTION: CONSIDER ONLY CRIME CHARGED**

You are here to determine whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or crime that is not charged in the indictment.[1]

---

[1] *See* Fed. R. Evid. 404(b) (permitting admission of other crimes evidence only for specific, limited purposes); *Huddleston v. United States*, 485 U.S. 681, 691 (1988) (discussing protections that should employed to protect against unfair prejudice should such other crimes evidence be admitted).

**United States' Objection to Defendant's Proposed Instruction—
Consider Only Crime Charged**

The Government objects to the Defendant's Proposed Instruction "Consider Only Crime Charged" because its purpose is not clear, and depending on its purpose, the proposed instruction is either insufficient or unnecessary.

First, if the Defendant is proposing the instruction in the event that the Court permits the introduction of "other crimes" evidence under Rule 404(b) of the Federal Rules of Evidence, the proposed instruction is insufficient. Instead, the Government submits that the Court should offer the Redbook instruction on Other Crimes Evidence, Instruction 2.321. The Redbook instruction provides the necessary and proper structure for ensuring that the jury properly considers such evidence, including by identifying the specific "other" evidence in question, and directly instructs the jury to consider such evidence only for a proper purpose under the rule (e.g., motive, identity, common scheme or plan, absence of mistake).

If the Defendant is proposing the instruction generally, without reference to 404(b) evidence, the instruction is unnecessary and confusing.

## DEFENSE PROPOSED INSTRUCTION: ELEMENTS OF THE OFFENSE

Mr. Bannon is charged with violating 2 U.S.C. § 192. That statute reads, in pertinent part, as follows:

> *Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of [Contempt of Congress] . . ..*

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged.

These elements are the following:

*First*, that the U.S. House of Representatives had the constitutional power to investigate the matter in issue or to make the particular inquiry:[1]

*Second*, that the Select Committee was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority granted by the U.S. House of Representatives;[2]

---

[1] *Watkins v. U.S.*, 354 U.S. 178, 187 (1957); *Sinclair v. U.S.*, 279 U.S. 263, 292 (1929); *McGrain v. Daugherty*, 273 U.S. 135, 173-174 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 196 (1880).

[2] *Gojack v. U.S.,* 384 U.S. 702, 708 (1966) (holding that specific, properly authorized subject of inquiry is essential element of offense under statute making is misdemeanor to refuse to answer questions when summoned before congressional committee); *U.S. v. Rumely*, 345 U.S. 41, 42-43 (1953); *U.S. v. Lamont*, 236 F.2d 312, 315 (2d Cir. 1956), *affirming* 18 F.R.D. 27, 33

54

*Third*, that the information sought from Mr. Bannon by the Select Committee was

pertinent to the authorized inquiry;[3]

*Fourth*, that the subpoena seeking documents and testimony was valid and issued

pursuant to lawful authority of the Select Committee and the authority of the U.S. House of

Representatives;[4] and

*Fifth*, that Mr. Bannon's actions in responding to the subpoena constituted a willful

default. "Willful default" as used in these instructions means that Mr. Bannon knew or should

reasonably have known that his conduct was unlawful, was conscious of wrongdoing, and that

his actions were deliberate and intentional – and not the result of accident, mistake, or

misunderstanding, or the assertion of a valid privilege.[5]

---

(S.D.N.Y.1955); *U.S. v. Orman*, 207 F.2d 148, 153 (3d Cir. 1953); *U.S. v. Kamin*, 136 F.Supp. 791, 793 (D. Mass. 1956).

[3] *Barenblatt v. U.S.*, 360 U.S. 109, 123 (1959); *Sacher v. U.S.* 356 U.S. 576, 577 (1958).

[4] *Gojack v. U.S.*, 384 U.S. 702, 716 (1966) ("[t]he legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense"); *see also Yellin v. United States*, 374 U.S. 109 (1963) (holding that failure of House Committee on Un-American Activities to comply with its rule on executive sessions excused a witness' refusal to answer questions, and witness was entitled to prove such defense when he discovered at his contempt trial that his rights under the executive session rule had been violated); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum).

[5] *Quinn v. U.S.*, 349 U.S. 155, 165 (1955); *U.S. v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) (holding that the statutory provisions concerning penalties for contempt of Congress, 2 U.S.C. § 192 and § 194, constitute "an orderly and often approved means of vindicating constitutional claims arising from a legislative investigation.") (citing *Sanders v. McClellan*, 463 F.2d 894, 899 (D.D.C. 1972); Under these provisions, constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.D.C. 1971); *Tobin v. United States*, 113 U.S. 306 F.2d 270, 276 (D.D.C. 1962); *see also United States v. Seeger*, 303 F.2d 478, 481–82 (2d Cir. 1962); *Licavoli v. U.S.*, 294 F.2d 207, 208 (D.D.C. 1961); *see also Ratzlaf v. United States*, 510 U.S. 135, 138 (1994); *United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir. 2019); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C.

**United States' Objection to Defendant's Proposed Instruction—**

**[SET FORTH IN SEPARATE FILING]**

---

2020); United States v. Myers, 2008 U.S. Dist. LEXIS 43981, *4, 2008 WL 2275457 (N.D. W. Va., June 3, 2008) (quoting Licavoli on "willfulness" and explaining that "willfulness" in the criminal contempt context means "a volitional act done by one who knows or reasonably should be aware that his conduct is wrongful."); "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena.  *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938).  There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute.  Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).*See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring).

**DEFENSE PROPOSED INSTRUCTION: DEFENSE THEORY**

Mr. Bannon has pleaded "Not Guilty" to the charges contained in the indictment. This plea of not guilty puts in issue each of the essential elements of the offense as described in these instructions and imposes on the government the burden of establishing each of these elements by proof beyond reasonable doubt.

The defendant contends that he is not guilty of the crimes charged based on the following:

After he received the subpoena from the Select Committee, he was advised by his attorney, Mr. Costello, that the former President of the United States had invoked executive privilege with respect to the materials and testimony sought by the subpoena. Mr. Bannon's attorney, Mr. Costello, further advised Mr. Bannon that because executive privilege had been invoked, Mr. Bannon was legally prohibited from complying with the subpoena and it was not his privilege to waive – that Mr. Bannon was bound by the former President's invocation of privilege and had to honor it.

Mr. Bannon's attorney told Mr. Bannon that official, authoritative writings from the Department of Justice supported this position. Specifically, Mr. Bannon's attorney informed Mr. Bannon that binding, authoritative, official opinions from the Department of Justice's Office of Legal Counsel and other official Department of Justice writings provided that when executive privilege has been invoked, the recipient of the subpoena could not be compelled by a congressional committee to appear as a witness or produce documents.

Mr. Costello further informed Mr. Bannon that the Department of Justice official writings also provided that the subpoena was invalid and unconstitutional because Select Committee rules would not allow a lawyer for the former President to attend the deposition to assert executive privilege.

Mr. Costello also informed Mr. Bannon that official, authoritative Department of Justice writings provided that, since executive privilege had been invoked by the former President, the criminal contempt of Congress statute that is charged in the indictment against Mr. Bannon could not be used against Mr. Bannon.

Based on the foregoing, and the principles underlying the Department of Justice writings, Mr. Costello directed Mr. Bannon that he was not permitted to comply with the subpoena.

The defendant also contends that he is not guilty of the crimes charged because Mr. Costello, on Mr. Bannon's behalf, tried to seek an accommodation with the Select Committee. Mr. Costello, on Mr. Bannon's behalf, advised the Select Committee that Mr. Bannon would comply with the subpoena if the Select Committee worked out the executive privilege issue with former President Trump or if a judge ordered Mr. Bannon to comply (in a civil enforcement proceeding). The Committee did not agree to either option. Later, Mr. Costello, on Mr. Bannon's behalf, as a further accommodation effort, asked the Committee to give him a one-week extension on compliance with the subpoena so that he could study a lawsuit that had just been filed which he believed could possibly resolve the privilege issue. Again, the Select Committee rejected the requested accommodation.

Mr. Bannon relied, at all times and in all regards, on the advice of his experienced attorney, Mr. Costello, and followed his advice at all relevant times. Mr. Bannon, in defending against the indictment in this case contends that he is not guilty because he relied on the advice of his attorney and therefore did not "willfully make default" as the charge requires the government to prove. Mr. Bannon also asks you to find him not guilty because he sought, through his lawyer, to accommodate the Select Committee and its subpoena in several ways, but the Select Committee unlawfully refused to engage in the constitutionally mandated accommodation process. He

contends that by seeking an accommodation, as required, Mr. Bannon did not willfully default as that term is used in the charges against him.

Mr. Bannon also raises the defense of entrapment by estoppel, the legal definition of which will be provided to you in these instructions, contending that he reasonably relied on the invocation of executive privilege and the official Department of Justice writings and reasonably believed, based on them, that he was not permitted to comply with the subpoena, that the subpoena was invalid and unconstitutional, that he could not be compelled to comply with the subpoena, and that he would not be committing a crime by not complying, and that the criminal contempt of Congress statute charged in this case could not be applied to him under all of the operative circumstances. Mr. Bannon also raises the defense of public authority and apparent public authority, which will be explained to you in these instructions, contending that he acted pursuant to the authority of the former President's direction when invoking executive privilege and on the authority of the Department of Justice through its OLC opinions and other official, authoritative writings. Mr. Bannon asserts that the fact that his experienced criminal defense attorney believed that he could not and did not have to comply with the subpoena and so advised him, in reliance on the invocation of executive privilege and the Department of Justice writings, further makes his (Mr. Bannon's) belief and reliance fully reasonable, as does the fact that the Department of Justice writings on which he relied have been consistent in what they provide for at least six decades and remain in full force.

Mr. Bannon also defends against this case by contending that it is barred by the constitutional principle of separation of powers, by the constitutional principle of executive privilege, and by the due process clause for the failure to provide a person so situated with fair

notice that he could be subjected to criminal prosecution under this statute, given the invocation of executive privilege and the Department of Justice official writings.

Mr. Bannon contends that if he was wrong to rely on the advice of his attorney and on the other principles that he believed both prohibited him and excused him from complying with the subpoena, then he was simply mistaken and misunderstood the situation, and therefore did not "willfully make[] default" and cannot be found guilty under this indictment.

Mr. Bannon also contends in defense of the charges against him that he is not guilty because the subpoena was not valid, as it was not issued based on valid authority, due to the improper composition of the Select Committee and its failure to adhere to binding rules.[1]


**United States' Objection to Defendant's Proposed Instruction—**

**[SET FORTH IN SEPARATE FILING]**

---

[1] 1A Fed. Jury Prac. & Instr. § 19:01 (6th ed.), 1A Fed. Jury Prac. & Instr. § 19:01 (6th ed.) (adapted to the defense theory in this case).  Mr. Bannon relies on the briefing on these issues already on record in this case and will not burden the Court here with a reiteration of the same unless the Court so directs.

## DEFENDANT'S STATEMENT ON THIS FILING

Mr. Bannon believes that the jury should be allowed to hear evidence at trial about what actually happened. Every defendant is allowed to present evidence on his actions and thoughts, and the actions of others, that pertain to the charges against him. Sometimes this is referred to as the theory of defense. The jury instructions do not determine the evidence that can be presented at trial. That is putting the cart before the horse. It is the evidence at trial that is followed by the jury instructions – which provide the jury with the framework under which to consider the trial evidence. The evidence that Mr. Bannon intends to present in support of his theory of defense are necessary in order to protect his Fifth and Sixth Amendment rights to due process, compulsory process, effective assistance of counsel, and fundamental fairness.

That is why, for instance, the trial judge in the *Licavoli* case allowed the defense to present extensive testimony at trial by the attorney for Mr. Licavoli who represented him before the congressional committee. At trial, Mr. Licavoli's attorney testified at length for the defense about his interactions and communications with the congressional committee, his interactions with and statements made to Mr. Licavoli as to the appropriate actions to take in response to the subpoena. This testimony was allowed because the trial judge acknowledged that he could not exclude the evidence on the ground that the theory is wrong – instead, a defendant has a right to present evidence on his theory of defense. The *Licavoli* trial judge informed trial counsel that he would allow the testimony, and then instruct the jury at the end of the case that that particular evidence was immaterial, given the trial judge's understanding of the intent element of 2 U.S.C. § 192.[1]

Mr. Bannon reserves all rights pursuant to Fed. R. Crim P. 30, and applicable law, regarding the instructions to be read to the jury at trial. We understand that the Court directed that

---

[1] *United States v. Peter Licavoli,* Criminal Action No. 951-59, U.S. District Court for the District of Columbia, March 28 - 30, 1960.

the parties to submit proposed jury instructions early, and we have complied with the Court's directive to the parties at the hearing on June 15, 2022, where the Court modified the Scheduling Order [Doc. 25]  as follows: "the portion of Paragraph 7 that requires the submission of the Proposed Jury Instructions to be done on July 11th, we'll just change that to June 30th; that's the only modification." Hearing Transcript, June 15, 2022, at 142. However, there are practical reasons that we cannot submit at this time every jury instruction that we will want the jury to hear at trial. For instance, there remain unresolved discovery disputes. In addition, the attendance of material defense witnesses is still a pending matter. Under those circumstances, it is not possible for us to predict all potential instructions that the defense may wish the jury to hear.

The timing and content of a criminal defendant's request for jury instructions are governed by Fed. R. Crim P. 30(a), which provides in pertinent part that "[a]ny party may request in writing that the court instruct the jury on the law as specified in the request. The request must be made at the close of the evidence or at any earlier time that the court reasonably sets. When the request is made, the requesting party must furnish a copy to every other party." Rule 30(d) also governs the content and timing of any *objection*, as follows: "Objections to Instructions. A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." We reserve our right under Fed. R. Crim. P. 30(a) to object in writing to any portion of the final jury instructions to be given, or requested but not given, *before the jury retires to deliberate*.

In addition, the parties have fully briefed, and the Court has decided, Mr. Bannon's Motion To Dismiss The Indictment [Doc. 58] and the Government's motion to exclude the advice of counsel defense [Doc. 29. By our filing proposed jury instructions here (and in any future

submission on instructions) we are not retreating from the positions taken in those, or other filings

the defense has submitted in this case. In short, we do not believe that this is the place to re-argue

factual and legal positions already clearly stated. By this submission, we make no waiver – for

purposes or reconsideration or appeal – of any issue already presented.

### Government's Objection to Defendant's "Statement"

The Government objects to the inclusion in the parties' joint submission of jury instructions

the "Defendant's Statement on this Filing," which the Government received this afternoon.  The

Defendant's Statement appears to include his complaints about the schedule for submitting jury

instructions to the Court and to argue that he should be permitted to introduce irrelevant evidence

at trial with no authority.  Because it is neither a jury instruction nor an objection to a jury

instruction, the Government asked the Defendant to submit his Statement separately from the

parties' joint submission of jury instructions.  The Defendant declined and informed the

Government that he would not participate in the joint filing at all unless his Statement were

included.  Finally, the Government notes that both parties already stated in the cover filing of this

submission that "certain instructions may change, subject to issues that arise during trial or

additional pretrial motions and orders."

Respectfully submitted,

/s/ *M. Evan Corcoran*
M. Evan Corcoran (D.C. Bar No. 440027)
400 East Pratt Street – 9th Floor
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

/s/ *David I. Schoen*
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

/s/ *Robert J. Costello*
Robert J. Costello (*Pro Hac Vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/s/ *Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

*Counsel for United States of America*

# MANUAL OF
# MODEL CRIMINAL
# JURY INSTRUCTIONS

## FOR THE
## DISTRICT COURTS OF THE
## NINTH CIRCUIT

Prepared by the
Ninth Circuit
Jury Instructions Committee

————————————

## 2022 Edition

*Last Updated March 2022*

### 5.4 Entrapment by Estoppel Defense

The defendant contends that [if] [although] [he] [she] committed the acts charged in the indictment, [he] [she] did so reasonably relying upon the affirmative advice of an authorized [federal government official] [agent of the federal government].

To establish this defense, the defendant has the burden to show by a preponderance of the evidence that:

First, an authorized [federal government official] [agent of the federal government] was empowered to render the claimed erroneous advice;

Second, the [federal government official] [agent of the federal government] had been made aware of all the relevant historical facts;

Third, the [federal government official] [agent of the federal government] affirmatively told the defendant the proscribed conduct was permissible;

Fourth, the defendant relied on the false information; and

Fifth, this reliance was reasonable.

In deciding this, you should consider all of the relevant circumstances, including the identity of the federal government [official] [agent], what the [official] [agent] said to the defendant, and how closely the defendant followed any instructions the [official] [agent] gave.

A preponderance of the evidence means that you must be persuaded that the things the defendant seeks to prove are more probably true than not true.  This is a lesser burden of proof than the government's burden to prove beyond a reasonable doubt each element of [*specify crime charged*].

If you find that the defendant has proved that [he] [she] reasonably relied upon the affirmative advice of the federal government [official] [agent], you must find the defendant not guilty of [*specify crime charged*].

### Comment

For applications of this defense, *see, e.g.*, *United States v. Lynch*, 903 F.3d 1061, 1075-78 (9th Cir. 2018) (marijuana dispensary); *United States v. Schafer*, 625 F.3d 629, 637 (9th Cir. 2010) (marijuana manufacturing); *United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004) (firearms offense); *United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109-10 (9th Cir. 2000) (immigration offense).

This defense applies only to advice from federal officials or authorized agents of the federal government, and not state or local officials.  *See, e.g.*, *United States v. Mack*, 164 F.3d 467, 474 (9th Cir. 1999) (rejecting entrapment by estoppel defense "because Mack did not rely on the advice or authority of federal officials or agents") (emphasis omitted)); *United States v.*

*Collins*, 61 F.3d 1379, 1385 (9th Cir. 1995) (noting entrapment by estoppel defense applies only when defendant relies either on "a federal government official empowered to render the claimed erroneous advice, or on an authorized agent of the federal government, who has been granted the authority from the federal government to render such advice.") (citation omitted).

Regarding "authorized agents," the Ninth Circuit has held that "[c]learly, the United States Government has made licensed firearms dealers federal agents in connection with the gathering and dispensing of information on the purchase of firearms. Under these circumstances, we believe that a buyer has the right to rely on the representations of a licensed firearms dealer, who has been made aware of all the relevant historical facts . . . ." *United States v. Tallmadge*, 829 F.2d 767, 774 (9th Cir. 1987). *See also United States v. Brebner*, 951 F.2d 1017, 1027 (9th Cir. 1991) (noting defendant may rely on advice of either federal government official, or "an authorized agent of the federal government who, like licensed firearms dealers, has been granted the authority from the federal government to render such advice").

"To establish affirmative authorization, a defendant must do more than show that the government made vague or even contradictory statements. Instead, the defendant must show that the government affirmatively told him the proscribed conduct was permissible." *Lynch*, 903 F.3d at 1076 (citations and internal quotations marks omitted) (rejecting entrapment by estoppel defense when government official advised that legality of marijuana business "was up to the cities and counties to decide how they wanted to handle the matter," because statement was too vague and ambiguous to qualify as affirmative authorization).

Reasonable reliance occurs if "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *Id*. at 1077 (citation omitted). *See also Batterjee*, 361 F.3d at 1217 (holding that defendant dealing with complicated intersection of immigration and criminal law, who was told by federal licensee that he was "legally purchasing and possessing a firearm," could reasonably rely on those assurances because he had no reason to believe he needed to inquire any further).

No Ninth Circuit authority clearly sets out the burden that a defendant must satisfy to make out an entrapment by estoppel defense. However, the Ninth Circuit has held that the entrapment by estoppel defense is very similar to the public authority defense, and the preponderance standard applies to the public authority defense. *See, e.g.*, *United States v. Doe*, 705 F.3d 1134, 1146 (9th Cir. 2013) (holding that defendant had burden of proving public authority defense by preponderance of the evidence because defense did not serve to negate any elements of charged offenses); *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) ("The difference between the entrapment by estoppel defense and the public authority defense is not great."). *See also United States v. Beaty*, 245 F.3d 617, 623 (6th Cir. 2001) (applying preponderance standard); *United States v. Stewart*, 185 F.3d 112, 124 (3rd Cir. 1999) (applying preponderance standard).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' OBJECTIONS TO DEFENDANT'S PROPOSED JURY INSTRUCTIONS

As noted in the parties' joint proposed jury instructions, ECF No. 89, the Defendant provided for the first time at 12:15 p.m. on June 30, 2022, his views on the elements of the charged offenses and a defense theory-of-the-case instruction. By this filing, the Government provides its objections to those proposed instructions.

### United States' Objection to Defendant's Proposed Instruction—Elements of the Offense

The Government objects to the Defendant's proposed elements of the offense for three reasons: 1) it does not inform the jury of the specific charge in each count; 2) it does not include an essential element of the offense; and 3) the elements it does include are erroneous, confusing, and pose questions of pure law to the jury.

First, the Government objects to the instruction because it does not inform the jury of what the Defendant is specifically charged with in each count. Since the Defendant also has moved to preclude reading or providing the indictment to the jury, the Government believes the Court must inform the jury of the conduct it is to judge for each count. The Defendant did not object to the inclusion of this in the Government's proposed instruction or to any of the other introductory statements in the Government's proposed instruction and it is the Government's position that those should be used.

-2768-

Second, the Government objects to the instruction because it does not instruct the jury that it must find the Defendant was subpoenaed by the Select Committee.  Although the fact that the Committee issued a subpoena to the Defendant likely will not be in dispute at trial, the statute is only applicable to someone who has been summoned, and, therefore, the Government believes this is an essential element of the offense and that its proposal on this element is sufficient, *see* ECF No. 89 at 7.  It does not appear that the Defendant objects to this element as proposed by the Government.

Third, the Government objects to the instruction because its articulation of the elements of the offense are either erroneous statements of the law, confusing, or require the jury to decide questions of pure law.

Objection to First Element

The first element improperly requires the jury to decide a pure question of law.  The Government does not dispute that "a conviction for a violation of Section 192 cannot be sustained unless it appears that Congress had the constitutional power to investigate the matter in issue or to make the particular inquiry."  *United States v. Seeger*, 303 F.2d 478, 481 (2d Cir. 1962).  However, this issue raises questions not of fact for the jury to decide, but of law for the Court to decide, which it already did in ruling on the Defendant's motion to dismiss—specifically, the question of the proper scope of Congress's authority to investigate under the Constitution.  Juries are not the proper decisionmaker on questions of law.  *United States v. Gaudin*, 515 U.S. 506, 513 (1995).

Not only is retaining this question for the Court required under the law, it is consistent with prior practice in the contempt of Congress context.  In *Wilkinson v. United States*, the Supreme Court affirmed the defendant's conviction for contempt of Congress by, among other things, rejecting his claims that the subpoena issued to him exceeded Congress's constitutional authority

because, according to the defendant there, it did not have a valid legislative purpose and improperly encroached on his First Amendment constitutional rights.  365 U.S. 399, 410-11, 413-15 (1961). The lower court findings on those issues that the Supreme Court affirmed, however, were not made by the jury.  They were made by the trial judge.  On these issues, the trial judge in that case instructed the jury:

> You are not concerned with whether the committee had a right to ask the questions or why it asked them. . . . You are not to consider . . . whether the claimed invalidity of the committee, lack of jurisdiction of the committee . . . because these are matters for my decision, and I have decided as a matter of law that the committee was properly authorized by Congress . . . .  I have determined as a matter of law that the committee had the right to ask this question.

*Wilkinson v. United States*, 774 F. Supp. 1360, 1362-63 (N.D. Ga. 1991).

Even if the constitutional authority of the Congress were a question for the jury, the Defendant's proposed instruction provides no guidance to the jury on how to judge whether Congress "had the constitutional power to investigate."  Jury instructions must not only accurately state the law.  They also must "provide the jury with sufficient understanding of the issues and applicable standards."  *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  The Defendant's proposed instruction does not define the constitutional power of Congress or otherwise describe the bounds of it to provide any standards by which the jury can judge whether the Committee is acting within that power.

Objection to Second Element

The Government objects to the second element because it is confusing and does not provide clear guidance to the jury.  First, it is confusing because it requires a finding of an authorized "investigation" and then a separate finding that "the inquiry" is within the scope of the authorized investigation.  But the Committee's "investigation" and "inquiry" are one

3

in the same, so the Defendant's instruction erroneously suggests there are separate questions the jury is supposed to determine under the element. By the Defendant's citation to *Gojack*, the Government believes the Defendant is seeking an instruction that the jury find the Defendant was subpoenaed in relation to an authorized investigation. *See Gojack v. United States*, 384 U.S. 702, 708 (1966) ("It can hardly be disputed that a specific, properly authorized subject of inquiry is an essential element of the offense."). The element as proposed by the Defendant also appears to be redundant to his proposed third element, which requires the jury to find pertinency to "the authorized inquiry," thus inherently requiring the jury to first identify an authorized inquiry.

The Government believes its formulation of this element, which incorporates the pertinency requirement for which the subject matter of the inquiry is a prerequisite, *see id.* ("Our decisions have pointed out that the obvious first step in determining whether the questions asked were pertinent to the subject under inquiry is to ascertain what that subject was." (citation and internal quotation marks omitted)), is clearer, simpler, and uses more plain English, such that it will provide better guidance to the jury. *See* ECF No. 89 at 7 ("Second, that the subpoena sought testimony or information pertinent to the investigation that the Select Committee was authorized to conduct."). At bottom, the parties do not appear to dispute the nature of the element, just the wording. If the Defendant had been willing to confer with the Government at all on the proposed elements of the offense, the parties may have been able to clarify this issue for the Court.

<u>Objection to the Third Element</u>

The Government objects only to the extent that 1) it believes the Defendant's proposal for his second and third elements unnecessarily and confusingly divides

pertinency to an authorized subject of inquiry into two elements, as described above; 2) it provides no definition of pertinency; and 3) the Government believes the word "investigation" is a simpler, more concrete word for lay jury instructions than "inquiry," which the Defendant's proposed element uses, and that, at the very least, the instructions should consistently use one or the other throughout so that the jury does not mistakenly conclude there are separate investigations and inquiries it is to consider.  With respect to defining pertinency, the Defendant has provided no objection to the Government's proposed definition in its proposed instruction, and the Government thinks this definition is sufficient and appropriate to provide guidance to the jury on what it is being asked to evaluate, *see* ECF No. 89 at 7-8.

> Objection to the Fourth Element

The Government objects to the Defendant's proposed fourth element for two reasons.  First, the proposal instructs the jury that it must find the subpoena "valid" and issued pursuant to "lawful authority" but nowhere defines these terms, thus failing to provide sufficient guidance to the jury on the standards it must use to judge "validity" and "lawful authority."  The Government can only guess that the Defendant wishes this instruction to require the jury to find the Committee complied with all of its rules based on his previous briefing and citation to *Yellin v. United States* as authority for this element. The jury, however, cannot be left to guess at what it is being asked to find.

Second, to the extent this is what the Defendant wishes this element to convey, the instruction is erroneous because the Government is not required to prove as an essential element that the Committee complied with all of its rules, as the Government has previously briefed, ECF No. 71 at 2-5, and described in its objection to the Defendant's

proposed defense theory instruction on this issue, ECF No. 89 at 22-24. The Government has found no case in which the Government has, as part of its burden, presented evidence of every procedural rule governing a committee and then presented evidence and testimony about compliance with each of those rules, and the Defendant cites none. It is not an essential element of the offense—indeed, defendants can waive protections they receive under a committee's rules, which removes it from the jury's consideration. *United States v. Bryan*, 339 U.S. 323, 330 (1950) ("We hold that the Government is not required to prove that a quorum of the Committee was present when the default occurred, and that under the circumstances disclosed by this record a defense of lack of a quorum was not open to respondent."). The Government's burden to prove essential elements of a criminal offense, however, is not waivable.

The Defendant cites *Gojack v. United States* and *Yellin* as support for his claim, but they do not support his position. First, the Defendant makes a selective citation from *Gojack*—specifically, "[t]he legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense," 384 U.S. at 716—that, when read in context, demonstrates the "essential element" the Court was discussing in that case was the need for the subject matter in relation to which the committee was conducting proceedings to be authorized. For example, the sentence following the one the Defendant quotes states, "If the contempt occurs before a subcommittee, the line of authority from the House to the Committee and then to the subcommittee must plainly and explicitly appear, and it must appear *in terms of a delegation with respect to a particular, specific subject matter*." *Id*. (emphasis added). The Court later concludes, "[a]bsent proof of a clear delegation to the subcommittee of

*authority to conduct an inquiry into a designated subject*, the subcommittee was without authority which can be vindicated by criminal sanctions under s 192, *nor was there an authoritative specification of the 'subject matter of the inquiry' necessary for the determination of pertinency* required by the section." *Id*. at 716-17 (emphasis added). This "essential element" identified by *Gojack* is captured by the Government's proposed instruction regarding pertinence to an authorized inquiry and the Defendant's second and third elements—although, for the reasons outlined above, the Government's formulation is preferable.

*Yellin* also does not stand for the proposition that the Government must prove every rule and compliance with it in the first instance, for it acknowledges the burden is on a defendant to prove a committee has not followed procedural rules that confer rights on witnesses. 374 U.S. 109, 123 (1963) ("It may be assumed that if petitioner had expressly rested his refusal to answer upon a violation of Rule IV and the Committee nevertheless proceeded, he would be entitled to acquittal, *were he able to prove his defense*. Otherwise, if Yellin could be convicted of contempt of Congress notwithstanding the violation of Rule IV, he would be deprived of the only remedy he has for protecting his reputation. Certainly the rights created by the Committee's rules cannot be that illusory." (emphasis added)).

If the Defendant had properly preserved any of the rules objections he has raised during this case—all of which he was on notice about at the time he defaulted, an appropriate instruction would instead inform the jury that it was entitled to acquit the Defendant if it found the Defendant had shown 1) that the Defendant objected to compliance with the subpoena on the ground that the Committee had violated the rule; 2) informed the Committee of his objection at the time he failed to comply; and 3) that the

Committee actually violated the rule. *See Bryan*, 339 U.S. at 332-33 ("[I]f respondent had

legitimate reasons for failing to produce the records of the association, a decent respect for

the House of Representatives, by whose authority the subpoenas issued, would have

required that she state her reasons for noncompliance upon the return of the writ. . . . To

deny the Committee the opportunity to consider the objection or remedy it is in itself a

contempt of its authority and an obstruction of its processes."); *Yellin*, 374 U.S. at 123.

Further, this instruction would belong in a separate defense instruction, not as part of the

elements of the offense the Government must prove.

<u>Objection to Fifth Element</u>

The Government objects to this element's instruction that the jury must find the

Defendant "knew or reasonably should have known that his conduct was unlawful, was

conscious of wrongdoing." As the Government has briefed many times and this Court has

found, mistake-of-law defenses are not available to the Defendant.

The Government also objects to the instruction that the jury must find the

Defendant's failure to comply was not the result of an assertion of a "valid privilege." As

the Government has briefed, the question of whether the Defendant actually had a privilege

excusing his compliance is a pure question of law—i.e., did executive privilege apply to

all of the records sought by the subpoena and did executive privilege allow the Defendant

to refuse to appear in the first place for a deposition. *See, e.g.* Gov't Reply, ECF No. 35,

at 22; Gov't Resp., ECF No. 43, at 56; Gov't Mot. in Limine, ECF No. 85, at 14-17. The

scope of a former President's executive privilege is not a question that is appropriate for a

jury to decide. The Defendant should have raised executive privilege as a defense at the

motion to dismiss stage. To the extent he did not do so, the Government has has raised it in its

motion in limine to ensure the issue is properly presented and decided by the Court pretrial. ECF No. 85 at 14-17.  In any event, the Defendant's instruction provides no guidance on how to judge whether the Defendant had a "valid privilege."  The instructions it would require demonstrate that it is a pure legal question.  For example, the Court would have to provide extensive instructions on what executive privilege is, which types of information it covers and which it does not, how it is appropriately asserted, and whether it applies to the mere appearance of someone at a deposition.  The Defendant provides no suggestions for these, and these are all legal considerations, not factual ones.

Finally, the Government objects to not providing instruction on what "willful" does *not* mean, as the Government proposes.  The Defendant has indicated through his many briefs and his proposed jury instructions that he has no intention of abiding by this Court's order granting the Government's motion to exclude good-faith reliance defenses.  Without including the Government's proposed instruction on unavailable defenses, ECF No. 89 at 8, the Defendant could easily exploit words like "misunderstanding," which he vigorously argues for including in the instruction in his objection to the Government's instruction on the elements, to argue that it means a misunderstanding as to the Defendant's legal obligations to comply.  But when considered in the context of the caselaw, "misunderstanding" clearly does not mean mistake-of-law, since courts have consistently rejected that such a defense is available.  It means instead that a defendant misunderstood a direction to appear or produce records from a congressional committee—for example, believing he had been granted an extension, believing the committee was still considering his objection, or believing that he was to appear in one place instead of another.  *See, e.g.*, *Empsak v. United States*, 349 U.S. 190, 202 (1955) (finding the "deliberateness" required

under the statute required that the defendant be given by the relevant committee a "clear-cut choice between compliance and noncompliance" and that, where a defendant properly raised an objection to complying, this required that the committee overrule the objection).

The Government's proposed instruction on the meaning of willfulness and the Government's instruction on unavailable defenses should be used instead of the Defendant's.  The definition of willfulness the Government offers in its proposal was copied almost verbatim from an instruction approved by the D.C. Circuit in *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947).  And the unavailable defenses instruction prevents the Defendant from exploiting otherwise undefined words to present irrelevant and unavailable defenses to the jury.

### United States' Objection to Defendant's Proposed Instruction—Defense Theory

The Government objects to the Defendant's Proposed Instruction "Defense Theory" because it misstates the law, describes defenses that are not available to the Defendant in this case, argues the Defendant's case, and attempts to put legal issues before the jury.

As a general matter, the Defendant's proposed instruction is improper and unnecessary because it restates multiple defense theories for which he has already proposed separate instructions, including Advice of Counsel, ECF No. 89 at 15, Accommodation Requirement, *id*. at 18, Authority of U.S. House of Representatives, *id*. at 21, and Entrapment by Estoppel, *id*. at 27, and includes advocacy about those defenses.  Accordingly, if the Defendant were entitled to any instructions on these issues as defenses—which he is not—his proposed Defense Theory instruction would be duplicative and improperly turn the Court into the narrator of the Defendant's arguments.  *See United States v. Hoffecker*, 530 F.3d 137, 176-77 (3d Cir. 2008) (finding defendant

not entitled to theory of defense instruction "because they were argument" and because "many of [defendant's] 'theory of the defense' instructions… duplicated other instructions that the District Court gave on the subject of criminal intent"); *United States v. Chowdhury*, 169 F.3d 402, 407 (6th Cir. 1999) ("Although a district court is required to instruct the jury on the theory of defense, it is not error to refuse to give 'instructions which merely represent a defendant's view of the facts of the case,' rather than a distinct legal theory."); *United States v. Paradies*, 98 F.3d 1266, 1287 (11th Cir. 1996) ("We find that the district court was correct in finding that the requested jury charge was partisan and that it aspired 'to place the . . . defendants' desired factual findings into the mouth of the court.'"); *United States v. Barham*, 595 F.2d 231, 244 (5th Cir. 1979) ("a defendant is not entitled to a judicial narrative of his version of the facts, even though such a narrative is, in one sense of the phrase, a 'theory of the defense.'") (internal quotations omitted).

With respect to the substance of the Defendant's proposed instruction, the Government takes the issues in turn.

Advice of Counsel

The Defendant's proposed instruction describes in detail advice that the Defendant's attorney allegedly provided him, and states that if the Defendant was wrong to rely on that advice, he did not willfully default. Instructions are not intended to be recitations of facts the Defendant finds favorable—indeed, his attorney's advice will not even be presented at trial since it is irrelevant, so the instruction seeks to present information to the jury that will not be in evidence. Moreover, this is not an accurate statement of the law for the reasons stated in the Government's objections to the Defendant's proposed instructions on willfulness, *see* ECF No. 89 at 13, and advice of counsel, *id*. at 17, the Government incorporates by reference those arguments here.

Accommodation

The Defendant's proposed instruction argues that the Defendant attempted to reach an "accommodation" with the Committee and that having done so provides him with a defense for willfully defaulting.  There is no such defense, and the Defendant should not be permitted to present it to jury.  The Government incorporates by reference here its objection to the Defendant's proposed instruction on "accommodation."  *See* ECF No. 89 at 19.

Entrapment by Estoppel

The Defendant's proposed instruction argues entrapment by estoppel.  The Government incorporates by reference here its objection to the Defendant's proposed instruction on the subject. *See* ECF No. 89 at 31.

Authority and Composition of the Committee

The Defendant's proposed instruction claims as a defense his after-the-fact claims about the authority and composition of the Committee.  The Government incorporates by reference here its objection to the Defendant's proposed instruction on the authority of the House.  ECF No. 89 at 22.

Constitutional Issues

The Defendant's proposed instruction also argues that his prosecution is barred by "the constitutional principle of separation of powers, by the constitutional principle of executive privilege, and by the due process clause."  These are legal questions that are not proper for the jury's consideration and are an attempt at nullification.  As stated elsewhere in the Government's filings, juries do not decide questions of law. *Gaudin*, 515 U.S. at 513.  And argument and instructions aimed at nullification are improper. *See United States v. Wilkerson*, 966 F.3d 828,

835436 (D.C. Cir. 2020) (citing *United States v. Dougherty*, 473 F.2d 1113, 1130– 37 (D.C. Cir.

1972)).

                                   Respectfully submitted,

                                   MATTHEW M. GRAVES
                                   United States Attorney
                                   D.C. Bar No. 481052

               By:     */s/ Amanda R. Vaughn*
                                   J.P. Cooney (D.C. 494026)
                                   Molly Gaston (VA 78506)
                                   Amanda R. Vaughn (MD)
                                   Assistant United States Attorneys
                                   United States Attorney's Office
                                   601 D Street, N.W.
                                   Washington, D.C. 20530
                                   (202) 252-1793 (Vaughn)
                                   amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :        Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant*. | : |
| | : |

## OPPOSITION TO GOVERNMENT'S OMNIBUS MOTION IN LIMINE

Defendant Stephen K. Bannon, by and through undersigned counsel, files this Opposition to the United States' Omnibus Motion In Limine, and in support thereof states as follows:

## Summary Of Argument

The Government feels that it must remind this Court of the rules of evidence so as to "maintain proper order and keep the jury focused." [Doc. 85 at 17]. What purports to be a primer on evidence, however, reflects little understanding of the adversary nature of a criminal trial, or the constitutional guarantees – such as confronting witnesses regarding bias – that are essential to a fair trial. The blanket rulings sought by the Government are inconsistent with the rights guaranteed to every defendant. The Government's motion continues its effort to deny Mr. Bannon the right to defend himself at trial factually and through the tools our Constitution guarantees. We believe that the Court is well-positioned to make evidentiary determinations on relevance at trial. We also believe that this Court is well-equipped to make evidentiary and instructional rulings at trial that would avoid the admission of evidence that would prejudice or confuse the jury. For these reasons, the Government's motion in limine should be denied.

1

## ARGUMENT

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Crim. P. 401. All relevant evidence is admissible, except as otherwise provided by the United States Constitution, by Act of Congress, or by applicable rule. Fed R. Crim. P. 402.

### Fears Of A Circus Atmosphere Are Unfounded

The Government is concerned about a "circus atmosphere at trial." [Doc. 85 at 1 – 3] This fear is baseless. As the Government well knows, Mr. Bannon has been present for numerous pretrial hearings. At these hearings – although some matters were closely contested – decorum prevailed. The same will hold true at trial.

### The Constitution Requires That Mr. Bannon Be Permitted To Confront The Witnesses Against Him On Bias

The Government makes the meritless argument that Mr. Bannon should not be allowed to test the credibility of the Members of Congress and staff – and who the prosecutors have characterized as "complainants"[1] – by questioning them about political motivations that affected the actions they took that led to this prosecution. [Doc. 85 at 5 – 7]. The Government's request should be denied, because the jury must be allowed to hear evidence that bears on witness credibility.

"The Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The Sixth Amendment "guarantees a

---

[1] *See* Hearing Tr. March 16, 2022, at 26 (AUSA stated that Congress is "essentially, the complainant in this case").

2

defendant the right to cross-examine the witnesses against him or her, and it is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *United States v. Wilson*, 605 F.3d 985, 1003, 390 U.S. App. D.C. 368 (D.C. Cir. 2010) (citation omitted); *see also Brookhart v. Janis*, 384 U.S. 1, 3 (1986) (finding that cross-examination is "the principal means by which the believability of a witness and the truth of his testimony can be tested."). Indeed, the Supreme Court has explained that defendants should be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness" and that denying defendants 'the right of effective cross-examination . . . would be constitutional error of the first magnitude[.]" *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (citations and internal quotation marks omitted); *see also Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006) (explaining that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (quoting *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)).

Cross-examination is an invaluable tool in helping jurors determine a fact in issue at a trial because it helps them to determine the weight to afford to each witness's testimony. *Douglas v. Alabama*, 380 U.S. 415, 419 (1965) (jurors are entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on testimony that purports to provide 'a crucial link in the proof . . . of petitioner's act.').

A witness's partiality and motive for testifying is always relevant to the credibility of that witness. Probing the motivation of a witness for testifying is an important aspect of the right to confrontation. *Davis*, *supra*, 415 U.S. at 316-17 ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-

3

examination."). "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id*. at 316 (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)); *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Fed. Evid. § 607.04[2][b] (Joseph M. McLaughlin, ed., Matthew Bender 4th ed. 2013) ("The exposure of a witness's motivation in testifying is so significant that in a criminal case, curtailment of this right may amount to a denial of the defendant's Constitutional right to confrontation of witnesses or due process") (footnotes omitted).

As the Supreme Court explained, bias evidence is always relevant under Federal Rule of Evidence 401 because "[a] successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 51 450 (1984) (holding that proffered testimony regarding prosecution witness's gang membership sufficed to show potential bias in defendant's favor, and such extrinsic evidence is admissible to show bias). Accordingly, the ability of a defendant to question witnesses about potential bias is a "proper and important function of the Constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-17 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)); *see also U.S. Foster*, 986 F.2d 541, 44 (D.C. Cir. 1993).

A witness's membership in a certain group is a proper subject of cross-examination because it is probative of a witness's adoption of certain values and beliefs, and the strength of those values and beliefs. *Abel*, *supra*, 469 U.S. at 45 (a witness's membership in a group, even without proof that the witness has personally adopted its tenets, is "certainly probative of bias."). As explained by the Court in *United States v. Foster*, 986 F.2d 541 (D.C. Cir. 1993):

4

-2784-

This is not so much a matter of showing a witness to be lying. An effective trial lawyer can often manage to leave the jury with the impression that the witness is too caught up in his own view, his confusions, his own particular slant on things, that it simply does not matter whether the witness believes his own testimony.

*Id.* at 544; *see also Abel*, *supra*, 469, U.S. at 46 (bias may be induced by many factors, including a witness' like, dislike, or fear of a party, or by the witness' self-interest).

It is difficult to fathom the Government's position that politics are irrelevant to the issues in this case. *See* Doc. 85 at 3 ("the Defendant has attempted to make this case and the issues in it about politics, not the law and the facts"). Criminal trials do not occur in vacuums, and Mr. Bannon's trial should be no exception. Context matters. Mr. Bannon is a former advisor to President Donald Trump, a Republican. The subject of the Select Committee's inquiry is the January 6, 2021, attack on the United States Capitol, which followed a contested Presidential election. The Select Committee is composed primarily of Democrats. In violation of the Select Committee's authorizing resolution, only two of the Committee's nine members are Republicans. These Republicans were appointed by the Democratic Speaker of the House without consultation from the (Republican) Minority Leader – also in violation of the Select Committee's authorizing resolution – and have each publicly expressed their disagreement with Mr. Bannon's particular brand of conservatism on numerous occasions. The Select Committee refused to engage in the constitutionally mandated accommodation process with Mr. Bannon, in contrast to its dealings with other subpoenaed witnesses. Mr. Bannon must be permitted to present evidence on this.

Compounding this obvious bias, some Members of the Select Committee have created their own brand of bias – by entering into book deals that create a financial and reputational bias. They have a stake in seeing to it that the version of events they wrote about in their books become the official version of events. Select Committee Members were responsible for referring the resolution on contempt to the full U.S. House of Representatives. Four days before that vote took place,

President Biden, a Democrat, publicly stated that he "hope[d] the committee goes after" aides of President Trump who did not respond subpoenas from the Select Committee.[2] The subsequent full-House vote to refer Mr. Bannon to the U.S. Attorney's Office for prosecution was largely along party lines.[3] Most recently, of course, the Select Committee began a media campaign designed to influence the public to the maximum extent possible and to use these hearings, run by a television executive, expressly for political purposes."[4]   For these reasons, the political ideologies and affiliations of the witnesses are appropriate topics of cross-examination in this case because such information is relevant to the jury's determination of whether a witness's bias, ulterior motive, or personal animus undermines their credibility.

### Testing Investigatory Tactics Is Always Fair Game

        The Government seems to argue that Mr. Bannon wants the jury to "decide" whether the prosecutors or other Government actors committed misconduct. [Doc. 85 at 7] Not so. The jury will be asked to make no such decision. However, the jury must be allowed to hear about the criminal investigation. Evidence about how the investigation was conducted is relevant to the jury's determination as to whether the information obtained in that investigation is complete and

---

[2] Amy B. Wang, *Biden says Justice Department should prosecute those who refuse Jan 6 committee's subpoenas*, THE WASHINGTON POST (Oct. 15, 2021) https://www.washingtonpost.com/politics/2021/10/15/biden-says-justice-department-should-prosecute-those-who-refuse-jan-6-committees-subpoenas/.

[3] Claudia Grisales, *The House votes to hold Steven Bannon in Contempt for defying a subpoena*, *NPR* (Oct. 21, 2021 4:28 P.M.) https://www.npr.org/2021/10/21/1048051026/u-s-house-approves-criminal-contempt-referral-for-steve-bannon.

[4] Annie Karni and Luke Broadwater, *Jan. 6 Hearings Give Democrats a Chance to Recast Midterm Message (June 7, 2022) (with quotes from Select Committee members and others about their political goals)*. https://www.nytimes.com/2022/06/07/us/politics/jan-6-hearings-tv-democrats.html

reliable. *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995); *Carriger v. Stewart,* 132 F.3d 463, 481 (9th Cir. 1997); *United States v. Hanna,* 55 F.3d 1456, 1460 (9th Cir. 1995).

In *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000), the Ninth Circuit held that the district court erred when it instructed the jury not to consider defects in the government's investigation, noting that "[t]o tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information." *Id.* at 46.

At every stage of this case, the investigators have over-reached. The prosecutors may want to pretend ignore it.[5] But Mr. Bannon has the right at trial to test the evidence against him at trial, and how it was obtained. This necessitates an examination of the investigation through the adversary process.

### Where Evidence At Trial Is Based On Acts Of
### Material Witnesses Who Are Subpoenaed Yet Fail To Appear,
### The Jury May Consider That In Assessing The Reliability Of The Evidence

The Government argues that if subpoenaed congressional witnesses fail to appear for trial, that must be kept from the jury. [Doc. 85 at 8]. It is hard to understand the logic. The jury will be asked to determine issues based upon the actions and perhaps even the communications (if not excluded, as many will be, because they are themselves or contain within them hearsay statements inadmissible under Fed. R. Evid. 801) of congressional members and staff. If the witnesses who took the actions and engaged in the communications testify at trial, they can be tested on cross-

---

[5] This issue was referenced at the last hearing, as follows: "I do continue to have serious issues with how the government treated the situation of Mr. Bannon's counsel and also how the government does not appear to have any issue with its conduct." Hearing Tr., June 15, 2022, at 129 – 130.

examination. If they are under subpoena and fail to appear, then all congressional evidence must be excluded. We expect to move for dismissal on that basis, if necessary. But if that motion is not fully granted, the jury must be able to hear about their failure to appear pursuant to subpoena, so that that can be weighed in assessing the other evidence at trial.

The Government's reliance on *United States v. Barnett*, 890, F.2d 1233 (D.C. Cir. 1989) is misplaced because the defense does not intend to argue to the jury that the Government had the peculiar power to secure the testimony of the Select Committee witnesses and failed to do so. [*See* Doc. 85 at 8]. The defense simply thinks that it is proper for the jury to hear that the Select Committee witnesses in this case were validly served with trial subpoenas and invoked privilege to avoid providing documents and testimony in a criminal case in which they are the purported complainants. Therefore, the cases cited by the Government on this issue are inapposite to Mr. Bannon's case.

Furthermore, if the subpoenas in Miscellaneous Case No. 22-60 are quashed pursuant to the Speech or Debate Clause, Mr. Bannon should not be precluded from arguing that the Government's assertion of privilege mandates dismissal, or, at the very least, that the Government's evidence should be limited accordingly. As set forth in Mr. Bannon's Opposition to the Movants' Motion To Quash in Miscellaneous Case No. 22-60, House General Counsel's Motion To Quash creates a fundamental conflict between Mr. Bannon's Fifth and Sixth Amendments rights to compulsory process and to present a defense at trial, and the Movants' Speech or Debate Clause privileges. *See* Opp. To Mot. To Quash, *In re Non-Party Subpoenas,* No. 22-MC-60-CJN (D.D.C. June 27, 2021), ECF 1 at 3. Because Movants set in motion the prosecution of Mr. Bannon, their assertion of privilege must yield to the due process and liberty interests of Mr. Bannon. If the Court grants Movant's Motion To Quash, then the only next step

8

**-2788-**

consistent with due process would be to either exclude all congressional evidence at Mr. Bannon's trial or dismiss the charges entirely to preserve Mr. Bannon's Fifth and Sixth Amendment Rights. *Id.* Such an argument is relevant in Mr. Bannon's case and is also supported by decades of Supreme Court precedent holding that the Government "can invoke its evidentiary privileges only at the price of letting the defendant go free." *Id.* (citing *United States v. Reynolds*, 345 U.S. 1, 12 (1953)).

The Supreme Court has held, for instance, that a criminal action must be dismissed when the government, on the grounds of privilege, elects not to produce documents relevant and material to a government witness's testimony. *Jenks*, 353 U.S. at 657; *Id.* at 670-71 (holding that it is "unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."); *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (when disclosure of informer's identity, or of contents of his communication, is relevant and helpful to criminal defendant, or is essential to a fair determination of a cause, the trial court may require disclosure and, if government withholds the information on grounds of privilege, dismiss the action); *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) (dismissal of prosecution for making false statements to government about CIA activities in which defendant was involved because nature of defendant's assignments was central to the charges against him and government's assertion of State Secrets privilege with respect to same deprived defendant of his right to present a meaningful defense).

The court's holding in the *Rainey* case is also illustrative on this issue. *See United States v. David Rainey*, Crim. No. 12-CR-00291-KDE-DEK (E.D. La. Jul. 14, 2015). There, the district court dismissed an obstruction of Congress charge against a *Deepwater Horizon* executive because, having found that the subpoenaed Members of Congress had a valid Speech or Debate privilege immunizing them from compelled testimony, the court found that dismissing the charges

9

was the only way to preserve Mr. Rainey's right to a fair trial. *Id.*, ECF No. 510 at 29:17-30:1; *see also* Brian M. Heberling, *Congressional Gamesmanship Leads To An Acquittal in Deepwater Horizon Case: United States v. David Rainey: A Case Study*, 20 BERKELEY J. CRIM. L. 260, 262 (Fall 2015) (noting that one of the key takeaways from the *Rainey* decision is that there is only one United States when it comes to a criminal prosecution, rendering the consequences of a privilege assertion by Members of Congress attributable to the Executive Branch). Simply put, it would be antithetical to the Sixth Amendment to allow the Government to use the subpoenaed Select-Committee witnesses' invocation of legislative immunity as both a sword and a shield.

### Evidence About The Investigation Of
### This Misdemeanor Is Relevant, Not Prejudicial

The Government argues that no evidence should be introduced or arguments made about the steps taken by the investigators and prosecution team. They rely on authority where counsel seeks a verdict based upon sympathy because of the punishment involved, or arguments that suggest a crime was trivial. Here, as detailed above, the steps taken by the investigators and prosecution team are highly relevant for the jury, which must assess the reliability of evidence in light of how the investigation was conducted.

On the latter issue, in the event that any evidence is introduced that potentially would confuse or prejudice the jury on this issue, the jury can be instructed that "[t]he question of possible punishment of the defendant in the event of a conviction is not a concern of yours and should not enter into or influence your deliberations in any way." *See* Redbook Instruction No. 2.505. However, Mr. Bannon believes that the logical extension of the decisions in the line of cases following *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013) and he respectfully maintains that he ought to be permitted to inform the jury that the

10

Government contends that Mr. Bannon must be sentenced to a mandatory prison term if there is a conviction.  *See* 2 U.S.C. § 192.[6]

### The Meadows And Scavino Declinations Bear On Whether
### <u>USDOJ Has Adhered To Its Official Published Policy In This Prosecution</u>

The issue of prior official writings of the Department of Justice was fully address by the parties in the briefing on Defendant's Motion To Dismiss The Indictment. [*See* Doc. 58]. While this Court declined to find as a matter of law that the indictment should be dismissed on that basis, the facts pertaining to prior official are essential evidence that go to the elements of the offense, as well as to the defense theory of the case.

The defense has sought discovery about the investigation into two other Select Committee subpoena recipients similarly situated to Bannon who were referred to the U.S. Attorney's Office for prosecution under 2 U.S.C. § 192. (The Government has refused to produce the requested documents, despite a prior Court order that the defense believes obligates them to do so). The referral came after a roughly party-line vote by the U.S. House of Representatives. Sound familiar? The difference is that the U.S. Attorney's Office declined to prosecute – in accordance with official U.S. Department of Justice policy and official published writings. We are entitled to that information. And, because it bears on the elements of this offense or our defenses, the jury is entitled to hear it, too. The evidence will most certainly be relevant in determining whether the Government has met its burden of proof in this case.

---

[6] Daniel Epps and William Ortman, *The Informed Jury*, 75 Vand. L. Rev. 823 (2022); Rachel E. Barkow*, Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing*, 152 U. Pa. L. Rev. 33.

11

## Statements Of Counsel Are Not Evidence

The Government complains that defense counsel have gray hair. They seek a blanket restriction on any statements by counsel reflecting their life experience. [Doc. 85 at 10 -]. No such order would be appropriate. Instead, the Court should give the standard Redbook Instruction 2.105 that has been submitted as agreed by the parties, which states, in pertinent part, that "[t]he statements and arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence." Moreover, as the transcript of the June 15, 2022 Hearing reflects and as Government counsel well knows, the reference to experience with entrapment by estoppel [Doc. 85 at 10] was made solely in the context of addressing Government counsel's regularly occurring insulting and patronizing attacks in each of the Government's submissions, notwithstanding its own apparently evolving understanding of the defense [June 15, 2022 Hearing Tr. at 31].

## At This Stage, Evidence Bearing On The Elements Of
## The Offense, And Defenses, Are Fact Questions For The Jury

The Government seems to think that any issue raised in a motion pre-trial is a legal issue that is off-limits at trial. Specifically, the Government argues that the Defendant may not present evidence or argument that: (1) goes to the element of the offense pertaining to the validity of the subpoena and its issuance in accordance with the authority granted to the Select Committee by the U.S. House of Representatives [Doc. 85 at 11 – 14]; and (2) goes to the issue of whether Mr. Bannon willfully made default (by his actions after being informed that former President Donald J. Trump had asserted executive privilege). While the facts and law were fully briefed at the motions stage – and thus will not be repeated here – that does not mean they must be sealed away in a box. The Government cites several cases that have already been discussed at length by the parties in multiple filings. But they totally mis-read the one case that matters most on the question

12

of whether the jury ultimately gets to hear evidence that goes to the elements of the crime and

defenses, *United States v. Gaudin*, 515 U.S. 506 (1995). It would have this Court relieve it of its

Constitutional duty to prove every element of the crime charged to the jury's satisfaction beyond

a reasonable doubt.  The Court is well aware of the principles involved in *Gaudin;* so out of respect

for the Court and counsel we will not repeat them here.[7]

Dated: July 1, 2022                  Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

    /s/ Robert J. Costello
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

---

[7] *See* Hearing Tr., June 15, 2022, at 9 ("And we know, from Justice Scalia's opinion in *Gaudin*, that pertinency, which used to be a judge question, is actually a question for the jury. And at least the background, very strong background, principle is that elements of the offense go to the jury.").

13

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 1st day of July 2022, a copy of the foregoing Opposition to United States' Omnibus Motion In Limine was served *via* the Court's CM/ECF system on registered parties and counsel.

                                               <u>   /s/ M. Evan Corcoran  </u>
                                               M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

**ORDER**

Now upon consideration of the United States' Omnibus Motion In Limine, the Defendant's Opposition, the Reply, and the entire record in this case, it is hereby **ORDERED** that the Government's Motion is **DENIED**.

**SO ORDERED.**

_____
Hon. Carl J. Nichols
*United States District Judge*

Dated:

15

**-2795-**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE NON-PARTY SUBPOENAS | Case No. 22-mc-00060-CJN |
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEPHEN K. BANNON,<br><br>*Defendant.* | Criminal No. 21-670 (CJN) |

## REPLY IN SUPPORT OF MOTION TO QUASH

DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

July 5, 2022

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 3

   I.    The Subpoenas Do Not Comply with Rule 17 ................................................ 3

   II.   Bannon's Individual Arguments Fail ........................................................... 7

       A.  The Speech or Debate Clause Fully Applies .......................................... 7

       B.  The House's Amicus Brief Was No Waiver .......................................... 12

       C.  Bannon Has Not Met His Burden to Refute the High-Ranking Official Doctrine ... 14

       D.  The General Counsel of the House of Representatives is not a Proper Witness ...... 16

   III.  The Witnesses from the Select Committee Staff Can Address Any Relevant Information
       Necessary for Bannon's Defense ................................................................ 19

   CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Bardoff v. United States*,
    628 A.2d 86 (D.C. 1993) ......................................................................................16

*Barry v. United States ex rel. Cunningham*,
    279 U.S. 597 (1929) ............................................................................................19

*Bowman Dairy Co. v. United States*,
    341 U.S. 214 (1951) ..............................................................................................4

*Budowich v. Pelosi*,
    2022 WL 2274359 (D.D.C.) ...........................................................................8, 12

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
    968 F.3d 755 (D.C. Cir. 2020).............................................................................22

*Dep't of Army v. Fed. Lab. Rels. Auth.*,
    56 F.3d 273 (D.C. Cir. 1995)...............................................................................13

*Doe v. McMillan*,
    412 U.S. 306 (1973) ..............................................................................................8

*District of Columbia v. Hayes, Jr.*,
    2007-CDC-15462 (D.C. Super. Ct.) ...................................................................16

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) ...................................................................................7, 8, 10

*Eastman v. Thompson*,
    2022 WL 1407965 (C.D. Cal.) ...........................................................................17

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012).............................................................................21

*In re Est. of Ferdinand Marcos Hum. Rts. Litig.*,
    94 F.3d 539 (9th Cir. 1996) .................................................................................12

*In re Grabis*,
    2018 WL 1508754 (Bankr. S.D.N.Y.)................................................................12

*In re U.S. ("Kessler")*,
    985 F.2d 510 (11th Cir. 1993) .............................................................................15

*In re U.S. ("Reno & Holder")*,
    197 F.3d 310 (8th Cir. 1999) ........................................................... 16

*Irwin v. Veterans Affairs*,
    498 U.S. 89 (1990) .......................................................................... 13

*Jamul Action Comm. v. Stevens*,
    2014 WL 3853148 (E.D. Cal.) ........................................................ 12

*Ky. Dep't of Corr. v. Thompson*,
    490 U.S. 454 (1989) ........................................................................ 21

*McCarthy v. Pelosi*,
    480 F. Supp. 3d 28 (D.D.C. 2020) .................................................... 8

*McSurely v. McClellan*,
    553 F.2d 1277 (D.C. Cir. 1976) .................................................. 9, 10

*Olim v. Wakinekona*,
    461 U.S. 238 (1983) ........................................................................ 21

*Rangel v. Boehner*,
    785 F.3d 19 (D.C. Cir. 2015) ........................................................ 7, 8

*Republican Nat'l Comm. ("RNC") v. Pelosi*,
    2022 WL 1294509 (D.D.C.) ............................................... 8, 9, 17, 19

*Senate Permanent Subcomm. on Investigations v. Ferrer*
    856 F.3d 1080 (D.C. Cir. 2017) ...................................................... 12

*Simplex Time Recorder Co. v. Sec'y of Lab.*,
    766 F.2d 575 (D.C. Cir. 1985) ........................................................ 15

*Sparf v. United States*,
    156 U.S. 51 (1895) .......................................................................... 14

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) .................................................................... 2, 10

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) .................................................. 9, 14, 21

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ...................................................................... 9

*United States v. Arthur Andersen, LLP*,
    Crim. No. H-02-121 (S.D. Tex.) ........................................................15

*United States v. Bannon*,
    No. 21-670 (D.D.C.)..............................9, 13, 14, 17, 18, 19, 20, 21, 22

*United States v. Binh Tang Vo*,
    78 F. Supp. 3d 171 (D.D.C. 2015)...................................................4, 6

*United States v. Cuthbertson*,
    651 F.2d 189 (3d Cir. 1981) .................................................................6

*United States v. Ehrlichman*,
    389 F. Supp. 95 (D.D.C. 1974)..........................................................16

*United States v. Ferguson*,
    37 F.R.D. 6 (D.D.C. 1965) ...................................................................3

*United States v. Finn*,
    919 F. Supp. 1305 (D. Minn. 1995) ....................................................6

*United States v. Gaudin*,
    515 U.S. 506 (1995) ...........................................................................14

*United States v. Helstoski*,
    442 U.S. 477 (1979) ...........................................................................13

*United States v. Johnson*,
    383 U.S. 169 (1966) .............................................................................7

*United States v. Libby*,
    432 F. Supp. 2d 26 (D.D.C. 2006)....................................................4, 5

*United States v. Morgan*,
    313 U.S. 409 (1941) ......................................................................14, 15

*United States v. Moussaoui*,
    Crim. No. 01-455-A (E.D. Va.) ........................................................15

*United States v. Mullins*,
    2013 WL 3506547 (N.D. Ill.) ..............................................................6

*United States v. Nixon*,
    418 U.S. 683 (1974) .........................................................................5, 6

*United States v. North*,
    713 F. Supp. 1448 (D.D.C. 1989) ........................................................................15

*United States v. Rainey*,
    No. 12-291 (E.D. La.) ........................................................................................11

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir.) ....................................................................................17

*United States v. Shanahan*,
    252 F.R.D. 536 (E.D. Mo. 2008) .........................................................................6

*United States v. Wittig*,
    250 F.R.D. 548 (D. Kan. 2008) ...........................................................................6

**Statutes**

2 U.S.C. § 192 ...................................................................................... 10, 11, 15

**Rules**

Fed. R. Crim. P. 16 ....................................................................................... 3

Fed. R. Crim. P. 17 ....................................................................................... 3

Fed. R. Evid. 602 ........................................................................................ 23

**Legislative Authorities**

H. Res. 503, 117th Cong. (2021) ................................................................... 19

H. Res. 730, 117th Cong. (2021) ................................................................... 19

Rule II, Rules of the U.S. House of Representatives, 117th Cong. (2021) .................................. 13

**Other Sources**

CNN, *"Misdemeanor from hell": Watch Bannon speak out after he's released*,
    YouTube (Nov. 15, 2021),
    https://perma.cc/5SN8-N3DA ............................................................................1

Jose Pagliery, *Steve Bannon Digs Into Roger Clemens' Playbook to Try to Beat Congress*,
    The Daily Beast (June 13, 2022),
    https://perma.cc/GC2S-VL8L ............................................................................7

**-2801-**

Kyle Cheney, *Judge rejects Bannon's effort to dismiss criminal case for defying Jan. 6 select committee*, POLITICO (June 5, 2022), https://perma.cc/3SPG-VZLN ............................................................................................1

2 Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Crim § 275 (4th ed. 2022)............. 4

**INTRODUCTION**

At a press conference in front of the courthouse after Defendant Bannon's initial appearance in this case, Bannon's counsel said of the Select Committee, "this thing was a scam from the beginning."[1]  Bannon himself declared, "I'm telling you right now, this is going to be the misdemeanor from hell," and that "[w]e're tired of playing defense, we're going to go on the offense on this . . . stand by."[2]  On June 15, 2022, at another courthouse press conference following a motions hearing before this Court, Bannon expressed interest in turning his trial into a political spectacle, referring to Members of Congress using derogatory nicknames, and saying: "I look forward to having Nancy Pelosi, and little Jamie Raskin, and shifty Schiff in here in trial answering questions under my . . . tough" lawyers.[3]

The criminal trial subpoenas issued by Bannon to the Speaker of the House, two other House leaders, the Chairman and all the Members of the January 6th Select Committee, the House General Counsel, and Select Committee staffers are apparently part of Bannon's strategy to turn this trial into political theater.  But those subpoenas should be quashed for several reasons:  *First*, Bannon has not identified any information sought by the subpoenas necessary to his defense.  His efforts to challenge the Select Committee's authority address legal, not factual, disputes.  *Second*, any evidence legally relevant and necessary to his defense can be competently addressed by Select Committee employees Kristin Amerling (Chief Counsel and Deputy Staff

---

[1] CNN, *"Misdemeanor from hell": Watch Bannon speak out after he's released*, YouTube, at 01:18-01:20 (Nov. 15, 2021), https://perma.cc/5SN8-N3DA (last viewed July 5, 2022).

[2] *Bannon says "we're taking down the Biden regime" ahead of first court appearance*, Irish Central (Nov. 16, 2021), https://perma.cc/J58D-6LKG.

[3] Kyle Cheney, *Judge rejects Bannon's effort to dismiss criminal case for defying Jan. 6 select committee*, POLITICO, at 00:02-00:13 (June 15, 2022), https://perma.cc/3SPG-VZLN (last viewed July 5, 2022).

Director) and Sean Tonolli (Senior Investigative Counsel), whom the Select Committee has made clear will be made available to testify at trial.  Quashing the subpoenas, therefore, deprives Bannon of no evidence necessary to his defense.

Moreover, there is a gaping flaw in one of the central themes that Bannon sounds in his opposition to the House motion to quash:  Bannon falsely equates the House Members' attempt to litigate the validity of their subpoenas with his own unilateral decision to defy a Congressional subpoena.  There is no unfairness in permitting the House Members to raise valid legal defenses like any other litigant would.  To the contrary, fairness would point in the opposite direction.  Bannon should not be permitted to use this opportunity to compel testimony from sitting Members of Congress and Members of a time- and security-sensitive investigation into a violent attack on the Capitol complex when he himself stands accused of failing to comply with his own subpoena for information about that subject.

In any event, Bannon fails to recognize that he, unlike the House Members (and their staff), has no valid constitutional or other ground empowering him to entirely disregard the Committee's subpoena.  Indeed, this Court has already found that Bannon lacked a clear legal basis to unilaterally defy his subpoena.  By contrast, the plain text of the Constitution establishes that Members of Congress and their staff have immunity from questioning outside of Congress for their legislative activities.  This immunity is a central feature of our democracy because it prevents both the Executive and Judicial Branches from interfering with Members of Congress (and their officers and staff) as they carry out their legislative responsibilities.  *Accord Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) ("In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.  Courts are not the place for such controversies." (footnote omitted)).  Bannon committed a criminal offense by

defying the Select Committee's subpoena to him, but he has no legally valid ground to compel the Speaker and other House Members (and their staff) to comply with criminal trial subpoenas that he has issued in an impermissible and transparent attempt to turn his trial into a political circus.

**ARGUMENT**

For the reasons explained in our Motion to Quash, that motion should be granted. None of the arguments in Bannon's response are logically or legally compelling. For example, nothing in Bannon's opposition brief cures his subpoenas' failure to comply with Federal Rule of Criminal Procedure 17(c). And, Speech or Debate Clause immunity applies, and none of the House officers or officials whom Bannon has summoned to his trial have actually waived their immunity. Finally, any relevant factual testimony necessary for Bannon's defense could be elicited from the Select Committee staff members who will be made available to testify.

## I.    The Subpoenas Do Not Comply with Rule 17

"The only discovery and inspection permitted in a criminal case is that provided by Rule 16, and it is of a very limited nature." *United States v. Ferguson*, 37 F.R.D. 6, 7 (D.D.C. 1965). That rule entitles a defendant "to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items," provided that "the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). Because Rule 16 only imposes an obligation on the government to turn over documents and objects, Rule 17 allows criminal defendants to order third-party "witness[es] to produce any books, papers, documents, data, or other objects the subpoena designates," so long as "compliance would [not] be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(1)-(2).

3

"It was not," however, "intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). We established in our opening brief that Bannon's subpoenas do not meet the basic requirements of Rule 17.

First, we pointed to the established rule in this district that "Rule 17 provides a limited grant of authority, mentioning pretrial production *only in connection with court approval*." *United States v. Binh Tang Vo*, 78 F. Supp. 3d 171, 178 (D.D.C. 2015) (emphasis added). Bannon claims that "Movants are exaggerating to say that" his failure to obtain court approval "was 'improper.'" Opp. to Mot. to Quash ("MTQ Opp.") at 15, ECF 7 (citing 2 Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Crim § 275 (4th ed. 2022)). Bannon's contention is belied though by the plain language of *Binh Tang Vo*, which permits pretrial production "only in connection with court approval." *Binh Tang Vo*, 78 F. Supp. 3d at 178.[4] Bannon's effort to impose an alternative schedule of production in his brief does not negate his failure to obtain the necessary court approval under Rule 17. The requirement for court approval is not just a technicality; it is a crucial step in ensuring that a trial subpoena—which is "issued by a court," that bears a court's seal, and is backed by the threat of court-imposed sanctions for non-compliance," *id.* at 180—is not used for improper purposes (such as broad discovery or a fishing expedition).

Second, we established that Bannon's subpoenas do not meet Rule 17's specificity and reasonableness requirements, are too broad, and seek testimony and documents irrelevant to the issues at trial. *See* Mot. to Quash ("MTQ") at 16-23, ECF 1. "[T]o compel production of

---

[4] And Wright & Miller itself makes clear that "[l]eave is required for a pre-trial subpoena duces tecum." *See* Wright & Miller, *supra* at 4.

4

documents under Rule 17(c), the party seeking production 'must clear three hurdles:

(1) relevancy; (2) admissibility; and (3) specificity.'" *United States v. Libby*, 432 F. Supp. 2d

26, 31 (D.D.C. 2006) (quoting *United States v. Nixon*, 418 U.S. 683, 700 (1974)). "A subpoena

that fails to satisfy these three requirements will be deemed unreasonable or oppressive and must

be either quashed or modified." *Id.*

Bannon fails to even acknowledge this standard, let alone meet it. Instead, he summarily

asserts that "Counsel for Mr. Bannon tailored its requests narrowly to capture documents that

reflect specific communications by each Movant related to Mr. Bannon, and specific documents

that reflect the bias of the Movant against Mr. Bannon." ECF 7, MTQ Opp. at 15. That

contention is negated by the face of the requests, which seek, among other things:

- "*All documents* . . . regarding the establishment of the January 6th Select Committee"

- "*All documents* . . . regarding the factors to be considered in determining whether to bring
  a civil or criminal action or other sanction for an alleged failure to comply with a
  Congressional subpoena, involving Mr. Bannon or any other individual"

- "*All documents* in your possession which tend to show a conflict of interest involving any
  Select Committee member or staff (including but not limited to documents that pertain to
  payments for a book that was written by and/or promoted by any Select Committee
  member or staff from January 6, 2021, up until the present date)"

ECF 1, MTQ, Exs. A-P (emphases added). This is precisely the sort of "fishing expedition"

prohibited by Rule 17, *see Nixon*, 418 U.S. at 699-700, not the particularized demands for

evidentiary material contemplated by Rule 17(c). *See also Libby*, 432 F. Supp. 2d at 31 ("[I]f the

[subpoenaing] party cannot reasonably specify the information contained or believed to be

contained in the documents sought but merely hopes that something useful will turn up, this is a

sure sign that the subpoena is being misused." (internal citation omitted)).

Bannon further summarily asserts that "each Movant has first-hand knowledge that is

exculpatory" as to whether "the Select Committee issued its subpoena without lawful authority"

and on Bannon's "request for an accommodation (a one-week extension)."  ECF 7, MTQ Opp. at

12.[5]  These conclusory representations do not meet Rule 17's standard.[6]  In sharp contrast to the

subpoenas here, the subpoena at issue in *Nixon* "precisely identified meetings between the

President and others" and the Special Prosecutor identified the "time, place, and persons present"

at discussions.  *Nixon*, 418 U.S. at 688.  Because Bannon falls far short of carrying his burden

under *Nixon*, the productions demanded by the subpoenas are clearly "unreasonable" and

"oppressive."  *Id.* at 698.

    Bannon's sweeping subpoenas exemplify why court approval is required before issuing

third-party subpoenas seeking pre-trial documents under Rule 17.  Without court supervision of

subpoenas, "Rule 17(c) would lend itself to discovery of the broadest sort"—the sort Bannon

demands here—"a result that the drafters of the Rule decried."  *Binh Tang Vo*, 78 F. Supp. 3d at

179 (quoting *United States v. Finn*, 919 F. Supp. 1305, 1329 (D. Minn. 1995)).

---

[5]  "[N]aked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule."  *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981).

[6] *See United States v. Wittig*, 250 F.R.D. 548, 552 (D. Kan. 2008) ("The specificity requirement ensures that Rule 17(c) subpoenas are used only to secure for trial certain documents or sharply defined groups of documents. . . . [The rule] demand[s] more than the title of a document and conjecture concerning its contents." (quotation marks and footnotes omitted)); *see also United States v. Shanahan*, 252 F.R.D. 536, 541 (E.D. Mo. 2008) ("As a general rule, requests for 'any and all documents' are emblematic of a discovery request or of a fishing expedition." (citation omitted)); *United States v. Mullins*, No. 12-596, 2013 WL 3506547, at *2, *4 (N.D. Ill. July 11, 2013) (quashing defense subpoena seeking "[a]ll notes, emails, interview reports, audio interviews, memoranda, reflections, and investigatory reports associated with 24-9 contracts investigations involving [the defendant]" because defendant "simply list[ed] broad categories of documents without specifying particular documents," "[h]is mere speculation about the existence of possibly relevant documents [wa]s not sufficient to justify his subpoenas," and he "failed to tailor his subpoenas to materials related to the contracts at issue in his case").

II.     **Bannon's Individual Arguments Fail**

Bannon asserts four flawed legal arguments in his opposition: (1) the Speech or Debate Clause does not apply; (2) because the House of Representatives filed an amicus brief in this prosecution, Speaker Pelosi, Majority Leader Hoyer, and Majority Whip Clyburn waived their immunity; (3) the "high-ranking official" doctrine does not apply; and (4) the General Counsel of the House of Representatives is a viable fact witness.  None of these arguments justify denying the motion to quash.

    A.   **The Speech or Debate Clause Fully Applies**

"Since the Glorious Revolution in Britain, and throughout United States history, the [Speech or Debate] privilege has been recognized as an important protection of the independence and integrity of the legislature."  *United States v. Johnson*, 383 U.S. 169, 178 (1966).  "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."  *Id.*  The Supreme Court has, therefore, "[w]ithout exception, . . . read the Speech or Debate Clause broadly to effectuate its purposes."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975); *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015).

Despite numerous Supreme Court and D.C. Circuit precedents to the contrary, Bannon insists that the Speech or Debate Clause does not apply here.[7]  He posits three reasons: (1) Speech or Debate immunity does not apply to alleged constitutional violations; (2) Members'

---

[7] In a recent article, Bannon's counsel "readily admitted that the House of Representatives and the Jan. 6 Committee would be right to try to hold them back under the U.S. Constitution's 'speech and debate clause.'"  Jose Pagliery, *Steve Bannon Digs Into Roger Clemens' Playbook to Try to Beat Congress*, The Daily Beast (June 13, 2022), https://perma.cc/GC2S-VL8L.

7

motives are relevant to Bannon's defense; and (3) the Speech or Debate Clause does not apply to criminal proceedings that arise from a contempt of Congress referral.

     1. Bannon argues, "[w]here – as here – actions by a Member of Congress or staff infringe upon the constitutional rights of a citizen, their acts are not protected by the Speech or Debate Clause." ECF 7, MTQ Opp. at 12. "This 'familiar' argument—made in almost every Speech or Debate Clause case—has been rejected time and again," *Rangel*, 785 F.3d at 24 (citation omitted), by the D.C. Circuit, the Supreme Court, and district courts in this jurisdiction. As the D.C. Circuit explained, "[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules, . . . or even the Constitution." *Id.* (internal quotation marks omitted). And the Supreme Court reasoned that an approach permitting courts to disregard the Speech or Debate Clause because a person alleges a constitutional violation "ignores the absolute nature of the speech or debate protection and [Supreme Court] cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-10; *see also Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (Speech or Debate Clause applies to all "actions within the 'legislative sphere,' . . . even though the[] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes" (internal citation omitted)); *McCarthy v. Pelosi*, 480 F. Supp. 3d 28, 37-39 (D.D.C. 2020), *aff'd*, 5 F.4th 34 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 897 (2022) (Speech or Debate immunity barred constitutional claims).

     As recently as last month, courts have dismissed on Speech or Debate grounds constitutional challenges to the Select Committee's subpoenas. *See Budowich v. Pelosi*, No. 21-3366, 2022 WL 2274359, at *6 (D.D.C. June 23, 2022) (Speech or Debate immunity applied notwithstanding Fifth, Fourth, and First Amendment claims); *Republican Nat'l Comm. ("RNC")*

*v. Pelosi*, No. 22-659, 2022 WL 1294509, at *8 (D.D.C. May 1, 2022) (Speech or Debate immunity applied notwithstanding Fourth and First Amendment claims), *appeal pending*, No. 22-5123 (D.C. Cir.).

Bannon's cites only *McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) to support his assertion that Speech or Debate immunity does not protect against constitutional claims. That case, however, held that Speech or Debate immunity did not apply to certain acts because those specific acts did not pertain to a subject "on which legislation could be had." *See id.* at 1296 ("The fact that [the investigator] took and transported *concededly extraneous material* and it is significant that he seized 'some personal letters' takes this case outside the protection of legislative immunity." (emphasis added)). Any suggestion that the subpoena issued to Bannon does not pertain to a subject on which legislation could be had, is simply false. The D.C. Circuit has already held that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2030-31 (2020)). And the subpoena issued to Bannon is important to the Select Committee's investigation. Bannon played a key role predicting and encouraging the attack on January 6. *See* U.S. House of Representatives' Br. at 11-12, *United States v. Bannon*, No. 21-670 (D.D.C. June 24, 2022), ECF 76-2.

2. Bannon next accuses the Select Committee of bad motives for issuing him a subpoena and suggests that Speech or Debate immunity should, therefore, not apply. *See* ECF 7, MTQ Opp. at 20 ("Speaker Pelosi has made incendiary statements about Mr. Bannon that include the phrase – no one is above the law."); *id.* at 7 (accusing the Select Committee Members of "bias against Mr. Bannon"). Even the case on which Bannon principally relies for his Speech or

Debate argument recognizes the idea that allegations of bad motive cannot so easily extinguish Speech or Debate immunity. *See McSurely*, 553 F.2d at 1295 (Wilkey, J., dissenting) ("In the usual case if the activity is arguably within the 'legitimate legislative sphere' the Speech or Debate Clause bars inquiry even in the face of a claim of 'unworthy motive.'"); ECF 7, MTQ Opp. at 12 (citing *McSurely*, 553 F.2d at 1288).

Supreme Court rulings have long "ma[d]e clear that in determining the legitimacy of a congressional act [courts] do not look to the motives alleged to have prompted it" because, even if true, "the claim of an unworthy purpose does not destroy the privilege." *Eastland*, 421 U.S. at 508-09 (citation omitted). "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies." *Tenney*, 341 U.S. at 378 (footnote omitted). When considering Speech or Debate immunity "[t]he courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* The Speech or Debate "privilege would be of little value if" Bannon could subject the subpoena recipients here "to the cost and inconvenience and distractions of a trial . . . based upon a jury's speculation as to motives." *Id.* at 377. Bannon's effort to invoke the alleged motives of the subpoena recipients is plainly barred by the Speech or Debate Clause.

3. Bannon insists that "[b]ecause Movants set in motion the prosecution of Mr. Bannon, they cannot now retreat behind the Speech or Debate Clause." ECF 7, MTQ Opp. at 3. The Constitution provides no "contempt prosecution exception" to Speech or Debate immunity. Moreover, to say that Members of Congress "set in motion" a prosecution under 2 U.S.C. § 192 ignores Bannon's personal role in defying his subpoena, the Department of Justice's role in bringing the charges, and the grand jury's role in issuing Bannon's indictment. The United

States, represented by the Department of Justice, "sets in motion" a contempt case under 2

U.S.C. § 192; neither Congress nor the Members who vote in favor of a contempt referral are the

prosecutors.

Bannon's argument is, in any event, far too sweeping. Under Bannon's theory of

criminal contempt, a defendant must be entitled to call any Member of Congress (or their staff)

involved in considering a contempt referral, lest Congressional evidence be excluded, or the

entire prosecution be dismissed. *See* ECF 7, MTQ Opp. at 19-23. Accepting Bannon's approach

to 2 U.S.C. § 192 would fatally undermine the statute.

This is but one of various reasons that Bannon's reliance on *United States v. Rainey*, No.

12-291, is misplaced. *See* ECF 7, MTQ Opp. at 14. That decision (unpublished and issued

orally) from the Eastern District of Louisiana was wrongly decided and is not binding on this

Court. *Rainey* is also materially different. In *Rainey*, the court "f[ound] that the evidence sought

by the defendant through documentary production and testimony [wa]s highly relevant to his

defense and material to the issues before the Court for the jury's consideration." MTQ Opp., Ex.

1, Rainey Jury Trial Tr. at 283:22-25, ECF 7-1. Here, Bannon has not established that the more

than twenty sweeping categories of materials he sought in the sixteen subpoenas, or that

testimony from these witnesses, are "essential" to his defense. And here, we have identified two

witnesses who are available to testify (on both direct and cross-examination) to any factual issues

this Court concludes are essential to Bannon's defense. *See infra* at 19-24.

In practice, Bannon's approach would make conviction at trial for a violation of 2 U.S.C.

§ 192 contingent on Members and their staff subjecting themselves to trial and document

production—an intrusion that the Speech or Debate Clause of the Constitution was designed to

prevent. The Speech or Debate Clause applies here and requires quashing the subpoenas.

**B.  The House's Amicus Brief Was No Waiver**

Bannon argues that Speaker Pelosi, Majority Leader Hoyer, and Majority Whip Clyburn

waived Speech or Debate immunity by filing an amicus brief in Bannon's criminal case.  *See*

ECF 7, MTQ Opp. at 2.  Bannon cites no authority for his theory that Members of Congress

waive Speech or Debate immunity (such that they must testify at a criminal trial) simply by

submitting an amicus brief.  *See id.*  To the contrary, courts have specifically rejected arguments

that the mere submission of an amicus brief waives immunity.  *See In re Est. of Ferdinand*

*Marcos Hum. Rts. Litig.*, 94 F.3d 539, 547 (9th Cir. 1996) ("Submission of the [amicus] brief

does not constitute an implied waiver of immunity."); *In re Grabis*, No. 13-10669, 2018 WL

1508754, at *8 (Bankr. S.D.N.Y. Mar. 26, 2018) ("[i]n submitting its amicus curiae brief" in a

similar case, Department of Education "did not waive its sovereign immunity"); *Jamul Action*

*Comm. v. Stevens*, No. 13-CV-01920, 2014 WL 3853148, at *9 (E.D. Cal. Aug. 5, 2014)

(rejecting argument that tribe waived sovereign immunity because it filed an amicus brief).

Furthermore, no court has ever held that Speech or Debate Clause immunity is waivable.

*Accord Budowich*, 2022 WL 2274359, at *7 ("the Court is not aware of one" case "holding that

the [Speech or Debate] Clause's immunity may be waived").  A Congressional entity may

choose not to assert its Speech or Debate immunity in a given case, but that is far different from

saying that Members of Congress have implicitly waived their immunity as to an entire category

of litigation or as to all potential invocations of the immunity in that case.  *See Senate Permanent*

*Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1087 (D.C. Cir. 2017) (rejecting argument

that by "seeking to enlist the judiciary's assistance in enforcing its subpoena," the Senate

subcommittee had "necessarily accepted an implicit restriction on the Speech or Debate

Clause").  Even "[a]ssuming" for the sake of argument that waiver of the immunity provided by

the Speech or Debate Clause is "possible," the Supreme Court has made clear that such waiver

12

"can be found only after explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 490-91 (1979); *id.* at 491 ("The ordinary rules for determining the appropriate standard of waiver do not apply in this setting."). The mere filing of an amicus brief is not an "explicit and unequivocal renunciation" of Speech or Debate immunity. *Cf. Dep't of Army v. Fed. Lab. Rels. Auth.*, 56 F.3d 273, 277 (D.C. Cir. 1995) ("In order to waive sovereign immunity, the Congress must 'unequivocally express[]' its desire to do so. *Irwin v. Veterans Affairs*, 498 U.S. 89, 95 (1990). This expression must appear on the face of the statute; it cannot be discerned in (lest it be concocted out of) legislative history.").

In any event, the amicus brief in Bannon's criminal case was not filed on behalf of Speaker Pelosi, Majority Leader Hoyer, or Majority Whip Clyburn. It was filed on behalf of the House of Representatives as an institution. *See* ECF 76-2, U.S. House of Representatives's Br. at 1, *Bannon* ("*The United States House of Representatives* files this amicus curiae brief in support of the position of the U.S. Department of Justice . . ." (emphasis added)). While the Speaker directed the filing of the amicus brief, after the United States House of Representatives' Bipartisan Legal Advisory Group ("BLAG")[8] authorized it, the brief "sp[oke] for, and articulate[d] *the institutional position of the House*." Rule II.8(b), Rules of the U.S. House of Representatives, 117th Cong. (2021) (emphasis added).[9] The filing of an amicus brief on behalf

---

[8] The BLAG consists of the Speaker, Majority Leader, Majority Whip, Minority Leader, and Minority Whip.

[9] The House of Representatives' brief stands in contrast to the amicus brief by Minority Leader McCarthy and Minority Whip Scalise, which was on behalf of these Members individually. *See* Mot. for Leave to File Amicus Curiae Br., *United States v. Bannon*, No. 21-670 (D.D.C. May 24, 2022), ECF 75; *see also* Tr. of Mot. Hr'g at 20:2-13, *United States v. Bannon*, No. 21-670 (June 15, 2022) ("THE COURT: In your view, is that amicus brief from the minority or is it just from two members of the minority? MR. CORCORAN: It's from the minority whip and the minority leader, so two members. THE COURT: Well, I don't know whether the minority party can act as an entity. MR. CORCORAN: Absolutely. THE COURT: I don't think it matters but for nomenclature purposes it is styled as a brief from two people. MR. CORCORAN: Absolutely.").

13

of the House of Representatives did not constitute waiver of Speech or Debate immunity on

behalf of Speaker Pelosi, Majority Leader Hoyer, Majority Whip Clyburn, or anyone else.

### C. Bannon Has Not Met His Burden to Refute the High-Ranking Official Doctrine

Bannon does not dispute that Members of Congress and their staff are high-ranking

government officials as set forth in *United States v. Morgan*, 313 U.S. 409, 422 (1941).  Instead,

he claims that this longstanding principle should not apply because the sixteen subpoena

recipients "possess exculpatory information regarding whether the accused was summoned under

the authority of the U.S. House of Representatives."  ECF 7, MTQ Opp. at 17.[10]

As an initial matter, the question of whether the Select Committee possessed authority to

issue the subpoena to Bannon is not a factual question subject to witness testimony before a jury.

As the Justice Department has pointed out, the scope of Congress's and the Select Committee's

authority is a question of law.  *See* Mot. in Limine at 11-14 *United States v. Bannon*, No. 21-670

(D.D.C. June 17, 2022), ECF 85.  And the jury in a criminal case does not have the power to

decide "pure questions of law."  *United States v. Gaudin*, 515 U.S. 506, 513 (1995) (emphasis

omitted) (discussing *Sparf v. United States*, 156 U.S. 51, 105-06 (1895)).  As the United States

rightly points out "[s]ubmitting the question of the meaning of House rules to the jury would risk

allowing the judicial branch to conclude the House rules have a meaning different from that

given them by the House, a violation of the Rulemaking Clause."  ECF 85, Mot. in Limine at 13,

*Bannon* (June 17, 2022).  Indeed, the D.C. Circuit has already held as a matter of law that the

Select Committee has a valid legislative purpose.  *See Trump v. Thompson*, 20 F.4th at 41-42.

---

[10] The sheer number of the subpoenas undermines Bannon's purported need.  Half a day of
testimony from each of the subpoenaed witnesses would take up nearly the entirety of a two-
week trial.

The information Bannon seeks, therefore, is not factual information essential to his case.  *See*

*United States v. North*, 713 F. Supp. 1448, 1449 (D.D.C. 1989).

But, even if Bannon somehow did identify some question of fact appropriate for

testimony, he falls far short of establishing the "extraordinary" or "exceptional" circumstances to

justify the sixteen subpoenas he issued and showing that the information cannot be obtained

elsewhere.  *See Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586-87 (D.C. Cir.

1985).  Bannon has not shown that each of the subpoena recipients has unique factual

information essential to his case that Ms. Amerling or Mr. Tonolli cannot provide.

Bannon attempts to distinguish the case law we cited applying *Morgan*'s "high-ranking

official" test by claiming that "[t]he cases pertain to civil depositions or criminal matters where

the officials did not have first-hand knowledge pertaining to an element of the offense, and did

not personally take steps to initiate the prosecution."  ECF 7, MTQ Opp. at 18.  Voting in favor

of a contempt referral, however, is not "personally tak[ing] steps to initiate" a prosecution under

2 U.S.C. § 192.  Contrary to Bannon's suggestion, courts have not hesitated to quash subpoenas

directed to Members or other high-ranking officials by defendants in criminal cases.  *See, e.g.*,

Order at 5, *United States v. Moussaoui*, Crim. No. 01-455-A (E.D. Va. Mar. 2, 2006) (quashing

document subpoena directed to House Member in capital prosecution), attached as Ex. A; Order,

*United States v. Arthur Andersen, LLP*, Crim. No. H-02-121 (S.D. Tex. May 14, 2002) (quashing

document subpoena directed to House Committee on Energy and Commerce in criminal case

arising out of Enron scandal), attached as Ex. B; *In re U.S. ("Kessler")*, 985 F.2d 510, 511-13

(11th Cir. 1993) (quashing criminal defendants' subpoena seeking to compel testimony of FDA

commissioner in support of motion to dismiss indictment on ground of selective prosecution).

This is true even in cases where Members of Congress or other important officials have first-

hand knowledge of information surrounding the prosecution. *See In re U.S. ("Reno & Holder")*, 197 F.3d 310, 310 (8th Cir. 1999) (granting petition for writ of mandamus when district court denied motion to quash subpoenas directing United States Attorney General and her deputy to testify in connection with decision declining to withdraw death notice in federal prosecution (and Deputy Attorney General himself convened and met with members of death penalty committee in deciding not to withdraw death notice)).[11]

### D.  The General Counsel of the House of Representatives is Not a Proper Witness

Bannon does not dispute that the work of the General Counsel of the House of Representatives to draft and file an amicus brief in the criminal case is privileged.  Bannon, however, insists that his focus is on the General Counsel's "change in position regarding whether the Select Committee has a 'ranking minority member.'"  ECF 7, MTQ Opp. at 16.

Although various subpoena recipients in the Select Committee's investigation have asserted this argument, no court has adopted it.  To the contrary, Judge Kelly recently held, "to the extent there is any uncertainty about whether [Representative Cheney] fits the bill" as the ranking minority member, "on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation

---

[11] *See also, e.g.*, *Bardoff v. United States*, 628 A.2d 86, 90 (D.C. 1993) (affirming conviction, in connection with defendants' disruption of Congressional hearing, where trial court quashed testimonial subpoenas to Senators and Senate Committee counsel; relying, in part, on defendants' "fail[ure] to proffer any reason why others present who did not hold such high office could not provide the testimony"); Order Granting Mot. to Quash Subpoena on U.S. Rep. Maxine Waters at 3, *District of Columbia v. Hayes, Jr.*, No. 2007-CDC-15462 (D.C. Super. Ct. Nov. 16, 2007) (in context of criminal trial of individual accused of disrupting Member's office, quashing subpoena to Member, who had witnessed those events, where other individuals also had witnessed relevant events; "Based on the Congresswoman's briefs, there were others present who saw and heard the defendants' actions and who could testify to them"), attached as Ex. C; *United States v. Ehrlichman*, 389 F. Supp. 95, 97-98 (D.D.C. 1974), *aff'd*, 546 F.2d 910 (D.C. Cir. 1976) (perjury prosecution wherein Speech or Debate Clause prohibited court from forcing the chairman of the Subcommittee or the Speaker of the House to answer questions concerning testimony to committee or to produce at trial official record of the testimony).

16

purposes." *RNC*, 2022 WL 1294509, at *16; *cf. Eastman v. Thompson*, No. 22-CV-00099, 2022 WL 1407965, at *6 (C.D. Cal. Jan. 25, 2022). Moreover, this Court has already held that "the Committee does have a member of the minority party, Representative Liz Cheney, who serves as Vice Chair, and it appears that the House believes that the Select Committee's composition is consistent with this requirement as well, and thus that the Subpoena here was validly issued." Tr. of Mots. Hr'g at 117:20-25, *United States v. Bannon*, No. 21-670 (D.D.C. June 15, 2022). This Court's reasoning is supported by the D.C. Circuit and consistent with Judge Kelly's view that courts must afford substantial deference to the House regarding the meaning and application of its own rules and procedures. *See United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir.), *op. supplemented on denial of reh'g*, 68 F.3d 489 (D.C. Cir. 1995) (if a court "interpret[s] the [House's] Rule differently than would the Congress itself . . . , the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone"). Bannon's "ranking minority member" objection has thus properly been rejected as a matter of law; it is not a question of fact for the jury.

Moreover, contrary to Bannon's representation, Mr. Letter has not "already . . . served as a fact witness for the Government in the case" nor has he changed his position. ECF 7, MTQ Opp. at 2-3. In the FBI interview to which Bannon refers, Mr. Letter served *as a lawyer* representing the Select Committee's Chief Counsel and Deputy Staff Director Kristin Amerling. Ms. Amerling, not Mr. Letter, was the subject of the interview. *See* Mot. to Dismiss Indictment, Ex. D ("FBI Interview Report") at 1, *United States v. Bannon*, No. 21-670 (D.D.C. Apr. 15, 2022), ECF 58-4 ("*KRISTIN AMERLING*, Chief Counsel and Deputy Staff Director, U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol, *was interviewed* at the Thomas P. O'Neill Jr. Federal Building . . . AMERLING *was*

17

*accompanied by* U.S. House of Representatives General Counsel DOUG LETTER." (emphasis added)); *id.* ("*AMERLING* was interviewed by" representatives from the United States Attorney's Office and the FBI (emphasis added)); *id.* ("After being advised of the identity of the interviewing AUSAs and Agents and the nature of the interview, *AMERLING* provided the following information (*AMERLING* was shown various numbered exhibits during the interview . . . )" (emphasis added)). Indeed, the header on each page of the document on which Bannon relies is: "Continuation of FD-302 of (U) November 2, 2021 *Interview of Kristin Amerling*, On 11/02/2021." *Id.* at 2 (emphasis added).

The document to which Bannon refers, moreover, is not a transcript of the interview of Ms. Amerling; it is a report of the interview written by FBI agents who were present at the interview. The context of the stray statement Bannon highlights from Ms. Amerling's interview is also important. Mr. Letter did not simply "state[] that the Select Committee had no ranking minority member." ECF 7, MTQ Opp. at 16. The context provided in the interview report is as follows:

> In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there was no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

ECF 58-4, FBI Interview Report at 4, *Bannon*.

None of this is inconsistent with the House of Representative's amicus brief, which explained that "[c]onsistent with House practice and precedent, the term 'ranking minority member' means the first member of the minority party appointed to the Select Committee by the Speaker" and "Representative Cheney, by virtue of being the first minority party Member

18

**-2820-**

appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee." ECF 76-2, U.S. House of Representatives's Br. at 9, *Bannon*. The House's amicus brief explained that "there is no formalistic division between majority Members and minority Members, or majority staff and minority staff" on the Select Committee. *Id.* at 10. "Rather, the Select Committee is functioning as a single, unified body with a joint staff. There is thus no Member who uses the formal title 'ranking member,' and matters like the division of time and questioning in depositions are not governed by party affiliation." *Id.*

In any event, whether or not Representative Cheney is assigned the formal title of "ranking minority member" is of no consequence to the elements of Bannon's offense. The Chair's authority to order the taking of depositions does not hinge on whether Representative Cheney's official title is "ranking minority member" or "Vice Chair." It is undisputed that the Chair consulted with Representative Cheney before issuing the subpoena Bannon defied, and the House, in approving the Select Committee's contempt referral, has concluded that House Resolution 503 was satisfied by the Chair's consultation with Representative Cheney. *See* H. Res. 730, 117th Cong. (2021) (approving the Select Committee's referral of Bannon); *RNC*, 2022 WL 1294509, at *16. In light of the deference courts must accord the House regarding the meaning and application of its own rules and procedures, and the presumption of regularity due Congress, that is sufficient. *See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.").

**III.    The Witnesses from the Select Committee Staff Can Address Any Relevant Information Necessary for Bannon's Defense**

Aside from summarily asserting that all sixteen subpoena recipients "possess critical exculpatory evidence that is essential to Mr. Bannon's ability to have a fair trial," ECF 7, MTQ

19

Opp. at 2, Bannon fails to explain precisely what information each subpoena recipient has and how it is "critical" to Bannon's defense. Deciphering what constitutes this "critical exculpatory evidence" is particularly difficult here given the sweeping scope of the more than twenty categories of materials Bannon demands in each subpoena. *See supra* at 3-6.

On page 12 of his opposition brief, Bannon claims that "[t]he Select Committee violated Mr. Bannon's constitutional right to due process in several respects" and lists two topics. ECF 7, MTQ Opp. at 12. *First*, he claims that "the Select Committee issued its subpoena without lawful authority" and "[e]ach of the Movants has first-hand knowledge that is exculpatory on this element." *Id. Second*, he claims that "the Select Committee rejected Mr. Bannon's reasonable request for an accommodation (a one-week extension)" and "each Movant has first-hand knowledge that is exculpatory on this critical trial issue." *Id.*[12]

With regard to the first due process theory, the question of the Select Committee's authority is legal, not factual. *See supra* at 14-16. Even if that were not the case, as the Justice Department has demonstrated, Bannon has waived any argument that the Select Committee's subpoena was invalid due to asserted defects in the Select Committee's authority, composition, or procedures because he failed to raise those arguments to the Select Committee. *See generally* Mot. in Limine, *United States v. Bannon*, No. 21-670 (D.D.C. Apr. 15, 2022), ECF 53. Because

---

[12] Elsewhere, Bannon categorizes the testimony he seeks differently, stating his defense requires testimony from Members of Congress on (1) "the decision-making process concerning the composition of the Select Committee, [(2)] the status of any 'ranking minority member,' [(3)] the refusal to engage in the constitutionally mandated accommodation process, [(4)] the rejection of executive privilege, and [(5)] other key defense issues to be put before the jury at trial." ECF 7, MTQ Opp. at 10. The first two of these topics—the composition of the Select Committee and "ranking-minority member" issue—appear to go to Bannon's first due process theory challenging the lawful authority of the Select Committee. The second two topics— accommodation and executive privilege—appear to go to Bannon's second due process theory.

20

Bannon's challenge to the authority of the Select Committee fails as a matter of law, testimony on any surrounding facts is not critical to Bannon's defense at trial.

Bannon's second claim likewise fails as a matter of law and, therefore, cannot be critical to Bannon's defense.  *See generally* ECF 85, Mot. in Limine, *Bannon* (June 17, 2022) (explaining why the bounds of Bannon's executive privilege assertion presents a legal question, not a factual question for the jury).  Bannon contends that the Select Committee violated his due process rights when it denied his request for a one-week extension.  *See* ECF 7, MTQ Opp. at 12. Bannon, however, has no "legitimate claim of entitlement" to an extension of time to respond to the Select Committee's subpoena.[13]  And contrary to Bannon's claim, there were not "competing positions asserted on the executive privilege issue by Presidents Trump and Biden, in light of the then pending lawsuit, *Trump v. Thompson*."  ECF 7, MTQ Opp. at 2.  *Trump v. Thompson* did not involve executive privilege claims by a former presidential advisor, *see* 20 F.4th at 16, and even if Bannon were correct that executive privilege could protect communications of a former presidential advisor made while he was not a government employee—a dubious argument in itself—executive privilege does not excuse complete defiance of a Congressional subpoena. Indeed, the former President's counsel himself made clear that the letter on which Bannon relies for his privilege assertion "didn't indicate that we believe there is immunity from testimony for your client.  As I indicated to you the other day, *we don't believe there is*."  ECF 52-3, Mot. in

---

[13] To make out a violation of due process, Bannon must first show the Government deprived him of a "liberty or property interest" to which he had a "legitimate claim of entitlement," and that "the procedures attendant upon that deprivation were constitutionally [in]sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  A "cognizable liberty or property interest," *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012), is essential because "[p]rocess is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). Only after a court concludes that a legitimate claim of entitlement exists does the court then evaluate whether the person received whatever process was due.

21

**-2823-**

Limine, Ex. 3, Email from Justin Clark to Robert Costello, *United States v. Bannon*, No. 21-670

(D.D.C. Apr. 15, 2022) (emphasis added); *accord Comm. on Judiciary of U.S. House of

Representatives v. McGahn*, 968 F.3d 755, 773 (D.C. Cir. 2020) (ability to invoke executive

privilege to refuse to answer specific questions during Congressional testimony is "unaffected by

an order compelling [the witness] to appear and testify").

    In any event, we made clear that Chief Counsel and Deputy Staff Director Kristin

Amerling and Senior Investigative Counsel Sean Tonolli—both of whom were subpoenaed by

Bannon—will be made available by the Select Committee to testify at trial regarding relevant

topics necessary to evaluate the elements or valid defenses in this case.[14]  To the extent

testimony about the authority of the Select Committee or the circumstances surrounding the

subpoena issued to Bannon are relevant to Bannon's defense, Ms. Amerling and Mr. Tonolli are

competent to testify on those issues.

    Bannon's only response is that "none of the Committee's staffers has any decision-

making authority" and, therefore, "none of the staffers therefore would be competent witnesses

to testify to some of the most fundamental issues Mr. Bannon seeks to raise in his defense."  ECF

7, MTQ Opp. at 10; *id.* ("Only the Members of Congress would be competent witnesses on

issues including the decision-making process concerning the composition of the Select

Committee, the status of any 'ranking minority member,' the refusal to engage in the

---

[14] ECF 1, MTQ at 26 ("Ms. Amerling and Mr. Tonolli will be available to testify to relevant questions from Bannon's counsel.  There should be no questions material to Bannon's defense that the other subpoenaed individuals would uniquely be able to answer."); *Id.* at 17 ("to the extent there is a need at trial for testimony about the subpoena to Bannon, two senior staff members on the Select Committee—Ms. Amerling and Mr. Tonolli—can provide relevant testimony regarding those elements or any available defenses, and the Select Committee will not assert Speech or Debate immunity as to those staff Members for such limited testimony."); *Id.* at 20 ("To the extent this Court concludes Bannon is constitutionally entitled to testimony by House personnel, the availability of Ms. Amerling and Mr. Tonolli will suffice.").

constitutionally mandated accommodation process, the rejection of executive privilege, and other key defense issues to be put before the jury at trial."). Bannon cites no authority for his assumption that the only witnesses competent to testify on an issue are those who had decision-making authority. And nowhere does Bannon explain why the authority to make the actual decisions is crucial for the witness testifying, particularly when the witness can testify about the decision process underlying those decisions. Ms. Amerling and Mr. Tonolli have personal knowledge and—to the extent it is admissible—can testify to these issues. *See* Fed. R. Evid. 602.

Bannon himself tells this Court that "[e]ach of the Movants has first-hand knowledge that is exculpatory on this element" of his allegation that "the Select Committee issued its subpoena without lawful authority." ECF 7, MTQ Opp. at 12. Even assuming that Bannon was correct that this element (1) is factual not legal—it is not—and (2) it could be exculpatory—it cannot— Ms. Amerling and Mr. Tonolli (who were both subpoenaed by Bannon and are both Movants on this Motion), by Bannon's own representation, "have first-hand knowledge" on this issue.

*     *     *

Throughout his opposition brief, Bannon asks for relief specific to his criminal case. ECF 7, MTQ Opp. at 3 ("If the Court grants Movant's Motion To Quash, then the only next step consistent with due process would be to either exclude all congressional evidence at Mr. Bannon's trial or dismiss the charges entirely to preserve Mr. Bannon's Fifth and Sixth Amendment Rights."); *id.* at 11 ("[S]hould this Court grant the Motion to Quash in whole or in part, we ask the Court to exclude all congressional evidence at his criminal trial."); *id.* at 13 ("[I]f this Court concludes that the Speech or Debate Clause immunizes Movants from complying with the subpoenas, dismissal is the only appropriate remedy to safeguard Mr. Bannon's Fifth and

23

**-2825-**

Sixth Amendment rights."). In fact, Bannon dedicates an entire section of his opposition to arguing that "granting the motion to quash will require the exclusion of all Congressional evidence at Mr. Bannon's criminal trial." *Id.* at 19-21.

Bannon's counsel has since clarified that his opposition to this motion to quash does not in fact seek relief in the criminal case, and that should he seek any relief that pertains to the subpoenaed witnesses, he would seek such relief on the docket of the criminal case. To the extent this Court contemplates the relief Bannon describes in four separate places in his brief, that is properly considered not in the present miscellaneous proceeding, but in Bannon's criminal proceeding so that the Department of Justice has an opportunity to respond.

## <u>CONCLUSION</u>

For the reasons stated above, the motion to quash should be granted.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER
   *General Counsel*
TODD B. TATELMAN
   *Principal Deputy General Counsel*
ERIC R. COLUMBUS
   *Special Litigation Counsel*
MICHELLE S. KALLEN
   *Special Litigation Counsel*
STACIE M. FAHSEL
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

July 5, 2022

24

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2022, I caused the foregoing document to be filed via the

CM/ECF system for the U.S. District Court for the District of Columbia, which I understand

caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter

# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )  Criminal No. 01-455-A
v.                              )
                                )
ZACARIAS MOUSSAOUI,            )
                                )
        Defendant.             )

ORDER

Before the Court is the Motion of U.S. Representative Curt
Weldon to Quash Subpoena (Docket #1584), in which Representative
Weldon objects to being called to give testimony about or provide
documents collected during his investigation of the government's
"Able Danger" program.  The government has filed a related Motion
In Limine to Exclude the Testimony of Proposed Defense Witnesses
Related to the Able Danger Program (Docket #1619) ("Motion to
Exclude"), in which it seeks a ruling preventing the defense from
calling three witnesses with personal knowledge of the "Able
Danger" program.[1]

On January 23, 2006, a trial subpoena was issued to

---

[1]The government's Motion to Exclude was filed under seal,
because it reveals the names of potential defense witnesses.
Because the Motion to Quash was not filed under seal, without
objection from the defense, it is clearly a matter of public
knowledge that the defense may wish to call witnesses
knowledgeable about the "Able Danger" program.  Therefore, the
Court will address both motions in this unsealed Order.

Representative Weldon commanding him to appear at this court on March 6, and to bring any documents in his possession referring or relating to the "Able Danger" program, or to any of the September 11 hijackers.  Representative Weldon objects to the subpoena on the grounds that as a member of Congress, his privilege under the Speech and Debate Clause of the United States Constitution immunizes him from being compelled to give testimony or provide documents in this case.[2]  Representative Weldon also states that he is no longer in possession of the chart that the defense seeks.[3]  The defendant objects to the Motion to Quash arguing that by discussing his knowledge of the "Able Danger" program in public, non-legislative fora such as The Oprah Winfrey Show, Representative Weldon has waived any privilege he may have had.

The Speech and Debate Clause provides a very strong protection to members of Congress against being questioned about activities that are "within the sphere of legitimate legislative activity."  Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 501 (1975).  If the court finds that the activities at issue are

---

[2]The Speech and Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl.1.

[3]Although the subpoena is more broadly written, the defense has expressed a particular interest in a chart referenced by Representative Weldon in his book, Countdown to Terror, and described in various newspaper articles.

within the sphere of legitimate legislative activity, then "the prohibitions of the Speech or Debate Clause are absolute" and the representative may not be questioned about them, other than by the Congress itself.  Id.  Legitimate legislative activity has been defined by the Supreme Court as matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." Gravel v. United States, 408 U.S. 606, 625 (1972).  Much, if not all, of the information responsive to the subpoena can be expected to have come from Representative Weldon's legitimate legislative activity of investigating a project that is clearly a proper subject for Congressional legislation.

It is also clear that Representative Weldon's public discussion of his "Able Danger" investigation is not sufficient to waive the privilege of the Speech and Debate Clause in the context of this subpoena.  The Supreme Court has held that any such waiver "can be found only after explicit and unequivocal renunciation of the protection." United States v. Helstoski, 442 U.S. 477, 491 (1979).  Representative Weldon's public statements about the "Able Danger" program never referenced, let alone renounced, the Representative's privilege under the Speech and

Debate Clause.  Based on these considerations, the Court does not find that the privilege has been waived.  Accordingly, the subpoena will be quashed.

This decision will not prejudice the defendant because clearly Representative Weldon possesses no first hand knowledge of the government's "Able Danger" program.  Anything he knows about the program either came from witnesses with more direct knowledge or the document which he no longer possesses.  That document can certainly be subpoenaed from Stephen Hadley, the person to whom Representative Weldon says he gave the document.  Moreover, as demonstrated by the government's Motion to Exclude, the defense has also subpoenaed three witnesses with first-hand knowledge of the "Able Danger" program.  These persons can provide much, if not all, of the information that the defense could expect to obtain from Representative Weldon.

In its Motion to Exclude, the government argues that the entire "Able Danger" issue is not relevant to this case, and, even if relevant, allowing the defense to raise this issue will cause substantial delay and confuse the jury.  The government also forcefully argues that no chart linking Mohammed Atta to Al Qaeda ever emerged from the "Able Danger" program, a contention disputed by the potential witnesses.[4]  What knowledge the

_____

[4]This contention is also disputed by Representative Weldon, who has stated in press reports that he viewed such a chart.  <u>See</u> Deft's Opp. To Rep. Curt Weldon's Mot. to Quash Subpoena.

government possessed before September 11 regarding members of Al Qaeda, and specifically links between Al Qaeda and the eventual hijackers, is a key issue in dispute in this death penalty trial. Accordingly, the Court finds that the information to be elicited from the three "Able Danger" witnesses is sufficiently relevant to the case, and that its relevance is not outweighed by considerations of confusion and waste of time.  Therefore, the government's Motion to Exclude is DENIED.  Accordingly, it is hereby

ORDERED that the Motion of U.S. Representative Curt Weldon to Quash Subpoena be and is GRANTED, and the subpoena is hereby QUASHED, and it is further

ORDERED that the government's Motion to Exclude be and is DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 2nd day of March, 2006.

/s/

_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

5

**-2833-**

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ARTHUR ANDERSEN, L.L.P., | ) |
| | ) |
| Defendant. | ) |

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED
5/15/02
MICHAEL N. MILBY, CLERK

Crim. No. H-02-121 (MH)

**ORDER**

UPON CONSIDERATION of the Motion to Quash Subpoena of the Committee on

Energy and Commerce of the U.S. House of Representatives ("Motion"), the Opposition, if any,

and the entire record herein, it is by the Court this 14 day of May , 2002

ORDERED

That the Motion is granted for all the reasons stated in the Memorandum of Points and

Authorities filed in support of the Motion.  It is further ORDERED

That the subpoena duces tecum directed to the Committee on Energy and Commerce,

issued on April 25, 2002, by Defendant, be and hereby is quashed.

Melinda Harmon
Hon. Melinda Harmon
United States District Judge

103

# Exhibit C

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION
DISTRICT OF COLUMBIA & TRAFFIC BRANCH

District of Columbia           :
                                   :
                                   :    **2007-CDC-15462**
**v.**                          :    **Magistrate Judge Marisa Demeo**
                                   :    **Trial: November 20, 2007**
**Theodore Hayes, Jr.**           :
                                   :
                                   :

---

## ORDER GRANTING MOTION TO QUASH SUBPOENA ON U.S. REPRESENTATIVE MAXINE WATERS

U.S. Representative Maxine Waters, through counsel to the U.S. House of Representatives, initially filed a Motion to Quash Subpoena to U.S. Representative Maxine Waters on three grounds: 1) requirements under Rule VIII of the Rules of the U.S. House of Representatives have not been met; 2) absent compelling or exceptional circumstances, Congresswoman Waters as a public official may not be required to testify; and 3) to the extent that the defendant seeks to question Congresswoman Waters regarding legislative or political activities, such questioning is barred by the Speech and Debate Clause of the U.S. Constitution, U.S. Const., art. I, § 6, cl. 1.

Beginning with the third argument, in Defendant's Memorandum in Opposition to the Motion to Quash, Defendant indicates that he "does not intend to query Congresswoman Waters about any legislative activities or political positions in this criminal trial." As the Reply of U.S. Representative Maxine Waters to Defendant's Opposition to Motion to Quash Subpoena correctly points out, the third argument is now moot as the Defendant would not ask Congresswoman Waters questions that would implicate the Speech and Debate Clause.

1

Moving briefly to the first argument that House Rule VIII requirements have not been met; therefore, the Congresswoman cannot be compelled to testify. Congresswoman Water's Memorandum and Points of Authorities describes that House Rule VIII was enacted by Congress pursuant to the Rulemaking Clause of the U.S. Constitution. U.S. Const. art. I, § 5, cl. 2. Without further legal authority, it is not clear how this internal rule interplays with the constitutional requirements and criminal procedural rules which normally govern this Court's rulings. *See, e.g., Jewish War Veterans v. Gates*, 2007 U.S. Dist. LEXIS 82716 (D.C. 2007) (in federal civil case court found that House Rule VIII was an internal rule that did not override Federal Civil Rules of Procedure). Because this Court is able to reach a conclusion on the Motion to Quash on the second argument, it will not take a position at this time on the House Rule VIII argument.

Congresswoman Waters' second argument is that as a public official, the defendant must show exceptional circumstances exist which she argues he has failed to do. After a review of the briefs and the case law, the Court agrees with the Congresswoman. In *Davis v. United States*, 390 A.2d 976, 981 (D.C. App. 1978), the D.C. Court of Appeals held that high level government officials should not testify personally at trial unless "a clear showing is made that such a proceeding is essential to prevent prejudice or injustice to the party who would require it."

Defendant argues that he is prejudiced and his 5th and 6th Amendment rights will be violated if he cannot confront Congresswoman Waters at trial. In *Bardoff v. United States*, 628 A.2d 86 (D.C. App. 1993), the D.C. Court of Appeals examined a 6th Amendment challenge to the trial court's quashing of subpoenas for United States

2

Senators who were present when two individuals were arrested during a protest of the "Iran-Contra" hearings. The Court held that the right to compulsory process "does not by its terms grant a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*" *Id.* at 92, *citing United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (quoting U.S. Const., amend VI). In *Bardoff*, the appellants were not able to demonstrate how the subpoenaed testimony would be more than cumulative of other evidence, why other individuals who were present could not testify to the same events, or that the missing testimony would be favorable, material, or exculpatory. *Id.* at 92.

Similarly, in this case the defendant has failed to establish these types of facts that would rise to the level of requiring a public official such as Congresswoman Waters to testify at the trial. The defendant argues that Congresswoman Waters is the alleged victim, and he should have the right to confront the victim. This case, however, does not involve charges that have a victim. The defendant is charged with disorderly conduct, not a charge such as threats or assault which would have a victim. Based on the Congresswoman's briefs, there were others present who saw and heard the defendants' actions and who could testify to them. Further, the defendant has proffered no specific facts that would support a conclusion by this Court that Congresswoman Waters' testimony would be favorable, material, or exculpatory. To the contrary, based on this Court's review of the briefs and exhibits, it appears that Congresswoman Waters' testimony could potentially be the most damaging to the defendant but certainly not in any way favorable or exculpatory.

3

Although Defendant mentions a 5th Amendment challenge to the Motion to Quash, he presents no legal argument or facts to support such a claim. Nevertheless, the *Bardoff* Court rejected a 5th Amendment claim in that case indicated that the rights under the 5th Amendment simply were not implicated there. Similarly, that right would not be implicated in this case either if Congresswoman Waters did not testify at trial.

Having considered the Motion to Quash Subpoena to U.S. Representative Maxine Waters, the Defendant's Opposition, and the Congresswoman's Reply, it is on this _16th___ day of _November_____, 2007 hereby

ORDERED that the motion is granted and the Subpoena to U.S. Representative Maxine Waters to appear for trial in this matter is quashed;

SO ORDERED.

_Maria M Demeo_
Magistrate Judge Marisa Demeo

Christine Davenport
Assistant Counsel
Office of the General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202-225-9700 (phone)
202-226-1360 (fax)
Counsel for Congresswoman Maxine Waters

Richard Carnell Baker, Esq.
Baker Simmons
2120 L Street, N.W., Suite 200
Washington, D.C. 20037

4

RECEIVED TIME    NOV. 16.   9:18AM          PRINT TIME    NOV. 16.   9:19AM

**-2840-**

Fax: 202-775-0056

Jeffrey Shapiro, Esq.
Assistant Attorney General for the District of Columbia
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
Fax: 202-727-3625

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

### DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL
### MEADOWS AND SCAVINO DECLINATION DISCOVERY

On June 27, 2022, Defendant Stephen K. Bannon filed a motion to compel discovery of materials and information related to the Government's decision not to prosecute Messrs. Meadows and Scavino for criminal contempt of Congress, following the referral from Congress for their prosecution [Doc. 86]. On June 29, 2022, the Government filed its opposition to the motion [Doc. 87]. Mr. Bannon now files his reply to the Government's opposition and in further support of his motion.

### **Introduction**

In his motion, Mr. Bannon asserted that the materials at issue must be produced under the Court's March 16, 2022 Order on discovery [Hearing Tr. March 16, 2022, at 96-97; Doc. 86 at 3-4] and under the Government's *Brady/Giglio* obligations and discovery obligations under the local rules. [Doc. 86 at 4-15].

The Government's response misses the thrust of Mr. Bannon's motion in just about every regard. Additionally, to the extent it attempts to address the defense of entrapment by estoppel, the opposition yet again reflects a fundamental misunderstanding of the defense.

1

### The Materials Sought Are Discoverable Under the Court's March 16th Order

The Government's Opposition argues first that the requested materials, including writings reflecting the decision not to prosecute Meadows and Scavino do not reflect "official policy" and therefore do not come within the Court's March 16, 2022 oral Order; rather they reflect the Government's "internal" "deliberative processes" and therefore are not discoverable.[1]

To be perfectly clear, the first and most direct items Mr. Bannon has sought and the Government has refused to produce are the letters or other writings that reflect the decision not to prosecute these men.[2] These are not documents protected by any formulation of a "deliberate processes" defense against production.[Doc. 87 at 1-2].

"The deliberative process privilege prevents discovery as to 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *NRA of Am. v. Cuomo*, 332 F.R.D. 420, 433 (N.D.N.Y. 2019), quoting *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citation omitted); *see also In re County of Erie*, 473 F.3d 413, 417 n.3 (2d Cir. 2007) (citing *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). "In order for

---

[1] The Government made this same unavailing claim that the requested materials are protected matters that relate solely to the "Government's internal deliberations" in response to Mr. Bannon's original request for relevant OLC opinions and other authoritative writings insofar as they relate to DOJ policy on what the Government characterized as "various issues relating to subpoenas directed at Executive Branch officials." [See Doc. 31 at 8-9, n. 2]. It was soundly rejected by the Court as is reflected in the Court's March 16, 2022 oral Order excerpted in Mr. Bannon's Motion to Compel, Doc. 86 at 3].

[2] As asserted in the Motion to Compel, these are documents which two New York Times reporters have described in an article, certainly more than implying that the requested documents already have been provided to them. [See Doc. 86 at 2, n.3]. That alone, in addition to the actual nature of the documents, rather sharply undercuts a "deliberative processes" excuse for refusing to produce.

2

**-2843-**

a document to be protected by this privilege, it must be an inter-agency or intra-agency document which is both predecisional and deliberative." *NRA of Am. v. Cuomo*, 332 F.R.D. at 433, quoting from *Children First Found., Inc. v. Martinez*, 2007 U.S. Dist. LEXIS 90723, 2007 WL 4344915, at *6 (N.D.N.Y. Dec. 10, 2007) (citing *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (additional citation omitted). Documents announcing a decision not to prosecute and that provide the reasoning for the declination, by their very nature cannot be "predecisional."

In determining whether a document is "predecisional" and "deliberative" and therefore protected, "courts look to whether the document '(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Cuomo, Id.* (citations omitted).

"The deliberative process privilege 'does not operate indiscriminately to shield all decision-making by public officials.'" "[T]he privilege is not an absolute bar but rather qualified." *Cuomo, Id.* (citations omitted). "The deliberative process privilege is fashioned in such a way that it protects the government's deliberative process from inquiry if it is collateral to the litigation itself. However, if the party's cause of action is directed at the government's intent in rendering its policy decision and is closely tied to the underlying litigation then the deliberative process privilege 'evaporates.'" *Cuomo*, 332 F.R.D. at 434 (citations omitted); see also, *In re Subpoena Duces Tecum Served on the Office of the Comptroller*, 145 F.3d 1422, 1424 (D.C. Cir. 1998)).

"The deliberative process privilege does not include "opinions or conclusions of those not part of that process . . . . underlying factual documents that are relied on in the decisionmaking process . . . , statements that summarize facts . . . , documents that describe an agency's policy

3

after it has been adopted, or . . . pre-decisional documents that are incorporated into the agency's final decision." *Cuomo*, 332 F.R.D. at 434 (citations omitted).

"When a Court determines the deliberative process privilege applies, in order to determine whether the privilege will bar disclosure or whether to permit disclosure, notwithstanding the privilege, a Court is to consider:  [1] the relevance of the evidence sought to be protected; [2] the availability of other evidence; [3] the seriousness of the litigation and the issues involved; [4] the role of the government in the litigation; and [5] the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Id.* (citations omitted).

Clearly, the letters to Congress or any other recipient announcing the decision not to prosecute Meadows and Scavino and any reasons or explanation provided therein are not protected from disclosure under any conception of "internal deliberations" or the "deliberative process."  As to any and all other documents which reflect the decision and which refer to DOJ policy supporting, opposed to, or related to the decision not to prosecute, the Government should be required to provide a privilege log for the documents to which it has a good faith basis for believing the deliberative process privilege applies, and it should be required to provide all even arguably responsive documents for an *in camera* review. *See Cuomo*, 332 F.R.D. at 435-436 (citations omitted).

"A log of documents withheld on the basis of the deliberative process privilege should provide various pieces of information, including, but not limited to, a description of the decision to which the documents relate, the date of the decision, the subject-matter of the documents in issue, the nature of the opinions and analyses offered, the date that documents were generated, the roles of the agency employees who authored or received the withheld documents and the number of employees among whom the documents were circulated. *Id*.

4

**-2845-**

Tellingly, the Department of Justice has not treated its declination letters and explanation for the declination as privileged or otherwise covered by "deliberative process" concerns. Rather they have treated them as public documents, with both Congress and the American people entitled to know their decisions and the bases for them. [See, e.g., Doc. 42, Letter from Attorney General Mukasey declining to prosecute Bolten or Miers; Doc. 58-16, Letter from U.S. Attorney for D.C. Machen declining to prosecute Lerner]. The same principles should be applied here.

### The Declination Materials are Relevant to the Defense Theory and Could Well be Brady/Giglio Material

The balance of the Government's response is devoted to arguing that the requested materials could not possibly be relevant to Mr. Bannon's entrapment by estoppel argument because he has no such argument. The government supports this claim with its recurrent absurd theme that Mr. Bannon has not at any time in this litigation identified "specific Office of Legal Counsel ("OLC") opinions on which he allegedly relied in deciding to defy the Committee's subpoena." It then asserts that he "has not even identified a single OLC opinion that sanctions his conduct, even putting aside for a moment whether he relied on it." [Doc. 87 at 2; 3-5].

The Government's assertions are patently and demonstrably false in all regards. Mr. Bannon will reply by simply referring to the record which unequivocally demonstrates the point.

On multiple occasions throughout this litigation, Mr. Bannon has specifically identified the OLC opinions and other authoritative writings on which he relied for his belief (and his experienced criminal defense lawyer's belief) that his response to the subpoena, once executive privilege was invoked, was the lawful, appropriate, and only correct one. He also has specifically identified others consistent with the ones he specifically relied on, which he believes support the

reasonableness of his belief.  [See e.g., Docs. 28, 30 at 16-22, 41 at 3, n.5, 4, 5, n.8, 7, n.9, 9 & n. 12, n.13, 58, 64 at 12, 73 at 6-9, 73 at 12-24, 86 at 6-8].  In each of these examples, Mr. Bannon has identified the specific OLC opinion or other authoritative writing he has relied on and he has explained the basis for his belief and reliance.

In case the specific reference, description, and explanation were not enough, Mr. Bannon has also provided the Court (and Government counsel) with full copies of many of the OLC opinions and other authoritative DOJ writings on which he relied.  [See e.g. Docs. 28-10, 28-11, 28-12, 41-2, 41-3, 41-4, 41-6, 41-7, 42, 58-7, 58-8, 58-9, 58-10, 58-11, 58-12, 58-14, 58-15, 58-16, 58-17, 58-18, 58-23].

Additionally, as the Government is aware, Mr. Costello wrote Government counsel a memorandum, dated October 29, 2021, urging the Government not to prosecute Mr. Bannon.  In that Memorandum, Mr. Costello cited to some of the specific OLC opinions on which he and Mr. Bannon had relied in their response to the subpoena.  [Exhibit 1 at 5-7; 9].  There is no reasonable, ethical excuse for the Government's assertion that "… the Defendant still cannot identify specific Office of Legal Counsel ("OLC") opinions on which he allegedly relied in deciding to defy the Committee's subpoena."  [Doc. 87 at 2, 3-5].  Mr. Bannon not only can identify the specific OLC opinions on which he relied for his response to the subpoena, he has done so repeatedly throughout this case and has provided copies of many of them.

Government counsel further assert that Mr. Bannon's reference to the rationale of the OLC opinions somehow removes him from the realm of an entrapment by estoppel [Doc. 87 at 2-3]. This is an incorrect statement of the law.  Mr. Bannon has emphasized the rationale of each of the OLC opinions and other authoritative DOJ writings to support the reasonableness of his belief that the relevant principles enunciated in the OLC opinions apply in full force to current executive

6

branch employees, former executive branch employees, and to people who might never have been executive branch employees, when executive privilege is invoked by the President or former President of the United States concerning communications between that person and the President.

His motion on this issue expressly states that when one is served with a Committee subpoena and executive privilege is invoked, the OLC opinions and other authoritative DOJ writings reflect binding DOJ policy as to the implications, rights, duties, and obligations that are triggered by the invocation of executive privilege – a constitutionally unique privilege and circumstance. Those implications, rights, duties, and obligations are addressed in significant detail in the OLC opinions relied upon and in many more. The rationale and detailed explanation (e.g. in the 1984 Olson Opinion) are cited in later opinions to emphasize the soundness of subsequent consistent opinions.

As Mr. Bannon demonstrates in his motion to compel and has consistently argued throughout these proceedings, the rationale in each relied-upon opinion and other consistent opinions is not based on distinguishing between current, former or non-employees of the executive branch; but on the specific factors identified on pages 5-10 of the motion to compel [Doc. 86 at 5-10], which apply in full force to people who receive Congressional subpoenas that implicate executive privileged communications or deliberations and that trigger the invocation of executive privilege.

The rationale in all these writings applies in full force to Mr. Bannon's circumstances, as do all of the underlying constitutional and other principles on which the authoritative writings are based. Therefore it was reasonable for Mr. Bannon to rely on the authoritative writings, whether they arise specifically in the context of a current, former or non-employee.

7

The reasonableness of Mr. Bannon's reliance on these OLC opinions is a question for a jury at this point. There is no universe in which it fairly can be said that he has not met the threshold for submission of the question of reasonableness to the jury. Mr. Bannon (and Mr. Costello) relied on the express words in each opinion and their view that their reliance was reasonable and correct is bolstered by the rationale that makes it crystal clear that the bases for the conclusions and directives in the authoritative writings are triggered when executive privilege is invoked.

As Ted Olson wrote, "Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." [Doc. 58-10 at 136]. That is a fundamental principle in this circumstance and it is not a matter which depends on the status of the other party to the privileged communication with the President [Doc. 86 at 4-10]; nor is it a matter of picking and choosing among "out-of-context one-liners" as Government counsel puts it [Doc. 87 at 3].

Government counsel would like to substitute their self-serving, narrow reading of the OLC opinions for Mr. Bannon's and for the jury's; but that is not what the law permits.

Fundamental principles underlying the entrapment by estoppel cases include, among others, that (1) "a criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence. *United States v. Abcasis*, 45 F.3d 39, 42 (2d Cir. 1995), quoting from *United States v. Johnson*, 994 F.2d 980, 988 (2d Cir.), *cert. denied*, 126 L. Ed. 2d 364, 114 S. Ct. 418 (1993); (2) "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id*, quoting from *Crane v. Kentucky*, 476 U.S. 683 (1986); and (3) due process prohibits the criminal prosecution and conviction of a person where official, authoritative pronouncements in the form of regulations, authoritative writings, and official statements reasonably lead one to believe the conduct at issue was lawful. *United States*

8

*v. Pennsylvania Industrial Chemical Corp. ("PICCO")*, 411 U.S. 655, 670-675 (1973).[3]
Additionally, a defendant is not "required to pass a credibility test to have their defense presented
to the jury." *Abacasis*, 45 F.3d at 44.[4]

Finally, the Government's contention that the decisions not to prosecute Meadows and
Scavino are not *Brady/Giglio* material merely because they post-date Mr. Bannon's reliance on
the OLC opinions misses the point entirely [Doc. 87 at 5]. Mr. Bannon's argument in the motion
to compel is simply that the decision not to prosecute Meadows and Scavino, if based in any part
on the invocation of executive privilege, is *Brady/Giglio* material first and foremost with respect
to Mr. Bannon's contention that executive privilege was invoked with respect to his subpoena and
the government's suggestion to the contrary, in light of the fact that it was invoked in the same
manner and form and by the same emissary of President Trump for all three men [Doc. 86 at 3,
notes 5 & 6]. That has nothing to do with whether the declination pre-dated Mr. Bannon's
prosecution.

Secondly, regardless of whether the Government agrees with the defense theory, it is the
defense theory that the principles of the OLC opinions do not distinguish between current, former,

---

[3] The *PICCO* case presents a classic vehicle to demonstrate the error in the Government's
position that the Court should find as a matter of law that the OLC opinions do not apply, based
on its restrictive reading. In *PICCO*, a plain reading of the regulations at issue, certainly left the
question open as to whether they applied to the defendant's specific conduct and whether case
law or more recently revised regulations should have made it clear to the defendant that the
regulations it relied on did not apply. The Government so argued in *PICCO*. 411 U.S. at 674-
675. But the Supreme Court rejected that argument, finding that such arguments do not go to the
availability of the defense; rather they are arguments for determination by the fact-finder at trial
for they go to whether the defendant actually relied on the regulations and whether its reliance
was reasonable. 411 U.S. at 675.

[4] As the Court expressly found in *Abcasis*, there was "surely good reason for the court to doubt
the good faith of the defendants' contention" concerning their reliance, let alone whether it was
reasonable. *Abcasis*, 45 F.3d at 44.

9

and non-employees of the executive branch; rather they turn on whether executive privilege was

invoked, as discussed earlier.  Therefore, the decision not to prosecute Meadows and Scavino, if

based at all on executive privilege and the OLC opinions, is *Brady* material as to Mr. Bannon's

defense theory. he is entitled to the material for the record.

Mr. Bannon relies on his Motion [Doc. 86] for any further reply to the Government's

Opposition [Doc. 87].

WHEREFORE, for the foregoing reasons, Defendant Stephen K. Bannon respectfully

requests that this Court GRANT his MOTION TO COMPEL.

Dated: July 6, 2022                          Respectfully submitted,

                                             SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                             ___/s/ M. Evan Corcoran_____
                                             M. Evan Corcoran (D.C. Bar No. 440027)
                                             400 East Pratt Street - Suite 900
                                             Baltimore, MD 21202
                                             Telephone: (410) 385-2225
                                             Facsimile: (410) 547-2432
                                             Email: ecorcoran@silvermanthompson.com

                                             ___/s/ Robert J. Costello_____
                                             Robert J. Costello (*pro hac vice*)
                                             Davidoff Hutcher & Citron LLP
                                             605 Third Avenue
                                             New York, New York 10158
                                             Telephone: (212) 557-7200
                                             Facsimile: (212) 286-1884
                                             Email: rjc@dhclegal.com

                                             ___/s/ David I. Schoen_____
                                             David I. Schoen (D.C. Bar No. 391408)
                                             David I. Schoen, Attorney at Law
                                             2800 Zelda Road, Suite 100-6
                                             Montgomery, Alabama 36106
                                             Telephone: (334) 395-6611
                                             Facsimile: (917) 591-7586
                                             Email: schoenlawfirm@gmail.com

*Counsel for Defendant Stephen K. Bannon*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of July, 2022, a copy of the foregoing Motion

was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

      /s/ M. Evan Corcoran
      M. Evan Corcoran (D.C. Bar No. 440027)

11

**EXHIBIT 1**

# DAVIDOFF HUTCHER & CITRON LLP

### ATTORNEYS AT LAW
### 605 THIRD AVENUE
### NEW YORK, NEW YORK 10158
————
### (212) 557-7200
### FAX (212) 286-1884
### WWW.DHCLEGAL.COM

## M E M O R A N D U M

TO:        United States Attorney for the District of Columbia ("USAO-DC")

FROM:   Robert J. Costello

DATE:    October 29, 2021

RE:        Congressional Referral of Stephen K. Bannon for Criminal Contempt

---

I — EXECUTIVE SUMMARY

This memo sets forth several legal bases for the USAO-DC to demonstrate that if this case were handled based upon the prevailing rules of the Justice Department, it would decline prosecution of Mr. Stephen K. Bannon, based on numerous opinions from the DOJ's Office of Legal Counsel ("OLC"), which, pursuant to well-settled law, are binding opinions on the Executive Branch of the United States, including the DOJ.

First, pursuant to a well-settled OLC opinion, the DOJ and USAO-DC in fact have discretion in deciding whether or not to prosecute Mr. Bannon, regardless of Congress's vote to recommend prosecution.

Second, pursuant to an OLC opinion, the subpoena, in this case, was *void ab initio*, because it specifically barred President Trump's counsel from appearing at Mr. Bannon's deposition or from reviewing the documents that Mr. Bannon was to produce, which violates the executive privilege because it prevented President Trump from protecting his executive privilege. Relatedly, the United States Supreme Court has held that a former president may invoke the executive privilege and there are several effective OLC holdings that a non-governmental, private citizen is bound by the President's invocation of the executive privilege.

Third, pursuant to another OLC opinion, the DOJ is not permitted to prosecute a former White House employee for contempt of Congress where the issue involves the invocation of executive privilege. Based on the foregoing, unless the Department wants to treat Mr. Bannon differently than the Justice Department rules set out for everyone else, the USAO-DC should decline to prosecute Mr. Bannon. A decision to decline would also go a long way to dispel the doubts about the Justice Department's independence, particularly in light of the inappropriate and inaccurate comments of a partisan Congress and the unfortunate interference by the President. It

1

would also uphold the Justice Department's traditional role of appropriately defending the prerogatives of the Executive Branch of government.

II — FACTUAL BACKGROUND

Through counsel, Mr. Bannon had communicated by emailed letters to the Select Committee Chairman Bennie G. Thompson, as well as by telephone with Committee counsel Sean Tonolli that, acting in accordance with instructions received from President Trump's counsel, Mr. Bannon would be unable to comply.

As Mr. Bannon's counsel, on September 23, 2021, I was contacted by Committee Chief Counsel Kristin Amerling, to inquire whether I would accept service for Mr. Bannon via email. Mr. Bannon immediately agreed, but before I informed Ms. Amerling, I was contacted by the Associated Press, CNN and MSNBC, who already had copies of the subpoena. I then notified Ms. Amerling that we would accept service of the subpoena.

The subpoena called for the production of documents and a private deposition. In addition to the subpoena, I was provided with a copy of the rules that would govern the taking of testimony. Surprisingly, the rules called for only Mr. Bannon's private counsel to attend the deposition and that a copy of the transcript of that deposition would not be made available to the witness, Mr. Bannon.

After the Committee notified the media that they had served subpoenas for Mark Meadows, the former Chief of Staff to President Trump, Mr. Bannon and two others, on the evening of October 5, 2021, I received a telephone call from Justin Clark, Esq., who informed me that he was counsel to President Donald Trump and that President Trump was going to invoke executive privilege for the four named individuals and that he would be sending a letter to confirm the instructions. On October 6, 2021, Justin Clark emailed me a letter stating, in part:

"President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch." Mr. Clark added that:

"Through the Subpoenas, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others, the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

Therefore, to the fullest extent permitted by law, President Trump instructed Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

Faced with this instruction by counsel to President Trump, I advised Mr. Bannon that he should not provide documents or testify, because Mr. Bannon must be guided by President Trump's invocation of the privilege.

2

As a matter of professional courtesy, I took a call from Sean Tonolli, Staff Counsel to the Select Committee.  Mr. Tonolli advised me that he was the Staff Counsel who would be questioning Mr. Bannon.  I took the opportunity to ask Mr. Tonolli about the rule that stated that only Mr. Bannon and his personal counsel could attend the deposition.  Mr. Tonolli confirmed "that was the position of the Select Committee."  I asked that question because if that rule were followed, there would be no one to represent the interests of President Trump whose privileges were at stake at Mr. Bannon's private deposition.  I was aware of the OLC Opinion issued on May 23, 2019, finding that where Congress, in a matter involving executive privilege, refuses to allow a representative of the Executive Branch to attend the private deposition and invoke the privileges of the President, the subpoenas were deemed by OLC to be illegal and invalid.  In light of the OLC opinion, I wanted to know from staff counsel if the Select Committee intended to enforce that rule which would abrogate the validity of Mr. Bannon's subpoena.  On October 7, 2021, the day before documents were due to the Committee from Mr. Bannon, and a day after receiving a letter of instructions from President Trump's counsel, on Mr. Bannon's behalf, I notified Chairman Thompson, that pursuant to President Trump's instruction, we would be unable to respond to the requests for documents or testimony.  This was not a contemptuous refusal; we were simply following the instructions of President Trump's counsel regarding privileges which belonged to President Trump.

Chairman Thompson responded the next day, October 8, 2021, claiming that Mr. Bannon could not take advantage of the executive privilege because he was a private citizen on January 6th.  Second, Chairman Thompson stated that the Committee had not received "any assertion, formal or otherwise, of any privilege from the (sic) Mr. Trump."  Third, Chairman Thompson argued that "even if your client had been a senior aide to the President during the time period covered by the…testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest."  As to points One and Two offered by the Chairman, both of his assertions are wrong and directly contradicted by opinions of the Office of Legal Counsel which are discussed more fully below.  As to the third point, we did not claim any immunity in our initial response to Chairman Thompson and the Select Committee.

On October 13, 2021, on Mr. Bannon's behalf, I responded to some of the remarks made by Chairman Thompson in his October 8, 2021 letter, that his use of the word "defiance" to describe Mr. Bannon's behavior was inappropriate because Mr. Bannon was merely following the instructions of counsel for President Trump and being appropriately response to the Select Committee's request.

On October 15, 2021, at 2:05 p.m., the Chairman again wrote to me, claiming that the basis for Mr. Bannon's refusal to produce documents or testify, namely President Trump's assertion of executive privilege, had not been made, in the opinion of the Committee.  Chairman Thompson again argued that Mr. Bannon did not have the immunity that we never claimed he had, and therefore, Chairman Thompson claimed that Mr. Bannon was in "willful non-compliance" of the Subpoena.  That letter provided that we had until 6:00 p.m. on Monday, October 18, 2021, to respond.  Slightly later that afternoon, President Biden interjected himself into this dispute by answering a reporter's question stating that the Justice Department should prosecute those who refused to comply with the Select Committee subpoenas.  Within an hour, the Attorney General's spokesman was forced to state that the Justice Department would make "its own independent decisions in all prosecutions based solely on the facts and the law.  Period.  Full stop."  The damage

3

had already been done. The Select Committee would not vote for another three days, the entire House would not vote until the following Thursday, October 21, 2021, but the message had been sent and it was impossible to unring the bell. The Select Committee would use the House to urge the Justice Department to make an example out of Stephen K. Bannon.

Late in the afternoon of October 18, 2021, as we were preparing to send our response to Chairman Thompson's October 15 letter as he provided, we were notified that President Trump filed a lawsuit in Federal Court in the District of Columbia, naming Chairman Thompson, in his official capacity, as well as the Select Committee. Instead of sending the letter I had prepared, I wrote a short note to Chairman Thompson informing him that we had just become aware that President Trump had filed a lawsuit and therefore, I was requesting a one-week adjournment of our response, so we could review the lawsuit and determine its impact on Mr. Bannon's response.

After we sent in our request for an adjournment, at 6:50 p.m., I received an email from the Office of White House Counsel. That letter stated that:

 "Mr. Bannon's tenure as a White House employee ended in 2017. To the extent any privileges could apply to Mr. Bannon's conversations with the (then) former (sic) President or White House staff, after the conclusion of his tenure, President Biden has already determined that an assertion of executive privilege is not in the public interest, and therefore is not justified…"

White House Counsel's letter fails to recognize that the conversations were with the *sitting* President and it continues to rely on the legally incorrect assertion that executive privilege only involves government employees, when the OLC, in an opinion by Solicitor General and then Acting Attorney General Paul Clement, states otherwise, as set forth *infra*. The letter also wrongfully claims that President Biden has any authority whatsoever to waive executive privilege asserted by President Trump.

The next morning, October 19, 2021, Chairman Thompson denied our request for a short adjournment, thereby terminating our ability to communicate before the Committee printed its conclusions and recommendations to the entire House that same day. Later that evening, the Committee held a televised press event to conduct a live vote to recommend to the entire House that Stephen K. Bannon be held in criminal contempt of Congress. In comments made by Committee members on television that night, they made clear that they intended to make an example out of Mr. Bannon. Even after the televised vote, and the fact that Chairman Thompson had prohibited us from responding by turning down our request for an adjournment to review the Trump Lawsuit, Chairman Thompson sent me another long-winded letter late in the evening, urging Mr. Bannon to "change course", relying on the letter from White House Counsel that the Chairman believed demonstrated "the inappropriateness of Mr. Bannon's reliance on assertions of executive privilege…"

As noted in the paragraphs above, Mr. Bannon has been appropriately responsive to both the Committee and to counsel to President Trump and has been responsive to the instructions and directions of President Trump's counsel. The response of the Committee, on the other hand, has been to leak to the press and issue grandstanding, legally incorrect press releases. Adopting the

partisan Congress' position would do great damage to executive privilege and would do great harm to future Presidents.

III — LEGAL BASES TO DECLINE PROSECUTION

The DOJ should decline to prosecute Mr. Bannon because a decision by the DOJ, a member of the Executive Branch, to prosecute Mr. Bannon would be violative of several binding OLC opinions. It is well settled that OLC opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies." See *Casa de Maryland. v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718, n.1 (4th Cir. 2019); *see also, Cherichel v. Holder*, 591 F.3d 1002, 1016, n.17 (8th Cir. 2010) (noting that "while OLC opinions are generally binding on the Executive branch…courts are not bound by them") (citations omitted). An OLC memorandum is final when it serves as the OLC's last word on the subject matter that was provided to the decisionmaker who requested it. *Samahon v. United States DOJ*, 2015 U.S. Dist. LEXIS 23813, *45 (E.D. Pa. Feb. 27, 2015).

A.      **The U.S. Attorney/D.O.J. has discretion to decide whether to indict for misdemeanor criminal contempt.**

The United States Attorney and the Department of Justice retain the discretion to refuse to charge a referred criminal contempt of Congress matter. On June 16, 2014, the Office of Legal Counsel ("OLC") issued an opinion letter for the United States Attorney for the District of Columbia, 38 Op. O.L.C. 1, on the issue of Prosecutorial Discretion regarding Citations for Contempt of Congress. The 2014 opinion was issued when the United States Attorney considered the finding of an earlier, 1984 opinion of OLC, 8 Op. O.L.C. 101 (1984) which concluded that the United States Attorney is not required by "the criminal contempt of Congress statute, 2 U.S.C. Sections 192, 194…(to) prosecute or refer to a grand jury for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of privilege in response to written instructions from the President of the United States." The 2014 OLC opinion affirmed the earlier 1984 opinion. We now know from the OLC opinion of Solicitor General Paul Clement in 2007 that executive privilege is not limited to Executive Branch Officials but applies equally to individuals outside the Government such as Mr. Bannon. Based on the foregoing, the United States Attorney and the DOJ have discretion to decline prosecution of Mr. Bannon and should do so in this instance. This would be consistent with prior decisions involving Eric Holder, Lois Lerner and others.

B.      **The Subpoena issued by the Select Committee was illegal and invalid.**

The subpoena accepted by counsel for Mr. Bannon was illegal and therefore invalid because it contained rules that, in an executive privilege case, denied access to the private deposition to everyone except the witness and his personal counsel. During a conversation with staff counsel Sean Tonolli, who stated that he was going to be the staff counsel questioning Mr. Bannon, I inquired about the written rule limiting attorney presence to Mr. Bannon's personal counsel. Mr. Tonolli confirmed that the rule was the position of the Select Committee. That rule, imposed by this Select Committee, knowing that it would encounter claims of executive privilege,

has been found by OLC to be unconstitutional and as a result, in the opinion of the OLC, the Subpoena issued by the Committee is illegal and invalid.

On May 13, 2019, the OLC issued an opinion regarding the constitutionality and enforceability of subpoenas issued by the House Committee on Oversight and Reform. The Committee sought to question the two witnesses subpoenaed "about matters that potentially involved communications that were protected by executive privilege. Although the Committee's Rule 15 (e) permitted the witnesses to be accompanied at the depositions by private counsel, who would owe duties to the witnesses themselves, the rule purported to bar the presence of agency counsel, who would represent the interests of the Executive Branch." In response to the request by the Attorney General, the OLC "advised that a congressional committee may not constitutionally compel an executive branch witness to testify about potentially privileged matters while depriving the witness of the assistance of agency counsel." While OLC speaks of "agency counsel" in the opinion, in a footnote, OLC adds that their "analysis applies equally to all counsel representing the interests of the Executive Branch, no matter whether the witness works for an "agency", as defined by statute."

With respect to the Constitutional question, the OLC stated: "we concluded that Congress may not compel an executive branch witness to appear without agency counsel and thereby compromise the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities...Committee subpoenas purporting to require the witnesses to appear without agency counsel were legally invalid and not subject to civil or criminal enforcement."

This same provision is found in the rules attached to the subpoena served upon Mr. Bannon's counsel and as such, renders the subpoena illegal and invalid in accordance with the opinion of the Office of Legal Counsel. The rule provided to counsel for Mr. Bannon reads:

> "3. Witnesses may be accompanied at a deposition by personal, non-governmental counsel to advise them of their rights. Only members, committee staff designated by the Chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend."

## C. The Department of Justice May Not Prosecute White House Officials or *former* White House Officials for Contempt of Congress.

On February 29, 2008, the OLC issued an opinion to then Attorney General Michael B. Mukasey, who asked whether the Department of Justice may bring before a grand jury, criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or *former* White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony. The OLC concluded it may not.

6

The opinion unequivocally explained that the:

"Department of Justice has long taken the position, *during administrations of both political parties*, that the criminal contempt of Congress statute does not apply to the President or presidential subordinates who exert executive privilege."

The opinion goes on to cite different examples of the Department of Justice adhering to that standard over the years, citing *opinions by Theodore Olson in 2008 during the George W. Bush Administration and Walter Dellinger during the Clinton Administration.*

**D.    Contrary to the position taken by Chairman Thompson, the Select Committee and current White House counsel, President Trump retains the right to exercise the invocation of executive privilege.**

The issue of whether President Trump can legally invoke executive privilege has plagued these proceedings, because the Committee, as well as certain sectors of the press, have consistently stated that Mr. Bannon could not invoke the executive privilege because executive privilege is held by the sitting President and not a former President; they add that even if President Trump could involve executive privilege, Mr. Bannon would not be covered because Mr. Bannon was not a government employee at the time of the communications. That position, embraced by the Select Committee, is wrong on both fronts. In *Nixon v. Adm'r of Gen Services,* 433 U.S. 425, 448-49 (1977), the Supreme Court stated:

"Nevertheless, we think that the Solicitor General states the sounder view and we adopt it. This Court held in *United States v. Nixon,* … that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; **the privilege is not for the benefit of the President as an individual, but for the Republic. Therefore, the privilege survives the individual President's tenure."** (emphasis supplied).

**E.    Contrary to Chairman Thompson's assertions, a non-governmental employee such as Stephen K. Bannon can invoke executive privilege.**

Although a theory that Mr. Bannon has no right to refuse to testify based upon executive privilege since he was not a government employee at the time has been bandied about by partisan members of the Select Committee and of Congress devoid of any knowledge of this area of the law, it is simply not accurate and not the policy of the DOJ.

On June 27, 2007, Paul Clement, who was at the time both the Solicitor General and Acting Attorney General of the United States, wrote a legal opinion for then President George W. Bush, concerning the issue of subpoenas that had been issued by the House Judiciary Committee, relating to the resignations of several United States Attorneys in 2006. The House sought documents in the possession of current or *former* White House officials. Additionally, testimony was sought from two *former* officials. The President requested guidance on whether he could assert executive

privilege with respect to *both* the current *and former* White House officials. Paul Clement found that:

> "communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch…fall within the scope of executive privilege...Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."

A prosecution of Mr. Bannon for criminal contempt of Congress would be in violation of years of precedent in cases involving the executive privilege and would fly in the face of the OLC opinions discussed above. It would only serve to satisfy the political agenda of the Select Committee and would not ensure answers to the questions they have posed. The Select Committee must first resolve their differences on executive privilege in Federal Court or with Donald Trump, rather than trying to utilize the Department of Justice to make an example of Mr. Bannon, as the Chairman of the Select Committee has stated on national television.

**F.    The Trump Lawsuit filed October 18, 2021 challenges the very existence of the Select Committee and therefore challenges its ability to issue subpoenas to anyone.**

On October 18, 2021, counsel for President Trump filed *Trump v. Bennie Thompson,* 21-Civ- 02769, ( D.D.C. 2021). That is the lawsuit we asked for time to review before responding to Chairman Thompson's letter of October 15, 2021. That lawsuit provides the Select Committee and counsel for President Trump with the Federal Court forum within which to decide the issues of the constitutionality of the Select Committee, President Trump's ability to invoke executive privilege and the scope of such invocation. The constitutionality of the Select Committee is challenged in the Trump lawsuit, because it has abrogated to itself investigative and prosecutorial powers that are the exclusive province of the Executive Branch. If President Trump prevails in that lawsuit, it will establish yet another basis to invalidate the subpoena issued to Mr. Bannon and indeed anyone else subpoenaed by the Select Committee. Simply put, President Trump argues that there is no legislative purpose to the Select Committee's actions. President Trump argues that the Select Committee's only purpose is to investigate. That investigative function belongs exclusively to the Executive Branch, more specifically, to the Federal Bureau of Investigation ("FBI"). The FBI has already investigated this event and reached conclusions that some Members of the House are not satisfied with, so they have unconstitutionally seized upon this to form a Select Committee to do that which is delegated solely to the Executive Branch. A favorable decision for President Trump will render all activities of the Select Committee unconstitutional and moot, including their referral for criminal prosecution.

## CONCLUSION

Any decision to go forward with a prosecution, would be contrary to all existing rules of the Justice Department and could appear to be based on the pressure being applied by a partisan Congress and unfortunately, by the President. A decision to decline would go a long way to demonstrate the Department of Justice and the Attorney General's desire to decide issues like this

solely on the law and the existing rules and regulations.  Any decision to go forward would violate decades of opinions of the OLC under both Democrat and Republican Presidents.

As detailed above, Mr. Bannon's conduct here was far from contemptuous.  In fact, he was acting on advice of counsel, consistent with the several opinions of the OLC which are outlined above.  Mr. Bannon is not a witness who has flouted either the Congress or the Independent Counsel assigned to investigate specified matters.  The law in the area of executive privilege is the basis of President Trump's current lawsuit in Federal Court against the Committee.  Mr. Bannon is covered by executive privilege, in the opinion of the OLC.  President Trump was entitled to invoke executive privilege according to the United States Supreme Court.  President Trump through his counsel directed Mr. Bannon not to provide documents or testimony, citing executive privilege.  The OLC has opined that under these circumstances, a current or former White House employee should not be indicted and charged with criminal contempt of Congress.  As I stated to Chairman Thompson, since the rules set up by the Select Committee did not allow for any participation by the President's counsel to protect executive privileges, and as the OLC opinion states, in circumstances exactly like this one, where Congress has imposed rules which prohibit counsel for the President to be present and object to testimony based upon executive privilege, the subpoena itself is unconstitutional, illegal and invalid.  That being the case, there is nothing for the United States Attorney's Office for the District of Columbia to consider.  Accordingly, the USAO-DC should refuse to allow itself to be used as a political pawn to make an example of Mr. Bannon, who was acting on the advice of both his own counsel and the settled policy of the Office of Legal Counsel, in preserving President Trump's invocation of executive privilege.  Therefore, the USAO-DC should decline to prosecute Mr. Bannon.

Respectfully submitted for your consideration,

Robert J. Costello
Counsel for Stephen K. Bannon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

<u>**UNITED STATES' REPLY IN SUPPORT OF MOTION IN LIMINE**</u>

In his opposition to the Government's motion in limine, ECF No. 94, the Defendant reveals that his trial strategy will be exactly what the Government's motion anticipated and what the Court must prevent: to expose the jury to as much irrelevant, prejudicial material as possible, in hopes of nullification.  Because the Defendant, the proponent of his desired evidence, has failed to meet his burden to establish its relevance and propriety, it should be excluded and the Government's motion should be granted.

**I.      Irrelevant Arguments Have No Place In a Criminal Trial.**

By opposing the Government's motion even with respect to the most undisputed tenets of criminal law—for example, that potential punishment is not relevant to a jury's consideration of whether a defendant committed the charged crime—the Defendant makes clear that unless ordered otherwise, he has no intention of abiding by the law or the Federal Rules of Evidence at trial.  The question for the jury to decide in this case is whether the Defendant received a subpoena and refused to appear.  The question is not whether the Committee members are politicians; whether defiance of a congressional subpoena is worthy of the punishment provided by law; or whether the Defendant's attorney should have participated in a voluntary interview with the Government.  Yet, throughout his opposition, the Defendant claims, based on inapposite caselaw or on no authority at all, that he should be permitted to introduce this and other irrelevant evidence.  But that is not

how a criminal trial works. "To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Fed. R. Evid. 103(d). "Pretrial motions *in limine* effectuate [Rule 103(d)'s] directive," and a "'pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations.'" *United States v. Zeese*, 437 F. Supp. 3d 86, 92 (D.D.C. 2020) (quoting *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980)). The Court should make it clear to the Defendant that he cannot treat the Judiciary like he did the Congress—by flouting clear rules requiring him to proceed otherwise. The Government's motion in limine to exclude improper and prejudicial arguments should be granted.

A.     **Cross-Examination About a Witness's Political Leanings**

The Defendant's opposition makes clear that he plans to cross-examine Committee witnesses called by the Government about a number of irrelevant and prejudicial matters, including the "contested" Presidential election, extraneous political disputes surrounding the Committee, and the political party and views of the witness and Committee members.

The Defendant claims the evidence he seeks to admit goes to "bias" and relies on the Supreme Court's decision in *United States v. Abel*, 469 U.S. 45 (1984), to argue that he should be allowed to delve into the individual motives of members of the Committee in conducting the January 6 investigation or the mere political affiliations of the witnesses. *See* ECF No. 94 at 3-4. But the Defendant does not acknowledge *Abel*'s definition of "bias" evidence as evidence that there may be something causing the witness to testify inaccurately or incompletely. 469 U.S. at 52 ("Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."). The Defendant does not explain how the mere fact that

a witness identifies with a particular political party meets this definition, and *Abel* does not support the Defendant's claim.  In that case, it was the witness's and the defendant's common membership as "brothers" in a gang whose tenets required members to lie on behalf of "brothers" that the Court found to be probative of bias.  469 U.S. at 52-54.  Identification with a political party is not the same as membership in a gang where "brotherhood" and lying are essential to its identity.  *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1180 (11th Cir. 2006) (distinguishing *Abel* from claims of bias based on party affiliation because "the witnesses' membership in the Communist party did not, by definition, impugn their credibility.  Membership in a political party, by itself, does not necessarily signify anything about a person's truthfulness and is thus distinguishable from 'a secret prison sect sworn to perjury and self-protection.' (quoting *Abel*, 469 U.S. at 54)).

The Defendant's reliance on the D.C. Circuit's decision in *United States v. Foster*, *see* ECF No. 94 at 4-5, is equally unavailing.  The selected quote the Defendant includes merely reinforces the meaning of "bias" articulated by the Supreme Court in *Abel*—whether there is something causing a witness to testify inaccurately.  The issue decided in *Foster*, however, was whether a defendant was entitled to cross-examine a law enforcement witness about his physical vantage point for observing illegal drug transactions about which he testified, *see* 986 F.2d 541, 543-44 (D.C. Cir. 1993)—shedding no light on the probative value of an individual's political party affiliation.

The Defendant also suggests he should be allowed to cross examine witnesses—although he does not identify which ones—about Members of Congress' book deals or public statements about the Defendant that Members or President Biden have made.  ECF No. 94 at 5-6.  If any of these individuals were Government witnesses, their particular views of the Defendant may be relevant bias evidence, but the Government does not plan to call any Members of Congress or

President Biden to testify in its case-in-chief.  And the Defendant offers no authority to counter

the Government's motion that he should be excluded from cross-examining testifying witnesses

about whether non-testifying witnesses might have a basis for testifying inaccurately should they

be called.  *See* Gov't Mot. in Limine, ECF No. 85 at 6-7 (collecting cases on the impropriety of

impeaching non-testifying witnesses).

At bottom, the Defendant's purported bias evidence fosters arguments to the jury that the

Committee was improperly picking on him by issuing him a subpoena, expecting him to comply,

and referring him for contempt when he refused.  *See, e.g.*, ECF No. 94 at 5 (claiming as evidence

of bias that the "Select Committee refused to engage in the constitutionally mandated

accommodation process with Mr. Bannon, in contrast to its dealings with other subpoenaed

witnesses."); *id.* at 6 ("The subsequent full-House vote to refer Mr. Bannon to the U.S. Attorney's

Office for prosecution was largely along party lines.").  The Defendant does not appear to contest,

however, the authority the Government cited in its motion in limine that selective prosecution

claims are improper issues for juries to decide, *see* Gov't Mot. in Limine at 3-4.  His attempt to

recharacterize his selective prosecution claims regarding the political makeup of the Committee as

"bias" evidence should be rejected and the Government's motion granted.

### B.    Investigatory Tactics

The Defendant tries to avoid established precedent that claims of government misconduct

are not proper questions for a jury, *see* Gov't Mot. in Limine at 7, by pointing this Court to

inapposite cases holding that defendants should be allowed to obtain and elicit testimony about

evidence investigators may have missed or minimized that would tend to exonerate them.  *See*

ECF No. 94 at 7 (citing, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (finding the defendant

would have benefited from presenting evidence that a government informant who identified the

4

defendant as the murderer had given inconsistent statements, and that evidence suggested the informant may have committed the offense); *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (finding evidence tending to support the defendant's claim that the government's cooperating witness committed the charged murder was *Brady* material)).   In *United States v. Sager*, for example, the primary case on which the Defendant relies, the lead agent investigating the defendant's mail fraud testified multiple times, in an inconsistent fashion, about whether an eyewitness to the fraud had confidently identified the defendant from a photo display.  227 F.3d 1138, 1142 (9th Cir. 2000).  When the defense sought to cross-examine the agent about the inconsistencies and apparent failures to pursue certain leads and corroborate certain evidence, the judge granted a government objection and instructed the jury not to "grade" the investigation.  *Id.* at 1143.  The Ninth Circuit determined the court had erred because it had prevented the jury from considering the apparent problems in the agent's investigation and testimony, and it was a circumstance in which "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud."  *Id.* at 1145.  That is, in *Sager,* whether the agent had conducted a thorough investigation, and was testifying accurately, was an issue probative of the defendant's guilt or innocence—including whether the agent had identified the right suspect.

Despite citing these cases, the Defendant then reveals, however, that he plans to do exactly what the law forbids: falsely tell the jury that "[a]t every stage of this case, the investigators have over-reached" and improperly imply that the Government committed misconduct in obtaining evidence relating to Mr. Costello's role in the offense. ECF No. 94 at 7 and n.5.  If the Defendant wishes to question testifying case agents about evidence they collected or ignored that tends to show the Defendant did not commit the offenses charged, he is free to do that.  He cannot, however,

relitigate his claims that the Government "over-reached" by obtaining non-privileged material relating to a fact witness in this case because it does not bear on his guilt or innocence.

### C.    Commentary on Absent Witnesses

The Defendant's argument for why he should be allowed to tell the jury that certain congressional witnesses raised a valid Constitutional privilege against compulsion is that he "simply thinks that it is proper for the jury to hear." ECF No. 94 at 8. There is no legal support for what the Defendant deems "proper" argument here and the Defendant cites none. In fact, because whether a witness has invoked any available privilege against compelled testimony has no bearing on the Defendant's guilt or innocence, the Defendant's presentation of the invocation is just the opposite of what the Defendant claims: an improper consideration for the jury. *See Bowles v. United States*, 439 F.2d 536, 541-42 (D.C. Cir. 1970) (finding trial court properly prevented defense from calling a witness to force him to assert his Fifth Amendment privilege in front of the jury and prevented both parties from arguing to the jury regarding the witness's absence because "[i]t is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege").

Instead of providing authority that supports his opposition to the Government's motion to preclude improper argument, the Defendant instead spends the majority of his argument addressing the Government's motion on missing witness claims to suggest that he will move for dismissal if the Court quashes his over-broad subpoenas to congressional witnesses. ECF No. 94 at 8. This claim was easily anticipated; the Defendant's counsel provided an interview to a journalist in which he stated he "liked the specter" and "optic" of forcing congressional witnesses to invoke their Speech or Debate Clause privilege and suggested it was a means to obtain a trial continuance. *See* "Steve Bannon Digs Into Roger Clemens' Playbook to Try to Beat Congress," *Daily Beast*,

June 13, 2022 (statements by David Schoen).  In any event, the Government will respond fully to such a motion if and when it is filed.  But the arguments that the Defendant does make on this front in his opposition already include fatal flaws.  The Defendant attempts to analogize his situation to cases in which the executive branch withheld *Jencks* material, ECF No. 94 at 9 (*Jencks v. United States*, 353 U.S. 657, 672 (1957) (prosecution could not withhold from defendant relevant reports written by government witnesses about the subject of their testimony)), or cases in which defendants could not present information relevant and material to supporting their defense at trial, *id.* (citing *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (prosecution could not withhold from defendant information related to a government informer's identity when such information was relevant and helpful to defendant); *United States v. Fernandez*, 913 F.2d 148, 158-59 (4th Cir. 1990) (involving classified material that court determined was "material" and "essential" to defense); Transcript, *United States v. Rainey*, Case No. 12-cr-00291, ECF No. 510 at 284-285 (dismissing charge for obstruction of Congress after finding that congressional witnesses who refused to testify based on an assertion of their Speech or Debate Clause privilege possessed "relevant, material, noncumulative evidence" undermining an element of the offense)).  The Defendant has not established how any of the information he is seeking from congressional witnesses is relevant and material to supporting his defense, and the information is not in the Government's possession—it is in the possession of another party, another branch of government. Should the Defendant eventually pursue his arguments for dismissal through his own motion, they will fail.

### D.   Punishment

It is black-letter law that it is improper to put a defendant's potential punishment in front of the jury because it is not a proper consideration for them.  *See Rogers v. United States*, 422 U.S.

35, 40 n.2 (1975) ("[P]unishment . . . is a matter exclusively within the province of the Court and is not to be considered by the jury in arriving at an impartial verdict." (internal quotation marks and citations omitted)); *United States v. Patrick*, 494 F.2d 1150, 1153-54 (D.C. Cir. 1974) (finding error where court allowed jury to consider punishment because "it is error for the court to put before the jury any considerations outside the evidence that may influence them"). The Defendant claims, without articulating why, that he should nonetheless be able to tell the jury in his case that there is a mandatory minimum sentence associated with his crime. ECF No. 94 at 10-11. The "why" is clear—the Defendant is improperly seeking nullification. In a tacit admission that the jury should not be considering such information, the Defendant suggests that the Court can just cure his improper statements to the jury with the Redbook instruction that the jury cannot consider such information. *See* 1 Criminal Jury Instructions for DC Instruction 2.505 (2021) ("Possible Punishment Not Relevant"). The Court must reject the Defendant's invitation to allow incompetent evidence in front of the jury. *See, e.g.*, Fed. R. Evid. 103; *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming exclusion of evidence that only would invite nullification).

### E.    Information Relating to Other Contempt Referrals

The Defendant asserts that evidence related to the Department of Justice's decision regarding contempt referrals of other individuals, with their own individual facts and circumstances, is "essential evidence," and "bears on the elements of this offense or our defenses," but does not say how. ECF No. 94 at 11. That is because there is no way that subsequent, different instances of contempt can tell the jury anything about whether the Defendant received a subpoena and deliberately refused to appear or produce records as required. The Defendant's conclusory assertions to the contrary cite no authority or reasoning and should be rejected.

**F.      Statements of Counsel**

The Defendant opposes the Government's motion to prevent his counsel from referencing their experience and improperly bolstering their arguments with it.   Like his arguments about introducing evidence relating to potential punishment to the jury, the Defendant asserts that any improper argument his counsel may make to the jury about counsel's life experience can be cured with an instruction.  *Id.* at 12.  The Defendant's arguments again invite the Court to disregard its obligations to ensure the parties present the jury with only relevant evidence and arguments and his invitation should be rejected.

**II.      Questions of Law Are Not for the Jury.**

The Defendant opposes the Government's motion to preclude him from presenting evidence or arguing to the jury about pure questions of law.   To support his opposition, the Defendant states only that the Government is responsible for proving the elements of the offense. ECF No. 12-13.

The Government's motion is not based on a claim that it should be relieved of its obligation to prove the elements of the offense.  The Defendant does not engage with or articulate a response to the Government's actual motion—that the issues of whether the Defendant had a valid privilege excusing him from any form of compliance;  whether the Committee's investigation is a constitutional exercise of Congress's powers; and whether the Rulemaking Clause requires legal deference to Congress's interpretation of its rules are legal questions only, not factual or mixed questions, and so are not appropriate for jury resolution.   Indeed, the Defendant still has not articulated how a jury would be asked to decide questions of constitutional law.   Moreover, these constitutional questions are not elements of the offense.  For example, the Government is not required to prove as an essential element of the offense that the Defendant had no valid

constitutional privileges, such as executive privilege, to raise in response to the subpoena, because constitutional privileges, like committee rules providing process protections, are defenses to compliance that can be waived, not essential elements. *See, e.g.*, *Hutcheson v. United States*, 369 U.S. 599, 607, 610-11 (1962) (describing a Fifth Amendment claim against answering congressional questions as a "constitutional challenge" to the conviction and finding the defendant had waived the challenge by not raising it before the relevant committee). The Defendant's inability to offer authority to support his position that these questions should be submitted to the jury demonstrate the lack of merit to his opposition to the Government's motion. The Government's motion to preclude the Defendant from arguing questions of law to the jury should be granted.

## III.    Conclusion

The Defendant suggests there is no cause for concern about an orderly trial in this case, but his actions have shown the opposite. In his opposition, he repeatedly argues he should be permitted to submit irrelevant and inflammatory information to the jury, in clear contravention of the law. In his submission of jury instructions in the parties' joint pretrial statement, the Defendant asks the Court to instruct the jury it must find the Defendant knew his conduct was unlawful and that his defiance is excused by his attorney's purported advice, ECF No. 89 at 12, 15-16, even though the Court has already barred such claims based on binding precedent, Order, ECF No. 49. The Defendant wants to seek nullification in this case and to ask the jury to stand in the place of the Court when it comes to deciding the law. The Court should grant the Government's motion in limine to prevent that lawless result.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

<u>**UNITED STATES' MOTION IN LIMINE TO EXCLUDE EVIDENCE OR ARGUMENT**</u>
<u>**RELATING TO THE DEFENDANT'S ELEVENTH-HOUR ASSERTION THAT HE IS**</u>
<u>**WILLING TO TESTIFY BEFORE THE SELECT COMMITTEE**</u>

According to public news reports, at midnight on July 10, 2022, the Defendant claimed to the Select Committee that he would now be willing to testify before it.[1]  The Defendant's last-minute efforts to testify, almost nine months after his default—he has still made no effort to produce records—are irrelevant to whether he willfully refused to comply in October 2021 with the Select Committee's subpoena.  Any evidence or argument relating to his eleventh-hour efforts should, therefore, be excluded at trial.

The Defendant has been charged with criminal contempt for willfully failing to produce records and appearing for testimony in compliance with a subpoena the Select Committee served on him on September 23, 2021.  The criminal contempt statute is not intended to procure compliance; it is intended to punish past noncompliance.  *See United States v. Fort*, 443 F.2d 670, 678 (D.C. Cir. 1970) (finding that Congress "may 'coerce' by means of civil contempt, 'punish' by means of criminal contempt, and perhaps even both" (citing *Jurney v. MacCracken*, 294 U.S. 125, 151-52 (1935); *In re Chapman*, 166 U.S. 661, 672 (1897))).  The charged defaults were

---

[1] *See, e.g.*, "Bannon, Facing Jail and Fines, Agrees to Testify to Jan. 6 Panel," N.Y. Times, July 10, 2022, *available at* https://www.nytimes.com/2022/07/10/us/politics/bannon-jan-6-trump.html (last accessed July 10, 2022).

-2874-

complete at the deadlines for compliance set by the Select Committee, which were in October 2021. *See, e.g.*, *United States v. Bryan*, 339 U.S. 323, 330 (1950) ("A default does not mature until the return date of the subpoena."); *United States v. McPhaul*, 272 F.2d 627, 630 (6th Cir. 1959) ("If appellant had any legitimate excuse for not complying with the subpoena, he should have made it known to the Subcommittee on the return day."); *cf. United States v. Donziger*, -- F.4th --, 2022 WL 2232222, at *11 (2d Cir. June 22, 2022) (in the criminal contempt of court context finding that "the district court did not abuse its discretion by punishing [the defendant] for his past disobedience of court orders, even if it had since been cured. Criminal contempt punishes retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . It is therefore beside the point that [the defendant] eventually complied with most of the court orders underlying his criminal contempt conviction" (internal quotation marks and citation omitted)). The Defendant's purported desire to testify now does not erase his past contempt. Evidence of it is thus irrelevant to the charged offenses and should be excluded under Federal Rules of Evidence 401 & 402.

The evidence's lack of probative value and, instead, propensity to result in confusion and a waste of time on collateral issues in violation of Federal Rule of Evidence 403, is clear when considering the circumstances of the Defendant's sudden efforts to cooperate. First, the Defendant apparently has not told the Committee he wishes to provide documents responsive to the subpoena, so his eleventh-hour efforts do nothing to begin to cure his failure to produce records.[2] Instead, his continued failure to comply with the subpoena's document demand while claiming he now will

---

[2] *See* "Bannon initiates talks with January 6 panel on testifying over Capitol attack," The Guardian, July 10, 2022, available at https://www.theguardian.com/us-news/2022/jul/10/steve-bannon-discussions-january-6-committee-capitol-attack (last accessed July 10, 2022).

testify suggests his actions are little more than an attempt to change the optics of his contempt on the eve of trial, not an actual effort at compliance.

Second, the Defendant's timing suggests that the only thing that has really changed since he refused to comply with the subpoena in October 2021 is that he is finally about to face the consequences of his decision to default.  On June 15, 2022, the Court denied his motion to dismiss the indictment; he is now one week from trial.  On June 29, 2022, former President Donald Trump's attorney, who sent the letter on which the Defendant claimed his noncompliance was based, confirmed what his correspondence has already established: that the former President never invoked executive privilege over any particular information or materials; that the former President's counsel never asked or was asked to attend the Defendant's deposition before the Select Committee; that the Defendant's attorney misrepresented to the Committee what the former President's counsel had told the Defendant's attorney; and that the former President's counsel made clear to the Defendant's attorney that the letter provided no basis for total noncompliance.[3] Even the Defendant's claim that the reason he is now willing to testify is because the former President is "waiving" executive privilege is subject to question given all of the evidence and law that has been addressed in this case, of which he must be aware, demonstrating that executive privilege never provided a basis for total noncompliance in the first place.  Indeed, when the Defendant asked for an extension of the Committee's final deadline—October 18, 2021, at 6:00 p.m.—he cited *Trump v. Thompson*, Case No. 21-cv-02769 (TSC) (D.D.C.), in which the former President challenged the National Archives' ability to turn over his presidential records to the Committee, suggesting it had some bearing on the Defendant's willingness to comply.  The D.C.

---

[3] The Government provided an FBI report of the interview in which the attorney made these statements to the Defendant on June 30, 2022, the day after the interview was conducted.

Circuit, however, long ago, in December 2021, decided in that case that even the former President's claims of executive privilege over his actual presidential records would fail.  20 F.4th 10, 32-46 (D.C. Cir. 2021).  Yet, the Defendant did not change course.  The Government notes as well that news reports indicate the Defendant's attorney in this case now also works for the former President and that his law firm is being paid by the former President's Super PAC.[4]

All of the above-described circumstances suggest the Defendant's sudden wish to testify is not a genuine effort to meet his obligations but a last-ditch attempt to avoid accountability.  Should evidence relating to it be introduced at trial, therefore, it will lead to extensive exploration of those circumstances so that the Government can rebut the improper nullification claim to which the evidence of his efforts to testify only can be relevant: "no harm, no foul."  The resulting mini-trial on an irrelevant, improper issue is the very kind of confusion and waste of resources Federal Rule of Evidence 403 is intended to preclude.  Accordingly, any evidence or argument relating to the Defendant's claimed willingness to now testify before the Select Committee should be excluded at trial.

---

[4] "Despite Growing Evidence, a Prosecution of Trump Would Face Challenges," N.Y. Times, June 18, 2022, available at https://www.nytimes.com/2022/06/18/us/politics/trump-jan-6-legal-defense.html (last accessed July 10, 2022); "Trump Group Pays for Jan. 6 Lawyers, Raising Concerns of Witness Pressure," N.Y. Times, June 30, 2022, available at https://www.nytimes.com/2022/06/30/us/trump-jan-6-lawyers-witness-pressure.html (last accessed July 10, 2022)

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Amanda R. Vaughn*
       J.P. Cooney (D.C. 494026)
       Molly Gaston (VA 78506)
       Amanda R. Vaughn (MD)
       Assistant United States Attorneys
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-1793 (Vaughn)
       amanda.vaughn@usdoj.gov

5

**-2878-**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

                                        CR Action
                                        No. 1:21-670

        vs.


STEPHEN K. BANNON,
            Defendant.

_____


IN RE: NON-PARTY SUBPOENAS

NANCY PELOSI, et al,                    MC Action
            Petitioner,                 No. 1:22-60
        vs.

STEPHEN K. BANNON,                      July 11, 2022
        Respondent.                     10:04 a.m.


                TRANSCRIPT OF IN-PERSON MOTIONS HEARING
                **BEFORE THE HONORABLE CARL J. NICHOLS**
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the U.S.:**          **AMANDA ROSE VAUGHN**
                           **MOLLY GULLAND GASTON**
                           **J.P. COONEY**
                            U.S. ATTORNEYS OFC. FOR D.C.
                            555 4th Street NW
                            Washington, DC 20001
                            202-252-1793


**For the Defendant:**     **DAVID I. SCHOEN**
                            DAVID I. SCHOEN, ATTORNEY AT LAW
                            2800 Zelda Road, Suite 100-6
                            Montgomery, AL 36106
                            334-395-6611

```
APPEARANCES (CONT'D.):




For the Defendant:        MATTHEW EVAN CORCORAN

                          SILVERMAN THOMPSON SLUTKIN WHITE
                          201 N. Charles Street, 25th Floor
                          Baltimore, MC  21201
                          410-385-2225

For the Petitioner:       DOUGLAS LETTER
                          U.S. HOUSE OF REPRESENTATIVES
                          Office of General Counsel
                          5140 O'Neill House Office Building
                          Washington, DC 20515
                          202-225-9700

                          MICHELLE KALLEN
                          OFFICE OF GENERAL COUNSEL
                          U.S. House of Representatives
                          5140 ONeill House Office Building
                          Washington, DC 23219
                          202-225-9700




Reported By:              LORRAINE T. HERMAN, RPR, CRC
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 4700-C
                          Washington, DC 20001
                          lorraine_herman@dcd.uscourts.gov



*** Proceedings recorded by stenotype shorthand and this
    transcript was produced by computer-aided
    transcription.
```

3

1          **DEPUTY CLERK:**  Good morning, Your Honor.  This

2     is -- this calendar has two cases this morning.  The first

3     case is criminal case year 2021-670, United States of

4     America versus Stephen K. Bannon.  The second case is

5     Miscellaneous case year 2022-060, In Re:  Nonparty

6     subpoenas, Nancy Pelosi, et al., versus Stephen K. Bannon,

7     who is not present in the courtroom.

8          Counsel, please come forward and introduce

9     yourselves for the record for both cases, beginning with the

10    government.

11         **MS. VAUGHN:**  Good morning, Your Honor.  Amanda

12    Vaughn, J.P. Cooney and Molly Gaston for the United States.

13    Also at counsel's table is FBI Special Agent Frank D'Amico.

14         **THE COURT:**  Ms. Vaughn, good morning.

15         As before, Counsel, whoever is at the podium,

16    please take your masks off.  I think it is helpful for

17    everyone.

18         **MR. SCHOEN:**  Your Honor, Evan Corcoran, David

19    Schoen and Keira Sherper here today for Mr. Bannon.

20         **THE COURT:**  Good morning, Counsel.

21         **MR. SCHOEN:**  Good morning, Your Honor.

22         **MR. LETTER:**  Good morning, Your Honor.  Douglas

23    Letter, General Counsel of the U.S. House of

24    Representatives, and presenting much of the argument today

25    will be Michelle Kallen from the Office of General Counsel.

4

1          **THE COURT:**  Good morning, counsel.  Ms. Kallen.

2          So obviously we have a number of pretrial motions

3    pending.  We also have the motion to quash filed in the

4    Miscellaneous action that Mr. Letter just mentioned.  Here's

5    how I'd like to proceed.

6          I would like to begin by hearing from the

7    government, from the Department of Justice, on all pending

8    matters.  Then I will hear from the House on the Motion to

9    Quash.  Then I'll hear from Mr. Bannon on all topics.

10          And then I'll hear -- so obviously there are

11    motions that have been filed.  There's the Motion to Quash

12    from the House subpoena recipients.  There are the various

13    motions that have been filed by the parties, some filed by

14    Mr. Bannon and some by the government.

15          Just for the sake of efficiency, I want to deal

16    with all of them together.  It doesn't matter who the Movant

17    is, I want to hear from the government on all topics, then

18    the House, then Mr. Bannon on all topics, and then we'll

19    just go back to the government.  If we need to do a short

20    surrebuttal for Mr. Bannon, we can do that.

21          So with that, Ms. Vaughn, will you be taking the

22    lead?

23          **MS. VAUGHN:**  Your Honor, Ms. Gaston will be taking

24    the lead today, and I'll be addressing on the Motion to

25    Compel.

1      **THE COURT:**  Okay.  Ms. Gaston.

2      **MS. GASTON:**  Good morning, Your Honor.

3      **THE COURT:**  Good morning.

4      Why don't -- let's start, if we could, with what I

5 think is a question -- it's a little unclear to me from the

6 papers, and that is, whether any question -- so, let me back

7 up.

8      I understand the government's position as to the

9 alleged violations of the House Resolution 503 in the

10 composition, formation, et cetera, of the Committee to be,

11 first, that those are defenses; those are not elements of

12 the charge here.

13      And then second -- and this is where I'm a little

14 bit unsure about the government's position.  Is the

15 government's position that those questions present pure

16 questions of law that the jury cannot resolve, or that there

17 is some question embedded in the arguments that Mr. Bannon

18 has made that is for the jury to resolve?

19      **MS. GASTON:**  Yes, Your Honor.  The government's

20 position with those objections, with his procedural

21 objections, is that he waived them --

22      **THE COURT:**  Understood.  I recognize the

23 government has argued that Mr. Bannon has waived them, and I

24 understand that argument.

25      Imagine hypothetically, Mr. Bannon, in his letters

1    to the Committee, you know, asserted reliance on assertion

2    of executive privilege and the like, had also said, By the

3    way, I have the following fundamental problems with the

4    House Committee composition and had raised, clearly before

5    the return date on the Subpoena, all of the objections he

6    now presents -- so let's put waiver to the side.  So they

7    had clearly been teed up and they are defenses in the

8    government's view.

9              Who resolves the question of whether -- assuming

10   all of those things -- whether that defense is legitimate?

11             **MS. GASTON:**  In that circumstances, Your Honor,

12   our position is that those are not things that can be

13   submitted to the jury because that would risk a violation of

14   the Rulemaking Clause because there is a situation in which

15   the jury could interpret the House's rules in a different

16   way than the House itself has interpreted it.

17             **THE COURT:**  Who determines whether the House has,

18   in fact, interpreted the rules in a particular way?

19             **MS. GASTON:**  So the Court would determine whether

20   the House has determined the rule -- whether the rules or

21   the House's interpretation is ambiguous.  In this situation,

22   the interpretation is not ambiguous because the House has

23   spoken, and so --

24             **THE COURT:**  Expressly or implicitly?

25             **MS. GASTON:**  Expressly.

1          **THE COURT:**  In the filings here or somewhere else?

2          **MS. GASTON:**  In the filings here and also through

3     the Committee's practice, Your Honor. *Yellin* and other

4     decisions stand for the proposition that the Committee's

5     practice and the Committee's consistency with respect to

6     that practice is something that the Court can look to, and

7     this is how the Committee --

8          **THE COURT:**  So the government's view then is,

9     these questions present what would be defenses.  Mr. Bannon

10    waived them, and even if he didn't, they are not defenses

11    that, in this circumstance, that can be presented to the

12    jury because it is up to me to decide whether the rules are

13    ambiguous and what the House's interpretation of the rules

14    is, and to allow the jury to come up with an interpretation

15    different than the House would be to violate the Rulemaking

16    Clause.

17          Do I have all of that right?

18          **MS. GASTON:**  Yes, Your Honor.

19          **THE COURT:**  And so is it also the government's

20    position that the question of whether the rules themselves,

21    House Resolution 503, is ambiguous, that is also a legal

22    question that I have to resolve?

23          **MS. GASTON:**  Your Honor, whether the House --

24    whether the resolution is ambiguous, I would have to ask as

25    to what?  Because I think -- just to reiterate something

1    that I think the government stated in its briefs, but just

2    to make sure that it's absolutely clear, the element of the

3    crime of contempt that is the "authority" element, that is

4    the element under the language "by the authority of either

5    House" is an element that essentially means the scope of the

6    authorized investigation.

7          And if you look -- if you look at the case law

8    that sets forth what that element is, it's cases like

9    *Gojack* that talks about whether a subcommittee to a standing

10   committee has an authorization to conduct a specific

11   investigation.  And I think it's useful to think about why

12   that element is the way it is.

13         So there are standing committees of the Congress

14   that have incredibly broad jurisdiction.  There's the Energy

15   and Commerce Committee, the Ways and Means Committee.  There

16   are all kinds of things that fall under the jurisdictions of

17   those committees.

18         So there can sometimes be a question whether that

19   committee has commenced an authorized investigation and

20   whether that investigation is within the scope of the

21   authority delegated to that committee.

22         That is not so much an issue in the circumstance

23   when there is a special committee that is created for a

24   specific purpose.  And if you look at *Gojack*, it speaks

25   directly to this.

9

1           So in that case, the Court noted that a

2      subcommittee had not defined the subject of its

3      investigation, but *Gojack* said that it was particularly

4      important for that to happen in a case where there is a

5      standing committee with a broad purpose rather than "a

6      special committee with a specific, narrow mandate."

7           And in this case, there is a specific committee

8      with a specific, narrow mandate.  If you look at the

9      authorizing resolution, it describes exactly what this

10     committee is for.  If you look at the name of this

11     committee, the name is, The Select Committee to Investigate

12     the January 6th Attack on the United States Capitol.  And so

13     that is what this element is, is there an authorization for

14     the House --

15          **THE COURT:**  No, I get that.  I get that.

16          I'm talking about the defense.  Mr. Bannon says

17     that House Resolution 503 also has certain procedural

18     protections to include it requires a certain number of

19     members.

20          He says, There have never been that number of

21     members on the Committee; that's a defense in the

22     government's view.  The question is whether the jury decides

23     any component of that.

24          In prior briefing, I thought the government's

25     position was so long as the rule -- so long as House

1    Resolution 503 is ambiguous, you must defer to the House's

2    later implicit or explicit interpretation of it.

3            My question is, who decides whether it's

4    ambiguous?

5            **MS. GASTON:**  The Court decides whether it's

6    ambiguous.  *Rostenkowski* states that the Court decides

7    whether it's ambiguous.

8            **THE COURT:**  So in no circumstance is the jury to

9    be presented with the question of ambiguity or non-ambiguity

10   as to the Rule?

11           **MS. GASTON:**  Yes.

12           **THE COURT:**  So let's turn then -- I don't need to

13   hear anything more on the rules questions.

14           So I'm happy to hear from you on -- and that was

15   one thing I wanted to make sure we focused on because it

16   wasn't technically within motions that we've never discussed

17   before.  It's a lingering question from motions that we've

18   already argued.

19           **MS. GASTON:**  All right.

20           **THE COURT:**  So feel free to address any of the

21   other motions in the order you would like.

22           **MS. GASTON:**  All right.  Thank you, Your Honor.

23           So just very briefly, continuing on that line of

24   thought, the defendant cannot, in our view, because of these

25   questions of law and the Rulemaking Clause, and because he

1    waived them, raised these objections as defenses at trial.

2                  Another thing the government wanted clarity on

3    with respect to questions of law versus questions of fact

4    for the jury is the question of executive privilege.  And

5    there are sort of two executive privilege issues floating

6    about.

7                  One is the legal question of whether executive

8    privilege excused the defendant's complete noncompliance

9    with the Subpoena, whether that was -- whether that provided

10   him complete immunity.  And then the separate question is a

11   question I will get to second, which is whether the

12   defendant can claim at trial that his belief --

13              **THE COURT:**  Right.

14          **MS. GASTON:**  -- that executive privilege provided

15   him a defense meant that he did not --

16              **THE COURT:**  Which would go to mens rea rather

17   than, I'll put it this way, a legal excuse or something like

18   it.

19          **MS. GASTON:**  Exactly.

20                  So the first thing -- because this doesn't seem to

21   have been teed up directly by the defendant's Motion to

22   Dismiss, we just wanted to point out that as a matter of

23   law -- and this is appropriate for the Court to decide at

24   the Rule 12 phase -- as a matter of law, the Court should

25   decide the question of whether the defendant has a complete

1    privilege against conviction based here on executive

2    privilege.

3            In the *United States versus Covington* Supreme

4    Court case that the government cited in its brief, the

5    Supreme Court found there that it was a legal issue for the

6    trial court to decide whether the defendant had a complete

7    defense to a crime based on his Fifth Amendment privilege.

8            And similarly --

9        **THE COURT:**  As it stands right now, I don't know

10   whether Mr. Bannon is even attempting to make this argument.

11   I didn't see much response to this, and I don't know what

12   his view on this question is.

13       **MS. GASTON:**  Your Honor, I agree.  I don't think

14   it was teed up directly.  And so the government is asking

15   that -- this is -- if --

16       **THE COURT:**  That I get an answer as to whether

17   Mr. Bannon is going to make this argument?

18       **MS. GASTON:**  Yes, Your Honor, because it's a legal

19   issue that cannot be presented to the jury.

20       **THE COURT:**  But it's a legal issue I can resolve,

21   but do I have in front of me the components of the arguments

22   to resolve that question?

23       **MS. GASTON:**  You do, Your Honor.

24           So on the record before this Court, the

25   determination must be that there was not an assertion of

1    executive privilege that allowed the defendant to engage in

2    total noncompliance.

3            And to be clear, you do not have to decide whether

4    there was an unambiguous assertion of executive privilege

5    back at the time.  And you don't have to decide whether the

6    former President had the same ability to do that as the

7    sitting President.  Even if both of those things were true,

8    executive privilege would not provide immunity for the

9    defendant's total noncompliance in this situation.

10           So with respect to the document charge and the

11   document part of the Subpoena, the subpoena called for

12   documents that could not possibly implicate executive

13   privilege.  And so the defendant engaged in total

14   noncompliance, including those provisions of the Subpoena.

15           And then with respect to testimony, even under the

16   Department's articulation of testimonial immunity, which is

17   not recognized by law, the defendant's total noncompliance

18   is not sanctioned.  That applies only to senior government

19   employees.  The defendant still did not show up and did not

20   make question-by-question assertions.

21           And practically, there is no way for a jury to

22   decide the scope of executive privilege.  It's impossible to

23   imagine fashioning jury instructions.

24           I'd note that in the defendant's jury

25   instructions, he sort of mentions executive privilege as

1    something that the jury could consider when it's thinking

2    about what the defendant did here.  But it does not attempt

3    to provide any instruction on how to consider executive

4    privilege.

5         And I don't know if that's because it is

6    impossible to do that, which I think it probably is with

7    respect to a jury trying to make this legal determination of

8    scope, or because it is confusing to the jury to have this

9    penumbra of executive privilege without understanding how to

10   interpret it.

11        **THE COURT:**  Well, I think from the defendant's

12   perspective, to date at least, it's relevant to

13   two questions; one of which we haven't talked about yet at

14   all.  First of all, there is the question of whether

15   executive privilege is essentially an excuse or a

16   justification as a matter of law standing alone.

17        Then there's the question of whether it goes to

18   mens rea.  And then there's the question of whether the

19   assertion provides him with a defense, whether it's

20   entrapment by estoppel or public authority.

21        And at least as I understand it to date, the

22   defendant has focused more on those defenses, though, to

23   some extent, to mens rea.

24        **MS. GASTON:**  Yes.

25        **THE COURT:**  So I think it is, at a minimum right

1    now, unclear to me whether the defendant intends to argue at

2    all that his noncompliance was excused altogether by the

3    assertion of privilege.

4        **MS. GASTON:**  And, Your Honor, the government is

5    simply saying that that is a legal determination, that is

6    not proper for the jury to make.

7        **THE COURT:**  Fair enough.

8        **MS. GASTON:**  So once we've established that that

9    is a legal determination, then the question is whether the

10   defendant can argue at trial that regardless of whether

11   there was an assertion or whether -- whether it provides a

12   complete legal defense --

13       **THE COURT:**  His mens rea was such --

14       **MS. GASTON:**  His mens rea was such --

15       **THE COURT:**  -- that it defeats the mens rea under

16   the statute.

17       **MS. GASTON:**  And that, Your Honor, is just a

18   mistake of law defense that is not available under --

19       **THE COURT:**  That's *Licavoli*, in the government's

20   view.

21       **MS. GASTON:**  Exactly.  As *Licavoli* provides, it's

22   no different from the advice of counsel defense that the

23   government has briefed extensively.  And one of my --

24       **THE COURT:**  Could it go to default?

25       **MS. GASTON:**  I'm sorry, Your Honor?

1    **THE COURT:**  Could the question either about

2    executive privilege back in the day or the most recent

3    letters that the government brought to my attention last

4    night, could those be relevant to whether Mr. Bannon made

5    default in October 2021?

6    **MS. GASTON:**  They --

7    **THE COURT:**  It's an element of the offense that

8    the defendant has to make default.

9    **MS. GASTON:**  Yes.  The defendant has to make

10    willful default.  That just means that you --

11    **THE COURT:**  Willful is mens rea.

12    **MS. GASTON:**  Willful is mens rea.  It means he --

13    **THE COURT:**  We talked about that before a lot.

14    **MS. GASTON:**  Exactly.  I won't go over all of it

15    now, but it simply means, he knew he had to appear and he

16    made a deliberate decision not to.

17    The last thing I want to say on that is the

18    defendant has really focused on the word "misunderstanding"

19    in the *Licavoli* decision.  I think probably because he wants

20    to suggest that misunderstanding could be a misunderstanding

21    of the law.

22    But to be clear, the misunderstanding discussed in

23    *Licavoli* was a mistake.  So the phrase in *Licavoli* that that

24    comes from is, "But a failure to respond to a subpoena might

25    be due to many causes other than deliberate intention; e.g.,

1    illness, travel trouble, misunderstanding, et cetera."

2              So the kind of misunderstanding that *Licavoli* is

3    talking about there is you got the day wrong that you were

4    supposed to appear.  You got the place wrong that you were

5    supposed to appear.  You got the time wrong.  There was a

6    misunderstanding on that front.  But otherwise, this is

7    something that, like, misunderstanding could swallow the

8    advice of counsel rule.  It could swallow the willfulness.

9         **THE COURT:**  Putting aside the advice of counsel,

10   would it be relevant, in the government's view, if

11   Mr. Bannon were to introduce evidence that he believed or

12   had been told that the return date on the Subpoena had been

13   moved back or would be moved back?

14        **MS. GASTON:**  Um -- if he thought he was supposed

15   to appear a week later and did not appear, then that would

16   be a mistake.

17        **THE COURT:**  What if -- and this goes to one of the

18   government's motions, which I get we have discussed before

19   as well.

20             Would testimony or evidence that I -- you know, I

21   understood the return date was October 24th, but in my

22   experience, return dates are always negotiable.  And I

23   thought it had been moved or I thought it was going to be

24   moved.  Would that be relevant and admissible?

25        **MS. GASTON:**  It would not, as long as he was in

1    receipt of a subpoena that said he had to appear on a

2    certain date and had no indication that it had actually

3    moved.

4         **THE COURT:**  But wouldn't that go to the jury's

5    decision about whether his statement is credible rather than

6    whether it's relevant and admissible?  I understand your

7    view is that would not be persuasive.

8         But what if Mr. Bannon testified or if someone

9    testified for him, I told Mr. Bannon the return date was

10   very likely to be moved, had been moved, was no longer

11   operative.

12        **MS. GASTON:**  If he was told that it had been

13   moved, that would absolutely be a mistake, and we would

14   expect to see some evidence that when he learned it had not

15   been moved --

16        **THE COURT:**  Might have to proffer some story along

17   these lines --

18        **MS. GASTON:**  Yes.

19        **THE COURT:**  -- but at least hypothetically could

20   be relevant.

21        **MS. GASTON:**  Yes.  And we would just say that the

22   defendant's position throughout this litigation, his counsel

23   have said on the record repeatedly, that that is not what

24   happened here.  It was a deliberate decision not to appear.

25        **THE COURT:**  So now let's talk about the Motion to

1    Exclude the most recent set of letters.  I get the

2    government's view -- as I understand it, the government's

3    view is the willful making of default was completed in

4    October 2021 when the return date for the Subpoena came and

5    went.  And whatever has happened since then is irrelevant to

6    that question.

7              What if Mr. Bannon had offered, two weeks after

8    the return date, November 7th or something like that, to

9    appear?

10             **MS. GASTON:**  Yes, Your Honor.  Ms. Vaughn is

11   handling that one.

12             **THE COURT:**  We can wait.  Why don't we wait.

13             **MS. GASTON:**  We'll hold that.

14             **THE COURT:**  Who's going to address the question of

15   the motion to continue the trial?

16             **MS. GASTON:**  I am.

17             **THE COURT:**  So I've read the papers.  I think

18   Mr. Bannon obviously argues that the press around the

19   January 6th Committee hearings warrants moving of the trial.

20   The fact that there are a lot of unresolved issues, at least

21   as of 10:30 a.m. today, warrants moving the trial.

22             He hasn't yet argued, but I think many people

23   are -- and I'm certainly interested in the government's

24   view -- of whether it makes sense to have a trial on Monday

25   when it's at least an open question whether Mr. Bannon will

1     be testifying in front of the Committee.

2             What's the government's view on that question?

3             **MS. GASTON:**  The government's view on that

4     question, Your Honor, is that the offense was completed at

5     the time that he willfully defaulted both on documents and

6     testimony.  And his decision whether to comply now has no

7     bearing on the criminal case.

8             **THE COURT:**  As you know, and as you say in your

9     papers, this case will not result in -- the relief sought in

10    this case is not an order compelling Mr. Bannon's testimony.

11    I recognized that in the first hearing in this case.

12            What this is is a backward-looking prosecution

13    for, in the government's view, past and complete

14    noncompliance, a completed criminal act that occurred

15    nine months ago.

16            If that's the case, why is there a rush to try

17    this case on Monday rather than a month or two from now,

18    since it is altogether backward-looking in the government's

19    view?

20            **MS. GASTON:**  Your Honor, I think it is important

21    for the purposes of vindicating the statute and Congress'

22    authority in these matters, to quickly adjudicate the

23    criminal matter.

24            And it would be bad precedent if we got into a

25    situation where a defendant could engage in total

1    noncompliance with the Committee, be referred for criminal

2    contempt, have a different branch of government expend

3    considerable resources in preparing --

4        **THE COURT:**  Branches.

5        **MS. GASTON:**  Branches.

6        -- expend considerable resources in preparing for

7    a criminal trial, only to have the defendant witness -- on

8    the eve of trial, say, Well, actually, I will comply now, in

9    hopes of the criminal case being dismissed.  That's a

10   different kind of contempt and obstruction, and it sort

11   of -- validating it would not serve the purpose of the

12   statute.

13       **THE COURT:**  And just to round out the point, the

14   government's view is none of the issues at trial -- let me

15   ask the question a little bit better.  Nothing about

16   Mr. Bannon's offer or the President's most -- the former

17   President's most recent letter or even an agreement by which

18   Mr. Bannon hypothetically does everything the Committee asks

19   of him, would in any way affect this case?

20       **MS. GASTON:**  That's correct, Your Honor.

21       **THE COURT:**  Okay.  And, therefore, in the

22   government's view, I should grant the Motion to Exclude

23   Evidence around the letters that were signed over the

24   weekend; that's the government's view?

25       **MS. GASTON:**  Yes, Your Honor.

1          **THE COURT:**  And what -- could Mr. Bannon argue

2     that -- as I recall, there was a statement or something from

3     the Chairman, from Mr. Thompson, suggesting that they would

4     be open to Mr. Bannon having a change of mind.

5          And why couldn't Mr. Bannon say, Look, I thought I

6     wasn't making default because it was -- they were leaving

7     the door open to my appearance.  My having now accepted that

8     open-door offer is inconsistent with being in default.

9          **MS. GASTON:**  If the defendant had done that a week

10    after his default, if the --

11         **THE COURT:**  Why does that matter?  The default, in

12    the government's view, was consummated on the day the return

13    date came and went.

14         **MS. GASTON:**  It was consummated on the day the

15    return date came and went.  And the Committee gave the

16    defendant, essentially, an opportunity to cure his

17    noncompliance.  He was in default.  The Committee could have

18    immediately referred him for contempt, and the House could

19    have immediately voted for it.

20         Instead, the Committee gave him another

21    opportunity after advising him of the risk of a referral.

22    And so the House giving him that opportunity to cure it back

23    at the -- close in time to his offense does not mean that he

24    has carte blanche to spend years defying and remaining in

25    contempt of the Subpoena only to, on the eve of trial,

1    change his course.

2         **THE COURT:**  Okay.  So again, I apologize.  I've

3    been distracting you from argument.  So go ahead and address

4    all of the issues that are otherwise pending.

5         **MS. GASTON:**  Otherwise, with respect to the Motion

6    to Continue, Your Honor, as the government stated in its

7    briefs, in terms of the reasons that the defendant has

8    articulated to date for a continuance, the first reason was

9    pretrial publicity.

10        And the government's position is that the case law

11   is clear that that can be handled through voir dire, and

12   only in extreme cases can publicity not be handled through

13   voir dire.  And those cases bear no resemblance whatsoever

14   to this.

15        Those are cases like *Rideau*, where the defendant's

16   confession was played on a loop on local television in a

17   small town.  Those are cases like *Sheppard*, where the

18   defendant's pregnant wife had been murdered and it sounds

19   like there was chaos in the courthouse.

20        The media coverage that the defendant has talked

21   about is media coverage of the January 6th hearings.  And as

22   the government stated, those are not about the defendant,

23   and there is not the sort of focused and targeted and

24   prejudicial coverage of the defendant that there is in those

25   other cases where courts have found that voir dire cannot

24

1    control for prejudice.

2            Next, the next issue was scheduling.  I think the

3    fact that we are here having a motions hearing means that

4    that issue is probably moot because all of the issues the

5    defendant was concerned in his motion were not teed up or

6    not being heard by the Court are being heard by the Court.

7            And then the last one last night was the

8    government's production on Friday, and that was *Jencks*

9    material of agent notes, that the government provided on the

10    deadline that the defendant asked the Court to impose and

11    that the Court imposed.

12            Providing, in an abundance of caution, some phone

13    records that he confirmed in his motion are not relevant to

14    this case, and informing the defendant that more than a

15    decade ago, I worked on the same committee as one of the

16    witnesses in the government's case, and that she and I were

17    members of a book club that I have not been to in more than

18    two years, so -- or approximately two years.

19            So to the extent that the defendant wants to use

20    that in cross-examination, he has the information and he can

21    use it.  He has not articulated what prejudice he suffers

22    from a timely *Jencks* disclosure, the production of

23    admittedly irrelevant materials and information that he can

24    use in cross-examination if he wishes.

25            **THE COURT:**  Okay.

1          How about -- I mean, I have a list.  What's the

2    government's view on Mr. Costello's motion to withdraw?

3          **MS. GASTON:**  The government has no objection to

4    Mr. Costello's motion to withdraw.  I assume we would have

5    objections to various testimony that he might offer if he

6    becomes a witness the way that he has suggested he is

7    withdrawing to become.

8          **THE COURT:**  Fair enough.  Those are evidentiary

9    questions that I'm sure we will take up.

10          **MS. GASTON:**  Yes.

11          **THE COURT:**  All right.

12          So why don't we go through, then -- well, let's go

13    then to the Motion to Compel the Meadows and Scavino

14    Declination Discovery?  Oh, you're not going to handle that.

15          **MS. GASTON:**  No, I'm sorry.

16          **THE COURT:**  Are you doing the Omnibus Motion in

17    Limine the government filed?

18          **MS. GASTON:**  Yes.

19          **THE COURT:**  Well, let's just tick through that.

20    Really, I have the issues.  Why don't you highlight anything

21    that you think is particularly noteworthy or difficult

22    there.

23          **MS. GASTON:**  Absolutely.

24          So first on that, let me just say broadly that

25    there seems to be this idea advanced in the defendant's

26

1      opposition that the Court can just let the jury hear all

2      kinds of things, some of it irrelevant and prejudicial, and

3      as long as they are instructed afterwards, there is no harm

4      no foul; that's the adversarial process.

5            That is not the way a trial works under the

6      Federal Rules of Evidence.  There are rules for relevance

7      for a reason, and Rule 103 exists for a reason, which

8      provides that the Court should, to the extent practical,

9      conduct a jury trial so that inadmissible evidence is not

10     suggested to the jury by any means; that means, like, not

11     through argument, not through stray comments.  The jury

12     should not be hearing inadmissible evidence.

13           And the government's Motion in Limine, quite

14     frankly, some of the things that the government included in

15     its opening brief were things that seemed obvious to us and

16     we did not expect opposition to them.  So it was a surprise

17     to receive opposition to things like no mention of the

18     potential punishment for the defendant, because that is such

19     a bedrock principle of law.

20           I will tick through very quickly.

21           So in terms of the cross-examination about a

22     witness's political affiliation, we're talking about things

23     here like asking the witness what their voter registration

24     is, like what the party of a member they've worked for is,

25     who they voted for.  And these are not things that the

1      defendant has articulated would lead a witness to slant his

2      or her testimony in the way described in *Abel* that is

3      grounds for appropriate cross-examination for bias.

4              Political affiliation does not say anything about

5      the truthfulness of factual testimony a witness might offer

6      about things like sending a subpoena by email.

7              In terms of the misconduct point, government

8      misconduct allegations, like selective prosecution

9      allegations, are not a matter that go to a defendant's guilt

10     or innocence, and they do not belong in front of a jury.

11             The *Sager* case that the defendant cited in his

12     opposition is a different kind of case.  It's a case in

13     which it was appropriate to cross-examine a witness, a

14     government agent witness, about inconsistencies in that

15     agent's testimony, about evidence that he, perhaps, should

16     have gotten and didn't.

17             But those are not government misconduct claims

18     like the defendant has suggested he wants to bring before

19     the jury in this case, claiming that the government has

20     committed misconduct.

21             In terms of the -- I will not go into detail on

22     the subject of the congressional witnesses.  I will just

23     reserve and say that we will respond to a motion on that

24     when and if it arises.

25             Punishment, I think, does not bear anymore

1    discussion.

2            Ms. Vaughn will handle the information related to

3    other contempt referrals.

4            And then the statements of counsel.  This is --

5    you know, their claims about their statements is, Well,

6    government -- the lawyers' statements are not evidence

7    before the jury.  But, again, improper bolstering or making

8    improper comments is the kind of thing that Rule 103 says

9    that the Court should not allow the jury to hear.

10           **THE COURT:**  Thank you.

11           Are you also going to address the three motions

12   for Mr. Bannon to exclude evidence regarding Mr. Costello's

13   emails and phone records, which I've largely addressed, but

14   the Motion in Limine about presenting the Indictment and the

15   Motion in Limine about evidence or argument regarding the

16   attack on the Capitol?

17           **MS. GASTON:**  Ms. Vaughn is going to handle those.

18           **THE COURT:**  Okay, great.  So, Ms. Vaughn.

19           Thank you.

20           **MS. VAUGHN:**  Good morning, Your Honor.

21           **THE COURT:**  Good morning.

22           **MS. VAUGHN:**  I can start with the defendant's

23   motions.

24           **THE COURT:**  Sure.

25           **MS. VAUGHN:**  The government defers to the Court on

29

1    the Indictment issue.

2              And then with respect to the Motion to Exclude

3    Evidence about January 6th, based on the defendant's reply,

4    it doesn't seem that he's seeking to exclude evidence about

5    the scope of the investigation and the pertinence of the

6    defendant's subpoena to that investigation.

7              So the Court -- I mean, the government has no

8    intention of introducing video of the attack or evidence

9    about specific attacks or things like that, but it certainly

10   plans to introduce evidence about why the Committee

11   believed --

12             **THE COURT:**  Right, it goes to pertinency.

13             **MR. COONEY:**  So we just ask for clarity on that

14   because we just don't want to be surprised with objection at

15   trial.

16             With respect to Mr. Costello's information, the

17   government doesn't intend to offer Mr. Costello's toll

18   records unless the defendant puts them in issue somehow.

19   For example, if he were to claim that they were not in touch

20   or something, he had no idea that the Committee had rejected

21   his reasons for not showing or things like that.

22             With respect to Mr. Costello's letters to the

23   Committee, I don't think the defendant objects to those.

24   And then it's not clear that he's moving to exclude any

25   other evidence relating to Mr. Costello.

1          **THE COURT:**  Okay.

2          **MS. VAUGHN:**  I can also address the Motion to

3     Compel and Motion in Limine that we filed last night with

4     respect to the late efforts at compliance --

5          **THE COURT:**  Yes.

6          **MS. VAUGHN:**  -- if the Court wants to hear more on

7     that.

8          **THE COURT:**  Well, let's talk about *Meadows* and

9     *Scavino* first.  I don't think we've addressed that at all.

10          **MS. VAUGHN:**  I think with respect to *Meadows* and

11     *Scavino*, we noted in our opposition that the government

12     doesn't have any documents laying out official policy

13     relating to Mr. *Meadows* and Mr. *Scavino* such that they would

14     fall within the Court's March 16th order.

15          So the question is, let's get back to basics, what

16     are the rules of discovery in a criminal case and does the

17     government's work product and decision-making about whether

18     or not someone is subject to criminal prosecution, is that

19     discoverable in this case.  And the defendant has not shown

20     that it has.

21          In fact, in his reply, he spends most of it

22     talking about civil discovery cases, but courts are clear

23     that civil discovery is not equal to Rule 16; and that

24     Rule 16 is much narrower in that.  The same with *Brady* and

25     *Giglio* material.

1              So, one, all of these materials were generated

2       weeks, months, well after the defendant was charged in this

3       case.  So they can't possible go to his intent at the time

4       because there's no way he could have relied on them.  They

5       didn't exist when he defaulted.

6              And the defendant tries to fall back on the

7       argument, Well, if we're allowed to put on an entrapment by

8       estoppel argument, then it goes to reasonableness.

9              But, again, the reasonableness standard is whether

10      an objective person in the defendant's position, someone

11      truly desirous of following the law, would have still

12      followed the course that he followed.  Materials created

13      weeks, months after that objective person acted couldn't

14      have possibly influenced the reasonableness of that act.

15             So for those reasons, the defendant hasn't met his

16      burden to show that he's entitled to these internal

17      deliberations, and his Motion to Compel should be denied.

18             **THE COURT:**  If entrapment by estoppel is a defense

19      that goes to the jury here, and if the defendant gets to put

20      on, say, for example, his theory about why he fits within

21      the DOJ opinions, the OLC opinions, why wouldn't he be able

22      to say, And DOJ actually has acted consistent with my

23      reading, see *Meadows*, see *Scavino*?

24             **MS. VAUGHN:**  *Meadows* and *Scavino* are completely

25      differently situated.  Again, this just goes --

32

1          **THE COURT:**  Why can't he make the argument?  The

2     government would say, They're a totally differently

3     situation.  They fit within the OLC opinions in a way you

4     don't.

5          **MS. VAUGHN:**  It's confusing for the jury.  He's

6     then asking the jury -- so this is how the testimony would

7     go.  The defendant testifies, because his lawyer can't

8     testify about what he relied on.  The defendant has to

9     testify.

10          The defendant testifies:  I read these five,

11     40-page OLC opinions, and based on the "principles," which

12     is what they said --

13          **THE COURT:**  I understand the government's view of

14     the --

15          **MS. VAUGHN:**  -- I decided -- and so then he's

16     asking the jury, Jury, you should decide whether I'm the

17     same as Mark Meadows or Dan Scavino.

18          That is so far afield from what entrapment by

19     estoppel is about.  Entrapment by estoppel is about being

20     essentially tricked by the government into committing a

21     crime.  It is not about, I read between the lines of 50

22     different documents and decided that surely they --

23          **THE COURT:**  No, that is why the government thinks

24     I should not allow this issue to go to the jury.  But if

25     it's going to the jury, if Mr. Bannon has an argument that

33

1    the DOJ opinions, by implication in the government's view,

2    give him this defense, then why isn't it relevant to show

3    that in the specific context of January 6th, the government

4    did decline, and he would argue, presumably in reliance on

5    prior OLC policy and statements, to not prosecute two people

6    who he would say are similarly situated to him?

7            The government would have the opportunity to say,

8    No, that's not right.  He's totally differently situated.

9    And you -- so you, jury, should conclude the defense is not

10   available.

11           **MS. VAUGHN:**  It's a temporal issue.  So the issue

12   of entrapment by estoppel is what was reasonable at the time

13   the defendant acted.  Things that happened that postdate

14   that can't inform the reasonableness of the actor at the

15   time.

16           **THE COURT:**  So if the government had given Meadows

17   or Scavino declination letters before, would they have been

18   admissible?  Again, assuming entrapment by estoppel goes to

19   the jury.

20           **MS. VAUGHN:**  We turned over to the defendant,

21   earlier, letters that the Department had issued in which it

22   referenced its official policies.  Of course, those all

23   called back to the underlying OLC opinions, but as we've

24   told the defendant, we just don't have anything like that

25   here.

-2911-

34

1          **THE COURT:**  Okay.  I can't remember if there were

2     other topics you were going to address.

3          **MS. VAUGHN:**  Yes.  I think the Court was asking

4     whether -- in respect to our Motion in Limine we filed last

5     night, when the default occurs.

6          **THE COURT:**  Yeah.

7          **MS. VAUGHN:**  And default, in plain English, is

8     just a failure to comply.  So then what defines the nature

9     of the default that's criminal is the "willfulness" word.

10    So a default is just not showing up as you're required or

11    not producing documents, and that was complete at the time.

12          So the Court had a question if he had complied

13    two weeks later.

14          **THE COURT:**  Yes.

15          **MS. VAUGHN:**  That wouldn't erase the basis for a

16    criminal contempt.

17          Now, certainly could it inform, you know,

18    Congress' decision to refer?  Could it inform the

19    government's exercise of its prosecutorial discretion?  Of

20    course.

21          But as far as whether the elements of the offense

22    are satisfied, they've already been satisfied, and there's

23    nothing that that later compliance could do to erase that.

24          So here we are now, nine months later, and it's

25    the same issue.  His default was complete in October 2021;

1    that's what he's being prosecuted for.  His later efforts to

2    comply don't change that.

3          It's the same in the contempt of court context.

4    It doesn't matter if someone cures later, they're still

5    guilty of the default at the time.

6          **THE COURT:**  So obviously I haven't heard from the

7    House yet on the Motion to Quash the Subpoena to the House

8    Members, but does the government agree with the proposition,

9    as a general matter, that if a motion seeking congressional

10   testimony -- or sorry -- if a subpoena seeking congressional

11   testimony is quashed based on Speech or Debate Clause

12   grounds, and the effect of that would be to make unavailable

13   to a defendant evidence that's highly relevant to his or her

14   defense, that that could result in a dismissal of an

15   indictment or some -- an instruction or something to the

16   benefit of the defendant, assuming, again -- I'm not saying

17   you agree with this but assuming that the evidence that the

18   defendant seeks to elicit through the Subpoena that's

19   quashed is highly relevant?

20         **MS. VAUGHN:**  Is material.

21         **THE COURT:**  Is material, yes.

22         **MS. VAUGHN:**  Yeah.  The government doesn't view it

23   as really any different from a claim that a defendant might

24   make if the government refuses to immunize a witness who's

25   claiming their Fifth Amendment.  So in that situation, for

1    there to be any adverse consequences to the government's

2    case, the defendant has to show some form of government

3    misconduct like it's been threatening the witness with

4    prosecution or -- and on top of that, has to show that it's

5    material and noncumulative.  And even the *Rainey* Court

6    recognized that.

7          So are there circumstances under which a witness's

8    unavailability because of a privilege could provide a basis

9    for some kind of adverse action, yes.

10          **THE COURT:**  And analytically, is the way the

11    government thinks about the way a Court should approach it

12    is, first, think about the immunity question; decide whether

13    or not to grant the Motion to Quash?  If the motion is

14    granted, hypothetically, then you take up the question of

15    what evidence was sought to be adduced?  Is it material?  Is

16    it nonduplicative, or whatever, and what is the effect of

17    its exclusion or nonavailability, I guess, on the case?

18          **MS. VAUGHN:**  Yes.

19          And I think just reading the briefs in the other

20    case, it seems that the privilege issue may not even be

21    determinative at the end of the day because the defendant

22    hasn't met his burden under Rule 17 to show that it's

23    relevant, admissible, material evidence.

24          So if that were the basis on which the motions

25    were quashed --

1          **THE COURT:** It would necessarily mean there was no

2    effect on the case --

3          **MS. VAUGHN:** Exactly.

4          **THE COURT:** -- if that were true.

5          **MS. VAUGHN:** Exactly.

6          **THE COURT:** Right. But if not, or if,

7    hypothetically, I thought that one needed to resolve

8    immunities first and were to agree that there was immunity,

9    the immunity forecloses the defendant from evidence that he

10   wishes to adduce. And then one has to think through, What

11   is that evidence and what does the exclusion of that

12   availability mean for the defendant's ability to try his

13   case?

14         **MS. VAUGHN:** Right.

15         And the question there is, What is the

16   nonspeculative basis to believe that this witness has

17   material, exculpatory information that is noncumulative that

18   the defendant -- you know, can't get from another source;

19   and was there some effort on the part of the government to

20   improperly make this an issue, which, looking ahead to the

21   defendant's motion if this should come to pass, the

22   government just doesn't think he'll be able to meet that.

23         **THE COURT:** Right. But it hasn't been filed yet

24   so who knows what it will say.

25         **MS. VAUGHN:** Right.

1          **THE COURT:**  Any other topics you'd like to

2     address, Ms. Vaughn?

3          **MS. VAUGHN:**  Not unless the Court has any

4     questions.

5          **THE COURT:**  No.  Thank you.

6          I'd like to hear from the House now, Ms. Kallen,

7     Mr. Letter?

8          **MR. LETTER:**  Thank you, Your Honor.  As I said

9     earlier, Ms. Kallen will be delivering most of the

10    presentation to Your Honor.

11         **THE COURT:**  Very well.

12         **MR. LETTER:**  I did, though, just want to start out

13    with a very brief introduction.

14         As you know here, criminal trial subpoenas have

15    been issued to the Speaker of the United States House of

16    Representatives, the Majority Leader, the Majority Whip, the

17    Chairman of the Select Committee, the Vice Chair of the

18    Select Committee, all of the other members of the Select

19    Committee, me and staffers for the Committee.

20         In calling for all of these witnesses to testify,

21    to us it seems clear that Mr. Bannon is attempting to turn

22    this into some sort of political circus that cannot be

23    allowed.

24         But the main point I very briefly wanted to make

25    is something I know you and I have discussed in this very

1   courtroom before, the speech or debate immunity.  There's a

2   key argument that is made right up front in Mr. Bannon's

3   opposition to the Motion to Quash, which is it's so unfair,

4   the members relying on speech or debate, when Mr. Bannon has

5   been summoned -- is here because he defied a subpoena.  And

6   they are saying, What a double standard.

7           Mr. Bannon's argument is, therefore, with the

8   Constitution itself.  The framers put the Speech or Debate

9   Clause in the Constitution as a key bulwark for our

10   democracy, and so it's right there in the Constitution.  We

11   know why it is there.

12           There is no similar provision, no constitutional

13   or legal basis that Mr. Bannon had to ignore the Subpoena

14   from the House.  And so, again, the main point I wanted to

15   make is, his argument really is the Constitution should be

16   different from what it is.

17           And so -- otherwise, I'm going to turn this over

18   to Ms. Kallen.  It may be appropriate for me to pop up

19   again.

20           **THE COURT:**  That's fine.

21           **MR. LETTER:**  Thank you, Your Honor.

22           **THE COURT:**  I'm happy to hear from Ms. Kallen.

23           **MS. KALLEN:**  Good morning, Your Honor.

24           **THE COURT:**  Good morning.

25           **MS. KALLEN:**  There's a proper way to contest a

1   subpoena, and the members of Congress and their staff

2   engaged in that process by moving to quash the subpoenas at

3   issue here.  They did not simply defy the judicial

4   subpoenas.

5           The 16 subpoenas that the defendant issued are

6   fatally flawed as a matter of law because, first, they do

7   not even meet the burden under Federal Rules of Criminal

8   Procedure 17 to establish both the testimony and the

9   documents the defendant seeks are essential and material to

10  his case.

11          The documents the defendant seeks are precisely

12  the sort of broad requests that read more like civil

13  discovery requests, not the targeted requests appropriate

14  under Rule 17(c).  And the Supreme Court has made clear that

15  Rule 17(c) is not an avenue to conduct discovery.

16          This Court also explained in the *Libby* case that

17  if a subpoenaing party cannot specify the information

18  contained in the documents sought but merely hopes that

19  something useful will show up, that is a sure sign that the

20  Subpoena is being misused, and that is the case here.

21          The trial testimony that the subpoenas seek is

22  cumulative and is neither material nor essential to

23  Mr. Bannon's defense.

24          **THE COURT:**  What if the question of whether the

25  House Committee was formed or exists in compliance with

1    House rules -- House Res. 503, if that's a question that

2    goes to the jury, why wouldn't some of this testimony be

3    relevant?  Why wouldn't Speaker Pelosi's testimony about

4    whether she believes the Committee was formed consistent

5    with the Resolution 503, or even her testimony about how it

6    was formed, why wouldn't that be relevant?

7         **MS. KALLEN:**  So accepting Your Honor's

8    representation that that would be a question of fact -- with

9    which we vehemently disagree, Your Honor.

10        **THE COURT:**  I'm assuming hypothetically.  I know

11   the Department's view is different.  But assuming

12   hypothetically for the question that this is a -- that there

13   are facts here that go to the jury, I assume it's a defense.

14   It doesn't really matter.

15        But assume it's a defense.  Mr. Bannon has the

16   defense that the Committee was formed inconsistent with

17   House rules, or even just simply is not operating with the

18   number of members required by House Res. 503.  Why isn't

19   some of the testimony sought by the Subpoena relevant?

20        **MS. KALLEN:**  So, Your Honor, it's still not

21   relevant to his defense because it does not excuse complete

22   noncompliance with the Subpoena.

23        But even if he can identify some sort of relevant

24   information, the two witnesses that will be made available

25   at trial, Ms. Amerling and Mr. Tonolli, are perfectly

42

1    competent to testify to anything that would be relevant on

2    that front.

3           THE COURT:  But isn't Speaker Pelosi a much more

4    relevant witness than the two witnesses that the House has

5    volunteered on the question of compliance with the rules.

6           MS. KALLEN:  Potentially, Your Honor, but the

7    legal standard is not whether or not someone is a much more

8    relevant witness, particularly in the context of

9    high-ranking government officials.

10          The question under Rule 17 is whether the

11   information is material and essential.  And it's not

12   essential when other people can testify.  And especially if

13   one considers the high-ranking official context.  Even

14   there, the fact that there are two witnesses who are

15   perfectly competent to testify on these issues, which is the

16   standard; that's sufficient to justify quashal.  And all of

17   that is assuming one sets aside the speech or debate

18   immunity.

19          THE COURT:  As to the speech or debate immunity,

20   as to the two witnesses whom the House is making available,

21   is the House or are they waiving Speech or Debate Clause

22   immunity with respect to their testimony?

23          MS. KALLEN:  No, Your Honor.

24          THE COURT:  So what happens if they are

25   cross-examined?  What if Mr. Bannon seeks to ask questions

43

1    outside the scope of direct when they are here?  Will they

2    assert Speech or Debate Clause immunity at that point?

3          **MS. KALLEN:**  I think, Your Honor, it depends on

4    the parameters of this Court's ruling with regard to the

5    various pending motions.  I think it's going to depend on

6    whether or not it applies to the sphere of issues that are

7    relevant at trial.

8          So -- and we indicated to the Court that we would

9    intend to seek a protective order, and that would be -- you

10   know, assuming that's still necessary, that would be subject

11   to the parameters of this Court's ruling on the various

12   other pending motions as to what's live issues at trial.

13         **THE COURT:**  So just to be clear, even the

14   witnesses who would appear voluntarily would be doing so but

15   not as a waiver of Speech or Debate Clause immunity.  They

16   would be appearing voluntarily.  They would seek -- assuming

17   that the Motion to Quash is otherwise granted and the like,

18   they would seek a protective order, what prohibiting

19   cross-examination outside of the scope of their direct or

20   even, you know, essentially examination that goes to a

21   defense that they don't address, or something like that?

22         **MS. KALLEN:**  Essentially, Your Honor, I think it

23   would depend on the scope of what's live with regard to the

24   individual defenses.  Our view is that some of the issues

25   that he raises as defenses are exclusively questions of law,

44

1    not questions of fact.

2        And so if this Court disagrees with that and

3    concludes that certain things are questions of fact, then

4    the parameters that would be appropriate to the defense

5    would be contingent on this Court's decision as to what

6    precisely is a question of fact and what precisely is a

7    question of law.

8        But I do think it's worth emphasizing to this

9    Court that no Court has held that waiver of speech or debate

10    immunity is even possible and so courts have hypothesized

11    that in the event that --

12        **THE COURT:**  Does the House believe that it can be

13    waived?

14        **MS. KALLEN:**  No, Your Honor.

15        **THE COURT:**  Okay.  So does that mean in any case

16    in which a member or the House -- well, a member might have

17    Speech or Debate Clause immunity, even if it's not asserted,

18    the Court must address whether it's appropriate?

19        **MS. KALLEN:**  No, Your Honor.

20        It's an immunity that the holder of the immunity

21    can raise when the holder of immunity concludes that it's

22    appropriate.  And so it's in the holder of the immunity's

23    power to decide whether or not to raise it.

24        That's not to say that the Court is without any

25    power to consider that.  It's not a question of, Oh, it's

45

1    not raised, therefore it's waived.

2         **THE COURT:**  No, no, I think we might be talking

3    past each other.

4         Does Speaker Pelosi have the constitutional

5    authority to waive her Speech or Debate Clause immunity?

6    Expressly waive it?

7         **MS. KALLEN:**  I can't speak to that, Your Honor.  I

8    can certainly -- you know, if Mr. Letter would like --

9         **THE COURT:**  We can take it up.  I don't think it's

10   material for today's purpose.  So I'm happy to hear from you

11   at the end of this, Mr. Letter.

12        Because no one is -- well, I guess I should say no

13   one in the Subpoena recipient group, in your view, is

14   attempting to waive Speech or Debate Clause immunity, it

15   doesn't matter.

16        I know Mr. Bannon argues that there has been a

17   waiver at least as to certain members, but you are not

18   taking the position that anyone has, in fact, waived.

19   Correct?

20        **MS. KALLEN:**  That's correct, Your Honor.

21        **THE COURT:**  Or could.  You don't need to address

22   that question?

23        **MS. KALLEN:**  Our position is that no one has

24   waived their immunity and no one intends to do so.

25        **THE COURT:**  Does Speech or Debate Clause immunity

1    apply to some of the topics that Mr. Bannon asked about,

2    like Tweets or book deals?

3        **MS. KALLEN:**  So it does not apply to express

4    communications with the press, Your Honor.  But beyond that,

5    questions about motives underlying what led to any

6    communication with the public, those are all covered by

7    speech or debate immunity.

8        **THE COURT:**  So there's at least -- there are some

9    topics Mr. Bannon seeks testimony about that would not be

10   covered by Speech or Debate Clause immunity.  That doesn't

11   mean the Subpoena is valid.  It just means that to the

12   extent that you seek to quash the Subpoena, it has to be on

13   some other basis, like Rule 17 or senior member of the

14   government?

15       **MS. KALLEN:**  That's correct, Your Honor.

16           And any of those topics still do not meet the

17   Rule 17 requirement that the testimony sought being material

18   and essential.

19       **THE COURT:**  And do you agree with DOJ, or at least

20   my colloquy earlier with Ms. Vaughn, that analytically, the

21   way to approach this question is to decide whether there's

22   immunity or whether the Motion to Quash should be granted?

23           And then if it is in part or in whole, you then

24   have to address the question of how it affects the criminal

25   case because that may, in fact, disable Mr. Bannon from

47

1    putting on evidence that is relevant to his case.

2         **MS. KALLEN:**  So I can't speak to the second piece

3    of that, Your Honor.  Our view was that the Motion to Quash

4    is an independent motion in and of itself with its own legal

5    standard, and any subsequent impact that it may or may not

6    have on the criminal trial is for the Department of Justice

7    to weigh it on.

8         I do want to address, Your Honor, the that

9    question you raised of the Department of Justice regarding

10   whether or not the challenges to the composition of the

11   Select Committee were that -- whether they are questions of

12   law or questions of fact.

13        **THE COURT:**  Yes.

14        **MS. KALLEN:**  And they are pure questions of law,

15   Your Honor.  And I direct the Court's attention to

16   two Supreme Court cases that support that proposition.

17        The first is the *Bryan* case.  That's B-R-Y --

18        **THE COURT:**  The old *Bryan*?

19        **MS. KALLEN:**  Yes, Your Honor.

20        And there the questions challenging the validity

21   of the Committee were expressly taken away from the jury and

22   decided by the Court at trial.

23        I'd also direct the Court's attention to the

24   *Wilkinson* case, which the Department of Justice raised in

25   their response to the jury instructions at ECF 90.  And in

1    both those cases, there were challenges to the validity of

2    committees, and those were viewed as questions of law.

3            Your Honor, also, this is a situation where the

4    House of Representatives has been crystal clear about its

5    position as to whether or not its rules were properly

6    followed.  Not just before this Court in the amicus brief

7    but also through subsequent actions of the House of

8    Representatives.

9            So this is certainly not one of those situations

10   where there's any ambiguity as to what the House's position

11   is because the House has been very clear that its position

12   is that its rules were followed, and proper rulemaking

13   deference under the Rulemaking Clause requires deference to

14   that conclusion.

15           **THE COURT:**  Does the House have a view about

16   whether, in light of Mr. Bannon's letter over the weekend,

17   the trial should occur in a week or whether we should pause

18   it?

19           **MS. KALLEN:**  Your Honor, the House's view is

20   that -- you know, we don't take -- we are here on the Motion

21   to Quash, Your Honor, not in terms of implications for the

22   criminal trial.

23           That said, by virtue of our contempt referral, the

24   crime was completed at the time of failure to comply with

25   the Subpoena, and that happened months ago.

1          I'd like to also address the high-ranking

2    government official doctrine.  These are not just any

3    subpoenas served on any witnesses.  The 16 subpoenas here

4    were served on the Speaker of the House of Representatives,

5    the Majority Leader, the Majority Whip, all members of the

6    January 6th Select Committee, three of its high-level staff

7    members and the General Counsel of the House of

8    Representatives.

9          To justify subpoenas to these high-ranking

10   officials, the defendant had to demonstrate with specificity

11   and in concrete terms what further information only these

12   high-ranking officials could supply that would be material

13   and essential to his defense, and he has not done so.

14         This is especially true because the Select

15   Committee has made clear that Chief Counsel and Deputy Staff

16   Director Kristen Amerling and Senior Investigative Counsel

17   Sean Tonolli will voluntarily be made available by the

18   Select Committee to testify, and they can competently

19   address any issues necessary to any of the elements or

20   defenses in this case.

21         And rather than specify the precise information

22   that the defendant seeks from each of these numerous

23   high-ranking officials, he insists that a proper defense

24   requires testimony from officials that he labels as having

25   decision-making authority.

50

1          But this decision-making authority is not a

2     prerequisite for competent trial testimony, nor does it

3     discount the testimony that Ms. Amerling or Mr. Tonolli

4     could provide.

5          In fact, if this Court took Mr. Bannon up on his

6     offer to invent some new decision-making authority test for

7     trial testimony, that would undermine the high-ranking

8     official test itself and that doctrine.  That's especially

9     true for contempt charges, Your Honor, where those with

10    decision-making authority over a contempt referral are the

11    members of Congress themselves.

12         Adopting that test means that high-ranking

13    government officials and high-ranking officials even in the

14    private sector would spend nearly all their time dealing

15    with litigation.

16         That is why the relevant question in the context

17    of a high-ranking official is whether -- and whether the

18    relevant question, even under the Federal Rules of Criminal

19    Procedure, is whether a witness can offer competent

20    testimony, not whether the actual decision maker is taking

21    the stand.

22         And even setting all of that aside, Your Honor,

23    then comes the question of speech or debate immunity.

24    Binding Supreme Court case law and binding D.C. precedent

25    establish that the actions at issue here squarely fall

1    within the sphere of legislative activity.  They are thus

2    covered by the Speech or Debate Clause, and there is

3    absolute immunity.

4         Your Honor, there is a process for contesting a

5    subpoena, a judicial subpoena is under Rule 17, and the

6    defendant did not follow that process.

7         There's also a process to contest a congressional

8    subpoena, but rather than engage in that process, the

9    defendant decided to defy the Subpoena altogether and defy

10   the Subpoena that he received from the Select Committee.

11   The United States seeks to hold him accountable for defiance

12   of that subpoena.

13        This is entirely different than the issue here

14   where the recipients have followed the proper process to

15   contest a judicial subpoena they moved to quash and the

16   subpoenas that the defendant issued to the 12 members of

17   Congress, three senior staff and the General Counsel of the

18   House of Representatives in his criminal trial do not comply

19   with the requirements for criminal trial subpoenas.  And for

20   that reason, they should be quashed.

21        But issuing blatantly improper subpoenas may be

22   the point here.  The defendant spends pages of his brief in

23   the Miscellaneous case arguing that if the Subpoena

24   recipients do not testify, the United States should be

25   stripped of its ability to present its evidence in the

52

1    criminal trial or the entire criminal prosecution should be

2    dismissed.

3              The purpose of these overbroad subpoenas appears

4    to be trapping members of Congress into foregoing speech or

5    debate immunity less they deem this prosecution.

6              Should this Court adopt Mr. Bannon's "Heads, I

7    win.  Tails, you lose" approach to contempt proceedings,

8    this playbook will be copied by any defendant who faces a

9    congressional subpoena that they don't like, and Congress'

10   subpoena power will be seriously undermined.  So we ask this

11   Court not to fall prey to that tactic.

12             The defendant issued sweeping subpoenas after he

13   stood on the steps of this very courthouse and vowed to use

14   his criminal trial as an opportunity to harass and burden

15   members of Congress.  He should not be permitted to abuse

16   this Court's subpoena power for that purpose.

17             So we ask that the Motion to Quash be granted.

18   Thank you.

19             **THE COURT:**  Thank you, Counsel.

20             Mr. Letter, anything you'd like to address?

21             **MR. LETTER:**  Thank you, Your Honor.  I'll be very

22   brief to address your questions.

23             First of all, on the trial point, whether the

24   trial should be postponed, as Ms. Kallen said, our view is

25   that's a determination for the Justice Department.  But the

53

1    Committee itself has no reason to think that it is
2    appropriate for the trial to be postponed.  But, again,
3    that's a judgment for the Executive Branch of the government
4    to make.
5        On the point about waiver -- and as Your Honor
6    knows, you have asked us to address this, which we'll be
7    doing several days from now in *Meadows*.
8        **THE COURT:**  Yes.
9        **MR. LETTER:**  But to just give you a preview,
10   because you've asked about it, at this point the position we
11   will most certainly be taking is the privilege is not
12   waivable.  But I know you're thinking, Hmmm?  That's because
13   we say that the privilege is absolute, but it is not
14   self-executing.
15       So members of Congress have the ability to choose,
16   in particular instances, not to assert the privilege.  And
17   this is discussed at considerable length, as we will be
18   setting out for you, in the Supreme Court decision in
19   *Helstoski*, where the Court addressed the question of
20   waivability.
21       And there, by the way, the Court just said, I
22   quote, Explicit and unequivocal renunciation of the
23   privilege would be necessary, even assuming that the
24   privilege could be waived.
25       So as you know, there are cases like *Meadows* where

1    the House has chosen not to assert executive -- assert

2    speech or debate immunity, but that does not mean that it is

3    waivable by particular members of the House.  It's just a

4    question of it's not self-executing.  And so we can choose

5    not to assert it.

6              One other thing, again, just giving you a preview,

7    one of the key cases here is *Senate Permanent Committee*

8    *versus Ferrer*, and there the Senate actually brought suit in

9    Federal District Court to enforce a subpoena pursuant to a

10   statute that allows that.

11             The defendant there said, Oh, okay.  I want to

12   then raise all of these other points.  The D.C. Circuit

13   said, No, not so fast.  Speech or debate immunity continues

14   to apply to other subjects even though the Senate had --

15             **THE COURT:**  Initiated a lawsuit.

16             **MR. LETTER:**  Exactly, Your Honor.  And so

17   that's -- it's a 2017 opinion of the D.C. Circuit.  In any

18   event, I hope that answers -- if Your Honor has any other --

19             **THE COURT:**  It does.

20             Thank you, Mr. Letter.

21             **MR. LETTER:**  Thank you, Your Honor.

22             **THE COURT:**  I look forward to seeing that brief.

23             Here is what I would like to do:  I'd like to give

24   the court reporter a break.  So why don't we take a brief

25   recess.  Let's take 10 minutes.  We'll come back at 11:20,

1    and then I'll hear from Mr. Corcoran and Mr. Schoen, I

2    expect.

3                    (Recess at 11:13 a.m. and concluded at 11:29 a.m.)

4            **DEPUTY CLERK:**  We are now back on the record.

5            **THE COURT:**  Mr. Corcoran.

6            **MR. CORCORAN:**  Good morning, Your Honor.

7            **THE COURT:**  Good morning.

8            **MR. CORCORAN:**  I am going to address the Motion to

9    Quash first and then try to work through the Motions in

10   Limine in workmanlike fashion.  And then David Schoen will

11   address the Motion to Continue and one of the Motions in

12   Limine as well.

13           **THE COURT:**  Sounds fine.

14           **MR. CORCORAN:**  First, with regard to the two-step

15   process for consideration of whether to grant the Motion to

16   Quash, and then depending on that, whether to go to a remedy

17   in a criminal case, we agree with that process and believe

18   that the Department of Justice -- we may have to brief the

19   issue in between and allow the Department of Justice to have

20   their say on any remedy.

21                    I want to address the notion of absolute immunity.

22   You know, more than 100 years ago in the field of physics,

23   there was a sense that time and space were absolute.  But

24   then Albert Einstein came up with an idea that things should

25   be considered relative to one another.  And that's how I

56

1    view these two constitutional issues because both are in the

2    text of the Constitution.

3         Different than what Mr. Letter has said -- and I

4    understand and respect his advocacy -- we are not trying to

5    rewrite the Constitution.  What we're saying is, Here are

6    two explicit grants with regard to members of Congress.

7    It's a protection, the Speech or Debate Clause, and with

8    regard to Mr. Bannon or any defendant, it's, you know,

9    it's --

10        **THE COURT:**  What's your best case for the

11   proposition that I could hold that Speech or Debate Clause

12   immunity as to a topic that's covered by Speech or Debate

13   Clause immunity can be overridden because of a criminal

14   defendants' Fifth or Sixth Amendment right?

15        **MR. CORCORAN:**  *Johnson*, 383 U.S. 178, the Supreme

16   Court said that the Speech or Debate Clause was designed to

17   preserve legislative independence, not supremacy.

18        And in our view, requiring members who have direct

19   personal knowledge regarding an alleged contempt of Court

20   will not infringe in the least on the legislative

21   independence of Congress.

22        **THE COURT:**  What issue, that's relevant in this

23   case, would the testimony or documents you seek go to?

24        **MR. CORCORAN:**  If I could just have one moment

25   before I get to that --

57

1          **THE COURT:**  Sure.

2          **MR. CORCORAN:**  -- because it's -- just on the

3     issue of the weighing of the two ideas, because I think that

4     is an important thing.

5          What I've quoted from *Johnson* with regard to the

6     need to preserve legislative independence, a contempt

7     resolution is not a legislative act.  And so there's no

8     concern in the area of contempt under *Johnson* -- I know it

9     doesn't deal directly with contempt of Congress.  These

10    cases come along, as we said before, every 10 or 20 years.

11         But the concept is that the Speech or Debate

12    Clause is designed to preserve legislative independence.

13    Here, you know, criminal contempt resolution, the Latin lex

14    legis law, a contempt resolution is not a law.  It's not a

15    law.

16         And so there's no infringement on the legislative

17    power of the Congress --

18         **THE COURT:**  So is your argument that --

19         **MR. CORCORAN:**  So it's not a waiver.  It just

20    doesn't apply.

21         **THE COURT:**  So your argument is that there is no

22    Speech or Debate Clause immunity regarding the reasons for

23    or the fact of the contempt resolution whatsoever.  So you

24    don't even need to worry about the defendant's

25    constitutional rights?  It's just a question of whether that

58

1    evidence is relevant?

2              **MR. CORCORAN:**  No, you definitely --

3              **THE COURT:**  You said there's no Speech or Debate

4    Clause immunity whatsoever because it's not a legislative

5    act.

6              **MR. CORCORAN:**  Right.

7              **THE COURT:**  Okay.  So immunity is out, and the

8    only question, in your view, is whether the testimony's

9    relevant?

10             **MR. CORCORAN:**  I don't think it's a question of

11   relevancy at all.  I think from our perspective, the

12   defendant has a right, and the Supreme Court in *Chambers*

13   *versus Mississippi*, it's called one of the most fundamental

14   rights; that a person accused of a crime can present a

15   defense and present witnesses in his own defense.

16             **THE COURT:**  Does a defendant have a constitutional

17   right to present irrelevant evidence?  Surely the answer is,

18   No.

19             **MR. CORCORAN:**  I don't know that there's any

20   constitutional right to present irrelevant evidence, but I

21   think a defendant has a right to present a defense.  And

22   you're going to hear that again from me as we go through the

23   Motions in Limine, et cetera.

24             But I think one of the key points that separates a

25   legislative act from a contempt is, contempt is a sword

1    where the Congress has pointed the sword at an individual

2    and has asked the Executive Branch to prosecute and has

3    asked this Court to preside.

4         In that circumstance, the members of Congress who

5    have factual information about the underlying facts that

6    constitute a contempt, they can't use as a shield --

7         **THE COURT:**  What noncumulative evidence do the

8    members you've tried to subpoena have about the contempt

9    resolution?

10        **MR. CORCORAN:**  Well, communicative --

11        **THE COURT:**  Let's talk specifically.  What do you

12   want to ask the members of the Committee about that you

13   wouldn't be able to elicit through other -- either the two

14   people who are volunteering to appear or witnesses on

15   Mr. Bannon's side?

16        **MR. CORCORAN:**  Yeah.

17        The testimony -- I won't go through each one of

18   them unless the Court wants me to, but let's start with the

19   testimony of Speaker Pelosi.  Her testimony would be

20   exculpatory.  And remember the test is not what the Speaker

21   thinks matters or what Mr. Letter or what the prosecutor

22   thinks isn't material to guilt or punishment doesn't make it

23   less likely, based on the evidence and testimony of

24   Speaker Pelosi, that Mr. Bannon is not guilty of a crime.

25        And we're dealing with an element of the offense

1    here, and that is that one of the elements, as we've

2    discussed, is that Mr. Bannon -- the government has proved

3    beyond a reasonable doubt that Mr. Bannon was subpoenaed in

4    accordance with the authority of the U.S. House of

5    Representatives.

6            At this stage, it's not a legal question.  It will

7    be up to the jury.  I disagree with the DOJ on that.  And

8    Justice Scalia has given the guidance on that in *Gaudin* that

9    it's a fact question for the jury.

10           With regard to Speaker Pelosi --

11           **THE COURT:**  Well, *Gaudin* is about pertinency.

12           **MR. CORCORAN:**  I understand that.

13           **THE COURT:**  That's not what we're talking about

14   here unless you're arguing that -- is there testimony you

15   would seek from one of these witnesses that goes to

16   pertinency?

17           **MR. CORCORAN:**  No.

18           **THE COURT:**  So it's just about whether the House

19   Committee complied with the rules?

20           **MR. CORCORAN:**  Not really.  It's not compliance

21   with the rules.  It's whether they acted within the

22   authority that was granted --

23           **THE COURT:**  That's what I mean.

24           **MR. CORCORAN:**  -- to them.

25           **THE COURT:**  I'm using that as a shorthand.

61

1          **MR. CORCORAN:**  And so what Speaker Pelosi -- for

2     instance, to get even more granular, what are her reasons

3     for not appointing the full membership of the House?  That's

4     something that's in her personal knowledge that would be

5     exculpatory, we believe, if the jury hears it.

6          What efforts has she made to obtain Mr. Bannon's

7     testimony as required by the contempt resolution?

8          The contempt resolution, which is H.Res. 730,

9     requires that she take action, all appropriate action, to

10    enforce the Subpoena.  That's after the referral has been

11    made to the Department of Justice.

12         And so we want to ask the Speaker, What efforts

13    have been undertaken?  If efforts have not been undertaken,

14    that goes to whether there was a real default, whether there

15    were realistic attempts to reach an accommodation.

16         The other thing she would testify about are the

17    reasons for not allowing a ranking minority member on the

18    Committee.  Again, that may be a disputed factual issue, but

19    that doesn't take it away from the jury.  They get to hear

20    our idea, based on the evidence.

21         And Chairman Thompson, same thing.  He

22    testified -- not testified -- well, at the hearing -- at one

23    of his hearings, he didn't testify but he spoke at the very

24    first hearing and said, There's no ranking member.  We'd

25    like his testimony on that so that the jury can consider

1  that as they look through H.Res. 503, which is the

2  resolution setting up the Select Committee.

3          **THE COURT:**  Didn't *United States versus Bryan*

4  bless -- the Supreme Court decision bless, either explicitly

5  or implicitly, taking away from the jury, which is what the

6  District Court judge did there, the question of whether the

7  Committee had acted in compliance with at least one rule.

8          **MR. CORCORAN:**  You called it the old *Bryan*, I

9  think, and I agree.  It's old and outdated.  I mean, now

10  it's clear --

11          **THE COURT:**  I don't get to ignore old and outdated

12  Supreme Court cases.

13          **MR. CORCORAN:**  Oh, I understand that.  But when

14  we're talking about whether an element of the crime goes to

15  the jury, I think you've got to go with more current

16  precedent, *Apprendi* and others.

17          I think --

18          **THE COURT:**  If the House Committee's compliance --

19  I mean in the general sense and whatever sense one wants to

20  argue about its compliance with the rules -- if that's a

21  defense rather than an element, does that mean it has to go

22  to the jury?

23          **MR. CORCORAN:**  Yes.  Yeah.  Yeah.

24          I mean, the idea is our -- what we want to do is

25  tell the jury what happened.  And we want to present the

1    witnesses who know what happened.  And then you will provide

2    the legal framework for how they can consider that, and

3    counsel will argue, as we will, as to how they should

4    consider it consistent with the law.  But that doesn't mean

5    we don't get to present it to the jury.  We just want to be

6    able to tell them what happened here.

7              I want to speak to the issue of the cumulative

8    nature of the testimony and whether staff would suffice,

9    because I think they certainly wouldn't.  I mean, the issue

10   really -- look, congressional staff play an important role

11   as to staff or any government agency.

12             But the staff members do not have the authority or

13   the power that is important to a contempt proceeding.

14   They've got no authority to appoint members to the

15   committee.  They have no authority to issue subpoenas or

16   sign subpoenas.  And they have no authority to deny, on

17   their own accord, an accommodation that is requested by a

18   witness.

19             Nor do they have any authority, as Speaker Pelosi,

20   does, to make further efforts -- or requirement to make

21   further efforts to obtain Mr. Bannon's testimony and force

22   the Subpoena after the contempt citation.

23             There's no question that a judicial law clerk has

24   an important role, but he can't sign a search warrant.  I

25   mean, we want the actual member, not a designee.  And while

64

1    we appreciate the House's offer to make two witnesses

2    available, I mean, it's a little bit cold comfort, because

3    the two witnesses that they agree to provide are the ones

4    that the government wants and has listed on their exhibit

5    list.  We've got a whole host of others and wish they would

6    allow us that.

7            The other problem is they've said that they're not

8    going to waive Speech or Debate Clause privilege for those

9    two staff; so the staff essentially can only testify on what

10   they think is appropriate.  That's a clash with our ability

11   to elicit from any congressional witness or staff what's

12   necessary to provide a defense to Mr. Bannon.

13           So our request is that you deny the Motion to

14   Quash and allow us to present these witnesses at trial.  If

15   there's some question about the cumulative nature of one

16   member over another, that could be something that is

17   discussed at trial in terms of number of witnesses, as is

18   often the case.

19           If the Court is inclined to grant the Motion to

20   Quash, then we'd like an opportunity to discuss remedies,

21   because it will certainly infringe upon Mr. Bannon's right

22   to have a fair trial.

23           Should I move to the Motions in Limine,

24   Your Honor?

25           **THE COURT:**  Yes.

1          **MR. CORCORAN:**  Okay.

2          I think the two that we've filed, the Presenting

3     of the Indictment to the Jury, Document 83 and Document 84,

4     precluding evidence or argument on the January 6th attack

5     are essentially agreed by the parties.

6          **THE COURT:**  That's the way it seems to me.

7          **MR. CORCORAN:**  I think -- in terms of the omnibus

8     government motion, I think -- my request, I guess, or

9     suggestion is -- would be to take it under advisement.

10    These are issues that can be resolved at trial.  The

11    government has asked for a lot of blanket restrictions that

12    I don't think are appropriate.

13         Today at argument they said they think we're going

14    to talk about possible punishment.  That's not anything we

15    would ever do.  Punishment is, of course, not relevant to

16    the jury's consideration as to whether the charges were

17    proved.

18         I think one key concept is politics.  You know,

19    politics is an important part of this case from the start to

20    finish, and in order to present -- guarantee Mr. Bannon a

21    fair trial, we're going to have to have the ability to

22    question witnesses and examine them as to whether politics

23    plays any role in their actions, and obviously the exposure

24    of a witness's motivation is constantly [sic] protected;

25    that's *Davis,* 415 U.S. at 316 to 317.

66

1          On the issue of how we can probe the investigation

2     that the government has undertaken, again, that's the same

3     thing.  We are not going to argue that in that form, that

4     there was "prosecutorial misconduct."

5          The issue is, we're allowed to ask witnesses what

6     was done in this investigation and what was not done, so

7     that the jury can be in a position to analyze not just the

8     results of the investigation but the quality of the

9     investigation.  And that's *Sager*, 227 F.3d at 1145.

10         On one -- one other thing that came up is

11    essentially -- and Ms. Gaston addressed this -- the Court's

12    questions about the rules, should they go to the jury or

13    not.  At this stage, it's our position -- of course, we

14    fully briefed these issues --

15         **THE COURT:**  Yes.

16         **MR. CORCORAN:**  -- and at that stage, we asked the

17    Court and we tried to present enough information that based

18    on the law, we could get the Indictment dismissed, and it

19    didn't happen.  Now these are issues that go to the jury.

20         When it comes to issues such as -- to use your

21    formulation, whether the House followed its own rules, we

22    are not asking the jury to make up any rules or resolve

23    ambiguous things.

24         What we want to do is go down and present to them

25    evidence on whether or not a ranking minority member was

1  consulted, whether or not there were the number of

2  committees that were required, in our view, in the

3  continuing resolution and things like that, whether an

4  accommodation was offered.

5          The arguments that Ms. Gaston made today,

6  persuasively, she can make to the jury because they're jury

7  arguments, because they're not arguments about whether that

8  evidence can come in at all.  And we feel that the

9  government is inviting you into error by keeping that

10  important information from the jury.

11          You know, we went back -- it's kind of

12  interesting -- and I'm not in any way endorsing *Licavoli*,

13  because you know our position on *Licavoli*, which is we don't

14  agree with it.  But we went back to look at it and got the

15  trial transcript.  It was a little bit like Raiders of the

16  Lost Ark because it's in the National Archives and not

17  online and everything.

18          But in that case -- and the reason that we wanted

19  to do that is because in the opinion at the circuit level

20  there's reference to defense lawyer testifying.  And so the

21  question is, Why is a defense lawyer testifying?  What did

22  he get into?

23          And in that case, that was discussed before the

24  trial.  And the judge said, "Of course, I will admit the

25  evidence.  I think that a defendant has a right to present

1    evidence on his theory.  I can't exclude it on the ground

2    that the theory is wrong.  He has a right to make a record

3    of his theory.  Then, of course, I'll instruct the jury that

4    that particular evidence is immaterial."  There's more

5    discussion, and the judge says, "I don't think that this is

6    the kind of matter from which I should exclude the jury."

7          When the witness -- in that case, the defense

8    lawyer testified.  He testified extensively about his

9    receipt of the Subpoena, his presence when the Subpoena was

10   served, his communications and his advice to Mr. Licavoli.

11         In other words, defense gets to present the facts,

12   and then the jury, using the legal framework provided by the

13   judge, gets to make a decision.  Is the person guilty or

14   innocent?  So that's all we are asking here.

15         I think with that, I'm through the Motions in

16   Limine.

17         **THE COURT:**  Very well.  Thank you.

18         Mr. Schoen.

19         **MR. SCHOEN:**  Yes, Your Honor.

20         Judge, what I thought I would do is deal with

21   the -- whichever order the Court prefers, the Motion to

22   Continue and the *Meadows* and *Scavino* Motion to Compel, and

23   then I'd like to address the questions the Court asked sort

24   of randomly early on.

25         **THE COURT:**  I'm happy to hear those two motions in

1    either order.

2              **MR. SCHOEN:**  Okay.  Thank you, Your Honor.

3              Ready, Judge?

4         **THE COURT:**  I'm ready.  Are you?

5         **MR. SCHOEN:**  Yes, Your Honor.

6         **THE COURT:**  Okay.

7         **MR. SCHOEN:**  All right.

8              Let's talk about the *Meadows* and *Scavino* motion

9    first, Your Honor.

10             We kind of lay it all out in the motion, but to be

11   clear, the declination letters is kind of the first, most

12   fundamental, thing we're talking about here, the reasons

13   given for not prosecuting them.  There may be other things

14   that also are not deliberative-process, covered information

15   but we don't know.  As they say in the papers, according to

16   The New York Times, they received a copy of these

17   declination letters.

18             First argument we make is that it comes within the

19   Court's oral order, and it does reflect policy on some

20   level.  These are high-profile cases.  Someone made a

21   decision on some policy level as to whether to prosecute

22   *Meadows* and *Scavino* and got a lot of pushback on that from

23   the Congress, publicly and otherwise.

24             The most direct reason that the letters are

25   relevant is because one of the issues here being contested

1   is whether the invocation of executive privilege was valid

2   here.  And now we see, from the letters last night, whether

3   it was specific enough and so on.

4          One of the fundamental points we tried to make in

5   the motion is executive privilege was invoked in *Bannon* by

6   the same person as agent for the former President, in the

7   same manner, with the exact same language, word for word

8   except for one sentence on immunity in the Bannon letter,

9   Meadows letter and Scavino letter.

10         If the government is challenging the invocation --

11  whether there was a valid invocation here -- remember, the

12  Committee challenged, Well, it wasn't -- executive privilege

13  wasn't ever invoked by the former President or to the

14  Committee specifically, and they're challenging the form of

15  that, and here we've seen it was raised in a recent hearing.

16  The Court said it wasn't clear whether executive privilege

17  was invoked unequivocally and so on.

18         To the extent that the *Meadows* and *Scavino*

19  decisions were based in any part on the invocation of

20  executive privilege and a finding that that was valid,

21  therefore, that it was properly invoked, then they're

22  directly relevant to that issue in this case.  Same manner,

23  same person, same language.

24         **THE COURT:**  You heard my -- the colloquy with

25  government counsel about the three ways in which the

1    invocation of executive privilege could be relevant here.

2    It could go to mens rea.  It could go to the affirmative

3    defenses of entrapment by estoppel or public authority or it

4    could just be -- I'll put it this way -- a freestanding

5    defense or excuse.

6            I understand Mr. Bannon has clearly argued

7    entrapment by estoppel and public authority are valid

8    defenses that should go to the jury, relying on the OLC

9    opinions, et cetera.

10           He's also argued at a minimum in the jury

11    instructions for a different view of mens rea than the

12    government, as to which his understanding of executive

13    privilege and the like, as it goes to his head, would be

14    relevant, you know, what was in his head.

15           Is Mr. Bannon arguing that he is -- the assertion

16    of privilege excuses or is a defense to this prosecution by

17    itself?

18           **MR. SCHOEN:**  Yes, Your Honor.

19           **THE COURT:**  Where does that appear in your papers?

20           **MR. SCHOEN:**  I'm not prepared to answer that

21    exactly right now, Your Honor.  But I'll tell you this --

22           **THE COURT:**  What's the argument?

23           **MR. SCHOEN:**  It's at the heart of every argument

24    we've made.

25           **THE COURT:**  Does it go to something other than

1      entrapment by estoppel and mens rea?

2              **MR. SCHOEN:**  Yes, it does.  Ordinarily,

3      Your Honor, it sounds like a crazy principle that the

4      invocation of privilege would excuse what we call here total

5      noncompliance; usually a privilege log, et cetera.

6              But the courts and the Justice Department have

7      treated executive privilege as unique.  They created --

8      let's say the OLC opinions, they created this idea that you

9      don't even have to appear.

10             By the way, Janet Reno in 1999 clemency OLC

11     opinion, which is cited by Cipollone and Purpura, in

12     representing people who have never been employed by the

13     Executive Branch, as applying to them also.

14             And Janet Reno says, Executive privilege is

15     different, you don't appear.  That's what all of the OLC

16     opinions that we've cited to Your Honor say.  It's because

17     the executive privilege and the separation of powers element

18     is different from every other kind of privilege that you

19     don't even have to appear or comply.

20             The other reason -- by the way, there's a second

21     reason offered by Mr. Costello for total -- what they're

22     calling total noncompliance --

23             **THE COURT:**  I understand.  It's just argument.  I

24     understand the point.  I don't think there's anything

25     binding anyone to some concession.  It wasn't total

1    noncompliance.  We're just using that as a term for purposes

2    of advancing the argument.

3           **MR. SCHOEN:**  Thank you, Your Honor.

4           The other argument to that is the very specific

5    OLC opinion that says, If agency counsel is not permitted,

6    by rules or otherwise, to accompany the deponent, then the

7    Subpoena is invalid, unconstitutional and can be ignored.

8    So that's another basis for why the invocation of executive

9    privilege itself excused any further compliance in this

10   case.

11          In terms of, you know, raising executive privilege

12   as a defense like this, again, I pointed out last time, the

13   OLC opinion itself, for example, the Olson memo,

14   specifically says that if one is relying -- I'm reading,

15   Page 135, Note 34.  "There is some doubt whether obeying the

16   President's direct order to assert his constitutional claim

17   of executive privilege would amount to a willful violation

18   of the statute."

19          **THE COURT:**  That seems to me that OLC screwed that

20   up.  No one read *Licavoli*.

21          **MR. SCHOEN:**  I disagree 100 percent, respectfully,

22   Your Honor.

23          **THE COURT:**  Okay.

24          **MR. SCHOEN:**  Again, it goes back to our

25   supplemental brief.  *Licavoli* did not involve executive

74

1        privilege; that changes the whole ballgame.  And according

2        to the OLC, it changes the whole ballgame because executive

3        privilege triggers separation of powers --

4                **THE COURT:**  Is *Licavoli* cited in the OLC opinions?

5                **MR. SCHOEN:**  No --

6                **THE COURT:**  So OLC --

7                **MR. SCHOEN:**  -- because it didn't apply.

8                **THE COURT:**  -- wrote a bunch of opinions and they

9        didn't address -- I mean, I get that it's a D.C. Circuit

10       opinion, so that rule may not apply in other circuits.

11               **MR. SCHOEN:**  Judge, they cite plenty of D.C.

12       Circuit opinions in here.  And it's hard to imagine Ted

13       Olson, Walter Dellinger -- you know, on and on and on --

14       luminaries in the law, weren't familiar with *Licavoli* when

15       they were researching the contempt of Congress statute.  I

16       don't think it's fair to assume that.

17               **THE COURT:**  So what's your definition of willful

18       consistent with *Licavoli*?

19               **MR. SCHOEN:**  You have to have some recognition

20       that what you're doing is wrong, wrongful conduct or

21       violates the law.  Mr. Bannon didn't --

22               **THE COURT:**  How is that consistent with *Licavoli*?

23               **MR. SCHOEN:**  Pardon?

24               **THE COURT:**  How is that consistent with *Licavoli*?

25               **MR. SCHOEN:**  Oh, it's not consistent with

75

1    *Licavoli.*

2              **THE COURT:**  But I'm bound by *Licavoli.*

3              **MR. SCHOEN:**  I don't think so because executive

4    privilege is in this case.  We've already made that point.

5    I know Your Honor and I disagree, respectfully.  But

6    executive privilege changes the ballgame on every level --

7              **THE COURT:**  So your view then -- I mean, I know

8    this -- we already discussed this*, is that Licavoli* mens

9    rea, holdings and the like, mean that the mens rea under the

10   statute means one thing in executive privilege contexts and

11   another thing and in non.

12             **MR. SCHOEN:**  Yes, Your Honor.  And the cases have

13   said -- the old cases, new cases, there's a dispute -- a

14   question comes up in this *United States versus U.S. House*,

15   Gorsuch wanted to raise executive privilege as a defense.

16   Well, it arose in the civil case, and they say, Listen, this

17   is a very difficult question.  Let's not deal with it if we

18   don't have to.

19             Which, by the way, that case has language in it

20   that goes directly to one of the Court's questions earlier,

21   Are we making a mistake dealing with all of this stuff right

22   now when we may not have to?

23             I mean, there's case after case that says it's

24   inappropriate for these kinds of issues to be determined in

25   the criminal sphere or otherwise.  There's an accommodation

76

1    process that's constitutionally mandated.

2    **THE COURT:**  Why didn't you bring Mr. Bannon's

3    letter to the Committee to my attention in your filing last

4    night?

5    **MR. SCHOEN:**  One reason is, the media response

6    that we saw today; that is, Oh, Bannon is trying to get out

7    of something.  Mr. Bannon has taken a principled stance from

8    day one.  And by the way, Your Honor, I only saw it for the

9    first time on Saturday night after I finished my Sabbath

10   observance; that's when I think it came out.

11       In any event, Mr. Bannon has taken a principled

12   stance.  "Bannon:  My hands are tied because executive

13   privilege was invoked.  My hands, for the first time now,

14   are untied by the person who invoked executive privilege.  I

15   can now comply with the Subpoena."  Period.

16       That's his position with Congress.  And it was

17   appropriate for him to go to Congress, because that's where

18   the dispute was.

19       I would like to get into this point.  I'm skipping

20   ahead.  But the Court asked before, Couldn't this issue

21   possibly go to default?  I saw a little snippet of the

22   government's motion last night.  I was traveling but I saw a

23   friend, Kyle Cheney, excerpted a part of it in a Twitter

24   feed today, this motion about barring testimony on this

25   thing, and I intend to address it in the papers.

77

1                However, of course that testimony has to come in

2       that he's now agreed to testify.  The government raised it

3       by way of their Motion in Limine.  We didn't raise it.  But

4       since it's been raised, of course it comes in.  Why?

5       Because there's a factual question here on when there was a

6       default.

7                On October 19th -- back up a step.  The Indictment

8       in this case charges the default on specific dates:  October

9       14th in Count 1, and by October 18th in Count 2.

10               On October 19th, Chairman Thompson wrote to

11      Mr. Bannon -- this is the 19th, after the date the

12      government claims the default happened -- "These

13      developments underscore the folly of any continuing defiance

14      of the Select Committee's subpoena by Mr. Bannon.  The

15      Select Committee remains focused on expeditiously obtaining

16      the testimony and documents necessary to meet our

17      responsibilities, and we continue to expect immediate

18      compliance," compliance with the Subpoena, "by Mr. Bannon."

19               It doesn't say with the Subpoena.  I added that.

20               "-- compliance by Mr. Bannon.  Should Mr. Bannon

21      choose to change his posture, please notify Select Committee

22      staff at 202-225-7800."  That's October 19th, after the

23      supposed date of the default.

24               The contempt referral, Mr. Corcoran referred to

25      it, resolved that the Speaker of the House shall otherwise

1    take all appropriate action to enforce the Subpoena.  The

2    subpoena is still out there to be enforced.  So there's a

3    real fact question for the jury on whether there was any

4    default in this case or if compliance with the Subpoena, as

5    Congressman Thompson urged -- (brief pause) -- yeah,

6    Thompson urged, is still compliance with the Subpoena today.

7              And before, the government, I think, said

8    something like, Well, for a week after, or something like

9    that.  That's not relevant.  It doesn't matter if it was a

10   week after or a day after, as long as that question is open.

11             There is a principle in the law that conduct can

12   waive a default.  If the parties act like a question is

13   still open and they're still negotiating or they're still

14   urging compliance, then there is a reasonable basis for a

15   jury to find there was no default.

16             **THE COURT:**  So that goes to the question of

17   whether these letters would be admissible.

18             **MR. SCHOEN:**  I don't know about the admissibility

19   of letters.  Testimony about --

20             **THE COURT:**  Testimony --

21             **MR. SCHOEN:**  -- Bannon's  willingness now to

22   testify and produce documents.

23             **THE COURT:**  Whatever evidence is going to be

24   proffered about Bannon's willingness to testify now would,

25   in your view, be relevant at a trial, but it doesn't tell me

1    one way or the other whether the trial should start on

2    Monday.

3            **MR. SCHOEN:**  The trial shouldn't -- well, I

4    haven't gotten that continued.

5            **THE COURT:**  No, but I understand your motion and

6    the arguments you made before about continuance.

7            **MR. SCHOEN:**  Right.

8            **THE COURT:**  But while we're on the topic --

9            **MR. SCHOEN:**  Yeah.  Yeah.

10           **THE COURT:**  -- are you arguing that the trial

11   should be postponed because Mr. Bannon has now made an

12   offer, such that it is, to testify; and it would be

13   inefficient or improper to have a trial while that offer is

14   extant?

15           **MR. SCHOEN:**  I think, number one, it would be

16   contrary to the constitutionally-mandated accommodation

17   process.

18           Here's my answer:  There's no reason to have this

19   trial starting on Monday when there are two things -- one

20   thing that infringes, in my view without question, on the

21   defendant's constitutional rights.  That's the publicity

22   risk that only exists in June and July and doesn't exist in

23   October, when we've proposed, in a case that's never been

24   continued before.  And the second reason is this

25   development.

80

1          Now, the government posed this development as --

2     and I saw it in the media also -- cynics.  Well, the last

3     minute before trial, to avoid trial.  That's the other

4     reason I didn't bring the letters to the Court's attention

5     directly.  It's a matter I brought it to Congress'

6     attention.  Let's see what they have to say about it.  So

7     far they have indicated they would like to hear his

8     testimony.

9          But this isn't a last-hour move by Mr. Bannon.

10    His principled position has been, My hands are tied.  His

11    hands were tied under his understanding of executive

12    privilege, his respect for the invocation of executive

13    privilege by a former President.  His hands were now untied

14    for the first time, and that's what he told Congress.

15         You know, the government mocks this idea about

16    respecting the invocation of privilege by a former

17    President.  And, of course -- and I see, again, in the media

18    it's misreported.  That's not the status.  The status is

19    uncertain at best.

20         Justice Kavanaugh wrote extensively in his comment

21    on the denial of cert in *Trump versus Thompson*.  Certainly

22    *Nixon versus GSA* recognizes a former President can have

23    executive privilege and can invoke executive privilege, but

24    it may be that the current President supersedes that.

25         So here's another thing:  Why no default?  On

1    October 18th, a letter comes from the Office of current

2    President Biden from a guy named Mr. Su, I think, S-U.  And

3    it says they've reviewed it and they don't see any reason

4    further for Mr. Bannon to avoid testimony, complying with

5    the Subpoena.

6            I'm paraphrasing obviously.  That's October 18th.

7    That's after the deadline had passed; and that's his view of

8    things, that there's no reason for you not to comply now.

9            So what does Bannon's lawyer do?  He writes to the

10   Committee and says, Listen, I've seen this case, *Trump*

11   *versus Thompson*.  I'd like a week extension to study that.

12           What's the issue in that case?  Exactly this

13   issue -- one of the issues.  Again, the Supreme Court took

14   it away from them.  But one of the issues is, Can the

15   current President supersede the former President.  Or I

16   think it's well settled that he or she can.  The question

17   is, Under what circumstances can it be superseded?  And so,

18   again, Bannon is trying to find out.  And in terms of this,

19   Is the guy seriously trying to comply with the law?

20           Look at every communication from Bannon's lawyer

21   to the Committee.  Bannon will comply with the Subpoena if

22   you work out privilege with former President Trump or you

23   take me before a Court and the Court says, This privilege

24   I'm relying on wasn't valid or orders me to testify

25   otherwise.

82

1          So that's why I say it's a principled position.

2     He's offered to comply.  He's not a guy who said, Get lost;

3     I'm not complying, and so on.  He said very specifically, I

4     will comply but my hands are tied.

5          I got myself a little disorganized now trying to

6     skip around to the questions.

7          And again, I know we've made this position to the

8     Court.  I don't know if I've made it clear, but I've tried

9     to make it clear, that in terms of the entrapment by

10     estoppel argument, it doesn't matter whether executive

11     privilege was properly invoked; the question is, Did he have

12     a reasonable belief?

13          And in terms of that argument of whether that

14     would have excused total noncompliance, absolutely.  That's

15     his -- the fundamental underlying principle of Mr. Bannon's

16     understanding and his lawyer's understanding and reasonable

17     belief in then OLC opinions is that it's the underlying

18     principles that make clear that once executive privilege is

19     invoked for communications or deliberations between a

20     President and another person, current employee, former

21     employee, outside advisor, that triggers the whole panoply

22     of rights, duties and obligations that are described in the

23     OLC opinions because they flow from the invocation of

24     executive privilege and separation of powers' concerns and

25     the presumption that privilege is valid once it's invoked;

1    and that executive privilege is different.

2         By the way, Judge, I think -- I mean, there's an

3    additional argument besides just the jury question on the

4    Indictment.  This is not an on-or-about indictment.  This is

5    an indictment' that charges the default on the specific

6    dates, October 14th and by October 18th.

7         There is a legal argument to be made, I believe,

8    that given his willingness to comply now, there can't be a

9    default as a matter of law; and that's based on the conduct

10   that showed that wasn't a drop-dead default date.  It no

11   longer existed as a default date by waiver by conduct.  But

12   it's, at a minimum, a jury question.

13        The *Meadows* and *Scavino* thing, to return to that

14   for a moment, by the way, is also relevant.  I mean, I cover

15   this to some degree, and we cover this to some degree in the

16   motion.  It's relevant because of the -- again, Bannon's

17   underlying belief on the applicability of the OLC opinions.

18   Which I think, by the way, the idea that the Justice

19   Department doesn't consider there to be a distinction

20   between former, current and outside people is also

21   highlighted by the fact that Navarro was indicted.  And

22   that's a sort of backwards way of looking at it.  But I

23   think that emphasizes it.  And some members of Congress have

24   made this statement publicly.  They don't see what the

25   distinction was between Meadows, Scavino, Bannon, Navarro.

84

1              So it's -- I mean, the Court may disagree with me.

2     I understand this.  And I hope, you know, we're going to get

3     a ruling on it today, I'm sure.  But it would be

4     unreasonable for someone to read these opinions, especially

5     a layperson, and not believe -- if you look at all of the

6     reasoning in them and all of the language in them, and not

7     believe that they would apply to a person when executive

8     privilege is involved based -- invoked based on

9     communications with the President or deliberations with the

10    President.  And, you know, Henry Kissinger, again, is one of

11    the best examples I can think of.

12             But certainly the question meets the threshold.

13    I'm -- call me crazy.  I'm shocked that this is a question

14    that we're still dealing with, quite frankly.

15             In the *Picco* case, P-i-c-c-o, there's a real

16    question there whether the regulations the person relied on

17    applied at all or they were outdated regulations and so on.

18    But the Court said this is -- they reversed it and said,

19    This is a question that has to go to the jury --

20             In *Abecassis*, does anybody really believe that

21    that agent gave Abecassis the right to bring in a heroin

22    deal in one town, while telling him about another town?  Was

23    it reasonable to believe in that?  But the error the Court

24    made was in not letting us put on the defense, not letting

25    the jury consider it.  The threshold is just not that high.

85

1    It's not so high that when we see here White House counsel,

2    Cipollone and Purpura, citing to an OLC opinion that deals

3    with Executive Branch advisors, and they're citing it in the

4    context of people never before employed by the Executive

5    Branch, I'd suggest it's not unreasonable for Mr. Bannon to

6    think that those OLC opinions apply also.  (Brief pause)

7    Discussed in the papers, you know, why the *Meadows* and

8    Scavino business would be *Brady* and *Giglio*.

9             And I suppose, you know, if these recent filings,

10   last night's filings, are relevant to this question at all,

11   it is that, again, the government appears to be taking issue

12   through this Justin Clark as to what was invoked, you know,

13   on executive privilege and so on.

14             And so, again, since he uses the same language,

15   were those same questions asked in the *Meadows* and *Scavino*

16   consideration, and the idea that I read in the Twitter post

17   that the government is complaining, through Justin Clark,

18   that there were no assertions as to specific documents and

19   all that, this was a protective assertion; that's recognized

20   as a matter of law.  It's recognized in the OLC opinions, a

21   protected or prophylactic assertion.  And some of the cases

22   say, even before privilege is invoked, if we are dealing

23   with communications, then they could be treated as

24   privileged.  But there is no impediment here or deficiency

25   because it supposedly wasn't specific enough.  Anyway,

1    *Meadows* and *Scavino*, Judge.

2              I think I covered it.  It's not deliberative

3    processes.  It is *Brady* material, potentially.  The fact

4    that executive privilege is invoked in the same manner by

5    the same person and so on is directly relevant to that.

6              Continuance motion, Judge.

7              **THE COURT:**  Thank you, Mr. Schoen.

8              **MR. SCHOEN:**  I was going to get into the

9    continuance motion.

10             **THE COURT:**  Oh, I thought we discussed it.

11             **MR. SCHOEN:**  No, Your Honor.

12             **THE COURT:**  Well, we discussed, at least, the

13   implications of the events over the weekend.

14             **MR. SCHOEN:**  That's right.

15             **THE COURT:**  So I don't think anything is rocket

16   science with respect to your motion, but your argument is --

17             **MR. SCHOEN:**  That might be because I was involved

18   with it, Judge.  I'm not close to a rocket scientist.  I

19   don't think anything I write is.

20             **THE COURT:**  But, I mean, it's not complex.  How's

21   that?

22             The argument, as I understand it is, it's really

23   two things.  One is, there is currently a lot of public

24   information flowing out of the January 6th Committee, and

25   that would be prejudicial to have a trial now.

1      MR. SCHOEN:  And Bannon has been cited, and

2  specifically we have important, I think, facts and specific

3  details about his mentions.  Those mentions are -- those are

4  just mentions of Bannon with respect to the January 6th

5  events, and they skyrocket after the hearings.

6      THE COURT:  How do we know that there won't be

7  similar hearings in October?

8      MR. SCHOEN:  We don't know that.  What we do know

9  is, the hearings are scheduled, publicly announced, for

10  tomorrow and the 14th, and they've said they want to report

11  in the fall.  But the fact that we don't know that they will

12  continue then, I don't think, is a good enough reason.

13  There are fundamental rights of the defendant at issue here.

14      THE COURT:  Why can't I take those

15  considerations -- why isn't the appropriate course to see

16  whether we can, through voir dire, seat a jury that is

17  appropriately unbiased and the like, and if we can't,

18  because of this reason among others, then we would postpone?

19      MR. SCHOEN:  Well, here's an answer in Mr. Justice

20  Jackson's words:  "The naive assumption that prejudicial

21  effects can be overcome by instructions to the jury, all

22  practicing lawyers know to be unmitigated fiction, one

23  cannot assume that the average juror is so endowed with a

24  sense of detachment, so clear in his introspective

25  perception of his own mental processes, that he may

88

1    confidently exclude even the unconscious influence of his

2    preconceptions as to probable guilt engendered by a

3    pervasive pretrial publicity."  That's why, Judge.  We can't

4    weed that out.

5              First of all, people come into a political --

6          **THE COURT:**  So what if the Boston Bomber -- to use

7    an example -- the Boston Marathon Bomber didn't get to move

8    his trial, notwithstanding the unique effects that that

9    conduct had on the City of Boston and the like with all the

10   publicity about both him and the trial, and the judge there

11   didn't move it, and that was not reversed, why is the

12   publicity here substantially worse such that either delay

13   or -- I know you haven't asked to move the trial physically,

14   but why is delay warranted here if not --

15         **MR. SCHOEN:**  I don't think, Judge, that it has to

16   be worse than another case.  I think this case stands on its

17   own facts.  This is the seminal event in the country right

18   now, by design.  I don't -- by design?  They were horrific

19   events that happened.

20             But the design is to influence as many people on a

21   daily basis as possible; that's their stated purpose in

22   hiring a television producer and in conducting these

23   hearings in prime time and otherwise; that's their purpose.

24   To effect potential jurors, anybody and everybody out there,

25   to change their minds for political reasons and others.

1   They've said this publicly.  So that's one thing, Judge.

2            But I think another is this principle.  Due

3   process requires that the accused receive a trial by an

4   impartial jury, free from outside influences.  Given the

5   pervasiveness of modern communications and the difficulty of

6   effacing prejudicial publicity from the minds of jurors, the

7   trial courts must take strong measures to ensure that the

8   balance is never weighed against the accused.

9            And that's the point here, Judge.  There is

10  nothing magic about this block in July, and there are risks

11  that are unique to this block in July.  I mean, Judge Kelly

12  found it.  The Justice Department from a different office,

13  apparently, consented that there was a risk from that.  So

14  why take the risk when we have these fundamental rights at

15  issue?

16            And I'd say this --

17            **THE COURT:**  What's the magic behind October?

18            **MR. SCHOEN:**  Nothing about October, just --

19            **THE COURT:**  What about August?

20            **MR. SCHOEN:**  -- it's just a date.  I mean, if the

21  question is -- I mean, I didn't pick August because August

22  was when the Judge Kelly trial was scheduled, the end of

23  August, and they moved that.  They felt that was still too

24  close in proximity, apparently.

25            So I don't know that there's a magic date but

1    October -- from October on, from what we know now --

2             **THE COURT:** What is it specifically? Is it the

3    fact that there are these hearings that are happening right

4    now on the eve of trial? And how long between those

5    hearings and the trial date is it, in your view, going to

6    cure it? Because there has to be a cure if --

7             **MR. SCHOEN:** Sure. I think that's credible. We

8    picked three months. I think that's a relatively arbitrary

9    date. I don't have any science that show that it would have

10   sufficiently dissipated by then. Based on what we know now,

11   we're willing to accede to the point that that would be a

12   date by which it was sufficiently dissipated.

13             I would say this, Judge, without any commentary on

14   the current players, but I would say a myopic insistence

15   upon expeditiousness in the face of a justifiable request

16   for delay can render the right to defend with counsel an

17   empty formality. A scheduled trial date should never become

18   such an overarching end that it results in the erosion of

19   the defendant's right to a fair trial.

20             If forcing a defendant to an early trial date

21   substantially impairs his ability to effectively present

22   evidence to rebut the prosecution's case or to establish

23   defenses, then pursuit of the goal of expeditiousness is far

24   more detrimental to our common purposes in the criminal

25   justice system than the delay of a few days or weeks that

1    may be sought.

2             I think the overarching principle is, Why now?

3    Yes, we set a trial date of now.  We didn't know any of

4    these factors then.

5             And the other thing, Judge, you know, I understand

6    the government took exception to it because it was raised in

7    a Reply, but we are closer now to the date.

8             I'm saying, Your Honor -- and I don't say this

9    lightly -- I believe firmly that if forced to trial in a

10   week, we would be providing ineffective assistance of

11   counsel to our client.

12            And I say that because today, a week ahead of

13   time, we don't know what defenses are permitted in the case.

14   I don't say this is the Court's doing.  There have been a

15   rash of Motions in Limine, which in my view have been

16   directed towards simply blocking the jury from finding out

17   what actually happened here.  Why did Bannon not comply from

18   Bannon's perspective?  Period.

19            But, anyway, when we develop a defense theory of

20   the case, Judge, that then means plugging in all of the

21   other elements that will be consistent with it from opening

22   to examinations, voir dire, exhibits, witnesses, testimony,

23   exercising the right of compulsory process, exercising the

24   right of confrontation.  We can't do that in a week.

25            Now, sure, we've had time to prepare, but we can't

1    prepare alternate theories, not know which witnesses to

2    prepare and so on.  And we are a week away from trial.

3           The other thing is, Judge, the government has said

4    here they anticipate their case taking one day, their

5    case-in-chief taking one day.  That's not a major lift then

6    to move that trial for that reason alone.

7           **THE COURT:**  Do you have a sense -- I suspect it

8    depends on some of my pretrial rulings, but assuming that

9    they go largely your way, how long would your case be?

10          **MR. SCHOEN:**  We've discussed it at some length to

11   try to give the Court -- we said originally two weeks.  I

12   happen to think that's longer than it will take.  It depends

13   100 percent on the Court's rulings.

14          You know, for example, we will -- we would

15   certainly call Mr. Costello as a witness, and he would

16   testify about the events that happened here.  But there's,

17   you know, got to be significant cross-examination, which

18   will depend, in part, on what issues the Court says can go

19   before the jury.  That cross-examination -- all of these

20   examinations and the development of the theory cannot

21   constitutionally effectively be done on the fly.

22          I am going to say this, Judge, just as an aside.

23   I know I was mocked last time for saying I have some

24   experience with entrapment by estoppel.  But I wasn't led to

25   a government Motion in Limine.  We shouldn't brag to the

1    jury about who we are.  Mine was a response to their

2    arguments on entrapment by estoppel.  I'm not in the habit

3    of blowing my own horn.

4         But I will say this, Judge, I bring

5    ineffectiveness cases against lawyers all around the

6    country, and have for about 30 years.  The number one

7    problem I see is the lawyer's unwillingness before the trial

8    to recognize the problems.  And then the defensiveness and

9    the ego that comes in after the fact in defending practices

10   that clearly were a function of a lack of preparation or a

11   lack of thought.

12        We've worked on this case 8, 10, 12 hours a day,

13   sometimes 20 hours a day.  There's not been a lack of

14   preparation here.  But we can't formulate a cogent defense

15   theory and plug everything else into it a week from now,

16   given the things that are outstanding and that wouldn't

17   change from rulings today.  I have to say that, Judge.  I

18   think I'm duty-bound to say it.  The Court may reject it,

19   but that's my perspective on it.

20        I don't think the Court needs anything else from

21   me.

22        **THE COURT:**  Thank you, Mr. Schoen.

23        **MR. SCHOEN:**  Thank you, Your Honor.

24        **THE COURT:**  Ms. Gaston or Ms. Vaughn?  I am happy

25   to hear from either or both of you.

1        **MS. VAUGHN:**  I will address the arguments defense

2   counsel made, Your Honor.

3        Actually, even though the Motion to Quash is not

4   ours, a couple of evidentiary issues came up during the

5   argument that I think we'd like to address as the

6   government, since they're related to the trial in this case.

7        **THE COURT:**  Sure.

8        **MS. VAUGHN:**  So the Court asked, I think, What

9   would happen if the question was submitted to the jury about

10  whether the rules were followed with respect to someone like

11  Speaker Pelosi?  And so I thought it would be helpful to

12  share the government's view of how that would work.

13       So let's say, for example, Mr. Corcoran cited the

14  rule about whether there was a conferral with a ranking

15  member before a subpoena for deposition testimony.

16       A conferral is the sort of internal rule

17  requirement that could be at issue in a trial.  So if that

18  were an issue, they could present evidence or ask witnesses,

19  Was there a conference between --

20       **THE COURT:**  Are you conceding this is a question

21  for the jury or are you just saying, assuming it's a

22  question for the jury?

23       **MS. VAUGHN:**  Assuming it's a question for the

24  jury.

25       **THE COURT:**  Okay.

1          **MS. VAUGHN:**  Well, I should make clear that we

2    view the question of whether there has to be someone with a

3    ranking minority title as different from whether

4    Representative Cheney as the Vice Chair needed to be

5    notified under the rules that there was going to be a

6    subpoena for a deposition or something like that.

7          **THE COURT:**  Okay.

8          **MS. VAUGHN:**  So let's say that internal rule were

9    at issue.  So Kristen Amerling is testifying.  The defendant

10   is free to ask her, This rule here that requires that notice

11   be sent to all the members, or whatever the rule is, was

12   that followed?  Ms. Amerling, to the extent that she has

13   personal knowledge of something, is a competent witness

14   under the rule so she testifies to that.  Then we get to the

15   end of the case, and it's time to instruct the jury.

16          Because of the Rulemaking Clause, the Court could

17   not submit to the jury the question of whether Ms. Cheney

18   qualifies as a ranking minority member, because the House

19   has spoken on that.  The Court could submit to the jury the

20   question of was she, as the ranking minority member,

21   consulted as required by the rules, whatever that rule might

22   be.

23          So that's how it would actually play out.  And

24   that, I think, is dictated by *Rostenkowski*, where it's the

25   Court deciding if there's ambiguity.  And *Rostenkowski* and

1    *Barker v. Conroy*, I think, is the case.  It's the Court

2    deciding whether there's ambiguity and the Court deciding

3    where the House has spoken on a rule, and then it can't

4    leave to the jury to potentially come up with a different

5    conclusion than what the House has come up with.

6         So when you think about it that way, the defendant

7    can't really show that testimony -- thinking ahead to their

8    request for relief, should it result in a certain way -- the

9    defendant really can't show the testimony they're seeking is

10   materially exculpatory if the witnesses that are already

11   testifying have personal knowledge of what happened.

12        They would have to then somehow not speculatively

13   establish that there was some kind of material difference

14   that that person was going to testify to as to what

15   occurred.  And they just haven't done that.

16        **THE COURT:**  So I guess I'm -- forgive me, maybe

17   I'm missing something.

18        Is it the government's position that I have to

19   decide, because it would be unconstitutional to allow the

20   jury to decide, that a House rule is X, if the House has

21   said it's Y?  And those are legal questions that I cannot

22   leave to the jury.

23        But once I decide what the House rules are or once

24   I decide what constitutionally they have to be deferred to,

25   the jury actually gets to decide whether the rules were, as

97

1    interpreted by me, actually complied with?

2        **MS. VAUGHN:**  Yes.

3        **THE COURT:**  Okay.

4        So what if I -- imagine hypothetically I say that

5    the House has said there has to be some -- I'm struggling

6    with the question that in this case, in the government's

7    view, would go to the jury.

8        **MS. VAUGHN:**  Well, because I think, like, there's

9    just no -- no one disputes that there were nine members on

10   the Committee.  But just to make up a rule -- let's say

11   there was a rule that the Committee has to have lunch, to

12   talk about the testimony, two days before the deposition.

13       Well, that obviously raises more factual questions

14   like, Was everyone at lunch?  Did they discuss the

15   deposition?  There could be factual issues there.  So I

16   think it's just difficult in the rules that the defendant

17   has been challenging here -- which, again, he's waived, in

18   our view but -- because there's just no factual dispute.

19   It's almost like there could be judicial notice of the fact

20   that there's only nine members on the Committee.

21       The problem for the defendant is once -- if he

22   hadn't waived it, the jury would still have to be instructed

23   that you have to accept the House's interpretation of its

24   rule that it's not required to have 13 members.

25       And so if there were a factual question on how

98

1    many members there were on the Committee, they could decide

2    that.  I guess the defendant could still argue to the jury

3    if there's some factual question.

4            **THE COURT:**  I mean, put differently, let's use the

5    inverse of that.  If the rule was clear, unambiguous, and

6    the House had adopted the view that there had to be

7    13 members of the Committee, and there's a factual dispute

8    about whether there were, that would be a jury question?

9            **MS. VAUGHN:**  In the government's view, yes.

10           **THE COURT:**  Okay.

11           **MS. VAUGHN:**  That's the kind of sort of mixed

12   question of law and fact that would go to the jury.

13           **THE COURT:**  Uh-huh.  Yep.

14           Let's go through the -- let's just, really

15   briefly, go through the other alleged rule violations here.

16   Can you just tick through, with each of the alleged rule

17   violations, what the government thinks is the line between

18   the law and the question for the jury?

19           **MS. VAUGHN:**  So we've addressed the number of

20   members.

21           **THE COURT:**  Yes.

22           **MS. VAUGHN:**  The ranking minority member issue.

23           **THE COURT:**  Okay.

24           **MS. VAUGHN:**  So I don't think we -- I mean, we've

25   disclosed in discovery that -- evidence that the

1    consultation requirements were followed, so it's not clear

2    to me that the defendant is challenging that.

3        It seems to be what the defendant is challenging

4    is that Ms. Cheney can't qualify because she's not the

5    ranking minority member.  But I think, as we talked about

6    last time, the House has made clear that its ranking

7    minority member is like a functional title, if not an

8    official title.  So for whatever purposes they need her

9    under the rules, that's what she's doing.

10        And then providing Rule 3b, I think that that's

11    the kind of rule, under *Rostenkowski*, where it's just clear

12    on its face it has to be provided before there's testimony.

13    And the defendant could elicit testimony that he never got

14    it, and the government would obviously offer testimony that

15    it's because he never showed up and that the Committee was

16    prepared to provide it.

17        **THE COURT:**  So let's just use that as an example.

18    If I say the rule required the defendant to be provided, no

19    later than his deposition, with these -- with the piece of

20    paper that says X, Y, Z, then it actually would be a

21    question for the jury what the plan was?

22        **MS. VAUGHN:**  Well, I think in that case, I

23    don't -- that rule, I don't think anyone is arguing there's

24    ambiguity in it.

25        I think the issue with the other --

1          **THE COURT:**  No, it's not about ambiguity.  It's

2    whether it was complied with.

3          **MS. VAUGHN:**  Right.  So whether --

4          **THE COURT:**  The rule could be clear but the

5    jury -- I understand your view to be, You, Judge Nichols,

6    need to decide, What does the rule mean?  Because to allow

7    the jury to have a view different than the House's view

8    would be unconstitutional.

9          I say as to this rule, it required X, whatever X

10    was.  There's a fact question about whether X occurred.

11          **MS. VAUGHN:**  Yeah.

12          **THE COURT:**  And here the X would be, the

13    government's view is, as to this specific rule, the rule

14    allows the provision of this information as late as the day

15    of the deposition.  Imagine I agree with that based on the

16    government's argument.

17          The question, I guess, is -- doesn't the jury then

18    still have to decide, Why was it not provided to Mr. Bannon;

19    and there would have to be some sliver of evidence, at

20    least, in front of the jury about what the House's plan had

21    been?

22          **MS. VAUGHN:**  Yes.

23          So if the defendant wants to challenge being

24    provided -- that he was never provided with it, and there

25    was a factual question about that, of whether they followed

1    the rule, that would be a jury question.

2              **THE COURT:**  Okay.

3              **MS. VAUGHN:**  But, again, this was an issue that

4    was known to him at the time and so under --

5              **THE COURT:**  I understand the view about waiver,

6    yep.

7              **MS. VAUGHN:**  So I say all that because it's kind

8    of looking ahead to when they start to seek a remedy, should

9    the subpoenas be quashed, that there really isn't -- because

10   of the rules that he is arguing are at issue -- there just

11   really isn't the kind of factual question that's going to

12   make any of these witnesses' testimony materially

13   exculpatory to that question that Ms. Amerling and

14   Mr. Tonolli aren't already addressing.

15              I think, as well, just looking ahead, to the

16   extent that the defendant wants to seek this remedy, the

17   government just wants to note -- if the subpoenas are

18   quashed, the government just wants to note to the Court that

19   we think that all can be resolved within a day or two.

20              The defenses and the elements issues have been

21   fully briefed.  We've been arguing them for months.  If the

22   defendant cannot articulate at this point why what he seeks

23   is materially exculpatory, after he's issued the subpoenas,

24   that's not a showing he's going to be able to make.

25              So to the extent that the Court quashes the

1    subpoenas and the defendant wishes to make a motion, the

2    government is happy to come back tomorrow and argue that

3    issue.  We don't think that there's any reason to delay

4    addressing that.

5            **THE COURT:**  What about the general point that

6    Mr. Schoen made, which is there is no magic to July 18th.

7    And to the extent that July is a month where he has -- he,

8    Mr. Bannon -- both particular concerns about publicity and

9    particular concerns about preparation, because there's no

10   magic to July 18th, there's really no reason not to delay,

11   perhaps not for three months, but for some reasonable period

12   of time, just the beginning of trial, almost for reasons

13   altogether unrelated to Mr. Bannon's offer.

14           What is the magic to July 18th?

15           **MS. VAUGHN:**  Well, the magic is that the

16   defendant's not the only one with speedy trial concerns.

17   The public has one too.  And there has to be a basis under

18   the Speedy Trial Act to push this and exclude time.

19           So I'll start with the publicity.  Courts are

20   uniform that a defendant being named in a news article, even

21   a lot, is not sufficient to either move venue or engage in a

22   lengthy continuance.

23           Here the defendant's cited to less than 30 seconds

24   of mentions of him in the hearings.  He has cited in a

25   number of mentions in the media within a day but has

-2980-

1    provided no information about what those mentions are.

2         I mean, the defendant is a public figure.  He

3    seeks publicity himself.  The Court can't just look at a

4    number that the defendant has provided and say, Well, that's

5    clearly pretrial publicity about this case, which is the

6    next issue.

7         The question of whether there's prejudicial

8    pretrial publicity is about whether the publicity is about

9    this case, whether the publicity is aimed at shaping

10   potential jurors' views of this case.

11        The fact that it's not an automatic continuance

12   for actual January 6th defendants, when these hearings are

13   going on, means it is -- it definitely should not be an

14   automatic continuance for someone whose case is sort of

15   ancillary to the subject matter on which the hearings are

16   focused.

17        The cases that Mr. Schoen cited, they all assume

18   that we already have jurors that are prejudiced beyond an

19   ability to be fair.  That is not the kind of publicity

20   that's at issue here, and there's no reason to think that --

21        **THE COURT:**  Okay.  What about their argument that

22   there is a lot going on.  There are lots of motions,

23   including a motion that was filed last night at midnight.

24   And because of that, there's only a week to -- assuming I

25   decide a bunch of motions today, there is only a week to

1    figure out openings and directs and cross and, you know,

2    maybe in a simple case that would be enough but in a

3    difficult, complicated case, that's not enough.  And, again,

4    there is no magic to July 18th.  What's your response to

5    that?

6           **MS. VAUGHN:**  Your Honor, my response is that the

7    defendant purposefully manufactured this.  He requested this

8    schedule.  In his initial request, he didn't want any of the

9    Motions in Limine to be filed until the later date on which

10   we filed them.

11          **THE COURT:**  But to be fair, to go back to the

12   original discussion about scheduling, the government wanted

13   to move faster, and Mr. Bannon wanted to move more slowly.

14   And I didn't, like, split the baby so to speak, just to

15   split the baby.  But I arrived on this date, which was

16   faster than Mr. Bannon had requested originally.  He wanted

17   a later trial date.

18          **MS. VAUGHN:**  Mr. Bannon has provided us his

19   witness list.  We've done our jury instructions.  We've

20   exchanged objections to witnesses.  We've exchanged

21   potential voir dire.

22          They -- they're experienced attorneys, Your Honor,

23   and this claim that they haven't been planning for

24   contingencies, the government just doesn't find credible.

25   To the extent that the Court is entertaining this, we submit

1    that the Court should engage in a questioning, in camera,

2    with defense counsel to evaluate exactly what it is they

3    don't think that they have done, that they have to do, to

4    provide effective assistance.

5          This claim is coming at the end of filing a Motion

6    to Continue for Pretrial Publicity, a motion to -- a

7    suggestion to this Court that they also wanted to continue

8    at some point to build their legislative purpose record, a

9    suggestion now in that the motions schedule they requested

10   isn't working for them, and a last-minute effort to comply

11   with the Subpoena.

12         It's just not -- I understand the defense has to

13   advocate for their client.  Their client doesn't want to go

14   to trial.  But it's just very telling that they are making

15   this claim at noon on Monday after they've had argument on

16   all of these other issues.

17         So the government would submit that at least the

18   Court should inquire as to specifically what it is they

19   think they still need to do.  And, again, balance that

20   against -- especially if the defendant -- all these

21   extraneous defenses are excluded, the issues in this case,

22   as they should be, are very narrow.  It's about whether he

23   got a subpoena, whether he knew about it and whether he

24   showed up when he knew he was supposed to be there.  Which I

25   can go to the Motion to Exclude and the *Meadows/Scavino*

1    issue from there.

2        **THE COURT:** Sure.  Briefly.  I have the arguments

3    so I don't think you need to --

4        **MS. VAUGHN:** One thing I just want to point out is

5    the Court asked Mr. Schoen how executive privilege

6    independently provides a defense to this case, and

7    Mr. Schoen only just kept citing back to DOJ opinions.  But

8    DOJ opinions, one, they don't provide an excuse but even if

9    they did, they're not the law.  And he has not shown that

10   under the law executive privilege provided a basis for total

11   noncompliance.

12       They talk a lot about showing up for testimony.

13   What they don't talk about is the document demand.  How are

14   communications with the Proud Boys and the Oath Keepers

15   possibly relevant to executive privilege?  How are

16   communications on his podcast possibly relevant to executive

17   privilege?  They don't address any of that.

18       So to the extent that they now are making an

19   independent claim that this case should be dismissed based

20   on executive privilege, the law just simply isn't that broad

21   when it comes to executive privilege.

22       I have to go back to the entrapment by estoppel

23   point one more time, because Mr. Schoen continually just

24   discusses about how he had a reasonable belief, reasonable

25   belief, reasonable belief.  He completely ignores the first

1    element that there has to be an affirmative statement.  The

2    government submitted with its proposed jury instructions an

3    example instruction out of the Ninth Circuit.  There are

4    several others.

5         It is not just the defendant's reasonable belief;

6    that's a mistake of law defense.  It is, There has to be an

7    affirmative statement.  And this notion that a defendant can

8    piece together statements that he's pulled out of five

9    different documents is just completely without limit.

10        I don't see why any defendant couldn't find some

11   20-year-old pleading and say, Well, I read this line out of

12   a pleading.  I therefore have an entrapment defense.  The

13   defendant just keeps ignoring that requirement and has not,

14   to this day, identified a single statement, which is why he

15   can't even begin to show that the *Meadows* and *Scavino* issues

16   are relevant.

17        I think, unless the Court has anything else,

18   that's everything.

19        **THE COURT:**  Thank you, Counsel.

20        Mr. Corcoran, briefly.

21        **MR. CORCORAN:**  Yeah, 30 seconds on the rulemaking

22   issue.  And this may be self-evident, but the suggestion was

23   that the jury would have some sort of a view on the House

24   Rules that would somehow create an unconstitutional conflict

25   with what's been expressed as the House of Representatives'

1    position on the meaning of the Rules; that's not going to
2    happen.

3        There's a jury verdict form that's going to have
4    two questions:  Guilty or not guilty on Count 1 and Count 2.
5    We don't impeach the verdict of the jury.  Whatever their
6    verdict is in the case, it is not going to be a statement on
7    what the meaning of the House Rules are, and so there could
8    never be a constitutional violation based on that.

9        **MR. SCHOEN:**  (Inaudible)

10       **THE COURT:**  Okay.  Mr. Schoen?

11       **MR. SCHOEN:**  The idea that we should move forward
12   because we provided our witness and exhibit list is just an
13   outrageous statement to make.  The government was told
14   clearly, and we filed in our papers, that we're not in a
15   position to make out an exhibit or witness list.

16       The government filed this motion to file
17   separately.  It's true.  It is misery for us to have to deal
18   with them in this meet and confer process.  It is misery.
19   But the Court ordered us to do it, so we crafted together a
20   potential witness and exhibit list while reserving the
21   rights.  It's outrageous to say that's a reason to move
22   forward because we provided it.  That's just not honest.
23   It's not honest to say we haven't identified a single OLC
24   opinion that we've relied on.  They say two things --

25       **THE COURT:**  No, I understand your argument there.

1    I get it.

2           **MR. SCHOEN:**  Okay.  Yeah.  And the last thing is I

3    don't know what argument they're saying we're making Monday

4    at noon.  We said in our papers why we can't be prepared for

5    this thing.  It's not -- I understand.  They would like to

6    go to trial, you know, November 13th last year if they

7    could.

8           But we have an obligation to our clients, and we

9    have an obligation to the Constitution.  And the

10   Constitution provides for fair trial rights and the right to

11   effective assistance of counsel, and we have the obligation

12   to speak up otherwise.

13          So all of this, you know, casting it off.  I don't

14   know what it takes.  I don't know what could happen here,

15   what they need this for.  A lot of it; that's what we need.

16   They want to know what we need specifically, we need to know

17   what defenses we're going to have and then build a case

18   around that.  We need to know all of the outstanding things

19   that are pending before the Court.  And, again, we don't sit

20   at home doing modeling, Well, let's plan a defense and then

21   jump into action depending on what that's going to be.

22          It's simply not fair.  Believe me, I don't say it

23   lightly when I have to say publicly we cannot provide

24   effective assistance of counsel.

25          Thank you, Your Honor.

1                  **THE COURT:**  Thank you, Mr. Schoen.

2                  I'm just looking at the clock.  My goal is today

3       to resolve orally at least a number of the pending motions.

4       I would like some time to reflect upon what I've heard this

5       morning.

6                  I think the most appropriate course is to

7       reconvene at 2 p.m., but it need not be in person.  That is

8       to say, I am happy to -- if people have things they need to

9       do or would rather not stick around in the courthouse for an

10      hour and 20 minutes and the like -- do this by phone if

11      people would prefer, because I don't intend to have anymore

12      argument on the questions that I'll be resolving.  I suppose

13      there may be some issues we should be discussing, but it

14      could be done as well by phone.

15                 So I guess I'm willing to either come back into

16      the courtroom and for people who would rather just listen by

17      phone to open a public line or I'm willing to just do it by

18      phone, if that's everyone's preference.  I am open to

19      either.

20                 Ms. Vaughn?  Ms. Gaston?  Do you have a view?

21      Would you rather just do it by phone?

22                 **MS. VAUGHN:**  We're fine to come back in person,

23      Your Honor.

24                 **THE COURT:**  Okay.  Counsel?

25                 **MR. SCHOEN:**  In person, Your Honor.

1          **THE COURT:**  All right.  So let's do that then.

2          Why don't we make it 1:30?  I was thinking 2:00

3     only because, if we were going to do it by phone, then I

4     would be keeping people around for less time, but 1:30 means

5     50 minutes from now.  So let's do that.  Let's go to a

6     recess.  I'll come back at 1:30 and issue an oral decision

7     on these questions.  Thank you.

8          **DEPUTY CLERK:**  All rise.

9          (Court recessed from 12:44 p.m. until 1:35 p.m.)

10         **DEPUTY CLERK:**  We are now back on the record.

11         **THE COURT:**  Thank you, Ms. Lesley.

12         Thank you for the argument this morning, Counsel,

13    and for all of the briefs that have been filed on all of the

14    pending motions.

15         Before me are multiple motions from two related

16    matters.  Obviously, *United States versus Bannon*, but also

17    *In re Nonparty Subpoenas*, the miscellaneous action filed to

18    quash the  subpoenas to various House members and staff.  I

19    will resolve all or at least a number of the pending motions

20    today.

21         A number of those motions turn on three key issues

22    in this case.  The first is the mens rea required for a

23    violation of the statute.  That is, what does it mean to

24    willfully make default?  The second is whether Mr. Bannon

25    can present to the jury his affirmative defenses of

1    entrapment by estoppel or public authority.  And the third

2    is whether and to what extent Mr. Bannon can present his

3    claims that the Select Committee or at least the Subpoena

4    issued to him is not in compliance with the House Rules.

5           I'll discuss each of those three sort of

6    overarching issues in turn, along with how, in my view, the

7    resolution of those questions resolves the pending motions.

8    So, as I indicated, the first question is what does the mens

9    rea willfully in 2 U.S. Code, Section 192 mean?  That is,

10   what does it mean to willfully make default?

11          In their proposed jury instructions and various

12   briefs, the parties present very different definitions of

13   willfully.  The government argues that it means deliberate

14   and intentional.  The government contends that willfully

15   "does not mean that the defendant's failure or refusal to

16   comply with the Select Committee Subpoena must necessarily

17   be for an evil or bad purpose.  The reason or purpose of

18   failure or refusal to comply is immaterial so long as the

19   failure or refusal was deliberate and intentional and was

20   not a mere inadvertence or accident."

21          Mr. Bannon, on the other hand, as we discussed

22   earlier, argues that to prove he acted willfully, the

23   government must show that he "was conscious of wrongdoing."

24   He argues therefore that it must be shown that he "acted on

25   his own volition and knew or should reasonably have known

1    that his conduct was unlawful."

2            Thus, in his proposed jury instruction, Mr. Bannon

3    proposes that the Court instruct the jury that willful

4    default "means that Mr. Bannon knew or should reasonably

5    have known that his conduct was unlawful, was conscious of

6    wrongdoing, and that his actions were deliberate and

7    intentional and not the result of accident, mistake or

8    misunderstanding or the assertion of a valid privilege."

9            In my view the precedent from the Court of Appeals

10   and the Supreme Court on this question is unequivocal and on

11   point.  In order to demonstrate that Mr. Bannon acted

12   willfully, as that term is used in Section 192, the

13   government need only prove beyond a reasonable doubt that

14   Mr. Bannon acted deliberately and intentionally in failing

15   to comply with the Subpoena.

16           As the Court of Appeals explained in *Licavoli*, "It

17   was established by the *Bryan* and *Fleischman* cases that he

18   who deliberately and intentionally fails to respond to a

19   subpoena willfully makes default.  Evil motive is not a

20   necessary ingredient of willfulness under this clause of the

21   statute.  A deliberate intention not to appear is

22   sufficient."

23           It was established by the *Quinn* case that a

24   deliberate intentional refusal is an element of the offense

25   of refusing to answer a pertinent question under the other

1    clause of the statute.  We discussed this in *United States*

2    *versus Deutch*.  So it is established that the intent

3    essential to constitute an offense under these two clauses

4    is the same in nature of deliberate, intentional failure

5    without more, in each case.

6              And there are other relevant quotes.  I'll just

7    read one more.  "It has been established since the *Sinclair*

8    case that reliance upon advice of counsel is no defense to a

9    charge of refusing to answer a question.  Such reliance is

10   not a defense to a charge of failure to respond.  The

11   elements of intent are the same in both cases.  All that is

12   needed in either event is a deliberate intention to do the

13   act.  Advice of counsel does not immunize that simple

14   intention.  It might immunize if evil motive or purpose were

15   an element of the offense, but such motives or purpose is

16   not an element of either of these offenses.  We are of

17   opinion that the doctrine laid down in *Sinclair* applies also

18   to a charge of willfully making default.  Advice of counsel

19   cannot immunize a deliberate intentional failure to appear

20   pursuant to a lawful subpoena lawfully served."

21             And then it goes on to summarize the holding,

22   which I think is important here.  In the case at bar there

23   can be no serious dispute about the deliberate intention of

24   *Licavoli* not to appear before the Committee pursuant to its

25   subpoena.  That he meant to stay away was made abundantly

1    clear.  That he did so upon the advice of a lawyer is no

2    defense.  The trial judge correctly instructed the jury.

3         And it's worth noting that the arguments made by

4    Mr. Licavoli in that care are much the same as Mr. Bannon's.

5    And again, to quote the *Licavoli* decision, *Licavoli*'s

6    principal point here is that the trial judge erred in

7    refusing to instruct the jury that if the accused acted upon

8    the advice of counsel, they should acquit.

9         Indeed, the judge instructed to the contrary.  The

10   Court of Appeals, of course, concluded that this contrary

11   instruction was proper.  These are clear and express

12   holdings that, in my view, are binding here.

13        As I've stressed many times, I have serious

14   reservations that the Court of Appeals' interpretation of

15   willfully is consistent with the modern understanding of the

16   word.  It's not consistent with modern case law surrounding

17   the use of that term, let alone the traditional definition

18   of the word.  But as I've previously held and I reiterate

19   again today, I am bound by *Licavoli* and its holdings.

20        So what does that mean for the pending motions?

21   First, as I've previously held, Mr. Bannon cannot present

22   evidence that he relied on advice of counsel as the reason

23   for declining to appear or produce documents.  The same goes

24   with the OLC opinions and other DOJ writings.

25        Mr. Bannon cannot present evidence regarding those

1    documents to demonstrate that he believed he was not

2    required to comply with the Subpoena, since that question is

3    irrelevant to whether Mr. Bannon deliberately and

4    intentionally failed to comply with the Subpoenas.  So too

5    with his assertions of privilege.  As a general matter, none

6    of that evidence can justify his failure to appear or

7    produce documents under *Licavoli*.

8            But that does not necessarily mean that all

9    evidence covered by the government's motions is irrelevant.

10   In my view, Mr. Bannon is entitled to offer evidence that

11   would tend to show he was not aware of the return date on

12   the Subpoenas, for example, or that he did not otherwise

13   intentionally fail to comply with them for a similar reason.

14           For such evidence to be relevant, however,

15   Mr. Bannon would need to demonstrate at trial that such

16   evidence would tend to establish that his failure to appear

17   or produce documents was either not deliberate or not

18   intentional, as the Court of Appeals has used those terms.

19   If Mr. Bannon cannot make such a proffer with some showing

20   that would tend to go to his mens rea so defined, then the

21   evidence would be altogether irrelevant and excluded.

22           Take an example:  If Mr. Bannon were to introduce

23   evidence at trial that he did not believe that the date for

24   complying with the Subpoena was the operative one, that

25   evidence would likely be admissible.  After all, Rule of

1    Evidence 401, which renders evidence relevant, unless

2    admissible under Rule 402 -- excuse me.

3            After all, Federal Rule of Evidence 401 renders

4    evidence relevant if it has any tendency to make a fact more

5    or less probable than it would be without the evidence and

6    the fact is of consequence in determining the action.

7            I note that this is not a method through which

8    Mr. Bannon can argue that he thought, for example, that he

9    was legally excused from responding to the Subpoena or that

10   the Subpoena was invalid, be it from the composition of the

11   Select Committee or some other alleged flaw.

12           Such arguments would not go to any aspect of

13   willfully, as the Court of Appeals has defined it.  It would

14   not show that the failure to attend was not deliberate and

15   intentional.  Thinking one is legally excused from

16   responding to a subpoena or that a subpoena is not valid is

17   not the same as thinking that the date had been put on hold.

18   While such evidence, that is, thinking that one is legally

19   excused from responding to a subpoena or that a subpoena is

20   not valid would be admissible under a more common

21   understanding of willfully, that is not the operative one

22   here.

23           So to the specific motions, the government's

24   Motion in Limine to Exclude Evidence of Department of

25   Justice Subpoenas and Writings, ECF No. 52, is granted in

1  part and denied in part.

2        This evidence is excluded to the extent that

3  Mr. Bannon would offer it to show that he was legally

4  excused from responding to the Subpoena or that he believed

5  that he was; that the Subpoena was invalid or he believed it

6  was; or that he was not otherwise required to respond to it.

7        But such evidence might, and I stress might, be

8  relevant if Mr. Bannon was prepared to offer evidence that

9  he did not think the date on the Subpoenas was operative.

10  It might be that Mr. Bannon cannot proffer that he intends

11  to introduce such evidence.  If not, then this evidence

12  would be entirely irrelevant and excluded.

13        But before such a proffer is made or not, and I

14  will not require Mr. Bannon to make one before trial begins,

15  granting this motion in its entirety is premature.  I do

16  note, however, that this decision says nothing about whether

17  such evidence -- talking about the evidence covered by the

18  government's motion, ECF No. 52, can be introduced to

19  support an entrapment by estoppel or other affirmative

20  defense, which I will discuss later.

21        Next is the government's Motion in Limine to

22  exclude evidence of the defendant's prior experience with

23  subpoenas, ECF No. 56.  I will also grant this motion in

24  part and deny it in part as well.

25        To the extent that Mr. Bannon would attempt to

1    introduce such evidence for the purposes of explaining that

2    he did not think he had to comply with the Subpoena or that

3    his understanding of privilege exempted him from following

4    the Subpoena's commands, then it cannot be admitted.

5         Again, if Mr. Bannon can proffer that he intends

6    to show that he did not believe the return dates on the

7    subpoenas were operative, perhaps because his prior

8    experience led him to believe that the return date had been

9    or maybe would be moved, then the evidence may be relevant.

10        I stress, once again, however, that such evidence

11   is only relevant so long as it would go to one of the narrow

12   aspects of mens rea element so defined by the Court of

13   Appeals.  If Mr. Bannon cannot proffer that he would intend

14   to make that showing, this evidence would be entirely

15   irrelevant.

16        These thoughts also resolve one part of the

17   government's omnibus Motion in Limine, ECF No. 85, Section

18   I.F of the Omnibus Motion seeks to exclude testimony from

19   defense counsel based on their "claimed experience."  Again,

20   that motion is granted in part and denied in part or that

21   portion of the motion.

22        The motion is granted to the extent that such

23   testimony would be offered to show that the advice that

24   counsel gave Mr. Bannon included that he had a justification

25   not to comply with the subpoenas.  To the extent it tries to

1    show that privilege or OLC documents justified Mr. Bannon in

2    not complying or to the extent that it was offered to show

3    that the subpoenas were invalid, or to the extent that this

4    testimony might shed light on Mr. Bannon's subjective belief

5    as it relates to the narrow mens rea requirement.  If, for

6    example, counsel had told Mr. Bannon that they were in

7    negotiations with the Select Committee, and that the date on

8    the subpoenas was no longer the operative one, then the

9    evidence might be relevant.

10           In light of what I've just said, it's also worth

11    clarifying, if necessary, my previous order, ECF No. 49, on

12    the United States' Motion in Limine to Exclude Evidence or

13    Argument Relating to Good-Faith Reliance on Law or Advice of

14    Counsel, which was ECF No. 29.

15           To the extent that Mr. Bannon seeks to argue that

16    his failure to comply with the Subpoena should be excused

17    because he relied in good faith on the advice of his

18    counsel -- and thus that he did not comply with the Subpoena

19    because he did not think it was valid as it applied to him

20    or he had a justification for not doing so -- such evidence

21    is clearly irrelevant in light of *Licavoli*.

22           But as I just noted, to the extent that

23    discussions with counsel might go to Mr. Bannon's subjective

24    belief about whether the date on the subpoenas was

25    operative, that evidence could be relevant.  Advice of

1    counsel that the Subpoena was invalid or that he was excused

2    from attending, of course, would remain barred.

3              It's worth repeating, again, how relatively low

4    the bar is for satisfying the mens rea of the statute.

5    Under *Licavoli*, which binds me, the only question is whether

6    the failure to appear was deliberate and intentional and not

7    due to inadvertence or accident.

8              If evidence is irrelevant to that question, if,

9    for example, it doesn't go to the question of whether

10   Mr. Bannon understood the date for compliance with the

11   Subpoena or something similar, then it is inadmissible.

12             I do want to reiterate my concerns with the mens

13   rea standard as held by *Licavoli*.  Evidence regarding the

14   reasons that Mr. Bannon did not comply with the Subpoena

15   here, for example, because he didn't believe the Subpoena

16   was valid or because he was -- he believed he was legally

17   excused from showing up as a result of the former

18   President's implication of executive privilege or because he

19   relied on his lawyers' advice on these topics, these are

20   relevant to the criminal charges here and therefore

21   inadmissible.

22             Such evidence would likely be admissible, however,

23   under a different definition of willfully.  It's likely, for

24   that reason, this dynamic created by this low bar of

25   willfully, I think is one reason that Mr. Bannon may seek to

1    introduce this evidence through the affirmative defenses of

2    entrapment by estoppel and public authority, which I will

3    discuss now.

4            So, as I indicated, the second sort of

5    overarching, relevant issue is whether the affirmative

6    defenses of entrapment by estoppel or public authority can

7    go to the jury.  I conclude that they cannot.

8            Begin with the defense of entrapment by estoppel.

9    As I explained at the June 15th hearing, none of the OLC

10   opinions or other DOJ statements concern a situation

11   involving communications by a nongovernment employee with

12   the President who, at the time of the Subpoena, was no

13   longer in office.

14           That dooms any invocation of entrapment by

15   estoppel.  While neither the Supreme Court nor the D.C.

16   Circuit has laid out the precise elements required by this

17   defense, I agree with the following statement from the

18   Eighth Circuit.  "Entrapment by estoppel arises when a

19   government official tells a defendant that certain conduct

20   is legal and the defendant commits what otherwise would be a

21   crime in reasonable reliance on that official

22   representation."

23           That's the *Peithman* case, 917 F.3d at 648.  So

24   assuming that this defense could even extend to documents,

25   like OLC opinions -- and I do believe the government

1    appeared during the last hearing to concede that it could,

2    none of the documents Mr. Bannon points to deals with his

3    situation specifically, and none of them is equivalent

4    therefore to a government official telling him that his

5    conduct is legal such that the government would be estopped

6    from pursuing the charges here.

7         At best, Mr. Bannon can draw inferences from the

8    opinions to his situation combining the underlying legal

9    principles from those opinions to the specific factual

10   situation here.

11        But because none of those opinions deals with this

12   precise factual situation, none standing on its own could

13   guide his decision.  Entrapment by estoppel requires a much

14   more precise showing than one by inference, and there are a

15   number of cases to that effect, including *United States*

16   *versus West Indies Transportation*, 127 F.3d 299, Third

17   Circuit.  So too here.

18        While the OLC opinions might, by their own terms,

19   apply to somewhat similar situations, they do not cover the

20   precise one here.  Because of that, I will not instruct the

21   jury on this defense.  And since I will not instruct the

22   jury on this defense, any evidence related to it is

23   irrelevant.

24        Turning next to the defense of public authority.

25   Again, the D.C. Circuit has not laid out the precise

124

1      contours of this defense.  But I agree with the Eleventh

2      Circuit that: "A defendant may assert a public authority

3      affirmative defense when he has knowingly acted in violation

4      of federal criminal law but has done so in reasonable

5      reliance on the authorization of a government official."

6      That's the *Alvarado* case, 808 F.3d 474, Eleventh Circuit

7      2015.

8               The Court went on to say, "The public authority

9      defense is narrowly defined, however, and a defendant will

10     not be allowed to assert the defense or to demand that the

11     jury be instructed on it unless he meets certain evidentiary

12     prerequisites.  First, as the name of the defense implies, a

13     federal law enforcement officer must have actually

14     authorized the defendant to commit the particular criminal

15     act at issue, and the defendant must have reasonably relied

16     on that authorization when engaging in that conduct.

17              "Second, the government official, on whom the

18     defendant purportedly relied, must have actually had the

19     authority to permit a cooperating individual to commit the

20     criminal act in question.  If, contrary to the defendant's

21     genuine belief, the official possessed no such authority,

22     then the public authority defense cannot be asserted."

23              As I understand it, Mr. Bannon seeks to base this

24     defense not on the OLC opinions or not specifically but also

25     at least on the instructions on former President Trump.  The

-3002-

1    former President, in his civilian capacity, is by definition

2    not a federal official.  This defense simply does not fit

3    the circumstances of this case.

4            Especially true, given under these circumstances,

5    the former President never instructed Mr. Bannon to not show

6    up altogether.  The letter from President Trump's counsel,

7    on which Mr. Bannon relies, instructed Mr. Bannon to, "(a)

8    where appropriate, invoke any immunities and privileges he

9    may have from compelled testimony in response to the

10   Subpoena; (b) not produce any documents concerning

11   privileged material in response to the Subpoena; and (c) not

12   provide any testimony concerning privileged material in

13   response to the Subpoena."

14           President Trump's counsel later clarified in an

15   email to Mr. Bannon's counsel that, "Just to reiterate, our

16   letter referenced below didn't indicate that we believe

17   there is immunity from testimony for your client."  The

18   lawyer continued, "As I indicated to you the other day, we

19   don't belief there is."

20           I will therefore not instruct the jury on a

21   defense of public authority, and I will exclude the evidence

22   that would go to that defense.  It is also worth noting

23   Mr. Bannon seeks to have me instruct the jury on the defense

24   of apparent authority, which I will not do, because the

25   defense has never been authorized in this or any other

1   circuit.

2            I'm repeating myself to some extent, but it is

3   worth acknowledging that this outcome, together with my

4   decisions relating to willfulness, might seem anomalous.

5   After all, it seems like the jury should hear the

6   defendant's side of the story that, for example, he was

7   acting on advice of counsel about OLC opinions or that he

8   thought that his conduct was consistent with the former

9   President's invocation of executive privilege.

10           But this evidence cannot establish the affirmative

11  defenses of entrapment by estoppel or actual authority.

12  Instead, those defenses are something of a round hole into

13  which Mr. Bannon seeks to fit evidence that would be more

14  naturally relevant to determining whether his alleged

15  noncompliance was willful.  But, again, *Licavoli* makes such

16  evidence irrelevant.  So the government's motion as to the

17  defenses of entrapment by estoppel and public authority is

18  granted.

19           The third major issue relates to whether and to

20  what extent questions regarding whether the Select Committee

21  is operating consistent with House Rules are questions for

22  the jury.  Mr. Bannon has raised challenges to the

23  composition of the Select Committee as well as particular

24  challenges to the alleged failure of his subpoena to comply

25  with certain House Rules.  Many were presented in his Motion

1    to Dismiss the case.  But as I explained at our last

2    hearing, those arguments did not warrant dismissal of the

3    Indictment.

4        The question now is whether these arguments go to

5    issues that must be decided by the jury.  As an initial

6    matter, I conclude that they are not relevant to an element

7    of the offense.  Rather, Mr. Bannon's challenges, based on

8    noncompliance with House Rules, are best characterized as

9    defenses to the charge at issue.

10       I think that's the clear implication in *United*

11   *States v. Bryan*, and it would be odd at the very least to

12   say that something can be waived.  And it is the case that

13   challenges to House Rules can in certain circumstances be

14   waived.  It would be odd to say that something that can be

15   waived is an essential element of the defense.

16       But as I discussed, Supreme Court precedent on

17   this matter is clear, challenges to a committee's failure to

18   comply with House Rules can be waived.  And the Supreme

19   Court has stated in other cases that rules, compliance

20   challenges, are defenses not elements of the offense.  For

21   example, in *Yellin*, at 374 U.S. at 123, the Court stated

22   that the defendant, "would be entitled to acquittal were he

23   able to prove his defense."

24       In my view, therefore, compliance with the House

25   Rules is not therefore an element of the offense.  But can

1    Mr. Bannon present these defenses and evidence regarding

2    them to the jury?

3            As the Court of Appeals has made clear, a

4    defendant may only present a defense to the jury "if the

5    record contains sufficient evidence from which a reasonable

6    jury could find for the defendant on his theory."  That's

7    *Akhigbe,* 642 F.3d at 1083.  I conclude that, for the most

8    part, this evidence is excludable and will not be presented

9    to the jury for two different though somewhat related

10   reasons.

11           First, Mr. Bannon has waived his arguments, at

12   least some of them.  The Supreme Court held in several

13   decisions in the 1950s and 1960s that claims that a

14   congressional committee is in violation of a rule -- and

15   therefore defenses based on such alleged violations -- can

16   be waived by failing to make them to the Committee.

17           As the Supreme Court put it in *United States

18   versus Bryan*, "if respondent had legitimate reasons for

19   failing to produce the records, a decent respect for the

20   House of Representatives by whose authority the subpoenas

21   issued would have required that she state her reasons for

22   noncompliance upon the return of the writ."

23           As the *Bryan* Court continued:  "To deny the

24   Committee the opportunity to consider the objection or

25   remedy is in itself a contempt to its authority and an

1    obstruction of its process."

2        As the Court of Appeals explained in *Shelton*,

3    "Contempt which might be avoided if valid and timely

4    objection is made and denied is not avoided by refusing to

5    produce what one lawfully could not be required to produce

6    if such objection had been made and denied."  And the

7    Supreme Court reiterated the *Bryan* rule a decade later in

8    the cause of *McPhaul versus U.S.*, 364 U.S. 372.

9        To be sure, the Court in *Bryan* did note that the

10   alleged defect there, the alleged lack of quorum, "was one

11   which could easily have been remedied."  That's a quote.

12   And here the alleged rule violations that Mr. Bannon points

13   to are ones that would not be so easily remedied.  But even

14   *Bryan* itself seemed to walk away from a suggestion that

15   waiver occurs only with respect to rules/violations that are

16   easily remedied.

17       To take a hypothetical the Court itself offered:

18   "Suppose one who has been summoned to produce papers fails

19   to deliver them as required but refuses to give any reason,

20   may he defend a prosecution for willful default many months

21   later on the ground that he had not been given a sufficient

22   time to gather the papers?  We think such a contention

23   hardly tenable."

24       Courts have suggested that such defenses are not

25   waived when the claimed violation of the rules could not

1    have been known by the subpoena recipient at the time.  As

2    the Court of Appeals has phrased it, "the objection which

3    the Court held should have been raised was one which the

4    witness had fully perceived at the time he appeared." That's

5    *Liveright*, 347 at 475.

6         But here, there's no serious argument that

7    Mr. Bannon could not have known of the alleged rules

8    violation he now points to.  The composition of the Select

9    Committee, the alleged lack of a ranking minority member and

10   the like were publicly known and discussed and was readily

11   available to Mr. Bannon as an objection at the time as they

12   are now.  Mr. Bannon "had reason to be aware," in the

13   language of *Liveright* of, these violations.

14        I indicated there were two reasons that I think

15   most of this evidence is excluded.  And the second is,

16   waiver aside, as the government has correctly argued, the

17   question of what the House Rules require is a legal

18   question.  That includes the question of whether a

19   particular rule is ambiguous and whether the House has taken

20   a view on a particular rule.

21        So those are questions what I must resolve as a

22   legal matter.  And I conclude that the rules Mr. Bannon

23   alleges violations of were, at a minimum, ambiguous and the

24   House has indicated its views of those rules.  In other

25   words, I must defer to the House's own interpretation of its

1    rules.  Any other rule, a rule that would allow me or the

2    jury to second guess the House's own view of the meaning of

3    its own rules and resolutions, would raise serious

4    separation of powers concerns.

5          The Rulemaking Clause vests exclusive control over

6    the House's rules with the House.  As it says, "Each House

7    may determine the rules of its proceedings."  To allow a

8    jury to say that the House's rules mean something different

9    than the House understands them would be to wrest that

10   Constitutionally-prescribed power from the Legislative

11   Branch and to bring it into the Judicial Branch.  Thus,

12   separation-of-powers concerns require me to decide these

13   questions as a matter of law and to defer to the House on

14   its own interpretations of its rules.

15         I conclude that, as to almost all issues, the

16   House's rules were -- or that Mr. Bannon could not present

17   evidence that the House's rules were not complied with.  By

18   making several contempt referrals to the Department of

19   Justice and in various briefs it is filed in this court,

20   including in this case, the entire House has, on multiple

21   occasions, ratified that the Committee is validly

22   constituted and operating.  That really resolves questions

23   about the number of members and whether Ms. Cheney is acting

24   as the ranking minority member.

25         But as we discussed earlier, if there is some rule

1    on which the House's view is apparent but a factual dispute

2    about whether that rule was complied with, that might be an

3    appropriate question for the jury.  If, for example, the

4    House rule required Mr. Bannon to be provided with

5    information before his deposition began but a question about

6    whether it did so, including the question of whether the

7    Committee intended to give Mr. Bannon that information on

8    the day of his deposition, in that context the jury might

9    need to reach that mixed question of law and fact.  But as I

10   understand it, there is not really such a defense pending

11   before me.

12        I therefore conclude that rules-based objections

13   to the composition of the Select Committee are not an

14   element of the charge but are a defense.  And subject to the

15   kind of rules-based defense being presented at trial that

16   includes an open question of fact, such evidence is excluded

17   from the trial here.

18        Note, however, this is a separate question from

19   whether the Select Committee has a valid legislative

20   purpose.  As I've previously indicated, that is a question

21   of law that the Court of Appeals has already answered in the

22   affirmative.

23        So how does that leave us on some of the other

24   pending motions?  The first is the government's Motion in

25   Limine to Exclude Evidence Relating to Objections to

1     Subpoena that Defendant Waive; that's ECF No. 53.  For the

2     reasons discussed, I'll grant this motion.

3             The defenses discussed in that motion that

4     Mr. Bannon might wish to raise were ones that he either was

5     or reasonably should have been aware of at the time of his

6     alleged noncompliance.  Since he did not communicate these

7     objections to the Select Committee at the time, I must

8     conclude that the defenses are waived.  In any event, such

9     evidence is irrelevant to questions that will go to the

10    jury.

11            As to Section II.A of the government's Omnibus

12    Motion in Limine, the government contends that the Select

13    Committee's constitutional and statutory legitimacy are not

14    factual questions for the jury.  They seek to exclude

15    evidence relating to them as a result.  The government is

16    correct, at least as the issues discussed in that motion.

17            Whether the Select Committee has a valid

18    legislative purpose is a pure question of law, one that the

19    Court of Appeals has endorsed, Mr. Bannon cannot offer

20    contrary evidence to this point.  It's a question of law

21    that won't go to the jury.  And I've already discussed the

22    questions about the Select Committee's compliance with House

23    rules.  Therefore, part II.A of the government's omnibus

24    Motion in Limine is granted.

25            So having addressed those three, sort of, general

134

1    overarching legal questions, there are still a number of

2    outstanding motions for me to deal with.  I'll turn to

3    those.

4         First is Mr. Bannon's Motion to Exclude Evidence,

5    ECF No. 56, relating to evidence that the government acquire

6    from subpoenas of cell phone and email records for and

7    interviews with and letters with Mr. Bannon's attorney,

8    Robert Costello.  I've effectively already granted part of

9    this motion.

10        As I noted in the prior hearing, I do not expect

11   the government to introduce any evidence obtained through

12   subpoenas relating to Mr. Costello's phone records or email

13   addresses, certainly not regarding the email addresses of

14   random people named Robert Costello that the government

15   incorrectly subpoenaed.  The former evidence about

16   Mr. Costello's emails and phone records I anticipate being

17   entirely unnecessary, and the latter of course is wholly

18   irrelevant.

19        Should at trial the government truly believe it is

20   necessary to introduce such evidence, it will need to make a

21   proffer outside of the presence of the jury, and I will be

22   very skeptical that any such proffer will be sufficient.

23   But until then, I'll grant the motion as to that information

24   with the understanding that I may consider this decision if

25   truly necessary and raised by the government.

1            As to evidence gleaned from interviews with

2    Mr. Costello or letters of the Committee however, the motion

3    is denied.  Mr. Costello knowingly engaged in those

4    interviews, and the evidence is thus not appropriate to

5    exclude, at least not at this stage, although it must go,

6    regardless of the party introducing it, to an element of the

7    offense as I've defined them.

8            The second is Mr. Bannon's Motion in Limine on

9    Presenting the Indictment to the Jury.  The motion is

10   granted.  This matter is within my discretion and given the

11   speaking nature of the Indictment, I find it inappropriate

12   to have it read or otherwise presented to the jury in its

13   totality.

14           I note that the government doesn't oppose this

15   motion.  When it comes to jury instructions, when we get

16   there, I do think it would be appropriate to advise the jury

17   of the specific charges that Mr. Bannon faces, but I don't

18   think it's appropriate to read the indictment in this

19   matter.

20           The next motion is Mr. Bannon's Motion in Limine

21   to Preclude Evidence or Argument Regarding the Attack on the

22   U.S. Capitol.  That's ECF 84.  I'll grant this motion as

23   well, to the extent that it covers general or specific

24   discussions of the nature of the January 6th events.

25           That being said, I won't prohibit the government

1      from using, at least sometimes, the full title of the Select

2      Committee.  I do admonish the government that unnecessary

3      invocation of the full title might lead me to reconsider

4      that decision.  And, of course, the government must prove

5      that the Select Committee's subpoena sought testimony and

6      records from Mr. Bannon that were pertinent to the topics

7      that the Select Committee was investigating.  That will

8      necessarily require some mentions of the events of January

9      6th generally.  I'll allow such evidence, but I intend to

10     police this line tightly.

11            Now to the remaining portions of the government's

12     Omnibus Motion in Limine with the caveats to be mentioned,

13     I'll grant the motion as to these remaining points with the

14     understanding that I might consider any of the rulings on

15     this motion as necessary during trial.

16            The government asks me to preclude Mr. Bannon from

17     making improper arguments that politicize the case.  I agree

18     that such arguments would be inappropriate.  This is not a

19     forum for partisan politics.  I will not allow it to become

20     one, but I also will not prevent Mr. Bannon from attempting

21     to show bias when cross-examining the witnesses.

22            It's a fine line to draw here, and I expect the

23     parties to respect it.  It goes without saying that a

24     witness cannot be called for the sole purpose of impeaching

25     him or her.  But a witness who is testifying is subject to

1    appropriate cross-examination, and bias is one such

2    appropriate topic.

3            Now, the government argues in Section I.B that

4    claims about government misconduct relating to its efforts

5    to procure Mr. Costello's email and phone records are not

6    proper issues for trial.  As I previously held, I agree with

7    that.  No evidence or arguments on this topic will be

8    permitted at the trial, either from Mr. Bannon or from the

9    government.  As I already indicated, if the government

10   believes it must introduce such evidence at trial, it needs

11   to make a proffer to me.  And just know that I will be

12   skeptical.

13           Questions about the government's conduct regarding

14   the subpoenas or subpoena for Mr. Costello's email and phone

15   records or efforts to procure that information, questions

16   about that conduct in my mind remain a matter for resolution

17   after trial not during it.

18           The government argues in Section I.C of its

19   Omnibus Motion that if Mr. Bannon's subpoenas to members of

20   Congress and their staff are quashed, the Court should

21   preclude him from arguing that this provides a basis for

22   acquittal or some adverse inference against the government.

23   I'll discuss in a moment whether the subpoenas will be

24   quashed.  But if they are, I agree with the government's

25   argument and will grant their motion conditionally in that

1    sense.

2            As the Court of Appeals has explained, "The rule

3    authorizing this inference referred to as applicable, in the

4    language of the Supreme Court, 'when a party has it

5    peculiarly within its power to produce witnesses whose

6    testimony would elucidate the transaction' and fails to do

7    so."  I find that, in these circumstances if I grant the

8    Motion to Quash, that the United States has no more power

9    than Mr. Bannon to compel the attendance of members of the

10   House and their staff to this trial.

11           The government asks, in part I.D of its motion,

12   that evidence or arguments relating to the misdemeanor,

13   nature of the charges or the potential punishment is

14   improper.  I heard defense counsel to agree that it would be

15   improper to discuss the potential punishments in front of

16   the jury.  And I certainly agree, as a result, that any

17   evidence relating to the potential penalties of the

18   conviction are improper.  It won't be allowed.

19           The government asks me in part I.E to preclude

20   Mr. Bannon from making claims about other individuals who

21   have not been prosecuted for contempt of Congress.  I agree

22   and will not allow such evidence.  It does not go, in my

23   view, to any of the elements of the charged offenses or

24   defenses and is thus irrelevant.

25           The final point in the Omnibus Motion is a little

1    tricky.  We discussed this earlier.  The government argues

2    that whether executive privilege excused Mr. Bannon from

3    compliance with the subpoenas altogether is not a factual

4    question for the jury.

5            We discussed at this hearing whether Mr. Bannon is

6    really making this argument, which is not an argument about

7    mens rea.  It's not an argument about entrapment by

8    estoppel.  It's really an argument that, I think in its

9    simplest form, would be that Mr. Bannon was excused from

10   responding to the Subpoena because it covered privileged

11   information.

12           I haven't really received briefing on this

13   question.  I think it is an unteed-up issue and it therefore

14   seems premature to rule on it now.  I don't think Mr. Bannon

15   really grappled with the government's argument on this

16   question, but I do think it's a distinct issue.

17           And just to be really clear, one question in this

18   case is did Mr. Bannon act with the requisite mens rea in

19   declining to appear for his deposition or producing

20   documents?  That's one question as to which I've already

21   reached a series of holdings about what that standard is and

22   what's relevant or not to it.

23           Another set of issues is whether the government is

24   estopped, as a result of, for example, the entrapment by

25   estoppel argument from prosecuting this case.  Those are not

1    the same questions, I believe, because the information here

2    was actually privileged, executive privilege, whether

3    Mr. Bannon was excused altogether from complying with the

4    Subpoena.  And whether that's a valid argument in this case

5    and whether it's being advanced is not clear to me, and

6    therefore, I am going to not resolve the government's motion

7    on that point.

8            The next pretrial motion is Mr. Bannon's Motion to

9    Compel the Meadows and Scavino Declination Discovery, Motion

10   for Discovery and Motion for Release of *Brady* Materials,

11   which is ECF No. 86.  I'll deny this motion.

12           My previous discovery order mandated the

13   government provide documents reflecting official DOJ policy.

14   The government has represented that no such records exist in

15   connection with the government's consideration of the

16   Congressional contempt referrals of Meadows or Scavino.  To

17   the extent it requires further clarification, my previous

18   order was never intended to mandate the disclosure of

19   internal work product by the Department.  Such an order

20   would be inappropriate for a myriad of reasons.

21           It was also not intended to mandate the disclosure

22   of specific declination decisions as to particular persons

23   unless they stated broader DOJ policy.  And given my

24   previous ruling on the unavailability of the entrapment by

25   estoppel defense, none of these declination documents would

1    be relevant in any event.

2    I will note Mr. Bannon hints in his brief some of

3    this information could be relevant to a selective

4    prosecution claim.  To an extent that Mr. Bannon wishes to

5    raise such a claim, he must move separately for it.  I will

6    not treat the passing mention of selective prosecution as

7    sufficient.

8    Also pending, as we all know, is the Motion to

9    Quash, which is ECF No. 1, in Miscellaneous Case 22-MC-60.

10   I'll grant this motion.

11   The Speech or Debate Clause provides that "for any

12   Speech or Debate in either House, [the Senators or

13   Representatives shall] not be questioned in any other

14   place."

15   The language of the Speech or Debate Clause is

16   absolute.  It bars the questioning of any member of Congress

17   in court, so long as that questioning relates to any speech

18   or debate in either House.

19   The Supreme Court has given speech or debate a

20   broad reading.  As the Court has put it:  "Without

21   exception, our cases have read the Speech or Debate Clause

22   broadly to effectuate its purpose."  That's *Eastland*.  Thus,

23   the Clause reaches not only the conduct of Congress people

24   but their staff too.  Nor is it limited to literal speech

25   and debate.  Rather, the question is whether the particular

1    activities about which testimony is sought fall within "the

2    legitimate legislative sphere."  That requires me to

3    determine whether the activities are "an integral part of

4    the deliberative and communicative processes by which

5    members participate in Committee and House proceedings with

6    respect to the consideration or rejection of proposed

7    legislation or with respect to other matters which the

8    Constitution places within the jurisdiction of either

9    House."  As the Supreme Court has also explained, "The power

10   to investigate and to do so through a compulsory process

11   plainly falls within that definition."  Again, that's

12   *Eastland*.  It specifically blessed, the Supreme Court did,

13   the issuance of subpoenas.

14            I conclude that much of the testimony that

15   Mr. Bannon would seek from the individuals he has subpoenaed

16   and most of the documents are barred by the Speech or Debate

17   Clause.  Questions as to the motivations of the Committee,

18   its internal deliberations, its reasons for subpoenaing him,

19   or the personal views of its members on internal House Rules

20   would all require testimony on an integral part of the

21   deliberative and communicative process by which the members

22   participate in the Committee.  The Speech or Debate Clause

23   bars such testimony.

24            To the extent that Mr. Bannon seeks

25   non-Congressional testimony from these members and to the

1    extent that he seeks documents not covered by the Speech or

2    Debate Clause, I do not believe such evidence is relevant

3    here.  As we discussed earlier, comments made to the press

4    or posted on social media are not covered by the Clause, so

5    too with documents relating to book deals and the like.  But

6    evidence on these topics is also not relevant to this case.

7          As I've already concluded, there will be little,

8    if any, evidence that will go to the jury about whether the

9    Select Committee complied with the House Rules.  And

10   therefore any nonspeech or debate testimony or documents

11   from the members of Congress at issue in the Subpoena or

12   their staff would be irrelevant to the trial.  And, of

13   course, under Rule 17, a subpoena must seek relevant

14   evidence.

15         Mr. Bannon argues that some members waived their

16   Speech or Debate Clause immunity by filing an amicus brief

17   in this case.  Assuming such immunity is waivable, and

18   obviously I discussed that topic to some extent with

19   Mr. Letter, such waiver would require an explicit and

20   unequivocal renunciation of the protection.  But the amicus

21   brief contains no such language and many courts have

22   concluded that the filing of an amicus brief waives no

23   privilege no matter what the privilege may be.  In any

24   event, the amicus brief was filed on behalf of the House as

25   a whole.  We would not provide a waiver as to the

1      individuals that Mr. Bannon seeks to subpoena.

2             One final point, as we discussed before,

3      Mr. Bannon has suggested that if he cannot subpoena these

4      members of Congress and therefore that this information is

5      not available to him, then he may move for dismissal of the

6      charges against him.

7             As we discussed, Mr. Bannon is, of course, now

8      free to file such a motion now that I've quashed the

9      Subpoena.  But I will note that Mr. Bannon must show that

10     the testimony he seeks would be relevant to an issue at

11     trial which, in my view, seems unlikely.

12            Since the question whether the Select Committee

13     complied with House Rules is not a defense, at least

14     generally speaking, that will be submitted to the jury.  And

15     in light of my decision about the other issues in this case,

16     the Motion to Quash in case number 22-mc-60 is thus granted.

17            That brings me to the final pending motion,

18     Mr. Bannon's Motion to Continue Trial, which is ECF No. 88.

19     I am cognizant -- and which is really, at this point, based

20     on three different though not unrelated grounds.  The first

21     is pretrial publicity.  The second is the status of the case

22     as the case exists.  And the third is, to some extent at

23     least, the fact of the letter that Mr. Bannon sent to the

24     Committee over the weekend.

25            I am certainly cognizant of Mr. Bannon's concerns

1    regarding publicity but, in my view, the correct mechanism

2    at this time for addressing that concern is through the voir

3    dire process.  It may very well be that, in light of the

4    ongoing Select Committee hearings, that we will be unable to

5    pick a jury, though I find that unlikely.  But should that

6    be the case, the motion may be renewed again then.  And if

7    we can't pick a jury and we have to suspend the trial, we

8    will do that.

9            Mr. Bannon also notes that discovery is

10   outstanding and, at the time of filing his Reply brief, it

11   was both unclear which defense witnesses or at least the

12   House witnesses would comply with the Subpoena.  It was

13   uncertain which defenses would be allowed at trial or the

14   scope of the Motions in Limine.  Those issues have now

15   largely been resolved by me.

16           If they were resolved in a way that would greatly

17   expand or complicate this case, perhaps all that might favor

18   an extension, but the motions did not pan out that way.  As

19   a result, I see no reason, based on preparation, for

20   extending this case any further.

21           And finally, as it relates to the letter that

22   Mr. Bannon sent over the weekend and the letter Mr. Bannon

23   received from former President Trump, I am not deciding one

24   way or the other today whether that evidence might be

25   relevant.

1              As we discussed, it's possible that it might come

2     in with respect to the arguments that Mr. Schoen made about

3     default and whether and to what extent Mr. Bannon's

4     compliance was left open by the Committee.  But even if

5     that's going to come in, that's a discrete issue and it

6     doesn't seem to me that we are incapable of taking that up

7     in the next week.

8              So with that, we have a pretrial conference on

9     Thursday.  What time?  Morning I think.  I forget when it

10    is, but I look forward to seeing everyone then.

11             Thank you, Counsel.

12             Mr. Schoen, would you like to say something?

13        **MR. SCHOEN:**  A couple of things that I don't

14    understand about the order.  I don't understand -- it's a

15    long time ago now so I'm not sure how to direct the Court to

16    it, but it was something about it would permit testimony

17    that Mr. Bannon believed that the date wasn't really the

18    date.  I'm not sure what that means.  Was that what we were

19    talking about today, whether there was a default or not?

20        **THE COURT:**  No, it goes to whether his failure to

21    appear was deliberate and intentional.  If he was mistaken

22    about the date or actually believed that the date had been

23    moved, I think that would go to mens rea.

24        **MR. SCHOEN:**  Had been moved or that that wasn't

25    the date anymore because the default had been waived?

1          **THE COURT:**  I think it could go to both, but he

2     cannot introduce evidence that he thought he was legally

3     excused from complying with the Subpoena because of the

4     exertion of executive privilege because he had been advised

5     by his counsel to that effect and the like.

6          **MR. SCHOEN:**  I got that.

7          **THE COURT:**  The question in the trial -- it's

8     really simple.

9          **MR. SCHOEN:**  I just want to be clear --

10         **THE COURT:**  Mr. Schoen, hold on a second.  The

11    question in the trial on mens rea is whether he failed to

12    appear, as *Licavoli* says, whether his failure to appear was

13    deliberate and intentional as to mens rea.  Did he make a

14    mistake?  Was it the result of inadvertence or, I suppose

15    hypothetically, because he did not believe the return date

16    was the return date?  I'm leaving open that possibility.

17    I'm not sure that you can make a proffer that he would

18    introduce such evidence.  I'm just leaving open that

19    possibility.

20         **MR. SCHOEN:**  And I'm not clear about what

21    Costello, if anything, can testify about.

22         **THE COURT:**  Well, not advice of counsel he gave to

23    Mr. Bannon but, to the extent that his discussions with the

24    Committee go to either, for example, whether it was left

25    open -- you've argued today that you might want to make an

1      argument that the Committee, you know, waived any default or

2      something like that, or left open his future compliance and

3      that Mr. Costello, I assume, would be able to testify about

4      that.

5              **MR. SCHOEN:**  Yeah.

6              **THE COURT:**  I'm not saying that this is true but,

7      if Mr. Costello, for example, told Mr. Bannon the return

8      date on the Subpoena is no longer October 18th, then that

9      testimony might be relevant.  Again, I'm not saying he did.

10             **MR. SCHOEN:**  Let me ask this, Judge:  Is there a

11     way -- if we were to respond to the government's motion to

12     bar that evidence by tomorrow or Wednesday, is there a way

13     the Court could resolve that issue?

14             **THE COURT:**  Are you talking about the letter?

15             **MR. SCHOEN:**  Yeah.  About raising this issue that

16     it is default?  I'd like --

17             **THE COURT:**  Yes.  Yes.  I have not resolved --

18             **MR. SCHOEN:**  Well --

19             **THE COURT:**  I have not resolved the government's

20     motion that they filed last night at midnight.

21             **MR. SCHOEN:**  I understand that, Judge.  I'm asking

22     whether it can be resolved.  In other words, we have to make

23     a decision.  What's the point in going to trial here if

24     there is no defenses?  So we have to make a decision about

25     that --

1          **THE COURT:**  Agreed.

2          **MR. SCHOEN:**  -- and have to do it very quickly.

3          **THE COURT:**  Yes.  Would you like to respond by

4     tomorrow to that motion?

5          **MR. SCHOEN:**  The question is I have to travel and

6     stuff back home.  I don't know if I could finish it by

7     tomorrow but I think we can.

8          **THE COURT:**  I'm happy to give you whatever time

9     you think you need.

10         **MR. SCHOEN:**  I think we can do it by Wednesday.

11         **THE COURT:**  Sure.  You say Wednesday, what time?

12         **MR. SCHOEN:**  I was going to say end of the day

13    Wednesday, but if you want to pick a time in the middle of

14    the day --

15         **THE COURT:**  No, it's just we're running out of

16    time.

17         **MR. SCHOEN:**  Yeah.  I'm traveling Wednesday to

18    come back up here also.  So I guess noon Wednesday.

19         **THE COURT:**  Fair enough.

20         **MR. SCHOEN:**  Listen, okay, last thing is, I didn't

21    understand -- two other things I didn't understand.  I think

22    I understood it, but I didn't hear it clearly enough.  The

23    Court said that the reason the OLC opinions don't apply

24    that's because Bannon wasn't employed at the time?

25         **THE COURT:**  Well, for all the reasons I said

1    before, there is no OLC opinion that says, We will not

2    prosecute someone in the situation that Mr. Bannon found

3    himself in.

4            **MR. SCHOEN:**  What was that situation?  That's my

5    question, I think, not being an Executive Branch employee at

6    the time?

7            **THE COURT:**  So I think there is a number of them.

8    One is not being an Executive Branch employee at the time

9    and the assertion of privilege by someone who was no longer

10   the President at the time of the Subpoena.  You don't

11   have -- there is no opinion that covers the circumstances.

12   I understand your view is that the President still has

13   privilege.  I'm just saying there is no opinion that

14   addresses the specific circumstances we find ourselves in

15   here.

16           **MR. SCHOEN:**  Even though the conversation --

17           **THE COURT:**  I don't want to hear argument on this

18   again --

19           **MR. SCHOEN:**  No, I am asking you a question.

20   Clearly the conversations occurred while he was still

21   President --

22           **THE COURT:**  I understand that.  I understand that.

23           **MR. SCHOEN:**  Okay.

24           The last thing I didn't understand was the Court

25   said that it didn't understand what we had raised -- I may

1    have just heard it wrong -- that we had raised the issue

2    that Rule 3b had to be given before the deposition and it

3    wasn't given.  I understood the Court to say it didn't

4    understand that issue to be presented to it.

5          **THE COURT:**  I don't think I said it that way.

6    What I meant to say is, if that is an issue at the trial,

7    then that might actually present a mixed question of law and

8    fact that the jury would get.  That is to say, I would have

9    to decide what the rule meant, but the jury might have to

10   decide whether the rule was complied with.  That's what I

11   meant to say.

12         **MR. SCHOEN:**  When the Court said it didn't have

13   the issue before it, I wanted to be clear that we raised

14   that issue.  Thank you.

15         **THE COURT:**  Thank you.  Anything else?

16         **MR. SCHOEN:**  [SHAKES HEAD]

17         **THE COURT:**  Okay.

18         **MS. VAUGHN:**  Nothing from the government.

19         **THE COURT:**  Okay.  So will the government want to

20   file a reply brief in support of its motion regarding the

21   letter/letters?

22         **MS. VAUGHN:**  We can file by Wednesday night, if we

23   appear on Thursday morning.

24         **THE COURT:**  It may not be long, and we can take it

25   up on Thursday if necessary.  Thank you, all.

152

1            (Proceedings concluded at 2:29 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, **Lorraine T. Herman, Official Court**

4        **Reporter,** certify that the foregoing is a true and

5        correct transcript of the record of proceedings in the

6        above-entitled matter.

7

8

9

10    ____July 12, 2022____          /s/_____
                **DATE**                    **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPUTY CLERK:**
**[4]** 2/25 55/4
111/8 111/10
**MR. COONEY:**
**[1]** 29/13
**MR.**
**CORCORAN: [25]**
55/6 55/8 55/14
56/15 56/24 57/2
57/19 58/2 58/6
58/10 58/19 59/10
59/16 60/12 60/17
60/20 60/24 61/1
62/8 62/13 62/23
65/1 65/7 66/16
107/21
**MR. LETTER: [8]**
3/22 38/8 38/12
39/21 52/21 53/9
54/16 54/21
**MR. SCHOEN:**
**[67]** 3/18 3/21
68/19 69/2 69/5
69/7 71/18 71/20
71/23 72/2 73/3
73/21 73/24 74/5
74/7 74/11 74/19
74/23 74/25 75/3
75/12 76/5 78/18
78/21 79/3 79/7
79/9 79/15 86/8
86/11 86/14 86/17
87/1 87/8 87/19
88/15 89/18 89/20
90/7 92/10 93/23
108/9 108/11
109/2 110/25
146/13 146/24
147/6 147/9
147/20 148/5
148/10 148/15
148/18 148/21
149/2 149/5
149/10 149/12
149/17 149/20
150/4 150/16
150/19 150/23
151/12 151/16
**MS. GASTON:**
**[50]** 5/2 5/19 6/11
6/19 6/25 7/2 7/18
7/23 10/5 10/11
10/19 10/22 11/14

11/19 12/13 12/18
12/23 14/24 15/4
15/8 15/14 15/17
15/21 15/25 16/6
16/9 16/12 16/14
17/14 17/25 18/12
18/18 18/21 19/10
19/13 19/16 20/3
20/20 21/5 21/20
21/25 22/9 22/14
23/5 25/3 25/10
25/15 25/18 25/23
28/17
**MS. KALLEN:**
**[19]** 39/23 39/25
41/7 41/20 42/6
42/23 43/3 43/22
44/14 44/19 45/7
45/20 45/23 46/3
46/15 47/2 47/14
47/19 48/19
**MS. VAUGHN:**
**[49]** 3/11 4/23
28/20 28/22 28/25
30/2 30/6 30/10
31/24 32/5 32/15
33/11 33/20 34/3
34/7 34/15 35/20
35/22 36/18 37/3
37/5 37/14 37/25
38/3 94/1 94/8
94/23 95/1 95/8
97/2 97/8 98/9
98/11 98/19 98/22
98/24 99/22 100/3
100/11 100/22
101/3 101/7
102/15 104/6
104/18 106/4
110/22 151/18
151/22
**THE COURT:**
**[219]**
**'**
**'when [1]** 138/4
**/**
**/s [1]** 153/10
**0**
**060 [1]** 3/5
**1**
**10 [3]** 54/25 57/10

93/12
**100 [3]** 55/22
73/21 92/13
**100-6 [1]** 1/22
**103 [2]** 26/7 28/8
**1083 [1]** 128/7
**10:04 [1]** 1/11
**10:30 [1]** 19/21
**11 [1]** 1/11
**1145 [1]** 66/9
**11:13 [1]** 55/3
**11:20 [1]** 54/25
**11:29 [1]** 55/3
**12 [4]** 11/24 51/16
93/12 153/10
**123 [1]** 127/21
**127 [1]** 123/16
**12:44 [1]** 111/9
**13 [1]** 97/24
**13 members [1]**
98/7
**135 [1]** 73/15
**13th [1]** 109/6
**14th [3]** 77/9 83/6
87/10
**15th [1]** 122/9
**16 [4]** 30/23 30/24
40/5 49/3
**16th [1]** 30/14
**17 [9]** 36/22 40/8
40/14 40/15 42/10
46/13 46/17 51/5
143/13
**178 [1]** 56/15
**1793 [1]** 1/19
**18th [9]** 77/9 81/1
81/6 83/6 102/6
102/10 102/14
104/4 148/8
**192 [2]** 112/9
113/12
**1950s [1]** 128/13
**1960s [1]** 128/13
**1999 [1]** 72/10
**19th [4]** 77/7
77/10 77/11 77/22
**1:21-670 [1]** 1/4
**1:22-60 [1]** 1/9
**1:30 [3]** 111/2
111/4 111/6
**1:35 [1]** 111/9
**2**
**20 [3]** 57/10 93/13

110/10
**20-year-old [1]**
107/11
**20001 [2]** 1/19
2/20
**201 [1]** 2/5
**2015 [1]** 124/7
**2017 [1]** 54/17
**202-225-7800 [1]**
77/22
**202-225-9700 [2]**
2/10 2/13
**202-252-1793 [1]**
1/19
**2021 [3]** 16/5 19/4
34/25
**2021-670 [1]** 3/3
**2022 [2]** 1/11
153/10
**2022-060 [1]** 3/5
**20515 [1]** 2/9
**21201 [1]** 2/6
**22-MC-60 [2]**
141/9 144/16
**2225 [1]** 2/6
**227 [1]** 66/9
**23219 [1]** 2/3
**24th [1]** 17/21
**25th [1]** 2/5
**2800 [1]** 1/22
**29 [1]** 120/14
**299 [1]** 123/16
**2:00 [1]** 111/2
**2:29 [1]** 152/1
**3**
**30 [3]** 93/6 102/23
107/21
**316 [1]** 65/25
**317 [1]** 65/25
**333 [1]** 2/19
**334-395-6611 [1]**
1/23
**34 [1]** 73/15
**347 [1]** 130/5
**36106 [1]** 1/22
**364 [1]** 129/8
**372 [1]** 129/8
**374 [1]** 127/21
**383 [1]** 56/15
**3b [2]** 99/10 151/2
**4**
**40-page [1]** 32/11

**401 [2]** 117/1
117/3
**402 [1]** 117/2
**410-385-2225 [1]**
2/6
**415 [1]** 65/25
**4700-C [1]** 2/20
**474 [1]** 124/6
**475 [1]** 130/5
**49 [1]** 120/11
**4th [1]** 1/18
**5**
**50 [2]** 32/21 111/5
**503 [8]** 5/9 7/21
9/17 10/1 41/1
41/5 41/18 62/1
**5140 [2]** 2/9 2/12
**52 [2]** 117/25
118/18
**53 [1]** 133/1
**555 [1]** 1/18
**56 [2]** 118/23
134/5
**6**
**60 [3]** 1/9 141/9
144/16
**642 [1]** 128/7
**648 [1]** 122/23
**6611 [1]** 1/23
**670 [2]** 1/4 3/3
**6th [12]** 9/12
19/19 23/21 29/3
33/3 49/6 65/4
86/24 87/4 103/12
135/24 136/9
**7**
**730 [1]** 61/8
**7800 [1]** 77/22
**7th [1]** 19/8
**8**
**808 [1]** 124/6
**83 [1]** 65/3
**84 [2]** 65/3 135/22
**85 [1]** 119/17
**86 [1]** 140/11
**88 [1]** 144/18
**9**
**90 [1]** 47/25
**917 [1]** 122/23
**9700 [2]** 2/10 2/13

**A**

**a.m [4]** 1/11 19/21 55/3 55/3
**Abecassis [2]** 84/20 84/21
**Abel [1]** 27/2
**ability [8]** 13/6 37/12 51/25 53/15 64/10 65/21 90/21 103/19
**able [7]** 31/21 37/22 59/13 63/6 101/24 127/23 148/3
**about [139]** 5/14 8/9 8/11 9/16 11/6 14/2 14/13 16/1 16/13 17/3 18/5 18/25 21/15 23/21 23/22 25/1 26/21 26/22 27/4 27/6 27/14 27/15 28/5 28/14 28/15 29/3 29/4 29/9 29/10 30/8 30/17 30/22 31/20 32/8 32/19 32/19 32/21 36/11 36/12 41/3 41/5 46/1 46/5 46/9 48/4 48/15 53/5 53/10 57/24 59/5 59/8 59/12 60/11 60/13 60/18 61/16 62/14 62/20 64/15 65/14 66/12 67/7 68/8 69/8 69/12 70/25 76/24 78/18 78/19 78/24 79/6 80/6 80/15 83/4 84/22 87/3 88/10 89/10 89/18 89/19 92/16 93/1 93/6 94/9 94/14 96/6 97/12 98/8 99/5 100/1 100/10 100/20 100/25 101/5 102/5 102/8 102/9 103/1 103/5 103/8 103/8 103/21 104/12 105/22 105/23 106/12 106/13 106/24 114/23 118/16 118/17

120/24 126/7 131/23 132/2 132/5 133/22 134/15 137/4 137/13 137/16 138/20 139/6 139/7 139/21 142/1 143/8 144/15 146/2 146/14 146/16 146/19 146/22 147/20 147/21 148/3 148/14 148/15 148/24
**above [1]** 153/6
**above-entitled [1]** 153/6
**absolute [5]** 51/3 53/13 55/21 55/23 141/16
**absolutely [4]** 8/2 18/13 25/23 82/14
**abundance [1]** 24/12
**abundantly [1]** 114/25
**abuse [1]** 52/15
**accede [1]** 90/11
**accept [1]** 97/23
**accepted [1]** 22/7
**accepting [1]** 41/7
**accident [3]** 112/20 113/7 121/7
**accommodation [5]** 61/15 63/17 67/4 75/25 79/16
**accompany [1]** 73/6
**accord [1]** 63/17
**accordance [1]** 60/4
**according [2]** 69/15 74/1
**accountable [1]** 51/11
**accused [4]** 58/14 89/3 89/8 115/7
**acknowledging [1]** 126/3
**acquire [1]** 134/5
**acquit [1]** 115/8

**acquittal [2]** 127/22 137/22
**act [11]** 20/14 31/14 57/7 58/5 58/25 78/12 102/18 114/13 124/15 124/20 139/18
**acted [11]** 31/13 31/22 33/13 60/21 62/7 112/22 112/24 113/11 113/14 115/7 124/3
**acting [2]** 126/7 131/23
**action [10]** 1/3 1/9 4/4 36/9 61/9 61/9 78/1 109/21 111/17 117/6
**actions [4]** 48/7 50/25 65/23 113/6
**activities [2]** 142/1 142/3
**activity [1]** 51/1
**actor [1]** 33/14
**actual [4]** 50/20 63/25 103/12 126/11
**actually [15]** 18/2 21/8 31/22 54/8 91/17 94/3 95/23 96/25 97/1 99/20 124/13 124/18 140/2 146/22 151/7
**added [1]** 77/19
**additional [1]** 83/3
**address [26]** 10/20 19/14 23/3 28/11 30/2 34/2 38/2 43/21 44/18 45/21 46/24 47/8 49/1 49/19 52/20 52/22 53/6 55/8 55/11 55/21 68/23 74/9 76/25 94/1 94/5 106/17
**addressed [6]** 28/13 30/9 53/19 66/11 98/19 133/25
**addresses [3]**

134/13 134/13 150/14
**addressing [4]** 4/24 101/14 102/4 145/2
**adduce [1]** 37/10
**adduced [1]** 36/15
**adjudicate [1]** 20/22
**admissibility [1]** 78/18
**admissible [9]** 17/24 18/6 33/18 36/23 78/17 116/25 117/2 117/20 121/22
**admit [1]** 67/24
**admitted [1]** 119/4
**admittedly [1]** 24/23
**admonish [1]** 136/2
**adopt [1]** 52/6
**adopted [1]** 98/6
**Adopting [1]** 50/12
**advanced [2]** 25/25 140/5
**advancing [1]** 73/2
**adversarial [1]** 26/4
**adverse [3]** 36/1 36/9 137/22
**advice [17]** 15/22 17/8 17/9 68/10 114/8 114/13 114/18 115/1 115/8 115/22 119/23 120/13 120/17 120/25 121/19 126/7 147/22
**advise [1]** 135/16
**advised [1]** 147/4
**advisement [1]** 65/9
**advising [1]** 22/21
**advisor [1]** 82/21
**advisors [1]** 85/3
**advocacy [1]** 56/4

**advocate [1]** 105/13
**affect [1]** 21/19
**affects [1]** 46/24
**affiliation [1]** 26/22 27/4
**affirmative [10]** 71/2 107/1 107/7 111/25 118/19 122/1 122/5 124/3 126/10 132/22
**afield [1]** 32/18
**after [24]** 19/7 22/10 22/21 31/2 31/13 52/12 61/10 63/22 75/23 76/9 77/11 77/22 78/8 78/10 78/10 81/7 87/5 93/9 101/23 105/15 116/25 117/3 126/5 137/17
**afterwards [1]** 26/3
**again [40]** 23/2 28/7 31/9 31/25 33/18 35/16 39/14 39/19 53/2 54/6 58/22 61/18 66/2 73/12 73/24 80/17 81/13 81/18 82/7 83/16 84/10 85/11 85/14 97/17 101/3 104/3 105/19 109/19 115/5 115/19 119/5 119/10 119/19 121/3 123/25 126/15 142/11 145/6 148/9 150/18
**against [6]** 12/1 89/8 93/5 105/20 137/22 144/6
**agency [2]** 63/11 73/5
**agent [5]** 3/13 24/9 27/14 70/6 84/21
**agent's [1]** 27/15
**ago [5]** 20/15 24/15 48/25 55/22 146/15
**agree [18]** 12/13

**A**

agree... **[17]** 35/8 35/17 37/8 46/19 55/17 62/9 64/3 67/14 100/15 122/17 124/1 136/17 137/6 137/24 138/14 138/16 138/21

agreed **[3]** 65/5 77/2 149/1

agreement **[1]** 21/17

ahead **[7]** 23/3 37/20 76/20 91/12 96/7 101/8 101/15

aided **[1]** 2/24

aimed **[1]** 103/9

Akhigbe **[1]** 128/7

al **[3]** 1/9 1/22 3/6

Albert **[1]** 55/24

all **[75]** 4/7 4/9 4/16 4/17 4/18 6/5 6/10 7/17 8/16 10/19 10/22 14/14 14/14 15/2 16/14 23/4 24/4 25/11 26/1 30/9 31/1 33/22 38/18 38/20 42/16 46/6 49/5 50/14 50/22 52/23 54/12 58/11 61/9 67/8 68/14 69/7 69/10 72/15 75/21 78/1 84/5 84/6 84/17 85/10 85/19 87/21 88/5 88/9 91/20 92/19 93/5 95/11 101/7 101/19 103/17 105/16 105/20 109/13 109/18 111/1 111/8 111/13 111/13 111/19 114/11 116/8 116/25 117/3 126/5 131/15 141/8 142/20 145/17 149/25 151/25

allegations **[2]** 27/8 27/9

alleged **[14]** 5/9 56/19 98/15 98/16

117/11 126/14 126/24 128/15 129/10 129/10 129/12 130/7 130/9 133/6

alleges **[1]** 130/23

allow **[13]** 7/14 28/9 32/24 55/19 64/6 64/14 96/19 100/6 131/1 131/7 136/9 136/19 138/22

allowed **[7]** 13/1 31/7 38/23 66/5 124/10 138/18 145/13

allowing **[1]** 61/17

allows **[2]** 54/10 100/14

almost **[3]** 97/19 102/12 131/15

alone **[3]** 14/16 92/6 115/17

along **[3]** 18/16 57/10 112/6

already **[13]** 10/18 34/22 75/4 75/8 96/10 101/14 103/18 132/21 133/21 134/8 137/9 139/20 143/7

also **[37]** 3/13 4/3 6/2 7/2 7/19 7/21 9/17 28/11 30/2 40/16 47/23 48/3 48/7 49/1 51/7 69/14 71/10 72/13 80/2 83/14 83/20 85/6 105/7 111/16 114/17 118/23 119/16 120/10 124/24 125/22 136/20 140/21 141/8 142/9 143/6 145/9 149/18

alternate **[1]** 92/1

although **[1]** 135/5

altogether **[8]** 15/2 20/18 51/9 102/13 116/21 125/6 139/3 140/3

Alvarado **[1]** 124/6

always **[1]** 17/22

am **[12]** 19/16 55/8 92/22 93/24 110/8 110/18 115/19 140/6 144/19 144/25 145/23 150/19

AMANDA **[2]** 1/16 3/11

ambiguity **[7]** 10/9 10/9 48/10 95/25 96/2 99/24 100/1

ambiguous **[12]** 6/21 6/22 7/13 7/21 7/24 10/1 10/4 10/6 10/7 66/23 130/19 130/23

Amendment **[3]** 12/7 35/25 56/14

AMERICA **[2]** 1/3 3/4

Amerling **[6]** 41/25 49/16 50/3 95/9 95/12 101/13

amicus **[5]** 48/6 143/16 143/20 143/22 143/24

among **[1]** 87/18

amount **[1]** 73/17

analytically **[2]** 36/10 46/20

analyze **[1]** 66/7

ancillary **[1]** 103/15

announced **[1]** 87/9

anomalous **[1]** 126/4

another **[13]** 11/2 22/20 37/18 55/25 64/16 73/8 75/11 80/25 82/20 84/22 88/16 89/2 139/23

answer **[7]** 12/16 58/17 71/20 79/18 87/19 113/25 114/9

answered **[1]** 132/21

answers **[1]**

54/18

anticipate **[2]** 92/4 134/16

any **[74]** 5/6 9/23 10/20 14/3 21/19 26/10 29/24 30/12 35/23 36/1 38/1 38/3 44/15 44/24 46/5 46/16 47/5 48/10 49/2 49/3 49/19 49/19 52/8 54/17 54/18 55/20 56/8 58/19 63/11 63/19 64/11 65/23 66/22 67/12 70/19 73/9 76/11 77/13 78/3 81/3 90/9 90/13 91/3 101/12 102/3 104/8 106/17 107/10 117/4 117/12 122/14 123/22 125/8 125/10 125/12 125/25 129/19 131/1 133/8 134/11 134/22 136/14 138/16 138/23 141/1 141/11 141/13 141/16 141/17 143/8 143/10 143/23 145/20 148/1

anybody **[2]** 84/20 88/24

anymore **[3]** 27/25 110/11 146/25

anyone **[3]** 45/18 72/25 99/23

anything **[14]** 10/13 25/20 27/4 33/24 42/1 52/20 65/14 72/24 86/15 86/19 93/20 107/17 147/21 151/15

anyway **[2]** 85/25 91/19

apologize **[1]** 23/2

apparent **[2]** 125/24 132/1

apparently **[2]**

89/13 89/24

Appeals **[12]** 113/9 113/16 115/10 116/18 117/13 119/13 128/3 129/2 130/2 132/21 133/19 138/2

Appeals' **[1]** 115/14

appear **[26]** 16/15 17/4 17/5 17/15 17/15 18/1 18/24 19/9 43/14 59/14 71/19 72/9 72/15 72/19 113/21 114/19 114/24 115/23 116/6 116/16 121/6 139/19 146/21 147/12 147/12 151/23

appearance **[1]** 22/7

APPEARANCES **[2]** 1/15 2/1

appeared **[2]** 123/1 130/4

appearing **[1]** 43/16

appears **[2]** 52/3 85/11

applicability **[1]** 83/17

applicable **[1]** 138/3

applied **[2]** 84/17 120/19

applies **[3]** 13/18 43/6 114/17

apply **[10]** 46/1 46/3 54/14 57/20 74/7 74/10 84/7 85/6 123/19 149/23

applying **[1]** 72/13

appoint **[1]** 63/14

appointing **[1]** 61/3

appreciate **[1]** 64/1

Apprendi **[1]** 62/16

157

**A**

**approach [3]**
36/11 46/21 52/7
**appropriate [23]**
11/23 27/3 27/13
39/18 40/13 44/4
44/18 44/22 53/2
61/9 64/10 65/12
76/17 78/1 87/15
110/6 125/8 132/3
135/4 135/16
135/18 137/1
137/2
**appropriately [1]**
87/17
**approximately [1]**
24/18
**arbitrary [1]** 90/8
**Archives [1]**
67/16
**are [162]**
**area [1]** 57/8
**aren't [1]** 101/14
**argue [11]** 15/1
15/10 22/1 33/4
62/20 63/3 66/3
98/2 102/2 117/8
120/15
**argued [7]** 5/23
10/18 19/22 71/6
71/10 130/16
147/25
**argues [9]** 19/18
45/16 112/13
112/22 112/24
137/3 137/18
139/1 143/15
**arguing [8]** 51/23
60/14 71/15 79/10
99/23 101/10
101/21 137/21
**argument [51]**
3/24 5/24 12/10
12/17 23/3 26/11
28/15 31/7 31/8
32/1 32/25 39/2
39/7 39/15 57/18
57/21 65/4 65/13
69/18 71/22 71/23
72/23 73/2 73/4
82/10 82/13 83/3
83/7 86/16 86/22
94/5 100/16
103/21 105/15

108/25 109/3
110/12 111/12
120/13 130/6
135/21 137/25
139/6 139/6 139/7
139/8 139/15
139/25 140/4
148/1 150/17
**arguments [19]**
5/17 12/21 67/5
67/7 67/7 79/6
93/2 94/1 106/2
115/3 117/12
127/2 127/4
128/11 136/17
136/18 137/7
138/12 146/2
**arises [2]** 27/24
122/18
**Ark [1]** 67/16
**arose [1]** 75/16
**around [7]** 19/18
21/23 82/6 93/5
109/18 110/9
111/4
**arrived [1]** 104/15
**article [1]** 102/20
**articulate [1]**
101/22
**articulated [3]**
23/8 24/21 27/1
**articulation [1]**
13/16
**as [204]**
**aside [5]** 17/9
42/17 50/22 92/22
130/16
**ask [12]** 7/24
21/15 29/13 42/25
52/10 52/17 59/12
61/12 66/5 94/18
95/10 148/10
**asked [14]** 24/10
46/1 53/6 53/10
59/2 59/3 65/11
66/16 68/23 76/20
85/15 88/13 94/8
106/5
**asking [9]** 12/14
26/23 32/6 32/16
34/3 66/22 68/14
148/21 150/19
**asks [4]** 21/18
136/16 138/11

138/19
**aspect [1]** 117/12
**aspects [1]**
119/12
**assert [8]** 43/2
53/16 54/1 54/1
54/5 73/16 124/2
124/10
**asserted [3]** 6/1
44/17 124/22
**assertion [11]** 6/1
12/25 13/4 14/19
15/3 15/11 71/15
85/19 85/21 113/8
150/9
**assertions [3]**
13/20 85/18 116/5
**assistance [4]**
91/10 105/4
109/11 109/24
**assume [7]** 25/4
41/13 41/15 74/16
87/23 103/17
148/3
**assuming [16]**
6/9 33/18 35/16
35/17 41/10 41/11
42/17 43/10 43/16
53/23 92/8 94/21
94/23 103/24
122/24 143/17
**assumption [1]**
87/20
**attack [5]** 9/12
28/16 29/8 65/4
135/21
**attacks [1]** 29/9
**attempt [2]** 14/2
118/25
**attempting [4]**
12/10 38/21 45/14
136/20
**attempts [1]**
61/15
**attend [1]** 117/14
**attendance [1]**
138/9
**attending [1]**
121/2
**attention [6]** 16/3
47/15 47/23 76/3
80/4 80/6
**attorney [2]** 1/21
134/7

**attorneys [2]** 1/18
104/22
**August [4]** 89/19
89/21 89/21 89/23
**authority [34]** 8/3
8/4 8/21 14/20
20/22 45/5 49/25
50/1 50/6 50/10
60/4 60/22 63/12
63/14 63/15 63/16
63/19 71/3 71/7
112/1 122/2 122/6
123/24 124/2
124/8 124/19
124/21 124/22
125/21 125/24
126/11 126/17
128/20 128/25
**authorization [4]**
8/10 9/13 124/5
124/16
**authorized [4]** 8/6
8/19 124/14
125/25
**authorizing [2]**
9/9 138/3
**automatic [2]**
103/11 103/14
**availability [1]**
37/12
**available [8]**
15/18 33/10 41/24
42/20 49/17 64/2
130/11 144/5
**avenue [2]** 2/19
40/15
**average [1]** 87/23
**avoid [2]** 80/3
81/4
**avoided [2]** 129/3
129/4
**aware [3]** 116/11
130/12 133/5
**away [7]** 47/21
61/19 62/5 81/14
92/2 114/25
129/14

**B**

**B-R-Y [1]** 47/17
**baby [2]** 104/14
104/15
**back [26]** 4/19 5/6
13/5 16/2 17/13

17/13 22/22 30/15
31/6 33/23 54/25
55/4 67/11 67/14
73/24 77/7 102/2
104/11 106/7
106/22 110/15
110/22 111/6
111/10 149/6
149/18
**backward [2]**
20/12 20/18
**backward-looking
[2]** 20/12 20/18
**backwards [1]**
83/22
**bad [2]** 20/24
112/17
**balance [2]** 89/8
105/19
**ballgame [3]** 74/1
74/2 75/6
**Baltimore [1]** 2/6
**Bankruptcy [1]**
2/19
**BANNON [156]**
**Bannon's [34]**
20/10 21/16 39/2
39/7 40/23 48/16
52/6 59/15 61/6
63/21 64/21 76/2
78/21 78/24 81/9
81/20 82/15 83/16
91/18 102/13
115/4 120/4
120/23 125/15
127/7 134/4 134/7
135/8 135/20
137/19 140/8
144/18 144/25
146/3
**bar [4]** 114/22
121/4 121/24
148/12
**Barker [1]** 96/1
**barred [2]** 121/2
142/16
**barring [1]** 76/24
**bars [2]** 141/16
142/23
**base [1]** 124/23
**based [23]** 12/1
12/7 29/3 32/11
35/11 59/23 61/20
66/17 70/19 83/9

**B**

**based... [13]** 84/8 84/8 90/10 100/15 106/19 108/8 119/19 127/7 128/15 132/12 132/15 144/19 145/19

**basics [1]** 30/15

**basis [12]** 34/15 36/8 36/24 37/16 39/13 46/13 73/8 78/14 88/21 102/17 106/10 137/21

**be [264]**

**bear [2]** 23/13 27/25

**bearing [1]** 20/7

**because [94]** 6/13 6/14 6/22 7/12 7/25 10/15 10/24 10/25 11/20 12/18 14/5 14/8 16/19 22/6 24/4 26/18 29/14 31/4 32/7 36/8 36/21 39/5 40/6 41/21 45/12 46/25 48/11 49/14 53/10 53/12 56/1 56/13 57/2 57/3 58/4 63/9 64/2 64/21 67/6 67/7 67/13 67/16 67/19 69/25 72/16 74/2 74/7 75/3 76/12 76/17 77/5 79/11 82/23 83/16 85/25 86/17 87/18 89/21 90/6 91/6 91/12 95/16 95/18 96/19 97/8 97/18 99/4 99/15 100/6 101/7 101/9 102/9 103/24 106/23 108/12 108/22 110/11 111/3 119/7 120/17 120/19 121/15 121/16 121/18 123/11 123/20 125/24 139/10 140/1 146/25 147/3 147/4

147/15 149/24

**become [3]** 25/7 90/17 136/19

**becomes [1]** 25/6

**bedrock [1]** 26/19

**been [58]** 4/11 4/13 6/7 9/20 11/21 17/12 17/12 17/23 18/10 18/12 18/15 23/3 23/18 24/17 33/17 34/22 36/3 37/23 38/15 39/5 45/16 48/4 48/11 61/10 61/13 61/13 72/12 77/4 79/23 80/10 87/1 91/14 91/15 93/13 97/17 100/21 101/20 101/21 104/23 107/25 111/13 114/7 117/17 119/8 125/25 129/6 129/11 129/18 129/21 130/1 130/3 133/5 138/21 145/15 146/22 146/24 146/25 147/4

**before [39]** 1/13 3/15 6/4 10/17 12/24 16/13 17/18 27/18 28/7 33/17 39/1 48/6 56/25 57/10 67/23 76/20 78/7 79/6 79/24 80/3 81/23 85/4 85/22 92/19 93/7 94/15 97/12 99/12 109/19 111/15 114/24 118/13 118/14 132/5 132/11 144/2 150/1 151/2 151/13

**began [1]** 132/5

**begin [3]** 4/6 107/15 122/8

**beginning [2]** 3/9 102/12

**begins [1]** 118/14

**behalf [1]** 143/24

**behind [1]** 89/17

**being [17]** 21/9

22/8 24/6 24/6 32/19 35/1 40/20 46/17 69/25 100/23 102/20 132/15 134/16 135/25 140/5 150/5 150/8

**belief [12]** 11/12 82/12 82/17 83/17 106/24 106/25 106/25 107/5 120/4 120/24 124/21 125/19

**believe [21]** 37/16 44/12 55/17 61/5 83/7 84/5 84/7 84/20 84/23 91/9 109/22 116/23 119/6 119/8 121/15 122/25 125/16 134/19 140/1 143/2 147/15

**believed [8]** 17/11 29/11 116/1 118/4 118/5 121/16 146/17 146/22

**believes [2]** 41/4 137/10

**belong [1]** 27/10

**below [1]** 125/16

**benefit [1]** 35/16

**besides [1]** 83/3

**best [5]** 56/10 80/19 84/11 123/7 127/8

**better [1]** 21/15

**between [8]** 32/21 55/19 82/19 83/20 83/25 90/4 94/19 98/17

**beyond [4]** 46/4 60/3 103/18 113/13

**bias [3]** 27/3 136/21 137/1

**Biden [1]** 81/2

**binding [4]** 50/24 50/24 72/25 115/12

**binds [1]** 121/5

**bit [4]** 5/14 21/15 64/2 67/15

**blanche [1]** 22/24

**blanket [1]** 65/11

**blatantly [1]** 51/21

**bless [2]** 62/4 62/4

**blessed [1]** 142/12

**block [2]** 89/10 89/11

**blocking [1]** 91/16

**blowing [1]** 93/3

**bolstering [1]** 28/7

**Bomber [2]** 88/6 88/7

**book [3]** 24/17 46/2 143/5

**Boston [3]** 88/6 88/7 88/9

**both [12]** 3/9 13/7 20/5 40/8 48/1 56/1 88/10 93/25 102/8 114/11 145/11 147/1

**bound [3]** 75/2 93/18 115/19

**Boys [1]** 106/14

**Brady [4]** 30/24 85/8 86/3 140/10

**brag [1]** 92/25

**branch [10]** 21/2 53/3 59/2 72/13 85/3 85/5 131/11 131/11 150/5 150/8

**Branches [2]** 21/4 21/5

**break [1]** 54/24

**brief [19]** 12/4 26/15 38/13 48/6 51/22 52/22 54/22 54/24 55/18 73/25 78/5 85/6 141/2 143/16 143/21 143/22 143/24 145/10 151/20

**briefed [3]** 15/23 66/14 101/21

**briefing [2]** 9/24 139/12

**briefly [5]** 10/23 38/24 98/15 106/2

107/20

**briefs [6]** 8/1 23/7 36/19 111/13 112/12 131/19

**bring [6]** 27/18 76/2 80/4 84/21 93/4 131/11

**brings [1]** 144/17

**broad [5]** 8/14 9/5 40/12 106/20 141/20

**broader [1]** 140/23

**broadly [2]** 25/24 141/22

**brought [3]** 16/3 54/8 80/5

**Bryan [11]** 47/17 47/18 62/3 62/8 113/17 127/11 128/18 128/23 129/7 129/9 129/14

**build [2]** 105/8 109/17

**Building [2]** 2/9 2/12

**bulwark [1]** 39/9

**bunch [2]** 74/8 103/25

**burden [4]** 31/16 36/22 40/7 52/14

**business [1]** 85/8

**C**

**calendar [1]** 3/2

**call [3]** 72/4 84/13 92/15

**called [5]** 13/11 33/23 58/13 62/8 136/24

**calling [2]** 38/20 72/22

**came [7]** 19/4 22/13 22/15 55/24 66/10 76/10 94/4

**camera [1]** 105/1

**can [74]** 4/20 6/12 7/6 7/11 8/18 11/12 12/20 15/10 19/12 23/11 23/12 24/20 24/23 26/1 28/22 30/2 41/23 42/12 44/12 44/21

-3036-

**C**

**can... [54]** 45/8
45/9 49/18 50/19
54/4 56/13 58/14
61/25 63/2 64/9
65/10 66/1 66/7
67/6 67/8 73/7
76/15 78/11 80/22
80/23 81/14 81/16
81/17 84/11 87/16
87/21 90/16 92/18
98/16 101/19
105/25 107/7
111/25 112/2
114/23 116/6
117/8 118/18
119/5 122/6 123/7
127/12 127/13
127/14 127/18
127/25 128/15
147/17 147/21
148/22 149/7
149/10 151/22
151/24
**can't [26]** 31/3
32/1 32/7 33/14
34/1 37/18 45/7
47/2 59/6 63/24
68/1 83/8 87/14
87/17 88/3 91/24
91/25 93/14 96/3
96/7 96/9 99/4
103/3 107/15
109/4 145/7
**cannot [25]** 5/16
10/24 12/19 23/25
38/22 40/17 87/23
92/20 96/21
101/22 109/23
114/19 115/21
115/25 116/19
118/10 119/4
119/13 122/7
124/22 126/10
133/19 136/24
144/3 147/2
**capacity [1]** 125/1
**Capitol [3]** 9/12
28/16 135/22
**care [1]** 115/4
**CARL [1]** 1/13
**carte [1]** 22/24
**case [115]** 3/3 3/3
3/4 3/5 8/7 9/1 9/4

9/7 12/4 20/7 20/9
20/10 20/11 20/16
20/17 21/9 21/19
23/10 24/14 24/16
27/11 27/12 27/12
27/19 30/16 30/19
31/3 36/2 36/17
36/20 37/2 37/13
40/10 40/16 40/20
44/15 46/25 47/1
47/17 47/24 49/20
50/24 51/23 55/17
56/10 56/23 64/18
65/19 67/18 67/23
68/7 70/22 73/10
75/4 75/16 75/19
75/23 75/23 77/8
78/4 79/23 81/10
81/12 84/15 88/16
88/16 90/22 91/13
91/20 92/4 92/5
92/9 93/12 94/6
95/15 96/1 97/6
99/22 103/5 103/9
103/10 103/14
104/2 104/3
105/21 106/6
106/19 108/6
109/17 111/22
113/23 114/5
114/8 114/22
115/16 122/23
124/6 125/3 127/1
127/12 131/20
136/17 139/18
139/25 140/4
141/9 143/6
143/17 144/15
144/16 144/21
144/22 145/6
145/17 145/20
**cases [27]** 3/2 3/9
8/8 23/12 23/13
23/15 23/17 23/25
30/22 47/16 48/1
53/25 54/7 57/10
62/12 69/20 75/12
75/13 75/13 85/21
93/5 103/17
113/17 114/11
123/15 127/19
141/21
**casting [1]**
109/13

**cause [1]** 129/8
**causes [1]** 16/25
**caution [1]** 24/12
**caveats [1]**
136/12
**cell [1]** 134/6
**cert [1]** 80/21
**certain [10]** 9/17
9/18 18/2 44/3
45/17 96/8 122/19
124/11 126/25
127/13
**certainly [14]**
19/23 29/9 34/17
45/8 48/9 53/11
63/9 64/21 80/21
84/12 92/15
134/13 138/16
144/25
**certify [1]** 153/4
**cetera [5]** 5/10
17/1 58/23 71/9
72/5
**Chair [2]** 38/17
95/4
**Chairman [4]**
22/3 38/17 61/21
77/10
**challenge [1]**
100/23
**challenged [1]**
70/12
**challenges [8]**
47/10 48/1 126/22
126/24 127/7
127/13 127/17
127/20
**challenging [6]**
47/20 70/10 70/14
97/17 99/2 99/3
**Chambers [1]**
58/12
**change [6]** 22/4
23/1 35/2 77/21
88/25 93/17
**changes [3]** 74/1
74/2 75/6
**chaos [1]** 23/19
**characterized [1]**
127/8
**charge [7]** 5/12
13/10 114/9
114/10 114/18
127/9 132/14

**charged [2]** 31/2
138/23
**charges [9]** 50/9
65/16 77/8 83/5
121/20 123/6
135/17 138/13
144/6
**Charles [1]** 2/5
**Cheney [5]** 76/23
95/4 95/17 99/4
131/23
**chief [2]** 49/15
92/5
**choose [3]** 53/15
54/4 77/21
**chosen [1]** 54/1
**Cipollone [2]**
72/11 85/2
**circuit [13]** 54/12
54/17 67/19 74/9
74/12 107/3
122/16 122/18
123/17 123/25
124/2 124/6 126/1
**circuits [1]** 74/10
**circumstance [4]**
7/11 8/22 10/8
59/4
**circumstances [9]**
6/11 36/7 81/17
125/3 125/4
127/13 138/7
150/11 150/14
**circus [1]** 38/22
**citation [1]** 63/22
**cite [1]** 74/11
**cited [10]** 12/4
27/11 72/11 72/16
74/4 87/1 94/13
102/23 102/24
103/17
**citing [3]** 85/2
85/3 106/7
**City [1]** 88/9
**civil [4]** 30/22
30/23 40/12 75/16
**civilian [1]** 125/1
**claim [10]** 11/12
29/19 35/23 73/16
104/23 105/5
105/15 106/19
141/4 141/5
**claimed [2]**
119/19 129/25

**claiming [2]**
27/19 35/25
**claims [7]** 27/17
28/5 77/12 112/3
128/13 137/4
138/20
**clarification [1]**
140/17
**clarified [1]**
125/14
**clarifying [1]**
120/11
**clarity [2]** 11/2
29/13
**Clark [2]** 85/12
85/17
**clash [1]** 64/10
**clause [36]** 6/14
7/16 10/25 35/11
39/9 42/21 43/2
43/15 44/17 45/5
45/14 45/25 46/10
48/13 51/2 56/7
56/11 56/13 56/16
57/12 57/22 58/4
64/8 95/16 113/20
114/1 131/5
141/11 141/15
141/21 141/23
142/17 142/22
143/2 143/4
143/16
**clauses [1]** 114/3
**clear [35]** 8/2
13/3 16/22 23/11
29/24 30/22 38/21
40/14 43/13 48/4
48/11 49/15 62/10
69/11 70/16 82/8
82/9 82/18 87/24
95/1 98/5 99/1
99/6 99/11 100/4
115/1 115/11
127/10 127/17
128/3 139/17
140/5 147/9
147/20 151/13
**clearly [9]** 6/4 6/7
71/6 93/10 103/5
108/14 120/21
149/22 150/20
**clemency [1]**
72/10
**clerk [1]** 63/23

**C**

client [4]  91/11
105/13 105/13
125/17
clients [1]  109/8
clock [1]  110/2
close [3]  22/23
86/18 89/24
closer [1]  91/7
club [1]  24/17
Code [1]  112/9
cogent [1]  93/14
cognizant [2]
144/19 144/25
cold [1]  64/2
colloquy [2]
46/20 70/24
COLUMBIA [1]
1/1
combining [1]
123/8
come [17]  3/8
7/14 37/21 54/25
57/10 67/8 77/1
88/5 96/4 96/5
102/2 110/15
110/22 111/6
146/1 146/5
149/18
comes [10]  16/24
50/23 66/20 69/18
75/14 77/4 81/1
93/9 106/21
135/15
comfort [1]  64/2
coming [1]  105/5
commands [1]
119/4
commenced [1]
8/19
comment [1]
80/20
commentary [1]
90/13
comments [3]
26/11 28/8 143/3
Commerce [1]
8/15
commit [2]
124/14 124/19
commits [1]
122/20
committed [1]
27/20

committee [93]
5/10 6/1 6/4 7/7
8/10 8/15 8/15
8/19 8/21 8/23 9/5
9/6 9/7 9/10 9/11
9/11 9/21 19/19
20/1 21/1 21/18
22/15 22/17 22/20
24/15 29/10 29/20
29/23 38/17 38/18
38/19 38/19 40/25
41/4 41/16 47/11
47/21 49/6 49/15
49/18 51/10 53/1
54/7 59/12 60/19
61/18 62/2 62/7
63/15 70/12 70/14
76/3 77/15 77/21
81/10 81/21 86/24
97/10 97/11 97/20
98/1 98/7 99/15
112/3 112/16
114/24 117/11
120/7 126/20
126/23 128/14
128/16 128/24
130/9 131/21
132/7 132/13
132/19 133/7
133/17 135/2
136/2 136/7 142/5
142/17 142/22
143/9 144/12
144/24 145/4
146/4 147/24
148/1
committee's [9]
7/3 7/4 7/5 62/18
77/14 127/17
133/13 133/22
136/5
committees [4]
8/13 8/17 48/2
67/2
committing [1]
32/20
common [2]
90/24 117/20
communicate [1]
133/6
communication
[2]  46/6 81/20
communications
[9]  46/4 68/10

82/19 84/9 85/23
89/5 106/14
106/16 122/11
communicative
[3]  59/10 142/4
142/21
compel [7]  4/25
25/13 30/3 31/17
68/22 138/9 140/9
compelled [1]
125/9
compelling [1]
20/10
competent [5]
42/1 42/15 50/2
50/19 95/13
competently [1]
49/18
complaining [1]
85/17
complete [9]  11/8
11/10 11/25 12/6
15/12 20/13 34/11
34/25 41/21
completed [4]
19/3 20/4 20/14
48/24
completely [3]
31/24 106/25
107/9
complex [1]
86/20
compliance [23]
30/4 34/23 40/25
42/5 60/20 62/7
62/18 62/20 73/9
77/18 77/18 77/20
78/4 78/6 78/14
112/4 121/10
127/19 127/24
133/22 139/3
146/4 148/2
complicate [1]
145/17
complicated [1]
104/3
complied [9]
34/12 60/19 97/1
100/2 131/17
132/2 143/9
144/13 151/10
comply [30]  20/6
21/8 34/8 35/2
48/24 51/18 72/19

76/15 81/8 81/19
81/21 82/2 82/4
83/8 91/17 105/10
112/16 112/18
113/15 116/2
116/4 116/13
119/2 119/25
120/16 120/18
121/14 126/24
127/18 145/12
complying [6]
81/4 82/3 116/24
120/2 140/3 147/3
component [1]
9/23
components [1]
12/21
composition [7]
5/10 6/4 47/10
117/10 126/23
130/8 132/13
compulsory [2]
91/23 142/10
computer [1]
2/24
computer-aided
[1]  2/24
concede [1]
123/1
conceding [1]
94/20
concept [2]  57/11
65/18
concern [3]  57/8
122/10 145/2
concerned [1]
24/5
concerning [2]
125/10 125/12
concerns [8]
82/24 102/8 102/9
102/16 121/12
131/4 131/12
144/25
concession [1]
72/25
conclude [9]  33/9
122/7 127/6 128/7
130/22 131/15
132/12 133/8
142/14
concluded [5]
55/3 115/10 143/7
143/22 152/1

concludes [2]
44/3 44/21
conclusion [2]
48/14 96/5
concrete [1]
49/11
conditionally [1]
137/25
conduct [17]  8/10
26/9 40/15 74/20
78/11 83/9 83/11
88/9 113/1 113/5
122/19 123/5
124/16 126/8
137/13 137/16
141/23
conducting [1]
88/22
confer [1]  108/18
conference [2]
94/19 146/8
conferral [2]
94/14 94/16
confession [1]
23/16
confidently [1]
88/1
confirmed [1]
24/13
conflict [1]
107/24
confrontation [1]
91/24
confusing [2]
14/8 32/5
Congress [25]
8/13 40/1 50/11
51/17 52/4 52/15
53/15 56/6 56/21
57/9 57/17 59/1
59/4 69/23 74/15
76/16 76/17 80/14
83/23 137/20
138/21 141/16
141/23 143/11
144/4
Congress' [4]
20/21 34/18 52/9
80/5
congressional
[10]  27/22 35/9
35/10 51/7 52/9
63/10 64/11
128/14 140/16

**C**

congressional...
**[1]** 142/25
**Congressman [1]**
78/5
**connection [1]**
140/15
**Conroy [1]** 96/1
**conscious [2]**
112/23 113/5
**consented [1]**
89/13
**consequence [1]**
117/6
**consequences [1]**
36/1
**consider [11]**
14/1 14/3 44/25
61/25 63/2 63/4
83/19 84/25
128/24 134/24
136/14
**considerable [3]**
21/3 21/6 53/17
**consideration [5]**
55/15 65/16 85/16
140/15 142/6
**considerations
[1]** 87/15
**considered [1]**
55/25
**considers [1]**
42/13
**consistency [1]**
7/5
**consistent [12]**
31/22 41/4 63/4
74/18 74/22 74/24
74/25 91/21
115/15 115/16
126/8 126/21
**constantly [1]**
65/24
**constitute [2]**
59/6 114/3
**constituted [1]**
131/22
**Constitution [10]**
2/19 39/8 39/9
39/10 39/15 56/2
56/5 109/9 109/10
142/8
**constitutional
[10]** 39/12 45/4

56/1 57/25 58/16
58/20 73/16 79/21
108/8 133/13
**constitutionally
[5]** 76/1 79/16
92/21 96/24
131/10
**constitutionally-
mandated [1]**
79/16
**Constitutionally-p
rescribed [1]**
131/10
**consultation [1]**
99/1
**consulted [2]**
67/1 95/21
**consummated [2]**
22/12 22/14
**CONT'D [1]** 2/1
**contained [1]**
40/18
**contains [2]**
128/5 143/21
**contempt [34]** 8/3
21/2 21/10 22/18
22/25 28/3 34/16
35/3 48/23 50/9
50/10 52/7 56/19
57/6 57/8 57/9
57/13 57/14 57/23
58/25 58/25 59/6
59/8 61/7 61/8
63/13 63/22 74/15
77/24 128/25
129/3 131/18
138/21 140/16
**contends [2]**
112/14 133/12
**contention [1]**
129/22
**contest [3]** 39/25
51/7 51/15
**contested [1]**
69/25
**contesting [1]**
51/4
**context [7]** 33/3
35/3 42/8 42/13
50/16 85/4 132/8
**contexts [1]**
75/10
**contingencies [1]**
104/24

**contingent [1]**
44/5
**continually [1]**
106/23
**continuance [7]**
23/8 79/6 86/6
86/9 102/22
103/11 103/14
**continue [9]**
19/15 23/6 55/11
68/22 77/17 87/12
105/6 105/7
144/18
**continued [4]**
79/4 79/24 125/18
128/23
**continues [1]**
54/13
**continuing [3]**
10/23 67/3 77/13
**contours [1]**
124/1
**contrary [5]** 79/16
115/9 115/10
124/20 133/20
**control [2]** 24/1
131/5
**conversation [1]**
150/16
**conversations [1]**
150/20
**conviction [2]**
12/1 138/18
**COONEY [2]** 1/17
3/12
**cooperating [1]**
124/19
**copied [1]** 52/8
**copy [1]** 69/16
**CORCORAN [7]**
2/4 3/18 55/1 55/5
77/24 94/13
107/20
**correct [7]** 21/20
45/19 45/20 46/15
133/16 145/1
153/5
**correctly [2]**
115/2 130/16
**Costello [10]**
29/25 72/21 92/15
134/8 134/14
135/2 135/3
147/21 148/3

148/7
**Costello's [10]**
25/2 25/4 28/12
29/16 29/17 29/22
134/12 134/16
137/5 137/14
**could [62]** 5/4
6/15 13/12 14/1
15/24 16/1 16/4
16/20 17/7 17/8
18/19 20/25 22/1
22/17 22/18 31/4
34/17 34/18 34/23
35/14 36/8 45/21
49/12 50/4 53/24
56/11 56/24 64/16
66/18 71/1 71/2
71/2 71/4 85/23
94/17 94/18 95/16
95/19 97/15 97/19
98/1 98/2 99/13
100/4 108/7 109/7
109/14 110/14
120/25 122/24
123/1 123/12
128/6 129/5
129/11 129/25
130/7 131/16
141/3 147/1
148/13 149/6
**couldn't [4]** 22/5
31/13 76/20
107/10
**counsel [51]** 2/8
2/11 3/8 3/15 3/20
3/23 3/25 4/1
15/22 17/8 17/9
18/22 28/4 49/7
49/15 49/16 51/17
52/19 63/3 70/25
73/5 85/1 90/16
91/11 94/2 105/2
107/19 109/11
109/24 110/24
111/12 114/8
114/13 114/18
115/8 115/22
119/19 119/24
120/6 120/14
120/18 120/23
121/1 125/6
125/14 125/15
126/7 138/14
146/11 147/5

147/22
**counsel's [1]**
3/13
**Count [4]** 77/9
77/9 108/4 108/4
**country [2]** 88/17
93/6
**couple [2]** 94/4
146/13
**course [19]** 23/1
31/12 33/22 34/20
65/15 66/13 67/24
68/3 77/1 77/4
80/17 87/15 110/6
115/10 121/2
134/17 136/4
143/13 144/7
**court [134]** 1/1
2/18 6/19 7/6 9/1
10/5 10/6 11/23
11/24 12/4 12/5
12/6 12/24 24/6
24/6 24/10 24/11
26/1 26/8 28/9
28/25 29/7 30/6
34/3 34/12 35/3
36/5 36/11 38/3
40/14 40/16 43/8
44/2 44/9 44/9
44/18 44/24 47/16
47/22 48/6 50/5
50/24 52/6 52/11
53/18 53/19 53/21
54/9 54/24 56/16
56/19 58/12 59/3
59/18 62/4 62/6
62/12 64/19 66/17
68/21 68/23 70/16
76/20 81/13 81/23
81/23 82/8 84/1
84/18 84/23 92/11
92/18 93/18 93/20
94/8 95/16 95/19
95/25 96/1 96/2
101/18 101/25
103/3 104/25
105/1 105/7
105/18 106/5
107/17 108/19
109/19 111/9
113/3 113/9
113/10 113/16
115/10 115/14
116/18 117/13

**C**

**court... [34]**
119/12 122/15
124/8 127/16
127/19 127/21
128/3 128/12
128/17 128/23
129/2 129/7 129/9
129/17 130/2
130/3 131/19
132/21 133/19
137/20 138/2
138/4 141/17
141/19 141/20
142/9 142/12
146/15 148/13
149/23 150/24
151/3 151/12
153/3

**Court's [13]**
30/14 43/4 43/11
44/5 47/15 47/23
52/16 66/11 69/19
75/20 80/4 91/14
92/13

**courthouse [3]**
23/19 52/13 110/9

**courtroom [3]** 3/7
39/1 110/16

**courts [9]** 2/19
23/25 30/22 44/10
72/6 89/7 102/19
129/24 143/21

**cover [3]** 83/14
83/15 123/19

**coverage [3]**
23/20 23/21 23/24

**covered [11]** 46/6
46/10 51/2 56/12
69/14 86/2 116/9
118/17 139/10
143/1 143/4

**covers [2]** 135/23
150/11

**Covington [1]**
12/3

**CR [1]** 1/3

**crafted [1]** 108/19

**crazy [2]** 72/3
84/13

**CRC [1]** 2/18

**create [1]** 107/24

**created [5]** 8/23
31/12 72/7 72/8

121/24

**credible [3]** 18/5
90/7 104/24

**crime [8]** 8/3 12/7
32/21 48/24 58/14
59/24 62/14
122/21

**criminal [31]** 3/3
20/7 20/14 20/23
21/1 21/7 21/9
30/16 30/18 34/9
34/16 38/14 40/7
46/24 47/6 48/22
50/18 51/18 51/19
52/1 52/1 52/14
55/17 56/13 57/13
75/25 90/24
121/20 124/4
124/14 124/20

**cross [12]** 24/20
24/24 26/21 27/3
27/13 42/25 43/19
92/17 92/19 104/1
136/21 137/1

**cross-examinatio
n [8]** 24/20 24/24
26/21 27/3 43/19
92/17 92/19 137/1

**cross-examine [1]**
27/13

**cross-examined
[1]** 42/25

**cross-examining
[1]** 136/21

**crystal [1]** 48/4

**cumulative [3]**
40/22 63/7 64/15

**cure [4]** 22/16
22/22 90/6 90/6

**cures [1]** 35/4

**current [7]** 62/15
80/24 81/1 81/15
82/20 83/20 90/14

**currently [1]**
86/23

**cynics [1]** 80/2

**D**

**D'Amico [1]** 3/13

**D.C [8]** 1/18 50/24
54/12 54/17 74/9
74/11 122/15
123/25

**daily [1]** 88/21

**Dan [1]** 32/17

**date [45]** 6/5
14/12 14/21 17/12
17/21 18/2 18/9
19/4 19/8 22/13
22/15 23/8 77/11
77/23 83/10 83/11
89/20 89/25 90/5
90/9 90/12 90/17
90/20 91/3 91/7
104/9 104/15
104/17 116/11
116/23 117/17
118/9 119/8 120/7
120/24 121/10
146/17 146/18
146/22 146/22
146/25 147/15
147/16 148/8
153/10

**dates [4]** 17/22
77/8 83/6 119/6

**DAVID [4]** 1/21
2/1 3/18 55/10

**David Schoen [1]**
55/10

**Davis [1]** 65/25

**day [19]** 16/2 17/3
22/12 22/14 36/21
76/8 78/10 92/4
92/5 93/12 93/13
100/14 101/13
102/25 107/14
125/18 132/8
149/12 149/14

**day one [1]** 76/8

**days [3]** 53/7
90/25 97/12

**DC [4]** 1/19 2/9
2/13 2/20

**dcd.uscourts.gov
[1]** 2/21

**dead [1]** 83/10

**deadline [2]**
24/10 81/7

**deal [7]** 4/15 57/9
68/20 75/17 84/22
108/17 134/2

**dealing [5]** 50/14
59/25 75/21 84/14
85/22

**deals [5]** 46/2
85/2 123/2 123/11
143/5

**debate [41]** 35/11
39/1 39/4 39/8
42/17 42/19 42/21
43/2 43/15 44/9
44/17 45/5 45/14
45/25 46/7 46/10
50/23 51/2 52/5
54/2 54/13 56/7
56/11 56/12 56/16
57/1 57/22 58/3
64/8 141/11
141/12 141/15
141/18 141/19
141/21 141/25
142/16 142/22
143/2 143/10
143/16

**decade [2]** 24/15
129/7

**decent [1]** 128/19

**decide [23]** 7/12
11/23 11/25 12/6
13/3 13/5 13/22
32/16 36/12 44/23
46/21 96/19 96/20
96/23 96/24 96/25
98/1 100/6 100/18
103/25 131/12
151/9 151/10

**decided [5]** 32/15
32/22 47/22 51/9
127/5

**decides [4]** 9/22
10/3 10/5 10/6

**deciding [4]**
95/25 96/2 96/2
145/23

**decision [26]**
16/16 16/19 18/5
18/24 20/6 30/17
34/18 44/5 49/25
50/1 50/6 50/10
50/20 53/18 62/4
68/13 69/21 111/6
115/5 118/16
123/13 134/24
136/4 144/15
148/23 148/24

**decision-making
[5]** 30/17 49/25
50/1 50/6 50/10

**decisions [5]** 7/4
70/19 126/4
128/13 140/22

**declination [7]**
25/14 33/17 69/11
69/17 140/9
140/22 140/25

**decline [1]** 33/4

**declining [2]**
115/23 139/19

**deem [1]** 52/5

**default [41]** 15/24
16/5 16/8 16/10
19/3 22/6 22/8
22/10 22/11 22/17
34/5 34/7 34/9
34/10 34/25 35/5
61/14 76/21 77/6
77/8 77/12 77/23
78/4 78/12 78/15
80/25 83/5 83/9
83/10 83/11
111/24 112/10
113/4 113/19
114/18 129/20
146/3 146/19
146/25 148/1
148/16

**defaulted [2]** 20/5
31/5

**defeats [1]** 15/15

**defect [1]** 129/10

**defend [2]** 90/16
129/20

**defendant [106]**
1/6 1/21 2/4 10/24
11/12 11/25 12/6
13/1 13/13 13/19
14/2 14/22 15/1
15/10 16/8 16/9
16/18 20/25 21/7
22/9 22/16 23/7
23/20 23/22 23/24
24/5 24/10 24/14
24/19 26/18 27/1
27/11 27/18 29/18
29/23 30/19 31/2
31/6 31/15 31/19
32/7 32/8 32/10
33/13 33/20 33/24
35/13 35/16 35/18
35/23 36/2 36/21
37/9 37/18 40/5
40/9 40/11 49/10
49/22 51/6 51/9
51/16 51/22 52/8
52/12 54/11 56/8

**D**

**defendant... [39]**
58/12 58/16 58/21
67/25 87/13 90/20
95/9 96/6 96/9
97/16 97/21 98/2
99/2 99/3 99/13
99/18 100/23
101/16 101/22
102/1 102/20
103/2 103/4 104/7
105/20 107/7
107/10 107/13
122/19 122/20
124/2 124/9
124/14 124/15
124/18 127/22
128/4 128/6 133/1
**defendant's [27]**
11/8 11/21 13/9
13/17 13/24 14/11
18/22 23/15 23/18
25/25 27/9 28/22
29/3 29/6 31/10
37/12 37/21 57/24
79/21 90/19
102/16 102/23
107/5 112/15
118/22 124/20
126/6
**defendants [1]**
103/12
**defendants' [1]**
56/14
**defending [1]**
93/9
**defense [78]** 6/10
9/16 9/21 11/15
12/7 14/19 15/12
15/18 15/22 31/18
33/2 33/9 35/14
40/23 41/13 41/15
41/16 41/21 43/21
44/4 49/13 49/23
58/15 58/15 58/21
62/21 64/12 67/20
67/21 68/7 68/11
71/5 71/16 73/12
75/15 84/24 91/19
93/14 94/1 105/2
105/12 106/6
107/6 107/12
109/20 114/8
114/10 115/2

118/20 119/19
122/8 122/17
122/24 123/21
123/22 123/24
124/1 124/3 124/9
124/10 124/12
124/22 124/24
125/2 125/21
125/22 125/23
125/25 127/15
127/23 128/4
132/10 132/14
132/15 138/14
140/25 144/13
145/11
**defenses [32]**
5/11 6/7 7/9 7/10
11/1 14/22 43/24
43/25 49/20 71/3
71/8 90/23 91/13
101/20 105/21
109/17 111/25
122/1 122/6
126/11 126/12
126/17 127/9
127/20 128/1
128/15 129/24
133/3 133/8
138/24 145/13
148/24
**defensiveness [1]**
93/8
**defer [3]** 10/1
130/25 131/13
**deference [2]**
48/13 48/13
**deferred [1]**
96/24
**defers [1]** 28/25
**defiance [2]**
51/11 77/13
**deficiency [1]**
85/24
**defied [1]** 39/5
**defined [6]** 9/2
116/20 117/13
119/12 124/9
135/7
**defines [1]** 34/8
**definitely [2]** 58/2
103/13
**definition [5]**
74/17 115/17
121/23 125/1

142/11
**definitions [1]**
112/12
**defy [3]** 40/3 51/9
51/9
**defying [1]** 22/24
**degree [2]** 83/15
83/15
**delay [6]** 88/12
88/14 90/16 90/25
102/3 102/10
**delegated [1]**
8/21
**deliberate [17]**
16/16 16/25 18/24
112/13 112/19
113/6 113/21
113/24 114/4
114/12 114/19
114/23 116/17
117/14 121/6
146/21 147/13
**deliberately [3]**
113/14 113/18
116/3
**deliberations [4]**
31/17 82/19 84/9
142/18
**deliberative [4]**
69/14 86/2 142/4
142/21
**deliberative-proc
ess [1]** 69/14
**deliver [1]** 129/19
**delivering [1]**
38/9
**Dellinger [1]**
74/13
**demand [2]**
106/13 124/10
**democracy [1]**
39/10
**demonstrate [4]**
49/10 113/11
116/1 116/15
**denial [1]** 80/21
**denied [6]** 31/17
118/1 119/20
129/4 129/6 135/3
**deny [5]** 63/16
64/13 118/24
128/23 140/11
**Department [15]**
4/7 33/21 47/6

47/9 47/24 52/25
55/18 55/19 61/11
72/6 83/19 89/12
117/24 131/18
140/19
**Department's [2]**
13/16 41/11
**depend [3]** 43/5
43/23 92/18
**depending [2]**
55/16 109/21
**depends [3]** 43/3
92/8 92/12
**deponent [1]** 73/6
**deposition [10]**
94/15 95/6 97/12
97/15 99/19
100/15 132/5
132/8 139/19
151/2
**Deputy [1]** 49/15
**described [2]**
27/2 82/22
**describes [1]** 9/9
**design [3]** 88/18
88/18 88/20
**designed [2]**
56/16 57/12
**designee [1]**
63/25
**desirous [1]**
31/11
**detachment [1]**
87/24
**detail [1]** 27/21
**details [1]** 87/3
**determination [5]**
12/25 14/7 15/5
15/9 52/25
**determinative [1]**
36/21
**determine [3]**
6/19 131/7 142/3
**determined [2]**
6/20 75/24
**determines [1]**
6/17
**determining [2]**
117/6 126/14
**detrimental [1]**
90/24
**Deutch [1]** 114/2
**develop [1]** 91/19
**development [3]**

79/25 80/1 92/20
**developments [1]**
77/13
**dictated [1]** 95/24
**did [36]** 11/15
13/19 13/19 14/2
17/15 26/16 33/4
38/12 40/3 51/6
62/6 67/21 73/25
82/11 91/17 97/14
106/9 115/1
116/12 116/23
118/9 119/2 119/6
120/18 120/19
121/14 127/2
129/9 132/6 133/6
139/18 142/12
145/18 147/13
147/15 148/9
**didn't [28]** 7/10
12/11 27/16 31/5
61/23 62/3 66/19
74/7 74/9 74/21
76/2 77/3 80/4
88/7 88/11 89/21
91/3 104/8 104/14
121/15 125/16
149/20 149/21
149/22 150/24
150/25 151/3
151/12
**difference [1]**
96/13
**different [26]**
6/15 7/15 15/22
21/2 21/10 27/12
32/22 35/23 39/16
41/11 51/13 56/3
71/11 72/15 72/18
83/1 89/12 95/3
96/4 100/7 107/9
112/12 121/23
128/9 131/8
144/20
**differently [4]**
31/25 32/2 33/8
98/4
**difficult [4]** 25/21
75/17 97/16 104/3
**difficulty [1]** 89/5
**dire [7]** 23/11
23/13 23/25 87/16
91/22 104/21
145/3

-3041-

**D**

**direct [8]** 43/1
43/19 47/15 47/23
56/15 69/24 73/16
146/15
**directed [1]** 91/16
**directly [8]** 8/25
11/21 12/14 57/9
70/22 75/20 80/5
86/5
**Director [1]** 49/16
**directs [1]** 104/1
**disable [1]** 46/25
**disagree [5]** 41/9
60/7 73/21 75/5
84/1
**disagrees [1]**
44/2
**disclosed [1]**
98/25
**disclosure [3]**
24/22 140/18
140/21
**discount [1]** 50/3
**discoverable [1]**
30/19
**discovery [11]**
25/14 30/16 30/22
30/23 40/13 40/15
98/25 140/9
140/10 140/12
145/9
**discrete [1]** 146/5
**discretion [2]**
34/19 135/10
**discuss [7]** 64/20
97/14 112/5
118/20 122/3
137/23 138/15
**discussed [29]**
10/16 16/22 17/18
38/25 53/17 60/2
64/17 67/23 75/8
85/7 86/10 86/12
92/10 112/21
114/1 127/16
130/10 131/25
133/2 133/3
133/16 133/21
139/1 139/5 143/3
143/18 144/2
144/7 146/1
**discusses [1]**
106/24

**discussing [1]**
110/13
**discussion [3]**
28/1 68/5 104/12
**discussions [3]**
120/23 135/24
147/23
**Dismiss [2]** 11/22
127/1
**dismissal [3]**
35/14 127/2 144/5
**dismissed [4]**
21/9 52/2 66/18
106/19
**disorganized [1]**
82/5
**dispute [6]** 75/13
76/18 97/18 98/7
114/23 132/1
**disputed [1]**
61/18
**disputes [1]** 97/9
**dissipated [2]**
90/10 90/12
**distinct [1]**
139/16
**distinction [2]**
83/19 83/25
**distracting [1]**
23/3
**DISTRICT [6]** 1/1
1/1 1/14 2/19 54/9
62/6
**do [60]** 4/19 4/20
7/17 12/21 12/23
13/3 13/6 14/6
27/10 34/23 40/6
44/8 45/24 46/16
46/19 47/8 51/18
51/24 54/23 59/7
59/11 62/24 63/12
63/19 65/15 66/24
67/19 68/20 81/9
87/6 87/8 91/24
92/7 105/3 105/19
108/19 110/9
110/10 110/17
110/20 110/21
111/1 111/3 111/5
114/12 118/15
121/12 122/25
123/19 125/24
134/10 135/16
136/2 138/6

139/16 142/10
143/2 145/8 149/2
149/10
**doctrine [3]** 49/2
50/8 114/17
**document [5]**
13/10 13/11 65/3
65/3 106/13
**documents [28]**
13/12 20/5 30/12
32/22 34/11 40/9
40/11 40/18 56/23
77/16 78/22 85/18
107/9 115/23
116/1 116/7
116/17 120/1
122/24 123/2
125/10 139/20
140/13 140/25
142/16 143/1
143/5 143/10
**does [39]** 14/2
21/18 22/11 22/23
27/4 27/25 30/16
35/8 37/11 41/21
44/12 44/15 45/4
45/25 46/3 48/15
50/2 54/2 54/19
58/16 62/21 63/20
69/19 71/19 71/25
72/2 81/9 84/20
100/6 111/23
112/8 112/10
112/15 114/13
115/20 116/8
125/2 132/23
138/22
**doesn't [28]** 4/16
11/20 29/4 29/17
30/12 35/4 35/22
37/22 41/14 45/15
46/10 57/9 57/20
59/22 61/19 63/4
77/19 78/9 78/25
79/22 82/10 83/19
100/17 104/24
105/13 121/9
135/14 146/6
**doing [8]** 25/16
43/14 53/7 74/20
91/14 99/9 109/20
120/20
**DOJ [11]** 31/21
31/22 33/1 46/19

60/7 106/7 106/8
115/24 122/10
140/13 140/23
**don't [83]** 5/4
10/12 12/9 12/11
12/13 13/5 14/5
19/12 25/12 25/20
29/14 29/23 30/9
32/4 33/24 35/2
43/21 45/9 45/21
48/20 52/9 54/24
57/24 58/10 58/19
62/11 63/5 65/12
67/13 68/5 69/15
72/9 72/15 72/19
72/24 74/16 75/3
75/18 78/18 81/3
82/8 83/24 86/15
86/19 87/8 87/11
87/12 88/15 88/18
89/25 90/9 91/8
91/13 91/14 93/20
98/24 99/23 99/23
102/3 105/3 106/3
106/8 106/13
106/17 107/10
108/5 109/3
109/13 109/14
109/19 109/22
110/11 111/2
125/19 135/17
139/14 146/13
146/14 149/6
149/23 150/10
150/17 151/5
**done [10]** 22/9
49/13 66/6 66/6
92/21 96/15
104/19 105/3
110/14 124/4
**dooms [1]** 122/14
**door [2]** 22/7 22/8
**double [1]** 39/6
**doubt [3]** 60/3
73/15 113/13
**DOUGLAS [2]** 2/7
3/22
**down [2]** 66/24
114/17
**draw [2]** 123/7
136/22
**drop [1]** 83/10
**drop-dead [1]**
83/10

**due [3]** 16/25
89/2 121/7
**during [4]** 94/4
123/1 136/15
137/17
**duties [1]** 82/22
**duty [1]** 93/18
**duty-bound [1]**
93/18
**dynamic [1]**
121/24

**E**

**e.g [1]** 16/25
**each [7]** 45/3
49/22 59/17 98/16
112/5 114/5 131/6
**earlier [8]** 33/21
38/9 46/20 75/20
112/22 131/25
139/1 143/3
**early [2]** 68/24
90/20
**easily [3]** 129/11
129/13 129/16
**Eastland [2]**
141/22 142/12
**ECF [13]** 47/25
117/25 118/18
118/23 119/17
120/11 120/14
133/1 134/5
135/22 140/11
141/9 144/18
**effacing [1]** 89/6
**effect [6]** 35/12
36/16 37/2 88/24
123/15 147/5
**effective [3]**
105/4 109/11
109/24
**effectively [3]**
90/21 92/21 134/8
**effects [2]** 87/21
88/8
**effectuate [1]**
141/22
**efficiency [1]**
4/15
**effort [2]** 37/19
105/10
**efforts [9]** 30/4
35/1 61/6 61/12
61/13 63/20 63/21

# E

efforts... [2] 137/4 137/15

ego [1] 93/9

Eighth [1] 122/18

Einstein [1] 55/24

either [19] 8/4 16/1 59/13 62/4 69/1 88/12 93/25 102/21 110/15 110/19 114/12 114/16 116/17 133/4 137/8 141/12 141/18 142/8 147/24

element [22] 8/2 8/3 8/4 8/5 8/8 8/12 9/13 16/7 59/25 62/14 62/21 72/17 107/1 113/24 114/15 114/16 119/12 127/6 127/15 127/25 132/14 135/6

elements [10] 5/11 34/21 49/19 60/1 91/21 101/20 114/11 122/16 127/20 138/23

Eleventh [2] 124/1 124/6

elicit [4] 35/18 59/13 64/11 99/13

else [5] 7/1 93/15 93/20 107/17 151/15

elucidate [1] 138/6

email [7] 27/6 125/15 134/6 134/12 134/13 137/5 137/14

emails [2] 28/13 134/16

embedded [1] 5/17

emphasizes [1] 83/23

emphasizing [1] 44/8

employed [3] 72/12 85/4 149/24

employee [5]

82/20 82/21 122/11 150/5 150/8

employees [1] 13/19

empty [1] 90/17

end [7] 36/21 45/11 89/22 90/18 95/15 105/5 149/12

endorsed [1] 133/19

endorsing [1] 67/12

endowed [1] 87/23

Energy [1] 8/14

enforce [3] 54/9 61/10 78/1

enforced [1] 78/2

enforcement [1] 124/13

engage [5] 13/1 20/25 51/8 102/21 105/1

engaged [3] 13/13 40/2 135/3

engaging [1] 124/16

engendered [1] 88/2

English [1] 34/7

enough [10] 15/7 25/8 66/17 70/3 85/25 87/12 104/2 104/3 149/19 149/22

ensure [1] 89/7

entertaining [1] 104/25

entire [2] 52/1 131/20

entirely [4] 51/13 118/12 119/14 134/17

entirety [1] 118/15

entitled [4] 31/16 116/10 127/22 153/6

entrapment [28] 14/20 31/7 31/18 32/18 32/19 33/12 33/18 71/3 71/7

72/1 82/9 92/24 93/2 106/22 107/12 112/1 118/19 122/2 122/6 122/8 122/14 122/18 123/13 126/11 126/17 139/7 139/24 140/24

equal [1] 30/23

equivalent [1] 123/3

erase [2] 34/15 34/23

erosion [1] 90/18

erred [1] 115/6

error [2] 67/9 84/23

especially [6] 42/12 49/14 50/8 84/4 105/20 125/4

essential [8] 40/9 40/22 42/11 42/12 46/18 49/13 114/3 127/15

essentially [9] 8/5 14/15 22/16 32/20 43/20 43/22 64/9 65/5 66/11

establish [6] 40/8 50/25 90/22 96/13 116/16 126/10

established [5] 15/8 113/17 113/23 114/2 114/7

estopped [2] 123/5 139/24

estoppel [27] 14/20 31/8 31/18 32/19 32/19 33/12 33/18 71/3 71/7 72/1 82/10 92/24 93/2 106/22 112/1 118/19 122/2 122/6 122/8 122/15 122/18 123/13 126/11 126/17 139/8 139/25 140/25

et [7] 1/9 3/6 5/10 17/1 58/23 71/9 72/5

et cetera [5] 5/10

17/1 58/23 71/9 72/5

evaluate [1] 105/2

EVAN [2] 2/4 3/18

eve [3] 21/8 22/25 90/4

even [35] 7/10 12/10 13/7 13/15 21/17 36/5 36/20 40/7 41/5 41/17 41/23 42/13 43/13 43/20 44/10 44/17 50/13 50/18 50/22 53/23 54/14 57/24 61/2 72/9 72/19 85/22 88/1 94/3 102/20 106/8 107/15 122/24 129/13 146/4 150/16

event [8] 44/11 54/18 76/11 88/17 114/12 133/8 141/1 143/24

events [6] 86/13 87/5 88/19 92/16 135/24 136/8

ever [2] 65/15 70/13

every [5] 57/10 71/23 72/18 75/6 81/20

everybody [1] 88/24

everyone [3] 3/17 97/14 146/10

everyone's [1] 110/18

everything [4] 21/18 67/17 93/15 107/18

evidence [115] 17/11 17/20 18/14 21/23 26/6 26/9 26/12 27/15 28/6 28/12 28/15 29/3 29/4 29/8 29/10 29/25 35/13 35/17 36/15 36/23 37/9 37/11 47/1 51/25 58/1 58/17 58/20 59/7 59/23 61/20 65/4 66/25 67/8 67/25 68/1 68/4

78/23 90/22 94/18 98/25 100/19 115/22 115/25 116/6 116/9 116/10 116/14 116/16 116/21 116/23 116/25 117/1 117/1 117/3 117/4 117/5 117/18 117/24 118/2 118/7 118/8 118/11 118/11 118/17 118/17 118/22 119/1 119/9 119/10 119/14 120/9 120/12 120/20 120/25 121/8 121/13 121/22 122/1 123/22 125/21 126/10 126/13 126/16 128/1 128/5 128/8 130/15 131/17 132/16 132/25 133/9 133/15 133/20 134/4 134/5 134/11 134/15 134/20 135/1 135/4 135/21 136/9 137/7 137/10 138/12 138/17 138/22 143/2 143/6 143/8 143/14 145/24 147/2 147/18 148/12

evident [1] 107/22

evidentiary [3] 25/8 94/4 124/11

evil [3] 112/17 113/19 114/14

exact [1] 70/7

exactly [10] 9/9 11/19 15/21 16/14 37/3 37/5 54/16 71/21 81/12 105/2

examination [9] 24/20 24/24 26/21 27/3 43/19 43/20 92/17 92/19 137/1

examinations [2]

**E**

examinations...
**[2]** 91/22 92/20
**examine [2]**
27/13 65/22
**examined [1]**
42/25
**examining [1]**
136/21
**example [20]**
29/19 31/20 73/13
88/7 92/14 94/13
99/17 107/3
116/12 116/22
117/8 120/6 121/9
121/15 126/6
127/21 132/3
139/24 147/24
148/7
**examples [1]**
84/11
**except [1]** 70/8
**exception [2]**
91/6 141/21
**excerpted [1]**
76/23
**exchanged [2]**
104/20 104/20
**excludable [1]**
128/8
**exclude [20]** 19/1
21/22 28/12 29/2
29/4 29/24 68/1
68/6 88/1 102/18
105/25 117/24
118/22 119/18
120/12 125/21
132/25 133/14
134/4 135/5
**excluded [6]**
105/21 116/21
118/2 118/12
130/15 132/16
**exclusion [2]**
36/17 37/11
**exclusive [1]**
131/5
**exclusively [1]**
43/25
**exculpatory [6]**
37/17 59/20 61/5
96/10 101/13
101/23
**excuse [7]** 11/17

14/15 41/21 71/5
72/4 106/8 117/2
**excused [15]**
11/8 15/2 73/9
82/14 117/9
117/15 117/19
118/4 120/16
121/1 121/17
139/2 139/9 140/3
147/3
**excuses [1]** 71/16
**executing [2]**
53/14 54/4
**executive [67]** 6/2
11/4 11/5 11/7
11/14 12/1 13/1
13/4 13/8 13/12
13/22 13/25 14/3
14/9 14/15 16/2
53/3 54/1 59/2
70/1 70/5 70/12
70/16 70/20 71/1
71/12 72/7 72/13
72/14 72/17 73/8
73/11 73/17 73/25
74/2 75/3 75/6
75/10 75/15 76/12
76/14 80/11 80/12
80/23 80/23 82/10
82/18 82/24 83/1
84/7 85/3 85/4
85/13 86/4 106/5
106/10 106/15
106/16 106/20
106/21 121/18
126/9 139/2 140/2
147/4 150/5 150/8
**exempted [1]**
119/3
**exercise [1]** 34/19
**exercising [2]**
91/23 91/23
**exertion [1]** 147/4
**exhibit [4]** 64/4
108/12 108/15
108/20
**exhibits [1]** 91/22
**exist [3]** 31/5
79/22 140/14
**existed [1]** 83/11
**exists [4]** 26/7
40/25 79/22
144/22
**expand [1]**

145/17
**expect [6]** 18/14
26/16 55/2 77/17
134/10 136/22
**expeditiously [1]**
77/15
**expeditiousness
[2]** 90/15 90/23
**expend [2]** 21/2
21/6
**experience [5]**
17/22 92/24
118/22 119/8
119/19
**experienced [1]**
104/22
**explained [7]**
40/16 113/16
122/9 127/1 129/2
138/2 142/9
**explaining [1]**
119/1
**explicit [4]** 10/2
53/22 56/6 143/19
**explicitly [1]** 62/4
**exposure [1]**
65/23
**express [2]** 46/3
115/11
**expressed [1]**
107/25
**expressly [4]**
6/24 6/25 45/6
47/21
**extant [1]** 79/14
**extend [1]** 122/24
**extending [1]**
145/20
**extension [2]**
81/11 145/18
**extensively [3]**
15/23 68/8 80/20
**extent [31]** 14/23
24/19 26/8 46/12
70/18 95/12
101/16 101/25
102/7 104/25
106/18 112/2
118/2 118/25
119/22 119/25
120/2 120/3
120/15 120/22
126/2 126/20
135/23 140/17

141/4 142/24
143/1 143/18
144/22 146/3
147/23
**extraneous [1]**
105/21
**extreme [1]** 23/12

**F**

**F.3d [5]** 66/9
122/23 123/16
124/6 128/7
**face [2]** 90/15
99/12
**faces [2]** 52/8
135/17
**fact [32]** 6/18
11/3 19/20 24/3
30/21 41/8 42/14
44/1 44/3 44/6
45/18 46/25 47/12
50/5 57/23 60/9
78/3 83/21 86/3
87/11 90/3 93/9
97/19 98/12
100/10 103/11
117/4 117/6 132/9
132/16 144/23
151/8
**factors [1]** 91/4
**facts [5]** 41/13
59/5 68/11 87/2
88/17
**factual [17]** 27/5
59/5 61/18 77/5
97/13 97/15 97/18
97/25 98/3 98/7
100/25 101/11
123/9 123/12
132/1 133/14
139/3
**fail [1]** 116/13
**failed [2]** 116/4
147/11
**failing [3]** 113/14
128/16 128/19
**fails [3]** 113/18
129/18 138/6
**failure [18]** 16/24
34/8 48/24 112/15
112/18 112/19
114/4 114/10
114/19 116/6
116/16 117/14

120/16 121/6
126/24 127/17
146/20 147/12
**fair [11]** 15/7 25/8
64/22 65/21 74/16
90/19 103/19
104/11 109/10
109/22 149/19
**faith [2]** 120/13
120/17
**fall [7]** 8/16 30/14
31/6 50/25 52/11
87/11 142/1
**falls [1]** 142/11
**familiar [1]** 74/14
**far [4]** 32/18
34/21 80/7 90/23
**fashion [1]** 55/10
**fashioning [1]**
13/23
**fast [1]** 54/13
**faster [2]** 104/13
104/16
**fatally [1]** 40/6
**favor [1]** 145/17
**FBI [1]** 3/13
**federal [8]** 26/6
40/7 50/18 54/9
117/3 124/4
124/13 125/2
**feed [1]** 76/24
**feel [2]** 10/20 67/8
**felt [1]** 89/23
**Ferrer [1]** 54/8
**few [1]** 90/25
**fiction [1]** 87/22
**field [1]** 55/22
**Fifth [3]** 12/7
35/25 56/14
**figure [2]** 103/2
104/1
**file [4]** 108/16
144/8 151/20
151/22
**filed [19]** 4/3 4/11
4/13 4/13 25/17
30/3 34/4 37/23
65/2 103/23 104/7
104/10 108/14
108/16 111/13
111/17 131/19
143/24 148/20
**filing [5]** 76/3
105/5 143/16

**F**

filing... [2] 143/22
145/10
filings [4] 7/1 7/2
85/9 85/10
final [3] 138/25
144/2 144/17
finally [1] 145/21
find [9] 78/15
81/18 104/24
107/10 128/6
135/11 138/7
145/5 150/14
finding [2] 70/20
91/16
fine [4] 39/20
55/13 110/22
136/22
finish [2] 65/20
149/6
finished [1] 76/9
firmly [1] 91/9
first [32] 3/2 5/11
11/20 14/14 20/11
23/8 25/24 30/9
36/12 37/8 40/6
47/17 52/23 55/9
55/14 61/24 69/9
69/11 69/18 76/9
76/13 80/14 88/5
106/25 111/22
112/8 115/21
124/12 128/11
132/24 134/4
144/20
fit [3] 32/3 125/2
126/13
fits [1] 31/20
five [2] 32/10
107/8
flaw [1] 117/11
flawed [1] 40/6
Fleischman [1]
113/17
floating [1] 11/5
Floor [1] 2/5
flow [1] 82/23
flowing [1] 86/24
fly [1] 92/21
focused [6] 10/15
14/22 16/18 23/23
77/15 103/16
follow [1] 51/6
followed [10]

31/12 31/12 48/6
48/12 51/14 66/21
94/10 95/12 99/1
100/25
following [4] 6/3
31/11 119/3
122/17
folly [1] 77/13
force [1] 63/21
forced [1] 91/9
forcing [1] 90/20
forecloses [1]
37/9
foregoing [2]
52/4 153/4
forget [1] 146/9
forgive [1] 96/16
form [5] 36/2 66/3
70/14 108/3 139/9
formality [1]
90/17
formation [1]
5/10
formed [4] 40/25
41/4 41/6 41/16
former [18] 13/6
21/16 70/6 70/13
80/13 80/16 80/22
81/15 81/22 82/20
83/20 121/17
124/25 125/1
125/5 126/8
134/15 145/23
formulate [1]
93/14
formulation [1]
66/21
forth [1] 8/8
forum [1] 136/19
forward [5] 3/8
54/22 108/11
108/22 146/10
foul [1] 26/4
found [4] 12/5
23/25 89/12 150/2
framers [1] 39/8
framework [2]
63/2 68/12
Frank [1] 3/13
frankly [2] 26/14
84/14
free [4] 10/20
89/4 95/10 144/8
freestanding [1]

71/4
Friday [1] 24/8
friend [1] 76/23
front [8] 12/21
17/6 20/1 27/10
39/2 42/2 100/20
138/15
full [3] 61/3 136/1
136/3
fully [3] 66/14
101/21 130/4
function [1] 93/10
functional [1]
99/7
fundamental [7]
6/3 58/13 69/12
70/4 82/15 87/13
89/14
further [7] 49/11
63/20 63/21 73/9
81/4 140/17
145/20
future [1] 148/2

**G**

GASTON [8] 1/17
3/12 4/23 5/1
66/11 67/5 93/24
110/20
gather [1] 129/22
Gaudin [2] 60/8
60/11
gave [5] 22/15
22/20 84/21
119/24 147/22
general [12] 2/8
2/11 3/23 3/25
35/9 49/7 51/17
62/19 102/5 116/5
133/25 135/23
generally [2]
136/9 144/14
generated [1]
31/1
genuine [1]
124/21
get [26] 9/15 9/15
11/11 12/16 17/18
19/1 30/15 37/18
56/25 61/2 61/19
62/11 63/5 66/18
67/22 74/9 76/6
76/19 82/2 84/2
86/8 88/7 95/14

109/1 135/15
151/8
gets [4] 31/19
68/11 68/13 96/25
Giglio [2] 30/25
85/8
give [7] 33/2 53/9
54/23 92/11
129/19 132/7
149/8
given [13] 33/16
60/8 69/13 83/8
89/4 93/16 125/4
129/21 135/10
140/23 141/19
151/2 151/3
giving [2] 22/22
54/6
gleaned [1] 135/1
go [58] 4/19
11/16 15/24 16/14
18/4 23/3 25/12
25/12 27/9 27/21
31/3 32/7 32/24
41/13 55/16 56/23
58/22 59/17 62/15
62/21 66/12 66/19
66/24 71/2 71/2
71/8 71/25 76/17
76/21 84/19 92/9
92/18 97/7 98/12
98/14 98/15
104/11 105/13
105/25 106/22
109/6 111/5
116/20 117/12
119/11 120/23
121/9 122/7
125/22 127/4
133/9 133/21
135/5 138/22
143/8 146/23
147/1 147/24
goal [2] 90/23
110/2
goes [20] 14/17
17/17 29/12 31/8
31/19 31/25 33/18
41/2 43/20 60/15
61/14 62/14 71/13
73/24 75/20 78/16
114/21 115/23
136/23 146/20
going [37] 12/17

17/23 19/14 25/14
28/11 28/17 32/25
34/2 39/17 43/5
55/8 58/22 64/8
65/13 65/21 66/3
78/23 84/2 86/8
90/5 92/22 95/5
96/14 101/11
101/24 103/13
103/22 108/1
108/3 108/6
109/17 109/21
111/3 140/6 146/5
148/23 149/12
Gojack [3] 8/9
8/24 9/3
good [18] 2/25
3/11 3/14 3/20
3/21 3/22 4/1 5/2
5/3 28/20 28/21
39/23 39/24 55/6
55/7 87/12 120/13
120/17
Good-Faith [1]
120/13
Gorsuch [1]
75/15
got [14] 17/3 17/4
17/5 20/24 62/15
63/14 64/5 67/14
69/22 82/5 92/17
99/13 105/23
147/6
gotten [2] 27/16
79/4
government [117]
3/10 4/7 4/14 4/17
4/19 5/23 8/1 11/2
12/4 12/14 13/18
15/4 15/23 16/3
21/2 23/6 23/22
24/9 25/3 25/17
26/14 27/7 27/14
27/17 27/19 28/6
28/25 29/7 29/17
30/11 32/2 32/20
32/23 33/3 33/7
33/16 35/8 35/22
35/24 36/2 36/11
37/19 37/22 42/9
46/14 49/2 50/13
53/3 60/2 63/11
64/4 65/8 65/11
66/2 67/9 70/10

-3045-

**G**

**government...**
**[61]** 70/25 71/12
77/2 77/12 78/7
80/1 80/15 85/11
85/17 91/6 92/3
92/25 94/6 98/17
99/14 101/17
101/18 102/2
104/12 104/24
105/17 107/2
108/13 108/16
112/13 112/14
112/23 113/13
122/19 122/25
123/4 123/5 124/5
124/17 130/16
133/12 133/15
134/5 134/11
134/14 134/19
134/25 135/14
135/25 136/2
136/4 136/16
137/3 137/4 137/9
137/9 137/18
137/22 138/11
138/19 139/1
139/23 140/13
140/14 151/18
151/19
**government's**
**[57]** 5/8 5/14 5/15
5/19 6/8 7/8 7/19
9/22 9/24 15/19
17/10 17/18 19/2
19/2 19/23 20/2
20/3 20/13 20/18
21/14 21/22 21/24
22/12 23/10 24/8
24/16 25/2 26/13
30/17 32/13 33/1
34/19 36/1 76/22
94/12 96/18 97/6
98/9 100/13
100/16 116/9
117/23 118/18
118/21 119/17
126/16 132/24
133/11 133/23
136/11 137/13
137/24 139/15
140/6 140/15
148/11 148/19
**grant [12]** 21/22

36/13 55/15 64/19
118/23 133/2
134/23 135/22
136/13 137/25
138/7 141/10
**granted [13]**
36/14 43/17 46/22
52/17 60/22
117/25 119/20
119/22 126/18
133/24 134/8
135/10 144/16
**granting [1]**
118/15
**grants [1]** 56/6
**granular [1]** 61/2
**grappled [1]**
139/15
**great [1]** 28/18
**greatly [1]** 145/16
**ground [2]** 68/1
129/21
**grounds [3]** 27/3
35/12 144/20
**group [1]** 45/13
**GSA [1]** 80/22
**guarantee [1]**
65/20
**guess [9]** 36/17
45/12 65/8 96/16
98/2 100/17
110/15 131/2
149/18
**guidance [1]** 60/8
**guide [1]** 123/13
**guilt [3]** 27/9
59/22 88/2
**guilty [5]** 35/5
59/24 68/13 108/4
108/4
**GULLAND [1]**
1/17
**guy [3]** 81/2 81/19
82/2

**H**

**H.Res. [2]** 61/8
62/1
**H.Res. 503 [1]**
62/1
**H.Res. 730 [1]**
61/8
**habit [1]** 93/2
**had [57]** 6/2 6/4

6/7 9/2 12/6 13/6
16/15 17/12 17/12
17/23 18/1 18/2
18/2 18/10 18/12
18/14 19/7 22/9
23/18 29/20 29/20
33/16 33/21 34/12
34/12 39/13 49/10
54/14 62/7 81/7
88/9 91/25 98/6
98/6 100/20
104/16 105/15
106/24 117/17
119/2 119/8
119/24 120/6
120/20 124/18
128/18 129/6
129/21 130/4
130/12 146/22
146/24 146/25
147/4 150/25
151/1 151/2
**hadn't [1]** 97/22
**hand [1]** 112/21
**handle [3]** 25/14
28/2 28/17
**handled [2]** 23/11
23/12
**handling [1]**
19/11
**hands [6]** 76/12
76/13 80/10 80/11
80/13 82/4
**happen [6]** 9/4
66/19 92/12 94/9
108/2 109/14
**happened [12]**
18/24 19/5 33/13
48/25 62/25 63/1
63/6 77/12 88/19
91/17 92/16 96/11
**happening [1]**
90/3
**happens [1]**
42/24
**happy [8]** 10/14
39/22 45/10 68/25
93/24 102/2 110/8
149/8
**harass [1]** 52/14
**hard [1]** 74/12
**hardly [1]** 129/23
**harm [1]** 26/3
**has [143]** 3/2 5/18

5/23 5/23 6/16
6/17 6/20 6/22
8/10 8/19 9/17
11/25 14/22 15/23
16/8 16/9 16/18
19/5 20/6 22/24
23/7 23/20 24/20
24/21 25/3 25/6
27/1 27/18 27/19
29/7 30/19 30/20
31/22 32/8 32/25
36/2 36/4 37/10
37/16 38/3 39/4
40/14 41/15 42/4
44/9 45/16 45/18
45/23 46/12 48/4
48/11 49/13 49/15
53/1 54/1 54/18
56/3 58/12 58/21
59/1 59/2 59/2
60/2 60/8 61/6
61/10 62/21 63/23
64/4 65/11 66/2
67/25 68/2 71/6
75/19 76/7 76/11
77/1 79/11 80/10
84/19 87/1 88/15
90/6 92/3 95/2
95/12 95/19 96/3
96/5 96/20 97/5
97/5 97/11 97/17
99/6 99/12 102/7
102/17 102/17
102/24 102/25
103/4 104/18
105/12 106/9
107/1 107/6
107/13 107/17
114/7 116/18
117/4 117/13
122/16 123/25
124/3 124/4
125/25 126/22
127/19 128/3
128/11 129/18
130/2 130/16
130/19 130/24
131/20 132/19
132/21 133/17
133/19 138/2
138/4 138/8
140/14 141/19
141/20 142/9
142/15 144/3

150/12
**hasn't [4]** 19/22
31/15 36/22 37/23
**have [154]**
**haven't [8]** 14/13
35/6 79/4 88/13
96/15 104/23
108/23 139/12
**having [5]** 22/4
22/7 24/3 49/24
133/25
**he [165]**
**he'll [1]** 37/22
**he's [15]** 29/4
29/24 31/16 32/5
32/15 33/8 35/1
71/10 77/2 82/2
82/2 97/17 101/23
101/24 107/8
**head [3]** 71/13
71/14 151/16
**Heads [1]** 52/6
**hear [21]** 4/8 4/9
4/10 4/17 10/13
10/14 26/1 28/9
30/6 38/6 39/22
45/10 55/1 58/22
61/19 68/25 80/7
93/25 126/5
149/22 150/17
**heard [7]** 24/6
24/6 35/6 70/24
110/4 138/14
151/1
**hearing [13]** 1/13
4/6 20/11 24/3
26/12 61/22 61/24
70/15 122/9 123/1
127/2 134/10
139/5
**hearings [13]**
19/19 23/21 61/23
87/5 87/7 87/9
88/23 90/3 90/5
102/24 103/12
103/15 145/4
**hears [1]** 61/5
**heart [1]** 71/23
**held [7]** 44/9
115/18 115/21
121/13 128/12
130/3 137/6
**helpful [2]** 3/16
94/11

**H**

**Helstoski [1]**
53/19
**Henry [1]** 84/10
**her [11]** 27/2
35/13 41/5 45/5
59/19 61/2 61/4
95/10 99/8 128/21
136/25
**here [76]** 3/19
5/12 7/1 7/2 12/1
14/2 18/24 24/3
26/23 31/19 33/25
34/24 38/14 39/5
40/3 40/20 41/13
43/1 48/20 49/3
50/25 51/13 51/22
54/7 54/23 56/5
57/13 60/1 60/14
63/6 68/14 69/12
69/25 70/2 70/11
70/15 71/1 72/4
74/12 77/5 85/1
85/24 87/13 88/12
88/14 89/9 91/17
92/4 92/16 93/14
95/10 97/17 98/15
100/12 102/23
103/20 109/14
114/22 115/6
115/12 117/22
121/15 121/20
123/6 123/10
123/17 123/20
129/12 130/6
132/17 136/22
140/1 143/3
148/23 149/18
150/15
**here's [4]** 4/4
79/18 80/25 87/19
**herman [4]** 2/18
2/21 153/3 153/10
**heroin [1]** 84/21
**high [14]** 42/9
42/13 49/1 49/6
49/9 49/12 49/23
50/7 50/12 50/13
50/17 69/20 84/25
85/1
**high-level [1]**
49/6
**high-profile [1]**
69/20

**high-ranking [10]**
42/9 42/13 49/1
49/9 49/12 49/23
50/7 50/12 50/13
50/17
**highlight [1]**
25/20
**highlighted [1]**
83/21
**highly [2]** 35/13
35/19
**him [27]** 11/10
11/15 14/19 18/9
21/19 22/10 22/20
22/21 22/22 33/2
33/6 51/11 76/17
84/22 88/10 101/4
102/24 112/4
119/3 119/8
120/19 123/4
136/25 137/21
142/18 144/5
144/6
**himself [2]** 103/3
150/3
**hints [1]** 141/2
**hiring [1]** 88/22
**his [116]** 5/20
5/25 11/12 12/7
12/12 15/2 15/13
15/14 18/5 18/22
20/6 22/10 22/16
22/23 23/1 24/5
24/13 27/1 27/11
29/21 30/21 31/3
31/15 31/17 31/20
32/7 34/25 35/1
35/13 36/22 37/12
39/15 40/10 41/21
47/1 49/13 50/5
51/18 51/22 52/14
56/4 58/15 61/23
61/25 68/1 68/3
68/8 68/9 68/10
68/10 71/12 71/13
71/14 73/16 76/16
77/21 80/7 80/10
80/10 80/11 80/12
80/13 80/20 81/7
82/15 82/16 83/8
87/3 87/24 87/25
88/1 88/8 90/21
99/19 104/8
104/18 106/16

111/25 112/2
112/25 113/1
113/2 113/5 113/6
116/5 116/6
116/16 116/20
119/3 119/7
120/16 120/17
121/19 123/2
123/4 123/8
123/13 125/1
126/8 126/14
126/24 126/25
127/23 128/6
128/11 132/5
132/8 133/5
139/19 141/2
145/10 146/20
147/5 147/12
147/23 148/2
**Hmmm [1]** 53/12
**hold [5]** 19/13
51/11 56/11
117/17 147/10
**holder [3]** 44/20
44/21 44/22
**holding [1]**
114/21
**holdings [4]** 75/9
115/12 115/19
139/21
**hole [1]** 126/12
**home [2]** 109/20
149/6
**honest [2]** 108/22
108/23
**Honor [81]** 3/1
3/11 3/18 3/21
3/22 4/23 5/2 5/19
6/11 7/3 7/18 7/23
10/22 12/13 12/18
12/23 15/4 15/17
15/25 19/10 20/4
20/20 21/20 21/25
23/6 28/20 38/8
38/10 39/21 39/23
41/9 41/20 42/6
42/23 43/3 43/22
44/14 44/19 45/7
45/20 46/4 46/15
47/3 47/8 47/15
47/19 48/3 48/19
48/21 50/9 50/22
51/4 52/21 53/5
54/16 54/18 54/21

55/6 64/24 68/19
69/2 69/5 69/9
71/18 71/21 72/3
72/16 73/3 73/22
75/5 75/12 76/8
86/11 91/8 93/23
94/2 104/6 104/22
109/25 110/23
110/25
**Honor's [1]** 41/7
**HONORABLE [1]**
1/13
**hope [2]** 54/18
84/2
**hopes [2]** 21/9
40/18
**horn [1]** 93/3
**horrific [1]** 88/18
**host [1]** 64/5
**hour [2]** 80/9
110/10
**hours [2]** 93/12
93/13
**HOUSE [96]** 2/8
2/9 2/12 2/12 3/23
4/8 4/12 4/18 5/9
6/4 6/16 6/17 6/20
6/22 7/15 7/21
7/23 8/5 9/14 9/17
9/25 22/18 22/22
35/7 35/7 38/6
38/15 39/14 40/25
41/1 41/1 41/17
41/18 42/4 42/20
42/21 44/12 44/16
48/4 48/7 48/11
48/15 49/4 49/7
51/18 54/1 54/3
60/4 60/18 61/3
62/18 66/21 75/14
77/25 85/1 95/18
96/3 96/5 96/20
96/20 96/23 97/5
98/6 99/6 107/23
107/25 108/7
111/18 112/4
126/21 126/25
127/8 127/13
127/18 127/24
128/20 130/17
130/19 130/24
131/6 131/6 131/9
131/13 131/20
132/4 133/22

138/10 141/12
141/18 142/5
142/9 142/19
143/9 143/24
144/13 145/12
**House's [17]** 6/15
6/21 7/13 10/1
48/10 48/19 64/1
97/23 100/7
100/20 130/25
131/2 131/6 131/8
131/16 131/17
132/1
**how [28]** 4/5 7/7
14/3 14/9 25/1
32/6 41/5 46/24
55/25 63/2 63/3
66/1 74/22 74/24
87/6 90/4 92/9
94/12 95/23 97/25
106/5 106/13
106/15 106/24
112/6 121/3
132/23 146/15
**How's [1]** 86/20
**however [8]** 77/1
116/14 118/16
119/10 121/22
124/9 132/18
135/2
**huh [1]** 98/13
**hypothesized [1]**
44/10
**hypothetical [1]**
129/17
**hypothetically [9]**
5/25 18/19 21/18
36/14 37/7 41/10
41/12 97/4 147/15

**I**

**I'd [11]** 4/5 13/24
38/6 47/23 49/1
54/23 68/23 81/11
85/5 89/16 148/16
**I'll [23]** 4/9 4/10
4/24 11/17 52/21
55/1 68/3 71/4
71/21 102/19
110/12 111/6
112/5 114/6 133/2
134/2 134/23
135/22 136/9
136/13 137/23

**I**

**I'll... [2]** 140/11
141/10
**I'm [51]** 5/13 9/16
10/14 15/25 19/23
25/9 25/15 32/16
35/16 39/17 39/22
41/10 45/10 60/25
67/12 68/15 68/25
69/4 71/20 73/14
75/2 76/19 81/6
81/24 82/3 84/3
84/13 84/13 86/18
91/8 93/2 93/18
96/16 96/17 97/5
110/2 110/15
110/17 126/2
146/15 146/18
147/16 147/17
147/18 147/20
148/6 148/9
148/21 149/8
149/17 150/13
**I've [19]** 19/17
23/2 28/13 57/5
81/10 82/8 82/8
110/4 115/13
115/18 115/21
120/10 132/20
133/21 134/8
135/7 139/20
143/7 144/8
**I.B [1]** 137/3
**I.C [1]** 137/18
**I.D [1]** 138/11
**I.E [1]** 138/19
**I.F [1]** 119/18
**idea [10]** 25/25
29/20 55/24 61/20
62/24 72/8 80/15
83/18 85/16
108/11
**ideas [1]** 57/3
**identified [2]**
107/14 108/23
**identify [1]** 41/23
**ignore [2]** 39/13
62/11
**ignored [1]** 73/7
**ignores [1]**
106/25
**ignoring [1]**
107/13
**II.A [2]** 133/11

133/23
**illness [1]** 17/1
**imagine [5]** 5/25
13/23 74/12 97/4
100/15
**immaterial [2]**
68/4 112/18
**immediate [1]**
77/17
**immediately [2]**
22/18 22/19
**immunities [2]**
37/8 125/8
**immunity [39]**
11/10 13/8 13/16
36/12 37/8 37/9
39/1 42/18 42/19
42/22 43/2 43/15
44/10 44/17 44/20
44/20 44/21 45/5
45/14 45/24 45/25
46/7 46/10 46/22
50/23 51/3 52/5
54/2 54/13 55/21
56/12 56/13 57/22
58/4 58/7 70/8
125/17 143/16
143/17
**immunity's [1]**
44/22
**immunize [4]**
35/24 114/13
114/14 114/19
**impact [1]** 47/5
**impairs [1]** 90/21
**impartial [1]** 89/4
**impeach [1]**
108/5
**impeaching [1]**
136/24
**impediment [1]**
85/24
**implicate [1]**
13/12
**implication [3]**
33/1 121/18
127/10
**implications [2]**
48/21 86/13
**implicit [1]** 10/2
**implicitly [2]** 6/24
62/5
**implies [1]**
124/12

**important [10]**
9/4 20/20 57/4
63/10 63/13 63/24
65/19 67/10 87/2
114/22
**impose [1]** 24/10
**imposed [1]**
24/11
**impossible [2]**
13/22 14/6
**improper [8]** 28/7
28/8 51/21 79/13
136/17 138/14
138/15 138/18
**improperly [1]**
37/20
**inadmissible [4]**
26/9 26/12 121/11
121/21
**inadvertence [3]**
112/20 121/7
147/14
**inappropriate [4]**
75/24 135/11
136/18 140/20
**Inaudible [1]**
108/9
**incapable [1]**
146/6
**inclined [1]** 64/19
**include [1]** 9/18
**included [2]**
26/14 119/24
**includes [2]**
130/18 132/16
**including [5]**
13/14 103/23
123/15 131/20
132/6
**inconsistencies
[1]** 27/14
**inconsistent [2]**
22/8 41/16
**incorrectly [1]**
134/15
**incredibly [1]**
8/14
**Indeed [1]** 115/9
**independence [4]**
56/17 56/21 57/6
57/12
**independent [2]**
47/4 106/19
**independently [1]**
106/6

**indicate [1]**
125/16
**indicated [9]** 43/8
80/7 112/8 122/4
125/18 130/14
130/24 132/20
137/9
**indication [1]**
18/2
**indicted [1]** 83/21
**indictment [12]**
28/14 29/1 35/15
65/3 66/18 77/7
83/4 83/4 127/3
135/9 135/11
135/18
**indictment' [1]**
83/5
**Indies [1]** 123/16
**individual [3]**
43/24 59/1 124/19
**individuals [3]**
138/20 142/15
144/1
**ineffective [1]**
91/10
**ineffectiveness
[1]** 93/5
**inefficient [1]**
79/13
**inference [3]**
123/14 137/22
138/3
**inferences [1]**
123/7
**influence [2]** 88/1
88/20
**influenced [1]**
31/14
**influences [1]**
89/4
**inform [3]** 33/14
34/17 34/18
**information [25]**
24/20 24/23 28/2
29/16 37/17 40/17
41/24 42/11 49/11
49/21 59/5 66/17
67/10 69/14 86/24
100/14 103/1
132/5 132/7
134/23 137/15
139/11 140/1
141/3 144/4

**informing [1]**
24/14
**infringe [2]** 56/20
64/21
**infringement [1]**
57/16
**infringes [1]**
79/20
**ingredient [1]**
113/20
**initial [2]** 104/8
127/5
**Initiated [1]** 54/15
**innocence [1]**
27/10
**innocent [1]**
68/14
**inquire [1]** 105/18
**insistence [1]**
90/14
**insists [1]** 49/23
**instance [1]** 61/2
**instances [1]**
53/16
**Instead [2]** 22/20
126/12
**instruct [8]** 68/3
95/15 113/3 115/7
123/20 123/21
125/20 125/23
**instructed [7]**
26/3 97/22 115/2
115/9 124/11
125/5 125/7
**instruction [5]**
14/3 35/15 107/3
113/2 115/11
**instructions [10]**
13/23 13/25 47/25
71/11 87/21
104/19 107/2
112/11 124/25
135/15
**integral [2]** 142/3
142/20
**intend [6]** 29/17
43/9 76/25 110/11
119/13 136/9
**intended [3]**
132/7 140/18
140/21
**intends [4]** 15/1
45/24 118/10
119/5

**I**

intent [3] 31/3 114/2 114/11
intention [6] 16/25 29/8 113/21 114/12 114/14 114/23
intentional [11] 112/14 112/19 113/7 113/24 114/4 114/19 116/18 117/15 121/6 146/21 147/13
intentionally [4] 113/14 113/18 116/4 116/13
interested [1] 19/23
interesting [1] 67/12
internal [6] 31/16 94/16 95/8 140/19 142/18 142/19
interpret [2] 6/15 14/10
interpretation [8] 6/21 6/22 7/13 7/14 10/2 97/23 115/14 130/25
interpretations [1] 131/14
interpreted [3] 6/16 6/18 97/1
interviews [3] 134/7 135/1 135/4
introduce [12] 3/8 17/11 29/10 116/22 118/11 119/1 122/1 134/11 134/20 137/10 147/2 147/18
introduced [1] 118/18
introducing [2] 29/8 135/6
introduction [1] 38/13
introspective [1] 87/24
invalid [5] 73/7 117/10 118/5 120/3 121/1

invent [1] 50/6
inverse [1] 98/5
investigate [2] 9/11 142/10
investigating [1] 136/7
investigation [11] 8/6 8/11 8/19 8/20 9/3 29/5 29/6 66/1 66/6 66/8 66/9
Investigative [1] 49/16
inviting [1] 67/9
invocation [13] 70/1 70/10 70/11 70/19 71/1 72/4 73/8 80/12 80/16 82/23 122/14 126/9 136/3
invoke [2] 80/23 125/8
invoked [13] 70/5 70/13 70/17 70/21 76/13 76/14 82/11 82/19 82/25 84/8 85/12 85/22 86/4
involve [1] 73/25
involved [2] 84/8 86/17
involving [1] 122/11
irrelevant [18] 19/5 24/23 26/2 58/17 58/20 116/3 116/9 116/21 118/12 119/15 120/21 121/8 123/23 126/16 133/9 134/18 138/24 143/12
is [583]
isn't [10] 33/2 41/18 42/3 59/22 80/9 87/15 101/9 101/11 105/10 106/20
issuance [1] 142/13
issue [62] 8/22 12/5 12/19 12/20 24/2 24/4 29/1 29/18 32/24 33/11 33/11 34/25 36/20 37/20 40/3 50/25

51/13 55/19 56/22 57/3 61/18 63/7 63/9 63/15 66/1 66/5 70/22 76/20 81/12 81/13 85/11 87/13 89/15 94/17 94/18 95/9 98/22 99/25 101/3 101/10 102/3 103/6 103/20 106/1 107/22 111/6 122/5 124/15 126/19 127/9 139/13 139/16 143/11 144/10 146/5 148/13 148/15 151/1 151/4 151/6 151/13 151/14
issued [8] 33/21 38/15 40/5 51/16 52/12 101/23 112/4 128/21
issues [37] 11/5 19/20 21/14 23/4 24/4 25/20 42/15 43/6 43/12 43/24 49/19 56/1 65/10 66/14 66/19 66/20 69/25 75/24 81/13 81/14 92/18 94/4 97/15 101/20 105/16 105/21 107/15 110/13 111/21 112/6 127/5 131/15 133/16 137/6 139/23 144/15 145/14
issuing [1] 51/21
it [363]
it's [134] 5/5 8/2 8/8 8/11 10/3 10/5 10/7 10/17 12/18 12/20 13/22 14/1 14/12 14/19 15/21 16/7 18/6 19/25 27/12 29/24 32/5 32/25 33/11 34/24 35/3 36/3 36/4 36/22 39/3 39/10 41/13 41/15 41/20 42/11 43/5 44/8 44/17 44/18 44/20

44/21 44/22 44/25 44/25 45/1 45/9 54/3 54/4 54/17 56/7 56/8 56/9 57/2 57/14 57/19 57/25 58/4 58/10 58/13 60/6 60/9 60/18 60/20 60/21 62/9 62/10 64/2 66/13 67/11 67/16 71/23 72/16 72/23 74/9 74/12 74/16 74/25 75/23 77/4 80/5 80/18 81/16 82/1 82/17 82/25 83/12 83/16 84/1 85/1 85/5 85/20 86/2 86/20 86/22 89/20 94/21 94/23 95/15 95/24 96/1 96/21 97/16 97/19 97/24 99/1 99/11 99/15 100/1 100/1 101/7 103/11 105/12 105/14 105/22 108/17 108/21 108/23 109/5 109/22 115/3 115/16 120/10 121/3 121/23 133/20 135/18 136/22 139/7 139/8 139/16 140/5 146/1 146/14 147/7 149/15
its [46] 8/1 9/2 12/4 23/6 26/15 33/22 34/19 36/17 47/4 48/4 48/5 48/11 48/12 49/6 51/25 51/25 62/20 66/21 88/16 97/23 99/6 99/12 107/2 114/24 115/19 118/15 123/12 128/25 129/1 130/24 130/25 131/3 131/7 131/14 131/14 135/12 137/4 137/18 138/5 138/11 139/8 141/22 142/18

142/18 142/19 151/20
itself [11] 6/16 39/8 47/4 50/8 53/1 71/17 73/9 73/13 128/25 129/14 129/17

---

**J**

J.P [2] 1/17 3/12
Jackson's [1] 87/20
Janet [2] 72/10 72/14
January [12] 9/12 19/19 23/21 29/3 33/3 49/6 65/4 86/24 87/4 103/12 135/24 136/8
Jencks [2] 24/8 24/22
Johnson [3] 56/15 57/5 57/8
judge [32] 1/14 62/6 67/24 68/5 68/13 68/20 69/3 74/11 83/2 86/1 86/6 86/18 88/3 88/10 88/15 89/1 89/9 89/11 89/22 90/13 91/5 91/20 92/3 92/22 93/4 93/17 100/5 115/2 115/6 115/9 148/10 148/21
judgment [1] 53/3
judicial [6] 40/3 51/5 51/15 63/23 97/19 131/11
July [10] 1/11 79/22 89/10 89/11 102/6 102/7 102/10 102/14 104/4 153/10
jump [1] 109/21
June [2] 79/22 122/9
jurisdiction [2] 8/14 142/8
jurisdictions [1] 8/16
juror [1] 87/23
jurors [3] 88/24 89/6 103/18

**J**

**jurors' [1]** 103/10
**jury [140]** 5/16
5/18 6/13 6/15
7/12 7/14 9/22
10/8 11/4 12/19
13/21 13/23 13/24
14/1 14/7 14/8
15/6 26/1 26/9
26/10 26/11 27/10
27/19 28/7 28/9
31/19 32/5 32/6
32/16 32/16 32/24
32/25 33/9 33/19
41/2 41/13 47/21
47/25 60/7 60/9
61/5 61/19 61/25
62/5 62/15 62/22
62/25 63/5 63/3
66/7 66/12 66/19
66/22 67/6 67/6
67/10 68/3 68/6
68/12 71/8 71/10
78/3 78/15 83/3
83/12 84/19 84/25
87/16 87/21 89/4
91/16 92/19 93/1
94/9 94/21 94/22
94/24 95/15 95/17
95/19 96/4 96/20
96/22 96/25 97/7
97/22 98/2 98/8
98/12 98/18 99/21
100/5 100/7
100/17 100/20
101/1 104/19
107/2 107/23
108/3 108/5
111/25 112/11
113/2 113/3 115/2
115/7 122/7
123/21 123/22
124/11 125/20
125/23 126/5
126/22 127/5
128/2 128/4 128/6
128/9 131/2 131/8
132/3 132/8
133/10 133/14
133/21 134/21
135/9 135/12
135/15 135/16
138/16 139/4
143/8 144/14

145/5 145/7 151/8
151/9
**jury's [2]** 18/4
65/16
**just [93]** 4/4 4/15
4/19 7/25 8/1
10/23 11/22 15/17
16/10 18/21 21/13
25/19 25/24 26/1
27/22 29/13 29/14
31/25 33/24 34/8
34/10 36/19 37/22
38/12 41/17 43/13
46/11 48/6 49/2
53/9 53/21 54/3
54/6 56/24 57/2
57/19 57/25 60/18
63/5 66/7 71/4
72/23 73/1 83/3
84/25 87/4 89/18
89/20 92/22 94/21
96/15 97/9 97/10
97/16 97/18 98/14
98/16 99/11 99/17
101/10 101/15
101/17 101/18
102/12 103/3
104/14 104/24
105/12 105/14
106/4 106/7
106/20 106/23
107/5 107/9
107/13 108/12
108/22 110/2
110/16 110/17
110/21 114/6
120/10 120/22
125/15 137/11
139/17 147/9
147/18 149/15
150/13 151/1
**justice [17]** 4/7
47/6 47/9 47/24
52/25 55/18 55/19
60/8 61/11 72/6
80/20 83/18 87/19
89/12 90/25
117/25 131/19
**Justice
Kavanaugh [1]**
80/20
**justifiable [1]**
90/15
**justification [3]**

14/16 119/24
120/20
**justified [1]** 120/1
**justify [3]** 42/16
49/9 116/6
**Justin [2]** 85/12
85/17

**K**

**KALLEN [8]** 2/11
3/25 4/1 38/6 38/9
39/18 39/22 52/24
**Kavanaugh [1]**
80/20
**Keepers [1]**
106/14
**keeping [2]** 67/9
111/4
**keeps [1]** 107/13
**Keira [1]** 3/19
**Kelly [2]** 89/11
89/22
**kept [1]** 106/7
**key [6]** 39/2 39/9
54/7 58/24 65/18
111/21
**kind [17]** 17/2
21/10 27/12 28/8
36/9 67/11 68/6
69/10 69/11 72/18
96/13 98/11 99/11
101/7 101/11
103/19 132/15
**kinds [3]** 8/16
26/2 75/24
**Kissinger [1]**
84/10
**knew [5]** 16/15
105/23 105/24
112/25 113/4
**know [73]** 6/1
12/9 12/11 14/5
17/20 20/8 28/5
34/17 37/18 38/14
38/25 39/11 41/10
43/10 43/20 45/8
45/16 48/20 53/12
53/25 55/22 56/8
57/8 57/13 58/19
63/1 65/18 67/11
67/13 69/15 71/14
73/11 74/13 75/5
75/7 78/18 80/15
82/7 82/8 84/2

84/10 85/7 85/9
85/12 87/6 87/8
87/8 87/11 87/22
88/13 89/25 90/1
90/10 91/3 91/5
91/13 92/1 92/14
92/17 92/23 104/1
109/3 109/6
109/13 109/14
109/14 109/16
109/16 109/18
137/11 141/8
148/1 149/6
**knowingly [2]**
124/3 135/3
**knowledge [4]**
56/19 61/4 95/13
96/11
**known [6]** 101/4
112/25 113/5
130/1 130/7
130/10
**knows [2]** 37/24
53/6
**Kristen [2]** 49/16
95/9
**Kyle [1]** 76/23

**L**

**labels [1]** 49/24
**lack [5]** 93/10
93/11 93/13
129/10 130/9
**laid [3]** 114/17
122/16 123/25
**language [10]** 8/4
70/7 70/23 75/19
84/6 85/14 130/13
138/4 141/15
143/21
**largely [3]** 28/13
92/9 145/15
**last [24]** 16/3
16/17 24/7 24/7
30/3 34/4 70/2
73/12 76/3 76/22
80/2 80/9 85/10
92/23 99/6 103/23
105/10 109/2
109/6 123/1 127/1
148/20 149/20
150/24
**last-hour [1]** 80/9
**last-minute [1]**

105/10
**late [2]** 30/4
100/14
**later [14]** 10/2
17/15 34/13 34/23
34/24 35/1 35/4
99/19 104/9
104/17 118/20
125/14 129/7
129/21
**Latin [1]** 57/13
**latter [1]** 134/17
**law [49]** 1/21 5/16
8/7 10/25 11/3
11/23 11/24 13/17
23/10 26/19 31/11
40/6 43/25 44/7
47/12 47/14 48/2
50/24 57/14 57/14
57/15 63/4 63/23
66/18 74/14 74/21
78/11 81/19 83/9
85/20 98/12 98/18
106/9 106/10
106/20 107/6
115/16 120/13
124/4 124/13
131/13 132/9
132/21 133/18
133/20 151/7
**lawful [1]** 114/20
**lawfully [2]**
114/20 129/5
**lawsuit [1]** 54/15
**lawyer [8]** 32/7
67/20 67/21 68/8
81/9 81/20 115/1
125/18
**lawyer's [2]** 82/16
93/7
**lawyers [2]** 87/22
93/5
**lawyers' [2]** 28/6
121/19
**lay [1]** 69/10
**laying [1]** 30/12
**layperson [1]**
84/5
**lead [4]** 4/22 4/24
27/1 136/3
**Leader [2]** 38/16
49/5
**learned [1]** 18/14

173

**L**

**least [25]** 14/12
14/21 18/19 19/20
19/25 45/17 46/8
46/19 56/20 62/7
86/12 100/20
105/17 110/3
111/19 112/3
124/25 127/11
128/12 133/16
135/5 136/1
144/13 144/23
145/11
**leave [3]** 96/4
96/22 132/23
**leaving [3]** 22/6
147/16 147/18
**led [3]** 46/5 92/24
119/8
**left [3]** 146/4
147/24 148/2
**legal [24]** 7/21
11/7 11/17 12/5
12/18 12/20 14/7
15/5 15/9 15/12
39/13 42/7 47/4
60/6 63/2 68/12
83/7 96/21 122/20
123/5 123/8
130/17 130/22
134/1
**legally [6]** 117/9
117/15 117/18
118/3 121/16
147/2
**legis [1]** 57/14
**legislation [1]**
142/7
**legislative [14]**
51/1 56/17 56/20
57/6 57/7 57/12
57/16 58/4 58/25
105/8 131/10
132/19 133/18
142/2
**legitimacy [1]**
133/13
**legitimate [3]**
6/10 128/18 142/2
**length [2]** 53/17
92/10
**lengthy [1]**
102/22
**Lesley [1]** 111/11

**less [5]** 52/5
59/23 102/23
111/4 117/5
**let [6]** 5/6 21/14
25/24 26/1 115/17
148/10
**let's [26]** 5/4 6/6
10/12 18/25 25/12
25/19 30/8 30/15
54/25 59/11 59/18
69/8 72/8 75/17
80/6 94/13 95/8
97/10 98/4 98/14
98/14 99/17
109/20 111/1
111/5 111/5
**letter [25]** 2/7
3/23 4/4 21/17
38/7 45/8 45/11
48/16 52/20 54/20
56/3 59/21 70/8
70/9 70/9 76/3
81/1 125/6 125/16
143/19 144/23
145/21 145/22
148/14 151/21
**letter/letters [1]**
151/21
**letters [17]** 5/25
16/3 19/1 21/23
29/22 33/17 33/21
69/11 69/17 69/24
70/2 78/17 78/19
80/4 134/7 135/2
151/21
**letting [2]** 84/24
84/24
**level [5]** 49/6
67/19 69/20 69/21
75/6
**lex [1]** 57/13
**Libby [1]** 40/16
**Licavoli [30]**
15/19 15/21 16/19
16/23 16/23 17/2
67/12 67/13 68/10
73/20 73/25 74/4
74/14 74/18 74/22
74/24 75/1 75/2
75/8 113/16
114/24 115/4
115/5 115/19
116/7 120/21
121/5 121/13

126/15 147/12
**Licavoli's [1]**
115/5
**lift [1]** 92/5
**light [6]** 48/16
120/4 120/10
120/21 144/15
145/3
**lightly [2]** 91/9
109/23
**like [73]** 4/5 4/6
6/2 8/8 10/21
11/17 17/7 19/8
23/15 23/17 23/19
26/10 26/17 26/23
26/24 27/6 27/8
27/18 29/9 29/21
33/24 36/3 38/1
38/6 40/12 43/17
43/21 45/8 46/2
46/13 49/1 52/9
52/20 53/25 54/23
54/23 61/25 64/20
67/3 67/15 68/23
71/13 72/3 73/12
75/9 76/19 78/8
78/8 78/12 80/7
81/11 87/17 88/9
94/5 94/10 95/6
97/8 97/14 97/19
99/7 104/14 109/5
110/4 110/10
122/25 126/5
130/10 143/5
146/12 147/5
148/2 148/16
149/3
**likely [5]** 18/10
59/23 116/25
121/22 121/23
**Limine [26]** 25/17
26/13 28/14 28/15
30/3 34/4 55/10
55/12 58/23 64/23
68/16 77/3 91/15
92/25 104/9
117/24 118/21
119/17 120/12
132/25 133/12
133/24 135/8
135/20 136/12
145/14
**limit [1]** 107/9
**limited [1]** 141/24

**line [6]** 10/23
98/17 107/11
110/17 136/10
136/22
**lines [2]** 18/17
32/21
**lingering [1]**
10/17
**list [6]** 25/1 64/5
104/19 108/12
108/15 108/20
**listed [1]** 64/4
**listen [4]** 75/16
81/10 110/16
149/20
**literal [1]** 141/24
**litigation [2]**
18/22 50/15
**little [9]** 5/5 5/13
21/5 64/2 67/15
76/21 82/5 138/25
143/7
**live [2]** 43/12
43/23
**Liveright [2]**
130/5 130/13
**local [1]** 23/16
**log [1]** 72/5
**long [12]** 9/25
9/25 17/25 26/3
78/10 90/4 92/9
112/18 119/11
141/17 146/15
151/24
**longer [7]** 18/10
83/11 92/12 120/8
122/13 148/8
150/9
**look [15]** 7/6 8/7
8/7 8/24 9/8 9/10
22/5 54/22 62/1
63/10 67/14 81/20
84/5 103/3 146/10
**looking [7]** 20/12
20/18 37/20 83/22
101/8 101/15
110/2
**loop [1]** 23/16
**lorraine [4]** 2/18
2/21 153/3 153/10
**lose [1]** 52/7
**lost [2]** 67/16
82/2
**lot [9]** 16/13

19/20 65/11 69/22
86/23 102/21
103/22 106/12
109/15
**lots [1]** 103/22
**low [2]** 121/3
121/24
**luminaries [1]**
74/14
**lunch [2]** 97/11
97/14

**M**

**made [32]** 5/18
16/4 16/16 39/2
40/14 41/24 49/15
49/17 61/6 61/11
67/5 69/20 71/24
75/4 79/6 79/11
82/7 82/8 83/7
83/24 84/24 94/2
99/6 102/6 114/25
115/3 118/13
128/3 129/4 129/6
143/3 146/2
**magic [8]** 89/10
89/17 89/25 102/6
102/10 102/14
102/15 104/4
**main [2]** 38/24
39/14
**major [2]** 92/5
126/19
**Majority [4]** 38/16
38/16 49/5 49/5
**make [50]** 8/2
10/15 12/10 12/17
13/20 14/7 15/6
16/8 16/9 32/1
35/12 35/24 37/20
38/24 39/15 53/4
59/22 63/20 63/20
64/1 66/22 67/6
68/2 68/13 69/18
70/4 82/9 82/18
95/1 97/10 101/12
101/24 102/1
108/13 108/15
111/2 111/24
112/10 116/19
117/4 118/14
119/14 128/16
134/20 137/11
147/13 147/17

174

# M

make... **[3]** 147/25
148/22 148/24
**maker [1]** 50/20
**makes [3]** 19/24
113/19 126/15
**making [18]** 19/3
22/6 28/7 30/17
42/20 49/25 50/1
50/6 50/10 75/11
105/14 106/18
109/3 114/18
131/18 136/17
138/20 139/6
**mandate [4]** 9/6
9/8 140/18 140/21
**mandated [3]**
76/1 79/16 140/12
**manner [3]** 70/7
70/22 86/4
**manufactured [1]**
104/7
**many [8]** 16/25
19/22 88/20 98/1
115/13 126/25
129/20 143/21
**Marathon [1]** 88/7
**March [1]** 30/14
**Mark [1]** 32/17
**masks [1]** 3/16
**material [19]** 24/9
30/25 35/20 35/21
36/5 36/15 36/23
37/17 40/9 40/22
42/11 45/10 46/17
49/12 59/22 86/3
96/13 125/11
125/12
**materially [3]**
96/10 101/12
101/23
**materials [4]**
24/23 31/1 31/12
140/10
**matter [29]** 4/16
11/22 11/24 14/16
20/23 22/11 27/9
35/4 35/9 40/6
41/14 45/15 68/6
78/9 80/5 82/10
83/9 85/20 103/15
116/5 127/6
127/17 130/22
131/13 135/10

135/19 137/16
143/23 153/6
**matters [5]** 4/8
20/22 59/21
111/16 142/7
**MATTHEW [1]** 2/4
**may [32]** 36/20
39/18 46/25 47/5
47/5 51/21 55/18
61/18 69/13 74/10
75/22 80/24 84/1
87/25 91/1 93/18
107/22 110/13
119/9 121/25
124/2 125/9 128/4
129/20 131/7
134/24 143/23
144/5 145/3 145/6
150/25 151/24
**maybe [3]** 96/16
104/2 119/9
**mc [4]** 1/9 2/6
141/9 144/16
**McPhaul [1]**
129/8
**me [41]** 5/5 5/6
7/12 12/21 15/1
21/14 25/24 38/19
39/18 58/22 59/18
65/6 73/19 78/25
81/23 81/24 84/1
84/13 93/21 96/16
97/1 99/2 109/22
111/15 117/2
121/5 125/23
131/1 131/12
132/11 134/2
136/3 136/16
137/11 138/19
140/5 142/2
144/17 145/15
146/6 148/10
**Meadows [24]**
25/13 30/8 30/10
30/13 31/23 31/24
32/17 33/16 53/7
53/25 68/22 69/8
69/22 70/9 70/18
83/13 83/25 85/7
85/15 86/1 105/25
107/15 140/9
140/16
**Meadows/Scavin
o [1]** 105/25

**mean [39]** 22/23
25/1 29/7 37/1
37/12 44/15 46/11
54/2 60/23 62/9
62/19 62/21 62/24
63/4 63/9 63/25
64/2 74/9 75/7
75/9 75/23 83/2
83/14 84/1 86/20
89/11 89/20 89/21
98/4 98/24 100/6
103/2 111/23
112/9 112/10
112/15 115/20
116/8 131/8
**meaning [3]**
108/1 108/7 131/2
**means [17]** 8/5
8/15 16/10 16/12
16/15 24/3 26/10
26/10 46/11 50/12
75/10 91/20
103/13 111/4
112/13 113/4
146/18
**meant [5]** 11/15
114/25 151/6
151/9 151/11
**measures [1]**
89/7
**mechanism [1]**
145/1
**media [7]** 23/20
23/21 76/5 80/2
80/17 102/25
143/4
**meet [5]** 37/22
40/7 46/16 77/16
108/18
**meets [2]** 84/12
124/11
**member [18]**
26/24 44/16 44/16
46/13 61/17 61/24
63/25 64/16 66/25
94/15 95/18 95/20
98/22 99/5 99/7
130/9 131/24
141/16
**members [43]**
9/19 9/21 24/17
35/8 38/18 39/4
40/1 41/18 45/17
49/5 49/7 50/11

51/16 52/4 52/15
53/15 54/3 56/6
56/18 59/4 59/8
59/12 63/12 63/14
83/23 95/11 97/9
97/20 97/24 98/1
98/7 98/20 111/18
131/23 137/19
138/9 142/5
142/19 142/21
142/25 143/11
143/15 144/4
**membership [1]**
61/3
**memo [1]** 73/13
**mens [25]** 11/16
14/18 14/23 15/13
15/14 15/15 16/11
16/12 71/2 71/11
72/1 75/8 75/9
111/22 112/8
116/20 119/12
120/5 121/4
121/12 139/7
139/18 146/23
147/11 147/13
**mental [1]** 87/25
**mention [2]** 26/17
141/6
**mentioned [2]** 4/4
136/12
**mentions [8]**
13/25 87/3 87/3
87/4 102/24
102/25 103/1
136/8
**mere [1]** 112/20
**merely [1]** 40/18
**met [2]** 31/15
36/22
**method [1]** 117/7
**MICHELLE [2]**
2/11 3/25
**middle [1]** 149/13
**midnight [2]**
103/23 148/20
**might [31]** 16/24
18/16 25/5 27/5
35/23 44/16 45/2
86/17 95/21
114/14 118/7
118/7 118/10
120/4 120/9
120/23 123/18

126/4 129/3 132/2
132/8 133/4 136/3
136/14 145/17
145/24 146/1
147/25 148/9
151/7 151/9
**mind [2]** 22/4
137/16
**minds [2]** 88/25
89/6
**Mine [1]** 93/1
**minimum [4]**
14/25 71/10 83/12
130/23
**minority [10]**
61/17 66/25 95/3
95/18 95/20 98/22
99/5 99/7 130/9
131/24
**minute [2]** 80/3
105/10
**minutes [3]** 54/25
110/10 111/5
**miscellaneous [5]**
3/5 4/4 51/23
111/17 141/9
**misconduct [7]**
27/7 27/8 27/17
27/20 36/3 66/4
137/4
**misdemeanor [1]**
138/12
**misery [2]** 108/17
108/18
**misreported [1]**
80/18
**missing [1]** 96/17
**Mississippi [1]**
58/13
**mistake [8]** 15/18
16/23 17/16 18/13
75/21 107/6 113/7
147/14
**mistaken [1]**
146/21
**misunderstandin
g [9]** 16/18 16/20
16/20 16/22 17/1
17/2 17/6 17/7
113/8
**misused [1]**
40/20
**mixed [3]** 98/11
132/9 151/7

**M**

**mocked [1]** 92/23
**mocks [1]** 80/15
**modeling [1]**
109/20
**modern [3]** 89/5
115/15 115/16
**MOLLY [2]** 1/17
3/12
**moment [3]** 56/24
83/14 137/23
**Monday [6]** 19/24
20/17 79/2 79/19
105/15 109/3
**Montgomery [1]**
1/22
**month [2]** 20/17
102/7
**months [9]** 20/15
31/2 31/13 34/24
48/25 90/8 101/21
102/11 129/20
**moot [1]** 24/4
**more [23]** 10/13
14/22 24/14 24/17
30/6 40/12 42/3
42/7 55/22 61/2
62/15 68/4 90/24
97/13 104/13
106/23 114/5
114/7 117/4
117/20 123/14
126/13 138/8
**morning [20]** 3/1
3/2 3/11 3/14 3/20
3/21 3/22 4/1 5/2
5/3 28/20 28/21
39/23 39/24 55/6
55/7 110/5 111/12
146/9 151/23
**most [14]** 16/2
19/1 21/16 21/17
30/21 38/9 53/11
58/13 69/11 69/24
110/6 128/7
130/15 142/16
**motion [117]** 4/3
4/8 4/11 4/24
11/21 18/25 19/15
21/22 23/5 24/5
24/13 25/2 25/4
25/13 25/16 26/13
27/23 28/14 28/15
29/2 30/2 30/3

31/17 34/4 35/7
35/9 36/13 36/13
37/21 39/3 43/17
46/22 47/3 47/4
48/20 52/17 55/8
55/11 55/15 64/13
64/19 65/8 68/21
68/22 69/8 69/10
70/5 76/22 76/24
77/3 79/5 83/16
86/6 86/9 86/16
92/25 94/3 102/1
103/23 105/5
105/6 105/25
108/16 117/24
118/15 118/18
118/21 118/23
119/17 119/18
119/20 119/21
119/22 120/12
126/16 126/25
132/24 133/2
133/3 133/12
133/16 133/24
134/4 134/9
134/23 135/2
135/8 135/9
135/15 135/20
135/20 135/22
136/12 136/13
136/15 137/19
137/25 138/8
138/11 138/25
140/6 140/8 140/8
140/9 140/10
140/11 141/8
141/10 144/8
144/16 144/17
144/18 145/6
148/11 148/20
149/4 151/20
**motions [38]** 1/13
4/2 4/11 4/13
10/16 10/17 10/21
17/18 24/3 28/11
28/23 36/24 43/5
43/12 55/9 55/11
58/23 64/23 68/15
68/25 91/15
103/22 103/25
104/9 105/9 110/3
111/14 111/15
111/19 111/21
112/7 115/20

116/9 117/23
132/24 134/2
145/14 145/18
**motivation [1]**
65/24
**motivations [1]**
142/17
**motive [2]** 113/19
114/14
**motives [2]** 46/5
114/15
**Movant [1]** 4/16
**move [13]** 64/23
80/9 88/7 88/11
88/13 92/6 102/21
104/13 104/13
108/11 108/21
141/5 144/5
**moved [14]** 17/13
17/13 17/23 17/24
18/3 18/10 18/10
18/13 18/15 51/15
89/23 119/9
146/23 146/24
**moving [4]** 19/19
19/21 29/24 40/2
**Mr [12]** 3/19 4/4
4/20 29/16 45/8
65/20 74/21 76/11
118/14 135/3
146/12 146/17
**Mr. [211]**
**Mr. Bannon [133]**
4/9 4/14 4/18 5/17
5/23 5/25 7/9 9/16
12/10 12/17 16/4
17/11 18/8 18/9
19/7 19/18 19/25
21/18 22/1 22/4
22/5 28/12 32/25
38/21 39/4 39/13
41/15 42/25 45/16
46/1 46/9 46/25
50/5 56/8 59/24
60/2 60/3 64/12
71/6 71/15 76/7
77/11 77/14 77/18
77/20 77/20 79/11
80/9 81/4 85/5
100/18 102/8
104/13 104/16
104/18 111/24
112/2 112/21
113/2 113/4

113/11 113/14
115/21 115/25
116/3 116/10
116/15 116/19
116/22 117/8
118/3 118/8
118/10 118/25
119/5 119/13
119/24 120/1
120/6 120/15
121/10 121/14
121/25 123/2
123/7 124/23
125/5 125/7 125/7
125/23 126/13
126/22 128/1
128/11 129/12
130/7 130/11
130/12 130/22
131/16 132/4
132/7 133/4
133/19 135/17
136/6 136/16
136/20 137/8
138/9 138/20
139/2 139/5 139/9
139/14 139/18
140/3 141/2 141/4
142/15 142/24
143/15 144/1
144/3 144/7 144/9
144/23 145/9
145/22 145/22
147/23 148/7
150/2
**Mr. Bannon's [28]**
20/10 21/16 39/2
39/7 40/23 48/16
52/6 59/15 61/6
63/21 64/21 76/2
82/15 102/13
115/4 120/4
120/23 125/15
127/7 134/4 134/7
135/8 135/20
137/19 140/8
144/18 144/25
146/3
**Mr. Corcoran [5]**
55/1 55/5 77/24
94/13 107/20
**Mr. Costello [6]**
29/25 72/21 92/15
135/2 148/3 148/7

**Mr. Costello's [9]**
25/2 25/4 28/12
29/17 29/22
134/12 134/16
137/5 137/14
**Mr. Justice [1]**
87/19
**Mr. Letter [7]**
38/7 45/11 52/20
54/20 56/3 59/21
143/19
**Mr. Licavoli [2]**
68/10 115/4
**Mr. Meadows [1]**
30/13
**Mr. Scavino [1]**
30/13
**Mr. Schoen [13]**
55/1 68/18 86/7
93/22 102/6
103/17 106/5
106/7 106/23
108/10 110/1
144/7 147/10
**Mr. Su [1]** 81/2
**Mr. Thompson [1]**
22/3
**Mr. Tonolli [3]**
41/25 50/3 101/14
**Ms [3]** 3/14 4/1
38/2
**Ms. [27]** 4/21 4/23
5/1 19/10 28/2
28/17 28/18 38/6
38/9 39/18 39/22
41/25 46/20 50/3
52/24 66/11 67/5
93/24 93/24 95/12
95/17 99/4 101/13
110/20 110/20
111/11 131/23
**Ms. Amerling [4]**
41/25 50/3 95/12
101/13
**Ms. Cheney [3]**
95/17 99/4 131/23
**Ms. Gaston [6]**
4/23 5/1 66/11
67/5 93/24 110/20
**Ms. Kallen [5]**
38/6 38/9 39/18
39/22 52/24
**Ms. Lesley [1]**
111/11

**M**

**Ms. Vaughn [8]**
4/21 19/10 28/2
28/17 28/18 46/20
93/24 110/20
**much [9]** 3/24
8/22 12/11 30/24
42/3 42/7 115/4
123/13 142/14
**multiple [2]**
111/15 131/20
**murdered [1]**
23/18
**must [20]** 10/1
12/25 44/18 89/7
112/16 112/23
112/24 124/13
124/15 124/18
127/5 130/21
130/25 133/7
135/5 136/4
137/10 141/5
143/13 144/9
**my [42]** 10/3
15/23 16/3 17/21
22/7 22/7 31/22
46/20 65/8 70/24
76/3 76/9 76/12
76/13 79/18 79/20
80/10 82/4 91/15
92/8 93/3 93/19
104/6 110/2 112/6
113/9 115/12
116/10 120/11
121/12 126/3
127/24 135/10
137/16 138/22
140/12 140/17
140/23 144/11
144/15 145/1
150/4
**myopic [1]** 90/14
**myriad [1]** 140/20
**myself [2]** 82/5
126/2

**N**

**naive [1]** 87/20
**name [3]** 9/10
9/11 124/12
**named [3]** 81/2
102/20 134/14
**NANCY [2]** 1/9
3/6

**narrow [5]** 9/6 9/8
105/22 119/11
120/5
**narrower [1]**
30/24
**narrowly [1]**
124/9
**National [1]** 67/16
**naturally [1]**
126/14
**nature [7]** 34/8
63/8 64/15 114/4
135/11 135/24
138/13
**Navarro [2]** 83/21
83/25
**nearly [1]** 50/14
**necessarily [4]**
37/1 112/16 116/8
136/8
**necessary [11]**
43/10 49/19 53/23
64/12 77/16
113/20 120/11
134/20 134/25
136/15 151/25
**need [21]** 4/19
10/12 45/21 57/6
57/24 99/8 100/6
105/19 106/3
109/15 109/15
109/16 109/16
109/18 110/7
110/8 113/13
116/15 132/9
134/20 149/9
**needed [3]** 37/7
95/4 114/12
**needs [2]** 93/20
137/10
**negotiable [1]**
17/22
**negotiating [1]**
78/13
**negotiations [1]**
120/7
**neither [2]** 40/22
122/15
**never [14]** 9/20
10/16 72/12 79/23
85/4 89/8 90/17
99/13 99/15
100/24 108/8
125/5 125/25

140/18
**new [3]** 50/6
69/16 75/13
**news [1]** 102/20
**next [8]** 24/2 24/2
103/6 118/21
123/24 135/20
140/8 146/7
**NICHOLS [2]** 1/13
100/5
**night [11]** 16/4
24/7 30/3 34/5
70/2 76/4 76/9
76/22 103/23
148/20 151/22
**night's [1]** 85/10
**nine [4]** 20/15
34/24 97/9 97/20
**nine months [1]**
20/15
**Ninth [1]** 107/3
**Nixon [1]** 80/22
**no [105]** 1/4 1/9
9/15 10/8 13/21
15/22 18/2 18/10
20/6 23/13 25/3
25/15 26/3 26/4
26/17 29/7 29/20
31/4 32/23 33/8
37/1 38/5 39/12
39/12 42/23 44/9
44/14 44/19 45/2
45/2 45/12 45/12
45/23 45/24 53/1
54/13 57/7 57/16
57/21 58/2 58/3
58/18 60/17 61/24
63/14 63/15 63/16
63/23 73/20 74/5
78/15 79/5 79/18
80/25 81/8 83/10
85/18 85/24 86/11
97/9 97/9 97/18
99/18 100/1 102/6
102/9 102/10
103/1 103/20
104/4 108/25
114/8 114/23
115/1 117/25
118/18 118/23
119/17 120/8
120/11 120/14
122/12 124/21
130/6 133/1 134/5

137/7 138/8
140/11 140/14
141/9 143/21
143/22 143/23
144/18 145/19
146/20 148/8
148/24 149/15
150/1 150/9
150/11 150/13
150/19
**non [4]** 1/8 10/9
75/11 142/25
**non-ambiguity [1]**
10/9
**non-Congression
al [1]** 142/25
**NON-PARTY [1]**
1/8
**nonavailability [1]**
36/17
**noncompliance
[19]** 11/8 13/2
13/9 13/14 13/17
15/2 20/14 21/1
22/17 41/22 72/5
72/22 73/1 82/14
106/11 126/15
127/8 128/22
133/6
**noncumulative
[3]** 36/5 37/17
59/7
**nonduplicative
[1]** 36/16
**none [8]** 21/14
116/5 122/9 123/2
123/3 123/11
123/12 140/25
**nongovernment
[1]** 122/11
**Nonparty [2]** 3/5
111/17
**nonspeculative
[1]** 37/16
**nonspeech [1]**
143/10
**noon [3]** 105/15
109/4 149/18
**not [335]**
**note [11]** 13/24
73/15 101/17
101/18 117/7
118/16 129/9
132/18 135/14

141/2 144/9
**noted [4]** 9/1
30/11 120/22
134/10
**notes [2]** 24/9
145/9
**noteworthy [1]**
25/21
**nothing [6]** 21/15
34/23 89/10 89/18
118/16 151/18
**notice [2]** 95/10
97/19
**notified [1]** 95/5
**notify [1]** 77/21
**noting [2]** 115/3
125/22
**notion [2]** 55/21
107/7
**notwithstanding
[1]** 88/8
**November [2]**
19/8 109/6
**now [55]** 6/6 12/9
15/1 16/15 18/25
20/6 20/17 21/8
22/7 34/17 34/24
38/6 53/7 55/4
62/9 66/19 70/2
71/21 75/22 76/13
76/15 77/2 78/21
78/24 79/11 80/1
80/13 81/8 82/5
83/8 86/25 88/18
90/1 90/4 90/10
91/2 91/3 91/7
91/25 93/15 105/9
106/18 111/5
111/10 122/3
127/4 130/8
130/12 136/11
137/3 139/14
144/7 144/8
145/14 146/15
**number [19]** 4/2
9/18 9/20 41/18
64/17 67/1 79/15
93/6 98/19 102/25
103/4 110/3
111/19 111/21
123/15 131/23
134/1 144/16
150/7
**numerous [1]**

**N**

numerous... [1]
49/22
NW [2]  1/18 2/19

**O**

O'Neill [1]  2/9
Oath [1]  106/14
obeying [1]  73/15
objection [7]  25/3
29/14 128/24
129/4 129/6 130/2
130/11
objections [9]
5/20 5/21 6/5 11/1
25/5 104/20
132/12 132/25
133/7
objective [2]
31/10 31/13
objects [1]  29/23
obligation [3]
109/8 109/9
109/11
obligations [1]
82/22
observance [1]
76/10
obstruction [2]
21/10 129/1
obtain [2]  61/6
63/21
obtained [1]
134/11
obtaining [1]
77/15
obvious [1]  26/15
obviously [10]
4/2 4/10 19/18
35/6 65/23 81/6
97/13 99/14
111/16 143/18
occasions [1]
131/21
occur [1]  48/17
occurred [4]
20/14 96/15
100/10 150/20
occurs [2]  34/5
129/15
October [20]  16/5
17/21 19/4 34/25
77/7 77/8 77/9
77/10 77/22 79/23

81/1 81/6 83/6
83/6 87/7 89/17
89/18 90/1 90/1
148/8
October 18th [1]
77/9
odd [2]  127/11
127/14
OFC [1]  1/18
off [2]  3/16
109/13
offense [12]  16/7
20/4 22/23 34/21
59/25 113/24
114/3 114/15
127/7 127/20
127/25 135/7
offenses [2]
114/16 138/23
offer [16]  21/16
22/8 25/5 27/5
29/17 50/6 50/19
64/1 79/12 79/13
99/14 102/13
116/10 118/3
118/8 133/19
offered [7]  19/7
67/4 72/21 82/2
119/23 120/2
129/17
office [8]  2/8 2/9
2/11 2/12 3/25
81/1 89/12 122/13
officer [1]  124/13
official [17]  2/18
30/12 33/22 42/13
49/2 50/8 50/17
99/8 122/19
122/21 123/4
124/5 124/17
124/21 125/2
140/13 153/3
officials [7]  42/9
49/10 49/12 49/23
49/24 50/13 50/13
often [1]  64/18
Oh [7]  25/14
44/25 54/11 62/13
74/25 76/6 86/10
okay [28]  5/1
21/21 23/2 24/25
28/18 30/1 34/1
44/15 54/11 58/7
65/1 69/2 69/6

73/23 94/25 95/7
97/3 98/10 98/23
101/2 103/21
108/10 109/2
110/24 149/20
150/23 151/17
151/19
OLC [31]  31/21
32/3 32/11 33/5
33/23 71/8 72/8
72/10 72/15 73/5
73/13 73/19 74/2
74/4 74/6 82/17
82/23 83/17 85/2
85/6 85/20 108/23
115/24 120/1
122/9 122/25
123/18 124/24
126/7 149/23
150/1
old [6]  47/18 62/8
62/9 62/11 75/13
107/11
Olson [2]  73/13
74/13
omnibus [9]
25/16 65/7 119/17
119/18 133/11
133/23 136/12
137/19 138/25
once [7]  15/8
82/18 82/25 96/23
96/23 97/21
119/10
one [87]  10/15
11/7 14/13 15/23
17/17 19/11 24/7
24/15 31/1 37/7
37/10 42/13 42/17
45/12 45/13 45/23
45/24 48/9 54/6
54/7 55/11 55/25
56/24 58/13 58/24
59/17 60/1 60/15
61/22 62/7 62/19
64/15 65/18 66/10
66/10 69/25 70/4
70/8 73/14 73/20
75/10 75/20 76/5
76/8 79/1 79/15
79/19 81/13 81/14
84/10 84/22 86/23
87/22 89/1 92/4
92/5 93/6 97/9

102/16 102/17
106/4 106/8
106/23 114/7
116/24 117/15
117/18 117/21
118/14 119/11
119/16 120/8
121/25 123/14
123/20 129/5
129/10 129/18
130/3 133/18
136/20 137/1
139/17 139/20
144/2 145/23
150/8
ONeill [1]  2/12
ones [3]  64/3
129/13 133/4
ongoing [1]  145/4
online [1]  67/17
only [21]  13/18
21/7 22/25 23/12
49/11 58/8 64/9
76/8 79/22 97/20
102/16 103/24
103/25 106/7
111/3 113/13
119/11 121/5
128/4 129/15
141/23
open [14]  19/25
22/4 22/7 22/8
78/10 78/13
110/17 110/18
132/16 146/4
147/16 147/18
147/25 148/2
open-door [1]
22/8
opening [2]  26/15
91/21
openings [1]
104/1
operating [3]
41/17 126/21
131/22
operative [7]
18/11 116/24
117/21 118/9
119/7 120/8
120/25
opinion [12]
54/17 67/19 72/11
73/5 73/13 74/10

85/2 108/24
114/17 150/1
150/11 150/13
opinions [30]
31/21 31/21 32/3
32/11 33/1 33/23
71/9 72/8 72/16
74/4 74/8 74/12
82/17 82/23 83/17
84/4 85/6 85/20
106/7 106/8
115/24 122/10
122/25 123/8
123/9 123/11
123/18 124/24
126/7 149/23
opportunity [7]
22/16 22/21 22/22
33/7 52/14 64/20
128/24
oppose [1]
135/14
opposition [6]
26/1 26/16 26/17
27/12 30/11 39/3
oral [2]  69/19
111/6
orally [1]  110/3
order [16]  10/21
20/10 30/14 43/9
43/18 65/20 68/21
69/1 69/19 73/16
113/11 120/11
140/12 140/18
140/19 146/14
ordered [1]
108/19
orders [1]  81/24
Ordinarily [1]
72/2
original [1]
104/12
originally [2]
92/11 104/16
other [57]  7/3
10/21 16/25 23/25
28/3 29/25 34/2
36/19 38/1 38/18
42/12 43/12 45/3
46/13 54/6 54/12
54/14 54/18 59/13
61/16 64/7 66/10
68/11 69/13 71/25
72/18 72/20 73/4

**O**

**other... [29]** 74/10
79/1 80/3 91/5
91/21 92/3 98/15
99/25 105/16
112/21 113/25
114/6 115/24
117/11 118/19
122/10 125/18
125/25 127/19
130/24 131/1
132/23 138/20
141/13 142/7
144/15 145/24
148/22 149/21
**others [5]** 62/16
64/5 87/18 88/25
107/4
**otherwise [16]**
17/6 23/4 23/5
39/17 43/17 69/23
73/6 75/25 77/25
81/25 88/23
109/12 116/12
118/6 122/20
135/12
**our [32]** 6/12
10/24 30/11 34/4
39/9 43/24 45/23
47/3 48/23 52/24
56/18 58/11 61/20
62/24 64/10 64/13
66/13 67/2 67/13
73/24 77/16 90/24
91/11 97/18
104/19 108/12
108/14 109/4
109/8 125/15
127/1 141/21
**ours [1]** 94/4
**ourselves [1]**
150/14
**out [28]** 11/22
21/13 30/12 38/12
53/18 58/7 69/10
73/12 76/6 76/10
78/2 81/18 81/22
86/24 88/4 88/24
91/16 95/23 104/1
106/4 107/3 107/8
107/11 108/15
122/16 123/25
145/18 149/15
**outcome [1]**

126/3
**outdated [3]** 62/9
62/11 84/17
**outrageous [2]**
108/13 108/21
**outside [6]** 43/1
43/19 82/21 83/20
89/4 134/21
**outstanding [4]**
93/16 109/18
134/2 145/10
**over [11]** 16/14
21/23 33/20 39/17
48/16 50/10 64/16
86/13 131/5
144/24 145/22
**overarching [5]**
90/18 91/2 112/6
122/5 134/1
**overbroad [1]**
52/3
**overcome [1]**
87/21
**overridden [1]**
56/13
**own [14]** 47/4
58/15 63/17 66/21
87/25 88/17 93/3
112/25 123/12
123/18 130/25
131/2 131/3
131/14

**P**

**P-i-c-c-o [1]**
84/15
**p.m [4]** 110/7
111/9 111/9 152/1
**page [2]** 32/11
73/15
**pages [1]** 51/22
**pan [1]** 145/18
**panoply [1]** 82/21
**paper [1]** 99/20
**papers [11]** 5/6
19/17 20/9 69/15
71/19 76/25 85/7
108/14 109/4
129/18 129/22
**parameters [3]**
43/4 43/11 44/4
**paraphrasing [1]**
81/6
**Pardon [1]** 74/23

**part [21]** 13/11
37/19 46/23 65/19
70/19 76/23 92/18
118/1 118/1
118/24 118/24
119/16 119/20
119/20 128/8
133/23 134/8
138/11 138/19
142/3 142/20
**participate [2]**
142/5 142/22
**particular [12]**
6/18 53/16 54/3
68/4 102/8 102/9
124/14 126/23
130/19 130/20
140/22 141/25
**particularly [3]**
9/3 25/21 42/8
**parties [5]** 4/13
65/5 78/12 112/12
136/23
**partisan [1]**
136/19
**party [5]** 1/8
26/24 40/17 135/6
138/4
**pass [1]** 37/21
**passed [1]** 81/7
**passing [1]** 141/6
**past [2]** 20/13
45/3
**pause [3]** 48/17
78/5 85/6
**peculiarly [1]**
138/5
**Peithman [1]**
122/23
**PELOSI [10]** 1/9
3/6 42/3 45/4
59/19 59/24 60/10
61/1 63/19 94/11
**Pelosi's [1]** 41/3
**penalties [1]**
138/17
**pending [15]** 4/3
4/7 23/4 43/5
43/12 109/19
110/3 111/14
111/19 112/7
115/20 132/10
132/24 141/8
144/17

**penumbra [1]**
14/9
**people [15]** 19/22
33/5 42/12 59/14
72/12 83/20 85/4
88/5 88/20 110/8
110/11 110/16
111/4 134/14
141/23
**perceived [1]**
130/4
**percent [2]** 73/21
92/13
**perception [1]**
87/25
**perfectly [2]**
41/25 42/15
**perhaps [4]** 27/15
102/11 119/7
145/17
**period [3]** 76/15
91/18 102/11
**Permanent [1]**
54/7
**permit [2]** 124/19
146/16
**permitted [4]**
52/15 73/5 91/13
137/8
**person [16]** 1/13
31/10 31/13 58/14
68/13 70/6 70/23
76/14 82/20 84/7
84/16 86/5 96/14
110/7 110/22
110/25
**personal [5]**
56/19 61/4 95/13
96/11 142/19
**persons [1]**
140/22
**perspective [4]**
14/12 58/11 91/18
93/19
**persuasive [1]**
18/7
**persuasively [1]**
67/6
**pertinence [1]**
29/5
**pertinency [3]**
29/12 60/11 60/16
**pertinent [2]**
113/25 136/6

**pervasive [1]**
88/3
**pervasiveness [1]**
89/5
**Petitioner [2]** 1/9
2/7
**phase [1]** 11/24
**phone [13]** 24/12
28/13 110/10
110/14 110/17
110/18 110/21
111/3 134/6
134/12 134/16
137/5 137/14
**phrase [1]** 16/23
**phrased [1]** 130/2
**physically [1]**
88/13
**physics [1]** 55/22
**Picco [1]** 84/15
**pick [4]** 89/21
145/5 145/7
149/13
**picked [1]** 90/8
**piece [3]** 47/2
99/19 107/8
**place [2]** 17/4
141/14
**places [1]** 142/8
**plain [1]** 34/7
**plainly [1]** 142/11
**plan [3]** 99/21
100/20 109/20
**planning [1]**
104/23
**plans [1]** 29/10
**play [2]** 63/10
95/23
**playbook [1]** 52/8
**played [1]** 23/16
**players [1]** 90/14
**plays [1]** 65/23
**pleading [2]**
107/11 107/12
**please [3]** 3/8
3/16 77/21
**plenty [1]** 74/11
**plug [1]** 93/15
**plugging [1]**
91/20
**podcast [1]**
106/16
**podium [1]** 3/15
**point [28]** 11/22

**P**

**point... [27]** 21/13 27/7 38/24 39/14 43/2 51/22 52/23 53/5 53/10 72/24 75/4 76/19 89/9 90/11 101/22 102/5 105/8 106/4 106/23 113/11 115/6 133/20 138/25 140/7 144/2 144/19 148/23
**pointed [2]** 59/1 73/12
**points [7]** 54/12 58/24 70/4 123/2 129/12 130/8 136/13
**police [1]** 136/10
**policies [1]** 33/22
**policy [6]** 30/12 33/5 69/19 69/21 140/13 140/23
**political [5]** 26/22 27/4 38/22 88/5 88/25
**politicize [1]** 136/17
**politics [4]** 65/18 65/19 65/22 136/19
**pop [1]** 39/18
**portion [1]** 119/21
**portions [1]** 136/11
**posed [1]** 80/1
**position [26]** 5/8 5/14 5/15 5/20 6/12 7/20 9/25 18/22 23/10 31/10 45/18 45/23 48/5 48/10 48/11 53/10 66/7 66/13 67/13 76/16 80/10 82/1 82/7 96/18 108/1 108/15
**possessed [1]** 124/21
**possibility [2]** 147/16 147/19
**possible [5]** 31/3 44/10 65/14 88/21

146/1
**possibly [5]** 13/12 31/14 76/21 106/15 106/16
**post [1]** 85/16
**postdate [1]** 33/13
**posted [1]** 143/4
**postpone [1]** 87/18
**postponed [3]** 52/24 53/2 79/11
**posture [1]** 77/21
**potential [8]** 26/18 88/24 103/10 104/21 108/20 138/13 138/15 138/17
**potentially [3]** 42/6 86/3 96/4
**power [10]** 44/23 44/25 52/10 52/16 57/17 63/13 131/10 138/5 138/8 142/9
**powers [4]** 72/17 74/3 131/4 131/12
**powers' [1]** 82/24
**practical [1]** 26/8
**practically [1]** 13/21
**practice [3]** 7/3 7/5 7/6
**practices [1]** 93/9
**practicing [1]** 87/22
**precedent [5]** 20/24 50/24 62/16 113/9 127/16
**precise [6]** 49/21 122/16 123/12 123/14 123/20 123/25
**precisely [3]** 40/11 44/6 44/6
**preclude [4]** 135/21 136/16 137/21 138/19
**precluding [1]** 65/4
**preconceptions [1]** 88/2
**prefer [1]** 110/11
**preference [1]**

110/18
**prefers [1]** 68/21
**pregnant [1]** 23/18
**prejudice [2]** 24/1 24/21
**prejudiced [1]** 103/18
**prejudicial [6]** 23/24 26/2 86/25 87/20 89/6 103/7
**premature [2]** 118/15 139/14
**preparation [1]** 93/10 93/14 102/9 145/19
**prepare [3]** 91/25 92/1 92/2
**prepared [4]** 71/20 99/16 109/4 118/8
**preparing [2]** 21/3 21/6
**prerequisite [1]** 50/2
**prerequisites [1]** 124/12
**prescribed [1]** 131/10
**presence [2]** 68/9 134/21
**present [28]** 3/7 5/15 7/9 51/25 58/14 58/15 58/17 58/20 58/21 62/25 63/5 64/14 65/20 66/17 66/24 67/25 68/11 90/21 94/18 111/25 112/2 112/12 115/21 115/25 128/1 128/4 131/16 151/7
**presentation [1]** 38/10
**presented [8]** 7/11 10/9 12/19 126/25 128/8 132/15 135/12 151/4
**presenting [4]** 3/24 28/14 65/2 135/9
**presents [1]** 6/6

**preserve [3]** 56/17 57/6 57/12
**preside [1]** 59/3
**President [25]** 13/6 13/7 70/6 70/13 80/13 80/17 80/22 80/24 81/2 81/15 81/15 81/22 82/20 84/9 84/10 122/12 124/25 125/1 125/5 125/6 125/14 145/23 150/10 150/12 150/21
**President Biden [1]** 81/2
**President's [5]** 21/16 21/17 73/16 121/18 126/9
**press [3]** 19/18 46/4 143/3
**presumably [1]** 33/4
**presumption [1]** 82/25
**pretrial [10]** 4/2 23/9 88/3 92/8 103/5 103/8 105/6 140/8 144/21 146/8
**prevent [1]** 136/20
**preview [2]** 53/9 54/6
**previous [4]** 120/11 140/12 140/17 140/24
**previously [4]** 115/18 115/21 132/20 137/6
**prey [1]** 52/11
**prime [1]** 88/23
**principal [1]** 115/6
**principle [6]** 26/19 72/3 78/11 82/15 89/2 91/2
**principled [4]** 76/7 76/11 80/10 82/1
**principles [3]** 32/11 82/18 123/9
**prior [5]** 9/24 33/5 118/22 119/7

134/10
**private [1]** 50/14
**privilege [87]** 6/2 11/4 11/5 11/8 11/14 12/1 12/2 12/7 13/1 13/4 13/8 13/13 13/22 13/25 14/4 14/9 14/15 15/3 16/2 36/8 36/20 53/11 53/13 53/16 53/23 53/24 64/8 70/1 70/5 70/12 70/16 70/20 71/1 71/13 71/16 72/4 72/5 72/7 72/14 72/17 72/18 73/9 73/11 73/17 74/1 74/3 75/4 75/6 75/10 75/15 76/13 76/14 80/12 80/13 80/16 80/23 80/23 81/22 81/23 82/11 82/18 82/24 82/25 83/1 84/8 85/13 85/22 86/4 106/5 106/10 106/15 106/17 106/20 106/21 113/8 116/5 119/3 120/1 121/18 126/9 139/2 140/2 143/23 143/23 147/4 150/9 150/13
**privileged [5]** 85/24 125/11 125/12 139/10 140/2
**privileges [1]** 125/8
**probable [2]** 88/2 117/5
**probably [3]** 14/6 16/19 24/4
**probe [1]** 66/1
**problem [3]** 64/7 93/7 97/21
**problems [2]** 6/3 93/8
**procedural [2]** 5/20 9/17
**Procedure [2]** 40/8 50/19
**proceed [1]** 4/5

180

**P**

**proceeding [1]**
63/13
**proceedings [6]**
2/23 52/7 131/7
142/5 152/1 153/5
**process [19]** 26/4
40/2 51/4 51/6
51/7 51/8 51/14
55/15 55/17 69/14
76/1 79/17 89/3
91/23 108/18
129/1 142/10
142/21 145/3
**processes [3]**
86/3 87/25 142/4
**procure [2]** 137/5
137/15
**produce [10]**
78/22 115/23
116/7 116/17
125/10 128/19
129/5 129/5
129/18 138/5
**produced [1]**
2/24
**producer [1]**
88/22
**producing [2]**
34/11 139/19
**product [2]** 30/17
140/19
**production [2]**
24/8 24/22
**proffer [10]** 18/16
116/19 118/10
118/13 119/5
119/13 134/21
134/22 137/11
147/17
**proffered [1]**
78/24
**profile [1]** 69/20
**prohibit [1]**
135/25
**prohibiting [1]**
43/18
**proper [7]** 15/6
39/25 48/12 49/23
51/14 115/11
137/6
**properly [3]** 48/5
70/21 82/11
**prophylactic [1]**

85/21
**proposed [5]**
79/23 107/2
112/11 113/2
142/6
**proposes [1]**
113/3
**proposition [4]**
7/4 35/8 47/16
56/11
**prosecute [4]**
33/5 59/2 69/21
150/2
**prosecuted [2]**
35/1 138/21
**prosecuting [2]**
69/13 139/25
**prosecution [10]**
20/12 27/8 30/18
36/4 52/1 52/5
71/16 129/20
141/4 141/6
**prosecution's [1]**
90/22
**prosecutor [1]**
59/21
**prosecutorial [1]**
34/19 66/4
**protected [2]**
65/24 85/21
**protection [2]**
56/7 143/20
**protections [1]**
9/18
**protective [3]**
43/9 43/18 85/19
**Proud [1]** 106/14
**prove [4]** 112/22
113/13 127/23
136/4
**proved [2]** 60/2
65/17
**provide [14]** 13/8
14/3 36/8 50/4
63/1 64/3 64/12
99/16 105/4 106/8
109/23 125/12
140/13 143/25
**provided [16]**
11/9 11/14 24/9
68/12 99/12 99/18
100/18 100/24
100/24 103/1
103/4 104/18

106/10 108/12
108/22 132/4
**provides [8]**
14/19 15/11 15/21
26/8 106/6 109/10
137/21 141/11
**providing [3]**
24/12 91/10 99/10
**provision [2]**
39/12 100/14
**provisions [1]**
13/14
**proximity [1]**
89/24
**public [17]** 14/20
46/6 71/3 71/7
86/23 102/17
103/2 110/17
112/1 122/2 122/6
123/24 124/2
124/8 124/22
125/21 126/17
**publicity [18]**
23/9 23/12 79/21
88/3 88/10 88/12
89/6 102/8 102/19
103/3 103/5 103/8
103/8 103/9
103/19 105/6
144/21 145/1
**publicly [6]** 69/23
83/24 87/9 89/1
109/23 130/10
**pulled [1]** 107/8
**punishment [6]**
26/18 27/25 59/22
65/14 65/15
138/13
**punishments [1]**
138/15
**pure [3]** 5/15
47/14 133/18
**purportedly [1]**
124/18
**purpose [17]** 8/24
9/5 21/11 45/10
52/3 52/16 88/21
88/23 105/8
112/17 112/17
114/14 114/15
132/20 133/18
136/24 141/22
**purposefully [1]**
104/7

**purposes [5]**
20/21 73/1 90/24
99/8 119/1
**Purpura [2]** 72/11
85/2
**pursuant [3]** 54/9
114/20 114/24
**pursuing [1]**
123/6
**pursuit [1]** 90/23
**push [1]** 102/18
**pushback [1]**
69/22
**put [11]** 6/6 11/17
31/7 31/19 39/8
71/4 84/24 98/4
117/17 128/17
141/20
**puts [1]** 29/18
**putting [2]** 17/9
47/1

**Q**

**qualifies [1]**
95/18
**qualify [1]** 99/4
**quality [1]** 66/8
**quash [23]** 4/3
4/9 4/11 35/7
36/13 39/3 40/2
43/17 46/12 46/22
47/3 48/21 51/15
52/17 55/9 55/16
64/14 64/20 94/3
111/18 138/8
141/9 144/16
**quashal [1]** 42/16
**quashed [9]**
35/11 35/19 36/25
51/20 101/9
101/18 137/20
137/24 144/8
**quashes [1]**
101/25
**question [138]**
5/5 5/6 5/17 6/9
7/20 7/22 8/18
9/22 10/3 10/9
10/17 11/4 11/7
11/10 11/11 11/25
12/12 12/22 13/20
13/20 14/14 14/17
14/18 15/9 16/1
19/6 19/14 19/25

20/2 20/4 21/15
30/15 34/12 36/12
36/14 37/15 40/24
41/1 41/8 41/12
42/5 42/10 44/6
44/7 44/25 45/22
46/21 46/24 47/9
50/16 50/18 50/23
53/19 54/4 57/25
58/8 58/10 60/6
60/9 62/6 63/23
64/15 65/22 67/21
75/14 75/17 77/5
78/3 78/10 78/12
78/16 79/20 81/16
82/11 83/3 83/12
84/12 84/13 84/16
84/19 85/10 89/21
94/9 94/20 94/22
94/23 95/2 95/17
95/20 97/6 97/20
98/3 98/8 98/12
98/18 99/21
100/10 100/17
100/25 101/1
101/11 101/13
103/7 112/8
113/10 113/25
114/9 116/2 121/5
121/8 121/9
124/20 127/4
130/17 130/18
130/18 132/3
132/5 132/6 132/9
132/16 132/18
132/20 133/18
133/20 139/4
139/13 139/16
139/17 139/20
141/25 144/12
147/7 147/11
149/5 150/5
150/19 151/7
**questioned [1]**
141/13
**questioning [3]**
105/1 141/16
141/17
**questions [45]**
5/15 5/16 7/9
10/13 10/25 11/3
11/3 14/13 25/9
38/4 42/25 43/25
44/1 44/3 46/5

# Q

**questions... [30]**
47/11 47/12 47/14
47/20 48/2 52/22
66/12 68/23 75/20
82/6 85/15 96/21
97/13 108/4
110/12 111/7
112/7 126/20
126/21 130/21
131/13 131/22
133/9 133/14
133/22 134/1
137/13 137/15
140/1 142/17
**quickly [3]** 20/22
26/20 149/2
**Quinn [1]** 113/23
**quite [2]** 26/13
84/14
**quorum [1]**
129/10
**quote [3]** 53/22
115/5 129/11
**quoted [1]** 57/5
**quotes [1]** 114/6

# R

**Raiders [1]** 67/15
**Rainey [1]** 36/5
**raise [8]** 44/21
44/23 54/12 75/15
77/3 131/3 133/4
141/5
**raised [15]** 6/4
11/1 45/1 47/9
47/24 70/15 77/2
77/4 91/6 126/22
130/3 134/25
150/25 151/1
151/13
**raises [2]** 43/25
97/13
**raising [2]** 73/11
148/15
**random [1]**
134/14
**randomly [1]**
68/24
**ranking [22]** 42/9
42/13 49/1 49/9
49/12 49/23 50/7
50/12 50/13 50/17
61/17 61/24 66/25

94/14 95/3 95/18
95/20 98/22 99/5
99/6 130/9 131/24
**rash [1]** 91/15
**rather [12]** 9/5
11/16 18/5 20/17
49/21 51/8 62/21
110/9 110/16
110/21 127/7
141/25
**ratified [1]** 131/21
**re [3]** 1/8 3/5
111/17
**rea [25]** 11/16
14/18 14/23 15/13
15/14 15/15 16/11
16/12 71/2 71/11
72/1 75/9 75/9
111/22 112/9
116/20 119/12
120/5 121/4
121/13 139/7
139/18 146/23
147/11 147/13
**reach [2]** 61/15
132/9
**reached [1]**
139/21
**reaches [1]**
141/23
**read [12]** 19/17
32/10 32/21 40/12
73/20 84/4 85/16
107/11 114/7
135/12 135/18
141/21
**readily [1]** 130/10
**reading [4]** 31/23
36/19 73/14
141/20
**ready [2]** 69/3
69/4
**real [3]** 61/14
78/3 84/15
**realistic [1]** 61/15
**really [25]** 16/18
25/20 35/23 39/15
41/14 60/20 63/10
84/20 86/22 96/7
96/9 98/14 101/9
101/11 102/10
131/22 132/10
139/6 139/8
139/12 139/15

139/17 144/19
146/17 147/8
**reason [31]** 23/8
26/7 26/7 51/20
53/1 67/18 69/24
72/20 72/21 76/5
79/18 79/24 80/4
81/3 81/8 87/12
87/18 92/6 102/3
102/10 103/20
108/21 112/17
115/22 116/13
121/24 121/25
129/19 130/12
145/19 149/23
**reasonable [15]**
33/12 60/3 78/14
82/12 82/16 84/23
102/11 106/24
106/24 106/25
107/5 113/13
122/21 124/4
128/5
**reasonableness
[4]** 31/8 31/9
31/14 33/14
**reasonably [4]**
112/25 113/4
124/15 133/5
**reasoning [1]**
84/6
**reasons [18]** 23/7
29/21 31/15 57/22
61/2 61/17 69/12
88/25 102/12
121/14 128/10
128/18 128/21
130/14 133/2
140/20 142/18
149/25
**rebut [1]** 90/22
**recall [1]** 22/2
**receipt [2]** 18/1
68/9
**receive [2]** 26/17
89/3
**received [4]**
51/10 69/16
139/12 145/23
**recent [5]** 16/2
19/1 21/17 70/15
85/9
**recess [3]** 54/25
55/3 111/6

recessed [1]
111/9
**recipient [2]**
45/13 130/1
**recipients [3]**
4/12 51/14 51/24
**recognition [1]**
74/19
**recognize [2]**
5/22 93/8
**recognized [5]**
13/17 20/11 36/6
85/19 85/20
**recognizes [1]**
80/22
**reconsider [1]**
136/3
**reconvene [1]**
110/7
**record [9]** 3/9
12/24 18/23 55/4
68/2 105/8 111/10
128/5 153/5
**recorded [1]** 2/23
**records [11]**
24/13 28/13 29/18
128/19 134/6
134/12 134/16
136/6 137/5
137/15 140/14
**refer [1]** 34/18
**reference [1]**
67/20
**referenced [2]**
33/22 125/16
**referral [5]** 22/21
48/23 50/10 61/10
77/24
**referrals [3]** 28/3
131/18 140/16
**referred [4]** 21/1
22/18 77/24 138/3
**reflect [2]** 69/19
110/4
**reflecting [1]**
140/13
**refusal [4]** 112/15
112/18 112/19
113/24
**refuses [2]** 35/24
129/19
**refusing [4]**
113/25 114/9
115/7 129/4

**regard [7]** 43/4
43/23 55/14 56/6
56/8 57/5 60/10
**regarding [14]**
28/12 28/15 47/9
56/19 57/22
115/25 121/13
126/20 128/1
134/13 135/21
137/13 145/1
151/20
**regardless [2]**
15/10 135/6
**registration [1]**
26/23
**regulations [2]**
84/16 84/17
**reiterate [4]** 7/25
115/18 121/12
125/15
**reiterated [1]**
129/7
**reject [1]** 93/18
**rejected [1]** 29/20
**rejection [1]**
142/6
**related [5]** 28/2
94/6 111/15
123/22 128/9
**relates [4]** 120/5
126/19 141/17
145/21
**relating [12]**
29/25 30/13
120/13 126/4
132/25 133/15
134/5 134/12
137/4 138/12
138/17 143/5
**relative [1]** 55/25
**relatively [2]** 90/8
121/3
**Release [1]**
140/10
**relevance [1]**
26/6
**relevancy [1]**
58/11
**relevant [62]**
14/12 16/4 17/10
17/24 18/6 18/20
24/13 33/2 35/13
35/19 36/23 41/3
41/6 41/19 41/21

# R

**relevant... [47]**
41/23 42/1 42/4
42/8 43/7 47/1
50/16 50/18 56/22
58/1 58/9 65/15
69/25 70/22 71/1
71/14 78/9 78/25
83/14 83/16 85/10
86/5 106/15
106/16 107/16
114/6 116/14
117/1 117/4 118/8
119/9 119/11
120/9 120/25
121/20 122/5
126/14 127/6
139/22 141/1
141/3 143/2 143/6
143/13 144/10
145/25 148/9
**reliance [7]** 6/1
33/4 114/8 114/9
120/13 122/21
124/5
**relied [9]** 31/4
32/8 84/16 108/24
115/22 120/17
121/19 124/15
124/18
**relief [2]** 20/9
96/8
**relies [1]** 125/7
**relying [4]** 39/4
71/8 73/14 81/24
**remain [2]** 121/2
137/16
**remaining [3]**
22/24 136/11
136/13
**remains [1]** 77/15
**remedied [3]**
129/11 129/13
129/16
**remedies [1]**
64/20
**remedy [5]** 55/16
55/20 101/8
101/16 128/25
**remember [3]**
34/1 59/20 70/11
**render [1]** 90/16
**renders [2]** 117/1
117/3

**renewed [1]**
145/6
**Reno [2]** 72/10
72/14
**renunciation [2]**
53/22 143/20
**repeatedly [1]**
18/23
**repeating [2]**
121/3 126/2
**reply [5]** 29/3
30/21 91/7 145/10
151/20
**report [1]** 87/10
**Reported [1]** 2/18
**reporter [3]** 2/18
54/24 153/4
**representation [2]**
41/8 122/22
**Representative
[1]** 95/4
**Representative
Cheney [1]** 95/4
**REPRESENTATIV
ES [12]** 2/8 2/12
3/24 38/16 48/4
48/8 49/4 49/8
51/18 60/5 128/20
141/13
**Representatives'
[1]** 107/25
**represented [1]**
140/14
**representing [1]**
72/12
**request [5]** 64/13
65/8 90/15 96/8
104/8
**requested [4]**
63/17 104/7
104/16 105/9
**requests [3]**
40/12 40/13 40/13
**require [6]** 118/14
130/17 131/12
136/8 142/20
143/19
**required [16]**
34/10 41/18 61/7
67/2 95/21 97/24
99/18 100/9
111/22 116/2
118/6 122/16
128/21 129/5

129/19 132/4
**requirement [5]**
46/17 63/20 94/17
107/13 120/5
**requirements [2]**
51/19 99/1
**requires [9]** 9/18
48/13 49/24 61/9
89/3 95/10 123/13
140/17 142/2
**requiring [1]**
56/18
**requisite [1]**
139/18
**Res [1]** 41/1
**Res. [1]** 41/18
**Res. 503 [1]**
41/18
**researching [1]**
74/15
**resemblance [1]**
23/13
**reservations [1]**
115/14
**reserve [1]** 27/23
**reserving [1]**
108/20
**resolution [18]**
5/9 7/21 7/24 9/9
9/17 10/1 41/5
57/7 57/13 57/14
57/23 59/9 61/7
61/8 62/2 67/3
112/7 137/16
**resolutions [1]**
131/3
**resolve [13]** 5/16
5/18 7/22 12/20
12/22 37/7 66/22
110/3 111/19
119/16 130/21
140/6 148/13
**resolved [8]**
65/10 77/25
101/19 145/15
145/16 148/17
148/19 148/22
**resolves [3]** 6/9
112/7 131/22
**resolving [1]**
110/12
**resources [2]**
21/3 21/6
**respect [24]** 7/5

11/3 13/10 13/15
14/7 23/5 29/2
29/16 29/22 30/4
30/10 34/4 42/22
56/4 80/12 86/16
87/4 94/10 128/19
129/15 136/23
142/6 142/7 146/2
**respectfully [2]**
73/21 75/5
**respecting [1]**
80/16
**respond [7]** 16/24
27/23 113/18
114/10 118/6
148/11 149/3
**respondent [2]**
1/11 128/18
**responding [5]**
117/9 117/16
117/19 118/4
139/10
**response [9]**
12/11 47/25 76/5
93/1 104/4 104/6
125/9 125/11
125/13
**responsibilities
[1]** 77/17
**restrictions [1]**
65/11
**result [10]** 20/9
35/14 96/8 113/7
121/17 133/15
138/16 139/24
145/19 147/14
**results [2]** 66/8
90/18
**return [17]** 6/5
17/12 17/21 17/22
18/9 19/4 19/8
22/12 22/15 83/13
116/11 119/6
119/8 128/22
147/15 147/16
148/7
**reversed [2]**
84/18 88/11
**reviewed [1]** 81/3
**rewrite [1]** 56/5
**Rideau [1]** 23/15
**right [39]** 7/17
10/19 10/22 11/13
12/9 14/25 25/11

29/12 33/8 37/6
37/14 37/23 37/25
39/2 39/10 56/14
58/6 58/12 58/17
58/20 58/21 64/21
67/25 68/2 69/7
71/21 75/21 79/7
84/21 86/14 88/17
90/3 90/16 90/19
91/23 91/24 100/3
109/10 111/1
**rights [8]** 57/25
58/14 79/21 82/22
87/13 89/14
108/21 109/10
**rise [1]** 111/8
**risk [5]** 6/13
22/21 79/22 89/13
89/14
**risks [1]** 89/10
**Road [1]** 1/22
**Robert [2]** 134/8
134/14
**Robert Costello
[2]** 134/8 134/14
**rocket [2]** 86/15
86/18
**role [3]** 63/10
63/24 65/23
**Room [1]** 2/20
**ROSE [1]** 1/16
**Rostenkowski [4]**
10/6 95/24 95/25
99/11
**round [2]** 21/13
126/12
**RPR [1]** 2/18
**rule [62]** 6/20
9/25 10/10 11/24
17/8 26/7 28/8
30/23 30/24 36/22
40/14 40/15 42/10
46/13 46/17 51/5
62/7 74/10 94/14
94/16 95/8 95/10
95/11 95/14 95/21
96/3 96/20 97/10
97/11 97/24 98/5
98/15 98/16 99/10
99/11 99/18 99/23
100/4 100/6 100/9
100/13 100/13
101/1 116/25
117/2 117/3

**R**

**rule... [16]** 128/14
129/7 129/12
130/19 130/20
131/1 131/1
131/25 132/2
132/4 138/2
139/14 143/13
151/2 151/9
151/10
**Rule 16 [1]** 30/24
**Rule 17 [6]** 40/15
42/10 46/13 46/17
51/5 143/13
**rulemaking [8]**
6/14 7/15 10/25
48/12 48/13 95/16
107/21 131/5
**rules [63]** 6/15
6/18 6/20 7/12
7/13 7/20 10/13
26/6 26/6 30/16
40/7 41/1 41/17
42/5 48/5 48/12
50/18 60/19 60/21
62/20 66/12 66/21
66/22 73/6 94/10
95/5 95/21 96/23
96/25 97/16 99/9
101/10 107/24
108/1 108/7 112/4
126/21 126/25
127/8 127/13
127/18 127/19
127/25 129/15
129/25 130/7
130/17 130/22
130/24 131/1
131/3 131/6 131/7
131/8 131/14
131/16 131/17
132/12 132/15
133/23 142/19
143/9 144/13
**rules-based [2]**
132/12 132/15
**rules/violations
[1]** 129/15
**ruling [4]** 43/4
43/11 84/3 140/24
**rulings [4]** 92/8
92/13 93/17
136/14
**running [1]**

149/15
**rush [1]** 20/16

**S**

**S-U [1]** 81/2
**Sabbath [1]** 76/9
**Sager [2]** 27/11
66/9
**said [40]** 6/2 9/3
18/1 18/23 32/12
38/8 48/23 52/24
53/21 54/11 54/13
56/3 56/16 57/10
58/3 61/24 64/7
65/13 67/24 70/16
75/13 78/7 82/2
82/3 84/18 84/18
87/10 89/1 92/3
92/11 96/21 97/5
109/4 120/10
135/25 149/23
149/25 150/25
151/5 151/12
**sake [1]** 4/15
**same [24]** 13/6
24/15 30/24 32/17
34/25 35/3 61/21
66/2 70/6 70/7
70/7 70/22 70/23
70/23 85/14 85/15
86/4 86/5 114/4
114/11 115/4
115/23 117/17
140/1
**sanctioned [1]**
13/18
**satisfied [2]**
34/22 34/22
**satisfying [1]**
121/4
**Saturday [1]** 76/9
**saw [5]** 76/6 76/8
76/21 76/22 80/2
**say [62]** 16/17
18/21 20/8 21/8
22/5 25/24 27/4
27/23 31/20 31/22
32/2 33/6 33/7
37/24 44/24 45/12
53/13 55/20 69/15
72/8 72/16 75/16
77/19 80/6 82/1
85/22 89/16 90/13
90/14 91/8 91/12

91/14 92/22 93/4
93/17 93/18 94/13
95/8 97/4 97/10
99/18 100/9 101/7
103/4 107/11
108/21 108/23
108/24 109/22
109/23 110/8
124/8 127/12
127/14 131/8
146/12 149/11
149/12 151/3
151/6 151/8
151/11
**saying [12]** 15/5
35/16 39/6 56/5
91/8 92/23 94/21
109/3 136/23
148/6 148/9
150/13
**says [17]** 9/16
9/20 28/8 68/5
72/14 73/5 73/14
75/23 81/3 81/10
81/23 92/18 99/20
118/16 131/6
147/12 150/1
**Scalia [1]** 60/8
**Scavino [22]**
25/13 30/9 30/11
30/13 31/23 31/24
32/17 33/17 68/22
69/8 69/22 70/9
70/18 83/13 83/25
85/8 85/15 86/1
105/25 107/15
140/9 140/16
**schedule [2]**
104/8 105/9
**scheduled [3]**
87/9 89/22 90/17
**scheduling [2]**
24/2 104/12
**SCHOEN [18]**
1/21 1/21 3/19
55/1 55/10 68/18
86/7 93/22 102/6
103/17 106/5
106/7 106/23
108/10 110/1
146/2 146/12
147/10
**science [2]** 86/16
90/9

**scientist [1]**
86/18
**scope [9]** 8/5
8/20 13/22 14/8
29/5 43/1 43/19
43/23 145/14
**screwed [1]**
73/19
**Sean [1]** 49/17
**search [1]** 63/24
**seat [1]** 87/16
**second [14]** 3/4
5/13 11/11 47/2
72/20 79/24
111/24 122/4
124/17 130/15
131/2 135/8
144/21 147/10
**seconds [2]**
102/23 107/21
**Section [6]** 112/9
113/12 119/17
133/11 137/3
137/18
**sector [1]** 50/14
**see [14]** 12/11
18/14 31/23 31/23
70/2 80/6 80/17
81/3 83/24 85/1
87/15 93/7 107/10
145/19
**seeing [2]** 54/22
146/10
**seek [13]** 40/21
43/9 43/16 43/18
46/12 56/23 60/15
101/8 101/16
121/25 133/14
142/15 143/13
**seeking [4]** 29/4
35/9 35/10 96/9
**seeks [18]** 35/18
40/9 40/11 42/25
46/9 49/22 51/11
101/22 103/3
119/18 120/15
124/23 125/23
126/13 142/24
143/1 144/1
144/10
**seem [4]** 11/20
29/4 126/4 146/6
**seemed [2]** 26/15
129/14

**seems [9]** 25/25
36/20 38/21 65/6
73/19 99/3 126/5
139/14 144/11
**seen [2]** 70/15
81/10
**Select [32]** 9/11
38/17 38/18 38/18
47/11 49/6 49/14
49/18 51/10 62/2
77/14 77/15 77/21
112/3 112/16
117/11 120/7
126/20 126/23
130/8 132/13
132/19 133/7
133/12 133/17
133/22 136/1
136/5 136/7 143/9
144/12 145/4
**selective [3]** 27/8
141/3 141/6
**self [3]** 53/14 54/4
107/22
**self-evident [1]**
107/22
**self-executing [2]**
53/14 54/4
**seminal [1]** 88/17
**Senate [3]** 54/7
54/8 54/14
**Senators [1]**
141/12
**sending [1]** 27/6
**senior [4]** 13/18
46/13 49/16 51/17
**sense [7]** 19/24
55/23 62/19 62/19
87/24 92/7 138/1
**sent [3]** 95/11
144/23 145/22
**sentence [1]** 70/8
**separate [2]**
11/10 132/18
**separately [2]**
108/17 141/5
**separates [1]**
58/24
**separation [5]**
72/17 74/3 82/24
131/4 131/12
**series [1]** 139/21
**serious [4]**
114/23 115/13

**S**

**serious... [2]**
130/6 131/3
**seriously [2]**
52/10 81/19
**serve [1]** 21/11
**served [4]** 49/3
49/4 68/10 114/20
**set [3]** 19/1 91/3
139/23
**sets [2]** 8/8 42/17
**setting [3]** 50/22
53/18 62/2
**settled [1]** 81/16
**several [4]** 53/7
107/4 128/12
131/18
**SHAKES [1]**
151/16
**shall [2]** 77/25
141/13
**shaping [1]** 103/9
**share [1]** 94/12
**she [11]** 24/16
41/4 61/6 61/9
61/16 67/6 81/16
95/12 95/14 95/20
128/21
**she's [2]** 99/4
99/9
**shed [1]** 120/4
**Shelton [1]** 129/2
**Sheppard [1]**
23/17
**Sherper [1]** 3/19
**shield [1]** 59/6
**shocked [1]**
84/13
**short [1]** 4/19
**shorthand [2]**
2/23 60/25
**should [53]** 11/24
21/22 26/8 26/12
27/15 28/9 31/17
32/16 32/24 33/9
36/11 37/21 39/15
45/12 46/22 48/17
48/17 51/20 51/24
52/1 52/6 52/15
52/24 55/24 63/3
64/23 66/12 68/6
71/8 77/20 79/1
79/11 90/17 95/1
96/8 101/8 103/13

105/1 105/18
105/22 106/19
108/11 110/13
112/25 113/4
115/8 120/16
126/5 130/3 133/5
134/19 137/20
145/5
**shouldn't [2]** 79/3
92/25
**show [22]** 13/19
31/16 33/2 36/2
36/4 36/22 40/19
90/9 96/7 96/9
107/15 112/23
116/11 117/14
118/3 119/6
119/23 120/1
120/2 125/5
136/21 144/9
**showed [3]** 83/10
99/15 105/24
**showing [8]**
29/21 34/10
101/24 106/12
116/19 119/14
121/17 123/14
**shown [3]** 30/19
106/9 112/24
**sic [1]** 65/24
**side [3]** 6/6 59/15
126/6
**sign [3]** 40/19
63/16 63/24
**signed [1]** 21/23
**significant [1]**
92/17
**SILVERMAN [1]**
2/5
**similar [5]** 39/12
87/7 116/13
121/11 123/19
**similarly [2]** 12/8
33/6
**simple [3]** 104/2
114/13 147/8
**simplest [1]**
139/9
**simply [8]** 15/5
16/15 40/3 41/17
91/16 106/20
109/22 125/2
**since [10]** 19/5
20/18 77/4 85/14

94/6 114/7 116/2
123/21 133/6
144/12
**Sinclair [2]** 114/7
114/17
**single [2]** 107/14
108/23
**sit [1]** 109/19
**sitting [1]** 13/7
**situated [3]** 31/25
33/6 33/8
**situation [14]**
6/14 6/21 13/9
20/25 32/3 35/25
48/3 122/10 123/3
123/8 123/10
123/12 150/2
150/4
**situations [2]**
48/9 123/19
**Sixth [1]** 56/14
**skeptical [2]**
134/22 137/12
**skip [1]** 82/6
**skipping [1]**
76/19
**skyrocket [1]**
87/5
**slant [1]** 27/1
**sliver [1]** 100/19
**slowly [1]** 104/13
**SLUTKIN [1]** 2/5
**small [1]** 23/17
**snippet [1]** 76/21
**so [205]**
**social [1]** 143/4
**sole [1]** 136/24
**some [57]** 4/13
4/14 5/17 14/23
18/14 18/16 24/12
26/2 26/14 35/15
36/2 36/9 37/19
38/22 41/2 41/19
41/23 43/24 46/1
46/8 46/13 50/6
64/15 69/19 69/21
72/25 73/15 74/19
83/15 83/15 83/23
85/21 92/8 92/10
92/23 96/13 97/5
98/3 100/19
102/11 105/8
107/10 107/23
110/4 110/13

116/19 117/11
126/2 128/12
131/25 132/23
136/8 137/22
141/2 143/15
143/18 144/22
**somehow [3]**
29/18 96/12
107/24
**someone [12]**
18/8 30/18 31/10
35/4 42/7 69/20
84/4 94/10 95/2
103/14 150/2
150/9
**something [29]**
7/6 7/25 11/17
14/1 17/7 19/8
22/2 29/20 35/15
38/25 40/19 43/21
61/4 64/16 71/25
76/7 78/8 78/8
95/6 95/13 96/17
121/11 126/12
127/12 127/14
131/8 146/12
146/16 148/2
**sometimes [3]**
8/18 93/13 136/1
**somewhat [2]**
123/19 128/9
**somewhere [1]**
7/1
**sorry [3]** 15/25
25/15 35/10
**sort [16]** 11/5
13/25 21/10 23/23
38/22 40/12 41/23
68/23 83/22 94/16
98/11 103/14
107/23 112/5
122/4 133/25
**sought [8]** 20/9
36/15 40/18 41/19
46/17 91/1 136/5
142/1
**sounds [3]** 23/18
55/13 72/3
**source [1]** 37/18
**space [1]** 55/23
**speak [5]** 45/7
47/2 63/7 104/14
109/12
**Speaker [14]**

38/15 41/3 42/3
45/4 49/4 59/19
59/20 59/24 60/10
61/1 61/12 63/19
77/25 94/11
**Speaker Pelosi
[1]** 59/24
**speaking [2]**
135/11 144/14
**speaks [1]** 8/24
**special [3]** 3/13
8/23 9/6
**specific [21]** 8/10
8/24 9/6 9/7 9/8
29/9 33/3 70/3
73/4 77/8 83/5
85/18 85/25 87/2
100/13 117/23
123/9 135/17
135/23 140/22
150/14
**specifically [11]**
59/11 70/14 73/14
82/3 87/2 90/2
105/18 109/16
123/3 124/24
142/12
**specificity [1]**
49/10
**specify [2]** 40/17
49/21
**speculatively [1]**
96/12
**speech [40]**
35/11 39/1 39/4
39/8 42/17 42/19
42/21 43/2 43/15
44/9 44/17 45/5
45/14 45/25 46/7
46/10 50/23 51/2
52/4 54/2 54/13
56/7 56/11 56/12
56/16 57/11 57/22
58/3 64/8 141/11
141/12 141/15
141/17 141/19
141/21 141/24
142/16 142/22
143/1 143/16
**speedy [2]** 102/16
102/18
**spend [2]** 22/24
50/14
**spends [2]** 30/21

# S

**spends... [1]** 51/22

**sphere [4]** 43/6 51/1 75/25 142/2

**split [2]** 104/14 104/15

**spoke [1]** 61/23

**spoken [3]** 6/23 95/19 96/3

**squarely [1]** 50/25

**staff [17]** 40/1 49/6 49/15 51/17 63/8 63/10 63/11 63/12 64/9 64/9 64/11 77/22 111/18 137/20 138/10 141/24 143/12

**staffers [1]** 38/19

**stage [4]** 60/6 66/13 66/16 135/5

**stance [2]** 76/7 76/12

**stand [2]** 7/4 50/21

**standard [7]** 31/9 39/6 42/7 42/16 47/5 121/13 139/21

**standing [5]** 8/9 8/13 9/5 14/16 123/12

**stands [2]** 12/9 88/16

**start [8]** 5/4 28/22 38/12 59/18 65/19 79/1 101/8 102/19

**starting [1]** 79/19

**state [1]** 128/21

**stated [7]** 8/1 23/6 23/22 88/21 127/19 127/21 140/23

**statement [9]** 18/5 22/2 83/24 107/1 107/7 107/14 108/6 108/13 122/17

**statements [6]** 28/4 28/5 28/6 33/5 107/8 122/10

**states [19]** 1/1

1/3 1/14 3/3 3/12 9/12 10/6 12/3 38/15 51/11 51/24 62/3 75/14 111/16 114/1 123/15 127/11 128/17 138/8

**States' [1]** 120/12

**status [3]** 80/18 80/18 144/21

**statute [11]** 15/16 20/21 21/12 54/10 73/18 74/15 75/10 111/23 113/21 114/1 121/4

**statutory [1]** 133/13

**stay [1]** 114/25

**stenotype [1]** 2/23

**step [2]** 55/14 77/7

**STEPHEN [4]** 1/6 1/11 3/4 3/6

**steps [1]** 52/13

**stick [1]** 110/9

**still [20]** 13/19 31/11 35/4 41/20 43/10 46/16 78/2 78/6 78/13 78/13 78/13 84/14 89/23 97/22 98/2 100/18 105/19 134/1 150/12 150/20

**stood [1]** 52/13

**story [2]** 18/16 126/6

**stray [1]** 26/11

**Street [2]** 1/18 2/5

**stress [2]** 118/7 119/10

**stressed [1]** 115/13

**stripped [1]** 51/25

**strong [1]** 89/7

**struggling [1]** 97/5

**study [1]** 81/11

**stuff [2]** 75/21 149/6

**Su [1]** 81/2

**subcommittee [2]** 8/9 9/2

**subject [7]** 9/2

27/22 30/18 43/10 103/15 132/14 136/25

**subjective [2]** 120/4 120/23

**subjects [1]** 54/14

**submit [4]** 95/17 95/19 104/25 105/17

**submitted [4]** 6/13 94/9 107/2 144/14

**subpoena [101]** 4/12 6/5 11/9 13/11 13/11 13/14 16/24 17/12 18/1 19/4 22/25 27/6 29/6 35/7 35/10 35/18 39/5 39/13 40/1 40/20 41/19 41/22 45/13 46/11 46/12 48/25 51/5 51/5 51/8 51/9 51/10 51/12 51/15 51/23 52/9 52/10 52/16 54/9 59/8 61/10 63/22 68/9 68/9 73/7 76/15 77/14 77/18 77/19 78/1 78/2 78/4 78/6 81/5 81/21 94/15 95/6 105/11 105/23 112/3 112/16 113/15 113/19 114/20 114/25 116/2 116/24 117/9 117/10 117/16 117/16 117/19 117/19 118/4 118/5 119/2 120/16 120/18 121/1 121/11 121/14 121/15 122/12 125/10 125/11 125/13 126/24 130/1 133/1 136/5 137/14 139/10 140/4 143/11 143/13 144/1 144/3 144/9 145/12 147/3

148/8 150/10

**Subpoena's [1]** 119/4

**subpoenaed [3]** 60/3 134/15 142/15

**subpoenaing [2]** 40/17 142/18

**subpoenas [41]** 1/8 3/6 38/14 40/2 40/4 40/5 40/21 49/3 49/3 49/9 51/16 51/19 51/21 52/3 52/12 63/15 63/16 101/9 101/17 101/23 102/1 111/17 111/18 116/4 116/12 117/25 118/9 118/23 119/7 119/25 120/3 120/8 120/24 128/20 134/6 134/12 137/14 137/19 137/23 139/3 142/13

**subsequent [2]** 47/5 48/7

**substantially [2]** 88/12 90/21

**such [51]** 15/13 15/14 26/18 30/13 66/20 79/12 88/12 90/18 114/9 114/15 116/14 116/15 116/19 117/12 117/18 118/7 118/11 118/13 118/17 119/1 119/10 119/22 120/20 121/22 123/5 124/21 126/15 128/15 129/6 129/22 129/24 132/10 132/16 133/8 134/20 134/22 136/9 136/18 137/1 137/10 138/22 140/14 140/19 141/5 142/23 143/2 143/17

143/19 143/21 144/8 147/18

**suffers [1]** 24/21

**suffice [1]** 63/8

**sufficient [7]** 42/16 102/21 113/22 128/5 129/21 134/22 141/7

**sufficiently [2]** 90/10 90/12

**suggest [2]** 16/20 85/5

**suggested [5]** 25/6 26/10 27/18 129/24 144/3

**suggesting [1]** 22/3

**suggestion [5]** 65/9 105/7 105/9 107/22 129/14

**suit [1]** 54/8

**Suite [1]** 1/22

**summarize [1]** 114/21

**summoned [2]** 39/5 129/18

**supersede [1]** 81/15

**superseded [1]** 81/17

**supersedes [1]** 80/24

**supplemental [1]** 73/25

**supply [1]** 49/12

**support [3]** 47/16 118/19 151/20

**suppose [4]** 85/9 110/12 129/18 147/14

**supposed [5]** 17/4 17/5 17/14 77/23 105/24

**supposedly [1]** 85/25

**supremacy [1]** 56/17

**Supreme [22]** 12/3 12/5 40/14 47/16 50/24 53/18 56/15 58/12 62/4 62/12 81/13 113/10 122/15

186

**S**

**Supreme... [9]** 127/16 127/18 128/12 128/17 129/7 138/4 141/19 142/9 142/12

**sure [16]** 8/2 10/15 25/9 28/24 40/19 57/1 84/3 90/7 91/25 94/7 106/2 129/9 146/15 146/18 147/17 149/11

**surely [2]** 32/22 58/17

**surprise [1]** 26/16

**surprised [1]** 29/14

**surrebuttal [1]** 4/20

**surrounding [1]** 115/16

**suspect [1]** 92/7

**suspend [1]** 145/7

**swallow [2]** 17/7 17/8

**sweeping [1]** 52/12

**sword [2]** 58/25 59/1

**system [1]** 90/25

**T**

**table [1]** 3/13

**tactic [1]** 52/11

**Tails [1]** 52/7

**take [19]** 3/16 25/9 36/14 45/9 48/20 54/24 54/25 61/9 61/19 65/9 78/1 81/23 87/14 89/7 89/14 92/12 116/22 129/17 151/24

**taken [4]** 47/21 76/7 76/11 130/19

**takes [1]** 109/14

**taking [10]** 4/21 4/23 45/18 50/20 53/11 62/5 85/11 92/4 92/5 146/6

**talk [8]** 18/25 30/8

59/11 65/14 69/8 97/12 106/12 106/13

**talked [4]** 14/13 16/13 23/20 99/5

**talking [11]** 9/16 17/3 26/22 30/22 45/2 60/13 62/14 69/12 118/17 146/19 148/14

**talks [1]** 8/9

**targeted [2]** 23/23 40/13

**technically [1]** 10/16

**Ted [1]** 74/12

**teed [4]** 6/7 11/21 12/14 24/5

**television [2]** 23/16 88/22

**tell [4]** 62/25 63/6 71/21 78/25

**telling [3]** 84/22 105/14 123/4

**tells [1]** 122/19

**temporal [1]** 33/11

**tenable [1]** 129/23

**tend [3]** 116/11 116/16 116/20

**tendency [1]** 117/4

**term [3]** 73/1 113/12 115/17

**terms [14]** 23/7 26/21 27/7 27/21 48/21 49/11 64/17 65/7 73/11 81/18 82/9 82/13 116/18 123/18

**test [4]** 50/6 50/8 50/12 59/20

**testified [6]** 18/8 18/9 61/22 61/22 68/8 68/8

**testifies [3]** 32/7 32/10 95/14

**testify [20]** 32/8 32/9 38/20 42/1 42/12 42/15 49/18 51/24 61/16 61/23 64/9 77/2 78/22 78/24 79/12 81/24

92/16 96/14 147/21 148/3

**testifying [6]** 20/1 67/20 67/21 95/9 96/11 136/25

**testimonial [1]** 13/16

**testimony [69]** 13/15 17/20 20/6 20/10 25/5 27/2 27/5 27/15 32/6 35/10 35/11 40/8 40/21 41/2 41/3 41/5 41/19 42/22 46/9 46/17 49/24 50/2 50/3 50/7 50/20 56/23 59/12 59/19 59/19 59/23 60/14 61/7 61/25 63/8 63/21 76/24 77/1 77/16 78/19 78/20 80/8 81/4 91/22 94/15 96/7 96/9 97/12 99/12 99/13 99/14 101/12 106/12 119/18 119/23 120/4 125/9 125/12 125/17 136/5 138/6 142/1 142/14 142/20 142/23 142/25 143/10 144/10 146/16 148/9

**testimony's [1]** 58/8

**text [1]** 56/2

**than [30]** 6/16 7/15 9/5 11/17 16/25 18/5 20/17 24/14 24/17 42/4 49/21 51/8 51/13 55/22 56/3 62/21 71/11 71/25 88/16 90/25 92/12 96/5 99/19 100/7 102/23 104/16 117/5 123/14 131/9 138/9

**Thank [27]** 10/22 28/10 28/19 38/5 38/8 39/21 52/18 52/19 52/21 54/20 54/21 68/17 69/2

73/3 86/7 93/22 93/23 107/19 109/25 110/1 111/7 111/11 111/12 146/11 151/14 151/15 151/25

**that [1024]**

**that's [109]** 9/21 14/5 15/19 20/16 21/9 21/20 21/24 26/4 33/8 34/9 35/1 35/13 35/18 39/20 41/1 42/16 43/10 44/24 45/20 46/15 47/17 50/8 52/25 53/3 53/12 54/17 55/25 56/12 56/22 60/13 60/23 61/3 61/4 61/10 62/20 64/10 65/6 65/14 65/25 66/2 66/9 68/14 72/15 73/8 76/1 76/10 76/16 76/17 77/22 78/9 79/21 79/23 80/3 80/14 80/18 81/6 81/7 81/7 82/1 82/14 83/9 83/22 85/19 86/14 88/3 88/21 88/23 89/1 89/9 90/7 90/8 92/5 92/12 93/19 95/23 98/11 99/9 99/10 101/11 101/24 103/4 103/20 104/3 107/6 107/18 108/1 108/3 108/21 108/22 109/15 109/21 110/18 122/23 124/6 127/10 128/6 129/11 130/4 133/1 135/22 139/20 140/4 141/22 142/11 146/5 146/5 149/24 150/4 151/10

**their [36]** 26/23 28/5 28/5 35/25 40/1 42/22 43/19 45/24 47/25 50/14

55/20 63/17 64/4 65/23 77/3 88/21 88/23 88/25 92/4 92/4 93/1 96/7 103/21 105/8 105/13 105/13 108/5 112/11 119/19 123/18 137/20 137/25 138/10 141/24 143/12 143/15

**them [32]** 4/16 5/21 5/23 7/10 11/1 26/16 29/18 31/4 59/18 60/24 63/6 65/22 66/24 69/13 72/13 81/14 84/6 84/6 101/21 104/10 105/10 108/18 116/13 123/3 128/2 128/12 128/16 129/19 131/9 133/15 135/7 150/7

**themselves [2]** 7/20 50/11

**then [82]** 4/8 4/9 4/10 4/17 4/18 4/18 5/13 7/8 10/12 11/10 13/15 14/17 14/18 15/9 17/15 19/5 24/7 25/12 25/13 28/4 29/2 29/24 31/8 32/6 32/15 33/2 34/8 36/14 37/10 44/3 46/23 46/23 50/23 54/12 55/1 55/9 55/10 55/16 55/24 63/1 64/20 68/3 68/12 68/23 70/21 73/6 75/7 78/14 82/17 85/23 87/12 87/18 90/10 90/23 91/4 91/20 92/5 93/8 95/14 96/3 96/12 99/10 99/20 100/17 109/17 109/20 111/1 111/3 114/21 116/20 118/11 119/4 119/9 120/8

**T**

**then... [8]** 121/11
124/22 134/23
144/5 145/6
146/10 148/8
151/7
**theories [1]** 92/1
**theory [8]** 31/20
68/1 68/2 68/3
91/19 92/20 93/15
128/6
**there [142]** 4/10
4/12 5/16 6/14
8/13 8/15 8/18
8/23 9/4 9/7 9/13
9/20 11/5 12/5
12/25 13/4 13/21
14/14 15/11 17/3
17/5 19/20 20/16
22/2 23/19 23/23
23/24 25/22 25/25
26/3 26/6 34/1
36/1 36/7 37/1
37/8 37/15 37/19
39/10 39/11 39/12
41/12 42/14 42/14
45/16 46/8 47/20
48/1 51/2 51/4
53/21 53/25 54/8
54/11 55/23 57/21
60/14 61/14 61/14
62/6 66/4 67/1
69/13 70/11 73/15
77/5 78/2 78/3
78/11 78/14 78/15
79/19 83/7 83/8
83/19 84/16 85/18
85/24 86/23 87/6
87/13 88/10 88/24
89/9 89/10 89/13
90/3 90/6 91/14
94/14 94/19 95/2
95/5 96/13 97/5
97/9 97/11 97/15
97/15 97/19 97/25
98/1 98/6 98/8
100/19 100/24
101/9 101/10
102/6 102/17
103/22 103/22
103/25 104/4
105/24 106/1
107/1 107/3 107/6
108/7 108/25

110/13 114/6
114/22 123/14
125/17 125/19
129/10 130/14
131/25 132/10
134/1 135/16
143/7 146/19
148/10 148/12
148/24 150/1
150/7 150/11
150/13
**there's [53]** 4/11
8/14 14/17 14/18
31/4 34/22 39/1
39/25 46/8 46/21
48/10 51/7 57/7
57/16 58/3 58/19
61/24 63/23 64/15
67/20 68/4 72/20
72/24 75/13 75/23
75/25 77/5 78/2
79/18 81/8 83/2
84/15 89/25 92/16
93/13 95/25 96/2
97/8 97/18 97/20
98/3 98/7 99/12
99/23 100/10
102/3 102/9
102/10 103/7
103/20 103/24
108/3 130/6
**therefore [18]**
21/21 39/7 45/1
70/21 107/12
112/24 121/20
123/4 125/20
127/24 127/25
128/15 132/12
133/23 139/13
140/6 143/10
144/4
**these [60]** 7/9
10/24 11/1 18/17
20/22 26/25 31/1
31/16 32/10 38/20
42/15 49/2 49/9
49/11 49/22 52/3
54/12 56/1 57/9
60/15 64/14 65/10
66/14 66/19 69/16
69/20 75/24 77/12
78/17 84/4 85/9
88/22 89/14 90/3
91/4 92/19 99/19

101/12 103/12
105/16 105/20
111/7 114/3
114/16 115/11
119/16 121/19
121/19 125/4
127/4 128/1
130/13 131/12
133/6 136/13
138/7 140/25
142/25 143/6
144/3
**they [122]** 6/6 6/7
7/10 16/6 22/3
22/6 26/3 26/25
27/10 29/19 30/13
31/3 31/4 32/3
32/12 32/22 33/17
39/6 40/3 40/6
42/21 42/24 43/1
43/1 43/15 43/16
43/18 43/21 47/11
47/14 49/18 51/1
51/15 51/20 52/5
52/9 59/6 60/21
61/19 62/1 63/2
63/3 63/9 63/15
63/16 63/19 64/3
64/5 64/10 65/13
65/13 66/12 69/15
69/16 72/7 72/8
74/8 74/11 74/15
75/16 80/6 80/7
80/7 81/3 82/23
83/24 84/7 84/17
84/18 85/23 87/5
87/10 87/11 88/18
89/23 89/23 92/4
92/9 94/18 96/12
96/15 96/24 97/14
98/1 99/8 100/25
101/8 103/17
104/22 104/23
105/2 105/3 105/3
105/7 105/9
105/14 105/18
105/19 105/22
106/8 106/9
106/12 106/13
106/17 106/18
108/24 109/5
109/6 109/15
109/16 110/8
115/8 120/6 122/7

123/19 127/6
130/11 133/14
137/24 140/23
145/16 148/20
**they're [16]** 32/2
35/4 64/7 67/6
67/7 70/14 70/21
72/21 78/13 78/13
85/3 94/6 96/9
104/22 106/9
109/3
**they've [8]** 26/24
34/22 63/14 64/7
81/3 87/10 89/1
105/15
**thing [26]** 10/15
11/2 11/20 16/17
28/8 54/6 57/4
61/16 61/21 66/3
66/10 69/12 75/10
75/11 76/25 79/20
80/25 83/13 89/1
91/5 92/3 106/4
109/2 109/5
149/20 150/24
**things [28]** 6/10
6/12 8/16 13/7
26/2 26/14 26/15
26/17 26/22 26/25
27/6 29/9 29/21
33/13 44/3 55/24
66/23 67/3 69/13
79/19 81/8 86/23
93/16 108/24
109/18 110/8
146/13 149/21
**think [124]** 3/16
5/5 7/25 8/1 8/11
8/11 12/13 14/6
14/11 14/25 16/19
19/17 19/22 20/20
24/2 25/21 27/25
29/23 30/9 30/10
34/3 36/12 36/19
37/10 37/22 43/3
43/5 43/22 44/8
45/2 45/9 53/1
57/3 58/10 58/11
58/21 58/24 62/9
62/15 62/17 63/9
64/10 65/2 65/7
65/8 65/12 65/13
65/18 67/25 68/5
68/15 72/24 74/16

75/3 76/10 78/7
79/15 81/2 81/16
83/2 83/18 83/23
84/11 85/6 86/2
86/15 86/19 87/2
87/12 88/15 88/16
89/2 90/7 90/8
91/2 92/12 93/18
93/20 94/5 94/8
95/24 96/1 96/6
97/8 97/16 98/24
99/5 99/10 99/22
99/23 99/25
101/15 101/19
102/3 103/20
105/3 105/19
106/3 107/17
110/6 114/22
118/9 119/2
120/19 121/25
127/10 129/22
130/14 135/16
135/18 139/8
139/13 139/14
139/16 146/9
146/23 147/1
149/7 149/9
149/10 149/21
150/5 150/7 151/5
**thinking [7]** 14/1
53/12 96/7 111/2
117/15 117/17
117/18
**thinks [5]** 32/23
36/11 59/21 59/22
98/17
**third [4]** 112/1
123/16 126/19
144/22
**this [253]**
**THOMPSON [8]**
2/5 22/3 61/21
77/10 78/5 78/6
80/21 81/11
**those [54]** 5/11
5/11 5/15 5/20
6/10 6/12 8/17
13/7 13/14 14/22
16/4 23/13 23/15
23/17 23/22 23/24
25/8 27/17 28/17
29/23 31/15 33/22
46/6 46/16 48/1
48/2 48/9 50/9

# T

**those... [26]** 64/8 68/25 85/6 85/15 87/3 87/3 87/14 90/4 96/21 103/1 111/21 112/5 112/7 115/25 116/18 123/9 123/11 126/12 127/2 130/21 130/24 133/25 134/3 135/3 139/25 145/14

**though [8]** 14/22 38/12 54/14 94/3 128/9 144/20 145/5 150/16

**thought [14]** 9/24 10/24 17/14 17/23 17/23 22/5 37/7 68/20 86/10 93/11 94/11 117/8 126/8 147/2

**thoughts [1]** 119/16

**threatening [1]** 36/3

**three [10]** 28/11 49/6 51/17 70/25 90/8 102/11 111/21 112/5 133/25 144/20

**threshold [2]** 84/12 84/25

**through [28]** 7/2 23/11 23/12 25/12 25/19 26/11 26/11 26/20 35/18 37/10 48/7 55/9 58/22 59/13 59/17 62/1 68/15 85/12 85/17 87/16 98/14 98/15 98/16 117/7 122/1 134/11 142/10 145/2

**throughout [1]** 18/22

**Thursday [3]** 146/9 151/23 151/25

**thus [8]** 51/1 113/2 120/18 131/11 135/4 138/24 141/22

144/16

**tick [3]** 25/19 26/20 98/16

**tied [4]** 76/12 80/10 80/11 82/4

**tightly [1]** 136/10

**time [47]** 13/5 17/5 20/5 22/23 31/3 33/12 33/15 34/11 35/5 48/24 50/14 55/23 73/12 76/9 76/13 80/14 88/23 91/13 91/25 92/23 95/15 99/6 101/4 102/12 102/18 106/23 110/4 111/4 122/12 129/22 130/1 130/4 130/11 133/5 133/7 145/2 145/10 146/9 146/15 149/8 149/11 149/13 149/16 149/24 150/6 150/8 150/10

**timely [2]** 24/22 129/3

**times [2]** 69/16 115/13

**title [5]** 95/3 99/7 99/8 136/1 136/3

**today [19]** 3/19 3/24 4/24 19/21 65/13 67/5 76/6 76/24 78/6 84/3 91/12 93/17 103/25 110/2 111/20 115/19 145/24 146/19 147/25

**today's [1]** 45/10

**together [4]** 4/16 107/8 108/19 126/3

**told [8]** 17/12 18/9 18/12 33/24 80/14 108/13 120/6 148/7

**toll [1]** 29/17

**tomorrow [5]** 87/10 102/2 148/12 149/4

149/7

**Tonolli [4]** 41/25 49/17 50/3 101/14

**too [6]** 89/23 102/17 116/4 123/17 141/24 143/5

**took [3]** 50/5 81/13 91/6

**top [1]** 36/4

**topic [5]** 56/12 79/8 137/2 137/7 143/18

**topics [11]** 4/9 4/17 4/18 34/2 38/1 46/1 46/9 46/16 121/19 136/6 143/6

**total [11]** 13/2 13/9 13/13 13/17 20/25 72/4 72/21 72/22 72/25 82/14 106/10

**totality [1]** 135/13

**totally [2]** 32/2 33/8

**touch [1]** 29/19

**towards [1]** 91/16

**town [3]** 23/17 84/22 84/22

**traditional [1]** 115/17

**transaction' [1]** 138/6

**transcript [4]** 1/13 2/24 67/15 153/5

**transcription [1]** 2/24

**Transportation [1]** 123/16

**trapping [1]** 52/4

**travel [2]** 17/1 149/5

**traveling [2]** 76/22 149/17

**treat [1]** 141/6

**treated [2]** 72/7 85/23

**trial [97]** 11/1 11/12 12/6 15/10 19/15 19/19 19/21 19/24 21/7 21/8 21/14 22/25 26/5

26/9 29/15 38/14 40/21 41/25 43/7 43/12 47/6 47/22 48/17 48/22 50/2 50/7 51/18 51/19 52/1 52/14 52/23 52/24 53/2 64/14 64/17 64/22 65/10 65/21 67/15 67/24 78/25 79/1 79/3 79/10 79/13 79/19 80/3 80/3 86/25 88/8 88/10 88/13 89/3 89/7 89/22 90/4 90/5 90/17 90/19 90/20 91/3 91/9 92/2 92/6 93/7 94/6 94/17 102/12 102/16 102/18 104/17 105/14 109/6 109/10 115/2 115/6 116/15 116/23 118/14 132/15 132/17 134/19 136/15 137/6 137/8 137/10 137/17 138/10 143/12 144/11 144/18 145/7 145/13 147/7 147/11 148/23 151/6

**tricked [1]** 32/20

**tricky [1]** 139/1

**tried [4]** 59/8 66/17 70/4 82/8

**tries [2]** 31/6 119/25

**triggers [2]** 74/3 82/21

**trouble [1]** 17/1

**true [8]** 13/7 37/4 49/14 50/9 108/17 125/4 148/6 153/4

**truly [3]** 31/11 134/19 134/25

**Trump [5]** 80/21 81/10 81/22 124/25 145/23

**Trump's [2]** 125/6 125/14

**truthfulness [1]** 27/5

**try [4]** 20/16 37/12 55/9 92/11

**trying [6]** 14/7 56/4 76/6 81/18 81/19 82/5

**turn [6]** 10/12 38/21 39/17 111/21 112/6 134/2

**turned [1]** 33/20

**Turning [1]** 123/24

**Tweets [1]** 46/2

**Twitter [2]** 76/23 85/16

**two [36]** 3/2 11/5 14/13 19/17 20/17 24/18 24/18 33/5 34/13 41/24 42/4 42/14 42/20 47/16 55/14 56/1 56/6 57/3 59/13 64/1 64/3 64/9 65/2 68/25 79/19 86/23 92/11 97/12 101/19 108/4 108/24 111/15 114/3 128/9 130/14 149/21

**two questions [1]** 14/13

**two Supreme [1]** 47/16

**two things [1]** 86/23

**two weeks [1]** 34/13

**two-step [1]** 55/14

# U

**U.S [15]** 1/16 1/18 2/8 2/12 2/19 3/23 56/15 60/4 65/25 75/14 112/9 127/21 129/8 129/8 135/22

**Uh [1]** 98/13

**Uh-huh [1]** 98/13

**Um [1]** 17/14

**unable [1]** 145/4

**unambiguous [2]** 13/4 98/5

**unavailability [2]**

**U**

unavailability... **[2]** 36/8 140/24
unavailable **[1]** 35/12
unbiased **[1]** 87/17
uncertain **[2]** 80/19 145/13
unclear **[3]** 5/5 15/1 145/11
unconscious **[1]** 88/1
unconstitutional **[4]** 73/7 96/19 100/8 107/24
under **[36]** 8/4 8/16 13/15 15/15 15/18 26/5 36/7 36/22 40/7 40/14 42/10 48/13 50/18 51/5 57/8 65/9 75/9 80/11 81/17 95/5 95/14 99/9 99/11 101/4 102/17 106/10 113/20 113/25 114/3 116/7 117/2 117/20 121/5 121/23 125/4 143/13
underlying **[7]** 33/23 46/5 59/5 82/15 82/17 83/17 123/8
undermine **[1]** 50/7
undermined **[1]** 52/10
underscore **[1]** 77/13
understand **[34]** 5/8 5/24 14/21 18/6 19/2 32/13 56/4 60/12 62/13 71/6 72/23 72/24 79/5 84/2 86/22 91/5 100/5 101/5 105/12 108/25 109/5 124/23 132/10 146/14 146/14 148/21 149/21 149/21 150/12 150/22

150/22 150/24 150/25 151/4
understanding **[10]** 14/9 71/12 80/11 82/16 82/16 115/15 117/21 119/3 134/24 136/14
understands **[1]** 131/9
understood **[5]** 5/22 17/21 121/10 149/22 151/3
undertaken **[3]** 61/13 61/13 66/2
unequivocal **[3]** 53/22 113/10 143/20
unequivocally **[1]** 70/17
unfair **[1]** 39/3
uniform **[1]** 102/20
unique **[3]** 72/7 88/8 89/11
UNITED **[19]** 1/1 1/3 1/14 3/3 3/12 9/12 12/3 38/15 51/11 51/24 62/3 75/14 111/16 114/1 120/12 123/15 127/10 128/17 138/8
unlawful **[2]** 113/1 113/5
unless **[8]** 29/18 38/3 59/18 60/14 107/17 117/1 124/11 140/23
unlikely **[2]** 144/11 145/5
unmitigated **[1]** 87/22
unnecessary **[2]** 134/17 136/2
unreasonable **[2]** 84/4 85/5
unrelated **[2]** 102/13 144/20
unresolved **[1]** 19/20
unsure **[1]** 5/14
unteed **[1]** 139/13
unteed-up **[1]**

139/13
untied **[2]** 76/14 80/13
until **[3]** 104/9 111/9 134/23
unwillingness **[1]** 93/7
up **[38]** 5/7 6/7 7/12 7/14 11/21 12/14 13/19 24/5 25/9 34/10 36/14 39/2 39/18 40/19 45/9 50/5 55/24 60/7 62/2 66/10 66/22 73/20 75/14 77/7 94/4 96/4 96/5 97/10 99/15 105/24 106/12 109/12 121/17 125/6 139/13 146/6 149/18 151/25
upon **[7]** 64/21 90/15 110/4 114/8 115/1 115/7 128/22
urged **[2]** 78/5 78/6
urging **[1]** 78/14
us **[10]** 26/15 38/21 53/6 64/6 64/14 84/24 104/18 108/17 108/19 132/23
use **[10]** 24/19 24/21 24/24 52/13 59/6 66/20 88/6 98/4 99/17 115/17
used **[2]** 113/12 116/18
useful **[2]** 8/11 40/19
uses **[1]** 85/14
using **[4]** 60/25 68/12 73/1 136/1
usually **[1]** 72/5

**V**

valid **[16]** 46/11 70/1 70/11 70/20 71/7 81/24 82/25 113/8 117/16 117/20 120/19 121/16 129/3

139/13
132/19 133/17 140/4
validating **[1]** 21/11
validity **[2]** 47/20 48/1
validly **[1]** 131/21
various **[7]** 4/12 25/5 43/5 43/11 111/18 112/11 131/19
VAUGHN **[12]** 1/16 3/12 3/14 4/21 19/10 28/2 28/17 28/18 38/2 46/20 93/24 110/20
vehemently **[1]** 41/9
venue **[1]** 102/21
verdict **[3]** 108/3 108/5 108/6
versus **[16]** 3/4 3/6 11/3 12/3 54/8 58/13 62/3 75/14 80/21 80/22 81/11 111/16 114/2 123/16 128/18 129/8
very **[22]** 10/23 18/10 26/20 38/11 38/13 38/24 38/25 48/11 52/13 52/21 61/23 68/17 73/4 75/17 82/3 105/14 105/22 112/12 127/11 134/22 145/3 149/2
vests **[1]** 131/5
Vice **[2]** 38/17 95/4
video **[1]** 29/8
view **[66]** 6/8 7/8 9/22 10/24 12/12 15/20 17/10 18/7 19/2 19/3 19/24 20/2 20/3 20/13 20/19 21/14 21/22 21/24 22/12 25/2 32/13 33/1 35/22 41/11 43/24 45/13 47/3 48/15 48/19 52/24 56/1 56/18 58/8 67/2 71/11

75/7 78/25 79/20 81/7 90/5 91/15 94/12 95/2 97/7 97/18 98/6 98/9 100/5 100/7 100/7 100/13 101/5 107/23 110/20 112/6 113/9 115/12 116/10 127/24 130/20 131/2 132/1 138/23 144/11 145/1 150/12
viewed **[1]** 48/2
views **[3]** 103/10 130/24 142/19
vindicating **[1]** 20/21
violate **[1]** 7/15
violates **[1]** 74/21
violation **[8]** 6/13 73/17 108/8 111/23 124/3 128/14 129/25 130/8
violations **[8]** 5/9 98/15 98/17 128/15 129/12 129/15 130/13 130/23
virtue **[1]** 48/23
voir **[7]** 23/11 23/13 23/25 87/16 91/22 104/21 145/2
volition **[1]** 112/25
voluntarily **[3]** 43/14 43/16 49/17
volunteered **[1]** 42/5
volunteering **[1]** 59/14
voted **[2]** 22/19 26/25
voter **[1]** 26/23
vowed **[1]** 52/13
vs **[2]** 1/5 1/10

**W**

wait **[2]** 19/12 19/12
waivability **[1]** 53/20

# W

**waivable [3]**
53/12 54/3 143/17
**waive [6]** 45/5
45/6 45/14 64/8
78/12 133/1
**waived [22]** 5/21
5/23 7/10 11/1
44/13 45/1 45/18
45/24 53/24 97/17
97/22 127/12
127/14 127/15
127/18 128/11
128/16 129/25
133/8 143/15
146/25 148/1
**waiver [12]** 6/6
43/15 44/9 45/17
53/5 57/19 83/11
101/5 129/15
130/16 143/19
143/25
**waives [1]** 143/22
**waiving [1]** 42/21
**walk [1]** 129/14
**Walter [1]** 74/13
**want [27]** 4/15
4/17 16/17 29/14
38/12 47/8 54/11
55/21 59/12 61/12
62/24 62/25 63/5
63/7 63/25 66/24
87/10 104/8
105/13 106/4
109/16 121/12
147/9 147/25
149/13 150/17
151/19
**wanted [12]**
10/15 11/2 11/22
38/24 39/14 67/18
75/15 104/12
104/13 104/16
105/7 151/13
**wants [11]** 16/19
24/19 27/18 30/6
59/18 62/19 64/4
100/23 101/16
101/17 101/18
**warrant [2]** 63/24
127/2
**warranted [1]**
88/14
**warrants [2]**

**19/19 19/21**
**was [198]**
**Washington [4]**
1/19 2/9 2/13 2/20
**wasn't [14]** 10/16
22/6 70/12 70/13
70/16 72/25 81/24
83/10 85/25 92/24
146/17 146/24
149/24 151/3
**way [39]** 6/3 6/16
6/18 8/12 11/17
13/21 21/19 25/6
26/5 27/2 31/4
32/3 36/10 36/11
39/25 46/21 53/21
65/6 67/12 71/4
72/10 72/20 75/19
76/8 77/3 79/1
83/2 83/14 83/18
83/22 92/9 96/6
96/8 145/16
145/18 145/24
148/11 148/12
151/5
**ways [2]** 8/15
70/25
**we [188]**
**we'd [3]** 61/24
64/20 94/5
**we'll [4]** 4/18
19/13 53/6 54/25
**we're [20]** 26/22
31/7 56/5 59/25
60/13 62/14 65/13
65/21 66/5 69/12
73/1 79/8 84/2
84/14 90/11
108/14 109/3
109/17 110/22
149/15
**we've [24]** 10/16
10/17 15/8 30/9
33/23 60/1 64/5
65/2 70/15 71/24
72/16 75/4 79/23
82/7 91/25 92/10
93/12 98/19 98/24
101/21 104/19
104/19 104/20
108/24
**Wednesday [7]**
148/12 149/10
149/11 149/13

149/17 149/18
151/22
**weed [1]** 88/4
**week [14]** 17/15
22/9 48/17 78/8
78/10 81/11 91/10
91/12 91/24 92/2
93/15 103/24
103/25 146/7
**weekend [5]**
21/24 48/16 86/13
144/24 145/22
**weeks [6]** 19/7
31/2 31/13 34/13
90/25 92/11
**weigh [1]** 47/7
**weighed [1]** 89/8
**weighing [1]** 57/3
**well [42]** 14/11
17/19 21/8 25/12
25/19 28/5 30/8
31/2 31/7 38/11
44/16 45/12 55/12
59/10 60/11 61/22
68/17 70/12 75/16
78/8 79/3 80/2
81/16 86/12 87/19
95/1 97/8 97/13
99/22 101/15
102/15 103/4
107/11 109/20
110/14 118/24
126/23 135/23
145/3 147/22
148/18 149/25
**went [6]** 19/5
22/13 22/15 67/11
67/14 124/8
**were [67]** 13/7
17/3 17/4 17/11
21/23 22/6 24/5
24/16 26/15 29/19
29/19 31/1 34/1
34/2 36/24 36/25
37/4 37/8 47/11
47/21 48/1 48/2
48/5 48/12 49/4
55/23 61/15 65/16
67/1 67/2 70/19
74/15 80/11 80/13
84/17 85/15 85/18
88/18 93/10 94/10
94/18 95/8 96/25
97/9 97/25 98/1

98/8 99/1 111/3
113/6 114/14
116/22 119/7
120/3 120/6
126/25 127/22
130/10 130/14
130/23 131/16
131/17 133/4
136/6 145/16
146/18 148/11
**weren't [1]** 74/14
**West [1]** 123/16
**what [144]** 5/4 7/9
7/13 7/25 8/8 9/9
9/13 12/11 14/2
17/17 18/8 18/23
19/7 20/12 22/1
24/21 26/23 26/24
30/15 32/8 32/12
32/18 33/12 34/8
35/1 36/15 36/16
37/10 37/11 37/15
37/24 39/6 39/16
40/24 42/24 42/25
43/18 44/5 44/6
46/5 48/10 49/11
54/23 56/3 56/5
56/22 57/5 59/7
59/11 59/20 59/21
59/21 60/13 60/23
61/1 61/2 61/6
61/12 62/5 62/24
62/25 63/1 63/6
64/9 66/5 66/6
66/24 67/21 68/20
71/14 72/4 72/15
72/21 74/20 80/6
80/14 81/9 81/17
83/24 85/12 87/8
88/6 89/19 90/1
90/2 90/10 91/13
91/17 92/18 94/8
96/5 96/11 96/14
96/23 96/24 97/4
98/17 99/3 99/9
99/21 100/6
100/20 101/22
102/5 102/14
103/1 103/21
105/2 105/18
106/13 108/7
109/3 109/14
109/14 109/15
109/15 109/16

109/17 109/21
110/4 111/23
112/2 112/8
112/10 115/20
120/10 122/20
126/20 129/5
130/17 130/21
139/21 143/23
146/3 146/9
146/18 146/18
147/20 149/11
150/4 150/25
151/6 151/9
151/10
**what's [14]** 20/2
25/1 43/12 43/23
56/10 64/11 71/22
74/17 81/12 89/17
104/4 107/25
139/22 148/23
**whatever [10]**
19/5 36/16 62/19
78/23 95/11 95/21
99/8 100/9 108/5
149/8
**whatsoever [3]**
23/13 57/23 58/4
**when [42]** 8/23
14/1 18/14 19/4
19/25 27/24 31/5
34/5 39/4 42/12
43/1 44/21 62/13
66/20 68/7 68/9
74/14 75/22 76/10
77/5 79/19 79/23
84/7 85/1 89/14
89/22 91/19 96/6
101/8 103/12
105/24 106/21
109/23 122/18
124/3 124/16
129/25 135/15
135/15 136/21
146/9 151/12
**where [20]** 5/13
9/4 20/25 23/15
23/17 23/25 48/3
48/10 50/9 51/14
53/19 53/25 59/1
71/19 76/17 95/24
96/3 99/11 102/7
125/8
**whether [156]**
**which [73]** 6/14

# W

**which... [72]**
11/11 11/16 13/16
14/6 14/13 17/18
21/17 26/7 27/13
28/13 32/11 33/21
36/7 36/24 37/20
39/3 41/9 42/15
44/16 47/24 53/6
61/8 62/1 62/5
67/13 68/6 70/25
71/12 72/11 75/19
83/18 90/12 91/15
92/1 92/17 97/17
102/6 103/5
103/15 104/9
104/15 105/24
107/14 114/22
117/1 117/7
118/20 120/14
121/5 122/2 125/7
125/24 126/13
128/5 129/3
129/11 130/2
130/3 132/1 139/6
139/20 140/11
141/9 142/1 142/4
142/7 142/21
144/11 144/18
144/19 145/11
145/13
**whichever [1]**
68/21
**while [9]** 63/25
79/8 79/13 84/22
108/20 117/18
122/15 123/18
150/20
**Whip [2]** 38/16
49/5
**WHITE [2]** 2/5
85/1
**who [26]** 3/7 4/16
6/9 6/17 10/3
26/25 33/6 37/24
42/14 43/14 52/8
56/18 59/4 59/14
63/1 72/12 76/14
82/2 93/1 110/16
113/18 122/12
129/18 136/25
138/20 150/9
**who's [2]** 19/14
35/24

**whoever [1]** 3/15
**whole [6]** 46/23
64/5 74/1 74/2
82/21 143/25
**wholly [1]** 134/17
**whom [2]** 42/20
124/17
**whose [3]** 103/14
128/20 138/5
**why [42]** 5/4 8/11
19/12 20/16 22/5
22/11 25/12 25/20
29/10 31/20 31/21
32/1 32/23 33/2
39/11 41/2 41/3
41/6 41/18 50/16
54/24 67/21 73/8
76/2 77/4 80/25
82/1 85/7 87/14
87/15 88/3 88/11
88/14 89/14 91/2
91/17 100/18
101/22 107/10
107/14 109/4
111/2
**wife [1]** 23/18
**Wilkinson [1]**
47/24
**will [75]** 3/25 4/8
4/21 4/23 11/11
19/25 20/9 21/8
25/9 26/20 27/21
27/22 27/23 28/2
37/24 38/9 40/19
41/24 43/1 49/17
52/8 52/10 53/11
53/17 55/10 56/20
60/6 63/1 63/3
63/3 64/21 67/24
81/21 82/4 87/11
91/21 92/12 92/14
92/18 93/4 94/1
111/19 118/14
118/20 118/23
122/2 123/20
123/21 124/9
125/20 125/21
125/24 128/8
133/9 134/20
134/21 134/22
136/7 136/19
136/20 137/7
137/11 137/23
137/25 138/22

141/2 141/5 143/7
143/8 144/9
144/14 145/4
145/8 150/1
151/19
**willful [9]** 16/10
16/11 16/12 19/3
73/17 74/17 113/3
126/15 129/20
**willfully [15]** 20/5
111/24 112/9
112/10 112/13
112/14 112/22
113/12 113/19
114/18 115/15
117/13 117/21
121/23 121/25
**willfulness [4]**
17/8 34/9 113/20
126/4
**willing [3]** 90/11
110/15 110/17
**willingness [3]**
78/21 78/24 83/8
**win [1]** 52/7
**wish [2]** 64/5
133/4
**wishes [4]** 24/24
37/10 102/1 141/4
**withdraw [2]** 25/2
25/4
**withdrawing [1]**
25/7
**within [15]** 8/20
10/16 30/14 31/20
32/3 51/1 60/21
69/18 101/19
102/25 135/10
138/5 142/1 142/8
142/11
**without [9]** 14/9
44/24 79/20 90/13
107/9 114/5 117/5
136/23 141/20
**witness [25]** 21/7
25/6 26/23 27/1
27/5 27/13 27/14
35/24 36/3 37/16
42/4 42/8 50/19
63/18 64/11 68/7
92/15 95/13
104/19 108/12
108/15 108/20
130/4 136/24

136/25
**witness's [3]**
26/22 36/7 65/24
**witnesses [28]**
24/16 27/22 38/20
41/24 42/4 42/14
42/20 43/14 49/3
58/15 59/14 60/15
63/1 64/1 64/3
64/14 64/17 65/22
66/5 91/22 92/1
94/18 96/10
104/20 136/21
138/5 145/11
145/12
**witnesses' [1]**
101/12
**won't [6]** 16/14
59/17 87/6 133/21
135/25 138/18
**word [6]** 16/18
34/9 70/7 70/7
115/16 115/18
**words [4]** 68/11
87/20 130/25
148/22
**work [5]** 30/17
55/9 81/22 94/12
140/19
**worked [3]** 24/15
26/24 93/12
**working [1]**
105/10
**workmanlike [1]**
55/10
**works [1]** 26/5
**worry [1]** 57/24
**worse [2]** 88/12
88/16
**worth [6]** 44/8
115/3 120/10
121/3 125/22
126/3
**would [171]**
**wouldn't [9]** 18/4
31/21 34/15 41/2
41/3 41/6 59/13
63/9 93/16
**wrest [1]** 131/9
**writ [1]** 128/22
**write [1]** 86/19
**writes [1]** 81/9
**writings [2]**
115/24 117/25

136/25
**wrong [6]** 17/3
17/4 17/5 68/2
74/20 151/1
**wrongdoing [2]**
112/23 113/6
**wrongful [1]**
74/20
**wrote [3]** 74/8
77/10 80/20

# Y

**yeah [14]** 34/6
35/22 59/16 62/23
62/23 78/5 79/9
79/9 100/11
107/21 109/2
148/5 148/15
149/17
**year [4]** 3/3 3/5
107/11 109/6
**years [6]** 22/24
24/18 24/18 55/22
57/10 93/6
**Yellin [2]** 7/3
127/21
**yep [2]** 98/13
101/6
**yes [37]** 5/19 7/18
10/11 12/18 14/24
16/9 18/18 18/21
19/10 21/25 25/10
25/18 30/5 34/3
34/14 35/21 36/9
36/18 47/13 47/19
53/8 62/23 64/25
66/15 68/19 69/5
71/18 72/2 75/12
91/3 97/2 98/9
98/21 100/22
148/17 148/17
149/3
**yet [4]** 14/13
19/22 35/7 37/23
**York [1]** 69/16
**you [155]**
**you'd [2]** 38/1
52/20
**you're [6]** 25/14
34/10 53/12 58/22
60/14 74/20
**you've [4]** 53/10
59/8 62/15 147/25
**your [108]** 3/1
3/11 3/16 3/18

# Y

**your... [104]**  3/21
3/22 4/23 5/2 5/19
6/11 7/3 7/18 7/23
10/22 12/13 12/18
12/23 15/4 15/17
15/25 18/6 19/10
20/4 20/8 20/20
21/20 21/25 23/6
28/20 38/8 38/10
39/21 39/23 41/7
41/9 41/20 42/6
42/23 43/3 43/22
44/14 44/19 45/7
45/13 45/20 46/4
46/15 47/3 47/8
47/15 47/19 48/3
48/19 48/21 50/9
50/22 51/4 52/21
52/22 53/5 54/16
54/18 54/21 55/6
56/10 57/18 57/21
58/8 64/24 66/20
68/19 69/2 69/5
69/9 71/18 71/19
71/21 72/3 72/16
73/3 73/22 74/17
75/5 75/7 75/12
76/3 76/8 78/25
79/5 86/11 86/16
86/16 90/5 91/8
92/9 92/9 93/23
94/2 100/5 104/4
104/6 104/22
108/25 109/25
110/23 110/25
125/17 150/12
**Your Honor [70]**
3/1 3/11 3/18 3/22
4/23 5/2 5/19 6/11
7/18 7/23 10/22
12/13 12/18 12/23
15/4 15/17 15/25
19/10 20/4 20/20
21/20 21/25 23/6
28/20 38/8 39/23
41/9 41/20 42/6
43/3 43/22 44/14
44/19 45/7 45/20
46/4 46/15 47/8
47/15 47/19 48/3
48/19 48/21 50/9
50/22 51/4 52/21
53/5 54/16 54/18

55/6 64/24 68/19
69/2 69/5 69/9
71/18 71/21 72/3
73/3 73/22 75/12
86/11 91/8 93/23
94/2 104/6 104/22
109/25 110/25
**Your Honor's [1]**
41/7
**yourselves [1]**
3/9

# Z

**Zelda [1]**  1/22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

**DEFENDANT BANNON'S OPPOSITION TO MOTION IN LIMINE TO BAR
TESTIMONY**

On July 10, 2022, the Government filed a motion to bar any evidence or argument related to Mr. Bannon's notice to the Committee that he has been advised by former President Trump, through Mr. Costello, that executive privilege is waived in order to permit him to comply with the subpoena, that Mr. Bannon is prepared to do so, and asking the Chairman of the Committee to work with Mr. Costello to coordinate the logistics [Doc. 105].[1]

**Introduction**

Mr. Bannon opposes the motion and asserts that he must be permitted to adduce testimony and argument showing that he has conveyed to the Committee, through his lawyer, Mr. Costello, the letter from former President Trump and Mr. Bannon's willingness, in light of the withdrawal of executive privilege, to fully comply with the outstanding subpoena.  Mr.

---

[1] The operative documents to which the Government's motion refers are attached hereto as Exhibit "1."  They are the June 9, 2022 letter from former President Trump to Mr. Costello and Mr. Costello's June 9, 2022 letter to Chairman Thompson. The letters were conveyed by email from Mr. Costello to Ms. Amerling, at 12:06 a.m. on July 10, 2022, with a request to provide them to Chairman Thompson.

1

Bannon incorporates herein by reference all prior pleadings and oral argument submitted in this case.[2]

**The Evidence is Directly Relevant to Defense Story of the Case and to "Default."**

The evidence at issue and argument related to it must be permitted, consistent with Mr. Bannon's Fifth and Sixth Amendment rights under the United States Constitution for a number of reasons, including, but not limited to the following:  Evidence of this development and Mr. Costello's communication to the Committee must be permitted in Mr. Bannon's case-in-chief, in order to allow him to explain the relevant events in this case surrounding his reasons for not complying with the subpoena to put the impact of the withdrawal of the privilege in context (to tell his defense story of the case and put forward a supportable theory of defense), and to demonstrate that there has been no default, willful or otherwise, as required under the statute; indeed, there has been a waiver of any default, based on words and conduct subsequent to the purported (and specifically alleged) dates of default.

It must also be permitted specifically for use in cross-examination of subpoenaed witnesses Pelosi and Thompson on issues directly relevant to the accommodation process and the question of whether there has been a "default," in light of the contempt referral directive to Ms. Pelosi requiring her to continue efforts to enforce the subpoena, and in light of Chairman Thompson's continued urging for Mr. Bannon's "compliance" with the subpoena [Exhibit 2 at pdf pages 4, 6], as described at oral argument on July 11, 2022[3] and again hereinbelow.

---

[2] With respect to the discussion on this subject during the oral argument held on July 11, 2022, Mr. Bannon would direct the Court's attention particularly to pages 76-83 of the transcript from that proceeding.

[3] See also, e.g., July 11, 2022, Hearing Tr. at 61, 77, 79.

Notwithstanding the Court's July 11, 2022, oral Order, apparently prohibiting evidence of the invocation of executive privilege, given the central role executive privilege and its withdrawal played in Mr. Bannon's compliance, evidence of both the invocation and the withdrawal should be permitted as well to explain Mr. Bannon's actions.

Without waiving that position, however, in any event, evidence and argument concerning Mr. Bannon's offer to comply with the subpoena must be allowed into evidence on the question of whether there has been a default – a fact question for the jury.

It appears from the Government's motion, [Doc. 105], that its position is that there was no executive privilege[4] and the default was already complete.  The Court has said, over Mr. Bannon's objection, that it will not permit evidence of executive privilege;[5] so the focus here will be on the Government's argument that the default was complete and compliance is no longer permitted vis a vis a default.

### There Has Been No Default and This is at Least a Fact Question for the Jury

The record in the case demonstrates that the Government is wrong.  There has been no default, based on the conduct of the parties – the Committee and the House – in waiving the default date and extending it by further conduct, with Chairman Thompson insisting on compliance with the subpoena after the purported "default" date and with the contempt referral

---

[4] To the extent the Government's position on matters related to the invocation of executive privilege are based on Justin Clark's recent claims in an interview he gave to the Government on June 29, 2022 [See Doc. 105 at 3], suffice to represent to the Court here that if Mr. Clark were to testify consistent with the report of his interview provided to the defense on June 30, 2022, Mr. Costello would testify that Mr. Clark's testimony would, in significant material part be untrue and reflects the omission of other material facts.

[5] At the end of this Opposition, Mr. Bannon will address this point briefly.

directing Speaker Pelosi to continue efforts to enforce the subpoena after the purported default.[6]

[Exhibit 2]. There are actually multiple relevant dates that demonstrate the point and render any

default date at best ambiguous. It is a matter for the trier of fact to determine whether there has

been any default at all, within the meaning of the statute.

First, the subpoena itself had return dates on it that required compliance by October 7,

2021, for the production of documents and October 14, 2021 for Mr. Bannon's appearance for a

deposition. [Exhibit 3]

Clearly, however, the subpoena date does not define the default; for it was extended by

words and conduct, apparently unilaterally, by Committee Chair Thompson in a letter to Mr.

Costello, dated October 8, 2021. [Exhibit 4].

In that October 8th letter, after the subpoena's production date had passed, Chairman

Thompson notes the failure to produce documents by October 7th; but he asks Mr. Costello to

"please produce all responsive documents and records identified in the subpoena." [Exhibit 4 at

Page 2, last paragraph]. This is, of course, after the return date had passed and compliance is still

---

[6] It is by now axiomatic, based on long-settled principles of contract law, that a party's conduct
can constitute a waiver of a default and, specifically, that a party's continued insistence on
performance after the purported default date has passed, can constitute just such a waiver. *See
e.g., Bowen v. Horgan*, 295 N.Y. 267, 269, 181 N.E. 567 (1932) (Continued insistence by one
party to a contract upon performance by the other party, even after default, may constitute a
waiver of such default. Here the sellers of the property did insist upon performance even after
default by the purchaser. So long as they insisted, they waived the default.");
*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.,* 298 F. Supp. 2d 81, 87-88 (D. D.C. 2004)
("Intent to waive a known right need not be expressly stated but may be inferred from conduct
inconsistent with an intent to enforce that right." "Whether waiver has occurred is typically a
question for the trier of fact.").
.

being insisted upon. Chairman Thompson sets no new date by which production was to be made, nor was another subpoena with a different date issued.

     The next relevant date with respect to the document production is found in the indictment.  [Exhibit 5] There it charges that Mr. Bannon willfully defaulted on the subpoena, to the extent it commanded the production of documents, by failing to produce them by October 18, 2021.  [Exhibit 5 at 9].

     However, the Committee surely did not consider that to actually be a default date or deadline, because on October 19, 2021, a day after the Committee voted to recommend that the House hold Mr. Bannon in contempt, Chairman Thompson made clear that compliance with the subpoena was still open to Bannon, urging him to "change (his) position." [Exhibit 2].

     Chairman Thompson further notes that the Committee is still focused on "expeditiously" obtaining the testimony and documents and he notes that the Committee expects immediate "compliance by Mr. Bannon", again by his words and conduct, making it indisputably clear that after October 18, 2022, the date alleged in the indictment as the date by which Mr. Bannon "did willfully make default," [Exhibit 5 at 9] that compliance was still open to Mr. Bannon and that, therefore there could not have been any default.   No new date was set by Chairman Thompson as a deadline or default date for compliance with the subpoena – compliance Chairman Thompson urged Mr. Bannon to make after the date charged in the indictment.

     The date for compliance was left open and remains open, having been waived and extended by conduct.  That is one reason the recent letters from former President Trump and Mr. Costello, offering compliance with the subpoena now that executive privilege has been waived is relevant and why testimony and argument on this subject must be permitted.

In further support of this point, as has been noted, in the final contempt referral from Congress, dated October 21, 2021, Speaker Pelosi is expressly directed to "otherwise take all appropriate action to enforce the subpoena." [Exhibit 2]. The language used by the House was specifically to "enforce the subpoena," certainly indicating there was an outstanding subpoena to be enforced, not one already defaulted on.

The history of relevant dates for Mr. Bannon's testimony is similar and provides even more emphatic support for this argument that there was no default and by the date charged in the indictment. All of the same conduct described above, by Chairman Thompson and in the contempt referral, applies in full force to Mr. Bannon's testimony and the default date alleged in the indictment is even earlier in Count 1. It charged that Mr. Bannon "did willfully make default" with respect to giving testimony on a date specific – October 14, 2021 [Exhibit 5 at 8]. The conduct referred to above, insisting on compliance with the outstanding subpoena with respect to both production and testimony, post-date October 14, 2022, constituting a waiver of the default date and expressly seeking compliance with the subpoena and enforcement of the subpoena after the date charged in the indictment.[7]

**Mr. Bannon Has at All Times Asserted Executive Privilege as a Basis for His Action**

The Court has said that it is not clear as to whether it is Mr. Bannon's position that the invocation of executive privilege (as opposed to reliance on advice of counsel or reliance on

---

[7] On October 15, 2021, after the fact, Chairman Thompson wrote to Mr. Costello to advise that the Committee viewed Mr. Bannon's failure to meet the October 7 and October 14 dates in the subpoena as non-compliance and advises that the Committee will meet on October 19, 2021 to consider invoking contempt procedures; but, again, in his letter of October 19, 2021, **after** the referral vote to which he referred, Chairman Thompson made it crystal clear that even then, compliance was still open to Mr. Bannon referring to the Committee's expectation of "compliance" by Mr. Bannon and of their continuing focus on trying to obtain his testimony and documents [Exhibit 2, Thompson letter at Page 2].

public authority or the OLC opinions) excused him from complying with the subpoena.  Yes, this

is Mr. Bannon's position and has been at all times in this case.  The Court is mistaken.  Mr.

Bannon expressly made that argument in his Motion to Dismiss and then wrote that the OLC

opinions on which he relied were fully consistent with this argument.  [See e.g., Doc. 58 at 14-

15; 16; 43-46].  He has made this same argument since the Government's first motion seeking to

bar his defenses in this case.  It is a defense that he has urged all along that he must be permitted

to raise under the authority of *United States v. United States House of Representatives*, 556 F.

Supp. 150, 152-153 (D. D.C. 1983); *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v.*

*Eastland*, 442 F.2d 751 (D.C. Cir. 1971); *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir.

1962), and *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020).  He has asserted his

position that executive privilege justified his actions based on the same legal principles he has

emphasized provide the foundation for the OLC opinions he repeatedly has referred to for their

consistent conclusion that the invocation of executive privilege makes it appropriate for the

witness to not appear or comply with the subpoena altogether.  It is not just that he relied on the

OLC opinions; it is also that he relied on the legal principles on which they are based and with

which he agrees, and has described in detail in his submissions and therefore it is his argument as

well that, based on the presumption of validity, separation of powers concerns and all of the

other reasons underlying the cited OLC opinions, his conducted was justified by executive

privilege.

To summarize and be clear once and for all, at all times in this case, among other

defenses, including those related to the Committee rules and composition issues, Mr. Bannon's

intended defenses have been that his response to the subpoena was justified and therefore not a

"willful" "default," as he believes those terms are defined in the law, by (1) the invocation of

executive privilege standing alone (independent of the OLC opinions, but based on the legal

principles described in the Olson 1984 Memo and other OLC opinions which Mr. Bannon has

adopted), (2) the advice of counsel, following the invocation of executive privilege, on which he

fully relied, (3) public authority in connection with the invocation of privilege, and (4) the OLC

opinions on which Mr. Bannon reasonably relied (and on which his attorney reasonably relied

and told him he must rely) – the entrapment by estoppel defense.[8]

### Conclusion

There is some irony in the Government's motion and its posture in this case.  One might

have thought that if the actual goal of the Committee were to get Mr. Bannon's testimony, it

would be leading the way, working in tandem with the Government, as it has in the prosecution

of this case, to shift gears and welcome the argument that there has been no default, given the

withdrawal of executive privilege and Mr. Bannon's ability now and expressed willingness to

produce the documents and testify before the Committee.  For if there already has been a default

on the subpoena, then that disposes of the subpoena and the underlying obligation.  *See, e.g.*

*United States v. Costello*, 198 F.2d 200, 204 (1952) (once there has been a willful default by an

expression by the witness that he will not comply, the committee cannot attempt to multiply the

contempt charges by trying to compel more answers).  Instead, Mr. Costello has heard nothing

---

[8] Of course, the other justification Mr. Bannon has asserted for his response to the subpoena is
based on the legal principles underlying the OLC opinions he has cited for the proposition that
the subpoena is invalid and unconstitutional if the Committee would not let the privilege holder's
counsel to attend any giving of testimony, as well as his reliance on those OLC opinions,
pursuant to the defense of entrapment by estoppel.  *See Congressional Oversight Of The White
House*, *supra*, at *56 ("subpoenas requiring White House personnel to testify without agency
counsel are therefore without legal effect and may not constitutionally be enforced, civilly or
criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from
Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23,
2019).

back from the Committee in response to his letter offering full compliance with the subpoena and

explaining why Mr. Bannon can now comply and the Government does not want the jury to hear

that Mr. Bannon has offered compliance and has done so now because of the withdrawal of

privilege.  The Government's approach in this case is revealing and, one might suggest hardly

well serves the public interest or its constitutionally mandated accommodation obligation, if,

indeed, the goal in this matter really ever were hearing from Mr. Bannon before the Committee.

Mr. Bannon must be permitted to adduce testimony and argument on the recent filings at issue.

 Dated: July 13, 2022                          Respectfully submitted,

                                               SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                                   /s/ M. Evan Corcoran
                                               M. Evan Corcoran (D.C. Bar No. 440027)
                                               400 East Pratt Street – Suite 900
                                               Baltimore, MD 21202
                                               Telephone: (410) 385-2225
                                               Facsimile: (410) 547-2432
                                               Email: ecorcoran@silvermanthompson.com

                                                   /s/ David I. Schoen
                                               David I. Schoen (D.C. Bar No. 391408)
                                               David I. Schoen, Attorney at Law
                                               2800 Zelda Road, Suite 100-6
                                               Montgomery, Alabama 36106
                                               Telephone: (334) 395-6611
                                               Facsimile: (917) 591-7586
                                               Email: schoenlawfirm@gmail.com

                          **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 13th day of July, 2022, a copy of the foregoing

Supplement was filed through the Court's CM/ECF system and was served *via* electronic delivery

on counsel of record.

                                                   /s/ M. Evan Corcoran
                                               M. Evan Corcoran (D.C. Bar No. 440027)

**EXHIBIT 1**



DONALD J. TRUMP

July 9, 2022

Stephen K. Bannon
c/o Robert J. Costello, Esquire
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158

Dear Steve,

I write about the Subpoena that you received in September 2021 from the illegally
constituted Unselect Committee, the same group of people who created the Russia
Russia Russia scam, Impeachment hoax #1, Impeachment hoax #2, the Mueller
Witch-Hunt (which ended in no "Collusion"), and other fake and never-ending
yarns and tales.

When you first received the Subpoena to testify and provide documents, I invoked
Executive Privilege. However, I watched how unfairly you and others have been
treated, having to spend vast amounts of money on legal fees, and all of the
trauma you must be going through for the love of your Country, and out of respect
for the Office of the President.

Therefore, if you reach an agreement on a time and place for your testimony, I
will waive Executive Privilege for you, which allows for you to go in and testify
truthfully and fairly, as per the request of the Unselect Committee of political
Thugs and Hacks, who have allowed no Due Process, no Cross-Examination, and
no real Republican members or witnesses to be present or interviewed. It is a
partisan Kangaroo Court.

Why should these evil, sinister, and unpatriotic people be allowed to hurt and
destroy the lives of so many, and cause such great harm to our Country?

It has been, from the time I came down the escalator at Trump Tower, a political
hit job against the overwhelming majority of Americans who support the concept
and policy of Making America Great Again and putting America First.

Good luck in all of your future endeavors.

                    Sincerely,



# DAVIDOFF HUTCHER & CITRON LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 286-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914) 381-7400

PALM BEACH
ATTORNEYS AT LAW
250 ROYAL PALM WAY
SUITE 202
PALM BEACH, FL 33480
(561) 567-8488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

July 9, 2022

Via Email
Chairman Bennie Thompson
c/o Kirstin Amerling, Esq.
1540 A Longworth HOB
Washington, DC 20515

Re:   Stephen K. Bannon

Dear Chairman Thompson:

On the morning of October 19, 2021, you denied our request for a one week adjournment in light of the filing of a lawsuit by President Donald J.Trump. Later that same day, your  Committee voted to recommend Stephen K. Bannon to the full House for a finding of criminal contempt.  After that, later that same evening, you wrote to me to make a point that your Committee was always willing to hear Mr. Bannon's testimony should he "change his posture" or should circumstances change.

Mr. Bannon has not had a change of posture or of heart.  Mr. Bannon has always been consistent, that because President Trump invoked executive privilege with respect to Mr. Bannon's testimony and the production of requested documents, Mr. Bannon was obligated to honor the President's invocation, unless and until, either your Committee reached a constitutionally required accommodation with President Trump as to the invocation of executive privilege or your Committee obtained a ruling from the Federal District Court that the invocation of executive privilege was improper or did not apply to the particular question or document sought.  I consistently informed you that if either of those events took place, Mr. Bannon would comply with the decision.

While Mr. Bannon has been steadfast in his convictions, circumstances have now changed.  President Trump has provided us with a letter, which is attached, attesting to the fact that back in October 2021, he did invoke executive privilege with respect to Mr. Bannon's testimony and document production.

Further, in light of the surrounding circumstances, even in the absence of any effort by your Committee to reach the requested accommodation with President Trump,

DAVIDOFF HUTCHER & CITRON LLP

Hon. Bennie Thompson
July 9, 2022
Page 2

President Trump has decided that it would be in the best interests of the American
people to waive executive privilege for Stephen K. Bannon, to allow Mr. Bannon to
comply with the subpoena issued by your Committee.  Mr. Bannon is willing to, and
indeed prefers, to  testify at your public hearing.

      Please contact me so that we can try to reach agreement on the time and place of
Mr. Bannon's testimony.

                              Very Truly Yours

                              /s/   Robert J. Costello

00955143

**-3083-**

**EXHIBIT 2**

# Congress of the United States of America

## House of Representatives

### Office of the Speaker

# CERTIFICATION

October 21, 2021

The undersigned, The Speaker of the House of Representatives of the United States, pursuant to the attached House Resolution 730, One Hundred Seventeenth Congress, hereby certifies to you the failure and refusal of Stephen K. Bannon to produce documents to or appear for a deposition before the Select Committee to Investigate the January 6th Attack on the United States Capitol of the House of Representatives as directed by subpoena. This failure and refusal is fully shown by the certified copy of the House Report 117–152 of said select committee which is also hereto attached.

*Nancy Pelosi,*

*Speaker of the House of Representatives.*



US-000461

# H. Res. 730

## *In the House of Representatives, U. S.,*

*October 21, 2021.*

*Resolved,* That Stephen K. Bannon shall be found to be in contempt of Congress for failure to comply with a congressional subpoena.

*Resolved,* That pursuant to 2 U.S.C. §§ 192 and 194, the Speaker of the House of Representatives shall certify the report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, detailing the refusal of Stephen K. Bannon to produce documents or appear for a deposition before the Select Committee to Investigate the January 6th Attack on the United States Capitol as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Mr. Bannon be proceeded against in the manner and form provided by law.

US-000462

2

*Resolved*, That the Speaker of the House shall otherwise take all appropriate action to enforce the subpoena.

Attest:



*Clerk.*

•HRES 730 EH

US-000463

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

### One Hundred Seventeenth Congress

## Select Committee to Investigate the January 6th Attack on the United States Capitol

October 19, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

     I write yet again to urge your client Stephen K. Bannon to change course and comply with the September 23, 2021, subpoena from the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").

     As explained in our prior correspondence, your stated reasons for Mr. Bannon's flat refusal to provide documents and appear at a deposition have no legal basis or support. Because of Mr. Bannon's continued refusal to comply with the subpoena, the Select Committee has unanimously voted to recommend that the House of Representatives find Mr. Bannon to be in contempt of Congress. The detailed basis for that recommendation is contained in the Select Committee's report, a copy of which is available at the following link: https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=114156. Should the House of Representatives agree with that recommendation, the Speaker of the House will certify the relevant statement of facts to the United States Attorney for the District of Columbia, "whose duty it shall be to bring the matter before the grand jury for its action." *See* 2 U.S.C. § 194.

     Additionally, President Biden's recently communicated views relating to your client's reliance on executive privilege as a basis for his non-compliance provide further support for the Select Committee's position. As you know, in its October 18, 2021, letter, the Office of the White House Counsel concluded that "at this point we are not aware of any basis for [Mr. Bannon's] refusal to appear for a deposition." The letter further noted that President Biden has "already determined that an assertion of executive privilege is not in the public interest, and therefore is not justified, with respect to certain subjects within the purview of the Select Committee." In short, the current President's statements should remove any doubt regarding the inappropriateness of Mr. Bannon's reliance on assertions of executive privilege as grounds for his noncompliance with the subpoena. Mr. Bannon has no basis in law to continue to defy the appropriate use of congressional subpoena authority.

SKB-000049

US-001018

Mr. Robert J. Costello
Page 2

These developments underscore the folly of any continuing defiance of the Select Committee subpoena by Mr. Bannon. The Select Committee remains focused on expeditiously obtaining the testimony and documents necessary to meet our responsibilities and we continue to expect immediate compliance by Mr. Bannon. Should Mr. Bannon choose to change his posture, please notify Select Committee staff at 202-225-7800.

Sincerely,

Bennie G. Thompson
Chairman

SKB-000050

US-001019

**-3089-**

**EXHIBIT 3**

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Stephen K. Bannon
c/o Robert Costello, Esq., Davidson, Huthcher and Citron, LLP

*To* _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: ██████████████████████████████████████

Date: October 7, 2021                                     Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: ███████████████████████████████

Date: October 14, 2021                                    Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                            Time: _____

*To* any authorized staff member or the United States Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 23ᵈ day of September , 2021.

_____
*Chairman or Authorized Member*

Attest: _____

*Clerk*

**-3091-**

US-000625

**EXHIBIT 4**

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

October 8, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
███████████████████████

Dear Mr. Costello,

I write in response to your October 7, 2021 letter which states that your client, Stephen Bannon, is "legally unable to comply" with the September 23, 2021 subpoena (the "Subpoena") issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"). Your letter relies on an apparent instruction from former President Donald Trump that appears limited to requesting that Mr. Bannon not disclose privileged information. Despite this limited instruction, your letter takes the inappropriate position that Mr. Bannon will not comply with any request for information or testimony sought by the Select Committee. Moreover, Mr. Trump's stated "intention to assert those executive privileges" that may or may not belong to him, does not provide a legal basis for Mr. Bannon's refusal to comply with the Subpoena.

You accepted service of the Subpoena for documents and testimony on Mr. Bannon's behalf on September 24, 2021. The Subpoena required that, by October 7, 2021 at 10:00 a.m., Mr. Bannon produce certain documents and other records referring or relating to the matters described in the Subpoena's schedule. All the requested documents relate directly to the inquiry being conducted by the Select Committee, serve a legitimate legislative purpose, and are within the scope of the authority expressly delegated to the Select Committee pursuant to House Resolution 503. In the letter accompanying the Subpoena, the Select Committee set forth the basis for its determination that the documents and records sought by the Subpoena and Mr. Bannon's deposition testimony are of critical importance to the issues being investigated by the Select Committee.

Your letter indicates that the sole basis for defiance of the Subpoena is Mr. Trump's "direction" to your client and his decision to "honor [Mr. Trump's] invocation of executive privilege." That position has no basis in law, and your letter does not cite any statute, case law, or other legal precedent for support.

*First*, virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege. You have provided no basis for Mr. Bannon's refusal to comply with

-3093-

US-000645

Mr. Robert J. Costello
Page 2

those portions of the Subpoena not covered by any privilege. Furthermore, blanket assertions of the deliberative process and attorney-client privileges, such as those apparently requested by Mr. Trump, have been rejected by courts as "unsustainable" even when—unlike the situation with Mr. Bannon—the subpoena recipient is an Executive Branch agency. *See Comm. on Oversight and Gov't Reform v. Holder*, 2014 WL 12662665, at *2 (D.D.C. 2014) (rejecting DOJ's assertion of deliberative process privilege on all documents after a particular date and noting that the "Attorney General has not cited any authority that would justify this sort of blanket approach").

*Second*, the Select Committee has not received any assertion, formal or otherwise, of any privilege from the Mr. Trump. Even assuming that, as a former President, Mr. Trump is permitted to formally invoke executive privilege, he has not done so. At most, Mr. Trump has "announced his intention to assert those executive privileges." The Select Committee is not aware of any legal authority, and your letter cites none, holding that the mere intention to assert a privilege absolves a subpoena recipient of his duty to comply.

*Third*, your letter indicates that Mr. Trump has requested that your client "to the fullest extent permitted by law ... not provide any testimony concerning privileged material in response to the Subpoena." Even if your client had been a senior aide to the President during the time period covered by the contemplated testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest that Mr. Trump has requested he assert. To the contrary, every court that has considered the absolute immunity Mr. Trump alludes to has rejected it. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) (rejecting former White House counsel's assertion of absolute immunity from compelled congressional process). *Miers* made clear that even the most senior Presidential advisors may not resist a congressional subpoena "based solely on their proximity to the President." *Id.* at 101 (citing *Harlow*, 457 U.S. at 810).[1] If there is no absolute immunity for senior Presidential advisors, then there certainly can be no such immunity for private citizens, such as Mr. Bannon, who occasionally communicate with the President on non-official, non-governmental, or campaign-related matters.

Regardless of any purported privilege assertion by Mr. Trump, Mr. Bannon has an ongoing obligation to produce documents to the Select Committee. Accordingly, please produce all responsive documents and records identified in the Subpoena. Should Mr. Bannon seek to withhold specific responsive documents, consistent with the Subpoena instructions, he must provide the Select Committee with a privilege log that "identifies and describes the material in a manner 'sufficient to enable resolution of any privilege claims.'" *See Comm. on Oversight*, 2014 WL 12662665 at *2 (quoting *Miers*, 558 F. Supp. 2d at 107). Such a privilege log should, at a minimum, provide the author(s) and recipient(s), indicate the general subject matter of each document being withheld, and the specific basis for withholding it.

---

[1] It is also worth noting that the court in *Miers* rejected the former White House Counsel's claim of absolute immunity from congressional testimony even though the sitting President had formally invoked executive privilege. *Id.* at 62.

US-000646

Mr. Robert J. Costello
Page 3

     Finally, the Select Committee expects Mr. Bannon's appearance at the time and place designated in the Subpoena for a deposition and respond fully to questions by the Select Committee. If there are specific questions at that deposition that you believe raise privilege issues, Mr. Bannon should state them at that time for the deposition record for the Select Committee's consideration and possible judicial review.

     Please be advised that the Select Committee will view Mr. Bannon's failure to respond to the Subpoena as willful non-compliance with the Subpoena. His willful non-compliance with the Subpoena would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C. §§ 192, 194—which could result in a referral from the House to the Department of Justice for criminal charges—as well as the possibility of having a civil action to enforce the Subpoena brought against Mr. Bannon in his personal capacity.

Sincerely,

Bennie G. Thompson
Chairman

**EXHIBIT 5**

RECEIVED

NOV 1 2 2021

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on May 25, 2021**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO. 21-cr-** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| STEPHEN K. BANNON, | : | **VIOLATION:** |
| | : | |
| Defendant. | : | **Count 1: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Testimony)** |
| | : | |
| | : | **Count 2: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Papers)** |
| | : | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates

and at the approximate times stated below:

## BACKGROUND

### The Select Committee

1.      On June 30, 2021, the U.S. House of Representatives (the "House") adopted House

Resolution 503, which established the Select Committee to Investigate the January 6th Attack on

the United States Capitol (the "Select Committee").

2.      According to House Resolution 503, the Select Committee's purpose was, in part:

To investigate and report upon the facts, circumstances, and causes relating to the
January 6, 2021, domestic terrorist attack upon the United States Capitol Complex
(hereafter referred to as the "domestic terrorist attack on the Capitol") and relating
to the interference with the peaceful transfer of power, including facts and causes
relating to the preparedness and response of the United States Capitol Police and
other Federal, State, and local law enforcement agencies in the National Capital
Region and other instrumentalities of government, as well as the influencing factors

that fomented such an attack on American representative democracy while engaged in a constitutional process.

3.      One of the Select Committee's functions, as set forth in House Resolution 503, was

to:

investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to . . . (B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing, and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and (C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation.

4.      House Resolution 503 provided that the Select Committee would issue a final report to the House, which would include recommendations for corrective measures, including possible "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent future similar acts and "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

5.      To accomplish the Select Committee's purposes and fulfill its functions, House Resolution 503, with reference to the rules of the House, authorized the Select Committee, through the Chair of the Select Committee ("Select Committee Chair"), "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."

**The Select Committee Subpoenas Stephen K. Bannon**

6.      STEPHEN K. BANNON was a private citizen. For approximately seven months in 2017, more than three years before the events of January 6, 2021, BANNON was employed in the Executive Branch of the U.S. Government as the Chief Strategist and Counselor to the

2

**-3098-**

President.   After departing the White House in 2017, BANNON did not work again in any

Executive Branch or federal government position.

7.      On September 23, 2021, the Select Committee issued a subpoena to BANNON.

The cover letter to the subpoena stated:

> The Select Committee has reason to believe that you have information relevant to
> understanding important activities that led to and informed the events at the Capitol
> on January 6, 2021.  For example, you have been identified as present at the Willard
> Hotel on January 5, 2021, during an effort to persuade Members of Congress to
> block the certification of the election the next day, and in relation to other activities
> on January 6. . . . Moreover, you are quoted as stating, on January 5, 2021, that
> "[a]ll hell is going to break loose tomorrow."  Accordingly, the Select Committee
> seeks both documents and your deposition testimony regarding these and multiple
> other matters that are within the scope of the Select Committee's inquiry.

8.      As described further below, the subpoena required BANNON to appear and

produce documents to the Select Committee on October 7, 2021, and to appear for a deposition

before the Select Committee on October 14, 2021.

9.      On September 24, 2021, BANNON accepted service of the subpoena through his

attorney.

### The Documents Commanded by the Subpoena

10.      The Select Committee's subpoena commanded BANNON to appear on October 7,

2021, at 10:00 a.m., at an office in the U.S. Capitol Complex and "produce the things identified

on the attached schedule touching matters of inquiry committed to [the Select Committee]" and

"not to depart without leave of [the Select Committee]."

11.      The schedule attached to the subpoena identified 17 categories of "documents and

communications" that BANNON was required to produce relevant to the Select Committee's

authorized investigation of the January 6th attack on the U.S. Capitol.

12.     The subpoena also included instructions for compliance with the document demand, titled, "DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS." The instructions directed that, if BANNON could not comply fully with the subpoena by the return date, he should comply "to the extent possible by that date" and provide an explanation and date certain for full compliance; that, if BANNON withheld any documents and communications, he should provide a detailed log of which records were withheld and why; and that, upon completion of BANNON's response to the subpoena, he should provide a written certification that a diligent search had been completed and all responsive documents had been produced.

*The Deposition Commanded by the Subpoena*

13.     The subpoena also commanded that BANNON appear on October 14, 2021, at 10:00 a.m., at an office in the U.S. Capitol Complex and "testify at a deposition touching matters of inquiry committed to [the Select Committee]" and "not to depart without leave of [the Select Committee]."

14.     The subpoena included a copy of the House's "Regulations for the Use of Deposition Authority," which provided, in part, that during a deposition:

> The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. . . . A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction . . . .

4

**-3100-**

**BANNON'S Refusal to Comply with the Subpoena**

15.    On October 7, 2021, by the 10:00 a.m. deadline, BANNON did not appear before the Select Committee, did not produce documents and communications, did not provide a log of withheld records, did not request an extension of time, and did not certify that he had conducted a diligent search for responsive records. In fact, BANNON had not communicated with the Select Committee in any way since accepting service of the subpoena on September 24, 2021.

16.    Instead, that evening, at 5:05 p.m., seven hours after BANNON had defaulted on the production deadline, BANNON, through his attorney, transmitted a letter ("BANNON's October 7 Letter") to the Select Committee's Chief Counsel. BANNON's October 7 Letter asserted that BANNON would not comply with the subpoena because former President Donald J. Trump had claimed that the subpoena sought records and testimony potentially protected by executive and other privileges and had instructed BANNON, "to the fullest extent permitted by law," to "(a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

17.    The next day, on October 8, 2021, the Select Committee Chair responded to BANNON in writing, rejected BANNON's reasons for non-compliance with the subpoena, and directed BANNON to comply. The Select Committee Chair stated, in part:

    a.    That the instruction from former President Trump appeared "limited to requesting that Mr. Bannon not disclose privileged information" and that it was thus inappropriate not to comply with any of the subpoena's requirements;

5

**-3101-**

       b.      That former President Trump's stated "intention to assert those executive privileges" did not provide a legal basis for non-compliance;

       c.      That "virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege";

       d.      That former President Trump had not made any privilege assertion to the Select Committee;

       e.      That BANNON was still obligated to provide documents and a privilege log for any withheld records;

       f.      That the Select Committee expected BANNON to appear for a deposition as commanded by the subpoena, and that "[i]f there are specific questions at that deposition that you believe raise privilege issues, Mr. Bannon should state them at that time for the deposition record for the Select Committee's consideration"; and,

       g.      That if BANNON failed to respond to the subpoena, the Select Committee would view it as "willful non-compliance" that "would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C. §§ 192, 194—which could result in a referral from the House to the Department of Justice for criminal charges."

      18.    At 5:19 p.m. on October 13, 2021, the evening before BANNON was required to appear before the Select Committee for a deposition and five days after receiving the Select Committee Chair's October 8 letter, BANNON, through his attorney, transmitted another letter to the Select Committee Chair ("BANNON's October 13 Letter"). BANNON's October 13 Letter

6

announced: "Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying."

        19.    On October 14, 2021, at 10:00 a.m., BANNON did not appear before the Select Committee to testify.

        20.    The following day, on October 15, 2021, the Select Committee Chair sent a letter to BANNON, through his attorney, addressing BANNON's refusal to produce documents or a log of withheld records and his failure to appear for deposition testimony, as required by the subpoena. In the letter, the Select Committee Chair stated, in part:

        a.    That BANNON had "now willfully failed to both produce a single document and to appear for his scheduled deposition. The Select Committee believes that this willful refusal to comply with the Subpoena constitutes a violation of federal law";

        b.    That the Select Committee would meet on Tuesday, October 19, 2021, to consider initiating contempt of Congress procedures based on BANNON's refusal to comply in any way with the subpoena; and,

        c.    That, if there were "any additional issues relating to [BANNON's] non-compliance with the Subpoena that have not been addressed," BANNON should "submit them in writing to the Select Committee by 6:00 p.m. E.S.T. on Monday, October 18, 2021 for the Select Committee's consideration in its deliberations."

21.     By 6:00 p.m. on October 18, 2021, BANNON made no substantive submission for the Select Committee's deliberations, did not produce documents and communications, did not provide a log of withheld records, did not certify that he had conducted a diligent search for responsive records, did not appear for a deposition, and did not comply with the subpoena in any way.

### COUNT ONE
### (Contempt of Congress (Testimony)—2 U.S.C. § 192)

22.     The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

23.     On October 14, 2021, in the District of Columbia and elsewhere, the defendant,

### STEPHEN K. BANNON,

having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to appear to give testimony as required by a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to appear for a deposition at 10:00 a.m. on October 14, 2021.

(In violation of Title 2, United States Code, Section 192)

8

**-3104-**

## COUNT TWO
### (Contempt of Congress (Papers)—2 U.S.C. § 192)

24.    The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

25.    By October 18, 2021, in the District of Columbia and elsewhere, the defendant,

## STEPHEN K. BANNON,

having been summoned as a witness by the authority of the U.S. House of Representatives to produce papers upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way with a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to produce documents and communications as delineated therein.

(In violation of Title 2, United States Code, Section 192)

A TRUE BILL

FOREPERSON

*Matthew M. Graves*

MATTHEW M. GRAVES
ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE**
**EVIDENCE OR ARGUMENT RELATING TO THE DEFENDANT'S**
**ELEVENTH-HOUR ASSERTION THAT HE IS WILLING TO**
**TESTIFY BEFORE THE SELECT COMMITTEE**

In his opposition to the Government's motion in limine to exclude his last-minute overture to the Committee, the Defendant articulates three reasons why his alleged attempt to provide testimony to the Committee is relevant.  First, the Defendant suggests he needs it to present evidence, in defiance of the Court's order to the contrary, of his mistake-of-law defense regarding executive privilege.  *See* ECF No. 107 at 2 (claiming the evidence should be admitted "to allow him to explain the relevant events in this case surrounding his reasons for not complying with the subpoena to put the impact of the withdrawal of the privilege in context").  The Court has already found mistake-of-law defenses are not available under the contempt statute and the Government will not further address the Defendant's continued efforts to relitigate settled issues here.  Second, the Defendant suggests that the evidence is relevant to his new claim that the Committee extended the date for his compliance.  Third, he claims, with no legal basis, that he is entitled to present the evidence to claim that the Committee "waived" the default of his subpoena.  *See* ECF No. 107 at 3 (claiming "[t]here has been no default, based on the conduct of the parties—the Committee and the House—in waiving the default date and extending it by further conduct").  These claims are meritless.  The Government's motion should be granted and the evidence excluded.

I.    **Factual Background**

On September 23, 2021, the Committee issued the Defendant a subpoena requiring him to produce responsive documents on October 7, 2021, and to appear for a deposition on October 14, 2021.  *See* Indictment, ECF No. 1, ¶ 7-8.

By the deadline for a document production on October 7, 2021, at 10:00 a.m., the Defendant had produced no documents to the Committee.  *Id*. ¶ 15.  Indeed, the Defendant had not communicated with the Committee and had made no efforts to comply between the date he was served with the subpoena and 10:00 a.m. on October 7.  He was thus in willful default at that time. Instead of complying, the Defendant's attorney sent a letter to the Committee's chief counsel later in the evening on October 7, after the deadline had passed, stating that the Defendant would not produce documents or testify as required by the subpoena based on a letter from the former President's attorney referring to executive privilege.  *Id*. ¶ 16.

The following day, on October 8, 2021, the Committee Chair responded to the Defendant in writing and rejected his reasons for not producing documents or testifying.  Ex. 1 at 1-2.  The Chair also informed the Defendant that he was still obligated to provide documents and stated that "the Select Committee expects Mr. Bannon's appearance at the time and place designated in the Subpoena for a deposition and respond fully to questions by the Select Committee."  *Id*. at 3.  The Chair informed the Defendant that if he had a privilege claim to make he had to do it on a question-by-question basis at the deposition.  *Id*.  The letter continued, "Please be advised that the Select Committee will view Mr. Bannon's failure to respond to the Subpoena as willful non-compliance with the Subpoena.  His willful non-compliance with the Subpoena will force the Select Committee to consider invoking the contempt of Congress procedures . . . which could result in a referral from the House to the Department of Justice for criminal charges."  *Id*.

On October 13, 2021, the Defendant's attorney wrote a letter to the Committee reiterating

his position with respect to executive privilege and again refused to produce documents or testify. Indictment ¶ 18.

On October 14, 2021, the Defendant did not appear for his deposition as required. *Id*. ¶ 19. He was, again, in willful default.

On October 15, 2021, the Committee Chair wrote to the Defendant again.  In the letter, the Chair stated, "Mr. Bannon has now willfully failed to both produce a single document and to appear for his scheduled deposition.  The Select Committee believes that this willful refusal to comply with the Subpoena constitutes a violation of federal law."  Ex. 2 at 1.  The letter then informed the Defendant that because he was in willful default, the Committee would be meeting on October 19, 2021, to consider invoking the criminal contempt of Congress process.  *Id*. at 2. The Committee then told the Defendant that if he believed "that there were any additional issues relating to his non-compliance with the Subpoena that have not been addressed" he should submit them in writing by 6:00 p.m. on October 18 for the Committee's consideration in its contempt deliberations.  *Id*. at 2-3.  The Defendant provided the Committee with nothing by that time. Instead, the Defendant submitted another letter, after the 6:00 p.m. deadline, merely asking for more time.

## II.    The Defendant's Late Effort to Comply Cannot Inform His Intent at the Time of Default.

"'Default' is, of course, a failure to comply with the summons."  *United States v. Bryan*, 339 U.S. 323, 327 (1950); *see also* "Default," Merriam-Webster, available at https://www.merriam-webster.com/dictionary/default (last accessed July 13, 2022) (defining "default" as a "failure to do something required by duty or law" and "failure to appear at the required time in a legal proceeding").  Accordingly, a default "mature[s]" on the return date of a congressional subpoena.  *Bryan*, 339 U.S. at 330 ("A default does not mature until the return date

of the subpoena."). A default occurs, therefore, whenever a witness is given a "clear-cut" choice between compliance and contempt and chooses not to comply. *See Quinn v. United States,* 349 U.S. 155, 166 (1955). The date for compliance can be extended, but where the date for compliance is clear and the defendant does not comply, the defendant is in default at the deadline.

In the Defendant's case, the unambiguous date of default for providing testimony was October 14, 2021, at 10:00 a.m. If the Defendant wishes to argue that, at the time of the deadline, he did not understand the Committee's October 8 letter to him to be demanding he appear for testimony on October 14 despite his executive privilege claim—in other words, that the Committee did not give him a choice between compliance and contempt on that date—he is free to do that. He will fail because of the plain language of the Committee's letter and his repeated admissions that his failure to comply was not due to some mistake, but such a defense is available to criminal contempt defendants. *See Flaxler v. Untied States*, 358 U.S. 147, 150-51 (1958) (finding no default occurred on the return date of the subpoena where the relevant committee, at the hearing on the return date, told the defendant he had ten additional days to produce records).

The Defendant, however, suggests that evidence of his last-minute effort to provide testimony, nine months later, somehow informed his understanding on October 14. This cannot possibly be the case, given that it post-dates the charged conduct. The Defendant's disregard of the deadlines set by the Committee was either intentional at the time he disregarded them or it was not. Arguing that his later compliance somehow informed his intent to default at the time of the charged offense, on the other hand, is like an argument by a defendant in a fraud or embezzlement case that, because he paid the money back after he stole it, he cannot be guilty of the original crime. *See United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980) (finding repayment of fraudulently obtained funds three years after the offense "as evidence of Sindona's 1972 intent is similarly

irrelevant.  The offense occurred and was complete when the misapplication took place.  What might have later happened as to repayment is not material and could not be a defense.  The immediate intent to misapply and defraud was established by the evidence." (internal citation marks and quotation omitted)); *United States v. Howard*, 245 F. Supp. 2d 24, 37 (D.D.C. 2003) (refusing to grant new trial on basis that court excluded evidence in fraud case that defendant intended to repay stolen funds after the fraud was complete because it "would have demonstrated nothing more than a last minute, desperate attempt to extract his hand from a cookie jar whose treasures he had already totally depleted and consumed before his fraudulent scheme had been detected.  It was therefore irrelevant to the issue of whether the defendant intended to defraud.").

Finally, the Defendant's late claim to want to testify is irrelevant with respect to his refusal to provide documents.  As the letters he attaches to his pleading show, the Defendant has never made an offer to provide documents.  The indictment charges him with two different defaults.  *See United States v. Orman*, 207 F.2d 148, 160 (3d Cir. 1953) ("Where there are separate refusals to produce documents or to answer separate questions it is proper for each refusal to be set forth in a separate count of the indictment.").  While his eleventh-hour efforts to cure his default on the testimonial demand are irrelevant across the board, they certainly can tell the jury nothing about his default on the subpoena's document demand.

## III.    The Defendant's New Claim of a "Waived" Default is Unsupported by Fact or Law.

In addition to his suggestion that his purported attempt at testimonial compliance a week before trial somehow informed his intent at the time he defaulted, the Defendant also claims that, because the Committee provided the Defendant with repeated opportunities to provide the information required by the subpoena after he was already in default—and even after it had voted him in criminal contempt—the Committee somehow "waived" the default.  In other words, the

Defendant appears to want to argue to the jury that the satisfaction of the elements of the offense are nullified because the Committee did not give up in its efforts to obtain the information it needed from the Defendant. This argument does not appear to have anything to do with his late efforts to comply; he made the offer a week before trial and he does not point to any communications from the Committee at that time. Instead, the Defendant appears to be testing a new theory for his defense by relying primarily not on his latest communications to the Committee, but on the Committee's letters to him after his default—and after it and the House had voted for contempt. This newly proposed defense theory, however, has no support in the law of contempt. Indeed, the Defendant cites only inapposite contract law cases in a footnote as his purported authority. ECF No. 107 at 4 n.6.

Instead, the law of contempt demonstrates that default, once it has occurred, cannot be erased by later efforts at compliance. There is a clear difference between civil and criminal contempt—while the former is coercive, the latter is punitive. *United States v. Fort*, 443 F.2d 670, 678 (D.C. Cir. 1970) (finding that Congress "may 'coerce' by means of civil contempt, 'punish' by means of criminal contempt, and perhaps even both" (citing *Jurney v. MacCracken*, 294 U.S. 125, 151-52 (1935); *In re Chapman*, 166 U.S. 661, 672 (1897))). Last month, for instance, the Second Circuit found in a criminal contempt of court case that completed contempt—even if subsequently cured—is prosecutable. *See United States v. Donziger*, -- F.4th --, 2022 WL 2232222, at *11 (2d Cir. June 22, 2022) ("Criminal contempt punishes retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . It is therefore beside the point that [the defendant] eventually complied with most of the court orders underlying his criminal contempt conviction" (internal quotation marks and citation omitted)). The Supreme Court has made similar findings.

*See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828–29, (1994) ("[A] fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience,' such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect. "[T]he defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense."). Under the Defendant's theory, however, the district court in *Donziger* should have refused the Defendant's efforts at compliance after his contempt lest it forgo the vindication of its authority through the criminal contempt process. The Defendant's notion of "waiver" would erase the difference and create an incentive for those seeking to enforce lawful orders—whether Congress or courts—to abandon efforts to gain compliance if it decides criminal contempt is appropriate. The Defendant cites no support for an outcome that is so contrary to a system of laws meant to foster orderly compliance by those subject to it.

The letters from the Committee that the Defendant cites in his opposition, *see* ECF No. 107 at 4-6, did not purport to waive the Defendant's default. To the contrary, as described above, they either repeatedly notified him he was in default, or, after he had been referred for criminal contempt, emphasized that the Committee still wanted the information it sought. At bottom, the Defendant is asking the Court to allow him to argue to the jury that it should blame the Committee for giving the Defendant repeated chances to provide the information it needed despite the Defendant ignoring its settled processes and orders. But both with respect to documents and to testimony, the Defendant had a "clear-cut" choice between compliance and contempt, and he chose contempt. Nothing about the Committee's exercise of discretion in offering him the opportunity to then comply changes, or "waives," his default. Just as he should be precluded from entering

7

**-3112-**

evidence of his last-ditch effort to present an air of compliance, the Defendant should be precluded from arguing to the jury that the Committee "waived" the ability to enforce a criminal statute.

## IV.   Conclusion

There is no irony in the Government's motion and its posture in this case.  Since receiving a referral from the U.S. House of Representatives in October 2021, the Department of Justice has expended its resources in investigating and prosecuting the Defendant's criminal contempt of Congress—a process wholly separate from the Committee's ongoing inquiry into that facts and circumstances of January 6, 2021.  Whether the Defendant cooperates with the Committee now—though the circumstances of his offer, including its last-minute nature, its inclusion of pre-conditions for his testimony, and its silence on providing relevant documents, counsels skepticism that he will—has no bearing on his criminal case.  The Defendant should not be permitted now to show similar contempt for the judicial process by ignoring the Court's orders and putting irrelevant and prejudicial evidence in front of the jury.  The Government's motion should be granted.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Amanda R. Vaughn
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov

# Exhibit 1



**BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

October 8, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

I write in response to your October 7, 2021 letter which states that your client, Stephen Bannon, is "legally unable to comply" with the September 23, 2021 subpoena (the "Subpoena") issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"). Your letter relies on an apparent instruction from former President Donald Trump that appears limited to requesting that Mr. Bannon not disclose privileged information. Despite this limited instruction, your letter takes the inappropriate position that Mr. Bannon will not comply with any request for information or testimony sought by the Select Committee. Moreover, Mr. Trump's stated "intention to assert those executive privileges" that may or may not belong to him, does not provide a legal basis for Mr. Bannon's refusal to comply with the Subpoena.

You accepted service of the Subpoena for documents and testimony on Mr. Bannon's behalf on September 24, 2021. The Subpoena required that, by October 7, 2021 at 10:00 a.m., Mr. Bannon produce certain documents and other records referring or relating to the matters described in the Subpoena's schedule. All the requested documents relate directly to the inquiry being conducted by the Select Committee, serve a legitimate legislative purpose, and are within the scope of the authority expressly delegated to the Select Committee pursuant to House Resolution 503. In the letter accompanying the Subpoena, the Select Committee set forth the basis for its determination that the documents and records sought by the Subpoena and Mr. Bannon's deposition testimony are of critical importance to the issues being investigated by the Select Committee.

Your letter indicates that the sole basis for defiance of the Subpoena is Mr. Trump's "direction" to your client and his decision to "honor [Mr. Trump's] invocation of executive privilege." That position has no basis in law, and your letter does not cite any statute, case law, or other legal precedent for support.

*First*, virtually all the documents and testimony sought by the Subpoena concern Mr. Bannon's actions as a private citizen and involve a broad range of subjects that are not covered by executive privilege. You have provided no basis for Mr. Bannon's refusal to comply with

**Jan. 6 Sel. Comm. 0013**

Mr. Robert J. Costello
Page 2

those portions of the Subpoena not covered by any privilege. Furthermore, blanket assertions of the deliberative process and attorney-client privileges, such as those apparently requested by Mr. Trump, have been rejected by courts as "unsustainable" even when—unlike the situation with Mr. Bannon—the subpoena recipient is an Executive Branch agency. *See Comm. on Oversight and Gov't Reform v. Holder*, 2014 WL 12662665, at *2 (D.D.C. 2014) (rejecting DOJ's assertion of deliberative process privilege on all documents after a particular date and noting that the "Attorney General has not cited any authority that would justify this sort of blanket approach").

*Second*, the Select Committee has not received any assertion, formal or otherwise, of any privilege from the Mr. Trump. Even assuming that, as a former President, Mr. Trump is permitted to formally invoke executive privilege, he has not done so. At most, Mr. Trump has "announced his intention to assert those executive privileges." The Select Committee is not aware of any legal authority, and your letter cites none, holding that the mere intention to assert a privilege absolves a subpoena recipient of his duty to comply.

*Third*, your letter indicates that Mr. Trump has requested that your client "to the fullest extent permitted by law ... not provide any testimony concerning privileged material in response to the Subpoena." Even if your client had been a senior aide to the President during the time period covered by the contemplated testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest that Mr. Trump has requested he assert. To the contrary, every court that has considered the absolute immunity Mr. Trump alludes to has rejected it. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) (rejecting former White House counsel's assertion of absolute immunity from compelled congressional process). *Miers* made clear that even the most senior Presidential advisors may not resist a congressional subpoena "based solely on their proximity to the President." *Id.* at 101 (citing *Harlow*, 457 U.S. at 810).[1] If there is no absolute immunity for senior Presidential advisors, then there certainly can be no such immunity for private citizens, such as Mr. Bannon, who occasionally communicate with the President on non-official, non-governmental, or campaign-related matters.

Regardless of any purported privilege assertion by Mr. Trump, Mr. Bannon has an ongoing obligation to produce documents to the Select Committee. Accordingly, please produce all responsive documents and records identified in the Subpoena. Should Mr. Bannon seek to withhold specific responsive documents, consistent with the Subpoena instructions, he must provide the Select Committee with a privilege log that "identifies and describes the material in a manner 'sufficient to enable resolution of any privilege claims.'" *See Comm. on Oversight*, 2014 WL 12662665 at *2 (quoting *Miers*, 558 F. Supp. 2d at 107). Such a privilege log should, at a minimum, provide the author(s) and recipient(s), indicate the general subject matter of each document being withheld, and the specific basis for withholding it.

---

[1] It is also worth noting that the court in *Miers* rejected the former White House Counsel's claim of absolute immunity from congressional testimony even though the sitting President had formally invoked executive privilege. *Id.* at 62.

**Jan. 6 Sel. Comm. 0014**

**-3116-**

Mr. Robert J. Costello
Page 3

      Finally, the Select Committee expects Mr. Bannon's appearance at the time and place designated in the Subpoena for a deposition and respond fully to questions by the Select Committee. If there are specific questions at that deposition that you believe raise privilege issues, Mr. Bannon should state them at that time for the deposition record for the Select Committee's consideration and possible judicial review.

      Please be advised that the Select Committee will view Mr. Bannon's failure to respond to the Subpoena as willful non-compliance with the Subpoena. His willful non-compliance with the Subpoena would force the Select Committee to consider invoking the contempt of Congress procedures in 2 U.S.C. §§ 192, 194—which could result in a referral from the House to the Department of Justice for criminal charges—as well as the possibility of having a civil action to enforce the Subpoena brought against Mr. Bannon in his personal capacity.

                                    Sincerely,

                                      Bennie G. Thompson
                                      Chairman

**Jan. 6 Sel. Comm. 0015**

Case 1:21-cr-00670-CJN   Document 110-2   Filed 07/13/22   Page 1 of 4

# Exhibit 2

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
## Select Committee to Investigate the January 6th Attack on the United States Capitol

October 15, 2021

Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, NY 10158

Dear Mr. Costello,

The Select Committee to Investigate the January 6th Attack ("Select Committee") is in receipt of your October 13, 2021 letter (the "October 13 letter"), in which you reassert that your client, Stephen Bannon, will not comply with the September 23, 2021 Subpoena to him for documents and deposition testimony (the "Subpoena"). As you know, the Subpoena demanded that Mr. Bannon produce documents by October 7, 2021 and appear on October 14, 2021 before the Select Committee to provide deposition testimony on a wide range of issues relating to the January 6, 2021 attack on the United States Capitol, as well as plans to interfere with the count of the 2020 Electoral College results. Mr. Bannon has now willfully failed to both produce a single document and to appear for his scheduled deposition. The Select Committee believes that this willful refusal to comply with the Subpoena constitutes a violation of federal law.

As justification for Mr. Bannon's complete failure to comply with any portion of the Subpoena, you continue to rely on ex-President Trump's stated intention to invoke executive privilege with respect to Mr. Bannon, and Mr. Trump's purported request that Mr. Bannon not produce documents to or testify before the Select Committee. As was explained in the Select Committee's October 8, 2021 letter (attached), the former President has not communicated any such assertion of privilege, whether formally or informally, to the Select Committee. Moreover, we believe that any such assertion of privilege—should it be made by the former President—will not prevent the Select Committee from lawfully obtaining the information it seeks.

Further, your letter makes no attempt to justify Mr. Bannon's failure to comply with the Subpoena's demand for documents and testimony on a range of subjects that do not involve communications with the former President. As is clear from the Subpoena and accompanying letter, and as underscored in the Select Committee's October 8, 2021 response letter, the Select Committee seeks documents and testimony on numerous other matters, including Mr. Bannon's

**Jan. 6 Sel. Comm. 0041**

Mr. Robert J. Costello
Page 2

communications with Members of Congress, presidential campaign representatives, and other
private parties concerning the events of January 6, 2021, that could not conceivably be barred by
a privilege claim.

Moreover, even if the Select Committee were inclined to accept the unsupported premise
that executive privilege reaches communications that the Select Committee seeks to examine
between President Trump and Mr. Bannon,[1] Mr. Bannon does not enjoy any form of absolute
immunity from testifying or producing documents in response to a Congressional subpoena.
Your citation to *Committee on Judiciary v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019) actually
supports the Select Committee, not your client. In *McGahn*, the district court unequivocally held
that even senior White House aides are not entitled to absolute immunity from testifying in
response to a Congressional subpoena. *Id.* at 214 ("To make the point as plain as possible, it is
clear to this Court … that, with respect to senior-level presidential aides, absolute immunity from
compelled congressional process simply does not exist.").[2] Indeed, the footnote in *McGahn* that
you selectively quote makes clear that a President lacks legal authority to order an aide not to
appear before Congress based on a claim of executive privilege. *See Id.* at 213, n. 34 ("But the
invocation of the privilege by a testifying aide is an order of magnitude different than DOJ's
current claim that the President essentially owns the *entirety* of a senior-level aide's testimony
such that the White House can order the individual not to appear before Congress *at all*."
(Emphasis in original)).

Accordingly, the Select Committee views Mr. Bannon's failure to produce documents by
the October 7, 2021 deadline as willful non-compliance with the Subpoena. Mr. Bannon has
persisted in his refusal to produce any documents to the Select Committee, and he has failed to
provide a privilege log identifying specific, asserted privileges. Mr. Bannon has now further
compounded his non-compliance by refusing to appear on October 14, 2021 at the Select
Committee deposition to which he was summoned to provide testimony. The Select Committee
will therefore be meeting on Tuesday, October 19, 2021 to consider invoking the contempt of
Congress procedures set forth in 2 U.S.C. §§ 192, 194.

If Mr. Bannon believes that there are any additional issues relating to his non-compliance
with the Subpoena that have not been addressed, please submit them in writing to the Select

---

[1] Notably, neither of the cases you cite supports the claim that communications between the former
President and a private citizen may be shielded by either the presidential communications or deliberative
process privilege. Indeed, the case you rely upon to support your presidential communications claim
specifically held that the privilege extends only to a President's closest advisors in the White House. *In re
Sealed Case (Espy)*, 121 F.3d 729, 752 (D.C. Cir. 1997). *See also Committee on the Judiciary v. Miers*,
558 F. Supp. 2d 53, 100 (D.D.C. 2008) (privilege claimants acknowledged that executive privilege
applies only to "a very small cadre of senior advisors").

[2] The *McGahn* court followed *Committee on the Judiciary v. Miers*, 558 F. Supp.2d 53, 108 (D.D.C.
2008), which reached the same conclusion 13 years ago. *McGahn*, 415 F. Supp. 3d at 202-03 ("this Court
finds that the *Miers* court rightly determined not only that the principle of absolute testimonial immunity
for senior-level presidential aides has no foundation in law, but also that such a proposition conflicts with
key tenets of our constitutional order").

Mr. Robert J. Costello
Page 3

Committee by 6:00 p.m. E.S.T. on Monday, October 18, 2021 for the Select Committee's consideration in its deliberations.

Sincerely,

Bennie G. Thompson
Chairman

Jan. 6 Sel. Comm. 0043

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' OBJECTIONS TO DEFENDANT'S TRIAL EXHIBITS

| Exhibit No. | Description | Date | Basis of Admissibility | Objections |
|---|---|---|---|---|
| 1A | Subpoena to Stephen K. Bannon (US-000303-000312) | September 23, 2021 | Relevant if redactions are made. | No objection. |
| 1B | Subpoena to Stephen K. Bannon (US-000303-000312) REDACTED | September 23, 2021 | Relevant (as redacted). | No objection. |
| 2 | FBI 302 report of November 2, 2021, interview with K. Amerling (US-000245-000252) | November 10, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |
| 3 | Email from S. Tonolli to K. Amerling. (US-000317-000318) | October 13, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |

| 4 | Transcript of Official Proceeding. (US-000397-000403) | October 14, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Irrelevant. |
|---|---|---|---|---|
| 5 | Email correspondence of K. Amerling (US-001143-001144) | November 5, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |
| 6 | RESERVED | | . | |
| 7 | H. Res. 8, 117th Cong. | January 4, 2021 | Official government document. | Irrelevant depending on purpose for which it is offered. |
| 8 | H. Res. 730, 117th Cong. (US-000459-000504) | October 21, 2021 | Official government document. | Irrelevant. |

| 9A | 117th Congress Regulations for Use of Deposition Authority (H41) | January 4, 2021 | Official government document. | No objection. |
|---|---|---|---|---|
| 9B | RESERVED | | | |
| 10 | J. Clark Letter (US-000971-000972) | October 6, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay depending on purpose for which it is offered; irrelevant subject to Court's order. |
| 11 | FBI 302 report of November 2, 2021, interview of S. Tonolli. (US-000358-000362) | November 10, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |
| 12A | Email from S. Tonolli to R. Costello. (US-000388) | October 13, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Unclear for what purpose this is being offered; we may object based on Rule 801/802: Hearsay or relevance grounds. |

| 12B | Email from R. Costello to S. Tonolli. (US-000391-000394) | October 13, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | No objection. |
|-----|-----|-----|-----|-----|
| 12C | Email from S. Tonolli to R. Costello. (US-000395-000396) | October 13, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Irrelevant depending on purpose for which it is offered. |
| 13 | FBI Record Receipt for Property. (US-000946-000963) | November 2, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Irrelevant subject to Court's order. |
| 14 | FBI 302 report memorializing Costello meeting. (US-001769-001782) | November 11, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |
| 15 | Handwritten notes of FBI Special Agent S. Hart (US-000325-000337) | November 2, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |

4

**-3125-**

| 16 | Email from FBI Special Agent S. Hart to Special Agent F. D'Amico. (US-002305-002310) | November 10, 2021 | Relevant. [Fed. R. Evid. 401, 402]. | Rule 801/802: Hearsay. |
|----|----|----|----|----|

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov