**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

## JOINT APPENDIX
### Volume VIII of XII
### (Pages: 3127 - 3576)

———————

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

## TABLE OF CONTENTS
### Joint Appendix Volume I of XII

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Docket Entries [1:22-mc-00060-CJN].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Indictment**
   **filed November 12, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
   **on November 15, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
   **on November 18, 2021..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
   **on December 7, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
   **filed February 4, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **158**

  **Exhibits:**

  1.  **Letter**
      **dated January 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **186**

  2.  **Letter**
      **dated January 28, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **194**

**Exhibits** to

**Defendant's Motion to Compel Discovery**
  **filed February 4, 2022, Continued:**

3.  Letter
    dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.  **FBI Interview of Robert J. Costello, Esquire**
    **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.  **H. Res. 503, Sec. 5(c)(6)(A) & (B)**
    **dated June 20, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.  **Procedures Adopted by 117th Congress**
  **Regulations for Use of Deposition Authority**
    **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.  **FBI Interview of U.S. House of Representatives**
  **General Counsel Doug Letter**
    **dated November 2, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.  **Letter from Ronald C. Machen Jr., U.S. Attorney,**
  **to Speaker of the House John A. Bohner**
    **dated March 31, 2015.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.  **Prosecution for Contempt of Congress of an**
  **Executive Branch Official Who Has Asserted a**
  **Claim of Executive Privilege**
    **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.  **Attempted Exclusion of Agency Counsel from**
  **Congressional Depositions of Agency**
  **Employees, Slip Op.**
    **dated May 23, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,
     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     Attachment:

     Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,
     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     Exhibit:

     1.    Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,
     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     Exhibit:

     1.    Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,**

**With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**Exhibits:**

1.    **E-mail Correspondence [US-001038-40]**
    **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark**
    **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel**
    **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello**
    **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel**
    **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain**
    **dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange**
    **dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 444

# TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument**
**Before the Honorable Carl J. Nichols**
　　**on March 16, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **457**

**Defendant's Surreply to the Government's Reply in Support of its**
**Motion *in Limine* to Exclude Evidence or Argument Relating to**
**Good-faith Reliance on Law or Advice of Counsel**
　　**filed March 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **556**

**Defendant's Supplemental Brief in Opposition to the**
**Government's Motion *in Limine* on Advice of Counsel,**
**With Exhibits,**
　　**filed March 22, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **565**

　　**Exhibits:**

　　1.　**Senate Committee Investigation**
　　　　　**dated August 8, 1958.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **577**

　　2.　**Application of 28 U.S.C. § 458 to Presidential**
　　　　**Appointments of Federal Judges**
　　　　　**dated December 18, 1995.** . . . . . . . . . . . . . . . . . . . . . . . . **584**

　　3.　**Letter from Michael B. Mukasey, Attorney**
　　　　**General, to the Hon. Nancy Pelosi, Speaker of the**
　　　　**House of Representatives**
　　　　　**dated February 29, 2008.** . . . . . . . . . . . . . . . . . . . . . . . . **599**

**Exhibits** to
**Defendant's Supplemental Brief in Opposition to the
Government's Motion** *in Limine* **on Advice of Counsel**
  **filed March 22, 2022, Continued:**

4.    Response to Congressional Requests for
      Information Regarding Decisions Made Under the
      Independent Counsel Act,
        10 Op. O.L.C. 68 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 601

5.    Rex Lee, Executive Privilege, Congressional Subpoena
      Power, and Judicial Review: Three Branches,
      Three Powers, and Some Relationships,
        1978 B.Y.U. L. Rev. 231, 259. . . . . . . . . . . . . . . . . . . . . . . . . 619

6.    Whether the Department of Justice May Prosecute
      White House Officials for Contempt of Congress,
        2008 WL 11489049 (O.L.C.). . . . . . . . . . . . . . . . . . . . . . . . . . 688

7.    Congressional Oversight of the White House,
        2021 WL 222744 (O.L.C.). . . . . . . . . . . . . . . . . . . . . . . . . . . 692

**Amended Exhibit** to
**Defendant's Supplemental Brief in Opposition to the
Government's Motion** *in Limine* **on Advice of Counsel**
  **filed March 23, 2022:**

3.    Letter from Michael B. Mukasey, Attorney
      General, to the Hon. Nancy Pelosi, Speaker of the
      House of Representatives
        dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 722

**Government's Response to Defendant's Supplemental Brief in
Opposition to the Government's Motion** *in Limine* **to Exclude
Evidence and Argument Relating to Good-faith
Reliance on Law or Advice of Counsel**
  **filed March 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 725

**Defendant's Supplemental Reply on Waiver**
  filed March 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

**Order**
  filed April 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 741

**Government's Motion** *in Limine* **to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
  filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 745

  <u>Exhibits:</u>

   1. **Letter from White House Deputy Counsel to Costello**
     dated October 18, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 765

   2. **Letter from Justin Clark to Costello**
     dated October 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 767

   3. **Emails from Justin Clark to Costello**
     various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 769

**Government's Motion** *in Limine* **to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
  filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 771

  <u>Exhibit:</u>

   1. **Subpoena**
     dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 781

**Government's Motion** *in Limine* **to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
  filed April 15, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 792

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

> **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**

> **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

> **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

> <u>**Exhibits:**</u>

> **A.** **H. Res. 8 (Adoption of Rules for 117th Congress)**
>
> > **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

> **B.** **H. Res. 503 (Authorizing House Select Committee)**
>
> > **dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

> **C.** **Regulations For Use Of Deposition Authority**
>
> > **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

> **D.** **Amerling and Letter FBI 302**
>
> > **dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
### Joint Appendix Volume III of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

    E.    **Rules of the 117th Congress**
            **dated February 2, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938

    F.    **Republican Conference Rules of the 117th Congress.** . . . . . . 991

    G.    **Congressional Oversight of The White House,**
            **45 Op. O.L.C. slip op. (Jan. 8, 2021).** . . . . . . . . . . . . . . . 1005

    H.    **Assertion of Executive Privilege Concerning the**
        **Dismissal and Replacement of U.S. Attorneys**
            **dated June 27, 2007.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1065

    I.    **Immunity of the Former Counsel to the President from**
        **Compelled Congressional Testimony,**
            **43 Op. O.L.C. slip op. (July 10, 2007).** . . . . . . . . . . . . . . 1075

    J.    **Prosecution for Contempt of Congress of an Executive**
        **Branch Official Who Has Asserted a Claim of Privilege,**
            **8 Op. O.L.C. 101 (1984).** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1079

    K.    **Whether the Department of Justice May Prosecute**
        **White House Officials for Contempt of Congress,**
            **32 Op. O.L.C 65 (2008).** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122

    L.    **Application of 28 U.S.C. Sec. 458 to Presidential**
        **Appointments of Federal Judges,**
            **19 Op. O.L.C slip op. (December 18, 1995).** . . . . . . . . . 1128

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
  **filed April 15, 2022, Continued:**

**M.**   Randolph D. Moss, *Executive Branch Legal Interpretation:*
     *A Perspective from the Office of Legal Counsel,*
       52 Admin. L. Rev. 1303 (2000)...................... 1143

**N.**   Testimonial Immunity Before Congress of the
     Former Counsel to the President,
       43 Op. O.L.C. slip op. (May 20, 2019). ............. 1172

**O.**   Response to Congressional Requests for
     Information Regarding Decisions Made
     Under the Independent Counsel Act,
       10 Op. O.L.C. 68 (1986)........................... 1194

**P.**   Letter from Ronald C. Machen Jr., U. S. Attorney, to
     Speaker John A. Boehner
       dated March 31, 2015. ............................ 1220

**Q.**   Letter from Michael B. Mukasey, Attorney General, to
     Speaker of the House, Hon. Nancy Pelosi
       dated February 29, 2008........................... 1228

**R.**   Steven G. Bradbury, *Memorandum for Attorneys of the*
     *Office Re: Best Practices for OLC Opinions*
       May 16, 2005...................................... 1231

**S.**   Trevor W. Morrison, *Stare Decisis in the*
     *Office of Legal Counsel,*
       110 COLUM. L. REV. 1448 (2010)................... 1237

**T.**   Walter Dellinger, et al., *Principles to*
     *Guide the Office of Legal Counsel*
       dated Dec. 21, 2004. ............................. 1261

**<u>Exhibits</u> to**

**Defendant's Motion to Dismiss the Indictment**
**    filed April 15, 2022, Continued:**

U.   David J. Barron, Memorandum for Attorneys of the
     Office Re: Best Practices for OLC Legal
     Advice and Written Opinions
          dated July 16, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268

V.   Frank H. Easterbrook, Presidential Review,
     40 CASE W. RES. L. REV. 905 (1990). . . . . . . . . . . . . . . 1275

W.   Presidential Authority to Decline to Execute
     Unconstitutional Statutes, OLC Mem. Op.
          dated November 2, 1984. . . . . . . . . . . . . . . . . . . . . . . . . 1302

X.   Douglas W. Kmiec, OLC's Opinion Writing Function:
     The Legal Adhesive for a Unitary Executive,
          15 CARDOZO L. REV. 337 (1993). . . . . . . . . . . . . . . . . 1316

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits** to
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

**Y.**    **Applying Estoppel Principles in Criminal Cases,**
        **78 YALE L.J. 1046 (1969)..** . . . . . . . . . . . . . . . . . . . . . . . . . **1355**

**Z.**    **Anne Bowen Pouliun, Prosecutorial Inconsistency,**
    **Estoppel, and Due Process: Making the**
    **Prosecution Get its Story Straight,**
        **18 Cal. L. Rev. 1423 (2001)..** . . . . . . . . . . . . . . . . . . . . . . . . . **1384**

**AA.**    **Rex E. Lee, Executive Privilege, Congressional Subpoena**
    **Power, and Judicial Review: Three Branches, Three**
    **Powers, and Some Relationships,**
        **1978 B.Y.U. L. REV. 231 (1978).** . . . . . . . . . . . . . . . . . . . . . . . **1441**

**BB.**    **John O. McGinnis, Models of the Opinion Function of the**
    **Attorney General: A Normative, Descriptive, and**
    **Historical Prolegomenon,**
        **15 CARDOZO L. REV 375 (1993)..** . . . . . . . . . . . . . . . . . **1510**

**CC.**    **Griffin B. Bell, The Attorney General: The Federal**
    **Government's Chief Lawyer and Chief Litigator, or**
    **One Among Many?,**
        **46 FORDHAM L. REV. 1049 (1978).** . . . . . . . . . . . . . . . **1572**

<u>**Exhibits**</u> **to**
**Defendant's Motion to Dismiss the Indictment**
 **filed April 15, 2022, Continued:**

     **DD.  Notes, The Immunity-Conferring**
          **Power of the Office of Legal Counsel,**
              **121 HARV. L. REV. 2086 (2008).** . . . . . . . . . . . . . . . . . . **1596**

     **EE.  U.S. Department of Justice, Criminal**
          **Resource Manual § 2055 (Public Authority Defense).** . . . . **1621**

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
 **filed April 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1627**

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
 **filed April 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1695**

**Defendant's Opposition to the Government's**
**Motion** *in Limine* **Based on Waiver**
 **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1698**

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
 **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1709**

**Defendant's Response to Government's Motion** *in*
*Limine* **to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
 **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1720**

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**

    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

**<u>Exhibits:</u>**

1.    **Letter from Chairman Bennie G. Thompson to**
    **Mr. Stephen K. Bannon**
        **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1793**

2.    **E-mail from Cooney to Costello**
        **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1796**

3.    **E-mail from Costello to Cooney**
        **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1800**

4.    **E-mail from Cooney to Costello**
        **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **1803**

## TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

**Government's Opposition to**
**Defendant's Motion to Exclude Evidence**
  filed May 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

**Defendant's Reply in Support of His Motion to Exclude Evidence**
  filed May 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence of Department of Justice Opinions and Writings**
  filed May 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

**Government's Reply in Support of Motion** *in Limine* **to**
**Exclude Evidence Relating to Objections to**
**Subpoena That Defendant Waived**
  filed May 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence of the Defendant's Prior Experience with Subpoenas**
  filed May 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

**Defendant's Reply in Support of His Motion to Dismiss Indictment,**
**With Exhibits,**
  filed May 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

  **Exhibits:**

  1. **Letter from Chairman Bennie G. Thompson to**
   **Mr. Stephen K. Bannon**
    dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 1885

  2. **Transcript of Oral Argument**
   **Before the Honorable Carl J. Nichols**
    on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to

**Defendant's Reply in Support of His Motion to Dismiss Indictment**
      **filed May 17, 2022, Continued:**

    3.     **Letter from Costello to Congressman Thompson**
           **dated October 18, 2021**............................. 1994

    4.     **Letter from Congressman Thompson to Costello**
           **dated October 19, 2021**............................. 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
      **filed May 25, 2022.**......................................... 2002

    **Attachment:**

    **Brief of United States House of Representatives as**
    *Amicus Curiae* **In Support of the Department of Justice**
          **dated May 10, 2022.**.............................. 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
      **filed May 25, 2022.**......................................... 2035

    **Attachment:**

    **Brief of the U.s. House of Representatives Minority Leader**
    **Kevin O. Mccarthy and the U.s. House of Representatives**
    **Minority Whip Stephen J. Scalise as Amicus Curiae**
          **dated May 24, 2022.**.................................. 2050

**Defendant's Notice Regarding Amicus Briefs**

    **filed June 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2065**


**Motion to Quash,**

**With Attachment,**

    **filed June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2072**


    <u>**Attachment:**</u>


    **Memorandum of Points and Authorities**

    **In Support of Motion to Quash,**

    **With Exhibits,**

        **dated June 13, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
      **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
      **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
      **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

    **Exhibits:**

    1.    **Letter from Bannon's Counsel to Prosecutors**
          **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

    2.    **Letter from Prosecutors to Bannon's Counsel**
          **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

    3.    **Letter from Justin Clark to Scott Gast**
          **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2448**

    4.    **Letter from Pat Cipollone to Chairman Nadler**
          **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . . . **2453**

    5.    **Plaintiff's Motion for Judgment on the Pleadings, or in the**
        **Alternative, for Summary Judgment, & in Opposition to**
        **Defendants' Motion for Summary Judgment**
          **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
      **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

## TABLE OF CONTENTS
### Joint Appendix Volume VII of XII

Page:

**Government's Opposition to Defendant's Motion to Compel**
    filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

**Joint Proposed Jury Instructions,**
**With Attachment,**
    filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

    <u>Attachment:</u>

    **Manual of Model Criminal Jury Instructions**
        dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

**Government's Objections to Defendant's Proposed Jury Instructions**
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

**Defendant's Opposition to Government's Omnibus Motion *in Limine***
    filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

**Office of General Counsel U.S. House of Representatives'**
**Reply in Support of Motion to Quash,**
**With Exhibits,**
    filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

    <u>Exhibits:</u>

    A.    Order - *U.S. v. Moussaoui*
        dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

    B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
        dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

    C.    Order Granting Motion to Quash Subpoena on
        U.S. Representative Maxine Waters - *D.C. v. Hayes*
        dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

      filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2842

      **Exhibit:**

      1.    **Memorandum**

              dated October 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2853

**Government's Reply in Support of Motion *in Limine***

      filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2863

**Government's Motion *in Limine* to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

      filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

      on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2879

**Defendant's Opposition to Motion *in Limine* to Bar Testimony,**
**With Exhibits,**

      filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3071

      **Exhibits:**

      1.    **Letters from former President Trump to Mr. Costello and**
            **Mr. Costello's Letter to Chairman Thompson**

              dated June 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3080

      2.    **Certification**

              dated October 21, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3084

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
      **filed July 13, 2022, Continued:**

    3.     **Subpoena**
         **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3090

    4.     **Letter from Thompson to Costello**
         **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3092

    5.     **Indictment**
         **dated November 12, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 3096

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence or Argument Relating to the Defendant's Eleventh-hour**
**Assertion That He Is Willing to Testify Before the Select Committee,**
**With Exhibits,**

      **filed July 13, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106

      **Exhibits:**

    1.     **Letter from Thompson to Costello**
         **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3114

    2.     **Letter from Thompson to Costello**
         **dated October 15, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3118

**Government's Objections to Defendant's Trial Exhibits**

      **filed July 14, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

**Transcript of In-person Motions Hearing and Pretrial Conference
Before the Honorable Carl J. Nichols**
         on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

**Defendant's Motion to Exclude Congressional Evidence or
Dismiss the Indictment Based on Granting the Motion to Quash,
With Exhibits,**
         filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

   **Exhibits:**

   1.    **Transcript Jury Trial
         Before the Honorable Kurt D. Engelhardt**
         *U.S. v. Rainey*, **No. 12-291**
                  on June 1, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

   2.    **Congressional Gamesmanship Leads To An
         Acquittal In Deepwater Horizon Case,
         U.S. v. David Rainey: A Case Study**
                  dated 2016.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

**Government's Opposition to Defendant's Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash**
         filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

**Government's Objections to Court's Proposed
Statement of the Case, Voir Dire, and Jury Instructions**
         filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## <u>TABLE OF CONTENTS</u>
### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3577

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3784

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
      on July 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3868

**Testimony of <u>Kristin Amerling</u>:**

    **Direct Examination by Ms. Vaugn.. . . . . . . . . . . . . . . . . . . . . . . . . . 3942**

**TABLE OF CONTENTS**
**Joint Appendix Volume X of XII**

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
> **on July 20, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3994**

> **Testimony of <u>Kristin Amerling</u>:**

> **Direct Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . . **4014**
> **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . . **4078**

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
> **on July 20, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4143**

> **Testimony of <u>Kristin Amerling</u>:**

> **Cross Examination by Mr. Corcoran (Continued).** . . . . . . . . . . . . **4149**
> **Redirect Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . **4211**

> **Testimony of <u>Stephen Hart</u>:**

> **Direct Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . . **4233**
> **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . . **4252**
> **Redirect Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . **4264**

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
> **filed July 21, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4289**

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
> **on July 21, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4295**

# TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
    **filed July 21, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4422

**Defendant's Notice Regarding Congressional Hearings**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4432

**Notice of Defendant's Objection to Jury Instruction Number 27**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4435

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
    **on July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4438

**Jury Instructions**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4555

**Counsels' Acknowledgment Concerning Trial Exhibits**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4585

**Government's Exhibit List**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4586

**Defendant's Exhibit List**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4588

**Note from Jury**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4591

**Verdict Form**
    **filed July 22, 2022**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4592

Order
  filed July 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
  filed July 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

  <u>Exhibits</u>:

  1. Screenshot of Episode 1996, War Room
    dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

  2. Bannon's Gettr Repost CNN Ad
    dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
  filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
  filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
  filed August 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
  filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**
>       filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4657**


**Defendant's Reply to Opposition to Motion for a New Trial**
>       filed August 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4676**


**Order**
>       filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4682**


**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
>       on October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4687**


**Judgment in a Criminal Case**
>       filed October 21, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4767**


**Defendant's Notice of Appeal**
>       filed November 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4772**


**Order Staying Sentence Pending Appeal**
>       filed November 7, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4779**

## <u>TABLE OF CONTENTS</u>
### Joint Appendix Volume XII of XII - Exhibits

**Page:**

**<u>Defendant's Exhibits:</u>**

9B.   **H41 Congressional Record - House**
       **dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4780**

30.   **Letter from Former President Donald Trump to**
       **Stephen K. Bannon**
       **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4781**

31.   **Letter from Robert J. Costello to**
       **Chairman Bennie Thompson**
       **dated July 9, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4782**

32.   **Letter from Chairman Bennie Thompson to**
       **Robert J. Costello**
       **dated July 14, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4784**

39.   **Article from Rolling Stone**
       **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **4786**

40.   **Daily Mail Article**
       **dated October 8, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4804**

**<u>Government's Exhibits:</u>**

1.   **House Resolution 503.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4808**

2.   **Subpoena to Stephen Bannon**
      **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **4822**

**Government's Exhibits**, Continued:

3.    **Emails re Service of Subpoena
dated September 23 and 24, 2021**................... 4832

4.    **Letter from Costello to
Chairman Thompson and Cover Email
dated October 7, 2021**............................ 4835

5.    **Letter from Chairman Thompson to Costello
dated October 8, 2021**............................ 4838

6.    **Letter from Costello to Chairman Thompson
dated October 13, 2021**........................... 4841

7.    **Letter from Chairman Thompson to Costello
dated October 15, 2021**........................... 4843

8.    **Letter from Costello to
Chairman Thompson and Cover Email
dated October 18, 2021**........................... 4846

9.    **Letters from Chairman Thompson to Costello
dated October 19, 2021**........................... 4848

10.    **Post on Stephen Bannon's Gettr Account
dated September 24, 2021.** ....................... 4851

11A.  **Post on Stephen Bannon's Gettr Account
dated October 8, 2021**............................ 4852

11B.  **DailyMail Article Linked in October 8, 2021
Post on Stephen Bannon's Gettr Account.** .............. 4853

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

CR Action
No. 1:21-670

vs.

Washington, DC
July 14, 2022

STEPHEN K. BANNON,

10:06 a.m.

Defendant.

TRANSCRIPT OF IN-PERSON MOTIONS HEARING
AND PRETRIAL CONFERENCE
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the U.S.:            **AMANDA ROSE VAUGHN**
                         **MOLLY GULLAND GASTON**
                         U.S. ATTORNEYS OFC. FOR D.C.
                         555 4th Street NW
                         Washington, DC  20001
                         202-252-1793

For the Defendant:       **DAVID I. SCHOEN**
                         DAVID I. SCHOEN, ATTORNEY AT LAW
                         2800 Zelda Road, Suite 100-6
                         Montgomery, AL  36106
                         334-395-6611

                         **MATTHEW EVAN CORCORAN**
                         **RIANE WHITE**
                         SILVERMAN THOMPSON SLUTKIN WHITE
                         201 N. Charles Street, 25th Floor
                         Baltimore, MC  21201
                         410-385-2225

Reported By:             **LORRAINE T. HERMAN, RPR, CRC**
                         Official Court Reporter
                         U.S. District & Bankruptcy Courts
                         333 Constitution Avenue, NW
                         Room 4700-C
                         Washington, DC 20001

*** Recorded by stenotype shorthand and this transcript was
      produced by computer-aided transcription.

**-3127-**

2

1              **P R O C E E D I N G S**

2        (Proceedings started at 10:06 a.m.)

3              **DEPUTY CLERK:**  Good morning, Your Honor.  This is

4    criminal case year 2021-670, *United States of America versus*

5    *Stephen K. Bannon*, who is not present.

6              Counsel, please come forward and introduce

7    yourselves for the record, beginning with the government.

8              **MS. VAUGHN:**  Good morning, Your Honor.  Amanda

9    Vaughn and Molly Gaston for the United States.

10             **THE COURT:**  Good morning, Counsel.

11             **MR. CORCORAN:**  Good morning, Your Honor.  Evan

12   Corcoran and David Schoen, and with us is Riane White, and

13   we've got a pro hac motion for --

14             **THE COURT:**  Yes, I saw that this morning, and that

15   seemed fine to me, and it is granted.  Welcome, Ms. White.

16             So it seems to me that there are a couple pending

17   motions that I would like to hear argument on and then just

18   general trial preparation issues.  Why don't we start with

19   the renewed Motion to Continue, which is ECF No. 108.

20             Mr. Schoen, will that be you?

21             **MR. SCHOEN:**  Yes, Your Honor.  Good morning,

22   Your Honor.

23             **THE COURT:**  Good morning.

24             **MR. SCHOEN:**  Your Honor, I really don't have much

25   to offer in the way of additional argument.  I think the

3

1    issues are raised.  The arguments are essentially the same

2    as we raised the other day.  And there are simply

3    additional, I believe, inflammatory, overly-prejudicial

4    developments.  And I don't need to speak just to hear myself

5    talk.  I know the Court's read the papers.

6           The hearings continued.  We enclosed or attached

7    the link to the --

8           **THE COURT:**  Yes.

9           **MR. SCHOEN:**  -- excerpt from there, the video and

10   the text.

11          And then there is this one-hour-long special

12   documentary on Mr. Bannon, called "Divided We Fall," set to

13   air on Sunday night, the eve of the trial, and being

14   promoted regularly.  I wanted to submit this one because

15   there's now a new, in my view at least, more inflammatory

16   trailer even that highlights it.

17          There are other things going on.  There are these

18   articles, a new disclosure, by Mother Jones Magazine about

19   some tapes that they say would indicate sort of the idea of

20   election fraud was Mr. Bannon's idea and all of that.  And,

21   again, something like that, of course, could come up at any

22   point in time.  The point here is the cumulative effect.

23   These hearings were scheduled for a finite period of time.

24   We discussed all of that the other day, Your Honor.  The

25   bottom line from our perspective is there's just no reason

4

1   to have this trial starting now.

2          **THE COURT:**  We could ask, for example, on Monday

3   if, as a result of the voir dire questions and the like, if

4   someone -- whatever the answers are from a potential juror,

5   we can explore with that juror whether and to what extent

6   that person, for example, watched the CNN piece or had seen

7   the Committee hearings this week.  Correct?

8          **MR. SCHOEN:**  Right.

9          The problem, Your Honor, is -- I tried to raise in

10  the paper, which we see all the time in jury selection is if

11  we -- once it's exposed to a group and they weren't familiar

12  with it before, then the risk is increased, in my view at

13  least, to prejudice the rest of the group that hasn't heard.

14  It comes up all the time.

15         I had a case, for example, in New York,

16  prospective juror stood up and said -- it was a Russian

17  Mafia case -- I think all Russians are guilty.

18         **THE COURT:**  I guess I should explain to you then

19  how jury selection in this case is going to work.  We're

20  going to be in the Ceremonial Courtroom so that every single

21  potential juror will be in the gallery, spread out.  Many

22  more people can sit in the ceremonial courtroom than in this

23  one.  I'm going to read to the jurors each of the voir dire

24  questions that I think are appropriate from what the parties

25  have proposed.

1    While we are at it, I'll just tell you, I've been

2    through them.  And I will be circulating to the parties this

3    afternoon, very likely, a Word document that would reflect

4    my take on the appropriate questions that would be asked.

5    Each question -- I think the parties did a very

6    good job of proposing them this way -- will be answerable

7    yes or no.  For "yes" answers, and only "yes" answers, I'll

8    ask the jurors to write the question to which they have a

9    "yes" answer on an index card.  We'll provide them with

10   index cards.

11   Then for the whole pool, I will collect the index

12   cards.  We will then excuse the entire pool.  I will have

13   each juror come in one by one off the list, and we will

14   discuss with that juror, and only in the presence of that

15   juror, why the juror answered "yes" to questions whatever,

16   and explore with them whether and to what extent they can be

17   seated in light of their answers.

18   So I don't intend to have any juror say anything

19   about his or her answer in the presence of other jurors,

20   one; and two, I don't intend to ask any questions of the

21   jurors when they're in the group setting that would expose

22   them to information that they wouldn't otherwise be aware

23   of.

24   **MR. SCHOEN:**  Your Honor, the second part of that

25   process was what I was referring to by individually

6

1    sequestered voir dire, of course, and that's what I think

2    would be -- without waiving our position that this can't be

3    cured by jury selection --

4        **THE COURT:**  Yes.  And that is definitely

5    preserved.  No doubt about it.

6        **MR. SCHOEN:**  Thank you, Your Honor.

7        Your Honor, my position is both of the motions

8    today are fully briefed, but obviously if the government

9    wants to speak on its motion, then --

10       **THE COURT:**  So let's do this:  I want to hear from

11   the government very briefly on the Motion to Continue Trial,

12   and then I want to hear from the government on their Motion

13   to Exclude the Most Recent Letters, and then I will hear

14   from you on that or Mr. Corcoran, once we've heard the

15   government's position, because I want to explore some things

16   with them that you might want to respond to.

17       **MR. SCHOEN:**  Yes, Your Honor.  Thank you.

18       **THE COURT:**  Thank you.

19       Ms. Gaston.

20       **MS. GASTON:**  Good morning, Your Honor.

21       **THE COURT:**  Good morning.

22       **MS. GASTON:**  I'm handling the Motion to Continue,

23   and then Ms. Vaughn will handle the Motion in Limine.

24       So I won't spend much of the Court's time because

25   what the Court just described is exactly what the government

1    expected to happen in voir dire.  And because of that, we

2    don't expect the jury to be exposed to things each other

3    juror may or may not have seen.

4         **THE COURT:**  Does the government think I should ask

5    the jury, the venire, questions about the very most-recent

6    set of hearings of the Committee?

7         **MS. GASTON:**  No, Your Honor.

8         The government believes that the proposed voir

9    dire that the parties jointly sent to the Court is

10   sufficient in that it asks the jurors if they have viewed

11   any of the hearings, if they have read or seen coverage of

12   the hearings in general --

13        **THE COURT:**  And if we get a "yes" answer to that

14   question, we can explore individually, outside the presence

15   of other jurors, whether and to what extent that has

16   happened.

17        **MS. GASTON:**  Exactly, Your Honor.

18        It seems that the defense is making some

19   assumptions about the viewership of the jury pool here, the

20   reach of some of these publications and channels that we

21   just don't think will bear out, and that we -- we think that

22   we will find a jury pool that, perhaps, has not seen the

23   hearings, has not really reviewed coverage, may not even

24   know who the defendant is.

25        And so we would just ask, to get to voir dire, ask

8

1    those questions, and --

2          **THE COURT:**  And see where we are.  And if it turns

3    out that, in fact, we cannot find 14 jurors who are

4    sufficiently unfamiliar, unbiased, et cetera, then we would

5    have to start again.

6          **MS. GASTON:**  Exactly.  We would be shocked if that

7    were the case but --

8          **THE COURT:**  I'm very hopeful it won't be, but as I

9    said, I'm open to considering what happens, of course, if

10   that, in fact, is the case.

11         And, of course, I will be very open to each side's

12   arguments about whether a particular juror's answers to the

13   questions require excusal -- yeah, them to be excused for

14   cause.

15         **MS. GASTON:**  Yes.  Thank you, Your Honor.

16         **THE COURT:**  Thank you.

17         So, Ms. Vaughn.

18         **MS. VAUGHN:**  Yes, Your Honor.

19         **THE COURT:**  I've read the parties' papers

20   regarding Mr. Bannon's -- the letter to Mr. Bannon and then

21   the letter that Mr. Bannon sent to the Committee.  It seems

22   to me that something we haven't really explored yet is what

23   evidence might be relevant to the question of default.

24         Obviously the government proposes a definition in

25   its brief, the Merriam-Webster's definition, that there has

1    to be a -- well, I'll just pull it out.

2                **MS. VAUGHN:**  A failure to comply --

3                **THE COURT:**  Yes.  A failure to --

4                **MS. VAUGHN:**  -- do something required.

5                **THE COURT:**  "A failure to do something required by

6    duty of law and failure to appear at the required time in a

7    legal proceeding."  So that's the question of default; and

8    that's not the same question as mens rea.

9                It's just, "Did Mr. Bannon make a default?"  And

10   then the question then is, "Did he fail to appear at the

11   required time in a legal proceeding or --" at least from the

12   government's perspective "-- or did he fail to do something

13   required by duty or law?"  That's clearly an element of the

14   offense.  This is in your Reply brief at Page 3.

15               **MS. VAUGHN:**  Yeah.

16               **THE COURT:**  And it seems to me, but I'd like to

17   have your view on this, doesn't that mean that the jury has

18   to decide what the required time for the production of

19   documents, on the one hand, or the appearance at the

20   deposition was?  Was there a required time and what was it?

21   And then, Did Mr. Bannon fail to act consistent with that

22   requirement.  Those are jury questions.  Correct?

23               **MS. VAUGHN:**  Yes.

24               **THE COURT:**  Okay.

25               So putting aside mens rea, would -- does the

1    government concede that evidence relating to whether there

2    was a date certain to respond is relevant and goes to the

3    jury?

4                **MS. VAUGHN:**  Yes.

5                **THE COURT:**  Okay.

6                So, for example, I'm not saying that this is this

7    case, but if you had a situation where you had a return date

8    and a subpoena but a substantial back-and-forth, including,

9    perhaps, an argument or an implied, leaving-open of the

10   return date or willingness to negotiate a new one, that

11   would all be relevant in the government's view?

12               **MS. VAUGHN:**  Yes.

13               **THE COURT:**  Okay.

14               **MS. VAUGHN:**  And I think there is a temporal

15   element to that too, which goes to this later evidence.

16               **THE COURT:**  Okay.

17               But let's just focus on what happened in October

18   of 2021.  It seems to me that the implications of those --

19   the element and the way one thinks about what it means to

20   make default is that Mr. Bannon would be entitled to, if he

21   wishes, put on evidence that would tend to show that the

22   return dates were not hard and fast.

23               **MS. VAUGHN:**  Well, I think it's hard to completely

24   separate default from his intent because if he --

25               **THE COURT:**  I agree they may be related, but the

1    government has to prove that he had an obligation to appear

2    on a particular date and that he failed to do so.

3              **MS. VAUGHN:**  Yes.

4              **THE COURT:**  And if Mr. Bannon offers evidence that

5    shows that that date actually wasn't the date, for whatever

6    reason, then there wouldn't be a default; or at least the

7    jury would have to consider that evidence in deciding what

8    the date for his obligation was.  Correct?

9              **MS. VAUGHN:**  Yes.

10             If there was evidence that the Committee had

11   excused the charge -- so we charged October 14th as the date

12   for testimony and October 18th as the date for document

13   production.

14             So if there was some evidence that the Committee

15   had pushed those dates prior to his default, that would be

16   evidence that --

17             **THE COURT:**  What about evidence after those dates

18   that would tend to suggest that those dates were actually in

19   flux?  Why does it matter when the evidence, the letter, the

20   conversation, whatever, occurred, so long as it goes to the

21   question of whether the dates were hard and fast?

22             **MS. VAUGHN:**  Well, that's why it's difficult to

23   separate default from his intent because the -- so

24   another -- the definition of default that the government

25   relies on in its proposed jury instructions, for example, is

**-3137-**

1    *Bryan*, which says default is, of course, a failure to comply

2    with the summons.

3         So the fact that there is a clear date set, and he

4    doesn't comply by that date, that is the moment in time at

5    which his default is judged.  So was the date of the 14th

6    set at that time, and by the 14th did he have the intent to

7    deliberately not comply.

8         **THE COURT:**  I get that.

9         But imagine -- I'm not saying that the evidence

10   supports this argument.  I'm just exploring the temporal

11   question, which is, imagine the government said, It has

12   always been our position, it's always been clear that

13   October 14th was the deadline to appear for the deposition.

14   And Mr. Bannon says, But Mr. Thompson told Mr. Costello --

15   I'm not saying this happened.

16        **MS. VAUGHN:**  Yeah.

17        **THE COURT:**  I'm just saying for example -- on

18   October 16th, that he had always intended that that date

19   would be a flexible one.

20        **MS. VAUGHN:**  That would seem like evidence to

21   impeach -- to use for impeachment purposes, the evidence --

22        **THE COURT:**  Why wouldn't it go to whether

23   October 14th was a hard and fast deadline?

24        **MS. VAUGHN:**  Because it's a post hoc statement

25   about what the intent of the Committee was at the time of

1    the default.

2          **THE COURT:**  But it's from the Chairman of the

3    Committee talking about what his view of the return date

4    was.

5          **MS. VAUGHN:**  Right.  So that could be impeachment

6    of the Committee witnesses or Thompson --

7          **THE COURT:**  Why wouldn't it just be evidence of

8    whether that date was hard and fast?

9          Let me put it this way:  I think the government

10   concedes that, appropriately in my view, default is a

11   question for the jury.  There are two parts of default.  One

12   is, what was the date that the obligation was required to

13   happen and did the defendant do it?

14         At least, it seems to me, the question of was the

15   date hard and fast is one on which there could be disputed

16   evidence.  I'm not saying there is.  I'm just saying it

17   could be.

18         So then the jury would have to decide, based on

19   the evidence -- the jury will have to decide based on the

20   evidence, did Mr. Bannon, for example, have an obligation to

21   appear for a deposition on October 14th, or was that

22   deadline malleable or not as set in stone as the government

23   has said?  And I get the government's view is that its case

24   is very strong, but I think these are clear jury questions.

25         Then the issue is in my mind, what, if any,

14

1    relevance, either on that question of default or perhaps

2    even on mens rea, would these later letters have?

3           So imagine, hypothetically, the case is made to

4    the jury that the return dates were malleable, to be

5    negotiated, flexible, not as hard and fast as the government

6    says, and that evidence is there; and the government, of

7    course, has its position on why that wouldn't be sufficient

8    or whatever.

9           And then Mr. Bannon says, Well, and also,

10   inconsistent with my view that the return date was

11   malleable, to be negotiated, et cetera, I later offered to

12   appear.  And that was all consistent.  So why wouldn't that

13   be relevant?

14          **MS. VAUGHN:**  I mean, that's no different from a

15   fraud defendant arguing, I always intended to pay back the

16   money, which courts consistently hold is irrelevant to the

17   issue of whether or not --

18          **THE COURT:**  It's not really the same.  It's saying

19   that the date wasn't hard and fast.  The element of the

20   element, that there had to be an obligation and a particular

21   deadline, he would say it was a malleable date.  There is no

22   similar requirement in a fraud case.

23          He just says, that element, you can't prove it.

24   The reason is, it was a malleable date.  And the evidence I

25   want to put on to show that it was malleable is what

1  happened in October and then my later offer in July to show

2  up.

3          **MS. VAUGHN:**  That just completely erases criminal

4  contempt, Your Honor.  There could be ten defaults.  If the

5  Committee says you have to appear on this day and he doesn't

6  appear, he's in default.  Then the Committee says --

7          **THE COURT:**  I'm not saying it's a strong argument.

8  I'm just asking why the evidence is altogether irrelevant,

9  the government wants to exclude it altogether.

10         **MS. VAUGHN:**  Because the crime of default is

11  complete at the time.  So if the defendant was not aware

12  that the Committee still wanted his information after

13  October 14th; that at the time he defaulted on October 14th,

14  it really has no bearing on his intention to defy the

15  subpoena.

16             And it also creates this perverse incentive where

17  people can just refuse to comply with government orders, go

18  to the brink and then say, Actually, I always intended to

19  comply.  I thought I could comply whenever I wanted to.

20         **THE COURT:**  Well, I'm not saying this is going to

21  be a successful argument, nor am I saying that the

22  government doesn't have evidence to show that these dates

23  weren't malleable.  I'm just saying that if the question of

24  malleability is at least -- has to go to the jury, and if

25  there is some evidence to that question, why isn't later

1  conduct at least potentially relevant to that question?

2  **MS. VAUGHN:** Well, the Supreme Court in *Quinn* says

3  that for there to be a chargeable offense under the statute,

4  there has to exist at that time a clear-cut choice between

5  compliance and contempt. So it is temporal. It's tied to

6  the date of the alleged default.

7  **THE COURT:** And Mr. Bannon says, or may say, There

8  wasn't a clear-cut choice. I thought that the dates were

9  malleable.

10  **MS. VAUGHN:** If he wants to put on evidence that

11  at the time he didn't show up on the 14th, he believed that

12  the dates were malleable, he can do that. If he wants to

13  argue that he read the Committee's October 8th letter as an

14  invitation for a continuing dialogue past the 14th, he can

15  do that.

16  But the fact that the Committee, afterward, is

17  still trying to get information that it's entitled to is not

18  evidence -- it doesn't provide any evidence of what the

19  clear-cut choice was at the charged time.

20  **THE COURT:** So in the government's view, should I

21  be excluding any and all evidence after the date that it

22  says the contempt on the deposition subpoena was completed?

23  **MS. VAUGHN:** The government thinks that that is

24  not relevant to determining whether, on the 14th or the

25  18th, he had a clear-cut choice.

1          **THE COURT:**  So any testimony or documents about

2     events that happened after October 18th is, in the

3     government's view, irrelevant and excludable?

4          **MS. VAUGHN:**  Yeah.  There could be, obviously,

5     instances where it's impeachment evidence.

6          **THE COURT:**  No, I'm talking about, sort of, direct

7     evidence rather than just impeachment.

8          **MS. VAUGHN:**  We don't believe that it provides

9     direct evidence of the defendant's intent and the

10    Committee's provision of a clear-cut choice at the time of

11    the default.

12         **THE COURT:**  Okay.  We've been talking about

13    default.  Obviously I well understand the questions around

14    mens rea.

15         Mr. Bannon has also made an argument about waiver

16    of default.  Can you just address the government's view on

17    that as well?

18         **MS. VAUGHN:**  There's just no support that the

19    government can find in the law that Congress or a Court in a

20    contempt of Court case can waive a criminal offense by just

21    continuing to get -- to try to get compliance.  That would,

22    essentially, turn the criminal contempt statute into a civil

23    contempt statute where someone can erase the past

24    noncompliance by simply complying later.

25         And so the flip side of that is someone can erase

1    their past noncompliance by the government entity seeking

2    it -- continuing to seek it.  It would create this perverse

3    incentive for the government to abandon its efforts to

4    enforce the law or gather information or get testimony or

5    whatever it might be that they are trying to get.  Um -- but

6    it does seem to me to go back to our earlier discussion

7    that, at least in theory, post October 18th statements could

8    go to the question of whether there was actually a clear

9    choice, a clear and cut choice, to appear on a particular

10   date.  Wouldn't it be relevant at least?

11         Imagine, from the government's perspective, a much

12   different scenario where the parties are really negotiating

13   return dates, when to appear and the like.  And rather than

14   send a letter that says, We think you are now in default,

15   there's just a contempt referral -- or I'm sorry, a contempt

16   resolution and then a contempt referral.

17         And while that is going on, the Chairman of the

18   Committee says to the person it's negotiating with, Hey, I

19   always intended these dates to be flexible.  I wanted to

20   work this out.  And even though that happened after the date

21   the government alleges that default occurred, why wouldn't

22   that later statement be at least relevant to the question of

23   whether the date was hard and fast?

24         **MS. VAUGHN:**  Well, I guess when I say "impeachment

25   evidence," that's kind of what I mean.

**-3144-**

1              **THE COURT:**  Okay.

2              **MS. VAUGHN:**  So if Ms. Amerling is testifying and

3      she says, Here is the letter that we sent on the 8th, and we

4      said, You're going to be in default if you don't show up, if

5      there was evidence that she knew the Chairman had expressed

6      something contrary to that letter or had expressed something

7      that undermined the clear words of the letter, that might be

8      relevant.

9              But as far as, sort of, the Committee's -- the

10     individual members', sort of, internal thoughts about

11     whether they still want to try to get compliance and things

12     like that, that's not really relevant.  The relevance is

13     what did the letter -- or what do the communications to the

14     defendant mean?

15             So if there's evidence that they didn't mean what

16     they said they meant, then that would be one thing.  But

17     mere evidence that they're continuing to try to get

18     compliance doesn't really undermine the meaning of the prior

19     letters.

20             **THE COURT:**  I get the impeachment argument, but

21     what if Mr. Bannon wanted to testify and say, Two days after

22     the government took the position that I had missed my

23     clear-cut deadline, Mr. Thompson was telling me it wasn't a

24     real deadline; he wanted me to appear the next week and we

25     should work it out?

1          **MS. VAUGHN:**  That couldn't possibly inform his

2     intent at the time.  It wouldn't be relevant.

3          **THE COURT:**  Wouldn't it go to whether there was a

4     default?  Whether that was, in fact, a hard and fast

5     deadline?

6          **MS. VAUGHN:**  Well, the default is really about

7     what was given to the defendant as a choice.

8          So if the defendant doesn't know about things, it

9     really can't be a choice that he's presented with.  And,

10    again, I think it would go more to this idea of, I'm reading

11    the words on the paper, but there's some evidence later that

12    those words, at that time, did not mean what they meant.  So

13    in your hypothetical, Chairman Thompson's words are sort of

14    backward-facing, like, I didn't mean what I said there.

15         Whereas the evidence that we're talking about is

16    more, You're in default.  We would still like this

17    information.  It's just not the same kind of evidence.

18         **THE COURT:**  Understood.  I get it.  Thank you.

19         Mr. Schoen or -- will you be addressing this as

20    well?

21         **MR. SCHOEN:**  Yeah.

22         **THE COURT:**  Thank you, Ms. Vaughn.

23         **MR. SCHOEN:**  Yes, Your Honor.

24         The Court's right on with its questions, I mean,

25    quite frankly.  This isn't a matter of Chairman Thompson

1    just insisting that they get the information still.  They

2    would really like to get it afterwards.  His words are, on

3    October 19th, "We continue to expect immediate compliance by

4    Mr. Bannon."  Compliance with what?  Compliance with the

5    subpoena that was still open.

6            The contempt referral to Speaker Pelosi, "Continue

7    all efforts to enforce the subpoena."  What subpoena, if

8    there's already been -- and by the way, the logical

9    conclusion of the government's --

10           **THE COURT:**  Well, one can default on a subpoena

11   and still have it be operative and binding on them.  Those

12   are not inconsistent.

13           **MR. SCHOEN:**  I would respectfully disagree with

14   that, Your Honor.  If he defaulted on the subpoena, then the

15   subpoena was extinguished.  That's my position, at least.

16           **THE COURT:**  Okay.

17           **MR. SCHOEN:**  The logical conclusion of the

18   government's argument, I think, points out just how sick,

19   I'll say, the definition of "willfulness" is from *Licavoli*

20   that we're applying.

21           When the government's theory -- when

22   Chairman Thompson wrote to Mr. Costello on the 19th, "Change

23   of course.  We expect compliance with the subpoena," they

24   could have gotten -- Bannon could have come in that day,

25   testified fully, given them all of the documents, and then

**-3147-**

1    they would charge him with criminal contempt still, because

2    according to their definition, he willfully defaulted on

3    the 14th.

4            That can't possibly be the way our system works.

5    It would strip away completely what we've been told in the

6    cases is the constitutionally-mandated accommodation

7    process.  We don't look at this in a vacuum.

8            There was a back-and-forth.  What did

9    President Biden's letter mean through this Jonathan Su on

10   the 18th when he said, on the 18th -- or after the 14th and

11   testimony has occurred already -- and he wrote in there,

12   "There's really no reason now not to comply.  We've already

13   said we don't think privilege applies. I know you may have

14   thought there were some privileges that you had from your

15   discussions with Trump or White House staff, but we've

16   analyzed that.  We don't think so.  Now there's no obstacle

17   to you testifying."

18           The date had already passed on the 14th, according

19   to the government.  The government chose the date to indict

20   -- for the indictment.  They chose not an on-or-about date.

21   They just chose the 14th for his testimony.  Any evidence

22   before or afterwards that shows that wasn't the firm date,

23   that they would have accepted compliance, would have

24   considered it to be compliance after that date, is relevant

25   for the jury.

1          It's not for government counsel to take that away

2     from the jury and decide, Well, actually what he meant was

3     this or what he meant was that.  And this is another

4     reason -- it's not just for impeachment.  It's another

5     reason why Chairman Thompson's presence under subpoena in

6     court is essential.  This goes to the accommodation process.

7     It goes to the back-and-forth; What's meant by compliance in

8     your letter?

9          I think that pretty much --

10         **THE COURT:**  What about -- so it seems to me, as

11    you heard my questioning of Ms. Vaughn, the government has

12    to prove, to prove default, that there was a clear date and

13    obligation and that Mr. Bannon didn't comply with it.  That

14    goes to just the question of the element of default.

15         You've hinted at this argument about waiver of

16    default.  And is your view that that is a separate question

17    from whether there was a default?  Is it, like, that there

18    was a default but it was excused somehow?

19         **MR. SCHOEN:**  I think the arguments are

20    intertwined; that is, that -- listen, the idea that we're

21    transforming this from criminal to civil doesn't hold any

22    water.  We apply civil contract principles in the criminal

23    realm all the time; that's *Santobello*, for example.

24         And so here it applies equally in force that

25    insistence on compliance after a default date arguably works

1    a waiver of the default.  But it also means that there was

2    no default at the time --

3            **THE COURT:**  Right.

4            It would be -- or at least one could argue that

5    it's irrelevant to the question of the component of the

6    default element about whether there was actually an

7    obligation to appear on a particular date.

8            **MR. SCHOEN:**  Right.  And we look at conduct before

9    or after that to determine whether that obligation was a

10   firm obligation that existed or whether it didn't really

11   exist or whether it existed and was waived.

12           **THE COURT:**  Thank you, Mr. Schoen.

13           So I want to just address a couple of other issues

14   before I take -- I think I am going to take a brief recess

15   and then just come back and decide the pending motions.  But

16   just while -- yes, please.

17           **MR. SCHOEN:**  I'm sorry.  May I ask a housekeeping

18   question, though, before?

19           **THE COURT:**  Yes.

20           **MR. SCHOEN:**  First of all, I assume I can sit

21   down, but I think --

22           **THE COURT:**  Well, I do have one question for you

23   that is in the way of housekeeping, which is the --

24   Mr. Bannon, you filed -- lodged your exhibit list last

25   night, I believe.  Do you have any objection to giving the

1    government some time to prepare its objections to your list?

2         **MS. VAUGHN:**  We're ready, Your Honor.

3         **THE COURT:**  You're ready in what sense?

4         **MS. VAUGHN:**  We can address them today.  We sent

5    the objections to the defense this morning.

6         **THE COURT:**  Okay.  Great.  Then you don't have to

7    take a position on that question.

8         **MR. SCHOEN:**  My question, Your Honor, was I made

9    the point -- and I think it's important for us -- that

10   during the course of the trial, or in the next couple of

11   days, I feel it's essential to make a record on any other

12   prejudicial publicity.  I'm trying to think for the Court,

13   though, what's the best way for me to do it.

14        I mean, I saw the shot today, or whenever it was,

15   last night, in the motion, This is the fourth time they're

16   filing.  It may be 10 times or 20 times I'd have to file.  I

17   don't need to call each one a Motion to Continue, I just

18   want to put the evidence in the record.

19        **THE COURT:**  Well, first of all, we can state --

20   and I recognize that you have a continuing objection to this

21   trial occurring on Monday, assuming I deny your pending

22   motion; and that that continuing objection is based on any

23   and all publicity that occurs up through and including the

24   end of the trial date.

25        **MR. SCHOEN:**  The question is for the Court of

1   Appeals, how will they -- I'd like to put in the record --

2           **THE COURT:**  Sure.  I would go ahead and lodge

3   motions --

4           **MR. SCHOEN:**  Okay.

5           **THE COURT:**  -- with whatever evidence you'd like

6   to support.

7           **MR. SCHOEN:**  I can call it a "Notice," if that's

8   preferrable.

9           **THE COURT:**  Yes, that's fine, yes.  And I think

10  it's very well-preserved.  But I understand that you would

11  want it as part of the record when it wouldn't normally be

12  so.  A notice and/or a motion is fine by me.

13          **MR. SCHOEN:**  Thank you, Your Honor.

14          **THE COURT:**  Thank you.

15          So just by way of housekeeping stuff, let me just

16  address a few issues.  As I already said -- I already

17  described, I believe, how voir dire will happen, assuming

18  we're going to trial on Monday.

19          It will be in the ceremonial courtroom down the

20  hall.  I will circulate to the parties today Word versions

21  of the questions that I intend to ask the jurors in a group.

22          As I said, those questions will be, hopefully,

23  amenable to yes-or-no answers.  I will ask the jurors to

24  write down the number of the question or questions only as

25  to which they have "yes" answers.

1          I'll then collect the note cards, and we will call

2     the jurors into the ceremonial courtroom one by one to do

3     what we normally do as a bench conference, but because of

4     COVID, the Court would prefer that we do it in a larger,

5     open setting; and so that will be in the ceremonial

6     courtroom.

7          And we're doing it over there so that we can do

8     the questions to the jury pool as a group in the ceremonial

9     courtroom rather than here, because all of them wouldn't fit

10    in here.  That's how we'll do voir dire on Monday, assuming

11    we're going to trial.

12         As to jury instructions, I have gone through the

13    parties' proposed jury instructions, and I will also be

14    circulating back to the parties today a draft set of

15    instructions.  Obviously some of them are dependent on what

16    happens at trial.  Right?  Whether there's been a prior

17    inconsistent statement.  There are plenty of agreed-upon

18    instructions that may or may not be used.

19         I also recognize, of course, that this is just a

20    set of draft instructions that will have to change depending

21    on -- or may change depending on how the trial goes.  So it

22    is not set in stone, but I would like the parties' continued

23    view on them.  I think it is easier to get them out today

24    rather than to wait until we're midstream in trial.

25         So as to -- I already dealt with the Motion to

1    Appear Pro Hac Vice from Ms. White.  I don't think I have

2    addressed, and I am going to grant, the Motion to Withdraw

3    as Attorney by Mr. Costello.  I think the government didn't

4    have an opposition to that before.  I think it's appropriate

5    and it's granted.  I had intended to deal with that last

6    hearing.

7            As to the other two motions, I'd like to take a

8    brief recess, and I will come back and discuss them.  And

9    then I'm happy to discuss any other issues, trial exhibit

10    objections and the like when we come back.  Okay?

11           (Recess from 10:40 a.m. to 10:55 a.m.)

12           **THE COURT:**  Thank you, Ms. Lesley.

13           So, Mr. Bannon has filed a renewed Motion to

14    Continue, ECF No. 108 for the same reasons that I denied the

15    prior Motion to Continue earlier this week, I'm going to

16    deny this Motion to Continue.  Mr. Bannon still, in my view,

17    has not shown sufficient cause warranting the further delay

18    or a delay of this trial.

19           As I said at the hearing earlier this week, I am

20    cognizant of concerns about publicity and bias and whether

21    we can seat a jury that is going to be appropriate and fair.

22           But, as I said before, I believe the appropriate

23    course is to go through the voir dire process, and I have

24    every intention of getting a jury that is going to be

25    appropriate and fair and unbiased.  But if we can't find 14

1     jurors who are so, I will then entertain the question of

2     whether we should continue the trial.  But we are going to

3     do the voir dire first.

4              As to the Motion in Limine to Exclude Evidence or

5     Argument, which is about whether the two recent letters, the

6     letter from President Trump to Mr. Bannon and from

7     Mr. Bannon to the Committee, are excluded for all purposes,

8     I am going to deny/hold that motion in abeyance.  Here is

9     why:  At the last hearing, I granted in part and denied in

10    part a number of evidentiary motions from the government on

11    the grounds that it was at least possible that Mr. Bannon

12    could proffer, outside the presence of the jury, the

13    argument that either the return date, the obligation date

14    under the subpoenas, was not the date the government says or

15    that he did not deliberately, intentionally not comply with

16    his obligations to appear on those dates, perhaps because he

17    believed that those dates were not operative.

18             And so I denied the government's motion insofar as

19    it would necessarily have precluded such evidence or

20    testimony.  And I basically said, I haven't yet required

21    Mr. Bannon to make a proffer about that kind of argument.

22    It's too early.  We are not at trial.  If he's able to make

23    a proffer, then that evidence might come in.

24             It seems to me, therefore, that this evidence we

25    are talking about now is at least potentially relevant,

30

1    potentially relevant, if such proffers are made, to the

2    question of whether there was a clear-cut obligation to show

3    up on the particular dates.  Either in the sense that just

4    the dates were the dates or in the sense that Mr. Bannon

5    acted deliberately and intentionally in not complying with

6    them, in the sense of *Licavoli*, because he believed the

7    dates were not, in fact, the dates.

8              If he makes that proffer and we hear evidence on

9    those questions, I think it's at least hypothetically

10   possible that he could argue that these letters, the more

11   recent letters, are consistent with that understanding at

12   the time.

13             But as with the other evidence about the dates and

14   his belief at the time about the dates, I am going to need a

15   proffer from Mr. Bannon at trial -- I'm not requiring it

16   yet, before this information goes in front of the jury.  So

17   whether we call it motion denied or held in abeyance pending

18   the trial, that's where we are.

19             So we're still going to be at trial Monday.  I am

20   not absolutely excluding evidence of the letter to the

21   Committee or the letter from President Trump to Mr. Bannon.

22             **MR. SCHOEN:**  May I ask a question?

23             **THE COURT:**  Yes, Mr. Schoen.

24             **MR. SCHOEN:**  Logistic question.  How exactly does

25   the Court see this working chronologically?  In other words,

1    this evidence is directly relevant for cross-examination

2    when the government puts on its case-in-chief.  I don't need

3    to go into --

4        **THE COURT:**  The cross.  I agree.

5        So logistically, I think I need to know more

6    then -- before the cross begins, I would like, essentially

7    outside of the jury, so the direct will have happened and

8    the cross -- assuming you will want to do the cross, I want

9    to have a conversation outside of the presence of the jury

10   about what you intend to show through the cross, as it

11   relates to elements that we have discussed are clearly

12   relevant in my view in this case.  And I'll just want to

13   understand what you intend to elicit through the use of

14   these documents if you would like to use them.

15       **MR. SCHOEN:**  I understand, Your Honor.  I thought

16   the Court meant something else.

17       I did want to take exception to the idea that

18   Mr. Bannon himself would have to make a proffer as to what

19   his belief was at the time.  I think this evidence is

20   directly relevant on cross-examination regardless of

21   whether -- of what Mr. Bannon's belief was.

22       **THE COURT:**  Fair enough.

23       **MR. SCHOEN:**  I think it goes independently as to

24   whether there was a default or whether there was a waiver of

25   default.

1          **THE COURT:**  Fair enough.

2          Yes, so I basically think that as it relates to

3     these two letters and/or -- I just want to make sure that --

4     this is obviously complicated in a sense because -- I agree

5     with you that *Licavoli* is very distorting in a sense; and

6     that evidence that might naturally be relevant to willful

7     default and the like, if willfulness required known

8     avoidance of a legal duty, ba, ba, ba, the line between its

9     exclusion and not is a little bit unclear.  I'm obviously,

10    in my view, bound by that.

11          And I just want to make sure that I have time to

12    police that line before we get into evidence that starts to

13    sound a lot more like an incorrect view of willfulness in

14    light of *Licavoli*.

15          **MR. SCHOEN:**  Understood, Your Honor.

16          It doesn't matter who or what I agree with, it

17    doesn't matter what the Court agrees with, but I would

18    say --

19          **THE COURT:**  Yes.

20          **MR. SCHOEN:**  -- back to the earlier discussion, I

21    do see the two as conceptually independent, that is, whether

22    there was a default or waiver of default and the other

23    element, the willful element.

24          **THE COURT:**  I agree.  I agree.  The government has

25    to prove that there was a default and it has to prove that

1    it was deliberate and intentional.  Those are separate.

2            **MR. SCHOEN:**  Thank you, Your Honor.

3            **THE COURT:**  They're related but they're separate.

4            **MR. SCHOEN:**  Yes, Your Honor.

5            Thank you, Your Honor.

6            **MS. VAUGHN:**  Your Honor, can I ask one follow-up

7    question?  We would also ask that before the defense argues

8    about this evidence in opening, that they either refrain

9    from doing so or we evaluate their proffer before they do

10   that.

11           **THE COURT:**  So that's a fair point.

12           Is the defense prepared to discuss that now or

13   would you like to have some time to discuss what you would

14   like your opening to say and then to have that conversation

15   before the openings?  That is to say, perhaps after we've

16   done jury selection but before we do openings.

17           **MR. CORCORAN:**  I don't think there's a need for

18   either of that.  We're not going to mention the letters in

19   opening.

20           **THE COURT:**  Very well.  Thank you.

21           So what other logistical things should we discuss

22   today?  We've talked about voir dire.  We've talked about

23   jury instructions.  We've talked about the trial starting on

24   Monday at 9 a.m. -- well, jury selection will begin at 9

25   a.m. on Monday in the ceremonial courtroom.

34

1          I have -- I now have exhibit lists from both

2     parties, and I have witness lists from both parties.  It

3     sounds like the government -- while the defendant's exhibit

4     list was a little late, the government has now had the

5     opportunity to lodge objections to them.

6          Ms. Vaughn, is it your view that I should be

7     hearing argument on those objections at this time?

8          **MS. VAUGHN:**  Your Honor, we don't have any problem

9     with addressing objections to both parties' exhibits now in

10     an effort to make the trial efficient.  And, obviously, if

11     there are issues that are going to rely on what testimony

12     comes in at trial --

13          **THE COURT:**  I must admit I would rather wait.

14          **MS. VAUGHN:**  Okay.

15          **THE COURT:**  It seems to me that we have the

16     technology to have the particular document published to me

17     only.  If the witness needs to be asked a couple questions

18     where the jury hasn't seen the document, we can do that.

19     And I would rather take up specific objections now where we

20     know what the specific issue is, why it's being introduced

21     rather than just doing it, in a sense, a little bit

22     acontextually.

23          **MS. VAUGHN:**  I think that's fine with the

24     government.

25          **THE COURT:**  We're not talking about a ton of

35

1    exhibits also.  I don't know that we're -- by my count we

2    have something like 35 total exhibits having been proposed.

3    I don't know if there's overlap.  I think there is a little

4    bit of overlap, so maybe a total of 25 to 30 nonoverlapping

5    exhibits.

6         It seems to me that we can do this trial

7    efficiently by taking up any objections to particular

8    exhibits as they are offered.

9         **MS. VAUGHN:**  That works for the government.

10        There are a couple other matters the government

11   would like to address.

12        **THE COURT:**  Yes.

13        **MS. VAUGHN:**  We would like to invoke the rule on

14   witnesses [sic] now or notify the Court that we want to do

15   that so that they are all excluded.

16        **THE COURT:**  Yes.

17        **MS. VAUGHN:**  It doesn't look like any of the

18   defendant's proposed exhibits include anything that we did

19   not already know about or have.  But the government has been

20   requesting, has never received reciprocal discovery, so we

21   just wanted to notify the Court and the defendant that

22   should he offer something we've never seen or never been

23   provided in reciprocal discovery at trial, we plan to move

24   to exclude that evidence.

25        **THE COURT:**  Okay.  So you are preemptively

**-3161-**

1    notifying the defendant that you will seek to exclude

2    evidence that you are not presently aware of.

3        **MS. VAUGHN:**  And letting the Court know that in

4    our view, to the extent there's reciprocal discovery, those

5    obligations have not been complied with.

6        And then we had a couple of other questions about

7    how the Court plans to handle jury selection.

8        **THE COURT:**  Yes.

9        **MS. VAUGHN:**  Is it the Court's practice to allow

10   the attorneys to ask follow-up questions during individual

11   voir dire?  Obviously understanding that there are limits on

12   how long we can do that and the scope of what we can ask.

13       **THE COURT:**  So here is how I normally do it.  I

14   don't prevent lawyers from asking questions.  Typically what

15   I will do is, I will pose some inquiry to the juror about

16   the reasons for the "yes" answers, explore a little bit

17   what's sort of obvious from the card.  Why did you answer

18   "yes" to Question 10?  Can you tell us a little more about

19   that?  Ba, ba, ba.

20       And then depending how that goes, I may say to the

21   government or defense counsel, Do you have anything you'd

22   like to follow up on?  And then see what counsel says.  So I

23   do not prohibit, altogether, questioning by counsel of the

24   of the jurors.  But I typically, for lack of a better word,

25   do the first set.  Okay?

1    **MS. VAUGHN:**  Got it.

2         And does the Court anticipate doing simultaneous

3    strikes for our peremptories or alternating?

4         **THE COURT:**  I think in this case, that we should

5    do alternating.

6         **MS. VAUGHN:**  Okay.

7         **THE COURT:**  Yeah.

8         **MS. VAUGHN:**  I think that was all the other

9    matters the government had questions on.

10        Thank you, Your Honor.

11        **THE COURT:**  Thank you.

12        Please.  Mr. Corcoran.

13        **MR. CORCORAN:**  Your Honor, with regard to

14   exhibits -- we agree with the Court's approach obviously.

15        One thing, and that is the use of exhibits in

16   opening by the government.  We would ask -- there are a

17   couple of exhibits, really I think just two, that are for

18   Mr. Bannon's Gettr account, which are articles, essentially,

19   and pictures of him.  And we would just ask that any exhibit

20   that we have objected to not be used or displayed to the

21   jury in opening by the defense.

22        **THE COURT:**  I agree with that.

23        I mean, I suppose you may not know what you intend

24   to do, but at least right now where I haven't ruled one way

25   or the other on whether a document's going to be admitted, I

1  would like those objected-to exhibits not to be used during

2  your openings.

3        If either party believes that it wants to use,

4  during the opening, a document to which there's an

5  objection, then we should discuss those documents now.

6        **MR. CORCORAN:**  The other housekeeping issue is,

7  we've asked the government to see the original of the

8  Subpoena.  The original, wet, signed copy of the Subpoena.

9  And essentially have not gotten that.  And we'd ask either

10  this weekend or bring it Monday.

11        There's not going to be a chain of custody issue.

12  We're not going to raise any chain of custody objection, if

13  an FBI agent -- the lawyers can bring it, essentially.  But

14  we would like to see the original.

15        Thank you.

16        **THE COURT:**  Okay.  Thank you, Mr. Corcoran.

17        Ms. Vaughn, what are your positions on these

18  two questions?

19        **MS. VAUGHN:**  Well, Your Honor, the government

20  doesn't have the original with the wet signature.  We only

21  ever got a copy from Congress.  So we can't provide that.

22        And the government doesn't plan to use any

23  exhibits in opening, but this does raise concerns because

24  obviously the government plans to discuss the correspondence

25  back and forth, and the defendant has objected to all

1    correspondence that his own attorney didn't write.

2           So I understand the Court's view that we should

3    wait, but that really does have a bearing on the

4    government's opening to be able to reference their

5    back-and-forth.

6           **THE COURT:**  So, for example, the government would

7    intend to discuss, potentially at least, Exhibit 5, which is

8    the October 8th, 2021 letter from Chairman Thompson to

9    Mr. Costello.

10          **MS. VAUGHN:**  Correct.  That one and the one on

11   the  15th [sic].

12          **THE COURT:**  Okay.  I didn't hear Mr. Corcoran

13   mention those documents.  I did, in a sense.

14          But, Mr. Corcoran, does Mr. Bannon object to

15   discussing, not showing maybe, but discussing at least --

16          **MS. VAUGHN:**  Yeah, we don't plan to show anything.

17          **THE COURT:**  -- those two letters in opening?  They

18   are not the documents about the Gettr account, as I

19   understand it.

20          **MS. VAUGHN:**  Correct.

21          **MR. CORCORAN:**  Discussing the letter, if

22   discussing the letters includes sending out their content,

23   then we would have the same hearsay objection that we've

24   raised to the exhibit.

25          If discussing the letters is limited to a letter

1    was sent in response, a letter -- you know, sort of in

2    general terms that doesn't get into the content of the

3    letter, we don't have an objection to that.

4           **THE COURT:**  So, Ms. Vaughn, just to be very clear

5    about it, you are talking about which letters exactly?

6           **MS. VAUGHN:**  So -- I mean, the admission of these

7    letters is the government's case.  Because they're

8    notifications to the defendant of the Committee's position.

9    So we're talking about -- they object to the October 8th

10   letter to the defendant and --

11          **THE COURT:**  I get -- yeah.

12          **MS. VAUGHN:**  These are the ones we plan to mention

13   in opening --

14          **THE COURT:**  That's my question.

15          **MS. VAUGHN:**  -- and with our first witness.

16          **THE COURT:**  Okay.

17          **MS. VAUGHN:**  And the October 15th letter.

18          **THE COURT:**  So those two.  So that's Exhibits 5

19   and 7.

20          **MS. VAUGHN:**  And Exhibit 9, the government doesn't

21   plan to use that in its case-in-chief.

22          **THE COURT:**  Okay.  And there are objections from

23   Mr. Bannon that they are hearsay and hearsay within hearsay.

24          **MS. VAUGHN:**  Uh-huh.

25          **THE COURT:**  So what's the government's response to

1    that?

2         **MS. VAUGHN:**  They are not being offered for the

3    truth.  So we're not offering the letters to prove what the

4    Committee's position was.  We're offering the letters to

5    show that the defendant was put on notice of what the

6    Committee's position was.

7              And in addition, there are comments in there like

8    directions to comply that are not actually assertions of

9    fact such that they would even qualify as hearsay, they're

10   imperative statements.

11             And the evidence about what the Committee's

12   position was is just going to come in through a witness who

13   was there and has personal knowledge.  These letters are

14   just the evidence that the defendant was made aware of the

15   position.  So we're not offering them for their truth.

16        **THE COURT:**  Okay.  Thank you, Ms. Vaughn.

17             Mr. Corcoran, what do you say?

18        **MR. CORCORAN:**  So, if I heard the government's

19   position correct that Exhibit 5, for example, which is the

20   one that I'm looking at here, is offered not for the truth

21   of any statement that's made in there but simply in some

22   ways that notice was given to the defendant on some subject.

23   And my response is that I don't believe that that's

24   accurate.

25             So this is a three-page letter that is setting

1    forth the position of a person on a lot of different issues.

2    In other words, it's a statement about a lot of different

3    things and legal positions; that person is

4    Chairman Thompson.  And as you know, we've subpoenaed him to

5    appear.

6              And so it certainly might be a different question

7    as to the admissibility of this document if he appeared in

8    court and was subject to cross-examination about what is

9    asserted in this letter.

10             In terms of notice, for instance, that he got a

11   subpoena or something like that, that will be, I understand

12   it, established through a witness that is being provided to

13   the government, somebody who was on their list,

14   Ms. Amerling, staff member, the only staff member who had

15   any communication with -- well, not the only staff member

16   but the main staff member who had communication with

17   Mr. Costello.

18             So these are not her words, but she will be able

19   to testify if the notice that the government seeks to

20   establish -- they'll be able to establish that through her

21   testimony, which of course, will be subject to

22   cross-examination here as required by the Sixth Amendment.

23             But to simply allow the government, as Ms. Vaughn

24   has said, you know, to make their whole case through

25   letters, lengthy letters, describing legal positions on a

43

1    topic, hearsay within hearsay, without allowing any

2    cross-examination of the person who is making that

3    statement, is error, Your Honor.

4        **THE COURT:**  So let's be a little bit more

5    specific, I suppose, if we can.  Let's imagine we take the

6    second paragraph in the letter -- sorry -- the paragraph

7    that says "Second."  "Second, the Select Committee has not

8    received any assertion, formal or otherwise, of any

9    privilege from Mr. Trump.  That sentence appears in here."

10            One question is whether this letter is being

11    offered for the truth of the fact that the Select Committee

12    has not received any assertion, formal or otherwise, of my

13    privilege from Mr. Trump.

14            I hear Ms. Vaughn to be saying that the letter is

15    not being offered for the truth of that underlying fact.

16    But I think your argument then is, But the letter is being

17    offered to prove the fact that that is the Select

18    Committee's -- was the Select Committee's position, and that

19    is an out-of-court statement by someone that that is the

20    Select Committee's position and it is, therefore, offered to

21    prove the truth of that matter.

22            Do I understand that correctly?

23        **MR. CORCORAN:**  That's right.

24            And maybe the better way to proceed, because these

25    are lengthy letters, is if the government is saying, We are

**-3169-**

44

1    offering this letter for a nonhearsay purpose that's

2    contained in the letter to provide the Court and defense

3    counsel with a redacted letter that just shows what their --

4    what the nonhearsay purpose of the letter would be.

5         Because, as I said, most of the letter citing

6    cases, talking about, you know, purported privileges, all

7    this kind of stuff, it's not sort of plain vanilla,

8    nonhearsay purpose.  And anything that is kind of a plain

9    vanilla, we're offering this letter to let the jury know

10   that Mr. -- that at least we sent a letter providing notice,

11   can be done in a redacted way that eliminates all of the

12   hearsay stuff.

13        **THE COURT:**  Thank you, Mr. Corcoran.

14        Ms. Vaughn.

15        **MS. VAUGHN:**  So, Your Honor, the government, to

16   show a willful default, has to show that when a witness

17   makes some sort of objection to appearing, that he's not

18   left hanging; that the Committee makes clear to him, We are

19   rejecting your reason for not appearing.  That's exactly

20   what this is.

21        It doesn't matter if it's true whether this was --

22   for the purposes of the relevance of this letter, it doesn't

23   matter if it was true that that was the Committee's

24   position.  Ms. Amerling is going to testify independently, I

25   was part of this.  This is our position.

1           This letter is only relevant because it shows that

2    the defendant was aware that his objections had been

3    rejected and that he was being directed to appear; that's

4    the relevance of this letter.

5           So we're not offering this to prove the

6    separate --

7           **THE COURT:**  What do you intend -- I don't mean to

8    get into your trial strategy, but since the most imminent

9    thing is what you intend to say in your opening about this

10   letter, what is it that you intend to say?

11          **MS. VAUGHN:**  So we intend to point out that the

12   defendant responded to the Committee subpoena by raising an

13   objection and claiming that he did not have to appear

14   because he had a privilege; and that the Committee then

15   responded and rejected that the supposed privilege was a

16   basis not to appear and then directed him to the proper

17   procedures of what he was supposed to do to comply with the

18   subpoena.

19          So I could go paragraph by paragraph, but none of

20   this is offered to prove that he -- it doesn't matter if the

21   Committee was right about its position on what executive

22   privilege was or was not.  We're not offering it to prove

23   that their claim that you don't have executive privilege is

24   actually true.

25          **THE COURT:**  But you are offering it to prove that

1    the Committee's position was this position --

2            **MS. VAUGHN:**  That's not --

3            **THE COURT:**  -- arising in an out-of-court

4    statement offered to prove that that was, in fact, the

5    Committee's statement -- position at the time.

6            **MS. VAUGHN:**  That's not the purpose that we are

7    entering this letter for.

8            **THE COURT:**  Okay.

9            **MS. VAUGHN:**  Ms. Amerling is going to testify

10   separately that we got a subpoena -- or we got a letter from

11   him asserting that he had this privilege.  The Committee did

12   not think that it provided a basis for his noncompliance, so

13   we sent him a letter notifying him of that fact.

14           **THE COURT:**  Okay.  That seems fine to me for

15   purposes of opening.

16           The question of whether the letter can be used

17   beyond that, I think I need to hear more on.  Because I

18   think the government agrees -- or do you agree, that the

19   letter at least would present a hearsay question if it was

20   being offered to prove the truth of, for example, the

21   statement that the Select Committee has not received any

22   assertion, formal or otherwise, of any privilege of

23   Mr. Trump.  That would be a hearsay problem.

24           **MS. VAUGHN:**  Select Committee -- if we offered it

25   to prove that they have not received the assertion, that

1    would be a hearsay problem.

2              We actually don't care if they ever received an

3    assertion.  What matters for the point of this case was that

4    the defendant was made aware that his position had been

5    rejected and that he was directed to appear.

6              Tellingly, I think, the defendant does not appear

7    to object to -- or I think the defendant is seeking to

8    enter, in his own case, his own agent statements to the

9    Committee, which are clearly hearsay when offered by him if

10   he's taking this same position that the assertions and the

11   letters are being offered for hearsay.  But they are not.

12   They're being offered to show that there was notice going

13   back and forth about the various --

14             **THE COURT:**  About what the positions were, not

15   whether the positions were --

16             **MS. VAUGHN:**  Exactly.

17             **THE COURT:**  -- whether the underlying facts were

18   true.

19             But what about Mr. Corcoran's argument that they

20   are being offered to prove that this is an out-of-court

21   statement being offered to prove that this was, in fact, the

22   Committee's position at the time?

23             **MS. VAUGHN:**  We are just not offering it to prove

24   that.

25             **THE COURT:**  You're offering it to prove that

1   notice was provided to the defendant that that was the

2   Committee's position at the time?

3           **MS. VAUGHN:**  Exactly.

4           **THE COURT:**  Just as Mr. Bannon will offer -- you

5   would probably acknowledge is appropriate -- that he can

6   offer these letters not to prove the underlying fact of his

7   position at the time, but that he provided notice to the

8   Committee at the time of his position.

9           **MS. VAUGHN:**  When he offers them, yes.

10          **THE COURT:**  Yes, exactly.

11          **MS. VAUGHN:**  Obviously when we offer his letters,

12  they're statements of a party opponent --

13          **THE COURT:**  That's what -- yes.

14          **MS. VAUGHN:**  But, for example, so the D.C.

15  Circuit, in *Hall*, 945 F3d. 507, that is a case where the

16  defendant's trying to offer his attorney's statements to him

17  that his fraud conduct was legal.  It's not being offered to

18  prove it's actually legal, it's just being offered to prove

19  that that was the defendant's belief.

20          **THE COURT:**  So here's what we're going to do for

21  purposes of the opening.  I think it's fine for the

22  government to mention these letters.  It sounded to me like

23  the government is going to mention them in less detail --

24          **MS. VAUGHN:**  Yeah.

25          **THE COURT:**  -- than would be provided through the

1    letter itself, if it's either through a witness or if the

2    government had been proposing, which it's not, to show them

3    to the jury.

4         It does seem to me that it is not a hearsay

5    problem to introduce something for the -- to establish that

6    notice of a position was provided rather than the truth of

7    the position.  But I don't have to confront all of those

8    nuances at this moment for purposes of the opening because

9    your representations about what you intend your opening to

10   be are sufficient to me, because they don't get into, it

11   seems to me, even the really core potential hearsay issues.

12   Okay?

13        **MS. VAUGHN:**  And if it would be helpful to the

14   Court, we're happy to provide the authority that we're

15   relying on for their admission at trial.

16        **THE COURT:**  It might be helpful.  It seems to me

17   that both parties have this issue.  I don't want to

18   overburden folks with a ton of briefing.  You have a lot

19   going on.

20        But I would ask that perhaps by midday Monday -- I

21   suspect we'll still be in the middle of jury selection --

22   that the parties set out for me, in five pages or less,

23   their views about whether these letters back and forth --

24   because obviously Mr. Bannon was sending letters to the

25   Committee and the Committee was sending letters to

1   Mr. Bannon -- whether and to what extent they're admissible

2   and for what purposes.

3          **MS. VAUGHN:**  Thank you.

4          **THE COURT:**  Thank you.

5          So that's that question.  There was another

6   question you had raised, Mr. Corcoran.

7          **MR. CORCORAN:**  Well, yes.  Just the original

8   Subpoena.  We want to see it.

9          **THE COURT:**  Yes.

10         **MR. CORCORAN:**  And the counsel kind of brushed it

11  off and said, We don't have it.  But we're entitled to see

12  it, and they have the ability to get it, I'm sure, and track

13  that down.

14         **THE COURT:**  Ms. Vaughn, why can't the House

15  witness bring it?

16         **MS. VAUGHN:**  I mean, we can ask, but we don't have

17  any ability to force them to give us things.  It's just like

18  their Discovery Motion early on that Congress is not part of

19  the prosecution team.

20         **THE COURT:**  I could order it.

21         **MS. VAUGHN:**  Mr. Letter might say speech or

22  debate, you know.  I don't know.  I just don't know how they

23  will -- I guess -- I don't know what the relevancy of it is.

24         **THE COURT:**  It's not totally clear to me either,

25  but it also seems like something that we should spend

1    essentially no time fighting over.

2              So I would like you to reach out to the House and

3    ask them, at my direction -- and you can communicate it's

4    coming from me -- to please provide you and, thereby defense

5    counsel, with the original copy of the Subpoena.  And to

6    notify me by 4 p.m. tomorrow if that's not going to happen.

7              **MS. VAUGHN:**  And just, logistically, does the

8    Court mean bring it on Monday or just that we need to

9    arrange separately --

10             **THE COURT:**  Make an arrangement.  I think Monday

11   morning would be fine.

12             **MS. VAUGHN:**  -- for them to view it?

13             **THE COURT:**  Yes, for them to view it.

14             **MS. VAUGHN:**  Okay.  Great.

15             **THE COURT:**  Any other topics for today?

16             (No response)

17             Thank you, Counsel.

18             Thank you, Counsel.

19             See you Monday morning.

20             (Proceedings concluded at 11:25 a.m.)

21

22

23

24

25

52

1                    **C E R T I F I C A T E**

2


3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

10    _____July 14, 2022_____          _/s/_____
                **DATE**                    **Lorraine T. Herman**
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**-3178-**

**DEPUTY CLERK:**
**[1]** 2/3
**MR.**
**CORCORAN: [9]**
2/11 33/17 37/13
38/6 39/21 41/18
43/23 50/7 50/10
**MR. SCHOEN:**
**[28]** 2/21 2/24 3/9
4/8 5/24 6/6 6/17
20/21 20/23 21/13
21/17 23/19 24/8
24/17 24/20 25/8
25/25 26/4 26/7
26/13 30/22 30/24
31/15 31/23 32/15
32/20 33/2 33/4
**MS. GASTON: [6]**
6/20 6/22 7/7 7/17
8/6 8/15
**MS. VAUGHN:**
**[75]**
**THE COURT:**
**[116]**

/

/s [1] 52/10

**1**

**10 [2]** 25/16 36/18
**100-6 [1]** 1/15
**108 [2]** 2/19 28/14
**10:06 [2]** 1/6 2/2
**10:40 [1]** 28/11
**10:55 [1]** 28/11
**11:25 [1]** 51/20
**14 [4]** 1/5 8/3
28/25 52/10
**14th [15]** 11/11
12/5 12/6 12/13
12/23 13/21 15/13
15/13 16/11 16/14
16/24 22/3 22/10
22/18 22/21
**15th [2]** 39/11
40/17
**16th [1]** 12/18
**1793 [1]** 1/13
**18th [6]** 11/12
16/25 17/2 18/7
22/10 22/10
**19th [2]** 21/3
21/22

**1:21-670 [1]** 1/3

**2**

**20 [1]** 25/16
**20001 [2]** 1/13
1/24
**201 [1]** 1/19
**202-252-1793 [1]**
1/13
**2021 [2]** 10/18
39/8
**2021-670 [1]** 2/4
**2022 [2]** 1/5 52/10
**21201 [1]** 1/19
**2225 [1]** 1/20
**25 [1]** 35/4
**25th [1]** 1/19
**2800 [1]** 1/15

**3**

**30 [1]** 35/4
**333 [1]** 1/23
**334-395-6611 [1]**
1/16
**35 [1]** 35/2
**36106 [1]** 1/16

**4**

**410-385-2225 [1]**
1/20
**4700-C [1]** 1/23
**4th [1]** 1/12

**5**

**507 [1]** 48/15
**555 [1]** 1/12

**6**

**6611 [1]** 1/16
**670 [2]** 1/3 2/4

**8**

**8th [4]** 16/13 19/3
39/8 40/9

**9**

**945 [1]** 48/15

**A**

**a.m [7]** 1/6 2/2
28/11 28/11 33/24
33/25 51/20
**abandon [1]** 18/3
**abeyance [2]** 29/8
30/17

ability [2] 50/12
50/17
able [4] 29/22
39/4 42/18 42/20
about [53]
above [1] 52/5
above-entitled [1]
52/5
absolutely [1]
30/20
accepted [1]
22/23
accommodation
[2] 22/6 23/6
according [2]
22/2 22/18
account [2] 37/18
39/18
accurate [1]
41/24
acknowledge [1]
48/5
acontextually [1]
34/2
act [1] 9/21
acted [1] 30/5
Action [1] 1/3
actually [10] 11/5
11/18 15/18 18/8
23/2 24/6 41/8
45/24 47/2 48/18
addition [1] 41/7
additional [2]
2/25 3/3
address [5] 17/16
24/13 25/4 26/16
35/11
addressed [1]
28/2
addressing [2]
20/19 34/9
admissibility [1]
42/7
admissible [1]
50/1
admission [2]
40/6 49/15
admit [1] 34/13
admitted [1]
37/25
after [11] 11/17
15/12 16/21 17/2
18/20 19/21 22/10
22/24 23/25 24/9

33/15
afternoon [1] 5/3
afterward [1]
16/16
afterwards [2]
21/2 22/22
again [3] 3/21 8/5
20/10
agent [2] 38/13
47/8
agree [9] 10/25
31/4 32/4 32/16
32/24 32/24 37/14
37/22 46/18
agreed [1] 27/17
agreed-upon [1]
27/17
agrees [2] 32/17
46/18
ahead [1] 26/2
aided [1] 1/25
air [1] 3/13
AL [1] 1/16
all [22] 3/20 3/24
4/10 4/14 4/17
10/11 14/12 16/21
21/7 21/25 23/23
24/20 25/19 25/23
27/9 29/7 35/15
37/8 38/25 44/6
44/11 49/7
alleged [1] 16/6
alleges [1] 18/21
allow [2] 36/9
42/23
allowing [1] 43/1
already [8] 21/8
22/11 22/12 22/18
26/16 26/16 27/25
35/19
also [9] 14/9
15/16 17/15 24/1
27/13 27/19 33/7
35/1 50/25
alternating [2]
37/3 37/5
altogether [3]
15/8 15/9 36/23
always [6] 12/12
12/12 12/18 14/15
15/18 18/19
am [7] 15/21
24/14 28/2 28/19
29/8 30/14 30/19

AMANDA [2] 1/11
2/8
amenable [1]
26/23
Amendment [1]
42/22
AMERICA [2] 1/2
2/4
Amerling [4] 19/2
42/14 44/24 46/9
analyzed [1]
22/16
another [4] 11/24
23/3 23/4 50/5
answer [4] 5/9
5/19 7/13 36/17
answerable [1]
5/6
answered [1]
5/15
answers [8] 4/4
5/7 5/7 5/17 8/12
26/23 26/25 36/16
anticipate [1]
37/2
any [30] 3/21 5/18
5/20 7/11 13/25
16/18 16/21 17/1
22/21 23/21 24/25
25/11 25/22 28/9
34/8 35/7 35/17
37/19 38/12 38/22
41/21 42/15 43/1
43/8 43/8 43/12
46/21 46/22 50/17
51/15
anything [5] 5/18
35/18 36/21 39/16
44/8
Appeals [1] 26/1
appear [20] 9/6
9/10 11/1 12/13
13/21 14/12 15/5
15/6 18/9 18/13
19/24 24/7 28/1
29/16 42/5 45/3
45/13 45/16 47/5
47/6
appearance [1]
9/19
APPEARANCES
[1] 1/10
appeared [1] 42/7
appearing [2]

**A**

appearing... [2]
44/17 44/19
appears [1] 43/9
applies [2] 22/13
23/24
apply [1] 23/22
applying [1]
21/20
approach [1]
37/14
appropriate [7]
4/24 5/4 28/4
28/21 28/22 28/25
48/5
appropriately [1]
13/10
are [68]
arguably [1]
23/25
argue [3] 16/13
24/4 30/10
argues [1] 33/7
arguing [1] 14/15
argument [16]
2/17 2/25 10/9
12/10 15/7 15/21
17/15 19/20 21/18
23/15 29/5 29/13
29/21 34/7 43/16
47/19
arguments [3]
3/1 8/12 23/19
arising [1] 46/3
around [1] 17/13
arrange [1] 51/9
arrangement [1]
51/10
articles [2] 3/18
37/18
as [47] 3/2 4/3 8/8
9/8 11/11 11/12
11/20 13/22 13/22
14/5 14/5 16/13
17/17 19/9 19/9
20/7 20/19 23/10
26/11 26/16 26/22
26/24 27/3 27/8
27/12 27/25 28/3
28/7 28/19 28/22
29/4 29/18 30/13
31/10 31/18 31/23
32/2 32/21 35/8
39/18 41/9 42/4

42/7 42/22 42/23
44/5 48/4
aside [1] 9/25
ask [20] 4/2 5/8
5/20 7/4 7/25 7/25
24/17 26/21 26/23
30/22 33/6 33/7
36/10 36/12 37/16
37/19 38/9 49/20
50/16 51/3
asked [3] 5/4
34/17 38/7
asking [2] 15/8
36/14
asks [1] 7/10
asserted [1] 42/9
asserting [1]
46/11
assertion [5] 43/8
43/12 46/22 46/25
47/3
assertions [2]
41/8 47/10
assume [1] 24/20
assuming [4]
25/21 26/17 27/10
31/8
assumptions [1]
7/19
attached [1] 3/6
attorney [3] 1/15
28/3 39/1
attorney's [1]
48/16
attorneys [2] 1/12
36/10
authority [1]
49/14
Avenue [1] 1/23
avoidance [1]
32/8
aware [6] 5/22
15/11 36/2 41/14
45/2 47/4
away [2] 22/5
23/1

**B**

ba [6] 32/8 32/8
32/8 36/19 36/19
36/19
back [14] 10/8
14/15 18/6 22/8
23/7 24/15 27/14

28/8 28/10 32/20
38/25 39/5 47/13
49/23
backward [1]
20/14
backward-facing
[1] 20/14
Baltimore [1]
1/19
Bankruptcy [1]
1/22
BANNON [34] 1/5
2/5 3/12 8/20 8/21
9/9 9/21 10/20
11/4 12/14 13/20
14/9 16/7 17/15
19/21 21/4 21/24
23/13 24/24 28/13
28/16 29/6 29/7
29/11 29/21 30/4
30/15 30/21 31/18
39/14 40/23 48/4
49/24 50/1
Bannon's [4] 3/20
8/20 31/21 37/18
based [3] 13/18
13/19 25/22
basically [2]
29/20 32/2
basis [2] 45/16
46/12
be [88]
bear [1] 7/21
bearing [2] 15/14
39/3
because [24]
3/14 6/15 6/24 7/1
10/24 11/23 12/24
15/10 22/1 27/3
27/9 29/16 30/6
32/4 38/23 40/7
43/24 44/5 45/1
45/14 46/17 49/8
49/10 49/24
been [14] 5/1
12/12 12/12 17/12
21/8 22/5 27/16
35/2 35/19 35/22
36/5 45/2 47/4
49/2
before [15] 1/8
4/12 22/22 24/8
24/14 24/18 28/4
28/22 30/16 31/6

32/12 33/7 33/9
33/15 33/16
begin [1] 33/24
beginning [1] 2/7
begins [1] 31/6
being [15] 3/13
34/20 41/2 42/12
43/10 43/15 43/16
45/3 46/20 47/11
47/12 47/20 47/21
48/17 48/18
belief [4] 30/14
31/19 31/21 48/19
believe [6] 3/3
17/8 24/25 26/17
28/22 41/23
believed [3]
16/11 29/17 30/6
believes [2] 7/8
38/3
bench [1] 27/3
best [1] 25/13
better [2] 36/24
43/24
between [2] 16/4
32/8
beyond [1] 46/17
bias [1] 28/20
Biden's [1] 22/9
binding [1] 21/11
bit [5] 32/9 34/21
35/4 36/16 43/4
both [5] 6/7 34/1
34/2 34/9 49/17
bottom [1] 3/25
bound [1] 32/10
brief [8] 8/25 9/14
24/14 28/8
briefed [1] 6/8
briefing [1] 49/18
briefly [1] 6/11
bring [4] 38/10
38/13 50/15 51/8
brink [1] 15/18
brushed [1] 50/10
Bryan [1] 12/1

**C**

call [4] 25/17 26/7
27/1 30/17
called [1] 3/12
can [32] 4/5 4/22
5/16 7/14 15/17
16/12 16/14 17/16

17/19 17/20 17/23
17/25 21/10 24/20
25/4 25/19 26/7
27/7 28/21 33/6
34/18 35/6 36/12
36/12 36/18 38/13
43/5 44/11 46/16
48/5 50/16 51/3
can't [7] 6/2 14/23
20/9 22/4 28/25
38/21 50/14
cannot [1] 8/3
card [2] 5/9 36/17
cards [3] 5/10
5/12 27/1
care [1] 47/2
CARL [1] 1/8
case [20] 2/4 4/15
4/17 4/19 8/7 8/10
10/7 13/23 14/3
14/22 17/20 31/2
31/12 37/4 40/7
40/21 42/24 47/3
47/8 48/15
cases [2] 22/6
44/6
cause [2] 8/14
28/17
ceremonial [7]
4/20 4/22 26/19
27/2 27/5 27/8
33/25
certain [1] 10/2
certainly [1] 42/6
certify [1] 52/4
cetera [2] 8/4
14/11
chain [2] 38/11
38/12
Chairman [9]
13/2 18/17 19/5
20/13 20/25 21/22
23/5 39/8 42/4
Chairman
Thompson [4]
20/25 21/22 39/8
42/4
Chairman
Thompson's [1]
23/5
change [3] 21/22
27/20 27/21
channels [1] 7/20
charge [2] 11/11

55

**C**

charge... **[1]** 22/1
**chargeable [1]** 16/3
**charged [2]** 11/11 16/19
**Charles [1]** 1/19
**chief [2]** 31/2 40/21
**choice [9]** 16/4 16/8 16/19 16/25 17/10 18/9 18/9 20/7 20/9
**chose [3]** 22/19 22/20 22/21
**chronologically [1]** 30/25
**Circuit [1]** 48/15
**circulate [1]** 26/20
**circulating [2]** 5/2 27/14
**citing [1]** 44/5
**civil [3]** 17/22 23/21 23/22
**claim [1]** 45/23
**claiming [1]** 45/13
**clear [17]** 12/3 12/12 13/24 16/4 16/8 16/19 16/25 17/10 18/8 18/9 19/7 19/23 23/12 30/2 40/4 44/18 50/24
**clear-cut [7]** 16/4 16/8 16/19 16/25 17/10 19/23 30/2
**clearly [3]** 9/13 31/11 47/9
**CNN [1]** 4/6
**cognizant [1]** 28/20
**collect [2]** 5/11 27/1
**COLUMBIA [1]** 1/1
**come [9]** 2/6 3/21 5/13 21/24 24/15 28/8 28/10 29/23 41/12
**comes [2]** 4/14 34/12
**coming [1]** 51/4

**comments [1]** 41/7
**Committee [28]** 4/7 7/6 8/21 11/10 11/14 12/25 13/3 13/6 15/5 15/6 15/12 16/16 18/18 29/7 30/21 43/7 43/11 44/18 45/12 45/14 45/21 46/11 46/21 46/24 47/9 48/8 49/25 49/25
**Committee's [15]** 16/13 17/10 19/9 40/8 41/4 41/6 41/11 43/18 43/18 43/20 44/23 46/1 46/5 47/22 48/2
**communicate [1]** 51/3
**communication [2]** 42/15 42/16
**communications [1]** 19/13
**complete [1]** 15/11
**completed [1]** 16/22
**completely [3]** 10/23 15/3 22/5
**compliance [12]** 16/5 17/21 19/11 19/18 21/3 21/4 21/4 21/23 22/23 22/24 23/7 23/25
**complicated [1]** 32/4
**complied [1]** 36/5
**comply [12]** 9/2 12/1 12/4 12/7 15/17 15/19 15/19 22/12 23/13 29/15 41/8 45/17
**complying [2]** 17/24 30/5
**component [1]** 24/5
**computer [1]** 1/25
**computer-aided [1]** 1/25
**concede [1]** 10/1
**concedes [1]** 13/10

**conceptually [1]** 32/21
**concerns [2]** 28/20 38/23
**concluded [1]** 51/20
**conclusion [2]** 21/9 21/17
**conduct [3]** 16/1 24/8 48/17
**conference [2]** 1/8 27/3
**confront [1]** 49/7
**Congress [3]** 17/19 38/21 50/18
**consider [1]** 11/7
**considered [1]** 22/24
**considering [1]** 8/9
**consistent [3]** 9/21 14/12 30/11
**consistently [1]** 14/16
**Constitution [1]** 1/23
**constitutionally [1]** 22/6
**constitutionally-mandated [1]** 22/6
**contained [1]** 44/2
**contempt [11]** 15/4 16/5 16/22 17/20 17/22 17/23 18/15 18/15 18/16 21/6 22/1
**content [2]** 39/22 40/2
**continue [10]** 2/19 6/11 6/22 21/3 21/6 25/17 28/14 28/15 28/16 29/2
**continued [2]** 3/6 27/22
**continuing [6]** 16/14 17/21 18/2 19/17 25/20 25/22 29/2
**contract [1]** 23/22
**contrary [1]** 19/6
**conversation [3]** 11/20 31/9 33/14

**copy [3]** 38/8 38/21 51/5
**CORCORAN [10]** 1/17 2/12 6/14 37/12 38/16 39/12 39/14 41/17 44/13 50/6
**Corcoran's [1]** 47/19
**core [1]** 49/11
**correct [7]** 4/7 9/22 11/8 39/10 39/20 41/19 52/4
**correctly [1]** 43/22
**correspondence [2]** 38/24 39/1
**Costello [5]** 12/14 21/22 28/3 39/9 42/17
**could [16]** 3/21 4/2 13/5 13/15 13/17 15/4 15/19 17/4 18/7 21/24 21/24 24/4 29/12 30/10 45/19 50/20
**couldn't [1]** 20/1
**counsel [11]** 2/6 2/10 23/1 36/21 36/22 36/23 44/3 50/10 51/5 51/17 51/18
**count [1]** 35/1
**couple [7]** 2/16 24/13 25/10 34/17 35/10 36/6 37/17
**course [11]** 3/21 6/1 8/9 8/11 12/1 14/7 21/23 25/10 27/19 28/23 42/21
**court [27]** 1/1 1/22 6/25 7/9 16/2 17/19 17/20 23/6 25/12 25/25 27/4 30/25 31/16 32/17 35/14 35/21 36/3 36/7 37/2 42/8 43/19 44/2 46/3 47/20 49/14 51/8 52/3
**Court's [6]** 3/5 6/24 20/24 36/9 37/14 39/2
**courtroom [7]**

4/20 4/22 26/19 27/2 27/6 27/9 33/25
**courts [2]** 1/22 14/16
**coverage [2]** 7/11 7/23
**COVID [1]** 27/4
**CR [1]** 1/3
**CRC [1]** 1/21
**create [1]** 18/2
**creates [1]** 15/16
**crime [1]** 15/10
**criminal [7]** 2/4 15/3 17/20 17/22 22/1 23/21 23/22
**cross [10]** 31/1 31/4 31/6 31/8 31/8 31/10 31/20 42/8 42/22 43/2
**cross-examinatio n [5]** 31/1 31/20 42/8 42/22 43/2
**cumulative [1]** 3/22
**cured [1]** 6/3
**custody [2]** 38/11 38/12
**cut [8]** 16/4 16/8 16/19 16/25 17/10 18/9 19/23 30/2

**D**

**D.C [2]** 1/12 48/14
**date [39]** 10/2 10/7 10/10 11/2 11/5 11/5 11/8 11/11 11/12 12/3 12/4 12/5 12/18 13/3 13/8 13/12 13/15 14/10 14/19 14/21 14/24 16/6 16/21 18/10 18/20 18/23 22/18 22/19 22/20 22/22 22/24 23/12 23/25 24/7 25/24 29/13 29/13 29/14 52/10
**dates [20]** 10/22 11/15 11/17 11/18 11/21 14/4 15/22 16/8 16/12 18/13 18/19 29/16 29/17 30/3 30/4 30/4

-3181-

**D**

**dates... [4]** 30/7
30/7 30/13 30/14
**DAVID [3]** 1/14
1/15 2/12
**day [4]** 3/2 3/24
15/5 21/24
**days [2]** 19/21
25/11
**DC [3]** 1/4 1/13
1/24
**deadline [7]**
12/13 12/23 13/22
14/21 19/23 19/24
20/5
**deal [1]** 28/5
**dealt [1]** 27/25
**debate [1]** 50/22
**decide [5]** 9/18
13/18 13/19 23/2
24/15
**deciding [1]** 11/7
**default [44]** 8/23
9/7 9/9 10/20
10/24 11/6 11/15
11/23 11/24 12/1
12/5 13/1 13/10
13/11 14/1 15/6
15/10 16/6 17/11
17/13 17/16 18/14
18/21 19/4 20/4
20/6 20/16 21/10
23/12 23/14 23/16
23/17 23/18 23/25
24/1 24/2 24/6
31/24 31/25 32/7
32/22 32/22 32/25
44/16
**defaulted [3]**
15/13 21/14 22/2
**defaults [1]** 15/4
**defendant [23]**
1/6 1/14 7/24
13/13 14/15 15/11
19/14 20/7 20/8
35/21 36/1 38/25
40/8 40/10 41/5
41/14 41/22 45/2
45/12 47/4 47/6
47/7 48/1
**defendant's [5]**
17/9 34/3 35/18
48/16 48/19
**defense [8]** 7/18

25/5 33/7 33/12
36/21 37/21 44/2
51/4
**definitely [1]** 6/4
**definition [5]** 8/24
8/25 11/24 21/19
22/2
**defy [1]** 15/14
**delay [2]** 28/17
28/18
**deliberate [1]**
33/1
**deliberately [3]**
12/7 29/15 30/5
**denied [4]** 28/14
29/9 29/18 30/17
**deny [3]** 25/21
28/16 29/8
**deny/hold [1]**
29/8
**dependent [1]**
27/15
**depending [3]**
27/20 27/21 36/20
**deposition [4]**
9/20 12/13 13/21
16/22
**described [2]**
6/25 26/17
**describing [1]**
42/25
**detail [1]** 48/23
**determine [1]**
24/9
**determining [1]**
16/24
**developments [1]**
3/4
**dialogue [1]**
16/14
**did [18]** 5/5 9/9
9/10 9/12 9/21
12/6 13/13 13/20
19/13 20/12 22/8
29/15 31/17 35/18
36/17 39/13 45/13
46/11
**didn't [8]** 16/11
19/15 20/14 23/13
24/10 28/3 39/1
39/12
**different [5]**
14/14 18/12 42/1
42/2 42/6

**difficult [1]** 11/22
**dire [12]** 4/3 4/23
6/1 7/1 7/9 7/25
26/17 27/10 28/23
29/3 33/22 36/11
**direct [3]** 17/6
17/9 31/7
**directed [3]** 45/3
45/16 47/5
**direction [1]** 51/3
**directions [1]**
41/8
**directly [2]** 31/1
31/20
**disagree [1]**
21/13
**disclosure [1]**
3/18
**discovery [4]**
35/20 35/23 36/4
50/18
**discuss [9]** 5/14
28/8 28/9 33/12
33/13 33/21 38/5
38/24 39/7
**discussed [2]**
3/24 31/11
**discussing [5]**
39/15 39/15 39/21
39/22 39/25
**discussion [2]**
18/6 32/20
**discussions [1]**
22/15
**displayed [1]**
37/20
**disputed [1]**
13/15
**distorting [1]**
32/5
**DISTRICT [4]** 1/1
1/1 1/9 1/22
**Divided [1]** 3/12
**do [39]** 6/10 9/4
9/5 9/12 11/2
13/13 16/12 16/15
19/13 24/22 24/25
25/13 27/2 27/3
27/4 27/7 27/10
29/3 31/8 32/21
33/9 33/16 34/18
35/6 35/14 36/12
36/13 36/15 36/21
36/23 36/25 37/5

37/24 41/17 43/22
45/7 45/17 46/18
48/20
**document [6]** 5/3
11/12 34/16 34/18
38/4 42/7
**document's [1]**
37/25
**documentary [1]**
3/12
**documents [7]**
9/19 17/1 21/25
31/14 38/5 39/13
39/18
**does [12]** 7/4
9/25 11/19 18/6
30/24 37/2 38/23
39/3 39/14 47/6
49/4 51/7
**doesn't [18]** 9/17
12/4 15/5 15/22
16/18 19/18 20/8
23/21 32/16 32/17
35/17 38/20 38/22
40/2 40/20 44/21
44/22 45/20
**doing [4]** 27/7
33/9 34/21 37/2
**don't [35]** 2/18
2/24 3/4 5/18 5/20
7/2 7/21 17/8 19/4
22/7 22/13 22/16
25/6 25/17 28/1
31/2 33/17 34/8
35/1 35/3 36/14
39/16 40/3 41/23
45/7 45/23 47/2
49/7 49/10 49/17
50/11 50/16 50/22
50/22 50/23
**done [2]** 33/16
44/11
**doubt [1]** 6/5
**down [4]** 24/21
26/19 26/24 50/13
**draft [2]** 27/14
27/20
**during [4]** 25/10
36/10 38/1 38/4
**duty [3]** 9/6 9/13
32/8

**E**

**each [6]** 4/23 5/5

5/13 7/2 8/11
25/17
**earlier [4]** 18/6
28/15 28/19 32/20
**early [2]** 29/22
50/18
**easier [1]** 27/23
**ECF [2]** 2/19
28/14
**effect [1]** 3/22
**efficient [1]** 34/10
**efficiently [1]**
35/7
**effort [1]** 34/10
**efforts [2]** 18/3
21/7
**either [9]** 14/1
29/13 30/3 33/8
33/18 38/3 38/9
49/1 50/24
**election [1]** 3/20
**element [10]** 9/13
10/15 10/19 14/19
14/20 14/23 23/14
24/6 32/23 32/23
**elements [1]**
31/11
**elicit [1]** 31/13
**eliminates [1]**
44/11
**else [1]** 31/16
**enclosed [1]** 3/6
**end [1]** 25/24
**enforce [2]** 18/4
21/7
**enough [2]** 31/22
32/1
**enter [1]** 47/8
**entering [1]** 46/7
**entertain [1]** 29/1
**entire [1]** 5/12
**entitled [4]** 10/20
16/17 50/11 52/5
**entity [1]** 18/1
**equally [1]** 23/24
**erase [2]** 17/23
17/25
**erases [1]** 15/3
**error [1]** 43/3
**essential [2]** 23/6
25/11
**essentially [7]** 3/1
17/22 31/6 37/18
38/9 38/13 51/1

**E**

**establish [3]**
42/20 42/20 49/5
**established [1]**
42/12
**et [2]** 8/4 14/11
**et cetera [2]** 8/4
14/11
**evaluate [1]** 33/9
**EVAN [2]** 1/17
2/11
**eve [1]** 3/13
**even [6]** 3/16 7/23
14/2 18/20 41/9
49/11
**events [1]** 17/2
**ever [2]** 38/21
47/2
**every [2]** 4/20
28/24
**evidence [56]**
**evidentiary [1]**
29/10
**exactly [9]** 6/25
7/17 8/6 30/24
40/5 44/19 47/16
48/3 48/10
**examination [5]**
31/1 31/20 42/8
42/22 43/2
**example [12]** 4/2
4/6 4/15 10/6
11/25 12/17 13/20
23/23 39/6 41/19
46/20 48/14
**exception [1]**
31/17
**excerpt [1]** 3/9
**excludable [1]**
17/3
**exclude [5]** 6/13
15/9 29/4 35/24
36/1
**excluded [2]** 29/7
35/15
**excluding [2]**
16/21 30/20
**exclusion [1]**
32/9
**excusal [1]** 8/13
**excuse [1]** 5/12
**excused [3]** 8/13
11/11 23/18
**executive [2]**

45/21 45/23
**exhibit [9]** 24/24
28/9 34/1 34/3
37/19 39/7 39/24
40/20 41/19
**Exhibit 9 [1]**
40/20
**exhibits [12]** 34/9
35/1 35/2 35/5
35/8 35/18 37/14
37/15 37/19 38/1
38/23 40/18
**exist [2]** 16/4
24/11
**existed [2]** 24/10
24/11
**expect [3]** 7/2
21/3 21/23
**expected [1]** 7/1
**explain [1]** 4/18
**explore [5]** 4/5
5/16 6/15 7/14
36/16
**explored [1]** 8/22
**exploring [1]**
12/10
**expose [1]** 5/21
**exposed [2]** 4/11
7/2
**expressed [2]**
19/5 19/6
**extent [5]** 4/5
5/16 7/15 36/4
50/1
**extinguished [1]**
21/15

**F**

**F3d [1]** 48/15
**facing [1]** 20/14
**fact [14]** 8/3 8/10
12/3 16/16 20/4
30/7 41/9 43/11
43/15 43/17 46/4
46/13 47/21 48/6
**facts [1]** 47/17
**fail [3]** 9/10 9/12
9/21
**failed [1]** 11/2
**failure [5]** 9/2 9/3
9/5 9/6 12/1
**fair [5]** 28/21
28/25 31/22 32/1
33/11

**Fall [1]** 3/12
**familiar [1]** 4/11
**far [1]** 19/9
**fast [9]** 10/22
11/21 12/23 13/8
13/15 14/5 14/19
18/23 20/4
**FBI [1]** 38/13
**feel [1]** 25/11
**few [1]** 26/16
**fighting [1]** 51/1
**file [1]** 25/16
**filed [2]** 24/24
28/13
**filing [1]** 25/16
**find [4]** 7/22 8/3
17/19 28/25
**fine [7]** 2/15 26/9
26/12 34/23 46/14
48/21 51/11
**finite [1]** 3/23
**firm [2]** 22/22
24/10
**first [5]** 24/20
25/19 29/3 36/25
40/15
**fit [1]** 27/9
**five [1]** 49/22
**flexible [3]** 12/19
14/5 18/19
**flip [1]** 17/25
**Floor [1]** 1/19
**flux [1]** 11/19
**focus [1]** 10/17
**folks [1]** 49/18
**follow [3]** 33/6
36/10 36/22
**follow-up [2]** 33/6
36/10
**force [2]** 23/24
50/17
**foregoing [1]**
52/4
**formal [3]** 43/8
43/12 46/22
**forth [8]** 10/8 22/8
23/7 38/25 39/5
42/1 47/13 49/23
**forward [1]** 2/6
**fourth [1]** 25/15
**frankly [1]** 20/25
**fraud [4]** 3/20
14/15 14/22 48/17
**front [1]** 30/16

**fully [2]** 6/8 21/25
**further [1]** 28/17

**G**

**gallery [1]** 4/21
**GASTON [3]** 1/11
2/9 6/19
**gather [1]** 18/4
**general [3]** 2/18
7/12 40/2
**get [22]** 7/13 7/25
12/8 13/23 16/17
17/21 17/21 18/4
18/5 19/11 19/17
19/20 20/18 21/1
21/2 27/23 32/12
40/2 40/11 45/8
49/10 50/12
**getting [1]** 28/24
**Gettr [2]** 37/18
39/18
**give [1]** 50/17
**given [3]** 20/7
21/25 41/22
**giving [1]** 24/25
**go [11]** 12/22
15/17 15/24 18/6
18/8 20/3 20/10
26/2 28/23 31/3
45/19
**goes [10]** 10/2
10/15 11/20 23/6
23/7 23/14 27/21
30/16 31/23 36/20
**going [31]** 3/17
4/19 4/20 4/23
15/20 18/17 19/4
24/14 26/18 27/11
28/2 28/15 28/21
28/24 29/2 29/8
30/14 30/19 33/18
34/11 37/25 38/11
38/12 41/12 44/24
46/9 47/12 48/20
48/23 49/19 51/6
**gone [1]** 27/12
**good [9]** 2/3 2/8
2/10 2/11 2/21
2/23 5/6 6/20 6/21
**got [6]** 2/13 37/1
38/21 42/10 46/10
46/10
**gotten [1]** 21/24
38/9

**government [59]**
**government's**
**[16]** 6/15 9/12
10/11 13/23 16/20
17/3 17/16 18/11
21/9 21/18 21/21
29/18 39/4 40/7
40/25 41/18
**grant [1]** 28/2
**granted [3]** 2/15
28/5 29/9
**Great [2]** 25/6
51/14
**grounds [1]**
29/11
**group [5]** 4/11
4/13 5/21 26/21
27/8
**guess [3]** 4/18
18/24 50/23
**guilty [1]** 4/17
**GULLAND [1]**
1/11

**H**

**hac [2]** 2/13 28/1
**had [27]** 4/6 4/15
10/7 10/7 11/1
11/10 11/15 12/18
14/20 16/25 19/5
19/6 19/22 22/14
22/18 28/5 34/4
36/6 37/9 42/14
42/16 45/2 45/14
46/11 47/4 49/2
50/6
**hall [2]** 26/20
48/15
**hand [1]** 9/19
**handle [2]** 6/23
36/7
**handling [1]** 6/22
**hanging [1]** 44/18
**happen [4]** 7/1
13/13 26/17 51/6
**happened [7]**
7/16 10/17 12/15
15/1 17/2 18/20
31/7
**happens [2]** 8/9
27/16
**happy [2]** 28/9
49/14
**hard [10]** 10/22

58

**H**

**hard... [9]** 10/23 11/21 12/23 13/8 13/15 14/5 14/19 18/23 20/4

**has [29]** 7/15 7/22 7/23 8/25 9/17 11/1 12/11 13/23 14/7 15/14 15/24 16/4 17/15 22/11 23/11 28/13 28/17 32/24 32/25 34/4 35/19 35/20 38/25 41/13 42/24 43/7 43/12 44/16 46/21

**hasn't [2]** 4/13 34/18

**have [69]**

**haven't [3]** 8/22 29/20 37/24

**having [1]** 35/2

**he [46]** 9/10 9/12 10/20 10/24 11/1 11/2 12/3 12/6 12/18 14/21 14/23 15/5 15/13 16/10 16/11 16/11 16/12 16/12 16/13 16/14 16/25 19/24 21/14 22/2 22/10 22/11 23/2 23/3 29/15 29/16 30/6 30/8 30/10 35/22 42/7 42/10 45/3 45/13 45/14 45/17 45/20 46/11 47/5 48/5 48/7 48/9

**he's [5]** 15/6 20/9 29/22 44/17 47/10

**hear [9]** 2/17 3/4 6/10 6/12 6/13 30/8 39/12 43/14 46/17

**heard [4]** 4/13 6/14 23/11 41/18

**hearing [5]** 1/7 28/6 28/19 29/9 34/7

**hearings [7]** 3/6 3/23 4/7 7/6 7/11 7/12 7/23

**hearsay [15]** 39/23 40/23 40/23 40/23 41/9 43/1

43/1 44/12 46/19 46/23 47/1 47/9 47/11 49/4 49/11

**held [1]** 30/17

**helpful [2]** 49/13 49/16

**her [3]** 5/19 42/18 42/20

**here [11]** 3/22 7/19 19/3 23/24 27/9 27/10 29/8 36/13 41/20 42/22 43/9

**here's [1]** 48/20

**HERMAN [3]** 1/21 52/3 52/10

**Hey [1]** 18/18

**highlights [1]** 3/16

**him [10]** 22/1 37/19 42/4 44/18 45/16 46/11 46/13 46/13 47/9 48/16

**himself [1]** 31/18

**hinted [1]** 23/15

**his [26]** 5/19 10/24 11/8 11/15 11/23 12/5 13/3 15/12 15/14 20/1 21/2 22/21 29/16 30/14 31/19 39/1 45/2 46/12 47/4 47/8 47/8 48/6 48/8 48/11 48/16 48/17

**hoc [1]** 12/24

**hold [3]** 14/16 23/21 29/8

**Honor [35]** 2/3 2/8 2/11 2/21 2/22 2/24 3/24 4/9 5/24 6/6 6/7 6/17 6/20 7/7 7/17 8/15 8/18 15/4 20/23 21/14 25/2 25/8 26/13 31/15 32/15 33/2 33/4 33/5 33/6 34/8 37/10 37/13 38/19 43/3 44/15

**HONORABLE [1]** 1/8

**hopeful [1]** 8/8

**hopefully [1]** 26/22

**hour [1]** 3/11

**House [3]** 22/15 50/14 51/2

**housekeeping [4]** 24/17 24/23 26/15 38/6

**how [12]** 4/19 21/18 26/1 26/17 27/10 27/21 30/24 36/7 36/12 36/13 36/20 50/22

**huh [1]** 40/24

**hypothetical [1]** 20/13

**hypothetically [2]** 14/3 30/9

**I**

**I'd [4]** 9/16 25/16 26/1 28/7

**I'll [6]** 5/1 5/7 9/1 21/19 27/1 31/12

**I'm [26]** 4/23 6/22 8/8 8/9 10/6 12/9 12/10 12/15 12/17 13/16 13/16 15/7 15/8 15/20 15/23 17/6 18/15 20/10 24/17 25/12 28/9 28/15 30/15 32/9 41/20 50/12

**I've [2]** 5/1 8/19

**idea [5]** 3/19 3/20 20/10 23/20 31/17

**imagine [5]** 12/9 12/11 14/3 18/11 43/5

**immediate [1]** 21/3

**imminent [1]** 45/8

**impeach [1]** 12/21

**impeachment [7]** 12/21 13/5 17/5 17/7 18/24 19/20 23/4

**imperative [1]** 41/10

**implications [1]** 10/18

**implied [1]** 10/9

**important [1]** 25/9

**incentive [2]**

15/16 18/3

**include [1]** 35/18

**includes [1]** 39/22

**including [2]** 10/8 25/23

**inconsistent [3]** 14/10 21/12 27/17

**incorrect [1]** 32/13

**increased [1]** 4/12

**independent [1]** 32/21

**independently [2]** 31/23 44/24

**index [3]** 5/9 5/10 5/11

**indicate [1]** 3/19

**indict [1]** 22/19

**indictment [1]** 22/20

**individual [2]** 19/10 36/10

**individually [2]** 5/25 7/14

**inflammatory [2]** 3/3 3/15

**inform [1]** 20/1

**information [7]** 5/22 15/12 16/17 18/4 20/17 21/1 30/16

**inquiry [1]** 36/15

**insistence [1]** 23/25

**insisting [1]** 21/1

**insofar [1]** 29/18

**instance [1]** 42/10

**instances [1]** 17/5

**instructions [7]** 11/25 27/12 27/13 27/15 27/18 27/20 33/23

**intend [12]** 5/18 5/20 26/21 31/10 31/13 37/23 39/7 45/7 45/9 45/10 45/11 49/9

**intended [5]** 12/18 14/15 15/18 18/19 28/5

**intent [6]** 10/24 11/23 12/6 12/25 17/9 20/2

**intention [2]** 15/14 28/24

**intentional [1]** 33/1

**intentionally [2]** 29/15 30/5

**internal [1]** 19/10

**intertwined [1]** 23/20

**introduce [2]** 2/6 49/5

**introduced [1]** 34/20

**invitation [1]** 16/14

**invoke [1]** 35/13

**irrelevant [4]** 14/16 15/8 17/3 24/5

**is [146]**

**isn't [2]** 15/25 20/25

**issue [6]** 13/25 14/17 34/20 38/6 38/11 49/17

**issues [8]** 2/18 3/1 24/13 26/16 28/9 34/11 42/1 49/11

**it [137]**

**it's [39]** 4/11 9/9 10/23 11/22 12/12 12/24 13/2 14/18 14/18 15/7 16/5 16/17 17/5 18/18 20/17 23/1 23/4 23/4 24/5 25/9 25/11 26/10 28/4 28/5 29/22 30/9 34/20 42/2 44/7 44/21 48/17 48/18 48/18 48/21 49/1 49/2 50/17 50/24 51/3

**its [12]** 6/9 8/25 11/25 13/23 14/7 18/3 20/24 25/1 31/2 32/8 40/21 45/21

**itself [1]** 49/1

**J**

jointly **[1]**  7/9
Jonathan **[1]**  22/9
Jones **[1]**  3/18
JUDGE **[1]**  1/9
judged **[1]**  12/5
July **[3]**  1/5 15/1
52/10
juror **[11]**  4/4 4/5
4/16 4/21 5/13
5/14 5/15 5/15
5/18 7/3 36/15
juror's **[1]**  8/12
jurors **[12]**  4/23
5/8 5/19 5/21 7/10
7/15 8/3 26/21
26/23 27/2 29/1
36/24
jury **[38]**  4/10
4/19 6/3 7/2 7/5
7/19 7/22 9/17
9/22 10/3 11/7
11/25 13/11 13/18
13/19 13/24 14/4
15/24 22/25 23/2
27/8 27/12 27/13
28/21 28/24 29/12
30/16 31/7 31/9
33/16 33/23 33/24
34/18 36/7 37/21
44/9 49/3 49/21
just **[57]**

**K**

kind **[6]**  18/25
20/17 29/21 44/7
44/8 50/10
knew **[1]**  19/5
know **[20]**  3/5
7/24 20/8 22/13
31/5 34/20 35/1
35/3 35/19 36/3
37/23 40/1 42/4
42/24 44/6 44/9
50/22 50/22 50/22
50/23
knowledge **[1]**
41/13
known **[1]**  32/7

**L**

lack **[1]**  36/24
larger **[1]**  27/4
last **[4]**  24/24

25/15 28/5 29/9
late **[1]**  34/4
later **[8]**  10/15
14/2 14/11 15/1
15/25 17/24 18/22
20/11
law **[5]**  1/15 9/6
9/13 17/19 18/4
lawyers **[2]**  36/14
38/13
least **[20]**  3/15
4/13 9/11 11/6
13/14 15/24 16/1
18/7 18/10 18/22
21/15 24/4 29/11
29/25 30/9 37/24
39/7 39/15 44/10
46/19
leaving **[1]**  10/9
leaving-open **[1]**
10/9
left **[1]**  44/18
legal **[7]**  9/7 9/11
32/8 42/3 42/25
48/17 48/18
lengthy **[2]**  42/25
43/25
Lesley **[1]**  28/12
less **[2]**  48/23
49/22
let **[3]**  13/9 26/15
44/9
let's **[4]**  6/10
10/17 43/4 43/5
letter **[45]**  8/20
8/21 11/19 16/13
18/14 19/3 19/6
19/7 19/13 22/9
23/8 29/6 30/20
30/21 39/8 39/21
39/25 40/1 40/3
40/10 40/17 41/25
42/9 43/6 43/10
43/14 43/16 44/1
44/2 44/3 44/4
44/5 44/9 44/10
44/22 45/1 45/4
45/10 46/7 46/10
46/13 46/16 46/19
49/1 50/21
letters **[26]**  6/13
14/2 19/19 29/5
30/10 30/11 32/3
33/18 39/17 39/22

39/25 40/5 40/7
41/3 41/4 41/13
42/25 42/25 43/25
47/11 48/6 48/11
48/22 49/23 49/24
49/25
letting **[1]**  36/3
Licavoli **[4]**  21/19
30/6 32/5 32/14
light **[2]**  5/17
32/14
like **[36]**  2/17 3/21
4/3 9/16 12/20
18/13 19/12 20/14
20/16 21/2 23/17
26/1 26/5 27/22
28/7 28/10 31/6
31/14 32/7 32/13
33/13 33/14 34/3
35/2 35/11 35/13
35/17 36/22 38/1
38/14 41/7 42/11
48/22 50/17 50/25
51/2
likely **[1]**  5/3
Limine **[2]**  6/23
29/4
limited **[1]**  39/25
limits **[1]**  36/11
line **[3]**  3/25 32/8
32/12
link **[1]**  3/7
list **[5]**  5/13 24/24
25/1 34/4 42/13
listen **[1]**  23/20
lists **[2]**  34/1 34/2
little **[7]**  32/9 34/4
34/21 35/3 36/16
36/18 43/4
lodge **[2]**  26/2
34/5
lodged **[1]**  24/24
logical **[2]**  21/8
21/17
Logistic **[1]**  30/24
logistical **[1]**
33/21
logistically **[2]**
31/5 51/7
long **[3]**  3/11
11/20 36/12
look **[3]**  22/7 24/8
35/17
looking **[1]**  41/20

LORRAINE **[3]**
1/21 52/3 52/10
lot **[4]**  32/13 42/1
42/2 49/18

**M**

made **[7]**  14/3
17/15 25/8 30/1
41/14 41/21 47/4
Mafia **[1]**  4/17
Magazine **[1]**  3/18
main **[1]**  42/16
make **[11]**  9/9
10/20 25/11 29/21
29/22 31/18 32/3
32/11 34/10 42/24
51/10
makes **[3]**  30/8
44/17 44/18
making **[2]**  7/18
43/2
malleability **[1]**
15/24
malleable **[9]**
13/22 14/4 14/11
14/21 14/24 14/25
15/23 16/9 16/12
mandated **[1]**
22/6
Many **[1]**  4/21
matter **[9]**  11/19
20/25 32/16 32/17
43/21 44/21 44/23
45/20 52/5
matters **[3]**  35/10
37/9 47/3
MATTHEW **[1]**
1/17
may **[14]**  7/3 7/3
7/23 10/25 16/7
22/13 24/17 25/16
27/18 27/18 27/21
30/22 36/20 37/23
maybe **[3]**  35/4
39/15 43/24
MC **[1]**  1/19
me **[28]**  2/15 2/16
8/22 9/16 10/18
13/9 13/14 18/6
19/23 19/24 23/10
25/13 26/12 26/15
29/24 34/15 34/16
35/6 46/14 48/22
49/4 49/10 49/11

49/16 49/22 50/24
51/4 51/6
mean **[15]**  9/17
14/14 18/25 19/14
19/15 20/12 20/14
20/24 22/9 25/14
37/23 40/6 45/7
50/16 51/8
meaning **[1]**
19/18
means **[2]**  10/19
24/1
meant **[6]**  19/16
20/12 23/2 23/3
23/7 31/16
member **[4]**  42/14
42/14 42/15 42/16
members' **[1]**
19/10
mens **[4]**  9/8 9/25
14/2 17/14
mention **[5]**  33/18
39/13 40/12 48/22
48/23
mere **[1]**  19/17
Merriam **[1]**  8/25
Merriam-Webster'
s **[1]**  8/25
midday **[1]**  49/20
middle **[1]**  49/21
midstream **[1]**
27/24
might **[9]**  6/16
8/23 18/5 19/7
29/23 32/6 42/6
49/16 50/21
mind **[1]**  13/25
missed **[1]**  19/22
MOLLY **[2]**  1/11
2/9
moment **[2]**  12/4
49/8
Monday **[12]**  4/2
25/21 26/18 27/10
30/19 33/24 33/25
38/10 49/20 51/8
51/10 51/19
money **[1]**  14/16
Montgomery **[1]**
1/16
more **[10]**  3/15
4/22 20/10 20/16
30/10 31/5 32/13
36/18 43/4 46/17

**M**

morning [12] 2/3 2/8 2/10 2/11 2/14 2/21 2/23 6/20 6/21 25/5 51/11 51/19

most [4] 6/13 7/5 44/5 45/8

most-recent [1] 7/5

Mother [1] 3/18

motion [21] 2/13 2/19 6/9 6/11 6/12 6/22 6/23 25/15 25/17 25/22 26/12 27/25 28/2 28/13 28/15 28/16 29/4 29/8 29/18 30/17 50/18

motions [7] 1/7 2/17 6/7 24/15 26/3 28/7 29/10

move [1] 35/23

Mr [3] 21/22 44/10 50/21

Mr. [57]

Mr. Bannon [31] 3/12 8/20 8/21 9/9 9/21 10/20 11/4 12/14 13/20 14/9 16/7 17/15 19/21 21/4 23/13 24/24 28/13 28/16 29/6 29/7 29/11 29/21 30/4 30/15 30/21 31/18 39/14 40/23 48/4 49/24 50/1

Mr. Bannon's [4] 3/20 8/20 31/21 37/18

Mr. Corcoran [8] 6/14 37/12 38/16 39/12 39/14 41/17 44/13 50/6

Mr. Corcoran's [1] 47/19

Mr. Costello [4] 12/14 28/3 39/9 42/17

Mr. Schoen [4] 2/20 20/19 24/12 30/23

Mr. Thompson [2] 12/14 19/23

**Mr. Trump [3]** 43/9 43/13 46/23

Ms [5] 6/19 19/2 34/6 38/17 44/14

Ms. [15] 2/15 6/23 8/17 20/22 23/11 28/1 28/12 40/4 41/16 42/14 42/23 43/14 44/24 46/9 50/14

Ms. Amerling [3] 42/14 44/24 46/9

Ms. Lesley [1] 28/12

Ms. Vaughn [9] 6/23 8/17 20/22 23/11 40/4 41/16 42/23 43/14 50/14

Ms. White [2] 2/15 28/1

much [4] 2/24 6/24 18/11 23/9

must [1] 34/13

my [20] 3/15 4/12 5/4 6/7 13/10 13/25 14/10 15/1 19/22 21/15 23/11 25/8 28/16 31/12 32/10 35/1 40/14 41/23 43/12 51/3

myself [1] 3/4

**N**

naturally [1] 32/6

necessarily [1] 29/19

need [8] 3/4 25/17 30/14 31/2 31/5 33/17 46/17 51/8

needs [1] 34/17

negotiate [1] 10/10

negotiated [2] 14/5 14/11

negotiating [2] 18/12 18/18

never [3] 35/20 35/22 35/22

new [4] 3/15 3/18 4/15 10/10

next [2] 19/24 25/10

NICHOLS [1] 1/8

**night [3]** 3/13 24/25 25/15

no [18] 1/3 2/19 3/25 5/7 6/5 7/7 14/14 14/21 15/14 17/6 17/18 22/12 22/16 24/2 26/23 28/14 51/1 51/16

noncompliance [3] 17/24 18/1 46/12

none [1] 45/19

nonhearsay [3] 44/1 44/4 44/8

nonoverlapping [1] 35/4

normally [3] 26/11 27/3 36/13

not [90]

note [1] 27/1

notice [11] 26/7 26/12 41/5 41/22 42/10 42/19 44/10 47/12 48/1 48/7 49/6

notifications [1] 40/8

notify [3] 35/14 35/21 51/6

notifying [2] 36/1 46/13

now [14] 3/15 4/1 18/14 22/12 22/16 29/25 33/12 34/1 34/4 34/9 34/19 35/14 37/24 38/5

nuances [1] 49/8

number [2] 26/24 29/10

NW [2] 1/12 1/23

**O**

object [3] 39/14 40/9 47/7

objected [3] 37/20 38/1 38/25

objected-to [1] 38/1

objection [9] 24/25 25/20 25/22 38/5 38/12 39/23 40/3 44/17 45/13

objections [10] 25/1 25/5 28/10

**34/5 34/7 34/9** 34/19 35/7 40/22 45/2

obligation [11] 11/1 11/8 13/12 13/20 14/20 23/13 24/7 24/9 24/10 29/13 30/2

obligations [2] 29/16 36/5

obstacle [1] 22/16

obvious [1] 36/17

obviously [13] 6/8 8/24 17/4 17/13 27/15 32/4 32/9 34/10 36/11 37/14 38/24 48/11 49/24

occurred [3] 11/20 18/21 22/11

occurring [1] 25/21

occurs [1] 25/23

October [17] 10/17 11/11 11/12 12/13 12/18 12/23 13/21 15/1 15/13 15/13 16/13 17/2 18/7 21/3 39/8 40/9 40/17

October 14th [4] 12/23 13/21 15/13 15/13

OFC [1] 1/12

off [2] 5/13 50/11

offense [3] 9/14 16/3 17/20

offer [7] 2/25 15/1 35/22 48/4 48/6 48/11 48/16

offered [19] 14/11 35/8 41/2 41/20 43/11 43/15 43/17 43/20 45/20 46/4 46/20 46/24 47/9 47/11 47/12 47/20 47/21 48/17 48/18

offering [10] 41/3 41/4 41/15 44/1 44/9 45/5 45/22 45/25 47/23 47/25

offers [2] 11/4 48/9

**Official [2]** 1/22 52/3

Okay [23] 9/24 10/5 10/13 10/16 17/12 19/1 21/16 25/6 26/4 28/10 34/14 35/25 36/25 37/6 38/16 39/12 40/16 40/22 41/16 46/8 46/14 49/12 51/14

once [2] 4/11 6/14

one [26] 3/11 3/14 4/23 5/13 5/13 5/20 9/19 10/10 10/19 12/19 13/11 13/15 19/16 21/10 24/4 24/22 25/17 27/2 27/2 33/6 37/15 37/24 39/10 39/10 41/20 43/10

one-hour-long [1] 3/11

ones [1] 40/12

only [8] 5/7 5/14 26/24 34/17 38/20 42/14 42/15 45/1

open [5] 8/9 8/11 10/9 21/5 27/5

opening [15] 33/8 33/14 33/19 37/16 37/21 38/4 38/23 39/4 39/17 40/13 45/9 46/15 48/21 49/8 49/9

openings [3] 33/15 33/16 38/2

operative [2] 21/11 29/17

opponent [1] 48/12

opportunity [1] 34/5

opposition [1] 28/4

order [1] 50/20

orders [1] 15/17

original [6] 38/7 38/8 38/14 38/20 50/7 51/5

other [21] 3/2 3/17 3/24 5/19 7/2

61

# O

**other... [16]** 7/15
24/13 25/11 28/7
28/9 30/13 30/25
32/22 33/21 35/10
36/6 37/8 37/25
38/6 42/2 51/15
**otherwise [4]**
5/22 43/8 43/12
46/22
**our [9]** 3/25 6/2
12/12 18/6 22/4
36/4 37/3 40/15
44/25
**out [15]** 4/21 7/21
8/3 9/1 18/20
19/25 21/18 27/23
39/22 43/19 45/11
46/3 47/20 49/22
51/2
**outside [4]** 7/14
29/12 31/7 31/9
**over [2]** 27/7 51/1
**overburden [1]**
49/18
**overlap [2]** 35/3
35/4
**overly [1]** 3/3
**overly-prejudicial**
**[1]** 3/3
**own [3]** 39/1 47/8
47/8

# P

**p.m [1]** 51/6
**page [2]** 9/14
41/25
**pages [1]** 49/22
**paper [2]** 4/10
20/11
**papers [2]** 3/5
8/19
**paragraph [4]**
43/6 43/6 45/19
45/19
**part [6]** 5/24
26/11 29/9 29/10
44/25 50/18
**particular [8]**
8/12 11/2 14/20
18/9 24/7 30/3
34/16 35/7
**parties [11]** 4/24
5/2 5/5 7/9 18/12

26/20 27/14 34/2
34/2 49/17 49/22
**parties' [4]** 8/19
27/13 27/22 34/9
**parts [1]** 13/11
**party [2]** 38/3
48/12
**passed [1]** 22/18
**past [3]** 16/14
17/23 18/1
**pay [1]** 14/15
**Pelosi [1]** 21/6
**pending [4]** 2/16
24/15 25/21 30/17
**people [2]** 4/22
15/17
**peremptories [1]**
37/3
**perhaps [6]** 7/22
10/9 14/1 29/16
33/15 49/20
**period [1]** 3/23
**person [6]** 1/7 4/6
18/18 42/1 42/3
43/2
**personal [1]**
41/13
**perspective [3]**
3/25 9/12 18/11
**perverse [2]**
15/16 18/2
**pictures [1]** 37/19
**piece [1]** 4/6
**plain [2]** 44/7
44/8
**plan [5]** 35/23
38/22 39/16 40/12
40/21
**plans [2]** 36/7
38/24
**please [4]** 2/6
24/16 37/12 51/4
**plenty [1]** 27/17
**point [6]** 3/22
3/22 25/9 33/11
45/11 47/3
**points [1]** 21/18
**police [1]** 32/12
**pool [5]** 5/11 5/12
7/19 7/22 27/8
**pose [1]** 36/15
**position [31]** 6/2
6/7 6/15 12/12
14/7 19/22 21/15

25/7 40/8 41/4
41/6 41/12 41/15
41/19 42/1 43/18
43/20 44/24 44/25
45/21 46/1 46/1
46/5 47/4 47/10
47/22 48/2 48/7
48/8 49/6 49/7
**positions [5]**
38/17 42/3 42/25
47/14 47/15
**possible [2]**
29/11 30/10
**possibly [2]** 20/1
22/4
**post [2]** 12/24
18/7
**potential [3]** 4/4
4/21 49/11
**potentially [4]**
16/1 29/25 30/1
39/7
**practice [1]** 36/9
**precluded [1]**
29/19
**preemptively [1]**
35/25
**prefer [1]** 27/4
**preferrable [1]**
26/8
**prejudice [1]** 4/13
**prejudicial [2]** 3/3
25/12
**preparation [1]**
2/18
**prepare [1]** 25/1
**prepared [1]**
33/12
**presence [6]** 5/14
5/19 7/14 23/5
29/12 31/9
**present [2]** 2/5
46/19
**presented [1]**
20/9
**presently [1]** 36/2
**preserved [2]** 6/5
26/10
**President [3]**
22/9 29/6 30/21
**President Biden's**
**[1]** 22/9
**President Trump**
**[1]** 29/6

**PRETRIAL [1]** 1/8
**pretty [1]** 23/9
**prevent [1]** 36/14
**principles [1]**
23/22
**prior [4]** 11/15
19/18 27/16 28/15
**privilege [9]**
22/13 43/9 43/13
45/14 45/15 45/22
45/23 46/11 46/22
**privileges [2]**
22/14 44/6
**pro [2]** 2/13 28/1
**probably [1]** 48/5
**problem [5]** 4/9
34/8 46/23 47/1
49/5
**procedures [1]**
45/17
**proceed [1]** 43/24
**proceeding [2]**
9/7 9/11
**proceedings [3]**
2/2 51/20 52/5
**process [4]** 5/25
22/7 23/6 28/23
**produced [1]**
1/25
**production [2]**
9/18 11/13
**proffer [7]** 29/12
29/21 29/23 30/8
30/15 31/18 33/9
**proffers [1]** 30/1
**prohibit [1]** 36/23
**promoted [1]**
3/14
**proper [1]** 45/16
**proposed [6]**
4/25 7/8 11/25
27/13 35/2 35/18
**proposes [1]** 8/24
**proposing [2]** 5/6
49/2
**prosecution [1]**
50/19
**prospective [1]**
4/16
**prove [23]** 11/1
14/23 23/12 23/12
32/25 32/25 41/3
43/17 43/21 45/5
45/20 45/22 45/25

46/4 46/20 46/25
47/20 47/21 47/23
47/25 48/6 48/18
48/18
**provide [6]** 5/9
16/18 38/21 44/2
49/14 51/4
**provided [7]**
35/23 42/12 46/12
48/1 48/7 48/25
49/14 51/4
**provides [1]** 17/8
**providing [1]**
44/10
**provision [1]**
17/10
**publications [1]**
7/20
**publicity [3]**
25/12 25/23 28/20
**published [1]**
34/16
**pull [1]** 9/1
**purported [1]**
44/6
**purpose [4]** 44/1
44/4 44/8 46/6
**purposes [7]**
12/21 29/7 44/22
46/15 48/21 49/8
50/2
**pushed [1]** 11/15
**put [7]** 10/21 13/9
14/25 16/10 25/18
26/1 41/5
**puts [1]** 31/2
**putting [1]** 9/25

# Q

**qualify [1]** 41/9
**question [39]** 5/5
5/8 7/14 8/23 9/7
9/8 9/10 11/21
12/11 13/11 13/14
14/1 15/23 15/25
16/1 18/8 18/22
23/14 23/16 24/5
24/18 24/22 25/7
25/8 25/25 26/24
29/1 30/2 30/22
30/24 33/7 36/18
40/14 42/6 43/10
46/16 46/19 50/5
50/6

-3187-

62

**Q**

**questioning [2]**
23/11 36/23
**questions [23]**
4/3 4/24 5/4 5/15
5/20 7/5 8/1 8/13
9/22 13/24 17/13
20/24 26/21 26/22
26/24 27/8 30/9
34/17 36/6 36/10
36/14 37/9 38/18
**Quinn [1]** 16/2
**quite [1]** 20/25

**R**

**raise [3]** 4/9
38/12 38/23
**raised [4]** 3/1 3/2
39/24 50/6
**raising [1]** 45/12
**rather [8]** 17/7
18/13 27/9 27/24
34/13 34/19 34/21
49/6
**rea [4]** 9/8 9/25
14/2 17/14
**reach [2]** 7/20
51/2
**read [5]** 3/5 4/23
7/11 8/19 16/13
**reading [1]** 20/10
**ready [2]** 25/2
25/3
**real [1]** 19/24
**really [16]** 2/24
7/23 8/22 14/18
15/14 18/12 19/12
19/18 20/6 20/9
21/2 22/12 24/10
37/17 39/3 49/11
**realm [1]** 23/23
**reason [7]** 3/25
11/6 14/24 22/12
23/4 23/5 44/19
**reasons [2]** 28/14
36/16
**received [6]**
35/20 43/8 43/12
46/21 46/25 47/2
**recent [4]** 6/13
7/5 29/5 30/11
**recess [3]** 24/14
28/8 28/11
**reciprocal [3]**

35/20 35/23 36/4
**recognize [2]**
25/20 27/19
**record [6]** 2/7
25/11 25/18 26/1
26/11 52/5
**Recorded [1]**
1/25
**redacted [2]** 44/3
44/11
**reference [1]** 39/4
**referral [3]** 18/15
18/16 21/6
**referring [1]** 5/25
**reflect [1]** 5/3
**refrain [1]** 33/8
**refuse [1]** 15/17
**regard [1]** 37/13
**regarding [1]**
8/20
**regardless [1]**
31/20
**regularly [1]** 3/14
**rejected [3]** 45/3
45/15 47/5
**rejecting [1]**
44/19
**related [2]** 10/25
33/3
**relates [2]** 31/11
32/2
**relating [1]** 10/1
**relevance [4]**
14/1 19/12 44/22
45/4
**relevancy [1]**
50/23
**relevant [19]** 8/23
10/2 10/11 14/13
16/1 16/24 18/10
18/22 19/8 19/12
20/2 22/24 29/25
30/1 31/1 31/12
31/20 32/6 45/1
**relies [1]** 11/25
**rely [1]** 34/11
**relying [1]** 49/15
**renewed [2]** 2/19
28/13
**Reply [1]** 9/14
**Reported [1]** 1/21
**Reporter [2]** 1/22
52/3
**representations**
**[1]** 49/9

**requesting [1]**
35/20
**require [1]** 8/13
**required [11]** 9/4
9/5 9/6 9/11 9/13
9/18 9/20 13/12
29/20 32/7 42/22
**requirement [2]**
9/22 14/22
**requiring [1]**
30/15
**resolution [1]**
18/16
**respectfully [1]**
21/13
**respond [2]** 6/16
10/2
**responded [2]**
45/12 45/15
**response [4]** 40/1
40/25 41/23 51/16
**rest [1]** 4/13
**result [1]** 4/3
**return [8]** 10/7
10/10 10/22 13/3
14/4 14/10 18/13
29/13
**reviewed [1]** 7/23
**RIANE [2]** 1/18
2/12
**right [9]** 4/8 13/5
20/24 24/3 24/8
27/16 37/24 43/23
45/21
**risk [1]** 4/12
**Road [1]** 1/15
**Room [1]** 1/23
**ROSE [1]** 1/11
**RPR [1]** 1/21
**rule [1]** 35/13
**ruled [1]** 37/24
**Russian [1]** 4/16
**Russians [1]** 4/17

**S**

**said [17]** 4/16 8/9
12/11 13/23 19/4
19/16 20/14 22/10
22/13 26/16 26/22
28/19 28/22 29/20
42/24 44/5 50/11
**same [7]** 3/1 9/8
14/18 20/17 28/14
39/23 47/10

**Santobello [1]**
23/23
**saw [2]** 2/14
25/14
**say [16]** 3/19 5/18
14/21 15/18 16/7
18/24 19/21 21/19
32/18 33/14 33/15
36/20 41/17 45/9
45/10 50/21
**saying [13]** 10/6
12/9 12/15 12/17
13/16 13/16 14/18
15/7 15/20 15/21
15/23 43/14 43/25
**says [16]** 12/1
12/14 14/6 14/9
14/23 15/5 15/6
16/2 16/7 16/22
18/14 18/18 19/3
29/14 36/22 43/7
**scenario [1]**
18/12
**scheduled [1]**
3/23
**SCHOEN [7]** 1/14
1/15 2/12 2/20
20/19 24/12 30/23
**scope [1]** 36/12
**seat [1]** 28/21
**seated [1]** 5/17
**second [4]** 5/24
43/6 43/7 43/7
**see [10]** 4/10 8/2
30/25 32/21 36/22
38/7 38/14 50/8
50/11 51/19
**seek [2]** 18/2 36/1
**seeking [2]** 18/1
47/7
**seeks [1]** 42/19
**seem [3]** 12/20
18/6 49/4
**seemed [1]** 2/15
**seems [14]** 2/16
7/18 8/21 9/16
10/18 13/14 23/10
29/24 34/15 35/6
46/14 49/11 49/16
50/25
**seen [6]** 4/6 7/3
7/11 7/22 34/18
35/22
**Select [7]** 43/7

43/11 43/17 43/18
43/20 46/21 46/24
**selection [7]** 4/10
4/19 6/3 33/16
33/24 36/7 49/21
**send [1]** 18/14
**sending [3]** 39/22
49/24 49/25
**sense [8]** 25/3
30/3 30/4 30/6
32/4 32/5 34/21
39/13
**sent [7]** 7/9 8/21
19/3 25/4 40/1
44/10 46/13
**sentence [1]** 43/9
**separate [6]**
10/24 11/23 23/16
33/1 33/3 45/6
**separately [2]**
46/10 51/9
**sequestered [1]**
6/1
**set [10]** 3/12 7/6
12/3 12/6 13/22
27/14 27/20 27/22
36/25 49/22
**setting [3]** 5/21
27/5 41/25
**she [3]** 19/3 19/5
42/18
**shocked [1]** 8/6
**shorthand [1]**
1/25
**shot [1]** 25/14
**should [12]** 4/18
7/4 16/20 19/25
29/2 33/21 34/6
35/22 37/4 38/5
39/2 50/25
**show [14]** 10/21
14/25 15/1 15/22
16/11 19/4 30/2
31/10 39/16 41/5
44/16 44/16 47/12
49/2
**showing [1]**
39/15
**shown [1]** 28/17
**shows [4]** 11/5
22/22 44/3 45/1
**sic [2]** 35/14
39/11
**sick [1]** 21/18

-3188-

**S**

side [1]  17/25
side's [1]  8/11
signature [1]
38/20
signed [1]  38/8
SILVERMAN [1]
1/18
similar [1]  14/22
simply [4]  3/2
17/24 41/21 42/23
simultaneous [1]
37/2
since [1]  45/8
single [1]  4/20
sit [2]  4/22 24/20
situation [1]  10/7
Sixth [1]  42/22
SLUTKIN [1]  1/18
so [82]
some [15]  3/19
6/15 7/18 7/20
11/14 15/25 20/11
22/14 25/1 27/15
33/13 36/15 41/21
41/22 44/17
somebody [1]
42/13
somehow [1]
23/18
someone [4]  4/4
17/23 17/25 43/19
something [13]
3/21 8/22 9/4 9/5
9/12 19/6 19/6
31/16 35/2 35/22
42/11 49/5 50/25
sorry [3]  18/15
24/17 43/6
sort [9]  3/19 17/6
19/9 19/10 20/13
36/17 40/1 44/7
44/17
sound [1]  32/13
sounded [1]
48/22
sounds [1]  34/3
speak [2]  3/4 6/9
Speaker [1]  21/6
Speaker Pelosi
[1]  21/6
special [1]  3/11
specific [3]  34/19
34/20 43/5

speech [1]  50/21
spend [2]  6/24
50/25
spread [1]  4/21
staff [5]  22/15
42/14 42/14 42/15
42/16
start [2]  2/18 8/5
started [1]  2/2
starting [2]  4/1
33/23
starts [1]  32/12
state [1]  25/19
statement [11]
12/24 18/22 27/17
41/21 42/2 43/3
43/19 46/4 46/5
46/21 47/21
statements [5]
18/7 41/10 47/8
48/12 48/16
STATES [5]  1/1
1/2 1/9 2/4 2/9
statute [3]  16/3
17/22 17/23
stenotype [1]
1/25
STEPHEN [2]  1/5
2/5
still [11]  15/12
16/17 19/11 20/16
21/1 21/5 21/11
22/1 28/16 30/19
49/21
stone [2]  13/22
27/22
stood [1]  4/16
strategy [1]  45/8
Street [2]  1/12
1/19
strikes [1]  37/3
strip [1]  22/5
strong [2]  13/24
15/7
stuff [3]  26/15
44/7 44/12
Su [1]  22/9
subject [3]  41/22
42/8 42/21
submit [1]  3/14
subpoena [19]
10/8 15/15 16/22
21/5 21/7 21/7
21/10 21/14 21/15

21/23 23/5 38/8
38/8 42/11 45/12
45/18 46/10 50/8
51/5
subpoenaed [1]
42/4
subpoenas [1]
29/14
substantial [1]
10/8
successful [1]
15/21
such [3]  29/19
30/1 41/9
sufficient [4]  7/10
14/7 28/17 49/10
sufficiently [1]
8/4
suggest [1]  11/18
Suite [1]  1/15
summons [1]
12/2
Sunday [1]  3/13
support [2]  17/18
26/6
supports [1]
12/10
suppose [2]
37/23 43/5
supposed [2]
45/15 45/17
Supreme [1]  16/2
sure [4]  26/2 32/3
32/11 50/12
suspect [1]  49/21
system [1]  22/4

**T**

take [9]  5/4 23/1
24/14 24/14 25/7
28/7 31/17 34/19
43/5
taking [2]  35/7
47/10
talk [1]  3/5
talked [3]  33/22
33/22 33/23
talking [9]  13/3
17/6 17/12 20/15
29/25 34/25 40/5
40/9 44/6
tapes [1]  3/19
team [1]  50/19
technology [1]

34/16
tell [2]  5/1 36/18
telling [1]  19/23
Tellingly [1]  47/6
temporal [3]
10/14 12/10 16/5
ten [1]  15/4
tend [2]  10/21
11/18
terms [2]  40/2
42/10
testified [1]  21/25
testify [4]  19/21
42/19 44/24 46/9
testifying [2]  19/2
22/17
testimony [8]
11/12 17/1 18/4
22/11 22/21 29/20
34/11 42/21
text [1]  3/10
than [8]  4/22 17/7
18/13 27/9 27/24
34/21 48/25 49/6
Thank [24]  6/6
6/17 6/18 8/15
8/16 20/18 20/22
24/12 26/13 26/14
28/12 33/2 33/5
33/20 37/10 37/11
38/15 38/16 41/16
44/13 50/3 50/4
51/17 51/18
that [368]
that's [29]  6/1 9/7
9/8 9/13 11/22
14/14 18/25 19/12
21/15 23/23 26/7
26/9 27/10 30/18
33/11 34/23 40/14
40/18 41/21 41/23
43/23 44/1 44/19
45/3 46/2 46/6
48/13 50/5 51/6
their [15]  5/17
6/12 18/1 22/2
33/9 39/4 39/22
41/15 42/13 42/24
44/3 45/23 49/15
49/23 50/18
them [26]  5/2 5/6
5/9 5/16 5/22 6/16
8/13 21/11 21/25
25/4 27/9 27/15

27/23 27/23 28/8
30/6 31/14 34/5
41/15 48/9 48/23
49/2 50/17 51/3
51/12 51/13
then [42]  2/17
3/11 4/12 4/18
5/11 5/12 6/9 6/12
6/13 6/23 8/4 8/20
9/10 9/10 9/21
11/6 13/18 13/25
14/9 15/1 15/6
15/18 18/16 19/16
21/14 21/25 24/15
25/6 27/1 28/9
29/1 29/23 31/6
33/14 36/6 36/20
36/22 38/5 39/23
43/16 45/14 45/16
theory [2]  18/7
21/21
there [57]
there's [15]  3/15
3/25 17/18 18/15
19/15 20/11 21/8
22/12 22/16 27/16
33/17 35/3 36/4
38/4 38/11
thereby [1]  51/4
therefore [2]
29/24 43/20
these [19]  3/17
3/23 7/20 13/24
14/2 15/22 18/19
30/10 31/14 32/3
38/17 40/6 40/12
41/13 42/18 43/24
48/6 48/22 49/23
they [39]  3/19
4/11 5/8 5/16 5/22
7/10 7/11 10/25
18/5 19/11 19/15
19/16 19/16 20/12
21/1 21/1 21/23
22/1 22/20 22/21
22/23 26/1 26/25
33/8 33/9 35/8
35/15 39/17 40/9
40/23 41/2 41/9
46/25 47/2 47/11
47/19 49/10 50/12
50/22
they'll [1]  42/20
they're [10]  5/21

-3189-

## T

**they're... [9]** 19/17 25/15 33/3 33/3 40/7 41/9 47/12 48/12 50/1
**thing [3]** 19/16 37/15 45/9
**things [8]** 3/17 6/15 7/2 19/11 20/8 33/21 42/3 50/17
**think [47]** 2/25 4/17 4/24 5/5 6/1 7/4 7/21 7/21 10/14 10/23 13/9 13/24 18/14 20/10 21/18 22/13 22/16 23/9 23/19 24/14 24/21 25/9 25/12 26/9 27/23 28/1 28/3 28/4 30/9 31/5 31/19 31/23 32/2 33/17 34/23 35/3 37/4 37/8 37/17 43/16 46/12 46/17 46/18 47/6 47/7 48/21 51/10
**thinks [2]** 10/19 16/23
**this [84]**
**THOMPSON [8]** 1/18 12/14 13/6 19/23 20/25 21/22 39/8 42/4
**Thompson's [2]** 20/13 23/5
**those [21]** 8/1 9/22 10/18 11/15 11/17 11/18 20/12 21/11 26/22 29/16 29/17 30/9 33/1 34/7 36/4 38/1 38/5 39/13 39/17 40/18 49/7
**though [3]** 18/20 24/18 25/13
**thought [4]** 15/19 16/8 22/14 31/15
**thoughts [1]** 19/10
**three [1]** 41/25
**three-page [1]** 41/25
**through [13]** 5/2

22/9 25/23 27/12 28/23 31/10 31/13 41/12 42/12 42/20 42/24 48/25 49/1
**tied [1]** 16/5
**time [36]** 3/22 3/23 4/10 4/14 6/24 9/6 9/11 9/18 9/20 12/4 12/6 12/25 15/11 15/13 16/4 16/11 16/19 17/10 20/2 20/12 23/23 24/2 25/1 25/15 30/12 30/14 31/19 32/11 33/13 34/7 46/5 47/22 48/2 48/7 48/8 51/1
**times [2]** 25/16 25/16
**today [8]** 6/8 25/4 25/14 26/20 27/14 27/23 33/22 51/15
**told [2]** 12/14 22/5
**tomorrow [1]** 51/6
**ton [2]** 34/25 49/18
**too [2]** 10/15 29/22
**took [1]** 19/22
**topic [1]** 43/1
**topics [1]** 51/15
**total [2]** 35/2 35/4
**totally [1]** 50/24
**track [1]** 50/12
**trailer [1]** 3/16
**transcript [3]** 1/7 1/25 52/4
**transcription [1]** 1/25
**transforming [1]** 23/21
**trial [26]** 2/18 3/13 4/1 6/11 25/10 25/21 25/24 26/18 27/11 27/16 27/21 27/24 28/9 28/18 29/2 29/22 30/15 30/18 30/19 33/23 34/10 34/12 35/6 35/23 45/8 49/15

**tried [1]** 4/9
**true [5]** 44/21 44/23 45/24 47/18 52/4
**Trump [6]** 22/15 29/6 30/21 43/9 43/13 46/23
**truth [8]** 41/3 41/15 41/20 43/11 43/15 43/21 46/20 49/6
**try [3]** 17/21 19/11 19/17
**trying [4]** 16/17 18/5 25/12 48/16
**turn [1]** 17/22
**turns [1]** 8/2
**two [11]** 5/20 13/11 19/21 28/7 29/5 32/3 32/21 37/17 38/18 39/17 40/18
**two questions [1]** 38/18
**typically [2]** 36/14 36/24

## U

**U.S [3]** 1/11 1/12 1/22
**Uh [1]** 40/24
**Uh-huh [1]** 40/24
**Um [1]** 18/5
**unbiased [2]** 8/4 28/25
**unclear [1]** 32/9
**under [3]** 16/3 23/5 29/14
**underlying [3]** 43/15 47/17 48/6
**undermine [1]** 19/18
**undermined [1]** 19/7
**understand [8]** 17/13 26/10 31/13 31/15 39/2 39/19 42/11 43/22
**understanding [2]** 30/11 36/11
**Understood [2]** 20/18 32/15
**unfamiliar [1]** 8/4
**UNITED [5]** 1/1

1/2 1/9 2/4 2/9
**until [1]** 27/24
**up [13]** 3/21 4/14 4/16 15/2 16/11 19/4 25/23 30/3 33/6 34/19 35/7 36/10 36/22
**upon [1]** 27/17
**us [4]** 2/12 25/9 36/18 50/17
**use [7]** 12/21 31/13 31/14 37/15 38/3 38/22 40/21
**used [4]** 27/18 37/20 38/1 46/16

## V

**vacuum [1]** 22/7
**vanilla [2]** 44/7 44/9
**various [1]** 47/13
**VAUGHN [14]** 1/11 2/9 6/23 8/17 20/22 23/11 34/6 38/17 40/4 41/16 42/23 43/14 44/14 50/14
**venire [1]** 7/5
**versions [1]** 26/20
**versus [1]** 2/4
**very [11]** 5/3 5/5 6/11 7/5 8/8 8/11 13/24 26/10 32/5 33/20 40/4
**Vice [1]** 28/1
**video [1]** 3/9
**view [22]** 3/15 4/12 9/17 10/11 13/3 13/10 13/23 14/10 16/20 17/3 17/16 23/16 27/23 28/16 31/12 32/10 32/13 34/6 36/4 39/2 51/12 51/13
**viewed [1]** 7/10
**viewership [1]** 7/19
**views [1]** 49/23
**voir [12]** 4/3 4/23 6/1 7/1 7/8 7/25 26/17 27/10 28/23 29/3 33/22 36/11
**vs [1]** 1/4

## W

**wait [3]** 27/24 34/13 39/3
**waive [1]** 17/20
**waived [1]** 24/11
**waiver [5]** 17/15 23/15 24/1 31/24 32/22
**waiving [1]** 6/2
**want [18]** 6/10 6/12 6/15 6/16 14/25 19/11 24/13 25/18 26/11 31/8 31/8 31/12 31/17 32/3 32/11 35/14 49/17 50/8
**wanted [7]** 3/14 15/12 15/19 18/19 19/21 19/24 35/21
**wants [5]** 6/9 15/9 16/10 16/12 38/3
**warranting [1]** 28/17
**was [102]**
**Washington [3]** 1/4 1/13 1/24
**wasn't [5]** 11/5 14/19 16/8 19/23 22/22
**watched [1]** 4/6
**water [1]** 23/22
**way [12]** 2/25 5/6 10/19 13/9 21/8 22/4 24/23 25/13 26/15 37/24 43/24 44/11
**ways [1]** 41/22
**we [110]**
**we'd [1]** 38/9
**we'll [3]** 5/9 27/10 49/21
**we're [25]** 4/19 20/15 21/20 23/20 25/2 26/18 27/7 27/11 27/24 30/19 33/18 34/25 35/1 38/12 40/9 41/3 41/4 41/15 44/9 45/5 45/22 48/20 49/14 49/14 50/11
**we've [14]** 2/13 6/14 17/12 22/5 22/12 22/15 33/15 33/22 33/22 33/23

65

**W**

**we've... [4]** 35/22 38/7 39/23 42/4
**Webster's [1]** 8/25
**week [4]** 4/7 19/24 28/15 28/19
**weekend [1]** 38/10
**Welcome [1]** 2/15
**well [21]** 9/1 10/23 11/22 14/9 15/20 16/2 17/13 17/17 18/24 20/6 20/20 21/10 23/2 24/22 25/19 26/10 33/20 33/24 38/19 42/15 50/7
**well-preserved [1]** 26/10
**were [15]** 3/23 8/7 10/22 11/18 11/21 14/4 16/8 16/12 22/14 29/17 30/4 30/7 47/14 47/15 47/17
**weren't [2]** 4/11 15/23
**wet [2]** 38/8 38/20
**what [77]**
**what's [4]** 23/7 25/13 36/17 40/25
**whatever [7]** 4/4 5/15 11/5 11/20 14/8 18/5 26/5
**when [14]** 5/21 11/19 18/13 18/24 21/21 21/21 22/10 26/11 28/10 31/2 44/16 47/9 48/9 48/11
**whenever [2]** 15/19 25/14
**where [11]** 8/2 10/7 15/16 17/5 17/23 18/12 30/18 34/18 34/19 37/24 48/15
**Whereas [1]** 20/15
**whether [38]** 4/5 5/16 7/15 8/12 10/1 11/21 12/22 13/8 14/17 16/24

18/8 18/23 19/11 20/3 20/4 23/17 24/6 24/9 24/10 24/11 27/16 28/20 29/2 29/5 30/2 30/17 31/21 31/24 31/24 32/21 37/25 43/10 44/21 46/16 47/15 47/17 49/23 50/1
**which [20]** 2/19 4/10 5/8 10/15 12/1 12/5 12/11 13/15 14/16 24/23 26/25 29/5 37/18 38/4 39/7 40/5 41/19 42/21 47/9 49/2
**while [4]** 5/1 18/17 24/16 34/3
**WHITE [6]** 1/18 1/18 2/12 2/15 22/15 28/1
**who [10]** 2/5 7/24 8/3 29/1 32/16 41/12 42/13 42/14 42/16 43/2
**whole [2]** 5/11 42/24
**why [16]** 2/18 5/15 11/19 11/22 12/22 13/7 14/7 14/12 15/8 15/25 18/21 23/5 29/9 34/20 36/17 50/14
**will [38]** 2/20 4/21 5/2 5/6 5/11 5/12 5/12 5/13 6/13 6/23 7/21 7/22 8/11 13/19 20/19 26/1 26/17 26/19 26/20 26/22 26/23 27/1 27/5 27/13 27/20 28/8 29/1 31/7 31/8 33/24 36/1 36/15 36/15 42/11 42/18 42/21 48/4 50/23
**willful [3]** 32/6 32/23 44/16
**willfully [1]** 22/2
**willfulness [3]** 21/19 32/7 32/13
**willingness [1]**

10/10
**wishes [1]** 10/21
**Withdraw [1]** 28/2
**within [2]** 40/23 43/1
**without [2]** 6/2 43/1
**witness [8]** 34/2 34/17 40/15 41/12 42/12 44/16 49/1 50/15
**witnesses [2]** 13/6 35/14
**won't [2]** 6/24 8/8
**word [3]** 5/3 26/20 36/24
**words [8]** 19/7 20/11 20/12 20/13 21/2 30/25 42/2 42/18
**work [3]** 4/19 18/20 19/25
**working [1]** 30/25
**works [3]** 22/4 23/25 35/9
**would [66]**
**wouldn't [12]** 5/22 11/6 12/22 13/7 14/7 14/12 18/10 18/21 20/2 20/3 26/11 27/9
**write [3]** 5/8 26/24 39/1
**wrote [2]** 21/22 22/11

**Y**

**yeah [9]** 8/13 9/15 12/16 17/4 20/21 37/7 39/16 40/11 48/24
**year [1]** 2/4
**yes [41]** 2/14 2/21 3/8 5/7 5/7 5/7 5/9 5/15 6/4 6/17 7/13 8/15 8/18 9/3 9/23 10/4 10/12 11/3 11/9 20/23 24/16 24/19 26/9 26/9 26/23 26/25 30/23 32/2 32/19 33/4 35/12 35/16 36/8 36/16 36/18 48/9 48/10 48/13 50/7

50/9 51/13
**yet [3]** 8/22 29/20 30/16
**York [1]** 4/15
**you [83]**
**you'd [2]** 26/5 36/21
**You're [4]** 19/4 20/16 25/3 47/25
**You've [1]** 23/15
**Your Honor [32]** 2/3 2/8 2/11 2/21 2/22 2/24 3/24 4/9 5/24 6/6 6/7 6/20 7/7 7/17 8/15 8/18 15/4 20/23 21/14 25/2 25/8 26/13 31/15 32/15 33/2 33/5 33/6 34/8 37/10 38/19 43/3 44/15
**yourselves [1]** 2/7

**Z**

**Zelda [1]** 1/15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**MOTION TO EXCLUDE CONGRESSIONAL EVIDENCE OR DISMISS THE
INDICTMENT BASED ON GRANTING THE MOTION TO QUASH
IN *IN RE:  NON-PARTY SUBPOENAS***

Defendant Stephen K. Bannon, by and through his undersigned counsel and pursuant to

the Fifth and Sixth Amendments to the United States Constitution, respectfully moves this Court

to dismiss the Indictment in light of the Court's July 11, 2022, oral Order granting the motion to

quash the outstanding subpoenas in the related case, *In Re: Non-Party Subpoenas*, Misc. Case No.

22 Misc-00060 (CJN).[1]

**Summary Of Argument**

Mr. Bannon faces trial on criminal charges – two counts of Contempt of Congress, in

violation of 2 U.S.C. § 192 – which stem from his conduct after receiving a subpoena dated

September 23, 2021, issued on behalf of the Select Committee to Investigate the January 6th Attack

on the United States Capitol ("Select Committee"). The Government contends that Congress is the

---

[1] Filed by the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable
Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable James B. Raskin, the
Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the
Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, the Honorable Jim Clyburn, the
Honorable Steny Hoyer, David Buckley, Douglas Letter, Kristen Amerling, and Sean Tonolli.

"complainant."[2] Mr. Bannon served subpoenas on nine Select Committee members.  They are: Reps. Thompson, Cheney, Schiff, Raskin, Lofgren, Luria, Aguilar, Murphy, and Kinzinger. Through the Select Committee, these nine members of Congress set in motion Mr. Bannon's prosecution by failing to accept his assertion of executive privilege (on orders of President Donald J. Trump, the holder of the privilege), by failing to grant Mr. Bannon's reasonable request for an accommodation that would have allowed a judge to resolve the privilege issues in a civil enforcement proceeding (instead of facing criminal prosecution), or for a one week extension to resolve the competing positions asserted on the executive privilege issue by Presidents Trump and Biden, in light of the then pending lawsuit, *Trump v. Thompson,* and by deciding to make a criminal referral in this case instead of working toward a resolution or engaging in a civil enforcement proceeding to resolve the executive privilege issue.

The Committee Members, ironically, filed a Motion To Quash the subpoenas, invoking a Speech and Debate Clause privilege in order to avoid testifying at Mr. Bannon's trial. Three other movants – Reps. Pelosi, Hoyer, and Clyburn – joined the motion, also on privilege grounds. Notably, these three Members of Congress did so after having already waived Speech or Debate Clause protection by submitting themselves to the jurisdiction of this Court by filing an amicus brief in support of the Government's position.[3] The final four movants – Messrs. Buckley, Letter, Tonolli, and Ms. Amerling – are key Select Committee staff. They, together with the Members of Congress identified above, possess critical exculpatory evidence that is essential to Mr. Bannon's ability to have a fair trial.  Mr. Letter already has served as a fact witness for the Government in

---

[2] *See* Hearing Tr. March 16, 2022, at 26 (Congress is "essentially, the complainant in this case").

[3] *See* Criminal No. 21-670 (CJN), Brief of the United States House of Representatives as Amicus Curiae in Support of the Department of Justice [Doc. 76-2].

2

the case [US-000245-000252] [4]; but now has exempted from testifying by invoking privilege when called to testify by the Defendant. All subpoenaed witnesses moved to quash based on their purported Speech and Debate Clause privilege. The Motion To Quash was assigned a separate Miscellaneous case number, Misc. Case No. 22-00060 (CJN); but it was consolidated with the instant case for purposes of oral argument on July 11, 2022. After hearing oral arguments from the non-party subpoena recipients, Government counsel, and Mr. Bannon, this Court granted the MotionTo Quash. [July 11, 2022 Hearing Tr. at 141-144].

Mr. Bannon respectfully asserts that granting the Motion To Quash created a fundamental conflict between Mr. Bannon's Fifth and Sixth Amendments rights to compulsory process, to Confrontation, and to present a defense at trial on the one hand, and the Movants' Speech or Debate Clause privileges on the other hand. Mr. Bannon respectfully argues that because Movants set in motion the prosecution of Mr. Bannon, they should not have been allowed to retreat behind the Speech or Debate Clause when evidence of their actions (and their testimony concerning the same) are directly relevant to Mr. Bannon's charges, and essential to securing his Fifth and Sixth Amendment rights. Their assertion of privilege must yield to the due process and liberty interests of Mr. Bannon. Now that the Court has granted their Motion To Quash, the only next step consistent with due process is to either exclude all congressional evidence at Mr. Bannon's trial or dismiss the charges entirely to preserve Mr. Bannon's Fifth and Sixth Amendment Rights. *See* discussion of *Rainey* case *infra* pp. 14-15 (dismissal of obstruction of Congress charge where subpoenaed members of Congress validly asserted Speech or Debate privilege). Otherwise, there would be a one-sided presentation of "evidence" at the criminal trial that is wholly untested by

---

[4] Bates Number references herein are to documents produced by the Government in Criminal No. 21-670 (CJN).

cross-examination or the ability to elicit critical exculpatory evidence from key Members of Congress and staff. The Constitution requires either the attendance of these congressional witnesses, or the exclusion of all congressional evidence at the criminal trial.  Testimony by staff members not authorized to make decisions or set policy for the Committee is not a constitutionally adequate substitute.

### **Factual Background**

The factual background underlying this case is well known to the Court; but it is set out here again for context.  On September 23, 2021, Kristen Amerling, Esquire, Chief Counsel and Deputy Staff Director of the Select Committee, served Mr. Bannon with a subpoena by email to his counsel, Robert J. Costello, Esquire. The subpoena directed Mr. Bannon to produce certain documents by October 7, 2021, and to appear for testimony on October 14, 2021. [US-000002].

On October 6, 2021, Mr. Costello received an emailed letter from Justin Clark, Esquire, counsel to President Trump, which stated in relevant part:

> President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.
>
> Through the Subpoenas, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others, the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court
>
> Therefore to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena.

[US-000971].

4

On October 7, 2021, Mr. Costello sent Ms. Amerling a letter detailing the communication from President Trump's counsel and further advised:

> It is therefore clear to us that since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert those executive privileges enumerated above, we must accept his direction and honor his invocation of executive privilege. As such, until these issues are resolved, we are unable to respond to your request for documents and testimony…We will comply with the directions of the courts, when and if they rule on these claims of both executive and attorney client privileges. Since these privileges belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr. Bannon is legally unable to comply with you subpoena requests for documents and testimony.

[US-000234 - 000235].

On October 8, 2021, Mr. Costello received a letter from Hon. Bennie G. Thompson, Chairman of the Select Committee, summarily rejecting all claims of privilege by President Trump with respect to Mr. Bannon. [US-000238 - 000239]. The letter advised that Mr. Bannon was obligated to produce documents "[r]egardless of any purported privilege assertion by Mr. Trump" and warned that if Mr. Bannon did not ignore President Trump's invocation of executive privilege and respond the subpoena, the Select Committee would view this as "willful non-compliance with the Subpoena….which could result in a referral from the House to the Department of Justice for criminal charges." *Id.*

In response to Chairman Thompson's October 8, 2021 letter, on October 13, 2021, Mr. Costello sent a letter to Chairman Thompson wherein he provided legal support for Mr. Bannon's reliance on President Trump's invocation of executive privilege and reiterated that Mr. Bannon would further respond to the subpoena if President Trump withdrew his claims of privilege, or if a court resolved the legal issues. [US-000315 – 000316]. The letter stated, in pertinent part, as follows:

5

As an initial matter, your use of the word "defiance" is inappropriate. Mr. Bannon's position is not in defiance of your Committee's subpoena; rather, Mr. Bannon noted that President Trump's counsel stated that they were invoking executive and other privileges and therefore directed us not to produce documents or give testimony that might reveal information President Trump's counsel seeks to legally protect. Mr. Bannon has testified on three prior occasions, before the Mueller Investigation, The House Intelligence Committee and the Senate Intelligence Committee. In each of those instances, when President Trump waived his invocation of the executive privileges, Mr. Bannon testified. As recently as today, counsel for President Trump, Justin Clark, Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved. Your Committee will have the right to challenge that exercise or its scope. That is an issue between the Committee and President Trump's counsel and Mr. Bannon is not required to respond at this time. See *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019) ("The President can certainly identify sensitive information that he deems subject to executive privilege, and his doing so gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf when, in the course of his testimony, he is asked a question that would require disclosure of that information.")[.]

Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying. As noted previously, Mr. Bannon will revisit his position if President Trump's position changes or if a court rules on this matter.

*Id*.

On October 13, 2021, Mr. Costello telephoned Sean Tonolli, Senior Investigative Counsel for the Select Committee, to inquire (1) whether it was possible for one of President Trump's lawyers to attend the deposition and make privilege objections on President Trump's behalf; and (2) whether the deposition could be conducted remotely. [US-000317]. Mr. Tonolli understood that "the thrust of these questions" by Mr. Costello were consistent with an ongoing effort to reach accommodation that would allow Mr. Bannon to appear in response to the subpoena. *Id.*

Because no accommodation was accepted by the Select Committee, notwithstanding the constitutional imperative requiring the parties to try to reach one, Mr. Bannon did not produce the subpoenaed documents or appear for testimony on October 14, 2021. [US-000277 -000288]. On October 15, 2021, Chairman Thompson sent Mr. Costello a letter that included a blanket rejection

6

of assertions of privilege by President Trump. [US-000299 - 000300]. The letter asked Mr. Bannon to provide any additional information he wished to the Select Committee by October 18, 2021. [US-000301].

On October 18, 2021, Mr. Costello sent Chairman Thompson a second letter, which stated:

> We write on behalf of Stephen Bannon. We have just been advised of the filing of a lawsuit in federal court for the District Court of Columbia entitled Donald J. Trump v. Bennie Thompson, et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we respectfully request a one-week adjournment of our response to your latest letter so that we might thoughtfully assess the impact of this pending litigation.

[US-000290]. On October 19, 2021, Chairman Thompson sent Mr. Costello a letter that summarily rejected Mr. Costello's request for a one-week adjournment. [US-000275]. On October 21, 2021, the House of Representatives voted 229-202, largely along party lines, to hold Mr. Bannon in criminal contempt of Congress, and the matter was referred to the U.S. Attorney's Office for the District of Columbia. [US-000459 – 000504]. On November 12, 2021, a grand jury charged Mr. Bannon in a two-count indictment. [Criminal No. 21-670 (CJN), Doc. 1].[5]

---

[5] Count One charges Mr. Bannon with Contempt of Congress, in violation of 2 U.S.C. § 192, alleging that "having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House, did willfully make default – that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to appear to give testimony in response to a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to appear for a deposition at 10:00 a.m. on October 14, 2021." *Id*. at 8. Count Two also charges him with Contempt of Congress, in violation of 2 U.S.C. § 192, alleging that "having been summoned as a witness by the authority of the U.S. House of Representatives to produce papers upon a matter under inquiry before a committee of the House, did willfully make default – that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, BANNON refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way with a subpoena dated September 23, 2021, issued by the Select Committee and commanding BANNON to produce documents and communications as delineated therein." by October 18, 2021. *Id*. at 9.

7

Members of the Select Committee have made public statements that reveal their bias against Mr. Bannon. To note just a few examples:

- Those who have come forward to the @January6thCmte committee have chosen to do the right thing by showing up, speaking to Congress, and providing information. There is no one above the law, and we continue to gather information and facts about the events of January 6th." Elaine Luria (@RepElaineLuria), Twitter (Apr. 13,2022,10:30 PM),https://twitter.com/RepElaineLuria/status/1514430760996024321?ref_src=twsrc%5Etfw.

- No one is above the law. No one can run out the clock. Our Select Committee will find the truth." Stephanie Murphy (@RepStephMurphy), Twitter (Dec. 1, 2021, 8:55 PM), https://twitter.com/repstephmurphy/status/1466224521371914243.

- No one is above the law. Sadly, a few of Mr. Trump's aides continue to think they are. Zoe Lofgren (@RepZoeLofgren), Twitter (Mar. 28, 2022, 6:30 PM), https://twitter.com/repzoelofgren/status/1508574278207393795.

- Steve Bannon was given every opportunity to comply with a lawful subpoena. He chose instead to make specious claims of executive privilege. Tonight, we voted to hold him in criminal contempt. Despite what he and Trump may believe, no one is above the law." Adam Schiff (@RepAdamSchiff), Twitter (Oct. 19, 2021, 7:58 PM), https://twitter.com/RepAdamSchiff/status/1450612312407257089.

- And to be a strong, self-sustaining, self-respecting democracy, we can't allow people to decide that they are above the law and that they are more important than our constitutional prophecies. Olafimihan Oshin, *Raskin: Pence was a Hero on Jan. 6 for Resisting 'Pressure Campaigns' and 'Coercive Efforts'*, The Hill (June 19, 2022, 11:37 AM), https://thehill.com/homenews/3529123-raskin-pence-was-a-hero-on-jan-6-for-resisting-pressure-campaigns-and-coercive-efforts/.

- Anyone who attempts to hinder our investigation, or who refuses to comply with a subpoena, can expect that we will use every tool at our disposal to ensure the Committee's work can continue. No one is above the law." Press Release, Pete Aguilar, Member, House Select Committee to Investigate the January 6th Attack on the United States Capitol, Aguilar Issues Statement on Grand Jury Indictment

8

of Steve Bannon (Nov. 13, 2021) https://aguilar.house.gov/2021/11/13/aguilar-issues-statement-grand-jury-indictment-steve-bannon/

On May 10, 2022, Douglas N. Letter, Esq., General Counsel to the U.S. House of Representatives, hand-filed a Motion with the Clerk of the Court seeking leave to file an amicus curiae brief in support of both the government's Opposition to Mr. Bannon's Motion to Dismiss [Criminal No. 21-670 (CJN), Doc. 65] and the government's Motion in Limine to exclude evidence relating to objections to the subpoena [Criminal No. 21-670 (CJN), Doc. 53]. The House's decision to file an amicus curiae brief in this case was approved by the three Democrat members of the House Bipartisan Legal Advisors Group ("BLAG") – namely, Reps. Pelosi, Hoyer, Clyburn.

Also on May 10, 2022, Speaker Pelosi issued a press release. Speaker Pelosi's press statement asserted that the vote to hold Mr. Bannon in contempt of Congress "upheld the genius of our Constitution[.]"[6] Speaker Pelosi further stated in the public statement, follows:

> The Department of Justice is to be commended for moving to hold Bannon accountable for his blatant defiance of a lawful subpoena. Now, Bannon is seeking to dismiss the case, claiming that the Select Committee to Investigate the January 6th Attack does not have standing to compel his testimony. By addressing many of Bannon's baseless arguments before the D.C. District Court, the House continues to defend this Constitutional power as well as its essential prerogative to establish its own rules and practices.
>
> No one is above the law. As the House's amicus brief makes crystal clear, *the subpoena of Steve Bannon issued by the Select Committee is legally valid, urgently needed and must be enforced.*

*Id.* (emphasis added).

On June 7, 2022, counsel for Mr. Bannon issued subpoenas for documents and testimony to the Movants here. *See* Motion To Quash Ex. A to P. The subpoenas sought specific information critical to Mr. Bannon's defense in this matter, which is not available from any other source.

---

[6] Press Release, Nancy Pelosi, Speaker of the U.S. House of Representatives (May 10, 2022).

9

On June 9, 2022, counsel for Mr. Bannon and counsel for the U.S. House of Representatives met and conferred via telephone. The Motion to Quash states that "[c]ounsel met, but were unable to agree on any withdrawal or narrowing of the subpoenas." Motion To Quash at 3. But that is not the whole story. Counsel for Mr. Bannon specifically offered to "make the process as accommodating and unintrusive as possible" by offering to arrange the date of testimony so that Members would not miss votes or be required to attend trial when the House was not in session. In addition, counsel for Mr. Bannon specifically offered – among other accommodations to reduce the burden of document production – to "work with individual Members on accommodations with respect to the production of documents." Counsel for the U.S. House of Representatives did not take us up on those very broad offers of accommodation.  House counsel acknowledged during that conference that none of the Committee's staffers has any decision-making authority. Therefore, by House Counsel's own admission, none of the staffers therefore would be competent witnesses to testify to some of the most fundamental issues Mr. Bannon seeks to raise in his defense, as detailed in earlier pleadings in this case.  Only the Members of Congress would be competent witnesses on issues including the decision-making process concerning the composition of the Select Committee, the status of any "ranking minority member," the refusal to engage in the constitutionally mandated accommodation process, the rejection of executive privilege, and other key defense issues to be put before the jury at trial.

On June 13, 2022, Movants filed their Motion to Quash on the grounds that: (1) the subpoenas are barred by the Speech or Debate Clause; (2) that the subpoenas lack the specificity required by Fed. R. Crim. Pro. 17; (3) that Mr. Bannon has not established "extraordinary" or "exceptional" circumstances that would permit him to compel the appearance and testimony of a

"high-ranking government official"; and (4) that the subpoena to House General Counsel seeks privileged information. Motion To Quash, Misc. Case No. 22-60 (CJN) [ECF 1 at 5].

On July 11, 2021, in an oral Order, the Court granted the Motion to Quash, [July 11, 2022 Hearing Tr. at 141-144], denying Mr. Bannon the ability to compel the testimony of any of the members. Two staff members will be permitted to testify voluntarily, with limitations even on that, and neither has any decision-making authority. The granting of the Motion to Quash irretrievably denies Mr. Bannon the exercise of his Fifth and Sixth Amendment rights (compulsory process, confrontation, effective assistance of counsel, due process, fair trial rights). Mr. Bannon therefore respectfully requests that the Court exclude all congressional evidence at his criminal trial or dismiss the indictment.

## **ARGUMENT**

### **Allowing Members Of Congress to Initiate A Criminal Prosecution For Criminal Contempt Of Congress and Then Retreat Behind The Speech And Debate Clause When Summoned As Trial Witnesses Requires the Requested Relief .**

The Speech or Debate Clause provides as follows:

> The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. Art. I § 6, cl. 1. To understand the scope afforded by the Speech or Debate Clause, it is important to understand its history. The clause traces its roots to England, where centuries of monarchs used the criminal and civil court systems to control dissent in the legislature. *United States v. Johnson*, 383 U.S 169, 178 (1966). The language of the Speech or Debate Clause mirrors the language of its predecessor in the English Bill of Rights of 1689, which states "'[t]hat the

Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament' 1 W. & M., Sess. 2, c. 2." *Id.* The "predominate thrust" of the Speech or Debate Clause is to protect critical or disfavored legislators against criminal charges by a hostile executive branch, or criminal conviction by a hostile judiciary. *Johnson*, *supra*, 383 U.S. at 182. Thus, the Speech or Debate Clause protects members of Congress and their aides against prosecutions that directly impinge upon or threaten the legislative process." *Gravel v. United States* 408 U.S. 606, 614 (1972).

Because the Speech or Debate Clause "was designed to preserve legislative independence, not supremacy," *Johnson,* 383 U.S. at 178, there are circumstances where a member of Congress (and staff) are subject to the compulsory process of the courts. For instance, in *Gravel v. United States*, the Supreme Court explicitly held that the Speech or Debate Clause does not immunize a member of Congress from service of process as a defendant in a civil matter or as a witness in a criminal case. 408 U.S. 606, 614 (1972); *see also United States v. Cooper*, 4 Dall., 341 (1800) ("The constitution gives to every man, charged with an offence, the benefit of compulsory process, to secure the attendance of his witnesses. I do not know of any privilege to exempt members of congress from the service, or the obligations, of a subpoena, in such cases.").

Where – as here – actions by a Member of Congress or staff infringe upon the constitutional rights of a citizen, their acts are not protected by the Speech or Debate Clause. *McSurely v. McClellan*, 553 F.2d 1277, 1288 (1976) (Speech or Debate Clause did not immunize senator and his aides were not immune from liability in private suit for damages in which plaintiffs alleged that documents taken in violation of Fourth Amendment from plaintiffs' home by state authorities, after being taken to Washington, DC, by investigator employed by Senate subcommittee, were disseminated outside halls of Congress).

12

The Select Committee violated Mr. Bannon's constitutional right to due process in several respects. First, the Select Committee issued its subpoena without lawful authority. An element of the offense in the criminal trial will be that Mr. Bannon was "summoned as a witness by the authority of the U.S. House of Representatives." [Criminal No. 21-670 (CJN), Doc. 1 at ¶¶ 23 & 25]. Each of the Movants has first-hand knowledge that is exculpatory on this element. Second, the Select Committee rejected Mr. Bannon's reasonable request for an accommodation (a one-week extension), even though much longer extensions were granted to many Select Committee deponents, despite the fact that the accommodation process is a constitutional imperative when there is a tension between a legislative subpoena and executive privilege. Again, each Movant has first-hand knowledge that is exculpatory on this critical trial issue.

It is worth noting the Court's opinion in *United States v. American Tel. & Tel. Co.*, 567 F.2d 121 (D.C. Cir. 1977). The decision in that case emphasizes the constitutional mandate which requires therespective parties to work toward accommodation when a conflict arises between an assertion of executive privilege (Mr. Bannon's obstacle until July 9, 2022), and a congressional subpoena authority, *Id*. at 130, and further directs that the Court should encourage and facilitate that accommodation process. *Id*. at 126-133; *see also, Comm. on the Judiciary of the United States House of Representatives v. McGahn,* 968 F.3d 755, 772 (D.C. Cir. 2020) (referring to the parties' historical responsibility to engage in negotiations to resolve their interbranch informational disputes; see also, *Id.* at 778 to end, Henderson, J., dissenting, discussing the importance of the accommodation process).[7]

---

[7] Other well settled legal principles also support the relief sought herein:  1.  '[O]ccasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible." *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 389-390, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (quoting *Nixon*, 418 U. S., at 692, 94 S. Ct. 3090, 41 L. Ed. 2d 1039);

The Framers did not rank some constitutional protections as superior to others. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976). The Sixth Amendment entitles Mr. Bannon to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Inherent in this right is the right to offer testimony of witnesses and compel their attendance. *Washington v.* Texas, 388 U.S. 14, 19 (1967) (it is fundamental to due process that "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense"); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (few rights are more fundamental than that of an accused person to present witnesses in his own defense.). This Court's Order granting the Motion to Quash, even if, *arguendo*, it was appropriately granted on the merits, in the context of this case and vis a vis Mr. Bannon's constitutional rights in this criminal prosecution violates Mr. Bannon's Fifth and Sixth Amendment rights and dismissal is the only appropriate remedy to safeguard those rights.

Courts have held that dismissal of an indictment is the appropriate remedy when the government's assertion of a privilege prevents a criminal defendant from securing documents and testimony relevant and material to the defense's case. *See Roviario v. United States*, 353 U.S. 53 (1957) (dismissal required where government refused to disclose identity of undercover witness who might be a material defense witness as to whether accused knowingly transported narcotics); *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) (dismissal of prosecution for making

---

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2025 (2020); 2.  It is especially inappropriate to try to resolve through the criminal process the complicated constitutional issues that arise in such disputes as these.  *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983); *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.C.Cir.1971); *Tobin v. United States*, 306 F.2d 270, 276 (D.C.Cir.1962).

14

**-3205-**

false statements to government about CIA activities in which defendant was involved because nature of defendant's assignments was central to the charges against him and government's assertion of State Secrets privilege with respect to same deprived the defendant of his right to present a meaningful defense); *See also* [Ex. 1] Trial Trans., Day 1 Afternoon Session, *United States v. David Rainey*, Crim. No. 12-CR-00291-KDE-DEK (E.D. La. Jul. 14, 2015), ECF No. 510.

In the *Rainey* case, (Crim. No. 12-CR-00291-KDE-DEK), the district court dismissed an obstruction of Congress charge against a *Deepwater Horizon* executive finding thatbecause the subpoenaed Members of Congress validly invoked their Speech or Debate privilege and could not be compelled to testify, dismissal of the charge was the only means of preserving the accused's right to a fair trial[8]:

> As seen earlier today, the Court found in favor of the House, and its ruling supported the House's long-standing constitutional privilege under the Speech or Debate Clause. The Court must now address what implication that ruling has on the defendant's right to a full trial and his constitutionally guaranteed rights, which I have just described.
>
> Thus, the Court finds that, similar to the holding in [*U.S. v. Fernandez*, 913 F.2d 148 which is a Fourth Circuit case, 1990, and consistent with the rulings in *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*, 353 U.S. 53, the government's prosecution of Count 1 under § 1505 must give way where the defendant seeks relevant, material, noncumulative

---

[8] *See* [Ex. 2] Brian M. Heberling, *Congressional Gamesmanship Leads To An Acquittal in Deepwater Horizon Case: United States v. David Rainey: A Case Study*,  20 Berkeley J. Crim. L. 260, 262 (Fall 2015) (noting the "lessons learned" from the *Rainey* case, including (1) there is only one United States when it comes to a criminal prosecution, rendering the consequences of a privilege assertion by Members of Congress attributable to the Executive Branch, (2) a criminal defendant's right to compulsory process cannot be vindicated by voluntary testimony limited in scope by the witness, (3) district courts have power to exclude all congressional evidence if a selective invocation of the Speech or Debate Clause privilege leads to a one-sided, unfair presentation of evidence, and may acquit a defendant if the ruling leads to a failure of proof on an essential element, and (4) given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should not pursue a criminal charge that requires congressional testimony if any alternatives are available.).

evidence related to his defense, but also where he has been precluded from obtaining this evidence due to the invocation of a constitutional privilege by a branch of the very same government involved in his prosecution. Because the defendant is not able to put on a full and fair defense, consistent with his constitutional rights and consistent with an element of the crime as described by the Fifth Circuit and set forth in the jurisprudence, under these circumstances the Court finds the only appropriate remedy is dismissal of Count 1.

[Ex. 1 at 29:17-30:1].

### Granting The Motion To Quash Requires The Exclusion
### Of All Congressional Evidence At Mr. Bannon's Criminal Trial

Movants claimed that the subpoenas request documents and materials that are irrelevant to Mr. Bannon's case and they should be exempt as "high-ranking officials.

Counsel for Mr. Bannon tailored the requests narrowly to capture documents that reflect specific communications by each Movant related to Mr. Bannon, and specific documents that reflect the bias of the Movant against Mr. Bannon and the intended testimony of each witness was directly relevant and narrowly tailored.[9] *See Welsh v. United States*, 404 F.2d 414, 417-418 (5th

---

[9] For example, the subpoena directed to Chairman Thompson seeks his testimony concerning all correspondence with Mr. Costello concerning Mr. Bannon, along with all Bannon-related decision-making by the Committee, his lack of consultation with a ranking minority member, his public statement that Rep. Cheney is not the ranking member on the Committee, along with information supporting the allegations he made in a lawsuit filed against President Trump, purporting to assess liability for the events of January 6, 2021, and claiming that he was personally injured by those events. *Thompson v. Trump*, 1:21-cv-00400(APM) (See e.g. Doc. 11-1 Amended Complaint). This hardly seems an appropriate prelude to service as the Chair of a Select Committee tasked with investigating those events. Furthermore, Select Committee Members Raskin and Schiff have each written books that they are currently marketing which assert their conclusions about liability for the events of January 6th, before they even began their purported "investigation" as members of the Select Committee. Subpoenas directed toward them seek to uncover personal, reputational, and financial conflicts of interests for these members, who clearly have a vested interest in ensuring that the Select Committee's conclusions are consistent with the conclusions they have drawn in their books and to take testimony from them on how the reason for subpoenaing Mr. Bannon jibes with their prejudgments on the events of January 6th. Examination of these witnesses at trial would have included focus on the formation of the Committee and the rejection of members proposed by Rep. McCarthy, the lack of a ranking minority member as required by the rules, the failure to provide a copy of Rule 3(b)(Pelosi on these subjects as well), all decision-making by the Committee vis a vis Mr. Bannon, the basis for his subpoena and the basis for not respecting the invocation of executive privilege, for refusing his

Cir.1968) ("if the accused avers facts which, if true, would be relevant to any issue in the case, the

requests for subpoenas must be granted, unless the averments are inherently incredible on their

face, or 'unless the Government shows, either by introducing evidence or from matters already of

record, that the averments are untrue or that the request is otherwise frivolous.' ... That test places

the burden of showing frivolity or abuse of process on the Government, where it properly

belongs.") (quoting *Greenwell v. United States*, 115 U.S. App. D.C. 44 (1963)).

The same response applies to Movant Douglas Letter's contention that he need not produce

documents pertaining to his change in position regarding whether the Select Committee has a

"ranking minority member." Mr. Letter voluntarily participated in an FBI interview where he

stated that the Select Committee had no ranking minority member. He later changed his position

and claimed that Representative Liz Cheney is the ranking member on the Select Committee;

however, Select Committee Chairman Thompson has explicitly said that Representative Cheney

is not the ranking member.[10] The jury in Mr. Bannon's criminal case is entitled to hear evidence

on that issue – which is critical to the "authority" element of the offense. If there are specific

documents that are covered by the attorney-client privilege, the proper course is to identify them

and determine whether an accommodation can be reached as to those documents, or whether a

_____

request to test the validity of his invocation in a civil enforcement proceeding, the denial of his
extension request, the decision to refer his case for criminal prosecution, and media statements
about Mr. Bannon and their contempt referral made by each of these members and others under
subpoena.  There will be no competent witness at trial to testify in place of these essential witnesses
and no witness with decision-making authority.

[10]YOUTUBE, *Watch: Jan. 6 House Select Committee Holds First Hearing On Capitol Riot* (July 27,
2021), https://www.youtube.com/watch?v=vHrt44ANHIA at 16:37; *see also* ( Kimberly Wehle,
*The Case for Subpoenaing Members of Congress to Testify on the January 6 Insurrection:
Democrats have strong constitutional arguments on their side*, THE ATLANTIC (Aug. 26, 2021),
(Thompson made clear at the opening hearing that Representative Liz Cheney "is not the ranking
member," and Adam Kinzinger is the only other Republican on the committee).

17

**-3208-**

modification to the subpoena to Mr. Letter should be made to excuse him from producing those documents. Mr. Bannon respectfully contends that it was error to quash the subpoena on that basis, or excuse Mr. Letter's appearance as a trial witness on that basis; but even if the ruling were correct, the relief he seeks herein still applies.

Movants argued that, even though they initiated this prosecution, they are "high-ranking government officials" who are too important and too busy to appear as trial witnesses. *See* [ECF 1 at 33, 38 in Misc. Case No. 22-00060 (CJN)]. The cases cited by the subpoenaed parties pertain to civil depositions or criminal matters where the officials did not have first-hand knowledge pertaining to an element of the offense, and did not personally take steps to initiate the prosecution.[11] Again, Mr. Bannon opposed this claim; but even if the Court was correct in granting the Motion to Quash on this ground, the relief sought herein applies.

---

[11] *See, e.g., Springfield Terminal Ry. Co. v. United Transp. Union*, 1989 WL 225031, at *1-2 (D.D.C. May 18, 1989) (civil case – court refused to compel ranking Minority Member of House Appropriations Committee to testify or produce documents in a dispute over an arbitral award where congressman was only tenuously connected to the issues in the lawsuit, and Plaintiff stonewalled all efforts congressman made to reach a less burdensome accommodation); *Simplex Time Recorder Co, v. Secretary of Labor*, 766 F.2d 575 (1985) (civil case – court refused to compel Department of Labor officials to testify regarding enforcement of the Occupational Safety and Health Act of 1970 where such decisions were discretionary and the information sought was available from other sources); *Bogan v. City of Boston*, 489 F.3d 417 (1st Cir. 2007) (civil case – district court did not abuse its discretion by issuing a protective order in civil rights case to prevent taking of deposition from mayor where other avenues for obtaining the requested information had not been exhausted); *In re U.S. ("Bernanke")*, 542 F. App'x 944 (Fed. Cir. 2013) (civil case – Chairman of Board of Governors of Federal Reserve entitled to protective order preventing his deposition because deposition created risks of disrupting significant ongoing government activities and probing into decision-making process of Federal Reserve without showing of extraordinary circumstances); *Blankenship v. Fox News Network, LLC*, 2020 WL 7234270 (S.D. Va. Dec. 8, 2020)( civil case – granting protective order to prevent deposition of Senators McConnell and Gardner where Plaintiff had not demonstrated Senators personal knowledge of facts at issue, and alternative avenues for securing information had not been exhausted); *Moriah v. Bank of China, Ltd.*, 72 F.Supp.3d 437 (S.D.N.Y. 2014) (civil case –victim of bombing which occurred in Israel and the personal representative of victim who was killed in bombing failed to demonstrate exceptional circumstances allowing deposition of the former House Majority Leader of the House of Representatives, where victim and personal representative could not establish former Leader

18

The cases that Movants relied upon are aimed at protecting the integrity of the administrative process and at ensuring that high-ranking officials are not dragged into civil lawsuits lawsuit that tangentially implicate their decisions or actions. *See United States v. Morgan*, 313 U.S. 409 (1941); *United States v. Newman*, 531 F. Supp.3d 181, 188 (D.D.C. 2021). That is not the situation in this criminal case. As detailed above, this is a case where the members have been subpoenaed have taken direct actions that resulted in prosecution of Mr. Bannon. In these circumstances, they are not merely high ranking official at the top of the pyramid but instead are, as the Government has stated to the Court, "complainants" in this case. By their actions directed at Mr. Bannon and aimed at subjecting him to criminal prosecution, they have necessarily waived

---

had unique first-hand knowledge related to any matter in action against Chinese bank relating to bombing); *Feldman v. Bd. of Educ. School Dist. #1 City & Cnty of Denver*, No. 09-CV-01049, 383154 (D. Colo. Jan. 28, 2010) (civil case – granting motion to prevent deposition of Senator where Senator had no first-hand knowledge or participation in the facts at issue); *In re U.S. ("Reno & Holder")*, 197 F.3d 310 (8th Cir. 1999) (defendant sentenced to death was not entitled to subpoenas directing AG and her deputy to testify in decision  not to withdraw death notice; since record contained sufficient evidence to establish factual basis for defendant's claim, testimony of AG and her deputy was not necessary); *Cano v. Davis*, NO. 01-CV-08477 (C.D. Cal. March 28, 2022) (civil case –plaintiffs in California voter redistricting challenge had not adequately alleged that the subpoenaed senators had first-hand knowledge of the state's redistricting plan and that subpoenas should be quashed pending court's ruling on defendant's summary judgment motion as to propriety of discovery on issues of intent); *Lederman v. N.Y.C. Dept. of Parks and Recreation*, 731 F.3d 199 (2d. Cir. 2013) (civil case – district court did not abuse its discretion in issuing protective order barring depositions of Mayor and former Deputy Mayor of New York in suit by visual artists challenging constitutionality of time, place, and manner restrictions on selling art because artists did not demonstrate exceptional circumstances, identify with particularity the information they needed, or contend that Mayor and his Deputy had first-hand knowledge about litigated claims or that relevant information could not be obtained elsewhere); *Bardoff v. United States* , 628 A.2d 86 (D.C. 1993) (civil case – protestors who disrupted Iran-Conta hearing not entitled to subpoena senators and chief counsel to question them concerning conduct of hearing, including decision to adjourn, as subject fell within area of legislative activity protected from being "questioned in any other place" by speech or debate clause); *McNamee v. Mass.*, 2012 WL 1665873 (D. Mass. May 10, 2012) (civil case – granting motion to quash subpoenas directed at congressman and chief of staff in worker's compensation action because plaintiff had not demonstrated that congressman or chief of staff had personal knowledge of facts at issue).

any argument that they are too high ranking or too busy to testify at trial. Nevertheless, of quashing their subpoenas was correct, it still must result in excluding the congressional evidence or dismissal of the indictment.

This Court accepted Movants' position that they have absolute immunity from subpoena process by a criminal defendant charged with Contempt of Congress under the Speech andor Debate Clause in its oral Order of July 11, 2022. The only way to preserve Mr. Bannon's Fifth and Sixth Amendment rights is to exclude all congressional evidence at trial. However, in a criminal prosecution, the Government's ultimate responsibility is to ensure justice is done. *Jencks v. United States*, 353 U.S. 657, 670-71 (1957). It follows that under the circumstances, the Government "can invoke its evidentiary privileges only at the price of letting the defendant go free." *Id.* (citing *United States v. Reynolds*, 345 U.S. 1, 12 (1953)). The Supreme Court has held, for instance, that a criminal action must be dismissed when the government, on the grounds of privilege, elects not to produce documents relevant and material to a government witness's testimony. *Jenks*, 353 U.S. at 657; *Id.* at 670-71 (holding that it is "unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."); *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (when disclosure of informer's identity, or of contents of his communication, is relevant and helpful to criminal defendant, or is essential to a fair determination of a cause, the trial court may require disclosure and, if government withholds the information on grounds of privilege, dismiss the action).

In a reversal of position, the same Members of Congress who initiated the prosecution of Mr. Bannon for asserting privilege when served with a subpoena asked this Court to excuse them from compliance with trial subpoenas based upon their own assertion of privilege. This Court

accepted their argument and granted their motion.  Speaker Pelosi has made incendiary statements about Mr. Bannon that include the phrase – no one is above the law. But it is the Members of Congress and staff who claim to be above compliance with a trial subpoena in the very criminal case they initiated.  Therefore, the relief sought herein must be granted.

The Fifth and Sixth Amendments guarantee that Mr. Bannon, like every criminal defendant, be afforded the opportunity to put on a defense at trial, to confront his accusers in court, and to compel production of evidence in their possession. Permitting Movants to selectively participate in Mr. Bannon's prosecution eviscerates those essential rights. Simply put, the House cannot have it both ways.

By filing an amicus curiae brief in support of the Government's position in this case, the subpoenaed witnesses have conceded the materiality and relevance of their testimony in Mr. Bannon's case. It would be contrary to fundamental fairness for them to avail themselves of the benefit of being heard by this Court and then hide behind legislative immunity to circumvent the legal and procedural protections afforded to the criminal defendants who come before it.  In any event, given the Court's ruling granting Movants' Motion To Quash, the indictment must be dismissed. In the alternative, evidence on which Movants would have been called to testify and on which they have relevant competent testimony to give, as identified herein, must be excluded.

## **CONCLUSION**

Based on the record in the related Miscellaneous Case, *In Re: Non-Party Subpoenas*, 22-00060 (CJN), , the record in the instant case, and based on the forgoing, this Court must either dismiss the indictment or exclude all congressional evidence at trial. The evidence Movants possess, as identified herein, is relevant, material, essential to the defense, and non-cumulative. Being left with the cross-examination of Select Committee staff who first-hand knowledge and

21

decision-making authority is a constitutionally inadequate substitute.  Finally, the Court

"conditionally" granted the Government's motion, over the Defendant's objection, to prohibit

argument by Mr. Bannon that granting the Motion To Quash provides a basis for acquittal an

adverse inference [July 11, 2022, Hearing Tr. 137-138]. However, Mr. Bannon respectfully

asserts that he must be permitted to argue that each Movant was free to testify voluntarily, and

the jury must be permitted to draw relevant inferences from Movants' failure to testify

voluntarily.

Dated: July 15, 2022                          Respectfully submitted,

                                              SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                              ____/s/ M. Evan Corcoran
                                              M. Evan Corcoran (D.C. Bar No. 440027)

                                               Riane A. White (*Pro Hac Vice*)
                                              400 East Pratt Street – Suite 900
                                              Baltimore, MD 21202
                                              Telephone: (410) 385-2225
                                              Facsimile: (410) 547-2432
                                              Email: ecorcoran@silvermanthompson.com

                                              ____/s/ David I. Schoen
                                              David I. Schoen (D.C. Bar No. 391408)
                                              David I. Schoen, Attorney at Law
                                              2800 Zelda Road, Suite 100-6
                                              Montgomery, Alabama 36106
                                              Telephone: (334) 395-6611
                                              Facsimile: (917) 591-7586
                                              Email: schoenlawfirm@gmail.com

                                              *Counsel for Defendant Stephen K. Bannon*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of July 2022, a copy of the foregoing Motion to Dismiss Based on Granting the Motion to Quash in *In Re:  Non-Party Subpoenas* was served *via* the Court's CM/ECF system on registered parties and counsel.

___/s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA      :
      :
      :     Criminal No. 21-670 (CJN)
      :
v.      :
      :
STEPHEN K. BANNON,      :
      :
     *Defendant.*      :
      :

**ORDER**

Upon consideration of Defendant's Second Motion To Dismiss, and based upon the entire record herein and in the related miscellaneous case, *In Re Non-Party Subpoenas*, 21-00060 (CJN), it is **ORDERED** that the Second Motion to Dismiss is hereby **GRANTED.**

_____
Hon. Carl J. Nichols
*United States District Judge*

Dated:

24

**-3215-**

# EXHIBIT 1

```
 1                   UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF LOUISIANA

 3

 4
     UNITED STATES OF AMERICA      *        Criminal Action
 5                                 *
     versus                        *        No. 12-291
 6                                 *
     DAVID RAINEY                   *        Section N
 7                                 *
                                   *        June 1, 2015
 8   * * * * * * * * * * * * * * * *

 9
                       DAY 1, AFTERNOON SESSION
10              TRANSCRIPT JURY TRIAL BEFORE
             THE HONORABLE KURT D. ENGELHARDT
11               UNITED STATES DISTRICT JUDGE

12
     Appearances:
13

14   For the United States:     U.S. Department of Justice
                                BY:  LEO R. TSAO, ESQ.
15                                   ROBERT A. ZINK, ESQ.
                                400 Poydras Street, Suite 1000
16                              New Orleans, Louisiana 70130

17

18   For David Rainey:          Jones Walker, LLP
                                BY:  MICHAEL W. MAGNER, ESQ.
19                              201 St. Charles Avenue, Suite 5100
                                New Orleans, Louisiana 70170

20

21   For David Rainey:          Steptoe & Johnson, LLP
                                BY:  REID H. WEINGARTEN, ESQ.
22                                   BRIAN M. HEBERLIG, ESQ.
                                     SCOTT ARMSTRONG, ESQ.
23                              1330 Connecticut Avenue, N.W.
                                Washington, DC 20036

24

25
```

```
1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, B-275
2                                   New Orleans, Louisiana 70130
                                    (504) 589-7778
3

4

5   Proceedings recorded by mechanical stenography using
    computer-aided transcription software.
6
```

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 124 of 481
Case 2:12-cr-00037-KDE-DEK Document 1651 Filed 07/15/21 Page 8 of 443

258

1                      <u>I N D E X</u>

2                                              <u>PAGE</u>

3   Preliminary Instructions                         259

4   Motions                                            271

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|        |    |                                                                  |
|--------|----|------------------------------------------------------------------|
| 03:17  | 1  | <u>**AFTERNOON SESSION**</u>                                      |
| 03:18  | 2  | **(June 1, 2015)**                                               |
| 03:47  | 3  | **THE COURT:**  Let me give you some general instructions        |

03:47    3    **THE COURT:**  Let me give you some general instructions
03:47    4    here.  I don't know whether there's much more that we can do
03:47    5    today because I have another matter with counsel to cover,
03:47    6    which you need not be concerned with.  But let me give you some
03:47    7    general instructions here today.
03:47    8         My job is to make sure that the jury pays
03:47    9    attention.  Please keep your eyes open during the trial.  If
03:47   10    you need a recess for any type of emergency, a personal
03:47   11    emergency, bathroom break, just so signal and we will try to
03:47   12    accommodate you.
03:47   13         As I indicated, the trial will proceed starting
03:47   14    at 8:30 in the morning.  We will take a midmorning break around
03:48   15    10:00 or 10:15 for about 10 or 15 minutes.  We'll take about an
03:48   16    hour for lunch.  Hopefully we can get you out of here a little
03:48   17    before noon so that you won't get caught up in any type of
03:48   18    crowd if you want to get lunch outside the building.
03:48   19         We will take a break about 3:00 or 3:15, and we
03:48   20    will conclude every day at 5:00 or a little before or after.
03:48   21    There may be some days where we finish early, like 4:30 or
03:48   22    4:15.  There may be a day when we ask you to go a few minutes
03:48   23    more, but it will not be longer than 5:15 or so unless we have
03:48   24    somebody on the stand that we want to finish, some business we
03:48   25    want to finish.

03:48   1          I will not keep you here until 6:00 or 7:00 at
03:48   2   night.  We will try to break at 5:00 or before.  That's my
03:48   3   commitment to you.  I know some of you are driving distances.
03:48   4   Some of you have parking.  We will have to give you some
03:48   5   information on parking -- which I sure wish we could
03:48   6   accommodate you on that, but the situation is as it is.
03:48   7          But I'm going to be sensitive to time in this
03:49   8   case, and I'd ask all of you-all to be very prompt.  I have
03:49   9   already warned the attorneys to make certain they are on time
03:49  10   and that their witnesses are on time so that there is as little
03:49  11   downtime in this case as possible.  I'm rather adamant that you
03:49  12   not be locked up in the jury room, which you're about to see,
03:49  13   longer than necessary.
03:49  14          I understand we are taking a break out of your
03:49  15   lives to sit in this case, and we are going to be very
03:49  16   deliberate in trying to get this case tried as quickly as
03:49  17   possible and as completely and fairly as possible.
03:49  18          I have no doubt that you as jurors -- and when I
03:49  19   make reference to jurors, I'm certainly referring to the
03:49  20   alternate jurors as well -- are mindful of your great
03:49  21   responsibilities and certainly aware that your conduct during
03:49  22   this trial will be observed by the Court, your fellow jurors,
03:49  23   the defendant, the attorneys for all the parties, and other
03:49  24   persons both inside and outside this courtroom.  I expect, and
03:49  25   your responsibility demands that you be extremely careful in

03:49   1   the manner in which you conduct yourselves, in order that no

03:49   2   one may doubt that this case is being fairly and impartially

03:50   3   tried and that, in the end, justice has been done.

03:50   4           For the same reason, the attorneys in this case,

03:50   5   the defendant, the witnesses, and all others who are identified

03:50   6   with or connected with this trial or its participants shall be

03:50   7   equally careful in their conduct.

03:50   8           During the course of the trial, jurors will not

03:50   9   engage -- or shall not engage or attempt to engage or have any

03:50   10  conversations or communications of any kind whatsoever with any

03:50   11  of the persons connected with this trial, including the

03:50   12  defendant, any relatives or family, the attorneys for the

03:50   13  government or the defendant, any witnesses or any other person

03:50   14  identified with this trial.

03:50   15          And likewise, any person identified with this

03:50   16  trial shall not engage or attempt to engage in any conversation

03:50   17  or communication whatsoever with any juror.  If this happens, I

03:50   18  ask that you report it to me immediately.

03:50   19          Further, you as jurors should avoid allowing

03:50   20  yourselves to be placed in a position, when outside of the

03:51   21  courtroom, where discussions about this case may be being

03:51   22  conducted by any of the parties to this trial.

03:51   23          Furthermore, the attorneys, the defendant, the

03:51   24  witnesses, and other persons who may be observing the trial or

03:51   25  are connected with it in any way must be particularly careful

03:51  1    not to discuss and shall not discuss the case where there is a

03:51  2    possibility that you, the jurors, may hear their remarks.  If

03:51  3    that occurs, again, I ask that you please notify me

03:51  4    immediately.

03:51  5            You should not take offense to the fact that

03:51  6    persons involved in this trial do not extend to you a friendly

03:51  7    greeting out in the hallway or wherever else you might happen

03:51  8    to cross paths.  The reason that such exchanges are not

03:51  9    permitted is because, although they may seem innocent enough,

03:51  10   they could, nonetheless, give the impression of a lack of

03:51  11   impartiality.  Creating an impression of being partial is as

03:51  12   bad as being biased, and that should be avoided.

03:51  13           I'd like at this time to give you the following

03:51  14   specific instructions:  During the course of the trial, you are

03:51  15   not to discuss this case with anyone.  That includes your

03:52  16   spouse, your children, your relatives, friends, strangers,

03:52  17   neighbors, anyone else you happen to come across during the

03:52  18   pendency of this trial.

03:52  19           Also, do not discuss this case among yourselves

03:52  20   until I have instructed you on the law and you have gone to the

03:52  21   jury room to make a decision at the end of the trial.

03:52  22   Otherwise, without realizing it, you may start forming opinions

03:52  23   before the trial is over and before the evidence has been fully

03:52  24   received.  It is important that you wait until all the evidence

03:52  25   is received and you have heard my instructions and the rules --

```
03:52   1   on the rules of law before you deliberate among yourselves.

03:52   2               Let me also add that during the course of the

03:52   3   trial, you will receive all of the evidence you may properly

03:52   4   consider to decide the case.  Because of this, do not

03:52   5   attempt -- do not attempt to gather any information on your own

03:52   6   which you think might be helpful.  Do not engage in any outside

03:52   7   reading on this case.  Do not attempt to visit any places

03:53   8   mentioned in this case.  And do not, in any other way, try to

03:53   9   learn about this case outside of this courtroom.

03:53   10              If any publicity about this case has come to

03:53   11  your attention before this moment, you must strike it from your

03:53   12  minds and completely disregard anything that has come to your

03:53   13  attention outside this courtroom.  This case is to be decided

03:53   14  only on the evidence and exhibits that have -- witness

03:53   15  testimony and exhibits that have been admitted here in this

03:53   16  courtroom.  It shall not be decided based upon anything that

03:53   17  occurs outside of the four walls of this courtroom.

03:53   18              From this moment on, you are not to read any

03:53   19  newspapers or other accounts of this trial, nor are you to view

03:53   20  or listen to any television news or radio reports or other

03:53   21  accounts of this trial, including those available on the

03:53   22  Internet, transmitted by other means, including Twitter.  This

03:53   23  is necessary because your verdict, as I said, must be based

03:53   24  solely on the evidence presented in this trial and in

03:53   25  accordance with what you hear and see in this courtroom and in
```

```
03:54    1    accordance with the Court's instructions on the law applicable
03:54    2    to the case.
03:54    3              I recognize that many of you use cell phones,
03:54    4    BlackBerrys, the Internet, and other tools of technology or
03:54    5    social media.  However, you must not use these tools to
03:54    6    communicate electronically with anyone about this case.  This
03:54    7    includes your family and friends; and you may not communicate
03:54    8    with anyone about this case on your cell phone through e-mail,
03:54    9    BlackBerry, iPhone, text messaging, or on Twitter or through
03:54   10    any blog or website, through any Internet chat room or by way
03:54   11    of any other social networking websites, including Facebook,
03:54   12    Myspace, LinkedIn, and YouTube.
03:54   13              Finally, you are not to reach any conclusions in
03:54   14    this case until all of the evidence has been presented, the
03:54   15    Court has instructed you on the law applicable to this case,
03:54   16    and it is given to you for your deliberation and your decision.
03:54   17              If you wish, during the course of this trial,
03:54   18    you may take notes.  We will provide you with a notebook and a
03:55   19    pen.  You need not take notes; but if you choose to do so, you
03:55   20    may.  If you do take notes, please leave them on your chairs
03:55   21    when you leave at night and also when you leave during the
03:55   22    breaks.  You can leave it seated upon your seat.  Remember that
03:55   23    notes are for your own personal use.  They are not to be given
03:55   24    or read to anyone else.
03:55   25              In the morning when you arrive and during the
```

1    day when you are in the building and the Court is in recess for

2    any reason that the jury is not required to be in the

3    courtroom, I ask that you please go to and remain in the jury

4    room, which we're about to show you, under the direct

5    supervision of the United States marshal, until the marshal

6    advises you to enter the courtroom.  Please do not remain in

7    the halls.  If you are in the halls, you are more likely to

8    come across someone involved in this trial, which would be in

9    violation of my prior instructions.

10            We will try to make the jury room comfortable

11   for you.  The jury room is the headquarters for the jury.

12   There will be cokes, coffee, restrooms, telephones, and other

13   refreshments and things that we can provide to you.  We try to

14   make you comfortable in there when you are not here in the

15   courtroom.

16            The trial in this case will proceed in the

17   following order.  First, counsel for the government and counsel

18   for the defendant have the opportunity to make an opening

19   statement.  The government will make its opening statement at

20   the beginning of this case.  The statement is nothing more than

21   an explanation of the government's theory of the case and

22   serves merely as an introduction to the evidence which the

23   government intends to produce during the course of the trial.

24            The defense may make an opening statement

25   following the opening statement of the government or may defer

03:56  1  the making of an opening statement until the close of the

03:56  2  government's case or may elect to make no opening statement at

03:56  3  all.  Like the government's opening statement, any defense

03:56  4  opening statement, if made, would be nothing more than an

03:56  5  explanation of the defendant's theory of the case.  No

03:56  6  defendant is required to make an opening statement but may do

03:57  7  so if he chooses.  He may choose not to do so and rest upon the

03:57  8  presumption of innocence to which he is entitled.

03:57  9         As I pointed out to you earlier, the defendant

03:57  10  is presumed innocent until proven guilty beyond a reasonable

03:57  11  doubt.  What is said in opening statements, whether by the

03:57  12  government or the defense, is not evidence and proves nothing.

03:57  13         Second, the government will introduce evidence

03:57  14  in support of the charge contained in the indictment.

03:57  15         Third, after the government has presented its

03:57  16  evidence, the defendant may present evidence, but the defendant

03:57  17  is not obliged to do so.  The burden is always on the

03:57  18  government to prove every element of the offense charged beyond

03:57  19  a reasonable doubt.  The law never imposes on any defendant in

03:57  20  a criminal case the burden of calling any witnesses or

03:57  21  introducing any evidence.

03:57  22         Fourth, rebuttal evidence may be introduced.

03:57  23         Fifth, at the conclusion of the evidence, the

03:57  24  parties will present oral argument in support of their

03:58  25  respective cases.  What is said in closing arguments is not

03:58    1    evidence just like what is said in opening statement is not

03:58    2    evidence.  The arguments are intended to present to you the

03:58    3    contentions of the respective parties as to what the evidence

03:58    4    has shown and what inferences may be drawn from the evidence.

03:58    5    Counsel for the government has the right to open and close the

03:58    6    arguments because the government has the burden of proof.

03:58    7                Finally, I will instruct you on the applicable

03:58    8    law, and you will then retire to deliberate and consider your

03:58    9    verdict, which must be unanimous, as to the defendant.

03:58    10                Although you as the jury are judges of the facts

03:58    11    in this case, you must accept and apply the law applicable to

03:58    12    this case as it is given to you by the Court.  The law

03:58    13    applicable to this case will be contained in the instructions

03:58    14    which I give you, both during the course of the trial and at

03:58    15    the conclusion of the trial following closing arguments, and it

03:58    16    is your duty to follow all such instructions.

03:58    17                I will provide a copy of the instructions to you

03:59    18    to take into the jury room at the time you deliberate.  It is

03:59    19    your duty to determine the facts and to determine them from the

03:59    20    evidence and the reasonable inferences arising from such

03:59    21    evidence; and in so doing, you must not indulge in guesswork or

03:59    22    speculation.  The evidence that you are to consider consists of

03:59    23    the testimony of witnesses and the exhibits admitted into

03:59    24    evidence.  The term "witness" means anyone who testifies in

03:59    25    person or by deposition.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 03:59 | 1  | The admission of evidence in court is governed               |
| 03:59 | 2  | by rules of law.  From time to time it may be the duty of an |
| 03:59 | 3  | attorney in this case to make an objection to -- and my duty as |
| 03:59 | 4  | a judge to rule on the objection and, thus, whether you can  |
| 03:59 | 5  | consider certain evidence.                                   |
| 03:59 | 6  | You must not concern yourselves with the                     |
| 03:59 | 7  | objections or the Court's reasons for ruling on them.  Do not |
| 03:59 | 8  | hold it against lawyers who make objections.  You must not   |
| 03:59 | 9  | consider testimony or exhibits to which an objection was     |
| 04:00 | 10 | sustained or which has been ordered stricken.                |
| 04:00 | 11 | There may be bench conferences, at which lawyers             |
| 04:00 | 12 | and I will talk solo, that the jury cannot hear.  We try to  |
| 04:00 | 13 | keep those to a minimum.  Some matters must be decided outside |
| 04:00 | 14 | of the hearing of the jury because they may not be admissible. |
| 04:00 | 15 | It is okay, during those bench conferences, if you wish to   |
| 04:00 | 16 | stand at your seat and stretch when we do have those         |
| 04:00 | 17 | conferences.  I will pledge to you I will keep those to a    |
| 04:00 | 18 | minimum in number and also in length.  We will try to make   |
| 04:00 | 19 | those as short as possible.                                  |
| 04:00 | 20 | If I instruct you not to consider testimony or              |
| 04:00 | 21 | evidence to which an objection is sustained or which has been |
| 04:00 | 22 | ordered stricken, you must completely ignore that material and |
| 04:00 | 23 | not take such evidence into consideration when deciding the  |
| 04:00 | 24 | case or be influenced by it in any way.                      |
| 04:00 | 25 | There are two kinds of evidence, direct and                 |

04:00    1    circumstantial.  Direct evidence is direct proof of a fact such

04:00    2    as testimony of an eyewitness.  Circumstantial evidence is

04:00    3    proof of facts from which you may infer or conclude that other

04:01    4    facts exist.  I will give you further instructions on these as

04:01    5    well as some other matters at the end of the case, but have in

04:01    6    mind that you may consider both kinds of evidence.

04:01    7            You must not be influenced in any degree by any

04:01    8    personal feeling of sympathy for or prejudice against any party

04:01    9    or any attorney.

04:01    10            No statement or ruling or remark which I may

04:01    11    make during the presentation of evidence is intended to

04:01    12    indicate my opinion as to what the facts are.  You are to

04:01    13    determine the facts.  In this determination, you alone must

04:01    14    decide on the believability of the evidence and its weight and

04:01    15    value.

04:01    16            As I indicated right now -- I think I said this

04:01    17    morning that we expected this trial to last perhaps two weeks.

04:01    18    What typically happens -- and this is not a promise, but

04:01    19    frequently the lawyers make decisions during the course of a

04:01    20    trial about things that might have been planned, and they may

04:02    21    change their minds about witnesses.  We will try to be -- my

04:02    22    point in pointing that out is that it's difficult for us to

04:02    23    give you an ending point of this trial other than the estimate

04:02    24    that I just gave you.

04:02    25            My pledge to you is that we will be efficient in

04:02   1   presenting this case.  We will follow the hours that I have

04:02   2   given you.  We will make the best use of your time.  We will

04:02   3   not keep you in the jury room any longer than is absolutely

04:02   4   necessary, and we will try this case efficiently and quickly to

04:02   5   its conclusion such that all of the attorneys can have into

04:02   6   evidence that which you are to consider in this case.

04:02   7            Let me -- before I send you into the jury

04:02   8   room -- I notice it's a little after 4:00.

04:02   9            Counsel, I don't believe there will be much more

04:02   10  for us to do.  I know we have another matter which we are about

04:02   11  to take up.  I would propose at this time to let these ladies

04:02   12  and gentlemen of the jury retire for the day after they go into

04:03   13  the jury room, and we will take care of our business and start

04:03   14  fresh tomorrow with the 15 of you.

04:03   15           So I'm going to go ahead and let you leave for

04:03   16  the day.  I will remind you of this, as I will every day and

04:03   17  before every break, please, please do not discuss the case with

04:03   18  anyone.  Please do not listen to or read any accounts of this

04:03   19  case or anything related to this case.  It's very important

04:03   20  that -- you have taken an oath to decide this case on the

04:03   21  evidence; and we have every reason to believe, after talking

04:03   22  with you and visiting with you, that you will do exactly that.

04:03   23           So at this point in time, we are going to let

04:03   24  you go.  Please be mindful of those rules.  We are going to

04:03   25  show you the jury room.  When you get here tomorrow, hopefully

| | |
|---|---|
| 04:03 | 1 |
| 04:03 | 2 |
| 04:03 | 3 |
| 04:03 | 4 |
| 04:04 | 5 |
| 04:04 | 6 |
| 04:04 | 7 |
| 04:04 | 8 |
| 04:04 | 9 |
| 04:04 | 10 |
| 04:04 | 11 |
| 04:04 | 12 |
| 04:04 | 13 |
| 04:05 | 14 |
| 04:05 | 15 |
| 04:05 | 16 |
| 04:05 | 17 |
| 04:05 | 18 |
| 04:05 | 19 |
| 04:05 | 20 |
| 04:05 | 21 |
| 04:05 | 22 |
| 04:05 | 23 |
| 04:05 | 24 |
| 04:06 | 25 |

1  everyone will be here by 8:30.  If you get here early, you will

2  have access to the jury room.  There's coffee and things in

3  there.  You can make yourself comfortable.

4          We would like to start right at 8:30.  And I'm

5  going to be very prompt unless one of you is missing.  So you

6  don't want to be the -- you know the old saying, there's one in

7  every crowd; don't be the one in every crowd.  If y'all are

8  here, we are going to start.  I know these folks will be here,

9  ready to go, and we will get this trial under way.

10          All right.  Thank all of you very much for your

11  patience today.

12          THE DEPUTY CLERK:  All rise.

13          (The jury exited.)

14          THE COURT:  You may be seated.  I apologize for the

15  delay.

16          The Court will now take up Record Document 419,

17  which is a motion to quash of nine nonparty subpoena

18  recipients.  If we may have counsel come forward for that

19  matter.

20          Make your appearances for the record, please.

21          Counsel, please make your appearances for the

22  record.

23          MR. TATELMAN:  Good afternoon, Your Honor.  Todd

24  Tatelman from the House General Counsel's Office.

25          THE COURT:  Good afternoon.

| | | |
|---|---|---|
| 04:06 | 1 | Okay. Counsel, we have already had our |
| 04:06 | 2 | appearance for defense counsel. Mr. Heberlig, are you on this? |
| 04:06 | 3 | **MR. HEBERLIG:** Yes, Your Honor. |
| 04:06 | 4 | **THE COURT:** Okay. I will advise you that I have read |
| 04:06 | 5 | all of the written materials submitted in connection with this |
| 04:06 | 6 | motion. I have also been very familiar with the case law that |
| 04:06 | 7 | is cited. As you all know, this is not the first time this |
| 04:06 | 8 | issue has arisen on the Court's docket in this case, so I'm |
| 04:06 | 9 | very, very familiar with the arguments and the jurisprudence |
| 04:06 | 10 | that has been cited by both sides. I will specifically ask |
| 04:06 | 11 | that you not repeat anything that is in the written material. |
| 04:06 | 12 | You may assume that I have read it fully and completely and |
| 04:06 | 13 | that I understand it. |
| 04:06 | 14 | I will also fully advise you, in the interest of |
| 04:06 | 15 | full disclosure, that I'm prepared to rule on it. If anyone |
| 04:06 | 16 | would like to make any remarks regarding -- and specifically |
| 04:06 | 17 | this is Record Document 419, the motion to quash -- now is the |
| 04:07 | 18 | time to do it. Anybody? |
| 04:07 | 19 | **MR. TATELMAN:** Nothing from the House, Your Honor. |
| 04:07 | 20 | **MR. HEBERLIG:** We rest on our papers, Your Honor. |
| 04:07 | 21 | **THE COURT:** Motion granted. |
| 04:07 | 22 | Let's move on. The Court also has before it -- |
| 04:07 | 23 | Counsel, if you-all would come forward again, and Mr. Tsao. I |
| 04:07 | 24 | know there's a motion for protective order as well, and I'll |
| 04:07 | 25 | take care of that too. But let me ask you to hold one second |

04:07    1   on that.

04:07    2           Mr. Tsao and Mr. Zink, if you would come

04:07    3   forward.

04:07    4           The Court also has three pending motions to

04:07    5   dismiss Count 1.  Those motions are a motion to dismiss Count 1

04:07    6   of the second superseding indictment for lack of a due and

04:08    7   proper exercise of the power of congressional inquiry, which is

04:08    8   Record Document 188.  The government has responded in

04:08    9   Record Document 213, and the defendant has replied in

04:08   10   Record Document 247.

04:08   11           There is also a motion to dismiss Count 1 of the

04:08   12   second superseding indictment because the May 4 briefing and

04:08   13   the May 14 letter were not part of a subcommittee

04:08   14   investigation, which is Record Document 190.  The government

04:08   15   responded at Record Document 214, and the defendant has replied

04:08   16   at Record Document 237.

04:08   17           There is a motion to dismiss Count 1 of the

04:08   18   second superseding indictment for unconstitutional vagueness,

04:08   19   which appears as Record Document 192.  The government responded

04:08   20   at Record Document 215, and the defendant replied at Record

04:08   21   Document 239.

04:08   22           The Court has also received the following

04:08   23   filings related to Count 1 and the pending motions.  First, the

04:09   24   defendant David Rainey's supplemental memorandum regarding

04:09   25   congressional witnesses and documents, which is

USCA Case #22-3086     Document #1997762     Filed: 05/03/2023     Page 140 of 481
Case 1:21-cr-00670-CJN-EB Document 165-10 Filed 07/15/22 Page 20 of 44

274

04:09   1   Record Document 392.

04:09   2               Secondly, the Bipartisan Legal Advisory Group of

04:09   3   the U.S. House of Representatives' memorandum of amicus curiae,

04:09   4   Record Document 415.

04:09   5               And third, the defendant's motion for remedial

04:09   6   relief in light of congressional subpoena recipient's refusal

04:09   7   to testify on speech or debate clause and high-ranking

04:09   8   government official grounds, which is Rec. Document 427, as

04:09   9   well as a handful of responses in opposition and replies to

04:09  10   each of the motions that I have just listed.

04:09  11               I also have before me a motion for protective

04:09  12   order at Record Document 474 and the defendant's motion in

04:09  13   response, which recently filed, I believe, on Friday, which is

04:09  14   Record Document 488.

04:10  15               Count 1 of the second superseding indictment

04:10  16   charges the defendant, himself as well as others, aiding and

04:10  17   abetting and causing others to do the same, with corruptly

04:10  18   endeavoring to influence, obstruct, and impede the due and

04:10  19   proper exercise of the power of inquiry under which an inquiry

04:10  20   and investigation was being had by a committee of the

04:10  21   United States House of Representatives, to wit:  The

04:10  22   Subcommittee on Energy and the Environment of the United States

04:10  23   House of Representatives Committee on Energy and Commerce, all

04:10  24   in violation of 18 U.S.C. § 1505, 2(a) and 2(b).

04:10  25               In his motion to dismiss Count 1 for lack of due

04:10  1  and proper exercise of the power of congressional inquiry, the

04:10  2  defendant argues, first, that a general rule authorizing

04:10  3  committees to conduct investigations within their areas of

04:10  4  jurisdiction does not automatically afford a subcommittee

04:11  5  within that committee sufficient authorization to conduct such

04:11  6  an investigation.  Instead, a formal resolution is required to

04:11  7  instigate a due and proper inquiry or investigation.

04:11  8          Secondly, the defendant argues that no such

04:11  9  resolution authorizing the committee or subcommittee to

04:11  10  investigate the *Deepwater Horizon* oil spill exists.  And third,

04:11  11  even if the subcommittee was duly authorized to investigate the

04:11  12  spill, the request for information sent to BP by

04:11  13  Representative Markey, then chairman of the Subcommittee on

04:11  14  Energy and the Environment, were not part of any duly

04:11  15  authorized investigation.

04:11  16          Specifically, the defendant asserts that

04:11  17  specific authorization was required whereby the committee

04:11  18  affirmatively delegated authority to proceed with a particular

04:11  19  course of action.  Furthermore, the defendant contends that the

04:11  20  Subcommittee on Oversight and Investigations had the proper

04:11  21  jurisdiction to perform such investigations, not the

04:11  22  Subcommittee on Energy and Environment.

04:11  23          In response, the government argued, among other

04:12  24  positions taken in their opposition at Record Document 213, "As

04:12  25  the facts alleged in the superseding indictment make clear" --

04:12   1   and I'm quoting from the government's opposition:  "As the
04:12   2   facts alleged in the superseding indictment make clear, and as
04:12   3   the facts at trial will demonstrate, the inquiry or
04:12   4   investigation was carried out by the Subcommittee on Energy and
04:12   5   Environment led by the subcommittee chairman.  The defendant's
04:12   6   remaining arguments are based on factual challenges to the
04:12   7   second superseding indictment that are not cognizable on a
04:12   8   motion to dismiss, and instead must be resolved by the jury."
04:12   9              In his second motion to dismiss Count 1, because
04:12  10   the May 4 briefing and the May 14 letter were not part of a
04:12  11   subcommittee investigation, the defendant avers, first, that
04:12  12   the committee delegated its investigative authority to the
04:12  13   Subcommittee on Oversight and Investigation, not the
04:12  14   Subcommittee on Energy and Environment.
04:12  15              Second, the Committee and the Subcommittee on
04:12  16   Oversight and Investigation jointly conducted an investigation
04:13  17   into the spill, not the Subcommittee on Energy and the
04:13  18   Environment.  And third, even if the Subcommittee on Energy and
04:13  19   Environment were conducting an investigation, the May 4
04:13  20   briefing and the May 14 letter were not part of any such
04:13  21   investigation.
04:13  22              Notably, at oral argument before this Court on
04:13  23   December 3, 2014, the government conceded that the May 4
04:13  24   briefing was not part of the charged conduct contained in the
04:13  25   indictment or the second superseding indictment, leaving only

04:13   1  the representations and/or omissions made by the defendant and

04:13   2  contained in BP's response to the May 14 letter as grounds for

04:13   3  the 1505 violation.

04:13   4          In response, the government expressly argued

04:13   5  that "The defendant's motion requires the Court to resolve

04:13   6  issues of fact that are reserved for the jury.  It is

04:13   7  well-settled law that factual issues" -- I'm still quoting --

04:13   8  "concerning an essential element of the offense must be decided

04:14   9  by the jury.  The Court may decide purely legal issues of

04:14  10  whether a subcommittee inquiry or investigation qualifies under

04:14  11  § 1505; and indeed, the Fifth Circuit has already concluded

04:14  12  that one does.  But the Court may not resolve contested factual

04:14  13  issues over whether such an inquiry or investigation *in fact*

04:14  14  existed in this case or what actions were part of that inquiry

04:14  15  or investigation."  The Court is quoting from

04:14  16  Record Document 214.

04:14  17          The Court deferred ruling on these motions as

04:14  18  well as the motion for unconstitutional vagueness for a later

04:14  19  date.  In the meantime, the defendant propounded a number of

04:14  20  discovery requests and filed a motion for early-return

04:14  21  subpoenas duces tecum to be served on various members of

04:14  22  Congress and their staffers.  That is at Record Document 206.

04:14  23          The Court granted the request.  The House did

04:14  24  not respond by the return date.  The defendant then moved to

04:15  25  compel compliance; and the House responded, asserting, among

04:15  1    other arguments, speech and debate privilege as absolute

04:15  2    privilege.  The Court found in favor of the House on speech and

04:15  3    debate grounds.

04:15  4              Soon thereafter, the defendant withdrew a number

04:15  5    of his subpoenas, and the House then voluntarily produced a

04:15  6    number of documents without representing the scope of the

04:15  7    search performed, the terms used, or the extent to which it

04:15  8    would not produce certain documents as privileged.  There is no

04:15  9    representation in response that the document production was

04:15  10   otherwise in compliance with the scope of the subpoena that was

04:15  11   issued and then withdrawn.

04:15  12             Subsequently the defendant supplemented his

04:15  13   motion to dismiss, arguing that any alleged understanding

04:15  14   between the committee chairman and the subcommittee chairman as

04:15  15   to the delegation of investigative authority upon which the

04:15  16   government intended to rely in establishing the due and proper

04:15  17   authorization element is insufficient for purposes of § 1505.

04:16  18             In addition, the defendant contended that the

04:16  19   documents produced by the House further demonstrate that the

04:16  20   May 14 letter was not part of any duly authorized inquiry or

04:16  21   investigation.  In support of his argument, the defendant

04:16  22   points to a number of e-mails and letter correspondence

04:16  23   demonstrating, in the defendant's view, that the subcommittee

04:16  24   was not authorized to conduct an investigation into the spill,

04:16  25   nor was Representative Markey's letter a part of a duly

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 145 of 481
Case 2:12-cr-00265-DEB  Document 1651  Filed 07/15/21  Page 24 of 43

279

04:16  1  authorized investigation.  The Court would reference

04:16  2  Exhibits A through Y attached to Record Document 315.

04:16  3          At the very least, the defendant argues, the

04:16  4  letters and e-mails produced call into question whether the

04:16  5  Subcommittee on Energy and Environment was properly

04:16  6  investigating the spill and whether Representative Markey's

04:16  7  service as chairman of that subcommittee sent the May 14 letter

04:16  8  as a due and proper exercise of the power of inquiry.

04:17  9          The Court finds the defendant's arguments

04:17  10  related to the communications produced by the House to be a

04:17  11  reasonable reading of those documents and plausible under the

04:17  12  circumstances.

04:17  13          Based on the existence of these documents, the

04:17  14  defendant sought to interview certain members of Congress and

04:17  15  their staffers to seek out more potentially exculpatory

04:17  16  evidence.  The House declined.  On March 10, 2015, Mr. Rainey

04:17  17  served trial subpoenas on six staffers and three congressmen,

04:17  18  all related to the alleged investigation and, more importantly,

04:17  19  relevant to the communications disclosed by the House.  The

04:17  20  subpoenas were returnable on June 1, 2015, the first day of the

04:17  21  trial, which is, of course, today, and that is why the Court is

04:17  22  taking the matter up today.

04:17  23          The House filed a motion to quash the subpoenas

04:17  24  on speech and debate as well as "high ranking government

04:18  25  official" grounds.  Earlier today, just now, the Court granted

04:18   1   the motion to quash.

04:18   2          The defendant, anticipating that the Court would

04:18   3   conform its ruling on the motion to quash with its earlier

04:18   4   denial of the motion to compel subpoenas duces tecum based on

04:18   5   the speech and debate privilege, filed a motion for remedial

04:18   6   relief in light of congressional witnesses' refusal to testify.

04:18   7   That is Record Document 427.  The government filed a response

04:18   8   in opposition at Record Document 438.

04:18   9          In light of the Court's decision granting the

04:18  10   motion to quash, the motion for remedial relief is now ripe for

04:18  11   consideration.

04:18  12          In his motion for remedial relief, the defendant

04:18  13   relies on two fundamental arguments:

04:18  14          First, the Constitution and fundamental fairness

04:18  15   prohibit trying Mr. Rainey under Count 1 where the defendant is

04:19  16   unable to call congressional witnesses of his choosing, whose

04:19  17   testimony is relevant and material to whether the Subcommittee

04:19  18   on Energy and Environment was duly authorized to investigate BP

04:19  19   and whether Representative Markey's May 14 letter was part of a

04:19  20   due and proper investigation, all the while utilizing the

04:19  21   voluntary testimony of certain other congressional staffers who

04:19  22   have agreed to testify in the government's case in chief and to

04:19  23   be cross-examined within the limited scope of direct.

04:19  24          And second, at the very least -- and I have not

04:19  25   even mentioned the motion for protective order, which seems to

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 147 of 481
Case 2:12-cr-00967-KDE-DEB Document 1651 Filed 07/15/21 Page 226 of 443

281

04:19  1  suggest that that limitation is even broader -- the limitation

04:19  2  on cross-examination is even broader, as argued by the House.

04:19  3         And second, at the very least, the Court should

04:19  4  exclude any evidence related to authorization of the

04:19  5  subcommittee investigation, specifically the testimony of the

04:19  6  congressional staffers who will voluntarily appear in the

04:19  7  government's case in chief, if the defendant is not permitted

04:20  8  to call witnesses of his choosing who may, and plausibly do,

04:20  9  hold exculpatory evidence critical to his defense.

04:20  10         In response, the government claims that a

04:20  11  criminal defendant does not have an unfettered right to call

04:20  12  witnesses and offer testimony that is incompetent, privileged,

04:20  13  or otherwise inadmissible, citing *Taylor v. Illinois*,

04:20  14  484 U.S. 400 (1988).  In support of this argument the

04:20  15  government asserts that under the Ninth Circuit case

04:20  16  *U.S. v. Renzi*, 769 F.2d 731, Courts are not permitted to weigh

04:20  17  the speech or debate privilege against a defendant's right to

04:20  18  compulsory process or to present a full defense.

04:20  19         Furthermore, the government avers that in order

04:20  20  for a defendant's right to present a defense to be implicated,

04:20  21  he must demonstrate that the evidence sought is both material

04:20  22  and favorable to his case, citing *U.S. v. Verrusio*, 762 F.3d 1,

04:21  23  a D.C. Circuit case from 2014.

04:21  24         The government further argues that the defendant

04:21  25  must offer definite and nonspeculative evidence that the

04:21  1  unavailable testimony is not cumulative, material, and
04:21  2  favorable, pursuant to *U.S. v. Valenzuela-Bernal*, 458 U.S. 858
04:21  3  (1982).
04:21  4          Finally, the government claims that the cases
04:21  5  cited by the defendant are inapposite because any such remedy
04:21  6  sought should not be used to punish the government, i.e., the
04:21  7  Executive Branch, through the Department of Justice, for a
04:21  8  privilege asserted by a nonparty, in this case the legislative
04:21  9  branch.
04:21  10         As a preliminary matter, the Court finds that
04:21  11  few rights are more fundamental than the rights of due process
04:21  12  and compulsory process under the Fifth and Sixth Amendments.
04:21  13  The Court has serious constitutional and fairness concerns with
04:22  14  regard to the following:
04:22  15         First, the defendant received only a partial
04:22  16  production of documents from the House, absent a list of
04:22  17  searches performed, a list of search terms, or any
04:22  18  representations as to documents that were withheld under the
04:22  19  House's privilege, which was asserted and which this Court
04:22  20  ruled in favor of.
04:22  21         Secondly, certain House witnesses agreed to
04:22  22  voluntarily testify in the government's case in chief, but such
04:22  23  testimony, as the House proclaimed, would be limited to the
04:22  24  scope of direct, presumably determined at the whim of the
04:22  25  witness' or house counsel's own discretion.

04:22   1    And third, the House, acting pursuant to its

04:22   2  privilege, refused defendant's subpoena request as to eight

04:22   3  other witnesses who, potentially and plausibly, hold material

04:22   4  and exculpatory information related to an essential element of

04:22   5  Count 1, which element has, in fact, already been identified by

04:22   6  the Fifth Circuit in this very case.

04:22   7    The Fifth Circuit explained, again, in this very

04:22   8  case, that an unauthorized frolic by a House entity or House

04:23   9  member might lose the protection afforded by § 1505 regardless

04:23   10  of its committee status because there would be no "due and

04:23   11  proper exercise of the power of inquiry."  That can be found in

04:23   12  *U.S. v. Rainey*, 757 F.3d 234, a Fifth Circuit opinion from this

04:23   13  year in this case.  By that same token, the Court finds that an

04:23   14  unauthorized frolic by an individual member would also lose the

04:23   15  protections afforded by § 1505 regardless of his status as

04:23   16  chairman of the subcommittee.  As seen repeatedly in the

04:23   17  government's briefing, these are factual issues that must be

04:23   18  developed at trial and must be submitted to the jury.

04:23   19    Each of these three areas of concern that I just

04:23   20  discussed directly implicate factual issues as they relate to

04:23   21  the defendant's right to present a full defense pursuant to the

04:24   22  Fifth and Sixth Amendments.  The Court finds that the evidence

04:24   23  sought by the defendant through documentary production and

04:24   24  testimony is highly relevant to his defense and material to the

04:24   25  issues before the Court for the jury's consideration.  The

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 150 of 481
Case 1:21-cr-00670-CJN-EB Document 165-10 Filed 07/15/22 Page 82 of 443

284

04:24  1  Court, as I stated, that finds the evidence sought is material

04:24  2  noncumulative and, based on the evidence in the record,

04:24  3  including but not limited to a number of written

04:24  4  communications, both internal and external to the House,

04:24  5  favorable to his defense or at least plausibly and arguably and

04:24  6  quite conceivably favorably to the defendant in this case.

04:24  7          The Court has considered all of the pleadings,

04:24  8  the relevant record, all of the cases cited by the parties.

04:24  9  The Court also finds the ruling today is in accord with the

04:24  10  rulings in *Renzi* and *Verrusio*, which I have cited earlier.  To

04:24  11  be clear, the Court is not engaging in a balancing or weighing

04:25  12  of the speech and debate privilege, which I have already ruled

04:25  13  in favor of, with the defendant's Fifth and Sixth Amendment

04:25  14  rights, but is considering each on an independent basis in an

04:25  15  attempt to honor and reconcile those fundamental constitutional

04:25  16  privileges which are before the Court.

04:25  17          As seen earlier today, the Court found in favor

04:25  18  of the House, and its ruling supported the House's

04:25  19  long-standing constitutional privilege under the Speech or

04:25  20  Debate Clause.  The Court must now address what implication

04:25  21  that ruling has on the defendant's right to a full trial and

04:25  22  his constitutionally guaranteed rights, which I have just

04:25  23  described.

04:25  24          Thus the Court finds that, similar to the

04:25  25  holding in *U.S. v. Fernandez*, 913 F.2d 148, which is a

04:25  1   Fourth Circuit case, 1990, and consistent with the rulings in

04:25  2   *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*,

04:26  3   353 U.S. 53, the government's prosecution of Count 1 under

04:26  4   § 1505 must give way where the defendant seeks relevant,

04:26  5   material, noncumulative evidence related to his defense, but

04:26  6   also where he has been precluded from obtaining this evidence

04:26  7   due to the invocation of a constitutional privilege by a branch

04:26  8   of the very same government involved in his prosecution.

04:26  9   Because the defendant is not able to put on a full and fair

04:26  10  defense, consistent with his constitutional rights and

04:26  11  consistent with an element of the crime as described by the

04:26  12  Fifth Circuit and set forth in the jurisprudence, under these

04:26  13  circumstances the Court finds the only appropriate remedy is

04:26  14  dismissal of Count 1.  The Court would reference the case of

04:26  15  *Calley v. Callaway*, 519 F.2d 184, which is a Fifth Circuit

04:27  16  opinion from 1975 in which the Court of Appeal expressed

04:27  17  approval of dismissal where a congressional privilege is

04:27  18  asserted prohibiting a defendant from evidence essential to his

04:27  19  defense.

04:27  20          Accordingly, for the reasons I have previously

04:27  21  stated, the defendant's motion for remedial relief is granted

04:27  22  and Count 1 is hereby dismissed with prejudice.

04:27  23          In addition to its findings related to the

04:27  24  defendant's constitutional rights, whereby the Court found that

04:27  25  the defendant has put forth reasonable and plausible evidence

USCA Case #22-3086    Document #1997762    Filed: 05/03/2023    Page 152 of 481
Case 2:12-cr-00026-RDP-TMP Document 1651 Filed 07/15/21 Page 231 of 443

286

04:27   1   demonstrating a potentially unauthorized investigation by the
04:27   2   subcommittee and/or Representative Markey.  Without the ability
04:27   3   to fully examine those witnesses voluntarily testifying in the
04:27   4   government's case in chief and, more importantly, to call
04:27   5   witnesses in his favor, and lacking any knowledge as to the
04:27   6   scope of the documentary production performed by the House, the
04:27   7   Court, consistent with the Supreme Court's guidance in
04:28   8   *U.S. v. Nobles*, 422 U.S. 225, and *Davis v. Alaska*, found at
04:28   9   415 U.S. 308, as well as pursuant to the Federal Rules of
04:28   10  Evidence giving the District Court broad discretion over the
04:28   11  admission or preclusion of evidence, hereby excludes all
04:28   12  evidence related to the documentary production by the House and
04:28   13  any testimony that the four witnesses would provide in the
04:28   14  government's case in chief.
04:28   15          As a result, an examination of all the
04:28   16  surrounding circumstances, as indicated in the Fifth Circuit's
04:28   17  opinion in this very case and in *U.S v. Mitchell*, 877 F.2d 294,
04:28   18  a Fourth Circuit opinion from 1989, is rendered impossible.
04:28   19  Absent any evidence of an authorized investigation, the Court
04:28   20  would therefore find that the government could not meet its
04:28   21  burden of establishing an essential element of the crime
04:28   22  charged in Count 1.  Therefore, the defendant's motion to
04:29   23  dismiss Count 1 of the second superseding indictment for lack
04:29   24  of a due and proper exercise of the power of congressional
04:29   25  inquiry (Record Document 188) and his motion to dismiss Count 1

04:29    1    of the second superseding indictment because the May 4 briefing

04:29    2    and the May 14 letter were not part of a subcommittee

04:29    3    investigation, which is Record Document 190, must also

04:29    4    necessarily be and are hereby granted.

04:29    5            In light of all the circumstances, the Court

04:29    6    further believes that the motion to dismiss for

04:29    7    unconstitutional vagueness, which is Record Document 192, is,

04:29    8    under the circumstances, with merit, and the Court will grant

04:29    9    it as well.

04:29    10           Now, that leaves the Court with a variety of

04:29    11   motions that it had referred to trial and a motion for

04:29    12   protective order for nonparties Phil Barnett, Jeffrey Duncan,

04:29    13   Michael Goo, and Michal Freedhoff.  The Court would determine

04:29    14   that that motion is at this point denied as moot, unless

04:30    15   counsel disagrees, insofar as that testimony relates solely and

04:30    16   only to Count 1; and the defendant's motion, as set forth in

04:30    17   Record Document 488, the most recently filed motion, is also

04:30    18   moot at this point in light of the Court's ruling on the other

04:30    19   motions that I have identified as record document numbers.

04:30    20           Does any counsel disagree with regard to those

04:30    21   two motions?

04:30    22           Now, the Court also ruled on a number of motions

04:30    23   in limine relative to issues arising under Count 1, in

04:30    24   particular, evidentiary issues arising under Count 1.  I would

04:30    25   ask counsel, since we are finished with the jury today, maybe

04:30  1  we can do this now on the record; or if you would like to

04:30  2  confer, maybe that would be the better thing to do.  I would

04:30  3  ask counsel to revisit certain of the motions that were filed

04:30  4  on a myriad of evidentiary issues that, in the Court's belief,

04:31  5  were related only to Count 1.

04:31  6        I, in particular, would ask that you confer on

04:31  7  those that are referred to trial first.  Those would be

04:31  8  Record Document 328, motion to admit lay opinion testimony of

04:31  9  Marcia McNutt; Record Document 333, which was pending and

04:31 10  referred to trial; motion to preclude task force from

04:31 11  mischaracterizing certain evidence as flow-rate estimates; a

04:31 12  motion to preclude hypothetical questions to lay witnesses,

04:31 13  which is Record Document 337; a motion in limine to preclude

04:31 14  improper lay opinion regarding Mr. Rainey's flow-rate

04:31 15  estimates, which is Record Document 420; Record Document 423,

04:31 16  motion in limine to admit defendant's proffer statements,

04:31 17  although I think that one was relative to not just Count 1 but

04:31 18  also Count 2.  That's my understanding.

04:32 19        And then there are other motions that are

04:32 20  pending, which I think I listed for you at the pretrial

04:32 21  conference -- I say pending.  There are motions in limine that

04:32 22  I have ruled on one way or another.  Some I have granted in

04:32 23  part and denied in part.  And those motions, insofar as they

04:32 24  pertain to the Count 2 trial we are going to have and commence

04:32 25  tomorrow morning, will need to be revisited in terms of whether

04:32  1   they are even applicable at this date in light of the dismissal

04:32  2   of Count 1.  I would like, Counsel, to confer on that.

04:32  3              At this point, is there anything else we need to

04:32  4   cover on the record?  If not, I would like to see counsel, task

04:32  5   force counsel and defense counsel, in the conference room.

04:32  6              Thank you all.

04:33  7          **THE DEPUTY CLERK:**  All rise.

04:33  8          (Proceedings adjourned.)

04:33  9                          * * *

10                     <u>**CERTIFICATE**</u>

11          I, Toni Doyle Tusa, CCR, FCRR, Official Court

12   Reporter for the United States District Court, Eastern District

13   of Louisiana, certify that the foregoing is a true and correct

14   transcript, to the best of my ability and understanding, from

15   the record of proceedings in the above-entitled matter.

16

17

18                          <u>*s/ Toni Doyle Tusa*</u>
                            Toni Doyle Tusa, CCR, FCRR
19                          Official Court Reporter

20

21

22

23

24

25

Case 2:21-cr-00074-DENDHoc Document 116-1 FileHed 07/15/22 05 Page 155 of 248 17

**1**

10 [2]  259/15 279/16
1000 [1]  256/15
10:00 or [1]  259/15
10:15 [1]  259/15
12-291 [1]  256/5
1330 [1]  256/22
14 [8]  273/13 276/10 276/20 277/2
 278/20 279/7 280/19 287/2
148 [1]  284/25
15 [1]  270/14
15 minutes [1]  259/15
1505 [7]  274/24 277/3 277/11 278/17
 283/9 283/15 285/4
18 [1]  274/24
184 [1]  285/15
188 [2]  273/8 286/25
190 [2]  273/14 287/3
192 [2]  273/19 287/7
1975 [1]  285/16
1982 [1]  282/3
1988 [1]  281/14
1989 [1]  286/18
1990 [1]  285/1

**2**

20036 [1]  256/23
201 [1]  256/18
2014 [2]  276/23 281/23
2015 [4]  256/7 259/2 279/16 279/20
206 [1]  277/22
213 [2]  273/9 275/24
214 [2]  273/15 277/16
215 [1]  273/20
225 [1]  286/8
234 [1]  283/12
237 [1]  273/16
239 [1]  273/21
247 [1]  273/10
275 [1]  257/1
291 [1]  256/5
294 [1]  286/17

**3**

308 [1]  286/9
315 [1]  279/2
328 [1]  288/8
333 [1]  288/9
337 [1]  288/13
353 [1]  285/2
353 U.S [1]  285/3
392 [1]  274/1
3:00 or [1]  259/19
3:15 [1]  259/19

**4**

400 [2]  256/15 281/14
415 [1]  274/4
415 U.S. 308 [1]  286/9
419 [2]  271/16 272/17
420 [1]  288/15
422 [1]  286/8
423 [1]  288/15
427 [2]  274/8 280/7
438 [1]  280/8
458 [1]  282/2
474 [1]  274/12
484 U.S. 400 [1]  281/14
488 [2]  274/14 287/17
4:00 [1]  270/8
4:15 [1]  259/22
4:30 [1]  259/21

**5**

500 [1]  257/1
504 [1]  257/2
5100 [1]  256/18
519 [1]  285/15
53 [1]  285/3
589-7778 [1]  257/2
5:00 or [2]  259/20 260/2
5:15 [1]  259/23

**6**

657 [1]  285/2
6:00 [1]  260/1

**7**

70130 [2]  256/16 257/2
70170 [1]  256/19
731 [1]  281/16
757 F.3d [1]  283/12
762 [1]  281/22
769 F.2d [1]  281/16
7778 [1]  257/2
7:00 at [1]  260/1

**8**

858 [1]  282/2
877 [1]  286/17
8:30 [3]  259/14 271/1 271/4

**9**

913 [1]  284/25

**A**

abetting [1]  274/17
ability [2]  286/2 289/14
able [1]  285/9
about [13]  259/15 259/15 259/19 260/12
 261/21 263/9 263/10 264/6 264/8 265/4
 269/20 269/21 270/10
above [1]  289/15
above-entitled [1]  289/15
absent [2]  282/16 286/19
absolute [1]  278/1
absolutely [1]  270/3
accept [1]  267/11
access [1]  271/2
accommodate [2]  259/12 260/6
accord [1]  284/9
accordance [2]  263/25 264/1
Accordingly [1]  285/20
accounts [3]  263/19 263/21 270/18
across [2]  262/17 265/8
acting [1]  283/1
action [2]  256/4 275/19
actions [1]  277/14
adamant [1]  260/11
add [1]  263/2
addition [2]  278/18 285/23
address [1]  284/20
adjourned [1]  289/8
admissible [1]  268/14
admission [2]  268/1 286/11
admit [2]  288/8 288/16
admitted [2]  263/15 267/23
advise [2]  272/4 272/14
advises [1]  265/6
Advisory [1]  274/2
affirmatively [1]  275/18
afford [1]  275/4
afforded [2]  283/9 283/15
after [5]  259/20 266/15 270/8 270/12
 270/21

afternoon [4]  256/9 259/1 271/23 271/25
 273/7
against [3]  268/8 269/8 281/17
agreed [2]  280/22 282/21
ahead [1]  270/15
aided [1]  257/5
aiding [1]  274/16
Alaska [1]  286/8
all [26]  260/8 260/8 260/23 261/5
 262/24 263/3 264/14 266/3 267/16
 270/5 271/10 271/10 271/12 272/5
 272/7 272/23 274/23 279/18 280/20
 284/7 284/8 286/11 286/15 287/5 289/6
 289/7
alleged [4]  275/25 276/2 278/13 279/18
allowing [1]  261/19
alone [1]  269/13
already [5]  260/9 272/1 277/11 283/5
 284/12
also [18]  262/19 263/2 264/21 268/18
 272/6 272/14 272/22 273/4 273/11
 273/22 274/11 283/14 284/9 285/6
 287/3 287/17 287/22 288/18
alternate [1]  260/20
although [3]  262/9 267/10 288/17
always [1]  266/17
Amendment [1]  284/13
Amendments [2]  282/12 283/22
AMERICA [1]  256/4
amicus [1]  274/3
among [4]  262/19 263/1 275/23 277/25
and/or [1]  277/1 286/2
another [3]  259/5 270/10 288/22
any [48]
Anybody [1]  272/18
anyone [8]  262/15 262/17 264/6 264/8
 264/24 267/24 270/18 272/15
anything [5]  263/12 263/16 270/19
 272/11 289/3
apologize [1]  271/14
Appeal [1]  285/16
appear [1]  281/6
appearance [1]  272/2
appearances [3]  256/12 271/20 271/21
appears [1]  273/19
applicable [6]  264/1 264/15 267/7
 267/11 272/9 276/6 278/1 289/1
apply [1]  267/11
appropriate [1]  285/13
approval [1]  285/17
are [49]
areas [2]  275/3 283/19
arguably [1]  284/5
argued [3]  275/23 277/4 281/2
argues [4]  275/2 275/8 279/3 281/24
arguing [1]  278/13
argument [4]  266/24 276/22 278/21
 281/14
arguments [9]  266/25 267/2 267/6
 267/15 272/9 276/6 278/1 279/9 280/13
arisen [1]  272/8
arising [3]  267/20 287/23 287/24
ARMSTRONG [1]  256/22
around [1]  264/25
as [72]
ask [10]  259/22 260/8 261/18 262/3
 265/3 272/10 272/25 287/25 288/3
 288/6
asserted [3]  282/8 282/19 285/18
asserting [1]  277/25
asserts [2]  275/16 281/15

A

assume [1] 272/12
at [40]
attached [1] 279/2
attempt [6] 261/9 261/16 263/5 263/5
 263/7 284/15
attention [3] 259/6 263/11 263/13
attorney [2] 268/3 269/9
attorneys [6] 260/9 260/23 261/4 261/12
 261/23 270/5
authority [3] 275/18 276/12 278/15
authorization [4] 275/5 275/17 278/17
 281/4
authorized [7] 275/11 275/15 278/20
 278/24 279/11 280/18 286/19
authorizing [2] 275/2 275/9
automatically [1] 275/4
available [1] 263/21
Avenue [2] 256/18 256/22
avers [2] 276/11 281/19
avoid [1] 261/19
avoided [1] 262/12
aware [1] 260/21

B

B-275 [1] 257/1
bad [1] 262/12
balancing [1] 284/11
Barnett [1] 287/12
based [6] 263/16 263/23 276/6 279/13
 280/4 284/2
basis [1] 284/14
bathroom [1] 259/11
be [62]
because [12] 259/5 262/9 263/4 263/23
 267/6 268/14 273/12 276/9 282/5
 283/10 285/9 287/1
been [11] 261/3 262/23 263/15 264/14
 268/10 268/21 269/20 272/6 272/10
 283/5 285/6
before [15] 256/10 259/17 259/20 260/2
 262/23 262/23 263/1 263/11 270/7
 270/17 272/22 274/11 276/22 283/25
 284/16
beginning [1] 265/20
being [5] 261/2 261/21 262/11 262/12
 274/20
belief [1] 288/4
believability [1] 269/14
believe [3] 270/9 270/21 274/13
believes [1] 287/6
bench [2] 268/11 268/15
Bernal [1] 282/2
best [2] 270/2 289/14
better [1] 288/2
between [1] 278/14
beyond [2] 266/10 266/18
biased [1] 262/12
Bipartisan [1] 274/2
BlackBerry [1] 264/9
BlackBerrys [1] 264/4
blog [1] 264/10
both [6] 260/24 267/14 269/6 272/10
 281/21 284/4
BP [2] 275/12 280/18
BP's [1] 277/2
branch [3] 282/7 282/9 285/7
break [5] 259/11 259/14 259/19 260/2
 260/14 270/17
breaks [1] 264/22
BRIAN [1] 256/21
briefing [6] 273/12 276/10 276/20

276/24 283/17 287/1
broader [2] 281/1 281/2
building [1] 259/18 265/1
burden [4] 266/17 266/20 267/6 286/21
business [1] 259/24 270/13
but [16] 259/6 259/23 260/6 260/7
 264/19 266/6 266/16 269/5 269/18
 272/25 277/12 282/22 284/3 284/14
 285/5 288/17

C

call [5] 279/4 280/16 281/8 281/11 286/4
Callaway [1] 285/15
Calley [1] 285/15
Calley v [1] 285/15
calling [1] 266/20
can [9] 259/4 259/16 264/22 265/13
 268/4 270/5 271/3 283/11 288/1
cannot [1] 268/12
care [2] 270/13 272/25
careful [3] 260/25 261/7 261/25
carried [1] 276/4
case [59]
cases [3] 266/25 282/4 284/8
caught [1] 259/17
causing [1] 274/17
CCR [3] 257/1 289/11 289/18
cell [2] 264/3 264/8
certain [8] 260/9 268/5 278/8 279/14
 280/21 282/21 288/3 288/11
certainly [2] 260/19 260/21
CERTIFICATE [1] 289/10
certify [1] 289/13
chairman [6] 275/13 276/5 278/14
 278/14 279/7 283/16
chairs [1] 264/20
challenges [1] 276/6
change [1] 269/21
charge [1] 266/14
charged [3] 266/18 276/24 286/22
charges [1] 274/16
Charles [1] 256/18
chat [1] 264/10
chief [5] 280/22 281/7 282/22 286/4
 286/14
children [1] 262/16
choose [2] 264/19 266/7
chooses [1] 266/7
choosing [2] 280/16 281/8
Circuit [10] 277/11 281/15 281/23 283/6
 283/7 283/12 285/1 285/12 285/15
 286/18
Circuit's [1] 286/18
circumstances [5] 279/12 285/13 286/16
 287/5 287/8
circumstantial [2] 269/1 269/2
cited [5] 272/7 272/10 282/5 284/8
 284/10
citing [2] 281/13 281/22
claims [1] 281/10 282/4
clause [2] 274/7 284/20
clear [3] 275/25 276/2 284/11
close [2] 266/1 267/5
closing [2] 266/25 267/15
coffee [2] 265/12 271/2
cognizable [1] 276/7
cokes [1] 265/12
come [6] 262/17 263/10 263/12 265/8
 271/18 272/23 273/2
comfortable [3] 265/10 265/14 271/3
commence [1] 288/24
Commerce [1] 274/23

commitment [1] 260/3
committee [2] 274/23 275/5
 275/9 275/17 276/12 276/15 278/14
 283/10
committees [1] 275/3
communicate [2] 264/6 264/7
communication [1] 261/17
communications [4] 261/10 279/10
 279/19 284/4
compel [2] 277/25 280/4
completely [4] 260/17 263/12 268/22
 272/12
compliance [2] 277/25 278/10
compulsory [2] 281/18 282/12
computer [1] 257/5
computer-aided [1] 257/5
conceded [1] 276/23
conceivably [1] 284/6
concern [2] 268/6 283/19
concerned [1] 259/6
concerning [1] 277/8
concerns [1] 282/13
conclude [2] 259/20 269/3
concluded [1] 277/11
conclusion [3] 266/23 267/15 270/5
conclusions [1] 264/13
conduct [7] 260/21 261/1 261/7 275/3
 275/5 276/24 278/24
conducted [1] 261/22 276/16
conducting [1] 276/19
confer [3] 288/2 288/6 289/2
conference [2] 288/21 289/5
conferences [3] 268/11 268/15 268/17
conform [1] 280/3
Congress [2] 277/22 279/14
congressional [10] 273/7 273/25 274/6
 275/1 280/6 280/16 280/21 281/6
 285/17 286/24
congressmen [1] 279/17
connected [3] 261/6 261/11 261/25
Connecticut [1] 256/22
connection [1] 272/5
consider [8] 263/4 267/8 267/22 268/5
 268/9 268/20 269/6 270/6
consideration [3] 268/23 280/11 283/25
considered [1] 284/7
considering [1] 284/14
consistent [4] 285/1 285/10 285/11
 286/7
consists [1] 267/22
Constitution [1] 280/14
constitutional [6] 282/13 284/15 284/19
 285/7 285/10 285/24
constitutionally [1] 284/22
contained [4] 266/14 267/13 276/24
 277/2
contended [1] 278/18
contends [1] 275/19
contentions [1] 267/3
contested [1] 277/12
conversation [1] 261/16
conversations [1] 261/10
copy [1] 267/17
correct [1] 289/13
correspondence [1] 278/22
corruptly [1] 274/17
could [3] 260/5 262/10 286/20
counsel [18] 259/5 265/17 265/17 267/5
 270/9 271/18 271/21 272/1 272/2
 272/23 287/15 287/20 287/25 288/3
 289/2 289/4 289/5 289/5
counsel's [2] 271/24 282/25
Count [24] 273/5 273/5 273/11 273/17

**C**

Count... [20]  273/23 274/15 274/25
276/9 280/15 283/5 285/3 285/14
285/22 286/22 286/23 286/25 287/16
287/23 287/24 288/5 288/17 288/18
288/24 289/2
Count 1 [22]  273/5 273/5 273/11 273/17
273/23 274/15 274/25 276/9 280/15
283/5 285/3 285/14 285/22 286/22
286/23 286/25 287/16 287/23 287/24
288/5 288/17 289/2
Count 2 [2]  288/18 288/24
course [5]  261/8 262/14 263/2 264/17
265/23 267/14 269/19 275/19 279/21
court [54]
Court's [7]  264/1 268/7 272/8 280/9
286/7 287/18 288/4
courtroom [10]  260/24 261/21 263/9
263/13 263/16 263/17 263/25 265/3
265/6 265/15
Courts [1]  281/16
cover [2]  259/5 289/4
Creating [1]  262/11
crime [2]  285/11 286/21
criminal [3]  256/4 266/20 281/11
critical [1]  281/9
cross [3]  262/8 280/23 281/2
cross-examination [1]  281/2
cross-examined [1]  280/23
crowd [3]  259/18 271/7 271/7
cumulative [1]  282/1
curiae [1]  274/3

**D**

D.C. [1]  281/23
D.C. Circuit [1]  281/23
date [3]  277/19 277/24 289/1
DAVID [4]  256/6 256/17 256/20 273/24
Davis [4]  286/8
Davis v [1]  286/8
day [8]  256/9 259/20 259/22 265/1
270/12 270/16 270/16 279/20
days [1]  259/21
DC [2]  256/7 256/23
debate [8]  274/7 278/1 278/3 279/24
280/5 281/17 284/12 284/20
December [1]  276/23
December 3 [1]  276/23
decide [4]  263/4 269/14 270/20 277/9
decided [4]  263/13 263/16 268/13 277/8
deciding [1]  268/23
decision [3]  262/21 264/16 280/9
decisions [1]  269/19
declined [1]  279/16
Deepwater [1]  275/10
Deepwater Horizon [1]  275/10
defendant [45]
defendant's [18]  266/5 274/5 274/12
276/5 277/5 278/23 279/9 281/17
281/20 283/2 283/21 284/13 284/21
285/21 285/24 286/22 287/16 288/16
defense [14]  265/24 266/3 266/12 272/2
281/9 281/18 281/20 283/21 283/24
284/5 285/5 285/10 285/19 289/5
defer [1]  265/25
deferred [1]  277/17
definite [1]  281/25
degree [1]  269/7
delay [1]  271/15
delegated [2]  275/18 276/12
delegation [1]  278/15
deliberate [4]  260/16 263/1 267/8

267/18
demands [1]  260/25
demonstrate [3]  276/3 278/19 281/21
demonstrating [2]  278/23 286/1
denial [1]  280/4
denied [2]  287/14 288/23
Department [2]  256/14 282/7
deposition [1]  267/25
described [2]  284/23 285/11
determination [1]  269/13
determine [4]  267/19 267/19 269/13
287/13
determined [1]  282/24
developed [1]  283/18
did [1]  277/23
difficult [1]  269/22
direct [6]  265/4 268/25 269/1 269/1
280/23 282/24
directly [1]  283/20
disagree [1]  287/20
disagrees [1]  287/18
disclosed [1]  279/19
disclosure [1]  272/15
discovery [1]  277/20
discretion [2]  282/25 286/10
discuss [5]  262/1 262/1 262/15 262/19
270/17
discussed [1]  283/20
discussions [1]  261/21
dismiss [11]  273/15 273/5 273/11 273/17
274/25 276/8 276/9 278/13 286/23
286/25 287/6
dismissal [3]  285/14 285/17 289/1
dismissed [1]  285/22
disregard [1]  263/12
distances [1]  260/3
DISTRICT [6]  256/1 256/2 256/11
286/10 289/12 289/12
do [25]  259/4 262/6 262/19 263/4 263/5
263/6 263/7 263/8 264/19 264/20 265/6
266/6 266/7 266/17 268/7 268/16
270/10 270/17 270/18 270/22 272/18
274/17 281/8 288/1 288/2
docket [1]  272/8
document [21]  271/16 272/17 273/8
273/9 273/10 273/14 273/15 273/16
273/19 273/20 273/21 274/1 274/4
274/8 274/12 274/14 274/24 277/16
277/22 278/9 279/2 280/7 280/8 286/25
287/3 287/7 287/17 287/19 288/8 288/9
288/13 288/15 288/15
Document 213 [1]  275/24
Document 214 [1]  273/15
Document 215 [1]  273/20
Document 237 [1]  273/16
Document 239 [1]  273/21
Document 474 [1]  274/12
documentary [3]  283/23 286/6 286/12
documents [8]  273/25 278/6 278/8
278/19 279/11 279/13 282/16 282/18
does [4]  275/4 277/12 281/11 287/20
doing [1]  267/21
don't [4]  259/4 270/9 271/6 271/7
done [1]  261/3
doubt [4]  260/18 261/2 266/11 266/19
downtime [1]  260/11
Doyle [5]  257/1 289/11 289/18 289/18
drawn [1]  260/3
driving [1]  260/3
duces [2]  277/21 280/4
due [11]  273/6 274/18 274/25 275/7
278/16 279/8 280/20 282/11 283/10

285/7 286/24
Duncan [1]  287/12
during [14]  259/9 260/21 261/8 262/14
262/17 263/2 264/17 264/21 264/25
265/23 267/14 268/15 269/11 269/19
duty [4]  267/16 267/19 268/2 268/3

**E**

e-mail [1]  264/8
e-mails [2]  278/22 279/4
each [3]  274/10 283/19 284/14
earlier [6]  269/6 279/25 280/3 284/10
284/17
early [1]  259/21 271/1 277/20
early-return [1]  277/20
EASTERN [2]  256/2 289/12
efficient [1]  269/25
efficiently [1]  270/4
eight [1]  283/2
elect [1]  266/2
electronically [1]  264/6
element [7]  266/18 277/8 278/17 283/4
283/5 285/11 286/21
else [4]  262/7 262/17 264/24 289/3
emergency [2]  259/10 259/11
end [3]  261/3 262/21 269/5
endeavoring [1]  274/18
ending [1]  269/23
Energy [10]  274/22 274/23 275/14
275/22 276/4 276/14 276/17 276/18
279/5 280/18
engage [6]  261/9 261/9 261/9 261/16
261/16 263/6
engaging [1]  284/11
ENGELHARDT [1]  256/10
enough [1]  262/9
enter [1]  265/6
entitled [2]  266/8 289/15
entity [1]  283/8
Environment [9]  274/22 275/14 275/22
276/5 276/14 276/18 276/19 279/5
280/18
equally [1]  261/7
ESQ [6]  256/14 256/15 256/18 256/21
256/21 256/22
essential [4]  277/8 283/4 285/18 286/21
establishing [2]  278/16 286/21
estimate [1]  269/23
estimates [2]  288/11 288/15
even [5]  275/11 276/18 280/25 281/1
281/2 289/1
every [7]  259/20 266/18 270/16 270/17
270/21 271/7 271/7
everyone [1]  271/1
evidence [51]
evidentiary [2]  287/24 288/4
exactly [1]  270/22
examination [2]  281/2 286/15
examine [1]  286/3
examined [1]  280/23
exchanges [1]  262/8
exclude [1]  281/4
excludes [1]  286/11
exculpatory [3]  279/15 281/9 283/4
Executive [1]  282/7
exercise [6]  273/7 274/19 275/1 279/8
283/11 286/24
exhibits [5]  263/14 263/15 267/23 268/9
279/2
Exhibits A through Y [1]  279/2
exist [1]  269/4

**E**

existed [1] 277/14
existence [1] 279/13
exists [1] 275/10
exited [1] 271/13
expect [1] 260/24
expected [1] 269/17
explained [1] 283/7
explanation [2] 265/21 266/5
expressed [1] 285/16
expressly [1] 277/4
extend [1] 262/6
extent [1] 278/7
external [1] 284/4
extremely [1] 260/25
eyes [1] 259/9
eyewitness [1] 269/2

**F**

F.2d [4] 281/16 284/25 285/15 286/17
F.3d [2] 281/22 283/12
Facebook [1] 264/11
fact [5] 262/5 269/1 277/6 277/13 283/5
facts [9] 267/10 267/19 269/3 269/4
 269/12 269/13 275/25 276/2 276/3
factual [5] 276/6 277/7 277/12 283/17
 283/20
fair [1] 285/9
fairly [2] 260/17 261/2
fairness [2] 280/14 282/13
familiar [2] 272/6 272/9
family [2] 261/12 264/7
favor [5] 278/2 282/20 284/13 284/17
 286/5
favorable [3] 281/22 282/2 284/5
favorably [1] 284/6
FCRR [3] 257/1 289/11 289/18
Federal [1] 286/9
feeling [1] 269/8
fellow [1] 260/22
Fernandez [1] 284/25
few [2] 259/22 282/11
Fifth [11] 266/23 277/11 282/12 283/6
 283/7 283/12 283/22 284/13 285/12
 285/15 286/16
Fifth Circuit [6] 277/11 283/6 283/7
 283/12 285/12 285/15
Fifth Circuit's [1] 286/16
filed [7] 274/13 277/20 279/23 280/5
 280/7 287/17 288/3
filings [1] 273/23
Finally [3] 264/13 267/7 282/4
find [1] 280/20
findings [1] 285/23
finds [8] 279/9 282/10 283/13 283/22
 284/1 284/9 284/24 285/13
finish [1] 259/21 259/24 259/25
finished [1] 287/25
first [9] 265/17 272/7 273/23 275/2
 276/11 279/20 280/14 282/15 288/7
flow [1] 288/11 288/14
flow-rate [2] 288/11 288/14
folks [1] 271/8
follow [2] 267/16 270/1
following [6] 262/13 265/17 265/25
 267/15 273/22 282/14
force [2] 288/10 289/5
foregoing [1] 289/13
formal [1] 275/6
forming [1] 262/22
forth [3] 285/12 285/25 287/16
forward [3] 271/18 272/23 273/3

found [5] 278/2 283/11 284/17 285/24
 287/8
four [2] 281/17 286/13
Fourth [3] 266/22 285/1 286/18
Fourth Circuit [2] 285/1 286/18
Freedhoff [1] 287/13
frequently [1] 269/19
fresh [1] 270/14
Friday [1] 274/13
friendly [1] 262/6
friends [2] 262/16 264/7
frolic [2] 283/8 283/14
full [5] 272/15 281/18 283/21 284/21
 285/9
fully [4] 262/23 272/12 272/14 286/3
fundamental [4] 280/13 280/14 282/11
 284/15
further [5] 261/19 269/4 278/19 281/24
 287/6
Furthermore [3] 261/23 275/19 281/19

**G**

gather [1] 263/5
gave [1] 269/24
general [4] 259/3 259/7 271/24 275/2
gentlemen [1] 270/12
get [7] 259/16 259/17 259/18 260/16
 270/25 271/1 271/9
give [3] 259/3 259/6 260/4 262/10
 262/13 267/14 269/4 269/23 285/4
given [4] 264/16 264/23 267/12 270/2
giving [1] 286/10
go [6] 259/22 265/3 270/12 270/15
 270/24 271/9
going [8] 260/7 260/15 270/15 270/23
 270/24 271/5 271/8 288/24
gone [1] 262/20
Goo [1] 287/13
Good [2] 271/23 271/25
governed [1] 268/1
government [29] 261/13 265/17 265/19
 265/23 265/25 266/12 266/13 266/15
 266/18 267/5 267/6 273/8 273/14
 273/19 274/8 275/23 276/23 277/4
 278/16 279/24 280/7 281/10 281/15
 281/19 281/24 282/4 282/6 285/8
 286/20
government's [11] 265/21 266/2 266/3
 276/1 280/22 281/7 282/22 283/17
 285/3 286/4 286/14
grant [1] 287/8
granted [2] 272/21 277/23 279/25
 285/21 287/4 288/22
granting [1] 280/9
great [1] 260/20
greeting [1] 262/7
grounds [4] 274/8 277/2 278/3 279/25
Group [1] 274/2
guaranteed [1] 284/22
guesswork [1] 267/21
guidance [1] 286/7
guilty [1] 266/10

**H**

had [4] 272/1 274/20 275/20 287/11
halls [2] 265/7 265/7
hallway [1] 274/9
handful [1] 274/9
happen [2] 261/2 262/17
happens [2] 261/17 269/18
has [27] 261/3 262/23 263/10 263/12
 264/14 264/15 266/15 267/4 267/5
 267/6 268/10 268/21 272/8 272/10

272/22 273/4 273/8 273/9 273/15
 284/21 285/6 285/25
have [40]
he [5] 266/7 266/7 266/8 281/21 285/6
headquarters [1] 265/11
hear [3] 262/2 263/25 268/12
heard [1] 262/25
hearing [1] 268/14
HEBERLIG [2] 256/21 272/2
helpful [1] 263/6
here [11] 259/4 259/7 259/16 260/1
 263/15 265/14 270/25 271/1 271/1
 271/8 271/8
hereby [3] 285/22 286/11 287/4
high [2] 277/4 279/24
high-ranking [1] 274/7
highly [1] 283/24
himself [1] 274/16
his [26] 274/25 276/9 278/5 278/12
 278/21 280/12 280/16 281/8 281/9
 281/22 283/15 283/24 284/5 284/22
 285/5 285/8 285/10 285/18 286/5
 286/25
hold [4] 268/8 272/25 281/9 283/3
holding [1] 284/25
honor [5] 271/23 272/3 272/19 272/20
 284/15
HONORABLE [1] 256/10
hopefully [2] 259/16 270/25
Horizon [1] 275/10
hour [1] 259/16
hours [1] 270/1
house [26] 271/24 272/19 274/3 274/21
 274/23 277/23 277/25 278/2 278/5
 278/19 279/10 279/16 279/19 279/23
 281/2 282/16 282/21 282/23 282/25
 283/1 283/8 283/8 284/4 284/18 286/6
House's [2] 282/19 284/18
However [1] 264/5
hypothetical [1] 288/12

**I**

I'd [2] 260/8 262/13
I'll [1] 272/24
I'm [9] 260/7 260/11 260/19 270/15
 271/4 272/8 272/15 276/1 277/7
i.e [1] 282/6
identified [5] 261/5 261/14 261/15 283/5
 287/19
if [24] 259/9 259/18 261/17 262/2
 263/10 264/17 264/19 264/20 265/7
 266/4 266/7 268/5 271/3 271/7 271/7
 271/18 272/15 272/23 273/2 275/11
 276/18 281/7 288/1 289/4
ignore [1] 268/22
Illinois [1] 281/13
immediately [2] 261/18 262/4
impartiality [1] 262/11
impartially [1] 261/2
impede [1] 274/18
implicate [1] 283/20
implicated [1] 281/20
implication [1] 284/20
important [2] 262/24 270/19
importantly [2] 279/18 286/4
imposes [1] 266/19
impossible [1] 286/18
impression [2] 262/10 262/11
improper [1] 288/14
in [158]
inadmissible [1] 281/13

I

inapposite [1]  282/5
includes [2]  262/15 264/7
including [5]  261/11 263/21 263/22
  264/11 284/3
incompetent [1]  281/12
indeed [1]  277/11
independent [1]  284/14
indicate [1]  269/12
indicated [3]  259/13 269/16 286/16
indictment [12]  266/14 273/6 273/12
  273/18 274/15 275/24 276/2 276/7
  276/25 276/25 286/23 287/1
individual [1]  283/14
indulge [1]  267/21
infer [1]  269/3
inferences [2]  267/4 267/20
influence [1]  274/18
influenced [2]  268/24 269/7
information [4]  260/5 263/5 275/12
  283/4
innocence [1]  266/8
innocent [2]  262/9 266/10
inquiry [13]  273/7 274/19 274/19 275/1
  275/7 276/3 277/10 277/13 277/14
  278/20 279/8 283/11 286/25
inside [1]  260/24
insofar [2]  287/15 288/23
instead [2]  275/6 276/8
instigate [1]  275/7
instruct [2]  267/7 268/20
instructed [2]  262/20 264/15
instructions [10]  259/3 259/7 262/14
  262/25 264/1 265/9 267/13 267/16
  267/17 269/4
insufficient [1]  278/17
intended [3]  267/2 269/11 278/16
intends [1]  265/23
interest [1]  272/14
internal [1]  284/4
Internet [3]  263/22 264/4 264/10
interview [1]  279/14
into [9]  267/18 267/23 268/23 270/5
  270/7 270/12 276/17 278/24 279/4
introduce [1]  266/13
introduced [1]  266/22
introducing [1]  266/21
introduction [1]  265/22
investigate [3]  275/10 275/11 280/18
investigating [1]  279/6
investigation [24]  273/14 274/20 275/6
  275/7 275/15 276/4 276/11 276/13
  276/16 276/16 276/19 276/21 277/10
  277/13 277/15 278/21 278/24 279/1
  279/18 280/20 281/5 286/1 286/19
  287/3
investigations [3]  275/3 275/20 275/21
investigative [2]  276/12 278/15
invocation [1]  285/7
involved [3]  262/6 265/8 285/8
iPhone [1]  264/9
is [97]
issue [1]  272/8
issued [1]  278/11
issues [10]  277/6 277/7 277/9 277/13
  283/17 283/20 283/25 287/23 287/24
  288/4
it [26]  259/23 260/6 261/18 261/25
  262/22 262/24 263/11 263/16 264/16
  264/22 267/12 267/16 267/18 268/2
  268/8 268/15 268/24 272/12 272/13
  272/15 272/18 272/22 277/6 278/7

its [13]  261/6 265/19 266/15 269/14
  270/5 276/12 280/3 280/3 283/1 283/10
  284/18 285/23 286/20

J

Jeffrey [1]  287/12
Jencks [1]  285/2
Jencks v [1]  285/2
job [1]  259/8
Johnson [1]  256/20
jointly [1]  276/16
Jones [1]  256/7
judge [2]  256/11 268/4
judges [1]  267/10
June [3]  256/7 259/2 279/20
June 1 [1]  279/20
jurisdiction [2]  275/4 275/21
jurisprudence [2]  272/9 285/12
juror [1]  261/17
jurors [7]  260/18 260/19 260/20 260/22
  261/8 261/19 262/2
jury [25]  256/10 259/8 260/12 262/21
  265/2 265/3 265/10 265/11 265/11
  267/10 267/18 268/12 268/14 270/3
  270/7 270/12 270/13 270/25 271/2
  271/13 276/8 277/6 277/9 283/18
  287/25
jury's [1]  283/25
just [8]  259/11 267/1 269/24 274/10
  279/25 283/19 284/22 288/17
justice [3]  256/14 261/3 282/7

K

keep [5]  259/9 260/1 268/13 268/17
  270/3
kind [1]  261/10
kinds [2]  268/25 269/6
know [7]  259/4 260/3 270/10 271/6
  271/8 272/7 272/24
knowledge [1]  286/5
KURT [1]  256/10

L

lack [4]  262/10 273/6 274/25 286/23
lacking [1]  286/5
ladies [1]  270/11
last [1]  269/17
later [1]  277/18
law [11]  262/20 263/1 264/1 264/15
  266/19 267/8 267/11 267/12 268/2
  272/6 277/7
lawyers [3]  268/8 268/11 269/19
lay [3]  288/8 288/12 288/14
learn [1]  263/9
least [4]  279/3 280/24 281/3 284/5
leave [5]  264/20 264/21 264/21 264/22
  270/15
leaves [1]  287/10
leaving [1]  276/25
led [1]  276/5
legal [2]  274/2 277/9
legislative [1]  282/8
length [1]  268/18
LEO [1]  256/14
let [8]  259/3 259/6 263/2 270/7 270/11
  270/15 270/23 272/25
Let's [1]  277/12
letter [10]  273/13 276/10 276/20 277/2
  278/20 278/22 278/25 279/7 280/19
  287/2
letters [1]  279/4

light [6]  274/6 280/6 280/9 287/5 287/18
like [9]  259/21 262/13 266/3 267/1 271/4
  272/16 288/1 289/2 289/4
likely [1]  265/7
likewise [1]  261/15
limine [4]  287/23 288/13 288/16 288/21
limitation [2]  281/1 281/1
limited [3]  280/23 282/23 284/3
LinkedIn [1]  264/12
list [2]  282/16 282/17
listed [2]  274/10 288/20
listen [2]  263/20 270/18
little [4]  259/16 259/20 260/10 270/8
lives [1]  260/15
LLP [2]  256/17 256/20
locked [1]  260/12
long [1]  284/19
long-standing [1]  284/19
longer [3]  259/23 260/13 270/3
lose [2]  283/9 283/14
LOUISIANA [5]  256/2 256/16 256/19
  257/2 289/13
lunch [2]  259/16 259/18

M

made [2]  266/4 277/1
MAGNER [1]  256/18
mail [1]  264/8
mails [2]  278/22 279/4
make [2]  259/8 260/9 260/19 262/21
  265/10 265/14 265/18 265/19 265/24
  266/2 266/6 268/3 268/8 268/18 269/11
  269/19 270/2 271/3 271/20 271/21
  272/16 275/25 276/2
making [1]  266/1
manner [1]  261/1
many [1]  264/3
March [1]  279/16
March 10 [1]  279/16
Marcia [1]  288/8
Markey [2]  275/13 286/2
Markey's [3]  278/25 279/6 280/19
marshal [2]  265/5 265/5
material [9]  268/22 272/11 280/17
  281/21 282/1 283/3 283/24 284/1 285/5
materials [1]  272/5
matter [6]  259/5 270/10 271/19 279/22
  282/10 289/15
matters [2]  268/13 269/5
may [46]
May 14 [8]  273/13 276/10 276/20 277/2
  278/20 279/7 280/19 287/2
May 4 [5]  273/12 276/10 276/19 276/23
  287/1
maybe [2]  287/25 288/2
McNutt [1]  288/9
me [8]  259/3 259/6 261/18 262/3 263/2
  270/7 272/25 274/11
means [2]  263/22 267/24
meantime [1]  277/19
mechanical [1]  257/5
media [1]  264/5
meet [1]  286/20
member [2]  283/9 283/14
members [2]  277/21 279/14
memorandum [2]  273/24 274/3
mentioned [2]  263/8 280/25
merely [1]  265/22
merit [1]  287/8
messaging [1]  264/9
MICHAEL [2]  256/18 287/13
Michal [1]  287/13

Case 1:21-cr-00670-CKK   Document 161-10   Filed 07/15/22   Page 160 of 143

**M**

midmorning [1]  259/14
might [4]  262/7 263/6 269/20 283/9
mind [1]  269/6
mindful [2]  260/20 270/24
minds [2]  263/12 269/21
minimum [2]  268/13 268/18
minutes [2]  259/15 259/22
mischaracterizing [1]  288/11
missing [1]  271/5
Mitchell [1]  286/17
moment [2]  263/11 263/18
moot [2]  287/14 287/18
more [10]  259/4 259/23 265/7 265/20
 266/4 270/9 279/15 279/18 282/11
 286/4
morning [4]  259/14 264/25 269/17
 288/25
most [1]  287/17
motion [40]
motions [13]  273/4 273/5 273/23 274/10
 277/17 287/11 287/19 287/21 287/22
 288/3 288/19 288/21 288/23
move [1]  272/22
moved [1]  277/24
Mr. [7]  272/2 272/23 273/2 273/2 279/16
 280/15 288/14
Mr. Heberlig [1]  272/2
Mr. Rainey [2]  279/16 280/15
Mr. Rainey's [1]  288/14
Mr. Tsao [2]  272/23 273/2
Mr. Zink [1]  272/2
much [3]  259/4 270/9 271/10
must [22]  261/25 263/11 263/23 264/5
 267/9 267/11 267/21 268/6 268/8
 268/13 268/22 269/7 269/13 276/8
 277/8 281/21 281/25 283/17 283/18
 284/20 285/4 287/3
my [10]  259/8 260/2 262/25 265/9 268/3
 269/12 269/21 269/25 288/18 289/14
myriad [1]  288/4
Myspace [1]  264/12

**N**

N.W [1]  256/22
necessarily [1]  287/4
necessary [3]  260/13 263/23 270/4
need [5]  259/6 259/10 264/19 288/25
 289/3
neighbors [1]  262/17
networking [1]  264/11
never [1]  266/19
New [3]  256/16 256/19 257/2
news [1]  263/20
newspapers [1]  263/19
night [2]  260/2 264/21
nine [1]  271/17
Ninth [1]  281/15
no [9]  256/5 260/18 261/1 266/2 266/5
 269/10 275/8 278/8 283/10
Nobles [1]  286/8
noncumulative [2]  284/2 285/5
nonetheless [1]  262/10
nonparties [1]  287/12
nonparty [2]  271/17 282/8
nonspeculative [1]  281/25
noon [1]  259/17
nor [2]  263/19 278/25
not [76]
Notably [1]  276/22
notebook [1]  264/18
notes [4]  264/18 264/19 264/20 264/23

nothing [4]  265/20 266/4 266/12 272/19
notice [7]  256/24 256/25 257/10 258/3
 287/9 289/6 289/10
notify [1]  262/3
now [9]  269/16 271/16 272/17 279/25
 280/10 284/20 287/10 287/22 288/1
number [7]  268/18 277/19 278/4 278/6
 278/22 284/3 287/22
numbers [1]  287/19

**O**

oath [1]  270/20
objection [4]  268/3 268/4 268/9 268/21
objections [2]  268/7 268/8
obliged [1]  266/17
observed [1]  260/22
observing [1]  261/24
obstruct [1]  274/18
obtaining [1]  285/6
occurs [2]  262/3 263/17
offense [2]  262/5 266/18 277/8
offer [2]  281/12 281/25
Office [1]  271/24
official [5]  257/1 274/8 279/25 289/11
 289/19
oil [1]  275/10
okay [3]  268/15 272/1 272/4
old [1]  271/6
omissions [1]  277/1
on [74]
one [8]  261/2 271/5 271/6 271/7 272/25
 277/12 288/17 288/22
only [6]  263/14 276/25 282/15 285/13
 287/16 288/5
open [2]  259/9 267/5
opening [11]  265/18 265/19 265/24
 265/25 266/1 266/2 266/3 266/4 266/6
 266/11 267/1
opinion [7]  269/12 283/12 285/16
 286/17 286/18 288/8 288/14
opinions [1]  262/22
opportunity [1]  265/18
opposition [4]  274/9 275/24 276/1 280/8
or [76]
oral [2]  266/24 276/22
order [7]  261/1 265/17 272/24 274/12
 280/25 281/19 287/12
ordered [2]  268/10 268/22
Orleans [1]  256/19 256/19 257/2
other [19]  260/23 261/13 261/24 263/8
 263/19 263/20 263/22 264/4 264/11
 265/12 269/3 269/5 269/23 275/23
 278/1 280/21 283/3 287/18 288/19
others [3]  261/5 274/16 274/17
otherwise [3]  262/22 278/10 281/13
our [3]  270/13 272/1 272/20
out [7]  259/16 260/14 262/7 266/9
 269/22 276/4 279/15
outside [8]  259/18 260/24 261/20 263/6
 263/9 263/13 263/17 268/13
over [9]  262/23 277/13 286/10
Oversight [3]  275/20 276/13 276/16
own [3]  263/5 264/23 282/25

**P**

PAGE [1]  258/2
papers [1]  272/20
parking [2]  260/4 260/5
part [12]  273/13 275/14 276/10 276/20
 276/24 277/14 278/20 278/25 280/19
 287/2 288/23 288/23
partial [2]  262/11 282/15
participants [1]  261/6
particular [3]  275/18 287/24 288/6

particularly [1]  261/25
parties [4]  260/17 261/24 266/24 267/3
 284/8
party [1]  269/8
paths [1]  262/8
patience [1]  271/11
pays [1]  259/8
pen [1]  264/19
pendency [1]  262/18
pending [5]  273/4 273/23 288/9 288/20
 288/21
perform [1]  275/21
performed [3]  278/7 282/17 286/6
perhaps [1]  269/17
permitted [3]  262/9 281/7 281/16
person [2]  261/13 261/15 267/25
personal [3]  259/10 264/23 269/8
persons [4]  262/24 261/11 261/24 262/6
pertain [1]  288/24
Phil [1]  287/12
phone [1]  264/8
phones [1]  264/3
placed [1]  261/20
places [1]  263/7
planned [1]  269/20
plausible [2]  279/11 285/25
plausibly [3]  281/8 283/3 284/5
pleadings [1]  284/7
please [11]  259/9 262/3 264/20 265/3
 265/6 270/17 270/17 270/18 270/24
 271/20 271/21
pledge [1]  268/17 269/25
point [6]  269/22 269/23 270/23 287/14
 287/18 289/3
pointed [1]  266/9
pointing [1]  269/22
points [1]  278/22
position [1]  261/20
positions [1]  275/24
possibility [1]  262/2
possible [4]  260/11 260/17 260/17
 268/19
potentially [3]  279/15 283/3 286/1
power [6]  273/7 274/19 275/1 279/8
 283/11 286/24
Poydras [2]  256/15 257/1
preclude [3]  288/10 288/12 288/13
precluded [1]  285/6
preclusion [1]  286/11
prejudice [2]  269/8 285/22
preliminary [1]  282/10
prepared [1]  272/15
present [6]  266/16 266/24 267/2 281/18
 281/20 283/21
presentation [1]  269/11
presented [3]  263/24 264/14 266/15
presenting [1]  270/1
presumably [1]  282/24
presumed [1]  266/10
presumption [1]  266/8
pretrial [1]  288/20
previously [1]  285/20
prior [1]  265/9
privilege [11]  278/1 278/2 280/5 281/17
 282/8 282/19 283/2 284/12 284/19
 285/7 285/17
privileged [2]  278/8 281/12
privileges [1]  284/16
proceed [3]  259/13 265/16 275/18
proceedings [3]  257/5 289/8 289/15
process [3]  281/18 282/11 282/12
proclaimed [1]  282/23
produce [2]  265/23 278/8

**P**

produced [4]  278/5 278/19 279/4 279/10
production [5]  278/9 282/16 283/23
  286/6 286/12
proffer [1]  288/16
prohibit [1]  280/15
prohibiting [1]  285/18
promise [1]  269/18
prompt [2]  260/8 271/5
proof [3]  267/6 269/1 269/3
proper [10]  273/7 274/19 275/1 275/7
  275/20 278/16 279/8 280/20 283/11
  286/24
properly [2]  263/3 279/5
propose [1]  270/11
propounded [1]  277/19
prosecution [2]  285/3 285/8
protection [1]  283/9
protections [1]  283/15
protective [4]  272/24 274/11 280/25
  287/12
prove [1]  266/18
proven [1]  266/10
proves [1]  266/12
provide [4]  264/18 265/13 267/17
  286/13
publicity [1]  263/10
punish [1]  282/6
purely [1]  277/9
purposes [1]  278/17
pursuant [4]  282/2 283/1 283/21 286/9
put [2]  285/9 285/25

**Q**

qualifies [1]  277/10
quash [6]  271/17 272/17 279/23 280/1
  280/3 280/10
question [1]  279/4
questions [1]  288/12
quickly [2]  260/16 270/4
quite [1]  284/6
quoting [3]  276/1 277/7 277/15

**R**

radio [1]  263/20
RAINEY [6]  256/6 256/17 256/20 279/16
  280/15 283/12
Rainey's [2]  273/24 288/14
ranking [2]  274/7 279/24
rate [2]  288/11 288/14
rather [1]  260/11
reach [1]  264/13
read [5]  263/18 264/24 270/18 272/4
  272/12
reading [2]  263/7 279/11
ready [1]  271/9
realizing [1]  262/22
reason [4]  261/4 262/8 265/2 270/21
reasonable [5]  266/10 266/19 267/20
  279/11 285/25
reasons [2]  266/7 285/20
rebuttal [1]  266/22
Rec. [1]  274/8
Rec. Document 427 [1]  274/8
receive [1]  263/3
received [4]  262/24 262/25 273/22
  282/15
recently [1]  274/13 287/17
recess [2]  259/10 265/1
recipient's [1]  274/6
recipients [1]  271/18
recognize [1]  264/3

reconcile [1]  284/15

Record Document 188 [2]  273/8 286/25
Record Document 190 [2]  273/14 287/3
Record Document 192 [1]  273/19
Record Document 213 [1]  273/9
Record Document 214 [1]  277/16
Record Document 247 [1]  273/10
Record Document 315 [1]  279/2
Record Document 328 [1]  288/8
Record Document 333 [1]  288/9
Record Document 337 [1]  288/13
Record Document 392 [1]  274/1
Record Document 415 [1]  274/4
Record Document 419 [2]  271/16
  272/17
Record Document 420 [1]  288/15
Record Document 423 [1]  288/15
Record Document 427 [1]  280/7
Record Document 488 [2]  274/14
  287/17
recorded [1]  257/5
reference [3]  260/19 279/1 285/14
referred [3]  287/11 288/7 288/10
referring [1]  260/19
refreshments [1]  265/13
refusal [2]  274/6 280/6
refused [1]  283/2
regard [2]  282/14 287/20
regarding [3]  272/16 273/24 288/14
regardless [2]  283/9 283/15
REID [1]  256/21
relate [1]  283/20
related [10]  270/19 273/23 279/10
  279/18 281/4 283/4 285/5 285/23
  286/12 288/5
relates [1]  287/23 288/17
relative [2]  287/23 288/17
relatives [2]  261/12 262/16
relevant [5]  279/19 280/17 283/24 284/8
  284/4
relief [5]  274/6 280/6 280/10 280/12
  285/21
relies [1]  280/13
rely [1]  278/16
remain [2]  265/3 265/6
remaining [1]  276/6
remark [1]  269/16
remarks [2]  262/2 272/16
remedial [5]  274/5 280/5 280/10 280/12
  285/21
remedy [2]  282/5 285/13
Remember [1]  264/22
remind [1]  270/16
rendered [1]  286/18
Renzi [2]  281/16 284/10
repeat [1]  272/11
repeatedly [1]  283/16
replied [3]  273/9 273/15 273/20
replies [1]  274/9
report [1]  261/18
Reporter [3]  257/1 289/12 289/19
reports [1]  263/20
representation [1]  278/9
representations [2]  277/1 282/18
Representative [5]  275/13 278/25 279/6
  280/19 286/2
Representative Markey [2]  275/13 286/2
Representative Markey's [1]  278/25
  279/6 280/19
Representatives [2]  274/21 274/23
Representatives' [1]  274/3
representing [1]  278/6

request [3]  275/12 277/23 283/2
required [4]  265/2 266/6 275/6 275/17
requires [1]  277/5
reserved [1]  277/24
resolution [2]  275/6 275/9
resolve [2]  277/5 277/12
resolved [1]  276/8
respective [2]  266/25 267/3
respond [1]  277/24
responded [4]  273/8 273/15 273/19
  277/25
response [7]  274/13 275/23 277/2 277/4
  278/9 280/7 281/10
responses [1]  274/9
responsibilities [1]  260/21
responsibility [1]  260/25
rest [2]  266/7 272/20
restrooms [1]  265/12
result [1]  286/15
retire [2]  267/8 270/12
return [2]  277/20 277/24
returnable [1]  279/20
revisit [1]  288/3
revisited [1]  288/25
right [9]  267/5 269/16 271/4 271/10
  281/1 281/17 281/20 283/2 289/5
rights [6]  282/11 282/11 284/14 284/22
  285/10 285/24
ripe [1]  280/10
rise [2]  271/12 289/7
ROBERT [1]  256/15
room [13]  260/12 262/21 264/10 265/4
  265/10 265/11 267/18 270/3 270/8
  270/13 270/25 271/2 289/5
Roviaro [1]  285/2
Roviaro v [1]  285/2
rule [3]  268/4 272/15 275/2
ruled [4]  282/20 284/12 287/22 288/22
rules [5]  262/25 263/1 268/2 270/24
  286/9
ruling [8]  268/7 269/10 277/17 280/3
  284/9 284/18 284/21 287/18
rulings [2]  284/10 285/1

**S**

said [5]  263/23 266/11 266/25 267/1
  269/16
same [4]  261/4 274/17 283/13 285/8
say [1]  288/21
saying [1]  271/6
scope [5]  278/6 278/10 280/23 282/24
  286/6
SCOTT [1]  256/22
search [2]  278/7 282/17
searches [1]  282/17
seat [2]  264/22 268/16
seated [4]  264/22 271/14
second [14]  266/13 272/25 273/6
  273/12 273/18 274/15 276/7 276/9
  276/15 276/25 280/24 281/3 286/23
  287/1
Secondly [3]  274/2 275/8 282/21
Section [1]  256/6
see [3]  260/12 263/25 289/4
seek [1]  279/15
seeks [1]  285/4
seem [1]  262/9
seems [1]  280/25
seen [2]  283/16 284/17
send [1]  270/7
sensitive [1]  260/7
sent [2]  275/12 279/7

serious [1] 282/13
served [2] 277/21 279/17
serves [1] 265/22
service [1] 279/7
SESSION [2] 256/9 259/1
set [2] 285/12 287/16
settled [1] 277/7
shall [5] 261/6 261/9 261/16 262/1
263/16
short [1] 268/19
should [5] 261/19 262/5 262/12 281/3
282/6
show [2] 265/4 270/25
shown [1] 267/4
sides [1] 272/10
signal [1] 259/11
similar [1] 284/24
since [1] 287/25
sit [1] 260/15
situation [1] 260/6
six [1] 279/17
Sixth [3] 282/12 283/22 284/13
so [13] 259/11 259/17 259/23 260/10
264/19 266/7 266/7 266/17 267/21
270/15 270/23 271/5 272/8
social [2] 264/5 264/11
software [1] 257/5
solely [2] 263/24 287/15
solo [1] 268/12
some [10] 259/3 259/6 259/21 259/24
260/3 260/4 260/4 268/13 269/5 288/22
somebody [1] 259/24
someone [1] 259/8
Soon [1] 278/4
sought [5] 279/14 281/21 282/6 283/23
284/1
specific [2] 262/14 275/17
specifically [4] 272/10 272/16 275/16
281/5
speculation [1] 267/22
speech [8] 274/7 278/1 278/2 279/24
280/5 281/17 284/12 284/19
spill [5] 275/10 275/12 276/17 278/24
279/6
spouse [1] 262/16
St [1] 256/18
staffers [5] 277/22 279/15 279/17
280/21 281/6
stand [2] 259/24 268/16
standing [1] 284/19
start [4] 262/22 270/13 271/4 271/8
starting [1] 259/13
stated [2] 284/1 285/21
statement [12] 265/19 265/19 265/20
265/24 265/25 266/1 266/2 266/3 266/4
266/6 267/1 270/14
statements [2] 266/11 288/16
STATES [9] 256/1 256/4 256/11 256/14
265/5 274/21 274/22 285/2 289/12
status [2] 283/10 283/15
stenography [1] 257/5
Steptoe [1] 256/20
still [1] 277/7
strangers [1] 262/16
Street [2] 256/15 257/1
stretch [1] 268/16
stricken [2] 268/10 268/22
strike [1] 263/11
subcommittee [26] 273/13 274/22 275/4
275/9 275/11 275/13 275/20 275/22
276/4 276/5 276/11 276/13 276/14

276/15 276/17 276/18 277/10 278/14
283/16 286/2 287/7
submitted [2] 272/5 283/18
subpoena [4] 271/17 274/6 278/10
283/2
subpoenas [6] 277/21 278/5 279/17
279/20 279/23 280/4
Subsequently [1] 278/12
such [13] 262/8 267/16 267/20 268/23
269/1 270/5 275/5 275/8 275/21 276/20
277/13 282/5 282/22
sufficient [1] 275/5
suggest [1] 281/1
Suite [2] 256/15 256/18
superseding [10] 273/6 273/12 273/18
274/15 275/25 276/2 276/7 276/25
286/23 287/1
supervision [1] 265/5
supplemental [1] 273/24
supplemented [1] 278/12
support [4] 266/14 266/24 278/21
281/14
supported [1] 284/18
Supreme [1] 286/7
Supreme Court's [1] 286/7
sure [2] 259/8 260/5
surrounding [1] 286/16
sustained [2] 268/10 268/21
sympathy [1] 269/8

T
take [13] 259/14 259/15 259/19 262/5
264/18 264/19 264/20 267/18 268/23
270/11 270/13 271/16 272/25
taken [2] 270/20 275/24
taking [2] 260/14 279/22
talk [1] 268/12
talking [1] 270/21
task [2] 288/10 289/4
Tatelman [1] 271/24
Taylor [1] 281/13
technology [1] 264/4
tecum [2] 277/21 280/4
telephones [1] 265/12
television [1] 263/20
term [1] 267/24
terms [3] 278/7 282/17 288/25
testifies [1] 267/24
testify [4] 274/7 280/6 280/22 282/22
testifying [1] 286/3
testimony [15] 265/15 267/23 268/9
268/20 269/2 280/17 280/21 281/5
281/12 282/1 282/23 283/24 286/13
287/15 288/8
text [1] 264/9
than [7] 259/23 260/13 265/20 266/4
269/23 270/3 282/11
Thank [2] 271/10 289/6
that [128]
That's [2] 260/2 288/18
their [9] 260/10 261/7 262/2 266/24
269/21 275/3 275/24 277/22 279/15
them [3] 264/20 267/19 268/7
then [6] 267/8 275/13 277/24 278/5
278/11 288/19
theory [2] 265/21 266/5
there [17] 259/21 259/22 260/10 262/1
265/12 265/14 265/22 265/25 270/9
271/3 273/11 273/17 278/8 283/10
288/19 288/21 289/3
there's [4] 259/4 271/2 271/6 272/24
thereafter [1] 278/4

therefore [2] 286/20 286/22
these [5] 264/3 267/6 287/4 287/11
277/17 279/13 283/17 283/19 285/12
they [10] 260/9 262/9 262/10 264/23
268/14 269/20 270/12 283/20 288/23
289/1
thing [1] 288/2
things [3] 265/13 269/20 271/2
think [4] 263/6 269/16 288/17 288/20
third [2] 266/15 274/5 275/10 276/18
283/1
this [88]
those [15] 263/21 268/13 268/15 268/16
268/17 268/19 270/24 273/5 279/11
284/15 286/3 287/20 288/7 288/7
288/23
three [3] 273/4 279/17 283/19
through [6] 264/8 264/9 264/10 279/2
282/7 283/23
thus [2] 268/4 284/24
time [12] 260/7 260/9 260/10 262/13
267/18 268/2 268/2 270/2 270/11
270/23 272/7 272/18
today [9] 259/5 259/7 271/11 279/21
279/22 279/25 284/9 284/17 287/25
Todd [1] 271/23
token [1] 283/13
tomorrow [3] 270/14 270/25 288/25
Toni [4] 257/1 289/11 289/18 289/18
too [1] 272/25
tools [2] 264/4 264/5
transcript [2] 256/10 289/14
transcription [1] 257/5
transmitted [1] 263/22
trial [39]
tried [2] 260/16 261/3
true [1] 289/13
try [9] 259/11 260/2 263/8 265/10
265/13 268/12 268/18 269/21 270/4
trying [2] 260/16 280/15
TSAO [3] 256/14 272/23 273/2
Tusa [4] 257/1 289/11 289/18 289/18
Twitter [2] 263/22 264/9
two [4] 268/25 269/17 280/13 287/21
type [2] 259/10 259/17
typically [1] 269/18

U
U.S [11] 256/14 274/3 281/22 282/2
282/2 284/25 285/2 285/2 285/3 286/8
286/17
U.S v [1] 286/17
U.S. [5] 281/14 281/16 283/12 286/8
286/9
U.S. v [1] 283/12
U.S. v. Nobles [1] 286/8
U.S. v. Renzi [1] 281/16
U.S.C [1] 274/24
unable [1] 280/16
unanimous [1] 267/9
unauthorized [3] 283/8 283/14 286/1
unavailable [1] 282/1
unconstitutional [3] 273/18 277/18 287/7
under [15] 265/4 271/9 274/19 277/10
279/11 280/15 281/15 282/12 282/18
284/19 285/3 285/12 287/8 287/23
287/24
understand [2] 260/14 272/13
understanding [3] 278/13 288/18 289/14
unfettered [1] 281/11
UNITED [9] 256/1 256/4 256/11 256/14
265/5 274/21 274/22 285/2 289/12
United States [4] 265/5 274/21 274/22

**U**

United States... [1]  285/2
unless [3]  259/23 271/5 287/14
until [7]  260/1 262/20 262/24 264/14
 265/5 266/1 266/10
up [5]  259/17 260/12 270/11 271/16
 279/22
upon [4]  263/16 264/22 266/7 278/15
us [2]  269/22 270/10
use [4]  264/3 264/5 264/23 270/2
used [2]  278/7 282/6
using [1]  257/5
utilizing [1]  280/20

**V**

v. [2]  281/16 286/8
vagueness [3]  273/18 277/18 287/7
Valenzuela [1]  282/2
Valenzuela-Bernal [1]  282/2
value [1]  269/15
variety [1]  287/10
various [1]  277/21
verdict [2]  263/23 267/9
Verrusio [2]  281/22 284/10
versus [1]  256/5
very [15]  260/8 260/15 270/19 271/5
 271/10 272/6 272/9 272/9 279/3 280/24
 281/3 283/6 283/7 285/8 286/17
view [2]  263/19 278/23
violation [3]  265/9 274/24 277/3
visit [1]  263/7
visiting [1]  270/22
voluntarily [4]  278/5 281/6 282/22 286/3
voluntary [1]  280/21

**W**

wait [1]  262/24
Walker [1]  256/17
walls [1]  263/17
want [4]  259/18 259/24 259/25 271/6
warned [1]  260/9
was [17]  268/9 274/20 275/11 275/17
 276/4 276/24 278/9 278/10 278/20
 278/24 278/25 279/5 280/18 280/19
 282/19 288/9 288/17
Washington [1]  256/23
way [7]  261/25 263/8 264/10 268/24
 271/9 285/4 288/22
we [46]
We'll [1]  259/15
we're [1]  265/4
website [1]  264/10
websites [1]  264/11
weeks [1]  269/17
weigh [1]  281/16
weighing [1]  284/11
weight [1]  269/14
WEINGARTEN [1]  256/21
well [10]  260/20 269/5 272/24 274/9
 274/16 277/7 277/18 279/24 286/9
 287/9
well-settled [1]  277/7
were [11]  273/13 275/14 276/10 276/19
 276/20 277/14 279/20 282/18 287/2
 288/3 288/5
what [10]  263/25 266/11 266/25 267/1
 267/3 267/4 269/12 269/18 277/14
 284/20
whatsoever [2]  261/10 261/17
when [11]  259/22 260/18 261/20 264/21
 264/21 264/25 265/1 265/14 268/16
 268/23 270/25

where [7]  259/21 261/21 262/1 280/15
 280/17 286/6 287/15
whereby [2]  275/17 285/24
wherever [1]  262/7
whether [10]  259/4 266/11 268/4 277/10
 277/13 279/4 279/6 280/17 280/19
 288/25
which [49]
while [1]  280/20
whim [1]  282/24
who [8]  261/5 261/24 267/24 268/8
 280/21 281/6 281/8 283/3
whose [1]  280/16
why [1]  279/21
will [51]
wish [3]  260/5 264/17 268/15
wit [1]  274/21
withdrawn [1]  278/11
withdrew [1]  278/4
withheld [1]  282/18
within [3]  275/3 275/5 280/23
without [3]  262/22 278/6 286/2
witness [2]  263/14 267/24
witness' [1]  282/25
witnesses [17]  260/10 261/5 261/13
 261/24 266/20 267/23 269/21 273/25
 280/16 281/8 281/12 282/21 283/3
 286/3 286/5 286/13 288/12
witnesses' [1]  280/6
won't [1]  259/17
would [25]  265/8 266/4 270/11 271/4
 272/16 272/23 273/2 278/8 279/1 280/2
 282/23 283/10 283/14 285/14 286/13
 286/20 287/13 287/24 288/1 288/2
 288/2 288/6 288/7 289/2 289/4
written [3]  272/5 272/11 284/3

**Y**

y'all [1]  271/7
year [1]  283/13
Yes [1]  272/3
you [133]
you're [1]  260/12
you-all [2]  260/8 272/23
your [33]  259/9 260/14 260/20 260/21
 260/22 260/25 262/15 262/16 262/16
 263/5 263/11 263/11 263/12 263/23
 264/7 264/8 264/16 264/16 264/20
 264/22 264/23 267/8 267/16 267/19
 268/16 270/2 271/10 271/20 271/21
 271/23 272/3 272/19 272/20
Your Honor [4]  271/23 272/3 272/19
 272/20
yourself [1]  271/3
yourselves [5]  261/1 261/20 262/19
 263/1 268/6
YouTube [1]  264/12

**Z**

ZINK [2]  256/15 273/2

**EXHIBIT 2**

# Berkeley Journal of Criminal Law

Volume 20
Issue 2 *Fall 2015*

Article 2

2016

# Congressional Gamesmanship Leads To An Acquittal In Deepwater *Horizon Case,* United States v. David Rainey: A Case Study

Brian M. Heberlig
bheberlig@steptoe.com

## Recommended Citation

Brian M. Heberlig, *Congressional Gamesmanship Leads To An Acquittal In Deepwater Horizon Case, United States v. David Rainey: A Case Study,* 20 Berkeley J. Crim. L. 260 (2015).
Available at: http://scholarship.law.berkeley.edu/bjcl/vol20/iss2/2

## Link to publisher version (DOI)

http://dx.doi.org/http://dx.doi.org/10.15779/Z383V98

This Article is brought to you for free and open access by the Law Journals and Related Materials at Berkeley Law Scholarship Repository. It has been accepted for inclusion in Berkeley Journal of Criminal Law by an authorized administrator of Berkeley Law Scholarship Repository. For more information, please contact jcera@law.berkeley.edu.

ISSUE 20:2                                                                    FALL 2015

# Congressional Gamesmanship Leads To An Acquittal In *Deepwater Horizon* Case

# *United States v. David Rainey*: A Case Study

Brian M. Heberlig*

I. INTRODUCTION ............................................................................ 261
II. BACKGROUND .............................................................................. 262
    A. The *Deepwater Horizon* Incident and Rainey's
       Involvement ......................................................................... 262
    B. The Indictment .................................................................... 265
    C. The Original Dismissal Of Count One ............................... 266
III. PRETRIAL LITIGATION ................................................................. 267
    A. Motions Practice Following The Remand .......................... 267
    B. Dealings With The Congressional Parties And
       Additional Motions Practice ............................................... 270
       1. Rainey's Subpoenas Duces Tecum to the
          Congressional Parties .................................................. 270
       2. Rainey's Motion to Compel ......................................... 271
       3. Negotiated Voluntary Productions of Documents
          from Individual Members of Congress Revealed
          Exculpatory Information .............................................. 274
       4. The District Court Denied Rainey's Motion to
          Compel ......................................................................... 275
       5. The Voluntary Production of Committee and

DOI http://dx.doi.org/10.15779/Z383V98

Copyright © 2015 Regents of University of California.

\* The author heads the white-collar criminal defense practice group at Steptoe & Johnson LLP and represented David Rainey at trial, together with Reid Weingarten of Steptoe & Johnson LLP and Mike Magner of Jones Walker LLP.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            261

        Subcommittee Records With No Meaningful
        Assurances Regarding Completeness ........................... 277
    6.  Rainey's Subpoenas For Trial Testimony to the
        Relevant Members of Congress and Committee Staff.. 277
    7.  The Congressional Witnesses Resist Taking Any
        Position On The Trial Subpoenas ................................. 279
    8.  The House of Representative's Amicus Brief in
        Opposition to Rainey's Motions to Dismiss ................ 281
    9.  The Congressional Witnesses' Motion to Quash .......... 282
    10. Rainey's Motion for Remedial Relief ........................... 283
    11. The Motion for a Protective Order by the
        Congressional Witnesses Willing to Testify for the
        Prosecution .................................................................... 288
IV. THE DISTRICT COURT'S RULINGS ....................................... 289
    A.  The Court's Order Granting the Congressional
        Witnesses' Motion To Quash Rainey's Trial Subpoenas ... 289
    B.  The Court's Order Granting Rainey's Pending Motions
        To Dismiss Count One and for Remedial Relief ............... 290
    C.  The Task Force's Motion For Reconsideration ................. 294
    D.  The Court's Order Denying the Task Force's Motion for
        Reconsideration ............................................................... 295
V. LESSONS LEARNED ................................................................. 299

## I.   INTRODUCTION

      After months of gamesmanship by Members of Congress and their staff, U.S. District Court Judge Kurt D. Engelhardt acquitted former BP executive David Rainey of the lead obstruction of Congress count on the first day of trial in *United States v. David Rainey*, Crim. No. 12-291 (E.D. La.). Rainey was the highest-ranking BP executive charged in the aftermath of the *Deepwater Horizon* oil spill. Even though a congressional subcommittee was the purported "victim" of Rainey's alleged crime, no Member of Congress or congressional staffer was willing to waive the protections of the Speech or Debate Clause of the U.S. Constitution and testify freely at Rainey's trial. Based on documents uncovered during pre-trial discovery, these congressional witnesses possessed critical exculpatory evidence suggesting that the alleged congressional inquiry was not duly authorized and was simply a frolic by then-Representative, now Senator, Edward Markey (D-MA) acting as an individual Member. Although the court upheld the

262              *BERKELEY JOURNAL OF CRIMINAL LAW*              Vol. 20:2

congressional witnesses' assertion of legislative privilege as absolutely protected by the Speech or Debate Clause, it held that the consequences of that privilege assertion were devastating to Rainey's prosecution on the obstruction of Congress charge. To avoid a one-sided, unfair presentation of evidence from the handful of congressional staffers willing to testify as prosecution witnesses, the court excluded all evidence from congressional witnesses and acquitted Rainey of the obstruction of Congress charge on a number of grounds shortly after empaneling the jury. Less than a week later, a New Orleans jury acquitted Rainey of the sole remaining charge alleging that Rainey made a false statement to federal law enforcement agents during an interview a year after the *Deepwater Horizon* incident.

This article analyzes the pre-trial litigation that led to Rainey's acquittal on the obstruction of Congress charge. It also contains the district court's unreported oral decisions from the bench, which addressed an important issue of first impression: the consequences to a criminal case of a fundamental conflict between the Speech or Debate Clause privilege and a criminal defendant's Fifth and Sixth Amendment rights to compulsory process and to present a defense at trial. Finally, it addresses some of the lessons learned from this case, including (1) there is only one United States when it comes to a criminal prosecution, rendering the consequences of a privilege assertion by Members of Congress attributable to the Executive Branch, (2) a criminal defendant's right to compulsory process cannot be vindicated by voluntary testimony limited in scope by the witness, (3) district courts have power to exclude all congressional evidence if a selective invocation of the Speech or Debate Clause privilege leads to a one-sided, unfair presentation of evidence, and may acquit a defendant if the ruling leads to a failure of proof on an essential element, and (4) given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should not pursue a criminal charge that requires congressional testimony if any alternatives are available.

## II. BACKGROUND

### A. The *Deepwater Horizon* Incident and Rainey's Involvement

David Rainey was a Ph.D. geologist who worked for BP for more than 30 years. In 2010, he was BP's Vice President of Exploration

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            263

for the Gulf of Mexico, the number two exploration job in the company. On April 20, 2010, a blowout of oil and gas occurred on the *Deepwater Horizon* drilling rig in the Gulf of Mexico. Eleven men were killed in the explosion. Over the next 87 days, oil leaked from the damaged well.

After the blowout, Rainey abandoned his normal job responsibilities and worked full time responding to the oil spill. He served on behalf of BP as a Deputy Incident Commander within the Unified Command, the organization coordinating the response to the oil spill. Unified Command consisted of representatives from federal, state and local governments, as well as BP and Transocean, the designated "responsible parties" for the oil spill response.

Among the many responsibilities he handled within the Unified Command, Rainey prepared some early "flow rate" estimates of the number of barrels of oil per day leaking from the well. Rainey estimated flow rate by calculating the volume of the oil on the water using overflight maps and standard protocols that estimate the thickness of oil by color. This methodology was highly uncertain but it was the best available at the time. The unknown conditions of the damaged well prevented BP from using the sophisticated computer modeling programs normally used by reservoir engineers to calculate flow from completed production wells. To account for the uncertainty, Rainey calculated a range of flow rate estimates with a "low," "best guess," and "high" estimate. On April 27, 2010, using this methodology, Rainey estimated a range of flow rate estimates from roughly 1,000 to 6,000 to 14,000 barrels of oil per day.

On April 26, 2010, a scientist from the National Oceanic and Atmospheric Administration ("NOAA") prepared his own estimate of flow rate. Using two methods, the surface methodology relied on by Rainey and a video methodology, the NOAA scientist estimated that the flow rate was approximately 5,000 barrels of oil per day.

On April 28, 2010, the Unified Command raised its initial flow rate estimate of 1,000 barrels of oil per day to 5,000 barrels of oil per day. This remained the official government estimate of flow rate until late-May 2010.[1]

_____

[1] Even today, following years of scientific study and extensive multi-district litigation, there is significant uncertainty as to the actual flow rate. According to the final report from the Flow Rate Technical Group, which was created to estimate the flow rate and volume of oil released, the flow rate "decreased over the 87 days [of the oil spill] from an initial 62,000 to a final 53,000 barrels per day, for a total release of 4.9 million barrels of oil . . . . The estimated uncertainty on these flow values is also

Hebering: United States v. David Rainey: A Case Study

264              *BERKELEY JOURNAL OF CRIMINAL LAW*              Vol. 20:2

In mid-May 2010, BP released a video clip of the plume of oil leaking into the Gulf. This led various individuals to attempt to estimate the flow rate, including a university professor who estimated the flow rate at 70,000 barrels per day. Soon thereafter, BP's general counsel requested a summary of the efforts to estimate flow rate within the Unified Command that had led to the 5,000 barrels per day estimate. Rainey wrote an internal memorandum for counsel that summarized the flow rate work of which he was aware, which became known as the "Rainey Memo."[2] BP subsequently sent the Rainey Memo to government officials within the Unified Command.

On May 14, 2010, Rep. Markey sent a letter to BP on letterhead of the House of Representative's Committee on Energy and Commerce requesting a variety of information regarding flow rate, including BP's current flow rate estimate and all documents that related to estimates of the amount of oil being released.[3] Rainey was asked to use his recently prepared Rainey Memo to draft a response to Rep. Markey's questions. After he did so, a team of BP executives and in-house and outside counsel revised and finalized the draft, ultimately sending the response

---

±10%." NATIONAL INCIDENT COMMAND, INTERAGENCY SOLUTIONS GROUP, FLOW RATE TECHNICAL GROUP, ASSESSMENT OF FLOW RATE ESTIMATES FOR THE DEEPWATER HORIZON / MACONDO WELL OIL SPILL 1-2 (2011). In the multi-district litigation related to the oil spill, the U.S. government argued that the total release was 5 million barrels, while BP maintained that the total release was 3.26 million barrels. Findings of Fact and Conclusions of Law, Phase Two Trial, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 (MDL 2179), Case 2:10-md-02179-GJB-SS, at 39 (E.D. La. Jan. 15, 2015), ECF No. 14021. BP also argued that the "discharge began at a relatively low rate" and increased over time as various restrictions in the wellbore eroded. *Id.* at 40. The district court described the evidence related to flow rate as "voluminous, dense, highly technical, and conflicting," and stated "[t]here is no way to know with precision how much oil discharged into the Gulf of Mexico." *Id.* at 40-41. With minimal analysis, the court "split the baby" and held that the total release was 4 million barrels. *Id.* at 43.

[2]   Rainey Memo filed as part of Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

[3]   Letter from Chairman Edward Markey, Subcommittee on Energy and Environment, Committee on Energy and Commerce, to Lamar McKay, President and CEO, BP America, Inc. (May 14, 2010) filed as Ex. E to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (or, in the Alternative, Motion for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2.

-3266-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          265

to Rep. Markey on May 24, 2010 with a copy of the Rainey Memo.[4]

Months later, after the well was capped, the U.S. Department of Justice created the *Deepwater Horizon* Task Force (the "Task Force") to investigate the circumstances leading up to the blowout and BP's actions during the response to the oil spill. Among other issues, the Task Force investigated whether BP intentionally understated and attempted to mislead the public and government officials about the flow rate.

On April 6, 2011, the Task Force interviewed Rainey in New Orleans, Louisiana. A colleague and I represented Rainey during the all-day interview. Three prosecutors, two law enforcement agents, and a paralegal participated for the Task Force. The interview was not recorded or transcribed. An FBI agent was the sole government participant who took notes during the interview. The FBI subsequently generated a 33-page, single spaced Form FD-302 summarizing the interview.[5]

## B. The Indictment

On November 14, 2012, Rainey was charged in a two-count indictment.[6] The indictment alleged that after Rainey received the NOAA flow rate estimate of 5,000 barrels of oil per day, he "reverse engineered" his own flow rate estimates to achieve consistent results.

---

[4]   BP's May 24, 2010 letter to Rep. Markey and production of documents filed as Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

[5]   FBI Form FD-302 summarizing Rainey's interview filed as Ex. 2 to Gov't's Mot. Concerning Potential Conflicts of Interest and "Unsworn Witness" Problems Arising from Defense Counsel's Status as a Witness to the Crime Charged in Count Two of the Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 7, 2013), ECF No. 99-2.

[6]   Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Nov. 14, 2012), ECF No. 1. The next day, the Department of Justice issued a press release announcing the charges and also stating that BP had agreed to plead guilty to a 14-count information, including an obstruction of Congress charge that mirrored Count One in Rainey's indictment, and pay a $4 billion criminal fine, the largest criminal fine in history as of that date. *See* Press Release, U.S. Dep't of Justice, BP Exploration and Production Inc. Agrees to Plead Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress Surrounding Deepwater Horizon Incident (Nov. 15, 2012), *available at* http://www.justice.gov/opa/pr/bp-exploration-and-production-inc-agrees-plead-guilty-felony-manslaughter-environmental; *see also* Information, United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012), ECF No. 1; Guilty Plea Agm., United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012), ECF No. 2.

266             *BERKELEY JOURNAL OF CRIMINAL LAW*              Vol. 20:2

The indictment accused Rainey of lying about his flow rate estimates in the Rainey Memo, in BP's response to Rep. Markey's letter, and during his Task Force interview. Count One alleged that Rainey obstructed a congressional investigation, in violation of 18 U.S.C. § 1505. Count Two alleged that Rainey made a false statement during his interview with the Task Force, in violation of 18 U.S.C. § 1001.

The obstruction of Congress charge alleged that following the *Deepwater Horizon* blowout, the Subcommittee on Energy and Environment, a subcommittee of the U.S. House of Representatives' Committee on Energy and Commerce, initiated an investigation into the amount of oil flowing from the well. It alleged that the May 14, 2010 letter from Rep. Markey, the Subcommittee Chairman, was part of the Subcommittee's investigation. The indictment accused Rainey of misleading the team of BP in-house and outside lawyers working on BP's response to the letter, and thereby causing BP to submit a false and misleading response to Rep. Markey. Among other things, the indictment accused Rainey of withholding documents and information inconsistent with the 5,000 barrels per day flow rate estimate, and causing BP to provide Rep. Markey with the Rainey Memo that allegedly contained false and misleading statements defending his flow rate estimates.

Rainey pleaded not guilty to the charges. He maintained that he acted in good faith and his flow rate estimates were legitimate and honest. He also categorically denied making any misrepresentations about his flow rate estimates in any forum. On Rainey's behalf, we also maintained that there was no basis for the obstruction of Congress charge because Rep. Markey sent his letter in an individual capacity and not as part of any authorized congressional inquiry.

### C.  The Original Dismissal Of Count One

On May 20, 2013, Judge Engelhardt dismissed Count One of the indictment, holding that Section 1505 did not apply to subcommittee investigations.[7] Analyzing Section 1505's language prohibiting obstruction of "any inquiry or investigation . . . being had by . . . any committee of either House," the district court held: "after consulting the text, context, and legislative history, the Court cannot 'say with

---

[7]    United States v. Rainey, 946 F. Supp. 2d 518, 545-46 (E.D. La. 2013). The Court denied as moot our motion based on unconstitutional vagueness, and denied without prejudice our motion seeking a determination that Rep. Markey's letter on which Count One was based was not part of a congressional investigation. *Id.* at 545.

-3268-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          267

certainty' that Congress intended section 1505 to reach subcommittee inquiries."[8]

On appeal, the Fifth Circuit reversed and remanded the case for trial.[9]  In its ruling, however, the court noted a limitation on the scope of Section 1505 that would become central to the legal proceedings before the district court on remand. The court stated that "[a] successful prosecution under § 1505 must arise from the obstruction of 'the *due and proper exercise of the power of inquiry* under which any inquiry or investigation is being had.'"[10] The court cited a decision in which the Fourth Circuit held that: "'[t]he question of whether a given congressional investigation is a 'due and proper exercise of the power of inquiry' for purposes of § 1505 can not be answered with a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances.'"[11] The Fifth Circuit in *Rainey* went on to state:

> With this discernment in mind, we observe that unauthorized frolics by a House entity might lose protection regardless of its committee status because there would be no 'due and proper exercise of the power of inquiry' to obstruct.  Indeed, Rainey invoked this statutory restraint below in a motion to dismiss count one, but the district court denied this motion without prejudice.  In sum, § 1505 is powerful, but not without internal restraints.[12]

Although we were disappointed by the Fifth Circuit's ruling, we viewed this statement, which was not necessary to the court's holding, as a potential signal to the district court to credit our argument that Rep. Markey's letter was an individual frolic not covered by the obstruction of Congress statute.

## III.  PRETRIAL LITIGATION

### A.  Motions Practice Following The Remand

Following the remand, the Task Force secured a superseding indictment on September 19, 2014, which contained the same two charges with minor modifications.[13] On behalf of Rainey, we moved to

---

[8]   *Id.* at 542.
[9]   United States v. Rainey, 757 F.3d 234, 235 (5th Cir. 2014).
[10]   *Id.* at 246 (quoting 18 U.S.C. § 1505) (emphasis in original).
[11]   *Id.* (quoting United States v. Mitchell, 877 F.2d 294, 300-01 (4th Cir. 1989)).
[12]   *Rainey*, 757 F.3d at 246-47.
[13]   Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D.

Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                                FALL 2015

268                *BERKELEY JOURNAL OF CRIMINAL LAW*                Vol. 20:2

dismiss Count One on three distinct grounds.

First, we argued that there was no "due and proper exercise of the power of inquiry" by a subcommittee as required by Section 1505.[14] We contended that there was no specific authorization of the subcommittee investigation alleged in the indictment, and that the general standing authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment was insufficient to authorize an "investigation" for purposes of Section 1505. We also asserted that Rep. Markey's actions could not be automatically attributed to the Subcommittee solely based on his status as its chairman. We relied heavily on a series of cases from the McCarthy era involving the House Un-American Activities Committee and other aggressive congressional inquiries, in which the Supreme Court required clear and specific authorization of any congressional investigation before there could be a conviction under the related contempt of Congress statute.[15]

Second, we argued that Rep. Markey sent the May 14, 2010 letter as an individual Member of Congress and not pursuant to any investigation by the Subcommittee on Energy and Environment.[16] Moreover, we contended that the Committee on Energy and Commerce carried out its investigation into the *Deepwater Horizon* incident through its Subcommittee on Investigations and Oversight, not the Subcommittee on Energy and Environment. Thus, BP's response to the May 14 letter was not within the scope of 18 U.S.C. § 1505. Although these arguments were fact-based, we supported them with documentary exhibits from the public domain and relied on a series of cases giving district courts the power to dismiss an indictment where the essential facts are undisputed and reveal that an element of the offense is missing.[17]

---

La. Sept. 19, 2014), ECF No. 179.

[14] Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Lack of a Due and Proper Exercise of the Power of Congressional Inquiry, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 188.

[15] *Id.* at 12-14 (citing Watkins v. United States, 354 U.S. 178 (1957) and Gojack v. United States, 384 U.S. 702 (1966)).

[16] Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190.

[17] *Id.* at 2 (citing United States v. Flores, 404 F.3d 320 (5th Cir. 2005) and United

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            269

Third, we argued that Section 1505 was unconstitutionally vague as applied to the allegations in the case.[18] The obstruction statute vaguely defines "corruptly," the criminal intent standard required, as acting with an "improper purpose."[19] We asserted that this language did not give fair warning that failing to disclose information in response to a voluntary congressional request where there was no legal duty to disclose was covered by the statute.

We recognized that the district court might conclude that the issues we had raised in these motions were factual disputes to be resolved by the jury. Therefore, we took steps to aggressively pursue evidence supporting our claim that Rep. Markey acted on his own without proper authorization. Specifically, we moved for authorization to serve early-return subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities.[20] We knew the federal rules of criminal procedure limited the scope of discovery a defendant could obtain from third parties, and we anticipated that the congressional witnesses and entities would likely object to the subpoenas. As a result, we narrowly tailored the proposed subpoenas to seek documentary evidence solely regarding whether there was an authorized investigation within the scope of 18 U.S.C. § 1505. We deliberately failed to seek a broader set of documents relevant to our defense in order to maximize the likelihood that the district court would authorize the subpoenas.

The district court held a motions hearing on December 3, 2014. In discussing the motions related to Count One, the court noted that the Fifth Circuit had identified a "limiting principle" in Section 1505, that is "whether or not an investigation is duly authorized."[21] According to the court:

---

States v. Fontenot, 665 F.3d 640 (5th Cir. 2011)).

[18]   Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 192.

[19]   *See* 18 U.S.C. § 1515(b) ("As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.").

[20]   Def. David Rainey's Mot. for Issuance of Early-Return Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 206.

[21]   Transcript of Oral Argument at 13, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 3, 2014).

Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                                    FALL 2015

270          *BERKELEY JOURNAL OF CRIMINAL LAW*          Vol. 20:2

> The reason for that is to prevent a member of Congress, whether it's Senator McCarthy or somebody else, from hauling off and doing a solo act investigation . . . and issuing subpoenas to people to appear all over the place and putting them on the rack to question them.[22]

The court took under advisement the motions to dismiss Count One. With respect to the early-return subpoenas, the court stated: "I'm more convinced now that the information [sought in the subpoenas] is material both for pretrial motion purposes as well as trial purposes."[23] Thus, the court authorized Rainey to serve the early-return document subpoenas on the congressional entities and individuals.[24]

### B. Dealings With The Congressional Parties And Additional Motions Practice

#### 1. Rainey's Subpoenas Duces Tecum to the Congressional Parties

In December 2014, Rainey served the subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities. On behalf of the congressional subpoena recipients, the U.S. House of Representatives General Counsel's office ("House Counsel") objected to the document subpoenas and declined to comply. Among other things, House Counsel asserted that the subpoena recipients were absolutely protected against making a compelled disclosure of legislative materials by the Speech or Debate Clause.[25] House Counsel offered to make a voluntary production of documents in lieu of subpoena compliance on behalf of the individual Members of Congress. With respect to the Committee on Energy and Commerce and the Subcommittee on Energy and Environment, however, House Counsel flatly declined to comply on Speech or Debate Clause and other grounds.[26]

When these congressional witnesses and entities refused to

---

[22] *Id.*

[23] *Id.* at 67.

[24] Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 11, 2014), ECF No. 264.

[25] U.S. CONST. art. I, § 6, cl. 1 ("for any Speech or Debate in either House they [Senators and Representatives] shall not be questioned in any other Place").

[26] House Counsel's letter objecting to the subpoenas filed as Ex. M to Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293-2.

-3272-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          271

comply with Rainey's document subpoenas, we knew we had a real opportunity to challenge the viability of the obstruction of Congress count. Based on the discovery we received from the Task Force, it was apparent that the prosecutors had not fully explored the authorization issue during the investigation. The only congressional records in the Task Force's massive discovery production were a small set of materials obtained informally from one of Rep. Markey's staff members. Moreover, while the Task Force had interviewed a few Markey staffers during the investigation, they had not interviewed Rep. Markey himself or any other Members of the Committee or Subcommittee. Thus, aside from the opinions of a few Markey staffers, the Task Force possessed no evidence that Rep. Markey's letter was part of an authorized Subcommittee investigation. We were convinced that no such evidence existed. We also believed that truthful testimony from congressional witnesses who did not work for Rep. Markey would confirm as much. Yet we were faced with a serious problem: assuming the congressional witnesses would raise the same objections to testimonial subpoenas, Rainey had no ability to compel this favorable evidence if the district court upheld the objections. Our strategy going forward was designed to compel the production of this favorable congressional evidence or obtain the dismissal of the obstruction of Congress charge.

### 2.  *Rainey's Motion to Compel*

On February 2, 2015, Rainey moved to compel compliance with the document subpoenas.[27] We maintained that the documents sought were central to a key element of the charged offense, whether the alleged investigation was a "due and proper exercise of the power of inquiry" by the Subcommittee. We also argued that Rainey's rights to compel the production of such evidence, and to present material evidence at trial, were guaranteed by the Fifth and Sixth Amendments.

We raised several arguments in response to the congressional parties' Speech or Debate Clause objections. First, relying on *Gravel v. United States*, 408 U.S. 606 (1972), we argued that the Speech or Debate Clause does not forbid disclosure of legislative act evidence if the evidence is "relevant to investigating possible third-party crime," where the legislative act is "in itself not criminal" and the legislator faces

---

[27]   Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293.

-3273-

272            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

neither criminal nor civil liability.[28] Specifically, we argued that the Speech or Debate Clause did not contain a non-disclosure privilege precluding the production of documents regarding legislative acts. The only circuit that had endorsed a "non-disclosure privilege" is the D.C. Circuit in *United States v. Rayburn House Office Building, Rm. 2113*, 497 F.3d 654 (D.C. Cir. 2007), where a divided panel concluded that the Executive Branch violated the Clause by executing a search warrant of Representative William Jefferson's congressional office. We relied on *In re Grand Jury Investigation (Eilberg)*, 587 F.2d 589 (3d Cir. 1978), where the Third Circuit enforced a grand jury subpoena for a congressman's telephone bills, stating that "the privilege when applied to records or third-party testimony is one of nonevidentiary use, not of non-disclosure."[29] We also relied on *United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011), where the Ninth Circuit similarly declined to recognize "some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize."[30]

Second, we argued that even if the Speech or Debate Clause applied to the production of documents in a third-party criminal case, Rainey's constitutional rights to compel production of evidence and present a defense under the Fifth and Sixth Amendments outweighed that interest. Noting that "the authors of the Bill of Rights did not undertake to assign priorities" between amendments, "ranking one as superior to the other,"[31] we urged the district court to balance the competing constitutional interests in Rainey's favor given the fundamental constitutional right of a criminal defendant to present a complete defense.[32] We relied on cases involving other analogous privileges, such as the state secrets privilege,[33] the warmaking power,[34]

---

[28]   *Gravel*, 408 U.S. at 628-29.

[29]   *Eilberg*, 587 F.2d at 597.

[30]   *Renzi*, 651 F.3d at 1032.

[31]   Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 561 (1976).

[32]   Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

[33]   United States v. El-Mezain, 664 F.3d 467, 523 n.16 (5th Cir. 2011) (stating that the absolute privilege against disclosure of state secrets "will not succeed when the information is helpful to the defense or essential to a fair determination of the cause . . .").

[34]   United States v. Moussaoui, 382 F.3d 453, 469-74 (4th Cir. 2004) (holding any potential burden on the Executive Branch's war-making power under Article II does not

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*                    273

the executive privilege,[35] and the informers privilege,[36] where courts
have held that those privileges cannot trump a criminal defendant's
constitutional rights. We also relied on a long history of Supreme Court
cases enforcing subpoenas for evidence served on both Members of
Congress and Presidents.[37]

Finally, we argued that any Speech or Debate Clause privilege
had been waived by selective invocation of the privilege, where the
congressional parties had produced certain documents to the Task Force
and permitted select congressional staff members to be interviewed
during the investigation. We knew we faced an uphill battle given the
Supreme Court's holding in *United States v. Helstoski*, 442 U.S. 477
(1979), that a waiver of the Speech or Debate Clause requires a "clear
and unambiguous [] expression of waiver."[38] Nonetheless, we urged the
district court to follow analogous precedent from the attorney-client and
work product context holding that a privilege holder may not wield a
privilege as both a sword and a shield in an unfair manner presenting a
distorted view of the subject matter covered by the privilege assertion.[39]

---

outweigh a defendant's rights under the Fifth and Sixth Amendments, even though "no
government interest is more compelling than the security of the nation") (citation
omitted).

[35]   United States v. Nixon, 418 U.S. 683 (1974) (rejecting claim of absolute Executive
Privilege, holding the privilege must be balanced against need for full factual disclosure
in criminal proceedings).

[36]   Roviaro v. United States, 353 U.S. 53, 59-61 (1957) (holding government's
"informer privilege" must give way to a defendant's rights if the informer's identity
would be "relevant and helpful" to the defense).

[37]   *See* United States v. Cooper, 4 U.S. (4 Dall.) 341 (C.C.D. Pa. 1800) (Chase, J.,
sitting on Circuit) (approving subpoena issued by a criminal defendant to Members of
Congress, stating that he "d[id] not know of any privilege to exempt member of
congress from . . . the obligations, of a subpoena, in such cases."); United States v.
Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (issuing subpoena duces tecum to President
Jefferson, requiring production of a letter for use by the defense in Aaron Burr's treason
trial); *Nixon*, 418 U.S. at 707-16 (upholding grand jury's subpoena for the Watergate
tapes); Clinton v. Jones, 520 U.S. 681, 701-02, 705 (1997) (upholding subpoena
requiring President Clinton's testimony in Paula Jones's civil lawsuit).

[38]   *Helstoski*, 442 U.S. at 493.

[39]   *See, e.g., In re* Pacific Pictures, 679 F.3d 1121, 1125, 1131 (9th Cir. 2012) (rejecting
selective waiver where disclosing party provided documents pursuant to subpoena to
US Attorney's Office).

Heberlig: United States v. David Rainey: A Case Study

274          *BERKELEY JOURNAL OF CRIMINAL LAW*          Vol. 20:2

### 3.  *Negotiated Voluntary Productions of Documents from Individual Members of Congress Revealed Exculpatory Information*

While the motion to compel was pending, we agreed to withdraw the document subpoenas to the individual Members of Congress in exchange for the voluntary production of documents responsive to the subpoena requests. We hoped that the voluntary productions would contain exculpatory evidence and knew that we would still be able to litigate the Speech or Debate Clause issues with the Committee and Subcommittee, which had flatly refused to provide any information responsive to the subpoenas. On behalf of the individual Members, House Counsel voluntarily produced documents with an express reservation that by doing so, the individual Members did not waive the protections of the Speech or Debate Clause. The ensuing voluntary productions contained a wealth of exculpatory evidence strongly suggesting that the May 14, 2010 letter from Rep. Markey was not part of any authorized investigation by the Subcommittee on Energy and Environment. We outlined this exculpatory evidence in a supplemental memorandum in support of Rainey's motions to dismiss Count One of the indictment.[40] Notably, the documents revealed that Rep. Markey and his staff did not seek authorization from the Committee on Energy and Commerce or the Subcommittee on Energy and Environment to send the May 14, 2010 letter to BP. The individuals who drafted and edited the May 14, 2010 letter were all Rep. Markey's personal staffers or staffers from a different committee that Markey chaired. These staffers originally drafted the letter to be sent by Rep. Markey on behalf of that different committee—the Select Committee on Energy Independence and Global Warming. Only at the last minute did they change the signature block to the Subcommittee on Energy and Environment.

More importantly, the documents revealed conclusively that Rep. Markey did not share the May 14, 2010 letter with the Committee or Subcommittee before he sent it to BP. Indeed, the ranking minority member of the Subcommittee possessed no documents responsive to Rainey's subpoena. Moreover, Rep. Markey failed even to notify Committee staff that he had sent a letter to BP requesting information

---

[40]   Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315.

-3276-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          275

until hours after sending the letter to BP. Upon learning of Rep. Markey's request, committee staffers voiced disapproval of the unilateral manner in which Rep. Markey had sought information. An email from the Committee on Energy and Commerce's chief counsel to its majority staff director stated: "This doesn't seem like the way things ought to work. Markey sent a letter to BP as Chair of E&E on E&C letterhead asking for certain BP documents to be produced with 24 hours.  We received no heads up until after the letter was sent (and I think in the press)." In addition, Rep. Markey's staffers noted that they had available "stashes" of Committee letterhead that could be used for the letter, calling into question claims by the Task Force that Rep. Markey's use of Committee on Energy and Commerce letterhead carried significance on the authorization issue.[41]

### 4.  The District Court Denied Rainey's Motion to Compel

On February 23, 2015, the district court held a hearing on the motion to compel. House Counsel took the position that the Speech or Debate Clause barred Rainey from compelling production of the documents.  However, House counsel suggested that Rainey should ask for the documents voluntarily and the Committee and Subcommittee might produce them.[42] Yet counsel was unwilling to make any commitments, stating: "I don't know that the committee has any additional responsive documents. We don't know that yet. The answer might be yes, might be no. I don't know whether the committee would be willing to produce that, would be willing to not assert its Speech or Debate rights."[43]

The district court noted that the Fifth Circuit in *Rainey* had suggested that the issue of whether a congressional investigation was duly authorized must be "answered by a careful examination of all the surrounding circumstances."[44] The court asked House Counsel: "So how would a defendant in Mr. Rainey's position be able to broach that issue

---

[41]  We attached the relevant documents as Exs. D-Y to the Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315-1.
[42]  Transcript of Oral Argument at 40, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015) ("he can't compel the documents. He needs to ask for them.").
[43]  *Id.* at 42.
[44]  *Id.* at 44-45.

276          *BERKELEY JOURNAL OF CRIMINAL LAW*          Vol. 20:2

and present that issue to the Court or, if need be, to the jury without information such as what has been subpoenaed in this case?"[45] House Counsel declined to answer, deferring to the prosecutors to explain the impact of the Speech or Debate Clause assertion.[46]

At the end of the hearing, the district court denied Rainey's motion to compel from the bench, accepting the House Counsel's argument that the Speech or Debate Clause prevented Rainey from compelling the production of legislative documents for his defense. However, in a foreshadowing of the district court's ultimate decision, the court raised serious concerns with the implications of its ruling:

> I think there were portions of the argument today, the obvious questions are what the implications of the Court's ruling are in terms of Count 1 in this case, and I recited a passage from the Fifth Circuit's opinion in this case—in this case—which troubles me greatly in terms of where we are.

> I think there are some evidentiary issues. There are issues relative to the viability of Count 1. And I might even add again, which I commented on a short while ago, on page 20 the Fifth Circuit has even seen fit to question whether § 1505 has a jurisdictional element, which touches upon some of the very documents which may or may not exist in connection with the subpoena that the Court cannot compel a response to.

> Moreover, my appreciation of the cases that are cited by counsel for the House are that the Court cannot even indulge in an ex parte or an in camera review of those documents for the same reasons that have been argued by the House here today. So we are sort of at a crossroads in the case, a very interesting one, and one that I think is troublesome in terms of the Fifth and Sixth Amendment arguments that have been made by the defendant.

> There is no request in this case for relief along those lines because, obviously, the Court hadn't made a decision on the subpoena. So now that we have a decision on the subpoena, we will go from here.[47]

The district court confirmed its ruling in a minute order issued the same day.[48]

---

[45]  *Id.* at 45.
[46]  *Id.* at 46.
[47]  *Id.* at 63-64.
[48]  Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 320.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            277

### 5. The Voluntary Production of Committee and Subcommittee Records With No Meaningful Assurances Regarding Completeness

Following the district court's ruling, with no ability to compel the production of documents, Rainey asked the Committee on Energy and Commerce and Subcommittee on Energy and Environment to voluntarily produce all documents responsive to the document requests in his subpoenas *duces tecum*. Given the importance of the documents to the authorization element of 18 U.S.C. § 1505, we sought to ensure that the voluntary production would be as comprehensive as compliance with the subpoenas. Specifically, we requested that the House Counsel identify the nature and extent of hard copy and electronic records maintained by the Committee and Subcommittee, the document custodians whose hard copy and electronic records would be searched as part of the voluntary production, and the key words that would be used to search for responsive documents.[49]

On behalf of the Committee and Subcommittee, House Counsel voluntarily produced a mere 57 pages of responsive documents, again with an express reservation that those entities were not waiving the Speech or Debate Clause privilege. However, House Counsel did not identify the custodians whose files were searched, the key words that were used for any electronic searches, or any of the other information requested by Rainey.[50] The voluntarily produced documents did not contain any discussion of an inquiry or investigation by the Subcommittee. The documents also failed to show any Committee or Subcommittee involvement in drafting Rep. Markey's May 14, 2010 letter to BP, or even awareness of the letter before Rep. Markey sent it to BP and the media.

### 6. Rainey's Subpoenas For Trial Testimony to the Relevant Members of Congress and Committee Staff

Based on the disclosure of exculpatory information, we asked to interview Rep. Markey, Rep. Henry Waxman (the Chairman of the Committee on Energy and Commerce), and Rep. Bart Stupak (the

---

[49]  *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[50]  *See* Exs. B & C to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

**-3279-**

Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                                    FALL 2015

278            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

Chairman of the Committee on Energy and Commerce's Subcommittee on Investigation and Oversight), as well as six Committee on Energy and Commerce staffers who sent or received the exculpatory emails in Rep. Markey's voluntary document production.[51] By 2015, neither Waxman nor Stupak was a Member of the House, and Markey was a U.S. Senator. On behalf of all nine witnesses, the House General Counsel's office informed Rainey that each of the Members and staffers declined to be interviewed.[52] Thereafter, on March 10, 2015, Rainey served subpoenas for trial testimony on Reps. Markey, Waxman, and Stupak, as well as the six Committee on Energy and Commerce staff members.[53]

The testimony of the Members was also relevant because the Task Force had asserted that there was an informal agreement between Reps. Waxman, Markey, and Stupak that authorized the Subcommittee investigation. Specifically, in a bill of particulars ordered by the district court, the Task Force alleged: "Chairman Markey of the Subcommittee, Chairman Henry Waxman of the Committee, and Chairman Bart Stupak of the Subcommittee on Oversight and Investigations, and their respective staff, reached an understanding on how to divide the jurisdiction of the Committee's overall investigation into the *Deepwater Horizon* blowout and oil spill."[54] Notably missing from the bill was any allegation specifying when the Members reached this purported understanding. Moreover, the documents voluntarily produced by Rep. Markey called into question this allegation. As a result, Rainey sought to compel trial testimony from the relevant individuals in support of his defense.

In early-April 2015, with the trial date less than two months away, we attempted to learn the congressional witnesses' position on Rainey's request for trial testimony and whether a motion to quash was forthcoming. In a telephone conversation, House Counsel indicated that

---

[51]  *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[52]  *See* Ex. B to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[53]  *See* Ex. D to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[54]  Government's Bill of Particulars at 6, United States v. Rainey, Crim. No. 12-291 (E.D. La. Jan. 6, 2015), ECF No. 274.

-3280-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

the subpoena recipients would likely move to quash, but might agree to voluntary testimony, although no decisions had been made and there was no timetable for the witnesses to decide. Accordingly, on April 13, 2015, Rainey asked the district court to set a deadline for the nine subpoenaed witnesses to file any motion to quash and to notify the parties whether they would voluntarily provide trial testimony without invoking the Speech or Debate Clause privilege.[55]

### 7.   The Congressional Witnesses Resist Taking Any Position On The Trial Subpoenas

On April 16, 2015, on behalf of the nine congressional witnesses, House Counsel opposed Rainey's request that the district court set a deadline for any motion to quash and decisions concerning potential voluntary testimony.[56] House Counsel contended that because the trial subpoenas were not returnable until June 1, 2015, the first day of trial, the district court lacked any "coercive power" over the subpoena recipients, and the subpoena recipients were under no obligation to take any positions until that time. In addition, House Counsel maintained that Rainey's pending motions to dismiss Count One rendered his request premature, because a dismissal could moot any need for the requested testimony. House Counsel also noted that three congressional staffers on the Task Force's witness list had agreed to testify at trial on the authorization issue without asserting (but supposedly without waiving) the Speech or Debate Clause in response to the prosecutors' questions or cross-examination questions "within the scope of direct about those same issues." Thus, according to House Counsel, Rainey would have an opportunity to question congressional witnesses about the authorization issue. House Counsel noted that they were "uncertain at this time" whether Reps. Markey and Waxman, who were also on the Task Force's witness list, would testify at trial.[57]

At a status conference on April 22, 2015, the district court indicated that it would not rule on Rainey's pending motions to dismiss until it understood whether the congressional witnesses subpoenaed by Rainey would testify at trial. During the status conference, the Task

---

[55]   Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs. at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392.
[56]   Opp'n to Defs. "Alternate or Interim" Request that the Court Order Nine Non-Party Witnesses to Respond Six Weeks Early to their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 16, 2015), ECF No. 400.
[57]   *Id.* at 4 n.4.

Heberlig: United States v. David Rainey: A Case Study

280                    *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

Force represented that Reps. Waxman and Markey had not yet agreed to testify in the Task Force's case, and would not decide whether to testify until the district court resolved Rainey's pending motions to dismiss.[58] In other words, these Members of Congress who possessed critical evidence on the authorization issue wanted to "wait and see" before deciding whether to testify for either side. This was particularly galling in the case of Rep. Markey, who had repeatedly demanded information in real time from BP during the emergency response to the oil spill, including requiring executives to participate in briefings and hearings in Washington, D.C.[59] Yet when it came time for Rainey to defend himself, Rep. Markey was unwilling to commit to testifying for either the prosecution or the defense.

       On April 23, 2015, Rainey formally moved the district court to set a deadline for the congressional witnesses.[60] Among other things,

---

[58]   The Task Force later memorialized this representation in a pleading. *See* Gov't's Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify at 6 n.2, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438 ("What government counsel informed the Court and the defense was that, as of [April 22, 2015], Reps. Waxman and Markey had not agreed to testify, but rather had chosen to wait and see how the Court would resolve the defendant's pending motions to dismiss. Depending on the resolution of those motions, Reps. Waxman and Markey were willing to revisit the issue of trial testimony on a voluntary basis."). House Counsel confirmed this position. Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431 (confirming it had authorized the prosecutors to represent at the April 22 status conference that "Senator Markey and former Congressman Waxman would resist being compelled to testify, but [] would defer making any final decision regarding voluntary testimony until after this Court rules on Mr. Rainey's pending motions to dismiss.").

[59]   *See, e.g.*, Exs. E, L, M, N to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2. Rep. Markey even later cited his "one man" investigation as a reason he should be elected to the U.S. Senate. *See Pay* (Ed Markey for MA, TV Ad), *available at* http://www.edmarkey.com/video/page/2/ (last visited Oct. 27, 2014) (Narrator: "Eleven Dead.  Communities ruined. The worst environmental disaster in American history. When BP tried to avoid responsibility, one man said no. . . . Ed Markey uncovered the extent of the damage, and when BP executives lied, Ed Markey held them accountable.").

[60]   Def. David Rainey's Mot. to Set Deadline for Cong. Witnesses to Respond to Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 405.

-3282-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            281

Rainey argued that the parties needed to know the congressional witnesses' positions on trial testimony sufficiently far in advance of trial to permit Rainey to seek relief if those witnesses declined to testify.

Later that same day, House Counsel filed a notice of intent to file a motion to quash on behalf of the nine congressional witnesses.[61] However, House Counsel asked the court not to set any deadline for the congressional witnesses to decide whether, and under what conditions, they would be willing to voluntarily testify at trial without invoking the Speech or Debate Clause privilege.[62]

### 8. The House of Representative's Amicus Brief in Opposition to Rainey's Motions to Dismiss

In the middle of the subpoena litigation, the Bipartisan Legal Advisory Group of the U.S. House of Representatives (the "House") filed an amicus brief in opposition to Rainey's motions to dismiss Count One, authored by the same attorneys fighting Rainey's subpoenas for trial testimony from the congressional witnesses.[63] The House reiterated many of the same arguments advanced by the Task Force. Specifically, the House claimed that the standing authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment, as evidenced in their rules and a post-hoc "Activity Report" of the Committee, provided sufficient authority to initiate the investigation alleged in the indictment. The House's brief was remarkably strident and dismissive of Rainey's arguments, which the district court had been considering for months, removing any doubt that the House was a partisan supporting the Task Force's efforts to convict Rainey.[64]

---

[61] Notice of Nine Non-Party Subpoena Recipients of Intent to Move to Quash, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 406.

[62] Resp. of Nine Non-Party Subpoena Recipients to Def.'s Mot. to Set Deadline, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 27, 2015), ECF No. 411. Counsel contended that if the district court granted the forthcoming motion to quash, the witnesses would "cease to be subject to the Court's jurisdiction (unless and until they, or some subset of them, voluntarily appear[ed] at trial)." *Id.* at 5.

[63] Mem. of *Amicus Curiae* Bipartisan Legal Advisory Group of the U.S. House of Representatives, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 5, 2015), ECF No. 415.

[64] *See id.* at 15 ("Mr. Rainey repeats *ad nauseum* an assertion that the E&E Subcommittee investigation lacked 'formal authorization.' . . . But that statement is false no matter how many times Mr. Rainey repeats it."); *id.* at 18 ("there is no logic to Mr. Rainey's argument"); *id.* at 19 (referring to one of Rainey's arguments: "This is nonsense."); *id.* at 21 ("Mr. Rainey offers no support for these extraordinary assertions,

282            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

### 9.   *The Congressional Witnesses' Motion to Quash*

On May 8, 2015, all nine congressional witnesses moved to quash the trial subpoenas served by Rainey.[65] The congressional witnesses principally contended that they were absolutely protected by the Speech or Debate Clause from being compelled by Rainey to testify in his criminal trial.[66] They argued that the testimony sought by Rainey regarding the authorization of the alleged congressional investigation related to core legislative acts squarely within the scope of the Clause.[67] In addition, the congressional witnesses observed that while the protection afforded by the Speech or Debate Clause "undeniably is broad, the Supreme Court long ago acknowledged and accepted the potential costs associated [with] those broad protections."[68] In other words, the congressional witnesses claimed that the Speech or Debate Clause trumped Rainey's right to present a meaningful defense in his criminal trial.

On May 13, 2015, Rainey opposed the motion to quash.[69] With respect to the Speech or Debate Clause, we reiterated many of the arguments we had advanced in our effort to compel compliance with Rainey's document subpoenas, namely that: (1) the Speech or Debate Clause allows questioning of legislators and their aides about legislative acts in third-party criminal cases that do not call into question the legality of those acts or assert liability against the witnesses; (2) the Speech or Debate Clause must be balanced against a criminal defendant's Fifth and Sixth Amendment rights, and such balancing favored Rainey's rights in this case; and (3) the congressional witnesses had waived the Speech or Debate Clause protection through selective

---

and . . . we are at a loss to understand how he could make them. Moreover, and in any event, asserting that the earth is flat does not make it so."); *id.* at 22 (denigrating Rainey's arguments as "quibbles").

[65]   Mot. to Quash of Nine Non-Party Subpoena Recipients, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419.

[66]   Mem. of P. & A. in Supp. of Mot. to Quash of Nine Non-Party Subpoena Recipients (Part I), United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419-1.

[67]   *Id.* at 16 (arguing that the application of the Clause was "not remotely close because all the matters into which Mr. Rainey seeks to probe are manifestly legislative.").

[68]   *Id.* at 16-17 (collecting cases).

[69]   Def. David Rainey's Opp'n to Nine Cong. Witnesses' Mot. to Quash their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 13, 2015), ECF No. 430.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          283

invocation of the privilege.[70] We acknowledged, however, that if the district court adhered to its earlier Speech or Debate Clause ruling, the same reasoning would support quashing the trial subpoenas.

### 10. Rainey's Motion for Remedial Relief

We anticipated that the district court was likely to adhere to its earlier reasoning and quash the trial subpoenas. Given the rapidly approaching trial date, however, we were concerned the district court would not have sufficient time to consider the consequences of that ruling on Rainey's criminal trial. As a result, on May 8, 2015, Rainey filed a motion for remedial relief in light of the congressional witnesses' refusal to testify.[71] House Counsel had indicated that congressional staffers closely associated with Rep. Markey would testify voluntarily for the Task Force without invoking privilege. At the same time, they maintained that the congressional witnesses subpoenaed by Rainey could not be compelled to testify and would not commit to testifying voluntarily without invoking the Speech or Debate Clause. No court had previously determined the proper remedy when witnesses with material, exculpatory, noncumulative evidence refuse to comply with a criminal defendant's trial subpoenas on Speech or Debate Clause grounds.[72] In our view, it made no difference that the Legislative Branch was asserting privilege while the Executive Branch was leading the prosecution, because the net result was the same: the United States was simultaneously prosecuting Rainey and relying on privilege assertions to deprive him of critical exculpatory evidence. Therefore, Rainey sought two forms of relief based on the unavailability of these congressional witnesses.

First, we argued that Rainey could not be tried for obstructing Congress, based in large part on the testimony of congressional witnesses favorable to the Task Force on the issue of a duly authorized investigation, while government privilege assertions simultaneously prevented Rainey from calling his own witnesses to challenge the Task

---

[70] *Id.* at 3.
[71] Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427.
[72] *See generally* United States v. Verrusio, 762 F.3d 1, 23-24 (D.C. Cir. 2014) (noting dearth of case law).

Heberlig: United States v. David Rainey: A Case Study

284                    *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

Force's case on that issue.[73] We relied on case law establishing that evidentiary privileges cannot trump a defendant's constitutional rights to compulsory process and due process. We analogized this case to charges dismissed where the government attempted to prosecute a defendant while declining on privilege grounds to produce witness statements of government informants,[74] or the identities of undercover agents.[75] In particular, we relied heavily on *United States v. Fernandez*, 913 F.2d 148, 163-64 (4th Cir. 1990), where the defendant was charged with making false statements about his work for the CIA but prevented by government privilege assertions from fully explaining the nature of his classified work and the context behind his statements. The Fourth Circuit affirmed the dismissal of the indictment, noting that "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution. . . . [C]ourts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence."[76] Similarly, in our case, where a government privilege assertion prevented Rainey from compelling witnesses with exculpatory information to testify in his defense, we argued that the proper remedy was dismissal of the charge.

Second, in the alternative, we argued that the district court should exclude any evidence offered by the Task Force on the issue of authorization. Relying on *United States v. Nobles*, 422 U.S. 225 (1975),

---

[73]  *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds at 11-21, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

[74]  *See* Jencks v. United States, 353 U.S. 657, 672 (1957) ("criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial.").

[75]  Roviaro v. United States, 353 U.S. 53, 60-61 (1957) ("[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, . . . the trial court may require disclosure and, if the Government withholds the information, dismiss the action.").

[76]  *Fernandez*, 913 F.2d at 154; *see also id.* at 164 ("The district court acted within its discretion in determining that the government's attempt to exclude evidence necessary to demonstrate this background, as well as its effort to require the defendant to use abbreviated and lifeless substitutions for this crucial evidence, would have deprived Fernandez of any real chance to defend himself.").

-3286-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          285

and other "sword and shield" cases prohibiting selective privilege assertions, we urged the court to prevent the Task Force from presenting a one-sided view of the evidence through a handful of favorable congressional staffers who did not intend to invoke the Speech or Debate Clause privilege, while Rainey was precluded based on government privilege assertions from compelling exculpatory testimony on the same subjects from other staffers and Members of Congress. Based on the subpoenaed congressional witnesses' advance notice that they were unwilling to waive the Speech or Debate Clause privilege, we requested a pretrial ruling excluding the one-sided testimony that the Task Force intended to offer on the authorization issue.[77]

On May 18, 2015, the Task Force opposed Rainey's motion for remedial relief on several grounds.[78] Relying on *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014), the Task Force argued that a defendant's right to present a defense must yield to the Speech or Debate Clause privilege and is not subject to any balancing.[79] In any event, the Task Force argued, Rainey had not sufficiently demonstrated that the Speech or Debate Clause privilege assertion was depriving him of specific material, exculpatory evidence necessary to present his defense. The Task Force also claimed the testimony sought by Rainey was cumulative because other congressional staffers who would be testifying at trial could be questioned on the authorization issue.

Significantly, the Task Force also maintained there was a distinction between a privilege assertion by the Executive Branch and the Legislative Branch of the government. The Task Force claimed that the Executive Branch did not control the Speech or Debate Clause privilege of the congressional witnesses and was not invoking privilege to deprive Rainey of evidence. Thus, the Task Force argued that the authority relied on by Rainey stood only for the proposition that the *Executive Branch* may be forced to elect between waiving a privilege or dismissing the prosecution. Similarly, the Task Force contended that the "sword and shield" doctrine applied only when a party asserts a

---

[77] *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Government Official" Grounds at 22-25, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

[78] Gov't Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438.

[79] *Renzi*, 769 F.2d at 749-50.

-3287-

286          *BERKELEY JOURNAL OF CRIMINAL LAW*          Vol. 20:2

privilege selectively. According to the Task Force, where the *Legislative Branch* invokes the Speech or Debate Clause privilege, such action cannot be attributed to the Executive Branch and did not justify the relief sought by Rainey.

House Counsel also opposed Rainey's motion for remedial relief.[80] Most notably, House Counsel asserted in conclusory fashion that the testimony Rainey sought from the congressional witnesses would not be exculpatory because each of the witnesses would supposedly testify that he or she believed the alleged Subcommittee on Energy and Environment investigation was duly authorized.[81] These bald representations were not accompanied by any affidavits or statements from the witnesses, each of whom had declined even to be interviewed by Rainey's counsel.[82] In addition, House Counsel argued that the selective waiver or "sword and shield" doctrine was simply inapplicable in the Speech or Debate Clause context.[83] House Counsel also contended that the Legislative Branch controlled the Speech or Debate Clause assertions, which, in their view, "may not be attributed to, and should not be wielded so as to penalize, the prosecution."[84]

In our reply brief, we argued that it did not matter that the Legislative Branch, not the Executive Branch, was selectively invoking privilege to suppress evidence favorable to Rainey.[85] We relied principally on two cases for this proposition. First, in *United States v.*

---

[80]   Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash Their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431.

[81]   *Id.* at 6.

[82]   Moreover, House Counsel continued to be dismissive of Rainey's interpretation of the contemporaneous documents produced by Rep. Markey. *See id.* at 6 (stating Rainey's assertion that the investigation was not authorized "simply is not true, no matter how many times Mr. Rainey repeats it or how fervently he wishes it were so."); *id.* (claiming that the congressional witnesses did not believe the documents suggested the investigation was unauthorized, "notwithstanding Mr. Rainey's efforts to spin gold out of documents that clearly are mere straw.").

[83]   *Id.* at 4 ("there simply is no constitutional impediment to an individual Member or staffer to whom the Clause otherwise applies choosing to assert it in response to some questions and not assert it in response to others. . . . But, even if some sort of sword/shield argument were available to Mr. Rainey as to an individual privilege holder (which it emphatically is not), that argument would not function on the collective basis that Mr. Rainey postulates.").

[84]   *Id.* at 8-10.

[85]   Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 7, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          287

*North*, 910 F.2d 843 (D.C. Cir. 1990) ("*North I*"), where Congress granted Colonel Oliver North immunity over the objections of the Executive Branch, the court held that North was entitled to a full *Kastigar* hearing, and stated that:

> the Fifth Amendment requires that the government establish priorities before making the immunization decision. The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted.[86]

In a follow-up decision, the D.C. Circuit made clear that "the government" meant the United States as a whole, and not simply the Executive Branch. In response to the argument that penalizing prosecutors for congressional immunity decisions would unduly restrict Congress's investigative role, the court responded:

> When Congress grants immunity before the prosecution has completed preparing its "case," the prosecutor, whoever that may be, can warn that the grant of immunity has its institutional costs; in this case, the [Independent Counsel] indeed warned Congress that "any grant of use and derivative use immunity would create serious—and perhaps insurmountable—barriers to the prosecution of the immunized witness." . . . The decision as to whether the national interest justifies that institutional cost is, of course, a political one to be made by Congress. Once made, however, that cost cannot be paid in the coin of a defendant's constitutional rights. That is simply not the way our system works. The political needs of the majority, or Congress, or the President never, never, never, should trump an individual's explicit constitutional protections.[87]

Second, we relied on *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975), a case involving the military prosecution of Lieutenant William Calley in connection with the My Lai incident during the Vietnam War. In that case, while Calley's military prosecution was pending, a House subcommittee conducted its own investigation of the My Lai incident, taking extensive evidence in executive session.[88] When Calley sought that evidence for use in his defense, the subcommittee refused to

---

[86]  *North I*, 910 F.2d at 862.
[87]  *United States v. North*, 920 F.2d 940, 945-46 (D.C. Cir. 1990) ("*North II*").
[88]  *Calley*, 519 F.2d at 219.

Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                                FALL 2015

288            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

disclose it, and the military court denied the request as a fishing expedition.[89] On appeal, the Fifth Circuit rejected Calley's claim of a Due Process violation because the defense had conceded the evidence was not exculpatory but merely relevant for impeachment of witnesses.[90] Importantly, however, the court stated:

> We do not consider whether the Hebert Subcommittee could properly invoke its congressional privilege and correctly refuse to furnish the requested testimony. The issue before us is not the legality of this action, but rather the effect of denying the testimony to the defense. Even if the privilege were properly invoked and the testimony validly withheld, the withholding of the material might require the Government to let the petitioner go free if he was denied evidence essential to his defense.[91]

Because a congressional invocation of privilege deprived Rainey of evidence critical for his defense, we argued that the required result should be dismissal—even though the privilege was invoked by a House Subcommittee, rather than the prosecutors.[92]

### 11. The Motion for a Protective Order by the Congressional Witnesses Willing to Testify for the Prosecution

On May 27, 2015, three business days before trial was set to begin, the four congressional staffers willing to testify voluntarily for the prosecution moved for a protective order limiting the scope of their testimony to specific legislative activities outlined by the witnesses.[93] As to all other activities and topics, the staffers indicated that they intended to assert the Speech or Debate Clause privilege to decline to answer questions. We viewed this tactic as a gift that played right into our argument that gamesmanship by the congressional witnesses was depriving Rainey of critical defense evidence.

On May 29, 2015, we opposed the motion for protective order and cross-moved to exclude all testimony by the four congressional

---

[89]  *Id.* at 220.
[90]  *Id.* at 222.
[91]  *Id.* at 220 n.60.
[92]  Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 9-10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.
[93]  Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 474.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            289

staffers.[94] We argued that permitting the staffers to testify only on limited topics would violate Rainey's Sixth Amendment right to meaningfully cross-examine the witnesses against him, and countenance a fundamentally unfair sword-and-shield use of the Speech or Debate Clause.[95] Specifically, the list of enumerated topics would have prevented Rainey from cross-examining the staffers about several relevant topics, including the investigative actions taken by a different committee chaired by Rep. Markey, and actions taken during different investigations by the Subcommittee on Energy and Environment. These and other areas covered by the proposed protective order would have shown that the "investigation" alleged in the indictment was fundamentally different than a normal, duly authorized congressional investigation.[96] Limiting the staffers' testimony in the manner requested would have also prevented Rainey from asking the staffers about their and Rep. Markey's history of actions adverse to the oil and gas industry, which was relevant to the witnesses' bias and prejudice against Rainey.[97] Accordingly, we asked the district court to deny the motion for a protective order and exclude all evidence from the congressional staffers. We believed the Task Force would be unable to prove its case without this staffer testimony and sought to capitalize on what we viewed as a tactical blunder by House Counsel that would not be viewed favorably by the district court.

## IV. THE DISTRICT COURT'S RULINGS

On June 1, 2015, the district court engaged in the *voir dire* process and empaneled a jury by early afternoon. At that point, jeopardy attached to Rainey's trial on Counts One and Two of the indictment.[98]

### A. The Court's Order Granting the Congressional Witnesses' Motion To Quash Rainey's Trial Subpoenas

After sending the jury home for the day, the district court

---

[94] Def. David Rainey's Opp'n to the Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, and Mem. in Supp. of Mr. Rainey's Cross Mot. to Exclude All Test. by Those Staffers, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 29, 2015), ECF No. 481-1.

[95] *Id.* at 1.

[96] *Id.* at 8.

[97] *Id.* at 8-9.

[98] "There are few if any rules of criminal procedure clearer than the rule that 'jeopardy attaches when the jury is empaneled and sworn.'" Martinez v. Illinois, 134 S. Ct. 2070, 2074 (2014) (quoting Crist v. Bretz, 437 U.S. 28, 35 (1978)).

**-3291-**

290            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

addressed the congressional witnesses' motion to quash. The court first asked the parties and House Counsel if anyone had anything to add to the pleadings that had been filed. All parties rested on their papers. Thereafter, the court summarily granted the congressional witnesses' motion to quash Rainey's trial subpoenas.[99]

### B. The Court's Order Granting Rainey's Pending Motions To Dismiss Count One and for Remedial Relief

The district court next addressed Rainey's pending motions to dismiss and his motion for remedial relief in light of the unavailability of the congressional witnesses, as well as the motion for a protective order filed by the four congressional staffers willing to testify for the prosecution. The court issued its ruling orally from the bench.

After the court summarized the parties' arguments on Rainey's motions to dismiss, it explained that it had deferred ruling on the motions while Rainey pursued congressional documents through the subpoena process. Although the court had granted Rainey permission to serve subpoenas on the congressional witnesses, it ultimately upheld their assertion of the Speech or Debate Clause privilege and denied Rainey's motion to compel compliance with the subpoenas. Thereafter, Rainey could only obtain the documents that the congressional witnesses and entities agreed to provide voluntarily. The court appeared to recognize that these voluntary document productions were deficient, stating:

> [T]he House . . . voluntarily produced a number of documents without representing the scope of the search performed, the terms used, or the extent to which it would not produce certain documents as privileged. There is no representation in response that the document production was otherwise in compliance with the scope of the subpoena that was issued and then withdrawn.[100]

Nonetheless, the voluntarily produced documents proved invaluable to Rainey's case. Critically, the district court held that those documents could be reasonably and plausibly read to call into question the existence of an authorized inquiry by the Subcommittee:

> [T]he defendant contended that the documents produced by the House further demonstrate that the May 14 letter was not part of any duly authorized inquiry or investigation. In support of his

---

[99] Transcript of Jury Trial at 272, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015) ("Motion granted").
[100] Transcript of Jury Trial at 278, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          291

> argument, the defendant points to a number of e-mails and letter correspondence demonstrating, in the defendant's view, that the subcommittee was not authorized to conduct an investigation into the spill, nor was Representative Markey's letter a part of a duly authorized investigation. . . .
>
> At the very least, the defendant argues, the letters and e-mails produced call into question whether the Subcommittee on Energy and Environment was properly investigating the spill and whether Representative Markey's service as chairman of that subcommittee sent the May 14 letter as a due and proper exercise of the power of inquiry.
>
> The Court finds the defendant's arguments related to the communications produced by the House to be a reasonable reading of those documents and plausible under the circumstances.[101]

Having already quashed Rainey's trial subpoenas for the congressional witnesses who authored the documents at issue, the district court recognized that Rainey was "not permitted to call witnesses of his choosing who may, and plausibly do, hold exculpatory evidence critical to his defense."[102]

> The district court then held as follows:
>
> As a preliminary matter, the Court finds that few rights are more fundamental than the rights of due process and compulsory process under the Fifth and Sixth Amendments. The Court has serious constitutional and fairness concerns with regard to the following:
>
> First, the defendant received only a partial production of documents from the House, absent a list of searches performed, a list of search terms, or any representations as to documents that were withheld under the House's privilege, which was asserted and which this Court ruled in favor of.
>
> Secondly, certain House witnesses agreed to voluntarily testify in the government's case in chief, but such testimony, as the House proclaimed, would be limited to the scope of direct, presumably determined at the whim of the witness' or house counsel's own discretion.
>
> And third, the House, acting pursuant to its privilege, refused defendant's subpoena request as to eight other witnesses who, potentially and plausibly, hold material and exculpatory

---

[101]  Transcript of Jury Trial at 278-79, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[102]  Transcript of Jury Trial at 281, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

Heberlig: United States v. David Rainey: A Case Study

292            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

information related to an essential element of Count 1, which element has, in fact, already been identified by the Fifth Circuit in this very case.

The Fifth Circuit explained, again, in this very case, that an unauthorized frolic by a House entity or House member might lose the protection afforded by § 1505 regardless of its committee status because there would be no "due and proper exercise of the power of inquiry." That can be found in *U.S. v. Rainey*, 757 F.3d 234, a Fifth Circuit opinion from this year in this case. By that same token, the Court finds that an unauthorized frolic by an individual member would also lose the protections afforded by § 1505 regardless of his status as chairman of the subcommittee. As seen repeatedly in the government's briefing, these are factual issues that must be developed at trial and must be submitted to the jury.

Each of these three areas of concern that I just discussed directly implicate factual issues as they relate to the defendant's right to present a full defense pursuant to the Fifth and Sixth Amendments. The Court finds that the evidence sought by the defendant through documentary production and testimony is highly relevant to his defense and material to the issues before the Court for the jury's consideration. The Court, as I stated, [] finds the evidence sought is material noncumulative and, based on the evidence in the record, including but not limited to a number of written communications, both internal and external to the House, favorable to his defense or at least plausibly and arguably and quite conceivably favorabl[e] to the defendant in this case.

The Court has considered all of the pleadings, the relevant record, all of the cases cited by the parties. The Court also finds the ruling today is in accord with the rulings in *Renzi* and *Verrusio*, which I have cited earlier. To be clear, the Court is not engaging in a balancing or weighing of the speech and debate privilege, which I have already ruled in favor of, with the defendant's Fifth and Sixth Amendment rights, but is considering each on an independent basis in an attempt to honor and reconcile those fundamental constitutional privileges which are before the Court.

As seen earlier today, the Court found in favor of the House, and its ruling supported the House's long-standing constitutional privilege under the Speech or Debate Clause. The Court must now address what implication that ruling has on the defendant's right to a full trial and his constitutionally guaranteed rights, which I have just described.

Thus the Court finds that, similar to the holding in *U.S. v. Fernandez*, 913 F.2d 148, which is a Fourth Circuit case, 1990,

Published by Berkeley Law Scholarship Repository, 2015

-3294-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

and consistent with the rulings in *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*, 353 U.S. 53, the government's prosecution of Count 1 under § 1505 must give way where the defendant seeks relevant, material, noncumulative evidence related to his defense, but also where he has been precluded from obtaining this evidence due to the invocation of a constitutional privilege by a branch of the very same government involved in his prosecution. Because the defendant is not able to put on a full and fair defense, consistent with his constitutional rights and consistent with an element of the crime as described by the Fifth Circuit and set forth in the jurisprudence, under these circumstances the Court finds the only appropriate remedy is dismissal of Count 1. The Court would reference the case of *Calley v. Callaway*, 519 F.2d 184, which is a Fifth Circuit opinion from 1975 in which the Court of Appeal expressed approval of dismissal where a congressional privilege is asserted prohibiting a defendant from evidence essential to his defense.

Accordingly, for the reasons I have previously stated, the defendant's motion for remedial relief is granted and Count 1 is hereby dismissed with prejudice.

In addition to its findings related to the defendant's constitutional rights, whereby the Court found that the defendant has put forth reasonable and plausible evidence demonstrating a potentially unauthorized investigation by the subcommittee and/or Representative Markey. Without the ability to fully examine those witnesses voluntarily testifying in the government's case in chief and, more importantly, to call witnesses in his favor, and lacking any knowledge as to the scope of the documentary production performed by the House, the Court, consistent with the Supreme Court's guidance in *U.S. v. Nobles*, 422 U.S. 225, and *Davis v. Alaska*, found at 415 U.S. 308, as well as pursuant to the Federal Rules of Evidence giving the District Court broad discretion over the admission or preclusion of evidence, hereby excludes all evidence related to the documentary production by the House and any testimony that the four witnesses would provide in the government's case in chief.

As a result, an examination of all the surrounding circumstances, as indicated in the Fifth Circuit's opinion in this very case and in *U.S v. Mitchell*, 877 F.2d 294, a Fourth Circuit opinion from 1989, is rendered impossible. Absent any evidence of an authorized investigation, the Court would therefore find that the government could not meet its burden of establishing an essential element of the crime charged in Count 1. Therefore, the defendant's motion to dismiss Count 1 of the second superseding indictment for lack of a due and proper exercise of the power of

Heberlig: United States v. David Rainey: A Case Study

294            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

> congressional inquiry (Record Document 188) and his motion to
> dismiss Count 1 of the second superseding indictment because
> the May 4 briefing and the May 14 letter were not part of a
> subcommittee investigation, which is Record Document 190,
> must also necessarily be and are hereby granted.
>
> In light of all the circumstances, the Court further believes that
> the motion to dismiss for unconstitutional vagueness, which is
> Record Document 192, is, under the circumstances, with merit,
> and the Court will grant it as well.[103]

The district court subsequently entered a minute order confirming its
rulings from the bench.[104]

Critically, the district court based its rulings, in part, on the Task
Force's inability to "meet its burden of establishing an essential element
of the crime charged" in Count One.[105] This ruling was an acquittal after
jeopardy had attached on Count One.[106] As a result, the Task Force had
no ability to appeal the district court's ruling,[107] and, indeed, did not file
any notice of appeal.

The next day, on June 2, 2015, trial commenced on Count Two
of the indictment with the parties delivering opening statements and the
Task Force calling its first witnesses.

### C. The Task Force's Motion For Reconsideration

On June 2, 2015, after the trial began, the Task Force filed a
motion for reconsideration of the district court's order granting Rainey's
motions to dismiss Count One and for remedial relief based on the

---

[103] Transcript of Jury Trial at 282-87, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[104] Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 4, 2015), ECF No. 499.

[105] Transcript of Jury Trial at 286, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[106] As the Supreme Court has stated, "our cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." Evans v. Michigan, 133 S. Ct. 1069, 1074-75 (2013); *see also id.* at 1075 ("Thus an 'acquittal' includes 'a ruling by the court that the evidence is insufficient to convict,' a 'factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability,' and any other 'rulin[g] which relate[s] to the ultimate question of guilt or innocence.'") (quoting United States v. Scott, 437 U.S. 82, 91 (1978)).

[107] *See* Sanabria v. United States, 437 U.S. 54, 68-69 (1978) (holding, in a case involving "an erroneous evidentiary ruling, which led to an acquittal for insufficient evidence," that the "judgment of acquittal, however erroneous, bars further prosecution on any aspect of the count and hence bars appellate review of the trial court's error.").

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          295

unavailability of the congressional witnesses.[108]

The Task Force represented that even though House Counsel declined to argue the motion to quash or make any other representations at the hearing the previous day, House Counsel was apparently "prepared" to represent to the court:

> (1) that each of the subpoenaed staffers was willing to testify voluntarily, subject to certain scheduling conflicts some of them had and (2) that Senator Markey had indicated his willingness to be available for testimony voluntarily if he could testify via video conference or some other means that would allow him to remain in Washington, DC, where the Senate is in session.[109]

The Task Force also noted that it had informed the court on June 1, 2015—the first day of trial—that Rep. Waxman was willing to testify voluntarily. The Task Force had interviewed Rep. Waxman by telephone for the first time on May 31, 2015, and reported that Rep. Waxman was prepared to testify that he authorized the Subcommittee on Energy and Environment investigation in a personal conversation with Rep. Markey.[110] This supposed personal conversation was never memorialized or disclosed to Rainey at any point during the five years between the *Deepwater Horizon* incident and the start of his trial.

The Task Force claimed that reconsideration was warranted because the subpoenaed congressional witnesses, "while unwilling to respond to a subpoena," would have been willing to testify voluntarily for the defense though they had never indicated their willingness to Rainey. However, their willingness was subject to unspecified "scheduling issues" or, in the case of Rep. Markey, the requirement that he testify by video or phone from Washington, D.C.[111] The Task Force failed to explain why the congressional witnesses had not previously disclosed their willingness to testify voluntarily during the weeks of pretrial litigation on these precise issues and only revealed it *after* the district court had dismissed Count One with prejudice.

### D. The Court's Order Denying the Task Force's Motion for Reconsideration

On June 4, 2015, at the conclusion of the evidentiary portion of

---

[108] Gov't's Mot. to Reconsider Dismissal of Count 1 of the Second Superseding Indictment, *United States v. Rainey*, Crim. No. 12-291 (E.D. La. June 2, 2015), ECF No. 491.

[109] *Id.* at 3.

[110] *Id.* at 5.

[111] *Id.* at 4.

Heberlig: United States v. David Rainey: A Case Study

296            *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

the trial and prior to closing arguments the next day, the district court orally denied the Task Force's motion for reconsideration from the bench. The district court noted that it was "disappointed" by the motion because it ignored a number of the bases for the court's ruling. The court then made the following findings:

> Number 1: Congress is the complainant and alleged victim of the crime alleged in Count 1. 18 U.S.C. § 1505 was designed to protect Congress from the type of activity that was alleged in Count 1. Congressional—congressmen and congresswomen and staffers should have had the most interest in the pursuit of this count and should have been here voluntarily, had it been their intent to do so, without the need for subpoenas, in the first place.

> Both the government's attorneys, Mr. Tsao and Mr. Zink, as well as defense counsel—and to their credit, Mr. Tsao and Mr. Zink practically pleaded with the House to ensure the appearances of these witnesses at trial for months, months. And counsel will agree with me, for months the Court and the parties were left to speculate about the intentions of House members whose appearance was desired.

> I might state that there were various representations, which changed seemingly on a weekly basis, as to whether they would or would not appear here in court and, if had they appeared, to what extent they would be willing to testify. Thus the Court finds unacceptable and irresponsible this conduct, as it resulted in the unnecessary and considerable expense of time and resources, particularly in taxpayer money to the federal government, both through expenditures and time made in this Court handling Count 1 and to the Department of Justice, who spent considerable resources charging Count 1 and pursuing it, not to mention the defendant and the cost of defending Count 1.

> The House has continually refused to make a clear and explicit declaration as to the intent of these witnesses appearing voluntarily or otherwise to testify in this trial. The Court, as well as the government and the defendant, have been presented with communications that are equivocal, confusing, and even misleading as to the status of these witnesses' appearances and the willingness of them to testify.

> In fact, earlier in the day Monday, I was advised that one congressman might appear, and yet House counsel was here and did not mention that when I gave him the opportunity to clarify, in which case the motion to quash would have been moot if I had known witnesses were willing to appear voluntarily. We never got a representation that all material witnesses from Congress would testify voluntarily and without condition. Had we gotten that representation, there would have been no issue.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

The Court afforded House counsel the opportunity to provide any additional information that was not contained in the briefing. I specifically asked if there was anything else not in the briefs that counsel would like to say to the Court at the time of the motion to quash on Monday afternoon. However, House counsel remained silent.

House counsel was not here to serve as a potted plant, and I make reference to that quote because it is—it happened to be made during the *United States v. North* case, which was cited by all parties in an episode relating to that case. Informing the Court at that time that all witnesses would testify unconditionally, without reservation, would have mooted the question on the motion to quash.

Next, video or telephonic appearance of a witness in this Court is unacceptable.  If a witness has been subpoenaed, the witness cannot substitute personal appearance absent consent of the parties and the Court, which was not forthcoming and which I would certainly not agree to had I known of any witness—is not acceptable, even if such a witness is a senator in the United States Senate.

I hardly think—I hardly think that had a congressman or senator issued a subpoena to appear before a House committee, a response that, well, I'm busy but I will appear before the House committee in a videoconference or in a telephone call, would have been acceptable to any member of the House committee, nor should it be.

The government indicates in its pleading that House counsel was prepared to advise the Court—prepared but did not—that certain House witnesses are now prepared to voluntarily appear and testify for the defendant. House counsel made no such representation when afforded the opportunity to do so.

Furthermore, the Court does not find that its rulings in any way called into question, when considering the representations contained in the motion—that is, the documentary production which occurred in February—the self-imposed limitation which the House sought to pursue in the protective order, had they appeared, and the failure to represent the intentions of Former Representative Stupak, who was also subpoenaed.

The Court's ruling remains valid, and the only appropriate remedy under the law and under the Constitution was to dismiss Count 1 in order to serve the constitutional interests of the Speech or Debate Clause, which the Court found to be meritul, as briefed by the House and the right under the Fifth and Sixth Amendments to confrontation, which the Court also found the defendant enjoyed under the Constitution, as do all defendants.

Heberlig: United States v. David Rainey: A Case Study

298            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

Neither the Court, the government, nor a criminal defendant are required to plead, implore, or solicit the voluntary testimony of witnesses that are material and possibly favorable to any party's case. The Sixth Amendment affords the right of not just process, compulsory process, not the right to merely request the attendance or beg for the witnesses to appear at trial. . . .

It appears to the Court that only when the viability of Count 1 and its subsequent dismissal arose did the House concern itself then with offering the voluntary testimony of certain individuals. However, the Court will not tolerate any party or nonparty changing its mind after the consequences of a particular course of action become unfavorable to that party.[112]

The court conveyed the frustration that the parties had endured for months in dealing with the congressional witnesses. Despite repeated attempts to secure the appearance of the congressional witnesses, or to get them even to commit to positions on voluntary testimony, the congressional witnesses stonewalled Rainey, the Task Force, and the district court at every step of the way. These so-called "victims" of the alleged crime were unwilling to make decisions of fundamental consequence to Rainey's trial until it became apparent that the district court was poised to dismiss Count One. And even then, the congressional witnesses failed to communicate their positions until *after* the court dismissed the charge with prejudice. Worst of all was Rep. Markey, who had spearheaded the supposed "investigation" that Rainey was accused of obstructing. No court or criminal defendant on trial for serious charges would have deemed acceptable video testimony from Washington, D.C. Such a proposal was disrespectful of the judicial process and an insult to Rainey's constitutional rights. The district court correctly observed that if the tables were turned, Rep. Markey would have never permitted an important witness subpoenaed for one of his congressional hearings to appear by video conference.

The next day, on June 5, 2015, following a four-day trial on Count Two of the indictment, a New Orleans jury acquitted Rainey of that remaining false statements charge after less than two hours of deliberations. After the jury announced its verdict, the district court stated "I agree with the verdict" and characterized it as "a correct verdict based on the evidence."[113]

---

[112] Transcript of Jury Trial at 1059-64, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[113] Transcript of Jury Trial at 1142, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

-3300-

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          299

## V.  LESSONS LEARNED

There are many lessons to be learned from this case.

First, when it comes to a criminal prosecution, there is only one United States. Even where the Legislative Branch invokes privilege at its own initiative without the endorsement of the Executive Branch, a criminal prosecution cannot proceed where the privilege assertion interferes with a defendant's right to present an effective defense.

Second, a criminal defendant's right to compulsory process of defense evidence is critically important and must not be abridged by the government. This fundamental right cannot be vindicated by voluntary testimony with the scope of examination defined by the witness. Impeachment and bias are always fair game on cross-examination. If a privilege invocation limits the scope of cross-examination, the proper remedy is to exclude the witness's testimony in its entirety.

Third, where a valid but selective privilege assertion leads to a one-sided, incomplete or unfair presentation of evidence, the district court may exclude all evidence on the subject at issue. If the result is an obvious failure of proof on an essential element of the offense, the court has the power to acquit the defendant on the charge at the outset of trial for insufficiency of the evidence without waiting for the inevitable at the close of the government's case. Such a ruling may not be appealed by the government under the Double Jeopardy Clause.

Finally, given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should avoid using the obstruction of Congress statute or any other charge requiring congressional testimony if any alternatives are available. At a minimum, prosecutors should ensure that they have the full cooperation of the relevant Members of Congress and their staff *before* pursuing criminal charges that require testimony from congressional witnesses. In this case, there was no referral from Congress to the Department of Justice to pursue the obstruction charge against Rainey. Instead, the Department of Justice created a Task Force to pursue criminal charges that decided on its own to charge Rainey with obstruction of a congressional investigation. Inexplicably, the Task Force never interviewed Rep. Markey during its investigation and only interviewed Rep. Waxman for the first time the day before trial was scheduled to begin. Had the prosecutors done so, they may well have determined that there was no duly authorized congressional investigation to support a criminal charge. Ultimately, however, the failure to perform this basic due diligence and the

ISSUE 20:2                                                                                      FALL 2015

300            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

gamesmanship of these Members of Congress and their staff, including their "wait and see" approach and unwillingness to take litigation positions or commit to unrestricted testimony, completely derailed a federal prosecution and wasted the time and resources of the parties and the Court. Such a debacle could have been avoided if the prosecutors had structured the case to avoid reliance on uncooperative, self-interested congressional witnesses.

**-3302-**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
CONGRESSIONAL EVIDENCE OR DISMISS THE INDICTMENT BASED ON
GRANTING THE MOTION TO QUASH**

The Defendant argues that the Court should dismiss the indictment because it quashed his

subpoenas seeking testimony from Members of Congress and their staff who have a privilege

against compelled testimony under the Speech or Debate Clause of the Constitution.  ECF No.

116.  But the Defendant's motion—which recycles a large amount of irrelevant material from his

failed opposition to the House of Representative's motion to quash and which displays disregard

for the Court's controlling orders in this case regarding his available defenses—fails to articulate

any testimony he seeks from these individuals that is relevant in his trial, much less that would be

exculpatory or non-cumulative.  His motion should be denied.

I.      **Factual Background**

On June 7, 2022—six months after the Court set a July trial date in this case and three

months after the Court denied the Defendant's motion to compel the Government to produce

House records outside of its possession, *see* 3/16/2022 Minute Order (denying in part ECF No.

28), the Defendant issued trial subpoenas to twelve Members of Congress, the House General

Counsel, and three congressional staff, *see In re Non-Party Subpoenas*, Case No. 22-mc-00060

(CJN), ECF No. 1-1, Exhibits A-P.  The House moved to quash.  *Id.*, ECF No. 1.  The Defendant

claimed that the information he needed from the subpoenaed Members was about his waived

objections to alleged rules violations, such as the number of Committee members or whether the Committee included a ranking minority member.  *See* Mot. Hrg., 7/11/22, Tr. at 60-62.

At the July 11, 2022, motions hearing, the Court determined that the information the Defendant claimed to seek from the subpoenaed witnesses is irrelevant.  In particular, the Court granted the Government's motion in limine on waived objections, ECF No. 53, and ruled that the Defendant cannot present to the jury evidence of alleged violations of the Committee's rules.  *See* Mot. Hrg., 7/11/22, Tr. at 127-133.  The Court specifically stated that "such evidence is irrelevant to questions that will go to the jury."  *Id*. at 133.

## II.     The Defendant Has Failed to Establish That Any of the Information He Seeks From The Witnesses in Question is Relevant, Exculpatory, and Non-Cumulative.

As the Court stated on July 11, 2022, to prevail on a claim that the indictment must be dismissed as a result of the quashed testimony of House witnesses, the Defendant "must show that the testimony he seeks would be relevant to an issue at trial."  *Id*. at 144:9-11 (stating further that any such showing "seem[ed] unlikely").  The Defendant fails to make any such showing in his motion.  Instead, he recycles much of his failed opposition to the House of Representatives' motion to quash, without acknowledging the Court's rulings, which foreclose admission of the evidence he claims the House witnesses possess.  The Defendant also claims that, short of dismissal, any "congressional evidence" must be excluded.  ECF No. 116 at 16.  With respect to this claim, the Defendant does not provide argument or cite any authority in the law or rules of evidence that relevant evidence must be excluded because irrelevant evidence has been so and the Court can reject this claim without further analysis.  His motion should be denied.

The Defendant asserts generally, but never explains specifically, what information he seeks from the subpoenaed House witnesses that he needs for trial.  As best the Government can tell, however, he continues to claim that he needs information related to "lack of consultation with a

ranking minority member…[,] that Rep. Cheney is not the ranking member on the Committee"
and to his various complaints about the witnesses' alleged biases and book deals.  *See* ECF No.
116 at 16-17, 16 n.9.  But as set forth above, the Court has already determined that the Defendant's
waived grievances regarding the rules are not relevant in this trial, and it has also decided that the
supposed bias evidence the Defendant seeks to elicit, such as book deals, are not relevant, *see* Mot.
Hrg., 7/11/22, Tr. at 143:3-6.

     To support his arguments, the Defendant cites the same cases he has cited in previous
pleadings where he raised the issue, which stand for the proposition that the executive branch
cannot assert a privilege and use it to withhold relevant and exculpatory material in its possession
from defendants.  But setting aside the question of whether the same principles even apply across
different branches of government, these cases merely underscore that the Defendant has not made
an adequate showing in his own case, because, as he concedes, all of the cases he cites are ones in
which the evidence in question was "relevant and material to the defense's case."  ECF No. 116 at
14-15 (citing *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (prosecution could not withhold
from defendant information related to a government informer's identity when such information
was relevant and helpful to defendant); *United States v. Fernandez*, 913 F.2d 148, 158-59 (4th Cir.
1990) (involving classified material the court determined was "material" and "essential" to
defense); Transcript, *United States v. Rainey*, Case No. 12-cr-00291, ECF No. 510 at 284-285
(dismissing charge for obstruction of Congress after finding that congressional witnesses who
refused to testify based on an assertion of their Speech or Debate Clause privilege possessed
"relevant, material, noncumulative evidence" undermining an element of the offense).  Here, the
Defendant has failed to point to a single piece of evidence that a specific subpoenaed House
witness has that is even relevant, let alone material to his defense and non-cumulative.

Notably, in the arguably analogous situation in which a defendant claims that an indictment must be dismissed if the Government declines to grant a defense witness immunity to free him to testify, a defendant must establish two things—first, that the Government exercised misconduct with respect to the proffered witness, and second, that the witness's testimony is materially exculpatory, non-cumulative, and unavailable from another source. *See United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006). Here, again, not only can the Defendant not show that any one of the House witnesses' testimony is materially exculpatory and non-cumulative, he also cannot establish that the Government has committed any misconduct with respect to them.

Finally, at the end of his motion, the Defendant "respectfully asserts," without any legal basis, that he should be permitted to argue to the jury regarding the House witnesses' absence at trial. ECF No. 116 at 22. He does so despite the fact that the Court already ruled on this issue, as well, and granted the Government's motion in limine to exclude any such evidence or argument. Mot. Hrg., 7/11/22, Tr. at 137-38. Nothing in the Defendant's motion provides a basis to reconsider that decision.[1]

## III.    Conclusion

The Defendant's motion ignores the Court's rulings on what is relevant at trial, attempts to relitigate settled issues, and continues to argue that he needs irrelevant information from the House witnesses. His motion should be denied.

---

[1] The Government is concerned by the Defendant's repeated assertions that he will raise to the jury issues this Court has already deemed irrelevant. If he does so in blatant disregard of this Court's pretrial orders, the Government will request a curative instruction at the time. In addition, depending on the extent of the Defendant's defiance, it may be appropriate for the Court to require the Defendant to proffer the specific questions he plans to ask a witness outside the presence of the jury before proceeding with questioning in the jury's presence. *See* Fed. R. Evid. 103(c) (allowing the court to require offer of proof in question-and-answer form); Fed. R. Evid 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
      J.P. Cooney (D.C. 494026)
      Molly Gaston (VA 78506)
      Amanda R. Vaughn (MD)
      Assistant United States Attorneys
      United States Attorney's Office
      601 D Street, N.W.
      Washington, D.C. 20530
      (202) 252-1793 (Vaughn)
      amanda.vaughn@usdoj.gov

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OBJECTIONS TO COURT'S PROPOSED STATEMENT OF THE**
**CASE, VOIR DIRE, AND JURY INSTRUCTIONS**

The Government has the following objections to the Court's proposed statement of the

case, voir dire, and jury instructions.

**Statement of the Case**

The Government objects to the following language in the proposed Statement of the Case:

"The October 7, 2021, deadline for producing documents was later moved to October 18, 2021."

The Indictment does not allege that the October 7, 2021, deadline was moved to October

18, 2021.  The statement is an inaccurate summary of the allegations.

**Voir Dire**

The Government objects to the following language on page 3 of the Court's proposed voir

dire: "The October 7, 2021, deadline for producing documents was later moved to October 18,

2021."

The Indictment does not allege that the October 7, 2021, deadline was moved to October

18, 2021.  The statement is an inaccurate summary of the allegations.

**Jury Instructions**

The Government objects to proposed instruction 2.108, defining reasonable doubt, because

it provides the instruction used in Superior Court instead of the instruction that has been used in

-3308-

the U.S. District Court, as noted in the Redbook's Comment to Instruction 2.108.  The parties

requested, ECF No. 89 at 2, and the Government believes it is appropriate to use, the instruction

in the Comment that has been used in U.S. District Court.  This instruction is as follows:

> The government has the burden of proving each defendant guilty beyond a reasonable doubt as to each count or charge against him. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely than not true, which we call the preponderance of the evidence. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him/her guilty. If, on the other hand, you think there is a real possibility that a defendant is not guilty, you must give him/her the benefit of the doubt and find him/her not guilty.

*See* Comment, Redbook Instr. 2.108.


                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              United States Attorney
                              D.C. Bar No. 481052

                    By:    */s/ Amanda R. Vaughn*
                              J.P. Cooney (D.C. 494026)
                              Molly Gaston (VA 78506)
                              Amanda R. Vaughn (MD)
                              Assistant United States Attorneys
                              United States Attorney's Office
                              601 D Street, N.W.
                              Washington, D.C. 20530
                              (202) 252-1793 (Vaughn)
                              amanda.vaughn@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     v.

STEPHEN K. BANNON,

     *Defendant.*

Criminal Action No. 1:21-cr-00670 (CJN)

<u>**STATEMENT OF THE CASE**</u>

     The indictment in this case charges the Defendant, Stephen K. Bannon, with two counts of contempt of Congress.   In 2021, the Select Committee to Investigate the January 6th Attack on the U.S. Capitol, a committee of the U.S. House of Representatives, was conducting an investigation into the January 6, 2021, attack on the U.S. Capitol.   According to the indictment, on September 23, 2021, the Select Committee issued a subpoena to the Defendant directing him to provide various records relating to its investigation by October 7, 2021, and to appear and give testimony at a deposition on October 14, 2021.   The October 7, 2021, deadline for producing documents was later moved to October 18, 2021.   The indictment alleges that the Defendant wilfully defaulted by not providing testimony on October 14, 2021, and by not producing records as required by October 18, 2021.   The indictment alleges that this failure to comply was deliberate and intentional.

     **DEFENSE'S OBJECTION:** The defense objects to the exclusion of the statutory language of 2 U.S.C. § 192, and further renews its request for a sentence explaining that the statements in the indictment are only allegations and that the Government has the burden of proof in this case. The defense further objects to the inclusion of the last sentence as cumulative considering the court's ruling in this case which adopts the Government's view that under this statute "willfully" means deliberate and intentional.

<u>**VOIR DIRE QUESTIONS**</u>

<u>Knowledge of the Parties and Other Jurors</u>

1. The United States is represented in this case by Assistant United States Attorneys Amanda Vaughn and Molly Gaston.  They will be assisted in this trial by Quiana Dunn-Gordon. Are you personally acquainted with, do you have any connection to or association with, or have you had any contact with Ms. Vaughn, Ms. Gaston, or Ms. Dunn-Gordon?

2. The Defendant is represented by David Schoen, Evan Corcoran, and Riane White.  Are you personally acquainted with, do you have any connection to or association with, or have you had any contact with Mr. Schoen, Mr. Corcoran, or Ms. White?

   **Defense Comment:** Ms. White entered her appearance in this case on July 15, 2022. (ECF 115).

3. The Defendant is Stephen K. Bannon.  Are you personally acquainted with, do you have any connection to or association with, or have you had any contact with Mr. Bannon?

4. The following is a list of individuals who may testify in this case:  Stephen Hart, Kristin Amerling, Sean Tonolli, Robert Costello, and Frank D'Amico.  Are you personally acquainted with, do you have any connection to or association with, or have you had any contact with any of these individuals?

   **Defense Objection:** The defense objects to Mr. Bannon's name being read to the jury venire as a prospective witness, since his name will already have been identified to the jury pool, and because he may elect not to testify, as is his right.

5. Please look around you.  Do you know or recognize any other member of the prospective jury panel, any member of the courtroom staff, or me?

<u>Knowledge of the Case</u>

6. Is there anything about the nature of the charges in this case or the parties involved that would prevent you from deciding this case fairly?

7. Have you heard, seen, or read anything, from any source, about this case?

   a. If you have heard, seen, or read anything about this case, have you formed any opinions about this case based on what you have heard, seen, or read?

   b. If you have heard, seen, or read anything about this case, is there anything about your knowledge of this case that would prevent you from following the Court's instructions and reaching a verdict based solely on the evidence presented during the trial?

8. Have you ever written or said anything for public consumption about the Defendant, the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol, or

the Committee's investigation?  For purposes of this question, writings or statements for public consumption include blog posts, articles, podcasts, or posts on any internet sites that are accessible to the general public.

9. During the pendency of this trial, I will instruct you not to watch, read, or listen to any news, commentary, or online postings related to this case, including from newspapers, television, radio, podcasts, social media, or anything else on the internet.  Would you have any trouble following that instruction?

<u>Case-Specific Questions</u>

10. Have you, a family member, or anyone close to you ever worked for or provided services to the U.S House of Representatives, U.S. Senate, or any government agency affiliated with the legislative branch?

11. Have you, a family member, or anyone close to you ever been subpoenaed by or asked by Congress or any congressional committee to testify or provide records?

12. Have you, a family member, or anyone close to you ever been required by any government agency, court, or law enforcement entity to provide records, statements, or testimony in any matter?

13. Were you, any member of your family, or a close friend present at the U.S. Capitol on January 6, 2021?

14. You will hear and see evidence in this case that the Defendant was subpoenaed for testimony and records by the U.S. House of Representative's Select Committee to Investigate the January 6th Attack on the United States Capitol.  Have you heard, seen, or read anything, from any source, about the Select Committee or its investigation?

15. If you are familiar with the Select Committee or its investigation, do you have any beliefs or opinions about the Select Committee, its investigation, or Congress more generally that would make it difficult for you to remain fair and impartial to both the government and the Defendant throughout the trial in this case?

16. The Select Committee has been holding hearings concerning events at the U.S. Capitol on January 6, 2021.  Have you watched or read coverage of those hearings?

17. If you have watched or read coverage of the Select Committee's hearings, will you have any difficulty putting aside any opinions you may have formed about the people involved in those events, following the law as I explain it to you, and deciding the case in a fair and impartial manner based solely on the evidence presented in court?

18. Do you have any beliefs or opinions about the Defendant, Stephen Bannon, or anyone associated with him, that would make it difficult for you to remain fair and impartial to both the government and the Defendant throughout the trial in this case?

3

**-3312-**

19.     Mr. Bannon is a former advisor to President Donald J. Trump.  Do you, your spouse or partner, or your family have any political beliefs that might prevent you from sitting in judgment of another person because that person's political beliefs are the same or different from your own?

20.     You may hear testimony from elected officials or government staff with the same or different political beliefs from your own.  Would you tend to believe or not believe the testimony of a witness simply because his or her political beliefs are the same or different from your own?

21.     As you sit here, do you have an opinion about the Defendant's guilt or innocence in this case?

<u>Experience with the Legal System and U.S. Government</u>

22.     Have you, a family member, or anyone close to you ever studied law or worked in the legal profession in any way, including as a lawyer, paralegal, assistant, or investigator, and including in a prosecutor's or defense attorney's office, or in a courthouse?

23.     Have you, a family member, or anyone close to you ever been the subject of a criminal investigation or accused of, arrested for, or charged with a crime?

24.     Have you, a family member, or anyone close to you ever been the victim of or a witness to a crime, regardless of whether that crime was reported to law enforcement, or testified in court or before a grand jury as a witness to a crime?

25.     Have you ever served on a grand jury?

26.     Have you ever served as a juror in a civil or criminal trial in either federal, state, or local court?

27.     If you have ever served on a grand jury or as a juror in a civil or criminal trial, was there anything about your service that might affect your ability to serve fairly and impartially as a juror at this trial?

28.     Have you, a family member, or anyone close to you ever been employed by any local, state, or federal law enforcement agency, or private security company?  Law enforcement agencies include, for example, the D.C. Metropolitan Police Department, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco Firearms, and Explosives, and the United States Capitol Police.

29.     Do you have any beliefs or opinions about law enforcement officers that would affect your ability to fairly and impartially evaluate the credibility of a law enforcement officer, like any other witness, simply because he or she is a law enforcement officer?

30.     Have you had any dealings with the United States Government in which you feel the government did not give you fair treatment?

31.    Do you have any beliefs or opinions about the United States Attorney's Office, the U.S. Department of Justice, criminal defense attorneys, the Federal Bureau of Investigation, any other law enforcement agency, or the government generally that would make it difficult for you to remain fair and impartial to both the government and the Defendant throughout the trial in this case?

32.    You may hear testimony from witnesses who are elected officials or government staff. Would you tend to believe or not believe the testimony of a witness simply because he or she is an elected official or government staff?  In other words, would you tend to give more or lesser weight to the testimony of an elected official or government staff than to the testimony of other witnesses?

Ability to Serve and Deliberate

33.    The prosecution has the burden of proof. This means that the jury cannot return a guilty verdict against a defendant unless the prosecution has proven beyond a reasonable doubt that the defendant is guilty of the crime charged. Would you have any difficulty accepting and applying this legal instruction?

34.    Every defendant in a criminal trial is presumed innocent and, therefore, has no obligation to testify or present any evidence in the case. Would you have any difficulty accepting and applying this legal instruction?

35.    To reach a verdict on a particular charge, every juror must agree on the verdict. That is, any verdict must be unanimous. In deliberations you must consider the opinions and points of your fellow jurors, but you must also follow your own conscience and be personally satisfied with any verdict. Would you have difficulty expressing your own opinions and thoughts about this case to your fellow jurors?

36.    I will instruct you on the law you must follow in rendering a verdict in this case.   Is there anything that would prevent you from following the law as I instruct?

37.    Is there anything about your political beliefs or affiliations that would prevent you from following the law as I instruct you or reaching a verdict based solely on the evidence you receive during the trial?

38.    Do you have any difficulty seeing or hearing that would make it difficult for you to follow or receive the evidence presented in the case?

39.    Are you taking any medications or do you have any physical condition that could make it difficult for you to sit as a juror and give your full attention to the trial and the evidence in this case?

40.    Do you feel so uncomfortable being in a room with other jurors and trial participants, due to the COVID-19 pandemic that it would be difficult for you to pay attention or otherwise to serve as a juror in this case?

41.    Are you currently caring for a relative or close friend who has been infected by, or exposed to a person infected with, COVID-19, such that it would be difficult for you to pay attention or otherwise to serve as a juror in this case?

42.    Do you have any difficulty speaking, understanding, reading, or writing the English language?

43.    Do you have any moral, religious, or ethical beliefs that prevent you from sitting in judgment of another person in a criminal trial?

44.    It is possible that this trial could continue into next week.   Would jury service on a matter of that length cause a severe and unavoidable hardship to you?

45.    No matter what you have heard or seen about events at the U.S. Capitol on January 6, 2021 from any source, and no matter what opinions you may have formed, will you have any difficulty putting that aside, following the law as I explain it to you, and deciding the case in a fair and impartial manner based solely on the evidence presented in court?

46.    Can you think of any other matter that might have some bearing on your ability to serve as a juror or your ability to render a fair and impartial verdict based solely on the evidence and my instructions on the law?

# Instruction 1.102 PRELIMINARY INSTRUCTION BEFORE TRIAL

Before we begin the trial, I want to explain some of the legal rules that will be important in this trial. I want to emphasize that these remarks are not meant to be a substitute for the detailed instructions that I will give at the end of the trial just before you start your deliberations. These preliminary instructions are intended to give you a sense of what will be going on in the courtroom and what your responsibilities as jurors will be.

# Instruction 1.105 NOTETAKING BY JURORS

## A. PRELIMINARY INSTRUCTION WHEN NOTETAKING IS PERMITTED

When you took your seats, you probably noticed that each of you had a notebook and pencil waiting for you. That is because I permit jurors to take notes during trial if they wish. Whether you take notes or not is entirely up to you. Many people find that taking notes helps them remember testimony and evidence; others find it distracts them from listening to the witnesses.

You will be permitted to take your notebooks back with you into the jury room during deliberations. You should remember, however, that your notes are only an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by another juror's notes.

Other than during your deliberations, the notebooks will remain locked in the courtroom during recesses and overnight. You will not be able to take the notebooks with you as you come and go and you will not be permitted to take them home with you overnight. At the end of the trial, when you come back to the courtroom to deliver your verdict, your notebooks will be collected, and the pages torn out and destroyed. No one, including myself, will ever look at any notes you have taken, so you may feel free to write whatever you wish.

## Instruction 1.107 PRELIMINARY INSTRUCTION TO JURY WHERE IDENTITY OF ALTERNATES IS NOT DISCLOSED

You have probably noticed that there are fourteen of you sitting in the jury box.  Only twelve of you will retire to deliberate in this matter.  Before any of you even entered the courtroom, we randomly selected the alternates' seats.  I will not disclose who the alternate jurors are until the end of my final instructions just before you begin your deliberations.  As any seat might turn out to be an alternate's seat, it is important that each of you think of yourselves as regular jurors during this trial, and that all of you give this case your fullest and most serious attention.

## Instruction 1.108 A JUROR'S RECOGNITION OF A WITNESS OR OTHER PARTY CONNECTED TO THE CASE

At the beginning of the jury-selection process, you were introduced to some witnesses in person. Others were identified to you only by name.  If, at any time during this trial, you suddenly realize that you recognize or might know any witness, lawyer, someone who is mentioned in the testimony or evidence, or anyone else connected with this case in any way, you should raise your hand immediately and ask to speak with me.

*       *       *

Now let me explain briefly some of the procedures we will follow and some of the rules of law that will be important in this case.  This is a criminal case that began when the grand jury returned an indictment.

As I previously told you, the indictment in this case charges the Defendant, Stephen K. Bannon, with two counts of contempt of Congress.  In 2021, the Select Committee to Investigate the January 6th Attack on the U.S. Capitol, a committee of the U.S. House of Representatives, was conducting an investigation into the January 6, 2021, attack on the U.S. Capitol.  According to the indictment, on September 23, 2021, the Select Committee issued a subpoena to the Defendant directing him to provide various records relating to its investigation by October 7, 2021, and to appear

2

and give testimony at a deposition on October 14, 2021. The October 7, 2021, deadline for producing documents was later moved to October 18, 2021. The indictment alleges that the Defendant wilfully defaulted by not providing testimony on October 14, 2021, and by not producing records as required by October 18, 2021. The indictment alleges that this failure to comply was deliberate and intentional.

You should understand clearly that the indictment that I just summarized is not evidence. The indictment is just a formal way of charging a person with a crime in order to bring him to trial. You must not think of the indictment as any evidence of the guilt of the defendant, or draw any conclusion about the guilt of the defendant just because he has been indicted.

At the end of the trial, you will have to decide whether or not the evidence presented has convinced you beyond a reasonable doubt that the defendant committed the offenses with which he has been charged. The defendant has been charged with two counts of contempt of Congress. To prove contempt of Congress, the government must prove beyond a reasonable doubt each of the elements of this offense. The elements of contempt of Congress are:

> *First*, that the Defendant was subpoenaed by the Select Committee to provide testimony or produce papers;
>
> *Second*, that the subpoena sought testimony or information pertinent to the investigation that the Select Committee was authorized to conduct;
>
> *Third*, that the Defendant failed to comply or refused to comply with the subpoena; and
>
> *Fourth*, that the Defendant's failure or refusal to comply was willful.

I will provide more details about each of these elements before you retire to deliberate.

DEFENSE'S OBJECTION: The defense objects that they elements as stated above do not require that the government prove that the subpoena was issued pursuant to valid authority. 2 U.S.C. § 192 reads, in pertinent part, "*Every person who having been summoned as a witness **by the authority** of either House of Congress to give testimony or to produce papers upon any matter under*

3

**-3318-**

*inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress…*" A congressional committee only has authority insofar as it follows its own rules. *See Yellin v. U.S.*, 374 U.S. 109, 124 (1963) ("It is not too exacting to require that the Committee be equally meticulous in obeying its own rules."); *Gojack v. U.S.*, 384 U.S. 702, 716 (1966) (holding that the legislative history of the contempt of Congress statute "makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense."). The defense therefore renews its request for the following instruction on the elements of the offense:

Mr. Bannon is charged with violating 2 U.S.C. § 192. That statute reads, in pertinent part, as follows:

> *Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of [Contempt of Congress] . . ..*

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged.

These elements are the following:

*First*, that the U.S. House of Representatives had the constitutional power to investigate the matter in issue or to make the particular inquiry:[1]

---

[1] *Watkins v. U.S.*, 354 U.S. 178, 187 (1957); *Sinclair v. U.S.*, 279 U.S. 263, 292 (1929); *McGrain v. Daugherty*, 273 U.S. 135, 173-174 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 196 (1880).

*Second*, that the Select Committee was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority granted by the U.S. House of Representatives;[2]

*Third*, that the information sought from Mr. Bannon by the Select Committee was pertinent to the authorized inquiry;[3]

*Fourth*, that the subpoena seeking documents and testimony was valid and issued pursuant to lawful authority of the Select Committee and the authority of the U.S. House of Representatives;[4] and

*Fifth*, that Mr. Bannon's actions in responding to the subpoena constituted a willful default. "Willful default" as used in these instructions means that Mr. Bannon knew or should reasonably have known that his conduct was unlawful, was conscious of wrongdoing, and that his actions were deliberate and intentional – and not the result of accident, mistake, or misunderstanding, or the assertion of a valid privilege.[5]

---

[2] *Gojack v. U.S.,* 384 U.S. 702, 708 (1966) (holding that specific, properly authorized subject of inquiry is essential element of offense when statute making is misdemeanor to refuse to answer questions when summoned before congressional committee); *U.S. v. Rumely*, 345 U.S. 41, 42-43 (1953); *U.S. v. Lamont*, 236 F.2d 312, 315 (2d Cir. 1956), *affirming* 18 F.R.D. 27, 33 (S.D.N.Y.1955); *U.S. v. Orman*, 207 F.2d 148, 153 (3d Cir. 1953); *U.S. v. Kamin*, 136 F.Supp. 791, 793 (D. Mass. 1956).

[3] *Barenblatt v. U.S.*, 360 U.S. 109, 123 (1959); *Sacher v. U.S.* 356 U.S. 576, 577 (1958).

[4] *Yellin v. United States*, 374 U.S. 109 (1963) (holding that failure of House Committee on Un-American Activities to comply with its rule on executive sessions excused a witness' refusal to answer questions, and witness was entitled to prove such defense when he discovered at his contempt trial that his rights under the executive session rule had been violated); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum).

[5] *Quinn v. U.S.*, 349 U.S. 155, 165 (1955); *U.S. v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) (holding that the statutory provisions concerning penalties for contempt of Congress, 2 U.S.C. § 192 and § 194, constitute "an orderly and often approved means of vindicating constitutional claims arising from a legislative investigation.") (citing *Sanders v.*

Every defendant in a criminal case is presumed to be innocent.  This presumption of innocence remains with the defendant throughout the trial unless and until he is proven guilty beyond a reasonable doubt.  The burden is on the government to prove the defendant guilty beyond a reasonable doubt, and that burden of proof never shifts throughout the trial.  The law does not require a defendant to prove his innocence or to produce any evidence.  If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which the defendant is charged, it is your duty to find him guilty of that offense.  On the other hand, if you find that the government has failed to prove any element of a particular offense beyond a reasonable doubt, you must find the defendant not guilty of that offense.

As I explain how the trial will proceed, I will refer to the "government" and to the "defense" or the "defendant."  When I mention the "government," I am referring to Assistant United States

---

*McClellan*, 463 F.2d 894, 899 (D.D.C. 1972); Under these provisions, constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.D.C. 1971); *Tobin v. United States*, 113 U.S. 306 F.2d 270, 276 (D.D.C. 1962); *see also United States v. Seeger*, 303 F.2d 478, 481–82 (2d Cir. 1962); *Licavoli v. U.S.*, 294 F.2d 207, 208 (D.D.C. 1961); *see also Ratzlaf v. United States*, 510 U.S. 135, 138 (1994); *United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir. 2019); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020); United States v. Myers, 2008 U.S. Dist. LEXIS 43981, *4, 2008 WL 2275457 (N.D. W. Va., June 3, 2008) (quoting Licavoli on "willfulness" and explaining that "willfulness" in the criminal contempt context means "a volitional act done by one who knows or reasonably should be aware that his conduct is wrongful."); "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena.  *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938).  There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute.  Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement."  *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).*See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring).

Attorneys, Ms. Vaughn and Ms. Gaston. When I mention the defendant or the defense, I am referring either to the defendant Mr. Bannon or to his attorneys, Mr. Schoen, Mr. Corcoran, or Ms. White.

As the first step in this trial, the government and the defendant will have an opportunity to make opening statements. The defendant may make an opening statement immediately after the government's opening statement or he may wait until the beginning of the defendant's case, or he may choose not to make an opening statement at all. You should understand that the opening statements are not evidence. They are only intended to help you understand the evidence that the lawyers expect will be introduced.

After the opening statement or statements, the government will put on what is called its case-in-chief. This means that the government will call witnesses to the witness stand and ask them questions. This is called direct examination. When the government is finished, the defense may ask questions. This is called cross-examination. When the defense is finished, the government may have brief re-direct examination. After the government presents its evidence, the defendant may present evidence, but he is not required to do so. The law does not require a defendant to prove his innocence or to produce any evidence. If the defense does put on evidence, the defense will call witnesses to the stand and ask questions on direct examination, the government will cross-examine, and the defense may have brief re-direct examination. When the defense is finished, the government may offer a rebuttal case, which would operate along the same lines as its case-in-chief.

At the end of all the evidence, I will instruct you once more on the rules of law that you are to apply in your deliberations when you retire to consider your verdict in this case. Then each side will have a chance to present closing arguments in support of its case. The statements of the lawyers in their closing arguments, just as in their questions and in their opening statements, are not evidence in this case. They are intended only to help you understand the evidence and what each side claims

the evidence shows.  Finally, at the end of the closing arguments, I will have a few additional instructions for you before you begin your deliberations.

I want to briefly describe my responsibilities as the judge and your responsibilities as the jury. My responsibility is to conduct this trial in an orderly, fair, and efficient manner, to rule on legal questions that come up in the course of the trial, and to instruct you about the law that applies to this case. It is your sworn duty as jurors to accept and apply the law as I state it to you.

Your responsibility as jurors is to determine the facts in the case.  You—and only you—are the judges of the facts.  You alone determine the weight, the effect, and the value of the evidence, as well as the credibility or believability of the witnesses.  You must consider and weigh the testimony of all witnesses who appear before you.  You alone must decide the extent to which you believe any witness.

You must pay very careful attention to the testimony of all of the witnesses because you will not have any transcripts or summaries of the testimony available to you during your deliberations. You will have to rely entirely on your memory and your notes if you choose to take any.

During this trial, I may rule on motions and objections by the lawyers, make comments to lawyers, question the witnesses, and instruct you on the law.  You should not take any of my statements or actions as any indication of my opinion about how you should decide the facts.  If you think that somehow I have expressed or even hinted at any opinion as to the facts in this case, you should disregard it.  The verdict in this case is your sole and exclusive responsibility.

You may consider only the evidence properly admitted in this case.  That evidence includes the sworn testimony of witnesses and the exhibits admitted into evidence.  Sometimes a lawyer's question suggests the existence of a fact, but the lawyer's question alone is not evidence.  If the evidence includes anything other than testimony and exhibits, I will instruct you about these other types of evidence when they are admitted during the trial.

During the trial, if the court or a lawyer makes a statement or asks a question that refers to evidence that you remember differently, you should rely on your memory of the evidence during your deliberations.

The lawyers may object when the other side asks a question, makes an argument, or offers evidence that the objecting lawyer believes is not properly admissible. You must not hold such objections against the lawyer who makes them or the party he or she represents. It is the lawyer's responsibility to object to evidence that they believe is not admissible.

If I sustain an objection to a question asked by a lawyer, the question must be withdrawn, and you must not guess or speculate what the answer to the question would have been. If a question is asked and answered, and I then rule that the answer should be stricken from the record, you must disregard both the question and the answer in your deliberations. You should follow this same rule if any of the exhibits are stricken.

You are not permitted to discuss this case with anyone until this case is submitted to you for your decision at the end of my final instructions. This means that, until the case is submitted to you, you may not talk about it even with your fellow jurors. This is because we don't want you making decisions until you've heard all the evidence and the instructions of law. In addition, you may not talk about the case with anyone else. It should go without saying that you also may not write about the case electronically through any blog, posting, or other communication, including "social networking" sites such as Facebook or Twitter until you have delivered your verdict and the case is over. This is because you must decide the case based on what happens here in the courtroom, not on what someone may or may not tell you outside the courtroom. I'm sure that, when we take our first recess, you will call home or work and tell them you have been selected for a jury. They will undoubtedly ask what kind of case you're sitting on. You may tell them it is a criminal case, but

nothing else.  Now, when the case is over, you may discuss any part of it with anyone you wish, but until then, you may not do so.

Although it is a natural human tendency to talk with people with whom you may come into contact, you must not talk to any of the parties, their attorneys, or any witnesses in this case during the time you serve on this jury.  If you encounter anyone connected with the case outside the courtroom, you should avoid having any conversation with them, overhearing their conversation, or having any contact with them at all.  For example, if you find yourself in a courthouse corridor, elevator, or any other location where the case is being discussed by attorneys, parties, witnesses, or anyone else, you should immediately leave the area to avoid hearing such discussions.  If you do overhear a discussion about the case, you should report that to me as soon as you can.  Finally, if you see any of the attorneys or witnesses involved in the case and they turn and walk away from you, they are not being rude; they are merely following the same instruction that I gave to them.

It is very unlikely, but if someone tries to talk to you about the case, you should refuse to do so and immediately let me know by telling the clerk or the marshal.  Don't tell the other jurors; just let me know, and I'll bring you in to discuss it.

Between now and when you are discharged from jury duty, you must not provide to or receive from anyone, including friends, co-workers, and family members, any information about your jury service.  You may tell those who need to know where you are, that you have been picked for a jury, and how long the case may take.  However, you must not give anyone any information about the case itself or the people involved in the case.  You must also warn people not to try to say anything to you or write to you about your jury service or the case.  This includes face-to-face, phone, or computer communications.

In this age of electronic communication, I want to stress that you must not use electronic devices or computers to talk about this case, including tweeting, texting, blogging, e-mailing, posting

information on a website or chat room, or any other means at all. Do not send or accept messages, including email and text messages, about your jury service. You must not disclose your thoughts about your jury service or ask for advice on how to decide any case.

You must decide the facts based on the evidence presented in court and according to the legal principles about which I will instruct you. You are not permitted, during the course of the trial, to conduct any independent investigation or research about the case. That means, for example, you cannot use the Internet to do research about the facts or the law or the people involved in the case. Research includes something even as simple or seemingly harmless as using the Internet to look up a legal term or view a satellite photo of the scene of the alleged crime.

I want to explain the reasons why you should not conduct your own investigation. All parties have a right to have the case decided only on evidence and legal rules that they know about and that they have a chance to respond to. Relying on information you get outside this courtroom is unfair because the parties would not have a chance to refute, correct, or explain it. Unfortunately, information that we get over the Internet or from other sources may be incomplete or misleading or just plain wrong. It is up to you to decide whether to credit any evidence presented in court and only the evidence presented in court may be considered. If evidence or legal information has not been presented in court, you cannot rely on it.

Moreover, if any of you do your own research about the facts or the law, this may result in different jurors basing their decisions on different information. Each juror must make his or her decision based on the same evidence and under the same rules.

In some cases, there may be reports in the newspaper or on the radio, Internet, or television concerning the case while the trial is ongoing. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity

about this trial inadvertently comes to your attention during trial, do not discuss it with other jurors or anyone else.  Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

Additionally, I want to instruct each of you to, if applicable, turn off push notifications on your phone.  If you have an iPhone, that can be accomplished by going to "Settings," then "Notifications."  You will then see a list of downloaded applications that may provide you with notifications.  For the pendency of this trial, I ask that you turn each of those relating to social media or—and this is very important—news service to "Off."  If you have your phones on you, please do that right now.  If not, please do it the second you next have possession of your phone.

After I submit the case to you, you may discuss it only when I instruct you to do so, and only in the jury room and only in the presence of all your fellow jurors.  It is important that you keep an open mind and not decide any issue in the case until after I submit the entire case to you with my final instructions.

## Instruction 2.100 FURNISHING THE JURY WITH A COPY OF THE INSTRUCTIONS

I will provide you with a copy of my instructions.  During your deliberations, you may, if you want, refer to these instructions.  While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole and you may not follow some and ignore others.  If you have any questions about the instructions, you should feel free to send me a note.  Please return your instructions to me when your verdict is rendered.

## Instruction 2.101 FUNCTION OF THE COURT

My function is to conduct this trial in an orderly, fair, and efficient manner; to rule on questions of law; and to instruct you on the law that applies in this case.

It is your duty to accept the law as I instruct you.  You should consider all the instructions as a whole.  You may not ignore or refuse to follow any of them.

## Instruction 2.102 FUNCTION OF THE JURY

Your function, as the jury, is to determine what the facts are in this case. You are the sole judges of the facts. While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the credibility or believability of the witnesses.

As human beings, we all have personal likes and dislikes, opinions, prejudices, and biases. Generally, we are aware of these things, but you also should consider the possibility that you have implicit biases, that is, biases of which you may not be consciously aware. Personal prejudices, preferences, or biases have no place in a courtroom, where our goal is to arrive at a just and impartial verdict. All people deserve fair treatment in our system of justice regardless of any personal characteristic, such as race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, or income level. You should determine the facts solely from a fair consideration of the evidence. You should decide the case without prejudice, fear, sympathy, favoritism or consideration of public opinion.

You may not take anything I may have said or done as indicating how I think you should decide this case. If you believe that I have expressed or indicated any such opinion, you should ignore it. The verdict in this case is your sole and exclusive responsibility.

## Instruction 2.103 JURY'S RECOLLECTION CONTROLS

If any reference by me or the attorneys to the evidence is different from your own memory of

the evidence, it is your memory that should control during your deliberations.

## Instruction 2.104 EVIDENCE IN THE CASE—JUDICIAL NOTICE, STIPULATIONS, DEPOSITIONS

### *If Applicable*

During your deliberations, you may consider only the evidence properly admitted in this trial. The evidence in this case consists of the sworn testimony of the witnesses, [the exhibits that were admitted into evidence] [the facts of which I took judicial notice] [the facts and testimony stipulated to by the parties] [depositions].

I may take what is called "judicial notice" of public acts, places, facts, and events that I consider to be matters of common knowledge or matters that can be determined easily through undisputed sources. In this case, I took judicial notice of [describe fact of which the court took judicial notice]. When I take judicial notice of a particular fact, you may [if you choose to do so,] regard that fact as proven evidence. [Because you are the sole judges of the facts, however, you are not required to accept any fact that is judicially noted.]

[During the trial, you were told that the parties had stipulated—that is, agreed—to certain facts. You should consider any stipulation of fact to be undisputed evidence.]

[During the trial, you were told that the parties had stipulated—that is, agreed—to what testimony [name of witness] would have given if s/he had testified in this case. You should consider this stipulated testimony to be exactly what s/he would have said had s/he testified here.]

[A deposition is the sworn testimony given by a witness before trial. The witness is placed under oath to tell the truth, and lawyers for each party may ask questions. The questions and answers are recorded by a court reporter. You may consider deposition testimony in the same way you would consider testimony actually given in court.]

When you consider the evidence, you are permitted to draw, from the facts that you find have been proven, such reasonable inferences as you feel are justified in the light of your experience. You should give any evidence such weight as in your judgment it is fairly entitled to receive.

## Instruction 2.105 STATEMENTS OF COUNSEL

The statements and arguments of the lawyers are not evidence.  They are only intended to assist you in understanding the evidence.  Similarly, the questions of the lawyers are not evidence.

**Instruction 2.106 INDICTMENT OR INFORMATION NOT EVIDENCE**

The indictment is merely the formal way of accusing a person of a crime.  You must not consider the indictment as evidence of any kind—you may not consider it as any evidence of the Defendant's guilt or draw any inference of guilt from it.

## Instruction 2.107 BURDEN OF PROOF – PRESUMPTION OF INNOCENCE

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven he is guilty beyond a reasonable doubt. This burden never shifts throughout the trial. The law does not require the Defendant to prove his innocence or to produce any evidence at all. If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which the Defendant is charged, it is your duty to find him guilty of that offense. On the other hand, if you find the government has failed to prove any element of a particular offense beyond a reasonable doubt, it is your duty to find the Defendant not guilty of that offense.

## Instruction 2.108 REASONABLE DOUBT

The government has the burden of proving the Defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not, or, in some cases, that its truth is highly probable. In criminal cases such as this one, the government's proof must be more powerful than that. It must be beyond a reasonable doubt. Reasonable doubt, as the name implies, is a doubt based on reason—a doubt for which you have a reason based upon the evidence or lack of evidence in the case. If, after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defendant's guilt, then you have a reasonable doubt.

Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based on reason. The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

## Instruction 2.109 DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence from which you may determine what the facts are in this case—direct evidence and circumstantial evidence.  When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence.  On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example.  Assume a person looked out a window and saw that snow was falling.  If he later testified in court about what he had seen, his testimony would be direct evidence that snow was falling at the time he saw it happen.  Assume, however, that he looked out a window and saw no snow on the ground, and then went to sleep and saw snow on the ground after he woke up.  His testimony about what he had seen would be circumstantial evidence that it had snowed while he was asleep.

The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact.  The law does not favor one form of evidence over another.  It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial.  You are permitted to give equal weight to both.  Circumstantial evidence does not require a greater degree of certainty than direct evidence.  In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

## Instruction 2.110 NATURE OF CHARGES NOT TO BE CONSIDERED

One of the questions you were asked when we were selecting this jury was whether the nature of the charges itself would affect your ability to reach a fair and impartial verdict. We asked you that question because you must not allow the nature of a charge to affect your verdict. You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

## Instruction 2.112 INADMISSIBLE AND STRICKEN EVIDENCE

### *If Applicable*

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made them or the party he or she represents. It is the lawyers' responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question, and you must not speculate as to what the answer would have been. If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations. [Likewise, exhibits as to which I have sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations.]

## Instruction 2.200 CREDIBILITY OF WITNESSES

In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified.

You are the sole judges of the credibility of the witnesses. You alone determine whether to believe any witness and the extent to which a witness should be believed. Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified.

You may consider anything that in your judgment affects the credibility of any witness. For example, you may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as a truthful person; whether the witness impresses you as having an accurate memory; whether the witness has any reason for not telling the truth; whether the witness had a meaningful opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case.

In evaluating the accuracy of a witness's memory, you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later recollections of the event, and the circumstances under which the witness was asked to recall details of the event.

[You may consider whether there are any [consistencies or] inconsistencies in a witness's testimony or between the witness's testimony and any previous statements made by the witness. You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit. You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood, or differences in perception.]

You may consider the reasonableness or unreasonableness, the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial, or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

## Instruction 2.207 POLICE OFFICER'S TESTIMONY

*If Applicable*

A police officer's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because he or she is a police officer.

## Instruction 2.208 RIGHT OF DEFENDANT NOT TO TESTIFY

### *If Applicable*

Every defendant in a criminal case has an absolute right not to testify.  The Defendant has chosen to exercise this right.  You must not hold this decision against him, and it would be improper for you to speculate as to the reason or reasons for his decision.  You must not assume the defendant is guilty because he chose not to testify.

## Instruction 2.209 DEFENDANT AS WITNESS

### *If Applicable*

A defendant has a right to become a witness in his/her own behalf.  His testimony should not be disbelieved merely because he is the defendant.  In evaluating his testimony, however, you may consider the fact that the defendant has an interest in the outcome of this trial.  As with the testimony of any other witness, you should give the defendant's testimony as much weight as in your judgment it deserves.

## Instruction 2.216 EVALUATION OF PRIOR INCONSISTENT STATEMENT OF A WITNESS

### *If Applicable*

[*When more than one of the following Parts is being given, the court should give the following paragraph first*:

The law treats prior inconsistent statements differently depending on the [nature of the statements and the] circumstances in which they were made. I will now explain how you should evaluate those statements.]

**PART A (for use when prior statements not made under oath are introduced):**

You have heard evidence that [name of witness] made a statement on an earlier occasion and that this statement may be inconsistent with his/her testimony here at trial. It is for you to decide whether the witness made such a statement and whether in fact it was inconsistent with the witness's testimony here. If you find such an inconsistency, you may consider the earlier statement in judging the credibility of the witness, but you may not consider it as evidence that what was said in the earlier statement was true.

**PART B (for use when prior statements made under oath are introduced):**

You [also] have heard evidence that [name of witness] made an earlier statement under oath, subject to the penalty of perjury at [a prior proceeding] [the grand jury] [a deposition] and that this statement may be inconsistent with [his] [her] testimony here at trial. If you find that the earlier statement is inconsistent with the witness's testimony here in court, you may consider this inconsistency in judging the credibility of the witness. You also may consider this earlier statement as evidence that what was said in the earlier statement was true.

**PART C (for use when prior identification statements are used to impeach a witness):**

You [also] have heard evidence that [name of witness] [made an identification] [provided a description] on an earlier occasion, and that his/her testimony here at trial may be inconsistent with

30

that [identification] [description].  It is for you to decide whether s/he [made such an identification] [provided such a description] and whether his/her testimony here was, in fact, inconsistent with it.  If you find such an inconsistency, you may consider this inconsistency in judging the credibility of [name of witness].  You also may consider the earlier [identification] [description] as evidence that what was said in the prior [identification] [description] was true.

## Instruction 2.217 EVALUATION OF PRIOR CONSISTENT STATEMENT OF A WITNESS

### *If Applicable*

You have heard evidence that [name of witness] [name of defendant] made a statement on an earlier occasion and that this statement may be consistent with his/her testimony here at trial.  This earlier statement was brought to your attention [both] to help you in evaluating the credibility of the witness [and as evidence in this case].  If you find that the earlier statement is consistent with the witness's present testimony in court, you may consider this consistency [both] in judging the credibility of the witness here at trial [but you may not use it] [and] as proof that what was said in the earlier statement was true.

It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact consistent with the witness's in-court testimony here.

32

### Instruction 2.307 MOTIVE

Motive is not an element of the offenses charged, and the government is not required to prove motive in this case.  You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charges beyond a reasonable doubt.

### Instruction 2.402 MULTIPLE COUNTS—ONE DEFENDANT

Each count of the indictment charges a separate offense.  You should consider each offense, and the evidence which applies to it, separately, and you should return separate verdicts as to each count.  The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not influence your verdict with respect to any other count of the indictment.

## Instruction 2.405 UNANIMITY—GENERAL

A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict.  In other words, your verdict, on each count, must be unanimous.

## Instruction 2.407 VERDICT FORM EXPLANATION

You will be provided with a Verdict Form for use when you have concluded your deliberations. The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be. Nothing in the form replaces the instructions of law I have already given you, and nothing in it replaces or modifies the instructions about the elements which the government must prove beyond a reasonable doubt. The form is meant only to assist you in recording your verdict.

## Instruction 2.500 REDACTED EXHIBITS

*If Applicable*

During the course of this trial, a number of exhibits were admitted in evidence.  Sometimes only portions of an exhibit were admitted, such as portions of a longer video, a document with some words or pictures blacked out or otherwise removed, or a video played without audio.  There are a variety of reasons why only a portion of an exhibit is admitted, including that the other portions are inadmissible or implicate an individual's privacy.  As you examine the exhibits, and you see or hear portions where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what has been taken out or why, and you should not hold it against either party.  You are to decide the facts only from the evidence that is before you.

**Instruction 2.501 EXHIBITS DURING DELIBERATIONS**

I will be sending into the jury room with you the exhibits that have been admitted into evidence.  You may examine any or all of them as you consider your verdicts.  Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

## Instruction 2.502 SELECTION OF FOREPERSON

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court. There are no specific rules regarding how you should select a foreperson. That is up to you. However, as you go about the task, be mindful of your mission—to reach a fair and just verdict based on the evidence. Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

## Instruction 2.508 CAUTIONARY INSTRUCTION ON PUBLICITY, COMMUNICATION, AND RESEARCH

I would like to remind you that, in some cases, there may be reports in the newspaper or on the radio, internet, or television concerning this case. If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it. You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom. If any publicity about this trial inadvertently comes to your attention, do not discuss it with other jurors or anyone else. Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

As you retire to the jury room to deliberate, I also wish to remind you of an instruction I gave you at the beginning of the trial. During deliberations, you may not communicate with anyone not on the jury about this case. This includes any electronic communication such as email or text or any blogging about the case. In addition, you may not conduct any independent investigation during deliberations. This means you may not conduct any research in person or electronically via the internet or in another way.

## Instruction 1.105 NOTETAKING BY JURORS

### B. FINAL INSTRUCTION WHEN NOTETAKING IS PERMITTED

During the trial, I have permitted those jurors who wanted to do so to take notes. You may take your notebooks with you to the jury room and use them during your deliberations if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who have not taken notes should rely on their own memory of the evidence. The notes are intended to be for the notetaker's own personal use.

### Instruction 2.509 COMMUNICATIONS BETWEEN COURT AND JURY DURING JURY'S DELIBERATIONS

If it becomes necessary during your deliberations to communicate with me, you may send a note by the clerk or marshal, signed by your foreperson or by one or more members of the jury.  No member of the jury should try to communicate with me except by such a signed note, and I will never communicate with any member of the jury on any matter concerning the merits of this case, except in writing or orally here in open court.

Bear in mind also that you are never, under any circumstances, to reveal to any person—not the clerk, the marshal or me—how jurors are voting until after you have reached a unanimous verdict. This means that you should never tell me, in writing or in open court, how the jury is divided on any matter—for example, 6-6 or 7-5 or 11-1, or in any other fashion—whether the vote is for conviction or acquittal or on any other issue in the case.

## Instruction 2.511 EXCUSING ALTERNATE JURORS

The last thing I must do before you begin your deliberations is to excuse the alternate jurors. As I told you before, the selection of alternates was an entirely random process; it's nothing personal. We selected two seats to be the alternate seats before any of you entered the courtroom. Since the rest of you have remained healthy and attentive, I can now excuse those jurors in seats [insert seat numbers].

Before you two leave, I am going to ask you to tear out a page from your notebook, and to write down your name and daytime phone number and hand this to the clerk. I do this because it is possible, though unlikely, that we will need to summon you back to rejoin the jury in case something happens to a regular juror. Since that possibility exists, I am also going to instruct you not to discuss the case with anyone until we call you. My earlier instruction on use of the Internet still applies; do not research this case or communicate about it on the Internet. In all likelihood, we will be calling you to tell you there has been a verdict and you are now free to discuss the case; there is, however, the small chance that we will need to bring you back on to the jury. Thank you very much for your service, and please report back to the jury office to turn in your badge on your way out.

## Instruction 3.101 PROOF OF STATE OF MIND

Someone's state of mind ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer someone's state of mind from the surrounding circumstances.  You may consider any statement made or acts done or omitted by the Defendant, and all other facts and circumstances received in evidence which indicate his state of mind.

It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.  You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the Defendant acted with the necessary state of mind.

## CONTEMPT OF CONGRESS: ELEMENTS OF THE OFFENSE

Counts One and Two of the Indictment charge the Defendant with contempt of Congress for willfully not providing testimony and information to the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol. Count One charges the Defendant with a willful failure to provide testimony. Count Two charges the Defendant with a willful failure to produce records.

As I have already mentioned, the burden of proof in the case lies on the government alone. It must prove each element beyond a reasonable doubt. Thus, to find the Defendant guilty of contempt of Congress, you must find that the government has proved each of the following elements beyond a reasonable doubt:

*First*, that the Defendant was subpoenaed by the Select Committee to provide testimony or produce papers;

*Second*, that the subpoena sought testimony or information pertinent to the investigation that the Select Committee was authorized to conduct;

*Third*, that the Defendant failed to comply or refused to comply with the subpoena; and

*Fourth*, that the Defendant's failure or refusal to comply was willful.

Some clarifications about these elements are necessary.For the second element, the testimony or information sought by the subpoena must be "pertinent." In order for you to find that the information was pertinent, the government must prove to you, beyond a reasonable doubt, that at the time the Select Committee issued the subpoena, the testimony or information sought could have related to the Select Committee's investigation in some way. Phrased differently, the government must prove to you, beyond a reasonable doubt, that there was, at the time the subpoena was issued, some connective reasoning between the topic under inquiry and the information sought. It does not matter whether the information the Defendant allegedly had *would* have been pertinent to the

authorized investigation.  All that matters is that it *could* have been pertinent at the time that the Select Committee sought the information.

For the fourth element, the government must prove to you, beyond a reasonable doubt, that the Defendant acted "willfully."  The word "willful," in this context, does not mean that the Defendant's failure or refusal to comply with the Select Committee's subpoena was for an evil or bad purpose.  The reason or purpose of the failure or refusal to comply is immaterial, so long as the failure or refusal was deliberate and intentional.  To be deliberate or intentional means that the failure to comply was not the result of inadvertence, accident, or mistake.

It is no defense to contempt of Congress that the Defendant failed to comply based on the advice he received from his attorney or someone else.  It is also not a defense to contempt of Congress that the Defendant failed to comply based on his understanding or belief of what the law required or allowed, or on his understanding that he had a privilege excusing him from comply.  All that is required is that the Defendant's failure or refusal to comply was deliberate and intentional.

**DEFENSE'S OBJECTION:** For the reasons stated on pages 3-5 *supra*, the defense renews its request for the following instruction on the elements of the offense:

Mr. Bannon is charged with violating 2 U.S.C. § 192. That statute reads, in pertinent part, as follows:

> *Every person who having been summoned as a witness by the authority of either*
>
> *House of Congress to give testimony or to produce papers upon any matter under*
>
> *inquiry before either House, or any joint committee established by a joint or*
>
> *concurrent resolution of the two Houses of Congress, or any committee of either*
>
> *House of Congress, willfully makes default, or who, having appeared, refuses to*
>
> *answer any question pertinent to the question under inquiry, shall be deemed guilty*
>
> *of [Contempt of Congress] . . ..*

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged.

These elements are the following:

*First*, that the U.S. House of Representatives had the constitutional power to investigate the matter in issue or to make the particular inquiry:[6]

*Second*, that the Select Committee was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority granted by the U.S. House of Representatives;[7]

*Third*, that the information sought from Mr. Bannon by the Select Committee was pertinent to the authorized inquiry;[8]

*Fourth*, that the subpoena seeking documents and testimony was valid and issued pursuant to lawful authority of the Select Committee and the authority of the U.S. House of Representatives;[9] and

---

[6] *Watkins v. U.S.*, 354 U.S. 178, 187 (1957); *Sinclair v. U.S.*, 279 U.S. 263, 292 (1929); *McGrain v. Daugherty*, 273 U.S. 135, 173-174 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 196 (1880).

[7] *Gojack v. U.S.,* 384 U.S. 702, 708 (1966) (holding that specific, properly authorized subject of inquiry is essential element of offense under statute making is misdemeanor to refuse to answer questions when summoned before congressional committee); *U.S. v. Rumely*, 345 U.S. 41, 42-43 (1953); *U.S. v. Lamont*, 236 F.2d 312, 315 (2d Cir. 1956), *affirming* 18 F.R.D. 27, 33 (S.D.N.Y.1955); *U.S. v. Orman*, 207 F.2d 148, 153 (3d Cir. 1953); *U.S. v. Kamin*, 136 F.Supp. 791, 793 (D. Mass. 1956).

[8] *Barenblatt v. U.S*., 360 U.S. 109, 123 (1959); *Sacher v. U.S.* 356 U.S. 576, 577 (1958).

[9] *Gojack v. U.S.*, 384 U.S. 702, 716 (1966) ("[t]he legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense"); *see also Yellin v. United States*, 374 U.S. 109 (1963) (holding that failure of House Committee on Un-American Activities to comply with its rule on executive sessions excused a witness' refusal to answer questions, and witness was entitled to prove such defense when he discovered at his contempt trial that his rights under the executive session rule had been violated); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum).

*Fifth*, that Mr. Bannon's actions in responding to the subpoena constituted a willful default. "Willful default" as used in these instructions means that Mr. Bannon knew or should reasonably have known that his conduct was unlawful, was conscious of wrongdoing, and that his actions were deliberate and intentional – and not the result of accident, mistake, or misunderstanding, or the assertion of a valid privilege.[10]

For the reasons stated above, the defense further renews its request for the following instruction regarding the authority of the U.S. House of Representatives and the constitutionally mandated accommodation requirement:

## DEFENSE PROPOSED INSTRUCTION: AUTHORITY OF U.S. HOUSE OF REPRESENTATIVES

The statute under which Mr. Bannon is charged, 2 U.S.C. § 192, provides as follows:

---

[10] *Quinn v. U.S.*, 349 U.S. 155, 165 (1955); *U.S. v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) (holding that the statutory provisions concerning penalties for contempt of Congress, 2 U.S.C. § 192 and § 194, constitute "an orderly and often approved means of vindicating constitutional claims arising from a legislative investigation.") (citing *Sanders v. McClellan*, 463 F.2d 894, 899 (D.D.C. 1972); Under these provisions, constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.D.C. 1971); *Tobin v. United States*, 113 U.S. 306 F.2d 270, 276 (D.D.C. 1962); *see also United States v. Seeger*, 303 F.2d 478, 481–82 (2d Cir. 1962); *Licavoli v. U.S.*, 294 F.2d 207, 208 (D.D.C. 1961); *see also Ratzlaf v. United States*, 510 U.S. 135, 138 (1994); *United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir. 2019); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020); United States v. Myers, 2008 U.S. Dist. LEXIS 43981, *4, 2008 WL 2275457 (N.D. W. Va., June 3, 2008) (quoting Licavoli on "willfulness" and explaining that "willfulness" in the criminal contempt context means "a volitional act done by one who knows or reasonably should be aware that his conduct is wrongful."); "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).*See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring).

> *Every person who having been summoned as a witness by the authority of either*
> *House of Congress to give testimony or to produce papers upon any matter under*
> *inquiry before either House, or any joint committee established by a joint or*
> *concurrent resolution of the two Houses of Congress, or any committee of either*
> *House of Congress, willfully makes default, or who, having appeared, refuses to*
> *answer any question pertinent to the question under inquiry, shall be deemed guilty*
> *of [Contempt of Congress] . . . .*

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged. One of the elements that the government must prove beyond a reasonable doubt is that the subpoena Mr. Bannon received was a valid subpoena, lawfully authorized by the U.S. House of Representatives.

Mr. Bannon asserts that the subpoena was issued without valid, lawful authority because the Rules of the House of Representatives were not followed, and because the Select Committee did not adhere to the House resolution establishing it and empowering it to act. It is up to you to determine whether the subpoena was lawfully authorized. In making that determination, you may consider the Rules established by the U.S. House of Representatives, the House resolution establishing it and empowering it to act, and any evidence that bears upon whether the Rules and authorizing resolution have been followed.[11]

---

[11] *Christoffel v. United States*, 338 U.S. 84, 88-90 (1949) (holding that the validity of a congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932); *United States v. Ballin*, 144 U.S. 1 (1892); *Yellin v. United States*, 374 U.S. 109 (1963); *Shelton v. United States*, 327 F.2d 601, 606 (D.C. Cir. 1963) (adherence to rules may be considered when determining the validity of a subpoena); *Watkins v. United States*, 354 U.S. 178 (1957); *Gojack v. United States*, 384 U.S. 702 (1966).

## DEFENSE PROPOSED INSTRUCTION: DEFAULT – ACCOMODATION REQUIREMENT

When a congressional committee issues a subpoena to a prospective witness and executive privilege is invoked, the committee has an obligation to work toward an accommodation with the witness before referring the matter for criminal prosecution.[12] If you conclude that executive privilege was invoked by former President Trump with respect to the subpoena Mr. Bannon received from the Committee, you may also consider whether the Select Committee fulfilled its obligation to try to reach an accommodation. [13]

The government has the burden of proving beyond a reasonable doubt each element of the offenses charged. One of the elements that the government must prove beyond a reasonable doubt is that by his actions in response to the subpoena, Mr. Bannon willfully made default. It is up to you to determine whether he willfully made default. In making that determination, you may consider whether the Select Committee tried to reach an accommodation with Mr. Bannon before a criminal referral of the matter was made to the U.S. Attorney's Office, as well as any other evidence admitted during this trial.

---

[12] *Congressional Oversight of the White House*, 45 Op. O.L.C. at 37-43 [Doc. 58-7 at pdf 38 of 60 to 44 of 60]; *United States v. American Tel & Tel Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977).

[13] *Congressional Oversight of the White House*, 45 Op. O.L.C. at 37-43 [Doc. 58-7 at 56, pdf 57of 60] ("A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course.").

## CONSIDER ONLY CRIME CHARGED

You are here to determine whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged.  The defendant is not on trial for any act, conduct, or crime that is not charged in the indictment.

DEFENSE'S CONTINUING OBJECTION TO EXCLUSION OF RELEVANT DEFENSES: This Court granted the Government's Motions in Limine to exclude Mr, Bannon from presenting defenses regarding advice of counsel (*see* ECF No. 49), entrapment by estoppel, public authority and apparent authority (*see* July 11, 2022, Minute Order). In order to preserve these issues for appeal, the defense objects to the exclusion on instructions on these defenses, and renews its request for the following instructions:

## DEFENSE PROPOSED INSTRUCTION: ADVICE OF COUNSEL

Stephen K. Bannon asserts that he is not guilty of the willful wrongdoing as charged in both counts of the indictment because he acted on the basis of advice from his attorney.

If before taking any action with respect to the subpoena at issue, Mr. Bannon, while acting in good faith and for the purpose of securing advice on the lawfulness of his future conduct, sought and obtained the advice of an attorney whom he considered to be competent, and made a full and accurate report or disclosure to this attorney of all important and material facts of which he had knowledge or had the means of knowing, and then acted strictly in accordance with the advice his attorney gave following this full report or disclosure, then Mr. Bannon would not have willfully done wrong in performing or failing to perform some act the law forbids or requires as those terms are used in these instructions.

Whether Mr. Bannon acted in good faith for the purpose of truly seeking guidance as to questions about which he was in doubt, whether he made a full and complete report or disclosure

to his attorney, and whether he acted strictly in accordance with the advice received, are all questions for you to determine.[14]

A defendant relies in good faith on the advice of counsel if:

- Before taking action, he in good faith seeks the advice of an attorney whom he considers competent to advise him on the matter; and

- He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct;

- He makes a full and accurate report to his attorney of all material facts that he knew; and

- He then acts strictly in accordance with the advice of this attorney.

The defendant does not have to prove his good faith. Rather, the government must prove beyond a reasonable doubt that the defendant acted willfully as charged in both counts of the indictment.[15]

### DEFENSE PROPOSED INSTRUCTION: ENTRAPMENT BY ESTOPPEL

Mr. Bannon has raised the affirmative defense of entrapment by estoppel. The defense of entrapment by estoppel is based on the legal principle, under the due process clause of the United States Constitution, that a person cannot be convicted of a crime for action he took based on his reasonable reliance on a statement by an authorized government official or on official written statements by an authorized government agency that led him to believe his conduct would be lawful.[16]

---

[14] 1A Fed. Jury Prac. & Instr. § 19:08 (6th ed.) (West January 2022)

[15] *United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017) (cited in source in Note 1).

[16] *Raley v. Ohio*, 360 U.S. 423, 438 (1959); *Cox v. Louisiana*, 379 U.S. 559, 571-72 (1965).

"The defense of entrapment by estoppel does not depend solely on the absence of criminal intent.  Nor is it limited to the circumstances of actual authorization.  It focuses on the *conduct of the government* leading the defendant to believe reasonably that he was authorized (to take the action he took)."[17]  "The doctrine (of entrapment by estoppel) depends on the unfairness of prosecuting one who has been led by (official government agency statements) to believe his acts were authorized."[18]

Mr. Bannon asserts that he responded to the Committee's subpoena as he did by relying on official statements by the United States Department of Justice, in the form of Office of Legal Counsel, or OLC Opinions, and other official Department of Justice writings regarding the duties, rights, and obligations that apply when executive privilege has been invoked with respect to the subpoena.

I instruct you that upon receipt of the subpoena and the invocation of executive privilege by the former President of the United States, Mr. Bannon was entitled to look to the Department of Justice's OLC opinions and other Department of Justice authoritative writings for guidance as to what his rights, obligations, and duties were with respect to the subpoena, to reasonably rely on the guidance provided in the OLC opinions and other Department of Justice authoritative writings, and to act in a manner he reasonably believed the OLC opinions and other authoritative writings authorized.[19]

To find Mr. Bannon not guilty based on his defense of entrapment by estoppel, you must find that:

---

[17] *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995).

[18] *Id*., citing *United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir. 1991); *United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991).

[19] *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675 (1973).

(1) Mr. Bannon reasonably believed that executive privilege was invoked regarding the Committee's subpoena to him;

(2) The OLC opinions and other authoritative Department of Justice writings give rise to a reasonable belief that Mr. Bannon was authorized to respond to the subpoena in the manner in which he did;

(3) Mr. Bannon relied on the OLC opinions and other authoritative Department of Justice writings; and

(4) Mr. Bannon's reliance was reasonable.[20]

I instruct you that the defense of entrapment by estoppel applies even if the official government statements the defendant reasonably relied on were misstatements of the law.[21]

If you find that he has satisfied these elements by a preponderance of the evidence, then prosecuting him would be unfair, it would violate the constitutional right to due process of law and you must find him

---

[20] *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992), citing *United States v. Smith*, 940 F.2d 710 (1st Cir. 1990).  *See also, United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J.) (defense simply requires reasonable reliance on a conclusion of statement of law issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field).  Judge Merhige also relies on Section 2.04(3)(b) of the Model Penal Code which provides as follows:

> A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when … (b) he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision; (iii) an administrative order or grant of permission; of (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."

*Barker*, 546 F.2d at 955.

*See also United States v. Jenkins*, 701 F.2d 850, 857-859 (10th Cir. 183); *United States v. North*, 910 F.2d 843, 886-887 (D.C. Cir. 1990) (where defendant is entitled to "believed authority" defense, unreasonable belief is okay since standard is subjective.  Even no belief at all regarding lawfulness of conduct results in acquittal; no need to show clear, direct instruction to act in a given time in a given way); *See also United States v. Cheek*, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

[21] *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994); *United States v. North*, 910 F.2d 843, 881, n.10, modified on other grounds, 920 F.2d 940 (D.C. Cir. 1990).

not guilty.[22]

A defendant must prove this affirmative defense by a preponderance of the evidence. A preponderance of the evidence means that you must be persuaded that the things the defendant seeks to prove are more probably true than not true. This is a lesser burden of proof than the government's burden to prove beyond a reasonable doubt each element of the crimes charged.[23]

If you find that the opinions of the Office of Legal Counsel of the United States Department of Justice or other official Department of Justice writings that Mr. Bannon relied on were such that they served to assure him that his conduct with respect to the subpoena in this case was legal, and if you find that the defendant reasonably relied on any opinion of the Office of Legal Counsel of the United States Department of Justice in taking the course of action he took, you must find him not guilty.[24]

In considering whether Mr. Bannon reasonably relied on the Office of Legal Counsel opinions and other official Department of Justice writings in believing that his response to the subpoena he received was authorized and lawful, you are entitled to consider the testimony of his

---

[22] *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992); *United States v. Smith*, 940 F.2d 710 (1st Cir. 1990), both cited with approval in *United States v. Abcasis*, 45 F.3d 39, 43 (2d Cir. 1995).

[23] *United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004); *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994).

[24] *See United States v. Smith*, 940 F2d 710 (1st. Cir. 1991) (entrapment by estoppel applies regardless of the intent nature of the crime charged or the defendant's mental state regarding intent; it rests, instead, on principles of fairness); *United States v. Hedges*, 912 F2d 1397 (11th Cir. 1990); *United Sates v. Clegg*, 846 F2d 1221 (9th Cir. 1988); *United States v. Tallmadge*, 829 F2d 767 (9th Cir. 1987). Adapted from requested jury instruction in *United States v. Abcasis,* 45 F.3d 39 (2d Cir. 1995) (convictions reversed for failure to give defense requested jury instruction on entrapment by estoppel).

lawyer and the advice his lawyer gave him on this subject on the question of whether such reliance was reasonable.[25]

## DEFENSE PROPOSED INSTRUCTION: PUBLIC AUTHORITY

Mr. Bannon asserts that he acted in reliance on public authority. Specifically, he contends that he took action with respect to the subpoena in this case in reliance on the former President of the United States's invocation of Executive Privilege and on official writings of the United States Department of Justice on the impact of the invocation of executive privilege on the rights, duties, and obligations of the recipient of a subpoena concerning which executive privilege has been invoked.

A defendant who commits an offense in reliance on public authority does not act willfully and should be found not guilty.[26]

To be found not guilty based on reliance on public authority, the defendant must prove that each of the following things are more likely true than not true:

- That former President Trump requested, directed, or authorized Mr. Bannon to engage in the conduct charged against him [or that former President of the United States, Donald Trump, through his authorized agent, Justin Clark, advised Mr. Bannon that he was invoking executive privilege as to the subpoena the Select Committee served on Mr.

---

[25] *United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987).

[26] "Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States v. Murdock*, 290 U.S. 389, 397-98 (1933); *Townsend v. United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See Model Penal Code § 2.04(3)(b); United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Merhige, J., concurring). *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* at 135 [Doc. 58-10] (May 30, 1984).

Bannon and instructed Mr. Bannon that based on his invocation of executive privilege, to the fullest extent permitted by law, Mr. Bannon was to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena;; and (c) not provide any testimony concerning privileged material in response to the Subpoena];

- That former President Trump had the actual authority to grant authorization for the defendant to engage in this conduct; On this point, I instruct you that a former President of the United States has the authority to invoke executive privilege concerning his communications with others and that once he invokes executive privilege, it is presumptively valid;[27] and

- In engaging in this conduct, the defendant reasonably relied on the former President's authorization, along with authorization from legal opinions from the Department of Justice's Office of Legal Counsel and other official Justice Department writings authorization. In deciding this, you should consider all of the relevant circumstances, including what the former President instructed, what the Department of Justice OLC opinions and other authoritative writings said, and how closely the defendant followed any instructions the official gave.[28]

---

[27] *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974; *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); Olson OLC Opinion of May 30, 1984 [Doc. 58-10] at 136: "In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that 'the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions.'"  "Thus the President's assertion of privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties."

[28] Adapted from Fed. Crim. Jury Instr. 7th Cir. 6.06 (2020 ed.).

## DEFENSE PROPOSED INSTRUCTION: APPARENT AUTHORITY

Mr. Bannon has asserted the defense of apparent authority, among other defenses to the charges against him. The defense of apparent authority requires a reasonable belief, whether that belief is correct or mistaken, that the source for the information relied upon had the authority to license the conduct at issue and did so.[29]

I instruct you that if you find that Mr. Bannon reasonably believed that he was authorized to respond to the subpoena as he did, based on former President Donald J. Trump's invocation of executive privilege and his belief that the former President had the authority to license him to respond as he did, you must find him not guilty, even if his belief in the former President's authority was mistaken.

Similarly, I instruct you that if you find that Mr. Bannon reasonably believed that he was authorized to respond to the subpoena as he did, based on the Office of Legal Counsel's opinions of other Department of Justice authoritative writings and his belief that these OLC opinions and other writings had the authority to license him to respond as he did, even if his belief in the authority of these sources was mistaken, then you must find him not guilty.

---

[29] *United States v. Barker*, 546 F.2d 940, 947-948, 954-957 (D.C. Cir. 1976); Model Penal Code § 2.04(3)(b).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**REPLY IN SUPPORT OF MOTION TO EXCLUDE CONGRESSIONAL EVIDENCE OR
DISMISS THE INDICTMENT BASED ON GRANTING THE MOTION TO QUASH
IN *IN RE:  NON-PARTY SUBPOENAS***

On July 15, 2022, Defendant Stephen K. Bannon, by and through his undersigned counsel,

filed a Motion to Exclude Congressional Evidence or Dismiss the Indictment Based on Granting

the Motion to Quash in *In re: Non-Party Subpoenas*, Misc. Case No. 22 Misc-00060 (CJN). [Doc.

116].  On July 16, 2022, the Government filed its Opposition to the Motion.  [Doc. 117].  Mr.

Bannon replies to the Government's Opposition.

The Government's Opposition reads as if the filing of Mr. Bannon's motion were a

surprise.  Of course, it was not.  Mr. Bannon previewed the motion in his Opposition to Motion to

Quash, advising that it would be filed in the event the Motion to Quash were granted.  [Doc. 7 at

3, 13, 14 in Misc. Case No. 22-00060 (CJN).  That motion and the arguments made therein, were,

of course, made in the Miscellaneous case and not in this case.  At oral arguments on July 11,

2022, the Court made clear that it understood that the defense may raise the same arguments it

raised in its Opposition to Movants' Motion to Quash in the Miscellaneous Case in a motion to

dismiss or exclude evidence in the criminal case.  [July 11, 2022, Hearing Tr. at 36, 144].  When

the Court addressed the prospective filing on July 11, 2022, the Court advised that since the Motion to Quash was granted, Mr. Bannon could file the instant motion, with the caveat that Mr. Bannon would have to show that testimony he sought through the subpoenas was "relevant to an issue at trial …." [July 11, 2022, Hearing Tr. at 144].

The Government's primary claim concerning the motion appears to be that Mr. Bannon "… fails to articulate any testimony he seeks from these individuals that is relevant in his trial, much less that would be exculpatory or non-cumulative." [Doc. 117 at 1] Similarly, it complains that Mr. Bannon "… never explains specifically, what information he seeks from the subpoenaed House witnesses that he needs for trial." [Doc. 117 at 2-3]. These assertions by the Government are incorrect.

The Government's assertion is incorrect because the very first item in Mr. Bannon's listing of examples of reasons for which he sought the testimony of the subpoenaed witnesses is his explanation that he sought the testimony of Chairman Thompson's testimony, "concerning all correspondence with Mr. Costello concerning Mr. Bannon, along with all Bannon-related decision-making by the Committee…." [Doc. 116 at 16, n.9].

Chairman Thompson's correspondence with Mr. Costello concerning Mr. Bannon is the direct subject of a defense in the case that the Court expressly has permitted to go forward – that the dates for compliance with the subpoena were malleable and not fixed, and that consistent with the Committee's purported goal of obtaining documents and testimony responsive to the subpoena, Chairman Thompson extended the dates for compliance, as reflected in the letters with Mr. Costello, such that there was no default. [See, e.g., July 14 Hearing Tr. at 13; *passim*]. Chairman Thompson's testimony with respect to the substance and intent of these letters would therefore be

exculpatory and highly relevant.  Only Chairman Thompson is competent to testify on these subjects, and the testimony would not be cumulative.

The Committee staff member witnesses the Government is tendering at trial are not competent to testify to the intent behind Chairman Thompson's letters to Mr. Costello.  Contrary to the Government's assertion, this **is** an example of Mr. Bannon articulating what a subpoenaed witness's testimony would be, and such testimony relates to a defense that this Court has ruled Mr. Bannon is allowed to raise. No witness can stand in as a substitute for Chairman Thompson in this case.

Similarly, testimony from Chairman Thompson and other Committee members who participated in the decision-making process with respect to Mr. Bannon's subpoena and the decision to hold him in contempt is relevant to the questions of why the constitutionally mandated accommodation process was not followed, why the Committee opted not to pursue a civil enforcement proceeding to allow the Court to determine the validity of President Trump's assertion of executive privilege despite Mr. Bannon's assurances that he would comply with the subpoena to the extent that the information sought was not covered by executive privilege.  - All  of these issues are directly relevant to the case, and are addressed in Chairman Thompson's correspondence with Mr. Costello.  [Doc. 116 at 16, n.9]

As for the other examples of testimony Mr. Bannon has sought in the subpoenas that were quashed and the bases for which such testimony was sought [See e.g., Doc. 116 at 16, n.9], Mr. Bannon is aware that this Court has ruled that Mr. Bannon is foreclosed from making certain legal arguments at trial, and that based on these rulings, some of the testimony the  defense sought to elicit from these witnesses is now deemed to be irrelevant.  Mr. Bannon expressly acknowledged this at the outset of his motion [Doc. 116 at 3]. But Mr. Bannon is entitled to preserve his objection

3

and arguments and to assert them in the context of this motion in this case, as opposed to the Miscellaneous Case. It is not true that Mr. Bannon failed to acknowledge the Court's evidentiary rulings and it is inaccurate for the Government to suggest otherwise. [Doc. 117 at 4, 5].

Next, the Government advises the Court that it should reject Mr. Bannon's claims that it should exclude relevant evidence at trial because it has, by granting the Motion to Quash, excluded irrelevant evidence. [Doc. 117 at 2]. Mr. Bannon has never made any such argument.

Finally, the Government argues that Mr. Bannon seeks in his motion to violate the Court's ruling concerning the absence of the House witnesses at trial and that the relief Mr. Bannon seeks on this issue is directly contrary to the relief sought in the Government's Omnibus Motion in Limine and granted by the Court. The Government even suggests that some prophylactic sanction should be considered in light of this purported "blatant disregard" for the Court's rulings on this subject.[1] [Doc. 117 at 4, n.1]. The Government has misrepresented the relief it sought in its Motion in Limine, the Court's ruling on the same, and the relief Mr. Bannon seeks in the instant Motion. These misrepresentations heighten the offensiveness of its suggestion of sanctions.

In its Omnibus Motion in Limine, seeking once and for all to prevent any opportunity for Mr. Bannon to actually put the operative facts in this case before the jury, one of the subjects addressed was the matter of the witnesses under subpoena in the event the Motion to Quash was granted. The Government requested that Mr. Bannon be prohibited at trial from arguing to the jury that granting the Motion to Quash should be the basis for acquittal or for drawing an adverse

---

[1] Not only it is completely untrue that Mr. Bannon made his arguments in "blatant disregard" of the Court's rulings; but before seeking the alternative relief at issue that he actually seeks, Mr. Bannon first expressly set out the Court's ruling, writing, "Finally, the Court "conditionally" granted the Government's motion, over the Defendant's objection, to prohibit argument by Mr. Bannon that granting the Motion To Quash provides a basis for acquittal an adverse inference [July 11, 2022, Hearing Tr. 137-138]." [See Doc. 116 at 22].

4

inference against the Government [Doc. 85 at 8]. The gist of the Government's request is that Mr. Bannon should not be permitted to argue that the failure of a witness whose subpoena was quashed to appear at trial is attributable to the Government, since the prosecution is a different branch of Government, and it is not responsible for the privilege or its invocation. [Doc. 85 at 8].

Mr. Bannon does not seek any relief contrary to the Government's motion or the Court's Order "conditionally" granting it. [Doc. 116 at 22]. Rather, Mr. Bannon seeks permission simply to argue that a subpoenaed witness, for example, Chairman Thompson on the relevant issues described above, was free to testify voluntarily, notwithstanding his right to claim privilege, as found by the Court, just as the staffers came forward to testify voluntarily. This is not a suggestion that Chairman Thompson was not entitled to his privilege claim or to move to quash the subpoenas based on it. It is not an argument that the Government is responsible for his decision to move to quash. But the fact is, Chairman Thompson and the other subpoenaed Members of Congress were free to testify voluntarily, and there is no reason Mr. Bannon should be precluded from presenting this information to the jury. The argument is especially appropriate with respect to Chairman Thompson, given the indisputable relevance of his testimony, the lack of a competent substitute for him on the subjects at issue, and his public statements about Mr. Bannon and the purported importance of his testimony and documents. In any event, what Mr. Bannon seeks is not contrary to the relief the Government sought in its Omnibus Motion in Limine and it certainly is not in "blatant disregard" of any previous ruling by this Court.

Mr. Bannon relies on his motion and all previous submissions in further reply to the Government's Opposition and he respectfully asks the Court to exclude all Congressional evidence or dismiss the indictment and to grant the additional relief sought for the reasons provided.

Dated: July 17, 2022                    Respectfully submitted,

                                          **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                               /s/ M. Evan Corcoran
                                          M. Evan Corcoran (D.C. Bar No. 440027)

                                          Riane A. White (*Pro Hac Vice*)
                                          400 East Pratt Street – Suite 900
                                          Baltimore, MD 21202
                                          Telephone: (410) 385-2225
                                          Facsimile: (410) 547-2432
                                        Email: ecorcoran@silvermanthompson.com

                                             /s/ David I. Schoen
                                          David I. Schoen (D.C. Bar No. 391408)
                                          David I. Schoen, Attorney at Law
                                          2800 Zelda Road, Suite 100-6
                                          Montgomery, Alabama 36106
                                          Telephone: (334) 395-6611
                                          Facsimile: (917) 591-7586
                                          Email: schoenlawfirm@gmail.com

                                          *Counsel for Defendant Stephen K. Bannon*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of July 2022, a copy of the foregoing Reply in Support of Motion to Dismiss Based on Granting the Motion to Quash in *In Re:  Non-Party Subpoenas* was served *via* the Court's CM/ECF system on registered parties and counsel.

   /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

<u>**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO EXHIBITS**</u>

Pursuant to the Court's direction at the hearing on Thursday, July 14, 2022, the Government is providing its response to the Defendant's objections to the Government's exhibits.

**I.    Government's Exhibits 2, 5, 7, and 9 (Committee's Letters to Defendant).**

The Defendant objects to the Committee's letters to him as hearsay.  Hearsay is an out-of-court assertion of fact offered in court to prove the truth of the matter asserted.  Fed. R. Evid. 801(a) & (c).[1]  The Government is not offering the letters to the Defendant to prove the truth of any matters asserted therein.  They are being offered solely to prove what the Defendant understood about whether the Committee had rejected his objection to complying with the subpoena and whether the Committee was requiring compliance with the subpoena despite his objection.  If the Government wanted—or needed—to independently prove the Committee's position, divorced from the Defendant's understanding of it, the Government would not need to introduce the letters at all.  The Government is calling a Committee staff member who could testify to those matters from her personal knowledge.  Statements offered merely to show what the Defendant was told or knew is not offered for a hearsay purpose.  *See, e.g.*, *United States v. Hall*,

---

[1] At the July 14, 2022, hearing, the Defendant's counsel suggested that any out-of-court statement is admissible as long as the declarant is testifying.  This is incorrect.  There is not general hearsay exception for testifying declarants.

945 F.3d 507, 514 (D.C. Cir. 2019) (finding statements by defendant's attorney that conduct was

legal offered to show defendant's belief it was legal were not offered for the truth but merely to

prove the defendant's belief); *United States v. Wright*, 783 F.2d 1091, 1098 (D.C. Cir.) (finding

the statements in a phone call the defendant received were not offered for their truth when they

were offered to show why the defendant had gone to a certain location); *United States v. Dupree*,

706 F.3d 131, 136 (2d Cir. 2013) ("'If the significance of an offered statement lies solely in the

fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is

not hearsay.' Thus, a statement offered to show its effect on the listener is not hearsay." (quoting

Fed. R. Evid. 801(c), Advisory Committee Note)) (citing *George v. Celotex Corp.*, 914 F.2d 26,

30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter

asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.")); *United

States v. Chavis*, 772 F.2d 100, 105 (5th Cir. 1985) (finding consumer complaints offered to show

fraud defendants were on notice of them were not offered for a hearsay purpose).

Moreover, many of the statements offered in the letters are not assertions at all, such as the

Committee's direction that the Defendant follow the procedures laid out in the subpoena if he

wished to raise a privilege.  *See, e.g.*, *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990)

(finding that nonassertive statements are not hearsay and that the statement has to be intended as

an assertion); *United States v. Safavian*, 435 F. Supp. 2d 36, 44-45 (D.D.C. (finding emails that

included requests for assistance, questions, or instructions were not hearsay); *United States v.

Moore*, Case No. 18-cr-198 (JEB), 2021 WL 1966570, at *5 (May 17, 2021) (finding a "question,

command, greeting, or other 'nonassertive' communication" in text messages were not hearsay).

These nonassertive statements are thus not subject to the hearsay rules.

## II.    Government's Exhibits 10, 11A, and 11B (Defendant's Statements on Social Media)

The Defendant objects to Exhibits 10, 11A, and 11B as hearsay.  Exhibits 10 and 11A are the Defendant's statements on his social media account.  They are therefore admissible statements of a party opponent.  Fed. R. Evid. 801(d)(2)(A).  Exhibit 11B is an article that the Defendant linked to in his social media post in 11A that includes statements attributed to the Defendant that he was standing with former President Trump and would not comply with the subpoena.  It is therefore also a statement of a party opponent because, by linking to it, the Defendant manifested an adoption of the article's assertion that he had made the statements attributed to him therein. Fed. R. Evid. 801(d)(2)(B).  Under the adoptive admission hearsay exception, the Defendant must have "manifested an adoption or belief in [the statement's] truth," *id.*, which means that he "understood and unambiguously assented" to the statement, *United States v. Beckham*, 968 F.2d 47, 316 (D.C. Cir. 1992).  The Defendant's understanding and assent can be manifested by his conduct, including his silence.  *Id.*; *United States v. Rivera*, Case No. 21-cr-60 (CKK), 2022 WL 2239800, at *2 (D.D.C. June 17, 2022).  Here, the Defendant affirmatively posted the article purported to include quotes from him on his own social media account.  The headline of the article, posted directly on his social media account, included a purported quote from him, and the statement the Defendant included above the post repeated the assertion the article said he had made.  The circumstances demonstrate that the Defendant manifested a belief that the statements attributed to him in the article, therefore, were his own.

## III.    Government's Exhibits 12A, 12B, 12C, and 12D (Defendant's Telephone Records)

The Defendant claims that his telephone records covering the time period in which he was served with the subpoena and willfully defaulted are irrelevant and unduly prejudicial.  The records are relevant because the Government must show the Defendant's failure to comply with the

Committee's subpoena was not an accident or mistake and the records reflect connected, several-minute long phone calls between the Defendant and his attorney at times when the Committee had already informed the Defendant's attorney that it had rejected the Defendant's basis for not complying. The phone records thus provide circumstantial evidence that the Defendant's attorney communicated the Committee's directions to the Defendant and they corroborate the Defendant's attorney's admissions on his behalf to the Government that the Defendant was engaged throughout the process of responding to the Committee. While they are relevant, there is no basis to find that the records have the tendency to suggest a verdict on an improper basis such that they should be excluded under Fed. R. Evid. 403. *See United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) ("Rule 403 does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the danger of unfair prejudice, and gives the court discretion to exclude evidence only if that danger substantially outweigh[s] the evidence's probative value.").

IV.    **Government's Exhibit 13 (Defendant's Attorney's Statement That His Failure to Comply was Not a Mistake).**

The Defendant claims his attorney's assertion of fact that his default was not a mistake is irrelevant and unduly prejudicial. The Defendant also objects on the basis of the rule of completeness, Fed. R. Evid. 106. As an initial matter, the Government intends to enter the following excerpts of the March 16, 2022, hearing transcript: 58:24-59:3; 59:7-14; and 60:10-13. First, the statements are clearly relevant. The Government must prove that the Defendant's default was not due to mistake or accident. The Defendant's attorney stated, in his presence, on his behalf, and on the record, that it was not due to mistake. This statement of fact thus goes directly to an element of the offense. It also does not invite a verdict on any ground other than a finding that the elements of the offense are met. For example, it does not reveal inflammatory or other-bad-acts

evidence about the Defendant; it is a statement limited to the central issue the jury will be deciding in this case.  Accordingly, it is not excludable under Fed. R. Evid. 403.

Second, the rule of completeness is not an exclusionary rule.  Instead, under the rule of completeness, Fed. R. Evid. 106, if a party enters one part of a recorded statement, the court can admit other parts requested by the adverse party that are necessary for the first excerpt not to be misleading.  *See* Advisory Committee Note, Fed. R. Evid. 106 (The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial.").  It does not allow admission of the entire recorded statement, but only those necessary to fix a misleading impression.  *See United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986) (noting the rule's "limited scope" and that it "will be invoked rarely and for a limited purpose.").  The Defendant's attorney's admission on his behalf that his default was not a mistake is not misleading without other parts of the transcript in which the statement is included.  To admit additional parts of the transcript, the Defendant has to identify the specific excerpts that correct some misleading impression left by the statements the Government wishes to enter.  *Id.*

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Amanda R. Vaughn*
     J.P. Cooney (D.C. 494026)
     Molly Gaston (VA 78506)
     Amanda R. Vaughn (MD)
     Assistant United States Attorneys
     United States Attorney's Office
     601 D Street, N.W.
     Washington, D.C. 20530
     (202) 252-1793 (Vaughn)
     amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |

---

**MOTION TO EXCLUDE HEARSAY EVIDENCE**

On July 14, 2022, the Court directed the parties, "in five pages or less" to provide the Court with "their views about whether these letters back and forth (between Chairman Thompson and Mr. Costello)… whether and to what extent they're admissible and for what purposes." [July 14, 2022 Hearing Tr. at 49-50]. Defendant Stephen K. Bannon, through his undersigned counsel now provides the submission the Court directed.

Mr. Bannon understands there to be three letters from Chairman Thompson to Mr. Costello at issue. These are Government Exhibits 5, 7, and 9.

Pursuant to Fed. R. Evid. 801 and 802, Mr. Bannon respectfully requests that this Court exclude Government Exhibits 5,7, and 9 from trial in this matter and in support states as follows:

Mr. Bannon is charged with two counts of contempt of Congress under 2 U.S.C. § 192 arising from a January 6 Select Committee subpoena. The Government seeks to offer as evidence at trial three letters from Rep. Bennie Thompson, Chairman of the Select Committee to Robert J. Costello, Esquire, former counsel to Mr. Bannon, regarding the Select Committee subpoena.

On June 4, 2022, the defense issued trial subpoenas to every Member of the Select Committee, including Chairman Thompson, to testify at trial and produce documents relating to

-3386-

his interactions with Mr. Bannon, and the Select Committee's decision to refer Mr. Bannon to the full House or a contempt vote. The Members moved to quash the subpoenas on Speech or Debate Clause grounds [Doc.1, 22-MC-60], and this Court granted the Motion by minute order on July 12, 2022. These Members of Congress have the ability to waive their legislative immunity and appear for testimony on a voluntary basis but have not indicated that they intend to do so. Mr. Bannon is thus in the unprecedented position of being barred from cross-examining the complainant who initiated the charges against him.

At the July 14, 2022, pretrial conference the Court informed the Parties it would be ruling on evidentiary objections to exhibits as they arose during trial. Defense counsel requested that the Parties be precluded from presenting the disputed exhibits to the jury during opening statements to prevent the jury from seeing materials later deemed inadmissible at trial. The Government advised that it planned to refer to the letters from Chairman Thompson to Mr. Costello in its opening statement. [July 14, 2022 Hearing Tr. at 38-40].

These letters are classic inadmissible hearsay and must be excluded, with the body of them having no relevance whatsoever other than for the truth of the matters asserted therein and no non-hearsay or hearsay exception basis for admission.

A hearsay statement is one that the declarant does not make while testifying, that is offered into evidence as proof of the truth of matter asserted in the statement. Fed. Rule. Evid. 801(c)(2). Hearsay is not admissible unless an exception applies. Fed. R. Evid. 802. Hearsay within hearsay is only admissible if an exception applies for each part of the combined statement. Fed. R. Evid. 805. Mr. Bannon believes that it might be most helpful to deal with the specifics of the letters, as the Court began to do in analyzing the issue on July 14, 2022 [July 14, 2022 Hearing Tr. at 43].

## **The Body of the Letters at Issue are Pure Inadmissible Hearsay**

Government's Exhibit 5 is a letter from Chairman Thompson to Mr. Costello dated October 8, 2021. This letter is filled with Chairman Thompson's characterizations of Mr. Bannon's position vis a vis the subpoena. He refers to Mr. Bannon's position on executive privilege as "inappropriate" and without any "legal basis." [10/8/21 letter at 1]. Chairman Thompson declares that all of the information sought appropriately relates directly to "serve a legitimate legislative purpose" and is "within the scope" of the delegated authority, and he refers the Committee's determination of the "critical importance" of what is being sought from Mr. Bannon. [*Id*.]. The only conceivable value of these assertions would be the truth of the matters asserted – they have no independent value nor purpose – and that is exactly why they must be excluded as pure hearsay under Rule 802.

The letter goes on to discuss Chairman Thompson's view of the validity of the executive privilege invocation, his view of the breadth of its application and its purported inapplicability. Chairman Thompson then asserts that the Committee had not actually received any invocation of executive privilege from "Mr. Trump" and he discussed his view of the validity and impact of what he would consider an intention to invoke privilege. *[Id.*at 1-2].

These are all disputed facts, offered in the letter only for the truth of the matters asserted. Moreover, the overriding prejudice and confusion of the jury that would result from their admission is exacerbated by the prohibition the Court has issued on Mr. Bannon in any way putting forward, discussing, or arguing anything related to executive privilege and its invocation in this case.

It surely would be constitutionally unfair to allow the Government to put this letter before the jury under these circumstances and especially without Chairman Thompson present to

testify.  The balance of the letter is devoted to more of the same, including Chairman

Thompson's view on Mr. Bannon's obligations and the applicable law.  None of this is

admissible; it is all pure hearsay without any recognized exception.

Government's Exhibit 7 is a letter from Chairman Thompson to Mr. Costello dated

October 15, 2021. Chairman Thompson's October 15, 2021 letter is similar in content to the

October 8, 2021 letter and is inadmissible hearsay for the same reasons.  Moreover, like the

October 8th and 19th letters any consideration under Rule 403 would require its exclusion as

well, especially in light of the prohibitions against Mr. Bannon discussing the substantive issues

reflected in the letters.

Government's Exhibit 9 is a letter from Chairman Thompson to Mr. Costello dated

October 19, 2021. The October 19th letter suffers from the same inadmissibility issues and more.

The letter references a statement from President Biden's White House Counsel declining to

assert executive privilege as to "certain subjects within the Select Committee's purview." *See*

Gov. Ex. 9. The Government is offering this letter as evidence that Mr. Bannon knew he had an

obligation to appear before the Select Committee, and that he was not protected by executive

privilege. The statement is therefore being offered for the truth of its matter and is hearsay within

hearsay because it references the out of court statement of a non-testifying declarant. *See* Fed. R.

Evid. 805.

Should this Court rule that the letters are admissible for a non-hearsay purpose, the

hearsay statements within the letters for which an exception does not exist should be redacted

and excluded from evidence.  The only portions of the letter that would constitute relevant

admissible non-hearsay would be those limited portions of the letters that are independently

relevant to some purpose other than for the truth of the matter asserted. For example, in the

October 15, 2022 letter (Govt. Exhibit 7), the last paragraph directs that if Mr. Bannon believes

there are additional issues concerning non-compliance with the subpoena that have not been

addressed, he should submit them to the Committee by 6:00 p.m. on October 18, 2021 for the

Committee's consideration.  [Govt. Exhibit 7 at 2]; The last paragraph of the October 19, 2021

letter arguably would fall in this same category.  [Govt. Exhibit 9 at 2]. These portions of these

letters could be admissible as non-hearsay as an "imperative."  *See e.g., United States v. DuPree*,

706 F.3d 131, 136-138 (2d Cir. 2013) (directing action, not offered for truth).  They also could

be admissible non-hearsay as a "verbal act."  *See e.g., Puma v. Sullivan*, 746 A.2d 871, 876

(D.C. 2000) (note offering to extend due date of promissory note).  They could also be

admissible non-hearsay as showing notice or knowledge. *Rogers v. Ingersoll-Rand Co.,* 144 F.3d

841, 845–846 (D.C. Cir. 1998) (Notice); *United States v. Baird*, 29 F.3d 647, 653 (D.C. Cir.

1994; (Knowledge or belief); *United States v. Wright*, 783 F.2d 1091, 1098-1099 (D.C. Cir.

1986) (Effect on listener or recipient).  The date of each letter also would be admissible.

Dated: July 18, 2022                             Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
Riane A. White (*Pro Hac Vice)*
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of July 2022, a copy of the Motion to Exclude

Hearsay Evidence was served *via* the Court's CM/ECF system on registered parties and counsel.


_____/s/ M. Evan Corcoran_____
M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

**MOTION TO EXCLUDE HEARSAY EVIDENCE**

   Upon consideration of the Defendant's Motion to Exclude Hearsay Evidence, it is this

day of July 2022,

   **ORDERED** that Defendant's Motion is **GRANTED**; and it is further

   **ORDERED** that Government's Exhibits 5,7, and 9 are inadmissible at trial; and it is

further

   ORDERED that the Government may not present to the jury the documents contained in

Government's Exhibits 5,7, and 9 during opening  or closing statements in this matter.

   **SO ORDERED.**

Dated:


           _____
           Hon. Carl J. Nichols
           *United States District Judge*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                                 CR Action
                                 No. 1:21-670

      vs.                         Washington, DC
                                 July 18, 2022
STEPHEN K. BANNON,

                                 9:26 a.m.
         Defendant.

     TRANSCRIPT OF JURY TRIAL - DAY 1 - MORNING SESSION
       **BEFORE THE HONORABLE CARL J. NICHOLS**
          UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the U.S.:**        **AMANDA ROSE VAUGHN**
                    **MOLLY GULLAND GASTON**
                    U.S. ATTORNEYS OFC. FOR D.C.
                    555 4th Street NW
                    Washington, DC  20001
                    202-252-1793

**For the Defendant:**    **DAVID I. SCHOEN**
                    DAVID I. SCHOEN, ATTORNEY AT LAW
                    2800 Zelda Road, Suite 100-6
                    Montgomery, AL  36106
                    334-395-6611

                    **MATTHEW EVAN CORCORAN**
                    SILVERMAN THOMPSON SLUTKIN WHITE
                    201 N. Charles Street, 25th Floor
                    Baltimore, MC  21201
                    410-385-2225

**Reported By:**        **LORRAINE T. HERMAN, RPR, CRC**
                    Official Court Reporter
                    U.S. District & Bankruptcy Courts
                    333 Constitution Avenue, NW
                    Room 4700-C
                    Washington, DC 20001
                    lorraine_herman@dcd.uscourts.gov

1               **P R O C E E D I N G S**

2         **DEPUTY CLERK:**  Good morning, Your Honor.  This is

3    criminal case year 2021-670, *United States of America versus*

4    *Stephen K. Bannon.*  Counsel, please come forward and

5    introduce yourselves for the record beginning with the

6    government.

7              **MS. VAUGHN:**  Good morning, Your Honor.

8              Amanda Vaughn and Molly Gaston for the United

9    States.  Also at counsel table is Special Agent Frank

10   D'Amico with the FBI.

11             **THE COURT:**  Good morning.

12             **MR. CORCORAN:**  Good morning, Your Honor.  Evan

13   Corcoran and David Schoen, for Mr. Bannon who is present,

14   and also at counsel table with us is Riane White.

15             **THE COURT:**  Good morning, Counsel.

16             I wanted to discuss just a few things before we

17   bring the venire in.

18             The first is just to discuss, briefly, and make

19   sure there's agreement on the number of qualified jurors

20   that we're attempting to get to.  In my view -- obviously,

21   we need 12 jurors.  In my view, there should be two

22   alternates; that's obviously 14.  We need at a minimum then

23   another six qualified jurors, because this is a misdemeanor

24   case and each side gets three peremptory challenges as a

25   result and another two qualified jurors because we're

1    seating two alternates. And by my count we need to qualify

2    22 jurors.

3            Ms. Vaughn, do you agree with that calculation?

4            **MS. VAUGHN:** Yes, Your Honor.

5            **THE COURT:** Mr. Corcoran?

6            **MR. CORCORAN:** Yes.

7            **THE COURT:** Okay. Thank you.

8            The second thing is that I very much expect that

9    while we, of course, have the names of the jurors, that we

10   will not and no one will mention the juror names on the

11   public record during voir dire today. We will use only

12   juror numbers. Okay?

13           Ms. Vaughn, understood?

14           **MS. VAUGHN:** Yes, Your Honor.

15           **THE COURT:** Mr. Corcoran?

16           **MR. CORCORAN:** Agreed, Your Honor.

17           **THE COURT:** Finally, my intent -- and I think we

18   could do it right now -- is to pick the two alternate seats

19   from the 14 by rolling this 14-sided die two times and those

20   will be the two -- I will roll it. Those will be the two

21   alternate seats.

22           So what I am going to do is I'm going to do that.

23   My intent, as well, is to have those two alternate seats be

24   known to the parties under seal only. We will not mention

25   on the public record what those alternate seats are. So I

1    am going to roll the die twice.  I am writing down the

2    seats.  Okay.

3            So now, if the parties -- if we could now put the

4    husher on.

5        (Bench conference.)

6            **THE COURT:**  Can everyone hear me?

7            **MS. VAUGHN:**  Yes, Your Honor.

8            **THE COURT:**  Mr. Corcoran, as well?  Okay.

9            **MR. CORCORAN:**  (Nodded.)

10           **THE COURT:**  The alternate seats are seats 9 and

11   12.  Okay.  Thank you.

12       (Bench conference concluded.)

13           **THE COURT:**  All right.  Those are just a couple

14   logistical things about selection.

15           I do want to just note for the record a couple of

16   modifications that I made to the materials that we will use

17   today, at least at the beginning of trial.

18           In particular, I had asked for any objections or

19   comments to my proposed statement of the case, voir dire

20   questions and pretrial jury instructions.  And here's what I

21   have done.  For the statement of the case, I agree with the

22   government's proposed edits of striking the sentence "The

23   October 7, 2021 deadline for producing documents was later

24   moved to October 18, 2021."

25           While the indictment does allege that the initial

5

1    deadline for producing documents was October 7, and while it

2    does charge the defendant for willfully defaulting on

3    October 18th, the precise allegation in the sentence that

4    I've now excluded is not found in the indictment.  I have

5    made that edit to the statement of the case and in other

6    places to be consistent.

7        The government also has asked me to modify

8    Proposed Instruction 2.108, defining a reasonable doubt.

9    Instead of using that instruction, they've asked that I use

10   an instruction from the comments of Redbook Instruction

11   2.108, which is commonly used in federal district court.  I

12   agree with this proposal and have updated the instruction

13   accordingly.

14       With regard to Mr. Bannon's proposed edits, I

15   agree with two of the proposed edits to the voir dire

16   questions, adding Ms. White to the list of counsel and

17   striking Mr. Bannon from the list of potential witnesses.  I

18   have not, however, modified the statement of the case to

19   include the statutory language of the statute.  I don't

20   believe that is necessary at this point.  And I don't

21   believe the last sentence is cumulative.

22       As for the defendant's objections to the jury

23   instructions, I note that these are obviously very well

24   preserved.  For the reasons I've previously articulated,

25   particularly during the motions hearing on July 11th, I will

6

1     not accept any of these proposed edits.  At this time,

2     though, I am really only dealing with the pretrial jury

3     instructions so that we have them if and when we are able to

4     seat the jury.

5          As to the charges that will go to the jury after

6     trial, those obviously remain a work in progress, both to

7     decide whether some of them are even necessary and then, of

8     course, whether modifications and the like are necessary.

9          And the last thing I will say is, I do have one

10    last motion from Mr. Bannon regarding the implications of my

11    decision on the Motion to Quash the Subpoena to Various

12    Members of Congress and the like in the related

13    Miscellaneous action.  I am not going to resolve that motion

14    right now.  I'm going to take it under advisement.

15         It seems to me that, at a minimum, Mr. Bannon is

16    arguing that there is -- I recognize that he's making a

17    number of arguments.  One of the arguments is that that

18    testimony could be relevant to the question around the

19    return date on the subpoenas, whether there was default and

20    perhaps even his mens rea and, for example, whether

21    Chairman Thompson's testimony could be relevant on those --

22    questions.

23         I want to think some more about that.  I also

24    think it will at least depend in part on how the evidence

25    comes in at trial.  So I am not denying that motion.  I'm

7

```
 1      certainly not granting it at this time.  I'm going to hold
 2      it at least for a while.
 3               So with that, I am happy to hear from the parties
 4      if there is anything they would like to discuss.  Otherwise,
 5      from my perspective at least, we are prepared to bring in
 6      the jury pool.
 7               MS. VAUGHN:  Nothing from the government,
 8      Your Honor.
 9               THE COURT:  Ms. Vaughn, thank you.
10               MR. CORCORAN:  Nothing on behalf of Mr. Bannon.
11               THE COURT:  Thank you.
12               Ms. Lesley, could you please bring in the venire?
13               DEPUTY CLERK:  Juror Number 1058, are you in the
14      courtroom?
15               (No response.)
16          (Prospective jurors enter the courtroom.)
17               THE COURT:  Good morning, everyone.
18               You should feel free to spread out.  In other
19      words, those of you who are on -- especially in the pews
20      here in the middle, you can use the entire row if you'd
21      like.  Great.
22               Good morning, ladies and gentlemen, and welcome.
23      My name is Carl Nichols.  I am the judge who will preside
24      over this matter.  You have been called to this ceremonial
25      courtroom for possible selection in a criminal case.
```

1          Before we proceed any further, I would like to

2    just address briefly some of the steps the Court has taken

3    to reduce the transmission of COVID-19 for all building

4    occupants, including those reporting for jury service.  The

5    Court is employing several different mitigation strategies

6    to reduce the transmission and spread of COVID-19.

7          For example, we've upgraded all building-wide

8    systems to MERV 13 filters as recommended by the EPA.  We've

9    worked with a professional computational fluid dynamics to

10   perform smoke testing of courtrooms, including this one.

11   Smoke testing identifies air flow patterns and where areas

12   of concern exist for possible increased virus transmission.

13   This courtroom and the one we will be having the trial in

14   tested very well and was originally one of three courtrooms

15   on this floor cleared for trial use under our initial COVID

16   reopening guidance.

17          We've installed plexiglass in the courtrooms, as

18   you can see, including this one.  We've reduced or at least

19   attempted to reduce the number of close contact interactions

20   with a deployment and use of direct communication handset

21   systems which you may see employed.

22          When we get to the trial, we will use a second

23   courtroom for juror breaks and deliberation, instead of

24   smaller jury rooms.  We've made masks available to all

25   jurors.  And the building requires masking in all public

1   spaces outside of the courtroom.  Please let us know if any

2   of you need a high-quality mask while in the building.

3           The Court asks jurors, judges and court staff to

4   self-monitor for symptoms and to stay home if any change in

5   physical condition is noted.

6           We've set up hand sanitizer stations throughout

7   the building for your use.  All of these efforts, in our

8   view, greatly reduce the likelihood of transmission while in

9   the building and in this and the other courtroom.  I hope

10  this information brings you some comfort.  If you'd like

11  additional information, please do not hesitate to ask.

12          With those strategies covered, we can proceed.

13  Would you all please stand so that Ms. Lesley can swear you

14  in and then we will begin the jury selection process.

15          **DEPUTY CLERK:**  Please raise your right hand.  Do

16  you and each of you solemnly swear or affirm that you will

17  well and truly answer all questions propounded to you?

18          **PROSPECTIVE JURORS:**  Yes.

19          **DEPUTY CLERK:**  Thank you.  Please be seated.

20          **THE COURT:**  Ladies and gentlemen, the purpose of

21  jury selection is to pick a jury whose members will be fair

22  and impartial, who will keep an open mind and who will

23  decide the case on the facts and the law.  From the people

24  here in the courtroom, we are going to pick 14 jurors.  This

25  process might take several hours.

1      You should all now have an index card and a pen or

2   a pencil.  Please look at your juror badge and write the

3   last three digits from your badge in the upper-right hand

4   corner of your index card.  Sorry, the last four digits, the

5   four digits from your badge.

6          **PROSPECTIVE JUROR:**  Where is that?

7          **THE COURT:**  The piece of paper that you should

8   have that has your juror number on it.  Does anyone not have

9   that piece of paper?

10         (No response.)

11         Okay.  On that piece of paper there is a

12  four-digit juror number.  Please write that four-digit

13  number on the upper, right-hand corner of your index card.

14         I'm, in a moment, going to ask you a series of 46

15  questions.  I'm going to ask it of everyone in here.  Each

16  question is a yes- or a no-question.  There is no right or

17  wrong answer to any of these questions, but you should be

18  able to answer each one, yes or no.

19         You must answer the questions candidly, consistent

20  with your promise now under oath to tell the truth.  If your

21  answer to a question is "yes", please write the number of

22  the question on your index card.  Again, if your answer is

23  "yes", write the question on the index card.  If your answer

24  is "no", do not write down the number of the question.  In

25  addition, you do not have to explain your "yes" or your "no"

1    answer in writing.

2            After I've asked the 46 questions, and you have

3    written down those questions as to which you have a "yes"

4    answer, I will ask you all to wait outside in the hall

5    again.  I will then call you back in one by one to come into

6    the courtroom.  I'll take -- we'll have taken your index

7    cards and may ask you follow-up questions about your answers

8    and about this matter more generally.

9            Before I begin asking you the series of yes or no

10   questions, I will also read you a short, neutral statement

11   of the case.  But before I do that, does anyone have any

12   questions for me?  Sir?

13           **PROSPECTIVE JURORS:**  (indiscernible) -- pencil.

14           **THE COURT:**  Looks like we need multiple pencils

15   and pens over here.  Okay.  One second.

16           **DEPUTY CLERK:**  Raise your hand, please.

17           **THE COURT:**  Okay, ma'am, do you have a question?

18           **PROSPECTIVE JUROR:**  Are we only writing down

19   yeses?

20           **THE COURT:**  You are only writing down the numbers

21   of the questions that you have a "yes" answer to.

22           **PROSPECTIVE JUROR:**  Got it.

23           **THE COURT:**  It may be that you don't have a "yes"

24   answer to any of them.  It could be one or two.  It could be

25   a number.  So just the number of the question that you

12

1     answer "yes" to.

2              Okay.  Thank you for that.

3              Okay.  This is the statement of the case, the

4     neutral statement of the case.

5              The indictment in this case charges the defendant,

6     Stephen K. Bannon, with two counts of contempt of Congress.

7     In 2021 the Select Committee to Investigate the January 6th

8     attack on the U.S. Capitol, a committee of the United States

9     House of Representatives, was conducting an investigation

10    into the January 6, 2021 attack on the U.S. Capitol.

11             According to the indictment, on September 23,

12    2021, the Select Committee issued a subpoena to the

13    defendant, directing him to provide various records relating

14    to its investigation by October 7, 2021, and to appear and

15    give testimony at a deposition on October 14, 2021.

16             The indictment alleges that the defendant

17    willfully defaulted by not providing testimony on

18    October 14, 2021, and by not producing records as required

19    by October 18, 2021.  The indictment alleges that this

20    failure to comply was deliberate and intentional.

21             Now for the questions.  So again, write down the

22    number only of questions to which you would answer yes.

23             So Question 1:  The United States is represented

24    in this case by Assistant United States Attorneys Amanda

25    Vaughn and Molly Gaston.  They will be assisted in this

1    trial by Quiana Dunn-Gordon.  Are you personally acquainted

2    with, do you have any connection to or association with, or

3    have you had any contact with Ms. Vaughn, Ms. Gaston or

4    Ms. Dunn-Gordon?

5            Number 2, the defendant is represented by David

6    Schoen, Evan Corcoran and Riane White.  Are you personally

7    acquainted with, do you have any connection to or

8    association with, or have you had any contact with

9    Mr. Schoen, Mr. Corcoran or Ms. White?

10            Question 3.  The defendant is Stephen K. Bannon.

11    Are you personally acquainted with, do you have any

12    connection to or association with, or have you had any

13    contact with Mr. Bannon?

14            Question 4:  The following is a list of

15    individuals who may testify in this case:  Stephen Hart,

16    Kristen Amerling, Sean Tonolli, Robert Costello and Frank

17    D'Amico.  Are you personally acquainted with, do you have

18    any connection to or association with, or have you had any

19    contact with any of those individuals?

20            Question 5:  Please look around you.  Do you know

21    or recognize any other member of the prospective jury panel,

22    any member of the courtroom staff or me?

23            Question 6:  Is there anything about the nature of

24    the charges in this case or the parties involved that would

25    prevent you from deciding this case fairly?

1          Question 7 -- and this is really a two-part

2     question, or maybe it's three-part.  Question 7 -- so 7 is,

3     Have you heard, seen or read anything from any source about

4     this case?

5          7(a), which is basically a follow-up question in a

6     way is:  If you have heard, seen or read anything about this

7     case, have you formed any opinions about this case based on

8     what you have heard, seen or read?

9          Then Question 7(b) is, If you have heard, seen or

10    read anything about this case, is there anything about your

11    knowledge of this case that would prevent you from following

12    the instructions from the Court and reaching a verdict based

13    solely on the evidence presented during the trial?

14         So again, that was Question 7, 7(a) and 7(b).  We

15    are now moving on to Question 8.

16         Question 8:  Have you ever written or said

17    anything for public consumption about the defendant, the

18    U.S. House Select Committee to Investigate the January 6th

19    attack on the U.S. Capitol or the Committee's investigation?

20    For purposes of this question, writings or statements for

21    public consumption include blog posts, articles, podcasts or

22    posts on any internet sites that are accessible to the

23    general public.

24         Question 9:  During the pendency of this trial, I

25    will instruct you not to watch, read or listen to any news,

1    commentary or online postings related to this case,

2    including from newspapers, television, radio, podcasts,

3    social media or anything else on the internet.

4        Would you have -- this is Question 9:  Would you

5    have any trouble following that instruction?

6        Question 10:  Have you, a family member or anyone

7    close to you ever worked for or provided services to the

8    United States House of Representatives, U.S. Senate or any

9    government agency affiliated with the legislative branch?

10       Question 11:  Have you, a family member or anyone

11   close to you ever been subpoenaed by or asked by Congress or

12   any congressional committee to testify or provide records?

13       Question 12:  Have you, a family member or anyone

14   close to you ever been required by any government agency,

15   court or law enforcement entity to provide records,

16   statements or testimony in any matter?

17       Question 13:  Were you, any member of your family

18   or a close friend present at the U.S. Capitol on January 6,

19   2021?

20       You will hear and see evidence in this case that

21   the defendant was subpoenaed for testimony and records by

22   the U.S. House of Representatives Select Committee to

23   Investigate the January 6th attack on the United States

24   Capitol.  Have you heard, seen or read anything from any

25   source about the Select Committee or its investigation?

1    That was Question 14.

2         **PROSPECTIVE JUROR:**  I have a question.  What

3    question number was it?

4         **THE COURT:**  That was Question 14.  Thank you.

5         Question 15:  If you are familiar with the Select

6    Committee or its investigation, do you have any beliefs or

7    opinions about the Select Committee, its investigation or

8    Congress more generally that would make it difficult for you

9    to remain fair and impartial to both the government and the

10   defendant throughout the trial in this case?

11        Question 16:  The Select Committee has been

12   holding hearings concerning events at the U.S. Capitol on

13   January 6, 2021.  Have you watched or read coverage of those

14   hearings?

15        Question 17:  If you have watched or read coverage

16   of the Select Committee's hearings, will you have any

17   difficulty putting aside any opinions you may have formed

18   about the people involved in those events, following the law

19   as I explain it to you and deciding the case in a fair and

20   impartial manner based solely on the evidence presented in

21   court?

22        Question 18:  Do you have any beliefs or opinions

23   about the defendant, Stephen Bannon, or anyone associated

24   with him that would make it difficult for you to remain fair

25   and impartial to both the government and the defendant

1    throughout the trial in this case?

2          Question 19:  Mr. Bannon is a former advisor to

3    President Donald J. Trump.  Do you, your spouse or partner

4    or your family have any political beliefs that might prevent

5    you from sitting in judgment of another person because that

6    person's political beliefs are the same or different from

7    your own?

8          Question 20:  You may hear testimony from elected

9    officials or government staff with the same or different

10   political beliefs from your own.  Would you tend to believe

11   or not believe the testimony of a witness simply because his

12   or her political beliefs are the same or different from your

13   own?

14         Question 21:  As you sit here, do you have any

15   opinion -- let me rephrase that.  I apologize.  As you sit

16   here, do you have an opinion about the defendant's guilt or

17   innocence in this case?

18         Question 22:  Have you, a family member or anyone

19   close to you ever studied law or worked in the legal

20   profession in any way, including as a lawyer, paralegal,

21   assistant or investigator, and including in a prosecutor's

22   or defense attorney's office or in a courthouse?

23         Question 23:  Have you, a family member or anyone

24   close to you ever been the subject of a criminal

25   investigation or accused of, arrested for or charged with a

1    crime?

2              Question 24:  Have you, a family member or anyone

3    close to you ever been the victim of or a witness to a crime

4    regardless of whether that crime was reported to law

5    enforcement or testified in court or before a grand jury as

6    a witness to a crime?

7              Question 25:  Have you ever served on a grand

8    jury?

9              Question 26:  Have you ever served as a juror in a

10   civil or criminal trial in either federal, state or local

11   court?

12             Question 26 [sic]:  If you have ever served on a

13   grand jury, or as a juror in a civil or criminal trial, was

14   there anything about your service that might affect your

15   ability to serve fairly and impartially as a juror at this

16   trial?

17             Question 28:  Have you, a family member --

18             **PROSPECTIVE JUROR:**  I think you might have -- I

19   misheard the number.

20             **THE COURT:**  Let me -- I should have said that

21   Question 27 was the question.  And I apologize if I didn't.

22             Question 27 was:  If you have ever served on a

23   grand jury or as a juror in a civil or criminal trial, was

24   there anything about your service that might affect your

25   ability to serve fairly and impartially as a juror at this

1    trial?  That was Question 27.

2            Let me just go through them again because this is

3    important.

4            Question 25 was -- these are short ones --

5    Question 25 was:  Have you ever served on a grand jury?

6            Question 26 was:  Have you ever served as a juror

7    in a civil or criminal trial in either federal, state or

8    local court?

9            Then 27 was:  If you have ever served on a grand

10   jury or as a juror in a civil or criminal trial, was there

11   anything about your service that might affect your ability

12   to serve fairly and impartially as a juror at this trial?

13           Question 28 is then:  Have you, a family member or

14   anyone close to you ever been employed by any local, state

15   or federal law enforcement agency or private security

16   company?

17           Law enforcement agencies include, for example, the

18   D.C. Metropolitan Police Department, the Federal Bureau of

19   Investigation, the Drug Enforcement Administration, the

20   Bureau of Alcohol, Tobacco, Firearms and Explosives and the

21   United States Capitol Police.

22           Question 29:  Do you have any beliefs or opinions

23   about law enforcement officers that would affect your

24   ability to fairly and impartially evaluate the credibility

25   of a law enforcement officer, like any other witness, simply

1   because he or she is a law enforcement officer?

2       Question 30:  Have you had any dealings with the

3   United States government in which you feel the government

4   did not give you fair treatment?

5       Question 31:  Do you have any beliefs or opinions

6   about the United States Attorneys Office, the

7   U.S. Department of Justice, criminal defense attorneys, the

8   Federal Bureau of Investigation, any other law enforcement

9   agency or the government generally that would make it

10  difficult for you to remain fair and impartial to both the

11  government and the defendant throughout the trial in this

12  case?

13      Question 32:  You may hear testimony from

14  witnesses who are elected officials or government staff.

15  Would you tend to believe or not believe the testimony of a

16  witness simply because he or she is an elected official or

17  government staff?  In other words, would you tend to give

18  more or lesser weight to the testimony of an elected

19  official or government staff than to the testimony of other

20  witnesses?

21      Question 33:  The prosecution has the burden of

22  proof.  This means that the jury cannot return a guilty

23  verdict against the defendant unless the prosecution has

24  proven beyond a reasonable doubt that the defendant is

25  guilty of the crime charged.  Would you have any difficulty

1   accepting and applying this legal instruction?  That was

2   Question 33.

3        Question 34:  Every defendant in a criminal trial

4   is presumed innocent and, therefore, has no obligation to

5   testify or present any evidence in the case.  Would you have

6   any difficulty accepting and applying this legal

7   instruction?

8        Question 35:  To reach a verdict on a particular

9   charge, every juror must agree on the verdict.  That is, any

10  verdict must be unanimous.  In deliberations you must

11  consider the opinions and points of your fellow jurors, but

12  you must also follow your own conscience and be personally

13  satisfied with any verdict.

14       Would you -- this is the question.  Would you have

15  difficulty expressing your own opinions and thoughts about

16  this case to your fellow jurors?  That was 35.

17       36:  I will instruct you on the law you must

18  follow in rendering a verdict in this case.  Is there

19  anything that would prevent you from following the law as I

20  instruct it?

21       Question 37:  Is there anything about your

22  political beliefs or affiliations that would prevent you

23  from following the law as I instruct you or reaching a

24  verdict based solely on the evidence you receive during the

25  trial?

1          Question 38:  Do you have any difficulty seeing or

2     hearing that would make it difficult for you to follow or

3     receive the evidence presented in the case?

4          Question 39:  Are you taking any medications or do

5     you have any physical condition that could make it difficult

6     for you to sit as a juror and give your full attention to

7     the trial and the evidence in this case?

8          Question 40:  Do you feel so uncomfortable being

9     in a room with other jurors and trial participants due to

10    the COVID-19 pandemic that it would be difficult for you to

11    pay attention or otherwise to serve as a juror in this case?

12         Question 41:  Are you currently caring for a

13    relative or a close friend who has been infected by or

14    exposed to a person infected with COVID-19, such that it

15    would be difficult for you to pay attention or otherwise to

16    serve as a juror in this case?  That was Question 41.

17         Question 42:  Do you have any difficulty,

18    speaking, understanding, reading or writing the English

19    language?

20         Question 43:  Do you have any moral, religious or

21    ethical beliefs that would prevent you from sitting in

22    judgment of another person in a criminal trial?

23         Question 44:  It is possible this trial could

24    continue into next week.  Would jury service on a matter of

25    that length cause a severe and unavoidable hardship to you?

1    That was question 44.

2            Question 45:  No matter what you have heard or

3    seen about events at the U.S. Capitol on January 6th, 2021

4    from any source and no matter what opinions you may have

5    formed, would you have any difficulty putting that aside,

6    following the law as I explain it to you, and deciding the

7    case in a fair and impartial manner, based solely on the

8    evidence presented in court?  That's question 45.

9            Finally, Question 46:  Can you think of any other

10   matter that might have some bearing on your ability to serve

11   as a juror or your ability to render a fair and impartial

12   verdict based solely on the evidence and my instructions on

13   the law?

14           Ladies and gentlemen, those are the 46 questions.

15   Again, your note cards should have your juror number on it

16   and the number of those questions that you answered "yes"

17   to?

18           Before we collect the cards, I want to answer

19   questions.  I have a question over here.

20           **PROSPECTIVE JUROR:**  Can you repeat Question 22?

21           **THE COURT:**  Of course.  I'm going to repeat

22   Question 22 at one person's request.  Here's the question.

23   This is Question 22:  Have you, a family member, or anyone

24   close to you ever studied law or worked in the legal

25   profession in any way, including as a lawyer, paralegal,

1    assistant or investigator, and including in a prosecutor's

2    or defense attorney's office or in a courthouse?  That was

3    22.

4              Are there any other questions that people would

5    like repeated?  Yes.

6              **PROSPECTIVE JUROR:**  Number 10, please.

7              **THE COURT:**  Number 10?

8              **PROSPECTIVE JUROR:**  (Nodded head.)

9              **THE COURT:**  Question 10:  Have you, a family

10    member or anyone close to you ever worked for or provided

11    services to the U.S. House of Representatives, U.S. Senate

12    or any government agency affiliated with the legislative

13    branch?

14              Any other questions you would like reread?  Yes,

15    sir.

16              **PROSPECTIVE JUROR:**  Number 7.

17              **THE COURT:**  Seven?

18              **PROSPECTIVE JUROR:**  (Nodded head.)

19              **THE COURT:**  So seven is the three-part question.

20    So seven is:  Have you heard, seen or read anything from any

21    source about this case?  That's 7.

22              7(a) is:  If you have heard, seen or read anything

23    about this case, have you formed any opinions about this

24    case based on what you have heard, seen or read?  That's

25    7(a).

1          7(b) is:  If you have heard, seen or read anything

2     about this case, is there anything about your knowledge of

3     this case that would prevent you from following the Court's

4     instructions and reaching a verdict based solely on the

5     evidence presented during the trial?  That's 7(b).

6          Yes, sir.

7          **PROSPECTIVE JUROR:**  Thirteen.

8          **THE COURT:**  Thirteen.  Thirteen is, were you, any

9     member of your family or a close friend present at the

10    U.S. Capitol on January 6, 2021?

11         Any other questions you would like me to reread?

12         (No response.)

13         Okay.  So what we're going to do, Ms. Lesley --

14    Ms. Lesley is going to -- we're going to do two things.  I

15    will leave it up to their good judgment about the most

16    efficient way to do it.

17         We're going to excuse all of you, as I said at the

18    beginning, and we will call you in individually to ask

19    questions.  Ms. Lesley will also collect your note cards so

20    that I have them for those discussions.

21         **DEPUTY CLERK:**  Before everyone -- or before you

22    all move, if you pass the cards down.  When you pass the

23    card down, please -- you know what?  Never mind.  I will get

24    them.  If you could now pass your card down.  Please put

25    your card in front of the one next to you --

1          **THE COURT:**  Ms. Lesley, I would rather have you

2    collect them.

3          **DEPUTY CLERK:**  Okay.

4       (Brief pause.)

5       (Prospective jurors exited the courtroom.)

6          **THE COURT:**  Let the record reflect that the venire

7    has been excused.  We are obviously still on the public

8    record, but we have just -- we will be discussing with

9    individual jurors their answers to questions and any other

10   topics that may be relevant to essential service here.

11      (Prospective juror steps up.)

12          So we will begin with Juror 1104; is that your

13   Juror Number?

14          **PROSPECTIVE JUROR:**  Uh-huh.

15          **THE COURT:**  You can take your mask off, sir.  I

16   think that would be helpful for everyone to be able to hear

17   you.

18          Your note card reflects that you answered "yes" to

19   just one question, which is Question 25.  Correct?

20          **PROSPECTIVE JUROR:**

21          **PROSPECTIVE JUROR:**  Correct.

22          **THE COURT:**  That question was, Have you ever

23   served in a grand jury?  And you answered "yes" to that.

24   Correct?

25          **PROSPECTIVE JUROR:**  Yes, I have.

1      **THE COURT:**  Can you tell us a little bit more

2  about your service on the grand jury, when it was?

3      **PROSPECTIVE JUROR:**  About eight years ago.  I

4  don't remember.  It was like three months.

5      **THE COURT:**  Okay.

6      **PROSPECTIVE JUROR:**  We heard the evidence they had

7  and then we would vote on was it enough to go to a trial.

8      **THE COURT:**  Do you recall what court that service

9  was in?

10     **PROSPECTIVE JUROR:**  No, I don't.

11     **THE COURT:**  Okay.  Was there anything about your

12  service on the grand jury that would cause you to worry

13  about your ability to be impartial in this case?

14     **PROSPECTIVE JUROR:**  No.

15     **THE COURT:**  Obviously, you didn't answer any "yes"

16  questions as to whether you have any knowledge about this

17  case or the defendant or a number of issues here.  I just

18  want to confirm that, in fact, you answered all the

19  questions truthfully about your knowledge.

20     **PROSPECTIVE JUROR:**  I did.

21     **THE COURT:**  Okay.  Thank you.

22     Ms. Vaughn, do you have any questions you would

23  like to follow up with?

24     Counsel should feel free to take your masks off

25  and to stand at the podium when you're asking questions.

 1          **MS. VAUGHN:**  Thank you, Your Honor.

 2          Good morning, sir.  I just have one question.  Do

 3  you recall if your jury service was in the District of

 4  Columbia or was it --

 5          **PROSPECTIVE JUROR:**  District of Columbia.

 6          **MS. VAUGHN:**  Okay.  Thank you.

 7          Thank you, Your Honor.

 8          **THE COURT:**  Thank you.  Mr. Corcoran?

 9          **MR. CORCORAN:**  No questions, Your Honor.  Thank

10  you very much.

11          **PROSPECTIVE JUROR:**  Thank you.  Thank you, sir.

12        (Prospective juror steps down.)

13          **THE COURT:**  Any objection to qualifying this juror

14  for jury service?

15          **MS. VAUGHN:**  Not from the government, Your Honor.

16          **MR. CORCORAN:**  No, Your Honor.

17          **THE COURT:**  Okay.

18        (Prospective juror steps up.)

19          **THE COURT:**  Good morning.

20          **PROSPECTIVE JUROR:**  Good morning.

21          **THE COURT:**  Feel free to take your mask off if you

22  would like.  You are Juror 1198.  Correct?

23          **PROSPECTIVE JUROR:**  Yes.

24          **THE COURT:**  Let the record reflect that you

25  answered "yes" to Questions 14, 16, 26, 39, 46, 22 and 7.

1          Let me take those in order that I asked them.  So

2    the first question, Question 7, that you answered "yes" to

3    is, Have you heard, seen or read anything from any source

4    about this case?  You answered "yes".  Can you describe what

5    you have heard, seen or read about this case?

6          **PROSPECTIVE JUROR:**  Yes, Your Honor.

7          I think I read different sources online.  Do you

8    want me to name the sources from what I read the --

9          **THE COURT:**  These are online news articles?

10         **PROSPECTIVE JUROR:**  Yes.

11         **THE COURT:**  Have you formed any opinion about this

12   case?

13         **PROSPECTIVE JUROR:**  Um, that's a question

14   difficult to answer.  It's a complicated matter.

15         **THE COURT:**  It's what?  Say that again?

16         **PROSPECTIVE JUROR:**  It's a complicated matter.

17         **THE COURT:**  Okay.  Can you explain why it's

18   complicated?

19         **PROSPECTIVE JUROR:**  I'm not an attorney.  I don't

20   know how these things work.  I am a common man.  It would

21   seem that it could be cut and dry to receive, the same way I

22   received a notice to be here today.  I am here, and you can

23   comply to those things.

24         **THE COURT:**  You also answered that you -- this is

25   Question 14 -- that you will hear and see evidence in this

1    case that the defendant was subpoenaed for testimony and

2    records by the U.S. House of Representatives Select

3    Committee to Investigate the January 6th attack on the

4    United States Capitol.  Have you heard, seen or read

5    anything from any source about the Select Committee or its

6    investigation?

7            You then also answered "yes" to the question, the

8    Select Committee has been holding hearings concerning events

9    at the U.S. Capitol on January 6th, 2021.  Have you watched

10   or read coverage of those hearings?  Those are related

11   answers, I think, to some extent.

12           Can you describe to me what coverage you have seen

13   or read either about the investigation or the hearings the

14   Committee has had?

15           **PROSPECTIVE JUROR:**  I watched one of the evening

16   hearings, and I read coverage by different newspapers.

17           **THE COURT:**  Okay.

18           **PROSPECTIVE JUROR:**  I have not kept up to date

19   with them.

20           **THE COURT:**  Okay.

21           You also answered "yes" to the question about

22   whether you have somebody in your family or you know someone

23   involved in the legal profession.  Can you describe why you

24   answered "yes" to that question?

25           **PROSPECTIVE JUROR:**  Yes, Your Honor.  Although in

1    Argentina, my sister is an attorney and prosecutor.

2          **THE COURT:**  Okay.  Is that the only person in your

3    family who has that connection to the legal profession?

4          **PROSPECTIVE JUROR:**  Yes, sir.

5          **THE COURT:**  Is there anything about her work as an

6    attorney in Argentina that you think would cause you to

7    be -- it would be difficult for you to be impartial in this

8    case?

9          **PROSPECTIVE JUROR:**  No, Your Honor.

10         **THE COURT:**  You also answered "yes" to Question

11   39:  Are you taking any medications or a physical condition

12   that would be difficult for you to serve as a juror?  Can

13   you explain that to me?

14         And if it's very personal, we can go, essentially,

15   under seal.  We can have that conversation in a way that

16   wouldn't be public, if you feel that that's something you

17   would like to do.

18         **PROSPECTIVE JUROR:**  No, that's okay, Your Honor.

19   I think I cracked one of my crowns, and I'm afraid it might

20   get infected, so I need to see my dentist.

21         **THE COURT:**  Do you have an appointment right now

22   to see your dentist?

23         **PROSPECTIVE JUROR:**  No, I do not, sir.

24         **THE COURT:**  You answered "yes" to the following

25   question, which is, Can you think of any other matter that

**-3423-**

1    might have some bearing on your ability to serve as a juror

2    or your ability to render a fair and impartial verdict based

3    solely on the evidence and my instructions on the law?  Can

4    you describe why you answered "yes" to that question?

5              **PROSPECTIVE JUROR:**  The reason I answered "yes" to

6    that is because I'm one of the executives at a small

7    company, and we have many contract negotiations going on

8    right now, which I am critical to.  If I am here for an

9    extended period of time --

10              **THE COURT:**  It would have a negative effect, in

11    your view, on your work?

12              **PROSPECTIVE JUROR:**  It would.  Correct.  My work

13    and not the case.

14              **THE COURT:**  Yeah.

15              Would -- I understand that that would be a

16    hardship, to some extent.  Would service, as a result -- in

17    other words, if you were required to serve, even though you

18    have this work, would that cause you to be concerned about

19    your ability to be impartial?

20              **PROSPECTIVE JUROR:**  No, Your Honor.

21              **THE COURT:**  Okay.  So I want to go back to your

22    first set of questions -- or answers about your knowledge of

23    this case.  You answered that -- and I'm paraphrasing -- you

24    might think it could be cut and dried, you know, you

25    received a summons to come here today.

1          In light of that answer and in light of what you

2     know about this case, do you think there is a chance that

3     you would have a difficult time following my instructions

4     and being impartial?

5          **PROSPECTIVE JUROR:**  No, Your Honor.

6          **THE COURT:**  Okay.  Thank you.

7          Ms. Vaughn, any questions, or Ms. Gaston?

8          **MS. GASTON:**  Thank you, Your Honor.

9          Good morning, sir.

10         **PROSPECTIVE JUROR:**  Good morning.

11         **MS. GASTON:**  You mentioned that you have seen some

12    coverage, you have seen some of the January 6th hearings and

13    that you have seen some of the coverage of that; is that

14    right?

15         **PROSPECTIVE JUROR:**  That's right.

16         **MS. GASTON:**  Do you recall if any of that coverage

17    had anything to do with the defendant, Mr. Bannon?

18         **PROSPECTIVE JUROR:**  Not specifically.

19         **MS. GASTON:**  Nothing further.

20         **THE COURT:**  Thank you.

21         Mr. Corcoran.

22         **MR. CORCORAN:**  Thank you, Your Honor.

23         Do you think it would be better to have a juror

24    who had not been exposed to information before trial so that

25    you feel that it's cut and dry about the receipt of

1    subpoena?  Do you feel it would be better to have somebody

2    who is not in your position, for a fair trial?

3                **PROSPECTIVE JUROR:**  To have something better than

4    me?

5                **MR. CORCORAN:**  Well, I'm just asking -- you said

6    that you thought that because of what you've seen suggests

7    that you come to trial today thinking that it's cut and

8    dried.  And my question is, Do you think that we would have

9    a fairer trial if somebody who had not seen the information

10   and did not come in thinking it was cut and dried, would

11   there be a fairer trial under those circumstances?

12               **PROSPECTIVE JUROR:**  I'm having a hard time

13   following you.

14               **MR. CORCORAN:**  Well, so the question was about,

15   one of the things we are looking for is somebody who can

16   make a decision just on the evidence in the case.  Okay?

17               And really what I am asking you is, you seem to

18   have said that you've been exposed to something, some

19   information that makes you think that it might be a

20   cut-and-dried case.  Is that accurate?

21               **PROSPECTIVE JUROR:**  Those are two different things

22   that I said.

23               **MR. CORCORAN:**  Okay.  Well, explain, if you would,

24   what you're saying then.

25               **PROSPECTIVE JUROR:**  One had to do with the direct

1    question being asked of me.  But the second one had to do

2    with have I read or am I aware of this, and I am aware of

3    this.  Not the particulars.  I don't know the case.  It

4    hasn't been presented.

5        **THE COURT:**  Let me ask a question.  Based on my

6    description of the statement of the case, put aside what you

7    heard before, but my description of the statement of the

8    case and what's the issue here, is that what led you to

9    question whether it might be cut and dried, as you use that

10   phrase?

11       **PROSPECTIVE JUROR:**  Correct.  Because I am not an

12   attorney, so I don't know the fact of this; that's where you

13   as the judge come in.

14       **THE COURT:**  Okay.  Thank you.

15       Sorry, Mr. Corcoran.

16       **MR. CORCORAN:**  I guess I want to just understand

17   if your comment "cut and dried" relates in any way to

18   anything that you've seen outside the courtroom about the

19   Select Committee.

20       **PROSPECTIVE JUROR:**  I'm under oath so my -- I

21   guess what you are leading to is if I'm selected as a juror.

22   If I'm selected as a juror, I will be under oath, so I have

23   to tell the truth and answer to the best of my ability and

24   make decisions to the best of my ability.

25       **MR. CORCORAN:**  I'm asking a slightly different

1    question and that is, I just want to know, you've used the

2    words, "cut and dried."  And I just want to know, in your

3    mind, is the idea that something might be cut and dried in

4    this case at all related to information that you've seen

5    about the Select Committee on January 6th?

6            **PROSPECTIVE JUROR:**  No.

7        **MR. CORCORAN:**  It's not related at all?

8            **PROSPECTIVE JUROR:**  No.

9        **MR. CORCORAN:**  Thank you.

10           **THE COURT:**  Thank you, sir.

11       (Prospective juror steps down.)

12           **THE COURT:**  Mr. Corcoran, what do you think?

13       **MR. CORCORAN:**  Well, I'd ask the Court to strike

14    for cause.  One thing, he's got an infection in his tooth,

15    which we don't want a juror who's going to have to leave

16    halfway through the trial because of infection.  The second

17    is, he's indicated he's an important executive at a small

18    company; and that that may pose a hardship on him.  And then

19    third, of course, is this idea of "cut and dried".

20           I think more than anything, the back-and-forth

21    that I had with him suggested that it may be difficult

22    for -- it may be the way that I speak, but I felt like there

23    was a little bit of a disconnect between the questions that

24    I was asking and the answers that I was receiving.

25           But certainly in a case like this one where we

1    filed motion after motion about the pretrial publicity,

2    there was a show -- a one-hour show on CNN last night -- in

3    fact, that named -- that was all about Mr. Bannon.

4              I think that -- and in a case where there are only

5    three strikes -- peremptory strikes, I think we would ask

6    the Court to err on the side of caution.  And where a juror

7    like this one comes in with some information about the case

8    and the Select Committee and then says that -- without being

9    prompted, that they think that they might view this as a

10   cut-and-dried case, we ask for them to be excused.

11             **THE COURT:**  Thank you, Mr. Corcoran.

12             Ms. Gaston.

13             **MS. GASTON:**  Thank you, Your Honor.  I think under

14   further questioning, he made clear when he said "cut and

15   dried," he meant the neutral statement of the case, and then

16   he clarified, in response to Your Honor's question, that he

17   would follow the Court's directions.

18             He said that he has viewed general coverage of the

19   January 6th hearings, but he doesn't remember it being

20   connected to the defendant and doesn't appear to have an

21   association between the defendant and general January 6th

22   coverage.

23             So there was nothing that this juror said that

24   makes it seem like he will not be fair.  He seems to take

25   answering questions under oath and his obligations to the

38

1    Court extremely seriously, and I think the disconnect came

2    from Mr. Corcoran asking him sort of general questions about

3    whether it would be better to have other jurors rather than

4    himself, which is a very -- which is sort of an impossible

5    question for him to answer.

6            **THE COURT:**  Thank you, Ms. Gaston.

7            I'm going to strike this juror for cause for sort

8    of the various reasons, to include a

9    not-very-well-articulated explanation about what he meant by

10   thinking that this case was cut and dried.  And to the

11   extent that is because he's seen something that wouldn't be

12   presented in the courtroom, I think discretion is the better

13   part of valor here, and excluding him at this time makes

14   sense.

15           He also has the other issues that Mr. Corcoran

16   noted, although, I don't think, frankly, if it was just his

17   job or just his tooth issue, that that would be sufficient.

18   But the other answers gave me pause and, therefore,

19   Juror 1198 will be excluded for cause.

20           Ms. Lesley, can you bring in the next juror?

21       (Prospective juror steps up.)

22           **THE COURT:**  Good morning.

23           **PROSPECTIVE JUROR:**  Good morning.

24           **THE COURT:**  You may feel free to take off your

25   mask if you like.  It might be easier for everyone.

1          You're Juror Number 1422.  Correct?

2          **PROSPECTIVE JUROR:**  Yes.

3          **THE COURT:**  Let the record reflect that you

4     answered "yes" to the following questions:  7, 10, 14, 16,

5     22, 23, 28 and 44.

6          **PROSPECTIVE JUROR:**  Yes.

7          **THE COURT:**  I just want to ask you some questions

8     about them, and the lawyers may have some follow-up

9     questions.

10         You answered "yes" to the question, Have you

11    heard, seen or read anything from any source about this

12    case.

13         **PROSPECTIVE JUROR:**  Yes.

14         **THE COURT:**  Can you tell us about that?

15         **PROSPECTIVE JUROR:**  I read the *New York Times*

16    every morning.  So just reading about the news on a daily

17    basis.  It's -- that's basically all I can tell you.

18         **THE COURT:**  You did not -- do you know

19    approximately how many articles you've read about this case?

20         **PROSPECTIVE JUROR:**  Maybe less than a handful.

21         **THE COURT:**  Okay.  You did not answer "yes" to the

22    follow-up questions, and they are whether you formed any

23    opinions or if there is anything about your knowledge of

24    this case that would cause you to be unable to follow my

25    instructions.  And I just want to ensure that you understand

1   those were the questions; and that you were intentionally

2   answering "no" to those.

3           **PROSPECTIVE JUROR:**  Yes.

4           **THE COURT:**  So that means that you have not formed

5   any opinions about this case.

6           **PROSPECTIVE JUROR:**  No.

7           **THE COURT:**  And that means that in your view, you

8   could, in fact, follow my instructions about it?

9           **PROSPECTIVE JUROR:**  Yes.

10          **THE COURT:**  Okay.

11          Question 10 asks whether you or anyone close to

12  you works or worked essentially in the legislative branch,

13  in the House of Representatives, Senate or legislative

14  branch.  Can you tell us why you answered "yes" to that

15  question?

16          **PROSPECTIVE JUROR:**  Yes.  I have a friend who

17  worked for -- works for the House of Representatives and he

18  is a lawyer for the House.

19          **THE COURT:**  Do you know in what --

20          **PROSPECTIVE JUROR:**  I don't.

21          **THE COURT:**  -- capacity?

22          How close a friend?

23          **PROSPECTIVE JUROR:**  We talk multiple times a year

24  but haven't spoken in a couple of months.

25          **THE COURT:**  Have you discussed this case --

1          **PROSPECTIVE JUROR:**  No.

2          **THE COURT:**  -- with your friend?

3          Okay.  You answered "yes" to Questions 14 and 16,

4    which are related in a way.

5          Fourteen asks whether you have heard, seen or read

6    anything from any source about the Select Committee or its

7    investigation, and 16 asks whether you've watched or read

8    coverage of the Select Committee's hearings, and you

9    answered "yes" to both of those.  So can you just describe

10   the reasons for why you answered "yes" to those?

11         **PROSPECTIVE JUROR:**  It's in the news.  And like I

12   said, I read the news regularly, and I watched the most

13   recent -- not recent, the June 28th hearing on this from the

14   Select Committee.

15         **THE COURT:**  Do you recall anything in that hearing

16   mentioning the defendant here?

17         **PROSPECTIVE JUROR:**  No.  I mean, I was also

18   working so --

19         **THE COURT:**  But you don't recall here having seen

20   anything mentioned during that hearing about the defendant?

21   I'm not asking you whether it was, just whether you recall.

22         **PROSPECTIVE JUROR:**  Nope.

23         **THE COURT:**  Okay.

24         You answered Questions 22 and 23 "yes".  I'll just

25   ask them together, although they are different.  The first

1    one is whether you have a family member or you or someone

2    else who is generally in the legal profession.  And then the

3    other one asks whether you, a family member or anyone close

4    to you was ever the subject of a criminal investigation or

5    charged with a crime.  So can you answer -- tell us why you

6    answered "yes" to those things?

7              **PROSPECTIVE JUROR:**  My husband is a barred lawyer,

8    although he is not practicing.  He works for the State

9    Department.  And then 23 was someone convicted of crime.

10   Right?

11             **THE COURT:**  I'm sorry?  Say that again.

12             **PROSPECTIVE JUROR:**  I'm sorry.  Twenty-three was

13   someone convicted of a crime.  Correct?

14             **THE COURT:**  Yes.

15             **PROSPECTIVE JUROR:**  Any uncle was convicted of a

16   sexual violence crime in the State of New Jersey.

17             **THE COURT:**  So you said your husband is a barred

18   lawyer but does not practice law.  Correct?

19             **PROSPECTIVE JUROR:**  Yes.

20             **THE COURT:**  What does he do at the State

21   Department generally?

22             **PROSPECTIVE JUROR:**  Yes.  He's a policy analyst

23   for the Bureau of Diplomatic Security.

24             **THE COURT:**  How long has he been at State?

25             **PROSPECTIVE JUROR:**  Since 2014.

1          **THE COURT:**  Okay.  And he hasn't practiced law

2     since then at least?

3          **PROSPECTIVE JUROR:**  No.  He got barred over his

4     time working there, so he hasn't practiced but he studied

5     before.

6          **THE COURT:**  Got it.  Okay.

7          And your uncle, when was that conviction and

8     where?

9          **PROSPECTIVE JUROR:**  It was in the State of New

10    Jersey.

11         **THE COURT:**  Right.

12         **PROSPECTIVE JUROR:**  And it was 2010.

13         **THE COURT:**  Is there anything about your uncle's

14    experience there that would lead you to conclude you could

15    not be impartial in this case as a juror?

16         **PROSPECTIVE JUROR:**  No.

17         **THE COURT:**  You also answered "yes" to Question

18    28, which is a long question and I'll paraphrase it.

19    Essentially, have you or anyone else to you [sic]  Been

20    employed by a law enforcement agency?

21         **PROSPECTIVE JUROR:**  Yes.

22         **THE COURT:**  Can you describe?

23         **PROSPECTIVE JUROR:**  My sister's husband, my

24    brother-in-law, is a police officer in the State of New

25    Jersey.  If you want the specific police department, I am

 1   happy to describe it.

 2            THE COURT:  No, that's okay.  So that's your

 3   brother-in-law.

 4            PROSPECTIVE JUROR:  It's my brother-in-law.

 5            THE COURT:  Has he been a police officer there as

 6   long as you've known him?

 7            PROSPECTIVE JUROR:  Just about, yeah.

 8            THE COURT:  Okay.  Is there anything about your

 9   experience, knowledge of his job, experience with him as a

10   police officer that would cause you to question your ability

11   to be impartial here?

12            PROSPECTIVE JUROR:  No.

13            THE COURT:  Question 44 asks whether jury service

14   would cause a severe and unavoidable hardship to you if it

15   were to extend into next week.  Can you explain that?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  If it's something highly personal, we

18   do have the ability to --

19            PROSPECTIVE JUROR:  It's not.

20            My boss is currently on vacation through the end

21   of the month and I am the next in line.  So, basically, it's

22   me and my team that need my support in order to make our

23   work function.  We're a small team.  It's only four of us.

24   So without her there is really no direction, and I'm the

25   direction provider.

1          So it's hardship in the grand sense of work and

2    the ability to execute.  And, obviously, if I -- I'm a

3    consultant.  So if I don't complete my client's -- what's

4    the word I am looking for -- projects in the set timeline,

5    then that obviously impacts the way the business gets paid

6    and the timeliness of it all.

7          **THE COURT:**  Okay.

8          **PROSPECTIVE JUROR:**  Which then impacts me.

9          **THE COURT:**  Yes.  Of course.  Thank you.

10         Mr. Corcoran, do you want to go first if you have

11   any questions?

12         **MR. CORCORAN:**  I think I do.

13         Good morning.

14         **PROSPECTIVE JUROR:**  Good morning.

15         **MR. CORCORAN:**  The first question I have is just

16   about the hardship.  So is there a potential for financial

17   impact on your business if you have to go into next week

18   being away from the office?

19         **PROSPECTIVE JUROR:**  Yes.

20         Again, my boss is on vacation until the end of the

21   month, so I'm in charge of making the decisions and keeping

22   on track with all of the work.  I am the main point of

23   contact, so I have meetings scheduled this week and into

24   next to make sure that, you know --

25         **MR. CORCORAN:**  And what kind of work do you do in

1    terms of what kind of people do you serve?

2            **PROSPECTIVE JUROR:**  I serve a variety of clients.

3    I'm a diversity, equity and inclusion consultant.  I serve

4    nonprofits, county and state governments in some cases,

5    businesses, large Fortune 500 companies.  But currently our

6    roster is short.  So we try to keep -- we're trying to keep

7    our current clients happy so that we can continue building

8    our client roster.

9            **MR. CORCORAN:**  Okay.

10           The second thing I wanted to follow up on is just

11   the Select Committee.  You indicated that you read *The New*

12   *York Times* daily; is that right?

13           **PROSPECTIVE JUROR:**  Yes.

14           **MR. CORCORAN:**  And then you've also watched some

15   of the hearings?

16           **PROSPECTIVE JUROR:**  Yes.

17           **MR. CORCORAN:**  And have you watched any news

18   coverage of the hearings as well?

19           **PROSPECTIVE JUROR:**  We don't have cable in my

20   house so --

21           **MR. CORCORAN:**  What's your perception of the work

22   that the Select Committee is doing?

23           **PROSPECTIVE JUROR:**  I think they are doing a

24   thorough investigation of what happened on January 6th.

25   They are trying to show things that have not been seen

1  before.

2          **MR. CORCORAN:**  Okay.  And I guess my question

3  is -- which of the hearings did you see?

4          **PROSPECTIVE JUROR:**  The June 28th.

5          **MR. CORCORAN:**  June 28th.  Do you remember what

6  the topic of that hearing was?

7          **PROSPECTIVE JUROR:**  I do.  It was the young

8  woman's testimony talking about what happened the morning, I

9  guess, leading up to the insurrection.  And she was just

10 speaking about her interactions with other people in the

11 White House, particularly the Chief of Staff.

12         **MR. CORCORAN:**  Can you be sure that you will be

13 able to put aside all that you've read and all that you

14 watched when you're making a decision in this case?

15         **PROSPECTIVE JUROR:**  Absolutely.  I have to do it

16 regularly for work so --

17         **MR. CORCORAN:**  Okay.  Thank you.

18         **THE COURT:**  Thank you.

19         **PROSPECTIVE JUROR:**  Thank you.

20         **THE COURT:**  Ms. Vaughn.

21         **MS. VAUGHN:**  Thank you, Your Honor.

22         Good morning.

23         **PROSPECTIVE JUROR:**  Good morning.

24         **MS. VAUGHN:**  Just a couple of questions.

25         Do you have specific deadlines coming up this week

1   at work that you are responsible for as opposed to someone

2   else on your team?

3            **PROSPECTIVE JUROR:**  Um, yes and no.

4            **MS. VAUGHN:**  What do you mean by that?

5            **PROSPECTIVE JUROR:**  It really depends on where the

6   client is in terms of our journey together.  And so I have

7   meetings this week to determine what those deadlines will

8   be.  So if, per chance, if I am selected, then that meeting

9   gets pushed, you know, until the end of this series of work,

10  so to speak.  In which case, it moves the deadline and kind

11  of prolongs us as a company getting paid.

12           **MS. VAUGHN:**  I see.  Is there anyone else in the

13  office that's able to handle those?

14           **PROSPECTIVE JUROR:**  Not for the series of clients

15  that I am working with, no.

16           **MS. VAUGHN:**  Okay.

17           Can I ask, with respect to your uncle, did you

18  feel that he was treated fairly by the court system and the

19  government and things like that generally?

20           **PROSPECTIVE JUROR:**  Yep.

21           **MS. VAUGHN:**  And do you maintain a relationship

22  with him to this day?

23           **PROSPECTIVE JUROR:**  He's my uncle.  There are

24  holidays, but -- although COVID has prevented us from

25  meetings but, yeah.  I mean, I get regular updates from --

1   it's my mom's brother.  So I get regular updates from her

2   whenever I speak to my parents.

3           **MS. VAUGHN:**  All right.  Thank you.

4           **THE COURT:**  Let me just ask you one question about

5   your work.  Do you have a sense of how your clients might

6   react if you told them that you were serving on a jury and

7   just ask if some of the deadlines could be put off?

8           **PROSPECTIVE JUROR:**  I don't.  I can assume that

9   they are reasonable people so --

10          **THE COURT:**  But you don't know?

11          **PROSPECTIVE JUROR:**  I don't know.  I could always

12  ask though.

13          **THE COURT:**  Fair enough.  Thank you so much.

14          **PROSPECTIVE JUROR:**  No worries.

15      (Prospective juror steps down.)

16          **THE COURT:**  Ms. Vaughn?

17          **MS. VAUGHN:**  Your Honor, I'm a little concerned

18  about the attention she might pay to the case given her work

19  obligations and her concerns about that.  So it might be

20  best to let her go.

21          **THE COURT:**  You're moving to exclude her or that's

22  your position?

23          **MS. VAUGHN:**  Yes, Your Honor.

24          **MR. CORCORAN:**  No objection, Your Honor.

25          **THE COURT:**  Okay.  Juror 1422 is excluded.

1           I will say, in my view, that was a pretty close

2    call.  Many people are going to have work obligations and

3    those didn't strike me as the most serious ones.  But

4    hopefully we're going to have plenty of jurors here and it

5    won't be a problem.

6           (Prospective juror steps up.)

7               **THE COURT:**  Please step forward to the podium.

8    Feel free to take off your mask if you are comfortable with

9    that.

10          You are Juror 1371.  Correct?

11              **PROSPECTIVE JUROR:**  Yes.

12              **THE COURT:**  I note for the record that you

13   answered "yes" to two questions, Questions 25 and 26.

14              **PROSPECTIVE JUROR:**  Yes.

15              **THE COURT:**  I want to ask you some questions about

16   those.

17          The first question asks whether you've ever served

18   on a grand jury.  Can you describe to us why you answered

19   "yes" to that question?

20              **PROSPECTIVE JUROR:**  Because I served on a grand

21   jury.

22              **THE COURT:**  Where was that grand jury?

23              **PROSPECTIVE JUROR:**  Okay.  I'm not sure of the

24   address but when you get off Judiciary Square.

25              **THE COURT:**  So it was probably D.C. Superior

1   Court?

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  How long ago did you serve on that

4   grand jury?

5              **PROSPECTIVE JUROR:**  It was the early 2000s.

6              **THE COURT:**  Do you recall how long you served on

7   that jury?

8              **PROSPECTIVE JUROR:**  It was about a month.

9              **THE COURT:**  Is there anything about that

10  experience that would cause you to be concerned about your

11  ability to be impartial in this case?

12             **PROSPECTIVE JUROR:**  No.

13             **THE COURT:**  And you also answered "yes" to

14  Question 26, which is whether you served as a juror in a

15  civil or criminal trial in federal, state or local court.

16  Can you describe that experience for us?

17             **PROSPECTIVE JUROR:**  Well, they call me every two

18  years, and I serve on a jury frequently.  So I served on a

19  couple civil cases, but I can't recall specifically what

20  they were.

21             **THE COURT:**  Did you ever serve as a --

22             **PROSPECTIVE JUROR:**  It's been a while ago.

23             **THE COURT:**  Were those all within the District of

24  Columbia?

25             **PROSPECTIVE JUROR:**  Yes.

1          **THE COURT:**  Do you recall whether you ever served

2     as a juror in federal court, in this building, basically?

3          **PROSPECTIVE JUROR:**  I want to say yes.

4          **THE COURT:**  Do you recall what type of case that

5     was?

6          **PROSPECTIVE JUROR:**  I want to say it was a union

7     dispute --

8          **THE COURT:**  Okay.

9          **PROSPECTIVE JUROR:**  -- if I'm not mistaken.

10         **THE COURT:**  Do any of your experiences serving as

11    a juror in those trials cause you to worry about your

12    ability to be impartial here?

13         **PROSPECTIVE JUROR:**  No.

14         **THE COURT:**  Did you ever serve on a criminal jury

15    before?

16         **PROSPECTIVE JUROR:**  Yes.

17         **THE COURT:**  Do you recall approximately when that

18    was and what kind of case it was or cases?

19         **PROSPECTIVE JUROR:**  That was a drug case, and that

20    was many years ago as well.  They call me every two years

21    so --

22         **THE COURT:**  Sure.

23         **PROSPECTIVE JUROR:**  -- I can't remember.  I can't

24    remember all of them.

25         **THE COURT:**  Did the jury in that drug case convict

1    the defendant, if you recall?

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  Okay.  Did you have a hard time --

4    I'll ask it very generally -- with the process of getting to

5    a unanimous verdict?

6              **PROSPECTIVE JUROR:**  No.

7              **THE COURT:**  Okay.

8              You didn't answer "yes" to any other questions and

9    I just want to make sure that, for example, you haven't

10   heard anything about this case or the defendant.

11             **PROSPECTIVE JUROR:**  I've heard something about it

12   but I haven't, you know -- glance at the news but nothing,

13   like, I'm sitting there listening, deciphering.

14             **THE COURT:**  What, if anything, do you recall

15   hearing about this case?

16             **PROSPECTIVE JUROR:**  The name.

17             **THE COURT:**  Anything else?

18             **PROSPECTIVE JUROR:**  No.

19             **THE COURT:**  What about -- do you recall anything

20   about the Select Committee's work that I asked some

21   questions about?

22             **PROSPECTIVE JUROR:**  (Shook head.)

23             **THE COURT:**  Okay.  Thank you.

24             Ms. Gaston.

25             **MS. GASTON:**  Good morning, ma'am.

54

1          **PROSPECTIVE JUROR:**  Good morning.

2          **MS. GASTON:**  Just a couple questions.  You

3     mentioned that you've heard the defendant's name in the

4     news.  Do you know anything about him or what he does or who

5     he is?

6          **PROSPECTIVE JUROR:**  I heard the name and I heard

7     about contempt, but that's about the extent of what I've

8     listened to on the news.

9          **MS. GASTON:**  Okay.  Have you read news stories or

10    heard news stories going into the details of this case?

11         **PROSPECTIVE JUROR:**  No.

12         **MS. GASTON:**  And then are you familiar with the

13    January 6th Committee?

14         **PROSPECTIVE JUROR:**  Yes.

15         **MS. GASTON:**  Do you know what they're doing?

16         **PROSPECTIVE JUROR:**  Not really.

17         **MS. GASTON:**  Nothing further, Your Honor.

18         **THE COURT:**  Thank you.

19         Mr. Corcoran.

20         **MR. CORCORAN:**  Good morning, ma'am.

21         **PROSPECTIVE JUROR:**  Good morning.

22         **MR. CORCORAN:**  With regard to your hearing the

23    word "contempt" associated with Mr. Bannon's name, do you

24    understand that the news sometimes prints things that aren't

25    the same as what we will hear in court?

55

 1           **PROSPECTIVE JUROR:**  Absolutely.

 2           **MR. CORCORAN:**  And you'll be able to just listen

 3    to the evidence in court?

 4           **PROSPECTIVE JUROR:**  Yes.

 5           **MR. CORCORAN:**  The only other thing is one of the

 6    pieces of information that we get is employment, and

 7    sometimes people don't answer that because they're not

 8    currently employed but they've had jobs in the past, and I'm

 9    just wondering if you fall into that category.

10           **PROSPECTIVE JUROR:**  I am currently employed.

11           **MR. CORCORAN:**  Where are you employed?

12           **PROSPECTIVE JUROR:**  Department -- Development

13    Finance Corporation.  It's a government agency.

14           **MR. CORCORAN:**  A government agency?

15           **PROSPECTIVE JUROR:**  Yes.

16           **MR. CORCORAN:**  Is it a D.C. government agency?

17           **PROSPECTIVE JUROR:**  No, it's a U.S.  It's United

18    States.  I just started this job last month.

19           **MR. CORCORAN:**  Congratulations.

20           **PROSPECTIVE JUROR:**  So it's -- thank you.  So it's

21    United States Development Finance Corporation.

22           **MR. CORCORAN:**  All right.  United States

23    Development Finance Corporation.  Thank you very much.

24           **PROSPECTIVE JUROR:**  You're welcome.

25           **THE COURT:**  Thank you, ma'am.

1          **PROSPECTIVE JUROR:**  Thank you.

2          (Prospective juror steps down.)

3          **THE COURT:**  Ms. Gaston?

4          **MS. GASTON:**  Nothing from the government,

5      Your Honor.

6          **THE COURT:**  Mr. Corcoran?

7          **MR. CORCORAN:**  Nothing here, Your Honor.

8          **THE COURT:**  We will qualify Juror 1371.

9          Ms. Lesley, bring in the next juror, please.

10         (Prospective juror steps up.)

11         **THE COURT:**  Yes, sir.  Thank you.  Good morning.

12         **PROSPECTIVE JUROR:**  Good morning.

13         **THE COURT:**  Feel free to take your mask off if

14     you'd like.  You're Juror Number 0014.  Correct?

15         **PROSPECTIVE JUROR:**  Yes.

16         **THE COURT:**  You answered "yes" to two questions.

17         **PROSPECTIVE JUROR:**  Yes.

18         **THE COURT:**  I just want to ask you some questions

19     about those.  You answered 'yes' to Question 16.  And,

20     again, that was the question asking whether you have watched

21     or read coverage of the hearings that the Select Committee

22     has been holding.

23         **PROSPECTIVE JUROR:**  Okay.

24         **THE COURT:**  So can you tell us a little about more

25     about that?  How many hearings have you watched and how

1    frequently -- just sort of --

2              **PROSPECTIVE JUROR:**  Just the first day.

3         **THE COURT:**  Do you recall what day that was?

4              **PROSPECTIVE JUROR:**  I think it was like a

5    Thursday -- when they -- the first one televised at night.

6         **THE COURT:**  And that was approximately how long

7    ago?  Do you recall?

8              **PROSPECTIVE JUROR:**  Maybe two or three weeks ago?

9         **THE COURT:**  Do you recall whether you heard any

10   mention of Mr. Bannon during that hearing?

11             **PROSPECTIVE JUROR:**  No.

12        **THE COURT:**  Okay.  Is there anything about your

13   watching that hearing that would lead you, in your mind at

14   least, to worry about being impartial --

15             **PROSPECTIVE JUROR:**  No.

16        **THE COURT:**  -- in a case here?

17        Okay.  You also answered "yes" to Question 22,

18   which is a long question, but it basically asks whether you

19   or anyone else in your family had anything to do with the

20   law.

21             **PROSPECTIVE JUROR:**  My aunt.  My aunt she was a

22   lawyer, yes.

23        **THE COURT:**  Is she still a lawyer?

24             **PROSPECTIVE JUROR:**  No.

25        **THE COURT:**  Where does she work?

1          **PROSPECTIVE JUROR:** Now she's retired but she

2     practiced maybe -- for maybe two years. Not that long at

3     all.

4          **THE COURT:** Where did she live when she was

5     practicing?

6          **PROSPECTIVE JUROR:** In D.C.

7          **THE COURT:** In D.C.?

8          **PROSPECTIVE JUROR:** Yes.

9          **THE COURT:** Any other family members involved with

10    the law?

11         **PROSPECTIVE JUROR:** No.

12         **THE COURT:** Okay. Thank you.

13         Mr. Corcoran or Ms. Vaughn. I'm happy to have

14    Ms. Vaughn go first.

15         Go ahead, Ms. Vaughn, if you're ready.

16         **MS. VAUGHN:** Good morning, sir.

17         **PROSPECTIVE JUROR:** Good morning.

18         **MS. VAUGHN:** What kind of law did your aunt

19    practice?

20         **PROSPECTIVE JUROR:** I think it was family.

21         **MS. VAUGHN:** Family law?

22         **PROSPECTIVE JUROR:** I think so, yeah. I'm not

23    100 percent sure.

24         **MS. VAUGHN:** Did you all talk a lot about her work

25    or --

1          **PROSPECTIVE JUROR:**  Oh, no.  That's why, when you

2     asked the question, I was, like -- you know, like -- yeah.

3          **MS. VAUGHN:**  Okay.  That's all I had.  Thank you.

4          **PROSPECTIVE JUROR:**  Okay.  Congratulations.

5          **MS. VAUGHN:**  Thank you.

6          **MR. CORCORAN:**  Sir, good morning.

7          **PROSPECTIVE JUROR:**  Good morning.

8          **MR. CORCORAN:**  I think just two questions.  One

9     is, when it lists your employment, it says that you're

10    involved with ADU.

11         **PROSPECTIVE JUROR:**  Right.

12         **MR. CORCORAN:**  And I'm just wondering what ADU is.

13         **PROSPECTIVE JUROR:**  It's an appliance company.

14    Appliance Distributors Unlimited.  It was appliance.

15         **MR. CORCORAN:**  And where is that company based?

16         **PROSPECTIVE JUROR:**  Takoma Park, Maryland.

17         **MR. CORCORAN:**  And the second thing is you said

18    you saw the first hearing by the Select Committee; is that

19    right?

20         **PROSPECTIVE JUROR:**  Yeah, I think that was the

21    first -- whatever the televised one was at night.  That was

22    the only one I watched.  I watched maybe a quarter of it.

23         **MR. CORCORAN:**  What's your feeling and perception

24    of the work that the Select Committee is doing?

25         **PROSPECTIVE JUROR:**  I guess everyone wants to sort

**-3451-**

1    of figure out what was going on, you know.  They are trying
2    to find the truth about what happened.
3        **MR. CORCORAN:**  Okay.  Okay.  Thank you,
4    Your Honor.
5        **THE COURT:**  Thank you.  Thank you, sir.
6        **PROSPECTIVE JUROR:**  Okay.
7        (Prospective juror steps down.)
8        **THE COURT:**  Ms. Vaughn?
9        **MS. VAUGHN:**  No objection from the government.
10        **THE COURT:**  Mr. Corcoran?
11        **MR. CORCORAN:**  No objection, Your Honor.
12        **THE COURT:**  We will qualify Juror 0014 for
13    cause -- we will qualify Juror 0014.
14        What I would like to do is, because it's just
15    after 11, I want to do one more potential juror, and then
16    we'll take a brief recess.  Go a little bit longer until the
17    lunch hour and see where we are.  Okay?
18        So, Ms. Lesley, could you please bring in juror
19    1178.
20        (Prospective juror steps up.)
21        **THE COURT:**  Good morning.
22        **PROSPECTIVE JUROR:**  Good morning.
23        **THE COURT:**  Feel free to take your mask off, if
24    you would like.  You don't have to.  You're Juror 1178.
25    Correct?

61

1              **PROSPECTIVE JUROR:**  Yes.

2              **THE COURT:**  And let the record reflect you

3      answered "yes" to four questions, 10, 16, 22 and 23.  I'm

4      just going to ask you some questions about those, and then

5      the lawyers may have some questions for you.

6              And I should have been noting this for each other

7      juror who came in, but if there's something particularly

8      personal that you would like to discuss, we have the ability

9      to talk on the phone under seal, basically.

10             **PROSPECTIVE JUROR:**  Uh-huh.

11             **THE COURT:**  So Question 10 is whether a family

12     member or anyone close to you has ever worked in the House

13     or the Senate or a legislative agency.  Can you explain your

14     "yes" answer to that?

15             **PROSPECTIVE JUROR:**  Yeah, my father is the shadow

16     Senator to Washington, D.C.

17             **THE COURT:**  How long has he been the shadow

18     Senator?

19             **PROSPECTIVE JUROR:**  A long, long time.  Since,

20     like, the '90s.

21             **THE COURT:**  And what's your understanding of what

22     that role entails?

23             **PROSPECTIVE JUROR:**  Um, I know that he's

24     nonvoting.  Just, you know -- he was elected by the people

25     but he can't vote so...

**-3453-**

1          **THE COURT:**  Anyone else in your family worked for

2     or provided services to those entities?

3          **PROSPECTIVE JUROR:**  Huh-uh.

4          **THE COURT:**  You answered "yes" to Question 16,

5     which is about watching or reading coverage of the

6     January 6th Select Committee hearings.

7          **PROSPECTIVE JUROR:**  Uh-huh.

8          **THE COURT:**  So can you describe how many hearings

9     you've watched?  Have you watched all of them?  The whole

10    hearing --

11         **PROSPECTIVE JUROR:**  No, I've just kind of seen it

12    on TV.  I haven't watched it very closely.

13         **THE COURT:**  Approximately how many minutes or

14    hours of the Select Committee hearings have you watched?

15         **PROSPECTIVE JUROR:**  Maybe five minutes.  Just, you

16    know -- I wouldn't say that I really watched it.

17         **THE COURT:**  Have you heard the defendant, here,

18    Mr. Bannon's name mentioned in any of the hearings that

19    you've watched?

20         **PROSPECTIVE JUROR:**  No.

21         **THE COURT:**  Is there anything about your -- what

22    you've seen of the hearings that would cause you to be

23    concerned that you would be -- would be unable to be

24    impartial in this case?

25         **PROSPECTIVE JUROR:**  No.

1      **THE COURT:**  You also answered "yes" to Question

2   22, which is about whether you or anyone in your family,

3   basically, works in the legal field generally.  Can you

4   explain your answer to that?

5      **PROSPECTIVE JUROR:**  Yeah, my father is a lawyer as

6   well.

7      **THE COURT:**  Does he also practice, in addition to

8   being a shadow Senator?

9      **PROSPECTIVE JUROR:**  Yes.

10      **THE COURT:**  What does he do?

11      **PROSPECTIVE JUROR:**  Just general law.  Like a lot

12   of stuff with real estate and tenants and things like that.

13      **THE COURT:**  And is that in the District of

14   Columbia?

15      **PROSPECTIVE JUROR:**  Yes.

16      **THE COURT:**  Is there anything about his experience

17   or your knowledge of his work that would make you concerned

18   you would not be able to be impartial here?

19      **PROSPECTIVE JUROR:**  Nope.

20      **THE COURT:**  You also answered "yes" to the

21   question of whether you or a family member or anyone else

22   close to you was the subject of criminal investigation or

23   was charged with a crime.

24      **PROSPECTIVE JUROR:**  Uh-huh.

25      **THE COURT:**  Can you explain your answer to that?

64

1            **PROSPECTIVE JUROR:**  Yeah, I think my father had a

2    DUI a few years ago.

3            **THE COURT:**  Do you recall approximately how long

4    ago?  I know you said a few years ago.

5            **PROSPECTIVE JUROR:**  I was a child.  Maybe 2008.

6            **THE COURT:**  Okay.  Was there anything about that

7    experience, your father's experience in the criminal justice

8    system that would, again, run the risk in your mind that you

9    would be unable to be impartial here?

10            **PROSPECTIVE JUROR:**  No.

11            **THE COURT:**  Okay.  Thank you.

12            Ms. Gaston.

13            **MS. GASTON:**  Good morning.

14            **PROSPECTIVE JUROR:**  Good morning.

15            **MS. GASTON:**  You mentioned that your father is the

16    D.C. shadow Senator.

17            **PROSPECTIVE JUROR:**  Uh-huh.

18            **MS. GASTON:**  Was he at or near the Capitol on

19    January 6th?

20            **PROSPECTIVE JUROR:**  No.

21            **MS. GASTON:**  And then you mentioned that your

22    father is a lawyer.  Has he ever practiced criminal law that

23    you're aware of?

24            **PROSPECTIVE JUROR:**  Not that I am aware of.

25            **MS. GASTON:**  In terms of the DUI incident that you

1    mentioned -- and if we want to talk about this on the

2    husher, we can -- but how did that turn out for your father?

3                **PROSPECTIVE JUROR:**  I think that -- I don't know.

4    I was a child.  I didn't really know about it.  I am not

5    really sure, but I know that it's fine now.

6                **MS. GASTON:**  Did you ever have discussions with

7    your father about whether he felt he had been treated fairly

8    in that process?

9                **PROSPECTIVE JUROR:**  No.  No.  No.  We never talked

10   about it.

11               **MS. GASTON:**  Do you have any feelings about

12   whether he was treated fairly?

13               **PROSPECTIVE JUROR:**  No.  I think it was fair.

14               **MS. GASTON:**  And then, finally, are you employed?

15               **PROSPECTIVE JUROR:**  Am I employed?

16               **MS. GASTON:**  Yes.

17               **PROSPECTIVE JUROR:**  Yes.

18               **MS. GASTON:**  What do you do?

19               **PROSPECTIVE JUROR:**  I work as a baby-sitter for a

20   family friend.

21               **MS. GASTON:**  Thank you.

22               **THE COURT:**  Mr. Corcoran.

23               **MR. CORCORAN:**  Good morning.

24               **PROSPECTIVE JUROR:**  Good morning.

25               **MR. CORCORAN:**  I just have one question and that

1    is, you said that you saw some of the Select Committee

2    hearings.  And I just want to know, what's your perception

3    of the work that the Select Committee is doing?

4        **PROSPECTIVE JUROR:**  Um, I think I answered "yes"

5    to the question because I've seen -- I've seen some footage

6    from inside the courthouse in regards to January 6th, but I

7    don't know if I've seen that specifically, and I can't say I

8    have an opinion on it.

9        **MR. CORCORAN:**  In terms of the work that the

10    Select Committee is doing, the coverage you have seen has

11    not made you think one way or another about their work?  It

12    hasn't left any view?

13        **PROSPECTIVE JUROR:**  Yeah.

14        **MR. CORCORAN:**  Okay, thank you.

15        **THE COURT:**  Thank you, ma'am.

16        **PROSPECTIVE JUROR:**  Thank you so much.

17    (Prospective juror steps down.)

18        **MR. CORCORAN:**  Thanks, Your Honor.  We would move

19    to strike her for cause.  The main reason is her father is

20    the Senator -- a shadow Senator from the District of

21    Columbia.

22        In this case, the government has, on several

23    occasions, stated that members of Congress are the

24    Complainants in the case.  So this situation is unlike -- is

25    not unlike any situation where one member of an organization

1    is the victim, and we have to listen to evidence to

2    determine whether a crime was committed.

3            **THE COURT:**  Is that true with respect to the

4    Senate?

5            **MR. CORCORAN:**  Well, it's -- it's Congress.

6            **THE COURT:**  Does the Senate have any role in this

7    case whatsoever?

8            **MR. CORCORAN:**  I think it's close enough,

9    Your Honor.  I think what we are talking about is whether

10    it's a member of the Senate, a -- I'd have the same -- let

11    me put it this way:  If a member of the Senate was seated

12    here to become a juror, I would have the very same

13    objection; and that is, essentially, they are in the shoes

14    of the victim in the case.

15            They will come to it -- this young woman will come

16    to it with her life experience, which is her father is a

17    shadow Senator for the District of Columbia.  Because of

18    that, particularly when we have a full panel and we just

19    have three strikes, we think it's best not to put in the

20    jury box somebody who has got a direct blood, family

21    relation, father/daughter sitting in judgment on the facts

22    of this case.

23            Thank you.

24            **THE COURT:**  Thank you, Mr. Corcoran.

25            Ms. Gaston?

1          **MS. GASTON:**   Your Honor, the government's position

2      is that there is no reason to strike this juror for cause.

3      The Senate is, as Your Honor noted, a different chamber of

4      the Congress.   The Committee is a House committee.   She is

5      not the Senator.   It is her father.

6          She talked about how she hasn't really paid

7      attention to what the Committee is doing, and she didn't

8      seem to have strong feelings about the Committee's work

9      about January 6th or any connection between her father and

10     January 6th.   And if Mr. Corcoran has concerns about that or

11     wants to ask questions about that to figure out what her

12     feelings are, we should ask her back in and ask more

13     questions.

14         **THE COURT:**   Thank you.

15         I am going to exclude the juror.   It seems like a

16     close call but given the objection from the defendant, given

17     the pretrial motions and the like, this is not just an

18     employee but it is a shadow Senator.   It's a political

19     position.

20         I don't think this is an obvious call but

21     precisely because we have a large pool and the ability to,

22     you know, find jurors who don't even get close to the line,

23     I'm going to exclude Juror 1178.

24         With that, for the reasons I indicated, we are

25     going to go into a brief recess.   I will leave the note

**-3460-**

1    cards right here.  And why don't we just take 15 minutes?  I

2    suspect everybody will be happy with a break of the like.

3                So we will see everyone back here at 11:20.

4                (Recess from 11:05 a.m. to 11:24 a.m.)

5            **THE COURT:**  Good morning.

6            **PROSPECTIVE JUROR:**  Good morning.

7            **THE COURT:**  Feel free to take your mask off.  You

8    are Juror 1061.  Correct?

9            **PROSPECTIVE JUROR:**  Correct.

10           **THE COURT:**  And I see that on your card, and let

11   the record reflect that you answered "yes" to none of the

12   questions.

13               I just want to confirm a few things that, in fact,

14   you have no awareness of this case before today, of course.

15           **PROSPECTIVE JUROR:**  Correct.  General things as

16   far as the news.  But when it came to this case, I had no

17   idea it was --

18           **THE COURT:**  What about the Select Committee, the

19   January 6th Committee?  Any knowledge about that committee?

20   Have you watched any hearings, read any news about it?

21           **PROSPECTIVE JUROR:**  No, unfortunately.  You can

22   check my phone data and my laptop.  I haven't checked on

23   anything, not because I don't believe in it but been very

24   busy recently.

25           **THE COURT:**  I know I asked this sort of as a

**-3461-**

 1    catch-all question, but let me just make sure I ask it

 2    again.  Is there anything that you heard about my

 3    description of the case and any of the questions that would

 4    lead you to conclude that you would be unable to be

 5    impartial if you were qualified as a juror in this matter?

 6            **PROSPECTIVE JUROR:**  No.

 7            **THE COURT:**  Thank you.

 8            Government?

 9            **MS. VAUGHN:**  No questions, Your Honor.

10            **THE COURT:**  Thank you.

11            Mr. Corcoran?

12            **MR. CORCORAN:**  Just one.

13            Good morning, sir.

14            **PROSPECTIVE JUROR:**  Good morning.

15            **MR. CORCORAN:**  Just to follow up on your job with

16    Test Yourself D.C.  Is that work with COVID testing?

17            **PROSPECTIVE JUROR:**  Yes.

18            **MR. CORCORAN:**  Okay.  And what kind of work is it?

19    Is it D.C. government or is it private sector?

20            **PROSPECTIVE JUROR:**  I'm technically a contractor

21    even though we do work under D.C. Health.  I do specifically

22    contract work.

23            **THE COURT:**  Perfect.  I can see why you are busy.

24    Thank you.

25            Thank you, Your Honor.

 1          **THE COURT:**  Thank you.

 2       (Prospective juror steps down.)

 3          **THE COURT:**  Ms. Vaughn?

 4          **MS. VAUGHN:**  No objection from the government,

 5   Your Honor.

 6          **THE COURT:**  Mr. Corcoran?

 7          **MR. CORCORAN:**  No objection, Your Honor.

 8          **THE COURT:**  All right.  Juror 1061 is qualified.

 9       (Prospective juror steps up.)

10          **THE COURT:**  Good morning.

11          **PROSPECTIVE JUROR:**  Good morning.

12          **THE COURT:**  Feel free to take your mask off if you

13   would like.

14          Am I correct that you're Juror Number 1703?

15          **PROSPECTIVE JUROR:**  Yes, sir.

16          **THE COURT:**  Let the record reflect that you

17   answered "yes" to the following questions:  6, 7, 7(a),

18   7(b), 10, 14, 15, 16, 17, 18, 19, 21, 22, 45.

19          **PROSPECTIVE JUROR:**  Yes, sir.

20          **THE COURT:**  I just want to ask you some follow-up

21   questions about those.  I'll start with the questions around

22   this case.

23          Question 6 was:  Is there anything about the

24   nature of the charges here that would prevent you from

25   testifying fairly?  Then it asks you if you had heard about

1    this case and if, from anything you've heard, whether you

2    had formed any opinions about it or if there's anything

3    about your knowledge that would prevent you from following

4    my instructions and reaching a verdict based solely on the

5    evidence.

6         So can you describe for us why you answered "yes"

7    to those four questions?

8         **PROSPECTIVE JUROR:**  I've read a lot about the case

9    and heard a lot about it and formed very negative opinions.

10        **THE COURT:**  What have you read, generally?  News

11   articles?

12        **PROSPECTIVE JUROR:**  Accounts of the riot at the

13   Capitol, accounts of the proceedings of the Committee, the

14   defendant not cooperating with the Committee.

15        **THE COURT:**  And you have formed an opinion about,

16   really, the conduct at issue in this case then?

17        **PROSPECTIVE JUROR:**  Yes.

18        **THE COURT:**  Are you, therefore, concerned that you

19   would be unable to render an impartial judgment based

20   entirely and only on the evidence presented in court?

21        **PROSPECTIVE JUROR:**  Yes.

22        **THE COURT:**  Okay.

23        You also answered "yes" to whether you or anyone

24   you know has worked essentially in the legislative arena,

25   the House, the Senate or an agency affiliated with the

1    legislative branch.

2            Can you just describe to us what person did or

3    perhaps it was you?

4            **PROSPECTIVE JUROR:**  I have a very close friend who

5    worked for the Sergeant at Arms of the Senate.

6            **THE COURT:**  When was that, approximately?

7            **PROSPECTIVE JUROR:**  Six or seven years ago.

8            **THE COURT:**  You also answered "yes" to

9    Questions 14, 15, 16, 17, 18 and 19, which part of those

10   questions asked about the Select Committee and its work and

11   hearings, and then also about -- questions about Mr. Bannon

12   and then his former -- his work as a former advisor to

13   President Trump and the like.

14           Can you just describe why you answered "yes" to

15   those questions?

16           **PROSPECTIVE JUROR:**  I watched many of the

17   proceedings and witnesses and what have you, so...

18           **THE COURT:**  And as you've said before, you've

19   drawn conclusions, at least to some extent, here.

20           You also answered "yes" to the question about

21   would you tend to believe or not believe the testimony of a

22   witness simply because his or her political beliefs are the

23   same or different from your own.  Can you tell us why you

24   answered "yes" to that question?

25           **PROSPECTIVE JUROR:**  From things he's said and

1    people who he's been affiliated with, I would not tend to

2    believe anything he said.

3              **THE COURT:**  Okay.  It asks -- another question

4    asks whether you or anyone in your family, close friend, has

5    been in the legal profession.  Can you describe to us --

6              **PROSPECTIVE JUROR:**  I have a sister-in-law who is

7    a judge.

8              **THE COURT:**  Where is she a judge?

9              **PROSPECTIVE JUROR:**  Louisiana District Court.

10             **THE COURT:**  Federal or state?

11             **PROSPECTIVE JUROR:**  State.

12             **THE COURT:**  How long has she been a judge there?

13             **PROSPECTIVE JUROR:**  Two years.

14             **THE COURT:**  Okay.  And then, finally, you answered

15   Question 45.  Again, basically said, yes, you would have

16   difficulty putting aside what you've heard about the events

17   of January 6th and following the law and the evidence.  And

18   is that basically consistent with the answers you gave

19   before, the reasons for that?

20             **PROSPECTIVE JUROR:**  Yes.

21             **THE COURT:**  Thank you.

22             Ms. Gaston?

23             **MS. GASTON:**  The government doesn't have any

24   questions.

25             **THE COURT:**  Mr. Corcoran?

1          **MR. CORCORAN:**  Just a quick one.

2          First of all, I really appreciate your candor.

3  And I just have one question and that is, we've only been

4  here a couple of hours, but have you had occasion to talk to

5  any other of the jurors who are waiting about your thoughts

6  or your perceptions or Mr. Bannon?

7          **PROSPECTIVE JUROR:**  No, sir.

8          **MR. CORCORAN:**  Okay.  Thanks very much.

9          **THE COURT:**  Thank you, sir.

10      (Prospective juror steps down.)

11          **THE COURT:**  Mr. Corcoran?

12          **MR. CORCORAN:**  We would move to strike for cause,

13  Your Honor.

14          **THE COURT:**  I assume the government agrees.

15          **MS. GASTON:**  No objection.

16          **THE COURT:**  Juror Number 1703 will be stricken for

17  cause.

18      (Prospective juror steps down.)

19          **THE COURT:**  Good morning.

20          **PROSPECTIVE JUROR:**  Good morning.

21          **THE COURT:**  Feel free to take your mask off, if

22  you would like.  You are Juror 0351.  Correct?

23          **PROSPECTIVE JUROR:**  Yes.

24          **THE COURT:**  Let the record reflect that you

25  answered "yes" to the following questions:  6, 7, 7(a), 8,

1    15, 16, 17 -- though you have a question mark on 17 -- 18,

2    19 a question mark also, 21 and 22.

3              I'll ask you some follow-up questions, and the

4    lawyers may as well.  If there's anything that you feel

5    uncomfortable discussing in this setting, we can also go on

6    these phones.  The only people who would hear us are myself

7    and the lawyers and a few other people.

8              So as to Questions 6, 7 and 7(a), 6 is, Is there

9    anything about the nature of the charges in this case or the

10   parties involved that would prevent you from deciding this

11   case fairly?  And you answered "yes".

12             Why did you answer that question "yes"?

13             **PROSPECTIVE JUROR:**  I think because I don't

14   know -- I know the background on the case.  I don't know

15   what the exact defense is on it, but from what I've read and

16   what I've concluded myself, like, it just seems like

17   there's -- I don't know what the defense would be because it

18   seems pretty straightforward to me.

19             **THE COURT:**  Did you form that opinion based on

20   your having read about this case in the press?

21             **PROSPECTIVE JUROR:**  Reading, watching the

22   hearings.

23             **THE COURT:**  Okay.  So you have watched Committee

24   hearings?

25             **PROSPECTIVE JUROR:**  Yeah.

77

1          **THE COURT:**  And do you recall whether the

2     defendant was mentioned in the hearings that you watched?

3          **PROSPECTIVE JUROR:**  Uh-huh.

4          **THE COURT:**  Okay.  And you -- you also answered

5     "yes" to -- and I know you answered just now, you gave an

6     answer that might also apply, but you said "yes" to the

7     question, If you have heard, seen or read anything about

8     this case, have you formed opinions about this case based on

9     what you have heard, seen or read?  And is that essentially

10    what you've already said?

11         **PROSPECTIVE JUROR:**  Yeah.

12         **THE COURT:**  So you're concerned that you could not

13    set aside what you already know to decide this matter based

14    on how I would instruct you?

15         **PROSPECTIVE JUROR:**  I mean, I believe in a

16    person's right to a free and fair jury, and I would follow

17    whatever direction and I think I could be impartial, but I

18    do have opinions.

19         **THE COURT:**  Okay.  Let me ask you some other

20    questions.  So would you give the same answer -- there's a

21    suite of questions or a group of questions, 15 through 18,

22    about the Committee hearings.  Not about this case, but

23    about the Committee hearings.  And would you essentially say

24    the same thing you said earlier about this case --

25         **PROSPECTIVE JUROR:**  Yeah.

**-3469-**

1     **THE COURT:** -- to those?

2     **PROSPECTIVE JUROR:** (Nodded head.)

3     **THE COURT:** Okay.

4     You answered "yes" to the following question:

5     Mr. Bannon is a former advisor to President Trump. Do you,

6     your spouse or partner or family have any political beliefs

7     that might prevent you from sitting in judgment of another

8     person because that person's political beliefs are the same

9     or different from your own?

10    Can you explain your answer to that?

11    **PROSPECTIVE JUROR:** I have differences in opinions

12    or views and in respect to his previous actions.

13    **THE COURT:** And you would have a hard time setting

14    these views aside or at least you're worried that that might

15    complicate your view of the evidence here?

16    **PROSPECTIVE JUROR:** It's a concern, but I do

17    think -- again, I believe first and foremost in someone's

18    right to a free, fair trial.

19    **THE COURT:** You also answered "yes" to the

20    question, Do you have an opinion about the defendant's guilt

21    or innocence in this case? And is that essentially the same

22    answer you already gave earlier?

23    **PROSPECTIVE JUROR:** Correct.

24    **THE COURT:** The last question is you answered

25    "yes" to having family members or other friends and the like

 1   who are in the legal profession generally.  Can you just

 2   describe to us why you answered "yes" there?

 3              **PROSPECTIVE JUROR:**  My wife is a lawyer.

 4              **THE COURT:**  Where does she work?

 5              **PROSPECTIVE JUROR:**  She works at the FTC.

 6              **THE COURT:**  How long has she been there?

 7              **PROSPECTIVE JUROR:**  She's been there for maybe

 8   15 years.  Before that, it was --

 9              **THE COURT:**  Does she do criminal work?

10              **PROSPECTIVE JUROR:**  -- at the DOJ.

11              **THE COURT:**  Excuse me.  She was at DOJ before

12   that?

13              **PROSPECTIVE JUROR:**  Uh-huh.

14              **THE COURT:**  Has she ever been a prosecutor --

15              **PROSPECTIVE JUROR:**  No.

16              **THE COURT:**  -- or worked in the criminal area?

17              **PROSPECTIVE JUROR:**  She's investigated consumer

18   protection cases.

19              **THE COURT:**  That could have a criminal component,

20   at least in theory?

21              **PROSPECTIVE JUROR:**  Yes.

22              **THE COURT:**  Okay.  Thank you.

23              Ms. Gaston?  Ms. Vaughn?

24              **MS. VAUGHN:**  Good morning.

25              **PROSPECTIVE JUROR:**  Good morning.

80

1          **MS. VAUGHN:**  I think that you said that you

2     believe first and foremost in the right to a fair and

3     impartial trial.  As part of that, do you think that it's

4     important to follow the Court's instructions, if you --

5          **PROSPECTIVE JUROR:**  Yes.

6          **MS. VAUGHN:**  -- are selected as a juror?

7          **PROSPECTIVE JUROR:**  Definitely.

8          **MS. VAUGHN:**  And do you -- even though you've seen

9     things in the media and have things that might recount facts

10    relevant to this case, would you have a hard time putting

11    that aside given that there will be facts presented to you

12    as a juror in this case?  Will you have a hard time ignoring

13    what you've learned and just focus on the facts you learned

14    in this case?

15         **PROSPECTIVE JUROR:**  I don't think so.  I think

16    facts, first and foremost, are the most important thing.

17         **MS. VAUGHN:**  So you'd be able to put aside what

18    you learned in the press and just focus on what --

19         **PROSPECTIVE JUROR:**  Yes.

20         **MS. VAUGHN:**  And given what you just said about

21    your view that it's important to follow the Court's

22    instructions, when the Court instructs you not to review any

23    additional press on this case, would you be able to follow

24    that?

25         **PROSPECTIVE JUROR:**  Yes.

81

1          **MS. VAUGHN:**  And when the Court instructs you on

2    what the law is and what the elements of the offense are,

3    would you be able to follow only those instructions and

4    apply it only to the facts that you see in this trial?

5          **PROSPECTIVE JUROR:**  Yes.

6          **MS. VAUGHN:**  Is that a "yes"?

7          **PROSPECTIVE JUROR:**  Yes.

8          **MS. VAUGHN:**  Do you have any concerns about your

9    ability to put aside what you've seen and be fair and

10   impartial?

11         **PROSPECTIVE JUROR:**  I do not.

12         **MS. VAUGHN:**  Okay.  Thank you.

13         **THE COURT:**  Thank you.

14         Mr. Corcoran?

15         **MR. CORCORAN:**  None, Your Honor.

16         **THE COURT:**  Thank you.

17         Thank you, sir.

18         **PROSPECTIVE JUROR:**  Thank you.

19      (Prospective juror steps down.)

20         **THE COURT:**  Mr. Corcoran?

21         **MR. CORCORAN:**  Your Honor, we would move to strike

22   for cause.

23         **THE COURT:**  Granted.

24         Next.

25      (Prospective juror steps up.)

1          **THE COURT:**  Good morning.  It's still morning.

2          **PROSPECTIVE JUROR:**  Good morning.

3          **THE COURT:**  You can feel free to take off your

4     mask if you would like.  You are Juror 0342.  Correct?

5          **PROSPECTIVE JUROR:**  Correct.

6          **THE COURT:**  You answered "yes" to two questions,

7     which, for the record, are Questions 10 and 22.  I'll ask

8     you just a few questions about that, and there may be some

9     follow-up questions.

10          Question 1 [sic] is, Have you, a family member or

11    anyone close to you worked in the House or the Senate or a

12    government agency affiliated with the legislative branch?

13          Can you describe why you answered "yes" to that

14    question, the details around that?

15          **PROSPECTIVE JUROR:**  If you count internships, I

16    interned with Senator McCaskill in 2018.  And then one of my

17    closer friends works with the Senate Intelligence Committee.

18          **THE COURT:**  How close are you to that friend?

19          **PROSPECTIVE JUROR:**  I mean, we've been good

20    friends since college so...

21          **THE COURT:**  How often do you speak to him or her?

22          **PROSPECTIVE JUROR:**  Once a week or something like

23    that.

24          **THE COURT:**  How long was your internship with

25    Senator McCaskill?

1          **PROSPECTIVE JUROR:**  Just for the fall semester, so

2     three months, maybe.

3          **THE COURT:**  So fall of 2018, four years ago?

4          **PROSPECTIVE JUROR:**  Yep -- no.  Sorry.  2016.  No,

5     that's not right either.  2014.  I'm sorry.

6          **THE COURT:**  Oh, 2014.  So eight years ago?

7          **PROSPECTIVE JUROR:**  Yes.

8          **THE COURT:**  Fall internship while you were in

9     college?

10          **PROSPECTIVE JUROR:**  Yes.

11          **THE COURT:**  What do you do now?

12          **PROSPECTIVE JUROR:**  I work in finance.

13          **THE COURT:**  Okay.  You also answered "yes" to the

14     Question 22, Have you, a family member or anyone close to

15     you ever studied law or worked in the legal profession in

16     any way, and it sort of lists it in topics.  So you can just

17     tell us why your answer was "yes" to that.

18          **PROSPECTIVE JUROR:**  So two of my grandparents were

19     lawyers, and my uncle was also a lawyer.

20          **THE COURT:**  Do you know what your grandparents

21     did, specifically what kind of practice?

22          **PROSPECTIVE JUROR:**  I don't really know.  I know

23     one of them was a corporate lawyer.  He was a lawyer in the

24     Army before that, but that was the 70s.  I am really not

25     sure beyond that.  The other two were more local.

84

1              **THE COURT:**  And your uncle?

2              **PROSPECTIVE JUROR:**  He was a local lawyer in

3       Illinois.

4              **THE COURT:**  Illinois?

5              **PROSPECTIVE JUROR:**  Yep.

6              **THE COURT:**  Do you know if he did any criminal law

7       practice?

8              **PROSPECTIVE JUROR:**  Yes, he did.

9              **THE COURT:**  He did?

10             **PROSPECTIVE JUROR:**  Yeah.

11             **THE COURT:**  Anything about your conversations with

12      him, your knowledge of his practice, anything like that,

13      lead you to conclude you couldn't be unbiased here?

14             **PROSPECTIVE JUROR:**  No.

15             **THE COURT:**  So we asked some questions about your

16      knowledge about this case and about the Select Committee.

17      You didn't answer "yes" to anything there.  I wanted to make

18      sure that you, in fact, intentionally and you knowingly

19      answered "no" to all of those questions.  You haven't heard

20      anything about this case?

21             **PROSPECTIVE JUROR:**  No.

22             **THE COURT:**  What, if anything, have you heard

23      about the Select Committee's work?

24             **PROSPECTIVE JUROR:**  To be honest, I haven't heard

25      that much.  I have taken a break from the news.  I've seen a

85

1    couple headlines, but I haven't really read that deeply into

2    any of it.

3        **THE COURT:**  Okay.  Ms. Gaston?

4        Counsel will have a couple follow-up questions for

5    you, potentially.

6        **MS. GASTON:**  Good morning.

7        **PROSPECTIVE JUROR:**  Good morning.

8        **MS. GASTON:**  Your friend who works for the Senate

9    Intelligence Committee, have you talked about January 6th

10    with that friend?

11        **PROSPECTIVE JUROR:**  Yeah.  I mean, not in any

12    serious capacity but, I mean, we are both in D.C.  It's a

13    topic to talk about for sure.

14        **MS. GASTON:**  Because -- have you talked with the

15    friend about whether he or she was at work on that day?

16        **PROSPECTIVE JUROR:**  He was not at the Capitol that

17    day.

18        **MS. GASTON:**  Okay.  And are you familiar with the

19    defendant at all?

20        **PROSPECTIVE JUROR:**  Yes.

21        **MS. GASTON:**  And what do you know about him?

22        **PROSPECTIVE JUROR:**  That he was an advisor for

23    President Trump.  I may know a few other things about his

24    background, but I am not confident enough to say I know for

25    sure.

1          **MS. GASTON:**  Is there anything about what you know

2     about him that would cause you concern about whether you

3     could be fair to him?

4          **PROSPECTIVE JUROR:**  No.

5          **MS. GASTON:**  Your uncle who may have done some

6     criminal law, do you know what side of the -- which table he

7     was sitting at?

8          **PROSPECTIVE JUROR:**  I believe -- honestly, I

9     haven't talked too much about the specific practice, but I

10    think he was more on the side of the defense.

11         **MS. GASTON:**  But you didn't really discuss his

12    practice with him?

13         **PROSPECTIVE JUROR:**  No.

14         **MS. GASTON:**  Nothing further.

15         **THE COURT:**  Mr. Corcoran?

16         **MR. CORCORAN:**  Good morning, sir.

17         **PROSPECTIVE JUROR:**  Good morning.

18         **MR. CORCORAN:**  I understand you worked up on the

19    Senate as an intern, and I understand it was just an

20    internship, but what was the scope of your responsibilities?

21         **PROSPECTIVE JUROR:**  I would do a couple research

22    projects, give tours of the Capitol, a lot of answering

23    phone calls, that kind of thing.  Nothing really too deep.

24         **MR. CORCORAN:**  Okay.

25              And when you were asked about your knowledge of

1    Steve Bannon, you indicated you knew he was former top

2    advisor to President Trump.  And then I think you said, you

3    know a few other things.  What comes to mind when you think

4    of the other things that are in your mind when you hear the

5    name Steve Bannon?

6            **PROSPECTIVE JUROR:**  Well, I -- admittedly, my

7    memory -- I am not saying I know these things.

8            **MR. CORCORAN:**  Of course.

9            **PROSPECTIVE JUROR:**  But I believe I remember

10   reading that he helped start this political organization

11   somewhere in Europe that was sort of -- but like -- I don't

12   know how to describe it.  Sort of a grassroots political

13   movement in Europe.

14           Then I want to say there was also, like, a farm

15   in, like, world of warcraft that he built that was -- he had

16   Chinese workers working for him to generate money.

17           Beyond that, I am not too sure.

18           **MR. CORCORAN:**  What was the source of that

19   information?

20           **PROSPECTIVE JUROR:**  News articles.

21           **MR. CORCORAN:**  News articles?

22           **PROSPECTIVE JUROR:**  I'd say *New York Times*,

23   *Washington Post*, things like that.

24           **MR. CORCORAN:**  And based on that information that

25   you've read about him being an advisor and other things,

88

1    what comes to your mind when you think of Steve Bannon?

2         **PROSPECTIVE JUROR:**  Obviously, I'm not a fan of

3    Steve Bannon personally.  But I wouldn't say that it would

4    impact my ability to make a judgment in this case.

5         **MR. CORCORAN:**  Okay.

6         Thank you, Your Honor.

7         **THE COURT:**  Thank you, very much.

8         (Prospective juror steps down.)

9         **MR. CORCORAN:**  Mr. Corcoran?

10        **MR. CORCORAN:**  Your Honor, we move to strike.  And

11   the main reason is any time that you are starting a criminal

12   trial with one juror who's not a fan of the defendant, I

13   think they should be struck.

14        **THE COURT:**  Thank you.

15        **MS. GASTON:**  Your Honor, the government would

16   submit that there is no reason to strike him.  He was very

17   forthcoming about that opinion but said repeatedly that he

18   did not think it would impact his ability to be fair.  And

19   the things that he did seem to know about the defendant have

20   no connection to what this trial is about.

21        **THE COURT:**  I agree with the government to a

22   point.  And if we were having a difficult time finding

23   otherwise-qualified jurors, I might in fact seat 0342.  But

24   it seems to me that, again, there is no reason to get close

25   to this line, at least not yet.  And therefore I will

1    exclude 0342.

2        (Prospective juror steps up.)

3            **THE COURT:**  Good morning.

4            **PROSPECTIVE JUROR:**  Good morning.

5            **THE COURT:**  You may take your mask off, if you are

6    comfortable doing so.  You are Juror 1391.  Correct?

7            **PROSPECTIVE JUROR:**  Yes.

8            **THE COURT:**  Your note card reflects that you

9    answered "yes" to the following questions:  7, 14, 16 and

10    26.

11            **PROSPECTIVE JUROR:**  Correct.

12            **THE COURT:**  I'm just going to ask you some

13    questions about that, then counsel may have some follow-ups.

14            So you answered "yes" to the question whether

15    you've heard, read or seen anything from any source about

16    this case, but then you answered "no" to whether you had

17    formed any opinions about the case and "no" to whether

18    there's anything that would prevent you from following my

19    instructions or reaching a verdict based solely on the

20    evidence presented during the trial.

21            So can you explain that?  First, can you start

22    with what have you read, seen or heard about this case?

23            **PROSPECTIVE JUROR:**  I read the newspaper.  I

24    listen to the news.  I do not do social media.  And I have

25    heard about this case from the newspaper and TV news.

1      **THE COURT:**  Do you recall what papers or what

2    channels on the TV that you've seen this case mentioned in?

3      **PROSPECTIVE JUROR:**  I listen to PBS, and I read

4    *The New York Times*, *The Washington Post* and watch Fox News.

5      **THE COURT:**  I just want to confirm that, as you

6    answered on your card, you have not formed any opinions

7    about this case specifically; is that correct?

8      **PROSPECTIVE JUROR:**  Correct.

9      **THE COURT:**  And based on what you know about it,

10    that you stand by your answer that there's nothing that

11    would prevent you from following my instructions or

12    otherwise being impartial.

13      **PROSPECTIVE JUROR:**  Correct.

14      **THE COURT:**  You also answered "yes" to the

15    questions which are related, Questions 14 and 16, which is

16    about, first, whether you have seen, read or heard anything

17    about the Select Committee.  And then 16 is whether you've

18    watched or read coverage of those hearings.

19      So can you describe to us how you've heard, seen

20    or read about the Committee and the hearings?

21      **PROSPECTIVE JUROR:**  Well, I've already told you

22    what news sources I get.  I would add NPR.

23      **THE COURT:**  Okay.

24      **PROSPECTIVE JUROR:**  And I watched the hearings on

25    TV.

**-3482-**

1          **THE COURT:**  Okay.  Do you recall any mention of

2     the defendant -- Mr. Bannon, here -- any mention during the

3     hearings you've watched?

4          **PROSPECTIVE JUROR:**  Yes.

5          **THE COURT:**  What do you recall being said about

6     him?

7          **PROSPECTIVE JUROR:**  I'm trying to remember.  I

8     believe at the last hearing there was reference -- not only

9     reference there were-- there was the visual, the videotape

10     of Mr. Bannon on his radio show.

11          **THE COURT:**  Do you recall what he said during the

12     video that was referenced during the hearing?

13          **PROSPECTIVE JUROR:**  He was implying that it was

14     going to be a very exciting day.

15          **THE COURT:**  And by "day" you are referring to

16     January 6?

17          **PROSPECTIVE JUROR:**  Yes.

18          **THE COURT:**  Is there anything about the

19     Committee's hearings more generally or that snippet in

20     particular that, in your view, would cause you to question

21     your ability to be impartial?

22          **PROSPECTIVE JUROR:**  There is nothing that would

23     question my ability to be impartial.

24          **THE COURT:**  Okay.  You also answered "yes" to 26,

25     which is whether you served as a juror in a civil or

1   criminal trial.  Can you just tell us when and where you did

2   that?

3            **PROSPECTIVE JUROR:**  You can tell from my gray hair

4   that I've been called to jury duty before.  I've been, I

5   think, twice on a jury.  Once was on an insurance case and

6   once was on a civil commitment case.

7            **THE COURT:**  So you've never been a juror on a

8   criminal case?

9            **PROSPECTIVE JUROR:**  No.

10           **THE COURT:**  Were both of those cases here in the

11  District of Columbia?

12           **PROSPECTIVE JUROR:**  Yes.

13           **THE COURT:**  Anything about those experiences as a

14  juror that would lead you to conclude that you couldn't be

15  impartial, follow my instructions and the like?

16           **PROSPECTIVE JUROR:**  To the contrary.  I found the

17  experience and the interaction a very important civic duty.

18           **THE COURT:**  Okay.  Thank you very much.

19           Ms. Vaughn?

20           **MS. VAUGHN:**  Good morning.

21           **PROSPECTIVE JUROR:**  Good morning.

22           **MS. VAUGHN:**  I just had a quick couple questions.

23  I notice that you are retired.

24           **PROSPECTIVE JUROR:**  Yes.

25           **MS. VAUGHN:**  I was wondering what you did when you

1    worked before.

2            **PROSPECTIVE JUROR:**  I was the research director at

3    the Communication Workers of America.

4            **MS. VAUGHN:**  Communication Workers of America.

5            And in your jury service, were both the juries you

6    served on able to reach a verdict?  You don't have to tell

7    me what the verdict was.

8            **PROSPECTIVE JUROR:**  Yes.

9            **MS. VAUGHN:**  And did you ever serve as the

10    foreperson?

11            **PROSPECTIVE JUROR:**  No.

12            **MS. VAUGHN:**  That's all I have.  Thank you.

13            **PROSPECTIVE JUROR:**  Thank you.

14            **THE COURT:**  Mr. Corcoran.

15            **MR. CORCORAN:**  Thank you, Your Honor.

16            Good morning, ma'am.

17            Just a couple questions to follow up on what you

18    said.  You indicated that you get news from the *New York*

19    *Times*, *The Post*, PBS, NPR; and that because of that, you've

20    actually heard about this case; is that correct?

21            **PROSPECTIVE JUROR:**  I added Fox News as well.

22            **MR. CORCORAN:**  And Fox News.  Okay.

23            And from those sources, you learned information

24    about this case?

25            **PROSPECTIVE JUROR:**  I read about the case, yes.  I

94

1    read that the case is happening.

2         **MR. CORCORAN:**  And what exactly do you remember

3    reading about?

4         **PROSPECTIVE JUROR:**  I don't remember a lot.  And I

5    will say, I was out of town over the weekend and got awoken

6    this morning at 6:30 to say I was coming here, so I did not

7    have a chance to read the papers today.

8         **MR. CORCORAN:**  Okay.

9         But from the prior sources, what -- if you could

10   just think back in your memory and think back to what you've

11   read that gives you some information about that this case

12   was going to happen.

13        **PROSPECTIVE JUROR:**  Well, it was very much what we

14   were told in the summary of what the case is about.  It's

15   whether Mr. Bannon is required legally to turn over -- to

16   testify and to turn over the information that was requested.

17        **MR. CORCORAN:**  Okay.  So that -- the legal issue

18   that you heard today in the neutral statement of the case is

19   something that you came to court today already understanding

20   was this case; is that right?

21        **PROSPECTIVE JUROR:**  Yes.

22        **MR. CORCORAN:**  Okay.

23        Okay.  Now, you said that you saw a video

24   presentation of Mr. Bannon at the Select Committee hearing;

25   is that right?

1          **PROSPECTIVE JUROR:**  I recall that, yes.

2          **MR. CORCORAN:**  And was that before or after you

3     had, from these news sources, heard that there was a case

4     that was going to be happening that's along the lines of the

5     statement of the case?

6          **PROSPECTIVE JUROR:**  I don't remember.

7          **MR. CORCORAN:**  Okay.

8          The videotape that you saw of Mr. Bannon, I think

9     your summary of it was that there was some suggestion -- or

10    some of the statement was suggesting that the day after

11    January 6 was going to be a very exciting day.  That was

12    your sort of --

13         **PROSPECTIVE JUROR:**  No, the day of January 6.

14         **MR. CORCORAN:**  The day of January 6th was going to

15    be a very exciting day.

16         And what was the commentary by the Committee

17    members on either side of that take?  What do you remember

18    about how they put that into context?

19         **PROSPECTIVE JUROR:**  I can't recall.

20         **SPEAKER6:**  Okay.  Why -- I mean, I guess what I'm

21    asking is, a videotape of any person saying, "January 6 is

22    going to be a very exciting day," is one thing.  But if it's

23    in the context of a hearing, there may be more information

24    involved.

25         And really what I'm asking you is, when you

1    turned -- finished watching the hearing, what can you think

2    about why that was presented at all in the hearing?  What

3    importance was that to the hearing?

4         **PROSPECTIVE JUROR:**  This was the hearing in which

5    the Committee was providing to the public, in the public

6    hearing, information to indicate that there were individuals

7    who were planning -- going up to the Capitol.  And, as I

8    recall, this videotape was to indicate that there was

9    infor-- based on what Mr. Bannon said on the videotape, that

10   he may have had some information that there was a plan to go

11   up to the Capitol.

12        **MR. CORCORAN:**  Okay.

13        I guess my question is this:  You've talked about

14   the various sources of information that you have about this

15   case, and in your mind, how would you approach the case

16   differently having all of that information presented to you,

17   including watching the videotape, than somebody who hadn't

18   seen it at all?

19        **PROSPECTIVE JUROR:**  I understand.  I think it's

20   really an important question.

21        **MR. CORCORAN:**  Okay.

22        **PROSPECTIVE JUROR:**  I am not familiar with the

23   legal requirements about providing testimony and about

24   providing documents.  I have no information about what those

25   legal requirements are.

97

1          Based on what the judge told us, it is my

2    understanding that's the question before the Court.

3    Therefore I feel very confident that I could be impartial in

4    considering that question and listening to the arguments and

5    evidence.

6          **MR. CORCORAN:**  Okay.  Well, thank you very much.

7          **THE COURT:**  Thank you, ma'am.

8          Ma'am, one -- hold on one second.

9          (Discussion between Mr. Schoen and Mr. Corcoran

10   off the record.)

11         **MR. CORCORAN:**  Just one follow-up question for my

12   co-counsel.  Are you working on a dissertation now?

13         **PROSPECTIVE JUROR:**  Yes.

14         **MR. CORCORAN:**  And what's the topic?

15         **PROSPECTIVE JUROR:**  It's the "Transformation of

16   Work in Telephone Company Call Centers."

17         **MR. CORCORAN:**  I love it!  Thank you very much.

18         **THE COURT:**  Thank you, ma'am.

19      (Prospective juror steps down.)

20         **THE COURT:**  Mr. Corcoran?

21         **MR. CORCORAN:**  Your Honor, we're going to move to

22   strike.  This is one of those instances where a person has

23   indicated that they thought they could be fair at a trial.

24   We heard her say that.

25         But it's also an instance where she has, from

1    multiple sources, heard not just about January 6th but about

2    this case.  And in her reading, and then beyond that, she

3    saw a Select Committee hearing where she recognized a clip

4    that was played involving Mr. Bannon and that she found

5    suggested implying that on January 6, it was going to be an

6    exciting day.  She took that to mean, in my follow-up

7    questioning, that the Committee, at least, was suggesting

8    that Mr. Bannon was somehow involved in the planning of the

9    violence.

10           And in this case, one of the issues, as I

11   understand it that the government has presented is the

12   reason for the Select Committee questioning, the reason for

13   the issuance of the Select Committee subpoena to Mr. Bannon,

14   was statements that he made on January 5th, the same

15   podcast.

16           So the bottom line is this, I guess, Your Honor:

17   Here is a potential juror who's actually seen, in the

18   setting of the Select Committee, something that will be a

19   key piece of evidence in the case, and she saw it and

20   thought to herself, Well, I understand that they're saying

21   that he's involved in the planning.

22           We move to strike.  There are plenty of jurors to

23   go.

24           Thank you.

25           **THE COURT:**  Thank you, Mr. Corcoran.

1          Ms. Vaughn?

2          **MS. VAUGHN:**  Your Honor, the government doesn't

3    think that there's a reason to strike this juror for cause.

4    She said that she had not heard anything about the issues in

5    this case beyond what was also summarized for her.  She said

6    she views it as a completely separate question.  She served

7    on juries before, and she said she takes it seriously.

8          And she -- and she was asked sort of a -- she was

9    asked a question more about, Well, what was the rest of the

10    hearing about?  And she reported that.

11          And so the standard is not, Has someone not been

12    exposed to it at all.  It's whether they're going to be

13    prejudiced.  She's taken an oath to tell the truth, as all

14    the potential jurors have here.  She seemed very convinced

15    of her own abilities.  And I'm not sure if there's a basis

16    to question whether she's a sufficient judge of her own

17    abilities.

18          **THE COURT:**  Thank you.

19          I am going to not grant the Motion to Exclude.  I

20    am going to qualify Juror 1391.

21          In my view, yes, she does have, obviously,

22    external information, but her answers were quite clear that

23    as to this case, her knowledge is limited; that she hasn't

24    prejudged anything; she understands the difference between

25    what she knows about the Committee and what this case is

1    about.

2              And I thought her demeanor was particularly clear

3    regarding her ability to follow instructions, to act

4    impartially and to not allow anything that she has learned

5    outside of the courtroom to prejudice her judgment here and,

6    I think most importantly, nothing in my view suggested that

7    she would -- either is or would be impartial -- I'm sorry.

8    Would be partial.  So for that reason, we will seat -- not

9    seat.  We will qualify 1391.

10             Mr. Corcoran?

11             **MR. CORCORAN:**  Your Honor, I just want to make a

12   statement for the record.  Just a follow-up.

13             I'm not asking the Court to reverse its position.

14   I'm simply making a record, and that is, we filed maybe

15   three or four motions to continue the trial.

16             **THE COURT:**  Uh-huh.

17             **MR. CORCORAN:**  And the basis for the motions was

18   the deluge of coverage of the Select Committee hearings and

19   of this case, in fact.  And at each instance -- and we asked

20   for a short period, really, three months.  And that was

21   denied.  And we're moving forward with trial.

22             But part of the Court's rationale, as I understood

23   it, was that this issue of the saturation of the media and

24   the jury pool would be taken care of --

25             **THE COURT:**  Yes.  And as we've heard, there are a

1   number of jurors who have said they could not or at least

2   would risk being able to sit as an impartial juror in this

3   case.  And we've heard from those jurors, and we just had a

4   juror who said she could.

5            And, in my view, the mere fact of media coverage

6   is not enough -- knowledge of media coverage is not enough

7   to exclude someone as a juror.  The reason that we're going

8   through this process is to see whether that -- in my view,

9   whether that media saturation, among other things, makes it

10  so that we can't find jurors who would be impartial, as we

11  have confronted this morning to some extent.

12           **MR. CORCORAN:**  And I totally understand and

13  appreciate and will abide by the Court's ruling.  And I

14  simply want to make a point for the record --

15           **THE COURT:**  Yes.

16           **MR. CORCORAN:**  -- that with respect to this juror,

17  it wasn't just media saturation, but that she had actually

18  seen something and recalled it at the hearing that will be

19  part of the evidence in this case.

20           Thank you, Your Honor.

21           **THE COURT:**  Thank you.

22           Let's bring the next juror in, please.

23      (Prospective juror steps up.)

24           **THE COURT:**  Good morning.  One second, please.

25           **PROSPECTIVE JUROR:**  Good morning, Your Honor.

1          **THE COURT:**  Actually, no, good afternoon.

2          You can take your mask off if you'd like.  You

3    don't have to.  You are juror 0873.  Correct?

4          **PROSPECTIVE JUROR:**  Yes, Your Honor.

5          **THE COURT:**  And you answered questions -- and I'll

6    just state for the record, you answered "yes" to the

7    following questions:  5, 7, 10, 14, 16, 22 and 23.  I'm just

8    going to ask you a few questions about those "yes" answers,

9    and then counsel for the parties may have some follow-up

10   questions.

11         You answered "yes" to the question, Do you know or

12   recognize any other member of the prospective jury panel,

13   any member of the courtroom staff or me?

14         Can you explain your answer there?

15         **PROSPECTIVE JUROR:**  Yes, Your Honor.

16         I recognize you.  I'm an attorney and I am

17   currently working on a case that you are presiding over.

18         **THE COURT:**  Is that a civil case or a criminal

19   case?

20         **PROSPECTIVE JUROR:**  It is a civil case.

21         **THE COURT:**  Okay.  And that case is currently

22   pending?

23         **PROSPECTIVE JUROR:**  Yes, sir.

24         **THE COURT:**  Where do you work?

25         **PROSPECTIVE JUROR:**  Kirkland and Ellis.

1          **THE COURT:**  Is that case set for trial in a couple
2    weeks?

3          **PROSPECTIVE JUROR:**  Yes, sir.

4          **THE COURT:**  Do you have any reason to believe that
5    based on your work on that matter, that you will be unable
6    to be impartial in this case?

7          **PROSPECTIVE JUROR:**  No, Your Honor.

8          **THE COURT:**  You also mentioned, in response to
9    Question 7, that you had heard, seen or read things about
10   this case.  Can you explain what you have read, seen or
11   heard about this matter?

12         **PROSPECTIVE JUROR:**  I've been -- I follow the news
13   pretty closely.  I've been reading things in the news since
14   the indictment, essentially.

15         **THE COURT:**  And you also answered "yes" to
16   Questions 14 and 16, about the Select Committee's work and
17   the hearings.

18         Can you describe how you've learned about the
19   Select Committee and how much you've watched of the
20   hearings?

21         **PROSPECTIVE JUROR:**  Sure.

22         I guess similar answer.  I follow the news
23   closely.  I read the news pretty frequently, and I have not
24   watched much of the hearings live, but I have seen clips on
25   news channels.

1          **THE COURT:**  Have you seen anything in the hearings

2    where the defendant, here, Mr. Bannon, has been mentioned?

3          **PROSPECTIVE JUROR:**  Not that I recall.

4          **THE COURT:**  Is there anything about your knowledge

5    about this case or the Committee hearings that would lead

6    you to conclude you couldn't be impartial in this matter?

7          **PROSPECTIVE JUROR:**  No, Your Honor.

8          **THE COURT:**  You also answered "yes" to Questions

9    22 and 23.

10         Twenty-two, I think at a minimum, you're obviously

11   a practicing attorney right now.  Is there anyone else in

12   your orbit who also is?

13         **PROSPECTIVE JUROR:**  My father-in-law is.

14         **THE COURT:**  What does your father-in-law do?

15         **PROSPECTIVE JUROR:**  He is Deputy General Counsel

16   in the FDIC.

17         **THE COURT:**  How long has he been in that role?

18         **PROSPECTIVE JUROR:**  In that role specifically, I

19   think three or four years.

20         **THE COURT:**  Do you know what he did before that?

21         **PROSPECTIVE JUROR:**  He's been at the FDIC for

22   30-plus years.

23         **THE COURT:**  You also answered whether you, a

24   family member or anyone close to you has been the subject of

25   a criminal investigation or accused of a crime.  Can you

1    describe to us the nature of that answer?  And if there's

2    anything particularly sensitive that you would like to

3    discuss with the husher on, we could do that.

4         **PROSPECTIVE JUROR:**  I would prefer to do the

5    husher, if that's possible.

6         **THE COURT:**  So we are going to go under seal.

7         (Sidebar discussion.)

8         **THE COURT:**  Can everyone hear one another?

9    Mr. Corcoran, we have you?  Ms. Vaughn?  Okay.

10         **PROSPECTIVE JUROR:**  I was arrested when I was 18

11    for under age possession of alcohol.

12         **THE COURT:**  Is that the only time you've

13    interacted with the criminal justice system as an arrestee?

14         **PROSPECTIVE JUROR:**  Yes.

15         **THE COURT:**  How long ago was that?

16         **PROSPECTIVE JUROR:**  I'm 30 now, so it was 12 years

17    ago.

18         **THE COURT:**  Thank you.

19         Okay.  We will go back on the record now.

20         (Sidebar discussion concluded.)

21         **THE COURT:**  So we are back from under seal.  The

22    last answer that you answered -- or question you answered

23    "yes" to is number 10, which is about whether you or anyone

24    close to you has ever worked for the House, Senate or an

25    agency affiliated with the legislative branch.

1          Can you explain your answer there?

2          **PROSPECTIVE JUROR:**  Yes, Your Honor.  My

3     sister-in-law worked for the Senate five or six years ago.

4               **THE COURT:**  For whom or for what entity?

5          **PROSPECTIVE JUROR:**  She worked for Senator Tim

6     Kaine.

7               **THE COURT:**  And what does she do now?

8          **PROSPECTIVE JUROR:**  She is in the healthcare

9     industry.  She went and got an MBA and is in a different

10    industry.

11              **THE COURT:**  Okay.  Thank you.

12         Ms. Gaston?

13         A few questions from the lawyers probably.

14         **MS. GASTON:**  Good afternoon.

15         **PROSPECTIVE JUROR:**  Hi.  Good afternoon.

16         **MS. GASTON:**  You mentioned that you follow the

17    news and have seen Committee clips.  Where have you seen

18    those things or read that coverage?

19         **PROSPECTIVE JUROR:**  *New York Times*, CNN, MSNBC,

20    *Wall Street Journal*, law.com, *American Lawyer*.  I read a lot

21    of news cites.

22         **MS. GASTON:**  And your sister-in-law, what did she

23    do when she worked in the Senate?

24         **PROSPECTIVE JUROR:**  She was a legislative

25    assistant, I believe.

1          **MS. GASTON:**  Is there anything in the coverage you

2     have seen that gives you an idea of what this case is going

3     to be about?

4          **PROSPECTIVE JUROR:**  Yes.  I think I have a pretty

5     good understanding of what the case is going to be about.  I

6     wouldn't say that I formed an opinion either way, but I

7     think I understand the issue.

8          **MS. GASTON:**  Okay.  And where did you gain that

9     understanding?

10          **PROSPECTIVE JUROR:**  From reading news articles.  I

11     think specifically I read an article last week about rulings

12     the Court made on the defense -- the defenses that the

13     defendant would be able to present or not present.

14          **MS. GASTON:**  Do you think that you would be able

15     to put those things out of your mind if you were to serve on

16     this jury?

17          **PROSPECTIVE JUROR:**  Yes.  I think I could be

18     impartial.  Like I said, I don't think I've formed an

19     opinion either way.  I just think I know a lot of the

20     background.

21          **MS. GASTON:**  And do you think you would be able to

22     make decisions based on only the facts that you learn in the

23     courtroom?

24          **PROSPECTIVE JUROR:**  Yes.

25          **MS. GASTON:**  Thank you.

1          **THE COURT:**  Mr. Corcoran?

2          **MR. CORCORAN:**  Thank you, Your Honor.

3     Good afternoon.

4          **PROSPECTIVE JUROR:**  Good afternoon.

5          **MR. CORCORAN:**  Just following up on the last

6     couple of questions.

7          You just indicated that based on your following of

8     the news, different news sources, that you have a pretty

9     good understanding of what the issues are in the case.  What

10    is your understanding?

11         **PROSPECTIVE JUROR:**  My understanding is that there

12    was a subpoena issued for testimony and records; and that

13    there is a question of whether or not the subpoena return

14    date was supposed to be a firm date or up for further

15    negotiation.

16         **MR. CORCORAN:**  Okay.

17         And you also indicated that you read something

18    that provided some information about potential defenses that

19    were at one time available to the defendant in the case; is

20    that correct?

21         **PROSPECTIVE JUROR:**  Yes.  I read an article last

22    week.  I believe it was either in *American Lawyer* or

23    law.com, one of those entities.

24         **MR. CORCORAN:**  What do you remember about what was

25    discussed in the article?

1          **PROSPECTIVE JUROR:**  I don't remember specifically

2    the defenses that would be excluded.  I remember there may

3    have been a constitutional aspect and I remember a -- that

4    there was a quote from a member of the defense team saying

5    that they weren't sure there were going to be any defenses

6    left or something to that effect.

7          **MR. CORCORAN:**  Okay.

8          Let me ask you about the case that you got pending

9    in front of the court here.  You said that that's -- is that

10   a civil case?

11         **PROSPECTIVE JUROR:**  Yes, it's a civil case.

12         **MR. CORCORAN:**  Is there a trial date in that case?

13         **PROSPECTIVE JUROR:**  It's August 1st.

14         **SPEAKER6:**  Are there any outstanding motions?

15         **PROSPECTIVE JUROR:**  Yes, I believe there are

16   several Motions in Limine filed by the plaintiffs that are

17   outstanding.

18         **MR. CORCORAN:**  Thank you, Your Honor.

19         **PROSPECTIVE JUROR:**  Thank you.

20         **THE COURT:**  Thank you.

21      (Prospective juror steps down.)

22         **THE COURT:**  Mr. Corcoran?

23         **MR. CORCORAN:**  Nothing further from the defense,

24   Your Honor.

25         **THE COURT:**  Ms. Vaughn?  Ms. Gaston?

1          **MS. GASTON:**  Nothing from the government,

2     Your Honor.

3          **THE COURT:**  So the parties are in agreement that

4     we will seat -- I apologize I keep saying that.  We will not

5     strike Juror 0873 for cause and I agree.

6          (Discussion between Ms. Lesley and the Court off

7     the record.)

8          **THE COURT:**  Ms. Gaston?

9          **MS. GASTON:**  Your Honor, if we could actually move

10    to strike that juror.

11         **THE COURT:**  The government wishes to strike Juror

12    0873?

13         **MS. GASTON:**  Yes.

14         **THE COURT:**  On what ground?

15         **MS. GASTON:**  A couple grounds.  One, he read

16    newspaper articles about excluded evidence and so, even

17    though he said that he couldn't remember exactly the kinds

18    of things that were discussed in the article, I am concerned

19    that, as he's sitting in the jury and starting to hear the

20    evidence, he will realize what the evidence is that he read

21    about that is not coming in, that when the attorneys on

22    either side make objections, he will sort of know what the

23    objections are based on, in a way that is not appropriate

24    for a juror.  And while I'm sure he will do his best to sort

25    of cast those things out of his mind, I am concerned that

1    that's not really possible in this situation.

2         **THE COURT:**  Thank you, Ms. Gaston.

3         Mr. Corcoran, why, in light of your argument

4    earlier, do you think it's appropriate to seat this juror?

5    It seems pretty inconsistent you argued as to 1391 but not

6    as to 0873.

7         **MR. CORCORAN:**  It's interesting, Your Honor.  I

8    was just going to say the same with regard to the government

9    because --

10        **THE COURT:**  Yes.

11        **SPEAKER6:**  We learn, Your Honor, moment by moment.

12   What we learned from Juror 1391 is that she -- her demeanor

13   indicated she could be fair and this gentleman's demeanor

14   and his statements indicated that he could be fair, and

15   that's why, when both of us said we wouldn't strike them and

16   I know that -- I think your sense was he could be fair as

17   well.

18        I know that the government changed its position,

19   but they are the ones who are being inconsistent.  Here is

20   somebody who, like Juror 1391, made a clear statement that

21   whatever information was provided in advance is not going to

22   affect his ability to listen carefully to the facts and make

23   a judgment based on that.  There is simply no difference

24   between the jurors on that topic.

25        Thank you.

1        **THE COURT:**  For the record, I did not seat Juror

2    1391 merely based on demeanor.  It seems to me that her

3    knowledge of this matter is substantially less-informed than

4    Juror 0873, who is a practicing lawyer and who has read not

5    just what this case is about, which is what 1391 testified

6    about, but actual specific pretrial rulings I have made,

7    statements by counsel about what the case is or is not about

8    now.  It seems to me that there is a substantive difference

9    between the knowledge coming into this court that the two

10   jurors have and that, in my mind, is a meaningful

11   difference.

12       Because neither party had moved to strike that

13   juror, I wasn't going to do so sua sponte, because I thought

14   that for various reasons it would be appropriate to at least

15   see if a person -- excuse me, that for various reasons that

16   I wouldn't sua sponte strike someone if both parties thought

17   that 0873 could be qualified for cause.  But now that the

18   government has moved to disqualify that juror, I agree with

19   that.

20       I am concerned both about his level of knowledge,

21   which is substantially more than 1391 and, frankly, by the

22   fact that I now know that he has -- and he now has disclosed

23   to me that he has a case pending in front of me that's going

24   to trial in two weeks.  Actually, I'm a little surprised

25   that neither party raised that as an objection to his

1   serving here.  For that reason 0873 will be excluded for

2   cause, a party now having moved to do so.

3          Ms. Lesley, could we please bring in Juror Number

4   0122?

5       (Prospective juror steps up.)

6          **THE COURT:**  Good afternoon.

7          **PROSPECTIVE JUROR:**  Good afternoon.

8          **THE COURT:**  Feel free to take your mask off, if

9   you feel comfortable.

10          **PROSPECTIVE JUROR:**  All right.

11          **THE COURT:**  You are juror 0122.  Correct?

12          **PROSPECTIVE JUROR:**  Yes.

13          **THE COURT:**  I note that you've answered "yes" to

14   two questions, and I just want to ask you some follow-ups to

15   those.  Those questions are 7 and 24, for the record.

16          **PROSPECTIVE JUROR:**  Uh-huh.

17          **THE COURT:**  Question 7 asked:  Have you heard,

18   seen or read anything from any source about this case?  And

19   you said "yes."

20          Can you describe to me what you have heard, seen

21   or read from any source about this case?

22          **PROSPECTIVE JUROR:**  Little snippets from the news.

23          **THE COURT:**  What have you heard?

24          **PROSPECTIVE JUROR:**  Um, not too much.  Just -- I

25   wasn't really paying too much attention to it.  Just heard

1   about the riots and people that were caught on the -- and

2   caught.

3        **THE COURT:**  And did you hear about the case

4   against Mr. Bannon or did you hear more generally about

5   January 6th?

6        **PROSPECTIVE JUROR:**  More in general.

7        **THE COURT:**  More in general?

8        **PROSPECTIVE JUROR:**  Yes, sir.

9        **THE COURT:**  Does anything you heard about either

10  this case or January 6th more generally cause you to

11  question whether you could be impartial here?

12       **PROSPECTIVE JUROR:**  No, because I wasn't really

13  paying attention to it.  I don't even know the names of it.

14       **THE COURT:**  Okay.  You also answered "yes" to

15  Question 24.  And I'm going to ask you the question, but if

16  there's anything that you would like to discuss, essentially

17  in a more private setting, we can go on these phones.  That

18  question is:  Have you, a family member or anyone close to

19  you ever been the victim or a witness to a crime, regardless

20  of whether the crime was reported or testified in court or

21  before a grand jury as a witness to a crime?

22       Can you explain why you answered "yes" to that

23  question?

24       **PROSPECTIVE JUROR:**  Yes.  Back in 2017 me and my

25  wife were both gunshot victims.

1           **THE COURT:**  I'm very sorry to hear that.

2           Did you end up testifying in the case against your

3      assailant?

4           **PROSPECTIVE JUROR:**  No, they never --

5           **THE COURT:**  Did you report it to law enforcement?

6           **PROSPECTIVE JUROR:**  Yeah, they knew about it.

7           **THE COURT:**  Did your experience with law

8      enforcement and with being the victim of that crime, does

9      that cause you to worry about whether you can be impartial

10     in this case?

11          **PROSPECTIVE JUROR:**  No, I don't.

12          **THE COURT:**  I hope you're okay now.

13          **PROSPECTIVE JUROR:**  I'm fine.

14          **THE COURT:**  Is there anything else that you'd like

15     to tell us about your answers or the fact that you answered

16     "no" to most things about how it would affect your service

17     as a juror here?

18          **PROSPECTIVE JUROR:**  No.

19          **THE COURT:**  Thank you very much.

20          Ms. Vaughn?

21          **MS. VAUGHN:**  Good afternoon, sir.

22          **PROSPECTIVE JUROR:**  How are you doing?

23          **MS. VAUGHN:**  Good.  I hope you're doing well too.

24          I have a couple questions about what happened to

25     you and your wife.

1         **PROSPECTIVE JUROR:**  Okay.

2         **MS. VAUGHN:**  Did you have any interactions with

3    the U.S. Attorneys Office in relation to that?

4         **PROSPECTIVE JUROR:**  No.  Not that I know of.  No,

5    I haven't.  I don't know if my wife has or not.

6         **MS. VAUGHN:**  Okay.  How did you feel about the law

7    enforcement's response to it?

8         **PROSPECTIVE JUROR:**  I think they did the best they

9    could with the information they had.  We were sitting on the

10   porch and someone came from the back and shot us.  And we

11   had no idea how the person looked or anything.  So I guess

12   the law enforcement did the best they could with the

13   information they had.

14        **MS. VAUGHN:**  Yeah.  I'm sorry that that happened

15   to you.

16        My -- I just had one other question.  Are you

17   currently working?

18        **PROSPECTIVE JUROR:**  Yes.

19        **MS. VAUGHN:**  What do you do for a living?

20        **PROSPECTIVE JUROR:**  I work as a trash tech at

21   Georgetown University Hospital.

22        **MS. VAUGHN:**  Thank you very much.

23        **PROSPECTIVE JUROR:**  Uh-huh.

24        **MR. CORCORAN:**  No questions, Your Honor.  Thank

25   you very much.

117

```
 1            THE COURT:  Thank you, sir.
 2        (Prospective juror steps down.)
 3            THE COURT:  Ms. Vaughn?
 4            MS. VAUGHN:  We don't have a motion, Your Honor.
 5            THE COURT:  Mr. Corcoran?
 6            MR. CORCORAN:  Nothing here, Your Honor.
 7            THE COURT:  Okay.  We'll qualify Juror 0122.
 8            Ms. Lesley, 1312.
 9        (Prospective juror steps up.)
10            THE COURT:  The podium here, sir.
11            Good afternoon.  Feel free to take off your mask
12    if you would like.
13            PROSPECTIVE JUROR:  Oh, thank you.
14            THE COURT:  You are Juror 1312.  Correct?
15            PROSPECTIVE JUROR:  Yes, sir.
16            THE COURT:  I'm just going to note for the record
17    that you answered "yes" to the following questions:  5, 7,
18    7(a), 16, 20, 21 and 39.
19            PROSPECTIVE JUROR:  Yes.
20            THE COURT:  I'm just going to ask you a few
21    follow-up questions, and then counsel for the parties may
22    have some follow-up.
23            You answered "yes" to Question 5, which is whether
24    you recognized anyone either in the venire or in the court
25    staff.  Can you describe why you answered "yes" to that
```

1    question.

2    **PROSPECTIVE JUROR:**  I simply recognized the face

3    of one of the jurors that you selected today.  Just in

4    spaces that I've been in Washington, oh, in the last 25,

5    30 years.  I don't even know his name, but I just recognize

6    his face.

7    **THE COURT:**  You just recognize --

8    **PROSPECTIVE JUROR:**  The face.

9    **THE COURT:**  -- that you've seen the face?

10    **PROSPECTIVE JUROR:**  Yes.

11    **THE COURT:**  Okay.  Thank you.

12    You also answered "yes" to Question 7 and 7(a),

13    and I'll just do them together.  The question was whether

14    you've heard, read or seen anything from any source about

15    this case.  And then you said, "yes," that you have formed

16    any opinions about this case based on what you've heard,

17    seen or read.

18    So can you describe what you know about this case,

19    where you learned of it, and what those opinions are that

20    you formed.

21    **PROSPECTIVE JUROR:**  Well, I saw the remark that

22    was in the news the other day about Mr. Bannon saying that

23    he would go "full medieval" during the course of this trial;

24    and that the judge was not taking that to heart.  And I felt

25    that that was a purely just preposterous statement.

1          **THE COURT:**  Which statement?

2          **PROSPECTIVE JUROR:**  To say that it would go

3     medieval.

4          **THE COURT:**  Okay.  As a result of that reaction,

5     do you think you would have a hard time being impartial in

6     this case?

7          **PROSPECTIVE JUROR:**  I would have a challenge.  I

8     would have a challenge, but you have to rise to your better

9     nature.

10          **THE COURT:**  Okay.

11          You also answered "yes" to Question 16, which is

12     about the Select Committee's hearings and whether you've

13     watched them.  And can up describe what you have watched and

14     how many, when, on what source.

15          **PROSPECTIVE JUROR:**  I've watched all of them.  I'm

16     a retiree so I have plenty of time to watch all of them.  On

17     my television, on MSNBC, every time that they've been on.

18          **THE COURT:**  And have you -- as a result of

19     watching those hearings, have you -- well, let me ask a

20     different question.  Have you seen, in those hearings, a

21     mention of Mr. Bannon?

22          **PROSPECTIVE JUROR:**  I believe so.

23          **THE COURT:**  Do you recall how many times?

24          **PROSPECTIVE JUROR:**  No.

25          **THE COURT:**  Do you recall what was said about

1    Mr. Bannon or what you saw about Mr. Bannon in those

2    hearings?

3              **PROSPECTIVE JUROR:**  I can't in this moment.

4              **THE COURT:**  Okay.

5              As a result of what you've seen about the

6    Committee hearings, are you worried that you would be unable

7    to be impartial in this case?

8              **PROSPECTIVE JUROR:**  Well, I think there's an

9    overwhelming amount of information that we've been

10   enlightened to that something went wrong; and that something

11   needs to be fixed in this country; and that we have a

12   political party that has members who have platformed

13   themselves and messaged to us predicated on the lie that the

14   election was stolen.

15             **THE COURT:**  Okay.

16             **PROSPECTIVE JUROR:**  And as an informed,

17   responsible individual, any time I hear anything out of

18   anyone who is on that -- who is in that park, I listen in my

19   most active way and with my most critical listening skills.

20             **THE COURT:**  You also answered "yes" to

21   Questions 20 and 21.  Twenty says:  Would you tend to

22   believe or not believe the testimony of a witness simply

23   because his or her political beliefs are the same or

24   different from your own?  Can you tell us what you mean by

25   that answer?

1          **PROSPECTIVE JUROR:**  Well, to build on what I said

2     before, I would have skepticism.

3          **THE COURT:**  You also said you do have an opinion,

4     sitting here today -- this is 21 -- about the defendant's

5     guilt or innocence in this case.  Can you describe to us --

6          **PROSPECTIVE JUROR:**  I do believe he's guilty.

7          **THE COURT:**  Okay.

8          Last, you also say that you are taking medications

9     or have a physical condition that could make it difficult

10    for you to sit as a juror.  If there's anything, you know,

11    highly sensitive that you'd like to --

12         **PROSPECTIVE JUROR:**  No, it's not at all.  I have

13    an artificial hip on one side and another side that is

14    starting to go bad.  I don't think -- sitting on these

15    chairs for a long period of time makes it kind of difficult

16    to get up and get loosened up again.  And I take an

17    anti-inflammatory medication for it that may make me a

18    little bit sleepy once in a while, but that's it.

19         **THE COURT:**  Okay.  Thank you so much.

20         Ms. Vaughn -- or Ms. Gaston.

21         **MS. GASTON:**  Nothing from the government.

22         **THE COURT:**  Thank you.

23         Mr. Corcoran.

24         **MR. CORCORAN:**  Good afternoon.  I really

25    appreciate your candor.

1          I just want to ask whether you, while you've been

2     here today, have had any chance to talk at all with any of

3     the other potential jurors about Stephen Bannon or what's

4     been in the news --

5              **PROSPECTIVE JUROR:**  We've made remarks.

6              **MR. CORCORAN:**  I'm sorry?

7              **PROSPECTIVE JUROR:**  We've made remarks.

8              **MR. CORCORAN:**  And do you remember which jurors

9     that -- obviously you've kind of been sitting next to each

10    other.  Which jurors have you made --

11             **PROSPECTIVE JUROR:**  I don't know their names.

12             **MR. CORCORAN:**  Well, I understand that.  But is it

13    somebody that's been in proximity to you, you know, sort of

14    sitting in line as you were in the courtroom?

15             **PROSPECTIVE JUROR:**  Yes.

16             **MR. CORCORAN:**  People -- within how many jurors of

17    you?

18             **PROSPECTIVE JUROR:**  Within my proximity.

19             **MR. CORCORAN:**  Within your proximity?  Two or

20    three jurors on either side; would that be --

21             **PROSPECTIVE JUROR:**  Well, there's only one juror

22    to your left and one to your right.

23             **MR. CORCORAN:**  So there have been remarks that

24    have been said to the jurors on either side of you; is that

25    accurate?

1          **PROSPECTIVE JUROR:** I'm feeling kind of pinned

2     down.

3          **MR. CORCORAN:** I don't know mean to make you

4     pinned down at all.

5          **PROSPECTIVE JUROR:** Because I like to be accurate

6     and honest, I feel as though you're trying to push me into a

7     position to say something very concrete.

8          **MR. CORCORAN:** Not at all. This is an open-ended

9     question. What was said by you or by any other juror about

10    Steve Bannon today?

11         **PROSPECTIVE JUROR:** I can't remember anything we

12    said.

13         **MR. CORCORAN:** But what was the nature?

14         **PROSPECTIVE JUROR:** Mine was critical. I can't

15    remember what other people said but mine was critical.

16         **MR. CORCORAN:** When you say "critical," was it

17    consistent with what you just said very --

18         **PROSPECTIVE JUROR:** Yes.

19         **MR. CORCORAN:** -- candidly, which you said you

20    think he is guilty?

21         **PROSPECTIVE JUROR:** Yes.

22         **MR. CORCORAN:** Okay. Thank you.

23         **THE COURT:** Thank you, sir.

24         **PROSPECTIVE JUROR:** Thank you.

25        (Prospective juror steps down.)

1          **THE COURT:**  Counsel.  Ms. Gaston?  Mr. Corcoran?

2          **MR. CORCORAN:**  Well, we move to exclude him for

3     cause.  And then I think, out of an abundance of caution, we

4     should probably recall the last juror, and then we can

5     handle the next juror.  I think he's only said it's within

6     arms' length, essentially.  And we didn't have any

7     foreknowledge to ask the last juror anything about that.

8          **THE COURT:**  Okay.

9          Ms. Gaston, what is the government's view on these

10    two points?  Start with, does the government agree to

11    exclude 1312?

12         **MS. GASTON:**  Yes, the government agrees.  The

13    government doesn't think we have to recall the last juror

14    because he was pretty clear that he doesn't know anything

15    about the defendant.  But I think it would be fine to ask

16    the next juror about any remark.

17         **THE COURT:**  Let's -- for prudence sake,

18    Ms. Lesley, let's bring in Juror 0122 briefly.  Juror 0122.

19         (Prospective juror steps up.)

20         **THE COURT:**  Welcome back, sir.  You can take your

21    mask off again.  Just a quick follow-up question.  Did you

22    discuss with any other potential juror this case and

23    whether, Mr. Bannon, for example, is guilty?

24         **PROSPECTIVE JUROR:**  No, sir.

25         **THE COURT:**  Did someone say that to you?

1        **PROSPECTIVE JUROR:**  No.

2        **THE COURT:**  Did you say that to someone?

3        **PROSPECTIVE JUROR:**  No, sir.

4        **THE COURT:**  Thank you.

5        Mr. Corcoran?

6        **MR. CORCORAN:**  No questions, Your Honor.

7        Thank you very much.

8        **THE COURT:**  Thank you, sir.

9        **PROSPECTIVE JUROR:**  All right.

10       (Prospective juror steps down.)

11       **THE COURT:**  In light of that, Mr. Corcoran, any

12   objection to qualifying 0122?

13       **MR. CORCORAN:**  No, Your Honor.

14       **THE COURT:**  Okay.  Thank you.

15       Now, let's bring 0331 in, please.

16       (Prospective juror steps up.)

17       **THE COURT:**  Good afternoon.  Feel free to take

18   your mask off, if you would like.

19       You are Juror 0331.  Correct?

20       **PROSPECTIVE JUROR:**  Yes.

21       **THE COURT:**  I note -- I have your note card here.

22   You answered "yes" to three questions.  And for the record,

23   those are Questions 14, 16 and 22.  I'll ask you a few

24   questions about those answers, and then counsel may have

25   some follow-up questions.

1          Fourteen asks whether you've heard, seen or read

2     anything from any source about the Select Committee or its

3     investigation, and then 16 asks whether you've watched or

4     read coverage of the Committee's hearings.  You answered

5     "yes" to those questions.

6          So can you just explain to us what you've learned

7     about the Committee and what hearings or portions of the

8     hearings you've watched?

9          **PROSPECTIVE JUROR:**  I have watched on television

10    all -- I believe all of the televised sessions that the

11    January 6th Committee has broadcasted.

12         **THE COURT:**  Do you recall whether, in the sessions

13    that you've watched, there was a discussion of Mr. Bannon?

14         **PROSPECTIVE JUROR:**  I do not recall specifically,

15    no.

16         **THE COURT:**  Is there anything about your watching

17    of those Committee hearings that has caused you to have a

18    view about this case?

19         **PROSPECTIVE JUROR:**  My view is that anybody

20    requested or required to testify in front of that Committee

21    should do so.

22         **THE COURT:**  In light of that, do you think, if a

23    case involves someone who didn't, that you would have a hard

24    time being impartial in considering the case about that

25    person?

1          **PROSPECTIVE JUROR:**  I do not think I would have a

2     problem being impartial.  I would want to know the full

3     background, the evidence and the nature of the allegations.

4     I don't think I would have a problem approaching that

5     impartially.

6          **THE COURT:**  Okay.  You answered "yes" to 22, as I

7     indicated, which is whether anyone in your family or you or

8     someone close to you has worked in the legal field

9     generally.  Can you describe why you answered "yes" to that

10    question?

11         **PROSPECTIVE JUROR:**  I'm sorry.  Can you repeat the

12    question again?

13         **THE COURT:**  So Question 22 was, Have you, a family

14    member or anyone close to you studied law or worked in the

15    legal field, whether as a lawyer or a paralegal or anything

16    like that?  You answered "yes" to that.  Can you tell us

17    why?

18         **PROSPECTIVE JUROR:**  Yes.  I am an attorney.  I

19    work, in D.C as an attorney.  I practice tax law for KPMG

20    here in the District.  I am also qualified as a lawyer in

21    England, where I originally lived and worked.

22         **THE COURT:**  How long have you worked at KPMG?

23         **PROSPECTIVE JUROR:**  Twenty years.

24         **THE COURT:**  Always doing tax?

25         **PROSPECTIVE JUROR:**  Always in tax.

1        **THE COURT:**  Is there anything in connection with

2   your work as an attorney that would cause you, in your view,

3   to be not impartial in this case?

4        **PROSPECTIVE JUROR:**  I do not believe so.  No, sir.

5   No.

6        **THE COURT:**  Okay.  Thank you.  Ms. Vaughn?

7        **MS. VAUGHN:**  Good afternoon.

8        I think I heard you say your view of the Committee

9   is that people should cooperate with it; did I hear that

10  right?

11       **PROSPECTIVE JUROR:**  Yes.

12       **MS. VAUGHN:**  Would you have any issue -- once the

13  Court instructs you on the elements and the law in this

14  case, would you have any issue putting that view aside and

15  just deciding this case based on the facts and the law as

16  the Court gives it to you?

17       **PROSPECTIVE JUROR:**  I do not believe I have an

18  issue with that.  I generally -- at present I do not know

19  what the elements of that alleged offense are, so I wouldn't

20  [sic] need to be instructed on that and would take that

21  instruction.

22       **MS. VAUGHN:**  Do you have any concerns about your

23  ability to be impartial and in doing that and taking that

24  instruction and applying it to the facts that you hear in

25  trial?

1          **PROSPECTIVE JUROR:**  I do not believe so, no.

2          **MS. VAUGHN:**  Thank you.

3          **THE COURT:**  Mr. Corcoran?

4          **MR. CORCORAN:**  Thank you, Your Honor.

5          Good afternoon, sir.  While you were here today,

6     did you hear -- did you overhear any other prospective juror

7     make any comment about Steve Bannon?

8          **PROSPECTIVE JUROR:**  No, sir.  No.

9          **MR. CORCORAN:**  Let me follow up on some of the

10    questions about you've watched the hearings.  You said you

11    watched all of them; is that correct?

12         **PROSPECTIVE JUROR:**  Yes; that's correct.

13         **MR. CORCORAN:**  Have you also watched any news

14    coverage of the hearings that followed?

15         **PROSPECTIVE JUROR:**  Some, yes.  Yes.

16         **MR. CORCORAN:**  Okay.  Describe that.

17         **PROSPECTIVE JUROR:**  I've watched the various

18    hearings.  Some on -- part of the PBS coverage of it and

19    some on the CNN coverage.  I tended to sort of turn off

20    when -- and not pay close attention to the commentary that

21    follows each session of the evidentiary hearing before the

22    Committee.  So I have, of course, seen and heard some of

23    that.

24         But when I am watching television, that is when I

25    will tend to go get dinner or something like that, because I

1    would much rather watch the hearing itself.  I am somewhat

2    impatient with watching the commentators, if that makes

3    sense.

4            **MR. CORCORAN:**  It does.

5            And in terms of the hearing, what's your -- what

6    are your overall feelings and perceptions about what's being

7    presented to the public?

8            **PROSPECTIVE JUROR:**  I've been disturbed by it.

9    I've had a very negative reaction to what I've learned about

10   what happened on January 6.  The more details that I've

11   learned in the course of listening to the hearings, the more

12   horrified, frankly, I've been at the events that occurred

13   that day.

14           **MR. CORCORAN:**  And one of the things that you

15   said, I think I got it right, is that your view is that

16   anybody who is requested to testify by the January 6th

17   Committee should do so; is that a fair statement?

18           **PROSPECTIVE JUROR:**  Excuse me.  Could you repeat

19   the question?

20           **MR. CORCORAN:**  I just wanted to try to capture

21   something you said earlier.  As I understand it, they were

22   words to the effect of, that your view is that anybody who

23   is requested to testify before the January 6th Committee

24   should do so.  Is that an accurate statement of your belief?

25           **PROSPECTIVE JUROR:**  That's an accurate statement

1    for the reason that all views, all -- anyone with any source

2    of information about it should present what they know or the

3    greatest possible range of inputs should be provided to the

4    Committee; that's my opinion.

5        **MR. CORCORAN:**  And what led you to that belief?

6        **PROSPECTIVE JUROR:**  Probably my training as a

7    lawyer; that any civil or criminal tribunal should have

8    access to the greatest range of relevant evidence.

9        **MR. CORCORAN:**  Okay.

10        And you understand that, from the neutral

11    statement of the case that was read this morning, that one

12    of the issues in this trial is whether there was compliance

13    with a subpoena by Mr. Bannon.

14        And my question is this:  Do you think that you

15    come into court today with a blank slate, in order to hear

16    the evidence on that topic?  Or that you're predisposed,

17    based on your training, based on what you've seen about the

18    Select Committee, that anybody who's requested to testify

19    should do so?

20        **PROSPECTIVE JUROR:**  Right.  My understanding is

21    that the offense of contempt of court or refusing to

22    cooperate is a relatively narrow technical issue that does

23    not relate directly to participation in any other greater,

24    more wide-ranging illegal activity, is my understanding.

25        What is incomplete, I will admit, is that it's a

1    relatively narrow technical question to be resolved, whether

2    the individual has validly or not validly agreed to

3    cooperate or has refused to cooperate and what reasons lie

4    behind that.

5        **MR. CORCORAN:**  And have you heard or read anything

6    about the potential defenses in this case?

7        **PROSPECTIVE JUROR:**  Potential offenses

8    specifically for this case?

9        **MR. CORCORAN:**  Yes.

10       **PROSPECTIVE JUROR:**  I have read in the newspaper

11   that these charges are being brought and that this trial was

12   pending for this offense against this individual.

13       **MR. CORCORAN:**  But in terms of your reading, did

14   any of the articles reference the availability or

15   unavailability of defenses to the charge?

16       **PROSPECTIVE JUROR:**  They made reference to

17   possible defenses that would be advanced on behalf of the

18   accused, yes, sir.

19       **MR. CORCORAN:**  Okay.  Thank you.

20       **MS. VAUGHN:**  Your Honor, may I?

21       **THE COURT:**  Yes.

22       **MS. VAUGHN:**  Do you mind just explaining a little

23   more about what you read about the availability of potential

24   defenses?

25       **PROSPECTIVE JUROR:**  Yes.  I believe I read an

1   article in *The Washington Post* that I -- that said that

2   various defenses had already been advanced or would be

3   advanced, had been advanced at some pretrial hearing or

4   would be advanced at trial, to the effect that the defendant

5   had a reasonable excuse or did not understand the nature of

6   what was being requested or otherwise had some reasonable

7   excuse for noncompliance.

8           **MS. VAUGHN:**  And do you remember about how long

9   ago you read this?

10          **PROSPECTIVE JUROR:**  It was yesterday.

11          **MS. VAUGHN:**  Yesterday.  Thank you.

12          **THE COURT:**  Thank you, sir.  You can be excused.

13      (Prospective juror steps down.)

14          **THE COURT:**  Mr. Corcoran?

15          **MR. CORCORAN:**  Thank you, Your Honor.

16          We would move to strike this juror for cause.  And

17  I'm not going to repeat all of the normal things.  I think

18  that the key additional point here, which we've dealt with

19  with one of the other jurors, that he's had, as recently as

20  yesterday, specific knowledge about the availability of

21  legal defenses in the case.  So we'd move to strike him.

22          **THE COURT:**  Thank you, Mr. Corcoran.

23          Ms. Vaughn?

24          **MS. VAUGHN:**  (indiscernible.)

25          **THE COURT:**  I agree that Juror 0331 should be

1   excluded for cause.

2          Counsel, just so you know, my plan was to go to

3   around 1:00.  So for another 10 or 15 minutes.  Just see

4   where we get to.  Not like a hard and fast break.  It may be

5   that we go a little bit longer or shorter than that.

6          Anyway, Ms. Lesley.

7          At the podium, ma'am.  Feel free to take your mask

8   off if you would like.

9      (Prospective juror steps up.)

10         **THE COURT:**  You are juror 1041.  Correct?

11         **PROSPECTIVE JUROR:**  Yes.

12         **THE COURT:**  You answered "yes" to four questions,

13  which I will just state for the record.  Questions 7, 14,

14  16, and 22.

15         Question 7 was and is:  Have you heard, seen or

16  read or heard anything from any source about this case?  Can

17  you describe what you have read, seen or heard about this

18  case and where.

19         **PROSPECTIVE JUROR:**  I've seen headlines in *The*

20  *Washington Post* talking about executive privilege.  I'm not

21  really clear.  I know that there's some debate on whether

22  there's executive privilege over whether Steve Bannon was

23  supposed to testify.

24         **THE COURT:**  What else have you heard about this

25  case or read?

1          **PROSPECTIVE JUROR:**  Nothing specific.

2          **THE COURT:**  And are you getting that information

3     entirely from *The Post* or do you have other news sources,

4     whether print or online or TV?

5          **PROSPECTIVE JUROR:**  Primarily *Washington Post*.

6     Sometimes *New York Times*.

7          **THE COURT:**  Okay.

8          **PROSPECTIVE JUROR:**  I have kind of a vague,

9     general idea of it, but I haven't seen anything specific.

10          **THE COURT:**  Do you have an understanding of what

11     the issues in this case are other than those that I read to

12     the jury earlier?

13          **PROSPECTIVE JUROR:**  No.

14          **THE COURT:**  Have you formed any opinions about

15     this case?

16          **PROSPECTIVE JUROR:**  No.

17          **THE COURT:**  You also answered "yes" to

18     two somewhat-related questions about whether you've heard,

19     seen or read anything about the Select Committee, and then

20     if you've watched some or read coverage about the hearings.

21     Can you describe to us what you know and what you've

22     watched?

23          **PROSPECTIVE JUROR:**  Again, mostly headlines.  I

24     think I watched part of the video in *The Washington Post*

25     where a police officer, a female, was testifying about what

1    happened, the events on January 6th, and what it was like,

2    the crowd surging and --

3            **THE COURT:**  Any other things that you've watched

4    or recall here today?

5            **PROSPECTIVE JUROR:**  I mean, I feel like it's just

6    a thing I'm generally aware of but, again, not a whole lot

7    of specifics.

8            **THE COURT:**  Do you recall, either in connection

9    with news about the Committee or the hearings that you've

10   watched or the portions of hearings, seeing anything

11   mentioned in the Committee about Mr. Bannon?

12           **PROSPECTIVE JUROR:**  Not specifically, no.

13           **THE COURT:**  Okay.  Based on either what you know

14   about this case or the Committee and its hearings more

15   generally, is there anything that would lead you to conclude

16   you would have a hard time being impartial in this matter?

17           **PROSPECTIVE JUROR:**  I don't think so.

18           **THE COURT:**  Then you also answered "yes" to

19   Question 22, which is whether you, a family member or anyone

20   close to you ever studied law or worked in the legal

21   profession.  Can you describe to us why you answered "yes"

22   to that question?

23           **PROSPECTIVE JUROR:**  I'm a lawyer.

24           **THE COURT:**  You're a lawyer.  Where do you work?

25           **PROSPECTIVE JUROR:**  I haven't practiced law in

1   about 10 years.

2           **THE COURT:**  Okay.  You're a lawyer by training?

3           **PROSPECTIVE JUROR:**  I'm a lawyer by training.

4   Recovering attorney.

5           **THE COURT:**  Yeah.  What did you do before --

6           **PROSPECTIVE JUROR:**  I did doc review.  I moved to

7   D.C. after law school looking for a job and I never found

8   one in the legal field.  So I haven't been practicing for

9   about 10 years.  So I just did -- working with various temp

10  agencies.

11          **THE COURT:**  Okay.  And what did you do now?

12          **PROSPECTIVE JUROR:**  I'm at the State Department.

13          **THE COURT:**  Obviously not as a lawyer.

14          **PROSPECTIVE JUROR:**  Right.  Not as a lawyer.  I

15  run a team at the Religious Freedom Office.

16          **THE COURT:**  Is there anything about your

17  background as a lawyer, including your work 10 years ago,

18  that you think would affect your ability to be impartial

19  here?

20          **PROSPECTIVE JUROR:**  I don't think so.  Also, my

21  dad was a judge.

22          **THE COURT:**  He was a judge?  Where was he a judge?

23          **PROSPECTIVE JUROR:**  In Southern Illinois.

24          **THE COURT:**  Federal or state?

25          **PROSPECTIVE JUROR:**  State.  District Court.

1          **THE COURT:**  So District of something county?

2          **PROSPECTIVE JUROR:**  Marion County, Southern

3    Illinois.  Yeah.

4          **THE COURT:**  Anything about his experience as a

5    judge, and your experience in the house, that would cause

6    you to be concerned about your ability to be impartial here?

7          **PROSPECTIVE JUROR:**  I don't think so.

8          **THE COURT:**  Did he have both criminal and civil

9    cases?

10          **PROSPECTIVE JUROR:**  Just civil cases.

11          **THE COURT:**  And that was true the whole time that

12    he was a judge?

13          **PROSPECTIVE JUROR:**  I was a kid.  I didn't really

14    follow his career.

15          **THE COURT:**  Okay.  Thank you very much.

16          Ms. Gaston.

17          **MS. GASTON:**  Good afternoon.

18          I think you mentioned seeing headlines about

19    executive privilege in this case.  Did you actually read

20    those articles or did you just move on to the next thing?

21          **PROSPECTIVE JUROR:**  I didn't read the articles.

22          **MS. GASTON:**  That's okay.

23          And do you know much about executive privilege?

24          **PROSPECTIVE JUROR:**  That the executive doesn't

25    have to testify if it has something to do with national

1    security.

2            **MS. GASTON:**  And if the Court were to instruct you

3    not to consider whether executive privilege applied in this

4    case, would you be able to follow that instruction?

5            **PROSPECTIVE JUROR:**  To not consider it?

6            **MS. GASTON:**  Yeah.

7            **PROSPECTIVE JUROR:**  I think so, yeah.

8            **MS. GASTON:**  I think those are all the questions.

9            **THE COURT:**  Mr. Corcoran?

10           **MR. CORCORAN:**  Good afternoon.

11           You mentioned, based on the coverage and the

12    headlines, that you had a vague, general idea of what this

13    case is about.  What's your general idea?

14           **PROSPECTIVE JUROR:**  Just that there's a question

15    of whether Steve Bannon should testify before the Committee.

16    Well, I guess whether executive privilege applies.  I guess

17    that's not what the case is about but that's -- my

18    interpretation is whether or not he has the executive

19    privilege to not have to testify.

20           **MR. CORCORAN:**  Okay.  Okay.

21           Thank you, Your Honor.

22           Thank you.

23           **THE COURT:**  Thank you.

24       (Prospective juror steps down.)

25           **THE COURT:**  Why don't we start with you,

1    Ms. Gaston.  What is the government's view on Juror 1041?

2         **MS. GASTON:**  The government has no motion,

3    Your Honor.

4         **THE COURT:**  Okay.

5         Mr. Corcoran?

6         **MR. CORCORAN:**  We'd move to strike, Your Honor.

7    Just based on her thinking that -- of a defense in the case

8    is executive privilege and her understanding of that from

9    the case law.

10        We're concerned that an issue that's already been

11   dealt with by a lot of briefing might somehow, by an

12   attorney in the jury room, be something that's discussed,

13   which at this point in the case, is not something to be

14   discussed.

15        **THE COURT:**  Ms. Gaston?

16        **MS. GASTON:**  Your Honor, the juror said that she

17   didn't actually read the articles that covered these issues;

18   and that she would be able to take your directions and

19   instructions on how to follow the facts.  And so the Court

20   doesn't think -- or the government doesn't think there's any

21   basis to this --

22        **MR. CORCORAN:**  Just to put a fine point on --

23        **THE COURT:**  Yeah.

24        **MR. CORCORAN:**  -- what we see as a potential

25   problem is, it's still uncertain whether the content of

1    certain letters will come in based on rulings and so forth.

2    But it's entirely possible that the jury will, through the

3    course of trial, hear the words "executive privilege".

4         And for somebody who is a lawyer, who believes the

5    case in some way turns on executive privilege, and that

6    somehow it's not being presented to the jury in the jury

7    room, it may just cause confusion and problems.

8         We've got a very large number of jurors that are

9    still available, and we'd ask that this juror be excluded

10   for cause.

11        **THE COURT:**  Thank you.

12        I'm going to deny that motion and qualify Juror

13   1041.  I think her knowledge is quite limited.  She's a

14   lawyer.  I have every confidence, based on her answers, her

15   demeanor, that she will follow my instructions to a T.  And

16   I don't think that her knowledge begins to approach the

17   level of knowledge of other jurors who we have excluded.

18   And unlike some jurors we've excluded, she doesn't -- didn't

19   suggest that she had any preconceived answer about either

20   the case or any of the parties and the like.  So we will

21   qualify 1041.

22        Why don't we do one more juror if we can, 0475.

23        (Prospective juror steps up.)

24        **THE COURT:**  Good afternoon.  Feel free to take

25   your mask off, if you would like.

1              You are juror 0475.  Correct?

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  And I note on your note card, you

4    answered "yes" to the following questions, for the record:

5    7, 14, 16, 22, 23, 24 and 26.  I'm just going to ask you

6    some questions about those answers, and then counsel will

7    likely have some follow-up.

8              So Question 7 is the one that was three parts, and

9    it asked whether you heard, seen or read anything from any

10   source about this case.

11             **PROSPECTIVE JUROR:**  Yes.

12             **THE COURT:**  Can you describe to us what you have

13   read, heard, seen from any source about it?

14             **PROSPECTIVE JUROR:**  Sure.  Just at a very high

15   level, aware that there is -- there are the hearings, that

16   there have been subpoenas, that not everyone has responded

17   to them.  So very broadly.  I don't have much more

18   specifics, but I thought to answer "yes" --

19             **THE COURT:**  Do you know anything about the

20   specific issues that we will be considering and either the

21   facts or the law that we will be considering in this case?

22             **PROSPECTIVE JUROR:**  I guess I assumed that if the

23   subpoena was issued, people are supposed to issue it -- or

24   supposed to respond, and I --

25             **THE COURT:**  Does that view, in your mind, cause

1    you to be concerned that you couldn't be impartial here when

2    you hear the facts and the law as I would instruct you?

3        **PROSPECTIVE JUROR:**  I don't think so.  I mean, on

4    the one hand, you read the indictment in a neutral way that

5    seems like straightforward facts, but there's a whole side

6    to the story we haven't heard yet and --

7        **THE COURT:**  Do you think you could consider all

8    those things fairly?

9        **PROSPECTIVE JUROR:**  Yes.

10       **THE COURT:**  You answered "yes" to Questions 14 and

11   16, which are related to some extent.  They're about the

12   Select Committee.  Fourteen was about whether you have

13   heard, seen or read anything from any source about the

14   Committee and its investigation.  And the second question

15   was about whether you've watched or read coverage of the

16   hearings.

17       Please describe to us what you've heard or read or

18   seen about the Committee and the hearings.

19       **PROSPECTIVE JUROR:**  Okay.  I've watched a few

20   excerpts of the hearings.  I don't remember everyone's name,

21   but some of the direct questioning, I believe, with the

22   Chief of Staff's assistant and some of the exchanges they

23   had and her testimony.

24       **THE COURT:**  Do you recall in the hearings, the

25   portions of the hearings that you've watched, any mention of

1    Mr. Bannon?

2              **PROSPECTIVE JUROR:**  Not that I recall.

3              **THE COURT:**  Do you read about the hearings in the

4    paper?

5              **PROSPECTIVE JUROR:**  Headlines on Twitter/social

6    media but not in a lot of depth.

7              **THE COURT:**  Okay.  Anything about your -- that the

8    information that you've watched or read about the Committee,

9    any concern, given what you've read, that you would be

10   unable to be impartial in this case?

11             **PROSPECTIVE JUROR:**  I don't think so.

12             **THE COURT:**  You also answered "yes" to Question

13   22, which is about whether you or anyone close to you has

14   ever worked in the legal field generally.  Can you explain

15   what the basis for what your "yes" answer there was?

16             **PROSPECTIVE JUROR:**  Yes, sir.  I was a paralegal

17   myself in the State of Georgia for about three years 15

18   years ago.  Now, I'm not an attorney or paralegal, but I

19   lead a small nonprofit that provides legal services in civil

20   legal aid cases.

21             **THE COURT:**  It's civil legal aid?

22             **PROSPECTIVE JUROR:**  Yes, sir.

23             **THE COURT:**  What kind of cases?

24             **PROSPECTIVE JUROR:**  Probate, estate planning,

25   Social Security, criminal record sealing and housing cases.

1          **THE COURT:**  How long have you been doing that?

2          **PROSPECTIVE JUROR:**  Just a little over two years.

3          **THE COURT:**  Is there anything about your current

4     employment that would cause you to have a bias or partiality

5     in any way?

6          **PROSPECTIVE JUROR:**  No, I don't think so.  We are

7     focused on District-specific cases.

8          **THE COURT:**  Okay.  In Questions 23 and 24, these

9     were about whether you or anyone has either been charged

10    with a crime, basically, or the victim of a crime.  And I

11    want to ask you questions about that, but if you are not

12    comfortable doing so on the public record, we can also

13    basically go under seal, and you can describe the basis for

14    those answers, if you would like that.

15         **PROSPECTIVE JUROR:**  Okay.

16         **THE COURT:**  Do you want to do that or are you

17    comfortable describing --

18         **PROSPECTIVE JUROR:**  It depends how specific you

19    want me to be.

20         **THE COURT:**  Why don't we start with general and

21    then --

22         **PROSPECTIVE JUROR:**  Sure, and if I'm not

23    comfortable, use the phone?

24         **THE COURT:**  Sure.  Let's talk about, first, the

25    question -- this is 23 -- whether you, a family member or

1    anyone close to you has ever been the subject of a criminal

2    investigation or charged with a crime, basically?

3            **PROSPECTIVE JUROR:**  I have not but I have family

4    members who have.

5            **THE COURT:**  How close are those family members?

6            **PROSPECTIVE JUROR:**  Immediate family.

7            **THE COURT:**  Immediate family.  When was the most

8    recent run-in with --

9            **PROSPECTIVE JUROR:**  The most recent issue would

10   have been -- I think the charge they were arrested for was

11   within the last couple years but, because of COVID, the

12   hearing itself was in another state within the last two

13   months.

14           **THE COURT:**  What state?

15           **PROSPECTIVE JUROR:**  Georgia.

16           **THE COURT:**  And what was the charge there or what

17   is the charge?

18           **PROSPECTIVE JUROR:**  It was related to a DUI.

19           **THE COURT:**  Okay.  In light of that or other

20   involvements that your family, your immediate family or

21   other family members have had with the criminal justice in

22   that sense, have you reached any conclusions or would those

23   experiences cause you to be partial or not be able to be

24   impartial in this case?

25           **PROSPECTIVE JUROR:**  I don't think so.

1          **THE COURT:**  Okay.

2          You also answered "yes" to whether you or anyone

3     close to you was the victim of crime and whether you

4     interacted with law enforcement relating to that.  Can you

5     describe that for us?

6          **PROSPECTIVE JUROR:**  I apologize if I

7     misunderstood.  I think that question also included victim

8     or witness of a crime --

9          **THE COURT:**  Yes, you're right.  Victim or a

10    witness.  Correct.  Thank you.

11         **PROSPECTIVE JUROR:**  I was responding -- in D.C. a

12    couple years ago I was witness to, I guess, an assault.  So

13    that's why I answered "yes".

14         **THE COURT:**  Did you testify in that case?

15         **PROSPECTIVE JUROR:**  No.

16         **THE COURT:**  Do you know whether the person who

17    committed the assault was prosecuted?

18         **PROSPECTIVE JUROR:**  I don't know.  I gave a

19    statement on the scene to police officers, and I was never

20    contacted about it.

21         **THE COURT:**  Did anything about that experience

22    cause you to have a particularly negative or positive view

23    about law enforcement that you think would affect your

24    service as a juror?

25         **PROSPECTIVE JUROR:**  No.

 1              **THE COURT:**  Okay.

 2              And last, you were asked and you said "yes" to

 3    having served as a juror before.

 4              **PROSPECTIVE JUROR:**  Yes, sir.

 5              **THE COURT:**  Can you describe your prior jury

 6    service?

 7              **PROSPECTIVE JUROR:**  Yes.  Last spring I was on a

 8    jury, I guess, at D.C. Superior Court, so on a criminal

 9    charge there.

10              **THE COURT:**  And do you recall what the charge was

11    for, the conduct?

12              **PROSPECTIVE JUROR:**  It was related to possession

13    of a firearm, and there were other charges to that single

14    incident.  I don't recall the specifics.

15              **THE COURT:**  Did the jury reach a verdict?

16              **PROSPECTIVE JUROR:**  We did.

17              **THE COURT:**  And was there anything about that

18    experience that would cause you to be concerned about

19    serving here?

20              **PROSPECTIVE JUROR:**  It was very grave and

21    unpleasant.  I take it very seriously.  So I -- I don't

22    really want to participate, because it's a lot of weight to

23    make those decisions.  But I think it was -- you know, my

24    fellow jurors I thought deliberated thoughtfully, and I

25    think -- I don't know.  I don't think the system went badly,

1    but it was not a pleasant experience.

2        **THE COURT:**  Thank you.

3        Ms. Vaughn?

4        **MS. VAUGHN:**  Good afternoon.

5        **PROSPECTIVE JUROR:**  Hi.

6        **MS. VAUGHN:**  With respect to the case involving

7    your immediate family member, how do you feel that they have

8    been treated by the court system or the government or law

9    enforcement?

10        **PROSPECTIVE JUROR:**  I think in the specific --

11    that specific case, as far as I know, I think they were

12    treated fairly.  I don't know -- I don't know all of the ins

13    and outs of everything, but I think my family has had fair

14    experiences with the court system.

15        **MS. VAUGHN:**  When your -- if you were to be seated

16    as a juror in this case, would you have any trouble sort of

17    not putting your family in the place of the parties here?

18        **PROSPECTIVE JUROR:**  Yeah, I think those are pretty

19    unrelated.  I don't think that would be a problem.

20        **MS. VAUGHN:**  When you were a paralegal, what kind

21    of -- did you work for a law firm or --

22        **PROSPECTIVE JUROR:**  A small firm for a couple

23    years and a couple private practitioners, mostly family law,

24    with a little experience in minor criminal defense cases.

25        **MS. VAUGHN:**  You sat on the criminal jury in D.C.

1    Superior Court.  Were you the foreperson?

2              **PROSPECTIVE JUROR:**  No.

3              **MS. VAUGHN:**  You said that -- you said that your

4    experience in Superior Court was unpleasant.

5              **PROSPECTIVE JUROR:**  I mean, I think it was as fine

6    as it could have been.  I just meant to express that it's a

7    weighty thing to do, and it's not something that I would

8    care to repeat if I didn't need to.

9              **MS. VAUGHN:**  Are you concerned that you might have

10   trouble sitting in judgment here again and making a

11   decision?

12             **PROSPECTIVE JUROR:**  I mean not -- I don't think

13   trouble.  In my past experience, the instructions were made

14   clear.  I think we deliberated the evidence, and it does not

15   feel good to make difficult decisions, but I think I was

16   able to do it so...

17             I don't think I would be any less able to

18   participate, but I do take it seriously and that was my past

19   experience.

20             **MS. VAUGHN:**  Can you just explain what you mean

21   when you say "You take it seriously"?

22             **PROSPECTIVE JUROR:**  I mean -- I don't know.  You

23   are listening carefully.  You are given clear instructions.

24   Even though we have to -- there is a high standard of proof,

25   you know.  I don't think anyone is ever walking around with

1      a hundred percent certainty, so I think it's a serious

2      thing, not just your personal conscience, but you're having

3      conversations in the jury room.  So you have to think

4      carefully about what you say, because you are influencing

5      one another as well.  So that's what I mean by "take it

6      seriously".

7              **MS. VAUGHN:**  And do you think you would have any

8      difficulty sharing your own views with the other jurors back

9      in the jury room or --

10             **PROSPECTIVE JUROR:**  No.  I try to be thoughtful

11     about what I say.  Part of taking it seriously is not

12     letting serious concerns go unmentioned.

13             **MS. VAUGHN:**  Thank you.

14             **THE COURT:**  Mr. Corcoran?

15             **MR. CORCORAN:**  Thank you.

16             You mentioned that you have a general perception

17     that, if a subpoena is issued, people are supposed to

18     respond.  But my question is, Would you be open at a trial

19     to considering evidence if it's presented that Mr. Bannon

20     did not have to appear on the subpoena date?  Would you be

21     able to consider that?

22             **PROSPECTIVE JUROR:**  Yes.  I'm assuming that,

23     collectively, you all will explain the law to us and then

24     present evidence as to what did or didn't happen.

25             **MR. CORCORAN:**  Okay.  Thank you.

1          **THE COURT:**  Thank you.  Thank you, ma'am.

2          **PROSPECTIVE JUROR:**  Okay.

3      (Prospective juror steps down.)

4          **THE COURT:**  Any motions to exclude this juror?

5          **MS. VAUGHN:**  No objection, Your Honor.  But I just

6    want to raise the government's concern that the last

7    question from counsel seemed to suggest a defense to the

8    witness.  And we don't think that that's appropriate to

9    frame questions that way to see if they're receptive to it.

10         **THE COURT:**  I understand the concern.  It seemed

11   to me that it was not over the line and it was an okay

12   question.

13         Mr. Corcoran, do you have any motion to exclude

14   that witness?

15         **MR. CORCORAN:**  No, Your Honor.

16         **THE COURT:**  Okay.  We will qualify Juror 0475.

17         We are a little bit later than I hoped to do lunch

18   break, but that is what it is.  Let's recess for lunch.  I'd

19   like to try to be back on the record by 2, if possible,

20   absent objection.

21         **MS. VAUGHN:**  That's fine for the government,

22   Your Honor.

23         **THE COURT:**  Is that okay?  2:00, Mr. Corcoran?

24         **MR. CORCORAN:**  Yes, Your Honor.

25         **THE COURT:**  That clock is a little fast, so we

1    have a little bit more time than that.

2                We will be on the record at 2 or as close to 2 as

3    possible.  Thank you, all.

4                **DEPUTY CLERK:**  All rise.

5                (Lunch recess at 1:12 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

154

1                    **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

10    _____July 18, 2022_____          /s/_____
               **DATE**                     **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPUTY CLERK: [8]**
2/2 7/13 9/15 9/19
11/16 25/21 26/3 153/4
**MR. CORCORAN:**
**[142]** 2/12 3/6 3/16 4/9
7/10 28/9 28/16 33/22
34/5 34/14 34/23 35/16
35/25 36/7 36/9 36/13
45/12 45/15 45/25 46/9
46/14 46/17 46/21 47/2
47/5 47/12 47/17 49/24
54/20 54/22 55/2 55/5
55/11 55/14 55/16
55/19 55/22 56/7 59/6
59/8 59/12 59/15 59/17
59/23 60/3 60/11 65/23
65/25 66/9 66/14 66/18
67/5 67/8 70/12 70/15
70/18 71/7 75/1 75/8
75/12 81/15 81/21
86/16 86/18 86/24 87/8
87/18 87/21 87/24 88/5
88/9 88/10 93/15 93/22
94/2 94/8 94/17 94/22
95/2 95/7 95/14 96/12
96/21 97/6 97/11 97/14
97/17 97/21 100/11
100/17 101/12 101/16
108/2 108/5 108/16
108/24 109/7 109/12
109/18 109/23 111/7
116/24 117/6 121/24
122/6 122/8 122/12
122/16 122/19 122/23
123/3 123/8 123/13
123/16 123/19 123/22
124/2 125/6 125/13
129/4 129/9 129/13
129/16 130/4 130/14
130/20 131/5 131/9
132/5 132/9 132/13
132/19 133/15 139/10
139/20 140/6 140/22
140/24 151/15 151/25
152/15 152/24
**MS. GASTON: [57]**
33/8 33/11 33/16 33/19
37/13 53/25 54/2 54/9
54/12 54/15 54/17 56/4
64/13 64/15 64/18
64/21 64/25 65/6 65/11
65/14 65/16 65/18
65/21 68/1 74/23 75/15

85/6 85/8 85/14 85/18
85/21 86/1 86/5 86/11
86/14 88/15 106/14
106/16 106/22 107/1
107/8 107/14 107/21
107/25 110/1 110/9
110/13 110/15 121/21
124/12 138/17 138/22
139/2 139/6 139/8
140/2 140/16
**MS. VAUGHN: [72]** 2/7
3/4 3/14 4/7 7/7 28/1
28/6 28/15 47/21 47/24
48/4 48/12 48/16 48/21
49/3 49/17 49/23 58/16
58/18 58/21 58/24 59/3
59/5 60/9 70/9 71/4
79/24 80/1 80/6 80/8
80/17 80/20 81/1 81/6
81/8 81/12 92/20 92/22
92/25 93/4 93/9 93/12
99/2 115/21 115/23
116/2 116/6 116/14
116/19 116/22 117/4
128/7 128/12 128/22
129/2 132/20 132/22
133/8 133/11 133/24
149/4 149/6 149/15
149/20 149/25 150/3
150/9 150/20 151/7
151/13 152/5 152/21
**PROSPECTIVE**
**JUROR: [530]**
**PROSPECTIVE**
**JURORS: [2]** 9/18
11/13
**SPEAKER6: [3]** 95/20
109/14 111/11
**THE COURT: [479]**

**'**
**'90s [1]** 61/20
**'yes [1]** 56/19

**/**
**/s [1]** 154/10

**0**
**0014 [3]** 56/14 60/12
60/13
**0122 [6]** 113/4 113/11
117/7 124/18 124/18
125/12
**0331 [3]** 125/15 125/19
133/25

**0342 [3]** 82/4 88/23
89/1
**0351 [1]** 75/22
**0475 [3]** 141/22 142/1
152/16
**0873 [7]** 102/3 110/5
110/12 111/6 112/4
112/17 113/1

**1**
**10 [16]** 15/6 24/6 24/7
24/9 39/4 40/11 61/3
61/11 71/18 82/7 102/7
105/23 134/3 137/1
137/9 137/17
**100 percent [1]** 58/23
**100-6 [1]** 1/15
**1041 [4]** 134/10 140/1
141/13 141/21
**1058 [1]** 7/13
**1061 [2]** 69/8 71/8
**11 [2]** 15/10 60/15
**1104 [1]** 26/12
**1178 [3]** 60/19 60/24
68/23
**1198 [2]** 28/22 38/19
**11:05 [1]** 69/4
**11:20 [1]** 69/3
**11:24 [1]** 69/4
**11th [1]** 5/25
**12 [4]** 2/21 4/11 15/13
105/16
**13 [2]** 8/8 15/17
**1312 [3]** 117/8 117/14
124/11
**1371 [2]** 50/10 56/8
**1391 [9]** 89/6 99/20
100/9 111/5 111/12
111/20 112/2 112/5
112/21
**14 [21]** 2/22 3/19 9/24
12/15 12/18 16/1 16/4
28/25 29/25 39/4 41/3
71/18 73/9 89/9 90/15
102/7 103/16 125/23
134/13 142/5 143/10
**14-sided [1]** 3/19
**1422 [2]** 39/1 49/25
**15 [8]** 16/5 69/1 71/18
73/9 76/1 77/21 134/3
144/17
**15 years [1]** 79/8
**16 [23]** 16/11 28/25
39/4 41/3 41/7 56/19

61/3 62/4 71/18 73/9
76/1 89/9 90/15 90/7
102/7 103/16 117/18
119/11 125/23 126/3
134/14 142/5 143/11
**17 [5]** 16/15 71/18 73/9
76/1 76/1
**1703 [2]** 71/14 75/16
**1793 [1]** 1/13
**18 [10]** 1/5 4/24 12/19
16/22 71/18 73/9 76/1
77/21 105/10 154/10
**18th [1]** 5/3
**19 [8]** 4/3 8/6 17/2
22/10 22/14 71/18 73/9
76/2
**1:00 [1]** 134/3
**1:12 [1]** 153/5
**1:21-670 [1]** 1/3
**1st [1]** 109/13

**2**
**2.108 [2]** 5/8 5/11
**20 [3]** 17/8 117/18
120/21
**20001 [2]** 1/12 1/23
**2000s [1]** 51/5
**2008 [1]** 64/5
**201 [1]** 1/18
**2010 [1]** 43/12
**2014 [3]** 42/25 83/5
83/6
**2016 [1]** 83/4
**2017 [1]** 114/24
**2018 [2]** 82/16 83/3
**202-252-1793 [1]** 1/13
**2021 [14]** 4/23 4/24
12/7 12/10 12/12 12/14
12/15 12/18 12/19
15/19 16/13 23/3 25/10
30/9
**2021-670 [1]** 2/3
**2022 [2]** 1/5 154/10
**21 [6]** 17/14 71/18 76/2
117/18 120/21 121/4
**21201 [1]** 1/19
**22 [25]** 3/2 17/18 23/20
23/22 23/23 24/3 28/25
39/5 41/24 57/17 61/3
63/2 71/18 76/2 82/7
83/14 102/7 104/9
125/23 127/6 127/13
134/14 136/19 142/5
144/13

156

**2**

**2225 [1]** 1/19
**23 [11]** 12/11 17/23
39/5 41/24 42/9 61/3
102/7 104/9 142/5
145/8 145/25
**24 [5]** 18/2 113/15
114/15 142/5 145/8
**25 [6]** 18/7 19/4 19/5
26/19 50/13 118/4
**25th [1]** 1/18
**26 [9]** 18/9 18/12 19/6
28/25 50/13 51/14
89/10 91/24 142/5
**27 [4]** 18/21 18/22 19/1
19/9
**28 [4]** 18/17 19/13 39/5
43/18
**2800 [1]** 1/15
**28th [3]** 41/13 47/4
47/5
**29 [1]** 19/22
**2:00 [1]** 152/23

**3**

**30 [2]** 20/2 105/16
**30 years [1]** 118/5
**30-plus [1]** 104/22
**31 [1]** 20/5
**32 [1]** 20/13
**33 [2]** 20/21 21/2
**333 [1]** 1/22
**334-395-6611 [1]** 1/16
**34 [1]** 21/3
**35 [2]** 21/8 21/16
**36 [1]** 21/17
**36106 [1]** 1/16
**37 [1]** 21/21
**38 [1]** 22/1
**39 [4]** 22/4 28/25 31/11
117/18

**4**

**40 [1]** 22/8
**41 [2]** 22/12 22/16
**410-385-2225 [1]** 1/19
**42 [1]** 22/17
**43 [1]** 22/20
**44 [4]** 22/23 23/1 39/5
44/13
**45 [4]** 23/2 23/8 71/18
74/15
**46 [5]** 10/14 11/2 23/9
23/14 28/25

**4700-C [1]** 1/23
**4th [1]** 1/12

**5**

**500 [1]** 46/5
**555 [1]** 1/12
**5th [1]** 98/14

**6**

**6611 [1]** 1/16
**670 [2]** 1/3 2/3
**6:30 [1]** 94/6
**6th [28]** 12/7 14/18
15/23 23/3 30/3 30/9
33/12 36/5 37/19 37/21
46/24 54/13 62/6 64/19
66/6 68/9 68/10 69/19
74/17 85/9 95/14 98/1
114/5 114/10 126/11
130/16 130/23 136/1

**7**

**70s [1]** 83/24

**9**

**9:26 [1]** 1/6

**A**

**a.m [3]** 1/6 69/4 69/4
**abide [1]** 101/13
**abilities [2]** 99/15
99/17
**ability [29]** 18/15
18/25 19/11 19/24
23/10 23/11 27/13 32/1
32/2 32/19 35/23 35/24
44/10 44/18 45/2 51/11
52/12 61/8 68/21 81/9
88/4 88/18 91/21 91/23
100/3 111/22 128/23
137/18 138/6
**able [21]** 6/3 10/18
26/16 47/13 48/13 55/2
63/18 80/17 80/23 81/3
93/6 101/2 107/13
107/14 107/21 139/4
140/18 146/23 150/16
150/17 151/21
**about [308]**
**above [1]** 154/5
**above-entitled [1]**
154/5
**absent [1]** 152/20
**Absolutely [2]** 47/15
55/1

**abundance [1]** 124/3
**accept [1]** 6/1
**accepting [2]** 21/1
21/6
**access [1]** 131/8
**accessible [1]** 14/22
**According [1]** 12/11
**accordingly [1]** 5/13
**accounts [2]** 72/12
72/13
**accurate [5]** 34/20
122/25 123/5 130/24
130/25
**accused [3]** 17/25
104/25 132/18
**acquainted [4]** 13/1
13/7 13/11 13/17
**act [1]** 100/3
**action [2]** 1/3 6/13
**actions [1]** 78/12
**active [1]** 120/19
**activity [1]** 131/24
**actual [1]** 112/6
**actually [8]** 93/20
98/17 101/17 102/1
110/9 112/24 138/19
140/17
**add [1]** 90/22
**added [1]** 93/21
**adding [1]** 5/16
**addition [2]** 10/25 63/7
**additional [3]** 9/11
80/23 133/18
**address [2]** 8/2 50/24
**Administration [1]**
19/19
**admit [1]** 131/25
**admittedly [1]** 87/6
**ADU [2]** 59/10 59/12
**advance [1]** 111/21
**advanced [5]** 132/17
133/2 133/3 133/3
133/4
**advisement [1]** 6/14
**advisor [6]** 17/2 73/12
78/5 85/22 87/2 87/25
**affect [8]** 18/14 18/24
19/11 19/23 111/22
115/16 137/18 147/23
**affiliated [6]** 15/9
24/12 72/25 74/1 82/12
105/25
**affiliations [1]** 21/22
**affirm [1]** 9/16

**afraid [1]** 31/19
**after [7]** 6/5 11/2 37/1
60/15 95/2 95/10 137/7
**afternoon [17]** 102/1
106/14 106/15 108/3
108/4 113/6 113/7
115/21 117/11 121/24
125/17 128/7 129/5
138/17 139/10 141/24
149/4
**again [21]** 10/22 11/5
12/21 14/14 19/2 23/15
29/15 42/11 45/20
56/20 64/8 70/2 74/15
78/17 88/24 121/16
124/21 127/12 135/23
136/6 150/10
**against [4]** 20/23
114/4 115/2 132/12
**age [1]** 105/11
**agencies [2]** 19/17
137/10
**agency [13]** 15/9
15/14 19/15 20/9 24/12
43/20 55/13 55/14
55/16 61/13 72/25
82/12 105/25
**Agent [1]** 2/9
**ago [19]** 27/3 51/3
51/22 52/20 57/7 57/8
64/2 64/4 64/4 73/7
83/3 83/6 105/15
105/17 106/3 133/9
137/17 144/18 147/12
**agree [10]** 3/3 4/21
5/12 5/15 21/9 88/21
110/5 112/18 124/10
133/25
**agreed [2]** 3/16 132/2
**agreement [2]** 2/19
110/3
**agrees [2]** 75/14
124/12
**ahead [1]** 58/15
**aid [2]** 144/20 144/21
**air [1]** 8/11
**AL [1]** 1/16
**alcohol [2]** 19/20
105/11
**all [60]** 4/13 8/3 8/7
8/24 8/25 9/7 9/13 9/17
10/1 11/4 25/17 25/22
27/18 36/4 36/7 37/3
39/17 45/6 45/22 47/13

# A

**all... [40]** 47/13 49/3 51/23 52/24 55/22 58/3 58/24 59/3 62/9 70/1 71/8 75/2 84/19 85/19 93/12 96/2 96/16 96/18 99/12 99/13 113/10 119/15 119/16 121/12 122/2 123/4 123/8 125/9 126/10 126/10 129/11 131/1 131/1 133/17 139/8 143/7 149/12 151/23 153/3 153/4

**allegation [1]** 5/3

**allegations [1]** 127/3

**allege [1]** 4/25

**alleged [1]** 128/19

**alleges [2]** 12/16 12/19

**allow [1]** 100/4

**along [1]** 95/4

**already [7]** 77/10 77/13 78/22 90/21 94/19 133/2 140/10

**also [57]** 2/9 2/14 5/7 6/23 11/10 21/12 25/19 29/24 30/7 30/21 31/10 38/15 41/17 43/17 46/14 51/13 57/17 63/1 63/7 63/20 72/23 73/8 73/11 73/20 76/2 76/5 77/4 77/6 78/19 83/13 83/19 87/14 90/14 91/24 97/25 99/5 103/8 103/15 104/8 104/12 104/23 108/17 114/14 118/12 119/11 120/20 121/3 121/8 127/20 129/13 135/17 136/18 137/20 144/12 145/12 147/2 147/7

**alternate [5]** 3/18 3/21 3/23 3/25 4/10

**alternates [2]** 2/22 3/1

**although [5]** 30/25 38/16 41/25 42/8 48/24

**always [3]** 49/11 127/24 127/25

**am [43]** 3/22 4/1 4/1 6/2 6/13 6/25 7/3 7/23 29/20 29/22 32/8 32/8 34/17 35/2 35/2 35/11 43/25 44/21 45/4 45/22 48/8 48/15 55/10 64/24

65/4 65/15 68/15 71/14 83/24 85/24 87/7 87/17 96/22 99/19 99/20 102/16 110/18 110/25 112/20 127/18 127/20 129/24 130/1

**AMANDA [3]** 1/10 2/8 12/24

**AMERICA [4]** 1/2 2/3 93/3 93/4

**American [2]** 106/20 108/22

**Amerling [1]** 13/16

**among [1]** 101/9

**amount [1]** 120/9

**analyst [1]** 42/22

**another [12]** 2/23 2/25 17/5 22/22 66/11 74/3 78/7 105/8 121/13 134/3 146/12 151/5

**answer [43]** 9/17 10/17 10/18 10/19 10/21 10/22 10/23 11/1 11/4 11/21 11/24 12/1 12/22 23/18 27/15 29/14 33/1 35/23 38/5 39/21 42/5 53/8 55/7 61/14 63/4 63/25 76/12 77/6 77/20 78/10 78/22 83/17 84/17 90/10 102/14 103/22 105/1 105/22 106/1 120/25 141/19 142/18 144/15

**answered [95]** 23/16 26/18 26/23 27/18 28/25 29/2 29/4 29/24 30/7 30/21 30/24 31/10 31/24 32/4 32/5 32/23 39/4 39/10 40/14 41/3 41/9 41/10 41/24 42/6 43/17 50/13 50/18 51/13 56/16 56/19 57/17 61/3 62/4 63/1 63/20 66/4 69/11 71/17 72/6 72/23 73/8 73/14 73/20 73/24 74/14 75/25 76/11 77/4 77/5 78/4 78/19 78/24 79/2 82/6 82/13 83/13 84/19 89/9 89/14 89/16 90/6 90/14 91/24 102/5 102/6 102/11 103/15 104/8 104/23 105/22 105/22 113/13 114/14

114/22 115/15 117/17 117/23 117/25 118/12 119/11 120/20 125/22 126/4 127/6 127/9 127/16 134/12 135/17 136/18 136/21 142/4 143/10 144/12 147/2 147/13

**answering [3]** 37/25 40/2 86/22

**answers [14]** 11/7 26/9 30/11 32/22 36/24 38/18 74/18 99/22 102/8 115/15 125/24 141/14 142/6 145/14

**anti [1]** 121/17

**anti-inflammatory [1]** 121/17

**any [162]**

**anybody [4]** 126/19 130/16 130/22 131/18

**anyone [40]** 10/8 11/11 15/6 15/10 15/13 16/23 17/18 17/23 18/2 19/14 23/23 24/10 40/11 42/3 43/19 48/12 57/19 61/12 62/1 63/2 63/21 72/23 74/4 82/11 83/14 104/11 104/24 105/23 114/18 117/24 120/18 127/7 127/14 131/1 136/19 144/13 145/9 146/1 147/2 150/25

**anything [100]** 7/4 13/23 14/3 14/6 14/10 14/10 14/17 15/3 15/24 18/14 18/24 19/11 21/19 21/21 24/20 24/22 25/1 25/2 27/11 29/3 30/5 31/5 33/17 35/18 36/20 39/11 39/23 41/6 41/15 41/20 43/13 44/8 51/9 53/10 53/14 53/17 53/19 54/4 57/12 57/19 62/21 63/16 64/6 69/23 70/2 71/23 72/1 72/2 74/2 76/4 76/9 77/7 84/11 84/12 84/17 84/20 84/22 86/1 89/15 89/18 90/16 91/18 92/13 99/4 99/24 100/4 104/1 104/4 105/2 107/1

113/18 114/9 114/16 115/14 116/11 118/14 120/17 121/10 123/11 124/7 124/14 126/2 126/16 127/15 128/1 132/5 134/16 135/9 135/19 136/10 136/15 137/16 138/4 142/9 142/19 143/13 144/7 145/3 147/21 148/17

**Anyway [1]** 134/6

**apologize [4]** 17/15 18/21 110/4 147/6

**appear [3]** 12/14 37/20 151/20

**APPEARANCES [1]** 1/9

**appliance [3]** 59/13 59/14 59/14

**applied [1]** 139/3

**applies [1]** 139/16

**apply [2]** 77/6 81/4

**applying [3]** 21/1 21/6 128/24

**appointment [1]** 31/21

**appreciate [3]** 75/2 101/13 121/25

**approach [2]** 96/15 141/16

**approaching [1]** 127/4

**appropriate [4]** 110/23 111/4 112/14 152/8

**approximately [6]** 39/19 52/17 57/6 62/13 64/3 73/6

**are [132]** 3/25 4/10 4/13 5/23 6/3 6/7 6/8 7/5 7/13 7/19 9/24 11/18 11/20 13/1 13/6 13/11 13/17 14/15 14/22 16/5 17/6 17/12 19/4 20/14 22/4 22/12 23/14 24/4 26/7 28/22 29/9 30/10 31/11 34/15 34/21 35/21 37/4 39/22 41/4 41/25 46/23 46/25 48/1 48/23 49/9 50/2 50/8 50/10 54/12 55/11 60/1 60/17 65/14 66/23 67/9 67/13 68/12 68/24 69/8 70/23 72/18 73/22 75/5 75/22 76/6 78/8 79/1 80/6 80/16 81/2 82/4 82/7 82/18 85/12

## A

**are... [58]** 85/18 87/4
88/11 89/5 89/6 90/15
91/15 92/23 96/25
97/12 98/22 100/25
102/3 102/17 105/6
105/21 108/9 109/14
109/15 109/16 110/3
110/23 111/19 111/19
113/11 113/15 115/22
116/16 117/14 118/19
120/6 120/23 121/8
125/19 125/23 128/19
130/6 132/11 134/10
135/2 135/11 139/8
141/8 142/1 142/15
142/23 143/11 145/6
145/11 145/16 146/5
149/18 150/9 150/23
150/23 151/4 151/17
152/17
**area [1]** 79/16
**areas [1]** 8/11
**aren't [1]** 54/24
**arena [1]** 72/24
**Argentina [2]** 31/1
31/6
**argued [1]** 111/5
**arguing [1]** 6/16
**argument [1]** 111/3
**arguments [3]** 6/17
6/17 97/4
**Arms [1]** 73/5
**arms' [1]** 124/6
**Army [1]** 83/24
**around [6]** 6/18 13/20
71/21 82/14 134/3
150/25
**arrested [3]** 17/25
105/10 146/10
**arrestee [1]** 105/13
**article [5]** 107/11
108/21 108/25 110/18
133/1
**articles [12]** 14/21
29/9 39/19 72/11 87/20
87/21 107/10 110/16
132/14 138/20 138/21
140/17
**articulated [2]** 5/24
38/9
**artificial [1]** 121/13
**as [128]** 2/24 3/23 4/8
5/22 6/5 8/8 8/17 11/3

12/18 16/19 17/14
17/15 17/20 18/5 18/9
18/13 18/15 18/23
18/25 19/6 19/10 19/12
21/19 21/23 22/6 22/11
22/16 23/6 23/11 23/25
25/17 27/16 31/5 31/12
32/1 32/16 35/9 35/13
35/21 35/22 37/9 43/15
44/5 44/6 44/9 46/18
48/1 48/11 50/3 51/14
51/21 52/2 52/10 52/20
54/25 63/5 65/19 68/3
69/15 69/16 69/25 70/5
73/12 73/18 76/4 76/8
80/3 80/6 80/12 86/19
90/5 91/25 92/13 93/9
93/21 96/7 98/10 99/6
99/13 99/23 100/22
100/25 101/2 101/7
101/10 105/13 110/19
111/5 111/6 111/16
112/25 114/21 115/17
116/20 119/4 119/18
120/5 120/16 121/10
122/14 123/6 127/6
127/15 127/19 127/20
128/2 128/15 130/21
131/6 133/19 133/19
137/13 137/14 137/17
138/4 140/24 143/2
147/24 148/3 149/11
149/11 149/16 150/5
150/6 151/5 151/24
153/2 153/2
**aside [11]** 16/17 23/5
35/6 47/13 74/16 77/13
78/14 80/11 80/17 81/9
128/14
**ask [42]** 9/11 10/14
10/15 11/4 11/7 25/18
35/5 36/13 37/5 37/10
39/7 41/25 48/17 49/4
49/7 49/12 50/15 53/4
56/18 61/4 68/11 68/12
68/12 70/1 71/20 76/3
77/19 82/7 89/12 102/8
109/8 113/14 114/15
117/20 119/19 122/1
124/7 124/15 125/23
141/9 142/5 145/11
**asked [19]** 4/18 5/7 5/9
11/2 15/11 29/1 35/1
53/20 59/2 69/25 73/10

84/15 86/25 99/8 99/9
100/19 113/17 142/9
148/2
**asking [12]** 11/9 27/25
34/5 34/17 35/25 36/24
38/2 41/21 56/20 95/21
95/25 100/13
**asks [13]** 9/3 40/11
41/5 41/7 42/3 44/13
50/17 57/18 71/25 74/3
74/4 126/1 126/3
**aspect [1]** 109/3
**assailant [1]** 115/3
**assault [2]** 147/12
147/17
**assistant [5]** 12/24
17/21 24/1 106/25
143/22
**assisted [1]** 12/25
**associated [2]** 16/23
54/23
**association [5]** 13/2
13/8 13/12 13/18 37/21
**assume [2]** 49/8 75/14
**assumed [1]** 142/22
**assuming [1]** 151/22
**attack [5]** 12/8 12/10
14/19 15/23 30/3
**attempted [1]** 8/19
**attempting [1]** 2/20
**attention [8]** 22/6
22/11 22/15 49/18 68/7
113/25 114/13 129/20
**attorney [13]** 1/15
29/19 31/1 31/6 35/12
102/16 104/11 127/18
127/19 128/2 137/4
140/12 144/18
**attorney's [2]** 17/22
24/2
**attorneys [6]** 1/11
12/24 20/6 20/7 110/21
116/3
**August [1]** 109/13
**aunt [3]** 57/21 57/21
58/18
**availability [3]** 132/14
132/23 133/20
**available [3]** 8/24
108/19 141/9
**Avenue [1]** 1/22
**aware [6]** 35/2 35/2
64/23 64/24 136/6
142/15

**awareness [1]** 69/14
**away [1]** 45/18
**awoken [1]** 94/5

## B

**baby [1]** 65/19
**baby-sitter [1]** 65/19
**back [14]** 11/5 32/21
36/20 68/12 69/3 94/10
94/10 105/19 105/21
114/24 116/10 124/20
151/8 152/19
**background [5]** 76/14
85/24 107/20 127/3
137/17
**bad [1]** 121/14
**badge [3]** 10/2 10/3
10/5
**badly [1]** 148/25
**Baltimore [1]** 1/19
**Bankruptcy [1]** 1/22
**BANNON [48]** 1/5 2/4
2/13 5/17 6/10 6/15
7/10 12/6 13/10 13/13
16/23 17/2 33/17 37/3
57/10 73/11 75/6 78/5
87/1 87/5 88/1 88/3
91/2 91/10 94/15 94/24
95/8 96/9 98/4 98/8
98/13 104/2 114/4
118/22 119/21 120/1
120/1 122/3 123/10
124/23 126/13 129/7
131/13 134/22 136/11
139/15 144/1 151/19
**Bannon's [3]** 5/14
54/23 62/18
**barred [3]** 42/7 42/17
43/3
**based [36]** 14/7 14/12
16/20 21/24 23/7 23/12
24/24 25/4 32/2 35/5
59/15 72/4 72/19 76/19
77/8 77/13 87/24 89/19
90/9 96/9 97/1 103/5
107/22 108/7 110/23
111/23 112/2 118/16
128/15 131/17 131/17
136/13 139/11 140/7
141/1 141/14
**basically [12]** 14/5
39/17 44/21 52/2 57/18
61/9 63/3 74/15 74/18
145/10 145/13 146/2

**B**

**basis [6]** 39/17 99/15 100/17 140/21 144/15 145/13

**be [173]**

**bearing [2]** 23/10 32/1

**because [36]** 2/23 2/25 17/5 17/11 19/2 20/1 20/16 32/6 34/6 35/11 36/16 38/11 50/20 55/7 60/14 66/5 67/17 68/21 69/23 73/22 76/13 76/17 78/8 85/14 93/19 111/9 112/12 112/13 114/12 120/23 123/5 124/14 129/25 146/11 148/22 151/4

**become [1]** 67/12

**been [65]** 7/24 15/11 15/14 16/11 17/24 18/3 19/14 22/13 26/7 30/8 33/24 34/18 35/4 42/24 43/19 44/5 46/25 51/22 56/22 61/6 61/17 65/7 69/23 74/1 74/5 74/12 75/3 79/6 79/7 79/14 82/19 92/4 92/4 92/7 99/11 103/12 103/13 104/2 104/17 104/21 104/24 109/3 114/19 118/4 119/17 120/9 122/1 122/4 122/9 122/13 122/23 122/24 130/8 130/12 133/2 133/3 137/8 140/10 142/16 145/1 145/9 146/1 146/10 149/8 150/6

**before [33]** 1/8 2/16 8/1 11/9 11/11 18/5 23/18 25/21 25/21 33/24 35/7 43/5 47/1 52/15 69/14 73/18 74/19 79/8 79/11 83/24 92/4 93/1 95/2 97/2 99/7 104/20 114/21 121/2 129/21 130/23 137/5 139/15 148/3

**begin [3]** 9/14 11/9 26/12

**beginning [3]** 2/5 4/17 25/18

**begins [1]** 141/16

**behalf [2]** 7/10 132/17

**behind [1]** 132/4

**being [22]** 22/8 33/4 35/1 37/8 37/19 45/18 57/14 63/8 87/25 90/12 91/5 101/2 111/19 115/8 119/5 126/24 127/2 130/6 132/11 133/6 136/16 141/6

**belief [2]** 130/24 131/5

**beliefs [14]** 16/6 16/22 17/4 17/6 17/10 17/12 19/22 20/5 21/22 22/21 73/22 78/6 78/8 120/23

**believe [30]** 5/20 5/21 17/10 17/11 20/15 20/15 69/23 73/21 73/21 74/2 77/15 78/17 80/2 86/8 87/9 91/8 103/4 106/25 108/22 109/15 119/22 120/22 120/22 121/6 126/10 128/4 128/17 129/1 132/25 143/21

**believes [1]** 141/4

**Bench [2]** 4/5 4/12

**best [7]** 35/23 35/24 49/20 67/19 110/24 116/8 116/12

**better [6]** 33/23 34/1 34/3 38/3 38/12 119/8

**between [8]** 36/23 37/21 68/9 97/9 99/24 110/6 111/24 112/9

**beyond [5]** 20/24 83/25 87/17 98/2 99/5

**bias [1]** 145/4

**bit [7]** 27/1 36/23 60/16 121/18 134/5 152/17 153/1

**blank [1]** 131/15

**blog [1]** 14/21

**blood [1]** 67/20

**boss [2]** 44/20 45/20

**both [13]** 6/6 16/9 16/25 20/10 41/9 85/12 92/10 93/5 111/15 112/16 112/20 114/25 138/8

**bottom [1]** 98/16

**box [1]** 67/20

**branch [7]** 15/9 24/13 40/12 40/14 73/1 82/12 105/25

**break [4]** 69/2 84/25 134/4 152/18

**breaks [1]** 8/23

**brief [3]** 26/4 60/16 68/25

**briefing [1]** 140/11

**briefly [3]** 2/18 8/2 124/18

**bring [10]** 2/17 7/5 7/12 38/20 56/9 60/18 101/22 113/3 124/18 125/15

**brings [1]** 9/10

**broadcasted [1]** 126/11

**broadly [1]** 142/17

**brother [4]** 43/24 44/3 44/4 49/1

**brought [1]** 132/11

**build [1]** 121/1

**building [8]** 8/3 8/7 8/25 9/2 9/7 9/9 46/7 52/2

**building-wide [1]** 8/7

**built [1]** 87/15

**burden [1]** 20/21

**Bureau [4]** 19/18 19/20 20/8 42/23

**business [2]** 45/5 45/17

**businesses [1]** 46/5

**busy [2]** 69/24 70/23

**C**

**cable [1]** 46/19

**calculation [1]** 3/3

**call [8]** 11/5 25/18 50/2 51/17 52/20 68/16 68/20 97/16

**called [2]** 7/24 92/4

**calls [1]** 86/23

**came [5]** 38/1 61/7 69/16 94/19 116/10

**can [93]** 4/6 7/20 8/18 9/12 9/13 23/9 23/20 26/15 27/1 29/4 29/17 29/22 30/12 30/23 31/12 31/14 31/15 31/25 32/3 34/15 38/20 39/14 39/17 40/14 41/9 42/5 43/22 44/15 46/7 47/12 48/17 49/8 50/18 51/16 56/24 61/13 62/8 63/3 63/25 65/2 69/21

70/23 72/6 73/2 73/14 73/23 74/5 76/5 78/10 79/1 82/3 82/13 83/16 89/21 89/21 90/19 92/1 92/3 96/1 102/2 102/14 103/10 103/18 104/25 105/8 106/1 113/20 114/17 114/22 115/9 117/25 118/18 119/13 120/24 121/5 124/4 124/20 126/4 127/9 127/11 127/16 133/12 134/16 135/21 136/21 141/22 142/12 144/14 145/12 145/13 147/4 148/5 150/20

**can't [10]** 51/19 52/23 52/23 61/25 66/7 95/19 101/10 120/3 123/11 123/14

**candidly [2]** 10/19 123/19

**candor [2]** 75/2 121/25

**cannot [2]** 20/22

**capacity [2]** 40/21 85/12

**Capitol [17]** 12/8 12/10 14/19 15/18 15/24 16/12 19/21 23/3 25/10 30/4 30/9 64/18 72/13 85/16 86/22 96/7 96/11

**capture [1]** 130/20

**card [14]** 10/1 10/4 10/13 10/22 10/23 25/23 25/24 25/25 26/18 69/10 89/8 90/6 125/21 142/3

**cards [6]** 11/7 23/15 23/18 25/19 25/22 69/1

**care [2]** 100/24 150/8

**career [1]** 138/14

**carefully [3]** 111/22 150/23 151/4

**caring [1]** 22/12

**CARL [2]** 1/8 7/23

**case [206]**

**cases [12]** 46/4 51/19 52/18 79/18 92/10 138/9 138/10 144/20 144/23 144/25 145/7 149/24

**cast [1]** 110/25

**catch [1]** 70/1

**catch-all [1]** 70/1

**C**

**category [1]** 55/9
**caught [2]** 114/1 114/2
**cause [39]** 22/25 27/12 31/6 32/18 36/14 38/7 38/19 39/24 44/10 44/14 51/10 52/11 60/13 62/22 66/19 68/2 75/12 75/17 81/22 86/2 91/20 99/3 110/5 112/17 113/2 114/10 115/9 124/3 128/2 133/16 134/1 138/5 141/7 141/10 142/25 145/4 146/23 147/22 148/18
**caused [1]** 126/17
**caution [2]** 37/6 124/3
**Centers [1]** 97/16
**ceremonial [1]** 7/24
**certain [1]** 141/1
**certainly [2]** 7/1 36/25
**certainty [1]** 151/1
**certify [1]** 154/4
**Chairman [1]** 6/21
**Chairman Thompson's [1]** 6/21
**chairs [1]** 121/15
**challenge [2]** 119/7 119/8
**challenges [1]** 2/24
**chamber [1]** 68/3
**chance [4]** 33/2 48/8 94/7 122/2
**change [1]** 9/4
**changed [1]** 111/18
**channels [2]** 90/2 103/25
**charge [9]** 5/2 21/9 45/21 132/15 146/10 146/16 146/17 148/9 148/10
**charged [6]** 17/25 20/25 42/5 63/23 145/9 146/2
**charges [7]** 6/5 12/5 13/24 71/24 76/9 132/11 148/13
**Charles [1]** 1/18
**check [1]** 69/22
**checked [1]** 69/22
**Chief [2]** 47/11 143/22
**child [2]** 64/5 65/4
**Chinese [1]** 87/16

**circumstances [1]** 34/11
**cites [1]** 106/21
**civic [1]** 92/17
**civil [18]** 18/10 18/13 18/23 19/7 19/10 51/15 51/19 91/25 92/6 102/18 102/20 109/10 109/11 131/7 138/8 138/10 144/19 144/21
**clarified [1]** 37/16
**clear [8]** 37/14 99/22 100/2 111/20 124/14 134/21 150/14 150/23
**cleared [1]** 8/15
**client [2]** 46/8 48/6
**client's [1]** 45/3
**clients [4]** 46/2 46/7 48/14 49/5
**clip [1]** 98/3
**clips [2]** 103/24 106/17
**clock [1]** 152/25
**close [40]** 8/19 15/7 15/11 15/14 15/18 17/19 17/24 18/3 19/4 22/13 23/24 24/10 25/9 40/11 40/22 42/3 50/1 61/12 63/22 67/8 68/16 68/22 73/4 74/4 82/11 82/18 83/14 88/24 104/24 105/24 114/18 127/8 127/14 129/20 136/20 144/13 146/1 146/5 147/3 153/2
**closely [1]** 62/12 103/13 103/23
**closer [1]** 82/17
**CNN [3]** 37/2 106/19 129/19
**co [1]** 97/12
**co-counsel [1]** 97/12
**collect [3]** 23/18 25/19 26/2
**collectively [1]** 151/23
**college [2]** 82/20 83/9
**COLUMBIA [8]** 1/1 28/4 28/5 51/24 63/14 66/21 67/17 92/11
**come [10]** 2/4 11/5 32/25 34/7 34/10 35/13 67/15 67/15 131/15 141/1
**comes [4]** 6/25 37/7 87/3 88/1

**comfort [1]** 9/10
**comfortable [6]** 50/8 89/6 113/9 145/12 145/17 145/23
**coming [4]** 47/25 94/6 110/21 112/9
**comment [2]** 35/17 129/7
**commentary [3]** 15/1 95/16 129/20
**commentators [1]** 130/2
**comments [2]** 4/19 5/10
**commitment [1]** 92/6
**committed [2]** 67/2 147/17
**committee [81]** 12/7 12/8 12/12 14/18 15/12 15/22 15/25 16/6 16/7 16/11 30/3 30/5 30/8 30/14 35/19 36/5 37/8 41/6 41/14 46/11 46/22 54/13 56/21 59/18 59/24 62/6 62/14 66/1 66/3 66/10 68/4 68/4 68/7 69/18 69/19 69/19 72/13 72/14 73/10 76/23 77/22 77/23 82/17 84/16 85/9 90/17 90/20 94/24 95/16 96/5 98/3 98/7 98/12 98/13 98/18 99/25 100/18 103/19 104/5 106/17 120/6 126/2 126/7 126/11 126/17 126/20 128/8 129/22 130/17 130/23 131/4 131/18 135/19 136/9 136/11 136/14 139/15 143/12 143/14 143/18 144/8
**Committee's [10]** 14/19 16/16 41/8 53/20 68/8 84/23 91/19 103/16 119/12 126/4
**common [1]** 29/20
**commonly [1]** 5/11
**communication [3]** 8/20 93/3 93/4
**companies [1]** 46/5
**company [7]** 19/16 32/7 36/18 48/11 59/13 59/15 97/16
**Complainants [1]**

66/24
**complete [1]** 45/3
**completely [1]** 99/6
**compliance [1]** 131/12
**complicate [1]** 78/15
**complicated [3]** 29/14 29/16 29/18
**comply [2]** 12/20 29/23
**component [1]** 79/19
**computational [1]** 8/9
**concern [6]** 8/12 78/16 86/2 144/9 152/6 152/10
**concerned [15]** 32/18 49/17 51/10 62/23 63/17 72/18 77/12 110/18 110/25 112/20 138/6 140/10 143/1 148/18 150/9
**concerning [2]** 16/12 30/8
**concerns [5]** 49/19 68/10 81/8 128/22 151/12
**conclude [6]** 43/14 70/4 84/13 92/14 104/6 136/15
**concluded [3]** 4/12 76/16 105/20
**conclusions [2]** 73/19 146/22
**concrete [1]** 123/7
**condition [4]** 9/5 22/5 31/11 121/9
**conduct [2]** 72/16 148/11
**conducting [1]** 12/9
**conference [2]** 4/5 4/12
**confidence [1]** 141/14
**confident [2]** 85/24 97/3
**confirm [3]** 27/18 69/13 90/5
**confronted [1]** 101/11
**confusion [1]** 141/7
**Congratulations [2]** 55/19 59/4
**Congress [7]** 6/12 12/6 15/11 16/8 66/23 67/5 68/4
**congressional [1]** 15/12

**C**

**connected [1]** 37/20
**connection [9]** 13/2
13/7 13/12 13/18 31/3
68/9 88/20 128/1 136/8
**conscience [2]** 21/12
151/2
**consider [5]** 21/11
139/3 139/5 143/7
151/21
**considering [5]** 97/4
126/24 142/20 142/21
151/19
**consistent [4]** 5/6
10/19 74/18 123/17
**Constitution [1]** 1/22
**constitutional [1]**
109/3
**consultant [2]** 45/3
46/3
**consumer [1]** 79/17
**consumption [2]**
14/17 14/21
**contact [6]** 8/19 13/3
13/8 13/13 13/19 45/23
**contacted [1]** 147/20
**contempt [4]** 12/6 54/7
54/23 131/21
**content [1]** 140/25
**context [2]** 95/18
95/23
**continue [3]** 22/24
46/7 100/15
**contract [2]** 32/7 70/22
**contractor [1]** 70/20
**contrary [1]** 92/16
**conversation [1]**
31/15
**conversations [2]**
84/11 151/3
**convict [1]** 52/25
**convicted [3]** 42/9
42/13 42/15
**conviction [1]** 43/7
**convinced [1]** 99/14
**cooperate [4]** 128/9
131/22 132/3 132/3
**cooperating [1]** 72/14
**CORCORAN [52]** 1/17
2/13 3/5 3/15 4/8 13/6
13/9 28/8 33/21 35/15
36/12 37/11 38/12 38/15
45/10 54/19 56/6 58/13
60/10 65/22 67/24

68/10 70/11 71/6 74/25
75/11 81/14 81/20
86/15 88/9 93/14 97/9
97/20 98/25 100/10
105/9 108/1 109/22
111/3 117/5 121/23
124/1 125/5 125/11
129/3 133/14 133/22
139/9 140/5 151/14
152/13 152/23
**corner [2]** 10/4 10/13
**corporate [1]** 83/23
**Corporation [3]** 55/13
55/21 55/23
**correct [37]** 26/19
26/21 26/24 28/22
32/12 35/11 39/1 42/13
42/18 50/10 56/14
60/25 69/8 69/9 69/15
71/14 75/22 78/23 82/4
82/5 89/6 89/11 90/7
90/8 90/13 93/20 102/3
108/20 113/11 117/14
125/19 129/11 129/12
134/10 142/1 147/10
154/4
**Costello [1]** 13/16
**could [41]** 3/18 4/3
6/18 6/21 7/12 11/24
11/24 22/5 22/23 25/24
29/21 32/24 40/8 43/14
49/7 49/11 60/18 77/12
77/17 79/19 86/3 94/9
97/3 97/23 101/1 101/4
105/3 107/17 110/9
111/13 111/14 111/16
112/17 113/3 114/11
116/9 116/12 121/9
130/18 143/7 150/6
**couldn't [5]** 84/13
92/14 104/6 110/17
143/1
**counsel [18]** 2/4 2/9
2/14 2/15 5/16 27/24
85/4 89/13 97/12 102/9
104/15 112/7 117/21
124/1 125/24 134/2
142/6 152/7
**count [2]** 3/1 82/15
**country [1]** 120/11
**counts [1]** 12/6
**county [3]** 46/4 138/1
138/2
**couple [20]** 4/13 4/15

40/24 47/24 51/19 54/2
75/4 85/1 85/4 86/21
92/22 93/17 103/1
108/6 110/15 115/24
146/11 147/12 149/22
149/23
**course [11]** 3/9 6/8
23/21 36/19 45/9 69/14
87/8 118/23 129/22
130/11 141/3
**court [50]** 1/1 1/21
5/11 8/2 8/5 9/3 9/3
14/12 15/15 16/21 18/5
18/11 19/8 23/8 27/8
36/13 37/6 38/1 48/18
51/1 51/15 52/2 54/25
55/3 72/20 74/9 80/22
81/1 94/19 97/2 100/13
107/12 109/9 110/6
112/9 114/20 117/24
128/13 128/16 131/15
131/21 137/25 139/2
140/19 148/8 149/8
149/14 150/1 150/4
154/3
**Court's [6]** 25/3 37/17
80/4 80/21 100/22
101/13
**courthouse [3]** 17/22
24/2 66/6
**courtroom [17]** 7/14
7/16 7/25 8/13 8/23 9/1
9/9 9/24 11/6 13/22
50/5 102/13 107/23 122/14
**courtrooms [3]** 8/10
8/14 8/17
**Courts [1]** 1/22
**coverage [28]** 16/13
16/15 30/10 30/12
30/16 33/12 33/13
33/16 37/18 37/22 41/8
46/18 56/21 62/5 66/10
90/18 100/18 101/5
101/6 106/18 107/1
126/4 129/14 129/18
129/19 135/20 139/11
143/15
**covered [2]** 9/12
140/17
**COVID [8]** 8/3 8/6 8/15
22/10 22/14 48/24
70/16 146/11
**COVID-19 [4]** 8/3 8/6

22/10 22/14
**CR [1]** 1/3
**cracked [1]** 31/19
**CRC [1]** 1/21
**credibility [1]** 19/24
**crime [21]** 18/1 18/3
18/4 18/6 20/25 42/5
42/9 42/13 42/16 63/23
67/2 104/25 114/19
114/20 114/21 115/8
145/10 145/10 146/2
147/3 147/8
**criminal [36]** 2/3 7/25
17/24 18/10 18/13
18/23 19/7 19/10 20/7
21/3 22/22 42/4 51/15
52/14 63/22 64/7 64/22
79/9 79/16 79/19 84/6
86/6 88/11 92/1 92/8
102/18 104/25 105/13
131/7 138/8 144/25
146/1 146/21 148/8
149/24 149/25
**critical [5]** 32/8 120/19
123/14 123/15 123/16
**crowd [1]** 136/2
**crowns [1]** 31/19
**cumulative [1]** 5/21
**current [2]** 46/7 145/3
**currently [8]** 22/12
44/20 46/5 55/8 55/10
102/17 102/21 116/17
**cut [14]** 29/21 32/24
33/25 34/7 34/10 34/20
35/9 35/17 36/2 36/3
36/19 37/10 37/14
38/10

**D**

**D'Amico [2]** 2/10
13/17
**D.C [17]** 1/11 19/18
50/25 55/16 58/6 58/7
61/16 64/16 70/16
70/19 70/21 85/12
127/19 137/7 147/11
148/8 149/25
**dad [1]** 137/21
**daily [2]** 39/16 46/12
**data [1]** 69/22
**date [7]** 6/19 30/18
108/14 108/14 109/12
151/20 154/10
**daughter [1]** 67/21

# D

**DAVID [4]** 1/14 1/15 2/13 13/5
**day [17]** 1/7 48/22 57/2 57/3 85/15 85/17 91/14 91/15 95/10 95/11 95/13 95/14 95/15 95/22 98/6 118/22 130/13
**DC [3]** 1/4 1/12 1/23
**dcd.uscourts.gov [1]** 1/24
**deadline [3]** 4/23 5/1 48/10
**deadlines [3]** 47/25 48/7 49/7
**dealing [1]** 6/2
**dealings [1]** 20/2
**dealt [2]** 133/18 140/11
**debate [1]** 134/21
**decide [3]** 6/7 9/23 77/13
**deciding [5]** 13/25 16/19 23/6 76/10 128/15
**deciphering [1]** 53/13
**decision [4]** 6/11 34/16 47/14 150/11
**decisions [5]** 35/24 45/21 107/22 148/23 150/15
**deep [1]** 86/23
**deeply [1]** 85/1
**default [1]** 6/19
**defaulted [1]** 12/17
**defaulting [1]** 5/2
**defendant [39]** 1/6 1/14 5/2 12/5 12/13 12/16 13/5 13/10 14/17 15/21 16/10 16/23 16/25 20/11 20/23 20/24 21/3 27/17 30/1 33/17 37/20 37/21 41/16 41/20 53/1 53/10 62/17 68/16 72/14 77/2 85/19 88/12 88/19 91/2 104/2 107/13 108/19 124/15 133/4
**defendant's [5]** 5/22 17/16 54/3 78/20 121/4
**defense [12]** 17/22 20/7 24/2 76/15 76/17 86/10 107/12 109/4

109/23 140/7 149/24 152/7
**defenses [10]** 107/12 108/18 109/2 109/5 132/6 132/15 132/17 132/24 133/2 133/21
**defining [1]** 5/8
**Definitely [1]** 80/7
**deliberate [1]** 12/20
**deliberated [2]** 148/24 150/14
**deliberation [1]** 8/23
**deliberations [1]** 21/10
**deluge [1]** 100/18
**demeanor [5]** 100/2 111/12 111/13 112/2 141/15
**denied [1]** 100/21
**dentist [2]** 31/20 31/22
**deny [1]** 141/12
**denying [1]** 6/25
**department [7]** 19/18 20/7 42/9 42/21 43/25 55/12 137/12
**depend [1]** 6/24
**depends [2]** 48/5 145/18
**deployment [1]** 8/20
**deposition [1]** 12/15
**depth [1]** 144/6
**Deputy [1]** 104/15
**describe [35]** 29/4 30/12 30/23 32/4 41/9 43/22 44/1 50/18 51/16 62/8 72/6 73/2 73/14 74/5 79/2 82/13 87/12 90/19 103/18 105/1 113/20 117/25 118/18 119/13 121/5 127/9 129/16 134/17 135/21 136/21 142/12 143/17 145/13 147/5 148/5
**describing [1]** 145/17
**description [3]** 35/6 35/7 70/3
**details [3]** 54/10 82/14 130/10
**determine [2]** 48/7 67/2
**Development [3]** 55/12 55/21 55/23
**did [65]** 20/4 27/20 34/10 39/18 39/21 47/3

48/17 51/3 51/21 52/14 52/25 53/3 58/4 58/18 58/24 65/2 65/6 73/2 76/12 76/19 83/21 84/6 84/8 84/9 88/18 88/19 92/1 92/25 93/9 94/6 104/20 106/22 107/8 112/1 114/3 114/4 115/2 115/5 115/7 116/2 116/6 116/8 116/12 124/21 124/25 125/2 128/9 129/6 129/6 132/13 133/5 137/5 137/6 137/9 137/11 138/8 138/19 138/20 147/14 147/21 148/15 148/16 149/21 151/20 151/24
**didn't [16]** 18/21 27/15 50/3 53/8 65/4 68/7 84/17 86/11 124/6 126/23 138/13 138/21 140/17 141/18 150/8 151/24
**die [2]** 3/19 4/1
**difference [4]** 99/24 111/23 112/8 112/11
**differences [1]** 78/11
**different [16]** 8/5 17/6 17/9 17/12 29/7 30/16 34/21 35/25 41/25 68/3 73/23 78/9 106/9 108/8 119/20 120/24
**differently [1]** 96/16
**difficult [16]** 16/8 16/24 20/10 22/2 22/5 22/10 22/15 29/14 31/7 31/12 33/3 36/21 88/22 121/9 121/15 150/15
**difficulty [9]** 16/17 20/25 21/6 21/15 22/1 22/17 23/5 74/16 151/8
**digit [2]** 10/12 10/12
**digits [3]** 10/3 10/4 10/5
**dinner [1]** 129/25
**Diplomatic [1]** 42/23
**dire [3]** 3/11 4/19 5/15
**direct [4]** 8/20 34/25 67/20 143/21
**directing [1]** 12/13
**direction [3]** 44/24 44/25 77/17
**directions [2]** 37/17

140/18
**directly [1]** 131/23
**director [1]** 93/2
**disclosed [1]** 112/22
**disconnect [2]** 36/23 38/1
**discretion [1]** 38/12
**discuss [8]** 2/16 2/18 7/4 61/8 86/11 105/3 114/16 124/22
**discussed [5]** 40/25 108/25 110/18 140/12 140/14
**discussing [2]** 26/8 76/5
**discussion [5]** 97/9 105/7 105/20 110/6 126/13
**discussions [2]** 25/20 65/6
**dispute [1]** 52/7
**disqualify [1]** 112/18
**dissertation [1]** 97/12
**Distributors [1]** 59/14
**district [17]** 1/1 1/1 1/8 1/22 5/11 28/3 28/5 51/23 63/13 66/20 67/17 74/9 92/11 127/20 137/25 138/1 145/7
**District-specific [1]** 145/7
**disturbed [1]** 130/8
**diversity [1]** 46/3
**do [179]**
**doc [1]** 137/6
**documents [3]** 4/23 5/1 96/24
**does [23]** 4/25 5/2 10/8 11/11 42/18 42/20 54/4 57/25 63/7 63/10 67/6 79/4 79/9 99/21 104/14 106/7 114/9 115/8 124/10 130/4 131/22 142/25 150/14
**doesn't [10]** 37/19 37/20 74/23 99/2 124/13 124/14 138/24 140/20 140/20 141/18
**doing [14]** 46/22 46/23 54/15 59/24 66/3 66/10 68/7 89/6 115/22 115/23 127/24 128/23 145/1 145/12

**D**

**DOJ [2]** 79/10 79/11
**don't [72]** 5/19 5/20
11/23 27/4 27/10 29/19
35/3 35/12 36/15 38/16
40/20 41/19 45/3 46/19
49/8 49/10 49/11 55/7
60/24 65/3 66/7 68/20
68/22 69/1 69/23 76/13
76/14 76/17 80/15
83/22 87/11 93/6 94/4
95/6 102/3 107/18
109/1 114/13 115/11
116/5 117/4 118/5
121/14 122/11 123/3
127/4 136/17 137/20
138/7 139/25 141/16
141/22 142/17 143/3
143/20 144/11 145/6
145/20 146/25 147/18
148/14 148/21 148/25
148/25 149/12 149/12
149/19 150/12 150/17
150/22 150/25 152/8
**Donald [1]** 17/3
**done [2]** 4/21 86/5
**doubt [2]** 5/8 20/24
**down [30]** 4/1 10/24
11/3 11/18 11/20 12/21
25/22 25/23 25/24
28/12 36/11 49/15 56/2
60/7 66/17 71/2 75/10
75/18 81/19 88/8 97/19
109/21 117/2 123/2
123/4 123/25 125/10
133/13 139/24 152/3
**drawn [1]** 73/19
**dried [12]** 32/24 34/8
34/10 34/20 35/9 35/17
36/2 36/3 36/19 37/10
37/15 38/10
**drug [3]** 19/19 52/19
52/25
**dry [2]** 29/21 33/25
**due [1]** 22/9
**DUI [3]** 64/2 64/25
146/18
**Dunn [2]** 13/1 13/4
**Dunn-Gordon [1]** 13/1
**during [13]** 3/11 5/25
14/13 14/24 21/24 25/5
41/20 57/10 89/20 91/2
91/11 91/12 118/23
**duty [2]** 92/4 92/17

**dynamics [1]** 8/9

**E**

**each [8]** 2/24 9/16
10/15 10/18 61/6
100/19 122/9 129/21
**earlier [5]** 77/24 78/22
111/4 130/21 135/12
**early [1]** 51/5
**easier [1]** 38/25
**edit [1]** 5/5
**edits [4]** 4/22 5/14
5/15 6/1
**effect [4]** 32/10 109/6
130/22 133/4
**efficient [1]** 25/16
**efforts [1]** 9/7
**eight [2]** 27/3 83/6
**either [19]** 18/10 19/7
30/13 83/5 95/17 100/7
107/6 107/19 108/22
110/22 114/9 117/24
122/20 122/24 136/8
136/13 141/19 142/20
145/9
**elected [5]** 17/8 20/14
20/16 20/18 61/24
**election [1]** 120/14
**elements [3]** 81/2
128/13 128/19
**Ellis [1]** 102/25
**else [12]** 15/3 42/2
43/19 48/2 48/12 53/17
57/19 62/1 63/21
104/11 115/14 134/24
**employed [8]** 8/21
19/14 43/20 55/8 55/10
55/11 65/14 65/15
**employee [1]** 68/18
**employing [1]** 8/5
**employment [3]** 55/6
59/9 145/4
**end [4]** 44/20 45/20
48/9 115/2
**ended [1]** 123/8
**enforcement [16]**
15/15 18/5 19/15 19/17
19/19 19/23 19/25 20/1
20/8 43/20 115/5 115/8
116/12 147/4 147/23
149/9
**enforcement's [1]**
116/7
**England [1]** 127/21

**English [1]** 22/18
**enlightened [1]**
120/10
**enough [6]** 27/7 49/13
67/8 85/24 101/6 101/6
**ensure [1]** 39/25
**entails [1]** 61/22
**enter [1]** 7/16
**entire [1]** 7/20
**entirely [3]** 72/20
135/3 141/2
**entities [2]** 62/2
108/23
**entitled [1]** 154/5
**entity [2]** 15/15 106/4
**EPA [1]** 8/8
**equity [1]** 46/3
**err [1]** 37/6
**especially [1]** 7/19
**essential [1]** 26/10
**essentially [11]** 31/14
40/12 43/19 67/13
72/24 77/9 77/23 78/21
103/14 114/16 124/6
**estate [2]** 63/12
144/24
**ethical [1]** 22/21
**Europe [2]** 87/11
87/13
**evaluate [1]** 19/24
**EVAN [3]** 1/17 2/12
13/6
**even [10]** 6/7 6/20
32/17 68/22 70/21 80/8
110/16 114/13 118/5
150/24
**evening [1]** 30/15
**events [7]** 16/12 16/18
23/3 30/8 74/16 130/12
136/1
**ever [35]** 14/16 15/7
15/11 15/14 17/19
17/24 18/3 18/7 18/9
18/12 18/22 19/5 19/6
19/9 19/14 23/24 24/10
26/22 42/4 50/17 51/21
52/1 52/14 61/12 64/22
65/6 79/14 83/15 93/9
105/24 114/19 136/20
144/14 146/1 150/25
**every [7]** 21/3 21/9
39/16 51/17 52/20
119/17 141/14
**everybody [1]** 69/2

**everyone [10]** 4/6 7/17
10/15 25/21 26/16
38/25 59/25 69/3 105/8
142/16
**everyone's [1]** 143/20
**everything [1]** 149/13
**evidence [34]** 6/24
14/13 15/20 16/20 21/5
21/24 22/3 22/7 23/8
23/12 25/5 27/6 29/25
32/3 34/16 55/3 67/1
72/5 72/20 74/17 78/15
89/20 97/5 98/19
101/19 110/16 110/20
110/20 127/3 131/8
131/16 150/14 151/19
151/24
**evidentiary [1]** 129/21
**exact [1]** 76/15
**exactly [2]** 94/2 110/17
**example [5]** 6/20 8/7
19/17 53/9 124/23
**excerpts [1]** 143/20
**exchanges [1]** 143/22
**exciting [5]** 91/14
95/11 95/15 95/22 98/6
**exclude [10]** 49/21
68/15 68/23 89/1 99/19
101/7 124/2 124/11
152/4 152/13
**excluded [10]** 5/4
38/19 49/25 109/2
110/16 113/1 134/1
141/9 141/17 141/18
**excluding [1]** 38/13
**excuse [6]** 25/17 79/11
112/15 130/18 133/5
133/7
**excused [3]** 26/7
37/10 133/12
**execute [1]** 45/2
**executive [12]** 36/17
134/20 134/22 138/19
138/23 138/24 139/3
139/16 139/18 140/8
141/3 141/5
**executives [1]** 32/6
**exist [1]** 8/12
**exited [1]** 26/5
**expect [1]** 3/8
**experience [20]** 43/13
44/9 44/9 51/10 51/16
63/16 64/7 64/7 67/16
92/17 115/7 138/4

## E

**experience... [8]** 138/5 147/21 148/18 149/1 149/24 150/4 150/13 150/19
**experiences [4]** 52/10 92/13 146/23 149/14
**explain [20]** 10/25 16/19 23/6 29/17 31/13 34/23 44/15 61/13 63/4 63/25 78/10 89/21 102/14 103/10 106/1 114/22 126/6 144/14 150/20 151/23
**explaining [1]** 132/22
**explanation [1]** 38/9
**Explosives [1]** 19/20
**exposed [4]** 22/14 33/24 34/18 99/12
**express [1]** 150/6
**expressing [1]** 21/15
**extend [1]** 44/15
**extended [1]** 32/9
**extent [7]** 30/11 32/16 38/11 54/7 73/19 101/11 143/11
**external [1]** 99/22
**extremely [1]** 38/1

## F

**face [4]** 118/2 118/6 118/8 118/9
**fact [11]** 27/18 35/12 37/3 40/8 69/13 84/18 88/23 100/19 101/5 112/22 115/15
**facts [15]** 9/23 67/21 80/9 80/11 80/13 80/16 81/4 107/22 111/22 128/15 128/24 140/19 142/21 143/2 143/5
**failure [1]** 12/20
**fair [25]** 9/21 16/9 16/19 16/24 20/4 20/10 23/7 23/11 32/2 34/2 37/24 49/13 65/13 77/16 78/18 80/2 81/9 86/3 88/18 97/23 111/13 111/14 111/16 130/17 149/13
**fairer [2]** 34/9 34/11
**fairly [12]** 13/25 18/15 18/25 19/12 19/24 48/18 65/7 65/12 71/25

76/11 143/8 149/12
**fall [4]** 55/9 83/1 83/3 83/8
**familiar [4]** 16/5 54/12 85/18 96/22
**family [49]** 15/6 15/10 15/13 15/17 17/4 17/18 17/23 18/2 18/17 19/13 23/23 24/9 25/9 30/22 31/3 42/1 42/3 57/19 58/9 58/20 58/21 61/11 62/1 63/2 63/21 65/20 67/20 74/4 78/6 78/25 82/10 83/14 104/24 114/18 127/7 127/13 136/19 145/25 146/3 146/5 146/6 146/7 146/20 146/20 146/21 149/7 149/13 149/17 149/23
**fan [2]** 88/2 88/12
**far [2]** 69/16 149/11
**farm [1]** 87/14
**fast [2]** 134/4 152/25
**father [14]** 61/15 63/5 64/1 64/15 64/22 65/2 65/7 66/19 67/16 67/21 68/5 68/9 104/13 104/14
**father's [1]** 64/7
**father/daughter [1]** 67/21
**FBI [1]** 2/10
**FDIC [2]** 104/16 104/21
**federal [10]** 5/11 18/10 19/7 19/15 19/18 20/8 51/15 52/2 74/10 137/24
**feel [30]** 7/18 20/3 22/8 27/24 28/21 31/16 33/25 34/1 38/24 48/18 50/8 56/13 60/23 69/7 71/12 75/21 76/4 82/3 97/3 113/8 113/9 116/6 117/11 123/6 125/17 134/7 136/5 141/24 149/7 150/15
**feeling [2]** 59/23 123/1
**feelings [4]** 65/11 68/8 68/12 130/6
**fellow [3]** 21/11 21/16 148/24
**felt [3]** 36/22 65/7

118/24
**female [1]** 135/25
**few [13]** 2/16 64/2 64/4 69/13 76/7 82/8 85/23 87/3 102/8 106/13 117/20 125/23 143/19
**field [5]** 63/3 127/8 127/15 137/8 144/14
**figure [2]** 60/1 68/11
**filed [3]** 37/1 100/14 109/16
**filters [1]** 8/8
**finally [4]** 3/17 23/9 65/14 74/14
**finance [4]** 55/13 55/21 55/23 83/12
**financial [1]** 45/16
**find [3]** 60/2 68/22 101/10
**finding [1]** 88/22
**fine [6]** 65/5 115/13 124/15 140/22 150/5 152/21
**finished [1]** 96/1
**firearm [1]** 148/13
**Firearms [1]** 19/20
**firm [3]** 108/14 149/21 149/22
**first [19]** 2/18 29/2 32/22 41/25 45/10 45/15 50/17 57/2 57/5 58/14 59/18 59/21 75/2 78/17 80/2 80/16 89/21 90/16 145/24
**five [2]** 62/15 106/3
**fixed [1]** 120/11
**floor [2]** 1/18 8/15
**flow [1]** 8/11
**fluid [1]** 8/9
**focus [2]** 80/13 80/18
**focused [1]** 145/7
**follow [44]** 11/7 14/5 21/12 21/18 22/2 27/23 37/17 39/8 39/22 39/24 40/8 46/10 70/15 71/20 76/3 77/16 80/4 80/21 80/23 81/3 82/9 85/4 89/13 92/15 93/17 97/11 98/6 100/3 100/12 102/9 103/12 103/22 106/16 113/14 117/21 117/22 124/21 125/25 129/9 138/14 139/4 140/19 141/15

142/7
**follow-up [17]** 11/7 14/5 39/8 39/22 71/20 76/3 82/9 85/4 97/11 98/6 100/12 102/9 117/21 117/22 124/21 125/25 142/7
**follow-ups [2]** 89/13 113/14
**followed [1]** 129/14
**following [25]** 13/14 14/11 15/5 16/18 21/19 21/23 23/6 25/3 31/24 33/3 34/13 39/4 71/17 72/3 74/17 75/25 78/4 89/9 89/18 90/11 102/7 108/5 108/7 117/17 142/4
**follows [1]** 129/21
**footage [1]** 66/5
**foregoing [1]** 154/4
**foreknowledge [1]** 124/7
**foremost [3]** 78/17 80/2 80/16
**foreperson [2]** 93/10 150/1
**form [1]** 76/19
**formed [18]** 14/7 16/17 23/5 24/23 29/11 39/22 40/4 72/2 72/9 72/15 77/8 89/17 90/6 107/6 107/18 118/15 118/20 135/14
**former [5]** 17/2 73/12 73/12 78/5 87/1
**forth [2]** 36/20 141/1
**forthcoming [1]** 88/17
**Fortune [1]** 46/5
**forward [3]** 2/4 50/7 100/21
**found [4]** 5/4 92/16 98/4 137/7
**four [11]** 10/4 10/5 10/12 10/12 44/23 61/3 72/7 83/3 100/15 104/19 134/12
**four-digit [2]** 10/12 10/12
**Fourteen [3]** 41/5 126/1 143/12
**Fox [3]** 90/4 93/21 93/22
**frame [1]** 152/9

## F

**Frank [2]** 2/9 13/16
**frankly [3]** 38/16
112/21 130/12
**free [18]** 7/18 27/24
28/21 38/24 50/8 56/13
60/23 69/7 71/12 75/21
77/16 78/18 82/3 113/8
117/11 125/17 134/7
141/24
**Freedom [1]** 137/15
**frequently [3]** 51/18
57/1 103/23
**friend [13]** 15/18 22/13
25/9 40/16 40/22 41/2
65/20 73/4 74/4 82/18
85/8 85/10 85/15
**friends [3]** 78/25 82/17
82/20
**front [4]** 25/25 109/9
112/23 126/20
**FTC [1]** 79/5
**full [4]** 22/6 67/18
118/23 127/2
**function [1]** 44/23
**further [7]** 8/1 33/19
37/14 54/17 86/14
108/14 109/23

## G

**gain [1]** 107/8
**GASTON [24]** 1/11 2/8
12/25 13/3 33/7 37/12
38/6 53/24 56/3 64/12
67/25 74/22 79/23 85/3
106/12 109/25 110/8
111/2 121/20 124/1
124/9 138/16 140/1
140/15
**gave [5]** 38/18 74/18
77/5 78/22 147/18
**general [14]** 14/23
37/18 37/21 38/2 63/11
69/15 104/15 114/6
114/7 135/9 139/12
139/13 145/20 151/16
**generally [18]** 11/8
16/8 20/9 42/2 42/21
48/19 53/4 63/3 72/10
79/1 91/19 114/4
114/10 127/9 128/18
136/6 136/15 144/14
**generate [1]** 87/16
**gentleman's [1]**

111/13
**gentlemen [3]** 7/22
9/20 23/14
**Georgetown [1]**
116/21
**Georgia [2]** 144/17
146/15
**get [16]** 2/20 8/22
25/23 31/20 48/25 49/1
50/24 55/6 68/22 88/24
90/22 93/18 121/16
121/16 129/25 134/4
**gets [3]** 2/24 45/5 48/9
**getting [3]** 48/11 53/4
135/2
**give [6]** 12/15 20/4
20/17 22/6 77/20 86/22
**given [7]** 49/18 68/16
68/16 80/11 80/20
144/9 150/23
**gives [3]** 94/11 107/2
128/16
**glance [1]** 53/12
**go [26]** 6/5 19/2 27/7
31/14 32/21 45/10
45/17 49/20 58/14
58/15 60/16 68/25 76/5
96/10 98/23 105/6
105/19 114/17 118/23
119/2 121/14 129/25
134/2 134/5 145/13
151/12
**going [54]** 3/22 3/22
4/1 6/13 6/14 7/1 9/24
10/14 10/15 23/21
25/13 25/14 25/14
25/17 32/7 36/15 38/7
50/2 50/4 54/10 60/1
61/4 68/15 68/23 68/25
89/12 91/14 94/12 95/4
95/11 95/14 95/22 96/7
97/21 98/5 99/12 99/19
99/20 101/7 102/8
105/6 107/2 107/5
109/5 111/8 111/21
112/13 112/23 114/15
117/16 117/20 133/17
141/12 142/5
**good [80]** 2/2 2/7 2/11
2/12 2/15 7/17 7/22
25/15 28/2 28/19 28/20
33/9 33/10 38/22 38/23
45/13 45/14 47/22
47/23 53/25 54/1 54/20

54/21 56/11 56/12
58/16 58/17 59/6 59/7
60/21 60/22 64/13
64/14 65/23 65/24 69/5
69/6 70/13 70/14 71/10
71/11 75/19 75/20
79/24 79/25 82/1 82/2
82/19 85/6 85/7 86/16
86/17 89/3 89/4 92/20
92/21 93/16 101/24
101/25 102/1 106/14
106/15 107/5 108/3
108/4 108/9 113/6
113/7 115/21 115/23
117/11 121/24 125/17
128/7 129/5 138/17
130/10 141/24 149/4
150/15
**Gordon [2]** 13/1 13/4
**got [10]** 11/22 36/14
43/3 43/6 67/20 94/5
106/9 109/8 130/15
141/8
**government [47]** 2/6
5/7 7/7 15/9 15/14 16/9
16/25 17/9 20/3 20/3
20/9 20/11 20/14 20/17
20/19 24/12 28/15
48/19 55/13 55/14
55/16 56/4 60/9 66/22
70/8 70/19 71/4 74/23
75/14 82/12 88/15
88/21 98/11 99/2 110/1
110/11 111/8 111/18
112/18 121/21 124/10
124/12 124/13 140/2
140/20 149/8 152/21
**government's [5]** 4/22
68/1 124/9 140/1 152/6
**governments [1]** 46/4
**grand [15]** 18/5 18/7
18/13 18/23 19/5 19/9
26/23 27/2 27/12 45/1
50/18 50/20 50/22 51/4
114/21
**grandparents [2]**
83/18 83/20
**grant [1]** 99/19
**Granted [1]** 81/23
**granting [1]** 7/1
**grassroots [1]** 87/12
**grave [1]** 148/20
**gray [1]** 92/3
**Great [1]** 7/21

**greater [1]** 131/23
**greatest [2]** 131/3
131/8
**greatly [1]** 9/8
**ground [1]** 110/14
**grounds [1]** 110/15
**group [1]** 77/21
**guess [15]** 35/16
35/21 47/2 47/9 59/25
95/20 96/13 98/16
103/22 116/11 139/16
139/16 142/22 147/12
148/8
**guidance [1]** 8/16
**guilt [3]** 17/16 78/20
121/5
**guilty [5]** 20/22 20/25
121/6 123/20 124/23
**GULLAND [1]** 1/11
**gunshot [1]** 114/25

## H

**had [49]** 4/18 13/3
13/8 13/12 13/18 20/2
27/6 30/14 33/17 33/24
34/9 34/25 35/1 36/21
55/8 57/19 59/3 64/1
65/7 69/16 71/25 72/2
75/4 87/15 89/16 92/22
95/3 96/10 99/4 101/3
101/17 103/9 112/12
116/9 116/11 116/13
116/16 122/2 130/9
133/2 133/3 133/5
133/6 133/19 139/12
141/19 143/23 146/21
149/13
**hadn't [1]** 96/17
**hair [1]** 92/3
**halfway [1]** 36/16
**hall [1]** 11/4
**hand [6]** 9/6 9/15 10/3
10/13 11/16 143/4
**handful [1]** 39/20
**handle [2]** 48/13 124/5
**handset [1]** 8/20
**happen [2]** 94/12
151/24
**happened [7]** 46/24
47/8 60/2 115/24
116/14 130/10 136/1
**happening [2]** 94/1
95/4
**happy [5]** 7/3 44/1

# H

**happy... [3]** 46/7 58/13 69/2
**hard [9]** 34/12 53/3 78/13 80/10 80/12 119/5 126/23 134/4 136/16
**hardship [6]** 22/25 32/16 36/18 44/14 45/1 45/16
**Hart [1]** 13/15
**has [59]** 5/7 8/2 10/8 16/11 20/21 20/23 21/4 22/13 26/7 30/8 30/14 31/3 37/18 38/15 42/24 44/5 48/24 56/22 61/12 61/17 64/22 66/10 66/22 67/20 68/10 72/24 74/4 74/12 79/6 79/14 97/22 97/25 98/11 99/11 100/4 104/2 104/17 104/24 105/24 112/4 112/18 112/22 112/22 112/23 116/5 120/12 126/11 126/17 127/8 132/2 132/3 138/25 139/18 140/2 142/16 144/13 145/9 146/1 149/13
**hasn't [6]** 35/4 43/1 43/4 66/12 68/6 99/23
**have [322]**
**haven't [14]** 40/24 53/9 53/12 62/12 69/22 84/19 84/24 85/1 86/9 116/5 135/9 136/25 137/8 143/6
**having [10]** 8/13 34/12 41/19 76/20 78/25 88/22 96/16 113/2 148/3 151/2
**he [83]** 20/1 20/16 37/14 37/14 37/15 37/16 37/16 37/18 37/18 37/19 37/24 37/24 38/9 38/15 40/17 42/8 42/8 42/20 42/24 43/1 43/3 43/4 43/4 44/5 48/18 54/4 54/5 61/17 61/24 61/25 63/7 63/10 64/18 64/22 65/7 65/7 65/12 74/2 83/23 84/2 84/6 84/8 84/9 85/15 85/16 85/22 86/6

**86/10** 87/1 87/10 87/15 87/15 88/16 88/17 88/19 91/11 91/13 96/10 98/14 104/15 104/17 104/20 110/15 110/17 110/17 110/20 110/20 110/22 110/24 111/14 111/16 112/22 112/22 112/23 118/23 123/20 124/14 124/14 137/22 137/22 138/8 138/12 139/18
**he's [16]** 6/16 36/14 36/17 36/17 38/11 42/22 48/23 61/23 73/25 74/1 98/21 104/21 110/19 121/6 124/5 133/19
**head [4]** 24/8 24/18 53/22 78/2
**headlines [6]** 85/1 134/19 135/23 138/18 139/12 144/5
**Health [1]** 70/21
**healthcare [1]** 106/8
**hear [22]** 4/6 7/3 15/20 17/8 20/13 26/16 29/25 54/25 76/6 87/4 105/8 110/19 114/3 114/4 115/1 120/17 128/9 128/24 129/6 131/15 141/3 143/2
**heard [71]** 14/3 14/6 14/8 14/9 15/24 23/2 24/20 24/22 24/24 25/1 27/6 29/3 29/5 30/4 35/7 39/11 41/5 53/5 53/11 54/3 54/6 54/6 54/10 57/9 62/17 70/2 71/25 72/1 72/9 74/16 77/7 77/9 84/19 84/22 84/24 89/15 89/22 89/25 90/16 90/19 93/20 94/18 95/3 97/24 98/1 99/4 100/25 101/3 103/9 103/11 113/17 113/20 113/23 113/25 114/9 118/14 118/16 126/1 128/8 129/22 132/5 134/15 134/16 134/17 134/24 135/18 142/9 142/13 143/6 143/13 143/17
**hearing [29]** 5/25 22/2

**41/13** 41/15 41/20 47/6 53/15 54/22 57/10 57/13 59/18 62/10 91/8 91/12 94/24 95/23 96/1 96/2 96/3 96/4 96/6 98/3 99/10 101/18 129/21 130/1 130/5 133/3 146/12
**hearings [63]** 16/12 16/14 16/16 30/8 30/10 30/13 30/16 33/12 37/19 41/8 46/15 46/18 47/3 56/21 56/25 62/6 62/8 62/14 62/18 62/22 66/2 69/20 73/11 76/22 76/24 77/2 77/22 77/23 90/18 90/20 90/24 91/3 91/19 100/18 103/17 103/20 103/24 104/1 104/5 119/12 119/19 119/20 120/2 120/6 126/4 126/7 126/8 126/17 129/10 129/14 129/18 130/11 135/20 136/9 136/10 136/14 142/15 143/16 143/18 143/20 143/24 143/25 144/3
**heart [1]** 118/24
**helped [1]** 87/10
**helpful [1]** 26/16
**her [40]** 17/12 31/5 44/24 47/10 49/1 49/18 49/19 49/20 49/21 58/24 66/19 66/19 67/16 67/16 68/5 68/9 68/11 68/12 73/22 82/21 97/24 98/2 99/5 99/15 99/16 99/22 99/23 100/2 100/3 100/5 111/12 112/2 120/23 140/7 140/8 141/13 141/14 141/14 141/16 143/23
**here [60]** 7/20 9/24 10/15 11/15 17/14 17/16 23/19 26/10 27/17 29/22 29/22 32/8 32/25 35/8 38/13 41/16 41/19 44/11 50/4 52/12 56/7 57/16 62/17 63/18 64/9 67/12 69/1 69/3 71/24 73/19 75/4 78/15 84/13 91/2 92/10 94/6

**98/17** 99/14 100/5 104/2 109/9 111/19 113/1 114/11 115/17 117/6 117/10 121/4 122/2 125/21 127/20 129/5 133/18 136/4 137/19 138/6 143/1 148/19 149/17 150/10
**here's [2]** 4/20 23/22
**herman [4]** 1/21 1/24 154/3 154/10
**herself [1]** 98/20
**hesitate [1]** 9/11
**Hi [2]** 106/15 149/5
**high [3]** 9/2 142/14 150/24
**high-quality [1]** 9/2
**highly [2]** 44/17 121/11
**him [23]** 12/13 16/24 36/18 36/21 38/2 38/5 38/13 44/6 44/9 48/22 54/4 82/21 84/12 85/21 86/2 86/3 86/12 87/16 87/25 88/16 91/6 124/2 133/21
**himself [1]** 38/4
**hip [1]** 121/13
**his [30]** 6/20 17/11 36/14 37/25 38/16 38/17 43/3 44/9 63/16 63/17 73/12 73/12 73/22 78/12 84/12 85/23 86/11 88/18 91/10 110/24 110/25 111/14 111/22 112/20 112/25 118/5 118/6 120/23 138/4 138/14
**hold [2]** 7/1 97/8
**holding [3]** 16/12 30/8 56/22
**holidays [1]** 48/24
**home [1]** 9/4
**honest [2]** 84/24 123/6
**honestly [1]** 86/8
**Honor [80]** 2/2 2/7 2/12 3/4 3/14 3/16 4/7 7/8 28/1 28/7 28/9 28/15 28/16 29/6 30/25 31/9 31/18 32/20 33/5 33/8 33/22 37/13 47/21 49/17 49/23 49/24 54/17 56/5 56/7 60/4 60/11 66/18 67/9 68/1

-3558-

**H**

**Honor... [46]** 68/3 70/9 70/25 71/5 71/7 75/13 81/15 81/21 88/6 88/10 88/15 93/15 97/21 98/16 99/2 100/11 101/20 101/25 102/4 102/15 103/7 104/7 106/2 108/2 109/18 109/24 110/2 110/9 111/7 111/11 116/24 117/4 117/6 125/6 125/13 129/4 132/20 133/15 139/21 140/3 140/6 140/16 152/5 152/15 152/22 152/24
**Honor's [1]** 37/16
**HONORABLE [1]** 1/8
**hope [3]** 9/9 115/12 115/23
**hoped [1]** 152/17
**hopefully [1]** 50/4
**horrified [1]** 130/12
**Hospital [1]** 116/21
**hour [2]** 37/2 60/17
**hours [3]** 9/25 62/14 75/4
**house [17]** 12/9 14/18 15/8 15/22 24/11 30/2 40/13 40/17 40/18 46/20 47/11 61/12 68/4 72/25 82/11 105/24 138/5
**housing [1]** 144/25
**how [45]** 6/24 29/20 39/19 40/22 42/24 49/5 51/3 51/6 56/25 56/25 57/6 61/17 62/8 62/13 64/3 65/2 68/6 74/12 77/14 79/6 82/18 82/21 82/24 87/12 90/19 95/18 96/15 103/18 103/19 104/17 105/15 115/16 115/22 116/6 116/11 119/14 119/23 122/16 127/22 133/8 140/19 145/1 145/18 146/5 149/7
**however [1]** 5/18
**huh [11]** 26/14 61/10 62/3 62/7 63/24 64/17 77/3 79/13 100/16 113/16 116/23
**Huh-uh [1]** 62/3

**hundred [1]** 151/1
**husband [3]** 42/7 42/17 43/23
**husher [4]** 4/4 65/2 105/3 105/5

**I**

**I'd [4]** 36/13 67/10 87/22 152/18
**I'll [10]** 11/6 41/24 43/18 53/4 71/21 76/3 82/7 102/5 118/13 125/23
**I'm [72]** 3/22 6/14 6/25 7/1 10/14 10/15 23/21 29/19 31/19 32/6 32/23 34/5 34/12 35/20 35/21 35/22 35/25 38/7 41/21 42/11 42/12 44/24 45/2 45/21 46/3 49/17 50/23 52/9 53/13 55/8 58/13 58/22 59/12 61/3 68/23 70/20 83/5 88/2 89/12 91/7 95/20 95/25 99/15 100/7 100/13 100/14 102/7 102/16 105/16 110/24 112/24 114/15 115/1 115/13 116/14 117/16 117/20 119/15 122/6 123/1 127/11 133/17 134/20 136/6 136/23 137/3 137/12 141/12 142/5 144/18 145/22 151/22
**I've [29]** 5/4 5/24 11/2 53/11 54/7 62/11 66/5 66/5 66/7 72/8 76/15 76/16 84/25 90/21 92/4 92/4 103/12 103/13 107/18 118/4 119/15 129/17 130/8 130/9 130/9 130/10 130/12 134/19 143/19
**idea [8]** 36/3 36/19 69/17 107/2 116/11 135/9 139/12 139/13
**identifies [1]** 8/11
**ignoring [1]** 80/12
**illegal [1]** 131/24
**Illinois [4]** 84/3 84/4 137/23 138/3
**immediate [4]** 146/6 146/7 146/20 149/7
**impact [3]** 45/17 88/4

88/18
**impacts [2]** 45/5 45/8
**impartial [50]** 9/22 16/9 16/20 16/25 20/10 23/7 23/11 27/13 31/7 32/2 32/19 33/4 43/15 44/11 51/11 52/12 57/14 62/24 63/18 64/9 70/5 72/19 77/17 80/3 81/10 90/12 91/21 91/23 92/15 97/3 100/7 101/2 101/10 103/6 104/6 107/18 114/11 115/9 119/5 120/7 126/24 127/2 128/3 128/23 136/16 137/18 138/6 143/1 144/10 146/24
**impartially [6]** 18/15 18/25 19/12 19/24 100/4 127/5
**impatient [1]** 130/2
**implications [1]** 6/10
**implying [2]** 91/13 98/5
**importance [1]** 96/3
**important [7]** 19/3 36/17 80/4 80/16 80/21 92/17 96/20
**importantly [1]** 100/6
**impossible [1]** 38/4
**incident [2]** 64/25 148/14
**include [4]** 5/19 14/21 19/17 38/8
**included [1]** 147/7
**including [10]** 8/4 8/10 8/18 15/2 17/20 17/21 23/25 24/1 96/17 137/17
**inclusion [1]** 46/3
**incomplete [1]** 131/25
**inconsistent [2]** 111/5 111/19
**increased [1]** 8/12
**index [6]** 10/1 10/4 10/13 10/22 10/23 11/6
**indicate [2]** 96/6 96/8
**indicated [11]** 36/17 46/11 68/24 87/1 93/18 97/23 108/7 108/17 111/13 111/14 127/7
**indictment [8]** 4/25 5/4 12/5 12/11 12/16

12/19 103/14 143/4
**indiscernible [2]** 11/13 133/24
**individual [4]** 26/9 120/17 132/2 132/12
**individually [1]** 25/18
**individuals [3]** 13/15 13/19 96/6
**industry [2]** 106/9 106/10
**infected [3]** 22/13 22/14 31/20
**infection [2]** 36/14 36/16
**inflammatory [1]** 121/17
**influencing [1]** 151/4
**infor [1]** 96/9
**information [28]** 9/10 9/11 33/24 34/9 34/19 36/4 37/7 55/6 87/19 87/24 93/23 94/11 94/16 95/23 96/6 96/10 96/14 96/16 96/24 99/22 108/18 111/21 116/9 116/13 120/9 131/2 135/2 144/8
**informed [2]** 112/3 120/16
**initial [2]** 4/25 8/15
**innocence [3]** 17/17 78/21 121/5
**innocent [1]** 21/4
**inputs [1]** 131/3
**ins [1]** 149/12
**inside [1]** 66/6
**installed [1]** 8/17
**instance [2]** 97/25 100/19
**instances [1]** 97/22
**instead [2]** 5/9 8/23
**instruct [7]** 14/25 21/17 21/20 21/23 77/14 139/2 143/2
**instructed [1]** 128/20
**instruction [11]** 5/8 5/9 5/10 5/10 5/12 15/5 21/1 21/7 128/21 128/24 139/4
**instructions [22]** 4/20 5/23 6/3 14/12 23/12 25/4 32/3 33/3 39/25 40/8 72/4 80/4 80/22 81/3 89/19 90/11 92/15

**I**

**instructions... [5]**
100/3 140/19 141/15
150/13 150/23
**instructs [3]** 80/22
81/1 128/13
**insurance [1]** 92/5
**insurrection [1]** 47/9
**Intelligence [2]** 82/17
85/9
**intent [2]** 3/17 3/23
**intentional [1]** 12/20
**intentionally [2]** 40/1
84/18
**interacted [2]** 105/13
147/4
**interaction [1]** 92/17
**interactions [3]** 8/19
47/10 116/2
**interesting [1]** 111/7
**intern [1]** 86/19
**interned [1]** 82/16
**internet [2]** 14/22 15/3
**internship [3]** 82/24
83/8 86/20
**internships [1]** 82/15
**interpretation [1]**
139/18
**introduce [1]** 2/5
**Investigate [4]** 12/7
14/18 15/23 30/3
**investigated [1]** 79/17
**investigation [19]** 12/9
12/14 14/19 15/25 16/6
16/7 17/25 19/19 20/8
30/6 30/13 41/7 42/4
46/24 63/22 104/25
126/3 143/14 146/2
**investigator [2]** 17/21
24/1
**involved [9]** 13/24
16/18 30/23 58/9 59/10
76/10 95/24 98/8 98/21
**involvements [1]**
146/20
**involves [1]** 126/23
**involving [2]** 98/4
149/6
**is [323]**
**issuance [1]** 98/13
**issue [13]** 35/8 38/17
72/16 94/17 100/23
107/7 128/12 128/14
128/18 131/22 140/10

142/23 146/9
**issued [4]** 12/12
108/12 142/23 151/17
**issues [9]** 27/17 38/15
98/10 99/4 108/9
131/12 135/11 140/17
142/20
**it [203]**
**it's [61]** 14/2 29/14
29/15 29/16 29/17
31/14 33/25 34/7 36/7
39/17 41/11 44/4 44/17
44/19 44/21 44/23 45/1
49/1 51/22 55/13 55/17
55/17 55/20 55/20
59/13 60/14 65/5 67/5
67/5 67/8 67/10 67/19
68/18 78/16 80/3 80/21
82/1 85/12 94/14 95/22
96/19 97/15 97/25
99/12 109/11 109/13
111/4 111/7 121/12
124/5 131/25 136/5
140/25 141/2 141/6
144/21 148/22 150/6
150/7 151/1 151/19
**its [12]** 12/14 15/25
16/6 16/7 30/5 41/6
73/10 100/13 111/18
126/2 136/14 143/14
**itself [2]** 130/1 146/12

**J**

**January [39]** 12/7
12/10 14/18 15/18
15/23 16/13 23/3 25/10
30/3 30/9 33/12 36/5
37/19 37/21 46/24
54/13 62/6 64/19 66/6
68/9 68/10 69/19 74/17
85/9 91/16 95/11 95/13
95/14 95/21 98/1 98/5
98/14 114/5 114/10
126/11 130/10 130/16
130/23 136/1
**January 6 [7]** 15/18
16/13 95/11 95/13
95/21 98/5 130/10
**January 6th [24]** 14/18
15/23 23/3 30/3 30/9
33/12 36/5 37/19 37/21
54/13 62/6 64/19 68/9
68/10 69/19 74/17
95/14 98/1 114/5

114/10 126/11 130/16
130/23 136/1
**Jersey [3]** 42/16 43/10
43/25
**job [5]** 38/17 44/9
55/18 70/15 137/7
**jobs [1]** 55/8
**Journal [1]** 106/20
**journey [1]** 48/6
**judge [14]** 1/8 7/23
35/13 74/7 74/8 74/12
97/1 99/16 118/24
137/21 137/22 137/22
138/5 138/12
**judges [1]** 9/3
**judgment [10]** 17/5
22/22 25/15 67/21
72/19 78/7 88/4 100/5
111/23 150/10
**Judiciary [1]** 50/24
**July [3]** 1/5 5/25
154/10
**June [3]** 41/13 47/4
47/5
**juries [2]** 93/5 99/7
**juror [157]**
**Juror 1198 [1]** 38/19
**jurors [40]** 2/19 2/21
2/23 2/25 3/2 3/9 7/16
8/25 9/3 9/24 21/11
21/16 22/9 26/5 26/9
38/3 50/4 68/22 75/5
88/23 98/22 99/14
101/1 101/3 101/10
111/24 112/10 118/3
122/3 122/8 122/10
122/16 122/20 122/24
133/19 141/8 141/17
141/18 148/24 151/8
**jury [57]** 1/7 4/20 5/22
6/2 6/4 6/5 7/6 8/4 8/24
9/14 9/21 9/21 13/21
18/5 18/8 18/13 18/23
19/5 19/10 20/22 22/24
26/23 27/2 27/12 28/3
28/14 44/13 49/6 50/18
50/21 50/22 51/4 51/7
51/18 52/14 52/25
67/20 77/16 92/4 92/5
93/5 100/24 102/12
107/16 110/19 114/21
135/12 140/12 141/2
141/6 141/6 148/5
148/8 148/15 149/25

151/3 151/9
**just [126]** 2/16 2/18
4/13 4/15 8/2 11/25
19/2 26/8 26/19 27/17
28/2 34/5 34/16 35/16
36/1 36/2 38/16 38/17
39/7 39/16 39/25 41/9
41/21 41/24 44/7 45/15
46/10 47/9 47/24 49/4
49/7 53/9 54/2 55/2
55/9 55/18 56/18 57/1
57/2 59/8 59/12 60/14
61/4 61/24 62/11 62/15
63/11 65/25 66/22 67/18
68/17 69/1 69/13 70/1
70/12 70/15 71/20 73/2
73/14 75/1 75/3 76/16
77/5 79/1 80/13 80/18
80/20 82/8 83/1 83/16
86/19 89/12 90/5 92/1
92/22 93/17 94/10
97/11 98/1 100/11
100/12 101/3 101/17
102/6 102/7 107/19
108/5 108/7 111/8
112/5 113/14 113/24
113/25 116/16 116/17
117/20 118/3 118/5
118/7 118/13 118/25
122/1 123/17 124/21
126/6 128/15 130/20
132/22 134/2 134/3
134/13 136/5 137/9
138/10 138/20 139/14
140/7 140/22 141/7
142/5 142/14 145/2
150/6 150/20 151/2
152/5
**justice [4]** 20/7 64/7
105/13 146/21

**K**

**Kaine [1]** 106/6
**keep [4]** 9/22 46/6 46/6
110/4
**keeping [1]** 45/21
**kept [1]** 30/18
**key [2]** 98/19 133/18
**kid [1]** 138/13
**kind [15]** 45/25 46/1
48/10 52/18 58/18
62/11 70/18 83/21
86/23 121/15 122/9
123/1 135/8 144/23

**K**

**kind... [1]** 149/20
**kinds [1]** 110/17
**Kirkland [1]** 102/25
**knew [2]** 87/1 115/6
**know [89]** 9/1 13/20
25/23 29/20 30/22
32/24 33/2 35/3 35/12
36/1 36/2 39/18 40/19
45/24 48/9 49/10 49/11
53/12 54/4 54/15 59/2
60/1 61/23 61/24 62/16
64/4 65/3 65/4 65/5
66/2 66/7 68/22 69/25
72/24 76/14 76/14
76/14 76/17 77/5 77/13
83/20 83/22 83/22 84/6
85/21 85/23 85/24 86/1
86/6 87/3 87/7 87/12
88/19 90/9 102/11
104/20 107/19 110/22
111/16 111/18 112/22
114/13 116/4 116/5
118/5 118/18 121/10
122/11 122/13 123/3
124/14 127/2 128/18
131/2 134/2 134/21
135/21 136/13 138/23
142/19 147/16 147/18
148/23 148/25 149/11
149/12 149/12 150/22
150/25
**knowingly [1]** 84/18
**knowledge [23]** 14/11
25/2 27/16 27/19 32/22
39/23 44/9 63/17 69/19
72/3 84/12 84/16 86/25
99/23 101/6 104/4
112/3 112/9 112/20
133/20 141/13 141/16
141/17
**known [2]** 3/24 44/6
**knows [1]** 99/25
**KPMG [2]** 127/19
127/22
**Kristen [1]** 13/16

**L**

**ladies [3]** 7/22 9/20
23/14
**language [2]** 5/19
22/19
**laptop [1]** 69/22
**large [3]** 46/5 68/21

141/8
**last [23]** 5/21 6/9 6/10
10/3 10/4 37/2 55/18
78/24 91/8 105/22
107/11 108/5 108/21
118/4 121/8 124/4
124/7 124/13 146/11
146/12 148/2 148/7
152/6
**later [2]** 4/23 152/17
**law [61]** 1/15 9/23
15/15 16/18 17/19 18/4
19/15 19/17 19/23
19/25 20/1 20/8 21/17
21/19 21/23 23/6 23/13
23/24 32/3 42/18 43/1
43/20 43/24 44/3 44/4
57/20 58/10 58/18
58/21 63/11 64/22 74/6
74/17 81/2 83/15 84/6
86/6 104/13 104/14
106/3 106/22 115/5
115/7 116/6 116/12
127/14 127/19 128/13
128/15 136/20 136/25
137/7 140/9 142/21
143/2 147/4 147/23
149/8 149/21 149/23
151/23
**law.com [2]** 106/20
108/23
**lawyer [29]** 17/20
23/25 40/18 42/7 42/18
57/22 57/23 63/5 64/22
79/3 83/19 83/23 83/23
84/2 106/20 108/22
112/4 127/15 127/20
131/7 136/23 136/24
137/2 137/3 137/13
137/14 137/17 141/4
141/14
**lawyers [6]** 39/8 61/5
76/4 76/7 83/19 106/13
**lead [8]** 43/14 57/13
70/4 84/13 92/14 104/5
136/15 144/19
**leading [2]** 35/21 47/9
**learn [2]** 107/22
111/11
**learned [11]** 80/13
80/13 80/18 93/23
100/4 103/18 111/12
118/19 126/6 130/9
130/11

**least [14]** 4/17 6/24 7/2
7/5 8/18 43/2 57/14
73/19 78/14 79/20
88/25 98/7 101/1
112/14
**leave [3]** 25/15 36/15
68/25
**led [2]** 35/8 131/5
**left [3]** 66/12 109/6
122/22
**legal [23]** 17/19 21/1
21/6 23/24 30/23 31/3
42/2 63/3 74/5 79/1
83/15 94/17 96/23
96/25 127/8 127/15
133/21 136/20 137/8
144/14 144/19 144/20
144/21
**legally [1]** 94/15
**legislative [10]** 15/9
24/12 40/12 40/13
61/13 72/24 73/1 82/12
105/25 106/24
**length [2]** 22/25 124/6
**Lesley [14]** 7/12 9/13
25/13 25/14 25/19 26/1
38/20 56/9 60/18 110/6
113/3 117/8 124/18
134/6
**less [3]** 39/20 112/3
150/17
**less-informed [1]**
112/3
**lesser [1]** 20/18
**let [21]** 9/1 17/15 18/20
19/2 26/6 28/24 29/1
35/5 39/3 49/4 49/20
61/2 67/10 69/10 70/1
71/16 75/24 77/19
109/8 119/19 129/9
**let's [6]** 101/22 124/17
124/18 125/15 145/24
152/18
**letters [1]** 141/1
**letting [1]** 151/12
**level [3]** 112/20 141/17
142/15
**lie [2]** 120/13 132/3
**life [1]** 67/16
**light [6]** 33/1 33/1
111/3 125/11 126/22
146/19
**like [71]** 6/8 6/12 7/4
7/21 8/1 9/10 11/14

19/25 24/5 24/14 25/11
27/4 27/23 28/22 31/17
36/22 36/25 37/7 37/24
38/25 41/11 48/19
53/13 56/14 57/4 59/2
59/2 60/14 60/24 61/8
61/20 63/11 63/12
68/15 68/17 69/2 71/13
73/13 75/22 76/16
76/16 78/25 82/4 82/22
84/12 87/11 87/14
87/15 87/23 92/15
102/2 105/2 107/18
111/20 114/16 115/14
117/12 121/11 123/5
125/18 127/16 129/25
134/4 134/8 136/1
136/5 141/20 141/25
143/5 145/14 152/19
**likelihood [1]** 9/8
**likely [1]** 142/7
**Limine [1]** 109/16
**limited [2]** 99/23
141/13
**line [6]** 44/21 68/22
88/25 98/16 122/14
152/11
**lines [1]** 95/4
**list [3]** 5/16 5/17 13/14
**listen [7]** 14/25 55/2
67/1 89/24 90/3 111/22
120/18
**listened [1]** 54/8
**listening [5]** 53/13
97/4 120/19 130/11
150/23
**lists [2]** 59/9 83/16
**little [15]** 27/1 36/23
49/17 56/24 60/16
112/24 113/22 121/18
132/22 134/5 145/2
149/24 152/17 152/25
153/1
**live [2]** 58/4 103/24
**lived [1]** 127/21
**living [1]** 116/19
**local [6]** 18/10 19/8
19/14 51/15 83/25 84/2
**logistical [1]** 4/14
**long [21]** 42/24 43/18
44/6 51/3 51/6 57/6
57/18 58/2 61/17 61/19
61/19 64/3 74/12 79/6
82/24 104/17 105/15

## L

**long... [4]** 121/15 127/22 133/8 145/1
**longer [2]** 60/16 134/5
**look [2]** 10/2 13/20
**looked [1]** 116/11
**looking [3]** 34/15 45/4 137/7
**Looks [1]** 11/14
**loosened [1]** 121/16
**lorraine [4]** 1/21 1/24 154/3 154/10
**lot [12]** 58/24 63/11 72/8 72/9 86/22 94/4 106/20 107/19 136/6 140/11 144/6 148/22
**Louisiana [1]** 74/9
**love [1]** 97/17
**lunch [4]** 60/17 152/17 152/18 153/5

## M

**ma'am [11]** 11/17 53/25 54/20 55/25 66/15 93/16 97/7 97/8 97/18 134/7 152/1
**made [14]** 4/16 5/5 8/24 37/14 66/11 98/14 107/12 111/20 112/6 122/5 122/7 122/10 132/16 150/13
**main [3]** 45/22 66/19 88/11
**maintain [1]** 48/21
**make [26]** 2/18 16/8 16/24 20/9 22/2 22/5 34/16 35/24 44/22 45/24 53/9 63/17 70/1 84/17 88/4 100/11 101/14 107/22 110/22 111/22 121/9 121/17 123/3 129/7 148/23 150/15
**makes [6]** 34/19 37/24 38/13 101/9 121/15 130/2
**making [5]** 6/16 45/21 47/14 100/14 150/10
**man [1]** 29/20
**manner [2]** 16/20 23/7
**many [11]** 32/7 39/19 50/2 52/20 56/25 62/8 62/13 73/16 119/14 119/23 122/16

**Marion [1]** 138/2
**mark [2]** 76/1 76/2
**Maryland [1]** 59/16
**mask [19]** 9/2 26/15 28/21 38/25 50/8 56/13 60/23 69/7 71/12 75/21 82/4 89/5 102/2 113/8 117/11 124/21 125/18 134/7 141/25
**masking [1]** 8/25
**masks [2]** 8/24 27/24
**materials [1]** 4/16
**matter [18]** 7/24 11/8 15/16 22/24 23/2 23/4 23/10 29/14 29/16 31/25 70/5 77/13 103/5 103/11 104/6 112/3 136/16 154/5
**MATTHEW [1]** 1/17
**may [31]** 8/21 11/7 11/23 13/15 16/17 17/8 20/13 23/4 26/10 36/18 36/21 36/22 38/24 39/8 61/5 76/4 82/8 85/23 86/5 89/5 89/13 95/23 96/10 102/9 109/2 117/21 121/17 125/24 132/20 134/4 141/7
**maybe [11]** 14/2 39/20 57/8 58/2 58/2 59/22 62/15 64/5 79/7 83/2 100/14
**MBA [1]** 106/9
**MC [1]** 1/19
**McCaskill [2]** 82/16 82/25
**me [46]** 4/6 5/7 6/15 11/12 13/22 17/15 18/20 19/2 25/11 29/1 29/8 30/12 31/13 34/4 35/1 35/5 38/18 44/22 45/8 49/4 50/3 51/17 52/20 67/11 70/1 76/18 77/19 79/11 88/24 93/7 102/13 109/8 112/2 112/8 112/15 112/23 112/23 113/20 114/24 119/19 121/17 123/6 129/9 130/18 145/19 152/11
**mean [18]** 41/17 48/4 48/25 77/15 82/19 85/11 85/12 95/20 98/6 120/24 123/3 136/5

143/3 150/5 150/12 150/20 150/22 151/5
**meaningful [1]** 112/10
**means [3]** 20/22 40/4 40/7
**meant [3]** 37/15 38/9 150/6
**media [9]** 15/3 80/9 89/24 100/23 101/5 101/6 101/9 101/17 144/6
**medication [1]** 121/17
**medications [3]** 22/4 31/11 121/8
**medieval [2]** 118/23 119/3
**meeting [1]** 48/8
**meetings [3]** 45/23 48/7 48/25
**member [32]** 13/21 13/22 15/6 15/10 15/13 15/17 17/18 17/23 18/2 18/17 19/13 23/23 24/10 25/9 42/1 42/3 61/12 63/21 66/25 67/10 67/11 82/10 83/14 102/12 102/13 104/24 109/4 114/18 127/14 136/19 145/25 149/7
**members [10]** 6/12 9/21 58/9 66/23 78/25 95/17 120/12 146/4 146/5 146/21
**memory [2]** 87/7 94/10
**mens [1]** 6/20
**mention [7]** 3/10 3/24 57/10 91/1 91/2 119/21 143/25
**mentioned [16]** 33/11 41/20 54/3 62/18 64/15 64/21 65/1 77/2 90/2 103/8 104/2 106/16 136/11 138/18 139/11 151/16
**mentioning [1]** 41/16
**mere [1]** 101/5
**merely [1]** 112/2
**MERV [1]** 8/8
**messaged [1]** 120/13
**Metropolitan [1]** 19/18
**middle [1]** 7/20
**might [25]** 9/25 17/4 18/14 18/18 18/24

19/11 23/10 31/19 32/1 32/24 34/19 35/9 36/3 37/9 38/25 49/5 49/18 49/19 77/6 78/7 78/14 80/9 88/23 140/11 150/9
**mind [14]** 9/22 25/23 36/3 57/13 64/8 87/3 87/4 88/1 96/15 107/15 110/25 112/10 132/22 142/25
**mine [2]** 123/14 123/15
**minimum [3]** 2/22 6/15 104/10
**minor [1]** 149/24
**minutes [4]** 62/13 62/15 69/1 134/3
**Miscellaneous [1]** 6/13
**misdemeanor [1]** 2/23
**misheard [1]** 18/19
**mistaken [1]** 52/17
**misunderstood [1]** 147/7
**mitigation [1]** 8/5
**modifications [2]** 4/16 6/8
**modified [1]** 5/18
**modify [1]** 5/7
**MOLLY [3]** 1/11 2/8 12/25
**Molly Gaston [1]** 2/8
**mom's [1]** 49/1
**moment [4]** 10/14 111/11 111/11 120/3
**money [1]** 87/16
**monitor [1]** 9/4
**Montgomery [1]** 1/16
**month [4]** 44/21 45/21 51/8 55/18
**months [5]** 27/4 40/24 83/2 100/20 146/13
**moral [1]** 22/20
**more [28]** 6/23 11/8 16/8 20/18 27/1 36/20 56/24 60/15 68/12 83/25 86/10 91/19 95/23 99/9 112/21 114/4 114/6 114/7 114/10 114/17 130/10 130/11 131/24 132/23 136/14 141/22 142/17 153/1

# M

**morning [64]** 1/7 2/2 2/7 2/11 2/12 2/15 17/7 7/22 28/2 28/19 28/20 33/9 33/10 38/22 38/23 39/16 45/13 45/14 47/8 47/22 47/23 53/25 54/1 54/20 54/21 56/11 56/12 58/16 58/17 59/6 59/7 60/21 60/22 64/13 64/14 65/23 65/24 69/5 69/6 70/13 70/14 71/10 71/11 75/19 75/20 79/24 79/25 82/1 82/1 82/2 85/6 85/7 86/16 86/17 89/3 89/4 92/20 92/21 93/16 94/6 101/11 101/24 101/25 131/11

**most [10]** 25/15 41/12 50/3 80/16 100/6 115/16 120/19 120/19 146/7 146/9

**mostly [2]** 135/23 149/23

**motion [11]** 6/10 6/11 6/13 6/25 37/1 37/1 99/19 117/4 140/2 141/12 152/13

**motions [7]** 5/25 68/17 100/15 100/17 109/14 109/16 152/4

**move [13]** 25/22 66/18 75/12 81/21 88/10 97/21 98/22 110/9 124/2 133/16 133/21 138/20 140/6

**moved [5]** 4/24 112/12 112/18 113/2 137/6

**movement [1]** 87/13

**moves [1]** 48/10

**moving [3]** 14/15 49/21 100/21

**Mr [5]** 3/15 28/8 56/6 81/20 98/13

**Mr. [83]** 2/13 3/5 4/8 5/14 5/17 6/10 6/15 7/10 13/9 13/9 13/13 17/2 33/17 33/21 35/15 36/12 37/3 37/11 38/2 38/15 45/10 54/19 54/23 57/10 58/13 60/10 62/18 65/22 67/24 68/10 70/11 71/6

73/11 74/25 75/6 75/11 78/5 81/14 86/15 88/9 91/2 91/10 93/14 94/15 94/24 95/8 96/9 97/9 97/9 97/20 98/4 98/8 98/25 100/10 104/2 105/9 108/1 109/22 111/3 114/4 117/5 118/22 119/21 120/1 120/1 121/23 124/1 124/23 125/5 125/11 126/13 129/3 131/13 133/14 133/22 136/11 139/9 140/5 144/1 151/14 151/19 152/13 152/23

**Mr. Bannon [33]** 2/13 5/17 6/10 6/15 7/10 13/13 17/2 33/17 37/3 57/10 73/11 75/6 78/5 91/2 91/10 94/15 94/24 95/8 96/9 98/4 98/8 104/2 114/4 118/22 119/21 120/1 120/1 124/23 126/13 131/13 136/11 144/1 151/19

**Mr. Bannon's [3]** 5/14 54/23 62/18

**Mr. Corcoran [45]** 3/5 4/8 13/9 33/21 35/15 36/12 37/11 38/2 38/15 45/10 54/19 58/13 60/10 65/22 67/24 68/10 70/11 71/6 74/25 75/11 81/14 86/15 88/9 93/14 97/9 97/20 98/25 100/10 105/9 108/1 109/22 111/3 117/5 121/23 124/1 125/5 125/11 129/3 133/14 133/22 139/9 140/5 151/14 152/13 152/23

**Mr. Schoen [2]** 13/9 97/9

**Ms [19]** 3/3 3/13 7/9 13/3 13/9 26/1 27/22 37/12 56/3 58/14 58/15 60/18 74/22 92/19 106/12 117/8 121/20 133/23 149/3

**Ms. [43]** 5/16 7/12 9/13 13/3 13/4 25/13 25/14 25/19 33/7 33/7 38/6 38/20 47/20 49/16

53/24 56/9 58/13 60/8 64/12 67/25 71/3 79/23 79/23 85/3 99/1 105/9 109/25 109/25 110/6 110/8 111/2 113/3 115/20 117/3 121/20 124/1 124/9 124/18 128/6 134/6 138/16 140/1 140/15

**Ms. Dunn-Gordon [1]** 13/4

**Ms. Gaston [16]** 33/7 38/6 53/24 64/12 67/25 79/23 85/3 109/25 110/8 111/2 121/20 124/1 124/9 138/16 140/1 140/15

**Ms. Lesley [11]** 7/12 9/13 25/13 25/14 25/19 38/20 56/9 110/6 113/3 124/18 134/6

**Ms. Vaughn [14]** 13/3 33/7 47/20 49/16 58/13 60/8 71/3 79/23 99/1 105/9 109/25 115/20 117/3 128/6

**Ms. White [1]** 5/16

**MSNBC [2]** 106/19 119/17

**much [26]** 3/8 28/10 49/13 55/23 66/16 75/8 84/25 86/9 88/7 92/18 94/13 97/6 97/17 98/20 103/24 113/24 113/25 115/19 116/22 116/25 121/19 125/7 130/1 138/15 138/23 142/17

**multiple [3]** 11/14 40/23 98/1

**must [6]** 10/19 21/9 21/10 21/10 21/12 21/17

**my [93]** 2/20 2/21 3/1 3/17 3/23 4/19 6/10 7/5 7/23 23/12 31/1 31/19 31/20 32/3 32/12 33/3 34/8 35/5 35/7 35/20 35/23 35/24 39/24 40/8 42/7 43/23 43/23 44/4 44/20 44/22 44/22 45/3 45/20 46/19 47/2 48/23 49/1 49/2 50/1 57/21 57/21 61/15 63/5 64/1

69/22 69/22 70/2 72/4 79/3 82/16 83/18 83/19 87/6 88/4 89/18 90/11 91/23 92/3 92/15 96/13 97/1 97/11 98/6 99/21 100/6 101/5 101/8 104/13 106/2 108/11 112/10 114/24 116/5 116/16 119/17 120/18 120/19 122/18 126/19 131/4 131/6 131/14 131/20 131/24 134/2 137/20 139/17 141/15 148/23 149/13 150/13 150/18 151/18

**myself [3]** 76/6 76/16 144/17

# N

**name [10]** 7/23 29/8 53/16 54/3 54/6 54/23 62/18 87/5 118/5 143/20

**named [1]** 37/3

**names [4]** 3/9 3/10 114/13 122/11

**narrow [2]** 131/22 132/1

**national [1]** 138/25

**nature [8]** 13/23 71/24 76/9 105/1 119/9 123/13 127/3 133/5

**near [1]** 64/18

**necessary [3]** 5/20 6/7 6/8

**need [9]** 2/21 2/22 3/1 9/2 11/14 31/20 44/22 128/20 150/8

**needs [1]** 120/11

**negative [4]** 32/10 72/9 130/9 147/22

**negotiation [1]** 108/15

**negotiations [1]** 32/7

**neither [2]** 112/12 112/25

**neutral [6]** 11/10 12/4 37/15 94/18 131/10 143/4

**never [6]** 25/23 65/9 92/7 115/4 137/7 147/19

**New [10]** 39/15 42/16 43/9 43/24 46/11 87/22 90/4 93/18 106/19

**N**

**New... [1]** 135/6
**news [42]** 14/25 29/9 39/16 41/11 41/12 46/17 53/12 54/4 54/8 54/9 54/10 54/24 69/16 69/20 72/10 84/25 87/20 87/21 89/24 89/25 90/4 90/22 93/18 93/21 93/22 95/3 103/12 103/13 103/22 103/23 103/25 106/17 106/21 107/10 108/8 108/8 113/22 118/22 122/4 129/13 135/3 136/9
**newspaper [4]** 89/23 89/25 110/16 132/10
**newspapers [2]** 15/2 30/16
**next [14]** 22/24 25/25 38/20 44/15 44/21 45/17 45/24 56/9 81/24 101/22 122/9 124/5 124/16 138/20
**NICHOLS [2]** 1/8 7/23
**night [3]** 37/2 57/5 59/21
**no [124]** 1/3 3/10 7/15 10/10 10/16 10/16 10/18 10/24 10/25 11/9 21/4 23/2 23/4 25/12 27/10 27/14 28/9 28/16 31/9 31/18 31/23 32/20 33/5 36/6 36/8 40/2 40/6 41/1 41/17 43/3 43/16 44/2 44/12 44/24 48/3 48/15 49/14 49/24 51/12 52/13 53/6 53/18 54/11 55/17 57/11 57/15 57/24 58/11 59/1 60/9 60/11 62/11 62/20 62/25 64/10 64/20 65/9 65/9 65/13 68/2 69/14 69/16 69/21 70/6 70/9 71/4 71/7 75/7 75/15 79/15 83/4 83/4 84/14 84/19 84/21 86/4 86/13 88/16 88/20 88/24 89/16 89/17 92/9 93/11 95/13 96/24 102/1 103/7 104/7 111/23 114/12 115/4 115/11 115/16 115/18

116/4 116/4 116/11 116/24 119/24 121/12 124/24 125/1 125/3 125/6 125/13 126/15 128/4 128/5 129/1 129/8 129/8 135/13 135/16 136/12 140/2 145/6 147/15 147/25 150/2 151/10 152/5 152/15
**no-question [1]** 10/16
**Nodded [4]** 4/9 24/8 24/18 78/2
**noncompliance [1]** 133/7
**none [2]** 69/11 81/15
**nonprofit [1]** 144/19
**nonprofits [1]** 46/4
**nonvoting [1]** 61/24
**Nope [2]** 41/22 63/19
**normal [1]** 133/17
**not [156]**
**not-very-well-articulat ed [1]** 38/9
**note [14]** 4/15 5/23 23/15 25/19 26/18 50/12 68/25 89/8 113/13 117/16 125/21 125/21 142/3 142/3
**noted [3]** 9/5 38/16 68/3
**nothing [18]** 7/7 7/10 33/19 37/23 53/12 54/17 56/4 56/7 86/14 86/23 90/10 91/22 100/6 109/23 110/1 117/6 121/21 135/1
**notice [2]** 29/22 92/23
**noting [1]** 61/6
**now [31]** 3/18 4/3 4/3 5/4 6/14 10/1 10/20 12/21 14/15 25/24 31/21 32/8 58/1 65/5 77/5 83/11 94/23 97/12 104/11 105/16 105/19 106/7 112/8 112/17 112/22 112/22 113/2 115/12 125/15 137/11 144/18
**NPR [2]** 90/22 93/19
**number [30]** 2/19 6/17 7/13 8/19 10/8 10/12 10/13 10/21 10/24 11/25 11/25 12/22 13/5

16/3 18/19 23/15 23/16 24/6 24/7 24/16 26/13 27/17 39/1 56/14 71/14 75/16 101/1 105/23 113/3 141/8
**numbers [2]** 3/12 11/20
**NW [2]** 1/12 1/22

**O**

**oath [5]** 10/20 35/20 35/22 37/25 99/13
**objection [13]** 28/13 49/24 60/9 60/11 67/13 68/16 71/4 71/7 75/15 112/25 125/12 152/5 152/20
**objections [4]** 4/18 5/22 110/22 110/23
**obligation [1]** 21/4
**obligations [3]** 37/25 49/19 50/2
**obvious [1]** 68/20
**obviously [13]** 2/20 2/22 5/23 6/6 26/7 27/15 45/2 45/5 88/2 99/21 104/10 122/9 137/13
**occasion [1]** 75/4
**occasions [1]** 66/23
**occupants [1]** 8/4
**occurred [1]** 130/12
**October [8]** 4/23 4/24 5/1 5/3 12/14 12/15 12/18 12/19
**October 14 [2]** 12/15 12/18
**OFC [1]** 1/11
**off [24]** 26/15 27/24 28/21 38/24 49/7 50/8 50/24 56/13 60/23 69/7 71/12 75/21 82/3 89/5 97/10 102/2 110/6 113/8 117/11 124/21 125/18 129/19 134/8 141/25
**offense [4]** 81/2 128/19 131/21 132/12
**offenses [1]** 132/7
**office [7]** 17/22 20/6 24/2 45/18 48/13 116/3 137/15
**officer [6]** 19/25 20/1 43/24 44/5 44/10

135/25
**officers [2]** 19/23 147/19
**official [4]** 1/21 20/16 20/19 154/3
**officials [2]** 17/9 20/14
**often [1]** 82/21
**oh [4]** 59/1 83/6 117/13 118/4
**okay [138]** 3/7 3/12 4/2 4/8 4/11 10/11 11/15 11/17 12/2 12/3 25/13 26/3 27/5 27/11 27/21 28/6 28/17 29/17 30/17 30/20 31/2 31/18 32/21 33/6 34/16 34/23 35/14 39/21 40/10 41/3 41/23 43/1 43/6 44/2 44/8 45/7 46/9 47/2 47/17 48/16 49/25 50/23 52/8 53/3 53/7 53/23 54/9 56/23 57/12 57/17 58/12 59/3 59/4 60/3 60/6 60/17 64/6 64/11 66/14 70/18 72/22 74/3 74/14 75/8 76/23 77/4 77/19 78/3 79/22 81/12 83/13 85/3 85/18 86/24 88/5 90/23 91/1 91/24 92/18 93/22 94/8 94/17 94/22 94/23 95/7 95/20 96/12 96/21 97/6 102/21 105/9 105/19 106/11 107/8 108/16 109/7 114/14 115/12 116/1 116/6 117/7 118/11 119/4 119/10 120/4 120/15 121/7 121/19 123/22 124/8 125/14 127/6 128/6 129/16 131/9 132/19 135/7 136/13 137/2 137/11 138/15 138/22 139/20 139/20 140/4 143/19 144/7 145/8 145/15 146/19 147/1 148/1 151/25 152/2 152/11 152/16 152/23
**once [5]** 82/22 92/5 92/6 121/18 128/12
**one [68]** 3/10 6/9 6/17 8/10 8/13 8/14 8/18 10/18 11/5 11/5 11/15

**O**

**one... [57]** 11/24 23/22 25/25 26/19 28/2 30/15 31/19 32/6 34/15 34/25 35/1 36/14 36/25 37/2 37/7 42/1 42/3 49/4 55/5 57/5 59/8 59/21 59/22 60/15 65/25 66/11 66/25 70/12 75/1 75/3 82/16 83/23 88/12 95/22 97/8 97/8 97/11 97/22 98/10 101/24 105/8 108/19 108/23 110/15 116/16 118/3 121/13 122/21 122/22 130/14 131/11 133/19 137/8 141/22 142/8 143/4 151/5
**one-hour [1]** 37/2
**ones [3]** 19/4 50/3 111/19
**online [4]** 15/1 29/7 29/9 135/4
**only [21]** 3/11 3/24 6/2 11/18 11/20 12/22 31/2 37/4 44/23 55/5 59/22 72/20 75/3 76/6 81/3 81/4 91/8 105/12 107/22 122/21 124/5
**open [3]** 9/22 123/8 151/18
**open-ended [1]** 123/8
**opinion [12]** 17/15 17/16 29/11 66/8 72/15 76/19 78/20 88/17 107/6 107/19 121/3 131/4
**opinions [22]** 14/7 16/7 16/17 16/22 19/22 20/5 21/11 21/15 23/4 24/23 39/23 40/5 72/2 72/9 77/8 77/18 78/11 89/17 90/6 118/16 118/19 135/14
**opposed [1]** 48/1
**orbit [1]** 104/12
**order [3]** 29/1 44/22 131/15
**organization [2]** 66/25 87/10
**originally [2]** 8/14 127/21
**other [54]** 5/5 7/18 9/9 13/21 19/25 20/8 20/17

20/19 22/9 23/9 24/4 24/14 25/11 26/9 31/25 32/17 38/3 38/15 38/18 42/3 47/10 53/8 55/5 58/9 61/6 75/5 76/7 77/19 78/25 83/25 85/23 87/3 87/4 87/25 101/9 102/12 116/16 118/22 122/3 122/10 123/9 123/15 124/22 129/6 131/23 133/19 135/3 135/11 136/3 141/17 146/19 146/21 148/13 151/8
**otherwise [6]** 7/4 22/11 22/15 88/23 90/12 133/6
**otherwise-qualified [1]** 88/23
**our [7]** 8/15 9/7 44/22 46/5 46/7 46/8 48/6
**out [9]** 7/18 60/1 65/2 68/11 94/5 107/15 110/25 120/17 124/3
**outs [1]** 149/13
**outside [4]** 9/1 11/4 35/18 100/5
**outstanding [2]** 109/14 109/17
**over [11]** 7/24 11/15 23/19 43/3 94/5 94/15 94/16 102/17 134/22 145/2 152/11
**overall [1]** 130/6
**overhear [1]** 129/6
**overwhelming [1]** 120/9
**own [11]** 17/7 17/10 17/13 21/12 21/15 73/23 78/9 99/15 99/16 120/24 151/8

**P**

**p.m [1]** 153/5
**paid [3]** 45/5 48/11 68/6
**pandemic [1]** 22/10
**panel [3]** 13/21 67/18 102/12
**paper [4]** 10/7 10/9 10/11 144/4
**papers [2]** 90/1 94/7
**paralegal [6]** 17/20 23/25 127/15 144/16

144/18 149/20
**paraphrase [1]** 43/18
**paraphrasing [1]** 32/23
**parents [1]** 49/2
**park [2]** 59/16 120/18
**part [12]** 6/24 14/1 14/2 24/19 38/13 73/9 80/3 100/22 101/19 129/14 135/24 151/11
**partial [2]** 100/8 146/23
**partiality [1]** 145/4
**participants [1]** 22/9
**participate [2]** 148/22 150/18
**participation [1]** 131/23
**particular [3]** 4/18 21/8 91/20
**particularly [7]** 5/25 47/11 61/7 67/18 100/2 105/2 147/22
**particulars [1]** 35/3
**parties [11]** 3/24 4/3 7/3 13/24 76/10 102/9 110/3 112/16 117/21 141/20 149/17
**partner [2]** 17/3 78/6
**parts [1]** 142/8
**party [4]** 112/12 112/25 113/2 120/12
**pass [3]** 25/22 25/22 25/24
**past [3]** 55/8 150/13 150/18
**patterns [1]** 8/11
**pause [2]** 26/4 38/18
**pay [4]** 22/11 22/15 49/18 129/20
**paying [2]** 113/25 114/13
**PBS [3]** 90/3 93/19 129/18
**pen [1]** 10/1
**pencil [2]** 10/2 11/13
**pencils [1]** 11/14
**pendency [1]** 14/24
**pending [4]** 102/22 109/8 112/23 132/12
**pens [1]** 11/15
**people [18]** 9/23 16/18 24/4 46/1 47/10 49/9 50/2 55/7 61/24 74/1

76/6 76/7 114/1 122/16 123/15 128/9 142/23 151/17
**per [1]** 48/8
**percent [2]** 58/23 151/1
**perception [4]** 46/21 59/23 66/2 151/16
**perceptions [2]** 75/6 130/6
**peremptory [2]** 2/24 37/5
**Perfect [1]** 70/23
**perform [1]** 8/10
**perhaps [2]** 6/20 73/3
**period [3]** 32/9 100/20 121/15
**person [12]** 17/5 22/14 22/22 31/2 73/2 78/8 95/21 97/22 112/15 116/11 126/25 147/16
**person's [4]** 17/6 23/22 77/16 78/8
**personal [4]** 31/14 44/17 61/8 151/2
**personally [6]** 13/1 13/6 13/11 13/17 21/12 88/3
**perspective [1]** 7/5
**pews [1]** 7/19
**phone [4]** 61/9 69/22 86/23 145/23
**phones [2]** 76/6 114/17
**phrase [1]** 35/10
**physical [4]** 9/5 22/5 31/11 121/9
**pick [3]** 3/18 9/21 9/24
**piece [4]** 10/7 10/9 10/11 98/19
**pieces [1]** 55/6
**pinned [2]** 123/1 123/4
**place [1]** 149/17
**places [1]** 5/6
**plaintiffs [1]** 109/16
**plan [2]** 96/10 134/2
**planning [4]** 96/7 98/8 98/21 144/24
**platformed [1]** 120/12
**played [1]** 98/4
**pleasant [1]** 149/1
**please [23]** 2/4 7/12 9/1 9/11 9/13 9/15 9/19 10/2 10/12 10/21 11/16

## P

please... [12] 13/20 24/6 25/23 25/24 50/7 56/9 60/18 101/22 101/24 113/3 125/15 143/17
plenty [3] 50/4 98/22 119/16
plexiglass [1] 8/17
plus [1] 104/22
podcast [1] 98/15
podcasts [2] 14/21 15/2
podium [4] 27/25 50/7 117/10 134/7
point [7] 5/20 45/22 88/22 101/14 133/18 140/13 140/22
points [2] 21/11 124/10
police [8] 19/18 19/21 43/24 43/25 44/5 44/10 135/25 147/19
policy [1] 42/22
political [13] 17/4 17/6 17/10 17/12 21/22 68/18 73/22 78/6 78/8 87/10 87/12 120/12 120/23
pool [3] 7/6 68/21 100/24
porch [1] 116/10
portions [3] 126/7 136/10 143/25
pose [1] 36/18
position [7] 34/2 49/22 68/1 68/19 100/13 111/18 123/7
positive [1] 147/22
possession [2] 105/11 148/12
possible [10] 7/25 8/12 22/23 105/5 111/1 131/3 132/17 141/2 152/19 153/3
Post [8] 87/23 90/4 93/19 133/1 134/20 135/3 135/5 135/24
postings [1] 15/1
posts [2] 14/21 14/22
potential [12] 5/17 45/16 60/15 98/17 99/14 108/18 122/3 124/22 132/6 132/7

132/23 140/24
potentially [1] 85/5
practice [9] 42/18 58/19 63/7 83/21 84/7 84/12 86/9 86/12 127/19
practiced [5] 43/1 43/4 58/2 64/22 136/25
practicing [5] 42/8 58/5 104/11 112/4 137/8
practitioners [1] 149/23
precise [1] 5/3
precisely [1] 68/21
preconceived [1] 141/19
predicated [1] 120/13
predisposed [1] 131/16
prefer [1] 105/4
prejudged [1] 99/24
prejudice [1] 100/5
prejudiced [1] 99/13
prepared [1] 7/5
preposterous [1] 118/25
present [9] 2/13 15/18 21/5 25/9 107/13 107/13 128/18 131/2 151/24
presentation [1] 94/24
presented [16] 14/13 16/20 22/3 23/8 25/5 35/4 38/12 72/20 80/11 89/20 96/2 96/16 98/11 130/7 141/6 151/19
preserved [1] 5/24
preside [1] 7/23
President [5] 17/3 73/13 78/5 85/23 87/2
President Trump [3] 73/13 85/23 87/2
presiding [1] 102/17
press [3] 76/20 80/18 80/23
presumed [1] 21/4
pretrial [6] 4/20 6/2 37/1 68/17 112/6 133/3
pretty [9] 50/1 76/18 103/13 103/23 107/4 108/8 111/5 124/14 149/18
prevent [13] 13/25

14/11 17/4 21/19 21/22 22/21 25/3 71/24 72/3 76/10 78/7 89/18 90/11
prevented [1] 48/24
previous [1] 78/12
previously [1] 5/24
Primarily [1] 135/5
print [1] 135/4
prints [1] 54/24
prior [2] 94/9 148/5
private [4] 19/15 70/19 114/17 149/23
privilege [10] 134/20 134/22 138/19 138/23 139/3 139/16 139/19 140/8 141/3 141/5
probably [4] 50/25 106/13 124/4 131/6
Probate [1] 144/24
problem [5] 50/5 127/2 127/4 140/25 149/19
problems [1] 141/7
proceed [2] 8/1 9/12
proceedings [3] 72/13 73/17 154/5
process [5] 9/14 9/25 53/4 65/8 101/8
producing [3] 4/23 5/1 12/18
profession [9] 17/20 23/25 30/23 31/3 42/2 74/5 79/1 83/15 136/21
professional [1] 8/9
progress [1] 6/6
projects [2] 45/4 86/22
prolongs [1] 48/11
promise [1] 10/20
prompted [1] 37/9
proof [2] 20/22 150/24
proposal [1] 5/12
proposed [6] 4/19 4/22 5/8 5/14 5/15 6/1
propounded [1] 9/17
prosecuted [1] 147/17
prosecution [2] 20/21 20/23
prosecutor [2] 31/1 79/14
prosecutor's [2] 17/21 24/1
prospective [40] 7/16 13/21 26/5 26/11 28/12 28/18 36/11 38/21 49/15 50/6 56/2 56/10

60/7 60/20 66/17 71/2 71/9 75/10 75/18 81/19 81/25 88/8 89/2 97/15 101/23 102/12 109/21 113/5 117/2 117/9 123/25 124/19 125/10 125/16 129/6 133/13 134/9 139/24 141/23 152/3
protection [1] 79/18
proven [1] 20/24
provide [3] 12/13 15/12 15/15
provided [6] 15/7 24/10 62/2 108/18 111/21 131/3
provider [1] 44/25
provides [1] 144/19
providing [4] 12/17 96/5 96/23 96/24
proximity [3] 122/13 122/18 122/19
prudence [1] 124/17
public [12] 3/11 3/25 8/25 14/17 14/21 14/23 26/7 31/16 96/5 96/5 130/7 145/12
publicity [1] 37/1
purely [1] 118/25
purpose [1] 9/20
purposes [1] 14/20
push [1] 123/6
pushed [1] 48/9
put [12] 4/3 25/24 35/6 47/13 49/7 67/11 67/19 80/17 81/9 95/18 107/15 140/22
putting [6] 16/17 23/5 74/16 80/10 128/14 149/17

## Q

qualified [8] 2/19 2/23 2/25 70/5 71/8 88/23 112/17 127/20
qualify [10] 3/1 56/8 60/12 60/13 99/20 100/9 117/7 141/12 141/21 152/16
qualifying [2] 28/13 125/12
quality [1] 9/2
quarter [1] 59/22
Quash [1] 6/11

**Q**

**question [195]**
**questioning [4]** 37/14
98/7 98/12 143/21
**questions [120]** 4/20
5/16 6/22 9/17 10/15
10/17 10/19 11/2 11/3
11/7 11/10 11/12 11/21
12/21 12/22 23/14
23/16 23/19 24/4 24/14
25/11 25/19 26/9 27/16
27/19 27/22 27/25 28/9
28/25 32/22 33/7 36/23
37/25 38/2 39/4 39/7
39/9 39/22 40/1 41/3
41/24 45/11 47/24
50/13 50/13 50/15 53/8
53/21 54/2 56/16 56/18
59/8 61/3 61/4 61/5
68/11 68/13 69/12 70/3
70/9 71/17 71/21 71/21
72/7 73/9 73/10 73/11
73/15 74/24 75/25 76/3
76/8 77/20 77/21 77/21
82/6 82/7 82/8 82/9
84/15 84/19 85/4 89/9
89/13 90/15 90/15
92/22 93/17 102/5
102/7 102/8 102/10
103/16 104/8 106/13
108/6 113/14 113/15
115/24 116/24 117/17
117/21 120/21 125/6
125/22 125/23 125/24
125/25 126/5 129/10
134/12 134/13 135/18
139/8 142/4 142/6
143/10 145/8 145/11
152/9
**Questions 14 [1]** 73/9
**Questions 20 [1]**
120/21
**Quiana [1]** 13/1
**quick [3]** 75/1 92/22
124/21
**quite [2]** 99/22 141/13
**quote [1]** 109/4

**R**

**radio [2]** 15/2 91/10
**raise [3]** 9/15 11/16
152/6
**raised [1]** 112/25
**range [2]** 131/3 131/8

**ranging [1]** 131/24
**rather [3]** 26/1 38/3
130/1
**rationale [1]** 100/22
**rea [1]** 6/20
**reach [3]** 21/8 93/6
148/15
**reached [1]** 146/22
**reaching [5]** 14/12
21/23 25/4 72/4 89/19
**react [1]** 49/6
**reaction [2]** 119/4
130/9
**read [93]** 11/10 14/3
14/6 14/8 14/10 14/25
15/24 16/13 16/15
24/20 24/22 24/24 25/1
29/3 29/5 29/7 29/8
30/4 30/10 30/13 30/16
35/2 39/11 39/15 39/19
41/5 41/7 41/12 46/11
47/13 54/9 56/21 69/20
72/8 72/10 76/15 76/20
77/7 77/9 85/1 87/25
89/15 89/22 89/23 90/3
90/16 90/18 90/20
93/25 94/1 94/7 94/11
103/9 103/10 103/23
106/18 106/20 107/11
108/17 108/21 110/15
110/20 112/4 113/18
113/21 118/14 118/17
126/1 126/4 131/11
132/5 132/10 132/23
132/25 133/9 134/16
134/17 134/25 135/11
135/19 135/20 138/19
138/21 140/17 142/9
142/13 143/4 143/13
143/15 143/17 144/3
144/8 144/9
**reading [10]** 22/18
39/16 62/5 76/21 87/10
94/3 98/2 103/13
107/10 132/13
**ready [1]** 58/15
**real [1]** 63/12
**realize [1]** 110/20
**really [27]** 6/2 14/1
34/17 44/24 48/5 54/16
62/16 65/4 65/5 68/6
72/16 75/2 83/22 83/24
85/1 86/11 86/23 95/25
96/20 100/20 111/1

113/25 114/12 121/24
134/21 138/13 148/22
**reason [14]** 32/5 66/19
68/2 88/11 88/16 88/24
98/12 98/12 99/3 100/8
101/7 103/4 113/1
131/1
**reasonable [5]** 5/8
20/24 49/9 133/5 133/6
**reasons [8]** 5/24 38/8
41/10 68/24 74/19
112/14 112/15 132/3
**recall [39]** 27/8 28/3
33/16 41/15 41/19
41/21 51/6 51/19 52/1
52/4 52/17 53/1 53/14
57/9 57/3 57/7 57/9
64/3 77/1 90/1 91/1
91/5 91/11 95/1 95/19
96/8 104/3 119/23
119/25 124/4 124/13
126/12 126/14 136/4
136/8 143/24 144/2
148/10 148/14
**recalled [1]** 101/18
**receipt [1]** 33/25
**receive [3]** 21/24 22/3
29/21
**received [2]** 29/22
32/25
**receiving [1]** 36/24
**recent [4]** 41/13 41/13
146/8 146/9
**recently [2]** 69/24
133/19
**receptive [1]** 152/9
**recess [5]** 60/16 68/25
69/4 152/18 153/5
**recognize [6]** 6/16
13/21 102/12 102/16
118/5 118/7
**recognized [3]** 98/3
117/24 118/2
**recommended [1]** 8/8
**record [32]** 2/5 3/11
3/25 4/15 26/6 26/8
28/24 39/3 50/12 61/2
69/11 71/16 75/24 82/7
97/10 100/12 100/14
101/14 102/6 105/19
110/7 112/1 113/15
117/16 125/22 134/13
142/4 144/25 145/12
152/19 153/2 154/5

**records [7]** 12/13
12/18 15/12 15/15
15/21 30/2 108/12
**recount [1]** 80/9
**Recovering [1]** 137/4
**Redbook [1]** 5/10
**reduce [4]** 8/3 8/6 8/19
9/8
**reduced [1]** 8/18
**reference [4]** 91/8 91/9
132/14 132/16
**referenced [1]** 91/12
**referring [1]** 91/15
**reflect [7]** 26/6 28/24
39/3 61/2 69/11 71/16
75/24
**reflects [2]** 26/18 89/8
**refused [1]** 132/3
**refusing [1]** 131/21
**regard [3]** 5/14 54/22
111/8
**regarding [2]** 6/10
100/3
**regardless [2]** 18/4
114/19
**regards [1]** 66/6
**regular [2]** 48/25 49/1
**regularly [2]** 41/12
47/16
**relate [1]** 131/23
**related [11]** 6/12 15/1
30/10 36/4 36/7 41/4
90/15 135/18 143/11
146/18 148/12
**relates [1]** 35/17
**relating [2]** 12/13
147/4
**relation [2]** 67/21
116/3
**relationship [1]** 48/21
**relative [1]** 22/13
**relatively [2]** 131/22
132/1
**relevant [5]** 6/18 6/21
26/10 80/10 131/8
**religious [2]** 22/20
137/15
**remain [4]** 6/6 16/9
16/24 20/10
**remark [2]** 118/21
124/16
**remarks [3]** 122/5
122/7 122/23
**remember [21]** 27/4

# R

**remember... [20]**
37/19 47/5 52/23 52/24
87/9 91/7 94/2 94/4
95/6 95/17 108/24
109/1 109/2 109/3
110/17 122/8 123/11
123/15 133/8 143/20
**render [3]** 23/11 32/2
72/19
**rendering [1]** 21/18
**reopening [1]** 8/16
**repeat [6]** 23/20 23/21
127/11 130/18 133/17
150/8
**repeated [1]** 24/5
**repeatedly [1]** 88/17
**rephrase [1]** 17/15
**report [1]** 115/5
**reported [4]** 1/21 18/4
99/10 114/20
**Reporter [2]** 1/21
154/3
**reporting [1]** 8/4
**Representatives [7]**
12/9 15/8 15/22 24/11
30/2 40/13 40/17
**represented [2]** 12/23
13/5
**request [1]** 23/22
**requested [6]** 94/16
126/20 130/16 130/23
131/18 133/6
**required [5]** 12/18
15/14 32/17 94/15
126/20
**requirements [2]**
96/23 96/25
**requires [1]** 8/25
**reread [2]** 24/14 25/11
**research [2]** 86/21
93/2
**resolve [1]** 6/13
**resolved [1]** 132/1
**respect [5]** 48/17 67/3
78/12 101/16 149/6
**respond [2]** 142/24
151/18
**responded [1]** 142/16
**responding [1]** 147/11
**response [6]** 7/15
10/10 25/12 37/16
103/8 116/7
**responsibilities [1]**

86/20
**responsible [2]** 48/1
120/17
**rest [1]** 99/9
**result [5]** 2/25 32/16
119/4 119/18 120/5
**retired [2]** 58/1 92/23
**retiree [1]** 119/16
**return [3]** 6/19 20/22
108/13
**reverse [1]** 100/13
**review [2]** 80/22 137/6
**Riane [2]** 2/14 13/6
**Riane White [2]** 2/14
13/6
**right [35]** 3/18 4/13
6/14 9/15 10/3 10/13
10/16 31/21 32/8 33/14
33/15 42/10 43/11
46/12 49/3 55/22 59/11
59/19 69/1 71/8 77/16
78/18 80/2 83/5 94/20
94/25 104/11 113/10
122/22 125/9 128/10
130/15 131/20 137/14
147/9
**right-hand [1]** 10/13
**riot [1]** 72/12
**riots [1]** 114/1
**rise [2]** 119/8 153/4
**risk [2]** 64/8 101/2
**Road [1]** 1/15
**Robert [1]** 13/16
**role [4]** 61/22 67/6
104/17 104/18
**roll [2]** 3/20 4/1
**rolling [1]** 3/19
**room [6]** 1/23 22/9
140/12 141/7 151/3
151/9
**rooms [1]** 8/24
**ROSE [1]** 1/10
**roster [2]** 46/6 46/8
**row [1]** 7/20
**RPR [1]** 1/21
**ruling [1]** 101/13
**rulings [3]** 107/11
112/6 141/1
**run [3]** 64/8 137/15
146/8
**run-in [1]** 146/8

# S

**said [59]** 14/16 18/20

25/17 34/5 34/18 34/22
37/14 37/18 37/23
41/12 42/17 59/17 64/4
66/1 73/18 73/25 74/2
74/15 77/6 77/10 77/24
80/1 80/20 87/2 88/17
91/5 91/11 93/18 94/23
96/9 99/4 99/5 99/7
101/1 101/4 107/18
109/9 110/17 111/15
113/19 118/15 119/25
121/1 121/3 122/24
123/9 123/12 123/15
129/10 130/15 130/21
133/1 140/16 148/2
150/3 150/3
**sake [1]** 124/17
**same [15]** 17/6 17/9
17/12 29/21 54/25
67/10 67/12 73/23
77/20 77/24 78/8 78/21
98/14 111/8 120/23
**sanitizer [1]** 9/6
**sat [1]** 149/25
**satisfied [1]** 21/13
**saturation [3]** 100/23
101/9 101/17
**saw [8]** 59/18 66/1
94/23 95/8 98/3 98/19
118/21 120/1
**say [28]** 6/9 29/15
42/11 50/1 52/3 52/6
62/16 66/7 77/23 85/24
87/14 87/22 88/3 94/5
94/6 97/24 107/6 111/8
119/2 121/8 123/7
123/16 124/25 125/2
128/8 150/21 151/4
151/11
**saying [7]** 34/24 87/7
95/21 98/20 109/4
110/4 118/22
**says [3]** 37/8 59/9
120/21
**scene [1]** 147/19
**scheduled [1]** 45/23
**SCHOEN [6]** 1/14 1/15
2/13 13/6 13/9 97/9
**school [1]** 137/7
**scope [1]** 86/20
**seal [6]** 3/24 31/15
61/9 105/6 105/21
145/13

**sealing [1]** 144/25
**Sean [1]** 13/16
**seat [7]** 6/4 88/23
100/8 100/9 110/4
111/4 112/1
**seated [3]** 9/19 67/11
149/15
**seating [1]** 3/1
**seats [7]** 3/18 3/21
3/23 3/25 4/2 4/10 4/10
**second [10]** 3/8 8/22
11/15 35/1 36/16 46/10
59/17 97/8 101/24
143/14
**sector [1]** 70/19
**security [4]** 19/15
42/23 139/1 144/25
**see [18]** 8/18 8/21
15/20 29/25 31/20
31/22 47/3 48/12 60/17
69/3 69/10 70/23 81/4
101/8 112/15 134/3
140/24 152/9
**seeing [3]** 22/1 136/10
138/18
**seem [5]** 29/21 34/17
37/24 68/8 88/19
**seemed [3]** 99/14
152/7 152/10
**seems [6]** 6/15 37/24
68/15 76/16 76/18
88/24 111/5 112/2
112/8 143/5
**seen [71]** 14/3 14/6
14/8 14/9 15/24 23/3
24/20 24/22 24/24 25/1
29/3 29/5 30/4 30/12
33/11 33/12 33/13 34/6
34/9 35/18 36/4 38/11
39/11 41/5 41/19 46/25
62/11 62/22 66/5 66/5
66/7 66/10 77/7 77/9
80/8 81/9 84/25 89/15
89/22 90/2 90/16 90/19
96/18 98/17 101/18
103/9 103/10 103/24
104/1 106/17 106/17
107/2 113/18 113/20
118/9 118/14 118/17
119/20 120/5 126/1
129/22 131/17 134/15
134/17 134/19 135/9
135/19 142/9 142/13
143/13 143/18

-3568-

177

**S**

**Select [47]** 12/7 12/12 14/18 15/22 15/25 16/5 16/7 16/11 16/16 30/2 30/5 30/8 35/19 36/5 37/8 41/6 41/8 41/14 46/11 46/22 53/20 56/21 59/18 59/24 62/6 62/14 66/1 66/3 66/10 69/18 73/10 84/16 84/23 90/17 94/24 98/3 98/12 98/13 98/18 100/18 103/16 103/19 119/12 126/2 131/18 135/19 143/12

**selected [5]** 35/21 35/22 48/8 80/6 118/3

**selection [4]** 4/14 7/25 9/14 9/21

**self [1]** 9/4

**self-monitor [1]** 9/4

**semester [1]** 83/1

**Senate [18]** 15/8 24/11 40/13 61/13 67/4 67/6 67/10 67/11 68/3 72/25 73/5 82/11 82/17 85/8 86/19 105/24 106/3 106/23

**Senator [12]** 61/16 61/18 63/8 64/16 66/20 66/20 67/17 68/5 68/18 82/16 82/25 106/5

**sense [6]** 38/14 45/1 49/5 111/16 130/3 146/22

**sensitive [2]** 105/2 121/11

**sentence [3]** 4/22 5/3 5/21

**separate [1]** 99/6

**September [1]** 12/11

**Sergeant [1]** 73/5

**series [4]** 10/14 11/9 48/9 48/14

**serious [4]** 50/3 85/12 151/1 151/12

**seriously [7]** 38/1 99/7 148/21 150/18 150/21 151/6 151/11

**serve [18]** 18/15 18/25 19/12 22/11 22/16 23/10 31/12 32/1 32/17 46/1 46/2 46/3 51/3 51/18 51/21 52/14 93/9

107/15

**served [18]** 18/7 18/9 18/12 18/22 19/5 19/6 19/9 26/23 50/17 50/20 51/6 51/14 51/18 52/1 91/25 93/6 99/6 148/3

**service [17]** 8/4 18/14 18/24 19/11 22/24 26/10 27/2 27/8 27/12 28/3 28/14 32/16 44/13 93/5 115/16 147/24 148/6

**services [4]** 15/7 24/11 62/2 144/19

**serving [4]** 49/6 52/10 113/1 148/19

**session [2]** 1/7 129/21

**sessions [2]** 126/10 126/12

**set [5]** 9/6 32/22 45/4 77/13 103/1

**setting [4]** 76/5 78/13 98/18 114/17

**seven [4]** 24/17 24/19 24/20 73/7

**several [4]** 8/5 9/25 66/22 109/16

**severe [2]** 22/25 44/14

**sexual [1]** 42/16

**shadow [7]** 61/15 61/17 63/8 64/16 66/20 67/17 68/18

**sharing [1]** 151/8

**she [63]** 20/1 20/16 47/9 49/18 57/21 57/23 57/25 58/1 58/4 58/4 68/4 68/6 68/6 68/7 74/8 74/12 79/4 79/5 79/6 79/9 79/11 79/14 85/15 97/25 98/2 98/3 98/4 98/6 98/19 99/4 99/4 99/5 99/6 99/6 99/7 99/7 99/8 99/8 99/8 99/10 99/14 99/21 99/23 99/24 99/25 100/4 100/7 101/4 101/17 106/5 106/7 106/8 106/9 106/22 106/23 106/24 111/12 111/13 140/16 140/18 141/15 141/18 141/19

**she's [6]** 58/1 79/7 79/17 99/13 99/16 141/13

**shoes [1]** 67/13

**Shook [1]** 53/22

**short [4]** 11/10 19/4 46/6 100/20

**shorter [1]** 134/5

**shot [1]** 116/10

**should [22]** 2/21 7/18 10/1 10/7 10/17 18/20 23/15 27/24 61/6 68/12 88/13 124/4 126/21 128/9 130/17 130/24 131/2 131/3 131/7 131/19 133/25 139/15

**show [4]** 37/2 37/2 46/25 91/10

**sic [4]** 18/12 43/19 82/10 128/20

**side [11]** 2/24 37/6 86/6 86/10 95/17 110/22 121/13 121/13 122/20 122/24 143/5

**Sidebar [2]** 105/7 105/20

**sided [1]** 3/19

**SILVERMAN [1]** 1/18

**similar [1]** 103/22

**simply [9]** 17/11 19/25 20/16 73/22 100/14 101/14 111/23 118/2 120/22

**since [5]** 42/25 43/2 61/19 82/20 103/13

**single [1]** 148/13

**sir [41]** 11/12 24/15 25/6 26/15 28/2 28/11 31/4 31/23 33/9 36/10 56/11 58/16 59/6 60/5 70/13 71/15 71/19 75/7 75/9 81/17 86/16 102/23 103/3 114/8 115/21 117/1 117/10 117/15 123/23 124/20 124/24 125/3 125/8 128/4 129/5 129/8 132/18 133/12 144/16 144/22 148/4

**sister [4]** 31/1 74/6 106/3 106/22

**sister's [1]** 43/23

**sit [5]** 17/14 17/15 22/6 101/2 121/10

**sites [1]** 14/22

**sitter [1]** 65/19

**sitting [13]** 17/5 22/21

53/13 67/21 78/7 86/7 110/19 116/9 121/4 121/14 122/9 122/14 150/10

**situation [3]** 66/24 66/25 111/1

**six [3]** 2/23 73/7 106/3

**skepticism [1]** 121/2

**skills [1]** 120/19

**slate [1]** 131/15

**sleepy [1]** 121/18

**slightly [1]** 35/25

**SLUTKIN [1]** 1/18

**small [5]** 32/6 36/17 44/23 144/19 149/22

**smaller [1]** 8/24

**smoke [2]** 8/10 8/11

**snippet [1]** 91/19

**snippets [1]** 113/22

**so [144]** 3/22 3/25 4/3 6/3 6/25 7/3 9/3 11/25 12/21 12/23 14/2 14/14 22/8 24/19 24/20 25/13 25/19 26/12 29/1 31/20 32/21 33/24 34/14 35/12 35/20 35/22 37/23 39/16 40/4 41/9 41/18 42/5 42/17 43/4 44/2 44/21 44/24 45/1 45/3 45/16 45/21 45/23 46/6 46/7 46/20 47/16 48/6 48/8 48/10 49/1 49/9 49/13 49/19 50/25 51/18 52/21 55/20 55/20 56/24 58/22 60/18 61/11 61/25 62/8 66/16 66/24 69/3 72/6 73/17 76/8 76/23 77/12 77/20 80/15 80/17 82/20 83/1 83/3 83/6 83/16 83/18 84/15 89/6 89/14 89/21 90/19 92/7 94/6 94/17 98/16 99/11 100/8 101/10 105/6 105/16 105/21 110/3 110/16 112/13 113/2 116/11 118/18 119/16 119/22 121/19 122/23 126/6 126/21 127/13 128/4 128/19 129/1 129/22 130/17 130/24 131/19 133/21 134/2 134/3 136/17 137/8 137/9 137/20 138/1

# S

**so... [20]** 138/7 139/7 140/19 141/1 141/20 142/8 142/17 143/3 144/11 145/6 145/12 146/25 147/12 148/8 148/21 150/16 151/1 151/3 151/5 152/25

**social [4]** 15/3 89/24 144/5 144/25

**solely [9]** 14/13 16/20 21/24 23/7 23/12 25/4 32/3 72/4 89/19

**solemnly [1]** 9/16

**some [60]** 6/7 6/23 8/2 9/10 23/10 30/11 32/1 32/16 33/11 33/12 33/13 34/18 37/7 39/7 39/8 46/4 46/14 49/7 50/15 53/20 56/18 61/4 61/5 66/1 66/5 71/20 73/19 76/3 77/19 82/8 84/15 86/5 89/12 89/13 94/11 95/9 95/10 96/10 101/11 102/9 108/18 113/14 117/22 125/25 129/9 129/15 129/18 129/19 129/22 133/3 133/6 134/21 135/20 141/5 141/18 142/6 142/7 143/11 143/21 143/22

**somebody [9]** 30/22 34/1 34/9 34/15 67/20 96/17 111/20 122/13 141/4

**somehow [3]** 98/8 140/11 141/6

**someone [13]** 30/22 42/1 42/9 42/13 48/1 99/11 101/7 112/16 116/10 124/25 125/2 126/23 127/8

**someone's [1]** 78/17

**something [24]** 31/16 34/3 34/18 36/3 38/11 44/17 53/11 61/7 82/22 94/19 98/18 101/18 108/17 109/6 120/10 120/10 123/7 129/25 130/21 138/1 138/25 140/12 140/13 150/7

**sometimes [3]** 54/24 55/7 135/6

**somewhat [2]** 130/1 135/18

**somewhere [1]** 87/11

**sorry [11]** 10/4 35/15 42/11 42/12 83/4 83/5 100/7 115/1 116/14 122/6 127/11

**sort [16]** 38/2 38/4 38/7 57/1 59/25 69/25 83/16 87/11 87/12 95/12 99/8 110/22 110/24 122/13 129/19 149/16

**source [20]** 14/3 15/25 23/4 24/21 29/3 30/5 39/11 41/6 87/18 89/15 113/18 113/21 118/14 119/14 126/2 131/1 134/16 142/10 142/13 143/13

**sources [10]** 29/7 29/8 90/22 93/23 94/9 95/3 96/14 98/1 108/8 135/3

**Southern [2]** 137/23 138/2

**spaces [2]** 9/1 118/4

**speak [4]** 36/22 48/10 49/2 82/21

**speaking [2]** 22/18 47/10

**Special [1]** 2/9

**specific [12]** 43/25 47/25 86/9 112/6 133/20 135/1 135/9 142/20 145/7 145/18 149/10 149/11

**specifically [12]** 33/18 51/19 66/7 70/21 83/21 90/7 104/18 107/11 109/1 126/14 132/8 136/12

**specifics [3]** 136/7 142/18 148/14

**spoken [1]** 40/24

**sponte [2]** 112/13 112/16

**spouse [2]** 17/3 78/6

**spread [2]** 7/18 8/6

**spring [1]** 148/7

**Square [1]** 50/24

**staff [9]** 9/3 13/22 17/9 20/14 20/17 20/19 47/11 102/13 117/25

**Staff's [1]** 143/22

**stand [3]** 9/13 27/25 90/10

**standard [2]** 99/11 150/24

**start [6]** 71/21 87/10 89/21 124/10 139/25 145/20

**started [1]** 55/18

**starting [3]** 88/11 110/19 121/14

**state [21]** 18/10 19/7 19/14 42/8 42/16 42/20 42/24 43/9 43/24 46/4 51/15 74/10 74/11 102/6 134/13 137/12 137/24 137/25 144/17 146/12 146/14

**stated [1]** 66/23

**statement [22]** 4/19 4/21 5/5 5/18 11/10 12/3 12/4 35/6 35/7 37/15 94/18 95/5 95/10 100/12 111/20 118/25 119/1 130/17 130/24 130/25 131/11 147/19

**statements [5]** 14/20 15/16 98/14 111/14 112/7

**STATES [17]** 1/1 1/2 1/8 2/3 2/9 12/8 12/23 12/24 15/8 15/23 19/21 20/3 20/6 30/4 55/18 55/21 55/22

**stations [1]** 9/6

**statute [1]** 5/19

**statutory [1]** 5/19

**stay [1]** 9/4

**step [1]** 50/7

**STEPHEN [7]** 1/5 2/4 12/6 13/10 13/15 16/23 122/3

**steps [36]** 8/2 26/11 28/12 28/18 36/11 38/21 49/15 50/6 56/2 56/10 60/7 60/20 66/17 71/2 71/9 75/10 75/18 81/19 81/25 88/8 89/2 97/19 101/23 109/21 113/5 117/2 117/9 123/25 124/19 125/10 125/16 133/13 134/9 139/24 141/23 152/3

**Steve [8]** 87/1 87/5 88/1 88/3 123/10 129/7

**134/22 139/15**

**still [5]** 26/7 57/23 82/1 140/25 141/9

**stolen [1]** 120/14

**stories [2]** 54/9 54/10

**story [1]** 143/6

**straightforward [2]** 76/18 143/5

**strategies [2]** 8/5 9/12

**Street [3]** 1/12 1/18 106/20

**stricken [1]** 75/16

**strike [21]** 36/13 38/7 50/3 66/19 68/2 75/12 81/21 88/10 88/16 97/22 98/22 99/3 110/5 110/10 110/11 111/15 112/12 112/16 133/16 133/21 140/6

**strikes [3]** 37/5 37/5 67/19

**striking [2]** 4/22 5/17

**strong [1]** 68/8

**struck [1]** 88/13

**studied [6]** 17/19 23/24 43/4 83/15 127/14 136/20

**stuff [1]** 63/12

**sua [2]** 112/13 112/16

**subject [5]** 17/24 42/4 63/22 104/24 146/1

**submit [1]** 88/16

**subpoena [10]** 6/11 12/12 34/1 98/13 108/12 108/13 131/13 142/23 151/17 151/20

**subpoenaed [3]** 15/11 15/21 30/1

**subpoenas [2]** 6/19 142/16

**substantially [2]** 112/3 112/21

**substantive [1]** 112/8

**such [1]** 22/14

**sufficient [2]** 38/17 99/16

**suggest [2]** 141/19 152/7

**suggested [3]** 36/21 98/5 100/6

**suggesting [2]** 95/10 98/7

**suggestion [1]** 95/9

**suggests [1]** 34/6

**S**

**suite [2]** 1/15 77/21
**summarized [1]** 99/5
**summary [2]** 94/14
95/9
**summons [1]** 32/25
**Superior [4]** 50/25
148/8 150/1 150/4
**support [1]** 44/22
**supposed [5]** 108/14
134/23 142/23 142/24
151/17
**sure [21]** 2/19 45/24
47/12 50/23 52/22 53/9
58/23 65/5 70/1 83/25
84/18 85/13 85/25
87/17 99/15 103/21
109/5 110/24 142/14
145/22 145/24
**surging [1]** 136/2
**surprised [1]** 112/24
**suspect [1]** 69/2
**swear [2]** 9/13 9/16
**symptoms [1]** 9/4
**system [6]** 48/18 64/8
105/13 148/25 149/8
149/14
**systems [2]** 8/8 8/21

**T**

**table [3]** 2/9 2/14 86/6
**take [34]** 6/14 9/25
11/6 26/15 27/24 28/21
29/1 37/24 38/24 50/8
56/13 60/16 60/23 69/1
69/7 71/12 75/21 82/3
89/5 95/17 102/2 113/8
117/11 121/16 124/20
125/17 128/20 134/7
140/18 141/24 148/21
150/18 150/21 151/5
**taken [5]** 8/2 11/6
84/25 99/13 100/24
**takes [1]** 99/7
**taking [6]** 22/4 31/11
118/24 121/8 128/23
151/11
**Takoma [1]** 59/16
**talk [8]** 40/23 58/24
61/9 65/1 75/4 85/13
122/2 145/24
**talked [6]** 65/9 68/6
85/9 85/14 86/9 96/13
**talking [3]** 47/8 67/9

134/20
**tax [3]** 127/19 127/24
127/25
**team [5]** 44/22 44/23
48/2 109/4 137/15
**tech [1]** 116/20
**technical [2]** 131/22
132/1
**technically [1]** 70/20
**Telephone [1]** 97/16
**televised [3]** 57/5
59/21 126/10
**television [4]** 15/2
119/17 126/9 129/24
**tell [17]** 10/20 27/1
35/23 39/14 39/17
40/14 42/5 56/24 73/23
83/17 92/1 92/3 93/6
99/13 115/15 120/24
127/16
**temp [1]** 137/9
**tenants [1]** 63/12
**tend [7]** 17/10 20/15
20/17 73/21 74/1
120/21 129/25
**tended [1]** 129/19
**terms [6]** 46/1 48/6
64/25 66/9 130/5
132/13
**Test [1]** 70/16
**tested [1]** 8/14
**testified [3]** 18/5 112/5
114/20
**testify [13]** 13/15
15/12 21/5 94/16
126/20 130/16 130/23
131/18 134/23 138/25
139/15 139/19 147/14
**testifying [3]** 71/25
115/2 135/25
**testimony [19]** 6/18
6/21 12/15 12/17 15/16
15/21 17/8 17/11 20/13
20/15 20/18 20/19 30/1
47/8 73/21 96/23
108/12 120/22 143/23
**testing [3]** 8/10 8/11
70/16
**than [12]** 20/19 34/3
36/20 38/3 39/20 96/17
112/3 112/21 134/5
135/11 152/17 153/1
**thank [127]** 3/7 4/11
7/9 7/11 9/19 12/2 16/4

27/21 28/1 28/6 28/7
28/8 28/9 28/11 28/11
33/6 33/8 33/20 33/22
35/14 36/9 36/10 37/11
37/13 38/6 45/9 47/17
47/18 47/19 47/21 49/3
49/13 53/23 54/18
55/20 55/23 55/25 56/1
56/11 58/12 59/3 59/5
60/3 60/5 60/5 64/11
65/21 66/14 66/15
66/16 67/23 67/24
68/14 70/7 70/10 70/24
70/25 71/1 74/21 75/9
79/22 81/12 81/13
81/16 81/17 81/18 88/6
88/7 88/14 92/18 93/12
93/13 93/15 97/6 97/7
97/17 97/18 98/24
98/25 99/18 101/20
101/21 105/18 106/11
107/25 108/2 109/18
109/19 109/20 111/2
111/25 115/19 116/22
116/24 117/1 117/13
118/11 121/19 121/22
123/22 123/23 123/24
125/4 125/7 125/8
125/14 128/6 129/2
129/4 132/19 133/11
133/12 133/15 133/22
138/15 139/21 139/22
139/23 141/11 147/10
149/2 151/13 151/15
151/25 152/1 152/1
153/3
**Thanks [2]** 66/18 75/8
**that [737]**
**that's [41]** 2/22 23/8
24/21 24/24 25/5 29/13
31/16 31/18 33/15
35/12 39/17 44/2 44/2
48/13 49/21 54/7 59/1
59/3 83/5 93/12 95/4
97/2 105/5 109/9 111/1
111/15 112/23 121/18
122/13 129/12 130/25
131/4 138/22 139/17
139/17 140/10 140/12
147/13 151/5 152/8
152/21
**their [4]** 25/15 26/9
66/11 122/11
**them [23]** 6/3 6/7

11/24 19/2 25/20 25/24
26/2 29/1 30/19 37/10
39/8 41/25 49/6 52/24
62/9 83/23 111/15
118/13 119/13 119/15
119/16 129/11 142/17
**themselves [1]** 120/13
**then [49]** 2/22 6/7 9/14
11/5 14/9 19/9 19/13
27/7 30/7 34/24 36/18
37/8 37/15 42/2 42/9
43/2 45/5 45/8 46/14
48/8 54/12 60/15 61/4
64/21 65/14 71/25
72/16 73/11 73/12
74/14 82/16 87/2 87/14
89/13 89/16 90/17 98/2
102/9 117/21 118/15
124/3 124/4 125/24
126/3 135/19 136/18
142/6 145/21 151/23
**theory [1]** 79/20
**there [100]** 2/21 6/16
6/19 7/4 10/11 10/16
13/23 14/10 18/14
18/24 19/10 21/18
21/21 24/4 25/2 27/11
31/5 33/2 34/11 36/22
37/2 37/4 37/23 39/23
43/4 43/13 43/14 44/5
44/8 44/24 45/16 48/12
48/23 51/9 53/13 57/12
62/21 63/16 64/6 68/2
70/2 71/23 74/12 76/8
79/2 79/6 79/7 80/11
82/8 84/17 86/1 87/14
88/16 88/24 91/8 91/9
91/9 91/18 91/22 95/3
95/9 95/23 96/6 96/8
96/10 98/22 100/25
102/14 104/4 104/11
106/1 107/1 108/11
108/13 109/2 109/4
109/5 109/12 109/14
109/15 111/23 112/8
115/14 122/23 126/13
126/16 128/1 131/12
136/15 137/16 142/15
142/15 142/16 144/15
145/3 146/16 148/9
148/13 148/17 150/24
**there's [20]** 2/19 61/7
72/2 76/4 76/17 77/20
89/18 90/10 99/3 99/15

**T**

**there's... [10]** 105/1 114/16 120/8 121/10 122/21 134/21 134/22 139/14 140/20 143/5

**therefore [5]** 21/4 38/18 72/18 88/25 97/3

**these [17]** 5/23 6/1 9/7 10/17 19/4 29/9 29/20 76/6 78/14 87/7 95/3 114/17 121/14 124/9 132/11 140/17 145/8

**they [38]** 7/4 12/25 27/6 37/9 37/9 39/22 41/25 46/23 46/25 49/9 51/17 51/20 52/20 57/5 60/1 67/13 67/15 88/13 95/18 97/23 97/23 101/1 109/5 111/19 115/4 115/6 116/8 116/8 116/9 116/12 116/13 130/21 131/2 132/16 143/22 146/10 149/7 149/11

**they're [6]** 54/15 55/7 98/20 99/12 143/11 152/9

**they've [3]** 5/9 55/8 119/17

**thing [14]** 3/8 6/9 36/14 46/10 55/5 59/17 77/24 80/16 86/23 95/22 136/6 138/20 150/7 151/2

**things [36]** 2/16 4/14 25/14 29/20 29/23 34/15 34/21 42/6 46/25 48/19 54/24 63/12 69/13 69/15 73/25 80/9 80/9 85/23 87/3 87/4 87/7 87/23 87/25 88/19 101/9 103/9 103/13 106/18 107/15 110/18 110/25 115/16 130/14 133/17 136/3 143/8

**think [128]** 3/17 6/23 6/24 18/18 23/9 26/16 29/7 30/11 31/6 31/19 31/25 32/24 33/2 33/23 34/8 34/19 36/12 36/20 37/4 37/5 37/9 37/13 38/1 38/12 38/16 45/12 46/23 57/4 58/20 58/22 59/8 59/20 64/1 65/3

65/13 66/4 66/11 67/8 67/9 67/19 68/20 76/13 77/17 78/17 80/1 80/3 80/15 80/15 86/10 87/2 87/3 88/1 88/13 88/18 92/5 94/10 94/10 95/8 96/1 96/19 99/3 100/6 104/10 104/19 107/4 107/7 107/11 107/14 107/17 107/18 107/19 107/21 111/4 111/16 116/8 119/5 120/8 121/14 123/20 124/3 124/5 124/13 124/15 126/22 127/1 127/4 128/8 130/15 131/14 133/17 135/24 136/17 137/18 137/20 138/7 138/18 139/7 139/8 140/20 140/20 141/13 141/16 143/3 143/7 144/11 145/6 146/10 146/25 147/7 147/23 148/23 148/25 148/25 149/10 149/11 149/13 149/18 149/19 150/5 150/12 150/14 150/15 150/17 150/25 151/1 151/3 151/7 152/8

**thinking [4]** 34/7 34/10 38/10 140/7

**third [1]** 36/19

**Thirteen [3]** 25/7 25/8 25/8

**this [235]**

**THOMPSON [1]** 1/18

**Thompson's [1]** 6/21

**thorough [1]** 46/24

**those [76]** 3/19 3/20 3/23 3/25 4/13 6/6 6/21 7/19 8/4 9/12 11/3 13/19 16/13 16/18 23/14 23/16 25/20 29/1 29/23 30/10 30/10 34/11 34/21 40/1 40/2 41/9 41/10 42/6 48/7 48/13 50/3 50/16 51/23 52/11 56/19 61/4 62/2 71/21 72/7 73/9 73/15 78/1 81/3 84/19 90/18 92/10 92/13 93/23 96/24 97/22 101/3 102/8 106/18 107/15 108/23 110/25 113/15

113/15 118/19 119/19 119/20 120/1 125/23 125/24 126/5 126/17 135/11 138/20 139/8 142/6 143/8 145/14 146/5 146/22 148/23 149/18

**though [9]** 6/2 32/17 49/12 70/21 76/1 80/8 110/17 123/6 150/24

**thought [8]** 34/6 97/23 98/20 100/2 112/13 112/16 142/18 148/24

**thoughtful [1]** 151/10

**thoughtfully [1]** 148/24

**thoughts [2]** 21/15 75/5

**three [18]** 2/24 8/14 10/3 14/2 24/19 27/4 37/5 42/12 57/8 67/19 83/2 100/15 100/20 104/19 122/20 125/22 142/8 144/17

**three-part [2]** 14/2 24/19

**through [6]** 19/2 36/16 44/20 77/21 101/8 141/2

**throughout [4]** 9/6 16/10 17/1 20/11

**Thursday [1]** 57/5

**Tim [1]** 106/5

**time [25]** 6/1 7/1 32/9 33/3 34/12 38/13 43/4 53/3 61/19 78/13 80/10 80/12 88/11 88/22 105/12 108/19 119/5 119/16 119/17 120/17 121/15 126/24 136/16 138/11 153/1

**timeline [1]** 45/4

**timeliness [1]** 45/6

**times [10]** 3/19 39/15 40/23 46/12 87/22 90/4 93/19 106/19 119/23 135/6

**Tobacco [1]** 19/20

**today [16]** 3/11 4/17 29/22 32/25 34/7 69/14 94/7 94/18 94/19 118/3 121/4 122/2 123/10 129/5 131/15 136/4

**together [3]** 41/25

48/6 118/13

**told [4]** 49/6 90/21 94/14 97/1

**Tonolli [1]** 13/16

**too [6]** 86/9 86/23 87/17 113/24 113/25 115/23

**took [1]** 98/6

**tooth [2]** 36/14 38/17

**top [1]** 87/1

**topic [5]** 47/6 85/13 97/14 111/24 131/16

**topics [2]** 26/10 83/16

**totally [1]** 101/12

**tours [1]** 86/22

**town [1]** 94/5

**track [1]** 45/22

**training [4]** 131/6 131/17 137/2 137/3

**transcript [2]** 1/7 154/4

**Transformation [1]** 97/15

**transmission [4]** 8/3 8/6 8/12 9/8

**trash [1]** 116/20

**treated [5]** 48/18 65/7 65/12 149/8 149/12

**treatment [1]** 20/4

**trial [56]** 1/7 4/17 6/6 6/25 8/13 8/15 8/22 13/1 14/13 14/24 16/10 17/1 18/10 18/13 18/16 18/23 19/1 19/7 19/10 19/12 20/11 21/3 21/25 22/7 22/9 22/22 22/23 25/5 27/7 33/24 34/2 34/7 34/9 34/11 36/16 51/15 78/18 80/3 81/4 88/12 88/20 89/20 92/1 97/23 100/15 100/21 103/1 109/12 112/24 118/23 128/25 131/12 132/11 133/4 141/3 151/18

**trials [1]** 52/11

**tribunal [1]** 131/7

**trouble [4]** 15/5 149/16 150/10 150/13

**true [3]** 67/3 138/11 154/4

**truly [1]** 9/17

**Trump [5]** 17/3 73/13 78/5 85/23 87/2

**T**

**truth [4]** 10/20 35/23
60/2 99/13
**truthfully [1]** 27/19
**try [4]** 46/6 130/20
151/10 152/19
**trying [5]** 46/6 46/25
60/1 91/7 123/6
**turn [4]** 65/2 94/15
94/16 129/19
**turned [1]** 96/1
**turns [1]** 141/5
**TV [5]** 62/12 89/25
90/2 90/25 135/4
**Twenty [4]** 42/12
104/10 120/21 127/23
**Twenty-three [1]**
42/12
**Twenty-two [1]** 104/10
**twice [2]** 4/1 92/5
**Twitter [1]** 144/5
**Twitter/social [1]**
144/5
**two [34]** 2/21 2/25 3/1
3/18 3/19 3/20 3/20
3/23 5/15 11/24 12/6
14/1 25/14 34/21 50/13
51/17 52/20 56/16 57/8
58/2 59/8 74/13 82/6
83/18 83/25 104/10
112/9 112/24 113/14
122/19 124/10 135/18
145/2 146/12
**two somewhat-related
[1]** 135/18
**two-part [1]** 14/1
**type [1]** 52/4

**U**

**U.S [14]** 1/10 1/11 1/22
12/8 12/10 14/18 14/19
15/8 15/22 24/11 24/11
30/2 30/9 55/17
**U.S. [6]** 15/18 16/12
20/7 23/3 25/10 116/3
**U.S. Attorneys [1]**
116/3
**U.S. Capitol [4]** 15/18
16/12 23/3 25/10
**U.S. Department [1]**
20/7
**uh [11]** 26/14 61/10
62/3 62/7 63/24 64/17
77/3 79/13 100/16

113/16 116/23
**Uh-huh [10]** 26/14
61/10 62/7 63/24 64/17
77/3 79/13 100/16
113/16 116/23
**Um [5]** 29/13 48/3
61/23 66/4 113/24
**unable [8]** 39/24 62/23
64/9 70/4 72/19 103/5
120/6 144/10
**unanimous [2]** 21/10
53/5
**unavailability [1]**
132/15
**unavoidable [2]** 22/25
44/14
**unbiased [1]** 84/13
**uncertain [1]** 140/25
**uncle [7]** 42/15 43/7
48/17 48/23 83/19 84/1
86/5
**uncle's [1]** 43/13
**uncomfortable [2]**
22/8 76/5
**under [16]** 3/24 6/14
8/15 10/20 31/15 34/11
35/20 35/22 37/13
37/25 61/9 70/21 105/6
105/11 105/21 145/13
**understand [16]** 32/15
35/16 39/25 54/24
86/18 86/19 96/19
98/11 98/20 101/12
107/7 122/12 130/21
131/10 133/5 152/10
**understanding [13]**
22/18 61/21 94/19 97/2
107/5 107/9 108/9
108/10 108/11 131/20
131/24 135/10 140/8
**understands [1]** 99/24
**understood [2]** 3/13
100/22
**unfortunately [1]**
69/21
**union [1]** 52/6
**UNITED [17]** 1/1 1/2
1/8 2/3 2/8 12/8 12/23
12/24 15/8 15/23 19/21
20/3 20/6 30/4 55/17
55/21 55/22
**University [1]** 116/21
**unless [1]** 20/23
**unlike [3]** 66/24 66/25

141/18
**Unlimited [1]** 59/14
**unmentioned [1]**
151/12
**unpleasant [2]** 148/21
150/4
**unrelated [1]** 149/19
**until [3]** 45/20 48/9
60/16
**up [52]** 9/6 11/7 14/5
25/15 26/11 27/23
28/18 30/18 38/21 39/8
39/22 46/10 47/9 47/25
50/6 56/10 60/20 70/15
71/9 71/20 76/3 81/25
82/9 85/4 86/18 89/2
93/17 96/7 96/11 97/11
98/6 100/12 101/23
102/9 108/5 108/14
113/5 115/2 117/9
117/21 117/22 119/13
121/16 121/16 124/19
124/21 125/16 125/25
129/9 134/9 141/23
142/7
**updated [1]** 5/12
**updates [2]** 48/25 49/1
**upgraded [1]** 8/7
**upper [2]** 10/3 10/13
**upper-right [1]** 10/3
**ups [2]** 89/13 113/14
**us [37]** 2/14 9/1 27/1
39/14 40/14 42/5 44/23
48/11 48/24 50/18
51/16 56/24 72/6 73/2
73/23 74/5 76/6 79/2
83/17 90/19 92/1 97/1
105/1 111/15 115/15
116/10 120/13 120/24
121/5 126/6 127/16
135/21 136/21 142/12
143/17 147/5 151/23
**use [10]** 3/11 4/16 5/9
7/20 8/15 8/20 8/22 9/7
35/9 145/23
**used [2]** 5/11 36/1
**using [1]** 5/9

**V**

**vacation [2]** 44/20
45/20
**vague [2]** 135/8
139/12
**validly [2]** 132/2 132/2

**valor [1]** 38/13
**variety [1]** 46/2
**various [9]** 6/11 12/13
38/8 96/14 112/14
112/15 129/17 133/2
137/9
**VAUGHN [27]** 1/10 2/8
3/3 3/13 7/9 12/25 13/3
27/22 33/7 47/20 49/16
58/13 58/14 58/15 60/8
71/3 79/23 92/19 99/1
105/9 109/25 115/20
117/3 121/20 128/6
133/23 149/3
**venire [4]** 2/17 7/12
26/6 117/24
**verdict [17]** 14/12
20/23 21/8 21/9 21/10
21/13 21/18 21/24
23/12 25/4 32/2 53/5
72/4 89/19 93/6 93/7
148/15
**versus [1]** 2/3
**very [42]** 3/8 5/23 8/14
28/10 31/14 38/4 38/9
53/4 55/23 62/12 67/12
69/23 72/9 73/4 75/8
88/7 88/16 91/14 92/17
92/18 94/13 95/11
95/15 95/22 97/3 97/6
97/17 99/14 115/1
115/19 116/22 116/25
123/7 123/17 125/7
130/9 138/15 141/8
142/14 142/17 148/20
148/21
**victim [9]** 18/3 67/1
67/14 114/19 115/8
145/10 147/3 147/7
147/9
**victims [1]** 114/25
**video [3]** 91/12 94/23
135/24
**videotape [6]** 91/9
95/8 95/21 96/8 96/9
96/17
**view [26]** 2/20 2/21 9/8
32/11 37/9 40/7 50/1
66/12 78/15 80/21
91/20 99/21 100/6
101/5 101/8 124/9
126/18 126/19 128/2
128/8 128/14 130/15
130/22 140/1 142/25

**V**

**view...** [1] 147/22
**viewed** [1] 37/18
**views** [5] 78/12 78/14
99/6 131/1 151/8
**violence** [2] 42/16
98/9
**virus** [1] 8/12
**visual** [1] 91/9
**voir** [3] 3/11 4/19 5/15
**vote** [2] 27/7 61/25
**vs** [1] 1/4

**W**

**wait** [1] 11/4
**waiting** [1] 75/5
**walking** [1] 150/25
**Wall** [1] 106/20
**want** [36] 4/15 6/23
23/18 27/18 29/8 32/21
35/16 36/1 36/2 36/15
39/7 39/25 43/25 45/10
50/15 52/3 52/6 53/9
56/18 60/15 65/1 66/2
69/13 71/20 87/14 90/5
100/11 101/14 113/14
122/1 127/2 145/11
145/16 145/19 148/22
152/6
**wanted** [4] 2/16 46/10
84/17 130/20
**wants** [2] 59/25 68/11
**warcraft** [1] 87/15
**was** [240]
**Washington** [11] 1/4
1/12 1/23 61/16 87/23
90/4 118/4 133/1
134/20 135/5 135/24
**wasn't** [4] 101/17
112/13 113/25 114/12
**watch** [4] 14/25 90/4
119/16 130/1
**watched** [48] 16/13
16/15 30/9 30/15 41/7
41/12 46/14 46/17
47/14 56/20 56/25
59/22 59/22 62/9 62/9
62/12 62/14 62/16
62/19 69/20 73/16
76/23 77/2 90/18 90/24
91/3 103/19 103/24
119/13 119/13 119/15
126/3 126/8 126/9
126/13 129/10 129/11

129/13 129/17 135/20
135/22 135/24 136/3
136/10 143/15 143/19
143/25 144/8
**watching** [9] 57/13
62/5 76/21 96/1 96/17
119/19 126/16 129/24
130/2
**way** [21] 14/6 17/20
23/25 25/16 29/21
31/15 35/17 36/22 41/4
45/5 66/11 67/11 83/16
107/6 107/19 110/23
120/19 141/5 143/4
145/5 152/9
**we** [131] 2/16 2/21
2/22 3/1 3/9 3/9 3/11
3/17 3/24 4/3 4/16 6/3
6/3 7/5 8/1 8/13 8/22
8/22 9/12 9/14 9/24
11/14 11/18 14/14
23/18 25/18 26/7 26/8
26/8 26/12 27/6 27/7
31/14 31/15 32/7 34/8
34/15 36/15 36/25 37/5
37/10 40/23 44/17 46/6
46/7 46/19 54/25 55/6
56/8 60/12 60/13 60/17
61/8 65/1 65/2 65/9
66/18 67/1 67/9 67/18
67/18 67/19 68/12
68/21 68/24 69/1 69/3
70/21 75/12 76/5 81/21
84/15 85/12 88/10
88/22 94/13 97/24
98/22 100/8 100/9
100/14 100/19 101/3
101/10 101/10 105/3
105/6 105/9 105/19
105/21 110/4 110/4
110/9 111/11 111/12
111/15 113/3 114/17
116/9 116/10 117/4
120/11 123/11 124/2
124/3 124/4 124/6
124/13 133/16 134/4
134/5 139/25 140/24
141/17 141/20 141/22
141/22 142/20 142/21
143/6 145/6 145/12
145/20 148/16 150/14
150/24 152/8 152/16
152/17 152/25 153/2
**we'd** [3] 133/21 140/6

141/9
**we'll** [3] 11/6 60/16
117/7
**we're** [12] 2/20 2/25
25/13 25/14 25/17
44/23 46/6 50/4 97/21
100/21 101/7 140/10
**we've** [16] 8/7 8/8 8/17
8/18 8/24 9/6 75/3
82/19 100/25 101/3
120/9 122/5 122/7
133/18 141/8 141/18
**week** [9] 22/4 44/15
45/17 45/23 47/25 48/7
82/22 107/11 108/22
**weekend** [1] 94/5
**weeks** [3] 57/8 103/2
112/24
**weight** [2] 20/18
148/22
**weighty** [1] 150/7
**welcome** [3] 7/22
55/24 124/20
**well** [34] 3/23 4/8 5/23
8/14 9/17 34/5 34/14
34/23 36/13 38/9 46/18
51/17 52/20 63/6 67/5
76/4 87/6 90/21 93/21
94/13 97/6 98/20 99/9
111/17 115/23 118/21
119/19 120/8 121/1
122/12 122/21 124/2
139/16 151/5
**went** [3] 106/9 120/10
148/25
**were** [42] 15/17 25/8
32/17 40/1 40/1 44/15
49/6 51/20 51/23 70/5
83/8 83/18 83/25 86/25
88/22 91/9 92/10 93/5
94/14 96/6 96/7 99/22
107/15 108/19 109/5
110/18 114/1 114/25
116/9 122/14 129/5
130/21 139/2 145/9
146/10 148/2 148/13
149/11 149/15 149/20
150/1 150/13
**weren't** [1] 109/5
**what** [197]
**what's** [11] 35/8 45/3
46/21 59/23 61/21 66/2
97/14 122/3 130/5
130/6 139/13

**whatever** [3] 59/21
77/17 111/21
**whatsoever** [1] 67/7
**when** [40] 6/3 8/22
25/22 27/2 27/25 37/14
43/7 47/14 50/24 52/17
57/5 58/4 59/1 59/9
67/18 69/16 73/6 80/22
81/1 86/25 87/3 87/4
88/1 92/1 92/25 95/25
105/10 106/23 110/21
111/15 119/14 123/16
129/20 129/24 129/24
143/1 146/7 149/15
149/20 150/21
**whenever** [1] 49/2
**where** [32] 8/11 10/6
35/12 36/25 37/4 37/6
43/8 48/5 50/22 55/11
57/25 58/4 59/15 60/17
66/25 74/8 79/4 92/1
97/22 97/25 98/3
102/24 104/2 106/17
107/8 118/19 127/21
134/4 134/18 135/25
136/24 137/22
**whether** [85] 6/7 6/8
6/19 6/20 18/4 27/16
30/22 35/9 38/3 39/22
40/11 41/5 41/7 41/21
41/21 42/1 42/3 44/13
50/17 51/14 52/1 56/20
57/9 57/18 61/11 63/2
63/21 65/7 65/12 67/2
67/9 72/1 72/23 74/4
77/1 85/15 86/2 89/14
89/16 89/17 90/16
90/17 91/25 94/15
99/12 99/16 101/8
101/9 104/23 105/23
108/13 114/11 114/20
115/9 117/23 118/13
119/12 122/1 124/23
126/1 126/3 126/12
127/7 127/15 131/12
132/1 134/21 134/22
135/4 135/18 136/19
139/3 139/15 139/16
139/18 140/25 142/9
143/12 143/15 144/13
145/9 145/25 147/2
147/3 147/16
**which** [45] 5/11 8/21
11/3 12/22 14/5 20/3

**W**

**which... [39]** 26/19 31/25 32/8 36/15 38/4 38/4 41/4 43/18 45/8 47/3 48/10 51/14 57/18 62/5 63/2 67/16 73/9 82/7 86/6 90/15 90/15 91/25 96/4 105/23 112/5 112/21 117/23 119/1 119/11 122/8 122/10 123/19 127/7 133/18 134/13 136/19 140/13 143/11 144/13

**while [12]** 3/9 4/25 5/1 7/2 9/2 9/8 51/22 83/8 110/24 121/18 122/1 129/5

**WHITE [6]** 1/18 2/14 5/16 13/6 13/9 47/11

**who [48]** 2/13 7/19 7/23 9/22 9/22 13/15 20/14 22/13 31/3 33/24 34/2 34/9 34/15 40/16 42/2 54/4 61/7 67/20 68/22 73/4 74/1 74/6 75/5 76/6 79/1 85/8 86/5 96/7 96/17 101/1 101/4 101/10 104/12 111/19 111/20 112/4 112/4 120/12 120/18 120/18 126/23 130/16 130/22 141/4 141/4 141/17 146/4 147/16

**who's [4]** 36/15 88/12 98/17 131/18

**whole [4]** 62/9 136/6 138/11 143/5

**whom [1]** 106/4

**whose [1]** 9/21

**why [30]** 29/17 30/23 32/4 40/14 41/10 42/5 50/18 59/1 69/1 70/23 72/6 73/14 73/23 76/12 79/2 82/13 83/17 95/20 96/2 111/3 111/15 114/22 117/25 127/9 127/17 136/21 139/25 141/22 145/20 147/13

**wide [2]** 8/7 131/24

**wide-ranging [1]** 131/24

**wife [4]** 79/3 114/15 115/25 116/5

**will [82]** 3/10 3/10 3/11

3/20 3/20 3/20 3/24 4/16 5/25 6/5 6/9 6/24 7/23 8/13 8/22 9/14 9/16 9/21 9/22 9/22 11/4 11/5 11/10 12/25 14/25 15/20 16/16 21/17 25/15 25/18 25/19 25/23 26/8 26/12 29/25 35/22 37/24 38/19 47/12 48/7 50/1 54/25 56/8 60/12 60/13 67/15 67/15 68/25 69/2 69/3 75/16 80/11 80/12 85/4 88/25 94/5 98/18 100/8 100/9 101/13 101/18 103/5 105/19 110/4 110/4 110/20 110/22 110/24 113/1 129/25 131/25 134/13 141/1 141/2 141/15 141/20 142/6 142/20 142/21 151/23 152/16 153/2

**willfully [2]** 5/2 12/17

**wishes [1]** 110/11

**within [7]** 51/23 122/16 122/18 122/19 124/5 146/11 146/12

**without [2]** 37/8 44/24

**witness [14]** 17/11 18/3 18/6 19/25 20/16 73/22 114/19 114/21 120/22 147/8 147/10 147/12 152/8 152/14

**witnesses [4]** 5/17 20/14 20/20 73/17

**woman [1]** 67/15

**woman's [1]** 47/8

**won't [1]** 50/5

**wondering [3]** 55/9 59/12 92/25

**word [2]** 45/4 54/23

**words [6]** 7/19 20/17 32/17 36/2 130/22 141/3

**work [48]** 6/6 29/20 31/5 32/11 32/12 32/18 44/23 45/1 45/22 45/25 46/21 47/16 48/1 48/9 49/5 49/18 50/2 53/20 57/25 58/24 59/24 63/17 65/19 66/3 66/9 66/11 68/8 70/16 70/18 70/21 70/22 73/10

73/12 79/4 79/9 83/12 84/23 85/15 97/16 102/24 103/5 103/16 116/20 127/19 128/2 136/24 137/17 149/21

**worked [26]** 8/9 15/7 17/19 23/24 24/10 40/12 40/17 61/12 62/1 72/24 73/5 79/16 82/11 83/15 86/18 93/1 105/24 106/3 106/5 106/23 127/8 127/14 127/21 127/22 136/20 144/14

**workers [3]** 87/16 93/3 93/4

**working [8]** 41/18 43/4 48/15 87/16 97/12 102/17 116/17 137/9

**works [7]** 40/12 40/17 42/8 63/3 79/5 82/17 85/8

**world [1]** 87/15

**worried [2]** 78/14 120/6

**worries [1]** 49/14

**worry [4]** 27/12 52/11 57/14 115/9

**would [176]**

**wouldn't [8]** 31/16 38/11 62/16 88/3 107/6 111/15 112/16 128/19

**write [6]** 10/2 10/12 10/21 10/23 10/24 12/21

**writing [5]** 4/1 11/1 11/18 11/20 22/18

**writings [1]** 14/20

**written [2]** 11/3 14/16

**wrong [2]** 10/17 120/10

**Y**

**yeah [23]** 32/14 44/7 48/25 58/22 59/2 59/20 61/15 63/5 64/1 66/13 76/25 77/11 77/25 84/10 85/11 115/6 116/14 137/5 138/3 139/6 139/7 140/23 149/18

**year [2]** 2/3 40/23

**years [27]** 27/3 51/18 52/20 52/20 58/2 64/2

64/4 73/7 74/13 79/8 83/3 83/6 104/19 104/22 105/16 106/3 118/5 127/23 137/1 137/9 137/17 144/17 144/18 145/2 146/11 147/12 149/23

**Yep [3]** 48/20 83/4 84/5

**yes [236]**

**yeses [1]** 11/19

**yesterday [3]** 133/10 133/11 133/20

**yet [2]** 88/25 143/6

**York [7]** 39/15 46/12 87/22 90/4 93/18 106/19 135/6

**you [1078]**

**you'd [7]** 7/20 9/10 56/14 80/17 102/2 115/14 121/11

**you'll [1]** 55/2

**you're [23]** 27/25 34/24 39/1 47/14 49/21 55/24 56/14 58/15 59/9 60/24 64/23 71/14 77/12 78/14 104/10 115/12 115/23 123/6 131/16 136/24 137/2 147/9 151/2

**you've [61]** 34/6 34/18 35/18 36/1 36/4 39/19 41/7 44/6 46/14 47/13 50/17 54/3 62/9 62/19 62/22 72/1 73/18 73/18 74/16 77/10 80/8 80/13 81/9 87/25 89/15 90/2 90/17 90/19 91/3 92/7 93/19 94/10 96/13 103/18 103/19 105/12 113/13 118/9 118/14 118/16 119/12 120/5 122/1 122/9 126/1 126/3 126/6 126/8 126/13 129/10 131/17 135/18 135/20 135/21 136/3 136/9 143/15 143/17 143/25 144/8 144/9

**young [2]** 47/7 67/15

**your [305]**

**Your Honor [76]** 2/2 2/7 2/12 3/4 3/14 3/16 4/7 7/8 28/1 28/7 28/9

**Y**

**Your Honor... [65]**
28/15 29/6 31/9 31/18
32/20 33/5 33/8 33/22
37/13 47/21 49/17
49/23 49/24 54/17 56/5
56/7 60/4 60/11 66/18
67/9 68/1 68/3 70/9
70/25 71/5 71/7 81/15
81/21 88/6 88/10 88/15
93/15 97/21 98/16 99/2
100/11 101/20 101/25
102/4 102/15 103/7
104/7 106/2 108/2
109/18 109/24 110/2
110/9 111/11 116/24
117/4 117/6 125/6
125/13 129/4 132/20
133/15 139/21 140/3
140/6 140/16 152/5
152/15 152/22 152/24
**Your Honor's [1]**
37/16
**Yourself [1]**  70/16
**yourselves [1]**  2/5

**Z**

**Zelda [1]**  1/15