**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## STEPHEN K. BANNON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————

## JOINT APPENDIX
## Volume XI of XII
## (Pages: 4422 - 4779)

————————

David I. Schoen
LAW OFFICE OF
  DAVID I. SCHOEN
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

Chrisellen R. Kolb
Elizabeth H. Danello
U.S. ATTORNEY'S OFFICE
(USA) APPELLATE DIVISION
601 D Street, NW
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

**Gibson Moore Appellate Services, LLC**
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

<u>**TABLE OF CONTENTS**</u>

**Joint Appendix Volume I of XII**

**Page:**

**Docket Entries [1:21-cr-00670-CJN-1]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Docket Entries [1:22-mc-00060-CJN]**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Indictment**
  **filed November 12, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Transcript of Return on Arrest Warrant & Initial Appearance**
**Before the Honorable Robin M. Meriweather**
  **on November 15, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Transcript of Video Arraignment/Status Conference**
**Before the Honorable Carl J. Nichols**
  **on November 18, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Transcript of Video Status Conference**
**Before the Honorable Carl J. Nichols**
  **on December 7, 2021.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**Defendant's Motion to Compel Discovery,**
**With Exhibits,**
  **filed February 4, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

  <u>**Exhibits:**</u>

  1. **Letter**
    **dated January 14, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

  2. **Letter**
    **dated January 28, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

**Exhibits** to

**Defendant's Motion to Compel Discovery**
     **filed February 4, 2022, Continued:**

3.    Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

4.    FBI Interview of Robert J. Costello, Esquire
          dated November 3, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 169

7.    H. Res. 503, Sec. 5(c)(6)(A) & (B)
          dated June 20, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

8.    Procedures Adopted by 117th Congress
      Regulations for Use of Deposition Authority
          dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

9.    FBI Interview of U.S. House of Representatives
      General Counsel Doug Letter
          dated November 2, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 231

10.   Letter from Ronald C. Machen Jr., U.S. Attorney,
      to Speaker of the House John A. Bohner
          dated March 31, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.   Prosecution for Contempt of Congress of an
      Executive Branch Official Who Has Asserted a
      Claim of Executive Privilege
          8 Op. O.L.C. 101 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

12.   Attempted Exclusion of Agency Counsel from
      Congressional Depositions of Agency
      Employees, Slip Op.
          dated May 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Government's Motion *in Limine* to Exclude Evidence or
Argument Relating to Good-faith Reliance on
Law or Advice of Counsel,
With Attachment,

     filed February 4, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

     Attachment:

     Letter
          dated October 7, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Defendant's Opposition to Government
Motion *in Limine* on Advice of Counsel,
With Exhibit,

     filed February 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

     Exhibit:

     1.     Declaration of Robert J. Costello, Esquire
          sworn on February 25, 2022.. . . . . . . . . . . . . . . . . . . . . . . 356

Defendant's Reply in Support of His Motion to Compel Discovery,
With Exhibit,

     filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

     Exhibit:

     1.     Table That Sets Forth the Positions
          Taken by the Government and Defense. . . . . . . . . . . . . . . . 385

**Government's Reply in Support of its Motion *in Limine* to Exclude Evidence or Argument Relating to Good-faith Reliance on Law or Advice of Counsel,**

**With Exhibits,**

filed March 8, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

**Exhibits:**

1.    **E-mail Correspondence [US-001038-40]**
        **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2.    **Letter from Justin Clark**
        **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422

3.    **Email from Committee Counsel**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 428

4.    **Email from Costello**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

5.    **Email from Committee Counsel**
        **dated October 13, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 436

6.    **Costello Email Chain**
        **dated October 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 439

7.    **Costello and Clark Email Exchange**
        **dated October 14-18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 444

## TABLE OF CONTENTS
## Joint Appendix Volume II of XII

**Page:**

**Transcript of Oral Argument
Before the Honorable Carl J. Nichols**
on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

**Defendant's Surreply to the Government's Reply in Support of its
Motion** *in Limine* **to Exclude Evidence or Argument Relating to
Good-faith Reliance on Law or Advice of Counsel**
filed March 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556

**Defendant's Supplemental Brief in Opposition to the
Government's Motion** *in Limine* **on Advice of Counsel,
With Exhibits,**
filed March 22, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565

**Exhibits:**

1. **Senate Committee Investigation**
   dated August 8, 1958.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 577

2. **Application of 28 U.S.C. § 458 to Presidential
   Appointments of Federal Judges**
   dated December 18, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . 584

3. **Letter from Michael B. Mukasey, Attorney
   General, to the Hon. Nancy Pelosi, Speaker of the
   House of Representatives**
   dated February 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . 599

<u>Exhibits</u> to
**Defendant's Supplemental Brief in Opposition to the Government's Motion** *in Limine* **on Advice of Counsel**
    **filed March 22, 2022, Continued:**

4.    **Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act,**
        **10 Op. O.L.C. 68 (1986)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **601**

5.    **Rex Lee, Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships,**
        **1978 B.Y.U. L. Rev. 231, 259** . . . . . . . . . . . . . . . . . . . . . . . . **619**

6.    **Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress,**
        **2008 WL 11489049 (O.L.C.)** . . . . . . . . . . . . . . . . . . . . . . . . **688**

7.    **Congressional Oversight of the White House,**
        **2021 WL 222744 (O.L.C.)** . . . . . . . . . . . . . . . . . . . . . . . . . . **692**

<u>Amended Exhibit</u> to
**Defendant's Supplemental Brief in Opposition to the Government's Motion** *in Limine* **on Advice of Counsel**
    **filed March 23, 2022:**

3.    **Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives**
        **dated February 29, 2008** . . . . . . . . . . . . . . . . . . . . . . . . . . . **722**

**Government's Response to Defendant's Supplemental Brief in Opposition to the Government's Motion** *in Limine* **to Exclude Evidence and Argument Relating to Good-faith Reliance on Law or Advice of Counsel**
    **filed March 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **725**

**Defendant's Supplemental Reply on Waiver**
        **filed March 30, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **735**

**Order**
        **filed April 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **741**

**Government's Motion *in Limine* to Exclude Evidence of**
**Department of Justice Opinions and Writings,**
**With Exhibits,**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **745**

        <u>Exhibits:</u>

        1.    **Letter from White House Deputy Counsel to Costello**
                **dated October 18, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **765**

        2.    **Letter from Justin Clark to Costello**
                **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **767**

        3.    **Emails from Justin Clark to Costello**
                **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **769**

**Government's Motion *in Limine* to Exclude Evidence**
**Relating to Objections to Subpoena That Defendant Waived,**
**With Exhibit,**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **771**

        <u>Exhibit:</u>

        1.    **Subpoena**
                **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **781**

**Government's Motion *in Limine* to Exclude Evidence of the**
**Defendant's Prior Experience with Subpoenas**
        **filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **792**

**Defendant's Notice Pursuant to Rule 12.3, Fed. R. Crim. P.**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **798**

**Defendant's Motion to Exclude Evidence**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **800**

**Defendant's Motion to Dismiss the Indictment,**
**With Exhibits,**

**filed April 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **807**

<u>**Exhibits:**</u>

**A.    H. Res. 8 (Adoption of Rules for 117th Congress)**

**dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **867**

**B.    H. Res. 503 (Authorizing House Select Committee)**

**dated June 30, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **912**

**C.    Regulations For Use Of Deposition Authority**

**dated January 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **927**

**D.    Amerling and Letter FBI 302**

**dated November 10, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . **929**

## TABLE OF CONTENTS
### Joint Appendix Volume III of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
   **filed April 15, 2022, Continued:**

E.    **Rules of the 117th Congress**
         **dated February 2, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938

F.    **Republican Conference Rules of the 117th Congress**. . . . . . 991

G.    **Congressional Oversight of The White House,**
         **45 Op. O.L.C. slip op. (Jan. 8, 2021)**. . . . . . . . . . . . . . . 1005

H.    **Assertion of Executive Privilege Concerning the**
      **Dismissal and Replacement of U.S. Attorneys**
         **dated June 27, 2007**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1065

I.    **Immunity of the Former Counsel to the President from**
      **Compelled Congressional Testimony,**
         **43 Op. O.L.C. slip op. (July 10, 2007)**. . . . . . . . . . . . . . . 1075

J.    **Prosecution for Contempt of Congress of an Executive**
      **Branch Official Who Has Asserted a Claim of Privilege,**
         **8 Op. O.L.C. 101 (1984)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1079

K.    **Whether the Department of Justice May Prosecute**
      **White House Officials for Contempt of Congress,**
         **32 Op. O.L.C 65 (2008)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1122

L.    **Application of 28 U.S.C. Sec. 458 to Presidential**
      **Appointments of Federal Judges,**
         **19 Op. O.L.C slip op. (December 18, 1995)**. . . . . . . . . . 1128

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**

      **filed April 15, 2022, Continued:**

M.      **Randolph D. Moss, Executive Branch Legal Interpretation:**
      **A Perspective from the Office of Legal Counsel,**
            52 Admin. L. Rev. 1303 (2000)...................... 1143

N.      **Testimonial Immunity Before Congress of the**
      **Former Counsel to the President,**
            43 Op. O.L.C. slip op. (May 20, 2019). ............. 1172

O.      **Response to Congressional Requests for**
      **Information Regarding Decisions Made**
      **Under the Independent Counsel Act,**
            10 Op. O.L.C. 68 (1986)........................... 1194

P.      **Letter from Ronald C. Machen Jr., U. S. Attorney, to**
      **Speaker John A. Boehner**
            dated March 31, 2015. ........................... 1220

Q.      **Letter from Michael B. Mukasey, Attorney General, to**
      **Speaker of the House, Hon. Nancy Pelosi**
            dated February 29, 2008........................... 1228

R.      **Steven G. Bradbury, Memorandum for Attorneys of the**
      **Office Re: Best Practices for OLC Opinions**
            May 16, 2005..................................... 1231

S.      **Trevor W. Morrison, Stare Decisis in the**
      **Office of Legal Counsel,**
            110 COLUM. L. REV. 1448 (2010).................. 1237

T.      **Walter Dellinger, et al., Principles to**
      **Guide the Office of Legal Counsel**
            dated Dec. 21, 2004. .............................. 1261

**<u>Exhibits</u> to**

**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

U.    **David J. Barron, Memorandum for Attorneys of the Office Re: Best Practices for OLC Legal Advice and Written Opinions**
    **dated July 16, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268**

V.    **Frank H. Easterbrook, Presidential Review, 40 CASE W. RES. L. REV. 905 (1990). . . . . . . . . . . . . . . 1275**

W.    **Presidential Authority to Decline to Execute Unconstitutional Statutes, OLC Mem. Op. dated November 2, 1984. . . . . . . . . . . . . . . . . . . . . . . . . . 1302**

X.    **Douglas W. Kmiec, OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive, 15 CARDOZO L. REV. 337 (1993). . . . . . . . . . . . . . . . . 1316**

## TABLE OF CONTENTS
### Joint Appendix Volume IV of XII

**Page:**

**Exhibits to**
**Defendant's Motion to Dismiss the Indictment**
    **filed April 15, 2022, Continued:**

Y.    **Applying Estoppel Principles in Criminal Cases,**
       **78 YALE L.J. 1046 (1969)**.......................... 1355

Z.    **Anne Bowen Pouliun, Prosecutorial Inconsistency,**
     **Estoppel, and Due Process: Making the**
     **Prosecution Get its Story Straight,**
       **18 Cal. L. Rev. 1423 (2001)**.......................... 1384

AA.    **Rex E. Lee, Executive Privilege, Congressional Subpoena**
     **Power, and Judicial Review: Three Branches, Three**
     **Powers, and Some Relationships,**
       **1978 B.Y.U. L. REV. 231 (1978).** ...................... 1441

BB.    **John O. McGinnis, Models of the Opinion Function of the**
     **Attorney General: A Normative, Descriptive, and**
     **Historical Prolegomenon,**
       **15 CARDOZO L. REV 375 (1993)**.................. 1510

CC.    **Griffin B. Bell, The Attorney General: The Federal**
     **Government's Chief Lawyer and Chief Litigator, or**
     **One Among Many?,**
       **46 FORDHAM L. REV. 1049 (1978)**............... 1572

**Exhibits** to

**Defendant's Motion to Dismiss the Indictment**
       **filed April 15, 2022, Continued:**

    DD.  Notes, The Immunity-Conferring
          Power of the Office of Legal Counsel,
               121 HARV. L. REV. 2086 (2008). . . . . . . . . . . . . . . . . . . 1596

    EE.  U.S. Department of Justice, Criminal
          Resource Manual § 2055 (Public Authority Defense). . . . . 1621

**Defendant's Notice of Filing,**
**With Attached Motion to Dismiss the Indictment and Exhibits Index,**
       **filed April 19, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

**Government's Response to Defendant's**
**Notice under Federal Rule of Procedure 12.3**
       **filed April 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

**Defendant's Opposition to the Government's**
**Motion *in Limine* Based on Waiver**
       **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1698

**Defendant's Opposition to the Government's**
**Motion to Exclude Prior Subpoena Evidence**
       **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1709

**Defendant's Response to Government's Motion *in***
***Limine* to Exclude Evidence of Department of**
**Justice Opinions and Writings [Doc. 52]**
       **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1720

**Government's Opposition to Defendant's Motion to Dismiss,**
**With Exhibits,**

    **filed May 6, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1745**

**<u>Exhibits:</u>**

    1.    **Letter from Chairman Bennie G. Thompson to**
           **Mr. Stephen K. Bannon**
                **dated September 23, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **1793**

    2.    **E-mail from Cooney to Costello**
                **dated November 3, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **1796**

    3.    **E-mail from Costello to Cooney**
                **dated November 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **1800**

    4.    **E-mail from Cooney to Costello**
                **dated November 5, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . **1803**

## TABLE OF CONTENTS
## Joint Appendix Volume V of XII

**Page:**

Government's Opposition to
Defendant's Motion to Exclude Evidence
      filed May 6, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1806

Defendant's Reply in Support of His Motion to Exclude Evidence
      filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1812

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of Department of Justice Opinions and Writings
      filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1818

Government's Reply in Support of Motion *in Limine* to
Exclude Evidence Relating to Objections to
Subpoena That Defendant Waived
      filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1837

Government's Reply in Support of Motion *in Limine* to Exclude
Evidence of the Defendant's Prior Experience with Subpoenas
      filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1846

Defendant's Reply in Support of His Motion to Dismiss Indictment,
With Exhibits,
      filed May 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1855

      Exhibits:

    1.    Letter from Chairman Bennie G. Thompson to
        Mr. Stephen K. Bannon
            dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 1885

    2.    Transcript of Oral Argument
        Before the Honorable Carl J. Nichols
            on March 16, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1894

**Exhibits** to
**Defendant's Reply in Support of His Motion to Dismiss Indictment**
    **filed May 17, 2022, Continued:**

3.    **Letter from Costello to Congressman Thompson**
            **dated October 18, 2021**............................. 1994

4.    **Letter from Congressman Thompson to Costello**
            **dated October 19, 2021**............................. 1997

**United States House of Representatives'**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment**
    **filed May 25, 2022.**........................................ 2002

    **Attachment:**

    **Brief of United States House of Representatives as**
    *Amicus Curiae* **In Support of the Department of Justice**
            **dated May 10, 2022.**............................. 2009

**United States House Minority Leadership**
**Motion for Leave to File** *Amicus Curiae* **Brief,**
**With Attachment,**
    **filed May 25, 2022.**........................................ 2035

    **Attachment:**

    **Brief of the U.s. House of Representatives Minority Leader**
    **Kevin O. Mccarthy and the U.s. House of Representatives**
    **Minority Whip Stephen J. Scalise as Amicus Curiae**
            **dated May 24, 2022.**............................. 2050

**Defendant's Notice Regarding Amicus Briefs**

**filed June 10, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2065**


**Motion to Quash,**

**With Attachment,**

**filed June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2072**


**<u>Attachment</u>:**


**Memorandum of Points and Authorities**

**In Support of Motion to Quash,**

**With Exhibits,**

**dated June 13, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2074**

## TABLE OF CONTENTS
### Joint Appendix Volume VI of XII

**Page:**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**
      **on June 15, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2229**

**Government's Omnibus Motion** *in Limine*
      **filed June 17, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2408**

**Defendant's Motion to Compel**
**Meadows & Scavino Declination Discovery,**
**With Exhibits,**
      **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2425**

      <u>**Exhibits:**</u>

    1.    **Letter from Bannon's Counsel to Prosecutors**
        **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2442**

    2.    **Letter from Prosecutors to Bannon's Counsel**
        **dated June 21, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2445**

    3.    **Letter from Justin Clark to Scott Gast**
        **dated October 6, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2448**

    4.    **Letter from Pat Cipollone to Chairman Nadler**
        **dated September 16, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . **2453**

    5.    **Plaintiff's Motion for Judgment on the Pleadings, or in the**
        **Alternative, for Summary Judgment, & in Opposition to**
        **Defendants' Motion for Summary Judgment**
        **dated May 20, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2459**

**Defendant's Opposition to Motion to Quash**
      **filed June 27, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2597**

# TABLE OF CONTENTS
## Joint Appendix Volume VII of XII

Page:

Government's Opposition to Defendant's Motion to Compel
     filed June 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2694

Joint Proposed Jury Instructions,
With Attachment,
     filed June 30, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2701

     Attachment:

     Manual of Model Criminal Jury Instructions
          dated March 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2765

Government's Objections to Defendant's Proposed Jury Instructions
     filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2768

Defendant's Opposition to Government's Omnibus Motion *in Limine*
     filed July 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2781

Office of General Counsel U.S. House of Representatives'
Reply in Support of Motion to Quash,
With Exhibits,
     filed July 5, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2796

     Exhibits:

     A.    Order - *U.S. v. Moussaoui*
          dated March 2, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2828

     B.    Order - *U.S. v. Arthur Andersen, L.L.P.*
          dated May 14, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2834

     C.    Order Granting Motion to Quash Subpoena on
          U.S. Representative Maxine Waters - *D.C. v. Hayes*
          dated November 16, 2007. . . . . . . . . . . . . . . . . . . . . . . . 2836

**Defendant's Reply in Further Support of Motion to Compel**
**Meadows and Scavino Declination Discovery,**
**With Exhibit,**

   filed July 6, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2842**

   Exhibit:

   1.     **Memorandum**

            **dated October 29, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2853**

**Government's Reply in Support of Motion** *in Limine*

   filed July 8, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2863**

**Government's Motion** *in Limine* **to Exclude Evidence or Argument**
**Relating to the Defendant's Eleventh-hour Assertion That**
**He Is Willing to Testify Before the Select Committee**

   filed July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2874**

**Transcript of In-person Motions Hearing**
**Before the Honorable Carl J. Nichols**

   on July 11, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2879**

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony,**
**With Exhibits,**

   filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3071**

   Exhibits:

   1.     **Letters from former President Trump to Mr. Costello and**
          **Mr. Costello's Letter to Chairman Thompson**

            **dated June 9, 2022**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3080**

   2.     **Certification**

            **dated October 21, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3084**

**Exhibits** to

**Defendant's Opposition to Motion** *in Limine* **to Bar Testimony**
　　　　**filed July 13, 2022, Continued:**

3.　　Subpoena
　　　　　　dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3090

4.　　Letter from Thompson to Costello
　　　　　　dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 3092

5.　　Indictment
　　　　　　dated November 12, 2021. . . . . . . . . . . . . . . . . . . . . . . . 3096

**Government's Reply in Support of Motion** *in Limine* **to Exclude**
**Evidence or Argument Relating to the Defendant's Eleventh-hour**
**Assertion That He Is Willing to Testify Before the Select Committee,**
**With Exhibits,**
　　　　**filed July 13, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3106**

**Exhibits:**

1.　　Letter from Thompson to Costello
　　　　　　dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 3114

2.　　Letter from Thompson to Costello
　　　　　　dated October 15, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 3118

**Government's Objections to Defendant's Trial Exhibits**
　　　　**filed July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3122**

## TABLE OF CONTENTS
### Joint Appendix Volume VIII of XII

**Page:**

**Transcript of In-person Motions Hearing and Pretrial Conference**
**Before the Honorable Carl J. Nichols**
      on July 14, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3127

**Defendant's Motion to Exclude Congressional Evidence or**
**Dismiss the Indictment Based on Granting the Motion to Quash,**
**With Exhibits,**
      filed July 15, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3192

    <u>**Exhibits:**</u>

    1.    **Transcript Jury Trial**
          **Before the Honorable Kurt D. Engelhardt**
          *U.S. v. Rainey*, No. 12-291
              on June 1, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3216

    2.    **Congressional Gamesmanship Leads To An**
          **Acquittal In Deepwater Horizon Case,**
          **U.S. v. David Rainey: A Case Study**
              dated 2016.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3260

**Government's Opposition to Defendant's Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
      filed July 16, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3303

**Government's Objections to Court's Proposed**
**Statement of the Case, Voir Dire, and Jury Instructions**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3308

**Defendant's Statement of the Case**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3310


**Defendant's Purposed Jury Instructions**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3316


**Defendant's Reply in Support of Motion to Exclude**
**Congressional Evidence or Dismiss the Indictment**
**Based on Granting the Motion to Quash**
      filed July 17, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3374


**Government's Response to Defendant's Objections to Exhibits**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3381


**Defendant's Motion to Exclude Hearsay Evidence**
      filed July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3386


**Transcript of Jury Trial - Day 1 - Morning Session**
**Before the Honorable Carl J. Nichols**
      on July 18, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3393

## TABLE OF CONTENTS
### Joint Appendix Volume IX of XII

**Page:**

**Transcript of Jury Trial - Day 1 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
     **on July 18, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3577**

**Transcript of Jury Trial - Day 2 - Morning Session**
**Before the Honorable Carl J. Nichols**
     **on July 19, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3784**

**Transcript of Jury Trial - Day 2 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
     **on July 19, 2022..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3868**

**Testimony of <u>Kristin Amerling</u>:**

     **Direct Examination by Ms. Vaugn..** . . . . . . . . . . . . . . . . . . . . . . . . . **3942**

**TABLE OF CONTENTS**
**Joint Appendix Volume X of XII**

**Page:**

**Transcript of Jury Trial - Day 3 - Morning Session**
**Before the Honorable Carl J. Nichols**
     on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3994

     Testimony of <u>Kristin Amerling</u>:

     **Direct Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . . . 4014
     **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4078

**Transcript of Jury Trial - Day 3 - Afternoon Session**
**Before the Honorable Carl J. Nichols**
     on July 20, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4143

     Testimony of <u>Kristin Amerling</u>:

     **Cross Examination by Mr. Corcoran (Continued).** . . . . . . . . . . . . 4149
     **Redirect Examination by Ms. Vaughn.** . . . . . . . . . . . . . . . . . . . . . 4211

     Testimony of <u>Stephen Hart</u>:

     **Direct Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . . . 4233
     **Cross Examination by Mr. Corcoran.** . . . . . . . . . . . . . . . . . . . . . . 4252
     **Redirect Examination by Ms. Gaston.** . . . . . . . . . . . . . . . . . . . . . 4264

**Defendant's Motion for Judgment of Acquittal Pursuant to**
**Rule 29, Federal Rules of Criminal Procedure**
     filed July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

**Transcript of Jury Trial - Day 4**
**Before the Honorable Carl J. Nichols**
     on July 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4295

# TABLE OF CONTENTS
## Joint Appendix Volume XI of XII

**Page:**

**Notice of Defendant's Objections to the Court's Final**
**Jury Instructions and Additional Requested Instructions**
      **filed July 21, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4422**

**Defendant's Notice Regarding Congressional Hearings**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4432**

**Notice of Defendant's Objection to Jury Instruction Number 27**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4435**

**Transcript of Jury Trial - Day 5**
**Before the Honorable Carl J. Nichols**
      **on July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4438**

**Jury Instructions**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4555**

**Counsels' Acknowledgment Concerning Trial Exhibits**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4585**

**Government's Exhibit List**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4586**

**Defendant's Exhibit List**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4588**

**Note from Jury**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4591**

**Verdict Form**
      **filed July 22, 2022.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4592**

Order
        filed July 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4593

Government's Response to Defendant's
Notice Regarding Publicity During Trial,
With Exhibits,
        filed July 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4595

        Exhibits:

        1.    Screenshot of Episode 1996, War Room
                    dated July 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4598

        2.    Bannon's Gettr Repost CNN Ad
                    dated July 17, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4599

Defendant's Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment Based on
Granting the Motion to Quash and Congressional Subpoena
Recipients' Refusal to Testify or Produce Documents
        filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4600

Defendant's Motion for a New Trial
        filed August 5, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4617

Government's Response in Opposition to Defendant's
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
        filed August 12, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4634

Defendant's Reply to the Government's Response to
Supplemental Brief in Support of Motion to Exclude
Congressional Evidence or Dismiss the Indictment
Based on Granting the Motion to Quash and Congressional
Subpoena Recipients' Refusal to Testify or Produce Documents
        filed August 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4649

**Government's Opposition to Defendant's Motion for a New Trial**
> filed August 19, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4657

**Defendant's Reply to Opposition to Motion for a New Trial**
> filed August 26, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4676

**Order**
> filed September 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4682

**Transcript of Sentencing Hearing**
**Before the Honorable Carl J. Nichols**
> on October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4687

**Judgment in a Criminal Case**
> filed October 21, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767

**Defendant's Notice of Appeal**
> filed November 4, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4772

**Order Staying Sentence Pending Appeal**
> filed November 7, 2022.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4779

## TABLE OF CONTENTS
### Joint Appendix Volume XII of XII - Exhibits

**Page:**

**Defendant's Exhibits:**

9B. **H41 Congressional Record - House**
dated January 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . 4780

30. **Letter from Former President Donald Trump to**
**Stephen K. Bannon**
dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4781

31. **Letter from Robert J. Costello to**
**Chairman Bennie Thompson**
dated July 9, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4782

32. **Letter from Chairman Bennie Thompson to**
**Robert J. Costello**
dated July 14, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . 4784

39. **Article from Rolling Stone**
dated September 24, 2021. . . . . . . . . . . . . . . . . . . . . . . 4786

40. **Daily Mail Article**
dated October 8, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . 4804

**Government's Exhibits:**

1. **House Resolution 503.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4808

2. **Subpoena to Stephen Bannon**
dated September 23, 2021. . . . . . . . . . . . . . . . . . . . . . . 4822

**Government's Exhibits, Continued:**

3.    **Emails re Service of Subpoena**
        **dated September 23 and 24, 2021**. . . . . . . . . . . . . . . . . . 4832

4.    **Letter from Costello to**
      **Chairman Thompson and Cover Email**
        **dated October 7, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4835

5.    **Letter from Chairman Thompson to Costello**
        **dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4838

6.    **Letter from Costello to Chairman Thompson**
        **dated October 13, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4841

7.    **Letter from Chairman Thompson to Costello**
        **dated October 15, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4843

8.    **Letter from Costello to**
      **Chairman Thompson and Cover Email**
        **dated October 18, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4846

9.    **Letters from Chairman Thompson to Costello**
        **dated October 19, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . 4848

10.   **Post on Stephen Bannon's Gettr Account**
        **dated September 24, 2021.** . . . . . . . . . . . . . . . . . . . . . . . 4851

11A.  **Post on Stephen Bannon's Gettr Account**
        **dated October 8, 2021**. . . . . . . . . . . . . . . . . . . . . . . . . . . 4852

11B.  **DailyMail Article Linked in October 8, 2021**
      **Post on Stephen Bannon's Gettr Account.** . . . . . . . . . . . . . . 4853

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |

**<u>NOTICE OF DEFENDANT'S OBJECTIONS TO THE COURT'S FINAL JURY
INSTRUCTIONS AND ADDITIONAL REQUESTED INSTRUCTIONS</u>**

During a hearing held on July 21, 2022, the Court provided the parties with a copy of the

jury instructions it was proposing to give in this case, subject to a consideration of the parties'

objections.  The Court also entertained discussion of a proposed instruction by the Government

and two additional proposed instructions by the Defendant.[1]  Mr. Bannon entered objections to

the Government's newly proposed instruction and reiterates and incorporates those here.

Previously, on July 17, 2022, Mr. Bannon sent an email to the Court's chambers, as

directed by the Court, concerning the matter of jury instructions and voir dire, and he filed by

ECF his proposed jury instructions and objections to proposed jury instructions.  [Doc. 120].  He

---

[1] The two additional proposed instructions from the Defendant are set out herein.  They were
provided to the Court during the July 21, 2022 hearing and they were provided to the
Government by email in advance of the hearing.  The Government objected to both.  It appears
from the final instructions the Court has advised the parties by email that it intends to actually
give to the jury, the Government's objections to these additional defense proposed instructions
were sustained and no part of these two additional proposed instructions is included in the final
instructions the Court intends to give.  Mr. Bannon formally indicates here his objection to the
decision to exclude these two additional proposed instructions. They reflect the defense theory
of the case, based on the narrow defense permitted to the Defendant, they reflect accurate
propositions of the law and the application of the relevant factual circumstances in this case to
the law and the defense theory is not reflected anywhere in the final instructions the Court has
advised that it intends to give.

reiterates and incorporates herein his requested proposed instructions and his objections in Doc.

120. Mr. Bannon, through counsel, made additional submissions related to jury instructions

through email submissions to chambers as directed and reiterates and incorporates those herein

as well. Mr. Bannon also reiterates and incorporates herein the objections he made during the

July 21, 2022, hearing and all other objections and proposals related to the jury instructions

previously made in this case.

Mr. Bannon now makes the following objections to the Court's final instructions

provided to the parties by email on July 21, 2022:

1.    Instruction 13: Mr. Bannon respectfully submits that the instruction read in full context

does not adequately reflect for the jury the role of the presumption of innocence. Mr.

Bannon respectfully submits that the instruction should end with words to the following

effect: The defendant is presumed innocent as a matter of law at all times unless or until

the government proves him guilty beyond a reasonable doubt. Even if this concept is

reflected elsewhere, it is required in this instruction as well for balance and to avoid jury

confusion on an important legal concept.

2.    Instruction 17: Mr. Bannon reserves the right to object to the Verdict Form when final

copies have been provided by the Court and to make any objection to this related

instruction.

3.    Instruction 24:

A.    Mr. Bannon objects to this instruction for the reasons and for reasons previously

stated. Mr. Bannon respectfully asserts that this key instruction on the elements of

the offense must use the language of the statute "willfully makes default" not a

colloquial alternative. The instruction as provided by the Court usurps the jury's role

by transforming "willfully makes default" into "willfully not providing testimony and information" or a "willful failure to provide testimony" or a "willful failure to produce documents." These terms could perhaps be used for further clarification to distinguish between Counts 1 and 2; but the language of the statute must be used. It is the jury's function to determine if the Defendant acted "willfully" and it is the jury's function whether the Defendant willfully made a "default." Mr. Bannon provided a proposed definition of "default" [Doc. 120] and submits that it should be used. But in any event, he objects to the Court's instruction insofar as it deviates from the language of the statute.

B. Next, Mr. Bannon objects to Instruction 24 because it entirely omits the relevant dates as charged in the indictments. Those dates are material parts of the charges in the indictment and the jury must be focused on that. As asserted during the hearing on July 21, 2022, for example, if the jury were to find that the Defendant willfully failed to provide testimony to the Committee on a date other than on October 14, 2021, for example, because that date had been extended expressly or implicitly by Committee letters after October 14, 2021, he must be find not guilty under Count 1. That is especially material here, in light of the defense the Court has permitted – a belief that the dates were not fixed dates and inferences from the Committee letters that other dates for compliance were encouraged. The same objection is made for the failure to use the date stated in Count 2 as well. This is particularly important because the date is an element of the offense charged and it is a different date from the date in the subpoena. The indictment charges a specific date in Count 1 for the commission of the alleged crime and a "by" date in Count 2. The failure to include them and explain

their material significance usurps the jury's role and in effect allows a conviction by a

something less than proof of every element beyond a reasonable doubt, denying Mr.

Bannon due process and his right to a jury trial and other Fifth and Sixth Amendment

rights.

C.  Mr. Bannon objects to the colloquial language instead of the statutory language

throughout Instruction 24, including in the Third and Fourth elements section.

D.  Mr. Bannon also objects to the inclusion in Instruction 24 of the litany of things that

do not constitute a defense to the charges, especially in the absence of any indication

of what does constitute a defense and the absence of any reference to the specific

defense permitted by the Court and advanced by the Defendant.

E.  Mr. Bannon objects to the failure to include the specific theory of defense instructions

he submitted or any formulation of the defense theory whatsoever.  The effect of

Instruction 24 and the instructions as a whole is to fail to adequately (if at all) instruct

the jury as to what could constitute a defense other than general terms "inadvertence,"

"accident," or "mistake."  There must be a far more informative explanation of what

"mistake" means in this context and an explanation of the defense of "mistake of

fact" as a concept and put into meaningful context for the specific parameters of

mistake of fact in this case by this Defendant.  Mr. Bannon reiterates his request for

the inclusion of his mistake of fact/defense theory proposed instruction (or some

variation on it that encompasses its elements) presented in hard copy at the July 21,

2022, hearing and provided to the Court hereinbelow.

F.  Mr. Bannon objects to the last sentence of Instruction 24, especially because it is

confusing in the context of this case and the defense contention that the Committee's

urging of compliance after the subpoena date led to his belief (perhaps a mistake of fact) that there had been no default and that compliance then would mean no default. Nowhere does Instruction 24 or any other instruction apprise the jury of the defense of mistake of fact as applied in the instant case and Mr. Bannon objects. The failure to include his mistake of fact theory of defense is especially prejudicial in light of the language in Instruction 24 that apparently is intended to eliminate a mistake of law defense. There is no reasonable way to expect a jury to read this language and believe, especially in the absence of an instruction, that Mr. Bannon has put forward a mistake of fact defense.

G.  Especially if the Court is to include, as Instruction 24 does, a provision that a belief that executive privilege excuses compliance is no defense, it should include an instruction that if the jury finds that executive privilege was invoked, that is a defense and, specifically that it would negate the "willfully" prong as well as the default prong.

Mr. Bannon respectfully objects to the Court's failure to include his proposed instructions and to the denial of his objections to the government's proposed instructions and to the Court's instructions.

There is nothing in the Court's instructions, with all due respect, from which the jury could understand that the specific mistake of fact defense the Court permitted as Mr. Bannon's only defense is actually a defense in the case. There is nothing in the instructions, for example, that would allow the jury to understand that if it concluded from the exchange of the Costello/Thompson letters, along with the Trump/Costello letters and the Committee's July 14, 2022 letter, that it (the jury) could infer from these

5

**-4426-**

letters that Mr. Bannon believed that the dates were flexible and had been extended, he either would have been right and there was no default or he would have made a mistake of fact that is a viable defense to the charge and specifically to the "willfully" element, even under the restrictive definition of that term to which Mr. Bannon has objected.

The following are the Defendant's additional proposed instructions provided to the Court by hard copy on July 21, 2022, and Mr. Bannon respectfully requests that they be included in the actual instructions to be given for the reasons asserted during the July 21, 2022, hearing.

## DEFENDANT'S ADDITIONAL PROPOSED JURY INSTRUCTIONS

### 1.   Mistake of Fact

**The Defendant, Stephen K. Bannon, contends that he believed that the dates for compliance with the subpoena were not fixed and were flexible and subject to change and that therefore he did not act "willfully" in failing to comply with the subpoenas by the dates set out in the indictment.  If you find that Mr. Bannon honestly and reasonably believed, based on the exchange of letters between his lawyer, Mr. Costello and the Committee, or because of Mr. Bannon's past experience with subpoenas, or because of his executive privilege claim, or because of his belief that negotiations were ongoing as part of an accommodation process, that the dates for his compliance with the subpoena, either for the production of documents on October 7, 2021 or for his appearance to testify on October 14, 2021, were not fixed dates, but were subject to extension, such that he believed he could still comply with the subpoena after the dates in the subpoena, then he would not have acted "willfully" as charged in the indictment and you must find him not guilty.**

**(Redbook) Instruction 9.600 DEFENSES OF ACCIDENT AND MISTAKE--NOTE**

Defenses of accident and mistake of fact (or non-penal law) have potential application to any case in which they could rebut proof of a required mental element. *See, e.g., Clark v. U.S.*, 593 A.2d 186, 194, n.14 (D.C. 1991) ("[T]he prosecution is required to prove beyond a reasonable doubt that the killing was intentional or not accidental," *quoting* Annotation, Homicide: Burden of Proof on Defense that Killing was Accidental, 63 A.L.R. 3d 936, 941 (1975)). In *Morgan v. D.C.*, 476 A.2d 1128 (D.C. 1984), the District of Columbia Court of Appeals clarified that a mistake of fact or non-penal law can negate general intent as well as specific intent: "[w]hile general intent is frequently defined as the intent to do the prohibited act, it also requires the absence of an exculpatory state of mind (e.g., mental disease, reasonable mistake of fact)." *Id.* at 1132 (citing R. Perkins & R. Boyce, Criminal Law, pp. 831-32 (3d ed. 1982)). The court observed the closeness of the concepts of "mistake of fact" and "mistake of non-penal law," offering the example of a trespasser who lacks criminal intent by reason of a mistaken but

6

reasonable belief that a prescriptive easement applies. "The mistake may be as to the actual length of time that adverse use has continued (mistake of fact) or as to the time required to establish a prescriptive easement (mistake of law)." *Id.* at 1133 n.4. These defenses are not confined to assault cases. *See, e.g.*, *Simms v. D.C.*, 612 A.2d 215 (D.C. 1992) (affirming abandonment as mistake of fact defense in the context of tampering with a vehicle, where intent is required); *Clark v. U.S.*, 593 A.2d 186 (D.C. 1991) (discussing accident in context of second-degree murder); *Goddard v. U.S.*, 557 A.2d 1315 (D.C. 1989) (finding trial court's refusal to instruct jury on abandonment in the context of unauthorized use of a vehicle was reversible error).

The hallmark of a mistake of fact defense is that "the defendant's belief was honest and reasonable." *Simms*, 612 A.2d at 219 (citing *Williams v. U.S.*, 337 A.2d 772, 774-75 (D.C. 1975)). A mistake-of-fact defense cannot rest solely upon the defendant's voluntary intoxication. *See Cooper v. U.S.*, 680 A.2d 1370, 1372 (D.C. 1996) (trial court did not err in precluding argument that defendant's drug use supported her defense of mistake in a Bail Reform Act prosecution).

The D.C. Court of Appeals has cautioned against shifting the burden of proof to the defendant, in the context of the defenses of accident and mistake. *See Clark*, 593 A.2d at 194 (finding it was error to instruct that the jury must find for the defendant "if you are satisfied that [his theory of accident] is what happened."); *Simms*, 612 A.2d at 219 (finding it was error to conclude defendant could not interpose mistake of fact defense of abandonment unless he proved abandonment by clear, unequivocal and decisive evidence).

**The Committee concluded that no general pattern instruction on these defenses could adequately provide for the range of contexts in which they arise, without resorting to a confusing array of alternative selections. The Court of Appeals has made it clear that a defense theory instruction tailored to the facts of the individual case is appropriate for this kind of defense. *See, e.g.*, *Clark*, 593 A.2d at 194-95.** (emphasis added)

*See also Abney v. U.S.*, 616 A.2d 856 (D.C. 1992) (holding that mistaken belief in constitutional law defense does not support a bona fide defense theory); *Wiggins v. U.S.*, 521 A.2d 1146 (D.C. 1987) (finding mistake of fact a valid defense as to defendant's belief of legitimacy of twenty-dollar bill); *Gaetano v. U.S.*, 406 A.2d 1291 (D.C. 1979) (discussing "bona fide belief" defense to unlawful entry); *Leiss v. U.S.*, 364 A.2d 803, 809 (D.C. 1976) (same); *Jackson v. U.S.*, 357 A.2d 409, 411 (D.C. 1976) (holding that a bona fide belief must have some reasonable basis before an accused can claim that such belief exonerates his behavior); *Smith v. U.S.*, 281 A.2d 438, 439-40 (D.C. 1971) (holding that it is not sufficient that an accused merely claim a belief of a right to enter; a bona fide belief must have some reasonable basis).

"Legal impossibility occurs when a defendant's actions, or actions a defendant causes, even if fully carried out, would not constitute a crime." *German v. U.S.*, 525 A.2d 596, 606-07 (D.C. 1987) (citations omitted). When a defendant's objective "is to do something that is not a crime," there is a defense of legal impossibility. *In re Doe*, 855 A.2d 1100, 1106 (D.C. 2004). However, "factual impossibility, where the intended substantive crime is impossible of accomplishment

7

merely because of some physical impossibility unknown to the defendant, is not a defense." *Id.* at 1106 (citing 2 Wayne R. LaFave, Substantive Criminal Law § 11.5(a), at 231 (2d ed. 2003) ("We have no reason to think that it would be a defense in the District of Columbia to a charge of attempted enticement of a child that the defendant was fooled because his target was in reality an undercover law enforcement officer."). "Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law, but a circumstance unknown to the actor prevents him or her from bringing about that objective." *German*, 525 A.2d at 607 (citing *U.S. v. Oviedo*, 525 F.2d 881, 883 (5th Cir. 1976)) (recognizing legal but not factual impossibility "is often elusive," however, "it may be more useful to inquire whether a defendant had the requisite mens rea and performed substantive acts in furtherance of a criminal objective." *In re Doe*, 855 A.2d at 1106 n.10.

### 2.  Waiver of Default

**The Defendant contends that, through their conduct, the Committee waived any default that might have occurred, and that, therefore any default that might have occurred by not complying with the subpoena by the dates set out in the subpoena was excused by the Committee, based on their wish to get the documents and testimony the Committee sought from Mr. Bannon.  A party's conduct, including a continued insistence on performance after a purported default date has passed, can constitute a waiver of a default.**

**Accordingly, even if you were to find that Mr. Bannon did not comply with the subpoenas by the dates provided in the subpoenas, if you find, from the Committee's conduct or words, written or spoken, that the Committee continued to insist on compliance with the subpoena, even after the dates in the subpoena had passed, then you may infer from the Committee's conduct or words that the Committee waived any default that had occurred. A waiver of default need not be expressly stated, but may be inferred from conduct inconsistent with an intent to enforce that right.[2]  Whether a waiver of any default occurred is for you as the trier of the facts to determine.  If you find that a default might have occurred, but that the Committee waived any default, then you must find Mr. Bannon not guilty.**

Dated: July 21, 2022                    Respectfully submitted,

                                        SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                            /s/ M. Evan Corcoran
                                        M. Evan Corcoran (D.C. Bar No. 440027)

                                         Riane A. White (*Pro Hac Vice*)
                                        400 East Pratt Street – Suite 900

---

[2] *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 87-88 (D. D.C. 2004) ("Intent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right."); *See also, Bowen v. Horgan*, 295 N.Y. 267, 269, 181 N.E. 567 (1932).

Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com


    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

*Counsel for Defendant Stephen K. Bannon*

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of July 2022, a copy of the Defendant's Additional Proposed Jury Instructions was served *via* the Court's CM/ECF system on registered parties and counsel.

                                        ____ /s/ M. Evan Corcoran
                                        M. Evan Corcoran (D.C. Bar No. 440027)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant.* | : | |

### DEFENDANT'S NOTICE REGARDING CONGRESSIONAL HEARINGS

At the pretrial conference in the above-captioned case, the question of how to bring it to the Court's attention if Congressional hearings occurred during the trial that raised a relevant issue concerning publicity and any possible impact on the jury was discussed. The Court advised that it would consider the Defendant to have a continuing objection [July 14, 2022 Tr. at 25] and that any additional relevant evidence appropriately would be raised by either a motion or a notice identifying the matter at issue. [July 14, 2022 Tr. at 25-26]. That is the purpose of this Notice.

During the prime-time television viewing hours, beginning at 8:00 p.m. on July 21, 2022, and widely broadcast across cable and network television, Select Committee hearings were conducted, in the same manner as earlier identified. The July 21, 2022, televised hearings included a feature segment on the Defendant Stephen K. Bannon of a particularly inflammatory nature. The following is a link to the video and audio segment, narrated by Representative Cheney:

https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=868196e1-a298-44bd-a1a5-8e1a419fffa5.

The nature and substance of the segment present a significant cause for concern regarding possible prejudice to Mr. Bannon's constitutional fair trial rights and right to a jury trial if a juror viewed the segment of was made aware of it in some manner.  The question is how to address the matter.

This case is at a stage in which the evidence has closed and the trial will move into closing argument, jury instructions, and deliberations.  During the proceedings held on July 21, 2022, outside the presence of the jury, a concern was raised in advance about the broadcast of the hearings at issue and a discussion was held among all parties and the Court about whether and in what manner, if at all, to broach the subject with the jury in advance.  The Court addressed the matter, by reminding the jury once again not to watch TV, etc., consistent with the views of the defense that this would be the most prudent way to handle this development, rather than highlighting it and perhaps increasing the chances that, once highlighted, it would become a factor in a juror's mind.  [July 21, 2022, Tr. at 94-97].  The defense continues to believe that the Court handled it in the most appropriate manner under all attending circumstances.

At the time of the discussion as to how to address the matter in advance, the exact substantive coverage of the widely advertised prime-time hearing was not known.  Now that we know that it included a highly inflammatory segment featuring Mr. Bannon, the question arises as to whether jurors should be questioned about any exposure to the piece.  An associated concern is whether a juror might be reticent to acknowledge having seen the broadcast or having heard about or discussed it if she or he believes she or he might have run afoul of a rule and be in trouble with the Court.

The Defendant respectfully requests, subject to the Court's experienced view on how best to address the matter, that there should be some inquiry, while assuring the jurors of the

importance of candor and that they will not suffer negative consequences if they acknowledge

exposure to the broadcast or its subject.

The defense also would like to give the Court notice that CNN that, upon information and

belief, has advertised that it is rebroadcasting on July 22, 2022, its Special Report on Mr. Bannon

that originally aired on July 17, 2022.

Dated: July 22, 2022                    Respectfully submitted,

                                        **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                        ___/s/ M. Evan Corcoran___
                                        M. Evan Corcoran (D.C. Bar No. 440027)
                                        Riane A. White (*pro hac vice*)
                                        210 N. Charles Street, 26th Floor
                                        Baltimore, MD 21201
                                        Telephone: (410) 385-2225
                                        Facsimile: (410) 547-2432
                                        Email: ecorcoran@silvermanthompson.com


                                        ___/s/ David I. Schoen___
                                        David I. Schoen (D.C. Bar No. 391408)
                                        David I. Schoen, Attorney at Law
                                        2800 Zelda Road, Suite 100-6
                                        Montgomery, Alabama 36106
                                        Telephone: (334) 395-6611
                                        Facsimile: (917) 591-7586
                                        Email: schoenlawfirm@gmail.com

                                        *Counsel for Defendant Stephen K. Bannon*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of July, 2022, a copy of the foregoing Notice

was served *via* the Court's CM/ECF system on all properly registered parties and counsel.


                                        ___/s/ M. Evan Corcoran___
                                        M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | :     Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

**NOTICE OF DEFENDANT'S OBJECTION TO JURY INSTRUCTION NUMBER 27**

Following closing arguments, the Court gave the jury an additional instruction. Without having a copy of the instruction or a real time transcript, we cannot quote directly from the instruction. However, a specific part of the instruction to which the defense objects relates to the Court's comment concerning a discussion of the rules during Mr. Corcoran's closing argument and the objection to it. The instruction certainly implied, if not outrightly asserted, that the argument was improper and should be disregarded. Respectfully, the Defendant does not believe the instruction was appropriate and believes that it unfairly targeted the Defendant's closing argument and risks unfairly prejudicing the jury.

The argument at issue concerned a reference to a factual issue concerning the provision of a copy of section Rule 3(b) pursuant to ¶11 of the 117th Congress's Regulations for Use of Deposition Authority. First, this was one narrow area which the Court had suggested in a pre-trial ruling might well be an area the defense can pursue and argue – the attending factual dispute - [July 11, 2022 Tr. at 132]. Secondly, there was testimony at trial directly concerning this factual dispute, with Ms. Amerling testifying that Mr. Bannon "… was not provided a copy of that paragraph that day." [July 20, 2022 Tr. at 712]. And of course, Defense Exhibit 9-B, used

in the course of that part of the examination of Ms. Amerling, was admitted into evidence.  [July 20, 2022 Tr. at 712-713].

The argument on this issue at close was proper argument, justified by the trial record and the Court's previous ruling.  Instruction 27, to the extent it focused on the Rules references in the closing argument and directed the jury to ignore the argument or suggested defense counsel did something wrong by going into that area, was unfairly prejudicial in violation of the Defendant's constitutional fair trial rights, including his right of confrontation, right to effective assistance of counsel, and right to a jury trial and the rights associated with the granting of the motion to quash, including the right to compulsory process, argued on July 21, 2022.  Counsel for Mr. Bannon was precluded during closing by the Court's ruling during closing argument from addressing the jury about a key piece of evidence that went to the credibility of the Government's key witness, Ms. Amerling.

Dated: July 22, 2022                    Respectfully submitted,

                                        SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                        ___/s/ M. Evan Corcoran_____
                                        M. Evan Corcoran (D.C. Bar No. 440027)
                                        Riane A. White (*pro hac vice*)
                                        210 N. Charles Street, 26th Floor
                                        Baltimore, MD 21201
                                        Telephone: (410) 385-2225
                                        Facsimile: (410) 547-2432
                                        Email: ecorcoran@silvermanthompson.com

                                        ___/s/ David I. Schoen_____
                                        David I. Schoen (D.C. Bar No. 391408)
                                        David I. Schoen, Attorney at Law
                                        2800 Zelda Road, Suite 100-6
                                        Montgomery, Alabama 36106
                                        Telephone: (334) 395-6611
                                        Facsimile: (917) 591-7586
                                        Email: schoenlawfirm@gmail.com

                                        *Counsel for Defendant Stephen K. Bannon*

2

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of July, 2022, a copy of the foregoing Objection to Instruction 27 was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

                                              ___/s/ M. Evan Corcoran_____

                                              M. Evan Corcoran (D.C. Bar No. 440027)

**-4437-**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                                        CR Action
                                        No. 1:21-670

        vs.                             Washington, DC
                                        July 22, 2022
STEPHEN K. BANNON,

                                        9:14 a.m.
            Defendant.

            TRANSCRIPT OF JURY TRIAL - DAY FIVE
        BEFORE THE HONORABLE CARL J. NICHOLS
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the U.S.:**          **AMANDA ROSE VAUGHN**
                           **MOLLY GULLAND GASTON**
                           U.S. ATTORNEYS OFC. FOR D.C.
                           555 4th Street NW
                           Washington, DC  20001
                           202-252-1793


**For the Defendant:**     **DAVID I. SCHOEN**
                           DAVID I. SCHOEN, ATTORNEY AT LAW
                           2800 Zelda Road, Suite 100-6
                           Montgomery, AL  36106
                           334-395-6611

                           **MATTHEW EVAN CORCORAN**
                           **RIANE WHITE**
                           SILVERMAN THOMPSON SLUTKIN WHITE
                           201 N. Charles Street, 25th Floor
                           Baltimore, MC  21201
                           410-385-2225


**Reported By:**           **LORRAINE T. HERMAN, RPR, CRC**
                           Official Court Reporter
                           U.S. District & Bankruptcy Courts
                           333 Constitution Avenue, NW
                           Room 4700-C
                           Washington, DC 20001
                           lorraine_herman@dcd.uscourts.gov

## **I N D E X**

Court's Instructions                           Page   1024

Closing Arguments by the Government            Page   1041

Closing Arguments by the Defense               Page   1058

Rebuttal for Closing Arguments                 Page   1087

1                       **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  Good morning, Your Honor.  This is

3     criminal case year 2021-670, United States of America versus

4     Stephen K. Bannon.

5              Counsel, please come forward and introduce

6     yourselves for the record beginning with the government.

7          **MS. VAUGHN:**  Good morning, Your Honor.  Amanda

8     Vaughn and Molly Gaston for the United States.  Paralegal

9     specialist Quiana Dunn-Gordon and FBI Special Agent D'Amico

10    are also at counsel table.

11         **MR. SCHOEN:**  Good morning, Your Honor.  David

12    Schoen, Mr. Bannon, along with Evan Corcoran.  Mr. Bannon is

13    at the defense table and Attorney Riane White, also,

14    Your Honor.

15             **THE COURT:**  Good morning, everyone.

16         **MR. SCHOEN:**  Good morning.  Thank you, Your Honor.

17         **THE COURT:**  I just want the record to reflect that

18    I received some objections from Mr. Bannon to the final or

19    close-to-final jury instructions that I had circulated to

20    the parties yesterday.

21             I emailed the final, final version, to the parties

22    about half an hour ago, which made some relatively modest

23    edits to the Instruction 24, and I sent that to the parties

24    in redline, so they should have exactly the changes I've

25    made.

1          I think we have provided the parties with hard

2    copies of the instructions, as I intended to use them.  And

3    then, of course, I will be reading them right now, and this

4    is the copy -- the one I am holding now that will be

5    provided to the jury.

6          **MR. CORCORAN:**  Your Honor, you just mean that you

7    previously provided the hard copies.  Correct?

8          **THE COURT:**  Well, I have the version -- I have a

9    hard-copy version that is clean -- all right.  There we

10   go --

11         **MR. CORCORAN:**  Thank you, Your Honor.

12         **THE COURT:**  -- of the exact version I intend to

13   give to the jury now.

14         So with that, Ms. Lesley, could you please bring

15   in the jury.

16         **MS. VAUGHN:**  Your Honor, could we clarify one

17   thing?

18         **THE COURT:**  Yes.

19         **MS. VAUGHN:**  Or two things, I guess.

20         First, we just want to confirm that the verdict

21   form that the parties had jointly offered is going to be the

22   one that is used.

23         **THE COURT:**  Yes, it is.  Thank you.

24         And I believe we sent that out perhaps this

25   morning as well.  But, yes, my understanding is the parties

1    jointly agreed on it and there is no objections to it, and

2    so we will use the one that the parties proposed.

3         **MS. VAUGHN:**  And we also want to confirm that the

4    indictment, in the first sentence says, "the dates are on or

5    about."  So we just want to confirm that that should not

6    be -- or whether we can include that when the Court says,

7    "As of the dates charged" to reflect the indictment, "As of

8    on or about the dates charged."

9         **THE COURT:**  Point me to exactly the language.

10        **MS. VAUGHN:**  In the instructions or the

11   indictment?

12        **THE COURT:**  I'm asking you where you would like me

13   to include that language that you are identifying.

14        **MS. VAUGHN:**  In Instruction 24 --

15        **THE COURT:**  Yes.

16        **MS. VAUGHN:**  -- where the Court has added "As of

17   the dates charged" in the second paragraph.

18        **THE COURT:**  Yes.

19        **MS. VAUGHN:**  Given the indictment's allegations,

20   we think it would be appropriate to say "as of on or about

21   the dates charged".

22        **THE COURT:**  I agree with that given the language

23   in the indictment.

24        **MS. VAUGHN:**  Thank you.

25        **MR. SCHOEN:**  We object to that.

**-4442-**

1          **THE COURT:**  Objection preserved, yes.  Thank you

2      for that.

3          **MR. CORCORAN:**  Slightly different issue,

4      Your Honor, which is, in the proposed instructions, I don't

5      know if there's an "on or about" instruction in the current

6      version of the instructions, but that was not in play.  So

7      we would like an opportunity to look at -- there's a pattern

8      jury instruction on "on or about," and we'd like a moment

9      just to look at that.

10          **THE COURT:**  Okay.  We can take a moment.

11          **MS. VAUGHN:**  We have no objection to giving that

12      instruction.

13          (Brief pause.)

14          **MR. CORCORAN:**  Your Honor, we would just ask for

15      the addition of Redbook Instruction 3.103.  I think both

16      parties are agreeable to that.

17          **MS. VAUGHN:**  No objection.

18          **THE COURT:**  Okay.  So we will include that

19      instruction.

20          I would propose to make it Instruction 24 before

21      we get to the elements.  It would just be the new

22      instruction before the elements, Instruction 24.  I just

23      need a copy now.

24          **MR. SCHOEN:**  Your Honor, I just want to be sure

25      that the record is clear.  Our objection is Count 1 uses the

1    term "on," not "on or about."  We believe it's a variance

2    from the indictment if the Court charges "on or about."

3    That's the objection, Your Honor.

4         **THE COURT:**  I understand.

5         **MR. SCHOEN:**  Okay.  Thank you.

6         **THE COURT:**  So the problem, Ms. Vaughn, is the

7    indictment uses the words "on" in Count 1 and "by" in

8    Count 2.

9         **MS. VAUGHN:**  Your Honor, on Page 1 of the

10   indictment, it says "all dates are on or about."

11        **THE COURT:**  Okay.  We're going to include then "on

12   or about," and we'll include the "on or about" instruction,

13   which is 3.103.  I just need that instruction.

14             Perhaps I can pull it up.

15        (Brief pause.)

16        **MS. VAUGHN:**  Your Honor, we have it.  We can email

17   it to your chamber's email address now.

18        **THE COURT:**  Am I right that it needs to include --

19   that it should include the alleged dates of the offense and

20   Instruction 3.103, on or about, proof of, says, The

21   indictment --

22        **MS. VAUGHN:**  Yes.  So it would say, The indictment

23   charges that the offense in Count 1 was committed on or

24   about October 14, 2021.  The offense in Count 2 was

25   committed on or about -- or by on or about October 18th.

1          **THE COURT:**  Okay.  We will work on that.

2          Okay.  We're ready now.

3          Ms. Lesley, please bring the jury in.

4          (Jury entered the courtroom at 9:25 a.m.)

5          **THE COURT:**  Good morning, ladies and gentlemen.

6          **JURORS:**  Good morning.

7          **THE COURT:**  Before we begin, I just want to give

8    you a very brief summary of the order of operations for this

9    morning.

10         So I will be reading to you the jury instructions

11   that will apply to your deliberations this morning.  After I

12   do that -- and I will do that orally.  I'll also mention in

13   my first instruction that you will also be getting a copy of

14   the instructions when you go deliberate.  So you should

15   listen, of course, but you will also get a copy of this when

16   you deliberate.

17         After that, the parties will then do their closing

18   arguments.  And once their closing arguments have been done,

19   I will then excuse you to begin your deliberations with one

20   or two final instructions about that.  So that's really just

21   an overview of what we're going to do this morning.

22         So as to the instructions, and these are my

23   instructions to you:  Instruction 1 is the use of the

24   instructions.

25         As I said, I will provide you with a copy of my

1   instructions.  During your deliberations you may, if you

2   want, refer to these instructions.  While you may refer to

3   any particular portion of the instructions, you are to

4   consider the instructions as a whole and may not follow some

5   and ignore others.

6          If you have any questions about the instructions,

7   you should feel free to send me a note.  Please return your

8   instructions to me when your verdict is rendered.

9          Instruction 2 concerns the role of the Court.  My

10  function is and has been to conduct this trial in an

11  orderly, fair and efficient manner, to rule on questions of

12  law and to instruct you on the law that applies in this

13  case.

14         It is your duty to accept the law as I instruct

15  you.  You should consider all the instructions as a whole.

16  You may not ignore or refuse to follow any of them.

17         The next instruction is the role of the jury.

18  Your function as the jury is to determine what the facts are

19  in this case.  You are the sole judges of the facts.  While

20  it is my responsibility to decide what is admitted as

21  evidence during the trial, you alone decide what weight, if

22  any, to give to that evidence.  You alone decide the

23  credibility or believability of the witnesses.

24         As human beings, we all have personal likes and

25  dislikes, opinions, prejudices and biases.  Generally we are

1    aware of these things, but you should also consider the

2    possibility that you have implicit biases, that is, biases

3    of which you may not be consciously aware.  Personal

4    prejudices, preferences or biases have no place in a

5    courtroom where our goal is to arrive at a just and

6    impartial verdict.

7            All people deserve fair treatment in our system of

8    justice regardless of any personal characteristic such as

9    race, national or ethnic origin, religion, age, disability,

10   sex, gender identity or expression, sexual orientation,

11   education or income level.

12           You should determine the facts solely from a fair

13   consideration of the evidence.  You should decide the case

14   without prejudice, fear, sympathy, favoritism or

15   consideration of public opinion.  You may not take anything

16   I may have said or done as indicating how I think you should

17   decide this case.

18           If you believe that I have expressed or indicated

19   any such opinion, you should ignore it.  The verdict in this

20   case is your sole and exclusive responsibility.

21           Instruction 4 is about recollection.  If any

22   reference by me or the attorneys to the evidence is

23   different from your own memory of the evidence, it is your

24   memory that should control during your deliberations.

25           Instruction 5 concerns statements of counsel.  The

**-4447-**

1    statements and arguments of the lawyers are not evidence.

2    They are only intended to assist you in understanding the

3    evidence.  Similarly, the questions of the lawyers are not

4    evidence.

5         Instruction 6 is about the indictment.  It is not

6    evidence.  The indictment is merely the formal way of

7    accusing a person of a crime.  You must not consider the

8    indictment as evidence of any kind.  You may not consider it

9    as any evidence of the defendant's guilt or draw any

10   inference of guilt from it.

11        Instruction 7 concerns the burden of proof and

12   presumption of innocence.  Every defendant in a criminal

13   case is presumed to be innocent.  This presumption of

14   innocence remains with the defendant throughout the trial

15   unless and until the government has proven he is guilty

16   beyond a reasonable doubt.  This burden never shifts

17   throughout the trial.  The law does not require the

18   defendant to prove his innocence or to produce any evidence

19   at all.

20        If you find that the government has proven beyond

21   a reasonable doubt every element of a particular offense

22   with which the defendant is charged, it is your duty to find

23   him guilty of that offense.

24        On the other hand, if you find that the government

25   has failed to prove any element of a particular offense

1    beyond a reasonable doubt, it is your duty to find the

2    defendant not guilty of that offense.

3           Instruction 8 concerns reasonable doubt.  The

4    government has the burden of proving the defendant guilty

5    beyond a reasonable doubt as to each count or charge against

6    him.  Some of you may have served as jurors in civil cases

7    where you were told that it is only necessary to prove that

8    a fact is more likely than not true, which we call the

9    preponderance of the evidence.

10          In criminal cases, the government's proof must be

11   more powerful than that.  It must be beyond a reasonable

12   doubt.  Proof beyond a reasonable doubt is proof that leaves

13   you firmly convinced of the defendant's guilt.  There are

14   very few things in this world that we know with absolute

15   certainty.

16          In criminal cases, the law does not require proof

17   that overcomes every possible doubt.  If, based on your

18   consideration of the evidence, you are firmly convinced that

19   the defendant is guilty of the crime charged, you must find

20   him guilty.

21          If, on the other hand, you think there is a real

22   possibility that a defendant is not guilty, you must give

23   him the benefit of the doubt and find him not guilty.

24          Instruction 9 concerns direct and circumstantial

25   evidence.  There are two types of evidence from which you

1    may determine what the facts are in this case:  Direct

2    evidence and circumstantial evidence.

3        When a witness, such as an eyewitness, asserts

4    actual knowledge of a fact, that witness's testimony is

5    direct evidence.  On the other hand, evidence of facts and

6    circumstances from which reasonable inferences may be drawn

7    is circumstantial evidence.

8        Let me give you an example.  Assume a person

9    looked out a window and saw that snow was falling.  If that

10   person later testified in court about what he had seen, his

11   testimony would be direct evidence that snow was falling at

12   the time he saw it happen.

13       Assume, however, that he looked out a window and

14   saw no snow on the ground and then went to sleep and saw

15   snow on the ground after he woke up.  His testimony about

16   what he had seen would be circumstantial evidence; that it

17   had snowed while he was asleep.

18       The law says that both direct and circumstantial

19   evidence are acceptable as a means of proving a fact.  The

20   law does not favor one form of evidence over another.  It is

21   for you to decide how much weight to give to any particular

22   evidence, whether it is direct or circumstantial.  You are

23   permitted to give equal weight to both.

24       Circumstantial evidence does not require a greater

25   degree of certainty than direct evidence.  In reaching a

1   verdict in this case, you should consider all of the

2   evidence presented, both direct and circumstantial.

3           Instruction 10 is nature of charges not to be

4   considered.  One of the questions you were asked when we

5   were selecting this jury was whether the nature of the

6   charges itself would affect your ability to reach a fair and

7   impartial verdict.  We asked you that question because you

8   must not allow the nature of a charge to affect your

9   verdict.  You must consider only the evidence that has been

10  presented in this case in reaching a fair and impartial

11  verdict.

12          Instruction 11 concerns inadmissible and stricken

13  evidence.  The lawyers in this case sometimes objected when

14  the other side asked a question, made an argument or offered

15  evidence that the objecting lawyer believed was not proper.

16  You must not hold such objections against the lawyer who

17  made them or the party he or she represents.  It is the

18  lawyer's responsibility to object to evidence that they

19  believe is not admissible.

20          If, during the course of the trial, I sustained an

21  objection to a lawyer's question, you should ignore the

22  question and you must not speculate as to what the answer

23  would have been.

24          If after a witness answered a question, I ruled

25  that the answer should be stricken, you should ignore both

**-4451-**

1    the question and the answer, and they should play no part in

2    your deliberations.

3            Instruction 12 concerns the credibility of

4    witnesses.  In determining whether the government has proved

5    the charges against the defendant beyond a reasonable doubt,

6    you must consider the testimony of all the witnesses who

7    have testified.  You are the sole judges of the credibility

8    of the witnesses.

9            You alone determine whether to believe any witness

10   and the extent to which a witness should be believed.

11   Judging a witness's credibility means evaluating whether the

12   witness has testified truthfully and also whether the

13   witness accurately observed, recalled and described the

14   matters about which the witness testified.

15           You may consider anything that mere judgment

16   affects the credibility of any witness.  For example, you

17   may consider the demeanor and the behavior of the witness on

18   the witness stand, the witness's manner of testifying,

19   whether the witness impresses you as a truthful person,

20   whether the witness impresses you as having an accurate

21   memory, whether the witness has any reason for not telling

22   the truth, whether the witness had a meaningful opportunity

23   to observe the matters about which he or she testified,

24   whether the witness has any interest in the outcome of this

25   case, stands to gain anything by testifying or has

1    friendship or hostility toward other people concerned with

2    this case.

3            In evaluating the accuracy of a witness's memory,

4    you may consider the circumstances surrounding the event,

5    including the time that elapsed between the event and any

6    later recollections of the event and the circumstances under

7    which the witness was asked to recall details of the event.

8            You may consider whether there are any

9    consistencies or inconsistencies in a witness's testimony or

10   between the witness's testimony and any previous statements

11   made by the witness.  You may also consider any

12   consistencies or inconsistencies between the witness's

13   testimony and any other evidence that you credit.  You may

14   consider whether any inconsistencies are the result of

15   lapses in memory, mistake, misunderstanding, intentional

16   falsehood or differences in perception.

17           You may consider the reasonableness or

18   unreasonableness, the probability or improbability of the

19   testimony of a witness in determining whether to accept it

20   as true and accurate.  You may consider whether the witness

21   has been contradicted or supported by other evidence that

22   you credit.

23           If you believe that any witness has shown him or

24   herself to be biased or prejudiced, for or against either

25   side in this trial, or motivated by self-interest, you may

**-4453-**

1    consider and determine whether such bias or prejudice has

2    colored the testimony of the witness so as to affect the

3    desire and capability of that witness to tell the truth.

4    You should give the testimony of each witness such weight as

5    in your judgment it is fairly entitled to receive.

6         Instruction 13 concerns the right of a defendant

7    not to testify.  Every defendant in a criminal case has an

8    absolute right not to testify.  The defendant here has

9    chosen to exercise this right.  You must not hold this

10   decision against him, and it would be improper for you to

11   speculate as to the reason or reasons for his decision.  You

12   must not assume the defendant is guilty because he chose not

13   to testify.

14         Instruction 14 concerns motive.  Motive is not an

15   element of the offenses charged and the government is not

16   required to prove motive in this case.  You may, however,

17   consider evidence of motive or lack of evidence of motive in

18   deciding whether or not the government has proved the

19   charges beyond a reasonable doubt.

20         Instruction 15 concerns multiple counts.  Each

21   count of the indictment charges a separate offense.  You

22   should consider each offense and the evidence which applies

23   to it separately and you should return separate verdicts as

24   to each count.  The fact that you may find the defendant

25   guilty or not guilty on any one count of the indictment

**-4454-**

1    should not influence your verdict with respect to any other

2    count of the indictment.

3        Instruction 16 is about unanimity.  A verdict must

4    represent the considered judgment of each juror, and in

5    order to return a verdict, each juror must agree on the

6    verdict.  In other words, your verdict on each count must be

7    unanimous.

8        Instruction 17 is about the verdict form and

9    explanation.  You will be provided with a verdict form for

10   use when you have concluded your deliberations.  The form is

11   not evidence in this case, and nothing in it should be taken

12   to suggest or convey any opinion by me as to what the

13   verdict should be.

14       Nothing in the form replaces the instructions of

15   law I've already given you, and nothing in it replaces or

16   modifies the instructions about the elements which the

17   government must prove beyond a reasonable doubt.  The form

18   is meant only to assist you in recording your verdict.

19       Instruction 18 concerns exhibits during

20   deliberations.  I will be sending to the jury room with you

21   the exhibits that have been admitted into evidence.  You may

22   examine any or all of them as you consider your verdicts.

23   Please keep in mind that exhibits that were only marked for

24   identification but were not admitted into evidence will not

25   be given to you to examine or consider in reaching your

1    verdict.

2              Instruction 19 is about the selection of a

3    foreperson.  When you return to the jury room, you should

4    first select a foreperson to preside over your deliberations

5    and to be your spokesperson here in court.  There are no

6    specific rules regarding how you should select a foreperson;

7    that is up to you.

8              However, as you go about the task, be mindful of

9    your mission, to reach a fair and just verdict based on the

10   evidence.  Consider selecting a foreperson who will be able

11   to facilitate your discussions, who can help you organize

12   the evidence, who will encourage civility and mutual respect

13   among all of you, who invite each juror to speak up

14   regarding his or her views about the evidence, and who will

15   promote a full and fair consideration of that evidence.

16             Instruction 20 is another instruction to repeat in

17   some ways what I've said before about publicity,

18   communications and research.  I'd like to remind you that,

19   in some cases, and this may be one again, there may be

20   reports in the newspaper or on the radio, internet or

21   television concerning this case.  If there should be such

22   media coverage in this case, you may be tempted to read,

23   listen to or watch it.

24             You must not read, listen to or watch such reports

25   because, again, you must decide this case solely on the

1  evidence presented in this courtroom.  If any publicity

2  about this trial inadvertently comes to your attention, do

3  not discuss it with any other jurors or anyone else.  Just

4  let me or my clerk know as soon as it -- after it happens,

5  if you can, and I will briefly discuss it with you.

6          As you retire to the jury room to deliberate, I

7  also want to wish -- when you do this later, I wish to

8  remind you of an instruction I gave you at the beginning of

9  the trial.  During deliberations, you may not communicate

10 with anyone not on the jury, about this case.  This includes

11 electronic communications such as emails or texts or any

12 blogging about the case.

13         In addition, you may not conduct any independent

14 investigation during deliberations.  This means you may not

15 conduct any research in person or electronically via the

16 internet or in any other way.

17         Instruction 21 is notetaking by jurors.  During

18 the trial, as you know, I've permitted those jurors who

19 wanted to do so to take notes.  You may take your notebooks

20 with you to the jury room and use them during your

21 deliberations, if you wish.

22         As I told you at the beginning of the trial, your

23 notes are only to be an aid to your memory.  They are not

24 evidence in the case, and they should not replace your own

25 memory of the evidence.

**-4457-**

1   Those jurors who have not taken notes should rely

2   on their own memory of the evidence.  The notes are intended

3   to be for the notetaker's own personal use.

4   The next instruction concerns communications

5   between you, the jury and me during your deliberations.  If

6   it becomes necessary during your deliberations to

7   communicate with me, you may send a note by the clerk or

8   marshal, signed by your foreperson or by one or more members

9   of the jury.

10   No member of the jury should try to communicate

11   with me except by such a signed note, and I will never

12   communicate with any member of the jury on any matter

13   concerning the merits of this case except in writing or

14   orally here in open court.

15   Bear in mind also that you are never, under any

16   circumstances, to reveal to any person, not the clerk, the

17   marshal or me, how jurors are voting until after you have

18   reached a unanimous verdict.  This means that you should

19   never tell me, in writing or in open court or otherwise, how

20   the jury is divided on any matter.  For example, 6/6, 7/5,

21   or 11/1 or in any other fashion whether the vote is for

22   conviction or acquittal or on any other in the case.

23   Instruction 23 concerns proof of state of mind.

24   Someone's state of mind ordinarily cannot be proved directly

25   because there is no way of knowing what a person is actually

**-4458-**

1  thinking, but you may infer someone's state of mind from

2  their surrounding circumstances.  You may consider any

3  statement made or acts done or omitted by the defendant and

4  all other facts and circumstances received in evidence,

5  which indicate the state of mind.

6          It is entirely up to you, however, to decide what

7  facts to find from the evidence received during this trial.

8  You should consider all of the circumstances in evidence

9  that you think are relevant in determining whether the

10 government has proved beyond a reasonable doubt that the

11 defendant acted with the necessary state of mind.

12         Instruction 24 concerns the use of the phrase "on

13 or about".  The indictment charges that the offense of Count

14 1 was committed on or about October 14th, 2021; and the

15 offense of Count 2 was committed by or on or about

16 October 18th, 2021.

17         The proof need not establish with certainty the

18 exact date of the alleged offense.  It is sufficient if the

19 evidence in the case establishes beyond a reasonable doubt

20 if the offense was committed on a date reasonably near the

21 date alleged.

22         Instruction 25, this is about the elements of the

23 offense of contempt of Congress charged here.  Counts 1 and

24 2 of the indictment charge the defendant with contempt of

25 Congress for willfully not providing testimony and

**-4459-**

1    information to the U.S. House Select Committee to

2    investigate the January 6th attack on the United States

3    Capitol.

4            Count 1 charges the defendant with the willful

5    failure to provide testimony on October 14th, 2021.  Count 2

6    charges the defendant with the willful failure to produce

7    records by October 18, 2021.

8            As I've already mentioned, the burden of proof in

9    the case lies on the government alone.  It must prove each

10   element beyond a reasonable doubt.  Thus, to find the

11   defendant guilty of contempt of Congress, you must find that

12   as of on or about the dates charged, the government has

13   proved each of the following elements beyond a reasonable

14   doubt:

15           First, that the defendant was subpoenaed by the

16   Select Committee to provide testimony or produce papers.

17   Second, that the subpoena sought testimony or information

18   pertinent to the investigation that the Select Committee was

19   authorized to conduct.

20           Third, that the defendant failed to comply or

21   refused to comply with the subpoena.  And, fourth, that the

22   defendant's failure or refusal to comply was willful.  Some

23   clarifications about the elements are necessary.

24           For the second element, the testimony or

25   information sought by the subpoena must be pertinent.  In

1    order for you to find that the information was pertinent,

2    the government must prove to you beyond a reasonable doubt

3    that at the time the Select Committee issued the subpoena,

4    the testimony or information sought could have related to

5    the Select Committee's investigation in some way.

6           Phrased differently, the government must prove to

7    you beyond a reasonable doubt that there was, at the time

8    the subpoena was issued, some connective reasoning between

9    the topic under inquiry and the information sought.  It does

10   not matter whether the information the defendant allegedly

11   had would have been pertinent to the authorized

12   investigation.  All that matters is that it could have been

13   pertinent at the time that the Select Committee sought the

14   information.

15          For the fourth element, the government must prove

16   to you beyond a reasonable doubt that the defendant acted

17   willfully.  The term willful in this context does not mean

18   that the defendant's failure or refusal to comply with the

19   Select Committee's subpoena was for an evil or bad purpose.

20          The reason or purpose of the failure or refusal to

21   comply is immaterial so long as the failure or refusal was

22   deliberate and intentional.  To be deliberate or intentional

23   means that the failure to comply was not the result of

24   inadvertence, accident or mistake, including a mistake

25   regarding the operative dates or date.

1           It is not a defense to contempt of Congress that

2    the defendant did not comply with the subpoena because of

3    the legal advice he received from his attorney or someone

4    else, because of his understanding or belief of what the law

5    required or allowed or because of his understanding or

6    belief that he had a legal privilege, such as executive

7    privilege, that excused him from complying.

8           Finally, if you find beyond a reasonable doubt

9    that the defendant deliberately and intentionally failed or

10   refused to comply with a subpoena at the time alleged by the

11   government, it is not a defense to contempt of Congress that

12   that defendant later offered to comply or that the Committee

13   later agreed to accept documents or testimony from him.

14          Finally, Instruction 26 is to consider only the

15   crime charged.  You are here to determine whether the

16   government has proved beyond a reasonable doubt that the

17   defendant is guilty of the crimes charged.  The defendant is

18   not on trial for any act, conduct or crime that is not

19   charged in the indictment.

20          As I said, I will have a few short instructions

21   after closing arguments.  But it is now time for closing

22   arguments.

23          So, Ms. Vaughn or Ms. Gaston.

24          **MS. GASTON:**  Good morning.

25          **JURORS:**  Good morning.

**-4462-**

1          **MS. GASTON:**  This case is not complicated but it

2     is important.

3               As Ms. Vaughn told you on Tuesday, this is a

4     simple case about a man, that man, Steve Bannon, who didn't

5     show up.

6               Why didn't he show up?  He didn't show up because

7     he did not want to provide the January 6 Committee with

8     documents.  He did not want to answer its questions.  And

9     when it really comes down to it, he did not want to

10    recognize Congress' authority or play by the government's

11    rules.

12              So why is this case important?  It is important

13    because our government only works if people show up.  It

14    only works if people play by the rules.  And it only works

15    if people are held accountable when they do not.  And in

16    this particular case, when the defendant deliberately chose

17    to defy a congressional subpoena, that was a crime.  Let's

18    talk about that crime.

19              First, let's talk about the Committee.  You saw it

20    laid out in House Resolution 503, which created the

21    Committee.

22              January 6th, 2021 was a dark day in our nation's

23    history.  A mob attacked the United States Capitol, the seat

24    of our federal government.  Rioters did violence to law

25    enforcement officers attempting to protect members of

**-4463-**

1    Congress, to the historic building in which our lawmakers

2    meet and pass legislation and to one of the most prized and

3    unbroken features of democracy in the United States, the

4    peaceful transfer of power.  The handing over of the

5    government from one President to the next.

6          In the wake of that devastating event, Congress

7    sought to make sense of it, learn from it and make sure that

8    it never happens again through legislation and funding.  And

9    for those purposes, it created the Select Committee to

10   investigate the January 6th attack on the United States

11   Capitol.

12         And the Committee got to work.  It did research.

13   It made voluntary requests for information and interviews.

14   And in some circumstances, it issued subpoenas, as is its

15   right under the authority of the Constitution, to require

16   witnesses to produce documents and give sworn answers to the

17   Committee's questions; and that's where the defendant comes

18   in.

19         As you know, years ago, the defendant had worked

20   for Donald Trump in the White House, and the Committee had

21   reason to believe that the defendant was still connected to

22   President Trump at the time of January 6th, 2021.

23         Furthermore, the Committee had reason to believe

24   that the defendant might have information about the events

25   leading up to and on January 6th.  And as you recall from

**-4464-**

1044

1    this cover letter to the subpoena, the Committee sought

2    information about, among other topics, efforts the defendant

3    was said to have engaged in to block the certification of

4    the election.  To block the peaceful transfer of power.

5            Here, the Committee asks about the defendant's

6    potential presence at meetings at the Willard Hotel on

7    January 5th, 2021, during an effort to persuade members of

8    Congress to block the certification.  And it also asked

9    about a public statement he made on January 5th, the day

10   before January 6th, in which he said, "All hell is going to

11   break loose tomorrow."

12           And on September 23rd, 2021, the Committee sent

13   the defendant a subpoena.  This document is not hard to

14   understand.  It tells the defendant what he is required to

15   do and when he is required to do it.  One, produce documents

16   to the Committee on October 7th at 10 a.m.  Two, appear for

17   a deposition at the Committee's offices on October 14th at

18   10 a.m.

19           But the defendant did not want to comply and

20   produce documents, so he didn't.  Between when the defendant

21   accepted the subpoena on September 24th and the document

22   deadline on October 7th at 10 a.m., the defendant and his

23   attorney had no contact with the Committee.  The deadline

24   came and went.  The defendant did not produce a single

25   document.

-4465-

1    Was that a mistake?  No.  That was intentional.

2    That night on October 7th, through his attorney, the

3    defendant sent a letter to the Committee claiming that a

4    privilege completely exempted him from complying with the

5    subpoena.

6    As you heard from Agent Hart, up to that point,

7    the defendant had not even bothered to collect documents

8    responsive to the subpoena.  That was so even though the

9    privilege he was claiming could not possibly cover

10   everything he had.

11   And the next day the defendant made his feelings

12   about the Committee and its subpoena clear when he posted on

13   Gettr that he was defying the Committee to, "stand with

14   Trump."

15   This is the defendant celebrating his defiance,

16   issuing a public statement to reporters, and this shows you

17   that the defendant knew that the subpoena had required him

18   to produce documents; and that he knew he had refused.  This

19   is not a mistake.

20   The Committee wrote back on October 8th, the next

21   day.  And it was clear, his claimed privilege was rejected.

22   First, it reminded him about the document deadline he had

23   missed.  It wrote:  "Regardless of any purported privilege

24   assertion by Mr. Trump, Mr. Bannon has an ongoing obligation

25   to produce documents to the Select Committee."

**-4466-**

1          Next, it reminded him that the subpoena required

2    him to attend the upcoming deposition.  The Committee wrote:

3    "Finally, the Select Committee expects Mr. Bannon's

4    appearance at the time and place designated in the subpoena

5    for a deposition and respond fully to questions by the

6    Select Committee."

7          And finally, the Committee advised the defendant

8    of the consequences if he continued to defy the subpoena.

9    It told him, "His willful noncompliance with the subpoena

10   would force the Select Committee to consider invoking the

11   contempt of Congress procedures in 2 United States Code

12   Sections 192, 194, which could result in a referral from the

13   House to the Department of Justice for criminal charges."

14         And you know that the defendant knew about this,

15   he was on notice about this, because as his lawyer told

16   Agent Hart, the defendant was receiving the communications

17   from the Committee, and he was fully engaged throughout the

18   entire process.

19         On October 13th, the night before the defendant

20   was required to appear for a deposition, his attorney wrote

21   back to the Committee.  He again refused to comply with the

22   subpoena or the Committee's rules, declaring that he would

23   not produce documents or testify until the Committee went to

24   court or coordinated with former President Trump.

25         Let's talk about that for a minute.  The defendant

**-4467-**

1    was not in a position to issue an ultimatum to the

2    Committee.  He was under a legal order to comply with the

3    Committee's rules.

4            Imagine if someone gets a parking ticket here in

5    the District.  He gets to his car and there's a pink piece

6    of paper tucked under the windshield wiper.  He takes the

7    ticket, he reviews the reason he got it.  Well, at that

8    point he has a decision to make.  He can go ahead and

9    comply; that is, pay it.  Or if he thinks he has an excuse,

10   he can give an explanation to the Office of Parking

11   Enforcement.

12           But if the D.C. government rejects his excuse,

13   that is it.  That is the end.  If he doesn't -- he has to

14   pay.  If he doesn't, the fine doubles, his car gets booted

15   or towed.  What he doesn't get to do is just ignore the

16   order to pay it.  He does not get to reject the authority of

17   the D.C. government to order him to do something.

18           But on the day of the deposition, October 14th,

19   that is exactly what the defendant did.  He ignored

20   Congress' lawful order that he appear to answer questions.

21   The defendant refused to show up.

22           One quick aside.  In his opening statement,

23   Mr. Corcoran said that you would not hear evidence that the

24   defendant ignored the subpoena.  And I guess that that is

25   technically true in the sense that he responded to the

1    subpoena with letters saying that he would ignore its

2    requirements.  But when it comes down to it, he ignored what

3    he was being told to do.

4              Back to October 14th.  At that point, the

5    defendant had defaulted -- and that is a fancy word for

6    "refused to comply" -- twice.  He had defaulted on

7    October 7th by ignoring the subpoena's demand for documents

8    and he had defaulted on October 14th by skipping the

9    deposition as the subpoena required, and on October 15th,

10    the Committee told him so.

11              The Committee reminded him that the subpoena had

12    demanded that the defendant produce documents by

13    October 7th, 2021 and appear on October 14th, 2021 for a

14    deposition.  And the Committee told the defendant that he

15    had already broken the law.  It wrote, "Mr. Bannon has now

16    willfully failed to both produce a single document and to

17    appear for his scheduled deposition.  The Select Committee

18    believes that this willful refusal to comply with the

19    subpoena constitutes a violation of federal law."

20              And the Committee told him that it was going to

21    consider referring him for contempt of Congress, that crime;

22    and that if he wanted to clarify anything before the

23    Committee did so, he needed to do so before October 18th at

24    6 p.m.

25              But you know what happened.  October 18th at

**-4469-**

1   6 p.m. came and went, and all the defendant did was send a

2   letter, again referencing the same privilege, trying to

3   stall.

4          And let me just say here, in this opening,

5   Mr. Corcoran promised you that you would see evidence of

6   negotiation of the defendant's lawyer, Mr. Costello, going

7   back and forth with Ms. Amerling and the Committee.  You saw

8   no such thing.

9          You saw for yourself the defendant's attorney's

10  letters to the Committee.  This is the sum total of them.

11  On October 7th, the defendant wrote to the Committee, "We

12  are unable to respond to your request for documents and

13  testimony" and "Mr. Bannon is legally unable to comply with

14  your subpoena requests for documents and testimony."

15         On October 13th he wrote, "Mr. Bannon will not be

16  producing documents or testifying."  And on October 18th he

17  wrote and asked for a one-week adjournment because of an

18  unrelated civil lawsuit.

19         So, in essence, what the defendant told the

20  Committee was, on October 7th, We won't comply.  On October

21  13th, We won't comply.  On October 18th, Can we have more

22  time to tell you that we still won't comply?  That is not

23  negotiation.

24         What the defendant did instead, defy a subpoena

25  and refuse to comply with the rules that Congress has

1    created for responding to it, that is a crime.  That is

2    contempt of Congress; and that's what the defendant is

3    charged with, two counts of contempt of Congress, one for

4    the documents and one for the testimony.

5         Let's go over the elements of contempt of

6    Congress.  You heard them from Judge Nichols just a few

7    minutes ago, and you'll need to find each of these in order

8    to conclude that the defendant is guilty.  And as we'll

9    discuss, the evidence here supports each and every one of

10   them beyond a reasonable doubt.

11        The elements are, first, that the defendant was

12   subpoenaed by the Select Committee to provide testimony or

13   produce papers.

14        Second, the subpoena sought testimony or

15   information pertinent to the investigation that the Select

16   Committee was authorized to conduct.

17        Third, that the defendant failed to comply or

18   refused to comply with the subpoena.

19        And fourth, that the defendant's failure or

20   refusal to comply was willful.

21        We can check off numbers one and three easily.

22   For number one, you know that the defendant was subpoenaed

23   by the Committee to provide both testimony and documents.

24   You have seen the subpoena.  You have heard testimony and

25   seen evidence about the defendant's attorney accepting

1   service of it on his behalf, and you have heard that his

2   attorney provided the subpoena to him.  Check.

3          And for number three, you know that the defendant

4   failed to comply.  That is, he provided neither testimony

5   nor documents.  You know by now that the defendant had

6   defaulted by 10 a.m. on October 7th as to the documents, and

7   by 10 a.m. on October 14th as to the testimony.  And

8   everything else, everything after those dates, that is just

9   more evidence of the defendant's default.

10         So you know, as to Count 1, testimony, the

11  defendant defaulted.  And you know, as to Count 2, the

12  documents, the defendant defaulted.  Check.

13         So for number two, the second element, let's break

14  it down in plain English.  All that means is, was the

15  subpoena asking for information related to the subject

16  matter that the Committee was supposed to be looking at and

17  how do you know that here?

18         Well, the subject matter the Committee was

19  supposed to be looking at is spelled out in its name, the

20  Select Committee to investigate the January 6th attack on

21  the United States Capitol.

22         And then there is House Resolution 503, the

23  legislation through which the Committee was created.  You

24  saw that and know that the Committee was created to look

25  broadly at the events leading up to and occurring on

1    January 6th.  And you know from Ms. Amerling's testimony,

2    from the letters that the Committee sent to the defendant,

3    and from the subpoena itself, those 17 items, that the

4    Committee believed that the defendant had information

5    pertinent to or related to that mission.

6           And as Judge Nichols also described to you, all

7    that matters here is that the information could have been

8    pertinent at the time that the Select Committee sought it;

9    that's the second element.  Check.

10          And that brings us to the fourth and final

11   element, willfulness.  Judge Nichols just instructed you and

12   told you that it means that the defendant's noncompliance

13   with the subpoena was deliberate and intentional, in other

14   words, on purpose.

15          It means that he knew he was commanded to appear

16   and he chose not to, for whatever reason.  It just means

17   that the defendant's noncompliance was not the result of an

18   accident or a mistake, like if he got the date wrong or the

19   time wrong or the location wrong.

20          A person acts willfully when he makes a choice to

21   do or not do something.  And as Judge Nichols told you, the

22   reason for that choice does not matter.  Here, it does not

23   matter if the defendant refused to comply because his lawyer

24   advised him so or if he believed that former President Trump

25   had asserted executive privilege.

1          Let me repeat that.  As long as the defendant knew

2    that he had been commanded by the Committee's subpoena to

3    produce documents and give testimony and chose not to, his

4    belief that he had a good excuse not to comply does not

5    matter; that is not a defense to contempt.

6          And let me just say, it may seem strict that the

7    defendant had to comply with the subpoena no matter what and

8    assert any privileges in the way Congress has set forth.  It

9    is strict for a reason.  Because, in order for the

10   government to function, citizens need to follow its rules

11   and, yes, recognize the government's authority.  It may not

12   always be fun.  Think back to the example of the parking

13   ticket.  But it is how we all live together in society.

14         If people could just ignore parking tickets

15   without consequences, we wouldn't be able to get anywhere

16   because of illegally-parked cars in the way.  If people,

17   like the defendant, can choose to ignore the government's

18   subpoenas, the important work of government to serve its

19   people cannot get done.  The Committee would be stalled in

20   its efforts to use legislation and funding to stop something

21   like January 6th from ever happening again.

22         As you know from all of the evidence in this case,

23   the defendant chose to refuse to produce documents and to

24   skip the deposition.  This was no mistake.  He did not go to

25   the wrong room in the House Office Building or send the

1    documents to the wrong email address.  Instead, the

2    defendant made a deliberate decision not to comply, and

3    that, ladies and gentlemen, is contempt.  That is a crime.

4        You know that the defendant acted willfully

5    because he told the Committee so repeatedly in letters.  In

6    all of his letters in front of you, you see the reason he

7    chose not to produce a single document or appear for

8    testimony, a privilege that he claimed the former President

9    gave him.  There is no accident there.

10        And the defendant chose to persist in that alleged

11    privilege, even after being told by the Committee that it

12    did not apply and after being warned that he could be

13    charged with a crime.  The defendant chose allegiance to

14    Donald Trump over compliance with the law.

15        He never changed course; not when the Committee

16    rejected his claimed privilege on October 8th; not when the

17    Committee warned him about contempt; not when the Committee

18    followed through and voted him in contempt; and not when the

19    full House referred him for prosecution.

20        If the defendant's default were because of a

21    mistake or accident, if we were talking about confusion

22    about a deadline, don't you think he would have spoken up

23    the moment he realized it?  That he would have informed the

24    Committee that he would have rushed in to clear things up

25    and comply?

**-4475-**

1          Look at letter after letter that the Committee

2     sent advising the defendant that, because he had missed the

3     dates, he might and ultimately would be referred for

4     prosecution.  You don't ignore those by mistake.  This was

5     no accident.

6          And let's talk for one last minute about what else

7     is not a mistake or an accident.  It is not a mistake or

8     accident to default on a subpoena because you don't take it

9     seriously or consider the subpoena's demands to be optional.

10    It is not a mistake or an accident to default on a subpoena

11    because you failed to anticipate that the Congress would

12    reject your stalling tactics.

13         So if the defense is trying to tell you that the

14    defendant thought that the dates on the subpoena,

15    October 7th and October 14th, the ones in black and white on

16    the face of that document, were not hard deadlines, please,

17    don't fall for that.

18         And if the defense is trying to blame the Congress

19    for refusing to negotiate with the defendant, whose idea of

20    negotiation is that the defendant gets to refuse and

21    Congress has to accept it, you can give that exactly as much

22    consideration as it is worth.  None.

23         We are here because the defendant had contempt for

24    Congress.  This is a situation in which the name of the

25    crime tells you everything you need to know.  Contempt.  The

1    dictionary tells us that contempt is the feeling that a

2    person or thing is beneath consideration, worthless or

3    deserving scorn.

4            The defendant here disdained Congress.  He thought

5    it was beneath him and, as a result, he chose to defy the

6    Committee.  He did not show up.

7            Lastly, in his opening and through his questioning

8    of witnesses, Mr. Corcoran has tried to tell you that this

9    case is about politics.  But the only person who is making

10   this case about politics is the defendant, and he is doing

11   it to distract and confuse you.  Don't let him.

12           There is nothing political about finding out why

13   January 6th happened and how to make sure that it never

14   happens again.  And there is nothing political about

15   enforcing the law against someone who, like the defendant,

16   flouts it.

17           You may feel that you have been asked to spend

18   your time during jury selection and these proceedings on

19   something that is small, a technical violation, something

20   that is not important.  That could not be further from the

21   truth.

22           Your decision to fulfill your civic jury duty, to

23   come to this courthouse and listen attentively to the

24   evidence and the Court's instructions and momentarily to

25   engage in thoughtful deliberations, that is an act of

**-4477-**

1    service to your country, and it is foundational to the rule

2    of law.

3            In his opening, Mr. Corcoran said that we're all

4    in this together in our country.  He is right.  We are all

5    participants in shared democracy.  But the defendant does

6    not agree.  He has contempt for our system of government,

7    and he does not think he has to play by its rules.

8            He had contempt for the Committee's need for

9    information about January 6th.  And when faced with a clear

10   decision whether to comply with the congressional subpoena

11   seeking information about January 6th and to ensure that

12   nothing like it happens again, the defendant chose defiance.

13   Find him guilty.

14           **THE COURT:**  Is the defense ready?

15           **MR. CORCORAN:**  Yes, Your Honor.

16           **THE COURT:**  Please.

17           **MR. CORCORAN:**  Thank you, Your Honor.

18           Good morning.

19           **JURORS:**  Good morning.

20           **MR. CORCORAN:**  None of us will soon forget January

21   6, 2021.  It's part of our collective memory.  But there's

22   no evidence in this case that Steve Bannon was involved at

23   all.  For purposes of this case, we have to put out of our

24   thoughts January 6th, because it's a case about a subpoena

25   and whether a man committed a crime in his actions with

1    regard to that subpoena.

2        Steve Bannon is innocent of the crimes with which

3    he is charged.  I told you that at the very beginning and

4    now you've seen the evidence.  And I'm going to explain why

5    the evidence shows that he is innocent.

6        Ms. Gaston spoke a little bit about the beginning

7    of the case and a letter that accompanied the subpoena and

8    the interest to speak to Mr. Bannon.  You heard the witness

9    who testified, Ms. Amerling, and she spoke about the

10   newspaper article she read and the book that she read and

11   the idea that, on his show, he said the day before

12   January 6th that he predicted that all hell would break

13   loose.  What she also said, of course, is that every major

14   media outlet in the country, every show on January 5th

15   predicted the same thing.

16       A subpoena, nonetheless, was prepared eight months

17   later.  I think it's important, at the very outset, for all

18   of us to understand that, even if you think in hindsight

19   that the path that Mr. Bannon took and the path that his

20   lawyer took, Mr. Costello, turned out to be a mistake, it

21   was not a crime.  It was not a crime.

22       You'll see on Page 27 of the instructions when you

23   get to them, there is a key sentence.  And it says, "If you

24   made a mistake, it's not a crime."  Essentially that's the

25   case.

1          I know you're going to find that the government

2   has not proved its case, and it has to prove its case beyond

3   a reasonable doubt.  What is a reasonable doubt?  It's a

4   doubt based on a reason.  If there is a reasonable doubt,

5   you must find Steve Bannon not guilty.

6          What are some examples of things -- of evidence in

7   the case that will give you pause for which you'll have a

8   reason to doubt that the government has proved its case?

9          Well, one of the things is this:  Ms. Amerling

10  testified that these are the rules that govern -- the

11  regulations that govern the use of deposition authority in

12  the 117th Congress, which is this Congress.

13          And, of course, there's a lot of legalese in this

14  document, but important to our consideration is this,

15  Paragraph 11, which says, "A witness shall not be required

16  to testify unless the witness has been provided with a copy

17  of Section 3(b)" --

18          **MS. GASTON:**  Objection, Your Honor.

19          **THE COURT:**  Overruled.

20          **MR. CORCORAN:**  -- "of H.Res. 8, 117th Congress,

21  and these regulations."

22          What did Ms. Amerling say?  She said to her

23  knowledge, Steve Bannon was not provided with Section 3(b).

24          **MS. GASTON:**  Objection, Your Honor.

25          **THE COURT:**  Mr. Corcoran, I'd like to tie this to

1    an issue that's actually in dispute.

2              **MR. CORCORAN:**  Yes, Your Honor.

3              That is a reason for you to doubt the prosecutor's

4    case.  You must find Steve Bannon -- you must give Steve

5    Bannon --

6              **MS. GASTON:**  Objection.

7              **MR. CORCORAN:**  -- the benefit of the doubt.

8              **THE COURT:**  Sustained.

9              **MR. CORCORAN:**  You must give Steve Bannon -- I'm

10   sorry, Your Honor.

11             **MS. GASTON:**  Your Honor, we request a sidebar

12   please.

13             **THE COURT:**  Yes.

14        (Sidebar discussion.)

15

16

17

18

19

20

21

22

23

24

25

1061





1   (Sidebar discussion concluded.)

12        **MR. CORCORAN:**  Let me talk about another issue on

13  which I believe you can doubt the government's case.

14  Ms. Amerling, who you spoke with, testified that a subpoena

15  is not valid unless it was signed by the Chairman of the

16  Committee.  This should raise a doubt about the

17  prosecution's case.  Let me show you.

18        (Brief pause.)

19     This is Government's Exhibit 5, which is a letter

20  purportedly from Chairman Thompson to Bob Costello.  If you

21  look at the last page of that letter, that is

22  Chairman Thompson's signature.

23            This is Government's Exhibit No. 7, a letter from

24  Chairman Thompson to Bob Costello, Mr. Bannon's lawyer.

25        (Brief pause.)

1063

1          That is the last page of the letter with

2    Chairman Thompson's signature.

3          (Brief pause.)

4          This is a one-page letter, Government's Exhibit

5    No. 9, and that is Chairman Thompson's signature.

6          (Brief pause.)

7          This is a subpoena in the case, the one that

8    Ms. Amerling testified had to be signed by the Chairman,

9    Mr. Thompson; that is the signature on the subpoena.

10         And you can ask yourself if one of those things is

11   different than the other.  Because that could be a doubt, a

12   doubt as to the government's case.  A reasonable doubt as to

13   whether Chairman Thompson signed the subpoena.

14         And if you wonder whether the signature is

15   legit --

16         **MS. GASTON:**  Objection, Your Honor.

17         **THE COURT:**  Sidebar again.

18         (Sidebar discussion.)

19         ██████████    ████████████

20         ██████████    ████████████████████████

21   ████████████████████████████████

22         ██████████  ████████████████████████

23   ████████████████████████████████████

24   ████████████████████████████████████

25   ██████████████████████████████████████

**-4484-**



1

2

3

4

5       (Sidebar discussion concluded.)

6            **MR. CORCORAN:**  Thank you, very much, Your Honor.

7            Now, when you're considering whether the

8  government has proved its case beyond a reasonable doubt,

9  one of the key things that you'll have to think about is the

10  testimony of the witnesses that you heard and their

11  credibility.

12          You heard the instructions and you'll have them

13  with you back when you deliberate, and the instructions say

14  that in determining whether the government has proved the

15  charges against the defendant beyond a reasonable doubt, you

16  must consider the testimony of all the witnesses who have

17  testified.

18          You're the sole judges of the credibility of

19  witnesses.  You alone determine whether to believe any

20  witness and the extent to which a witness should be

21  believed.

22          One of the key things to get and to consider --

23  and, again, I'm just referencing what has been instructed to

24  you and what you'll have back in the jury box -- but for

25  this case, you need to consider whether a witness has an

1    interest in the outcome of the case.  And you need to

2    consider whether a witness has a friendship or hostility

3    towards anybody connected with the case; that's something

4    that you need to consider when you're thinking about that

5    testimony.

6         Does Ms. Amerling -- does Ms. Amerling have an

7    interest in the outcome of the case?  Of course she does.

8    She has been doing Committee work for democratic members of

9    Congress for 20 years.  Does she seem like somebody who is

10   used to getting their way?  We've all encountered people in

11   positions of power who demand that you do things their way.

12   We've all encountered that.

13        She testified that the Select Committee had

14   interviewed more than 1,000 witnesses.  So there's a

15   question, Why?  Why was Steve Bannon singled out?

16        In her 20 years, Ms. Amerling had never been a

17   witness in a criminal contempt of Congress case.  Twenty

18   years.  This is the only time, when she testified yesterday

19   and the day before, in 20 years that she had ever been the

20   witness in a criminal contempt of Congress case.

21        Are we to believe that no subpoena recipient in

22   20 years has raised a legal objection?  Are we to believe

23   that no lawyers involved in the scheduling or the scope of a

24   deposition have ever come to loggerheads so they couldn't

25   resolve it?  She testified that she's been involved with

1       every single subpoena issued by a Select Committee, dozens

2       and dozens of them.

3                The letters back and forth in this case between

4       the Committee and Bob Costello, a handful of letters that

5       you'll have back in the jury room.  The government wants you

6       to believe that that's a paper trail to a crime.  Look at

7       those letters.  That's not a paper trail to a crime.  It's

8       two lawyers communicating and trying to negotiate over a

9       legal issue.

10               The key is that the negotiations over the dates of

11      the subpoena, October 7th and October 14th, those dates were

12      placeholders.  Placeholders.

13               Politics.  I asked you at the start of the case,

14      just as you listen to the evidence, as you look at the

15      documents, ask yourself, Is it in any way affected by

16      politics; and that's your decision.  Because there's a

17      question, Why did Ms. Amerling rush to judgment on Steve

18      Bannon?  Why?

19               We know there was no need for a rush.  She said

20      again and again, there was an urgency.  But what do we know?

21      That was back in October of 2021.  The Committee is still

22      doing its work and will continue its work until the end of

23      this year.  More than a year and several months were

24      available to work through the privilege objection that was

25      raised so that he could testify.

1        How do we know she rushed to judgment?  Well, she

2  told you -- she told you herself that she filled out the

3  proof of service of the subpoena.  It's Government's Exhibit

4  Page 2, and the second page.  She told you that she filled

5  it out.

6        And if you look, if you look at the date -- first

7  look at the top where it says Proof of Service and then

8  that's her signature, as she testified, and the date.  So

9  she filled out the proof of service before it was served.

10  And I asked her that, I said, And the proof of service is

11  the page that is intended to prove when service of the

12  subpoena is accomplished.  Correct?

13        Answer:  That's correct.

14        Question.  Okay.  You filled out this proof of

15  service before service was accepted.  Correct?

16        That's correct.

17        Why fill out the proof of service before it's even

18  accomplished?  That's a reason, that's a reason for you to

19  doubt the government's case.  And you must give Steve Bannon

20  the benefit of the doubt and find him not guilty.

21        You might ask yourself, Why?  Why did Ms. Amerling

22  want to make an example of Steve Bannon?  Well, what does

23  the evidence show?  He was a top advisor to President Trump.

24  He has a show, podcast on political topics that has a very

25  large following.  And it's an election year.

1   What do we know?  You're going to judge the
2   credibility of the witnesses.

3   What do we know about Ms. Amerling's testimony
4   based upon her being on the stand here in court?  Her
5   demeanor on the stand captures the essence of this case.
6   Did she listen with an open mind or did she just want things
7   to go her way?

8   Her testimony in court precisely mirrored the
9   interactions that she had with Bob Costello, Mr. Bannon's
10  lawyer.  The way that she conducted herself in the
11  courtroom, in a nutshell, were exactly the way, exactly the
12  way, she conducted herself in dealing with Mr. Bannon's
13  lawyer, Bob Costello.  Exactly.  That explains why we're
14  here today.  She didn't listen to Steve Bannon's reasonable
15  request.  Can you try to reach an agreement with President
16  Trump, and I'll testify before the Committee like I've done
17  before other congressional committees?

18  Can you bring the privilege issue in a civil case
19  to a judge and get it resolved?  I will abide by the Judge's
20  rules.

21  Can we take a week to consider new -- a new thing
22  that just happened, the filing of a lawsuit on executive
23  privilege?  Can we just have a week?

24  This case is not, as the prosecutor said, about
25  the need for people to play by the rules.  This is about

1    Ms. Amerling saying, People need to play by her rules.

2            And the real question I think -- or one question

3    anyway is, did Chairman Thompson even get to consider these

4    questions, the reasonable ideas that were put forth so that

5    Mr. Bannon could testify?

6            When I asked Ms. Amerling about it, I said, "Did

7    Chairman Thompson communicate with President Trump or his

8    representatives to try to explore getting rid of executive

9    privilege so Mr. Bannon could testify?"

10           There was an objection.  There was a ruling.

11           "The witness:  Okay.  Thank you, Your Honor."

12           The answer is, No.  He didn't even consider that

13   option.

14           What other parts of Ms. Amerling's testimony

15   raised questions?  Well, you may remember I talked to her

16   about the subpoena and the 17 boilerplate topics.  And I

17   said, Look, is that boilerplate included with the subpoenas

18   that go out to all the other recipients?  And she said --

19   she responded like it was a national secret.  She said, "I

20   can't give you a roadmap to that."

21           If a witness is evasive, you've got to use that in

22   assessing her credibility, and you've got to question her

23   testimony.  And it took cross-examination for her to admit

24   that she had no personal knowledge at all.  No direct

25   personal knowledge at all that Steve Bannon had even one

1    single document that was responsive to this case, and yet

2    she wants him charged with a crime.

3         I asked again and again about the subpoena and the

4    different letters back and forth.  Who wrote this?  What

5    human being picked the dates of October 7th and 14th?  Why?

6    Why those dates?  It is a straightforward question which she

7    didn't want to answer.

8         On cross-examination I asked her the most basic

9    question about the October 14th date for testimony.  The

10   government says it's a firm date and that's why Mr. Bannon

11   committed a crime.  I asked her the most basic question:

12   "Do you have direct knowledge sitting here today who

13   selected October 14th, 2021 as the date for Mr. Bannon to

14   testify?  Who?"  What was her answer?

15        "To the best of my recollection, because of the

16   multiple roles that we understood Mr. Bannon potentially had

17   with respect to the events of January 6th, at the time that

18   we put the subpoena together, there was a general interest

19   in obtaining information from him expeditiously because we

20   believed that this information could potentially lead us to

21   other relevant witnesses or other relevant documents or

22   perhaps inform the Committee about avenues that it shouldn't

23   go down.  So to the best of my recollection there was a

24   general interest in including deadlines that required

25   expeditious response."

1    I just asked who.  The entire foundation for the

2    government's case rests on Ms. Amerling.  We have been here

3    for a week and there were two witnesses.  If her testimony

4    gives you a reason to doubt whether the government has

5    proved its case, you have to give Steve Bannon the benefit

6    of the doubt.

7    Now, another thing about Ms. Amerling is her

8    relationship with the prosecutor.  It raises questions.  She

9    has a relationship -- Ms. Amerling has a relationship with

10   one of the prosecutors in the case, Ms. Gaston.  It goes

11   back 15 years.

12   Ms. Amerling's been, throughout her career, a

13   staff member aligned with one political party.  She's served

14   democratic members of Congress her entire career, and she's

15   contributed her own money to democratic causes.  You heard

16   that Ms. Gaston, the prosecutor, and Ms. Amerling have known

17   each other for 15 years.  You've heard that they worked

18   together under a democratic member of Congress.

19   You heard that their relationship goes beyond

20   that, that they socialized outside of work, that they were

21   members in a book club, and the book club consisted of

22   people who all worked, at one time or another, for a

23   democratic member of Congress.

24   Make no mistake, I'm not against book clubs.  I'm

25   not against book clubs.  But why did Ms. Amerling try to

1    downplay her connection to the prosecutor?

2           You heard Agent Hart.  You heard him testify.  He

3    was an FBI agent investigating the case.  And you heard him

4    say that it was important to him to know whether, when he's

5    investigating a crime and he's talking to somebody who says,

6    Hey, a crime was committed, whether that person has any

7    bias.

8           And you heard what she did not tell in her

9    November 2nd, 2021 interview with Agent Hart, where the

10   prosecutors were present that she had a personal

11   relationship with the prosecutor.

12          Why?  Why is she trying to hide her personal

13   connection to the prosecutor from the FBI?  That's a serious

14   question.  And she acknowledged that sometimes the book club

15   members discussed political events of the day.  And it's not

16   surprising.  I mean, they all had a shared background in

17   that they worked under a democratic Congress.

18          The thing about bias is that sometimes people

19   become blind to it.  As the Court said just a moment ago,

20   there could be a bias in somebody that they're not aware of.

21          Ms. Amerling worked for 20 years for one political

22   party in a political arena, Congress, where there are

23   constant fights, political fights.  Over time, drop by drop,

24   it builds up.  It may be that Ms. Amerling, herself, can no

25   longer see how her long-time career for one political party

1    affects her.

2          But you've got to see it, and that's why I ask you

3    to consider whether any testimony or evidence was affected

4    by politics.  Why is it important?  Fairness and neutrality.

5          Let me give you an example.  God forbid a family

6    member dies and you have to figure out somebody who's going

7    to help settle the estate.  You decide, all right, let's get

8    a neutral mediator to look at this and we'll decide how to

9    split things up, whatever it is, and see who gets what

10   fairly and neutrally.  And it goes on for months and months

11   and months, and everybody involved, or almost everybody,

12   thinks that it's a fair process.

13         Then you learn that one of the people who stands

14   to gain under that estate and the person you thought was the

15   neutral mediator had known each other for 15 years and were

16   in the book club together.  That's going to cause you to

17   have a real doubt about the fairness and the neutrality.

18   That would make you question whether they're impartial, and

19   that's a reasonable doubt.

20         If this issue involving the relationship between

21   the prosecutor, as it should, gives you pause, gives you a

22   doubt, you must give Steve Bannon the benefit of the doubt.

23         There are no second chances when we're dealing

24   with a criminal case.  There are no second chances.  If you

25   have a doubt a year from now, one year from now, and you say

1    to yourself, Wait a minute, I sat on a jury that voted to

2    convict a defendant in a criminal case where the chief

3    witness and the prosecutor had known each other for 15

4    years, you might have a doubt.  A year from now will be too

5    late.  You've got to consider the doubts it could have

6    today.  And if you've got a doubt in your mind, you have to

7    give Steve Bannon the benefit of that doubt.

8         What's another thing about Ms. Amerling's

9    testimony that raises questions, serious questions?  Why did

10   she play down her political affiliations when she spoke to

11   the FBI?  Why did she play them down?  She was asked in her

12   November 2nd, 2020 -- I'm sorry, 2021 interview about the

13   Committee.  And she said that she was non-partisan.  That's

14   what she told the FBI.

15        Here's the question:  "Now, when you were

16   interviewed by the FBI on November 2nd, 2021, you told the

17   FBI agent that you and other members of the staff were

18   non-partisan, didn't you?

19        "Answer:  That's correct."

20        That's what she said, non-partisan.  What does

21   non-partisan mean?  Well, it means free from party

22   affiliation.  Why would she downplay her party affiliation?

23   Wait a minute.  She's worked for 20 years for only one

24   political party.  She's contributed her own money to

25   political candidates of one party.  That's the definition of

1   being affiliated with a party.  That's not non-partisan.

2              Did Steve Bannon commit a crime?  He didn't

3   intentionally refuse to comply with the subpoena.

4   Absolutely not.  He didn't refuse to comply with anything.

5   He clearly and repeatedly, through his lawyer, Bob Costello,

6   said, Let's remove the obstacle to my coming and testifying.

7   Let's get rid of the obstacle of executive privilege and

8   I'll testify as I've done on several occasions before

9   Congress.

10             Let me show you just one example of a letter.

11  This is a letter -- and it's Government's Exhibit 6, from --

12  it's to the Chairman of the Committee, Mr. Thompson.  The

13  date is 13th of October, 2021, the day before the government

14  says Mr. Bannon committed a crime.

15             Then look at this paragraph that's highlighted.

16  This is Government's Exhibit 6.  It said, "Mr. Bannon has

17  testified on three prior occasions before the Mueller

18  Investigation, the House Intelligence Committee and the

19  Senate Intelligence Committee.  In each of those instances,

20  when President Trump waived his invocation of the executive

21  privileges, Mr. Bannon testified."

22             What does Mr. Costello suggest?  Two different

23  tracks.  Either -- you can read this letter when you get

24  back in the jury box.  And this is, again, Government's

25  Exhibit 6.

**-4497-**

1           It offers two solutions:  Number one, talk to

2      President Trump and get him to waive executive privilege as

3      he's done before, and I've testified before when he's done

4      so, or take it to a judge and have it resolved in a civil

5      context and I'll comply.

6           That's what Steve Bannon said.  Is that a refusal?

7      Is that contemptuous?  Of course not.  It's saying, Remove

8      an obstacle and I'll testify.

9           The dates in the subpoena were placeholders,

10     essentially.  You heard that, in these instances where a

11     subpoena is sent to a recipient and dates are provided for

12     documents or testimony, there's a lot of negotiation that

13     follows; and that often the person testifies long after the

14     dates in the subpoena.  In other words, there's no magic to

15     those dates.

16          And you know when I asked Ms. Amerling again and

17     again, Why those dates?  Why those dates?  All she could say

18     was -- well, she didn't know really.  She really didn't know

19     or who picked the dates.  The fact of the matter is the

20     dates on the subpoena are still on the subpoena.  They're

21     still under negotiation.

22          Now, you're going to have in the jury room the

23     instructions and you've heard the Judge instruct you on the

24     law.  You'll see that, when the instruction talks about the

25     elements of the offense, it says, this is not a defense,

**-4498-**

1       this is not a defense, et cetera, et cetera.

2               Just to be clear, we didn't put on a defense in

3       this case.  It's the government's burden of proof.  So we're

4       not putting any letter or anything on as a defense in the

5       case.  So that language about this defense doesn't apply,

6       et cetera, et cetera, we've been here for a week and we

7       heard two witnesses.  We didn't feel a need to put on a

8       defense.

9               But the letters, the recent letters from President

10      Trump to Bob Costello for the Committee, saying, Look,

11      President Trump has agreed to withdraw executive privilege.

12      Let's talk about when we can have him testify.

13              You'll see that there is this response back.  This

14      is Defense Exhibit 32.  We were the ones who had to bring

15      this to your attention, not the government.

16              But on July 14th, not long ago, for certain, Bob

17      Costello writes to the Chairman -- I'm sorry, the Chairman

18      writes to Bob Costello responding to a letter that he sent

19      on January 9th. And he says, essentially, Great.  Now

20      you're willing to comply.  I understand that executive

21      privilege has been waived.  And what does he say?  Give us

22      the documents, and then we'll schedule the deposition.

23              What did it say right here, this sentence?  "We

24      anticipate that the deposition will occur in the near

25      future."  What does that tell you?  This is the very same

1    subpoena that we're talking about.  The very same subpoena

2    that we're talking about is still under negotiation.

3        The prosecutor says these letters don't matter

4    because Steve Bannon should have come back, should have come

5    in to testify even though we charged him with a crime.

6        The prosecutor in questioning yesterday said, Hey,

7    wait a minute.  Didn't Mr. Bannon try to dismiss the charges

8    against him?  Well, of course, when a criminal case is

9    pending against you, you've got to deal with that case.

10   You've got to deal with that case.

11       And, of course, Mr. Bannon was not in a position

12   to testify.  He could not have testified until he received

13   and learned that President Trump had agreed --

14   **MS. GASTON:**  Objection, Your Honor.

15   **THE COURT:**  Overruled.

16   **MR. CORCORAN:**  And this is Defendant's Exhibit 30.

17       Again, it was the defense who showed you these

18   letters and introduced these letters, but this is a July 9th

19   letter from President Donald J. Trump to Steve Bannon.  It

20   says, "I write about the subpoena that you received."

21       He says, "When you first received the subpoena to

22   testify and provide documents, I invoked executive

23   privilege."

24       And he says, "Therefore, if you reach an agreement

25   on a time and a place of your testimony, I will waive

1    executive privilege for you, which allows you to go in and

2    testify truthfully and fairly."

3         The prosecutor says, Why didn't he come in in

4    October, November, December, et cetera, et cetera?  Well,

5    this letter removed the obstacle in July.  And it's an

6    important question to consider.

7         Look, you're being asked to find somebody guilty

8    of a crime.  You are being asked to find somebody guilty of

9    a crime of contempt of Congress with respect to a subpoena,

10    when his testimony on that subpoena may occur in the near

11    future.  That's not me saying it.  It's Chairman Thompson.

12         Again, Defendant's Exhibit 32, which is a letter

13    to Bob Costello from Chairman Thompson.  What does it say?

14    Right here.  "We anticipate that the deposition will occur

15    in the near future."

16         "We anticipate that the deposition will occur in

17    the near future."  The prosecutors are asking you to find

18    Mr. Bannon guilty of a crime when he may testify in the near

19    future on the subpoena that they're trying to say that he

20    committed a crime on.

21         Look, the prosecutors are basically saying, You've

22    got no choice.  But you do have a choice.  Our system gives

23    you the power to decide the evidence, not the prosecutors.

24    And they can't order you to do anything.

25         How can you find that Steve Bannon intentionally

1    and willfully committed a crime when he acted honestly to

2    protect his privilege.

3            Think about this example.  Some time ago, you

4    received in the mail a letter asking you to come to court

5    for your jury service.  Imagine --

6            **MS. GASTON:**  Objection, Your Honor.

7            **THE COURT:**  Overruled.

8            **MR. CORCORAN:**  Imagine, when you received the

9    letter, you realized you couldn't appear in court on that

10   date.  Just impossible.  Got a lawyer.  The lawyer presented

11   your objection.  Perhaps the lawyer just asked for an

12   additional week.  What was your intent at that date?  What

13   was your intent?  Because that's what's really being asked

14   of you, What was Steve Bannon's intent?

15           In your mind, you're not refusing to comply.

16           **MS. GASTON:**  Objection, Your Honor.

17           **THE COURT:**  Ms. Gaston, you presented a

18   hypothetical about a parking ticket.  He's presenting a

19   hypothetical about a summons.

20           **MS. GASTON:**  Sidebar, Your Honor.

21           **THE COURT:**  Sure.

22       (Sidebar discussion.)

23   ████████████    ████████████████████████████████

24   ████████████████████████████████████████

25       ████████████    █████████████████████████







13    (Sidebar discussion concluded.)

14         **MR. CORCORAN:**  Thank you, Your Honor.

15         So the question is, in that hypothetical situation

16    where the person has received a summons, knows they cannot

17    appear on that date, asks that an objection be raised, what

18    is in the mind of that person?  And what's in the mind of

19    the person is they're not committing a crime.  They're

20    trying to resolve and remove an obstacle.

21         Now, you might think to yourself, you know, in

22    hindsight maybe Mr. Bannon should have taken a different

23    path.  Hindsight's 20/20.

24         You might think, You know what?  I kind of think

25    it was a mistake for him and his lawyer to try to protect

1    his privilege, but --

2              **MS. GASTON:**  Objection, Your Honor.

3              **THE COURT:**  Sustained.

4              **MR. CORCORAN:**  The Court will instruct you about

5    the law on intent, already has, and you'll have that back in

6    the jury room.  And what you'll have are the instructions on

7    Page 27.  And I want to focus you on one sentence.  One

8    sentence from that instruction, which is critical.  It says,

9    "To be deliberate or intentional means that the failure to

10   comply was not the result of inadvertence, accident or

11   mistake."

12             If you find that Mr. Bannon made a mistake in the

13   path he chose, he's not guilty.  You cannot find him guilty.

14             Most mornings before work I have a cup of coffee

15   and I listen to the radio.  A bit old-fashioned.  But

16   through the years, I have heard reports from other countries

17   about their elections.  The people in power try to take

18   steps to put -- to silence the opposition.  When I hear

19   that, I think to myself, Thank God it doesn't happen in this

20   country.

21             Right now the Presidency, the Senate and the

22   Congress are in the hands of one party, the Democrats --

23             **MS. GASTON:**  Objection, Your Honor.

24             **THE COURT:**  Sustained.

25             **MR. CORCORAN:**  That's okay.  It's okay to have

1    political views that are different from others.  We come to

2    our views, each of us, honestly.  Some of the things that

3    control those views we have no control over:  Where we're

4    born.  When we're born.  What family our family is, and what

5    we're exposed to over life.  We come to our political views

6    honestly.

7            But no one in this country should face a criminal

8    prosecution --

9            **MS. GASTON:**  Objection.

10           **MR. CORCORAN:**  -- that's based in any way on

11   politics.

12           **THE COURT:**  Sustained.

13           **MR. CORCORAN:**  That's why I asked you at the start

14   of the case to listen carefully to the evidence.

15           Five or ten years from now, you'll look back and

16   you'll know that you upheld an essential principle in our

17   country; prosecution has to be based on unbiased, neutral

18   evidence.  Politics can play no role.  It's important.  We

19   are all in this together.

20           And Steve Bannon is innocent.

21           Thank you, Your Honor.

22           **THE COURT:**  Thank you.

23           **MS. VAUGHN:**  Your Honor, can we have a 15-minute

24   break?

25           **THE COURT:**  Yes, I think that would be useful for

1    various reasons.  Why don't we say 10 minutes.  Two minutes

2    is pretty quick.  It's 11:04.  Let's say 11:15.

3              We are in recess.

4         (Recess was taken from 11:04 a.m. to 11:15 a.m.)

5         **THE COURT:**  Is the government ready?

6         **MS. VAUGHN:**  Yes, Your Honor.

7              (Jury entered the courtroom.)

8         **MS. VAUGHN:**  Ladies and gentlemen, the defense

9    wants to make this hard, difficult, confusing.  They want

10   you to wonder, What am I missing here?  When a subpoena says

11   October 7th, does it really say October 7th?

12             You're not missing anything.  This is not

13   difficult.  This is not hard.  There were two witnesses

14   because it's as simple as it seems.

15             Your eyes aren't deceiving you about what is in

16   black and white on paper.  How much clearer could that

17   subpoena have been?  "You are hereby commanded under the

18   authority of the U.S. government to tell us what you know

19   about January 6th."  How much clearer could the Committee's

20   letters have been?  Your excuse is no excuse.  You must

21   comply.

22             The defendant didn't fail to comply because he

23   thought there was play in the joints.  He chose not to

24   comply.  He made a deliberate decision not to comply.

25   Because he didn't want to.

1          How much clearer could he have been than this.  On

2    his social media on October 8th, he yelled it from the

3    mountaintop.  I don't see anywhere in here where it says, I

4    think the Committee gave me a couple more weeks.  I think

5    the Committee is going to give me a pass because of this

6    privilege my friend, former President Donald Trump, has

7    given me.  It says he will not comply.  That is not a

8    negotiation.

9          So let's talk about what's really going on here.

10   You saw that subpoena and the documents and topics it

11   required the defendant to turn over.  You'll be able to look

12   at it again in the deliberation room.  How many of those

13   items require the defendant to tell the Select Committee

14   what he might know about former President Trump and

15   January 6th.  The former President, he proclaimed right

16   here, that he stood with in refusing to comply with the

17   subpoena.

18         How convenient that the former President tried to

19   give the defendant an excuse for his defiance?

20         The defendant stood with Donald Trump all right.

21   And that choice, the deliberate decision to stand with

22   former President Trump, that is a choice, a deliberate

23   decision to defy the subpoena.

24         This wasn't a negotiation.  Robert Costello was

25   doing exactly what the defendant wanted him to do.  He told

1    the government, in his effort to get his client off, that

2    he -- that the defendant was engaged the entire time.  He

3    knew exactly what was going on.

4             All Mr. Costello was doing was serving his

5    client's wishes.  What is a negotiation about hiding behind

6    a privilege that Ms. Amerling explained, in response to

7    Mr. Corcoran's questions, was not available for total

8    defiance and noncompliance?  What is a negotiation about

9    that?

10            That is like a child continuing to argue with

11   their parent after they've been told they're grounded.  That

12   kid knows they're grounded.  They can argue all they want.

13   It doesn't change the fact that the decision has been made.

14            The Committee, the government, made the decision

15   here.  We need to know what you know.  We're time limited.

16   This is urgent.  We only have a few months.  What you're

17   claiming as an excuse is not.  Now you need to comply.

18            The defendant didn't comply not because he was

19   mistaken.  Not because he thought the dates might be

20   continued.  He chose to comply -- he chose not to comply

21   because he didn't want to.

22            And let me say one more thing on Mr. Costello.

23   You heard from Special Agent Hart that he came in on his own

24   to try to convince the government that there was no crime

25   here.  But he didn't mention anything when he was doing that

1    that this was a mistake?  Wouldn't he have said all the

2    facts he could to convince the government that there was no

3    crime?

4          You heard Special Agent Hart.  All Mr. Costello

5    kept saying was he had the same privilege that the Committee

6    had already rejected.  He didn't say they thought the dates

7    were malleable.  He didn't say that the defendant made a

8    mistake.  It's because he didn't.  This is a last-minute

9    excuse.  Another excuse.

10         And let me comment for a minute on this claim of

11   privilege, Mr. Corcoran's comment that he just made a

12   mistake on the path he chose in relying on this privilege.

13   Judge Nichols just instructed you earlier this morning that

14   the defendant's belief that executive privilege excused him

15   does not provide a defense to his deliberate choice.

16         But you know what it does tell you?  It tells you

17   he made a choice.  He made a choice to hide behind a

18   privilege claim, even after he was told it didn't excuse

19   him.  That letter from just a few days ago that the

20   defendant showed you where he says, Just kidding.  Now the

21   former President said he's going to waive, and I'm going to

22   comply.  That shows you his choice.  He's continuing to make

23   the choice, the deliberate decision that he first made in

24   October of 2021.  This is not a mistake.  It's a choice.

25   It's contempt and it's a crime.

1          The defendant thinks that he didn't -- his choice

2     can't be deliberate because the Committee didn't take him up

3     on the options he provided them.  I think Mr. Corcoran

4     referred to it as the Committee -- all he wanted was the

5     Committee to remove an obstacle for him; that the Committee

6     had some obligation to go to a court or go to former

7     President Trump himself and get their permission to exercise

8     their own authority to get to the bottom of January 6th.

9          That's like saying that the referee on a soccer

10    field can't make calls on plays unless they go over to the

11    baseball diamond next door and get the umpire's opinion

12    first.

13         You heard Ms. Amerling.  The courts are a

14    completely different part of our government.  And you heard

15    her, the Committee doesn't answer to former President Trump.

16         By making this argument to you, the defendant just

17    confirms his contempt.  He is still trying to dictate to the

18    Committee the terms of his compliance.  He thinks his

19    authority as one man is greater than our government's, the

20    one which we have all consented to.

21         That's not the way this works.  He doesn't get to

22    tell the Committee that it's beneath his compliance; and

23    they need to appeal to a different power or person.  That's

24    the definition of contempt.

25         He doesn't get to tell the Committee that they

1    need to wait nine months or more for information that

2    Ms. Amerling told you was essential for them finding new

3    information, new witnesses, new leads.  They're

4    time-limited.  Instead of 14 months, now at most, because he

5    still hasn't complied, they have 5.  That was not the

6    defendant's choice to make, but he made it deliberately.  He

7    committed contempt.

8            And the defendant claims that his sudden offer to

9    comply a week or so ago somehow is evidence that he hasn't

10   been unlawfully brushing off the Committee for nine months.

11           But again, as Judge Nichols instructed you earlier

12   this morning, later attempts to comply, the Committee

13   refusing to give up on trying to get to the bottom of this,

14   they don't erase the defendant's earlier crimes.

15           He willfully, deliberately failed to comply in

16   October 2021.  He can't change that by claiming he's willing

17   to give the Committee what it was entitled to nine months

18   ago now, which, by the way, he still hasn't done.

19           And, ladies and gentlemen, when it comes to the

20   defendant's sudden effort to comply, you know what's really

21   going on there.  A few days before his criminal trial, after

22   refusing to comply for months, after he couldn't convince

23   the government that he hadn't committed a crime, after being

24   charged with federal crimes, after he couldn't get the

25   charges tossed, and even after the lawsuit he claimed was so

1    essential to his response, even after that was resolved in

2    favor of the Committee, of its right to get the information,

3    after all that, he and his friend, former President Trump,

4    suddenly decide he's going to comply?  Give me a break.

5            The only purpose of those letters was so that the

6    defendant could come in here and use it to try to convince

7    you that a deadline is not a deadline.  Don't be fooled by

8    that.  He thinks he can convince you it's no harm no foul.

9    That's not what the evidence in this case shows.

10            That sudden decision to comply is nothing but a

11   ploy.  And it's not even a good one because the defendant

12   forgot to tell the Committee he would provide them

13   documents.  To this day, he hasn't said he would.

14            And by the way, when you go back into that

15   deliberation room, compare the name-calling and rants in the

16   letter from former President Trump sent to the defendant a

17   few days ago to the serious career investigator Ms. Amerling

18   who testified in this trial.  That will tell you all you

19   need to know about how seriously you should take the

20   defendant's sudden change of heart.

21            That letter, which they provided to you, they put

22   it into evidence, tells you everything you need to know

23   about the defendant and the former President's contempt for

24   the work of the Committee.

25            The defendant willfully defied the subpoena when

1    he didn't provide documents on October 7th.  He willfully

2    defied the subpoena when he didn't come to his deposition on

3    October 14th.  His haphazard attempt to get out of his

4    contempt by pretending to comply now is a waste of

5    everyone's time.

6             You know that, by October 7th, the defendant

7    didn't intend to comply.  Mr. Corcoran spent a lot of time

8    talking about, There's all these people that have worked

9    with the Committee and none of them have been charged.

10   Right.

11            Ms. Amerling told you, if there's a real problem

12   with the date, people call the Committee and they work it

13   out.  The Committee hadn't heard a word from him on

14   October 7th.  And you know that wasn't a mistake because the

15   letter that night his attorney sent made that clear.  It

16   said, We're not complying.  His attorney admitted to the

17   government, we haven't even gathered a single document.

18            They were claiming a privilege over something they

19   didn't even know whether they had because they didn't care

20   to look, because he didn't care to comply.  He was in

21   contempt at 10 a.m. on October 7th.  And he certainly was in

22   contempt at 10 a.m. on October 14th.  He got that letter

23   from the Committee on October 8th saying, You better come or

24   else.  We're rejecting your excuse.  And he didn't.

25            These are the hard facts.  These are the hard

1    facts in black and white in this case on paper.  You don't

2    even need Ms. Amerling's testimony or Special Agent Hart's

3    testimony to know that.

4           The defendant keeps trying to distract you from

5    it, distract you from what's in black and white.  He wants

6    to talk about electronic signatures versus handwritten

7    signatures.  They want to talk about that because they don't

8    want to talk about the clear dates in the subpoena.  They

9    want to talk about proof of service, which --

10          By the way, let's look at that for a minute.

11   Proof of service, date 9/23/21, Ms. Amerling's email sending

12   the subpoena to Mr. Costello, 9/23/21, and what does

13   Mr. Costello say the next day?  "Confirmed with my client.

14   Got it."

15          What are we talking about here?  They want to talk

16   about proof of service because they don't want to talk about

17   the Committee making it clear that the defendant's excuse

18   had been rejected.  They want to talk about what human

19   picked the date on the subpoena.  What human?  This is a

20   committee.  It's a body.

21          Ms. Amerling testified they worked collaboratively

22   together.  By the way, across party lines.  We all live in

23   the modern world.  Organizations act as a body.  Why are we

24   talking about which person suggested the date first?  The

25   date was the date.  It's on the subpoena.  It was

1    authorized.  It went out.  It was delivered.

2              They just want to keep talking about what human

3    was in the room because they don't want to talk about how

4    clear the defendant's refusals were.  They want to talk

5    about book club.  I don't know what courtroom Mr. Corcoran

6    was in, but all I learned from that testimony was that

7    Ms. Amerling and Ms. Gaston are book club dropouts and that

8    they have no personal relationship.

9              Why are we talking about a book club?  We're

10   talking about a book club because the defendant doesn't want

11   to talk about the fact that he was happy to proclaim in

12   public that he had no regard for the Committee and he did

13   not intend to comply.

14             And politics, why are we talking about politics?

15   What is political about a violent attack on the seat of our

16   government?  What is political about trying to understand

17   why that happened and how we stop it from happening again?

18             The only person injecting politics into this case

19   is seated over there.  It's the defendant.  And the only

20   reason they want to talk about politics is because they want

21   to distract you from the fact that the defendant is

22   undermining our system of government by refusing to

23   recognize its authority.  The only reason they want to talk

24   about any of these things is because they don't want to talk

25   about his contempt.

1    Mr. Corcoran said that our system gives you the
2    power as the jury to decide this case and he's right.  But I
3    can't help but recognize the irony that he now wants to rely
4    on how our system is supposed to work.  That, again, just
5    shows how deliberate the defendant's choice was to ignore it
6    before.

7    Folks, when you come to this courtroom and when
8    you go into your deliberation room, you don't leave your
9    common sense at the door.  You know, we all know, from
10   everyday life, that a deadline is a deadline.  And it was a
11   deadline here.  The Committee told the defendant so many
12   times, defiance is a crime.

13   But he didn't listen because he didn't care.  He
14   had contempt for them and the public service they are trying
15   to perform.  He had contempt for the people's effort to find
16   out the who, the what and the why of the day when our
17   government was attacked.  When the foundational processes of
18   our democracy to transfer power from one to another was
19   attacked.

20   The defendant is not above the law.  He is not the
21   decider of the law.  He is guilty.

22   **THE COURT:**  Ladies and gentlemen of the jury, you
23   have now heard the closings.  I have really just a few last
24   remarks for you.  One is an instruction I want to give you
25   about the closings that you just heard.

1       This will be Instruction 27, Statements and

2  Closing.  Ladies and gentlemen, during closings, I sustained

3  objections to certain statements by counsel.  You should not

4  consider those statements.

5       You also heard about a purported rules violation

6  by the Committee in not providing the defendant with a copy

7  of certain rules and about certain inconsistencies and

8  signatures.  You may not consider these issues as a defense

9  in this case.  Instead, you should comply with my prior

10  instructions regarding the elements that must be proven here

11  beyond a reasonable doubt.

12       The last thing I have to do before you begin your

13  deliberations is to excuse the alternate juror.  As I told

14  you before, the selection of alternates was an entirely

15  random process.  It's nothing personal.  We selected two

16  seats to be the alternate seats before any of you entered

17  the courtroom.

18       We have already, as everyone knows, excused one

19  juror for health reasons.  Since the rest of you have

20  remained healthy and attentive, I can now excuse the juror

21  in seat 12.

22       Juror in seat 12, before you leave, I'm going to

23  ask you to tear out a page from your notebook and to write

24  down your name and daytime phone number and hand this to

25  Ms. Lesley.  I do this because it is possible, though

1    unlikely, that we will need to summon you back to rejoin the

2    jury in case something happens to one of the other 12

3    jurors.  Since that possibility exists, I'm also going to

4    instruct you not to discuss the case with anyone until we

5    call you.

6         My earlier instructions regarding use of the

7    internet, reading about the case and the like still applies.

8    Don't research this case or communicate about it on the

9    internet.

10        In all likelihood, we will be calling you to tell

11   you there is a verdict and you are now free to discuss the

12   case.  There is, however, the small chance that we will need

13   to bring you back on to the jury.

14        Thank you very much for your service.  And please

15   report back to the jury office, after you provide Ms. Lesley

16   with this information, to turn in your badge on the way out.

17        With that, ladies and gentlemen of the jury, you

18   are free to return to your deliberation room, really the

19   courtroom.  We will finalize the written jury instructions

20   and bring copies by.  We will also be bringing the admitted

21   exhibits by, together with the verdict form.

22        I want to thank you again, as I likely will later,

23   but certainly thank you again for your time this week and

24   your service in this very important duty.

25        With that, we are adjourned.

1      **DEPUTY CLERK:**  All rise.

2      (Jury exited the courtroom at 11:38 a.m.)

3      (Recess.)

4      (Jury entered the courtroom at 2:47 p.m.)

5      **THE COURT:**  So, good afternoon, everyone.

6      Just a little bit ago I received a note from the

7  jury dated today's date, July 22nd, 2022, at 2:15.  And the

8  note signed by the foreperson says, "We have reached a

9  verdict on both counts."

10     Ms. Lesley, as a result, could you please take the

11 verdict?

12     **DEPUTY CLERK:**  (Complied.)

13     **THE COURT:**  Will the foreperson of the jury please

14 rise.

15     **DEPUTY CLERK:**  Has the jury agreed upon a verdict?

16     **THE FOREPERSON:**  We have.

17     **DEPUTY CLERK:**  Count 1, Contempt of Congress,

18 willful failure to appear for testimony.  As to Count 1, how

19 do you unanimously find the defendant?

20     **THE FOREPERSON:**  We find the defendant guilty.

21     **DEPUTY CLERK:**  Count 2, Contempt of Congress,

22 willful failure to provide records.  As to Count 2, how do

23 you unanimously find the defendant?

24     **THE FOREPERSON:**  We find the defendant guilty.

25     **DEPUTY CLERK:**  Thank you.

1    **THE COURT:**  Members of the jury, is the verdict

2    just announced the verdict of each and every jury?

3    **JURORS:**  Yes.

4    **THE COURT:**  Thank you, Ms. Lesley.

5    Ladies and gentlemen of the jury, I want to thank

6    you for your service.

7    As I think you know from my instructions, from how

8    I attempted at least to conduct this trial and from other

9    things that were said during the trial, jury service is

10   critically important.  You invested an entire week in this,

11   and I think you did so both seriously and recognizing the

12   important role that you all played.

13   I very much appreciate your service.  I know we

14   all do, and we thank you for it.  And you are now

15   discharged.

16   Thank you.

17   **MS. VAUGHN:**  Your Honor, can we go on the line

18   just one second?

19   (Sidebar discussion.)





5    (Sidebar discussion concluded.)

6    **THE COURT:**  All right.  So we obviously need to

7    talk, at a minimum, about a sentencing schedule.  Is the

8    government asking for anything in between now and

9    sentencing?

10    **MS. VAUGHN:**  No, Your Honor.

11    **THE COURT:**  Okay.

12    It is my practice in all cases to have a

13    presentence investigation report prepared.  The current

14    practice right now or the current timeline for that is --

15    for various reasons, including COVID and January 6th cases

16    and the like is that takes approximately 90 days, which

17    would have us sometime in the late October timeframe.

18    Now I'm simply looking at my calendar.  So I would

19    like to do the sentencing in this matter, if available to

20    the parties, on October 21st, at 3 p.m.

21    **MS. VAUGHN:**  That's fine for the government,

22    Your Honor.

23    **MR. CORCORAN:**  That works for us, Your Honor.

24    **THE COURT:**  Okay.  So obviously there will be a

25    presentence investigation report prepared.  You obviously

1    know how those things work.

2           What I would ask is, Mr. Corcoran, that the

3    parties submit sentencing memoranda no later than

4    October 14, 2022 at the close of business that day.

5           And for the purpose of facilitating that I would

6    ask that Mr. Bannon, with counsel, report to the Probation

7    Office today before leaving, if possible.

8           So, again, 3 p.m., October 21st.  I think in this

9    courtroom.

10          Anything from the government's perspective we

11   should address otherwise?

12           **MS. VAUGHN:**  No, Your Honor.

13           **THE COURT:**  Mr. Corcoran?  Mr. Schoen?

14           **MR. CORCORAN:**  No, Your Honor.

15           **THE COURT:**  Okay.  Thank you all.  Thank you all

16   for your professionalism this week.  And we will see you all

17   in October.

18           (Proceedings adjourned at 2:54 p.m.)

19

20

21

22

23

24

25

1104

1          **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9    _____July 22, 2022_____          _/s/_____

10            **DATE**                    **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPUTY CLERK: [6]**
1019/2 1100/1 1100/12
1100/17 1100/21
1100/25
**JURORS: [4]** 1024/6
1041/25 1057/19
1101/3
**MR. CORCORAN: [31]**
1020/6 1020/11 1022/3
1022/14 1057/15
1057/17 1057/20
1059/20 1060/2 1060/7
1060/9 1060/21
1060/24 1061/2 1061/9
1061/23 1062/12
1064/3 1065/6 1079/16
1081/8 1083/23
1084/11 1084/14
1085/4 1085/25
1086/10 1086/13
1101/25 1102/23
1103/14
**MR. SCHOEN: [5]**
1019/11 1019/16
1021/25 1022/24
1023/5
**MS. GASTON: [26]**
1041/24 1042/1
1059/18 1059/24
1060/6 1060/11
1060/15 1061/13
1063/16 1063/20
1079/14 1081/6
1081/16 1081/20
1081/23 1082/5 1082/9
1082/13 1082/16
1083/4 1083/9 1083/13
1083/18 1085/2
1085/23 1086/9
**MS. VAUGHN: [22]**
1019/7 1020/16
1020/19 1021/3
1021/10 1021/14
1021/16 1021/19
1021/24 1022/11
1022/17 1023/9
1023/16 1023/22
1086/23 1087/6 1087/8
1101/17 1101/20
1102/10 1102/21
1103/12
**THE COURT: [69]**
1019/15 1019/17

1020/8 1020/12
1020/18 1020/23
1021/9 1021/12
1021/15 1021/18
1021/22 1022/1
1022/10 1022/18
1023/4 1023/6 1023/11
1023/18 1024/1 1024/5
1024/7 1057/14
1057/16 1059/19
1059/25 1060/8
1060/13 1060/19
1060/23 1061/1 1061/5
1061/17 1062/5
1063/17 1063/19
1063/22 1065/1
1079/15 1081/7
1081/17 1081/21
1081/25 1082/7
1082/11 1082/14
1082/18 1083/7
1083/11 1083/15
1083/22 1084/3
1084/12 1085/3
1085/24 1086/12
1086/22 1086/25
1087/5 1097/22 1100/5
1100/13 1101/4
1101/22 1102/3 1102/6
1102/11 1102/24
1103/13 1103/15
**THE FOREPERSON:**
**[3]** 1100/16 1100/20
1100/24

**/**

**/s [1]** 1104/9

**1**

**1,000 [1]** 1066/14
**10 [2]** 1030/3 1087/1
**10 a.m [7]** 1044/16
1044/18 1044/22
1051/6 1051/7 1094/21
1094/22
**100-6 [1]** 1017/15
**1024 [1]** 1018/3
**1041 [1]** 1018/4
**1058 [1]** 1018/5
**1087 [1]** 1018/6
**11 [2]** 1030/12 1059/15
**11/1 [1]** 1037/21
**117th [2]** 1059/12
1059/20

**11:04 [2]** 1087/2
1087/4
**11:15 [1]** 1087/2
**11:15 a.m [1]** 1087/4
**11:38 a.m [1]** 1100/2
**12 [4]** 1031/3 1098/21
1098/22 1099/2
**13 [1]** 1033/6
**13th [4]** 1046/19
1049/15 1049/21
1076/13
**14 [4]** 1023/24 1033/14
1092/4 1103/4
**14th [16]** 1038/14
1039/5 1044/17
1047/18 1048/4 1048/8
1048/13 1051/7
1055/15 1067/11
1071/5 1071/9 1071/13
1078/16 1094/3
1094/22
**15 [5]** 1033/20 1072/11
1072/17 1074/15
1075/3
**15-minute [1]** 1086/23
**15th [1]** 1048/9
**16 [1]** 1034/3
**17 [3]** 1034/8 1052/3
1070/16
**1793 [1]** 1017/13
**18 [2]** 1034/19 1039/7
**18th [6]** 1023/25
1038/16 1048/23
1048/25 1049/16
1049/21
**19 [1]** 1035/2
**192 [1]** 1046/12
**194 [1]** 1046/12
**1:21-670 [1]** 1017/3

**2**

**20 [7]** 1035/16 1066/9
1066/16 1066/19
1073/21 1075/23
1084/23
**20 years [1]** 1066/22
**20/20 [1]** 1084/23
**20001 [2]** 1017/12
1017/24
**201 [1]** 1017/19
**202-252-1793 [1]**
1017/13
**2020 [1]** 1075/12
**2021 [20]** 1023/24

1038/14 1038/16
1039/5 1039/7 1042/22
1043/22 1044/7
1044/12 1048/13
1048/13 1057/21
1067/21 1071/13
1073/9 1075/12
1075/16 1076/13
1090/24 1092/16
**2021-670 [1]** 1019/3
**2022 [4]** 1017/5 1100/7
1103/4 1104/9
**21 [3]** 1036/17 1095/11
1095/12
**21201 [1]** 1017/19
**21st [2]** 1102/20
1103/8
**22 [2]** 1017/5 1104/9
**2225 [1]** 1017/20
**22nd [1]** 1100/7
**23 [1]** 1037/23
**23rd [1]** 1044/12
**24 [5]** 1019/23 1021/14
1022/20 1022/22
1038/12
**24th [1]** 1044/21
**25 [1]** 1038/22
**25th [1]** 1017/19
**26 [1]** 1041/14
**27 [3]** 1058/22 1085/7
1098/1
**2800 [1]** 1017/15
**2:15 [1]** 1100/7
**2:47 p.m [1]** 1100/4
**2:54 p.m [1]** 1103/18
**2nd [3]** 1073/9
1075/12 1075/16

**3**

**3 p.m [2]** 1102/20
1103/8
**3.103 [3]** 1022/15
1023/13 1023/20
**30 [1]** 1079/16
**32 [2]** 1078/14 1080/12
**333 [1]** 1017/23
**334-395-6611 [1]**
1017/16
**36106 [1]** 1017/16

**4**

**410-385-2225 [1]**
1017/20
**4700-C [1]** 1017/23

**4**

**4th [1]**  1017/12

**5**

**503 [2]**  1042/20
1051/22
**555 [1]**  1017/12
**5th [3]**  1044/7 1044/9
1058/14

**6**

**6 p.m [2]**  1048/24
1049/1
**6/6 [1]**  1037/20
**6611 [1]**  1017/16
**670 [2]**  1017/3 1019/3
**6th [19]**  1039/2
1042/22 1043/10
1043/22 1043/25
1044/10 1051/20
1052/1 1053/21
1056/13 1057/9
1057/11 1057/24
1058/12 1071/17
1087/19 1088/15
1091/8 1102/15

**7**

**7/5 [1]**  1037/20
**7th [17]**  1044/16
1044/22 1045/2 1048/7
1048/13 1049/11
1049/20 1051/6
1055/15 1067/11
1071/5 1087/11
1087/11 1094/1 1094/6
1094/14 1094/21

**8**

**8th [4]**  1045/20
1054/16 1088/2
1094/23

**9**

**9/23/21 [2]**  1095/11
1095/12
**90 [1]**  1102/16
**9:14 [1]**  1017/6
**9:25 [1]**  1024/4
**9th [2]**  1078/19
1079/18

**A**

**a.m [12]**  1017/6 1024/4
1044/16 1044/18

**1044/22 1051/6 1051/7**
1087/4 1087/4 1094/21
1094/22 1100/2
**abide [1]**  1069/19
**ability [1]**  1030/6
**able [3]**  1035/10
1053/15 1088/11
**about [129]**
**above [2]**  1097/20
1104/5
**above-entitled [1]**
1104/5
**absolute [2]**  1028/14
1033/8
**Absolutely [1]**  1076/4
**accept [4]**  1025/14
1032/19 1041/13
1055/21
**acceptable [1]**
1029/19
**accepted [2]**  1044/21
1068/15
**accepting [1]**  1050/25
**accident [9]**  1040/24
1052/18 1054/9
1054/21 1055/5 1055/7
1055/8 1055/10
1085/10
**accompanied [1]**
1058/7
**accomplished [2]**
1068/12 1068/18
**accountable [1]**
1042/15
**accuracy [1]**  1032/3
**accurate [2]**  1031/20
1032/20
**accurately [1]**  1031/13
**accusing [1]**  1027/7
**acknowledged [1]**
1073/14
**acquittal [1]**  1037/22
**across [1]**  1095/22
**act [3]**  1041/18
1056/25 1095/23
**acted [4]**  1038/11
1040/16 1054/4 1081/1
**Action [1]**  1017/3
**actions [1]**  1057/25
**acts [2]**  1038/3
1052/20
**actual [1]**  1029/4
**actually [2]**  1037/25
1060/1

**added [1]**  1021/16
**addition [2]**  1022/15
1036/13
**additional [1]**  1081/12
**address [3]**  1023/17
1054/1 1103/11
**adjourned [2]**  1099/25
1103/18
**adjournment [1]**
1049/17
**admissible [1]**
1030/19
**admit [1]**  1070/23
**admitted [5]**  1025/20
1034/21 1034/24
1094/16 1099/20
**advice [1]**  1041/3
**advised [2]**  1046/7
1052/24
**advising [1]**  1055/2
**advisor [1]**  1068/23
**affect [3]**  1030/6
1030/8 1033/2
**affected [2]**  1067/15
1074/3
**affects [2]**  1031/16
1074/1
**affiliated [1]**  1076/1
**affiliation [2]**  1075/22
1075/22
**affiliations [1]**  1075/10
**after [22]**  1024/11
1024/17 1029/15
1030/24 1036/4
1037/17 1041/21
1051/8 1054/11
1054/12 1055/1
1077/13 1089/11
1090/18 1092/21
1092/22 1092/23
1092/24 1092/25
1093/1 1093/3 1099/15
**afternoon [1]**  1100/5
**again [26]**  1035/19
1035/25 1043/8
1046/21 1049/2
1053/21 1056/14
1057/12 1063/17
1065/23 1067/20
1067/20 1071/3 1071/3
1076/24 1077/16
1077/17 1079/17
1080/12 1088/12
1092/11 1096/17

**1097/4 1099/22**
1099/23 1103/8
**against [11]**  1028/5
1030/16 1031/5
1032/24 1033/10
1056/15 1065/15
1072/24 1072/25
1079/8 1079/9
**age [1]**  1026/9
**agent [10]**  1019/9
1045/6 1046/16 1073/2
1073/3 1073/9 1075/17
1089/23 1090/4 1095/2
**Agent Hart [2]**  1045/6
1046/16
**ago [11]**  1019/22
1043/19 1050/7
1073/19 1078/16
1081/3 1090/19 1092/9
1092/18 1093/17
1100/6
**agree [3]**  1021/22
1034/5 1057/6
**agreeable [1]**  1022/16
**agreed [5]**  1021/1
1041/13 1078/11
1079/13 1100/15
**agreement [2]**  1069/15
1079/24
**ahead [1]**  1047/8
**aid [1]**  1036/23
**AL [1]**  1017/16
**aligned [1]**  1072/13
**all [58]**  1020/9 1023/10
1025/15 1025/24
1026/7 1027/19 1030/1
1031/6 1034/22
1035/13 1038/4 1038/8
1040/12 1044/10
1049/1 1051/14 1052/6
1053/13 1053/22
1054/6 1057/3 1057/4
1057/23 1058/12
1058/17 1065/16
1066/10 1066/12
1070/18 1070/24
1070/25 1072/22
1073/16 1074/7
1077/17 1086/19
1088/20 1089/4
1089/12 1090/1 1090/4
1091/4 1091/20 1093/3
1093/18 1094/8
1095/22 1096/6 1097/9

# A

**all... [9]** 1099/10 1100/1 1101/12 1101/14 1102/6 1102/12 1103/15 1103/15 1103/16

**allegations [1]** 1021/19

**alleged [5]** 1023/19 1038/18 1038/21 1041/10 1054/10

**allegedly [1]** 1040/10

**allegiance [1]** 1054/13

**allow [1]** 1030/8

**allowed [1]** 1041/5

**allows [1]** 1080/1

**almost [1]** 1074/11

**alone [5]** 1025/21 1025/22 1031/9 1039/9 1065/19

**along [1]** 1019/12

**already [6]** 1034/15 1039/8 1048/15 1085/5 1090/6 1098/18

**also [17]** 1019/10 1019/13 1021/3 1024/12 1024/13 1024/15 1026/1 1031/12 1032/11 1036/7 1037/15 1044/8 1052/6 1058/13 1098/5 1099/3 1099/20

**alternate [2]** 1098/13 1098/16

**alternates [1]** 1098/14

**always [1]** 1053/12

**am [3]** 1020/4 1023/18 1087/10

**AMANDA [2]** 1017/10 1019/7

**AMERICA [2]** 1017/2 1019/3

**Amerling [28]** 1049/7 1058/9 1059/9 1059/22 1062/14 1063/8 1066/6 1066/6 1066/16 1067/17 1068/21 1070/1 1070/6 1072/2 1072/7 1072/9 1072/16 1072/25 1073/21 1073/24 1077/16 1089/6 1091/13 1092/2 1093/17 1094/11 1095/21 1096/7

**Amerling's [7]** 1052/1 1069/3 1070/14 1072/12 1075/8 1095/2 1095/11

**among [2]** 1035/13 1044/2

**announced [1]** 1101/2

**another [8]** 1029/20 1035/16 1062/12 1072/7 1072/22 1075/8 1090/9 1097/18

**answer [11]** 1030/22 1030/25 1031/1 1042/8 1047/20 1068/13 1070/12 1071/7 1071/14 1075/19 1091/15

**answered [1]** 1030/24

**answers [1]** 1043/16

**anticipate [4]** 1055/11 1078/24 1080/14 1080/16

**any [53]** 1025/3 1025/6 1025/16 1025/22 1026/8 1026/19 1026/21 1027/8 1027/9 1027/9 1027/18 1027/25 1029/21 1031/9 1031/16 1031/21 1031/24 1032/5 1032/8 1032/10 1032/11 1032/13 1032/14 1032/23 1033/25 1034/1 1034/12 1034/22 1036/1 1036/3 1036/11 1036/13 1036/15 1036/16 1037/12 1037/12 1037/15 1037/16 1037/20 1037/21 1037/22 1038/2 1041/18 1045/23 1053/8 1065/19 1067/15 1073/6 1074/3 1078/4 1086/10 1096/24 1098/16

**anybody [1]** 1066/3

**anyone [3]** 1036/3 1036/10 1099/4

**anything [11]** 1026/15 1031/15 1031/25 1048/22 1076/4 1078/4 1080/24 1087/12

1089/25 1102/8 1103/10

**anyway [1]** 1070/3

**anywhere [2]** 1053/15 1088/3

**appeal [1]** 1091/23

**appear [10]** 1044/16 1046/20 1047/20 1048/13 1048/17 1052/15 1054/7 1081/9 1084/17 1100/18

**appearance [1]** 1046/4

**APPEARANCES [1]** 1017/9

**applies [3]** 1025/12 1033/22 1099/7

**apply [3]** 1024/11 1054/12 1078/5

**appreciate [1]** 1101/13

**appropriate [1]** 1021/20

**approximately [1]** 1102/16

**are [67]** 1019/10 1021/4 1021/13 1022/16 1023/10 1024/22 1025/3 1025/18 1025/19 1025/25 1027/1 1027/2 1027/3 1028/13 1028/18 1028/25 1029/1 1029/19 1029/22 1031/7 1032/8 1032/14 1035/5 1036/23 1036/23 1037/2 1037/15 1037/17 1038/9 1039/23 1041/15 1042/15 1049/12 1050/11 1055/23 1057/4 1059/6 1059/10 1066/21 1066/22 1073/22 1074/23 1074/24 1077/11 1077/20 1080/8 1080/17 1080/21 1085/6 1085/22 1086/1 1086/19 1087/3 1087/17 1091/13 1094/25 1094/25 1095/15 1095/23 1096/7 1096/9 1096/14 1097/14 1099/11 1099/18 1099/25

1101/14

**aren't [1]** 1087/15

**arena [1]** 1073/22

**argue [1]** 1089/10 1089/12

**argument [2]** 1030/14 1091/16

**arguments [8]** 1018/4 1018/5 1018/6 1024/18 1024/18 1027/1 1041/21 1041/22

**arrive [1]** 1026/5

**article [1]** 1058/10

**as [92]**

**aside [1]** 1047/22

**ask [8]** 1022/14 1063/10 1067/15 1068/21 1074/2 1098/23 1103/2 1103/6

**asked [21]** 1030/4 1030/7 1030/14 1032/7 1044/8 1049/17 1056/17 1067/13 1068/10 1070/6 1071/3 1071/8 1071/11 1072/1 1075/11 1077/16 1080/7 1080/8 1081/11 1081/13 1086/13

**asking [5]** 1021/12 1051/15 1080/17 1081/4 1102/8

**asks [2]** 1044/5 1084/17

**asleep [1]** 1029/17

**assert [1]** 1053/8

**asserted [1]** 1052/25

**assertion [1]** 1045/24

**asserts [1]** 1029/3

**assessing [1]** 1070/22

**assist [2]** 1027/2 1034/18

**assume [3]** 1029/8 1029/13 1033/12

**attack [4]** 1039/2 1043/10 1051/20 1096/15

**attacked [3]** 1042/23 1097/17 1097/19

**attempt [1]** 1094/3

**attempted [1]** 1101/8

**attempting [1]** 1042/25

**attempts [1]** 1092/12

**attend [1]** 1046/2

## A

**attention [2]** 1036/2
1078/15
**attentive [1]** 1098/20
**attentively [1]** 1056/23
**attorney [10]** 1017/15
1019/13 1041/3
1044/23 1045/2
1046/20 1050/25
1051/2 1094/15
1094/16
**attorney's [1]** 1049/9
**attorneys [2]** 1017/11
1026/22
**authority [9]** 1042/10
1043/15 1047/16
1053/11 1059/11
1087/18 1091/8
1091/19 1096/23
**authorized [4]** 1039/19
1040/11 1050/16
1096/1
**available [3]** 1067/24
1089/7 1102/19
**Avenue [1]** 1017/23
**avenues [1]** 1071/22
**aware [3]** 1026/1
1026/3 1073/20

## B

**back [21]** 1045/20
1046/21 1048/4 1049/7
1053/12 1065/13
1065/24 1067/3 1067/5
1067/21 1071/4
1072/11 1076/24
1078/13 1079/4 1085/5
1086/15 1093/14
1099/1 1099/13
1099/15
**background [1]**
1073/16
**bad [1]** 1040/19
**badge [1]** 1099/16
**Baltimore [1]** 1017/19
**Bankruptcy [1]**
1017/22
**BANNON [47]** 1017/5
1019/4 1019/12
1019/12 1019/18
1042/4 1045/24
1048/15 1049/13
1049/15 1057/22
1058/2 1058/8 1058/19

1059/5 1059/23 1060/4
1060/5 1060/9 1066/15
1067/18 1068/19
1068/22 1070/5 1070/9
1070/25 1071/10
1071/13 1071/16
1072/5 1074/22 1075/7
1076/2 1076/14
1076/16 1076/21
1077/6 1079/4 1079/7
1079/11 1079/19
1080/18 1080/25
1084/22 1085/12
1086/20 1103/6
**Bannon's [6]** 1046/3
1062/24 1069/9
1069/12 1069/14
1081/14
**baseball [1]** 1091/11
**based [6]** 1028/17
1035/9 1059/4 1069/4
1086/10 1086/17
**basic [2]** 1071/8
1071/11
**basically [1]** 1080/21
**be [72]** 1020/3 1020/4
1020/21 1021/6
1021/20 1022/21
1022/24 1024/10
1024/13 1026/3
1027/13 1028/10
1028/11 1029/6
1029/11 1029/16
1030/3 1030/25
1031/10 1032/24
1033/10 1034/6 1034/9
1034/11 1034/13
1034/20 1034/25
1035/5 1035/8 1035/10
1035/19 1035/19
1035/21 1035/22
1036/23 1037/3
1037/24 1039/25
1040/22 1049/15
1051/16 1051/19
1053/12 1053/15
1053/19 1054/12
1055/3 1055/9 1056/20
1058/20 1059/15
1063/8 1063/11
1065/20 1073/20
1073/24 1075/4 1078/2
1084/17 1085/9
1086/17 1086/25

1088/11 1089/19
1091/2 1093/7 1098/1
1098/10 1098/16
1099/10 1099/20
1102/24
**Bear [1]** 1037/15
**because [49]** 1030/7
1033/12 1035/25
1037/25 1041/2 1041/4
1041/5 1042/6 1042/13
1046/15 1049/17
1052/23 1053/9
1053/16 1054/5
1054/20 1055/2 1055/8
1055/11 1055/23
1057/24 1063/11
1067/16 1071/15
1071/19 1079/4
1081/13 1087/14
1087/22 1087/25
1088/5 1089/18
1089/19 1089/21
1090/8 1091/2 1092/4
1093/11 1094/14
1094/19 1094/20
1095/7 1095/16 1096/3
1096/10 1096/20
1096/24 1097/13
1098/25
**become [1]** 1073/19
**becomes [1]** 1037/6
**been [29]** 1024/18
1025/10 1030/9
1030/23 1032/21
1034/21 1040/11
1040/12 1052/7 1053/2
1056/17 1059/16
1065/23 1066/8
1066/16 1066/19
1066/25 1072/2
1072/12 1078/6
1078/21 1087/17
1087/20 1088/1
1089/11 1089/13
1092/10 1094/9
1095/18
**before [29]** 1017/8
1022/20 1022/22
1024/7 1035/17
1044/10 1046/19
1048/22 1048/23
1058/11 1066/19
1068/9 1068/15
1068/17 1069/16

1069/17 1076/8
1076/13 1076/17
1077/3 1077/3 1085/14
1092/21 1097/6
1098/12 1098/14
1098/16 1098/22
1103/7
**begin [3]** 1024/7
1024/19 1098/12
**beginning [5]** 1019/6
1036/8 1036/22 1058/3
1058/6
**behalf [1]** 1051/1
**behavior [1]** 1031/17
**behind [2]** 1089/5
1090/17
**being [10]** 1048/3
1054/11 1054/12
1069/4 1071/5 1076/1
1080/7 1080/8 1081/13
1092/23
**beings [1]** 1025/24
**belief [4]** 1041/4
1041/6 1053/4 1090/14
**believability [1]**
1025/23
**believe [13]** 1020/24
1023/1 1026/18
1030/19 1031/9
1032/23 1043/21
1043/23 1062/13
1065/19 1066/21
1066/22 1067/6
**believed [6]** 1030/15
1031/10 1052/4
1052/24 1065/21
1071/20
**believes [1]** 1048/18
**beneath [3]** 1056/2
1056/5 1091/22
**benefit [6]** 1028/23
1060/7 1068/20 1072/5
1074/22 1075/7
**best [2]** 1071/15
1071/23
**better [1]** 1094/23
**between [9]** 1032/5
1032/10 1032/12
1037/5 1040/8 1044/20
1067/3 1074/20 1102/8
**beyond [24]** 1027/16
1027/20 1028/1 1028/5
1028/11 1028/12
1031/5 1033/19

## B

**beyond... [16]** 1034/17
1038/10 1038/19
1039/10 1039/13
1040/2 1040/7 1040/16
1041/8 1041/16
1050/10 1059/2 1065/8
1065/15 1072/19
1098/11
**bias [4]** 1033/1 1073/7
1073/18 1073/20
**biased [1]** 1032/24
**biases [4]** 1025/25
1026/2 1026/2 1026/4
**bit [3]** 1058/6 1085/15
1100/6
**black [4]** 1055/15
1087/16 1095/1 1095/5
**blame [1]** 1055/18
**blind [1]** 1073/19
**block [3]** 1044/3
1044/4 1044/8
**blogging [1]** 1036/12
**Bob [10]** 1062/20
1062/24 1067/4 1069/9
1069/13 1076/5
1078/10 1078/16
1078/18 1080/13
**body [2]** 1095/20
1095/23
**boilerplate [2]** 1070/16
1070/17
**book [11]** 1058/10
1072/21 1072/21
1072/24 1072/25
1073/14 1074/16
1096/5 1096/7 1096/9
1096/10
**booted [1]** 1047/14
**born [2]** 1086/4 1086/4
**both [9]** 1022/15
1029/18 1029/23
1030/2 1030/25
1048/16 1050/23
1100/9 1101/11
**bothered [1]** 1045/7
**bottom [2]** 1091/8
1092/13
**box [2]** 1065/24
1076/24
**break [5]** 1044/11
1051/13 1058/12
1086/24 1093/4
**brief [7]** 1022/13
1023/15 1024/8
1062/18 1062/25
1063/3 1063/6
**briefly [1]** 1036/5
**bring [6]** 1020/14
1024/3 1069/18
1078/14 1099/13
1099/20
**bringing [1]** 1099/20
**brings [1]** 1052/10
**broadly [1]** 1051/25
**broken [1]** 1048/15
**brushing [1]** 1092/10
**building [2]** 1043/1
1053/25
**builds [1]** 1073/24
**burden [5]** 1027/11
1027/16 1028/4 1039/8
1078/3
**business [1]** 1103/4

## C

**calendar [1]** 1102/18
**call [3]** 1028/8 1094/12
1099/5
**calling [2]** 1093/15
1099/10
**calls [1]** 1091/10
**came [3]** 1044/24
1049/1 1089/23
**can [28]** 1021/6
1022/10 1023/14
1023/16 1035/11
1036/5 1047/8 1047/10
1049/21 1050/2
1053/17 1055/21
1062/13 1063/10
1069/15 1069/18
1069/21 1069/23
1073/24 1076/23
1078/12 1080/25
1086/18 1086/23
1089/12 1093/8
1098/20 1101/17
**can't [6]** 1070/20
1080/24 1091/2
1091/10 1092/16
1097/3
**candidates [1]**
1075/25
**cannot [4]** 1037/24
1053/19 1084/16
1085/13
**capability [1]** 1033/3

**Capitol [4]** 1039/3
1042/23 1043/11
1051/21
**captures [1]** 1069/5
**car [2]** 1047/5 1047/14
**care [3]** 1094/19
1094/20 1097/13
**career [4]** 1072/12
1072/14 1073/25
1093/17
**carefully [1]** 1086/14
**CARL [1]** 1017/8
**cars [1]** 1053/16
**case [83]** 1019/3
1025/13 1025/19
1026/13 1026/17
1026/20 1027/13
1029/1 1030/1 1030/10
1030/13 1031/25
1032/2 1033/7 1033/16
1034/11 1035/21
1035/22 1035/25
1036/10 1036/12
1036/24 1037/13
1037/22 1038/19
1039/9 1042/1 1042/4
1042/12 1042/16
1053/22 1056/9
1056/10 1057/22
1057/23 1057/24
1058/7 1058/25 1059/2
1059/2 1059/7 1059/8
1060/4 1062/13
1062/17 1063/7
1063/12 1065/8
1065/25 1066/1 1066/3
1066/7 1066/17
1066/20 1067/3
1067/13 1068/19
1069/5 1069/18
1069/24 1071/1 1072/2
1072/5 1072/10 1073/3
1074/24 1075/2 1078/3
1078/5 1079/8 1079/9
1079/10 1086/14
1093/9 1095/1 1096/18
1097/2 1098/9 1099/2
1099/4 1099/7 1099/8
1099/12
**cases [6]** 1028/6
1028/10 1028/16
1035/19 1102/12
1102/15
**cause [1]** 1074/16

**causes [1]** 1072/15
**celebrating [1]**
1045/15
**certain [4]** 1078/16
1098/3 1098/7 1098/7
**certainly [2]** 1094/21
1099/23
**certainty [3]** 1028/15
1029/25 1038/17
**certification [2]**
1044/3 1044/8
**certify [1]** 1104/4
**cetera [6]** 1078/1
1078/1 1078/6 1078/6
1080/4 1080/4
**Chairman [15]**
1062/15 1062/20
1062/22 1062/24
1063/2 1063/5 1063/8
1063/13 1070/3 1070/7
1076/12 1078/17
1078/17 1080/11
1080/13
**Chairman Thompson**
**[7]** 1062/20 1062/24
1063/13 1070/3 1070/7
1080/11 1080/13
**Chairman**
**Thompson's [3]**
1062/22 1062/3 1063/5
**chamber's [1]** 1023/17
**chance [1]** 1099/12
**chances [2]** 1074/23
1074/24
**change [3]** 1089/13
1092/16 1093/20
**changed [1]** 1054/15
**changes [1]** 1019/24
**characteristic [1]**
1026/8
**charge [3]** 1028/5
1030/8 1038/24
**charged [19]** 1021/7
1021/8 1021/17
1021/21 1027/22
1028/19 1033/15
1038/23 1039/12
1041/15 1041/17
1041/19 1050/3
1054/13 1058/3 1071/2
1079/5 1092/24 1094/7
**charges [14]** 1023/2
1023/23 1030/3 1030/6
1031/5 1033/19

# C

**charges... [8]** 1033/21
1038/13 1039/4 1039/6
1046/13 1065/15
1079/7 1092/25
**Charles [1]** 1017/19
**check [4]** 1050/21
1051/2 1051/12 1052/9
**chief [1]** 1075/2
**child [1]** 1089/10
**choice [15]** 1052/20
1052/22 1080/22
1080/22 1088/21
1088/22 1090/15
1090/17 1090/17
1090/22 1090/23
1090/24 1091/1 1092/6
1097/5
**choose [1]** 1053/17
**chose [15]** 1033/12
1042/16 1052/16
1053/3 1053/23 1054/7
1054/10 1054/13
1056/5 1057/12
1085/13 1087/23
1089/20 1089/20
1090/12
**chosen [1]** 1033/9
**circulated [1]** 1019/19
**circumstances [8]**
1029/6 1032/4 1032/6
1037/16 1038/2 1038/4
1038/8 1043/14
**circumstantial [8]**
1028/24 1029/2 1029/7
1029/16 1029/18
1029/22 1029/24
1030/2
**citizens [1]** 1053/10
**civic [1]** 1056/22
**civil [4]** 1028/6
1049/18 1069/18
1077/4
**civility [1]** 1035/12
**claim [2]** 1090/10
1090/18
**claimed [4]** 1045/21
1054/8 1054/16
1092/25
**claiming [5]** 1045/3
1045/9 1089/17
1092/16 1094/18
**claims [1]** 1092/8
**clarifications [1]**

**clarify [2]** 1020/16
1048/22
**clean [1]** 1020/9
**clear [10]** 1022/25
1045/12 1045/21
1054/24 1057/9 1078/2
1094/15 1095/8
1095/17 1096/4
**clearer [3]** 1087/16
1087/19 1088/1
**clearly [1]** 1076/5
**clerk [4]** 1036/4
1037/7 1037/16
1100/15
**client [2]** 1089/1
1095/13
**client's [1]** 1089/5
**close [2]** 1019/19
1103/4
**closing [8]** 1018/4
1018/5 1018/6 1024/17
1024/18 1041/21
1041/21 1098/2
**closings [3]** 1097/23
1097/25 1098/2
**club [8]** 1072/21
1072/21 1073/14
1074/16 1096/5 1096/7
1096/9 1096/10
**clubs [2]** 1072/24
1072/25
**Code [1]** 1046/11
**coffee [1]** 1085/14
**collaboratively [1]**
1095/21
**collect [1]** 1045/7
**collective [1]** 1057/21
**colored [1]** 1033/2
**COLUMBIA [1]** 1017/1
**come [13]** 1019/5
1056/23 1066/24
1079/4 1079/4 1080/3
1081/4 1086/1 1086/5
1093/6 1094/2 1094/23
1097/7
**comes [5]** 1036/2
1042/9 1043/17 1048/2
1092/19
**coming [1]** 1076/6
**commanded [3]**
1052/15 1053/2
1087/17
**comment [2]** 1090/10

**commit [1]** 1076/2
**committed [13]**
1023/23 1023/25
1038/14 1038/15
1038/20 1057/25
1071/11 1073/6
1076/14 1080/20
1081/1 1092/7 1092/23
**committee [103]**
**Committee's [9]**
1040/5 1040/19
1043/17 1044/17
1046/22 1047/3 1053/2
1057/8 1087/19
**committees [1]**
1069/17
**committing [1]**
1084/19
**common [1]** 1097/9
**communicate [6]**
1036/9 1037/7 1037/10
1037/12 1070/7 1099/8
**communicating [1]**
1067/8
**communications [4]**
1035/18 1036/11
1037/4 1046/16
**compare [1]** 1093/15
**completely [2]** 1045/4
1091/14
**compliance [3]**
1054/14 1091/18
1091/22
**complicated [1]**
1042/1
**complied [2]** 1092/5
1100/12
**comply [59]** 1039/20
1039/21 1039/22
1040/18 1040/21
1040/23 1041/2
1041/10 1041/12
1044/19 1046/21
1047/2 1047/9 1048/6
1048/18 1049/13
1049/20 1049/21
1049/22 1049/25
1050/17 1050/18
1050/20 1051/4
1052/23 1053/4 1053/7
1054/2 1054/25
1057/10 1076/3 1076/4
1077/5 1078/20

**1081/15 1085/10**
1087/21 1087/22
1087/24 1087/24
1088/7 1088/16
1089/17 1089/18
1089/20 1089/20
1090/22 1092/9
1092/12 1092/15
1092/20 1092/22
1093/4 1093/10 1094/4
1094/7 1094/20
1096/13 1098/9
**complying [3]** 1041/7
1045/4 1094/16
**concerned [1]** 1032/1
**concerning [2]**
1035/21 1037/13
**concerns [14]** 1025/9
1026/25 1027/11
1028/3 1028/24
1030/12 1031/3 1033/6
1033/14 1033/20
1034/19 1037/4
1037/23 1038/12
**conclude [1]** 1050/8
**concluded [5]** 1034/10
1062/11 1065/5
1084/13 1102/5
**conduct [7]** 1025/10
1036/13 1036/15
1039/19 1041/18
1050/16 1101/8
**conducted [2]** 1069/10
1069/12
**confirm [3]** 1020/20
1021/3 1021/5
**Confirmed [1]** 1095/13
**confirms [1]** 1091/17
**confuse [1]** 1056/11
**confusing [1]** 1087/9
**confusion [1]** 1054/21
**Congress [36]**
1038/23 1038/25
1039/11 1041/1
1041/11 1043/1 1043/6
1044/8 1046/11
1048/21 1049/25
1050/2 1050/3 1050/6
1053/8 1055/11
1055/18 1055/21
1055/24 1056/4
1059/12 1059/12
1059/20 1066/9
1066/17 1066/20

**C**

**Congress... [10]**
1072/14 1072/18
1072/23 1073/17
1073/22 1076/9 1080/9
1085/22 1100/17
1100/21
**Congress' [2]** 1042/10
1047/20
**congressional [3]**
1042/17 1057/10
1069/17
**connected [2]** 1043/21
1066/3
**connection [2]** 1073/1
1073/13
**connective [1]** 1040/8
**consciously [1]**
1026/3
**consented [1]** 1091/20
**consequences [2]**
1046/8 1053/15
**consider [41]** 1025/4
1025/15 1026/1 1027/7
1027/8 1030/1 1030/9
1031/6 1031/15
1031/17 1032/4 1032/8
1032/11 1032/14
1032/17 1032/20
1033/1 1033/17
1033/22 1034/22
1034/25 1035/10
1038/2 1038/8 1041/14
1046/10 1048/21
1055/9 1065/16
1065/22 1065/25
1066/2 1066/4 1069/21
1070/3 1070/12 1074/3
1075/5 1080/6 1098/4
1098/8
**consideration [7]**
1026/13 1026/15
1028/18 1035/15
1055/22 1056/2
1059/14
**considered [2]** 1030/4
1034/4
**considering [1]**
1065/7
**consisted [1]** 1072/21
**consistencies [2]**
1032/9 1032/12
**constant [1]** 1073/23
**constitutes [1]**

1048/19
**Constitution [2]**
1017/23 1043/15
**contact [1]** 1044/23
**contempt [35]** 1038/23
1038/24 1039/11
1041/1 1041/11
1046/11 1048/21
1050/2 1050/3 1050/5
1053/5 1054/3 1054/17
1054/18 1055/23
1055/25 1056/1 1057/6
1057/8 1066/17
1066/20 1080/9
1090/15 1091/17
1091/24 1092/7
1093/23 1094/4
1094/21 1094/22
1096/25 1097/14
1097/15 1100/17
1100/21
**contemptuous [1]**
1077/7
**context [2]** 1040/17
1077/5
**continue [1]** 1067/22
**continued [2]** 1046/8
1089/20
**continuing [2]**
1089/10 1090/22
**contradicted [1]**
1032/21
**contributed [2]**
1072/15 1075/24
**control [3]** 1026/24
1086/3 1086/3
**convenient [1]**
1088/18
**convey [1]** 1034/12
**convict [1]** 1075/2
**conviction [1]** 1037/22
**convince [5]** 1089/24
1090/2 1092/22 1093/6
1093/8
**convinced [2]** 1028/13
1028/18
**coordinated [1]**
1046/24
**copies [3]** 1020/2
1020/7 1099/20
**copy [8]** 1020/4
1020/9 1022/23
1024/13 1024/15
1024/25 1059/16

1098/6
**CORCORAN [13]**
1017/17 1019/12
1047/23 1049/9 1056/8
1057/3 1059/25 1091/3
1094/7 1096/5 1097/1
1103/2 1103/13
**Corcoran's [2]** 1089/7
1090/11
**correct [7]** 1020/7
1068/12 1068/13
1068/15 1068/16
1075/19 1104/4
**Costello [19]** 1049/6
1058/20 1062/20
1062/24 1067/4 1069/9
1069/13 1076/5
1076/22 1078/10
1078/17 1078/18
1080/13 1088/24
1089/4 1089/22 1090/4
1095/12 1095/13
**could [25]** 1020/14
1020/16 1040/4
1040/12 1045/9
1046/12 1052/7
1053/14 1054/12
1056/20 1063/11
1067/25 1070/5 1070/9
1071/20 1073/20
1075/5 1077/17
1079/12 1087/16
1087/19 1088/1 1090/2
1093/6 1100/10
**couldn't [4]** 1066/24
1081/9 1092/22
1092/24
**counsel [5]** 1019/5
1019/10 1026/25
1098/3 1103/6
**count [21]** 1022/25
1023/7 1023/8 1023/23
1023/24 1028/5
1033/21 1033/24
1033/25 1034/2 1034/6
1038/13 1038/15
1039/4 1039/5 1051/10
1051/11 1100/17
1100/18 1100/21
1100/22
**Count 2 [1]** 1023/8
**countries [1]** 1085/16
**country [6]** 1057/1
1057/4 1058/14

1085/20 1086/7
1086/17
**counts [4]** 1033/20
1038/23 1050/3 1100/9
**couple [1]** 1088/4
**course [10]** 1020/3
1024/15 1030/20
1054/15 1058/13
1059/13 1066/7 1077/7
1079/8 1079/11
**court [20]** 1017/1
1017/22 1021/6
1021/16 1023/2 1025/9
1029/10 1035/5
1037/14 1037/19
1046/24 1069/4 1069/8
1073/19 1081/4 1081/9
1085/4 1091/6 1101/1
1104/3
**Court's [2]** 1018/3
1056/24
**courthouse [1]**
1056/23
**courtroom [12]** 1024/4
1026/5 1036/1 1069/11
1087/7 1096/5 1097/7
1098/17 1099/19
1100/2 1100/4 1103/9
**courts [2]** 1017/22
1091/13
**cover [2]** 1044/1
1045/9
**coverage [1]** 1035/22
**COVID [1]** 1102/15
**CR [1]** 1017/3
**CRC [1]** 1017/21
**created [5]** 1042/20
1043/9 1050/1 1051/23
1051/24
**credibility [9]** 1025/23
1031/3 1031/7 1031/11
1031/16 1065/11
1065/18 1069/2
1070/22
**credit [2]** 1032/13
1032/22
**crime [35]** 1027/7
1028/19 1041/15
1041/18 1042/17
1042/18 1048/21
1050/1 1054/3 1054/13
1055/25 1057/25
1058/21 1058/21
1058/24 1067/6 1067/7

1112

# C

**crime... [18]** 1071/2 1071/11 1073/5 1073/6 1076/2 1076/14 1079/5 1080/8 1080/9 1080/18 1080/20 1081/1 1084/19 1089/24 1090/3 1090/25 1092/23 1097/12
**crimes [4]** 1041/17 1058/2 1092/14 1092/24
**criminal [13]** 1019/3 1027/12 1028/10 1028/16 1033/7 1046/13 1066/17 1066/20 1074/24 1075/2 1079/8 1086/7 1092/21
**critical [1]** 1085/8
**critically [1]** 1101/10
**cross [2]** 1070/23 1071/8
**cross-examination [2]** 1070/23 1071/8
**cup [1]** 1085/14
**current [3]** 1022/5 1102/13 1102/14

# D

**D'Amico [1]** 1019/9
**D.C [3]** 1017/11 1047/12 1047/17
**dark [1]** 1042/22
**date [22]** 1038/18 1038/20 1038/21 1040/25 1052/18 1068/6 1068/8 1071/9 1071/10 1071/13 1076/13 1081/10 1081/12 1084/17 1094/12 1095/11 1095/19 1095/24 1095/25 1095/25 1100/7 1104/9
**dated [1]** 1100/7
**dates [27]** 1021/4 1021/7 1021/8 1021/17 1021/21 1023/10 1023/19 1039/12 1040/25 1051/8 1055/3 1055/14 1067/10 1067/11 1071/5 1071/6 1077/9 1077/11

1077/14 1077/15 1077/17 1077/17 1077/19 1077/20 1089/19 1090/6 1095/8
**DAVID [3]** 1017/14 1017/15 1019/11
**day [14]** 1017/7 1042/22 1044/9 1045/11 1045/21 1047/18 1058/11 1066/19 1073/15 1076/13 1093/13 1095/13 1097/16 1103/4
**days [4]** 1090/19 1092/21 1093/17 1102/16
**daytime [1]** 1098/24
**DC [3]** 1017/4 1017/12 1017/24
**dcd.uscourts.gov [1]** 1017/24
**deadline [9]** 1044/22 1044/23 1045/22 1054/22 1093/7 1093/7 1097/10 1097/10 1097/11
**deadlines [2]** 1055/16 1071/24
**deal [2]** 1079/9 1079/10
**dealing [2]** 1069/12 1074/23
**deceiving [1]** 1087/15
**December [1]** 1080/4
**decide [13]** 1025/20 1025/21 1025/22 1026/13 1026/17 1029/21 1035/25 1038/6 1074/7 1074/8 1080/23 1093/4 1097/2
**decider [1]** 1097/21
**deciding [1]** 1033/18
**decision [14]** 1033/10 1033/11 1047/8 1054/2 1056/22 1057/10 1067/16 1087/24 1088/21 1088/23 1089/13 1089/14 1090/23 1093/10
**declaring [1]** 1046/22
**default [4]** 1051/9 1054/20 1055/8 1055/10

**defaulted [6]** 1048/5 1048/6 1048/8 1051/6 1051/11 1051/12
**defendant [125]**
**defendant's [23]** 1027/9 1028/13 1039/22 1040/18 1044/5 1049/6 1049/9 1050/19 1050/25 1051/9 1052/12 1052/17 1054/20 1079/16 1080/12 1090/14 1092/6 1092/14 1092/20 1093/20 1095/17 1096/4 1097/5
**defense [19]** 1018/5 1019/13 1041/1 1041/11 1053/5 1055/13 1055/18 1057/14 1077/25 1078/1 1078/2 1078/4 1078/5 1078/8 1078/14 1079/17 1087/8 1090/15 1098/8
**defiance [5]** 1045/15 1057/12 1088/19 1089/8 1097/12
**defied [2]** 1093/25 1094/2
**definition [2]** 1075/25 1091/24
**defy [5]** 1042/17 1046/8 1049/24 1056/5 1088/23
**defying [1]** 1045/13
**degree [1]** 1029/25
**deliberate [16]** 1024/14 1024/16 1036/6 1040/22 1040/22 1052/13 1054/2 1065/13 1085/9 1087/24 1088/21 1090/15 1091/2 1097/5
**deliberately [4]** 1041/9 1042/16 1092/6 1092/15
**deliberation [4]** 1088/12 1093/15 1097/8 1099/18
**deliberations [15]** 1024/11 1024/19 1025/1 1026/24 1031/2

1034/10 1034/20 1035/4 1036/9 1036/14 1036/21 1037/5 1037/6 1056/25 1098/13
**delivered [1]** 1096/1
**demand [2]** 1048/7 1066/11
**demanded [1]** 1048/12
**demands [1]** 1055/9
**demeanor [2]** 1031/17 1069/5
**democracy [3]** 1043/3 1057/5 1097/18
**democratic [6]** 1066/8 1072/14 1072/15 1072/18 1072/23 1073/17
**Democrats [1]** 1085/22
**Department [1]** 1046/13
**deposition [16]** 1044/17 1046/2 1046/5 1046/20 1047/18 1048/9 1048/14 1048/17 1053/24 1059/11 1066/24 1078/22 1078/24 1080/14 1080/16 1094/2
**DEPUTY [1]** 1100/15
**described [2]** 1031/13 1052/6
**deserve [1]** 1026/7
**deserving [1]** 1056/3
**designated [1]** 1046/4
**desire [1]** 1033/3
**details [1]** 1032/7
**determine [7]** 1025/18 1026/12 1029/1 1031/9 1033/1 1041/15 1065/19
**determining [4]** 1031/4 1032/19 1038/9 1065/14
**devastating [1]** 1043/6
**diamond [1]** 1091/11
**dictate [1]** 1091/17
**dictionary [1]** 1056/1
**did [30]** 1041/2 1042/7 1042/8 1042/9 1042/24 1043/12 1044/19 1044/24 1047/19 1048/23 1049/1

**D**

**did... [19]** 1049/24
1053/24 1054/12
1056/6 1059/22
1067/17 1068/21
1069/6 1069/6 1070/3
1070/6 1072/25 1073/8
1075/9 1075/11 1076/2
1078/23 1096/12
1101/11
**didn't [36]** 1042/4
1042/6 1042/6 1044/20
1069/14 1070/12
1071/7 1075/18 1076/2
1076/4 1077/18
1077/18 1078/2 1078/7
1079/7 1080/3 1087/22
1087/25 1089/18
1089/21 1089/25
1090/6 1090/7 1090/8
1090/18 1091/1 1091/2
1094/1 1094/2 1094/7
1094/19 1094/19
1094/20 1094/24
1097/13 1097/13
**dies [1]** 1074/6
**differences [1]**
1032/16
**different [9]** 1022/3
1026/23 1063/11
1071/4 1076/22
1084/22 1086/1
1091/14 1091/23
**differently [1]** 1040/6
**difficult [2]** 1087/9
1087/13
**direct [10]** 1028/24
1029/1 1029/5 1029/11
1029/18 1029/22
1029/25 1030/2
1070/24 1071/12
**directly [1]** 1037/24
**disability [1]** 1026/9
**discharged [1]**
1101/15
**discuss [5]** 1036/3
1036/5 1050/9 1099/4
1099/11
**discussed [1]** 1073/15
**discussion [8]**
1060/14 1062/11
1063/18 1065/5
1081/22 1084/13
1101/19 1102/5

**discussions [1]**
1035/11
**disdained [1]** 1056/4
**dislikes [1]** 1025/25
**dismiss [1]** 1079/7
**dispute [1]** 1060/1
**distract [4]** 1056/11
1095/4 1095/5 1096/21
**DISTRICT [5]** 1017/1
1017/1 1017/8 1017/22
1047/5
**divided [1]** 1037/20
**do [32]** 1024/12
1024/12 1024/17
1024/21 1036/2 1036/7
1036/19 1042/15
1044/15 1044/15
1047/15 1047/17
1048/3 1048/23
1051/17 1052/21
1052/21 1066/11
1067/20 1068/1 1069/1
1069/3 1071/12
1080/22 1080/24
1088/25 1098/12
1098/25 1100/19
1100/22 1101/14
1102/19
**document [10]**
1044/13 1044/21
1044/25 1045/22
1048/16 1054/7
1055/16 1059/14
1071/1 1094/17
**documents [30]**
1041/13 1042/8
1043/16 1044/15
1044/20 1045/7
1045/18 1045/25
1046/23 1048/7
1048/12 1049/12
1049/14 1049/16
1050/4 1050/23 1051/5
1051/6 1051/12 1053/3
1053/23 1054/1
1067/15 1071/21
1077/12 1078/22
1079/22 1088/10
1093/13 1094/1
**does [26]** 1027/17
1028/16 1029/20
1029/24 1040/9
1040/17 1047/16
1052/22 1052/22

1053/4 1057/5 1057/7
1066/6 1066/6 1066/7
1066/9 1068/22
1075/20 1076/22
1078/21 1078/25
1080/13 1087/11
1090/15 1090/16
1095/12
**doesn't [10]** 1047/13
1047/14 1047/15
1078/5 1085/19
1089/13 1091/15
1091/21 1091/25
1096/10
**doing [6]** 1056/10
1066/8 1067/22
1088/25 1089/4
1089/25
**don't [19]** 1022/4
1054/22 1055/4 1055/8
1055/17 1056/11
1079/3 1087/1 1088/3
1092/14 1093/7 1095/1
1095/7 1095/16 1096/3
1096/5 1096/24 1097/8
1099/8
**Donald [5]** 1043/20
1054/14 1079/19
1088/6 1088/20
**done [9]** 1024/18
1026/16 1038/3
1053/19 1069/16
1076/8 1077/3 1077/3
1092/18
**door [2]** 1091/11
1097/9
**doubles [1]** 1047/14
**doubt [49]** 1027/16
1027/21 1028/1 1028/3
1028/5 1028/12
1028/12 1028/17
1028/23 1031/5
1033/19 1034/17
1038/10 1038/19
1039/10 1039/14
1040/2 1040/7 1040/16
1041/8 1041/16
1050/10 1059/3 1059/3
1059/4 1059/4 1059/8
1060/3 1060/7 1062/13
1062/16 1063/11
1063/12 1063/12
1065/8 1065/15
1068/19 1068/20

1072/4 1072/6 1074/17
1074/19 1074/22
1074/22 1074/25
1075/4 1075/6 1075/7
1098/11
**doubts [1]** 1075/5
**down [7]** 1042/9
1048/2 1051/14
1071/23 1075/10
1075/11 1098/24
**downplay [2]** 1073/1
1075/22
**dozens [2]** 1067/1
1067/2
**draw [1]** 1027/9
**drawn [1]** 1029/6
**drop [2]** 1073/23
1073/23
**dropouts [1]** 1096/7
**Dunn [1]** 1019/9
**Dunn-Gordon [1]**
1019/9
**during [16]** 1025/1
1025/21 1026/24
1030/20 1034/19
1036/9 1036/14
1036/17 1036/20
1037/5 1037/6 1038/7
1044/7 1056/18 1098/2
1101/9
**duty [5]** 1025/14
1027/22 1028/1
1056/22 1099/24

**E**

**each [19]** 1028/5
1033/4 1033/20
1033/22 1033/24
1034/4 1034/5 1034/6
1035/13 1039/9
1039/13 1050/7 1050/9
1072/17 1074/15
1075/3 1076/19 1086/2
1101/2
**earlier [4]** 1090/13
1092/11 1092/14
1099/6
**easily [1]** 1050/21
**edits [1]** 1019/23
**education [1]** 1026/11
**efficient [1]** 1025/11
**effort [4]** 1044/7
1089/1 1092/20
1097/15

# E

**efforts [2]** 1044/2 1053/20
**eight [1]** 1058/16
**either [2]** 1032/24 1076/23
**elapsed [1]** 1032/5
**election [2]** 1044/4 1068/25
**elections [1]** 1085/17
**electronic [2]** 1036/11 1095/6
**electronically [1]** 1036/15
**element [9]** 1027/21 1027/25 1033/15 1039/10 1039/24 1040/15 1051/13 1052/9 1052/11
**elements [10]** 1022/21 1022/22 1034/16 1038/22 1039/13 1039/23 1050/5 1050/11 1077/25 1098/10
**else [5]** 1036/3 1041/4 1051/8 1055/6 1094/24
**email [4]** 1023/16 1023/17 1054/1 1095/11
**emailed [1]** 1019/21
**emails [1]** 1036/11
**encountered [2]** 1066/10 1066/12
**encourage [1]** 1035/12
**end [2]** 1047/13 1067/22
**enforcement [2]** 1042/25 1047/11
**enforcing [1]** 1056/15
**engage [1]** 1056/25
**engaged [3]** 1044/3 1046/17 1089/2
**English [1]** 1051/14
**ensure [1]** 1057/11
**entered [4]** 1024/4 1087/7 1098/16 1100/4
**entire [5]** 1046/18 1072/1 1072/14 1089/2 1101/10
**entirely [2]** 1038/6 1098/14
**entitled [3]** 1033/5 1092/17 1104/5

**equal [1]** 1029/23
**erase [1]** 1092/14
**essence [2]** 1049/19 1069/5
**essential [3]** 1086/16 1092/2 1093/1
**essentially [3]** 1058/24 1077/10 1078/19
**establish [1]** 1038/17
**establishes [1]** 1038/19
**estate [2]** 1074/7 1074/14
**et [6]** 1078/1 1078/1 1078/6 1078/6 1080/4 1080/4
**et cetera [6]** 1078/1 1078/1 1078/6 1078/6 1080/4 1080/4
**ethnic [1]** 1026/9
**evaluating [2]** 1031/11 1032/3
**EVAN [2]** 1017/17 1019/12
**evasive [1]** 1070/21
**even [16]** 1045/7 1045/8 1054/11 1058/18 1068/17 1070/3 1070/12 1070/25 1079/5 1090/18 1092/25 1093/1 1093/11 1094/17 1094/19 1095/2
**event [5]** 1032/4 1032/5 1032/6 1032/7 1043/6
**events [4]** 1043/24 1051/25 1071/17 1073/15
**ever [3]** 1053/21 1066/19 1066/24
**every [9]** 1027/12 1027/21 1028/17 1033/7 1050/9 1058/13 1058/14 1067/1 1101/2
**everybody [2]** 1074/11 1074/11
**everyday [1]** 1097/10
**everyone [3]** 1019/15 1098/18 1100/5
**everyone's [1]** 1094/5
**everything [5]** 1045/10

1051/8 1051/8 1055/25 1093/22
**evidence [73]** 1025/21 1025/22 1026/13 1026/22 1026/23 1027/1 1027/3 1027/4 1027/6 1027/8 1027/9 1027/18 1028/9 1028/18 1028/25 1028/25 1029/2 1029/2 1029/5 1029/5 1029/7 1029/11 1029/16 1029/19 1029/20 1029/22 1029/24 1029/25 1030/2 1030/9 1030/13 1030/15 1030/18 1032/13 1032/21 1033/17 1033/17 1033/22 1034/11 1034/21 1034/24 1035/10 1035/12 1035/14 1035/15 1036/1 1036/24 1036/25 1037/2 1038/4 1038/7 1038/8 1038/19 1047/23 1049/5 1050/9 1050/25 1051/9 1053/22 1056/24 1057/22 1058/4 1058/5 1059/6 1067/14 1068/23 1074/3 1080/23 1086/14 1086/18 1092/9 1093/9 1093/22
**evil [1]** 1040/19
**exact [2]** 1020/12 1038/18
**exactly [9]** 1019/24 1021/9 1047/19 1055/21 1069/11 1069/11 1069/13 1088/25 1089/3
**examination [2]** 1070/23 1071/8
**examine [2]** 1034/22 1034/25
**example [8]** 1029/8 1031/16 1037/20 1053/12 1068/22 1074/5 1076/10 1081/3
**examples [1]** 1059/6
**except [2]** 1037/11 1037/13

**exclusive [1]** 1026/20
**excuse [15]** 1024/19 1047/9 1047/12 1053/4 1087/20 1087/20 1088/19 1089/17 1090/9 1090/9 1090/18 1094/24 1095/17 1098/13 1098/20
**excused [3]** 1041/7 1090/14 1098/18
**executive [12]** 1041/6 1052/25 1069/22 1070/8 1076/7 1076/20 1077/2 1078/11 1078/20 1079/22 1080/1 1090/14
**exempted [1]** 1045/4
**exercise [2]** 1033/9 1091/7
**Exhibit [10]** 1062/19 1062/23 1063/4 1068/3 1076/11 1076/16 1076/25 1078/14 1079/16 1080/12
**exhibits [4]** 1034/19 1034/21 1034/23 1099/21
**exists [1]** 1099/3
**exited [1]** 1100/2
**expects [1]** 1046/3
**expeditious [1]** 1071/25
**expeditiously [1]** 1071/19
**explain [1]** 1058/4
**explained [1]** 1089/6
**explains [1]** 1069/13
**explanation [2]** 1034/9 1047/10
**explore [1]** 1070/8
**exposed [1]** 1086/5
**expressed [1]** 1026/18
**expression [1]** 1026/10
**extent [2]** 1031/10 1065/20
**eyes [1]** 1087/15
**eyewitness [1]** 1029/3

# F

**face [2]** 1055/16 1086/7
**faced [1]** 1057/9
**facilitate [1]** 1035/11

## F

**facilitating [1]** 1103/5
**fact [8]** 1028/8 1029/4
1029/19 1033/24
1077/19 1089/13
1096/11 1096/21
**facts [10]** 1025/18
1025/19 1026/12
1029/1 1029/5 1038/4
1038/7 1090/2 1094/25
1095/1
**fail [1]** 1087/22
**failed [8]** 1027/25
1039/20 1041/9
1048/16 1050/17
1051/4 1055/11
1092/15
**failure [11]** 1039/5
1039/6 1039/22
1040/18 1040/20
1040/21 1040/23
1050/19 1085/9
1100/18 1100/22
**fair [8]** 1025/11 1026/7
1026/12 1030/6
1030/10 1035/9
1035/15 1074/12
**fairly [3]** 1033/5
1074/10 1080/2
**fairness [2]** 1074/4
1074/17
**fall [1]** 1055/17
**falling [2]** 1029/9
1029/11
**falsehood [1]** 1032/16
**family [3]** 1074/5
1086/4 1086/4
**fancy [1]** 1048/5
**fashion [1]** 1037/21
**fashioned [1]** 1085/15
**favor [2]** 1029/20
1093/2
**favoritism [1]** 1026/14
**FBI [7]** 1019/9 1073/3
1073/13 1075/11
1075/14 1075/16
1075/17
**fear [1]** 1026/14
**features [1]** 1043/3
**federal [3]** 1042/24
1048/19 1092/24
**feel [3]** 1025/7 1056/17
1078/7
**feeling [1]** 1056/1

**feelings [1]** 1045/11
**few [8]** 1028/14
1041/20 1050/6
1089/16 1090/19
1092/21 1093/17
1097/23
**field [1]** 1091/10
**fights [2]** 1073/23
1073/23
**figure [1]** 1074/6
**filing [1]** 1069/22
**fill [1]** 1068/17
**filled [4]** 1068/2
1068/4 1068/9 1068/14
**final [6]** 1019/18
1019/19 1019/21
1019/21 1024/20
1052/10
**finalize [1]** 1099/19
**finally [4]** 1041/8
1041/14 1046/3 1046/7
**find [29]** 1027/20
1027/22 1027/24
1028/1 1028/19
1028/23 1033/24
1038/7 1039/10
1039/11 1040/1 1041/8
1050/7 1057/13 1059/1
1059/5 1060/4 1068/20
1080/7 1080/8 1080/17
1080/25 1085/12
1085/13 1097/15
1100/19 1100/20
1100/23 1100/24
**finding [2]** 1056/12
1092/2
**fine [2]** 1047/14
1102/21
**firm [1]** 1071/10
**firmly [2]** 1028/13
1028/18
**first [13]** 1020/20
1021/4 1024/13 1035/4
1039/15 1042/19
1045/22 1050/11
1068/6 1079/21
1090/23 1091/12
1095/24
**FIVE [2]** 1017/7
1086/15
**Floor [1]** 1017/19
**flouts [1]** 1056/16
**focus [1]** 1085/7
**Folks [1]** 1097/7

**follow [3]** 1025/4
1025/16 1053/10
**followed [1]** 1054/18
**following [2]** 1039/13
1068/25
**follows [1]** 1077/13
**fooled [1]** 1093/7
**forbid [1]** 1074/5
**force [1]** 1046/10
**foregoing [1]** 1104/4
**foreperson [7]** 1035/3
1035/4 1035/6 1035/10
1037/8 1100/8 1100/13
**forget [1]** 1057/20
**forgot [1]** 1093/12
**form [8]** 1020/21
1029/20 1034/8 1034/9
1034/10 1034/14
1034/17 1099/21
**formal [1]** 1027/6
**former [14]** 1046/24
1052/24 1054/8 1088/6
1088/14 1088/15
1088/18 1088/22
1090/21 1091/6
1091/15 1093/3
1093/16 1093/23
**forth [5]** 1049/7 1053/8
1067/3 1070/4 1071/4
**forward [1]** 1019/5
**foul [1]** 1093/8
**foundation [1]** 1072/1
**foundational [2]**
1057/1 1097/17
**fourth [4]** 1039/21
1040/15 1050/19
1052/10
**free [4]** 1025/7
1075/21 1099/11
1099/18
**friend [2]** 1088/6
1093/3
**friendship [2]** 1032/1
1066/2
**front [1]** 1054/6
**fulfill [1]** 1056/22
**full [2]** 1035/15
1054/19
**fully [2]** 1046/5
1046/17
**fun [1]** 1053/12
**function [3]** 1025/10
1025/18 1053/10
**funding [2]** 1043/8

1053/20
**further [1]** 1056/20
**Furthermore [1]**
1043/23
**future [5]** 1078/25
1080/11 1080/15
1080/17 1080/19

## G

**gain [2]** 1031/25
1074/14
**GASTON [8]** 1017/11
1019/8 1041/23 1058/6
1072/10 1072/16
1081/17 1096/7
**gathered [1]** 1094/17
**gave [3]** 1036/8 1054/9
1088/4
**gender [1]** 1026/10
**general [2]** 1071/18
1071/24
**Generally [1]** 1025/25
**gentlemen [8]** 1024/5
1054/3 1087/8 1092/19
1097/22 1098/2
1099/17 1101/5
**get [24]** 1022/21
1024/15 1047/15
1047/16 1053/15
1053/19 1058/23
1065/22 1069/19
1070/3 1074/7 1076/7
1076/23 1077/2 1089/1
1091/7 1091/8 1091/11
1091/21 1091/25
1092/13 1092/24
1093/2 1094/3
**gets [5]** 1047/4 1047/5
1047/14 1055/20
1074/9
**getting [3]** 1024/13
1066/10 1070/8
**Gettr [1]** 1045/13
**give [28]** 1020/13
1024/7 1025/22
1028/22 1029/8
1029/21 1029/23
1033/4 1043/16
1047/10 1053/3
1055/21 1059/7 1060/4
1060/9 1068/19
1070/20 1072/5 1074/5
1074/22 1075/7
1078/21 1088/5

**G**

**give... [5]** 1088/19
1092/13 1092/17
1093/4 1097/24
**given [5]** 1021/19
1021/22 1034/15
1034/25 1088/7
**gives [5]** 1072/4
1074/21 1074/21
1080/22 1097/1
**giving [1]** 1022/11
**go [16]** 1020/10
1024/14 1035/8 1047/8
1050/5 1053/24 1069/7
1070/18 1071/23
1080/1 1091/6 1091/6
1091/10 1093/14
1097/8 1101/17
**goal [1]** 1026/5
**God [2]** 1074/5
1085/19
**goes [3]** 1072/10
1072/19 1074/10
**going [21]** 1020/21
1023/11 1024/21
1044/10 1048/20
1049/6 1058/4 1059/1
1069/1 1074/6 1074/16
1077/22 1088/5 1088/9
1089/3 1090/21
1090/21 1092/21
1093/4 1098/22 1099/3
**good [14]** 1019/2
1019/7 1019/11
1019/15 1019/16
1024/5 1024/6 1041/24
1041/25 1053/4
1057/18 1057/19
1093/11 1100/5
**Gordon [1]** 1019/9
**got [14]** 1043/12
1047/7 1052/18
1070/21 1070/22
1074/2 1075/5 1075/6
1079/9 1079/10
1080/22 1081/10
1094/22 1095/14
**govern [2]** 1059/10
1059/11
**government [49]**
1018/4 1019/6 1027/15
1027/20 1027/24
1028/4 1031/4 1033/15
1033/18 1034/17
1038/10 1039/9
1039/12 1040/2 1040/6
1040/15 1041/11
1041/16 1042/13
1042/24 1043/5
1047/12 1047/17
1053/10 1053/18
1057/6 1059/1 1059/8
1065/8 1065/14 1067/5
1071/10 1072/4
1076/13 1078/15
1087/5 1087/18 1089/1
1089/14 1089/24
1090/2 1091/14
1092/23 1094/17
1096/16 1096/22
1097/17 1102/8
1102/21
**government's [18]**
1028/10 1042/10
1053/11 1053/17
1062/13 1062/19
1062/23 1063/4
1063/12 1068/3
1068/19 1072/2
1076/11 1076/16
1076/24 1078/3
1091/19 1103/10
**Great [1]** 1078/19
**greater [2]** 1029/24
1091/19
**ground [2]** 1029/14
1029/15
**grounded [2]** 1089/11
1089/12
**guess [2]** 1020/19
1047/24
**guilt [3]** 1027/9
1027/10 1028/13
**guilty [25]** 1027/15
1027/23 1028/2 1028/4
1028/19 1028/20
1028/22 1028/23
1033/12 1033/25
1033/25 1039/11
1041/17 1050/8
1057/13 1059/5
1068/20 1080/7 1080/8
1080/18 1085/13
1085/13 1097/21
1100/20 1100/24
**GULLAND [1]** 1017/11

**H**

**H.Res [1]** 1059/20
**had [53]** 1019/19
1020/21 1029/10
1029/16 1029/17
1031/22 1040/11
1041/6 1043/19
1043/20 1043/23
1044/23 1045/7
1045/10 1045/17
1045/18 1045/22
1048/5 1048/6 1048/8
1048/11 1048/15
1051/5 1052/4 1052/25
1053/2 1053/4 1053/7
1055/2 1055/23 1057/8
1063/8 1066/13
1066/16 1066/19
1069/9 1070/24
1070/25 1071/16
1073/10 1073/16
1074/15 1075/3
1078/14 1079/13
1090/5 1090/6 1091/6
1094/19 1095/18
1096/12 1097/14
1097/15
**hadn't [2]** 1092/23
1094/13
**half [1]** 1019/22
**hand [4]** 1027/24
1028/21 1029/5
1098/24
**handful [1]** 1067/4
**handing [1]** 1043/4
**hands [1]** 1085/22
**handwritten [1]**
1095/6
**haphazard [1]** 1094/3
**happen [2]** 1029/12
1085/19
**happened [4]** 1048/25
1056/13 1069/22
1096/17
**happening [2]**
1053/21 1096/17
**happens [5]** 1036/4
1043/8 1056/14
1057/12 1099/2
**happy [1]** 1096/11
**hard [9]** 1020/1 1020/7
1020/9 1044/13
1055/16 1087/9
1087/13 1094/25
1094/25

**hard-copy [1]** 1020/9
**harm [1]** 1093/8
**Hart [6]** 1045/6
1046/16 1073/2 1073/9
1089/23 1090/4
**Hart's [1]** 1095/2
**has [58]** 1021/16
1025/10 1027/15
1027/20 1027/25
1028/4 1030/9 1031/4
1031/12 1031/21
1031/24 1031/25
1032/21 1032/23
1033/1 1033/7 1033/8
1033/18 1038/10
1039/12 1041/16
1045/24 1047/8 1047/9
1047/13 1048/15
1049/25 1053/8
1055/21 1056/8 1057/6
1057/7 1059/2 1059/2
1059/8 1059/16 1065/8
1065/14 1065/23
1065/25 1066/2 1066/8
1066/22 1068/24
1068/24 1072/4 1072/9
1072/9 1073/6 1076/16
1078/11 1078/21
1084/16 1085/5
1086/17 1088/6
1089/13 1100/15
**hasn't [4]** 1092/5
1092/9 1092/18
1093/13
**have [89]**
**haven't [1]** 1094/17
**having [1]** 1031/20
**he [193]**
**he's [11]** 1073/4
1073/5 1077/3 1077/3
1081/18 1085/13
1090/21 1090/22
1092/16 1093/4 1097/2
**health [1]** 1098/19
**healthy [1]** 1098/20
**hear [2]** 1047/23
1085/18
**heard [26]** 1045/6
1050/6 1050/24 1051/1
1058/8 1065/10
1065/12 1072/15
1072/17 1072/19
1073/2 1073/2 1073/3

1117

# H

**heard... [13]** 1073/8
1077/10 1077/23
1078/7 1085/16
1089/23 1090/4
1091/13 1091/14
1094/13 1097/23
1097/25 1098/5
**heart [1]** 1093/20
**held [1]** 1042/15
**hell [2]** 1044/10
1058/12
**help [3]** 1035/11
1074/7 1097/3
**her [32]** 1035/14
1059/22 1066/16
1068/8 1068/10 1069/4
1069/4 1069/7 1069/8
1070/1 1070/15
1070/22 1070/22
1070/23 1071/8
1071/11 1071/14
1072/3 1072/7 1072/12
1072/14 1072/15
1073/1 1073/8 1073/12
1073/25 1074/1
1075/10 1075/11
1075/22 1075/24
1091/15
**here [31]** 1033/8
1035/5 1037/14
1038/23 1041/15
1044/5 1047/4 1049/4
1050/9 1051/17 1052/7
1052/22 1055/23
1056/4 1069/4 1069/14
1071/12 1072/2 1078/6
1078/23 1080/14
1087/10 1088/3 1088/9
1088/16 1089/15
1089/25 1093/6
1095/15 1097/11
1098/10
**Here's [1]** 1075/15
**hereby [1]** 1087/17
**herman [4]** 1017/21
1017/24 1104/3 1104/9
**herself [5]** 1032/24
1068/2 1069/10
1069/12 1073/24
**Hey [2]** 1073/6 1079/6
**hide [2]** 1073/12
1090/17
**hiding [1]** 1089/5

**highlighted [1]**
1076/15
**him [47]** 1027/23
1028/6 1028/20
1028/23 1028/23
1032/23 1033/10
1041/7 1041/13 1045/4
1045/17 1045/22
1046/1 1046/2 1046/9
1047/17 1048/10
1048/11 1048/20
1048/21 1051/2
1052/24 1054/9
1054/17 1054/18
1054/19 1056/5
1056/11 1057/13
1068/20 1071/2
1071/19 1073/2 1073/3
1073/4 1077/2 1078/12
1079/5 1079/8 1084/25
1085/13 1088/25
1090/14 1090/19
1091/2 1091/5 1094/13
**himself [1]** 1091/7
**hindsight [2]** 1058/18
1084/22
**Hindsight's [1]**
1084/23
**his [63]** 1027/18
1029/10 1029/15
1033/11 1035/14
1041/3 1041/4 1041/5
1044/22 1045/2
1045/11 1045/15
1045/21 1046/9
1046/15 1046/20
1047/5 1047/12
1047/14 1047/22
1048/17 1051/1 1051/1
1052/23 1053/3 1054/6
1054/16 1056/7 1056/7
1057/3 1057/25
1058/11 1058/19
1070/7 1076/5 1076/20
1080/10 1081/2
1084/25 1085/1 1088/2
1088/19 1089/1 1089/1
1089/4 1089/23
1090/15 1090/22
1091/1 1091/17
1091/18 1091/18
1091/22 1092/8
1092/21 1093/1 1093/3
1094/2 1094/3 1094/3

1094/15 1094/16
1096/25
**historic [1]** 1043/1
**history [1]** 1042/23
**hold [2]** 1030/16
1033/9
**holding [1]** 1020/4
**honestly [3]** 1081/1
1086/2 1086/6
**Honor [40]** 1019/2
1019/7 1019/11
1019/14 1019/16
1020/6 1020/11
1020/16 1022/4
1022/14 1022/24
1023/3 1023/9 1023/16
1057/15 1057/17
1059/18 1059/24
1060/2 1060/10
1060/11 1063/16
1065/6 1070/11
1079/14 1081/6
1081/16 1081/20
1084/14 1085/2
1085/23 1086/21
1086/23 1087/6
1101/17 1102/10
1102/22 1102/23
1103/12 1103/14
**HONORABLE [1]**
1017/8
**hostility [1]** 1032/1
1066/2
**Hotel [1]** 1044/6
**hour [1]** 1019/22
**House [8]** 1039/1
1042/20 1043/20
1046/13 1051/22
1053/25 1054/19
1076/18
**how [26]** 1026/16
1029/21 1035/6
1037/17 1037/19
1051/17 1053/13
1056/13 1068/1
1073/25 1074/8
1080/25 1087/16
1087/19 1088/1
1088/12 1088/18
1093/19 1096/3
1096/17 1097/4 1097/5
1100/18 1100/22
1101/7 1103/1
**however [5]** 1029/13

1033/16 1035/8 1038/6
1099/12
**human [5]** 1025/24
1071/5 1095/18
1095/19 1096/2
**hypothetical [3]**
1081/18 1081/19
1084/15

# I

**I'd [2]** 1035/18 1059/25
**I'll [5]** 1024/12 1069/16
1076/8 1077/5 1077/8
**I'm [12]** 1021/12
1058/4 1060/9 1065/23
1072/24 1072/24
1075/12 1078/17
1090/21 1098/22
1099/3 1102/18
**I've [8]** 1019/24
1034/15 1035/17
1036/18 1039/8
1069/16 1076/8 1077/3
**idea [2]** 1055/19
1058/11
**ideas [1]** 1070/4
**identification [1]**
1034/24
**identifying [1]** 1021/13
**identity [1]** 1026/10
**ignore [11]** 1025/5
1025/16 1026/19
1030/21 1030/25
1047/15 1048/1
1053/14 1053/17
1055/4 1097/5
**ignored [3]** 1047/19
1047/24 1048/2
**ignoring [1]** 1048/7
**illegally [1]** 1053/16
**illegally-parked [1]**
1053/16
**Imagine [3]** 1047/4
1081/5 1081/8
**immaterial [1]** 1040/21
**impartial [4]** 1026/6
1030/7 1030/10
1074/18
**implicit [1]** 1026/2
**important [14]** 1042/2
1042/12 1042/12
1053/18 1056/20
1058/17 1059/14
1073/4 1074/4 1080/6

**I**

important... **[4]**
1086/18 1099/24
1101/10 1101/12
**impossible [1]**
1081/10
**impresses [2]** 1031/19
1031/20
**improbability [1]**
1032/18
**improper [1]** 1033/10
**inadmissible [1]**
1030/12
**inadvertence [2]**
1040/24 1085/10
**inadvertently [1]**
1036/2
**include [7]** 1021/6
1021/13 1022/18
1023/11 1023/12
1023/18 1023/19
**included [1]** 1070/17
**includes [1]** 1036/10
**including [4]** 1032/5
1040/24 1071/24
1102/15
**income [1]** 1026/11
**inconsistencies [4]**
1032/9 1032/12
1032/14 1098/7
**independent [1]**
1036/13
**indicate [1]** 1038/5
**indicated [1]** 1026/18
**indicating [1]** 1026/16
**indictment [18]** 1021/4
1021/7 1021/11
1021/23 1023/2 1023/7
1023/10 1023/21
1023/22 1027/5 1027/6
1027/8 1033/21
1033/25 1034/2
1038/13 1038/24
1041/19
**indictment's [1]**
1021/19
**infer [1]** 1038/1
**inference [1]** 1027/10
**inferences [1]** 1029/6
**influence [1]** 1034/1
**inform [1]** 1071/22
**information [23]**
1039/1 1039/17
1039/25 1040/1 1040/4

1040/9 1040/10
1040/14 1043/13
1043/24 1044/2
1050/15 1051/15
1052/4 1052/7 1057/9
1057/11 1071/19
1071/20 1092/1 1092/3
1093/2 1099/16
**informed [1]** 1054/23
**injecting [1]** 1096/18
**innocence [3]** 1027/12
1027/14 1027/18
**innocent [4]** 1027/13
1058/2 1058/5 1086/20
**inquiry [1]** 1040/9
**instances [2]** 1076/19
1077/10
**instead [4]** 1049/24
1054/1 1092/4 1098/9
**instruct [5]** 1025/12
1025/14 1077/23
1085/4 1099/4
**instructed [4]** 1052/11
1065/23 1090/13
1092/11
**instruction [46]**
1019/23 1021/14
1022/5 1022/8 1022/12
1022/15 1022/19
1022/20 1022/22
1022/22 1023/12
1023/13 1023/20
1024/13 1024/23
1025/9 1025/17
1026/21 1026/25
1027/5 1027/11 1028/3
1028/24 1030/3
1030/12 1031/3 1033/6
1033/14 1033/20
1034/3 1034/8 1034/19
1035/2 1035/16
1035/16 1036/8
1036/17 1037/4
1037/23 1038/12
1038/22 1041/14
1077/24 1085/8
1097/24 1098/1
**instructions [32]**
1018/3 1019/19 1020/2
1021/10 1022/4 1022/6
1024/10 1024/14
1024/20 1024/22
1024/23 1024/24
1025/1 1025/2 1025/3

1025/4 1025/6 1025/8
1025/15 1034/14
1034/16 1041/20
1056/24 1058/22
1065/12 1065/13
1077/23 1085/6
1098/10 1099/6
1099/19 1101/7
**Intelligence [2]**
1076/18 1076/19
**intend [3]** 1020/12
1094/7 1096/13
**intended [4]** 1020/2
1027/2 1037/2 1068/11
**intent [4]** 1081/12
1081/13 1081/14
1085/5
**intentional [6]**
1032/15 1040/22
1040/22 1045/1
1052/13 1085/9
**intentionally [3]**
1041/9 1076/3 1080/25
**interactions [1]**
1069/9
**interest [7]** 1031/24
1032/25 1058/8 1066/1
1066/7 1071/18
1071/24
**internet [4]** 1035/20
1036/16 1099/7 1099/9
**interview [2]** 1073/9
1075/12
**interviewed [2]**
1066/14 1075/16
**interviews [1]** 1043/13
**introduce [1]** 1019/5
**introduced [1]**
1079/18
**invested [1]** 1101/10
**investigate [3]** 1039/2
1043/10 1051/20
**investigating [2]**
1073/3 1073/5
**investigation [8]**
1036/14 1039/18
1040/5 1040/12
1050/15 1076/18
1102/13 1102/25
**investigator [1]**
1093/17
**invite [1]** 1035/13
**invocation [1]** 1076/20
**invoked [1]** 1079/22

**invoking [1]** 1046/10
**involved [4]** 1057/22
1066/23 1066/25
1074/11
**involving [1]** 1074/20
**irony [1]** 1097/3
**is [253]**
**issue [7]** 1022/3
1047/1 1060/1 1062/12
1067/9 1069/18
1074/20
**issued [4]** 1040/3
1040/8 1043/14 1067/1
**issues [1]** 1098/8
**issuing [1]** 1045/16
**it [178]**
**it's [34]** 1023/1
1057/21 1057/24
1058/17 1058/24
1059/3 1067/7 1068/3
1068/17 1068/25
1071/10 1073/15
1074/12 1076/11
1076/12 1077/7 1078/3
1080/5 1080/11
1085/25 1086/18
1087/2 1087/14 1090/8
1090/24 1090/25
1090/25 1091/22
1093/8 1093/11
1095/20 1095/25
1096/19 1098/15
**items [2]** 1052/3
1088/13
**its [18]** 1042/8 1043/14
1045/12 1048/1
1051/19 1053/10
1053/18 1053/20
1057/7 1059/2 1059/2
1059/8 1065/8 1067/22
1067/22 1072/5 1093/2
1096/23
**itself [2]** 1030/6
1052/3

**J**

**January [25]** 1039/2
1042/7 1042/22
1043/10 1043/22
1043/25 1044/7 1044/9
1044/10 1051/20
1052/1 1053/21
1056/13 1057/9
1057/11 1057/20

**J**

**January... [9]** 1057/24 1058/12 1058/14 1071/17 1078/19 1087/19 1088/15 1091/8 1102/15
**January 6 [1]** 1042/7
**January 6th [19]** 1039/2 1042/22 1043/10 1043/22 1043/25 1044/10 1051/20 1052/1 1053/21 1056/13 1057/9 1057/11 1057/24 1058/12 1071/17 1087/19 1088/15 1091/8 1102/15
**jointly [2]** 1020/21 1021/1
**joints [1]** 1087/23
**judge [11]** 1017/8 1050/6 1052/6 1052/11 1052/21 1069/1 1069/19 1077/4 1077/23 1090/13 1092/11
**Judge's [1]** 1069/19
**judges [3]** 1025/19 1031/7 1065/18
**Judging [1]** 1031/11
**judgment [5]** 1031/15 1033/5 1034/4 1067/17 1068/1
**July [6]** 1017/5 1078/16 1079/18 1080/5 1100/7 1104/9
**juror [7]** 1034/4 1034/5 1035/13 1098/13 1098/19 1098/20 1098/22
**jurors [7]** 1028/6 1036/3 1036/17 1036/18 1037/1 1037/17 1099/3
**jury [48]** 1017/7 1019/19 1020/5 1020/13 1020/15 1022/8 1024/3 1024/4 1024/10 1025/17 1025/18 1030/5 1034/20 1035/3 1036/6 1036/10 1036/20 1037/5 1037/9 1037/10

1037/12 1037/20 1056/18 1056/22 1065/24 1067/5 1075/1 1076/24 1077/22 1081/5 1085/6 1087/7 1097/2 1097/22 1099/2 1099/13 1099/15 1099/17 1099/19 1100/2 1100/4 1100/7 1100/13 1100/15 1101/1 1101/2 1101/5 1101/9
**just [46]** 1019/17 1020/6 1020/20 1021/5 1022/9 1022/14 1022/21 1022/22 1022/24 1023/13 1024/7 1024/20 1026/5 1035/9 1036/3 1047/15 1049/4 1050/6 1051/8 1052/11 1052/16 1053/6 1053/14 1065/23 1067/14 1069/6 1069/22 1069/23 1072/1 1073/19 1076/10 1078/2 1081/10 1081/11 1090/11 1090/13 1090/19 1090/20 1091/16 1096/2 1097/4 1097/23 1097/25 1100/6 1101/2 1101/18
**justice [2]** 1026/8 1046/13

**K**

**keep [2]** 1034/23 1096/2
**keeps [1]** 1095/4
**kept [1]** 1090/5
**key [4]** 1058/23 1065/9 1065/22 1067/10
**kid [1]** 1089/12
**kidding [1]** 1090/20
**kind [2]** 1027/8 1084/24
**knew [6]** 1045/17 1045/18 1046/14 1052/15 1053/1 1089/3
**know [49]** 1022/5 1028/14 1036/4 1036/18 1043/19 1046/14 1048/25

1050/22 1051/3 1051/5 1051/10 1051/11 1051/17 1051/24 1052/1 1053/22 1054/4 1055/25 1059/1 1067/19 1067/20 1068/1 1069/1 1069/3 1073/4 1077/16 1077/18 1077/18 1084/21 1084/24 1086/16 1087/18 1088/14 1089/15 1089/15 1090/16 1092/20 1093/19 1093/22 1094/6 1094/14 1094/19 1095/3 1096/5 1097/9 1097/9 1101/7 1101/13 1103/1
**knowing [1]** 1037/25
**knowledge [5]** 1029/4 1059/23 1070/24 1070/25 1071/12
**known [3]** 1072/16 1074/15 1075/3
**knows [3]** 1084/16 1089/12 1098/18

**L**

**lack [1]** 1033/17
**ladies [8]** 1024/5 1054/3 1087/8 1092/19 1097/22 1098/2 1099/17 1101/5
**laid [1]** 1042/20
**language [4]** 1021/9 1021/13 1021/22 1078/5
**lapses [1]** 1032/15
**large [1]** 1068/25
**last [6]** 1055/6 1062/21 1063/1 1090/8 1097/23 1098/12
**last-minute [1]** 1090/8
**Lastly [1]** 1056/7
**late [2]** 1075/5 1102/17
**later [9]** 1029/10 1032/6 1036/7 1041/12 1041/13 1058/17 1062/12 1099/22 1103/3
**law [20]** 1017/15 1025/12 1025/12 1025/14 1027/17

1028/16 1029/18 1029/20 1034/15 1041/4 1042/24 1048/15 1048/19 1054/14 1056/15 1057/2 1077/24 1085/5 1097/20 1097/21
**lawful [1]** 1047/20
**lawmakers [1]** 1043/1
**lawsuit [3]** 1049/18 1069/22 1092/25
**lawyer [14]** 1030/15 1030/16 1046/15 1049/6 1052/23 1058/20 1062/24 1069/10 1069/13 1076/5 1081/10 1081/10 1081/11 1084/25
**lawyer's [2]** 1030/18 1030/21
**lawyers [5]** 1027/1 1027/3 1030/13 1066/23 1067/8
**lead [1]** 1071/20
**leading [2]** 1043/25 1051/25
**leads [1]** 1092/3
**learn [2]** 1043/7 1074/13
**learned [2]** 1079/13 1096/6
**least [1]** 1101/8
**leave [2]** 1097/8 1098/22
**leaves [1]** 1028/12
**leaving [1]** 1103/7
**legal [5]** 1041/3 1041/6 1047/2 1066/22 1067/9
**legalese [1]** 1059/13
**legally [1]** 1049/13
**legislation [4]** 1043/2 1043/8 1051/23 1053/20
**legit [1]** 1063/15
**Lesley [6]** 1020/14 1024/3 1098/25 1099/15 1100/10 1101/4
**let [12]** 1029/8 1036/4 1049/4 1053/1 1053/6 1056/11 1062/12 1062/17 1074/5 1076/10 1089/22

# L

**let... [1]** 1090/10
**let's [13]** 1042/17
1042/19 1046/25
1050/5 1051/13 1055/6
1074/7 1076/6 1076/7
1078/12 1087/2 1088/9
1095/10
**letter [26]** 1044/1
1045/3 1049/2 1055/1
1055/1 1058/7 1062/19
1062/21 1062/23
1063/1 1063/4 1076/10
1076/11 1076/23
1078/4 1078/18
1079/19 1080/5
1080/12 1081/4 1081/9
1090/19 1093/16
1093/21 1094/15
1094/22
**letters [16]** 1048/1
1049/10 1052/2 1054/5
1054/6 1067/3 1067/4
1067/7 1071/4 1078/9
1078/9 1079/3 1079/18
1079/18 1087/20
1093/5
**level [1]** 1026/11
**lies [1]** 1039/9
**life [2]** 1086/5 1097/10
**like [18]** 1021/12
1022/7 1022/8 1035/18
1052/18 1053/17
1053/21 1056/15
1057/12 1059/25
1066/9 1069/16
1070/19 1089/10
1091/9 1099/7 1102/16
1102/19
**likelihood [1]** 1099/10
**likely [2]** 1028/8
1099/22
**likes [1]** 1025/24
**limited [2]** 1089/15
1092/4
**line [1]** 1101/17
**lines [1]** 1095/22
**listen [10]** 1024/15
1035/23 1035/24
1056/23 1067/14
1069/6 1069/14
1085/15 1086/14
1097/13
**little [2]** 1058/6 1100/6

**live [2]** 1053/13
1095/22
**location [1]** 1052/19
**loggerheads [1]**
1066/24
**long [5]** 1040/21
1053/1 1073/25
1077/13 1078/16
**long-time [1]** 1073/25
**longer [1]** 1073/25
**look [20]** 1022/7
1022/9 1051/24 1055/1
1062/21 1067/6
1067/14 1068/6 1068/6
1068/7 1070/17 1074/8
1076/15 1078/10
1080/7 1080/21
1086/15 1088/11
1094/20 1095/10
**looked [2]** 1029/9
1029/13
**looking [3]** 1051/16
1051/19 1102/18
**loose [2]** 1044/11
1058/13
**lorraine [4]** 1017/21
1017/24 1104/3 1104/9
**lot [3]** 1059/13
1077/12 1094/7

# M

**made [22]** 1019/22
1019/25 1030/14
1030/17 1032/11
1038/3 1043/13 1044/9
1045/11 1054/2
1058/24 1085/12
1087/24 1089/13
1089/14 1090/7
1090/11 1090/17
1090/17 1090/23
1092/6 1094/15
**magic [1]** 1077/14
**mail [1]** 1081/4
**major [1]** 1058/13
**make [12]** 1022/20
1043/7 1043/7 1047/8
1056/13 1068/22
1072/24 1074/18
1087/9 1090/22
1091/10 1092/6
**makes [1]** 1052/20
**making [3]** 1056/9
1091/16 1095/17

**malleable [1]** 1090/7
**man [4]** 1042/4 1042/4
1057/25 1091/19
**manner [2]** 1025/11
1031/18
**many [2]** 1088/12
1097/11
**marked [1]** 1034/23
**marshal [2]** 1037/8
1037/17
**matter [13]** 1037/12
1037/20 1040/10
1051/16 1051/18
1052/12 1052/23
1053/5 1053/7 1077/19
1079/3 1102/19 1104/5
**matters [4]** 1031/14
1031/23 1040/12
1052/7
**MATTHEW [1]** 1017/17
**may [41]** 1025/1
1025/2 1025/4 1025/16
1026/3 1026/15
1026/16 1027/8 1028/6
1029/1 1029/6 1031/15
1031/17 1032/4 1032/8
1032/11 1032/13
1032/17 1032/20
1032/25 1033/16
1033/24 1034/21
1035/19 1035/19
1035/22 1036/9
1036/13 1036/14
1036/19 1037/7 1038/1
1038/2 1053/6 1053/11
1056/17 1070/15
1073/24 1080/10
1080/18 1098/8
**maybe [1]** 1084/22
**MC [1]** 1017/19
**me [27]** 1021/9
1021/12 1025/7 1025/8
1026/22 1029/8
1034/12 1036/4 1037/5
1037/7 1037/11
1037/17 1037/19
1049/4 1053/1 1053/6
1062/12 1062/17
1074/5 1076/10
1080/11 1088/4 1088/5
1088/7 1089/22
1090/10 1093/4
**mean [4]** 1020/6
1040/17 1073/16

1075/21
**meaningful [1]**
1031/22
**means [11]** 1029/19
1031/11 1036/14
1037/18 1040/23
1051/14 1052/12
1052/15 1052/16
1075/21 1085/9
**meant [1]** 1034/18
**media [3]** 1035/22
1058/14 1088/2
**mediator [2]** 1074/8
1074/15
**meet [1]** 1043/2
**meetings [1]** 1044/6
**member [6]** 1037/10
1037/12 1072/13
1072/18 1072/23
1074/6
**members [9]** 1037/8
1042/25 1044/7 1066/8
1072/14 1072/21
1073/15 1075/17
1101/1
**memoranda [1]**
1103/3
**memory [9]** 1026/23
1026/24 1031/21
1032/3 1032/15
1036/23 1036/25
1037/2 1057/21
**mention [2]** 1024/12
1089/25
**mentioned [1]** 1039/8
**mere [1]** 1031/15
**merely [1]** 1027/6
**merits [1]** 1037/13
**might [8]** 1043/24
1055/3 1068/21 1075/4
1084/21 1084/24
1088/14 1089/19
**mind [12]** 1034/23
1037/15 1037/23
1037/24 1038/1 1038/5
1038/11 1069/6 1075/6
1081/15 1084/18
1084/18
**mindful [1]** 1035/8
**minimum [1]** 1102/7
**minute [9]** 1046/25
1055/6 1075/1 1075/23
1079/7 1086/23 1090/8
1090/10 1095/10

# M

**minutes [3]** 1050/7
1087/1 1087/1
**mirrored [1]** 1069/8
**missed [2]** 1045/23
1055/2
**missing [2]** 1087/10
1087/12
**mission [2]** 1035/9
1052/5
**mistake [23]** 1032/15
1040/24 1040/24
1045/1 1045/19
1052/18 1053/24
1054/21 1055/4 1055/7
1055/7 1055/10
1058/20 1058/24
1072/24 1084/25
1085/11 1085/12
1090/1 1090/8 1090/12
1090/24 1094/14
**mistaken [1]** 1089/19
**misunderstanding [1]**
1032/15
**mob [1]** 1042/23
**modern [1]** 1095/23
**modest [1]** 1019/22
**modifies [1]** 1034/16
**MOLLY [2]** 1017/11
1019/8
**moment [4]** 1022/8
1022/10 1054/23
1073/19
**momentarily [1]**
1056/24
**money [2]** 1072/15
1075/24
**Montgomery [1]**
1017/16
**months [11]** 1058/16
1067/23 1074/10
1074/10 1074/11
1089/16 1092/1 1092/4
1092/10 1092/17
1092/22
**more [10]** 1028/8
1028/11 1037/8
1049/21 1051/9
1066/14 1067/23
1088/4 1089/22 1092/1
**morning [17]** 1019/2
1019/7 1019/11
1019/15 1019/16
1020/25 1024/5 1024/6

1024/9 1024/11
1024/21 1041/24
1041/25 1057/18
1057/19 1090/13
1092/12
**mornings [1]** 1085/14
**most [5]** 1043/2
1071/8 1071/11
1085/14 1092/4
**motivated [1]** 1032/25
**motive [5]** 1033/14
1033/14 1033/16
1033/17 1033/17
**mountaintop [1]**
1088/3
**Mr [7]** 1019/12
1019/18 1049/13
1049/15 1063/9
1076/12 1079/11
**Mr. [45]** 1019/12
1045/24 1045/24
1046/3 1047/23
1048/15 1049/5 1049/6
1056/8 1057/3 1058/8
1058/19 1058/20
1059/25 1062/24
1069/9 1069/12 1070/5
1070/9 1071/10
1071/13 1071/16
1076/14 1076/16
1076/21 1076/22
1079/7 1080/18
1084/22 1085/12
1089/4 1089/7 1089/22
1090/4 1090/11 1091/3
1094/7 1095/12
1095/13 1096/5 1097/1
1103/2 1103/6 1103/13
1103/13
**Mr. Bannon [18]**
1019/12 1045/24
1048/15 1058/8
1058/19 1070/5 1070/9
1071/10 1071/13
1071/16 1076/14
1076/16 1076/21
1079/7 1080/18
1084/22 1085/12
1103/6
**Mr. Bannon's [4]**
1046/3 1062/24 1069/9
1069/12
**Mr. Corcoran [11]**
1047/23 1049/5 1056/8

1057/3 1059/25 1091/3
1094/7 1096/5 1097/1
1103/2 1103/13
**Mr. Corcoran's [2]**
1089/7 1090/11
**Mr. Costello [8]**
1049/6 1058/20
1076/22 1089/4
1089/22 1090/4
1095/12 1095/13
**Mr. Schoen [1]**
1103/13
**Mr. Trump [1]** 1045/24
**Ms [2]** 1072/16
1095/21
**Ms. [48]** 1020/14
1023/6 1024/3 1041/23
1041/23 1042/3 1049/7
1052/1 1058/6 1058/9
1059/9 1059/22
1062/14 1063/8 1066/6
1066/6 1066/16
1067/17 1068/21
1069/3 1070/1 1070/6
1070/14 1072/2 1072/7
1072/9 1072/10
1072/12 1072/16
1072/25 1073/21
1073/24 1075/8
1077/16 1081/17
1089/6 1091/13 1092/2
1093/17 1094/11
1095/2 1095/11 1096/7
1096/7 1098/25
1099/15 1100/10
1101/4
**Ms. Amerling [27]**
1049/7 1058/9 1059/9
1059/22 1062/14
1063/8 1066/6 1066/6
1066/16 1067/17
1068/21 1070/1 1070/6
1072/2 1072/7 1072/9
1072/16 1072/25
1073/21 1073/24
1077/16 1089/6
1091/13 1092/2
1093/17 1094/11
1096/7
**Ms. Amerling's [7]**
1052/1 1069/3 1070/14
1072/12 1075/8 1095/2
1095/11
**Ms. Gaston [5]**

1041/23 1058/6
1072/10 1081/17
1096/7
**Ms. Lesley [6]** 1020/14
1024/3 1098/25
1099/15 1100/10
1101/4
**Ms. Vaughn [3]** 1023/6
1041/23 1042/3
**much [8]** 1029/21
1055/21 1065/6
1087/16 1087/19
1088/1 1099/14
1101/13
**Mueller [1]** 1076/17
**multiple [2]** 1033/20
1071/16
**must [33]** 1027/7
1028/10 1028/11
1028/19 1028/22
1030/8 1030/9 1030/16
1030/22 1031/6 1033/9
1033/12 1034/3 1034/5
1034/6 1034/17
1035/24 1035/25
1039/9 1039/11
1039/25 1040/2 1040/6
1040/15 1059/5 1060/4
1060/4 1060/9 1065/16
1068/19 1074/22
1087/20 1098/10
**mutual [1]** 1035/12
**my [17]** 1020/25
1024/13 1024/22
1024/25 1025/9
1025/20 1036/4
1071/15 1071/23
1076/6 1088/6 1095/13
1098/9 1099/6 1101/7
1102/12 1102/18
**myself [1]** 1085/19

---

# N

**name [4]** 1051/19
1055/24 1093/15
1098/24
**name-calling [1]**
1093/15
**nation's [1]** 1042/22
**national [2]** 1026/9
1070/19
**nature [3]** 1030/3
1030/5 1030/8
**near [6]** 1038/20

**N**

**near... [5]** 1078/24
1080/10 1080/15
1080/17 1080/18
**necessary [4]** 1028/7
1037/6 1038/11
1039/23
**need [24]** 1022/23
1023/13 1038/17
1050/7 1053/10
1055/25 1057/8
1065/25 1066/1 1066/4
1067/19 1069/25
1070/1 1078/7 1089/15
1089/17 1091/23
1092/1 1093/19
1093/22 1095/2 1099/1
1099/12 1102/6
**needed [1]** 1048/23
**needs [1]** 1023/18
**negotiate [2]** 1055/19
1067/8
**negotiation [10]**
1049/6 1049/23
1055/20 1077/12
1077/21 1079/2 1088/8
1088/24 1089/5 1089/8
**negotiations [1]**
1067/10
**neither [1]** 1051/4
**neutral [3]** 1074/8
1074/15 1086/17
**neutrality [2]** 1074/4
1074/17
**neutrally [1]** 1074/10
**never [8]** 1027/16
1037/11 1037/15
1037/19 1043/8
1054/15 1056/13
1066/16
**new [6]** 1022/21
1069/21 1069/21
1092/2 1092/3 1092/3
**newspaper [2]**
1035/20 1058/10
**next [8]** 1025/17
1037/4 1043/5 1045/11
1045/20 1046/1
1091/11 1095/13
**NICHOLS [7]** 1017/8
1050/6 1052/6 1052/11
1052/21 1090/13
1092/11
**night [3]** 1045/2

1046/19 1094/15
**nine [3]** 1092/1
1092/10 1092/17
**no [46]** 1017/3 1021/1
1022/11 1022/17
1026/4 1029/14 1031/1
1035/5 1037/10
1037/25 1044/23
1045/1 1049/8 1053/7
1053/24 1054/9 1055/5
1057/22 1062/23
1063/5 1066/21
1066/23 1067/19
1070/12 1070/24
1070/24 1072/24
1073/24 1074/23
1074/24 1077/14
1080/22 1086/3 1086/7
1086/18 1087/20
1089/24 1090/2 1093/8
1093/8 1096/8 1096/12
1102/10 1103/3
1103/12 1103/14
**non [5]** 1075/13
1075/18 1075/20
1075/21 1076/1
**non-partisan [5]**
1075/13 1075/18
1075/20 1075/21
1076/1
**noncompliance [4]**
1046/9 1052/12
1052/17 1089/8
**none [2]** 1055/22
1057/20 1094/9
**nonetheless [1]**
1058/16
**not [163]**
**note [5]** 1025/7 1037/7
1037/11 1100/6 1100/8
**notebook [1]** 1098/23
**notebooks [1]** 1036/19
**notes [4]** 1036/19
1036/23 1037/1 1037/2
**notetaker's [1]** 1037/3
**notetaking [1]** 1036/17
**nothing [8]** 1034/11
1034/14 1034/15
1056/12 1056/14
1057/12 1093/10
1098/15
**notice [1]** 1046/15
**November [4]** 1073/9
1075/12 1075/16

1080/4
**now [34]** 1020/3
1020/4 1020/13
1022/23 1023/17
1024/2 1041/21
1048/15 1051/5 1058/4
1065/7 1072/7 1074/25
1074/25 1075/4
1075/15 1077/22
1078/19 1084/21
1085/21 1086/15
1089/17 1090/20
1092/4 1092/18 1094/4
1097/3 1097/23
1098/20 1099/11
1101/14 1102/8
1102/14 1102/18
**number [5]** 1050/22
1051/3 1051/13 1077/1
1098/24
**numbers [1]** 1050/21
**nutshell [1]** 1069/11
**NW [2]** 1017/12
1017/23

**O**

**object [2]** 1021/25
1030/18
**objected [1]** 1030/13
**objecting [1]** 1030/15
**objection [21]** 1022/1
1022/11 1022/17
1022/25 1023/3
1030/21 1059/18
1059/24 1060/6
1063/16 1066/22
1067/24 1070/10
1079/14 1081/6
1081/11 1081/16
1084/17 1085/2
1085/23 1086/9
**objections [4]** 1019/18
1021/1 1030/16 1098/3
**obligation [2]** 1045/24
1091/6
**observe [1]** 1031/23
**observed [1]** 1031/13
**obstacle [6]** 1076/6
1076/7 1077/8 1080/5
1084/20 1091/5
**obtaining [1]** 1071/19
**obviously [3]** 1102/6
1102/24 1102/25
**occasions [2]** 1076/8

1076/17
**occur [4]** 1078/24
1080/10 1080/14
1080/16
**occurring [1]** 1051/25
**October [57]** 1023/24
1023/25 1038/14
1038/16 1039/5 1039/7
1044/16 1044/17
1044/22 1045/2
1045/20 1046/19
1047/18 1048/4 1048/7
1048/8 1048/9 1048/13
1048/13 1048/23
1048/25 1049/11
1049/15 1049/16
1049/20 1049/20
1049/21 1051/6 1051/7
1054/16 1055/15
1055/15 1067/11
1067/11 1067/21
1071/5 1071/9 1071/13
1076/13 1080/4
1087/11 1087/11
1088/2 1090/24
1092/16 1094/1 1094/3
1094/6 1094/14
1094/21 1094/22
1094/23 1102/17
1102/20 1103/4 1103/8
1103/17
**October 14 [1]** 1103/4
**October 14th [13]**
1038/14 1039/5
1044/17 1047/18
1048/4 1048/8 1048/13
1051/7 1055/15
1067/11 1071/13
1094/3 1094/22
**October 18th [6]**
1023/25 1038/16
1048/23 1048/25
1049/16 1049/21
**October 7th [16]**
1044/16 1044/22
1045/2 1048/7 1048/13
1049/11 1049/20
1051/6 1055/15
1067/11 1087/11
1087/11 1094/1 1094/6
1094/14 1094/21
**OFC [1]** 1017/11
**off [3]** 1050/21 1089/1
1092/10

# O

**offense [15]** 1023/19
1023/23 1023/24
1027/21 1027/23
1027/25 1028/2
1033/21 1033/22
1038/13 1038/15
1038/18 1038/20
1038/23 1077/25
**offenses [1]** 1033/15
**offer [1]** 1092/8
**offered [3]** 1020/21
1030/14 1041/12
**offers [1]** 1077/1
**office [4]** 1047/10
1053/25 1099/15
1103/7
**officers [1]** 1042/25
**offices [1]** 1044/17
**Official [2]** 1017/22
1104/3
**often [1]** 1077/13
**okay [13]** 1022/10
1022/18 1023/5
1023/11 1024/1 1024/2
1068/14 1070/11
1085/25 1085/25
1102/11 1102/24
1103/15
**old [1]** 1085/15
**old-fashioned [1]**
1085/15
**omitted [1]** 1038/3
**once [1]** 1024/18
**one [53]** 1020/4
1020/16 1020/22
1021/2 1024/19
1029/20 1030/4
1033/25 1035/19
1037/8 1043/2 1043/5
1044/15 1047/22
1049/17 1050/3 1050/4
1050/9 1050/21
1050/22 1055/6 1059/9
1063/4 1063/7 1063/10
1065/9 1065/22 1070/2
1070/25 1072/10
1072/13 1072/22
1073/21 1073/25
1074/13 1074/25
1075/23 1075/25
1076/10 1077/1 1085/7
1085/7 1085/22 1086/7
1089/22 1091/19

1091/20 1093/11
1097/18 1097/24
1098/18 1099/2
1101/18
**one-page [1]** 1063/4
**one-week [1]** 1049/17
**ones [2]** 1055/15
1078/14
**ongoing [1]** 1045/24
**only [18]** 1027/2
1028/7 1030/9 1034/18
1034/23 1036/23
1041/14 1042/13
1042/14 1042/14
1056/9 1066/18
1075/23 1089/16
1093/5 1096/18
1096/19 1096/23
**open [3]** 1037/14
1037/19 1069/6
**opening [4]** 1047/22
1049/4 1056/7 1057/3
**operations [1]** 1024/8
**operative [1]** 1040/25
**opinion [4]** 1026/15
1026/19 1034/12
1091/11
**opinions [1]** 1025/25
**opportunity [2]** 1022/7
1031/22
**opposition [1]**
1085/18
**option [1]** 1070/13
**optional [1]** 1055/9
**options [1]** 1091/3
**orally [2]** 1024/12
1037/14
**order [10]** 1024/8
1034/5 1040/1 1047/2
1047/16 1047/17
1047/20 1050/7 1053/9
1080/24
**orderly [1]** 1025/11
**ordinarily [1]** 1037/24
**Organizations [1]**
1095/23
**organize [1]** 1035/11
**orientation [1]**
1026/10
**origin [1]** 1026/9
**other [30]** 1027/24
1028/21 1029/5
1030/14 1032/1
1032/13 1032/21

1034/1 1034/6 1036/3
1036/16 1037/21
1037/22 1038/4 1044/2
1052/13 1063/11
1069/17 1070/14
1070/18 1071/21
1071/21 1072/17
1074/15 1075/3
1075/17 1077/14
1085/16 1099/2 1101/8
**others [2]** 1025/5
1086/1
**otherwise [2]** 1037/19
1103/11
**our [25]** 1022/25
1026/5 1026/7 1042/13
1042/22 1042/24
1043/1 1057/4 1057/6
1057/21 1057/23
1059/14 1080/22
1086/2 1086/4 1086/5
1086/16 1091/14
1091/19 1096/15
1096/22 1097/1 1097/4
1097/16 1097/18
**out [22]** 1020/24
1029/9 1029/13
1042/20 1051/19
1056/12 1057/23
1058/20 1066/15
1068/2 1068/5 1068/9
1068/14 1068/17
1070/18 1074/6 1094/3
1094/13 1096/1
1097/16 1098/23
1099/16
**outcome [3]** 1031/24
1066/1 1066/7
**outlet [1]** 1058/14
**outset [1]** 1058/17
**outside [1]** 1072/20
**over [14]** 1029/20
1035/4 1043/4 1050/5
1054/14 1067/8
1067/10 1073/23
1086/3 1086/5 1088/11
1091/10 1094/18
1096/19
**overcomes [1]**
1028/17
**Overruled [3]** 1059/19
1079/15 1081/7
**overview [1]** 1024/21
**own [8]** 1026/23

1036/24 1037/2 1037/3
1072/15 1075/24
1089/23 1091/8

# P

**p.m [6]** 1048/24
1049/1 1100/4 1102/20
1103/8 1103/18
**page [14]** 1018/3
1018/4 1018/5 1018/6
1023/9 1058/22
1062/21 1063/1 1063/4
1068/4 1068/4 1068/11
1085/7 1098/23
**paper [5]** 1047/6
1067/6 1067/7 1087/16
1095/1
**papers [2]** 1039/16
1050/13
**paragraph [3]** 1021/17
1059/15 1076/15
**Paralegal [1]** 1019/8
**parent [1]** 1089/11
**parked [1]** 1053/16
**parking [5]** 1047/4
1047/10 1053/12
1053/14 1081/18
**part [3]** 1031/1
1057/21 1091/14
**participants [1]**
1057/5
**particular [5]** 1025/3
1027/21 1027/25
1029/21 1042/16
**parties [11]** 1019/20
1019/21 1019/23
1020/1 1020/21
1020/25 1021/2
1022/16 1024/17
1102/20 1103/3
**partisan [5]** 1075/13
1075/18 1075/20
1075/21 1076/1
**parts [1]** 1070/14
**party [11]** 1030/17
1072/13 1073/22
1073/25 1075/21
1075/22 1075/24
1075/25 1076/1
1085/22 1095/22
**pass [2]** 1043/2 1088/5
**path [5]** 1058/19
1058/19 1084/23
1085/13 1090/12

**P**

pattern [1] 1022/7
pause [8] 1022/13
1023/15 1059/7
1062/18 1062/25
1063/3 1063/6 1074/21
pay [3] 1047/9 1047/14
1047/16
peaceful [2] 1043/4
1044/4
pending [1] 1079/9
people [17] 1026/7
1032/1 1042/13
1042/14 1042/15
1053/14 1053/16
1053/19 1066/10
1069/25 1070/1
1072/22 1073/18
1074/13 1085/17
1094/8 1094/12
people's [1] 1097/15
perception [1]
1032/16
perform [1] 1097/15
perhaps [4] 1020/24
1023/14 1071/22
1081/11
permission [1] 1091/7
permitted [2] 1029/23
1036/18
persist [1] 1054/10
person [19] 1027/7
1029/8 1029/10
1031/19 1036/15
1037/16 1037/25
1052/20 1056/2 1056/9
1073/6 1074/14
1077/13 1084/16
1084/18 1084/19
1091/23 1095/24
1096/18
personal [10] 1025/24
1026/3 1026/8 1037/3
1070/24 1070/25
1073/10 1073/12
1096/8 1098/15
perspective [1]
1103/10
persuade [1] 1044/7
pertinent [8] 1039/18
1039/25 1040/1
1040/11 1040/13
1050/15 1052/5 1052/8
phone [1] 1098/24

phrase [1] 1038/12
Phrased [1] 1040/6
picked [3] 1071/5
1077/19 1095/19
piece [1] 1047/5
pink [1] 1047/5
place [3] 1026/4
1046/4 1079/25
placeholders [3]
1067/12 1067/12
1077/9
plain [1] 1051/14
play [11] 1022/6
1031/1 1042/10
1042/14 1057/7
1069/25 1070/1
1075/10 1075/11
1086/18 1087/23
played [1] 1101/12
plays [1] 1091/10
please [11] 1019/5
1020/14 1024/3 1025/7
1034/23 1055/16
1057/16 1060/12
1099/14 1100/10
1100/13
ploy [1] 1093/11
podcast [1] 1068/24
point [4] 1021/9
1045/6 1047/8 1048/4
political [16] 1056/12
1056/14 1068/24
1072/13 1073/15
1073/21 1073/22
1073/23 1073/25
1075/10 1075/24
1075/25 1086/1 1086/5
1096/15 1096/16
politics [11] 1056/9
1056/10 1067/13
1067/16 1074/4
1086/11 1086/18
1096/14 1096/14
1096/18 1096/20
portion [1] 1025/3
position [2] 1047/1
1079/11
positions [1] 1066/11
possibility [3] 1026/2
1028/22 1099/3
possible [3] 1028/17
1098/25 1103/7
possibly [1] 1045/9
posted [1] 1045/12

potential [1] 1044/6
potentially [2] 1071/16
1071/20
power [8] 1043/4
1044/4 1066/11
1080/23 1085/17
1091/23 1097/2
1097/18
powerful [1] 1028/11
practice [2] 1102/12
1102/14
precisely [1] 1069/8
predicted [2] 1058/12
1058/15
preferences [1]
1026/4
prejudice [2] 1026/14
1033/1
prejudiced [1] 1032/24
prejudices [2] 1025/25
1026/4
prepared [3] 1058/16
1102/13 1102/25
preponderance [1]
1028/9
presence [1] 1044/6
present [1] 1073/10
presented [5] 1030/2
1030/10 1036/1
1081/10 1081/17
presentence [2]
1102/13 1102/25
presenting [1]
1081/18
preserved [1] 1022/1
preside [1] 1035/4
Presidency [1]
1085/21
President [24] 1043/5
1043/22 1046/24
1052/24 1054/8
1068/23 1069/15
1070/7 1076/20 1077/2
1078/9 1078/11
1079/13 1079/19
1088/6 1088/14
1088/15 1088/18
1088/22 1090/21
1091/7 1091/15 1093/3
1093/16
President's [1]
1093/23
presumed [1] 1027/13
presumption [2]

1027/12 1027/13
pretending [1] 1094/4
pretty [1] 1087/2
previous [1] 1032/10
previously [1] 1020/7
principle [1] 1086/16
prior [2] 1076/17
1098/9
privilege [31] 1041/6
1041/7 1045/4 1045/9
1045/21 1045/23
1049/2 1052/25 1054/8
1054/11 1054/16
1067/24 1069/18
1069/23 1070/9 1076/7
1077/2 1078/11
1078/21 1079/23
1080/1 1081/2 1085/1
1088/6 1089/6 1090/5
1090/11 1090/12
1090/14 1090/18
1094/18
privileges [2] 1053/8
1076/21
prized [1] 1043/2
probability [1]
1032/18
Probation [1] 1103/6
problem [2] 1023/6
1094/11
procedures [1]
1046/11
proceedings [3]
1056/18 1103/18
1104/5
process [3] 1046/18
1074/12 1098/15
processes [1] 1097/17
proclaim [1] 1096/11
proclaimed [1]
1088/15
produce [16] 1027/18
1039/6 1039/16
1043/16 1044/15
1044/20 1044/24
1045/18 1045/25
1046/23 1048/12
1048/16 1050/13
1053/3 1053/23 1054/7
producing [1] 1049/16
professionalism [1]
1103/16
promised [1] 1049/5
promote [1] 1035/15

# P

**proof [19]** 1023/20 1027/11 1028/10 1028/12 1028/12 1028/16 1037/23 1038/17 1039/8 1068/3 1068/7 1068/9 1068/10 1068/14 1068/17 1078/3 1095/9 1095/11 1095/16
**proper [1]** 1030/15
**propose [1]** 1022/20
**proposed [2]** 1021/2 1022/4
**prosecution [4]** 1054/19 1055/4 1086/8 1086/17
**prosecution's [1]** 1062/17
**prosecutor [11]** 1069/24 1072/8 1072/16 1073/1 1073/11 1073/13 1074/21 1075/3 1079/3 1079/6 1080/3
**prosecutor's [1]** 1060/3
**prosecutors [5]** 1072/10 1073/10 1080/17 1080/21 1080/23
**protect [3]** 1042/25 1081/2 1084/25
**prove [11]** 1027/18 1027/25 1028/7 1033/16 1034/17 1039/9 1040/2 1040/6 1040/15 1059/2 1068/11
**proved [11]** 1031/4 1033/18 1037/24 1038/10 1039/13 1041/16 1059/2 1059/8 1065/8 1065/14 1072/5
**proven [3]** 1027/15 1027/20 1098/10
**provide [12]** 1024/25 1039/5 1039/16 1042/7 1050/12 1050/23 1079/22 1090/15 1093/12 1094/1 1099/15 1100/22
**provided [11]** 1020/1 1020/5 1020/7 1034/9

1051/2 1051/4 1059/16 1059/23 1077/11 1091/3 1093/21
**providing [2]** 1038/25 1098/6
**proving [2]** 1028/4 1029/19
**public [5]** 1026/15 1044/9 1045/16 1096/12 1097/14
**publicity [2]** 1035/17 1036/1
**pull [1]** 1023/14
**purported [2]** 1045/23 1098/5
**purportedly [1]** 1062/20
**purpose [5]** 1040/19 1040/20 1052/14 1093/5 1103/5
**purposes [2]** 1043/9 1057/23
**put [7]** 1057/23 1070/4 1071/18 1078/2 1078/7 1085/18 1093/21
**putting [1]** 1078/4

# Q

**question [20]** 1030/7 1030/14 1030/21 1030/22 1030/24 1031/1 1066/15 1067/17 1068/14 1070/2 1070/2 1070/22 1071/6 1071/9 1071/11 1073/14 1074/18 1075/15 1080/6 1084/15
**questioning [2]** 1056/7 1079/6
**questions [14]** 1025/6 1025/11 1027/3 1030/4 1042/8 1043/17 1046/5 1047/20 1070/4 1070/15 1072/8 1075/9 1075/9 1089/7
**Quiana [1]** 1019/9
**quick [2]** 1047/22 1087/2

# R

**race [1]** 1026/9
**radio [2]** 1035/20 1085/15

**raise [1]** 1062/16
**raised [4]** 1066/22 1067/25 1070/15 1084/17
**raises [2]** 1072/8 1075/9
**random [1]** 1098/16
**rants [1]** 1093/15
**reach [4]** 1030/6 1035/9 1069/15 1079/24
**reached [2]** 1037/18 1100/8
**reaching [3]** 1029/25 1030/10 1034/25
**read [5]** 1035/22 1035/24 1058/10 1058/10 1076/23
**reading [3]** 1020/3 1024/10 1099/7
**ready [3]** 1024/2 1057/14 1087/5
**real [4]** 1028/21 1070/2 1074/17 1094/11
**realized [2]** 1054/23 1081/9
**really [10]** 1024/20 1042/9 1077/18 1077/18 1081/13 1087/11 1088/9 1092/20 1097/23 1099/18
**reason [18]** 1031/21 1033/11 1040/20 1043/21 1043/23 1047/7 1052/16 1052/22 1053/9 1054/6 1059/4 1059/8 1060/3 1068/18 1068/18 1072/4 1096/20 1096/23
**reasonable [31]** 1027/16 1027/21 1028/1 1028/3 1028/5 1028/11 1028/12 1029/6 1031/5 1033/19 1034/17 1038/10 1038/19 1039/10 1039/13 1040/2 1040/7 1040/16 1041/8 1041/16 1050/10 1059/3 1059/3 1059/4 1063/12 1065/8

1065/15 1069/14 1070/4 1074/19 1098/11
**reasonableness [1]** 1032/17
**reasonably [1]** 1038/20
**reasoning [1]** 1040/8
**reasons [4]** 1033/11 1087/1 1098/19 1102/15
**Rebuttal [1]** 1018/6
**recall [2]** 1032/7 1043/25
**recalled [1]** 1031/13
**receive [1]** 1033/5
**received [11]** 1019/18 1038/4 1038/7 1041/3 1079/12 1079/20 1079/21 1081/4 1081/8 1084/16 1100/6
**receiving [1]** 1046/16
**recent [1]** 1078/9
**recess [3]** 1087/3 1087/4 1100/3
**recipient [2]** 1066/21 1077/11
**recipients [1]** 1070/18
**recognize [4]** 1042/10 1053/11 1096/23 1097/3
**recognizing [1]** 1101/11
**recollection [3]** 1026/21 1071/15 1071/23
**recollections [1]** 1032/6
**record [4]** 1019/6 1019/17 1022/25 1104/5
**recording [1]** 1034/18
**records [2]** 1039/7 1100/22
**Redbook [1]** 1022/15
**redline [1]** 1019/24
**refer [2]** 1025/2 1025/2
**referee [1]** 1091/9
**reference [1]** 1026/22
**referencing [2]** 1049/2 1065/23
**referral [1]** 1046/12
**referred [3]** 1054/19 1055/3 1091/4

1126

**R**

**referring [1]** 1048/21
**reflect [2]** 1019/17
1021/7
**refusal [7]** 1039/22
1040/18 1040/20
1040/21 1048/18
1050/20 1077/6
**refusals [1]** 1096/4
**refuse [6]** 1025/16
1049/25 1053/23
1055/20 1076/3 1076/4
**refused [8]** 1039/21
1041/10 1045/18
1046/21 1047/21
1048/6 1050/18
1052/23
**refusing [6]** 1055/19
1081/15 1088/16
1092/13 1092/22
1096/22
**regard [2]** 1058/1
1096/12
**regarding [5]** 1035/6
1035/14 1040/25
1098/10 1099/6
**regardless [2]** 1026/8
1045/23
**regulations [2]**
1059/11 1059/21
**reject [2]** 1047/16
1055/12
**rejected [4]** 1045/21
1054/16 1090/6
1095/18
**rejecting [1]** 1094/24
**rejects [1]** 1047/12
**rejoin [1]** 1099/1
**related [3]** 1040/4
1051/15 1052/5
**relationship [7]**
1072/8 1072/9 1072/9
1072/19 1073/11
1074/20 1096/8
**relatively [1]** 1019/22
**relevant [3]** 1038/9
1071/21 1071/21
**religion [1]** 1026/9
**rely [2]** 1037/1 1097/3
**relying [1]** 1090/12
**remained [1]** 1098/20
**remains [1]** 1027/14
**remarks [1]** 1097/24
**remember [1]** 1070/15

**remind [2]** 1035/18
1036/8
**reminded [3]** 1045/22
1046/1 1048/11
**remove [4]** 1076/6
1077/7 1084/20 1091/5
**removed [1]** 1080/5
**rendered [1]** 1025/8
**repeat [2]** 1035/16
1053/1
**repeatedly [2]** 1054/5
1076/5
**replace [1]** 1036/24
**replaces [2]** 1034/14
1034/15
**report [4]** 1099/15
1102/13 1102/25
1103/6
**Reported [1]** 1017/21
**Reporter [2]** 1017/22
1104/3
**reporters [1]** 1045/16
**reports [3]** 1035/20
1035/24 1085/16
**represent [1]** 1034/4
**representatives [1]**
1070/8
**represents [1]**
1030/17
**request [3]** 1049/12
1060/11 1069/15
**requests [2]** 1043/13
1049/14
**require [5]** 1027/17
1028/16 1029/24
1043/15 1088/13
**required [11]** 1033/16
1041/5 1044/14
1044/15 1045/17
1046/1 1046/20 1048/9
1059/15 1071/24
1088/11
**requirements [1]**
1048/2
**research [4]** 1035/18
1036/15 1043/12
1099/8
**Resolution [2]**
1042/20 1051/22
**resolve [2]** 1066/25
1084/20
**resolved [3]** 1069/17
1077/4 1093/1
**respect [4]** 1034/1

1035/12 1071/17
1080/9
**respond [2]** 1046/5
1049/12
**responded [2]**
1047/25 1070/19
**responding [2]** 1050/1
1078/18
**response [4]** 1071/25
1078/13 1089/6 1093/1
**responsibility [3]**
1025/20 1026/20
1030/18
**responsive [2]** 1045/8
1071/1
**rest [1]** 1098/19
**rests [1]** 1072/2
**result [7]** 1032/14
1040/23 1046/12
1052/17 1056/5
1085/10 1100/10
**retire [1]** 1036/10
**return [5]** 1025/7
1033/23 1034/5 1035/3
1099/18
**reveal [1]** 1037/16
**reviews [1]** 1047/7
**RIANE [2]** 1017/18
1019/13
**rid [2]** 1070/8 1076/7
**right [19]** 1020/3
1020/9 1023/18 1033/6
1033/8 1033/9 1043/15
1057/4 1074/7 1078/23
1080/14 1085/21
1088/15 1088/20
1093/2 1094/10 1097/2
1102/6 1102/14
**Rioters [1]** 1042/24
**rise [2]** 1100/1
1100/14
**Road [1]** 1017/15
**roadmap [1]** 1070/20
**Robert [1]** 1088/24
**role [4]** 1025/9
1025/17 1086/18
1101/12
**roles [1]** 1071/16
**room [14]** 1017/23
1034/20 1035/3 1036/6
1036/20 1053/25
1067/5 1077/22 1085/6
1088/12 1093/15
1096/3 1097/8 1099/18

**ROSE [1]** 1017/10
**RPR [1]** 1017/21
**rule [2]** 1025/11
1057/1
**ruled [1]** 1030/24
**rules [14]** 1035/6
1042/11 1042/14
1046/22 1047/3
1049/25 1053/10
1057/7 1059/10
1069/20 1069/25
1070/1 1098/5 1098/7
**ruling [1]** 1070/10
**rush [2]** 1067/17
1067/19
**rushed [2]** 1054/24
1068/1

**S**

**said [31]** 1024/25
1026/16 1035/17
1041/20 1044/3
1044/10 1047/23
1057/3 1058/11
1058/13 1059/22
1067/19 1068/10
1069/24 1070/6
1070/17 1070/18
1070/19 1073/19
1075/13 1075/20
1076/6 1076/16 1077/6
1079/6 1090/1 1090/21
1093/13 1094/16
1097/1 1101/9
**same [5]** 1049/2
1058/15 1078/25
1079/1 1090/5
**sat [1]** 1075/1
**saw [9]** 1029/9
1029/12 1029/14
1029/14 1042/19
1049/7 1049/9 1051/24
1088/10
**say [20]** 1021/20
1023/22 1049/4 1053/6
1059/22 1065/13
1073/4 1074/25
1077/17 1078/21
1078/23 1080/13
1080/19 1087/1 1087/2
1087/11 1089/22
1090/6 1090/7 1095/13
**saying [9]** 1048/1
1070/1 1077/7 1078/10

**S**

**saying... [5]** 1080/11 1080/21 1090/5 1091/9 1094/23
**says [24]** 1021/4 1021/6 1023/10 1023/20 1029/18 1058/23 1059/15 1068/7 1071/10 1073/5 1076/14 1077/25 1078/19 1079/3 1079/20 1079/21 1079/24 1080/3 1085/8 1087/10 1088/3 1088/7 1090/20 1100/8
**schedule [2]** 1078/22 1102/7
**scheduled [1]** 1048/17
**scheduling [1]** 1066/23
**SCHOEN [4]** 1017/14 1017/15 1019/12 1103/13
**scope [1]** 1066/23
**scorn [1]** 1056/3
**seat [4]** 1042/23 1096/15 1098/21 1098/22
**seated [1]** 1096/19
**seats [2]** 1098/16 1098/16
**second [10]** 1021/17 1039/17 1039/24 1050/14 1051/13 1052/9 1068/4 1074/23 1074/24 1101/18
**secret [1]** 1070/19
**Section [2]** 1059/17 1059/23
**Sections [1]** 1046/12
**see [10]** 1049/5 1054/6 1058/22 1073/25 1074/2 1074/9 1077/24 1078/13 1088/3 1103/16
**seeking [1]** 1057/11
**seem [2]** 1053/6 1066/9
**seems [1]** 1087/14
**seen [5]** 1029/10 1029/16 1050/24 1050/25 1058/4
**select [22]** 1035/4 1035/6 1039/1 1039/16

1039/18 1040/3 1040/5 1040/13 1040/19 1043/9 1045/25 1046/3 1046/6 1046/10 1048/17 1050/12 1050/15 1051/20 1052/8 1066/13 1067/1 1088/13
**selected [2]** 1071/13 1098/15
**selecting [2]** 1030/5 1035/10
**selection [3]** 1035/2 1056/18 1098/14
**self [1]** 1032/25
**self-interest [1]** 1032/25
**Senate [2]** 1076/19 1085/21
**send [4]** 1025/7 1037/7 1049/1 1053/25
**sending [2]** 1034/20 1095/11
**sense [3]** 1043/7 1047/25 1097/9
**sent [10]** 1019/23 1020/24 1044/12 1045/3 1052/2 1055/2 1077/11 1078/18 1093/16 1094/15
**sentence [5]** 1021/4 1058/23 1078/23 1085/7 1085/8
**sentencing [4]** 1102/7 1102/9 1102/19 1103/3
**separate [2]** 1033/21 1033/23
**separately [1]** 1033/23
**September [2]** 1044/12 1044/21
**serious [3]** 1073/13 1075/9 1093/17
**seriously [3]** 1055/9 1093/19 1101/11
**serve [1]** 1053/18
**served [3]** 1028/6 1068/9 1072/13
**service [20]** 1051/1 1057/1 1068/3 1068/7 1068/9 1068/10 1068/11 1068/15 1068/15 1068/17 1081/5 1095/9 1095/11 1095/16 1097/14

1099/14 1099/24 1101/6 1101/9 1101/13
**serving [1]** 1089/4
**set [1]** 1053/8
**settle [1]** 1074/7
**several [2]** 1067/23 1076/8
**sex [1]** 1026/10
**sexual [1]** 1026/10
**shall [1]** 1059/15
**shared [2]** 1057/5 1073/16
**she [52]** 1030/17 1031/23 1058/9 1058/10 1058/10 1058/13 1059/22 1066/7 1066/8 1066/9 1066/13 1066/18 1066/19 1066/25 1067/19 1068/1 1068/1 1068/2 1068/2 1068/4 1068/4 1068/8 1068/9 1069/6 1069/6 1069/9 1069/10 1069/12 1069/14 1070/18 1070/19 1070/19 1070/24 1071/2 1071/6 1072/8 1073/8 1073/10 1073/12 1073/14 1075/10 1075/10 1075/11 1075/11 1075/13 1075/13 1075/14 1075/20 1075/22 1077/17 1077/18 1077/18
**she's [5]** 1066/25 1072/13 1072/14 1075/23 1075/24
**shifts [1]** 1027/16
**short [1]** 1041/20
**should [43]** 1019/24 1021/5 1023/19 1024/14 1025/7 1025/15 1026/11 1026/12 1026/13 1026/16 1026/19 1026/24 1030/1 1030/21 1030/25 1030/25 1031/1 1031/10 1033/4 1033/22 1033/23 1034/1 1034/11 1034/13 1035/3 1035/6 1035/21 1036/24

1037/1 1037/10 1037/18 1038/8 1062/16 1065/20 1074/21 1079/4 1079/6 1084/22 1086/7 1093/19 1098/3 1098/9 1103/11
**shouldn't [1]** 1071/22
**show [12]** 1042/5 1042/6 1042/6 1042/13 1047/21 1056/6 1058/11 1058/14 1062/17 1068/23 1068/24 1076/16
**showed [2]** 1079/17 1090/20
**shown [1]** 1032/23
**shows [5]** 1045/16 1058/5 1090/22 1093/9 1097/5
**side [2]** 1030/14 1032/25
**sidebar [11]** 1060/11 1060/14 1062/11 1063/17 1063/18 1065/5 1081/20 1081/22 1084/13 1101/19 1102/5
**signature [6]** 1062/22 1063/2 1063/5 1063/9 1063/14 1068/8
**signatures [3]** 1095/6 1095/7 1098/8
**signed [6]** 1037/8 1037/11 1062/15 1063/8 1063/13 1100/8
**silence [1]** 1085/18
**SILVERMAN [1]** 1017/18
**Similarly [1]** 1027/3
**simple [2]** 1042/4 1087/14
**simply [1]** 1102/18
**Since [2]** 1098/19 1099/3
**single [6]** 1044/24 1048/16 1054/7 1067/1 1071/1 1094/17
**singled [1]** 1066/15
**sitting [1]** 1071/12
**situation [2]** 1055/24 1084/15
**skip [1]** 1053/24
**skipping [1]** 1048/8

**S**

sleep [1] 1029/14
Slightly [1] 1022/3
SLUTKIN [1] 1017/18
small [2] 1056/19
1099/12
snow [4] 1029/9
1029/11 1029/14
1029/15
snowed [1] 1029/17
so [50] 1019/24
1020/14 1021/2 1021/5
1022/6 1022/18 1023/6
1023/22 1024/10
1024/14 1024/20
1024/22 1033/2
1036/19 1040/21
1041/23 1042/12
1044/20 1045/8
1048/10 1048/23
1048/23 1049/19
1051/10 1051/13
1052/24 1054/5
1055/13 1066/14
1066/24 1067/25
1068/8 1070/4 1070/9
1071/23 1077/4 1078/3
1078/5 1084/15 1088/9
1092/9 1092/25 1093/5
1097/11 1100/5
1101/11 1102/6
1102/18 1102/24
1103/8
soccer [1] 1091/9
social [1] 1088/2
socialized [1] 1072/20
society [1] 1053/13
sole [4] 1025/19
1026/20 1031/7
1065/18
solely [2] 1026/12
1035/25
solutions [1] 1077/1
some [14] 1019/18
1019/22 1025/4 1028/6
1035/17 1035/19
1039/22 1040/5 1040/8
1043/14 1059/6 1081/3
1086/2 1091/6
somebody [6] 1066/9
1073/5 1073/20 1074/6
1080/7 1080/8
somehow [1] 1092/9
someone [3] 1041/3

1047/4 1056/15
someone's [2]
1037/24 1038/1
something [8] 1047/17
1052/21 1053/20
1056/19 1056/19
1066/3 1094/18 1099/2
sometime [1] 1102/17
sometimes [3]
1030/13 1073/14
1073/18
soon [2] 1036/4
1057/20
sorry [3] 1060/10
1075/12 1078/17
sought [9] 1039/17
1039/25 1040/4 1040/9
1040/13 1043/7 1044/1
1050/14 1052/8
speak [2] 1035/13
1058/8
Special [4] 1019/9
1089/23 1090/4 1095/2
Special Agent Hart [1]
1090/4
specialist [1] 1019/9
specific [1] 1035/6
speculate [2] 1030/22
1033/11
spelled [1] 1051/19
spend [1] 1056/17
spent [1] 1094/7
split [1] 1074/9
spoke [4] 1058/6
1058/9 1062/14
1075/10
spoken [1] 1054/22
spokesperson [1]
1035/5
staff [2] 1072/13
1075/17
stall [1] 1049/3
stalled [1] 1053/19
stalling [1] 1055/12
stand [5] 1031/18
1045/13 1069/4 1069/5
1088/21
stands [2] 1031/25
1074/13
start [2] 1067/13
1086/13
state [5] 1037/23
1037/24 1038/1 1038/5
1038/11

statement [4] 1038/3
1044/9 1045/16
1047/22
statements [6]
1026/25 1027/1
1032/10 1098/1 1098/3
1098/4
STATES [11] 1017/1
1017/2 1017/8 1019/3
1019/8 1039/2 1042/23
1043/3 1043/10
1046/11 1051/21
STEPHEN [2] 1017/5
1019/4
steps [1] 1085/18
Steve [24] 1042/4
1057/22 1058/2 1059/5
1059/23 1060/4 1060/4
1060/9 1066/15
1067/17 1068/19
1068/22 1069/14
1070/25 1072/5
1074/22 1075/7 1076/2
1077/6 1079/4 1079/19
1080/25 1081/14
1086/20
still [10] 1043/21
1049/22 1067/21
1077/20 1077/21
1079/2 1091/17 1092/5
1092/18 1099/7
stood [2] 1088/16
1088/20
stop [2] 1053/20
1096/17
straightforward [1]
1071/6
Street [2] 1017/12
1017/19
stricken [2] 1030/12
1030/25
strict [2] 1053/6
1053/9
subject [2] 1051/15
1051/18
submit [1] 1103/3
subpoena [81]
1039/17 1039/21
1039/25 1040/3 1040/8
1040/19 1041/2
1041/10 1042/17
1044/1 1044/13
1044/21 1045/5 1045/8
1045/12 1045/17

1046/1 1046/4 1046/8
1046/9 1046/22
1047/24 1048/1 1048/9
1048/11 1048/19
1049/14 1049/24
1050/14 1050/18
1050/24 1051/2
1051/15 1052/3
1052/13 1053/2 1053/7
1055/8 1055/10
1055/14 1057/10
1057/24 1058/1 1058/7
1058/16 1062/14
1063/7 1063/9 1063/13
1066/21 1067/1
1067/11 1068/3
1068/12 1070/16
1071/3 1071/18 1076/3
1077/9 1077/11
1077/14 1077/20
1077/20 1079/1 1079/1
1079/20 1079/21
1080/9 1080/10
1080/19 1087/10
1087/17 1088/10
1088/17 1088/23
1093/25 1094/2 1095/8
1095/12 1095/19
1095/25
subpoena's [2] 1048/7
1055/9
subpoenaed [3]
1039/15 1050/12
1050/22
subpoenas [3]
1043/14 1053/18
1070/17
such [12] 1026/8
1026/19 1029/3
1030/16 1033/1 1033/4
1035/21 1035/24
1036/11 1037/11
1041/6 1049/8
sudden [4] 1092/8
1092/20 1093/10
1093/20
suddenly [1] 1093/4
sufficient [1] 1038/18
suggest [2] 1034/12
1076/22
suggested [1] 1095/24
Suite [1] 1017/15
sum [1] 1049/10
summary [1] 1024/8

**S**

**summon [1]** 1099/1
**summons [2]** 1081/19
1084/16
**supported [1]** 1032/21
**supports [1]** 1050/9
**supposed [3]** 1051/16
1051/19 1097/4
**sure [4]** 1022/24
1043/7 1056/13
1081/21
**surprising [1]** 1073/16
**surrounding [2]**
1032/4 1038/2
**sustained [6]** 1030/20
1060/8 1085/3 1085/24
1086/12 1098/2
**sworn [1]** 1043/16
**sympathy [1]** 1026/14
**system [6]** 1026/7
1057/6 1080/22
1096/22 1097/1 1097/4

**T**

**table [2]** 1019/10
1019/13
**tactics [1]** 1055/12
**take [11]** 1022/10
1026/15 1036/19
1036/19 1055/8
1069/21 1077/4
1085/17 1091/2
1093/19 1100/10
**taken [4]** 1034/11
1037/1 1084/22 1087/4
**takes [2]** 1047/6
1102/16
**talk [22]** 1042/18
1042/19 1046/25
1055/6 1062/12 1077/1
1078/12 1088/9 1095/6
1095/7 1095/8 1095/9
1095/15 1095/16
1095/18 1096/3 1096/4
1096/11 1096/20
1096/23 1096/24
1102/7
**talked [1]** 1070/15
**talking [11]** 1054/21
1073/5 1079/1 1079/2
1094/8 1095/15
1095/24 1096/2 1096/9
1096/10 1096/14
**talks [1]** 1077/24

**task [1]** 1035/8
**tear [1]** 1098/23
**technical [1]** 1056/19
**technically [1]**
1047/25
**television [1]** 1035/21
**tell [15]** 1033/3
1037/19 1049/22
1055/13 1056/8 1073/8
1078/25 1087/18
1088/13 1090/16
1091/22 1091/25
1093/12 1093/18
1099/10
**telling [1]** 1031/21
**tells [5]** 1044/14
1055/25 1056/1
1090/16 1093/22
**tempted [1]** 1035/22
**ten [1]** 1086/15
**term [2]** 1023/1
1040/17
**terms [1]** 1091/18
**testified [20]** 1029/10
1031/7 1031/12
1031/14 1031/23
1058/9 1059/10
1062/14 1063/8
1065/17 1066/13
1066/18 1066/25
1068/8 1076/17
1079/12 1093/18
1095/21
**testifies [1]** 1077/13
**testify [19]** 1033/7
1033/8 1033/13
1046/23 1059/16
1067/25 1069/16
1070/5 1070/9 1071/14
1073/2 1076/8 1077/8
1078/12 1079/5
1079/12 1079/22
1080/2 1080/18
**testifying [4]** 1031/18
1031/25 1049/16
1076/6
**testimony [48]** 1029/4
1029/11 1029/15
1031/6 1032/9 1032/10
1032/13 1032/19
1033/2 1033/4 1038/25
1039/5 1039/16
1039/17 1039/24

1040/4 1041/13
1049/13 1049/14
1050/4 1050/12
1050/14 1050/23
1050/24 1051/4 1051/7
1051/10 1052/1 1053/3
1054/8 1065/10
1065/16 1066/5 1069/3
1069/8 1070/14
1070/23 1071/9 1072/3
1074/3 1075/9 1077/12
1079/25 1080/10
1095/2 1095/3 1096/6
1100/18 1029/10
**texts [1]** 1036/11
**than [9]** 1028/8
1028/11 1029/25
1063/11 1066/14
1067/23 1088/1
1091/19 1103/3
**thank [23]** 1019/16
1020/11 1020/23
1021/24 1022/1 1023/5
1057/17 1065/6
1070/11 1084/14
1085/19 1086/21
1086/22 1099/14
1099/22 1099/23
1100/25 1101/4 1101/5
1101/14 1101/16
1103/15 1103/15
**that [441]**
**that's [38]** 1023/3
1024/20 1043/17
1050/2 1052/9 1058/24
1060/1 1066/3 1067/6
1067/7 1067/16 1068/8
1068/13 1068/16
1068/18 1068/18
1071/10 1073/13
1074/2 1074/16
1074/19 1075/13
1075/19 1075/20
1075/25 1076/1
1076/15 1077/6
1080/11 1081/13
1085/25 1086/10
1086/13 1091/9
1091/21 1091/23
1093/9 1102/21
**their [12]** 1024/17
1024/18 1037/2 1038/2
1065/10 1066/10
1066/11 1072/19

1085/17 1089/11
1091/7 1091/8
**them [18]** 1020/2
1020/3 1025/16
1030/17 1034/22
1036/20 1049/10
1050/6 1050/10
1058/23 1065/12
1067/2 1075/11 1091/3
1092/2 1093/12 1094/9
1097/14
**then [10]** 1020/3
1023/11 1024/17
1024/19 1029/14
1051/22 1068/7
1074/13 1076/15
1078/22
**there [39]** 1020/9
1021/1 1028/13
1028/21 1028/25
1032/8 1035/5 1035/19
1035/21 1037/25
1040/7 1051/22 1054/9
1054/9 1056/12
1056/14 1058/23
1059/4 1067/19
1067/20 1070/10
1070/10 1071/18
1071/23 1072/3
1073/20 1073/22
1074/23 1074/24
1078/13 1087/13
1087/23 1089/24
1090/2 1092/21
1096/19 1099/11
1099/12 1102/24
**there's [11]** 1022/5
1022/7 1047/5 1057/21
1059/13 1066/14
1067/16 1077/12
1077/14 1094/8
1094/11
**Therefore [1]** 1079/24
**these [17]** 1024/22
1025/2 1026/1 1050/7
1056/18 1059/10
1059/21 1070/3
1077/10 1079/3
1079/17 1079/18
1094/8 1094/25
1094/25 1096/24
1098/8
**they [47]** 1019/24
1027/2 1030/18 1031/1

**T**

**they... [43]** 1036/23
1036/24 1042/15
1066/24 1072/17
1072/20 1072/20
1073/16 1073/17
1080/24 1084/16
1087/9 1089/12
1089/12 1090/6
1091/10 1091/23
1091/25 1092/5
1092/14 1093/21
1093/21 1094/12
1094/18 1094/18
1094/19 1094/19
1095/7 1095/7 1095/8
1095/15 1095/16
1095/18 1095/21
1096/2 1096/3 1096/4
1096/8 1096/20
1096/20 1096/23
1096/24 1097/14
**they're [9]** 1073/20
1074/18 1077/20
1080/19 1084/19
1084/19 1089/11
1089/12 1092/3
**they've [1]** 1089/11
**thing [10]** 1020/17
1049/8 1056/2 1058/15
1069/21 1072/7
1073/18 1075/8
1089/22 1098/12
**things [16]** 1020/19
1026/1 1028/14
1054/24 1059/6 1059/9
1063/10 1065/9
1065/22 1066/11
1069/6 1074/9 1086/2
1096/24 1101/9 1103/1
**think [25]** 1020/1
1021/20 1022/15
1026/16 1028/21
1038/9 1053/12
1054/22 1057/7
1058/17 1058/18
1065/9 1070/2 1081/3
1084/21 1084/24
1084/24 1085/19
1086/25 1088/4 1088/4
1091/3 1101/7 1101/11
1103/8
**thinking [2]** 1038/1
1066/4

**thinks [5]** 1047/9
1074/12 1091/1
1091/18 1093/8
**Third [2]** 1039/20
1050/17
**this [148]**
**THOMPSON [10]**
1017/18 1062/20
1062/24 1063/9
1063/13 1070/3 1070/7
1076/12 1080/11
1080/13
**Thompson's [3]**
1062/22 1063/2 1063/5
**those [19]** 1036/18
1037/1 1043/9 1051/8
1052/3 1055/4 1063/10
1067/7 1067/11 1071/6
1076/19 1077/15
1077/17 1077/17
1086/3 1088/12 1093/5
1098/4 1103/1
**though [3]** 1045/8
1079/5 1098/25
**thought [6]** 1055/14
1056/4 1074/14
1087/23 1089/19
1090/6
**thoughtful [1]** 1056/25
**thoughts [1]** 1057/24
**three [3]** 1050/21
1051/3 1076/17
**through [8]** 1043/8
1045/2 1051/23
1054/18 1056/7
1067/24 1076/5
1085/16
**throughout [4]**
1027/14 1027/17
1046/17 1072/12
**Thus [1]** 1039/10
**ticket [4]** 1047/4
1047/7 1053/13
1081/18
**tickets [1]** 1053/14
**tie [1]** 1059/25
**time [26]** 1029/12
1032/5 1040/3 1040/7
1040/13 1041/10
1041/21 1043/22
1046/4 1049/22 1052/8
1052/19 1056/18
1066/18 1071/17
1072/22 1073/23

1073/25 1079/25
1081/3 1089/2 1089/15
1092/4 1094/5 1094/7
1099/23
**time-limited [1]** 1092/4
**timeframe [1]** 1102/17
**timeline [1]** 1102/14
**times [1]** 1097/12
**today [4]** 1069/14
1071/12 1075/6 1103/7
**today's [1]** 1100/7
**together [8]** 1053/13
1057/4 1071/18
1072/18 1074/16
1086/19 1095/22
1099/21
**told [27]** 1028/7
1036/22 1042/3 1046/9
1046/15 1048/3
1048/10 1048/14
1048/20 1049/19
1052/12 1052/21
1054/5 1054/11 1058/3
1068/2 1068/2 1068/4
1075/14 1075/16
1088/25 1089/11
1090/18 1092/2
1094/11 1097/11
1098/13
**tomorrow [1]** 1044/11
**too [1]** 1075/4
**took [3]** 1058/19
1058/20 1070/23
**top [2]** 1068/7 1068/23
**topic [1]** 1040/9
**topics [4]** 1044/2
1068/24 1070/16
1088/10
**tossed [1]** 1092/25
**total [2]** 1049/10
1089/7
**toward [1]** 1032/1
**towards [1]** 1066/3
**towed [1]** 1047/15
**tracks [1]** 1076/23
**trail [2]** 1067/6 1067/7
**transcript [2]** 1017/7
1104/4
**transfer [3]** 1043/4
1044/4 1097/18
**treatment [1]** 1026/7
**trial [17]** 1017/7
1025/10 1025/21
1027/14 1027/17

1030/20 1032/25
1036/2 1036/9 1036/18
1036/22 1038/7
1041/18 1092/21
1093/18 1101/8 1101/9
**tried [2]** 1056/8
1088/18
**true [4]** 1028/8
1032/20 1047/25
1104/4
**Trump [24]** 1043/20
1043/22 1045/14
1045/24 1046/24
1052/24 1054/14
1068/23 1069/16
1070/7 1076/20 1077/2
1078/10 1078/11
1079/13 1079/19
1088/6 1088/14
1088/20 1088/22
1091/7 1091/15 1093/3
1093/16
**truth [3]** 1031/22
1033/3 1056/21
**truthful [1]** 1031/19
**truthfully [2]** 1031/12
1080/2
**try [9]** 1037/10
1069/15 1070/8
1072/25 1079/7
1084/25 1085/17
1089/24 1093/6
**trying [12]** 1049/2
1055/13 1055/18
1067/8 1073/12
1080/19 1084/20
1091/17 1092/13
1095/4 1096/16
1097/14
**tucked [1]** 1047/6
**Tuesday [1]** 1042/3
**turn [2]** 1088/11
1099/16
**turned [1]** 1058/20
**Twenty [1]** 1066/17
**twice [1]** 1048/6
**two [14]** 1020/19
1024/20 1028/25
1044/16 1050/3
1051/13 1067/8 1072/3
1076/22 1077/1 1078/7
1087/1 1087/13
1098/15
**types [1]** 1028/25

# U

**U.S [5]** 1017/10 1017/11 1017/22 1039/1 1087/18
**ultimately [1]** 1055/3
**ultimatum [1]** 1047/1
**umpire's [1]** 1091/11
**unable [2]** 1049/12 1049/13
**unanimity [1]** 1034/3
**unanimous [2]** 1034/7 1037/18
**unanimously [2]** 1100/19 1100/23
**unbiased [1]** 1086/17
**unbroken [1]** 1043/3
**under [12]** 1032/6 1037/15 1040/9 1043/15 1047/2 1047/6 1072/18 1073/17 1074/14 1077/21 1079/2 1087/17
**undermining [1]** 1096/22
**understand [5]** 1023/4 1044/14 1058/18 1078/20 1096/16
**understanding [4]** 1020/25 1027/2 1041/4 1041/5
**understood [1]** 1071/16
**UNITED [11]** 1017/1 1017/2 1017/8 1019/3 1019/8 1039/2 1042/23 1043/3 1043/10 1046/11 1051/21
**unlawfully [1]** 1092/10
**unless [4]** 1027/15 1059/16 1062/15 1091/10
**unlikely [1]** 1099/1
**unreasonableness [1]** 1032/18
**unrelated [1]** 1049/18
**until [6]** 1027/15 1037/17 1046/23 1067/22 1079/12 1099/4
**up [20]** 1023/14 1029/15 1035/7 1035/13 1038/6 1042/5 1042/6 1042/6 1042/13 1043/25 1045/6

1047/21 1051/25 1054/22 1054/24 1056/6 1073/24 1074/9 1091/2 1092/13
**upcoming [1]** 1046/2
**upheld [1]** 1086/16
**upon [2]** 1069/4 1100/15
**urgency [1]** 1067/20
**urgent [1]** 1089/16
**us [10]** 1052/10 1056/1 1057/20 1058/18 1071/20 1078/21 1086/2 1087/18 1102/17 1102/23
**use [12]** 1020/2 1021/2 1024/23 1034/10 1036/20 1037/3 1038/12 1053/20 1059/11 1070/21 1093/6 1099/6
**used [2]** 1020/22 1066/10
**useful [1]** 1086/25
**uses [2]** 1022/25 1023/7

# V

**valid [1]** 1062/15
**variance [1]** 1023/1
**various [2]** 1087/1 1102/15
**VAUGHN [5]** 1017/10 1019/8 1023/6 1041/23 1042/3
**verdict [27]** 1020/20 1025/8 1026/6 1026/19 1030/1 1030/7 1030/9 1030/11 1034/1 1034/3 1034/5 1034/6 1034/6 1034/8 1034/9 1034/13 1034/18 1035/1 1035/9 1037/18 1099/11 1099/21 1100/9 1100/11 1100/15 1101/1 1101/2
**verdicts [2]** 1033/23 1034/22
**version [5]** 1019/21 1020/8 1020/9 1020/12 1022/6
**versus [2]** 1019/3 1095/6
**very [11]** 1024/8

1028/14 1058/3 1058/17 1065/6 1068/24 1078/25 1079/1 1099/14 1099/24 1101/13
**via [1]** 1036/15
**views [5]** 1035/14 1086/1 1086/2 1086/3 1086/5
**violation [3]** 1048/19 1056/19 1098/5
**violence [1]** 1042/24
**violent [1]** 1096/15
**voluntary [1]** 1043/13
**vote [1]** 1037/21
**voted [2]** 1054/18 1075/1
**voting [1]** 1037/17
**vs [1]** 1017/4

# W

**wait [4]** 1075/1 1075/23 1079/7 1092/1
**waive [3]** 1077/2 1079/25 1090/21
**waived [2]** 1076/20 1078/21
**wake [1]** 1043/6
**want [37]** 1019/17 1020/20 1021/3 1021/5 1022/24 1024/7 1025/2 1036/7 1042/7 1042/8 1042/9 1044/19 1068/22 1069/6 1071/7 1085/7 1087/9 1087/25 1089/12 1089/21 1095/7 1095/8 1095/9 1095/15 1095/16 1095/18 1096/2 1096/3 1096/4 1096/10 1096/20 1096/20 1096/23 1096/24 1097/24 1099/22 1101/5
**wanted [4]** 1036/19 1048/22 1088/25 1091/4
**wants [5]** 1067/5 1071/2 1087/9 1095/5 1097/3
**warned [2]** 1054/12 1054/17
**was [129]**
**Washington [3]**

1017/4 1017/12 1017/24
**wasn't [2]** 1088/24 1094/14
**waste [1]** 1094/4
**watch [2]** 1035/23 1035/24
**way [20]** 1027/6 1036/16 1037/25 1040/5 1053/8 1053/16 1066/10 1066/11 1067/15 1069/7 1069/10 1069/11 1069/12 1086/10 1091/21 1092/18 1093/14 1095/10 1095/22 1099/16
**ways [1]** 1035/17
**we [100]**
**we'd [1]** 1022/8
**we'll [4]** 1023/12 1050/8 1074/8 1078/22
**we're [16]** 1023/11 1024/2 1024/21 1057/3 1069/13 1074/23 1078/3 1079/1 1079/2 1086/3 1086/4 1086/5 1089/15 1094/16 1094/24 1096/9
**we've [3]** 1066/10 1066/12 1078/6
**week [10]** 1049/17 1069/21 1069/23 1072/3 1078/6 1081/12 1092/9 1099/23 1101/10 1103/16
**weeks [1]** 1088/4
**weight [4]** 1025/21 1029/21 1029/23 1033/4
**well [12]** 1020/8 1020/25 1047/7 1051/18 1059/9 1068/1 1068/22 1070/15 1075/21 1077/18 1079/8 1080/4
**went [5]** 1029/14 1044/24 1046/23 1049/1 1096/1
**were [25]** 1028/7 1030/4 1030/5 1034/23 1034/24 1034/20 1054/21 1055/16 1067/11 1067/23

**W**

**were... [15]** 1069/11
1070/4 1072/3 1072/20
1073/10 1074/15
1075/15 1075/17
1077/9 1078/14
1087/13 1090/7
1094/18 1096/4 1101/9

**what [78]** 1024/21
1025/18 1025/20
1025/21 1029/1
1029/10 1029/16
1030/22 1034/12
1035/17 1037/25
1038/6 1041/4 1044/14
1047/15 1047/19
1048/2 1048/25
1049/19 1049/24
1050/2 1053/7 1055/6
1058/13 1059/3 1059/6
1059/22 1065/23
1065/24 1067/20
1068/22 1069/1 1069/3
1070/14 1071/4
1071/14 1073/8 1074/9
1075/14 1075/20
1075/20 1076/22
1077/6 1078/21
1078/23 1078/25
1080/13 1081/12
1081/12 1081/14
1084/17 1084/24
1085/6 1086/4 1086/4
1087/10 1087/15
1087/18 1088/14
1088/25 1089/3 1089/5
1089/8 1089/15
1089/16 1090/16
1092/17 1093/9
1095/12 1095/15
1095/18 1095/19
1096/2 1096/5 1096/15
1096/16 1097/16
1103/2

**what's [6]** 1075/8
1081/13 1084/18
1088/9 1092/20 1095/5

**whatever [2]** 1052/16
1074/9

**when [58]** 1021/6
1024/14 1024/15
1025/8 1029/3 1030/4
1030/13 1034/10
1035/3 1036/7 1042/9

1042/15 1042/16
1044/15 1044/20
1045/12 1048/2
1052/20 1054/15
1054/16 1054/17
1054/18 1057/9
1058/22 1065/7
1065/13 1066/4
1066/18 1068/11
1070/6 1073/4 1074/23
1075/10 1075/15
1076/20 1076/23
1077/3 1077/16
1077/24 1078/12
1079/8 1079/21
1080/10 1080/18
1081/1 1081/8 1085/18
1086/4 1087/10
1089/25 1092/19
1093/14 1093/25
1094/2 1097/7 1097/7
1097/16 1097/17

**where [14]** 1021/12
1021/16 1026/5 1028/7
1043/17 1068/7 1073/9
1073/22 1075/2
1077/10 1084/16
1086/3 1088/3 1090/20

**whether [37]** 1021/6
1029/22 1030/5 1031/4
1031/9 1031/11
1031/12 1031/19
1031/20 1031/21
1031/22 1031/24
1032/8 1032/14
1032/19 1032/20
1033/1 1033/18
1037/21 1038/9
1040/10 1041/15
1057/10 1057/25
1063/13 1063/14
1065/7 1065/14
1065/19 1065/25
1066/2 1072/4 1073/4
1073/6 1074/3 1074/1
1094/19

**which [38]** 1019/22
1022/4 1023/13 1026/3
1027/22 1028/8
1028/25 1029/6
1031/10 1031/14
1031/23 1032/7
1033/22 1034/16
1038/5 1042/20 1043/1

1044/10 1046/12
1051/23 1055/24
1058/2 1059/7 1059/12
1059/15 1062/13
1062/19 1065/20
1071/6 1080/1 1080/12
1085/8 1091/20
1092/18 1093/21
1095/9 1095/24
1102/16

**while [3]** 1025/2
1025/19 1029/17

**white [8]** 1017/18
1017/18 1019/13
1043/20 1055/15
1087/16 1095/1 1095/5

**who [30]** 1030/16
1031/6 1035/10
1035/11 1035/12
1035/13 1035/14
1036/18 1037/1 1042/4
1056/9 1056/15 1058/9
1062/14 1065/16
1066/9 1066/11 1071/4
1071/12 1071/14
1072/1 1072/22 1073/5
1074/9 1074/13
1077/19 1078/14
1079/17 1093/18
1097/16

**who's [1]** 1074/6

**whole [2]** 1025/4
1025/15

**whose [1]** 1055/19

**why [33]** 1042/6
1042/12 1056/12
1058/4 1066/15
1066/15 1067/17
1067/18 1068/17
1068/21 1068/21
1069/13 1071/5 1071/6
1071/10 1072/25
1073/12 1073/12
1074/2 1074/4 1075/9
1075/11 1075/22
1077/17 1077/17
1080/3 1086/13 1087/1
1095/23 1096/9
1096/14 1096/17
1097/16

**will [45]** 1020/3 1020/4
1021/2 1022/18 1024/1
1024/10 1024/11
1024/12 1024/13

1024/15 1024/17
1024/19 1024/25
1034/9 1034/20
1034/24 1035/10
1035/12 1035/14
1036/5 1037/11
1041/20 1049/15
1057/20 1059/7
1067/22 1069/19
1075/4 1078/24
1079/25 1080/14
1080/16 1085/4 1088/7
1093/18 1098/1 1099/1
1099/10 1099/12
1099/19 1099/20
1099/22 1100/13
1102/24 1103/16

**Willard [1]** 1044/6

**willful [10]** 1039/4
1039/6 1039/22
1040/17 1046/9
1048/18 1050/20
1082/19 1100/18
1100/22

**willfully [9]** 1038/25
1040/17 1048/16
1052/20 1054/4 1081/1
1092/15 1093/25
1094/1

**willfulness [1]**
1052/11

**willing [2]** 1078/20
1092/16

**window [2]** 1029/9
1029/13

**windshield [1]** 1047/6

**wiper [1]** 1047/6

**wish [3]** 1036/7 1036/7
1036/21

**wishes [1]** 1089/5

**withdraw [1]** 1078/11

**without [2]** 1026/14
1053/15

**witness [35]** 1029/3
1030/24 1031/9
1031/10 1031/12
1031/13 1031/14
1031/16 1031/17
1031/18 1031/19
1031/20 1031/21
1031/22 1031/24
1032/7 1032/11
1032/19 1032/20
1032/23 1033/2 1033/3

## W

**witness... [13]** 1033/4
1058/8 1059/15
1059/16 1065/20
1065/20 1065/25
1066/2 1066/17
1066/20 1070/11
1070/21 1075/3
**witness's [7]** 1029/4
1031/11 1031/18
1032/3 1032/9 1032/10
1032/12
**witnesses [16]**
1025/23 1031/4 1031/6
1031/8 1043/16 1056/8
1065/10 1065/16
1065/19 1066/14
1069/2 1071/21 1072/3
1078/7 1087/13 1092/3
**woke [1]** 1029/15
**won't [3]** 1049/20
1049/21 1049/22
**wonder [2]** 1063/14
1087/10
**word [2]** 1048/5
1094/13
**words [4]** 1023/7
1034/6 1052/14
1077/14
**work [13]** 1024/1
1043/12 1053/18
1066/8 1067/22
1067/22 1067/24
1072/20 1085/14
1093/24 1094/12
1097/4 1103/1
**worked [8]** 1043/19
1072/17 1072/22
1073/17 1073/21
1075/23 1094/8
1095/21
**works [5]** 1042/13
1042/14 1042/14
1091/21 1102/23
**world [2]** 1028/14
1095/23
**worth [1]** 1055/22
**worthless [1]** 1056/2
**would [34]** 1021/12
1021/20 1022/7
1022/14 1022/20
1022/21 1023/22
1029/11 1029/16
1030/6 1030/23

1033/10 1040/11
1046/10 1046/22
1047/23 1048/1 1049/5
1053/19 1054/22
1054/23 1054/24
1055/3 1055/11
1058/12 1074/18
1075/22 1086/25
1093/12 1093/13
1102/17 1102/18
1103/2 1103/5
**wouldn't [2]** 1053/15
1090/1
**write [2]** 1079/20
1098/23
**writes [2]** 1078/17
1078/18
**writing [2]** 1037/13
1037/19
**written [1]** 1099/19
**wrong [5]** 1052/18
1052/19 1052/19
1053/25 1054/1
**wrote [9]** 1045/20
1045/23 1046/2
1046/20 1048/15
1049/11 1049/15
1049/17 1071/4

## Y

**year [7]** 1019/3
1067/23 1067/23
1068/25 1074/25
1074/25 1075/4
**years [14]** 1043/19
1066/9 1066/16
1066/18 1066/19
1066/22 1072/11
1072/17 1073/21
1074/15 1075/4
1075/23 1085/16
1086/15
**yelled [1]** 1088/2
**yes [14]** 1020/18
1020/23 1020/25
1021/15 1021/18
1022/1 1023/22
1053/11 1057/15
1060/2 1060/13
1086/25 1087/6 1101/3
**yesterday [3]** 1019/20
1066/18 1079/6
**yet [1]** 1071/1
**you [393]**

**you'll [14]** 1050/7
1058/22 1059/7 1065/9
1065/12 1065/24
1067/5 1077/24
1078/13 1085/5 1085/6
1086/15 1086/16
1088/11
**you're [11]** 1059/1
1065/7 1065/18 1066/4
1069/1 1077/22
1078/20 1080/7
1081/15 1087/12
1089/16
**you've [11]** 1058/4
1070/21 1070/22
1072/17 1074/2 1075/5
1075/6 1077/23 1079/9
1079/10 1080/21
**your [110]**
**Your Honor [39]**
1019/2 1019/7 1019/11
1019/14 1019/16
1020/6 1020/11
1020/16 1022/4
1022/14 1022/24
1023/3 1023/9 1023/16
1057/15 1057/17
1059/18 1059/24
1060/2 1060/10
1060/11 1063/16
1065/6 1070/11
1079/14 1081/6
1081/16 1081/20
1084/14 1085/2
1085/23 1086/23
1087/6 1101/17
1102/10 1102/22
1102/23 1103/12
1103/14
**yourself [6]** 1049/9
1063/10 1067/15
1068/21 1075/1
1084/21
**yourselves [1]** 1019/6

## Z

**Zelda [1]** 1017/15

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| STEPHEN K. BANNON, | Criminal Action No. 1:21-cv-00670 (CJN) |
| *Defendant.* | |

**JURY INSTRUCTIONS**

1

## Instruction 1:  Use of the Instructions

I will provide you with a copy of my instructions.  During your deliberations, you may, if you want, refer to these instructions.  While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole and may not follow some and ignore others.  If you have any questions about the instructions, you should feel free to send me a note.  Please return your instructions to me when your verdict is rendered.

### Instruction 2:  The Role of the Court

My function is to conduct this trial in an orderly, fair, and efficient manner; to rule on questions of law; and to instruct you on the law that applies in this case.

It is your duty to accept the law as I instruct you.  You should consider all the instructions as a whole.  You may not ignore or refuse to follow any of them.

## Instruction 3:  The Role of the Jury

Your function, as the jury, is to determine what the facts are in this case.  You are the sole judges of the facts.  While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence.  You alone decide the credibility or believability of the witnesses.

As human beings, we all have personal likes and dislikes, opinions, prejudices, and biases. Generally, we are aware of these things, but you also should consider the possibility that you have implicit biases, that is, biases of which you may not be consciously aware.  Personal prejudices, preferences, or biases have no place in a courtroom, where our goal is to arrive at a just and impartial verdict.  All people deserve fair treatment in our system of justice regardless of any personal characteristic, such as race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, or income level.  You should determine the facts solely from a fair consideration of the evidence.  You should decide the case without prejudice, fear, sympathy, favoritism or consideration of public opinion.

You may not take anything I may have said or done as indicating how I think you should decide this case.  If you believe that I have expressed or indicated any such opinion, you should ignore it.  The verdict in this case is your sole and exclusive responsibility.

4

## Instruction 4:  Recollection

If any reference by me or the attorneys to the evidence is different from your own memory of the evidence, it is your memory that should control during your deliberations.

## Instruction 5:  Statements of Counsel

The statements and arguments of the lawyers are not evidence.  They are only intended to assist you in understanding the evidence.  Similarly, the questions of the lawyers are not evidence.

## Instruction 6:  Indictment is Not Evidence

The indictment is merely the formal way of accusing a person of a crime.  You must not consider the indictment as evidence of any kind—you may not consider it as any evidence of the Defendant's guilt or draw any inference of guilt from it.

## Instruction 7: The Burden of Proof and Presumption of Innocence

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven he is guilty beyond a reasonable doubt. This burden never shifts throughout the trial. The law does not require the Defendant to prove his innocence or to produce any evidence at all. If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which the Defendant is charged, it is your duty to find him guilty of that offense. On the other hand, if you find the government has failed to prove any element of a particular offense beyond a reasonable doubt, it is your duty to find the Defendant not guilty of that offense.

8

## Instruction 8:  Reasonable Doubt

The government has the burden of proving the Defendant guilty beyond a reasonable doubt as to each count or charge against him.  Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely than not true, which we call the preponderance of the evidence.  In criminal cases, the government's proof must be more powerful than that.  It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.  If, on the other hand, you think there is a real possibility that a defendant is not guilty, you must give him the benefit of the doubt and find him not guilty.

## Instruction 9:  Direct and Circumstantial Evidence

There are two types of evidence from which you may determine what the facts are in this case—direct evidence and circumstantial evidence.  When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence.  On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example.  Assume a person looked out a window and saw that snow was falling.  If he later testified in court about what he had seen, his testimony would be direct evidence that snow was falling at the time he saw it happen.  Assume, however, that he looked out a window and saw no snow on the ground, and then went to sleep and saw snow on the ground after he woke up.  His testimony about what he had seen would be circumstantial evidence that it had snowed while he was asleep.

The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact.  The law does not favor one form of evidence over another.  It is for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial.  You are permitted to give equal weight to both.  Circumstantial evidence does not require a greater degree of certainty than direct evidence.  In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

### Instruction 10:  Nature of Charges Not to be Considered

One of the questions you were asked when we were selecting this jury was whether the nature of the charges itself would affect your ability to reach a fair and impartial verdict.  We asked you that question because you must not allow the nature of a charge to affect your verdict.  You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

11

## Instruction 11:  Inadmissible and Stricken Evidence

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper.  You must not hold such objections against the lawyer who made them or the party he or she represents.  It is the lawyers' responsibility to object to evidence that they believe is not admissible.

If, during the course of the trial, I sustained an objection to a lawyer's question, you should ignore the question, and you must not speculate as to what the answer would have been.  If, after a witness answered a question, I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations.

## Instruction 12:  Credibility of Witnesses

In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all the witnesses who have testified.

You are the sole judges of the credibility of the witnesses.  You alone determine whether to believe any witness and the extent to which a witness should be believed.  Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified.

You may consider anything that in your judgment affects the credibility of any witness.  For example, you may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as a truthful person; whether the witness impresses you as having an accurate memory; whether the witness has any reason for not telling the truth; whether the witness had a meaningful opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case.

In evaluating the accuracy of a witness's memory, you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later recollections of the event, and the circumstances under which the witness was asked to recall details of the event.

You may consider whether there are any consistencies or inconsistencies in a witness's testimony or between the witness's testimony and any previous statements made by the witness.  You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit.  You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood, or differences in perception.

13

You may consider the reasonableness or unreasonableness, the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial, or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive.

14

## Instruction 13:  Right of Defendant Not to Testify

Every defendant in a criminal case has an absolute right not to testify.  The Defendant has chosen to exercise this right.  You must not hold this decision against him, and it would be improper for you to speculate as to the reason or reasons for his decision.  You must not assume the defendant is guilty because he chose not to testify.

### Instruction 14:  Motive

Motive is not an element of the offenses charged, and the government is not required to prove motive in this case.  You may, however, consider evidence of motive or lack of evidence of motive in deciding whether or not the government has proved the charges beyond a reasonable doubt.

## **Instruction 15:  Multiple Counts**

Each count of the indictment charges a separate offense.  You should consider each offense, and the evidence which applies to it, separately, and you should return separate verdicts as to each count.  The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not influence your verdict with respect to any other count of the indictment.

17

## **Instruction 16:  Unanimity**

A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict.  In other words, your verdict, on each count, must be unanimous.

## Instruction 17:  Verdict Form Explanation

You will be provided with a Verdict Form for use when you have concluded your deliberations.  The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be.  Nothing in the form replaces the instructions of law I have already given you, and nothing in it replaces or modifies the instructions about the elements which the government must prove beyond a reasonable doubt.  The form is meant only to assist you in recording your verdict.

## <u>Instruction 18:  Exhibits During Deliberations</u>

I will be sending into the jury room with you the exhibits that have been admitted into evidence.  You may examine any or all of them as you consider your verdicts.  Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

20

## Instruction 19:  Selection of Foreperson

When you return to the jury room, you should first select a foreperson to preside over your deliberations and to be your spokesperson here in court.  There are no specific rules regarding how you should select a foreperson.  That is up to you.  However, as you go about the task, be mindful of your mission—to reach a fair and just verdict based on the evidence.  Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

21

## Instruction 20:  Cautionary Instruction on Publicity, Communications, and Research

I would like to remind you that, in some cases, there may be reports in the newspaper or on the radio, internet, or television concerning this case.  If there should be such media coverage in this case, you may be tempted to read, listen to, or watch it.  You must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom.  If any publicity about this trial inadvertently comes to your attention, do not discuss it with other jurors or anyone else.  Just let me or my clerk know as soon after it happens as you can, and I will then briefly discuss it with you.

As you retire to the jury room to deliberate, I also wish to remind you of an instruction I gave you at the beginning of the trial.  During deliberations, you may not communicate with anyone not on the jury about this case.  This includes any electronic communication such as email or text or any blogging about the case.  In addition, you may not conduct any independent investigation during deliberations.  This means you may not conduct any research in person or electronically via the internet or in another way.

## <u>Instruction 21: Notetaking by Jurors</u>

During the trial, I have permitted those jurors who wanted to do so to take notes. You may take your notebooks with you to the jury room and use them during your deliberations if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in the case, and they should not replace your own memory of the evidence. Those jurors who have not taken notes should rely on their own memory of the evidence. The notes are intended to be for the notetaker's own personal use.

**Instruction 22:  Communications between Court and Jury During Jury's
Deliberations**

If it becomes necessary during your deliberations to communicate with me, you may send a

note by the clerk or marshal, signed by your foreperson or by one or more members of the jury.  No

member of the jury should try to communicate with me except by such a signed note, and I will never

communicate with any member of the jury on any matter concerning the merits of this case, except

in writing or orally here in open court.

Bear in mind also that you are never, under any circumstances, to reveal to any person—not

the clerk, the marshal or me—how jurors are voting until after you have reached a unanimous verdict.

This means that you should never tell me, in writing or in open court, how the jury is divided on any

matter—for example, 6-6 or 7-5 or 11-1, or in any other fashion—whether the vote is for conviction

or acquittal or on any other issue in the case.

24

**-4578-**

## **Instruction 23:  Proof of State of Mind**

Someone's state of mind ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer someone's state of mind from the surrounding circumstances.  You may consider any statement made or acts done or omitted by the Defendant, and all other facts and circumstances received in evidence which indicate his state of mind.

It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.  You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the Defendant acted with the necessary state of mind.

## <u>Instruction 24: "On or About" – Proof Of</u>

The indictment charges that the offense of Count 1 was committed "on or about" October 14, 2021, and the offense of Count 2 was committed by or "on or about" October 18, 2021.  The proof need not establish with certainty the exact date of the alleged offense.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

26

## Instruction 25:  Contempt of Congress – Elements of the Offense

Counts One and Two of the Indictment charge the Defendant with contempt of Congress for willfully not providing testimony and information to the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol.  Count One charges the Defendant with a willful failure to provide testimony on October 14, 2021.  Count Two charges the Defendant with a willful failure to produce records by October 18, 2021.

As I have already mentioned, the burden of proof in the case lies on the government alone.  It must prove each element beyond a reasonable doubt.  Thus, to find the Defendant guilty of contempt of Congress, you must find that, as of on or about the dates charged, the government has proved each of the following elements beyond a reasonable doubt:

> *First*, that the Defendant was subpoenaed by the Select Committee to provide testimony or produce papers;

> *Second*, that the subpoena sought testimony or information pertinent to the investigation that the Select Committee was authorized to conduct;

> *Third*, that the Defendant failed to comply or refused to comply with the subpoena; and

> *Fourth*, that the Defendant's failure or refusal to comply was willful.

Some clarifications about these elements are necessary.

For the second element, the testimony or information sought by the subpoena must be "pertinent."  In order for you to find that the information was pertinent, the government must prove to you, beyond a reasonable doubt, that at the time the Select Committee issued the subpoena, the testimony or information sought could have related to the Select Committee's investigation in some way.  Phrased differently, the government must prove to you, beyond a reasonable doubt, that there was, at the time the subpoena was issued, some connective reasoning between the topic under inquiry and the information sought.  It does not matter whether the information the Defendant allegedly had

27

**-4581-**

would have been pertinent to the authorized investigation. All that matters is that it could have been pertinent at the time that the Select Committee sought the information.

For the fourth element, the government must prove to you, beyond a reasonable doubt, that the Defendant acted "willfully." The word "willful," in this context, does not mean that the Defendant's failure or refusal to comply with the Select Committee's subpoena was for an evil or bad purpose. The reason or purpose of the failure or refusal to comply is immaterial, so long as the failure or refusal was deliberate and intentional. To be deliberate or intentional means that the failure to comply was not the result of inadvertence, accident, or mistake, including a mistake regarding the operative date.

It is not a defense to contempt of Congress that the Defendant did not comply with the subpoena because of the legal advice he received from his attorney or someone else, because of his understanding or belief of what the law required or allowed, or because of his understanding or belief that he had a legal privilege, such as executive privilege, that excused him from complying.

Finally, if you find beyond a reasonable doubt that the Defendant deliberately and intentionally failed or refused to comply with the subpoena at the time alleged by the Government, it is not a defense to contempt of Congress that the Defendant later offered to comply or that the Committee later agreed to accept documents or testimony from him.

## **Instruction 26:  Consider Only Crime Charged**

You are here to determine whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged.  The defendant is not on trial for any act, conduct, or crime that is not charged in the indictment.

### Instruction 27:  Statements in Closing

Ladies and gentlemen, during closings I sustained objections to certain statements by counsel.  You should not consider those statements.  You also heard about a purported rules violation by the Committee in not providing the Defendant with a copy of certain rules and about certain inconsistencies in signatures.  You may not consider these issues as a defense in this case. Instead, you should comply with my prior instructions regarding the elements that must be proved beyond a reasonable doubt.

# UNITED STATES DISTRICT COURT
## THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

Plaintiff,

vs.                                                    Case No.: **21-CR-670 (CJN)**

**DEFENDANT'S NAME**
Defendant.

### COUNSELS' ACKNOWLEDGMENT CONCERNING TRIAL EXHIBITS

Counsel acknowledges that they have jointly reviewed the exhibits that were admitted

into evidence with the Courtroom Deputy and have agreed on the exhibits that shall be submitted

to the jury during deliberations.

7/22/2022

**DATE EXHIBITS WENT TO JURY**

**APPROVED BY:**

GOVERNMENT COUNSEL

DEFENSE COUNSEL

-4586-

| | |
|---|---|
| Government | ✓ |
| Plaintiff | |
| Defendant | |
| Joint | |
| Court | |

United States

VS.

Stephen K. Bannon

Civil/Criminal No. 21-cr-670 (CJN)

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| 1 | House Resolution 503 | 7/19/22 | 7/19/22 | Kristin Amerling | 7/22/2022 |
| 2 | September 23, 2021 Subpoena to Stephen Bannon | 7/19/22 | 7/19/22 | Kristin Amerling | 7/22/2022 |
| 3 | September 23 and 24, 2021 Emails re Service of Subpoena | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 4 | October 7, 2021 Letter from Costello to Chairman Thompson and Cover Email | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 5 | October 8, 2021 Letter from Chairman Thompson to Costello | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 6 | October 13, 2021 Letter from Costello to Chairman Thompson | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 7 | October 15, 2021 Letter from Chairman Thompson to Costello | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 8 | October 18, 2021 Letter from Costello to Chairman Thompson and Cover Email | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 9 | October 19, 2021 Letters from Chairman Thompson to Costello | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 10 | September 24, 2021 Post on Stephen Bannon's Gettr Account | 7/20/22 | 7/20/22 | Stephen Hart | 7/22/2022 |

United States

vs.

Stephen K. Bannon

Civil/Criminal No. 21-cr-670 (CJN)

| Government | ✓ |
|---|---|
| Plaintiff | |
| Defendant | |
| Joint | |
| Court | |

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| 11A | October 8, 2021 Post on Stephen Bannon's Gettr Account | 7/20/22 | 7/20/22 | Stephen Hart | 7/22/2022 |
| 11B | DailyMail Article Linked in October 8, 2021 Post on Stephen Bannon's Gettr Account | 7/20/22 | 7/20/22 | Stephen Hart | 7/22/2022 |
| 12A | Toll records for T-Mobile number ending in 7048 | | | | |
| 12B | Toll records for T-Mobile number ending in 1293 | | | | |
| 12C | Subscriber records for T-Mobile numbers ending in 1293 and 7048 | | | | |
| 12D | Certification of Business Records for T-Mobile numbers ending in 1293 and 7048 | | | | |
| 13 | David Schoen statements at March 16, 2022 Hearing, Tr. at 59:11-14; 60:10-13 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

-4587-

United States of America

vs.

Stephen K. Bannon

Civil/Criminal No. 21-cr-670

| Government | ☐ |
| Plaintiff | ☐ |
| Defendant | ✓ |
| Joint | ☐ |
| Court | ☐ |

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| 1A | Subpoena to Stephen K. Bannon (US-000303-000312) | | | | |
| 1B | Subpoena to Stephen K. Bannon (US-000303-000312)- REDACTED | | | | |
| 2 | FBI 302 report of November 2, 2021 interview with K. Amerling (US-00245-000252) | 7/20/22 | | Kristin Amerling | |
| 3 | October 13,2021 Email. from S. Tonolli to K. Amerling (US-000317-000318) | | | | |
| 4 | Transcript of Official Proceeding. (US-000397-000403) | | | | |
| 5 | November 5, 2021, Email correspondence of K. Amerling (US-001143-001144) | | | | |
| 6 | RESERVED | | | | |
| 7 | H. Res. 8, 117th Cong. | | | | |
| 8 | H. Res. 730, 117th Cong. (US-000459-000504) | 7/20/22 | | Kristin Amerling | |
| 9A | 117th Congress Regulations for Use of Deposition Authority (H-41)] | | | | |

-4588-

United States of America

vs.

Stephen K. Bannon

Civil/Criminal No. 21-cr-670

Government ☐
Plaintiff ☐
Defendant ✓
Joint ☐
Court ☐

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| 9B | RESERVED | 7/20/22 | 7/20/22 | Kristin Amerling | 7/22/2022 |
| 10 | J. Clark Letter dated October 6, 2021 (US-000971-000972) | | | | |
| 11 | FBI 302 report of November 2, 2021, interview of S. Tonolli. (US-000358-000362) | | | | |
| 12A | October 13, 2021, email from S. Tonolli to R. Costello. (US-000388) | | | | |
| 12B | October 13, 2021, email from R. Costello to S. Tonolli. (US-000391-000394) | | | | |
| 12C | October 13, 2021, email from S. Tonolli to R. Costello. (US-000395-000396) | | | | |
| 13 | FBI Record Receipt for Property. (US-000946-000963) | | | | |
| 14 | FBI 302 report memorializing Costello meeting. (US-001769-001782) | | | | |
| 15 | Handwritten notes of FBI Special Agent S. Hart (US-000325-000337) | | | | |
| 16 | November 10, 2021, email from FBI Special Agent S. Hart to Special Agent F. D'Amico | | | | |

-4589-

United States of America

vs.

Stephen K. Bannon

Civil/Criminal No. CR 21-670 (CJN)

- [ ] Government
- [ ] Plaintiff
- [✓] Defendant
- [ ] Joint
- [ ] Court

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| 30 | July 9, 2022 Letter from Former President Donald Trump to Stephen K. Bannon | 7/20/2022 | 7/20/2022 | Kristin Amerling | 7/22/2022 |
| 31 | July 9, 2022 Letter from Robert J. Costello to Chairman Bennie Thompson | 7/20/2022 | 7/20/2022 | Kristin Amerling | 7/22/2022 |
| 32 | July 14, 2022 Letter from Chairman Bennie Thompson to Robert J. Costello | 7/20/2022 | 7/20/2022 | Kristin Amerling | 7/22/2022 |
| 39 | Article from Rolling Stone dated 9/24/2021 | 7/20/22 | 7/20/22 | Stephen Hart | 7/22/2022 |
| 40 | Daily Mail Article dated 10/8/2021 | 7/20/22 | 7/20/22 | Stephen Hart | 7/22/2022 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

-4590-

CO 109A - Rev. 3/2010

## UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

United States of America

                                    )
                                    )
            vs.                     )        Civil/Criminal No.:  CR 21-670 (CJN)
                                    )
                                    )
        Stephen K. Bannon           )
                                    )

### NOTE FROM JURY

We have reached a verdict on both counts.

Date: 7/22/22

Time: 2:15

FOREPERSON

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 1:21-cr-00670 (CJN)

STEPHEN K. BANNON,

       *Defendant.*

## VERDICT FORM

**Count 1 (Contempt of Congress – Willful Failure to Appear for Testimony)**

    As to Count 1, we unanimously find the Defendant:

    _____✓_____ Guilty

    _____ Not Guilty

**Count 2 (Contempt of Congress – Willful Failure to Provide Records)**

    As to Count 2, we unanimously find the Defendant:

    _____✓_____ Guilty

    _____ Not Guilty

7/22/22
_____          _____
Date                                                    Foreperson

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

STEPHEN K. BANNON,

*Defendant.*

Criminal Action No. 1:21-cr-00670 (CJN)

### <u>ORDER</u>

This matter is before the Court on two of Defendant's Motions, which were made or renewed during the trial in this matter. The first is Defendant's Motion for Judgment of Acquittal, which was also memorialized in a filing on July 21, 2022, *see* ECF No. 125. The second is Defendant's renewed Motion to Dismiss the Case, *see* Mot. to Dismiss the Case, ECF No. 116, which the Court had previously denied without prejudice to its being renewed after the government had rested its case-in-chief. *See* Trans. of July 19, 2022 (p.m.) at 64:12–21 (denying the Motion without prejudice to subsequent renewal at trial); Trans. of July 21, 2022 (a.m.) at 28:9–11 (acknowledging the Motion had been renewed).

Accordingly, it is

**ORDERED** that the Motion for Judgment of Acquittal, ECF No. 125, is **DENIED**. The Court concludes that the evidence presented in the government's case was sufficient to sustain a conviction. The only reason the Court did not make this ruling on the record at the time the Motion was made orally was the Court's concern about the risk of potential jury bias, as the Court articulated on the record. *See, e.g.*, Trans. of July 21, 2022 (a.m.) at 27:23–28:8.

As to the Defendant's renewed Motion to Dismiss the Case, however, the Court believes that it would benefit from further briefing. It is thus further

1

**ORDERED** that on or before August 5, 2022, the Defendant shall file a brief of no more than 15 pages in further support of his renewed Motion to Dismiss the Case.  The government may file a response, also not to exceed 15 pages, on or before August 12, 2022.  A reply, if any, shall be filed on or before August 19, 2022, and shall not exceed 7 pages.

**IT IS SO ORDERED**.

DATE:  July 27, 2022

_____
CARL J. NICHOLS
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 21-cr-670 |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' RESPONSE TO DEFENDANT'S NOTICE REGARDING**
**PUBLICITY DURING TRIAL**

On July 22, 2022, the Defendant filed a notice with the Court identifying publicity relating to the Defendant that occurred during trial. ECF No. 127. Specifically, the Defendant noted that he had been mentioned during the July 21, 2022, hearing held by the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee"). *Id*. at 2. The Defendant stated in his notice that he made the filing in accordance with his counsel's discussion with the Court at the pretrial conference on July 14, 2022, about how the Defendant should complete the record for appeal relating to his pretrial publicity claims. *See* Pretrial Conf. Hrg., 7/14/22, Tr. at 25-26.

The Defendant did not, however, include in his notice any of the publicity about the Committee, the Defendant, or the trial proceedings that the Defendant himself generated in the lead up to or during trial. Accordingly, the Government files this response to the Defendant's notice to add to the record the Defendant's own efforts to publicize the CNN program about which the Defendant has raised claims of prejudice, *see* ECF No. 108 at 5-6; ECF No. 127 at 3, and to garner coverage of the Committee's work and his trial.

Specifically, the Government provides notice of the following:

1) On a July 12, 2022, episode of his podcast, War Room, the Defendant discussed his eleventh-hour offer to testify before the Committee. He also stated that listeners should

**-4595-**

pray for "our enemies" because "we're going medieval on these people, we're going to savage our enemies." *See* Episode 1996, War Room, July 12, 2022, *available at* https://warroom.org/2022/07/12/episode-1996-pfizer-ccp-backed-partners-elon-musk-trolls-trump-alan-dershowitz-on-partisan-america-and-the-constitution-informants-confirmed-at-j6/ (last accessed July 27, 2022) (time 16:37 to 17:46).

2) On July 15, 2022, after moving to continue trial because of a CNN program planned for Sunday, July 17, 2022, about the Defendant, *see* ECF No. 108 at 5-7, an advertisement for the CNN program was posted to the Gettr page of the Defendant's podcast, the War Room. *See* Ex. 1.

3) On July 17, 2022, the Defendant's personal Gettr account reposted an advertisement for the same CNN program. *See* Ex. 2.

4) On July 18, 2022, after trial had concluded for the day, the Defendant gave a press conference in front of the courthouse doors. During the press conference, the Defendant called the Committee's hearings a "show trial." *See* "Bannon calls Jan. 6 committee hearing a 'show trial,'" Wash. Post, July 18, 2022, *available at* https://www.washingtonpost.com/video/politics/bannon-calls-jan-6-committee-hearing-a-show-trial/2022/07/18/c2dfca98-3788-43f8-95ee-db31b978ccca_video.html (last accessed July 27, 2022).[1]

5) On July 19, 2022, after trial had concluded for the day, the Defendant gave a press conference in front of the courthouse doors. During the press conference, the Defendant complained that Committee Chair Rep. Bennie Thompson was not testifying in his trial, referred to another member of the Committee and another member of Congress by derogatory names, and accused the Committee of not investigating January 6 in good faith. *See* "Prosecutors say Bannon willfully ignored subpoena," Associated Press Archive, July 24, 2022, *available at* https://www.youtube.com/watch?v=3SR_EJL5nkw (last accessed July 27, 2022).

6) On July 20, 2022, after trial had concluded for the day, the Defendant gave a press conference in front of the courthouse doors. During the press conference, the Defendant called the Committee's work a "show trial, the Moscow show trial of the 1930s." He also reiterated what had been admitted into evidence during the trial that day about his public statements at the time he refused to comply with the Committee's subpoena, stating, "I stand with Trump and the Constitution." The Defendant further commented on the evidence admitted during trial that day, stating, "Hey, the big news coming out of the FBI is they went to the Gettr account, check it out." *See* "Bannon's team questions House subpoena deadline," Associated Press Archive, July 25, 2022, *available at* https://www.youtube.com/watch?v=RJ9qH4zMMI0 (last accessed July 27, 2022).

---

[1] The Government notes that while it links here to one source for each of the Defendant's courthouse press conferences, the Defendant's and his attorney's statements during the press conferences he held throughout trial were covered by several national news outlets.

7) On July 21, 2022, after proceedings had concluded for the day, the Defendant gave a press conference in front of the courthouse doors. During the press conference, both the Defendant and his counsel commented on issues relevant to legal issues that had been litigated in the case proceedings. The Defendant's attorney commented on his advice-of-counsel and executive privilege claims and the Defendant discussed purported details about his prior compliance with congressional subpoenas. In addition, the Defendant again reiterated his public statement that had been entered into evidence the prior day: "I stand with Trump and the Constitution." *See* "Trump ex-adviser Bannon rests case in trial, calling no witnesses," Reuters, July 21, 2022, *available at* https://www.reuters.com/world/us/ex-trump-aide-bannon-seek-dismissal-criminal-contempt-congress-charges-2022-07-21/ (last accessed July 27, 2022) (excerpts of press conference included in video at top of article).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov

← **Post**

| Log In | Sign Up |
|--------|---------|

**WarRoom — Home of ultraMAGA** ✅
@WarRoom · Jul 15                                              ⋯

WarRoom Posse: CNN reveals 'The Master Plan' Sunday Night LIVE 8pm EDT



00:12

Posted on 11:00 AM · Jul 15th, 2022

**889** Likes    **391** Reposts

💬        👍        🔁        ↗

**Trump454545** @Trump454545 · Jul 19                          ⋯
Replying to @WarRoom
OUR MAN              @SteveBannon

💬 0      👍 0      🔁 0                                        ↗

**philipjb** @philipjb · Jul 18                                ⋯
Replying to @WarRoom

Have your own opinion to voice out?
GETTR opens your way to new experiences.

| Log In | Sign Up |
|--------|---------|

We use necessary cookies to make our site work. We would like to set additional cookies to understand site usage and remember your settings. We also use cookies set by other sites to help deliver content from their services. **Learn More**

Accept All Cookies

Refuse Non-Essential Cookies

**-4598-**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

Criminal No. 21-670 (CJN)

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO EXCLUDE CONGRESSIONAL EVIDENCE OR DISMISS THE
INDICTMENT BASED ON GRANTING THE MOTION TO QUASH AND
CONGRESSIONAL SUBPOENA RECIPIENTS'
REFUSAL TO TESTIFY OR PRODUCE DOCUMENTS

Defendant Stephen K. Bannon, through undersigned counsel, hereby submits this

Supplemental Brief in accordance with this Court's July 27, 2022, Order [Doc. 137].[1]  All previous

filings and argument related to the Motion to Quash and the instant motion are incorporated herein,

including all pleadings and argument in this case and in the related case, Misc. Case No. 22-60

(CJN).  We respectfully submit that the refusal of the congressional witnesses to comply with

---

[1] The Motion is now in an unusual procedural posture.  It seeks to dismiss the indictment based on granting the motion to quash and the corresponding refusal of the subpoena recipients to testify voluntarily or otherwise, or, in the alternative, to exclude the Congressional evidence adduced by the Government at trial through Ms. Amerling [Docs. 116, 121].  During the Hearing on July 21, 2022, the Court asked whether it could reserve judgment on this Motion to Dismiss, like the then pending Rule 29 motion, while the jury deliberates and the undersigned agreed that the Court could [July 21, 2022, Tr. at 59-60].  However, since then, the Court has denied the Rule 29 motion and specifically made a finding on the sufficiency of the evidence [Doc. 137 at 1].  The instant motion is directly relevant to the sufficiency of the evidence, to the extent relief it seeks includes the exclusion of Congressional testimony.  Without that testimony, the question of the sufficiency of the evidence would be completely different.  It is not clear, for that reason, how the Court could have granted the Rule 29 motion before fully and fairly considering the instant motion – a motion on which the Court directed further briefing [Doc. 137 at 1-2] – or what relief the Court intends to consider, in light of already having decided the sufficiency of the evidence question in advance of deciding the instant motion.

-4600-

Defendant's trial subpoenas seeking testimony and documents and the Court's Order quashing the subpoenas resulted in a trial that violated Mr. Bannon's Fifth and Sixth Amendment rights. In support thereof, Mr. Bannon states as follows:

**Background**

Mr. Bannon assumes the Court's familiarity with all relevant facts and will simply summarize certain directly relevant facts herein. Mr. Bannon incorporates by reference, *inter alia*, the facts and argument set forth in Defendant's Motion To Exclude Congressional Evidence or Dismiss the Indictment Based on Granting the Motion to Quash ("Motion to Dismiss") [Doc. 116], in his Reply [Doc. 121], and all oral argument on the subject, including, but not limited to, the proffer provided at the Court's direction. [See July 21, 2022 Tr. at 35-66; see also July 19, 2022 Tr. at 522].

The Indictment in this case charged Mr. Bannon with two counts of Contempt of Congress, in violation of 2 U.S.C. § 192, stemming from his conduct after receiving a Congressional Subpoena for documents and testimony, issued on behalf of the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"). [Doc. 1]. Mr. Bannon accepted service of the Subpoena. There followed back and forth communications between Mr. Bannon (through his attorney) and Rep. Bennie Thompson, the chair of the Select Committee. Among other reasons, Mr. Bannon's position was that he was unable to comply with the Subpoena because President Donald J. Trump involved executive privilege and that his attorney had directed him that he could not comply as a matter of law. Mr. Bannon advised that he could and would comply if the Committee resolved the executive privilege issue with former President Trump or if a judge ordered him to comply (in the context of a civil enforcement proceeding). Nonetheless, Chairman Thompson initiated a report (H. Rept. 117-152) and resolution (H. Res. 727)

2

**-4601-**

recommending that the House of Representatives find Mr. Bannon in Contempt of Congress. On October 21, 2020, the resolution passed on a largely party line vote of 229 yeas to 202 nays. The same day the matter was referred to U.S. Attorney's Office for the District of Columbia for prosecution.

On June 2, 2022, the defense served subpoenas seeking trial testimony and documents from sixteen Members of Congress and congressional staff (hereinafter "Movants"). [*See* Case No. 22-mc-60, ECF. 1 at 13]. Service of all sixteen subpoenas was accepted. *Id*. at Exs. A-P. Movants sought to quash the subpoenas. In a disingenuous and constitutionally insufficient formulation, Movants argued that:

> To the extent testimony about Bannon's subpoena from the Select Committee or his interactions with the Select Committee are material to his defense at trial, two Select Committee staff members – Chief Counsel and Deputy Staff Director Kristin Amerling and Senior Investigative Counsel Sean Tonolli – will voluntarily be made available by the Select Committee despite their Speech or Debate immunity to testify as to the narrow topics that are relevant to the elements of the charged crime and available defenses.

*Id*. at 2-3.

Movants contended – a mistaken contention as the trial testimony that is quoted in the next section of this brief demonstrates – that these two staff members (who not coincidentally were identified as Government witnesses on the Government Witness List) could provide all relevant testimony needed, such that the Members of Congress need not appear. This was a constant theme in the Motion To Quash, as reflected below:

> . . . to the extent there is a need at trial for testimony about the subpoena to Bannon, two senior staff members on the Select Committee – Ms. Amerling and Mr. Tonolli – can provide relevant testimony regarding those elements or any available defenses . . .

*Id*. at 17.

3

**-4602-**

> . . . any relevant testimony can be obtained from Ms. Amerling and Mr. Tonolli.
> There is no basis to believe that any of the other subpoenaed individuals would
> have additional relevant evidence.

*Id*. at 20.

> Ms. Amerling and Mr. Tonolli will be available to testify to relevant questions from
> Bannon's counsel. There should be no questions material to Bannon's defense that
> the other subpoenaed individuals would uniquely be able to answer.

*Id*. at 26.

This Court granted the Motion to Quash. [*See* Case No. 22-mc-60, Minute Order, July 12, 2022]. That Order had a two-fold effect. First, it prevented Mr. Bannon from calling his own witnesses – namely, Members of Congress with the actual authority to issue a subpoena, opine as to the pertinence or lack thereof of requests in the subpoena and proposed deposition inquiries, take the procedural steps necessary to seek deposition testimony, authorize accommodations, pursue alternative avenues to criminal prosecution such as negotiating on executive privilege or seeking a civil adjudication of the privilege dispute, and initiate a criminal prosecution. That made it impossible to fully challenge the Government's evidence as presented through a congressional staffer.  Granting the Motion to Quash denied Mr. Bannon his constitutional rights to due process of law, compulsory process, to confrontation, to effective assistance of counsel, and to a fair jury trial.

Second, the ruling had the effect of denying to Mr. Bannon the basic documents that the Government must provide to the defense in any criminal trial. The Government did not provide Mr. Bannon with any prior emails, drafts, and other statements of Ms. Amerling (excepting those that Ms. Amerling voluntarily provided to the prosecutors). In other words, Ms. Amerling asserted Speech or Debate Clause Privilege and withheld those documents in her possession or control which ordinarily must be provided to the defense in order to accord with due process.  This, of

course, was in addition to all relevant and discoverable documents from the Committee and from the House to which Mr. Bannon was entitled and had sought in discovery.

On July 15, 2022, Mr. Bannon moved to dismiss the Indictment based on Movants' assertion of legislative immunity and the Court's Order granting the Motion to Quash and briefed the reasons why allowing Movants to use their privilege as both a sword and a shield would violate Mr. Bannon's Fifth and Sixth Amendment rights to due process, compulsory process, confrontation, a fair jury trial, and effective assistance of counsel. [Doc. 116].

Mr. Bannon's jury trial began on July 18, 2022. On July 21, 2022, the Court heard oral arguments on the defense's Motion to Dismiss [Doc. 116]. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court reserved ruling on the Motion until the jury rendered its verdict. [Minute Order, July 21, 2022]. On July 22, 2022, the jury convicted Mr. Bannon on both counts. On July 27, 2022, the Court ordered the Parties to provide further briefing. [Doc. 137].

**The Evidence At Trial Demonstrated That Mr. Bannon's
Constitutional Rights Were Violated When He Faced Trial After
The Congressional Subpoena Recipients Refused To Testify Or Produce Documents and
the Motion to Quash was Granted.**

Although we cannot in the limited space allowed for this supplemental brief provide every example, the evidence at trial made clear that Ms. Amerling did *not* have the knowledge or authority possessed by the other congressional subpoena recipients who Mr. Bannon was prevented from calling at trial.

For instance, a key issue at trial was whether the date(s) on the Subpoena were fixed or flexible. *See*, *e.g.*, Trial Tr. Jul. 19, 2022, at 5, 13. However, Ms. Amerling could *not* provide the most basic answers at trial about the return dates on the Subpoena:

**COUNSEL:** *How was that date arrived upon? In other words, who decided October 7 was going to be the date that is on the subpoena?*

**MS. AMERLING:** *The ultimate decision-maker for the Select Committee is the Chair and Members of the Select Committee.*

**COUNSEL:** *So you're saying that Chairman Thompson decided that Steve Bannon should appear to produce documents or produce them in an electronic form on October 7, 2021; is that your testimony?*

**MS. AMERLING:** *My testimony is that the subpoena is directing Mr. Bannon to produce documents on that date, and the person who is authorized to sign that subpoena for the Select Committee is the Chairman of the Select Committee, Chairman Bennie Thompson.*

**COUNSEL:** *I understand both of the things you just said but I've got a slightly different question. This is a human process. So I want to know what human decided that October 7, 2021, is the date that Steve Bannon should appear to produce documents. What human being made that decision?*

**MS. AMERLING:** *Sir, I'm not sure I'm – I thought I'd answered your question.*

**COUNSEL:** *You didn't. So let me--*

**MS. AMERLING:** *Chairman Thompson signs the subpoena. He has the authority to demand that witnesses comply with the subpoena.*

**COUNSEL:** *I understand that the Chairman has the authority to sign the Committee—the subpoena. And I also understand your testimony that if the Chairman doesn't sign the subpoena, that it's invalid; is that correct?*

**MS. AMERLING:** *A valid subpoena requires the Chair's signature, yes.*

**COUNSEL:** *Ok. Now back to my question as to who, what person, decided to put October 7?*

**GOVERNMENT:** *Your Honor, the witness has answered the question.*

**THE COURT:** *I think I am going to allow this question, at least one more time. I think the witness has answered portions but not the question directly. If there is an answer.*

**COUNSEL:** *Do you know who decided that Steve Bannon should appear – do you have firsthand knowledge, firsthand knowledge of who the person is who decided that Steve Bannon should appear on October 7, 2021, to produce documents?*

**MS. AMERLING:** *With any subpoena there is generally discussion among staff, and there is advice given to the members of the Select Committee on what is the appropriate language in the subpoena. And then the ultimate decision for what is reflected in the subpoena is made by the individual who has the authority to sign the subpoena.*

Trial Tr. July 20, 2022, at 677:4-679:4.

6

A second major issue at trial involved the letters back and forth between Chairman Thomson and Mr. Bannon (via his attorney). Government counsel acknowledged that the letters comprised the Government's whole case. Pretrial Hearing Tr. July 14, 2022, at 40 ("MS. VAUGHN: So -- I mean, the admission of these letters is the government's case.) Yet Ms. Amerling could not answer the most basic questions about these letters. The following exchange occurred at trial:

> **COUNSEL:** [Referencing Government's Exhibit 5] *And this is essentially your response over the signature of Chairman Thompson to Mr. Costello's letter that we just saw raising an objection. Is that correct?*
>
> **MS. AMERLING:** *This is the response of the Select Committee to Mr. Costello.*
>
> **COUNSEL:** *Well, that's something I want to ask you about, because the Select Committee is made up of people, right?*
>
> **MS. AMERLING:** *That's correct.*
>
> **COUNSEL:** *What person drafted this letter?*
>
> **MS. AMERLING:** *As I've described, letters generally are drafted by a number of staff and reviewed by members; and then Mr. Thompson is authorized to sign the letters on behalf of the Committee.*
>
> **COUNSEL:** *And can you identify for the jury any language in Government's Exhibit No. 5 that Chairman Thompson wrote?*
>
> **MS. AMERLING:** *Chairman Thompson signed the letter, so he has his name on the entire—he's representing the Committee with respect to the entire content of the letter.*
>
> **COUNSEL:** *I understand what you're saying. But what I'm asking you is: Can you identify any words in this letter that were words written by Chairman Thompson?*
>
> **MS. AMERLING:** *As I said, the process for drafting letters generally is that staff counsels draft the letters and members review the letters. So it's difficult for me to identify any one sentence to address that question.*
>
> **COUNSEL:** *How about one word?*
>
> **MS. AMERLING:** *No.*

Trial Tr. July 20, 2022, at 719:13-720:15.

7

**-4606-**

Another key issue at trial was whether Mr. Bannon was subpoenaed pursuant to the authority of the U.S. House of Representatives. Ms. Amerling acknowledged that the Subpoena would be invalid if not signed by Chairman Thompson. Yet she had no knowledge whether he signed the Subpoena.

> **COUNSEL:** *Ms. Amerling, the signature at the bottom that says, "Chairman or authorized member", did you see Chairman Thompson sign Government's Exhibit No. 2?*
>
> **MS. AMERLING:** *I believe that I did but I can't say for certain. I've seen him sign some but not all.*

Trial Tr. July 20, 2022, at 686:25-687:1.

Additionally, at the Court's direction, Mr. Bannon, through counsel, made a specific and detailed proffer as to what areas of inquiry would have been directed to the subpoena recipients in order to further demonstrate, with specifics, the prejudice that resulted from granting the Motion to Quash and from being denied the evidence sought through the subpoenas. [July 21, Tr. at 35-60].[2] Mr. Bannon will not burden the Court with a full recitation here of the details of the proffer; rather he incorporates the same herein by reference and will summarize the areas raised in the proffer that provide examples of how Mr. Bannon's constitutional rights were denied by granting the Motion to Quash in the context of this trial on these Contempt of Congress charges.

Mr. Bannon began his proffer by advising the Court that the Congressional testimony was especially important because the Court had barred almost every defense Mr. Bannon had sought to raise. [July 21, 2022 Tr. at 36]. He then advised the Court that, to preserve the record, he wanted to be clear that one line of inquiry he would have pursued with the Congressional witnesses would have related to rules issues, including issues concerning the composition of the Committee

---

[2] See also Doc. 116 at 16, n.9; Doc. 121 at 2-4.

and other related issues raised earlier in the case (e.g. the lack of a ranking minority member, the failure to provide Mr. Bannon with a copy of Rule 3(b), etc.).  Mr. Bannon advised the Court that he recognized this line of defense had been barred; but he took exception to that ruling and wanted to preserve the record. Only the subpoenaed witnesses could have competently testified on decision that were made surrounding these issues and the reasons for them. [Id.]

Next, Mr. Bannon advised that a primary area of examination for the subpoenaed witnesses would have related directly to the theory of prosecution argued to the jury- that Mr. Bannon and Mr. Costello "ignored" the subpoena.  They absolutely did nothing of the kind, addressing the subpoena in letter after letter, offering to comply if the Committee worked out the executive privilege issue with former President Trump or if they would go before a judge and a judge ordered Mr. Bannon to testify after considering the privilege issue  [*Id*. at 36-39].  Mr. Bannon advised that he wanted to examine Chairman Thompson and/or the Committee members on the constitutionally mandated accommodation process, why, if Mr. Amerling testified truthfully that the Committee considered Mr. Bannon to have important information to provide, the Committee refused to pursue the course of a civil enforcement proceeding as Mr. Bannon had suggested, why they decided to proceed criminally, why they would not accommodate his reasonable request for a one week extension of time [*Id*. at 39].

Other specific material areas of inquiry, directly relevant to the charges against Mr. Bannon would have focused on why the Committee believed Mr. Bannon's testimony to be pertinent or important.  Mr. Bannon explained that he was entitled to hear this from the Committee members who made the decision to seek his testimony and documents, not from a staffer whose hearsay testimony on the subject should not have been admitted and who, in any event, had no authority to make such evaluations and corresponding decisions on subpoenas – only the Committee members

did. [*Id*. at 40]. If the testimony were so important, why wouldn't the Committee agree to a one week extension (a courtesy it had extended to others), especially since the Committee's work and calling of witnesses continues now, some 8 months later? What did Chairman Thompson mean when he wrote to Mr. Bannon asking him to submit his reasons for noncompliance by October 18th? What reasons might have been availing and why? Why the 18th? What kind of reasons might have persuaded the Committee to "change course?" [*Id*. at 41]. What did Chairman Thompson mean when he wrote, after his so-called deadline had passed, urging Mr. Bannon to "change course" and comply with the September 23rd subpoena? What did that mean vis a vis the one defense the Court permitted Mr. Bannon to raise – the mistake of fact defense concerning the malleability of the dates for compliance? [*Id*. at 42]. Ms. Amerling testified that if Mr. Bannon had appeared to testify an hour late that might have been compliance. Would the Committee have agreed to later dates for Mr. Bannon's testimony, in light of its claimed importance, their ongoing "investigation, accommodations made to others, the constitutional imperative to accommodate, the resolution in *Trump v. Thompson*, the Jonathan Su letter?

From the Committee's perspective – those with the actual authority to modify the dates and to decide whether and when to consider Mr. Bannon in default – how flexible were the dates and times? Why did the date on the subpoena requiring the production of documents by October 7th change to a default date of "by October 18th? Why arbitrarily the 18th? Why not the 23rd of December, or a month later or 6 months later? The investigation is ongoing and the information purportedly was important. It somehow better serves the Committee's "investigation" to pursue criminal charges than to take reasonable steps to actually get Mr. Bannon's testimony and documents (e.g. civil enforcement proceeding; giving a one week extension to study *Trump v. Thompson*)?

Congress is the complaining witness in the case. It is hard to imagine there was no coordination between Congress and the prosecution in arriving at that date in Count II and Mr. Bannon was entitled to ask the Congressional decision makers that question, pursuant to the single defense the Court permitted. [*Id*. at 42-44]. Chairman's Thompson's answers to these questions (his continued urging to "comply" with the subpoena; his failure to use the term "default" even through his letter of July 14, 2022) would have been directly relevant to the reasonableness of Mr. Bannon's belief that the dates were not fixed and Mr. Bannon could have demonstrated this through cross-examination.[3] [*Id*. at 42-44]. Mr. Bannon wanted to examine the Committee members about their public statements that indicated they did not actually want to get his testimony; rather they just wanted to try to humiliate him, punish him, and make him an example – all impermissible purposes behind a legislative subpoena and directly relevant to pertinence. [*Id*. at 45; Doc. 116 at 8]. Moreover, it is the Committee's view of pertinence, not its staffer's that controls and Mr. Bannon was entitled to examine Committee members on that threshold issue.

As the Court is aware, Mr. Bannon has asserted that it was error to deny him the defense of advice of counsel and to define "willfully" as the Court did. Had Mr. Bannon been permitted to call Chairman Thompson to testify, he would have provided exculpatory evidence, at least to the extent that the Committee knew that Mr. Bannon's position was that he was fully relying on the advice of counsel and on his belief of the impact of the invocation of executive privilege, and

---

[3] As the Court is aware, Mr. Bannon objected to the admission of the letters into evidence on hearsay grounds [Doc. 123] and fully rejects the notion, raised at the July 21, 2022 Hearing that the letters somehow speak for themselves [See July 21, 2022 Tr. at 43-46]. The use of the letters through Ms. Amerling and without the subpoenaed letter writer and other authorizing Committee members highlighted the Confrontation Clause violation, along with the compulsory process, fair jury trial, effective assistance of counsel, and due process violations. *See e.g. Crawford v. Washington*, 541 U.S. 36 (2004); *United States v. Nobles*, 422 U.S. 225 (1975); *Davis v. Alaska*, 415 U.S. 308 (1974).

otherwise offered to comply, if the privilege issue were resolved by a court order or resolution with former President Trump. [*Id*. at 47]. Mr. Bannon also sought to examine the Committee members about the historic tension between the branches when executive privilege is invoked, the constitutional principle of presumptive validity when it is invoked and he would have wanted the Committee members to truthfully acknowledge that they well knew that only a court, not Congress, is the ultimate arbiter of such a dispute – directly contradicting Government counsel's representations to the jury that the Committee had the right to order compliance notwithstanding the invocation of privilege or in its closing argument, that the Committee's role in the matter is like that of a "referee."

In her testimony, Ms Amerling imbued the Committee with a purportedly sincere, nonpartisan agenda of wanting to legitimately investigate the events of January 6th. Had Mr. Bannon been permitted to have the subpoenaed witnesses testify, he would have presented through cross-examination a very different picture of the Committee and its agenda (and therefore their truly improper agenda with respect to Mr. Bannon), by exposing their extraordinary conflicts of interests. [*Id*. at 52]. Mr. Bannon would have asked Chairman Thompson why, when on October 18th, President Biden, through his counsel, purported to remove former President Trump's executive privilege invocation, the Committee would not give Mr. Bannon one week to study this development and its implications – one of the issues in *Trump v. Thompson* – especially if the information they sought truly were pertinent and important. Mr. Bannon also would have examined the subpoenaed witnesses about the significance of the dates, the changes in dates, and the continuing urging for compliance after what were claimed to be the originally relevant dates; but he needed the Committee members with real authority on the subject, especially in a case in which his only permitted defense centered around the dates. [*Id*. at 56-59].

**The Indictment Must Be Dismissed or the Congressional Evidence Must be Excluded Because Mr. Bannon's**
**Constitutional Rights Were Violated When He Faced Trial After**
**The Congressional Subpoena Recipients Refused To Testify Or Produce Documents and the Motion to Quash was Granted.**

The Sixth Amendment entitles Mr. Bannon to a "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Inherent in this right is the right to offer testimony of witnesses and compel their attendance. *Washington v.* Texas, 388 U.S. 14, 19 (1967) (it is fundamental to due process that "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense"); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (few rights are more fundamental than that of an accused person to present witnesses in his own defense.); *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973).

This Court's Order granting the Motion to Quash, even if, *arguendo*, it was appropriately granted on the merits, in the context of this case, and vis a vis Mr. Bannon's constitutional rights in this criminal prosecution, violates Mr. Bannon's Fifth and Sixth Amendment rights and dismissal is the only appropriate remedy to safeguard those rights. The Defendant's constitutional rights in a criminal case must prevail over a claim of government privilege. *United States v. Moussaoui*, 382 F.3d 453, 474 (4th Cir. 2004).

The decision in *United States v. Rainey*, 12-CR-00291-KDE-DEK (E.D. La., July 14, 2015) [Doc. 116-1] makes clear that the dismissal of an indictment is the appropriate remedy to preserve a criminal defendant's right to a fair trial when a defendant, like Mr. Bannon, seeks relevant, material, noncumulative evidence related to his defense, but where he is precluded from obtaining such evidence due to the invocation of a constitutional privilege by a branch of the Government

13

that is prosecuting the case.  [Doc. 116-1 at 29:17-30:1; Doc. 116-2].  Just as in *Rainey*, there are "factual issues that must be developed at trial and must be submitted to the jury" regarding the subjects of inquiry identified above (and issues related to the legislative purpose of the Bannon subpoena, rules violations), which require documents and testimony from the Chairman and/or members of the Committee and the denial of the same by their assertion of privilege and the granting of the motion to quash denied Mr. Bannon his most fundamental, constitutionally guaranteed rights to compulsory process, to confrontation, to effective assistance of counsel, to due process,  to a fair jury trial, and the right to present a full defense .  [Doc. 116-1 at Tr. page 283].  *See also, United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990); *Roviaro v. United States*, 353 U.S. 53 (1957); *Jencks v. United States*, 353 U.S. 657, 670-71 (1957); *United States v. Reynolds*, 345 U.S. 1, 12 (1953) (the law "will not allow governmental privileges to work against a criminal defendant who has a substantial stake in the outcome of the trial.").[4]

Alternatively, this Court must exclude the Congressional testimony.  *Rainey, Supra.; See e.g., United States v. Nobles, 422 U.S. 225, 230-231 (1975)*[5]; *United States v. Nixon*, 418 U.S. 683,

---

[4] See also, Note, A Defendant's Right to Inspect Pretrial Congressional Testimony of Government Witnesses, 80 Yale L.J. 1388, 1411(1971); *United States v. Beekman*, 155 F.2d 580 (2d Cir. 1946); *United States v. Andolschek*, 142 F.2d 503 (2d Cir. 1944).

[5] "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."

713 (1974) ("generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial"); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).[6]

## <u>CONCLUSION</u>

The subpoena recipients' invocation of privilege and the Court's Order quashing the subpoenas denied Mr. Bannon his constitutional rights under the Fifth and Sixth Amendments, including his right to due process of law, his right to compulsory process, his right of confrontation, his right to effective assistance of counsel and to a fair jury trial. The indictment must be dismissed or the Congressional evidence must be excluded.

Dated: August 5, 2022                                   Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

_____/s/ M. Evan Corcoran_____
M. Evan Corcoran (D.C. Bar No. 440027)
Riane A. White (*Pro Hac Vice*)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

_____/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

*Counsel for Defendant Stephen K. Bannon*

---

[6] The Court confirmed with Government counsel that it would not call Chairman Thompson and that he would not be testifying at the trial. [July 21, 2022 Tr. at 61, 64-65].

15

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of August 2022, a copy of the foregoing

Supplemental Briefing was served *via* the Court's CM/ECF system on registered parties and

counsel.


       /s/ David I. Schoen

David I. Schoen
*Counsel for the Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 21-670 (CJN) |
| : | |
| v. : | |
| : | |
| STEPHEN K. BANNON, : | |
| : | |
| *Defendant*. : | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion To Exclude or Dismiss, the Government's

Opposition, and the supplemental briefs submitted by the Parties, it is hereby:

**ORDERED,** that the Defendant's Motion To Exclude Evidence or to Dismiss is

**GRANTED**; and it is further

**ORDERED** that the Indictment in the above-captioned case is hereby **DISMISSED** with

prejudice.

**SO ORDERED.**

Dated: _____          _____
                                    Hon. Carl J. Nichols
                                    *United States District Judge*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant.* | : | |

### DEFENDANT'S MOTION FOR A NEW TRIAL

Defendant, Stephen K. Bannon, by and through the undersigned counsel, pursuant to Rule 33, Federal Rules of Criminal Procedure, respectfully moves this Court for a new trial, based on the following:

### INTRODUCTION

On July 22, 2022, the jury returned a verdict of guilty on the two charges of criminal contempt of Congress, charged in this case, under 2 U.S.C. § 192.

Rule 33 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

**Rule 33.  New Trial:**

**(a)  Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires….

**(b)  Time to File.**

    (**2**) *Other Grounds.* Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Rule 33 provides that [u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). "A court

1

evaluates a Rule 33 motion differently from how it evaluates a Rule 29 motion because it is not required to consider the evidence in the light most favorable to the government, and it may weigh the testimony and consider the credibility of the witnesses." *United States v. Johnson*, 2007 U.S. Dist. LEXIS 14806, *20-*21, 2007 WL 666566 (D. D.C., February 28, 2007), *citing*, *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991). "A court should grant a Rule 33 motion only if "a serious miscarriage of justice may have occurred." *United States v. Johnson, Id*., *citing*, *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (*quoting Tibbs v. Florida*, 457 U.S. 31, 38 n.11(1982)). A serious miscarriage of justice has occurred in this case.

Any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial. 3 Fed. Prac. & Proc. Crim. §589 (4th ed.) (Wright & Miller). *See e.g. United States v. Vicaria*, 12 F.3d 195 (11th Cir. 1994) (new trial motion appropriately granted for failure to give defense theory jury instruction, even if the failure was not legal error).

Mr. Bannon respectfully submits that there are many examples of reversible error in this case, all of which he has preserved for appeal. He does not intend to address each one in this motion and the exclusion of any matter previously objected to or otherwise preserved for appeal is not indicative of anything other than that the focus of this motion is limited to a few select issues, mainly related to the jury instructions given and rejected. All issues remain preserved.

### THE COURT'S CONSTRUCTION OF "WILLFULLY" AND ASSOCIATED RULINGS REQUIRE A NEW TRIAL

As has been discussed many times throughout these proceedings, the Government moved early on to bar Mr. Bannon from telling the jury the story of what actually happened in this case – why he did not comply with the subpoena on the dates charged in the indictment. This began, of course, with the Government's tellingly styled "Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel." [Doc. 29]. The

Government's overreaching effort in this regard continued throughout the proceedings.  See e.g.

Docs. 35, 43, 52, 53, 54, 65, 70, 71, 72, 85, 87, 101, along with various additional filings and

argument in further support of the wholesale effort to bar Mr. Bannon from raising any defense

to the charges against him, to tell the true story of the case for the jury to consider, and positions

with respect to jury instructions directed toward that same end.[1]

_____

[1] The Government's motion expressly asserted the following: [T]he Defendant's excuses for non-compliance are without merit, and his erroneous reliance on privileges and purported advice of counsel is no defense to contempt. The deliberate failure to comply with a congressional subpoena – *regardless of motivation* – constitutes the crime of contempt." [Doc. 29 at 1] (emphasis added). The Government's motion, again granted by the Court without qualification, goes even further than just referring to an advice of counsel defense (and jury instruction). The Government urged the Court to take the following extraordinary position:  "But even if his contempt were based on an erroneous but good-faith belief that he had a valid legal excuse for ignoring the subpoena's demands, whether by his own determination or his attorney's, it is no defense. All evidence and argument related to good-faith reliance on the law or an attorney's advice should therefore be excluded at trial." [Doc. 29 at 8].

At oral argument, the Government reiterated its position that, other than an accident, there is no legal justification for failing to comply with a congressional subpoena. Government counsel put it as follows: "So contempt of Congress for willful default is about whether or not you showed up; that is whether to produce records or to testify." [3/16/22 Hearing Tr. at 4] (emphasis added). "So if a defendant makes a deliberate and intentional decision not to appear, he has the requisite intent for contempt; that is, does the defendant know he's been summoned and does he intentionally, knowing that, not show up? That is all that is required." [*Id*. at 5] (emphasis added). "And what the Supreme Court made clear is that that intentional choice not to comply, that is inherently a criminal choice. There is no innocent way that someone decides they are just not going to comply with the statute. [*Id*. at 6] (emphasis added). "And that's where contempt of Congress draws (sic), between someone who accidentally does not comply with their obligations, and someone who makes an intentional and deliberate choice not to do so." [*Id*. at 7].

Finally, in response to the Court's direct question as to what the Government needs to prove in this case on *mens rea*, the Government summed up its position as follows:  "The government would need to demonstrate that the defendant knew he had been summonsed; so that means, knew that Congress was requiring him to show up and produce records on October 7th; and that Congress was requiring him to show up and testify on October 14th. And that he knew that that was the obligation; and that despite knowing that, he decided not to comply. He has to have – the government has to prove that he was given a clear choice from Congress. Either show up or you are in contempt. That would be all that the government is required to show there." … "And it's no different from in the contempt of court context. A witness gets a summons to appear before a grand jury or to appear for testimony in trial. And if they deliberately decide, I will not appear,

The Court granted the Government's motion in wholesale fashion, holding that the reason or motivation for not complying is legally irrelevant under this criminal statute which carries a mandatory sentence of incarceration upon conviction.[2]  [Doc. 49].  [See also, Doc. 29 at 1, 8; 3/16/22 Hearing Tr. at 4, 5, 6, 7, 8; Doc. 49].  In its Order, the Court agreed with the Government that under *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), "willfully" in the context of this criminal statute (which purports to have a mandatory minimum incarceration provision) requires nothing more than that the defendant acted "deliberately and intentionally" in not complying with a Congressional subpoena.  [Doc. 49].

The effect of the Court's Order was to bar Mr. Bannon from putting on any evidence or argument whatsoever as to the true reasons he responded to the subpoena as he did. Mr. Bannon was barred from putting on any evidence or argument that he never believed he was doing anything unlawful; and indeed, understood and believed that he responded to the subpoena in the only way the law permitted, once executive privilege was invoked.  How to respond to a congressional subpoena, let alone when executive privilege is invoked, certainly is not an intuitive process; but Mr. Bannon was prohibited from putting on evidence or argument that he

─────────────

they are subject to prosecution for contempt. It's the same principle in the contempt of Congress." [*Id*. at 8].

[2] In contrast, Justice Thomas has noted that some commentators have suggested that it is impermissible for any crime punishable by the possibility of incarceration to dispense with a guilty *mens rea* requirement.  *Staples v. United States*, 511 U.S. 600, 616-617 (1994).  The rejection of a *mens rea* that includes some consciousness of the wrongfulness of the conduct, in favor of the standard adopted by the Court, has come under sustained criticism for many years in especially compelling terms where a term of incarceration is the possible consequence of conviction, with commentators asserting that the error in permitting the same is of constitutional dimensions. *See e.g.,* H. Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107, 147-152 (1962); Dubin, *Mens Rea Reconsidered: A Plea for a Due Process of Criminal Responsibility*, 18 Stan. L. Rev. 322 (1966); Note, *Criminal Liability Without Fault: A Philosophical Perspective*, 75 Colum. L. Rev. 1517 (1975).

relied on his experienced lawyer's direction that the law prohibited him from complying with the subpoena.  [Doc. 30-1]

But the situation, as it developed, was actually much more violative of Mr. Bannon's constitutional rights.  Even though he was prohibited from letting the jury know his innocent state of mind and the reasons he responded as he did – purportedly because the reasons for "noncompliance" were irrelevant as a matter of law, the Court nevertheless permitted the Government to argue its false, concocted reasons for Mr. Bannon's failure to comply.  The Government argued repeatedly and with impunity that Mr. Bannon "ignored" the subpoena and had "no justification" for doing so and that he did it because he thinks he is "above the law" and "didn't care" and "had contempt" for the Committee, and more. [See e.g. July 19, 2022 Tr. at 496:18-19; July 22, 2022 Tr. at 1030].[3]

In granting the Government's motion to bar Mr. Bannon's defense, the Court held that Mr. Bannon's reasons for not complying with the subpoena were not relevant, since "willfully" in the context of this statute uniquely does not require any proof that the defendant believed or understood his conduct to be wrongful or against the law.  In its Order, the Court indicated that it might have a different view on "willfully" if this were a matter of first impression and repeated this theme throughout the proceedings in this case, asserting the following on July 11, 2022: "As I've stressed many times, I have serious reservations that the Court of Appeals' interpretation of

_____

[3] The Court also permitted Government counsel to argue to the jury that Congress had unilateral authority to require compliance with its subpoena notwithstanding the invocation of executive privilege and it allowed Government counsel to argue that Congress is situated like a authoritative "referee" with respect to the conflict.  [July 22, 2022 Tr. at 1024:9-12].  Under no cognizable jurisprudential principle, consistent with the constitutional concept of separation of powers, is the Congress like a "referee" or in any way recognized as an appropriate arbiter over a conflict between Article 1 and Article 2 branch interests, especially given the constitutional presumption of validity for the invocation of executive privilege.  Only an Article 3 court can serve in that role.

**-4621-**

willfully is consistent with the modern understanding of the word. It's not consistent with

modern case law surrounding the use of that term, let alone the traditional definition of the word.

But as I've previously held and I reiterate again today, I am bound by *Licavoli* and its holdings."

[July 11, 2022 Tr. at 115].[4]

## THE COURT'S DECISION CANNOT BE RECONCILED WITH THE RELEVANT BINDING UNITED STATES SUPREME COURT JURISPRUDENCE ON "WILLFULLY"

Mr. Bannon, of course, advised the Court on multiple occasions that he believed the

operative definition of "willfully" was legally unsupportable for several reasons, he also advised

the Court that he disagreed that the Court was bound by *Licavoli* for several reasons.  [See e.g.

Doc. 30].  Many of the errors Mr. Bannon has preserved for appeal flow directly from the

Court's adoption of this definition of "willfully."  It is, with all due respect, legally

unsupportable.  Recent decisions from the United States Supreme Court emphatically

demonstrate the error and the legally unsupportable idea that "willfully" in the context of any

criminal statute, let alone one purporting to have a mandatory minimum incarceration element,

can dispense with the fundamental requirement that there be some evidence of a wrongful or

criminal purpose.  The most obvious constitutional obstacle to such an interpretation, is its

violation of due process for the failure to give fair notice and for the potential for ensnaring the

---

[4] It is puzzling that the Court considered itself bound by the holding in *Licavoli*; but otherwise did not follow the course taken by the district court in *Licavoli*.  In *Licavoli*, while the court refused to give an advice of counsel jury instruction, based on its (mis)understanding of "willfully," it nevertheless, let the jury hear the reasons the defendant did not comply, finding that it was required to at least let the defendant tell his story and present the jury with his theory of the case, even if not legally cognizable.  [See July 11, 2022 Tr. at 67-68].  In the instant case, of course, in acceding to the Government's demand, the Court refused to allow any reference to Mr. Bannon's advice of counsel, his belief that his response was required by the invocation of executive privilege, his reliance on the OLC opinions, or his lawyer's directives and, indeed, the expressly was instructed, over Mr. Bannon's objections, not to consider his true reasons.  [Doc. 129 at 28]

innocent within its ambit.

The following universal principles concerning *mens rea*, as reaffirmed by the United

States Supreme Court just over a month ago in *Xiulu Ruan v. United States*, 132 S. Ct. 2370, 213

L. Ed. 2d 706, 2022 U.S. LEXIS 3089 at *13*-*19, 2022 WL 2295024 (June 27, 2022) provide a

helpful overview:

> "First, as a general matter, our criminal law seeks to punish the "'vicious
> will.'" *Morissette* v. *United States*, 342 U. S. 246, 251 (1952); see also *id.*, at 250,
> n. 4 (quoting F. Sayre, Cases on Criminal Law, p. xxxvi (R. Pound ed. 1927)).
> With few exceptions, "'wrongdoing must be conscious to be
> criminal.'" *Elonis* v. *United States*, 575 U. S. 723, 734, (2015)
> (quoting *Morissette*, 342 U. S., at 252). Indeed, we have said that consciousness
> of wrongdoing is a principle "as universal and persistent in mature systems of
> [criminal] law as belief in freedom of the human will and a consequent ability and
> duty of the normal individual to choose between good and evil." *Id.*, at 250, 72 S.
> Ct. 240, 96 L. Ed. 288.
>
> Consequently, when we interpret criminal statutes, we normally "start
> from a longstanding presumption, traceable to the common law, that Congress
> intends to require a defendant to possess a culpable mental
> state." *Rehaif* v. *United States*, 588 U. S. ___, 139 S. Ct. 2191, 2195, 204 L. Ed.
> 2d 594 (2019). We have referred to this culpable mental state as "scienter," which
> means the degree of knowledge necessary to make a person criminally
> responsible for his or her acts. See *ibid.*; Black's Law Dictionary 1613 (11th ed.
> 2019); *Morissette*, 342 U. S., at 250-252.
>
> Applying the presumption of scienter, we have read into criminal statutes
> that are "*silent on the required mental state*"—meaning statutes that contain
> no *mens rea* provision whatsoever "'that *mens rea* which is necessary to separate
> wrongful conduct from "otherwise innocent conduct." *Elonis*, 575 U. S., at 736
> (quoting *Carter* v. *United States*, 530 U. S. 255, 269 (2000); emphasis added). …
>
> And when a statute is not silent as to *mens rea* but instead "*includes* a
> general scienter provision," "the presumption applies with equal or greater force"
> to the scope of that provision. *Rehaif*, 588 U. S., at ___, 139 S. Ct. 2191, 2195,
> 204 L. Ed. 2d 594 (emphasis added)….

The decision in *Xiulu Ruan* focuses on interpreting "knowingly" and the corresponding

*mens rea* in the context of a criminal statute; so it is not necessarily dispositive of the required

threshold interpretation of "willfully" in the context of a criminal statute.  The decision in *Xiulu*

*Ruan* is important, though, for its emphasis on the need for a criminal statute to include a *mens rea* (here, "knowingly") element in such a way that separates criminal conduct from innocent conduct and does run the risk of ensnaring the latter within its ambit.

On this background, the words of Justice Alito, joined in his dissenting opinion by Justice Thomas, in *Rehaif v. United States*, 588 U.S. --, 139 S. Ct. 2191, 204 L. Ed. 2d 504 (2019), juxtaposing "knowingly" in the criminal context with "willfully" to emphasis that the latter, "willfully," inexorably requires knowledge that the conduct charged is illegal, are instructive. Justice Alito wrote, "… where Congress wants to require proof that a criminal defendant knew his conduct was illegal, it specifies that the violation must be 'willful.'  In ordinary speech, "willfulness" does not require or even suggest knowledge of illegality." But we have construed the term as used in statutes to mean 'intentional violation of a known legal duty.'"  *Rehaif*, 139 S. Ct. at 2205 (Alito, J. dissenting) (citations omitted).  Justice Alito then goes on to juxtapose "knowingly" with "willfully" to demonstrate that the question of whether "knowingly" requires knowledge of illegality is an open question, specifically because Congress's convention is to use "willfully" when it wants to make clear that knowledge of illegality is required.  *Id.*

In *Elonis v. United States*, 575 U.S. 723, 734 (2015), the Court quoted from Justice Jackson's famous opinion in *Morissette v. United States*, 342 U.S. 246, 250-252 (1952), in which he wrote of the principle that "wrongdoing must be conscious to be criminal" that this principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." The Court in *Elonis* wrote that for Justice Jackson, the "central thought" "is that a defendant must be 'blameworthy in mind' before he can be found guilty, a concept couts have expressed over time through various terms such as *mens rea,* scienter, malice aforethought, guilty

knowledge, and the like." *Elonis*, 575 U.S. at 734, *quoting from Morissette*, 342 U.S. at 252.

The Court in *Elonis* then emphasized the need to require proof that the defendant knew his conduct was unlawful when "willfulness" is charged, by presenting examples of cases that highlighted the danger of innocent conduct being ensnared within the statute's ambit, absent that requirement. *Elonis*, 575 U.S. at 735-737.

It is impossible to reconcile this Court's conclusion as to the meaning of "willfully" in the context of the criminal statute at issue here with these fundamental principles.[5]

## THE COURT'S CONSTRUCTION OF "WILLFULLY" CANNOT BE RECONCILED WITH DECISIONS FROM THIS CIRCUIT AND OTHERS

This Circuit has, in no uncertain terms, echoed these same fundamental principles enunciated *Rehaif* concerning the threshold requirement that "willfulness" in a criminal statute requires that the defendant know that his conduct is wrongful or illegal. In *United States v. Burden*, 934 F.3d 675, 689-693 (D. C. Cir. 2019), the Court wrote at length about the use of the term "willfully" in criminal statutes. The Court noted that while "willfully" is a word of many meanings, with the construction often depending on context, in the criminal context, it means acting with a "bad purpose." The Court wrote, "In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Burden*, 934 F.3d at 690, *citing Bryan v. United States*, 524 U.S.

---

[5] The Court in *Rehaif* also reaffirmed the fundamental principle that there is a "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalizes otherwise innocent conduct.'" *Rehaif*, 139 S. Ct. at 2195, *quoting from*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994). These scienter requirements "advance (the) basic principle of criminal law by helping to 'separate those who understand the wrongful nature of their act from those who do not.'" *Id.* at 2196. The Court then characterizes the cases in which the Court "has emphasized scienter's importance in separating wrongful from innocent acts" as "legion" and many of them. *Id.*

184, 191-192 (1998).

The Court wrote further, "[W]hen Congress wants to ensure that defendants will be convicted only if they have a more culpable state of mind, it limits the crime to conduct that a defendant engages in "willfully." *Id*.  Like the Supreme Court in *Rehaif*, the D.C. Circuit juxtaposed "willfully" with "knowingly" to the same end.  *Id*.  The Court in *Burden* went on to explain what it meant by suggesting "willfulness" has different meanings by differentiating between those limited situations in which "willfulness" means the Government has to prove that the defendant knew which law he was breaking and all other statutes charging that the defendant acted "willfully" in which the Government need only prove that the defendant knew his conduct was illegal, without knowing which specific statute he was violating.  *Burden*, 934 F.3d at 690-692.  But in any event, when a criminal statute charges that the defendant acted "willfully" the Government must at least prove that he knew his conduct was illegal (and the Court lists numerous cases so holding). *Id*. at 691-692.

Other Circuits have articulated these same fundamental principles when "willfulness" is charged in a criminal statute.  For example, the Ninth Circuit in *United States v. Singh*, 979 F.3d 697, 712 (9th Cir. 2020) explained that the expression in *Bryan*, that "willfully" is sometimes said to be "a word of many meanings" refers to the two interpretations courts have applied.  For certain particularly complicated or technical criminal statutes, like those is *Cheek v. United States*, 498 U.S. 192, 201 (1991), "willfully" requires "proof that the defendant was aware of the provision she is charged with violating."  *See also, Ratzlaf v. United States*, 510 U.S. 135, 146-147 (1994).  *Singh*, 979 F.3d at 712.  But for other statutes, the threshold showing the Government is required to make, when "willfully" is an element of the criminal statute is the Government must simply, but at least, prove that the "defendant acted with knowledge that his

conduct was unlawful." *Singh*, 979 F.3d at 712.

There is absolutely no way to reconcile this Court's interpretation of "willfulness" with these universal principles as enunciated by this Circuit almost 60 years after *Licavoli* and the idea that the Court nevertheless is bound by a decision concerning a statute that arguably has gone into desuetude or that 60 years of subsequent jurisprudence from the Supreme Court and this Circuit can be overcome by the same simply finds no support in the relevant jurisprudence.

Every citizen accused of a crime must be afforded the constitutional right to present a defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). It is a fundamental right rooted in the Fifth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses, as well as other fair trial rights. That guarantee extends to the evidence and argument a defendant is allowed to present, and the jury instructions on defense theories. *See*, *e.g*., *United States v. Johnson*, 944 F.2d 980, 988 (2d Cir.) ("A criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence."), *cert*. *denied*, 126 L.Ed. 2d 364, 114 S. Ct. 418 (1993). These fundamental rights were violated in this case.

## SEVERAL CONSTITUTIONAL ERRORS FLOW FROM THE COURT'S CONSTRUCTION OF "WILLFULLY"

There are many errors of reversible magnitude that flow from the Court's decision on "willfully." These are all preserved for appeal; but more efficiently, warrant the granting of this motion for a new trial. They include, but are not limited to, the Court's refusal to permit argument or evidence on the defenses that Mr. Bannon did not act willfully because he relied on the advice and directives of his counsel, he acted on his belief that the invocation of executive

privilege prohibited him from complying with the subpoena, and because he acted in reliance on the Office of Legal Counsel opinions and other authoritative DOJ writings.[6]

The issues flowing from the Court's decision on "willfully" also include the error in failing to give Mr. Bannon's requested theory of defense and elements of the defense instruction, and in giving the "Elements of the Offense" instruction (Instruction 25) over Mr. Bannon's objections.[7]  Instruction 25 violates Mr. Bannon's constitutional rights in a number of ways, including failing to account for his defense theory, highlighting for the jury defenses it cannot consider, while prohibiting Mr. Bannon was adducing evidence on or arguing those defenses and all of the other issues raised in his objections.

---

[6] The Department of Justice itself has opined that there is "some doubt" that one can be said to have acted "willfully" under this statute when he acts out of obeyance to the invocation of executive privilege with respect to the subpoena at issue.  [Doc. 58-10 at pdf page 36, n.34; *Prosecution for Contempt of Congress of an Executive Branch Official Who has Asserted a Claim of Executive Privilege* at 135, n.34. *(May 30, 1984).*  Further on the subject of the OLC opinions and the Court's July 11, 2022 decision barring Mr. Bannon's defense of entrapment by estoppel, Mr. Bannon respectfully asserts that the Court unconstitutionally usurped the jury's function by prohibiting the defense as a gatekeeper, rather than permitting the jury to determine the reasonableness of Mr. Bannon's reliance on the OLC and other authoritative writings at issue and in doing so violated Mr. Bannon's right to put on a defense and to due process of law. *United States v. Pennsylvania Industrial Chemical Corp.,* 411 U.S. 655, 675 (1973) (Government's argument that the regulations at issue were not the applicable regulations is a question for the jury to determine – did the defendant rely on the regulations and was the reliance reasonable).

[7] Mr. Bannon filed his requested jury instructions and objections to proposed instructions on July 17, 2022, [Doc. 120]], and incorporates the same by reference herein.  He filed and orally argued additional objections and requests subsequent to that filing.  On July 21, 2022, Mr. Bannon filed additional objections [Doc. 126] to what the Court had advised were the Court's final version of the jury instructions to be given.  At that time the "Elements of the Offense" instruction was Instruction No. 24 and Mr. Bannon's objections of July 21, 2022 so reflects.  [See Doc. 126 at 2-6].  At the last minute, on July 22, 2022, notwithstanding an email the Court sent to the parties at 8:46 a.m. on July 22, 2022 purporting to provide the parties with the final version of the jury instructions that would be given, with the proviso that: "The Court does not intend to hear anything further from the parties on these questions" the Court nevertheless later added an instruction requested by the Government, over Mr. Bannon's objection, as new Instruction No. 24 [July 22, 2022 Tr. at 954-956] and the Elements of the Offense instruction became Instruction No. 25.  [See Doc. 129 at 26-27].

The instructions also violated Mr. Bannon's constitutional rights by failing to use the language in the statute charged: "willfully makes default," while using a loaded interpretation of statutory language that advised the jury that this term meant "willfully not providing testimony and information" and a "willful failure to provide testimony" and a "willful failure to produce records," rather than having the jury determine the meaning of the contested term. Similarly, the Court failed to define "default" as requested and failed to provide an instruction on "waiver of default" or "mistake of fact" (the only defense the Court permitted), as requested. [See Doc. 120; Doc. 126 at 6-8].

**ADDITIONAL ERRORS SURROUNDING THE JURY INSTRUCTIONS**

It was error for the Court to add the language "on or about" in Instruction No. 24 over Mr. Bannon's objection. [Doc. 129 at 26; July 22, 2022 Tr. at 954-956]. The Instruction advises the jury that Count 1 charges that the offense was committed "on or about" October 24, 2021 and that Count 2 charges that the offense was committed "by or on or about" October 18, 2021. That is not accurate. There is a prefatory line in the indictment that dates therein are "on or about." [Indictment at 1]; but that is merely surplusage in the context of this case and it is at variance with the Government's theory of prosecution and evidence at trial, given the direct relevance of specific dates and times, according to the prosecution's case, and the language used in the rest of the indictment, especially the Counts actually charged.

Paragraph 15 of the indictment refers to October 7, 2021 at 10:00 a.m. as a "deadline" and ¶16 refers to the charged "default" as having occurred when that deadline was missed. How can that be reconciled with the dates and times being "approximate?" Moreover, Count 1 clearly charges the commission of the alleged crime "on October 14," not "on or about" and Count 2 charges "by October 18, 2021" not "on or about." At a minimum the instruction was

unconstitutionally confusing to the jury; but it was far worse than that, especially in light of the

only defense the Court allowed – mistake of fact – which made the dates for compliance a

central issue for the jury.

Does the subpoena really direct Mr. Bannon to produce documents by "on or about"

October 7, 2021 and appear to testify "on or about" October 14? Was 10:00 a.m. on both days

approximate? Of course not; but if the prefatory language is to be credited, that is how ¶¶ 8, 10,

13 of the indictment are to be read. That was not the testimony in the case and that is not what

the subpoena provided. The dates were not "approximate." If Instruction No. 24 is accurate,

how approximate were the dates? There was never any evidence at trial that the dates were

approximate; just the opposite is true. When Mr. Bannon attempted to argue that he understood

compliance with the subpoena to satisfy it was still open, based on an October 15th letter and an

October 19th letter, the Government argued vehemently against that. The testimony at trial was

at variance with the jury instructions and with the indictment if this is the case, creating

violations of Mr. Bannon's rights to due process of law and other constitutional fair trial rights.

This issue also is relevant to the issues raised concerning the granting of the Motion to

Quash, as questions around the malleability of the dates were among the areas of inquiry Mr.

Bannon had for the subpoena recipients. [See e.g., Doc. 141 at 10].

At the end of closing arguments, the Court gave the jury an additional instruction without

giving the parties any opportunity to review it, comment on it, or make objections prior to giving

it to the jury, in violation of Rule 30(b) & (d). [July 22, 2022 Tr. at 1030; Instruction No. 27,

Doc. 129 at 30]. Mr. Bannon filed a written objection at the earliest opportunity after the

instruction was given. [Doc. 128]. The instruction followed the Court's prohibition during Mr.

Corcoran's closing argument on raising rules violations issues – specifically his reference to the

Rule 3(b) violation.  However, this is an issue the Court expressly indicated could well be an area the defense could explore, with respect to the factual dispute surrounding it.  [July 11, 2022 Tr. at 132].  Secondly, there was testimony adduced at trial concerning the factual dispute over Rule 3(b).  [July 20, 2022 Tr. at 712].  Additionally, Exhibit 9-B was admitted into evidence during Ms. Amerling's examination.  [July 20, 2022 Tr. at 712-713].  The argument on this issue was proper argument; yet Mr. Bannon was prohibited from pursuing it and the jury was given the clear message by the prohibition, emphasized by this additional instruction, that Mr. Corcoran had engaged in improper argument.  The prohibition and the instruction violated Mr. Bannon's constitutional rights to a fair jury trial, to compulsory process (see Doc. 141), to confrontation, and to the effective assistance of counsel and he is entitled to a new trial.

## <u>CONCLUSION</u>

Based on all of the foregoing, and all previous submissions in this case, Mr. Bannon respectfully submits that the jury's verdict should be set aside, in light of the many constitutional errors attending these proceedings, with a new trial ordered.

Dated: August 5, 2022                              Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

___/s/ M. Evan Corcoran___
M. Evan Corcoran (D.C. Bar No. 440027)
Riane A. White (*Pro Hac Vice*)
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

___/s/ David I. Schoen___
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-
Montgomery, Alabama 36106
Telephone: (334) 395-6611

Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of August, 2022, a copy of the Motion for New

Trial was served *via* the Court's CM/ECF system on registered parties and counsel.

___/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## <u>ORDER ON MOTION FOR NEW TRIAL</u>

Upon consideration of the Defendant's Motion for New Trial it is this _____ day of

August, 2022,

**ORDERED** that Defendant's Motion is **GRANTED.**

**SO ORDERED.**

Dated:

_____
Hon. Carl J. Nichols
*United States District Judge*

-4633-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S**
**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO EXCLUDE**
**CONGRESSIONAL EVIDENCE OR DISMISS THE INDICTMENT**

Defendant Stephen K. Bannon's Supplemental Brief in response to the Court's July 27, 2022, Order marks the third time that the Defendant has set forth, at length, various issues that he would explore through questioning of Members of Congress if he were able to compel them to testify at his trial. And for the third time, the Defendant fails to articulate any materially favorable, relevant, and non-cumulative information any such witness would provide—indeed, the Defendant does not even proffer what information his desired congressional witnesses would supply, because he does not know and can only speculate. Mere speculation, and a desire to conduct an irrelevant fishing expedition through these witnesses' testimony, does not amount to the showing the Defendant has to make to establish a compulsory process violation of his Fifth and Sixth Amendment rights. There is a reason that the legal section of the Defendant's Supplemental Brief fails to engage with relevant and applicable legal precedent: there is no legal support for the extraordinary relief he seeks of dismissal of the indictment against him. The Defendant's Motion to Dismiss (ECF No. 116), to which his Supplemental Brief relates, should be denied.[1]

---

[1] Given the current posture of this case, the Defendant's motion as to exclusion of evidence is no longer an issue, and in any event, he has not provided a basis for excluding relevant, admissible evidence.

**-4634-**

I.    **The Defendant Cannot Make the Minimum Threshold Showing Required to Establish a Compulsory Process Violation Based on Congress' Assertion of the Speech or Debate Clause, Much Less any Legal Basis to Dismiss the Indictment**

As an initial matter, it is not settled law that the Court could or should undertake a balancing between the Defendant's Fifth and Sixth Amendment rights and Congress's Speech or Debate Clause privilege. The Ninth Circuit, for instance, has held that courts cannot do so. *See United States v. Renzi*, 769 F.3d 731, 749-50 (9th Cir. 2014) (holding "that the district court properly declined to balance Congressman Kolbe's Speech or Debate privilege against Renzi's right to present a defense," when defendant-Congressman Renzi claimed that his rights were violated when Congressman Kolbe asserted Speech or Debate privilege to prevent staffer from testifying). Moreover, as the Government has previously noted, *see* ECF No. 117 at 4, in the analogous situation in which a defendant demands dismissal of an indictment because he cannot call as a witness an individual with a valid Fifth Amendment privilege whom the Government declines to immunize, courts do not grant such relief unless: i) the Government has exercised misconduct regarding the witness, and ii) the testimony is materially exculpatory, non-cumulative, and unavailable from another source. *See United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006). Here, unlike in a circumstance in which the Government could immunize a witness and remove an obstacle to his testimony, the Government has no ability to override Congress's decision to assert the Speech or Debate Clause privilege or secure congressional witnesses' testimony in spite of that assertion. Accordingly, where, as here, there has been no Government misconduct regarding the congressional witnesses, and the Defendant has not established any testimony the witnesses can provide that is materially exculpatory, non-cumulative, and unavailable from the witnesses who were offered by Congress, dismissal is not an appropriate result.

The Court need not reach the question regarding whether or how to engage in balancing in such a circumstance, because the Defendant here has not made the threshold showing necessary to allow the Court to do so.  The D.C. Circuit has repeatedly determined that other defendants making the same argument as the Defendant failed to establish a compulsory process violation based on an assertion of the Speech or Debate Clause privilege.  In *United States v. Verrusio*, 762 F.3d 1, 23 (D.C. Cir. 2014), the Court reviewed a district court's denial of the defendant's motion to dismiss based on his claim that the quashing of a subpoena to a congressional staffer "deprived him of material evidence, thereby violating his rights to compulsory process and due process." The Court first established that the defendant "must show more than the mere absence of testimony…[r]ather, he must make some showing that the evidence lost would be both material and favorable to the defense" and that a "witness' testimony is material only if its absence actually prejudiced the defendant's ability to mount a defense."  *Id*. (internal citations omitted).  It then found that the testimony that the defendant had proffered he would elicit from the unavailable witness—extraneous information that did not go to any issue the Government was required to prove—was not material.  *Id*. at 24.

The defendant in *United States v. Dean* made an argument similar to the Defendant's and failed to make a showing of a compulsory process violation.  55 F.3d 640, 662-63 (D.C. Cir. 1995). Defendant Dean was charged, in part, with making false statements during a hearing before a congressional Committee, including through her testimony that a panel allocating public funding did so "solely on information provided by the Assistant Secretary for Housing"—when Dean in fact knew that the panel had also considered information that Dean, who was not the Assistant Secretary for Housing, provided.  *Id*. at 662.  Before the district court and on appeal, Dean argued that she was entitled to call as a witness the Chairman of the Committee—in response to whose

questions Dean was alleged to have made this false statement—for the purpose of eliciting whether the Chairman was familiar with Dean's job responsibilities and that this had some bearing on whether Dean intended to make a false statement. *Id*. The Circuit determined that the proffered testimony "would not have altered the essential untruthfulness" of Dean's statement, and she was thus not prejudiced. *Id*. at 662-663.

To be successful, a defendant's proffer regarding the materiality of the information he seeks to introduce through an unavailable witness cannot be speculative. *See United States v. Kaixiang Zhu*, 854 F.3d 247, 255-256 (4th Cir. 2017) (affirming district court's denial of motion to dismiss for alleged compulsory process violation, explaining that defendant's argument was "grounded in speculation, and he cannot satisfy the materiality requirement with speculative evidence"); *United States v. Clemens*, Case No. 10-CR-223, at *45 (D.D.C. June 4, 2012) (Court denying motion for dismissal of indictment where defendant could not call a Member of Congress to testify because what the witness would say was "highly speculative," and "even assuming there can be a balancing that takes place between the Speech and Debate Clause and the defendant's due process rights, it seems to me that the evidence suggesting the due process right would have to be stronger than what we have here. And that there would have to be some definitive indication that a witness would in fact provide testimony that would in fact exonerate a defendant."). The Defendant in this case has offered nothing more than speculation and therefore cannot establish a compulsory process violation.

The unreported oral ruling in *United States v. Rainey* that the Defendant has cited repeatedly throughout his briefing does nothing to change this conclusion. Case No. 12-CR-291 (E.D.La). Indeed, a closer look at *Rainey* demonstrates that there is a very high evidentiary bar for establishing a compulsory process violation. In *Rainey*, the defendant was charged with

obstruction of Congress, in violation of 18 U.S.C. § 1505, for obstruction of "an inquiry and investigation" by the House Committee of Energy and Commerce into the BP oil spill.  *See* 12-CR-291, Second Superseding Indictment, ECF No. 179 at 15.  A subject of considerable litigation and discovery in the *Rainey* case was whether the defendant's charged contact with a Member and Chairman of a congressional subcommittee constituted an official Committee investigation—that is, whether the investigation was a "due and proper exercise of the power of inquiry"—an element of the obstruction charge against the defendant.  *See* Transcript, ECF No. 510 at 274-279 (Court recounting the litigation and discovery on this question, and stating that the defendant's contention that communications produced by the House in discovery undermined the Government's claim that the investigation was sanctioned activity on the part of the Energy and Commerce Committee was "a reasonable reading of those documents and plausible under the circumstances").  It was against this backdrop that the *Rainey* Court determined that the testimony of congressional witnesses who were participants in the communications in question constituted "relevant, material, noncumulative evidence related to his defense," *id*. at 285, and dismissed the charge.  In contrast, as described below, the Defendant's claims about the testimony that congressional witnesses would provide in this case is speculative, irrelevant, and untethered to the elements of the offenses with which he is charged.  He has failed to make any showing that the testimony in question is relevant, materially favorable, or non-cumulative, and his Motion to Dismiss should be denied.

## II.     The Defendant Has Failed to Identify Any Non-Speculative, Materially Favorable, Relevant, or Non-Cumulative Information He Was Denied

Throughout his Supplemental Brief, the Defendant contends that the congressional testimony he sought would go to various "issues at trial"—but none of the information that he proffers is relevant with respect to the elements of the offense with which he was charged, contempt of Congress.  As the Court properly instructed the jury during trial, the elements of the

5

**-4638-**

offense are (1) that the Defendant was subpoenaed by the Committee to provide testimony or produce papers; (2) that the subpoena sought testimony or information pertinent to the investigation that the Committee was authorized to conduct; (3) that the Defendant failed to comply or refused to comply with the subpoena; (4) that the Defendant's failure or refusal to comply was willful.  *See* Final Jury Instructions, ECF No. 120 at 27.  All of the information that the Defendant claims he was entitled to elicit from a congressional witness is unrelated to these elements and is immaterial to any valid defense.

The Defendant's first unavailing claim is that Kristin Amerling, the Committee's Chief Counsel and Deputy Staff Director who testified at length during trial, did not have the "knowledge or authority possessed by other congressional subpoena recipients" the Defendant sought to call. ECF No. 141 at 5.  But Ms. Amerling was authorized by the House to testify as its representative, *see* 7/11/2022 Tr. at 49:15-20 (House Counsel notifying the Court that "the Select Committee has made clear that Chief Counsel and Deputy Staff Director Kristin Amerling…will voluntarily be made available by the Select Committee to testify [and can] competently address any issues necessary to any of the elements or defenses" in the case), and the Defendant's claim that any other subpoena recipient would have testified differently from Ms. Amerling as to the Committee's positions is pure speculation.  Furthermore, Ms. Amerling demonstrated her competence at trial through her extensive testimony, based on personal knowledge, of the subpoena issued to the Defendant and his default upon it.  *See* Fed. R. 601 ("Every person is competent to be a witness except as otherwise provided in these rules"); 7/19/22 Tr. at 554:11 (Ms. Amerling's testimony that she advised on the subpoena), 7/20/22 Tr. at 606:13, 614:1, 672:10-13, 679:9-10 (Ms. Amerling's testimony that she participated in and advised Committee Members about the drafting of the subpoena to the Defendant).  The Defendant's speculative contention that Ms. Amerling did

not provide the testimony he wishes other congressional witnesses might have is simply a complaint that he did not like her truthful answers to his questions.

The Defendant cites the extensive and irrelevant questions that he posed to Ms. Amerling regarding "who" on the Committee decided the return dates—such as October 7, 2021, for documents—clearly indicated in the subpoena issued to him.  ECF No. 141 at 6.  Ms. Amerling answered that the dates on Committee subpoenas are generally the result of discussions among Committee staff and Members, that the "ultimate decision-maker for the Select Committee is the Chair and Members of the Select Committee," and that the return dates on the subpoena to the Defendant reflected that process and decision-making—the process and decision-making of the Committee as a body.  *Id*.  Although he proclaims that this line of questioning was related to the "key issues at trial…whether the date(s) on the Subpoena were fixed or flexible," *id*. at 5, the Defendant does not explain the relevance of which staff or Members contributed to the decision of what dates were ultimately printed on the final and valid subpoena issued to the Defendant.  That is because he cannot—it is not relevant who contributed to the decision about what dates were on the subpoena.  Ms. Amerling testified that the dates on a final subpoena reflect the Chairman's decision—*see* 7/20/22 Tr. at 679:2-4 ("[T]he ultimate decision for what is reflected in the subpoena is made by the individual who has the authority to sign the subpoena")—and the subpoena the Defendant accepted service of clearly stated that he was required to provide documents to the Committee at 10:00 a.m. on October 7, 2021, and to appear for a Committee deposition at 10:00 a.m. on October 14, 2021.

Similarly, the Defendant claims that Ms. Amerling did not satisfactorily answer his questions about which individual Committee Members and staff drafted the letters that the Committee sent to the Defendant.  ECF No. 6 at 7.  But his objections are again to Ms. Amerling's

truthful description of the process by which the Committee, as a body, drafted letters for the Committee Chairman's approval and signature. Here too, the Defendant fails to establish any relevance, to any element of the crime of contempt of Congress, of who contributed to the drafting of the letters that were subsequently finalized, sent to the Defendant, and provided him with notice of the Committee's position as stated in those letters.

Finally, through mischaracterization of Ms. Amerling's testimony regarding the Committee Chairman's signature on the subpoena, the Defendant continues his improper attempt at trial to suggest the subpoena was invalid. The Court has already determined that the validity of the subpoena was not a legitimate and contested issue at trial because the Defendant waived it. *See* 7/20/22 Tr. at 684:4-9 (after Defendant attempted to question the validity of the Chairman's signature on the subpoena, the Court ruled that "questions going to whether the subpoena was valid because it was or was not authorized by Chairman Thompson, signed by him, are irrelevant. They were waived by Mr. Bannon, never presented to the Committee."). Accordingly, the Defendant could not properly ask any witness about this issue. But even if the signature issue were a live one, the Defendant's Supplemental Brief conflates the fact that Ms. Amerling did not see the Chairman sign the subpoena with the issue of whether it bore his valid signature—which Ms. Amerling testified to at trial, because she recognized it. *See* 7/19/22 Tr. at 565:1-6 (Ms. Vaughn: "And there's a signature on the subpoena. Do you recognize that signature?" Ms. Amerling: "I do." Ms. Vaughn: "Whose signature is that?" Ms. Amerling: "That's the signature of the Chairman of the Select Committee, Chairman Bennie Thompson.").

In the guise of seeking testimony related to pertinence—one of the elements of contempt of Congress—the Defendant suggests that he is entitled to ask Committee members "why the Committee believed Mr. Bannon's testimony to be pertinent or important"—and then lists a host

of topics that have no bearing on the element of pertinence. *Id*. at 9-11. First, the Defendant claims that Ms. Amerling's testimony about why the Committee sought the information demanded by the subpoena is insufficient and that "only the Committee members" had authority to make evaluations and corresponding decisions on subpoenas. *Id*. at 9-10. But here, the Defendant misunderstands who determines pertinence—not a witness, and not the Court, but the jury. At trial, Ms. Amerling testified about what the Committee was seeking from the Defendant. *See* 7.20.22 Tr. at 613-623 (Ms. Amerling's testimony that she participated in putting together the 17 categories of documents the subpoena required the Defendant to provide, and why the Committee sought them). It was then for the jury to find whether these categories of documents and information were related to the Committee's authorized investigation. *See* Final Jury Instructions, ECF No. 129 at 27 (instructing the jury on the definition of pertinence for their deliberations). What any individual—whether a Member of Congress, a staffer, or some other person—might think is pertinent is not relevant; what matters is what the jury finds to be so. And the Defendant provides no authority for his claim that Ms. Amerling's testimony, based on her work on the subpoena and the Committee's investigation, is somehow invalid, and it is wholly speculative to suggest that any Committee member may have answered his questions differently. Next, the Defendant lists other questions that he would ask, including why the Committee did not afford the Defendant an extension of time to explain his default on the subpoena; various questions about the October 18, 2021, deadline the Committee chose and enforced for that explanation; and whether the Committee would have agreed to later dates for the Defendant's testimony. ECF No. 141 at 10. None of these questions relate in any way to pertinence—whether the subpoena sought information relevant to the Committee's authorized investigation—or for that matter, any other element of the offense. Nor

9

**-4642-**

does the Defendant provide any explanation for how testimony on these questions would be materially favorable to his defense.

Again attempting to cloak irrelevant information under the mantle of "pertinence," the Defendant suggests he should have been permitted to call Committee witnesses for the sole purpose of examining them about their public statements "that indicated they did not actually want to get his testimony; rather they just wanted to try to humiliate him, punish him, and make him an example." *Id.* at 11. But an individual member's motivation is irrelevant in determining whether a Committee acted with a legislative purpose, *Barenblatt v. United States*, 360 U.S. 109, 133 (1959), and as described above, the jury is the determiner of pertinence—not a witness. Similarly, the Defendant concedes that one of his motivations to call Committee witnesses is for the purpose of cross-examining them—even though presumably, having called the witnesses, he would be directing their testimony—about their "conflicts of interests" and political motivations, and why the White House Counsel's Office sent a letter to the Defendant. *Id.* at 12. It is improper, however, to call a witness for the purpose of impeachment. *United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986) ("Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be employed as a mere subterfuge to get before the jury evidence not otherwise admissible.") (citation omitted).

The Defendant asserts that he is entitled to call Congressional witnesses to ask them about "the constitutionally mandated accommodation process" (which he has never established exists with respect to a private citizen witness refusing to comply with a subpoena, *see* Government's Objection to Defense Proposed Instruction, Accommodation Requirement, ECF No. 89 at 19-20); why the Committee chose to proceed criminally rather than civilly; and why the Committee declined to provide the Defendant more time to explain his noncompliance. ECF No. 141 at 9.

The Defendant attempts to confer relevance on these questions by claiming they go to the Government's "theory" that the Defendant "ignored" the subpoena—but he cannot manufacture relevance where there is none. None of the elements of the crime of contempt of Congress concern whether the Committee accommodated the Defendant in any way, and the Government was required to—and did—prove only that the Defendant willfully defaulted on a subpoena, not why and whether the Committee chose to refer him once he did so.

The Defendant also raises that he would seek to question Committee witnesses about "how flexible were the dates and times" on the subpoena "[f]rom the Committee's perspective," and that answers to these questions would be relevant to the Defendant's reasonableness.[2]  *Id*. at 10-11. The testimony at trial established that the Committee's position was that the dates and times were not flexible—they were exactly what were stated clearly and firmly on the subpoena to the Defendant.  7/19/20 Tr. at 562:12-13 (testimony that defendant "was required to produce the documents…by October 7, 2021, at 10:00 a.m."); 563:19-20 (testimony that subpoena required Defendant "to appear at 10:00 a.m. on October 14, 2021" for a deposition).  And in any event, such questions about what Committee members thought are irrelevant—as the Court noted through its questions during argument—to the Defendant's state of mind.  Instead, the relevant question is what the Defendant thought.  The record is quite clear that there were no communications between the Defendant and the Committee outside of the written letters that the jury received in evidence. 7/21/22 Tr. at 43:18-19, 44:12 (Court asking, "But what does Chairman Thompson's testimony tell us about Mr. Bannon's mens rea since it, by definition, was not known to Mr. Bannon what Mr. Thompson thought in his head…That doesn't go to mens rea…").  Accordingly, the

---

[2] The Defendant again claims that he would have elicited this information "through cross-examination," which is perplexing, as he is the party that attempted to compel the congressional witnesses' testimony.

Committee members, by definition, lack any information that would be relevant to Defendant's state of mind.

It is clear that this desired area of inquiry is nothing more than a fishing expedition. At argument, the defense's response to questions about the relevance of such a line of inquiry was, "Well, that's part of the issue. The fact that it's a question is a reason to have the discussion." 7/21/22 Tr. at 43:22-24. But such an answer is a concession that the Defendant is merely speculating about what answers the congressional witnesses might provide, and that he endeavors to engage in a fishing expedition on the witness stand. *See also id.* at 57:3-8 (Court: "Does [Chairman Thompson] have any personal knowledge of the indictment?" Mr. Schoen: "I have no idea. We would ask him that. It's another reason—good idea, Judge. It's another reason we need him on the stand."). The Defendant appears to be arguing for a standard for dismissal that if he is curious about the answer that a witness might give to a question, it is relevant and material. But that is not the law, and his claims do not constitute a sufficient non-speculative proffer to establish that the testimony the Defendant is seeking is material to his defense. Indeed, the Defendant's arguments here are like the unsuccessful attempt by the defendant in *Dean*, 55 F.3d at 662-63, to claim that she needed to call the Committee Chairman to whom she had made false statements to elicit whether the Chairman independently knew the truthful answer to the question he posed.

The Defendant's Supplemental Brief also makes claims that he should have been permitted to call Committee witnesses to ask them questions about various defenses, objections, and legal issues that the Court deemed were not available or appropriate for the jury. For instance, the Defendant submits that he was entitled to ask such witnesses about his eleventh-hour challenges to the Committee's composition, whether it had a ranking minority member, or Committee rules, and asserts that "[o]nly the subpoenaed witnesses could have competently testified on decisions

that were made surrounding these issues and the reasons for them." *Id*. at 8-9. As an initial matter, because the defenses in question were not available to him, any answers to questions about them could not possibly be relevant or materially exculpatory. Indeed, the Defendant knows how any House witness would answer questions on these issues—the House filed an amicus brief in this case representing the view of the House as to the rules challenges, *see* ECF No. 76-2—and he is aware, therefore, that those answers are not material to his defense or exculpatory in any way. Similarly, the Defendant argues that he should have been permitted to call Chairman Thompson to ask questions about the Defendant's barred advice-of-counsel defense and his claims about executive privilege, ECF No. 141 at 11-12, but the Committee's position on these questions is abundantly clear from the correspondence in the record: the Defendant raised issues related to executive privilege, the Committee rejected them, and the Defendant did not follow the Committee's rules with respect to asserting privileges and objections.

In sum, the Defendant does not proffer a single line of questioning that he would ask of Committee witnesses that is relevant, material to his defense, and non-cumulative; indeed, for the most part, the Defendant does not even explain what the desired witnesses' testimony would be— because he does not know and is merely speculating that their testimony might have been helpful. But speculation and proffers of immaterial testimony do not establish a compulsory process violation, and the Defendant's Motion to Dismiss because he was not permitted to call congressional witnesses to testify should be denied.

### III.    The Defendant's Cursory Claim Regarding Documents is Meritless

The Defendant's Supplemental Brief also claims—without any basis or further explanation—that the Court's order to quash "had the effect of denying to Mr. Bannon the basic documents that the Government must provide to the defense in any criminal trial." ECF No. 141 at 4; *see also* 7/21/22 Tr. at 12:15-18 (Mr. Schoen: "We asked for documents, drafts and things

like that of these letters").  These documents, the Defendant says, include "any prior emails, drafts, and other statements of Ms. Amerling (excepting those that Ms. Amerling voluntarily provided to the prosecutors)" and "ordinarily must be provided to the defense in order to accord with due process."  ECF No. 141 at 4.  But as the Government has previously stated, it met and exceeded all of its Rule 16, *Brady*, and *Giglio* discovery obligations, and provided the Defendant with all of Ms. Amerling's prior emails, drafts, and other statements in its possession.  As the Court recognized in the March 16, 2022, Motion Hearing, the Government is not responsible for material not in its possession.  *See* 3/16/22 Tr. at 95 (denying Defendant's request for materials in the House's possession, Court stated that "Rule 16 only requires the government to provide information 'within the government's possession, custody or control.'…The government in this context refers to the prosecuting office, not the entirety of government, including a separate branch").  And in any event, with respect to the Defendant's subpoena for documents from the House, the appropriate standard is not Rule 16, but Rule 17—under which the party seeking production must establish relevancy, admissibility, and specificity.  *See United States v. Libby*, 432 F. Supp. 2d 26, 21 (D.D.C. 2006) (citations omitted).  The Defendant's vague suggestion that there may be other "prior emails, drafts, or other statements" that he would have wanted from the Committee—without any explanation of the topic of these materials or their relevance to matters at issue in his trial—does not establish any of these.  To the extent that he seeks dismissal with respect to documents, the Defendant has not made the threshold showing necessary.  His motion on these grounds should be denied.

**IV.    Conclusion**

The Court has given the Defendant three opportunities to articulate materially favorable, relevant, and non-cumulative information that the Congressional witnesses he seeks would provide.  The Defendant has failed each time to provide any legal basis or the facts necessary to establish a compulsory process violation.  His Motion to Dismiss (ECF No. 116) should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Amanda R. Vaughn
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : Criminal No. 21-670 (CJN) |
| | : |
| v. | : |
| | : |
| STEPHEN K. BANNON, | : |
| | : |
| *Defendant.* | : |
| | : |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO
SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO EXCLUDE CONGRESSIONAL EVIDENCE OR DISMISS THE
INDICTMENT BASED ON GRANTING THE MOTION TO QUASH AND
CONGRESSIONAL SUBPOENA RECIPIENTS'
<u>REFUSAL TO TESTIFY OR PRODUCE DOCUMENTS</u>**

On August 5, 2022, Defendant Stephen K. Bannon, through undersigned counsel, filed his

supplemental brief in support of his motion to exclude evidence or dismiss the indictment in light

of the Court's decision granting the motion to quash the congressional subpoenas [Doc. 141],

pursuant to the Court's July 27, 2022 Order [Doc. 137]. On August 12, 2022, the prosecution filed

its response [Doc. 143]. Mr. Bannon now files his reply, within the page limit directed by the

Court [Doc. 137 at 2].[1]  Mr. Bannon again incorporates herein all previous submissions and

---

[1] Throughout this case the prosecution has proceeded as if it has license to broadly
mischaracterize the record and make whatever misrepresentations of fact it deems useful, all
without consequences.  (See e.g., (1) its earlier representations to the Court that Mr. Bannon
never cited a single relevant OLC opinion, (2) its claim that it needed to subpoena Mr. Costello's
telephone, email, and social media records  purportedly to determine  if he provided Mr. Bannon
with a copy of the congressional subpoena, and (3) that DOJ policy only requires supervisory
authority for obtaining attorney records if they are obtained directly from the attorney, and not
when they are obtained in wholesale fashion, without notice through a third-party).  That pattern
continues here with the misrepresentation that Mr. Bannon has failed in three attempts to in any
way cite anything relevant in the congressional materials or testimony he subpoenaed [Doc. 143
at 1].  Highlighting these misrepresentations in the past has proven to be of no avail; so this

argument on this and the related motion to quash litigation. The failure to reply to any argument in the prosecution's response should not in any way be deemed a concession of merit.

The prosecution argues at page 2 of its response that the Court should not engage in any balancing of Mr. Bannon's fundamental constitutional rights against the privilege claimed by the subpoena recipients. This argument was not raised in response [Doc. 117] to Mr. Bannon's motion and should be deemed waived. It is also undercut by the authority from this Circuit cited by the prosecution on the following page of its response (and by the Court in *Rainey*, which expressly rejected it). Additionally, contrary to the prosecution's assertions, and as noted at oral argument on the underlying motion, there is no requirement to show government misconduct in connection with the denial of the materials or testimony for the requested relief to be granted.

The cases the prosecution cites at pages 3-4 of its response, the only other place in its response where any legal authority is cited, are inapposite.

In typical fashion, the prosecution cites to cases in support of its position, while omitting fundamental details. For example, the prosecution cites *United States v. Verrusio*, 762 F.3d 1 (D.C. Cir. 2014) in arguing that the Court need not balance the Speech and Debate Clause privilege against the constitutional rights violation Mr. Bannon has claimed from quashing the subpoenas. [Doc. 143 at 3]. However, the prosecution neglects to tell the Court that in *Verrusio*, the defendant waived the entire balancing argument by failing to raise it in the district court. 762 F.3d at 23. To the extent the defendant made a secondary argument that the quashing of the subpoena violated

---

practice will be ignored here, other than to note the special irony that such a practice is engaged in by representatives of the "public integrity" division of the U.S. Attorney's office.

his rights to compulsory process and due process, the information denied by granting the motion to quash was in no way material to the case. *Id.* That certainly is not so in the instant case.[2]

The prosecution's reliance on *United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995), is even less availing. Again, the prosecution again failed to advise this Court that Dean waived a primary argument he made in trying to show the materiality of the quashed testimony – that there was no proper legislative purpose – so the Court could not even address the merits. 55 F.3d at 663. Secondly, Dean claimed that if the subpoena had not been quashed, the testimony he sought would have proven that the substance of his perjurious statement actually was true. The court dismissed the argument out of hand on the merits; that is why it did not have to reach the balancing of constitutional rights Mr. Bannon argues for here. 55 F.3d at 662. These cases are inapposite

At pages 5-13 of its response, the prosecution argues that Mr. Bannon has not identified any information denied to him by quashing the subpoenas that is material, favorable, relevant or non-cumulative. The assertion is patently untrue.

Mr. Bannon relies on his previous written and oral submissions to demonstrate the material, non-cumulative nature of the prejudice he has suffered from quashing the subpoenas. He has demonstrated the favorable/material nature of the testimony and information he sought through the subpoenas, which, by definition, is non-cumulative, since to the extent any of the information was adduced at trial, it came in through a witness without any decision-making or other relevant

---

[2] Additionally, Mr. Bannon's constitutional challenge is not limited to his rights to compulsory process and due process. He clearly was denied his rights under the Confrontation Clause by allowing Amerling to testify on subjects for which she had no authoritative or decision-making role; the right to confrontation on the material subjects to which she was permitted to testify could only have been exercised by examining the congressional witnesses whose testimony and documents Mr. Bannon was denied. Mr. Bannon also was denied his rights to a jury trial and to the effective assistance of counsel and his other fair trial rights by having the subpoenas quashed.

3

**-4651-**

authority, not competent to testify to the substance of the information, and over Mr. Bannon's objection. He also does not concede that the information and testimony he was denied by quashing the subpoenas has to be favorable or exculpatory to prove a violation of his rights to confrontation, to due process, to compulsory process, to effective assistance of counsel, or to a fair jury trial. That is especially so here, where, because the motion to quash was granted, meaningful cross-examination on the substance of Ms. Amerling's testimony was denied by her inability meaningfully or competently (in a non-hearsay manner) to provide answers to material questions and, with Mr. Bannon denied the ability to call witnesses who would be competent for substantive cross-examination on the relevant issues.

Mr. Bannon addresses here one prime example of material information/testimony that crystallizes the denial of his identified constitutional rights. As the Court is aware, the one defense the Court permitted Mr. Bannon to raise was a mistake of fact defense – specifically that the dates for compliance with the subpoena (and therefore any default dates) were malleable and not fixed, and that compliance remained open to him on later dates. Mr. Bannon made clear that this defense and his belief concerning the same was a function, in large part, of the letters exchanged between Messrs. Costello and Thompson (along with his understanding of the constitutionally mandated accommodation process, the Su letter which was sent after the purported dates had passed, and more). The prosecution, in turn, asserted to the Court that the letters between Costello and Thompson were so vitally important they constituted the government's whole case against Mr. Bannon. [July 14, 2022 Hearing Tr. at 40].

At pages 7 and 11 of its response, the prosecution argues here that the dates and times for compliance with the subpoena were absolutely fixed and were "exactly what were stated clearly and firmly on the subpoena to the Defendant" and were "not flexible." [Doc. 143 at 11]. That is a

very troubling assertion in light of the representations made by the prosecution in order to convince the Court to instruct the jury, over Mr. Bannon's vehement objection, that the dates at issue actually are just "approximate" dates.  [See Doc. 129 at 26; July 22, 2022 Hearing Tr. at 954-956; Doc. 142 at 13-14].  This clearly is a key issue in the case, given the single defense the Court permitted; but Mr. Bannon was denied the ability to develop the issue with any witness who had any decision-making authority or decision-making role with respect to the dates, their flexibility, the lack of any accommodation in contrast to the constitutional imperative to accommodate and the practice of accommodating others similarly situated or who otherwise was competent to testify on the subject.

Mr. Bannon refers in some detail to the relevant letters between Costello and Thompson, to the reasons arising from those letters that he believed the dates were flexible, at least to a degree sufficient to put the matter before the jury, and he has explained at some length why it was critically important to this defense to have a chance to examine Chairman Thompson (and other Committee members) on the flexibility of the dates, especially in light of the claimed importance the Committee placed on the information they claimed to want to hear from Mr. Bannon.  The letters continued to urge Mr. Bannon's compliance with the subpoena through as recently as July 14, 2022 and did not refer to a default; moreover, the indictment dates vary from the subpoena dates, and Mr. Su's letter on behalf of President Biden urges compliance after the purportedly firm dates had passed.  [See Doc. 107 at 1-6; 141 at 7-8, 9-11, 12 and other sources previously cited].  The prosecution's response is simply wrong insofar as it dismisses this as irrelevant, non-material, cumulative evidence.  This matter compellingly demonstrates the constitutional rights violations suffered by Mr. Bannon from quashing the subpoenas and it demands a dismissal of the indictment.

The prosecution's argument on the matter of "pertinence," another area of prejudice cited by Mr. Bannon from granting the motion to quash, is circular and nonsensical.  The prosecution

5

**-4653-**

argues that Mr. Bannon misunderstands the concept, because actually all that matters on the question of pertinence is what the jury finds.  [Doc. 143 at 9].  Obviously, what the jury finds on the issue is of ultimate importance at trial; but just as obviously, the jury is informed (hopefully) by the actual evidence it hears and, with the subpoenas quashed, Mr. Bannon was prevented by inquiring of the actual parties who sought to compel his testimony as to what they believed the pertinence of his testimony and documents would be.  The purported pertinence arguably was belied by their public statements to the media about their view of Mr. Bannon and their purpose in proceeding criminally against him.  He was entitled to examine before the jury a witness who actually was charged with deciding questions of pertinence vis a vis Mr. Bannon's subpoena  and on which the criminal charges in this case are based.

The prosecution groups all rules related areas of inquiry together and asserts that these were all matters that had been waived and therefore the motion to quash could not have violated Mr. Bannon's rights on those subjects.  [Doc. 143 at 12-13].  But that just is not true.  The Court expressly found that a factual dispute about the provision of a copy of Rule 3(b) was fair game for inquiry and, in fact, Mr. Bannon specifically objected to the Court's denial of a relevant line of inquiry on this subject at trial and to a jury instruction which ran afoul of the Court's ruling on this subject.  [Doc. 128].  Mr. Bannon was entitled to inquire on this subject of a person competent to testify about the decision to withhold providing Mr. Bannon with a copy of the Rule with his subpoena as the Committee's Rules required and as was the practice with other witnesses.  His constitutional rights were denied by granting the motion to quash, preventing the same.

## **CONCLUSION**

Based on all of the foregoing and all relevant previous submissions and argument, Mr. Bannon respectfully submits that the requested relief must be granted, with the case against him

6

**-4654-**

dismissed based on the violation of his fundamental constitutional rights by granting the motion

to quash.

Dated: August 19, 2022                          Respectfully submitted,


                                     SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                          /s/ M. Evan Corcoran
                                     M. Evan Corcoran (D.C. Bar No. 440027)
                                     Riane A. White (*Pro Hac Vice*)
                                     400 East Pratt Street – Suite 900
                                     Baltimore, MD 21202
                                     Telephone: (410) 385-2225
                                     Facsimile: (410) 547-2432
                                     Email: ecorcoran@silvermanthompson.com


                                          /s/ David I. Schoen
                                     David I. Schoen (D.C. Bar No. 391408)
                                     David I. Schoen, Attorney at Law
                                     2800 Zelda Road, Suite 100-6
                                     Montgomery, Alabama 36106
                                     Telephone: (334) 395-6611
                                     Facsimile: (917) 591-7586
                                     Email: schoenlawfirm@gmail.com


                                     *Counsel for Defendant Stephen K. Bannon*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of August 2022, a copy of the foregoing Reply Supplemental Briefing was served *via* the Court's CM/ECF system on registered parties and counsel.


    /s/ David I. Schoen    
        David I. Schoen
          *Counsel for the Defendant*

**-4656-**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL

The Defendant seeks a new trial based on several claims of error in the instructions the Court gave the jury in this case and the Court's adherence to controlling law defining the intent element of the contempt of Congress statute. The Defendant has failed to demonstrate that any of the issues he points to constitute error and has fallen far short of his burden to demonstrate that there is reason to doubt the validity of the verdict in this case. His motion should be denied.

## I.    LEGAL STANDARD

The Defendant moves for a new trial under Federal Rule of Criminal Procedure 33. "Motions for a new trial are not favored and are viewed with great caution." *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (internal citations and quotation marks omitted). "Despite the court's broad authority to order a new trial, it should be exercised sparingly and limited to situations presenting a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* at 32 (internal quotations and citations omitted); *see also United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (A new trial "is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990))); *United States v. Cook*, 526 F. Supp. 2d 10, 14 (D.D.C. 2007), *aff'd*, 330 F. App'x 1 (D.C. Cir. 2009) (finding that where the defendant asserted a constitutional *Brady* violation, to be entitled to a new trial under Rule 33, the defendant

had to demonstrate that the violation resulted "in a verdict [not] worthy of confidence"); *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) ("In order to grant a new trial, the evidence must preponderate heavily against the verdict." (citations and internal quotation marks omitted)). To be entitled to a new trial, therefore, the Defendant bears the burden of demonstrating that "(1) there was substantial error and (2) the error affected the defendant's substantial rights." *United States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (noting the defendant bears the burden of proving a new trial is warranted). In making this showing, the Defendant must "overcome a strong presumption . . . in favor of upholding the jury verdict." *United States v. Rogers*, 918 F.2d at 213 (citations and internal quotation marks omitted).

Here, the Defendant seeks a new trial based primarily on the Court's jury instructions. A challenged jury instruction provides a basis for a new trial where the instruction was erroneous, and the error makes it highly probable "that the jury convicted on an improper theory." *Borda*, 786 F. Supp. 2d at 41 (quoting *United States v. Rhone*, 864 F.2d 832, 835 (D.C. Cir. 1989)) (internal quotation marks omitted). In other words, as with any Rule 33 motion, the error must raise questions about the validity of the verdict. Courts evaluating motions for new trials on claims that the jury was instructed incorrectly, therefore, consider whether the jury instructions provided comport with applicable law. Where they do, courts reject claims that a new trial is necessary. *See, e.g.*, *United States v. Bikundi*, Case No. 14-cr-30 (BAH), 2016 WL 912169, at *36-39 (D.D.C. Mar. 7, 2016) (considering case law defining whether certain facts require juror unanimity to determine whether it was error justifying a new trial to refuse a unanimity instruction on the manner and means of a fraud scheme); *United States v. Adams*, 150 F. Supp. 3d 32, 37-38 (D.D.C. 2015) (considering case law on unanimity requirements to determine whether refusal to give

requested unanimity instruction was error justifying a new trial); *Borda*, 786 F. Supp. 2d at 41-43 (considering propriety of instructions under case law on drug quantity determinations in drug distribution case to determine whether new trial warranted).

In his summary of the legal standard for a new trial under Rule 33, the Defendant cites an Eleventh Circuit case, *United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994), for the proposition that a finding of legal error in the court's jury instructions is not required to grant a new trial under Rule 33.  *See* ECF No. 142 at 2 (citing *Vicaria* for the proposition that "new trial motion appropriately granted for failure to give defense theory jury instruction, even if the failure was not legal error").  To the extent the Defendant cites *Vicaria* to suggest the Court can order a new trial based purely on the failure to give instructions the Defendant wanted, he is incorrect. *Vicaria* does not stand for such a sweeping proposition.  Instead, in that case the Eleventh Circuit only held that the district court had not abused its discretion when it found it should have given a defense theory instruction, even if it were not legally required to, because the question of guilt in the case was close (and had previously resulted in a mistrial because of a deadlocked jury) and the court found the jury may have been confused on certain questions relating to the Defendant's intent without the instruction.  12 F.3d at 198-99.  The out-of-circuit case does nothing to water down this circuit's law that a new trial only should be ordered in circumstances of a serious miscarriage of justice based on an error likely resulting in an erroneous verdict.  Indeed, the only court in this district to cite *Vicaria* cited it only for the proposition—consistent with other courts' holdings— that a jury instruction necessitates a new trial where the instruction was "clearly erroneous and prejudicial." *Adams*, 150 F. Supp. 3d at 36.

The Defendant also cites a legal treatise for the proposition that "[a]ny error sufficient to require a reversal on appeal is an adequate ground for granting a new trial."  ECF No. 142 at 2

(citing 3 Fed. Prac. & Proc. Crim. § 589 (4th ed.) (Wright & Miller)). To the extent the Defendant cites the treatise to suggest that this Court's stated doubts about whether the D.C. Circuit and Supreme Court will uphold the controlling precedent in this case is sufficient to order a new trial, he is incorrect. Were the Court to order a new trial, in conducting the new trial, it would be no more free to ignore *Bryan* (1950), *Licavoli*, *Fields*, and similar cases, without the D.C. Circuit or Supreme Court first considering them, than it was before.

## II.    ARGUMENT

The Defendant claims an injustice requiring a new trial has occurred because he was not permitted to present evidence of a purported good-faith reliance defense and the Court instructed the jury on the settled meaning of "willful" under the contempt of Congress statute instead of instructing the jury on the Defendant's desired meaning. ECF No. 142 at 11-12. He also claims an injustice occurred based on the Court's refusal to provide two jury instructions offered by the Defendant and the Court's instructions on the meaning of "default," the indictment's allegations about when the offense occurred, and the unavailability of waived objections to the Committee's operations as defenses. ECF No. 142 at 12-15. The Defendant has failed to show error meeting the requirements of Rule 33 on any of these grounds.

### A.    The Defendant's Efforts to Relitigate the Meaning of Willfulness Do Not Provide a Basis for a New Trial.

Most of the errors the Defendant claims stem from his continued effort to have the Court ignore controlling precedent on the meaning of "willful" in the contempt of Congress statute. Yet, just as he failed to do in his prior pleadings, he provides no basis for this Court to do so. Both the Supreme Court and the D.C. Circuit have held that "willful" as used in the contempt of Congress statute requires only that the failure to comply be deliberate and intentional, nothing more. *United States v. Bryan*, 339 U.S. 323, 328-30 (1950); *Licavoli v. United States*, 294 F.2d 207, 208 (D.C.

Cir. 1961); *Dennis v. United States*, 171 F.2d 986, 990 (D.C. Cir. 1948); *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947). Notably, just as the Defendant did here, the defendant in *Bryan* (1950) claimed she would not produce the records required by a congressional subpoena based on the advice she received from counsel. 339 U.S. at 325. Yet, the Supreme Court held nevertheless that where the Government introduced evidence "that respondent had been validly served with a lawful subpoena directing her to produce records . . . and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default." 339 U.S. at 330. It was this holding on which the D.C. Circuit relied in reaching the same conclusion in *Licavoli* that it had reached over a decade earlier in *Fields* and *Dennis*: that a defendant was in criminal contempt of Congress where he deliberately and intentionally defied a subpoena, regardless of whether his motive was bad or evil. *Licavoli*, 294 F.2d at 208. This case is controlled by those precedents and the Court limited the evidence and argument at trial and instructed the jury accordingly. And the Defendant does not claim that the Court failed to properly adhere to those precedents—he concedes that it did so adhere. There is no error warranting a new trial.

The Defendant nevertheless claims that the Court committed error by refusing to ignore controlling precedent in favor of a heightened standard of "willful" that has never been adopted by any court for contempt offenses. To support his argument, the Defendant first cites to dicta in Supreme Court cases in which the Court merely confirmed the need for crimes to have a mens rea element. *See* ECF No. 142 at 7-8 (citing *Xinlu Ruan v. United States*, 132 S.Ct. 2370, 2377 (2022); *Elonis v. United States*, 575 U.S. 723, 734 (2015)). He also claims that one of the cases to which he cites, *Elonis*, "emphasized the need to require proof that the defendant knew his conduct was unlawful when willfulness is charged," *id*. at 9 (purporting to cite *Elonis*, 575 U.S. at 735-37), but the case does not address the standard for willfulness at all, let alone in the contempt context—

indeed, the word "willful" appears nowhere in the Court's opinion.  The Defendant then relies on the dicta he cites to suggest that the controlling Supreme Court and D.C. Circuit precedent on the meaning of willfulness in the contempt of Congress statute does not give the statute a mens rea requirement to separate innocent conduct from criminal conduct.  *Id*. at 8-9.  Not so.  The contempt of Congress statute has a criminal mens rea element—it makes criminal a failure to comply that is the result of a conscious, deliberate decision not to comply.  This is the willfulness standard for both contempt of Congress and contempt of court.  *See* Gov't Mot. to Exclude Good-Faith Reliance, ECF No. 29, at 6-8 (collecting cases defining "willful" in the contempt of court context as a deliberate and intentional violation of a court order and cases finding advice-of-counsel or good-faith reliance to provide no defense).  And a deliberate decision to defy a government order— that is, to consciously assert that the individual decides what the law requires of him in place of the Congress or the courts—is a mens rea requirement separating an innocent failure to comply from a culpable one.

Second, in his attempt to claim that adhering to controlling precedent was error, the Defendant cites the dissenting opinion in *Rehaif v. United States*, 139 S.Ct. 2191, 2205 (2019) (Alito, J., dissenting), the D.C. Circuit's opinion in *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019), and a Ninth Circuit opinion, *United States v. Singh*, 979 F.3d 697 (9th Cir. 2020), for the proposition that willfulness, when used in a criminal statute, can never mean less than that a defendant knew his conduct was unlawful.  *See* ECF No. 142 at 8, 9-11.  The Defendant has made this claim before, *see* Def's Opp'n to Gov't Mot to Exclude Good-Faith Reliance, ECF No. 30, at 12-13, and it is no less incorrect than it was the first time he made it.  As the Government pointed out when the Defendant first cited *Burden*, the Circuit in that case cited the Supreme Court's note in its 1998 *Bryan* decision that willfulness has many meanings and only was deciding in that case

the parties dispute as to whether *Bryan*'s (1998) standard of willfulness or the *Ratzlaf/Cheek* standard of willfulness applied to the statute at issue. 934 F.3d at 689-90. The *Burden* court was not asked to and did not decide whether the spectrum of willfulness was limited to those two standards. Nor does Justice Alito's dissenting opinion in *Rehaif* or the Ninth Circuit's opinion in *Singh* purport to limit the spectrum of willfulness to the intermediate standard in *Bryan* (1998) or the highest standard in *Ratzlaf/Cheek*. Justice Alito cited the highest standard of willfulness—that used in tax cases—which requires knowledge of a known legal duty, to argue that "knowingly" as used in an unlawful firearm possession statute could not mean knowledge of illegality. 139 S.Ct. at 2205. Justice Alito did not discuss or consider the spectrum of willfulness. And the Defendant's claim that the *Singh* court "explained that the expression in *Bryan*, that 'willfully' is sometimes said to be a 'word of many meanings' refers to the two interpretations courts have applied,"— which, according to the Defendant are the two articulated in *Bryan* (1998) and *Ratzlaf/Cheek*, ECF No. 142 at 10—is wrong and misleading. What the Ninth Circuit actually said is that the *Bryan* (1998) and *Ratzlaf/Cheek* standards of willfulness "are *two primary interpretations* of 'willfully' in the criminal context," 979 F.3d at 712 (emphasis added), not that they are the only two. And no court has held that willfulness is so limited to just those two standards. To the contrary, several circuits, including the D.C. Circuit, have found post-*Bryan* (1998) that certain statutes' use of "willful" as the mens rea element requires nothing more than deliberate, intentional action and does not require knowledge of unlawfulness. *See, e.g.*, *United States v. George*, 386 F.3d 383, 388-89 (2d Cir. 2004); *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002); *United States v. Hsia*, 176 F.3d 517, 521-22 (D.C. Cir. 1999); *see also* Gov't Reply in Support of Mot. to Exclude Good-Faith Reliance, ECF No. 35, at 16-17 (collecting cases).

As the Government has briefed before, *id*. at 18-20, and as this Court recognized in its orders on the issue, despite the Defendant's efforts to argue otherwise, the Court is bound by the precedent directly addressing the statute at issue in this case. *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it."); *Mdewakanton Sioux Indians of Minnesota v. Zinke*, 264 F. Supp. 3d 116, 130 n.21 (D.D.C. 2017) ("However, because the D.C. Circuit has not yet addressed the application of [a more recent Supreme Court opinion] to § 2401(a), this Court continues to follow the D.C. Circuit's prior conclusion until the D.C. Circuit addresses it in the first instance."). Moreover, the Supreme Court has made clear that "[w]e do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

The Court followed controlling precedent here and the Defendant has failed to show that doing so was error. The evidentiary and instructional errors he claims "flow" from the Court's adherence to controlling law, *see id*. at 11-12 & n.7, are not, therefore, errors at all. Nor did the Court's implementation of controlling law violate the Defendant's right to present a defense. As he has before, the Defendant cites to the constitutional right to present a defense without acknowledging that his right extends only to admissible, relevant evidence. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of

evidence."); *United States v. Libby*, 475 F. Supp. 2d 73, 91 (D.D.C. 2007) ("[A]lthough the

Constitution entitles a defendant an opportunity 'to present [his] version of the facts . . . to the jury

so it may decide where the truth lies,' that guarantee extends only to relevant evidence." (quoting

*Washington v. Texas*, 388 U.S. 14, 19 (1967)) (other citations omitted)).  Claims that the Defendant

relied on his attorney's advice or his own interpretation of the law are not admissible defenses in

a contempt case.  And a new trial would not remedy the purported errors the Defendant asserts.

The Court still would be bound by controlling law in a new trial and would have to reject the

Defendant's proposals relating to it just as it did the first time around.  The Defendant's continued

efforts to contest the Supreme Court's and D.C. Circuit's precedents on the intent standard in the

statute are issues for his appeal, not a new trial motion.  Accordingly, any claims for a new trial

based on the Defendant's desire for the Court to have changed the controlling definition of

"willful" must be rejected.

> **B.**     **The Defendant Has Failed to Meet his Burden to Demonstrate that the Court
>            Committed Any Additional Errors in its Instructions to the Jury that Call the
>            Verdict Into Question.**

Aside from his efforts to relitigate the meaning of "willfulness," the Defendant claims four

additional errors in the Court's instructions to the jury:  1) the Court's rejection of the Defendant's

"mistake of fact" and "waiver of default" instructions, ECF No. 142 at 13; 2) the Court's

instructions on "default," *id*.; 3) the Court's instruction describing the indictment's allegations of

"on or about," *id*. at 13-14; and 4) the Court's instruction that the jury should not consider the

Defendant's arguments about his waived objection to the Committee's compliance with rules

requiring it to give him a copy of House Resolution 8, Section 3(b) before he testified, *id*. at 14-

15.  The Defendant has failed to meet his burden that any of these decisions by the Court

constituted error, let alone errors calling the jury's verdict into question.

1.    **Defendant's Proposed Instructions on "Mistake of Fact" and "Waiver of Default"**

The Defendant claims it was error to refuse to give his proposed instructions on "mistake of fact" and "waiver of default," ECF No. 126 at 6, 8 (proposed instructions).  ECF No. 142 at 13.  First, it was not error for the Court to reject the Defendant's "mistake of fact" instruction.  The Defendant's proposed instruction informed the jury of his defense theory that he did not act willfully because he believed the dates for compliance had been moved or were not fixed.  ECF No. 126 at 6 ("The Defendant . . . contends that he believed that the dates for compliance with the subpoena were not fixed and were flexible and subject to change and that therefore he did not act 'willfully.'").  Although the Court did not provide the specific instruction the Defendant wanted, it did instruct the jury: "To be deliberate and intentional means that the failure to comply was not the result of inadvertence, accident, or mistake, including a mistake regarding the operative date."  ECF No. 129 at 28.  Defendants are not entitled to instructions in whatever form they want, and the Defendant does nothing to explain why the instruction the Court gave was insufficient to communicate his theory of the case to the jury for its consideration, as he must to sustain his burden to show he is entitled to a new trial.  *See United States v. Pray*, 869 F. Supp. 2d 44, 50 (D.D.C. 2012) ("A defendant has no right to have any instruction on [the defendant's defense theory] given in the particular form he desired, or with any special emphasis." (internal quotation marks and citation omitted) (alteration in original)) (denying motion for a new trial based on court's refusal to give defense theory instruction as submitted where instructions given conveyed defendant's defense).

Moreover, by giving any instruction at all acknowledging the Defendant's proposed theory that he made a mistake about the operative dates, the Court likely went beyond what the law required because there was no evidence in the record supporting such a theory.  *See United States*

10

*v. Howard*, 245 F. Supp. 2d 24, 39 (D.D.C. 2003) ("A defendant in a criminal case is entitled to adequate jury instructions on his theory of defense, provided that there is evidence to reasonably support such a theory." (quoting *United States v. Hopkins*, 716 F.2d 739, 749 (10th Cir. 1982)) (internal quotation marks omitted)). Other than defense counsel's questions and argument at trial, neither of which are evidence, there was no evidence presented at trial that the Defendant failed to comply with the subpoena because he "honestly and reasonably believed" that the dates for compliance with the subpoena "were not fixed dates," ECF No. 126 at 6 (Defendant's proposed defense theory instruction). The only evidence of the Defendant's intent presented at trial demonstrated that the Defendant's refusal to comply with the subpoena had nothing to do with a "mistake" about the dates and everything to do with his decision to "stand with" former President Donald Trump. *See*, *e.g.*, Gov't Exs. 4 and 6 (Defendant's letters to the Committee stating he would not comply with the subpoena because, as he represented to the Committee, the former President told him not to based on some undefined assertion of executive privilege); Gov't Exs. 11A & 11B (Defendant's social media posts); Gov't Ex. 8 (Defendant's response to the Committee's request for an explanation as to why he did not comply with the subpoena). Accordingly, the Defendant was not even entitled to the defense theory instruction he got, let alone the one he submitted. He cannot show error resulting in a miscarriage of justice.

Nor was it error for the Court to refuse to give the Defendant's instruction that, by continuing to seek the records and testimony the subpoena commanded, the Committee "waived" his criminal contempt. Other than asserting it was error, the Defendant cites no authority for why it was error and why it may have resulted in an erroneous verdict. The Defendant has yet to cite any authority that criminal contempt can be cured by later compliance. Instead, all the authority demonstrates that it cannot. *See United States v. Fort*, 443 F.2d 670, 678 (D.C. Cir. 1970) (finding

that Congress "may 'coerce' by means of civil contempt, 'punish' by means of criminal contempt, and perhaps even both" (citing *Jurney v. MacCracken*, 294 U.S. 125, 151-52 (1935); *In re Chapman*, 166 U.S. 661, 672 (1897))); *United States v. Donziger*, -- F.4th --, 2022 WL 2232222, at *11 (2d Cir. June 22, 2022) ("Criminal contempt punishes retrospectively for a completed act of disobedience, such that the contemnor cannot avoid or abbreviate the confinement through later compliance. . . . It is therefore beside the point that [the defendant] eventually complied with most of the court orders underlying his criminal contempt conviction" (internal quotation marks and citation omitted)).  Again, the Defendant has failed to meet his burden to show an error might have occurred, let alone one resulting in a miscarriage of justice.

### 2.    Instruction for "Default"

The Defendant has failed to show that it was prejudicial error rendering the verdict invalid to instruct the jury that it must find the Defendant failed to comply with the subpoena instead of just instructing the jury that it had to find the Defendant "defaulted."  *See* ECF No. 142 at 13 (claiming the Court violated the Defendant's constitutional rights "by failing to use the language in the statute charged: 'willfully makes default'").  The Defendant asserts the Court's instruction was error because it should have allowed "the jury [to] determine the meaning of the contested term."  *Id*. at 142.  But it is not the jury's role to determine what statutory terms mean; that is a legal question.

"Default" is not a layman's term, and there is no requirement in the law that jury instructions must only use statutory wording to explain the elements of the offense to the jury.  In fact, refusing to define terms sufficiently for the jury runs contrary to law, as a court's instructions must "provide the jury with sufficient understanding of the issues and applicable standards."  *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010) (internal quotation marks and citation

omitted); *see also, e.g.*, *Carter v. Kentucky*, 450 U.S. 288, 302 (1981) ("Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law."); *United States v. Tasis*, 689 F.3d 623, 627 (6th Cir. 2012) (finding Court did not abuse its discretion in rejecting the defendant's proposed instruction where the court gave an instruction conveying the same information "in a more straightforward way" and by "choosing a plain English jury instruction over a generic (and wordy) pattern jury instruction"). Indeed, convictions are reversed where courts do not instruct the jury on the proper meaning of statutory terms. *See, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 570-71 (2016) (reversing bribery conviction because district court insufficiently defined the statutory terms surrounding "official act" under the bribery statute in its instructions to the jury and finding only one of multiple ways to interpret the statute's reference to "question" and "matter" was correct under the law).

Moreover, the Defendant does not identify why explaining the element of default as a "fail[ure] to comply or refus[al] to comply with the subpoena," Final Jury Instr., ECF No. 129, at 27, was error or why that definition calls the validity of the verdict into question. The instruction was directly in line with how courts have defined "default" under the contempt of Congress statute. *See Bryan* (1950), 339 U.S. at 327 ("'Default' is, of course, a failure to comply with the summons."); *Fields*, 164 F.2d at 100 (affirming jury instruction that referred to the act that must have been willful as a "failure or refusal to comply"). Nor does he explain how that definition was "contested" by the parties, as he now claims it was. *See* ECF No. 142 at 13 (claiming the court used a "loaded interpretation of statutory language . . . rather than having the jury determine the meaning of the *contested* term" (emphasis added)). In his own pleadings, the Defendant has found the need to define the term, not just rely on the statutory text as he now claims the jury should have done, and has defined it in accordance with how the Court defined it for the jury. *See* ECF No. 30

at 12 ("There is no definition of 'makes default' . . . in 2 U.S.C. § 192. Generally, 'makes default' means failure to fulfill a legal duty" (citing "Default," Black's Law Dictionary (8th ed. 2004))). Having failed to identify why the definition given was not in accordance with the law and may have led to a verdict based on an incorrect understanding of the applicable elements, the Defendant cannot meet his burden for a new trial.

### 3.    Instruction for "On or About"

The Defendant has failed to demonstrate any prejudicial error in the Court's instruction regarding "on or about." ECF No. 142 at 13 (claiming error in Final Jury Instruction No. 24 (adapted from Redbook Instruction 3.103)). To support his argument, the Defendant claims that the "on or about" language in the indictment is surplusage and that the Government's evidence varied from the indictment as to the date. ECF No. 142 at 13-14.

As an initial matter, the Defendant's effort to seek a new trial under Rule 33 on this basis fails because he has not met his burden to show that the instruction, even if in error, calls the verdict into doubt. The Defendant appears to assert in his motion that the jury should have been instructed about what the indictment alleged only by reference to the specific language in the specific paragraphs of the Counts, i.e., paragraphs 23 and 25 of the indictment. In other words, that Count One occurred "on October 14" and that Count Two occurred "by October 18." Even if that had been the instruction, the Defendant does not explain why the verdict may have turned out any differently. With respect to Count One, there was no evidence or argument relating to an alleged date of willful default other than a date of October 14, when the Defendant failed to show for a deposition as required by the subpoena. With respect to Count Two, there was no evidence or argument relating to an alleged date of willful default other than a date of October 7, and, therefore, a date occurring by October 18. The Defendant does not argue otherwise. Instead, he

14

**-4670-**

appears to concede that the evidence and argument was limited to asking the jury to determine

whether these dates were the dates of willful default.  *See* ECF No. 142 at 13 (claiming the "direct

relevance of specific dates and times, according to the prosecution's case").  A motion for a new

trial cannot be granted based on error that does not call the verdict into doubt.

In any event, the Defendant has not shown error in the first place.  His arguments about the

error of the "on or about" instruction are meritless because they are based on a misunderstanding

of pleading requirements and the law of prejudicial variance.  First, the Defendant argues defining

all dates in the indictment as "on or about" dates is "surplusage."  But he does not explain why

this renders the instruction the Court gave invalid.  As best the Government can glean, the

Defendant apparently believes the language should have been struck from the indictment as

"surplusage" and that, if it had been, the instruction the Court gave would not have followed the

indictment.  But the Defendant forfeited his argument that the language should be struck from the

indictment by not timely raising it.  Having so forfeited the objection, on appeal, such a claim only

would be subject to plain error review.  *See Johnson v. United States*, 520 U.S. 461, 466–67 (1997)

("Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that

is plain, and (3) that affect[s] substantial rights." (internal quotations omitted)).  Yet, the Defendant

cannot show it was error at all for the indictment to define the dates of the offense, so he certainly

cannot show it was plain error not to strike the definition.

The Defendant cites no authority for his assertion that defining the dates as "on or about"

dates was strikable surplusage—likely because his claim has no support in the law.  "Surplusage"

subject to striking in an indictment consists only of allegations that are "not relevant to the charge

and are inflammatory and prejudicial."  *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir.

1998) (affirming district court's refusal to strike allegations about the defendant's murder of airline

passengers in an air piracy case as surplusage).  The sentence at the beginning of the indictment in this case, that the allegations therein occurred "on or about the dates and at the approximate times stated below," ECF No. 1 at 1, is not irrelevant or prejudicial.  It defines an essential allegation of the indictment—the dates on which the offense occurred.  This is standard pleading language and recognized by courts as providing the requisite notice to defendants that indictments must give.  *See, e.g.*, *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (finding an indictment alleging that the defendant attempted to illegally re-enter the United States "on or about" a certain date was legally sufficient).  And, just because the language is at the beginning of the indictment, and not in paragraphs 23 and 25 specifically, does not mean the language does not define the dates in those paragraphs.  *See United States v. Bowdoin*, 770 F. Supp. 2d 142, 145-46 (D.D.C. 2011) (reviewing an indictment for sufficiency and noting that "the indictment must be viewed as a whole" (citations omitted)).  The Defendant does not explain how it was improper for the Court to track the indictment's unchallenged language when describing the indictment's allegations.

The Defendant's claim that the Court's instruction was error because it resulted in a variance also is without merit.  Again, he cites no authority to support the claim, and there is none.  A reversible, prejudicial variance occurs when the evidence at trial "proves facts materially different from those alleged in the indictment."  *United States v. Lorenzana-Cordon*, 949 F.3d 1, 4 (D.C. Cir. 2020) (citation and internal quotation marks omitted).  Variances have nothing to do with a court's instructions.  To the extent the Defendant instead meant to argue that he is entitled to a new trial because the Government's evidence at trial—that the Defendant defaulted on October 14 and October 7 and by October 18—constituted a prejudicial variance because the indictment alleged these dates to be "on or about," he is incorrect.  It is well-settled that minor variations in the proof at trial from "on or about" dates in an indictment do not constitute prejudicial variances.

*See Cogdell v. United States*, 307 F.2d 176, 178 (D.C. Cir. 1962) (finding no prejudicial variance where the indictment alleged an event occurring "on or about March 1," and the evidence at trial showed it occurred on March 3 or 4). Here there was not even a variation from the "on or about" dates. The Government proved the Defendant's crimes occurred exactly on and by the dates alleged.

The Defendant cannot show prejudicial error calling the verdict into doubt in the Court's instructions relating to "on or about" dates, which tracked exactly the allegations of the indictment. He has failed to meet his burden to demonstrate he is entitled to a new trial on this basis.

### 4.     Instruction for Waived Objection

Finally, the Defendant claims he is entitled to a new trial because the Court instructed the jury that it should not consider defense counsel's statements in closing, *see* Trial Tr., 7/22/22, at 992:22-993:8 (defense closing argument), that a reasonable doubt was raised because the Committee had never provided the Defendant with a copy of Section 3(b) of House Resolution 8. ECF No. 142 at 14. Specifically, the Court instructed the jury:

> [D]uring closings, I sustained objections to certain statements by counsel. You should not consider those statements. You also heard about a purported rules violation by the Committee in not providing the Defendant with a copy of certain rules . . . . You may not consider these issues as a defense in this case.

ECF No. 129 at 30. The Defendant claims this was error because his argument in closing about the rules violation was "an issue the Court expressly indicated could well be an area the defense could explore, with respect to the factual dispute surrounding it" and "there was testimony adduced at trial concerning the factual dispute over Rule 3(b)." ECF No. 142 at 15. The Defendant is incorrect. The Court did not "expressly indicate" the Defendant could raise Section 3(b) as a defense. Instead, the Court held that rules-based objections to the Committee had been waived as a defense at trial where the Defendant was on notice of them at the time he defaulted and had not

raised them to the Committee. Hrg. Tr., 7/11/22, at 128:11-130:13 (finding that "there's no serious argument that Mr. Bannon could not have known of the alleged rules violation he now points to"). It later found, specifically with respect to the Defendant's arguments about Section 3(b), that it appeared the objection fell within the category of waived objections and that, to present the argument to the jury, there must be some evidence presented that the Defendant had made a timely objection on the basis of Section 3(b) before the Committee. *See* Trial Tr., 7/20/22, 709-10. The Defendant never offered or proffered such evidence. The only evidence he can point to is testimony from a committee staffer that the deposition rules required witnesses to be provided Section 3(b) before they testified and that the Defendant was not provided Section 3(b) because he never showed up to his deposition. *See* ECF No. 142 at 15 (citing Trial Tr., 7/20/22, at 712-713). This is not evidence that the Defendant raised an objection to appearing for testimony on the basis of not receiving Section 3(b). And he has never offered, proffered, or otherwise made the Government or the Court aware of any evidence that he did raise such an objection. That is because there is no such evidence, because it did not happen. The Defendant was not, therefore, under this Court's rulings or the applicable law, entitled to make the argument to the jury that he was excused from complying with the subpoena because he did not receive Section 3(b) before the date of his deposition. The Court's instruction to the jury to disregard the improper argument the defense nevertheless made, in contravention of the law, was proper and cannot support a finding that the instruction led to a verdict on an improper theory. *See* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

**III.    CONCLUSION**

The Defendant's motion for a new trial fails to meet his burden under Rule 33.  He claims multiple errors without offering any basis to conclude they call the verdict into doubt, and the errors he claims are not, in fact, errors at all.  Instead, he attempts to obtain a new trial by relitigating issues already decided by this Court, without offering any new basis to reconsider them, and by relying on misinterpretations of the evidence, this Court's pretrial and trial rulings, and the controlling law.  His motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
J.P. Cooney (D.C. 494026)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1793 (Vaughn)
amanda.vaughn@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## DEFENDANT'S REPLY TO OPPOSITION TO MOTION FOR A NEW TRIAL

On August 5, 2022, Defendant, Stephen K. Bannon, by and through the undersigned counsel, filed a Motion for a New Trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure [Doc. 142].  On August 19, 2022, the prosecution filed its Opposition [Doc. 145].  Mr. Bannon now files his Reply.  All previous written and oral submissions in this case are incorporated by reference herein and familiarity with all of the same is assumed.  The failure to address any of the prosecution's arguments should not in any way be deemed a concession of merit as to any such argument.

At page 6 of its Opposition, the prosecution once again directs the Court's attention to contempt of court cases and continues to argue that in the contempt of court cases there is no requirement that a criminal defendant know that his conduct was unlawful and therefore there is no such requirement under the criminal contempt of Congress statute charged here.  The argument fails for a number of reasons.  [See Doc. 30 at 22-24].  Perhaps the most fundamental distinction between the two is that disputes between the legislative and executive branch over compliance with a congressional subpoena historically have been resolved through negotiation and accommodation between the parties. *See e.g., Trump v. Mazars USA, LLP*, 140 S. Ct. 219,

1

**-4676-**

229 (2020). That certainly is not the case with contempt of court.

Additionally, the two circumstances are distinguished by the now unassailable principle that when it comes to a dispute between the legislative and executive branch over a congressional subpoena that the parties cannot resolve – its scope, the applicability of executive privilege, etc. – a third branch, the judicial branch is brought in to resolve the dispute. *See e.g.*, *Comm. on the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020). Congress is not the "referee," as the prosecution argued to the jury, as to its own subpoena. The prosecution continues to ignore the separation of powers issues, especially highlighted when executive privilege has been invoked, whether by a current or former President and, of course, it ignores the OLC opinions that address this specific issue and that reflect authority that is binding on the prosecution.

At pages 7-9 of its Opposition, the prosecution dismisses out of hand the clear recent pronouncements from the United States Supreme Court (and this Circuit) on *mens rea* generally and on "willfully" specifically, cited in Mr. Bannon's Motion for a New Trial [Doc. 142 at 6-11].

One of the fundamental flaws in the prosecution's position on this issue is its failure to appreciate the centrality of the constitution-based principle that a criminal statute must always be construed to avoid the danger of drawing within its ambit innocent conduct or, as the court in *Bryan v. United States*, 524 U.S. 184, 195, n.22 (1998) put it, the danger of convicting a defendant with an innocent state of mind. It is this principle that the definition of "willfully" adopted by the Court in this case, at the prosecution's urging, violates. The undisputed evidence in the record is that Mr. Bannon understood his conduct in relation to the subpoena not only to be lawful; he firmly understood it to be the only lawful response to the subpoena, once executive privilege had been invoked. He, of course, went a step further and advised that he would comply

if the Committee took him before a court and a court so ordered.  [Doc. 30-1].

The prosecution cites three cases that it asserts support its position that to act "willfully" in a criminal case a defendant need not have known that his conduct was unlawful.  Consistent with its practice throughout these proceedings, the prosecution's representations regarding the import of these cases are not accurate.  The cases are either inapposite or support Mr. Bannon's position.  They all of course long pre-date the recent United States Supreme Court jurisprudence.

In two of the cases the prosecution cites, *United States v. George*, 386 F.3d 383, 388-389 (2d Cir. 2004) and *United States v. Hsia*, 176 F.3d 517, 521-522 (D.C. Cir. 1999), the courts emphasize that the statute at issue required the defendant to know the information he provided was false, which itself is inherently wrong to do.  *See e.g., Hsia*, 176 F.3d at 522.  The instant situation presents a very different scenario.  The Committee's subpoena provided for Mr. Bannon to provide documents and testimony; but he was advised that executive privilege was invoked and prohibited him from complying.  There certainly is nothing inherently wrong with his response and it presents the exact danger that every authoritative "willfulness" case Mr. Bannon has cited unequivocally recognizes the law prohibits – the criminal conviction of a defendant with an innocent state of mind.  *See e.g., George*, 386 F.3d at 392, *citing, Bryan*, 524 U.S. at 193 (requiring that the defendant know his conduct was unlawful).  It also presents the much more complicated situation akin to *Ratzlaf*, *Cheek*, and *Bryan*, in which the Court highlighted the constitutional imperative to avoid the risk of convicting an innocent actor or imposing criminal liability on an innocent state of mind (and especially with a purportedly mandatory incarceration element).

The third case cited by the prosecution provides even less support for its position.  The

3

**-4678-**

court in *United States v. Sprong*, 287 F.3d 663, 666 (7th Cir. 2002).[1]  This case simply recognizes the well-established principle that there are some acts that are *mala in se* and the conduct charged under the operative statute in the case, the unauthorized destruction of another person's property was, indeed, *malum in se*.  Therefore, under such a statute, the requisite *mens rea*, by definition includes knowledge that the conduct is unlawful when engaged in intentionally.  *Sprong*, 287 F.3d at 666.

The prosecution's discussion at pages 10-11 of the Opposition discounts the importance of and the constitutional right to a defense theory instruction.  The instruction that was given on mistake of fact is certainly no meaningful or legally adequate substitute for the requested instruction.  It is just a generalized statement not at all drawn to the actual context of this case and the specific narrow defense.  Mr. Bannon requested a factually and legally correct defense theory instruction on this defense that the Court declined to give.  It was especially prejudicial here since this was the only defense the Court permitted Mr. Bannon to pursue at trial.  The prosecution's claim that no instruction at all was required on this defense theory because no direct evidence was adduced in a defense case at trial to reflect such a defense, [Doc. 145 at 11], completely misapprehends the competence of evidence adduced through cross-examination and, in this case, through the letters that gave rise to an inference supporting the defense and the requested defense theory instruction.

The prosecution appears at pages 12-14 of its Opposition, to misunderstand the argument or the legal principles attending the objection to the Court's instruction on "default."  [See Doc. 142 at 13].  Mr. Bannon throughout these proceedings has maintained that the term "willfully

---

[1] The prosecution cites this case as *United States v. Urfer* in its Opposition at 7, using the name of another defendant in the case.  Westlaw uses that case name.  Lexis uses *United States v. Sprong* for the case cited as 287 F.3d 663 (7th Cir. 2002).

4

**-4679-**

makes default" is ambiguous in this context, especially with the complicating factor of the executive privilege invocation.

He has argued consistently that he could not have "defaulted," as that term properly is defined, if he responded to the subpoena as the law required and that he could not have defaulted if the dates for compliance were malleable and even were still open as of the July 14, 2022 Thompson letter, as he believed.  The Court's instruction, in effect, impermissibly decided that factual issue for the jury, removing the prosecution's burden of proving every element beyond a reasonable doubt and rejected Mr. Bannon's theory of defense on the matter.  The instruction Mr. Bannon proposed should have been given.  It reflected his theory of defense and was an accurate statement of the law.  [Doc. 142 at 13-14].

Finally, on the error Mr. Bannon has argued arises from the Court's jury instruction given at the end of closing arguments [See Doc. 142 at 14-15], the prosecution's discussion at pages 17-18 of its Opposition ignores the violation of Rule 30(b) & (d) of the Federal Rules of Criminal Procedure.  The prosecution's submission on this point also misstates the record, urging the Court to reject the argument because any argument related to the Rule 3(b) violation purportedly was waived.  [Doc. 145 at 17-18].  As reflected in Mr. Bannon's Motion for a New Trial, to the contrary, the Court expressly indicated the factual dispute surrounding Rule 3(b)'s requirements and non-compliance remained open as a possible avenue the defense could explore at trial and the defense did just that.  [See Doc. 142 at 15 and record citations therein].  It was error to give the impactful instruction the Court gave without providing for notice or comment by the Defendant prior to giving it.

<u>**CONCLUSION**</u>

Mr. Bannon respectfully relies on his Motion for a New Trial and all previous oral and written submissions in this case in further reply to the prosecution's Opposition and respectfully submits that the jury's verdict should be set aside, in light of the many constitutional errors attending these proceedings, with a new trial ordered.

Dated: August 26, 2022                                   Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

_____/s/ M. Evan Corcoran_____
M. Evan Corcoran (D.C. Bar No. 440027)
Riane A. White (*Pro Hac Vice)*
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

_____/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26[h] day of August, 2022, a copy of the Reply to Opposition to Motion for New Trial was served *via* the Court's CM/ECF system on registered parties and counsel.

_____/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)

6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 1:21-cr-00670 (CJN) |
| STEPHEN K. BANNON, | |
| *Defendant*. | |

## <u>ORDER</u>

Pending before the Court are Defendant's Motion for New Trial, ECF No. 142, and Supplement to his Motion to Dismiss, ECF Nos. 116, 141. The Court will deny both Motions.

\*     \*     \*

The Court begins with Defendant's Motion for a New Trial. Most of that motion argues that the Court's jury instructions and prior decisions regarding the meaning of "willfully" in 2 U.S.C. § 192, along with the Court's other holdings that flowed from that interpretation, necessitate a new trial. *See* Mot. for New Trial, ECF No. 142, at \*2–\*13. But as the Court has held on several prior occasions, *see, e.g.*, Order, ECF No. 49; *see also* Transcript of Oral Arg. of March 16, 2022 at 86:14–89:25, Transcript of Oral Arg. of June 15, 2022, at 126:21–127:21, Defendant's arguments are foreclosed by binding precedent from the Court of Appeals, which this Court cannot, of course, ignore. Defendant's arguments on this score do not warrant a new trial.

Defendant also argues that the Court erred by not including his defense theory in the jury instructions. *See id.* at \*12. But Defendant cites no authority demonstrating why that was an error. *See id.* Defendant also appears to take issue with the Court's having defined the meaning of the criminal statute for the jury. *See id.* at \*13. But that is precisely the Court's role.

1

Finally, Defendant argues that the Court's addition of the "on or about" language in Jury Instruction 24 was error. *See id.* at *13–*15. The Court disagrees. That language is charged in the Indictment, *see* ECF No. 1, at *1, and was properly presented in the jury instructions. The same goes for Jury Instruction 27. That curative instruction was appropriate to make clear that the jury could not consider improper arguments made by Defendant in closing. *Cf.* Fed. R. Evid. 103(d). It was not an error to include that instruction.

In any event, a new trial "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (quotations omitted). Defendant's arguments relating to the jury instructions, while certainly well preserved, do not demonstrate a serious miscarriage of justice.

*       *       *

As for Defendant's renewed Motion to Dismiss the Case, the Court previously asked for supplemental briefing on that motion. *See* Order, ECF No. 137. In his supplemental brief, Defendant argues (as he did before and during trial) that his inability to compel certain members of the House of Representatives to testify violated his Fifth and Sixth Amendment rights. *See* Supp. to Mot. to Dismiss, ECF No. 141. The Court disagrees.

To succeed on this argument, Defendant "must show more than a mere absence of testimony. Rather, he must make some showing that the evidence lost would be both material and favorable to the defense." *United States v. Verrusio*, 762 F.3d 1, 23 (D.C. Cir. 2014) (quotations and citations omitted). And "[a] witness' testimony is material only if its absence actually prejudiced the defendant's ability to mount a defense." *Id.* (quotations omitted) (alteration accepted).

Defendant has not shown that the testimony from any member of the House of Representatives that he sought would be material. Most of what Defendant proffers are questions he would ask, not the accompanying testimony. Moreover, as Defendant acknowledges, many of those questions would seek testimony concerning issues that the Court has previously held were irrelevant. *See* Supp. to Mot. to Dismiss at 8–9, 11–12; *see also* Transcript of July 11, 2022, at 111:12–145:15. To be sure, Defendant has preserved his objections to the Court's prior decisions regarding both Defendant's reliance on advice of counsel (and the definition of "willfully") and claimed rules violations by the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol. But in light of those prior decisions, that Defendant was unable to produce testimony on these topics does not provide a basis for dismissal of the indictment. The same goes for Defendant's argument that he should have been allowed to ask Committee members why the Committee did not proceed with a civil proceeding or why they did not accommodate his request for a one-week extension of time, which do not go to any elements of the offense.

Defendant also contends that he would have sought to elicit testimony from Committee witnesses showing that he did not "ignore" the subpoena. *Id.* at 9. But beyond failing to demonstrate what that testimony would have been, he also does not adequately explain how such testimony would have been material on this question when, *inter alia*, the letters he exchanged with the Committee were admitted at trial;[1] a Committee employee did testify regarding those letters; and Defendant declined to present any evidence. *See id.*

---

[1] Indeed, Defendants appears to argue that he would have established that he would have made this showing in part through the letters that were admitted. *See* Supp.to Mot. to Dismiss at 9 ("Next, Mr. Bannon advised that a primary area of examination for the subpoenaed witnesses would have related directly to the theory of prosecution argued to the jury—that Mr. Bannon and

Defendant also argues that he would have sought to elicit testimony from Committee members about why they believed that Defendant's testimony would be pertinent or important to the Committee's inquiry. *See id.* at 9–11. But none of the actual questions Defendant proffers really goes to pertinency, nor any other element of the offense. Indeed, after stating that "[o]ther specific material areas of inquiry, directly relevant to the charges . . . would have focused on why the Committee believed [Defendant's] testimony to be pertinent or important," the supplemental brief identifies as possible questions, among others, "What did Chairman Thompson mean when he wrote, after his so-called deadline had passed, urging Mr. Bannon to 'change course and comply with the September 23rd subpoena?" and "What did that mean vis a vis . . . the mistake of fact defense concerning the malleability of the date for compliance?" *Id.* at 10. The Court fails to see how those questions would have elicited any evidence going to pertinency.

Defendant also argues that he would have "examine[d] the Committee members about their public statements that indicated that they did not actually want to get his testimony[.]" *Id.* at 11. But as the government contends, and as Defendant fails seriously to counter in his reply, a specific member's motive does not go to whether the Committee acted with a legislative purpose. *See Barenblatt v. United States*, 360 U.S. 109, 133 (1959). Further, and as the Court previously held at trial, a witness cannot be called for the sole purpose of impeachment. *See United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986).

_____

Mr. Costello 'ignored' the subpoena. They absolutely did nothing of the kind, addressing the subpoena *in letter after letter . . . .*" (emphasis added)).

In the end, Defendant offers little to demonstrate that the actual testimony he would elicit would have been material to the issues at trial.  That falls short of his burden.  *See United States v. Kaixiang Zhu*, 854 F.3d 247, 255–56 (4th Cir. 2017).[2]

Defendant also argues that his rights "to confrontation, to effective counsel, and to a fair trial" were also denied.  Supp. to Mot. to Dismiss at 4.  But these arguments are underdeveloped.  Defendant never explains the governing legal test for these theories, nor explains how the facts of his case apply given that governing framework.

Finally, Defendant briefly argues that he was denied essential documents from the Committee witness (Kristin Amerling) who did testify.  *See* Supp. to Mot. to Dismiss at 4.  But this theory is again underdeveloped.  Defendant appears to fault the prosecution for not turning over more of Amerling's emails and other records.  *See id.*  But the government is not responsible for turning over records not in its possession.

Accordingly, it is

**ORDERED** that Defendant's Renewed Motion to Dismiss, ECF No. 116, is **DENIED**.  It is further

**ORDERED** that the Defendant's Motion for a New Trial, ECF No. 142, is **DENIED**.

**IT IS SO ORDERED**.

DATE:  September 2, 2022

CARL J. NICHOLS
United States District Judge

---

[2] Defendant argues that the Committee's invocation of the Speech or Debate Clause means that the case must be dismissed, as it violates his Fifth and Sixth Amendment rights.  *See id.* at 13–15.  But as the government points out, it is not settled law that a court can or should balance those rights.  In any event, Defendant has failed to point to any material evidence he would have elicited if he had been permitted to call these witnesses.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                                  CR Action
                                  No. 1:21-670

       vs.                          Washington, DC
                                  October 21, 2022

STEPHEN K. BANNON,

                                  9:06 a.m.

         Defendant.

                TRANSCRIPT OF SENTENCING HEARING
             **BEFORE THE HONORABLE CARL J. NICHOLS**
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the U.S.:**         **J.P. COONEY**
                      U.S. ATTORNEYS OFC. FOR D.C.
                      555 4th Street NW
                      Washington, DC  20001
                      202-252-1793

**For the Defendant:**   **DAVID I. SCHOEN**
                      DAVID I. SCHOEN, ATTORNEY AT LAW
                      2800 Zelda Road, Suite 100-6
                      Montgomery, AL  36106
                      334-395-6611

                      **MATTHEW EVAN CORCORAN**
                      **RIANE WHITE**
                      SILVERMAN THOMPSON SLUTKIN WHITE
                      201 N. Charles Street, 25th Floor
                      Baltimore, MC  21201
                      410-385-2225

**Reported By:**       **LORRAINE T. HERMAN, RPR, CRC**
                      Official Court Reporter
                      U.S. District & Bankruptcy Courts
                      333 Constitution Avenue, NW
                      Room 6720
                      Washington, DC 20001

1                    **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  Good morning, Your Honor.  This is

3    criminal case year 2001-670, *United States of America versus*

4    *Stephen K. Bannon*.  Probation Officer is Renee

5    Moses-Gregory.

6          Counsel, please come forward and introduce

7    yourselves for the record beginning with the government.

8          **MR. COONEY:**  Good morning, Your Honor.  J.P.

9    Cooney on behalf of the United States.

10         **THE COURT:**  Mr. Cooney, good morning.

11         Mr. Schoen.

12         **MR. SCHOEN:**  Good morning, Your Honor.  David

13    Schoen for Mr. Bannon.  With me is Evan Corcoran, Riane

14    White.  Mr. Bannon is at the defense table, Your Honor.

15         **THE COURT:**  Good morning, everyone.

16         **MR. SCHOEN:**  Good morning.

17         **THE COURT:**  We are here, obviously, to sentence

18    the defendant, Mr. Bannon, on two counts of contempt of

19    Congress in violation of 2 U.S. Code Section 192.

20         Are both parties prepared to proceed?

21         **MR. COONEY:**  Yes, Your Honor.

22         **MR. SCHOEN:**  Yes, Your Honor.

23         **THE COURT:**  So I have read all of the materials,

24    which means I have read probation's presentence

25    investigation report and recommendation, the pretrial

1    services report and the sentencing memoranda and exhibits

2    submitted by the government and the defendant, including the

3    briefs and supporting materials that were submitted by both

4    parties yesterday evening without, I should note, seeking

5    leave of Court.

6         Before we begin, does anyone have anything to add

7    to those written materials, just anything written to add to

8    those written materials?

9         **MR. COONEY:**  No, Your Honor.

10        **MR. SCHOEN:**  No, Your Honor.

11        **BY THE COURT:**  Does the government object to my

12   considering Mr. Bannon's submission from last night?

13        **MR. COONEY:**  No, we do not.

14        **THE COURT:**  Does Mr. Bannon object to my

15   considering the government's submission from last night?

16        **MR. SCHOEN:**  No, Your Honor.

17        **THE COURT:**  Do we have any witnesses or victims

18   who will testify today?

19        **MR. COONEY:**  No, Your Honor.

20        **MR. SCHOEN:**  No, Your Honor.  There are no

21   victims, Your Honor.

22        **THE COURT:**  So here is a roadmap of how I intend

23   to proceed.  I'll first consider any objections to the

24   presentence investigation report and make my findings with

25   respect to it.

4

1          I will then go through the guidelines calculation.

2     Then I will hear from counsel for both parties and, at that

3     point, Mr. Bannon, if he wishes to address the Court.  As

4     always, the defendant need not address the Court.  It's

5     Mr. Bannon's option.  And then I'll likely take a quick

6     recess and return to pronounce the sentence.

7          The government has not raised any objections to

8     the final PSR; is that correct?

9          **MR. COONEY:**  That is correct.

10          **THE COURT:**  I recognize that Mr. Bannon has raised

11     certain objections to the PSR as reflected at Pages 27 to 30

12     of the PSR.  Most of those objections are arguments about

13     the appropriate guidelines calculation and some other legal

14     arguments.  But two of them, the objections that is, do

15     relate to the inclusion of certain information in the PSR.

16          Is that correct, Mr. Schoen?  Do I have that

17     right?

18          **MR. SCHOEN:**  Yes, Your Honor.  I think that is

19     correct.

20          **THE COURT:**  Does Mr. Bannon have any objections to

21     the PSR beyond those identified at Pages 27 to 30?

22          **MR. SCHOEN:**  I want to be clear on one of the

23     legal arguments in the objections.

24          There is an argument, legal argument, that both

25     there is no mandatory minimum sentence and -- sentence of

5

1    incarceration, and that it's not appropriate to sentence a

2    defendant to incarceration with a statute that has a

3    willfulness element, as the Court has construed it.  That

4    is, unless the defendant believes he or she has done

5    something wrong or unlawful.

6            The only one I'd like to discuss, if it's okay

7    with the Court today, would be the mandatory minimum.

8        **THE COURT:**  I'd be happy to hear from you on that.

9    What I'd like to do is just table that for one second

10   because I'm going to do the guidelines calculation, and it's

11   relevant to my guidelines calculation.

12           I think it's fair to say that all of the

13   objections, including those to the PSR, are preserved.  I

14   just wanted to note that a couple of them go to the factual

15   information that is included in the PSR and to distinguish

16   those from some of the legal arguments.

17       **MR. SCHOEN:**  I think, Your Honor, to that extent

18   they are set out in the objections.  The Court has them set

19   out in the addendum, and the Court can certainly rule on

20   what it has before it --

21       **THE COURT:**  Thank you.

22       **MR. SCHOEN:**  -- with respect to those factual --

23       **THE COURT:**  Yes.  Thank you, Mr. Schoen.

24           Mr. Bannon, have you had a chance to review the

25   presentence investigation report with your counsel?

**-4691-**

6

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  And have you had enough time to talk

3   with your counsel about the report and the memoranda that

4   have been filed in this matter?

5          **THE DEFENDANT:**  Yes, Your Honor.

6          **THE COURT:**  Are you completely satisfied with the

7   services of your counsel, here?

8          **THE DEFENDANT:**  Yes, Your Honor.

9          **THE COURT:**  Thank you.

10          As I've noted, Mr. Bannon has preserved all of his

11   objections to the PSR.  As it relates to the factual

12   information contained in the PSR and Mr. Bannon's objections

13   to the conclusion of that factual information, in my view,

14   those factual materials are properly included in the PSR.  I

15   therefore accept the factual findings contained in the PSR

16   regarding the circumstances of the offense, and I adopt

17   those facts for the purposes of imposing a sentence.

18          In addition, because there is no objection to my

19   consideration of the materials that were filed last night, I

20   also adopt the facts contained in the parties' submissions,

21   in particular, Mr. Bannon's submission from last night, as

22   well as the facts in the record from the trial.  Now, that's

23   step one.

24          Step two, as I indicated before, is I of course

25   have to calculate the appropriate guidelines range.  As

1    everyone knows, under the Supreme Court's decision in *United*
2    *States versus Booker*, the guidelines are not mandatory.
3    They are merely advisory.  But I nevertheless must calculate
4    them correctly and consider them.

5        There are a couple of points of disagreement
6    between the parties, the first of which is about the
7    applicable guideline provision.  The government and the
8    probation office argue that the Court should apply
9    Guidelines Section 2X5.2, while the defendant argues that
10    the Court should apply Guideline Section 2J1.5.

11        With respect to the contempt of Congress statute,
12    2 U.S. Code Section 192, the statutory index of the
13    Sentencing Guidelines references two guidelines provisions,
14    Section 2J1.1 and Section 2J1.5.  Section 2J1.1, entitled
15    Contempt, instructs the Court to apply Section 2X5.1, the
16    catch-all provision for other felony offenses.

17        Application note for Section 2X5.1 explains that,
18    for Class A misdemeanors, such as contempt of Congress, the
19    Court shall apply Section 2X5.2.  If this Court were to
20    apply Section 2X5.2 to Mr. Bannon's conduct, the base
21    offense level would be 6.

22        Section 2J1.5, on the other hand, which is
23    entitled Failure to Appear by a Material Witness, instructs
24    this Court to apply the base offense level of 6 if the
25    failure to appear was in respect to a felony prosecution,

1    and a base offense level of 4 if the failure was with

2    respect to a misdemeanor prosecution.

3            I agree with the government that the best

4    guideline provision to apply here is 2X5.2.  Mr. Bannon's

5    conduct was more analogous to contempt of Court than simply

6    failing to appear as a witness.  In my view, Mr. Bannon's

7    base offense level is therefore 6.

8            But even if I were to apply Section 2J1.5, as

9    Mr. Bannon proposes, Mr. Bannon's base offense level, in my

10   view, would still be 6.  His failure to appear before the

11   House Select Committee about the events of January 6 was

12   not, in my view, analogous to a failure to appear in respect

13   to a misdemeanor prosecution, but was more analogous to a

14   failure to appear in respect to a felony prosecution.  So

15   the base offense level, in my view here, is 6.

16           We then have to look to Section 3D1.2 of the

17   Sentencing Guidelines to see how the offenses group.

18   Section 3D1.2 instructs that "All counts involving

19   substantially the same harm shall be grouped together into a

20   single group."

21           So I have to determine whether Mr. Bannon's

22   conviction arising from the failure to produce documents and

23   his conviction arising from the failure to testify, the two

24   counts at issue here, involved "substantially the same

25   harm."  Section 3D1.2 provides four reasons why counts may

1     involve substantially the same harm.

2              In my view Section 3D1.2(b) applies here.  Counts

3     1 and 2 involved the same victim, so to speak, Congress.

4     And the two acts, refusal to produce documents and refusal

5     to testify, were connected by a common objective.

6     Therefore, the two counts would be grouped together.

7              Then we turn to Sections 3D1.3 and 3D1.4 to

8     calculate the combined offense level.  Because the two

9     counts are grouped together and the same guidelines applies

10    to each, Mr. Bannon's offense level remains 6.

11             Finally, at least as to this point, we turn to

12    Section 3E1.1, Acceptance of Responsibility.  Mr. Bannon

13    argues that his offense level should be reduced by two

14    levels for acceptance of responsibility.

15             He argues that he is not precluded from an

16    acceptance of responsibility decrease merely because he

17    exercised his constitutional right to trial and the

18    defendants who go to trial may still receive this reduction

19    when they do not contest their factual guilt.  Mr. Bannon

20    argues that, because his challenges to the government's case

21    were legally and constitutionally based rather than

22    factually based, he is not precluded from receiving this

23    reduction.

24             The government responds that Mr. Bannon has not

25    clearly demonstrated his acceptance of responsibility as

1    required by guideline section 3E1.1(a).  The government

2    argues that Mr. Bannon's "claim for acceptance of

3    responsibility is contradicted by a sustained bad faith," as

4    Mr. Bannon still to this day, as the government has put it,

5    has not produced a single document or attempted to appear

6    for a deposition with the Select Committee.  The government

7    further argues that Mr. Bannon has not expressed remorse and

8    has attacked the Select Committee at every turn.

9         On this point, I agree with the government.

10   Although Mr. Bannon did challenge the government's case at

11   trial on primarily legal and constitutional grounds, as he

12   is, of course, permitted to do, he did seek to present

13   arguments that would have contested his factual guilt.

14   Obviously, some of those arguments were precluded by my

15   pretrial rulings.

16        But, moreover, he has expressed no remorse for his

17   actions, and he has yet to demonstrate that he has any

18   intention of complying with the subpoenas.  Therefore,

19   Mr. Bannon will not receive a reduction for acceptance of

20   responsibility and his offense level remains at 6.

21        Mr. Bannon has zero criminal history points and,

22   therefore, falls within Criminal History Category I; that's

23   undisputed.  Mr. Bannon's guideline sentence range would

24   therefore be 0 to 6 months.  But the government argues and

25   probation agrees that there is a one-month mandatory

1    minimum.

2              Mr. Schoen, this is where I'd like to hear your

3    argument on that question.

4              **MR. SCHOEN:**  Yes, Your Honor.

5              I'm sure that detailed guideline calculation is

6    exactly why Your Honor decided to become a judge.

7              **THE COURT:**  That and other things.

8              **MR. SCHOEN:**  Yes, Your Honor.

9              Your Honor, I think the main point I'd like to

10   make -- we addressed it in the papers briefly.  There's not

11   a lot of law on it one way or the other.  But the main point

12   I think I'd like to make is that, in arguing against --

13   sorry.

14             In arguing in favor of a mandatory minimum

15   sentence of incarceration, the government, again today,

16   appears to apply what I call the Bannon Rule.  That is, the

17   government changes its position in this case only for

18   Mr. Bannon from every other case I'm aware of in which the

19   government has addressed this issue.

20             There may be cases I'm not aware of, but I

21   certainly am aware of several in which the government took

22   the exact opposite position.  And the government ought to be

23   estopped from taking any other position in this case and

24   certainly advocating the position here.  But the government

25   doesn't just take the position it takes here.  It does it

1    stridently.

2    The government can't imagine in their papers how
3    anyone could read the language any differently than
4    requiring a mandatory minimum sentence of incarceration.

5    So I would direct the Court's attention, as a
6    preliminary matter -- I say preliminary.  This won't go on
7    very long.  First of all, to the case of *Block* that we cite
8    in the papers*.  Block*, as the Court is aware, is a decision
9    by United States Magistrate Judge Robinson in this district.
10   And Judge Robinson concluded at the end that there is a
11   mandatory minimum.

12   But she noted things in that report and
13   recommendation or order.  Eventually, by the way, what
14   happened in that case was they went before -- an appeal was
15   made to Judge Robinson's decision that went before Judge
16   Lamberth, and Judge Lamberth allowed the defendant to
17   withdraw his plea based on this issue, based on his
18   understanding of this issue.

19   And he noted in his decision, Judge Lamberth that
20   is, that in that case alone the parties filed at least four
21   memoranda apprising the Court of their views, all of their
22   views, that there is no mandatory minimum sentence in this
23   case.

24   So, for example, the one argument the government
25   made in that case, in *Block*, was that the term punishable in

1    the statute does not mean shall be punished as it's used in

2    other statutes.  Specifically, they referred to -- they

3    contrasted it with 18 U.S.C. 924.  And in 192, as the

4    government pointed out, this same Department of Justice --

5    192 does not say a Court shall not place on probation any

6    party convicted of a violation of the statute.  It just

7    means capable of being or able to be punished.

8         They cited to Black's Law Dictionary.  They cited

9    to a case, *United States versus Hunter*.  And I'm now

10   referring to Document 23, the government's submission in the

11   *Block* case in this same district in 2011.  I think their

12   submission was made 2010, but the decision came down 2011.

13        The government argued that "shall" wasn't related

14   in that case to "for not less than one month," because

15   they're separated by clauses.  Shall appears to modify,

16   according to the government, the "be deemed guilty of a

17   misdemeanor" clause rather than the "for not less than one

18   month" clause, since the words are separated by many words

19   and a comma, the government argued.

20        As to the impact of the table of statutory

21   provisions regarding mandatory minimum terms of

22   imprisonment, the government argued that the sentencing

23   commission's interpretation of a particular statute is not

24   controlling authority, and the Court should ignore that.

25   And they cited to a D.C. Circuit case, *United States versus*

1    *Price*, a 1993 case.  That was the government's argument in

2    *Block*.

3         **THE COURT:**  But the government is not estopped.

4    What's your best argument for why there's no mandatory

5    minimum here?

6         **MR. SCHOEN:**  The government's arguments, the

7    arguments that I'm making.  The arguments that the

8    government --

9         **THE COURT:**  What if I think those are not

10   compelling?  Tell me how the estoppel --

11        **MR. SCHOEN:**  Then Your Honor is going to rule

12   against me.

13        **THE COURT:**  So isn't the statute pretty clear?  It

14   says -- I understand the point about "shall be deemed

15   guilty" being separable, but don't the words imprisonment --

16   "and imprisonment in a common jail for not less than 1 month

17   nor more than 12 months," they have to mean something.  Why

18   is that not a mandatory minimum and a mandatory maximum?

19        **MR. SCHOEN:**  We're removing "punishable."  And

20   "punishable" versus "shall be punished," we don't see as

21   mandatory language.  And, as the government said, there is

22   no provision in this statute as there are in other statutes

23   that probation cannot be part of the sentence in this case.

24             That's part of the argument.  But, Judge, you

25   know, we go back many other cases.  I mean, the judge argued

1          in *Tejada*, all four parties, the judge, probation, the

2          government, the defendant, argued in *Tejada* that there is no

3          mandatory minimum sentence.

4                    **THE COURT:**  But I have an independent --

5                    **MR. SCHOEN:**  Of course.

6                    **THE COURT:**  Those are not binding decisions, like

7          the D.C. Circuit.  I have an independent obligation to

8          review the statute to make a correct guidelines calculation.

9                    And I'm trying to understand what the best

10         argument is, from a statutory interpretation perspective,

11         about why this isn't a mandatory minimum.  Is it a mandatory

12         maximum in your view?  Could I sentence Mr. Bannon for more

13         than 12 months?

14                   **MR. SCHOEN:**  No, Your Honor, you could not.

15                   **THE COURT:**  Why not?

16                   **MR. SCHOEN:**  It's a different --

17                   **THE COURT:**  Don't they stand or fall together?

18                   **MR. SCHOEN:**  No, Your Honor, they don't.  Because

19         on the threshold, the question is, what's the Court's

20         authority, first of all, to impose punishment.  Secondly,

21         the statute certainly can set a cap on what that can be.

22                   The question here is, is the -- first of all, is

23         Congress's silence on the no-probation factor relevant?

24         There's no analogue to that on the cap and on the maximum

25         end of it.  And the question here is, again, whether the

1    Court can affirmatively give -- the Court affirmatively has

2    to give some sentence of incarceration.  I think that that's

3    conceptually different from than on the cap.

4            Now, I'll say this:  Judge Lamberth noted in his

5    opinion that there was some basis at least for the defendant

6    to have had inquiry notice, let's say, that there could be a

7    mandatory maximum.  He said he thinks this is a case of

8    lawyering falling short.

9            However, as I say, he allowed the defendant to

10   withdraw his plea.  It was a function of two things.  One,

11   Judge Robinson's failure to advise the defendant that there

12   was a mandatory maximum.  And secondly --

13           **THE COURT:**  Minimum.

14           **MR. SCHOEN:**  That was a plea case, mandatory

15   minimum.  Sorry, Your Honor.

16           And secondly, because the Court believed the

17   defendant's understanding of the case, based on all of the

18   precedent.

19           I will say that there are cases they cite in *Block*

20   and elsewhere in which the D.C. Circuit has at least

21   recognized that conviction -- and conviction is, under this

22   statute, a suspended sentence has been given.  I don't say

23   the Court, as a matter of legal authority, put his

24   imprimatur on it.

25           I do say that there are at least two cases in

1    which the Circuit here recognized that in -- that the

2    District Court had imposed suspended sentences.  And those

3    would be, for example, *D.C. Bar versus Kleindienst*,

4    K-l-e-i-n-d-i-e-n-s-t.  I'm old enough to remember who

5    *Kleindienst* was.  And that's 345 Atlantic 2d 146, 149, note

6    5, D.C. Circuit 1975, a case from the Ninth Circuit, if the

7    Court's interested.

8            And then there's a case -- *Elliot Abrams*' case,

9    which is at 662 Atlantic 2d 867, 870, D.C. Circuit 1995.

10   And of course the case we cite in the brief also is the

11   *Watkins* case in which the defendant was convicted of seven

12   counts of violation of Section 192 and received a suspended

13   sentence.

14           Anyway, Judge, those are the arguments.  The

15   arguments that the government made and joined by the

16   defendant, and some of the cases joined by the judge and

17   joined by probation, are the arguments that I have to make

18   about why there is no mandatory minimum.

19           I think, you know, the question is, I'd like a

20   ruling on it, square ruling on it anyway.  If the Court

21   finds the language is clear and that there is a mandatory

22   minimum, I would just like to have that ruling.

23           **THE COURT:**  Of course.  Mr. Schoen, thank you.

24           **MR. SCHOEN:**  Thank you.

25           **THE COURT:**  Would the government like to respond?

1          **MR. COONEY:**  Just briefly, Your Honor, three

2     points.  First, the government is not estopped.  Second --

3          **THE COURT:**  Why not?

4          **MR. COONEY:**  Because this -- well, for two

5     important reasons.  The most important being is that there

6     is an intervening event, which is the *Block* decision.  *Block*

7     is law.  It's in the District Court of the District of

8     Columbia.  You are not bound by it because it is a

9     Magistrate Judge's decision and a District Court decision,

10    not a Circuit decision but we now have law.

11         And, second, candidly, Your Honor, we get it wrong

12    sometimes.  And the government had it wrong in 2010, which

13    brings me to my third point.  Magistrate Judge Robinson got

14    it right in *Block*.  There is no other way to read this

15    statute on its plain terms.

16         If the Court were to interpret it the way the

17    government urged in 2010 or the way the defense urges today,

18    then the 30-day to 1-year range in the statute would be

19    merely a suggestion, and the Court could sentence the

20    defendant to any term of imprisonment it deemed appropriate.

21    That cannot possibly be the law or what Congress intended

22    when it said "punishable by a term of 1 month and no more

23    than 12 months."

24         **THE COURT:**  Thank you, counsel.

25         So on this question, I hold that 2 U.S. Code

1   Section 192 imposes a mandatory minimum sentence of

2   incarceration of 1 month, but also has a mandatory maximum

3   sentence of incarceration of 12 months.

4          The plain language of the statute, in my view, is

5   clear.  The defendant convicted under the statute "shall be

6   deemed guilty of a misdemeanor punishable by imprisonment

7   for not less than one month."  That's the minimum.

8   Obviously, there's language about the mandatory maximum.

9          I believe the statute is clear on that point and

10  the government is not estopped for the reasons given by

11  counsel.  To include, those are just litigating positions.

12  There was an intervening decision.

13         More important, I have an independent duty to

14  decide what the sentencing range is here, whether it's the

15  guidelines range or the statutory provisions regardless of

16  what the government has argued in the past.

17         In my view, the statute sets out a mandatory

18  minimum of 1 month and a mandatory maximum of 12 months.

19  Going back to the guidelines range, what that means here is

20  that, whereas normally the guidelines range would have been

21  0 to 6 months, the guidelines range is actually 1 to 6

22  months.  The guidelines range is 1 to 6 months incarceration

23  with a mandatory minimum of 1 month.

24         I would just note that, even if Mr. Bannon were

25  correct that guidelines section -- and I indicated this

1    before -- 2J1.5 is applicable and his failure to appear is

2    analogous to a failure to appear with respect to a

3    misdemeanor prosecution, his base offense level would be 4

4    and the correct guidelines range would still be 1 to 6

5    months.

6            Likewise, even if Mr. Bannon were granted the

7    two-level reduction for acceptance of responsibility, his

8    base offense level would be 4 and the guideline range would

9    still be 1 to 6 months.

10           And even if Mr. Bannon were right as to both the

11   applicable guideline and the acceptance of responsibility

12   reduction, his base offense level would be 2 and the

13   guideline range would still be 1 to 6 months.  So that's the

14   period of incarceration.

15           **MR. SCHOEN:**  Your Honor?

16           **THE COURT:**  Mr. Schoen?

17           **MR. SCHOEN:**  Just so the record is clear.  The

18   argument -- the other argument we made that we should not be

19   imposing a sentence of incarceration on a person who

20   doesn't -- the statute doesn't require even believes that

21   his conduct was unlawful, et cetera, is somewhat associated

22   with or related to the idea of no mandatory minimum.

23           Again, I think we've made that argument.

24           **THE COURT:**  You have made that argument.  You've

25   preserved it.  I reject it.  It's preserved for purposes of

1    appeal.

2            **MR. SCHOEN:**  I do have two other commentators I'd

3    like to bring to the Court's attention, because I do think

4    this is a fundamental principle, at least as a matter of

5    legal philosophy, that there has to be some belief or

6    understanding that, once conduct was unlawful or criminal,

7    in order for a sentence of incarceration or criminal

8    liability even to be imposed, I would cite the Court to the

9    great philosopher, H.L.A. Hart, who wrote, "Those who lack

10   fault shall not be liable to criminal punishment."

11           And frankly, Blackstone, in his commentaries

12   that -- two William Blackstone Commentaries, *20-22, said,

13   "To constitute a crime against human laws, there must be

14   first a will, a vicious will and, secondly, an unlawful act

15   consequent upon such victim's will."

16           So I think it is a fundamental settled principle

17   of criminal law.  Again, we go back to, in a sense, the

18   definition of willful that we've talked about before.  I

19   understand the Court's position.

20           But I do think it's a fundamental tenet of

21   American criminal law, at least, that for criminal

22   liability, there has to be some showing of a belief or

23   understanding that one's conduct was criminal or wrongful

24   or --

25           **THE COURT:**  The problem is that runs square into

1    what the D.C. Circuit has said the mens rea is under the

2    statute, and the D.C. Circuit has blessed at least certain

3    sentences of incarceration under the statute in light of

4    that very same mens rea.

5         **MR. SCHOEN:**  Well, the Court just hit on my second

6    point and that is criminal liability but, even more so,

7    incarceration.

8         **THE COURT:**  I understand.

9         **MR. SCHOEN:**  We don't put people in prison in this

10   country, my view and the view of many others, unless we find

11   that they believe they did something wrong.

12        **THE COURT:**  Understood.

13        **MR. SCHOEN:**  Thank you, Your Honor.

14        **THE COURT:**  The argument is preserved.  I do not

15   believe and I find and hold that that is not a reason to

16   ignore the mandatory minimum here.  That is as to

17   incarceration.

18            As to the fine, at least as I read the papers,

19   both the government and probation appear to take the

20   position that the relevant fine range is between $100 and

21   $100,000.  Mr. Bannon has not objected to that position.

22            But Guideline Section 5E1.2 addresses fines for

23   individual defendants, and Section 5E1.2(c) contains a table

24   with fine ranges based on the offense level.  Under that

25   table for offense level 6, which is the offense level that I

1    determine applies here, the minimum fine, guidelines range

2    fine is $1,000 and the maximum fine is $9,500 under the

3    guidelines range.

4         Does the government agree that that is the

5    applicable guidelines fine range?

6         **MR. COONEY:**  You're right, Your Honor.  We were

7    inartful in our sentencing memorandum.  The guidelines range

8    is exactly what you articulated, $1,000 to $9500.  The range

9    would be 1,000 to 100,000 under the statute.

10        **THE COURT:**  The statutory range?

11        **MR. COONEY:**  Correct.  Correct.

12        **THE COURT:**  So in advocating -- just to be clear

13   then, and I'll hear from you on the appropriate, the reasons

14   for it --

15        **MR. COONEY:**  Yes.

16        **THE COURT:**  -- but the government is advocating

17   for an in-guidelines period of incarceration at the top end

18   but a variance on the fine?

19        **MR. COONEY:**  Exactly correct.

20        **THE COURT:**  Okay.  Thank you.

21        So I conclude that the range I've just

22   articulated, $1,000 to $9500, is the guidelines range for

23   the fine here notwithstanding the parties -- well, in light

24   of the government's concession and notwithstanding the fact

25   that, as far as I can tell, Mr. Bannon didn't object to the

24

1    probation to the PSR, which seems to suggest that the range

2    is $100 to $100,000.

3            Finally, do the parties agree that the applicable

4    mandatory special assessment in this case is $50 because

5    there are two misdemeanors?  I know it's a small point.

6            **MR. COONEY:**  Yes, Your Honor.

7            **THE COURT:**  Mr. Schoen?  This appears to be a yes.

8            So obviously, Mr. Bannon objects to my guidelines

9    calculation for the various reasons that we've already

10   discussed, objects as articulated by Mr. Schoen today and as

11   reflected in his objections to the presentence report.

12           But for purposes, just to be very clear for the

13   record, I hold that the guidelines range is 1 to 6 months on

14   each of the two counts, for which Mr. Bannon was convicted,

15   and that the fine range is $1,000 to $9500 under the

16   guidelines.  That's my guidelines calculation, and of course

17   the $50 mandatory special assessment.

18           At this time, I'd like to hear from the parties

19   about what they believe an appropriate sentence would be.

20   Obviously, I must consider the guidelines but also the other

21   Section 3553(a) factors.  Let me just say this at the

22   outset.  I hope the parties recognize that I understand this

23   case, sat through a trial, made a number of pretrial

24   rulings.

25           I recognize that the trial did not address all of

1    the evidence and facts because of my pretrial rulings.  But

2    I've reviewed the record again, including the record at

3    sentencing.  You don't need to repeat everything that you

4    have already argued.

5              I'd like to hear from you about the most salient

6    points as to why you think, for example, from the

7    government, you believe that a 6-month period of

8    incarceration and $200,000 worth of fines is appropriate.

9         **MR. COONEY:**  I'm going to start backwards, since

10    Your Honor just dealt with the fines.

11        **THE COURT:**  Yes.

12        **MR. COONEY:**  We recommend a $200,000 fine because

13    that is exactly what the defendant has asked for.  The

14    defendant rejected the -- or refused to cooperate with the

15    financial investigation of probation with respect to the

16    PSR.

17             The same financial investigation that is conducted

18    in every case of every defendant convicted of federal

19    crimes, be they misdemeanors or felonies, be they violent

20    crimes or financial crimes --

21        **THE COURT:**  This is that investigation to figure

22    out whether the defendant has an ability to pay an

23    appropriate fine.

24        **MR. COONEY:**  It is.

25        **THE COURT:**  And doesn't the appropriate fine

1    really have to be tied to the offense?

2         **MR. COONEY:**  Yes.

3         **THE COURT:**  Okay.  So let's assume Mr. Bannon,

4    notwithstanding the fact that he provided no information,

5    has an ability to pay any fine.  How is a $200,000 fine

6    warranted here in light of the guidelines range?

7         **MR. COONEY:**  Because it amplifies his contempt for

8    the criminal justice system, his contempt for the law, his

9    contempt for Congress.  It is consistent with his conduct

10   throughout this case, and it is an appropriate punishment

11   under the circumstances.  He has invited that.  He has

12   requested that, and the Court should take him up on it.

13        **THE COURT:**  Mr. Bannon didn't say, to be very

14   clear -- this is what he said in the PSR:  "I am willing and

15   able to pay in full any fine levied against me."  He didn't

16   concede that a $200,000 fine was appropriate.

17        **MR. COONEY:**  I read that as an invitation for the

18   Court to impose the maximum fine, particularly for the

19   reasons that I stated, that this conduct, that his decision

20   to not cooperate with the financial investigation, simply

21   amplifies his contemptuous conduct.

22        **THE COURT:**  Do you believe that there is -- if

23   putting that aside, putting aside Mr. Bannon's interactions

24   with the probation office, that an above-guidelines fine

25   would be warranted if that had not happened?

1          **MR. COONEY:**  Had that not occurred?

2          **THE COURT:**  In other words, if Mr. Bannon had

3     provided the financial information to the probation office,

4     and it said he can pay any fine -- I don't know what it

5     would say, but except to pay any fine -- the government

6     believe -- I don't see any argument from the government that

7     an above-guidelines fine would be otherwise appropriate

8     here.

9          **MR. COONEY:**  I think that an above-guidelines fine

10    would otherwise be appropriate insofar as the Court could

11    impose that and that would not be an unreasonable sentence

12    given the fact that Mr. Bannon could not have committed a

13    more malicious contempt.

14         He could not have been in more contempt of

15    Congress.  In that respect, I believe it would be perfectly

16    appropriate to sentence him to the maximum term of

17    imprisonment and the maximum fine --

18         **THE COURT:**  So let's turn to the --

19         **MR. COONEY:**  But --

20         **THE COURT:**  Yes, understood.  Okay, so let's go to

21    that because then that becomes the same argument about

22    incarceration.

23         **MR. COONEY:**  Yes.

24         So, Your Honor, we told the Court -- or we told

25    the jury during closing arguments that this case was neither

1    uncomplicated -- or that it was not complicated but that it

2    was important.  And the importance of this case has

3    everything to do with the defendant's obligations as a

4    citizen of the United States.

5              Your Honor, today and every day over at the U.S.

6    Attorney's Office there are citizens checking in at the

7    kiosk to appear for testimony before the grand jury under a

8    subpoena that obligates them to do so.

9              Every day citizens walk in and out pursuant to

10   subpoenas just like the ones the defendant received.  Those

11   citizens put themselves in harm's way to cooperate and to

12   fulfill those obligations.

13             Many of those citizens are objects of ridicule,

14   subjected to threats, subjected to potential harm.  Many of

15   them have to be relocated from their homes to comply with

16   those subpoenas.

17             This man, the defendant, a man of means, a public

18   figure, suffered no such threats, no such potential harm.

19   He chose, hiding behind a fabricated claim of executive

20   privilege and advice of counsel, to thumb his nose at

21   Congress.

22             Your Honor, the defendant is not above the law.

23   And that is exactly what makes this case important.  It must

24   be made clear to the public, to the citizens, like the ones

25   who appear before the grand jury over at the U.S. Attorney's

1    Office every day, that no one is above the law.  When they

2    are served with a valid subpoena, that they are expected to

3    adhere to it and to fulfill their obligations.

4        **THE COURT:**  Do you agree that, if Mr. Bannon had a

5    legitimate claim of executive privilege or if there had been

6    a legitimate claim of privilege, from the government's

7    perspective, that his conduct would have been appropriate?

8        **MR. COONEY:**  No.

9        **THE COURT:**  Why not?

10       **MR. COONEY:**  That is what makes this so egregious.

11   If he had a valid claim of executive privilege -- and I

12   should say, if we are talking about testimonial immunity,

13   that privilege, that might be one thing.

14       But we're not under even the defendant's view of

15   executive privilege.  If the defendant intended to

16   faithfully invoke executive privilege to faithfully rely on

17   his advice of counsel with respect to that, he would have

18   shown up.

19       This defendant never lifted a finger to try and

20   find a responsive document, did not try to submit a

21   privilege log, did not even appear before the Select

22   Committee to hear its questions and to invoke executive

23   privilege as the subpoena commanded him to do.

24       **THE COURT:**  Do you know why the Committee didn't

25   seek to enforce its subpoena against Mr. Bannon in court as

1    committees often do through civil action?

2              **MR. COONEY:**  I do not.

3              **THE COURT:**  Is that relevant here?

4              **MR. COONEY:**  No.

5              **THE COURT:**  Why not?  I mean, it seems to me that,

6    at least in certain circumstances, a committee seeks

7    judicial resolution of someone's obligation to appear

8    through the filing of an affirmative lawsuit, which has been

9    permitted perhaps misguidedly by courts, that allow

10   congressional committees to litigate in court, but they

11   didn't choose that here.

12             So why -- the fact that there was at least one

13   tool in the Committee's arsenal that it didn't invoke, why

14   isn't that at least somewhat relevant?

15             **MR. COONEY:**  Because a contempt of Congress

16   statute is a penal statute.  It is intended to punish the

17   conduct.  It is not an enforcement statute which is

18   separate.

19             But in this particular case on these facts, the

20   defendant maintained his recalcitrance despite being warned

21   in writing on multiple occasions of the consequences of

22   continuing his contempt and being provided the opportunity

23   to explain himself.

24             He did none of those things.  We might be in a

25   different circumstance had the defendant fulfilled his

1    minimal obligation, and that is to show up, but he failed to

2    even do that.

3         **THE COURT:**  But what about his argument that

4    they're sort of related points.  One is, unlike some

5    defendants, perhaps he was represented by counsel.  He

6    retained counsel.  Counsel was engaged with the Committee.

7         He didn't -- I mean, to some extent, I'm not

8    putting these words in Mr. Bannon's mouth.  I'm just -- one

9    could argue he engaged with the Committee.  He did not

10   ignore the Committee altogether, and he was being provided

11   advice by counsel, as reflected in declarations, including

12   the declaration that was submitted last night.

13        All of those things show that he is less culpable

14   at least than others who would be potentially in contempt of

15   Congress, including people, for example, who might not have

16   ever engaged with the Committee or people who lied or

17   provided false information or testimony.

18        So why don't those facts cut in Mr. Bannon's

19   favor?

20        **MR. COONEY:**  I disagree, because the factual

21   record in this case illustrates or demonstrates that the

22   defendant's claim of executive privilege was merely a smoke

23   screen, that it was a cloak intended to cover an intent not

24   to comply, not to cooperate and not to reveal information.

25        If it were any different, Your Honor, then once

1    his purported claim of executive privilege, what he claims

2    tied his hands, was relieved last summer, he would have

3    appeared and testified before the Select Committee.

4         Instead, he reached out to the Select Committee

5    with the hyperbolic letter provided to him by the former

6    President.  And he said, I will come, but I will come on my

7    terms, on my conditions.  He had no interests in genuine

8    compliance or adherence to his obligations.

9         He had an interest in making a public spectacle of

10    the Committee's hearings.  And that is consistent with all

11    of the public statements that the government outlined in our

12    sentencing memorandum and that are contained, I believe, in

13    the presentence report as well.

14         Throughout this entire case, the defendant has

15    tried to make it about nothing other than politics and

16    retribution.  He has tried to point the finger at other

17    individuals, other institutions, at the United States

18    Congress, to try and excuse his own conduct.

19         Throughout, he has acted as if he is above the

20    law.  He is not.  And as I said, it is critical that this

21    defendant and that the citizens of this country be sent a

22    message that no person, regardless of their means,

23    regardless of their station, regardless of the influence of

24    their friends or their patrons, is above the law.

25         Throughout the case and today, all the government

1    has asked and all we are asking here at sentencing is that

2    this man, Stephen Bannon, be treated like every other

3    citizen, that he be held accountable for his crimes and that

4    he be sentenced like any other citizen.

5            And despite the fact that, as I said before, I can

6    think of no more egregious contempt than the one that he has

7    engaged in.  Because we asked him to be treated like every

8    citizen, we are asking for what we asked for in the vast

9    majority of cases a guideline sentence at the top end of the

10   range.

11           **THE COURT:**  One question before you sit down.

12   It's about the sentence that I impose.  There's also the

13   question of, as Mr. Bannon has asked, whether I allow him to

14   be released pending an appeal, assuming there is one.

15           Government opposes that.  And it seems to me the

16   government's argument is basically his appeal would not

17   present substantial questions that are likely to succeed.

18           **MR. COONEY:**  Correct.

19           **THE COURT:**  Right?  Do I have that right?

20           **MR. COONEY:**  Correct.

21           **THE COURT:**  Because *Licavoli* is binding, you,

22   Judge Nichols, got it right.  He's not going to get that

23   overturned, and even if he does, he will not win.  All fair?

24           **MR. COONEY:**  All fair.

25           **THE COURT:**  Okay.  Thank you, Counsel.

1              **MR. COONEY:**  Thank you.

2              **THE COURT:**  Mr. Schoen or Mr. Corcoran?

3              **MR. CORCORAN:**  Your Honor, I know we usually don't

4      split allocution.  I'm just going to speak to the fine

5      because I was dealing with probation on that.  And then

6      Mr. Schoen will address the other issues.

7              It's really on my shoulders but -- excuse me -- it

8      should not be viewed as anything that would affect

9      Mr. Bannon's sentence.  I won't put the probation writer's

10     name in the record, but she is a very fine person and you

11     could see, by reading the report, very thorough.

12             Not only going into Mr. Bannon's history but also,

13     when we got to the financial end of things, I said that my

14     understanding was that that part of the report is not to get

15     an idea of a person's wealth in terms of sentencing but to

16     see, in terms of if a fine is possibly going to be imposed,

17     does the defendant have the capacity to pay and does it have

18     to be on a schedule or something like that.

19             And I had essentially suggested, if he stipulates

20     that he can pay the maximum sentence that's imposed, will

21     that satisfy the probation department, and her answer was,

22     yes.  That's it.

23             **THE COURT:**  My understanding from probation is

24     that they were actually -- happy is probably the wrong way

25     to put it, but -- perfectly willing to accept that

1    representation because it meant that they didn't have to do

2    the work of digging through and writing up Mr. Bannon's

3    financial information.  So it was essentially a time-saver.

4        **MR. CORCORAN:**  Absolutely, Your Honor.

5        **THE COURT:**  And what I heard from probation was

6    that, in no way, did that interaction reflect a

7    inappropriate attempt by Mr. Bannon to keep information from

8    probation but it was essentially a time-saver.

9        **MR. CORCORAN:**  Absolutely.  Thank you, Your Honor.

10       **THE COURT:**  Thank you.  Mr. Schoen.

11       **MR. SCHOEN:**  Your Honor, the temptation is to

12   respond directly to what Mr. Cooney just said.  But I'm

13   going to try to avoid that temptation for now, and then I'll

14   respond to it at the end.

15       I will say at the beginning that I hope that no

16   American buys into just about anything that Mr. Cooney just

17   said, except that Mr. Bannon ought to be treated like any

18   other citizen.

19       Mr. Bannon ought to be treated like any other

20   citizen who gets a subpoena, any other lay citizen who gets

21   a subpoena from Congress and who hires a lawyer, any other

22   citizen who relies on that experienced lawyer's advice, any

23   other citizen for whom executive privilege is invoked.

24       And the idea now -- well, I'll get into this more

25   in a moment.  But the idea now that the government argues,

1    well, this is a smoke screen. It was never actually

2    invoked. They argued to the jury, as they did today, his

3    reason for not complying was that he was above the law.

4    After spending almost a year arguing that he must

5    be prohibited from telling the jury why he didn't comply,

6    from putting forward any reason as to why he didn't comply

7    because no reason matters, but then the jury is told his

8    reason was he was above the law, he thought he was above the

9    law, and today you should sentence him because he thought he

10   was above the law, the record in this case doesn't show that

11   at all. It shows just the opposite.

12   Let me take it from here, Your Honor. The

13   probation recommendation in this case, Your Honor, as the

14   Court is aware, is for a sentence of 30 days and a fine

15   that's above the guidelines.

16   As Your Honor knows, we believe that there should

17   be no sentence of incarceration. Any sentence of

18   incarceration should be suspended and it wouldn't be

19   appropriate to impose a sentence of incarceration in this

20   case.

21   Otherwise, the probation recommendation, after a

22   full investigation by experienced people, signed off by a

23   supervisor in the probation office, is a reasonable

24   recommendation absent the fine.

25   The fine is extraordinary and should not be

1    applied like that, and there shouldn't be any jail sentence.

2    And frankly, I don't waive any other objection we've made.

3    But it's certainly closer to where we should be than the

4    government's position is.

5            Let me say this, Judge, as an overview.  What I

6    propose to do is focus on the 3553(a) factors and how I

7    think that relates to the facts of this case mindful of the

8    Court's admonition to not rehash all of the facts.  I will

9    go into those facts that I think are relevant to 3553(a)

10    factors with this caveat in the beginning.  I've made the

11    point before.

12            It is our view that it is especially inappropriate

13    for this case to have been brought as a criminal case but,

14    more importantly, for the present circumstances, for any

15    punitive sentence to be imposed.  You know, the Court said

16    earlier that one of the factors guiding it was that there

17    had been no showing of remorse.

18            I want to address that.  And I want to address it

19    in a way that I hope the Court understands and appreciates

20    and doesn't feel is inflammatory, but I feel very strongly

21    about it.  And that is that, you know, this is not the

22    ordinary sentencing.  It's true.  Where a defendant comes

23    before the Court begging the Court for mercy, showing

24    contrition for the conduct, explaining why the defendant

25    feels remorse.

1          Because it's a case in which, quite frankly,

2     Mr. Bannon should make no apology.  No American should make

3     any apology for the way -- the manner in which Mr. Bannon

4     proceeded in this case.

5          The factors that are most relevant under 3553 are

6     the (a)(2)(A) and (B) factors, basically the -- excuse me --

7     reflect the seriousness of the offense and all that, and

8     provide just punishment, and afford adequate deterrence.  I

9     want to focus on that.

10         Mr. Bannon, as the Court knows, is an American

11    citizen, received a subpoena from a congressional committee,

12    followed by notice from counsel for the former President

13    that executive privilege is being invoked.

14         Now, I'll get into this in a moment.  They've

15    taken this position now.  Mr. Clark has appeared, and it

16    didn't mean this and it didn't mean that.  The letter speaks

17    for itself.  The subsequent emails speak for themselves and

18    don't amount to how the government has characterized them.

19         It plainly says in there that he should invoke --

20    that executive privilege has been invoked and that he should

21    follow it to the fullest extent of the law whatever that

22    means.  And that's relevant, Your Honor, because a primary

23    question the Court asked earlier.  Does Mr. Cooney know why

24    the Committee didn't go to a civil enforcement proceeding?

25         In any event, the reason I say Mr. Bannon should

1    show no remorse relates to the deterrence factor.  There is
2    nothing here to deter.  There is nothing here to punish.
3    And the message in punishing or asserting a deterrence
4    justification runs afoul, I believe, of the Constitution and
5    of principles that we all hold dear to us.
6            Frankly, God forbid, we should ever want to deter
7    an American citizen from honoring the values that Mr. Bannon
8    honored in this case.  It sounds corny, but it's true and I
9    mean it.
10           Mr. Bannon in this case hired this experienced
11   lawyer.  Then executive privilege was invoked.  That
12   lawyer -- we have sworn, undisputed testimony.  That lawyer
13   then told Mr. Bannon, Mr. Bannon's hands were tied.
14           He could not comply with the subpoena in either
15   regard, documents or testimony.  And that the only lawful
16   course he could take, consistent with the Constitution and
17   his obligations, once executive privilege has been invoked,
18   would be to do exactly what Mr. Bannon did.
19           That's not a man who thinks he's above the law.
20   That's a man who is acting to the greatest values that we
21   hold in this country with respect to the Constitution,
22   adherence to what he understands the Constitution to
23   require.
24           And it reflects a respect for the institution of
25   the office of the President.  And that goes for the

1    institution itself, which includes, in this case and

2    otherwise, the invocation by a former President, as we're

3    told in *Nixon versus GSA*, and as Justice Kavanaugh wrote in

4    his opinion on the cert denial in *Trump versus Thompson*.

5         The significance and the implications of the

6    invocation of executive privilege and the fundamental

7    constitutional principle of separation of powers, as he

8    understood these principles and as his experienced lawyer

9    explained them to him, was the sole -- were the sole

10   motivating factors behind Mr. Bannon's actions.

11        He acted at all times in a manner he firmly

12   believed was the only lawful course our Constitution permits

13   and the only lawful course his experienced lawyer told him

14   or opened to him once executive privilege was invoked.

15        Never, at any time did Mr. Bannon believe in any

16   way, shape or form that he was acting in any way that was

17   wrongful or against the law.  And that's vitally important

18   to both the punishment, just punishment and the deterrence

19   factor here.

20        Never did he intend to defy any lawful authority

21   and never should a Court or any other institution in this

22   country seek to punish or deter conduct so motivated and for

23   which a reasonable, articulable basis existed and was given

24   as in this case, reflected in the clear unequivocal advice

25   of counsel, as demonstrated by Mr. Costello's repeated

1    declarations under penalty of perjury in this case which

2    remain competently undisputed.

3            An equally fundamental privilege, well settled

4    privilege is that executive privilege is presumptively valid

5    once it's invoked.  And Mr. Bannon respected that

6    presumption, and we should never, ever, ever seek to deter

7    that respect.

8            But there's much more to this story that's

9    relevant to the concept of deterrence and that demonstrates

10   that there's no punitive measure let alone a sentence of

11   incarceration that is necessary or appropriate in this case,

12   and of course that's the guidepost under the introduction to

13   3553.

14           Notwithstanding the unequivocal advice of his

15   counsel, Mr. Bannon, through his lawyer, wrote to the

16   Committee Chair.  He engaged through his counsel, although

17   never directly with the Committee.  The Committee never

18   engaged directly with Mr. Bannon.

19           The Committee asked Mr. Bannon's counsel if he

20   would accept service, and they were perfectly fine

21   apparently with engaging just with his counsel.  Never

22   addressed him.  Notwithstanding the unequivocal advice of

23   his experienced counsel, he wrote to the Committee Chair on

24   October 13th, and he explained that his hands were tied.

25           However -- and this is vitally important here on

1    the matter of deterrence and why we're here and shouldn't be

2    here.

3           He specifically wrote to the Committee that, if

4    the Committee could work out the privilege issue with former

5    President Trump or if they would take the matter to a

6    competent court, a court in a civil enforcement proceeding,

7    just like, one after another, congressional committee has

8    done throughout history, and that judge determined that

9    Mr. Bannon must comply with the subpoena because executive

10   privilege didn't apply or because it had not been properly

11   invoked or because the privilege would not cover some of the

12   materials or the testimony at issue or because executive

13   privilege still required some other response, like a

14   privileged matter -- log, or some other measure, he would

15   fully comply.

16          He asked them to take this to the appropriate

17   arbiter.  Executive privilege has been invoked.  I don't

18   know exactly what my obligations are.  I know that my lawyer

19   has told me I cannot comply with the subpoena.  Committee,

20   go before a judge and let's have that judge tell me what to

21   do, and I will comply with that.

22          That's not a person who is above the law.  That's

23   a person trying to act consistent with the law.  That's the

24   kind of conduct we should encourage in this country.  Take

25   your controversy to a judge and let the judge decide and

1    comply.  And express, as he did, that he is fully willing to

2    comply once that happens.

3           In suggesting that we go before a judge for his or

4    her direction, Mr. Bannon suggested a perfectly appropriate

5    course of action, if the Committee were indeed actually ever

6    interested in getting his testimony.  We know otherwise.  We

7    believe otherwise from the public statements many of the

8    Committee members made trying to make an example out of

9    Mr. Bannon.

10          And quite frankly transforming this into, as I

11   believe it was from the start, a partisan political agenda

12   with no interest in investigation.  The Committee wouldn't

13   have been composed as it was if it were interested in an

14   investigation.  The Committee -- Speaker Pelosi chose, as

15   the Chair of this Committee, Chairman Thompson.

16          Chairman Thompson sued President Trump immediately

17   before becoming Chairman of this so-called investigative

18   Committee claiming that President Trump was responsible for

19   the events of January 6th and that he, Chairman Thompson,

20   was personally injured by it.  The American people deserve

21   better than that, something different from that in a

22   Committee they're supposed to believe.

23          But that wasn't the reason Mr. Bannon didn't

24   comply.  These are my thoughts about the Committee and

25   thoughts that Mr. Bannon spoke about, about the Committee

1    after the event in this case, which is perfectly

2    appropriate.

3         You know, Judge Silverman of blessed memory wrote

4    an article on why the First Amendment is the most important

5    value in this country.  Mr. Bannon is vocal.  He speaks out

6    about a lot of issues, and he spoke out about this

7    Committee.  That doesn't demean the process.  They're

8    accurate statements about the Committee.

9         Quite frankly, Speaker Pelosi demeaned the process

10   when she appointed Thompson as the Chair, when she appointed

11   Raskin and Schiff on the Committee, two people who wrote

12   books about the events of January 6th and have a vested

13   interest, perhaps financial, including financial, in making

14   sure that this Committee comes to the same conclusions they

15   reached in their books.

16        The American people and any American citizen who

17   is interested in the events of January 6th and believes they

18   were important deserves better, not a political, partisan

19   political agenda like that.

20        But, again, the government claims Mr. Bannon

21   saying those kinds of things demeans the process and

22   therefore he should be punished.  No, he didn't respond to

23   the subpoena as they would have liked because executive

24   privilege was invoked, but he asked the Court to consider

25   it.

1          Had the Committee taken up Mr. Bannon's request

2     and suggestion and gone before a court, it would have

3     allowed him to do all that was in his power to try to honor

4     the invocation of executive privilege and the institution of

5     the presidency and the presumption of validity and the

6     separation of powers, fundamental principles in which

7     Mr. Bannon believes from head to toe, the Constitution of

8     our United States and the fundamental principles underlying

9     them, that people have died for, that people have spoken

10    aggressively for, to ensure that they remain guarantees that

11    are honored.

12          But he would have yielded to the conclusion and

13    the directive of a competent court, and he would have come

14    forward and provided whatever he could, whatever the

15    subpoena called for that was within his power and he made

16    that clear.  But they didn't take that route.

17          Your Honor will recall that, at one point during

18    the government's closing argument, consistent with the

19    outrageous overreaching by the prosecution that we've seen

20    in this case, a misdemeanor case in which three prosecutors

21    were assigned four FBI agents in a case they told the Court

22    was open and shut, a simple case.

23          One of these prosecutors told the jury that

24    Mr. Bannon not complying with the Committee's subpoena and

25    command to produce documents and appear was like a

1    participant in a sporting event defying the referee.  That's

2    the transcript of July 22nd, 2022 at 10:24, lines 9 to 12.

3            That was an offensively false analogy.  It's

4    offensive to our Constitution and the fundamental principles

5    underlying the Constitution.

6            A congressional committee, under our

7    constitutional system of checks and balances and

8    characterized by a formalized separation of powers, is not

9    the referee with respect to its own conduct or authority by

10    any means.

11            Indeed, our Founding Fathers were crystal clear

12    about this.  Consider for a moment what Mr. Madison said in

13    "Federalist 47."  He was speaking about an objection that

14    was raised by the New York Committee claiming there was

15    insufficiency in the proposed Constitution on the question

16    of separation of powers.

17            And he wanted to assure them of the importance of

18    separation of powers and that it would be honored.  He wrote

19    about the danger of excessive power in one branch,

20    specifically the legislative branch.

21            "No political truth is certainly of greater

22    intrinsic value or is stamped with the authority of more

23    enlightened patrons of liberty than that on which the

24    objection is founded."  The objection that separation of

25    powers was not sufficiently accounted for in the proposed

1    Constitution.

2           He went on to say, "The accumulation of all powers

3    legislative, executive and judiciary in the same hands,

4    whether of one, a few or many, and whether hereditary,

5    self-appointed, or elective, may justly be pronounced the

6    very definition of tyranny."

7           Allowing a constitution -- a congressional

8    committee to be its own command action and to be the referee

9    of its own authority and its commands is tyranny according

10   to Mr. Madison not just according to me.

11          Madison goes on to refer to his Oracle, who we

12   know was Montesquieu, on the exact question of a legislative

13   branch being the ultimate judge of the propriety of its own

14   conduct.  Again, this goes to the deterrence factor,

15   Your Honor.

16          Because Mr. Bannon wasn't willing, through his

17   lawyer, and could not and should not have been required to

18   follow the command of a congressional committee when

19   executive privilege had been invoked, and he understood it

20   to be invoked, and this idea that it was a smoke screen is

21   belied by President Trump's letter of July 9th in which he

22   confirms that he invoked executive privilege.

23          It's belied by the letter from Clark using the

24   same language used in the other letters to the other people

25   who we have referred to in the past with the exception of

1    one clause in the letter but not relevant on this point.

2              In any event, Madison went on to discuss -- this

3    won't go on too long, Judge, but I think it's important.

4    This is an important issue.  I think these are important

5    constitutional principles.  And it's very important, I

6    think, for the Court and the world to know that Mr. Bannon

7    stands for the Constitution.

8              On the exact question of the legislative branch

9    being the ultimate judge of the propriety of its own

10   conduct, Madison was clear.  He wrote again, in "Federalist

11   47," "there can be no liberty where the legislative and

12   executive powers are united in the same person or body of

13   magistrates or if the power of judging be not separated from

14   the legislative and executive powers."

15             He went on to say -- to write to say, "where the

16   *whole* power of one department is exercised by the same hands

17   which possess the *whole* power of another department, the

18   fundamental principles of a free constitution, are

19   subverted.  This would have been the case -- if the entire

20   legislative body had possessed the supreme judiciary."

21             "The entire legislature, can perform no judiciary

22   act..."

23             "The entire legislature again can exercise no

24   executive prerogative..."

25             Madison explained further, "The reasons on which

1     Montesquieu grounds his maxim are a further demonstration of

2     his meaning.  'When the legislative and executive powers are

3     united in the same person or body,' says he [Montesquieu],

4     'there can be no liberty because apprehensions may arise

5     lest *the same* monarch or senate should *enact* tyrannical

6     laws, to *execute* them in a tyrannical manner.'  Again 'Were

7     the power of judging joined with the legislative, the life

8     and liberty of the subject would be exposed to arbitrary

9     controul, for *the judge* would then be *the legislator*.'"

10              Judge, these are fundamental, constitutional

11     principles that were important to our Founding Fathers and

12     they must remain just as important to us today.  I don't say

13     this from any political perspective.

14              I represented the Democratic party of the United

15     States just this year.  I represent the Libertarian party.

16     I represent independent candidates.  I represented a

17     Socialist candidate for President in the 2020 election,

18     Your Honor.  I've never represented the Republican Party.

19     These are universal principles that every American should

20     care about and our Founding Fathers did care about.

21              Finally on Madison, Your Honor, in "Federalist

22     48," he went on with this theme to express its importance.

23     He warned about the dangers to liberty posed specifically by

24     the legislative branch if it's allowed to expand its already

25     vast power.  And this will be my last quote, Your Honor.

1           Madison wrote in "Federalist 48," "The legislative

2     department derives a superiority in our governments from

3     other circumstances.  Its constitutional powers being at

4     once more extensive and less susceptible of precise limits,

5     it can with the greater facility, mask under complicated and

6     indirect measures, the encroachments which it makes on the

7     co-ordinate departments."  Encroachments which we must not

8     allow to happen, we must not allow the Committee ever to be

9     a law unto itself.

10          These prosecutors, in their excessive zeal to make

11    Mr. Bannon their trophy were willing to mislead the jury on

12    this point and, perhaps more significantly, pervert or tear

13    asunder fundamental constitutional principles and

14    specifically, the fundamental constitutional principle of

15    separation of powers.

16          By arguing to this jury that Mr. Bannon failed to

17    obey a referee, the congressional committee, he asked for

18    the course -- the lawfully course to be taken, go before a

19    judge.  The Committee is not and cannot be the referee of

20    the obligations arising from its subpoena or the validity or

21    implications of the invocation of executive privilege.

22          Mr. Bannon, on the other hand, was true to those

23    precious constitutional values and advised the Committee

24    that he would comply with the directive on his obligations

25    with respect to the subpoena and the privilege holder if

1    only the Committee would submit the matter to the

2    jurisdiction of the appropriate branch of government,

3    judicial branch.

4         We should never punish or seek to deter that

5    course of action in Mr. Bannon or anyone else so situated.

6    But Mr. Bannon didn't just stop there in his efforts.  He

7    made another effort to see if there were a way to comply

8    while still respecting executive privilege.

9         On October 18th, 2021, President Biden, through a

10   representative, wrote to Mr. Costello purporting to override

11   or supercede former President Trump's invocation of

12   executive privilege.

13        At the same time, Mr. Costello -- we know from his

14   sworn testimony -- learned about the lawsuit *Trump versus*

15   *Thompson* in which a primary issue was whether an incumbent

16   president can supersede the invocation of privilege of a

17   former president and, if so, under what circumstances?

18        Mr. Costello asked the Committee for a one-week

19   extension to allow him to study the matter and evaluate the

20   impact of those developments.  If the Trump invocation had

21   been overruled as a matter of law, then Mr. Bannon believed

22   he would be free to comply.

23        The Committee immediately rejected his request for

24   a one-week extension, having already scheduled a televised

25   conference to evoke to hold Mr. Bannon in contempt.  Far

52

1    from defying the Committee, as we've been told by the

2    government, Mr. Bannon has tried one more time to find a way

3    to comply and the Committee simply was not interested.  Its

4    media plans and finding a way to make an example of

5    Mr. Bannon were the Committee's overriding priority.

6         Your Honor, when we talk about deterrence,

7    specifically in this context, it would be deterring someone

8    from ignoring a subpoena from Congress.  That's not what

9    Mr. Bannon did by any means.  Mr. Bannon had a principle

10   reason for not complying with the subpoena.

11        And more than that -- not more than that, less

12   than that but also relevant, he had the reason that his

13   experienced lawyer told him, this is the only way you can

14   respond to that subpoena.  There's nothing about the offense

15   conduct -- oh, and he testified on multiple other occasions

16   before other committees when executive privilege was

17   resolved or not invoked.

18        There's nothing about defendant's conduct,

19   Mr. Bannon's reasons for his response to the subpoena, that

20   he believed or understood at any time to be unlawful or

21   wrong.  Rather, he believed at all times, as directed by his

22   experienced counsel, that he took the only lawful course

23   open to him once he understood executive privilege to have

24   been invoked.

25        To put it in Section 3553(a) terms, therefore

-4738-

1    there is nothing to punish that should be punished and

2    nothing to deter that should be deterred in the future.  In

3    fact, we must encourage citizens, when executive privilege

4    is invoked, to pursue the appropriate legal course.

5           This case didn't turn on whether Mr. Costello was

6    right or wrong about whether a privileged log should have

7    been turned over.  One can bet his or her bottom dollar

8    that, if a privileged log had been turned over, we'd be in

9    the same situation today.  It didn't turn on that kind of

10   technicality.  But Mr. Costello has explained his reasons

11   for why he believed --

12           **THE COURT:**  What if Mr. Costello had produced

13   non-privileged documents?

14           **MR. SCHOEN:**  I didn't hear the question,

15   Your Honor.

16           **THE COURT:**  What if Mr. Costello or Mr. Bannon had

17   produced non-privileged documents?

18           **MR. SCHOEN:**  I can only offer my view on it

19   Your Honor.  I don't believe --

20           **THE COURT:**  To date, correct, no non-privileged

21   responsive document has been produced.  Correct?

22           **MR. SCHOEN:**  Correct, Your Honor.  And let me

23   explain that.

24           **THE COURT:**  And I read -- and it seems to me that

25   from the FBI 302s about Mr. Costello's discussions with the

1    FBI -- not to characterize them as meetings or interviews or

2    whatever -- he seems to acknowledge that, at least some of

3    the categories of the subpoena, would call for

4    non-privileged documents.

5            **MR. SCHOEN:**  Well, Mr. Costello drafted a letter,

6    which he provided to the government at that time in which he

7    listed 7, I believe, maybe 12, but 7 categories of questions

8    to which he believed he had -- Mr. Bannon had nothing

9    responsive.  He gave that draft to the government.

10           It was never given to the Committee because the

11   Committee called everything off.  They said, We're going

12   forward with this.  That's one reason.  Mr. Costello was

13   prepared to do that.  But Mr. Costello, as the Court is

14   aware, understood the OLC opinion to be to mean that, if the

15   Committee will not allow a privilege holder to be present

16   for a deposition, then the entire subpoena is invalid.

17           **THE COURT:**  That's why I asked about documents.

18           **MR. SCHOEN:**  Then the entire subpoena is invalid.

19   That's how -- this is one subpoena with two categories to

20   it.  He viewed -- he's made it clear in his declaration.  He

21   viewed the entire subpoena as being invalid.  And who is

22   Mr. Bannon to say that my lawyer is wrong on such a legal

23   question?  I don't think that's fair.  So beyond --

24           **THE COURT:**  Let's just go to -- now so --

25           **MR. SCHOEN:**  I'd like to address that question

1    though if the document -- whether he's produced anything,

2    Your Honor.

3        **THE COURT:**  Sure.  Has he produced any documents?

4        **MR. SCHOEN:**  No, Your Honor.

5        Two things about that.  One, as the Court is

6    aware, the government makes the case in their papers that

7    there was something wrong, let's say, for Mr. Corcoran to

8    have approached Committee counsel about trying to work out

9    an accommodation.

10       Of course the law requires an accommodation.  But

11   let me say how that came up.  I did a radio show.  The radio

12   show host, my good friend and his friends with Congressman

13   Raskin, on the radio publicly he said, Why don't you just

14   get the Committee to drop the criminal charges so they can

15   get the information?

16       I said, radio host -- who I'm sure would prefer

17   not to have his name mentioned here -- I said, Radio Host,

18   that's not for Mr. Bannon.  Right now, Mr. Bannon is under

19   indictment.  Take it to Congressman Raskin.

20       And it was reported to me that he did, and

21   Congressman Raskin said, Unfortunately, at this point, it's

22   out of my hands.  You'll have to go to the U.S. Attorney's

23   office.  That's the genesis of that.

24       Mr. Corcoran did exactly the right thing in

25   approaching the Committee to say, Let's work out an

1    accommodation.  Let's not go criminal with this.  Let's get

2    you the information.  That's step one.  Step two -- and

3    that, by the way, if privilege were removed.

4           So without going into any privileged

5    conversations, eventually a letter was issued by President

6    Trump on July 9th saying that privilege was removed.  So

7    government counsel, in my view at least, mocked the response

8    today that Mr. Costello made, but their response was --

9    again, you can parse the words however you like.

10          The response, I can assure the Court was,

11   privilege has been removed.  Mr. Bannon can now comply.  He

12   would like -- he wants to testify in a public forum and so

13   on.  Okay.  That's what Mr. Bannon wanted.  But the response

14   from the Committee was to give a deadline for compliance

15   that came during the course of this trial.

16          The decision was made by Mr. Costello that you

17   couldn't possibly do all of those things at once.  They

18   couldn't have Mr. Bannon appear before the Committee or

19   provide documents, first, going through the documents, while

20   he was in the middle of preparing for trial and sitting

21   through the trial.  And that ended the matter.  That was a

22   firm deadline that Chairman Thompson gave.

23          So that's the end of that, Your Honor.  And at

24   this point, quite frankly, the government decided to seek

25   punitive action.  They refused any accommodation.  The

1    subpoena now is extinguished based on this result in this

2    case.

3         But that's not to say that Mr. Bannon isn't

4    willing still to engage with the Committee.  But he hasn't

5    heard further from the time the Committee set that deadline

6    knowing that he couldn't comply.  But, again, that's not a

7    matter of remorse.  It's not a matter relevant to

8    deterrence, in my view.

9         I've said before, Your Honor, that this kind of

10   situation -- again, this is a very specific situation, but I

11   mean the kind of situation in which a defendant acts on

12   principle, reasonable, valid principle, principles he

13   believed to be valid, his lawyer believed to be valid.  And

14   it's not appropriate to assess criminal liability and

15   punishment against that person.  I don't need to go into

16   that argument further.

17        But the prosecution argues that Mr. Bannon should

18   be punished because he has spoken out against the

19   January 6th Commission, he's undermined its legitimacy, and

20   he imperils the integrity of our system.

21        That position ignores the fact that his consistent

22   reasons communicated by Mr. Costello over and over for

23   responding as he did, and the message to the public was,

24   executive privilege is important.  I must honor it.  Not,

25   I'm thumbing my nose at a committee.  Not, I'm ignoring a

58

1    committee.  Not, I'm ignoring my obligations.

2              I am honoring the Constitution and I'm respecting

3    the institution of the presidency.  That's the message

4    Mr. Bannon sent and not that he's above the law.  But it was

5    because of the invocation of executive privilege.

6              Now, ironically, the prosecution argues that that

7    demeans that process and the congressional process, and that

8    they say Mr. Bannon referred to this as a show trial, that

9    that demeans the integrity of this process.

10             They omit, of course, Mr. Bannon's repeated

11   statements to the media about his great respect for this

12   Court and for the jury in this case.  That hardly demeaned

13   the process.

14             I would suggest this, however, Your Honor -- and I

15   mean this sincerely -- with respect to demeaning the

16   integrity of this process, consider Mr. Bannon's actions,

17   relying on executive privilege and his good-faith belief in

18   what he did as a constitutional principle, and what the

19   government did with respect to a lawyer's records in this

20   case.

21             Government counsel, unequivocally, knowing that an

22   Historic Communications Act order is one of the most

23   intrusive mechanisms we have in our system, lied, flat out

24   lied to a federal judge in order to try to get

25   Mr. Costello's social media, email and telephone records.

-4744-

1          How did they lie?  They told the judge in the

2     application that a particular email address belonged to

3     Mr. Costello, the lawyer in this case.  They made those

4     representations and all of their names appear on this

5     application.

6          They made that representation to a judge and it

7     wasn't true.  Was it just sloppy?  Was it sloppy to get 600

8     or more pages of some other American citizen's papers with

9     the imprimatur of the federal judge on the order authorizing

10    it?  That's more than sloppy.

11         They had four FBI agents on this case.  They could

12    have figured out whether that belonged to Mr. Costello.  And

13    the same goes for the other records of other

14    non-Mr. Costello in this case's records.  That's a lie to a

15    federal judge.  That demeans the integrity of this process.

16         I know the Court said it intends to address this

17    after the case, but it's a very serious violation.  And I

18    haven't seen any document yet that shows a correction to

19    that federal judge to whom those representations were made.

20         And instead, the government has the audacity to

21    complain that, in our investigation of exactly what

22    happened, the person whose records the government seized and

23    gave to us was notified that his records had been reviewed

24    by the government.

25         In this case, the government argued repeatedly

60

1    over the past year that Mr. Bannon should be barred from

2    raising any deficiency in the Committee or its composition

3    because he had waived them.  And earlier they convinced the

4    Court to find a waiver of that.

5         Now they argue that he challenged the legitimacy

6    of the Committee.  He was never permitted to do that in

7    front of the jury; and that was a defense that, quite

8    frankly, we believed he was entitled to, demonstrating the

9    political nature of the effort, the basis for bringing this

10   case criminal.  The government gives no paper to his efforts

11   at accommodation, which, as we say, the courts have said,

12   were constitutionally mandated.

13        What the prosecution really wants is to punish and

14   shoot down Mr. Bannon and others who would follow suit for

15   speaking out about the use of an investigative, in quotes,

16   committee for a partisan political agenda and not for an

17   investigation.  I understand that.  I understand they know

18   that this message goes to millions of people around the

19   world, and they don't want that message.

20        But politics has infected this process at least in

21   Congress for far too long, if this is truly meant to get at

22   the events of January 6th.  That's obviously beyond our

23   scope here.  But it's relevant because the government raised

24   this issue of demeaning the Committee.  Telling the truth

25   about this Committee or speaking one's mind about the

1    Committee is not only perfectly acceptable in this country,

2    it's an obligation if one believes it to be true.

3         And if you're an American concerned about the

4    events of January 6th and you want a real objective

5    full-fledged investigation, then you should speak out about

6    the Committee and its partisan political agenda.  Its public

7    statements and its pre-determined conclusions readily lead a

8    reasonable observer to believe that the Committee was

9    illegitimate from its inception.

10        But we're not, in this case, talking about that as

11   a basis for not complying with the subpoena.  This case is

12   about the invocation of executive privilege.  And Mr. Bannon

13   is entitled, in my view, obligated to speak out about the

14   Committee as he has.

15        An issue the government has raised in its papers

16   now is about this Mr. Clark.  Respectfully, we object to any

17   of the factual -- purportedly factual statements from

18   Mr. Clark being considered by the Court through these 302s

19   or whatever the government claims, some agent's notes of

20   what Mr. Clark said.

21        This is a sensitive subject to me, so I try to

22   move beyond all of that.  I have, unfortunately, a good deal

23   of personal experience with Mr. Clark, and he is nothing but

24   a thug.  I wouldn't believe a thing he says.  He's one of

25   what one might call the Three Stooges who were operating

1    from the government during that time.  But there were four

2    of them, so four stooges isn't a thing.

3            He has lied to me personally.  He has ripped me

4    off personally.  And so I don't think he's worthy of

5    believing as to anything he says, quite frankly.  But

6    unfortunately, that's my own personal baggage that I would

7    be happy to substantiate.

8            But in any event, it's certainly not competent

9    testimony in this form.  And the emails, as the government's

10   construed them don't lead to the conclusion they would lead

11   to, but Mr. Costello has provided the Court with a rebuttal

12   to what Mr. Clark said.

13           But you know what, Judge?  The reason the whole --

14   one of the main reasons the whole Clark thing or the

15   executive privilege was a smoke screen argument all is

16   completely irrelevant is because Mr. Bannon was the only one

17   willing to put this to the test.

18           He said, take me before a judge.  If you find,

19   Judge, privilege wasn't invoked properly, there was no

20   privilege, or this is a smoke screen or Clark testifies he

21   didn't mean this when he said that, then it would have all

22   gone out the door and he would have testified and he would

23   have complied, which he assured the Committee he would do.

24           So it doesn't really matter what Clark claims now,

25   because Bannon was willing to put it all before a judge.  He

1    also provided the government with all of Clark's

2    correspondence, Costello did.  We have the Trump letter of

3    July 9th confirming that privilege was invoked.  So this is

4    all, to borrow their word, a smoke screen, Your Honor.  It's

5    a kinard.  It's not a relevant issue.  It's an issue just

6    intended to inflame the Court and to put more heat into this

7    case.

8              So when the government stands before Your Honor

9    and says, Mr. Bannon could not have committed a more

10   malicious contempt of Congress than what he did in this

11   case, that's outrageous.  Shame on them and every American

12   who hears that kind of thing should reject it out of hand.

13             A more egregious or malicious contempt of Congress

14   would have been, Screw you, Congress.  Take your subpoena

15   and shove it.  Or, I'm going to ignore your subpoena,

16   Congress.  Not, I'm relying on the invocation of executive

17   privilege by a former President of the United States and on

18   what my lawyer told me is the only lawful course of action I

19   can take.  That's not malicious, that's responsible.

20             Your Honor, the question ultimately is what

21   message the Court wants to send with its sentence in this

22   case.  I know that this Court -- without knowing any more

23   about the Court than what I've read and what I've seen in

24   person, honors and cherishes our Constitution as much as any

25   American could.

1          And I know that the Court values these principles

2     of separation of powers.  The Court's written about it.  The

3     Court's written about these principles, not just as a judge

4     but as an advocate at the highest levels.

5          I know, therefore, that the Court doesn't consider

6     it corny when I talk about the value of these principles.

7     But I worry that a message of a harsh sentence in this case

8     sends just exactly the wrong message.

9          What's the alternative?  Mr. Bannon gets the

10    subpoena as a layperson, a congressional committee subpoena.

11    That raises immediately a host of technical questions he

12    needs a lawyer for.  But then add to the mix the invocation

13    of executive privilege, and that lawyer has to wrestle with

14    what to do and how to proceed.  But he tells his client what

15    to do.

16         This lawyer has come forward and admitted exactly

17    what he did, right or wrong.  Warts on.  Warts off.

18    Everyone can criticize the action that he took.  But

19    Mr. Bannon wasn't in a position to override it.  We don't

20    want to send a message to people that this is a

21    free-for-all.

22         When you get a subpoena from a congressional

23    committee and hire a lawyer, ignore your lawyer.  Do what

24    you think is best.  Ignore the invocation of executive

25    privilege.  You decide what the courts haven't been able to

1    decide, the extent to which an incumbent's view on executive

2    privilege supersedes a former president's view.  You decide,

3    layperson.

4            That's not a message we can afford to send,

5    Your Honor.  Mr. Bannon never, at any time, believed he was

6    above the law, never acted in any way to lead anyone to

7    believe he thought he was above the law.  He acted in a

8    responsible manner.

9            That's why, Your Honor, quite frankly, I don't

10   believe it would be fair or appropriate for him to come

11   before the Court and say he's terribly sorry about how he

12   proceeded.  He proceeded based on a reasonable

13   constitutional belief.  He proceeded based on his advice of

14   counsel.  And more than that, he gave the Committee an out.

15           He wanted to find a way to comply that would be

16   consistent with his direction from counsel and with his

17   respect for the institution of the presidency.  He could

18   have done no more and to punish or deter that or to expect,

19   remorse or contrition about that, I don't think it would be

20   fair to expect, reasonable to expect or responsible to

21   expect as an American, Your Honor.  Thank you very much.

22           **THE COURT:**  Thank you, Mr. Schoen.

23           **MR. SCHOEN:**  We ask, Your Honor, as you know -- as

24   Your Honor knows --

25           **THE COURT:**  Yes.

1        **MR. SCHOEN:**  -- for a sentence of no

2   incarceration.  If any sentence of incarceration were

3   imposed, that it be suspended.  That no fine be imposed but,

4   in any event, a minimum fine, certainly within the

5   guidelines, and we certainly seek a stay pending appeal,

6   first of all, self-surrender but, secondly, a stay pending

7   appeal.

8        Your Honor has spoken at great length, far more

9   eloquently than I, about its reservations concerning the

10  *Licavoli* holding, and its apparent inconsistency with modern

11  standard for the willfully, and with the traditional

12  standard.

13       I have brought to the Court's attention a couple

14  of cases just in the last couple of years on this question

15  of "willfully."  I think that Justice Alito and Justice

16  Thomas have spoken clearly in contrasting willfully with

17  knowingly.

18       But in any event, it meets the substantial

19  question standard in this circuit.  Even if the Court were

20  to think that the Court did everything exactly right, it

21  still would meet the standard because reasonable jurors

22  could disagree.

23       Thank you, Your Honor.

24       **THE COURT:**  Thank you, Mr. Schoen.

25       My intent is to take a recess before I impose the

1    sentence.  But, Mr. Schoen, does Mr. Bannon -- Mr. Bannon,

2    do you intend to speak?  You need not.  It's your option.

3        **THE DEFENDANT:**  My lawyers have spoken for me,

4    Your Honor.

5        **THE COURT:**  Okay.  Thank you.

6        So I'm going to take a brief recess, and then I

7    will come back and walk through my analysis and the sentence

8    here.

9        (Break)

10        **THE COURT:**  Thank you, Ms. Lesley.

11        Before I walk through the 3553(a) factors and

12    pronounce the sentence, I'd just like to briefly recap for

13    everyone the parties' positions.

14        The government requests an in-guideline sentence

15    of 6 months total incarceration, which is at the top end of

16    the sentencing guidelines, plus an above-guidelines fine of

17    $100,000 on each count for a total of $200,000 in fines.

18        The defendant, as we've heard, of course, argues

19    for a sentence of probation.  And the probation office

20    recommends 30 days of incarceration on the two counts

21    running concurrently, so 30 days of incarceration, and a

22    $20,000 fine.

23        In imposing a sentence I must consider the Section

24    3553(a) factors, the first of which is the nature and

25    seriousness of the offense.

68

1          The subpoena here was issued to Mr. Bannon in

2     connection with the January 6th Committee's investigation of

3     the events of that day.  As I have said in other contexts,

4     but it bears repeating again, the events of January 6th were

5     undeniably serious.

6          A large mob entered or sought to enter the United

7     States Capitol while a Joint Session of Congress was meeting

8     to certify the results of the presidential election.  Many

9     of the rioters planned to come to the Capitol for the

10    express purpose of interrupting those proceedings.

11         Many used violence against law enforcement

12    officers or engaged in vandalism.  Many of those rioters

13    engaged in planning efforts before January 6th suggesting

14    that they intended to engage in violence.

15         The January 6th Committee thus has every reason to

16    investigate what happened that day, including who may have

17    been involved in planning or instigating what happened and

18    thus what, if anything, can be done to prevent similar

19    horrific events from occurring in the future.

20         To that end, the Committee issued a subpoena to

21    Mr. Bannon that required him to produce documents and

22    provide testimony on a number of topics related to the

23    Committee's inquiry.

24         Mr. Bannon, however, has not produced a single

25    document to the Committee, has not provided the Committee

1    with a log regarding responsive documents he might be

2    withholding on whatever ground, and has not provided any

3    testimony on any topic.

4        Mr. Bannon's primary argument is that he could not

5    do so or was excused from doing so because former President

6    Trump had asserted executive privilege with respect to the

7    subpoena.  There are, however, several problems with this

8    position.

9        First, the record reflects that, in the fall of

10   2021, former President Trump had not actually asserted

11   executive privilege over any particular document or

12   testimony and had certainly not directed Mr. Bannon that it

13   would be appropriate for him not to provide any information

14   to the Committee whatsoever.

15       Instead, the October 6th, 2021 letter from Justin

16   Clark, counsel to former President Trump, stated that

17   President Trump was instructing Mr. Bannon to, "Not produce

18   any documents concerning privileged material," and "not

19   provide any testimony concerning privileged material."

20       Second, on January 6, 2021, Mr. Bannon was a

21   private citizen who had not been employed in the executive

22   branch for several years.  That does not mean he could not

23   have been in possession of documents covered by executive

24   privilege or a participant in conversations that might be

25   covered by executive privilege.  But it does mean that he

1    was less likely to have such information than others who

2    were working in the executive branch at the time.

3        Third, and somewhat relatedly, some of the

4    information sought by the subpoena, both documents and

5    testimony, is information as to which no conceivable claim

6    of executive privilege could be made.  Even Mr. Bannon's

7    counsel, Mr. Costello, appeared to acknowledge that point in

8    his meetings with the FBI and DOJ after the House referred

9    Mr. Bannon for prosecution for contempt.

10        Nevertheless, Mr. Bannon did not produce such

11   documents to the Committee or testify regarding such topics

12   nor did he provide the Committee with a log of any documents

13   that he was withholding based on executive privilege.

14   Indeed, to this day, he has not provided the Committee with

15   such a log.  Thus, the Court does not even know if he has

16   any such documents.

17        Even though, in July of this year, former

18   President Trump withdrew any executive privilege barrier to

19   Mr. Bannon's production of privileged documents or testimony

20   about assertedly privileged matters, Mr. Bannon still has

21   not produced a single document or privilege log or appeared

22   for testimony.

23        All of this reflects that the offense here was

24   quite serious, and all of this cuts in favor of a

25   substantial sentence.  But other facts cut in Mr. Bannon's

1    favor.

2            First, a congressional subpoena directed to

3    someone who, like Mr. Bannon, may have been communicating

4    directly with the then-President of the United States does

5    present potential executive privilege issues that implicate,

6    among other things, the various OLC opinions on interbranch

7    subpoenas and that, in many respects, have not been resolved

8    by the courts.

9            Second, throughout this process, Mr. Bannon was

10    represented by counsel, including in discussions and letters

11    with the Committee.  And the record reflects that his

12    counsel was advising him how to respond to the subpoena.

13            Mr. Bannon did not completely ignore the fact that

14    he had received a subpoena nor did he fail to engage with

15    the Committee at all.  And while his counsel's advice may

16    have been overly aggressive or misguided, it does appear

17    that, at least to some extent, Mr. Bannon was following that

18    advice.

19            Third, the Committee, as other congressional

20    committees have done in the past, could have but did not

21    attempt to sue Mr. Bannon civilly and seek a court order

22    requiring Mr. Bannon to comply with the subpoena in whole or

23    in part.  Instead, the Committee moved quickly to hold

24    Mr. Bannon in contempt and to refer this case for

25    prosecution.  These points cut in Mr. Bannon's favor.

1          Moving to the second factor, the history and

2     characteristics of the defendant, Mr. Bannon served in the

3     United States Navy for several years until he was honorably

4     discharged in 1983.  He then obtained an MBA from Harvard in

5     1985.

6          He worked as an investment banker.  And then,

7     ultimately, from 2012 to 2016, he was the executive chairman

8     at Breitbart News Network.  He resigned in August 2016 and

9     began working on Donald Trump's presidential campaign.

10         From August 2016 to December 2016, he was the CEO

11    of Donald Trump for President.  He then became the chief

12    strategist and senior counselor to President Trump in August

13    of 2016.  That is to say he became an executive branch

14    employee at that time.

15         Mr. Bannon resigned from that position in August

16    2017 and launched his own podcast.  Since 2017, he has been

17    self-employed and, as I indicated earlier, has not been an

18    employee of the executive branch since that time and

19    certainly not on January 6th, 2021.

20         As I noted earlier, Mr. Bannon does not have a

21    criminal history under the sentencing guidelines.  Although

22    he was indicted in August 2020 by a federal grand jury for

23    certain alleged crimes, he received a presidential pardon

24    regarding them.  And although he was indicted last month by

25    a New York grand jury for similar crimes, similar alleged

1    crimes, he has not been convicted of them.

2                As I stated earlier, in my view, Mr. Bannon has

3    not taken responsibility for his actions with respect to his

4    refusal to comply with the two congressional subpoenas.  He

5    has, however, been compliant with the conditions of release

6    and with all proceedings that have occurred in this court.

7                As to the next factor, protecting the public,

8    respect for the law and deterrence, I conclude that

9    Mr. Bannon appears to be of, perhaps, some very small risk

10   of recidivism at least with respect to congressional

11   subpoenas.

12               As explained before, Mr. Bannon has still refused

13   to comply with either the subpoena -- excuse me, with either

14   the document or testimony components of the subpoena, has

15   yet to produce either a single document or a privileged log

16   to the Select Committee.

17               Specific deterrence as to Mr. Bannon appears at

18   least a little necessary.  But much more important, others

19   must be deterred from committing similar crimes.  Respect

20   for Congress is, of course, an important piece of our

21   constitutional system.  And flaunting congressional

22   subpoenas betrays a lack of respect for the legislative

23   branch which exercises the will of the people of the United

24   States.  Overall, this factor weighs slightly against

25   Mr. Bannon.

74

1            As to the need, the next factor, to avoid

2      unwarranted sentencing disparities, I recognize that

3      convictions, under 2 U.S. Code Section 192, are relatively

4      rare.  There's not a great deal of comparative data about

5      such sentences.  The government points to five sentences

6      that are 50 or more years older as comparators.

7            First, the sentence in *Licavoli* of 6 months

8      incarceration for refusal to testify at all in response to a

9      congressional subpoena but, as Mr. Bannon notes, that

10     defendant had a substantial criminal history.

11           Second, the sentence in *Tobin* of 30 days for not

12     providing certain documents in response to a subpoena,

13     although that defendant had provided some other documents.

14           The sentence in *Hutchinson* of 6 months for a

15     defendant who testified before Congress but refused to

16     answer 18 questions.

17           The sentence in *Yellin* of 12 months for a

18     defendant who testified before Congress but refused to

19     answer four questions but, as Mr. Bannon notes, the

20     conviction there was overturned on appeal.

21           And finally, fifth, the sentence in *Seger* of 12

22     months for a defendant who testified before Congress but

23     refused to answer 10 questions but, as Mr. Bannon notes

24     again, that conviction was also overturned on appeal.

25           The government argues that Mr. Bannon should

75

1   receive 6 months because he refused to testify at all and

2   refused to produce any documents, such that he deserves a

3   more stringent sentence than the defendant in *Tobin* and a

4   comparative sentence to the defendant in *Licavoli*.

5        And again, as we heard earlier, Mr. Bannon argues

6   that, if the Court is going to impose a term of

7   incarceration, it should be no more than what the Court

8   believes is the mandatory minimum and, of course, Mr. Bannon

9   has argued that probation only should be imposed.

10       I should note that I am also aware from the

11  Sentencing Commission of two other cases in which the

12  defendants pleaded guilty to contempt of Congress and were

13  sentenced to one month and probation respectively.

14       So the lack of many comparator sentences, the fact

15  that all of the existing comparator sentences provided by

16  the government are ones imposed many years ago under very

17  different circumstances lead me to conclude that these cases

18  are essentially sui generis and there is no risk here of

19  creating unwarranted sentencing disparities either way.  In

20  my view, this factor does not weigh heavily in my analysis.

21       So having heard from the parties, based on my

22  considerations of the presentence investigation report, the

23  other pretrial services materials, the sentencing memoranda,

24  including those submitted yesterday, all of the Section

25  3553(a) factors as discussed above and the guidelines as

1    I've calculated before, I believe that the guidelines

2    provide an appropriate sentence in this case.

3              And I will impose a sentence of 4 months of

4    incarceration for each count running concurrently, along

5    with a fine of $6,500, which is essentially the same ratio

6    of 4 months is to 6 months as $6500 is approximately to

7    $9500.  That is the -- the $9500, again, is the top end of

8    the fine range.

9              In my view, the sentence I'm imposing reflects the

10   fact that there can be more culpable ways to be in contempt

11   of Congress than Mr. Bannon's conduct, such as by

12   intentionally not responding at all, not engaging at all and

13   the like.  But for the reasons I've already discussed, I do

14   believe that Mr. Bannon does have some culpability here.

15             Mr. Bannon also argues that he should not have to

16   serve his sentence while he appeals.  I agree.  I am

17   prepared to release Mr. Bannon from his sentence of

18   incarceration pursuant to 18 U.S. Code Section 1343, if he

19   files a timely appeal.

20             In particular, I find that Mr. Bannon is not

21   likely to flee or pose a danger to the safety of any person

22   or the community; and that such an appeal would not be taken

23   for the purpose of delay but rather would raise substantial

24   questions of law.

25             In particular, as I've noted throughout this case,

1    there is a substantial question regarding what it should

2    mean for a defendant to willfully make default under the

3    contempt of Congress statute and what evidence a defendant

4    should be permitted to introduce on that question.

5         This case also raises substantial questions about

6    the effect of the congressional subpoena recipients,

7    invocation of the Speech or Debate Clause, and questions

8    regarding whether and to what extent the Committee was

9    formed and operate in compliance with its rules.

10        Mr. Bannon's appeal, again assuming he appeals,

11   would present those substantial questions.  So if Mr. Bannon

12   files an appeal, as he has stated is his intention, I will

13   enter an order releasing him from serving his term of

14   incarceration until his appeal is resolved.

15        As a result, you, Stephen Bannon, are hereby

16   committed to the custody of the Bureau of Prisons for a term

17   of imprisonment for concurrent terms of 4 months on each of

18   Counts 1 and 2.

19        You are also ordered to pay a fine of $6500 and a

20   special assessment of $25 per count for a total of $50.

21   Regarding monetary penalties, the special assessment of $50

22   is payable immediately to the Clerk of Court.  Payments for

23   criminal penalties are due in monthly installments of $500

24   to commence 30 days after the date of the judgment.

25        The probation office shall release the presentence

1    investigation report to all appropriate agencies in order to

2    execute the Court's sentence.  Under 18 U.S. Code Section

3    3742, you have a right to appeal the sentence and judgment

4    imposed by me.  If you choose to do so, you must file any

5    appeal within 14 days after the entry of judgment.  If

6    you're unable to afford the cost of an appeal, you may

7    request permission to file an appeal without cost to you.

8              As to voluntary surrender, I believe it's

9    appropriate here.  In particular, I believe the way this

10   should work is that I will enter the judgment assuming an

11   appeal is noticed.  I will then enter an order releasing

12   Mr. Bannon from his obligation to appear for his period of

13   incarceration.

14             If an appeal is not noticed, and therefore I don't

15   enter that order, then Mr. Bannon must make arrangements to

16   surrender voluntarily no later than November 15th, which is

17   the period, basically, after the period by which an appeal

18   must be noticed.

19             Are there any other -- and I should say, I think

20   it's crystal clear all of the objections that have been

21   lodged by Mr. Bannon, both in the papers, throughout the

22   trial, with respect to the PSR and again today.  I don't

23   think we need to rehash them now.

24             But is there anything, Mr. Schoen, in particular,

25   you feel the need to preserve for the record?

1          **MR. SCHOEN:**  No, Your Honor.

2          **THE COURT:**  Thank you.

3          Does the government wish to note anything?

4          **MR. COONEY:**  No, Your Honor.

5          **THE COURT:**  Okay.

6          Thank you, all.

7          I apologize.  We will get the judgment out as

8    quickly as possible, so that these post-judgment things can

9    happen.  Okay?  Thank you, all.

10          (Proceedings concluded at 11:07 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

1                    **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9    ___October 28, 2022___          /s/_____
                **DATE**                    **Lorraine T. Herman**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Stephen K. Bannon | ) Case Number:  CR 21-670 (CJN) |
| | ) USM Number: 05635-509 |
| | ) Matthew Corcoran,  David Schoen, and Riane White |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1 and 2 of Indictment filed 11/12/2021
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 2§192 | CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; | 10/14/2021 | 1 |
| | Contempt of Congress (Testimony) | | |
| 2§192 | CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; | 10/18/2021 | 2 |

   The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/21/2022
Date of Imposition of Judgment

_Carl J. Nichols_ (signature)
Signature of Judge

Carl J. Nichols    U.S. District Judge
Name and Title of Judge

10/21/2022
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

| | | Judgment—Page ___2___ of ___5___ |
|---|---|---|

DEFENDANT:  Stephen K. Bannon
CASE NUMBER:  CR 21-670 (CJN)

## ADDITIONAL COUNTS OF CONVICTION

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| | Contempt of Congress (Papers) | | |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    3    of    5

DEFENDANT:   Stephen K. Bannon
CASE NUMBER:   CR 21-670 (CJN)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Four (4) Months as to each count, to run concurrently

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☑  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**-4769-**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
         Sheet 5 — Criminal Monetary Penalties

| | | | Judgment — Page | 4 | of | 5 |
|---|---|---|---|---|---|---|

DEFENDANT: Stephen K. Bannon
CASE NUMBER: CR 21-670 (CJN)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 50.00 | $ | $ 6,500.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 6 — Schedule of Payments

|  |  |
|---|---|
|  | Judgment — Page   5   of   5 |

DEFENDANT:  Stephen K. Bannon
CASE NUMBER:  CR 21-670 (CJN)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $   6,550.00          due immediately, balance due

      ☐  not later than                              , or
      ☑  in accordance with    ☑  C,   ☐  D,   ☐  E, or   ☐  F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☑  Payment in equal     monthly      (e.g., weekly, monthly, quarterly) installments of  $   500.00    over a period of
        13 mo.     (e.g., months or years), to commence     30        (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal                   (e.g., weekly, monthly, quarterly) installments of  $              over a period of
                       (e.g., months or years), to commence                  (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within                (e.g., 30 or 60 days) after release from
        imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:
        The financial obligations are immediately payable to the Clerk of the Court for the U.S. District
        Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of
        address, you shall notify the Clerk of the Court of the change until such time as the financial
        obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number
Defendant and Co-Defendant Names
*(including defendant number)* | Total Amount | Joint and Several
Amount | Corresponding Payee,
if appropriate |
|---|---|---|---|
|  |  |  |  |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## <u>NOTICE OF APPEAL</u>

Defendant Stephen K. Bannon hereby gives notice that he appeals to the United States Court of Appeals for the District of Columbia Circuit from the final judgment of conviction and sentence entered on October 21, 2022 [ECF## 161; 162].[1]  Under Rule 3 (c)(1)&(4), Federal Rules

---

[1] Rule 4(b)(1)(A)(i) of the Federal Rules of Appellate Procedure provides in pertinent part that in a criminal case, a notice of appeal must be filed within 14 days of the entry of the judgment being appealed.  Rule 4(b)(6) provides that the judgment is "entered" within the meaning of Rule 4(b) when it is "entered on the criminal docket."  The circumstances in this case surrounding the entry of the judgment on the criminal docket are most puzzling.

Mr. Bannon was sentenced on October 21, 2022.  At the end of the sentencing hearing, the Court advised the parties that the Court would "get the judgment out as quickly as possible."  [Tr. 10/21/2022 Sentencing Hearing at 79].  The Court also set a voluntary surrender date of November 15, 2022, which the Court characterized as "the period, basically, after the period by which an appeal must be noticed." [*Id*. at 78].  That date would be removed and a stay pending appeal would be ordered, once the notice of appeal was timely filed. [*Id*. at 78].

No judgment was actually entered on the criminal docket until October 31, 2022.  In fact, on October 30, 2022, defense counsel communicated among themselves, expressing concern that the judgment had not yet been entered and the voluntary surrender date was approaching.  As of October 30, 2022, the last entry on the criminal docket was a Minute Order entry related to the sentencing proceedings earlier that date.  Accordingly, early in the morning on October 31, 2022, the undersigned agreed to draft an email to the Court's staff, with copies to opposing counsel, inquiring as to when the judgment would be entered.  However, before the email was sent, at 10:44 a.m., the parties, for the first time, received ECF notice that the judgment had been entered on that date – October 31, 2022.  That notice provided that the judgment was "entered" on October 31, 2022 and "filed" on October 21, 2022.  [Exhibit 1].

1

of Appellate Procedure, the Notice of Appeal, of course encompasses all orders in the case

preceding the judgment (See also Notes to 2021 Amendments) and that is the intention here.  It

also is intended to encompass the ancillary Order entered in the related case *In Re:  Non-Party*

*Subpoenas*, 1:22-mc-00060-CJN.  [Minute Order of 7/12/2022].


Dated: November 4, 2022                        Respectfully submitted,

                                   **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                        /s/ M. Evan Corcoran
                                   M. Evan Corcoran (D.C. Bar No. 440027)
                                   Riane White (*Pro Hac Vice)*
                                   210 N. Charles Street, 26th Floor
                                   Baltimore, MD 21201
                                   Telephone: (410) 385-2225
                                   Facsimile: (410) 547-2432
                                   Email: ecorcoran@silvermanthompson.com


                                        /s/ David I. Schoen
                                   David I. Schoen (D.C. Bar No. 391408)
                                   David I. Schoen, Attorney at Law
                                   2800 Zelda Road, Suite 100-6
                                   Montgomery, Alabama 36106
                                   Telephone: (334) 395-6611
                                   Facsimile: (917) 591-7586
                                   Email: schoenlawfirm@gmail.com
                                   *Counsel for Defendant Stephen K. Bannon*

---

With the delivery of that notice on October 31, 2022, the judgment and statement of reasons for
the judgment were then actually entered on and appeared on October 31, 2022, for the first time
on the criminal docket as ECF## 161& 162.  However, despite the fact that they were not
actually entered on the criminal docket until October 31, 2022 and no notice of the entry of
judgment went out to the parties until October 31, 2022, the judgment was entered on the
criminal docket on October 31, 2022, as if it had been entered on the criminal docket ten (10)
days earlier with the docket entry for both the judgment and the statement of reasons reflected as
"10/21/2022."  This is very puzzling and had the effect of dramatically shortening the statutory
period for Mr. Bannon to file his notice of appeal, since the controlling date under Rule 4(b)(6) is
the date of entry on the criminal docket and that now (erroneously) appears as "10/21/2022"
instead of the actual date of entry, "10/31/2022."  As a result, Mr. Bannon had to file within four
(4) days of the actual entry date (October 31, 2022) instead of fourteen (14) days, so as to file
within 14 days of the date of entry on the criminal docket (Rule 4 (b)(6)), even though that date
clearly is wrong.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 4th day of November, 2022, a copy of the foregoing

NOTICE OF APPEAL was served *via* the Court's CM/ECF system on registered parties and

counsel.


    /s/ M. Evan Corcoran

M. Evan Corcoran (D.C. Bar No. 440027)

**-4774-**

4

**EXHIBIT 1**

USCA Case #22-3086    Document #1997764    Filed: 05/03/2023    Page 387 of 389
11/4/22, 5:35 PM    Activity in Case 1:21-cr-00670-CJN USA v. BANNON Judgment
Case 1:21-cr-00670-CJN    Document 166-1    Filed 11/04/22    Page 2 of 3

From: DCD_ECFNotice@dcd.uscourts.gov,
To: DCD_ECFNotice@dcd.uscourts.gov,
Subject: Activity in Case 1:21-cr-00670-CJN USA v. BANNON Judgment
Date: Mon, Oct 31, 2022 10:44 am

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### District of Columbia

### Notice of Electronic Filing

The following transaction was entered on 10/31/2022 at 10:44 AM and filed on 10/21/2022
Case Name:          USA v. BANNON
Case Number:        1:21-cr-00670-CJN
Filer:
Document Number: 161

Docket Text:
**JUDGMENT as to STEPHEN K. BANNON. Statement of Reasons Not Included. Signed by Judge Carl J. Nichols on 10/21/2022. (zstd)**

**1:21-cr-00670-CJN-1 Notice has been electronically mailed to:**

Stanley McKennett Brand    stanleymbrand@gmail.com

Matthew Evan Corcoran    ecorcoran@silvermanthompson.com, efiling@silvermanthompson.com

David I. Schoen    dschoen593@aol.com

Charles D. Tobin    tobinc@ballardspahr.com, LitDocket_East@ballardspahr.com, mendezc@ballardspahr.com, mishkinm@ballardspahr.com

Eric Randal Columbus    eric.columbus@mail.house.gov

J.P. Cooney    joseph.cooney@usdoj.gov, CaseView.ECF@usdoj.gov, USADC.CriminalDocket@USDOJ.gov, USADC.ECFFraud@USDOJ.gov, USADC.ECFPCCR@usdoj.gov, amanda.rohde@usdoj.gov

Todd Barry Tatelman    todd.tatelman@mail.house.gov, ogc.ecf@mail.house.gov

Stanley Edmund Woodward, Jr    stanley@brandwoodwardlaw.com, mark@brandwoodwardlaw.com, meghan@brandwoodwardlaw.com

Amanda Rose Vaughn    amanda.vaughn@usdoj.gov, joseph.mcclanahan@usdoj.gov, usadc.criminaldocket@usdoj.gov, usadc.ecfpccr@usdoj.gov

11/4/22, 5:35 PM                      Activity in Case 1:21-cr-00670-CJN USA v. BANNON Judgment

Case 1:21-cr-00670-CJN   Document 166-1   Filed 11/04/22   Page 3 of 3

Maxwell S. Mishkin    mishkinm@ballardspahr.com, LitDocket_East@ballardspahr.com

Michelle S. Kallen    MKallen@jenner.com, 4043426420@filings.docketbird.com, docketing@jenner.com

Molly Gulland Gaston    molly.gaston@usdoj.gov, CaseView.ECF@usdoj.gov, Chad.Byron@usdoj.gov,
USADC.CriminalDocket@USDOJ.gov, USADC.ECFFraud@USDOJ.gov, USADC.ecfpccr@usdoj.gov,
amanda.rohde@usdoj.gov

Douglas N. Letter    douglas.letter@mail.house.gov, ogc.ecf@mail.house.gov

Lauren Russell    russelll@ballardspahr.com

Stacie Marion Fahsel    stacie.fahsel@mail.house.gov

Riane A. White    rwhite@silvermanthompson.com

**1:21-cr-00670-CJN-1 Notice will be delivered by other means to::**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**suppressed
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=10/31/2022] [FileNumber=7998062-0
] [ab915dfea8cb3f0cb3229a985d1b1dd37c328fbddb85bbc28a8de19c481669f1343
448325cf80bf61f2380791897c5ca31d883dd679f13c217a8db621391331a]]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     v.                                                    Criminal Action No. 1:21-cr-0670 (CJN)

STEPHEN K. BANNON,

     *Defendant*.

## ORDER STAYING SENTENCE PENDING APPEAL

Pursuant to 18 U.S.C. § 3143(b), and as the Court explained at the Defendant's sentencing hearing, the Court finds that Defendant Stephen K. Bannon (a) is not likely to flee or pose a danger to the safety of any other person or the community if released and (b) that his appeal is not taken for the purpose of delay but rather raises a substantial question of law that is likely to result in a reversal or an order for a new trial.

Accordingly, it is

**ORDERED** that the sentence in this case shall be STAYED pending Stephen K. Bannon's appeal of his conviction, *see* ECF No. 166.

DATE:  November 7, 2022

_____
CARL J. NICHOLS
United States District Judge

1