ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 22-3086

————————————

UNITED STATES OF AMERICA,                              Appellee,

v.

STEPHEN K. BANNON,                              Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

> MATTHEW M. GRAVES
> United States Attorney
>
> CHRISELLEN R. KOLB
> J.P. COONEY
> MOLLY GASTON
> * ELIZABETH H. DANELLO
> D.C. Bar #407606
> Assistant United States Attorneys
> * Counsel for Oral Argument
> 601 D Street, NW, Room 6.232
> Washington, D.C. 20530
> Elizabeth.Danello@usdoj.gov
> (202) 252-6829

Cr. No. 21-670-CJN

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are Stephen K. Bannon, appellant, and the United States of America, appellee. The same parties appeared in the district court. Appearing as amici in the district court were (1) the United States House of Representatives and (2) the United States House of Representatives Minority Leader Kevin O. McCarthy and Minority Whip Stephen J. Scalise.

## Rulings Under Review

Bannon appeals from the October 21, 2022, judgment of conviction for two counts of contempt of Congress, 2 U.S.C. § 192, entered following a jury trial before the Honorable Carl J. Nichols (Appendix 4767). Bannon challenges: (1) the district court's denial of Bannon's motion to dismiss the indictment on the ground that the congressional subpoena was invalid and the court's related exclusion of evidence about compliance with House of Representatives' procedural rules (*id.* 2341-49, 3005-11);

(2) the court's order quashing Bannon's subpoenas to Members of Congress and their staff and its order denying Bannon's subsequent motion to dismiss the indictment or exclude the government's congressional evidence (*id.* 3019-21, 3931); (3) the court's exclusion of Bannon's good-faith defense, based on the court's determination that the mens rea for contempt of Congress requires proof only that the defendant acted deliberately and intentionally (*id.* 741, 2993-94); and (4) the court's exclusion of Bannon's defenses of entrapment by estoppel and public and apparent authority (*id.* 2353, 2995-96, 3000-04).

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the Addendum to the Brief for Appellant.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

COUNTERSTATEMENT OF THE CASE........................................... 3

    Procedural History ................................................................3

    Relevant Facts .....................................................................3

SUMMARY OF ARGUMENT.......................................................10

ARGUMENT ..........................................................................12

    I.   The District Court Properly Rejected Bannon's Challenges
        to the Congressional Subpoena. ..............................................12

        A.   Background ........................................................12

        B.   Standard of Review.............................................13

        C.   Discussion ........................................................14

            1.   Bannon Fails to Show that the Subpoena Did Not
                Advance a Legislative Purpose....................................14

            2.   Bannon Waived His Procedural Objections to the
                Subpoena. .................................................16

            3.   Bannon's Procedural Objections Lack Merit...............21

    II.  The District Court Did Not Err in Quashing Bannon's
        Subpoenas to Members of Congress and Their Staff...............26

        A.   Background ........................................................26

        B.   Standard of Review.............................................28

        C.   Discussion ........................................................28

III.  The District Court Did Not Err in Applying the Settled Mens Rea for Contempt of Congress to Preclude Bannon's Irrelevant Good-Faith Defense .................................................. 32

    A.  Background .......................................................... 33

    B.  Standard of Review ............................................. 34

    C.  The District Court Applied the Correct Mens Rea Standard .............................................................. 34

        1.  Binding Precedent Forecloses Bannon's Good-Faith Defense. ............................................. 34

        2.  Bannon Shows No Basis for This Court to Overrule the Settled Interpretation of Section 192. ................... 38

    D.  Bannon's Other Constitutional Claims Lack Merit. .......... 47

        1.  Bannon Shows No Debasement of Executive Privilege. ....................................................... 48

        2.  Bannon's "As Applied" Challenge Fails. ....................... 51

IV.  Department of Justice Writings Did Not Excuse Bannon's Default. ...................................................... 54

    A.  Background .......................................................... 54

    B.  Standard of Review ............................................. 57

    C.  Discussion ........................................................... 57

        1.  Entrapment by Estoppel .................................. 58

        2.  Public Authority ............................................. 62

        3.  Apparent Authority ......................................... 64

CONCLUSION .................................................................. 65

# TABLE OF AUTHORITIES*

**Cases**

\* *Agostini v. Felton*, 521 U.S. 203 (1997)...................................................42

*Barenblatt v. United States*, 360 U.S. 109 (1959)............................16, 23

*Browder v. United States*, 312 U.S. 335 (1941) ...............................41, 43

*Bryan (Sillasse) v. United States*, 524 U.S. 184 (1998) ...................42, 44

*Bryson v. United States*, 419 F.2d 695 (D.C. Cir. 1969) ........................48

*Carter v. United States*, 530 U.S. 255 (2000).........................................40

*Chambers v. Mississippi*, 410 U.S. 284 (1973).......................................37

*Cheek v. United States*, 498 U.S. 192 (1991)..........................................43

*Christoffel v. United States*, 338 U.S. 84 (1949) ....................................21

*Cox v. Louisiana*, 379 U.S. 559 (1965) .............................................58, 60

*Dellums v. Powell*, 642 F.2d 1351 (D.C. Cir. 1980)...............................49

*Dennis v. United States*, 171 F.2d 986 (D.C. Cir. 1948) ........................37

\* *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975).........16, 28, 29

*Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582 (D.C. Cir. 1978).......21

*Fields v. United States*, 164 F.2d 97 (D.C. Cir. 1947)............................37

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*Gojack v. United States*, 384 U.S. 702 (1966) .................................. 18, 19

*Gravel v. United States*, 408 U.S. 606 (1972) .................................. 28, 29

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995).......................23

*Hutcheson v. United States*, 369 U.S. 599 (1962) ............................ 16, 17

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019)........................................39

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008)........39

*La. Pub. Serv. Comm'n v. Fed. Energy Reg. Comm'n*, 522 F.3d 378 (D.C. Cir. 2008) ...................................................................38

\* *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961)...... 33, 36, 40, 46

*McPhaul v. United States*, 364 U.S. 372 (1960)....................................17

*Metzenbaum v. Fed. Energy Reg. Comm'n*, 675 F.2d 1282 (D.C. Cir. 1982) ...................................................................22

*Morissette v. United States*, 342 U.S. 246 (1952)..................................40

\* *Quinn v. United States*, 349 U.S. 155 (1955)........................ 14, 35, 41, 46

*Raley v. Ohio*, 360 U.S. 423, 426 (1959)..........................................58, 61

*Ramsey v. U.S. Parole Comm'n*, 840 F.3d 853 (D.C. Cir. 2016)............31

*Rangel v. Boehner*, 785 F.3d 19 (D.C. Cir. 2015) ..................................28

*Ratzlaf v. United States*, 510 U.S. 135 (1994) .......................................42

*Sanders v. McClellan*, 463 F.2d 894 (D.C. Cir. 1972)......................46, 51

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968) ............... 16, 17

\* *Sinclair v. United States*, 279 U.S. 263, *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995) ..... 35, 36, 42

*Staples v. United* States, 511 U.S. 600 (1994) ....................................... 41

*Taylor v. Illinois*, 484 U.S. 400 (1998) ................................................ 37

\* *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) ........... 44, 46, 50, 53

\* *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021),
*cert. denied*, 142 S. Ct. 680 (2022) .................................... 10, 14, 29, 48

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439 (1993) ...................................... 39

*United States v. Alvarado*, 808 F.3d 474 (11th Cir. 2015 ................. 62, 63

*United States v. Arif*, 897 F.3d 1 (1st Cir. 2018) .................................... 38

*United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015) ..................... 15

*United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) ........................ 64

*United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004) ..................... 58

\* *United States v. Bryan (Helen)*, 339 U.S. 323
(1950) ............................................................. 16-17, 19-21, 35, 45, 53

*United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019) ........................ 43

*United States v. Cox*, 906 F.2d 1170 (10th Cir. 2018) ............................ 59

*United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013) .............................. 62

*United States v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995) ............... 22

*United States v. Eaton*, 179 F.3d 1328 (11th Cir. 1999) ........................ 60

*United States v. Fleischman*, 339 U.S. 349 (1950) ................................. 35

*United States v. George*, 386 F.3d 383 (2d Cir. 2004) ............................ 44

*United States v. Hall*, 945 F.3d 507 (D.C. Cir. 2019) ...................... 14, 28

*United States v. Hector*, No. 19-4957, 2022 WL 402493
   (4th Cir.), *cert. denied*, 143 S. Ct. 189 (2022) ..................................... 57

*United States v. Helstoski*, 442 U.S. 477 (1979) .................................... 30

*United States v. Holmquist*, 36 F.3d 154 (1st Cir. 1994) ...................... 64

*United States v. Howell*, 37 F.3d 1197 (7th Cir. 1994) .................... 58, 61

*United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999) ........................... 43

\* *United States v. Jumah*, 493 F.3d 868 (7th Cir. 2007) .......................... 63

*United States v. Lanier*, 520 U.S. 259 (1997) ....................................... 52

*United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) ............................ 61

*United States v. Liveright*, 347 F.2d 473 (D.C. Cir. 1965) .............. 18, 20

*United States v. Marquardo*, 149 F.3d 36 (1st Cir. 1998) ..................... 52

*United States v. McSurely*, 473 F.2d 1178 (D.C. Cir. 1972) .................. 19

*United States v. Nixon*, 418 U.S. 683 (1974) ......................................... 50

*United States v. North*, 910 F.2d 843 (D.C. Cir. 190),
   *withdrawn and superseded in irrelevant part*, 920 F.2d 940
   (D.C. Cir. 1990) ..................................................................................... 64

*United States v. Pa. Indus. Chem. Corp. (PICCO)*,
411 U.S. 655 (1973) ........................................................ 58, 61

*United States v. Pardue*, 385 F.3d 101 (1st Cir. 2004) ..................... 57, 61

*United States v. Peithman*, 917 F.3d 635 (8th Cir. 2019) ....................... 58

*United States v. Rayburn House Office Building*, 497 F.3d 654
(D.C. Cir. 2007) ................................................................ 29

\* *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) ......... 22, 25

*United States v. Sariles*, 645 F.3d 315 (5th Cir. 2011) .......................... 64

*United States v. Seeger*, 303 F.2d 478 (2d Cir. 1962) ........................... 19

*United States v. Sheehan*, 512 F.3d 621 (D.C. Cir. 2008) ...................... 34

*United States v. Theunick*, 651 F.3d 578 (6th Cir. 2011) ...................... 64

*United States v. Urfer*, 287 F.3d 663 (7th Cir. 2002) ........................... 44

*United States v. Valenzuela–Bernal*, 458 U.S. 858 (1982) .................... 31

*United States v. Verrusio*, 762 F.3d 1 (D.C. Cir. 2014) ......................... 30

\* *United States v. West Indies Transport, Inc.*, 127 F.3d 299
(3d Cir. 1997) ................................................................ 59, 62

*United States v. X–Citement Video, Inc.*, 513 U.S. 64 (1994) ................ 40

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005). ........................ 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........................................................... 51

\* *Watkins v. United States*, 354 U.S. 178 (1957) ............... 36, 41, 45, 46, 47

x

*Yellin v. United States*, 374 U.S. 109 (1963) ......................... 18, 20, 36, 41

*Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) ................................................. 38

*Zafiro v. United States*, 506 U.S. 534 (1993) .......................................... 47

## Other References

2 U.S.C. § 192 ................................... 2-3, 11, 18-19, 32, 34-45, 51, 56, 60

18 U.S.C. § 2(b) ..................................................................... 44

18 U.S.C. §1001(a) ............................................................... 44

Fed. R. Crim. P. 30(d) ......................................................... 25

Fed. R. Crim. P. 52(b) ......................................................... 25

U.S. Const., Art. I, § 5, cl. 2 ................................................ 25

U.S. Const., Art. I, § 6 ......................................................... 28

H.R. Res. 503, 117th Cong. (2021) ................................. 4, 20-23

Department of Justice, Office of Legal Counsel, About the
   Office, https://www.justice.gov/olc (last visited May 31, 2023) ........... 59

*Attempted Exclusion of Agency Counsel From Congressional
   Depositions of Agency Employees*, 2019 WL 2563045
   (O.L.C. May 23, 2019) ...................................................... 56

*Congressional Oversight of the White House*, 2021 WL 222744
   (Jan. 8, 2021) ............................................................. 56

*Immunity of the Former Counsel to the President from
   Compelled Congressional Testimony*, 31 Op. O.L.C. 191
   (July 10, 2007) ........................................................... 55

*Prosecution for Contempt of Congress of an Executive Branch Official
   Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C.
   101 (May 30, 1984) .................................................... 47, 55

# GLOSSARY

| | |
|---|---|
| A. | Appendix |
| Br. | Brief for Appellant |
| Committee | House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol |
| DOJ | Department of Justice |
| OLC | Office of Legal Counsel, Department of Justice |

# ISSUES PRESENTED

I.    Whether, in this prosecution for contempt of Congress based on the defendant's refusal to comply with a congressional subpoena, the district court erred in rejecting the defendant's waived and meritless challenges to the subpoena.

II.    Whether the district court erred in quashing the defendant's subpoenas of Members of Congress and their staff and then in declining to dismiss the indictment or exclude the government's congressional evidence, where the subpoenas sought information that was protected by the Speech or Debate Clause and otherwise irrelevant.

III.    Whether the district court erred in barring the defendant's claimed good-faith defense, where binding precedent holds that, for purposes of the contempt-of-Congress statute, 2 U.S.C. § 192, a defendant "willfully" makes default when he "deliberately and intentionally" fails to comply with a congressional subpoena and where the defendant's motive for defaulting thus affords no defense.

IV.    Whether the district court erred in precluding (A) defenses of entrapment by estoppel and actual public authority based on Department of Justice writings that did not sanction the criminal conduct in this case

and (B) a defense of apparent public authority that had no legal or factual support.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 22-3086

_____

UNITED STATES OF AMERICA,                                    Appellee,

v.

STEPHEN K. BANNON,                                    Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR APPELLEE

_____

## INTRODUCTION

Stephen Bannon defied a subpoena to testify and provide documents to the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (Committee). Bannon does not dispute that he deliberately refused to appear and to provide a single document. He defended his noncompliance by claiming that former President Trump had invoked executive privilege. As the Committee explained, however, executive privilege

could not justify Bannon's wholesale default. President Trump never actually asserted a privilege claim. Nor did he suggest that Bannon should not produce any documents or should refuse to appear. In fact, President Trump's attorney correctly cautioned that Bannon was not immune from testifying. The subpoena focused on Bannon's activities as a private citizen and addressed many topics for which executive privilege could not possibly apply. If the subpoena did touch on any privileged matters, Bannon was required to explain to the Committee which documents were allegedly subject to a valid privilege claim and, at the deposition, assert any privilege on a question-by-question basis. Bannon ignored those procedures. Indeed, he chose not to follow any of the subpoena's commands, despite the Committee's repeated warnings that he needed to comply. Convicted of two counts of contempt of Congress, 2 U.S.C. § 192, Bannon now appeals. He shows no reason this Court should overturn his convictions for deliberately disobeying a lawful congressional subpoena.

## COUNTERSTATEMENT OF THE CASE

### Procedural History

By indictment filed on November 12, 2021, Bannon was charged with two counts of violating 2 U.S.C. § 192: (1) refusing to appear on October 14, 2021, for a deposition before the Committee and (2) refusing to produce documents and communications to the Committee by October 18, 2021, as required by subpoena dated September 23, 2021 (Appendix (A.) 37). On July 22, 2022, following trial by jury before the Honorable Carl J. Nichols, Bannon was found guilty as charged (A.4592). On October 21, 2022, Judge Nichols sentenced Bannon to concurrent terms of four months' incarceration and a $6,500 fine (A.4763, 4767).[1] Bannon filed a timely notice of appeal on November 4, 2022 (A.4772). The district court stayed execution of the sentence pending appeal (A.4779).

### Relevant Facts

On January 6, 2021, rioters stormed the United States Capitol and delayed the scheduled vote of a Joint Session of Congress to certify the

---

[1] The schedule of payments in the Judgment and Commitment Order erroneously lists the total fine as $6,550 (A.4771). The record should be remanded to correct that clerical error.

2020 presidential vote (A.3947). The attack caused injuries to more than 140 law-enforcement officers and several deaths (*id.*). On June 30, 2021, the United States House of Representatives adopted House Resolution 503,[2] which established the Committee and directed it to investigate and report on the "facts, circumstances, and causes," including the "influencing factors," of the January 6 attack (A.3946-47, 3950-51, 3955, 3957, 4808). The resolution authorized the Committee to subpoena witnesses to provide testimony and documents (A.4817).

Public accounts indicated that Bannon—a former presidential advisor who left the White House in 2017 (A.766)—played multiple roles relating to the events of January 6, including predicting on a podcast that "all hell was going to break loose" that day and participating in discussions with Members of Congress and others regarding efforts to overturn the election results (A.3964-65; see A.4824). On September 23, 2021, the Committee issued a subpoena ordering Bannon (1) to produce, by October 7, 2021, at 10:00 a.m., documents relating to 17 categories of information spanning the period from April 1, 2020, to the date of the

---

[2] *See* H.R. Res. 503, 117th Cong. (2021).

subpoena; and (2) to appear for a deposition on October 14, 2021 (A.3963, 3967-68, 4822).

The subpoena covered a wide range of topics (A.4825-26). It primarily sought information related to Bannon's activities and communications with people outside the White House (e.g., A4825-26 ¶¶ 4 (financing of rally-goers' travel to Washington), 5 (Bannon's "War Room" podcast), 6 (communications with "March for Trump" group), 7 (information related to January 5, 2021, meeting at the Willard Hotel), 15 (communications with Proud Boys, Oath Keepers, and other groups), 16 (communications with Members of Congress)). Only three inquiries touched on Bannon's communications with President Trump, and even those were limited to communications occurring in 2020 and 2021, after Bannon had left the White House (A.4825 ¶¶ 2, 8, 9).

Attached to the subpoena were instructions stating that if Bannon could not comply by the specified date, he should comply to the extent he could and explain why full compliance was not possible (A.4828 ¶13). If Bannon withheld documents for any reason, including privilege, he should provide a detailed log to the Committee (A.4828 ¶14). The subpoena package also provided the House of Representatives' general

rules for depositions, which stated that to assert a privilege, the witness had to appear for the deposition and assert the privilege on a question-by-question basis (A.4831).

On September 24, 2021, Bannon's attorney, Robert Costello, accepted service of the subpoena on Bannon's behalf (A.3972-74, 4035, 4039, 4045, 4832). Costello later confirmed to prosecutors that he provided Bannon with the subpoena and subsequent letters from the Committee, and he said that Bannon was "fully engaged throughout the entire process" (A.4248-49).

The deadline of 10:00 a.m. on October 7, 2021, for production of documents passed without any word from Bannon or his attorney (A.3971, 4042). At 5:05 p.m. on October 7, Costello emailed a letter to Kristin Amerling, Deputy Staff Director and Chief Counsel of the Committee (A.4044-46, 4835). Costello's letter included an excerpt of an October 6, 2021, letter from Justin Clark, counsel for President Trump (A.4835). The Clark letter noted that the subpoena of Bannon sought records and testimony "including but not limited to" information that was "potentially" protected by "executive and other privileges" and that President Trump was "prepared" to defend those privileges in court (*id.*).

The Clark letter further relayed President Trump's instruction that, "to the fullest extent permitted by law," Bannon should not produce any documents or provide any testimony "concerning privileged material" in response to the subpoena (*id.*). Based on Clark's letter, Costello told the Committee that President Trump had asserted his intention to assert executive privilege and that Bannon would comply with the subpoena only "when and if" the courts resolved the privilege issue (A.4835-36). On October 8, 2021, Bannon posted on the social media platform GETTR, "Steve Bannon tells the January 6 select committee that he will NOT comply with their subpoena" (A.4242, 4852).

On October 8, 2021, Amerling emailed to Costello a letter from Committee Chairman Bennie Thompson rejecting Bannon's claimed ground for noncompliance (A.4050-51, 4838). Chairman Thompson noted that President Trump had not actually asserted executive privilege; that most of the documents and testimony sought could not possibly be protected by executive privilege; and that Bannon was required to provide non-privileged documents and a log of documents he was withholding and to raise any testimonial privilege objection at the deposition (A.4838-40). Chairman Thompson reiterated that Bannon still

needed to honor the subpoena, and he warned that noncompliance could result in a referral to the Department of Justice (DOJ) for a criminal contempt prosecution (A.4839-40).

On October 13, 2021, Costello wrote the Committee and repeated that Bannon would not comply with the subpoena because "[a]s recently as today," Clark had told him that "President Trump is exercising his executive privilege" and had directed Bannon not to produce documents or testify until the privilege issue was resolved (A.4060-61, 4841). On October 14, after reviewing Costello's letter to the Committee, Clark emailed Costello and stated, "To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated October 6, 2021 . . ." (A.443). Forwarding this email to Bannon, Costello warned, "I don't know what game Clark is playing but it puts Steve Bannon in a dangerous position. Beware." (A.442.)

On October 15, 2021, Chairman Thompson responded to Costello's October 13 letter and again rejected Bannon's executive-privilege rationale (A.4062-63, 4843). He noted that Bannon had not produced a single document or appeared for his deposition; he reiterated the Committee's position that executive privilege did not excuse Bannon's

8

noncompliance; he warned that the Committee would meet on October 19, 2021, to consider contempt procedures; and he added that if Bannon wanted to provide the Committee with any information about his noncompliance, he should do so by 6:00 p.m. on October 18, 2021 (A.4843-45).

On October 16, 2021, Clark emailed Costello again and stated, "Just to reiterate, [the October 6 letter from Clark] didn't indicate that we believe there is immunity from testimony for your client. As I indicated to you the other day, we don't believe there is." (A.448.) Costello urged Clark to contact the Committee directly (A.447), but Clark did not do so and instead deferred to Costello to invoke executive privilege if he "believe[d] it to be appropriate" (A.208-09, 448).

Costello did not respond to the Committee's request for additional information by the October 18 deadline (A.4072). Instead, at 6:02 p.m. on October 18, Costello sent the Committee a letter requesting a one-week adjournment so the Bannon team could assess the effect of a lawsuit President Trump had just filed against the Committee (A.4070-71, 4846-47). The Committee rejected that request on the ground that the Trump

lawsuit was immaterial to the Bannon subpoena (A.4073, 4848).[3] On October 19, 2021, the Committee informed Bannon by letter that it had unanimously voted to recommend that he be prosecuted for contempt of Congress (A.4073, 4849).[4]

## Summary of Argument

The district court correctly denied Bannon's motion to dismiss the indictment based on his post-indictment challenges to the subpoena and precluded evidence about those challenges at trial. The indictment alleged a valid legislative purpose for the subpoena. Bannon waived his procedural challenges to the subpoena by failing to raise them before the

---

[3] As Chairman Thompson noted, the lawsuit involved the Committee's attempt to obtain records from the Archivist of the United States (A.4848). The complaint did not mention Bannon. *See Trump v. Thompson*, 1:21-cv-02769-TSC, ECF 1. The district court's denial of the plaintiff's motion for a preliminary injunction was affirmed by this Court. *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021). The district court ultimately dismissed the case as moot. 1:21-cv-02769-TSC, ECF 62.

[4] By letter dated October 18, 2021, Jonathan Su, Deputy Counsel to President Biden, informed Costello that President Biden had determined that an assertion of executive privilege was not justified as to the Bannon subpoena (A.766). Shortly before trial, on July 9, 2022, President Trump wrote Bannon and said that he previously had invoked executive privilege but now waived it as to Bannon's testimony; the letter did not mention production of documents (A.4781).

Committee. In any event, those challenges lacked merit and provided no defense to the charges.

Bannon's subpoenas of congressional witnesses sought information that was both protected by the Speech or Debate Clause and otherwise irrelevant. The district court did not err in quashing the subpoenas and denying Bannon's subsequent motion for remedial sanctions.

The district court properly applied the settled mens rea for contempt of Congress, 2 U.S.C. § 192, when it barred Bannon's defense that he believed in good faith he did not need to comply with the subpoena. The Supreme Court and this Court have held that the statute requires only a deliberate intention to default and that good faith is no defense. These cases bind the Court and are still good law. The district court's mens rea ruling also did not interfere with the exercise of executive privilege or render the statute unconstitutionally overbroad or vague.

The district court correctly concluded that Department of Justice memoranda in unrelated cases provided no support for Bannon's defenses of entrapment by estoppel and public authority. Bannon's defense of apparent authority lacked any legal or factual support.

11

**ARGUMENT**

## I.    The    District    Court    Properly    Rejected Bannon's    Challenges    to    the    Congressional Subpoena.

Bannon contends that the subpoena lacked a valid legislative purpose and was issued in violation of certain procedural rules (Brief for Appellant (Br.) 48-56). The district court did not err in rejecting these claims.

### A.    Background

In his correspondence with the Committee, Bannon raised just one objection—that the subpoena sought information for which President Trump had asserted a claim of executive privilege (A.4835, 4841-42). After indictment, the government moved in limine to exclude evidence relating to subpoena objections Bannon had failed to raise (A.771). Bannon opposed the motion and moved to dismiss the indictment based in part on procedural objections to the subpoena, including: (1) the Committee had only nine members, (2) there was no "ranking minority member," and (3) the Committee failed to provide Bannon with a copy of Rule 3(b) of House Res. 8, 117th Cong., 1st Sess. (2021), which concerns deposition procedures (A.818-26, 1698). Bannon also argued that the

subpoena lacked a valid legislative purpose (A.826-27; see A.1775-82 (government opposition)).

The district court denied Bannon's dismissal motion and excluded evidence or argument about Bannon's procedural objections (A.2341-49, 3005-10, 4105). The court found that the indictment on its face alleged a valid legislative purpose for the subpoena (A.2346-49). It found that Bannon had waived his procedural objections by not raising them with the Committee (A.3005-08). Alternatively, the court ruled that the rules about the Committee's composition were ambiguous, and the court thus deferred to the House's interpretation, which accepted the Committee as "validly constituted and operating" (A.2342-46, 3008-09). The court also found that Bannon had no right to a copy of the deposition procedures before he appeared (A.2346).

## B.    Standard of Review

Because Bannon's subpoena challenges raise questions of law, the district court's denial of the motion to dismiss should be reviewed de novo. *See United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005). The Court should review the district court's exclusion of evidence about

compliance with House rules for abuse of discretion. *See United States v. Hall*, 945 F.3d 507, 514 (D.C. Cir. 2019).

### C.    Discussion

#### 1.    Bannon Fails to Show that the Subpoena Did Not Advance a Legislative Purpose.

Congress may use its investigative power only for a "valid legislative purpose." *Quinn v. United States*, 349 U.S. 155, 161 (1955). Bannon does not dispute that the Committee's investigation had a valid legislative purpose, as this Court has held it "plainly" did. *Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 680 (2022) (see Br. 53 n.34). He argues, though, that the district court should have dismissed the indictment on the ground that the subpoena to him lacked a valid legislative purpose (Br. 53 & n.53). The district court did not err.

The indictment on its face established the subpoena's legislative purpose. It alleged that the Committee was authorized to subpoena witnesses to provide such testimony and documents that the Committee deemed necessary to its investigation of the "facts, circumstances, and causes" of the January 6 insurrection (A.38). Listing some of Bannon's

actions, the indictment further alleged that the Committee believed Bannon had information "relevant to understanding important activities that led to and informed" the January 6 events at the Capitol (A.39). The indictment also charged that Bannon had been subpoenaed to provide documents "relevant to the Select Committee's authorized investigation" and to appear to testify at a deposition "touching matters of inquiry committed" to the Committee (A.39-40). The indictment thus sufficiently alleged that the subpoena sought information relevant to the Committee's authorized investigation. The district court properly relied on the indictment's assertions to deny the motion to dismiss. *See United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) ("When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations.").

Bannon nonetheless claims that certain Members of the Committee targeted him for improper, political reasons (Br. 53). None of the quotes offered to show this allegedly partisan agenda even mentions Bannon (see A.827-28 n.17, cited in Br. 53 n.35). Moreover, the motives of individual Members did not bear on whether the Committee acted with a legislative purpose. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S.

491, 508 (1975) ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."); *Barenblatt v. United States*, 360 U.S. 109, 133 (1959) (declining to inquire into "the motives of committee members") (internal quotation marks omitted).

## 2. Bannon Waived His Procedural Objections to the Subpoena.

The district court correctly found that Bannon waived his procedural objections by not raising them before the Committee. "[A] decent respect for the House of Representatives" requires that a witness "state her reasons for noncompliance upon the return of the writ." *United States v. (Helen) Bryan*, 339 U.S. 323, 332 (1950); *see also Hutcheson v. United States*, 369 U.S. 599, 608-11 (1962) (noting "the rule" that investigating committees "are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer"); *Shelton v. United States*, 404 F.2d 1292, 1299-1300 (D.C. Cir. 1968) (if defendant believed subpoena invalid under Fourth Amendment, "he was under obligation to inform the Subcommittee of his position"). A witness who does not comply with a congressional subpoena cannot defend against a contempt charge based on an objection the witness could have raised, but

16

failed to raise, at the time of the default. *See (Helen) Bryan*, 339 U.S. at 332-35 (defendant waived objection to issuing committee's lack of quorum when she raised it for the first time at her contempt trial); *Hutcheson*, 369 U.S. at 611 (objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court"); *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (defendant could not raise at trial claim that government failed to show he could have produced records, where he failed to raise that claim before the committee and thereby deprived the committee of the opportunity to consider and possibly remedy the objection); *Shelton*, 404 F.2d at 1300 (contempt "is not avoided" if defendant failed to raise "valid and timely objection").

Bannon does not dispute that he never objected to the subpoena based on the Committee's size, its lack of "ranking minority member," or the need for a copy of Rule 3(b).[5] He establishes no reason that the waiver rule should not apply. He cites (at 54) the exception to the rule where, at

---

[5] Although Bannon asserts (at 55) that he "put the Select Committee on notice" of his "objection[]" that President Trump's attorney would not be allowed to attend the deposition, he in fact never raised such an objection with the Committee (see A.205).

17

the time of the subpoena, the witness did not know or reasonably could not have known the basis for the objection. *See Yellin v. United States*, 374 U.S. 109, 122 (1963); *United States v. Liveright*, 347 F.2d 473, 475-76 (D.C. Cir. 1965). Bannon cannot show he was clueless about the Committee's composition, which was widely reported in the public media, or of his right to a copy of Rule 3(b) once he appeared, which was spelled out in the deposition procedures attached to the subpoena (A.4831 ¶ 11).

Bannon also errs in arguing that he could not have waived his procedural objections because they went to an element of the offense (Br. 55). As the district court instructed the jury, to establish the offense of contempt of Congress, the government was required to prove: (1) Bannon was subpoenaed by the Committee to provide testimony or produce papers; (2) the subpoena sought testimony or information pertinent to the investigation that the Committee was authorized to conduct; (3) Bannon failed to comply or refused to comply with the subpoena; and (4) his failure or refusal to comply was willful (A.4460). *See* 2 U.S.C. § 192.

These instructions recognize that "a clear chain of authority from the House to the questioning body is an essential element of the offense." *Gojack v. United States*, 384 U.S. 702, 716 (1966). Similarly, "pertinency

of [Congress's] demands to the valid subject of the legislative inquiry" is an essential element. *United States v. McSurely*, 473 F.2d 1178, 1203 (D.C. Cir. 1972). A committee's compliance with procedural rules, however, is not an element of the offense of contempt of Congress. *See (Helen) Bryan*, 339 U.S. at 328-29 (government does not have to prove that a quorum of the congressional committee was present when default occurred).

Bannon errs in likening compliance with procedural rules to the elements of congressional authority and pertinency (Br. 55). The statutory requirement that the witness be summoned "by the authority of either House of Congress," 2 U.S.C. § 192, requires only that the relevant committee "was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority." *United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962); *see also Gojack*, 384 U.S. at 716. The pertinency element looks to whether the questions to the witness related to a matter the committee was authorized to investigate. *See McSurely,* 473 F.2d at 1203. Bannon's rules-based objections did not bear on whether the Committee was authorized by Congress to investigate the January 6 attack and to subpoena Bannon.

House Resolution 503 gave the Committee that authority. Nor were they relevant to whether the Bannon subpoena related to the focus of the Committee's investigation, as the face of the subpoena established it did.

Rather, Bannon's claims about the composition of the Committee and application of its rules were procedural objections that could be raised only as defenses—if they were preserved. *See Yellin*, 374 US. at 123 ("It may be assumed that if petitioner had expressly rested his refusal to answer upon a violation of Rule IV and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his *defense*.") (emphasis added); *(Helen) Bryan*, 339 U.S. at 332 (acknowledging that witness could have declined to testify or produce documents based on lack of quorum, but "the defense" failed in that case because witness did not raise objection at the time); *Liveright*, 347 F.2d at 475 (committee's failure to comply with authorizing resolution "a valid defense" to contempt). Because Bannon did not preserve his rules-based defenses, the district court properly denied his motion to dismiss the indictment and excluded as irrelevant evidence about the procedural rules.

20

Bannon's reliance on *Christoffel v. United States*, 338 U.S. 84 (1949), and *Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582 (D.C. Cir. 1978) (Br. 50), is misplaced. In *Christoffel*, the Supreme Court reversed a conviction for perjury before Congress because the government failed to prove that a quorum was present at the hearing. *Christoffel* was premised on the fact that a "competent tribunal" is an element of perjury. 338 U.S. at 85 n.2 (quoting perjury statute). As the Supreme Court later explained, a "competent tribunal" is not an element of contempt of Congress, and thus *Christoffel* "is inapposite" in a Section 192 case. *(Helen) Bryan*, 399 U.S. at 328. In *Exxon*, this Court cautioned that a resolution authorizing a particular congressional investigation did not allow for subpoenas by individual Members of Congress. 589 F.2d at 592. Bannon cannot show that Chairman Thompson, who signed his subpoena (A.4822), lacked authority to do so (see A.4817 (House Resolution 503 authorized Chairman to issue subpoenas)).

### 3.    Bannon's Procedural Objections Lack Merit.

Bannon's complaints about the Committee's composition and process lack merit anyway.

*First*, the district court correctly dismissed Bannon's challenge to the size of the Committee, which would have required the court to override Congress's interpretation of its own rules. The Rulemaking Clause of the Constitution, U.S. Const., Art. I, § 5, cl. 2, "clearly reserves to each House of the Congress the authority to make its own rules . . . ." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). In general, Congress's conformity to its procedural rules is "political in nature" and therefore "nonjusticiable." *Metzenbaum v. Fed. Energy Reg. Comm'n*, 675 F.2d 1282, 1287 (D.C. Cir. 1982). In the limited situation where a claim that Congress did not follow its internal rules "requires no resolution of ambiguities," a court may consider the claim. *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995). But if a procedural rule is "sufficiently ambiguous," principles of separation of powers require the judiciary to defer to Congress's interpretation. *Rostenkowski*, 59 F.3d at 1306.

The size provision in House Resolution 503 is sufficiently ambiguous that the district court properly declined to override Congress's interpretation. Although House Resolution 503 stated that the Speaker "shall" appoint 13 members (A.4810), it nowhere said that the Committee

22

could not function with a lesser number. Nor did the size of the Committee afford any procedural protections for witnesses. Moreover, although "'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'" *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (citing authorities and examples). The fact that the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina operated with only 11 members, despite the authorizing resolution's direction that Speaker "shall" appoint 20 members (A.2018-19), illustrates the malleability of "shall." Here, the Congress that enacted House Resolution 503 debated the same claim Bannon raises about the size of the Committee but nonetheless approved the Committee's recommendation to refer Bannon and other witnesses for contempt prosecution (see A.2019-20 & n.2). The district court did not err in deferring to Congress's evident view that its own committee was properly constituted and authorized to act. *See generally Barenblatt*, 360 U.S. at 118 ("[T]he proper meaning of an authorization to a congressional committee is not to be derived alone from its abstract terms unrelated to the definite content furnished them by the course of congressional actions.").

23

*Second*, Bannon errs in claiming he could refuse to comply with the subpoena because the Committee lacked a "ranking minority member," as necessary to subpoena a witness for a deposition (A.4817-18).[6] The term "ranking minority member" is sufficiently ambiguous to require deference to Congress's interpretation. As the House of Representatives explained in an amicus brief, this term can mean "the first member of the minority party appointed to the Select Committee by the Speaker" (A.2023). Bannon does not contest that the Vice Chair of the Committee was from the minority party.[7] Congress's ratification of the Committee's work indicates that Congress believed the Vice Chair could assume the

---

[6] This objection would not bear on Bannon's failure to provide documents. There appears to be no requirement that the Chairman consult with the "ranking minority member" before issuing a document subpoena (A.4817; see A.962).

[7] Bannon cites (at 47) a statement in an FBI interview by then-House Counsel Douglas Letter that "there were no majority or ranking members" on the Committee (A.237). As the House amicus brief explained, this statement was taken out of context (A.2023). There was "no formalistic division" between majority and minority members and their staff because the Committee operated "as a single, unified body with a joint staff" (A.2024). Letter did not suggest that the Committee lacked a Member who would be considered the "ranking minority member" for purposes of exercising the Committee's subpoena authority (*id.*).

24

role of ranking minority member. Again, Congress's interpretation of its own rule controls. *See Rostenkowski,* 59 F.3d at 1306.

*Third*, there was no defect in the Committee's failure to provide Bannon with a copy of Rule 3(b) before the deposition. The rules governing depositions in the House provide: "A witness shall not be required to *testify* unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations" (A.4831 ¶ 11) (emphasis added). Witnesses thus are entitled to a copy of Rule 3(b) before they testify, not before they appear. Because Bannon never appeared, there was no need to give him a copy of the rule. The Committee staff in fact was prepared to give Bannon a copy had he shown up (A.429, 4150).[8]

---

[8] Bannon claims (at 51-52) that the district court erred in adding a jury instruction regarding Rule 3(b). We assume he is referring to the instruction that the jury could not consider "a purported rules violation by the Committee in not providing the defendant with a copy of certain rules" (A.4519). The court was responding to the defense closing argument that the Committee's failure to provide a copy of Rule 3(b) was a reason to doubt Bannon's guilt (A.4480-81). Bannon did not object before the jury retired. He fails to show that the court plainly erred in instructing the jury not to consider an irrelevant issue or that he suffered prejudice as a result. *See* Fed. R. Crim. P. 30(d) and 52(b).

## II.    The District Court Did Not Err in Quashing Bannon's Subpoenas to Members of Congress and Their Staff.

Bannon challenges the district court's orders quashing his subpoenas to various Members of Congress and their staff and denying his later motion for remedial sanctions (Br. 41-48). The court properly enforced the protections of the Speech or Debate Clause of the Constitution. The material Bannon sought also did not bear on any element of the charged offense.

### A.    Background

Bannon subpoenaed the Speaker of the House, the Majority Leader, the Majority Whip, the members of the Committee, the House Counsel, and three Committee staff members to testify at trial and to provide documents on a range of topics regarding the Committee's authority, the subpoena to Bannon and subsequent correspondence, and the decision to refer Bannon for prosecution (A.2113-2223). Bannon later proffered that he sought to ask numerous questions, including why the Committee was constituted as it was, what Committee members were thinking when they issued the subpoena, what Chairman Thompson meant in using certain language in his letters, whether the Committee thought the

26

stated deadlines for compliance were flexible, and why the Committee chose not to pursue civil remedies for Bannon's noncompliance (A.4333-50, 4604-09).

The recipients moved to quash the subpoenas (A.2072). Among other claims, they argued that they were immunized by the Speech or Debate Clause (A.2087-96). The movants stated, however, that two subpoena recipients—Amerling and Senior Investigative Counsel Sean Tonolli—would be made available to testify at trial but only as to matters relevant to the elements of the offense and available defenses (A.2098-99).[9]

Over Bannon's opposition (A.2597), the district court granted the motion to quash (A.3019-21). It held that much of the testimony and most of the documents sought were protected by the Speech or Debate Clause, there was no waiver of the privilege, and any information not so covered was irrelevant (A.3019-22). Bannon then moved to exclude the government's congressional testimony or to dismiss the indictment (A.3192). The government opposed (A.3303), and supplemental pleadings

---

[9] Amerling did in fact testify for the government and was cross-examined by Bannon. Neither side called Tonolli.

27

followed (A.4600, 4634, 4649). Finding that the information sought was not material, the district court denied Bannon's motion (A.3931, 4683-86).

### B.    Standard of Review

The scope of the Speech or Debate Clause is a legal question that is reviewed de novo. *See Rangel v. Boehner*, 785 F.3d 19, 22 (D.C. Cir. 2015). A district court's exclusion of evidence is reviewed for abuse of discretion. *Hall*, 945 F.3d at 514.

### C.    Discussion

The Speech or Debate Clause, U.S. Const., Art. I, § 6, provides that "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." "Without exception," the Supreme Court has read the Speech or Debate Clause "broadly to effectuate its purposes" of ensuring that Congress may perform its constitutional duties independently. *Eastland*, 421 U.S. at 501. The Clause applies to acts "essential to legislating," *Gravel v. United States*, 408 U.S. 606, 621 (1972), including legislative fact-finding and the issuance of subpoenas by congressionally authorized committees, *Eastland*, 421 U.S. at 504. The Clause provides both a testimonial and a non-disclosure privilege.

28

*United States v. Rayburn House Office Building*, 497 F.3d 654, 659-60 (D.C. Cir. 2007). It also protects not only Members of Congress but their aides to the extent the aides' conduct would be protected if performed by a Member. *Gravel*, 408 U.S. at 616-618.

The district court correctly applied the Speech or Debate Clause to quash the congressional subpoenas. Because the Committee had been created and authorized by the House to advance a valid legislative purpose, *Trump v. Thompson*, 20 F.4th at 41, the Committee's structure and the matters related to its investigation fell within the "sphere of legitimate legislative activity." *Eastland*, 421 U.S. at 503. The subpoenaed Members and their staff thus enjoyed absolute immunity from compelled testimony or document production. *See id.* at 501 (explaining that, when properly invoked, "the prohibitions of the Speech or Debate Clause are absolute").

Contrary to Bannon's claim (at 42), neither the filing of an amicus brief by the House of Representatives (A.2009) nor the voluntary appearance for an FBI interview by three House staff members (A.234, 425) served to waive the protections of the Speech or Debate Clause. Bannon cites no case, nor are we aware of any, holding that Congress

may waive the Clause's protections. In any event, "such waiver could be shown only by an explicit and unequivocal expression." *United States v. Helstoski*, 442 U.S. 477, 493 (1979). There was no "explicit and unequivocal" waiver here.

The absolute protection of the Speech or Debate Clause did not yield to Bannon's competing desire for evidence, as he assumes (Br. 46). The purpose of the Speech or Debate Clause is not to "assure fair trials" but "to preserve the constitutional structure of separate, coequal, and independent branches of government." *Helstoski*, 442 U.S. at 491. As in *United States v. Verrusio*, 762 F.3d 1, 23 (D.C. Cir. 2014), Bannon "points to *no* case in which *any* court has found that a defendant's Fifth and Sixth Amendment rights trump the Speech or Debate Clause privilege." The district court thus properly upheld the privilege here.[10]

Moreover, none of the information Bannon sought from the subpoena recipients was relevant to the charged offenses, despite his conclusory claims to the contrary (Br. 42, 46). The subpoenas did not seek

---

[10]    Because the district court did not reach the issue whether the congressional witnesses were "high-ranking government officials," Bannon's bare-bones claim that they were not (Br. 47) is beside the point.

information bearing on any of the four elements of contempt of Congress. See supra p. 18 (listing elements). Lawmakers' thoughts and behind-the-scenes conduct (see Br. 41, 45-46) would reveal nothing about whether Bannon in fact received a subpoena pertinent to an authorized investigation and willfully refused to comply. Individual Members' reasons for referring Bannon for prosecution after he had defaulted (Br. 41 & n.27) also did not bear on whether Bannon defaulted in the first place. And as we have discussed, see supra pp. 18-19, the "authority" element of the offense (see Br. 45) does not turn on how the Committee was constituted—a challenge that Bannon waived anyway.

The quashing order did not violate Bannon's rights to compulsory process and to present a defense, as he claims (Br. 42).[11] A defendant is entitled to present only evidence that is "material and favorable to his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982). Because the testimony Bannon sought from the congressional witnesses

---

[11] Bannon also mentions in passing his rights to effective assistance of counsel and to confrontation (Br. 42). It is not clear how the quashing of witness subpoenas implicates those rights. Because Bannon does not develop these additional constitutional claims, this Court should decline to address them. *See, e.g., Ramsey v. U.S. Parole Comm'n*, 840 F.3d 853, 865 n.6 (D.C. Cir. 2016).

did not meet this standard, barring the evidence did not violate Bannon's constitutional rights, and no dismissal was warranted.

Nor did the court abuse its discretion in denying Bannon's alternative request to exclude testimony of the government's congressional witnesses. The only congressional witness the government called was Amerling, who testified about the Committee's investigative authority, the subpoena to Bannon, and the correspondence between Costello and the Committee. Bannon had ample opportunity to cross-examine Amerling, and he identifies no relevant question she was unable to answer (see Br. 43). Bannon fails to show why barring immaterial congressional evidence required exclusion of government testimony that focused on the issues properly before the jury.

## III.  The District Court Did Not Err in Applying the Settled Mens Rea for Contempt of Congress to Preclude Bannon's Irrelevant Good-Faith Defense.

Bannon claims that the district court violated his Fifth and Sixth Amendment rights by applying a mens rea standard that prevented him from establishing a good-faith defense (Br. 12-41). He shows no error. To establish contempt of Congress under 2 U.S.C. § 192, the government

32

must establish a deliberate and intentional default. *Licavoli v. United States*, 294 F.2d 207, 209 (D.C. Cir. 1961). A defendant's motive for failing to comply with a subpoena—including the claim that he relied on advice of counsel—is irrelevant to his guilt. *Id.* at 208-09. The district court properly applied this mens rea standard in precluding Bannon's good-faith defense.

## A.    Background

Before trial, the government moved in limine to exclude evidence or argument relating to a defense of good faith or reliance on advice of counsel (A.313). The motion prompted a flurry of pleadings (e.g., A.331, 392, 556, 565, 725). After hearing argument, the district court granted the government's motion (A.741). The court recognized that it was bound by *Licavoli* (A.742-44; see also A.542-45). The court thus did not allow Bannon to present evidence or argument that he had believed in good faith he did not need to comply with the subpoena based on: (1) advice of counsel, (2) President Trump's purported invocation of executive privilege, and (3) DOJ writings, particularly opinions by the Office of Legal Counsel (OLC) (e.g., A.744, 2993-94).

Over defense objection, the court also instructed the jury that the word "willful" does not mean "for an evil or bad purpose"; that "[t]he reason or purpose of the failure or refusal to comply is immaterial so long as the failure or refusal was deliberate and intentional" and "not the result of inadvertence, accident or mistake"; and that it was not a defense that the defendant did not comply "because of the legal advice he received from his attorney or someone else, because of his understanding or belief of what the law required or allowed or because of his understanding or belief that he had a legal privilege, such as executive privilege, that excused him from complying" (A.4461-62).

## B.    Standard of Review

A district court's construction of the mens rea for a criminal statute is reviewed de novo. *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008).

## C.    The District Court Applied the Correct Mens Rea Standard.

### 1.    Binding Precedent Forecloses Bannon's Good-Faith Defense.

The statute criminalizing contempt of Congress, 2 U.S.C. § 192, provides:

34

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, *willfully makes default*, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months (emphasis added).

The Supreme Court has held that the mens rea element of Section 192 requires "a deliberate, intentional refusal to answer." *Quinn*, 349 U.S. at 165-66; *accord Sinclair v. United States*, 279 U.S. 263, 299 (1929) ("No moral turpitude is involved. Intentional violation is sufficient to constitute guilt."), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995); *see also United States v. Fleischman*, 339 U.S. 349, 360, 364 (1950) (evidence "amply sustains" Section 192 conviction where defendant failed to present evidence to excuse her noncompliance, such as she "had tried in good faith to bring about compliance with the subpoena," or she "had been ill or necessarily out of town"); *(Helen) Bryan*, 339 U.S. at 330 ("prima facie" case of willful default where evidence showed that defendant had been directed to produce records

"and that on the day set out in the subpoena she intentionally failed to comply"). The Supreme Court also has made clear that good faith does not excuse a deliberate failure to comply with a congressional subpoena. *See Yellin*, 374 U.S. at 123 ("Of course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense."); *Watkins v. United States*, 354 U.S. 178, 208 (1957) ("An erroneous determination on [witness's] part, even if made in the utmost good faith, does not exculpate him . . . ."); *Sinclair*, 279 U.S. at 299 (exclusion of evidence that defendant refused to answer "in good faith on the advice of competent counsel" did not entitle defendant to new trial because defendant's "mistaken view of the law is no defense").

In accord with these cases, this Court in *Licavoli* held that "willfully makes default" for purposes of Section 192 means "a deliberate, intentional failure, without more." 294 F.2d at 208. The defendant in *Licavoli* refused to appear before a Senate select committee and was convicted under Section 192. On appeal, he argued that the district court was required to instruct the jury that advice of counsel was a defense. *Id.* at 207. This Court rejected the premise that "evil motive" is "a necessary

ingredient of willfulness" under the statute. *Id.* at 208. Citing several Supreme Court cases and its own precedent, the Court held that the intent required to constitute an offense under Section 192 means no more than "[a] deliberate intention not to appear." *Id.* The Court recognized that not all failures to respond to a subpoena are "willful," and it noted that circumstances such as "illness, travel trouble, misunderstanding, etc.," could prevent compliance. *Id.* The Court held, though, that a defendant's reliance on advice of counsel "is not a defense to a charge of failure to respond." *Id.* at 209; *see also Dennis v. United States*, 171 F.2d 986, 990 (D.C. Cir. 1948); *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947).

The district court thus followed controlling authority in defining "willfully" as "deliberately and intentionally" and in barring evidence or argument that Bannon acted in good faith. Bannon cannot establish error, much less constitutional error, in the exclusion of an irrelevant defense. *See, e.g., Taylor v. Illinois*, 484 U.S. 400, 410 (1998) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)

37

(defendant "must comply with established rules of procedure and evidence"); *see United States v. Arif*, 897 F.3d 1, 11 (1st Cir. 2018) (because fraud defendant's good-faith belief in the efficacy of the products he marketed was irrelevant to charged offense, excluding evidence of that belief, even if objection was not waived, did not violate defendant's Sixth Amendment right to present a defense).

## 2.    Bannon Shows No Basis for This Court to Overrule the Settled Interpretation of Section 192.

Seeking to sidestep *Licavoli*, Bannon argues that the accepted mens rea standard for Section 192 cannot be reconciled with more recent Supreme Court cases stating that criminal offenses requiring "willful" conduct generally require proof that the defendant knew his conduct was unlawful (Br. 17-21). *Licavoli* is binding authority, however. *See La. Pub. Serv. Comm'n v. Fed. Energy Reg. Comm'n*, 522 F.3d 378, 390 (D.C. Cir. 2008) (a panel of the Court lacks authority to overturn the decision of a prior panel). Moreover, this Court is bound by the Supreme Court cases, such as *Quinn* and *Sinclair*, holding that Section 192 requires only a deliberate intent not to answer and that good faith is not a defense. *See Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005) ("[T]he Supreme Court's

38

interpretation of a statute binds lower federal courts in their application of that statute."). Even if the Court had authority to revisit the mens rea element of Section 192, Bannon could not justify overruling a long-standing statutory interpretation, where stare decisis "has special force." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) (internal quotation marks omitted).

To start, the text of Section 192 supports reading "willfully" to require only a deliberate intent not to comply. Courts "ordinarily assume, absent a clearly expressed legislative intention to the contrary, that the legislative purpose is expressed by the ordinary meaning of the words used." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) (internal quotation marks omitted). Here, the statute criminalizes two acts: (1) "willfully makes default," and (2) "having appeared, refuses to answer any question pertinent to the question under inquiry." 2 U.S.C. § 192. The comma after "willfully makes default" indicates that "willfully" modifies only "makes default." *See United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 454 (1993) ("[T]he meaning of a statute will typically heed the commands of its punctuation."). As the Court explained in *Licavoli,* it was unnecessary to

add "willfully" to the second actus reus because "a refusal to answer—the witness having appeared, being present and conscious of what is going on, understanding the question, and being advised of its pertinency—is obviously in and of itself a willful act." 294 F.2d at 208. The addition of "willfully" to "makes default" simply ensures that the statute does not criminalize defaults where, for example, the witness was physically unable to comply. *Id.* See also A.4461 (jury instruction that "willfully" excludes inadvertence, accident, or mistake).

Contrary to Bannon's claims (at 19-21 & n.4), the mens rea standard applied by the district court is sufficient "to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 256-57 (2000) (quoting *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). The Supreme Court and this Court's interpretation of the mens rea element of Section 192 does not conflict with the basic principle that "wrongdoing must be conscious to be criminal." *Morissette v. United States*, 342 U.S. 246, 252 (1952) (Br. 18, 20). By definition, anyone who "deliberately and intentionally" refuses to obey a congressional subpoena knows about the subpoena and chooses not to comply. In the context of having been "summoned by the authority"

40

of Congress, 2 U.S.C. § 192, such deliberate default is not "otherwise innocent conduct." Rather, it is a "basic wrong," *Browder v. United States*, 312 U.S. 335, 342 (1941), that does not need a heightened mens rea to weed out innocent acts. The Supreme Court's disclaimer of a good-faith defense 11 years after *Morissette*, *see Yellin*, 374 U.S. at 123, belies Bannon's claim that the settled mens rea for Section 192 cannot be reconciled with the requirement of "conscious" wrongdoing.[12]

Bannon places undue weight on recent Supreme Court cases construing different criminal statutes. None of Bannon's cited cases (at 17-20) involves contempt or even mentions Section 192. The Supreme Court cases that do address this statute hold that contempt of Congress requires only a deliberate and intentional refusal and that good faith is not a defense. *See, e.g., Quinn*, 349 U.S. at 165-66; *Watkins*, 354 U.S. at

---

[12] Bannon argues that the statute's "mandatory minimum" sentence supports his reading (Br. 17). To be clear, the statute mandates a one-month term of imprisonment and $100 fine and allows no more than a $1,000 fine and one year "in a common jail." 2 U.S.C. § 192. This relatively light sentence weighs against, not for, a stricter mens rea. *Cf. Staples v. United* States, 511 U.S. 600, 616 (1994) ("light penalties, such as fines or short jail sentences, not imprisonment in the state penitentiary," were historically "a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*").

208; *Sinclair*, 279 U.S. at 299. This Court may not infer from cases interpreting other statutes that the Supreme Court has changed its mind about Section 192. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (internal quotation marks omitted).

Indeed, "willfully" is a word "of many meanings whose construction is often dependent on the context in which it appears." *(Sillasse) Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks omitted). In many criminal statutes, "willfully" means that the defendant acted with a "bad purpose," i.e., with "knowledge that his conduct was unlawful." *Id.* at 191-92. Yet that is just the "general" rule. *Id.* at 191. In the context of certain technical or regulatory statutes, "willfully" means something more—that the defendant knew he was violating a specific legal duty. *See Ratzlaf v. United States*, 510 U.S. 135, 149 (1994)

(currency structuring); *Cheek v. United States*, 498 U.S. 192, 201 (1991) (criminal tax statutes). And in other contexts, "willfully" means something less—"an intentional as distinguished from an accidental act." *Browder*, 312 U.S. at 341-42 (using passport obtained with false statements). The Supreme Court has not overruled *Browder* or decisions adopting a similar interpretation of "willfully" in the context of Section 192.

The lower court cases Bannon cites (at 21-22) do not conflict with the settled interpretation of Section 192. Many of these cases do not control in this jurisdiction, and none mentions Section 192. Nor do cases from this Court advance Bannon's claims. In *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019) (Br. 21-22), this Court interpreted only the Arms Export Control Act and did not refer to Section 192. Although the Court noted that, "[a]s a general matter," the word "willful" in the criminal context refers to an act "undertaken with a bad purpose," 934 F.3d at 690 (internal quotation marks omitted), the Court did not purport to construe that term in all contexts. In fact, this Court elsewhere has recognized that "willful" conduct does not always require a bad purpose. *See United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) (holding

43

that "willfully" causing false statements to be filed, in violation of 18 U.S.C. §§ 2(b) and 1001(a), does not require that the defendant knew his conduct was unlawful). Other courts similarly recognize that, for some statutes, "willfully" does not mean that the defendant knew his conduct was unlawful. *See United States v. George*, 386 F.3d 383, 386 (2d Cir. 2004) (making false statements on passport application); *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002) (injuring federal property; advice-of-counsel defense did not apply).

The "context" of Section 192, *(Sillasse) Bryan*, 524 U.S. at 191, supports reading "willfully" to require a deliberate and intentional default, without regard to a given defendant's motive for not complying. The contempt statute arises from Congress's investigative power. "This power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted); *see Quinn*, 349 U.S. at 160-61 (without the ability to compel testimony, including "through judicial trial," Congress "could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively"). Citizens subpoenaed by Congress have an "unremitting

obligation" to comply and "to respect the dignity of the Congress and its committees." *Watkins*, 354 U.S. at 187. By punishing witnesses who intentionally shirk that "unremitting obligation," Section 192 "vindicat[es] the authority of Congress to compel the disclosure of facts which are needed in the fulfillment of the legislative function." *(Helen) Bryan*, 339 U.S. at 327.

Against this backdrop, there is sound reason to maintain the prevailing definition of "willfully" for Section 192. Criminalizing the deliberate intent to default on a congressional subpoena encourages compliance and thus enables Congress to fulfill its assigned constitutional duties. If, as Bannon urges, "willfully" in this context means "in bad faith," then any witness could attempt to thwart a congressional inquiry by claiming a good-faith belief, however misguided, that he did not have to comply. Witnesses should not be allowed to sabotage Congress's legislative function so easily. *See (Helen) Bryan*, 339 U.S. at 331 (if subpoena is treated as "an invitation to a game of hare and hounds," then "the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity").

Finally, by punishing deliberate and intentional default, the statute vindicates strong congressional interests while still allowing individuals with valid grounds for noncompliance to preserve their rights. A witness charged with contempt can claim that he misunderstood the subpoena or physically was unable to respond. *Licavoli*, 294 F.2d at 208. Subpoenaed witnesses also retain all their common-law and constitutional protections, *Mazars*, 140 S. Ct. at 2032, and there is "an orderly and often approved means" for vindicating those rights. *Sanders v. McClellan*, 463 F.2d 894, 899 (D.C. Cir. 1972). A witness who claims a privilege can raise that claim before Congress, which may uphold the privilege or require the witness to answer. *See Quinn*, 349 U.S. at 165. If Congress overrules the privilege claim, the witness can either comply with the subpoena or risk contempt. *See Watkins*, 354 U.S. at 208 (witness who refuses to answer "acts at his peril"). If ultimately charged with contempt, the witness can move to dismiss based on the privilege claim. *See Sanders*, 463 F.2d at 899 ("Should prosecution occur, the witness' claims could then be raised before the trial court."). What the statute and case law do not allow, however, is for someone like Bannon to avoid compliance with a

46

congressional subpoena and a later contempt conviction simply by claiming that he believed he did not need to comply.[13]

### D.    Bannon's Other Constitutional Claims Lack Merit.

Bannon argues that by barring his defense that he acted in good faith, the district court (1) undermined executive privilege and thus violated the principle of separation of powers, and (2) applied the statute

---

[13] In a case where an Executive Branch employee does not comply with a subpoena because the sitting President has asserted executive privilege or another constitutional objection, the DOJ would not prosecute. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (May 30, 1984) (A.1080). Bannon does not fall into this narrow exception because President Trump was not the incumbent and Bannon no longer worked for the Executive Branch.

Bannon complains (at 14 n.3) that the government in closing argument argued he was legally obliged to comply with the subpoena once the Committee overruled his objections (A.4468, 4474). The government accurately stated the law. *See Watkins*, 354 U.S. at 187, 208. Bannon's challenge to the government's comments about his views toward the subpoena in its opening statement and closing argument (Br. 14-15) also shows no basis for reversal. The government's comments were reasonable inferences from the evidence, which showed that, despite the Committee's clear warnings, Bannon chose not to comply. Also, the district court instructed that the attorneys' arguments were not evidence (A.3897), and juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540 (1993).

in a way that rendered it unconstitutionally overbroad and vague (Br. 23-30). Neither argument has merit.

### 1. Bannon Shows No Debasement of Executive Privilege.

As a threshold matter, Bannon lacks standing to complain about any injury to executive privilege. As he conceded from the start (A.4836), he was not the privilege holder. *See Trump v. Thompson*, 20 F.4th at 26 (executive privilege is "held by the Executive Branch"); *Bryson v. United States*, 419 F.2d 695, 698 (D.C. Cir. 1969) (noting "the long-standing rule that a testimonial privilege may be claimed only by the holder of the privilege").

Moreover, Bannon's executive-privilege argument lacks any factual basis. Although Bannon claims it is "undisputed" that President Trump invoked executive privilege (Br. 33), in fact there was no valid invocation of executive privilege in this case. This Court need not address the scope of executive privilege when asserted by a former President. As the district court found, the correspondence between Clark and Costello did not reflect "an unambiguous invocation of executive privilege" (A.2352-53; see also A.4839 (Committee states that even if President Trump were permitted to invoke executive privilege, "he has not done so")). The

48

October 6 Clark letter, on which Bannon relies, cited only the vague and anticipatory statements that the subpoena sought "potentially" protected information and that President Trump was "prepared" to defend executive privilege in court (A.4835). Moreover, the Clark letter failed to identify any specific matter allegedly subject to the privilege, despite the requirement that executive-privilege claims "be made with particularity." *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980). Although Bannon complains (at 7) that President Trump's counsel could not attend the deposition to assert specific privilege claims—an objection that did not bear on production of documents—President Trump never asked to send his counsel and in fact left it to Costello to identify what might be privileged (A.208, 448). There could be no "infring[ement]" of President Trump's purported right to assert executive privilege (Br. 25) when President Trump chose not to press an executive-privilege claim.

The Clark-Costello correspondence certainly did not justify Bannon's complete default on executive-privilege grounds. President Trump did not direct Bannon to refuse to produce any documents or to fail to appear (see A.4835). In noting that the subpoena sought information "included but not limited to" material potentially protected

by executive privilege (*id.*), the Clark letter implicitly conceded that executive privilege would not cover everything in the subpoena. Clark also expressly warned Costello that Bannon was not immune from testifying (A.448). Indeed, most of the subpoena covered matters involving only private parties (see A.4825-26), which fell outside the reach of executive privilege. *See Mazars*, 140 S. Ct. at 2032-33 (declining "to transplant [executive-privilege] protection root and branch to cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations"). And because Bannon had left government service long before the time period covered by the subpoena, he was not privy to any presidential communications that could be privileged. *See id.* (executive privilege "safeguards the public interest in candid, confidential deliberations *within the Executive Branch*") (emphasis added). Thus, although presidential communications are presumptively privileged, *see United States v. Nixon*, 418 U.S. 683, 706-07 (1974) (Br. 25-26), there was no assertion of executive privilege here, let alone one that could have justified Bannon's blanket default.

Bannon also fails to show how the *Licavoli* mens rea standard could have impaired executive privilege. If Bannon had a valid executive-

privilege defense, he was free to ask the DOJ not to seek an indictment or to move to dismiss the indictment on that legal ground. *See Sanders*, 463 F.2d at 899. The availability of judicial review, which the Committee itself acknowledged (A.4840 (referring to "possible judicial review")), belies Bannon's claim (at 25) that Congress had a "veto" over executive privilege. Furthermore, if President Trump had wanted to invoke executive privilege, he could have communicated directly with the Committee. The *Licavoli* standard merely precluded a trial defense that Bannon thought executive privilege applied. It did not undermine the privilege itself.

## 2. Bannon's "As Applied" Challenge Fails.

Application of the *Licavoli* standard in light of Bannon's attempt to invoke executive privilege did not render Section 192 unconstitutionally overbroad or vague, as Bannon contends (Br. 26-33).

An overbroad statute is one that reaches "a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Bannon shows no overbreadth here. He argues that the *Licavoli* mens rea standard sweeps in lawful conduct—specifically, his noncompliance "undertaken

in good faith" based on executive privilege and OLC opinions (Br. 27, 29). The logic of this argument is hard to follow. If, as *Licavoli* holds, good faith does not excuse deliberate default, then deliberate noncompliance is not lawful conduct. It is unlawful conduct, which the statute appropriately punishes.

Bannon also fails to show that the statute is unconstitutionally vague. The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed by the courts, made it reasonably clear at the time of the charged conduct that the conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). It was "reasonably clear" that Bannon's deliberate and intentional default was criminal conduct, particularly given the Committee's repeated warnings that Bannon was required to comply with the subpoena and risked contempt if he refused (A.4840, 4844). *See United States v. Marquardo*, 149 F.3d 36, 42 & n.4 (1st Cir. 1998) (no vagueness in application of criminal contempt-of-court statute; the "willfully" mens rea requirement—defined as "the knowledge that one is violating a court order"—ensured adequate notice to defendant).

Nor does *Licavoli* inject uncertainty into what "default" means (Br. 29). Bannon argues that the "constitutional imperative" that Congress and the Executive Branch work toward accommodation somehow rendered the actus reus of the offense vague (*id.*). As a threshold matter, while there is a "tradition" of negotiation and compromise when branches of government conflict, *Mazars*, 140 S. Ct. at 2031, the Committee had no obligation to negotiate with Bannon, a private citizen. Furthermore, President Trump neither directed Bannon not to testify nor sought an extension for Bannon, so there was no conflict to resolve even between Congress and the former President. Bannon also cannot show that, when he deliberately refused to obey the subpoena, he did not understand he was defaulting, particularly given the Committee's warnings that it would treat noncompliance as default. Bannon's public pronouncement that "Steve Bannon tells the January 6 select committee that he will NOT comply with their subpoena" (A.4852) reinforces that he understood his conduct amounted to default. *See (Helen) Bryan*, 339 U.S. at 327 ("'Default' is, of course, a failure to comply with the summons.").

## IV. Department of Justice Writings Did Not Excuse Bannon's Default.

Bannon asserts that the district court erred in barring his defenses that the DOJ, mainly through the opinions of the OLC, made clear he did not have to comply with the subpoena and would not be prosecuted because President Trump had invoked executive privilege (Br. 30-41). Bannon's asserted belief that he did not need to comply was irrelevant under *Licavoli* and related cases, as we have discussed in the last section. Here we address his proffered defenses of entrapment by estoppel (Br. 36-38), public authority (*id.* 38-39), and apparent authority (*id.* 39-40), all of which the district court properly rejected.

### A. Background

In the district court, Bannon claimed that certain OLC opinions established that he need not and should not comply with the Committee's subpoena (e.g., A.363-64, 367-69). The government moved in limine to exclude evidence of DOJ opinions and writings (A.745). Bannon opposed the motion and filed a notice that he sought to raise defenses of entrapment by estoppel, actual public authority, and apparent public authority (A.798, 1720). He also moved to dismiss the indictment in part on the ground that prosecuting him in light of the OLC opinions would

54

violate due process (A.830-52; see also A.1747-71, 1818 (government responsive pleadings)).

The OLC opinions on which Bannon relied addressed, in various contexts, the effect of an assertion of executive privilege or other constitutional objection by an incumbent President or Attorney General, where current or former Executive Branch employees are subpoenaed to testify before Congress about matters relating to their official duties. *See, e.g., Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege (Prosecution for Contempt)*, 8 Op. O.L.C. 101 (May 30, 1984) (A.1080) (United States Attorney could decline to prosecute Administrator of Environmental Protection Agency for refusing to turn over government documents over which the President had asserted a claim of executive privilege); *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (July 10, 2007) (A.1076) (former Counsel to the President was immune from having to testify "about matters arising during her tenure as Counsel to the President and relating to her official duties in that capacity"); *Attempted Exclusion of Agency Counsel From Congressional Depositions of Agency Employees*,

2019 WL 2563045, at *2 (O.L.C. May 23, 2019) (congressional subpoena to agency employees, who were called to discuss matters "within the scope of their official duties," was invalid because the committee did not permit agency counsel to attend the deposition); *Congressional Oversight of the White House*, 2021 WL 222744, at *33, *36 (Jan. 8, 2021) (A.1006) (Section 192 does not apply to "executive branch officials" who invoke a sitting President's assertion of executive privilege; certain close advisors to a sitting President are immune from compelled testimony "about their official duties in that capacity" even after they leave the White House).

The district court held that Bannon's due-process arguments did not warrant dismissal (A.2353). It found that none of the DOJ documents Bannon had cited addressed the specific factual scenario here, where a congressional subpoena sought communications "between a nongovernmental employee and a President who, at the time of the Subpoena, was no longer in office and had not clearly directed the Subpoena recipient to decline to comply altogether" (A.2351-52). The court precluded Bannon from raising defenses of either entrapment by estoppel or public authority, which the DOJ writings did not support

(A.2995-96, 3000-04). The court also found no legal support for a defense of apparent authority (A.3003-04).

## B.    Standard of Review

The issues whether a defendant may raise defenses of entrapment by estoppel or public authority, including apparent public authority, are legal questions that are reviewed de novo. *See United States v. Hector*, No. 19-4957, 2022 WL 402493, at *2 (4th Cir.) (public authority), *cert. denied*, 143 S. Ct. 189 (2022); *United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (entrapment by estoppel).

## C.    Discussion

Bannon's claim that DOJ writings excused his default overlooks several key facts. First, Bannon was a private citizen for the entire period covered by the subpoena (A.766 (Bannon's tenure at White House ended in 2017), 4825 (subpoena covered period starting April 1, 2020)). Second, the subpoena did not seek information about any of Bannon's official duties but addressed only his post-White House activities (A.4825-26 (listing subject areas)). And third, President Trump did not actually assert a claim of executive privilege or suggest Bannon pursue a course of complete noncompliance. See supra pp. 48-50. Government opinions

57

addressing other factual scenarios did not give Bannon "license" to defy the Committee's subpoena (Br. 28, 33).

## 1.    Entrapment by Estoppel

Grounded in the Due Process Clause, the defense of entrapment by estoppel arises when "a government official tells a defendant that certain conduct is legal, and the defendant commits what otherwise would be a crime in reasonable reliance on the official representation." *United States v. Peithman*, 917 F.3d 635, 648 (8th Cir. 2019) (internal quotation marks omitted); *see United States v. Pa. Indus. Chem. Corp. (PICCO)*, 411 U.S. 655, 673-75 (1973); *Cox v. Louisiana*, 379 U.S. 559, 568-71 (1965); *Raley v. Ohio*, 360 U.S. 423, 426, 437-38 (1959). Entrapment by estoppel is a "rarely available" defense, *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994), and one for which the defendant bears the burden, *United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004). To raise the defense, the defendant must show: "(1) a government official (2) told the defendant that certain criminal conduct was legal, (3) the defendant actually relied on the government official's statements, (4) and the defendant's reliance was in good faith and reasonable in light of the identity of the government official, the point of law represented, and the

58

substance of the official's statement." *United States v. West Indies Transport, Inc.*, 127 F.3d 299, 313 (3d Cir. 1997); *see United States v. Cox*, 906 F.2d 1170, 1191 (10th Cir. 2018) (similar elements).

Bannon fails to show that any government official told him that "certain criminal conduct was legal." *West Indies Transport*, 127 F.3d at 313. He claims (at 38) that he was "entitled to rely on the former President's invocation and directive." Even assuming arguendo that entrapment by estoppel could ever apply to a statement by a former government official, President Trump never told Bannon it would be legal to refuse any compliance with the subpoena and in fact advised the opposite (A.448, 4835). The OLC does not advise private citizens (A.1232); *see also* Department of Justice, Office of Legal Counsel, About the Office, https://www.justice.gov/olc (last visited May 31, 2023) (OLC "is not authorized to give legal advice to private persons").

Moreover, none of Bannon's cited DOJ materials (Br. 33-35 & nn. 18, 20, 22-23) addresses a factual situation like this one. None states that a witness need not comply with a congressional subpoena where the witness is a private citizen, the subpoena covers only matters occurring while the witness was a private citizen, and there has been no

unambiguous assertion of executive privilege. See supra pp. 55-56 (summarizing key opinions). In *Prosecution for Contempt*, the OLC in fact noted that its conclusions were limited to the "unique circumstances" presented (A.1081). Furthermore, none of the opinions involving Executive Branch employees subpoenaed to provide testimony would bear on Bannon's obligation to provide documents.

Bannon's cobbling together of different OLC opinions did not meet his burden to show that a government official told him his own conduct was legal.[14] Entrapment by estoppel typically requires that a government official made representations "directly to the defendant." *United States v. Eaton*, 179 F.3d 1328, 1332 (11th Cir. 1999); *see Cox*, 379 U.S. at 570-71

---

[14] Bannon cites (at 24 n.5) an OLC footnote suggesting that there was "some doubt" about whether an Executive Branch employee who complies with a President's "direct order" to assert executive privilege thereby engages in a "willful" default on a congressional subpoena (A.1114 n.34). As the district court noted, this footnote did not acknowledge binding case law about the meaning of "willfully" in section 192 (A.2951 ("No one read *Licavoli*.")). In any event, the question of willfulness in such a case would never arise because, as that same OLC opinion explains, a privilege assertion by a sitting President would preclude application of section 192, and therefore the DOJ would not seek an indictment (A.1080-81). Also, Bannon was not an Executive Branch employee and there was no direct order to use executive privilege as a reason to default on the entire subpoena.

(police officials told demonstrators that they could stand in the spot for which they later were convicted of demonstrating near a courthouse); *Raley*, 360 U.S. at 437-38 (chairman and other commission members indicated to witnesses later prosecuted for contempt that they could rely on the privilege against self-incrimination). Even in cases involving agency rules, those rules addressed the defendant's specific situation. *See PICCO*, 411 U.S. at 1815-17 (Army Corps of Engineers regulation specifically stated that the ban on discharge of industrial pollutants, which defendant was charged with violating, applied only to water deposits hindering navigation); *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (government agency declared that sales promotion program that was predicate for indictment was legal). Bannon cites no case, nor are we aware of any, allowing the defense based on extrapolation from a range of opinions involving differently situated individuals. The district court thus properly barred his entrapment-by-estoppel defense. *See Pardue*, 385 F.3d at 108 (affirming exclusion of defense where no government official ever told defendant it was legal to possess ammunition); *Howell*, 37 F.3d at 1205 (no factual basis for the

defense where defendants "can point to no specific misleading statement on which they relied").[15]

## 2.     Public Authority

The defense of public authority is an affirmative defense that may arise where the defendant "has knowingly acted in violation of federal criminal law, but has done so in reasonable reliance on the authorization of a governmental official." *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015). As with entrapment by estoppel, the defendant bears the burden of proof. *United States v. Doe*, 705 F.3d 1134, 1145 (9th Cir. 2013). But while an entrapment-by-estoppel defense is premised on the defendant's belief that his conduct was lawful, with a public-authority defense, "the defendant engages in conduct at the request of a government official that the defendant knows to be otherwise illegal."

---

[15] Although the Court need not reach the question, Bannon also could not satisfy the element that he "actually relied" on the statements of a "government official[]." *West Indies Transport*, 127 F.3d at 313. The record indicates that Costello read the OLC opinions and interpreted them for Bannon (A.369). In addition, Bannon could not show that his reliance on the OLC opinions was "reasonable in light of the identity of the government official, the point of law represented, and the substance of the official's statement," *West Indies Transport*, 127 F.3d at 313, given that OLC does not advise private citizens and there was no statement condoning Bannon's conduct.

*United States v. Jumah*, 493 F.3d 868, 874 n.4 (7th Cir. 2007). The issue of a public-authority defense most commonly arises where a government informant engages in drug sales and claims he did so at the direction of his law-enforcement handlers. *See, e.g., id.* at 871.

Unlike the drug informant-turned-dealer, Bannon does not suggest that he knew his conduct was unlawful. He simply recasts his meritless entrapment-by-estoppel defense that he thought his conduct was lawful because President Trump and OLC had authorized it (Br. 38-39). Bannon thus fails to meet the basic requirement of a public-authority defense that the defendant engage in conduct he "knows to be otherwise illegal." *Jumah*, 493 F.3d at 874 n.4. In any event, President Trump left office before the subpoena was issued and thus was not a "government official" with authority to direct Bannon to disregard the subpoena, as would be required for the defense of public authority. *Alvarado*, 808 at 484. Likewise, OLC is authorized only to provide legal advice (A.1232). That role does not include directing federal employees—or private citizens like Bannon—to act, much less to act in violation of the law.

### 3.    Apparent Authority

No court has recognized an apparent-authority defense (see Br. 39-40). Bannon cites *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), in which a single judge of this Court stated that the defendant's reasonable reliance on the "apparent authority" of a government official could make out the defense. *Id.* at 949 (opinion of Wilkey, J.). This Court later rejected the claim that *Barker* established an apparent-authority defense. *United States v. North*, 910 F.2d 843, 879, 881 (D.C. Cir. 190) ("[W]e have read *Barker*, and reread it, and simply cannot find in it a rule of law to apply."; holding that district court did not err in refusing to give an authorization defense instruction), *withdrawn and superseded in irrelevant part*, 920 F.2d 940 (D.C. Cir. 1990). The courts of appeals to have addressed the question agree that the official's authority must be actual, not apparent. *E.g., United States v. Theunick*, 651 F.3d 578, 589 (6th Cir. 2011); *United States v. Sariles*, 645 F.3d 315, 317-19 (5th Cir. 2011) (citing cases from Second, Third, Fourth, and Eleventh Circuits); *United States v. Holmquist*, 36 F.3d 154, 161 n.6 (1st Cir. 1994). In any event, it was not apparent that either

President Trump or the OLC had the power to authorize Bannon to violate the law, and neither one in fact authorized Bannon's default.

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the district court should be affirmed and that the record should be remanded to correct a clerical error in the Judgment and Commitment Order. See supra p. 3 n.1.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
J.P. COONEY
MOLLY GASTON
Assistant United States Attorneys

/s/

ELIZABETH H. DANELLO
D.C. Bar #407606
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Danello@usdoj.gov
(202) 252-6829

65

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,929 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
ELIZABETH H. DANELLO
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of June, 2023, I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, David I. Schoen.

/s/
ELIZABETH H. DANELLO
Assistant United States Attorney
